# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF GEORGIA
# GAINESVILLE DIVISION

FAIR FIGHT INC., JOHN DOE, and
JANE DOE,

                Plaintiffs,

     v.

TRUE THE VOTE, CATHERINE
ENGELBRECHT, DEREK
SOMERVILLE, MARK DAVIS, MARK
WILLIAMS, RON JOHNSON, JAMES
COOPER, and JOHN DOES 1-10,

              Defendants.

**Case No. 2:20-cv-00302-SCJ**

# PLAINTIFFS' MEMORANDUM IN SUPPORT OF TEMPORARY
# RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

STATEMENT OF FACTS ....................................................................................2

I.  Following the November Election, false claims of voter fraud have been willfully propagated, directly resulting in intimidation and harassment of voters and election workers...................................................................................2

II.  Defendants have now launched a coordinated campaign to harass and intimidate voters across Georgia.. ...........................................................5

A.  The "Landmark" Voter Challenge Program. ...................................5

B.  The Voter Monitoring Program and Million Dollar Bounty.......................9

ARGUMENT ......................................................................................................11

I.  Plaintiffs are likely to succeed on the merits of their claims............................11

A.  Defendants' conduct violates § 11(b) of the Voting Rights Act.................11

B.  This Court can issue the requested injunction even if voter challenges are ostensibly permitted by state law. ...............................................18

II.  Plaintiffs will suffer irreparable harm in the absence of relief.........................21

III.  The balance of the equities favors Plaintiffs and preliminary relief is in  the public interest....................................................................................23

A.  Defendants' conduct undermines electoral integrity.................................23

B.  The public interest is advanced by ensuring voters can participate in elections free from intimidation, as federal law guarantees.......................24

CONCLUSION. ..................................................................................................25

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*Arizona v. Inter Tribal Council of Arizona, Inc.*,
570 U.S. 1 (2013).................................................................18, 19, 20, 21

*Bolland v. Raffensperger*,
No. 2020-CV-343018 (Ga. Super. Ct., Fulton Cnty. Dec. 8, 2020)....................4

*Brooks v. Mahoney*,
No. 4:20-cv-00281 .................................................................3

*Burson v. Freeman*,
504 U.S. 191 (1992) (plurality opinion of Blackmun, J.)..................................24

*Cameron v. Johnson*,
262 F. Supp. 873 (S.D. Miss. 1966), *aff'd*, 390 U.S. 611 (1968)...........12, 15, 17

*Council of Alternative Political Parties v. Hooks*,
121 F.3d 876 (3d Cir. 1997) .................................................................21

*Craig v. Simon*,
980 F.3d 614 (8th Cir. 2020) .................................................................19

*Democratic Nat'l. Comm. v. Republican Nat'l. Comm.*,
671 F. Supp. 2d 575 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir.
2012) .................................................................16, 23

*Ga. Coal. for People's Agenda, Inc. v. Kemp*,
347 F. Supp. 3d 1251 1268 (N.D. Ga. 2018)....................................................22

*Georgia Republican Party v. Raffensperger*,
No. 2:20-CV-00135, ECF No. 31. (S.D. Ga. Dec. 18, 2020)............................14

*Langenhorst v. Pecore*,
No. 1:20-cv-1701, ECF No. 26 (E.D. Wisc. Nov. 16, 2020) .............................3

*League of United Latin Am. Citizens - Richmond Region Council 4614
v. Pub. Interest Legal Found.*,
No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018)..................13

# TABLE OF AUTHORITIES

PAGE(S)

*League of Women Voters of North Carolina v. North Carolina,*
769 F.3d 224 (4th Cir. 2014) ................................................21

*Majority Forward v. Ben Hill Cty Bd. of Elections,*
No. 1:20-cv00266-LAG, ECF No. 12................................6, 7

*Mont. Democratic Party v. Eaton,*
581 F. Supp. 2d 1077 (D. Mont. 2008)................................14

*Ne. Ohio Coal. for the Homeless v. Husted,*
No. 2:06-CV-896, 2016 WL 3166251 (S.D. Ohio June 7, 2016),
*aff'd in part, rev'd in part,* 837 F.3d 612 (6th Cir. 2016) ................17

*Pearson v. Kemp,*
No. 1:20-cv-04809-TCB, ECF No. 74 (N.D. Ga. Dec. 7, 2020)........4

*Pirkle v. Wolf,*
No. 4:20-cv-02088, ECF No. 20 (M.D. Pa. Nov. 16)................3

*Russell v. Lundergan-Grimes,*
784 F.3d 1037 (6th Cir. 2015) ................................................24

*Smiley v. Holm,*
285 U.S. 355, 366 (1932)................................................18

*South Carolina v. Katzenbach,*
383 U.S. 301 (1966)................................................16

*Taniguchi v. Kan Pac. Saipan, Ltd.,*
566 U.S. 560 (2012)................................................12

*Teper v. Miller,*
82 F.3d 989 (11th Cir. 1996) ................................................19

*United States by Katzenbach v. Original Knights of the Ku Klux Klan,*
250 F. Supp. 330 (E.D. La. 1965)................................................20

*United States v. Clark,*
249 F. Supp. 720 (S.D. Ala. 1965) ................................................16

# TABLE OF AUTHORITIES

PAGE(S)

*United States v. Madden*,
    403 F.3d 347 (6th Cir. 2005) ...............................................................................24

*United States v. Nguyen*,
    673 F.3d 1259 (9th Cir. 2012) .............................................................................12

*United States v. Sayre*,
    522 F. Supp. 973 (W.D. Mo. 1981) ....................................................................19

*United States v. Simms*,
    508 F. Supp. 1179 (W.D. La. 1979) ....................................................................19

*Wellons v. Comm'r, Ga. Dep't of Corr.*,
    754 F.3d 1260 (11th Cir. 2014) ...........................................................................11

*Wesberry v. Sanders*,
    376 U.S. 1 (1964)................................................................................................25

*Whatley v. City of Vidalia*,
    399 F.2d 521 (5th Cir. 1968) ..............................................................................15

*Williams v. Rhodes*,
    393 U.S. 23 (1968)..............................................................................................24

*Willingham v. Cty. of Albany*,
    593 F. Supp. 2d 446 (N.D.N.Y. 2006).................................................................17

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................................................11

*Wood v. Raffensperger*,
    No. 2020-CV-342959 (Ga. Super. Ct., Fulton Cnty. Dec. 8, 2020)......................4

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886)............................................................................................24

**STATUTES**

42 U.S.C. § 1985(3) ................................................................................................19

52 U.S.C. § 10101(b) ..............................................................................................15

## TABLE OF AUTHORITIES

**PAGE(S)**

52 U.S.C. § 10307(b) ..................................................................11, 19, 20

52 U.S.C. § 20507(d) ..........................................................................8

O.C.G.A. § 21-2-217 ............................................................................7

O.C.G.A. § 21-2-380(b) ........................................................................7

O.C.G.A. §§ 21-2-380(b), 21-2-384 ......................................................8

Voting Rights Act § 11(b)...............................................................passim

**OTHER AUTHORITIES**

H. Rep. No. 89-439 ......................................................................15, 17, 19

U.S. Const. art. I. § 4........................................................................18, 19

# INTRODUCTION

Plaintiffs have moved for a temporary restraining order and/or preliminary injunction to put an end to the campaign of harassment, intimidation, and frivolous challenges initiated by Defendants True the Vote and others working in concert with them (collectively, "Defendants" or "True the Vote"). For the last two weeks, as Georgia voters returned to the polls for the January 5, 2021, runoff elections, True the Vote and its supporters have taken drastic measures to deter and intimidate voters and undermine confidence in the electoral system. Most recently, Defendants coordinated a highly publicized, statewide attack on the eligibility of over 364,000 Georgia voters. The attack has left thousands of lifelong Georgia residents falsely accused of illegal voting, in fear that casting a ballot will incur criminal penalties. Defendants' conduct plainly violates § 11(b) of the Voting Rights Act, which protects voters from intimidation and harassment.

There is no do-over once the election has passed and voters have been deterred from the polls for fear of reprisal or harassment. Immediate injunctive relief is both appropriate and necessary to prevent any further irreparable harm to Plaintiffs and countless Georgians whose voting rights have been knowingly and intentionally placed in jeopardy with little time to spare before the runoff elections.

1

# STATEMENT OF FACTS

**I.   Following the November election, false claims of voter fraud have been willfully propagated, directly resulting in intimidation and harassment of voters and election workers.**

In the wake of the November election, a small but fervent number of organizations and individuals have willfully bred false claims that the election was plagued with fraudulent and illegal voting. Not only are these claims unfounded, they have been repeatedly proven false. Nevertheless, there remains a zealous contingency that refuses to be dissuaded by fact or evidence that their proselytizing is doing real, unmitigated damage, not just to our democratic systems writ large, but to individual voters and election workers, many of whom have found themselves the targets of menacing harassment as a direct result of these false claims. Among those most dedicated to spreading these false claims are True the Vote, a Texas-based group that touts itself as a "nonpartisan, voter's rights and election integrity organization." Ex. 23. In reality, True the Vote has spent over a decade making baseless claims about widespread voter fraud and launched unfounded attacks on the eligibility of thousands of lawful voters. *See* Exs. 6-7.

In the weeks that followed the November general election, True the Vote turned its sights on Georgia. On November 11, it filed litigation in federal district court, in which it claimed that tens of thousands of ineligible voters cast illegal

ballots in Georgia's general election for President-elect Joe Biden. *See Brooks v. Mahoney*, No. 4:20-cv-00281, Compl., ECF No. 1 (S.D. Ga. Nov. 11, 2020). But rather than make its case in court, where it would have to prove its claims and its "evidence" would be tested, True the Vote voluntarily dismissed its case just four days later. *See Brooks v. Mahoney*, No. 4:20-cv-00281, Notice of Voluntary Dismissal, ECF No. 20 (S.D. Ga. Nov. 16, 2020).[1]

True the Vote was not alone in its attempts to sow doubt about Georgia's election results. Its efforts mirrored those of Sidney Powell, who famously announced she intended to "release the Kraken," and prove illegal voting had tainted the election, as well as L. Lin Wood, Jr., who, when his litigious efforts to overturn the clear decision of Georgia voters failed, publicly called for the imposition of martial law. Exs. 15, 16. *None* of the suits that claimed that Georgia's election results were anything but legitimate were able to withstand even the slightest bit of scrutiny. *See, e.g.*, *Wood v. Raffensperger*, No. 2020-CV-342959 (Ga. Super. Ct., Fulton Cnty. Dec. 8, 2020) (dismissing case alleging tens of thousands of out-of-state residents illegally voted in Georgia's General Election); Order, *Bolland v.*

---

[1] True the Vote brought similar cases in Pennsylvania, Michigan, and Wisconsin. None were successful. *See Pirkle v. Wolf*, No. 4:20-cv-02088, ECF No. 20 (M.D. Pa. Nov. 16) (True the Vote dismissing case); *Bally v. Whitmer*, No. 4:20-cv-02088, ECF No. 16 (W.D. Mich. Nov. 16, 2020) (same); *Langenhorst v. Pecore*, No. 1:20-cv-1701, ECF No. 26 (E.D. Wisc. Nov. 16, 2020) (same).

*Raffensperger*, No. 2020-CV-343018 (Ga. Super. Ct., Fulton Cnty. Dec. 8, 2020) (dismissing case and finding plaintiffs' claim that tens of thousands of people illegally voted in Georgia based on the National Change of Address registry was based on "speculation rather than duly pled facts"); *Pearson v. Kemp*, No. 1:20-cv-04809-TCB, ECF No. 74 (N.D. Ga. Dec. 7, 2020) (dismissing case alleging the National Change of Address registry showed over 20,000 ineligible votes cast ballots in Georgia's election).

While such claims of widespread fraud have not succeeded in court, they have had real consequences. A Fulton County election worker was forced to go into hiding after he was falsely accused of discarding a ballot and his personal information, including his license plate, was posted online. *See* Ex. 10. One Gwinnett County election worker was accused of being a traitor and threatened with a noose. *See* Ex. 11. Incidents like these led one Republican Georgia election official to plead with the public in a press conference in early December that "[s]omeone is going to get hurt, someone is going to get shot, someone is going to get killed" if these feverish claims do not stop. Ex. 9. And yet Defendants have continued to feed this frenzy.

## II. Defendants have now launched a coordinated campaign to harass and intimidate voters across Georgia.

## A.      The "Landmark" Voter Challenge Program

In the wake of the wave of losses that groups and individuals alleging voter fraud suffered in their litigation following the general election—which, as of today, amount to more than *fifty* losses in court[2]—True the Vote has chosen to forego the courts all together, pivoting to a strategy of mass challenges of voter eligibility submitted directly to Georgia's boards of elections themselves. While True the Vote has previously launched similar attacks on the right to vote on a smaller scale in other states, *see* Exs. 6, 17-19, its present efforts in Georgia are notable for their breathtaking scale and clearly calculated timing.[3] On December 18—after voting was already well underway in Georgia's Senate runoff election—True the Vote announced it was mounting a "landmark coordinated" effort "to preemptively challenge 364,541 potentially ineligible voters" across the State's 159 counties. Ex.

---

[2] Jim Rutenberg, *Trump's Fraud Claims Died in Court, but the Myth of Stolen Elections Lives On,* N.Y. TIMES (Dec. 26, 2020), available at: https://www.nytimes.com/2020/12/26/us/politics/republicans-voter-fraud.html?action=click&module=Top%20Stories&pgtype=Homepage

[3] To give just a few examples, True the Vote famously attempted, through its spinoff organization the Ohio Voter Integrity Project, to have elections officials remove more than 2,100 voters from voter rolls in Ohio in 2012. Ex. 18. Local election officials found these efforts to be unfounded and rejected the challenges. *Id*. It also challenged the rights of eight members of an African American family, which it claimed had registered to vote using an address of a vacant lot in Cincinnati. However, the address was actually that of the family's home, for over three decades. *Id*. Voter eligibility challenges driven by True the Vote in North Carolina, Maryland, and Wisconsin were also rejected for faulty evidence. Ex. 19.

1. With assistance from individual electors, including Defendants Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, and James Cooper among others, True the Vote has asserted these indiscriminate mass challenges in at least 85 counties to date, using lists of voters in each county—sometimes numbering in the tens of thousands—that they purport to have created by comparing Georgia's voter registration database to the U.S. Postal Service's National Change of Address (NCOA) registry. *See* Ex. 1, Ex. 8.

These challenges have already been rejected in multiple counties and most recently by a federal court, for good (and obvious) reasons. Just yesterday, in a lawsuit filed against the Ben Hill and Muscogee County election boards, the Middle District of Georgia held that the challenges could not be lawfully sustained under the National Voter Registration Act, and that requiring the challenged voters to re-prove their eligibility would likely violate their constitutional rights. *See* Order, *Majority Forward v. Ben Hill Cty Bd. of Elections*, No. 1:20-cv00266-LAG, ECF No. 12 at 7 (N.D. Ga. Dec. 28, 2020). The Court also found that sustaining the challenges risked disenfranchising thousands of voters, as the process for resolving such disputes can deter eligible Georgians from voting. *See id*.

Georgia law further confirms that the recent spate of residency-based challenges is meritless, as the law does not require a voter to reside at their

permanent in-state residence in order to cast a ballot. *See* O.C.G.A. § 21-2-217 (describing, for example, that one does not lose residency for voting purposes if one moves away temporarily, is away attending college or university, has moved for government service, among other reasons). Thus, any Georgia voter who temporarily relocated during the pandemic to be closer to family or care for someone ill, or who moved for a few months to take college classes, or to work a summer job, or for any other number of perfectly valid reasons, may request to receive mail at any other address—even outside the state—without forfeiting their right to vote in the county where they are registered. There is nothing irregular or unusual about voting while outside of one's voting jurisdiction; indeed, the availability of absentee voting accommodates exactly that. *See* O.C.G.A. § 21-2-380(b). For precisely this reason, among others, the NCOA registry is a notoriously unreliable means of determining voter eligibility; the database offers no explanation of why any individual requested a change of address, which is critical to determine whether that individual has lost their right to vote in Georgia elections. *See* Ex. 21 at 2 (describing the NCOA registry as an "error-ridden list"), Ex. 22 (claims of voter fraud based on cross-referencing names and addresses of voters with the National Change of Address database were unsubstantiated).

Because the NCOA registry is such an unreliable means of determining voter eligibility, federal law further prohibits states from removing voters from registration rolls on the ground that the individual is suspected to have moved unless strict procedures are followed. Specifically, "[a] State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant changed residence unless" (1) the State receives written confirmation from the voter of change of address, or (2) the voter fails to respond to a postcard notice, and also fails to vote in at least two subsequent federal general election cycles. 52 U.S.C. § 20507(d).

To endorse Defendants' challenges would mean that simply being away from home (or receiving mail outside one's permanent home) establishes probable cause that a voter is ineligible—which is nonsensical in light of the election procedures (i.e., absentee voting) that have been designed specifically to facilitate voting by absent residents. *See* O.C.G.A. §§ 21-2-380(b), 21-2-384. The purpose of these challenges is not to present evidence that the over 364,000 voters who are the victims of these challenges (the "Targeted Voters") are ineligible, but rather to raise the specter that certain Georgia voters are "illegal" and should not be permitted to vote notwithstanding the absence of any legal support for such claims.

While Defendants' "landmark" voter challenge efforts have already been rejected by many counties, with more likely to follow, calling more than 364,000 voters' eligibility into doubt has real (and dangerous) consequences. When Defendants submit these lists of challenged voters, they become part of the public record, and predictably make their way online. *See, e.g.*, Ex. 12 (Cobb County publishing challenge list online). In fact, an individual claiming to work with True the Vote online has already threatened that "[i]f the Georgia counties refuse to handle the challenges of 366,000 ineligible voters in accordance with the law, I plan to release the entire list so America can do the QC." Ex. 2. In this current political environment, in which cries of voter fraud have reached a fever pitch and have resulted in in doxing, harassment, and death threats, *see supra* at 5, these are serious accusations. Indeed, this is precisely the reason Plaintiffs John and Jane Doe are proceeding in this suit anonymously.

### B.  The Voter Monitoring Program and Million Dollar Bounty

To complement Defendants' mass voter challenges, and to ensure that they will be able to "monitor" voters in the Senate Runoff, Defendants are recruiting volunteers to personally watch voters return ballots to drop box locations as part of their effort to implement the "most comprehensive ballot security initiative in

Georgia history." Ex. 3. Promises such as these are alarming, particularly given True the Vote's history of harassing voters at the polls. *See* Exs. 6-7.

Along with this live monitoring effort, True the Vote also created a "election integrity hotline" which will be available to "citizen watchdogs" "24 hours a day, seven days a week" to respond and "take action" as necessary. Ex. 3. True the Vote described this effort as "the most aggressive election integrity operation *in American history*." Ex. 13. As a final touch, True the Vote also announced a program called "Validate the Vote"—an innocuous sounding initiative which allegedly established a $1 million reward fund to "incentivize" individuals to report instances of "election malfeasance." Ex. 4.

In sum, Defendants have now published lists of hundreds of thousands of Georgians who they claim are ineligible to vote, recruited volunteers to monitor voters as they return their ballots, urged "citizen watchdogs" to take photos and videos of voters who are exercising their fundamental right to vote under the pretenses of documenting "illegal" activity, and have now offered their supporters a one million dollar bounty as incentive to accuse individuals of voting illegally. The collective impact of these efforts is to expose thousands of lawful Georgia voters to the threat of harassment from Defendants' supporters who may take it upon

10

themselves to "catch and expose" what they erroneously perceive to be illegal voting, or to suppress votes outright.

## ARGUMENT

To obtain preliminary injunctive relief, Plaintiffs must establish that (1) they are likely to succeed on the merits; (2) they are likely to suffer irreparable injury in the absence of preliminary relief; (3) the balance of equities tips in their favor; and (4) the requested injunction in in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The same standard applies to a temporary restraining order. *See, e.g.*, *Wellons v. Comm'r, Ga. Dep't of Corr.*, 754 F.3d 1260, 1263 (11th Cir. 2014). Each factor weighs strongly in favor of relief in this case.

## I.     Plaintiffs are likely to succeed on the merits of their claims.

### A.     Defendants' conduct violates § 11(b) of the Voting Rights Act.

Plaintiffs are likely to prevail on their claim that Defendants have violated § 11(b) of the Voting Rights Act (VRA), codified at 52 U.S.C. § 10307(b). Section 11(b) provides in relevant part: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b).

To prove a § 11(b) violation, Plaintiffs must show that Defendants' conduct is objectively intimidating or threatening to voters. The operative words of § 11(b)—

to "intimidate," "threaten," and "coerce," or to attempt to do so—should be given their commonly understood meaning. *See Taniguchi v. Kan Pac. Saipan, Ltd.*, 566 U.S. 560, 566 (2012) (unless otherwise defined in the statute, statutory terms are to be given their "ordinary meaning"). To "intimidate" is to "make timid or fearful" or to "compel or deter or as if by threats," to "threaten" is to "utter threats against" or "cause to feel insecure or anxious," and to "coerce" is to "compel to an act or choice" or "achieve by force or threat."[4] Thus, by the plain language of the statute, § 11(b)'s protections are not limited to overt acts of violence and pure physical force; it also prohibits acts of intimidation which involve no physical threat of bodily harm. *See, e.g.*, *Cameron v. Johnson*, 262 F. Supp. 873, 897 (S.D. Miss. 1966), *aff'd*, 390 U.S. 611 (1968) (finding threat of criminal prosecution for voting sufficient for voter intimidation); *see also United States v. Nguyen*, 673 F.3d 1259, 1261 (9th Cir. 2012) (finding violation of California criminal voter intimidation statute where defendant mailed letters to voters with Hispanic surnames, warning that their personal information would be made available to organizations that were "against immigration"). More recently, a federal court held plaintiffs had stated a valid claim under § 11(b) where the defendants published names of allegedly ineligible voters,

---

[4] Definitions available at https://www.merriam-webster.com/ (last accessed Dec. 29, 2020).

subjecting those voters to "fear of harassment" from those who might believe or act on defendants' publication. *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Interest Legal Found.* ("*LULAC*"), No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018).

Defendants' conduct easily violates the plain language of § 11(b). As in *LULAC*, Defendants have created circumstances that are objectively likely to result in voter intimidation. Not only have some of their challenged lists been published online—indeed, they may be considered part of the public record—threats of doxing and harassment have already begun to emerge. *See* Ex. 2 (individual claiming to work with True the Vote stating that "[i]f the Georgia counties refuse to handle the challenges of 366,000 ineligible voters in accordance with the law, I plan to release the entire list so America can do the QC"); *see also* Ex. 20 (same individual stating: "Ok America. I'm done. We are going to start publishing the list of ineligible GA for all to review."). In addition to the serious risk of harassment that they now face as a result of Defendants' conduct, voters on these lists may also now be confused as to whether they are entitled to vote, even if they are a fully eligible and lawful Georgia voter. As one court explained in considering a similar mass challenge effort by the Montana Republican Party to voters based on change of address data, "[o]ne can imagine the mischief an immature political operative could inject into an election

cycle were he to use the [challenge] statutes, not for their intended purpose of protecting the integrity of the people's democracy, but rather to execute a tawdry partisan ploy." *Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1079 (D. Mont. 2008). "Voters might be intimidated, confused, or even discouraged from voting upon receiving notice that their right to vote—the most precious right in a government of, by, and for the people—has been challenged." *Id.* Similarly, just this past week, the Southern District of Georgia refused to grant the Georgia Republican Party's request to segregate certain ballots until those voters' eligibility could be confirmed. *See* Order Dismissing Case, *Georgia Republican Party v. Raffensperger*, No. 2:20-CV-00135, ECF No. 31. (S.D. Ga. Dec. 18, 2020).  As the court indicated at the hearing in that case, segregating ballots could lead to "voter suppression"— that is, "amid the confusion, there might be voters who are confused about what it means to have your vote set aside for possible later questioning." Ex. 25 at 75:15- 18. Indeed, that is precisely what has happened and is happening here. This intimidation has been and (absent an injunction from this Court, will continue to be) the wholly predictable consequence of Defendants' actions.

To be sure, Plaintiffs need not show that Defendants intended to intimidate voters to obtain relief. While the VRA's predecessor voter intimidation statute, the Civil Rights Act of 1957, prohibited any person from intimidating voters, or

attempting to intimidate voters, "*for the purpose of* interfering with [the right to vote]," 52 U.S.C. § 10101(b) (emphasis added), Congress *removed* this purpose requirement when it passed § 11(b). This was not an accident or oversight. In testimony before the Senate Judiciary Committee, then-Attorney General Katzenbach explained that § 11(b) "represents a substantial improvement over [the Civil Rights Act]," which now prohibits voting intimidation. Voting Rights, Part 1: *Hearings on S. 1564 Before the S. Comm. on the Judiciary*, 89th Cong. 16 (1965). Attorney General Katzenbach expressly noted that, "under [the VRA] no subjective 'purpose' need be shown, in either civil or criminal proceedings, in order to prove intimidation . . . Rather, defendants *would be deemed to intend the natural consequences of their acts*." *Id.* (emphasis added). The House Report adopted this reasoning, explaining, "unlike [the Civil Rights Act] (which requires proof of a 'purpose' to interfere with the right to vote) no subjective purpose or intent need be shown." H. Rep. No. 89-439 at 30, 89th Congress, 1st Sess. 32 (1965); *see also Cameron*, 262 F. Supp at 884 n.9 (comparing both statutes and concluding the VRA does not require proof of a "purpose" to interfere with the right to vote, as the Civil Rights Act does); *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (concluding Congress "broadened the law in 1965 by adopting [§ 11(b)]"). And, in fact, in this case, it cannot be seriously disputed that voter intimidation is the natural

consequence of Defendants' actions. As another federal court observed when it prohibited the national Republican Party from engaging in similar "ballot security" measures:

> [I]t is all but certain that anti-fraud initiatives . . . will result in the disenfranchisement of many individuals whose eligibility is not in question. Some voters—especially in minority districts where the legacy of racism and history of clashes between the population and authorities has given rise to a suspicion of police and other officials—may choose to refrain from voting rather than wait for the qualifications of those ahead of them to be verified, especially if the verification process becomes confrontational.

*Democratic Nat'l. Comm. v. Republican Nat'l. Comm.*, 671 F. Supp. 2d 575, 612 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012).

It should also be noted that Defendants' activity does not need to actually deter voters from the polls *en masse* to constitute unlawful intimidation. *See United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (explaining activity which discouraged voters from voting is actionable under Civil Rights Act, but also noting "[t]he success or failure of intimidation, threats or coercion, is immaterial, since 'attempts' are equally proscribed"). Nor do Plaintiffs need to show that Defendants were motivated by discriminatory animus. While many parts of the VRA were intended "to banish the plight of racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966), Congress explicitly invoked the Elections Clause of the Constitution, not the Fifteenth Amendment, when it passed § 11(b) of

the VRA. *See* H. Rep. No. 89-439 (1965) at 30-31; *see also id.* at 30 ("The prohibited acts of intimidation [under the VRA] need not be racially motivated."). In light of both the plain text of § 11(b) and this legislative history, multiple courts have held that § 11(b) <u>does not</u> require proof of racial discrimination. *See Willingham v. Cty. of Albany*, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006); *Cameron*, 262 F. Supp. 873 at 884 n.9. Nevertheless, as noted above, Defendants must be presumed to know the likely consequences of their acts. And the unavoidable reality is that the false flags of voter fraud upon which Defendants' mass "challenges" rest are deeply planted in a disgraceful history of racial discrimination in voting, a problem that is especially prevalent in the American South. *See*, *e.g. Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *28 (S.D. Ohio June 7, 2016), *aff'd in part, rev'd in part,* 837 F.3d 612 (6th Cir. 2016) (practices purportedly aimed at combatting voter fraud have "a pernicious history of intimidation of minority voters").

Ultimately, because Plaintiffs have shown Defendants have engaged in conduct which has had (and will continue to have) an intimidating effect on voters, Plaintiffs are likely to succeed on the merits of their claim. This factor weighs in favor of their request for relief.

17

**B.    This Court can issue the requested injunction even if voter challenges are ostensibly permitted by state law.**

While the Elections Clause of the Constitution gives states the primary responsibility for setting the "Times, Places, and Manner" of federal elections, it also gives Congress the ultimate power to "at any time by Law make or alter such Regulations . . ." U.S. Const. art. I. § 4. As the Supreme Court explained in *Smiley v. Holm*:

> It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relating to notices, registration, supervision of voting, *protection of voters*, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns: in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved.

285 U.S. 355, 366 (1932) (emphasis added). More recently, the Supreme Court confirmed that "[t]he Clause empowers Congress to pre-empt," "alter," or "supplant" state statues regulating federal elections. Indeed, "[t]he power of Congress over the 'Times, Places and Manner' of congressional elections 'is paramount, and may be exercised at any time, and to any extent which it deems expedient . . .'" in *Arizona v. Inter Tribal Council of Arizona, Inc.*, 570 U.S. 1, 8-9 (2013) (quoting *Ex parte Siebold*, 100 U.S. 371, 392 (1880)).

When Congress passed § 11(b), it explicitly invoked the Elections Clause as the basis for its authority. *See* H. Rep. No. 89-439 (1965) at 30-31 ("The power of Congress to reach intimidation by private individuals . . . derives from article I, section 4"); *see also United States v. Simms*, 508 F. Supp. 1179, 1186–87 (W.D. La. 1979) (holding "11(b), part of which now constitutes § 1973i(c), was enacted as part of Congress' authority to make 'necessary and proper' legislation to their Constitutional power to regulate federal elections under Article I, Section 4 of the Constitution"); *United States v. Sayre*, 522 F. Supp. 973, 976 (W.D. Mo. 1981) (same). As a result, Defendants cannot use Georgia's voter challenge laws as a shield: if those laws allow for voter intimidation that violates § 11(b), they are preempted. *Teper v. Miller*, 82 F.3d 989, 999 (11th Cir. 1996) (Georgia statute that had the effect of limiting the time for making contributions to candidates for federal office preempted by the Federal Election Campaign Act)*, see also Craig v. Simon*, 980 F.3d 614, 617 (8th Cir. 2020) (Minnesota Nominee Vacancy Statute preempted by federal law setting date for federal elections).

To be clear, Georgia law does not endorse the broad, indiscriminate, mass challenges advanced by Defendants, but even if it did, such actions must also comply with federal laws proscribing voter intimidation—and they clearly do not. *See* 42 U.S.C. § 1985(3); 52 U.S.C. § 10307(b); *Inter Tribal Council of Ariz.*, 570 U.S. 1;

*cf. United States by Katzenbach v. Original Knights of the Ku Klux Klan,* 250 F. Supp. 330, 348 (E.D. La. 1965) (noting that "acts otherwise lawful may become unlawful and be enjoined under [the Civil Rights Act's voter intimidation provision] if the purpose and effect of the acts is to interfere with the right to vote").[5] That state law may provide the mechanism to file voter challenges does not give Defendants the right to file frivolous challenges—much less against over 364,000 Georgians, just two weeks before the state's Senate Runoff—when the obvious consequence is the intimidation of voters across the state. *See* 52 U.S.C. § 10307(b).

Finally, to find that Defendants' activity is proscribed and pre-empted by federal law under Congress's Elections Clause Power, this Court need not find that Congress explicitly outlawed these kinds of challenges. To the contrary, the Supreme Court recently clarified that the normal presumption against pre-emption *does not* apply to the Elections Clause because the sole purpose of the Elections Clause was explicitly to preempt states' electoral regulations. *See Inter Tribal Council of Ariz.*, 570 U.S. at 13-14. As the Supreme Court explained:

> There is good reason for treating Elections Clause legislation differently: The assumption that Congress is reluctant to pre-empt does not hold when Congress acts under that constitutional provision, which

---

[5] Because the Civil Rights Act requires a showing of purpose, *see supra* at 15, *Katzenbach*'s invocation of "purpose" is inapplicable to § 11(b), which prohibits activity which has an objectively intimidating effect on voters, regardless of its intended purpose.

empowers Congress to 'make or alter' state election regulations. Art. I, § 4, cl. 1. When Congress legislates with respect to the 'Times, Places and Manner' of holding congressional elections, it *necessarily* displaces some element of a pre-existing legal regime erected by the States.

*Id.* at 14. For all of these reasons, the Court should find that Defendants have engaged (or will engage) in unlawful voter intimation under the VRA and should immediately enjoin the Defendants from intimidating voters. Filing such challenges is a privilege, not a right. Defendants have manifestly abused that privilege.

## II.     Plaintiffs will suffer irreparable harm in the absence of relief.

In the absence of injunctive relief, Defendants' voter challenges are likely to irreparably injure Plaintiffs. Infringements or abridgements on the right to vote necessarily constitute irreparable harm because they cannot be remedied after the election. *See, e.g.*, *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (finding irreparable injury based on threatened injury to North Carolina's minority voters and explaining, "once the election occurs, there can be no do-over and no redress"); *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997) (finding irreparable harm based on alleged denial of "voting and associational rights" because those rights "cannot be alleviated after the election"). For that reason, courts have easily found irreparable harm satisfied where Plaintiffs have alleged voter intimidation. As one court explained:

> [I]f potential members of the electorate suffer intimidation, threatening conduct, or coercion such that their right to vote freely is abridged, or altogether extinguished, Plaintiff would be irreparably harmed. Further, if some potential voters are improperly dissuaded from exercising their franchise, it is unlikely those voters can be identified, their votes cannot be recast, and no amount of traditional remedies such as money damages would suffice after the fact.

*Ariz. Democratic Party*, No. 2:16-cv-03752, ECF No. 31 at 21 (D. Ariz. Nov. 4, 2016). The same is true here. Defendants' conduct cannot be adequately remedied after voters have already been made fearful to exercise their right to vote and the January election has come and gone.

Additionally, if the challenges continue, Fair Fight must divert resources to help Georgians as they navigate these challenges and ensure Georgians are not disenfranchised or dissuaded by them. *See* Declaration of Lauren Groh-Wargo, Ex. 24, ¶¶ 13-14. This, too, constitutes irreparable harm. *See, e.g., Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251 1268 (N.D. Ga. 2018) (finding irreparable harm where "[p]laintiffs' organizational missions . . . will continue to be frustrated and organization resources will be diverted to [address the challenged law]" . . . "[s]uch mobilization opportunities cannot be remedied once lost").

III.   **The balance of the equities favors Plaintiffs and preliminary relief is in the public interest.**

A.   **Defendants' conduct undermines electoral integrity.**

While Defendants claim to engage in these efforts in the name of "ballot security," courts across the country have examined these claims of widespread voter fraud in the 2020 General Election and have universally found they are without merit. For this reason, among many others, Defendants' efforts to catch and expose "illegal voting" in the Senate Runoff in no way ensures "electoral integrity" in Georgia's elections. Indeed, the state of Georgia has been more aggressive than most other states in purging its voter lists to ensure that ineligible voters do not remain on the voter registration rolls. *See* Ex. 14 (describing Georgia's purge of 500,000 voters in 2018 as one of the largest purges in American history).

History shows that voter intimidation efforts themselves compromise the integrity of our nation's elections. Certain "ballot security" efforts, much like Defendants' mass challenges, "present[] an ongoing threat to the participation of minority individuals in the political process, and continue[] to pose a far greater threat to the integrity of that process than the type of voter fraud the [Defendant] is prevented from addressing by [engaging in ballot security efforts]." *Democratic Nat'l Comm.*, 671 F. Supp. 2d at 578-79. Here, too, Defendants' vigilante efforts squarely do not ensure electoral integrity—they undermine it.

**B.    The public interest is advanced by ensuring voters can participate in elections free from intimidation, as federal law guarantees.**

The temporary relief that Plaintiffs seek would enforce federal law securing the right to vote, which clearly advances the public interest. "[V]oter intimidation and coercion [are] . . . obvious harm[s] that federal law strongly and properly prohibits." *United States v. Madden*, 403 F.3d 347, 352 (6th Cir. 2005) (Boggs, C.J., concurring in part and dissenting in part); *see also Russell v. Lundergan-Grimes*, 784 F.3d 1037, 1051 (6th Cir. 2015) (voters have a "right against voter intimidation"—"the right to cast a ballot free from threats or coercion"). The constitutional interest at stake in this litigation is the voters' "most precious" "right . . . , regardless of their political persuasion, to cast their votes effectively" and free of intimidation. *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). The interest in "protecting voters from confusion and undue influence" is "compelling," *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion of Blackmun, J.), and laws that protect voters from intimidation safeguard the "fundamental political right . . . preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

To ensure that elections in the United States would be free from harassment and intimidation, Congress created specific tools—the laws that Plaintiffs invoke here. These laws were not written to create illusory rights; they were written to ensure that the intimidation and violence that plagued our nation's elections

24

throughout the nineteenth and twentieth century did not persist into our future. Defendants cannot be permitted to engage in conduct that threatens the most basic right in American democracy. "[O]ther rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion for a temporary restraining order should be granted.

Dated this 29th day of December, 2020.

Respectfully Submitted,

Marc E. Elias*
Uzoma Nkwonta*
Aria C. Branch**
Christina A. Ford*
**PERKINS COIE LLP**
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
unkwonta@perkinscoie.com
abranch@perkinscoie.com
christinaford@perkinscoie.com

/s/ Allegra J. Lawrence
Allegra J. Lawrence (GA Bar No. 439797)
Leslie J. Bryan (GA Bar No. 091175)
Maia Cogen (GA Bar No. 832438)
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com

Thomas J. Tobin**
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
ttobin@perkinscoie.com

Molly E. Mitchell**
**PERKINS COIE LLP**
1111 West Jefferson Street, Suite 500
Boise, ID  83702-5391
Phone: (208) 343-3434
Fax: (208) 343-3232
mmitchell@perkinscoie.com

Dara Lindenbaum (GA Bar No. 980780)
**SANDLER REIFF LAMB
ROSENSTEIN & BIRKENSTOCK,
P.C.**
1090 Vermont Avenue, NW, Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

*Counsel for Plaintiffs*
**Pro hac vice* motion pending
***Pro hac vice* motion forthcoming

26