# Exhibit 21

# BRENNAN CENTER FOR JUSTICE

# VOTER PURGES

Myrna Pérez

Brennan Center for Justice *at New York University School of Law*

## ABOUT THE BRENNAN CENTER FOR JUSTICE

The Brennan Center for Justice at New York University School of Law is a non-partisan public policy and law institute that focuses on fundamental issues of democracy and justice. Our work ranges from voting rights to redistricting reform, from access to the courts to presidential power in the fight against terrorism.  A singular institution – part think tank, part public interest law firm, part advocacy group – the Brennan Center combines scholarship, legislative and legal advocacy, and communications to win meaningful, measurable change in the public sector.

## ABOUT THE BRENNAN CENTER'S VOTING RIGHTS AND ELECTIONS PROJECT

The Voting Rights and Elections Project works to expand the franchise, to ensure that every eligible American can vote, and to ensure that every vote cast is accurately recorded and counted. The Center's staff provides top-flight legal and policy assistance on a broad range of election administration issues, including voter registration systems, voting technology, voter identification, statewide voter registration list maintenance, and provisional ballots.

© 2008. This paper is covered by the Creative Commons "Attribution-No Derivs-NonCommercial" license (see http://creativecommons.org). It may be reproduced in its entirety as long as the Brennan Center for Justice is credited, a link to the Center's web page is provided, and no change is imposed.  The paper may not be reproduced in part or altered in form, or if a fee is changed, without the Center's permission. Please let the Brennan Center for Justice know if you reprint.

## ABOUT THE AUTHOR

Myrna Pérez is counsel for the Democracy Program at the Brennan Center for Justice, focusing on a variety of voting rights and election administration issues including the Brennan Center's efforts to restore the vote to people with felony convictions.  Prior to joining the Center, Ms. Pérez was the Civil Rights Fellow at Relman & Dane, a civil rights law firm in Washington, D.C.  A graduate of Columbia Law School and the Harvard Kennedy School of Government, Ms. Pérez clerked for the Honorable Anita B. Brody of the United States District Court for the Eastern District of Pennsylvania and for the Honorable Julio M. Fuentes of the United States Court of Appeals for the Third Circuit.

## ACKNOWLEDGMENTS

The author would like to thank the Brennan Center's Wendy Weiser, Michael Waldman, Fritz Schwarz, Erika Wood, Adam Skaggs, Jennifer Rosenberg, Liz Budnitz, Justin Levitt, Susan Lehman, Maggie Barron, Thaddeus Kromelis, Margaret Chen, Jonathan Blitzer, Jafreen Uddin, Monique Chase, and Laura Seago, as well as Carla Small, Arielle Saposh, Andrew Allison, David Wake, Amalea Smirneotopolis, and Kathleen Wells for their helpful assistance. The Brennan Center for Justice sincerely appreciates the assistance and cooperation of the election officials and advocates who allowed themselves to be interviewed for this report, and gratefully extends our thanks.

The Center thanks the Bullitt Foundation, the Carnegie Corporation, the Charles H. Revson Foundation, the Educational Foundation of America, the Ford Foundation, the Irving Harris Foundation, the JEHT Foundation, the Joyce Foundation, the Mitchell Kapor Foundation, the Open Society Institute, the Rockefeller Family Fund, the Tides Foundation, and the Wallace Global Fund for the generous support that made this paper possible. The statements made and the views expressed in this paper are solely the responsibility of the Brennan Center.

## TABLE OF CONTENTS

| | |
|---|---|
| Executive Summary | 1 |
| I. Introduction | 6 |
| II. Types of Voter Purges | 7 |
|     *A. Change of Address* | 8 |
|         *1. Post Card Purges and Other Triggers for Address Confirmation Notices* | 10 |
|         *2. Information Sources Used to Identify Registrants Who Have Moved* | 12 |
|         *3. Address Verification Procedures* | 13 |
|         *4. Voter Classification After an Address Confirmation Notice is Sent* | 13 |
|     *B. Death* | 14 |
|     *C. Disenfranchising Criminal Convictions* | 14 |
|         *1. Authority and Responsibility* | 15 |
|         *2. Sources of Information* | 15 |
|     *D. Duplicate Records* | 15 |
|     *E. Inactivity/Failure to Vote* | 18 |
|         *1. Inadequate Guidance* | 18 |
|         *2. Programs Targeting Voters who Failed to Vote* | 18 |
|     *F. Incapacitation* | 19 |
|         *1. Varying Rights* | 19 |
|         *2. Sources for Identifying Individuals* | 20 |
| III. Problems with Purges | 20 |
|     *A. Source Lists are Riddled with Errors* | 20 |
|     *B. Purges are Conducted in Secret, Without Notice to Voters* | 21 |
|     *C. Bad "Matching" Criteria Leaves Voters Vulnerable to Purges* | 22 |
|     *D. Purges are Conducted with Insufficient Oversight* | 24 |
| IV. Policy Recommendations | 25 |
|     *A. Transparency and Accountability for Purges* | 26 |
|         *1. Develop and Publish Uniform, Non-Discriminatory Rules for Purges* | 26 |
|         *2. Provide Public Notice of an Impending Purge* | 26 |
|         *3. Develop and Publish Rules to Remedy Erroneous Inclusion in an Impending Purge* | 27 |
|         *4. Do Not Use Failure to Vote as a Trigger for a Purge* | 27 |
|         *5. Develop Directives and Criteria with Respect to the Authority to Purge Voters* | 27 |
|         *6. Preserve Purged Voter Registration Records* | 28 |
|         *7. Make Purge Lists Publicly Available* | 28 |
|         *8. Make Purge Lists Available at Polling Places* | 29 |

*B. Strict Criteria for the Development of Purge Lists*                                                          29

    *1. Ensure a High Degree of Certainty that Names on a Purge List Belong There*                29

    *2. Establish Strict Criteria for Matching*                                                          29

    *3. Audit Purge Source Lists*                                                                        29

    *4. Monitor Duplicate Removal Procedures*                                                            30

*C. "Fail-Safe" Provisions to Protect Voters*                                                                   30

*D. Universal Registration*                                                                                     30

V. Emerging Issues with Respect to Purges                                                                       31

    *A. Voter Caging*                                                                                    32

    *B. Comparing Databases Within and Across State Lines*                                               33

VI. Conclusion                                                                                                  33

Endnotes                                                                                                        34

Appendices                                                                     *available at* www.brennancenter.org

    *A. Ohio Case Study*

    *B. Washington State Case Study*

    *C. Nevada Case Study*

    *D. Missouri Case Study*

    *E. Kentucky Case Study*

    *F. Computerized Voter Statewide Databases and Purges*

    *G. Undeliverable Mail*

# EXECUTIVE SUMMARY

Voter registration lists, also called voter rolls, are the gateway to voting. A citizen typically cannot cast a vote that will count unless her name appears on the voter registration rolls. Yet state and local officials regularly remove — or "purge" — citizens from voter rolls. In fact, thirty-nine states and the District of Columbia reported purging more than 13 million voters from registration rolls between 2004 and 2006.[1] Purges, if done properly, are an important way to ensure that voter rolls are dependable, accurate, and up-to-date. Precise and carefully conducted purges can remove duplicate names, and people who have moved, died, or are otherwise ineligible.

Far too frequently, however, eligible, registered citizens show up to vote and discover their names have been removed from the voter lists. States maintain voter rolls in an inconsistent and unaccountable manner. Officials strike voters from the rolls through a process that is shrouded in secrecy, prone to error, and vulnerable to manipulation.

While the lack of transparency in purge practices precludes a precise figure of the number of those erroneously purged, we do know that purges have been conducted improperly before. Over the past several years, every single purge list the Brennan Center has reviewed has been flawed. In 2004, for example, Florida planned to remove 48,000 "suspected felons" from its voter rolls. Many of those identified were in fact eligible to vote.[2] The flawed process generated a list of 22,000 African Americans to be purged, but only 61 voters with Hispanic surnames, notwithstanding Florida's sizable Hispanic population. To compound the problem, the purge list over-represented African Americans and mistakenly included thousands who had had their voting rights restored under Florida law.[3] Under pressure from voting rights groups, Florida ordered officials to stop using the purge list.[4] To compound the problem, the purge list over-represented African Americans and mistakenly included thousands who had had their voting rights restored under Florida law.

In New Jersey in 2005, the Brennan Center worked with a political science professor to analyze a purge list prepared by a political party using "matching" techniques. We found that the list was compiled using a number of faulty assumptions and that it would have harmed eligible voters if used as the basis for a purge. In 2006, the Secretary of State of Kentucky attempted to purge the state's rolls based on a flawed attempt to identify voters who had moved from Kentucky to neighboring South Carolina and Tennessee. A resulting lawsuit uncovered the fact that eligible voters who had not, in fact, moved out of the state of Kentucky were caught up in the purge; a state court ordered the state to reverse the purge.

The purges reviewed for this report give no greater grounds for comfort. While the reasons vary from state to state, no state reviewed in this report uses purge practices or procedures that are free from risk of error or manipulation, that have sufficient voter protections, or that have adequate procedures to catch and correct errors.

The secret and inconsistent manner in which purges are conducted make it difficult, if not impossible, to know exactly how many voters are stricken from voting lists erroneously.  And when purges are made public, they often reveal serious problems. Here are a few examples recent examples:

- In Mississippi earlier this year, a local election official discovered that another official had wrongly purged 10,000 voters from her home computer just a week before the presidential primary.

- In Muscogee, Georgia this year, a county official purged 700 people from the voter lists, supposedly because they were ineligible to vote due to criminal convictions. The list included people who had never even received a parking ticket.

- In Louisiana, including areas hit hard by hurricanes, officials purged approximately 21,000 voters, ostensibly for registering to vote in another state.   A voter could avoid removal if she provided proof that the registration was cancelled in the other state, documentation not available to voters who never actually registered anywhere else.

FINDINGS

This report provides one of the first systematic examinations of the chaotic and largely unseen world of voter purges. In a detailed study focusing on twelve states, we identified four problematic practices with voter purges across the country:

**Purges rely on error-ridden lists.** States regularly attempt to purge voter lists of ineligible voters or duplicate registration records, but the lists that states use as the basis for purging are often riddled with errors.  For example, some states purge their voter lists based on the Social Security Administration's Death Master File, a database that even the Social Security Administration admits includes people who are still alive.[5]  Even though Hilde Stafford, a Wappingers Falls, NY resident, was still alive and voted, the master death index lists her date of death as June 15, 1997.[6] As another example, when a member of a household files a change of address for herself in the United States Postal Service's National Change of Address database, it sometimes has the effect of changing the addresses of all members of that household.  Voters who are eligible to vote are wrongly stricken from the rolls because of problems with underlying source lists.

**Voters are purged secretly and without notice.** None of the states investigated in this report statutorily require election officials to provide public notice of a systematic purge or even individual notice to those voters whose names are removed from the rolls as part of the purge.  Additionally, with the exception of registrants believed to have changed addresses, many states do not notify individual voters before purging them. In large part, states that do provide individualized notice do not provide such notice for all classes of purge candidates.  For example, our research revealed that it is rare for states to provide notice when a registrant is believed to be deceased. Without proper notice to affected individuals, an erroneously purged voter will likely not be able to correct the error

before Election Day. Without public notice of an impending purge, the public will not be able to detect improper purges or to hold their election officials accountable for more accurate voter list maintenance.

**Bad "matching" criteria leaves voters vulnerable to manipulated purges.** Many voter purges are conducted with problematic techniques that leave ample room for abuse and manipulation. State statutes rely on the discretion of election officials to identify registrants for removal. Far too often, election officials believe they have "matched" two voters, when they are actually looking at the records of two distinct individuals with similar identifying information. These cases of mistaken identity cause eligible voters to be wrongly removed from the rolls. The infamous Florida purge of 2000 — conservative estimates place the number of wrongfully purged voters close to 12,000 — was generated in part by bad matching criteria.[7] Florida registrants were purged from the rolls in part if 80 percent of the letters of their last names were the same as those of persons with criminal convictions.[8] Those wrongly purged included Reverend Willie D. Whiting Jr., who, under the matching criteria, was considered the same person as Willie J. Whiting.[9] Without specific guidelines for or limitations on the authority of election officials conducting purges, eligible voters are regularly made unnecessarily vulnerable.

> NO EFFECTIVE NATIONAL STANDARD GOVERNS VOTER PURGES. THIS MAKES THE RISK OF BEING PURGED UNPREDICTABLE AND DIFFICULT TO GUARD AGAINST.

**Insufficient oversight leaves voters vulnerable to manipulated purges.** Insufficient oversight permeates the purge process beyond just the issue of matching. For example, state statutes often rely on the discretion of election officials to identify registrants for removal and to initiate removal procedures. In Washington, the failure to deliver a number of delineated mailings, including precinct reassignment notices, ballot applications, and registration acknowledgment notices, triggers the mailing of address confirmation notices,[10] which then sets in motion the process for removal on account of change of address. Two Washington counties and the Secretary of State, however, reported that address confirmation notices were sent when any mail was returned as undeliverable, not just those delineated in state statute. Since these statutes rarely tend to specify limitations on the authority of election officials to purge registrants, insufficient oversight leaves room for election officials to deviate from what the state law provides and may make voters vulnerable to poor, lax, or irresponsible decision-making.

POLICY RECOMMENDATIONS

No effective national standard governs voter purges; in fact, methods vary from state to state and even from county to county. A voter's risk of being purged depends in part on where in the state he or she lives. The lack of consistent rules and procedures means that this risk is unpredictable and difficult to guard against. While some variation is inevitable, every American should benefit from basic protections against erroneous purges.

Based on our review of purge practices and statutes in a number of jurisdictions, we make the following policy recommendations to reduce the occurrence of erroneous purges and protect eligible voters from erroneous purges.

### A. Transparency and Accountability for Purges

States should:

- **Develop and publish uniform, non-discriminatory rules for purges.**

- **Provide public notice of an impending purge.** Two weeks before any county-wide or state-wide purge, states should announce the purge and explain how it is to be conducted. Individual voters must be notified and given the opportunity to correct any errors or omissions, or demonstrate eligibility before they are stricken from the rolls.

- **Develop and publish rules for an individual to prevent or remedy her erroneous inclusion in an impending purge.** Eligible citizens should have a clear way to restore their names to voter rolls.

- **Stop using failure to vote as a trigger for a purge.** States should send address confirmation notices <u>only</u> when they believe a voter has moved.

- **Develop directives and criteria with respect to the authority to purge voters.** The removal of any record should require authorization by at least two officials.

- **Preserve purged voter registration records.**

- **Make purge lists publicly available.**

- **Make purge lists available at polling places.** Purge lists should be brought to the polls on Election Day so that errors can be identified and pollworkers can find the names of erroneously purged voters and allow them to vote regular ballots.

*B. Strict Criteria for the Development of Purge Lists*

States should:

- **Ensure a high degree of certainty that names on a purge list belong there.** Purge lists should be reviewed multiple times to ensure that only ineligible voters are included.

- **Establish strict criteria for matching voter lists with other sources.**

- **Audit purge source lists.** If purge lists are developed by matching names on the voter registration list to names from other sources like criminal conviction lists, the quality and accuracy of the information in these lists should be routinely "audited" or checked.

- **Monitor duplicate removal procedures.** States should implement uniform rules and procedures for eliminating duplicate registrations.

*C. "Fail-Safe" Provisions to Protect Voters*

States should ensure that:

- **No voter is turned away from the polls because her name is not found on the voter rolls.** Instead, would-be voters should be given provisional ballots, to which they are entitled under the law.

- **Election workers are given clear instructions and adequate training as to HAVA's provisional balloting requirements.**

*D. Universal Voter Registration*

States should:

- **Take the affirmative responsibility to build clean voter rolls consisting of all eligible citizens.** Building on other government lists or using other innovative methods, states can make sure that all eligible citizens, and only eligible citizens, are on the voter rolls.

- **Ensure that voters stay on the voter rolls when they move within the state.**

- **Provide a fail-safe mechanism of Election Day registration for those individuals who are missed or whose names are erroneously purged from the voter rolls.**

## I.   INTRODUCTION

In 1959, the local Citizens Council, a white supremacist group with an organizational mission of maintaining racial segregation, together with a local election official removed 85% of the African American voters from the registration rolls of Washington Parish, Louisiana, under the guise of removing from the rolls all persons illegally registered.[11]

In 2007, almost 50 years after a court found that the Washington Parish purge was unconstitutional both in purpose and effect, election officials in Louisiana removed more than 21,000 people from the voter registration rolls, the majority from areas most devastated by Hurricane Katrina a year earlier.[12] Almost a third of those removed were from Orleans Parish,[13] which has a majority African American population.[14]  A voter could avoid removal if she provided proof that the registration was cancelled in the other state, documentation not available to voters who never actually registered anywhere else.[15]

While we may be past the days in which election officials are complicit with those who intentionally seek to target persons of color for removal from the voter rolls, the way in which voter registration lists are maintained in this country may sometimes have a similar effect.[16]

Voter registration lists are the gateway to voting. In most instances,[17] a citizen can only vote and have her vote count if her name appears on the registration rolls. Yet officials regularly remove, or "purge," citizens each day from voter registration lists. In fact, at least 13 million people were purged from voter rolls between the close of registration for the 2004 federal general election and the close of registration for the 2006 federal general election.  A voter has been "purged" if her registration status has changed such that she is no longer listed on the registration list as a person who is able to cast a regular ballot or a ballot that will be counted.

> WHEN PURGES GO WRONG, ELIGIBLE VOTERS OFTEN DISCOVER THEY HAVE BEEN KNOCKED OFF VOTER ROLLS ONLY WHEN THEY SHOW UP AT THE POLLS TO VOTE—AND CAN'T.

Dependable, accurate, and up-to-date voter registration lists increase the integrity of our elections in many ways. They let candidates and get-out-the-vote groups work more efficiently. Dependable lists also reduce confusion at the polls, make turnout numbers more precise and election misconduct easier to detect and deter. To the extent that they help insure that registration lists correctly reflect eligible registrants, precise, carefully conducted purges are important.

Unfortunately, many of the voter purges in this country are performed in a slipshod manner and leave ample room for abuse and manipulation. When purges go wrong, eligible voters are removed from the rolls, frequently with no notice or knowledge until they show up at the polls to vote.

This report examines what goes wrong with those purges, how voter purges are conducted, and how to minimize the risk that eligible voters will be incorrectly purged across the county. Our analysis is based on a review and examination of state statutes, regulatory materials, and news reports in the following twelve states, representing a cross-section of regions, election systems, and purge practices: Florida, Kentucky, Indiana, Michigan, Missouri, Nevada, New York, Ohio, Oregon, Pennsylvania, Washington, and Wisconsin. In five states — Kentucky, Missouri, Nevada, Ohio, and Washington — we also conducted extensive interviews with state and local election officials charged with the maintenance of voter registration lists.

Due to the secret nature of purges, it is difficult to know the full extent of the problem, or the exact number of people who have been wrongfully kept from voting. What we do know is that in the states studied, purge practices are unnecessarily secretive and in need of improvement. When purges are made public, they reveal serious problems. Given the margins by which elections are won, these purges matter greatly, and there is reason to believe that the number of people wrongfully purged makes a difference. There is no reason for purges to be kept secret — they undermine confidence in elections, and cast doubt on our concept of fairness.

The Brennan Center is dedicated to investigating the precise nature of these purges conducted behind closed doors. We encourage election officials, legislators, advocates and concerned members of the public to use this report to improve voter purge practices and ensure that the rights of eligible voters are not jeopardized.

## II.   TYPES OF VOTER PURGES

Purges occur as part of a process of "list maintenance" that states and localities use to update and clean their voter registration lists. Depending on the state, purges are conducted by local officials, state officials, or both. Voters are generally purged on one of the following grounds: (1) changes of address, (2) death, (3) disenfranchising criminal conviction, (4) duplication of other records, (5) inactivity or failure to vote, and (6) mental incapacitation.

Three statutes provide the bulk of the few existing federal requirements and voter protections for conducting purges — the National Voter Registration Act of 1993 ("NVRA"), the Help America Vote Act of 2002 ("HAVA"), and the Voting Rights Act of 1965.  Under the NVRA, any state purge practice must be "uniform, non-discriminatory, and in compliance with the Voting Rights Act of 1965."[18] The NVRA also imposes certain limitations on election officials as to when and how registrants can be removed from the voter rolls on account of change of address,[19] which afford some protections against one type of purge. HAVA emphasizes that voter purges must be done in accordance with the NVRA,[20] and requires that the process for maintaining statewide computerized voter registration databases, which HAVA requires, include minimum standards of accuracy to ensure that registration records are accurate and regularly updated.[21]

Purges can be "systematic," meaning that they are large-scale and done in an organized and pre-planned fashion, or they can be "routine," meaning that they affect an individual voter and are based on individualized information. A systematic purge is one in which all people believed to be deceased are removed from the registration rolls; a routine purge is one in which a son brings his mother's death certificate to the local registrar and asks that she be removed from the rolls. Routine purges can have serious consequences for individual voters, but given the sheer number of persons affected, it is especially important to ensure that systematic purges are done well, with adequate protections for affected voters.

This section examines the statutes, policies, and procedures employed by states and localities for purging voters, and explains the policy choices that may affect the ability of voters to cast ballots which count. The particulars of how purges are conducted reveal how purge practices vary dramatically from jurisdiction to jurisdiction, how there is also a lack of consistent protections for voters, and how there are opportunities for mischief in the purge process.

## A. CHANGE OF ADDRESS

Twenty-nine million voting-age Americans move each year.[22] Accordingly, it is no surprise that changes of name and address accounted for 43% of all voter registration transactions for the time period between the close of the 1996 elections to right after the close of the 1998 elections.[23] From the close of the 2004 elections to the close of the 2006 elections, changes of name, address, and political party accounted for more than 30% of all voter registration transactions.[24]

Election officials we interviewed reported that changes of address are the most difficult aspect of list maintenance.[25] A number of election officials believe that changes of address account for the bulk of duplicate registrations on the voter rolls[26] because people who have moved often re-register at their new places of residency without notifying election officials in their former places of residence of the address change.[27]

IF A JURISDICTION USES UNDELIVERABLE MAIL FROM A MASS MAILING AS THE SOLE BASIS FOR PURGING A VOTER, IT BREAKS FEDERAL LAW.

Under federal law, election officials may purge a registrant believed to no longer be a resident of the election jurisdiction if two conditions are satisfied. First, the registrant must fail to respond to an address confirmation notice from the relevant election office in the time period designated under state law. The notice must be sent by forwardable mail and include a postage prepaid, pre-addressed response card. Second, the registrant must fail to vote in two federal general elections following the mailing of the address confirmation notice.[28] The sending of these notices starts the running of the clock for the time period in which a person must vote in two subsequent federal general elections or be removed from the rolls in those states that conduct purges.[29]



SAMPLE TIMETABLE FOR CHANGE-OF-ADDRESS PURGE

*Timeline not drawn to scale.*

In spite of this federal mandate, there are great discrepancies in the methods states and localities use to implement purges based on changes of address, including: differences in which events trigger the mailing of a notice seeking address confirmation; which information sources are used to identify registrants who have moved; how registrants' addresses are verified; and how officials proceed when a person does not respond to an address confirmation notices.

### 1. Post Card Purges and other Triggers for Address Confirmation Notices

The most common triggers causing a local election official to send an address confirmation notice include: the return of a mailing sent to the person from the election office; an acceptable source provides information suggesting that the person has moved; or the election office undertakes a program to verify addresses and finds an address that appears questionable.

In several states, officials are given the authority to send an address confirmation notice to a registrant if other undeliverable mail is returned to the election office in certain circumstances.[30] States, and even counties within states, vary in the type of mail that can trigger the mailing of a confirmation notice. Some states or counties will send an address confirmation notice based on the return of a mailing sent to all registered voters designed to ferret out bad addresses. This is sometimes referred to as a "canvass." In other jurisdictions, a wider array of undeliverable election mail may trigger the mailing of an address confirmation notice, such as absentee ballots, registration acknowledgement notices, and precinct reassignment notices.[31]

If a purge arises from a mass mailing, typically a non-forwardable postcard, it is referred to as a "post-card purge."[32] In some cases, a postcard mailing is part of a jurisdiction's canvassing efforts. When postcards are returned as undeliverable, the jurisdiction usually sends an address confirmation notice to the voter. If the voter does not respond to the notice and fails to vote in two subsequent federal elections, the voter can be lawfully purged from the voter registration list, provided that the removal does not take place within 90 days of a federal election. If a jurisdiction uses undeliverable mail from a mass mailing as the sole basis for purging a voter, it breaks federal law. A Michigan law is legally vulnerable on this ground because if the original "voter identification" card — the card sent to new registrants — is returned as undeliverable to the local clerk, the clerk cancels the registration.[33]

Although returned postcards from mass mailings probably form the most common basis for supposed changes of address, this kind of returned mail is not a reliable indicator that a person has moved for the reasons set forth below. Several of the factors that make this method unreliable affect voters in poor and minority communities more than those in other communities. Before presuming that returned mail means a person has moved, states and localities should consider the following sources of error:

**a. Voter registration lists suffer from typos and other clerical errors**

Mail sent to a listed registration address may be returned as undeliverable because of a typo or other data entry errors on the voter rolls. Large government databases are notoriously vulnerable to

such flaws.[34] One study found that as many as 26% of records in a Florida social service database included city names that were spelled differently from the same names on a master list, including more than 40 spelling variations of Fort Lauderdale, one of the largest cities in the state.[35] Address numbers and names may be mistyped or transposed. Portions of addresses apartment numbers or house numbers or directional indicators (e.g., S. Main St. or N. Main St.) may be dropped. Addresses may be entered incorrectly (e.g., 211-2 Main St. becomes 21 Main St.).

### b. A voter may not be listed on the mailbox of her residential voting address

Mail sent to a listed registration address may be returned as undeliverable because the United States Postal Service does not know that the voter actually lives at the address listed. Couples, roommates, or family members may list only one or two members of the residential unit on the mailbox. Particularly when the unlisted members of the unit do not share the same surname as the listed member, the postal delivery person may simply presume that the individual in question does not live at the listed address.

### c. A voter may live at a non-traditional residence

Mail sent to a listed registration address may be returned as undeliverable because the voter does not live at a traditional address.  Homeless individuals, who have the right to register and vote in every state, are a prime example of this problem.[36] Depending on the law of the state, these citizens may list a homeless shelter or government building as their legal voting residence, even if the institution listed will not accept their mail.

### d. A voter may be temporarily away from her permanent residence

Mail sent to a listed registration address may be returned as undeliverable because the voter is temporarily away from her permanent residence, and does not receive mail there. For example, an active duty member of the military may have difficulty receiving mail. In one notorious Louisiana case, a member of Congress who received her mail in Washington D.C. rather than at her home address in her district was challenged after a letter to her home was returned as undeliverable.[37]

### e. A voter's permanent mailing address may differ from her residential voting address

Mail sent to a listed registration address may be returned as undeliverable because the voter receives mail elsewhere — at a post office box, for example.  When individuals register to vote, they list their physical residences, but not all Americans receive mail at their residential addresses.

### f. Mail may not be properly delivered

Sometimes, of course, mail sent to a listed registration address is returned as undeliverable because it was not delivered properly, through no fault of the voter.[38] Mail can be lost or misrouted, causing

it to be returned to the sender.  Erratic mail problems can be quite significant. In the 1990 census, for example, the *New York Times* reported that "[a]lthough at least 4.8 million [census] forms were found to be undeliverable by the Postal Service, 1.8 million of those were later delivered by hand."[39] Moreover, ineffective mail delivery is more common in poor and minority communities.[40]

**g. A voter's street name may have changed**

Mail sent to a listed registration address may be undeliverable because the street name may have changed since the voter registered, even though the voter remains in the same residence. In Milwaukee in 2006, for example, when street addresses were checked against a postal service address program, city officials reviewing the list of discrepancies found that some addresses were flagged because of changes to the street names themselves.[41]

**h. A voter may refuse to accept certain mail**

Mail sent to a listed registration address may be undeliverable because the voter refuses to accept the piece of mail in question. There is no requirement that an individual accept a piece of mail offered for delivery, rather than sending it back with the delivery person. Catherine Herold of Ohio, for example, reported that she refused to accept delivery of a partisan mailing — which was returned undelivered and then used as purported evidence of her allegedly invalid registration.[42]

**i. A voter may have moved permanently, but nevertheless remains eligible to vote**

State rules differ as to when a voter who has moved must inform election officials of her new address.  At a minimum, however, federal law provides that if a voter has moved within the same area covered by a given polling place — if, for example, a voter moves from one apartment to another within the same apartment complex — she may legitimately vote at that polling place even if she has not yet notified a registrar of her move.[43]

Federal law prohibits systematic purges within 90 days of an election.[44]  Voter advocacy groups have criticized jurisdictions which have sent or have contemplated sending a mass mailing as the first step to confirm addresses when the initial mailing has taken place within 90 days of an election.[45] Mass mailings of this kind are inadvisable not only because undelivered mail is an unreliable indicator that a person has moved (as explained above), but also because of timing.  Election officials are busiest in the 90 days preceding an election: they must process new registrations, update registration records, identify polling locations, prepare voting materials, and more. Without the time to exercise due care, data entry and other mistakes are more likely, subjecting eligible voters to the risk of a purge.

*2. Information Sources Used to Identify Registrants Who Have Moved*

Often voters do not tell election officials they have moved out of a jurisdiction, and so it is hard for officials to identify invalid records on voter registration lists. States, therefore, turn elsewhere to

identify voters who have moved.  Given the NVRA's explicit authorization to do so, it is no surprise that states often rely heavily on information provided by the United States Postal Service, its licensees, and the USPS's National Change of Address database.[46] This method, though, has its own problems, including inaccuracies in postal service data and cost to election officials.[47] Some states use information gained in connection with jury notices and information from other departments, such as the bureau of motor vehicles to identify address changes.[48] For example, in Kentucky, one election official used information on changes of address for updating driver's licenses to update addresses in the voter registration list.[49]

In some states, individuals can provide information about someone else's change of address that is then acted upon by election officials. In Nevada, county clerks can send an address confirmation notice based on information gained from another voter or other "reliable person" who submits an affidavit stating that a particular voter has moved outside the county with the intent to abandon her residence.[50]

### 3. Address Verification Procedures

Some state statutes permit broad canvasses to confirm voters' addresses. For example, some states allow local election officials to conduct door-to-door canvasses to find voters.[51] In actuality, however, a local election official we interviewed reported that this was not a widespread practice.[52]

Some state statutes permit localities to initiate their own efforts to identify registrants who have moved. In some cases, the acceptable methods are unspecified or unlimited. Missouri law grants election officials broad authority and wide latitude to verify a person's address.  The statute reads, in relevant part: "[t]he election authority may investigate the residence or other qualifications of any voter at any time it deems necessary. The election authority shall investigate material affecting any voter's qualifications brought to its attention from any source, and such investigations shall be conducted in the manner it directs."[53]

### 4. Voter Classification After an Address Confirmation Notice is Sent

While the details of the process differ, after sending address confirmation notices states tend to follow one of two schemes: states designate any voter who is sent an address confirmation notice as "inactive,"[54] while others do not designate a voter as "inactive" until after the voter fails to respond to the address confirmation notice in a timely matter.[55] This distinction is relevant because in some states, the voting experience of someone designated "inactive" may be different from, and more difficult than, that of an "active" voter. In Massachusetts, for example, inactive voters shoulder additional identification burdens when they show up to vote.[56] In Oregon, where all elections in the state are allowed to be conducted by mail, inactive voters are not statutorily required to be given ballots by mail.[57]  Additionally, some polling stations are reported to have a list of inactive voters that is separate and apart from the active voter list.  There is at least some anecdotal evidence that sometimes the lists of inactive voters are not available at the polling stations, putting inactive voters at a disadvantage when attempting to vote.

## B. DEATH

Both HAVA and the NVRA address the removal of deceased voters from the voter rolls. Under the NVRA, states must make a "reasonable effort" to remove those who have died from the registration rolls.[58] HAVA directs each state to coordinate its voter registration database with state death records for the purposes of removing names of deceased persons from the voter rolls.[59]

Different agencies in different states maintain records of deaths, and so election officials get information about deceased registrants from varying sources. In some states, the department of health sends a list to election officials.[60] Elsewhere, local and state registrars or departments of vital statistics send a list of deceased persons to voting officials.[61]  Still other states do not designate which agency is charged with providing information on decedents.[62]

Some states permit election officials to consider sources other than data from state agencies in gathering information on decedents. In some states, for example, election officials are permitted to use newspaper obituaries to identify deceased registrants.[63] In Washington State, a registrant may be removed from the registration rolls if another registered voter signs a statement of personal knowledge or belief that the registrant is deceased.[64] Elsewhere, state law authorizes the use of other sources, without specifying what sources may be considered.[65]

## C. DISENFRANCHISING CRIMINAL CONVICTIONS[66]

State have a blizzard of varying laws regarding the voting rights of people with criminal convictions. Kentucky and Virginia permanently disenfranchise all people with felony convictions unless their rights are specifically restored by the government, while in Maine and Vermont, people with criminal convictions do not lose their voting rights at all — even prisoners are permitted to vote. Most state laws, however, fall somewhere in between those two positions.

Thirteen states and the District of Columbia automatically restore voting rights to formerly incarcerated persons upon their release from prison.[67] In contrast, eight states permanently disenfranchise citizens convicted of certain crimes unless the government approves individual rights restoration.[68] Five states allow probationers to vote and automatically restore the voting rights of persons with criminal convictions after release from prison and discharge from parole.[69] It is most common for a state to restore an individual's voting rights upon completion of his sentence, including prison, parole, and probation.[70]

Federal law provides little guidance or voter protections in this area. The NVRA permits states to purge people with felony convictions from the voter rolls consistent with state law.[71] HAVA requires states to "coordinate the computerized list with State agency records on felony status" to remove registrants made ineligible by criminal convictions.[72] As with other types of purges addressed in this report, state purge practices for people ineligible because of felony convictions are varied in numerous ways.

*1. Authority and Responsibility*

The responsibility for purging people with disenfranchising convictions differs from state to state. In some states, like Kentucky, the statutory responsibility rests with state election officials.[73] In other states, like Nevada, local officials are responsible.[74] There are also hybrid systems for removing people with disenfranchising convictions: in Washington, for example, local officials remove some people convicted of felonies while state officials remove others.[75] In Florida, local officials are required to conduct removals, but do so in accordance with information provided by state officials.[76] In other cases, state election law does not clearly delineate which officials are responsible for removing ineligible persons with felony convictions.[77]

*2. Sources of Information*

Under federal law, United States Attorneys are required to notify states' chief election officials of felony convictions in federal court.[78] State election officials, then, in turn notify relevant local election officials. In addition to the provision of information by U.S. Attorneys, some state statutes provide that election officials are to obtain information on people with disenfranchising convictions from a number of other sources.[79] State statutes, however, do not always provide clear guidance as to what sources election officials can rely on in gathering information about registrants rendered ineligible by criminal convictions.[80] Consequently, sources vary on a county-by-county basis.[81]

### D. DUPLICATE RECORDS

Often when voters move within a state, they register to vote in a new neighborhood without canceling their registration in the old one. Or, accidentally, a voter can register from the same address multiple times. Federal law says that state systematic purge programs should screen for and eliminate duplicate names from the centralized state voter registration list. But the federal law gives no specific guidance on how states should identify such duplicate records, or what processes should be followed.[82] As a result, from state to state and county to county, officials remove duplicates in an inconsistent and confusing manner. There is not even any uniformity as to how duplicate registration records should be resolved once they are detected. For example, while a number of officials, when encountering what they presume to be duplicate registrations for the same person, presume that the more recent registration is the accurate one,[83] one election official in Michigan reported a practice of removing the newer registration when confronted with a duplicate.[84]

Given the errors and inconsistencies in the records on state voter rolls, it may be impossible to tell with certainty whether two records indeed refer to the same person and therefore are duplicates — unless the affected individuals are contacted and can confirm the duplication. States and localities therefore typically rely to some extent on approximation and assumptions, which may not be accurate in some circumstances.

Some statewide list maintenance programs identify potential duplicate records automatically, but rely on local election officials to sort through the flagged records. These registrars are supposed to

purge only actual duplicates, while leaving untouched any records falsely flagged as duplicates.[85] The process is often confusing and time-consuming. For example, Missouri law gives local election officials explicit authority to identify and remove duplicate records, but it does not specify how duplicates should be identified or what evidence is enough to remove a voter.[86] As a result, different county election officials in Missouri follow very different procedures for identifying duplicate records. In one county, election officials request confirmation from voters for possible duplicate records, and the duplicate record is purged if the voter does not respond or appear to vote in the following election.[87] In a different county, election officials simply flag possible duplicates and monitor for voting fraud but take no further action.

Most state statutes, in fact, offer very little guidance to local election officials and do not specify what identifying characteristics should be verified, or what degree of approximation is permitted.[88] One election official in Ohio stated that their ability to identify duplicates is further complicated by, among other things, name changes after marriage and poorly programmed registration software that slows down the process.[89] When local election offices become busy with processing large numbers of new registrations prior to elections, they tend to relax the level of scrutiny they pay to checking the accuracy of duplicate matches.[90]

Despite vague laws and scarce resources, local election officials reported increased pressure from state officials to "clean" the voter registration list of duplicate records.[91] Such pressure, in the absence of counterbalancing restrictions or guidelines, is likely in the future to result in larger numbers of improperly purged registrants.



## AN EXAMPLE OF DUPLICATE RESOLUTION

Possible duplicate record flagged by statewide database

County 1 receives notification of possible duplication

County 2 receives notification of possible duplication

County 1 independently investigates record to determine the source of duplication

County 2 independently investigates record to determine the source of duplication

County 1 reaches conclusion about the cause of duplicate notice and must coordinate resolution with County 2

County 2 reaches (potentially different) conclusion and must coordinate resolution with County 1

Voter's registration is restored *only* if *both* counties agree to same resolution and take coordinated sequential steps to update voter's record from both counties. Otherwise, voter will not be properly registered and may not be able to vote a regular ballot.

Source: Jennifer Brunner, Ohio Secretary of State, Statewide Voter Registration Database (SWVRD) System Manual (2008), 31-32, *available at* http://www.sos.state.oh.us/SOS/Upload/elections/directives/2008/Dir2008-52.pdf.

E. INACTIVITY/FAILURE TO VOTE

Federal law explicitly states that a person cannot be purged merely for a failure to vote — a basic protection for registered voters who may only vote sporadically.[92] This protection ensures that a voter does not lose her right to vote simply because she chooses not to exercise that right in a particular election. Accordingly, federal law prevents election officials from relying on the fact that a voter has not voted for some time to conclude that she moved, died, or otherwise becomes ineligible and then to cancel her registration based on that conclusion.

Election officials are, however, permitted to remove voters pursuant to the NVRA's change of address process. Under the NVRA, states must send forwardable address confirmation notices to voters believed to have moved with a postage prepaid and pre-addressed response card to either confirm a continuing address or update the state with a new address. If the card is not returned, the state cannot remove the voter unless the voter not only does not return the card confirming her address, but also does not vote in at least one of the two general federal elections following the notice's mailing.[93]

*1. Inadequate Guidance*

Voters who have not voted for a designated period of time, or have not responded to an address confirmation notice, nor presented themselves to vote in the subsequent elections are often referred to as "inactive voters."[94] Most of the state statutes surveyed for this report fail to provide clear guidance on how to meet the NVRA's requirements relating to "inactive voters."

The Kentucky statute, for example, reiterates the NVRA requirement outlined above, but does not provide any guidance on how an inactive voter should be allowed to vote (for example, by signing a written affidavit confirming her address). As a result, local election officials impose inconsistent requirements for inactive voters who turn up at the polls on Election Day. One Kentucky county requires inactive voters to sign an affidavit before being allowed to vote, whereas another county requires an election officer at the polling place to call a central election office to confirm the registration before allowing inactive voters to receive a ballot.

The inconsistent requirements at different polling places can lead to the de facto disenfranchisement of inactive voters who should, instead, be protected by the NVRA. For example, in locations where telephone confirmations are required before inactive voters are allowed to vote, the polling places are sometimes not equipped with sufficient telephone lines to keep up with the high volume of voters in heavy turnout precincts, effectively forcing precincts to turn away inactive voters rather than allowing them to vote.[95] Thus, voters who would otherwise have been classified as active again could instead find themselves purged for failure to vote, despite attempting to do so.  This problem reportedly occurred to inactive voters in St. Louis County in 2006.[96]

*2. Programs Targeting Voters who Failed to Vote*

Some jurisdictions' policies stretch compliance with the NVRA's prohibition against purging a

voter merely for failure to vote.  For example, in Ohio, though not required to do so by law,[97] many jurisdictions send address confirmation cards exclusively to registered voters who did not vote in the most recent election, rather than to all registered voters, as many other states do.[98] Ninety days following each general election in Wisconsin, state election officials are required to identify persons who have not voted within the previous four years and mail them a notice that informs the addressees that their registration will be "suspended" unless they apply to continue their registration.[99] Thus, the simple failure to vote in these jurisdictions is sufficient to trigger a process that could ultimately result in being purged from the voter registration list.

### F. INCAPACITATION[100]

Federal law offers even fewer guidelines for removing voters from the registration rolls because of mental incapacitation. In contrast to its references to purges based on felony convictions or death, HAVA does not mention the removal of persons adjudged incapacitated. The NVRA simply provides that states must comply with state law in removing names from the registration list of voters because of mental incapacity.[101]

#### 1. Varying Rights

State laws vary with respect to the voting rights of persons who are mentally incapacitated.  Pennsylvania, Michigan and Indiana, for example, do not by statute disenfranchise persons who are adjudged mentally incapacitated.  In fact, Pennsylvania's statute goes as far as specifying the means for determining the residency of individuals who live at institutions for mentally ill patients expressly for the purpose of voter registration.[102]  Indiana's law specifies that the "[d]etention or commitment of an individual...does not deprive the individual of . . . [t]he right to . . . [v]ote."[103] Like Pennsylvania, Indiana law specifies the residency of persons who are committed so that they may be able to vote.[104] In contrast, the Oregon Constitution contains a disenfranchising provision that renders ineligible those specifically adjudicated incompetent to vote.[105]

The statutory practices for purging voters for mental incapacitation similarly vary. States like Missouri and New York provide only the most general standards for disenfranchising persons on account of mental incapacitation, providing that persons who are declared incapacitated may be removed from the rolls.[106]  Similarly, Nevada requires cancellation of a registration when "the insanity or mental incompetence of the person registered is legally established."[107] By contrast, states like Florida indicate that the declaration of mental incapacitation must be specifically with respect to voting before a person can be removed from the voter rolls.[108]

The experience of election officials suggests that the public is not always informed as to the state voting protections for persons perceived to be mentally incapacitated. For example, local officials in Nevada and Ohio reported that they have had removal requests made by individuals relating to another voter on the grounds of mental incapacitation even when there was no court adjudication.[109]

## 2. Sources for Identifying Individuals

In a number of states, like Kentucky,[110] election officials are supposed to receive, pursuant to statute, lists indicating the names of persons who may no longer be eligible to vote on account of mental incapacity from state circuit or probate courts, district courts, or in the case of some states, for example, Washington[111] and New York,[112] the office of the court administrator. These practices are consistent with the policy of not depriving a person of the franchise absent court adjudication.

In practice, however, the lists of those ineligible to vote on account of mental incapacitation do not always come from the court system. At least one locality in Missouri claims to receive incapacitation lists from the state Department of Health and Human Services. One county election official in Ohio reported that local board of elections staff, sent to nursing facilities to help the elderly vote, sometimes determine that a particular person is incapable of voting.

## III.   PROBLEMS WITH PURGES

Our review of state purge practices reveals a number of shortcomings. Across the country, problems occur because the lists used to identify people to be purged are unreliable, purges are done in secret, election officials use bad matching criteria, and purges are conducted with insufficient oversight.

### A. SOURCE LISTS ARE RIDDLED WITH ERRORS

States regularly purge their voter registration lists of ineligible voters or duplicate registration records, but the lists states use as the basis for purging voters are often riddled with errors, which result in the removal of many eligible voters. For example, some states purge voter registration rolls of individuals based on the Social Security Administration's Death Master File,[113] a database of 77 million deaths, dating back to 1937.[114] Unfortunately, even the Social Security Administration admits there are people in its master death index who are not actually dead.[115] The master death index lists the date of death of Hilde Stafford, a Wappingers Falls, NY resident, as June 15, 1997. The 85-year-old's response: "I'm still alive," Stafford said, "I still vote."[116] Indeed, from January 2004 to September 2005, the Social Security Administration had to "resurrect" the records of 23,366 people wrongly added to its Death Master File, meaning that the Administration was presented with irrefutable evidence that it had incorrectly listed 1,100 people a month, or more than 35 a day, as deceased.[117]

> EVEN THE SOCIAL SECURITY ADMINISTRATION ADMITS THERE ARE PEOPLE IN ITS MASTER DEATH INDEX WHO ARE NOT ACTUALLY DEAD.

Lists can be inaccurate because they are overbroad, lack specificity, or simply contain errors. For example, when a member of a household files a change of address for herself in the United States Postal

Service's National Change of Address database, the filing sometimes has the incorrect effect of changing the address of all members of that household.[118] Lists may also fail to contain sufficiently specific identifying information, for example, only names and ages.[119]

Indeed, Florida's infamous purge of people presumed to have felony convictions in 2000 is a prime example of a bad purge based on unreliable underlying lists. The purge list wrongly included some, such as Reverend Willie Dixon, because the list contained inaccurate information — Reverend Dixon had been pardoned of a crime he committed in his youth and had his voting rights restored.[120] In other cases, the list reflected a misunderstanding of what types of crimes resulted in permanent disenfranchisement. Floridian Wallace McDonald was purged from the voter rolls for committing a misdemeanor, even though misdemeanors do not affect one's voting rights.[121] Additionally, the purge wrongly included more than 300 individuals who had conviction dates in the future.[122] Other problems with this purge are addressed below.

## B. PURGES ARE CONDUCTED IN SECRET, WITHOUT NOTICE TO VOTERS

Approximately one week before the Mississippi's March 2008 presidential primary election, the circuit clerk of Madison County, Mississippi discovered that a local election commissioner had purged more than 10,000 residents from the voter registration rolls. County Election Commissioner Sue Sautermeister reportedly accessed the voter registration list from her home computer and purged the voters, including a Republican congressional candidate, his wife and daughter, and some people who had voted as recently as the November 2007 elections.[123] Fortunately, the Secretary of State's office and others recognized that Sautermeister's actions violated the NVRA, and worked to restore the purged voters in time for the March election.[124]

The public — voters, advocates, and others — rarely, if ever, receive meaningful notice of systematic purges. In fact, none of the states we studied have statutes requiring election officials to notify the public in advance of systematic purges. The statutes themselves generally do not provide notice by specifying when systematic purges will or should occur — a typical indication would be that such a purge must take place at least 90 days before an election,[125] but offering no further specificity. Adequate advance notice is essential to prevent erroneous purges. When registrants are properly informed of pending purges, they can act to correct or clarify a situation. Conversely, registrants may be denied due process of law if they are disenfranchised without notice and without a meaningful opportunity to challenge the purge. An Election Day discovery that a purge has taken place is generally too late for the affected voter to cast a ballot that is counted.

Except for registrants believed to have changed addresses, many states do not notify individual registrants believed to be candidates for purges either. When states do give individual notice, they rarely do so for all types of purges. For example, states rarely require notice when a voter is believed to have died. Florida and New York, for instance, statutorily require the provision of notice prior to removal in other circumstances, but appear to omit the notice requirement when the person is believed to be dead.[126] Without such notice, it is far harder to correct errors when the voter has been confused with an unfortunate decedent, or is, in any case, very much alive.

In certain circumstances in some states, officials are statutorily required to notify registrants after they are removed.[127] While that is better than no notice at all, notice after the fact could preclude an erroneously purged voter from being reinstated in time for an upcoming election.

Some state laws require officials to tell registrants with disqualifying convictions before they are purged; indeed, in some states these voters may have more protections than those affected by other types of purges. In Florida and Washington, election officials must give advance warning to voters with disqualifying convictions, and give them an opportunity to respond prior to removal.[128]  Indiana law requires election officials to send a notice to the last known address of all people who are disenfranchised because they are imprisoned no later than the day after the registration has been canceled from the rolls.[129]

With notice provided neither to the public nor to the affected voter, election officials can conduct purges with little outside scrutiny or oversight. The lack of transparency makes voters vulnerable to manipulated or haphazard purges.

## C. BAD "MATCHING" CRITERIA LEAVES VOTERS VULNERABLE TO PURGES

In 2008, the Elections Director for Muscogee County, Georgia, sent out 700 letters to local residents informing them that they were ineligible to vote because they were convicted felons. More than one-third of the voters called to report that there had been a mistake. The purged voters included an octogenarian who insisted she had never even received a parking ticket. According to media reports, the list that went to Muscogee County was generated by a new computer program, and included voters whose names, but not necessarily other information, corresponded or "matched" the names of those with felony convictions.[130]

Largely because of HAVA, states now have computerized statewide voter registration databases. These digital lists have improved the registration process substantially.  But they can also boost the danger of wrongful purging since large numbers of people can now be purged at one time. The inadequacies of existing purge protections are apparent in the use of bad "matching" criteria.

Computerized database "interoperability" allows for election officials to purge registrants because of an apparent "match" of identifying information in a voter registration record to records found in lists of people ineligible to vote for various reasons. However, far too often what appears to be a "match" will actually be the records of two distinct registrants with similar identifying information.  States have failed to implement protections to ensure that eligible voters are not erroneously purged.

There are many reasons states have trouble with matching requirements. Often, state statutes do not often specify what information — what fields and how many — must match to warrant removal of a registrant from the voter registration list.[131] This means that local purging officials use their own, often varied and insufficient, matching standards. For example, two Nevada county election officials reported different match standards for the removal of deceased registrants. One reported that if a person's name and address or age on the report provided by the Department of Vital Statistics matches

the record of a registrant, the official would remove that registrant from the rolls. Another reported that she removed registrants when the date of birth, social security number, and first and last names of deceased people provided by the state's Department of Vital Statistics matched a registrant's record.

States that do set forth requirements for the kind of identifying information elections officials should use frequently require too little information — for example name and date of birth — to be confident that a particular registered voter is the same person listed on a list subject to purging.[132]

Elementary statistics preclude reaching such a conclusion on such little information. In a group of 23 people, it is more likely than not that two will share the same day and month of birth; in a group of 180, it is more likely than not that two will share the same birth date, including year of birth.

Also, in any group of significant size, statistics teaches us that there will be many with the same first and last names — and it is likely that at least two such individuals will be born on the same day.[133] Certain names are more popular in certain years. For example, it would be unsurprising to find two Jessica Smiths born on the same day in 1985, or Lisa Smiths in 1965, or Mildred Smiths in 1925. Likewise, the prevalence of surnames will fluctuate with the immigration patterns of particular ethnicities, which vary from decade to decade.

Purging officials who ignore prefixes or suffixes can increase the likelihood of erroneous matches. A 2005 attempt to identify double voters and duplicate registrations on the New Jersey voter rolls was flawed in this respect: in seeking duplicates, it ignored middle names and suffixes, alleging that the voter records of distinct registrants J.T. Kearns Jr. and J.T. Kearns Sr. belonged to the same individual.[134]

> IN A LARGE GROUP, STATISTICS TEACHES US THAT THERE WILL BE MANY WITH THE SAME FIRST AND LAST NAMES — AND IT IS LIKELY THAT AT LEAST TWO SUCH INDIVIDUALS WILL BE BORN ON THE SAME DAY.

Another problem arises when states do not specify how exacting purging officials must be when comparing fields. For example, in Missouri, where exact matches are not required, one election official reportedly deemed an approximate date of birth (e.g., a difference by one month or one day) as sufficient to establish a match.

In Florida, lists of ineligible people provided to election officials must contain certain identifying information, but the Florida statutes does not establish how or to what extent the information must exactly match that of a registrant before the registrant can be removed.[135] The Florida purge of 2000 discussed above — conservative estimates place the number of wrongly purged voters close to 12,000 — was generated in part by bad matching criteria. Florida registrants were purged from the rolls if, in part, 80 percent of the letters of their last names were the same as those of known felons.[136]



**HOW BAD MATCHING CRITERIA CAN RESULT IN DISENFRANCHISEMENT**

```
    Field   >> FN        >> MN          >> LN      >> D.O.B

>> Name 1: >> John       >> Fitzgerald  >> George  >> 11/20/1976

>> Name 2: >> Johnny     >> Fred        >> Georges >> 11/22/1976


>> Number First Name matching letters = 04 >>
>> Percentage of Last Name = 85.7% >>
>> Result = MATCH >>
```

Source: Gregory Palast, *The Wrong Way to Fix the Vote*, Wash. Post, June 10, 2001, at B01.

Those wrongly purged included Reverend Willie D. Whiting Jr., who under the matching criteria, was considered to be the same person as Willie J. Whiting.[137] These purges were wildly inaccurate. In Miami-Dade County, for example, over half of the African American registrants who appealed their placement on the felon exclusion list were found to be eligible voters.[138]

The matching criteria some states use, however, may not differ greatly from the criteria responsible for the erroneous purge in Florida. To identify possible duplicates, New York requires only that the first three letters of the first name, the first five letters of the last name, and date of birth match, although it will consider other information if it is available.[139]

### D. PURGES ARE CONDUCTED WITH INSUFFICIENT OVERSIGHT

Insufficient oversight permeates the purge process beyond just the issue of matching. For example, state statutes often rely on the discretion of election officials to identify registrants for removal and to initiate removal procedures. Since these statutes rarely tend to specify limitations on the authority of election officials to purge registrants, eligible registrants may be unnecessarily made vulnerable to poor, lax, or irresponsible decision-making.[140]

Insufficient oversight also leaves room for election officials to deviate from what the state law provides. In Washington, the failure to deliver a number of delineated mailings, including precinct reassignment notices, ballot applications, and registration acknowledgment notices, triggers the mailing of address confirmation notices,[141] which then sets in motion the process for removal on account of change of address. Two Washington counties and the Secretary of State, however, reported that address confirmation notices were sent when any mail was returned as undeliverable, not just those delineated in state statute. Although Ohio's election law expressly provides that information regarding the deaths of persons over age 18 must come directly from government health agencies, one local official reported using obituaries as a source to identify deceased registrants, and another official reported a practice of sending inquiries to local funeral homes, a practice also not condoned by statute.[142] An election official in Missouri reported relying on both personal knowledge and obituaries, even though the state election code does not provide for the use of those sources.

The state statutes examined are generally more specific with respect to the amount of discretion election officials have to remove registrants for mental incapacitation than they are with respect to other grounds for removal. In a number of states we examined, a determination to purge someone because of mental incapacitation occurs only if individuals meet certain legal criteria, for example, if they are declared mentally incapacitated with respect to voting.[143] However, elections officials interviewed for this report indicated that in spite of these statutory strictures, they sometimes make their own determinations that particular residents are incapable of voting and deny ballots according to that determination.[144]

## IV.   POLICY RECOMMENDATIONS

While much of election administration is governed by state law, the NVRA and HAVA provide guidance, and in some cases, explicit requirements, for how voters' rights to register and participate in the political process should be protected. Through the NVRA,[145] Congress minimized the states' historical ability to function as a gatekeeper for registration in many ways by requiring states to use and accept the Federal Mail Voter Registration Application.[146] It also made it easier to get on the voter rolls by requiring states to: distribute the Federal Mail Voter Registration Application to public and private entities and voter registration organizations;[147] permit a person to register to vote at the same time as applying for or renewing a driver's license;[148] and provide voter registration services at designated public agencies.[149]

HAVA facilitates voter registration by requiring states to create and maintain a single statewide computerized database of its registered voters, and to coordinate that database with other state databases, including state agency records on felony status[150] and state agency records on death.[151]

WHEN THERE IS A QUESTION, FEDERAL LAW CLEARLY FAVORS THE INCLUSION OF ALL ELIGIBLE REGISTRANTS RATHER THAN THE REMOVAL OF EACH AND EVERY INELIGIBLE REGISTRANT.

The text of these two laws clearly prioritizes the inclusion of all eligible registrants over the removal of each and every ineligible registrant when there is a question. The relevant section in the NVRA begins with "each State shall ensure that any eligible applicant is registered to vote in an election."[152] While the NVRA also requires states to

undertake a program to conduct list maintenance, they must only conduct a "reasonable" effort to purge the names of registrants who are ineligible because they have died or, in certain circumstances, have changed their addresses."[153] The NVRA permits, but does not require, a state to remove a registrant from the official list of eligible voters when a registrant has requested removal or when the law of the state disenfranchises persons on account of criminal conviction or mental incapacity.[154]

HAVA requires that states perform regular "list maintenance" and make "reasonable effort[s]" to ensure that ineligible voters and duplicate records are removed from the voter rolls.[155]  Before addressing purges, HAVA expressly requires states to "ensure that each registered voter appears in the computerized list" and that "only voters who are not registered or who are not eligible to vote are removed from the computerized list."[156]

The existing federal requirements and voter protections do not go far enough, however, to protect voters. Indeed, the NVRA and HAVA do not specifically address most aspects of purge practices. Given the problems identified in our review of state purge practices and statutes, we recommend that states take action to reduce the occurrence of erroneous purges. Below are some recommendations of best practices based on our research.

## A. TRANSPARENCY AND ACCOUNTABILITY FOR PURGES

Purges of voter registration lists should be conducted in a transparent and uniform manner. Any rules or procedures developed with respect to purges should establish accountability at all stages of a purge.

### *1. Develop and publish uniform, non-discriminatory rules for purges.*

State election officials should publicly post consistent and fair rules that describe when, why, how, and by whom a voter registration record can be purged from the voter rolls. States should clearly identify appropriate sources of information on ineligible people and ensure that all localities are conforming to the same standards when relevant.  State election officials should work with local election officials to ensure that state protocols are understood and being followed.

While the state of Ohio is not without its troubles in election administration, it can be commended for publicly posting all directives, advisories, and memoranda related to elections on the Secretary of State's website. Not only does this practice allow local election officials easy access to the documents, it also gives members of the public the opportunity to be informed and educated as to election-related policies. Armed with this knowledge, watchdogs and individuals can help encourage compliance and hold localities accountable for any lapses. Irrespective of the nature of the rules, their transparency is necessary to ensure that they are fair and effective protocols.

### *2. Provide public notice of an impending purge.*

States should provide public notification of any organized county-wide or state-wide purge at least two weeks prior to the purge, and provide a detailed explanation of how that purge is to be conducted.

Before a voter is removed from the voter registration list for any reason, she should be individually notified and given the opportunity to correct any errors or omissions, or demonstrate eligibility.

For most types of purge candidates, New York notifies registrants at risk of being purged 14 days in advance of the purge.[157] Best practices would extend this protection to all individuals who are candidates for purges and give each 30 days to respond before purging them from the voter rolls.

### 3. Develop and publish rules to remedy erroneous inclusion in an impending purge.

The rules and procedures for curing erroneous inclusion in an impending purge should be publicly posted and widely available. Additionally, for registrants who have been purged from the voter registration list, states should explicitly set out means by which they may be restored easily to the voter registration list, without regard to the voter registration deadline.

Pennsylvania, by statute, provides certain registrants both notice of an impending purge and a process for responding to any erroneous purge. Pennsylvania is required to send written notice to each individual whose registration is canceled.[158] Pennsylvania law also offer an additional protection: its statutes specifically contemplate the possibility that a registrant can be incorrectly reported as dead or incorrectly removed on the grounds of death and sets forth a process for addressing these instances.[159] States could and should apply this protection to all classes of purges.

### 4. Do not use failure to vote as a trigger for a purge.

States should ensure that registrants are sent address confirmation notices only in response to an indication that the registrant has moved — not when a registrant has not voted for some time. All voters who have been inactive should be allowed to vote by regular ballot up until they are purged. If an inactive registrant votes during any of the two federal election cycles, they should remain on the voter registration list.

### 5. Develop directives and criteria with respect to who has the authority to purge voters.

No one person, acting alone, should be able to remove names from the list. The removal of any record should require authorization by at least two officials. Good directives for purge authorization minimize opportunities for mischief in the process.

Although majority support from the local election commission is required in Mississippi prior to the removal of any voter from the voter registration list, Madison County election commissioner Sue Sautermeister managed to purge more than 10,000 names from the list, alone, reportedly from her home computer.[160] This example highlights the importance of purge protocols which preclude non-compliance, for example, by designing the database so two people must enter an authorization code before voters can be removed.

*6. Preserve purged voter registration records.*

Statewide voter registration databases should have the design capacity to keep the records of names removed from the voter registration list, including who authorized the removal and on what grounds. Maintenance of this information ensures that the removal of any registrants is properly documented, allows for easier restoration to the list, and assigns accountability for the purge.

All media reports suggest that the Mississippi Secretary of State was successfully able to reinstate the voters purged by the Madison County commissioner.[161] Officials from the Secretary of State's office indicated that the database is designed such that voting records are retained, even when the voter status changes.[162] This design feature of the database makes for easier restoration than when the record is erased.

*7. Make purge lists publicly available.*

The records of voters purged from the list and the reason for removal should be made available for public inspection and copy. If any code is used to identify the reason for removal, a key defining each code symbol shall be made accessible to the public. These lists should also be brought to the polls on Election Day. This allows the public to verify that purged records were removed for fair reasons.

For example, Washington requires the Secretary of State and each county auditor to compile lists of everyone who is removed from the voting rolls and the reason for their removal; these lists must be preserved and kept available for public inspection for at least two years.[163] Additionally, some states allow voters to check their registration status electronically via voter portal functions on their websites that allow voters to check the status of their registration by entering their name and/or other personal information.[164]

While these portals are a useful resource, there are some limits to their helpfulness. For example, not all interfaces inform the voter when the system was last updated. This is problematic because a voter unable to find her registration record might, instead of waiting for the system to be updated, send in an additional form out of desire to ensure that her name make it onto the rolls. Additional registration forms for the same individual increase administrative burdens for the registrar and the likelihood that there are errors in the registration. This problem can be ameliorated simply by noting when the interface was last updated. Another problem with portals is that not everyone will search for their record using the information as exactly listed on their registration application, or an inputting error will prevent a voter from being able to find her registration record. This problem can be corrected by designing the interface such that when a registration record is not found, more information is solicited and then the interface displays to the seeker similar names affiliated with the information provided. Individuals who suspect that they have found their record, but that the record contains misspellings or other errors, can then call the registrar's office and correct the problem.

Notwithstanding the usefulness of portals, they are an inferior substitute to purge lists because portals confine the information provided to a unique voter and do not allow voters and their advocates to observe trends.

*8. Make purge lists available at polling places.*

The records of voters purged from the list over the past two federal election cycles should be made available at the polls so that individuals erroneously purged can be identified and allowed to vote by regular ballot.

### B. STRICT CRITERIA FOR THE DEVELOPMENT OF PURGE LISTS

To ensure a high degree of accuracy, states should use strict criteria for the development of purge lists.  States should establish measures to protect eligible people from erroneous removal from the voter registration list.

*1. Ensure a high degree of certainty that names on a purge list belong there.*

Before purging any name from the voter registration list, authorized officials should have a high degree of certainty that a name belongs to an ineligible person or a duplicate record. Purge lists should be reviewed multiple times to ensure that only ineligible people are included.

*2. Establish strict criteria for matching.*

If purge lists are developed by matching names on the voter registration list to names from other sources, states should specify the information sufficient for attaining a high degree of certainty, including, at a minimum, last name, first name, middle name, prefix, suffix, date of birth, and address or driver's license number. Exact matches of a large number of fields substantially reduce the risk that such purges will erroneously remove eligible people.

As discussed throughout the report, the Florida purge in 2000 underscores the need for strict matching criteria. When records were deemed a match because 80% of the last name was the same, approximately 12,000 people were misidentified as disenfranchised felons.

*3. Audit purge source lists.*

If purge lists are developed by matching names on the voter registration list to names from other sources (for example, criminal conviction lists) the quality and accuracy of the information in these lists should be routinely "audited" or checked. Errors in source lists may lead to the erroneous removal of eligible people. Accordingly, election officials should calibrate reliance based on the known accuracy of the source list.

*4. Monitor duplicate removal procedures.*

States should implement uniform rules and procedures for eliminating duplicate registrations in accordance with HAVA. States should provide clear guidance to election officials with respect to when to flag a possible duplicate registration, how to verify that the registration is in fact duplicative, and when to remove that registration from the voter registration list.

### C. "FAIL-SAFE" PROVISIONS TO PROTECT VOTERS

While inaccurate purges will be mitigated with the implementation of the previously mentioned recommendations, there must still be mechanisms in place to protect voters in the event that a person is incorrectly removed from the voter registration list.

*1. No voter should be turned away from the polls because her name is not found
   on the voter registration list.*

Instead, she should be provided a provisional ballot which will be counted upon determination by election officials that she is eligible to vote. In many states, however, voters have not been given the provisional ballots to which they are entitled.[165]

*2. Election workers should be given clear instructions and adequate training as to
   HAVA's provisional balloting requirements.*

HAVA sets forth a number of requirements with respect to the use of provisional ballots as a fail-safe in the event that a voter's name does not appear on the registration list. Election workers should clearly understand that: no voter should be denied a provisional ballot; all voters must be given the opportunity to substantiate their eligibility to vote; all voters must be informed as to how they can substantiate their eligibility and how they can determine whether a ballot was counted; and the ballots must be counted when a voter confirms that she is eligible and registered to vote.

### D. UNIVERSAL VOTER REGISTRATION

The purge systems currently in place are rife with error and vulnerable to manipulation. Even the best processes for culling the voter rolls will inevitably be imperfect and will erroneously lead to purges of at least some eligible voters.  No eligible citizen should be deprived of the right to vote or put through an obstacle course because of these system malfunctions. Currently, eight states have a backup system in place that will protect the votes of those American caught up in a faulty purge — a system of Election Day registration which enables eligible citizens to register and vote on Election Day (or other days on which voting takes place). Some fear that Election Day registration may overwhelm election officials with a swarm of new and unexpected voters. Although those fears are baseless, they can be completely eliminated if Election Day registration is embedded within a system of universal voter registration in which the government takes the

affirmative responsibility of adding all eligible citizens in its records to the voter lists. Under such a system, there would be far fewer unregistered voters who show up at the polls on Election Day since virtually all eligible citizens would be registered.  In addition to providing a fail-safe for those voters wrongly purged, universal voter registration would increase confidence in the accuracy of voter registration lists since they would have been assembled by election officials rather than by voters.

Universal voter registration has other benefits as well: it would add up to 50 million unregistered Americans to the voter rolls; eliminate the opportunity for partisan or other gamesmanship with voter registration rules and procedures; reduce fears of potential voter fraud, as those derive largely from the potential for fraudulent registrations; and reduce burdens on election officials, who currently devote substantial resources to processing voter registration forms in the months and days leading up to an election. The elements of a system of universal registration are as follows:

- The government takes affirmative responsibility to build clean voter lists consisting of all eligible citizens.

- Each eligible citizen only has to register once within a state; the government ensures that voters stay on the lists when they move within state.

- Election Day registration is available as a fail-safe for those eligible citizens whose names are erroneously not added to or erroneously purged from the voter rolls.

## V.    EMERGING ISSUES WITH RESPECT TO PURGES

There are numerous blemishes in our country's voting history. Since the end of Reconstruction in the late nineteenth century, the voting rights of poor and minority citizens have been restricted through a complex system of laws enacted by state legislatures and intended to limit or ignore the commands of the 14th and 15th Amendments.  In the immediate aftermath of the Civil War and the Reconstruction Amendments, voting among African American men briefly soared in the former slave states.[166] In Louisiana in 1867, for example, approximately 90% of the eligible black male population had registered to vote.[167] However, by the end of the Reconstruction era in 1877, most Southern states had erected significant new barriers to minority voting that re-established control by the white Democratic Party, eliminating these hard-won rights from the vast majority of non-white voters.[168] At first glance, these new voting laws appeared race-neutral, so as not to violate the 14th and 15th Amendments, but in effect they purposely excluded many African Americans from the polls.  Poll taxes, literacy tests, and grandfather clauses, for example, proved to be effective barriers to African American voting.  Though these new restrictions did not, on face, target one group of voters over another, they were discriminatorily applied to African American voters.[169]

Some commentators argue that voter purges are simply a variation of older, more overt methods of disenfranchisement intended to reduce minority participation.[170] Courts have agreed: one court overturned the aforementioned Louisiana purge, finding it "massively discriminatory in

purpose and effect,"[171] and another referred to a Texas statute requiring yearly re-registration as a "direct descendant of the poll tax" that unconstitutionally disenfranchised voters.[172] Although other courts differ on the motivations of purges, they do not deny that their effect can be discriminatory.[173]

Irrespective of whether purging officials act with racial animus, if done without adequate protections, voter purges can have the same disenfranchising effect as the overt voter restrictions used in earlier decades. While new nuances to problematic purges are always emerging, there are at least two relatively new issues for which problems are predictable.

### A. VOTER CAGING

In the later half of the twentieth century, a category of voter purges known as "voter caging" arose as a new tactic to generate lists of voters to be purged from voter registration lists or challenged at the polls. Adapted from a direct mail marketing practice of sorting mailing addresses,[174] voter caging is a controversial method of targeting voters in which non-forwardable mail is sent to registered voters at their voter registration address. Some percentage of that mail is returned to the sender as undeliverable for a variety of reasons, many unrelated to the recipient's status as a voter.[175] On this basis alone, the sender (typically a political operative) uses the list of returned mail to either request election officials to purge the names from the registration list or later challenge the validity of the voter's registration at the polls on Election Day, or both.

> COMPUTERIZED VOTER REGISTRATION LISTS NOW MAKE IT POSSIBLE FOR THOUSANDS OF VOTERS TO BE DISENFRANCHISED WITH A SINGLE KEYSTROKE.

Voter caging has been demonstrated to produce grossly inaccurate results and has threatened to disenfranchise thousands of legitimately registered voters.[176] The history of voter caging is littered with examples of political operatives targeting poor and minority neighborhoods where mail delivery might be less reliable or where voters are believed to be threatening to certain political interests. First uncovered in 1958, the practice has frequently been used to generate purges of thousands of voters. In 1986, for example, the Republican National Committee ("RNC") hired a vendor to conduct a voter caging effort in at least three states, intending to purge voters residing in primarily African American neighborhoods.[177] Unearthed in subsequent litigation, an RNC internal memorandum discussing the targeting of Louisiana voters stated the goal of the voter caging program:

> I would guess that this program will eliminate at least 60-80,000 folks from the rolls . . . If it's a close race, which I'm assuming it is, this could really keep the black vote down considerably.[178]

In more modern times, reports of intended voter caging efforts have surfaced in Ohio, Michigan, and Virginia.[179] Because voters who are victims of caging cannot cast a regular ballot, purges of this kind pose a significant threat to the completeness of voter registration lists, and ultimately, to the legitimacy of our nation's elections.

### B. COMPARING DATABASES WITHIN AND ACROSS STATE LINES

HAVA's requirement of centralized computer voter registration databases has allowed election officials to maintain their voter lists with greater ease as states move away from many separate voter lists, but it also significantly amplifies the potential for large-scale disenfranchisement.[180] Indeed, computerized voter registration lists now make it possible for thousands of voters to be disenfranchised with a single keystroke.

Officials have increasingly focused attention on ways of making state databases "interoperable" with other databases that may contain relevant information on registered voters. "Interoperability" is generally defined as a method of connecting or integrating multiple databases so that changes in one database can be recognized and mirrored in a second database automatically. Seizing on language in HAVA which requires or recommends states to "coordinate" voter registration databases with felony conviction databases, death records, and records of voter moves through state DMV databases,[181] several groups of states have started to compare voter registration lists among each other and initiate voter purges based on matches between records on different states' lists, presuming that individuals who have moved from one state to another have neglected to notify the original state before registering to vote in the new state.[182]

The problem is that there are not always sufficient protections to ensure that the same individuals are identified as opposed to two different individuals with similar identifying information. In 2006, for example, the Kentucky State Board of Elections attempted to match names on its registration database against lists of voters in Tennessee and South Carolina, and purged 8,000 voters as a result of the match — without notifying the voters, and in violation of specific provisions of federal law.

Interoperability technology grants many opportunities to improve election administration and the maintenance of voter registration databases. Yet because of the speed and scale at which information can be shared, interoperability in many ways poses a greater threat to the right to vote than traditional methods of record coordination. State and local officials should strive to use existing computer and electronic technology in a way that enhances the experiences of voters and minimizes disenfranchising errors during the voter registration processes.

## VI.   CONCLUSION

Purges should be a carefully calibrated process designed to account for the complications that invariably arise. Without adequate safeguards, voters experience an unreasonable risk of disenfranchisement, and purges are vulnerable to manipulation. The above recommendations will go far in minimizing unnecessary risks to voters and should be implemented without delay.

## ENDNOTES

1   U.S. Election Assistance Comm'n, *The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 2005-2006: A Report to the 110ᵗʰ Congress,* 50 (2007), *available at* http://www.eac.gov/clearinghouse/docs/the-impact-of-the-national-voter-registration-act-on-federal-elections-2005-2006/attachment_download/file).

2   Ford Fessenden, *Florida List for Purges of Voters Proves Flawed*, N.Y. TIMES, July 10, 2004, at A02.

3   *Id.*

4   *Florida Scraps Flawed Felon Voting List*, ASSOC. PRESS, USA TODAY, July 10, 2004.

5   John Ferro, *Deceased Residents on Statewide Voter List*, POUGHKEEPSIE JOURNAL, Oct. 29, 2006.

6   *Id.*

7   Adam C. Smith, *No Telling if Voter Rolls are Ready for 2004,* ST. PETERSBURG TIMES, Dec. 21, 2003.

8   Gregory Palast, *The Wrong Way To Fix the Vote*, WASH. POST, June 10, 2001, at B1.

9   *Id.*

10  WASH. REV. CODE ANN. § 29A.08.620 (2008).

11  *See United States v. McElveen*, 180 F. Supp. 10, 11-14 (E.D. La. 1960) (ruling that the removals were in violation of the Fifteenth Amendment and that the voters taken off the registration rolls were illegally removed) *Id.* at 14.

12  Marsha Shuler, *Registrar Drops More than 21,000 from Voters Rolls*, THE ADVOCATE, Aug. 17, 2007, at A10.

13  *Id.*

14  Joe Gyan Jr., *Study: N.O. Population Older, Less Poor, City Remains Majority Minority*, THE ADVOCATE, Sept. 13, 2007, at A1 (reporting that New Orleans' black population dropped from 67% before Hurricane Katrina to 58% a year later).

15  Press Release, Secretary of State Jay Dardenne, Voters Registered in Multiple States Should Notify Registrar of Voters to Avoid Being Cancelled (June 15, 2007); Letter from Robert Poche to Voter entitled "Notice:  Letter of Intent to Challenge" (June 15, 2007).  Both documents were attached as exhibits to the Complaint filed in *Segue v. Louisiana*, No. 07-5221, 2007 U.S. Dist. LEXIS 74428 (E.D. La. Oct. 3, 2007) and are available at http://moritzlaw.osu.edu/electionlaw/litigation/documents/exhibit_000.pdf.

16  Although, it was not too long ago in which a political operative involved in a voter caging effort noted, "I would guess that this program will eliminate at least 60-80,000 folks from the rolls. . . . If it's a close race, which I'm assuming it is, this could really keep the black vote down considerably."  *See* Martin Tolchin, G.O.P. Memo Tells of Black Vote Cut, N.Y. TIMES, Oct. 25, 1986, at 7.

17  North Dakota is the only state that does not require voter registration.  Eight other states — Idaho, Maine, Minnesota, Montana, New Hampshire, Wisconsin and Wyoming — have Election Day registration, which allows voters to register and vote on Election Day. *See* IOWA CODE ANN. § 48A.7A (2008); IDAHO CODE ANN. § 34-408A (2008); ME. REV. STAT. ANN. tit. 21-A, § 122.4 (2008); MINN. R. 8200.5100 (2007); MONT. ADMIN. R. 44.3.2015(1)(a) (2008); N.H. REV. STAT. ANN. § 654:7-a (2008); WIS. STAT. ANN. § 6.55 (2007); WYO. STAT. ANN. § 22-3-104(f) (2008).

18  42 U.S.C. § 1973gg-6(b)(1) (2008).

19   *See* 42 U.S.C. § 1973gg-6(d)(1)-(2) (2008).

20   42 U.S.C. § 15483(a)(2)(A)(i) (2008).

21   42 U.S.C. § 15483(a)(4) (2008).

22   Lawrence Norden et. al, Better Ballots 10 (Brennan Center for Justice ed., 2008), *available at* http://www.brennancenter.org/page/-/Democracy/Better%20Ballots.pdf (calculated average of number of voting-age persons who moved between 2000 and 2006, as reported by the U.S. Census Bureau).

23   U.S. Federal Election Commission, *The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 1997-1998: A Report to the 106th Congress* 11 (July 1999), *available at* http://www.eac.gov/files/clearinghouse/reports_surveys/The%20Impact%of%20the%20 NVRA%20of%201993%20on%20Admin%20of%20Elections%20for%2097-98/pdf.

24   U.S. Election Assistance Commission, *The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 2005-2006: A Report to the 110th Congress* 10 (June 2007), *available at* http://www.eac.gov/program-areas/research-resources-and-reports/copy_of_docs/the-impact-of-the-national-voter-registration-act-on-federal-elections-2005-2006/attachment_download/file.

25   Confirmed by interviews with local boards of election officials in Missouri and Washington conducted in 2007.  All interviews are on file at the Brennan Center.

26   Confirmed by interviews with local boards of election officials in Kentucky, Missouri, and Washington conducted in 2007.  All interviews are on file at the Brennan Center.

27   While the NVRA does not specifically raise the issue of duplicates, and instead clarifies that the limitations imposed by the NVRA are not interpretable as precluding "correction of registration records," 42 U.S.C. § 1973gg-6(c)(2)(B)(ii), (2008) HAVA instructs states to conduct list maintenance "in a manner that ensures that . . . duplicate names are eliminated from the computerized list," 42 U.S.C. § 15483(a)(2)(B)(iii).  Some states, like Washington, Wash. Rev. Code Ann. § 29A.08.610 (2008) and Florida, Fla. Stat. Ann. §§ 98.075, 98.073 (2008), have codified some guidance for addressing the problem of duplicate registrations, albeit with varying degrees of helpfulness.  Election statutes in other states, for example, Ohio, and Wisconsin, however, remain silent on the topic of duplicate registration.  A number of local officials indicated that duplicates are generally the result of change of addresses, and as such, their processes for responding to duplicates are essentially the purge practices with respect to change of addresses.

28   The NVRA makes clear that no person is to be removed from the statewide registration list solely on account of failure to vote. 42 U.S.C. § 1973gg-6(b)(2). The NVRA does permit, however, the removal of a name from the registration list if a person does not respond to an address confirmation notice AND does not vote in the subsequent two federal elections. *Id.*

29   A problem occurred in Travis County, Texas whereby individuals believed to have moved because of returned mail were purged despite having voted in at least one of the two subsequent federal elections after the mail was returned.  Any update or information needed by election officials should have occurred while the person was at the polls voting. But for reasons not entirely clear, these voters were purged despite their having voted. *See* Marty Toohey, *Glen Maxey TV Ads Allege Voter Disenfranchisement*, Austin American-Statesman, Feb. 3, 2008.

30   Arkansas, Florida, Maine and Oklahoma all permit the mailing of address confirmation notices in such circumstances. *See* Ark. Const. amend. 51, § 7 (2008); Fla. Stat. § 98.065(4) (2008); Me. Rev. Stat. Ann. tit. 21-A, § 162-A (2008); Okla. Stat. ANN.  tit. 26, § 4-120.2 (2008).

31 Wash. Rev. Code § 29A.08.620 (2008).

32 The section that follows is taken in large part from: Justin Levitt & Andrew Allison, Brennan Ctr. for Justice, A Guide to Voter Caging 3-6 (2007), *available at* http://www.brennancenter.org/dynamic/subpages/download_file_49608.pdf.

33 MCLS § 168.499(3) (2008).

34 *See* Association for Computing Machinery, Statewide Databases of Registered Voters 21 (Feb. 2006), *available at* http://www.acm.org/usacm/PDF/VRD_report.pdf.

35 Nancy Cole & Ellie Lee, Abt Assocs., Inc., Feasibility and Accuracy of Record Linkage to Estimate Multiple Program Participation, Vol. III, Results of Record Linkage 20 (Econ. Research Serv., Elec. Publ'ns from the Food Assistance & Nutrition Research Program, 2004).

36 *See* Nat'l Coalition for the Homeless, State-by-State Chart of Homeless People's Voting Rights (2008), *available at*  http://www.nationalhomeless.org/getinvolved/projects/vote/chart.pdf; *cf.* Sec'y of State of Mo., Mandate for Reform: Election Turmoil in St. Louis, November 7, 2000 27 (2001), *available at* http://bond.senate.gov/mandate.pdf.

37 Jon Margolis, *GOP Sued Over Voters Tactic*, Chi. Tribune, Oct. 8, 1986, at C9. There are many other examples of voters who are temporarily away from their permanent residences. A college student may legally reside at her parents' home address and register to vote there while she is away at school, even though she does not receive mail at her parents' house. A voter may be on an extended vacation and have canceled or transferred mail service, or may have done the same for a temporary job transfer. *See* Steve Suo, *Some Inactive Voters Aren't*, The Oregonian, Aug. 27, 2000, at C1. A citizen living overseas, but registered to vote at her last domestic residence, might also receive no mail at her registered address; for example, mail sent to one such voter in New Hampshire was returned undelivered despite the fact that the voter was eligible to vote. Memorandum from Bud Fitch, Deputy Att'y Gen., N.H. Dep't of Justice, to Robert Boyce, Chairman, N.H. Sen. Internal Aff. Comm., et al. 3 (Apr. 6, 2006), *available at* http://doj.nh.gov/publications/nreleases/pdf/040606wrongful_voting. pdf. Similarly, a member of the armed forces, stationed away from his voting residence, could illegitimately get caught up in the purge process.

38 *More Mail Undelivered*, Ft. Lauderdale Sun-Sentinel, Apr. 16, 1994, at 3A.

39 Felicity Barringer, *Cities Seek Bush's Backing to Avert Census 'Crisis,'* N.Y. Times, Apr. 18, 1990, at A17. *See also, e.g.,* James Barron, *Sign of Approval, But Will It Bring Mail?*, N.Y. Times, Aug. 2, 2004, at B1. Also, in larger group residential homes, the voting residence may quite properly list the street address, but mail will not be delivered without a unit number.

40 *See* Dayne L. Cunningham, *Who Are To Be the Electors? A Reflection on the History of Voter Registration in the United States*, 9 Yale L. & Pol'y Rev. 370, 393-94 & nn.134-35 (1991) (considering studies of the distribution of census surveys and tax forms shows that ineffective mail delivery is more common in poor and minority communities). *Cf.* Chandler Davidson et al., Republican Ballot Security Programs: Vote Protection or Minority Vote Suppression—or Both? 14 (2004), http://www.votelaw.com/blog/blogdocs/GOP_Ballot_Security_Programs.pdf.

41 Larry Sandler & Greg Borowski, *Parties Spar Over City Voter Lists*, Milwaukee J. Sentinel, Oct. 27, 2006, at B1; *see also* Tom Kertscher, *Landlord Sees a Lot in a Name*, Milwaukee J. Sentinel, June 8, 2004 at B5. The same apparently happened to some challenged voters in Louisiana in 1986. *See* Thomas M. Burton, *Democrats Sue Over GOP Bid to Mail Down the Vote*, Chi. Tribune, Sept. 25, 1986, at C1.

42 John Riley, *Complications, Challenges Abound*, Newsday, Oct. 31, 2004, at A37; *see also,* Sandy Theis, *Fraud-busters Busted*, Cleveland Plain Dealer, Oct. 31, 2004, at H1.

43   42 U.S.C. § 1973gg-6(e)(1)(2008). Similarly, a voter who has moved within the same registrar's jurisdiction and congressional district may return to vote at her former polling place without re-registering. 42 U.S.C. § 1973gg-6(e)(2)(A)(i)(2008). Especially in urban areas where there is high mobility within a particular neighborhood, undeliverable mail may simply reflect the recent move of a voter who remains fully eligible to vote.

44   42 U.S.C. § 1973gg-6(2)(A).

45   *See also* Kandiss Crone, *Hosemann: Voter Purge Violated Federal Law*, WLBT News 3, Mar. 5, 2008, http://www.wlbt.com/Global/story.asp?s=7973229; Joint Press Release, Advancement Project, MERA, Michigan NAACP and ACORN, Voting Groups Caution Michigan Election Officials on Eve of National Secretary of State Conference (July 24, 2008), *available at* http://www.democraticunderground.com/discuss/duboard.php?az=view_all&address=159x12543.

46   42 U.S.C. § 1973gg-6(c)(2008).

47   For example, one Kentucky election official reported that the information compiled by the Postal Service does not match the criteria his county uses to identify voters.

48   Indiana and Florida are examples of states that use jury notices and information from other government agencies to identify people who may have moved. Ind. Code Ann. § 3-7-38.2-2(c) (2), (4) (2008) (permitting the use of information from a court regarding jury notices and from the bureau of motor vehicles regarding the surrender of a person's Indiana license for the operation of a motor vehicle to another jurisdiction); Fla. Stat. Ann. § 98.065(4) (2008) (permitting the use of information regarding jury notices signed by a voter and returned to the courts and information from the Department of Highway Safety and Motor Vehicles indicating that the legal address of a registered voter might have changed).

49   Unless another authority is otherwise cited, information in this report about Kentucky was derived from interviews with county clerks conducted in April 2007 and an interview with an official from the State Board of Election conducted in September 2008.  All interviews are on file at the Brennan Center.

50   Nev. Rev. Stat. Ann.  § 293.535 (2008).

51   Mich. Comp. Laws Serv. § 168.509dd(3)(a) (2008) (permitting house-to-house canvasses as part of a program to remove the names of unqualified voters from the voter registration list); Wis. Stat. Ann. § 6.40(2)(b) (2007) (permitting municipal clerks to conduct door-to-door canvasses to identify voters who no longer reside at their registered addresses); 25 Pa. Cons. Stat. Ann. § 1901(b)(2) (2008) (allowing election officials to visit registered addresses to supplement other list maintenance activities); Nev. Rev. Stat. Ann. § 293.530(2) (2008) (permitting county clerks to conduct house-to-house canvasses to investigate registrations). New York's statute provides a variation whereby New York Board of Elections employees are required to conduct a canvass upon written request of any Board of Elections member.  N.Y. Elec. Law § 5-710 (Consol. 2008).

52   This was reported to us by an interviewee from Nevada in March 2007.  Unless another authority is cited, information in this report about Nevada was derived from interviews conducted with county clerks and registrars in March, 2007.

53   Mo. Rev. Stat. § 115.191 (2008).

54   Wash. Rev. Code Ann. § 29A.08.620(1) (2008) (designating voters as inactive if certain pieces of mail are returned to sender as undeliverable); N.Y. Elec. Law § 5-712(5) (Consol. 2008) (designating all voters who are sent an address confirmation notice as inactive); Or. Rev. Stat. § 247.563(3) (2007) (designating the registration of voters sent address confirmation notices as inactive until further determination).

55   Fla. Stat. Ann. § 98.065 (4)(c) (2008) (designating as inactive all voters who have been sent an address confirmation notice and who have not returned the postage prepaid, preaddressed return form

within 30 days or for which an address confirmation notice has been returned as undeliverable.); Mo. Rev. Stat. § 115.193(5) (2008) (designating any voter as an inactive voter if . . . the voter fails to respond to the notice . . . within thirty days after the election authority sends such notice).

56  *See* 950 Mass. Code Regs. 54.04(6) (2008).

57  *Cf.* Or. Rev. Stat. § 254.470(2)(a) (2007) (directing that ballots be sent "to each *active* elector") (emphasis added).

58  42 U.S.C. § 1973gg-6(a)(4)(A) (2008).

59  42 U.S.C. § 15483(a)(2)(A)(ii)(II) (2008).

60  *See e.g.* Fla. Stat. Ann. § 98.093(2)(a) (2008) (requiring the Department of Health to furnish monthly to the department a list containing the name, address, date of birth, date of death, social security number, race, and sex of each deceased person 17 years of age or older.); Ind. Code Ann. § 3-7-45-2.1(b)(1) (2008) (stating that the state department of health provides election officials with information on decedents); N.Y. Elec. Law § 5-708(1) (Consol. 2008) (stating that state health department must deliver to the state board of elections monthly records of the names of all persons of voting age for whom death certificates were issued); Ohio Rev. Code Ann. § 3503.18 (2008) (directing the chief health officer and director of health to file list of decedents with board of elections); 4 Pa. Code § 183.6(d)(1) (2008) (stating that death notices are received from the department of health for the purposes of removing records).

61  *See e.g.*, Mo. Rev. Stat. § 115.195(1) (2008) (state or local registrar of vital statistics provides election officials with a list of decedents); Wash. Rev. Code Ann. § 29A.08.510(1) (2008) (state department of vital statistics provides the list to the Secretary of State).

62  Nevada statute does not specify what state agency provides the names of Nevada residents who have died. In fact, the statute permits local officials to cancel the registration of a voter only if the county clerk "has personal knowledge of the death of the person registered, or if an authenticated certificate of the death of any elector is filed in his office." Nev. Rev. Stat. § 293.540(1) (2008).

63  Wash. Rev. Code Ann. § 29A.08.510(2) (2008) (permitting county auditors to use newspaper obituary articles to cancel a voter's registration). Election officials in three Washington counties confirmed the use of this practice.

64  Wash. Rev. Code Ann. § 29A.08.510(3) (2008).

65  Kentucky permits the removal of a deceased registrant based on the notification of "other reliable sources." Ky. Rev. Stat. Ann. § 116.113(1) (2008). Similarly, Florida law suggests that the state permits removal of deceased registrants based on information from "other sources." Fla. Stat. Ann. § 98.093(3) (2008).

66  For more information on the voting rights of persons with criminal convictions, please visit the Brennan Center's website at: http://www.brennancenter.org/content/section/category/voting_after_criminal_conviction/. *See also* Erika Wood, Restoring the Right to Vote (Brennan Center for Justice ed., 2008) *available at* http://www.brennancenter.org/content/resource/restoring_the_right_to_vote/ for a discussion of why voting rights should be restored to persons with criminal convictions upon release from prison.

67  The thirteen states are Hawaii, Illinois, Indiana, Massachusetts, Michigan, Montana, New Hampshire, North Dakota, Ohio, Oregon, Pennsylvania, Rhode Island, and Utah.

68  Those eight states are Alabama, Arizona, Delaware, Florida, Mississippi, Nevada, Tennessee, and Wyoming.

69  The five states are California, Colorado, Connecticut, New York, and South Dakota.

70  These twenty states are Alaska, Arkansas, Georgia, Idaho, Indiana, Kansas, Louisiana, Maryland, Minnesota, Missouri, Nebraska, New Jersey, New Mexico, North Carolina, Oklahoma, South Carolina, Texas, Washington, West Virginia, Wisconsin. (Nebraska imposes a two-year waiting period after completion of sentence.)

71  42 U.S.C. § 1973gg-6(a)(3)(b) (2008).

72  42 U.S.C. § 15483(a)(2)(A)(ii)(I) (2008).

73  *See* Ky. Rev. Stat. Ann. § 116.113 (2008).

74  *See* Nev. Rev. Stat. Ann. § 293.540(3) (2008) (vesting county clerks with the task of canceling the voter registrations of persons convicted of felonies).

75  Unless otherwise cited, information pertaining to Washington was derived from interviews with four county board of elections officials as well as with staff from the Secretary of State's office conducted during February-April, 2007.  All interviews are on file with the Brennan Center.

76  Fla. Stat. Ann. § 98.075(5) (2008).

77  For example, the Missouri statute specifically requires the county's election authority, which is generally the county auditor, to *remove* registrants reported dead or adjudged incapacitated, but with respect to those with criminal convictions, the statute only directs that the election authority to determine the voting qualifications of those reported convicted or pardoned. Mo. Rev. Stat. § 115.199 (2008). Some local officials in Missouri indicated that it is not their practice to purge persons convicted of disenfranchising crimes from the rolls. Instead, the registrant is placed in a particular status indicating current ineligibility. When the registrant's sentence has been completed, the person's eligibility is reactivated upon a showing of the appropriate documentation. *See* interviews with officials from city boards of election in Missouri conducted in 2007. Also, Pennsylvania, which automatically restores voting rights upon release from prison, does not indicate in its election statutes that individuals are removed because of incarceration — instead, the statute specifies that incarcerated persons are not eligible for absentee ballots. *See* 25 Pa. Cons. Stat. Ann. § 2602(w) (2008).

78  42 U.S.C. §§ 1973gg-6(g)(1), (g)(5) (2008).

79  Fla. Stat. Ann. § 98.093(2)(c)-(f) (2008) (stating that the department of law enforcement, board of executive clemency, and department of corrections, in addition to the U.S. Attorney, will provide information about people with criminal convictions to election officials); Ind. Code Ann. §§ 3-7-46-4.1, 3-7-46-6 (2008) (stating that department of correction and county sheriffs will provide information about people with criminal convictions).

80  For example, in Nevada, the state statute does not specify where the purging officials are to receive information on who has been convicted of disqualifying convictions. Nev. Rev. Stat. Ann. § 293.540(3) (2008). Note, however that Nevada statutes do require the Director of the Department of Corrections to submit monthly to each county clerk in this state a list which provides the name of each persons released from prison by expiration of term of imprisonment during the previous month or who was discharged from parole during the previous month. *See* Nev. Rev. Stat. Ann. § 209.134 (2008).

81  In Nevada, local election officials reported varying practices with respect to the removal of individuals with criminal convictions. One local official reported a practice of obtaining information on disqualifying convictions from jury questionnaires. Another stated that he receives such information from the state Department of Corrections.  A third reported finding information on disqualifying convictions by reviewing courts' judgments.

82  42 U.S.C. § 15483(a)(2)(B)(iii) (2008).

83  Nevada officials offered examples of this assumption.

84  Interview with a county election official in Michigan conducted in September 2008 is on file at the Brennan Center.  A county official in Washington similarly reported that the newer registration record is removed when faced with a known duplicate.

85  *E.g.*, Missouri's statewide voter registration database creates a duplicate list on a monthly basis, and local election officials are responsible for working through the list. (Confirmed by a Missouri county board of election official.) Washington's statewide voter registration list produces a potential duplicate report that local election officials check daily. (Confirmed by a Washington county board of elections official.) The Ohio Secretary of State's office creates a daily duplicate list that is accessed by county elections officials. (Confirmed by a Ohio county board of elections officials.)

86  Mo. Ann. Stat. § 115.165(4) (2008).

87  Unless another authority is otherwise cited, information in this report about Missouri was derived from interviews with staff from the Secretary of State's office, officials from city boards of election, a county election official, and voter protection advocates conducted in 2007.  All interviews are on file with the Brennan Center.

88  *See, e.g.*, Nev. Rev. Stat. Ann. § 293.540(9) (2008) (authorizing removal of duplicate records, but providing no criteria for identifying matching records). *But see* Wash. Rev. Code Ann. § 29A.08.610 (2008) (providing required criteria of identical date of birth, similar names and compared signatures; the only statute of those surveyed to provide such detailed criteria).

89  Unless another otherwise cited, information in this report about Ohio was derived from interviews with county board of elections officials conducted during February-March, 2007.  All interviews are on file with the Brennan Center.

90  A Missouri board of election official attested to the consequences of these periods of heightened activity.

91  This has been the case, for instance, in Missouri and Ohio according to local elections officials there.

92  *See* 42 U.S.C. § 1973gg-6(b)(2) (2008).

93  42 U.S.C. § 1973gg-6(d)(2) (2008).

94  *See, e.g.*, U.S. Election Assistance Commission, *The Impact of the National Voter Registration Act of 1993 on the Administration of Elections for Federal Office 2005-2006*  97 (2007), *available at* http://www.eac.gov/clearinghouse/docs/the-impact-of-the-national-voter-registration-act-on-federal-elections-2005-2006/attachment_download/file.

95  This scenario reportedly occurred in both 2000 and 2006 in precincts in St. Louis, Missouri according to voter protection advocates working in the state.

96  Interviews with voter protection advocates in Missouri conducted in 2007.

97  Ohio Rev. Code Ann. § 3503.21(B) (2008).

98  Ohio boards of election officials confirmed this practice.

99  Wis. Stat. Ann. § 6.50(1)-(3) (2007).  Note that Wisconsin, a state with Election Day registration, is exempt from the NVRA.

100 While the NVRA and some state laws contemplate the removal of persons from voter registration rolls for the reason of mental incapacitation in accordance with state law, our interviews with local officials indicate that very few registrants are purged from voter rolls on this basis.

101 42 U.S.C. § 1973gg-6(a)(3)(b) (2008).

102 25 Pa. Cons. Stat. § 1302(a)(4) (2008).

103 Ind. Code Ann. § 12-26-2-8(1)(F) (2008).

104 *See Id.* § 3-5-5-17 (2008) (specifying that individuals who are committed to institutions for the mentally ill do not gain residency in the precinct of the institution).

105 Or. Const. art. 2, § 3 (2007).

106 Mo. Rev. Stat. §§ 115.199, 115.133 (2) (2008); N.Y. ELEC. LAW § 5-400(1)(c) (Consol. 2008) (cancelling a voter's registration, including the registration of a voter in inactive status, if he has been adjudicated incompetent).

107 Nev. Rev. Stat. Ann. § 293.540(2) (2008).

108 Fla. Stat. Ann. § 98.075(4) (2008). Washington and Ohio similarly indicate that the declaration of mental incapacitation must be specifically with respect to voting to warrant removal from the rolls. Wash. Rev. Code Ann.§ 29A.08.515 (2008) (cancelling the voter registration for one who has been appointed a guardian and adjudicated incompetent with respect to voting); Ohio Rev. Code Ann. § 3503.21(4) (2008) (cancelling a registration based upon adjudication of incompetency of the registered elector for the purpose of voting).

109 Confirmed by interviews with local boards of election officials in Kentucky, Nevada, and Ohio conducted in 2007.  All interviews are on file at the Brennan Center.

110 Ky. Rev. Stat. §116.113(2) (2008) (circuit court). In Florida, Missouri, Nevada, and Ohio, election officials also receive lists of individuals ineligible to vote due to adjudication of mental incapacity from state courts. Fla. Stat. Ann. § 98.093(2)(b) (2008) (circuit court); Mo. Rev. Stat. § 115.195(3) (2008) (probate division of the circuit court); Nev. Rev. Stat. Ann. § 293.542 (2008) (district court); Ohio Rev. Stat. § 3503.18 (2008) (probate judge).

111 Washington's statutes strongly suggest as much. The text of the statute indicates that the computerized statewide voter registration list must be coordinated with other agency databases within the state, including the office of the administrator for the courts. *See* Wash. Rev. Code Ann. § 29A.08.651(5) (2008). However, the statute is not more explicit than the county auditor will receive official notice that a court has imposed a guardianship for an incapacitated person and has determined that the person is incompetent for the purpose of rationally exercising the right to vote. *See Id.* § 29A.08.515.

112 *See* N.Y. Elec. Law §§ 5-614(5), 5-106(6) (Consol. 2008). Note that lists can be also be supplied by any court with jurisdiction over such matters. *Id.* § 5-708(3).

113  This was confirmed by county boards of election officials in Washington; Press Release, Wash. Sec'y of State, State's First Consolidated List of Registered Voters Combats Voter Fraud (Feb. 20, 2007), *available at* http://www.secstate.wa.gov/office/osos_news.aspx?i=FenKyLcm7pnRO0P0kcR9kA%3d%3d.

114 John Ferro, *Deceased Residents on Statewide Voter List*, Poughkeepsie Journal, Oct. 29, 2006.

115 *Id.*

116 *Id.*

117 Office of the Inspector General, Social Security Administration, *Audit Report* 2 (Sept. 2006), *available at* http://www.ssa.gov/oig/ADOBEPDF/A-06-06-26020.pdf.

118 An Ohio election official reported that entire households were removed when an address appeared in the national change of address list on account of one individual associated with that address moving. A

Kentucky county official similarly reported that the National Change of Address database is unreliable and that the postal service is incapable of differentiating which person in a household has moved.

119 An Ohio county official reported that the list he received with the names of deceased residents sometimes contained records without dates of birth, making it hard to use to guide the removal of deceased registrants.  A Nevada official opined that the lists from the Department of Vital Statistics were of an adequate quality, but sometimes hard to use because they provided a decedent's age instead of providing the decedent's date of birth.

120 *Id.*

121 *Id.*

122 Greg Palast, *Ex-Con Game: How Florida's "Felon" Voter-Purge Was Itself Felonious*, Harper's Mag., Mar. 1, 2002, *available at* http://www.ejfi.org/voting/voting-95.htm.

123 Kandiss Crone, *Hosemann: Voter Purge Violated Federal Law*, WLBT News 3, Mar. 5, 2008, http://www.wlbt.com/Global/story.asp?s=7973229; Lucy Weber, *Purged Voting Rolls to be Fixed*, Clarion Ledger, Mar. 6, 2008, at 1A; Lucy Weber, *Thousands of Names Removed From Madison County Voter Rolls*, Clarion Ledger, Mar. 5 2008, at 1; Lucy Weber, *Resignation, Investigation Urged in Madison Co. After Vote-Roll Purge*, Clarion Ledger, Mar. 7, 2007, at 1A; Cheryl Lasseter, *Landrum Asking for Voter-Roll Investigation*, WLBT News 3, Mar. 6, 2008, http://www.wlbt.com/Global/story.asp?s=7977823.

124 Andrew Ujifusa, *Change to Voter Rolls Called Into Question*, Madison County Herald J., Mar. 13, 2008, at 1; Kandiss Crone, *Hosemann: Voter Purge Violated Federal Law*, WLBT News 3, Mar. 5, 2008, http://www.wlbt.com/Global/story.asp?s=7973229; Lucy Weber, *Purged Voting Rolls to be Fixed*, Clarion Ledger, Mar. 6, 2008, at 1A; Lucy Weber, *Thousands of Names Removed From Madison County Voter Rolls*, Clarion Ledger, Mar. 5 2008, at 1; Lucy Weber, *Resignation, Investigation Urged in Madison Co. After Vote-Roll Purge*, Clarion Ledger, Mar. 7, 2007, at 1A; Cheryl Lasseter, *Landrum Asking for Voter-Roll Investigation*, WLBT News 3, Mar. 6, 2008, http://www.wlbt.com/Global/story.asp?s=7977823

125 *See generally* Wash. Rev. Code Ann. § 29A.08.605 (2008); Ky. Rev. Stat. Ann. § 116.112(6) (2008).

126 *See* Fla. Stat. Ann. § 98.075(3) (2008); N.Y. Elec. Law § 5-402(2) (Consol. 2008). Interestingly, Florida's decision to exempt persons presumed deceased from notice requirements is in contrast to its statute squarely requiring that a registrant be given notice and the opportunity to respond to the charge of ineligibility on account of mental incapacitation prior to removal from the registration rolls, Fla. Stat. Ann. § 98.075(4), (7) (2008), protections for which Florida is unique among the states studied in expressly providing.

127 Ind. Code Ann. § 3-7-46-9 (2008) (requiring notification after removal from the registration list, specifically sent to the last known address of all people disenfranchised on account of imprisonment not later than the day following the day that the registration has been canceled from the rolls).

128 Fla. Stat. Ann. § 98.075(7) (2008); Wash. Rev. Code Ann. § 29A.08.520(1) (2008) (requiring that if a registrant is found on a list of felons, the canceling authority must send a notice of the proposed cancellation and an explanation of the requirements for restoring the right to vote once all terms of sentencing have been completed; if the person fails to respond within thirty days, the registration is to be canceled).

129 Ind. Code Ann. § 3-7-46-9 (2008).

130 *See, e.g.*, Alan Riquelmy, *Political Confusion: Removal Letter Confuses Law-Abiding Voters*, Columbus Ledger-Enquirer, April 3, 2008, at A01.

131 *See e.g.*, American Civil Liberties Union, *Purged!: How Flawed and Inconsistent Voting Systems Could Deprive Millions of Americans of the Right to Vote* 8 (2004), *available at* http://tinyurl.com/4vdl75.

132 Election officials in Washington state reported only using a few fields to identify voters for removal.

133 Michael P. McDonald & Justin Levitt, *Seeing Double Voting* 11 (July 1, 2007) (unpublished manuscript, submitted to the 2007 Conference on Empirical Legal Studies), *available at* http://papers.ssrn.com/sol3/Delivery.cfm/SSRN_ID997888_code698321.pdf?abstractid=997888&mirid=1.

134 Brennan Center for Justice at NYU School of Law & Michael McDonald, Preliminary Analysis of the September 15, 2005 Report Submitted to the New Jersey Attorney General by the New Jersey Republican Party 6-7 (2005), *available at* http://www.brennancenter.org/page/-/d/download_file_35010.pdf.

135 Fla. Stat. Ann. § 98.093(2)(a) (2008).

136 Gregory Palast, *The Wrong Way To Fix the Vote*, Wash. Post, June 10, 2001, at B1.

137 *Id.*

138 U.S. Commission on Civil Rights, Voting Irregularities in Florida During the 2000 Presidential Election, Ch. 5 (June 2001) available at http://www.usccr.gov/pubs/vote2000/report/ch5.htm. African Americans constituted over 65% of the voters on the county's exclusion list. Id. Ch. 1, available at http://www.usccr.gov/pubs/vote2000/report/ch1.htm.

139 N.Y. COMP. CODES R. & REGS. tit. 9 § 6217.8 (2008).

140 Missouri's statutes are an example of a wide grant of authority given to election officials regarding the sources and methods permitted to verify a person's address, reading "[t]he election authority may investigate the residence or other qualifications of any voter at any time it deems necessary. The election authority shall investigate material affecting any voter's qualifications brought to its attention from any source, and such investigations shall be conducted in the manner it directs." Mo. Ann. Stat. § 115.191 (2008).

141 Wash. Rev. Code Ann. § 29A.08.620 (2008).

142 Ohio Rev. Code Ann. § 3503.18 (2008).

143 Fla. Stat. Ann. § 98.075(4) (2008). Wash. Rev. Code Ann. § 29A.08.515 (2008) ("Upon receiving official notice that a court has imposed a guardianship for an incapacitated person and has determined that the person is incompetent for the purpose of rationally exercising the right to vote, under chapter 11.88 RCW, if the incapacitated person is a registered voter in the county, the county auditor shall cancel the incapacitated person's voter registration."); Ohio Rev. Code Ann. § 3503.21(4) (2007) ("The adjudication of incompetency of the registered elector for the purpose of voting as provided in section 5122.301 [5122.30.1] of the [Ohio] Revised Code.").

144 Confirmed by county boards of election officials in Ohio.

145 42 U.S.C. § 1973gg *et. seq.*

146 42 U.S.C. § 1973gg-4(a)(1) (2006); *see Charles H. Wesley Educ. Found. v. Cox,* 408 F.3d 1349, 1355 (11th Cir. 2005) (holding that NVRA prohibited state from rejecting voter registration applications postmarked by correct date under state law); *see also Assoc. of Cmty. Organizations for Reform Now v. Edgar,* 56 F.3d 791, 792-3, 795 (7th Cir. 1995) (overriding state law to the extent that it conflicts with the NVRA).

147 42 U.S.C. § 1973gg-4(b) (2006).

148  42 U.S.C. § 1973gg-3(a)(1) (2006).

149  42 U.S.C. § 1973gg-5(a)(2)(A) (2006).

150  42 U.S.C. § 15483(a)(2)(A)(ii)(I) (2006).

151  42 U.S.C. § 15483(a)(2)(A)(ii)(II) (2006).

152  42 U.S.C. § 1973gg-6(a)(1) (2006) (enumeration omitted) (emphasis added).

153  42 U.S.C. § 1973gg-6(a)(4)(A)-(B) (2006).

154  42 U.S.C. § 1973gg-6(a)(3)(A)-(B) (2006).

155  42 U.S.C. § 15483(a)(4)(A) & (B)(2)(iii) (2006).

156  *Id.* § 15483(a)(2)(B)(i) & (ii).

157  The New York Board of Elections must notify voters by mail and wait 14 days prior to cancellation for any reason except request to be removed (which includes registering in another state), death, or inactivity for two general elections. N.Y. ELECTION LAW § 5-402(2) (McKinney 2007).

158  25 PA. CONS. STAT. ANN. § 1203(h) (2006).

159  *Id.* § 1505(c) (2006).

160  Lucy Weber, *Purged Voter Rolls To Be Fixed*, CLARION-LEDGER, Mar. 6, 2008 at 1A.

161  Lucy Weber, *Resignation, Investigation Urged in Madison Co. After Voter-Roll Purge*, MADISON COUNTY JOURNAL, Mar.7, 2008 at 1; Andrew Ujifusa, *Change to Voter Rolls Called Into Question*, MADISON COUNTY JOURNAL, Mar. 13, 2008 at 1.

162  *See* Letter from C. Delbert Hosemann, Mississippi Secretary of State (Mar. 31, 2008) (on file with the Brennan Center).  A later conversation with staff from the Secretary of State's office clarified this feature.

163  WASH. REV. CODE § 29A.08.770 (2008). Other states grant the public varying degrees of access to records of voters purged. *See, e.g.*, FLA. STAT. ANN. § 98.045(2)-(3) (2007); MICH. COMP. LAWS § 168.514 (2007); WIS. STAT. §§ 6.33, 6.36 (2007).

164  Of the twelve states covered in this report, for example, the following ten provide readily accessible voter portal functions on their websites: Indiana, Kentucky, Michigan, Missouri, Nevada, New York, Ohio, Pennsylvania, Washington, and Wisconsin.

165  *See, e.g.*, People for the American Way et al., *Shattering the Myth: An Initial Snapshot of Voter Disenfranchisement in the 2004 Elections*, at 8 (December 2004); Demos, *Continuing Failures in "Fail-Safe" Voting*, at 4 (Dec. 2005), *available at* http://www.demos-usa.org/pubs/December%20PB%20 Report%20Draft%2015.pdf.

166  *See* ROBERT M. GOLDMAN, RECONSTRUCTION AND BLACK SUFFRAGE: LOSING THE VOTE IN REESE AND CRUIKSHANK 13 (Univ. Press of Kansas 2001).

167  CHANDLER DAVIDSON AND BERNARD GROFMAN EDS., QUIET REVOLUTION IN THE SOUTH 104 (Princeton Univ. Press 1994).

168  *Id.* at 105.

169  *Id.*

170  Steve Barber *et al.*, *The Purging of Empowerment: Voter Purge Laws and the Voting Rights Act*, 23 HARV. C.R.-C.L. L. REV. 483, 486-87 (1988).

171  *United States v. McElveen*, 180 F.Supp. 10, 11-13 (E.D. La. 1960) (finding that purges for errors in voter registration affected 85% of black voters and only 0.07% of white voters, despite similar errors among half of white registrations).

172  *Beare v. Smith*, 321 F. Supp. 1100, 1103 (S.D. Tex. 1971), *aff 'd sub nom. Beare v. Briscoe*, 498 F.2d 244, 248 (5th Cir. 1974).

173  *See, e.g.*, *Toney v. White*, 488 F.2d 310, 312 (5th Cir. 1973) (voiding the results of an election on the ground that a voter purge conducted 30 days prior to the election had a racially discriminatory effect, notwithstanding a lack of evidence suggesting the purge was racially motivated).

174  Paul Kiel, TPMMuckraker.com, Cage Match: Did Griffin Try to Disenfranchise African American Voters in 2004?, http://www.tpmmuckraker.com/archives/003523.php (June 26, 2007).

175  Justin Levitt & Andrew Allison, A Guide to Voter Caging 3-6 (Brennan Center for Justice ed., 2007) *available at* http://www.brennancenter.org/dynamic/subpages/download_file_49608.pdf.

176  *Id.*

177  Chandler Davidson et al., Center for Voting Rights and Protection, Republican Ballot Security Programs: Vote Protection or Minority Vote Suppression or Both? 17 (2004) *available at* http://www.votelaw.com/blog/blogdocs/GOP_Ballot_Security_Programs.pdf.

178  Martin Tolchin, *G.O.P. Memo Tells of Black Vote Cut*, N.Y. Times, Oct. 25, 1986, at 7.

179  *See 2004 Presidential Election: Hearing Before the Committee on House Judiciary Subcommittee on Constitution, Civil Rights, and Civil Liberties*, (2008) (statement of J. Gerald Hebert, Executive Director & Director of Litigation, The Campaign Legal Center); Chandler Davidson *et al.*, *Election Law: Vote Caging as a Republican Ballot Security Technique*, 34 Wm. Mitchell L. Rev. 533, 561 (2008); Teresa James, *Caging Democracy: A 50-Year History of Partisan Challenges to Minority Voters* 16-20, 22 (Project Vote ed., Sept. 2007), *available at* http://projectvote.org/index.php?id=355.

180  At the time of publication, most, but not all, states have implemented centralized statewide voter registration databases. For example, California's VoteCal system is not expected to be fully deployed until 2010. *See* http://www.sos.ca.gov/elections/bidders_library/q_a_rfp_regional_co.pdf.

181  42 U.S.C. § 15483(1)(A)(iv); *see also* §§ 15483(2)(A)(ii)(I)-(II), (5)(B)(i)-(ii).

182  *See* Memorandum of Understanding Between the States of Missouri, Iowa, Nebraska and Kansas for the Improvement of Election Administration, December 2005, *available at* http://www.sos.mo.gov/elections/2005-12-11_MO-KS-IA-NE-MemorandumOfUnderstanding.pdf; *see also* Sean Greene, *Midwest Voter Registration Data-Sharing Project Moves Forward: Kansas Leads Groups of States Crosschecking Information; Advocates Voice Concern*, electionline.org, Dec. 13, 2007, http://www.pewcenteronthestates.org/report_detail.aspx?id=33612; M. Mindy Moretti, *Western States Contemplate Voter Information Sharing: Interstate Cooperation Has Promise and Pitfalls, Officials Decide*, electionline.org, Feb. 2, 2006, http://www.pewcenteronthestates.org/report_detail.aspx?id=33814.

## SELECTED BRENNAN CENTER PUBLICATIONS

*Better Ballots*

LAWRENCE NORDEN, ET. AL

*A Return to Common Sense: Seven Bold Ways to Revitalize Democracy*

MICHAEL WALDMAN

(Sourcebooks 2008)

*Fair Courts: Setting Recusal Standards*

JAMES SAMPLE

*Eligible for Justice: Guidelines for Appointing Defense Counsel*

THE ACCESS TO JUSTICE PROJECT

*A Citizen's Guide to Redistricting*

JUSTIN LEVITT

*Restoring the Right to Vote*

ERIKA WOOD

*Twelve Steps to Restore Checks and Balances*

AZIZ Z. HUQ

*The Truth About Voter Fraud*

JUSTIN LEVITT

*Access to Justice: Opening the Courthouse Door*

DAVID UDELL AND REBEKAH DILLER

*An Agenda for Election Reform*

WENDY WEISER AND JONAH GOLDMAN

For more information, please visit

www.brennancenter.org or call 212-998-6730

# BRENNAN
# CENTER
# FOR JUSTICE

*At New York University School of Law*

161 Avenue of the Americas, 12th Floor
New York, NY 10013
212.998.6730
www.brennancenter.org