# Exhibit 25

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION


GEORGIA REPUBLICAN PARTY,     :
INC.,et al.,                  :
                              :
     Plaintiffs,              :
                              :
  v.                          :
                              :   CASE NUMBER 2:20-CV-00135
BRAD RAFFENSPERGER, et al.,   :
                              :
     Defendants.              :
_____

                    <u>MOTION HEARING</u>
                (Via video conferencing)


        BEFORE THE HONORABLE LISA GODBEY WOOD
                United States Courthouse
                 801 Gloucester Street
                  Brunswick, Georgia
                  December 18, 2020

COURT REPORTER:  Victoria L. Root, CCR
                 United States Court Reporter
                 Post Office Box 10552
                 Savannah, Georgia  31412
                 (912) 650-4066

2

1                      A P P E A R A N C E S

2

3    FOR PLAINTIFFS:

4            GEORGE N. MEROS, JR., Esquire
             BENJAMIN J. GIBSON, Esquire
5            JEFFREY S. YORK, Esquire
             LEAH J. ZAMMIT, Esquire
6            Shutts & Bowen, LLP
             215 South Monroe Street, Suite 804
7            Tallahassee, Florida  32301
             (850) 241-1717
8

9

     FOR BRAD RAFFENSPERGER AND REBECCA SULLIVAN:
10

             RUSSELL DAVID WILLARD, Esquire
11           Office of the Attorney General
             40 Capitol Square, S.W.
12           Atlanta, Georgia  30334
             (404) 656-7298
13

14

     FOR DEFENDANTS PATRICIA GIBSON, PATRICIA FEATHERSTONE,
15   KEITH RUSTIN, TOMMY CLARK, AND SANDRA DEAN:

16           RICHARD K. STRICKLAND, Esquire
             BRADLEY J. WATKINS, Esquire
17           AARON W. MUMFORD, Esquire
             Brown, Readdick, Bumgartner, Carter,
18           Strickland & Watkins, LLP
             5 Glynn Avenue
19           Brunswick, Georgia  31520
             (912) 264-8544
20

21

22

23

24

25

3

1              A P P E A R A N C E S (Continued)

2


3    FOR DEFENDANTS THOMAS MAHONEY, III; MARY ANN HEIMES;
     MALINDA HODGE; ANTWAN LANG; AND DEBBIE RAUERS:

4
            BENJAMIN M. PERKINS, Esquire
5           Oliver Maner, LLP
            218 West State Street
6           Savannah, Georgia  31401
            (912) 236-3311

7
            JENNIFER R. DAVENPORT, Esquire
8           Chatham County Attorney's Office
            124 Bull Street
9           Savannah, Georgia  31401
            (912) 652-7881

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                         I N D E X

2

3                                                    Page

4    PROCEEDINGS.  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .     5

5

     ARGUMENT

6

         By Mr. Meros .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .     8
7        By Mr. Willard .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .    33
         By Mr. Perkins .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .    53
8        By Mr. Watkins .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .    55
         By Mr. Meros .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .    61

9

10   CERTIFICATE OF REPORTER.  .  .  .  .  .  .  .  .  .  .  .  .  .  .     77

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

5

1                    P R O C E E D I N G S

2          (Call to order at 3:22 p.m.)

3              THE COURT:  Good afternoon.

4              IN UNISON:  Good afternoon, Judge.

5              THE COURT:  All right, Ms. Sharp.  Call the next

6    case.

7              COURT CLERK:  Georgia Republican Party, Incorporated;

8    National Republican Senatorial Committee; Perdue for Senate;

9    Georgians for Kelly Loeffler; Bethany Ballard; Ashley Gilles;

10   Jean Seaver v. Brad Raffensperger; Rebecca Sullivan;

11   David Worley; Matthew Mashburn; Anh Le; Patricia Gibson;

12   Patricia Featherstone; Keith Rustin; Tommy Clark; Sandra Dean;

13   Thomas Mahoney; Marianne Heimes; Malinda Hodge; Antwan Lang;

14   Debbie Rauers.

15             On behalf of the plaintiffs is Leah Zammit,

16   Benjamin Gibson, George Meros, Jeffrey York.  On behalf of

17   Defendant Brad Raffensperger and Rebecca Sullivan is

18   Russell Willard.  On behalf of Defendants Patricia Gibson,

19   Patricia Featherstone, Keith Rustin, Tommy Clark, Sandra Dean

20   is Rick Strickland, Brad Watkins, and Aaron Mumford.  On behalf

21   of Defendants Thomas Mahoney, Marianne Heimes, Malinda Hodge,

22   Antwan Lang, and Debbie Rauers is Benjamin Perkins and

23   Jennifer Davenport.

24             THE COURT:  All right.  Ready for the plaintiffs?

25             MR. MEROS:  Yes, Your Honor.

6

1          THE COURT:  And ready for the Defense?

2          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

3          UNIDENTIFIED SPEAKER:  Yes.

4          THE COURT:  All right.

5          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

6          THE COURT:  Counsel, let me make some preliminary

7     remarks and observations.  First, let me apprise everybody that

8     we do have a public line available.  Of course, if there

9     weren't COVID, we would all be here together.  But because of

10    the challenges of the current epidemic, it's hard for people

11    that are located outside of this area to get here in a hurry,

12    and it's also not safe for us to all be packed into one

13    courtroom at this time, so I did allow the hearing to proceed

14    by way of video conference so we could get to it in a timely

15    fashion.

16          Obviously, time is important.  And the plaintiffs

17    filed their complaint and petitioned for emergency relief last

18    night, Thursday night.  The defendants, I believe, have just

19    received word about the suit today.

20          And the reason that I'm jumping on it and hearing it

21    today is because contained in the request for emergency relief

22    is an allegation that, come Monday, the way that the election

23    will be handled moves into somewhat of a different phase in

24    that by 8:00 on Monday, the various boards of election will

25    have the permission to separate the outer envelope of mail-in

7

1    ballots from the inner envelope of mail-in ballots.  And the

2    plaintiffs allege that that would then challenge any kind of

3    identification of ballots that they claim would be improper.

4    And that explains the timing of why I'm having the hearing on

5    such a quick basis.

6            By way of further preliminaries, we have some

7    attorneys who are local who are here in the courtroom.  We have

8    some members of the public, citizens, who, of course, are

9    entitled to listen and observe.  We also, because of COVID,

10   have a public line open so that anybody from anywhere can dial

11   in to that public line and listen to the proceedings.

12           For the benefit of those of you who are participating

13   remotely either by audio or by video, whether you're a member

14   of the bar or not, I need to remind everybody who is

15   participating that it is improper to make any kind of video or

16   audio recording of this event.  And you need to be careful to

17   listen closely.  We, of course, have a court reporter who is

18   also appearing remotely who will make an official record of the

19   proceeding that will be available at some point in the future.

20           I have had the opportunity to read and review the

21   complaint, the request for emergency relief, and the affidavits

22   that were submitted, including one that was just submitted, in

23   preparation for the hearing.

24           I am going to give each side, the plaintiffs and the

25   defendants, an hour for their presentation.  If you discover

1   some compelling need to go beyond that, I'll hear you on that,

2   but just, in your mind, order things accordingly.

3           It is extraordinary relief that the plaintiffs seek,

4   and it is their burden to show that they're entitled to that

5   relief, so we'll, of course, begin with the plaintiffs.

6           Who will begin that presentation on behalf of the

7   plaintiffs?

8           MR. MEROS:  Your Honor, this is George Meros on

9   behalf of the plaintiffs.  I will be arguing today.

10          THE COURT:  All right.  Mr. Meros, if you will begin

11  and get us started.

12          MR. MEROS:  Thank you, Your Honor, and may it please

13  the Court.  My name is George Meros of Shutts & Bowen law firm

14  in Tallahassee.  And as I stated before, also Mr. York and

15  Ms. Zammit of Shutts & Bowen are present as well.

16          The very good news, Your Honor, is I feel certain I

17  will not take up an hour of your time, but this is -- excuse

18  me -- this is an important matter --

19          THE COURT:  And --

20          MR. MEROS:  -- but one that --

21          THE COURT:  Let me interject because you're correct,

22  Mr. Meros.  It is very important.  And that's why we're jumping

23  on it.  And, you know, ordinarily, people get 15, 20 minutes

24  for oral argument, but I'm having an extended amount of time

25  because it is very important for everybody in our state and in

9

1     the country.  So with that, if you'll continue.

2              MR. MEROS:  Yes, yes.  Thank you very much.

3              And what Your Honor said before in the introduction

4     about what our papers say and why immediate and extraordinary

5     relief is necessary is right on point.

6              As of Monday, if there is not a temporary injunction

7     or if there is not some interim relief to preserve or segregate

8     ballots without depriving anyone of the right to vote, without

9     imposing additional burdens on the right to vote, but to have

10    a process by which this Court or others could determine whether

11    there will be violations of the federal Voting Rights Act --

12    and if, in fact, there is not a suspension of some proceedings

13    and the ability to get this put to rest -- and in large part,

14    this is an issue of law.

15             Without that, there will be ballots that will be

16    separated from envelopes where the envelopes would identify

17    individuals where the ballots would not.  And once that occurs,

18    with the commingling, it will be impossible to determine

19    whether a given individual voted in a senatorial election in

20    another state and is poised to or did thereafter vote in a

21    senator- -- in a federal election in Georgia involving two

22    senate races.  And that's why this -- is one of the many

23    reasons why this is so important.

24             We have facts that we have shown in the declaration,

25    and we have Mr. Morgan, the declarant, who is available to

1    testify -- and I will not repeat that testimony but to the

2    extent that we can offer either additional information or

3    answer questions for the Court or the others.  But we have

4    facts to show that there is a pool of individuals that have,

5    in fact, voted in elections in other states involving senate

6    elections.

7            We also have information that many of those same

8    individuals have either filed a change of address or have,

9    in fact, registered to vote in Georgia in an election involving

10   senate races -- two senate races.  And if, in fact -- and so

11   what we have here is we have individuals that are poised to

12   vote in this election despite the fact that they have already

13   voted for a senator or senators in another state.

14           And I say this is an issue of law because the federal

15   Voting Rights Act -- and Section 11(a) and 11(e) of the Voting

16   Rights Act make it clear, in our view, that voting twice in

17   senate elections is unlawful.  And there must be a remedy for

18   that because the whole purpose of the Voting Rights Act and

19   that prohibition is to make sure that individuals have an equal

20   right to the electoral process.  And if some are voting twice,

21   that is not the same, and that is unlawful as compared to those

22   who have voted once.  And Mr. Morgan can describe in some more

23   detail why that's so important.

24           I also want to make it very clear that this is not

25   something that should burden the state officials and the county

1   officials in a process by which there can be some opportunity

2   to understand what has happened and what might well happen in

3   this runoff election.  We are only asking for the ability to

4   have segregated, preserved votes, both absentee and in-person

5   voting preserved so that there can be some identification and

6   some ability to determine the extent to which this unlawful

7   conduct has occurred or might well occur.

8           And it is not our intent to try to dictate to this

9   Court or to the state and local officials how, necessarily, to

10  do that.  We want this to be a smooth process.  We want it to

11  be a process that is one simply to understand the lawfulness of

12  certain conduct and to -- and if there are violations, to make

13  sure that those innocent who have voted for a single senator

14  that -- for a single senator have the same right to vote as

15  those who have voted unlawfully.  And so what -- however that

16  is -- and however best to do that, we certainly respect the

17  expertise and the right of local and state officials to try to

18  determine how to do that.

19          And, again, it is so important to understand that

20  none of this would impact or implicate a burden on the right of

21  voters to elect their candidate of choice.  To the contrary, it

22  will preserve the right of people to the franchise that have

23  followed the law.

24          And we don't know, now, how many people that might

25  be.  We do know that there are individuals that -- or that

there are numbers of people that Mr. Morgan has identified that will only increase in number and probably substantially so. And if nothing were to occur before Monday, then that number of people who potentially have a vote -- have voted in violation of the Voting Rights Act, there would be no remedy for that. It would be irreparable.  The right to cast a vote as -- the same as other people lawfully would be lost.  And that, we suggest, cannot fairly occur under federal law or the Constitution.

Now, there might be individuals in the state government that suggest that they don't have any authority or power over this.  We respectfully suggest that, in fact, the Secretary of State has the power to issue bulletins to county boards about how to handle ballots cast by new registrants and the state board of elections has the ability to issue an emergency rule requiring suggestion of these ballots.

And we also believe it clear that county boards would be required to comply with regulations issued by the state board of elections.  And, again, we would not dictate how that is done.  We would be more than happy to try to facilitate and to make it easier to have that done if that is the best way to go about it.

The -- with regard to the -- then --

And you have this, Your Honor, and you've already read it, so I'm not going to go through all of the elements of

1    a TRO or a preliminary injunction.

2            But in looking at this, it's hard to imagine how the

3    public interest could be more greatly impacted than one person

4    walking into a voting booth and electing for a senate -- a

5    senator and another person to have walked into that same voting

6    booth and voted for a senator and then gone on to another state

7    in another voting booth and voting for another senator.  That

8    is fundamentally an issue of fairness.  It's an issue of

9    federal law.  And it's an issue of the right to the same vote

10   as other people have.

11           I think it equally clear that the facts will show

12   that we're entitled to relief.  And the numbers strongly

13   suggest already that there is a high likelihood that the

14   thousands and thousands of individuals who have registered to

15   vote in Georgia and -- between 4- and 500 individuals that we

16   know have voted in other states and have registered in Georgia

17   in this runoff election suggests very strongly that it is no

18   accident that this will be one individual that has voted twice

19   in senate elections.

20           So we think the facts will clearly show that.  We

21   think the law -- and this case cries out for a declaratory

22   judgment.  Opponents will say that somehow the federal Voting

23   Rights Act does not protect against this conduct.  We think

24   that is clearly not the case.  But we do not shy away.  We

25   embrace the right to have that issue decided.

14

1          If the Court were to decide that there's no cause of

2   action for voting for two different senators with others voting

3   for one, so be it.  If, in fact, there is an evaluation of

4   ballots in a process where there is some suspended period of

5   time where these things can be assessed and there are no

6   violations, so be it.

7          But if there are those that have violated the law,

8   then that means there are others that have had their right to

9   vote diminished and diluted.

10         Now, if Your Honor -- Mr. Mark Morgan, the declarant

11   in Exhibit H, I believe, of the memorandum, is here and

12   available if the Court would like.  I don't want to be

13   repetitive.  I would ask Mr. Morgan, if you would like it, to

14   briefly describe his declaration.  But to -- to the extent that

15   he can expand on additional information that may be upcoming

16   and available in short order, we would be happy to provide that

17   and offer Mr. Morgan up for any questions the Court or others

18   might have.

19         THE COURT:  Well, let me ask some legal questions to

20   you, Mr. Meros.  I do have the affiant's affidavits.  And if

21   there are other reasons that you want to develop, you can have

22   him sworn and walk him through questions.  But at this point,

23   I don't have any questions for him.  I do have some questions

24   for you.

25         And so let me start in on the standing part.  And I'm

15

1   looking at the redressability prong of standing.  And so what

2   you've just shared with me -- and it is contained, of course,

3   in your filings -- is that what you'd like is to have -- the

4   people who registered and voted in other states and then seek

5   to vote in Georgia, have their ballots set aside.

6           How does that redress the rights that you seek to

7   vindicate?

8           MR. MEROS:  The way we believe that works is exactly

9   what you said, and that is if there is a potential of people

10  violating federal law, then you set that aside until you can

11  assess and determine whether the violations are real, whether

12  they are substantial, or whether they are minimal.

13          THE COURT:  Wait.  But you make --

14          MR. MEROS:  And the Court has --

15          THE COURT:  Wait, wait.  You're making a little bit

16  of a leap that I'm asking you to draw a line.  I understand

17  you're asking to set those ballots aside -- not separate them

18  from the outer envelope, just set those aside, and then you're

19  leaping to say that they could then be referred to as possible

20  violations of what you allege would be a violation of federal

21  law.

22          But the fact that someone voted in California, for

23  example, in the November election and the fact that they then

24  voted in Georgia for the January election doesn't prove that

25  they voted for Senate twice.

16

1        MR. MEROS:  Well, that would be an issue -- I'm
2   sorry.  Go ahead.

3        THE COURT:  That would be an issue.  And you can vote
4   for a president and all the other offices that might have been
5   on the ballot in California and not have voted for a senate
6   [sic] in California.  And likewise, come January, you could
7   show up and vote for the public service commission that is
8   on the ballot as well as the U.S. Senate.  You could actually
9   have voted in California and Georgia and never voted for a
10  U.S. senator.

11       And so even if we pull those ballots aside and set
12  them in their own private stack, just having them there and you
13  some day doing actually more than setting them aside but
14  investigating these people, even if you investigated them and
15  even if you came to me and said, "I found Mr. Joe Smith voted
16  in California and voted in Georgia, so throw this ballot out,"
17  you haven't shown anything.  You haven't shown he's voted for
18  Senate twice, once, or zero.

19       In fact, wouldn't we have to rip open that ballot and
20  look at his private vote to tell that?

21       MR. MEROS:  You know, I would -- we certainly
22  wouldn't need to rip open the ballot.  And it is an issue of
23  fact as to what occurred if we have proof of that, if we have
24  those materials preserved.

25       THE COURT:  But right now, all that you have is --

17

1  you know, you -- remember, this is an extraordinary relief that

2  you seek, and so you can't just come in here and say, "You

3  know, we think this might have happened" or "We think this

4  might be about to happen" or "We think the chances are even

5  that this is going to happen."

6         You've got an extraordinary burden to bear.  And

7  right now, at best, all you can say is somebody voted for

8  something in one state, and somebody wants to vote for

9  something else in another state, but I don't see any proof that

10 anybody voted for a senator twice.

11        MR. MEROS:  Well, Your Honor, I respectfully suggest

12 that there is more than just an even chance that there have

13 been some that have voted or will vote twice.

14        THE COURT:  What's --

15        MR. MEROS:  We have --

16        THE COURT:  Wait, wait.  Show me in the record.

17        Where is that proof?

18        MR. MEROS:  We have information that approximately

19 between 400 and 500 individuals, which will likely be a larger

20 number, that have voted in -- for -- in Senate elections in

21 states outside of Georgia.  We also know --

22        THE COURT:  Do you have the names of the people that

23 cast their ballots for senators or just the names of people

24 that cast a ballot for something in California or other states?

25        MR. MEROS:  That cast a ballot in a federal election

18

1    that involved senatorial candidates.

2         THE COURT:  Well, then understand how we started the

3    question off.  You understand that in really every ballot that

4    had a U.S. senator on it, it also had a -- like, a president on

5    it, too.  And the fact that you turned in a ballot doesn't

6    prove that you voted for a senator.

7         MR. MEROS:  By itself, it may not under certain

8    circumstances.

9         THE COURT:  So --

10        MR. MEROS:  It may --

11        THE COURT:  -- other than -- understand that that

12   is what Aristotelian logic tells us, that by itself, it proves

13   nothing.

14        So other than that, what do you have?  Because I

15   agree.  By itself, it proves nothing.  So what do you have

16   other than that?

17        MR. MEROS:  We have the fact that these individuals

18   that have cast votes in federal elections have now registered

19   to vote for a runoff election that involves two senators and a

20   public service commission race.

21        I would suggest, Your Honor, that that by itself is

22   enough to raise a concern and more probable than not that there

23   are individuals that have voted in a race involving senatorial

24   elections that have raced to Georgia to register to vote in an

25   election that effectively only involves two senators and a PSC

19

1    race.  Now --

2                THE COURT:  And I do --

3                MR. MEROS:  -- might that be --

4                THE COURT:  I do understand that's your suggestion.

5         Let me take you sort of to the next level, and that

6    is:  If I agreed with you that you suggesting that is enough

7    for this extraordinary relief and had every board of election

8    in the state do something different, handle in-person voters

9    that come next week different than all the in-person voters

10   that have already come under the system that has been applied

11   for days now, even if I did that, even if we set those people

12   aside in a special area, their ballots, how, then, would you

13   prove that they voted for the Senate in the states they

14   originated from?

15               MR. MEROS:  I think Mr. Morgan can talk about what

16   he has been able to find in other states.  We cannot say that

17   every individual voted for a senator in the state of Kansas --

18               THE COURT:  How many --

19               MR. MEROS:  -- because --

20               THE COURT:  -- would you -- how many could you say,

21   "I know this person marked the bubble for Senate?"  How could

22   you?

23               MR. MEROS:  Well, we could undergo -- we could have

24   some sort of process by which there would be some -- once

25   we understand --

20

```
1          THE COURT:  What I'm asking you -- what would that
2   process be?
3          MR. MEROS:  That process could be an inquiry to
4   individuals that's saying, "We are aware, John Smith, that you
5   voted in Kansas.  We are aware that" --
6          THE COURT:  You would do --
7          MR. MEROS:  -- "you voted" --
8          THE COURT:  Would you conduct that?
9          MR. MEROS:  No, no.  Certainly not, no.  That --
10         THE COURT:  Who would?  The --
11         MR. MEROS:  -- in fact, could be --
12         THE COURT:  -- secretary of state?
13         MR. MEROS:  -- supervisor of elections.  It could be
14  any number of ways.
15         THE COURT:  So they'd call these voters in one at a
16  time and interrogate them?
17         MR. MEROS:  Not -- no.  It would not necessarily be
18  a confrontational process.  It could be one that is respectful.
19  It could be one where there are misunderstandings.  But it
20  all -- but that would be a way to make sure -- on the other
21  hand, Your Honor, what you have here is if you, in fact, have
22  individuals that have done that, by virtue of there being less
23  than perfect evidence, we have no evidence at all by virtue of
24  time -- by virtue of the way -- and no remedy under the federal
25  Voting Rights Act.
```

1      All we're asking for here is some means by which

2  there could be questioning, there could be a request for an

3  explanation or something.

4      THE COURT:  But as part of that respectful

5  questioning that you would do of these voters that we pull

6  aside, would you have to ask them --

7      MR. MEROS:  Ask them what?

8      THE COURT:  -- about their vote?

9      MR. MEROS:  Oh, no.

10     THE COURT:  You would have to ask them --

11     MR. MEROS:  You'd say --

12     THE COURT:  -- "Did you vote for Senate?"

13     MR. MEROS:  -- "Did you vote for a senator in a

14  senate election in Kansas in -- on X date?  Did you thereafter

15  register to vote in Georgia, and did you vote for a senator in

16  Georgia?"  That simple.

17     But -- that simple but also that extraordinarily

18  important because we do know that there is a probability

19  that the majority of individuals that came into Georgia and

20  registered to vote in a runoff election in a high-profile,

21  highly publicized senatorial election is probable, I would

22  suggest, if not almost clear that many of those individuals

23  voted for senators and not just the PSC.

24     THE COURT:  How would you --

25     MR. MEROS:  And --

22

1            THE COURT:  -- convince me that -- setting up here

2    sort of in midstream, that sort of system wouldn't serve to

3    suppress some voters when they understand that you can come and

4    vote, but, you know, even if you hadn't cast a ballot for a

5    senator before, we're going to set you aside, and we're going

6    to ask you some respectful questions later?

7            How is that not, A, confusing to some voters and, B,

8    perhaps a cause of suppression for others?

9            MR. MEROS:  And I would suggest to you, Your Honor,

10   that we have tried very carefully not to do anything that would

11   suggest suppression of the vote.  Everyone --

12           THE COURT:  Right.

13           MR. MEROS:  -- can and will be able to vote.

14           THE COURT:  But --

15           MR. MEROS:  And, in fact, in -- people have voted in

16   absentee balloting.

17           And, also, in early in-person voting, there has been

18   substantial voting in that area, many of which we probably do

19   not have the ability to determine that there was an invalid

20   vote because it's too late.  With regard to absentee ballots

21   and absentee voting, that has already occurred.

22           The vote would not be suppressed.  Everyone will be

23   able to vote.  And it's not unlike provisional voting where

24   you can have a vote that, for whatever reason, is provisional,

25   whether it's because of, you know, a mark that, you know, is

1    unclear or whatever, but that is put aside for a while, that

2    will be counted if it's legally appropriate.

3           And that's -- those are the ways that (audio

4    disruption) Georgia and the officials in the state of Georgia

5    know how to do those things and know how to do them well.  And

6    so those -- many, many of those votes have already gone out

7    there.  There's no -- and time and time again, we have tried to

8    make it clear that there is no one at risk here other than --

9    if, in fact, there is proof that there was double voting, then

10   that vote would be invalidated just like sometimes provisional

11   votes are (audio disruption).

12           But, again, without that effort, then we won't know.

13   And those hundreds and on their way to thousands of individuals

14   that raced to Georgia in a -- in an election relating to

15   high-profile senators, we won't have any remedy to make sure

16   that every voter has one vote and not two votes.

17           And --

18           THE COURT:  Let me --

19           MR. MEROS:  -- if I may --

20           THE COURT:  Let me continue with some standing

21   questions.

22           MR. MEROS:  Sure.

23           THE COURT:  I know you're familiar and well-versed

24   with the recent cases that have come out across the state of

25   Georgia.  And with regard to standing, some of the causes of

1     action that have been put forth before, we've -- we have heard

2     from the Eleventh Circuit about those.

3             And, you know, when there are multiple cases filed,

4     the respective sides sort of learn as they go, and -- but when

5     I look at who the plaintiffs are in this suit, it's my

6     understanding that neither David Perdue or Kelly Loeffler

7     themselves -- neither of those candidates is a plaintiff.

8     They're -- they do have committees that are.

9             Is that correct?

10            MR. MEROS:  Yes, Your Honor.  They do have

11    committees.  They are not individual plaintiffs.

12            THE COURT:  All right.  Tell me:  With regard -- I

13    know you're traveling under -- and at least one of your causes

14    of action -- Section 11 of the Voting Rights Act.  Tell me

15    how that -- the injury that you're putting forth squares with

16    Section 11.  It seems almost the flip side of it.

17            Here, we would have more votes being counted rather

18    than what the language of Section 11 seems geared toward, and

19    that is a willful failure or refusal to tabulate votes.

20            MR. MEROS:  Right.  It's not just a willful refusal.

21    It is -- it also -- in 11(a) and 11(e) and other provisions, it

22    talks about making sure that the vote (audio interruption) --

23    heard something.

24            THE COURT:  Well, let -- yeah.  11(a) says "No person

25    acting under color of law shall fail or refuse to permit any

25

1    person to vote who is entitled to vote under any provision of

2    Chapter 103 to 107" (audio interruption) --

3            I'm sorry.  Someone is -- all right.

4            -- "or who is otherwise qualified to vote, or

5    willfully fail or refuse to tabulate (audio disruption), count,

6    and report such person's vote."

7            So how does (a) apply to you?

8            MR. MEROS:  Because, in fact, if a person can vote

9    lawfully in only one senate race (audio disruption) and others

10   can violate that provision -- I'm sorry.

11           THE COURT REPORTER:  Excuse me, Judge.  There's

12   somebody not muted, and they're having a conversation.  I can

13   hear them.

14           THE COURT:  Thank you.

15           Let me remind everybody who's participating on the

16   phone it -- it is an important hearing.  And whatever

17   conversation you're having may be important, too, but you need

18   to have it separately from this one.  To do otherwise, we're

19   going to have to start excluding lines so that we can hear the

20   people who are speaking.  I'm sure you understand, and I'll

21   appreciate your compliance with that request.

22           All right.  Mr. Meros, if you'll continue.

23           MR. MEROS:  Yes, Your Honor.

24           Under Section 11(a), it says, like you said, "No

25   person acting under color of law shall fairly refuse to permit

26

1   any person to vote who is entitled to vote," and it goes on.

2   But then "vote" is defined -- is a defined term that means

3   "all action necessary to make a vote effective in any primary,

4   special, or general election, including, but not limited to

5   registration," and it goes on from there.

6          And under Gray v. Maine, a vote is not properly

7   counted or included in appropriate totals, in violation of

8   Section 11(a), where it is diluted by the counting of unlawful

9   ballots.

10          And so what we're saying is the right to cast a vote

11   is a vote that is not diluted; that a vote is the same as

12   others, not that I get one vote and someone else gets two

13   votes.

14          THE COURT:  Well, how is that not a generalized harm

15   that every other voter suffers?  How is that --

16          MR. MEROS:  Generalized harm?

17          THE COURT:  Yeah.  How would that be a particularized

18   harm?

19          MR. MEROS:  Well, I -- anytime you have senatorial

20   elections and one person can, in our view, violate the Voting

21   Rights Act and vote twice and another individual votes once,

22   that's a very particular harm.

23          And also, Your Honor, election -- Section 11(e) of

24   the Voting Rights Act specifically talks about voting in --

25   voting more than once.  And here's -- and with regard to

27

1  standing and redressability, we suggest that, clearly, there's

2  standing here and redressability because we have the real

3  potential -- and we believe the preponderance of the evidence

4  will show that it's a violation --

5        THE COURT:  Wait.  Before you jump on, how do you get

6  around Wood v. Raffensperger as far as your dilution goes?

7        MR. MEROS:  I'm sorry.  Wood -- the Wood case --

8        THE COURT:  Right.

9        MR. MEROS:  -- is that -- well, Your Honor --

10        THE COURT:  How do you get around the dilution

11  conclusions reached by the Eleventh Circuit?

12        MR. MEROS:  Well, the -- that case talks about vote

13  dilution, and that case, you know, definitely has some bearing

14  on whether you call something vote dilution.  But here, we have

15  a -- an express violation of the federal Voting Rights Act, and

16  that's redressable by invalidating that vote.

17        And that's not -- and, certainly, the Court -- and

18  that case does not suggest that there is no remedy for a

19  violation of federal law, and there are -- its specific private

20  causes of action under the Voting Rights Act and the Schwier

21  case, Schwier v. Cox, makes that very clear.

22        And, also, if I may, Your Honor, I mean, the Wood

23  case does talk about dilution, but it talks about it, in the

24  Eleventh Circuit, as a generalized harm.  Here, there's nothing

25  generalized about an individual that has voted twice in

28

1    violation of federal law vis-à-vis other people.  That's --

2              THE COURT:  But it's --

3              MR. MEROS:  That is --

4              THE COURT:  -- harm to the plaintiffs.

5         How does that harm the individual plaintiffs in any

6    more particular way?

7              MR. MEROS:  Well, the plaintiffs here have dedicated

8    millions of dollars toward electing senators.  They have

9    diverted resources to doing that, to getting out the right to

10   vote, to doing all the things that you do in particularly

11   critical elections.

12        But what they do not do themselves, you know, what

13   they have not urged others to do, which some others have urged

14   others to do it, is to violate the Voting Rights Act in

15   preserving the right to vote.  If there's only one senatorial

16   election versus two, then there's less power with that person

17   that votes once rather than a person that votes twice.

18        It's just like Northern Florida in the old days where

19   there was no redistricting and a given elector had 10 times the

20   power than an elector in South Florida had.  And that's exactly

21   the sort of thing that is a critical element of vote dilution.

22   And 11(e) was designed to protect lawful voters like ours and

23   like the three individual plaintiffs.

24             THE COURT:  Let me walk you through -- we've

25   concentrated time on standing, and I appreciate your responses.

29

1   Let me hear you weigh in with regard -- if you were to be found

2   to have had proper standing for some or all of your causes of

3   action, then that would lead us to look at the four prongs that

4   you need to show to succeed on your TRO.  Walk me through how

5   you would do so.

6              MR. MEROS:  Well, as I said before, if you're talking

7   about the prongs of the TRO, I would suggest it's absolutely

8   in the public interest to make sure that voting is not done in

9   violation of federal law and that Congress has made it clear

10   that that is unlawful.  And so the public interest is

11   extraordinarily substantial.

12              And balance that against the individuals and the

13   redressability.  Once again, we're talking about preserving

14   their rights to vote, not diminishing them, not -- you know,

15   not abusing the voters but making their right to vote vis-à-vis

16   those who might have violated the law.

17              Now, success on the merits, I think, Your Honor,

18   again that is something that we certainly think we will be able

19   to actually prove by a preponderance of the evidence.  And we

20   have already shown what is -- what are extraordinary

21   circumstances.

22              And if, in fact, it ends up that there is no

23   violation or a small number of violations, then there will be

24   no harm to anyone, and there will be a benefit to the public

25   to know what has happened or not happened.  But in an election

1   of this importance and the proof that we have to this extent

2   and -- you know, and the federal Voting Rights Act, it would

3   be --

4            THE COURT:  As to the -- I'm sorry.  As to the people

5   that voted in person last week, there is nothing that can be

6   done about their votes; is that correct?

7            MR. MEROS:  That's correct, Your Honor, yeah.  And

8   keep in mind, Your Honor, that the reason -- frankly, the

9   reason for that is because there was no way to find out and

10  to understand any earlier than December 8th the number of

11  registered voters -- new registered voters and then the ability

12  to ascertain:  Are there -- in this extraordinary amount of

13  voters, is --

14           THE COURT:  Why does --

15           MR. MEROS:  -- some of that --

16           THE COURT:  Why does knowing the actual number

17  matter?

18           MR. MEROS:  Well, it matters -- let's say that there

19  was 200,000 individuals that registered to vote or that had --

20           THE COURT:  If there were 100 and the race was that

21  close, it would matter; right?  If there were 10 and the race

22  was that close, it would matter.  Or if there's 100,000 and the

23  race were that close, it would matter.

24           It's hard to know what number matters until the

25  election happens, and -- so why not, just knowing what the

31

1   system was from the get-go, make the motion?

2           MR. MEROS:  You needed the names of the voters and

3   the registrants to understand and to determine whether there

4   was any potential problem.

5           THE COURT:  Don't -- you need those names in order

6   for the board of elections to follow through on any TRO that I

7   issued, but you wouldn't need the names to make the motion that

8   you made.

9           MR. MEROS:  I -- no.  Respectfully, I don't believe

10  so, Your Honor.  I think the names --

11          THE COURT:  I still don't know the names.  They're

12  not before me.  You didn't need those to bring this motion.

13  You haven't ever submitted them.

14          MR. MEROS:  Well, we have Mr. Morgan here.  But the

15  names of the registrants are -- it's public information, and

16  that's the information from which one can discern whether

17  there's been voting in another state, and it would not be --

18          THE COURT:  Before -- but before any voting ever

19  began, you were aware that people were allowed to register here

20  who had voted elsewhere, and so why not make that -- just like

21  right now, you've come forth.  You still don't know the exact

22  number, and you still don't know all the names, but you've come

23  forth.  Why not do it even earlier?  I don't -- I'm still not

24  sure about the timing.

25          MR. MEROS:  (Audio disturbance) not be right,

1    Your Honor.  We would be faced with very strong opposition

2    about "How dare you look into things that show nothing."

3            And we, being in a position, through no fault of our

4    own, not having the information until 10 days ago and, in fact,

5    without knowing that there would ultimately be a runoff -- the

6    fact that there was a runoff happened.  Who knows whether

7    anyone would have guessed or determined that there was going to

8    be a runoff.

9            But all of those things -- I would suggest to you,

10   Your Honor, that we would be accused of guessing and being

11   irresponsible to do the sorts of things you're concerned about.

12   And that's exactly what we chose not to do, not to be

13   irresponsible; to get the information as quickly as we possibly

14   could; and to provide a remedy that is not a burden on the

15   voter, that is an effort to implement the federal Voting Rights

16   Act.

17           THE COURT:  All right.  Well, if you'd like to

18   reserve the balance of your time for a reply, this would

19   probably be a natural break if -- but, Mr. Meros, is that --

20   would you like to do that?

21           MR. MEROS:  Yes, Your Honor.

22           THE COURT:  All right.  Then let me turn to the

23   Defense to hear their response.

24           Who was going to take the lead in that regard?

25           MR. WILLARD:  Your Honor, I believe that would be me.

1  This is Mr. Willard -- Russ Willard from the State Attorney
2  General's Office.  I'm here on behalf of Secretary of State
3  Raffensperger and the vice chair of the state election board,
4  Rebecca Sullivan.

5  THE COURT:  All right.  Mr. Willard, if you'll
6  proceed.

7  MR. WILLARD:  Your Honor, I apologize at the outset.
8  To borrow from Benjamin Franklin, my remarks -- or I apologize
9  for the length of my remarks.  I didn't have time to make them
10  shorter due to the lack of notice.

11  Along those lines, I'd like to address a couple of
12  elephants in the room.  And I'm not referring to the animal
13  symbol or the plaintiffs.  Mr. Gibson and Ms. Zammit, who are
14  on the pleadings in this case, are also on the pleadings in a
15  state court action brought by the RNC and the state GOP against
16  my clients.

17  There were a total of seven e-mails exchanged between
18  us yesterday afternoon.  We had a 9 a.m. conference call this
19  morning.  At no time during any of that period of time did
20  they indicate that they had filed suit against my clients, were
21  seeking a TRO or an emergency hearing, so we didn't find out
22  about this until 10:00 this morning.

23  In addition, Plaintiffs, especially the state
24  Republican Party, appear to be engaging in a little bit of
25  forum shopping.  Since the start of the November 2020 general

1    election cycle, the plaintiffs have filed suit in the Northern

2    District in Atlanta, Fulton Superior Court; and one of their

3    affiliate identities filed in the Augusta Division of the

4    Southern District yesterday.

5           We have four more divisions than the Southern

6    District to go, I guess, as they continue their quest to find a

7    judge who will rule in their favor, and we haven't even begun

8    exploring the Middle District yet.

9           But that dovetails into a discussion about what is

10   missing from the plaintiffs' complaint, and that is any

11   reference to the Northern District case of NAACP v. Kemp,

12   1:17-CV-1397, that was heard in 2017 in front of Judge Batten.

13   That is the consent decree that the State is operating under.

14   That is what requires us to accept voter registrations until

15   December 7th.

16          And yet Plaintiffs failed to bring this case in the

17   Northern District.  They failed to identify this as a related

18   case.  They have also failed to name or notice any of

19   the parties to that order or decree.  There are at least

20   six separate entities that were party to that decree on the

21   plaintiffs' side, none of whom have been noticed of this

22   hearing or this case by the plaintiffs.

23          So what is this case?  It is a belated attempt to

24   change the rules of the game as the clock strikes midnight or,

25   as Judge Batten found yesterday in dismissing a similar belated

1    attack on Georgia's election framework, is an attack on the

2    election that is already underway and at halftime.

3            Why must their claims --

4            THE COURT:  I think --

5            MR. WILLARD:  -- be denied?

6            THE COURT:  -- that was -- I think that was

7    Judge Hall that used that --

8            MR. WILLARD:  I'm sorry.

9            THE COURT:  -- analogy, but --

10           MR. WILLARD:  Yes.  Judge Batten was earlier this

11   year.

12           THE COURT:  Right.

13           MR. WILLARD:  I apologize.  That was Judge --

14           THE COURT:  I think Judge --

15           MR. WILLARD:  -- Hall.

16           THE COURT:  -- Judge Hall used the football analogy.

17   Judge Batten --

18           MR. WILLARD:  He did.

19           THE COURT:  -- used all those.

20           But nevertheless, continue.

21           MR. WILLARD:  Well -- and I was there, Your Honor.

22   I have been standing in front of the fire hose now for a couple

23   of months.  I was the one who argued it in front of Judge Hall,

24   and I extend my deepest apologies for not remembering that that

25   was Judge Hall yesterday morning.

36

1          But Plaintiffs' claim must fail because they lack
2     standing.  They've waited too close to the election to bring
3     the claim.  They've waited too long after their claim allegedly
4     accrued to seek relief.  They've failed to state a viable claim
5     for relief, and they have failed to satisfy any of the prongs
6     for granting PI relief.
7          In terms of standing, the plaintiffs have asserted
8     the same arguments and submitted the same affidavits in the
9     Northern District case that was held in front of Judge Ross
10    yesterday afternoon, and she found that they lacked standing to
11    proceed.
12          THE COURT:  And tell me about that case.
13          Was -- Section 11, Voting Rights Act, was that set
14    forth in that suit as well?
15          MR. WILLARD:  They did not articulate a VRA claim in
16    that suit, Your Honor, but they have asserted, as the basis for
17    the standing, that the VRA criminal provision gives them some
18    cause of action and ability to bring the claim.  And they --
19          THE COURT:  And just --
20          MR. WILLARD:  -- cite to --
21          THE COURT:  -- to clarify -- wait.  Just to clarify,
22    in the case with Judge Ross also, or you're referring back to
23    the case --
24          MR. WILLARD:  No.
25          THE COURT:  -- on --

1          MR. WILLARD:  I'm back to this case, Your Honor.

2    They --

3          THE COURT:  Okay.

4          MR. WILLARD:  -- did not assert Voting Rights Act

5    claims in the case in front of Judge Ross, but they were

6    claiming the same sort of generalized injury, and they utilized

7    the same declarations to form the basis for that injury.

8          The plaintiffs argue that FEC v. Akins gives them

9    standing, but it does not.  As the Third Circuit held recently

10   in the Bognet case, Akins involved a statutory right not at

11   issue in a vote dilution claim under equal protection.

12   Instead, the plaintiffs here have only a generalized grievance

13   about government and vote dilution and how the State organizes

14   its electoral framework.

15         As the Court noted, 2 weeks ago, we got a decision

16   in the Wood v. Raffensperger case out of the Eleventh Circuit.

17   Plaintiffs failed to address that case at all in their

18   briefing.  Here, as in Wood, the plaintiffs' interests are no

19   different than any other person interested in ensuring the

20   proper administration of an election.

21         As the Eleventh Circuit found, while vote dilution is

22   a basis for standing in the limited context of gerrymandering

23   or malapportionment, cases where voters are harmed compared to

24   irrationally favored voters from other districts -- and that is

25   what Plaintiffs' counsel was referring to when he talked about

38

the fact that Northern District Florida voters used to have a
greater weight of their votes than voters in the rest of
Florida.  It was the same thing as under the old county unit --

THE COURT:  County unit --

MR. WILLARD:  -- system in Georgia.

THE COURT:  -- system.  Right, right.

MR. WILLARD:  What the Eleventh Circuit expressly
found is that it does not convey standing in a case where votes
may be improperly counted.  Vote dilution is not an appropriate
basis for standing in that context.  And that is just a
2-week-old decision at this point.

Plaintiffs also, as the Court correctly noted, lacked
Article III standing under Jacobson because there is no
traceability or redressability based on the named defendants.
I'm stealing a little bit of the thunder from the Chatham
County attorney, but I think you're going to hear from him
shortly that they have named the wrong board in Chatham County.
I think they've submitted an affidavit to that effect.

But in terms of the state defendants, who -- I am
here appearing on behalf of Secretary Raffensperger and
Ms. Sullivan -- there is no traceability of any decision on the
part of county election officials to register someone to vote
in the January 5th runoff or to count their ballot for the
January 5th runoff, so there is no traceability back to my
clients.

39

1           In addition, there is no redressability as to my

2    clients because, as the court found in Jacobson, federal courts

3    lack the ability to, in effect, take a named defendant and

4    direct them to go out and direct somebody else who isn't

5    named in the litigation to do something, in this case, the

6    158 unnamed county election entities that are not a party to

7    this case.

8           In addition to an absolute lack of standing to

9    proceed with their claims --

10          THE COURT:  Let me --

11          MR. WILLARD:  -- Plaintiffs --

12          THE COURT:  Before --

13          MR. WILLARD:  -- cannot --

14          THE COURT:  Wait.

15          MR. WILLARD:  -- get around --

16          THE COURT:  Whoa, whoa, whoa.  Before we get on to --

17          MR. WILLARD:  That's fine.

18          THE COURT:  -- nonstanding, let me back you up

19   because I think, although Wood v. Raffensperger may not be

20   highlighted in their pleadings, obviously, they're aware of it.

21   And this case, unlike Raffensperger, unlike the case that

22   Judge Ross dealt with, unlike the case that Judge Hall dealt

23   with, this one does contain a Voting Rights Act allegation that

24   hasn't been addressed head-on by Raffensperger or the Ross case

25   or the Hall case.

1          And so what the plaintiffs are saying in this case is

2   Congress has elevated their specific allegations to a concrete

3   individualized harm.  They're saying that Section 11, in fact,

4   statutorily confers the kind of standing that they're urging in

5   this case.

6          How do you respond to that?

7          MR. WILLARD:  Their only apparent authority for that

8   statement in regards to saying that they have a private right

9   of action under a federal criminal statute in terms of double

10  voting is a reference to the Schwier case.  And the Schwier

11  case was not a federal criminal statute giving somebody a

12  private right of action.  The Schwier case involved the federal

13  Privacy Act where you had a private right of action and an

14  interest at the individualized level to bring those claims.

15         There is nothing in the criminal provisions of the

16  Voting Rights Act that confers a private right of action on any

17  of these plaintiffs or establishes more than a generalized

18  grievance against the administration of the State's election

19  framework.  Additionally, their Voting Rights Act analysis

20  is nonsensical at best.  They argue that you cannot vote in a

21  runoff when you have already voted in an election.

22         Now, first, there is no reference in the Voting

23  Rights Act prohibitions to a runoff election.  There is a

24  reference in the national -- in the NVRA legislation to a

25  runoff election, so, clearly, Congress understands how to

1   include a runoff election when it wants to.

2          But to read the prohibition as Plaintiffs ask this

3   Court to read it is to say that if you have cast a ballot in

4   one of the VRA-contemplated elections on the front end under

5   the Voting Rights Act, you cannot then subsequently vote in a

6   runoff even though there is no reference in runoff within that

7   provision of the VRA.

8          And what that means -- if you actually take their

9   argument at its word, it means that the only eligible voters

10  who can vote in the January 5th runoff are individuals who were

11  registered to vote prior to November 4th and failed to cast

12  a ballot in any state, including Georgia, in the November 3rd

13  general election, and that is absurd --

14          THE COURT:  What they --

15          MR. WILLARD:  -- because --

16          THE COURT:  -- may --

17          MR. WILLARD:  -- individuals --

18          THE COURT:  Wait, wait, wait.  I understand why that

19  would be hard to swallow.

20          But what they may say is, "No.  What we're trying

21  to prohibit is for you to be able to cast a vote for one given

22  seat in one state and then come in and cast a vote for a

23  different senate seat in this state."

24          MR. WILLARD:  And, Your Honor, that is a very

25  compelling policy argument, but it's just that.  It's a policy

42

1    argument that finds no textual support in the Voting Rights Act

2    or in the State's framework.  You can argue that it is good

3    policy to prevent somebody who votes in North Carolina -- I

4    think North Carolina had a senate election.  I'm not sure.

5         But let's say they cast an in-person or an early vote

6    on November 3rd and their boss walks in on November 4th and

7    says, "I'm moving you to Atlanta, and you've got to be in

8    Atlanta by November 10th" and they arrive in Atlanta and they

9    say, "I want to have a voice in who is going to represent me in

10   Congress.  I'm going to go out and register to vote, and I'm

11   going to cast my ballot for the January 5th runoff election so

12   I can have a say in who my elected state senator is going to

13   be."

14        It's an interesting policy discussion as to whether

15   they should be permitted to cast a ballot or not, but

16   Plaintiffs cannot cite to any express statutory prohibition

17   against doing that.  What they have attempted to say is that

18   the Voting Rights Act criminal provision which has that

19   prohibition against casting multiple votes at an election

20   prohibits that.

21        But the only way to read that is the contorted

22   reading that says the runoff election is the same as the

23   general election, which then gets you to the point of if I went

24   in person and cast a ballot on November 3rd in Georgia and

25   voted in Georgia's two senatorial elections, under Plaintiffs'

1    reading, I cannot then go out and vote in the January 5th

2    runoff because I will have already cast a ballot at the general

3    election, if you're going to read the general election and the

4    runoff as two different elections that I cannot have cast

5    ballots in.

6            Your Honor, I'm happy to entertain any additional

7    questions you have about standing at this point.  Otherwise,

8    I'm going to move on to the fact that Plaintiffs have waited

9    too long and too close to the election to bring their claims.

10           THE COURT:  All right.  Proceed.

11           MR. WILLARD:  Plaintiffs cannot get around Purcell

12   abstention and the Purcell principle as articulated by the

13   Eleventh Circuit.  We are now not on the eve of the election,

14   as the Court in Purcell admonished Courts to refrain from

15   interfering in the election framework.

16           We are, as the Eleventh Circuit found in the

17   New Georgia Project v. Raffensperger case 2 months ago, in the

18   midst of an election.  We have already had, as of 2 days ago,

19   400,000 absentee votes that were already mailed out, returned,

20   and have been accepted by county election officials.  We have

21   had another quarter of a million voters who have already cast

22   in-person ballots in the state of Georgia.  We are halfway over

23   the waterfall of the election.  We are seeing the tidal pool at

24   the bottom.

25           Plaintiffs have waited too close to that election.

44

They filed suit -- I don't know whether they filed before the
courthouse closed yesterday or after hours, but they filed
their lawsuit on December 17th.  Plaintiffs have been chirping
in the ear, both publicly and privately, of my clients
since November 4th about this issue, but they wait until
December 17th to bring this issue before the Court.

        There is -- as the Court admonished in Purcell, as
the Eleventh Circuit has held as recently as the New Georgia
Project case, the attendant harm with judicial interference in
the election framework at this point goes to the fact that
election officials will have to be notified.  The public will
have to be notified.  Training will have to be conducted.
Procedural safeguards will have to be enacted on the fly.  All
of that is why the Supreme Court and the Eleventh Circuit have
set down bright-line rules and told the judicial branch to stay
out of the election framework once the electoral process has
begun.

        In addition, Your Honor, the plaintiffs have waited
too late from the time when their cause of action accrued to
bring these claims.  As the Court correctly acknowledged, they
didn't have to wait until they had a list.  They still haven't
proffered a list.  They've got a declaration testimony that
says somebody who is consulting for them has a list, but they
haven't presented it to the Court as a basis for moving forward
on an evidentiary fact-finding basis.

1    And so you have inexcusable delay on the part of the

2 plaintiffs, any one of whom could have intervened in the case

3 in front of Judge Batten back in 2017.  They could have

4 objected to the consent decree.  They could have brought a TRO

5 at any point in the intervening 3 and a half years trying to

6 get some sort of certainty or setting aside or clarification on

7 what the TRO and the consent decree actually established for

8 Georgia elections.

9    Instead, they wait until after we are now in our

10 fifth election cycle of the year.  We have completed a primary,

11 a primary runoff, a general election, a state-level general

12 election runoff, and are about to have the January 5th runoff.

13    And they wait until we are less than 3 weeks out from

14 that, after you've had three-quarters of a million people who

15 have already cast lawful ballots in this race, to come in at --

16 and say, "We want to poke it.  We want to throw some judicial

17 sand into the gas tank and see -- and hope and pray that it

18 doesn't have any unintended effects."  That's what they're

19 doing here, and it is improper and prohibited under both the

20 Purcell doctrine as well as laches.

21    It is just as nonsensical to Plaintiffs' argument --

22 and, Your Honor, I'm going to move on from Purcell and laches

23 unless you have any questions for me.

24    THE COURT:  You can move on.

25    MR. WILLARD:  It is just as nonsensical in terms of

1    the PI factors, their likelihood of success on the merits.

2    In effect, what they are coming to the Court and saying is that

3    a federal criminal statute, which I've already addressed how

4    nonsensical their reading of the federal criminal statute is --

5    but they're basically saying the federal criminal provisions

6    of the Voting Rights Act expressly prohibit what Judge Batten

7    found 3 and a half years ago the NVRA actually requires the

8    State to do, and that is process all voter registrations that

9    are submitted at least 30 days out from any federal election.

10            There is no irreparable injury to the plaintiffs.

11   They have a perfectly viable state process that they can go

12   forward to challenge any voter's registration or ballot that

13   has been cast.  They don't want to do that because I think they

14   think it's going to be too hard reading between the lines or

15   too resource intensive.  They plead that they don't have the

16   resources to go do this.

17            Your Honor, I believe anybody who has watched TV over

18   the last 4 weeks would laugh at the concept that they lack

19   resources.  Political ads are aired in such a way now and are

20   so permeating the airwaves that we're interpreting your

21   regularly scheduled political ad to bring you your scheduled

22   Christmas programming.

23            Even if they didn't -- even if they had some sort of

24   resource argument, it doesn't excuse the burden that would be

25   placed on state and county election officials and the public,

1    who has some realistic expectation that the election framework

2    that was in place on November 20th when these elections were

3    certified from November 3rd and the candidates were finalized,

4    that the rules of the game in effect at that point, in effect

5    when UOCAVA ballots went out, in effect when votes started

6    being processed and cast, that those rules of the game would

7    stay in place for the entirety of the election cycle and not

8    have somebody coming in at the 11th hour attempting to put

9    their hand on the scale and adjust who can cast a lawful ballot

10   because they feel that those individuals may be more inclined

11   to vote for their opponent than for themselves.

12          The -- that dovetails in with the final two factors,

13   which, in election cases, are considered in tandem, and that is

14   the balancing of the equities and the public's interest.  And

15   in this case, Your Honor, whether you want to cite to Purcell,

16   whether you want to talk about laches, whether you want to talk

17   about the public's faith in the process, whether you want to

18   talk about individual county election officials, county

19   election volunteers, state election officials, their ability to

20   conduct the election in the time frame that is set out in

21   statute under the framework that has been in place for months

22   or years, or whether you want us scrambling over the weekend

23   trying to come up with a regulatory paradigm that the Eleventh

24   Circuit has already said, "You can't order us to do" -- but

25   that -- we would be in a situation of trying to change the

48

1   wheels on the car as we're going down the interstate of this
2   electoral cycle.

3           I want to address some specific points that the
4   plaintiffs made in their argument.  And it really -- their
5   choice of words, whether they intended to let it slip or not --
6   but the Eleventh Circuit has required, for standing purposes,
7   that you have a concrete injury.  Instead, Plaintiffs used, in
8   response to questions from you, that there is a chance, there
9   may be a probability.  That is insufficient to confer standing
10  in the Eleventh Circuit.

11          Your Honor, I'm happy to take any questions.  I feel
12  like I've taken enough of the Court's time today already.

13          My last closing is Plaintiffs have said that they
14  couldn't bring this until the election was certified.
15  Your Honor has already put the light of that in terms of "You
16  could have brought these claims before you knew who the voters
17  were or before you saw any list of who the voters were."

18          It's a -- they're making a framework argument.  It's
19  not a fact-based argument.  Their making a framework argument
20  here.  If they were at the state level, if they were bringing
21  a challenge in one of the 159 counties, then it's a fact-based
22  inquiry as to who did what in terms of the individual voter
23  registrants.  But they're making a procedural framework
24  argument.  That cause of action could have been brought 3 and a
25  half years ago.

1          They also claim that they didn't know that there

2   would be a runoff.  I forget how many candidates there were for

3   the Loeffler seat, but there was nobody in the world who would

4   have taken a bet on the fact that the Loeffler seat would not

5   have ended in a runoff.  The only question was who was going to

6   be in that runoff election.

7          And the NRSC was going to have a candidate in that

8   election.  The Georgia Republican Party was going to have a

9   candidate in this election.  Maybe the Loeffler campaign

10  wouldn't have been a plaintiff.  Maybe there was some

11  uncertainty as to whether it was going to be the Doug Collins

12  campaign in the runoff.  But there has always been a certainty

13  that there was going to be a runoff election for at least one

14  Georgia senate seat.

15         And with that, I think I will turn the balance of our

16  time over to the Chatham and the Glynn County attorneys.

17         THE COURT:  Before we do that, let me come back to a

18  line of inquiry that I began with the plaintiffs, and that is,

19  ultimately, even if all you said were wrong, I want to hear you

20  address my question about even -- how would setting aside these

21  ballots result in proving that someone voted for Senate twice

22  even if I interpreted the Voting Rights Act as the plaintiffs

23  urge?

24         MR. WILLARD:  They would have to have an evidentiary

25  determination voter by voter, which is contemplated under

50

1   the Georgia code -- they just haven't elected to pursue that

2   route -- where you're asking the voter, "How did you vote?

3   What races did you vote for?"

4           That's the only way to ascertain whether somebody

5   submitted a ballot that was an undervote or not, to determine

6   whether they cast a ballot for a particular office appearing on

7   that ballot.  We've got ballots in the state where -- we've had

8   an unprecedented number of undervotes in the presidential race

9   in the state of Georgia this year.

10          Apparently, there were a lot of voters who said, "A

11  pox on all your houses."

12          Or you had situations where you had voters who said,

13  "My cousin is running for county commission chair.  I don't

14  normally vote.  I'm going to go in and vote for county

15  commission chair."

16          But plaintiffs cannot make that factual tie-in at

17  this point, and there's really no mechanism in federal court to

18  make that tie-in.  They've had ample opportunity to challenge

19  electors and the ballots cast by electors at the county level.

20  They have elected not to pursue that route.

21          THE COURT:  Is there any argument to be made that

22  taking this as the initial step and getting a statewide order

23  to go ahead and set those ballots aside and then, at some point

24  in the future, as they request in their initial pleadings, if

25  the margin of victory is such that those set-aside ballots

1  might be decisive, then to undertake that state procedure?

2          MR. WILLARD:  Your Honor, the secretary of state,

3  Vice Chair Rebecca Sullivan, the three members of the state

4  election board, who I wasn't able to communicate with before

5  this election, they don't have ballots sitting in their office.

6  The ballots are maintained by the 159 county officials who have

7  been charged under the state constitution and state statutes

8  with determining whether -- that a person has lawfully

9  submitted that ballot and then tabulating that ballot result.

10          So --

11          THE COURT:  And that fact --

12          MR. WILLARD:  -- under Jacobson --

13          THE COURT:  Wait, wait.  That fact is obvious.

14          MR. WILLARD:  Right.

15          THE COURT:  What I'm asking is:  What they're trying

16  to do right now is just have these set aside.  Obviously,

17  they're not in your office or your client's office.  They're at

18  each of the 159 county board of --

19          MR. WILLARD:  Right.

20          THE COURT:  -- election offices.  I'm not asking

21  about where they are.  I know that.

22          MR. WILLARD:  Well, no.

23          THE COURT:  I'm asking you:  Is the order -- can the

24  order be flipped?

25          MR. WILLARD:  No.  In terms of -- under Jacobson

1   and redressability, they -- you have no ability to order those

2   159 county officials who -- or, actually, I guess, in this

3   case, 158 unnamed county officials who are actually in

4   possession of those ballots from not doing anything with them

5   because Plaintiffs failed to name them.  Plaintiffs have failed

6   to go out and get the individuals in front of you who could

7   grant the relief that they are seeking.

8           THE COURT:  Having -- if they were to succeed in

9   having the ballots set aside, could they then file individual

10  lawsuits to then institute that process in the separate

11  counties?

12          MR. WILLARD:  There is a county mechanism which they

13  have failed to avail themselves of at this point.

14          But as Your Honor already acknowledged, there are

15  individuals who would be caught up in at least Plaintiffs'

16  convoluted theory of illegal votes who have been casting

17  ballots for now 5 full days, whose ballots are already in the

18  system, who engaged in early in-person voting, who -- those

19  ballots, there's no way to bring those back out at this point.

20          THE COURT:  I see.

21          MR. WILLARD:  And so at that point, you have a

22  Bush v. Gore problem because you have individuals who fall

23  within this class whose votes are going to have been treated

24  differently than the --

25          THE COURT:  Yes.

1        MR. WILLARD:  -- absentee ballots that are sitting in

2   an election office this weekend.

3        THE COURT:  All right.  So who do you pass the gavel

4   to?

5        MR. WILLARD:  I think I'm going to pass it to

6   Mr. Perkins because he's one who I know is on the call.  And

7   I'm sorry.  I'm not sure who is on the call from Glynn County.

8   Hopefully, Mr. Perkins does so he can pass it on to them after

9   he's finished.

10        THE COURT:  All right.  Mr. Perkins, are you on the

11   call?

12        MR. PERKINS:  Yes, Your Honor.  I'm actually on your

13   screen.  I'm in the --

14        THE COURT:  I see you.

15        MR. PERKINS:  -- conference room.  We -- thank you,

16   Your Honor.

17        THE COURT:  At the head of the table?

18        MR. PERKINS:  That's right, Your Honor.  I apologize

19   for the camera angle, but we were on pretty short notice here.

20        THE COURT:  That's fine.  Go ahead.

21        MR. PERKINS:  Your Honor, very quickly, as

22   Mr. Willard noted, there is an issue as far as the parties that

23   were named.  My clients, the Chatham County defendants, are not

24   the proper parties in this case.  And I base that on the relief

25   sought.  The relief sought seeks to -- seeks a determination

54

of what voters were new registrants and then to separate those
ballots out.

The declaration of Russell Bridges that was filed
earlier today, Docket Number 28, is -- demonstrates this for
you.  He is the election superintendent for Chatham County.
He -- in his declaration, he states that the board of
elections' only involvement in the absentee ballot process is
opening the envelope containing the ballots and tabulating the
ballots.

Chatham County is unique.  If we're not the only
state, we're one of very few that have a separate board of
elections and a board of registrars.  And the board of
registrars in Chatham County handles things like registration,
as the name would indicate to you, and so that -- it is the
entity that is capable of determining, although it would take
a lot of work, if a voter is a new registrant.

The board of elections doesn't do that.  The board of
elections -- I think the most easy way I can describe it to you
is they count the votes.  The board of registrars does the
rest.  So right off, that is a significant issue as far as the
relief that is sought against my clients.

I do have with me Colin McRae, who is the chairman of
the board of registrars also.  I have with me Sabrina German,
who is the director of voter registration in Chatham County, if
that need should arise, Your Honor.

55

1          THE COURT:  All right.  Thank you, Mr. Perkins.

2          Who will be next for on the Defense?

3          UNIDENTIFIED SPEAKER:  Your Honor, Mr. Watkins is

4   going to --

5          THE COURT:  All right.  Then if -- Mr. Watkins, if

6   you'll approach.

7          And I think our camera will go to Mr. Watkins so the

8   rest of you can see him as well.

9          MR. WATKINS:  All right, Judge.  I'll try to be

10  brief.

11         We adopt the arguments that were asserted by the

12  secretary of state.  I wanted to add briefly to the standing

13  argument and specifically the prong that deals with whether the

14  injury is based on some hypothetical future harm as opposed

15  to something that is impending.  I know the Court is well aware

16  of the standard and the standard that the possible future

17  injury -- a possible future injury is not sufficient and has to

18  be reasonably and certainly impending.  And the Court touched

19  on these issues when questioning Plaintiffs' counsel.

20         As I see it, the Court would have to sort of come to

21  three conclusions in order to get there on this prong to

22  satisfy standing.  One, the Court would have to satisfy itself

23  that this really is a violation of the Voting Rights Act for

24  somebody to vote for a senate candidate in one state in the

25  November election, move lawfully to another state for a -- for,

56

we would assume, a non-nefarious reason, and then attempt to
register and vote in another senate race.

So if that's the case, the Court would have to decide
that that is, in fact, in violation of the Voting Rights Act
and that violates the provision that prohibits -- or sets the
standard that you can't vote two times, quote, for an election
to the same candidacy or office.

And that's subject to interpretation, but that's a
legal issue that the Court would have to decide in order to
determine that, well, this really is harm that is certainly
impending.

The next thing the Court would have to decide is
that --

THE COURT:  Let me -- before we go to the next one,
let's focus on that one.  Walk me through what your argument is
about why they don't succeed on that prong.

MR. WATKINS:  Well, I'll just tell you the various
interpretations.  So one interpretation would be that -- and
the plaintiffs' interpretation is that that is a vote for the
same candidacy or office because they would interpret voting
for a senate seat very broadly.

So broadly speaking, if you vote for a senate seat
and then move and try to vote for another senate seat in
another state, then that's violative of the Voting Rights Act,
as opposed to a more narrow interpretation in that you're

1    voting for that senate -- particular senate seat, and you can't

2    vote twice for that particular senate seat.

3              And, of course, the secretary of state's counsel,

4    I think, made a good point that the Voting Rights Act doesn't

5    touch upon runoff elections.  And certainly, a fair

6    interpretation is that, as contemplated, that somebody -- a

7    voter, like a voter in Georgia who doesn't move, can vote in

8    that particular race and also -- as distinguished from a

9    subsequent runoff race.

10             But that's a legal interpretation that the

11   plaintiffs, I think, correctly point out has not been decided.

12   That -- they argue that it suggests that it should be decided

13   this way or that it's implied that it should be decided that

14   way based on statutory construction.  But that hasn't been

15   decided, and that is something this Court would have to decide,

16   to take that leap that this is, in fact, an injury that's going

17   to occur.

18             THE COURT:  And so your argument would be not only is

19   that a standing issue but then, also, plugged back into

20   substantial likelihood of success on the merits that there's no

21   case law interpreting it one way or the other, so --

22             MR. WATKINS:  So how do you come to the conclusion

23   that you're most likely to succeed on that legal principle,

24   especially, Your Honor, when you're -- this Court is confined

25   to view that from the highest standard?

58

This is a mandatory injunction that the plaintiffs are seeking.  They're seeking to cause the County or the State to take certain action, so it's a mandatory injunction against a government actor.  And our circuit has held that that is even a heightened standard beyond what is already a high standard which requires not just proving by a preponderance of the evidence on each of those four points but actually going beyond that and proving by clear and convincing evidence.

And so it's a heightened standard on top of a heightened standard when they're seeking this mandatory injunction against a government actor.  But yeah -- so that's sort of the first hurdle.

And beyond that, as to Glynn County, the affidavit of this Mr. Morgan, as Your Honor quickly picked up on, doesn't say and can't say that these voters in other states voted for a senate race in those other states.  In terms of Glynn County, in Paragraph 24, the best it can say is that eight folks that have been newly registered in Glynn County came from another state and voted in the general election.  It doesn't say and they have not established that they voted for a senator in another election.

And then to your point, Your Honor, how, then, do you -- if you set these ballots aside, how do you then go prove that in order to satisfy that there is impending harm?  Because if you can't prove that, then you're not going to have

59

1    standing.

2          You know, these voters are certainly going to be

3    wary, you would think, if there were some nefarious purpose, to

4    admit that.  What if they were to take the Fifth if asked?  But

5    that's a problem.

6          And then the third issue -- the third hurdle that

7    they would have to get by is they would -- as we know, we have

8    had early voting for 5 full days.  I would think they would

9    have the burden to show that these eight voters in Glynn County

10   haven't already voted, because there's no way to undo it and

11   segregate these votes if they've already voted.  So you would

12   have to assume that these eight voters in Glynn County hadn't

13   already voted.  And if they have voted, you'd have to assume

14   that they have voted, as I say, in another senate in another

15   state.

16         Outside of standing -- and I think standing's been,

17   obviously, hit on by the secretary of state's attorney.  But

18   outside of standing, another issue is that, in terms of

19   Glynn County, well, who -- what decision does the local board

20   make versus the State?

21         So you're being asked to enjoin a mandatory

22   injunction against the local board.  Well, the duties of the

23   local board versus the duties of the state election board are

24   set out by statute.  And I would submit that the state election

25   board is the one that would make a call as to segregating

1   certain ballots of newly registered voters.  And I would cite

2   the Court to O.C.G.A. Section 21-3-31, Subsections 1, 2, and 7,

3   which lay out that if the -- it's the state board that

4   promulgates the (audio disruption) rules, not the local board.

5           The only thing they cite to in terms of the local

6   board's ability to make rules is to make rules to guide poll

7   workers, but that is secondary to the very explicit duties of

8   the State (audio disruption) in terms of making rules governing

9   regulating elections, how they're conducted, whether they're

10  uniform, whether they're fair.  And so, in any circumstance, we

11  would say, even if the Court got by the standing issues and got

12  by the other issues, that we would not be the party that would

13  make that call.

14          Finally, the last point I'll make is that Plaintiff

15  was notably vague about how this would actually be done.  I

16  mean, how would this be done?  They're asking for segregation

17  of all ballots, not just mail-in ballots.  And so the way it

18  works is somebody comes in to vote in person.  There's not

19  notice to a poll worker whether this person has registered to

20  vote a week ago, 3 weeks ago, 2 months ago.  So how would it

21  work?

22          And they say, well, they'll just leave it to the

23  Counties to decide how it would work.  But it's an

24  impossibility.  And that's why they've shied away from

25  explaining to the Court, well, how do you do this in practice?

1    How do you segregate every ballot, not just a mail-in ballot,

2    but an in-person ballot?  And how do you educate the poll

3    workers to do that?  And where is this list of names that

4    allows you to do it?  And so it's an impossibility to do.

5             Beyond that, again, we would just rely on the same

6    arguments that the secretary of state is going to assert in

7    this action, and we would ask that the requested relief be

8    denied.  Thank you.

9             THE COURT:  All right.  Thank you, Mr. Watkins.

10            Anybody else want to be heard for the Defense?

11       (No response.)

12            THE COURT:  Well, then let me turn back to Mr. Meros

13   for reply.  I see he's been pacing anxiously.

14            And it is now time to return to your argument, so let

15   me hear anything further you would like to argue.

16            MR. MEROS:  Yes, ma'am.  And my apologies.  I am

17   a pacer.  I didn't realize I was being watched, but I'll

18   certainly learn from this.

19            THE COURT:  It's -- I'm not criticizing you.  I -- as

20   you say, it's an important case.  And I can still remember --

21   it's not -- I haven't been on the bench that long.  I remember

22   what it was like to be listening to the other side and -- so,

23   in any event, it's not a criticism.  It's just an observation.

24            MR. MEROS:  No.  That's quite all right, Your Honor.

25   And thank you very much for your time.  You've been very

62

1    generous with your time, and we very much appreciate that.

2        The gentleman from Glynn County, I believe, is

3    correct about something that he said, and that is it is the

4    state election board that has the ability to do and to

5    implement the sort of limited relief, setting aside ballots

6    until we can understand what violations of the Voting Rights

7    Act, if any, have occurred.

8        There has been a lot of talk about Jacobson and a lot

9    of talk about no one else can do it, but he is correct that the

10   state election board has the ability to issue recommendation,

11   issue rules.  The secretary of state has the ability to issue

12   guidance on that and so, again, limited relief -- very limited

13   relief to deal with an extraordinarily important issue.

14       Now, the secretary of state said to Your Honor that

15   the Voting Rights Act is a policy judgment in this context.

16   Congress made that policy judgment in passing the Voting Rights

17   Act.  And in 11(a) and 11(e), they were very clear about what

18   policy the United States had.

19       To some extent, the secretary of state is arguing

20   that it isn't so important to prevent voting twice as it is to

21   make the situation more difficult than we want it to be.  I

22   cannot imagine, Your Honor, a more important policy choice

23   under these circumstances.

24       The secretary also suggested that we were too late.

25   And the Court and I talked about the fact that if, in fact, we

had guessed, if, in fact, that we had had some fear that this might be occurring without the facts to suggest it, I imagine the secretary of state would demonize us as he has so far today.  That is why we did it at the very earliest possibility, in August -- I mean, in -- I'm sorry -- on December 8th, to try to figure out what's going on.  That's 10 days ago.

And in those 10 days, we have gone to extraordinary lengths to have enough information to be confident that there are violations here that would require invalidation of a vote or many votes.

Your Honor also suggested that there might be a difference -- or what if the number of votes that were preserved or segregated, under no circumstances would there be a sufficient number of votes to affect the election?  That would be a relevant consideration as to what to do.  We don't doubt that.  And -- but if, in fact, there is the potential for 500 votes or 1,000 votes, as we know from prior elections, you can have a very important vote with a disparity much less than 400 votes.

We have, in fact, conceded that there are any number of votes that have been cast that are irreparably, for our plaintiffs, gone and unavailable.  We can't do anything about that.  We don't purport to do anything about that.  What we don't want to do -- what we want to do is to stop the bleeding of the potential for federal violations in voting twice in

1    senatorial elections.

2         The secretary's -- the gentleman from the secretary's

3    office specifically told the Court that there is a process by

4    which electors can be questioned -- can be asked questions,

5    can be -- can discuss with electors certain issues of ballots

6    without problem.  That's existing -- that's an existing

7    practice in the secretary of state's office.  We think that

8    makes eminently good sense.  And what makes good sense and what

9    makes good policy and what is consistent with federal law, that

10   remedy is what we would be perfectly happy to have.

11        The secretary's counsel also said that the Voting

12   Rights Act in this context does not apply to runoff elections.

13   We would respectfully suggest that that is clearly wrong.  The

14   Georgia constitution provides that a runoff election is part of

15   a general primary and runoff election.  It is not sui generis.

16   It's not an exception to the Voting Rights Act.  It is a part

17   of the process of voting.

18        And I have yet to hear an explanation from the

19   defendant's as to how it can be that a violation of the Voting

20   Rights Act is less important than the challenges faced in

21   determining how many -- how many ballots should be invalidated

22   under these circumstances.

23        We welcome the opportunity, given the ability to have

24   some evidentiary relief, some evidentiary proceedings, to dig

25   further into this, to provide additional information.  There

1  have been a lot of accusations about how bad we are and things

2  we've done and all of that, and we're more than happy to

3  provide evidence about what actually occurred with regard to

4  the attorney general's office or the other individual counties

5  with respect to this issue.

6          THE COURT:  Secretary of state says if a runoff is

7  part of a general election, then, if you voted in the general

8  election, why should you be able to vote again in the runoff

9  if --

10          MR. MEROS:  But we're --

11          THE COURT:  -- it gives the --

12          MR. MEROS:  -- dealing with --

13          THE COURT:  -- if it gives the interpretation that

14  you're saying?

15          MR. MEROS:  I'm not sure I understand.  But what we

16  are talking about is -- so what is the difference in voting in

17  the general election and voting in the runoff for the same

18  election -- or for the same senatorial --

19          THE COURT:  So --

20          MR. MEROS:  -- election?

21          THE COURT:  -- if somebody votes in one general

22  election, let's say, in California and then moves to Georgia

23  and votes in that runoff, how is that a crime and voting in the

24  general election in Georgia and then voting in the runoff in

25  Georgia -- seems like --

1          MR. MEROS:  Well, Your Honor, under the Voting Rights
2     Act, a runoff is a continuation of the general --
3          THE COURT:  Right.
4          MR. MEROS:  -- and it's voting twice.  One can't vote
5     twice.
6          THE COURT:  In both cases?
7          MR. MEROS:  Certainly.
8          THE COURT:  So --
9          MR. MEROS:  You know --
10         THE COURT:  -- if I --
11         MR. MEROS:  -- (indiscernible) -- I'm sorry.  Go
12    ahead.
13         THE COURT:  The only difference would be -- if one
14    person voted in California, moved here, and then voted in the
15    runoff and one person was in Georgia the whole time, voted
16    here, and then voted in the runoff, what -- why is one a crime
17    and one not?
18         MR. MEROS:  Well -- and I don't know whether it's a
19    crime.  I know that it's a federal violation.  I know there are
20    criminal penalties, but I'm not suggesting that everyone has
21    committed crimes.  So let me just be clear about that.
22         THE COURT:  Why is the California situation
23    prohibited by the Voting Rights Act if the just plain straight
24    Georgia one is not?
25         MR. MEROS:  The -- well, the general election itself

1    has ended.

2             THE COURT:  I thought it was --

3             MR. MEROS:  There's a --

4             THE COURT:  -- a continuation.

5             MR. MEROS:  It is -- it is one -- it is part of one

6    type of election, yes.  And, Your Honor I'll be frank with you.

7    That might be a distinction.  I can't tell you right now that

8    there is no distinction between the two.  What I can tell

9    you -- and I'll be happy to try to supplement that because I

10   don't want to overstate.  But if the -- and let me go back a

11   minute.

12            The general election is still happening now because

13   it is a continuation.

14            THE COURT:  Right.

15            MR. MEROS:  And so let's say you have a race for the

16   governor and I vote early by mail and I do a -- vote by mail --

17   well, an early voting at the voting booth and voting by mail as

18   well.  There's an obligation for the supervisors of election to

19   look at that and say, "No, you can't do that.  That's voting

20   twice."

21            THE COURT:  Understood.

22            MR. MEROS:  The same, arguably, could be exactly the

23   same here because this race is a continuation of the -- the

24   general is a continuation all the way through the runoff.

25            Now, might that be a distinction under the Voting

1    Rights Act?  I don't think so.  But I also don't want to
2    overstate.
3            I do know that we certainly have evidence --
4    substantial evidence of individuals that have voted in other
5    states and are now poised to vote in the senatorial elections
6    here.  Clearly, under those circumstances, in our view, there
7    is no question that there is more than probative evidence, but
8    there's a substantial amount of evidence that that will result
9    in violations of the Voting Rights Act.
10           The supervisor talked about the consent decree and
11   how we failed to advise the Court of the consent decree and
12   that that is somehow dispositive.  I would suggest, Your Honor,
13   that it isn't even apropos to what the arguments are and what
14   the legal issues are.
15           That consent decree arose from a circumstance where
16   you had a general election, you had a potential -- a runoff.
17   And if it goes to runoff, you didn't have any opportunity to
18   register to vote for the runoff.  And the consent decree
19   required what now exists, and that is that you have 30 days to
20   register for the runoff.
21           And it's nothing whatsoever to do -- it's not -- with
22   this matter.  With this matter, we had a general election, and
23   we had 30 days for registration.  That registration occurred.
24   So I'm at a complete loss as to what impact, if any, that has
25   on the case.

69

1          _Purcell_ is all about having elections at a period of

2     time when there would be voter confusion with regard to what

3     they're doing.  That's not this case.  As I've said before, so

4     many of these individuals as of Monday will have already voted.

5     Others will have already voted.  Others that will vote on that

6     date will have the ability -- the pure ability to vote subject

7     to a preservation time and a time by which to implement the

8     will of Congress in this matter.

9          And, Your Honor, with that, if you have any other

10    questions, I'll be happy to answer them.  But otherwise, we

11    truly appreciate your time.

12          THE COURT:  Certainly.

13          Counsel, I hate to hold you longer, but I am going to

14    take about a 20-minute break and let -- allow you to go have a

15    comfort break, and we'll reconvene at approximately 5:35.

16          All right.  We'll be in recess.

17          COURT SECURITY OFFICER:  All rise.

18          Court's in recess.

19       (A recess was taken from 5:13 p.m. to 5:45 p.m.)

20          COURT SECURITY OFFICER:  This honorable court is back

21    in session.  Come to order and be seated.

22          THE COURT:  All right.  Counsel, have a seat.

23          Had -- did we lose our lead defense counsel?

24    There -- is he down to the left?  All right.

25          MR. WILLARD:  I'm here, Your Honor.

1        THE COURT:  Okay.  I appreciate the swift appearance

2   by both sides and apologize in advance for the rough nature of

3   my findings of fact and conclusions of law.  Ordinarily, even

4   for a TRO, I will take the time to carefully compose and draft,

5   redraft, and triple draft written findings of fact and

6   conclusions of law.

7        But because of the timing that this was brought to

8   me late yesterday afternoon and because Monday, the election

9   will continue, it is important that I go ahead and rule and

10  whichever side is dissatisfied with that ruling make any

11  attempts that they can make to seek the higher level of review.

12       And so these will be my very rough, on-the-cuff,

13  on-the-run findings of fact and conclusions of law.  And

14  although they might not be polished, they are nevertheless --

15  I'm confident in the conclusions that I am going to make.

16       As the record will reflect, the plaintiffs brought

17  the lawsuit last night.  They seek multiple causes of action,

18  including a cause grounded in the Voting Rights Act.  They

19  seek -- they filed not only their complaint but also request

20  for temporary restraining order issued in an emergency

21  capacity.

22       I was able to read and review all of the documents

23  that were submitted by the plaintiff and study those in

24  anticipation of the hearing.  We were able to, in less than

25  24 hours, schedule the hearing and assemble the attorneys for

71

1    both sides so that we could have robust oral argument in court

2    both by -- in person and by video conference here this

3    afternoon.  I have had the opportunity to hear from both sides

4    for the last hours plus, and I believe each side was able to be

5    heard thoroughly.

6            After hearing from both sides, reviewing the

7    affidavits that were submitted and the arguments that were

8    made, it is my finding that the plaintiffs do not have standing

9    to obtain the relief that they seek.

10           As for the non-Voting Rights Act claims, I find,

11   for the reasons that are set forth in prior decisions,

12   including the Eleventh Circuit's recent decision in the <u>Wood v.</u>

13   <u>Raffensperger</u> case, that standing is lacking for the reasons

14   that are set forth therein.

15           I am aware that, in this case, the -- there were not

16   just individual voters that were plaintiffs but also the

17   campaign committees and supporters of Senator Loeffler and

18   Senator Perdue.  But -- although <u>Wood v. Raffensperger</u> did

19   provide some indication that perhaps, if it were the actual

20   candidate that were a plaintiff, that the standing argument

21   might be analyzed differently, here, we're not presented with

22   that case.  And I find that even as to those two plaintiffs,

23   the -- their harm is -- doesn't have the requisite

24   particularity and concrete nature that is necessary to proceed

25   at this stage.

72

1        I note that, of course, the plaintiffs do have the

2   burden of showing that standard.  And at least so far, with

3   what has been presented to me at this point, they haven't been

4   able to meet that.

5        I mention that -- the Wood case and also the case

6   that -- in Augusta that Judge Hall addressed recently and the

7   case in Atlanta that Judge Ross has reached.  For the reasons

8   that are set forth in the -- Wood v. Raffensperger that was

9   decided by the Eleventh Circuit earlier this month, I find that

10  standing is lacking for the non-Voting Rights Act claims even

11  with this constellation of plaintiffs.

12       As for the voting act claims, it has the same fate.

13  Plaintiffs have been unable to, so far, meet the standard for

14  showing that they, in fact, have standing to proceed on that

15  claim.  Specifically, they haven't shown, with the requisite

16  degree, that they've suffered an injury in fact that is

17  particularized and concrete.

18       I find that they haven't met the standard in showing

19  that the Voting Rights Act elevates what would otherwise be

20  general harm into a particularized harm.  I think both sides

21  agree that perhaps that might be possible to someday show but

22  that that has not been shown as of tonight.

23       And if that were not enough, the other prong that is

24  a problem for the plaintiffs is redressability.  That is a

25  problem.  I think both parties acknowledge that it's not

1  entirely clear whatsoever that what is -- has already happened

2  all this week when voters came to vote and what will continue

3  to happen as voters continue to vote next week and beyond -- it

4  is not clear that that's a voting right violation, and yet we

5  do have a risk of suppressing other voters from coming in, a

6  risk of confusion.

7          I'm not entirely clear why the plaintiffs waited

8  until last night to bring forth these issues, but I'm concerned

9  on a number of levels with what it would mean to, at this

10  point, switch course.

11          Having addressed standing, just for the good of the

12  order, let me make it clear, some of the fundamental concepts

13  about standing.  Of course, Article III of the Constitution

14  limits the subject matter jurisdiction of all federal courts,

15  including this one, to cases and controversies.

16          Our courts are courts of limited jurisdiction, and

17  that's one of the most fundamental principles of law.  We're

18  not constituted as freewheeling enforcers of the Constitution

19  and the laws, and it is incumbent on a plaintiff who comes to

20  federal court to bear the burden of proving that his or her

21  suit falls within our jurisdiction.

22          Standing, as I've already portended, has three prongs

23  that must be satisfied.  One is that the plaintiff suffered

24  an injury in fact; second, that it's fairly traceable to the

25  challenged conduct of the defendant; and, third, that it's

74

1    likely to be redressed by a favorable judicial decision.

2          I do find that the plaintiff, as I said, has not been

3    able to prove to the requisite standard that he has suffered

4    and she has suffered an injury in fact or that it's likely to

5    be redressed by a favorable judicial decision.

6          On the redressability, it is speculative at this

7    point how that would even work out to be proven.  We've heard

8    that even if certain ballots, the ones that haven't already

9    been cast and put into the general pool -- that even if those

10   were to be segregated and someday someone were to ask them

11   questions, they don't have to answer those questions.  They

12   could take the Fifth and so forth.  There's a lot of logistical

13   problems and hitches with the redressability issue.

14         As we've hinted at in discussing the voting act

15   standing, the kind of injury that's necessary to support

16   standing is an injury that's distinct from a generally

17   available grievance about the Government as discussed in

18   Wood v. Raffensperger.  These -- the plaintiffs have not shown

19   the kind of particularized and concrete injury that satisfies

20   that prong.

21         If we were to get past standing, as I've said, I

22   would find that the plaintiffs still wouldn't be able to

23   satisfy the requirements for obtaining this extraordinary

24   relief of temporary restraining order or preliminary

25   injunction.  They would trip on substantial likelihood of

1    prevailing on the merits for the reasons that I've identified

2    in talking about the standing issue.

3            And as far as the threatened injury to the movant

4    outweighing whatever damages the proposed injunction may cause,

5    again, I have some real problem with that weighing in that

6    the -- at this point, Plaintiff hasn't been able to carry their

7    burden of showing that a Voting Rights Act would even come into

8    play, and yet he would ask for us to, midstream, jump in and

9    alter the way that ballots are being handled and the way that

10   voters are being handled.

11           And there is a lot of room for confusion and really

12   illustrates why there's the fundamental rules peppering the

13   case law that federal judges shouldn't jump into an ongoing

14   election and change the rules mid-election.

15           And I would be concerned about voter suppression,

16   that, amid the confusion, there might be voters who are

17   confused about what it means to have your vote set aside for

18   possible later questioning.

19           And all this dawn at this late juncture in the middle

20   of an election is -- leads me to conclude that the balance of

21   the injuries comes out on the side of the defendant rather than

22   the plaintiff.  For that reason, I would find that it's not

23   proper to order that the TRO be granted in the way that the

24   plaintiffs have requested that it be done.

25           So just to conclude, I find that there is no standing

76

1   for any of the claims.  There -- and so that motion will be

2   denied.  And I will issue a very short written order that just

3   refers to my oral findings.

4          Again, Counsel, it is, of course, an important

5   election, and I appreciate your time and attention this evening

6   in helping me to address the motion and -- at the earliest

7   possible juncture.

8          All right.  Counsel, we'll be in recess.

9          COURT SECURITY OFFICER:  All rise.

10          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

11          UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

12          THE COURT:  Yes.

13      (Proceedings concluded at 6:01 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

77

1                    C E R T I F I C A T E

2

3        I, Victoria L. Root, Certified Court Reporter, in and for

4    the United States District Court for the Southern District of

5    Georgia, do hereby certify that, pursuant to Section 753,

6    Title 28, United States Code, the foregoing is a true, correct,

7    and complete transcript of the stenographically reported

8    proceedings held via video conference in the above-entitled

9    matter and that the transcript page format is in conformance

10   with the regulations of the Judicial Conference of the United

11   States.

12       WITNESS MY HAND AND SEAL this 24th day of December, 2020.

13

14

15

16

17

18

19   _____
     VICTORIA L. ROOT, CCR B-1691
20   United States Court Reporter
     Southern District of Georgia
21   Savannah Division

22

23

24   Post Office Box 10552
     Savannah, Georgia  31412
25   (912) 650-4066