**United States District Court**
**Northern District of Georgia**
**Gainesville Division**

| | |
|---|---|
| **Fair Fight, Inc., John Doe,** and **Jane Doe**, | **Civ. No. 2:20-cv-00302-SCJ** |
| *Plaintiffs*, | **Hon: Steve C. Jones** |
| *v.* | |
| **True the Vote, Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, James Cooper,** and **John Does 1-10**, | **Response in Opposition to Plaintiffs' Motion for a Temporary Restraining Order And/Or Preliminary Injunction** |
| *Defendants*. | |

# Response in Opposition to Plaintiffs' Motion for a Temporary Restraining Order And/Or Preliminary Injunction

## Facts

**A.    Plaintiffs allegations are either inaccurate or unrelated to their claims.**

Throughout their facts section, Plaintiffs make various allegations—with no admissible or verified evidence to back up such allegations—that are either inaccurate or entirely unrelated to their claims. ECF 11-1, at 8-17. For example, any claims of voter fraud from the November election, prior litigation (either by True the Vote, Inc. ("TTV") or others), or acts by unconnected third parties (ECF 11-1, at 8-11) are irrelevant to determining whether Defendants violated § 11(b) of the Voting Rights Act ("VRA").

1

Moreover, Plaintiffs erroneously allege (again with no evidence) that Defendants have accused Plaintiffs of "illegal voting." *See, e.g.,* ECF 11-1, at 7. This is false. The challenges merely initiate a process to verify the eligibility of voters who have been deemed "potentially ineligible." *See infra* Parts B-C.

Plaintiffs also highlight that the Middle District of Georgia recently held that the challenges violated the National Voter Registration Act ("NRVA") (ECF 11-1, at 12) but, like Plaintiffs here, the court in *Majority Forward v. Ben Hill Cty Bd. of Elections*, No. 1:20-cv-00266-LAG, ECF. 12 (N.D. Ga. Dec. 28, 2020) failed to recognize the differences between O.C.G.A. § 21-2-229 and § 21-2-230. *See infra* Parts B-C (distinguishing the two and showing that the Section 230 procedure does not violate the NRVA).

Finally, Plaintiffs allude to improper actions by various individuals and then attempt to transfer those actions to Defendants. *See generally* ECF 11-1, at 8-17 (including issues with certain election officials, threats of publishing of lists, and allegations of "doxing, harassment, and death threats"). But Plaintiffs have failed to connect any of these activities to Defendants. Indeed, they have failed to even allege that Defendants participated in any of these activities. Plaintiffs are unable to do so because neither Defendants, nor any of their agents, have engaged in such activities. Indeed, no such evidence exists. Defendants have not harassed, threat-

ened, doxed, or attacked anyone. Any allegations or suggestions to the contrary are false.

**B.    Georgia law permits challenges to an elector's right to vote in a particular election.**

Plaintiffs allege that the challenges are unlawful. ECF 11-1, at 11-15. However, Georgia law permits challenges to an elector's right to vote in a particular election.

Under Georgia law, a person may not vote in an Georgia election unless they are "[a] resident of this state and of the county or municipality in which he or she seeks to vote[.]" O.C.G.A. § 21-2-216(a). Accordingly, Georgia law sets out a process for challenging an elector's right to vote in an election,[1] providing that: "[a]ny elector of the county or municipality may challenge the right of any other elector of the county or municipality, whose name appears on the list of electors, to vote in an election. . . ." O.C.G.A. § 21-2-230(a).

It is important to recognize that Georgia law permits two distinctly different challenges to the ability of an ineligible elector to vote. First, the presence of the elector on the list of electors (called under federal law "voter registration lists")

---

[1]As explained below, these challenges do not result in an automatic disqualification of the challenged elector, but triggers a statutory procedure where the county election board must take further steps to verify the challenged elector's current eligibility to vote in the run-off election.

can be challenged under O.C.G.A. § 21-2-229. The current challenges were not brought under this section since the challenges did not question the challenged electors presence on the list of electors. Second, the eligibility of a registered elector to vote in a particular election can be challenged under O.C.G.A. § 21-2-230. The current challenges were brought under this section and only question the challenged elector's eligibility to vote in the run-off election and did not seek to have the elector removed from the registration list, which, as noted, is a separate and different challenge under Georgia law.

**C.    Georgia law does not violate federal law.**

Plaintiffs have alleged that O.C.G.A. § 21-2-230 violates federal law which regulates voter registration lists, the NVRA. ECF 11-1, at 14. This is not true.

First, O.C.G.A. § 21-2-230 governs challenging an elector's right to vote in an particular election, not the elector's eligibility to be on the voter registration list. And any remedy under O.C.G.A. § 21-2-230 involves preventing an ineligible voter from voting in a specific election, here the run-off election, and does not involve the removal of a voter from the voter registration rolls or the cancellation of an individual's voter registration. *See Cook v. Board of Registrars of Randolph County*, 727 S.E.2d 478, 482 (2012) (making clear that while O.C.G.A. § 21-2-229 permits an elector "to challenge a person's right to register to vote or to remain on

4

the list of electors," O.C.G.A. § 21-2-230 "grants an elector . . . the authority to challenge another elector's right to vote in a particular election.").

The NVRA contains a provision which requires that "[a] State . . . complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters," 52 U.S.C.A. § 20507(c)(2)(A), and lays out specific guidance regarding the process for removing names from the voter rolls, *id*. at § 20507(d). However, these provisions are not at issue here since the Section 230 procedure does not involve "remov[ing] the names of ineligible voters from the official lists of eligible voters," but, instead, questions their right to vote in a particular election.

Indeed, nothing in these challenges under O.C.G.A. § 21-2-230 involves removal of any voter from the voter registration rolls, nor does it seek to cancel the registration of any challenged elector. As a result, none of the prohibitions or requirements under the NVRA are triggered here.

**D.     The National Change of Address Registry is undisputably a legally valid source of data.**

Plaintiffs argue that the National Change of Address ("NCOA") Registry is "notoriously unreliable[.]" ECF 11-1, at 13-14. This is wrong as a matter of law.

There is nearly overwhelming authority that establishes the NCOA as a legally sufficient basis for taking action.

This Court in *Black Voters Matter Fund* found that relying on NCOA information supplied by the USPS *itself answered the claim that voter registrations were wrongly cancelled. Id.* at *26-27 (That "Georgia's NCOA process meets the plain language of the NVRA safe harbor" answers the claim that "Defendant has cancelled voter registrations for individual . . . when those individuals in fact have not moved."). By definition, a "safe harbor," such as the NCOA Process in the NVRA, is a process or procedure that is sufficient as a matter of law. Moreover, the court in *Black Voters Matter Fund* denied that any claimed discrepancies between plaintiffs' "accurate" voter address list and the NCOA list proved errors in the NCOA. *Id.* at 27-28 (any actual discrepancies were likely due to the timing of sampling the NCOA's rolling database). So *Black Voters Matter Fund* affirms the legal sufficiency of the NCOA as a matter of law to establish a factual basis that the elector has moved.

Additionally, the recent United States Supreme Court case of *Husted v. A. Philip Randolf Inst.*, 138 S. Ct. 1833, 1840 (2018) affirmed the reliance of thirty-six states on the NCOA for data in fulfilling the NVRA's obligation to remove from voter registration rolls the names of voters ineligible by reason of change in

residence. The Court could not have been more unequivocal in its assessment of using the NCOA as a basis for taking action: "This procedure is undisputably lawful." *Id.* at 1840.

## Argument

### I. The complaint is unverified and provides virtually no supporting admissible evidence.

A motion for a temporary restraining order or a preliminary injunction must be supported by admissible evidence. As this Court has stated, "to support or oppose a motion for a preliminary injunction, a party must present evidence that goes beyond the unverified allegations of the pleadings and motion papers. . . Bare pleadings and attorney argument, however, are not evidence and do not satisfy the plaintiff's burden." *Interface, Inc. v. Tandus Flooring US, LLC*, 2013 U.S. Dist. LEXIS 158608, *7, 2013 WL 5945177 (N.D. Ga. Nov. 5, 2013) (citations, quotations, and punctuation omitted). Although, "[a]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction," such evidence must be "appropriate given the character and objectives of the injunctive proceeding." *Levis Strauss & Co. v. Sunrise Int'l Trading, Inc.*, 51 F.3d 982, 985 (11th Cir. 1995) (citation and quotations omitted).  In considering Plaintiffs' Motion, this

Court "can consider only facts presented by affidavit or testimony and cannot

consider facts provable under the modern liberal interpretation of the complaint

but which have not yet been proved. Indeed, proof to support a preliminary

injunction must be strong and clear in view of the restraint put upon the defendant

at a time before his liability has actually been adjudged." *Societe Comptoir de

L'Industrie Cotonniere, Establissements Boussac v. Alexander's Dep't Stores,

Inc.*, 190 F.Supp. 594, 601 (S.D.N.Y. Jan. 20, 1961).

In the instant case, the complaint is unverified, and Plaintiffs' motion is

unsupported by any affidavits other than Exhibit 24, the declaration of a "Senior

Advisor" to Plaintiff Fair Fight, Inc. proffered to establish Plaintiffs' standing to

bring this action (the "Declaration"). ECF 11-25. As such, Plaintiffs offer only

unsupported and speculative allegations, not evidence, in support of their request

for emergency relief.  There are no affidavits from the Doe Plaintiffs setting forth

evidence of actions allegedly taken by Defendants in violation of the NRVA, nor

affidavits from individuals with personal knowledge of any alleged actions taken

by Defendants. That is plainly insufficient, and the motion must be denied. *See

Northeastern Florida Chapter of Ass'n of General Contractors v. Jacksonville*,

896 F.2d 1283, 1286 (11th Cir. 1990) (movant failed to present evidence to

demonstrate irreparable injury, but only conclusory allegations and conjecture).

8

Rather than offering actual evidence of Defendants' purported "intimida-tion, threats, or coercion" of voters (which Defendants deny), Plaintiffs attempt to support their motion with unverified, inadmissible social media posts, e-mails, and articles that appear to be from the internet. Plaintiffs offer *nothing* to demonstrate that their "proof" is credible, authentic, or genuine.

For example, Plaintiffs submit two purported Twitter posts by an account named "Crusade for Freedom," but fail to offer any evidence whatsoever that the posts are genuine and authentic, or that "Crusade for Freedom" is in any way related to or associated with Defendants. ECF11-1, p. 13; *see generally* ECF 11-2, 11-3, 11-21. Plaintiffs allege that the list of challenged voters is part of the "public record," but offer no evidence whatsoever that the "list" has been published at all. ECF 11-1, p. 13. Plaintiffs primarily rely on internet articles in support of their motion, but again, offer absolutely nothing to support a finding that the articles are what Plaintiffs claim they are, much less that Plaintiffs are entitled to injunctive relief. *See* Fed.R.Evid. 901; *In re Homestore.com, Inc. Sec. Litig.*, 347 F.Supp.2d 769, 782 (C.D. Ca. May 11, 2004) ("Printouts from a web site do not bear the indicia of reliability demanded for self-authenticating documents under Federal Rule of Evidence 902"). Indeed, many of the exhibits to the motion bear have no relation to True the Vote whatsoever, and their inclusion in the motion is suspect

9

and inflammatory. *See, e.g.* ECF 11-11, 11-12, 11-15, 11-16, 11-17, 11-22; Fed.R.Evid. 401, 402.

There simply is no evidence to support Plaintiffs' wild allegations in the complaint and motion, and thus, no evidence to support Plaintiffs' request for emergency injunctive relief. Plaintiffs may not rely on unsupported, unverified, unauthenticated, and conclusory allegations, many of which are totally unrelated to Defendants, to obtain satisfy their burden of proof. As such, the motion must be denied.

## II. Plaintiffs do not have Article III Standing.

Plaintiffs John Doe, Jane Doe and Fair Fight, Inc. have not met their burden of producing evidence supporting their Article III standing. The complaint is not verified, nor does it include any affidavits or declarations authenticating exhibits Plaintiffs use to support Doe Plaintiffs' fear of harassment. It does not include any admissible evidence supporting such a "reasonable fear." Plaintiffs submit one affidavit on behalf of Fair Fight, ECF 11-25, but it only supports Fair Fight's diversion of resources allegations, which are not contested by Defendants. It does not support any allegations of Doe Plaintiffs. Even if this Court ignores this lack of actual evidence, Plaintiffs allegations are also not enough to support Article III

10

standing as a matter of law.

A plaintiff bears the burden of proof on the threshold jurisdictional question of standing and must prove each of the following standing elements: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020). An injury in fact is "an invasion of a legally protected interest that is both concrete and particularized and actual or imminent, not conjectural or hypothetical." *Trichell v. Midland Credit Mgmt., Inc.*, 964 F.3d 990, 996 (11th Cir. 2020). Plaintiffs fail to establish either an injury in fact or redressability for Plaintiffs John Doe and Jane Doe.

The Supreme Court has ruled that public disclosure "promotes transparency and accountability in the electoral process to an extent other measures cannot." *John Doe No. 1 v. Reed*, 561 U.S. 186, 199 (2010) (upholding public disclosure of voters' information on referendum petitions). In order to foreclose public disclosure in this context, voters need to show a reasonable probability that disclosure will lead to threats, harassment, or reprisals by producing evidence such as specific evidence of past or present harassment or a pattern of threats or specific manifestations of public hostility. *See id.* at 204.

Plaintiffs fail to establish an injury in fact for Doe Plaintiffs beyond a

speculative, hypothetical injury supported by mere allegations, not evidence. Plaintiffs allege Doe Plaintiffs are both "citizen[s] and registered voter[s] in Georgia" ECF 1, ¶¶ 15, 16. Plaintiffs allege Doe Plaintiffs are permanent residents of Georgia who are eligible to vote. *Id.* According to Plaintiffs, Doe Plaintiffs had their mail forwarded to another location and were included in Defendants' Section 230 challenge to moved voters, and that their names and addresses have been published online. *Id.* Doe Plaintiffs allege they "reasonably fear[ ] that Defendants and their supporters will subject [them] to harassment for voting." *Id.* Yet, Plaintiffs have not produced any evidence that support this allegation. Plaintiffs have not provided specific evidence that Doe Plaintiffs have experienced harassment as a result of Defendants' Section 230 challenge. Nor have Plaintiffs provided any authenticated evidence that show a pattern of threats or specific manifestations of public hostility. Doe Plaintiffs merely speculate that they could be subject to harassment by "Defendants and their supporters." Such speculation does not support Article III standing as a matter of law.

Doe Plaintiffs also fail to establish how their alleged injury would be redressed by a favorable decision. Plaintiffs prayer for relief does not request any injunction against the public disclosure of the Doe Plaintiffs' information. If Doe Plaintiffs' injury in fact is a fear of harassment by Defendants' undefined "support-

ers" because their names were published online, the injunctions sought against Defendants' Section 230 challenges will not redress that alleged injury.

Likewise, Plaintiff Fair Fight, Inc. does not have Article III standing because it has not met its burden of proving redressability. Fair Fight has linked its injury-in-fact to the alleged diversion of resources Defendants' Section 230 challenges have caused. Defendants do not challenge that allegation. But even if Plaintiffs are granted the declaratory and injunctive relief sought, Fair Fight's diversion of resources will not be redressed. Because Fair Fight fails to establish the redressability of its alleged injury, it has not established Article III standing as a matter of law.

### III. Plaintiffs' motion for a temporary restraining order should be denied.

### A.    Plaintiffs are unlikely to succeed on the merits of the case.

### 1.    Defendants' conduct does not violate § 11(b) of the Voting Rights Act.

The Voting Rights Act § 11(b) prohibits acts or attempts that "intimidate," "threaten," or "coerce" any person for voting or attempting or urging or aiding any

person to vote or attempt to vote. Plaintiffs' allegation that TTV's use of and support for the Section 230 procedure "easily violates the plain language of § 11(b),"[2] ECF #11-1 at 13, distorts the meaning of these terms to apply to the activities they criticize. Plaintiffs claim that they need not show "discriminatory animus," ECF #11-1 at 16, because they rely on a version of § 11(b) that misstates its foundation in the Fifteenth Amendment and the Elections Clause, *id.* Plaintiffs' claim that no discriminatory animus is necessary is wrong and based on a selective view of the legislative history of the terms and the statutory provision that uses them. Further, Plaintiffs provide no evidence, that Defendants acted with discriminatory animus.

The legislative history of § 11(b) demonstrates that, in fact, Congress relied on the Fifteenth Amendment in supporting all aspects of § 11(b) but one. *See*, *e.g.* H. Rep. No. 89-439 at 1-4, 6, 8, 17-19, 54. During Congressional hearings about the "intent" provision of § 11(b), then-Attorney General Katzenbach affirmed that the provision was predicated on the Fifteenth Amendment, acknowledged that the Fifteenth Amendment required showing discriminatory animus, and asserted that he believed that the law "as drafted can be squarely based on the Fifteenth amend-

---

[2]Section 11(b) refers to the provision now codified at 52 U.S.C. § 10307(b), formerly 42 U.S.C. § 1973i(b).

ment." *Hearings on S. 1564*, 89th Cong. 192-96 (1965). Article I section 4 justifies an aspect of § 11(b) that is not at issue here and § 11(b) is not untethered from the Fifteenth Amendment to provide the limitless reach that Plaintiffs envision.

As Attorney General Katzenbach acknowledged, the Supreme Court has held that Fifteenth Amendment provided Congress with "no power to legislate in respect to State and local elections, as distinguished from Federal elections . . . ." Senate Hearing 193. So Congress "explicitly" invoked article I, section 4 only *in justifying § 11's apparent reach to individuals in state elections*.H. Rep. No. 89-439 at 30-31 (emphasis added).[3] The only aspect of § 11 that is anchored to the Elections Clause is its application to local elections. The rest, including the terms at issue here, are anchored in the Fifteenth Amendment and are subject to the Court's interpretations thereto. While the House Report at one point blankly advised that under its version of the legislation, "the prohibited acts of intimida-tion need not be racially motivated," both the House bill and the Senate ver-

---

[3]Similarly, *United States v. Simms* recognized that a related provision's *apparent reach to state elections* was constitutionally sound as a "necessary and proper" means of protecting the federal franchise. 508 F. Supp. 1179, 1185 (W.D. La. 1979) *See also id.* at 1186-87 (acknowledging that the Fifteenth Amendment does not authorize federal law to "punish individual action as it relates to state elections.").

sion—which was passed in lieu of House bill—based § 11(b)'s "intimidation,"

"coercion," and "threats" in federal elections on the Fifteenth Amendment and not

article I, section 4. *See* House Conference Report 711 at 1. So, contrary to Plain-

tiffs' assertions, § 11(b)'s "intimidate," "coerce," and "threaten" do not float free

of any objective meaning. Because the Section 230 procedure is racially neutral on

its face (and in practice), it "violates the Fifteenth Amendment only if motivated

by a discriminatory purpose." *City of Mobile, Ala. v. Bolden*, 446 U.S. 55, 62

(1980).[4] Plaintiffs have denied the need to show such a purpose and have not even

offered allegations of a discriminatory purpose. Yet Plaintiffs' claims would fail

even under the standard that they espouse because they have provided no support-

ing evidence.

Plaintiffs interpret Attorney General Katzenbach's opinion that "no subjec-

tive 'purpose' need be shown . . . in order to prove intimidation" and that an

accused "would be deemed to intend the natural consequences of their acts," ECF

#11-1 at 15, to mean that the Court should accept, on the basis of their unsup-

ported, scattershot allegations, that "voter intimidation is the natural consequence"

of the Section 230 procedure, ECF #11-1 at 15-16 and enjoin Defendants from

---

[4] *Bolden*'s holding on § 2 of the Voting Rights Act was superseded by a 1982 amendment that does not affect its application here. *See United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1550 (11th Cir. 1984).

employing it, ECF #1 at 29. This is wrong.

To say that in applying a law it is presumed that an accused "intends the natural consequences of their acts," is to apply the familiar "general intent" requirement that does not relieve the accuser's burden to convince the fact finder of that intent or the elements of a crime nor shift the burden to the accused to disprove that intent. *Mann v. United States*, 319 F.2d 404, 409 (5th Cir. 1963) (Requiring an accused to overcome an inference with opposing evidence creates a presumption and an improper burden on the accused, "*especially harmful when a person is required to overcome a presumption as to anything subjective . . .* and a barrier almost impossible to hurdle results." (emphasis added)). Plaintiffs offer purely subjective, unsupported allegations of intimidation, coercion, or threat and effectively demand that Defendants prove that they did not intend to invoke those subjective reactions.

As to the Section 230 procedure, Plaintiffs baldly allege that to "challenge the eligibility of more than 364,000 Georgians to vote on the grounds that these voters no longer reside in the State of Georgia," is "to intimidate and deter eligible and qualified Georgians," *and* that this intimidation is motivated by animus. ECF #1 at ¶ 4. Nowhere do Plaintiffs explain how a employing a legal process can be "intimidation," and despite their claims that they need not do so, they allege a

discriminatory intent—but again, provide no evidence of the existence of such. The closest that Plaintiffs come to offering a basis for this proposition is to cite cases in which a legal process was said to have been wrongfully applied—either in a discriminatory manner or in violation of other law. *See* ECF #1 at ¶¶ 32, 63-67.

In sum, Plaintiffs ask the Court to simply conclude, without evidence, that they are intimidated, coerced, or threatened "as a natural consequence" of being subject to Georgia's Section 230 procedure, ECF #1 at ¶¶ 29-33, 43-51; being aware of the existence of publicity about the Section 230 proceedings, *id.* ¶¶ 38-42, 52, 55, 56, and knowing of Plaintiffs' monitoring election procedures and encouraging others to monitor election procedures, *id.* ¶¶ 57-62. Plaintiffs allege, without evidence, that TTV's efforts to recruit volunteers as poll watchers is nefarious and intimidating. *Id.* ¶ 57. Volunteer poll watchers are allowed under Georgia law. O.C.G.A. § 21-2-208. Likewise, Plaintiffs allege, without evidence, that TTV has created a "one million dollar bounty as incentive to accuse individuals of voting illegally." *Id.* ¶ 61. Far from a "bounty," this whistle blower fund has been created to protect voters who allege voter fraud or wrongdoing if they themselves are targeted for intimidation or threats.

Plaintiffs have not even alleged, let alone provided any evidence of, anything from which the Court could infer that Defendants intend to intimidate,

coerce, or threaten. Plaintiffs merely allege that they are, as a subjective matter, intimidated, coerced, or threatened by perfectly legal activities and state law procedures. If, as Defendants contend, § 11(b)'s "intimidation," "coercion," or "threats" include, as a matter of law, the requirement that Plaintiffs show a discriminatory intent, then the Complaint borders on frivolousness.

### 2.    Defendants' conduct is protected under the First Amendment.

Enjoining Defendants' lawful Section 230 challenges—which  were brought in almost every Georgian county without regard to the county's racial or political demographics—would prohibit constitutionally protected activity without any of the narrowing required on such infringement.

Plaintiffs allege—without actual evidence—that Defendants have launched a coordinated campaign of frivolous mass challenges to voters, false accusations of fraudulent conduct, and encouragement of outright harassment of voters and election officials. ECF 1, at  ¶10. Again, Plaintiffs do not provide any verified or authenticated evidence of such harassment, or threat of harassment, brought about by Defendants. While Plaintiffs allege Defendants' Section 230 challenges are "frivolous," they provide no substantiated evidence for that allegation. The Defendants have brought their challenges according to Georgia law and have substantiated their claims with a legally valid set of data (NCOA). As discussed,

*supra*, Defendants have not called for even one voter to be removed from the registration list. They have simply asked each county board of elections to evaluate whether Defendants' claims are supported by probable cause and if so, for the board to follow the legal process allowed under Georgia law for determining whether the voter is eligible.

Defendants' Section 230 challenges are quintessential petitions to the government to address grievances, and their speech surrounding such petitions is quintessential exercise of their free speech rights. As such, both are protected under the First Amendment. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity. *Cantwell v. Connecticut*, 310 U.S. 296, 311 (1940). Without evidence that a petition was made with some sort of "wrongfulness," a petition to the government is constitutionally protected. For instance, the Petition Clause does not provide absolute immunity for libel. *McDonald v. Smith*, 472 U.S. 479, 483 (1985). Nor does it immunize against consequences for bringing "baseless litigation." *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983). But the Constitution does specifically "protect[ ] vigorous advocacy, *certainly of lawful ends*, against government intrusion." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 429 (1963) (emphasis added).

20

Like the NAACP in *Button*, Defendants here are advocating lawful means of vindicating their legal rights. The right to vote is certainly fundamental, but included within the right to vote is the principle that valid and eligible votes should not be diluted by unlawful votes. "The right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Bush v. Gore*, 531 U.S. 98, 105 (2000) (quoting *Reynolds v. Sims*, 377 U.S. 533, 555 (1964)) Defendants' Section 230 challenges seek to prevent such vote dilution by ensuring that all the people listed as eligible voters are, in fact, legally eligible to cast votes.

Plaintiffs attempt to sweep constitutionally protected activity into the definitions of harassment and intimidation without any attempt to specifically narrow what kinds of Section 230 challenges would fall outside of that protection. To Plaintiffs, simply bringing Section 230 challenges, as allowed under Georgia law, qualifies as harassment and intimidation. Such a proposition—especially without supporting evidence of wrongdoing within the petition—cannot withstand constitutional scrutiny.

The doctrine of constitutional avoidance provides that, "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is fairly possible, [courts] are

obligated to construe the statute to avoid such problems." *I.N.S. v. St. Cyr*, 533 U.S. 289, 299–300 (2001). Defendants' Section 230 challenges involve their First Amendments rights to free speech and petition, as well as their right to vote. Pursuant to this cardinal principle of constitutional avoidance, § 11(b) must be construed narrowly, to avoid infringement upon those fundamental constitutional rights. This Court must hold that without evidence of wrongdoing underlying the Section 230 challenges, § 11(b) must allow for Defendants' right to challenge voters' right to vote in a particular election, as allowed under Georgia law.

### 3.   Federal law does not pre-empt Georgia's voter challenge statute.

Plaintiffs allege that because Congress "explicitly" invoked article I, section 4 in passing § 11(b), ECF #11-1 at 25, that the Section 230 procedure is preempted as a matter of law, *id.*, and that this Court need not find if and how § 11(b) actually applies to the Section 230 procedure. *Id.* at 26. As explained *supra*, Congress invoked the Election Clause as justifying § 11(b)'s application to state and local elections, not in any other respect. It is "necessary and proper" to apply § 11(b) to state and local elections held in conjunction with federal elections because it is impractical to separate any "federal intimidation" from "state and local intimida- tion." But it is not "necessary and proper" to effectuate federal elections to blindly accept any and all allegations of intimidation, coercion, or threats simply because

they are made in the context of a federal election. The Section 230 procedure is "preempted" by federal law—§ 11(b)—only to the extent that it is demonstrated to violate that law. And Plaintiffs have not and cannot demonstrate that the Section 230 procedure violates § 11(b).

## B.     Defendants will suffer irreparable harm if Plaintiffs' TRO is granted.

Defendants' challenges under Section 230 cannot be the cause of "irreparable harm" as required by the injunction standard. Such measures are lawful, and only have the effect of identifying ineligible voters. If a voter is eligible, then they will still be able to vote and will not be disenfranchised from voting in any way by such a challenge. There can be no irreparable harm from Defendants' actions.

Such challenges do not stop an eligible elector from voting, and thus cannot be "infringements or abridgements on the right to vote" as Fair Fight alleges. Fair fight further relies on their assumption that Defendants' actions constitute "voter intimidation" that will make voters "fearful." As analyzed *supra,* lawful challenges under Section 230 cannot be voter intimidation under Section 11(b). Since Defendants' actions do not prevent any eligible voter from voting and cannot be considered "voter intimidation," there is no irreparable harm at stake in the absence of an injunction.

## C.     The balance of equities favors Defendants and preliminary relief is not

**in the public interest.**

The US Supreme Court has noted that "the balance of equities and consider-ation of the public interest [] are pertinent in assessing the propriety of any injunctive relief..." *Winter v. Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 32 (2008). Thus, the Court must analyze the balance of equities presented by each party as well as how granting injunctive relief serves public interest. Because the balance of equities tips strongly in Defendants' favor and enjoining Defendants' would be against public interest, the Court should deny the injunction.

**1.    Electoral integrity is undermined when ineligible voters cast ballots.**

Defendants in challenging the eligibility of potentially ineligible voters according to the procedure set forth in O.C.G.A. § 21-2-230 are seeking to uphold electoral integrity by ensuring ineligible voters do not cast votes. If ineligible voters cast votes, then electoral integrity is undermined and compromised. The public has an interest in electoral integrity, and Defendants' efforts to ensure ineligible voters do not cast votes ensure the integrity of elections. Fair Fight essentially seeks to enjoin all of Defendants' activities designed to prevent ineligible voters from casting ballots. If Fair Fight succeeds, then they will have prevented a measure designed to prevent the vote dilution described by the Court

in *Reynolds* by merely alleging Defendants' claims are without merit..

Thus, the two equities to balance are Defendants' lawfully prescribed efforts to ensure ineligible voters do not cast ballots, against Fair Fight's contention that Defendants' efforts amount to voter intimidation. Since Defendants' actions are designed to prevent the undermining of the electoral process and is not voter intimidation, the balance of equities tips strongly in favor of Defendants.

**2.      The public interest is advanced by ensuring that voters remain free to petition the government.**

Denying the injunction would serve the public interest by ensuring that voters remain free to petition the government, a right protected by the First Amendment. Safeguarding constitutional rights serves public interest. Defendants' Section 230 challenges are precisely the type of petition to the government for a redress of grievances protected by the First Amendment.

# Conclusion

For these reasons, Plaintiffs' motion for a temporary restraining order should be denied.

Dated: December 30, 2020          /s/ Ray Smith, III
                                  Ray Smith, III, GA # 662555

SMITH & LISS, LLC
Five Concourse Parkway
Suite 2600
Atlanta, GA 30328
Telephone: (404) 760-6000
Facsimile: (404) 760-0225
*Local Counsel for Defendants*

Respectfully Submitted,

James Bopp, Jr.,* IN # 2838-84
  jboppjr@aol.com
Jeffrey P. Gallant,* VA # 46876
  jgallant@bopplaw.com
Courtney Turner Milbank,* IN# 32178-29
  cmilbank@bopplaw.com
Melena Siebert,* IN # 35061-15
  msiebert@bopplaw.com
Rob Citak,* KY # 98023
  rcitak@bopplaw.com
THE BOPP LAW FIRM, PC
1 South 6th Street
Terre Haute, Indiana 47807
Telephone: (812) 232-2434
Facsimile: (812) 235-3685
*Lead Counsel for Defendants*
**Pro hac vice* applications pending

## Certificate of Compliance

The undersigned counsel certifies that the foregoing has been prepared in Times New Roman (14 point) font, as required by the Court in Local Rule 5.1(B).

Respectfully submitted this 30th day of December, 2020.

**SMITH & LISS, LLC**

*/s/ Ray S. Smith, III*

Ray S. Smith, III
Georgia Bar No. 662555
Local Counsel for Defendants

Five Concourse Parkway
Suite 2600
Atlanta, Georgia 30328
(404) 760-6000
rsmith@smithliss.com

## Certificate of Service

I hereby certify that the foregoing document was served electronically on December 30, 2020, upon all counsel of record via the United States District Court for the Northern District of Georgia, electronic filing system.

**SMITH & LISS LLC**            /s/ *Ray S. Smith, III*
Five Concourse Parkway          Ray S. Smith, III
Suite 2600                      Georgia Bar No. 662555
Atlanta, Georgia 30328          *Local Counsel for Defendants*
(404) 760-6000
rsmith@smithliss.com