**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | |
|---|---|
| **FAIR FIGHT, INC.; JOHN DOE; and JANE DOE,** | **CIVIL ACTION FILE NO.** |
| **Plaintiffs,** | **2:20-CV-00302-SCJ** |
| **v.** | |
| **TRUE THE VOTE, INC.; CATHERINE ENGELBRECHT; DEREK SOMERVILLE; MARK DAVIS; MARK WILLIAMS; RON JOHNSON; JAMES COOPER; and JOHN DOES 1–10,** | |
| **Defendants.** | |

## ORDER

This matter is before the Court on Plaintiffs' Motions for a Temporary Restraining Order and/or Preliminary Injunction (Doc. No. [11]) and to Proceed Anonymously (Doc. No. [2]).[1] Defendants oppose the Motions. Doc. Nos. [21]; [22]. The Court held an evidentiary hearing via videoconference on

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

December 31, 2020. Doc. No. [25].[2] Following the hearing, Plaintiffs submitted

further evidence (Doc. No. [26]), to which Defendants have responded (Doc. No.

[27]). The Court now rules as follows.

## I.   **BACKGROUND**

Plaintiff Fair Fight, Inc. ("Fair Fight") is a political action committee based

in Georgia. Doc. No. [1], p. 5, ¶ 11. Plaintiffs John Doe and Jane Doe ("Doe

Plaintiffs"), proceeding anonymously, are Georgia voters who allegedly have

suffered harm from Defendants' voter challenges, which are discussed further

below. Id. at 7–8, ¶¶ 15–16. Defendant True the Vote, Inc. ("TTV") is a 501(c)(3)

organization that is incorporated in Texas and whose stated purpose is to combat

voter fraud. Id. at 8, ¶ 17. Defendant Catherine Engelbrecht is TTV's founder and

Executive Director. Id. at 9, ¶ 18. The other individual Defendants are allegedly

Georgia residents who have assisted with the voter challenges at issue in this

lawsuit. Id. at 9–10, ¶¶ 19–23.

Plaintiffs filed this action on December 23, 2020, alleging that Defendants

violated Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b)

_____

[2] Due to the urgency of Plaintiffs' request for preliminary injunctive relief, the Court is
issuing this Order before the transcript to the evidentiary hearing is available. Once the
transcript is prepared, it will be filed on the docket.

("Section 11(b)"), by submitting 364,541 voter challenges under O.G.C.A. § 21-2-230. Doc. No. [1], p. 14, ¶ 38; see also Doc. No. [1-1]. Georgia law permits two types of pre-election challenges to be made by electors of a county/municipality against fellow electors in the same county/municipality: (1) a challenge of the qualifications of the elector (under O.C.G.A. § 21-2-229); and (2) a challenge of the right of an elector to vote in a particular election (under O.C.G.A. § 21-2-230). See Allen v. Yost, 281 Ga. 102, 103–04, 636 S.E.2d 517, 518 (2006) (describing O.C.G.A. § 21–2–230 as "a means for an elector to challenge the qualifications of another elector prior to the election . . . ."); see also Cook v. Bd. of Registrars of Randolph Cty., 291 Ga. 67, 71, 727 S.E.2d 478, 482 (2012) ("A challenge brought under O.C.G.A. § 21-2-230 involves a pre-election contest regarding a particular election—whether a voter is qualified to vote in it.").

O.C.G.A. § 21-2-229 provides in relevant part that "[a]ny elector of a county or municipality may challenge the qualifications of any person applying to register to vote in the county or municipality and may challenge the qualifications of any elector of the county or municipality whose name appears on the list of electors." In addition, § 229 provides that if the county board of registrars upholds the challenge, "the person's application for registration shall

be rejected or the person's name removed from the list of electors, as appropriate." O.C.G.A. § 21-229(d).

O.C.G.A. § 21-2-230, on the other hand, provides that "any elector of the county or municipality may challenge the right of any other elector of the county or municipality, whose name appears on the list of electors, to vote in an election." The challenge must "be in writing and specify distinctly the grounds of such challenge." O.C.G.A. § 21-2-230(a). "Upon the filing of such challenge, the [county] board of registrars shall immediately consider such challenge and determine whether probable cause exists to sustain such challenge." O.C.G.A. § 21-2-230(b).

Under both § 229 and § 230, once a challenge is filed, a statutory procedure is triggered by which the Board of Registrars (in the county in which the challenge was made) must determine the eligibility of the challenged elector to vote. Both statutes also provide for notice, hearing, and appeal.

In their brief in opposition to Plaintiffs' motion for preliminary injunction, Defendants assert that Plaintiffs have "failed to recognize the differences between O.C.G.A. § 21-2-229 and § 21-2-230." Doc. No. [21], p. 2. Defendants further state that the elector challenges at issue in this litigation "were brought

under [§ 230] and only question the challenged elector's eligibility to vote in the run-off election and did not seek to have the elector removed from the registration list . . . ." Id. at p. 4.[3]

Plaintiffs contend that TTV has mobilized residents in every Georgia county to submit *en masse* O.G.C.A. § 21-2-230 challenges to election boards to prevent allegedly ineligible voters from voting in the January 5, 2021 Senate runoff election. See Doc. No. [1] pp. 2–3, ¶¶ 4–6. TTV purportedly has facilitated these challenges by providing the challengers with lists of Georgia voters who appear on the National Change of Address Registry ("NCOA") and thus no longer receive mail at the address associated with their voter registration. Id. at 2–3, ¶ 4.

Plaintiffs allege Defendants' activity violates Section 11(b), which makes it unlawful to harass or intimidate voters, because their activity creates a risk that challenged electors will be harassed or intimidated and may be discouraged from voting. Doc. No. [11-1], p. 19. Plaintiffs have requested this Court to enter a

---

[3] It is worth noting that subsections (g) and (h) of § 230 provide for a challenged elector's removal from the list of electors when "the challenge is based upon grounds that the challenged elector is not qualified to remain on the list of electors." Defendants argue that they are challenging under § 230 to contest only the challenged electors' eligibility to vote in the January 5 runoff election.

Temporary Restraining Order ("TRO") or Preliminary Injunction ordering Defendants and their aides to cease all efforts to: (1) challenge the eligibility of Georgia electors; (2) participate, recruit, train, or advertise poll-watching activities; and (3) record electors and election workers at the polls. See Doc. No. [11], pp. 1–2.

Plaintiffs have also asked this Court to allow Doe Plaintiffs to proceed anonymously based on their alleged fear of harassment if their actual identities are known. Doc. No. [2]. Through redacted declarations, Doe Plaintiffs have stated that they are Georgia voters who are temporarily residing in a different State due to work, intend to maintain Georgia as their permanent state of residence, intend to vote in Georgia, and have experienced fear from having their names published publicly as a result of Defendants' voter challenges. See Doc. No. [26].

Defendants oppose (Doc. No. [21]) Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction (Doc. No. [11]). Defendants argue that Plaintiffs have failed to support their request for a TRO because their Complaint is unverified and the attachments thereto—including newspaper articles and social media posts—are inadmissible as evidence. Doc. No. [21], pp.

6

7–10.[4] Thus, Defendants assert, Plaintiffs have failed to show injury-in-fact or redressability for Doe Plaintiffs and thus do not have standing. Id. at 10–13. Defendants also assert that Plaintiffs have failed to show that they are entitled to a preliminary injunction. Id. at 13–25.

Finally, Defendants oppose (Doc. No. [22]) Doe Plaintiffs' Motion to Proceed Anonymously (Doc. No. [2]). While Doe Plaintiffs argue that the Court should grant this Motion "given the real threats of voter intimidation" they may experience from being associated with this lawsuit (Doc. No. [2-1], p. 1), Defendants argue that Doe Plaintiffs have failed to show the requisite privacy rights or threat of harm to justify proceeding anonymously and that fairness and public interest dictate that they should not proceed anonymously (See Doc. No. [22], pp. 3–10).

After full briefing and evidentiary hearing, this matter is now ripe for ruling.

---

[4] Defendants also argued that Plaintiffs failed to provide affidavits to support their allegations concerning voter intimidation and other non-organizational-standing matters. See Doc. No. [21], p. 8. At the evidentiary hearing (Doc. No. [25]), however, Defendants agreed to consider the submission of Doe Plaintiffs' declarations, which Plaintiffs offered to submit during the hearing. Those declarations have now been filed. Doc. No. [26].

II.    **LEGAL STANDARD**

A.    **Motion to Proceed Anonymously**

In exceptional circumstances, a "party may proceed anonymously in federal court by establishing 'a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings.'" In re: Chiquita Brands Int'l, Inc., 965 F.3d 1238, 1247 (11th Cir. 2020) (quoting Plaintiff B v. Francis, 631 F.3d 1310, 1315–16 (11th Cir. 2011)). In deciding a motion to proceed anonymously, a district court should first consider three circumstances: (1) whether the movant is challenging government activity; (2) whether the movant would be compelled, absent anonymity, to disclose information of utmost intimacy; and (3) whether lack of anonymity would be against the movant's penal interest. Id. A court must then carefully consider every circumstance of the particular case before determining whether privacy outweighs publicity. Id. Additional factors the court should consider include whether the movant is minor; whether the movant, absent anonymity, faces a real threat of physical harm; whether anonymity poses a unique threat of fundamental unfairness to the opposing party. Id. When a plaintiff shows a need for anonymity, a defendant's "general plea for 'openness' is not convincing." Id.

8

(quoting <u>Plaintiff B</u>, 631 F.3d at 1318). No factor is dispositive when conducting this analysis. <u>Doe v. Frank</u>, 951 F.2d 320, 323 (11th Cir. 1992). And a district court has "a zone of choice within which [it] may go either way." <u>In re: Chiquita Brands Int'l, Inc.</u>, 965 F.3d at 1246 (internal quotations omitted).

## B.  <u>Standing</u>

To bring a lawsuit in federal court, a plaintiff must have standing. <u>Trichell v. Midland Credit Mgmt., Inc.</u>, 964 F.3d 990, 996 (11th Cir. 2020). To have standing, the plaintiff must show that it has suffered an injury in fact that has a causal connection to the defendant's conduct, and which the court likely can redress with a favorable decision. <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 561 (1992); <u>Trichell</u>, 964 F.3d at 996 (stating that the party invoking a federal court's jurisdiction has the burden to establish standing). An organization may have standing under a "diversion-of-resources" theory when it must divert resources to counteract a defendant's unlawful acts, thereby impairing the organization's ability to engage in its typical projects. <u>Havens Realty Corp. v. Coleman</u>, 455 U.S. 363, 379 (1982); <u>Common Cause Ind. v. Lawson</u>, 937 F.3d 944, 952–53 (7th Cir. 2019) (listing cases finding organizational standing for voter-advocacy groups that were forced to divert resources to counteract unlawful election activity).

9

C.      **Standard for TRO and Preliminary Injunction**

The Court considers four factors when deciding whether to issue a TRO or preliminary injunction pursuant to Federal Rule of Civil Procedure 65: (1) whether there is a substantial likelihood of success on the merits; (2) whether the TRO or preliminary injunction is necessary to prevent irreparable injury; (3) whether the threatened injury outweighs the harm that the TRO or preliminary injunction would cause to the non-movant; and (4) whether the TRO or preliminary injunction would be adverse to the public interest. Parker v. State Bd. of Pardons & Paroles, 275 F.3d 1032, 1034–35 (11th Cir. 2001). Injunctive relief is an extraordinary and drastic remedy and should not be granted unless the movant clearly establishes the burden of persuasion as to each of these four factors. Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000).

In addition, "[a]t the preliminary injunction stage, a district court may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is 'appropriate given the character and objectives of the injunctive proceeding.'" Levi Strauss & Co. v. Sunrise Int'l Trading Inc., 51 F.3d 982, 985 (11th Cir. 1995). The decision to grant preliminary

10

injunctive relief is within the broad discretion of the district court. Majd–Pour v. Georgiana Cmty. Hosp., Inc., 724 F.2d 901, 902 (11th Cir. 1984).

## III.   ANALYSIS

Before addressing the merits of Plaintiffs' Motions, the Court begins by expressing its grave concerns regarding Defendants' coordinated, broad-strokes challenge[5] to more than 360,000 Georgia voters on the eve of an unprecedented two-seat Senate runoff.

First, the Court is extremely concerned that Defendants' actions are an attempt to circumvent the requirements of the National Voter Registration Act ("NVRA")[6] for identifying ineligible voters. While the Court notes that Plaintiffs are not directly bringing an NVRA challenge, Defendants' argument that the NVRA is not implicated at all fails. Defendants argue that, because O.C.G.A. § 21-2-230 contemplates challenges to a voter's eligibility to vote in an election, in contrast to § 21-2-229, which contemplates challenges to a voter's registration, the

---

[5]  The Court recognizes that Defendant TTV did not (and could not) directly file any O.G.C.A. § 21-2-230 challenges. However, since it is uncontested that TTV encouraged, assisted, and acted in concert with the individual Defendants who did file the challenges, the Court refers to "Defendants' challenges" throughout this Order.

[6]  See 52 U.S.C. §§ 20501–20511

11

NVRA is not implicated. Doc. No. [21], p. 5. This argument ignores the purpose and plain language of the statutory safeguards Congress included in the NVRA.

Section 8 of the NVRA "pairs the mandate that states maintain accurate voter rolls with multiple constraints on how the states may go about doing so." N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections, No. 1:16CV1274, 2016 WL 6581284, at *3 (M.D.N.C. Nov. 4, 2016) (citation omitted). In particular, Section 8 of the NVRA provides that "the name of a registrant *may not* be removed from the official list of eligible voters" except under certain circumstances: (1) "at the request of the registrant"; (2) "as provided by State law, by reason of criminal conviction or mental incapacity"; (3) "death of a registrant"; or (4) "a change in the residence of the registrant." § 20507(a)(3)–(4) (emphasis added). Where removal is predicated on change of address, more conditions apply:

> (1) A State *shall not* remove the name of a registrant from the official list of *eligible voters* in elections for Federal office on the ground that the registrant has changed residence unless the registrant—
>
>> (A) confirms in writing that the registrant has changed residence to a place outside the registrar's jurisdiction in which the registrant is registered; or
>>
>> (B) (i) has failed to respond to a notice described in paragraph (2); and (ii) has not voted or appeared to vote . . . in an election during the

> period beginning on the date of the notice and
> ending on the day after the date of the second
> general election for Federal office that occurs
> after the date of the notice.

52 U.S.C.A. § 20507(d)(1) (emphases added).[7]

Thus, the statute sets out the mechanism states *must* use to determine who may be removed from the list of "eligible voters," or, conversely, *to determine who is ineligible to vote*. Husted v. A. Philip Randolph Inst., ___ U.S. ___, 138 S. Ct. 1833, 1835 (2018) ("The National Voter Registration Act (NVRA) addresses the removal of ineligible voters from state voting rolls, 52 U.S.C. § 20501(b), including those who are ineligible 'by reason of' a change in residence."). Remaining registered, or on the list of eligible voters, is meaningless if one is precluded from voting. Indeed, courts have recognized that the purpose of the NVRA's list maintenance fail safe provisions is to protect the right to *vote*—not some arbitrary right to remain on the list of electors. See Montana Democratic Party v. Eaton, 581 F. Supp.

---

[7] Defendants argue that this Court's recent Order in Black Voters Matter Fund v. Raffensperger, No. 1:20-CV-04869-SCJ, 2020 WL 7394457 (N.D. Ga. Dec. 16, 2020) "affirms the legal sufficiency of the NCOA as a matter of law to establish a factual basis that the elector has moved." Doc. No. [21], p. 6. Defendants misstate the Court's holding. First, the Court never implied that the NCOA affirmatively establishes that a voter has moved—only that, *for purposes of NVRA list maintenance*, States may legally use it to flag voters who may have moved and begin the process to confirm that they have moved (notice and the passage of two general elections). See id. at *9–11.

13

2d 1077, 1081 (D. Mont. 2008), <u>as amended</u> (Oct. 10, 2008) ("[A] state cannot prevent a citizen from voting on the ground that the citizen has changed his or her address. This rule is . . . designed to protect the citizen's *right to vote* for at least two federal election cycles while the citizen updates his or her registration information.") (emphasis added)).

Further, Section 8(c)(2)(A) of the NVRA (the "90 Day Provision") "requires states to 'complete, not later than 90 days prior to the date of a primary or general election for Federal office, any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters.'" <u>Arcia v. Fla. Sec'y of State</u>, 772 F.3d 1335, 1338–39 (11th Cir. 2014) (citing 42 U.S.C. § 1973gg–6(c)(2)(A)). Congress' use of "the phrase 'any program' suggests that the 90 Day Provision has a broad meaning." <u>Id.</u> at 1334. And the distinction between individualized removals and systematic ones exists because

> individualized removals are safe to conduct at any time because this type of removal is usually based on individual correspondence or rigorous individualized inquiry, leading to a smaller chance for mistakes. For programs that systematically remove voters, however, Congress decided to be more cautious.

<u>Id.</u> at 1346. Though it is true that TTV is a private party and not a state actor, its broad-strokes challenge to over 360,000 voters' eligibility based only on the

14

NCOA can be categorized as a systematic attempt to identify ineligible voters. See id. at 1334 (finding program at issue was systematic because it "did not rely upon individualized information or investigation to determine which names from the voter registry to remove. Rather, the [program] used a mass computerized data-matching process to compare the voter rolls with other state and federal databases . . . .").

Thus, Defendants appear to be attempting to circumvent the requirements of the NVRA for identifying ineligible voters. Though Defendants are correct that this is not an NVRA challenge (and indeed, it is doubtful Defendants, as private entities/persons, could even be sued under Section 8, as its requirements apply to States) the foregoing lends support to Plaintiffs' argument that Defendants' § 21-2-230 challenges are frivolous. See Doc. No. [11-1], p. 26.

Also, the Court is concerned that Defendants' § 21-2-230 challenges may disenfranchise eligible voters. As Plaintiffs note, a global pandemic continues to rage. Many of the voters flagged by Defendants' use of the NCOA may be temporarily out of state for various COVID-19 related reasons.[8] Though it is true

---

[8] Indeed, people may appear on the NCOA list for any number of reasons that do not affect their eligibility to vote. For example, Doe Plaintiffs have had their mail forwarded

that § 21-2-230 provides some due process to voters whose eligibility is challenged, the voters targeted by Defendants may be unable to appear for a county board of elections hearing to defend their eligibility, see § 21-2-230(g), or to correct their challenged absentee ballot, see § 21-2-230(e). Such issues are even more likely given that Defendants began filing their challenges *after* early voting had already begun. This concern was shared by another District Court Judge in a similar case, who recently stated:

> One can imagine the mischief an immature political operative could inject into an election cycle were he to use [state challenge] statutes, not for their intended purpose of protecting the integrity of the people's democracy, but rather to execute a tawdry partisan ploy. Voters might be intimidated, confused, or even discouraged from voting upon receiving notice that their right to vote—the most precious right in a government of, by, and for the people—has been challenged.

---

while taking a temporary job assignment out of state. Doc. No. [26], pp. 1–2. People sometimes have their mail forwarded (and thereby appear on the NCOA) for reasons other than changing their residency. That is exactly why the NVRA prohibits states from relying solely on the NCOA to remove voters from voter rolls. And, as stated above, Defendants cannot seriously distinguish using NCOA information to remove someone from the voter rolls and using that same information to prevent someone from voting in a specific election. The end is the same: NCOA information alone is used to disenfranchise a voter. The NVRA is crafted to prevent exactly that. Defendants thus present a difference without a distinction.

16

Eaton, 581 F. Supp. 2d at 1079.[9]

Finally, the Court addresses Defendants' First Amendment arguments. See Doc. No. [21], pp. 19–22. Doubtless those arguments will be more fully addressed as this litigation proceeds. However, the Court notes that there are narrow carve-outs from constitutionally protected speech—including true threats.[10] And, in at least one case, the Supreme Court has held that a state's interest in "preventing voter intimidation and election fraud" is sufficiently compelling to survive strict scrutiny under the First Amendment. Burson v. Freeman, 504 U.S. 191, 206 (1992).

The right to vote is a "'fundamental political right' that is 'preservative of all rights.'" Williams v. Rhodes, 393 U.S. 23, 38 (1968) (quoting Yick Wo v.

_____

[9] The "mischief" mentioned by the district judge in the Eaton case is of serious concern, as Defendants' broad-stroke/mass challenges (filed in the weeks immediately preceding the January 5, 2021 runoff election) could cause confusion to voters and add extra work to the boards of elections through having to possibly hold hearings and otherwise resolve over 360,000 voter challenges prior to certifying the elections — on top of their numerous other election duties.

[10] A true threat is a statement in which "the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals." United States v. Castillo, 564 F. App'x 500, 502 (11th Cir. 2014) (quoting Virginia v. Black, 538 U.S. 343, 359 (2003)). "The speaker need not actually intend to carry out the threat." Black, 538 U.S. at 359–60. "Rather, a prohibition on true threats 'protect[s] individuals from the fear of violence' and 'from the disruption that fear engenders,' in addition to protecting people 'from the possibility that the threatened violence will occur.'" Id. at 360.

Hopkins, 118 U.S. 356, 370 (1886)). Our country, and the South in particular, has a long and storied history of voter intimidation and harassment that has taken both overt and subtle forms. Though the Court finds, infra, that Plaintiffs have not met their burden for a preliminary injunction, that is not the end of the inquiry. It remains to be seen whether Defendants have violated federal law—and the consequences of any such violation "should not rest on the shoulders of citizens seeking to vote." Eaton, 581 F. Supp. 2d at 1080.

The Court now turns to its analysis.

### A.   Plaintiffs' Motion to Proceed Anonymously Is Due to Be Granted

Here, Plaintiffs do not allege that absent anonymity they will be compelled to disclose intimate information or statements against their penal interest. The activity they are challenging is one undertaken by private parties, and neither Doe Plaintiff is a minor. However, Doe Plaintiffs fear they and their families will become targets for harassment, retaliation, or violence for their participation in this action if their names are made public. Doc. No. [2-1]. This Court finds, in light of the current climate surrounding this runoff election, their fears to be reasonable. Since the general election, Georgia election workers and officials have reported receiving threats predicated on unfounded claims of voter fraud. Doc.

18

Nos. [2-1], p.2 n.1; [11-10]; [11-11]; [11-12]. The atmosphere has been serious enough for state officials to make a public plea for the accusations to stop before people are seriously harmed or killed. Doc. Nos. [2-1], p. 2 n.3; [11-10]; [11-12]. Both Doe Plaintiffs are registered in a county where the list of challenged electors has already been published as part of the public record; thus, making their names and addresses accessible online. And because Plaintiffs have submitted declarations *in camera*—which Defendants have reviewed in redacted form—this Court does not find anonymity to be fundamentally unfair to Defendants.

**B.    <u>Plaintiffs Have Standing</u>**

First, Defendants do not contest that Fair Fight has established it has suffered an injury-in-fact under a diversion-of-resources theory. Doc. No. [21], p. 10. Defendants argue, however, that Fair Fight has not shown redressability. <u>Id.</u> at 13. Fair Fight countered during the preliminary injunction hearing (Doc. No. [25]) that a favorable decision will redress its injury because Fair Fight will then be able to stop diverting the resources it has had to reallocate to assist voters affected by Defendants' actions. The Court finds that Fair Fight has established standing by (1) showing an injury-in-fact through a diversion of resources, (2)

showing that Defendants caused this injury, and (3) showing that a favorable decision would provide redressability.

Defendants also argue that Doe Plaintiffs lack standing because they have not established an injury-in-fact or redressability. Id. at 11. Working without the benefit of Doe Plaintiffs' declarations, Defendants argue that Doe Plaintiffs' allegations are harm were too speculative to constitute an injury-in-fact. Id. at 12. And Defendants' contend that Doe Plaintiffs failed to establish redressability because they failed to request an injunction against the public disclosure of their information, and any fear of harassment from their names already having been published would not be redressed by the requested relief. Id. at 12–13. After reviewing Doe Plaintiffs' declarations, the Court disagrees with Defendants. Doe Plaintiffs have alleged a harm attributable to Defendants by showing that Defendants challenged their ability to vote in the upcoming runoff election, which has created stress and a fear of harm. Furthermore, the Court finds for present purposes that Doe Plaintiffs have shown redressability. If the Court ultimately provides a favorable opinion declaring that the manner in which Defendants carried out their O.G.C.A. § 21-2-230 challenges was unlawful, Doe

Plaintiffs will not be subjected to this harm in later elections. Thus, the Court finds for now that Doe Plaintiffs have established standing.[11]

**C.**   **Plaintiffs' Motion Is Due to Be Denied Because Plaintiffs Have Not Demonstrated a Likelihood of Success on the Merits of Their Claim**

Plaintiffs' request for injunctive relief stems from their claim under Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b). Under Section 11(b),

> [n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote, or intimidate, threaten, or coerce any person for exercising any powers or duties under [certain other provisions] of this title.

52 U.S.C. § 10307(b). Put another way, Section 11(b) prohibits intimidating or threatening a person for voting or attempting to vote by, among other things,

---

[11] Furthermore, even if the Court were to find that Doe Plaintiffs lack standing, the Court would undertake a full legal analysis for this emergency order because Fair Fight has standing. Cf. Am. Civil Liberties Union of Ga. v. Rabun Cty. Chamber of Commerce, Inc., 698 F.2d 1098, 1108–09 (11th Cir. 1983) ("Because we have determined that at least these two individuals have met the requirements of Article III, it is unnecessary for us to consider the standing of the other plaintiffs in this action."); see also Town of Chester, N.Y. v. Laroe Estates, Inc., --- U.S. ----, 137 S. Ct. 1645, 1650–51 (2017) ("At least one plaintiff must have standing to seek each form of relief requested in the complaint.").

frightening or promising reprisal against such a person for voting or attempting to vote. See Nat'l Coal. on Black Civic Participation v. Wohl, No. 20 CIV. 8668 (VM), 2020 WL 6305325, at *13 (S.D.N.Y. Oct. 28, 2020), reconsideration denied, No. 20 CIV. 8668 (VM), 2020 WL 6365336 (S.D.N.Y. Oct. 29, 2020) (construing "intimidate," "threaten," and "coerce" under Section 11(b) under their familiar definitions). Thus, "[t]o establish a claim under Section 11(b), a plaintiff must show that the defendant has intimidated, threatened, or coerced someone for voting or attempting to vote, or has attempted such intimidation, threat, or coercion." Id.

Section 11(b) provides a private right of action to affected individuals, and such claimants may bring lawsuits against private individuals who allegedly violate Section 11(b). Id. While the more overtly violent voter-related harms that have marred this nation's history clearly constitute voter intimidation and threats, see United States v. McLeod, 385 F.2d 734, 741 (5th Cir. 1967), courts agree that subtler forms of intimidation can give rise to a Section 11(b) claim, see Nat'l Coal. on Black Civic Participation, 2020 WL 6305325 at *16. For example, courts have found Section 11(b) violations when individuals harassed voters at the polls by implying they would be arrested, directing derisive noises at them, following

22

them out of polling places, and recording their license plate numbers. <u>See</u> <u>Nat'l</u> <u>Coal. on Black Civic Participation</u>, 2020 WL 6305325 at \*16–17 (citing cases).

Further, unlike similar statutes such as Section 131(b) of the Civil Rights Act of 1957, Section 11(b) has no intent requirement. In other words, a plaintiff need not show animus or an intent to harass or intimidate in order to succeed on a Section 11(b) claim. The plain language of the statute controls, <u>Pinares v. United</u> <u>Techs. Corp.</u>, 973 F.3d 1254, 1260 (11th Cir. 2020), and the wording of Section 11(b) contains no intent requirement, 52 U.S.C. § 10307(b).[12] And courts routinely interpret this provision as containing no intent requirement. <u>See, e.g.</u>, <u>Willingham v. Cty. of Albany</u>, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006); <u>League</u> <u>of United Latin Am. Citizens</u>, 2018 WL 3848404 at \*3–4 (analyzing the text of Section 11(b) against similar statutes that explicitly require a showing of intent); <u>Nat'l Coal. on Black Civic Participation</u>, 2020 WL 6305325 at \*13; <u>but see</u> <u>Parson</u> <u>v. Alcorn</u>, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016).

---

[12] Indeed, looking to the legislative history, Congress specifically omitted such an intent requirement to make it easier to bring a claim under Section 11(b). <u>See</u> H.R. Rep. No. 89-439, at 30 (1965) (stating that "no subjective purpose or intent need be shown" to bring a Section 11(b) claim) ); Hearings on S. 1564 Before the S. Comm. on the Judiciary, 89th Cong. 16 (1965) ("This variance from the language of § 1971(b) is intended to avoid the . . . burden of proof of 'purpose'. . . .").

23

As the movants, Plaintiffs must clearly establish that they are likely to succeed on the merits of their claim. See Siegel v. LePore, 234 F.3d 1163, 1176 (11th Cir. 2000). Of course, that means Plaintiffs needed to present sufficient evidence to show that they are likely to succeed. See id. Here, Plaintiffs have submitted Doe Plaintiffs' signed declarations, which the Court reviewed *in camera* and filed to the docket in redacted form after Defendant's had an opportunity to review and respond. See Doc. Nos. [26]; [27]. The declarations summarize Doe Plaintiffs' reasons for changing their mailing addresses, affirm they still maintain residency in Georgia, and state their fear of retaliation from Defendants and their supporters if their name was publicly associated with this action. Plaintiffs have also submitted the declaration of Lauren Groh-Wargo, Senior Advisor to Fair Fight, in which Ms. Groh-Wargo detailed how Fair Fight learned of TTV's challenges and the actions it took in response. Doc. No. [11-25]. Plaintiffs have not submitted any other declarations or affidavits for the Court to consider. Nor have they verified their Complaint.

Plaintiffs have filed several exhibits with their Complaint and Motion for a TRO. This evidence includes various news articles on voter fraud rumors, the climate in Georgia running up to the runoff election, voter purges, and TTV's

history of coordinating voter challenges across the country. Plaintiffs also provide screenshots of a TTV tweet and press releases from its website about its initiatives for the Georgia runoff election.

In addition to an email from "gaelectorchallenge@truethevote.org" challenging Cobb County electors (Doc. No. [11-6]), they include a Cobb County press release regarding the challenges (Doc. No. [11-13]). While Cobb County's Board of Elections ultimately denied the challenges, the press release provides public access to the list of challenged electors. Doc. No. [11-13].

Plaintiffs allege that challenge lists in other counties are also available as part of the public record, but they do not identify which counties have already published these lists, and it is unclear how many challenged electors are still at risk of having their information made accessible online. They do provide evidence of a Twitter user, "@Crusade4Freedom," threatening to publish the entire list of the approximately 366,000 challenged Georgia electors. Doc. Nos. [11-3]; [11-21]. They state that this user claims to work with TTV. Doc. No. [11-1], p. 15. However, they provide no evidence to confirm that these tweets were made on behalf of, in association with, or at the encouragement of TTV.

25

After careful review and consideration of the evidence and arguments, the Court finds that Plaintiffs have not provided enough evidence at this point to show that they are likely to succeed on the merits of their claims. Most critically, the evidence provided to date does not show that Defendants have harassed or intimidated voters. First, the affidavits from Doe Plaintiffs show only that they (1) were shocked and distressed by Defendants' O.G.C.A. § 21-2-230 challenges against them and (2) fear potential harassment if their names are associated with the challenges. Doc. No. [26]. While the Court does not doubt that Doe Plaintiffs have legitimate fear of retaliation, there is insufficient evidence at this point to connect intimidation or harassment (real or attempted) to Defendants. At this stage, the connection to Defendants is too tenuous to find they have violated Section 11(b).

Second, the other evidence Plaintiffs have attached to their Complaint and Motion fails to show that *Defendants* have harassed or intimidated voters by facilitating or directly undertaking the O.G.C.A. § 21-2-230 challenges. The news articles Plaintiffs provide certainly punctuate the highly divided—and often outright dangerous—environment this election season has fomented. But as much as this milieu may be intimidating to voters, the articles do not connect

Defendants directly to intimidation suffered by the voters who are the subject of the O.G.C.A. § 21-2-230 challenges. The social media account postings likewise underscore this threatening atmosphere, but they do not show that *Defendants* have intimidated or threatened voters in violation of Section 11(b). How third-party actors react to Defendants' actions is not directly attributable to Defendants without clearer connections borne out by evidence. And while Plaintiffs do provide some evidence more directly linked to Defendants—such as the Cobb County voter challenge email (Doc. No. [11-6])—this evidence tends to show only that Defendants are availing themselves of the O.G.C.A. § 21-2-230 voter challenge process. They do not show that Defendants' challenges or other actions have threatened or intimidated voters.

To be sure, Plaintiffs may yet prove their Section 11(b) claim. For example, during the preliminary injunction hearing (Doc. No. [25]), Plaintiffs indicated that Defendants may be undertaking such actions as offering a "bounty" to unearth voter fraud and recruiting intimidating individuals to patrol voting polls. If corroborated by evidence, such allegations may support Plaintiffs' Section 11(b) claim. And as stated above, this Court is deeply concerned that Defendants'

O.G.C.A. § 21-2-230 challenges run afoul of the NVRA.[13] And if Plaintiffs later provide enough evidence to show that these particular O.G.C.A. § 21-2-230 challenges run afoul of the NVRA, the Court may be positioned to find that the challenges were frivolous. The frivolity of such voter challenges, in turn, may tend to support Plaintiffs' contentions that these challenges result only in voter harassment and intimidation. But at this point, Plaintiffs have failed to provide enough evidence to show that. Thus, this Court cannot grant Plaintiffs' request for a TRO or preliminary injunction based on Section 11(b).[14]

**IV.    CONCLUSION**

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion to Proceed Anonymously (Doc. No. [2]) and **DENIES** Plaintiffs' Motion for a Temporary Restraining Order and/or Preliminary Injunction (Doc. No. [11]).

---

[13] To be clear, the Court does not suggest that O.G.C.A. § 21-2-230 facially conflicts with the NVRA. But the Court harbors serious concerns that the manner in which the voter challenges at issue are being undertaken and entertained conflicts with the NVRA.

[14] Because a failure to show a likelihood of success on the merits is fatal to a party's request for a TRO, a court need not address the other requirements. Bloedorn v. Grube, 631 F.3d 1218, 1229 (11th Cir. 2011); Pittman v. Cole, 267 F.3d 1269, 1292 (11th Cir. 2001). Accordingly, because Plaintiffs have not satisfied their burden on the first prong of the analysis, this Court declines to address the remaining prongs.

While this Court denies Plaintiffs' motion for injunctive relief, this case is not yet over. As this Court has expressed clearly, an eleventh-hour challenge to the franchise of more than 360,000 Georgians is suspect. So too is the manner in which Defendants mounted their challenges. The Court will not abide attempts to sidestep federal law to disenfranchise voters. Nor will it tolerate actors brandishing these voter challenges to intimidate and diminish the franchise, for such acts diminish democracy itself. But the Court must rely on proper evidence and facts to determine whether these acts have in fact run afoul of federal law. The Court looks forward to seeing what evidence the Parties bring to bear.

**IT IS SO ORDERED** this 1st day of January, 2021.

 s/Steve C. Jones
**HONORABLE STEVE C. JONES**
**UNITED STATES DISTRICT JUDGE**

29