# UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

FAIR FIGHT, INC., JOHN DOE, and
JANE DOE,

                Plaintiffs,

    v.

TRUE THE VOTE, CATHERINE
ENGELBRECHT, DEREK
SOMERVILLE, MARK DAVIS, MARK
WILLIAMS, RON JOHNSON, JAMES
COOPER, and JOHN DOES 1–10,

                Defendants,

  FAIR FIGHT ACTION, INC.,

                Counter-Defendant.

**Case No. 2:20-CV-00302-SCJ**

## PLAINTIFFS FAIR FIGHT, INC., JOHN DOE, JANE DOE, AND COUNTER-DEFENDANT FAIR FIGHT ACTION, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS

# TABLE OF CONTENTS

INTRODUCTION ............................................................................................1

BACKGROUND .............................................................................................3

I.    Defendants engaged in a coordinated campaign to harass and intimidate voters across Georgia. ...........................................3

II.    Plaintiffs sought immediate injunctive relief, and Defendants filed counterclaims. ...............................................................5

STANDARD OF REVIEW ...............................................................................7

ARGUMENT ...................................................................................................8

I.    Counts 1–4 should be dismissed because they are defenses or denials improperly asserted as counterclaims, and they do not state a claim for relief or articulate cognizable injuries. .....................8

    A.    Count 1 seeks a declaration of the law without an underlying cause of action. ...................................................10

    B.    Count 2 fails to state a claim for relief under the First Amendment because Plaintiffs are not state actors. ...............12

    C.    Count 3 asserts another constitutional defense, without state action, and without a particularized injury sufficient to demonstrate standing. ...........................................14

    D.    Count 4 rests on an erroneous interpretation of § 11(b) rejected by this Court and fails to state a plausible claim for relief under the Fifth Amendment. ......................................16

II.    Defendants fail to state a claim that Fair Fight has violated § 11(b) of the Voting Rights Act. ...............................................18

    A.    Section 11(b) of the VRA does not protect individuals who attempt to disqualify others from voting. ..........................19

    B.    Defendants have not plausibly alleged that Fair Fight has engaged in conduct that could be considered intimidating under the VRA. ...........................................................21

CONCLUSION ...............................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Aldana v. Del Monte Fresh Produce, N.A., Inc.*,
416 F.3d 1242 (11th Cir. 2005) ............................................................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)............................................................................23

*Bedwell v. Braztech Int'l, L.C.*,
No. 1:17-cv-22335, 2017 WL 4810599 (S.D. Fla. Oct. 25, 2017)................9, 12

*Bognet v. Sec'y of Commonwealth of Pa.*,
980 F.3d 336 (3d Cir. 2020) ..............................................................15

*Brooks v. Mahoney*,
No. 4:20-cv-00281, Compl., ECF No. 1 (S.D. Ga. Nov. 11, 2020) ....................3

*Cellemetry, LLC v. Mobile Star GPS, LLC*,
No. 1:08-CV-2212-MHS, 2008 WL 11417231 (N.D. Ga. Sept. 12,
2008) .........................................................................................10, 11

*CISPES (Comm. in Solidarity with People of El Salvador) v. FBI*,
770 F.2d 468 (5th Cir. 1985) ..............................................................18

*Cranley v. Nat'l Life Ins. Co. of Vermont*,
318 F.3d 105 (2d Cir. 2003) ..............................................................12

*Dadeland Dodge, Inc. v. Chrysler Motors LLC*,
No. 07-22324-CIV, 2007 WL 9702150 (S.D. Fla. Oct. 30, 2007)................8, 12

*Delegates to Republican Nat'l Convention v. Republican Nat. Comm.*,
No. SACV 12-00927 DOC, 2012 WL 3239903 (C.D. Cal. Aug. 7,
2012) .........................................................................................21

*Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*,
830 F. App'x 377 (3d Cir. 2020) ........................................................15

*Gagliardi v. TJCV Land Tr.*,
889 F.3d 728 (11th Cir. 2018) ............................................................11

*Hunt v. Aimco Props., L.P.*,
   814 F.3d 1213 (11th Cir. 2016) ...........................................................7

*In re Rawson Food Serv., Inc.*,
   846 F.2d 1343 (11th Cir. 1988) ...................................................8, 12

*Kinsey v. King*,
   257 F. App'x 136 (11th Cir. 2007) ...................................................14

*Kowalski v. Tesmer*,
   543 U.S. 125 (2004) ...........................................................................7

*League of United Latin Am. Citizens - Richmond Region Council 4614
   v. Public Interest Legal Found.*,
   No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) .................20

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) .........................................................................16

*Mulhall v. UNITE HERE Local 355*,
   618 F.3d 1279 (11th Cir. 2010) ..........................................................9

*Muransky v. Godiva Chocolatier, Inc.*,
   979 F.3d 917 (11th Cir. 2020) ...........................................................7

*Nat'l Broad. Co. v. Commc'ns Workers of Am., AFL-CIO*,
   860 F.2d 1022 (11th Cir. 1988) .........................................12, 14, 16

*Nat'l Coal. on Black Civic Participation v. Wohl*,
   No. 20 CIV. 8668 (VM), 2020 WL 6305325 (S.D.N.Y. Oct. 28,
   2020) .................................................................................................23

*Ne. Ohio Coal. for the Homeless v. Husted*,
   No. 2:06-CV-896, 2016 WL 3166251 (S.D. Ohio June 7, 2016) ....................22

*Sephus v. Gozelski*,
   864 F.2d 1546 (11th Cir. 1989) .......................................................13

*Shelley v. Kraemer*,
   334 U.S. 1 (1948) ...............................................................13, 14, 16

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ...................................................................15

*Thomas v. U.S. Bank Nat'l Ass'n*,
  No. 1:14-CV-0548-TCB-JSA, 2015 WL 11233459 (N.D. Ga. July
  15, 2015) ........................................................................................11

*Trump v. New York*,
  141 S. Ct. 530 (2020) .....................................................................9

*U.S. ex rel. Osheroff v. Humana Inc.*,
  776 F.3d 805 .................................................................................23

*United States v. Bowker*,
  372 F.3d 365 (6th Cir. 2004) .........................................................18

*United States v. McLeod*,
  385 F.2d 734 (5th Cir. 1967) .........................................................24

*United States v. Shrader*,
  675 F.3d 300 (4th Cir. 2012) .........................................................17

*United States v. Wayerski*,
  624 F.3d 1342 (11th Cir. 2011) .....................................................17

*Wood v. Raffensperger*,
  981 F.3d 1307 (11th Cir. 2020) .....................................................14

*Wood v. Raffensperger*,
  No. 1:20-CV-5155-TCB, 2020 WL 7706833 (N.D. Ga. Dec. 28,
  2020) .............................................................................................15

**STATUTES**

52 U.S.C. § 10307(b) .........................................................................1, 19

Declaratory Judgment Act ...................................................................10

National Voter Registration Act of 1993 .................................6, 9, 10, 11

Voting Rights Act ........................................................................passim

**OTHER AUTHORITIES**

Fed. R. Civ. P. 8(c)(2) ..................................................................8

Fed R. Civ. P. 12(b)(6) ...............................................................7

H.R. No. 89-439 (June 1, 1965) ...............................................19

U.S. Const. amend. I ...................................................6, 12, 14

U.S. Const. amend. V ...............................................................14, 16

U.S. Const. amend. XIV ...........................................................13

## **INTRODUCTION**

In the weeks before Georgia's Senate Runoff, Defendants accused hundreds of thousands of Georgians of being ineligible to vote based on unreliable data. They actively recruited volunteers to engage in objectively intimidating behavior, including by staking out ballot return sites and photographing voters who they deemed suspicious. They even offered a $1 million reward to encourage citizen vigilantes to find evidence of illegal voting. They did all this to foment repeatedly disproven claims and theories of widespread voter fraud that, quite simply, does not exist.

Defendants' efforts fanned the flames of an increasingly volatile and dangerous environment where false claims of voter fraud have increasingly led to threats of violence against voters, elections officials, and public office holders alike. To protect the Georgia electorate from these brazen efforts to make it more difficult for lawful voters to participate in the election, Plaintiffs sued Defendants under § 11(b) of the Voting Rights Act (VRA), a statute which outlaws conduct that is objectively likely to intimidate voters. 52 U.S.C. § 10307(b). Though the Court denied Plaintiffs' initial motion for emergency preliminary relief, the Court expressed "grave concerns" about Defendants' coordinated attack on Georgia voters in the eleventh hour before the election.

A subset of Defendants, including True the Vote, now attempt to bring five "counterclaims" against Plaintiffs. None have merit or state any viable claim for relief. The first four "counterclaims" are merely defenses and denials, rather than affirmative claims, most of which this Court already rejected in its January 1st Order. What's more, several of Defendants' purported counterclaims violate basic tenets of constitutional law by attempting to assert constitutional claims against purely private parties. Because Plaintiffs are not state actors—and are not alleged to be engaged in state action—they are not proper defendants in any claim seeking to enforce Defendants' constitutional rights. And even if Defendants had sued the proper actors, Defendants have not alleged injuries sufficient to support Article III standing. Defendants' asserted vote dilution "injury," for example, is nothing more than a speculative and generalized grievance that federal courts have repeatedly and thoroughly rejected nationwide.

Defendants' final remaining counterclaim attempts to sue Plaintiff Fair Fight, Inc. and Counter-Defendant Fair Fight Action, Inc. (collectively, "Fair Fight") for voter intimidation under § 11(b) of the VRA for no other reason than that, in this lawsuit and in public statements, Fair Fight accused Defendants of engaging in voter suppression. But § 11(b) of the VRA cannot protect Defendants here. The VRA does not and was not intended to protect those who attempt to disqualify others from

voting. And even if it did, Defendants have not plausibly alleged that Fair Fight has engaged in conduct that could be considered intimidating under the VRA. Indeed, Defendants fail to allege any facts identifying any conduct whatsoever by Fair Fight Action—a separate organization which was not a party to the Complaint. Moreover, Defendants' reading of § 11(b), if successful, would give would-be intimidators license to engage in aggressive "anti-fraud" measures, comfortable in the knowledge that any efforts to intimidate voters would be legally excused if the intimidators can claim they were protecting their own votes from dilution by supposedly fraudulent votes. This surely could not have been what Congress intended. For all these reasons, Defendants' final counterclaim against Fair Fight must also be dismissed.

## **BACKGROUND**

### I.   **Defendants engaged in a coordinated campaign to harass and intimidate voters across Georgia.**

In the wake of the 2020 General Election, Defendants attempted to sow doubt that the election was plagued with fraudulent and illegal voting. *See* Compl., ECF No. 1 ¶ 34. Defendant True the Vote, for example, filed litigation claiming that tens of thousands of ineligible voters cast illegal ballots for President Biden in Georgia's general election. *See Brooks v. Mahoney*, No. 4:20-cv-00281, Compl., ECF No. 1 (S.D. Ga. Nov. 11, 2020). Though this legal challenge to the election did not succeed, Defendants' claims of voter fraud contributed to an increasing fever pitch that the

election had been stolen—claims that resulted in doxing, harassment, and threats of violence to Georgia's election workers. *See* Compl. ¶¶ 35–37.

Rather than reconsider their actions in light of these dangerous consequences, Defendants barreled on with a vengeance, launching and attempting to "execute"— just before the Senate Runoff—what True the Vote itself described as "the most aggressive election integrity operation in American history." *Id.* ¶ 59. This "operation" included partnering with individual electors to file challenges against 364,000 Georgians, contending that they were ineligible to vote based on entries Defendants purportedly found in the United States Postal Service's National Change of Address (NCOA) registry. This registry is a notoriously unreliable database for the purpose of determining voter eligibility. *See id.* ¶¶ 4, 38–48.

Though unprecedented in their size, scope, and timing, these challenges were entirely consistent with True the Vote's history of filing meritless challenges against voters. *See id.* ¶¶ 29–31. In their Counterclaim, Defendants have now admitted that True the Vote helped file these voter challenges "in almost every county in Georgia" and that they intend to keep filing these types of challenges in the future. Answer & Countercl., ECF No. 40 ¶¶ 125, 145. Finally, to complement their mass challenge effort, True the Vote—which also has a history of harassing voters at the polls— encouraged volunteers to watch voters return their ballots to drop box locations;

created a "voter integrity hotline" available to "citizen watchdogs" "24 hours a day, seven days a week" to respond and "take action" as necessary; and announced a $1 million reward fund to "incentivize" individuals to find evidence of illegal voting. Compl. ¶¶ 32–33, 57–60.

## II.    Plaintiffs sought immediate injunctive relief, and Defendants filed counterclaims.

In response to these tactics, Plaintiffs quickly filed suit, raising a single claim of voter intimidation under the Voting Rights Act. *See id.* ¶¶ 76–79. Plaintiffs also filed a Motion for Temporary Injunction seeking to prohibit Defendants from engaging in similar conduct in the future. *See* ECF No. 11.

On January 1, 2021, the Court denied Plaintiffs' motion, finding that at this early stage of litigation, it was not satisfied that there was sufficient evidence of harassment or intimidation. *See* Order, ECF No. 29, at 26. The Court emphasized, however:

> [T]his case is not yet over. As this Court has expressed clearly, an eleventh-hour challenge to the franchise of more than 360,000 Georgians is suspect. So too is the manner in which Defendants mounted their challenges. The Court will not abide attempts to sidestep federal law to disenfranchise voters. Nor will it tolerate actors brandishing these voter challenges to intimidate and diminish the franchise, for such acts diminish democracy itself.

*Id.* at 29. The Court also noted that "Plaintiffs may yet prove their Section 11(b) claim." *Id.* at 27.

-5-

One week later, Defendants filed an answer to Plaintiffs' complaint. *See* Answer & Countercl. Additionally, Defendants True the Vote, Inc., Mark Williams, and Ron Johnson (hereinafter, "Defendants") brought "counterclaims" against Plaintiffs and additional party Fair Fight Action, Inc. *Id.* Count 1 alleges that Defendants' Section 230 challenges do not violate the National Voter Registration Act of 1993 (NVRA). *See id.* ¶¶ 124–130. Count 2 alleges that judicial enforcement of the VRA against Defendants would violate Defendants' First Amendment rights to file Section 230 challenges. *See id.* ¶¶ 131–138. Count 3 alleges that judicial enforcement of the VRA against Defendants would dilute Defendants' right to vote. *See id.* ¶¶ 139–142. Count 4 alleges that judicial enforcement of § 11(b) of the VRA without an intent requirement would render § 11(b) unconstitutionally vague. *See id.* ¶¶ 143–156. Collectively, Counts 1–4 mention Plaintiffs only to note that Plaintiffs seek judicial enforcement of § 11(b). *See, e.g.*, *id.* ¶¶ 134–136. Counts 1–4 do not otherwise allege misconduct or any element of state action on the part of Plaintiffs. Count 5, Defendants' sole remaining counterclaim, alleges that Fair Fight violated § 11(b) of the VRA by suing Defendants for their efforts to attempt to disqualify others from voting and accusing Defendants of engaging in voter suppression. *See id.* ¶¶ 157–174.

Plaintiffs move to dismiss all of Defendants' counterclaims.

## STANDARD OF REVIEW

"To withstand a motion to dismiss under Rule 12(b)(6)," Defendants must allege "'enough facts to state a claim to relief that is plausible on its face.'" *Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1221 (11th Cir. 2016) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A 'claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Although "the plaintiff's 'facts' must be accepted as alleged," the Court need not accept "[b]ald assertions" or "unwarranted deductions of fact." *Aldana v. Del Monte Fresh Produce, N.A., Inc.*, 416 F.3d 1242, 1248 (11th Cir. 2005) (citations and quotation omitted).

"The doctrine of standing asks whether a litigant is entitled to have a federal court resolve his grievance. This inquiry involves 'both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise.'" *Kowalski v. Tesmer*, 543 U.S. 125, 128–29 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)). To establish Article III standing, a party must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Muransky v. Godiva*

*Chocolatier, Inc.*, 979 F.3d 917, 924 (11th Cir. 2020) (*quoting Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016)).

## ARGUMENT

I.   **Counts 1–4 should be dismissed because they are defenses or denials improperly asserted as counterclaims, and they do not state a claim for relief or articulate cognizable injuries.**

Defendants' first four counterclaims attempt to repackage mere counterarguments and rebuttals as causes of action, but the Federal Rules of Civil Procedure and settled precedent from the Eleventh Circuit draw a clear distinction between defenses and affirmative claims. For instance, the Eleventh Circuit has explained that "[a] defense which points out a defect in the plaintiff's prima facie case is not an affirmative defense," much less a counterclaim. *See In re Rawson Food Serv., Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988). And the Federal Rules of Civil Procedure provide that "[i]f a party mistakenly designates a defense as a counterclaim or a counterclaim as a defense, the court must, if justice requires, treat the pleading as though it were correctly designated." Fed. R. Civ. P. 8(c)(2). When a purported "counterclaim" merely presents a disagreement of statutory interpretation as a basis for denying requested relief, the "counterclaim" is properly treated as a denial, not a separate cause of action. *Cf. Dadeland Dodge, Inc. v.*

*Chrysler Motors LLC*, No. 07-22324-CIV, 2007 WL 9702150, at *3 (S.D. Fla. Oct. 30, 2007).

That Defendants' first four counterclaims (Counts 1–4) are contingent on this Court's future interpretation of the NVRA and § 11(b) and seek only to prevent *the Court* from granting Plaintiffs' requested relief further illustrates they are in fact defenses, not separate causes of action. As other courts in this Circuit have recognized, "an affirmative defense is a reason why a plaintiff's requested recovery should be eliminated whereas a counterclaim is 'essentially an action which asserts a right to [a remedy].'" *Bedwell v. Braztech Int'l, L.C.*, No. 1:17-cv-22335, 2017 WL 4810599, at *4 (S.D. Fla. Oct. 25, 2017) (quoting *Am. First Fed., Inc., v. Lake Forest Park, Inc.*, 198 F.3d 1259, 1264 (11th Cir. 1999)). Tellingly, Counts 1–4 do not seek any relief from Plaintiffs or allege any present injury. Instead, they are focused on avoiding liability should the Court find Plaintiffs prevail on their action in this case. This reveals yet another defect in the Counts that requires dismissal: a claim "must be 'ripe,' not dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all,'" in order to invoke this Court's jurisdiction. *Trump v. New York*, 141 S. Ct. 530, 535 (2020) (quotation omitted); *cf. Mulhall v. UNITE HERE Local 355*, 618 F.3d 1279, 1291–92 (11th Cir. 2010) ("[I]f a plaintiff's claimed injury depends on the resolution of other judicial proceedings,

there may well be fitness concerns that render the plaintiff's claim presumptively unripe.").

All of this points to only one conclusion: Counts 1–4 are not counterclaims, but defenses dressed up in disguise. They should be dismissed.

## A.   Count 1 seeks a declaration of the law without an underlying cause of action.

Even assuming Defendants' counterclaims were properly pled, they would still fail to advance any plausible claims. At best, Count 1 seeks an improper advisory opinion that Defendants' Section 230 challenges do not violate the NVRA. *See* Answer & Countercl. ¶¶ 124–130. The Court lacks jurisdiction both under Article III and federal law to hear this "claim," as evident from the fact that Plaintiffs have not affirmatively brought an NVRA claim in this case; that Defendants' "Count 1" contains no allegations about Plaintiffs at all; and that Defendants fail to identify any cognizable injury or right infringed.

Defendants merely seek a declaration of the law. *See id.* at 36 ¶ A; *see also id.* ¶ 93 (alleging jurisdiction under the Declaratory Judgment Act). But "declaratory judgment is a remedy, not an independent cause of action[;] . . . it must be predicated on a claim for relief." *Cellemetry, LLC v. Mobile Star GPS, LLC*, No. 1:08-CV-2212-MHS, 2008 WL 11417231, at *2 (N.D. Ga. Sept. 12, 2008). In other words, the Declaratory Judgment Act merely "enlarge[s] the range of remedies available in

the federal courts"; it does not supply an independent claim. *Gagliardi v. TJCV Land Tr.*, 889 F.3d 728, 735 (11th Cir. 2018) (quotation and citations omitted). Where plaintiffs "fail[] to state a plausible claim for relief . . . there are no actual justiciable controversies upon which th[e] Court may issue declaratory relief." *Thomas v. U.S. Bank Nat'l Ass'n*, No. 1:14-CV-0548-TCB-JSA, 2015 WL 11233459, at *15 (N.D. Ga. July 15, 2015), *report and recommendation adopted*, No. 1:14-CV-548-TCB, 2015 WL 11236541 (N.D. Ga. Aug. 13, 2015), *aff'd sub nom. Thomas v. US Bank Nat'l Ass'n*, 675 F. App'x 892 (11th Cir. 2017).[1]

Not only do Defendants not assert any cause of action under the NVRA, their entire claim appears to be premised on an objection to this Court's January 1st Order, in which the Court expressed its "grave concerns" that, in "an attempt to circumvent the [NVRA]," Defendants launched a "coordinated, broad-strokes challenge to more than 360,000 Georgia voters on the eve of an unprecedented two-seat Senate runoff." Order at 11. Here, Defendants recycle the same arguments this Court has already rejected and object to the Court's conclusion that removing a voter from the rolls and preventing someone from voting in an election is a "difference without a

---

[1] As discussed in greater detail in the proceeding sections, Defendants also fail to state a cause of action in Counts 2, 3, and 4. Thus, Defendants' request for declaratory relief with respect to these claims, *see* Answer & Countercl. at 36–37 ¶¶ B–D, must be denied. *Cellemetry*, 2008 WL 11417231, at *2.

distinction." *Id*. at 16 n.8. Whatever grievances Defendants have with the Court's analysis, *see* Answer & Countercl. ¶¶ 126–30, they are merely arguments and denials, not counterclaims. *See Rawson*, 846 F.2d at 1349; *Dadeland Dodge*, 2017 WL 9702150, at *3; *Bedwell*, 2017 WL 4810599, at *4. By seeking declaratory relief without alleging an underlying cause of action, Defendants have failed to state a claim and Count 1 should be dismissed.

### B. Count 2 fails to state a claim for relief under the First Amendment because Plaintiffs are not state actors.

Count 2 similarly fails to advance a cognizable legal theory and instead violates basic tenets of constitutional law by attempting to assert a First Amendment "claim" against purely private parties. Defendants contend that Plaintiffs' requested relief would violate their First Amendment rights by prohibiting and punishing them for filing Section 230 challenges. *See* Answer & Countercl. ¶ 138. But it is well settled that the First Amendment "do[es] not apply to private parties unless those parties are engaged in activity deemed to be 'state action.'" *Nat'l Broad. Co. v. Commc'ns Workers of Am., AFL-CIO*, 860 F.2d 1022, 1024 (11th Cir. 1988) (quotation omitted). The same is true of most constitutional claims. *See Cranley v. Nat'l Life Ins. Co. of Vermont*, 318 F.3d 105, 111 (2d Cir. 2003) ("Because the United States Constitution regulates only the Government, not private parties, a litigant claiming that his constitutional rights have been violated must first establish

that the challenged conduct constitutes 'state action.'" (quotation omitted)).
Plaintiffs are not state actors, Defendants have not alleged otherwise, and the "mere
use of legal process is not state action." *Sephus v. Gozelski*, 864 F.2d 1546, 1549
(11th Cir. 1989).

Attempting to circumvent these fatal defects, Defendants allege that the
*judicial enforcement* of § 11(b) against them would amount to state action. *See*
Answer & Countercl. ¶ 136. But the prospect of future state action does not support
a constitutional cause of action against *private parties*. In advancing this claim,
Defendants misconstrue the Supreme Court's decision in *Shelley v. Kraemer*, 334
U.S. 1 (1948). There, the Respondents sued the Petitioners for breach of a racially
restrictive covenant and attempted to divest Petitioners of their property. Though the
Petitioners in *Shelley* challenged the judicial enforcement of racially restrictive
covenants as a violation of the Fourteenth Amendment, that argument was a *defense*
against the enforcement of the covenants, not an independent cause of action. *See id*.
at 7; *see also* Brief of Petitioners at 2, *Shelley v. Kraemer*, 334 U.S. 1 (1948) (Nos.
72, 87), 1947 WL 30427, at *2 ("In their amended answer to the bill of complaint
petitioners duly raised the *defense* that the enforcement by the court of such
restrictive covenant would contravene the Fourteenth Amendment of the United
States Constitution. . . ." (emphasis added)). And though the Supreme Court agreed

-13-

with the Petitioners, at no point did the Court entertain or endorse constitutional causes of action against non-state actors. If anything, *Shelley* illustrates that Defendants have erroneously mischaracterized their First Amendment defense as a counterclaim. "Constitutional claims that fail to allege state action"—like Defendants' First Amendment claim—"are insubstantial and frivolous." *Kinsey v. King*, 257 F. App'x 136, 138–39 (11th Cir. 2007). Accordingly, Count 2 should be dismissed.

**C.    Count 3 asserts another constitutional defense, without state action, and without a particularized injury sufficient to demonstrate standing.**

In Count 3, Defendants cite the risk of vote dilution as the basis for yet another constitutional law *defense* (not a counterclaim), but their "claim," once again, is untethered to any state actor.[2] For the reasons stated above, the absence of government action is fatal. *See supra* § I(B); *Nat'l Broad. Co.*, 860 F.2d at 1024 (First and Fifth Amendments do not apply to private parties unless they are engaged in state action). Count 3 also advances an impermissibly generalized "vote dilution" theory that has been rejected repeatedly by federal courts across the country, including the Eleventh Circuit. *See, e.g.*, *Wood v. Raffensperger*, 981 F.3d 1307,

---

[2] Count 3 does not even identify the constitutional provision Defendants seek to enforce but alleges generally that enforcement of § 11(b) would result in vote dilution and would violate the constitutional right to vote.

-14-

1314–15 (11th Cir. 2020) (*Wood I*) (finding vote-dilution claim based on counting allegedly unlawful absentee ballots a "paradigmatic generalized grievance") (quoting *Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 356 (3d Cir. 2020)); *Bognet*, 980 F.3d at 356–57 (rejecting claim that vote dilution will occur by counting illegal or fraudulent votes because such injury would have a "proportional effect o[n] every vote" and thus is a "paradigmatic generalized grievance that cannot support standing" (quotations and citations omitted)); *Wood v. Raffensperger*, No. 1:20-CV-5155-TCB, 2020 WL 7706833, at *3 (N.D. Ga. Dec. 28, 2020) (*Wood II*) ("Courts have consistently found that a plaintiff lacks standing where he claims that his vote will be diluted by unlawful or invalid ballots.") (collecting cases); *Donald J. Trump for President, Inc. v. Sec'y of Pennsylvania*, 830 F. App'x 377 (3d Cir. 2020) (rejecting vote-dilution claim based on counting of allegedly illegal votes).

It is blackletter law that a plaintiff must demonstrate a "concrete" and "particularized," injury in order to establish standing. *Spokeo, Inc. v. Robins*, 578 U.S. —, 136 S. Ct. 1540, 1548 (2016). Though Defendants speculate that their votes will be diluted by unlawful ballots unless they can submit Section 230 challenges, *see* Answer & Countercl. ¶¶ 140–142, this purported injury would affect *all* Georgia voters in the same manner, not just Defendants. Such "generalized grievances"

-15-

cannot support Article III standing, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 575 (1992). For these reasons, Count 3 should be dismissed.

**D.    Count 4 rests on an erroneous interpretation of § 11(b) rejected by this Court and fails to state a plausible claim for relief under the Fifth Amendment.**

Defendants next invoke the Fifth Amendment's Due Process Clause to avoid the enforcement of § 11(b), but again fail to articulate a viable cause of action. Specifically, they contend that applying § 11(b) without proof of "racial animus" or "an intent to intimidate any elector from voting" would render the statute "unconstitutionally vague." Answer & Countercl. ¶¶ 147–48, 155–156. The Fifth Amendment, like the First, does not provide a cause of action against private parties unless they are engaged in government action. *See Nat'l Broad. Co.*, 860 F.2d at 1024. So once again, Defendants have failed to state a claim for relief under the Constitution, *see supra* § I(B)—which is also a symptom of their attempt to mislabel another erroneous affirmative defense as a counterclaim. *See Shelley*, 334 U.S. at 7.

This claim, too, is nothing more than an argument with the Court's legal conclusions in its January 1st Order. Specifically, Defendants disagree with the Court's conclusion that "a plaintiff need not show animus or an intent to harass or intimidate in order to succeed on a Section 11(b) claim." Order at 23. "[C]ourts routinely interpret this provision as containing no intent requirement." *Id.* (citations

omitted). In support of their claim, Defendants recycle the same arguments they made in their opposition to Plaintiffs' motion for a preliminary injunction that the Court previously considered and rejected.

Further, Defendants make no attempt to reconcile their argument with the plain language of the statute, nor can they overcome the "strong presumption that statutes passed by Congress are valid." *United States v. Wayerski*, 624 F.3d 1342, 1347 (11th Cir. 2011) (noting a challenge begins with the plain language of the statute itself) (citation omitted). Though Defendants rely on the fact that voter challenges are permitted by Georgia law, this argument misses the point. The mere availability of a Section 230 challenge does not create a safe haven for intimidating, harassing, or coercive conduct under § 11(b). It is Defendants' specific *conduct*— coordinating a mass campaign of frivolous challenges, encouraging "citizen watchdogs" to report their fellow Georgians for suspected illegal voting, offering a $1 million bounty to "incentivize" reporting "election malfeasance," etc., *see* Compl. ¶¶ 2–6—that creates liability, and not simply their use of the Section 230 challenge process. *See generally* Compl.

Defendants also do not allege that the terms "intimidate," "threaten," or "coerce" are vague. Courts routinely conclude these terms are not ambiguous. *See e.g.*, *United States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012) ("'Harass' and

'intimidate' are not obscure words."), *cert. denied*, 568 U.S. 1049 (2012); *United States v. Bowker*, 372 F.3d 365, 383 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1182 (2005) (concluding in criminal context that the words "threaten" and "harass" have generally accepted and easily ascertained meanings); *CISPES (Comm. in Solidarity with People of El Salvador) v. FBI*, 770 F.2d 468, 476 (5th Cir. 1985) (rejecting vagueness challenge to the word "coerce" and concluding "with little discussion or difficulty" that it was "constitutionally sound" (citation omitted)). In other words, this is not a case in which a person "of common intelligence must necessarily guess" as to whether a specific act is proscribed by statute, *see* Answer & Countercl. ¶ 155 (quoting *Georgia Pac. Corp. v. Occupational Safety & Health Rev. Comm'n*, 25 F.3d 999, 1005 (11th Cir. 1994)); the conduct challenged by Plaintiffs falls plainly within the ambit of § 11(b). Thus, even if Count 4 were properly before this Court, Defendants have not stated a plausible claim that § 11(b) is void for vagueness as applied to them. For these reasons, Count 4 should also be dismissed.

## II.     Defendants fail to state a claim that Fair Fight has violated § 11(b) of the Voting Rights Act.

Count 5—Defendants' final counterclaim—alleges that Fair Fight itself engaged in voter intimidation in violation of the VRA by suing Defendants and

accusing Defendants of engaging in voter suppression.[3] *See* Answer & Countercl. ¶¶ 157–174. Defendants' claim is meritless. For the reasons explained below, § 11(b) of the VRA does not protect individuals who attempt to disqualify others from voting, and even if it did, Defendants have not plausibly alleged that Fair Fight has engaged in conduct that could be considered intimidating under the VRA.

### A.   Section 11(b) of the VRA does not protect individuals who attempt to disqualify others from voting.

Consideration of Defendants' voter intimidation claim can begin and end with the plain language of the statute. The text of § 11(b) reads:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person ***for voting or attempting to vote***, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person ***for urging or aiding any person to vote or attempt to vote*** . . .

52 U.S.C. § 10307(b) (emphases added). As the House Report to the VRA explained, the latter part of this provision "covers intimidation of those who engage in activities to encourage others to register or vote." H.R. No. 89-439 at 2439 (June 1, 1965).

Thus, § 11(b) protects individuals who have been targeted for (1) voting, or (2) helping others to vote. Unsurprisingly, the statute, by its own terms, does *not* protect an individual who challenges another person's eligibility to vote or attempts

---

[3] As noted *infra* at 23, only Fair Fight, Inc. is a plaintiff in the suit against Defendants. Fair Fight Action, Inc. is a wholly separate organization.

to disqualify another person from voting. Such a reading would flip § 11(b) on its head.

None of the Defendants claim that they have been intimidated for voting or for helping others to vote. Instead, they allege only that they may be intimidated from filing challenges under Section 230 and consequently from protecting their own votes from "dilution." Answer & Countercl. ¶¶ 160–161. Of course, no court has ever found that the VRA protects one's ability to attempt to disqualify or prevent others from voting. This is not surprising: even beyond the text of the VRA, both common sense and prior cases canvassing the scope of § 11(b) confirm that Defendants' reading would render the statute meaningless. If challenging another person's right to vote were protected by the VRA, many defendants who have been found to violate § 11(b) could have invoked that very same section as a defense. In *League of United Latin American Citizens - Richmond Region Council 4614 v. Public Interest Legal Foundation*, for example, the court held the plaintiffs had stated a valid claim under § 11(b) where the defendants repeatedly published names of allegedly ineligible voters, creating a serious risk that these voters would be subject to harassment. *See* No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018). In that case, no one suggested—rightly so—that the defendants' own conduct was equally protected under the VRA as an anti-fraud measure.

Defendants' reading of the VRA would give would-be intimidators license to engage in aggressive "anti-fraud" measures, comfortable in the knowledge that any efforts to intimidate voters from exercising their right to vote could be legally excused if the intimidators can claim they were protecting their own votes from dilution by supposedly fraudulent votes. As other courts have noted, "[a]ll too frequently," parties have urged strained interpretations of the VRA "to accomplish exactly that which the Voting Rights Act is designed to prevent: disenfranchisement of voters who historically have suffered discrimination." *Delegates to Republican Nat'l Convention v. Republican Nat. Comm.*, No. SACV 12-00927 DOC, 2012 WL 3239903, at *12 (C.D. Cal. Aug. 7, 2012) (citing *U. S. by Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 336 (E.D. La. 1965)). This surely could not have been what Congress intended by passing § 11(b).

### B. Defendants have not plausibly alleged that Fair Fight has engaged in conduct that could be considered intimidating under the VRA.

Even if Defendants' efforts to disqualify others from voting were protected by the VRA—which they are not—Defendants have not plausibly alleged that Fair Fight engaged in intimidating conduct under the statute.

At bottom, Defendants claim Fair Fight itself has intimidated them simply by accusing Defendants of engaging in voter suppression. *See generally* Answer & Countercl. ¶¶ 157–174. In particular, Defendants point to Stacey Abrams' statement

to the press that True the Vote has engaged in voter suppression, *see id.* ¶¶ 164–165,

as well as counsel's statements—about a judicial decision in a different case to which

Defendants are not even parties—which characterized a legal victory against Section

230 challenges as a "blow to GOP voter suppression," *id.* ¶ 163. Neither of these

statements are plausibly intimidating or threatening; they merely state an opinion

that True the Vote and its allies engage in intimidating behavior—an opinion shared

by other civil rights organizations,[4] by federal courts,[5] and by the late Representative

Elijah Cummings.[6] But more importantly, even if this Court accepted Defendants'

---

[4] The NAACP Legal Defense Fund has also accused True the Vote of engaging in voter intimidation by filing meritless voter challenges. *See* NAACP Legal Defense Fund, *LDF Sends Joint Letter to Texas Secretary of State Regarding Voter Eligibility Challenges & Warning Against Voter Suppression* (Sept. 12, 2018), available at: https://www.naacpldf.org/press-release/ldf-sends-joint-letter-texas-secretary-state-regarding-voter-eligibility-challenges-warning-voter-suppression/.

[5] *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-CV-896, 2016 WL 3166251, at *28 (S.D. Ohio June 7, 2016), *aff'd in part, rev'd in part on other grounds*, 837 F.3d 612 (6th Cir. 2016) (describing True the Vote's practice of discriminating against and intimidating minority voters).

[6] *See* Letter from Ranking Member Elijah Cummings to Catherine Engelbrecht, Founder of True the Vote (Oct. 4, 2012) (Congressman Cummings criticizing True the Vote's history of voter challenges and warning, "[a]t some point, an effort to challenge voter registrations by the thousands without any legitimate basis may be evidence of illegal voter suppression"), available at: https://oversight.house.gov/sites/democrats.oversight.house.gov/files/migrated/upl oads/EEC%20to%20TTV%2010-04-12.pdf. This Court may consider public documents at the motion to dismiss stage without converting this motion to dismiss

basic legal theory, their allegations do not connect Fair Fight itself to any conduct which could plausibly be considered intimidating under the VRA. Nor do Defendants allege any facts identifying any conduct whatsoever by Fair Fight Action—a separate organization which was not a party to the Complaint, but which Defendants have added as a Counter-Defendant. *See Iqbal*, 556 U.S. at 678 (a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the *defendant* is liable for the misconduct alleged" (emphasis added)).

As courts have previously explained, intimidating conduct includes threats of violence or bodily harm, as well as threats of "economic harm, legal action, dissemination of personal information, and surveillance . . . depending on the circumstances," none of which are present here in any context that triggers § 11(b). *Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20 CIV. 8668 (VM), 2020 WL 6305325, at *13 (S.D.N.Y. Oct. 28, 2020), *reconsideration denied*, No. 20 CIV. 8668 (VM), 2020 WL 6365336 (S.D.N.Y. Oct. 29, 2020). Though Fair Fight, Inc. (but not Fair Fight Action) filed this lawsuit under §11(b), it cannot be that *any* legal action constitutes intimidation, as even Defendants concede. *See* Answer &

---

to a motion for summary judgment. *See U.S. ex rel. Osheroff v. Humana Inc.*, 776 F.3d 805, 811 & n.4 (11th Cir. 2015).

Countercl. ¶¶ 169–170. And a lawsuit seeking to protect voters from intimidation is not the type of litigation that creates liability under the VRA. Instead, courts have recognized threats of legal action as intimidating conduct under civil rights statutes only when those claims were baseless or frivolous. *See, e.g.*, *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) (noting the intimidating effect of "baseless" prosecutions against persons for organizing voter registration drives).

Fair Fight Inc.'s lawsuit against Defendants is far from baseless or frivolous—this Court has already recognized that Defendants' "eleventh-hour challenge" to over 360,000 Georgia voters was "suspect" and may very well have violated federal law. *See* Order at 29; *see also id.* at 11 (Court "expressing its grave concerns regarding Defendants' coordinated, broad-strokes challenge to more than 360,000 Georgia voters on the eve of an unprecedented two-seat Senate runoff"). For this reason, too, Fair Fight Inc.'s own lawsuit against Defendants cannot be the basis for a voter intimidation claim.

Finally, Defendants raise two emails that a non-party Section 230 challenger received; both emails were sent by individuals who are neither associated, nor alleged to have any relationship with, Fair Fight. *See* Answer & Countercl. ¶ 167. Nor do those emails make any reference to Fair Fight Inc.'s litigation against Defendants. *See id.* Though Fair Fight in no way endorses those emails, it is not

surprising that Section 230 challengers received pushback for filing hundreds of thousands of voter challenges after Defendants vigorously promoted these efforts across their social media platforms, calling them the centerpiece of "the most aggressive election integrity operation in American history." Compl. ¶ 59.

After launching such an operation and being called to answer for it, Defendants now play the role of the victim. But the only true victims here are the more than 360,000 Georgia voters who were accused of voting illegally under Defendants' cynical and dishonest mass challenge program, including the John and Jane Doe Plaintiffs who felt it necessary to proceed anonymously for fear of retribution for filing this suit. It is Defendants, not Plaintiffs, who have engaged in intimidating conduct and attempted to dissuade Georgians from exercising their right to vote.

## CONCLUSION

For the reasons discussed above, Defendants' counterclaims should be dismissed.

Dated this 29th day of January 2021.

Respectfully Submitted,

*/s/ Uzoma N. Nkwonta*

Allegra J. Lawrence (GA Bar No. 439797)

Marc E. Elias*
Uzoma N. Nkwonta*

Leslie J. Bryan (GA Bar No. 091175)
Maia Cogen (GA Bar No. 832438)
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-
hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com

Dara Lindenbaum (GA Bar No.
980780)
**SANDLER REIFF LAMB
ROSENSTEIN & BIRKENSTOCK,
P.C.**
1090 Vermont Avenue, NW, Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

Aria C. Branch*
Christina A. Ford*
Joel J. Ramirez**
**PERKINS COIE LLP**
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
unkwonta@perkinscoie.com
abranch@perkinscoie.com
christinaford@perkinscoie.com
jramirez@perkinscoie.com

Thomas J. Tobin*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
ttobin@perkinscoie.com

Molly E. Mitchell*
**PERKINS COIE LLP**
1111 West Jefferson Street, Suite 500
Boise, ID  83702-5391
Phone: (208) 343-3434
Fax: (208) 343-3232
mmitchell@perkinscoie.com

*Counsel for Plaintiffs*
*Admitted *pro hac vice*
**Pro hac vice motion* forthcoming

## CERTIFICATE OF SERVICE

I hereby certify that on January 29, 2021, I electronically filed this Memorandum in Support of Motion to Dismiss Defendants' Counterclaims through this Court's CM/ECF system.


Dated: January 29, 2021

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), NDGa, I hereby certify that the foregoing Memorandum in Support of Motion to Dismiss Defendants' Counterclaims has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGa, using a font type of Times New Roman and a point size of 14.

Dated: January 29, 2021

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta