AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
for the

_____ District of _____

| | |
|---|---|
| _____ | ) |
| *Plaintiff* | ) |
| v. | )    Civil Action No. |
| | ) |
| _____ | ) |
| *Defendant* | ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: _____

*(Name of person to whom this subpoena is directed)*

❏ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material:

| Place: | Date and Time: |
|---|---|
| | |
| | |

❏ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: _____

*CLERK OF COURT*

OR

_____          _____
*Signature of Clerk or Deputy Clerk*                    *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* _____ _____ , who issues or requests this subpoena, are:

## Notice to the person who issues or requests this subpoena

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Exhibit 1 to Notice of Subpoena

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Exhibit 1 to Notice of Subpoena

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

Exhibit 1 to Notice of Subpoena

**United States District Court**
**Northern District of Georgia**
**Gainesville Division**

| | |
|---|---|
| **Fair Fight, Inc., John Doe,** and **Jane Doe**, | |
| *Plaintiffs* and *Counter-Defendants*, | |
| *v.* | |
| **True the Vote, Inc., Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, James Cooper,** and **John Does 1-10**, | **Civ. No. 2:20-cv-00302-SCJ** **Hon: Steve C. Jones** |
| *Defendants* and *Counter-Plaintiffs*, | |
| **Fair Fight Action, Inc.,** *Counter-Defendants.* | |

**Exhibit A to Subpoena Duces Tecum for Ms. Stacey Abrams**

Pursuant to Rule 45 of the Federal Rules of Civil Procedure, Defendants True the Vote, Inc., Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, James Cooper (collectively, "**Defendants**"), you are commanded to produce at the time, date, and place set forth in the attached subpoena the documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material following the Definitions and Instructions.

1

Exhibit 1 to Notice of Subpoena

# Definitions

For the purpose of this subpoena, including the instructions, the terms listed below are defined as follows:

1. "**Communication(s)**" include(s) any disclosure, transfer, or exchange of information or opinion, however made, including but not limited to: emails, voice mails, fax, memoranda, inquiries, reports, and notes, whether such notes are kept with official files or not. It includes communications made by or to You in a personal capacity, as well as communications made by or to You in Your capacity with Fair Fight, Inc. or Fair Fight Action, Inc.

2. "**Concern(ing)**" or "**Related To**" means constituting, reflecting, comprising, setting forth, disclosing, explaining, summarizing, showing, stating, describing, recording, noting, embodying, containing, mentioning, studying, analyzing, discussing or evaluating, directly or indirectly, in whole or in part.

3. "**Document**" or "**Documents**" is defined to be synonymous in meaning and equal in scope to the usage of the term "Documents and electronically stored information ("**ESI**") in Federal Rule of Civil Procedure 34(a)(1)(A). The term(s) will always include all emails or other ESI. A draft or non-identical copy is a separate Document within the meaning of the term.

4. "**Election**" means any special or regularly-scheduled general election or run-off election held in the State of Georgia for any publicly elected office.

5. "**Georgia Elector Challenge**" means any challenge to the eligibility of an individual registered to vote in Georgia in advance of the Run-off Election.

6. "**Identify**" must be construed to require identification of:

(a) natural Persons by name, title, present business affiliation, present business

2

Exhibit 1 to Notice of Subpoena

address and telephone number, or if a present business affiliation or present

business address is not known, the last known business and home address and

telephone numbers; or

(b) businesses or other organizations by name, address, identities of natural

Persons who are officers, directors, or managers of the business or organization,

and contact Persons, where applicable.

7. "**Intimidate[s][d]**," "**Intimidation,**" "**Harass[ed][ment]**," and "**Voter Suppression**"
incorporates the meaning used in Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. §
10307(b), and/or as contemplated by Plaintiffs' use of these words as used in their Complaint.
ECF No. 1, attached herein as Exhibit B.

8. "**Person(s)**" means a natural person, organization, or other legal entity, including a
corporation, limited liability company, partnership, proprietorship, association, cooperative,
government, governmental subdivision, governmental agency, or any other group or combination
acting as an entity.

9. "**Run-off Election**" means the election held in Georgia, which culminated on January
5, 2021, and in which voters elected both of Georgia's U.S. Senators.

10. "**You**" and "**Your**" means Ms. Stacey Abrams, whether acting as an individual or in
an official capacity.

## Instructions

1. Please produce Documents and other items responsive to this subpoena in accordance
with Federal Rule of Civil Procedure 45.

2. Unless otherwise stated, the time frame covered by this subpoena January 1, 2020,

3

Exhibit 1 to Notice of Subpoena

through the present. Where an admission is true for one period of time, but not for the entire period, You should admit the statement with a qualification stating the applicable time period.

3. Produce the requested Documents based on all information in Your possession, custody, or control, including that of any of Your agents, accountants, attorneys, consultants, employees, or other representatives, or any Person for whom You can obtain information by Request, or from whom You have a legal right to bring information within Your possession by demand.

4. To the extent that precise and complete Documents cannot be furnished, You should supply such information as is available. When firsthand knowledge is not available, You should answer to the best of Your knowledge, information and belief, and such answer should be so described.

5. With respect to every oral Communication You refuse to divulge based on a claim of privilege, You must nevertheless provide the following information, unless divulging the information would disclose the privileged information:

      a.    the nature of the privilege claimed (including work-product);

      b.    if the privilege is being asserted in connection with a claim or defense governed by state law, state the privilege rule being invoked;

      c.    the date of the Communication;

      d.    the place where it was made, the names of the Persons present while it was made, and, if not apparent, the relationship of the Persons present to the declarant; and

      e.    the general subject matter of the oral Communication.

4

Exhibit 1 to Notice of Subpoena

6. If Document(s) responsive to this subpoena has(ve) been lost, mutilated or destroyed, so state and identify each such Document, and state to which item demanded in this subpoena the Document would have been responsive.

7. If You have no Documents in Your possession, custody, or control that are responsive to a particular demand made in this subpoena, so state.

8. If You object to any part of this subpoena, state Your reason for such objection and produce Documents responsive to all parts of such Request to which You do not object.

9. Any responsive ESI should be produced in a format readily accessible to Plaintiff (i.e., pdf, jpg, etc.), and in a format that is electronically searchable. Any email should be produced in a manner that includes its attachment(s).

10. A Request to produce a "printout and electronic copy of all unique versions of a website" means You should provide:

    a.    Printouts of complete versions of all unique websites including Landing Pages and other linked web pages, and printouts of all unique emails, text messages, social media posts, and prerecorded telephone calls. The printouts must be produced in color if the original appeared in color; and

    b.    Electronic copies of the HTML versions of all unique websites and all unique emails, text messages, social media posts, and prerecorded telephone calls including any embedded or linked audio or visual or audiovisual content in the format in which it was originally presented, any pop-up dynamic content on the page, or any other dynamic or static content contained therein. The electronic copy should be produced in

5

Exhibit 1 to Notice of Subpoena

native electronic format with extracted text or Optical Character Recognition (OCR) and all related metadata, and with corresponding image renderings as converted to Group IV, 300 DPI, single-page Tagged Image File Format (TIFF) or as color JPEG images (where color is necessary to interpret to contents), and not in source code.

18. If You claim that any Document otherwise responsive to any of these Requests is privileged, identify the Document and the grounds for such claim of privilege sufficiently to allow the Court to determine the validity of the claim. Such identification must include for each such Document:

    a.    the nature of the Document;

    b.    the Identity of the Person who created the Document;

    c.    the Identity of the Person to whom the Document was directed;

    d.    the subject matter of the Document;

    e.    the date of the Document;

    f.    the Identity of all Parties who executed the Document;

    g.    the nature of the privilege which You claim; and

    h.    the custodian of the Document.

11. Terms of inclusion: You shall construe the words "and" as well as "or" either disjunctively or conjunctively as necessary to bring within the scope of these discovery Requests all responses that otherwise might be construed to be outside of their scope. You shall construe the word "each" to include the word "every," and You shall construe "every" to include the word "each." You shall construe the word "any" to include the word "all," and You shall construe the

6

Exhibit 1 to Notice of Subpoena

word "all" to include the word "any." The term "including" means "including but not limited to." Except where the Request states otherwise, You shall construe any reference to the singular as including the plural, and You shall construe any reference to the plural as including the singular.

12. Please produce Documents and other items in response to this subpoena on March 22, 2021. Documents should be bates labeled and produced to: Ray Smith, III, Smith & Liss, Five Concourse Parkway, Ste. 2600, Atlanta, Georgia 30328, in paper form, by email, or in electronic PDF format on a removable storage device such as a CD, DVD, or flash drive, of via another means agreed upon

## Documents and Materials To Be Produced

1.  All Documents and Communications in which You referred to, or discussed, the Georgia Elector Challenge.

2.  All Documents and Communications in which You referred to, or discussed, any Defendant, whether individually, or collectively.

3.  All Documents and Communications in which You referred to, or discussed, True the Vote, Inc., whether Related To the Georgia Elector Challenge, or more generally.

4.  All Documents and Communications in your control or possession which You believe support the allegations of "intimidat[e][es][ed][ion]," "harass[ed][ment]," or "Voter Suppression" alleged in this litigation made by Fair Fight, Inc. For specific allegations, *see* ¶¶ 1, 4, 6, 7, 8, 9, 10, 11, 12, 14, 15, 16, 29, 32, 35, 37, 53, 56, 62, 64, 65, 66, 67, 70, 71, 72, 73, 74, 75, 77, 78, 79

7

Exhibit 1 to Notice of Subpoena

# Exhibit B
## to
## Subpoena to Stacey Abrams
## Complaint, ECF No. 1

Exhibit 1 to Notice of Subpoena

# UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF GEORGIA
# GAINESVILLE DIVISION

| | |
|---|---|
| FAIR FIGHT, INC., JOHN DOE, and JANE DOE, | |
| Plaintiffs, | Case No. _____ |
| v. | |
| TRUE THE VOTE, CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1-10, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| Defendants. | |

Plaintiffs Fair Fight, Inc., John Doe, and Jane Doe, by and through the undersigned attorneys, file this Complaint for Declaratory and Injunctive Relief against Defendants, and upon information and belief allege as follows:

## NATURE OF THE ACTION

1.      Plaintiffs Fair Fight, Inc., John Doe, and Jane Doe bring this lawsuit and seek this Court's immediate intervention to put a halt to Defendants' ongoing assault on the fundamental right to vote through their widespread and well-publicized attempts at voter suppression and intimidation.

Exhibit 1 to Notice of Subpoena

2. In the wake of the 2020 General Election, which saw historic turnout across the country and in Georgia, Defendant True the Vote, a Texas organization, has spearheaded a coordinated attack on Georgia's electoral system, threatening voters with entirely frivolous claims of fraudulent and illegal voting that have reached feverish heights in the weeks leading up to the January 5, 2021 runoff.

3. While courts across the country (and in Georgia) have repeatedly found claims of widespread voter fraud in the 2020 General Election to be wholly without merit, Defendants remain undeterred, partnering up to engage in a massive operation to "catch" and expose supposedly illegal voters, in what True the Vote itself has described as "the most aggressive election integrity operation in American history."

4. Crucially, the focus of these efforts has been to intimidate and deter eligible and qualified Georgians—particularly Black and brown voters and first-time voters—from exercising their fundamental right to vote. Just last week, for example, True the Vote announced that the organization, in partnership with electors in each Georgia county, intended to preemptively challenge the eligibility of more than 364,000 Georgians to vote on the grounds that these voters no longer reside in the State of Georgia. To be sure, these challenges are meritless because the "evidence" they have presented—purported lists of names culled from the U.S. Postal Service

Exhibit 1 to Notice of Subpoena

National Change of Address ("NCOA") registry—is notoriously unreliable as a means of determining voter eligibility. Even assuming these registries are entirely accurate (which they are not), there are innumerable reasons why individuals may change their mailing address while maintaining residency in Georgia, including, for instance, temporary relocation for military service, employment, school, or travel. There is nothing improper about voting while outside of one's permanent residence; the concept of absentee voting accommodates exactly that. *See* O.C.G.A. § 21-2-380(b). Indeed, federal law plainly prohibits election officials from removing individuals from the voter rolls simply because of an address change unless several strict precautions are followed.

5.    To complement these mass voter challenges, Defendants are also recruiting volunteers to monitor voters as they return their ballots and are encouraging "citizen watchdogs" to report suspected instances of illegal voting to their 24/7 "voter integrity" hotline.

6.    As a final touch, Defendants also established a $1 million reward fund to "incentivize" individuals to report instances of "election malfeasance." The obvious effect of this million-dollar bounty will be to encourage Defendants' supporters to generate even more baseless accusations of voter fraud—an effort that

Exhibit 1 to Notice of Subpoena

is likely to subject Georgia voters, and particularly Georgians of color, to harassment, particularly if they appeared on Defendants' erroneous and unsubstantiated lists of purportedly ineligible voters.

7.    While several counties have already rejected True the Vote's mass challenges, and multiple courts have already thrown out their supporters' frivolous claims of voter fraud, these repeated attempts at voter suppression have lasting effects on of the electorate: lawful voters will be deterred and intimidated from participating in the political process out of fear that they will be accused by Defendants and their supporters of voting illegally.

8.    These fears are objectively reasonable. In the past few weeks, as claims of voter fraud reached a fever pitch, many of Georgia's election workers were harassed and faced death threats. Defendants collectively fed this frenzy and continue to breed false claims of voter fraud—threatening the safety and well-being of Georgia's voters and its election workers.

9.    Defendants' conduct has created an atmosphere of intimidation and is plainly unlawful. In the aftermath of previous voter suppression efforts in our history, Congress responded forcefully by enacting laws that unequivocally prohibit

Exhibit 1 to Notice of Subpoena

such conduct, including § 11(b) of the Voting Rights Act, which outlaws any acts that are objectively likely to intimidate voters. 52 U.S.C. § 10307(b).

10. Because Defendants' coordinated campaign of frivolous mass challenges to hundreds of thousands of voters, false accusations of fraudulent conduct, and encouragement of outright harassment of voters and election officials has and will continue to intimidate voters in violation of the Voting Rights Act, immediate judicial relief is critical to ensuring that Georgians can fully and freely participate in the electoral process and exercise the rights to which they are constitutionally entitled.

## **PARTIES**

11. Plaintiff Fair Fight, Inc. (Fair Fight) is a political action committee based in Georgia. Fair Fight's core mission is to secure the voting rights of Georgians, a mission that includes voter engagement and voter turn-out, particularly among young people and people of color. Fair Fight's mission is thwarted when, as is occurring because of Defendants' wrongdoing alleged in this Complaint, qualified voters in Georgia are unable to vote without intimidation or interference.

12. To combat the harm Defendants have caused and will continue to cause by lodging their frivolous challenges against hundreds of thousands of Georgians,

Exhibit 1 to Notice of Subpoena

Fair Fight has already begun to divert and will continue to divert its limited resources, including staff time, volunteer time, and money, to educate voters about how to overcome voter suppression efforts and intimidation of voters. In particular, Fair Fight has diverted, and will continue to divert, staff resources, volunteer resources, and funds to ensure that Georgians whose eligibility to vote has been challenged know that they are in fact eligible to vote. In addition, because some counties are scheduling hearings to determine voters' eligibility based on Defendants' challenges, Fair Fight has diverted and will continue to divert staff resources, volunteer resources, and funds to ensure that voters have the support they need to defend themselves against such challenges. Specifically, Fair Fight has and will continue to divert staff, monetary, and volunteer resources to monitor county challenge hearings, organize partner organizations to offer comments at the hearings, and contact individuals on the lists of challenged voters to offer information and support.

13. To undertake the actions described above to counteract Defendants' wrongdoing, Fair Fight has diverted and will continue to divert resources from Fair Fight's mobilization efforts to encourage Georgians to vote in the January 5, 2021 runoff, which include phone banking, in-person events, as well as providing support

Exhibit 1 to Notice of Subpoena

to voters during the January 5, 2021 runoff election cycle as they navigate absentee ballot hazards, long lines, and other impediments to voting.

14.    The actions that Fair Fight is taking to counteract Defendants' challenges and intimidation are not actions Fair Fight has taken in the past. These new actions are necessitated by and traceable to Defendants' wrongdoing described in this Complaint. If the relief requested in this Complaint is granted, that relief will redress Fair Fight's injuries.

15.    Plaintiff John Doe is a citizen and registered voter in Georgia. While John Doe's permanent residence is in Georgia, John Doe is temporarily located in another state for work. To ensure he would not miss any mail while on this work assignment, John Doe forwarded his mail to his current location. A few days ago, John Doe's name and address appeared on a list submitted by Defendants challenging John Doe's right to vote in Georgia. John Doe, however, is a fully qualified and eligible elector in Georgia. Because Defendants claimed that John Doe is not eligible to vote, and because Defendants' list containing John Doe's name and address has been published online, John Doe reasonably fears that Defendants and their supporters will subject him to harassment for voting. For the same reason, he is proceeding under a fictitious name in this lawsuit.

Exhibit 1 to Notice of Subpoena

16.     Plaintiff Jane Doe is a citizen and registered voter in Georgia. While Jane Doe's permanent residence is in Georgia, and Jane Doe is in fact presently located in Georgia, Jane Doe is currently splitting her time between Georgia, where she works, and another state, for family obligations. To ensure she would not miss any mail while with family, Jane Doe forwarded her mail to her family's address. Recently, Jane Doe's name and address appeared on a list submitted by Defendants challenging Jane Doe's right to vote in Georgia. Jane Doe, however, is a fully qualified and eligible elector in Georgia. Because Defendants claimed that Jane Doe is not eligible to vote, and because Defendants' list containing Jane Doe's name and address has been published online, Jane Doe reasonably fears that Defendants and their supporters will subject her to harassment for voting. For the same reason, she is proceeding under a fictitious name in this lawsuit.

17.     Defendant True the Vote is a 501(c)(3) organization whose stated purpose is to combat voter fraud. While True the Vote is incorporated in Texas, the organization is responsible for coordinating efforts to challenge over 364,000 Georgians' eligibility to vote and recruiting Georgians to engage in its "ballot security" operation in Georgia in advance of the state's January Senate Runoff.

Exhibit 1 to Notice of Subpoena

18.     Defendant Catherine Engelbrecht is the founder and Executive Director of True the Vote. Defendant Engelbrecht is a resident of Texas. Defendant Engelbrecht, as Executive Director of True the Vote, has organized True the Vote's "voter integrity" efforts in the state of Georgia, including organizing the mass challenges to over 364,000 Georgia voters.

19.     Defendant Derek Somerville is a resident of Forsyth County, Georgia. Upon information and belief, Defendant Somerville has assisted and acted in concert with True the Vote in its effort to challenge the eligibility of hundreds of thousands of Georgians to vote.

20.     Defendant Mark Davis is a resident of Gwinnett County, Georgia. Upon information and belief, Defendant Davis has assisted and acted in concert with True the Vote in its effort to challenge the eligibility of hundreds of thousands of Georgians to vote.

21.     Defendant Mark Williams is a resident of Gwinnett County, Georgia. Upon information and belief, Defendant Williams has assisted and acted in concert with True the Vote in its effort to challenge the eligibility of hundreds of thousands of Georgians to vote.

Exhibit 1 to Notice of Subpoena

Case 2:20-cv-00302-SRW Document 1-1 Filed 07/23/21 Page 21 of 73

22.     Defendant Ron Johnson is a resident of Jackson County, Georgia. Upon information and belief, Defendant Johnson has assisted and acted in concert with True the Vote in its effort to challenge the eligibility of hundreds of thousands of Georgians to vote.

23.     Defendant James Cooper is a resident of Walton County, Georgia. Upon information and belief, Defendant Cooper has assisted and acted in concert with True the Vote in its effort to challenge the eligibility of hundreds of thousands of Georgians to vote.

24.     Upon information and belief, Defendants John Does 1-10 have assisted and acted in concert with True the Vote in its effort to challenge the eligibility of hundreds of thousands of Georgians to vote. The identities and precise residences of all John Does are presently unknown to Plaintiffs and could not be ascertained prior to filing this Complaint. Plaintiffs will amend this complaint to add the true names and capacities of Does when his or her identities are known.

## JURISDICTION AND VENUE

25.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under federal law.

Exhibit 1 to Notice of Subpoena

26.     This Court has personal jurisdiction over the non-resident Defendants because Defendants caused and will continue to cause tortious injury in this state, *see* O.C.G.A. § 9-10-91(2), and have purposefully availed themselves of Georgia by coordinating and executing mass challenges in the state of Georgia, as explained throughout this Complaint. This Court also has personal jurisdiction over the resident Defendants.

27.     Venue is proper in the Northern District of Georgia under 28 U.S.C. § 1391, and in the Gainesville Division under Local Civ. R. 3.1, because several Defendants reside in this district and division, and events giving rise to the claim occurred within this district and division.

28.     This Court has the authority to enter declaratory and injunctive relief under Rules 57 and 65 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202.

## STATEMENT OF FACTS AND LAW

**A.     DEFENDANTS HAVE A HISTORY OF USING MERITLESS CHALLENGES AND TACTICS TO INTIMIDATE VOTERS.**

29.     True the Vote has a long history of advancing meritless voter challenges and other tactics to intimidate and suppress Black and brown voters around the country.

Exhibit 1 to Notice of Subpoena

30.     Among True the Vote's abusive tactics is the practice of "voter caging"—challenging one's voter registration on the basis of unreliable information.

31.     In 2012, for example, True the Vote submitted meritless challenges against voters in Ohio. *See* Ex. 6. Many of the challenges were submitted against low-income voters, and the majority of the challenges were later thrown out. Even still, voters who were challenged by True the Vote received a letter in the mail alerting them that their right to vote had been challenged—a notice voters reasonably find alarming.

32.     In Franklin County, Ohio, True the Vote trained its volunteers to use cameras to intimidate voters when they entered the polling place, record their names on tablet computers, and attempt to stop voters before they could cast their vote. *See* Ex. 7. True the Vote also provided software to local citizen groups to monitor prospective voters, which disproportionately targeted Black voters and college students. *See Ne. Ohio Coal. for the Homeless v. Husted* ("*NEOCH*"), No. 2:06-cv-896, 2016 WL 3166251, at *28 (S.D. Ohio June 7, 2016), *aff'd in part, rev'd in part on other grounds*, 837 F.3d 612 (6th Cir. 2016).

33.     That same year, the Harris County attorney's office received multiple calls about True the Vote's volunteers disrupting polling locations. When the

Exhibit 1 to Notice of Subpoena

assistant county attorney visited True the Vote's offices to investigate, he found a map designating certain polling locations to target, which the county attorney interpreted "as the group's intention to target specific minority areas." Ex. 6.

## B. DEFENDANTS HAVE NOW LAUNCHED A COORDINATED CAMPAIGN TO HARASS AND INTIMIDATE VOTERS ACROSS GEORGIA.

34.   In the wake of Georgia's 2020 General Election, in which Georgia's Black and brown voters exercised their political power to elect their candidates of choice, certain organizations, including True the Vote, have erupted with unfounded claims that the 2020 General Election was plagued with fraudulent and illegal voting.

35.   While none of these claims have succeeded in court, the idea that the election was plagued by fraud and illegal voting has led to genuine harassment and threats. Georgia county election workers, for example have received so many threats in the past month that they have required police protection and patrols outside their homes. One Georgia election worker was even forced to go into hiding after his personal information was posted online.

36.   As one Republican Georgia election official pleaded with the public in a press conference in early December, if these feverish claims do not stop,

Exhibit 1 to Notice of Subpoena

"[s]omeone is going to get hurt, someone is going to get shot, someone is going to get killed."

37.    This public plea, however, has not deterred Defendants from continuing to feed this frenzy. Indeed, Defendants continue to advance these dangerous accusations and have now engaged in a statewide campaign to intimidate and prevent Georgia voters from participating in Georgia's January Senate Runoff.

### The "Landmark" Voter Challenge Program

38.    On December 18—just two and a half weeks before Georgia's January Senate Runoff—True the Vote announced it was mounting a "landmark coordinated" effort "to preemptively challenge 364,541 potentially ineligible voters" across Georgia's 159 counties. Ex. 1. As of December 22, True the Vote confirmed that it had filed such challenges in at least 85 counties. *See* Ex. 8.

39.    This effort is so large that True the Vote has created its own dedicated email account, gaelectorchallenge@truethevote.com, for willing Georgians, or "patriots," as True the Vote calls them, to submit these voter challenges on their behalf. *See* Ex. 5.

40.    To date, True the Vote has publicly identified Defendants Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, and James Cooper as the

Exhibit 1 to Notice of Subpoena

Georgians who have been critical in helping them to challenge hundreds of thousands of Georgia voters. *See* Ex. 1. Other John Doe Defendants have assisted True the Vote in this effort, but are currently unknown to Plaintiffs.

41.    Defendants claim to bring these challenges under Georgia's "Elector Challenge" provision, which allows an individual to challenge a voter's eligibility if the individual can show probable cause exists that the voter does not meet the qualifications to cast a ballot. *See id.*; *see also* O.G.C.A. § 21-2-230.

42.    As Defendants explained in their press release announcing this "landmark" effort, Defendants crafted their list of over 364,000 Georgians who they claim are "potentially ineligible" to vote by comparing Georgia's voter registration database to United States Postal Service's National Change of Address (NCOA) registry. *See* Ex. 1.

43.    These challenges have already been rejected in several counties, and for good (and obvious) reasons. Georgia law does not require a voter to reside at their permanent in-state residence for that voter to lawfully cast a ballot in Georgia. *See* O.C.G.A. § 21-2-217 (describing, for example, that one does not lose residency for voting purposes if one moves away temporarily, is away attending college or university, has moved for government service, among other reasons).

Exhibit 1 to Notice of Subpoena

44.    Thus, any Georgia voter who temporarily relocated, whether to attend school, for temporary employment, to be closer to family or care for someone ill during the pandemic, or even for military service, may request to receive mail at an address other than where they registered to vote without forfeiting their right to vote in the county where they are registered.

45.    And while Georgia establishes many rules for determining one's residency for voting purposes, *see* O.C.G.A. § 21-2-217(a), whether a voter's name appears in the NCOA registry or whether a voter forwarded their mail to a new address are not among the reasons that a person shall be considered to have lost their residence in the state or county under Georgia law. Indeed, the NCOA registry gives no explanation of why any individual requested a change of address, which is critical to determine whether a voter is eligible to vote under Georgia law.

46.    Federal law even prohibits a state from removing a voter from voter registration lists on the ground that the individual is suspected to have moved unless strict procedures are followed. Specifically, "[a] State shall not remove the name of a registrant from the official list of eligible voters in elections for Federal office on the ground that the registrant changed residence unless" (1) the State receives written confirmation from the voter of change of address, or (2) the voter fails to respond to

Exhibit 1 to Notice of Subpoena

a postcard notice, and also fails to vote in at least two subsequent federal general election cycles. 52 U.S.C. § 20507(d).

47.   In other words, there is nothing irregular or unusual about voting while outside of one's voting jurisdiction; indeed, the availability of absentee voting accommodates exactly that. *See* O.C.G.A. § 21-2-380(b).

48.   Defendants are fully aware that the lists they have presented are insufficient to require the outright removal of over 364,000 voters from Georgia's voter rolls. *See* Ex. 1 (True the Vote's press release acknowledging that their challenges will not in itself "remove voter names from the registry").

49.   The purpose of these challenges, then, is purely to raise the specter that certain Georgia voters are "illegal" and should not be permitted to vote—a claim that is squarely undermined by the fact that Georgia permits those temporarily away from their permanent Georgia residence to vote.

50.   But even if Defendants' "landmark" voter challenge effort is unsuccessful on the merits, as it surely will be, Defendants' actions—calling more than 364,000 voters' eligibility into doubt—will have real consequences.

51.   At the outset, if any Georgia county permits these challenges to move forward—even if the county does not remove those voters from the voter registration

Exhibit 1 to Notice of Subpoena

rolls—those voters may be required to cast a provisional ballot or a challenged ballot in the January runoff election and incur the burden of re-establishing their eligibility to vote. *See* O.C.G.A. § 21-2-230. These voters may also be asked to appear at a hearing in an attempt to prove their eligibility—a difficult task under normal circumstances for a voter who is temporarily away from Georgia, and a task made even more difficult during a global pandemic.

52.    Additionally, when Defendants submit these lists of challenged voters, they become part of the public record, and predictably make their way online. Notably, an individual claiming to work with True the Vote online has already threatened that "[i]f the Georgia counties refuse to handle the challenges of 366,000 ineligible voters in accordance with the law, I plan to release the entire list so America can do the QC." Ex. 2.

53.    As one court explained in considering a similar mass challenge effort by the Montana Republican Party to voters based on change of address data, "[o]ne can imagine the mischief an immature political operative could inject into an election cycle were he to use the [challenge] statutes, not for their intended purpose of protecting the integrity of the people's democracy, but rather to execute a tawdry partisan ploy." *Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1079 (D.

Exhibit 1 to Notice of Subpoena

Mont. 2008). "Voters might be intimidated, confused, or even discouraged from voting upon receiving notice that their right to vote—the most precious right in a government of, by, and for the people—has been challenged." *Id.*

54. As another federal court explained when it prohibited the national Republican Party from engaging in similar "ballot security" measures:

 [I]t is all but certain that anti-fraud initiatives . . . will result in the disenfranchisement of many individuals whose eligibility is not in question. Some voters—especially in minority districts where the legacy of racism and history of clashes between the population and authorities has given rise to a suspicion of police and other officials— may choose to refrain from voting rather than wait for the qualifications of those ahead of them to be verified, especially if the verification process becomes confrontational.

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 612 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012).

55. This is precisely the effect that Defendants' "landmark" challenge effort has had and will have on Georgia voters. Those who are challenged, even if they are a lawful Georgia voter, may be afraid to exercise their right to vote now that their "legality" has been questioned.

56. In this current political environment, in which cries of voter fraud have reached a fever pitch and have resulted in in doxing, harassment, and death threats,

Exhibit 1 to Notice of Subpoena

qualified, eligible voters may fear they will be harassed if they exercise their right to vote simply because their names appeared on True the Vote's challenge lists.

### The Voter Monitoring Program and Million Dollar Bounty

57.    To complement Defendants' mass voter challenges for the January Senate Runoff, Defendants are recruiting volunteers to personally watch voters return ballots to drop box locations as part of their effort to implement the "most comprehensive ballot security initiative in Georgia history." Ex. 3.

58.    Along with this live monitoring effort, True the Vote also created a "voter integrity hotline" which will be available to "citizen watchdogs" "24 hours a day, seven days a week" to respond and "take action" as necessary. Ex. 3.

59.    True the Vote has itself described these efforts as "the most aggressive election integrity operation *in American history*."

60.    As a final touch, True the Vote also announced a program called "Validate the Vote"—an innocuous sounding initiative which allegedly established a $1 million reward fund to "incentivize" individuals to report instances of "election malfeasance." Ex. 4.

61.    In sum, Defendants have now published lists of hundreds of thousands of Georgians who they claim are ineligible to vote, recruited volunteers to monitor

Exhibit 1 to Notice of Subpoena

voters as they return their ballots, urged "citizen watchdogs" to take photos and videos of illegal activity, and have now offered their supporters a one million dollar bounty as incentive to accuse individuals of voting illegally.

62.     These efforts, especially when considered together, will expose lawful Georgia voters to the threat of harassment from Defendants' supporters who may very well attempt to "catch and expose" illegal voting. This risk is most acute for the thousands of Georgians whom Defendants have wrongfully accused of being ineligible to vote.

## C.     VOTER INTIMIDATION TACTICS HAVE LONG BEEN JUSTIFIED AS EFFORTS TO PREVENT "VOTER FRAUD" OR ENSURE "ELECTORAL INTEGRITY"

63.     Defendants' purported justification in challenging hundreds of thousands of Georgians' eligibility to vote, along with their other attempts to suppress the vote, is to ensure the integrity of the election and prevent voter fraud.

64.     This is not surprising. Voter intimidation efforts, particularly those aimed at Black and brown voters, have frequently been "ostensibly aimed at combatting voter fraud." *NEOCH*, 2016 WL 3166251, at *28.

65.     As just one example, for forty years, the Republican National Committee (RNC) was bound by a Consent Decree prohibiting it from engaging in

Exhibit 1 to Notice of Subpoena

"ballot security" efforts which were, in practice, simply voter intimidation tactics. This Consent Decree originated from, among other things, the RNC's practice of voter caging—that is, the practice of challenging voters' eligibility at the polls based on unreliable information, just as Defendants have done in Georgia with their mass challenge effort. *See Democratic Nat'l Comm.*, 671 F. Supp. 2d at 579. As a result of the Democratic National Committee's lawsuit to protect voters against these intimidation tactics, the RNC was prohibited from engaging in "ballot security" efforts until it was released from the Consent Decree just a few years ago.

66.     Similarly, in the early 1990s, the North Carolina Republican Party sent 150,000 postcards to primarily Black voters that included false information about the state's voter registration requirements and warned those voters it would be a "federal crime . . . to knowingly give false information about your name, residence or period of residence to an election official." 671 F. Supp. 2d at 581. The Department of Justice later sued the North Carolina Republican Party for voter intimidation and entered into a substantially similar consent decree with the state party. *See* Consent Order, *U.S. v. N.C. Republican Party*, No. 91-161-Civ-5F (E.D.N.C. Feb. 27, 1992).

Exhibit 1 to Notice of Subpoena

67.    As one federal court explained in rejecting the RNC's request to engage in certain "ballot security" efforts in 2009, "[v]oter intimidation presents an ongoing threat to the participation of minority voters in the political process, and continues to pose a far greater danger to the integrity of that process than the type of voter fraud the [Defendant] is prevented from addressing by [engaging in ballot security efforts]." 671 F. Supp. 2d at 578-79.

68.    Of course, the notion of widespread voter fraud in modern American politics is itself a fraud. Courts that have examined the evidence have repeatedly concluded that widespread voter fraud does not exist. *See, e.g.*, *Mich. All. for Retired Americans et al. v. Benson, et al.*, No. 20-000108-MM at 16 (Mich. Ct. Cl. Sept. 18, 2020) ("The documentary evidence in this case reveals that the incidences of voter fraud and absentee ballot fraud are minimal and that the fears of the same are largely exaggerated."); *Harding v. Edwards*, No. 3:20-cv-00495, ECF No. 88 at 22-24 (M.D. La. Sept. 16, 2020) (explaining "Defendants' evidence [of voter fraud] is woefully inadequate"); *Paher v. Cegavske*, 2020 WL 2089813, at *6 & n.10 (D. Nev. Apr. 30, 2020) (finding "claim of voter fraud is without any factual basis"); *Applewhite v. Commonwealth*, No. 330 M.D. 2012, 2014 WL 184988, at *57 (Pa. Commw. Ct. Jan. 17, 2014) (in a challenge to Pennsylvania's voter ID law, court

Exhibit 1 to Notice of Subpoena

noting, "[t]he parties [we]re not aware of any incidents of in-person voter fraud in Pennsylvania and d[id] not have direct personal knowledge of in person voter fraud elsewhere"); *Brakebill v. Jaeger*, No. 16-cv-00008 (DLH), ECF No. 50 at 25 (D.N.D. Aug. 1, 2016) (court concluding "[t]he undisputed evidence before the Court reveals that voter fraud in North Dakota has been virtually non-existent"); *One Wis. Inst. v. Thomsen*, No. 15-cv-324 (JDP), 2016 WL 4059222, at *2 (W.D. Wis. July 29, 2016) *rev'd in part*, 963 F.3d 665 (federal judge remarking "[t]he Wisconsin experience demonstrates that a preoccupation with mostly phantom election fraud leads to real incidents of disenfranchisement, which undermine rather than enhance confidence in elections, particularly in minority communities"); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014) ("North Carolina asserts goals of electoral integrity and fraud prevention. But nothing in the district court's portrayal of the facts suggests that those are anything other than merely imaginable.").

69. Similarly, despite voluminous litigation challenging the results of the 2020 General Election, judges across the country, and from across the political spectrum, have concluded there is no evidence to support the theory that the General Election was plagued by widespread voter fraud, let alone any fraud at all.

Exhibit 1 to Notice of Subpoena

70.     Undeterred by these findings, Defendants have assumed the role of vigilantes to prosecute those whom they deem ineligible to vote, while intimidating and deterring thousands of lawful voters in the process.

### D.     TO COMBAT THIS KIND OF VIGILANTISM, CONGRESS REPEATEDLY PROHIBITED ACTS OF VOTER INTIMIDATION

71.     The Ku Klux Klan Act of 1871 (the "Klan Act") was the last of the Enforcement Acts—legislation passed during Reconstruction to protect newly freed slaves and their supporters from violence and harassment. While the Klan Act is most well known for making state officials liable in federal court if they deprive anyone of their civil rights or the equal protection of the law, *see* 42 U.S.C. § 1983, the Klan Act also prohibited private actors from engaging in conspiracies to intimidate voters.  *See* 42 U.S.C. § 1985(3).

72.     Many years later, Congress reaffirmed its commitment to outlawing voter intimidation in the Civil Rights Act of 1957. That Act, now codified at 52 U.S.C. § 10101(b), prohibited any person from intimidating voters, or attempting to intimidate voters, "for the purpose of interfering with [the right to vote]." In the years following the Civil Rights Act, courts interpreted that provision to require purposeful intent to intimidate voters and to discriminate on the basis of race. *See, e.g.*, *United States v. McLeod*, 385 F.2d 734, 750 (5th Cir. 1967) (holding plaintiffs failed to

Exhibit 1 to Notice of Subpoena

prove voter intimidation under the Civil Rights Act because there was a good-faith, "legitimate" motive for the Defendants' actions).

73.    Several years after passing the Civil Rights Act, explicitly recognizing that voter intimidation would be difficult to prove under that Act, Congress passed § 11(b) of the Voting Rights Act. The text of § 11(b) reads: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote . . . ." 52 U.S.C. § 10307(b). By its plain text, § 11(b) removed the "purpose" requirement found in the Civil Rights Act, thus removing the requirement that plaintiffs demonstrate a specific purpose to intimidate voters to bring a successful cause of action for voter intimidation.

74.    Indeed, in testimony before the Senate Judiciary Committee, then-Attorney General Katzenbach explained that § 11(b) "represents a substantial improvement over [the Civil Rights Act]," which now prohibits voting intimidation. Voting Rights, Part 1: *Hearings on S. 1564 Before the S. Comm. on the Judiciary*, 89th Cong. 16 (1965). As Katzenbach further explained, "under [the VRA] no

Exhibit 1 to Notice of Subpoena

subjective 'purpose' need be shown, in either civil or criminal proceedings, in order to prove intimidation . . . Rather, defendants would be deemed to intend the natural consequences of their acts." *Id.* The House Report went on to adopt this reasoning, explaining: "The prohibited acts of intimidation need not be racially motivated; indeed, unlike [the Civil Rights Act] (which requires proof of a 'purpose' to interfere with the right to vote) no subjective purpose or intent need be shown." H. Rep. No. 89-439 at 30, 89th Congress, 1st Sess. 32 (1965).

75.    As a result, Plaintiffs need not show that Defendants have any specific, purposeful intent to intimidate voters (against voters of color or otherwise) to demonstrate a violation of § 11(b); rather, the legal test is whether Defendants' conduct is objectively intimidating or threatening to voters.

## CAUSES OF ACTION

### COUNT I
### Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b)

76.    Plaintiffs reallege and incorporate by reference paragraphs 1 to 75 of this Complaint as though fully set forth herein.

77.    Section 11(b) of the Voting Rights Act prohibits any person, "whether acting under color of law or otherwise," from acts which "intimidate, threaten, or

Exhibit 1 to Notice of Subpoena

coerce . . . any person for voting or attempting to vote," or any attempted acts to do so. 52 U.S.C. § 10307(b).

78. Defendants, by engaging in an unprecedented effort to challenge the eligibility of hundreds of thousands of Georgians to vote, by recruiting "citizen watchdogs" to watch voters return their ballots, and by offering a $1 million reward to incentivize its supporters to find evidence of "illegal voting," have engaged in activities which are objectively likely to intimidate voters in violation of § 11(b) of the Voting Rights Act.

79. Plaintiffs are entitled to a declaration that Defendants have violated § 11(b) of the Voting Rights Act and an injunction enjoining Defendants and their agents from any further activity which intimidates voters.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants, and:

A. Declare that Defendants have violated § 11(b) of the Voting Rights Act.

B. Temporarily and permanently enjoin the Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from:

Exhibit 1 to Notice of Subpoena

       i. Submitting challenges to any voter's eligibility in the State of Georgia;

      ii. Contacting any voter at their home, in person, by mail, by phone, by internet, or by any other means, in an attempt to confirm their eligibility to vote;

    iii. Participating in any poll-watching, poll-monitoring, or election-observing activities; recruiting and training individuals for these activities; or advertising these activities;

    iv. Photographing or video recording voters or election workers during the course of voting or working at the polls;

C.     Require Defendants to withdraw their pending challenges to voters in each of Georgia's 159 counties.

D.     Order True the Vote to cease any and all operations in the State of Georgia.

E.     Award Plaintiffs their costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

F.     Grant such other and further relief as the Court deems just and proper.

Exhibit 1 to Notice of Subpoena

Dated this, the 23rd day of December, 2020.

Respectfully Submitted,

Marc E. Elias*
Uzoma Nkwonta*
Christina A. Ford*
**PERKINS COIE LLP**
700 Thirteenth St., N.W., Suite 800
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
melias@perkinscoie.com
unkwonta@perkinscoie.com
christinaford@perkinscoie.com

Thomas J. Tobin*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
ttobin@perkinscoie.com

Molly E. Mitchell*
**PERKINS COIE LLP**
1111 West Jefferson Street, Suite 500
Boise, ID  83702-5391
Phone: (208) 343-3434
Fax: (208) 343-3232
mmitchell@perkinscoie.com

*Counsel for Plaintiffs*
**Pro hac vice motion* forthcoming

*s/Allegra J. Lawrence*
Allegra J. Lawrence (GA Bar No. 439797)
Leslie J. Bryan (GA Bar No. 091175)
Maia Cogen (GA Bar No. 832438)
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com

Dara Lindenbaum (GA Bar No. 980780)
**SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW, Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

Exhibit 1 to Notice of Subpoena

# Exhibit 1

Exhibit 1 to Notice of Subpoena

# TRUE THE VOTE PARTNERS WITH GEORGIANS IN EVERY COUNTY TO PREEMPTIVELY CHALLENGE 364,541 POTENTIALLY INELIGIBLE VOTERS

**True the Vote Partners with Georgians in Every County to Preemptively Challenge 364,541 Potentially Ineligible Voters**

*Citizen-led Effort Seeks to Confirm All Votes Cast in U.S. Senate Runoff Elections are Legal, While Ensuring Any Voter Challenged Has Full Opportunity to Prove Their Voting Eligibility*

**ATLANTA, Georgia** – True the Vote announced today it is submitting 364,541 Elector Challenges on behalf of Georgia voters representing all 159 counties. An Elector Challenge is a unique feature in Georgia law (GA. CODE ANN. § 21-2-230). It allows a voter to challenge the eligibility of any other voters in his or her county if probable cause exists to show that the challenged voter does not meet the qualifications legally required to cast a ballot. It represents one of the few vehicles that states have to update voter rolls ahead of an election without compromising any legitimate voters' right to have their vote counted.

Exhibit 1 to Notice of Subpoena

"Ongoing debates about the November election throughout the country have Americans focused intently on improving the integrity of our elections and restoring the faith of voters. Today we assisted concerned Georgia voters in taking a stand for the sanctity of every legal vote," **said Catherine Engelbrecht, the founder and president of True the Vote.** "It is our hope that this historic challenge marks the beginning of the great awakening of American voters to serve our democracy by getting involved in the process.

"We are proud to be working alongside patriots from across the Peach State; Derek Somerville of Forsyth county and Mark Davis of Gwinnett county who have been leading citizen efforts to highlight issues in Georgia's voter rolls, Mark Williams of Gwinnett County who coordinated among eight print shops to get written challenges printed and delivered within 48 hours, and Ron Johnson of Jackson County and James Cooper of Walton County, who led the charge in recruiting hundreds of volunteer challengers across the state," **Engelbrecht continued.** "Everyone pitched in. This is the power of citizen engagement and the core of what True the Vote exists to do in our pursuit of free, fair and secure elections."

Today's landmark coordinated challenge is the result of True the Vote's voter registry research, which identified 124,114 registered voters who no longer reside in the county of record and 240,427 voters who no longer reside in the state of Georgia, according to filings with the United States Postal Service National Change of Address (NCOA) and other supporting commercial databases. True the Vote's research was performed uniformly across all counties, without regard to any demographic or voting history.

"Filing the challenges preemptively, before absentee ballots are opened, will help ensure only legal, eligible votes are counted in Georgia's January 5 runoff elections," **Engelbrecht concluded.**

According to Georgia law, an Elector Challenge must be filed before a vote is cast. Once a vote has been cast, or in the case of absentee ballots, once the ballot has been removed from its signed envelope, there is no way to identify which ballot belongs to the ineligible party.

In fact, the best way to ensure only eligible voters are voting in the upcoming runoff elections is through Elector Challenges. States must comply with National Voter Registration Act standards in cleaning their voter rolls. Under Section 8 of the National Voter Registration Act, states are required to conduct a general voter registration list maintenance program that makes a reasonable effort to remove ineligible voters. The NVRA's standards limit removal of names only to very narrow conditions, with ineligible names remaining on the list over an extended period of time.

Exhibit 1 to Notice of Subpoena

An Elector Challenge does not remove voter names from the registry. Voters who have been challenged will have the opportunity, via GA. CODE ANN. § 21-2-230 to prove eligibility and still have their vote counted in the upcoming runoff election.

"I've said since Election Day that I must follow the law in the execution of our elections, and I've also encouraged Georgians to report any suspected problems for my office to investigate," **said Georgia Secretary of State Brad Raffensperger.** "Though federal law restricts our ability to update our voter registration lists, the Elector Challenge is a vehicle under our law to ensure voter integrity. I support any effort that builds faith in our election system that follows the proper legal procedure."

# # #

*True the Vote* *(TTV) is an IRS-designated 501(c)3 voters' rights organization, founded to inspire and equip volunteers for involvement at every stage of our electoral process. TTV empowers organizations and individuals across the nation to actively protect the rights of legitimate voters, regardless of their political party affiliation. For more information, please visit* ***www.truethevote.org****.*

Exhibit 1 to Notice of Subpoena

# Exhibit 2

Exhibit 1 to Notice of Subpoena



**Crusade for Freedom**
@Crusade4Freedom

We just prospectively challenged the eligibility of
360,000 voters in GA.

Largest single election challenge in Georgia and
American history.

#eyesonGA
#validatethevoteGA



**Crusade for Freedom**
@Crusade4Freedom

If the Georgia counties refuse to handle the challenges
of 366,000 ineligible voters in accordance with the law, I
plan to release the entire list so America can do the QC.

#validatethevoteGA #eyesonGA

12:46 PM · Dec 20, 2020 · Twitter for iPhone

Exhibit 1 to Notice of Subpoena

# Exhibit 3

Exhibit 1 to Notice of Subpoena

# TRUE THE VOTE LAUNCHES GEORGIA ELECTION INTEGRITY HOTLINE AS PART OF THE MOST COMPREHENSIVE BALLOT SECURITY EFFORT IN GEORGIA HISTORY

**True the Vote Launches Georgia Election Integrity Hotline as Part of the Most Comprehensive Ballot Security Effort in Georgia History**

*Election Integrity Hotline to Serve as Important Resource for Georgia Voters and Volunteers in Senate Runoff Elections*

**ATLANTA, Georgia** – True the Vote today launched a Georgia Election Integrity Hotline to assist Georgia voters and volunteers during the Senate runoff elections. The hotline offers live, bilingual support 24 hours a day for Georgians who have questions or concerns, or who have witnessed election fraud, manipulation or illegal action taking place. Voters can fill out an online report available at **GAValidatetheVote.org** or call the hotline at 855-702-0702.

"True the Vote is working around the clock to provide critical tools and resources for Georgia voters as we head

Exhibit 1 to Notice of Subpoena

into the final days before the runoff elections," **said True the Vote Founder and President Catherine Engelbrecht.** "Our Georgia Election Integrity Hotline will serve as an important resource to voters, volunteers, and election workers who believe in ensuring the law is upheld throughout our election process. Anyone with questions or concerns during the election can call our live, bilingual voter hotline or submit a report online and we'll be available 24 hours a day, seven days a week to respond, assist, and take action as necessary. We are all citizen watchdogs and we are asking voters to join us as we focus our 'Eyes On Georgia' in the most comprehensive ballot security initiative in Georgia history."

This week, True the Vote also announced its **partnership with the Georgia Republican Party**. In addition to the Georgia Election Integrity Hotline, True the vote will assist with the Senate runoff election process, including publicly available signature verification training, monitoring absentee ballot drop boxes, and other nonpartisan election integrity initiatives.

# # #

*True the Vote* *(TTV) is an IRS-designated 501(c)3 voters' rights organization, founded to inspire and equip volunteers for involvement at every stage of our electoral process. TTV empowers organizations and individuals across the nation to actively protect the rights of legitimate voters, regardless of their political party affiliation. For more information, please visit* **www.truethevote.org***.*

Exhibit 1 to Notice of Subpoena

# Exhibit 4

Exhibit 1 to Notice of Subpoena

# TRUE THE VOTE LAUNCHES "VALIDATE THE VOTE" INITIATIVE AND WHISTLEBLOWER COMPENSATION FUND TO ENSURE ELECTION VALIDITY, PROCESS INTEGRITY

**True the Vote Launches "Validate the Vote" Initiative and Whistleblower Compensation Fund to Ensure Election Validity, Process Integrity**

*Establishes Fund in Excess of $1 Million to Incentivize Election Malfeasance Reporting; Takes Steps to Resolve Illegal Actions Through Litigation and Ensure Final Vote Tally is Valid to Maintain Public Confidence in U.S. Election System*

**HOUSTON, Texas –** True the Vote, the country's largest voters' rights organization formed to prevent election fraud, today launched "Validate the Vote," an initiative to provide that the 2020 election returns reflect the principle of "one vote for one voter." The initiative, led by Catherine Engelbrecht, aims to protect the integrity of our nation's electoral system and ensure public confidence and acceptance of election outcomes critical to American democracy.

Exhibit 1 to Notice of Subpoena

"Unfortunately, there is significant tangible evidence that numerous illegal ballots have been cast and counted in the 2020 general election, potentially enough to sway the legitimate results of the election in some of the currently contested states," said Englebrecht. " True the Vote is stepping up to provide the resources needed that will ensure voters, election workers, and volunteers who are observing the extended ballot counting process – and seeing firsthand the illegal actions taking place – have the resources they need to document and report the malfeasance with the confidence that these issues will be pursued by every available legal channel.

As of today, True the Vote's **Election Integrity Hotline** (855-702-0702) has received thousands of calls reporting alleged incidents of fraud.  Additionally, multiple True the Vote election workers working alongside independent election workers across contested states have seen firsthand examples of election officials refusing to obey state election laws and counting votes illegally. These incidents include ballots being counted after deadlines, election workers refusing to recognize challengers who seek to contest a ballot, or similar. The establishment of the Whistleblower Compensation Fund will enable individuals with critical information to come forward and be supported.

"True the Vote aims to facilitate a discussion that reflects credible facts, evidence, and demonstrably actionable incidents of voter fraud.  The current media reporting environment is rife with sensationalism that threatens the ability to quickly and accurately determine and bring focus to where actual issues have occurred and could undermine confidence in this election and, fundamentally, the free election system that underpins the Democracy.  We need a result that tells us whether the election is legitimate and that every vote is validated," added Engelbrecht.  "The vote integrity issues seen this election cycle, in particular, have largely been fueled by efforts to radically expand mail-in voting, which created numerous opportunities for voter fraud that does not exist with in-person voting.  In addition, there are numerous statistical anomalies that must be reconciled to restore confidence in the vote."

The integrity of elections is the core of our Democratic Republic.  Regardless of the outcome, the legitimacy of our leaders, the ability to govern, and the preservation of our election system are at stake.  Validate the Vote aims to support the constitutional rights of every voter and expose, fight and remedy fraud where it has occurred.

Please call the **Election Integrity Hotline** at 855-702-0702 to report voter fraud or visit **ValidatetheVote.us** for more information, report voter fraud or contribute.

# # #

Exhibit 1 to Notice of Subpoena

*True the Vote* (TTV) is an IRS-designated 501(c)3 voters' rights organization, founded to inspire and equip volunteers for involvement at every stage of our electoral process. TTV empowers organizations and individuals across the nation to actively protect the rights of legitimate voters, regardless of their political party affiliation. For more information, please visit *www.truethevote.org*.

Exhibit 1 to Notice of Subpoena

1

# Exhibit 5

Exhibit 1 to Notice of Subpoena

## Eveler, Janine

| | |
|---|---|
| **From:** | Absentee |
| **Sent:** | Friday, December 18, 2020 2:29 PM |
| **To:** | Eveler, Janine |
| **Subject:** | FW: Section 21-2-230 Elector Challenge |
| **Attachments:** | COBB_county.csv; COBB_county.xlsx |

Sincerely,

The Absentee Team
770/528-2684

www.cobbelections.org

---

**From:** GA Elector Challenge [gaelectorchallenge@truethevote.org]
**Sent:** Friday, December 18, 2020 2:14 PM
**To:** info@cobbelections.org
**Subject:** Section 21-2-230 Elector Challenge

December 18, 2020

Cobb County

736 Whitlock Ave., Ste.400

Marietta, GA 30064

VIA EMAIL

RE: Elector Challenge

Please accept this letter as a challenge to the attached electors' eligibility to vote in the January 5, 2021 Election, pursuant to Georgia Code § 21-2-230.

Available data from the United States Postal Service National Change of Address (NCOA) and other commercially available sources demonstrates probable cause to believe these individuals no longer reside where they are registered to vote. In fact, these electors appear to have permanently established other residence, as reflected in their change of address, to residential addresses outside of the Georgia county in which they are currently registered to vote.

Georgia Code § 21-2-217 requires that if a person removes to another state, or to another county or municipality within the state of Georgia, with the intention of remaining there an indefinite time and making another state, county, or municipality such person's place of residence, such person shall be considered to have lost their residence in Georgia, or in the former county or municipality, notwithstanding that such person may intend to return at some indefinite future period.

Elector voter registration numbers, registered addresses, and address changes have been provided by attachment as CSV and XML spreadsheets. If you would prefer to receive these files in another format, please let me know.

Additionally, hard copies of individual challenges are being delivered to your office under separate cover.

Exhibit 1 to Notice of Subpoena

Respectfully,

Pamela F Reardon

Voter ID: 03615023

Cobb County

4050 Coyte Dr

Marietta, GA 30062

**CAUTION:** This email originated outside Cobb County Government. Please exercise caution when opening links/attachments in this email .

2

Exhibit 1 to Notice of Subpoena

# Exhibit 6

Exhibit 1 to Notice of Subpoena

# Is True the Vote Intimidating Minority Voters From Going to the Polls?

*Poll-watching organization volunteers have been accused of being aggressive.*

By **DAN HARRIS and MELIA PATRIA**
November 1, 2012, 12:27 PM • 13 min read

## Top Stories

House passes COVID-19 relief bill, measure now heads to Senate
2 hours ago


Congress reaches deal on $900B COVID-19 relief package
Dec 21, 6:21 AM


Vatican: OK to get virus vaccines using abortion cell lines
Dec 21, 2:29 PM


Trump entertains desperate schemes to overturn election
Dec 21, 3:54 PM


Former President Barack Obama shares family quarantine details
Dec 19, 9:21 AM


HONESTY IN ELECTIONS



**'True the Vote' Volunteers Intimidating Voters?**
*Grassroots organization believes voter fraud is a sweeping national epidemic, but is it?*

Nov. 2, 2012 — -- Teresa Sharp, a homemaker and grandmother, has lived in Hamilton County, Ohio, for nearly 30 years. A former poll worker and a Democrat, she says she has voted in every election since she was 18.

"Voting to me is, like, sacred, like my children," she said. "It lets me at least have an opinion about how I want to live in America."

ADVERTISEMENT


• ABC News Live



24/7 coverage of breaking news and live events

Sharp is keenly aware that her vote counts. Hamilton County, which includes Cincinnati, is hotly contested in a swing state that could decide this extraordinarily close presidential race. So naturally, Sharp was surprised when she received a letter in the mail that said, "You are hereby notified that your right to vote has been challenged by a qualified elector under RC 3503.243505.19."

"Nobody's ever challenged me, especially my right to vote," Sharp said. "I'm confused. I'm concerned and pretty darn mad."

Her husband, Herbert, her sons, Christopher and Herbert Jr., her daughters, Aseneth and Eleanor, and her elderly aunt, all residents at the same family home in Hamilton County, also received a similar letter.

"I thought to myself that there's somebody out here trying to scare people into not voting," she said.

The letter came from the county board of elections, and was prompted by an official challenge submitted by a member of The Ohio Voter Integrity Project, a local affiliate of a grassroots organization called True the Vote. The organization believes that voter fraud is a sweeping national epidemic and has enlisted and trained an army of citizen volunteers to challenge voters in the name of what they call "voter integrity."

Their promotional and recruitment videos talk about "willful, fraudulent behavior," and, "people voting who are not who they said they were." They said they address the important need to keep elections free and fair for all citizens.

The goals sound admirable, and even patriotic, but Sharp and other Democrats say True the Vote is less about voter integrity than voter suppression, and is specifically meant to intimidate minorities, low-income people and students who might vote for President Obama.

"I was like, 'Whoa, why are they targeting my family? What did we do?'" said Sharp.

While it is legal in 46 states for any citizen to challenge another citizen's right to vote, election officials said, it very rarely happens.

But this election cycle, the challenge against Sharp was among 1,077 citizen challenges received by the Hamilton County Board of Elections alone. The challenge against Sharp incorrectly cited her property as a vacant lot, but after a hearing Hamilton County election officials threw it out.

Attempts to reach Marlene Kocher, the member of the local Integrity Project who challenged Sharp, were not successful. Other True the Vote volunteers declined to speak with us on camera.

However, True the Vote founder Catherine Engelbrecht, who travels the country speaking about voter fraud, agreed to speak with "Nightline" in her first national television interview. Engelbrecht denied the allegations that her organization was attempting to intimidate voters from the polls.

Exhibit P to Notice of Subpoena

"Our goal really is to encourage citizens to get involved in the process," she said. "It has been a continued shock and disappointment, frankly, to hear these allegations that continue to be leveled at us. It's unfortunate that there are those that have tried to take this and twist it into something that it's not."

Engelbrecht started True the Vote three years ago after serving as a poll watcher in Houston, where she said she witnessed things that disturbed her.

"All the way through to what can only be called voter fraud," she said. "We saw people who would come in with multiple registrations. We saw people who would come in and want to vote but their name had already been signed in the poll book. We recognized there's something not quite right."

Engelbrecht said that voter fraud can have a major impact on the outcome of an election.

"There have been many elections in the not-too-distant past that have been within such a tight margin that it really makes it very clear: Every vote counts," she said. "So you really begin to ask yourself, 'How much fraud's OK?'

"If there's a way to improve the process, and if there's a way for citizens to serve in the process and be a part of that contribution, then that's what we need to do," she added.

To stamp out voter fraud, True the Vote launched "integrity projects" all over the country by recruiting volunteers to start their own independent local chapters. True the Vote provides the groups with proprietary software to vet voter registrations, looking for inaccuracies that might be challengeable. Engelbrecht said the software compares the voter roll against the Social Security death index, property tax records and other public records.

"True the Vote is not turning in challenges," she said. "Citizen groups and private citizens across the country are using our software. ... The role, then, of a citizen volunteer is to look through. If you find anything, flag it and turn it over to the county officials."

Engelbrecht insisted that the organization is all about cleaning up voter rolls and denied that there is any political agenda behind the challenges.

"We do not attach party to anything that we do inside of the research," she said.

Teresa Sharp disagreed that challenging voters like her helped to keep elections fair.

"Right," she said. "Just the poor black neighborhoods. right? Everybody else is clean... So we're the dirty ones, we're the fraudulent folks."

While she agreed the challenge did not intimidate her, she expressed concern for others who might be challenged and not understand what it

Exhibit P is Notice of Subpoena

meant.

Election officials in Hamilton County agreed that the challenge against Sharp was ill-placed and that the challenger was clearly wrong in her research asserting Sharp's home was a vacant lot.

Alex Trianfilou, the Republican chair of the Hamilton County Board of Elections, said the local Integrity Project is doing a public service.

"They're reviewing the county and making sure our voter registration roles are accurate, and we think that's an important public service," he said.

Timothy Burke, the chairman of the Hamilton County Board of Elections and a Democrat, acknowledged that some of the challenges brought to the office correctly identified places where, say, a trailer park no longer existed. But others, he said, targeted college students who didn't list their dorm room or people who were mobile or lived in low-income areas -- and the majority of challenges were thrown out.

"Voter fraud has just not historically been a problem here in Hamilton County," Burke said. "I just think it's a smoke screen for their real effort, and that is to intimidate and prevent Democrats, and especially African-American Democrats, from voting."

Burke sees the challenges in context of what he said is a greater effort in Ohio to make voting more difficult, citing legislative moves to limit early voting days and pointing out billboards that went up in minority neighborhoods in several Ohio cities that said, "Voter Fraud is a Felony," with warnings of stiff fines and jail time.

"They're there for one purpose and that's to scare voters," he said. "There is a real concern that some voters have been confused, some voters have been intimidated, and the possibility that they might not show up because of it is a real shame."

Sharp also pointed out the billboards, and brought "Nightline" to one near her home.

"It makes me think back in the '20s and '30s and '40s when everything was segregated," she said, "you know, white people over there, and then black folks and everybody over there."

The billboard company in Cincinnati said the billboards were paid for by an anonymous family fund that wished to remain anonymous, and the billboards have since come down. "Nightline" found no evidence True the Vote was associated with the billboards.

Engelbrecht adamantly denied that True the Vote targets people based on race.

"Teresa Sharp has nothing to worry about because our citizens go into this race-blind, party-blind," she said. "This is literally nothing more than citizens doing what is legally allowed, what anyone can do in an effort to better our overall process and there is nothing more to it than that."

Engelbrecht conceded that the group's software program flags addresses with a high number of registered voters. When asked if the system was biased against people who live in multi-generational homes, she said, "That's the way we segment data just because it is an all-volunteer group that has only limited time."

In a video of an online training session for True the Vote volunteers, obtained by "Nightline" from an activist, an instructor said, "We have to exercise some discretion as we go through this too. You get the wrong person at the keyboard with this tool, if they were doing it for the wrong reasons they could get everyone in trouble. ... All they have to do is find a single judge that is sympathetic to their cause and it shuts us down in every state. So we have to be really careful about who we talk to and what we explain to people about how this thing works."

The instructor said the tool allows volunteers to vet across state lines, processing up to 3,000 voter registrations in 20 hours.

"If you have a friend that you know well, and you want to get him involved, I would just speak in generalities, don't go into real specifics," he said. "Because, like you, we would vet that person. They would sign a non-disclosure."

In response, Engelbrecht said that the remarks were taken out of context and were presented during the course of a longer conversation about the use of the group's publicly available research.

In a statement, she said, "True the Vote's research template was designed to identify potential inaccuracies in the voter rolls and support challenges or concerns by citizens so they may directly participate in the citizen challenge process. This important legal process was designed to protect voters from fraud and abuse, and relies on citizens to ensure the integrity of our voter rolls. Given the enormous value of this work, we, as an organization, take reasonable steps to help prevent the misuse of our data that supports the noble efforts of well-intended citizens who stand in the gap so every American vote is counted."

Read the full statement HERE

Engelbrecht insisted True the Vote is nonpartisan, and the volunteer training videos on its website do say that.

But there is evidence to suggest otherwise. Engelbrecht runs a Tea Party group in Houston and True the Vote recently donated $5,000 to a Republican organization.

Engelbrecht told "Nightline" the donation was a mistake, and said that her Tea Party group and True the Vote are two separate organizations. But True the Vote organizes national summits where members have made clear they want to see President Obama out of office.

"I'm not being over the top here: I fear the Obama gang is setting themselves up to steal the elections, if possible," one volunteer leader said.

But again, Engelbrecht denied that the group had a political agenda.

"Our agenda is to make sure that the election process is as free and as fair as it can be for all American voters," she said. "To the extent that the administration is standing in the way of that, I take exception."

True the Vote has said it is mobilizing one million poll watchers to go to voting places across the country. The problem, critics said, is that those watchers are mostly white and many of the polling places they target serve mostly black or minority voters.

In 2010, people in Texas complained that poll watchers who were affiliated with True the Vote were being overly aggressive and intimidating. According to Douglas Ray, the senior assistant county attorney for Harris County, Texas, the county where Engelbrecht lives, there were several complaints of True the Vote volunteers being disruptive to voters.

Ray said he went to the True the Vote offices and saw push pins on a map that he interpreted as the group's intention to target specific minority areas. This year, he said, his office has already received complaint calls about True the Vote volunteers at early voting locations.

The county attorney's office directed "Nightline" to an early voting location in Houston where there were Caucasian poll watchers in a predominantly African-American neighborhood, where citizens have already begun to complain.

Despite all the controversy the group has kicked up, study after study -- by the U.S. Department of Justice, investigative journalists and a bipartisan commission -- has found voter fraud to be virtually non-existent.

But Engelbrecht said her group's observations suggested there was "room for improvement." At last count, she said, her organization turned in 33 names to counties, and True the Vote was looking into close to 2,000 registrations that have almost identical matches. Although those might appear to be low numbers in context of the greater population, she said the 2000 presidential election was decided by 537 votes in Florida.

But Ray said voter fraud is not a current threat to democracy.

"I think that she is looking at things and perceiving a problem where a problem really doesn't exist," Ray said.

Whether Engelbrecht is dreaming it up or not, thousands of people agree with her and True the Vote volunteers will be showing up at polling places across the country this Election Day.

But Teresa Sharp is not deterred. In fact, she recently voted early in Hamilton County without incident.

"Too many people sacrificed their life for me to have that opportunity," she said.

Exhibit P to Notice of Subpoena

**True the Vote Founder Catherine Engelbrecht's full statement to ABC News:**

"The remarks you refer to were taken out of context and are presented during the course of a longer conversation about the use of our publicly-available research. True the Vote's research template was designed to identify potential inaccuracies in the voter rolls and support challenges or concerns by citizens so they may directly participate in the citizen challenge process. This important legal process was designed to protect voters from fraud and abuse, and relies on citizens to ensure the integrity of our voter rolls. Given the enormous value of this work, we, as an organization, take reasonable steps to help prevent the misuse of our data that supports the noble efforts of well-intended citizens who stand in the gap so every American vote is counted.

We recognize that maintaining voter rolls can be a highly charged issue, full of fodder for false claims of impropriety -- and we want no part of it. The data, and our volunteers' work with it, should be treated with utmost integrity; at no time being used for partisan or personal purposes."

💬 Comments (76)

 NEWS    VIDEO    LIVE    SHOWS    2020 ELECTIONS    CORONAVIRUS    ⠿    🔍

Before You Go                                                    Taboola Feed

Getting this Treasure is impossible! Prove us wrong
Hero Wars | Sponsored

Need to Kill Time On Your Way to Work? Try This RPG Game
Raid: Shadow Legends | Free Download | Sponsored

If You Wear Asics, You'll Love This Trick
Wikibuy | Sponsored

Tommy Chong: Throw Out Your CBD Now
Tommy Chong's CBD | Sponsored

Men's Cotton Velvet Winter Warm Non-slip Shoes
SweetieCathy | Sponsored

Famous Economist: How Dollar Crash Will Unfold
Stansberry Research | Sponsored

Kobe Bryant's widow slams lawsuit from mom seeking support

State senator dies from COVID-19 complications

Exhibit P to Notice of Subpoena

# Exhibit 7

Exhibit 1 to Notice of Subpoena

# The Washington Post

*Democracy Dies in Darkness*

# Tea party-linked poll watchers rejected in Ohio county

By **Ed O'Keefe**

November 6, 2012 at 12:11 p.m. EST

COLUMBUS – Local volunteers with the tea party-linked organization True the Vote were rejected as poll watchers by county officials Tuesday amid questions about how the volunteers applied to monitor the polls.

Ohio law permits groups of at least five candidates to assign poll observers, but candidates backing the group withdrew their support when charges surfaced Monday that candidate names had been falsified or copied on forms requesting observer status, according to the Columbus Dispatch.

Catherine Engelbrecht, president of True the Vote, told the Dispatch that the rejection was "a final, desperate attempt to deny citizens their right to observe elections."
"The Ohio Democratic Party has projected paranoia on an international scale by promoting the idea that concerned citizens would dare observe elections to ensure a fair process," Engelbrecht said in a statement. "If the Ohio Democratic Party thinks True the Vote-trained poll watchers are legion, wait until it meets our lawyers."
True the Vote volunteers in Columbus contacted by The Washington Post on Tuesday morning did not return requests for comment.
In a recent interview with The Post, Engelbrecht rejected suggestions that her Houston-based group – which has reportedly recruited millions of volunteers – would attempt to intimidate or attempt to raise questions about the validity of African-American and Latino voters.
"Contrary to various interest groups' statements, True the Vote has never been investigated or charged with intimidating voters," Engelbrecht told The Post. "A poll watcher's sole purpose is to monitor the process of our elections. They are trained to never speak with voters, only authorities within the poll."
But people who complained to the Franklin County Board of Elections about the group said True the Vote volunteers were told at recent training sessions to use cameras to intimidate voters when they enter the polling place, record their names on tablet computers and attempt to stop questionably qualified voters before they could get to a voting machine, the Dispatch reported.
A Franklin County Board of Elections spokesman did not immediately return requests for comment.



## Comments are not available on this story.

Share your feedback by emailing the author. Have a question about our comment policies? Review our guidelines or contact the commenting team here.

Exhibit 1 to Notice of Subpoena

# Exhibit 8

Exhibit 1 to Notice of Subpoena

12/22/2020
GOP activist's voter challenges raise questions in Georgia
Case 2:20-cv-00302-SRW Document 60-1 Filed 12/23/20 Page 69 of 73

# GOP activist's voter challenges raise questions in Georgia

By BILL BARROW    today



ATLANTA (AP) — When a conservative organization announced plans this month to launch an election integrity operation in Georgia, the group's news release included a high-profile name: the chairman of the state's Republican Party. Less than a week later, the same group announced plans to challenge the eligibility of hundreds of thousands of Georgia voters.

To Democrats in the state and voting rights advocates, it was verification of what they have long argued — that the Georgia GOP is supporting efforts to suppress voting in one of the nation's newest political battlegrounds. It also raised questions about the legality of any coordination between the state party and the group True the Vote, charges the organization's founder disputes.

ADVERTISEMENT

Exhibit 1 to Notice of Subpoena

A relatively obscure conservative group, True the Vote is among the numerous political organizations descending on Georgia ahead of a pair of high-stakes Senate run-offs on Jan. 5. The outcome of the contests will determine which party controls the Senate as President-elect Joe Biden launches his administration.

On Dec. 14, True the Vote announced it was launching an "election integrity" campaign in Georgia as "partners with (the) Georgia GOP to ensure transparent, secure ballot effort" for the Senate runoffs. The release featured a quote attributed to Georgia Republican Chairman David Shafer: "The resources of True the Vote will help us organize and implement the most comprehensive ballot security initiative in Georgia history."

**READ MORE:**
- Loeffler's wealth, Trump loyalty face scrutiny in Georgia
- In Georgia, Warnock brings faith and activism to the arena
- Georgia governor blasts attacks on family over election

The Dec. 14 release described True the Vote's effort as "publicly available signature verification training, a statewide voter hotline, monitoring absentee ballot drop boxes and other election integrity initiatives." Days later, the group said it was challenging the eligibility of more than 360,000 voters spread across all 159 Georgia counties. The state GOP was not featured in that disclosure.

Campaign finance law forbids political parties from accepting contributions — including non-cash, "in-kind" contributions of goods and services — from any corporation. Not-for-profits with the tax status granted to True the Vote also have strict limits on the kind of activities they conduct, essentially allowing for generic voter registration and turnout drives.

Adav Noti, an elections law and campaign finance law expert at the nonpartisan Campaign Legal Center in Washington, said the law means True the Vote "absolutely cannot collaborate with a political party on voter registration or get-out-the-vote efforts or anything related to those areas in a campaign."

ADVERTISEMENT



True the Vote founder Christine Engelbrecht, a former Texas tea party leader, disputes that, saying there is no "coordination" with Shafer or any of his staff. She said training materials her group is providing for poll workers, for example, are publicly available and the state GOP is not involved in any training sessions with True the Vote. She acknowledged, though, that some poll workers who get True the Vote materials could end up volunteering for the GOP as poll workers.

Georgia Republican Party officials, including Shafer, did not respond to multiple inquiries from The Associated Press about the party's relationship with Engelbrecht.

True the Vote was founded in 2009 and has a reputation for training conservative poll watchers to be aggressive in highlighting potential voter fraud. Voter fraud in the United States is rare, and there is no evidence of any significant problems in this year's presidential election. That has been confirmed in Georgia by Gov. Brian Kemp and Secretary of State Brad Raffensperger, both Republicans, and nationwide by officials including Attorney General William Barr.

Exhibit 16 Notice of Subpoena

But much of Engelbrecht's work in the weeks before the Georgia runoffs is focused on identifying registered voters her group argues are not eligible. She said her group's citizen-led challenges to tens of thousands of Georgia voters are based on residency records.

Lauren Groh-Wargo of Fair Fight Action, a political organization started by Georgia Democrat Stacey Abrams after she lost the 2018 governor's race, called it "a Hail Mary attempt by Republicans to suppress the vote two weeks out from an election, with people already voting."

**Full Coverage:** Election 2020

Early voting in Georgia began Dec. 14, the same day True the Vote said it had formed an alliance with the state Republican Party. Both parties expect close races between Republican Sens. David Perdue and Kelly Loeffler and their respective Democratic challengers, Jon Ossoff and Raphael Warnock, reflecting Georgia's new status as a battleground state. Biden became the first Democrat to carry Georgia in a presidential race since 1992, edging President Donald Trump by just 12,000 votes out of about 5 million cast.

Elections officials nationwide routinely conduct maintenance of voter rolls — removing voters who have moved or died or have been inactive for certain periods of time — between election seasons. But federal law prevents those practices so close to an election. True the Vote, however, is taking advantage of a state law that allows individual voters to challenge another voter's eligibility. A state court in Fulton County, which includes most of the city of Atlanta, ruled earlier this year that federal restrictions on changing voter rolls within 90 days of an election overrides state law. That ruling, however, doesn't necessarily apply statewide.

In at least one populous Georgia county — suburban Atlanta's Cobb — the local elections board already has rejected True the Vote's challenges. But in Muscogee County, home to Georgia's second-largest city, Columbus, the board found "probable cause" for the complaints. That means the affected Muscogee voters — Groh-Wargo said they number several thousand — could have to cast provisional ballots and then prove their eligibility to have those ballots counted.

Engelbrecht said her group has filed challenges in as many as 85 counties.

She insisted the voter challenges are separate from True the Vote operations that might overlap with the GOP's election-security program. She said neither Shafer nor any of his subordinates played any role in corralling the Georgia voters who filed the challenges with local elections officials.

She added that no money has changed hands between the party and True the Vote.

Noti, the elections law expert, said federal law is clear that "a contract or an agreement or an exchange of money is not required for coordination to be established."

It's not the first time that Engelbrecht's activities have drawn scrutiny. She spent years fighting with the IRS to win her group's tax-exempt classification. And most recently, True the Vote declared itself aligned with Trump's reelection campaign and its multistate legal effort to overturn the general election results. That drew considerable financial support, including top Trump donor Fred Eshelman, according to Bloomberg News.

But after True the Vote ended several of its lawsuits in battleground states, including Georgia, Eshelman filed suit against Engelbrecht's organization to recover a $2.5 million contribution, alleging it had failed to investigate and expose any election fraud.

# CIVIL COVER SHEET

The JS44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form is required for the use of the Clerk of Court for the purpose of initiating the civil docket record. (SEE INSTRUCTIONS ATTACHED)

| I. (a) PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| FAIR FIGHT, INC., JOHN DOE, and JANE DOE | TRUE THE VOTE, CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1-10 |

**(b) COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF** ___FULTON COUNTY___
(EXCEPT IN U.S. PLAINTIFF CASES)

**COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT** _____
(IN U.S. PLAINTIFF CASES ONLY)

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c) ATTORNEYS** (FIRM NAME, ADDRESS, TELEPHONE NUMBER, AND E-MAIL ADDRESS)

Allegra J. Lawrence
LAWRENCE & BUNDY LLC
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309

**ATTORNEYS** (IF KNOWN)

## II. BASIS OF JURISDICTION
(PLACE AN "X" IN ONE BOX ONLY)

☐ 1 U.S. GOVERNMENT PLAINTIFF

☐ 2 U.S. GOVERNMENT DEFENDANT

☒ 3 FEDERAL QUESTION (U.S. GOVERNMENT NOT A PARTY)

☐ 4 DIVERSITY (INDICATE CITIZENSHIP OF PARTIES IN ITEM III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES
(PLACE AN "X" IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDANT)
(FOR DIVERSITY CASES ONLY)

| PLF | DEF | | PLF | DEF | |
|---|---|---|---|---|---|
| ☐ 1 | ☐ 1 | CITIZEN OF THIS STATE | ☐ 4 | ☐ 4 | INCORPORATED OR PRINCIPAL PLACE OF BUSINESS IN THIS STATE |
| ☐ 2 | ☐ 2 | CITIZEN OF ANOTHER STATE | ☐ 5 | ☐ 5 | INCORPORATED AND PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE |
| ☐ 3 | ☐ 3 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | ☐ 6 | ☐ 6 | FOREIGN NATION |

## IV. ORIGIN (PLACE AN "X "IN ONE BOX ONLY)

☒ 1 ORIGINAL PROCEEDING

☐ 2 REMOVED FROM STATE COURT

☐ 3 REMANDED FROM APPELLATE COURT

☐ 4 REINSTATED OR REOPENED

☐ 5 TRANSFERRED FROM ANOTHER DISTRICT (Specify District)

☐ 6 MULTIDISTRICT LITIGATION - TRANSFER

☐ 7 APPEAL TO DISTRICT JUDGE FROM MAGISTRATE JUDGE JUDGMENT

☐ 8 MULTIDISTRICT LITIGATION - DIRECT FILE

## V. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE - DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

52 U.S.C. § 10307(b)

**(IF COMPLEX, CHECK REASON BELOW)**

☐ 1. Unusually large number of parties.

☐ 2. Unusually large number of claims or defenses.

☐ 3. Factual issues are exceptionally complex

☐ 4. Greater than normal volume of evidence.

☐ 5. Extended discovery period is needed.

☐ 6. Problems locating or preserving evidence

☐ 7. Pending parallel investigations or actions by government.

☐ 8. Multiple use of experts.

☐ 9. Need for discovery outside United States boundaries.

☐ 10. Existence of highly technical issues and proof.

## CONTINUED ON REVERSE

FOR OFFICE USE ONLY

RECEIPT # _____  AMOUNT $ _____  APPLYING IFP _____  MAG. JUDGE (IFP) _____

JUDGE _____  MAG. JUDGE _____ (Referral)  NATURE OF SUIT _____  CAUSE OF ACTION _____

Exhibit 1 to Notice of Subpoena

## VI. NATURE OF SUIT (PLACE AN "X" IN ONE BOX ONLY)

**CONTRACT - "0" MONTHS DISCOVERY TRACK**
- ☐ 150 RECOVERY OF OVERPAYMENT & ENFORCEMENT OF JUDGMENT
- ☐ 152 RECOVERY OF DEFAULTED STUDENT LOANS (Excl. Veterans)
- ☐ 153 RECOVERY OF OVERPAYMENT OF VETERAN'S BENEFITS

**CONTRACT - "4" MONTHS DISCOVERY TRACK**
- ☐ 110 INSURANCE
- ☐ 120 MARINE
- ☐ 130 MILLER ACT
- ☐ 140 NEGOTIABLE INSTRUMENT
- ☐ 151 MEDICARE ACT
- ☐ 160 STOCKHOLDERS' SUITS
- ☐ 190 OTHER CONTRACT
- ☐ 195 CONTRACT PRODUCT LIABILITY
- ☐ 196 FRANCHISE

**REAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- ☐ 210 LAND CONDEMNATION
- ☐ 220 FORECLOSURE
- ☐ 230 RENT LEASE & EJECTMENT
- ☐ 240 TORTS TO LAND
- ☐ 245 TORT PRODUCT LIABILITY
- ☐ 290 ALL OTHER REAL PROPERTY

**TORTS - PERSONAL INJURY - "4" MONTHS DISCOVERY TRACK**
- ☐ 310 AIRPLANE
- ☐ 315 AIRPLANE PRODUCT LIABILITY
- ☐ 320 ASSAULT, LIBEL & SLANDER
- ☐ 330 FEDERAL EMPLOYERS' LIABILITY
- ☐ 340 MARINE
- ☐ 345 MARINE PRODUCT LIABILITY
- ☐ 350 MOTOR VEHICLE
- ☐ 355 MOTOR VEHICLE PRODUCT LIABILITY
- ☐ 360 OTHER PERSONAL INJURY
- ☐ 362 PERSONAL INJURY - MEDICAL MALPRACTICE
- ☐ 365 PERSONAL INJURY - PRODUCT LIABILITY
- ☐ 367 PERSONAL INJURY - HEALTH CARE/ PHARMACEUTICAL PRODUCT LIABILITY
- ☐ 368 ASBESTOS PERSONAL INJURY PRODUCT LIABILITY

**TORTS - PERSONAL PROPERTY - "4" MONTHS DISCOVERY TRACK**
- ☐ 370 OTHER FRAUD
- ☐ 371 TRUTH IN LENDING
- ☐ 380 OTHER PERSONAL PROPERTY DAMAGE
- ☐ 385 PROPERTY DAMAGE PRODUCT LIABILITY

**BANKRUPTCY - "0" MONTHS DISCOVERY TRACK**
- ☐ 422 APPEAL 28 USC 158
- ☐ 423 WITHDRAWAL 28 USC 157

**CIVIL RIGHTS - "4" MONTHS DISCOVERY TRACK**
- ☐ 440 OTHER CIVIL RIGHTS
- ☑ 441 VOTING
- ☐ 442 EMPLOYMENT
- ☐ 443 HOUSING/ ACCOMMODATIONS
- ☐ 445 AMERICANS with DISABILITIES - Employment
- ☐ 446 AMERICANS with DISABILITIES - Other
- ☐ 448 EDUCATION

**IMMIGRATION - "0" MONTHS DISCOVERY TRACK**
- ☐ 462 NATURALIZATION APPLICATION
- ☐ 465 OTHER IMMIGRATION ACTIONS

**PRISONER PETITIONS - "0" MONTHS DISCOVERY TRACK**
- ☐ 463 HABEAS CORPUS- Alien Detainee
- ☐ 510 MOTIONS TO VACATE SENTENCE
- ☐ 530 HABEAS CORPUS
- ☐ 535 HABEAS CORPUS DEATH PENALTY
- ☐ 540 MANDAMUS & OTHER
- ☐ 550 CIVIL RIGHTS - Filed Pro se
- ☐ 555 PRISON CONDITION(S) - Filed Pro se
- ☐ 560 CIVIL DETAINEE: CONDITIONS OF CONFINEMENT

**PRISONER PETITIONS - "4" MONTHS DISCOVERY TRACK**
- ☐ 550 CIVIL RIGHTS - Filed by Counsel
- ☐ 555 PRISON CONDITION(S) - Filed by Counsel

**FORFEITURE/PENALTY - "4" MONTHS DISCOVERY TRACK**
- ☐ 625 DRUG RELATED SEIZURE OF PROPERTY 21 USC 881
- ☐ 690 OTHER

**LABOR - "4" MONTHS DISCOVERY TRACK**
- ☐ 710 FAIR LABOR STANDARDS ACT
- ☐ 720 LABOR/MGMT. RELATIONS
- ☐ 740 RAILWAY LABOR ACT
- ☐ 751 FAMILY and MEDICAL LEAVE ACT
- ☐ 790 OTHER LABOR LITIGATION
- ☐ 791 EMPL. RET. INC. SECURITY ACT

**PROPERTY RIGHTS - "4" MONTHS DISCOVERY TRACK**
- ☐ 820 COPYRIGHTS
- ☐ 840 TRADEMARK
- ☐ 880 DEFEND TRADE SECRETS ACT OF 2016 (DTSA)

**PROPERTY RIGHTS - "8" MONTHS DISCOVERY TRACK**
- ☐ 830 PATENT
- ☐ 835 PATENT-ABBREVIATED NEW DRUG APPLICATIONS (ANDA) - a/k/a Hatch-Waxman cases

**SOCIAL SECURITY - "0" MONTHS DISCOVERY TRACK**
- ☐ 861 HIA (1395ff)
- ☐ 862 BLACK LUNG (923)
- ☐ 863 DIWC (405(g))
- ☐ 863 DIWW (405(g))
- ☐ 864 SSID TITLE XVI
- ☐ 865 RSI (405(g))

**FEDERAL TAX SUITS - "4" MONTHS DISCOVERY TRACK**
- ☐ 870 TAXES (U.S. Plaintiff or Defendant)
- ☐ 871 IRS - THIRD PARTY 26 USC 7609

**OTHER STATUTES - "4" MONTHS DISCOVERY TRACK**
- ☐ 375 FALSE CLAIMS ACT
- ☐ 376 Qui Tam 31 USC 3729(a)
- ☐ 400 STATE REAPPORTIONMENT
- ☐ 430 BANKS AND BANKING
- ☐ 450 COMMERCE/ICC RATES/ETC.
- ☐ 460 DEPORTATION
- ☐ 470 RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS
- ☐ 480 CONSUMER CREDIT
- ☐ 485 TELEPHONE CONSUMER PROTECTION ACT
- ☐ 490 CABLE/SATELLITE TV
- ☐ 890 OTHER STATUTORY ACTIONS
- ☐ 891 AGRICULTURAL ACTS
- ☐ 893 ENVIRONMENTAL MATTERS
- ☐ 895 FREEDOM OF INFORMATION ACT 899
- ☐ 899 ADMINISTRATIVE PROCEDURES ACT / REVIEW OR APPEAL OF AGENCY DECISION
- ☐ 950 CONSTITUTIONALITY OF STATE STATUTES

**OTHER STATUTES - "8" MONTHS DISCOVERY TRACK**
- ☐ 410 ANTITRUST
- ☐ 850 SECURITIES / COMMODITIES / EXCHANGE

**OTHER STATUTES - "0" MONTHS DISCOVERY TRACK**
- ☐ 896 ARBITRATION (Confirm / Vacate / Order / Modify)

**\* PLEASE NOTE DISCOVERY TRACK FOR EACH CASE TYPE. SEE LOCAL RULE 26.3**

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF CLASS ACTION UNDER F.R.Civ.P. 23    DEMAND $_____

JURY DEMAND ☐ YES ☐ NO  (CHECK YES ONLY IF DEMANDED IN COMPLAINT)

## VIII. RELATED/REFILED CASE(S) IF ANY

JUDGE_____    DOCKET NO._____

CIVIL CASES ARE DEEMED RELATED IF THE PENDING CASE INVOLVES:  (CHECK APPROPRIATE BOX)
- ☐ 1. PROPERTY INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- ☐ 2. SAME ISSUE OF FACT OR ARISES OUT OF THE SAME EVENT OR TRANSACTION INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- ☐ 3. VALIDITY OR INFRINGEMENT OF THE SAME PATENT, COPYRIGHT OR TRADEMARK INCLUDED IN AN EARLIER NUMBERED PENDING SUIT.
- ☐ 4. APPEALS ARISING OUT OF THE SAME BANKRUPTCY CASE AND ANY CASE RELATED THERETO WHICH HAVE BEEN DECIDED BY THE SAME BANKRUPTCY JUDGE.
- ☐ 5. REPETITIVE CASES FILED BY PRO SE LITIGANTS.
- ☐ 6. COMPANION OR RELATED CASE TO CASE(S) BEING SIMULTANEOUSLY FILED (INCLUDE ABBREVIATED STYLE OF OTHER CASE(S)):

- ☐ 7. EITHER SAME OR ALL OF THE PARTIES AND ISSUES IN THIS CASE WERE PREVIOUSLY INVOLVED IN CASE NO. _____ , WHICH WAS DISMISSED. This case ☐ IS   ☐ IS NOT (check one box) SUBSTANTIALLY THE SAME CASE.

_____    12/23/2020
SIGNATURE OF ATTORNEY OF RECORD    DATE

Exhibit 1 to Notice of Subpoena