## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| FAIR FIGHT, INC., JOHN DOE, and JANE DOE, | |
| Plaintiffs, | **Case No. 2:20-CV-00302-SCJ** |
| v. | |
| TRUE THE VOTE, CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1–10, | |
| Defendants, | |
| FAIR FIGHT ACTION, INC., | |
| Counter-Defendant. | |

## PLAINTIFFS FAIR FIGHT, INC., JOHN DOE, JANE DOE, AND COUNTER-DEFENDANT FAIR FIGHT ACTION, INC.'S REPLY TO DEFENDANTS' RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

ARGUMENT .......................................................................................................2

    I.    The VRA does not protect Defendants' efforts to restrict voting. .......2

    II.    Defendants' legally flawed attempt to invoke vote dilution does
        not create a cause of action under § 11(b). ...........................................5

    III.    Defendants still have not identified any allegations that
         sufficiently state a claim under § 11(b). ..............................................8

CONCLUSION ....................................................................................................11

# TABLE OF AUTHORITIES

**CASES**                                                              **PAGE(S)**

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...............................................................................9

*Bognet v. Sec'y Commonwealth of Pa.*,
    980 F.3d 336 (3d Cir. 2020) ...................................................................7

*Delgado v. Smith*,
    861 F.2d 1489 (11th Cir. 1988) ........................................................3, 4

*Donald J. Trump for President, Inc. v. Sec'y of Pa.*,
    830 F. App'x 377 (3d Cir. 2020) ..........................................................7

*Johnson v. Governor of Fla.*,
    405 F.3d 1214 (11th Cir. 2005) ............................................................3

*Mont. Democratic Party v. Eaton*,
    581 F. Supp. 2d 1077 (D. Mont. 2008)...............................................10

*Negron v. City of Miami Beach*,
    113 F.3d 1563 (11th Cir. 1997) ............................................................6

*Voris v. Eikel*,
    346 U.S. 328 (1953)...............................................................................5

*Wood v. Raffensperger*,
    981 F.3d 1307 (11th Cir. 2020) ......................................................6, 7

*Wood v. Raffensperger*,
    No. 1:20-CV-5155-TCB, 2020 WL 7706833 (N.D. Ga. Dec. 28,
    2020) ..................................................................................................6, 7

**STATUTES**

52 U.S.C. § 10307(b) .................................................................1, 2, 3, 10

**OTHER AUTHORITIES**

H.R. Rep. No. 89-439, 89th Cong., 1st Sess. (1965), *reprinted in* 1965
      U.S.C.C.A.N. 2437 ...............................................................................................3

**INTRODUCTION**

Section 11(b) of the Voting Rights Act provides a cause of action against those who intimidate or threaten any person "for voting or attempting to vote." 52 U.S.C. § 10307(b). Defendants (also referred to collectively throughout this brief as "True the Vote") have conceded that their first four counterclaims should be dismissed, *see* Defs.' Resp., ECF No. 64 at 7, but with their sole remaining counterclaim, they attempt to rewrite the statute to mean precisely the opposite of what it says. But the Voting Rights Act was not intended to and cannot properly be read to somehow protect individuals or entities like True the Vote that seek to *prevent* people from voting, including by intimidating voters. It is thus not surprising that True the Vote's opposition to Plaintiffs' motion to dismiss the remaining counterclaim identifies no federal law—and certainly no legal interpretation of § 11(b)—that confers on Defendants a *right* to restrict voting. This "up-is-down" approach to statutory interpretation in True the Vote's remaining counterclaim is no less flawed than the inappropriate election tactics that precipitated Defendants' present predicament.

What is more, True the Vote never explains precisely *how* Plaintiffs' conduct was intimidating. Defendants clearly object to the merits of Plaintiffs' lawsuit, and they disagree with non-party Stacey Abrams's criticism in television interviews of True the Vote's tactics, but they never connect those statements to Fair Fight, Inc.

or Fair Fight Action beyond the fact that Ms. Abrams is affiliated with both organizations—an implausible theory that would allow Defendants to drag into court just about any organization with which Ms. Abrams is connected regardless of their separateness. In any event, demanding legal accountability from—and mounting public criticism of—an organization that attempts to have voters removed from the rolls and to otherwise delegitimize the results of an election are not "voter intimidation" under any recognized definition of that term. True the Vote's disagreements with Plaintiffs' allegations and this Court's prior conclusions do not state a plausible or viable counterclaim for voter intimidation. All of the counterclaims should be dismissed.

## ARGUMENT

### I.     The VRA does not protect Defendants' efforts to restrict voting.

Though True the Vote acknowledges that § 11(b) of the VRA, 52 U.S.C. § 10307(b), prohibits intimidating any person for *voting* or *attempting to vote*, Defendants advance a reading of this statute that would do just the opposite: it would protect the right to *prevent* others from voting on the theory that voter fraud may ensue. The result that True the Vote seeks, in itself, reveals the implausibility of the counterclaim because it would render the VRA's protections meaningless by creating an affirmative right to engage in the very conduct that the statute forbids.

By its own terms, § 11(b) states that "[n]o person . . . shall intimidate, threaten, or coerce . . . any person for voting or attempting to vote, or . . . for urging or aiding any person to vote or attempt to vote." 52 U.S.C. § 10307(b). In other words, the statute protects individuals who have been targeted for (1) voting, or (2) "encourag[ing] others to register or vote." H.R. Rep. No. 89-439, 89th Cong., 1st Sess. (1965), *reprinted in* 1965 U.S.C.C.A.N. 2437 at 2439. True the Vote (and its co-Defendants) do not fall into either category. They were not voting, attempting to vote, or encouraging others to vote when they challenged the eligibility of over 364,000 Georgians or recruited volunteers to watch and report on Georgian voters as they returned their ballots. *See* Compl., ECF No. 1 ¶¶ 4–6. Instead, Defendants attempted to *prevent* others from voting. To use § 11(b) to shield this behavior not only contradicts the statute's terms but also does violence to the goals Congress sought to achieve in passing its landmark voting rights law.

Beyond the statute's plain language, it is well-documented that Congress enacted the VRA to eliminate discrimination in voting and safeguard the ability of all citizens to vote. *See, e.g.*, *Johnson v. Governor of Fla.*, 405 F.3d 1214, 1227 (11th Cir. 2005); *Delgado v. Smith*, 861 F.2d 1489, 1492 (11th Cir. 1988). Section 11(b) furthers these purposes by targeting both overt and subtle forms of voter intimidation, including "harass[ing] voters at the polls by implying they would be

arrested, directing derisive noises at them, following them out of polling places, and recording their license plate numbers." Order (Jan. 1, 2021), ECF No. 29 at 22–23 (citing *Nat'l Coal. on Black Civic Participation v. Wohl*, No. 20 Civ. 8668, 2020 WL 6305325, at *16–17 (S.D.N.Y. Oct. 28, 2020) (collecting cases)). Prohibiting these practices advances Congress's goal of "expand[ing] access to the ballot." *Delgado*, 861 F.2d at 1493.

Though True the Vote insists that Defendants were merely protecting their right to vote "by preventing voter fraud," Defs.' Resp. 17, nothing in the text or purpose of § 11(b) supports the notion that Defendants' so-called "anti-voter fraud" measures enjoy federal protection. True the Vote audaciously suggests that the VRA's definition of "vote"—encompassing "all action necessary to make a vote effective," *id*. at 9 (quoting 52 U.S.C. § 10307(b))—confers a right to *nullify* the supposedly fraudulent votes of others. Not so: when Congress passed the VRA, Republican members objected to it on the grounds that, in their view, the VRA did far too little to curtail "instances of vote frauds." Voting Rights Act of 1965 Report No. 439, at p. 43 ("Republican Views") (June 1, 1965). There is absolutely no support for the position that the VRA was meant to provide affirmative protection for activities aimed at *preventing* people from voting or attempting to vote purportedly in the name of fraud prevention.

-4-

It is difficult to imagine a more incongruous result than the one True the Vote urges. As Plaintiffs have explained, True the Vote challenged the eligibility of 364,000 Georgians to vote, encouraged volunteers to surveille voters at ballot drop box locations, established a "voter integrity hotline" for "citizen watchdogs" to report on Georgia voters "24 hours a day, seven days a week," and announced a $1 million reward to "incentivize" individuals to find evidence of voter fraud. Compl. ¶¶ 38, 57–61. This Court has already expressed grave concern about True the Vote's "eleventh-hour challenge to the franchise" and "the manner in which Defendants mounted their challenges." Order (Jan. 1, 2021) at 29. In short, § 11(b), which was designed to tamp down actions aimed at limiting access to the ballot box, cannot be used to safeguard those same actions. *Voris v. Eikel*, 346 U.S. 328, 333 (1953) ("[An act] must be liberally constructed in conformance with its purpose, and in a way which avoids harsh and incongruous results.").

## II. Defendants' legally flawed attempt to allege a theory of vote dilution does not create a cause of action under § 11(b).

True the Vote's attempt to clothe their counterclaim in the language of vote dilution fundamentally misunderstands both the jurisprudence of vote dilution and the protections that § 11(b) affords. Though the VRA prohibits diluting the voting strength of certain minority groups, True the Vote has not brought a vote dilution claim. *See* Answer & Countercl., ECF No. 40 at 30. Vote dilution occurs when a

minority group's ability to elect its candidate of choice has been unacceptably impaired. *See Negron v. City of Miami Beach,* 113 F.3d 1563, 1566 (11th Cir. 1997). Here, Defendants pursue a different theory of vote dilution—one that presumes that their votes would have been diluted if illegal votes were counted—but the United States Court of Appeals for the Eleventh Circuit recently rejected this theory. *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) ("*Wood I*").[1]

The Eleventh Circuit explained that vote dilution does not occur simply because an illegal vote is accidentally counted; instead, vote dilution "requires a point of comparison" to determine whether one group's votes are improperly favored over another's. *Id.* "'No single voter is specifically disadvantaged' if a vote is counted improperly, even if the error might have a 'mathematical impact on the final tally and thus on the proportional effect of every vote.'" *Id.* (quoting *Bognet v. Sec'y Commonwealth of Pa.*, 980 F.3d 336, 356 (3d Cir. 2020)). Thus, "[c]ourts have consistently found that a plaintiff lacks standing where he claims that his vote will be diluted by unlawful or invalid ballots." *Wood v. Raffensperger*, No. 1:20-CV-5155-TCB, 2020 WL 7706833, at *3 (N.D. Ga. Dec. 28, 2020) ("*Wood II*")

---

[1] Although the plaintiff in *Wood I* argued within the constitutional context that counting illegal votes results in vote dilution, the Eleventh Circuit's reasoning in that case applies here because Defendants rely on the same theory of vote dilution in an attempt to articulate a cause of action.

(collecting cases). To the extent True the Vote attempts to hitch the counterclaim to the VRA's protection against vote dilution, that effort fails because Defendants have not asserted—and would not have standing to raise—a vote dilution claim in the first place.

Unsurprisingly, True the Vote fails to cite a single case in support of the argument that § 11(b) protects attempts to nullify the supposedly unlawful votes of other voters. Though they identify a few cases about vote dilution generally, *see* Defs.' Resp. 10, Defendants fail to connect these cases to their theory of vote-dilution-by-voter-fraud, and they ignore the bevy of cases that expressly reject this argument. *See, e.g.*, *Wood I*, 981 F.3d at 1314–15; *Bognet*, 980 F.3d at 356; *Wood II*, 2020 WL 7706833, at *3; *Donald J. Trump for President, Inc. v. Sec'y of Pa.*, 830 F. App'x 377 (3d Cir. 2020). That Georgia law provides for elector eligibility challenges, as True the Vote argues, has nothing to do with vote dilution, nothing to do with the VRA, and nothing to do with whether Plaintiffs have "intimidated" Defendants for submitting frivolous mass challenges in violation of § 11(b). Perhaps because True the Vote fundamentally misunderstands what vote dilution is, Defendants do not allege that they engaged in conduct protected by § 11(b), or that Plaintiffs intimidated them for engaging in such conduct. Accordingly, Defendants' final counterclaim should be dismissed.

**III.   Defendants still have not identified any allegations that sufficiently state a claim under § 11(b).**

Even after True the Vote mangles the VRA's plain language and clear purpose, Defendants also fail to allege any facts that plausibly support their contorted legal theory. Indeed, they hardly allege any facts at all, with only a cursory mention that (1) Plaintiffs brought this lawsuit against Defendants for their frivolous voter challenges, and (2) Stacey Abrams—who is not a party to this lawsuit— publicly criticized True the Vote's long history of voter intimidation and the unfounded challenges. True the Vote believes Plaintiffs' allegations and Ms. Abrams's critiques are mistaken; proposes that mistaken statements are legally actionable; and then draws the ill-fitting conclusion that there was therefore "intimidation." Defendants are wrong at every turn.

True the Vote's indiscriminate challenges were frivolous and intimidating, and, as Plaintiffs will continue to show in their affirmative case, one scheme in Defendants' long playbook of voter suppression. Yet Plaintiffs need not prove their case in its entirety to defeat True the Vote's counterclaim or to demonstrate Plaintiffs had reasonable grounds for bringing this lawsuit. That much has already been resolved by this Court: in deciding Plaintiffs' motion for a temporary restraining order, the Court acknowledged the legitimate basis for Plaintiffs' allegations, explaining, "[a]s this Court has expressed clearly, an eleventh-hour challenge to the

-8-

franchise of more than 360,000 Georgians is suspect. So too is the manner in which Defendants mounted their challenges." Order (Jan. 1, 2021) at 29.

True the Vote has not plausibly alleged that Plaintiffs' actions were "intimidating" within the context of § 11(b). Defendants' arguments in this regard are not merely wrong; they are lacking altogether. Aside from a prefatory quotation of the pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), True the Vote fails to cite a single legal precedent in the entire second half of their brief, where they purport to argue that Plaintiffs have "engaged in conduct that could be considered intimidating under Section 11(b)." Defs.' Resp. 13–17. And the only person True the Vote identifies who may have considered any conduct to be intimidating is Tommy Roberts—a non-party to this lawsuit who allegedly received unsolicited emails from other non-parties. *See* Answer & Countercl. ¶ 167. Nowhere does True the Vote allege—let alone explain—how *Plaintiffs'* actions intimidated *these Defendants*.

Instead of constructing a legal argument about intimidation under the VRA, True the Vote attempts to relitigate this Court's prior Order, which found support for Plaintiffs' argument that Defendants' challenges were frivolous. *See* Defs.' Resp. 14. As this Court held, "Defendants' argument that the NVRA is not implicated at all fails," Order (Jan. 1, 2021) at 11, and "Defendants appear to be attempting to

-9-

circumvent the requirements of the NVRA for identifying ineligible voters," *id.* at

15. It is no surprise that True the Vote objects to these adverse conclusions, but

Defendants' untimely plea for reconsideration fails to respond to Plaintiffs' Motion

to Dismiss. True the Vote has counter-sued Plaintiffs under § 11(b), which prohibits

intimidation related to voting. 52 U.S.C. § 10307(b). Whether True the Vote can

justify its own behavior is a matter to be resolved in Plaintiffs' case; the argument

that True the Vote's voter challenges were a lawful prerogative under Georgia law

is simply one more affirmative defense due to be dismissed as inappropriate in a

counterclaim.[2]

In sum, True the Vote has not plausibly alleged that Plaintiffs have engaged

in intimidating conduct. Provided the opportunity to explain Plaintiffs' alleged

intimidation, True the Vote produces nothing more than an empty syllogism:

Plaintiffs' statements were false; false statements are wrongful; therefore, Plaintiffs'

statements were intimidating. This argument fails, as a matter of logic and as a matter

---

[2] As with True the Vote's other affirmative defenses, this defense also fails. That Georgia has enacted a process for voter challenges does not abrogate the VRA's prohibition on intimidation, and it is the manner and breadth of True the Vote's challenges that run afoul of federal law—not the simple fact that Defendants availed themselves of a state procedure. *Cf. Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1079 (D. Mont. 2008) ("One can imagine the mischief an immature political operative could inject into an election cycle were he to use the [challenge] statutes, not for their intended purpose of protecting the integrity of the people's democracy, but rather to execute a tawdry partisan ploy.").

of law. Plaintiffs' statements were supported by evidence and law, and—perhaps most importantly for these purposes—did not intimidate any person for voting or attempting to vote. True the Vote's bare assertions to the contrary fail to state a plausible claim for relief.

## CONCLUSION

Defendants have agreed that their first four "counterclaims" should be dismissed. For the reasons discussed above, Defendants' fifth and final counterclaim should also be dismissed.

Dated this 18th day of March 2021.

Respectfully submitted,

/s/ Uzoma N. Nkwonta

| | |
|---|---|
| Allegra J. Lawrence (GA Bar No. 439797) | Marc E. Elias* |
| Leslie J. Bryan (GA Bar No. 091175) | Uzoma N. Nkwonta* |
| Maia Cogen (GA Bar No. 832438) | Aria C. Branch* |
| **LAWRENCE & BUNDY LLC** | Christina A. Ford* |
| 1180 West Peachtree Street, Suite 1650 | Joel J. Ramirez* |
| Atlanta, GA 30309 | **PERKINS COIE LLP** |
| Telephone: (404) 400-3350 | 700 Thirteenth St., N.W., Suite 800 |
| Fax: (404) 609-2504 | Washington, D.C. 20005-3960 |
| allegra.lawrence-hardy@lawrencebundy.com | Telephone: (202) 654-6200 |
| leslie.bryan@lawrencebundy.com | Facsimile: (202) 654-9959 |
| maia.cogen@lawrencebundy.com | melias@perkinscoie.com |
| | unkwonta@perkinscoie.com |
| Dara Lindenbaum (GA Bar No. 980780) | abranch@perkinscoie.com |
| | christinaford@perkinscoie.com |
| | jramirez@perkinscoie.com |

-11-

**SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW, Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

Thomas J. Tobin*
**PERKINS COIE LLP**
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Phone: (206) 359-8000
Fax: (206) 359-9000
ttobin@perkinscoie.com

Molly E. Mitchell*
**PERKINS COIE LLP**
1111 West Jefferson Street, Suite 500
Boise, ID  83702-5391
Phone: (208) 343-3434
Fax: (208) 343-3232
mmitchell@perkinscoie.com

*Counsel for Plaintiffs*
*Admitted pro hac vice*

## CERTIFICATE OF SERVICE

I hereby certify that on March 18, 2021, I electronically filed this Memorandum in Support of Motion to Dismiss Defendants' Counterclaims through this Court's CM/ECF system.


Dated: March 18, 2021          */s/ Uzoma N. Nkwonta*
                               Uzoma N. Nkwonta

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), NDGa, I hereby certify that the foregoing Memorandum in Support of Motion to Dismiss Defendants' Counterclaims has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGa, using a font type of Times New Roman and a point size of 14.

Dated: March 18, 2021

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta