**United States District Court**
**Northern District of Georgia**
**Gainesville Division**

| | |
|---|---|
| **Fair Fight, Inc., Scott Berson, Jocelyn Heredia,** and **Jane Doe**, | |
| *Plaintiffs,* | |
| *v.* | |
| **True the Vote, Inc., Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, James Cooper,** and **John Does 1-10**, | **Civ. No. 2:20-cv-00302-SCJ**<br><br>**Hon: Steve C. Jones** |
| *Defendants.* | |

**Brief in Support of Defendants' Motion for Summary Judgment**

**Defs.' Br. ISO**
**Summ. J.**

# Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Motion for Summary Judgment Legal Standard . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Defendants' conduct does not violate § 11(b) . . . . . . . . . . . . . . . . . . . . . . . . 4

    A.    Georgia law permits voter challenges. . . . . . . . . . . . . . . . . . . . . . . 9

    B.    Mark Davis and Derek Somerville did not act in concert with
           True the Vote's voter challenges. . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    C.    Named Defendants did not have any contact with any Challenged
           Voter or with Fair Fight, and the § 11(b) violation claims are
           unsupported by any evidence. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    D.    The voter challenges were not frivolous. . . . . . . . . . . . . . . . . . . . . 19

          1.    True the Vote's data analysis was not frivolous. . . . . . . . . . 19

          2.    Davis and Somerville data analysis was not frivolous. . . . . . 22

          3.    Named Defendants did not based challenges upon racial or
              other demographic data. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

II. Judicial Enforcement of § 11(b) as sought to be applied by Plaintiffs,
    would be unconstitutional. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    A.    Judicial enforcement of § 11(b), as sought to be applied by Plaintiffs,
           would violate their right to free speech
           under the First Amendment. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    B.    Judicial enforcement of § 11(b), as sought to be applied by Plaintiffs,
           would violate their right to petition under the First Amendment. . . 28

    C.    Judicial enforcement of § 11(b), as sought to be applied by Plaintiffs,
           unconstitutionally violates defendants'

right to vote via vote dilution. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

    D.    Judicial Enforcement of § 11(b), as sought to be applied by Plaintiffs, is unconstitutionally vague. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

III. Named Defendants' § 230 Challenges did not violate the National Voter Registration Act. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

# Table of Authorities

**Cases**

*3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331 (N.D. Ga. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Allen v. Tyson Foods, Inc.*, 121 F.3d 642 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . 2

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . 2

*Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983)  . . . . . . . . . . . . . 28

*Bush v. Gore*, 531 U.S. 98 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Cantwell v. Connecticut*, 310 U.S. 296(1940). . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Doe v. Gwinnett Cnty. Sch. Dist.*, No. 1:18-CV-05278-SCJ, 2021 WL 4531082 (N.D. Ga. Sept. 1, 2021), appeal dismissed sub nom. *Doe v. Gwinnett Cnty. Pub. Sch.*, No. 21-13379-CC, 2022 WL 1008037 (11th Cir. Feb. 23, 2022)  . . . . . . . . 2

*Fitzpatrick v. City of Atlanta*, 2 F.3d 1112 (11th Cir. 1993) . . . . . . . . . . . . . . . 3, 4

*Georgia Pac. Corp. v. Occupational Safety & Health Review Comm'n*, 25 F.3d 999 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*Husted v. A. Philip Randolf Inst.*, 138 S.Ct. 1833 (2018) . . . . . . . . . . . . . . . . . . 19

*I.N.S. v. St. Cyr*, 533 U.S. 289 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Johnson v. Clifton*, 74 F.3d 1087 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 3

*Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 512 F. Supp. 3d 1354 (M.D. Ga. 2021) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) . . . . . . . 3

*Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Reed v. Town of Gilbert*, 576 U.S. 155 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Reynolds v. Sims*, 377 U.S. 533 (1964) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*Shelley v. Kraemer*, 334 U.S. 1 (1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Stewart v. Booker T. Washington Ins.*, 232 F.3d 844 (11th Cir. 2000) . . . . . . . . . 4

*United States v. Martinez*, 736 F.3d 981 (11th Cir. 2013), cert. granted, judgment vacated on other grounds, 576 U.S. 1001 (2015) . . . . . . . . . . . . . . . . . . . . . . . . . 27

*United States v. Nguyen*, 673 F.3d 1259 (9th Cir. 2012) . . . . . . . . . . . . . . . . . . . 5

*Watts v. United States*, 394 U.S. 705 (1969) . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

**Constitutions, Statutes, and Regulations**

52 U.S.C. § 10307(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

52 U.S.C. § 20501 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 4

52 U.S.C. § 20510 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Fed. R. Civ. P. 56(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

O.C.G.A. § 21-2-216(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

O.C.G.A. § 21-2-229 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

O.C.G.A. § 21-2-230 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8-12, 24

**Defs.' Br. ISO**
**Summ. J.**                    vi

## Introduction

Defendants True the Vote, Inc. ("**TTV**"), Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, and James Cooper (collectively, "**Named Defendants**") did not violate Section 11(b) of the Voting Rights Act of 1965. When this Court denied Plaintiffs' preliminary motion for injunctive relief, it stated, "[a]fter careful review and consideration of the evidence and arguments, the Court finds that Plaintiffs have not provided enough evidence at this point to show that they are likely to succeed on the merits of their claims. Most critically, the evidence provided to date does not show that Defendants have harassed or intimidated voters." Order, ECF No. 29 at 26. After sixteen months, during which parties have produced voluminous amounts discovery, including 11 depositions and two expert reports, nothing has changed—the Plaintiffs still have no evidence that any Named Defendant harassed or intimidated voters.

The undisputed facts show that Named Defendants never contacted Challenged Voters directly; that they carefully analyzed the data underlying their Voter Challenges, and that they submitted Voter Challenges in accordance with Georgia law. They never threatened legal, economic, or physical harm to any

**Defs.' Br. ISO**
**Summ. J.**                                    1

Challenged Voter. Their purpose was clear and lawful: alert the proper

government officials charged with ensuring free and fair elections in Georgia that

the Challenged Voters *may* not have been legally eligible to cast ballots in the

2021 Senate Run-off Election in an effort to prevent vote dilution of those voters

who were *legally* eligible to cast ballots in that election.

The Named Defendants would have no problem if 100% of the people

legally eligible to vote in Georgia elections did so, even if their preferred

candidates were defeated. In the words of Mr. Davis, "that actually is a fair fight."

## Argument

## Motion for Summary Judgment Legal Standard

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant

summary judgment if the movant shows that there is no genuine dispute as to any

material fact and the movant is entitled to judgment as a matter of law."

A factual dispute is genuine if the evidence would allow a reasonable jury to find

for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248

(1986). A fact is "material" if it is "a legal element of the claim under the

applicable substantive law which might affect the outcome of the case." *Allen v.*

*Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing the court—by reference to materials in the record—that there is no genuine dispute as to any material fact that should be decided at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). The moving party satisfies this burden merely by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support [an essential element of] the nonmoving party's case." *Id.* at 325. The district court must determine whether the moving party has met its burden by viewing the evidence and all factual inferences in the light most favorable to the party opposing the motion. *Johnson v. Clifton*, 74 F.3d 1087, 1090 (11th Cir. 1996). Once the moving party has adequately supported its motion, the burden shifts to the non-movant to show that summary judgment is improper by coming forward with specific facts showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The court should resolve all reasonable doubts in the non-movant's favor. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

The court must "avoid weighing conflicting evidence or making credibility

**Defs.' Br. ISO
Summ. J.**                                  3

determinations." *Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 848 (11th Cir. 2000). A genuine dispute for trial does not exist when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. *Fitzpatrick*, 2 F.3d at 1115 (citations omitted).

Cross motions for summary judgment must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." *3D Med. Imaging Sys., LLC v. Visage Imaging, Inc.*, 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017).

### I. Defendants' conduct does not violate § 11(b).

The Voting Rights Act of 1965 prohibits intimidating or threatening a person for voting or attempting to vote. 52 U.S.C. § 10307(b) ("**§ 11(b)**"). Courts have held within the context of voting, intimidation and threats are not necessarily limited to the threat of violence or bodily harm, but can include threats of economic harm, legal action, dissemination of personal information, and surveillance, depending on the context. *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020) (granting TRO against robocalls that "warned" people voting by mail would be used by police departments, credit

**Defs.' Br. ISO Summ. J.** 4

card companies, and the CDC to bring legal, economic, and physical harm to voters). The *Wohl* Court relied on various legal authorities to hold "that threats and intimidation include messages that a *reasonable recipient familiar with the context of the message* would interpret as a threat of injury tending to deter individuals from exercising their voting rights." *Id.* at 477 (emphasis added).

The contexts under which courts have found violations of § 11(b) are varied, but they all involved more than simply asking appropriate government authorities to ensure that people who have reported a move out of a voting district are, in fact, still eligible to vote in that district. Since the context of an § 11(b) claim is critical, examples of actions that rose to the level of "intimidation" under § 11(b) will show what type of behavior meets this definition. *See Daschle v. Thune*, Decision and Order at 2, No. 4:04 Civ. 04177 (D.S.D. Nov. 1, 2004) (finding violation when defendants followed Native Americans into polling places, "ostentatiously making noises" behind them, discussing Native Americans who were prosecuted for illegally voting, following them out of the polling places, and recording their license plate numbers); *see also United States v. Nguyen*, 673 F.3d 1259, 1265 (9th Cir. 2012) (holding widely distributing letter among Latino

immigrants warning them that voting could lead to their personal information being turned over to people "against immigration" could provide basis of unlawful intimidation); *United States v. McLeod*, 385 F.2d 734, 737-38 (5th Cir. 1967) (finding § 11(b) violation when law enforcement officials stationed themselves around voter registration meetings, recorded the information of attendees, and then used that information to later arrest and prosecute attendees for "traffic violations"). Economic pressure may also be considered a form of intimidation. *See, e.g., United States v. Beaty*, 288 F.2d 653, 654-57 (6th Cir. 1961) (holding eviction of sharecroppers as punishment for registering to vote constitutes unlawful intimidation); *United States v. Bruce*, 353 F.2d 474, 476-77 (5th Cir. 1965) (finding unlawful intimidation when landowner restricted access to his property for voter registration efforts).

In virtually all of these cases where violations of § 11(b), or laws similar to § 11(b), were found, the defendants directly communicated the intimidating message, or acted in an intimidating manner, to the voters themselves or to people attempting to register voters (***making robocalls to voters*** . . . ***following voters*** . . . ***sending letters to Latino immigrants*** . . . ***using law enforcement officials to***

***record who attends voter registration meetings*** . . . ***evicting people*** . . . and

***preventing person attempting to register voters access to property***). Therefore,

the courts found it "reasonable" for the direct recipients of these messages or

actions to feel intimidated by the defendants within these contexts.

Here, the undisputed facts show Named Defendants' actions did not come

close to the types of actions courts have found to be intimidating or threatening.

Plaintiffs have provided no evidence they stood outside polling places to

intimidate potential voters or sent threatening letters to voters. In fact, Named

Defendants had no direct contact with Challenged Voters at all. TTV Resp. to First

Rogs. No. 5; Somerville Am. Resp. and Obj. 2d Interrogs., Resp. No. 7; First

Davis Tr. 171:4-21; Williams Tr. 63:2-64:1; Johnson Resp. to First Interrogs.

Resp. No. 5; Cooper Resp. to First Interrogs. Resp. No. 5; Cooper Tr. 45:1-9;

50:13-22. Named Defendants did not publicly publish any list of Challenged

Voters. TTV Tr. 257:11-14; Second Somerville Tr. 71:16-72:19; 72:21-73:14;

Second Davis Tr. 46:3-14; 80:7-10. TTV did not create a "bounty" in order to

incentivize Challenges or accusations of voter fraud. TTV Tr. 71:11-19, 71:22-

72:1, 74:8-17, 75:5-18, 76:15-19; TTV Tr. 316:3-12; TTV Tr. 316:19-317:5; First

Somerville Tr. 150:15-152:4. TTV did not create a hotline in order to intimidate voters—it turned over any credible accusation of voter irregularities to the proper government authorities. TTV Tr. 81:16-21; TTV Tr. 85:21-86:9;TTV Tr. 82:18-21; TTV Tr. 68:16-69:7; *id.* 81:22-82:4; TTV Tr. 85:13-20; TTV Tr. 93:17-95:3; TTV Am. Resp. 2d RFP Resp. No. 18; First Somerville Tr. 150:15-152:4. Named Defendants analyzed data and/or submitted Challenges to government election officials based upon that data as permitted under Georgia law. O.C.G.A. § 21-2-230. Most of those Challenges were rejected and not pursued in any way by county boards of elections. *See* Def TTV 1838; First Somerville Tr. 93:11-15. Within this context, Challenged Voters were not the direct "recipients" of any of the Named Defendants' actions, and it would be wholly unreasonable to find Named Defendants' lawful actions amounted to an § 11(b) violation.

Context is key—there has never been a Court that has held a defendant violated § 11(b) by exercising his rights as permitted under law. This Court should not be the first to do so. Named Defendants' motion for summary judgment should be granted.

**Defs.' Br. ISO**
**Summ. J.**                    8

A.      **Georgia law permits voter challenges.**

Georgia law permits challenges to an elector's right to vote in a particular election. Under Georgia law, a person may not vote in an Georgia election unless they are "[a] resident of this state and of the county or municipality in which he or she seeks to vote[.]" O.C.G.A. § 21-2-216(a). Accordingly, Georgia law sets out a process for challenging an elector's right to vote in an election, providing that: "[a]ny elector of the county or municipality may challenge the right of any other elector of the county or municipality, whose name appears on the list of electors, to vote in an election. . . ." O.C.G.A. § 21-2-230(a). ("**§ 230 Challenge**").

A § 230 Challenge does not result in automatic disqualification of the challenged voter—it simply triggers a process at the county board of registrars. First, the Board considers the § 230 Challenge to determine if probable cause exists to sustain it. *Id.* at (b). If the Board does not find probable cause exists, the § 230 Challenge is denied. *Id.* If the Board finds probable cause, the Board notifies the poll officers of the Challenged Voter's precinct, and if practical, notifies the Challenged Voter in order to afford the Challenged Voter an opportunity to answer the § 230 Challenge. *Id.* If the Challenged Voter appears at the polling

**Defs.' Br. ISO
Summ. J.**                     9

place to vote, the Challenged Voter is given an opportunity to appear before the Board and answer the grounds of the § 230 Challenge. *Id.* at (c). If the Board then denies the § 230 Challenge based upon the Challenged Voter's answer, the Challenged Voter shall be permitted to vote in the election even if the polls have already closed. *Id.* at (h). If the Challenged Voter appears at the polls to vote and "it is not practicable to conduct a hearing prior to the close of the polls," the Challenged Voter may cast a provisional ballot. *Id.* at (i). If the § 230 Challenge is subsequently denied, the provisional ballot will be certified along with all the other consolidated returns for that election. *Id.*

It is important to recognize that Georgia law permits two distinctly different challenges to the ability of an ineligible elector to vote. First, the presence of the elector on the list of electors (called under federal law "voter registration lists") can be challenged under O.C.G.A. § 21-2-229. The Challenges at issue in this case were not brought under this section since the Challenges did not question the Challenged Voters' presence on the list of electors. Second, the eligibility of a registered elector to vote in a particular election can be challenged under O.C.G.A. § 21-2-230. The current challenges were brought under this section and only

**Defs.' Br. ISO**
**Summ. J.**                                    10

question the challenged elector's eligibility to vote in the run-off election and did not seek to have the elector removed from the registration list, which, as noted, is a separate and different challenge under Georgia law.

After this case was initiated, the Georgia Legislature made changes to the Georgia Election Code. Two significant changes directly impact § 230 Challenges. First, the legislature made it clear that "[t]here shall not be a limit on the number of persons whose qualifications such elector may challenge." *Id.* at (a). (Effective March 25, 2021). The second change to § 230, relevant here, is that "[f]ailure to comply with the provisions of this Code section by the board of registrars shall subject such board to sanctions by the State Election Board." *Id.* at (j).

The changes to § 230 make it clear—submitting "mass" Challenges is not prohibited and the Boards have greater accountability to be functionally responsive to voters who submit § 230 Challenges. Named Defendants[1] submitted

---

[1]TTV did not submit any § 230 Challenges as only registered voters in any particular Georgia County may submit such Challenges. O.C.G.A. § 21-2-230. However, TTV did compile the list of Challenged Voters at issue in this case, and received permission to submit § 230 Challenges on behalf of individuals who volunteered to serve as Challengers in various counties. TTV Resp. to 2d Interrog. Resp. No. 14; TTV Tr. 255:4-256:13. Throughout this brief, the process TTV undertook of submitting § 230 Challenges on behalf of volunteers who gave it permission to do so will be referred to as TTV submissions, as grammatically

§ 230 Challenges as permitted under Georgia law operative at the time, and as bolstered by the 2021 version of the same law.

Submitting § 230 Challenges in accordance with the letter and spirit of Georgia law cannot provide the "context" for a violation of § 11(b). Named Defendants did not have the authority to determine a Challenged Voter's eligibility to vote in the run-off election—that authority rests solely with the appropriate government officials. O.C.G.A. § 21-2-230. They simply provided credible, non-frivolous information to the applicable Board so that the Board could decide, under Georgia law, whether to require Challenged Voters to provide proof of residency based upon the § 230 Challenge submitted. TTV Tr. 342:15-343:1:18; TTV Resp. to First Interrogs. Resp. No. 5; First Somerville Tr. First Somerville Tr. 48:15-21; 78:6-9; Second Somerville Tr. 189:4-191:1; 56:18-57:11; 78:6-9;189:4-191:1. Named Defendants did not seek to prevent even one eligible voter from casting his or her ballot. *See* TTV Tr. 152:15-154:19; *id.* 169:22-170:18; Second Davis Tr. 199:9-18. Named Defendants sought to petition their government—asking it to ensure that voters who were *ineligible* under the

_____

appropriate.

law to cast a ballot be prevented from doing so—in order to protect the rights, and

prevent vote dilution, of all the eligible voters who legally cast ballots. TTV Tr.

342:15-343:1; TTV's Resp. First Interrogs. Resp. No. 5;  First Somerville Tr.

124:1-12; 127:9-15;  Second Davis Tr. 59:7-8l 86:22-87:3; 90:14-21. They had

every right to do so under Georgia law then, and continue to have that right now.

Exercising their lawful rights to government authorities, without any direct contact

with Challenged Voters, cannot support an § 11(b) violation claim.

**B.     Mark Davis and Derek Somerville did not act in concert with True the Vote's voter challenges.**

The First Amended Complaint alleges that Mr. Davis and Mr. Somerville

"assisted and ***acted in concert with True the Vote*** in its effort to challenge the

eligibility of hundreds of thousands of Georgians to vote." First Am. Compl. ¶¶

20, 21. (emphasis added). Plaintiffs have alleged TTV "challenge[d] over 364,000

Georgians' eligibility to vote and recruit[ed] Georgians to engage in its 'ballot

security' operation in Georgia in advance of the state's January Senate Runoff."

*Id.* at ¶ 18. Much of the rest of the First Amended Complaint's factual allegations

describes TTV's alleged history of meritless challenges and various "tactics"

Plaintiffs allege intimidate and suppress votes. *Id.* at ¶¶ 30-35; 39-41; 58-61.

Defendants Davis' and Somerville's alleged actions are not mentioned in the First Amended Complaint outside of the allegation they "acted in concert with" TTV. Plaintiffs alleged, in their single claim, that "Defendants, by engaging in an unprecedented effort to challenge the eligibility of hundreds of thousands of Georgians to vote, by recruiting "citizen watchdogs" to watch voters return their ballots, and by offering a $1 million reward to incentivize its supporters to find evidence of "illegal voting," have engaged in activities which are objectively likely to intimidate voters in violation of § 11(b) of the Voting Rights Act. *Id.* at ¶ 79.

The undisputed facts in the record show that Mr. Davis and Mr. Somerville did not act in concert with TTV—not on Challenges, not on the alleged "citizen watchdogs" to watch voters return their ballots, and not on the alleged "$1 million reward to incentivize its supporters to find evidence of 'illegal voting.'" First Somerville Tr. 150:15-152:4. Neither Mr. Davis nor Mr. Somerville had any knowledge of the methodology, process, or analysis of TTV's Challenge Lists. First Somerville Tr. 29:5-31:17;32:20-33:4;45:3-11; 103:6-13; 157:7-15 Somerville Interrog. Resp. Ct. Order Resp. No. 1, 4; First Davis Tr. 38:22-39:14;

**Defs.' Br. ISO**
**Summ. J.**                                    14

41:10-42:16; 46:12-47:10; Second Davis Tr. 95:4-9; Davis Interrog. Resp. Ct.

Order Resp. No. 1. Plaintiffs have shown no evidence that Mr. Davis and Mr.

Somerville were involved in the alleged "citizen watchdogs" or the $1 million

fund, and Mr. Davis and Mr. Somerville testified to the contrary.  First Somerville

Tr. 150:15-152:4. Mr. Davis and Mr. Somerville were mentioned in TTV's

December 2020 press release because TTV was trying to generally acknowledge

the work of Georgians who were attempting to contribute to the effort of voter

integrity. Second Somerville Tr.  132:8-14.

Besides the undisputed facts which show that Mr. Davis and Mr. Somerville

did not "act in concert" with TTV, the undisputed facts show their independent

work cannot support an § 11(b) violation claim either. Neither Mr. Davis nor Mr.

Somerville had any direct contact with Challenged Voters. Somerville Am. Resp.

and Obj. 2d Interrogs., Resp. No. 7; First Davis Tr. 171:4-21. They did not publish

the Davis/Somerville Challenge List publicly. Second Somerville Tr. 71:16-72:19;

72:21-73:14; Second Davis Tr. 46:3-14; 80:7-10. Volunteers submitted Challenges

to the appropriate government officials, based on the Davis/Somerville Challenge

List, independently from TTV. First Somerville Tr. 89:22-15; 97:22-99:19;

**Defs.' Br. ISO
Summ. J.**                              15

Somerville Interrog. Resp. Ct. Order Resp. No. 1.

It is an undisputed fact that neither Mr. Davis nor Mr. Somerville threatened legal, economic, or physical harm to any of the Challenged Voters. It is an undisputed fact that Mr. Davis and Mr. Somerville compiled the Davis/Somerville Challenge List with care and with painstaking detail. Somerville Interrog. Resp. Ct. Order Resp. No. 2;  drive for Mr. Somerville to distribute to challengers. Davis Interrog. Resp. Ct. Order Resp. No. 2; *see also* Part I.D.2.

The allegations that Mr. Davis and Mr. Somerville "acted in concert with" TTV are wholly unsupported by the record. Even if this Court finds their independent work is relevant to Plaintiffs' claims, nothing in the record supports their allegations that Mr. Davis and Mr. Somerville violated § 11(b). Mr. Davis and Mr. Somerville did not contact any Challenged Voter—they certainly did not threaten legal, economic, or physical harm to any of the Challenged Voters. They didn't publicly post the Davis/Somerville Challenge List.

Mr. Davis' and Mr. Somerville's conduct does not come anywhere close to the reprehensible actions of others who have violated § 11(b). They carefully and lawfully availed themselves of a process authorized by Georgia statute. Doing so

is not an § 11(b) violation. and this Motion for Summary Judgment should be granted, as to Mr. Davis and Mr. Somerville.

**C.   Named Defendants did not have any contact with any Challenged Voter or with Fair Fight, and the § 11(b) violation claims are unsupported by any evidence.**

Mark Williams used his printing business to print TTV's Challenges. Williams Tr. 19:4-18; 21:11-22:15; Williams Resp. to First Interrogs. Resp. No. 1. Ron Johnson helped to find other volunteers willing to submit TTV's Challenges in other counties. Johnson Resp. to First Interrogs. Resp. No. 5. James Cooper also helped to find volunteers willing to submit TTV's Challenges. Cooper Resp. to First Interrogs. Resp. No. 5; Cooper Tr. 45:1-9; 50:13-22. TTV and Catherine Engelbrecht, in her capacity as TTV's President, worked with a team of data analysts to compile the TTV Challenge List. *See* TTV Resp. to 2d Interrog. Resp. No. 14. TTV also organized and submitted the Challenges in 65 Georgia counties, on behalf of the volunteers who had authorized them to do so. TTV Am. Resp. First RFP Resp. No. 2. TTV ran a voter integrity hotline, and turned any credible incidents over to the proper authorities—but did not have reason to turn any hotline calls over to Georgia authorities. TTV Tr. 68:16-69:7; 81:16-21;81:22-

**Defs.' Br. ISO**
**Summ. J.**                              17

82:4; 82:18-21; 85:13-86:9; 93:17-95:3; TTV Am. Resp. 2d RFP Resp. No. 18.

TTV established a fund to provide a legal support for people who reported

information—the purpose of which was primarily to head off the chilling effect of

the threat of legal action against challengers or those with information. TTV Tr.

71:11-19, 71:22-72:1, 74:8-17, 75:5-18, 76:15-19; 316:3-12; 316:19-317:5. As

described above, Mark Davis and Derek Somerville worked on the

Davis/Somerville Challenge List independently and not in conjunction with TTV.

First Somerville Tr. 29:5-31:17;32:20-33:4;45:3-11;103:6-13; 157:7-15

Somerville Interrog. Resp. Ct. Order Resp. No. 1, 4; First Davis Tr. 38:22-39:14;

41:10-42:16; 46:12-47:10; Second Davis Tr. 95:4-9; Davis Interrog. Resp. Ct.

Order Resp. No. 1. At times, various Named Defendants made public statements in

general about issues surrounding voter integrity in Georgia—but none of those

statements called for physical violence or threatened harm to any Plaintiff. *See,*

*e.g.,*Second Somerville Tr. 75:1-84:10. At the most, these public statements called

into question what the authorities should do when people cast illegal ballots. *See*

*id.*

The things all these Named Defendants have in common? None of them

contacted Challenged Voters directly. None of them contacted Fair Fight. None of them published Challenge Lists publicly. None of them threatened Challenged Voters with any legal, economic, or physical harm. All of those commonalities are undisputed in the record. Plaintiffs provided no evidence otherwise. This motion for summary judgment should be granted because no Named Defendant had any contact with a Challenged Voter or with Fair Fight, and the § 11(b) violation claim is unsupported by any evidence showing otherwise.

**D.      The voter challenges were not frivolous.**

**1.      True the Vote's data analysis was not frivolous.**

The starting point TTV utilized for its Challenge List was the U.S. Postal Service National Change of Address ("**NCOA**") data. OpSec Tr. 93:16-94:2. The NCOA is used by thirty-six states in required list maintenance to trigger sending a National Voting Rights Act ("**NVRA**") "return card," which is designed to ascertain the putative voter's current address and explains the procedures for affirming residence. *Husted v. A. Philip Randolf Inst.*, 138 S.Ct. 1833, 1839-40 (2018). The practice of using the NCOA data for this purpose was pronounced as "undisputably lawful" by the United States Supreme Court. *Id.*

**Defs.' Br. ISO**
**Summ. J.**                        19

In addition to the usual CASS and DPV data hygiene for NCOA records, OpSec, the contractor used by TTV for data analysis, refined the data for all the counties[2] in Georgia using proprietary algorithms to compare the addresses in the registration file to other commercially available information to identify people who had moved out of the registered county or lived outside Georgia, *id.* at 113:6-17.[3]

OpSec's proprietary process sought to verify the identity of an individual before considering residency by comparing to data gathered from a combination of lists, *id.* at 96:3-11, including other state registrations and "five or six other data sources." *Id.* at 95:14-15;17-18; 96:12-1. It is designed to identify persons who have deployed for military service, *id.* at 128:3-7; persons that, intending to move, file an NCOA request and then change their mind, *id.* at 127:12-128:2; persons that forward their mail because they were on vacation, *id.* at 126:22-127:5, 128:1-

---

[2]*See*, *e.g.*, TTV analyzed data for all 159 Georgia counties, with the intention of submitting Challenges in every county in which they had a volunteer Challenger. Because they did not get volunteers in all counties, TTV submitted Challenges in only 65 counties. TTV Am. Resp. First RFP, Reps. No. 2.

[3]In matching information from Georgia's voter rolls and other data, OpSec used fields that conformed with respect to data format and data type. *Id.* at 106:22-107:3.

**Defs.' Br. ISO
Summ. J.**                          20

2; persons that moved for non-military government service and submit an NCOA, *id.* at 126:9-16, 128:1-2; persons submitting an address change for purposes of attending school, *id.* at 125:17-19, 128:1-2; and persons that have moved inside the county or jurisdiction in which they were registered, *id.* at 125:2.

OpSec's proprietary process utilized uses a 4000-row algorithm which involved a complex series of other algorithms, such as dissimilarity and similarity indexes and fuzzy logic. *Id.* at 107:13-108:4; 113:22-114:3. The process used regression modeling throughout and includeds a process to identify the regression technique most likely to produce an accurate result. *Id.* at 118:19-119:22.

The process decided whether similar identifying information is sufficient to assume an accurate identity, and if it is not, assigned a risk factor to it. *Id.* at 108:8-11. An algorithm evaluated flagged data, pulling information from outside sources to resolve the risk, and if the question could not be resolved, a match based on the information would not have been included. *Id.* at 116:12-16;119:16-22; 119:16-22.

OpSec reviewed the results of matching names in the voter files and the NCOA registry to ensure that it was reasonable with respect to false positives and

**Defs.' Br. ISO**
**Summ. J.**                    21

false negative to within one standard deviation of the potential error that might be expected. *Id.* at 140:8-141:7.

> **2.    Davis and Somerville data analysis was not frivolous.**

The Davis/Somerville Challenge List was not frivolous—Mr. Davis used his extensive experience in working with data and mailing lists to compile the data for the Davis/Somerville Challenge List. First Davis Tr. 21; Davis Interrog. Resp. Ct. Order Resp. No. 2. Mr. Davis' and Mr. Somerville's data analysis included running CASS & NCOA processing of voter-provided move status, geocoding to verify move locations, and extensive work to remove military and student voters, who they knew were likely to be eligible to vote. *Id.* Mr. Davis and Mr. Somerville did not consider racial or any other demographic data when compiling the Davis/Somerville Challenge List. First Davis Tr. 166:5-168:22; Second Somerville Tr. 30:6-32:14; 188:4-22. Second Davis Tr. 40:19-41:5; 185:15-188:4.

Research since the run-off election, which has been provided to the Georgia Secretary of State, has confirmed that the Davis/Somerville Challenge List was far from frivolous.  Davis Interrog. Resp. Ct. Order Resp. No. 3. ("**SOS Analysis**"). The SOS Analysis shows over 3,500 voters who had submitted changes of address

**Defs.' Br. ISO**
**Summ. J.**                         22

outside the statutory grace period, cast ballots in their old county, and then updated their voter registration to their new county after the run-off. *Id.* The SOS Analysis showed that over 37% of the voters who indicated a change of address within Georgia have updated their voter registration addresses to the same addresses shown in the NCOA data provided to the USPS prior to the run-off election. *Id.* These voters have provided post-election, self-confirmation to the Secretary of State or their county's board of elections that the information on the Davis/Somerville Challenge List was accurate at the time they compiled it. *Id.*

### 3. Named Defendants did not based challenges upon racial or other demographic data.

OpSec used no demographic information in processing the data or compiling the Challenge List. OpSec Tr. 163:13-164:8; 149:14-17. After the List was compiled, OpSec consulted a "TrueAppend" document as a quality check on its results by looking at the overall number of moved provided in that report.[4] The TrueAppend report includes age and demographic information but no changes were ever made to the Challenge List as a result of demographic information.

---

[4]As recorded in the timestamp footer in the report, the earliest that OpSec could have viewed it was on December 19, 2020. *See* TTV Tr. Exhibit 8 (also marked OPSEC 0009-0029).

**Defs.' Br. ISO**
**Summ. J.**                              23

OpSec Tr. 150:16-18, 151:13-16, 152:6-9; OpSec Tr. Exhibit 10. If demographic

or other characteristics of individuals on the Challenge List were ever considered

by OpSec or TTV, it was after and in response to Plaintiff's suit. OpSec Tr.

163:13-164:8; 149:14-17.

## II. Judicial Enforcement of § 11(b) as sought to be applied by Plaintiffs, would be unconstitutional.

Judicial enforcement of private agreements amounts to state action, and as

such, is subject to constitutional limitations. *Shelley v. Kraemer*, 334 U.S. 1, 19

(1948). The same would be true for judicial enforcement of a private cause of

action permitted under federal law as here.

Defendants' § 230 Challenges involve their First Amendments rights to free

speech and petition, as well as their right to vote. Georgia law specifically

provides for the types of Challenges brought by Named Defendants, and the

Georgia legislature has since confirmed, via additional statutory language, that

"mass" Challenges are permitted under this law. O.C.G.A. § 21-2-230(a).

If this Court were to adopt Plaintiffs' interpretation of § 11(b) and find that

Named Defendants' speech and conduct was encompassed by § 11(b), § 11(b)

would be rendered unconstitutional as applied on several grounds. First, § 11(b)

**Defs.' Br. ISO**
**Summ. J.**                24

would be unconstitutional as applied under the First Amendment since Named

Defendants' speech does not contain true threats outside of First Amendment

protection and since Named Defendants' § 230 Challenges are lawful actions to

petition the government. Second, § 11(b) would be unconstitutional as applied

under the First Amendment as violating Named Defendants' right to vote. And

third, § 11(b) would be unconstitutional as applied under the Due Process Clause

of the Fourteenth Amendment since it would be rendered unconstitutionally

vague.

Furthermore, the doctrine of constitutional avoidance provides that, "if an

otherwise acceptable construction of a statute would raise serious constitutional

problems, and where an alternative interpretation of the statute is fairly possible,

[courts] are obligated to construe the statute to avoid such problems." *I.N.S. v. St.

Cyr*, 533 U.S. 289, 299–300 (2001). Pursuant to this cardinal principle of

constitutional avoidance, § 11(b) must be construed narrowly, to avoid

infringement upon those fundamental constitutional rights. This Court must hold

that without evidence of wrongdoing or illegality underlying the § 230 Challenges,

§ 11(b) must allow for Defendants' right to challenge voters' right to vote in a

particular election, as allowed under Georgia law.

**A.    Judicial enforcement of § 11(b), as sought to be applied by Plaintiffs, would violate their right to free speech under the First Amendment.**

Content-based restrictions on speech are subject to strict scrutiny, and a court must "consider whether a regulation of speech on its face draws distinctions based on the message a speaker conveys." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (citation omitted). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both are distinctions drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Id.* at 163-64. Whether the content of the speaker's message is threatening or intimidating to voters is specifically at issue in a claim brought under § 11(b) and so this Court must use strict scrutiny to analyze these claims. *Id.* at 163.

The Supreme Court has defined narrow categories of speech which can be prohibited based on content. Only the category of "true threats" is relevant here. *Watts v. United States*, 394 U.S. 705, 708 (1969) (per curiam) (holding content-based restrictions "must be interpreted with the commands of the First

**Defs.' Br. ISO Summ. J.**                        26

Amendment clearly in mind. What is a threat must be distinguished from what is constitutionally protected speech."). The *Watts* Court held that "political hyperbole" is not a true threat, even when "crude," "abusive, and inexact." *Watts*, 394 U.S. at 708.

The Eleventh Circuit adopted the same objective standard for true threats that most other circuits employ— a true threat is a communication that, when taken in context, "would have a reasonable tendency to create apprehension that its originator will act according to its tenor." *United States v. Martinez*, 736 F.3d 981, 986 (11th Cir. 2013), cert. granted, judgment vacated, 576 U.S. 1001 (2015) (vacating on grounds unrelated to applying objective standard).

As analyzed in Part I., in virtually all of the cases where violations of § 11(b), or laws similar to § 11(b), were found, the defendants communicated the intimidating message, or acted in an intimidating manner, directly and specifically to the voters themselves or to people attempting to register voters. The undisputed facts cited in Part I show that it is undisputed that Challenged Voters were not the direct "recipients" of any of the Named Defendants' action, and those actions could not meet the definition of true threat anyway.

**Defs.' Br. ISO**
**Summ. J.**                                27

Named Defendants' actions do not meet the Eleventh Circuit's objective test for true threats. Therefore, the speech surrounding the § 230 Challenges submitted by Named Defendants do not lose the First Amendment protection and penalizing such speech under § 11(b) would render § 11(b) unconstitutional as applied.

**B.     Judicial enforcement of § 11(b), as sought to be applied by Plaintiffs, would violate their right to petition under the First Amendment.**

Furthermore, Named Defendants' § 230 Challenges are quintessential petitions to the government to address grievances and are also protected under the First Amendment. Because First Amendment freedoms need breathing space to survive, government may regulate in the area only with narrow specificity. *Cantwell v. Connecticut*, 310 U.S. 296, 311 (1940). Without evidence that a petition was made with some sort of "wrongfulness," a petition to the government is constitutionally protected. *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983) (finding no protection against consequences for bringing "baseless litigation."). But the Constitution does specifically "protect[ ] vigorous advocacy, *certainly of lawful ends*, against government intrusion." *Nat'l Ass'n for Advancement of Colored People v. Button*, 371 U.S. 415, 429 (1963) (emphasis added).

**Defs.' Br. ISO**
**Summ. J.**                           28

Like the NAACP in *Button*, Defendants here are advocating lawful means of vindicating their legal rights. Enjoining Defendants' lawful § 230 Challenges—which were brought in almost every Georgian county without regard to the county's racial or political demographics—would prohibit constitutionally protected activity without any of the narrowing required for such infringement and render § 11(b) unconstitutional as applied.

**C.    Judicial enforcement of § 11(b), as sought to be applied by Plaintiffs, unconstitutionally violates defendants' right to vote via vote dilution.**

The right to vote is certainly fundamental, but included within the right to vote is the principle that valid and eligible votes should not be diluted by unlawful votes. *Bush v. Gore*, 531 U.S. 98, 105 (2000); *see also Reynolds v. Sims*, 377 U.S. 533, 555 (1964). Defendants' § 230 Challenges sought to prevent vote dilution by ensuring that all the people listed as eligible voters were legally eligible to cast votes. Because of these strong First Amendment protections, enforcing § 11(b), as sought to be applied by Plaintiffs unconstitutionally violates Named Defendants's right to vote via vote dilution.

**Defs.' Br. ISO**
**Summ. J.**                              29

**D.     Judicial Enforcement of § 11(b), as sought to be applied by Plaintiffs, is unconstitutionally vague.**

A statute or regulation is considered unconstitutionally vague under the due process clause of the Fifth or Fourteenth Amendments if it "forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application." *Georgia Pac. Corp. v. Occupational Safety & Health Review Comm'n*, 25 F.3d 999, 1005 (11th Cir. 1994).

The undisputed facts show Named Defendants did not have any contact with a Challenged Voter, nor did they threaten legal, economic, or physical harm to any Challenged Voter (through either the § 230 Challenges, the support fund, or the voter integrity hotline). It stands to reason, if the Named Defendants are found liable here, it would have to be on the basis of bringing "mass" § 230 Challenges. But that would sweep constitutionally protected activity into the definitions of harassment and intimidation without any attempt to specifically narrow or define what kinds of § 230 Challenges would fall outside of that protection. How many § 230 Challenges would a voter in Georgia be able to bring without running the risk of liability under § 11(b)? One? Ten? Twenty? If Named Defendants are

found liable under § 11(b) because they brought "mass" challenges—even though

the Georgia legislature has made it clear the number of § 230 Challenges a voter

may bring is not limited—no "man of common intelligence" in Georgia would

know which, or how many, voter challenges allowed under Georgia law, would be

considered a violation of § 11(b). Such a finding by this Court would chill

Georgians' First Amendment activity out of the fear of liability and confusion over

exactly what petitions to government would be permitted under such a holding. As

a result, § 11(b) would be rendered unconstitutionally vague.

### III. Named Defendants' § 230 Challenges did not violate the National Voter Registration Act.

The NVRA generally applies to state election officials in regards to voter

registration list maintenance. *See* 52 U.S.C. § 20501, *et seq.* Plaintiffs here have

not brought an NVRA claim against Named Defendants—nor could they, since

they provided no written notice to the chief election official of Georgia.

*Id.* at § 20510(b)(1). However, they use an alleged violation of the NVRA as a

proxy argument for an § 11(b) violation. That argument is without merit.

The Eleventh Circuit has not handed down controlling authority on whether

the types of § 230 Challenges Named Defendants submitted are pre-empted by the

**Defs.' Br. ISO**
**Summ. J.**                              31

NVRA. A district court did enjoin Muscogee County *election officials* from

"upholding a challenge to any voter's eligibility solely on the basis of information

in the NCOA registry." *Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 512

F. Supp. 3d 1354, 1375 (M.D. Ga. 2021). Even if that were controlling law, which

it isn't, it doesn't apply here and does not implicate an § 11(b) violation.

First, it is an undisputed fact that neither TTV's Challenges nor the

Challenges based upon the Davis/Somerville Challenge List were based solely on

information in the NCOA registry. TTV, Mr. Davis, and Mr. Somerville did start

with data from the NCOA when compiling their Challenge Lists, but they certainly

didn't end there. See Part I.D.1, 2. They performed other data analysis on these

lists, using a variety of commercial and proprietary processes. *Id.* Even if this

Court agrees that the NVRA pre-empts the types of § 230 Challenges the Named

Defendants submitted before the run-off election, there was no controlling legal

authority so holding at the time they submitted them.

Second, even if this Court agrees that the Named Defendants' § 230

Challenges were pre-empted by the NVRA, that does not equate to an § 11(b)

violation. It is undisputed that Named Defendants submitted the § 230 Challenges

**Defs.' Br. ISO**
**Summ. J.**                          32

to county officials as is their right under the First Amendment and Georgia law.

TTV Tr. 257:11-14; Second Somerville Tr. 71:16-72:19; 72:21-73:14; Second

Davis Tr. 46:3-14; 80:7-10. It is undisputed that Named Defendants had no direct

contact with Challenged Voters regarding the Challenges. TTV Resp. to First

Rogs. No. 5; Somerville Am. Resp. and Obj. 2d Interrogs., Resp. No. 7; First

Davis Tr. 171:4-21; Williams Tr. 63:2-64:1; Johnson Resp. to First Interrogs.

Resp. No. 5; Cooper Resp. to First Interrogs. Resp. No. 5; Cooper Tr. 45:1-9;

50:13-22.  It is undisputed that Named Defendants never threatened legal,

economic, or physical harm to any of the Challenged Voters. *See id.*

Because no controlling legal authority prohibited the types of § 230

Challenges Named Defendants submitted prior to their submission, and because

the plain statutory language permits these types of § 230 Challenges, Named

Defendants did not act unlawfully when submitting the § 230 Challenges prior to

the run-off election. Further, because Named Defendants did not engage in any

behavior that comports with the type of behaviors that have been § 11(b)

violations, submitting these lawful § 230 Challenges cannot support Plaintiffs'

claims.

**Defs.' Br. ISO**
**Summ. J.**                                        33

**Conclusion**

Because the undisputed material facts show that Named Defendants

engaged in constitutionally-protected conduct that did not violate § 11(b), this

motion for summary judgment should be granted.

Dated: May 16, 2022                    Respectfully Submitted,

*/s/ David F. Guldenschuh*              */s/ James Bopp, Jr.*
David F. Guldenschuh                    James Bopp, Jr.,* IN # 2838-84
GA Bar No. 315175                        jboppjr@aol.com
David F. Guldenschuh P.C.               Jeffrey P. Gallant,* VA # 46876
P.O. Box 3                               jgallant@bopplaw.com
Rome, Georgia 30162-0333                Courtney Turner Milbank,* IN#
Telephone: 706-295-0333                 32178-29
Email: dfg@guldenschuhlaw.com            cmilbank@bopplaw.com
*Local Counsel for Defendants*          Melena Siebert,* IN # 35061-15
                                         msiebert@bopplaw.com
                                        THE BOPP LAW FIRM, PC
                                        1 South 6th Street
                                        Terre Haute, Indiana 47807
                                        Telephone: (812) 232-2434
                                        Facsimile: (812) 235-3685
                                        *Lead Counsel for Defendants*
                                        *Admitted Pro hac vice

**Defs.' Br. ISO**
**Summ. J.**                    35

## Certificate of Compliance

The undersigned counsel certifies that the foregoing has been prepared in

Times New Roman (14 point) font, as required by the Court in Local Rule 5.1(B).

Respectfully submitted on May 16, 2022

*/s/ James Bopp, Jr.*
James Bopp, Jr.
*Lead Counsel for Defendants*

**Defs.' Br. ISO**
**Summ. J.**                    36