**United States District Court**
**Northern District of Georgia**
**Gainesville Division**

|  |  |
|---|---|
| **Fair Fight, Inc., Scott Berson, Jocelyn Heredia,** and **Jane Doe**,<br><br>*Plaintiffs,*<br><br>*v.*<br><br>**True the Vote, Inc., Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, James Cooper,** and **John Does 1-10**,<br><br>*Defendants.* | **Civ. No. 2:20-cv-00302-SCJ**<br><br>**Hon: Steve C. Jones** |

**Defendants' Statement of Undisputed Material Facts**

**True the Vote, Inc. /Catherine Engelbrecht Statement of Facts**

**Georgia Voter Challenge**

**1.** True the Vote, Inc. ("**TTV**") compiled a challenge list encompassing all 159 counties in Georgia ("**Challenge List**") and intended to submit challenges on behalf of challengers in all of them. In order to do so, TTV needed eligible voters to volunteer to serve as challengers in each of these counties. TTV's Responses to

**Defs.' Stmt.**
**Undisputed Facts**                    1

Plaintiffs' Second Interrogatories (June 7, 2021) ("**TTV Resp. to 2d Interrog.**"), Resp. No. 14, Ex. A.

**2.** On the day that TTV's press release announcing this was issued, Attorney Mark Elias sent letters to the Boards of Elections in several Georgia counties. TTV 1455-57 (Letter from Marc Elias to Kristi L. Royston (Dec. 18, 2020)), Ex. B.

**3.** Several people serving as challengers started receiving intimidating and harassing messages via email and social media. TTV Resp. to 2d Interrog. Resp. No. 14.

**4.** As the Run-off election neared and the intimidation and harassment of challengers increased, TTV did not receive authorization to submit the challenge list from a registered voter in every Georgia county. *Id.*

**5.** Therefore, TTV did not submit challenges in all of Georgia's 159 counties as originally planned, but only submitted challenges in the counties noted in TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24, 2021) ("**TTV Am. Resp. First RFP**"), Resp. No. 2, Ex. C. The counties in which TTV submitted Challenges is as follows:

**Defs.' Stmt.
Undisputed Facts**                                2

| | | |
|---|---|---|
| Appling | Habersham | White |
| Bacon | Hall | Wilcox |
| Baldwin | Hancock | Wilkes |
| Banks | Hart | |
| Barrow | Henry | |
| Ben Hill | Houston | |
| Bibb | Jackson | |
| Bleckley | Jasper | |
| Brooks | Jefferson | |
| Butts | Johnson | |
| Calhoun | Jones | |
| Charlton | Lamar | |
| Cherokee | Lee | |
| Clarke | Madison | |
| Clayton | McDuffie | |
| Cobb | McIntosh | |
| Coffee | Oconee | |
| Columbia | Oglethorpe | |
| Coweta | Rockdale | |
| Crawford | Sumter | |
| Crisp | Taliaferro | |
| Dawson | Tattnall | |
| DeKalb | Terrell | |
| Dodge | Thomas | |
| Dooly | Tift | |
| Dougherty | Toombs | |
| Douglas | Towns | |
| Fayette | Union | |
| Franklin | Walton | |
| Fulton | Webster | |
| Gwinnett | Wheeler | |

*Id.* (reordered alphabetically).

**6.** TTV prepared analysis for all 159 counties but challenges were ultimately submitted in 65 counties because those were the counties for which individual electors committed to filing the challenges. Transcript Excerpts of Deposition of Catherine Engelbrecht, TTV 30(b)(6) (Jan. 26, 2022) ("**TTV Tr.**"), Ex. D, 255:4-256:13.

**7.** Based on its understanding of the governing statute and the process it outlined, and a meeting with the Georgia Secretary of State, TTV expected the challenge process to be orderly and organized and not burdensome to a challenged individual. TTV Tr. 152:15-154:19;169:22-170:18.

**8.** TTV had communications with individual challengers to discuss the process to have been followed and the threats that were being experienced, and TTV directed them where to submit information on the threats. TTV Tr. 159:21-161:2.

**9.** TTV had a meeting with the Secretary of State in mid-December to describe the Challenge and help understand the process in the counties to avoid friction or inappropriate process. TTV Tr. 168:5-22.

**Defs.' Stmt.**
**Undisputed Facts**                     4

10. In that meeting, the Secretary of State commented that because the voter registration list had not been cleaned and considering the normal rate of moves that the number of names on the Challenge List was "about right." TTV Tr. 169:1-12; 171:1-5.

11. The impetus behind the Challenges was in part that electors had contacted TTV about challenges in Georgia, and the challenge statute afforded an opportunity for citizens to engage in that way. TTV Tr. 223:17-224:6.

12. The purpose of the Challenges was to help electors bring to the attention of the counties those records that showed voters that appeared not to comply with eligibility standards for the runoff election. TTV Tr. 206:1-4.

13. The intent of TTV and the purpose of the Challenges was not to have people removed from voter registration rolls in Georgia, but for the county boards to confirm with the Challenged Voters whether they had moved. TTV Tr. 342:15-343:1; TTV Resp. to First Interrogs, Ex. E, Resp. No. 5.

14. Neither TTV nor any of the individual volunteers had any contact with the Challenged Voters. TTV Resp. to First Interrogs. Resp. No. 5.

**Other Activities**

**Defs.' Stmt.
Undisputed Facts**                           5

**15.** TTV never considered releasing the Challenge List to the public. TTV Tr. 257:11-14.

**16.** TTV was also involved in litigation in several states regarding possibly illegal ballots cast in the 2020 general election ("**Validate the Vote**"). The Validate the Vote name was created by a consultant of a donor in early November 2020. TTV Tr. 66:12-21, 67:16-20.

**17.** The name Validate the Vote was used with respect to these national litigation efforts in connection with the 2020 general election and sometimes included the name of the state in which the litigation efforts were directed. TTV Tr. 69:4-7.

**18.** The counting of illegal ballots in Democratic counties in several states was the subject of publicity regarding Validate the Vote, not the challenges in Georgia. TTV Tr. 267:6-268:2, 268:17-22, 276:3-5, 276:19-277:2, 277:3-5.

**Work with OpSec**

**19.** TTV hired OpSec Group LLC ("**OpSec**") to analyze publicly available data to create a list of registered Georgia voters to be challenged under O.G.C.A. § 21-2-230 as having changed their residency. Transcript Excerpts of Deposition

of Gregg Phillips (Jan. 25, 2022) ("**OpSec Tr.**"), Ex. F 54:21; 57:11-21.

20. TTV contracted with OpSec to prepare analysis for all Georgia counties, and the challenges were limited by the residency of electors willing to mount a challenge in their county. TTV Tr. 231:11-19.

21. TTV received or viewed data from the TrueAppend on December 19, 2020; the data was not used in creating the Challenge Lists, TTV Tr. 244:17-245:10, 248:13-22, and the demographic information, which is automatically included, was reviewed as a result of claims that the List exhibited bias. TTV Tr. 185:1-5.

**Fraud Hotline**

22. Consistently over a number of election cycles, TTV hosts a hotline that is available online and uses a toll free number. TTV Tr. 81:16-21.

23. Reports of impropriety or malfeasance or reports of missing ballots or extra ballots were reviewed and either forwarded to the appropriate authorities or further vetted. TTV Tr. 85:21-86:9.

24. The election integrity hotline had live operators taking calls starting in late September of 2020. TTV Tr. 82:18-21.

**Defs.' Stmt.**
**Undisputed Facts**          7

**25.** During the 2020 election cycle TTV's national election integrity hotline came to be associated with Validate the Vote. TTV Tr. 68:16-69:7; 81:22-82:4.

**26.** TTV referred easily answered questions or concerns to the official websites of the relevant government entities. TTV Tr. 85:13-20.

**27.** The purpose of the election integrity hotline was to gather information regarding potential violations that had already occurred and though TTV did report some incidents to authorities no reports received relevant to Georgia at the time of the runoff resulted in the need to follow up or report contact information to appropriate authorities. TTV Tr. 93:17-95:3; TTV's Amended Responses to Plaintiffs' Second Requests for Production (Jun. 18, 2021) ("**TTV Am. Resp. 2d RFP**"), Ex. G, Resp. No. 18.

**28.** During the runoff period, TTV made available training for signature verification and absentee ballot training. TTV Tr. 96:5-102:6.

**Support Fund**

**29.** In conjunction with its work on the Challenge List, TTV established a fund to provide legal support for people who reported information primarily to head off the chilling effect of the threat of legal action against challengers or those

with information. TTV Tr. 71:11-19, 71:22-72:1, 74:8-17, 75:5-18, 76:15-19.

30. The fund was also used to support litigation in several states in regard to the November 2020 presidential election. TTV Tr. 316:3-12.

31. As a result of the initiative associated with the fund, TTV received credible reports of criminal malfeasance that it submitted to authorities. TTV Tr. 316:19-317:5.

**Withdrawn Challengers**

32. Claire Joseph Martin was the only Georgia volunteer serving as a challenger who withdrew or attempted to withdraw a Georgia Elector Challenge in his or her name. TTV Resp. to 2d Interrog. Resp. No. 11.

33. Mr. Martin gave permission to submit Challenges on his behalf in Taliaferro County. Before the Taliaferro County Challenge List was submitted on his behalf, he submitted challenges to three of the voters on the List and who had requested absentee ballots. TTV Resp. to 2d Interrog. Resp. No. 11.

34. On December 20, 2020, he asked to "hold" the Challenge on his behalf and noted that two of the three challenges were residents in long-term care and were eligible to vote in Taliaferro County. TTV Resp. to 2d Interrog. Resp. No.

**Defs.' Stmt.**
**Undisputed Facts**                    9

11; TTV Tr. 327:10-15.

**35.** TTV submitted the withdrawal of the Challenge in Taliaferro County on Dec. 21. TTV Resp. to 2d Interrog. Resp. No. 11.

**36.** Mr. Martin later reported that Taliaferro County Chief Registrar confirmed with him that one of the three people on his challenge list did not live in Taliaferro County and the absentee ballot for that voter was rejected. TTV Resp. to 2d Interrog. Resp. No. 11.

**37.** TTV knows of no other instance in which TTV or a challenger learned that a voter whose name appeared on a Challenge List was in fact a resident of the County in which they were registered to vote. TTV Resp. to 2d Interrog. Resp. No. 12.

## OpSec/Gregg Phillips Statement of Facts

**38.** OpSec was founded in 2020. OpSec Tr. 36:19.

**39.** True the Vote contracted with OpSec to analyze publicly available data to create TTV's Challenge List. OpSec Tr. 54:21, 57:11-21.

**The Challenge List**

**40.** OpSec prepared lists for all the counties in Georgia. OpSec Tr. 149:2-4.

**Defs.' Stmt.**
**Undisputed Facts**                   10

TTV Tr. 231:11-13 (Analysis was prepared for all Georgia Counties); TTV Tr. 255:6 ("we had done the analysis to support [challenges in all 159 counties].")

**41.** The counties for which challenges were submitted were those counties for which a Georgia voter lived in the jurisdiction and wished to file a challenge. OpSec Tr. 149:9-13; TTV Tr. 253:20-254:4; 255:7-11; 256:7-13.

**OpSec's Process and the Challenge List**

**42.** In creating the Challenge List OpSec used the Georgia official voter registration file, the NCOA, the Coding Accuracy Support System ("**CASS**"), Delivery Point Validation ("**DPV**") and proprietary algorithms ("**proprietary process**") to help verify identity. OpSec Tr. 93:16-94:2.

**43.** In matching information from Georgia's voter rolls and other data, OpSec used fields that conformed with respect to data format and data type. OpSec Tr. 106:22-107:3.

**44.** OpSec's proprietary process compared the addresses in the registration file to government and commercially available information in order to identify people who had either moved out of the county in which they were registered or live outside the State of Georgia. OpSec Tr. 113:6-17.

**Defs.' Stmt.**
**Undisputed Facts**                    11

**45.** OpSec's proprietary process was developed by Gregg Phillips in 2006 and through use has demonstrated its accuracy. OpSec Tr. 108:16-22.

**46.** OpSec used its proprietary process in addition to regular address matching to produce the Challenge List. OpSec Tr. 118:11-15.

**47.** OpSec's proprietary process is designed to infer, from consulting other sources of data, the purpose for which the person has submitted an NCOA request. OpSec Tr. 129:8-12.

**48.** Among the persons that OpSec's proprietary process is designed to identify are persons who have deployed for military service, OpSec Tr. 128:3-7; persons that, intending to move, file an NCOA request and then change their mind, *id.* 127:12-128:2; persons that forward their mail because they were on vacation, *id.* 126:22-127:5, 128:1-2; persons that moved for non-military government service and submit an NCOA, *id.* 126:9-16, 128:1-2; persons submitting an address change for purposes of attending school, *id.* 125:17-19, 128:1-2; persons that have moved inside the county or jurisdiction in which they were registered, *id.* 125:2.

**49.** OpSec's proprietary process does not consider as dispositive whether or

**Defs.' Stmt.**
**Undisputed Facts**                    12

not a person filed a permanent or temporary address change. OpSec Tr. 138:16-22.

50. OpSec's proprietary process seeks to verify the identity of an individual before considering residency by comparing to data gathered from a combination of lists. OpSec Tr. 96:3-11.

51. OpSec used databases other than NCOA and the voter file list to identify persons who had moved, OpSec Tr. 94:17, 95:3-9, including other state registrations, *id.* 95:14-15; 96:12-17, and "five or six other data sources." OpSec Tr. 95:17-18.

52. To the extent that it is needed for the proprietary process, OpSec's proprietary algorithm also uses the address information from TrueNCOA and SmartyStreets. OpSec Tr. 112:1-9; 119:16-22.

53. In producing the Challenge List, OpSec used, among other things, county tax records. OpSec Tr. 97:2-4.

54. OpSec's proprietary process mitigates a lack of unique identifiers between voter registration rolls and NCOA lists by resolving for identity first, which, among other things, works to eliminate a false match between persons with the same first and last name but a different middle initial. OpSec Tr. 120:12-20.

**Defs.' Stmt.**
**Undisputed Facts**                     13

**55.** OpSec's proprietary process of verifying identity is a means of and is used to correct potential matches of individuals in the voter file sharing a first and last name and address. OpSec Tr. 141:11-20.

**56.** OpSec's approach of verifying identity and residency is a proprietary process that uses a 4000-row algorithm, involving a complex series of mostly common algorithms, such as dissimilarity and similarity indexes and fuzzy logic. OpSec Tr. 107:13-108:4; 113:22-114:3.

**57.** The fuzzy logic used in OpSec's proprietary process is designed to ascertain whether similar information is similar enough to assume that an identity is accurate. If it is not, then it assigns a risk factor to it. OpSec Tr. 108:8-11.

**58.** In seeking to remove false positives or false negatives, OpSec's proprietary processing includes a quality control algorithm that evaluates every piece of data flagged as having a risk of being potentially inaccurate. OpSec Tr. 118:3-11.

**59.** The formulas and algorithms "execute," meaning that they pull in information from outside sources, using that information to process and resolve the risk assigned by the quality control algorithm. OpSec Tr. 119:16-22.

**Defs.' Stmt.**
**Undisputed Facts**            14

60. OpSec's proprietary process further processes flagged questions of whether it's likely to be the same person, organization or street to attempt to resolve the question. OpSec Tr. OpSec Tr. 119:16-22. If the question cannot be resolved, a match based on the information would have been kicked out and not included, *id.* 116:12-16.

61. OpSec's proprietary process utilizes regression modeling including a model management process to identify the regression technique most likely to produce an accurate result. OpSec Tr. 118:19-119:22.

62. Regressions are run throughout the proprietary process. OpSec Tr. 119:5-9.

63. The names of individuals using military addresses were removed by identifying zip codes including military bases, FPO and other military designations, OpSec Tr. 129:16-130:1.

64. UOCAVA ballots and postcard ballots in general are handled by counties and counties don't make public that information. OpSec Tr. 135:20-136:8.

65. OpSec reviewed the results of matching names in the voter files and the

**Defs.' Stmt.**
**Undisputed Facts**                    15

NCOA registry to ensure that it was reasonable with respect to false positives and false negative to within one standard deviation of the potential error that might be expected. OpSec Tr. 140:8-141:7.

66. The process reviewed for instances where the name does not match the name in the voter file or the name associated with that registration number and that name would likely have been "kicked out" as an exception, but it's possible that the name could be included in the Challenge List. OpSec Tr. 145:5-18.

67. The process reviewed for instances where the registered address and the addressed to which the registrant moved are the same and it is possible that those names would appear on the Challenge List, especially if a different name was associated with the two addresses. OpSec Tr. 145:19-146:7.

68. The process cannot confirm whether an individual re-registered at the address to which the NCOA suggested the individual moved. OpSec Tr. 146:8-14.

69. OpSec used a TrueAppend document as a quality check on numbers by looking at the overall number of moved provided in that report as a check to see if there were noticeable accuracy issues with the result of its analysis; the report includes age and other demographic information that was not relevant, and OpSec

**Defs.' Stmt.**
**Undisputed Facts**                16

does not believe that any changes were made to the Challenge List after reviewing the report. OpSec Tr. 150:16-18, 151:13-16, 152:6-9; TrueAppend Doc., Ex. G

**70.** Hard copies of the Challenge List were not sent to counties in addition to electronic copies because it would have been unnecessary and the counties did not want them to be sent. OpSec Tr. 160:9-161:10.

**71.** If OpSec considered demographic and other characteristics of individuals on the Challenge List at all, it was only after and in response to Plaintiffs' suit, OpSec Tr. 163:13-164:8; 149:14-17, in which it is claimed, directly or indirectly, that the Challenges were aimed particularly at certain demographics, Amended Complaint ¶¶ 4, 16, 30.

**72.** OpSec uses DataWalk to do a type of regression analysis and data linkage but DataWalk was not used to generate the Challenge List. OpSec Tr. 164:18 -165:5.

**73.** OpSec might also use DataWalk to look at linkages between files denoting deceased persons in order to exclude them, but does not typically cross-check with such files. OpSec Tr. 166:1-18.

**74.** Neither OpSec nor Gregg Phillips know who tweets under the account

Crusade for Freedom. OpSec Tr. 167:22-168:10.

**75.** OpSec's analysis found that there were ineligible voters on the Georgia voter roll. OpSec Tr. 71:13.

## Derek Somerville Statement of Facts

**76.** Mr. Somerville did not help or volunteer to help with TTV's Challenges in any way, including methodology of analysis, compiling a list of Challenges, or timing of any Challenges. Transcript Excerpts of First Deposition of Derek Somerville (Oct. 6, 2021) ("**First Somerville Tr.**"), Ex. I, 29:5-31:17; Defendant Derek Somerville's Responses and Objections to Plaintiffs' Interrogatories Pursuant to Court Order (Dec. 17, 2021) ("**Somerville Interrog. Resp. Ct. Order**"), Ex. J, Resp. No. 1,

**77.** Mr. Somerville and Mr. Davis worked together, independently from TTV, to run a separate data analysis for the Runoff election, which eventually was used by volunteers working with Mr. Somerville and Mr. Davis to submit voter challenges in various Georgia counties. ("**Davis/Somerville Challenge List**") First Somerville Tr. 32:20-33:4;45:3-11; Somerville Interrog. Resp. Ct. Order Resp. No. 1.

**78.** Mr. Davis took the lead in researching and identifying voters to include on the Davis/Somerville Challenge List. Based upon his review of this research and his discussions with Mr. Davis, Mr. Somerville understood the research and identification process to be as follows:

a.     Split the input voter data into 3 parts for processing so the databases would not exceed the dbase file size limitation of 2.14 gigabytes.

b.     Imported the data into 3 dbase structures with processing fields appended (added) to the structure.

c.     Copied the residence addresses into the "COA" (Change of address) fields created for CASS (Coding Accuracy Support System) and NCOA (National Change of Address) processing.

d.     Ran CASS & NCOA processing & saved the processing certifications.

e.     Created an empty table called "Moved" and imported the records that received an updated address during NCOA processing.

f.     Set a relation on the voter registration number into the vote history trailer data and flagged the voters in the "Moved" table who voted in the

**Defs.' Stmt.**
**Undisputed Facts**          19

general election.

g.      Geocoded (assigned latitude & longitude) & digitally mapped the "Moved" table to assign the county of the new address.

h.      Copied out a file of voters who cast ballots in the General Election with changes of address to a new state or to a new county in Georgia more than 30 days before the general and/or the runoff elections. This yielded a file of voters with a change of address to another state, as well as in state voters who, based on the month of their "Move Effective Dates", appeared to have had residency issues when they voted in the General Election, along with voters who voted in the General who appeared to have similar residency issues heading into the Runoff Election.

i.      Removed changes of address to PO Boxes.

j.      Eliminated UOCAVA (Military) voters by matching against the absentee voter data.

k.      Mr. Davis sent Mr. Somerville a copy of the file so that I could remove as many voters at military bases as possible.

l.      Mr. Somerville sent the semi-final challenge list to Mr. Davis.

**Defs.' Stmt.**
**Undisputed Facts**              20

m.      Output a "Final" challenge list removing voters with changes of address prior to June of 2019 as we believed they would have already been through the Secretary of State's NCOA processing, subsequent verification inquiries, and associated list maintenance activities.

n.      Created a report format for printed lists of challenged voters.

o.      Output a PDF list for each county.

p.      Output an Excel file for each county.

q.      Did an SQL query to get a count by county. The final count was 39,141 voters and the average number of challenged voters per county was 246.

r.      Mr. Davis uploaded the Davis/Somerville Challenge List to Google drive for Mr. Somerville to distribute to challengers.

Somerville Interrog. Resp. Ct. Order Resp. No. 2.

**79.** Mr. Somerville received no assistance from TTV in helping to prepare the Davis/Somerville Challenge List. Somerville Interrog. Resp. Ct. Order Resp. No. 4.

**80.** Mr. Somerville had no knowledge of how the TTV Challenge List was

**Defs.' Stmt.
Undisputed Facts**            21

developed, who participated in it, the methodology TTV used, or any other degree

of knowledge pertaining to the TTV Challenge List. First Somerville Tr. 40:11-18;

42:15-43:9; Somerville Interrog. Resp. Ct. Order Resp. No. 1.

**81.** The Davis/Somerville Challenge List was completely unrelated to the

TTV Challenge List. First Somerville Tr. 59:1-7.

**82.** Mr. Somerville's hope was that the Davis/Somerville Challenge List

would be used by counties to determine whether "there was a flaw in the process

that was exacerbated by circumstances surrounding the election[.] And did that, in

turn, result in a number of votes that may have been ineligible? - regardless of who

cast them, regardless of where they were cast, or regardless by whom." In other

words, whether the Georgia voter rolls had a "data integrity issue." First

Somerville Tr. 46:15-47:15.

**83.** Mr. Somerville's intent in working with Mr. Davis on the

Davis/Somerville Challenge List was to encourage people to hold their

government accountable by participating in a meaningful way—his intent was

never to scare people away from participating in an election. Transcript Excerpts

of Second Deposition of Derek Somerville (Feb. 2, 2022) (**"Second Somerville**

**Tr.**"), Ex. K 187:5-13.

84. At times, Mr. Somerville made public statements in general about issues surrounding voter integrity in Georgia—but none of those statements called for physical violence or threatened harm to any Plaintiff. *See* Second Somerville Tr. 75:1-84:10.

85. Mr. Somerville testified that it "wasn't evident" to him that voters on the Davis/Somerville Challenge List "would ever be aware they were on the list." But if these voters were asked to verify their residency by a county board, they simply had to show, through a benign process, they had not permanently moved from that county and were still eligible to vote there. First Somerville Tr. 56:18-57:11.

86. Mr. Somerville hoped that "if there was probable cause to believe that a vote may have been cast in an ineligible fashion – which may very well happen unbeknownst to the person who cast that vote – that that would be looked into by the local boards and remedied accordingly." "'Remedied' does not necessarily mean they don't vote, or that the voter is "purged" from the voter rolls. It simply means ensuring they vote in the proper county." First Somerville Tr. 48:15-21; 78:6-9; Second Somerville Tr. 189:4-191:1.

**Defs.' Stmt.**
**Undisputed Facts**               23

**87.** Mr. Somerville did not believe that the Davis/Somerville Challenge List would have any short term impact; the effort was "really to highlight a very real issue with the integrity of the voter file, not necessarily to effect an outcome in any short order." First Somerville Tr. 54:16-55:9.

**88.** The Davis/Somerville Challenge List was developed and used to highlight the fact that "the larger the amount of mail-in ballots, the more exaggerated the affect of a bad voter file." First Somerville Tr. 153:1-12.

**89.** In recognition that military service in another county or state did not make a voter ineligible to cast a ballot in their home county, Mr. Somerville and Mr. Davis "went out of [their] way to make sure that . . . [they] removed individuals that appeared to be either serving in the military, or even remotely located near a military base in case the dependent – or dependents were caught up in that." First Somerville Tr. 76:8-14; Second Somerville Tr. 20:18-21:4;26:10-21.

**90.** In recognition that students away from their home address were also likely eligible voters in their home counties, Mr. Somerville and Mr. Davis also made efforts to exclude them from the Davis/Somerville Challenge List, including identifying and removing students connected to addresses being on or near

**Defs.' Stmt.
Undisputed Facts**                    24

campuses. Second Somerville Tr. 22:16-24:8.

91. The Davis/Somerville Challenge List consisted of "roughly 40,000 [registered voters] across all 159 counties [they] believed need[ed] to be verified by county election boards before the January 5, 2020, runoff." First Somerville Tr. 86:14-18.

92. Mr. Somerville had "tremendous confidence" that the voters on the Davis/Somerville Challenge List "filed a change of address for one reason or another, and that there was and continues to be cause for each county election board to confirm that those individuals are still eligible voters within their county." First Somerville Tr. 87:21-88:4.

93. Mr. Somerville, primarily through social media, asked if voters would be willing to submit voter challenges in their county, using the appropriate Davis/Somerville Challenge List. If a voter expressed interest, Mr. Somerville made that county's list available to that Challenger, via email or Dropbox. The Challenger then was responsible for submitting the Challenge based upon the Davis/Somerville Challenge List to the appropriate county. First Somerville Tr. 89:22-15; 97:22-99:19; Somerville Interrog. Resp. Ct. Order Resp. No. 1.

**Defs.' Stmt.**
**Undisputed Facts**                    25

94. The Davis/Somerville Challenge List was never released to the public. Second Somerville Tr. 71:16-72:19; 72:21-73:14.

95. Mr. Somerville had no contact with any Challenged Voter regarding the Challenges. Defendant Derek Somerville's Amended Responses and Objections to Plaintiffs' Second Interrogatories (Oct. 28, 2021) ("**Somerville Am. Resp. 2d Interrog.**"), Ex. L, Resp. No. 7.

96. To Mr. Somerville's knowledge, no county board of election accepted any Challenge submitted on the basis of the Davis/Somerville Challenge List. First Somerville Tr. 93:11-15.

97. Mr. Somerville's understanding of TTV's press release in December of 2020, was that TTV was trying to generally acknowledge the "work of Georgians" who were attempting to contribute to the effort of voter integrity, which is why his and Mr. Davis' names were included. Second Somerville Tr. 132:8-14.

98. Mr. Somerville had fairly minimal contact with TTV, and none of his contact resulted in substantive cooperation or coordination between the Davis/Somerville Challenge List and the TTV Challenge List efforts. First Somerville Tr. 103:6-13; 157:7-15; Somerville Interrog. Resp. Ct. Order Resp.

**Defs.' Stmt.**
**Undisputed Facts**          26

Nos. 1,4.

**99.** Mr. Somerville understood that the Davis/Somerville Challenge List

would not prevent any eligible voter from voting, it would simply start a process

undertaken by proper county authorities, which was designed to protect voters by

identifying "those votes that are not eligible and would otherwise disenfranchise

the very voters that [they were] trying to protect." First Somerville Tr. 124:1-12;

127:9-15.

**100.** Mr. Somerville did not discuss with TTV, nor did he have any

knowledge of, TTV's 24/7 hotline or the "whistleblower fund" described in TTV's

November 6, 2020, press release. First Somerville Tr. 150:15-152:4.

**101.** After the Davis/Somerville Challenge List was compiled, Mr.

Somerville ran several analyses on the data, including a breakdown of the file

based on voter behavior. Mr. Somerville's intent on this post facto review was to

ensure that the data did not contain any particular bias regarding any other factor

other than the data reflecting an address change the voter had submitted to the

USPS. Second Somerville Tr. 30:6-32:14.

**102.** Mr. Somerville never considered race, sex, voting preference, or any

other demographic characteristic of the voters when working to compile the

Davis/Somerville Challenge List. Second Somerville Tr. 30:6-32:14; 188:4-22.

### Mark Davis Statement of Facts

**103.** Mark Davis is the president of Data Productions, which does marketing

for commercial, nonprofit, and political organizations. Transcript Excerpts of First

Deposition of Mark Davis (Oct. 4, 2021) ("**First Davis Tr.**"), Ex. M 17:6-9.

**104.** Mr. Davis has been admitted to testify as an expert witness in data

analytics five times over the last 20 years in disputed elections, including in

matters involving residency issues and redistricting errors. First Davis Tr. 19:6-13.

**105.** As part of his work with Data Productions, Mr. Davis processed

between 50-60 million records in 2021, using a variety of data tools, including the

USPS NCOA (National Change of Address) and CASS certification (Coding

Accuracy Support System). First Davis Tr. 21:14-21.

**106.** Mr. Davis has matched the NCOA data with voter registration files for

over 20 years, including during the 2020 election cycle. First Davis Tr. 27:4-

28:21.

**107.** Mr. Davis noticed "residency issues with the Georgia Voter Database

**Defs.' Stmt.**
**Undisputed Facts**               28

for many, many years." First Davis Tr. 32:11-33:17.

**108.** Because of Mr. Davis' observations of residency issues with the Georgia Voter Database, he ran NCOA processing in November of 2020 to "ascertain the extent of the issues statewide." First Davis Tr. 33:18-20.

**109.** Mr. Davis did not act in concert with, or cooperate with TTV, TTV's data analysis, or its voter challenge efforts for the January 2021 Runoff. First Davis Tr. 38:22-39:14; 41:10-42:16; 46:12-47:10; Transcript Excerpts of Deposition of Mark Davis (Jan. 19, 2022) ("**Second Davis Tr.**"), Ex. N 95:4-9; Defendant Mark Davis' Responses and Objections to Plaintiffs' Interrogatories Pursuant to Court Order (Dec. 14, 2021) ("**Davis Interrog. Resp. Ct. Order**"), Ex. O, Resp. No. 1.

**110.** Mr. Davis supports efforts "to clean up voter rolls and ensure people don't vote with residency issues because they're casting ballots for people who don't represent them" and diluting the votes of eligible voters. First Davis Tr. 58:22-59:9; Second Davis Tr. 175:4-14.

**111.** When the residency of a voter is called into question via a voter challenge, the Board of Elections would be responsible for investigating any

challenges it accepts. First Davis Tr. 120:7-22.

112. Mr. Davis ran data analysis on the Georgia voter rolls after the November 2020 election. ("**Davis November Analysis**") First Davis Tr. 28:7-14; Second Davis Tr. 28:3-18.

113. Mr. Davis ran a separate data analysis for the Runoff Election; voters then volunteered to submit voter challenges in counties using this list. ("**Davis/Somerville Challenge List**") Second Davis Tr. 28:19-32:17.

114. Mr. Davis took the lead in researching and identifying voters to include on the Davis/Somerville Challenge List. Mr. Davis' research included the following steps:

a.   Split the input voter data into 3 parts for processing so the databases would not exceed the dbase file size limitation of 2.14 gigabytes.

b.   Imported the data into 3 dbase structures with processing fields appended (added) to the structure.

c.   Copied the residence addresses into the "COA" (Change of address) fields created for CASS (Coding Accuracy Support System) and NCOA (National Change of Address) processing.

**Defs.' Stmt.**
**Undisputed Facts**                    30

d.      Ran CASS & NCOA processing & saved the processing

certifications.

e.      Created an empty table called "Moved" and imported the records that

received an updated address during NCOA processing.

f.      Set a relation on the voter registration number into the vote history

trailer data and flagged the voters in the "Moved" table who voted in the

general election.

g.      Geocoded (assigned latitude & longitude) & digitally mapped the

"Moved" table to assign the county of the new address.

h.      Copied out a file of voters who cast ballots in the General Election

with changes of address to a new state or to a new county in Georgia more

than 30 days before the general and/or the runoff elections. This yielded a

file of voters with a change of address to another state, as well as in state

voters who, based on the month of their "Move Effective Dates", appeared

to have had residency issues when they voted in the General Election, along

with voters who voted in the General who appeared to have similar

residency issues heading into the Runoff Election.

**Defs.' Stmt.**
**Undisputed Facts**                31

i.      Removed changes of address to PO Boxes.

j.      Eliminated UOCAVA (Military) voters by matching against the absentee voter data.

k.      Mr. Davis sent Mr. Somerville a copy of the file so that he could remove as many voters at military bases as possible.

l.      Mr. Somerville then sent the semi-final challenge list to Mr. Davis.

m.      Output a "Final" challenge list removing voters with changes of address prior to June of 2019 as we believed they would have already been through the Secretary of State's NCOA processing, subsequent verification inquiries, and associated list maintenance activities.

n.      Created a report format for printed lists of challenged voters.

o.      Output a PDF list for each county.

p.      Output an Excel file for each county.

q.      Did an SQL query to get a count by county. The final count was 39,141 voters and the average number of challenged voters per county was 246.

r.      Mr. Davis uploaded the Davis/Somerville Challenge List to Google

**Defs.' Stmt.**
**Undisputed Facts**                    32

drive for Mr. Somerville to distribute to challengers.

Davis Interrog. Resp. Ct. Order Resp. No. 2.

115. After the Run-off Election, Mr. Davis continued to analyze data related to Georgia voters. This data indicates that some voters who appeared to have residency issues (i.e., moved to another county more than 30 days before the election) voted in the General Election. Mr. Davis provided this data analysis to the Georgia Secretary of State in May of 2021 ("**SOS Analysis**"). Davis Interrog. Resp. Ct. Order Resp. No. 3.

116. The SOS Analysis showed that out of the 39,141 voters on the Davis/Somerville Challenge List, 26,854 had changes of address within the state of Georgia, and since the runoff, 9,950 voters (37.05%) have updated their voter registration addresses to the same addresses shown in the NCOA data provided to the USPS when they moved originally. These voters have provided post-election, self-confirmation to the Secretary of State or their county's board of elections that the information on the Davis/Somerville Challenge List was accurate at the time Mr. Davis compiled it. Davis Interrog. Resp. Ct. Order Resp. No. 3; *see also* First Davis Tr. 132:8-22; Second Davis Tr. 60:16-61:3; 164:19-165:9;166:21-168:14.

**Defs.' Stmt.**
**Undisputed Facts**            33

**117.** In addition, the SOS Analysis shows 18,202 voters of the 26,854 voters (67.8%) who submitted a change of address within the State of Georgia voted in the Run-off election. Of those 67.8% of voters, the data indicates 3,556 voters (19.5%) cast ballots for the Run-off Election in their old county, but have since updated their registration addresses to the same address they gave the USPS when they moved, which is in a different county than the one in which they voted. Since the Run-off Election, the Georgia Secretary of State has removed 1,486 of the voters on the Independent Run-off List. Of those, 403 (27%) voted in the Run-off Election. Davis Interrog. Resp. Ct. Order Resp. No. 3.

**118.** Of the voters described in the SOS Analysis, "94% of them would have been offered a ballot with a state house race on it that they don't live in, about 86.5% would have been offered a chance to vote in a state senate district that they no longer lived n, and approximately 64% would have been offered the chance to cast a ballot in a congressional district they no longer lived in." Second Davis Tr. 169:10-17.

**119.** Neither the Davis November Analysis nor the Davis/Somerville Challenge List took into account race, sex, or party affiliation. First Davis Tr.

**Defs.' Stmt.**
**Undisputed Facts**          34

166:5-168:22; Second Davis Tr. 40:19-41:5; 185:15-188:4.

**120.** Mr. Davis had no contact with any individual voters with potential residency issues according to his data analysis, nor did he encourage anyone else to contact individual voters with potential residency issues. First Davis Tr. 171:4-21. Mr. Davis and Mr. Somerville removed members of the military, to the best of their ability, from their list of voters with potential residency issues. Second Davis Tr. 29:1-17; 36: 14-37:6.

**121.** Mr. Davis and Mr. Somerville did not publish the Davis/Somerville Challenge List to the general public. Second Davis Tr. 46:3-14; 80:7-10.

**122.** Mr. Davis' "primary motivation" in compiling the list of voters with potential residency issues was "to prevent illegal votes from being cast." Second Davis Tr. 59:7-8l 86:22-87:3; 90:14-21.

**123.** Mr. Davis believes it is the job of election officials and law enforcement to determine who may or may not have committed a crime as it relates to casting unlawful votes. Second Davis Tr. 59:8-11.

**124.** The Davis/Somerville Challenge List contained quite a number of voters who were registered to vote at commercial mail receiving agencies (such as

UPS stores), rather than at their residence; he hoped election officials would notice this issue and work towards resolving it. Second Davis Tr. 67:5-68:8; 70:22-71:16.

125. Mr. Davis denies challenging a voter with a potential residency issue is voter intimidation. Second Davis Tr. 140:4-22.

126. The challenge in Muscogee County, Georgia did not come from the Davis/Somerville List. Second Davis Tr. 144:7-15.

127. Mr. Davis did not seek to intimidate any lawful voter. Second Davis Tr. 199:9-18.

Mark Williams Statement of Facts

128.  Mark Williams owns a printing company, and his company printed the § 230 Challenges for TTV. Transcript Excerpts of Deposition of Mark Williams (Sept. 23, 2021) ("**Williams Tr.**"), Ex. P, 19:4-18; 21:11-22:15; Defendant Mark Williams's Responses to Plaintiffs' First Interrogatories (March 15, 2021) ("**Williams Resp. to First Interrogs.**"), Ex. Q, Resp. No. 1.

129. Mr. Williams introduced Ron Johnson and James Cooper to Gregg Phillips. Williams Tr. 23:3-24:7.

130. Mr. Williams did not help compile the TTV Challenge Lists. Williams

Tr. 35:4-15.

**131.** Mr. Williams volunteered to be the TTV Challenger in Gwinnett County. He submitted the Challenges to the Gwinnett Board with the hopes that the Board would vet the list, but he was told the Board would not vet them at all. Williams Tr. 63:2-64:1.

**Ron Johnson Statement of Facts**

**132.** Ron Johnson contacted eligible Georgia voters he knew to ask if they would be interested in bringing a § 230 Challenges in the county in which they live. He gave TTV the contact information for any Georgia voter who expressed an interest in participating in these Challenges. Defendant Ron Johnson's Responses to Plaintiffs' First Interrogatories (March 15, 2021) (" **Johnson Resp. to First Interrogs.**"), Ex. R, Resp. No. 5.

**133.** Mr. Johnson communicated with the volunteers to get their signed permission for TTV to submit the Challenges in there name. *Id.*

**134.** Mr. Johnson did not help compile the TTV Challenge Lists. Johnson Resp. to First Interrogs. Resp. Nos. 1-4.

**James Cooper Statement of Facts**

**135.** James Cooper contacted eligible Georgia voters he knew to ask if they would be interested in bringing a § 230 Challenges in the county in which they live. He prepared a "form" email to send to potential Challengers, which described the potential Challenges. He gave TTV the contact information for any Georgia voter who expressed an interest in participating in these Challenges. Defendant James Cooper's Responses to Plaintiffs' First Interrogatories (March 15, 2021) ("**Cooper Resp. to First Interrogs.**"), Ex. S, Resp. No. 5.

**136.** Mr. Cooper communicated with the volunteers to get their signed permission for TTV to submit the Challenges in there name. Cooper Resp. to First Interrogs. Resp. No. 5.

**137.** Mr. Cooper did not help compile the TTV Challenge Lists. Cooper Resp. to First Interrogs. Resp. Nos. 1-4.

**Scott Berson Statement of Facts**

**138.** Alton Russell submitted a § 230 Challenge in Muscogee County, which included Plaintiff Scott Berson. Plaintiff Scott Berson's Responses to Defendants' First Set of Interrogatories (Jun. 23, 2021) ("**Berson Resp. to**

**Defs.' Stmt.
Undisputed Facts**          38

**Interrogs.**"), Ex. T, Resp. No. 3.

**139.** Mr. Berson was never contacted directly by any Challenger, including any Named Defendant. Berson Resp. to Interrogs., Resp. No. 14.

**140.** Mr. Berson "read in the Columbus Ledger-Enquirer that challenges had been filed against people with out-of-state mailing addresses and I figured I was probably on the list." Berson Resp. to Interrogs., Resp. No. 6.

**141.** He subsequently "received a phone call from a community organizer" informing him he had been challenged, but he doesn't know the identity of the person who called him. Berson Resp. to Interrogs., Resp. No. 6.

**142.** Mr. Berson cast a provisional ballot in the run-off election, which was subsequently counted after he verified his eligibility with Muscogee County election officials. Berson Resp. to Interrogs., Resp. No. 12, 13.

**143.** Mr. Berson describes having to find suitable identification and proof of residency after changing mailing addresses as "extremely frustrating and burdensome." Berson Resp. to Interrogs., Resp. No. 8.

### Jocelyn Heredia Statement of Facts

**144.** Ms. Heredia was a Challenged Voter in Banks County. Transcript

**Defs.' Stmt.**
**Undisputed Facts**                     39

Excerpts of Deposition of Jocelyn Heredia (Oct. 15, 2021) ("**Heredia Tr.**"), Ex. U, 20:13-21:7.

**145.** TTV filed an open records request with Banks County regarding its Challenge there, Banks County ORR, Ex. V, Def TTV 1836-37; the County responded with minutes from a meeting that showed it dismissed the Challenge List because no one requested a probable cause hearing. Banks County Board Minutes, Ex. W, Def TTV 1838.

**146.** Ms. Heredia testified that Banks County, not any Challenger, published her name on its website. Heredia Tr. 31:22-32:3.

**147.** Ms. Heredia did submit a change of address form. Heredia Tr. 13:1-13.

**148.** Ms. Heredia testified that no one said anything to her while she was standing in line to vote that intimidated her or targeted her. Heredia Tr. 48:16-49:3.

**149.** However, Ms. Heredia testified she felt "intimidated from the get-go," as soon as she got to the polling location because she was the only Hispanic person in line to vote in a predominantly Republican county. Heredia Tr. 48:1-9.

**150.** Ms. Heredia testified that she did not know she was Challenged until

**Defs.' Stmt.**
**Undisputed Facts**                40

later, when she got into the polling location. Heredia Tr. 49:4-50:2.

**151.** Ms. Heredia testified her feeling of intimidation increased when she learned she had been Challenged based upon her change of address. Heredia Tr. 48:10-15.

**152.** Ms. Heredia testified that because she was Challenged, election officials asked her to fill out a paper ballot. Heredia Tr. 23:22-24:7.

**153.** The election officials explained to Ms. Heredia that if she provided the requisite proof of residency at her voter registration address, her provisional ballot would be counted. Heredia Tr. 23:22-24:13.

**154.** Ms. Heredia testified that she submitted the provisional ballot and provided the election officials with proof of her residency in Banks County. Heredia Tr. 24:8-13.

**155.** Ms. Heredia testified that a woman "of Asian descent" was also in the separate line to file a provisional ballot, but she does not know if that woman was a Challenged Voter or was filing a provisional ballot for some other reason. Heredia Tr. 45:9-14.

**Doe Plaintiffs Statement of Facts**

**Defs.' Stmt.
Undisputed Facts**                     41

**156.** Doe Plaintiffs both declared that they learned of their Challenge when they "read a story in the local paper about True the Vote's challenges and saw my name and address had been published online." ECF No. 26, ¶ 5.

**157.** Doe Plaintiffs assert "Defendants published a list with my address on it." *id.* at ¶ 8.

**158.** The Doe Plaintiffs assert they were "extremely upset" when they learned their eligibility to vote had been challenged. *Id.* at ¶ 5.

**159.** The Doe Plaintiffs declared that the Challenge would not prevent either one of them from voting in the run-off election, but they feared they "could" become the target of harassment "from Defendants and their supporters." *Id.* at ¶ 8.

**Defs.' Stmt.
Undisputed Facts**                                      42

Dated: May 16, 2022                              Respectfully Submitted,

*/s/ David F. Guldenschuh*                       */s/ James Bopp, Jr.*
David F. Guldenschuh                             James Bopp, Jr.,* IN # 2838-84
GA Bar No. 315175                                  jboppjr@aol.com
David F. Guldenschuh P.C.                        Jeffrey P. Gallant,* VA # 46876
P.O. Box 3                                         jgallant@bopplaw.com
Rome, Georgia 30162-0333                         Courtney Turner Milbank,* IN#
Telephone: 706-295-0333                          32178-29
Email: dfg@guldenschuhlaw.com                      cmilbank@bopplaw.com
*Local Counsel for Defendants*                   Melena Siebert,* IN # 35061-15
                                                   msiebert@bopplaw.com
                                                 THE BOPP LAW FIRM, PC
                                                 1 South 6th Street
                                                 Terre Haute, Indiana 47807
                                                 Telephone: (812) 232-2434
                                                 Facsimile: (812) 235-3685
                                                 *Lead Counsel for Defendants*
                                                 *Admitted Pro hac vice*

**Defs.' Stmt.**
**Undisputed Facts**          43