United States District Court
Northern District of Georgia
Gainesville Division

| | |
|---|---|
| **Fair Fight, Inc., John Doe,** and **Jane Doe**, <br><br> *Plaintiffs* and *Counter-Defendants*, <br><br> v. <br><br> **True the Vote, Inc., Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, James Cooper,** and **John Does 1-10**, <br><br> *Defendants* and *Counter-Plaintiffs*, <br><br> **Fair Fight Action, Inc.,** <br> *Counter-Defendants*. | Civ. No. 2:20-cv-00302-SCJ <br><br> Hon: Steve C. Jones |

**Defendant True the Vote, Inc.'s Responses to Plaintiffs' Second Interrogatories**

Pursuant to Federal Rule of Civil Procedure 33, Defendant True the Vote, Inc. ("TTV") responds to Plaintiffs' Second Interrogatories.

# General Objections

1. Defendant TTV objects to these requests to the extent that they purport to

**Def. TTV
Resp. to 2d Interrog.**                    1

call for the production of documents/information that: (a) contain privileged attorney-client communications; (b) constitute attorney work product; (c) disclose the mental impressions, conclusions, opinions, or legal theories of any attorneys or other representatives of the Plaintiffs; (d) were prepared in anticipation of litigation; or (e) are otherwise protected from disclosure under applicable privileges, immunities, laws, or rules.

2. Defendant TTV objects to these requests to the extent that they are vague, not limited in scope, unreasonably broad and burdensome, or beyond the scope of either category of permissible discovery under Fed. R. Civ. P. 26(b)(1).

3. Defendant TTV objects to the instructions accompanying the requests to the extent that they purport to impose obligations beyond those imposed by the Federal Rules of Civil Procedure, or any order promulgated by this Court.

4. Defendant TTV objects to discovery requests that are not proportional to the needs of the case and that are not "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).

5. Defendant TTV objects to requests for information the benefit of which is outweighed by its lack of importance in resolving the issues at stake in this case,

the amount in controversy, the parties' relative access to relevant information, the parties' resources, and whether the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed. R. Civ. P. 26(b)(1). Consistent with this rule, Defendant TTV does not produce multiple copies of a communication, e.g., where one email chain has multiple communications, earlier included ones are not produced as separate documents.

6.  Subject to and without waiving any of the foregoing General Objections, which are hereby incorporated into each specific response, Defendant TTV (a) makes further objections in response to individual requests and (b) makes the required good-faith attempt to fulfill the duty to provide all responsive information readily available without undue labor and expense.

7.  Defendant TTV objects to producing individuals' personal information, including emails and phone numbers, based upon privacy and relevancy.

## Definitions

Except as specifically defined below, the terms used in these requests shall be construed and defined in accordance with the Federal Rules of Civil Procedure, wherever applicable. Any terms not defined shall be given their ordinary meaning.

**Def. TTV**
**Resp. to 2d Interrog.**                3

1.      "Communication" means any transfer of information, whether written, oral, electronic, or otherwise, and includes transfers of information via email, report, letter, text message, voicemail message, written memorandum, note, summary, and other means. It includes communications entirely internal to True the Vote, as well as communications that include or are with entities and individuals outside of that organization.

2.      "Comprehensive Ballot Security Initiative" means your program announced in your December 15, 2020 Press Release, including, but not limited to, the Election Integrity Hotline, plans to monitor absentee ballot drop boxes, and "other nonpartisan election integrity initiatives."

3.      "County" means any county in Georgia, as well as all employees, staff, agents, and representatives of the county, including the county boards of registrar's offices, county registrars, or any other person with a responsibility for conducting or supervising elections in the county.

4.      "Date" means the exact day, month, and year, if ascertainable, or, if not, the est available approximation (including relationship to other events).

5.      "December 18, 2020 Press Release" means the press release posted on your

**Def. TTV**
**Resp. to 2d Interrog.**                4

Ex. A to Defs.' Statement of Facts

Website on that date, attached hereto as <u>Exhibit A</u>.

6.  "December 14, 2020 Press Release" means the press release posted on your Website on that date, attached hereto as Exhibit B.

7.  "December 15, 2020 Press Release" means the press release posted on your Website on that date, attached hereto as <u>Exhibit E</u>.

8.  "Describe" means explain with particularity.

9.  "Document" is synonymous in meaning and scope to the term "document" as used under Federal Rule of Civil Procedure 34 and the definitions for "writings and recordings" as set forth in Federal Rule of Evidence 1001, and it includes records, reports, lists, data, statistics, summaries, analyses, communications (as defined above), any computer discs, tapes, printouts, emails, databases, and any handwritten, typewritten, printed, electronically recorded, taped, graphic, machine-readable, or other material, of whatever nature and in whatever form, including all non-identical copies and drafts thereof, and all copies bearing any notation or mark not found on the original.

10. "Election" means any special or regularly-scheduled general election or run-off election held in the State of Georgia for any publicly elected office.

**Def. TTV**
**Resp. to 2d Interrog.**                5

11. "Georgia Elector Challenges" means the challenges to voter eligibility of registered Georgia voters in advance of the Run-off Election in which you have been and are involved and which are described, among other places, in your December 18, 2020 Press Release.

12. "Georgia Republican Party" means the state and/or county committees of the Republican Party, which works to elect Republican candidates to elected office, and their former, current, and/or future employees, staff, agents, consultants, and representatives. This term specifically encompasses the Georgia Republican Party that you announced a "partnership" with in your December 14, 2020 Press Release.

13. "Identify," when used in reference to a communication, means to state when and where the communication was made; each of the makers and recipients thereof, in addition to all others present; the medium of communication; and its substance.

14. "Identify," when used in reference to a government agency, firm, partnership, corporation, proprietorship, association, other entity, or person, means

**Def. TTV**
**Resp. to 2d Interrog.**                    6

to state its, his, or her full name and present or last-known address.

15. "Identify," when used in reference to processes or steps taken by you or others with whom you have worked on the matters at issue in this litigation, means to chronologically detail each and every action taken by any and all entities or persons, to identify the actor, and to detail how and when that action was or will be taken and for how long.

16. "Including" means "including but not limited to."

17. "November 10, 2020 Press Release" means the press release posted on your Website on that date, attached hereto as Exhibit C.

18. "November Election" means the most recent election that was held in Georgia that culminated on Election Day on November 3, 2020, to include the general election and the special election held on that date.

19. "Person" means not only natural persons, but also firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, trust groups, and organizations; federal, state, or local governments or government agencies, offices, bureaus, departments, or entities; other legal, business, or government entities; and all subsidiaries, affiliates,

**Def. TTV**
**Resp. to 2d Interrog.**                                  7

divisions, departments, branches, and other units thereof or any combination thereof.

20. "Relating to," "regarding," and their cognates are to be understood in their broadest sense and shall be construed to include pertaining to, commenting on, memorializing, reflecting, recording, setting forth, describing, evidencing, or constituting.

21. "Run-off Election" means the January 5, 2021 Senate Run-off election held in Georgia.

22. "Targeted Voter" or "Targeted Voters" means the registered Georgia voters who are the subject of the Georgia Elector Challenges.

23. "True the Vote Website" or "Website" means your website maintained at https://truethevote.org, a hard copy of the current home page is attached hereto as Exhibit D.

24. "Validate the Vote" Program refers to the initiative announced in your November 10, 2020 Press Release which you claim "[e]stablishes a whistleblower fund in excess of $1 million to support those who come forward with credible evidence of criminal malfeasance; takes the steps to resolve illegal actions through

litigation and ensure the final vote tally is valid to maintain public confidence in U.S. election system."

25. "Voter" means any registered voter in Georgia and all persons who may properly register to vote in the state by the close of discovery in this case.

26. "You" and "your" means the organization that goes by the name of True the Vote, Inc., its officers, directors, partners, members, managers, employees, representatives, agents, consultants, or anyone acting on its behalf.

## Interrogatories

**Interrogatory No. 10:** Describe in detail your involvement in any other elector challenges that were filed in Georgia in the six months leading up to the November Election.

**Response:** True the Vote had no involvement in any other elector challenges that were filed in Georgia in the six months leading up to the November election.

**Interrogatory No. 11:** Identify all "Georgia volunteers serving as challengers" (as described in your response to Interrogatory No. 1) who withdrew or attempted to withdraw Georgia Elector Challenges submitted in their names, and describe in detail the reasons why those individuals sought to withdraw the

challenges.

**Response:** Clair Joseph Martin was the only Georgia volunteer serving as a challenger who withdrew or attempted to withdraw a Georgia Elector Challenge in his or her name.

James Cooper initially contacted Clair Joseph Martin to see if he would give True the Vote permission to submit Georgia Elector Challenges on his behalf in Taliaferro County and included the Taliaferro County challenge list in my email to Mr. Martin. Mr. Martin gave such permission via email. Before True the Vote could submit the challenges for Taliaferro County Challenge List on his behalf, Mr. Martin submitted challenges to three of the voters who were on the challenge list for Taliaferro County and who had also requested absentee ballots for the Run-off election.

After Mr. Martin submitted these three challenges, he emailed James Cooper on December 20, 2020, stating that two of the three challenges were for people who were eligible to vote in Taliaferro County. Later that same day, Mr. Martin asked, via an email to True the Vote and James Cooper, to "hold" the Taliaferro County challenges on his behalf. Mr. Cooper then emailed Mr. Martin's request to

**Def. TTV
Resp. to 2d Interrog.**                10

hold his challenges to True the Vote. On December 21, 2020, True the Vote submitted Mr. Martin's withdrawal of his challenges to Taliaferro County.

Following TTV's withdrawal of Mr. Martin's challenges, he emailed Mr. cooper to report that the Taliaferro County Chief Registrar did confirm with him that one of the three people on his challenge list did not live in Taliaferro County and the absentee ballot for that voter was rejected.

**Interrogatory No. 12:** Identify and describe in detail each instance in which you or the "Georgia volunteers serving as challengers" (as described in your response to Interrogatory No. 1) learned that a Targeted Voter was in fact a resident of the County in which they were registered to vote, and what, if any, steps you took in response to learning such information.

**Response:** Other than the communications involving Mr. Martin described in TTV's Response No. 11, TTV knows of no other instance in which TTV or the "Georgia volunteers serving as challengers"learned that a Targeted Voter was in fact a resident of the County in which they were registered to vote.

Under a Section 230 challenge allowed by Georgia law, the challenger submits challenges to his or her county election board. After the challenger

**Def. TTV
Resp. to 2d Interrog.**                                    11

submits these challenges, the county board of elections has the responsibility to determine if the challenge provides enough probable cause for further action under the law. If so, the challenged voters may be "flagged" by the county election board. When flagged, the challenged voter is not removed from the voting rolls and is not prevented from casting a ballot. If a flagged voter subsequently submits an absentee ballot or attempts to cast an in-person ballot, that voter will be asked by county election officials to provide identification showing eligibility to vote in that particular county. If the voter cannot provide that identification, that challenged voter is still able to cast a provisional ballot or follow other procedures for "curing" their registration. The county does not have the responsibility to inform the challenger of the outcome of any particular challenge. Therefore, neither the individual challengers nor TTV would have been expected to, and did not, learn of the results of the challenges, including the final determination of the residency or voter eligibility of any particular challenged voter.

In most of the counties in which TTV submitted challenges on individual challenger's behalf, the board of elections declined to find probable cause or declined to pursue the challenges in any way.

**Def. TTV**
**Resp. to 2d Interrog.**                    12

**Interrogatory No. 13:** List all counties in Georgia in which you submitted, or partnered with "Georgia volunteers" to submit, Georgia Elector Challenges.

**Response:** Previously answered. *See* Defendant True the Vote, Inc.'s Amended Responses to Plaintiffs' First Requests for Production, Response to Request for Production No. 2.

**Interrogatory No. 14:** Describe in detail why you did not submit Elector Challenges to all 159 Georgia Counties as you claimed in your December 18, 2020 Press Release.

**Response:** At the time of the press release on December 18, 2020, True the Vote compiled challenge lists for all 159 counties and intended to submit challenges on behalf of challengers in all of them. In order to do so, True the Vote needed eligible voters to volunteer to serve as challengers in each of these counties.

The press release was designed as a tool to recruit challengers as well as inform people of True the Vote's plans. On the same day as True the Vote's press release was issued, Mark Elias sent letters to the Boards of Elections in several Georgia counties. *See, e.g.*, Def. TTV 1455. Several people who served as

**Def. TTV**
**Resp. to 2d Interrog.**                13

challengers started to receive intimidating and harassing messages via email and social media. As the Run-off election neared and the intimidation and harassment of challengers increased, True the Vote did not receive authorization to submit the challenge list from a registered voter in every Georgia county. Therefore, True the Vote did not submit challenges in all of Georgia's 159 counties as originally planned, but only submitted challenges in the counties noted in Defendant True the Vote, Inc.'s Amended Responses to Plaintiffs' First Requests for Production, Response to Request for Production No. 2.

I, the undersigned, affirm under the penalties for perjury that the foregoing answers to Plaintiff's Interrogatories are true and correct.

Date: _____06/07/21_____   _____
                                Catherine Engelbrecht, President
                                True the Vote, Inc.

| | |
|---|---|
| Dated: June 7, 2021 | Respectfully Submitted, |
| /s/ Courtney Kramer<br>Courtney Kramer, GA No. 483608<br>ckramer@bopplaw.com | James Bopp, Jr.,* IN # 2838-84<br>  jboppjr@aol.com<br>Jeffrey P. Gallant,* VA # 46876<br>  jgallant@bopplaw.com |
| Courtney Kramer, Of Counsel<br>THE BOPP LAW FIRM, PC<br>821 Atlanta St.<br>Roswell, GA 30075<br>Telephone: (770) 715-2646<br>Facsimile: (812) 235-3685<br>*Local Counsel for Defendants* | Courtney Turner Milbank,* IN# 32178-29<br>  cmilbank@bopplaw.com<br>Melena Siebert,* IN # 35061-15<br>  msiebert@bopplaw.com<br>THE BOPP LAW FIRM, PC<br>1 South 6th Street<br>Terre Haute, Indiana 47807<br>Telephone: (812) 232-2434<br>Facsimile: (812) 235-3685<br>*Lead Counsel for Defendants*<br>**Admitted Pro hac vice* |

**Def. TTV**
**Resp. to 2d Interrog.**                15

Ex. A to Defs.' Statement of Facts

# Certificate of Service

I hereby certify that the foregoing document was served electronically on June 7, 2021, upon all counsel of record via email.

*/s/ Melena S. Siebert*
Melena S. Siebert
Indiana Bar No. 35061-15
*Counsel for Defendants*
*\*Admitted Pro hac vice*

**Def. TTV**
**Resp. to 2d Interrog.** 17

Ex. A to Defs.' Statement of Facts