Page 1

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

-------------------------------X
FAIR FIGHT, INC., SCOTT BERSON,)
JOCELYN HEREDIA, and JANE DOE, )
      Plaintiffs,     )
                          )
      vs.             )Case No.
                         )2:20-cv-00302-SCJ
TRUE THE VOTE, CATHERINE    )
ENGELBRECHT, DEREK SOMERVILLE, )
MARK DAVIS, MARK WILLIAMS,    )
RON JOHNSON, JAMES COOPER, and )
JOHN DOES 1-10.          )
      Defendants.    )
                         )
FAIR FIGHT ACTION, INC.,    )
      Counter-Defendant. )
-------------------------------X

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
30(b)(6) VIDEOTAPED DEPOSITION OF
CATHERINE ENGELBRECHT
APPEARING REMOTELY
Wednesday, January 26, 2022
8:05 a.m. Central Time

Reported by:  Lori J. Goodin, RPR, CLR, CRR
RSA, California CSR #13959

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Ex. D to Defs.' Statement of Facts

Page 2

```
 1                  REMOTE APPEARANCES
 2
 3   FOR PLAINTIFFS:
         ELIAS LAW GROUP
 4       UZOMA N. NKWONTA, ESQUIRE
         MARCOS MOCINE-MCQUEEN, ESQUIRE
 5       JACOB SHELLY, ESQUIRE
         JOEL RAMIREZ, ESQUIRE
 6       10 G Street, Northeast
         Suite 600
 7       Washington, D.C.  20002
         202-968-4490
 8       unkwonta@elias.law
         mmcqueen@elias.law
 9       jshelly@elias.law
         jramirez@elias.law
10   AND CO-COUNSEL:
         LAWRENCE & BUNDY LLC
11       LESLIE J. BRYAN, ESQUIRE
         1180 West Peachtree Street
12       Suite 1650
         Atlanta, Georgia  30309
13       404-400-3350
         leslie.bryan@lawrencebundy.com
14   AND CO-COUNSEL:
         SANDLER REIFF LAMB ROSENSTEIN
15       & BIRKENSTOCK, P.C.
         DARA LINDENBAUM, ESQUIRE
16       1090 Vermont Avenue, Northwest
         Suite 750
17       Washington, D.C.  20005
         202-479-1111
18       lindenbaum@sandlerreiff.com
19
20
21
22
```

Ex. D to Defs.' Statement of Facts

Page 3

1            REMOTE APPEARANCES CONTINUED

2

3    FOR DEFENDANTS:

4        THE BOPP LAW FIRM, PC

5        JAMES BOPP, JR., ESQUIRE

6        MELENA SIEBERT, ESQUIRE

7        1 South 6th Street

8        Terre Haute, Indiana   47807

9        812-232-2434

10       jboppjr@aol.com

11       msiebert@bopplaw.com

12

13   Also present:

14       Joe Cerda, video/document technician

15

16

17

18

19

20

21

22

Ex. D to Defs.' Statement of Facts

Page 4

```
 1                  INDEX TO EXAMINATION

 2   WITNESS:  CATHERINE ENGELBRECHT

 3   EXAMINATION BY                        PAGE

 4   MR. NKWONTA                            10

 5   MS. SIEBERT                           337

 6

 7                  INDEX TO EXHIBITS

 8               CATHERINE ENGELBRECHT

 9       Fair Fight, Inc., et al. v. True the Vote

10               Wednesday, January 26, 2022

11             Lori J. Goodin, RPR, CLR, CRR,

12               RSA, California CSR #13959

13   EXHIBIT    DESCRIPTION                PAGE

14   Exhibit  1  Validate the Vote 2020 document  266

15   Exhibit  1A Crawford e-mail, 11/21/20      333

16   Exhibit  8  TrueAppend Report, 12/16/20    244

17   Exhibit  9  Engelbrecht e-mail, 12/16/20   219

18   Exhibit 13  Williams e-mail, 12/18/20      219

19   Exhibit 15  Williams e-mail, 12/12/20      140

20   Exhibit 16  Count by Race and Party        248

21   Exhibit 19  True the Vote invitation

22               to join a Zoom call, 12/19/20  159
```

Ex. D to Defs.' Statement of Facts

Page 5

1                    INDEX TO EXHIBITS

2                  CATHERINE ENGELBRECHT

3        Fair Fight, Inc., et al. v. True the Vote

4                 Wednesday, January 26, 2022

5               Lori J. Goodin, RPR, CLR, CRR,

6                 RSA, California CSR #13959

7   EXHIBIT      DESCRIPTION                       PAGE

8   Exhibit 20  Engelbrecht text, 12/17/20         173

9   Exhibit 21  True the Vote invoice, 12/7/20     178

10  Exhibit 25  Holsworth e-mail, 12/30/20         197

11  Exhibit 26  E-mail chain, 12/28/20             201

12  Exhibit 30  Engelbrecht e-mail, 12/21/20       161

13  Exhibit 35  Reports from the Voter Integrity

                Hotline                            84

14  Exhibit 36  E-mail chain, 12/18/20             226

15  Exhibit 37  Cooper e-mail, 12/15/20            241

16  Exhibit 38  Cooper e-mail, 12/18/20            239

17  Exhibit 39  Cooper e-mail, 12/15/20            237

18  Exhibit 40  Cooper e-mail, 12/19/20            240

19  Exhibit 44  Brightbart article                 324

20  Exhibit 46  IPS article, 11/5/12               211

21  Exhibit 47  Gateway Pundit article, 9/24/20   322

22

Ex. D to Defs.' Statement of Facts

Page 6

```
 1                    INDEX TO EXHIBITS
 2                 CATHERINE ENGELBRECHT
 3       Fair Fight, Inc., et al. v. True the Vote
 4               Wednesday, January 26, 2022
 5             Lori J. Goodin, RPR, CLR, CRR,
 6               RSA, California CSR #13959
 7    EXHIBIT    DESCRIPTION                    PAGE
 8    Exhibit 61  True the Vote press release about
                  the Georgia Election Integrity
 9                Hotline                        95
10    Exhibit 62  True the Vote press release    252
11    Exhibit 63  True the Vote blog post,
                  11/10/20                       314
12    Exhibit 64  Audio transcript from True the
                  Vote Live                      69
13    Exhibit 65  Audio transcript of Seals in the
                  Polls, 8/13/21                 60
14    Exhibit 66  Georgia lawsuit, 11/11/20      280
15    Exhibit 71  Eshelman e-mail, 5/11/20       291
16    Exhibit 72  Time for a Hero Facebook page  258
17    Exhibit 73  Crusade for Freedom tweet      263
18    Exhibit 74  990EZ for Time for a Hero, 2019  47
19    Exhibit 75  Notice of Deposition for
                  Catherine Engelbrecht          20
20    Exhibit 76  30(b)(6) Notice issued to
                  True the Vote                  18
21    Exhibit 79  True the Vote's Second
                  Amended Response               92
22
```

Ex. D to Defs.' Statement of Facts

```
                                                      Page 7

 1                  INDEX TO EXHIBITS

 2                CATHERINE ENGELBRECHT

 3        Fair Fight, Inc., et al. v. True the Vote

 4               Wednesday, January 26, 2022

 5              Lori J. Goodin, RPR, CLR, CRR,

 6               RSA, California CSR #13959

 7     EXHIBIT    DESCRIPTION                    PAGE

 8     Exhibit 81  True the Vote, Inc.'s Responses

 9                 to Plaintiffs' First

10                 Interrogatories               164

11     Exhibit 84  True the Vote, Inc.'s Amended

12                 Responses to Plaintiffs' First

13                 Request for Admission         162

14

15

16

17                 (All exhibits were provided

18                 electronically to the reporter.)

19

20

21

22
```

Ex. D to Defs.' Statement of Facts

Page 8

```
1            WEDNESDAY, JANUARY 26, 2022, 8:05 A.M.

2

3                   PROCEEDINGS

4            THE VIDEOGRAPHER:  We are now

5      beginning this video deposition.  Today's

6      date is January 26, 2022.  The time on the

7      video record is 8:05 a.m.

8            This is the deposition of Catherine

9      Engelbrecht, taken in the matter of Fair

10     Fight, Inc. versus True the Vote.

11           Will counsel please identify

12     themselves for the record and whom they

13     represent.

14           MR. NKWONTA:  Good morning.  My name

15     is Uzoma Nkwonta, and I represent the

16     plaintiffs in this case.  I am joined with

17     co-counsel.  I will let them represent

18     themselves -- or introduce themselves, I

19     should say, I'm sorry.

20           MS. BRYAN:  Good morning.  This is

21     Leslie Bryan from Lawrence and Bundy.  I

22     represent the plaintiffs.
```

Ex. D to Defs.' Statement of Facts

Page 9

1               MS. LINDENBAUM:  Good morning.  This

2       is Dara Lindenbaum from Sandler Reiff Lamb

3       Rosenstein & Birkenstock, also representing

4       the plaintiffs.

5               MR. SHELLY:  Jacob Shelly with Elias

6       Law Group with plaintiffs.

7               MR. RAMIREZ:  Joel Ramirez with

8       Elias Law Group with plaintiffs.

9               MR. MOCINE-MCQUEEN:  Marcos

10      Mocine-McQueen, Elias Law Group with the

11      plaintiffs.

12              THE VIDEOGRAPHER:  Okay.  Counsel,

13      and before we swear in the witness, do all

14      parties agree or stipulate to the witness

15      being sworn in remotely through Zoom?

16              MR. NKWONTA:  Yes, plaintiffs agree.

17              MR. BOPP:  And I don't think I

18      entered my appearance.  I am James Bopp,

19      representing the defendants and both -- and

20      representing both deponents in this action --

21      in this matter here today.

22              And, Melena Siebert will probably be

Page 10

1        joining us later, who is also counsel for the

2        defendants.  And we consent to remote

3        deposition.

4                    THE VIDEOGRAPHER:  Okay, counsel.

5        With that being said, we will swear in the

6        witness, thanks.

7                           *   *   *

8    Whereupon,

9                    CATHERINE ENGELBRECHT,

10   a witness called for examination, having been

11   first duly sworn, was examined and testified as

12   follows:

13                          *   *   *

14                    EXAMINATION

15   BY MR. NKWONTA:

16        Q.    Morning, Ms. Engelbrecht.

17        A.    Good morning.

18        Q.    My name is Uzoma Nkwonta.  As I

19   mentioned before, I represent the plaintiffs in

20   this case.

21             And, my understanding is that you

22   are appearing today in your personal capacity and

Ex. D to Defs.' Statement of Facts

Page 11

1 as the representative of True the Vote.  Is that

2 correct?

3    A. Yes.

4    Q. Great.  Ma'am, I just want to ask

5 you a few preliminary questions before we get

6 into the mechanics of the deposition.

7      Have you been deposed before?

8    A. No.

9    Q. So, this is your first time?

10    A. It is.  Yes.

11    Q. In that case, I would like to go

12 over a few ground rules for the deposition just

13 so that we all proceed with the same

14 understanding.

15      So, the testimony today, all of your

16 testimony today, as you have heard is under oath

17 just as if you were testifying in court.  Is that

18 fair?

19    A. Yes.

20    Q. And if at any point you don't

21 understand a question that I'm asking, just let

22 me know.  I will do my best to rephrase the

Ex. D to Defs.' Statement of Facts

Page 12

1    question or be a little bit clearer.

2              And if you do answer the question,

3    then I will assume that you understood the

4    question.  Is that fair?

5         A.   Yes.

6         Q.   Okay.  And for the benefit of

7    everyone and the court reporter, I would ask that

8    you continue to do as you are doing now and

9    answer audibly with yeses or nos, rather than

10   head nods or head shakes or gestures so that the

11   court reporter can keep an accurate record.  Does

12   that sound good?

13        A.   Yes.

14        Q.   During the deposition, I would ask

15   that you allow me to finish my question before

16   giving your answer and I will do the same.  And

17   that will help us have a clean transcript at the

18   end.  Is that fair?

19        A.   Yes.

20        Q.   From time to time your attorney may

21   make an objection to my question.  And that is

22   fine.

Ex. D to Defs.' Statement of Facts

Page 13

1     You are okay to answer the question

2 unless your attorney instructs you not to answer

3 the question after he makes his objection.

4     Is that fair?

5 A. Yes.

6 Q. If there is any time with which you

7 would like to take a break, just let me know.

8 And I will find a good place to stop the

9 questioning so you can take a break.

10     I would only ask that if I am in the

11 middle of a question or if there is a question

12 pending that you would answer the question before

13 taking a break.

14     Is that fair?

15 A. Yes.

16 Q. And I know you mentioned this

17 earlier, I'm not sure if it was on the record or

18 off the record.

19     But would you mind repeating where

20 you were located for this deposition?

21 A. Cat Spring, Texas.

22 Q. And could you give me the address of

Ex. D to Defs.' Statement of Facts

Page 14

1   where you are located for this deposition?

2          A.    Sure.   The full address?

3          Q.    Yes, please.

4          A.    Yes, okay.  Sure.   13909 Track Road

5   in Cat Spring, Texas.

6          Q.    And how are you viewing this

7   deposition?  Are you on a laptop or are you on a

8   phone or some other device?

9          A.    I am on laptop.

10         Q.    And is there anyone in the room with

11  you currently?

12         A.    No.

13         Q.    And do you have any documents with

14  you currently?

15         A.    No.

16         Q.    Do you have any devices with

17  electronic copies of documents with you?

18         A.    No.   I have my -- I mean this is

19  probably too extreme, but I have my phone and I

20  have my headphone cases and that is it and a cup

21  of coffee.

22         Q.    All right.   So, because we are

Ex. D to Defs.' Statement of Facts

Page 15

1    taking this deposition remotely, I may not be

2    able to see what you have in front of you or who

3    may enter the room.

4              And I just want to clarify that it

5    would not be appropriate for your attorney or

6    anyone else to tell you how to answer a specific

7    question that I ask.

8              And ask you to agree not to exchange

9    any communication with anyone whether by text or

10   e-mail related to the questions that I ask during

11   the deposition.  Is that fair?

12        A.    Yes.

13        Q.    Great.  So, we will get into some of

14   my additional preliminary questions now that we

15   have set those ground rules.

16              How did you prepare to testify

17   today?

18        A.    Spoke with my attorney.  Reviewed

19   all of the documents that we had submitted

20   heretofore.  Reviewed the questions that were

21   outlined as being the primary subject matters for

22   today's review.  And I guess that is really about

Ex. D to Defs.' Statement of Facts

Page 16

1    it.

2         Q.    Okay.  And when did you speak with

3    your attorney, without disclosing what you

4    discussed?

5         A.    Yesterday -- or, no.  Monday,

6    Monday.

7         Q.    And approximately how much time

8    would you say you spent preparing for this

9    deposition, again without disclosing the

10   specifics of what you have discussed?

11        A.    Five or six hours.  Six hours.

12        Q.    All right.  And are you on any

13   medication today that would affect your ability

14   to testify truthfully or to respond truthfully to

15   any of my questions?

16        A.    No.

17        Q.    Excellent.

18             MR. NKWONTA:  Could we pull up

19       Exhibit 76, please.  Or Document 76.

20             MR. BOPP:  This might be a good

21       time, as I did yesterday.  I would like to,

22       with your agreement, enter a, enter a

Ex. D to Defs.' Statement of Facts

Page 17

1      continuing objection.  And the continuing

2      objection means I won't have to object

3      repeatedly over the same things that have

4      already been decided by the court which we

5      understand, but we want to preserve our

6      objections.

7              We object to any questions

8      concerning activities before the 2016

9      election, meaning in previous elections prior

10     to 2016.

11             Any questions regarding any

12     activities other than in the State of

13     Georgia, any activities other than voter

14     eligibility challenges, preelection to the

15     Georgia runoff, and any questions regarding

16     the activities of King Street Patriots.

17             MR. NKWONTA:  Understood.  And so my

18     understanding is that will be your standing

19     objection.

20             To clarify on our end, will you be

21     instructing your witness not to answer

22     questions in light of those objections or

Ex. D to Defs.' Statement of Facts

Page 18

1      subject to those objections?

2              MR. BOPP:  No, if -- no.  And as I

3      did -- I just didn't.  I -- as long as they

4      are within the subject matter and within the

5      court orders, the parameters of this court

6      order, she will be permitted to answer for

7      sure.

8              MR. NKWONTA:  All right.  So, I

9      think that means we can proceed.

10             MR. BOPP:  And if it ever occurs, I

11     mean I would do it if the question -- at the

12     time of the question.  I'm not giving a

13     blanket, you know, advice to my client on how

14     to handle questions.  Those would have to

15     arise, if they arose.

16             MR. NKWONTA:  Understood.  I

17     appreciate that.  So, I think we are all set

18     to proceed.

19                 (Exhibit 76 marked for

20                   identification.)

21   BY MR. NKWONTA:

22     Q.    Ms. Engelbrecht, the document that

Ex. D to Defs.' Statement of Facts

Page 19

1    has just been shared with you, and I guess with

2    everyone on the Zoom call, is Exhibit 76, or

3    Document 76, which is the 30(b)(6) Notice issued

4    to True the Vote.

5              Have you seen this document before?

6         A.   Yes.

7         Q.   And do you understand that you have

8    been designated as a representative to answer

9    questions on behalf of True the Vote, Inc.  or

10   True the Vote?

11        A.   Yes.  Yes.

12             MR. NKWONTA:  Can we scroll down a

13      few pages to Exhibit A, please.

14             Sorry, next page.  The page right

15      after.

16   BY MR. NKWONTA:

17        Q.   And have you reviewed these topics

18   in Exhibit A of the 30(b)(6) Notice?

19        A.   Yes.

20        Q.   Are you prepared to testify about

21   all of these topics in Exhibit A of the 30(b)(6)

22   Notice?

Ex. D to Defs.' Statement of Facts

Page 20

1        A.    Yes.

2        Q.    Great.

3              MR. NKWONTA:  You can take that

4     down.  And can we pull up Document 75,

5     please.

6                    (Exhibit 75 marked for

7                     identification.)

8  BY MR. NKWONTA:

9        Q.    Ms. Engelbrecht, do you recognize

10 Document 75?  Have you seen this document before?

11       A.    Yes.

12       Q.    And this is a deposition notice

13 issued to you individually; is that correct?

14       A.    Yes.

15       Q.    And do you understand that you are

16 also being deposed today in your individual

17 capacity?

18       A.    Yes.

19       Q.    Okay.  And as we have done with the

20 prior deposition in this case, we will ask that

21 you agree that your answers today will be

22 attributed to you and/or True the Vote, unless we

Ex. D to Defs.' Statement of Facts

Page 21

1   specify otherwise, or you specify otherwise in

2   the deposition in response to that question.  Is

3   that fair?

4          A.    Yes.

5                MR. NKWONTA:  And do you agree to

6       that, counsel.

7                MR. BOPP:  Do I agree to what?

8                MR. NKWONTA:  That Ms. Engelbrecht's

9       answers will be attributed to Ms. Engelbrecht

10      and True the Vote, unless she specifies

11      otherwise in response, just as we did

12      yesterday?

13               MR. BOPP:  I assume your questions

14      are directed at her in both capacities.

15               THE VIDEOGRAPHER:  And counsel,

16      sorry.  I apologize.  This is Joe.  I just

17      want to make sure for clarity that

18      Document 75 and 76, will those be entered

19      into as exhibits?

20               MR. NKWONTA:  Yes, those will be

21      entered in as exhibits.

22               I think what might be best is I will

Ex. D to Defs.' Statement of Facts

Case 2:20-cv-00302-SCJ   Document 155-7   Filed 05/16/22   Page 22 of 79

1/26/2022                     Fair Fight, Inc. et al. v. True the Vote, et al.        Catherine Engelbrecht 30(b)(6)
                              Confidential - Pursuant to Protective Order

Page 22

```
 1      continue to refer to them throughout the

 2      deposition as 75 and 76.  And then we can

 3      decide after the fact whether we want to

 4      number them sequentially.  Is that fair?

 5              THE VIDEOGRAPHER:  Understood.

 6  BY MR. NKWONTA:

 7      Q.    Ms. Engelbrecht, I want to start

 8  with some background questions for you.

 9              Where do you currently reside?

10      A.    In Cat Spring, Texas.

11      Q.    Are you a Texas native?

12      A.    Yes.

13      Q.    And what do you do for a living?

14      A.    In addition to my work with True the

15  Vote, I am the co-founder of a healthcare fintech

16  software company.

17      Q.    What is your role with True the

18  Vote?

19      A.    I am both the founder of the

20  organization and its current president.

21      Q.    Sorry, I didn't hear the last bit of

22  your answer.  Do you mind repeating that?
```

Ex. D to Defs.' Statement of Facts

Page 66

1    concerns with him?

2         A.    Yes, I recall that we talked about

3    it and I understand.  I mean it is a lot.

4         Q.    And when you talked about it with

5    him did he relay the concerns about the program

6    being partisan?

7         A.    Not the program.  No, our program

8    was not partisan.  He was shocked at, you know,

9    how could it be that the comments were taken and

10   twisted in a way that made things seem negative.

11   That was a shock to him.

12        Q.    I want to ask you about a different

13   program.  Have you heard or used the phrase,

14   Validate the Vote?

15        A.    Yes.

16        Q.    And where did that phrase come from?

17        A.    It was a recommended name given to,

18   or suggested to me, by a consultant of a donor

19   that had come to us and had suggested, the

20   consultant suggested the name, Validate the Vote,

21   and I have used it.

22        Q.    Is that phrase -- is that name, is

Ex. D to Defs.' Statement of Facts

Page 67

1    that specific to True the Vote?

2         A.    I don't know.

3         Q.    Have you heard of any other

4    organizations that have used that phrase for any

5    of their programs?

6         A.    I have.  I have.

7         Q.    Which ones?

8         A.    The consultant who suggested that we

9    use that name went on to start his own

10   organization or had some other affiliation with

11   an organization that was using that name.

12   Whether or not they are still doing anything I

13   don't know.

14              But I recall seeing the -- I was

15   shocked to see that that had occurred.

16        Q.    When did the consultant recommend

17   this name to you?

18        A.    On November the 5th.

19        Q.    What year?

20        A.    Oh, sorry, 2020.

21        Q.    And when did you see the consultant

22   start a different organization and use that same

Ex. D to Defs.' Statement of Facts

Page 68

1    phrase?

2          A.    I do not recall.  Shortly

3    thereafter, but I do not recall.

4          Q.    Other than that, do you recall any

5    other instances of organizations announcing sort

6    of Validate the Vote issues?

7          A.    I do -- I cannot give you a specific

8    organization to direct your intentions to, but

9    that term I have seen many times, often with the,

10   you know, with the state attached to it, Validate

11   the Vote in a certain state or something like

12   that.

13              So, my recollection is I have read

14   it and seen it other places, but I can't give you

15   any other specifics about where to look.

16         Q.    And during the 2020 election cycle

17   and the lead up to the 2021, the January 2021

18   runoff in Georgia, was Validate the Vote or the

19   phrase or the name of one of the programs that

20   True the Vote was initiating in Georgia and

21   elsewhere?

22         A.    Validate the Vote was used broadly.

Ex. D to Defs.' Statement of Facts

Page 69

1    We had an election integrity hotline, and it

2    didn't have a name so to speak.  So we named it

3    Validate the Vote.

4              And then when the attentions turned

5    towards Georgia, as I recall, we would say

6    Validate the Vote Georgia, but it was still a

7    national effort.

8              Does that answer your question?

9        Q.   Yes, it does.  You have used the

10   word, bounty on fraud, before, correct?  In

11   discussing the Validate the Vote program?

12       A.   I don't -- I have read through this

13   in the preparation for this.  I don't recall

14   saying that but -- I don't recall saying that,

15   but -- well, I will leave it at that.  I don't

16   recall saying it.

17             MR. NKWONTA:  Joe, can you pull up

18        Exhibit 64, please.  And if we can go to

19        Page 3 of Exhibit 64.

20                  (Exhibit 64 marked for

21                   identification.)

22   BY MR. NKWONTA:

Ex. D to Defs.' Statement of Facts

Page 69

1    We had an election integrity hotline, and it

2    didn't have a name so to speak.  So we named it

3    Validate the Vote.

4              And then when the attentions turned

5    towards Georgia, as I recall, we would say

6    Validate the Vote Georgia, but it was still a

7    national effort.

8              Does that answer your question?

9         Q.   Yes, it does.  You have used the

10   word, bounty on fraud, before, correct?  In

11   discussing the Validate the Vote program?

12        A.   I don't -- I have read through this

13   in the preparation for this.  I don't recall

14   saying that but -- I don't recall saying that,

15   but -- well, I will leave it at that.  I don't

16   recall saying it.

17             MR. NKWONTA:  Joe, can you pull up

18        Exhibit 64, please.  And if we can go to

19        Page 3 of Exhibit 64.

20                  (Exhibit 64 marked for

21                   identification.)

22   BY MR. NKWONTA:

Ex. D to Defs.' Statement of Facts

                                                        Page 71

1          A.    Sure.   These were extemporaneous

2     unscripted, just me talking.

3                And, I used that word for -- clearly

4     it is there.  I don't recall saying it, but

5     clearly it was there.  It was very much just sort

6     of a riff of trying to explain, you know, what

7     Validate the Vote was going to try to do.

8                And that is the nature of all of the

9     comments, which is just sort of a riff of trying

10    to explain it.

11         Q.    In addition to the protection that

12    you mentioned that you wanted to offer to

13    whistleblowers, did that also include legal

14    support?  Did you also discuss offering legal

15    support to whistleblowers?

16         A.    I do recall in other instances

17    saying that it would be -- you know, legal

18    support would be one of the things that we would

19    hope to be able to offer.

20         Q.    And why did you want to offer legal

21    support to whistleblowers?

22         A.    There were people coming to us and

Ex. D to Defs.' Statement of Facts

Page 72

1    just over the years, you know, people that have

2    information that they would like to share and are

3    concerned.

4              And want to not be left hanging if

5    they say something that, you know, would lead to

6    a place of needing counsel, you know, needing

7    some kind of representation.  And, you know, I

8    can appreciate that.

9              So we just wanted to create an

10   environment where if they wanted to say something

11   we would, we would be with them.

12        Q.   Did you offer that in order to, in

13   order to encourage whistleblowers to come

14   forward?

15        A.   Is the question did we offer to pay

16   for legal counsel in order to encourage the

17   whistleblowers to come forward?  Is that -- I'm

18   sorry --

19              MR. BOPP:  Catherine, Catherine --

20              THE WITNESS:  Could you repeat it?

21        Could you repeat the question?

22              MR. BOPP:  Excuse me, I am speaking.

Ex. D to Defs.' Statement of Facts

Page 74

1      witness during the testimony.  And I ask that

2      you refrain from doing that further in this

3      deposition.

4              You have not asserted any objections

5      to my questions.  You don't get to object to

6      your witness's own testimony.

7    BY MR. NKWONTA:

8        Q.    Ms. Engelbrecht, I will repeat my

9    question.  Did you offer legal support because

10   you thought it would encourage whistleblowers to

11   come forward?

12       A.    Thank you.  I thought that by making

13   it known that there would be legal support for

14   people who came forward, that it may encourage

15   people who were otherwise concerned about not

16   being able to withstand the whirlwind that these

17   things came to elicit.

18       Q.    So, was it your view that concerns

19   about legal ramifications would keep some

20   whistleblowers from coming forward?

21       A.    I'm sorry, can you repeat the

22   question?

Ex. D to Defs.' Statement of Facts

Page 75

```
 1        Q.    Sure.  Was it your view that
 2   concerns about potential legal ramifications
 3   would keep some whistleblowers from coming
 4   forward?
 5        A.    It was my concern that, or my belief
 6   that, in the environment in which we find
 7   ourselves, it seems that it doesn't take too much
 8   to end up being caught into a lawsuit.
 9             And that we have all watched as
10   people who never thought they would find
11   themselves involved in anything like this do.
12   And that keeps a lot of people -- that has a very
13   chilling effect.
14             And so the thought was to try to
15   create an environment, as I say here on this
16   exhibit that is on the screen, to create a space
17   for people to come to and know that they wouldn't
18   be alone.
19        Q.    So, and just to make sure I am fully
20   understanding, I think I am following what you
21   are saying.
22        A.    Sure.  Sure.
```

Ex. D to Defs.' Statement of Facts

Page 76

1          Q.    To make sure I'm fully

2    understanding.

3                 Was it your concern that without

4    providing that legal support people may not come

5    forward because they were concerned about

6    potential legal ramifications?

7                 MR. BOPP:  I object.  Asked and

8          answered now multiple times.  You are

9          harassing the witness.

10                But you may answer if you, you know,

11         and if you -- you may answer.

12                THE WITNESS:  Yeah, I feel like I

13         have answered it.  I feel like I have

14         answered the question.

15                We thought that creating or making

16         it known that if people came forward and

17         needed some kind of legal support that we

18         would help support that.  That was the reason

19         that I said what I said.

20   BY MR. NKWONTA:

21         Q.    I understand that you feel like you

22   have answered the question.  I do, I do want to

Ex. D to Defs.' Statement of Facts

Page 81

1    forward would be taken care of and not just left.

2         Q.    So, is one way to read this then is

3    that the dollars or the support, the financial

4    support or donations or dollars of True the

5    Vote -- and True the Vote's efforts will increase

6    as awareness of the Validate the Vote program and

7    these other efforts grows.

8              Is that, is that a fair reading?

9         A.    Yes, I think that is fair.

10        Q.    You also had a Validate the Vote

11   program hotline; is that right?

12        A.    Yes.

13        Q.    Was it called a Validate the Vote

14   Program Hotline or was there a specific name for

15   it?

16        A.    Well, not initially.  Every election

17   cycle we host a hotline that is both available

18   online, and then we have a toll free number that

19   people can call and share any manner of things.

20             And that has been consistent over a

21   number of cycles.

22             In the most recent cycle, we had

Ex. D to Defs.' Statement of Facts

Page 81

1    forward would be taken care of and not just left.

2         Q.    So, is one way to read this then is

3    that the dollars or the support, the financial

4    support or donations or dollars of True the

5    Vote -- and True the Vote's efforts will increase

6    as awareness of the Validate the Vote program and

7    these other efforts grows.

8              Is that, is that a fair reading?

9         A.    Yes, I think that is fair.

10        Q.    You also had a Validate the Vote

11   program hotline; is that right?

12        A.    Yes.

13        Q.    Was it called a Validate the Vote

14   Program Hotline or was there a specific name for

15   it?

16        A.    Well, not initially.  Every election

17   cycle we host a hotline that is both available

18   online, and then we have a toll free number that

19   people can call and share any manner of things.

20              And that has been consistent over a

21   number of cycles.

22              In the most recent cycle, we had

Ex. D to Defs.' Statement of Facts

Page 82

1    started the hotline in late September.  And we

2    didn't begin to use the name Validate the Vote

3    until, as I mentioned, November 5th or 6th,

4    something like that.

5          Q.    But the hotline itself doesn't have

6    a specific name separate from Validate the Vote;

7    is that right?

8          A.    Just the Election Integrity Hotline.

9          Q.    And someone didn't have any ideas

10   for that?

11         A.    No.

12         Q.    Well, it is the Validate the Vote

13   hotline that you initiated, when did that hotline

14   take off for the 2020 election?  Or when was that

15   hotline officially opened?

16         A.    In, in, the hotline itself, just the

17   election integrity hotline, that is actually up

18   on our website right now.  But we added the -- we

19   expanded the use of it for, to host live, live

20   operators taking calls and so forth.  That

21   started in late September of 2020.

22         Q.    So, that hotline started in late

Ex. D to Defs.' Statement of Facts

Page 85

1    through the Voter Integrity Hotline?

2         A.    This is consistent with the layout

3    of the rollup report that came to us, yes.

4         Q.    And this is a document that True the

5    Vote produced, correct?

6         A.    Yes.

7         Q.    And this should reflect the reports

8    from the Voter Integrity Hotline or whatever the

9    hotline is called; is that right?

10        A.    Yes.

11        Q.    What did True the Vote do to vet

12   these reports?

13        A.    As they came in, the reports came in

14   either via phone or via e-mail.  If they came in

15   via phone and the report was something that was

16   easily answered, that could be directed back to

17   either the individual's location and therefore

18   their own municipality's website for certain

19   questions or concerns, then that instruction was

20   given.

21              If there were reports of some type

22   of impropriety or malfeasance, or something that

Ex. D to Defs.' Statement of Facts

Page 86

1    seemed beyond just a standard, you know, I didn't

2    get my ballot, I got two ballots, where can I

3    vote, those kinds of things, the things that rose

4    beyond that, then those would be reviewed and

5    either forwarded to the appropriate authorities

6    or further vetted.  And, you know, determined

7    whether or not it would be appropriate to have

8    additional support in verifying the information

9    that had been provided.

10        Q.   Does this document reflect all of

11   the reports that you recorded from the Voter

12   Integrity Hotline?

13        A.   If this is the first page of the

14   document then, from the Election Integrity

15   Hotline, it would not have been because that

16   started in the end of September.

17        Q.   Let me rephrase my question then and

18   limit it to the runoff election.

19        A.   Sure.

20        Q.   For the runoff election in Georgia,

21   does this, does this spreadsheet capture all of

22   the reports from the Voter Integrity Hotline?

Ex. D to Defs.' Statement of Facts

Page 93

1   your responses to Interrogatories 2 and 3,

2   including, but not limited to, all documents and

3   communications surrounding the launch of the

4   hotline, follow-up with users of the hotline,

5   vetted reports, and follow-up with the

6   authorities charged with investigating such

7   claims as described in your response to

8   Interrogatory Number 3."

9             Is that a correct reading of Request

10  Number 18?

11      A.    That is a correct reading, yes.

12      Q.    And in your response you state that,

13  "The defendant True the Vote has produced the

14  record of all hotline contacts relevant to

15  Georgia during the time frame of the runoff

16  election."  Is that correct?

17      A.    Yes.  And that would be relevant to

18  Georgia at the time of the runoff collection --

19  runoff election, yes.

20      Q.    You also state that, in the second

21  paragraph, "None of these contacts resulted in

22  the need for True the Vote to follow up or report

Ex. D to Defs.' Statement of Facts

Page 94

1    the contact information to appropriate

2    authorities."

3                    Is that correct?

4                    THE WITNESS:  Can we -- I apologize.

5         Could we just scroll down so I can see that

6         in the response?

7                    MR. NKWONTA:  Keep scrolling.

8                    THE WITNESS:  I can go -- yes.

9                    MR. NKWONTA:  The next page.

10                   THE WITNESS:  The next page.

11                   MR. NKWONTA:  And then the paragraph

12        starting with None of these concepts.

13                   Can you scroll down a little bit

14        more, Joe?

15                   THE WITNESS:  Yes.  Yes.

16   BY MR. NKWONTA:

17        Q.    Is it accurate that none of the

18   reports to your election integrity hotline or

19   Validate the Vote hotline resulted in the need

20   for True the Vote to report anything to

21   authorities?

22        A.    Specific to this request for

Ex. D to Defs.' Statement of Facts

Page 95

1   production around the Georgia runoff and the

2   exhibit that we have looked at, that would be the

3   case, yes.

4               MR. NKWONTA:  You can pull that

5        down, Joe.  I would like to ask about some of

6        your other election related efforts.

7               If we could pull up Exhibit 61.  And

8        can we scroll to the next page.

9                    (Exhibit 61 marked for

10                   identification.)

11  BY MR. NKWONTA:

12       Q.    Do you recognize this document,

13  Ms. Engelbrecht?

14       A.    Yes.

15       Q.    What is it?

16       A.    This was, based on its formatting,

17  this would have been taken from our website.  And

18  it just describes that we launched the Election

19  Integrity Hotline specific to the runoff period.

20       Q.    And this is a press release issued

21  by True the Vote, correct?

22       A.    Yes.  Or a blog post, but yes.

Ex. D to Defs.' Statement of Facts

Page 96

1          Q.    Or a blog post?

2          A.    Or a blog post.  I'm not certain

3     that this was a press release, but it most

4     certainly was posted on our website.

5          Q.    Now, this press release makes

6     reference to efforts to provide signature

7     verification along with -- sorry, signature

8     verification training, absentee ballot drop box

9     monitoring, and other nonpartisan election

10    integrity initiatives.

11               Is that correct?

12         A.    Yes.

13         Q.    I want to explore each of those.

14    What signature training did you provide or what

15    signature verification training did you provide?

16         A.    We posted online a signature

17    verification training course.

18               For that program particularly we had

19    worked with a signature verification specialist,

20    someone who is accredited in that field and has

21    worked in law enforcement and even in elections.

22               And so, she led the course, again

Ex. D to Defs.' Statement of Facts

Page 97

1    online, but led the course in describing for

2    volunteers who would be potentially working in

3    that capacity what to look for.

4              And, you know, when you are looking

5    at signature verifications, how do you, if you

6    are going to compare two signatures, what are

7    some key traits that to an untrained eye you

8    might want to look at first.  These are people

9    that -- most of them had never worked in that

10   capacity before.

11             So, just some basic understandings

12   of signature verification.  And then the process

13   behind that.

14             So, taking the actual process of

15   looking at the signature and then in the greater

16   context of what that means inside of an election.

17   And the standards particularly in Georgia were

18   changing and how to do as best as you could to,

19   as a volunteer to be useful in that -- for the

20   state in that capacity.

21        Q.    Who provided the training?

22        A.    I do not remember her name.  We

Ex. D to Defs.' Statement of Facts

Page 98

1    worked only -- with her only on that one effort

2    or one training program.  I believe it is all in

3    the training which is still I believe all online.

4          Q.    Were you able to --

5                Are you still able to obtain that

6    information if it is still online, the identity

7    of the trainer?

8          A.    Yes.

9          Q.    Is that something you would be

10   willing to provide if we requested it?

11         A.    Yes.

12               MR. BOPP:  Excuse me.  Any requests

13      for anything after this deposition including

14      production of documents, you can make in

15      writing to us.

16               And after the deposition, we will

17      then consider whether or not that request is

18      proper and determine whether or not, under

19      the rules and under the court's scheduling

20      orders, we will respond.

21               The witness, you know, is not -- I

22      mean, she is represented by counsel.  There

Ex. D to Defs.' Statement of Facts

Page 99

1        is a legal aspect to this.  Okay.  And that

2        is what we would like for you to do so that

3        we know what requests you are making by

4        putting it in writing, and then we can

5        respond appropriately.

6                    MR. NKWONTA:  Understood.  And we

7        wouldn't direct the request to her.  It was

8        more so just trying to understand access to

9        the information.  But, yes, understood.  We

10       will -- we would send any request to you and

11       counsel, of course.

12                   MR. BOPP:  Thank you.

13   BY MR. NKWONTA:

14       Q.   Ms. Engelbrecht, am I right that the

15   training -- from what I understood, the training

16   was actually a link online provided on your

17   website that others could access, or was this a

18   set in-person training?

19       A.   No, this is all online.

20            We used a training platform called

21   Teachable which is -- it allows for both the

22   support of a slide deck and audio or video and

Ex. D to Defs.' Statement of Facts

Page 100

1    then supporting curriculum.

2              So that depending upon the training,

3    the volunteer or the participant would

4    potentially have a workbook to work from.  And in

5    this instance there were some exhibits that were

6    a part of that platform.

7         Q.   And how would one access this

8    training?

9         A.   We have a, on our website, there is

10   a training page.  And during this period of time

11   that training along with the absentee ballot

12   review training and the basic election worker

13   overview training would have been posted as

14   links.

15             And so, what would have happened is,

16   if someone was interested, they would go and sign

17   up, and automatically they get a log-in to

18   Teachable and then they can take the courses.  It

19   doesn't cost anything.  Yes.

20        Q.   And you mentioned there is election

21   worker training.

22             Aside from signature verification,

Ex. D to Defs.' Statement of Facts

Page 101

1    was there any other type of training relating to

2    the election that you posted online?

3           A.     There was absentee ballot training.

4    That I recall.  There -- those are the only two

5    that are specific to Georgia that I recall.

6           Q.     What was the absentee ballot

7    training for, what did it entail specifically?

8           A.     Sure.  The process for -- well, most

9    people don't even know that you can volunteer to

10   help review absentee ballots.  And given the

11   great influx of mail ballots in the 2020

12   election, our thought was more people that can

13   help volunteer to support this, the better the

14   throughput, the better overall accuracy of the

15   process.

16              And so, in light of that, the

17   absentee ballot -- and every state runs their

18   process a little different, everything from how

19   you engage, who you talk with to even find out if

20   there is a, you know, a need, or how you would go

21   about connecting yourself with the appropriate

22   individuals to even find your way toward being a

Ex. D to Defs.' Statement of Facts

Page 102

1    volunteer.

2              That would have been a part of what

3    was included in the training.  And then typically

4    a very dry recitation of state law and process to

5    give people some indication of what to expect so

6    that they feel more comfortable in volunteering.

7         Q.   Is that training still available

8    publicly?

9         A.   I do not think it is still posted

10   live on our website but it is still available.

11        Q.   Can you clarify.  So, if it was not

12   posted live on your website, how is it available?

13        A.   Sure.  That is a great.  It is an

14   important distinction I believe.

15             Well, historically what we have done

16   is kept some links up that are more universal in

17   nature and just keep those up year round, but

18   then those are more that are more specific and

19   are more rule dependent that we only feature

20   during the appropriate election cycle.

21             So, we certainly do not want to have

22   information up that is no longer correct.  And

Ex. D to Defs.' Statement of Facts

Page 152

1      right?

2              MS. SIEBERT:  Sounds good.

3              MR. BOPP:  I am logging off.  Bye

4      Cathy.

5              THE WITNESS:  All right.

6    BY MR. NKWONTA:

7          Q.    Ms. Engelbrecht, could you explain

8    what you meant by what should have been a simple

9    process that, I forget your exact words, but went

10   off the rails or something along those lines?

11         A.    Sure, sure.  Would you like me to

12   describe the process as I understood it should

13   have been conducted?

14         Q.    Yes, please.

15         A.    Okay.  So, the way that the standard

16   reads and what we were expecting was -- and this

17   was informed by a meeting we had with the

18   Secretary of State, which I'm sure we will get

19   to.

20              But the elector challenges should

21   have been taken in by the -- or accepted by the

22   counties.  They should have been reviewed for the

Ex. D to Defs.' Statement of Facts

Page 153

1    determination by the boards, whether or not they

2    wanted to move those challenges forward.

3              If they wanted to move the

4    challenges forward or to review them, then what

5    would have -- let me say that differently.

6              Not to review them but to accept

7    them, what would have happened would have been

8    they would have taken or should have taken the

9    spreadsheets that were provided electronically,

10   submitted those to the state.  The state then

11   therefore the rolls would have flagged the

12   record.

13             And if the voter that had a flagged

14   record did choose to vote, then if they voted in

15   person and their record was challenged, they,

16   they would at the point of -- in the polling

17   place they would show their ID which of course is

18   a Georgia standard anyway.

19             If the challenge was incorrect then

20   the challenge would have been resolved

21   immediately.

22             And if they voted in-person and

Ex. D to Defs.' Statement of Facts

Page 154

1    didn't have ID that showed their correct address

2    or the address as it was listed on the

3    registration, then they would have voted a

4    provisional ballot and then been given the

5    opportunity in the extended hearing window to

6    resolve that so they could still vote and cast a

7    regular ballot.

8                And then the last example would have

9    been if someone had voted via absentee, the -- as

10   that came in and before they were separated, the

11   security envelope, the carrier envelope from the

12   ballot, there would have been a designation of

13   challenge.

14               And then similarly they would have

15   been given the opportunity to cure if they, the,

16   the indication inside the ballot was that the

17   address was in fact different.

18               And, that it should have been -- it

19   should have been a very organized process.

20        Q.   An organized process that would have

21   resulted in all 364,000 challenged voters having

22   to present evidence of residency if they

Ex. D to Defs.' Statement of Facts

Page 159

1   their residence.

2            So, this was not without, you know,

3   causation.  But yes, then in the case of absentee

4   ballots, that would have been given the curing

5   process -- or resolved during the curing process.

6       Q.    And what would -- we'll return to

7   the specific operation of the curing process and

8   of the challenge process.  I do want to get back

9   to the meeting between you and Mr. Davis and

10  Mr. Somerville.

11           MR. NKWONTA:  Joe, could we pull up

12      Exhibit 19.  And can we enlarge that a little

13      bit as well.  Great.

14                (Exhibit 19 marked for

15                 identification.)

16  BY MR. NKWONTA:

17      Q.    Do you recognize Exhibit 19,

18  Ms. Engelbrecht?

19      A.    Yes.

20      Q.    What is it?

21      A.    That was a notice that was sent from

22  True the Vote to all the elector challengers who

Ex. D to Defs.' Statement of Facts

Case 2:20-cv-00302-SCJ   Document 155-7   Filed 05/16/22   Page 52 of 79

1/26/2022                    Fair Fight, Inc. et al. v. True the Vote, et al.        Catherine Engelbrecht 30(b)(6)
                            Confidential - Pursuant to Protective Order

Page 160

1    we were working with.

2               And this, as I mentioned earlier,

3    was part of the discussions that we had with

4    Derek, because of the confusion and concern that

5    was being experienced by the elector challengers

6    who were a part of our project.

7               And so this was an invitation to

8    participate in a Zoom call where we could talk

9    about what people were experiencing.

10       Q.    And what did you all discuss during

11   those Zoom calls?

12       A.    The process that was to have been

13   followed.  And the people shared their concerns

14   of threats that they were receiving.  And we gave

15   direction as to where to submit those to so that

16   we would have them on record.

17       Q.    And where did you ask them to submit

18   the threats to?

19       A.    I don't recall.  Somewhere, within

20   True the Vote.  I don't recall the specific

21   e-mail address or whatever.

22       Q.    And do you still have a record of

Ex. D to Defs.' Statement of Facts

Page 161

1    those threats?

2        A.   Yes.

3             MR. NKWONTA:  Could we pull that

4    down and pull up Exhibit 30.

5             (Exhibit 30 marked for

6                  identification.)

7             MR. NKWONTA:  And then before I get

8    into this, I will note that I have referred

9    to these documents as either document number

10   or exhibit number interchangeably.

11            We will just say either Document

12   Number 30 or Exhibit Number 30.  I'm

13   referring to the exhibits.

14   BY MR. NKWONTA:

15       Q.   So, Exhibit Number 30 is an e-mail

16   from you Ms. Engelbrecht to Brian Robinson.  And

17   beneath it an e-mail to Senator Williams; is that

18   correct?

19       A.   Yes.

20       Q.   Do you recognize that e-mail?

21       A.   Yes.

22       Q.   And what was the date of that

Ex. D to Defs.' Statement of Facts

Page 168

1    consultant?

2         A.    Brian Robinson.

3         Q.    And when you attended that meeting,

4    who was present at the meeting?

5         A.    Jordan Fuchs, Ryan Germany, Brian

6    Robinson, for a brief period of time Secretary

7    Raffensperger, and myself.  And that is all I

8    recall.

9         Q.    When did this meeting occur?

10        A.    I don't recall specifically.  It was

11   in, you know, mid-December, somewhere in there.

12        Q.    How long did it last?

13        A.    I don't recall that, either.

14        Q.    What did you all discuss at this

15   meeting?

16        A.    I went with the express purpose of

17   describing the elector challenge and the wanting

18   to make sure that we understood, as best as we

19   could, what that process would look like at the

20   county level for the electors who wanted to

21   participate in their -- with their counties to

22   avoid any friction or inappropriate process.

Ex. D to Defs.' Statement of Facts

Page 169

1                         And, I expressed that I was

2       concerned about the size of the number, how large

3       it was.  And I expressed that, you know, even

4       though we had done what we could to refine the

5       list so to be, you know, as exact as possible,

6       but the number was still large.

7                         Secretary Raffensperger quickly

8       commented that he thought the number was about

9       right because they hadn't been able to clean the

10      list and so people move.  And he did some fast

11      math in his head, yeah, XYZ, it should be about

12      that number.

13                        And I remember the feeling of

14      saying, you know, this is a -- the only way we

15      can see to do this is to run the whole list, and

16      he agreed.

17                        And again it is a process that

18      electors can participate in, and it is afforded

19      in state law.  And that was kind of it. And then

20      we went through the specific steps of what would

21      happen.

22                        Another thing I recall crisply is my

Ex. D to Defs.' Statement of Facts

Page 170

1  conversation exchange with Ryan Germany, where I

2  wanted to understand if this was a burden on

3  counties and what that would look like and the

4  timing, because they were beginning to prepare

5  to -- for the early opening of absentee ballot

6  applications.

7           And Mr. Germany saying that it would

8  be a very simple process, that counties could

9  forward on the spreadsheet to the state.  The

10  state would forward it to their vendor.  And it

11  would be flagged as I have described in previous

12  comments.

13           So, the, the -- our understanding,

14  my understanding leaving that meeting was

15  following the process would be a, a smooth way to

16  support these electors who had, you know, come to

17  us with concern, out of concern for the fact that

18  the rolls weren't being maintained.

19      Q.    You mentioned you were concerned

20  about the size of the challenges and how large it

21  was.  Why were you concerned about the size of

22  the challenges?

Ex. D to Defs.' Statement of Facts

Page 171

1        A.    It is just because it is a big

2   number.  It is a big number.  But when you don't

3   clean the rolls for two years and, you know,

4   13 percent of the population moved, it is just

5   going to be a big number, but it's a lot.

6        Q.    So, what concerns did that create

7   for you, the fact that the number was big.

8              Why was that concerning to you?

9        A.    Because of the recognition that it

10  was going to draw attention, as it should,

11  because it is a -- it is worthy of attention that

12  our rolls would ever be that bad.

13             But I also knew that it would draw

14  negative attention in which I didn't want.

15             But, you know, were we to do less,

16  my feeling was we would have been potentially

17  accused of targeting or trying to be selective,

18  and that is not what we wanted either.

19             So, we just applied the same

20  standard statewide.

21        Q.    In that meeting what information did

22  you provide the Secretary of State's office?

Ex. D to Defs.' Statement of Facts

Page 185

1          A.    They looked at other data elements

2    that are tracked in the Georgia file.  When it

3    was mentioned that there was bias, we wanted to

4    see what the records of the state would show, so

5    they did that analysis.

6          Q.    What other analysis did they

7    conduct?

8          A.    Relative to all of this, I don't

9    recall.

10          Q.    Is there anyone from True the Vote

11    who would recall?  Are there any -- sorry, let

12    me -- you were -- I think you were shaking your

13    head but I will let you answer.

14          A.    Sorry, no.  I'm sorry, no.  I'm --

15    that is my thinking nod.  No, I don't think so.

16    No.

17          Q.    Are there any documents that you

18    could review that would help refresh your

19    recollection of any other analyses that you

20    conducted?

21          A.    No.  I don't recall.  I don't think

22    so.

Ex. D to Defs.' Statement of Facts

Page 206

1   challenges was to bring to the -- to help

2   electors bring to the attention of their local

3   counties, records that appeared not to comply

4   with eligibility standards.

5              And it is within state law for them

6   to -- for citizens to participate in that way to

7   ask that question.  And that is the extent of the

8   elector challenge.

9        Q.    And if the challenges, as True the

10  Vote claims, does not result in a person be

11  removed, then why go through the effort of

12  scrubbing military addresses?

13       A.    As I have said, it was just a choice

14  that we made to not -- I mean, there are, you

15  know, deployments.  There are different ways in

16  which addresses are identified.

17             And because there is a filter that

18  exists within the expanded NCOA, we just chose to

19  remove them.

20       Q.    You chose to remove them because

21  there are a lot of valid reasons why someone in

22  the military might file a notice of change of

Ex. D to Defs.' Statement of Facts

Page 223

1    involved because we have been given indication

2    from the Secretary of State that they didn't need

3    printed copies.

4              So, there is a lot of there is a lot

5    that is inherent within this trying to understand

6    what the process was going to be going forward.

7         Q.   Are you able to testify today that

8    your challenge list did not include voters who

9    lived on military installations?

10        A.   No.  I can testify that we did -- we

11   put the data through all of the filters and

12   followed the process that I have described.

13             But, data is data.  It is possible.

14             MR. NKWONTA:  We can pull down

15      Exhibit 9 -- or Exhibit 13.

16   BY MR. NKWONTA:

17        Q.   Ms. Engelbrecht, how did you go

18   about recruiting challengers to submit these

19   challenges in various counties in Georgia?

20        A.   Some had already -- some Georgians

21   had already come to us which was really the

22   impetus behind the idea that there might be

Ex. D to Defs.' Statement of Facts

Page 224

1    something that we could help them with.

2              And Georgia's elector challenge laws

3    are unique in that it did afford an opportunity

4    for citizens to engage in that way.

5              So, there were some that had come to

6    us initially.

7              And our thought was that others that

8    would be interested would either come to us or be

9    referred if that was something that was of

10   interest.

11        Q.   Were some of these voters referred

12   by Republican Party officials?

13        A.   They were referred by, that group of

14   James Cooper and Mark Williams as people that

15   they knew for different counties, but we never

16   did any deeper dives into their affiliations.

17        Q.   Were any of the voters who

18   approached you, were any of them referred by the

19   Republican Party officials?

20        A.   I don't recall.  I don't think so,

21   but I don't recall specifically.

22        Q.   When the voters approached you or

Ex. D to Defs.' Statement of Facts

Page 231

1    BY MR. NKWONTA:

2         Q.    Do you want to take a minute just to

3    read that e-mail?

4         A.    Okay.

5         Q.    How many challengers did the True

6    the Vote reach out to?

7               How many potential challengers did

8    True the Vote reach out to in order to seek

9    assistance in submitting these challenges?

10        A.    I don't know.

11        Q.    Did True the Vote try to recruit

12   challengers in all Georgia counties?

13        A.    We were open to that for sure and

14   prepared the analysis to support that.

15              But as far as the individuals and

16   the voters who wanted to participate that was --

17   you know, as much as people coming to us as it

18   was people being referred that were also coming

19   to us, so --

20        Q.    So this e-mail that went to

21   potential challengers stated that True the Vote

22   has identified over 500,000 people on the Georgia

Ex. D to Defs.' Statement of Facts

Page 244

1       want to return to Exhibit 8.

2                       (Exhibit 8 marked for

3                        identification.)

4    BY MR. NKWONTA:

5          Q.    I guess this is the first time you

6    are seeing Exhibit 8 in this deposition.

7                 Ms. Engelbrecht, do you recognize

8    Exhibit 8?

9          A.    This is the first time I have seen

10   it.

11         Q.    And you have never seen any analysis

12   of any political party breakdown or racial or

13   demographic breakdown of the challenge lists?

14         A.    No, I have seen that.  I have seen

15   that.

16         Q.    Where did you see that?

17         A.    It was provided when there were

18   comments being made of, you know, as I mentioned

19   earlier of bias being entered in.  And because

20   Georgia uniquely tracks those elements, you can

21   run, you know, the data or an analysis around

22   whether or not that was true or whether or not

Ex. D to Defs.' Statement of Facts

Page 245

1    the, what the data shows.

2              So, I knew that that had occurred.

3         Q.    Do you know when this analysis was

4    first conducted?

5         A.    The analysis on this exhibit?  Or --

6         Q.    The analysis of the demographic

7    breakdown of the challenge list.

8         A.    I don't know exactly.  It came later

9    as a form of reputation of the assertion that

10   there was -- that that was part of this.

11             But, I don't know the date, no.

12        Q.    True the Vote announced its

13   challenge program on December 18th, 2020; is that

14   correct?

15        A.    I don't recall exactly.  It would

16   have been around then, yes.

17        Q.    And if I told you the date was --

18   the date that had been provided by defendants was

19   December 18th, would you have any reason to

20   dispute that?

21        A.    No real reason to dispute it, no.

22        Q.    And if you look at this file here,

Ex. D to Defs.' Statement of Facts

Page 248

1        Exhibit 8 and pull up Exhibit 16.

2                        (Exhibit 16 marked for

3                         identification.)

4    BY MR. NKWONTA:

5        Q.    Ms. Engelbrecht, Exhibit 16 is based

6    as OPSEC 61.  Is this the text file that you are

7    referring to?

8        A.    No, this looks more -- this is sort

9    of a classic dot TXT presentation of the

10   information looks like it would have been that,

11   but it is not that, as I recall.  That looks like

12   more of an Excel or standard spreadsheet format.

13       Q.    Have you seen this breakdown before?

14       A.    I can't attest to the absolute

15   numbers but broadly, something broken down by the

16   race that is tracked inside of the state rolls,

17   yes.

18       Q.    And when was this analysis

19   conducted?

20       A.    I could not tell you except to say

21   that it was post the elector challenge effort or

22   initiative.

Ex. D to Defs.' Statement of Facts

Page 253

1          Q.     And at the time you issued this

2     press release is it fair to say that you had not

3     identified challengers in all 159 counties?

4          A.     Yeah, I think that is fair to say,

5     yes.

6          Q.     How many challengers had you

7     identified at the time True the Vote issued this

8     press release?

9          A.     That I do not recall.

10          Q.     Do you know how many counties or how

11     many challenges True the Vote had submitted at

12     the time that it issued this press release or

13     website post?

14          A.     At this point I don't believe that

15     there had been any submitted.  But I do not --

16     let me rephrase that.

17               I do not specifically recall that.

18     I have a general recollection, but I do not

19     specifically recall.

20          Q.     How many challenges did True the

21     Vote end up filing for the, for the runoff

22     election?

Ex. D to Defs.' Statement of Facts

Page 254

1          A.    We ended up with electors that

2    wanted to challenge, totaling 65 total counties.

3    And, so submissions were made in those counties

4    on behalf of those electors.

5          Q.    And why didn't True the Vote file

6    challenges in all 159 counties as it stated in

7    the press release?

8              THE WITNESS:  Guys, I just got a

9         password required notice.  Can you all see

10        that on the screen or is it just me?

11             THE VIDEOGRAPHER:  Sorry, Catherine.

12        This is Joe.  That might be on your end.  I'm

13        not sure what it is relating to.

14             THE WITNESS:  It is, it is.  I

15        apologize.  I just Xed out of it and it is

16        gone.  I apologize.

17             THE VIDEOGRAPHER:  Okay.

18             THE WITNESS:  I'm sorry, could you

19        repeat the question?

20    BY MR. NKWONTA:

21          Q.    Sure.

22             MR. NKWONTA:  Can the court reporter

Ex. D to Defs.' Statement of Facts

Page 255

1       read back the question, please.

2                   (Whereupon, the record was read by

3           the reporter as requested.)

4                   THE WITNESS:  Again, I think the

5           press release was meant to acknowledge that

6           we had done the analysis to support that.

7           The reason that we didn't ultimately is

8           because it wasn't for us to do.

9                   It was for electors in the, in their

10          respective counties.  And that is just the

11          way the process works.

12  BY MR. NKWONTA:

13      Q.    But True the Vote said it was going

14  to do this in the press release, in the very

15  first line, right?

16      A.    Yeah.  Again, I think that the

17  intent of the line was to suggest that we -- that

18  True the Vote was prepared to do that and do that

19  in every county.

20                  But, you know, we go quickly into

21  the description of an elector challenge.  And it

22  is, you know, the qualifications therein, so that

Ex. D to Defs.' Statement of Facts

Page 256

1    is, that is what was -- that is how it was meant

2    to be taken.

3         Q.    So, True the Vote did not actually

4    intend to file challenges in all 159 counties?

5         A.    Oh, no.  We were definitely prepared

6    to do that, but it was up to electors.

7              I mean the reason the True the Vote

8    exists is to help support citizens who want to

9    engage in their process.  And this is a process

10   in Georgia that is afforded to electors and, you

11   know, that is -- we were ready to do that.

12             But, the process is that you only

13   work with electors from their specific counties.

14             MR. NKWONTA:  Can we take a brief

15       five-minute break?

16             THE VIDEOGRAPHER:  We are now going

17       off the record --

18             MR. NKWONTA:  Is that okay with you

19       all?

20             MS. SIEBERT:  Sure.

21             THE VIDEOGRAPHER:  The time is

22       3:00 p.m.

Ex. D to Defs.' Statement of Facts

Page 257

```
 1                    (Recess taken -- 3:00 p.m.)

 2                    (After recess -- 3:07 p.m.)

 3                    THE VIDEOGRAPHER:  We are now going

 4         back on the video record.  The time is

 5         3:07 p.m.

 6    BY MR. NKWONTA:

 7         Q.    Ms. Engelbrecht, we just took a

 8    short break.  Do you understand that you are

 9    still under oath?

10         A.    Yes.

11         Q.    Has True the Vote ever discussed or

12    considered publishing the list of challenged

13    voters in Georgia?

14         A.    No.

15         Q.    Has True the Vote issued the list of

16    challenged voters to the challengers, for

17    instance, who requested them?

18         A.    Yes.  If an elector asked for the

19    list, given that they had already signed off on

20    our, you know, agreement and terms that this is,

21    you know, to be, to be used for review purposes

22    and so forth.  And, but, yes.
```

Ex. D to Defs.' Statement of Facts

Page 267

1   together for this donor's use.

2        Q.    And is this, this one pager, is this

3   essentially the framework for the Georgia elector

4   challenge or the activities that occurred in

5   Georgia afterward?

6        A.    I -- no.  This doesn't have any -- I

7   mean, we could look at it.  I would like to look

8   at the whole thing.  But, I don't believe so, no.

9        Q.    So, this document -- let's look at

10  the first sentence underneath which says, "Goal:

11  To ensure the 2020 election returns reflect one

12  vote cast by one eligible voter and therefore

13  protect the right to vote and the integrity of

14  the election."

15           Is that correct?  Does that reflect

16  your understanding?

17       A.    Yes.

18       Q.    And, underneath that, the Problem,

19  it says, "There is significant evidence that

20  there are numerous instances of illegal ballots

21  being cast and counted in the 2020 general

22  election.  Most of these illegal votes are being

Ex. D to Defs.' Statement of Facts

Page 268

1    counted in Democratic counties and are

2    suppressing legitimate results."

3              Do you see that first paragraph

4    underneath Problem?

5         A.    I do.

6         Q.    And who wrote that?

7         A.    Pardon me, sorry.  I don't, I don't

8    specifically recall.

9         Q.    But the document came from True the

10   Vote, right?

11        A.    That is correct, yes.

12        Q.    How did True the Vote determine that

13   most of the illegal votes were being counted in

14   Democratic counties?

15        A.    I would not know why that would have

16   been written that way.

17        Q.    This was prepared shortly after the

18   November presidential election, correct?

19        A.    Yes.

20        Q.    Before new results had been

21   published --

22        A.    That's correct.

Ex. D to Defs.' Statement of Facts

Page 276

     1          THE WITNESS:  Can you scroll up, can

     2     you scroll a little bit, Joe?

     3          That would have been going back to

     4     the litigation support for the cases that

     5     were being filed shortly after the election.

     6  BY MR. NKWONTA:

     7     Q.    So, the items that we discussed on

     8  that OPSEC invoice including litigation support,

     9  that was part of the aggregating and analyzing

    10  data to identify patterns of election subversion

    11  that we see in this document?

    12     A.    I mean I would, aggregate and

    13  analyze data to identify patterns full stop.

    14  But, that would have been part of that, yes.

    15     Q.    "File lawsuits in federal court with

    16  capacity to be heard by SCOTUS," the Supreme

    17  Court of the United States; is that correct?

    18     A.    That is what it says, yes.

    19     Q.    And is that referring to the

    20  lawsuits that were filed in Georgia,

    21  Pennsylvania, Michigan, Wisconsin, Arizona?

    22          And also it lists the key states

Ex. D to Defs.' Statement of Facts

Page 277

1    here below as well, Arizona, Nevada --

2          A.    Uh-huh.

3          Q.    Are those the lawsuits or legal

4    actions that that plan is referring to?

5          A.    Yes.  Those would have been in that

6    timeline of lawsuits.

7          Q.    And then next it goes on to the

8    legal strategy for the Validate the Vote program.

9                And it states that, "Jim Bopp will

10   file federal suits in the seven closest

11   battleground states to investigate voter fraud,

12   expose it and nullify the results of the state's

13   election so that the presidential electors can be

14   selected in a special election or by the state

15   legislature."

16               Why was the goal to nullify the

17   results of the state's election even before the

18   election had been certified?

19         A.    I do not know why this was -- I

20   don't -- that was not the goal.  Let me answer it

21   that way.  That was not the goal.

22               As we discussed earlier the goal was

Ex. D to Defs.' Statement of Facts

Page 316

1    in excess of $1 million.  Is that correct?

2         A.    Yes.

3         Q.    And was the purpose of that million

4    dollars to reward people that came forward with

5    evidence of voter fraud?

6         A.    The fund was to -- or the idea of

7    the fund was to support people that would come

8    forward, as we discussed previously, to have

9    funds available should they be necessary for

10   their legal support.

11              Also through this we were funding

12   the state election or county election lawsuits.

13        Q.    Did you present any of the evidence

14   that you obtained through this initiative to any

15   of the courts or to -- or to Mr. Eshelman?

16        A.    I don't recall.  I talked to his

17   consultants daily.  I don't recall anything in

18   specific.

19        Q.    Did True the Vote obtain any

20   evidence of -- any credible evidence of criminal

21   malfeasance as referenced in this press release

22   after announcing this initiative?

Ex. D to Defs.' Statement of Facts

Page 317

1        A.    We did have some reports that we

2   considered credible.

3        Q.    And did you submit those reports to

4   anyone?

5        A.    Yes.  They have been submitted.

6        Q.    Where did you submit those reports?

7        A.    There are active investigations in

8   Georgia and in Arizona, and I guess, those are

9   the two active states.

10       Q.    What was the criminal malfeasance or

11  misconduct identified in those reports or alleged

12  in those reports?

13       A.    I don't -- I mean those are active

14  investigations and our approach to this point has

15  been that we don't comment on active

16  investigations.

17       Q.    So, you are not willing to disclose

18  or identify the nature of any of the reports of

19  fraud or evidence of fraud that you received?

20            THE WITNESS:  May I consult with

21       counsel and just make sure I am answering the

22       question properly?  I just want to make sure

Ex. D to Defs.' Statement of Facts

Page 327

1    Sorry, sorry.

2          Q.    And who is that challenger that

3    asked to withdraw their challenge?

4          A.    I don't recall his name.

5          Q.    Was it Joe Martin?

6          A.    That does sound familiar, yes.  That

7    sounds correct.

8          Q.    And do you recall why Joe Martin

9    chose to withdraw his challenge?

10         A.    My general recollection is that in

11   looking at names on a challenger list he

12   identified that a couple of them were at long --

13   were residents at long-term care facilities.

14               And he didn't -- for that purpose he

15   didn't want to move forward.  And he notified

16   Amy.  And we notified -- as I understand it, we

17   notified the county.  And that was -- that is the

18   end of it as far as I know or as far as I recall.

19         Q.    And did you determine or make any

20   efforts to determine whether those voters were

21   properly included in the challenge list?

22         A.    We didn't submit the challenge list

Ex. D to Defs.' Statement of Facts

Page  342

1          Q.    Let me rephrase.  Based upon your

2    experience and knowledge of election data

3    analysis, would the type of data that would

4    have -- that partially would have been sought by

5    those lawsuits, i.e. the voter rolls, the voter

6    records that you testified to earlier.

7                Based upon your experience in this

8    election data space, would that type of data have

9    been critical and used to assess whether there

10   was further evidence of election fraud?

11         A.    Yes.

12               MR. NKWONTA:  Objection, calls for

13      speculation.

14   BY MS. SIEBERT:

15         Q.    Was it ever True the Vote's intent

16   for -- I'm speaking now for the Georgia

17   challengers for the runoff election.

18               Was it ever True the Vote's intent

19   to -- through those helping with those challenges

20   or working with people to submit those

21   challenges, to have people removed from the voter

22   registration rolls in Georgia?

Ex. D to Defs.' Statement of Facts

Page 343

1        A.    No.

2        Q.    Was the purpose of those challenges

3   ever to prevent somebody who was legally allowed

4   to vote in Georgia from doing so?

5        A.    No.  No.

6              MS. SIEBERT:  I think that is all I

7       have.

8              THE VIDEOGRAPHER:  Any redirect.

9              MR. NKWONTA:  Nothing further.

10             THE VIDEOGRAPHER:  Okay.  With that

11       we are now ending the deposition.  The time

12       on record is 5:25 p.m.

13      (Whereupon, signature not having been waived,

14   the deposition suspended at 5:25 p.m.)

15                        *   *   *

16

17

18

19

20

21

22

Ex. D to Defs.' Statement of Facts