**United States District Court**
**Northern District of Georgia**
**Gainesville Division**

| | |
|---|---|
| **Fair Fight, Inc., John Doe,** and **Jane Doe,** | |
| *Plaintiffs* and *Counter-Defendants*, | |
| *v.* | |
| **True the Vote, Inc., Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, James Cooper,** and **John Does 1-10,** | Civ. No. 2:20-cv-00302-SCJ<br><br>Hon: Steve C. Jones |
| *Defendants* and *Counter-Plaintiffs*, | |
| **Fair Fight Action, Inc.,** *Counter-Defendants.* | |

**Defendant True the Vote, Inc.'s Responses to Plaintiffs' First Interrogatories**

Pursuant to Federal Rule of Civil Procedure 33, Defendant True the Vote, Inc. ("TTV") responds to Plaintiffs' First Interrogatories.

# General Objections

1.    Defendant TTV objects to these requests to the extent that they purport to call for the production of documents/information that: (a) contain privileged

**Def. TTV**
**Resp. to Interrog.**          1

attorney-client communications; (b) constitute attorney work product; (c) disclose the mental impressions, conclusions, opinions, or legal theories of any attorneys or other representatives of the Plaintiffs; (d) were prepared in anticipation of litigation; or (e) are otherwise protected from disclosure under applicable privileges, immunities, laws, or rules.

2.      Defendant TTV objects to these requests to the extent that they are vague, not limited in scope, unreasonably broad and burdensome, or beyond the scope of either category of permissible discovery under Fed. R. Civ. P. 26(b)(1).

3.      Defendant TTV objects to the instructions accompanying the requests to the extent that they purport to impose obligations beyond those imposed by the Federal Rules of Civil Procedure, or any order promulgated by this Court.

4.      Defendant TTV objects to discovery requests that are not proportional to the needs of the case and that are not "relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).

5.      Defendant TTV objects to requests for information the benefit of which is outweighed by its lack of importance in resolving the issues at stake in this case, the amount in controversy, the parties' relative access to relevant information, the

**Def. TTV**
**Resp. to Interrog.**                    2

parties' resources, and whether the burden or expense of the proposed discovery outweighs its likely benefit. *See* Fed. R. Civ. P. 26(b)(1). Consistent with this rule, Defendant TTV does not produce multiple copies of a communication, e.g., where one email chain has multiple communications, earlier included ones are not produced as separate documents.

6.     Subject to and without waiving any of the foregoing General Objections, which are hereby incorporated into each specific response, Defendant TTV (a) makes further objections in response to individual requests and (b) makes the required good-faith attempt to fulfill the duty to provide all responsive information readily available without undue labor and expense.

7.     Defendant TTV objects to producing individuals' personal information, including emails and phone numbers, based upon privacy and relevancy.

## Definitions

Except as specifically defined below, the terms used in these requests shall be construed and defined in accordance with the Federal Rules of Civil Procedure, wherever applicable. Any terms not defined shall be given their ordinary meaning.

1.     "Communication" means any transfer of information, whether written, oral,

**Def. TTV**
**Resp. to Interrog.**          3

electronic, or otherwise, and includes transfers of information via email, report, letter, text message, voicemail message, written memorandum, note, summary, and other means. It includes communications entirely internal to True the Vote, as well as communications that include or are with entities and individuals outside of that organization.

2.     "Comprehensive Ballot Security Initiative" means your program announced in your December 15, 2020 Press Release, including, but not limited to, the Election Integrity Hotline, plans to monitor absentee ballot drop boxes, and "other nonpartisan election integrity initiatives."

3.     "County" means any county in Georgia, as well as all employees, staff, agents, and representatives of the county, including the county boards of registrar's offices, county registrars, or any other person with a responsibility for conducting or supervising elections in the county.

4.     "Date" means the exact day, month, and year, if ascertainable, or, if not, the est available approximation (including relationship to other events).

5.     "December 18, 2020 Press Release" means the press release posted on your Website on that date, attached hereto as <u>Exhibit A</u>.

**Def. TTV**
**Resp. to Interrog.**                    4

6.     "December 14, 2020 Press Release" means the press release posted on your Website on that date, attached hereto as Exhibit B.

7.     "December 15, 2020 Press Release" means the press release posted on your Website on that date, attached hereto as Exhibit E.

8.     "Describe" means explain with particularity.

9.     "Document" is synonymous in meaning and scope to the term "document" as used under Federal Rule of Civil Procedure 34 and the definitions for "writings and recordings" as set forth in Federal Rule of Evidence 1001, and it includes records, reports, lists, data, statistics, summaries, analyses, communications (as defined above), any computer discs, tapes, printouts, emails, databases, and any handwritten, typewritten, printed, electronically recorded, taped, graphic, machine-readable, or other material, of whatever nature and in whatever form, including all non-identical copies and drafts thereof, and all copies bearing any notation or mark not found on the original.

10.    "Election" means any special or regularly-scheduled general election or run-off election held in the State of Georgia for any publicly elected office.

**Def. TTV**
**Resp. to Interrog.**                     5

11.     "Georgia Elector Challenges" means the challenges to voter eligibility of registered Georgia voters in advance of the Run-off Election in which you have been and are involved and which are described, among other places, in your December 18, 2020 Press Release.

12.     "Georgia Republican Party" means the state and/or county committees of the Republican Party, which works to elect Republican candidates to elected office, and their former, current, and/or future employees, staff, agents, consultants, and representatives. This term specifically encompasses the Georgia Republican Party that you announced a "partnership" with in your December 14, 2020 Press Release.

13.     "Identify," when used in reference to a communication, means to state when and where the communication was made; each of the makers and recipients thereof, in addition to all others present; the medium of communication; and its substance.

14.     "Identify," when used in reference to a government agency, firm, partnership, corporation, proprietorship, association, other entity, or person, means to state its, his, or her full name and present or last-known address.

**Def. TTV**
**Resp. to Interrog.**                    6

15.　"Identify," when used in reference to processes or steps taken by you or others with whom you have worked on the matters at issue in this litigation, means to chronologically detail each and every action taken by any and all entities or persons, to identify the actor, and to detail how and when that action was or will be taken and for how long.

16.　"Including" means "including but not limited to."

17.　"November 10, 2020 Press Release" means the press release posted on your Website on that date, attached hereto as <u>Exhibit C</u>.

18.　"November Election" means the most recent election that was held in Georgia that culminated on Election Day on November 3, 2020, to include the general election and the special election held on that date.

19.　"Person" means not only natural persons, but also firms, partnerships, associations, corporations, subsidiaries, divisions, departments, joint ventures, proprietorships, syndicates, trust groups, and organizations; federal, state, or local governments or government agencies, offices, bureaus, departments, or entities; other legal, business, or government entities; and all subsidiaries, affiliates, divisions, departments, branches, and other units thereof or any combination

**Def. TTV**
**Resp. to Interrog.**　　　　　7

thereof.

20.     "Relating to," "regarding," and their cognates are to be understood in their broadest sense and shall be construed to include pertaining to, commenting on, memorializing, reflecting, recording, setting forth, describing, evidencing, or constituting.

21.     "Run-off Election" means the January 5, 2021 Senate Run-off election held in Georgia.

22.     "Targeted Voter" or "Targeted Voters" means the registered Georgia voters who are the subject of the Georgia Elector Challenges.

23.     "True the Vote Website" or "Website" means your website maintained at https://truethevote.org, a hard copy of the current home page is attached hereto as Exhibit D.

24.     "Validate the Vote" Program refers to the initiative announced in your November 10, 2020 Press Release which you claim "[e]stablishes a whistleblower fund in excess of $1 million to support those who come forward with credible evidence of criminal malfeasance; takes the steps to resolve illegal actions through litigation and ensure the final vote tally is valid to maintain public confidence in

U.S. election system."

25.    "Voter" means any registered voter in Georgia and all persons who may properly register to vote in the state by the close of discovery in this case.

26.    "You" and "your" means the organization that goes by the name of True the Vote, Inc., its officers, directors, partners, members, managers, employees, representatives, agents, consultants, or anyone acting on its behalf.

# Interrogatories

**Interrogatory No. 1:** Describe with particularity your "Landmark" Voter Challenge Program, including the individuals or entities involved in the program, their role, and their expertise, if any, relevant to their role; the date when the program was initiated; the purposes and/or goals of the program; and the methodology employed in determining which voters to challenge.

**Response:**

## Overview of Landmark Voter Challenge Program

The Georgia Elector Challenge project was an effort that TTV started in order to support Georgians who were concerned about the accuracy of their elections and wanted to do whatever they could improve the transparency and

accuracy of the upcoming Special Election. To that end, TTV undertook an effort to identify electors who appeared not to meet the qualifications legally required to cast a ballot. This effort began towards the end of November. The goal was to file Section 230 challenges preemptively, before absentee ballots were opened to help ensure only legal, eligible votes were going to be counted in the Run-off Election.

To the best of TTV's knowledge, there has been no organization that has supported a statewide elector challenge at the scale required in Georgia. The size of the challenge was notable only because the voting rolls have not been cleaned in two years. TTV reviewed the rolls for the whole state because we were not targeting based on county, voting profile, or any other demographic.

**Individuals and Entities Involved in Landmark Voter Challenge Program**

Entities that were involved in the Georgia Elector Challenges include True the Vote, Inc., OpSec Group LLC ("OpSec"), and various print shops throughout Georgia. The individuals who were directly involved include Catherine Engelbrecht, Amy Holsworth, James Cooper, Ron Johnson, Mark Williams, and Gregg Phillips.

Catherine Engelbrecht is the Founder and President of TTV, and her

**Def. TTV**
**Resp. to Interrog.**                10

expertise includes over a decade of election integrity work, including supporting citizen-led voter challenges in a number of states. Amy Holsworth coordinated communications with challengers and communications support for both challengers and county representatives. Mark Williams, James Cooper, and Ron Johnson assisted with recruiting hundreds of voter challengers across the state of Georgia. Mark Williams owns a printing company and coordinated among eight print shops to expedite printing of individual challenges, when necessary. For the purposes of these interrogatories, any reference to Ms. Engelbrecht is a reference to her actions in her official capacity as President of TTV.

Gregg Phillips, managing partner of OpSec, has more than three decades of experience project management, elections and big data. OpSec developed formulas to assess the fit, risk and reliability of data analytics across multiple industries. OpSec uses complex analytical approaches to investigate complex issues, evaluate the risk in decisions, and build measured solutions. OpSec observes, researches and interprets results using applications and data known to law enforcement, program integrity and election professionals. OpSec's approach to analytics is measured and balanced.

**Def. TTV**
**Resp. to Interrog.**               11

## Goal of Voter Challenge Program

The goal of the Georgia Elector Challenge was simple: to preserve and promote election integrity in the State of Georgia.

TTV believes and is founded on the principle that every person legally authorized to vote in any particular election should do so if he or she chooses, and no one who is legally authorized to vote should be prevented from doing so. Likewise, people who are not authorized under law to cast a ballot should not be allowed to do so, as illegal ballots not only dilute the effect of legally cast ballots, but also cause people to question the results of the democratic process fundamental to our system of governance.

To that end, TTV supports efforts at the local and state levels across the country to ensure all those casting ballots are legally authorized to do so. TTV does this through a variety of programs, including data analysis, at issue here.

## Methodology

TTV's methodology began with acquiring the Georgia voter rolls, obtained from the Secretary of State, current as of December 5, 2020. TTV contracted with OpSec to produce the county-by-county list of voters to be challenged on the basis

**Def. TTV**
**Resp. to Interrog.**                    12

of residency only. TTV gave OpSec explicit instructions to exclude records of voters whose identities could not be resolved, whose names appeared as being deceased according to the Social Security Death Index database, and whose addresses appeared to correlate with military installations or college campuses. TTV limited OpSec's review to only those records in which the voter appeared to have provided USPS with a permanent change of address notice ninety days prior to January 5th. OpSec also removed any records that appeared to be duplicated with the dataset properly defined. OpSec then used the NCOA, as well as other commercially available data and tools, as well as identity resolution algorithms to identify and review records of those voters who appeared to have filed permanent change of address notices with USPS.  After this process of identification, review, and reconciliation, OpSec provided TTV with digital spreadsheets of the challenged voters to send via email to the respective County Board of Elections on behalf of the Georgia volunteers serving as challengers for various Georgia counties. When necessary, Mark Williams coordinated getting the lists of challenged voters printed in order to submit as hard copies to various Georgia counties.

**Def. TTV**
**Resp. to Interrog.**                    13

**Interrogatory No. 2:** Describe with particularity your "Comprehensive Ballot Security Initiative," including the individuals or entities involved in the initiative, their role, and their expertise, if any; the date when the program was initiated; the purposes and/or goals of the program; and the methodology of the program.

**Response:** TTV has worked to support comprehensive ballot security efforts since our founding in 2010. For the state of Georgia specifically, the elector challenge effort started in November 2020 to assist and serve as a resource to Georgia Voters and Volunteers in the Run-off Election.  In addition to the Georgia Elector Challenges, TTV launched an Election Integrity Hotline that offered live bilingual support 24 hours a day for Georgians who had questions or concerns, or who have witnessed potential election fraud, potential vote manipulation, or potential illegal actions taking place at polling locations. The Initiative also included various features such as publicly available signature verification training and volunteer recruitment.

The goal was to help to recruit, train, mobilize, and support concerned citizens to be active in election integrity efforts, to be alert to potential problems

**Def. TTV**
**Resp. to Interrog.**                  14

that can manifest at polling locations that can impact election integrity, and to respectfully engage with the appropriate authorities when questions or concerns related to election integrity arise. TTV never counsels or trains volunteers to confront or approach individuals who are attempting to vote with any concerns that may arise. TTV always trains and counsels its volunteers to work through the proper authorities with any questions or concerns.

Virtually every absentee ballot drop box had security cameras recording for the entire period of time relevant to the Run-off Election. TTV did not install these security cameras—county or state election authorities installed and maintained them. TTV has reviewed, and is in the process of reviewing, publicly available video footage from these government-installed security cameras. If there is security footage that in TTV's view, gives rise to a concern surrounding election integrity, TTV will alert whatever government body is charged with investigatory authority to the concern. This process was what TTV was referring to when it mentioned "monitoring absentee ballot drop boxes" in its press releases. TTV did not train, encourage, or direct volunteers or any other individual to monitor absentee ballot drop boxes.

**Def. TTV**
**Resp. to Interrog.**                15

Ms. Engelbrecht has longstanding involvement with citizen engagement and ballot security initiatives and was directly involved in the Initiative. Amy Holsworth coordinated the volunteer support and general outreach that was involved. Communications were done by Genevieve Carter and her team.

**Interrogatory No. 3:** Describe with particularity your Validate the Vote Program, including the individuals or entities involved in the program, their role, and their expertise, if any; the date when the program was initiated; the purposes and/or goals of the program; and the methodology of the program.

**Response:** Initiated on November 6, 2020, the Validate the Vote program was an initiative to provide that the 2020 election returns reflected the principle of "one vote for one voter." The initiative aimed to protect the integrity of our nation's electoral system and ensure public confidence and acceptance of election outcomes critical to American democracy. Ms. Engelbrecht decided that it was time for TTV to step in and provide resources to help ensure voters, election workers, and volunteers who are observing the extended ballot counting process – and seeing firsthand the illegal actions taking place – had the resources they needed to document and report the malfeasance with the confidence that these

**Def. TTV**
**Resp. to Interrog.**                16

issues will be pursued by every available legal channel and that they would be
supported legally, if necessary.

TTV created the "Validate the Vote" program for the national presidential
election and from that TTV created "Validate the Vote Georgia." When TTV came
to Georgia, we simply took the logo and put the word "Georgia" in the center of
the logo. TTV then made all the resources we had available for the national
election available in Georgia for the Run-off Election. TTV started an election
integrity hotline where anyone who witnessed an alleged incident of fraud could
call and report it or submit a report online. From there, TTV volunteers would
follow up with the appropriate authorities charged with investigating such claims.

In addition, TTV coordinated the Georgia Elector Challenges and
Comprehensive Ballot Security Initiative, described in Response Nos. 1-3.

**Interrogatory No. 4:** Identify each of the entities and individuals, including
the "Georgia voters" referred to in your December 18, 2020 Press Release, with
whom you worked on the Elector Challenges. Include their name, their contact
information, their role in the challenge efforts (including the county or counties in
which they were involved in the challenge efforts), and how you became

**Def. TTV**
**Resp. to Interrog.**                    17

connected to them.

 **Response:** The individuals who were referenced in the Press Release include Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, and James Cooper.

On December 15, 2020, Ms. Engelbrecht had dinner with Derek Somerville and Gregg Phillips. During this dinner, everyone introduced themselves to each other and provided one another with information on their background and interest in election integrity efforts.

On December 17, 2020, Ms. Engelbrecht sent a text message to Derek Somerville, informing him that TTV had a meeting with the Georgia Secretary of State's office. Ms. Engelbrecht never had any further conversation with Mr. Somerville about that meeting, nor did that text lead to any coordination between Mr. Somerville or TTV.

On December 19, 2020, Mr. Somerville sent an email to Catherine Engelbrecht which contained talking points for elector challengers that he had constructed on his own accord. Mr. Somerville did not ask Ms. Engelbrecht to share these talking points with TTV's volunteers, but after reviewing the

**Def. TTV**
**Resp. to Interrog.**                    18

information, Ms. Engelbrecht did send the information contained in his talking points to TTV's volunteer challengers. Ms. Engelbrecht added some additional detail to the message as well.

On December 20, 2020, Mr. Somerville and Mark Davis participated in a "Citizen Challenge Q&A" Zoom call hosted by Catherine Engelbrecht. In that meeting, Ms. Engelbrecht explained TTV's election integrity activities. Mr. Somerville offered some encouragement to challengers during this Zoom call, but did not contribute to or assist in any actual component of TTV's elector challenges.

The list of Georgia Elector Challengers includes approximately 70 people. Challengers were either already connected with TTV, having gone through our training or participated in one of our past projects, or they were referred to us via word of mouth from other challengers.

TTV contacted each challenger, explained the project and challenge methodology, and secured written authorization to name them as challengers in their county of residence. TTV then submitted the challenges on behalf of the challengers to each of their respective counties, either electronically or in printed

**Def. TTV**
**Resp. to Interrog.**                    19

hard copy, or where required, both electronically and in printed hard copy. TTV submitted all of the electronic challenges via the email address: gaelectorchallenge@truethevote.org. TTV used this email address to submit the Georgia Elector Challenges in order to protect the individual challengers' personal emails from the spam and inevitable harassment TTV anticipated would come from the challenges.

TTV objects to Interrogatory No. 4 to the extent it calls for any individual's personal and private information that may be protected by such individual's right to privacy under the U.S. Constitution or the Georgia State Constitution.

TTV's counsel contacted Plaintiffs' counsel to seek agreement that the parties would seek a protective order, which would preclude publication of confidential information and would require the parties to seek a motion for leave to file under seal if any documents containing personal information were to be filed with the Court. In addition, TTV's counsel asked Plaintiffs' counsel if they would agree not to sue any person identified as an individual challenger. While Plaintiffs' counsel was willing to discuss a protective order and filing under seal, as allowed, they were not willing to agree not to sue individual challengers.

**Def. TTV**
**Resp. to Interrog.**                20

Therefore, TTV objects to Interrogatory Number 4 to the extent it seeks

information protected by the First Amendment to the United States Constitution,

namely the right of association and the right to petition the government for a

redress of grievances, both of which are protected from undue disclosure and

investigation.

Further, TTV objects to Interrogatory Number 4 to the extent it seeks

information that would likely lead to intimidation or harassment of individual

challengers in violation of Section 11(b) of the Voting Rights Act. *See*

Defendants' Answer to Plaintiffs' Complaint for Declaratory and Injunctive

Relief, Affirmative Defenses, and Counterclaims Against Plaintiffs and Defendant

Fair Fight Action, Inc., ECF No. 40.

**Interrogatory No. 5:** Describe in detail the steps you have taken, if any, to

guard against the risk that challenged voters whose names are included in the

Elector Challenges will suffer from harassment or will be otherwise deterred from

voting in Georgia's Elections, including the Run-off Election. If you have taken

no such steps, state that you have taken none.

**Response:** As noted in Response No. 2, TTV never counsels or trains

**Def. TTV**
**Resp. to Interrog.**              21

volunteers to confront or approach individuals who are attempting to vote with any concerns that may arise. TTV always trains and counsels its volunteers to work through the proper authorities with any questions or concerns.

In bringing the Georgia Elector Challenges on behalf of individual voters, TTV followed the steps under Section 230 of the Georgia Election Code. By following the law as written in Section 230, no challenged voters would be subject to any intimidation or harassment by TTV or its volunteers, as neither TTV nor its individual volunteers had any contact with the challenged voters.

Ms. Engelbrecht sent an email to Georgia Elector Challengers stating that the challenger was *"not alleging any voter has acted improperly*, only that probable cause, as established under both Federal and State law, supports my challenge to believe the voter (elector) has changed their residence. Further, I am not asking the Board of Elections to remove the people on my list from the voter rolls, only to confirm with each voter whether or not they have moved.  So, by following the law and flagging these voters, it can be further investigated." (emphasis added). TTV did not accuse, either directly or indirectly, any voter of acting improperly, and it certainly did not seek to prevent those legally authorized

**Def. TTV**
**Resp. to Interrog.**                    22

to vote from doing so.

**Interrogatory No. 6:** Describe in detail the "voter registry research" that, per your December 18, 2020 Press Release, you claim to have done to identify the challenged voters, including but not limited to (1) the identities of any person involved in such research and their experience and/or qualifications for conducting such research and accurately identifying voters; (2) any and all data and/or databases used in this process or for this purpose, including each of the "other supporting commercial databases" referred to in your December 18, 2020 Press Release; (3) the methodology used to identify the challenged voters, including but not limited to what information was used to "match" voters (e.g., first and last names, dates of birth, etc.) and the basis upon which you concluded that the voters' inclusion in the database made them ineligible to vote under Georgia law; and (4) any evaluation or analysis of the individual characteristics of any challenged voters, including racial, partisan, or geographic makeup or characteristics.

**Response:** *See* Response No. 1.

**Interrogatory No. 7:** State whether it is True the Vote's position that a

**Def. TTV**
**Resp. to Interrog.**                23

Georgia voter who files a change-of-address with the U.S. Postal Service to an address in another state has invalidated their Georgia voter registration, and/or has become ineligible to vote in Georgia.

**Response:** TTV's position is that if a person of his or her own free will submits documented notice to the USPS of their permanent relocation to an address outside of the state or county, and if precautionary exclusions are considered with respect to voters who have moved due to military service or college attendance, then it is reasonable to consider whether, in fact, the voter truly no longer resides in the state or county and thus is no longer legally authorized to vote in that county.  Further, TTV also considers it true that the change of address information provides probable cause for the county board of elections for a valid Section 230 Challenge.

**Interrogatory No. 8:** Describe your self-proclaimed "partnership" with the Georgia Republican Party "to assist with the Senate runoff election process," as announced in your December 14, 2020 Press Release, including but not limited to the names and contact information of each the entities and individuals with whom True the Vote has been and intends to work with in this partnership, the

**Def. TTV**
**Resp. to Interrog.**                    24

approximate date when the partnership began, and the purpose and/or goals of the partnership.

**Response:** The partnership with the Georgia Republican Party ("GA GOP") was announced on December 14, 2020, shortly after a meeting with Chairman David Shafer, Executive Director Stewart Bragg, and Florida Elections Day Operations Director Alyssa Gonzalez Specht. The term "partnership" was used only to emphasize the party's seeming interest in nonpartisan election integrity efforts.

In this meeting, Ms. Engelbrecht presented the tools that TTV could provide in the interest of election integrity. Ms Engelbrecht discussed how TTV would be offering a variety of nonpartisan programs in Georgia, including recruiting volunteers for general service, sponsoring publicly available election worker and signature verification training, a statewide voter hotline, and other election integrity initiatives. These initiatives were all publicly available and provided at no cost. TTV's communications director, Genevieve Carter, drafted a press release and received verbal approval from the GA GOP for a press release. After this, TTV and the GA GOP had no further communications.

**Def. TTV**
**Resp. to Interrog.**                    25

TTV extended this same partnership offer to the Democratic Party, but to no avail as there was no response from Senator Nikema Williams.

**Contact Information:**

| | |
|---|---|
| David Shafer: | Email: david@gagop.org |
| Stewart Bragg: | Email: stewart@gagop.org |
| Alyssa Gonzalez Specht: | Email: aspecht@donaldtrump.com |

**Interrogatory No. 9:** Identify all individuals or entities that you have reason to believe may have communications or documents relevant to this litigation, that are not within True the Vote's custody or control. If you have reason to believe that a particular entity or individual has documents specifically responsive to any of the requests for production set forth in Plaintiffs First Requests for Production to True the Vote, identify the relevant number or numbers of each request for production when you identify that person or entity.

**Response:** I believe that Brad Raffensperger, Ryan Germany, Gabe Sterling, Jordan Fuchs, and the Georgia Secretary of State's office as a whole relevant to Interrogatory 6.

I believe that OpSec has information relevant to the creation of the lists of

**Def. TTV
Resp. to Interrog.**                         26

challenged voters.

I believe Stacey Abrams and Mark Elias have communications or documents relevant to Interrogatory 5.

Further, I believe that Senator Nikema Williams has communications or documents relevant to Interrogatory 8.

I, the undersigned, affirm under the penalties for perjury that the foregoing answers to Plaintiff's Interrogatories are true and correct.

Date: _____03/15/21_____          _____

Catherine Engelbrecht, President
True the Vote, Inc.

**Def. TTV**
**Resp. to Interrog.**                    27

Ex. E to Defs.' Statement of Facts

Dated: March 15, 2021

/s/ Ray Smith, III

Ray Smith, III, GA # 662555

rsmith@smithliss.com

SMITH & LISS, LLC

Five Concourse Parkway

Suite 2600

Atlanta, GA 30328

Telephone: (404) 760-6000

Facsimile: (404) 760-0225

*Local Counsel for Defendants*

Respectfully Submitted,

James Bopp, Jr.,* IN # 2838-84

  jboppjr@aol.com

Jeffrey P. Gallant,* VA # 46876

  jgallant@bopplaw.com

Courtney Turner Milbank,* IN#

32178-29

  cmilbank@bopplaw.com

/s/ Melena Siebert

Melena Siebert,* IN # 35061-15

  msiebert@bopplaw.com

THE BOPP LAW FIRM, PC

1 South 6th Street

Terre Haute, Indiana 47807

Telephone: (812) 232-2434

Facsimile: (812) 235-3685

*Lead Counsel for Defendants*

*Admitted Pro hac vice*

**Def. TTV**

**Resp. to Interrog.**                28

# Certificate of Service

I hereby certify that the foregoing document was served electronically on

March 15, 2021, upon all counsel of record via email.

_/s/ Melena S. Siebert_
Melena S. Siebert
Indiana Bar No. 35061-15
_Counsel for Defendants_
*Admitted Pro hac vice

**Def. TTV**
**Resp. to Interrog.**                    29