Page 1

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

--------------------------------X
FAIR FIGHT, INC., SCOTT BERSON,   :
JOCELYN HEREDIA, AND JANE DOE,    :
           Plaintiffs,           :

  v.                               : Case No.:
                             : 2:20-CV-00302-SCJ

TRUE THE VOTE, INC., CATHERINE    :
ENGELBRECHT, DEREK SOMERVILLE,    :
MARK DAVIS, MARK WILLIAMS,        :
RON JOHNSON, JAMES COOPER, AND    :
JOHN DOES 1-10,                   :
           Defendants.           :
--------------------------------X


Deposition of GREGG PHILLIPS, as the corporate
representative of OpSec Group LLC and individually
Conducted Virtually
Tuesday, January 25, 2022
10:02 a.m. ET



Reported by: Matthew Goldstein, RMR, CRR

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Ex. F to Defs.' Statement of Facts

Page 2

1      Deposition of GREGG PHILLIPS, conducted

2   virtually:

3      Pursuant to Notice, before Matthew Goldstein,

4   RMR, CRR, Notary Public in and for the State of

5   Maryland.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Ex. F to Defs.' Statement of Facts

Page 3

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
     JACOB SHELLY, ESQUIRE
 3   ELIAS LAW GROUP
     700 13th Street, NW
 4   Suite 600
     Washington, D.C. 20005
 5   202.434.1609
 6
 7   ON BEHALF OF THE PLAINTIFFS:
     LESLIE J. BRYAN, ESQUIRE
 8   LAWRENCE & BUNDY LLC
     1180 West Peachtree Street NW
 9   Suite 1650
     Atlanta, Georgia 30309
10   404.400.3350
11
12   ON BEHALF OF THE DEFENDANTS:
     JAMES BOPP, ESQUIRE
13   THE BOPP LAW FIRM
     1 S 6th Street
14   Terre Haute, Indiana 47807
     812.232.2434
15
16   ALSO PRESENT:
17   DESHAWN WHITE - VIDEOGRAPHER/EXHIBIT
18                  TECHNICIAN
19   TINA MENG, ELIAS LAW GROUP
20
21
22
```

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 4

1                    C O N T E N T S
2    EXAMINATION OF GREGG PHILLIPS                    PAGE
3    By MR. SHELLY                                      8
4
5                      E X H I B I T S
6                      (Attached)
7    PHILLIPS        DEPOSITION EXHIBIT               PAGE
8     Exhibit 1    Plaintiffs'  Notice of Rule         12
                   30(B)(6) Deposition of OpSec
9                  Group LLC
10    Exhibit 2    Plaintiffs' Notice to Take the      14
                   Deposition  of Gregg Phillips
11    Exhibit 3    PolitiFact Fact-check Did 3         26
                   million undocumented immigrants
12                 vote in this year's election
13    Exhibit 4    CNN.com - Transcripts              41
14    Exhibit 5    Def TTV 288, Invoice INV-0007      57
15    Exhibit 6    OpSec's Amended Responses to       76
                   Plaintiffs' Request for
16                 Production
17    Exhibit 7    Def Davis 005266 through Def       102
                   Davis 00527, NCOALink
18                 Processing Summary Report
19    Exhibit 8    OPSEC 0032 through OPSEC 0033,     132
                   December 16, 2020, E-mail
20                 Correspondence
21    Exhibit 9    OPSEC 0051, Spreadsheet Table      144
22

Ex. F to Defs.' Statement of Facts

Page 5

1              E X H I B I T S, CON'T

2                 (Attached)

3    PHILLIPS        DEPOSITION EXHIBIT                    PAGE

4    Exhibit 10    OPSEC 0009 through OPSEC 0029,    149
                   TrueAppend Report

5    Exhibit 11    OPSEC 60, Excel Spreadsheet        156

6    Exhibit 12    OPSEC 0031, December 15, 2020,    158
                   E-mail Correspondence

7    Exhibit 13    OPSEC 0045 through OPSEC 0047,    159
                   December 20, 2020, E-mail

8                  Correspondence

9    Exhibit 14    Def TTV 1439 through Def TTV      161
                   1439 through Def TTV 1441,

10                 December 28, 2020, E-mail
                   Correspondence

11   Exhibit 15    OPSEC 61, Excel Spreadsheet        163

12   Exhibit 16    OPSEC 0049 through OPSEC 0050,    164
                   DataWalk Screenshot

13   Exhibit 17    OPSEC 0059, Voter History Files   165
                   Screenshot

14   Exhibit 18    Crusade4Freedom Screenshot         167

15   Exhibit 19    OPSEC 0041, Notes                  168

16

17

18

19

20

21

22

Ex. F to Defs.' Statement of Facts

Page 6

1            THE VIDEOGRAPHER:  This is Tape Number 1

2    for the videotaped deposition of Gregg Phillips in

3    the matter of Fair Fight, Incorporated, et al.,

4    versus True the Vote in the United States District

5    Court for the Northern District of Georgia, the

6    Gainesville Division.  Case

7    Number 2:20-CV-00302-SCJ.

8            This deposition is being held by Zoom

9    video remote conferencing, the physical recording

10   in Fredericksburg, Virginia, on January 25th,

11   2022.

12           The time on the video screen is

13   10:02 a.m. Eastern Time.

14           My name is DeShawn White.  I am the

15   legal videographer from Digital Evidence Group.

16           The court reporter is Matthew Goldstein

17   in association with Digital Evidence Group.

18           Will counsel please introduce themselves

19   for the record.

20           MR. SHELLY:  I'm Jacob Shelly with Elias

21   Law Group on behalf of the plaintiffs.

22           MS. BRYAN:  Good morning.  Leslie Bryan,

Ex. F to Defs.' Statement of Facts

Page 7

1    Lawrence & Bundy, on behalf of the plaintiffs.

2              MS. MENG:  Hi.  This is Tina Meng with

3    Elias Law Group on behalf of plaintiffs as well.

4              MR. BOPP:  I'm done with your counsel

5    being introduced.  Thank you.

6              James Bopp, attorney for defendants, and

7    here Gregg Phillips and his company.

8              THE VIDEOGRAPHER:  Will the court

9    reporter please swear in the witness.

10

11

12

13

14

15

16

17

18

19

20

21

22

Ex. F to Defs.' Statement of Facts

Page 8

1                    P R O C E E D I N G S

2    Whereupon,

3                    GREGG PHILLIPS,

4    being first duly sworn or affirmed to testify to

5    the truth, the whole truth, and nothing but the

6    truth, was examined and testified as follows:

7        EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

8    BY MR. SHELLY:

9        Q.    Thank you.

10             Good morning, Mr. Phillips.  I'm Jacob

11   Shelly and I represent the plaintiffs in this

12   case.

13             Can you repeat your full name for the

14   record.

15       A.    Gregg Alan Phillips.

16       Q.    And your address for the record?

17       A.    1752 Coates Pass, Birmingham, Alabama

18   35242.

19       Q.    Is that where you are right now?

20       A.    Yes.

21       Q.    Have you ever been deposed before?

22       A.    Yes.

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 9

```
1        Q.   How many times?

2        A.   Many.

3        Q.   In what kinds of cases?

4        A.   Mostly related to my various work as a

5   government employee.

6        Q.   When was the most recent?

7        A.   I don't know.

8        Q.   Have you ever been deposed over a web

9   platform before?

10       A.   No.

11       Q.   Okay.  So I'd like to start by going

12  over a few ground rules for the deposition so that

13  we all have the same understanding.

14            All testimony today is under oath just

15  as if you were testifying in court.

16            Does that make sense?

17       A.   Yes.

18       Q.   For the benefit of everyone and the

19  court reporter, and especially since we are all

20  remote, please make your answers audible.  Head

21  shakes and nods are hard to put on the record.

22  Okay?
```

Ex. F to Defs.' Statement of Facts

1/25/2022         Fair Fight, Inc. et al. v. True the Vote, et al.         Gregg Phillips

Page 10

1      A.   Yes.

2      Q.   Please allow me to finish my question

3  before giving your answer.  That will help us have

4  a clean transcript for the record.

5           Sound good?

6      A.   Yes.

7      Q.   From time to time, your attorney may

8  make an objection to my question.  And that's

9  fine, but you are to answer regardless unless he

10  specifically instructs you not to answer.

11           Does that make sense?

12      A.   Yes.

13      Q.   If at any point you do not understand a

14  question that I'm asking, please let me know and I

15  will do my best to rephrase or clarify.  And if

16  you do answer, I will assume you understood the

17  question.

18           Is that fair?

19      A.   Yes.

20      Q.   If at any time you would like to take a

21  break, please let me know and I'll try to find a

22  good place to stop and we can go off the record

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

```
 1   for a few minutes.  The only exception is that if

 2   I asked you a question, I ask that you answer the

 3   question before we take a break.  Okay?

 4        A.   Okay.

 5        Q.   How are you viewing this deposition?

 6   Are you on a laptop or phone?

 7        A.   Laptop.

 8        Q.   Do you have any documents with you,

 9   either hard copies or electronic?

10        A.   No.

11        Q.   Is anyone else in the room with you?

12        A.   No.

13        Q.   Because we are taking your deposition

14   remotely, I may not always be able to see what you

15   have in front of you, who enters the room while

16   you are testifying.  You understand that it would

17   not be appropriate for your attorney or anyone

18   else to tell you how to answer a particular

19   question that I ask?

20        A.   Yes.

21        Q.   And you agree that while you are

22   testifying today, you will not exchange
```

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

1   communications, whether by text, e-mail or other

2   messaging, about how to answer the questions that

3   I ask?

4        A.   Yes.

5        Q.   All right.  What did you do to prepare

6   for today's deposition?

7        A.   Read through documents.  Read the --

8   looked at the law, looked at files, looked at some

9   of your filings -- or the filings.

10        Q.   And besides your counsel, did you talk

11   to anybody about today's deposition?

12        A.   No.

13            MR. SHELLY:  Can we pull up Exhibit A

14   and mark it as Exhibit 1.

15            (Phillips Deposition Exhibit 1 was

16   marked for identification and attached to the

17   transcript.)

18   BY MR. SHELLY:

19        Q.   Do you recognize this document,

20   Mr. Phillips?  There's a few pages.  We can scroll

21   through.

22        A.   Yes.

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 13

1      Q.    Do you understand that you have been

2    designated as a representative to answer questions

3    on behalf of OpSec Group LLC?

4      A.    Yes.

5      Q.    And are you prepared to testify about

6    all the topics in Exhibit A, which we can scroll

7    to if that would be helpful?  It's a few pages

8    down.

9           MR. BOPP:  I think this is a time for me

10   to interject an objection.  We of course want to

11   preserve the objections we have made to the scope

12   of the subject matters that you are intending to

13   ask.  And in order to expedite this, we would like

14   to make a continuing objection, with your

15   agreement; otherwise we'll just object to every

16   one or whatever.

17          And the continuing objections would be

18   any questions regarding any activities of the

19   deponent prior to the 2016 election, any

20   activities of the deponent in any other place

21   other than Georgia, any activities of the deponent

22   except for voter eligibility challenges

Ex. F to Defs.' Statement of Facts

Page 14

1    preelection in the Georgia runoff election, and

2    any questions regarding the activities of King

3    Street Patriots.  So we'd like to have a

4    continuing objection to that, with your agreement,

5    to expedite this.

6              MR. SHELLY:  Yes, I agree to that.

7              MR. BOPP:  Thank you.

8    BY MR. SHELLY:

9        Q.   So, Mr. Phillips, my question is, those

10   objections having been heard, are you otherwise

11   prepared to testify to each of the topics in

12   Exhibit A?

13       A.   Yes.

14             MR. SHELLY:  Can we pull up Exhibit B.

15             (Phillips Deposition Exhibit 2 was

16   marked for identification and attached to the

17   transcript.)

18   BY MR. SHELLY:

19       Q.   And do you recognize this document?

20       A.   Yes.

21       Q.   Do you understand that you are also

22   being deposed in your individual capacity?

Ex. F to Defs.' Statement of Facts

Page 15

1       A.   Yes.

2       Q.   And, similarly, to make this as

3   efficient as possible, to save us the trouble of

4   asking and answering all my questions twice, do

5   you agree that your answers this morning may be

6   attributed to you and OpSec unless specified

7   otherwise?

8       A.   Yes.

9       Q.   Great.

10          MR. SHELLY:  You can take that down.

11   BY MR. SHELLY:

12       Q.   And I'd like to start with just some

13   brief background.

14          Where did you grow up, Mr. Phillips?

15       A.   I was a military brat and grew up all

16   over the world.

17       Q.   Okay.  Where did you go to college?

18       A.   University of Alabama.

19       Q.   And what was your major?

20       A.   Commerce and business administration.

21       Q.   Did you complete any course work in

22   econometrics or statistics?

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 36

1    database and made a match.

2          Q.    And where do you get citizenship data

3    from?

4          A.    We have -- we have --

5                MR. BOPP:  Excuse me.

6                I object to the question.  It goes

7    beyond the scope of the subject matter which, with

8    respect to the two states, are limited to data

9    analysis and record linkage, in number 2, and

10   voter registry and research in number 3.

11               So you are beyond the scope of your

12   subject matter specification, so I instruct him

13   not to answer.

14   BY MR. SHELLY:

15         Q.    Mr. Phillips, what year was OpSec

16   founded?

17         A.    The company --

18         Q.    Yes.

19         A.    -- was founded in 2020.

20         Q.    Okay.  So for these questions that are

21   before OpSec was created, these will be questions

22   in your individual capacity without regard to the

Ex. F to Defs.' Statement of Facts

Page 54

1      Q.   When did you first discuss generating

2   lists of registered Georgia voters to be

3   challenged for change of residency?  And I'll

4   refer to these lists as "challenge lists" for

5   simplicity.

6      A.   Can you repeat your question.

7           MR. BOPP:  I object unless it's limited

8   to one of the six states and a particular

9   election.

10          MR. SHELLY:  So my question referenced

11  Georgia specifically, but I will further clarify

12  that I am referring to the challenge program that

13  occurred in December -- in between the general and

14  runoff elections in Georgia spanning from end of

15  2020 to beginning of 2021.

16          MR. BOPP:  Okay.

17  BY MR. SHELLY:

18     Q.   My question is, when did you first

19  discuss generating lists of registered Georgia

20  voters to be challenged for change of residency?

21     A.   Approximately the beginning of December.

22     Q.   And whose idea was that?

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

```
                                              Page 57
     1              MR. SHELLY:  Mr. White, can you pull up

     2    Exhibit N, as in Nancy.

     3              (Phillips Deposition Exhibit 5 was

     4    marked for identification and attached to the

     5    transcript.)

     6    BY MR. SHELLY:

     7        Q.  Do you recognize this document,

     8    Mr. Phillips?

     9        A.  It looks like an invoice, yeah.

    10        Q.  Yes.

    11              I believe this is an invoice from OpSec

    12    to True the Vote for $400,000.  And it reflects

    13    that you had been paid the entire amount by

    14    December 7th, 2020.

    15              Does that look right to you?

    16        A.  I don't recall the specifics of the

    17    payments, but that's what it says.

    18        Q.  Does this invoice cover your work

    19    generating challenge lists?

    20        A.  This goes way beyond that.  There's a

    21    lot more to this than that.

    22        Q.  Okay.  But it includes that and goes
```

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 71

1    that analysis?

2          A.    Because that's what we were hired by

3    True the Vote to do.

4          Q.    And what did that analysis show?

5          A.    It depends on the topic.

6          Q.    What topics were you asked to analyze?

7          A.    I don't have a specific list.

8          Q.    Can you give me some examples?

9          A.    Ineligible voters.

10         Q.    And what did you find?

11         A.    What did I find about what?

12         Q.    When you analyzed the data.

13         A.    We found that there were ineligible

14   voters on the voter roll.  Isn't that why --

15         Q.    In addition to the challenge lists --

16         A.    I didn't say --

17         Q.    You didn't say what?

18               MR. BOPP:  I'm sorry, Jacob.

19               Gregg, you need to wait until the end of

20   the question before you answer, please.

21   BY MR. SHELLY:

22         Q.    Did you use that analysis for your --

Ex. F to Defs.' Statement of Facts

Page 93

1               MR. SHELLY:  Okay.  Return at

2     12:30 Eastern.

3               MR. BOPP:  Okay.  Great.  Thank you.

4               THE VIDEOGRAPHER:  The time is

5     11:57 a.m.  We're now off the record.

6               (Recess from the record.)

7               THE VIDEOGRAPHER:  Okay.  The time is

8     12:31 p.m.  We are now on the record.

9     BY MR. SHELLY:

10        Q.   Okay.  Mr. Phillips, I would like to ask

11     you some questions now about the challenge lists

12     that you generated in Georgia for the 2021 runoff

13     election.

14               What data files did you use to generate

15     the challenge lists?

16        A.   The underlying data file, the state

17     voter registration file.

18        Q.   And presumably the NCOA list as well?

19        A.   We used NCOA.  We used several other

20     USPS products.  We use the CASS system, the Coding

21     Accuracy Support System.  We use Delivery Point

22     Verification.  We use several different

Ex. F to Defs.' Statement of Facts

1/25/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Gregg Phillips

Page 94

1    components.  We also have a proprietary algorithm

2    that we used to help verify identity.

3        Q.   Okay.  To make sure I understood that,

4    my understanding is that NCOA has a list of people

5    who submit to the USPS that they want their mail

6    to be forwarded.  There's a list of names in the

7    voter rolls and there was the list of names who

8    submitted NCOA requests.

9             I understand you used various databases,

10   algorithms to perform the match, but am I correct

11   that the NCOA list of individuals and the voter

12   file list of individuals -- that those were the

13   two lists you used?

14       A.   No, that's an oversimplification.

15       Q.   Okay.  Can you explain what other

16   information you used?

17       A.   Yes.  I just did.  We used Advanced Data

18   Hygiene, as you guys and others have argued is the

19   correct way to go.  We agree.  We also used other

20   types of databases to help us -- help us verify

21   identity as best we can.

22       Q.   Okay.  What other lists of individuals

                                    Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 95

1   besides the NCOA list did you use to identify

2   individuals who had moved?

3          A.    There's lots of different possibilities

4   out there, what we used specifically in the query.

5   I mean, the algorithms that we used access Oracle

6   queries so that we can basically consolidate all

7   the data we need and eliminate all the data we

8   don't need to, you know, eliminate false positives

9   and false negatives as best we can.

10         Q.    And what else could a person do to

11  indicate that they had changed residency that you

12  looked at besides sending a mail-forwarding

13  request to the post office?

14         A.    We look at other state data

15  registrations.  We look at a lot of things.  It

16  depends on the situation.  This one was pretty

17  simple, but it depends on the situation.  We could

18  access five or six different data sources.

19         Q.    Understood.

20               And I'm just asking specifically for the

21  Georgia challenge lists that you created.

22               Did I understand you to --

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 96

1              (Unintelligible cross-talk.)

2       Q.    Sorry?

3       A.    We used proprietary lists.  I mean, we

4    used some of the lists on the invoice you saw.  We

5    gather all sorts of data to help verify identity.

6    Because if you don't verify identity, then

7    residency is really -- you know, it has some risk

8    in determining the residency.

9              So we seek to identify -- verify

10   identity first.  And we -- I don't know who else

11   does that, but we do it.

12      Q.    And did I hear you correctly to say that

13   you matched Georgia's voter registration list to

14   voter registration rolls in other states to create

15   the challenge lists at issue in this case?

16      A.    Not only, but you asked me were there

17   other data sources.  And that was one, yes.

18      Q.    That was one you used.  Okay.

19             So besides requesting their mail to be

20   forwarded to the post office, besides registering

21   to vote in another state, is there anything else

22   that a registered Georgia voter could do to have

Ex. F to Defs.' Statement of Facts

Page 97

1   ended up on your list?

2          A.   Sure.  You can look at all kinds of

3   things.  You can look at tax records to see if

4   people sold their house and moved.  You can look

5   at all kinds of things.

6          Q.   I'm asking specifically, what did you

7   look at to create --

8          A.   Those are some of the things that we

9   did.

10         Q.   You looked at tax records as well?

11         A.   In some cases, yes.

12         Q.   Which cases did you decide to look at

13   tax records for?

14         A.   I don't recall specifically.

15         Q.   Which tax records did you look at?

16         A.   We would look at county tax records.

17         Q.   And what are you looking at

18   specifically, whether an individual paid taxes in

19   the county where they're registered or something

20   different?

21         A.   No, to see if they moved.

22         Q.   Okay.  Anything else that you looked at

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 106

1       Q.   So would you agree that it's

2    important --

3       A.   So assuming that you're performing an

4    actual linkage, yes.

5       Q.   Did you perform an actual linkage?

6       A.   Can you define what you mean by

7    "linkage."

8       Q.   Well, I'm repeating the term that you

9    just used.

10           What do you understand that to mean?

11      A.   No, that's not true.  You just said

12   "linkage."

13           What do you mean by "linkage"?

14      Q.   Is that not the term that you just used?

15      A.   You asked me a question about linkage.

16   Read the question.

17      Q.   Did you attempt to link information

18   between Georgia's voter rolls and other data sets?

19      A.   What do you mean by "link"?

20      Q.   Match.

21      A.   Match?  Sure.

22      Q.   When you performed that matching, do you

Ex. F to Defs.' Statement of Facts

1/25/2022            Fair Fight, Inc. et al. v. True the Vote, et al.            Gregg Phillips

Page 107

```
 1    agree that it's important that the fields conform

 2    with respect to data format and data type?

 3         A.   Yes.

 4         Q.   Do you agree that it would be important

 5    that both databases used for the match use

 6    standardized abbreviations?

 7         A.   We have a separate approach that we use

 8    for that because we verify identity first.

 9         Q.   Okay.  Can you tell me about how you

10    verify the identity?

11         A.   No.

12         Q.   Why not?

13         A.   Because it's a proprietary service that

14    my company used.

15         Q.   Okay.  This case has a protective order

16    in place specifically so we can understand these

17    questions.

18         A.   It's a 4,000-row algorithm.

19              What do you want to know?

20         Q.   I want to know what you do to verify the

21    identities before you perform the matching.

22         A.   Assessing -- assessing identity involves
```

Ex. F to Defs.' Statement of Facts

Page 108

1   a complex series of mostly common algorithms,

2   things like dissimilarity indexes, similarity

3   indexes.  We use some fuzzy logic.  We use a

4   number of different things.  That's my answer.

5        Q.   Okay.  What is fuzzy logic?

6        A.   Fuzzy logic is a set of -- in identity

7   is a set of algorithms that's designed to

8   ascertain whether something similar is near

9   similar enough to assume that identity is

10  accurate.  And if it's not, then it assigns a risk

11  factor to it.

12       Q.   And is this something that you developed

13  yourself or you used an outside vendor for it?

14       A.   Yes.  I developed --

15       Q.   Which one?  Is that something --

16       A.   I developed it myself in 2006.

17       Q.   Okay.  Has its accuracy ever been

18  analyzed by anybody else?

19       A.   Its accuracy.  We use it every day in

20  our business.  So it's used in practice, and we've

21  done 43 million cases, so its accuracy is pretty

22  well known.

Ex. F to Defs.' Statement of Facts

Page 112

1  mean, we would use them as oracles.  And when the

2  algorithm needs information, it would seek the

3  information from one, the other or both.

4       Q.   What kind of information would it need?

5       A.   The address information that TrueNCOA

6  and SmartyStreets provide.

7       Q.   Were there any others that you used

8  besides TrueNCOA and SmartyStreets?

9       A.   Not for addresses.

10       Q.   For any other forms of data that were

11  relevant to the challenge lists?

12       A.   What's the question?

13       Q.   I asked if there were any other programs

14  similar to what TrueNCOA and SmartyLinks [sic]

15  provides.  And you said not related to addresses.

16       A.   No.

17       Q.   Can you clarify what I got wrong?

18       A.   You didn't get it wrong.  You asked me

19  if there were any more.  I said no.

20       Q.   Understood.

21            What queries did you use in producing

22  the challenge list?

Ex. F to Defs.' Statement of Facts

Page 113

1          A.   What queries did we use?  What do you

2     mean?

3               MR. SHELLY:  Can we pull up Exhibit C.

4     And go to the top of page 13.

5     BY MR. SHELLY:

6          Q.   I have some questions about number 4

7     here at the top.  It says, "OpSec compared, using

8     algorithms, queries, and various regression

9     techniques" --

10         A.   Yeah.

11         Q.   -- "the addresses in the registration

12    file to government and commercially available

13    information in order to identify people who have

14    either moved out of the county in which they are

15    registered or who live outside the State of

16    Georgia."

17         A.   Right.

18         Q.   So I'll just start at the beginning, I

19    guess.

20              Can you tell me all of the algorithms

21    you used?

22         A.   As I said, we have a proprietary

Page 114

1   algorithm that my company owns that we use

2   primarily for the identity and residency

3   resolution.

4        Q.   Okay.  Are you willing to produce that

5   algorithm or provide it in a format that we can

6   review?

7        A.   No.

8        Q.   Okay.  And in the same context, can you

9   tell me what queries you used?

10       A.   Well, the query would be a query against

11  the True- -- in this case, TrueNCOA and possibly

12  SmartyStreets.  So they would -- they would pass

13  it through their CASS system to clean it up,

14  perform some hygiene on it.  They'd look at

15  delivery point verifications and those kind of

16  things.  If we found some anomalies, we might

17  access another system like a SmartyStreets, but

18  that's it.  That's the query.

19       Q.   So when you say you performed "hygiene,"

20  can you give me a concrete example of what it

21  would mean to provide hygiene to a piece of data

22  that you analyzed here?

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 116

1   address, say, 123 Main, in a city that had a Main

2   Street and a Main Avenue, how would know the CASS

3   system know or SmartyStreets -- would either of

4   those systems know how to complete it?  Or what

5   would it do in that situation?

6        A.   You would have to ask them how they

7   would do it.  To us, I mean, again, it's a

8   function of whether or not it's likely to be the

9   same person, organization or street.  And then it

10  assigns sort of a risk score to it.  And then it's

11  processed differently.

12            That might be a case where we would go

13  and look at, say, a SmartyStreets to see if we can

14  ascertain what the situation is.  In the cases

15  where we cannot, we would kick it out and not

16  include it.

17       Q.   Okay.  And when you say it would assign

18  a "risk score," is that like a scale of 1 to 10?

19  Or what kind of risk score can be given?

20       A.   We have risk scoring built into our

21  scoring mechanisms inside of our algorithms.

22       Q.   So I'm trying to figure out what's

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 118

1         Q.   Were you able to eliminate the risk?

2         A.   You can never eliminate all of the risk.

3         Q.   Did you analyze every piece of data that

4    was flagged as a risk of potential inaccuracies?

5         A.   The quality control algorithms would,

6    yes, in seeking to remove any false positives or

7    false negatives that might be in the system.

8         Q.   And that's something that you did

9    in-house or that's something that TrueNCOA would

10   have done or something different?

11        A.   No, that's something our algorithm does.

12        Q.   And you run the data through your

13   algorithm on the back end after you -- after

14   TrueNCOA performs the match; is that correct?

15        A.   Yes.

16        Q.   And do you know how TrueNCOA or these

17   others assign risk?

18        A.   How they assign risk?  I have no idea.

19        Q.   Moving on to the next clause in this

20   answer, what regression techniques did you use?

21        A.   Our modeling is pretty significant.  We

22   use some k-means modeling.  We use a variety of

Ex. F to Defs.' Statement of Facts

Page 119

1    different techniques in our scoring.  And then we

2    use a model management process to identify the

3    regression technique most likely to produce an

4    accurate result.

5        Q.   And in what stage in the process were

6    you running these regressions?

7        A.   They're run through the process.  It's

8    all baked into the system.  Again, this whole

9    thing took a few minutes.

10       Q.   Am I understanding that you did these

11   regressions after you received the preliminary

12   match back from TrueNCOA, and then you're

13   providing your own further analysis on it?

14       A.   I didn't say that.

15       Q.   Can you clarify what I misunderstood?

16       A.   The formulas and algorithms that we use

17   execute.  As they need information, they pull

18   information in from an outside entity, say,

19   TrueNCOA or whatever.  It feeds it into the system

20   and then it continues to process it and keeps

21   working to solve -- solve for the risk.  And

22   ultimately we come up with a list.

Ex. F to Defs.' Statement of Facts

Page 120

1            MR. SHELLY:  Okay.  You can take this

2    exhibit down, Mr. White.

3    BY MR. SHELLY:

4        Q.   When you were matching the voter

5    registration rolls to the NCOA list, what fields

6    were matched between those files?

7        A.   We just uploaded the file.  CASS does

8    the matching -- I'm sorry.  The source does the

9    matching, TrueNCOA or SmartyStreets.

10       Q.   Okay.

11       A.    In this case TrueNCOA first.

12       Q.   Are you familiar with the term "unique

13   identifier" in the context of data matching?

14       A.   Sure.

15       Q.   Are there any common unique identifiers

16   between the voter registration rolls and NCOA

17   lists?

18       A.   Well, that -- not as many as there

19   should be, and that's why we seek to resolve

20   identity first.

21       Q.   Are there any unique identifiers common

22   between those two lists?

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 125

1          Q.   What are some reasons you are aware of

2     that someone could submit an address change to the

3     postal service while remaining eligible to vote

4     where they are registered?

5          A.   I have no speculation on that point.

6          Q.   Okay.  Just to clarify, you understand

7     that someone can submit an NCOA list and still be

8     properly registered, but you're not sure in what

9     scenarios that may be the case?

10          A.   I didn't understand that's what you

11     asked.  Is that what you're asking?

12          Q.   So my second question was, what are some

13     reasons you're aware of that someone can submit an

14     address change to the postal office while

15     remaining eligible to vote where they are

16     registered?

17          A.   Maybe they're being deployed in the

18     military.  Maybe -- might have something to do

19     with school.  Those kind of things.

20          Q.   Any other examples you're aware of?

21          A.   Moved inside the county or inside the

22     jurisdiction in which they were registered.

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 126

1    There's a few.

2         Q.   Is it your understanding that someone

3    who moved for other non-military government

4    service could still be eligible to vote in

5    Georgia?

6         A.   I don't have a perfect list to offer

7    you.  You asked me for some ideas.  Those were

8    three.

9         Q.   And now I'm offering you some more and

10   asking if they're consistent with what you would

11   have understood the requirements to be.

12             So, one, would you have understood

13   someone who moved for non-military government

14   service to remain eligible to vote in Georgia even

15   if they submitted an NCOA?

16        A.   Sure.

17        Q.   And would you understand someone to

18   remain eligible to vote in Georgia if they had a

19   temporary move or a part-time job or to visit

20   family?

21        A.   It depends on the circumstance, but yes.

22        Q.   And would you recognize that someone

Ex. F to Defs.' Statement of Facts

Page 127

1    would remain eligible to vote if they forwarded

2    their mail for some mail-specific purpose, for

3    example, if they were on vacation and needed their

4    mail to be forwarded?

5          A.   Yep.

6          Q.   And if someone intended to move and so

7    filed an NCOA request, but did not actually move,

8    you would agree that they would remain eligible to

9    vote in Georgia?

10         A.   It depends on their circumstance.  I

11   can't answer that.

12         Q.   And the question is, if someone is

13   living in Georgia, they intend to move so they

14   file an NCOA request to forward their mail, and

15   then they change their mind and do not actually

16   move, you would agree that they're still eligible

17   to vote in Georgia?

18         A.   Sure.  If they still submitted the

19   permanent move change, yeah.

20         Q.   Okay.  Who was responsible for removing

21   the names of eligible voters such as these from

22   the challenge lists?

Ex. F to Defs.' Statement of Facts

Page 128

1       A.   We did our best to -- first of all, the

2   code.  Let's put it that way.

3       Q.   Okay.  To go through those examples

4   again, would the code be able to identify someone

5   who is deployed for military service?

6       A.   As best we can, yes.  We pulled out

7   300,000 voters off the initial query.

8       Q.   Okay.  I'll ask you another question

9   about that in a second, but would the code be able

10  to recognize someone who moved because they were a

11  college student?

12      A.   It might.

13      Q.   How would it do that?

14      A.   If they submitted a permanent change or

15  a temporary change.

16      Q.   Okay.  Would the code --

17      A.   We also --

18      Q.   -- also identify --

19      A.   I'm sorry.  Go ahead.

20      Q.   Go ahead.

21      A.   Go ahead.

22      Q.   Would the code be able to identify

Ex. F to Defs.' Statement of Facts

Page 129

1   someone who moved for non-military government

2   service?

3       A.   Possibly.  And it depends, again, how

4   they submitted their NCOA and if they sold their

5   house or -- you're making suppositions that can't

6   be made.  It's not a one piece or another; it's

7   the aggregate of it.

8       Q.   Okay.  So I understand that the code

9   cannot identify the purpose that someone submitted

10  an NCOA request, but your answer is you think you

11  can infer it from other sources of data?

12      A.   As best we can.  And then when the

13  challenge is made, the probable cause has to be

14  identified by the county.  And they are the ones

15  with the capability of doing that.

16      Q.   What steps did you take specifically to

17  remove the names of individuals who live on or

18  near a military base?

19      A.   We have a list of ZIP codes that include

20  all the military bases.  We also use some of the

21  military designators, FPO, that kind of thing.

22  And we pull those directly from -- in the initial

Ex. F to Defs.' Statement of Facts

1/25/2022         Fair Fight, Inc. et al. v. True the Vote, et al.         Gregg Phillips

Page 130

1   query, rather than waiting till the end.

2       Q.   When you say "we" --

3            (Unintelligible cross-talk.)

4       Q.   -- was anyone else responsible for that

5   besides you?

6            (Unintelligible cross-talk.)

7       Q.   But there was no other person

8   responsible for removing these names besides you?

9       A.   No.

10      Q.   If a person moved to an address, for

11  example, Camp Lejeune, North Carolina, would that

12  suggest to you that the person lives on a military

13  base?

14      A.   Potentially.

15      Q.   What about an address on Andrews Air

16  Force Base?

17      A.   Potential.

18      Q.   Barksdale Air Force Base?

19      A.   Moved to or from?  What's the question?

20      Q.   To.  To.

21      A.   It depends.  It depends on what their

22  submission said to the post office.  So is it

Page 135

1    Base example, do you know what town Moody Air

2    Force Base is closest to in Georgia?

3         A.   Macon?  I don't know.

4         Q.   I'll represent to you that I believe

5    it's Valdosta.

6         A.   Yeah, that's right.

7         Q.   Did you examine whether any addresses

8    with a Valdosta address could be in the military

9    or family of someone in the military?

10        A.   We probably did, yeah.

11        Q.   Would you have removed those voters?

12        A.   Assuming that it met the matching

13   requirement, sure.

14             MR. SHELLY:  You can take this exhibit

15   down, Mr. White.

16   BY MR. SHELLY:

17        Q.   Mr. Phillips, are you familiar with

18   UOCAVA?

19        A.   Of course.

20        Q.   Did you examine whether any voters on

21   your list had requested a UOCAVA ballot?

22        A.   As best we can.  As you know, UOCAVA

Ex. F to Defs.' Statement of Facts

Page 136

1    ballots and postcard ballots in general are not

2    handled by the state; they're handled by the

3    counties individually.

4         Q.   How would you have researched or sought

5    to identify whether an individual had requested a

6    UOCAVA ballot?

7         A.   Almost impossible because the counties

8    don't publicize that.

9         Q.   Okay.  When you say "almost impossible,"

10   so was there anything you did to identify whether

11   a voter had requested a UOCAVA ballot?

12        A.   No, I am not aware of any way to do that

13   effectively.

14        Q.   Did you -- I think you said you did --

15   well, let me just ask the question.

16             Did you take any steps to remove all the

17   names of college or university students who were

18   temporarily away from home?

19        A.   Anyone temporary that had registered the

20   temporary address change, yes.  Permanent address

21   changes, what we tried to do was eliminate the ZIP

22   codes in and around the schools.

Page 138

1      A.   I don't have any opinion about moving to

2   college campuses.

3      Q.   I didn't hear you.  Could you repeat

4   that last part.

5      A.   I don't have any opinion on your

6   question.

7      Q.   Is it your understanding that most

8   students who attend college reside in a dormitory?

9      A.   I would believe that to be false.

10      Q.   Did you take any steps to remove the

11   names of individuals who were temporarily

12   attending college, but did not live in a

13   dormitory?

14      A.   Did they register as permanent moves

15   from the NCOA?

16      Q.   Am I gathering correctly that your

17   analysis of whether voters were eligible turned on

18   whether they filed a permanent or temporary change

19   of address?

20      A.   It might.  As I said, it's a complex

21   algorithm.  It's 4,000 rows long.  It doesn't --

22   it doesn't work like your brain does.

Ex. F to Defs.' Statement of Facts

Page 140

1      Q.   Do you know what proportion of the

2   original list that TrueNCOA flagged that you would

3   have sent along for further verification?

4      A.   I recall that we probably got -- the

5   initial cut was probably 700,000 or so.  And then

6   it ultimately got down to, what, 360-, so whatever

7   that delta is.

8      Q.   Approximately how much time did you

9   spend reviewing the names that were matched

10  between the voter file and the NCOA registry?  Or

11  am I understanding correctly that the code did all

12  the analysis and you personally did not do any

13  further?

14     A.   There's a little bit of sort of

15  reviewing the quality of reports to ensure that

16  we're within something we consider reasonable on

17  the false positives and false negatives, but an

18  hour maybe.

19     Q.   Okay.  And what would you have

20  considered reasonable?

21     A.   Maybe a standard deviation.

22     Q.   Can you just explain that a little bit

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 141

1   more?  A standard deviation of what?

2        A.   Relative to the potential error rate

3   that we might expect.  That's the best way to

4   frame it.

5        Q.   Okay.  And what error rate did you

6   expect?

7        A.   Less than one standard deviation.

8        Q.   If you had had more time, would you have

9   done anything more?

10       A.   No.

11       Q.   Did you do anything to correct for

12   potential matches of individuals in the voter file

13   who share a first name, last name and reside at

14   the same address?  Or am I understanding that you

15   relied on TrueNCOA to determine whether that would

16   be a match?

17       A.   I never said that, but the import of

18   verifying identity can't be overstated in this

19   case.  And that would come as a result of helping

20   verify identity.

21       Q.   Okay.  So when you pulled the voter

22   file, there was -- if there were two individuals

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 145

1    It was system-generated.

2            MR. SHELLY:  You can take this down,

3    Mr. White.

4    BY MR. SHELLY:

5        Q.  Mr. Phillips, did you review the

6    challenge lists for instances where the name of

7    the registrant in the challenge file does not

8    match the name in the voter file or the registrant

9    with that registration number?

10       A.  We would have, yes.

11       Q.  And if you had noticed that, would you

12   still -- should that person have been included in

13   the challenge list if their name in the challenge

14   list did not match the name assigned to that

15   registration number in the registration rules?

16       A.  That likely would have been an exception

17   and would have been kicked out, but it's possible

18   it could be included.

19       Q.  Did you review the challenge list for

20   instances where the address an individual is

21   registered at and the address where a registrant

22   moved to are identical?

Ex. F to Defs.' Statement of Facts

Page 146

1        A.    There are some anomalies like that, yes.

2        Q.    Should those anomalies have been removed

3    from the challenge list?

4        A.    I would like to think they would, but

5    it's possible they wouldn't.  There are some other

6    reasons why, especially if it was a different

7    name.

8        Q.    Would you review the challenge list to

9    confirm whether an individual reregistered at the

10   address where the NCOA match suggested the

11   individual moved to?

12       A.    That was beyond our capacity.  So in

13   that case, what we would say is submit the

14   challenge and let the county figure it out.

15       Q.    Do you know what it would mean when a

16   record shows a "moved to" street address of

17   general delivery?

18       A.    It could mean a lot of things.  They

19   didn't give an address.  They didn't have an

20   address when they moved.  It's possibly a homeless

21   person.  There are dozens of reasons.

22       Q.    Would you still understand that to

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 149

1    were -- we were called to work.

2          Q.   How many counties did you prepare

3    challenge lists for?

4          A.   I think we did them all.

5          Q.   And in how many counties were challenge

6    lists actually submitted?

7          A.   I don't know the answer to that.

8    Catherine can answer that.

9          Q.   Do you know how counties were chosen for

10   lists to be submitted?

11         A.   I believe it's where we found a Georgia

12   voter that lived in the jurisdiction to make the

13   challenge.

14         Q.   After you conducted the initial match,

15   did you analyze demographic information or other

16   characteristics of the individuals you identified?

17         A.   Not until after you sued us.

18              MR. SHELLY:  Can we pull up Exhibit H.

19              (Phillips Deposition Exhibit 10 was

20   marked for identification and attached to the

21   transcript.)

22

Ex. F to Defs.' Statement of Facts

Page 150

1    BY MR. SHELLY:

2        Q.    This is a TrueAppend document.  We can

3    scroll through it several pages.  Once you have a

4    sense, can you tell me if you're familiar with

5    this document.  Feel free to ask Mr. White to

6    scroll directly.

7        A.    Yes, I am familiar with it.

8        Q.    Can you describe what it is for me?

9        A.    It is a quality check on numbers.

10       Q.    Do you know when this document was

11   created?  It looks like it says December 16th.

12       A.    Probably before we sent the challenges

13   out.

14       Q.    Okay.  And do you know why it was

15   created?

16       A.    Yes, quality control.  Trying to pull --

17   remove voters that would be a false positive or

18   false negative.

19       Q.    Okay.

20             MR. SHELLY:  Can you scroll to the next

21   page, Mr. White.  Next page.

22

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 151

1    BY MR. SHELLY:

2          Q.    How would you have used age information

3    for your quality control?

4          A.    We wouldn't.  This was -- this is part

5    of the report that comes back from TrueAppend.

6                MR. SHELLY:  Next page.

7    BY MR. SHELLY:

8          Q.    How would you have used business owner

9    information?

10         A.    We don't.  It's part of the report that

11   comes back from TrueAppend.

12         Q.    Which parts of this report did you use?

13         A.    Probably just looked at the overall

14   numbers and then tried to assess whether or not

15   there was some accuracy -- noticeable accuracy

16   issues.  And we don't use this product anymore,

17   but that would be it.

18         Q.    Why don't you use this project anymore?

19         A.    Product.

20               It's not effective.  We have automated

21   testing tools now that we did not have.

22         Q.    Do you know how much OpSec paid for this

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 152

1    report?

2         A.    Probably nothing.  Twenty bucks --

3         Q.    TrueAppend provided it for free?

4         A.    -- forty bucks?  I don't know.  I don't

5    know how much...

6         Q.    Would you make any changes to the

7    challenge lists after reviewing -- after reviewing

8    information in this report?

9         A.    Not that I recall.

10              MR. SHELLY:  You can take this one down,

11   Mr. White.

12   BY MR. SHELLY:

13        Q.    Mr. Phillips, once a voter has been

14   challenged, what is your understanding of what

15   that voter must do to be able to cast a ballot and

16   have that ballot counted?

17        A.    Prove who they were -- or prove where

18   they lived.  Excuse me.  Sorry.

19        Q.    Did you consider the burden this process

20   could impose over the Christmas holidays on voters

21   who were temporarily outside of Georgia for a

22   legitimate reason?

Ex. F to Defs.' Statement of Facts

Page 160

1            MR. SHELLY:  It's just -- I'm squinting

2    on the screen, but what I want is actually at the

3    top of page 2, which is why I wasn't seeing it.

4    And the date line is actually right above this

5    page.  It might be helpful context.  It's the

6    first line of the previous page.  It shows this

7    was a December 20th e-mail.

8    BY MR. SHELLY:

9        Q.   Mr. Phillips, you write, "Because these

10   are supplemental to the electronic filing, we

11   don't really have a huge need to get these shipped

12   out immediately.  If we drop ship across the next

13   week or so, can you get us a cost estimate?  There

14   is some strategy at play here and we are adjusting

15   tactics to compensate."

16           And as you can see, this is an e-mail

17   string with Mark Williams.

18           Do you see what I'm referring to?

19       A.   Yes.

20       Q.   Okay.  My question is, what is the

21   "strategy at play" that you are referencing?

22       A.   Whether or not we were going to ship

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 161

1   both the hard copy in addition to the electronic

2   copy which was being shipped.

3        Q.   Okay.  And how did you adjust tactics?

4        A.   We ended up not shipping them to the

5   counties.

6        Q.   Okay.  And why was that decision made?

7        A.   Cost, among other things, but the

8   counties were okay with just getting them

9   electronically, and they didn't want the boxes

10  dumped on their doorstep.

11       Q.   Got it.

12            MR. SHELLY:  Can we pull up Exhibit L.

13            (Phillips Deposition Exhibit 14 was

14  marked for identification and attached to the

15  transcript.)

16  BY MR. SHELLY:

17       Q.   At the top here, this is December 28th,

18  you e-mail Roberta, "Can you please purchase the

19  newest GA voter filer?  I think it is $250.  We

20  need to have it expedited if possible."

21            Who is Roberta?

22       A.   She's a volunteer that used to work for

Ex. F to Defs.' Statement of Facts

Page 163

1    to get -- I was probably trying to get the file.

2    There are two files in Georgia.  One file has

3    history on it and one file has the actual voter

4    registrations.  And they're linked by the UVID.

5    And I was probably trying to get one file before

6    the other one was done, is what I was probably

7    trying to do.

8              MR. SHELLY:  Can we pull up Exhibit M.

9              (Phillips Deposition Exhibit 15 was

10   marked for identification and attached to the

11   transcript.)

12   BY MR. SHELLY:

13        Q.   Are you familiar with this spreadsheet?

14        A.   I'm not.  And I know you guys are saying

15   that I submitted these, but I don't use Excel.

16   And I'm a little unclear on -- you're saying I

17   submitted this in Excel, and that's -- that just

18   doesn't ring true to me.  I'm not sure.  But I'm

19   familiar with the numbers, so...

20        Q.   Okay.  So this looks to me like a

21   spreadsheet of racial data.

22              Do you know when this --

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 164

1        A.    No idea.

2        Q.    -- spreadsheet would have been created?

3        A.    No idea.

4        Q.    Okay.  But you did not create this and

5   you have not seen this; is that correct?

6        A.    I may have seen it after the -- I mean,

7   as I said, we probably looked after we were sued,

8   but not before.  I have no idea.

9        Q.    Okay.

10       A.    It's not relevant.

11             MR. SHELLY:  Will you put up Exhibit O.

12             (Phillips Deposition Exhibit 16 was

13   marked for identification and attached to the

14   transcript.)

15   BY MR. SHELLY:

16       Q.    Are you familiar with this document?

17       A.    I am.

18       Q.    Can you explain what it is?

19       A.    It's a screenshot from a product called

20   DataWalk.  It's an intelligence community and law

21   enforcement product that they use to link data.

22       Q.    And how did you use this?

Ex. F to Defs.' Statement of Facts

Page 165

1      A.   We used it, and use it regularly, to do

2   a type of regression analysis and data linkage.

3      Q.   Was it used to generate the challenge

4   lists?

5      A.   No.

6      Q.   Okay.

7           MR. SHELLY:  Can we pull up Exhibit P.

8           (Phillips Deposition Exhibit 17 was

9   marked for identification and attached to the

10  transcript.)

11  BY MR. SHELLY:

12     Q.   Are you familiar with this document?

13     A.   It doesn't ring a bell, but it looks a

14  little bit like a DataWalk document.  I can barely

15  see it.  It's too small to see, but I assume it's

16  a DataWalk document.

17     Q.   Mr. --

18     A.   Let me rephrase that.

19          I don't know.  We don't usually look at

20  this.

21          MR. SHELLY:  Mr. White, can you zoom in

22  on, say, the top circle?

Page 166

1              THE WITNESS:  Yeah, that's a DataWalk

2     document.

3     BY MR. SHELLY:

4         Q.   Did you use this in relation to the

5     challenge lists?

6         A.   No.

7         Q.   What would you have used this for?

8         A.   Just looking at different linkages

9     between different files and checking to see what

10    we can find.  In this particular -- if we used it,

11    we used it to exclude.  Because we typically don't

12    get into the whole deceased voter thing that

13    people talk about.

14        Q.   You say you typically do not research

15    whether there are deceased voters?

16        A.   We will occasionally look when we are

17    asked, but it's not a topic -- it was not a topic

18    for the challenges and not a topic in Georgia.

19        Q.   Okay.

20             MR. SHELLY:  You can take that one down,

21    Mr. White.

22

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 167

1    BY MR. SHELLY:

2         Q.   Mr. Phillips are you familiar with the

3    Crusade for Freedom?

4         A.   No.

5         Q.   Are you familiar with the Twitter

6    account @Crusade4Freedom?

7              MR. BOPP:  I object.  I mean, if you

8    think this is relevant, you can tell me why, but,

9    otherwise, I'm going to object.  There's no

10   foundation laid.  This isn't relevant at all to

11   anything.

12             MR. SHELLY:  Can we --

13             MR. BOPP:  And it's way beyond the scope

14   of the subject matter.  But, I mean, if you want

15   to tell me, fine; if you don't, I'll just stand on

16   my objection.

17             MR. SHELLY:  Can we pull up Exhibit T.

18             (Phillips Deposition Exhibit 18 was

19   marked for identification and attached to the

20   transcript.)

21   BY MR. SHELLY:

22        Q.   So these are tweets.  The first one

Ex. F to Defs.' Statement of Facts

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 168

1    says, "We just prospectively challenged the

2    eligibility of 360,000 voters in Georgia.  Largest

3    single election challenge in Georgia and American

4    history."

5           Does this refresh your recollection

6    about what the Crusade for Freedom is?

7    A.    No.  I'm not on Twitter so...

8    Q.    Okay.  Fair to say that you do not know

9    who tweets under this account?

10   A.    No, I don't know.

11   Q.    Okay.

12          MR. SHELLY:  Can you pull up Exhibit U.

13          (Phillips Deposition Exhibit 19 was

14   marked for identification and attached to the

15   transcript.)

16   BY MR. SHELLY:

17   Q.    Are you familiar with this document?

18   A.    Yes.

19   Q.    Can you explain what it is?

20   A.    It's sort of a brain dump when I was

21   first kind of working through some of the ideas

22   and how we might be able to put it together.  It

Ex. F to Defs.' Statement of Facts