Case 2:20-cv-00302-SCJ   Document 155-12   Filed 05/16/22   Page 1 of 48

10/6/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville
                        Confidential - Pursuant to Protective Order

Page 1

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

------------------------------------x
FAIR FIGHT, INC.,
SCOTT BERSON,
JOCELYN HEREDIA,
and JANE DOE,

                    Plaintiffs,


                v.

TRUE THE VOTE,
CATHERINE ENGELBRECHT,
DEREK SOMERVILLE,
MARK DAVIS,
MARK WILLIAMS,
RON JOHNSON,
JAMES COOPER,
and JOHN DOES 1-10,

                    Defendants,
FAIR FIGHT ACTION, INC.,

                    Counter-Defendant.
------------------------------------x
Case No. 2:20-CV-00302-SCJ
------------------------------------x


 *** CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER ***
REMOTE DEPOSITION OF
DEREK SOMERVILLE
Wednesday, October 6, 2021

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Ex. I to Defs.' Statement of Facts

Page 2

1                          October 6, 2021

2                          9:17 a.m. Eastern Daylight Time

3

4              Remote video deposition of DEREK

5     SOMERVILLE, taken by Plaintiffs, pursuant to

6     Notice, dated September 23, 2021, before Brandon

7     Rainoff, a Federal Certified Realtime Reporter

8     and Notary Public of the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

```
 1   A P P E A R A N C E S:
 2   ELIAS LAW GROUP LLP
 3   Attorneys for Plaintiffs
             10 G Street, Northeast
 4           Suite 600
             Washington, D.C.  20002
 5           202.968.4490
     BY:    CHRISTINA A. FORD, ESQ.
 6           202.968.4558
             cford@elias.law
 7           JOEL J. RAMIREZ, ESQ.
             202.968.4499
 8           jramirez@elias.law
 9
10   LAWRENCE & BUNDY LLC
     Attorneys for Plaintiffs
11           1180 West Peachtree Street Northwest
             Suite 1650
12           Atlanta, Georgia  30309
             404.400.3350
13   BY:    MICHELLE L. McCLAFFERTY, ESQ.
             404.400.1755
14           michelle.mcclafferty@lawrencebundy.com
15
16   THE BOPP LAW FIRM, PC
     Attorneys for Defendants
17           1 South Sixth Street
             Terre Haute, Indiana 47807-3510
18           812.232.2434
     BY:    COURTNEY KRAMER, ESQ.
19           ckramer@bopplaw.com
20
21   ALSO PRESENT:
     ALICIA HOLMSTOCK, Legal Videographer
22   ALEX RENNICK, Digital Document Technician
```

Ex. I to Defs.' Statement of Facts

```
                                                          Page 4
 1    I N D E X   O F   E X A M I N A T I O N

 2    Witness:

 3    Derek Somerville

 4

 5    Examination:

 6    By Ms. Ford..........................Page 9

 7

 8            I N D E X   O F   E X H I B I T S

 9     Exhibit A ................................Page 13

      Four-page document entitled: Plaintiffs Notice to

10    Take the Deposition of Defendant Derek Somerville,

      dated September 23, 2021 (no Bates Nos.)

11

12     Exhibit B ................................Page 35

      Document Bates stamped Def. Somerville 0004,

13    single-page SMS message From: Catherine Englebrecht,

      To: Derek Somerville, Date: December 17, 2020

14

15     Exhibit D ................................Page 41

      Multipage document bearing heading on first page:

16    Derek Somerville (no Bates Nos.)

17

18     Exhibit C ................................Page 62

      Three-page email chain, top email From: Derek

19    Somerville, To: Catherine Engelbrecht, Subject: RE:

      FW: Elector Challenge Follow-Up Items, Sent: December

20    19, 2020 (no Bates Nos.)

21

22
```

Ex. I to Defs.' Statement of Facts

10/6/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville
                    Confidential - Pursuant to Protective Order

Page 5

1        I N D E X   O F   E X H I B I T S, CON'T

2    Exhibit E ................................Page 94
     Three-page document entitled: True The Vote Partners
3    With Georgians in Every County to Preemptively
     Challenge 364,541 Potentially Ineligible Voters (no
4    Bates Nos.)

5

6    Exhibit F ................................Page 115
     Single-page email From: Catherine Engelbrecht, To:
7    Amy Holsworth, Subject: Citizen Challenge Q&A Zoom
     call Sunday night at 6p et, Sent: December 19, 2020
8    (no Bates No.)

9

10   Exhibit I ................................Page 125
     Single-page document bearing heading: Jim Flenniken
11   (no Bates No.)

12

13   Exhibit G ................................Page 138
     Multipage document entitled: Defendant Derek
14   Somerville's Responses to Plaintiffs' First
     Interrogatories, dated March 15, 2021 (no Bates Nos.)

15

16   Exhibit J ................................Page 145
     Multipage document entitled: Defendant Derek
17   Somerville's Responses to Plaintiffs' First Requests
     for Production, dated March 15, 2021 (no Bates Nos.)

18

19   Exhibit L ................................Page 149
     Two-page document entitled: True The Vote Launches
20   Georgia Election Integrity Hotline as Part of the
     Most Comprehensive Ballot Security Effort in Georgia
21   History, dated December 15, 2020 (no Bates Nos.)

22

Ex. I to Defs.' Statement of Facts

```
                                                      Page 6

 1          I N D E X   O F   E X H I B I T S, CON'T

 2     Exhibit M ...............................Page 151

       Three-page document entitled: True The Vote Launches

 3     "Validate the Vote" Initiative and Whistleblower Fund

       to Ensure Election Validity, Process Integrity, dated

 4     November 6, 2020 (no Bates Nos.)

 5

 6     Exhibit K ...............................Page 152

       Single-page document bearing heading: Derek

 7     Somerville, dated November 15, 2020 (no Bates No.)

 8

 9

10                (All exhibits were provided

11             electronically to the reporter.)

12

13

14

15

16

17

18

19

20

21

22
```

Ex. I to Defs.' Statement of Facts

Page 7

```
 1                    *      *      *

 2                P R O C E E D I N G

 3              Wednesday, October 6, 2021

 4                 Remote Deposition

 5            9:17 a.m. Eastern Daylight Time

 6                    *      *      *

 7              THE VIDEOGRAPHER:  We are now on the

 8       record.  This is tape No. 1 of the videotape

 9       deposition of Derek Somerville, in the matter of

10       Fair Fight, Inc., et al., plaintiffs v. True The

11       Vote, et al., defendants, and Fair Fight Action,

12       Inc., counter-defendant, in the United States

13       District Court for the Northern District of

14       Georgia, Gainesville Division, Case No.

15       2:20-CV-00302-SCJ.

16              This deposition is being held remotely

17       by Zoom conferencing.  Video recording is in

18       Olympia, Washington, on October 6, 2021.

19              The time on the video screen is 9:17

20       Eastern Time.

21              My name is Alicia Holmstock.  I am the

22       legal videographer from Digital Evidence Group.
```

Ex. I to Defs.' Statement of Facts

Page 8

```
 1    The court reporter is Brad Rainoff, in

 2    association with Digital Evidence Group.

 3              All parties to this deposition are

 4    appearing remotely and have agreed to the

 5    witness being sworn in remotely unless an

 6    objection is stated to this agreement.

 7              Due to the nature of remote reporting,

 8    please pause briefly before speaking to ensure

 9    all parties are heard completely.

10              Will counsel please introduce

11    themselves and who they represent for the

12    record?

13              MS. FORD:  My name is Christina Ford.

14    I represent the plaintiffs, and I'm here from

15    Elias Law Group.

16              MS. KRAMER:  Courtney Kramer with Bopp

17    Law firm representing the defendants.

18              MS. McCLAFERTY:  This is Michelle

19    McClafferty with Lawrence Bundy, also on behalf

20    of plaintiffs.

21              MR. RAMIREZ:  This is Joel Ramirez

22    with the Elias Law Group on behalf of
```

Ex. I to Defs.' Statement of Facts

Page 9

1   plaintiffs.

2            THE VIDEOGRAPHER:  Will the court

3   reporter please swear in the witness?

4   DEREK SOMERVILLE,

5              having been duly sworn, was examined and

6              testified as follows:

7   EXAMINATION

8   BY MS. FORD:

9        Q.   Good morning, Mr. Somerville.  Thank

10   you for being here today.  My name is Christina,

11   Christina Ford, and I represent the plaintiffs

12   in this case.

13            Will you please state your home

14   address for the record?

15        A.   5130 Saddlebred Lane, Cumming,

16   Georgia, 30028.

17        Q.   Right.

18            And where are you located today?

19        A.   I'm located in Roswell, Georgia.

20        Q.   Okay.

21            Just generally, what location are you

22   in today?

Ex. I to Defs.' Statement of Facts

Page 10

1                     Is it a law firm?

2          A.    I'm in the offices of my counsel at

3     821 Atlanta, Roswell, Georgia.

4          Q.    Thank you.

5                Mr. Somerville, I just want to go over

6     a couple ground rules for this deposition,

7     particularly because we are appearing remotely,

8     so that we all have the same understanding.

9                If at any point you do not understand

10    a question I'm asking, will you please let me

11    know?  And then I will do my best to rephrase or

12    clarify the question.

13               Does that sound good?

14         A.    It does.

15         Q.    At any time you would like to take a

16    break, please let me know.  I'll try to find a

17    good stopping point.

18               The only thing I would ask is if we

19    are in the middle of a line of questioning, that

20    we resolve that line before taking a break.

21               Will you let me know if you need or

22    want a break?

Ex. I to Defs.' Statement of Facts

Page 11

1       A.    Understood.

2       Q.    Today as you know, the court reporter

3    is recording the questions and answers.  But the

4    reporter can only take down verbal answers, so

5    please answer with an audible "yes" or "no."

6             Does that sound good?

7       A.    Yes.

8       Q.    Great.

9             Finally, as the court reporter

10   mentioned, please wait until I finish asking my

11   question before you begin answering; and I will

12   do my very best to let you finish so that we are

13   not talking over each other.

14            Does that sound good?

15      A.    Yes.

16            MS. KRAMER:  Counsel, I hate to

17   interrupt, but do we mind taking the exhibit

18   screen off until we need them? -- until we use

19   them?

20            MS. FORD:  That's fine with me.

21            MS. KRAMER:  Okay.  Perfect.

22            MS. FORD:  Okay.  Great.

Ex. I to Defs.' Statement of Facts

Page 12

1    BY MS. FORD:

2        Q.    Mr. Somerville, you said you are

3    viewing this deposition by laptop today?

4        A.    Yes.

5        Q.    Do you have any documents with you in

6    the room? -- either hard copies or electronic?

7        A.    I do not.

8        Q.    Is anyone else in the room with you

9    other than Ms. Kramer?

10       A.    There is not.

11       Q.    Just because I am obviously not

12   present with you today, I cannot tell what you

13   have in front of you or if anyone else enters

14   the room.

15            Do you agree do let me know if anyone

16   else enters today?

17       A.    Yes.

18       Q.    Okay.  Great.

19            Do you agree to let me know if you put

20   any other -- any documents in front of you? --

21   either hard copy or electronic?

22       A.    Yes.

Ex. I to Defs.' Statement of Facts

Page 13

1          Q.    All right.  Two last points here.

2               Do you understand it would not be

3     appropriate for your attorney or anyone else to

4     tell you how to answer a particular question

5     that I ask today?

6          A.    Yes.

7          Q.    Do you agree that while you are

8     testifying today, you will not exchange

9     communications -- whether in-person or

10    electronic -- about how to answer questions

11    asked?

12         A.    Yes.

13         Q.    Great.

14               MS. FORD:  Could we please put up

15    Exhibit A and mark it as Exhibit A?

16               (Exhibit A, Four-page document

17    entitled: Plaintiffs Notice to Take the

18    Deposition of Defendant Derek Somerville, dated

19    September 23, 2021 (no Bates Nos.), marked for

20    identification)

21               (Pause)

22

Page 14

1    BY MS. FORD:

2         Q.    Mr. Somerville, this is just the

3    notice of deposition for today's deposition.

4               Do you recognize this document?

5         A.    Yes.

6         Q.    Great.

7               Are you prepared to testify today?

8         A.    Yes.

9               MS. FORD:  We can take this down.

10   BY MS. FORD:

11        Q.    Mr. Somerville, just some brief

12   background about yourself.

13              Where do you live in Georgia?

14        A.    At the address I provided earlier,

15   5130 Saddlebred Lane.

16        Q.    What county is that in?

17        A.    Fulton County.

18        Q.    Okay.

19              How long have you lived there?

20        A.    Roughly nine years.

21        Q.    Before that, did you also live in

22   Georgia?

Ex. I to Defs.' Statement of Facts

Page 29

```
 1       A.     -- and to -- to -- I'm sorry.  I
 2   didn't meaning to speak over you.
 3              And I think it can be pursued with a
 4   relative degree of accuracy.
 5       Q.     Were you asked to help with True The
 6   Vote's challenges in any way?
 7       A.     I was not.
 8       Q.     Did you volunteer to help in any way?
 9       A.     I did not.
10       Q.     You mentioned that you participated in
11   a call on December 16 with Mark Davis and Gregg
12   Phillips.
13              Is that correct?
14       A.     Yes.
15       Q.     Who proposed having that call?
16       A.     I don't recall.
17       Q.     What was the general purpose of the
18   call?
19       A.     An introduction between Mark and
20   Gregg.
21       Q.     Is it your understanding that was the
22   first time Mark and Gregg had met?
```

Ex. I to Defs.' Statement of Facts

Page 30

1          A.     Yes.

2          Q.     And you were facilitating that

3     introduction?

4          A.     Yes.

5          Q.     So the title of that meeting was:

6     Elector challenge alignment.

7                 Can you help me understand what was

8     meant by "alignment"?

9          A.     My understanding -- my recollection is

10    that, in my understanding -- because I have

11    not -- I have no way of validating this -- that

12    Mark Davis has been involved in voter data for

13    quite some time, potentially decades.

14                It was also my understanding that

15    Gregg -- and forgive me, I don't recall his last

16    name -- that Gregg also had a passion for data.

17                And so my understanding in that call

18    was to bring those two together -- excuse me --

19    so that they could discuss the nuances of the

20    data in our Georgia election files.

21         Q.     Okay. I just want to drill down that,

22    and make sure I understand here.

Ex. I to Defs.' Statement of Facts

Page 31

1                 So did "alignment" then mean alignment

2      of methodology? --

3          A.    No.

4          Q.    -- in compiling a list?

5          A.    No.

6          Q.    No?  Okay.

7                 Did it mean alignment of the voters

8      who would appear on the list?

9          A.    No.

10         Q.    Did it mean alignment of the timing of

11     challenges?

12         A.    No.

13         Q.    Can you help me understand, then, more

14     of what you mean?

15         A.    It meant the alignment of the data

16     definitions and general election data universe

17     in Georgia.

18                 So to give a little more definition

19     there, large datasets are unique.  And one data

20     field in one dataset in one state doesn't

21     necessarily mean the same thing as it means in

22     another state.

Ex. I to Defs.' Statement of Facts

Page 32

1             So part of it was to bring the two

2     together so that they could have a technical

3     discussion between the two of them about data,

4     which is not my forte.

5             And the other was just me trying to

6     make introductions in two people that seemed to

7     be professionals in a similar space.

8         Q.    Okay.

9             I mean, at the time of this call, it

10    seems that True The Vote was already

11    contemplating doing their challenge effort, as

12    you mentioned.

13            Were you and Mark separately

14    considering a challenge effort?

15        A.    Mark and I were separately

16    investigating a similar -- similar matter --

17    right? -- similar scope in terms of the --

18    whether or not people had cast votes that were

19    ineligible.

20            But -- so you might want to restate

21    your question.

22            But, yes, Mark and I were absolutely

Ex. I to Defs.' Statement of Facts

Page 33

1      investigating the data at that time independent

2      of True The Vote, independent of True The Vote's

3      data, independent of their people, their

4      resources -- completely independent of them.

5          Q.    Sure.

6                You say you were investigating.

7                At the time of this call, though, were

8      you both already contemplating that you might

9      file challenges?

10               Or help file challenges?

11         A.    We were considering our options, yes.

12         Q.    Okay.

13               And did you share that with True The

14     Vote?

15               Was that apparent to either True The

16     Vote or Gregg Phillips by the time of that call?

17         A.    I don't recall.

18         Q.    At any point in time, did you share

19     with True The Vote that you and Mark were

20     contemplating doing your own challenges?

21         A.    I don't recall the specifics of doing

22     so, but it's reasonable to assume that we would

Ex. I to Defs.' Statement of Facts

Page 40

1    what I asked of her.

2          Q.    Then you would have sent it back to

3    her?

4          A.    Yes.

5          Q.    Did she respond to that at all?

6          A.    I don't recall.

7          Q.    Okay.

8                MS. FORD:  We can take this down.

9                Thank you.

10   BY MS. FORD:

11         Q.    Mr. Somerville, so what is your best

12   understanding of what was involved in developing

13   the challenge list that True The Vote submitted?

14         A.    I was never consulted on the

15   development of the list, so I have no

16   understanding of how it was developed, who

17   participated in it, or any other degree of that

18   list at all.  I have no knowledge of it.

19         Q.    Okay.

20               MS. FORD:  Can we pull up Exhibit D,

21   please, and Mark it with Exhibit D?

22

Ex. I to Defs.' Statement of Facts

10/6/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville
                   Confidential - Pursuant to Protective Order

Page 42

1    Thomas:  I did not have visibility into the

2    details of True The Vote's challenge, only

3    collaborated on methodology.

4             Did you write this?

5        A.    I believe I did.

6        Q.    What do you mean by -- when you said

7    you "collaborated on methodology"?

8        A.    I don't recall.

9             The only collaboration that took place

10   is, again, the discussions that we had on data

11   definitions, or the general political arena.

12            So I don't -- I don't believe there is

13   a lot behind the term "methodology" in that

14   response.

15       Q.    Mr. Somerville, can you just help me

16   explain why you would say you collaborated on

17   methodology if today you are saying you didn't?

18       A.    Well, I think the methodology is the

19   data definitions that I just shared, and then

20   the general political arena inside the state of

21   Georgia.

22            Beyond that, there was absolutely no

Ex. I to Defs.' Statement of Facts

Page 43

1    collaboration on their list, on how it was

2    compiled, on whether it was quality assured,

3    their numbers, how they delivered it, where they

4    delivered it.  There was no collaboration

5    whatsoever on any of that.

6         Q.    Okay.

7               Then just to go back to when you said

8    you shared information on general political

9    environment, what do you mean by that?

10        A.    As any general political discussion

11   would be, the state of our political

12   environment.

13              It was a very -- there is a lot of

14   activity going on at that time.  There was a lot

15   of passion around the election on all sides and

16   on countless topics.  It was a very complex

17   time.

18              So it was just a simple discussion of,

19   "Well, this is Georgia, and here is what I

20   believe is going on in Georgia" -- the kind of

21   conversation you would have with anybody that is

22   unfamiliar with your state and wants to talk

Ex. I to Defs.' Statement of Facts

Page 45

1    separate set of elector challenges in advance of

2    the runoff election.

3              Did you decide to move forward on

4    that?

5       A.    We did.

6       Q.    When did you decide to do that?

7       A.    I don't recall.  Mark and I --

8       Q.    Was it -- sorry.  Please answer.

9       A.    Mark and I were looking at the impact

10   of address change on the database well before

11   True The Vote showed up in the state.

12      Q.    Did you decide to move forward around

13   this same time when you were meeting with True

14   The Vote in -- in mid-December?

15      A.    I don't recall a firm decision to move

16   forward, as you state it.

17      Q.    Okay.

18      A.    At the time, Mark and I were looking

19   at the data and trying to see what the data was

20   telling us.

21             That -- that was the extent of the

22   effort.

Ex. I to Defs.' Statement of Facts

Page 46

1        Q.    Okay.

2              What was the data telling you?

3        A.    That due to a confluence of issues --

4    largely related to the pandemic, and a very

5    large turnout in absentee voting, and a very --

6    and 6.9 million mailers sent by the Secretary of

7    State's office -- that it was highly probable

8    that individuals voted in counties where they no

9    longer resided -- is what the data suggested --

10       Q.    Okay.

11       A.    -- which I believe is not terribly

12   atypical in an election.

13       Q.    What were you hoping the challenges

14   would accomplish?

15             And here I mean your own, not True The

16   Vote's.

17       A.    Well, the effort in any such effort is

18   always about the integrity of the process.

19             So without any regard to political

20   affiliation, geography, any -- any metric on the

21   individual, the fundamental question is:  Was

22   there a flaw in the process that was exacerbated

Ex. I to Defs.' Statement of Facts

Page 48

1              The hope is that a process is

2      followed, by which we can help ensure the

3      integrity of the process.  It's about the data,

4      not the outcome.

5          Q.    Sure.

6              Well, I'm sure -- or I assume -- that

7      you hoped something would happen when the

8      challenges were filed.

9              And I'm trying to understand what --

10     regardless of outcome, what did you hope or

11     expect would happen when the challenges were

12     filed with each county?

13         A.    Well, I'm not aware of what was

14     necessarily filed all throughout the state.

15             But, again, I guess my hope would be

16     that, if there was probable cause to believe

17     that a vote may have been cast in an ineligible

18     fashion -- which may very well happen

19     unbeknownst to the person who cast that vote --

20     that that would be looked into by the local

21     boards and remedied accordingly.

22             There is no consideration for how that

Page 54

1    that's difficult to get across during a time

2    when people were very emotional.  I'm not wired

3    that way.

4              My interest was rising above all of

5    the vitriol, all the noise, all the -- all of

6    it, and to see if there was a practical issue

7    that needed to be addressed within our state to

8    the benefit of all citizens in our state.

9    Q.    Okay.

10             At the time that you and Mark were

11   working on putting these lists together, did you

12   think that it was feasible that these -- all of

13   these residency issues could be resolved before

14   the runoff election?

15             (Pause)

16   A.    I don't recall, because, again, it

17   really wasn't ours to determine how this was

18   going to be handled by the government.

19             I also don't believe that I had any

20   expectation that that -- that was going to have

21   a short-term impact.

22             I think the effort was really to

Ex. I to Defs.' Statement of Facts

Page 55

1       highlight a very real issue with the integrity

2       of our voter file, not necessarily to effect an

3       outcome in any short order, if that makes sense.

4           Q.     I think so.

5                  You mean you thought potentially

6       long-term this would just highlight issues with

7       the voter rolls.

8                  Is that fair?

9           A.     Yes.

10                 To expand, I'm well aware there were

11      people in our state and certainly throughout the

12      country that wanted to see a different outcome

13      in our election, and that wanted to participate

14      in reversing the course of the results of the

15      election.

16                 That was not one of my motives at any

17      point in time, ever.

18                 For me, it was then, and continues to

19      be, and will always be, around the integrity of

20      the overall process, as it benefits everybody in

21      our state.

22                 I take a very practical approach to

Ex. I to Defs.' Statement of Facts

                                                          Page 56

 1     literally everything that I do, and this was no

 2     exception.

 3              There were procedural deficiencies

 4     that were highlighted largely as a consequence

 5     to the large number of absentee ballot requests

 6     that were sent out.  And we believed there were

 7     a number of people that inadvertently cast a

 8     ballot and may not have updated their address.

 9              So this was much more about

10     highlighting a procedural vulnerability than it

11     was affecting an outcome that was consistent

12     with much of what was being pressed around the

13     media at that time -- if that gives you

14     additional clarity.

15        Q.    It does.  Thank you.

16              How did you think the voters on these

17     lists would react?

18        A.    Well, it wasn't evident to me that

19     voters on these lists would ever be aware they

20     were on the list.

21              So I don't suspect that there was a

22     great -- I don't -- plus, I think that, as I

Ex. I to Defs.' Statement of Facts

Page 57

1    understand the process, the -- an appropriate

2    reaction would be to simply demonstrate that you

3    did not move; that you still are a legal

4    resident of the county.

5              So I viewed this then, and I view the

6    challenge as it's provided for under our laws, a

7    very benign process that encourages citizens to

8    participate in the effort to ensure election

9    integrity.

10             I didn't see anything hostile or

11   aggressive about it whatsoever.

12             MS. FORD:  Could we pull up Exhibit D

13   again, please, and go to page 2?

14             (Pause)

15             MS. FORD:  We might want to make it

16   bigger -- the paragraph -- the first paragraph

17   starting:  Yesterday afternoon.

18   BY MS. FORD:

19        Q.   So here you say:  Starting yesterday

20   afternoon, and with the support of countless

21   Georgians across the state who demand

22   transparency and integrity in our elections, we

Ex. I to Defs.' Statement of Facts

Page 59

 1              When you say you are submitting -- I'm

 2      sorry -- "we are submitting formal challenges,"

 3      this is an effort that is entirely separate from

 4      True The Vote?

 5         A.    I can't make it clear enough.  This is

 6      completely unrelated to True The Vote,

 7      absolutely unrelated to True The Vote.

 8              MS. FORD:  We can pull this down.

 9      Thank you.

10         A.    Now, you know, we are aware that True

11      The Vote was doing -- was launching challenges.

12              But I -- I don't know that -- I don't

13      know when they did those relative to the

14      December 18 time stamp on that post, so -- but

15      completely independent of what they were doing.

16         Q.    Following up on that, if you are were

17      aware that True The Vote was filing challenges,

18      and your general hope -- sorry, I won't say

19      "hope" -- maybe motivation in working on this

20      was to highlight data issues, election integrity

21      issues, why move forward with your own at all?

22         A.    I don't understand your question.

Ex. I to Defs.' Statement of Facts

Page 76

1     long extremely quickly.

2              Our motivations for this effort here

3     were truly, truly benign, and I think it's

4     evident in these posts.

5              When we went through the data, we

6     identified a number of individuals that had

7     indicated that they had moved.

8              Then, exercising an abundance of

9     caution, we went out of our way to make sure

10    that, as it states here, we removed individuals

11    that appeared to be either serving in the

12    military, or even remotely located near a

13    military base in case the dependent -- or

14    dependents were caught up in that.

15             Anyone that was and inactive record,

16    as it says here, that we removed; anybody who

17    voted electronically, we removed; anybody who

18    submitted a change of address within the prior

19    18 months, which I believe is the statute in the

20    state, we removed.

21             We erred on the side of the voter over

22    and over again until we arrived at -- and I

Ex. I to Defs.' Statement of Facts

Page 78

1            In this case, this is a very binary

2     effort.  It simply says:  If these conditions

3     are met, then there is probable cause to believe

4     that a vote might have been cast ineligibly, and

5     that should be remedied.

6            And "remedied" does not necessarily

7     mean they don't vote.

8            It simply means ensuring they vote in

9     the proper county.

10       Q.    Understood.

11            And what do you mean by "it could do

12    more damage than good" if too many voters were

13    on the list?

14       A.    I didn't say it would be too -- it

15    would do more damage than good if too many

16    voters were on the list.  I was explaining --

17       Q.    Sorry.

18            Please put it in your own words, then.

19       A.    I was explaining the general doctrine

20    that would suggest that:  What's the likely

21    outcome of your effort?  And if it's going

22    to end -- if it's going to harm people, then you

Ex. I to Defs.' Statement of Facts

Page 86

1    effort which was around the integrity of the

2    data.  So I believe the prevailing logic was

3    that the change of address process has a maximum

4    period under which mail will be forwarded.  And

5    I believe the maximum period -- again, I could

6    be mistaken here -- was 18 months.

7              In other words, if it's beyond that,

8    then the record is probably no longer active and

9    mail is no longer being forwarded.

10             That's my recollection.

11        Q.   And you don't know the time period

12   that True The Vote used, I assume?

13        A.   I do not.

14        Q.   Then finally here, you say:  We

15   continued to fine tune our list until we arrived

16   at roughly 40,000 across all 159 counties we

17   believe need to be verified by county election

18   boards before the January 5th, 2020 runoff.

19             What do you mean by "fine tune the

20   list"?

21        A.   As I previously indicated, accuracy

22   matters.  And it was very important for the

Ex. I to Defs.' Statement of Facts

Page 87

1    effort -- for Mark and I, two individuals --

2    that we be very disciplined in approach, and

3    that we don't take any steps that inadvertently

4    advances inaccurate information.

5              The entire objective is to promote

6    accuracy within the data file.

7              So if we weren't fine tuning and

8    constantly checking, rechecking our work, it

9    would have been at counter-purposes to advance a

10   number of records that appear inaccurate only to

11   find that our work was actually inaccurate.

12             So I believe the "fine tune" is just

13   the disciplined approach of making sure that

14   everything we are doing is as accurate as we

15   possibly can be.

16        Q.   Okay.

17             By the end when you had arrived at

18   this, you know, roughly 40,000 list, did you

19   have confidence in that list?

20             And in that methodology?

21        A.   I have tremendous confidence that

22   those individuals filed a change of address for

Page 88

1    one reason or the other, and that there was and

2    continues to be cause for each county election

3    board to confirm that those individuals are

4    still eligible voters within their county.

5        Q.    If you could go back and do it again,

6    are there any improvements you would make?

7        A.    Our motivation was consistent

8    throughout, which was around trying to encourage

9    the integrity of the file, which benefits every

10   voter, period.  So I don't believe our

11   motivation would change.

12              I believe our methodology was solid.

13              I believe that we probably would not

14   have done a whole lot different with respect to

15   our efforts.  No, I don't believe so.

16       Q.    Okay.

17              Did you and Mark ultimately have

18   challenges filed in all 159 counties?

19       A.    No.  By no stretch of the imagination

20   did we have challenges in 159 counties.

21       Q.    How many counties would you estimate,

22   then?

Ex. I to Defs.' Statement of Facts

Page 89

1          A.     And the number is not actually known

2     to us because we made these files generally

3     available to those that wanted to participate in

4     the process, so it would be conjecture on my

5     part.

6                 But I know it was not a significant

7     number.

8                 I think a takeaway from this certainly

9     was that there -- it was much more complicated a

10    process than we estimated.

11                But I don't believe it was very many.

12    And most of them were -- to my knowledge --

13    were -- smaller rural counties in the north side

14    of the state are the only ones I can vaguely

15    recall.

16                There was an awful lot going on at

17    that time.  And we can't submit a challenge

18    outside of county that we live in.  So our --

19    our activity is somewhat limited to -- to the

20    counties that we are in.

21         Q.    Okay.

22                What do you mean when you say you:

Page 93

1     file is, and, frankly, how poorly-managed by the

2     state, to the detriment of all citizens, that it

3     is.

4          Q.    Do you know how many counties accepted

5     challenges that -- of the lists that you and

6     Mark put together?

7          A.    I don't.

8               But I think we would have heard it --

9     you know, heard a fair amount about it if there

10    were.

11              I don't believe that there -- to my

12    knowledge, I'm not sure that any county accepted

13    a challenge.

14              I have no recollection of any county

15    accepting a challenge.

16         Q.    Did that surprise you that no county

17    accepted them?

18         A.    I don't know if I was surprised.

19              Again, I think we opened with a

20    discussion around, you know, what the government

21    does and doesn't do remains a mystery to me.

22              You know, I think that there was a

Ex. I to Defs.' Statement of Facts

                                                        Page 97

 1    almost 400,000 voters -- ten times as many -- is

 2    not disciplined?

 3         A.    If their methodology sought to include

 4    that volume and they executed it with

 5    discipline, then theirs was a disciplined

 6    process.

 7              So I can't speak to how they --

 8    whether they executed with discipline.

 9              I understand the spirit of the

10    question, but it's evident that we used a

11    different process because the numbers are so --

12    so different.

13         Q.    Sure.

14              MS. FORD:  We can pull this down.

15    Thank you.

16              Can we pull Exhibit D back up and go

17    to page 22, please?

18              (Pause)

19              MS. FORD:  And just make this purple

20    box bigger, please?

21    BY MS. FORD:

22         Q.    This is a post from December 17 in

Ex. I to Defs.' Statement of Facts

Page 98

1    which you write:  Volunteers needed from each

2    county for a voter-integrity project!  15-minute

3    effort, performed from home.  PM me if

4    interested.

5              Do you recognize this?

6         A.    I do.

7         Q.    Was this the post essentially

8    recruiting individuals to submit elector

9    challenges to specific counties?

10        A.    Yeah -- I recall, yes.  This would

11   have been an effort to involve individuals in

12   their counties with these challenges,

13   independent of True The Vote.

14              This is not related to True The Vote

15   at all.

16        Q.    Okay.

17              So no one here who reached out to

18   you -- sorry.

19              I was about to put multiple double

20   negatives there.

21              Did you forward any of these

22   individuals who were interested to True The

Ex. I to Defs.' Statement of Facts

Page 99

1      Vote?

2          A.      No.

3          Q.      What exactly were you asking these

4      volunteers to do?

5          A.      Well, it's been a bit, but I suspect

6      this was about -- as we mentioned before --

7      identifying individuals that wanted to

8      participate with their local board of election

9      with this eligibility effort that we were

10     underway.

11              We could -- we could only submit

12     challenges in our own counties.  We can't submit

13     them in other counties.  So this was a largely

14     unsuccessful effort to identify individuals that

15     wanted to participate in the action.

16              Again, there -- you know, the context

17     of the day was there was an awful lot of

18     activity going on, but this is wholly unrelated

19     to True The Vote, and was largely unsuccessful.

20         Q.      Why do you categorize it as

21     unsuccessful?

22         A.      As I indicated earlier, we did not

Ex. I to Defs.' Statement of Facts

Page 103

1            MS. FORD:  Trying to see where this

2      is.  Looking for something that starts on

3      December 19.  Or -- sorry.  I'm sorry.  I have

4      got something confused.

5   BY MS. FORD:

6            Q.    You mentioned in your discovery

7      responses that:  On December 19, 2020, I sent an

8      email to Catherine Engelbrecht which contained

9      talking points for elector challenges that I

10     constructed on my own accord.

11            Is in the email that containing

12     talking points that you are referring to?

13            A.    I believe so.

14            Q.    Okay.

15            In your discovery responses, you

16     mentioned that you assumed True The Vote had

17     legal resources who would review my assumptions

18     in the talking points.

19            What assumptions are you referring to?

20            A.    It's pretty -- well, it's just as you

21     have stated.  I shared those talking points

22     which I had drafted on my own accord with

Ex. I to Defs.' Statement of Facts

Page 124

1            So my assumption is that that's a

2    process to ensure that we are not wholly relying

3    on any one piece of information.

4            You know, my understanding and my

5    belief that the NCOA is -- it is an indicator

6    that there may be an anomaly, but then that

7    needs to be substantiated through subsequent

8    diligence.

9            That's my understanding of how it

10   works in the state -- that at no point would any

11   of these challenges prevent an eligible voter

12   from voting.  That's not the intent.

13           The intent is to identify if there is

14   a data anomaly, then put in motion a process

15   that ultimately, when fully adjudicated,

16   identifies whether or not an individual -- with

17   their participation, hopefully -- whether or not

18   they are eligible or not.

19           I firmly believe -- and I -- I don't

20   mean to go long here -- that there are

21   individuals that are unaware that they are still

22   registered at their own county.  So this is a

Ex. I to Defs.' Statement of Facts

Page 127

1     said, "Our challenges sought to force that

2     verification"?

3         A.    Well, I think I was speaking more

4     broadly on the data integrity effort.  I think

5     the word "challenge" just became common

6     vernacular.

7              As it turned out, not that many were

8     ultimately submitted.

9              But I think this captures well the

10    point, which was that there is a process to

11    protect voters, but that process needs to be

12    undertaken in order to identify those votes that

13    are not eligible and would otherwise

14    disenfranchise the very voters that we're trying

15    to protect.

16        Q.    Here you seem to be recognizing that

17    the NVRA traditional NCOA process was not going

18    to occur in the few months or weeks before the

19    runoff election.

20              Is that correct?

21        A.    I don't -- I don't know if that's what

22    I was acknowledging.

Ex. I to Defs.' Statement of Facts

Page 150

 1     Gregg.

 2              And this press release discusses a

 3     24/7 hotline to report voter fraud that True The

 4     Vote had just launched.

 5              Have you seen this before?

 6       A.    I have not.

 7       Q.    Have you ever discussed this hotline

 8     with True The Vote?

 9       A.    I have not.

10       Q.    Were you aware that True The Vote had

11     launched this hot line?

12       A.    I don't have any recollection of it.

13     If it was shared with me, I don't have any

14     recollection of it at all.

15       Q.    Okay.

16              We can go to it, or you can just take

17     my word for it -- that this release also

18     mentions plans to -- quote -- "monitor absentee

19     ballot drop boxes."

20              Is that something you ever discussed

21     with True The Vote?

22       A.    No, it was not.

Ex. I to Defs.' Statement of Facts

10/6/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville
                   Confidential - Pursuant to Protective Order

                                                                    Page 151

   1          Q.    Okay.

   2                And were you aware of these plans?

   3          A.    No, I was not.

   4                MS. FORD:  Can we pull up Exhibit M

   5      and mark it as Exhibit M?

   6                (Exhibit M, Three-page document

   7      entitled: True The Vote Launches "Validate the

   8      Vote" Initiative and Whistleblower Fund to

   9      Ensure Election Validity, Process Integrity,

  10      dated November 6, 2020 (no Bates Nos.), marked

  11      for identification)

  12  BY MS. FORD:

  13          Q.    This is a press release from True The

  14      Vote that was released in November, 2020,

  15      discussing True The Vote's whistleblower fund

  16      for those who reported instances of voter fraud

  17      or election fraud.

  18                Have you seen this before?

  19          A.    I don't believe I have.

  20          Q.    Did you ever discuss this

  21      whistleblower fund with True The Vote?

  22          A.    I did not.

                                              Ex. I to Defs.' Statement of Facts

Page 152

1       Q.    Were you aware they had launched this

2    fund?

3       A.    I don't have any recollection of it,

4    no.

5            MS. FORD:  We can take this down,

6    thank you.

7            Can we please pull up Exhibit K and

8    mark it as Exhibit K?

9            (Exhibit K, Single-page document

10    bearing heading: Derek Somerville, dated

11    November 15, 2020 (no Bates No.), marked for

12    identification)

13           (Pause)

14           MS. FORD:  Can we scroll up, please?

15           Or actually, I'm sorry.  It's there.

16    BY MS. FORD:

17       Q.    This is a snapshot from your Facebook,

18    in which you write on November 15, 2020:  This

19    is what we are up against.  600,000 mail ballots

20    and counting.

21           Did you write this?

22       A.    It appears I did, yes.

Ex. I to Defs.' Statement of Facts

Page 153

1          Q.     Who is the "we" in "this is what we

2      are up against"?

3          A.     I believe the context would be that

4      "we" is the people of Georgia.

5               The issue is, as I indicated earlier,

6      that the larger the amount of mail-in ballots,

7      the more exaggerated the affect of a bad voter

8      file.

9               So to me, the intent here is to

10     highlight the fact that we have a reliance on

11     mail-in ballots that's greater than ever -- is

12     how I would understand it.

13               It was a year ago, but that -- that I

14     believe is the context; and that is what I

15     believe today is the primary issue.

16         Q.     Okay.

17               So you -- you thought it was

18     concerning that so many mail ballots are being

19     either requested or cast?

20         A.     Well, I think I've continued to

21     maintain that the primary issue that we have

22     with respect to the quality of the election in

Page 157

1   significant number of people that were unaware,

2   due to circumstances, that they may have cast a

3   vote in a county that they are no longer

4   eligible to vote in.  And I believe the NCOA

5   process was the only way to meaningfully alert

6   the voters that that was a condition.

7       Q.    Mr. Somerville, do you have any

8   regrets about working with True The Vote in

9   December of 2020?

10      A.    Well, I don't think you can

11  characterize what I did was work with them.

12            I met them.  I spoke with them.  I

13  have been cordial to them, as I would be

14  anybody.  So I didn't work with them, so I don't

15  have regrets working with them.

16            Admittedly, our motivation for effort

17  was benign.  It was governed by the laws in this

18  state, and it was driven by a passion to bring a

19  sensible discussion around:  How we can improve

20  the overall environment for everybody?

21            And our association with True The Vote

22  has, I think, skewed that a little bit.

Ex. I to Defs.' Statement of Facts