Case 2:20-cv-00302-SCJ   Document 155-14   Filed 05/16/22   Page 1 of 46

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

GAINESVILLE DIVISION

_____

FAIR FIGHT, INC.,                          )
SCOTT BERSON, JOCELYN HEREDIA,             )
and JANE DOE,                              )
    Plaintiffs,                        )
                                       )
v.                                         )     Case No.
                                       )  2:20-cv-00302
TRUE THE VOTE, CATHERINE                   )        SCJ
ENGELBRECHT, DEREK SOMERVILLE,             )
MARK DAVIS, MARK WILLIAMS,                 )
RON JOHNSON, JAMES COOPER,                 )
and JOHN DOES 1-10,                        )
    Defendants.                        )
_____)


Videotaped Deposition of DEREK SOMERVILLE

Conducted Remotely via Zoom

Thursday, January 20, 2022

8:02 a.m. CST


Reported by Lisa A. Knight, RDR, CRR, RSA


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Ex. K to Defs.' Statement of Facts

Page 2

1                    Pursuant to Notice, the videotaped

2     deposition of DEREK SOMERVILLE was conducted

3     remotely via Zoom on behalf of the

4     Plaintiffs, at 8:02 a.m. CST, on Thursday,

5     January 20, 2022, reported stenographically

6     by Lisa A. Knight, Realtime Diplomate

7     Reporter, Certified Realtime Reporter, and

8     Realtime Systems Administrator.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

```
 1               A P P E A R A N C E S
 2               (All appearing remotely)
 3
 4     COUNSEL FOR THE PLAINTIFFS
            ELIAS LAW GROUP LLP
 5          BY:  CHRISTINA A. FORD, ESQUIRE
                 cford@elias.law
 6               JACOB SHELLY, ESQUIRE
                 jshelly@elias.law
 7               TINA MENG, ESQUIRE
                 tmeng@elias.law
 8          10 G Street NE
            Suite 600
 9          Washington, District of Columbia 20002
            202.968.4490
10     -and-
11          LAWRENCE & BUNDY LLC
            BY:  MAIA COGEN, ESQUIRE
12               maia.cogen@lawrencebundy.com
            1180 West Peachtree Street NW
13          Suite 1650
            Atlanta, Georgia 30309
14          404.400.3350
15
16     COUNSEL FOR THE DEFENDANTS
            THE BOPP LAW FIRM
17          BY:  MELENA S. SIEBERT, ESQUIRE
                 msiebert@bopplaw.com
18          1 South 6th Street
            Terre Haute, Indiana 47807
19          812.232.2434
20
21     ALSO PRESENT:
22          MITCHELL MAHON, Videographer
```

Ex. K to Defs.' Statement of Facts

```
                                                        Page 4
1                        I N D E X
2                     DEREK SOMERVILLE
3                     JANUARY 20, 2022
4    EXAMINATION OF DEREK SOMERVILLE:
5         BY MS. FORD                            8
6         BY MS. SIEBERT                         183
7
8                  DEPOSITION EXHIBITS
9                    DEREK SOMERVILLE
10                   JANUARY 20, 2022
11   NUMBER              DESCRIPTION          MARKED
12   Somerville 1    Plaintiffs' Notice to      12
                     Take the Deposition of
13                   Derek Somerville
14   Somerville 2    E-mail string              18
15   Somerville 3    E-mail string              24
16   Somerville 4    E-mail string              29
17   Somerville 5    Text string, Bates Def     38
                     Somerville 000714 to
18                   -719
19   Somerville 6    E-mail string              42
20   Somerville 7    E-mail string              43
21   Somerville 8    Text string, Bates Def     45
                     Somerville 000182
22                   to -442
```

Ex. K to Defs.' Statement of Facts

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

```
                                                         Page 5
   1              DEPOSITION EXHIBITS, CON'T
        NUMBER           DESCRIPTION           MARKED
   2    Somerville 9   E-mail string              51
   3    Somerville 10  Facebook post              75
   4    Somerville 11  Facebook post              78
   5    Somerville 12  E-mail string              96
   6    Somerville 13  E-mail string              98
   7    Somerville 14  E-mail                    120
   8    Somerville 15  E-mail string             125
   9    Somerville 16  Facebook Messenger        141
                       printout, Bates Def
  10                   Somerville 000162 to
                       -163
  11    Somerville 17  Facebook Messenger        145
                       printout, Bates Def
  12                   Somerville 000160 to
                       -161
  13    Somerville 18  Text string, Bates Def    148
                       Somerville 000720 to
  14                   -727
  15    Somerville 19  Text string, Bates Def    166
                       Somerville 000731 to
  16                   -733
  17    Somerville 20  Text string, Bates Def    176
                       Somerville 000172 to
  18                   -175
  19    Somerville 21  E-mail string             179
  20
        **REPORTER'S NOTE:  All quotations from exhibits
  21    are reflected in the manner in which they were
        read into the record and do not necessarily
  22    indicate an exact quote from the document.
```

Ex. K to Defs.' Statement of Facts

Page 6

1          PROCEEDINGS

2              THE VIDEOGRAPHER:  We are going

3      on the record.  This is Tape No. 1 of

4      the videotaped deposition of Derek

5      Somerville taken by plaintiffs in the

6      matter of Fair Fight, Inc., et al.,

7      versus True the Vote, et al., in the

8      United States District Court for the

9      Northern District of Georgia,

10     Gainesville Division, Case No.

11     2:20-cv-00302-SCJ.

12             This deposition is being held

13     remotely over Zoom videoconference on

14     January 20, 2022.  The time is 8:02

15     Central.

16             My name is Mitchell Mahon; I'm

17     the legal videographer from Digital

18     Evidence Group.  The court reporter is

19     Lisa Knight, in association with

20     Digital Evidence Group.

21             Will counsel please introduce

22     themselves for the record.

Ex. K to Defs.' Statement of Facts

Page 7

1              MS. FORD:  This is Christina

2         Ford from Elias Law Group for the

3         plaintiffs.  And with me today, I have

4         Tina Meng and Jacob Shelly, and then

5         also Maia Cogen from Lawrence & Bundy.

6              MS. SIEBERT:  Melena Siebert

7         for defendants.

8              THE VIDEOGRAPHER:  And will the

9         court reporter please ask for

10        stipulations.

11             THE STENOGRAPHER:  The

12        attorneys participating in this

13        deposition acknowledge that I am not

14        physically present in the deposition

15        room, and that I will be reporting

16        this deposition remotely.

17             They further acknowledge that

18        in lieu of an oath administered in

19        person, I will administer the oath

20        remotely.  The parties also agree that

21        the witness has verified that he is,

22        in fact, Derek Somerville.

Ex. K to Defs.' Statement of Facts

Page 8

1          The parties and their counsel

2     further agree that the witness may be

3     in a state where I am not a notary and

4     stipulate to the witness being sworn

5     in by an out-of-state notary.

6          If any party has an objection

7     to this manner of proceeding, please

8     state so now.

9          MS. FORD:  We have no

10     objection.

11          MS. SIEBERT:  None.  No

12     objection.

13          THE STENOGRAPHER:  Thank you.

14          DEREK SOMERVILLE,

15  having been first duly sworn to state the

16  whole truth, testified as follows:

17               EXAMINATION

18  BY MS. FORD:

19     Q.    Mr. Somerville, thank you again

20  for being here today.  I know it took a great

21  deal of effort.  We'll endeavor to do this as

22  quickly as possible.

Ex. K to Defs.' Statement of Facts

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 9

1          A.     I appreciate that.

2          Q.     Can you please just state your

3    full name for the record.

4          A.     My name is Derek Somerville.

5          Q.     And where is your home address?

6          A.     My home address is

7    5130 Saddlebred Lane, Cumming, Georgia.

8          Q.     And where are you giving this

9    deposition from today?

10         A.     I'm presently in Murray,

11   M-u-r-r-a-y, Kentucky.

12         Q.     Okay.  Thank you.

13                And I know we covered this

14   before, but I just -- as a refresher, I

15   wanted to go through a couple of the ground

16   rules for this deposition so that we have the

17   same understanding.

18                All testimony today is under

19   oath, just as if you were testifying in

20   court.  Does that make sense?

21         A.     It does.

22         Q.     Great.

Ex. K to Defs.' Statement of Facts

Page 10

1              And for the benefit of

2    everyone, and especially for the court

3    reporter, please make sure your answers are

4    audible today.

5              Please also allow me to finish

6    my question before giving your answer, and I

7    will do my very best to let you completely

8    finish your answer before I ask another

9    question.

10             Does that sound good?

11    A.      Yes.

12    Q.      And from time to time, your

13   attorney may make an objection to my

14   question.  And that's fine, but you are to

15   answer unless she specifically instructs you

16   not to answer on the basis that a topic is

17   privileged.

18             Does that make sense?

19    A.      Yes.

20    Q.      Great.

21             And if, at any point, you do

22   not understand a question that I'm asking,

Ex. K to Defs.' Statement of Facts

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 11

1    please let me know, and I will do my best to

2    rephrase or clarify a question.  So if you

3    answer a question, I will assume that you

4    understood it.

5              Is that fair?

6         A.    Yes.

7         Q.    Okay.  And if, at any time, you

8    would like a break, please let me know, and

9    we can find a good place to stop and go off

10   the record.

11             Does that also sound good?

12        A.    Yes.

13        Q.    Great.

14             Mr. Somerville, I just have to

15   ask a couple of questions because I'm

16   obviously not in the room with you.

17             Do you have any documents with

18   you, either hard copies or electronic?

19        A.    I do not.

20        Q.    Okay.  And is anyone else in

21   the room with you?

22        A.    There is no one else in here

Ex. K to Defs.' Statement of Facts

Page 12

1    but me.

2          Q.     Okay.  And do you understand

3    that it would not be appropriate for your

4    attorney, or for anyone else, to tell you how

5    to answer a particular question that I ask

6    you?

7          A.     I do.

8          Q.     Okay.  And do you agree that

9    while you're testifying today, you will not

10   exchange communications with anyone about how

11   to answer questions?

12         A.     I agree to that.

13         Q.     Okay.  Excellent.

14                MS. FORD:  Mitchell, can we

15         please pull up Exhibit [sic] A?  And

16         we can mark that as Exhibit 1.

17                (Somerville Exhibit 1,

18         Plaintiffs' Notice to Take the

19         Deposition of Derek Somerville,

20         was marked for identification, as

21         of this date.)

22   ///

Ex. K to Defs.' Statement of Facts

Page 13

1   BY MS. FORD:

2        Q.     And this is just the deposition

3   notice for today.

4               Mr. Somerville, do you

5   recognize this?

6        A.     I do.

7        Q.     Okay.  Great.  So you're

8   prepared to testify pursuant to this notice?

9        A.     I'm present.

10       Q.     Okay.  Without disclosing any

11  specific communications you may have had with

12  your attorneys, can you describe at a high

13  level what you did to prepare for today?

14       A.     I did not prepare for today,

15  other than a procedural call with my counsel

16  yesterday.

17       Q.     Okay.

18              MS. FORD:  And, Mitch, we can

19        take this down.  Thank you.

20  BY MS. FORD:

21       Q.     And, Mr. Somerville, I would

22  just like to ask you a couple questions about

Ex. K to Defs.' Statement of Facts

Case 2:20-cv-00302-SCJ   Document 155-14   Filed 05/16/22   Page 14 of 46

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 14

1    the process that was undertaken to search and

2    produce documents for this case.

3          A.    (Nodded head up and down.)

4          Q.    I'm not going to bring these

5    up, because I think we talked about them last

6    time, but, Mr. Somerville, you remember

7    receiving, I assume, requests for production

8    in this case?

9          A.    I do.

10          Q.    Can you describe at a high

11    level how you searched for and identified

12    documents that were responsive to those

13    requests?

14          A.    Yeah.  At a high level or a low

15    level, the definition is probably the same,

16    I scoured through normal search criteria any

17    area that I might have had communication, be

18    that text, e-mail, and then social media

19    platforms.

20          Q.    Okay.  How long did that search

21    take?

22          A.    I don't recall the specific

Ex. K to Defs.' Statement of Facts

Page 15

1    amount of time, but I dedicated a significant

2    amount of time to it.

3        Q.    And did anyone help you with

4    searching for documents that were responsive

5    to the requests?

6        A.    I recall reaching out to a

7    couple of individuals, where I did not retain

8    the e-mail, and asked if they could forward

9    them back to me.  And so I -- a few that

10   I did reach out for that.

11            But in terms of actually

12   searching my own materials, nobody helped me

13   with that.

14       Q.    Okay.  Just so I understand

15   that:  It sounds like you had some

16   communications that you no longer -- you

17   didn't have in your own possession but you

18   knew were probably out there, so you --

19       A.    That is correct.  By a matter

20   of standard practice, any large files

21   associated with e-mails, I tend not to retain

22   those e-mails.  That's in my professional and

Ex. K to Defs.' Statement of Facts

Page 16

1    personal practice as well.

2              So where I had any belief that

3    I had sent any, I reached out to folks that

4    they may have them.  And I had some success

5    with that.

6         Q.    Okay.  Were there documents

7    that you knew at one point you possessed that

8    were responsive that you could not find?

9         A.    I don't have any recollection

10   of that.  No.

11        Q.    Okay.  And when you say you --

12   of, like, the large files that you no longer

13   have or possessed, at what point did you

14   delete those files?

15        A.    I don't recall.

16        Q.    Was it after the start of this

17   litigation?

18        A.    I don't recall.

19        Q.    Do you have a memory of whether

20   you deleted those files in December 2020,

21   when you were undertaking this initial

22   investigation and sort of challenge effort?

Ex. K to Defs.' Statement of Facts

Page 17

1        A.      Again, I don't recall.  It's a

2    regular maintenance practice of mine.  And

3    these would have been extremely large files,

4    particularly the voter files.  And that's

5    typically the normal practice.

6                Often, it would be shortly

7    after having that piece of communication.

8    But I don't recall a specific date.

9        Q.      Okay.  And have you withheld

10   any documents that you thought were

11   responsive but that you did not produce to

12   us?

13       A.      No.

14       Q.      Okay.  Mr. Somerville, I would

15   like to ask you a couple of follow-up

16   questions about how you conducted your

17   analysis of the Georgia voter files last

18   year.

19       A.      Okay.

20              MS. SIEBERT:  Ms. Ford, I just

21          want to lodge a continuing objection.

22              Of course, Mr. Somerville can

Ex. K to Defs.' Statement of Facts

Case 2:20-cv-00302-SCJ   Document 155-14   Filed 05/16/22   Page 18 of 46

2/20/2022         Fair Fight, Inc. et al. v. True the Vote, et al.         Derek Somerville

Page 18

1          answer, but a continuing objection to

2          any line of questioning regarding the

3          scope of anything Mr. Somerville might

4          have done with voter files not in

5          conjunction with True the Vote, our

6          continuing objection for the record.

7                    MS. FORD:  Okay.  Understood.

8                    MS. SIEBERT:  Thank you.

9                    MS. FORD:  Thanks, Melena.

10                   Mitch, can we pull up

11         Exhibit [sic] D.  We're just skipping

12         B and C.

13                   THE STENOGRAPHER:  And you want

14         to mark this as Exhibit 2?

15                   MS. FORD:  Yes.  Thank you.

16                   (Somerville Exhibit 2,

17         E-mail string, was marked for

18         identification, as of this

19         date.)

20    BY MS. FORD:

21         Q.    All right.  Let's see.  Derek,

22    are you able to see this -- Mr. Somerville?

Ex. K to Defs.' Statement of Facts

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

1                    Do you agree with that?

2          A.     I do.

3          Q.     Okay.  At the bottom of this

4    first page --

5                    MS. FORD:  So, Mitch, if you

6          can scroll down.

7    BY MS. FORD:

8          Q.     -- Mr. Davis writes, "Our

9    purpose here is to identify voters who moved

10   across county lines more than 30 days before

11   the election but voted unlawfully in their

12   county.  The investigation has also revealed

13   many out-of-state voters, presumably mostly

14   students, military, et cetera, but some of

15   those are probably also illegitimate."

16                    Did I read that correctly?

17         A.     You did.

18         Q.     Okay.  And, Mr. Somerville, why

19   do you believe Mr. Davis singled out military

20   voters here?

21         A.     Well, I don't interpret him as

22   singling out military voters.  I think what

Ex. K to Defs.' Statement of Facts

Page 21

```
 1    Mark was providing was examples of legitimate

 2    reasons why an individual may be registered

 3    in a county that they do not reside in.

 4    Military being one example of it.

 5         Q.    Okay.  And students being

 6    another example?

 7         A.    And "et cetera," as he

 8    indicates there.  There are several scenarios

 9    under which that might be legitimate.  Yes.

10         Q.    Okay.  And under that

11    "et cetera" category, who would fall in that

12    category, in your opinion?

13         A.    Well, in my opinion, I guess

14    anybody that our state law and our federal

15    laws permit to live in an area other than

16    where they're registered to vote.

17              So I think the predominance of

18    those, of course, would be, as Mark has

19    indicated here -- which I think is also

20    Mark's -- Mark very clearly stating his

21    intent, which is to not ensnare individuals

22    that are legitimately voting into his
```

Ex. K to Defs.' Statement of Facts

Page 22

1    effort -- but students, military, individuals

2    that have temporarily moved, for temporary

3    purposes.  For example, those that would

4    spend the winter down in Florida might be a

5    good example.

6        Q.    Okay.  And I know we talked

7    about military voters last time, so I won't

8    retread that territory.

9            But for student voters -- in

10   the list of voter challenges that you and

11   Mr. Davis pulled together, were student

12   voters excluded?

13       A.    To the extent that we were able

14   to identify that they were likely student

15   voters, yes.

16           So obviously there's no record

17   in the voter file that indicates somebody's a

18   student, but where we saw a large number of

19   files from the NCOA that came back to common

20   addresses, you could identify those addresses

21   as being on or near campuses.  And so those

22   were excluded, to my recollection.

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 23

1          Q.     Okay.  So just to put that in

2     maybe, like, concrete terms:  If you saw an

3     address that looked like a dorm, are you

4     saying that you would have removed that from

5     the challenge list?

6          A.     That's my recollection.  Yes.

7          Q.     Okay.  And who was removing

8     that?  You or Mr. Davis?

9          A.     Well, I'm not aware of all of

10    Mark's activities, but anytime I came across

11    records that appeared to fall within those

12    categories, I removed them as well.

13         Q.     Okay.  And what about

14    individuals, as you mentioned, who

15    temporarily moved?  How did you remove those

16    individuals from the list?

17         A.     Well, I'm not sure we would

18    have clarity into those.  And, again, that's

19    the importance of this process, is our lists

20    were not aimed at removing anybody's ability

21    to vote.  They were aimed at encouraging

22    local boards of elections to confirm that

Ex. K to Defs.' Statement of Facts

Page 24

1    those individuals still resided in the county

2    in which they were registered.

3              So this process wasn't a

4    function of trying to remove people, it was a

5    function of trying to engage a process that's

6    already used by the State.

7         Q.    Okay.

8              MS. FORD:  We can take this

9         down, Mitch.  Thank you.

10             And could we please put up

11        Exhibit 5 -- I'm sorry, Exhibit [sic]

12        E.  And I guess that's going to be

13        marked as Exhibit 3.

14             (Somerville Exhibit 3,

15        E-mail string, was marked for

16        identification, as of this

17        date.)

18   BY MS. FORD:

19        Q.    Mr. Somerville, can you read

20   this document?

21        A.    It would help if it got

22   enlarged.  Okay.

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 26

1    for.

2              For military purposes, for

3    example, and I know that we covered this in

4    the last deposition, we did our best to

5    identify geographies that were associated

6    with military bases.  But there's no way to

7    know if somebody lives -- there's a military

8    person that is assigned to a location that's

9    not associated with a military base.

10              So this is acknowledging that

11   we put forth our best effort.  As we said

12   countless times in public forums, we erred on

13   the side of the voter.  If it looked even

14   remotely close, in this case, to a military

15   record, we excluded them.

16              But certainly there's a

17   military individual that's living somewhere

18   not near a base, assigned to, you know, a

19   military function that we would not have been

20   able to associate with a base.  It's

21   imperfect.  It's data.

22        Q.    And at the end -- by the time

Ex. K to Defs.' Statement of Facts

Page 30

1   BY MS. FORD:

2        Q.     Mr. Somerville, can you please

3   take a moment to look over this document?

4        A.     (Document[s] reviewed.)

5               Okay.

6        Q.     And have you seen this before?

7        A.     Well, it appears to be my

8   e-mail.  So, yes.

9        Q.     Okay.  And can you explain what

10  this is?

11       A.     Yeah.  It looks like a

12  breakdown of the challenge file based on

13  voter behavior.  And it looks like we

14  identified the Atlanta counties as well.

15       Q.     Okay.  And when you say "a

16  breakdown," are you referring to the

17  challenge universe that you and Mr. Davis put

18  together?

19       A.     Based on the numbers in this

20  e-mail, yes.

21       Q.     Okay.  And that's the -- just

22  to confirm -- 39,141?

Ex. K to Defs.' Statement of Facts

Page 31

1          A.     Yes.

2          Q.     Okay.  Whose idea was it to

3    conduct this analysis?

4          A.     Well, it appears to be my

5    analysis.

6          Q.     Okay.  And what was the purpose

7    of conducting this analysis?

8          A.     I carved that data up a

9    thousand different ways.  And so there's a

10   couple of guiding principles -- or several

11   guiding principles when we engaged in this

12   effort.

13                Number one is it was

14   nonpartisan.  So I wanted to make sure that

15   as we compiled our data, that our data was

16   distributed and driven by the conditions that

17   we set forth, which was the change of

18   address, and that there wasn't any particular

19   bias regarding any other factor other than

20   the data.

21                But I'm certainly interested,

22   throughout the process, on how that data fell

Page 32

1    through:  Was it more prevalent in our

2    more -- the NCOA process, was it more

3    prevalent in our more dense counties?  Was it

4    more prevalent in counties that voted one

5    way, voted another way?

6              Again, PivotTables in Excel are

7    very simple, and I wanted to carve that data

8    up and understand it as many different ways

9    as I possibly could.

10             But I -- this is a post facto

11   review.  This is not anything that happened

12   prior to the data, as obviously it's

13   reviewing the final product, which was those

14   39,000 records.  It's informative.

15        Q.   What other -- you mentioned you

16   ran it across a number of dimensions.  What

17   other dimensions did you examine?

18        A.   Well, effectively, with Excel

19   PivotTables, you can cross-reference anything

20   in the file.

21             So we would have run it to

22   check for multiple records.  We would have

Ex. K to Defs.' Statement of Facts

Page 71

1   it was just such a loud forum, and we just

2   didn't want to be part of that.  And we

3   rejected any overtures from anybody who tried

4   to enlist us to be part of any of that.

5               So I think we were very

6   sensitive about how our work was conducted

7   and how it was going to be perceived and how

8   it would be used.

9       Q.    Okay.  And just one more

10  follow-up here, and then I think we might be

11  ready for a break.

12              But here when you say you want

13  to discuss sharing with the public, I just

14  want to better understand what was on your

15  mind here.

16              Was it ever an option to you

17  that you and Mark would just release the list

18  of 39,141 names to the public?

19      A.    No, that's not what is intended

20  here at all.  I don't believe that would have

21  been our intent at any point in time.

22              I think the most likely

Page 72

1    interpretation of this is that we were trying

2    to put pressure on the Secretary of State's

3    office.  The media certainly is one way to do

4    that.  And that might have been part of that

5    discussion.

6                But in terms of -- and I'm not

7    sure I understand what you mean by "release."

8    But I don't have any recollections of any --

9    and I can't imagine we would ever have wanted

10   to, per se, "release."

11               Now, file -- individual county

12   files were made available to individual

13   challengers.  But I don't know that I

14   understand what you mean by "release."

15               But by "public," I think,

16   again, it just comes back to, you know, how

17   we frame our effort and how that effort is

18   used during a time when there's an awful lot

19   of noise in the air.

20        Q.    Sure.

21               And by "release," I just meant,

22   you know, instead of doing a Facebook post

Ex. K to Defs.' Statement of Facts

Page 73

1    that says we found 39,000 individuals who we

2    think there should be more investigation of,

3    I mean, you know, you go on Facebook and you

4    actually list the 39,000 individual names.

5              So that's not something you

6    ever contemplated?

7         A.    There is no scenario under

8    which I would have either contemplated or

9    agreed to anything, nor would have Mark.

10   That would have been too inflammatory, and it

11   would have been counter to the intent of the

12   effort.

13             So, no, there's no scenario

14   under which we would have considered that.

15        Q.    Okay.  And can you just explain

16   what you mean by "that would have been

17   inflammatory"?

18        A.    Well, I would draw your

19   attention back to, you know, prior testimony

20   and testimony in this deposition.  We readily

21   acknowledged that there were individuals on

22   that list that did not intend to do anything

Ex. K to Defs.' Statement of Facts

Page 75

1                    THE DEPONENT:  No.  Thank you.

2                    MS. FORD:  Great.

3                    So maybe we'll come back at

4          10:10?

5                    THE VIDEOGRAPHER:  It would be

6          9:10 your time.

7                    MS. FORD:  Sorry.  Thanks.

8                    THE VIDEOGRAPHER:  All right.

9          We're going off the record.  The time

10         is 9:04.  Thanks.

11                   (Recess taken.)

12                   THE VIDEOGRAPHER:  We are going

13         back on the record.  The time is

14         9:12 a.m.

15                   MS. FORD:  Mitch, could we

16         please bring up Exhibit [sic] L.

17                   THE STENOGRAPHER:  This will be

18         marked as Exhibit 10.

19                   (Somerville Exhibit 10,

20         Facebook post, was marked for

21         identification, as of this

22         date.)

Page 76

1                  MS. FORD:  If we could make

2          this as big as possible.

3    BY MS. FORD:

4          Q.    So, Mr. Somerville, I assume

5    you'll need a second to review this, so

6    please just take a moment to read it.

7          A.    (Document[s] reviewed.)

8                  I recall this.

9          Q.    Okay.  So did you publish this

10   original post on -- it looks like, on

11   December 4, 2020?

12         A.    I did.

13         Q.    Okay.

14                 MS. FORD:  And, Mitch, if we

15         can scroll down to the bottom.  Great.

16   BY MS. FORD:

17         Q.    At the bottom of this post, you

18   say, "We need to identify the abusers, start

19   throwing people in jail, and close the

20   loopholes."

21                 Did I read that correctly?

22         A.    You did.

Ex. K to Defs.' Statement of Facts

Page 77

1        Q.     Can you elaborate on that

2    sentiment?

3        A.     Yeah.  That's probably a little

4    hyperbole for the platform that it was on.

5               But I think -- and I think the

6    statement is pretty clear.  The reality is

7    that we know that there were tremendous

8    numbers of these registrations, and often, in

9    cases, they were drafted in a way to make it

10   appear as if they were apartments, for

11   example.

12              So they would call the mailbox

13   "apartment number," when it most certainly

14   wasn't.  That's a willful act.  That's done

15   deliberately.

16              But, again, that statement,

17   I think, is just more in-the-moment bluster

18   than anything.  Obviously we can't start

19   throwing people into jail.  But it's

20   Facebook.

21       Q.     Did you think your comment

22   might make someone think twice about voting,

Page 78

1    who fell into this category?

2          A.      No, not at all.  Yeah, I don't

3    have that kind of reach.

4          Q.      So this was just shared with

5    your personal friends and audience on

6    Facebook?

7          A.      Well, I don't know how the

8    Facebook algorithms work, so I don't entirely

9    understand, you know, where this stuff goes.

10   But I can tell by the interaction, it doesn't

11   go very far.  I'm not a particularly

12   important person in this discussion.

13                But, again, that's just

14   Facebook bluster.

15         Q.      Okay.

16                MS. FORD:  Can we please pull

17         up Exhibit [sic] M.

18                THE STENOGRAPHER:  That will be

19         marked Exhibit 11.

20                (Somerville Exhibit 11,

21         Facebook post, was marked for

22         identification, as of this

Page 79

1          date.)

2     BY MS. FORD:

3          Q.     And, Mr. Somerville, this

4     appears to be a Facebook post from

5     December 5, 2020.

6                    Do you recognize this one?

7          A.     I recognize that I posted it,

8     yeah.  I have to reread a lot of it, but I do

9     recognize it.

10         Q.     Okay.  And here, you appear to

11    be referring to a voter that you've given the

12    name Dave.

13                   Does that seem right to you?

14         A.     That does seem right to me.

15         Q.     Okay.

16                   MS. FORD:  Can we please scroll

17              to page 3.  I believe we want to keep

18              going.  Okay.

19    BY MS. FORD:

20         Q.     So here, Mr. Somerville,

21    I believe you've written a comment on your

22    own post, and I'll just read it for the

Ex. K to Defs.' Statement of Facts

Case 2:20-cv-00302-SCJ   Document 155-14   Filed 05/16/22   Page 36 of 46

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 80

1    record, since it won't be on the record

2    otherwise.

3              "P.S.  This is just one guy,

4    one abuser, but we find them everywhere we

5    look.  And because of that, we're going to

6    keep looking.  I believe there are some

7    extremely committed investigators with the

8    SoS's office who are as committed as they

9    come, but the sheer volume of these abuses,

10   coupled with weak laws and weaker

11   enforcement, often ties their hands.

12             "Citizens can help, though.

13   Perhaps we should start outing these abusers

14   by name?"

15             And what was your purpose in

16   writing this comment?

17        A.    Well, I think I need to read --

18   I would have to read what I was responding

19   to, number one, to know what my purpose was.

20             It looks like I'm defending the

21   Secretary of State's office, because I know

22   they were getting a lot of heat.

Ex. K to Defs.' Statement of Facts

Page 81

1                      I clearly make a statement that

2        there's good people in the Secretary of

3        State's office investigating, when I don't

4        know any of them personally.  So I'm giving

5        them an awful lot of benefit.

6                      And I'm just engaging in banter

7        with somebody that I'm not even sure I know

8        who they are, which I don't actually know

9        that person.

10                     So can you be more specific?

11       Because there's a number of sentences in

12       there that speak to different things.

13            Q.    Yeah.  Sure.

14                     So I'm specifically interested

15       in the -- maybe these last two sentences:

16       "Citizens can help them," referring to the

17       Secretary of State's office.  "Perhaps we

18       should start outing these abusers by name?"

19                     What did you mean when you

20       said, "...we should start outing these

21       abusers by name?"

22            A.    I don't think I said we should

Ex. K to Defs.' Statement of Facts

Page 82

1    start outing these -- I said, "Perhaps we

2    should start outing these abusers by name?"

3              I think what's instructive is

4    we've never outed anybody by name.  So this

5    is back-and-forth banter, the tone of which

6    it's hard to determine, at what time of day,

7    what was going on, what was happening.

8              Obviously we didn't believe in

9    outing people by name because we never outed

10   anybody by name.  It's also posed as a

11   question.  So I don't -- I don't believe it's

12   anything.

13        Q.    So --

14        A.    Banter on Facebook.

15        Q.    At the end of the day, do you

16   think it would be inappropriate to out voters

17   by name?

18        A.    Well, I think my actions have

19   answered that question already.  We've never

20   done it; we never intended to do it.

21        Q.    So why publish this, then?

22        A.    Publish what, Christina?

Ex. K to Defs.' Statement of Facts

Page 83

1       Q.    Publish this comment, which, in

2    my interpretation, at least, is not to one

3    person, but it's just you elaborating on your

4    initial post.

5       A.    Well, the abusers, number one,

6    that I think I'm referencing are the ones

7    that are specifically manipulating the

8    system.  And that's with reference to those

9    commercial mail-receiving agencies.  So

10   that's number one.

11            Number two is it's posed as a

12   question; it's not posed as a statement.  I'm

13   not saying we should.  I'm simply saying

14   perhaps we should.

15            Again, this is -- there's a lot

16   of context here.  There are a lot of things

17   that you say in those contexts that don't

18   necessarily reveal a fundamental base

19   opinion.

20            We've got thousands upon

21   thousands upon thousands of lines of material

22   out there.  You've drawn attention to one

Ex. K to Defs.' Statement of Facts

Page 84

1   line in, literally, tens of thousands of

2   pages of context, I'm sure, that posed as a

3   rhetorical question of:  Should we out these

4   abusers by name?

5                We've never done it, not once.

6   So clearly we didn't think that was the right

7   thing to do.  It's just a rhetorical question

8   in a stream of comments in Facebook.

9   Obviously didn't guide our process because we

10  never did that, nor would we.

11               MS. FORD:  Can we please scroll

12       to the next page, Mitch.

13               (Complied.)

14               MS. FORD:  Sorry.  Actually,

15       can we scroll up just a little bit

16       more?

17  BY MS. FORD:

18       Q.    Mr. Somerville, I know you say

19  you were being hyperbolic here and it was a

20  rhetorical question, but, you know, a

21  response from someone named Kristel Kretchmer

22  is, "Yes!  Out the abusers by name."

Ex. K to Defs.' Statement of Facts

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 132

1    wanted to have the names of Georgians in

2    there, but Mark was conspicuously absent.

3    And I had felt, given the amount of work and

4    his knowledge and his expertise, that that

5    was an oversight.  And "pissed" is probably a

6    strong word at the time, so I'm not quite

7    sure why I chose that word.

8              But it was important to me that

9    Mark -- if they were trying to acknowledge

10   the work of Georgians that were attempting,

11   you know, to contribute to the integrity --

12   the effort of voter integrity, that Mark

13   Davis's most certainly should have been in

14   there.

15             And I don't recall how our work

16   was originally characterized, so I don't

17   understand -- you know, I don't recall --

18   I don't recall how they originally

19   characterized it, but clearly, I made that

20   comment as well.

21             But, yeah, to the extent that

22   I didn't agree with the content, that's what

Ex. K to Defs.' Statement of Facts

Page 187

1   And then the tertiary effect of that, as

2   I discuss, is, you know, you want to coach

3   people around you, that are watching you, in

4   how to engage in these efforts.

5                    Not through, you know, again,

6   hyperbolic rhetoric, which we're all prone to

7   at times, and not to baseless allegations,

8   not to baseless theories that might actually

9   scare people from participating in an

10  election or participating in holding their

11  government accountable, but actually

12  encouraging people to participate in a

13  meaningful way.

14                   I've spoken countless times on

15  this topic, when invited.  And I know that's

16  all there, so it's easy to watch.  And

17  I maintain the same message to everybody:

18  Those processes and that data belongs to all

19  of us, the people.

20                   So not only do we have a right

21  to ensure that those processes are followed,

22  but I think we have an obligation.  And,

Ex. K to Defs.' Statement of Facts

Page 188

1   again, that goes all the way back to my

2   taking the oath as a U.S. Marine and, again,

3   as an FBI agent.

4              So our motive certainly wasn't

5   to effect a specific outcome.  We have real

6   concerns -- that's why we did an analysis --

7   to make sure that the data didn't -- couldn't

8   be used by anybody in a partisan way.

9              Our motives were good.  Mark

10  Davis is a very, very good man, a very

11  knowledgeable guy.  And I hope I'm considered

12  in the same light by others.  And I feel very

13  good about the work that we did.

14             I will tell you I -- and I know

15  this is not counsel's intent, but this is

16  profoundly insulting to have been

17  characterized as someone who would

18  participate in a racist activity, when I've

19  literally put my life on the line to defend

20  people that do not share my ethnicity.  And

21  I've carved out a life that's made that a

22  perfectly clear priority of mine.

Ex. K to Defs.' Statement of Facts

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 189

1                    So I'm -- I don't want to use

2      this as a forum for that, but that was our

3      intent, Ms. Siebert.

4           Q.     Mr. Somerville, if somebody

5      ended up on your challenge list who turned

6      out to be legally allowed to vote in Georgia,

7      for instance, one of those military voters

8      that you discussed that might have lived far

9      enough outside of a base that you didn't --

10     you know, that the data didn't catch it, and

11     so it turns out that that person on the list

12     was legally allowed to vote in Georgia, would

13     you have any problem with that person casting

14     a vote in Georgia?

15          A.     The whole intent of the process

16     is to ensure that legitimate, legal voters

17     don't have their vote cancelled out by an

18     ineligible voter.

19                 And so not only would we not

20     have a problem with that, that would be a

21     victory.  The process, as I understand it, is

22     specifically designed so that you are

Ex. K to Defs.' Statement of Facts

Page 190

1    presenting evidence to a board of probable

2    cause.

3              You're not suggesting that

4    somebody did vote ineligibly.  You're not

5    suggesting they broke the law.  You're not

6    suggesting any of that.  You're asking the

7    Board of Elections to engage in a lawful

8    process that's enumerated under both federal

9    and state law to ensure that the integrity of

10   that voter file is intact.

11             If you challenge an individual

12   and the Board of Elections invokes that very

13   rigid process and that individual

14   substantiates that they're a legitimate

15   voter, then the process worked just as good

16   as if you challenged a voter and it was

17   determined that they were ineligible.

18             So, you know, I think there's a

19   lot of -- there's a lot of misinformation

20   around that process, or what the intent is,

21   but it certainly is never to purge anybody.

22   That word gets used an awful lot.  It's to

Ex. K to Defs.' Statement of Facts

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 191

1    invoke a process.

2              So I would hope that -- no.

3    Rephrase that.  So we're thrilled with

4    anybody who casts a vote.  Absolutely.

5         Q.    Okay.

6              MS. SIEBERT:  Mitchell, could

7         you pull up -- I think it was

8         Exhibit 12, if I recall correctly.

9              Yeah, this is it.  If you could

10        scroll down just a bit.

11   BY MS. SIEBERT:

12        Q.    Mr. Somerville, you just

13   testified -- and I'm paraphrasing here --

14   that it wasn't your intention ever to, you

15   know, unjustly accuse anybody of voting

16   illegally or anything like that.

17             And so just to refresh your

18   recollection of this, I believe this is an

19   e-mail that you sent with some lists of kind

20   of talking points about this process.

21             Does that align with your

22   recollection?

Ex. K to Defs.' Statement of Facts