Case 2:20-cv-00302-SCJ   Document 155-16   Filed 05/16/22   Page 1 of 35

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

GAINESVILLE DIVISION

_____

| | |
|---|---|
| FAIR FIGHT, INC., | ) |
| SCOTT BERSON, JOCELYN HEREDIA, | ) |
| and JANE DOE, | ) |
| | ) |
|     Plaintiffs, | ) |
| | ) |
| v. | )   Case No. |
| | ) 2:20-cv-00302 |
| TRUE THE VOTE, CATHERINE | )    SCJ |
| ENGELBRECHT, DEREK SOMERVILLE, | ) |
| MARK DAVIS, MARK WILLIAMS, | ) |
| RON JOHNSON, JAMES COOPER, | ) |
| and JOHN DOES 1-10, | ) |
| | ) |
|     Defendants. | ) |

_____)


Videotaped Deposition of MARK DAVIS

Conducted Remotely via Zoom

Monday, October 4, 2027

9:04 a.m. EDT


Reported by Lisa A. Knight, RDR, CRR, RSA

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Ex. M to Defs.' Statement of Facts

Case 2:20-cv-00302-SCJ   Document 155-16   Filed 05/16/22   Page 2 of 35

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

                                                    Page 2

1            DIGITAL EVIDENCE GROUP

2                Pursuant to Notice, the videotaped

3    deposition of MARK DAVIS was conducted

4    remotely via Zoom on behalf of the

5    Plaintiffs, at 9:04 a.m. EDT, on Monday,

6    October 4, 2021, reported stenographically by

7    Lisa A. Knight, Realtime Diplomate Reporter,

8    Certified Realtime Reporter, and Realtime

9    Systems Administrator.

10

11

12

13

14

15

16

17

18

19

20

21

22

                                        Ex. M to Defs.' Statement of Facts

Page 3

```
 1              A P P E A R A N C E S
 2             (Appearing Remotely)
 3                *     *     *
 4
 5    COUNSEL FOR THE PLAINTIFFS
           ELIAS LAW GROUP LLP
 6         BY:  JACOB SHELLY, ESQUIRE
                jshelly@elias.law
 7              CHRISTINA A. FORD, ESQUIRE
                cford@elias.law
 8         10 G Street NE
           Suite 600
 9         Washington, DC 20002
10         202.968.4490
11
12         LAWRENCE & BUNDY LLC
           BY:  LESLIE J. BRYAN, ESQUIRE
13              leslie.bryan@lawrencebundy.com
           1180 West Peachtree Street NW
14         Suite 1650
           Atlanta, Georgia 30309
15         404.400.3350
16
17         PERKINS COIE LLP
           BY:  TORRYN TAYLOR, ESQUIRE
18              ttaylor@perkinscoie.com
           505 Howard Street
19         Suite 1000
           San Francisco, California 94105
20         415.344.7122
21
22
```

Ex. M to Defs.' Statement of Facts

Page 4

1            A P P E A R A N C E S (Cont.)

2       COUNSEL FOR THE DEFENDANTS

3            THE BOPP LAW FIRM

4            BY:  MELENA S. SIEBERT, ESQUIRE

5                 msiebert@bopplaw.com

6                 COURTNEY KRAMER, ESQUIRE

7                 ckramer@bopplaw.com

8            1 South 6th Street

9            Terre Haute, Indiana 47807

10           812.232.2434

11

12       ALSO PRESENT:

13           HENRY MARTE, VIDEOGRAPHER

14

15

16

17

18

19

20

21

22

Ex. M to Defs.' Statement of Facts

Case 2:20-cv-00302-SCJ   Document 155-16   Filed 05/16/22   Page 5 of 35

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 5

```
 1                    I N D E X
 2                   MARK DAVIS
 3                 OCTOBER 4, 2021
 4   EXAMINATION OF MARK DAVIS:              PAGE
 5        BY MR. SHELLY                       8
 6        BY MS. SIEBERT                     156
 7
 8               DEPOSITION EXHIBITS
 9                   MARK DAVIS
10                 OCTOBER 4, 2021
11   NUMBER         DESCRIPTION             PAGE
12   Davis A     Plaintiffs' Notice to       13
                 take the Deposition of
13               Defendant Mark Davis,
                 No Bates
14   Davis B     Affidavit of Mark Davis,    80
                 No Bates
15   Davis C     Mark Davis Facebook Post,  114
                 May 7 at 2:07 p.m.,
16               No Bates
17   Davis D     E-mail string, top e-mail   70
                 to Catherine Engelbrecht
18               from Derek Somerville,
                 12/19/20, No Bates
19   Davis E     Zoom meeting invitation    143
                 (TTV Legal Update),
20               12/27/20, No Bates
21   Davis F     Mark Davis Facebook Post,  142
                 December 17, 2020,
22               No Bates
```

Ex. M to Defs.' Statement of Facts

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 6

1                     DEPOSITION EXHIBITS, CON'T

2                           MARK DAVIS

3                         OCTOBER 4, 2021

4    NUMBER              DESCRIPTION                PAGE

5    Davis J      Zoom meeting invitation,    144
                  12/30/20 (Georgia Elector

6                 Challenger Townhall),
                  No Bates

7    Davis K      Mark Davis Facebook post    116
                  dated May 7 showing

8                 partial tag list, No
                  Bates

9    Davis L      Printout of Data               19
                  Productions' website,

10                No Bates

11

12

13

14

15   **REPORTER'S NOTE:  All quotations from

16   exhibits are reflected in the manner in which

17   they were read into the record and do not

18   necessarily indicate an exact quote from the

19   document.

20

21

22

Ex. M to Defs.' Statement of Facts

Page 7

```
 1                    PROCEEDINGS
 2            THE VIDEOGRAPHER:  We are now
 3      on the record.  My name is Henry
 4      Marte; I'm a videographer on behalf of
 5      Digital Evidence Group.  Today's date
 6      is October 4, 2021; and the time is
 7      9:04 a.m.
 8            This deposition is being held
 9      by remote Zoom in the matter of Fair
10      Fight, Inc., et al., versus True the
11      Vote.  The deponent today is Mr. Mark
12      Davis.  All parties to this deposition
13      are appearing remotely and have agreed
14      to the witness being sworn in
15      remotely.
16            Counsel, please identify
17      themselves for the record, after which
18      the court reporter will administer the
19      oath to the witness.
20            MR. SHELLY:  I'm Jacob Shelly
21      from Elias Law Group representing
22      plaintiffs.
```

Ex. M to Defs.' Statement of Facts

Page 8

1              MS. BRYAN:  Good morning.  I'm

2        Leslie Bryan with Lawrence & Bundy,

3        representing plaintiffs.

4              MS. TAYLOR:  Torryn Taylor from

5        Perkins Coie, also with plaintiffs.

6              MS. FORD:  Christina Ford from

7        Elias Law Group representing

8        plaintiffs.

9              MS. KRAMER:  Courtney Kramer

10       with Bopp Law Firm representing

11       defendants.

12             MS. SIEBERT:  Melena Siebert

13       with The Bopp Law Firm representing

14       defendants.

15             MARK DAVIS,

16   having been first duly sworn to state the

17   whole truth, testified as follows:

18                  EXAMINATION

19   BY MR. SHELLY:

20       Q.    Good morning, Mr. Davis.

21             Could you just state your

22   record -- your name -- your full name for the

Ex. M to Defs.' Statement of Facts

Page 9

1    record once more.

2          A.      Mark Alan Davis.

3          Q.      And your address, for the

4    record.

5          A.      325 Wesfork, W-e-s-f-o-r-k,

6    Way, Suwanee, Georgia 30024.

7          Q.      Thank you.

8                  And I'd like to start by going

9    over some of the ground rules for this

10   deposition, which will overlap slightly about

11   what the stenographer just said, but just to

12   make sure we're all on the same page.

13                 All testimony here is under

14   oath just as if you were testifying in court.

15   Does that make sense?

16         A.      It does.

17         Q.      How many times have you been

18   deposed before?

19         A.      Let me think here.

20                 (Pause.)

21                 I don't recall exactly off the

22   top of my head.  I'd have to think about that

Page 10

1    one for a few minutes.

2          Q.     More than five?

3          A.     No.  Less than five.

4          Q.     But more than one?

5          A.     More than one, yes.

6          Q.     Fair enough.

7                 For the benefit of everyone and

8    the court reporter, and especially since we

9    are all remote, please make your answers

10   audible because head shakes and nods are hard

11   to put in the record.

12                Please allow me to finish my

13   question before giving your answer.  That

14   will also help us have a clean transcript for

15   the record.

16                Does that sound good?

17         A.     Yes.

18         Q.     From time to time, your

19   attorney may make an objection -- and that's

20   fine -- but you are to answer it regardless,

21   unless she specifically instructs you not to

22   answer.

Ex. M to Defs.' Statement of Facts

Page 11

```
1                     Does that make sense?
2         A.     Yes.
3         Q.     If at any point you do not
4    understand a question that I am asking, will
5    you please let me know?
6         A.     Yes.
7         Q.     And I will do my best to
8    rephrase or otherwise clarify the question.
9    If you do answer a question, I will assume
10   you understood it.
11                   Is that fair?
12        A.     Yes.
13        Q.     If, at any time, you would like
14   to take a break, please let me know, and I
15   will try to find a good place to stop, and we
16   can go off the record for a few minutes.  The
17   only exception is that if I have asked you a
18   question, I do ask that you answer the
19   question before we take a break.
20                   Is that all right?
21        A.     Understood.
22        Q.     And you gave me your home
```

Ex. M to Defs.' Statement of Facts

Page 12

1    address.  Is that the address you are located

2    for this deposition?

3          A.    Yes.

4          Q.    And how are you viewing this

5    deposition?  Is this a laptop?  It looks like

6    a computer of some sort.  I imagine it's not

7    a phone.

8          A.    This is a workstation.

9          Q.    And do you have any documents

10   with you related to this deposition, either

11   hard copies or electronic?

12         A.    In this room or at my disposal?

13         Q.    At your disposal.

14         A.    No.

15         Q.    And is anyone in the room with

16   you?

17         A.    No.  I have a wife upstairs

18   who's doing her own Zoom meeting today.

19         Q.    Okay.  I have a kid home sick,

20   who may be making an appearance at some point

21   as well, but hopefully it's just you and me.

22               Because we are taking your

Ex. M to Defs.' Statement of Facts

Page 13

1    deposition remotely, I may not always be able

2    to see what you have in front of you or if

3    you [sic] may enter the room while you're

4    testifying.

5              Do you understand it would not

6    be appropriate for your attorney or anyone

7    else to tell you how to answer a particular

8    question I ask?

9         A.    Understood.

10        Q.    And do you agree that while we

11   are testifying today, you will not exchange

12   communications, whether by text, e-mail, or

13   other messaging, about how to answer the

14   questions that I ask?

15        A.    Yes.

16        Q.    Okay.  Great.  Let's get

17   started.

18              MR. SHELLY:  Henry, can you

19        please pull up Exhibit A.

20              (Davis Exhibit A,

21        Plaintiffs' Notice to take the

22        Deposition of Defendant Mark

Ex. M to Defs.' Statement of Facts

Page 14

```
 1          Davis, No Bates, was marked for

 2          identification, as of this

 3          date.)

 4     BY MR. SHELLY:

 5          Q.     Mr. Davis, do you recognize

 6     this document?

 7          A.     It appears to be the first

 8     page of the lawsuit.

 9               MR. SHELLY:  If you can scroll

10          down, Henry.

11     BY MR. SHELLY:

12          Q.     This is the notice about this

13     deposition we're taking right now.

14          A.     Okay.

15          Q.     Have you seen this before?

16          A.     I don't know that I have.

17          Q.     Are you prepared to testify

18     today?

19          A.     I am.

20          Q.     Without disclosing any specific

21     communications you may have had with your

22     lawyers, can you describe at a high level
```

Ex. M to Defs.' Statement of Facts

Page 15

1    what you did to prepare for today?

2          A.     Nothing comes to mind other

3    than discuss it with my attorneys.  You know,

4    I was told generally what you said earlier,

5    about waiting for the full question before

6    answering and so on, so forth.  It basically

7    said about what you said.

8          Q.     Okay.  Great.

9                 I would like to start with --

10                MR. SHELLY:  You can take that

11         down, Henry.  Thank you.

12   BY MR. SHELLY:

13         Q.     I would like to start with some

14   brief background about yourself.

15                Can you tell me where you grew

16   up?

17         A.     I grew up in Atlanta, Georgia.

18         Q.     Have you been in Georgia your

19   whole life?

20         A.     All but about a year of it,

21   yes.

22         Q.     And you're registered to vote

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 17

1        Q.      Have you received any formal

2    training in quantitative analysis or

3    statistics?

4        A.      No.

5        Q.      What do you do professionally?

6        A.      I'm the president of Data

7    Productions, which does marketing for

8    commercial, nonprofit, and political

9    organizations.  And I create an enhanced

10   version of the Georgia Voter Database that

11   candidates and organizations use when they

12   run for office.

13       Q.      How long have you held that

14   role?

15       A.      Data Productions was

16   incorporated in 1991.  Over the years, we

17   merged with another company, and I bought it

18   back.  And it's kind of a long story, but

19   I've been doing this kind of work for

20   approximately 30 years now.

21       Q.      Are you the founder of Data

22   Productions?

Ex. M to Defs.' Statement of Facts

Page 19

1    nuts.

2         Q.      Would you consider data

3    processing to be your strong suit?

4         A.      Yes.

5         Q.      And why is that?

6         A.      I've been admitted to testify

7    as an expert witness in data analytics 5

8    times over the last 20 years in various

9    disputed elections.  I've been working with

10   voter data for longer than most people have.

11   I know it well.  And I'm -- I've testified in

12   court over residency issues and redistricting

13   errors and things like that.

14        Q.      And what happens if a client or

15   you try to perform a project without good

16   data processing?

17        A.      I'm not sure I understand the

18   question.

19        Q.      Sure.

20             MR. SHELLY:  Henry, can you

21        pull up Exhibit L.

22             (Davis Exhibit L,

Ex. M to Defs.' Statement of Facts

Page 21

1    that data processing is very important.

2          Q.     Fair to say that the quality of

3    processing affects of validity of the

4    conclusions that can be drawn from the data?

5          A.     Yes.

6                 MR. SHELLY:  Thank you.  Henry,

7          you can take that one down.

8    BY MR. SHELLY:

9          Q.     Mr. Davis, you mentioned that

10   you perform National Change of Address

11   processing as part of your data processing

12   services.  Is that right?

13         A.     Yes.

14         Q.     And roughly how many times a

15   year would you say you perform NCOA

16   processing?

17         A.     I don't know the answer to that

18   question off the top of my head, but it's

19   often.  It's regular.  I would say I probably

20   will process 50, 60 million records this

21   year.

22         Q.     And when you say "process those

Ex. M to Defs.' Statement of Facts

Page 27

1    leave and another permanent change of address

2    when they come back.

3         Q.    Got it.

4               Have you ever matched the NCOA

5    list to a voter registration file?

6         A.    Often.

7         Q.    When have you done so?

8         A.    The enhanced version of the

9    motor voter database that I build, I've been

10   running NCOA processing on that data for in

11   excess of 20 years, I believe.

12              It's -- again, it's required by

13   the Postal Service when we do mailings for

14   campaigns or organizations, that kind of

15   thing.

16        Q.    Okay.  And did you perform this

17   matching for the 2020 election?

18        A.    Yes.

19        Q.    Just once or how many times?

20        A.    Off the top of my head, I don't

21   recall how many times I did it for 2020.

22        Q.    More than once?

Ex. M to Defs.' Statement of Facts

Page 28

1          A.     At least once.

2          Q.     Is part of the potential

3    confusion that you also ran it for the Senate

4    elections in January, which was around the

5    same time?  Or just that you do it so often

6    that you're not sure how many times?

7          A.     Well, I know I ran NCOA

8    processing when I built the file that

9    candidates were using.  I also ran NCOA on

10   the voter database in November.  I believe it

11   was -- I don't remember the exact date, but

12   it was in November.

13         Q.     After the election?

14         A.     After the election.

15         Q.     Am I understanding correctly,

16   you don't recall running it before the

17   November election?  Or is it possible --

18         A.     I would need to look.  It's

19   something that I do regularly, but I don't

20   want to give an unclear answer, so I'll just

21   say I did it at least once in 2020.

22         Q.     Okay.  Did you publish your

Ex. M to Defs.' Statement of Facts

Page 32

1        outside of, you know, professional

2        background.

3              MR. SHELLY:  Okay.  I do have

4        some more questions on that, but

5        I appreciate the objection.

6   BY MR. SHELLY:

7        Q.    Mr. Davis, were you ever paid

8   for any of this analysis that you performed

9   for the NCOA matching?

10       A.    That's a broad question.

11       Q.    Sorry.  For the November,

12  specifically, matching that you recall.

13       A.    No.

14       Q.    And can you tell me a little

15  bit about why you performed that matching?

16              MS. SIEBERT:  Objection.  This

17       is irrelevant to the subject matter of

18       the case.  It has nothing to do with

19       the November election.

20              Mark, I'm going to go ahead and

21       instruct you to answer this.  But,

22       again, we're nearing the end.

Ex. M to Defs.' Statement of Facts

Page 33

1          A.     I have been seeing residency

2     issues with the Georgia Voter Database for

3     many, many years.  I've seen them just show

4     up in the voter data that I've worked on for

5     various reasons.  They are especially

6     apparent following redistricting and

7     reapportionment.

8                 And when I have seen them in

9     the past, especially in some of the cases

10    I've testified in as an expert witness over

11    the years, it became obvious to me that we

12    have major issues here in Georgia with

13    residency.  And in the past few cases where

14    I have seen them, I became curious about what

15    I would see if I performed the kind of

16    analysis I normally do as an expert witness

17    statewide.

18                 And so out of curiosity, in

19    November, I ran NCOA processing to ascertain

20    the extent of the issues statewide.

21    BY MR. SHELLY:

22          Q.     Okay.  After you completed that

Ex. M to Defs.' Statement of Facts

Page 38

1    first instance?

2          A.    I told her that I thought that

3    if we had these kinds of residency issues in

4    the general, then it was entirely possible

5    we'd have the same issues in the runoff.

6          Q.    And what was her response?

7          A.    I don't recall her exact

8    response.

9          Q.    But she reacted positively to

10   it, that this was something that she would

11   consider?

12         A.    I don't recall her reaction,

13   other than she was glad to be aware of the

14   information.

15               We didn't know each other well

16   at the time, and -- I mean, she really didn't

17   know me from Adam, so I really couldn't

18   characterize her response to it.  I guess

19   that would be a question for her.

20         Q.    Did she ask for your

21   assistance?

22         A.    During the phone call with

Ex. M to Defs.' Statement of Facts

Page 39

1    Gregg Phillips, I was invited to consider

2    taking some sort of role here in Georgia with

3    True the Vote.  And I declined that

4    invitation because I just don't have the

5    bandwidth for it.

6         Q.    What was -- what were you being

7    asked to do that you didn't have time for?

8         A.    There was nothing specific.

9    There -- he did mention the possibility -- he

10   mentioned they were seeking to build a team

11   in Georgia and asked if I would consider

12   becoming involved potentially in some sort of

13   a leadership role.  And I declined.  I don't

14   have the time.

15        Q.    Okay.  It does seem to me that

16   the analysis that you ran was relevant to the

17   challenges that are at the heart of this

18   suit, so I would like to ask you a few more

19   questions about those.

20              You mentioned that your NCOA

21   list covered a 48-month period.  I'm looking

22   for what window that would cover.

Ex. M to Defs.' Statement of Facts

Page 41

1       we're suing over.

2               So I think understanding the

3       basis of his analysis will help us

4       better understand the challenge

5       program, while I do appreciate the

6       distinction, that his analysis did not

7       actually -- we have not yet

8       established that they used his data in

9       the challenges.

10              MS. SIEBERT:  If you would

11      permit me.

12              Mark, can you please clarify:

13      Did you share your actual data

14      analysis with Catherine and Gregg?

15              THE DEPONENT:  I did not share

16      any of my data with Catherine or

17      Gregg.  We talked in generalities

18      about issues that are very known to

19      them.

20              True the Vote has been aware

21      for many, many, many years that every

22      Secretary of State in the nation faces

Ex. M to Defs.' Statement of Facts

Page 42

1       issues with the cleanliness of their

2       voter rolls largely due to provisions

3       of the 1993 National Voter

4       Registration Act.

5            I was not telling either of

6       them anything they didn't already know

7       about the problem, in general.  I just

8       simply told them what I was seeing in

9       Georgia.  Neither of them was

10      surprised to hear it.

11           MS. SIEBERT:  Okay.

12           THE DEPONENT:  But I did no

13      data processing for True the Vote at

14      all, and I did no data processing of

15      this nature for the runoff for True

16      the Vote.

17           MS. SIEBERT:  So, Mr. Shelly,

18      I understand from Mr. Davis's

19      testimony just now that he did not

20      perform any data analysis and did not

21      share any specific data analysis with

22      True the Vote.

Ex. M to Defs.' Statement of Facts

Page 46

1    call -- but we established a relationship

2    after that and began to work collaboratively.

3         Q.     Did you discuss challenging

4    voters with him?

5         A.     We did discuss the possibility

6    of doing it not affiliated with True the

7    Vote.

8         Q.     And was that before or after

9    the call with Ms. Engelbrecht that you

10   mentioned?

11        A.     I don't recall.

12        Q.     Okay.  Did he ask for your

13   assistance challenging any Georgia voters?

14        A.     Well, we did discuss creating

15   our own challenges, but not True the Vote's

16   challenges.

17        Q.     And did you pursue that?

18             MS. SIEBERT:  I'm going to

19        object to this question.  Again,

20        beyond the scope.

21             This lawsuit is about the

22        challenges that were, quote, in

Ex. M to Defs.' Statement of Facts

Page 47

1          concert with True the Vote.  So this

2          is beyond the scope of this lawsuit.

3               Mark, you can go ahead and

4          answer.

5          A.    I did do data processing for

6    other people to file challenges, not in

7    coordination with True the Vote, not

8    affiliated with True the Vote.  A totally

9    different perspective than True the Vote.

10               I'll stop there.

11   BY MR. SHELLY:

12          Q.    Okay.  And who were these other

13   groups?

14          A.    Excuse me?

15          Q.    What other group were you

16   providing -- were you assisting with voter

17   challenges?

18          A.    No group in particular.

19          Q.    Are there other individuals?

20          A.    They were created to permit

21   other interested individuals to file them if

22   they wished to file them.

Ex. M to Defs.' Statement of Facts

Page 58

1        way, I would hope that Mr. Davis would

2        answer.

3                MS. SIEBERT:  All right.  Mark,

4        go ahead.

5        A.     I'm not aware of residency

6    challenges that were filed before the

7    general, but it wouldn't surprise me to learn

8    that there were.  There weren't any that I

9    was involved with.

10   BY MR. SHELLY:

11       Q.     Do I understand correctly that

12   filing these challenges were your idea in the

13   first instance?  Or did someone else first

14   provide that idea?

15       A.     It certainly was not my

16   original idea.  That's been a topic that's

17   been discussed for quite some time.

18                There have been previous

19   challenges in previous elections filed on

20   residency issues, as far as I'm aware.  It's

21   not a new idea by any stretch.

22       Q.     Did you support these

Page 59

1    challenges -- I'll make this one specific to

2    the post-November challenges that True the

3    Vote filed.  Did you support those

4    challenges?

5         A.     In general, I support any

6    effort to clean up the voter rolls and ensure

7    people don't vote with residency issues

8    because they're casting ballots for people

9    that don't represent them.

10               So to that extent, I would

11   support efforts to prevent people from

12   casting illegal ballots.

13        Q.     And what did you hope the

14   impact of these challenges would be on the

15   voters?

16        A.     I hoped that the counties that

17   accepted challenges would simply give them

18   additional scrutiny to make sure that they

19   retained the eligibility to vote in a

20   particular election.

21               In other words, under Georgia

22   law, if they move from one county to another

Ex. M to Defs.' Statement of Facts

Page 120

1    investigation is done and those people are

2    identified, and those persons who broke the

3    law were identified, you know, it's really up

4    to our elected -- our elections officials and

5    law enforcement to determine who did and

6    didn't break the law.

7              There is NCOA evidence that

8    indicates that that is a possibility, but

9    that's not a be all end all, without an

10   investigation.  Even when the Secretary of

11   State has actionable NCOA evidence, he has to

12   verify it.

13             A Board of Elections that

14   accepts a challenge would also investigate.

15   So if the residency of these voters is going

16   to be called into question, it should be done

17   by our elections officials.

18             I see evidence that quite a few

19   voters may have cast ballots in counties they

20   no longer lived in.  And, you know, that's up

21   to our elections officials and law

22   enforcement to investigate.

Ex. M to Defs.' Statement of Facts

Page 166

1        Q.     Is that correct?

2        A.     Yes --

3        Q.     Okay.

4        A.     -- it's quite different.

5        Q.     Okay.  So thinking about within

6    that -- within that scope of the data

7    analysis that you have ever done in voter

8    integrity issues, so discounting campaign,

9    discounting any other kind of marketing or

10   mass mail data analysis that you've done, so

11   in the voter integrity data analysis that

12   you've done, have you ever done any data

13   analysis where you focused on any particular

14   demographic of the individuals?

15       A.     Well, it depends on how you

16   define the word "demographic."

17       Q.     Race, sex, things like that.

18       A.     No.

19       Q.     Okay.

20       A.     The analysis that I did for

21   challenges, there were Republicans that were

22   challenged, there were Democrats that were

Ex. M to Defs.' Statement of Facts

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 167

1    challenged.  There were people of all race,

2    male and female and I guess other or -- there

3    was no criteria by any of that stuff that

4    comes to mind that was used.

5              I mean, at the end of the day,

6    a vote is either a lawful ballot or an

7    unlawful ballot, whether you're talking about

8    a Democrat or a Republican.

9        Q.    So in the voting integrity

10   analysis data that you've done, is it fair to

11   say that you are agnostic as far as race,

12   gender, sex, even political party?

13       A.    I deliberately avoided making

14   decisions along those lines.

15             Now, subsequent to all of this,

16   my understanding is the Secretary of State's

17   office chose, on their own, to run some

18   background on voting histories of some of

19   these voters that were -- that they're

20   investigating.  But I didn't even want to

21   look.

22             So what they came up with, what

Ex. M to Defs.' Statement of Facts

Page 168

1    they showed, is that this was not a highly

2    partisan group of voters that were not --

3    there were -- there was some primary vote

4    history.

5              And in some of these voters'

6    background, but compared to your average

7    general election voter, most of these folks

8    appeared to be low-interest voters or

9    less-involved voters, in terms of voting

10   every time in every election or in every

11   primary or what have you.

12       Q.    And, again, was that across the

13   spectrum of political party, race, gender,

14   all of that kind of thing, or --

15       A.    Based on what the Secretary of

16   State's office saw, I recall seeing some

17   primary vote history.  I don't recall seeing

18   them do any kind of racial breakdown on it.

19   That's something that I can do.  It's

20   something that I haven't done, but, you know,

21   I do obviously have the data to be able to do

22   that.

Ex. M to Defs.' Statement of Facts

Page 171

1   compliance with the NVRA.  But other than

2   that, I have not worked with a lot of voter

3   data outside of our own state.

4        Q.     That's fair.  That's fair.

5               To your knowledge or your

6   understanding, when somebody does -- an

7   individual decides to make a Section 230

8   challenge in their county, is the process

9   that they would -- that that individual would

10  then go knock on somebody's door and say,

11  Hey, I don't think you're eligible to vote in

12  Gwinnett County?

13       A.     No.  I see no reason to do

14  that.

15       Q.     Okay.

16       A.     In fact, I would -- if I were

17  asked about it, I would encourage people to

18  avoid any kind of contact with these voters

19  unless it's done by an elected official or a

20  county official or someone conducting an

21  official investigation.

22               As an example, I would hope

Ex. M to Defs.' Statement of Facts