Case 2:20-cv-00302-SCJ   Document 155-17   Filed 05/16/22   Page 1 of 60

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 1

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

```
-------------------------------x
FAIR FIGHT, INC., SCOTT BERSON,:
JOCELYN HEREDIA, and JANE DOE, :
                               :
          Plaintiffs,          :
                               :
     vs.                       :
                               :         Case No.
TRUE THE VOTE, CATHERINE       :
ENGELBRECHT, DEREK SOMERVILLE, : 2:20-cv-00302-SCJ
MARK DAVIS, MARK WILLIAMS,     :
RON JOHNSON, JAMES COOPER, and :
JOHN DOES 1-10,                :
                               :
          Defendants.          :
                               :
FAIR FIGHT ACTION, INC.,       :
                               :
          Counter-Defendant.   :
-------------------------------x
```

VIRTUAL VIDEOTAPED DEPOSITION OF
MARK A. DAVIS
Wednesday, January 19, 2022
9:05 a.m. Eastern Standard Time

REPORTER:  Dawn A. Jaques, CSR, CLR

_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Ex. N to Defs.' Statement of Facts

Page 2

```
 1   APPEARANCES:
 2   On behalf of the Plaintiffs:
          TINA MENG, ESQ.
 3        CHRISTINA FORD, ESQ.
          JOEL RAMIREZ, ESQ.
 4        UZOMA NKWONTA, ESQ.
          Elias Law Group LLP
 5        10 G Street, NE
          Suite 600
 6        Washington, D.C.  20002
          PHONE:   (202) 968-4592   (Ms. Meng)
 7                 (202) 968-4558   (Ms. Ford)
          EMAIL:   tmeng@elias.law
 8                 cford@elias.law
                   jramirez@elias.law
 9                 unkwonta@elias.law
10   -and-
11        MAIA COGEN, ESQ.
          Lawrence & Bundy LLC
12        1180 West Peachtree Street
          Suite 1650
13        Atlanta, Georgia  30309
          PHONE:   (404) 400-3346
14        EMAIL:   maia.cogen@lawrencebundy.com
15
16   On behalf of the Defendants:
          MELENA S. SIEBERT, ESQ.
17        The Bopp Law Firm
          1 South Sixth Street
18        Terre Haute, Indiana  47807-3510
          PHONE:   (812) 232-2434
19        EMAIL:   msiebert@bopplaw.com
20
21   VIDEOGRAPHER AND EXHIBIT TECHNICIAN:
22        Mitchell Mahon, Digital Evidence Group
```

Ex. N to Defs.' Statement of Facts

Case 2:20-cv-00302-SCJ   Document 155-17   Filed 05/16/22   Page 3 of 60

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

```
 1                    I-N-D-E-X
 2   WITNESS:                               PAGE:
 3   MARK A. DAVIS
 4        Examination by Ms. Meng  ........ 7, 189
 5        Examination by Ms. Siebert  ....... 161
 6
 7                    E-X-H-I-B-I-T-S
 8   DAVIS DEPOSITION EXHIBIT:                 PAGE:
 9   Exhibit 1   Notice of Deposition          11
10   Exhibit 2   Plaintiffs' First Requests for
                 Production to Mark Davis       12
11   Exhibit 3   Plaintiffs' Second Requests for
                 Production to Mark Davis       13
12   Exhibit 4   November 26, 2020, email chain
                 SUBJECT: Independent Verification
13               (No Bates)  (4 pages)          23
14   Exhibit 5   December 14, 2020, email chain
                 SUBJECT: FYI - From the Georgia
15               Voter Guide
                 (No Bates)  (2 pages)          34
16   Exhibit 6   December 15, 2020, email chain
                 SUBJECT: County Count
17               (No Bates)  (2 pages)          38
18   Exhibit 7   Somerville text exchanges with
                 Mark Davis
19               (No Bates)  (261 pages)        49
20   Exhibit 8   December 22-23, 2020, email chain
                 SUBJECT: Citizen Challenges:
21               Update and Encouragement
22               (No Bates)  (3 pages)          53
```

Ex. N to Defs.' Statement of Facts

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

```
                                                    Page 4
 1                     INDEX (Continued)
 2                     E-X-H-I-B-I-T-S
 3    DAVIS DEPOSITION EXHIBIT:                     PAGE:
 4    Exhibit 9    November 29-30, 2020,
                   Facebook posts
 5                 (No Bates)  (2 pages)              61
 6    Exhibit 10   December 4, 2020, Facebook post
                   (No Bates)  (5 pages)              66
 7    Exhibit 11   December 5, 2020, Derek Somerville
                   Facebook post
 8                 (No Bates)  (22 pages)             75
 9    Exhibit 12   December 16, 2020, email chain
                   SUBJECT: Georgia Elector
10                 Challenge Instructions/Materials
                   (No Bates)  (2 pages)              96
11    Exhibit 13   December 19-20, 2020, email chain
                   SUBJECT: Citizen Challenge Q&A
12                 Zoom call Sunday night at 6pm et
                   (No Bates)  (2 pages)              98
13    Exhibit 14   December 28-29, 2020, email chain
                   SUBJECT: Elector Challenge Access
14                 (No Bates)  (3 pages)             153
15
16
17
18
19
20
21
22
```

Ex. N to Defs.' Statement of Facts

Page 5

1                P R O C E E D I N G S

2             THE VIDEOGRAPHER:  We are going on the

3     record.  This is Tape No. 1 of the videotaped

4     deposition of Mark Davis, taken by Plaintiffs in

5     the matter of Fair Fight, Inc., et al., vs. True

6     the Vote, in the United States District Court for

7     the Northern District of Georgia, Gainesville

8     Division, Case No. 2:20-cv-00302-SCJ.

9             This deposition is being held remotely

10    over Zoom videoconference on January 19th, 2022.

11    The time on the video screen is 9:05 a.m.

12            My name is Mitchell Mahon; I am the

13    legal videographer from DEG.  The court reporter

14    is Dawn Jaques, in association with Digital

15    Evidence Group.

16            Will counsel please introduce

17    themselves for the record?

18            MS. MENG:  Good morning, everyone.  My

19    name is Tina Meng on behalf of Plaintiffs, Elias

20    Law Group.

21            MS. FORD:  I'm Christina Ford, also

22    with Elias Law Group on behalf of Plaintiffs, but

Ex. N to Defs.' Statement of Facts

Page 6

1    I will not be speaking today.

2              THE VIDEOGRAPHER:  Will the court

3    reporter please swear in the witness?

4              MS. SIEBERT:  Melena Siebert on behalf

5    of Defendants today.  And I believe there is one

6    more attorney for Plaintiffs.

7              THE VIDEOGRAPHER:  They might be

8    muted.

9              THE REPORTER:  Ms. Cogen, did she

10   state hers?

11             MS. COGEN:  Yes, Maia Cogen for

12   Plaintiffs today.

13             THE REPORTER:  Would you raise your

14   right hand to be sworn, please?

15      (The witness was administered the oath.)

16   Whereupon,

17                   MARK A. DAVIS,

18        was called as a witness, after having been

19        first duly sworn by the Notary Public,

20        was examined and testified as follows:

21

22

Ex. N to Defs.' Statement of Facts

Page 7

```
 1          EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

 2                  BY MS. MENG:

 3          Q    Good morning, Mr. Davis.  How are you?

 4          A    Good morning.  I'm all right.  How

 5     about yourself?

 6          Q    Good.  So my name is Tina Meng, as I

 7     said before, and I represent the Plaintiffs in

 8     this case.

 9                  Just for the record, would you state

10     your full name and address?

11          A    Mark Allen Davis, 325 Wesfork,

12     W-E-S-F-O-R-K -- there's no T in there -- Way,

13     Suwanee, Georgia, S-U-W-A-N-E-E, 30024.

14          Q    Great.  And I know, you know, this is

15     the second time that you've been deposed for this

16     case, but just as a refresher, I'd like to go over

17     some of the ground rules for the deposition so

18     we're all on the same page.

19                  All the testimony today is under oath

20     just as you were testifying in court.

21                  Does that make sense to you?

22          A    Yes, it does.
```

Ex. N to Defs.' Statement of Facts

Page 8

1          Q    Great.  So for the benefit of everyone

2    and the court reporter, especially since we're all

3    remote, please make sure to answer audibly.  Head

4    shakes and nods are hard to put on the record, so

5    a yes or no or a spoken answer would be most

6    helpful.

7               Please allow me to finish my question

8    before giving your answer, and I'll do the same

9    when you're responding.  Again, this is for a

10   clear transcript and for the record.

11              Does that sound good to you?

12         A    Mm-hmm.  Yes, it does.

13         Q    Great.  From time to time, your

14   attorney may make an objection to a question that

15   I ask, and that's fine, but you are to answer

16   unless she specifically instructs you not to

17   answer based on a topic of privilege.

18              Does that make sense as well?

19         A    Yes, it does.

20         Q    Great.  So if at any point you do not

21   understand a question that I'm asking, will you

22   please let me know?

Ex. N to Defs.' Statement of Facts

Page 9

1          A     Yes, I will.

2          Q     Okay.  I will do my best to rephrase

3     or otherwise clarify, and I will assume that if

4     you answer a question, the question makes sense to

5     you.  Is that fair?

6          A     Yes.

7          Q     Great.  Now, if at any time you'd like

8     a break, please let me know.  I'll try to find a

9     good place to stop and we can go off the record

10    for a few minutes.

11               The only exception to that is if I've

12    asked you a question, I please just ask that you

13    answer the question before taking a break.

14               Sound good?

15         A     Yes.

16         Q     Now, what address are you located at

17    for this deposition?

18         A     325 Wesfork Way, Suwanee, Georgia

19    30024.

20         Q     Okay.  And how are you viewing this

21    deposition?  Is it by laptop, or monitor with a

22    video camera?

Ex. N to Defs.' Statement of Facts

Page 10

```
 1          A     I have a desktop with two screens.  So

 2     if you see me looking left and right, that's why.

 3          Q     Sure.  And do you have any documents

 4     with you, either hard copies or electronic?

 5          A     I do not.  The only thing on my desk

 6     is some paperwork and some unopened mail.

 7          Q     Sounds good.

 8                And is anyone in the room with you

 9     right now?

10          A     No.  I do have a wife working

11     upstairs, and a stepdaughter who I believe is

12     asleep in her bedroom.

13          Q     Great.  We'll try not to bother her

14     then.

15                Because we're taking the deposition

16     remotely, I may not always be able to see who is

17     entering the room or in front of you, so do you

18     understand that it would not be appropriate for

19     you -- for your attorney or anyone else to tell

20     you how to answer a question I ask you today?

21          A     Yes.

22          Q     Great.  And do you agree that while
```

Ex. N to Defs.' Statement of Facts

Page 11

1    you're testifying, you will not exchange

2    communications -- whether by text, email, or other

3    messaging -- to anyone else about how to answer a

4    question today?

5          A    Yes.

6          Q    Great.  If you don't have any other

7    questions for me, I think we can get started.

8          A    Okay.

9          Q    Great.  Mitch, do you mind pulling up

10   Exhibit A and mark it as Exhibit 1 for me?

11              (Davis Exhibit 1 was marked

12               for identification.)

13              BY MS. MENG:

14         Q    Mr. Davis, do you recognize this

15   document?

16         A    I don't, but it appears to be notice

17   of this deposition.

18         Q    Yes.  I believe this is a notice to

19   take the deposition of you, noted for

20   January 19th, 2022, to begin at 9:00 a.m.

21              Are you prepared to testify today?

22         A    I am.

Page 12

```
 1        Q    Great.  Now, without disclosing any
 2   specific communications you may have had with your
 3   lawyers, can you describe at a high level what you
 4   did to prepare for today?
 5        A    Reviewed discovery documents that I
 6   provided to you.  That's all I can think of
 7   really.
 8        Q    Okay.  Mitch, you can take that
 9   exhibit down.
10             So Mr. Davis, I'd like to ask you a
11   few questions about the process to search and
12   produce documents for today.
13             So, Mitch, if you could pull up
14   Exhibit B, which we can mark as Exhibit 2.
15             (Davis Exhibit 2 was marked
16              for identification.)
17             BY MS. MENG:
18        Q    Great, thank you.
19             Mr. Davis, do you recognize this
20   document?
21        A    Yes.
22        Q    Okay.  And you've seen it before?
```

Ex. N to Defs.' Statement of Facts

1/19/2022            Fair Fight, Inc. et al. v. True the Vote, et al.            Mark A. Davis

Page 13

1          A    Yes.

2          Q    So just to identify this, do you agree

3    that this is a Plaintiffs' First Requests for

4    Production to you?

5          A    I'd have to go back and compare them,

6    but it appears to be.

7          Q    Yeah.  So just for the record, I think

8    in the title of the document it says "First

9    Requests."  Do you see that at the top there?

10         A    Excuse me?

11         Q    At the top, I think it says

12   "Plaintiffs' First Requests for Production to

13   Defendant Mark Davis," the title of the document.

14         A    Okay.

15         Q    Great.  Thank you, Mitch.  Can you

16   pull up Exhibit C and mark it as Exhibit 3?

17              (Davis Exhibit 3 was marked

18               for identification.)

19              BY MS. MENG:

20         Q    So Mr. Davis, do you recognize this

21   document?

22         A    Yes.

Ex. N to Defs.' Statement of Facts

1/19/2022         Fair Fight, Inc. et al. v. True the Vote, et al.         Mark A. Davis

Page 14

1          Q    Okay.  And you've seen it before?

2          A    I believe so.

3          Q    Okay.  And this, according to the

4     title of the document, do you agree that it's the

5     Plaintiffs' Second Requests for Production to you,

6     Mark Davis?

7          A    That's what it appears to be.

8          Q    Okay.  Great, thank you.

9               Mitch, you can take that exhibit down.

10    Thank you.

11              Now, Mr. Davis, how did you search for

12    and identify documents that were responsive to the

13    two requests for production that you just saw?

14         A    I thought through the requests, went

15    over them with my attorney, and then with whatever

16    was appropriate, I went looking for responsive

17    documents to provide.

18         Q    Okay.  And when did you undertake the

19    search for documents?

20         A    It's been some time.  I don't recall

21    specifically.

22         Q    Okay.  And do you remember how long

Ex. N to Defs.' Statement of Facts

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

1   the search took in terms of hours, days, weeks?

2        A    It depends on which search we're

3   talking about.  The way that certain requests were

4   defined in the original request, there was a lot

5   that didn't appear relevant.

6            There was language used in the

7   definitions linking the requests to being in the

8   context of True the Vote, and there was later a

9   hearing with the judge to determine how that was

10  to be interpreted, I suppose.

11           And then this latest hearing that we

12  had, the judge, I believe, ruled that a lot of the

13  stuff that we did not think was within the scope

14  of the original requests should be viewed in that

15  context, and I was asked to go back and redo some

16  of that stuff.

17           I wasn't given a great deal of time to

18  do that, and I had a lot of work to do and we had

19  holidays going on, so I devoted as much time as I

20  could to it, but I really didn't have a lot of

21  time available to devote to it, so I did the best

22  that I could to try to deliver responsive

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 16

1   documents to you.

2          Q     That makes sense.

3                And can you just briefly describe the

4   process you took in terms of, you know, where you

5   might have looked for documents?

6          A     Depends on the question.  Some of

7   those questions were very broad, and I did the

8   best that I could to review computer files,

9   databases, source files from various places,

10  emails, et cetera.

11               It really depends on the question, I

12  suppose.

13         Q     Great, okay.  But in general, you

14  looked at your computer, devices that you have,

15  things that you had access to and communicate on;

16  is that correct?

17         A     I looked wherever was appropriate in

18  the context of the question.

19         Q     Okay.  And did anyone else help you in

20  any way with searching for documents?

21         A     No.

22         Q     Okay.  Have you withheld any documents

Ex. N to Defs.' Statement of Facts

Page 17

1    for any reason from production?

2         A    It depends, again, on the context of

3    the question.

4         Q    And by question, you're referring to

5    the requests for production?

6         A    Each of the requests, right.

7         Q    Okay.  And can you just elaborate a

8    little bit on, you know, what the general

9    parameters were that you might have withheld

10   documents based on the production requests?

11        A    Some weren't relevant to the question

12   asked.  And again, as I said earlier, a lot of the

13   definitions that were in the original requests

14   asked for, for example, communications relating to

15   the challenge that I and True the Vote worked on,

16   and we didn't -- we didn't get involved with

17   True the Vote's challenge.  They did that all on

18   their own.  That was their own effort.

19             So a lot of the questions, the way the

20   definitions were provided and the way the

21   questions were asked, there were some documents

22   that just didn't have anything to do with

Ex. N to Defs.' Statement of Facts

Page 18

1    answering that question in the context in which it

2    was asked.

3         Q    Okay.  Were there any documents,

4    records, or communications that you believed were

5    covered by the requests for production that

6    perhaps you couldn't find?

7         A    Yes.  There were some -- there were

8    some text messages that I deleted prior to the

9    lawsuit, and then after the judge's most recent

10   interpretation of the scope of the requests, I did

11   go looking for some that I recalled in my mind

12   that I could not locate.  So there were some.

13              Some of those have been produced from

14   other sources, so they are available now, but

15   there were a couple that come to mind.

16              One was a text message thread between

17   Derek Somerville and I, and another was a text

18   message exchange between Catherine at

19   True the Vote that I could not locate either.

20              I get a lot of junk texts and a lot of

21   junk email, and I do my best to try to keep that

22   cleaned out on a regular basis, otherwise it piles

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 19

1   up and just gets unmanageable, and it's possible

2   that I may have accidentally deleted those when I

3   was cleaning out text messages at some point last

4   year.  I'm not sure.  All I know is I could not

5   locate some of them.

6         Q    Okay.  And so you referred to two

7   specific communications that you don't recall --

8   or that you weren't able to find.

9              Could you just explain or elaborate,

10  based on your memory of those communications, what

11  were contained in those text messages?

12        A    Well, there was a thread between Derek

13  Somerville and I that touched on a lot of topics,

14  and I'm aware that it's been disclosed, so I would

15  imagine that we'll be reviewing that today.

16             There was also a text message that I

17  had exchanged with Catherine in relation to the

18  launch of a website that was being discussed, and

19  I believe that that text exchange led to a phone

20  call, a brief phone call, where I expressed those

21  concerns.

22             Those are the only two that

Ex. N to Defs.' Statement of Facts

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 20

1    immediately come to mind.

2         Q    Okay.  And do you know when that phone

3    call took place?

4         A    I don't recall, but I believe that

5    that may be in the text messages between Derek and

6    I, which I think you guys have a copy of.

7         Q    Okay.  So soon thereafter about that

8    text message did --

9         A    Around that time that the text message

10   occurred.

11        Q    Okay.  And you had mentioned that you

12   routinely delete communications, emails, texts and

13   things like that.

14             On what regular basis are you deleting

15   things on devices?

16        A    I don't have any set schedule.  Well,

17   I get a lot of texts and emails that are -- for

18   example, there are certain accounts, when I log

19   in, I get a confirmation, text message or email.

20             When I process National Change of

21   Address processing for a customer, I'll get

22   notices that it's been received and been returned,

Ex. N to Defs.' Statement of Facts

Page 21

1   and when I log in to different places, I'll get

2   confirmations.  And I try to almost immediately

3   clean those out when they come in because there's

4   just no reason for me to keep them.

5              Or as another example, if I get an

6   email from somebody or a text message from

7   somebody saying, hey, can you give me a call when

8   you get a minute?  You know, as soon as I pick up

9   the phone and do that, I'll normally just delete

10  the text because it's no longer needed.

11             So I don't have any real set schedule

12  or anything, but I do try to keep junk cleaned out

13  as much as I can because it stacks up and gets

14  into the hundreds or thousands if I don't.

15        Q    Okay.  And can you describe how the

16  text message thread with Mr. Davis might have

17  fallen into that criteria for how you clear out

18  your messages?

19        A    You mean Mr. Somerville?

20        Q    Oh, yes, sorry.

21        A    Well, the messages that we exchanged

22  early on, at some point I just didn't feel like

Ex. N to Defs.' Statement of Facts

Page 22

1   they were relevant and I just, you know, wiped

2   them out.  I didn't think I would need them again

3   in the future.

4              The rest of the thread that happened

5   after that point, I can only assume that I may

6   have deleted it by accident at some point last

7   summer or last fall, because when I went to look

8   for it, it was not there.

9        Q    And so just to clarify, do you use a

10  phone device for your text messages?

11       A    I do.

12       Q    And is there like a trash folder or a

13  deleted messages part of --

14       A    Not that I'm aware of.

15       Q    Sorry?

16       A    Not that I'm aware of.

17       Q    Okay.  And do you recall, I know you

18  had said that perhaps some of these messages were

19  deleted by accident.

20              Do you recall a time frame by which

21  you would have gone into your phone and deleted

22  things, and messages might have gotten erased that

Page 23

1    you didn't mean to?

2         A    As I said, I think sometime last

3    summer or last fall, I would imagine.  I'm not at

4    all sure.  I just don't know.

5         Q    Okay.  And what about messages on

6    other social media platforms, do you routinely go

7    through and clear those out or delete them?

8         A    Typically not.

9         Q    Okay.  So Mr. Davis, I'd like to ask

10   you a couple follow-up questions about how you

11   conducted your analysis of the Georgia voter files

12   last year.

13              Mitch, could you pull up Exhibit D and

14   mark it as Exhibit 4, please?

15              (Davis Exhibit 4 was marked

16               for identification.)

17              MS. SIEBERT:  If possible, I'd like to

18   lodge just a continuing objection, just for the

19   record, to questions related to Mr. Davis's work

20   that was not in conjunction with True the Vote,

21   either for the runoff election or for the November

22   election, just for the record.

Ex. N to Defs.' Statement of Facts

Page 24

1          Of course, we'll instruct him to

2     answer, but if okay with you, I'd like to just

3     lodge a continuing objection for the record.

4          MS. MENG:  Thank you, Melena, that's

5     noted.  And I would say that these questions are

6     based off of documents that were produced, and

7     so --

8          MS. SIEBERT:  No, of course.  Of

9     course.

10          BY MS. MENG:

11     Q    So Mr. Davis, could you just take a

12     moment a take a look at this document in front of

13     you.  I believe it's an email chain, and it may be

14     multiple pages, but I'd like to just focus you on

15     the first page for now.

16     A    Sorry, did you ask for a response?

17     Q    Oh, no.  I just wanted you to review

18     it, and let me know when you've had a chance to

19     look it over.

20     A    I recall this email.

21     Q    Okay.  And do you agree that this is

22     an e-mail chain between you and Mr. Somerville

Page 28

1   for some period of time intending to return,

2   there's no issue with them voting.

3        Q    Okay.  So in the eventual list of

4   about 40,000 voter challenges that you and

5   Mr. Somerville pulled together, were the names of

6   voters who forwarded their -- were the names of

7   voters who forwarded their mail to an address on a

8   military base therefore excluded?

9        A    Well, the number you're quoting --

10   based on the number you're quoting, I think I need

11   to draw some distinctions here.

12             That initial list that I output of

13   40,100 something, I'd have to look at the count,

14   that list I don't think is really relevant to this

15   case.  That list was produced basically for the

16   Trump attorneys and for me to continue as a

17   starting point to work with.  That was not used to

18   challenge voters in the runoff election.

19             The selection criteria for that file,

20   and the processing that I did for that file, were

21   different.  So I just want to draw that

22   distinction.

Ex. N to Defs.' Statement of Facts

Page 29

1          Q     Sure.  Thank you for that

2     clarification.

3               So in the list that you eventually did

4     pull together for voter challenges, did you

5     exclude names of military voters?

6          A     Well, in the absentee voter database,

7     there are UOCAVA voters in there, and those are

8     military typically, or subject to the Act, so

9     basically military and their families, so those

10    were dropped.

11               And Derek Somerville, being

12    ex-military, is pretty familiar with where

13    military bases are, so to what extent we could, we

14    did attempt to suppress as much as possible what

15    could likely be members of the military.  But at

16    the end of the day, ferreting out those kinds of

17    issues is what investigations are for.

18               So, you know, the number of records

19    was quite large, wasn't really possible for

20    private citizens like us to do those kinds of

21    investigations, so it's up to our county elections

22    officials or state elections officials, whatever

Ex. N to Defs.' Statement of Facts

Page 30

1    the case may be, to take on that task.

2         Q    Okay.  And Mr. Davis, you mentioned

3    that there was different criteria for this list of

4    about 40,000 voter names that were pulled together

5    for the Trump attorneys, but you had referenced

6    before, that criteria was different than the list

7    of voters that you and Mr. Somerville worked

8    together to pull for voter challenges.

9              Can you just elaborate on how that

10   criteria was different?

11        A    Well, for one thing, after I output

12   the initial list, it was basically just a down and

13   dirty first draft or first look at those issues.

14             And one of the things that I noticed

15   within a couple days, I believe, of generating

16   that file was that it contained some changes of

17   address that were to P.O. Boxes, so almost

18   immediately I wound up dropping about 5,000

19   records out of there.

20             And the other important distinction to

21   make is in the selection criteria, because if a

22   person moved more than 30 days -- moved to another

Ex. N to Defs.' Statement of Facts

Page 31

1    county more than 30 days before the general

2    election, that would indicate potential residency

3    issues for voting in the general, but for the

4    runoff, that date range is obviously quite

5    different.

6              So, for example, if someone had moved

7    with a Move Effective Date in October or November

8    of 2020, we would want to suppress all of those

9    because they're either within the grace period of

10   30 days or irrelevant; whereas the date for the

11   runoff was obviously a couple months later, and so

12   the selection criteria for that would have been

13   different.

14             And we also did some other

15   suppressions when we generated the challenge list.

16   For example, in our analysis of the voter data, it

17   appeared that the Secretary of State had done list

18   maintenance in 2019, and so we assumed that

19   changes of address that were from that time period

20   probably would have already been through their

21   NCOA process and subsequent list maintenance

22   activities, so we limited the scope to changes of

Ex. N to Defs.' Statement of Facts

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 32

1    address that were beyond that time.

2              We did what we could to suppress

3    military, and I'm trying to think what other

4    suppressions we did.

5              Well, I assume we're probably going to

6    go through some additional communications here

7    that will help refresh my memory on this, but

8    there were a number of suppressions that we did

9    for the runoff file that shouldn't be conflated

10   with analysis that we did for the general

11   election, and I think this is an issue that keeps

12   coming up.

13             Analysis that I did for the general

14   election and for issues related to the general

15   election is different from analysis that I did for

16   potential issues related to the runoff.  So that

17   distinction needs to be made.

18             And the list that you're referencing,

19   the 40,219, or whatever that final count was, that

20   particular file I don't think is particularly

21   relevant here to the issues at hand in this case,

22   but that's my opinion, so ...

Ex. N to Defs.' Statement of Facts

Page 36

1     "Done.  No way to catch them all, but I'm sure I

2     removed a few thousand records."

3              Do you see that?

4       A    I think he's talking about the

5     military scrub I asked him to do.

6       Q    Okay.  And just to clarify the time

7     frame here, these e-mails were sent in the middle

8     of December, so based on what you were saying with

9     the previous list that you did for the general

10    election, would this list have been for -- this

11    analysis have been for the runoff election; is

12    that correct?

13      A    Yes.

14      Q    Okay.  And what did you believe

15    Mr. Somerville meant by there's no way to catch

16    them all?

17      A    Well, the scrub he did would have been

18    military bases, people living on base, but there's

19    also people who live off base, some closer than

20    others.

21              So I think what he was saying is he

22    did his best effort to suppress as much military

Ex. N to Defs.' Statement of Facts

Page 37

1    as possible, but there's no way to catch them all.

2              At the end of the day, as I said, you

3    know, that's what investigations are for, and so

4    it's a best efforts kind of situation.  We made a

5    good-faith effort to do what we could with regard

6    to the military.

7         Q    Okay.  And how confident were you in

8    how accurate your analyses were in capturing or

9    removing the data that you were seeking to remove?

10        A    As far as the military or --

11        Q    Military, or any other type of

12   category, like student voters, et cetera.

13        A    Well, I have a lot of experience doing

14   this kind of work, and I gave my best efforts to

15   the cause as well.

16             Our goal was to produce legitimate

17   challenges as much as possible.  We didn't want to

18   inconvenience people unnecessarily, but at the

19   same time, it appears to me, or at least the data

20   indicates, that there likely were a lot of

21   unlawful votes that were cast in the general

22   election, and because we were seeing that, we were

Ex. N to Defs.' Statement of Facts

Page 40

1   Mr. Somerville is referring to here related to

2   voter names from the runoff as opposed to --

3          A     No.

4          Q     -- anything we discussed before?  No?

5          A     No.  I think what he's talking about

6   here -- and again, I'm not real sure where he was

7   going with this.

8                I had produced a count by county, so

9   basically 159 separate counts, one for each

10  county, indicating how many voters were being

11  challenged in each county.  I believe the average

12  was less than 250.  If I recall off the top of my

13  head properly, I think it was like 146 or

14  something per county was the average.

15               And I'm not sure why he asked for that

16  count, but it was an aggregate level number.  I

17  feel confident that none of this here refers to

18  partisanship with regard to any particular voter.

19               The production of the challenge list

20  was not done based on partisanship or race, or any

21  kind of criteria like that.  The count that he

22  produced this from was an aggregate level count of

Ex. N to Defs.' Statement of Facts

Page 41

1    how many were being challenged per county, and for

2    whatever reason, it appears he did some sort of

3    workup based on which of those counties were red

4    and blue.  And I'm not sure what the point of this

5    was, but I would encourage you to ask him.

6         Q    Okay.  And what's your understanding

7    of the reference to red and blue in this analysis?

8         A    I can only assume that he's referring

9    to the counties that voted either Democrat or

10   Republican.  Again, I'd encourage you to ask him.

11        Q    Sure.  Is it fair to say, then, that

12   you and Mr. Somerville didn't discuss this

13   analysis further?

14        A    I don't recall if we did or didn't.

15   Quite frankly, when I saw it, I didn't really see

16   the point of it.

17        Q    And do you know if this analysis was

18   shared with anyone else?

19        A    I don't know.

20        Q    And so just to clarify for my own

21   understanding, and apologies if you've already

22   said this, but you said that you had sent

Ex. N to Defs.' Statement of Facts

Page 46

1   generally available basically to help support the

2   challenges that were issued.

3          Q    Okay.  And are you aware if anyone at

4   True the Vote might have had access, as you had

5   said, because the certifications were publicly

6   available?

7          A    Well, they were available to the

8   challengers.  I don't believe we published it to

9   the public, but certainly members of the public

10  could have obtained them from an Open Records

11  Request from any of the counties where they were

12  filed, but I don't recall us publishing it to the

13  general public.  I wouldn't see any reason to do

14  that.

15              Can you repeat your question?  I

16  forget the original context.

17         Q    Yeah.  I was just asking if you knew

18  if the NCOA certifications were ever disclosed to

19  anyone at True the Vote?

20         A    Not that I'm aware of.  I suppose it's

21  possible.  I don't know why it would be relevant

22  to True the Vote.  Their effort was their effort,

Page 59

1   by the prospect of prosecution.  It should be

2   obvious.  If you're aware that what you're doing

3   is unlawful, you shouldn't do it.

4          Q    Okay.  And was it ever your goal to

5   partake in efforts that would lead to the criminal

6   prosecution of voters?

7          A    My primary motivation was to prevent

8   illegal votes from being cast.  It's the job of

9   our election officials and law enforcement to

10  determine who may or may not have committed a

11  crime.

12              I've tried to make a point of not

13  accusing any particular voter of violating the

14  law, even though they may have.  I'll leave it

15  there.

16          Q    So, Mitch, could you pull up Exhibit 7

17  again?

18              MS. SIEBERT:  Ms. Meng, I'm sorry,

19  what exhibit number was this email?  I missed it.

20              MS. MENG:  It was Exhibit 8.

21              MS. SIEBERT:  Thank you.

22              MS. MENG:  Mm-hmm.

Ex. N to Defs.' Statement of Facts

1/19/2022           Fair Fight, Inc. et al. v. True the Vote, et al.           Mark A. Davis

                                                              Page 60

1              BY MS. MENG:

2         Q    Mitch, do you mind scrolling to pages

3    221 and 222, please?  Great, thank you.

4              So Mr. Davis, just to confirm, this is

5    the text message thread between you and

6    Mr. Somerville that we had reviewed previously,

7    correct?

8         A    Yes.

9         Q    Okay.  And at the top of the

10   screenshot on page 222 here, it looks like you and

11   Mr. Somerville are discussing the SoS, which I

12   presume to be Secretary of State's office,

13   conducting some investigation.

14             Do you see that?

15        A    Yes.

16        Q    Can you elaborate on what type of

17   investigations the two of you were discussing?

18        A    In May, I had received an update to

19   the voter file, and when I compared the NCOA

20   processing that I did in November to the May copy

21   of the voter file, there were over 10,000 voters

22   that had voted in the general election who had

Ex. N to Defs.' Statement of Facts

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 61

1    since updated their own registrations to the exact

2    same addresses that they gave to the United States

3    Postal Service when they moved originally.

4                   And since that count had gotten up so

5    high, I decided it was probably about time for the

6    Secretary of State to go ahead and open an

7    official investigation into those issues, and I

8    did ask for that investigation, and they did

9    commit to doing it if I would provide the data for

10   them to do the investigation, which I did do at

11   some point in May.  I don't remember the exact

12   date.

13        Q    Okay.  Mitch, do you mind pulling up

14   Exhibit K?  And this is marked as Exhibit 9.

15                   (Davis Exhibit 9 was marked

16                    for identification.)

17                   BY MS. MENG:

18        Q    Mr. Davis, do you recognize this

19   document?

20        A    Can you zoom in on it?  It's really

21   small.  Yes, I recognize it.

22        Q    Okay.  And can you explain what it is?

Ex. N to Defs.' Statement of Facts

1/19/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Mark A. Davis

Page 67

1   at this?  And Mitch will blow it up for you.

2   Thank you.

3          A     I remember this one.

4          Q     And can you explain what it is?

5          A     Well, we found quite a number of

6   voters that were registered to vote at commercial

7   mail receiving agencies, and in many instances,

8   the fact that their residence that they're

9   claiming appears to be an 8 x 8 inch box in a

10  UPS store, or whatever they measure, many times

11  was disguised as an apartment number or a unit

12  number instead of a P.O. Box number.

13              Again, Georgia law requires us to be

14  registered where we actually reside.  One of the

15  obvious problems with people registering at a

16  UPS store is that we're assigned our voting

17  districts for house, senate, congressional, county

18  commission, school board, any number of election

19  districts, and if you're registered at a

20  UPS store, you might live miles away in completely

21  different districts, and you may be casting

22  ballots in voting districts that you don't live

Ex. N to Defs.' Statement of Facts

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 68

1    in.

2          So there's obvious problems with that,

3    and quite frankly, I was astounded to find that in

4    the data.  There are obvious ways to identify

5    those registrations in the CASS™ certification

6    process, and in my view, our Secretary of State

7    and/or the counties can and should be addressing

8    those concerns.

9          Q    Okay.  And here, this is a post where

10   it looks like you've reposted something that

11   Mr. Somerville had posted and labeled with you,

12   which I know is perhaps something that the social

13   media website allows you to do.  Is that correct?

14         A    Yeah, he posted it and tagged me in

15   the post.

16         Q    Okay.  Now, Mitch, if we could go to

17   the bottom of the page.  So right there, the last

18   paragraph we see that this post said, "We need to

19   identify the abusers, start throwing people in

20   jail, and close the loopholes."

21              Do you see that, Mr. Davis?

22         A    I do.

Ex. N to Defs.' Statement of Facts

Page 70

1   determine violations of law.  My main concern is

2   correcting the problem.

3        Q    Did you agree with the sentiment that

4   Mr. Somerville wrote here with this sentence?

5        A    I think I just expressed my sentiment

6   on the matter.  That's his.  I would ask him about

7   it.

8        Q    Okay.  But it is true that you were

9   tagged in this post, and you then reposted it; is

10  that correct?

11       A    Correct.

12       Q    Okay.  And what did you -- why did you

13  decide to share the post?

14       A    Excuse me?

15       Q    Why did you decide to share the post?

16       A    I think it's important for people to

17  understand that this kind of stuff and this kind

18  of trash is in our voter database, and no one

19  seems to be doing anything about the issue.

20       Q    And what did you hope would be the

21  reaction of someone reading this post?

22       A    Well, I would hope our elections

Ex. N to Defs.' Statement of Facts

Page 71

1   officials would sit up and take notice of this and

2   work towards resolving the issue, but I would just

3   about bet money that if I were to go into the last

4   copy of the voter database that I received and do

5   yet another analysis of this issue, I'd still

6   find tons of people registered to vote at

7   commercial mail receiving agencies that they don't

8   live at.  I mean, this is -- this should be an

9   obvious and completely nonpartisan issue here.

10        Q    Did you think the comment that you

11   shared that we just reviewed here might make

12   someone think twice about voting?

13        A    I would hope it would make people

14   aware that they can't register to vote anywhere

15   other than where they actually live, and no one

16   lives in a UPS store that I'm aware of.

17        Q    Okay.  And how do you think this post

18   might have affected someone who is an out-of-state

19   voter?

20        A    I'm not sure I understand your

21   question.

22        Q    Let me rephrase that.

Ex. N to Defs.' Statement of Facts

Page 80

1    movers can appear in the data processing because

2    many of them actually file permanent changes of

3    address for what technically is a long-term

4    temporary move, and for that reason, I don't like

5    to talk much about individual voters by name.  I

6    don't think that's a smart thing to do.

7              And I certainly don't support

8    publishing any of this analysis or putting people

9    on the spot, and, you know, we avoided doing that

10   with these efforts.

11        Q    And why is it that you didn't want to,

12   as you had said, put people on the spot or publish

13   information?

14        A    I think I just explained that not all

15   of these are actual permanent changes of address.

16              There's going to be some in the mix

17   where a person may have gone out of the state or

18   to another county for some temporary purpose, even

19   though it may be a long-term temporary change of

20   address, classed as a permanent change of address

21   by the Postal Service.

22        Q    Okay.  And what was the concern that

Ex. N to Defs.' Statement of Facts

Page 86

1        Q    And so did you agree with this comment

2    that -- agree with this comment and the sentiment

3    that voters should be punished if they are, as you

4    said, voting illegally?

5        A    Well, as I said before, if a voter --

6    and we can pull up the law and read the plain

7    language of it, but I'm paraphrasing here, but my

8    understanding of O.C.G.A. § 21-2-562 is that if a

9    voter willfully misleads elections officials about

10   where they live so they can cast an unlawful

11   ballot, it appears to me to say that that is a

12   felony.

13            Now, as far as who should and

14   shouldn't be prosecuted and all of that, that's up

15   to our elections officials and law enforcement.

16            Quite frankly, I don't expect to see a

17   whole lot of that because I so seldom see them

18   take any kind of meaningful action when voter

19   fraud is uncovered and admitted to on the record

20   in a courtroom.  I don't see much activity going

21   on there.

22            So again, my primary motivation is to

Ex. N to Defs.' Statement of Facts

Page 87

1   effect change that would help prevent unlawful

2   votes from being cast and effect changes in policy

3   to help identify and thwart unlawful voting.

4              You know, one of the issues that I

5   have raised before in my prior deposition here is

6   that, in the general election, the data seems to

7   indicate there were over 100,000 voters who had

8   moved from the county they were registered in to a

9   new county more than 30 days before the election.

10             The vast majority of those voters did

11  not attempt to cast unlawful ballots in a county

12  they no longer live in, but it appears that the

13  same data indicates that tens of thousands may

14  have done precisely that.  And if that's the case,

15  that means the voters that obeyed the law didn't

16  get to have their votes counted, and folks who

17  broke the law did, and any of us should have an

18  issue with that.

19             MS. SIEBERT:  Ms. Meng, for just a

20  second, my dog needs to be let in my office.  I'm

21  just going to go off camera for 5 seconds and let

22  her in so she doesn't drive me crazy.

Ex. N to Defs.' Statement of Facts

1/19/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Mark A. Davis

Page 90

1    believe generally refers violations of election

2    law to the Attorney General's Office of Georgia,

3    but it's also my understanding that county

4    district attorneys can hold grand jury hearings.

5    You know, so I think that, in general, that can

6    take a number of different forms.

7              That's not really my issue.  You know,

8    if a county identifies some sort of unlawful

9    voting and refers it for prosecution to their

10   county district attorney, I believe that would be

11   an appropriate venue for that.  But again, I'm not

12   a lawyer, but based on what I am aware of, that's

13   my opinion.

14              But again, my primary motivation is to

15   thwart illegal voting in the first place.  As far

16   as any consequences, I'm not super optimistic that

17   anyone is going to get prosecuted.  Even if they

18   have committed a felony, I'd be surprised.

19   Because I so often see obvious vote fraud go

20   unpunished, I'm not optimistic that it's going to

21   happen simply because it's been identified.

22              I'll leave it there.

Ex. N to Defs.' Statement of Facts

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 95

1   challenges, and some of the smallest counties

2   might have received very, very few.  So I had a

3   disagreement in terms of the scope.

4              One of the issues that popped up early

5   on was my desire to make sure everyone was aware

6   that our challenge was not True the Vote's, and

7   vice versa, and I wanted people to be aware of the

8   difference in the philosophies surrounding the

9   challenges.

10             And then the other instance that I

11  recall was there was some talk about publishing

12  voter data on the website, and I think I may have

13  misunderstood what they were doing, and I had

14  expressed a concern about what I thought their

15  plans to be, but I think it turns out some of my

16  concerns were unfounded.

17       Q    Okay.  And you had referred to,

18  you know, wanting your challenges to be more

19  legitimate.  Can you elaborate on what you mean by

20  "legitimate"?

21       A    I don't mean to imply that theirs were

22  illegitimate.  Theirs was broader than the one

Ex. N to Defs.' Statement of Facts

Page 140

1    information, you're referring to what exactly?

2    The information that you believed at the time

3    would be revealed on this website?

4        A     Well, your organization has alleged

5    that True the Vote and myself has intimidated

6    voters.  I'm not aware of any contact that we've

7    engaged in that would constitute intimidation of

8    any particular voter.

9              Challenging a voter on its face I

10   don't think is voter intimidation.  That is a

11   First Amendment petition to your government for

12   redress of grievances, and it is specifically

13   protected under Georgia law in 21-2-230.  A

14   challenge is a lawful vehicle for petitioning your

15   government for redress of grievances.  I don't

16   believe that constitutes voter intimidation.  I

17   guess we're going to see what the court system

18   believes on that.

19             But as long as challenges are handled

20   appropriately, and we're not publishing them to

21   the public or trying to intimidate voters, I don't

22   see any issue with them.  It seemed perfectly

Page 144

1           Directing your attention, Mr. Davis,

2    to page 193, it says here, "[T]hey're literally

3    sitting there defending a challenge that didn't

4    even come from True the Vote."

5           Do you see that?

6       A    Yes.

7       Q    Okay.  And can you clarify who the

8    "they" you're referring to in this text is?

9       A    I don't remember, but what I do

10   remember is that the -- that I was referring to

11   the challenge down in Muscogee, and that challenge

12   didn't come from either True the Vote or me and

13   Derek, so I think that was the point I was making,

14   and I really don't recall who the "they" was in

15   that part of the message.

16      Q    Okay.  So pivoting now to another

17   topic, Mr. Davis, what discussions, if any, have

18   you had with officials or individuals in the

19   Secretary of State's office regarding voter

20   challenges and list maintenance?

21           I know you've before referred to the

22   May 2011 conversations about investigations, but

Ex. N to Defs.' Statement of Facts

Page 164

1    investigation was specifically related to votes

2    that were cast in the general election.

3        Q    Okay.  So would any of this post

4    challenge data analysis have had any impact on the

5    challenges themselves?

6        A    Say that again.

7        Q    Would any of the post challenge data

8    analysis that you performed have any impact on the

9    challenges themselves that had already been

10   submitted in some form?

11       A    Some of the names on the list would

12   have been in common, but the selection criteria

13   for the challenge and the selection criteria for

14   the SoS investigation were different.

15            The investigation that I asked for

16   from the Secretary of State's office related to

17   the general election and to votes cast in the

18   general election with residency issues.

19            And one of the primary reasons that I

20   asked for it was because thousands and thousands

21   of voters were coming in after the election and

22   officially updating their own registration

Page 165

1  addresses to the exact same addresses that they

2  gave to the Postal Service when they originally

3  moved, and that seemed to me to be pretty solid

4  corroborating evidence that the NCOA information

5  was accurate, and if that proved accurate, why

6  would we doubt the Move Effective Dates that they

7  had given to the Post Office when they originally

8  moved.

9          Q    Okay.  So let me give you an example

10  just to make sure I'm understanding what you were

11  just testifying about, okay?

12          Jane Doe -- not the Jane Doe that's

13  named as a plaintiff here, but just a Jane Doe --

14  submits a permanent change of address record to

15  the Post Office in, let's say, June of 2020, okay?

16          That would have showed up on your --

17  you know, the data analysis that you did, correct?

18          A    Yes.

19          Q    Okay.  And then Jane Doe then, let's

20  say, voted in the -- and she had moved -- she had

21  submitted and moved either outside of the county

22  where she was registered, either to another state

Ex. N to Defs.' Statement of Facts

Page 166

1  or another county in Georgia.  That's the

2  assumption that I'm making, okay?

3          So then let's say Jane Doe voted in

4  the county in which she was registered at.  That

5  would have shown up in your data analysis,

6  correct?

7      A    Well, to be clear --

8          MS. MENG:  Sorry, just to interject, I

9  just want to object to this hypothetical.  It

10  assumes facts that aren't in the evidence, and

11  it's a leading question as well.

12          BY MS. SIEBERT:

13      Q    And I understand that, and I'm not --

14  let me clarify.  Let me rephrase this, Mr. Davis,

15  because I'm just trying to understand.  I am just

16  trying to understand why the testimony you just

17  gave about the dates of the NCOA addresses and

18  confirmation are important, okay, and trying to

19  put it in a real-world example, but maybe that's

20  not the best way to do it.

21          So somebody who -- what you're -- take

22  me through the specific timeline of that type of

Page 167

1  person that would have -- the type of voter that

2  would have put you on alert in May when you did

3  that post election data analysis, and specifically

4  why the timeline is important.

5       A    Okay.  So when I ran NCOA on the voter

6  database, the records that had NCOA matches were

7  flagged in the data, and then I pulled those into

8  a file called "moved."

9            From that, I excluded any changes of

10  address from October and November of 2020, October

11  because those would have been occurring within the

12  grace period under O.C.G.A. § 21-2-217 -- or,

13  actually, I believe 218 -- that defines the 30-day

14  grace period.  So I excluded any from October

15  because they were in the grace period, or at least

16  the vast majority were, and then I excluded

17  November because they were irrelevant.

18            So what remained in that file was

19  approximately 580,000, and all of those changes of

20  address, the Move Effective Dates would have been

21  before the grace period.

22            And I also want to clarify that none

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 168

1    of the records that I gave the Secretary of

2    State's office to investigate involved voters who

3    moved outside the state.  They were only people

4    who moved within the state, where the data

5    indicated that they had moved from one county to

6    another county more than 30 days before the

7    election.

8              So in May, I received an update to the

9    voter file, and when I compared the data from

10   November to the data from May, there were over

11   10,000 voters who had since updated their own

12   registration to the exact same address that they

13   had originally given to the Postal Service when

14   they filed their changes of address.

15             So the reason that I did that was

16   because, to me, that seems to be pretty strong

17   corroborating evidence that the person did, in

18   fact, move to the address they gave to the Postal

19   Service; and since the Move Effective Date they

20   gave to the Postal Service was more than 30 days

21   before the election, they should have updated

22   their registration to their new county, as

Ex. N to Defs.' Statement of Facts

Page 169

1   required, and they should have cast their ballots

2   in their new county.

3              And one of the major reasons this is

4   important is because, when I compared the two and

5   the addresses matched, I was also able to pull

6   over the person's new county and the person's new

7   voting districts, and when I compared the voting

8   districts to their previous voting districts, what

9   it showed me is that people that returned to their

10  old county to cast a ballot, 94% of them would

11  have been offered a ballot with a state house race

12  on it that they don't live in, about 86.5% would

13  have been offered a chance to vote in a state

14  senate district that they no longer lived in, and

15  approximately 64% would have been offered the

16  chance to cast a ballot in a congressional

17  district that they no longer lived in.

18              They also could have cast ballots for

19  county sheriff, district attorney, school board,

20  county commission, could have even voted on tax

21  increases that they will never have to pay because

22  they no longer live there.

Page 175

1    registration is updated so that they can cast a

2    lawful ballot and actually vote for the people who

3    actually represent them.

4          Q    Do you think that the laws in Georgia

5    that require people to vote in the municipality,

6    county, and even precinct in which they reside,

7    makes sense?

8          A    I do.  Clearly, the goal of those laws

9    is to ensure people are voting in the right

10   districts, and it is a bedrock foundation of our

11   republic that we vote on the representatives who

12   actually represent us.  And if you're voting in

13   districts that you don't live in, you're diluting

14   the votes of the people who do live there.

15            And not only that, but as I stated

16   earlier, there were large numbers of people

17   similarly situated going into the general

18   election.  The voters who obeyed the law, knowing

19   they weren't properly registered in their current

20   county, didn't get to vote, but apparently many

21   voters who were in that situation chose to go vote

22   in their old county.

Ex. N to Defs.' Statement of Facts

Page 185

1   UPS store, I don't know why they would be

2   intimidated.

3            Now, somebody who is registered at a

4   UPS store I hope would learn that that's not

5   proper and take immediate steps to correct their

6   registration.

7        Q    Okay.  Was it ever in anything that

8   you did with this data analysis, either you, in

9   connection with -- you and Derek Somerville, was

10  it ever your intention to intimidate somebody that

11  was legally able to vote in Georgia --

12       A    Not at all.

13       Q    -- to prevent them from doing that?

14       A    Not at all.

15       Q    Okay.  Did you ever in your data

16  analysis take into account someone's race?

17       A    No, that was not part of it, and it's

18  pretty easy to demonstrate.  And if you want, I'll

19  walk how to do that, in case Fair Fight would like

20  to follow along.  I'd be happy to demonstrate

21  that.

22       Q    Why don't you do that.

Ex. N to Defs.' Statement of Facts

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 186

1          A     Okay.  So you have the databases that

2     I gave you for discovery, you have files M voter

3     1, 2 and 3.  In those files, there's a field

4     called DLV_Code.  If you run a count of the ones

5     with an M in that field, your count will come up

6     to over 600,000.

7               But if you then exclude any changes of

8     address with a Move Effective Date in October of

9     2020 or November of 2020, then you're going to

10    drop down to the same count that you see in the

11    data file called "Moved."

12              And then in the data file called

13    "Moved," if you go through there and count the

14    records where the COA state equals Georgia, and

15    the county name field does not equal the new

16    county field, and the new county field is not

17    blank, and the voted field is not empty, then you

18    will come out with almost the same count as the --

19    oh, and it's not a P.O. box -- well, let me back

20    up.  Strike that last part.  Leave the P.O. Boxes

21    in for now, you'll come up with a count that's

22    virtually identical to the file called "Issues."

Ex. N to Defs.' Statement of Facts

Page 187

1                    Now, I subsequently removed the

2     P.O. Boxes, and that dropped the count down to

3     around 35,000.  So it's not difficult to

4     demonstrate that there were no partisan influences

5     or racial influences on the selection criteria.

6                    And I went so far with the challenge

7     data, after it was cast in stone and the challenge

8     efforts had concluded and all of that, I took the

9     certified copy of the qualified list of electors

10    for the runoff election, and I actually did a

11    query by race, and then I compared it to a query

12    by race that I did on the challenge list, and the

13    percentages -- the racial percentages in the

14    challenge list differed very little from the

15    racial percentages in the qualified list of

16    electors that were able to vote in the runoff in

17    total.

18                   So I don't think it's very difficult

19    to show that there were not any racial or partisan

20    motivations for the challenge.  There were

21    Republicans challenged, there were Democrats

22    challenged, there were people of all the different

Page 188

1    racial codes that were challenged.

2              The criteria was objective, and none

3    of that was involved, despite the claims that have

4    been made to the contrary.

5         Q    If 100% of the people -- speaking as a

6    citizen, if 100% of the people in Georgia who are

7    legally able to vote, whether they be serving in

8    the military somewhere else or students somewhere

9    else or voting properly in the district they're

10   registered in, let's just assume 100% of the

11   people who are registered to vote correctly do so,

12   so you have 100% turnout, would you have any

13   problem at all with 100% of the people who are

14   legally allowed to vote in Georgia voting?

15        A    If they do it lawfully, I don't have

16   an issue with it.  I'd love to see it.

17        Q    What if -- if that happened, would you

18   have a problem with it if that resulted in

19   whatever your political preferences are never

20   winning another election?

21        A    No, that actually is a fair fight.

22        Q    I'm just making sure I don't have any

Ex. N to Defs.' Statement of Facts

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 199

1    think twice about voting, the ones that you had

2    deemed to be ineligible?

3        A    If a voter knows they're ineligible to

4    cast a lawful ballot, perhaps they should think

5    twice about violating the law.

6            But if a voter is properly registered,

7    there's no reason for any voter to be intimidated

8    by a post talking about people who aren't.

9        Q    So Mr. Davis, I want to again move to

10   strike your answer as nonresponsive and ask you to

11   answer the simple question that was it your intent

12   in making the Facebook post to make voters think

13   twice about voting based on whether or not you

14   thought they were ineligible?

15       A    I don't seek to intimidate any lawful

16   voter, period.  If you consider that an invalid

17   response to that question, I don't know what else

18   to say.

19           Voters that knowingly cast ballots

20   unlawfully should be concerned.  I don't know what

21   else to tell you there.

22       Q    So did you want ineligible voters to

Ex. N to Defs.' Statement of Facts