**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

FAIR FIGHT, INC., SCOTT BERSON,
JOCELYN HEREDIA, and JANE DOE,

      Plaintiffs,

      v.

TRUE THE VOTE, INC., CATHERINE
ENGELBRECHT, DEREK
SOMERVILLE, MARK DAVIS,
MARK WILLIAMS, RON JOHNSON,
JAMES COOPER, and JOHN DOES 1-
10,

      Defendants.

Civil Action No.
2:20-cv-00302-SCJ

**BRIEF IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................... 1

   A. True the Vote's "Validate the Vote" initiative originated from a scheme to overturn the presidential election results. ................................................... 1

   B. The Validate the Vote scheme transitioned from the presidential election to the Georgia runoff election. ............................................................ 2

   C. Validate the Vote violated federal law. ......................................... 4

   D. Defendants' scheme intimidated Georgia voters. ............................... 6

LEGAL STANDARD ...................................................................... 8

ARGUMENT ................................................................................. 8

II. Defendants engaged in voter intimidation through True the Vote's "Validate the Vote" scheme and landmark "Georgia Elector Challenges." .................................. 10

   A. True the Vote's "Validate the Vote" program was originally hatched to overturn the presidential election results. ................................................ 11

   B. After its failed attempt to overturn the presidential election results, True the Vote targeted Georgia's runoff election. ....................................... 14

   C. Frivolous challenges and false accusations of unlawful conduct intimidate voters. ........................................................................................... 15

      1. NCOA data cannot determine eligibility to vote. ..................... 16

      2. Improper matching that misidentified voters. ......................... 17

      3. Voters on the challenge lists were already registered at their new address or had not moved at all. ........................................... 19

      4. Voters on the challenged lists lived near or on military installations. ....20

      5. Challenge lists include addresses in municipalities with universities. ....20

      6. True the Vote ignored clear warnings and evidence that its challenge list was error prone. ...................................................... 21

   D. True the Vote's Validate the Vote scheme created an atmosphere of intimidation. .............................................................................. 23

      1. Offering bounties on reports of fraud and recruiting former Navy SEALs to patrol polling places is objectively intimidating. ............... 24

2.   True the Vote publicly amplified false claims and intimidating conduct. .............................................................................................26

3.   Defendants encouraged and amplified threats of election-related vigilantism on social media. ..................................................................28

E.  True the Vote's mass challenges and Validate the Vote scheme put voters in fear of adverse legal consequences and harassment.....................................31

III. Defendants' affirmative defenses lack merit.................................................33

**CONCLUSION** .....................................................................................................35

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Atta v. Cisco Sys., Inc.*,
No. 1:18-cv-1558-CC-JKL, 2019 WL 12383117 (N.D. Ga. Apr.
26, 2019) ....................................................................................................23, 30

*Brooks v. Mahoney*,
No. 4:20-cv-00281 (S.D. Ga. Nov. 11, 2020) ............................................12, 13

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)................................................................................................8

*Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC*,
497 F. Supp. 3d 371 (D. Minn. 2020)................................................................28

*Democratic Nat'l Comm. v. Republican Nat'l Comm.*,
671 F. Supp. 2d 575 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir.
2012) ....................................................................................................15, 25, 26

*Ga. Pac. Corp. v. Occupational Safety & Health Rev. Comm'n*,
25 F.3d 999 (11th Cir. 1994) ..............................................................................34

*Irby v. Bittick*,
44 F.3d 949 (11th Cir. 1995) ................................................................................8

*League of United Latin Am. Citizens - Richmond Region Council 4614
v. Pub. Int. Legal Found.*,
No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ..............9, 31

*Marion v. DeKalb Cnty.*,
821 F. Supp. 685 (N.D. Ga. 1993)........................................................................8

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
475 U.S. 574 (1986)................................................................................................8

*Mont. Democratic Party v. Eaton*,
581 F. Supp. 2d 1077 (D. Mont. 2008)..............................................................16

i

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    498 F. Supp. 3d 457 (S.D.N.Y. 2020) ....................................................8, 9, 10, 25

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    512 F. Supp. 3d 500 (S.D.N.Y. 2021) ..................................................................9

*United States v. A Single Fam. Residence & Real Prop. Located at*
    *900 Rio Vista Blvd., Fort Lauderdale*,
    803 F.2d 625 (11th Cir. 1986) ...........................................................................30

*United States v. Clark*,
    249 F. Supp. 720 (S.D. Ala. 1965) ....................................................................29

*Washington v. Davis*,
    426 U.S. 229 (1976)...............................................................................................9

**Statutes**

52 U.S.C. § 10307(b) ...................................................................................................8

52 U.S.C. § 20507 ........................................................................................................5

O.C.G.A. § 21-2-230(h) ...............................................................................................5

O.C.G.A. § 21-2-571.....................................................................................................31

**Other Authorities**

Fed. R. Civ. P. 56 .........................................................................................................8

## PRELIMINARY STATEMENT

Since Reconstruction, opportunistic political groups and their affiliates have raised the specter of "voter fraud" to suppress votes and subvert elections. Regrettably, the 2020 election cycle added yet another chapter to this familiar story: True the Vote, a Texas organization trumpeting baseless claims of voter fraud— while banking millions of dollars—embarked on a nationwide scheme involving frivolous lawsuits and legal challenges against voters in Georgia and elsewhere, in a Hail Mary attempt to change the outcome of the presidential and Georgia runoff election in favor of Republicans. But the timing of these efforts and the absence of supporting evidence makes plain they could achieve no lawful objective; they operated solely to intimidate and harass voters.

**A.   True the Vote's "Validate the Vote" initiative originated from a scheme to overturn the presidential election results.**

Just two days after the 2020 general election, a donor paid True the Vote $2 million to assist in overturning election results. Statement of Undisputed Material Fact ("SUMF") ¶ 44. True the Vote proposed to achieve this goal through a national scheme it called "Validate the Vote." SUMF ¶¶ 45-46. Specifically, True the Vote and its founder, Catherine Engelbrecht,[1] created a funding proposal that outlined an

---

[1] True the Vote and its founder and current president, Catherine Engelbrecht, are referred to collectively as "True the Vote" unless otherwise specified.

1

imaginary "[p]roblem" of "Democrat officials" committing "deliberate election fraud" and "counting illegal votes," and proposed a solution that would involve True the Vote filing lawsuits around the country to "nullify the results of" targeted states' elections—including Georgia's—"so that the Presidential Electors c[ould] be selected in a special election or by the state legislature." SUMF ¶ 46. Engelbrecht even suggested that she had been coordinating efforts with the Trump team, and that the campaign would pay some of True the Vote's fees. SUMF ¶ 48.

### B.    The Validate the Vote scheme transitioned from the presidential election to the Georgia runoff election.

True the Vote's scheme to overturn the presidential election failed because it was unable to produce concrete evidence of voter fraud, even after its funder repeatedly implored the organization to provide specific evidence. SUMF ¶ 53. Rather than subject the organization's entirely baseless claims to judicial scrutiny, True the Vote abruptly dismissed all four of its federal court lawsuits challenging the presidential results (just days after filing them), and turned its "attention[] . . . towards Georgia" for the Senate runoffs, where it launched its attacks against

citizens directly; "Validate the Vote" became "Validate the Vote Georgia." SUMF ¶ 55.[2]

To implement "Validate the Vote Georgia," True the Vote offered a $1 million "bounty" for reports of voter fraud,  SUMF ¶¶ 145-148, recruited Navy SEALS to confront voters and poll workers, SUMF ¶¶ 150-151, and, with the help of individual Defendants and state Republican Party officials, launched the largest mass challenge effort in Georgia history, targeting hundreds of thousands of voters just two weeks before the January 2021 runoff election. SUMF ¶¶ 58-59, 61. These challenges relied on data from the U.S. Postal Service's National Change of Address database ("NCOA") and effectively accused every voter who had filed a request to forward their mail to a different address over the past several years of being unlawfully registered. SUMF ¶¶ 60-61.

But much like True the Vote's frivolous lawsuits to overturn the presidential election, Defendants knew their "evidence" was thin from the get-go. True the Vote admitted it had no way of knowing whether voters who had filed a change of address

---

[2] True the Vote's funder, Fred Eshelman, would eventually sue the organization, defense counsel James Bopp, the Bopp Law Firm, OpSec, and Gregg Phillips for breach of contract, fraudulent misrepresentation, and conversion. Eshelman alleged that True the Vote misspent his donation on efforts he never agreed to fund, like the "*largely baseless challenges to the eligibility of hundreds of thousands of voters in the 2021 Georgia Senate runoffs*." SUMF n.2.

had moved away permanently, or just temporarily. SUMF ¶¶ 69-71. And when one of True the Vote's challengers in Taliaferro County opted to investigate further, he found a list populated with eligible, lawful residents; he was so aghast that he demanded the challenges be withdrawn. SUMF ¶¶ 112-116.

What the Taliaferro County challenger discovered was no one-off problem: True the Vote prepared its bloated challenge lists as part of their plan to "build momentum through broad publicity" and "galvanize Republican" support at the expense of accuracy. SUMF ¶¶ 46, 130. Its challenge lists were riddled with substantial, obvious errors that would have given pause to anyone remotely interested in accuracy. Missing data and missing values in key fields suggest that some voters were misidentified; thousands of entries reported voter addresses near or *on* military installations and in municipalities with universities, which strongly suggests that their address changes were temporary (i.e. to attend college or for military service). SUMF ¶¶ 80-104. And the list of problems only goes on. *See infra* § I.B.1.a.

### C.    Validate the Vote violated federal law.

Perhaps the most obvious flaw of True the Vote's scheme is that it asked county officials to violate well-established federal law. The National Voter Registration Act ("NVRA") makes clear that voters cannot be removed from the

registration rolls and prevented from voting based on a change of address alone unless the following preconditions are met: either (1) the voter has confirmed in writing that their residence has changed, or (2) the voter has both failed to respond to a notice about their change of address and has not voted or appeared to vote in the last two general elections. *See* 52 U.S.C. § 20507(d)(1); *see also* TRO Order at 11-13, ECF No. 29 (rejecting Defendants' attempts to distinguish challenges to a voter's eligibility from challenges to a voter's registration).

The NVRA also prohibits states from conducting "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists of eligible voters." 52 U.S.C. § 20507(c)(2)(A). Defendants' challenges, however, would have required county officials to do just that, within *two weeks* of the runoff election. O.C.G.A. § 21-2-230(h) (requiring that "the challenged elector's name shall be removed" from the rolls if the challenged is based on the elector's qualifications to remain on the "list of electors"). Given the last-minute nature of Defendants' launch, they could not have expected the counties to complete the procedures mandated by federal law—or even to adjudicate each challenge—in time for the runoff election.

**D.   Defendants' scheme intimidated Georgia voters.**

Defendants' scheme could achieve no lawful objective in the two-and-a-half-week period between True the Vote's public announcement of their mass challenges and the January 2021 runoff. It was supported not by evidence or law, but rather True the Vote's and its donor's desire to influence election outcomes. By True the Vote's admission, the evidence-free allegations of fraud in the Validate the Vote scheme were written "as a promotional piece," to build public momentum and galvanize support; the truth was irrelevant. SUMF ¶¶ 134, 138. And election officials could not possibly have conducted hearings on approximately 366,000 voter challenges in two weeks. Thus, the only plausible outcome of Defendants' challenges and election-subversion activities is voter harassment and intimidation.

That is precisely what happened as the challenges unfolded and voters were informed that their eligibility was in question. Plaintiffs and other voters expressed feelings of fear, anxiety, and in some cases apprehension about voting in future elections. SUMF ¶¶ 152-174. And Plaintiff Fair Fight, a political action committee dedicated to securing the voting rights of Georgians, was forced to divert resources from its get-out-the-vote activities to monitoring Defendants' challenges and assisting voters to respond, including by attending Board of Elections hearings on

the challenges, expending financial and staffing resources to collect and analyze challenge lists, and assisting voters who had been challenged. SUMF ¶¶ 1-19.

True the Vote's actions during the 2021 runoff election are textbook examples of voter intimidation. As Dr. Vernon Burton, a historian with expertise in civil rights and the American South, has explained, mass challenges "[g]rounded on unsubstantiated claims of voter fraud" and "the pretext of purifying elections" feature prominently in Georgia's well-documented history of voter suppression and discrimination in voting. SUMF ¶ 154 & n.9. In fact, voter challenge laws were historically designed to disenfranchise Black voters and were applied with devastating effect. SUMF ¶ 154 & n.9. Defendants' coordinated campaign of frivolous mass challenges, false accusations of fraudulent conduct, and encouragement of harassment of voters and election officials are common tools of voter intimidation and suppression. SUMF ¶ 154 & n.9.

Section 11(b) of the Voting Rights Act ("VRA") empowers courts to protect citizens from these types of sweeping attacks, which are objectively likely to intimidate voters. The undisputed evidence demonstrates that Defendants' mass elector challenges and other elements of the Validate the Vote program have intimidated Georgia voters, and will continue to threaten lawful voters with disenfranchisement, harassment, and fear of legal repercussions absent judicial relief

7

to ensure that Georgians can fully and freely participate in the electoral process. The Court should grant Plaintiffs' motion for summary judgment.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. The moving party bears the initial burden, but it need not disprove the opposing party's claims. Instead, the moving party may point out the absence of evidence to support the non-moving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Marion v. DeKalb Cnty.*, 821 F. Supp. 685, 687 (N.D. Ga. 1993). In defending its claims, the non-moving party must do "more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "must come forward with significant, probative evidence demonstrating the existence of a triable issue of fact." *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995).

## ARGUMENT

Section 11(b) of the VRA prohibits all actions or attempts to "intimidate, threaten, or coerce" any person "for voting or attempting to vote." 52 U.S.C. § 10307(b). These expansive protections for voters reflect the VRA's "ambitious aims of encouraging true enforcement of the Fifteenth Amendment's promise of

unencumbered access" to the franchise. *Nat'l Coal. on Black Civic Participation v. Wohl* ("*Wohl I*"), 498 F. Supp. 3d 457, 476 (S.D.N.Y. 2020). The law targets actions that make voters "timid or fearful," or that "inspire or affect with fear," or "threaten" through "promise [of] punishment, reprisal, or other distress," regardless of the perpetrator's subjective intent. *Nat'l Coal. on Black Civic Participation v. Wohl* ("*Wohl II*"), 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021) (quoting *United States v. Piervinanzi*, 23 F.3d 670, 677 (2d Cir. 1994)).

Threats or intimidation, moreover, can appear in several forms, and subtler, nonviolent voter-related harm can give rise to a Section 11(b) violation. TRO Order at 22; *Wohl I*, 498 F. Supp. 3d at 477. For instance, "[c]onduct that 'put[s] [an individual] in fear of harassment and interference with their right to vote'" is "sufficient to support [a] § 11(b) claim.'" *Wohl II*, 512 F. Supp. 3d at 509 (citation omitted). Similarly, accusing voters of criminal conduct or suggesting that they are otherwise ineligible to vote also likely violates Section 11(b). *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.* ("*LULAC*"), No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018). The same is true of "actions or communications that inspire fear of economic harm, . . . privacy violations, and even surveillance," all of which "constitute unlawful threats or intimidation under the statute." *Wohl II*, 512 F. Supp. 3d. at 509.

Additionally, actors are "presumed to have intended the natural consequences of [their] deeds" because "[f]requently the most probative evidence" of what an actor intended to do is "objective evidence of what actually happened." *Washington v. Davis*, 426 U.S. 229, 253 (1976) (Stevens, J., concurring). Thus, as to voter intimidation, courts will consider "[d]efendants' prior conduct and expressed goals," taken together with the context of those actions, to identify whether the natural outcome of those actions is voter intimidation. *Wohl I*, 498 F. Supp. 3d at 485.

True the Vote's coordination, execution, and promotion of the largest mass challenge effort in Georgia history, and the accompanying elements of its Validate the Vote scheme—including its "bounty on fraud" and recruitment of former Navy SEALs to patrol polling stations—fall squarely within the categories of conduct proscribed by Section 11(b). Unrefuted testimony from impacted voters confirm that Defendants' actions were highly likely to (and did in fact) "intimidate or threaten" individuals for attempting to vote, in violation of the VRA. Thus, Plaintiffs are entitled to judgment as a matter of law.

## I. Defendants engaged in voter intimidation through True the Vote's "Validate the Vote" scheme and landmark "Georgia Elector Challenges."

Defendants' actions violate Section 11(b)'s objective test several times over. For one, their mass challenges directly accused hundreds of thousands of voters of

10

unlawful activity in a manner reasonably likely to put them in fear of adverse legal consequences. These allegations were frivolous as demonstrated by numerous, obvious flaws in True the Vote's methodology. Nevertheless, consistent with the "Validate the Vote" scheme, True the Vote pressed forward and publicized its false accusations in order to build public momentum and galvanize support—particularly from Republican officials—for unfounded claims of widespread fraud, in a cynical attempt to undermine the 2020 presidential and January 2021 runoff elections. The serious allegations lodged against the individual Plaintiffs, along with the 250,000-plus Georgia voters named in these challenges, intimidated and discouraged eligible citizens, and will continue to do so in future elections absent injunctive relief.

### A.      True the Vote's "Validate the Vote" program was originally hatched to overturn the presidential election results.

"Validate the Vote," the name given to True the Vote's election subversion scheme, was launched two days after the November 2020 general election, when Republican donor Fred Eshelman enlisted True the Vote's assistance in overturning the presidential election results in exchange for several million dollars. SUMF ¶ 44. In response, True the Vote prepared a proposal titled "Validate the Vote 2020." SUMF ¶ 45-46. The plan was to highlight the purported counting of "illegal ballots . . . in Democrat counties," which True the Vote claimed was the "result of Democrat

officials [sic] refusal to obey state election laws and counting illegal votes." SUMF ¶ 46.

Of course, True the Vote now admits that it did not have any evidence that this "problem" actually existed. When asked whether True the Vote had evidence supporting these claims, Ms. Engelbrecht (the organization's founder, current president, and Rule 30(b)(6) witness) said: "No, this was a *promotional piece* that was written." SUMF ¶ 49. Nor would Ms. Engelbrecht explain why True the Vote sought to challenge the results of only the presidential election, even though the "problem" she identified would affect all ballots, including races won by Republican candidates. SUMF ¶ 49. But her own communications reveal that she was coordinating efforts with the Trump campaign and even believed at one point that the campaign would pay True the Vote's legal fees. SUMF ¶ 48.

True the Vote nevertheless launched a comprehensive effort to gin up evidence of voter fraud in Georgia and several other "targeted states," with the ultimate goal of forcing a "special election" where state legislatures, rather than voters, would select presidential electors, or the next president would be selected "by the U.S. House of Representatives." SUMF ¶¶ 45-46.

The first step of this scheme was to initiate "federal civil rights lawsuit[s]" in four "targeted states," including Georgia.[3] *See* Compl., *Brooks v. Mahoney*, No. 4:20-cv-00281 (S.D. Ga. Nov. 11, 2020), ECF No. 1. In all four complaints, True the Vote promised to deliver evidence of "illegal votes" by "ineligible voters," and sought to overturn each state's election results. *See, e.g.*, *id*. ¶ 45. The lawsuits specifically foreshadowed "sophisticated and groundbreaking analysis" using, among other tools "United States Postal Service records"—the same type of records True the Vote would use to challenge the voting rights of hundreds of thousands of Georgia residents. *See, e.g.*, *id.* And the complaints threw in a raft of radical, evidence-free claims for good measure. In the Georgia case, for instance, True the Vote alleged that over 73,000 "votes were cast for Joe Biden in Georgia by noncitizens," *id.* ¶ 41, a claim that similarly lacked any evidentiary support.

But True the Vote never mustered *any* proof of ineligible voting in *any* of the lawsuits it filed, despite repeated requests from its funder, Eshelman, imploring the organization to provide "real evidence" supporting their accusations. SUMF ¶ 53. Instead, True the Vote voluntarily dismissed all four cases just days after filing, prompting its funder to later file his own lawsuit accusing True the Vote of fraudulently inducing his donation and ultimately using it—not for the presidential

---

[3] True the Vote also filed lawsuits in Michigan, Wisconsin, and Pennsylvania.

13

challenges as originally earmarked—but to support "largely baseless challenges to the eligibility of hundreds of thousands of voters in the 2021 Georgia Senate runoffs." SUMF n.2.

**B.     After its failed attempt to overturn the presidential election results, True the Vote targeted Georgia's runoff election.**

Following dismissal of True the Vote's frivolous "election fraud" lawsuits, True the Vote focused its attention on the runoff election. "Validate the Vote" became "Validate the Vote Georgia": True the Vote "simply took the logo and put the word 'Georgia' in the center" but all key elements of the national plan remained. SUMF ¶¶ 55. To execute this plan, True the Vote enlisted OpSec Group and its founder Gregg Phillips, who gained national notoriety after the 2016 presidential election when he claimed, without any basis, that more than three million votes were cast by non-citizens. SUMF ¶ 79.[4] True the Vote also recruited Defendants Mark Davis and Derek Somerville to serve as collaborators. SUMF ¶¶ 58-59. The U.S.

---

[4] In direct contravention of this Court's December 22, 2021 Order that "Defense Counsel shall not instruct individual and Rule 30(b)(6) witnesses to not answer questions absent compliance with applicable discovery rules and law"—an Order that was necessary after Defense Counsel repeatedly violated this rule during other depositions in this case—Defense Counsel instructed Mr. Phillips not to answer questions about his 2016 claims. Dec. 22 Order at 2, ECF No. 142; OpSec Tr. 42:3–44:19. Because these claims predated OpSec's creation in 2020, they were necessarily asked in Mr. Phillips's individual capacity. *See* Ex. 45, G. Phillips Dep. Notice.

Postal Service records that True the Vote alluded to in its prior lawsuits, but failed to show the courts, became the basis for a slapdash elector challenge effort in which True the Vote would accuse several hundred thousand Georgians of being registered illegally.

### C.     Frivolous challenges and false accusations of unlawful conduct intimidate voters.

This Court previously recognized that the frivolity of Defendants' accusations challenging the eligibility of Georgians to vote "may tend to support Plaintiffs' contentions that these challenges result *only in voter harassment and intimidation*." TRO Order at 28 (emphasis added). The record establishes that not only were the elector challenges frivolous as a legal matter, but the challenge lists were so hastily and carelessly constructed that widespread errors were inevitable and obvious.

Undisputed evidence shows that True the Vote *knew* its challenge lists were inaccurate and included individuals who were properly registered. SUMF ¶ 66. It also *knew* that its challenges would burden registrants. SUMF ¶ 66. And yet True the Vote took virtually no precautions to minimize the number of eligible voters on their challenge lists. It was thus entirely foreseeable that eligible voters would be included in the challenge lists, would feel intimidated upon receipt of formal notice, and would reluctantly decide in the future that the safer course may be not to vote at all. SUMF ¶¶ 172-174; *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671

15

F. Supp. 2d 575, 612 (D.N.J. 2009) (concluding challenged voters "may choose to refrain from voting rather than wait for the qualifications of those ahead of them to be verified, especially if the verification becomes confrontational"), *aff'd*, 673 F.3d 192 (3d Cir. 2012).

### 1.    NCOA data cannot determine eligibility to vote.

A foundational problem with Defendants' challenges is that they were constructed from attempts to match the state voter registration records to NCOA data showing individuals who have asked the Postal Service to forward their mail to a different address. SUMF ¶ 60-61. As Defendants admit, individuals who submit an NCOA request do not forfeit their eligibility to vote in their home jurisdiction. SUMF ¶¶ 69- 71. Thus, residency-based voter challenges "are *per se*, that is, on their face, insufficient to cancel an elector's registration." *Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077 (D. Mont. 2008).

Having started from the false premise that a voter's eligibility can be determined from NCOA data alone, Defendants' search for Georgia voters in the NCOA registry was disastrously fraught with incredibly poor methodology. Even OpSec acknowledges that "the import of verifying identity can't be overstated in this case." SUMF ¶ 85. Yet Defendants made no serious effort to do so. Their sloppy, haphazard attempt to match inadequate and incomplete data fields with no

meaningful quality control produced exactly what one would expect: a bloated challenge file rife with errors. Dr. Mayer's unrefuted expert report reviewed the challenge file and identified multiple critical errors for which Defendants are unable to provide any justification. SUMF ¶ 80-125.

## 2.     Improper matching that misidentified voters.

The databases that True the Vote used to construct its challenge lists do not allow for foolproof matching. The public voter file that OpSec relied on includes only one unique identifier—the voter registration number—for each registered voter. SUMF ¶ 81. The file does not include any other potential unique identifiers, such as social security numbers or driver's license numbers. SUMF ¶ 81. Instead, the voter file lists a person's name, address, birth year, race, gender, registration date, and date last voted—none of which is necessarily exclusive to any one person. SUMF ¶ 81. The NCOA registry, in turn, does not include an individual's voter registration number or *any other* unique identifier. SUMF ¶ 82. Thus, the only common fields between the voter file and NCOA registry are a person's name and address, which cannot—and certainly did not—dependably identify a unique individual. SUMF ¶ 82Thus, even if True the Vote had exactly matched all common fields between the voter file and the NCOA registry, its challenge list still would have been unreliable

17

because there is nothing to ensure proper reconciliation across these files to establish non-residency.

But True the Vote did not even do that much. Instead, it settled for *partial* matches between the files. SUMF ¶ 83. For example, OpSec accepted purported matches where individuals in the voter file and NCOA registry with the same first and last names had *different* middle initials or *different* name suffixes (e.g., Jr. or Sr.). SUMF ¶ 83. And OpSec did not even care to investigate how frequently this was occurring. SUMF ¶ 83. True the Vote's challenge file is also missing several sources of identification found in the State's voter registration records, including middle name or middle initial, maiden name, suffix, or birth year, which are critical when matching individual records from one database to another. SUMF ¶ 86. Instead, the only fields that appear to have been matched between the voter file and the NCOA registry are first name, last name, and address. SUMF ¶ 86. Because name and address combinations are far from unique in the voter file, this resulted in obvious errors and false matches, SUMF ¶ 87, with a disproportionate racial impact: Black voters comprise 27.3% of all individuals in the challenge file, but 40.3% of instances in which a single NCOA entry matched to multiple voter registration records. SUMF ¶ 88.

True the Vote and OpSec refused to provide more than vagaries about what,

if anything, they did to reduce these and other errors. SUMF ¶ 84.

### 3. Voters on the challenge lists were already registered at their new address or had not moved at all.

Dr. Mayer found at least five individuals whose registration address and "moved to" address in True the Vote's challenge file are identical, meaning that the voter had not moved at all. SUMF ¶¶ 89-90. Mr. Phillips admitted that he knew these errors were in the challenge file and that they should have been removed—and yet they were not. SUMF ¶ 89. Mr. Phillips also admitted that he knew voter registrations remain valid where a voter moves within the same county, SUMF ¶ 97, and yet Dr. Mayer found 145 examples where a challenged individual's registration address and "moved to" address were in the same county. SUMF ¶ 98.

Dr. Mayer also found 6,377 entries where individuals had re-registered at their new address—where they were challenged for having moved to. In other words, True the Vote inexplicably challenged the eligibility of voters who were registered at the very address that True the Vote alleged to be their new home. SUMF ¶ 99. Mr. Phillips testified that True the Vote's approach to this issue was to throw up their hands and make it someone else's problem: "[Reviewing for this error] was beyond our capacity so in that case what we would say is submit the challenge and let the county figure it out." SUMF ¶ 123.

19

### 4.     Voters on the challenged lists lived near or on military installations.

Defendants knew that Georgia residents who relocate temporarily for military service remain eligible to vote in Georgia. SUMF ¶ 105. Indeed, the only consistent explanation Defendants have provided about how they refined the accuracy of their challenge file is their claim to have removed military voters. SUMF ¶ 105. And yet, Dr. Mayer found 22,956 challenged voters who, according to True the Vote's challenge file, moved to an address near a military installation, including 397 registrants who are listed as living *on* a military base. SUMF ¶ 106. When asked what further analysis True the Vote performed to identify whether military voters who moved to a base retained their eligibility to vote in Georgia, Mr. Phillips admitted the obvious: "We didn't." SUMF ¶ 107.

### 5.     Challenge lists include addresses in municipalities with universities.

True the Vote made no attempt to remove from the challenge lists the names of individuals who had temporarily relocated to attend a college or university. Again, Defendants knew that students remain eligible to vote at their home address. SUMF ¶ 108. Yet they did nothing to screen these individuals from the challenge file.

Dr. Mayer ultimately found 35,056 registrants in the challenge file that were alleged to have moved to a city containing academic institutions that Georgia

residents regularly attend. SUMF ¶ 109. In all, 57,534 registrants in the challenge file—22.9% of the entire list—are alleged to have moved to or near a military installation, or to a municipality with a college or university. SUMF ¶ 110.

### 6.    True the Vote ignored clear warnings and evidence that its challenge list was error prone.

True the Vote's own recruited challenger and two of its close allies warned the organization of obvious errors in its challenge list to no avail. In Taliaferro County, recruited challenger Joe Martin—who was also the Chair of the Taliaferro County Republican Party—became suspicious upon reviewing the list of 37 names that True the Vote asked him to challenge, and asked: "[H]ow did this list come about? Where did this list come from? Who generated the list?" SUMF ¶ 113.[5] Rather than challenge all 37 individuals on True the Vote's Taliaferro County list, Mr. Martin winnowed the list himself and chose to submit letters challenging only the three registrants on the list who had requested an absentee ballot for the runoff elections. SUMF ¶ 114. But Mr. Martin soon discovered that even this small subset was faulty: the three challenged voters were all elderly individuals who either lived

---

[5] True the Vote's regular practice was to submit challenges under a volunteer's name using a True the Vote email account without telling the volunteer who was being challenged. SUMF ¶ 112. Mr. Martin requested the list of Taliaferro voters before submitting the challenge.

in Taliaferro County or maintained a homestead exemption there, and thus were properly registered. SUMF ¶ 115.

Upon learning this information, Mr. Martin promptly withdrew all challenges and informed True the Vote about the problems with its challenge list: "My experience with the True the Vote data base has not been good," he wrote in an email, because of "[c]oncerns with the quality of your information." SUMF ¶ 116. After summarizing the relevant events, he repeated again, "Impact of [] challenges. Not good! Indicates problem with data accuracy and relevance." SUMF ¶ 116.[6] Without telling Mr. Martin it was doing so, True the Vote nonetheless challenged all 37 individuals in the Taliaferro County challenge list under Mr. Martin's signature, SUMF ¶ 117-118, and was subsequently forced to withdraw these challenges in response to complaints from Mr. Martin.

Defendant Mark Davis gave further warnings. While generally supportive of challenge efforts, Davis "took exception" with True the Vote's challenge methodology. SUMF ¶ 120. A smaller, more focused list, Mr. Davis believed, would have been "more legitimate." SUMF ¶ 120. But True the Vote insisted on "including as many records as possible [in its] challenge." SUMF ¶ 121.

---

[6] Notably, Mr. Martin—the only challenger who requested to see the list of individuals to be challenged in his county—was also the one challenger to request that his challenges be withdrawn. SUMF n.6.

Regrettably, Mr. Davis created his own challenge file of nearly 40,000 registrants and failed to heed his own advice by neglecting to perform any other review of his NCOA match to remove college students or other potentially eligible voters. SUMF ¶¶ 122, 124. While Mr. Davis and True the Vote were each disinterested in the problems with their own challenge lists, they had no trouble recognizing the flaws in each other's. Mr. Phillips (True the Vote's analyst) specifically criticized Mr. Davis's approach for failing to verify the identity of individuals on the voter rolls before matching to the NCOA. SUMF ¶ 125. His assessment of Mr. Davis's list was blunt: "This is bad process." SUMF ¶ 125.[7]

### D. True the Vote's Validate the Vote scheme created an atmosphere of intimidation.

Apart from its frivolous voter challenges, True the Vote announced—just over two weeks before the runoff election—that the Validate the Vote scheme it had adapted to Georgia was "the most comprehensive ballot security effort in Georgia history." Dec. 15 Press Release. The scheme involved offering "bounties" enticing

---

[7] Immediately after Mr. Phillips made this candid admission, counsel for Defendants went off the record over Plaintiffs' counsel's objection and while a question was pending to coach the witness not so share any further criticisms of Mr. Davis's approach. Mid-deposition conferences between counsel and witness are not allowed for this purpose, *see Atta v. Cisco Sys., Inc.*, No. 1:18-cv-1558-CC-JKL, 2019 WL 12383117, at *3 (N.D. Ga. Apr. 26, 2019), and so the Court should not permit Defendants to dispute Mr. Phillips's view that Mr. Davis's challenge process was invalid and unreliable.

Georgians to report their fellow citizens for alleged fraud, and recruiting Navy SEALs to monitor polling places and insert themselves in interactions with poll workers and voters. These actions amplified the atmosphere of intimidation that True the Vote itself had helped to create.

> ### 1. Offering bounties on reports of fraud and recruiting former Navy SEALs to patrol polling places is objectively intimidating.

Ms. Engelbrecht was concerned that voters would not come forward with allegations of fraud, ironically, because of the atmosphere of intimidation surrounding the election. In her own words, she was "troubled" by the intimidation suffered by electors. SUMF ¶ 145. Recognizing the "chilling effect" such an environment could have, SUMF ¶ 45, Ms. Engelbrecht decided that she needed to "put[] a bounty on the fraud." SUMF ¶¶ 147-148. So True the Vote announced a whistleblower fund in excess of $1 million. SUMF ¶ 146. But as Dr. Burton's unrefuted expert report explains, bounties historically have been "used to direct suspicion around minority voters" by "incentivizing individuals to create or suspect fraud where there may have been none." SUMF ¶ 147. Nevertheless, Ms. Engelbrecht promoted the bounty in press releases and on her podcast, repeating that "Validate the Vote is about [] putting a bounty on the fraud." SUMF ¶ 148.

The bounty encouraged the public to monitor fellow citizens' voting activities,

which is yet another form of intimidation. The impact of such activities is readily apparent when viewed against the backdrop of Georgia's history of discriminatory practices rooted in false claims of voter fraud used to disenfranchise Black citizens. *See Wohl I*, 498 F. Supp. 3d at 483 & n.23 (assessing the history of discriminatory practices implicated by the conduct in question, in assessing voter intimidation claim); SUMF ¶ 154 & n.9. Thus, "in context, it is not difficult to see how" True the Vote's monetary exchange for alleged information about voter misconduct "may cause reasonable Black voters to resist voting out of fear." *Wohl I*, 498 F. Supp. 3d at 483; Turner Decl. ¶ 11.

True the Vote also promoted a plan to send former combat-trained veterans to polling places precisely because of their intimidating presence. As Ms. Engelbrecht described it, polling places "need[ed] people who were unafraid to call it like they see it," and if "[y]ou want to talk about people who understand and respect law and order and chain of command, you get some S[EALS] in those polls," especially so those SEALS could "interact with voters." SUMF ¶ 151,. Courts have long recognized that these types of "ballot security" measures are likely to intimidate voters, particularly racial minorities who have all too often been the target of these schemes. As one court concluded, a Republican National Committee "ballot security" program that involved "posting off-duty sheriffs and policemen . . . at

polling places in minority precincts"—which for decades had been prohibited under a consent decree—would disenfranchise even those voters whose eligibility was not questioned. *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 579, 612 (D.N.J. 2009). "Some voters—especially in minority districts where the legacy of racism and history of clashes between the population and authorities has given rise to a suspicion of police and other officials—may choose to refrain from voting rather than wait for the qualifications of those ahead of them to be verified, especially if the verification process becomes confrontational." *Id*.

### 2. True the Vote publicly amplified false claims and intimidating conduct.

True the Vote's press releases and other communications surrounding its campaign in Georgia were designed to "[b]uild public momentum through broad publicity"—a tactic detailed in True the Vote's Validate the Vote proposal—but misrepresented facts and exaggerated its already bloated allegations of fraud for "promotional purposes." SUMF ¶ 130. In its December 18, 2020 press release, for instance, True the Vote announced that it had "partner[ed] with Georgians in every county to preemptively challenge 364,541 potentially ineligible voters" in 159 counties. SUMF ¶ 131. Like several other press releases, this one too was part of the Validate the Vote plan to "[b]uild public momentum through broad publicity," SUMF ¶ 46, and was false, SUMF ¶ 131. True the Vote simply wanted the public to

26

*believe* that it was targeting voters in every county. In reality, it had not yet recruited challengers in all or even half of all counties by the time it issued that press release. SUMF ¶ 131.

Ironically, True the Vote's attempts to foment public support for the Validate the Vote scheme stoked the very environment Ms. Engelbrecht recognized was intimidating to voters. She publicly "offer[ed] tips to ordinary Americans to prevent the Democrat plan to steal the election in 2020," SUMF ¶ 134—a plan referenced in True the Vote's Validate the Vote proposal. And despite True the Vote's assertions that the Georgia Elector Challenges did not accuse any voter of "act[ing] improperly" or seek to "remove people . . . from the voter rolls," SUMF ¶ 135, its public communications did just that. Recruiting emails from True the Vote alleged that 99.9% of the voters on the challenged list were incorrectly registered and that if the challenges had occurred in October, "it is very likely Trump would have won Georgia." SUMF ¶ 136. Volunteers wrote back that True the Vote could use their names and signature to "purg[e] the rolls of the deceased, nonexistent and nonresidents of my county." SUMF ¶ 137. Unsurprisingly, True the Vote did not

correct these assumptions or otherwise suggest that these challengers had the wrong idea.[8]

### 3.   Defendants encouraged and amplified threats of election-related vigilantism on social media.

Defendants also used or expressed support for threatening rhetoric on social media. For instance, Mr. Somerville and Mr. Davis published a Facebook post about voters registered with UPS store P.O. boxes, and someone commented "I think a search warrant is in order here," to which Mr. Davis responded, "great idea!" SUMF ¶ 140. Another individual commented on this post, "[l]et's see if any one has the balls to prosecute to the max or if they will just get a hand slap!" SUMF ¶ 140. Some comments went even further, expressing a desire to physically harm voters who allegedly violated the state's election laws. One individual left the comment, "Hang that prick!!!" in reference to a post by Mr. Somerville and Mr. Davis about a voter who appeared to be registered in Georgia and another state. SUMF ¶ 140.

---

[8] In keeping with its habit of overstating facts and figures for "promotional" reasons, True the Vote's recruitment email stated that the challenge list was "99.9 percent likely to be incorrectly registered." SUMF ¶ 135. The email also stated that True the Vote had identified over 500,000 people on the Georgia voter rolls "that shouldn't be there." SUMF ¶ 135. But in her deposition, Engelbrecht stated that the 500,000 number was incorrect and that True the Vote had no way of knowing whether the 99.9 percent figure was correct. SUMF ¶ 135.

All of these messages, which promote criminal prosecution of voters or vigilantism, reflect objectively threatening and intimidating rhetoric supported by Defendants, especially in the context of the "highly divided—and often outright dangerous—environment [the] election season ha[d] fomented." TRO Order at 26; *see also Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 379 (D. Minn. 2020) (finding that "[t]he presence of armed 'guards' at the polls with no connection to state government  is certainly likely to intimidate voters"); *United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (finding local sheriff using his law enforcement power "highly intimidatory and coercive" to Black voters).

In yet another example, an organization affiliated with Ms. Engelbrecht and True the Vote publicly threatened to publish the names of all challenged voters. On December 20, 2020—shortly after True the Vote submitted the bulk of its Georgia Elector Challenges—a Twitter account titled "Crusade for Freedom" posted on Twitter: "We just prospectively challenged the eligibility of 360,000 voters in GA. Largest single election challenge in Georgia and American history." SUMF ¶ 141. Two days later, Crusade for Freedom tweeted: "If the Georgia counties refuse to handle the challenges of 366,000 ineligible voters in accordance with the law, I plan

29

to release the entire list so America can do the QC." SUMF ¶ 141. Both tweets added the hashtags #eyesonGA and #validatethevoteGA.

Ms. Engelbrecht admitted that these hashtags mirrored the slogans appearing on several True the Vote documents, an internal invoice between OpSec and True the Vote, and the phrase "validate the vote" was in fact the slogan recommended to True the Vote by a private donor's consultant. SUMF ¶ 56. Ms. Engelbrecht also admitted that Crusade for Freedom's logo in its tweets matched the logo in a Facebook post from an organization named Time for a Hero—which was founded by Ms. Engelbrecht and Mr. Phillips—that promised, "Crusade for Freedom coming soon." SUMF ¶ 142.[9]

Only a week after Crusade for Freedom's threat to publish the names of challenged voters, Mr. Davis and Mr. Somerville expressed concern that Ms. Engelbrecht would post complaints and challenges of voters on a website. On

---

[9] While a question was pending in Ms. Engelbrecht's deposition about Time for a Hero's social media posts, defense counsel instructed Ms. Engelbrecht to turn off her video and audio and conferred with Ms. Engelbrecht over Plaintiffs' counsel's objection. Because of defense counsel's improper conduct, *see Atta*, 2019 WL 12383117, at *3, the Court should draw all inferences regarding Ms. Engelbrecht's involvement in Time for a Hero, Time for a Hero's relationship with True the Vote, and the Crusade for Freedom tweets in Plaintiffs' favor. *See United States v. A Single Fam. Residence & Real Prop. Located at 900 Rio Vista Blvd., Fort Lauderdale*, 803 F.2d 625, 630 n.4 (11th Cir. 1986) (concluding "[t]he district court drew a permissible inference" from deponent's failure to testify "that [deponent's] testimony would not have been favorable to the claim").

December 30, 2020, Mr. Davis texted Mr. Somerville, "Derek, we need to stop this. If they publish they will be flooded with defamation complaints." SUMF ¶ 143. Further, publishing the names would "literally mak[e] good on one of the 'Threats' alleged in [Plaintiffs'] complaint." SUMF ¶144. The threat of publishing names of challenged voters and corresponding allegations that they are ineligible to vote is unquestionably intimidating, as Mr. Davis and Mr. Somerville themselves have admitted. SUMF ¶ 143-145. Such largescale attempts by Defendants to link voters' names and personal information to condemnations of unlawful voter registration, leading to "adverse publicity, intimidation, embarrassment, [or] fear of harassment associated with their participation in the electoral process" constitute voter intimidation under Section 11(b). *See LULAC*, 2018 WL 3848404, at *1.

### E. True the Vote's mass challenges and Validate the Vote scheme put voters in fear of adverse legal consequences and harassment.

Accusations of illegal conduct are serious. Under Georgia law, a person who "does not possess all the qualifications" to vote commits a felony by knowingly casting a ballot. O.C.G.A. § 21-2-571; *see also id.* § 21-2-573. Punishment can include imprisonment for up to 10 years and fines up to $100,000. *Id.* § 21-2-571; *see also id.* § 21-2-573. And even if a Georgian does not know the specific consequences they may face for registering or voting illegally, it is common knowledge that doing so is a punishable crime.

31

Even frivolous challenges to a voter's eligibility can raise fears of adverse legal consequences and intimidate voters. As Dr. Mayer explains, "voters whose eligibility is challenged may perceive a legal risk if they vote, which . . . dramatically increases the cost of voting and discourages turnout even if the individual is eligible." SUMF ¶ 152. This risk is particularly acute for low-information voters or voters of lower socioeconomic status who may lack the resources to navigate the law or understand whether they remain eligible to vote despite being formally challenged. SUMF ¶ 153. Similarly, Dr. Burton explains that "voters may be reasonably hesitant to arrive at the polls to 'prove' their eligibility if [they have] been challenged," particularly in Georgia, which has "launched numerous investigations into voters accused of wrongdoing" over the past decade. SUMF ¶ 154-174.

Voters who were targets of Defendants' challenges expressed feelings of fear, anxiety, and outright intimidation. Plaintiff Jane Doe feared that she or her family would become the target of harassment from Defendants and their supporters if she voted. SUMF ¶ 155. Plaintiff Jocelyn Heredia testified that she was "the only Hispanic" in line at her polling place, and being pulled aside because of the legal challenge "made [her] feel intimidated." SUMF ¶ 158. Ms. Heredia's name was publicly listed as a "challenged voter" on Banks County's website for six months. SUMF ¶ 158. Gamaliel Turner found the experience of being challenged to be

32

"scary, confusing, and intimidating." SUMF ¶ 172. As a Black voter growing up in the segregation era, thinking about his experience in the January runoff elections "gives [him] PTSD." SUMF ¶ 173. Mr. Turner wonders "if it is even worth trying to vote again given the trouble that the voter challenge has caused [him]." SUMF ¶ 174. And the list goes on. SUMF ¶ 163-166. Defendants' conduct was not just objectively intimidated, it struck fear in lifelong Georgia residents and lawful voters.

## II.   Defendants' affirmative defenses lack merit.

When confronted with the obvious consequences of their election subversion scheme, Defendants raised several defenses that misinterpret the VRA and misapply (or ignore entirely) settled precedent, including that: (1) the First Amendment bars relief for voter intimidation; (2) that enforcement of Section 11(b) itself violates the right to vote; and (3) that Section 11(b) would be unconstitutionally vague absent a requirement that Plaintiffs prove intent. The Court rejected these arguments already, and there is no reason for it to revisit its decision.

First, Defendants' free speech argument fails because Defendants' conduct at issue is not protected by the First Amendment. As this Court explained, the First Amendment does not protect "true threats," TRO Order at 17, and even if it did, "preventing voter intimidation and election fraud" is a sufficiently compelling state

interest to survive strict scrutiny under the First Amendment. *Id*. (quoting *Burson v. Freeman*, 504 U.S. 191, 206 (1992)).

Second, Defendants' argument that the VRA protects their right to keep others from voting turns the landmark civil rights legislation and decades of settled precedent on their head. This Court correctly observed that Defendants' up-is-down theory is unprecedented in suggesting that those who would prevent others from voting are the real victims of voter suppression. *See* ECF No. 111. at 16–17 & n.9.

Finally, this Court concluded that "a plaintiff need not show animus or an intent to harass or intimidate to succeed on a Section 11(b) claim," for good reason: the plain language of the statute imposes no such requirement; courts have repeatedly interpreted Section 11(b) to require no showing of intent and have rejected the notion that the terms intimidate, threaten, and coerce are vague. TRO Order at 23. In other words, this is not a case in which a person "of common intelligence must necessarily guess" as to whether a specific act is proscribed by statute—the standard for unconstitutional vagueness. *Ga. Pac. Corp. v. Occupational Safety & Health Rev. Comm'n*, 25 F.3d 999, 1005 (11th Cir. 1994).

The Court should therefore reject Defendants' affirmative defenses, and grant Plaintiffs' motion for summary judgment.

34

## CONCLUSION

For the foregoing reasons, Plaintiffs are entitled to summary judgment.

Respectfully submitted, this 16th day of May, 2022.

| | |
|---|---|
| Allegra J. Lawrence | */s/ Uzoma N. Nkwonta* |
| Georgia Bar No. 439797 | Marc E. Elias* |
| Leslie J. Bryan | Uzoma N. Nkwonta* |
| Georgia Bar No. 091175 | Christina A. Ford* |
| Maia Cogen | Tina Meng* |
| Georgia Bar No. 832438 | Marcos Mocine-McQueen* |
| **LAWRENCE & BUNDY LLC** | Joel J. Ramirez* |
| 1180 West Peachtree Street, Suite 1650 | Jacob Shelly* |
| Atlanta, GA 30309 | **ELIAS LAW GROUP LLP** |
| Telephone: (404) 400-3350 | 10 G Street NE, Suite 600 |
| Fax: (404) 609-2504 | Washington, D.C. 20002 |
| allegra.lawrence- | Telephone: (202) 968-4490 |
| hardy@lawrencebundy.com | melias@elias.law |
| leslie.bryan@lawrencebundy.com | unkwonta@elias.law |
| maia.cogen@lawrencebundy.com | cford@elias.law |
| | tmeng@elias.law |
| Dara Lindenbaum | mmcqueen@elias.law |
| Georgia Bar No. 980780 | jramirez@elias.law |
| **SANDLER REIFF LAMB** | jshelly@elias.law |
| **ROSENSTEIN & BIRKENSTOCK,** | |
| **P.C.** | *Counsel for Plaintiffs* |
| 1090 Vermont Avenue, NW, Suite 750 | *Admitted pro hac vice |
| Washington, DC 20005 | |
| Telephone: (202) 479-1111 | |
| Fax: 202-479-1115 | |
| lindenbaum@sandlerreiff.com | |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the within and foregoing ***Brief in Support of Plaintiffs' Motion for Summary Judgment*** with the Clerk of Court using the CM/ECF system, which will automatically send-e-mail notification to all counsel of record.

This 16th day of May, 2022.

*/s/ Uzoma Nkwonta*
Uzoma Nkwonta
*Counsel for Plaintiffs*

## **<u>CERTIFICATE OF COMPLIANCE</u>**

Pursuant to LR 7.1(D), N.D. Ga., I hereby certify that the foregoing ***Brief in Support of Plaintiffs' Motion for Summary Judgment*** has been prepared in accordance with the font type and margin requirements of LR 5.1, N.D. Ga., using a font type of Times New Roman and a point size of 14.

This 16th day of May, 2022          */s/ Uzoma N. Nkwonta*
                                     Uzoma N. Nkwonta