**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | |
|---|---|
| FAIR FIGHT, INC., SCOTT BERSON, JOCELYN HEREDIA, and JANE DOE, | |
| Plaintiffs, | **Civil Action No. 2:20-cv-00302-SCJ** |
| v. | |
| TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1-10, | |
| Defendants. | |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Plaintiffs Fair Fight, Inc., Scott Berson, Jocelyn Heredia, and Jane Doe, by and through counsel, offer the following undisputed material facts:

**I.      The Plaintiffs**

    **A.      Fair Fight**

1.      Plaintiff Fair Fight, Inc. is a is a political action committee with a non-contribution account, commonly known as a Hybrid PAC, registered with the Federal Election Commission, the Georgia Government Transparency and

1

Campaign Finance Commission, and various state campaign finance regulators. Ex. 15, Fair Fight Declaration ("Decl.") ¶ 3.

2.      Part of Fair Fight's mission is to secure the voting rights of Georgians, which includes advocating for voter engagement and voter turn-out, particularly among young people and people of color. *Id.* ¶ 4.

3.      Fair Fight's voter engagement activities include efforts to support and elect pro-voting rights progressive leaders. To encourage voter participation, Fair Fight also conducts programmatic activities including the preparation and sponsorship of digital advertising, mailings, phone banks and calls, and text messaging. *Id.* ¶ 5.

4.      Fair Fight also raises money and provides funding for voter engagement activities. *Id.* ¶ 5.

5.      For the 2020 general election and the runoff election conducted on January 5, 2021, Fair Fight engaged in voter participation work including educating voters about the voting process, engaging in get-out-the-vote activities, monitoring long lines at polling locations, and helping voters navigate the absentee ballot process. *Id.* ¶ 6.

6.      On December 14, 2020, the first day of early voting, Fair Fight learned from a True the Vote press release that True the Vote and the Georgia Republican

Party were partnering to engage in what they termed as "the most comprehensive ballot security initiative in Georgia history." *Id.* ¶ 7

7.    On December 18, Fair Fight learned from a True the Vote press release that True the Vote, and groups of individuals working in concert with True the Vote, including the other Defendants in this case, intended to mount challenges to the eligibility of hundreds of thousands of Georgians to cast their votes in the runoff election. *Id.* ¶ 8.

8.    Upon learning about Defendants' challenges, Fair Fight was forced to redirect efforts of its staff and volunteers to combat Defendants' actions targeted at limiting ballot access. *Id.* ¶ 10.

9.    Specifically, Fair Fight reallocated staff from its voter mobilization activities described above to instead monitoring Georgia's 159 counties to determine which counties received challenges that Defendants were supporting. That monitoring included in some instances physically attending the Board of Elections hearings on Defendants' challenges, attempting to learn which voters were being challenged, advocating against those challenges, reporting back to Fair Fight the results of those challenges, and, through a phonebank, and then attempting to inform challenged voters of their rights. *Id.* ¶ 11.

10.    During this time, Fair Fight expended additional financial resources in

promoting the Voter Protection Hotline so that voters could obtain assistance if they were challenged, and but for Defendants' actions, Fair Fight would not have expended as many financial resources to this effort and otherwise could have allocated these funds to its get out the vote program. *Id.* ¶ 12.

11.     Fair Fight also expended significant financial and staff resources to collect and analyze the challenge lists, some of which they obtained only from attending these Board of Elections challenge hearings. *Id.* ¶ 13.

12.     In addition to committing Fair Fight's paid staff to track and respond to Defendants efforts, Fair Fight also redirected its volunteers' time. Fair Fight had organized a large group of volunteers to gather information about general voting logistics, including confirming with counties their early voting locations, dates, and hours for runoff elections. During this time, Fair Fight volunteers were also advocating for extending early voting opportunities, but because of Defendants' challenges, Fair Fight was forced to redirect the above-described efforts of its volunteers to, instead, reaching out to voters on Defendants' challenge lists and attending Boards of Elections meetings, some in-person, across the state. That re-direction of effort required extensive Fair Fight staff involvement coordinate volunteers and took staff away from their voter engagement activities. *Id.* ¶ 14.

13.    Because True the Vote and other Defendants in this action have indicated they will continue to file similar challenges in the future, after the Runoff Election, Fair Fight turned its challenge tracking effort into an operational program called Democracy Watch, in order to respond to unlawful voter challenges if and when they are filed, advocate on the voters' behalf, and educate voters about their rights if they are challenged. *Id*. ¶ 15.

14.    Democracy Watch is now operational in 31 Georgia counties. By August 2022, it will be operational in 50 counties. *Id.* ¶ 16.

15.    Democracy Watch is monitored and overseen by Fair Fight's Research and Voter Protection Staff, and it requires a substantial number of Fair Fight volunteers to operate. To run Democracy Watch, Fair Fight has had to hire two additional staff members and has fully allocated five staff members to oversee the program. These staff hires command a significant portion of Fair Fight's resources. *Id.* ¶ 17. If Fair Fight's Research Staff did not have to oversee the Democracy Watch program, Fair Fight would allocate their time to educating voters about election administration changes, researching better methods to turn out voters, and counteracting election disinformation efforts. *Id.* ¶ 18.

16.    Similarly, if Fair Fight's volunteers were not asked to participate in Democracy Watch, Fair Fight would be able to redirect their time to more traditional

voter engagement activities, such voter mobilization and voter education. To date, Fair Fight has limited its voter education efforts to the State of Georgia due to limited volunteer capacity. Absent the drain on its resources caused by Defendants' challenges, Fair Fight would expand its voter education efforts to other states. *Id.* ¶ 19.

17.     Fair Fight has also been forced to direct additional funds to promote and educate the public about the Voter Protection Hotline, which voters can call if they find themselves the subject of a voter challenge. This promotion has cost Fair Fight hundreds of thousands of dollars. If Fair Fight did not have to expend these funds on directing voters to resources, should they be challenged, they would have allocated them towards their get out the vote program. *Id.* ¶ 20.

18.     Unless and until this litigation is successful, Fair Fight will continue to divert significant staff resources, volunteer time, and money combatting True the Vote and its cooperators' efforts to intimidate voters and restrict access to the polls. *Id.* ¶ 21.

19.     The actions that Fair Fight has to take to counteract Defendants' challenges and intimidation are not actions Fair Fight has taken in the past, and as described above, such actions are necessitated by, Defendants' wrongdoing at the center of this case. *See supra* ¶¶ 1-18.

**B.    Jocelyn Heredia**

20.    Plaintiff Jocelyn Heredia is a resident and registered voter in Banks County Georgia. Ex. 8, Jocelyn Heredia Dep. Tr.  ("Heredia Tr.") at 11:19-25.

21.    In January of 2020, Ms. Heredia submitted a change of address form to USPS when she moved temporarily from her residence in Banks County to be closer to Atlanta for a job. *Id.* 12:17-25.

22.    She returned to her Banks County residence in March 2020, where she has resided ever since. *Id.*

23.    Ms. Heredia learned that her vote was being challenged when she went to cast her in-person ballot for the runoff election in January 2021. She felt intimidated that she was being targeted in this way, particularly as a person of color in a predominantly white county. *Id.* 44:12-45:8.

24.    When Ms. Heredia was pulled aside at her polling location because of Defendants' challenge, she was one of only two persons of color in polling place line, and the second person of color was pulled aside as well. *Id.* 44:21-45:8.

25.    Ms. Heredia was also listed as a "challenged voter" on Banks County's website for at least six months. *Id.* 31:24-32:3; 61:17-62:20.

26.     Ms. Heredia felt intimidated throughout her voting experience both because the legal implications of being challenged were unclear to her, and she also felt she was being targeted as a person of color. *Id*. 44:12-45:8.

27.     According to the challenge list obtained from the Banks County website, Ms. Heredia was challenged by both Jerry Boling and Dan Gassaway. Ex. 30, Banks County Challenge List. Jerry Boling was True the Vote's challenge volunteer for Banks County, *see* Ex. 31, True the Vote County Challenger List, and Dan Gassaway was a volunteer challenger who submitted Mr. Davis and Mr. Somerville's challenge lists. Ex. 32, Davis and Somerville County Challenger List.

### C.     Jane Doe

28.     Plaintiff Jane Doe is a resident and registered voter in Clarke  County, Georgia. Ex. 16, Jane Doe Decl. ¶ 2.

29.     While Jane Doe's permanent residence is in Georgia, and Jane Doe is presently located in Georgia, in 2020, Jane Doe split her time between Georgia and another state where her spouse had accepted a short-term career opportunity. *Id*. ¶ 3.

30.     To ensure she would not miss any mail while she was away, Jane Doe completed a USPS change of address form to forward her mail to her spouse's out-of-state address. *Id*. ¶ 4.

31.     Jane Doe never intended to give up her residency in Georgia—she still owns a home there, pays taxes in Georgia, and worked in Georgia. *Id.*

32.     Jane Doe's name and address appeared on a challenge list prepared by True the Vote and submitted by one of its volunteers named Gordon Rhoden. *Id.* ¶ 5.

33.     When Jane Doe learned of the challenge, she was extremely upset because it felt like someone was trying to deprive her of her right to vote—in a very public way. *Id.*

34.     Because Defendants claimed that Jane Doe is not eligible to vote, and because Defendants' list containing Jane Doe's name and address had been published online, Jane Doe feared that Defendants and their supporters would subject her to harassment for voting. This fear was based on her own observations of events that occurred in Georgia following the November 2020 election, including reports of the state's election workers getting harassed, threatened, and doxed. *Id.* ¶¶ 7-8.

35.     Even though Jane Doe was able to vote in the Runoff Election, the experience of being challenged was stressful. She feared that she could—or her family could—become the next target of harassment from True the Vote and their supporters for having voted, especially because her name and address had

been published online and she had been publicly identified as a challenged voter. Id. ¶ 9.

36.    Although Jane Doe has been fully settled back in Georgia since July 2021, even today her name can be found online as a challenged voter in  Clarke County, and she thus fears that she will be challenged again in future elections and that her eligibility to vote will be questioned. *Id.* ¶¶ 10-11.

37.    Jane Doe believes that she should not have to worry about being targeted or facing retribution for exercising her right to vote. *Id.* ¶ 12.

## II.    Defendants collaborated with True the Vote to implement its Validate the Vote scheme in Georgia, and coordinated the largest mass challenge effort in Georgia history.

38.    True the Vote is a Texas-based organization founded by Catherine Engelbrecht, who is also its current president. Ex. 12, True the Vote / Catherine Engelbrecht Dep. Tr.  ("TTV/Engelbrecht Tr.") 22:17-20. True the Vote describes itself as a 501(c)(3) organization, but has frequently collaborated with Republican party officials to monitor polling places and challenge voters, among other activities. *See, e.g.*, TTV/Engelbrecht Tr. 112:2-13. True the Vote has been accused of voter intimidation dating back to 2012, including members of Congress Ex. 33, Elijah Cummings 2012 Letter.

39.     Derek Somerville is a resident of Georgia who, in the weeks leading up to Georgia's January 2021 runoff, was also involved in analyzing voter address information and coordinating efforts to challenge the eligibility of tens of thousands of voters across the state of Georgia. Ex. 10, Derek Somerville Reopened Dep. Tr. ("Somerville II Tr.") 68:3-16. Over several weeks, Mr. Somerville participated in around a dozen calls with True the Vote, and participated in two or three calls with Ms. Engelbrecht. *Id.* 91:5-12. Mr. Somerville also personally met with Ms. Engelbrecht on at least one occasion, and had half a dozen conversations with Ms. Engelbrecht on the phone on a one-on-one basis. *Id.* 91:9-15. Mr. Somerville also admits that he had, on at least one occasion, told Ms. Engelbrecht that he thought True the Vote's challenge strategy was broad, *id.* 94:11-16, and had copied Ms. Engelbrecht on emails he sent out about voter challenges in an attempt to influence True the Vote's tone on this topic, *id.* 122:8-10.

40.     Mark Davis worked collaboratively with Mr. Somerville in analyzing voter data and coordinating efforts to challenge the eligibility of tens of thousands of voters. *Id.* 68:3-16; Ex. 6, Mark Davis First Dep. Tr.  ("Davis I Tr.") 45:1-8. At some point, Mr. Davis had a phone call with Mr. Gregg Phillips where Mr. Davis provided Mr. Phillips with a primer on voter data in Georgia and gave Mr. Phillips information to "get started" with analysis into challenges. Davis I Tr. 49:12-50:21.

11

41.     Mark Williams is also a Georgia resident who assisted with the printing of challenge letters that True the Vote would then send to individual counties in support of True the Vote's voter challenges. Ex. 3, Mark Williams Dep. Tr. ("Williams Tr.") 19:4-12. In particular, True the Vote would send Mr. Williams compiled lists of challenged voters, and Mr. Williams would print individual letters for the challenges. *Id.* 22:4-13. Mr. Williams also introduced True the Vote to other individuals who collaborated on the challenges, including Ron Johnson and James Cooper. *Id.* 22:19-23:2.

42.     Ron Johnson was previously the Georgia GOP chairman for all counties with less than a population of 80,000 people, and also assisted True the Vote with its efforts in Georgia, specifically in forwarding the names of individuals to True the Vote that could serve as potential challengers in various counties across the state. Ex. 5, Ron Johnson Dep. Tr.  ("Johnson Tr.") 35:13-17; 42:18-43:2. Many of these challengers were chairmen of their respective county Republican Party. *Id.* 41:6-8; 42:16-21; 43:6-9.

43.     James Cooper, who previously served as the 3rd Vice Chair for the 10th District of the Georgia Republican Party, Ex. 2, James Cooper Dep. Tr.  ("Cooper Tr.) 11:9-17, was similarly involved in recruiting challengers for True the Vote across the state. *Id.* 28:2-15; 31:12-17.

A. **True the Vote's "Validate the Vote" initiative started as a coordinated scheme to overturn presidential election results in Georgia and other battleground states.**

44.     Shortly after the November 2020 election, conservative donor Fred Eshelman contacted Catherine Engelbrecht seeking True the Vote's assistance in overturning the results of the presidential election. TTV/Engelbrecht Tr. 266:11–15, 285:21–286:4, 292:20–293:3.

45.     True the Vote hatched a plan to identify "illegal voters and illegal votes," "build public momentum" and "[g]alvanize Republican legislative support in key states," including in Georgia, "to have the state's election results overturned." Ex. 1, *Eshelman v. TTV-* Validate the Vote 2020  ("Validate the Vote 2020") at 582. A consultant for True the Vote funder, Fred Eshleman, recommended the name "Validate the Vote," which True the Vote adopted. TTV/Engelbrecht Tr. 66:12-67:20.

46.     On November 5, 2020, two days after the general election, True the Vote shared a proposal summarizing its strategy for implementing the "Validate the Vote" scheme and overturning the presidential election results. The proposal sought to highlight the purported "[p]roblem" of "Democrat officials" and "deliberate election fraud" resulting from the "counting [of] illegal votes," and included a five-part plan:

- Solicit whistleblower testimonies from those impacted by or involved in elections fraud;

- Build public momentum through broad publicity;

- Galvanize Republican legislative support in key states;

- Aggregate and analyze data to identify patterns of election subversion; and

- File lawsuits in Federal Court with capacity to be heard by the Supreme Court of the United States.

Validate the Vote 2020 at 1.

47.    The proposal also identified OPSEC Group, LLC, and its founder and President, Gregg Phillips, as the Data and Research team. *Id.*

48.    True the Vote even assured its donor that the Trump campaign would "cover" True the Vote's legal fees. TTV/Engelbrecht Tr. 305:3–305:8.

49.    True the Vote did not have any evidence that the "problem" described in its proposal existed; rather, Ms. Engelbrecht repeatedly described the language used in the Validate the Vote proposal as "promotional." *See* TTV/Engelbrecht Tr. 269:17–271:13. Nor could Ms. Engelbrecht explain why True the Vote wanted to challenge the results of *only* the presidential election, despite promoting that voter fraud was widespread. *Id.* at 285:13–20. However, Engelbrecht had been engaged in conversations with the Trump campaign, Ex. 41, Email from F. Eshelman, and as noted above, she believed at one point that the campaign would pay True the Vote's

fees. *See*, *e.g.*, Ex. 40, Email from C. Engelbrecht.

50.     Consistent with its Validate the Vote scheme, True the Vote launched a nationwide effort to gin up evidence of voter fraud with the ultimate goal of forcing one of three scenarios: (1) a "special election" in which voters would choose new electors, (2) state legislatures, rather than voters, would select presidential electors, or (3) the next president would be selected by the U.S. House of Representatives. Validate the Vote 2020 at 1. The organization also enlisted OPSEC to "aggregate and analyze data to identify patterns of election subversion." *Id.*

51.     One of the first steps in the plan was to pursue litigation in battleground states. Days after the 2020 election True the Vote filed lawsuits in Michigan, Wisconsin, Georgia, and Pennsylvania in which they promised to deliver to the court evidence of, among other offenses, "votes by ineligible voters." *See, e.g.*, Compl. ¶ 45, *Brooks v. Mahoney*, No. 4:20-cv-00281-RSB-CLR (S.D. Ga. Nov. 11, 2020); Compl. ¶ 73, *Bally v. Whitmer*, No. 1:20-cv-01088-JTN-PJG (W.D. Mich. Nov. 11, 2020); Compl. ¶¶ 34, 44, *Langenhorst v. Pecore*, No. 1:20-cv-01701-WCG, (E.D. Wisc. Nov. 12, 2020); Compl. ¶ 26, *Pirkle v. Wolf*, No. 4:20-cv-02088-MWB, (M.D. Pa. Nov. 10, 2020).

52.     True the Vote promised a "sophisticated and groundbreaking analysis" using, among other tools "United States Postal Service records"; the same type of

records True the Vote would use when challenging the eligibility of hundreds of thousands of Georgia voters. *See Brooks*, Compl. ¶ 45; *Bally*, Compl. ¶ 73; *Langenhorst,* Compl. ¶¶ 34, 44; *Pirkle*, Compl. ¶ 26. But True the Vote never provided the courts with any such evidence. Days later, on November 16, 2020, True the Vote filed motions to voluntarily dismiss all four the cases.[1]

53.     None of the promised research or evidence—including the analysis of Postal Service records—materialized, even after its funder repeatedly implored the organization to provide "real evidence." Ex. 39, Email from N. Howard; TTV/Engelbrecht Tr. 288:11-290:9.[2] Just days after filing these four lawsuits, True

---

[1] True the Vote was not alone in bringing such suits and some even depended on Postal Service records. None of the suits challenging Georgia's election results were deemed meritorious. *Wood v. Raffensperger*, No. 2020-CV-342959 (Ga. Super. Ct., Fulton Cnty. Dec. 8, 2020) (dismissing case alleging tens of thousands of out-of-state residents illegally voted in Georgia's General Election); *Boland v. Raffensperger*, No. 2020-CV-343018 (Ga. Super. Ct., Fulton Cnty. Dec. 8, 2020) (dismissing case and finding plaintiffs' claim that tens of thousands of people illegally voted in Georgia based on the National Change of Address registry was based on "speculation rather than duly pled facts"); *Pearson v. Kemp*, No. 1:20-cv04809-TCB, ECF No. 74 (N.D. Ga. Dec. 7, 2020) (dismissing case alleging the National Change of Address registry showed over 20,000 ineligible voters cast ballots in Georgia's general election).

[2] True the Vote's funder, Fred Eshelman, would eventually sue the organization, defense counsel James Bopp, the Bopp Law Firm, OpSec, and Gregg Phillips for breach of contract, fraudulent misrepresentation, and conversion. Eshelman alleged that True the Vote misspent his donation on efforts he never agreed to fund, like the "*largely baseless challenges to the eligibility of hundreds of thousands of voters in the 2021 Georgia Senate runoffs*." Ex. 42, Mar. 19, 2021 Verified App. for Temp.

the Vote abandoned them, voluntarily dismissing the cases. TTV/Engelbrecht Tr. 290:10-16.

54.    In connection with the Validate the Vote scheme, True the Vote also planned to "[g]alvanize Republican legislative support in key states," including Georgia. Validate the Vote 2020 at 1. Indeed, Ms. Engelbrecht had previously called for "more collaboration among conservative groups, suggesting that participants at the meeting work with groups like the Republican National Lawyers Association to formulate plans to challenge registrations and disqualify voters." Ex. 14, Dr. Vernon Burton Expert Report ("Burton Rep.") at 23 (citation omitted).

**B.    As the Georgia runoff elections approached, "Validate the Vote" became "Validate the Vote Georgia."**

55.    When "attentions turned towards Georgia" for the Senate runoff election, "Validate the Vote" became "Validate the Vote Georgia." TTV/Engelbrecht Tr. 69:4–7. True the Vote "simply took the logo and put the word 'Georgia' in the center of the logo. TTV then made all the resources [it] had available for the national election available in Georgia for the Run-off Election." Ex. 19, TTV Resp. to Interrogatory No. 3 at 17. But Validate the Vote Georgia remained part of True the Vote's national effort. TTV/Engelbrecht Tr. 69:4–7.

---

Inj. ¶¶ 42-43 (emphasis added).

56.     The donor's consultant, who originally proposed the name "Validate the Vote," also coined the phrase "Validate the Vote Georgia" for True the Vote's activities directed toward the runoff election. *Id*. at 264:12–16.

57.     True the Vote enlisted OPSEC for its efforts in Georgia as well. The invoice that OPSEC issued to True the Vote listed only a single item—"Eyes on Georgia"— an umbrella project which included both OPSEC's analysis for True the Vote's Georgia Elector Challenges and its work to gather and analyze data to overturn the presidential election, *id*. at 182:6–183:20; *see also* Def TTV 288; Ex. 21, Dec. 14, 2020 True the Vote Press Release.

**C.     Defendants launched mass voter challenges.**

58.     On December 18, 2020, True the Vote issued a press release announcing that it had "partner[ed] with Georgians in every county to preemptively challenge 364,541 potentially ineligible voters." Ex. 22, Dec. 18, 2020 True the Vote Press Release. The press release also touted that True the Vote was "working alongside patriots across the Peach State," including Defendants Somerville, Davis, Williams, Johnson, and Cooper. TTV/Engelbrecht Tr. at 251:18–252:14.

59.     The press release also stated that True the Vote had "probable cause" to suspect that the 364,151 individuals being challenged did "not meet the qualifications legally required to cast a ballot." Ex. 22, Dec. 18 Press Release.

60.     The challenge lists were constructed by matching the Georgia voter registration database of all registered voters ("voter file") to the USPS's National Change of Address ("NCOA") registry, which lists the names and addresses of individuals who have requested the United States Postal Service to forward their mail to a different address. *See* Ex. 20, TTV Am. Resp. Pls' First Req. for Admission ("TTV RFA") Nos. 12-13; Williams Tr. 114:10-115:5; Ex. 13, Dr. Ken Mayer Expert Report ("Mayer Rep.") at 16.

61.     Defendants Mark Davis and Derek Somerville used a similar methodology to prepare 39,141 challenges against Georgia voters. Mark Davis Reopened Dep. Tr. ("Davis II Tr.") 41:20-17; Davis I Tr. 22:9-23:3; Sommerville II 94:18-20;

62.     Ron Johnson and James Cooper—Georgia Republican Party officials— recruited Georgia Republican Party county chairs to lend their names to True the Vote's mass challenges. *See* Cooper Tr. 31:13–17, 57:17–58:9; Johnson Tr. 34:4-8. Ron Johnson also volunteered to be a challenger himself. Johnson Tr. 91:13-21; TTV/Engelbrecht Tr. 144:9-15.

63.     Defendant Mark Williams was referred to True the Vote by David Shafer, "the Chairman of the GOP," Ex. 34, Dec. 12, 2020 M. Williams Email; *see*

*also* TTV/Engelbrecht 141:13–142:2,[3] and printed True the Vote's challenges and assisted with finalizing the challenge lists, *see* TTV/Engelbrecht Tr. 222:8–19, 252:9–14.

64.     True the Vote and Mr. Davis and Mr. Somerville also had significant contact and collaboration throughout this whole time period. *See* Somerville II Tr. 91:1-15 (Mr. Somerville admitting having several conversations with True the Vote, and around half a dozen one-on-one conversations with Ms. Engelbrecht); *id.* at 94:11-16 (Mr. Somerville admitting he shared with Ms. Engelbrecht concerns about the broadness of True the Vote's challenge list strategy); *id.* at 104:3-15 (Mr. Somerville admitting he "definitely spoke on the [December 20] call" hosted by True the Vote to update volunteers about the challenge efforts); *id.* at 115:17–116:11 (Mr. Somerville admitting he copied Ms. Engelbrecht on emails about challenge lists to "try to influence their tone").

65.     True the Vote ultimately submitted challenges against 250,783 registrants across 65 counties. Mayer Rep. at 1, 14.

---

[3] David Shafer is also the GOP official with whom True the Vote spoke before announcing it was partnering with the GOP to bring its Georgia Elector Challenges. *See* TTV/Engelbrecht Tr. 141:19–142:2; *see also* Dec. 14 Press Release.

### 1.  Defendants' challenges were frivolous.

66.     Defendants knew their challenge lists included eligible Georgia voters who were properly registered, and they knew that their challenges would burden registrants. *See, e.g.*, Ex. 11, OPSEC Group, LLC / Gregg Phillips Dep. Tr. ("OPSEC/Phillips Tr." 147:20–22, Ex. 9, Davis II Tr. 35:21–37:1; TTV/Engelbrecht Tr. 208:18–209:2 (explaining the importance of not challenging military voters).

67.     "NCOA data are not error-free, and the companies that conduct NCOA matching note that false positives occur "on a regular basis," which will invariably produce errors in the challenge list. Mayer Rep. at 33.

68.     Even where the NCOA entries are accurate, the NCOA registry does not provide sufficiently specific or unique information to reliably match NCOA data to a voter file because the NCOA registry does not include any unique identifier, like a social security number or other identification number that is unique to each voter. Mayer Rep. at 6.

69.     Even where it is certain that a registered voter submitted a change of address request, that does not mean the individual changed or abandoned their prior residence. The registrant may be forwarding their mail to a friend's house, or they may need access to their mail while on vacation. Voting eligibility is not affected, of course, where no move occurred. *Id.* at 14.

70.     Individuals who submit a change of address request do not thereby forfeit their eligibility to vote. *See, e.g.*, TTV RFA at 1; Ex. 7, Derek Somerville First Dep. Tr.  ("Somerville I Tr.") at 125:16-126:3 ("There are literally thousands of individuals that legitimately used NCOA to forward their mail out of the county/state but remain legal residents.").

71.     Defendants had no way of knowing whether voters who had filed a permanent change of address had moved away permanently, or just temporarily for a period longer than 12 months. TTV/Engelbrecht Tr. 209:17–211:8; Davis II Tr. 26:2–27:5.

72.     True the Vote's goal was to create a presumption that all voters identified in its challenge lists would not be permitted vote absent further evidence proving their eligibility.

73.     Defendants also fundamentally oppose the NVRA's safeguards; they view the NVRA as "antiquated." Davis I Tr. 112:16-22.

74.     True the Vote explained to its volunteers the challenge process that it hoped to see implemented: "[w]hen the challenge letter is received at your election office[, election officials] are required by G[eorgia] law to not let a ballot be cast or counted until the individual that has been challenged comes in and proves they are

not dead, or they still live in the same location." Ex. 28, Email from M. Williams to A. Holsworth.[4]

75.    Ms. Engelbrecht confirmed this understanding, testifying that if the challenge process had gone the way she envisioned it, all 360,000-plus voters on its challenge lists would be required to show proof of their residency before being allowed to vote in the runoff election, *see* TTV/Engelbrecht Tr. 158:1–159:5.

76.    True the Vote's voter challenge list did "not come anywhere close to what would be required for valid practices in academic studies of election administration." Mayer Rep. at 2.

77.    True the Vote's own allies—Defendants Mark Davis and Derek Somerville—warned that the scope of the challenge program was entirely too broad. *See* Davis I Tr. 61:19-62:7; Somerville II Tr. 88:17-89:13.

---

[4] Mr. Cooper testified that this explanation was "basically . . . the script" used to educate volunteers about the basis for True the Vote's challenges and the challenge process. Cooper Tr. 42:20–43:21. Yet Ms. Engelbrecht admitted that this script contains "a number of things . . . that are not correct" and omits critical nuances about True the Vote's challenges. TTV/Engelbrecht Tr. 231:20–232:5.

**2. The data used to construct the challenge file, and the methods used to identify registrants who have allegedly moved, were unreliable and generated tens of thousands of obvious errors.**

78.     True the Vote retained and collaborated with OPSEC Group, LLC and its founder, Gregg Phillips, to review data files and prepare lists of voters to challenge in each county in Georgia. TTV/Engelbrecht Tr. at 125:22-126:11.

79.     Mr. Phillips gained notoriety after the 2016 presidential election when he claimed, without any basis, that more than three million votes were cast by non-citizens. OPSEC/Phillips Tr. 41:6-10; Ex. 29, G. Phillips CNN Interview Tr. at 8. But this allegation was obviously fabricated, as it came before statewide voter records were even available for review, and Mr. Phillips steadfastly refused to provide his data or methodology for outside verification. *See* Phillips CNN Interview Tr. at 8.

80.     Dr. Mayer's review of the challenge file prepared by OPSEC and True the Vote uncovered missing data, missing values in key fields, anomalous values and obvious errors, lack of adequate data preparation, challenge file addresses near or on military installations, challenge file addresses in municipalities with universities, and other inadequate data practices for which Defendants are unable to provide any justification. *See infra* ¶¶ -.

### i.      Mismatches between data files

81.      The databases Defendants used do not allow for foolproof matching, as the Georgia voter file contains only one unique identifier—the voter registration number—for each registered voter. Mayer Rep. 16. The remaining information included in the voter file—a person's name, address, birth year, race, gender, registration date, and date last voted—is not necessarily exclusive to any one person. *Id.* at 16. And the voter file does not include any other potential unique identifiers, such as social security numbers or driver's license numbers. *Id.* at 15-16.

82.      The NCOA registry also does not include a person's voter registration number or any other unique identifier. *Id.* at 16-17. Nor does a person's voter registration number appear in any other database that could have been matched to the voter file to establish non-residency. *Id.* Thus, the only common fields between the voter file and NCOA registry are a person's name and address, which cannot— and certainly did not—dependably identify a unique individual. *Id.* at 16.

83.      In preparing the challenge lists, OPSEC accepted partial matches, where individuals in the voter file and NCOA registry had the same first and last names but *different* middle initials or *different* name suffixes (e.g., Jr. or Sr.). OPSEC/Phillips Tr. at 117:5-9, 17-19.

84.     True the Vote and OPSEC refused to provide concrete information about how these matching errors were reduced or identified. *See* Mayer Rep. 20-23; OPSEC/Phillips Tr. 109:9-12.

85.     As OPSEC admits, "the import of verifying identity can't be overstated in this case." OPSEC/Phillips Tr. 136:14-16; *see also* Davis I Tr. 21:2-5.

### ii.     Missing data

86.     True the Vote's challenge file does not include several sources of identification found in the voter file, including middle name or middle initial, maiden name, suffix, or birth year. Mayer Rep. at 24. Instead, the only fields that appear to have been matched between the voter file and the NCOA registry are first name, last name, and address. *Id.* at 24-25.

87.     Because name and address combinations are far from unique in the voter file, this resulted in obvious errors. *Id.* at 25. Dr. Mayer found that there were 85,219 records in the Georgia voter file that had at least one duplicate entry with the same first name, last name, street address, apartment number, city, and zip code. *Id.* Dr. Mayer also found 1,375 entries in True the Vote's challenge file, where one entry in the NCOA database was linked to multiple individuals who share the same name and address, meaning that at least some of those individuals from the voter file were misidentified and had not submitted a change of address form at all. *Id.* at 26.

88.    This error, moreover, had a disparate racial effect: Black voters comprise 27.3% of all individuals in the challenge file, but among the individuals in duplicated records, 40.3% are Black. *Id.*

### iii.    Missing values in key fields

89.    Dr. Mayer found 15,360 records in the challenge file that failed to show any street address in the "moved to" address fields. Mayer Rep. at 26-27. Another 27 records show the "moved to" street address as "general delivery," *id.* at 27, which Mr. Phillips admitted could mean "dozens" of things, including that the voter "didn't have an address when they moved" or was homeless. OPSEC/Phillips Tr. 141:10-16.

90.    The lack of a "moved to address" is important because this means the challenge lists included thousands of Georgia votes who may not have permanently moved out of their county—indeed, who may not have moved at all. Mayer Rep. at 26-27.

### iv.    Anomalous values and obvious errors

91.    Apart from fields that were entirely missing from the challenge files, there were also fields that were completed incorrectly and inconsistently, exemplified by all of the 9,270 records in the Henry County challenge list containing erroneous zip code data. Mayer Rep. at 27.

92.    Additionally, city spellings and abbreviations differ arbitrarily—for example, Dauphin Island, Alabama is only sometimes abbreviated to "Dauphin Isl," and San Juan Capistrano, California is only sometimes abbreviated to "San Juan Capo." *Id.* at 28.

93.    None of these errors or abbreviations exist in the voter file, further confirming True the Vote settled for approximate matches in putting together their challenge files. *Id.*

94.    Dr. Mayer also found 263 examples where the name of the registrant in the challenge file does not match the name in the voter file under the voter registration number provided. *Id.*

95.    Dr. Mayer found five examples where the registration address and "moved to" address in the challenge file were identical, indicating that the voter had not, in fact, moved at all, "rais[ing] further questions about the validity of the NCOA matching process used, as well as the lack of quality control in reviewing the results (to the extent they were reviewed at all)." *Id.*

96.    Gregg Phillips (OPSEC) admitted that he knew these errors were in the challenge file and that they should have been removed. OPSEC/Phillips Tr. 140:14-22.

97.     Mr. Phillips knew that registrations remain valid where a voter moves within the same county, but nonetheless, voters who changed their address to another address within the same county were still included in the challenge lists. *Id.* at 120:22-121:2.

98.     Dr. Mayer found 145 instances where a targeted individual's registration address and "moved to" address was in the same county. Mayer Rep. at 28.

99.     Dr. Mayer also found 6,377 examples where individuals had already re-registered at their "new" address, indicating that True the Vote inexplicably challenged the eligibility of voters who were registered at the address that True the Vote believe to be their home. Mayer Rep. at 29.

100.   Mr. Phillips admitted that "[reviewing for this error] was beyond our capacity so in that case what we would say is submit the challenge and let the county figure it out." OPSEC/Phillips Tr. 146:8-14.

101.   Finally, Dr. Mayer found 336 examples where challenged individuals were not registered to vote in Georgia at all, meaning they were wrongfully accused of being registered or voting unlawfully. Mayer Rep. at 29.

### v.  Lack of adequate data preparation

102.   Because True the Vote use any unique identifiers conduct its match, it was especially important to regularize the fields that were matched so that they have a common format. Mayer Rep. at 29.

103.   But the address fields in the challenge file do not match the address fields in the voter file. *Id.* The challenge list provides two fields for a street address and apartment or unit number, while the voter file provides four separate fields for house number, street name, street suffix, and apartment or unit number. *Id.*

104.   Dr. Mayer found that of the 41,691 records in the challenge file that have a value in the apartment or unit number field, several are not valid: five are recorded as missing rather than blank, one is recorded as either a spreadsheet cell reference or a typographical error ("=g16"), one is recorded as an en dash ("-"), and another is recorded as "Null." *Id.*

### vi.  Challenge file included addresses near or on military installations

105.   Defendants knew that Georgia residents who temporarily relocate due to military service remain eligible to vote in Georgia. *See, e.g.*, TTV Resp. to First Interrogatories No. 7 at 24; OPSEC/Phillips Tr. 120:14-20.

106.   Dr. Mayer found 22,956 registrants who, according to the challenge file, moved to an address on a military installation, including 397 registrants who

are listed as actually living *on a military installation*. Mayer Rep. at 30. For example, the challenge list includes 41 registrants with an address on Fort Knox, KY; 35 on Fort Bragg, NC; 29 on Fort Campbell, KY; 23 on Joint Base Lewis McChord, WA; 16 on Fort Stewart, GA; 15 on Fort Meade, MD; 14 on Eglin Air Force Base, FL; 13 on Fort Irwin, CA; 12 on Camp Lejeune, NC; and nine at the United States Air Force Academy, CO. *Id.*

107.   Gregg Phillips (OPSEC) was aware that voters who submit even a *permanent* change of address form to USPS listing their new duty station remain eligible to vote in the state where they registered. OPSEC/Phillips Tr. 126:2-11. However, when asked what further analysis was performed to identify whether military voters who moved to a base retained their eligibility to vote in Georgia, Mr. Phillips admitted "[w]e didn't." *Id.* 126:12-15.

### vii.   Challenge file included addresses in municipalities with universities.

108.   Defendants also knew that students remain eligible to vote at their original residence when attending school out of state (or out of county). *See, e.g.*, TTV  Resp. to First Interrogatories No. 7 at 24; OPSEC/Phillips Tr. 120:14-21.

109.   Dr. Mayer found 35,056 registrants in the challenge file with a "new" address in a city containing academic institutions that Georgia residents regularly attend. Mayer Report at 31. As one example, the small town of Dahlonega is home

to the University of North Georgia, as well as the Army base Camp Merrill. *Id.* at

50. From this town of 7,500 people, True the Vote challenged 273 individuals. *Id.*

110.    In all, 57,534 registrants in the challenge file—or 22.9% of the entire

list—are alleged to have moved to or near a military installation, or to a municipality

with a college or university. *Id.* at 32.

111.    Dr. Mayer concluded that the "matching process ostensibly used by

True the Vote does not adhere to standard practice in political science." *Id.* at 32.

Because Defendants did not "ensure that data fields were conforming, that missing

and anomalous values were identified and corrected, and that implausible matches

(such as duplicates and name changes) were either removed or investigated further

to identify possible errors," their validation process was "wholly inadequate." *Id.*

### viii.    Volunteer challengers and fellow defendants warned True the Vote of obvious errors.

112.    True the Vote's regular practice was to submit challenges from a True

the Vote email account under a volunteer's name without telling the volunteer who

was being challenged. *See* Cooper Tr. 75:3-76:4. However, when Joe Martin, Chair

of the Taliaferro County Republican Party, was identified as a registered voter

willing to submit True the Vote's challenge list in his county, Ex. 4, Joseph Martin

Dep. Tr. ("Martin Tr.") 20:17-22, he requested the challenge list for Taliaferro

County to submit himself. *Id.* 43:19-44:2.

113.   After receiving True the Vote's list of 37 names, Mr. Martin asked: "How did this list come about? Where did this list come from? Who generated the list?" Martin Tr. 38:19-20. Martin expressed that he believed standard practice required providing two sources for the allegation that a voter had changed residency, and nothing about the challenge lists reflected that multiple sources had been consulted. *Id.* 46:20-47:5.

114.   Martin was "not comfortable" that the list he received "was valid," *id.* 38:17-19, and so rather than challenge all 37 individuals on True the Vote's Taliaferro County list, Mr. Martin winnowed the list himself and chose to submit letters challenging only the three registrants on the list who had requested an absentee ballot for the runoff elections. *Id*. 55:7-12.

115.   But Martin soon discovered that even this limited subset was faulty. According to county elections officials: (1) the first person he challenged did not live in New Jersey, as his challenge letter alleged, and instead was a 100-year-old woman living in Taliaferro County, (2) the second person he challenged lived in a nursing home and maintained a permanent residence in Taliaferro County, and (3) the third person he challenged also lived in a nursing home. Martin Tr. 61:12–66:7.

116.   As a result, Martin promptly withdrew all of his challenges and updated True the Vote about the issues he encountered: "My experience with the True the

Vote data base has not been good," he wrote in an email, because of "[c]oncerns with the quality of your information." *Id.* 87:4–8, 87:16–18. After summarizing the relevant events, he repeated again, "Impact of 3 challenges. Not good! Indicates problem with data accuracy and relevance." *Id.* 77:6–78:9; 83:20–84:9.[5]

117.   Shortly after Martin shared that his desire to withdraw his challenges, Defendant Cooper emailed Ms. Engelbrecht that he would immediately look for a replacement challenger in Taliaferro County to resubmit the list. Cooper Tr. 105:14-20.

118.   True the Vote also proceeded with challenges to all 37 individuals on the Taliaferro County challenge list under Martin's name but without telling Martin it was doing so. Martin Tr. 56:4-57:9.[6]

119.   Defendant Mark Davis also took "exception" to the logic of True the Vote's challenge methodology. Davis I Tr. 60:15-18.

120.   Mr. Davis specifically objected that he "was not on board with the philosophy surrounding [TTV's] challenge," as he "felt it was too broad," and that

---

[5] Notably, Mr. Martin—the only challenger who requested to see the list of individuals to be challenged in his county, Cooper Tr. 75:3–76:4—was also the one challenger to request that his challenges be withdrawn. *See* TTV/Engelbrecht Tr. 328:4–13.

[6] Mr. Martin was "shocked" when he later learned from open records requests that True the Vote had done this. Martin Tr. 57:5–15, 62:21–63:3.

he wanted his challenges to "be more legitimate, more smaller." *Id.* ; Davis II Tr. 94:14-17.

121.   Ms. Engelbrecht and True the Vote, however, were intent on "including as many records as possible within [True the Vote's] challenge." Engelbrecht/TTV Tr. 149:20-150:1.

122.   Mr. Davis also recognized that many registrants who file a "permanent" change of address form with the postal service only intend to relocate temporarily, and filing a "permanent" change of address form does not indicate that the individual has moved permanently. A "permanent" change of address form is required for mail forwarding that lasts longer than a year; thus, if the registrant is a student or member of the military whose temporary relocation is expected to last longer than one year, they must complete a permanent change of address form to ensure mail forwarding for the duration of their temporary relocation. Davis II Tr. 26:14-27:5.

123.   True the Vote did not conduct any such investigation to determine whether voters who filed a "permanent" change of address were students or otherwise away temporarily; instead, Mr. Phillips spent "an hour maybe" reviewing the challenge file to ensure the number of errors looked "reasonable" relative to his expectations, and he deemed that sufficient. OPSEC/Phillips Tr. 140:8-141:10.

124.   Unfortunately, Mr. Davis himself also failed to perform the necessary analysis on his own challenge file of 40,000 registrants. He asked Mr. Somerville to manually remove names with addresses that might be affiliated with military bases, but not remove college students or other potentially eligible voters. Davis I Tr. 149:18-150:1.

125.   While Mr. Davis and Mr. Phillips (OPSEC) were each disinterested in the problems with their own challenge lists, they had no trouble recognizing each other's flaws. *See* OPSEC/Phillips Tr. 103:13-16. Mr. Phillips specifically criticized Mr. Davis's approach for failing to verify the identity of individuals on the voter rolls before matching to the NCOA, and assessed Mr. Davis's methodology bluntly by stating: "This is bad process." *Id*.

### 3. True the Vote made good on its call to collaborate and galvanize support from Republicans by coordinating its Validate the Vote scheme with Georgia Republican Party officials.

126.   True the Vote also partnered with and "galvanize[d] support" from Republicans in Georgia. In a December 14, 2020 press release, True the Vote announced that it was "partner[ing]" with the Georgia Republican Party to help them "implement the most comprehensive ballot security initiative in Georgia history." Dec. 14 Press Release.

127.   For its mass elector challenges, True the Vote recruited challengers solely through two Georgia Republican Party officials, Defendants James Cooper and Ron Johnson, who in turn relied on Republican Party contacts to recruit challengers, several of whom were GOP party officials themselves. Cooper Tr. 33:3–13; 36:11–37:19; 115:15–22; Johnson Tr. 34:4–8; TTV/Engelbrecht Tr. 239:22–240:15; *see also* Cooper Tr. 139:8–14.

128.   Mr. Cooper testified that True the Vote ran its recruitment process from the Georgia GOP spreadsheet, recruiting Republican county chairs, and then recruiting a different challenger if a current or former Republican county chair did not want to be a challenger. *See* Cooper Tr. 58:3–9; 129:22–130:4.

129.   Joe Martin—the volunteer who ultimately requested that his challenge be withdrawn (and Chair of the Taliaferro County Republican Party)—even thought that Mr. Cooper had recruited him on behalf of the Georgia Republican Party, as Cooper signed his True the Vote recruitment email as coming from the "3rd Vice Chair 10th District Republican Party." Williams 0377.[7]

---

[7] Although True the Vote denied Plaintiffs' Request for Admission No. 17 that it reached out to the Georgia Republican Party before reaching out to the Democratic Party of Georgia, that denial was false. As Ms. Engelbrecht testified in her deposition on behalf of True the Vote, she reached out to and partnered with the Georgia Republican Party before attempting to contact the Democratic Party of Georgia. *See* TTV/Engelbrecht Tr. 166:14–167:4.

130.   True the Vote's press release announcing its partnership with the Georgia Republican Party was just one of many designed to further the Validate the Vote scheme—specifically, the plan to "[b]uild public momentum through broad publicity." Validate the Vote 2020 at 1; TTV/Engelbrecht Tr. 274:16–275:12.

### 4. Defendants' public statements stoked fears, accused hundreds of thousands of Georgians of acting unlawfully, and exaggerated its efforts to build momentum for its Validate the Vote scheme.

131.   True the Vote's December 18, 2020 press release announcing its mass challenges stated that it had "partner[ed] with Georgians in every county to preemptively challenge 364,541 potentially ineligible voters," Ex. 22, Dec. 18 Press Release. In fact, it had not. *See* TTV/Engelbrecht Tr. 252:18–22. Instead, Ms. Engelbrecht testified that this language was intended to signal "willingness" to partner with Georgians in every county. *Id*. 251:14–17.

132.   Ms. Engelbrecht testified that the point of the press release was "more to show just support for the engagement of citizens," *id*. 252:16–17, *i.e.*, to build the public momentum necessary to accomplish Validate the Vote's goals.

133.   The press releases had another goal: to elicit donations. Ms. Engelbrecht hoped that as awareness of the Validate the Vote program and its other efforts increased, so too would financial support or donations to True the Vote. *See* TTV/Engelbrecht Tr. 81:2–9. Indeed, True the Vote anticipated having its "legal

fees . . . covered by the Trump campaign" because the campaign was going to use its research collected from the Validate the Vote scheme. *Id.* 305:3–8, 306:18–21.

134.   Ms. Engelbrecht has also publicly "offer[ed] tips to ordinary Americans to prevent the Democrat plan to steal the election in 2020," *see id.* 323:15–324:3— a plan referenced in True the Vote's Validate the Vote proposal that Ms. Engelbrecht admits was "promotional," *id*. 269:17–271:13.

135.   Despite True the Vote's assertions that the Georgia Elector Challenges did not accuse any voter of "act[ing] improperly" or seek to "remove people . . . from the voter rolls," TTV Resp. to Interrogatories No. 5 at 22, its recruitment email stated it was 99.9 percent certain that over 500,000 people on the Georgia voter rolls shouldn't be there. Williams 0375. But in her deposition, Ms. Engelbrecht stated that the 500,000 number was incorrect and that it had no way of knowing whether the 99.9 percent figure was correct. *See* TTV/Engelbrecht Tr. 232:5–234:15.

136.   One of the recruiting emails for the True the Vote challenges claimed that if the challenges had occurred in October, "it is very likely Trump would have won Georgia." Williams 0389.

137.   True the Vote's volunteers also believed they were removing people from the voter rolls and that the challenged voters were violating the law. Volunteers responded to recruiting emails stating that True the Vote could use their names and

signatures to "challenge the illegal votes." *See, e.g.*, Ex. 35, Dec. 15, 2020 Dodge County Challenger Email; Ex. 36, Dec. 18, 2020 Jones County Challenger Email; Ex. 37, Dec. 15, 2020 Barrow County Challenger Email; Ex. 38, Dec. 19, 2020 Calhoun County Challenger Email; *see also* TTV/Engelbrecht Tr. 236:6–243:19.

138.   True the Vote did not correct these responses: they furthered its mission of building "public momentum" and were consistent with True the Vote's assertions that "illegal" voting was rampant and those votes were being counted due to the malfeasance of Democratic officials. Validate the Vote 2020 at 1.

139.   On November 29, 2020, Defendants Mark Davis and Derek Somerville published a Facebook post about a scenario in which a voter dubbed "Dave" was alleged to have illegally voted in Georgia despite living in New York. In response, one individual wrote: "[c]an we start turning people in for election fraud? I have a list of a few people who should be made sorry they voted in two states," Ex. 25, Nov. 30, 2020 Davis Facebook Post at 1, of which Mr. Davis expressed support by "liking" the message.

140.   Several days later, on December 4, 2020, Mr. Somerville and Mr. Davis published another post about voters registered with UPS store P.O. boxes, and someone commented "I think a search warrant is in order here," to which Mr. Davis responded, "great idea!" Ex. 26, Dec. 4, 2020 Davis and Somerville Facebook Post

at 3. Another individual commented on this post: "[l]et's see if any one has the balls to prosecute to the max or if they will just get a hand slap!" *Id.* at 4. Yet another individual commented: "Hang that prick!!!" Ex. 27, Dec. 5, 2020 Davi and Somerville Facebook Post at 6.

141. On December 20, 2020—shortly after True the Vote submitted the bulk of its Georgia Elector Challenges—a group called "Crusade for Freedom" posted: "We just prospectively challenged the eligibility of 360,000 voters in GA. Largest single election challenge in Georgia and American history." Ex. 23, Crusade for Freedom Tweets. Two days later, Crusade for Freedom tweeted: "If the Georgia counties refuse to handle the challenges of 366,000 ineligible voters in accordance with the law, I plan to release the entire list so America can do the QC." *Id.*; TTV/Engelbrecht Tr. 264:17–265:3. Both tweets contained the hashtags #eyesonGA and #validatethevoteGA. *Id*.

142. Ms. Engelbrecht admitted that these hashtags mirrored the slogans appearing on several True the Vote documents, an internal invoice between OPSEC and True the Vote. *See* TTV/Engelbrecht Tr. 264:7–16. Ms. Engelbrecht also admitted that she was not aware of any groups other than True the Vote that challenged the eligibility of approximately 366,000 voters in Georgia during the runoff elections. *Id*. 264:2–6. And she admitted that Crusade for Freedom's logo in

its tweets matched the logo in a Facebook post from an organization named Time for a Hero—which was founded by Ms. Engelbrecht and Mr. Phillips, *id.* 37:4–6—that stated, "Crusade for Freedom coming soon," *id.* 261:10–11.

143.  About a week later, on December 30, 2020, Mr. Davis texted Mr. Somerville, "Derek, we need to stop this. If they publish they will be flooded with defamation complaints." Davis II Tr. 129:3-10; 129:11-19 (Mr. Davis describing his concern that complaints were going to be made public).

144.  Mr. Davis further explained that publishing the names would "literally mak[e] good on one of the 'Threats' alleged in [Plaintiffs'] complaint." Somerville 371. Mr. Davis texted Ms. Englebrecht to implore her not to publish the names.

**D.    True the Vote threatened to place a bounty on fraud and SEALS at polling places.**

145.  True the Vote also created a "hotline," which it used to gather information or data that OPSEC would aggregate for use in overturning electoral results. TTV/Engelbrecht Tr. 70:11–14. Yet Ms. Engelbrecht was "troubled" by the "intimidation" suffered by electors who received threats to themselves and their businesses, TTV/Engelbrecht Tr. 330:4–10, and recognized the "chilling effect" such an environment could have. *Id.* 75:13.

146.  True the Vote then announced a whistleblower fund in excess of $1 million, TTV/Engelbrecht Tr. 315:20–316:2.

147.   Historically, bounties in the voting context have been "used to direct suspicion around minority voters" by "incentivizing individuals to create or suspect fraud where there may have been none." Burton Rep. at 26.

148.   Nevertheless, Ms. Engelbrecht promoted the bounty in press releases and on her podcast, stating that "Validate the Vote is about [] putting a bounty on the fraud." Ex. 43, Engelbrecht Podcast Transcript; TTV/Engelbrecht Tr. 70:6–7.

149.   True the Vote did not report any of the tips submitted to the Validate the Vote Georgia hotline to state authorities for action or investigation. *See id*. 94:17–95:3.

150.   With respect to the Georgia Senate runoffs, True the Vote characterized its Validate the Vote scheme as part of "the most comprehensive ballot security effort in Georgia history." Dec. 14 Press Release.

151.   That "ballot security" effort also involved soliciting Georgia voters to act as "citizen watchdogs" by reporting "election fraud, manipulation or illegal action taking place." *Id*. True the Vote targeted specific citizens to serve as "watchdogs": it launched a "Continue to Serve" initiative that recruited veterans and first responders, including Navy SEALS, to monitor polling places. *See* Ex. 24, Seals at the Polls Podcast Tr. As Ms. Engelbrecht explained, polling places "need[ed] people who were unafraid to call it like they see it," and if "[y]ou want to talk about

people who understand and respect law and order and chain of command, you get some S[EALS] in those polls." Ms. Engelbrecht explained how the SEALS could "interact with voters," TTV/Engelbrecht Tr. 63:18–21, and election officials: "no, no, that is not—this is what it says and this is, this is how we're going to play the show," *id*. 62:9–12.

> **E.    Defendants' actions were objectively intimidating, and, in fact, intimidated voters.**

152.   "[V]oters whose eligibility is challenged may perceive a legal risk if they vote, which again dramatically increases the cost of voting and discourages turnout even if the individual is eligible." Mayer Rep. at 41.

153.   This risk is particularly acute for low-information voters or voters of lower socioeconomic status who may lack the resources to navigate the law or understand whether they are still eligible to vote. Mayer Rep. at 39-41.

154.   "[V]oters may be reasonably hesitant to arrive at the polls to 'prove' their eligibility if it has been challenged," particularly in a state, like Georgia, that has for the past decade "launched numerous investigations into voters accused of wrongdoing," particularly minority voters. Burton Rep. at 17–20, 25.[8]

---

[8] Georgia's "Elector Challenge" provision, O.C.G.A. § 21-2-230, was enacted over 100 years ago, the Elector Challenge provision was, like True the Vote's Validate the Vote scheme, "[g]rounded on unsubstantiated claims of voter fraud" and "the

155.   When Plaintiff Jane Doe first learned that her eligibility to vote had been challenged by Defendants by reading a local paper that publicly disclosed her name, she feared that she or her family could become the target of harassment from Defendants and their supporters if she voted. Jane Doe Decl. ¶¶ 5, 7, 9.

156.   Jane Doe was especially concerned because she had seen reports of Georgia's elections workers being harassed, threatened, and doxed after the general election. *Id.* ¶ 7.

157.   Jane Doe's information still remains publicly online to this day, and she fears she will be challenged again in future elections and that her eligibility to vote will be questioned again. *Id.* ¶ 11.

158.   Similarly, Plaintiff Jocelyn Heredia testified that she felt intimidated when she was challenged by Defendants. Heredia Tr. 44:21-45:8. Heredia was also publicly listed as a "challenged voter" on Banks County's website for six months.

---

pretext of purifying elections." Burton Rep. at 8. Designed to disenfranchise Black voters, it was used with devastating effect for decades in mass challenges to suppress Black voting power and steal elections for white supremacists, most famously Eugene Talmadge and Marvin Griffin in 1946. *See id.* 8–14. The Talmadge and Griffin mass challenges were the largest in Georgia history—until True the Vote's. *See id.* 24–25. The Talmadge and Griffin challenges were brought shortly before election day and curbed the ability of Black Georgians, who had just gained access to vote in primaries, the ability to exert influence over the primary process. *See* Burton Rep. at 24. Likewise, True the Vote brought its mass challenges not months before the election, but mere days before Georgia elected its first Black Senator to the United States Congress. *See id.* at 24–25.

*Id.* 31:24-32:3, 61:17-62:21. For Ms. Heredia, the challenge was an intimidating experience, both because of the unclear legal implications and because she felt she was being targeted as a person of color in a predominantly white county. *Id.* 44:12-45:8.

159.   Stephanie Pfeiffer Stinetorf is another voter who experienced anxiety about her ability to participate in the Georgia runoff elections in January 2021 after she was challenged by Defendants. *See infra* ¶¶ 160-166.

160.   Stinetorf moved to Georgia in 2018, and registered to vote at the time. Ex. 17, Stinetorf Decl. ¶ 2. She is a civilian employee of the United States Department of Defense, and as part of her job, received military orders to move to Germany in August 2020, at which time she submitted a change of address form to ensure she would continue to receive mail. *Id.* ¶¶ 3-4.

161.   When Stinetorf learned that her absentee ballot for the January 2021 runoff election had been challenged, she became "very confused and concerned." *Id.* ¶¶ 6-8.

162.   Stinetorf immediately emailed and called the county registrar to get more information about the challenge, and her "anxiety grew" when she did not hear back for several days. *Id.* ¶ 10.

163.   Given the demands of Ms. Stinetorf's job and the time difference between the U.S. and Germany, she was not sure that she could remedy the problem or participate in any challenge hearings to protect her right to vote, which caused her significant amount of stress. *Id.* ¶ 9.

164.   Several days after Stinetorf initially found out her ballot had been challenged, she learned that a court order prevented her county from discarding her ballot unless the challenger was able to present further information about her ineligibility. *Id.* ¶ 11.

165.   Even though these issues were eventually resolved, Stinetorf found the process of trying to figure out why she had been challenged and how she could prove her eligibility to vote in Georgia was "difficult and confusing," and she is not sure she could have personally resolved the issue if not for the intervening order allowing her ballot to be counted. *Id.* ¶ 12.

166.   Stinetorf is also concerned about the impact on her and her husband, who is also a Georgia voter stationed in Germany, of any future challenges and the time and energy it would take for them to defend their right to vote. *Id.* ¶ 13.

167.   Another voter, Gamaliel Warren Turner, Sr., is a 68-year-old retired veteran and lifelong Georgia resident who is registered to vote in Muscogee County. Ex. 18, Turner Decl. ¶ 2.

168.   Turner registered to vote when he was 18 and has voted in almost every election over the past 50 years. *Id.* ¶ 2.

169.   Turner is employed as a government contractor with the United States Navy, and in October 2019 had to temporarily relocate to Camarillo, California for his job. *Id.* ¶ 3. Turner thus submitted a postal service change of address form to avoid missing mail deliveries while away on temporary work assignment; however, he always intended to return to Georgia and thus never registered to vote in California or changed his citizenship or residence from Georgia to another state. *Id.* ¶¶ 3-4.

170.   Turner voted by absentee ballot in the 2020 primary and general election, and requested that the registrar mail his ballot to his California address for the runoff election. *Id.* ¶ 6.

171.   However, Turner was one of 4,000 voters who had been challenged by Defendants in Muscogee County. *Id.* ¶ 7.

172.   As a result of the challenges, Turner became worried about the legality of his participation in the January runoff elections. And while he successfully sued the Muscogee County Board of Elections to ensure his ballot would be counted, the "entire experience was scary, confusing, and intimidating," as he did not know how

he would resolve the situation in time to vote. *Id*. ¶¶ 8-9. Turner also had to pay an extra charge to send his ballot via FedEx for expedited delivery. *Id.* ¶ 10.

173.   As a Black voter and veteran growing up in the segregation era, he found the challenge process discouraging, and "[t]hinking back to the senseless difficulty of [his] voting experience in the January runoff elections gives [him] PTSD." *Id*. ¶¶ 11-12.

174.   Turner wonders "if it is even worth trying to vote again given the trouble that the voter challenge has caused [him]." *Id.* ¶ 11.

Respectfully submitted, this 16th day of May, 2022.

Allegra J. Lawrence
Georgia Bar No. 439797
Leslie J. Bryan
Georgia Bar No. 091175
Maia Cogen
Georgia Bar No. 832438
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com

Dara Lindenbaum
Georgia Bar No. 980780
**SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW, Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

*/s/ Uzoma N. Nkwonta*
Marc E. Elias*
Uzoma N. Nkwonta*
Christina A. Ford*
Joel J. Ramirez*
Jacob Shelly*
Tina Meng*
Marcos Mocine-McQueen*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
melias@elias.law
unkwonta@elias.law
cford@elias.law
jramirez@elias.law
jshelly@elias.law
tmeng@elias.law
mmcqueen@elias.law

*Counsel for Plaintiffs*
*Admitted pro hac vice*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the within and foregoing *Statement of Undisputed Material Facts* with the Clerk of Court using the CM/ECF system, which will automatically send-e-mail notification to all counsel of record. This 16th day of May, 2022.

*/s/ Uzoma Nkwonta*
Uzoma Nkwonta
*Counsel for Plaintiffs*