9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 9

1   answer the question, I will assume that you

2   understand it.  Does that sound good?

3        A    Yes.

4        Q    Okay.  If at any point you want to

5   take a break, let me know.  I'll try to find a

6   good place to stop.

7             The one exception is that if I'm

8   asking a question, then we have to finish

9   answering that question before we can take the

10  break.  Does that sound good?

11       A    Unless I need advice from the counsel.

12       Q    Sounds good, okay.  And as you know,

13  today a court reporter will be recording this

14  session.  The court reporter can only record

15  audible responses, so I will ask that you answer

16  with an audible yes or no.

17            A head shake, for instance, won't come

18  out on the transcript, so we need audible

19  responses.  Does that sound good?

20       A    Yes, sir.

21       Q    Okay.  And finally, if you could

22  please wait until I'm finished asking a question,

Page 10

1   that would be great, because otherwise we'll be

2   talking over each other; that way we have a clear

3   record for the Court.  Does that sound good?

4          A    Yes.

5          Q    Okay, great.  All right, so let's dive

6   right in.  So first, what did you do to prepare

7   for today's deposition?

8          A    Nothing.

9          Q    Nothing.  Did you meet with anyone

10  regarding this deposition?

11         A    Counsel yesterday.

12         Q    Okay, yesterday.  And have you

13  discussed this deposition with anyone other than

14  your attorneys?

15         A    No.

16         Q    Okay.  All right, so first I want to

17  get a little personal background.

18              How long have you been a resident of

19  Walton County?

20         A    1998.

21         Q    Since '98.  And are you a registered

22  voter in Walton County?

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 11

```
 1          A     Yes.

 2          Q     How long have you been a registered

 3    voter there?

 4          A     Since I moved in 1998.  I don't recall

 5    the exact date.

 6          Q     That's fine.

 7                And what is your occupation?

 8          A     Own a trucking company.

 9          Q     Do you also serve as the 3rd Vice

10    Chair for the 10th District of the Georgia

11    Republican Party?

12          A     No longer serve as the 3rd Vice Chair.

13          Q     No longer.  When did you serve as the

14    Vice Chair?

15          A     From the convention of 2019 to the

16    convention of '21.

17          Q     '21, great.  And during that time,

18    what were your duties as the Vice Chair?

19          A     Under our district rules, we have no

20    specific list of duties as a 3rd Vice Chair.

21          Q     Okay.  So then what did you do like on

22    a daily basis when you fulfilled that role?
```

Page 12

1          A    You're going to have to ask that

2     again.  I'm sorry.

3          Q    Sure, no problem.

4               So there were no set duties.  On a

5     daily basis while you were serving as the

6     Vice Chair, what did you do?

7          A    I did anything that was requested of

8     me by the Chair of the district, as provided in

9     our rules.

10         Q    And who was the Chair of the district

11    at the time?

12         A    The Chair of the district at the time

13    was Karen Schwinn.

14         Q    Can you give me just a few examples of

15    the sorts of things that Karen Schwinn asked you

16    to do as the Vice Chair?

17         A    Developed a GOTV for the January

18    runoff and for the November election, general

19    election last year.

20              I reorganized counties that fell into

21    the unorganized category.

22         Q    Okay.  Did you say GOTV?

Page 13

1        A     Yes, "Get Out The Vote."

2        Q     Okay, thank you.

3              Can you describe what that is?

4        A     It is plans that we do to turn out

5   Republican votes for Republican nominees.

6        Q     And you mentioned two different kinds

7   of counties in the second part of your answer.

8              Can you remind me what those are?

9        A     I'm sorry?

10       Q     You mentioned two different kinds of

11   counties, I believe, in the second part or your

12   answer.  Unorganized I think was one of them.

13              Can you describe what that is?

14       A     Unorganized county is when a county

15   does not have a local county party.  They are

16   considered unorganized within the party structure.

17       Q     Okay.  And part of your role is to get

18   them organized?

19       A     Yes.

20       Q     Okay.  So how long have you been

21   involved in Georgia politics?

22              A     Since 2010.

Page 26

1   use to develop this belief?

2       A    There's publications out there from

3   places that show voters that have voted that no

4   longer live in the state of Georgia.

5           There's just been a multiple -- I

6   mean, I can't recall all the places that I have

7   been able to pull information from over that

8   period of time, but in my gut, I believe there was

9   fraud in the state of Georgia.

10      Q    Okay.  And just to clarify then, these

11  things that you read about the people who no

12  longer live in the state of Georgia, none of these

13  sources contained any discussion of the NCOA?

14      A    I couldn't recall that specifically.

15  I mean, this was last November.

16      Q    Okay.  Did Mr. Williams know that you

17  held this belief?

18      A    I do not know the answer to that.

19      Q    Do you have a sense of why he called

20  you then to invite you to this meeting to discuss

21  the Georgia elector challenges?

22      A    As I had said earlier, we worked -- we

Page 27

1    have used each other's services for many years.

2    We are members of the Republican Party here in

3    Georgia, we have a long-standing relationship, and

4    most of the time we tend to agree.

5         Q    Before getting involved with the

6    True the Vote's Georgia elector challenges, were

7    you acquainted with any of the challengers that

8    ultimately submitted changes through

9    True the Vote?

10        A    Some.

11        Q    Some.  How did you know them?

12        A    You would have to ask specifically --

13   I mean, some of them were county chairs, some of

14   them I knew through the party, some of them I did

15   not know.

16        Q    Okay.  Any of these people that you

17   just referenced, had you worked with any of them

18   on elections or political matters before?

19        A    Political matters, some of them, yes.

20        Q    Are those were the county chairs?

21        A    Correct.

22        Q    And what sorts of political matters,

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 28

1   just a list that you can give?

2        A    Well, there would be nothing in

3   particular.  As a 3rd Vice Chair, I'm in and out

4   of counties within our district, and just talking

5   in general to the county chairs and the members of

6   their party.  No specific work relation there,

7   unless I actually had organized their county

8   during that time.

9        Q    Got it.  So for any of the challengers

10  that you ended up recruiting, did you discuss with

11  them what the challenges were based on?

12       A    Based on the National Change of

13  Address Registry.  Some I talked to, some I didn't

14  talk to.  Everything I did was virtually through

15  email, which y'all have a record of.

16       Q    All right.  So when you say

17  "talked to" then, do you mean email, or do you

18  mean also on the phone or text?

19       A    Well, I would make -- I would -- it

20  just depends on who it was.  You know, there was

21  text messages, there was emails, there were some

22  phone calls.  I mean, I can't recall who and when

1    and where.

2         Q    Okay, but you said it depends on who

3    it was.  Were there certain people in particular,

4    then, that you chose to call as opposed to email?

5         A    There were -- there were -- there

6    were -- if I had an email address, I emailed.  If

7    I didn't have an email address and could get a

8    phone number, I would talk.

9         Q    And how did you have this information,

10   either the email or the phone, beforehand?

11        A    Emails typically were people that I

12   already knew, or either were sent through a mutual

13   contact.

14        Q    And phones?

15        A    Phones were people that I already

16   knew; or they would forward emails out that had my

17   contact on it, they'd call me.

18        Q    Okay.  And who are these mutual

19   contacts that connected you with some of the

20   challengers?

21        A    County party chairmen, people just I

22   know in general.  I can't recall specific

Case 2:20-cv-00302-SCJ   Document 156-5   Filed 05/16/22   Page 10 of 51

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 30

1    individual names.

2         Q    When you say county party chairman, do

3    you mean one county in particular, or several

4    counties?

5         A    No, there would be -- like I would

6    send -- I would send an email, and basically they

7    would forward it.

8         Q    I'm sorry, can you repeat that last

9    part?

10        A    When I would send emails sometimes,

11   the people would forward the email.

12        Q    And you're talking about county chairs

13   specific here?  If you sent them an email, they

14   would forward it?

15        A    I don't -- no, not all the county

16   chairs would forward the email.

17        Q    Okay.  But some of them did?

18        A    Some.  Yes, I would think some of them

19   did.

20        Q    Okay.  You don't know for sure?

21        A    I do not know for sure.

22        Q    Did any of these county chairs that

Page 31

1   you emailed, did you have any sort of

2   correspondence with them about the email that you

3   had sent, or any calls, any sort of subsequent

4   communication?

5         A    I don't recall.  All my emails were

6   turned over.

7         Q    All of them?

8         A    Yes, sir.

9         Q    Okay.  So sometimes there were no

10  responses to the emails?

11        A    Right.

12        Q    Okay, so it's a good time to ask this

13  then.  So just generally speaking, what was your

14  role in True the Vote's Georgia elector

15  challenges?

16        A    To attempt to recruit people to

17  challenge the voters in the county.

18        Q    And were any of the challengers that

19  you recruited suggested to you?

20        A    I don't recall if any were actually

21  suggested.

22        Q    I believe you mentioned -- did you

Page 32

1    know all of the people that you reached out to

2    recruit?

3         A    No, sir.

4         Q    No.  The ones you did know, other than

5    the county chairs, we discussed that part, but

6    other challengers, how did you know them?

7         A    Some through the party, some just

8    acquaintances.  Some would be party members, some

9    would be just general acquaintances.

10        Q    All right.  And did you work with

11   anyone else to recruit challengers?

12        A    Me personally, did I work with anyone

13   to recruit challengers?  Is that the question?

14        Q    Yes, sir.

15        A    I'm sorry.

16             MR. BOPP:  Yeah.  Jim, if you don't

17   understand the question, don't rephrase it, just

18   tell him you don't understand the question.  He'll

19   be happy to rephrase it so you'll know what it is.

20             THE WITNESS:  So could you rephrase

21   the question for me, please, sir?

22

Case 2:20-cv-00302-SCJ  Document 156-5  Filed 05/16/22  Page 13 of 51

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 33

1              BY MR. RAMIREZ:

2        Q    Surely, sure.

3              So when you were recruiting

4    challengers, were you doing that solo?  Were you

5    doing that with any other people?

6        A    Myself and Ron Johnson were recruiting

7    challengers.

8        Q    Okay.  Like separately at the same

9    time, or together?

10       A    Separately at the same time.

11       Q    Okay, got it.

12       A    He took basically North Georgia, I

13   took South Georgia.

14       Q    Got it.  And over what period of time

15   did you recruit challengers for the

16   True the Vote's voter challenge effort?

17       A    I don't recall the exact amount of

18   time.

19       Q    Do you have a general sense that you

20   can give me?

21       A    A week and a half to two weeks.

22       Q    Yeah, so end state, start date, if you

Page 34

1    can recall?

2         A    I can't recall exact dates.

3         Q    Generally, would the start be before

4    or after the general election?

5         A    It was after the general election.

6         Q    Okay.  And the end dates -- let's see,

7    two or three weeks.  Would that be before or after

8    Christmas?

9         A    It was before Christmas.

10        Q    Before Christmas.

11             You didn't recruit anyone after

12   Christmas?

13        A    No, sir.

14        Q    Okay.  And, Kenzie, are you my

15   hot seater?

16             THE VIDEOGRAPHER:  Yes, I am.

17             MR. RAMIREZ:  Okay.  If we could pull

18   up Tab 1 and mark it as Exhibit 1.

19             (Cooper Exhibit 1 was marked

20              for identification.)

21             BY MR. RAMIREZ:

22        Q    Okay, can you see this, Mr. Cooper?

Case 2:20-cv-00302-SCJ  Document 156-5  Filed 05/16/22  Page 15 of 51

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 35

1          A     Yes, sir.

2          Q     And the font might be a little small

3    for you, it is on my screen, but hopefully you can

4    read it.

5               Kenzie, is there a way to scroll

6    between the pages?

7               THE VIDEOGRAPHER:  Yeah.  Do you want

8    side by side, or just one by one?

9               MR. RAMIREZ:  Let's see it side by

10   side, see if it's too small, if that works.

11              MR. BOPP:  I'm sorry, but that is very

12   difficult for me to see.  It's just too small.

13              MR. RAMIREZ:  Can we make it bigger,

14   Kenzie?  And if we can't, then let's go back to

15   one page and make it larger, and then we can

16   scroll.

17              THE VIDEOGRAPHER:  I can make one at a

18   time bigger, if that's what you want.  You want to

19   go back to one page?

20              MR. RAMIREZ:  I think that looks good.

21              Can you see that, Mr. Bopp?

22              MR. BOPP:  I can, thank you.

Case 2:20-cv-00302-SCJ   Document 156-5   Filed 05/16/22   Page 16 of 51

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 36

1          MR. RAMIREZ:  Mr. Cooper, can you see

2     that?

3          THE WITNESS:  Yes, sir.

4          BY MR. RAMIREZ:

5      Q    Okay.  So, Mr. Cooper, do you

6     recognize this email?

7      A    I do.

8      Q    Did you write this email?

9      A    I did.

10      Q    And to whom did you send it?

11      A    This was generic that I sent out to

12     the people that I had the email contact

13     information for; that would have been to some

14     county chairs, I believe, and general

15     acquaintances and whatnot, as I could obtain email

16     addresses.

17      Q    And this list of people to whom you

18     sent it, that list you developed yourself?  You

19     did not have anyone suggest names to whom to send

20     this email?

21      A    The state party had a PDF -- not a

22     PDF, an Excel spreadsheet on the state website

Page 37

1    that was a list of the county chairs.  That had

2    contact information for all the county chairs, and

3    I used that as a resource.

4          Q    All right.  So I know we covered this

5    to some extent, but I don't think I've asked this

6    specific question.

7               This particular email, did you know

8    every person to whom you sent it?

9          A    No.

10         Q    The people you did not know to whom

11   you sent it, how did you obtain their contact

12   information?

13         A    Most of the ones that got this that I

14   did not know were on the state website as county

15   party chairmen.

16         Q    And the people you did know, these

17   were affiliates of yours either through the

18   party or through personal connection?

19         A    Yes, sir.

20         Q    Did you know whether each person to

21   whom you sent this email was a registered Georgia

22   voter?

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 38

1          A    Yes, sir.  As far as the county, to

2     hold a county party office or a state party

3     office, you're required to be a Georgia voter, so

4     I did know that they were all registered voters.

5               And my acquaintances that were sent

6     this, yes, I knew they were registered voters.

7          Q    Got it.  One second.

8               Kenzie, can we see the higher part of

9     this email where it says To and From and that

10    information?  Awesome, thank you.

11              Okay, just to clarify, Mr. Cooper,

12    your email address there, does ".gop" stand for

13    Republican party?

14         A    No, sir, that's a personal gmail

15    address that I used when I was -- when I got

16    elected as the 3rd Vice Chair, I created that to

17    keep my business and my activity politically

18    separate.

19         Q    Okay.  So what does GOP stand for in

20    the email address?

21         A    Grand Old Party.

22         Q    Sorry, can you repeat that?

Case 2:20-cv-00302-SCJ   Document 156-5   Filed 05/16/22   Page 19 of 51

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 40

1   you know, party correspondence as well.

2        Q    Okay.  Would you say that every person

3   to whom you sent this email in this exhibit was a

4   registered Republican voter?

5        A    Could you rephrase?  Could you restate

6   the question, please?

7        Q    Sure.  Actually, it might be easier

8   to -- Kenzie, can we take down the blowup?

9   Thanks.  So now you can see the whole email again,

10  Mr. Cooper.

11            My question was, this email that you

12  sent, was it sent only to registered Republican

13  voters?

14       A    I can't confirm that.

15       Q    Okay.  You knew that every person to

16  whom you sent the email was a registered Georgia

17  voter; is that correct?

18       A    The people I sent the email to, I did

19  not confirm they were a registered voter, but if

20  they're on our state's list as county chair,

21  they're required to be -- one of the requirements

22  to hold an elected office in the Georgia

Page 41

1    Republican Party is to be a registered voter in

2    the county in which you reside.

3         Q    Okay.  So then is it fair to say that

4    every person to whom you sent this list -- sorry,

5    every person to whom you sent this email that

6    appeared on that list, all those people would have

7    to be registered Republican voters in Georgia?

8         A    I'm not sure that I'm understanding

9    exactly what you're asking, sir.

10        Q    Okay, I can rephrase.

11             So you stated that the one requirement

12   to be on this state list you have for the Georgia

13   Republican Party, to be on that list, you have to

14   be a registered voter in Georgia; is that correct?

15        A    Yes.  To be a county party officer or

16   a state party officer, you have to be a registered

17   voter in the county in which you reside.

18        Q    Okay.  So is it fair to say then, on

19   that list in particular, all those registered

20   voters are registered Republican voters?

21        A    In the --

22        Q    In Georgia.

Page 42

1          A     Georgia is an open primary state.  I

2     don't know if they're registered Republican or

3     not.

4          Q     Okay.  Helpful, thank you.

5                People not on the list that you knew

6     through personal connections, I want to clarify

7     that's the case.

8                If you sent an email to someone -- if

9     you sent this email to someone, and that person's

10    name wasn't on this state county list, you knew

11    about that person because you knew them

12    personally; is that correct?

13         A     Yes, unless this was forwarded to

14    someone from someone else.

15         Q     Right, right.  So anyone to whom you

16    sent this email that wasn't on the list, did you

17    know whether those people were registered

18    Republican voters in Georgia?

19         A     I couldn't confirm that, no.

20         Q     Okay.  This email that you sent -- and

21    I'm sure you can see it, it's the bottom of this

22    chain of emails in this exhibit.

Page 43

1       A     Mm-hmm.

2       Q     Is that the first contact you had with

3    each of the prospective challengers that you

4    recruited or attempted to recruit?

5       A     The initial email -- that would be the

6    initial email that I would send, yes.

7       Q     Any person to whom you sent the email,

8    did you have any prior contact with them about the

9    Georgia elector challenges?

10      A     There were some that I only had a

11   phone number for that I had to call to get an

12   email address.

13      Q     Okay.  And in those conversations, did

14   you discuss the elector challenges at all?

15      A     Basically I would outline what we was

16   doing, just like this initial email, and then get

17   the email address and send them the email.

18      Q     Okay.  Did you have a script for any

19   of these calls?

20      A     Basically you're looking at the

21   script.

22      Q     Okay.  Other than the people who

Case 2:20-cv-00302-SCJ   Document 156-5   Filed 05/16/22   Page 23 of 51

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 44

1   forwarded this email, and other than yourself, did

2   anyone else send this email to prospective

3   challengers?

4        A    I do not know the answer to that.

5        Q    How many people replied to your email?

6        A    I couldn't recall the answer to that.

7        Q    I'm sorry, just making sure you were

8   finished.

9             Is there a tracker or perhaps a

10  document that would help refresh your memory on

11  that topic?

12       A    I'm sorry?

13       Q    If you can't recall, is there a

14  tracker or is there a document that would help

15  refresh your memory on that topic, the number of

16  people that responded to this email?

17       A    I mean, I turned over all of the

18  emails that I had.

19       Q    Did anyone call or text you in

20  response to receiving this email?

21       A    I do not recall.  I mean, I don't -- I

22  simply just don't remember.

Page 45

1          Q     Okay.  Then maybe a more useful

2     question would be, after you sent this email, sort

3     of what happened next as part of your recruitment

4     process?

5          A     When I sent this email, if they

6     replied -- if they replied back that they wanted

7     to challenge, I would then forward the email to --

8     oh, my goodness, I can't recall all of the emails,

9     but it was a group of emails.  One was to

10    Mark Williams, one was -- I mean, I'd cc

11    Mark Williams in sending it.

12               Because what I'd do is, once they sent

13    in what True the Vote needed as far as their

14    voter ID, their signature, and statement that they

15    could -- you know, they would challenge the voters

16    or the electors in their county, I would then

17    forward that back to Mark Williams, Ron Johnson,

18    Catherine, there was two other gentlemen, and Amy,

19    a lady named Amy, and I believe that was it.

20               So if they replied back to it with

21    permission, I would forward or send their reply,

22    the whole chain, to that group of individuals.

Page 55

1               So your recruitment work in this case

2      for True the Vote, other than the Defendants in

3      this case, did you discuss that with anyone else?

4           A    I'm unsure about what you're actually

5      asking.

6           Q    So you were involved in helping to

7      recruit challengers for True the Vote during the

8      runoff, right?  Is that correct?

9           A    Yes.

10          Q    Did you discuss that, your role in

11     recruiting challengers for this effort, did you

12     discuss that with anybody -- with anyone?

13          A    With the folks that I was trying to

14     recruit, yes.

15          Q    Okay.  And I assume also with the

16     other Defendants in this case?

17          A    Yes.

18          Q    Anyone else?

19          A    No, not that I'm aware of.

20          Q    Got it.  Okay, give me one moment.

21               Kenzie, can we take this one down and

22     pull up Tab 2 and mark it as Exhibit 2?

Page 56

1               (Cooper Exhibit 2 was marked

2                for identification.)

3               BY MR. RAMIREZ:

4          Q     So this one is a little bit longer.

5     It's a few pages.  Could we blow this up a bit,

6     just the whole page?  Is there a way to do that?

7     Yeah, great, okay.

8               Mr. Cooper, I'll give you a

9     few minutes here to look over this document.

10    There are a few pages here, so I'm not sure if you

11    can scroll.  Looks like I cannot, so, Kenzie, you

12    might have to do that for him.

13              Mr. Cooper, go ahead and review this

14    document, and let me know when you're ready.

15              THE VIDEOGRAPHER:  And you can just

16    let me know when you're done reading, and I'll

17    scroll down for you.

18              THE WITNESS:  Okay, this is starting

19    at the end.  Can we go to the beginning first?

20              THE VIDEOGRAPHER:  This is the last

21    page of this little bit, and then this is the next

22    to last.

Case 2:20-cv-00302-SCJ   Document 156-5   Filed 05/16/22   Page 27 of 51

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 57

1              MR. BOPP:  You're going to have to

2    make that bigger because I can't possibly read

3    that.  I'm sorry.  Thank you.

4              THE WITNESS:  Okay, can we go to the

5    bottom of this, please?

6              (Witness reviewing Exhibit 2

7               on Zoom screen.)

8              THE VIDEOGRAPHER:  I believe this is

9    the first page.

10             MR. RAMIREZ:  That's right.

11             Okay, can we blow up the first half of

12   the page?  Yeah, above that, actually.  I want the

13   first email.  Yeah, thank you.

14             THE VIDEOGRAPHER:  You're welcome.

15             BY MR. RAMIREZ:

16        Q    Okay.  All right.

17             So Mr. Cooper, do you see where you've

18   written, "I have not updated any shared files with

19   the counties I have sent in"?

20        A    I have not updated -- I have not

21   updated any files with the counties I have sent

22   in, yes.

Page 58

1           Q     Yes.  So what are those shared files

2     that you're referring to?

3           A     That would be the -- that would be

4     that spreadsheet that was downloaded from the

5     state party's website that would go in, and if it

6     was the county chair that was going to challenge,

7     their information was already there.  And if it

8     was not the county chair, Amy would put in the

9     name of the person that was challenging.

10          Q     And what do you mean by the counties

11    that you have sent in?

12          A     Well, if you go in the order of this

13    email, you will have seen that I had Clarke,

14    Hancock, Dodge, and I don't recall the other

15    counties listed in the email at the beginning of

16    this, but none of those counties were updated, and

17    that's what this email was referring to.

18          Q     Okay.  So "sent in" refers to updating

19    the shared file?

20          A     Correct.

21          Q     Got it.  So this email dated

22    December 17 at 9:40 a.m., do you see that?

Page 59

1          A     Yes, sir.

2          Q     Okay.  By this time, had you finished

3     recruiting challengers for the Georgia elector

4     challenge?

5          A     I don't remember.

6          Q     Can we exit out of this, Kenzie?

7     Thanks.  And then let me see if we can see it.

8     Can we blow up the next email in this thread?

9               THE VIDEOGRAPHER:  Starting with "Good

10    morning everyone"?

11              MR. RAMIREZ:  Yeah.  Great, thank you.

12    Okay.

13              BY MR. RAMIREZ:

14         Q     Mr. Cooper, do you see where

15    this email from James Williams references

16    "final files"?

17         A     Let me move this out of the way so it

18    doesn't cover it up.  Yes.

19         Q     So what does that mean, "final files"?

20         A     I do not know exactly what "final

21    files" mean.  Mr. Williams was the one that was

22    doing the printing of the letters, so I really

Page 60

1   don't know what his final files would be -- would

2   mean.

3         Q    Does it perhaps mean the shared files

4   that you reference in the next email?

5         A    I do not know.

6         Q    Okay.  Did you send Mr. Williams any

7   information regarding the voter challenges after

8   he sent you this email?

9         A    I do not remember.

10        Q    Okay.  Can we take this one down,

11  Kenzie?  Thanks.  And can we actually pull this

12  one down and put Exhibit 1 back up?  Okay.

13             And then can we blow up the last piece

14  of this email where it says "On Wednesday," there

15  to the end?  Great, thanks.

16             Okay, Mr. Cooper, do you see where you

17  write we have identified over 500,000 people in

18  the state of Georgia?

19        A    Yes.

20        Q    How did you come up with that 500,000

21  number?

22        A    That is -- that is what in the meeting

Page 73

1          Q     Okay.  You never called him?

2          A     I didn't call him, I don't believe.

3     Honestly, I couldn't -- I couldn't swear to that.

4     I really can't remember.

5          Q     Okay.  All right, Kenzie, can we take

6     this one down and put up Tab 3 and mark it as

7     Exhibit 3?

8                (Cooper Exhibit 3 was marked

9                 for identification.)

10               BY MR. RAMIREZ:

11          Q     How are you doing, Mr. Cooper?  Do you

12     need a break, or we're doing good?

13          A     I'm good.

14          Q     All right, great.  Okay, let's see if

15     we can blow this up.  Is this just one page?  Two

16     pages.

17               THE VIDEOGRAPHER:  Do you want side by

18     side again, or just pull up the first one?

19               MR. RAMIREZ:  Can we blow up the

20     second one, actually.

21               THE VIDEOGRAPHER:  Okay.

22               MR. RAMIREZ:  Great, okay.

Page 74

1           BY MR. RAMIREZ:

2           Q    Okay, so Mr. Cooper, the last

3    paragraph, I suppose, of the last email that

4    starts "Another question," do you see that?

5           A    Which -- you're talking about the

6    bottom one, the one that I sent, or the top one

7    where it says, "Mark, can you extract the names

8    for this request?"

9           Q    The bottom one.

10          A    Yes.

11          Q    Okay.  This is another question that

12   you refer to in that paragraph that you're getting

13   from folks.  How are you getting that question?

14   How are they communicating with you?

15          A    This was in reference to Mr. Martin

16   there in Taliaferro County wanting to see the list

17   of names before he agreed to challenge.

18          Q    Just him?

19          A    Yes, sir.

20          Q    Okay.  And you say afterwards --

21          A    Yeah, I went ahead and read that.  Go

22   ahead and ask your question.

Page 75

1          Q     Yeah.  So what does that mean,

2     "afterwards"?  After what?

3          A     I was -- I had some people ask if they

4     could get the list that they challenged after the

5     challenges were made so that they would know if

6     they was to be asked a question who they had

7     challenged.

8          Q     How many people about would you say

9     asked you for this afterwards?

10         A     I don't know the exact number of

11    people that had asked.

12         Q     Ballpark figure?

13         A     Maybe three or four.

14         Q     Okay.  So then for those three or four

15    people, does that mean that the challenges were

16    submitted in their names before they saw the

17    lists?

18         A     Yes.

19         Q     Was that true of all the people you

20    recruited?

21         A     No.  Mr. Martin wanted to see the list

22    before he agreed to challenge.

Case 2:20-cv-00302-SCJ   Document 156-5   Filed 05/16/22   Page 34 of 51

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 76

1          Q     Right.  And is he the only one that

2     actually saw the list before submitting

3     challenges?

4          A     To the best of my memory, yes.

5          Q     Okay.  So this first paragraph in the

6     email you sent, "I have one chair in the 10th,"

7     that refers to Mr. Martin?

8          A     Yes, sir.

9          Q     Okay.  And forgive me if this is a

10    stupid question, but what is he the chair of?

11         A     Taliaferro County Republican Party.

12         Q     Okay.  Which is in the 10th --

13         A     10th Congressional District.

14         Q     Okay, got it.

15               And did you know Mr. Martin previously

16    before communicating with him about the Georgia

17    elector challenges?

18         A     I did.

19         Q     How did you know him?

20         A     I was the 3rd Vice Chair of the

21    10th District, and he was the Chair in the

22    10th District.

Case 2:20-cv-00302-SCJ   Document 156-5   Filed 05/16/22   Page 35 of 51

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 77

1          Q     Okay.  So does that mean he -- let me

2     just clarify.  I got a little confused.

3                I think you mentioned a Karen Sweeney,

4     is that correct, earlier?

5          A     Chairman Schwinn, Chairwomen Schwinn

6     was the Chair.

7          Q     She was the District Chair of the

8     10th?

9          A     She was the District Chair of the

10    10th.

11         Q     And Mr. Martin was?

12         A     He was the County Chairman of

13    Taliaferro County.

14         Q     Got it, okay.

15               When did you first contact Mr. Martin

16    about the Georgia elector challenges?

17         A     I do not recall the exact date.

18         Q     Was that initial outreach email that

19    we pulled up before in Exhibit 1, was that the

20    first contact you made, or did you contact him

21    before sending that email?

22         A     I don't recall, honestly.

Page 78

1          Q     If you had contacted him, would it

2     have been by email or phone?

3          A     I don't recall how I contacted him

4     initially.

5          Q     Okay.  But your subsequent

6     communications with him, they were all email?

7          A     Yes, to the best of my recollection.

8          Q     When did Mr. Martin first ask you to

9     see the list of names that he was challenging?

10         A     I don't recall.

11         Q     So this email was dated December 16.

12               Do you see that?

13         A     Yes, sir.

14         Q     Is it fair to say that he asked you to

15     see the list of names before you sent this email?

16         A     Yes, sir.

17         Q     Okay.  This is at 3:25 p.m.

18               Kenzie, can we take this down for a

19     second and put Exhibit 1 back up?  And then can we

20     blow up the last email which starts "On

21     Wednesday"?  Okay.

22               Do you see the date on this email as

Page 103

1    challenge list?

2          A     Not that I recall.

3          Q     What was the extent of your

4    communication with Ms. Engelbrecht as part of this

5    challenge effort?

6          A     Email.

7          Q     What did you discuss with her?

8          A     Instances like this where I forwarded

9    the challenge -- this request of Mr. Martin, and

10   all of the challenges that -- or challengers that

11   agreed to challenge, she received the cc's.

12         Q     How often did she respond to the --

13   like this, like email.  How often did she reply by

14   email to the emails that you had forwarded to her?

15         A     I don't remember.

16         Q     Was it for more or less than 50% of

17   the challengers you recruited?

18         A     Honestly, I don't remember.

19         Q     Did you ever have a phone conversation

20   with Ms. Engelbrecht about the elector challenges?

21         A     I don't remember.

22         Q     You mentioned at least one, the

Case 2:20-cv-00302-SCJ   Document 156-5   Filed 05/16/22   Page 38 of 51

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 104

1    meeting at Mr. Williams' house where you said she

2    was on the phone.

3          A    Yes, she was on conference call in the

4    initial meeting.

5          Q    Right.  Were there any other instances

6    where Ms. Engelbrecht spoke to you over the phone

7    regarding the elector challenges?

8          A    Not directly, no.

9          Q    What do you mean, not directly?

10         A    I believe there was one Zoom meeting

11   after the -- with the attorneys.

12         Q    Okay.  After what?

13         A    After we received the lawsuit.

14         Q    Got it, okay.

15              So in this email from Ms. Engelbrecht,

16   do you see where she refers to putting together a

17   one-pager to support challengers?

18         A    Yes, sir.

19         Q    Did she ever send that one-pager to

20   you?

21         A    I don't remember.  I don't believe so.

22         Q    Were you ever provided anything from

Case 2:20-cv-00302-SCJ   Document 156-5   Filed 05/16/22   Page 39 of 51

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 105

1   True the Vote to send to the challengers you

2   recruited?

3          A    Say that one question one more time,

4   please.

5          Q    Sure.  Were you ever provided anything

6   from True the Vote to send to the challengers you

7   recruited?

8          A    No.

9          Q    No.  So all the communications you had

10  with the challengers, those were -- that wasn't a

11  script or anything?  That was something that you

12  yourself drafted, wrote, sent to them?

13         A    Correct.

14         Q    Okay.  And then do you see in your

15  email here where you state, "I'll look for someone

16  else in Taliaferro county"?

17         A    Yes.

18         Q    Are you referring to another

19  challenger?

20         A    Yes.

21         Q    Did you find another challenger?

22         A    No.

Page 106

1          Q     No.  So to your knowledge, were any

2     challenges submitted in Taliaferro County after

3     you sent this email?

4          A     I do not know.

5          Q     When you were looking for someone

6     else, as it says in this email, what were you

7     doing?

8          A     In looking for a challenger, I

9     basically go back to a list of acquaintances that

10    I know personally, and at the same time that this

11    was going on, I was also recruiting for the

12    other -- the other south portion of the state.

13               So to the best that I can recall, I

14    didn't even attempt to reach out to anyone else in

15    Taliaferro County.

16          Q     Okay.  So if you weren't reaching out

17    to anybody, what were you doing when you were

18    looking for someone else, as that sentence says?

19          A     Well, the sentence states that I will

20    look for someone else.  It didn't say I was going

21    to get someone else.  So I basically focused on

22    other counties.

Page 107

1          Q     Got it, okay.

2                So after you sent this email, you did

3    not attempt to recruit someone else in Taliaferro

4    County?

5          A     Not that I can remember, no.

6          Q     Okay.  The end of this email that you

7    sent, you wrote from having talked to individuals

8    over the weekend.  Do you see that?

9          A     Yes.

10         Q     Were these people that you talked to

11   challengers?

12         A     These people that I was talking to, I

13   was trying to recruit as challengers.

14         Q     Okay.  So they were not challengers

15   yet?  They had not yet given permission?

16         A     Correct.

17         Q     Okay.  Why would those people have

18   been contacted by the counties to make their case?

19         A     It was in the news here in the state

20   of Georgia about the elector challengers, and it

21   was widely known that county election offices was,

22   you know, trying to -- was making people make

Page 113

1    but I don't know.

2          Q    Yeah, just to be clear, I'm not asking

3    you to make assumptions, just anything that you

4    were told in these conversations.  Did these

5    people explain to you why they didn't want to make

6    their case?

7          A    Not that I remember.

8          Q    No one did?  Did Mr. Martin explain --

9    well, let me take a step back.

10          So you say that -- do you see where

11   you say, "Now that's not the case with Joe"?

12         A    Right.  Mr. Martin's reason for

13   wanting to withdraw is in his email.

14         Q    Okay.  But that means that he

15   didn't -- the reason why he wanted to withdraw is

16   different than the other people you reference in

17   this email; is that correct?

18         A    Correct.

19         Q    Okay.  And when you say that's not the

20   case with Joe, do you mean that he is not running

21   off?

22         A    No.  It means that the reason that he

Page 114

1    is wanting to withdraw is different than the folks

2    that I was trying to recruit.

3          Q    Okay, meaning that Mr. Martin was fine

4    making his case?

5          A    Correct.

6          Q    Okay.  So I'm going to ask a few more

7    questions about this one, but I want to refer back

8    to a different exhibit that we have, Mr. Cooper.

9               So, Kenzie, can we pull this down and

10   put Exhibit 1 back up?  Thanks.  And then just the

11   first half of this exhibit up until -- let's go

12   down to where it says, "Best, Caesar Gonzalez."

13   Yeah, that's great, thanks.

14              So I know we've already seen this

15   exhibit, Mr. Cooper, but I want to just confirm

16   that you recognize this first email as well

17   because I don't think we've talked about it yet.

18         A    Yes.

19         Q    Okay.  So how did you know

20   Mr. Gonzalez?

21         A    He was -- Mr. Gonzalez was referred to

22   me.  I don't remember who he was referred by.

Page 115

```
 1        Q    I just want to make sure I understand.

 2             So some of the people you reached out

 3   to were referred to you to reach out to?

 4        A    Yes.

 5        Q    And who referred them to you?

 6        A    I don't remember who referred

 7   Mr. Gonzalez.

 8        Q    Do you have a sense of who it might

 9   have been?  Would it be -- would it be one of the

10   county chairs perhaps?

11        A    I don't remember who referred

12   Mr. Gonzalez.

13        Q    Okay.  And you don't know -- how do I

14   phrase this?

15             Any referrals you would have received,

16   would they have been from your professional

17   network, so your capacity as a business owner?

18        A    No.

19        Q    Would it have been through people that

20   know you through your involvement in GOP politics

21   in Georgia?

22        A    Yes.
```

Page 116

 1          Q    Okay.  So in this email to Mr. Cooper,

 2    Mr. Gonzalez said he got a call from Douglas

 3    County asking how he wants to handle the

 4    challenged ballots.  Do you see that?

 5          A    Yes.

 6          Q    Is this an example of the kind of

 7    conversations that you were having in the last

 8    exhibit we looked at?

 9               We can pull that back up if you need

10    to see it again.

11          A    Yes, I can't remember exactly the

12    call, but he was being requested to come in and

13    present his case.

14          Q    Okay.  So this is after his challenge

15    was submitted?

16          A    Yes.

17          Q    Okay.  And he asks you, "How do I

18    handle this?"  Do you see that?

19          A    Yes.

20          Q    So what did you tell him?

21          A    Yes, I see that now.

22          Q    Okay.  And what did you tell him?

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 117

1          A    That was -- when I spoke with him, I

2    told him basically the same thing that Catherine

3    had referred in the past email, is that it is not

4    required.

5          Q    Okay.  And did you reply to this email

6    to tell him that?  Did you call him?  How did you

7    tell him that?

8          A    I don't remember.

9          Q    Okay.  Did you ever reply to this

10   email?

11         A    I do not remember.

12         Q    Okay.  So you said you told him

13   essentially what Catherine Engelbrecht told you,

14   that he was not required to show up to make his

15   case; is that correct?

16         A    I'm pretty sure that that's what was

17   told to him.

18         Q    Okay.  Did you give similar advice to

19   the other challengers who talked to you about

20   their concerns that the county is contacting them?

21         A    I don't remember.

22         Q    Well, would it have been the same

Page 137

1            Did True the Vote instruct you to

2    reach out to those chairs?

3         A    No.

4         Q    Did anyone instruct you to reach out

5    to them?

6         A    No.

7         Q    So at this initial meeting we

8    discussed where -- at Mark Williams' -- I think

9    you said place of business; is that correct?

10        A    Correct.

11        Q    At that meeting, did they ask you to

12   recruit challengers?

13        A    They asked if I would be willing to

14   help recruit challengers, yes.

15        Q    And why did they ask you that?

16        A    I don't know.

17        Q    Did they indicate why they thought you

18   would be a good person to do recruiting?

19        A    I do not know.  Mark Williams called

20   me and asked me to come to the meeting.

21        Q    Did he say why he thought you should

22   be involved in the meeting?

Page 138

```
 1          A     He thought that I would be interested

 2     in what they was going to discuss.

 3          Q     Okay.  But he didn't suggest to you

 4     that you should do recruiting?

 5          A     Prior to the meeting, no.

 6          Q     And at the meeting --

 7          A     At the meeting, I was asked if I would

 8     be willing to recruit.

 9          Q     And who asked you that?

10          A     It would have been -- I can't remember

11     the gentleman's name again.  Oh, Gregg Phillips

12     and Catherine Engelbrecht.

13          Q     And when they asked you to recruit,

14     did they say why they thought you should be the

15     one to do that?

16          A     No.  They just asked if I would be

17     willing to help them in recruiting.

18          Q     Did they -- do you know if they -- did

19     they mention, other than yourself and Ron Johnson,

20     whether they were looking to enlist anyone else to

21     help with the recruitment part of the challenges?

22          A     I don't remember the exact whole
```

Page 139

1    conversation that evening.

2          Q     How long was the conversation?

3          A     I don't remember exactly.

4          Q     Were you aware of any other similar

5    conversations that True the Vote was having with

6    the volunteers in Georgia?

7          A     No.

8          Q     Did you recruit any democratic county

9    chairs to be challengers?

10         A     Not that I'm aware of.

11         Q     Did you attempt to reach out to any of

12   them?

13         A     No.  I do not have access to Democrat

14   Party chairmen's list.

15         Q     Do you know who they are or their

16   contact information?

17         A     I do not.

18         Q     No.  So that's not like on a website

19   where the information for the GOP chairs is?

20         A     I do not know.

21         Q     Do you know if any of the individuals

22   you recruited were registered Democrats?

Page 140

1        A     I do not know.  Georgia is an open

2    primary state, so there's no requirement of

3    registration by party affiliation.

4        Q     Okay.  Kenzie, can we take down this

5    exhibit and pull up Exhibit 1 again?  Great.  And

6    then can we blow up the last email starting "On

7    Wednesday."  Yeah, thank you.  Give me a second

8    here.

9              Okay, Mr. Cooper, do you see at the

10   end of the second paragraph here, starting the

11   sentence, "If this very type action had been taken

12   in October it is very likely Trump would have won

13   Georgia!  We can't look back now we must look

14   forward and save the senate!"

15       A     That's correct.

16       Q     This email comes from your .gop

17   address; is that right?

18       A     Yes.

19       Q     So did you send this email to -- you

20   said you don't know, that Georgia is an open

21   primary state, but do you know specifically

22   whether any individual to whom you sent this email

Page 141

1    was a Democratic voter?

2          A    Do not know.

3          Q    Okay.  What do you mean by "save the

4    senate" here?

5          A    I am a Republican, I vote Republican,

6    and by "saving the senate," I meant exactly save

7    the senate.

8          Q    I'm not sure what you mean, though, by

9    "save the senate."  Can you elaborate?

10         A    Republicans control the senate at this

11   time.  If we lose the two Republican senate seats

12   in the state of Georgia, we lose the senate as

13   Republicans.

14         Q    Okay.  Is it safe to say that one of

15   the goals that you wanted to forward with getting

16   involved with the True the Vote project was to

17   make sure that Republicans won the runoff

18   election?

19         A    Wanted to make sure that the election

20   was fair.

21         Q    Even if that meant that Democrats won?

22         A    Even if that means Democrats win.