Case 2:20-cv-00302-SCJ   Document 156-6   Filed 05/16/22   Page 1 of 15

9/23/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

Page 17

```
 1   this e-mail?
 2          A.     No.
 3                 MS. KRAMER:  Counsel, can you guys
 4          please zoom in to this e-mail.  Even on my
 5          laptop, it's kind of hard to see, if you
 6          don't mind.  That's much better.  Thank you.
 7   BY MS. TAYLOR:
 8          Q.     Mr. Williams, can you still see the
 9   exhibit?
10          A.     Yes, I can read it fine on my phone.
11          Q.     Great.
12                 It looks like, from your reply, that
13   Catherine Engelbrecht was cc'd on the e-mail.
14                 Did you know who she was before this
15   e-mail?
16          A.     No.
17          Q.     Okay. And had you heard of True the
18   Vote before this e-mail?
19          A.     No.
20          Q.     Okay. So this was your first contact
21   with them or with anyone at True the Vote?
22          A.     Let me clarify that answer.  The
```

Case 2:20-cv-00302-SCJ   Document 156-6   Filed 05/16/22   Page 2 of 15

9/23/2021              Fair Fight, Inc. et al. v. True the Vote, et al.              Mark Williams

Page 18

1   chairman of the GOP told me that he had given them
2   my number.  And that's the first I've heard of them.
3   So this was -- this was a follow-up e-mail to that,
4   but that was the first I've heard of them.
5        Q.    Okay.  And who is the chairman of the
6   GOP that's being referenced here?
7        A.    David Shafer.
8        Q.    And is he the chairman of the Georgia
9   state GOP or county?
10       A.    State.
11       Q.    And how do you know -- how do you know
12  Mr. Shafer?
13       A.    We do a lot of printing with them and
14  things like that, so he knows me as a printer.
15       Q.    Okay.  And do you know what his
16  relationship with True the Vote is?
17       A.    I have no idea.
18       Q.    He just reached out to you and put you
19  in touch -- or let you know that they would be
20  reaching out to you, rather?
21       A.    Correct.
22       Q.    Okay.  And we'll get into this a

Case 2:20-cv-00302-SCJ   Document 156-6   Filed 05/16/22   Page 3 of 15

9/23/2021           Fair Fight, Inc. et al. v. True the Vote, et al.           Mark Williams

Page 19

1    little bit more a little later on, but can you just
2    describe for me at a very high level your
3    involvement with True the Vote after this e-mail.
4         A.    I met with Gregg.  And he explained
5    that they were trying to -- they needed to print the
6    letters and explained the job to me.  And I told him
7    what we can do and things along those lines.  So
8    they were bringing that to me.
9         Q.    When you say "letters," are you
10   referring to the challenge letters that True the
11   Vote issued in the January runoff election?
12        A.    Correct.
13        Q.    And who did you generally
14   communicate -- during the scope of this printing
15   project that you were doing with True the Vote, who
16   did you communicate with?
17        A.    I believe it was almost always Gregg.
18   I believe that's correct.
19        Q.    Did you have any other interactions
20   with Catherine Engelbrecht?
21        A.    I spoke with her on the phone a few
22   times, but I think that's about it.

Case 2:20-cv-00302-SCJ   Document 156-6   Filed 05/16/22   Page 4 of 15

9/23/2021           Fair Fight, Inc. et al. v. True the Vote, et al.           Mark Williams

Page 20

1    Q.    What about with James Cooper; did you
2    work with him at all for this project?
3    A.    Vaguely.  Very vaguely.
4    Q.    When you say "vaguely," just so that
5    we're clear, what do you mean by that?
6    A.    I introduced them -- James Cooper to
7    them.  And so -- and so I didn't work with him in
8    any capacity, but I did introduce them.
9    Q.    How do you know James Cooper?
10   A.    I've known him many years through
11   mostly Republican party stuff.
12   Q.    Did you work with a Ron Johnson at
13   all?
14   A.    In the same capacity.
15   Q.    Did you know him previous?
16   A.    Yes, I've known him for a long time,
17   too.
18   Q.    Through your printing company?
19   A.    Through Republican party mostly.
20   Q.    Okay. And what about Mark Davis?
21   A.    Yes, I know Mark Davis.
22   Q.    And Derek Somerville?

Case 2:20-cv-00302-SCJ   Document 156-6   Filed 05/16/22   Page 5 of 15

9/23/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

Page 21

 1       A.    Met Mark [inaudible] Derek Somerville,
 2   I think.
 3       Q.    Do you recall working with anyone else
 4   at True the Vote during this time?
 5       A.    Not -- no, I don't.
 6       Q.    How about anyone else at OPSEC?
 7       A.    At where?
 8       Q.    OPSEC, which was Gregg Phillips'
 9   company.
10       A.    No.  No, not at all.
11       Q.    When you were generally communicating
12   with these people, you said mostly you were
13   interacting with Gregg Phillips for this project,
14   was that mostly over e-mail?  Or how were you
15   communicating?
16       A.    It was almost all phone calls just
17   about.  And we didn't have a lot of interaction,
18   just -- it was basically just a customer/vendor
19   relationship.
20       Q.    Okay. What -- can you broadly
21   describe what those -- what types of customer/vendor
22   interactions you're talking about?

Case 2:20-cv-00302-SCJ   Document 156-6   Filed 05/16/22   Page 6 of 15

9/23/2021                Fair Fight, Inc. et al. v. True the Vote, et al.                Mark Williams

Page 22

1     A.     Well, they brought the project here
2     and we discussed it.  And then once we did, then we
3     produced the job and got it to them.
4     Q.     So what did True the Vote ask you to
5     do with regard to compiling these challenge lists?
6     A.     They sent us lists and we printed
7     them.  They sent us the list -- well, they sent us
8     the individual letters, is what they sent us, files
9     with the individual letters, and we printed them and
10    gave them the copies.
11    Q.     So you printed the letters and then
12    gave them back to True the Vote?
13    A.     Yes.
14    Q.     Did you do anything else?
15    A.     Not that I recall.
16    Q.     Okay.  Why did you agree to work with
17    True the Vote?
18    A.     Well, as I said, it was a
19    customer/vendor relationship.  And when they told me
20    that they were trying to -- that they had intentions
21    of working to challenge a lot of the votes and
22    things, I introduced them to a couple of people,

Case 2:20-cv-00302-SCJ   Document 156-6   Filed 05/16/22   Page 7 of 15

9/23/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

Page 23

1   which was Ron Johnson and James Cooper.  And then it
2   went from there, so that was it.
3          Q.    Okay.  Did you reach out to anyone to
4   ask them to become a challenger on behalf of True
5   the Vote?
6          A.    Not that I recall.
7          Q.    Okay.  But you did reach out to James
8   Cooper and to Ron Johnson?
9          A.    Correct, to introduce them to Gregg
10  and his group.
11         Q.    Okay.  And do you know what Ron
12  Johnson and James Cooper did for True the Vote?
13         A.    I wasn't involved in that part, so not
14  really.
15         Q.    You have no idea?
16         A.    No idea.
17         Q.    When you introduced them, what were
18  you -- what did you think you were introducing them
19  for?
20         A.    For their connections to people all
21  across the state, that they might be able to help
22  them make connections across the state.

Case 2:20-cv-00302-SCJ   Document 156-6   Filed 05/16/22   Page 8 of 15

9/23/2021         Fair Fight, Inc. et al. v. True the Vote, et al.         Mark Williams

Page 24

1      Q.     Connections for what?
2      A.     To -- I guess to do the challenges.  I
3   just knew that both of these guys were real big in
4   the party and stuff and held positions and things
5   like that.  So I just assumed that they would be
6   able to help them be introduced to people and
7   things.  So I introduced them to them.
8      Q.     Did True the Vote -- or did Gregg ask
9   you to reach out to anybody you might know who might
10  be able to do that?
11     A.     No.  He described what they were
12  doing.  And I thought there was a couple people that
13  might be able to help him, so I just introduced
14  them.
15     Q.     So how did you reach out to Mr. Cooper
16  and to Mr. Johnson in order to introduce them to
17  Mr. Phillips and True the Vote?
18     A.     To the best of my recollection, it was
19  phone calls.
20     Q.     What did you tell them?
21     A.     That I had somebody that they probably
22  should meet and have a discussion with.

Case 2:20-cv-00302-SCJ   Document 156-6   Filed 05/16/22   Page 9 of 15

9/23/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

Page 25

1      Q.     No other details?
2      A.     Not that I recall.
3      Q.     Did you tell them anything about the
4    project True the Vote was working on?
5      A.     I don't recall.
6      Q.     Okay.  So you just asked them to come
7    meet this guy you knew?
8      A.     Yes.  That they were working on
9    something they might be interested in, I think is
10   what I said.
11            MS. TAYLOR:  Kenzie, can we pull up
12       0759.
13            (Exhibit 2, Bates Nos. Def Williams
14       0759-780, E-mail Chain, received and marked.)
15   BY MS. TAYLOR:
16     Q.     Mr. Williams, this is a very long
17   e-mail thread, unfortunately.  And you're more than
18   welcome to scroll through the whole thing, but I can
19   represent to you today that it's a series of
20   forwarded e-mails that all end up with you at the
21   end.
22                   And I'd like to turn your attention to

Case 2:20-cv-00302-SCJ   Document 156-6   Filed 05/16/22   Page 10 of 15

9/23/2021         Fair Fight, Inc. et al. v. True the Vote, et al.         Mark Williams

Page 112

1   did you believe were the problems with this
2   election?
3       A.    Well, I do believe that there was a
4   lot of votes that were placed that were not -- that
5   shouldn't have been placed.  And the NCOA is the
6   place that it was showing up and exposing that.  And
7   I felt like we were the -- and that's why I agreed
8   to do the Gwinnett County challenge or I chose to do
9   the Gwinnett County challenge, because I felt like
10  it was -- there was some things going on and I
11  wanted it exposed.
12      Q.    Just so that we're clear, are you
13  referring to this happening with the general
14  election in November or with the runoff election in
15  January or both?
16      A.    I would say both.
17      Q.    And did this -- did this feeling you
18  have inform your decision to work with True the Vote
19  for this challenge project?
20      A.    Yes -- well, not for the printing
21  project.  It gave me the -- the want to be the
22  challenger in my county, but as far as working with

Case 2:20-cv-00302-SCJ   Document 156-6   Filed 05/16/22   Page 11 of 15

9/23/2021               Fair Fight, Inc. et al. v. True the Vote, et al.              Mark Williams

Page 113

1    the project, the project itself here was just a

2    printing project.  So that was -- it's almost like

3    two different issues.

4                MS. TAYLOR:  Can we pull up

5         Document 0855 and mark it as the next

6         exhibit.

7                (Exhibit 19, Bates Nos. Def Williams

8         0855, 12/17/20 Letter, received and marked.)

9    BY MS. TAYLOR:

10        Q.    Do you recognize this, Mr. Williams?

11        A.    Hold on just a second.  Let me see.

12              (Document review.)

13              THE WITNESS:  Yes.

14   BY MS. TAYLOR:

15        Q.    Is this your challenge letter or one

16   of them?

17        A.    Yes.

18        Q.    And is this what all of the challenge

19   letters you would have helped print for True the

20   Vote looked like?

21        A.    Mostly so, yes.

22        Q.    When you say "mostly so," what were

Case 2:20-cv-00302-SCJ   Document 156-6   Filed 05/16/22   Page 12 of 15

9/23/2021        Fair Fight, Inc. et al. v. True the Vote, et al.        Mark Williams

Page 114

1   the variations?

2        A.    I don't know that there was any
3   variations.  I'm just leaving that out there.  But,
4   yes, this should have been what the letters looked
5   like.

6        Q.    Okay.  Save for the name and -- the
7   names of who's being challenged and who's issuing
8   it; correct?

9        A.    Correct.

10       Q.    In this letter, you write, "Based on
11  available data from the United States Postal Service
12  and other commercially available sources."

13             The "data from the US Postal Service,"
14  is that referring to the NCOA registry?

15       A.    Yes.

16       Q.    And what are the other commercially
17  available sources?

18       A.    I believe that's just encompassing.  I
19  don't believe that there was -- and I say this -- I
20  don't know because I didn't actually compile the
21  data myself, but I believe that was just
22  encompassing.

Case 2:20-cv-00302-SCJ   Document 156-6   Filed 05/16/22   Page 13 of 15

9/23/2021             Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

Page 115

1        Q.      So your understanding was the
2   challenges were based solely on the NCOA registry;
3   is that right?
4        A.      I was comfortable with that being the
5   source of the information.
6        Q.      Okay.  What did you hope the effect of
7   these challenges would be, the ones that you issued?
8        A.      Well, I wanted to -- and my personal
9   view was to expose this.  If there was wrongdoing, I
10  wanted to expose it and take it from there.
11       Q.      Can you elaborate on what you mean by
12  "wrongdoing."
13       A.      I believe that a lot of votes were
14  voted in a place where -- in a district where people
15  didn't actually live and weren't allowed to vote.
16       Q.      And you said you challenged roughly
17  32,000 voters; is that right?
18       A.      I believe that's correct.
19       Q.      How do you think your challenges to
20  those voters would have affected those voters?
21       A.      I have no idea how it would have
22  affected them.

Case 2:20-cv-00302-SCJ   Document 156-6   Filed 05/16/22   Page 14 of 15

9/23/2021         Fair Fight, Inc. et al. v. True the Vote, et al.         Mark Williams

Page 116

1    Q.    Well, if your challenges had been
2    accepted, they wouldn't have been eligible to vote;
3    is that right?
4    A.    Yes.  And that was the -- that was the
5    thought there, was that these people voted in an
6    election they're not supposed to be voting in.  Did
7    they vote twice?  Did they vote illegally?  What was
8    the story here?  That was the thought process there.
9    Q.    And do you know what would have
10   happened had the Board of Elections in Gwinnett
11   County at that hearing voted to actually consider
12   your challenges?  Do you know what would have
13   happened to the voters who had been challenged?
14   A.    Well, it would have been vetted.  By
15   the laws set up, it would have been vetted out the
16   way it should have been and it would have been found
17   out if each one had been eligible to vote or not.
18   And if they weren't, their vote would have been
19   pulled out.
20   Q.    What's your understanding of that
21   vetting process?
22   A.    To verify where they lived and where

Case 2:20-cv-00302-SCJ  Document 156-6  Filed 05/16/22  Page 15 of 15

9/23/2021    Fair Fight, Inc. et al. v. True the Vote, et al.    Mark Williams

Page 117

1   they -- and where they were eligible to vote at the
2   time, to verify that and if they did actually vote
3   in an improper place.
4       Q.    Do you know how that would have been
5   verified?
6       A.    I don't know.
7       Q.    Given the chance, would you issue
8   these challenges again?
9       A.    Absolutely.
10      Q.    Is there anything that you would have
11  done differently?
12      A.    As far as the challenges, no.
13      Q.    What's the qualification as far as the
14  challenges?
15      A.    What are you asking there?  What do
16  you mean?
17      Q.    You qualified your answer that you
18  wouldn't have done anything differently as far as
19  the challenges.
20            Are you implying that you would have
21  done something differently as far as something else
22  related to this?