Page 18

1          A.          Yes, I believe so.

2          Q.          Okay.  We may cover some things today

3     that are included on that, and it's totally fair if

4     you don't recall, you can -- you can say you don't

5     know or you don't recall.  But, I do want to cover

6     some things that may touch on those discovery

7     responses that you've already submitted responses to,

8     all right?

9          A.          Do you want me to dig up a copy of

10     that so that I can quote that precisely?  I mean, I

11     don't think its --

12          Q.          There's no need, Mr. Martin.  I

13     actually have a copy of that.

14          A.          I mean the dates and even the times

15     on all of those are in that package, somewhere.

16          Q.          That's fair.  And, I actually have a

17     copy of your responses here, that if we need to

18     reference them today, I can mark those as an exhibit

19     and pull them up.

20                    I want to return quickly to the call

21     you received from Mr. Cooper.  Can you give me a

22     ballpark estimate around roughly that may have been

Page 19

1   just, for the record?  It doesn't have to be precise.

2              MS. KRAMER:  Counsel, can I just

3   clarify for my client real fast?

4              MS. TAYLOR:  Sure.

5              MS. KRAMER:  Joe, if you don't

6   recall, that's -- it's okay to say that.  It's okay.

7   You don't need the papers in front of you right now.

8   Just whatever you remember right now, during this

9   deposition, that's how you should answer.

10             THE WITNESS:  Well, I want to be

11  precise.  And, it's written down, you have the -- I

12  believe you have a specific timeline of any

13  interactions that I had with James, James Cooper.

14  It's, you know.

15       Q.    Mr. Martin, just to be clear, I'm not

16  asking for a precise date.  Just roughly the month,

17  year, even, that you may have spoken with him.  And

18  you mentioned that this was a phone call, for

19  example.

20       A.    It was during the election cycle.

21       Q.    Okay.  And, when you say "election

22  cycle" are you referring to the general election, or

Page 20

1    the runoff election, or both?

2          A.      I believe it was the runoff election.

3          Q.      Okay.  So, the runoff election was in

4    January of 2021.  Would you say you spoke with Mr.

5    Cooper that month?  Or, the month before, perhaps?

6    Roughly speaking.  It doesn't have to be precise.

7          A.      Now, again, it's in the written -- I

8    believe there's a complete timeline in the written

9    documentation.

10         Q.      Okay.  And it's okay if you don't

11   remember, Mr. Martin.

12         A.      I mean if you want to ask me -- if

13   you want to quote what I said in the written

14   documentation, I'll verify that.

15         Q.      Understood, Mr. Martin.  We can move

16   on.

17                 Did -- can you explain to me what

18   you -- what that phone conversation with Mr. Cooper

19   entailed?

20         A.      I believe our initial conversation

21   was he asked me to find a voter who would be willing

22   to challenge out-of-state/out-of-county voters.

Case 2:20-cv-00302-SCJ   Document 156-8   Filed 05/16/22   Page 4 of 49

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 21

1          Q.          And by "voters" you mean, voters who

2     are registered in the state and in the county?

3          A.          No, someone who is registered in

4     Taliaferro County.

5          Q.          Okay.  But was actually out of state

6     or out of the county?

7          A.          No.  Someone who was a registered

8     voter, living in Taliaferro County, who would be

9     willing to challenge voters who presumably did not

10    live in the county or in the state.

11         Q.          Okay.  I think we were saying the

12    same thing there, just a little bit differently.

13                     When Mr. Copper reached out to you

14    asking you to identify a voter, did he represent to

15    you that he was affiliated with True the Vote in any

16    way?

17         A.          No.

18         Q.          Okay.  In what capacity did he reach

19    out to you, with this request?

20         A.          I was under the impression he was

21    reaching out to me as a member of the 10th District

22    GOP.

Page 22

1       Q.      Okay.  And are you a member --

2       A.      On the initial -- on the initial

3   request.

4       Q.      And are you a member of the 10th

5   District GOP as well, Mr. Martin?

6       A.      At the time I was the chairman of the

7   Taliaferro County GOP.

8       Q.      And for how long were you in that

9   position?

10      A.      Probably four years.

11      Q.      And, you said "at the time."  So, you

12  are no longer the chairman; is that correct?

13      A.      That is correct.

14      Q.      And, when did that tenure end?

15      A.      I guess it was February this year.

16      Q.      Do you have any record of that

17  initial phone call you received from Mr. Cooper?

18      A.      You mean did I record it?  No.

19      Q.      For example, did you take any notes

20  or did he send you any documents?

21      A.      I believe we began corresponding by

22  E-mail after that.

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 36

1          A.      No.

2          Q.      -- of issuing these challenges?

3          A.      No.

4          Q.      Did you discuss anything else in

5     general about -- about the issuance of these

6     challenges, aside from -- and, like I said, we'll get

7     into -- kind of the actions that you took on your own

8     afterwards.  But, in this initial time zone here,

9     where you agreed to serve as at the challenger, did

10    you have any other additional conversations with

11    Mr. Cooper, or anyone at True the Vote, about --

12    about the process, or what it would entail?

13         A.      Again, you're using the word

14    "conversations."  I do not believe we had discussed

15    anything on the phone.  And, all the written

16    documentation would be in the E-mail.  And I believe

17    you have that E-mail traffic in its entirety.

18         Q.      Okay.  And just to be clear, when I

19    reference conversations, I'm including E-mail, any --

20    any kind of communication that you may have had with

21    anyone at True the Vote, or Mr. Cooper.  Does that

22    make sense?

Page 37

1        A.        I did not have any discussions with

2    anyone from True the Vote, except for James Cooper.

3                  Are you done with the text over here?

4        Q.        Yes.

5        A.        Good.  Okay.

6                  MS. TAYLOR:  You can pull that down.

7    Thank you, Henry.

8    BY MS. TAYLOR:

9        Q.        So, can you walk me through the

10   process of issuing the challenges?  And again, not --

11   not getting into, quite yet, the specific individual

12   actions that you took.  But, what it actually

13   entailed, as far as submitting the challenges?

14       A.        Please clarify.  There's -- are you

15   speaking of the challenges that True the Vote sent in

16   regarding to the December 13th letter, that you just

17   had up on the screen?  Is that what you're referring

18   to?

19       Q.        Yes.  Mr. Martin, I believe that was

20   dated December 17th, but --

21       A.        I'm sorry, 17th.

22       Q.        -- Yes.  I'm referring to the

Page 38

1    challenges that you agreed to submit, in your name,

2    in connection with True the Vote, on behalf of

3    Taliaferro County.

4         A.     Okay.  Now -- now let's go back to

5    your specific question.  What specifically were you

6    asking regarding that list of 37 individuals?

7         Q.     I'm -- I'm asking if you could just

8    walk me through what the challenge process was.  How

9    you would go about challenging those 37 individuals?

10        A.     Yes.  I did nothing, with regards to

11   the entirety of the list of 37 people.  I believe

12   it -- it came to -- I attempted to validate that the

13   list was real.  And I took a different path to

14   challenge.

15        Q.     Can you explain that a little bit?

16        A.     Again, it's in the -- it's in the --

17   it's in the -- it's in the written documentation.  I

18   was not comfortable that -- that the -- the list was

19   valid.  How -- how did this list come about?  Where

20   did this list come from?  Who generated the list?

21   And, I asked an individual with the 10th District

22   GOP, I sent him the list and said:  Can you help me

Page 39

1    out here; what's going on?  And again, I believe you

2    have that E-mail.

3              At that point in time, that

4    individual said three of these people have already

5    voted, have sent in absentee ballots.  Don't ask me

6    how they knew that.  They just said three of these

7    people, which caused an urgency for me; that if it

8    was true that these people did not live in the

9    county, and that they were voting, that seemed to be

10   not right at all.

11        Q.     And, just to clarify what you said

12   just then, who was it that you spoke with; who told

13   you that three of the people on the list had already

14   voted?

15        A.     Again, I don't have his name right in

16   front of me.  It's in the documentation that -- that

17   you should have there.  If you don't have his name

18   there, then I'll have to go offline and try and dig

19   out -- I don't have a copy of the written

20   documentation, and I don't have a recollection of

21   specifically.  I believe he was the treasurer of the

22   10th District GOP.

Page 40

1        Q.      Okay.  That's fair if you don't

2    recall --

3        A.      Do you have that name in -- do you

4    have that name in the paperwork you have there?

5        Q.      I'm not actually sure that we do.

6    And, we can go back and look.  But, there's no need

7    for you to go back and look at everything.  I'm

8    asking you today is just what you remember sitting

9    here today about everything that I'm asking you about

10   today.  So, no need for you to go back and look.  And

11   we can certainly go back and look on our side.

12              MS. TAYLOR:  Henry, can you please

13   pull up and mark as the next exhibit the document

14   Ending in Bates 0052.

15              (Whereupon, Exhibit 2, E-mail String

16   beginning Bates No. OPSEC 0052 was marked for

17   identification.)

18   BY MS. TAYLOR:

19       Q.      Mr. Martin, can you see this

20   document?

21       A.      I can see it.  Yes, yes.

22       Q.      Okay.  And, I know you're not on this

Page 41

1    E-mail thread.  But, if I could turn your attention

2    to the -- to the second page.

3                    MS. TAYLOR:  Actually, Henry, if we

4    could.  Yeah, right here.

5    BY MS. TAYLOR:

6          Q.      So, this is an E-mail from James

7    Cooper at the bottom here.  And he says, "I have one

8    chair in the 10th that wants the names of the folks

9    he will be challenging.  He is the Taliaferro county

10   Chair.  He said he wants to do it, but will not

11   unless he sees the names."

12                  Did I read that correctly?

13         A.      Correct.

14         Q.      And is that you referring to you,

15   Mr. Martin?  Are you the Taliaferro County Chair?

16         A.      Yes.

17         Q.      Okay.

18         A.      And you see please note -- please

19   note that that sign, the "3rd Vice Chair," the "10th

20   District Republican Party, GOP State Committee," Mr.

21   James Cooper.

22         Q.      Right.  And so, just for the record,

Page 42

1   you're referring to James Cooper's signature in his

2   E-mail; is that correct?

3          A.      In the E-mail where he indicates that

4   I want the list.  Because -- yes.

5          Q.      And is that -- is this E-mail

6   address, jamescooper.gop@gmail.com, is that the

7   E-mail you would have been corresponding with

8   Mr. Cooper on -- with?  As far as you can recall?

9          A.      Yeah.  Again, I'd have to look at my

10  address book right here and see if I have another

11  address for him.  But yes, I mean, I presume so.

12  Look at the E-mails that you have with my name

13  corresponding to him.  Again, you have that

14  documentation.  You're asking me to remember an

15  E-mail address from two years ago, and you have it

16  right in front of you.

17         Q.      That's fair, Mr. Cooper.  I'm just

18  asking what --

19         A.      Martin.

20         Q.      Sorry, Mr. Martin.  I'm just asking

21  what you recall.  And you pointed out that he has

22  that signature below his name in this E-mail.  Why --

Page 43

1    why is it that of note?

2         A.      Well, I'm reemphasizing that it's

3    not -- he didn't sign that as representing True the

4    Vote.  He signed that as Republican Party.  I'm just

5    em- -- just highlighting -- you've highlighted he was

6    referring to me and I said yes.  And I'm saying he's

7    referring to me, but he's signing that as, you know.

8                   MS. KRAMER:  Counsel, do you mind if

9    we take a quick 5, 10-minute break.

10                  MS. TAYLOR:  Yes, that should be

11   fine.

12                  MS. KRAMER:  Okay.  Thank you.

13                  THE TECH:  All right.  Stand by,

14   please.  The time is 9:50 a.m., off the record.

15                  (Recess taken.)

16                  THE TECH:  The time is 10:00 a.m.,

17   back on the record.

18   BY MS. TAYLOR:

19        Q.      So, Mr. Martin, before we went off

20   the record just then, we were looking at an E-mail in

21   which it indicated that you had asked to see the

22   names of the -- the folks you would be challenging,

Page 44

1    correct?  Before you --

2         A.      Correct.

3         Q.      Okay.  And, did you ask to see that

4    list of names before you agreed to serve as the

5    challenger for Taliaferro County?

6         A.      I believe so.  This is dated the

7    16th.  It would be the day before I signed the --

8         Q.      And, you'll see here Mr. Cooper

9    writes, "He said he wants to do it, but will not

10   unless he sees the names."

11              Does that sound right to you?

12        A.      Say again.

13        Q.      Mr. Cooper writes in this E-mail that

14   "He said he wants to do it, but will not unless he

15   sees the names."

16              I believe in reference to you?

17        A.      Yes, yes.

18        Q.      That sounds accurate?

19              Okay.  So, did you ask Mr. Cooper for

20   this list?

21        A.      Yes.  As I explained to you, he is

22   the only person that I communicated with that, yes.

Case 2:20-cv-00302-SCJ   Document 156-8   Filed 05/16/22   Page 15 of 49

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 45

1          Q.          Okay.  And, what was his response to

2     that request; when you asked to see the list of

3     names?

4          A.          Well, I eventually got the list of

5     names.  Because I sent it to the -- to the treasurer

6     of the GOP.

7          Q.          Okay.

8                    MS. TAYLOR:  Henry, can we pull up

9     and mark as the next exhibit, the document ending in

10    Bates stamp 257.

11                    (Whereupon, Exhibit 3, List of Names,

12    was marked for identification.)

13    BY MS. TAYLOR:

14         Q.          Mr. Martin, do you recognize this?

15         A.          Not yet, no.  But I assume if we

16    count down there, and there are 37 names on it, that

17    would be the list that he sent me.

18         Q.          Okay.  And I'll -- I can represent to

19    you today, Mr. Martin, that I have counted.  There

20    are 37 names on this list.  So, is it fair to say

21    that this is the list of names that you received from

22    Mr. Cooper?

Page 46

1          A.          Yes, in some form or other.  It just

2     doesn't look familiar.  But, yes.

3          Q.          Okay.

4          A.          Those are the names.

5          Q.          Yes.  I believe originally this must

6     have been an Excel spreadsheet of some sort.  And

7     it's just been converted into a PDF here; so the

8     formatting might be a little bit different.

9                    When did you see this for the first

10     time?

11          A.          Sometime in December.

12          Q.          And, it was Mr. Copper that showed it

13     to you?

14          A.          Again, Mr. Copper and I were

15     communicating by E-mail.  So, it would have been sent

16     to me by E-mail.

17          Q.          Okay.  And you mentioned having some

18     questions about how this list was generated; is that

19     correct?

20          A.          Yes.  I wanted some, you know,

21     single-source documents are -- in my line of work,

22     when you only have a single source of validation,

Page 47

1    you -- you -- you want two sources.  You want to know

2    that it's a good -- how it came about.  Where is

3    the -- what do you call it?  Providence, or how did

4    it come about?  How was it generated?  I didn't get

5    any of that information.  I just got this right.

6                    Here if you have somebody, for

7    example, Beatrice Davis Paterson, Passaic, New

8    Jersey.  Where did that come from?

9                    You know, Larry Ratliff, Grady,

10   Oklahoma.  Well, I knew Larry.  He had moved to

11   Oklahoma.  So that validated -- well, that's somebody

12   that actually moved.  And the next question in my

13   mind was:  Did any of these people vote?  Or, what --

14   what's the process to see that they don't vote?  If

15   they really don't live in Taliaferro County, Georgia.

16        Q.     So, did you ask Mr. Copper how the

17   list was generated?  Or was that something you looked

18   into on your own?

19        A.     Again, I don't recall.  You know --

20   my skepticism of wanting to have it validated and

21   wanting to know before I put my name on something,

22   was, you know, I may have asked him, you saw him ask

Page 48

1    somebody else for the list.

2                     So, you know, I didn't know how this

3    was generated.  I didn't know how you would get this

4    information.  I know a lot more now than I did at the

5    time.  But, at the moment when I got the list -- this

6    list, it was just a list.

7          Q.      Do you recall sitting here today

8    whether or not you had a conversation, at any time,

9    with Mr. Copper, about how the list was generated, or

10   where the names came from?

11         A.      Yeah.  Again, I'm -- I may have, it

12   would be in -- if I asked him that question, it would

13   be in the E-mail traffic.

14         Q.      But sitting here today, you don't

15   recall?

16         A.      Well, I'm sure I asked him for the

17   list.  And I'm sure in the process I said, where did

18   you get this?  That may have been when he said, well,

19   he got it from True the Vote.  I don't know.  That

20   may have been when, you know -- that other -- the --

21   the document you just showed me, showed him asking

22   somebody else.  It wasn't even True the Vote.  Wasn't

Page 49

1    it -- was Phillips or somebody.  And it was Austine

2    something.  That other thing.  So, I didn't know any

3    of that.

4        Q.      You anticipated my next question a

5    little bit.

6                Were you told anything about who

7    generated the list?  Were you told it was True the

8    Vote?

9        A.      I would think so.

10       Q.      Okay.  And you mentioned recognizing

11   a couple of names on this list.  Is that right?

12       A.      Right.

13       Q.      That you recognized at the time of

14   your initial review of the list?

15       A.      Correct.

16       Q.      Can you describe for me what other

17   independent research you may have done into the names

18   that appeared on this list, to the extent you did

19   any?

20       A.      Yes.  I sent the list to -- and I

21   don't have the name right off -- but I believe he was

22   the treasurer of the 10th District GOP.  And he

Page 54

1                    At that point in time, I thought it

2     was important to challenge those three individuals.

3     Because at that point in time, I had this list that

4     said they didn't live here.  And I had the fact that

5     they had already submitted absentee ballots.

6                    I believe you have in your package

7     three letters that I sent to both the superintendent

8     of elections, with a copy to the registrar,

9     identifying, I believe, the individuals' names from

10    this list; and, I believe, the Georgia statute that

11    says that any voter can challenge any person.

12                    At that point in time, as the

13    chairman of the GOP, I felt if these people didn't

14    live in Taliaferro County, they should not be voting

15    in Taliaferro County.

16                    Let us call those challenges "the

17    three challenges," that I personally took.

18         Q.      Okay.

19         A.      Okay.  So, we have two sets of

20    challenges.  37 and three.

21         Q.      Real quick, Mr. Martin.  Just to

22    clarify.  Those three that you took, they are a part

Page 55

1    of the 37; is that correct?

2          A.      They are individuals that are on the

3    list of 37, yes.

4          Q.      Okay.

5          A.      The information that they didn't live

6    in Taliaferro County came from the list of 37.

7          Q.      Understood.  So, you issued a

8    specific challenge to three of the voters that were

9    on the list of 37, apart from the list of 37 names

10   that were being challenged that was issued by True

11   the Vote, with your name?

12         A.      Correct.

13         Q.      Okay.  And, you submitted the

14   names -- or excuse me.  You submitted the challenges

15   to those three specific individuals before or after

16   True the Vote submitted the challenges with your name

17   for the 37 as a whole?

18         A.      Yeah.  Again you're asking me for a

19   timeline.  To my knowledge True the Vote, James

20   Cooper, had not submitted 37 names.  I did not find

21   out they actually transmitted that by E-mail at some

22   point in time.

Page 56

1                    Again, you're talking about over two

2      or three days here, of a lot of activity.  And I was

3      moving in one direction to make sure that illegal

4      votes weren't counted.  Not to be -- and I did not

5      know what True to Vote was doing.  So, and they did

6      not copy me on the -- on the E-mail where they sent

7      the 37 votes -- 37 names in.  And you know, they --

8      and they -- again, it was -- it looked like, when I

9      looked at it in some package somewhere, it's some

10     funny number, 336 something.  You know, it looks like

11     it's a generic E-mail that goes to every county or

12     something.  I couldn't figure out how that worked.

13                    Am I being clear or no?

14          Q.     So you're not -- I think I'm

15     following.  Just a follow-up to make sure that I'm

16     understanding.

17                    You were not copied on the submission

18     of the challenges in your name --

19          A.     Correct.

20          Q.     -- of the 37 voters?

21          A.     Correct.

22          Q.     Okay.  And so, you're not sure

Page 57

1    exactly as to the exact date when that may have

2    happened?

3         A.     Right.

4         Q.     That makes sense.

5         A.     I did not become aware that they

6    actually sent that in until we began the written

7    deposition; when I went back and asked the county

8    registrar under an Open Records Request for all

9    information related to this subject matter.

10        Q.     Okay.

11        A.     And that was way later than anything

12   that occurred.

13               At that point in time, you know, I

14   was sort of shocked that they had actually sent that

15   in.

16        Q.     And, did Mr. Copper, at any point,

17   tell you that voters who were registered in

18   Taliaferro County but did not live in Taliaferro

19   County weren't eligible to vote there?  Or, how did

20   you come to that understanding?

21        A.     I mean is it not logical?  I mean, if

22   you don't live -- if your -- don't live here, you

Page 58

1    shouldn't be voting here, should you?

2          Q.     Okay.  So, you came to that

3    conclusion logically on your own, would you say?

4          A.     Well, I would think so.

5          Q.     Okay.

6                 MS. TAYLOR:  Henry, can we pull up

7    and mark as the next exhibits -- its actually three

8    documents, but we can look at them one at a time.

9    The ones that ends in Bates 0001, 0002 and 0003.

10                THE TECH:  Okay.  So, should I bring

11   up one first.

12                MS. TAYLOR:  You can bring up one

13   first.  Yeah.  And then we can just click through

14   them for Mr. Martin.

15                (Whereupon, Exhibit 4, Letter

16   beginning Bates No. Martin 0001, was marked for

17   identification.)

18                (Whereupon, Exhibit 5, Letter

19   beginning Bates No. Martin 0002, was marked for

20   identification.)

21                (Whereupon, Exhibit 6, Letter

22   beginning Bates No. Martin 0003, was marked for

Page 59

1    identification.)

2         Q.      Mr. Martin, let Henry know when

3    you've had a chance to look at this and we can click

4    to the next one.

5         A.      Yep.  You see this is dated the 18th.

6    You see the dates on these are -- see?  17th and then

7    this is dated the 18th.

8         Q.      Uh-huh.

9                 And, we'll go through these kind of

10   collectively.  I just want to let you put your eyes

11   on them.

12        A.      Yes.

13                MS. TAYLOR:  Henry, could you go to

14   0002.

15                THE TECH:  Got it.

16                MS. TAYLOR:  And then 0003.

17        Q.      So, I assume the answer is yes.  But,

18   you recognize these letters, Mr. Martin?

19        A.      Yes.  Absolutely.

20        Q.      Okay.  And are -- these are the three

21   individuals that you challenged on your own, separate

22   and apart from the list of 37 that True the Vote

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 60

1    challenged on your behalf.  Is that correct?

2          A.      Correct.

3          Q.      Okay.  And these are challenges that

4    you also withdraw later?

5          A.      Correct.

6          Q.      Okay.

7          A.      But they -- it was based on the

8    information that Mr. Cooper had provided me that they

9    did -- you'll see all the addresses are from the

10   list -- the previous list of 37.

11         Q.      That's right.

12                 So you got these three names from the

13   list of 37?

14         A.      Right.  What was concerning me was

15   these people are already asked for absentee ballots

16   or had already submitted absentee ballots.

17         Q.      Okay.  And, is this your handwriting

18   at the very bottom of the document?

19         A.      Which one?

20         Q.      Well, let's do both.  The -- let's

21   start with the very bottom here.  "I hereby retract

22   this challenge."

Page 61

1                      Is that your handwriting and

2     signature?

3          A.      Absolutely, yes.

4          Q.      Okay.  And then, the handwriting

5     right above that, whose is that?  Do you know?

6          A.      The -- I believe that's Ms. Vivian

7     Miller, the Taliaferro County Voter Registrar.

8          Q.      Okay.  So, can you walk me through

9     the withdrawal process for these challenges?

10                     Let's start with, how you came to the

11    decision to withdraw each of these three?

12         A.      Let's go to 001 first.  So, I gave it

13    to him on the 17th.

14         Q.      Okay.

15         A.      And it was my under -- I didn't know

16    who Beatrice Davis was.  You know, I would never

17    recognize her.  But the list said she was living in

18    Patterson, New Jersey.  And, Georgia Code 22-230 says

19    any person has a right to challenge a person that is

20    not living in the county.  So, I challenged it as

21    chairman of the Georgia Republican Party.  I didn't

22    know whether she was a Republican or a Democrat or

Page 62

1    what.

2          Q.     Okay.

3          A.     And that's my voter ID.  Georgia code

4    says any registered voter -- I'm a registered voter.

5    And I sent it to the superintendent of elections --

6    it probably should have gone directly to the Voter

7    Registrar.  Judge Stevens, who's the superintendent

8    of elections, called up Mrs. Davis.  Said she lives

9    in Taliaferro County.  Ms. Vivian Milner told me

10   that.  You know, who was I to disagree with a judge,

11   who was validating that somebody lived in Taliaferro

12   County.  So I went, oh, and -- and on the 18th

13   retracted the challenge.

14         Q.     Okay.

15         A.     So -- and that definitely made me

16   concerned about the list of 37.

17         Q.     And, at this time, Mr. Martin, you

18   still weren't aware if True the Vote had submitted

19   that list of 37 challenges with your name on it yet,

20   right?

21         A.     I was not aware that True to Vote

22   submitted the list of 37 until an Open Records

Page 63

1    Request by me sometime in January.  True the Vote

2    never CCed me on anything, nor informed me, to my

3    knowledge, that they had submitted it.

4                  And, in the process of discussing

5    this with Mrs. Milner, she indicated to me, when they

6    received this, probably on the 18th, when -- when we

7    talked about this, she said they would schedule a

8    hearing and I would have to validate that she did not

9    live -- that these people did not live here.  And I

10   said no, that's not what -- then we read Georgia law.

11   Georgia law says it's the registrar's responsibility

12   to validate where somebody lives.  But, since Judge

13   Stevens, on this particular case said they don't live

14   here -- I mean she said they live here.  I was not

15   going to argue with the judge.  Right?  I mean, who's

16   going to argue with a judge.  Right?  So, I retracted

17   the challenge.

18                  And then began to question, oh boy,

19   now what's the list of 37, the validation of the 37.

20                  Do you want to go to 002?  Or do you

21   have any questions about this one?

22        Q.      We can move on to 002.  I have a

Page 64

1    couple of questions about the whole process, but

2    let's get through why you withdrew each of these,

3    specifically first.

4         A.      Sure.   Again, this is Simons and the

5    current residence was Greene County.   So, I

6    challenged that.   If you live in Greene County, you

7    ought to vote in Greene County.   The Taliaferro

8    County tax commissioner, Ms. Milner went to the

9    Taliaferro County tax commissioner, and the tax

10   commissioner said that Mr. Clifford has a homestead

11   exemption on a house in this County.

12                 Well, the law says if you have a

13   homestead exemption, that's your residence.   Even

14   though they were living in and residing in Greene

15   County.

16                 Well, I wasn't going to argue that

17   the homestead exemption was illegal or inappropriate.

18   So, how could I argue with that?   Even though they

19   were living in a different county.   They had claimed

20   a homestead exemption in Taliaferro County.   The law

21   says that the homestead exemption makes them --

22   that's their residence.   I don't have -- she didn't

Page 65

1    write down the law -- maybe she did.  21-217 of the

2    Georgia code.

3              So, again, here was information

4    provided by True the Vote, that -- okay, yeah, they

5    didn't live here, but -- gee.  Legally you're not

6    going to win this case.  So, I retracted the

7    challenge.

8         Q.    Okay.

9         A.    Are we on the third one?

10             MS. TAYLOR:  Yeah.  Henry, can we

11   pull up 0003, please?

12        Q.    And, the third one.

13        A.    And, I must say, through this process

14   Ms. Milner, the registrar, you know, we were working

15   together.  She was very proactive, you know.  And we

16   were working -- it wasn't an adversarial

17   relationship, so to speak.

18        Q.    Okay.

19        A.    Okay.  Melba Carmichael, again -- the

20   list of 37 showed her living in Wilkes County.  She

21   had actually asked for an absentee ballot in

22   Taliaferro County.  She had lived in Wilkes County.

Page 66

1    Mrs. Milner called her.  She asked that her name be

2    removed from the Taliaferro County list.  And, at

3    this time, her ballot was rejected.  Because she

4    lived out of county, tried to vote in the county

5    and -- but she lived -- she was a resident of Wilkes

6    County.  So, therefore, I was happy with that.  I

7    retracted the challenge.

8          Q.     Just to be clear, you said she asked

9    for the name to be removed.  Are you referring to

10   Ms. Carmichael or Ms. Milner asked --

11         A.     I'm going to read what's -- what

12   Ms. Milner unsigned says, "Voter requested name be

13   removed from Taliaferro County voter registration

14   list.  21-2-232(a)."  I believe that's the Georgia

15   code says if you don't live in the county, you can't

16   vote.  "Ballot voted in 1/5/21 election rejected.

17   21-2-230(g)."

18               So, I believe this is Ms. Milner's

19   writing.  And I believe at that point in time,

20   undated, I withdrew the challenge.  Because I was

21   satisfied that they had taken action, appropriate

22   action.  So 33 percent of the test cases that I've

Page 67

1    tested had voted basically illegally, in my mind.

2    And 66 percent of them, in my mind, were

3    questionable.  Two-thirds of the -- of the test cases

4    -- looking at the three test cases, 66 percent of

5    them, in my mind, didn't live in the county, but had

6    voted in the county.  33 percent of them, one-third

7    of them, the ballot, at this point in time was

8    rejected.

9          Q.      Okay.

10         A.      Based on those, not my -- my

11   challenge, but those laws, I believe 21-2-232 and

12   21-2-230, are Georgia laws.  I believe that all that

13   was written by Mrs. Milner, the -- the Taliaferro

14   County voter registrar, chief registrar.

15         Q.      So it was your belief that 66 percent

16   of these three test cases, in other words, two out of

17   the three were people who voted in Taliaferro County

18   but were not residents of Taliaferro County, but the

19   votes were still legal; is that right?

20         A.      No, no, no.  66 percent of the three

21   test cases, in my mind, had voted in Taliaferro

22   County.  And, of those 66 percent -- 66 percent, a

Page 68

1    third of them, one of them was rejected.  The other

2    one, in my mind, shouldn't have voted in Taliaferro

3    County.  But, I didn't have grounds to argue that

4    point.  Because the law says, if you have a homestead

5    exemption, that's your residence.  So, I would have

6    to argue that they didn't have a legal homestead

7    exemption before I could argue that they voted

8    illegally.  So, anybody that has -- say somebody has

9    a house here in Taliaferro County and they moved to

10   anywhere in Georgia; if they maintain a homestead

11   exemption in Taliaferro County, they can vote in

12   Taliaferro County even if they never live here.  The

13   homestead exemption may be inappropriate or illegal;

14   but the law says that that's their residence, as I

15   understand it.

16        Q.     Okay.

17        A.     So, you can see from these, as I call

18   them, test cases, there's a lot of nuances to all of

19   this.  You know, it's not clear-cut.  It's not, yeah,

20   you have an address out of -- you have an address

21   that's not in the county, but it's not clear-cut

22   that -- that the individual has a right to vote in

Page 75

1   from me to -- can you go -- I can't see.

2   BY MS. TAYLOR:

3          Q.     Are you able to see both pages of the

4   document side by side?

5          A.     Okay.  Let me -- okay.

6          Q.     Okay.  Mr. Martin, and would you

7   agree that this E-mail that you sent on December 20th

8   at 9:54 a.m. to Amy Holsworth copying James Cooper,

9   it's a version of the same E-mail we just looked at

10  previously; is that correct?

11         A.     Right.

12         Q.     Okay.  And, if we could turn to 0187

13  now --

14         A.     But -- but I do not recall -- I'm

15  certainly clear that it says it's from me; but I do

16  not recall who Amy Holsworth, Amy@truethevote is, or

17  was.

18         Q.     Okay.  This is the next E-mail.  Take

19  a look at it.

20         A.     Right.

21         Q.     Okay.  And, is this also an E-mail

22  similar to the last two?

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 76

1          A.          Correct.

2          Q.          Okay.  And this one is sent to

3    Catherine Engelbrecht, copying James Cooper on

4    December 20th at 9:45 a.m.; is that right?

5          A.          That's what it looks like.

6          Q.          Okay.  So, these last two E-mails,

7    you sent within the hour of the first one that we

8    looked at.  Do you know why you followed up with

9    these later two E-mails?

10          A.          No.

11          Q.          But you see that they are sent to

12    different people; is that right?

13          A.          Right, and I -- as I said earlier, I

14    was not -- I'm not aware -- I was not aware that I

15    sent anything to True the Vote.

16          Q.          Okay.  Do you know who Catherine

17    Engelbrecht is?

18          A.          She's True the Vote.

19          Q.          And when you say "she's True the

20    Vote," what do you mean by that?

21          A.          Her name, you know, when you get

22    anything from True the Vote, her name is on it.

Page 77

1          Q.      Okay.

2                  MS. TAYLOR:  Let's pull back up the

3      first one, if we could, Henry.  It's 0005.  Just --

4      we'll just go over that one.

5      BY MS. TAYLOR:

6          Q.      In all three of these, Mr. Martin,

7      you write, "Impact of challenges.  Not good!"

8                  What -- what did you mean by that

9      statement?

10         A.      Well, you know, they were --

11     supposedly didn't live in the county.  You know, the

12     data -- again, this is the two-source validation of

13     the data.  You had a list of 37 people.  I tested

14     three of them.  One of them sure didn't look like she

15     lived in Patterson, New Jersey.  The other one didn't

16     live in the county, but she had a homestead exemption

17     here, so that was a little iffy.  And then, the third

18     one, at this point in time, there was no resolution

19     yet.  But in my mind, you know -- but then when we

20     got the resolution of the third one, one-third of the

21     people that were tested did not live in the county

22     but had voted in the county.  So one-third, you know,

Page 78

1    I don't know if that's good or bad.  You know, in

2    batting averages, that's pretty good.  But, some

3    other averages, that's not very good.

4              So, I was just providing feedback

5    that, hey -- you know, I didn't want to be -- I

6    didn't know what the list of 37.  And, after the

7    experience of working with the registrar, I didn't

8    want to put her through the painful process of

9    validating those 37 individuals.

10        Q.    Okay.

11        A.      And believe me, at this point, I did

12   not know they had already submitted 37.

13        Q.    Right.

14        A.      This was my way of checking the list.

15        Q.    Right.  You highlight for Mr. Cooper

16   and Mr. Marsh here, that "Ms. Davis is 100 years old

17   and not living in Patterson, NJ."

18              And based on that, you retracted the

19   challenge.  Can you just, I know this is very basic,

20   but state for me why that fact was important?

21        A.      Well, the superintendent of elections

22   confirmed -- you know, she called up -- you know, she

Page 79

1    took it personal that I had challenged this lady.

2    And she called her up and said where do you live?

3    And the lady said, you know, I'm not living in

4    Patterson, New Jersey.

5          Q.      Okay.

6          A.      What would you do?  I mean, I

7    retracted the challenge.

8          Q.      But the fact that she was not living

9    in Patterson, New Jersey, what did that mean to you?

10         A.      Well, at that point in time, it made

11   me question the list -- the list of 37.

12         Q.      Because it implied that she was, in

13   fact, living in Taliaferro County and was

14   appropriately registered there?

15         A.      Right, the superintendent of the --

16   the first line, highlight the first line.  Beatrice

17   Davis listed as out of state.  But the superintendent

18   of elections confirmed Mrs. Davis is living in

19   Taliaferro County with a personal phone call to her

20   Taliaferro County address.  How can you argue with

21   that?  I wasn't going to call her up.  I certainly

22   wasn't going to drive by her address to see if she

Case 2:20-cv-00302-SCJ   Document 156-8   Filed 05/16/22   Page 40 of 49

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 80

1    was living there.  But the judge did.  The probate

2    judge did.  How could you argue with that?

3         Q.      And then you end that paragraph about

4    Beatrice Davis in parentheses, "(Not sure where the

5    out of state residence information came from.  But it

6    appears incorrect)."

7              Did I read that right?

8         A.      You absolutely read that right.

9         Q.      Okay.  And then in the next

10   paragraph, this kind of summarizes what you found

11   out?

12        A.      Now, remember, these are all people

13   who have already asked for an absentee ballot.

14        Q.      Right, and who had voted, right?  Or

15   had just asked for a ballot?

16        A.      Again, I'd have to look at what

17   Mr. Marsh -- what Mr. Marsh's reply to me -- and I

18   don't know how -- I don't have a clue how he could

19   confirm either one of those.  But, he said these

20   people -- I believe he said they had voted absentee.

21   Whether that meant they had asked for an absentee

22   ballot or they had filed an absentee ballot.  It was

Page 81

1   obviously that Ms. Carmichael had already voted.  The

2   other two, I -- you know.

3          Q.     Not sure.

4                 But in this -- this next paragraph

5   about Clifford Simons, it says, "She is living in a

6   nursing home in Greene County, but still has a house

7   in Taliaferro County."  And that she has a homestead

8   exemption; is that right?

9          A.     Correct.

10         Q.     And again, this is very basic, but

11   why were those facts important to you?

12         A.     The list of 37 said she lived in

13   Greene County.  The registrar, we have a history --

14   Taliaferro County has history of people who do not

15   live here voting.  Or let me use the word "local

16   lore."

17         Q.     Okay.

18         A.     That people and -- and I've been --

19   in a public hearing, a senior government official

20   told me that his sister lives in Augusta, but she

21   votes in Taliaferro County.  This was a number of

22   years ago, when I first moved here.  And he said

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 82

1    that's her home place.  You always vote at your home

2    place.  And I was like, wow, that's something I never

3    heard of before.  Maybe that's the way they do it in

4    Georgia.  But, not where I'm from.

5           Q.     Okay.

6           A.     So, here we have a person who lives

7    in Greene County.  And, you know, we had a

8    discussion, me and -- the registrar and I, whether or

9    not she can vote in Taliaferro County.  And I said, I

10   don't think she can.  So, the chief registrar went to

11   the tax commissioner; found out Ms. Simons has a

12   house, and is paying taxes, and she has a homestead

13   exemption.  The law states, again, 21-2-230, I

14   believe that's in the voter registration law, states

15   that a person who has a homestead advantage, that's

16   presumed to be their residence.  So, I wasn't going

17   to go back and challenge the homestead exemption.

18          Q.     Fair enough.  And then, at the end of

19   this paragraph, you write again, "Again not sure

20   where the out of county residence information came

21   from."

22          A.     Yeah.  Again, the first one was out

Page 83

1    of state.  So this was a perfect test case.  One was

2    out of state.  It appeared to be incorrect.  And, you

3    know, I'm kind of going, where did it come from?  The

4    second one was out of county.  Where did the

5    information come from?

6          Q.       And, did you ever receive a response

7    from Mr. Cooper; where this out of state information

8    came from, and the out of county information?

9          A.       Again, not to my recollection.  But,

10   you may have something that will surprise me.

11         Q.       I'm not sure that I do, Mr. Martin.

12   But, after you submitted these first three, as

13   we're -- we've been calling them test challenges; did

14   you go back to the list of 37 and check any more of

15   the names on the list?

16         A.       No.

17         Q.       And, why not?

18         A.       What do I say?  Burned once, your

19   fault; burned twice, my fault.

20         Q.       So, in other words, you identified

21   some concerning areas, or some concerns about the out

22   of state and out of county information already on the

Page 84

1    list; and you did not find it worth your time to --

2    to verify any of the other names at that point?  Is

3    that right?

4          A.      Right.  And at this point in time, I

5    did not know that Carmichael was going to be

6    disqualified.

7          Q.      Right.  It says -- it says for --

8          A.      This was written on the 20th of

9    December.  We were batting 100 percent strikeouts.

10         Q.      All right.  As you mentioned, it says

11   in this E-mail here, "No resolution as of yet," in

12   reference to Ms. Carmichael.  Presumably, that was

13   resolved a couple of days later?  Or?

14         A.      Yeah, I believe it was resolved.  If

15   you go back to 003, I believe it resolved later that

16   day --

17         Q.      Okay.

18         A.      -- but this was 9:00 in the morning.

19   I believe it was resolved.  It's not dated.  But, I

20   withdrew that challenge when her ballot was rejected.

21         Q.      And she requested to be removed from

22   the voter rolls herself, too?

Case 2:20-cv-00302-SCJ   Document 156-8   Filed 05/16/22   Page 45 of 49

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 85

1          A.       Correct.

2          Q.       All right.  Okay.  Aside from these

3     three E-mails now, where you have mentioned the

4     impact of the challenge is not good, that you sent

5     around 9:00, 10:00 a.m. on the 20th; did you tell

6     anyone else that you had withdrawn these three

7     challenges?

8          A.       Not that I recall.

9          Q.       Okay.

10               MS. TAYLOR:  And, Henry, if you could

11     zoom out of this cropped part of the -- yeah, that

12     would be great.

13          Q.       And the bottom E-mail down here,

14     Mr. Martin, it looks like you write on the 17th

15     around 4:00 p.m., "I will be providing these three

16     letters to the Registrar and Superintendent

17     tomorrow."

18               Are those three letters you're

19     referring to the challenge letters for these three

20     individuals?

21          A.       Yeah, I believe so.  001, 002 and

22     003, if you -- I believe you --

Page 86

1          Q.        Okay.   That makes sense.

2                    MS. TAYLOR:   All right.   Henry, if

3     you could pull up 0181, which is another version of

4     this E-mail that we looked at, Mr. Martin.   This one

5     was the one that you had send to Amy Holsworth

6     copying James Cooper.

7     BY MS. TAYLOR:

8          Q.        In this E-mail, you write at the top,

9     "My experience that the True the Vote database has

10    not been good."

11                   Again, can you just explain to me

12    what you mean by that statement?

13         A.        Yeah, I'll be honest with you, I have

14    no idea why I was communicating with Amy.   I don't

15    know where I got her -- Amy Holsworth, I have no idea

16    where I got her name or -- or why I sent this; unless

17    James Cooper told me to tell her, you know, because

18    at this point in time on the 20th, three days later,

19    I was very concerned with them using my name on the

20    list of 37.

21         Q.        That's all right.

22         A.        So, I was trying to get my -- you

Page 87

1  know, I had given him my signature and said, yeah, go

2  ahead and submit it.  I believe that was on the 17th.

3  But, at this point in time, I was uncomfortable.

4          Q.      And that would explain --

5          A.      Hence, the first statement there.

6          Q.      Yeah --

7          A.      "My experience with the True the Vote

8  data base has not been good."

9          Q.      And the next line that says, "Please

10 hold on to any challenge letters to Taliaferro

11 County"?

12         A.      Yes.

13         Q.      Okay.

14         A.      And, that's at 9 -- that's

15 December 20th, 9:54 in the morning.

16         Q.      That is right.

17         A.      And I said, "Concerns with the

18 quality of your information.  Submitted three

19 challenge letters Thursday evening for individuals on

20 the True the Vote list who had already asked for

21 absentee ballots."

22                 See, that clarifies who had already

Page 88

1   asked for absentee ballots in Taliaferro County.  So,

2   evidently the database was absentee ballots

3   requested, not submitted.

4        Q.     Okay.  As you read just there, it

5   says, "Concerns with the quality of your

6   information."

7             MS. TAYLOR:  And then, Henry, if you

8   go to the next page, where his E-mail continues.

9        Q.     At the top it says, "Indicates a

10  problem with data accuracy and relevance."

11            What were you referring to, just to

12  be clear for the record, when you say "data"?  Are

13  you talking about the names themselves and the

14  addresses?

15       A.     Well, the addresses specifically.

16  The names -- you know, the names -- it appears the

17  names were all Taliaferro County names.  At one point

18  in time they -- they were or are Taliaferro County

19  voters.  But, the data I was referring to is the

20  reference to them being out of state or out of

21  county.  And that reiterates the information -- you

22  know, I'm feeding back realtime data here.  This is

9/28/2021         Fair Fight, Inc. et al. v. True the Vote, et al.         Joseph Martin

Page 89

1   real -- you know, you sent me a list of 37 names, and

2   this is my results of the test cases; three test

3   cases.  As you can see, I'm uncomfortable.  Please

4   hold onto any challenge letters to Taliaferro County.

5         Q.      Did you receive a response to this

6   E-mail?

7         A.      You know -- if I did, it's in the

8   package that we provided to you.  If not, then it

9   isn't.  I don't -- I don't recall.

10        Q.      Okay.

11        A.      Again, I'll repeat, I was not aware,

12  when True the Vote sent the list of 37 to -- to

13  Taliaferro County.

14        Q.      And like you said, you write again

15  here, "Please hold on to any challenge letters to

16  Taliaferro County."  Were you under the impression,

17  at the time, that your challenge letters to

18  Taliaferro County were being held after you sent this

19  E-mail?

20        A.      I was aware that they had not been

21  sent.  I was not aware -- let me put it the other

22  way.  I was not aware they had been sent.  And I was