1   nuts.

2        Q.     Would you consider data

3   processing to be your strong suit?

4        A.     Yes.

5        Q.     And why is that?

6        A.     I've been admitted to testify

7   as an expert witness in data analytics 5

8   times over the last 20 years in various

9   disputed elections.  I've been working with

10  voter data for longer than most people have.

11  I know it well.  And I'm -- I've testified in

12  court over residency issues and redistricting

13  errors and things like that.

14       Q.     And what happens if a client or

15  you try to perform a project without good

16  data processing?

17       A.     I'm not sure I understand the

18  question.

19       Q.     Sure.

20              MR. SHELLY:  Henry, can you

21       pull up Exhibit L.

22              (Davis Exhibit L,

Case 2:20-cv-00302-SCJ   Document 156-9   Filed 05/16/22   Page 2 of 37

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 20

1          Printout of Data Productions'

2          website, No Bates, was marked

3          for identification, as of this

4          date.)

5     BY MR. SHELLY:

6          Q.     Mr. Davis, do you recognize

7     this?  This is the website for Data

8     Productions.

9          A.     It appears to be.

10          MR. SHELLY:  Can you scroll

11          down to page 2, Henry?

12     BY MR. SHELLY:

13          Q.     That paragraph right there, in

14     the middle, "Why Data Processing?"  The

15     website says, "Data processing is the dull

16     older cousin to big data.  But without good

17     data processing," it says, "big data is just,

18     well, a big mess."

19               Do you agree with that?

20          A.     To a certain extent, that's

21     fluff that my web developer put in there.

22     But, in general, I would say that I agree

Page 21

1    that data processing is very important.

2         Q.    Fair to say that the quality of

3    processing affects of validity of the

4    conclusions that can be drawn from the data?

5         A.    Yes.

6              MR. SHELLY:  Thank you.  Henry,

7         you can take that one down.

8    BY MR. SHELLY:

9         Q.    Mr. Davis, you mentioned that

10   you perform National Change of Address

11   processing as part of your data processing

12   services.  Is that right?

13        A.    Yes.

14        Q.    And roughly how many times a

15   year would you say you perform NCOA

16   processing?

17        A.    I don't know the answer to that

18   question off the top of my head, but it's

19   often.  It's regular.  I would say I probably

20   will process 50, 60 million records this

21   year.

22        Q.    And when you say "process those

Page 22

1    records," can you describe a little bit about

2    what that process is?

3         A.    I license software that allows

4    me to run CASS certification as well as

5    National Change of Address processing.  And

6    I own -- I buy an annual subscription that

7    allows me to run up to a hundred million

8    records a year.

9         Q.    And so am I to understand that

10   you're matching the NCOA list against some

11   other file?

12        A.    That's not quite the way it

13   works.  That's a bit of an

14   oversimplification.

15              The way it works is the

16   software -- it refers to the needed fields

17   that are in a particular database --

18   transmits that data to an NCOA compiler

19   that's got a special license from the Postal

20   Service to provide those services.

21              They actually do the matching

22   according to very strict USPS compliance

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

1  rules.  And then the information comes back

2  to me, and it's merged back into the original

3  database.

4       Q.    Okay.  And is there one firm,

5  it sounds like, who performs the actual match

6  that you use?

7       A.    In my particular case, it's

8  BCC.  But there are a number of them.

9       Q.    Okay.  And where did you learn

10  to do the part of this process that you do?

11       A.    I forget what year it was, but

12  at some point, the Postal Service mandated

13  compliance with move update requirements for

14  First-Class Mail.  Years later, they also

15  required compliance with move update

16  requirements for Presorted Standard or what

17  we commonly refer to as "bulk mail."

18            So I don't remember exactly

19  what years those were, but it was quite a few

20  ago.

21       Q.    And does the NCOA processing

22  ever produce a false match, where there's --

Page 43

1          So my objection stands.

2          MR. SHELLY:  Okay.  Well, how

3     about I get through a few more

4     questions on a different subject, and

5     then depending on the one -- where

6     those lead, we can perhaps revisit

7     this in a bit.

8          MS. SIEBERT:  That sounds good.

9  BY MR. SHELLY:

10     Q.    Mr. Davis, you mentioned at

11  this initial meeting with Ms. Engelbrecht --

12  well, let me first ask:  Was that your only

13  conversations with Ms. Engelbrecht, the

14  initial discussion that you mentioned with

15  Gregg Phillips and Derek Somerville?

16     A.    That was my initial

17  conversation with anyone with True the Vote.

18          As far as subsequent

19  conversations with Catherine, I don't recall

20  any in specifics.  I do recall participating

21  in a Zoom call, or maybe two, that were

22  general, you know, "everyone's invited" kind

Page 44

1    of broadcast.  And I tuned in to just keep

2    current with what they were doing.

3              But I don't recall other

4    specific conversations.  We may have talked

5    on other occasions.  There was so much

6    activity in November, I just don't recall

7    specifics.

8         Q.    When you say you participated

9    in these conversations where everyone was

10   invited, were those open to the public?  Or

11   what did you mean by that?

12        A.    I believe they were open to

13   basically anyone on True the Vote's list.

14   They may have been open to the public, for

15   all I recall.

16             But it was not a two-way

17   conversation.  I didn't speak in those

18   meetings.  I just tuned in to see what they

19   were up to.

20        Q.    Do you know why you were

21   invited or how you ended up on those calls?

22        A.    I don't.

Page 45

1          Q.     You mentioned Derek Somerville

2     in this call.

3                 How do you know him?

4          A.     I met Derek, I believe, in

5     November.  He expressed similar interests

6     about the quality of the voter file.  And we

7     continued to kind of work collaboratively on

8     it.

9                 He's a former investigator -- a

10    former special agent with the FBI, and

11    I thought it would be useful to have him dig

12    into some specifics -- specific sort of

13    random samples from the data to see if he

14    could sort of independently verify whether or

15    not there was additional evidence or

16    corroborating evidence on these changes of

17    address that he could find.  And he spent

18    quite a bit of time doing that.

19         Q.     Did you reach out to him in the

20    first instance?

21         A.     No.  We met on a conference

22    call -- I can't remember which conference

Case 2:20-cv-00302-SCJ   Document 156-9   Filed 05/16/22   Page 9 of 37

10/4/2021        Fair Fight, Inc. et al. v. True the Vote, et al.        Mark Davis

Page 46

1    call -- but we established a relationship

2    after that and began to work collaboratively.

3         Q.    Did you discuss challenging

4    voters with him?

5         A.    We did discuss the possibility

6    of doing it not affiliated with True the

7    Vote.

8         Q.    And was that before or after

9    the call with Ms. Engelbrecht that you

10   mentioned?

11        A.    I don't recall.

12        Q.    Okay.  Did he ask for your

13   assistance challenging any Georgia voters?

14        A.    Well, we did discuss creating

15   our own challenges, but not True the Vote's

16   challenges.

17        Q.    And did you pursue that?

18             MS. SIEBERT:  I'm going to

19        object to this question.  Again,

20        beyond the scope.

21             This lawsuit is about the

22        challenges that were, quote, in

Page 47

```
 1          concert with True the Vote.  So this

 2          is beyond the scope of this lawsuit.

 3               Mark, you can go ahead and

 4          answer.

 5          A.    I did do data processing for

 6     other people to file challenges, not in

 7     coordination with True the Vote, not

 8     affiliated with True the Vote.  A totally

 9     different perspective than True the Vote.

10               I'll stop there.

11     BY MR. SHELLY:

12          Q.    Okay.  And who were these other

13     groups?

14          A.    Excuse me?

15          Q.    What other group were you

16     providing -- were you assisting with voter

17     challenges?

18          A.    No group in particular.

19          Q.    Are there other individuals?

20          A.    They were created to permit

21     other interested individuals to file them if

22     they wished to file them.
```

Page 48

1       Q.    And how did you provide your

2   analysis to these other individuals?

3           MS. SIEBERT:  Again, I'm going

4           to object that this is beyond the

5           scope of the litigation.  And same

6           objections as before.

7               Mark, you can go ahead and

8           answer.

9       A.    I generated files for each

10  county and put them -- made them available on

11  the internet for interested parties who

12  wanted to file them to download them.

13  BY MR. SHELLY:

14      Q.    And was that accessible to the

15  public?

16      A.    No.  It was only accessible to

17  people that we provided access to.

18      Q.    And, just ballpark, how many

19  people had access to this?

20          MS. SIEBERT:  Same objection.

21              Mark, go ahead and answer this.

22          But, again, I'm going to shut down

Case 2:20-cv-00302-SCJ   Document 156-9   Filed 05/16/22   Page 12 of 37

10/4/2021        Fair Fight, Inc. et al. v. True the Vote, et al.        Mark Davis

Page 49

1        this line of questioning pretty soon.

2        Beyond the scope.

3        A.      I don't know the answer to that

4    question.  In fact, I don't know who

5    specifically filed what where or anything

6    like that.

7              I did do the data processing.

8    I did create the data to do challenges, but

9    I did not organize them or recruit people to

10   file them or anything of that nature.

11   BY MR. SHELLY:

12        Q.      You mentioned Gregg Phillips

13   was on this initial call with

14   Ms. Engelbrecht.

15              How did you meet Mr. Phillips?

16        A.      I actually did not say that.

17   I said that I had a conference call with him

18   and Derek.

19              I believe that Catherine and

20   Gregg had taken Derek out to dinner one day

21   previous to that and wanted to meet me.  And

22   Catherine was not available for the call, but

Page 50

1    Gregg was, so if I recall correctly, it was

2    just me and Derek and Gregg Phillips on that

3    call.

4         Q.      And what did you discuss on

5    this call?

6         A.      We compared our backgrounds in

7    data processing and data analytics and

8    working with voter data.

9              He, I believe, comes from

10   Texas, and I'm from Georgia.  We talked about

11   how different states store data differently.

12             And I just basically kind of

13   gave him a little bit of a primer on data

14   that's available from the state, where to get

15   it, what it looks like, what's in it, those

16   kinds of things.

17             They were looking to do their

18   own analysis of the Georgia Voter Database,

19   and I just basically gave them some

20   information about, you know, how to get

21   started.

22        Q.      Did you recommend -- if I

Page 51

1    remember the acronym -- BCC to perform the

2    actual processing?

3          A.    No.  I left it up to them,

4    which provider they wanted to use.  There's

5    several dozen of them.

6          Q.    And did you have any more

7    conversations with Mr. Phillips after this

8    one?

9          A.    Not that I recall.

10         Q.    How about:  Did you communicate

11   with Mr. Mark Williams last year about

12   perceived voting irregularities in Georgia?

13         A.    Not that I recall.  But Mark

14   and I are old friends, and we've talked about

15   those kinds of issues over the years a number

16   of times.  But I don't recall a specific

17   discussion with him last year about it.

18         Q.    Do you recall any discussions

19   specifically about challenging Georgia voters

20   who were suspected of having changed their

21   address?

22         A.    Not that I recall.

Page 58

1          way, I would hope that Mr. Davis would

2          answer.

3                    MS. SIEBERT:  All right.  Mark,

4          go ahead.

5          A.    I'm not aware of residency

6     challenges that were filed before the

7     general, but it wouldn't surprise me to learn

8     that there were.  There weren't any that I

9     was involved with.

10    BY MR. SHELLY:

11         Q.    Do I understand correctly that

12    filing these challenges were your idea in the

13    first instance?  Or did someone else first

14    provide that idea?

15         A.    It certainly was not my

16    original idea.  That's been a topic that's

17    been discussed for quite some time.

18                    There have been previous

19    challenges in previous elections filed on

20    residency issues, as far as I'm aware.  It's

21    not a new idea by any stretch.

22         Q.    Did you support these

Case 2:20-cv-00302-SCJ   Document 156-9   Filed 05/16/22   Page 16 of 37

10/4/2021        Fair Fight, Inc. et al. v. True the Vote, et al.        Mark Davis

Page 59

1    challenges -- I'll make this one specific to

2    the post-November challenges that True the

3    Vote filed.  Did you support those

4    challenges?

5        A.     In general, I support any

6    effort to clean up the voter rolls and ensure

7    people don't vote with residency issues

8    because they're casting ballots for people

9    that don't represent them.

10             So to that extent, I would

11   support efforts to prevent people from

12   casting illegal ballots.

13       Q.     And what did you hope the

14   impact of these challenges would be on the

15   voters?

16       A.     I hoped that the counties that

17   accepted challenges would simply give them

18   additional scrutiny to make sure that they

19   retained the eligibility to vote in a

20   particular election.

21             In other words, under Georgia

22   law, if they move from one county to another

Page 60

1    more than 30 days before the election, and

2    that is a permanent change of address, then

3    they lose their residency in their previous

4    county.  And they must be registered in their

5    new county in order to vote lawfully in that

6    county.

7                  Under Georgia law, outside that

8    30-day grace period, we're only permitted to

9    vote in the county we actually live in.

10        Q.    Have you ever filed a voter

11   challenge?

12        A.    No.

13        Q.    Why not?

14        A.    I've never felt the need to.

15        Q.    But you supported the

16   challenges that True the Vote filed?

17        A.    I took exception with some of

18   their logic.  It's not the way I would have

19   done it, but I had no input into the criteria

20   used for their challenges or the data

21   processing they did for their challenges or

22   any of that kind of stuff.

Page 61

1                You know, that was their

2    project; it was not mine.  And I did not

3    participate in it.

4          Q.     What would you have done

5    differently than what they did?

6          A.     I probably would have narrowed

7    the scope.  But other than that, from what

8    I understand about what they did, they

9    identified people they believed to have

10   potential residency issues and wanted the

11   registrars to give them increased scrutiny

12   just to make sure that they did retain the

13   eligibility to vote in a particular election.

14               So in -- as far as that's

15   concerned, I'm all in favor of preserving the

16   integrity of the vote and making sure that

17   people who are properly qualified are able to

18   vote and vote lawfully.

19         Q.     And what do you mean when you

20   say that you wished they had reduced the

21   scope?

22         A.     They did a larger challenge

Page 62

1    than I thought was best.  I would have

2    limited the scope to people that had voted in

3    the general election because, for example,

4    you know, there are over a quarter million

5    people who moved out of Georgia.  And

6    I wouldn't have expected very many of them to

7    cast ballots here.  Thousands of them did.

8               But, at the same time, if they

9    don't live here anymore, then they shouldn't

10   be voting here.  So it's not that I really

11   object to their criteria, but I probably

12   personally wouldn't have done it that way.

13        Q.    And you say you worked with

14   people who had a different perspective than

15   True the Vote.

16               Was that perspective -- are you

17   referring to the scope or were there other

18   areas where their perspectives differed?

19        A.    I don't -- it wasn't my

20   intention to put it quite the way you just

21   did.

22               From what I have since learned

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 63

1    about their challenge, I would have done it

2    differently.  I didn't have any input into

3    their challenge or the logic behind it or

4    their data processing criteria or the way

5    they did it.  That was all up to them.

6          Q.     Is there anything else you

7    would have done differently besides narrowing

8    it to people who had voted in the

9    November election?

10         A.     Not that I can think of off the

11   top of my head.

12         Q.     Did you ever urge anyone to

13   participate in the challenge process?

14         A.     I did have a Facebook post

15   where I encouraged people -- where

16   I basically reposted a post from Derek

17   looking for volunteers.  Other than that,

18   I don't recall urging any specific person.

19         Q.     Did you ever talk with anybody

20   about the methodology for developing a

21   challenge list?

22         A.     I did talk with people about

Page 64

1    the methodology that I used in my own, but

2    not True the Vote's, that I recall.

3               Well, in thinking about that,

4    it's entirely possible I did discuss the

5    differences between the two with people.

6    I just don't recall specifics of who and when

7    and all that kind of stuff.

8         Q.    When you say "the differences

9    between the two," are you referring to the

10   difference between yours and SureBill's?

11        A.    No.

12        Q.    Between yours and True the

13   Vote's?

14        A.    Yes.

15        Q.    And did you discuss those

16   differences with True the Vote?

17        A.    I don't recall.  Like I said,

18   I didn't have input or really attempt to have

19   input that I recall into what they were

20   doing.  That was their business.  I didn't

21   try to tell them what to do.

22               I may have told them what

Page 92

1   Normally, when I'm processing the voter

2   database, I'll run NCOA on the mailing

3   address and the physical address.  So when

4   you're talking about 7.6 million records,

5   you're talking about double that in an NCOA

6   run.

7          Q.      How long does that process

8   take, from start to finish, to do it right?

9          A.      It really depends on the

10  workload that my compiler has at the time.

11  I will typically kick it off on maybe a

12  Friday afternoon and then just forget about

13  it for a day.  When I come back the next day,

14  it's usually done.

15              I don't know about -- exactly

16  how many hours.  It's not like I'm sitting

17  there at my computer having to watch it.

18  Once I start the process, it just runs.

19          Q.    Okay.  Okay.  Returning to this

20  document in paragraph 7, you say you've been

21  brought in as an expert witness in a total of

22  five election disputes, which I think you

Page 93

1    mentioned earlier.

2                Can you tell me about those

3    five cases?

4                MS. SIEBERT:  Again, I'm

5         objecting to relevance.

6         A.    Well, I can't tell you what

7    those cases were off the top of my head.  I'd

8    have to research that.  But off the top of my

9    head, I couldn't tell you the exact document

10   name.

11               Two of them related to a

12   dispute election in House District 1 back in,

13   I believe it was, 2002; two them were related

14   to a dispute in House District 28, I believe

15   in 2018 or 2019, or both -- there was two

16   cases surrounding that one as well; and then

17   the fifth case was in Long County, Georgia,

18   just after the primary of 2020.

19   BY MR. SHELLY:

20        Q.    And was any of your testimony

21   about data processing related to the address

22   of potentially ineligible voters?

Page 94

1          A.      Yes.

2          Q.      In how many of them?

3          A.      All of them.

4          Q.      And were those conclusions as a

5     result of the same processing you've been

6     describing here?

7          A.      Yes and no.

8                  Some residency issues are

9     caused by redistricting or districting

10    issues.  Usually those are errors made by the

11    county.  And some are caused by people

12    moving.  Some are caused just by people

13    straight up being assigned to the wrong

14    county.  Some people claim to live somewhere

15    that they don't.

16                 There's any number of issues

17    that can cause residency- or districting-type

18    issues, so I can't really give you a pat

19    answer for all circumstances.

20         Q.      Okay.  Let's skip down to

21    paragraph 14.  I read it to say, "Although

22    our state laws on residency appear to be

Page 95

1    clear, there is obvious conflict between the

2    effective implementation and administration

3    of those laws and the 1993 National Voter

4    Registration Act, as well as some existing

5    Georgia case law which has only made the

6    situation worse."

7              Can you tell me what you meant

8    by "obvious conflict"?

9         A.    Well, as you may be aware, when

10   a Secretary of State gets an NCOA match,

11   they're required to contact the voter to

12   investigate that NCOA match.  Basically ask

13   the voter:  Do you still claim residency at

14   the current address you're registered at or

15   have you moved?

16              You have to send out those

17   letters and investigate that.  And the

18   Secretary of State is prohibited by the

19   1993 National Voter Registration Act from

20   doing so-called list maintenance within

21   90 days of a federal election.

22              And here, in Georgia, 21-2-233

Page 96

1    permits a Secretary of State to run that

2    National Change of Address processing, it

3    appears, pretty much at its discretion.  In

4    fact, I believe that term "discretion" is

5    used.  Yet the 1993 NVRA prohibits what it

6    can actually do with that information.

7             So our Secretary of State is on

8    record blaming the 1993 National Voter

9    Registration Act and its prohibitions,

10   preventing him from preventing some of these

11   votes that have been cast with residency

12   issues.

13            He and his staff have admitted

14   on multiple occasions that such errors do

15   happen, but they claim that the NVRA

16   prohibits them from being able to address

17   them in a meaningful way.

18       Q.    And so you say that voter

19   challenges then is as a way to get around

20   those NVRA restrictions?

21       A.    It's not really --

22            MS. SIEBERT:  Objection --

Page 110

1    those are going to be valid.  And, of course,

2    certainly not anywhere close to that number

3    actually cast ballots in the election.

4          Q.      Do you have any idea how many

5    of those 267,255 voters may have been

6    military or student voters?

7          A.      No, I do not.

8          Q.      In paragraph 24, you calculate

9    122,231 voters who moved across state [sic]

10   lines but within Georgia.

11              Would your methodology have

12   identified all of the registered voters who

13   submitted NCOA notices for an address outside

14   of their county but within Georgia?

15         A.      Well, to start with, as

16   I mentioned earlier, I completed this

17   analysis just before testifying.  And after

18   that testimony, I realized some of those had

19   changed their addresses to P.O. Boxes.  So

20   I would revise that number of 122- to

21   approximately 110-.

22              But, yes, the USPS data shows

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 111

1    that they moved from one county to another

2    county in Georgia.  And based on the move

3    effective date they gave the Post Office when

4    they filed their change of address, that move

5    effective date was more than 30 days in

6    advance of the election.  But, of course, not

7    all those people cast ballots.

8         Q.     True the Vote calculated this

9    figure in their challenges within state

10   movers to be 124,114.

11             Do you know why there would be

12   a discrepancy?

13        A.     I wasn't involved in their

14   processing.  I couldn't tell you.

15             I would imagine they would have

16   done different dates.  That might be one

17   possible explanation.  Because, as I

18   mentioned earlier, NCOA is a window.  It's

19   either looking back 18 months or it's looking

20   back 48 months.

21             So when you process NCOA, it's

22   a particular snapshot at a particular moment

Page 112

1    in time.  So that, alone, could easily

2    account for the disparity.

3              I just recently ran NCOA again,

4    and, you know, the numbers had gone up

5    considerably as far as the number of hits

6    statewide.  So it's really a moving target.

7              And that's part of the reason

8    for the certification, is one of the primary

9    reasons for the certifications, is in order

10   to be in compliance with United States Postal

11   Service move update requirements, the

12   processing has to be done within a certain

13   amount of time of when you do the mailing or

14   you can risk losing your postage discounts.

15        Q.    And then can we look at

16   paragraph 36.  You refer to the antiquated

17   Voter Registration Act.

18        A.    Yes.

19              I believe the 1993 National

20   Voter Registration Act should be amended so

21   that it's more helpful in keeping our

22   nation's voter rolls cleaner.

Page 113

1                    I would advocate for the use of

2    a national voter data clearinghouse, not

3    federalized elections or federalized voter

4    registration but something similar to or

5    perhaps even ERIC, E-R-I-C, the Electronic

6    Registration Information Clearinghouse.

7                    Somewhere in the neighborhood

8    of half of our states are participating

9    states.  My understanding is it's an NGO, and

10   that each state sends a designee to

11   participate in the governance of ERIC.

12                   And the states will submit

13   voter data with a hatched version of the full

14   date of birth and Social Security number so

15   that that information remained confidential,

16   but at the same time can be matched against

17   other member states.

18                   It's very useful in determining

19   if a voter is registered in more than one

20   state, which happens often.  As an example,

21   the 267,000 that moved out of Georgia, some

22   large number of them probably are registered

Page 114

1    in other states.

2              I'm not privy to the results of

3    the analysis that ERIC does, but I would

4    imagine that they routinely find people who

5    have moved from one state to another.  And

6    when they move to their new state, they got a

7    driver's license and registered to vote and

8    never cancelled their voter registration in

9    Georgia.

10             So, yes, I do believe that, you

11   know, in this day and age, that's nearly a

12   30-year-old law there.  And technology has

13   advanced considerably since those days.

14             Yes, I do believe that we can

15   do better and that we can keep our voter

16   rolls cleaner and we can help ensure people

17   are able to vote and vote lawfully and vote

18   for people who actually represent them.

19             MR. SHELLY:  Henry, can we look

20        at Exhibit C now.

21             (Davis Exhibit C,

22        Mark Davis Facebook Post, May 7 at

Page 147

1          I've asked everything that I have on

2      my list?

3              MS. SIEBERT:  Sounds good.

4              THE VIDEOGRAPHER:  The time is

5      11:49 a.m.  Going off the record.

6              (Recess taken.)

7              THE VIDEOGRAPHER:  The time is

8      11:54 a.m.  Back on the record.

9  BY MR. SHELLY:

10      Q.   I do have just a few final

11  questions for you, Mr. Davis.  I want to make

12  sure I understand the mechanics of this

13  matching, as I'm calling it, the best I can.

14              Another example:  If a person's

15  last name is hyphenated in one file but not

16  the other, would that show up as a match?

17  Or, my understanding, that that would depend

18  entirely on the algorithm that is being used?

19      A.   It depends on the matching

20  algorithm used by the Postal Service.

21              If there is -- if there's not a

22  match, then I would not be provided with a

Page 148

1   new address, so they wouldn't be on the list

2   to begin with.

3        Q.     Okay.  Your list of

4   approximately 40,000 names that you

5   identified of people who voted in the general

6   or otherwise you were concerned about their

7   eligibility to vote, did that include anyone

8   who was registered or moved to a military

9   base?

10       A.     Derek is also a former Marine,

11  and we did the best that we could to scrub

12  military bases out of there.

13             But, again, as I mentioned

14  earlier, when someone files a permanent

15  change of address when they really intend to

16  go away temporarily, that is something that

17  needs to be addressed with some sort of

18  investigation, either mailing them a letter

19  or a notice, as the Secretary of State does,

20  or sending an investigator to ask that

21  person, you know:  Did you move from this

22  address to that address?  Was it a temporary

Page 149

1    move or a permanent move?  Or an

2    investigation by a county that accepts a

3    challenge.

4                There's additional data to be

5    gathered.  This is a place to begin the

6    process, but it's not the be all end all of

7    any of these processes.

8         Q.    You mentioned -- did

9    Mr. Somerville remove the military names, or

10   is that something that you did yourself?

11        A.    I had him do it because he's

12   aware of where the big military bases are and

13   did his best to scrub any of them out of the

14   data.

15        Q.    Okay.  Do you have -- do you

16   know how many names that removed?

17        A.    I don't recall.

18        Q.    And did you do any similar

19   scrubbing for other reasons?  A person could

20   be in a similar situation?  For example,

21   people who are registered and on a college

22   campus?

Page 150

1       A.      Not that I recall.  I know

2   there's a very low number of college-age

3   voters on the list.  But, again, those issues

4   are basically the subject of the inquiry,

5   whether that's done through the mail by the

6   Secretary of State or done by the county

7   board of elections in reviewing a challenge

8   or done by the Secretary of State's office as

9   they continue to investigate these issues.

10      Q.      And do you think that the

11  county boards of election could do the proper

12  investigation for 40,000 names before the

13  runoff election?

14      A.      Well, that's a statewide

15  number.  No county has near that total.

16      Q.      But -- so did you think that

17  each county could perform all the

18  investigations they needed to do before the

19  election?

20      A.      I don't know.  That's for the

21  county to determine.  It's up to the county

22  to accept or reject a challenge.  And, as

Page 151

1    you're aware, many of them did reject them.

2                    You know, that was part of the

3    reason that I, you know, limited the scope of

4    the challenges, is because, A, since they had

5    already voted in the general and many of them

6    already with potential residency issues, I

7    felt like that was on stronger footing, as

8    far as the counties go, in their ability to

9    process a challenge as well as and the

10   strength of the challenge itself.

11                   So, yeah, I would agree that

12   the larger the number is, the more difficult

13   it is on the counties.  And, in part, I think

14   that may be part of the reason that some of

15   the counties rejected challenges, because

16   they just didn't want to deal with it.

17                   And then part of the other

18   reason is the threat of a lawsuit backed by

19   an organization with millions of dollars

20   behind them.  A lot of voters were

21   intimidated and a lot of counties were

22   intimidated.

Page 152

1      Q.     Do you intend to file any

2   challenges in the future?

3      A.     I hope that I don't have to.

4   I hope that these issues will be addressed by

5   our elected officials.

6              I do intend to keep researching

7   these issues in the future and identifying

8   and calling attention to these issues as I've

9   done for 20 years.  I intend to remain an

10  advocate for election integrity, yeah.

11             I don't think it's okay for

12  people to vote in districts they don't live

13  in for people who don't represent them.

14  I think all Americans should view it that

15  way.  Voting for our representatives is the

16  bedrock of our Constitutional republic.

17  I don't think it's acceptable that we have

18  people casting unlawful ballots.

19     Q.     A second ago you mentioned that

20  this process has resulted in the intimidation

21  of a lot of voters.

22             Can you elaborate on what you