Page 24

1            Of course, we'll instruct him to

2      answer, but if okay with you, I'd like to just

3      lodge a continuing objection for the record.

4            MS. MENG:  Thank you, Melena, that's

5      noted.  And I would say that these questions are

6      based off of documents that were produced, and

7      so --

8            MS. SIEBERT:  No, of course.  Of

9      course.

10           BY MS. MENG:

11      Q    So Mr. Davis, could you just take a

12      moment a take a look at this document in front of

13      you.  I believe it's an email chain, and it may be

14      multiple pages, but I'd like to just focus you on

15      the first page for now.

16      A    Sorry, did you ask for a response?

17      Q    Oh, no.  I just wanted you to review

18      it, and let me know when you've had a chance to

19      look it over.

20      A    I recall this email.

21      Q    Okay.  And do you agree that this is

22      an e-mail chain between you and Mr. Somerville

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 25

1    about some efforts to begin analyzing data?

2          A    Yes.  A discussion was had early on

3    about replicating my work elsewhere, which is hard

4    to do because not a lot of people do the kind of

5    voter data analytics that I typically get involved

6    with, but this effort was basically to try to

7    replicate the NCOA processing that I did from

8    another source just to give it added credibility,

9    and this I believe was one of the initial emails

10   where that was discussed.

11         Q    Great.  So at the bottom of the first

12   page, in the last two paragraphs, you write, "Our

13   purpose here is to identify voters who moved

14   across county lines."

15              And then in the paragraph following,

16   you say, "This investigation has also revealed

17   many out of state voters, presumably mostly

18   students, military, but some of those are probably

19   also illegitimate."

20              Did I read that correctly?

21         A    Yes.

22         Q    Okay.  And Mr. Davis, why did you

Page 26

1    single out military voters here?

2         A    Well, when you file a National Change

3    of Address with the Postal Service, you have the

4    option of classifying it as temporary or

5    permanent, and when you're going to the beach for

6    the summer or something like that, you know, say

7    for six months, you can file a temporary change of

8    address, and when you do that, they will forward

9    your mail to the beach for you, but they won't

10   turn around and tell the folks sending you that

11   mail to update their database to your new address

12   because it's filed as a temporary change of

13   address.

14              So what tends to happen is, because

15   you can't file a temporary change of address for

16   longer than one year, people who are moving

17   temporarily for longer than one year end up filing

18   those changes of address as permanent changes of

19   address when they leave, and then typically they

20   will file another permanent change of address when

21   they come back.

22              So a student going away for four years

Page 27

1    of college or a member of the military going away

2    for a tour of duty likely would file permanent

3    changes of address when they leave and permanent

4    changes of address when they come back, which

5    makes them difficult to distinguish in the data.

6              Q    Okay.  And you mentioned students as

7    well, so --

8              A    I'm sorry?

9              Q    You mentioned students as well in this

10   sentence and the answer that you just gave, so

11   could you just clarify?  When you noted that,

12   presumably, mostly students and military are

13   out-of-state voters, but some of those are

14   probably also illegitimate, were you trying to

15   convey that these student and military voters

16   would be legitimate voters despite them being out

17   of state?

18             A    No.  In the situation where a person

19   leaves the state temporarily, even if it does

20   exceed the one year allowed by the Postal Service

21   to file as a temporary change of address,

22   a student or a member of the military who leaves

Page 28

1  for some period of time intending to return,

2  there's no issue with them voting.

3       Q    Okay.  So in the eventual list of

4  about 40,000 voter challenges that you and

5  Mr. Somerville pulled together, were the names of

6  voters who forwarded their -- were the names of

7  voters who forwarded their mail to an address on a

8  military base therefore excluded?

9       A    Well, the number you're quoting --

10 based on the number you're quoting, I think I need

11 to draw some distinctions here.

12           That initial list that I output of

13 40,100 something, I'd have to look at the count,

14 that list I don't think is really relevant to this

15 case.  That list was produced basically for the

16 Trump attorneys and for me to continue as a

17 starting point to work with.  That was not used to

18 challenge voters in the runoff election.

19           The selection criteria for that file,

20 and the processing that I did for that file, were

21 different.  So I just want to draw that

22 distinction.

Page 29

1          Q     Sure.  Thank you for that

2     clarification.

3               So in the list that you eventually did

4     pull together for voter challenges, did you

5     exclude names of military voters?

6          A     Well, in the absentee voter database,

7     there are UOCAVA voters in there, and those are

8     military typically, or subject to the Act, so

9     basically military and their families, so those

10    were dropped.

11               And Derek Somerville, being

12    ex-military, is pretty familiar with where

13    military bases are, so to what extent we could, we

14    did attempt to suppress as much as possible what

15    could likely be members of the military.  But at

16    the end of the day, ferreting out those kinds of

17    issues is what investigations are for.

18               So, you know, the number of records

19    was quite large, wasn't really possible for

20    private citizens like us to do those kinds of

21    investigations, so it's up to our county elections

22    officials or state elections officials, whatever

Page 33

1          Q     Okay, that's helpful.  Thank you,

2     Mr. Davis.

3                And just to ask a follow-up question

4     to your point about this list that was provided to

5     the Trump attorneys, when was that list put

6     together, or when did that analysis begin?

7          A     Well, the NCOA run that I did I

8     believe was November 25th, if I'm not mistaken,

9     and an initial copy of that analysis would have

10    gone to them in some period not long thereafter.

11               Had that case continued, I certainly

12    would have revisited that file and refined it

13    more.  That was just an initial draft, an initial

14    look, but it ended up not going farther, so that's

15    where it sat.

16         Q     And when you say "case," can you

17    clarify what you mean by that?  Was it a lawsuit

18    or --

19         A     Well, there was a challenge filed by

20    the Trump attorneys and Republican Party Chairman

21    David Shafer that I had been in communication with

22    a number of attorneys about that case, and they

 1    had asked for my analysis.

 2              There were a number of analysts that

 3    they were in discussions with at the time

 4    regarding various issues that different people had

 5    raised.

 6              Residency issues are in my lane, so to

 7    speak, so I was asked to submit what I was aware

 8    of that were issues with regard to those as they

 9    related specifically to the general election.

10        Q    Okay.  And you had said before that

11    that list was about 40,205 voters, correct?

12        A    The initial version of it was roughly

13    40,000 voters, a little more than that.

14        Q    Okay.

15        A    You have a copy of it, by the way.

16        Q    Okay, thank you.

17              So, Mitch, if you could pull up

18    Exhibit E for us and label it as Exhibit 5.

19              (Davis Exhibit 5 was marked

20               for identification.)

21              BY MS. MENG:

22        Q    Mr. Davis, could you take a moment

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 35

1    just to take a look at this email communication,

2    and let me know when you've been able to skim it

3    over.

4          A    Yeah, I think -- I do recognize this,

5    and I think we basically just went over that.

6               Again, we had assumed that changes of

7    address that the Secretary of State likely picked

8    up when they did their list maintenance activities

9    in 2019, we didn't want to recover that same old

10   ground.

11              O.C.G.A. § 21-2-234 requires the

12   Secretary of State to do list maintenance in the

13   first six months of every odd year, so they would

14   have done list maintenance activities, unless

15   prevented by some sort of special election or

16   something like that.

17              They would have done their list

18   maintenance activities in the first six months of

19   2019, so I recall limiting our challenged voters

20   to the period beyond that.

21        Q    Okay.  And at the top here, you see a

22   message that Mr. Somerville sent you that said,

Page 36

1   "Done.  No way to catch them all, but I'm sure I

2   removed a few thousand records."

3            Do you see that?

4        A    I think he's talking about the

5   military scrub I asked him to do.

6        Q    Okay.  And just to clarify the time

7   frame here, these e-mails were sent in the middle

8   of December, so based on what you were saying with

9   the previous list that you did for the general

10  election, would this list have been for -- this

11  analysis have been for the runoff election; is

12  that correct?

13       A    Yes.

14       Q    Okay.  And what did you believe

15  Mr. Somerville meant by there's no way to catch

16  them all?

17       A    Well, the scrub he did would have been

18  military bases, people living on base, but there's

19  also people who live off base, some closer than

20  others.

21            So I think what he was saying is he

22  did his best effort to suppress as much military

Page 37

1    as possible, but there's no way to catch them all.

2              At the end of the day, as I said, you

3    know, that's what investigations are for, and so

4    it's a best efforts kind of situation.  We made a

5    good-faith effort to do what we could with regard

6    to the military.

7         Q    Okay.  And how confident were you in

8    how accurate your analyses were in capturing or

9    removing the data that you were seeking to remove?

10        A    As far as the military or --

11        Q    Military, or any other type of

12   category, like student voters, et cetera.

13        A    Well, I have a lot of experience doing

14   this kind of work, and I gave my best efforts to

15   the cause as well.

16             Our goal was to produce legitimate

17   challenges as much as possible.  We didn't want to

18   inconvenience people unnecessarily, but at the

19   same time, it appears to me, or at least the data

20   indicates, that there likely were a lot of

21   unlawful votes that were cast in the general

22   election, and because we were seeing that, we were

Page 38

1    making an effort to try to prevent the same from

2    happening in the runoff.

3              So I have a lot of experience doing

4    this kind of stuff, and I gave it my best effort,

5    so I'm confident that I did the best that I could.

6         Q    Okay.  Mitch, do you mind pulling up

7    Exhibit F, and we can mark that as Exhibit 6.

8              (Davis Exhibit 6 was marked

9               for identification.)

10             BY MS. MENG:

11        Q    Mr. Davis, if you could take just a

12   moment to look over this email communication.

13        A    I recognize it.

14        Q    Okay.  And this appears to be an email

15   sharing an analysis of challenged voters by

16   categories related to votes in the presidential

17   election, partisan affiliation, and I believe

18   geographic proximity to Atlanta; is that correct?

19        A    I don't think it has to do with

20   partisan affiliation.

21             There was an email, I believe -- well,

22   not an email, but a text message from Derek asking

Page 39

1   if I happened to have a count by county, and I

2   just did a quick SQL query and generated one and

3   sent it to him because he had asked for it.  And

4   then, of course, the count by county was based on

5   our final challenge list for the runoff.

6              And so having that, for whatever

7   reason, this is an analysis that he did.  I didn't

8   particularly see the reason for it, but apparently

9   he did, so, you know, it would probably be best to

10  ask him about it.

11        Q    Okay.  And this grand total number of

12  39,941, would you say that's the number of voter

13  names that you had put together for challenges

14  related to the runoff election?

15        A    I'd have to look for the exact number,

16  but it was in that range for sure.  That more than

17  likely is the correct number.  I don't have it in

18  front of me, so I can't --

19        Q    Sure.

20        A    I can't say that definitively.

21        Q    So I guess posed another way, is the

22  county count and the number -- the analysis that

Page 92

1        Q     Sure.  Let's take a five-minute break

2    and come back at around 11:05, 11:06.

3        A     Thank you so much.

4              THE VIDEOGRAPHER:  We're going off the

5    record.  The time is 11:01.

6              (A break was taken.)

7              THE VIDEOGRAPHER:  We're going back on

8    the record.  The time is 11:08 a.m.

9              BY MS. MENG:

10       Q     So Mr. Davis, I'd like to ask you a

11   couple of questions about your interactions with

12   True the Vote.

13             How many times would you say you've

14   been on calls with True The Vote or any

15   representative from True the Vote?

16       A     I recall two.  It's been a while.

17             I had just met -- well, I've never

18   actually met True the Vote people in person, but I

19   had been introduced to True the Vote shortly

20   before all of this started following the general

21   election.  I had not known them for very long.

22       Q     So sorry, just to clarify that

Page 93

1  timeline, you said that you met them before the

2  general election; is that correct?

3       A     I had a phone call with Gregg Phillips

4  following the general election; and then there was

5  a -- it was a Zoom meeting that Catherine

6  Engelbrecht had hosted; and then I think there was

7  one occasion where I ended up speaking with her on

8  the phone at one point that I had forgotten about

9  until recently when it came up.

10      Q     Okay.  And so you'd say that you've

11  communicated directly with Ms. Engelbrecht on the

12  phone about one time that you can recall; is that

13  correct?

14      A     I recall one.  I'm not discounting the

15  possibility there could have been others.  There

16  was so much activity going on following the

17  general election, it's kind of a blur, but my best

18  recollection is one, but I'm not going to sit here

19  and say there might not have been others.

20      Q     Okay.  And do you -- have you ever

21  texted, messaged, or contacted Ms. Engelbrecht

22  directly in a non-phone conversation context?

Page 94

1         A     There was a message that I sent her

2    during a Zoom call that she hosted, and then there

3    was another occasion that I recall texting her

4    with a concern about some activity that they were

5    going to be -- or they had proposed doing on the

6    web.

7         Q     Okay.  And have you ever had any

8    disagreements with anyone at True the Vote?

9         A     Quite a few.

10        Q     Okay.  Can you just briefly describe

11   what some of those are?  We may get into some

12   detail about that later, but if you could just

13   give a brief overview.

14        A     I was not on board with the philosophy

15   surrounding their challenge.  I felt it was too

16   broad.  From my own perspective, I wanted mine to

17   be more legitimate, more smaller.  I wanted our

18   challenge to be focused.

19             As I think I mentioned before, I think

20   our average number of challenged voters per county

21   was under 250.  Of course, the larger counties

22   with larger staffs would have received larger

Page 95

1    challenges, and some of the smallest counties

2    might have received very, very few.  So I had a

3    disagreement in terms of the scope.

4                One of the issues that popped up early

5    on was my desire to make sure everyone was aware

6    that our challenge was not True the Vote's, and

7    vice versa, and I wanted people to be aware of the

8    difference in the philosophies surrounding the

9    challenges.

10               And then the other instance that I

11   recall was there was some talk about publishing

12   voter data on the website, and I think I may have

13   misunderstood what they were doing, and I had

14   expressed a concern about what I thought their

15   plans to be, but I think it turns out some of my

16   concerns were unfounded.

17        Q    Okay.  And you had referred to,

18   you know, wanting your challenges to be more

19   legitimate.  Can you elaborate on what you mean by

20   "legitimate"?

21        A    I don't mean to imply that theirs were

22   illegitimate.  Theirs was broader than the one

Page 96

1     that I contemplated.

2               I felt like my approach was the

3     correct approach.  I mean, obviously, that's why

4     we pursued ours the way that we did and with the

5     philosophy that we pursued it.

6               Does that answer your question?

7          Q    Sure, it does.

8               So, Mitch, can we pull up Exhibit N?

9     And this will be labeled as Exhibit 12, please.

10              Mitch, are you there?  Oh, okay.

11    Thank you.  Sorry about that.

12              THE VIDEOGRAPHER:  I'm sorry, N or M?

13              MS. MENG:  N as in Nancy.

14              THE VIDEOGRAPHER:  I gotcha.  My bad.

15              There you go.

16              MS. MENG:  And we'll mark this as

17    Exhibit 12.

18              (Davis Exhibit 12 was marked

19               for identification.)

20              BY MS. MENG:

21         Q    So Mr. Davis, are you familiar with

22    this document?

Page 127

1    there was something either he or I wanted to

2    discuss in depth and didn't want to sit there and

3    type it all into a text message.  There's a lot of

4    that all the way through these text messages.

5                  I would assume we spoke.  I don't

6    recall specifically if we spoke.  I can't

7    really --

8         Q    And do you recall -- okay.

9                  And do you recall the content, if you

10   had had a call, what that would have been about?

11        A    I don't.  I'm sorry.

12        Q    At the top of the screenshot on

13   page 173, there's a text message from

14   Mr. Somerville referring to a call scheduled for

15   10:00 a.m. that was postponed.

16                  Were you on that call?

17        A    I don't know what call that

18   references, or who it was with, or really anything

19   about it.

20        Q    Okay.  Mitch, can you go to page 180

21   and 181?  So Mr. Davis, you'll see at the bottom

22   of 180, extending onto 181, you say, "Derek, I am

Page 128

1   telling you you need to send me Catherine's

2   contact info and get us on a cal [sic] ASAP."

3           Do you see that?

4      A    Did you have a question or --

5      Q    Yeah.  I just wanted to see if you had

6   located the text message I was speaking about.

7      A    I see it, yes.

8      Q    Okay.  Why did you urgently need

9   Ms. Engelbrecht's contact information?

10     A    I don't remember.  It may have been

11  about my concerns about the website.  I just don't

12  recall specifically what that was about.  It's

13  been quite some time.

14     Q    And you refer here to a call that you

15  were requesting between the three of you ASAP.

16          Do you remember if a call ever

17  resulted from your text message here?

18     A    I don't recall having a call.  I

19  suppose it may have been possible that we did, but

20  I don't recall any specifics about any call.

21     Q    Mitch, can you go to page 189 and 190?

22  Actually, Mitch, can you just scroll up a little

Page 129

1    bit on 189 to the previous page to get a time and

2    date stamp?  Okay, perfect.

3              So Mr. Davis, you see this a text

4    conversation starting on December 30th?

5         A    Okay.

6         Q    Okay.  And you send Mr. Somerville a

7    text that reads, "Derek we need to stop this.  If

8    they publish they will be flooded with defamation

9    complaints."  Do you see that on page 189?

10        A    I do, yes.

11        Q    So when did you first hear about this

12   publishing effort that you referred to?

13        A    I don't remember when or where or what

14   the context was, but I had heard there was going

15   to be a website launched that voter data was to be

16   loaded into that was going to collect information

17   from the public to be used for challenges, and my

18   perception at the time was that the complaints for

19   the public were going to be public as well.

20             Since that time, I've actually gotten

21   on that website, and they have a flowchart on

22   there about how it works, and I believe I may have

Page 130

1    misunderstood what they were doing.

2              It does not appear that -- while it

3    does appear publicly available voter data is being

4    used, it doesn't appear to indicate that

5    complaints from the general public are going to be

6    published to the public.  It indicates instead

7    that those concerns would be compiled into

8    challenges for elections officials, which would be

9    the proper venue for those concerns.

10             So my panic, if you will, over that

11   may have been misplaced.  My concerns may have

12   been misplaced.

13        Q    And so who did you hear about this

14   publication effort from in the first instance?

15             MS. SIEBERT:  And I'm just going to

16   object again to this line of questioning as

17   irrelevant.

18             Mark, you can go ahead and answer, but

19   I just wanted to assert that objection over this

20   line of questioning.

21             THE WITNESS:  I honestly don't

22   remember.  I think you asked that previously, and

Page 131

1    I don't remember where I heard about it.  It's

2    been quite some time, and I just can't recall.

3              BY MS. MENG:

4         Q    And you previously stated that you've

5    been on this website before.

6              Do you know the URL address or the

7    name of the website?

8         A    I went just the other day on the

9    True the Vote website, and it was under one of the

10   categories, and I had found it, and I read the

11   information that was contained on the website, and

12   I saw their flowchart, and I was definitely very

13   concerned about the approach that they were taking

14   when I first heard about it, but I may have

15   misunderstood what their intentions for the

16   website were.

17        Q    So I think you previously stated the

18   website would publicize names and information of

19   voters; is that correct?

20        A    My understanding is that they intended

21   to load the voter file in there, and of course,

22   the voter database is public record.  So if that's

Page 136

1    that she waived whatever privileges applies.

2         A    I recall her assuring me that their

3    plans had been vetted with legal counsel.

4         Q    Sure, but did she say anything about

5    the motivations or the purpose of the website?

6         A    Well, my understanding generally of

7    the purpose of the website was that it was to help

8    make voter data public so that it could be easily

9    accessed by the public and reviewed by the public,

10   so that if the public saw issues with the voter

11   rolls, they could provide comments to

12   True the Vote that could be compiled together and

13   used to file challenges with the local elections

14   officials, if there were issues that needed to be

15   addressed.

16              That was my general understanding from

17   the get-go.  I don't recall specifics of the

18   conversation, but I would imagine she reiterated

19   those goals.

20        Q    Mitch, if you could scroll and put 190

21   and 191 on the screen.

22              So Mr. Davis, do you see here you, in

Page 137

1   relaying a copy of a text message to

2   Mr. Somerville, you say, "You can do it after the

3   election with a short list of guaranteed

4   defensible examples.  I can help with that."

5             Do you see that?

6        A    Yes.

7        Q    So can you elaborate on what you meant

8   by a short list of guaranteed defensible examples?

9        A    Well, if she, through the website,

10  identifies voters that may have voted illegally,

11  and those voters get referred to the Secretary of

12  State's office for an investigation, and that

13  investigation concludes that they did vote

14  illegally and they're referred to the

15  Attorney General for prosecution, that's public

16  record.  That's what I had in mind in those

17  comments.

18       Q    Okay.  And can you give us a little

19  bit more detail on your offering to help with

20  that?

21       A    Well, I assume that she knows how to

22  submit a challenge, and she knows that she can

Page 138

1  also request an investigation from the Secretary

2  of State's office, and if she needed to contact

3  people to do that with, I could have given that to

4  her.

5              I didn't mean that I was going to get

6  involved and do all the heavy lifting, but I

7  certainly could offer her some of my advice on how

8  to proceed on those things.

9              But I think the point I was trying to

10  make there is that it's important to be pretty

11  careful before you start making public allegations

12  against any particular individual voter, and it's

13  best not to do that.  As we've discussed

14  previously, the appropriate venue for those

15  complaints would be our elections officials rather

16  than taking it public.

17       Q    Okay.  And on page 191, that text

18  message states, "But if you do it now you're

19  literally making good on one of the 'Threats'

20  alleged in their complaint."

21              Do you see that?

22       A    Right.

Page 139

1       Q     What complaint are you referring to?

2       A     Yours.

3       Q     The one in this case, correct?

4       A     Yes.

5       Q     Okay.  And did you believe the

6    publishing of voter challenge or allegation

7    information would be threatening?

8       A     Well, we did not publish challenge

9    information on particular voters.  That

10   information went to the appropriate venue.

11           Now, the public can request -- you

12   know, file an Open Records Request and obtain that

13   information, but that's not us publishing it.

14      Q     Okay.  And so, therefore, you had no

15   concerns if that information ended up being

16   public, as long as you yourself was not publishing

17   it?

18      A     I don't have any control over Open

19   Records Requests to county governments.

20           I don't know what else to say.

21      Q     And so in this message when you're

22   referring to the threats and the public

Case 2:20-cv-00302-SCJ   Document 156-12   Filed 05/16/22   Page 28 of 29

1/19/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Mark A. Davis

Page 140

1    information, you're referring to what exactly?

2    The information that you believed at the time

3    would be revealed on this website?

4        A    Well, your organization has alleged

5    that True the Vote and myself has intimidated

6    voters.  I'm not aware of any contact that we've

7    engaged in that would constitute intimidation of

8    any particular voter.

9              Challenging a voter on its face I

10   don't think is voter intimidation.  That is a

11   First Amendment petition to your government for

12   redress of grievances, and it is specifically

13   protected under Georgia law in 21-2-230.  A

14   challenge is a lawful vehicle for petitioning your

15   government for redress of grievances.  I don't

16   believe that constitutes voter intimidation.  I

17   guess we're going to see what the court system

18   believes on that.

19             But as long as challenges are handled

20   appropriately, and we're not publishing them to

21   the public or trying to intimidate voters, I don't

22   see any issue with them.  It seemed perfectly

Page 141

1  lawful to me.

2        Q    And so just focusing on -- putting

3  aside challenges and just focusing on what at the

4  time you had described your understanding of what

5  would be made public on this particular website,

6  what information specifically did you perceive to

7  be making good on the threats in the Complaint in

8  this case that would have appeared on that

9  website?

10        A    I feel like we've been over this

11  repeatedly, but I'll state it again.

12             My initial understanding of the

13  website was that it was going to be publishing

14  voter data, which is public record, and collecting

15  allegations against individual voters from the

16  public, and my fear was that those were going to

17  be published on the website as well.

18             Since that time, I've come to believe

19  that my concerns were misplaced and that's not

20  actually going to be happening because the website

21  seems to be indicating that those issues with any

22  particular voter are going to be gathered and