Page 66

1          A.     Yeah.  I'm trying to remember.

2     So is the blue me and -- or is the blue Mark?

3          Q.     The blue -- I believe you

4     produced this, so the blue should be you and

5     the black should be Mark.

6          A.     Okay.  I got it.  I see the

7     word "dude" in blue.  That is most certainly

8     me.

9               Well, let me read this again.

10    One moment.

11               (Document[s] reviewed.)

12               Yeah, again, so if this is me,

13    I don't recall what we're talking about

14    investigating.  But at this point, we would

15    have brought a lot of attention to the data

16    issues in the voter file, most certainly,

17    which were, frankly, not flattering on the

18    performance of the Secretary of State's

19    office.

20               And through the same process,

21    we would have drawn attention to

22    registrations at places I mentioned; for

Page 67

1    example, commercial mail-receiving agencies

2    that are forbidden by law and those kind of

3    conditions underneath Georgia law.  We would

4    have drawn a fair amount of attention to

5    that.

6              So, again, this is recollection

7    that I'm trying to develop while we're

8    speaking, but I suspect what I'm talking

9    about is just the attention that we were

10   trying to bring to this issue, which I feel

11   we did a fairly good job of bringing

12   attention to, to the issues in the voter

13   file.

14       Q.    Okay.  Thank you.

15            MS. FORD:  And, Mitch, can we

16       go to page 137 and 138 of the same

17       exhibit.

18            (Complied.)

19   BY MS. FORD:

20       Q.    Mr. Somerville, I realize we're

21   skipping around, so I do want to orient you.

22   We're back in December 2020, December 15th

Page 68

1    specifically.

2          A.     Right.

3          Q.     And here, Mark says, "The

4    challenge files are out there."

5                 And you respond, "10-4.  I have

6    had no luck with our election super.  What

7    was the total count for all the challenge

8    files?"

9                 Mark responds, "39,141."

10                And you respond, "10-4.  Let's

11   touch when you're able to discuss next steps,

12   sharing with the public, et cetera."

13                And just to clarify:  This is

14   talking about the challenges that you and

15   Mr. Davis prepared; correct?

16         A.     Correct.

17         Q.     Okay.  Can you explain what you

18   meant by discussing next steps and sharing

19   with the public?

20         A.     Well, again, this is looking

21   back on a conversation in December.  So

22   I don't have a specific recollection of what

Page 69

1   was precisely on my mind at the time, but,

2   you know, we were sharing publicly, you

3   know -- I say "publicly," through social

4   media, that this effort was underway, which,

5   again, I know you're well aware of, as we've

6   produced all of those -- all of that

7   information.

8               And so I suspect that just is

9   how do we -- you know, how do we -- again, at

10  that time -- so we have to remember the

11  context, too; right?

12              So there's a tremendous amount

13  of noise regarding the election at that time.

14  How do we properly frame our effort, if asked

15  about it?  You know, how do we equip others

16  who are engaged, again, like the folks that

17  volunteered, to properly discuss it?

18              I suspect that that's what

19  I intended by that.

20        Q.    And just to --

21        A.    Christina, if I can just add.

22        Q.    Sure.

Page 70

1          A.     You know, we can't overstate

2     how much vitriol was being spewed at that

3     point in time.  And I know Mark didn't, and

4     I certainly didn't, want our effort to be

5     looped into any of that.

6                So all of our conversations

7     about this in the public, you know, I think

8     needed to be subject to the same level of

9     discipline as the work itself.

10         Q.     To follow up on that --

11    I completely understand, you know, you -- you

12    were trying to make sure you were not part of

13    the vitriol.

14                Did you have a concern that

15    someone would take this and run with it and

16    it would become part of that narrative?

17         A.     No, no, because I didn't think

18    that we left any room for that.  But, again,

19    there was so much -- it was such a loud

20    period, if that makes sense.

21                And I'm cognizant of the forum

22    here, so I'm trying to be very specific.  But

Page 82

1    start outing these -- I said, "Perhaps we

2    should start outing these abusers by name?"

3              I think what's instructive is

4    we've never outed anybody by name.  So this

5    is back-and-forth banter, the tone of which

6    it's hard to determine, at what time of day,

7    what was going on, what was happening.

8              Obviously we didn't believe in

9    outing people by name because we never outed

10   anybody by name.  It's also posed as a

11   question.  So I don't -- I don't believe it's

12   anything.

13        Q.    So --

14        A.    Banter on Facebook.

15        Q.    At the end of the day, do you

16   think it would be inappropriate to out voters

17   by name?

18        A.    Well, I think my actions have

19   answered that question already.  We've never

20   done it; we never intended to do it.

21        Q.    So why publish this, then?

22        A.    Publish what, Christina?

Page 83

1          Q.      Publish this comment, which, in

2      my interpretation, at least, is not to one

3      person, but it's just you elaborating on your

4      initial post.

5          A.      Well, the abusers, number one,

6      that I think I'm referencing are the ones

7      that are specifically manipulating the

8      system.  And that's with reference to those

9      commercial mail-receiving agencies.  So

10     that's number one.

11             Number two is it's posed as a

12     question; it's not posed as a statement.  I'm

13     not saying we should.  I'm simply saying

14     perhaps we should.

15             Again, this is -- there's a lot

16     of context here.  There are a lot of things

17     that you say in those contexts that don't

18     necessarily reveal a fundamental base

19     opinion.

20             We've got thousands upon

21     thousands upon thousands of lines of material

22     out there.  You've drawn attention to one

Page 84

1   line in, literally, tens of thousands of

2   pages of context, I'm sure, that posed as a

3   rhetorical question of:  Should we out these

4   abusers by name?

5           We've never done it, not once.

6   So clearly we didn't think that was the right

7   thing to do.  It's just a rhetorical question

8   in a stream of comments in Facebook.

9   Obviously didn't guide our process because we

10  never did that, nor would we.

11          MS. FORD:  Can we please scroll

12      to the next page, Mitch.

13          (Complied.)

14          MS. FORD:  Sorry.  Actually,

15      can we scroll up just a little bit

16      more?

17  BY MS. FORD:

18      Q.   Mr. Somerville, I know you say

19  you were being hyperbolic here and it was a

20  rhetorical question, but, you know, a

21  response from someone named Kristel Kretchmer

22  is, "Yes!  Out the abusers by name."

Page 85

1              Do you agree it seems that some

2       people took that suggestion seriously?

3              A.    Well, based on what I'm looking

4       at, three people did.  And that's one

5       person's opinion that -- I don't doubt that

6       there's plenty of people that think that all

7       these people should be -- that -- I don't

8       doubt there are people throughout the state

9       that have any myriad of opinions on how

10      things should be handled.  That's not what

11      guided our effort.

12              So I, frankly, don't put a

13      great deal of weight in that exchange.  But

14      I certainly don't know who Kristel is.  And

15      I don't agree with outing the abusers.

16              What's -- at the end of the

17      day, that's not what we did, that's not what

18      we would have done.

19              Q.    Okay.

20              A.    It's hyperbolic.  Exactly.

21      That's exactly what it is.

22              Q.    And, Mr. Somerville, further

Page 86

1    down, about the middle of the way down, you

2    respond to someone named Brandon.

3                    And you say, "As Mark states, I

4    would anticipate formal challenges being

5    filed in all counties for those voters who

6    appear ineligible.  If that happens as

7    planned, all documentation will be public."

8                    So did you think there was

9    value in publicizing voter information

10   through formal challenges?

11       A.     Well, I'm not sure how you're

12   interpreting that statement.

13                   So what I intended by that, and

14   how I interpret it now, is that any challenge

15   that we do -- anytime you engage the

16   government, that material is going to become

17   public record.

18                   Now, how the government treats

19   that is beyond our purview, it's beyond our

20   influence.  But I would imagine that any

21   challenge that was filed, obviously that data

22   has to be made public, at least be made

Page 87

1    accessible to people who want it.

2              Certainly I didn't think that

3    the Boards of Elections were going to nail

4    these lists on the front door, and I don't

5    know that they did that.  But I think all

6    exchange with the government ultimately needs

7    to be public.

8         Q.    Did you have any concerns that

9    once these lists became part of the public

10   record, that some of the individuals who

11   engaged in more of the vitriol that you've

12   talked about would take some of these names

13   and run with it?

14        A.    No.  Maybe I'm giving too much

15   benefit to humanity.

16              But, no, I -- number one is

17   what's being -- what's being communicated to

18   the Board of Elections in these challenge

19   files is that an individual has a National

20   Change of Address record.  That's -- that

21   doesn't indicate anything other than there's

22   probable cause to believe that they may have

Case 2:20-cv-00302-SCJ  Document 156-13  Filed 05/16/22  Page 12 of 35

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 88

1    moved.

2            So I don't think, number one,

3    that being on that list is inflammatory or

4    incendiary or would incite any type of

5    punitive response, because it's simply -- you

6    know, as much as these proceedings try to

7    have -- you know, use the word "targeted"

8    over and over and over again, there's no

9    people targeted here.

10            Data conditions are targeted,

11    and that is that there's probable cause to

12    believe, as provided for under the NVRA and

13    in our state code, that the individual may

14    have moved.

15            And we have a very, very

16    balanced and very measured process for the

17    Board of Elections to use to follow up with

18    those individuals and determine whether or

19    not they have, in fact, moved.

20            So I've never viewed the

21    Section 230 challenges as an incendiary

22    process, if you will.  And, in fact, I'm not

Page 89

1    quite certain how anybody would know, nor

2    care to know, why somebody was on a challenge

3    list, because the process is benign.

4              It's -- you know, they don't

5    throw people in jail for being on that list,

6    that I'm aware of.  You get a card from the

7    Board of Election that asks you whether or

8    not you moved.

9              So -- and, you know -- and I

10   want to make sure we're not conflating two

11   different issues.  There's the CASS

12   certification that identified addresses that

13   were not legal addresses in Georgia.

14             That's different than the NCOA

15   list that indicated that people had moved on

16   the challenge list, which I believe is the

17   sole basis for the 39,000 individuals that we

18   challenged.

19             But, again, to conclude on this

20   piece:  Going in, finding an individual line,

21   reasonably, you know, as you say, hyperbolic

22   exchange with a complete stranger on

Page 90

1    Facebook, I don't think that's demonstrative

2    of our intent or expectations of outcome.

3    I think our work product speaks for itself.

4         Q.    Okay.  Thank you.

5              MS. FORD:  Mitch, we can take

6         this down.  We finally won't have

7         exhibits for a minute.

8    BY MS. FORD:

9         Q.    Mr. Somerville, I'd like to ask

10   you a couple of questions about your

11   interactions with True the Vote.

12              How many times would you say

13   you've been on calls with True the Vote or

14   any representatives from True the Vote?

15              And I should clarify.  By

16   "calls," I mean a Zoom call, a -- you know...

17        A.    If you will permit me just to

18   think, here.

19        Q.    Sure.

20        A.    It's an impressively low

21   number.

22              (Pause.)

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 91

1              I can't imagine I've had more

2      than a dozen calls, per se.  And likely much

3      less.  Very limited interaction, in my

4      definition.

5          Q.    And how many times have you

6      directly communicated with Ms. Engelbrecht?

7          A.    Again, an impressively low

8      number of times.

9              I've met once with her in

10     person.  I believe in terms of conference

11     calls, which include related to these

12     proceedings, three -- two or three, maybe.

13     Very few.  And then in terms of one-on-one

14     conversations on the phone, half a dozen,

15     maybe.

16         Q.    And I just want to clarify

17     that.

18              You're not speaking about

19     talking to her in the context of this

20     specific lawsuit; right?

21         A.    No.  I mean at one point, she

22     called and said, you know, "You're going to

Page 92

1    see that you've been named in a lawsuit."

2    You know -- so prior to these proceedings

3    going underway.

4          Q.    Right.

5                Have you spoken with her one on

6    one since then?

7          A.    I don't believe I have, no.

8          Q.    Okay.  Have you ever had any

9    disagreements with anyone at True the Vote?

10         A.    Well, can we clarify "anyone"?

11   Or would you like me to?

12               I'm aware of two people at True

13   the Vote.

14         Q.    So I would include

15   Ms. Engelbrecht in this category.  I would

16   include Ms. Holsworth in this category.  And

17   I guess I can separately ask about Gregg

18   Phillips, who was affiliated but, my

19   understanding is, not officially.

20         A.    Okay.  So, for the record, I do

21   not know that second name.  It's not familiar

22   to me at all.

Page 93

1              So the only interactions I've

2    had with anybody at True the Vote -- and I'm

3    now learning that Gregg is affiliated with

4    but not part of -- is I've spoken with

5    Ms. Engelbrecht and I've spoken with Gregg

6    Phillips.

7              In terms of disagreements --

8    and I'm not trying to be difficult here --

9    can you further qualify here what you mean by

10   "disagreement"?

11        Q.    Sure.

12             Did you ever have differences

13   of opinion on things they did or approaches

14   they were taking, I would say, specifically

15   about the voter challenge effort, you know,

16   starting in the fall/winter of 2020 and

17   onward?

18        A.    Okay.   Thank you for that.

19             You know -- well, I think,

20   first, as is evidenced by our work, we took

21   fundamentally different paths in our approach

22   to the NCOA effort.

Page 94

1                     I think prior testimony,

2        I indicated that we were unaware that True

3        the Vote was engaged in the effort in

4        Georgia, and learned about it kind of at the

5        last minute.  And if my memory serves me

6        correctly, literally maybe the day before the

7        press release.

8                     So we did not have the benefit

9        of understanding nor influencing their

10       methodology.

11                    So that said, with specific

12       kind of regard to your question:  I felt at

13       the time -- I've indicated it in prior

14       testimony and I shared with Catherine, I'm

15       sure -- that I thought that their strategy

16       was broad, in terms of the record count.

17                    Obviously we started with,

18       I think, you know, 580,000, or north of half

19       a million hits on the NCOA, and we whittled

20       that down to 39,000.  And I believe that our

21       approach was the right approach for what we

22       were trying to accomplish.

Page 95

1            It's not the approach that True

2    the Vote took.  So -- but I'm not also

3    privileged to what they were trying to

4    accomplish.

5            So I guess that's a roundabout

6    way of saying that had we to do this effort

7    over again, we would employ the same level of

8    discipline and same process.  We would not

9    have adopted the approach that True the Vote

10   took.

11        Q.    Okay.  And I guess separate

12   from the challenge lists, in terms of, you

13   know, a strategy for publicity or media, did

14   you ever have any disagreements with them?

15        A.    The only conversation we ever

16   had about media was the press release that

17   they were -- that Mark and I were included

18   in.  But "disagreement" is probably strong.

19   It was just the -- well, let me answer your

20   question first.

21            So other than that press

22   release where Mark and my name appear, we

Page 96

1    never had any discussion around any other

2    press activities, to my recollection.

3          Q.    Okay.  Thank you.

4                MS. FORD:  Mitch, could we

5          please pull up Exhibit [sic] N.

6                THE STENOGRAPHER:  This will be

7          marked Exhibit 12.

8                (Somerville Exhibit 12,

9          E-mail string, was marked for

10         identification, as of this

11         date.)

12   BY MS. FORD:

13         Q.    Mr. Somerville, this appears to

14   be an e-mail you sent to Mr. Davis.  And

15   I just want you to take a few seconds to

16   refresh your recollection.  And let me know

17   when you're finished.

18         A.    (Document[s] reviewed.)

19                Okay.  For the parts that I can

20   see, I'm good.

21         Q.    Okay.  Great.

22                So this appears to me to be --

Page 97

1    let's start with the first e-mail that you

2    sent on December 16th at 10:22 p.m.

3               It appears to be an e-mail that

4    you sent to -- we actually don't -- the

5    recipients are blocked out, but it's a

6    message about thanking people for helping

7    with the elector challenges and giving some

8    instructions.

9               And it appears to me that you

10   forward this to Mr. Davis.  And you said,

11   "FYI, this went out to a few key people to

12   start getting it into the broader networks."

13              Do you agree with that summary?

14        A.    I do.

15        Q.    Okay.  Can you elaborate on who

16   the few key people were?

17        A.    I'm sorry.  I don't recall who

18   those would have been, nor is there any

19   reason -- I must have just cut this into that

20   document.  I don't -- I don't know who those

21   would have been.  I apologize.  It may come

22   to me as we discuss, but I don't recall.

Page 98

1        Q.      Okay.  And what did you mean by

2    "getting it into the broader networks"?  What

3    networks was that in reference to?

4        A.      Again, this is, you know,

5    over-a-year-old recollection.  I suspect "the

6    broader networks" means the individuals

7    within the counties that intended to

8    volunteer to conduct a challenge.

9        Q.      Okay.

10       A.      Yeah, that "networks" is not

11   media.  Let me be crystal clear, if that's

12   where you're headed.  "The broader networks"

13   would be just the network of, largely,

14   grassroots individuals that wanted to

15   participate in the challenge process.

16       Q.      Okay.

17            MS. FORD:  Mitch, we can take

18        this down.  And if we could pull up

19        Exhibit [sic] 0 and mark this as

20        Exhibit 13.

21            (Somerville Exhibit 13,

22        E-mail string, was marked for

Page 99

1           identification, as of this

2           date.)

3    BY MS. FORD:

4           Q.     Mr. Somerville, if you could

5    just take a few seconds to review.  And let

6    me know when you've at least skimmed it.

7           A.     (Document[s] reviewed.)

8                  Okay.  Thank you.

9           Q.     Okay.  This appears to be an

10   e-mail conversation between you and Mr. Davis

11   about an upcoming True the Vote Zoom call.

12                 Do you agree with that summary?

13          A.     I do.

14          Q.     Okay.  And in this e-mail, you

15   state to Mr. Davis that the call is to talk

16   about next steps.

17                 And what next steps were you

18   referring to?

19          A.     Well, I don't know that I would

20   have actually known what specific next steps.

21   I think, literally, it would have meant

22   learning about what the next steps were.

Page 100

1           So I'm not entirely certain

2    that we knew what those next steps were.

3           Q.     Okay.   That makes sense.

4    That's a fair point.

5           A.     And, I'm sorry, that sounds

6    like an -- evasive, but it's not.  I don't

7    know.  I think that's probably why we wanted

8    to be on that call.

9                 And if my memory serves me

10   correct, I don't know that we were on the

11   original -- again, we may have learned about

12   the call late.  I just don't recall.  I do

13   recall the call, but I don't recall this

14   specifically.

15          Q.     And here, you say, the call

16   will be attended -- "Will be largely attended

17   as they invited all of their volunteers (many

18   of which were also our volunteers)."

19                 I understand that to mean, at

20   the point of going into the call, you already

21   had some visibility into the fact that the

22   two groups shared at least some volunteer

Page 113

1    looking at the first page here -- "...it's

2    why I was so pissed when I saw their press

3    release and it's also why I was concerned

4    when they shared with me their numbers."

5              And I would just ask you to

6    elaborate on what you meant by why you were

7    concerned when they shared numbers with you.

8         A.    Yeah, sure.

9              And obviously in that post, I'm

10   sure there's -- in that same message, there's

11   other context with respect to Mark and how he

12   felt.  But the initial press release that I

13   received did not acknowledge Mark at all.

14             So that was issue number one,

15   because, again, it's -- it is -- this is

16   Mark's -- I know I stressed this already, but

17   this is Mark's life passion.  This is what he

18   does.  He's incredibly good at it.

19             And I was highly sensitive to

20   the idea -- and it's not necessarily True the

21   Vote's fault.  They would not have known

22   that.  But they met with me, so I become the

Page 114

1   face of the effort.  And that was not my

2   intent.  And I was very concerned about that.

3                    And I was probably using a

4   little bit of heightened language here to

5   show Mark empathy.  But I was certainly

6   concerned -- I mean, not upset.  I'm a combat

7   veteran.  I don't upset the way most people

8   upset.  But I was concerned about the press

9   release mentioning -- excuse me -- me and not

10  Mark.

11                   And, of course, we've never

12  adopted the methodology that everybody should

13  have been included in the challenge list that

14  showed up on the NCOA, although I don't

15  know -- I mean, so many of those are inactive

16  individuals, to begin with, that haven't --

17  you know, again, so I don't know the

18  consequence of that.

19                   It just wasn't the methodology

20  that we would have implemented, and obviously

21  not one we agreed with or we would have done

22  that ourselves.

Page 115

1          But I think, if you don't mind,

2     as you read into that same text bubble, if

3     you will, meaning that's the same context

4     that I shared with those two messages, is

5     making sure that -- as I say here, that I've

6     been a good vehicle to work that he's done.

7          So, you know, this is really

8     kind of an effort to empathize with Mark, to

9     calm him down and let him know that, Hey,

10    I appreciate what you do.  I appreciate your

11    expertise.  They may not have understood that

12    or recognized that, and it upset me as well.

13        Q.    That makes sense.

14        A.    And if I may, Christina, I know

15    I'm -- I hate to continue to add to this.

16          I don't think that that was --

17    I think that was entirely inadvertent, that

18    Mark was -- felt -- you know, that I think

19    Mark was not permitted to speak.

20          So I don't believe that that

21    was deliberate, by any stretch of the

22    imagination.  I think these are individuals

Page 116

1    that, you know -- that all of us had known

2    each other, literally, for a couple days at

3    that point.

4              So I do want to go on record as

5    saying I don't think that was deliberate.

6         Q.    And by that, you just mean

7    Catherine allowing Mr. Davis to speak on the

8    call, or acknowledgment of his work?

9         A.    Yeah.  Correct.  I don't

10   believe that was deliberate.

11        Q.    Okay.  And can you explain what

12   you meant at the very end of this text when

13   you say, "We're simply pawns to them here in

14   Georgia"?

15        A.    Yeah.  You know, there is a

16   feeling, especially in the -- when you

17   initially meet organizations that come in

18   from out of town, that -- and this is not

19   specific to True the Vote.  I need to stress

20   that.

21              This is the general feeling

22   that I had about this time, where we had all

Page 117

1   of these actors coming in from out of state

2   telling us about our data, telling us about

3   our problems.

4                  And I was reasonably suspicious

5   of anybody and everybody that was popping

6   into Georgia all of a sudden to have

7   conversations about the integrity of our

8   elections, when we've been mindful of those

9   for years and years.  And, indeed, Mark has

10  for three decades.

11                 And so, you know, there's very

12  much a sense -- and that comment isn't

13  necessarily directed at True the Vote, but

14  just the broader sense of organizations

15  coming in.  They're going to do their thing,

16  they're going to leave, and we're going to be

17  left behind.  And that's just how it is.

18                 So that's the spirit in which

19  that was shared.  And I'm probably -- again,

20  you know, I'm taking a bit of a poke at them

21  to empathize with Mark, to get him talking,

22  because he was pretty upset.

Page 118

1       Q.     Thank you.

2              MS. FORD:  And, Mitch, can we

3       please go to page 192 and 193.

4   BY MS. FORD:

5       Q.     And, Mr. Somerville, for

6   context, this is a December 31st -- I believe

7   this to be 2020, which is the same date of

8   the preliminary injunction hearing in this

9   case, at the very beginning.

10             Did you watch that hearing?

11      A.     I did.

12      Q.     Okay.  And I just want to read

13  this into the record so that the record

14  reflects what we're speaking about.

15             Here, you say, "I always felt

16  the size of the TTV challenge was too big and

17  was going to invite the argument the

18  opposition is now using to call this

19  systemic."

20             And Mark responds, "The hell of

21  it is they're literally sitting there

22  defending a challenge that didn't even come

Page 120

1    lot of people, who was doing what.

2              And I believe -- and, again,

3    this is subject to kind of the degradation of

4    my memory over time here -- that this was in

5    relationship to a challenge that was being

6    attributed to True the Vote, and for which an

7    injunction was being sought, but was not True

8    the Vote's challenge.  If that makes sense.

9        Q.    It does.  I know that there

10   were a lot of people filing challenges around

11   this time.

12             Do you know who did file those

13   challenges that Mark was speaking about?

14       A.    I do not.

15       Q.    Okay.

16             MS. FORD:  And can we please

17       pull up Exhibit [sic] P.

18             THE STENOGRAPHER:  This will be

19       marked Exhibit 14.

20             (Somerville Exhibit 14,

21       E-mail, was marked for

22       identification, as of this

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 121

1          date.)

2     BY MS. FORD:

3          Q.     Mr. Somerville, this is a

4     version of an e-mail we've seen before today,

5     the subject line of which is:  Citizen

6     Challenges:  Update and Encouragement.

7               And you appear to be providing,

8     although we can't see it, some talking points

9     and some background and instructions on the

10    challenges.

11              Does that seem right to you?

12         A.     It does.

13         Q.     Okay.  And in the recipient

14    line, you appear to have included

15    Ms. Engelbrecht.  Do you agree with that?

16         A.     Let me -- we're a size 2 font

17    right now.  Forgive me.

18         Q.     And I'm not talking about the

19    To line.  I'm talking about the CC line.

20         A.     Okay.  I do see her on the copy

21    line, yes.

22         Q.     Okay.  Great.

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 122

1                   Can you explain why

2    Ms. Engelbrecht was included on this e-mail?

3        A.      Absolutely.  I felt then, as I

4    feel now, that we had engaged in a very

5    disciplined process.  And I felt like our

6    messaging, our instruction, and our tone was

7    very responsible, given the environment at

8    the time.  And so I would have copied

9    Catherine to try to influence their tone as

10   well.

11                   And some of these talking

12   points, you know -- unfortunately, I can't

13   scroll down there.  But, you know, there is

14   several points in this e-mail that I thought

15   were important for people that were not from

16   Georgia to read.

17                   THE DEPONENT:  Thank you for

18        that.

19        A.      You know, as you go through

20   there -- because you get the tone of this

21   e-mail, which is, number one, they're

22   permitted by law -- right? -- that this is

Page 123

1    your process.  You know, that the Secretary

2    of State's office themselves had challenged

3    voters during this time who had moved out

4    based on, you know, NCOA.

5              I make very clear in the point

6    that we have gone to great lengths to

7    mitigate the impact on the military.  And

8    that -- finally, that the victory really is

9    in challenging the government to perform at a

10   higher standard.

11             Those are all -- the tone and

12   text and content of that, as an overarching

13   theme for our challenges, was very important

14   to me.  And I would have copied anybody that

15   I thought that sentiment might influence.

16        Q.    And when you say you were

17   trying to influence the tone here, did you

18   have concerns about True the Vote's tone in

19   relation to the challenges?

20        A.    I didn't, only because we

21   didn't have enough time to understand -- you

22   know, again, I don't -- if you can scroll up

Page 124

1   to the date.  I'm sure this came out -- if

2   you don't mind scrolling up to the date.

3                 I mean, by this point -- again,

4   you know, we have literally met

5   Catherine days prior.  And so, you know, my

6   tendency in business, as well, is if we're

7   engaged in something that I think is a good

8   effort, I want to spread that as far as I

9   can, independent of a concern or not.

10                So I didn't have any concerns,

11  per se, maybe with their tone, but I didn't

12  fully -- to this day, I still don't fully

13  understand the organization or how they

14  operate.

15                I did think, as indicated

16  before, the size of their challenge was not

17  as targeted -- I don't like that word, so I

18  shouldn't use that word -- wasn't as specific

19  as ours.  And I didn't agree with that, but

20  I've made that perfectly clear.

21                But I think proactively

22  influencing individuals is as important, you