1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 39

1          THE WITNESS:  What's the question?  I'm

2     sorry.

3     BY MR. SHELLY:

4          Q.   In your November 2016 tweet, you

5     tweeted --

6          A.   I'm sorry.  I don't see that I wrote

7     those tweets.  There's some misinformation in

8     there, and I don't -- I don't recall those exact

9     words, and I'm not certain that I actually tweeted

10    them.

11         Q.   Did you speak with anyone at True the

12    Vote about non-citizen voting in the six target

13    states after the November 2016 election?

14         A.   Not specifically the six states.

15         Q.   Did you speak with True the Vote about

16    analysis that would have included those six

17    states?

18         A.   You need to clarify the question.  I

19    mean, I don't know whether you're talking about

20    before or after.  I mean, you're -- I just can't

21    answer a question that I don't understand.

22         Q.   Did you speak to True the Vote in

Page 40

1    November 2016 about non-citizen voting?

2         A.    When?

3         Q.    In November 2016.

4         A.    Probably not.

5         Q.    Did you discuss initiating legal action

6    with True the Vote related to non-citizen voting

7    in the 2016 election?

8         A.    At some point post November probably,

9    but not in November.

10        Q.    Who did you discuss this with at True

11   the Vote?

12        A.    I don't recall specifically.

13        Q.    Did you or True the Vote ever initiate

14   legal action related to your findings?

15        A.    No.

16        Q.    Why not?

17        A.    Because we were threatened and my family

18   was threatened and we decided that it just wasn't

19   appropriate to take action and put us in further

20   danger.

21        Q.    Okay.

22             MR. SHELLY:  Mr. White, can you pull up

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 41

1    Exhibit R.

2              (Phillips Deposition Exhibit 4 was

3    marked for identification and attached to the

4    transcript.)

5    BY MR. SHELLY:

6         Q.   Mr. Phillips, did you conduct an

7    interview with CNN in January 2017 about

8    allegations of non-citizen voting in the 2016

9    election?

10        A.   Yes.

11             MR. SHELLY:  Can we go to page 10.

12   Great.

13   BY MR. SHELLY:

14        Q.   This is the third paragraph down

15   starting with "Obviously."  Reading ahead a few

16   sentences, you say, "When we complete this

17   analysis, we're going [to] lay it out to the

18   public.  We're going to lay out our methodologies.

19   We're going to lay out our hypothesis.  We're

20   going to lay out our outputs.  We're going to lay

21   out the raw data for everyone to see."

22             Did I read that correctly?

Page 42

1       A.   Yes, but I don't recall the exact words.

2   You read what's on the screen.

3       Q.   Okay.  And do you agree that this was in

4   the context of analysis of non-citizen voting in

5   the 2016 election?

6       A.   I don't recall --

7            MR. BOPP:  I object.  The question goes

8   beyond the limit of the six states and, therefore,

9   you're violating the court's order, and I instruct

10  him not to answer.

11           MR. SHELLY:  This is an interview that

12  he gave with CNN.  I'm not asking about Oregon or

13  any state that's not among the six states.  I'm

14  just asking him about what he told CNN related to

15  the 2016 election.

16           MR. BOPP:  I've made my objection to

17  your question.

18           MR. SHELLY:  And I understand you're

19  instructing him not to answer in his 30(b)(6) or

20  his individual capacity?

21           MR. BOPP:  I did instruct him not to

22  answer because your --

Page 43

1          MR. SHELLY:  Okay.  I just want to make

2    sure that I heard correctly.  I will continue with

3    my questions.

4    BY MR. SHELLY:

5        Q.   When did you complete this analysis,

6    Mr. Phillips?

7        A.   I don't recall.

8          MR. BOPP:  Same --

9          Gregg, you need to pause for just a

10   second so I can enter -- because, you know, half

11   of his questions are completely in violation of

12   the court order, so I need to be able to interject

13   with an objection.

14          So I object.  Your question goes beyond

15   the court's limitation on your questions.  And it

16   needs to be the six states and also be 2012

17   forward.  I instruct him to not answer.

18   BY MR. SHELLY:

19       Q.   And what did you find when you completed

20   your analysis?

21          MR. BOPP:  Same objection and same

22   instruction.

Page 44

1    BY MR. SHELLY:

2        Q.   Did you ever release your methodology?

3             MR. BOPP:  Same objection.  Same

4    instruction.

5    BY MR. SHELLY:

6        Q.   Did you ever release your raw data?

7             MR. BOPP:  Same objection.  Same

8    instruction.

9    BY MR. SHELLY:

10       Q.   Do you plan to release your analysis,

11   methodology or raw data?

12            MR. BOPP:  Same objection.  Same

13   instruction.

14   BY MR. SHELLY:

15       Q.   Did any independent third party ever

16   confirm your allegations related to the 2016

17   election?

18            MR. BOPP:  Same objection.  Same

19   instruction.

20            MR. SHELLY:  You can take this down,

21   Mr. White.

22            THE VIDEOGRAPHER:  My apologies.  What?

Case 2:20-cv-00302-SCJ   Document 156-14   Filed 05/16/22   Page 7 of 50

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 45

1          MR. SHELLY:  I'm all done with this

2     exhibit.  You can take it down.  Thank you.

3          THE VIDEOGRAPHER:  Okay.

4     BY MR. SHELLY:

5          Q.   Mr. Phillips, what do you do for a

6     living now?

7          A.   I own a technology company.

8          Q.   Is that OpSec?

9          A.   No.

10         Q.   What's the name of the company?

11         A.   CoverMe Services.

12         Q.   Did you found OpSec?

13         A.   Yes.

14         Q.   Are you the managing partner at OpSec?

15         A.   Yes.

16         Q.   And these are positions that you

17    continue to hold today?

18         A.   Yes.

19         Q.   Okay.  Just to clean up the previous

20    section about the 2016, Mr. Phillips, can you just

21    confirm that you intend to follow your attorney's

22    instruction not to answer?

Page 46

1      A.   Yes, I intend to follow my attorney's

2   instructions.

3      Q.   Thank you.

4           What services does OpSec perform?

5      A.   Research, election intelligence

6   gathering, some operational activities.

7      Q.   And what kinds of operational

8   activities?

9      A.   It depends on the situation.

10      Q.   I think you told me that OpSec was

11   founded in 2020.

12           Do you remember when in 2020 it was

13   founded?

14      A.   Formally founded in 2020, yes.

15      Q.   Was that -- do you know what part of the

16   year?

17      A.   I don't.

18      Q.   Before the fall elections?

19      A.   Yes.

20      Q.   How many employees does OpSec have?

21      A.   No legitimate employee.  No full-time

22   employees beyond me.  We hire contractors.

Case 2:20-cv-00302-SCJ   Document 156-14   Filed 05/16/22   Page 9 of 50

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 101

1    the file that was used?

2          A.   I don't know right off the top of my

3    head, no.

4          Q.   Is that something you looked into in

5    preparation for this deposition?

6          A.   No, just because that's not what we were

7    doing.  You're asking about data cleanliness.  And

8    what we were trying to do is ascertain whether

9    people still lived in the jurisdiction or not.

10   And we were compelled to assist the challenging

11   voters to give a specific reason.

12          And it's up to the counties to determine

13   reasonable suspicion or probable cause or whatever

14   it is in Georgia.  A challenger has to give a

15   specific reason.  The specific reason is they

16   don't live in the jurisdiction anymore.

17          Q.   If your window for including people who

18   submitted an NCOA request goes back in time far

19   enough, is there a possibility that they could

20   have moved back to Georgia, but would still be on

21   your list because of their previous move out of

22   state?

Page 102

1      A.   Sure.  It's possible.

2      Q.   But I'm understanding you're not sure

3   how far back those requests would have been

4   included for your lists?

5      A.   No.  It's not relevant.

6      Q.   Okay.

7           MR. SHELLY:  Can we pull up Exhibit S.

8           (Phillips Deposition Exhibit 7 was

9   marked for identification and attached to the

10  transcript.)

11          MR. SHELLY:  You can scroll down a page

12  or two.

13  BY MR. SHELLY:

14     Q.   So this is an NCOALink processing

15  summary report that was produced by Mr. Davis, who

16  attempted to match the Georgia voter file with

17  NCOA data.

18          Take a look at this and tell me, was

19  anything like this produced during your matching

20  process?

21     A.   We don't use this particular tool.  And

22  no.  It's irrelevant.

Page 103

1      Q.   Okay.

2           MR. SHELLY:   Can you go to bottom of

3    page 5 of this document, Mr. White.

4    BY MR. SHELLY:

5      Q.   Do you see here, at the bottom left

6    corner, there are some counts for insufficient

7    data, address not found, multiple responses?

8      A.   Yeah.

9      Q.   Am I understanding correctly that you

10   did not develop any similar counts for your

11   analysis?

12     A.   No, my guess is he didn't use either

13   CASS or DPV.  And I would suggest that he didn't

14   clean the rolls as it relates to identity

15   verification first or he wouldn't have had this.

16   This is bad process.

17     Q.   Okay.  What should Mr. Davis have done?

18          MR. BOPP:  Excuse me.  I need to talk to

19   my client for a second, so we will go off.

20          THE VIDEOGRAPHER:  Do you want to go off

21   the record, Counsel?

22          MR. SHELLY:  I just want to reiterate my

Page 104

1   objection to conferring between the witness and

2   counsel about how to answer my questions.

3            (Pause from the record.)

4            MR. BOPP:  Okay.  We're back.  You can

5   resume your questioning.

6   BY MR. SHELLY:

7       Q.   Mr. Phillips, you were telling me that

8   there was -- that this document illustrates that

9   Mr. Davis used a bad process.

10           Can you explain what you meant by that?

11      A.   I was just speculating.  It was not

12  appropriate.  We don't do it this way.

13      Q.   What does this document indicate was not

14  done that should have been done?

15      A.   I really can't speculate.  I'm sure that

16  Mr. Davis is doing a good job.

17      Q.   Is this -- is your answer informed by

18  off-the-record discussions you just had with

19  counsel?

20      A.   No.

21      Q.   Did you discuss your testimony with

22  counsel during that recess?

Page 105

1                MR. BOPP:  You know, your Honor -- I

2     mean, your Honor -- Jacob, there was no pending

3     question when I sought to consult with my client.

4     There was no pending question, no pending answer.

5     So --

6                But go ahead, Gregg, you can answer.

7                THE WITNESS:  No, I don't -- I don't --

8     I'm not as aware of Mr. Davis' process as I should

9     be to make a comment, so I don't know.

10               MR. SHELLY:  You can take this exhibit

11    down.

12    BY MR. SHELLY:

13         Q.   For complex record linkage, do you think

14    it is important that fields used to link records

15    in different databases conform with respect to

16    data format and data type?

17         A.   What was the question?

18         Q.   For complex record linkage, do you think

19    it is important that fields used to link records

20    in different databases conform with respect to

21    data format and data type?

22         A.   Sure.

Page 106

1       Q.   So would you agree that it's

2    important --

3       A.   So assuming that you're performing an

4    actual linkage, yes.

5       Q.   Did you perform an actual linkage?

6       A.   Can you define what you mean by

7    "linkage."

8       Q.   Well, I'm repeating the term that you

9    just used.

10           What do you understand that to mean?

11      A.   No, that's not true.  You just said

12   "linkage."

13           What do you mean by "linkage"?

14      Q.   Is that not the term that you just used?

15      A.   You asked me a question about linkage.

16   Read the question.

17      Q.   Did you attempt to link information

18   between Georgia's voter rolls and other data sets?

19      A.   What do you mean by "link"?

20      Q.   Match.

21      A.   Match?  Sure.

22      Q.   When you performed that matching, do you

Page 107

1    agree that it's important that the fields conform

2    with respect to data format and data type?

3         A.   Yes.

4         Q.   Do you agree that it would be important

5    that both databases used for the match use

6    standardized abbreviations?

7         A.   We have a separate approach that we use

8    for that because we verify identity first.

9         Q.   Okay.  Can you tell me about how you

10   verify the identity?

11        A.   No.

12        Q.   Why not?

13        A.   Because it's a proprietary service that

14   my company used.

15        Q.   Okay.  This case has a protective order

16   in place specifically so we can understand these

17   questions.

18        A.   It's a 4,000-row algorithm.

19             What do you want to know?

20        Q.   I want to know what you do to verify the

21   identities before you perform the matching.

22        A.   Assessing -- assessing identity involves

Page 108

1    a complex series of mostly common algorithms,

2    things like dissimilarity indexes, similarity

3    indexes.  We use some fuzzy logic.  We use a

4    number of different things.  That's my answer.

5         Q.   Okay.  What is fuzzy logic?

6         A.   Fuzzy logic is a set of -- in identity

7    is a set of algorithms that's designed to

8    ascertain whether something similar is near

9    similar enough to assume that identity is

10   accurate.  And if it's not, then it assigns a risk

11   factor to it.

12        Q.   And is this something that you developed

13   yourself or you used an outside vendor for it?

14        A.   Yes.  I developed --

15        Q.   Which one?  Is that something --

16        A.   I developed it myself in 2006.

17        Q.   Okay.  Has its accuracy ever been

18   analyzed by anybody else?

19        A.   Its accuracy.  We use it every day in

20   our business.  So it's used in practice, and we've

21   done 43 million cases, so its accuracy is pretty

22   well known.

Page 109

1    Q.   Has it been independently verified by

2   anybody else?

3    A.   Nope.

4    Q.   Who performed the match between the

5   voter rolls and the other lists that you were

6   analyzing?

7    A.   What individual?

8    Q.   That's my question, yes.

9         Are you thinking of an answer or was my

10   question unclear?

11    A.   I answered you.

12    Q.   Who was the individual?

13    A.   Me.

14    Q.   Oh.

15         Did anybody else assist with that

16   matching effort?

17    A.   Not that I recall.

18    Q.   Approximately on what date was the match

19   completed?

20    A.   Mid December.

21    Q.   Can you tell me a few examples -- can

22   you give me a complete list of all of the

Page 110

1   technology that you used to perform that match?

2        A.   No -- I mean, yeah, I can tell you.  It

3   was co-done by me and my company.

4        Q.   Okay.  What was -- I believe you said

5   you used a vendor called TrueNCOA?

6        A.   That's one of the ones we used, yes.

7        Q.   Can you tell me what their role was

8   exactly?

9        A.   Their role wouldn't be anything other

10  than just being the group that performed -- that

11  made the match.

12           MR. BOPP:  I'm sorry, Jacob.  I need to

13  take this call for a second.  Do you mind if we

14  suspend for just a second?

15           MR. SHELLY:  Sure.  That's fine.

16           MR. BOPP:  Yeah.

17           MR. SHELLY:  You can go off the record.

18           THE VIDEOGRAPHER:  Okay.  The time is

19  12:53 p.m.  We are now off the record.

20           (Recess from the record.)

21           THE VIDEOGRAPHER:  The time is 1:13 p.m.

22  We are now on the record.

Page 111

1    BY MR. SHELLY:

2         Q.   Mr. Phillips, I understood at one point

3    you said that you personally performed the match,

4    I also understood you to say that TrueNCOA

5    performed the match.

6              Can you clarify anything that I may have

7    misunderstood with that?

8         A.   I thought you meant the person that

9    uploaded it.  I uploaded it.  I'm sorry.

10        Q.   You uploaded -- you uploaded it to

11   TrueNCOA?

12        A.   And -- we wouldn't do just one.  There

13   were probably more.  SmartyStreets is one that we

14   used sometimes.  I mean, there are others.

15        Q.   SmartyStreets is in addition to

16   TrueNCOA?

17        A.   At times.  Depending on the results we

18   get back, we can use both.

19        Q.   So you would upload it to TrueNCOA.  You

20   would get a match back, and then sometimes you

21   would provide match data to SmartyStreets?

22        A.   It might not go in that direction.  I

Page 114

1    algorithm that my company owns that we use

2    primarily for the identity and residency

3    resolution.

4         Q.   Okay.  Are you willing to produce that

5    algorithm or provide it in a format that we can

6    review?

7         A.   No.

8         Q.   Okay.  And in the same context, can you

9    tell me what queries you used?

10        A.   Well, the query would be a query against

11   the True- -- in this case, TrueNCOA and possibly

12   SmartyStreets.  So they would -- they would pass

13   it through their CASS system to clean it up,

14   perform some hygiene on it.  They'd look at

15   delivery point verifications and those kind of

16   things.  If we found some anomalies, we might

17   access another system like a SmartyStreets, but

18   that's it.  That's the query.

19        Q.   So when you say you performed "hygiene,"

20   can you give me a concrete example of what it

21   would mean to provide hygiene to a piece of data

22   that you analyzed here?

Page 115

1       A.   Well, I think the USPS definition of

2    "CASS" is pretty clear.  I mean, I think they --

3    you know, it basically standardizes -- goes

4    through and standardized addresses, finds missing

5    things, kind of rearranges, fixes it up.  Like it

6    might add a ZIP plus four.

7            You know, if there was a typo in the --

8    maybe a lowercase in an address, they might make

9    it upper case.  So they perform that

10   data-cleansing process and then produce the list.

11           And then we would go through and -- or

12   they would go through and push it through another

13   one of their queries for -- you know, to see if

14   the address was -- they could validate the

15   delivery point, so could an address actually be

16   delivered on that.  And that might push us off

17   into something else, to maybe look for something

18   else.

19       Q.   Okay.

20       A.   But it was done in a matter of minutes.

21   This wasn't a lengthy process.

22       Q.   So if there was an -- if a voter had an

Page 116

1    address, say, 123 Main, in a city that had a Main

2    Street and a Main Avenue, how would know the CASS

3    system know or SmartyStreets -- would either of

4    those systems know how to complete it?  Or what

5    would it do in that situation?

6         A.   You would have to ask them how they

7    would do it.  To us, I mean, again, it's a

8    function of whether or not it's likely to be the

9    same person, organization or street.  And then it

10   assigns sort of a risk score to it.  And then it's

11   processed differently.

12        That might be a case where we would go

13   and look at, say, a SmartyStreets to see if we can

14   ascertain what the situation is.  In the cases

15   where we cannot, we would kick it out and not

16   include it.

17        Q.   Okay.  And when you say it would assign

18   a "risk score," is that like a scale of 1 to 10?

19   Or what kind of risk score can be given?

20        A.   We have risk scoring built into our

21   scoring mechanisms inside of our algorithms.

22        Q.   So I'm trying to figure out what's

Page 117

1   the -- will it tell you that this is high risk,

2   medium risk, low risk or is that like 1 to 100?

3        A.   It would likely give you a number.

4        Q.   And what would the scale be?

5        A.   On this, I don't know what was used.  So

6   zero to 100, likely.

7        Q.   Okay.  And 100 would mean very, very

8   high risk?

9        A.   No, low risk.

10       Q.   Low risk.  Okay.

11            And so how low would the number need to

12   be?  In other words, how high would the risk need

13   to be for you to perform further analysis?  If it

14   returns a risk score of like 2, would you perform

15   further analysis on that?

16       A.   We might depending on what it is.

17   Again, verifying identity is important.  The

18   problem in places like Georgia is that they don't

19   give you all the info you need to get a good

20   perfect verification on identity, but that too has

21   risk to it as well.  So you look at risk across

22   the board with the data.

Page 118

1      Q.    Were you able to eliminate the risk?

2      A.    You can never eliminate all of the risk.

3      Q.    Did you analyze every piece of data that

4   was flagged as a risk of potential inaccuracies?

5      A.    The quality control algorithms would,

6   yes, in seeking to remove any false positives or

7   false negatives that might be in the system.

8      Q.    And that's something that you did

9   in-house or that's something that TrueNCOA would

10  have done or something different?

11     A.    No, that's something our algorithm does.

12     Q.    And you run the data through your

13  algorithm on the back end after you -- after

14  TrueNCOA performs the match; is that correct?

15     A.    Yes.

16     Q.    And do you know how TrueNCOA or these

17  others assign risk?

18     A.    How they assign risk?  I have no idea.

19     Q.    Moving on to the next clause in this

20  answer, what regression techniques did you use?

21     A.    Our modeling is pretty significant.  We

22  use some k-means modeling.  We use a variety of

Page 119

1    different techniques in our scoring.  And then we

2    use a model management process to identify the

3    regression technique most likely to produce an

4    accurate result.

5         Q.   And in what stage in the process were

6    you running these regressions?

7         A.   They're run through the process.  It's

8    all baked into the system.  Again, this whole

9    thing took a few minutes.

10        Q.   Am I understanding that you did these

11   regressions after you received the preliminary

12   match back from TrueNCOA, and then you're

13   providing your own further analysis on it?

14        A.   I didn't say that.

15        Q.   Can you clarify what I misunderstood?

16        A.   The formulas and algorithms that we use

17   execute.  As they need information, they pull

18   information in from an outside entity, say,

19   TrueNCOA or whatever.  It feeds it into the system

20   and then it continues to process it and keeps

21   working to solve -- solve for the risk.  And

22   ultimately we come up with a list.

Page 120

1            MR. SHELLY:  Okay.  You can take this

2      exhibit down, Mr. White.

3      BY MR. SHELLY:

4            Q.   When you were matching the voter

5      registration rolls to the NCOA list, what fields

6      were matched between those files?

7            A.   We just uploaded the file.  CASS does

8      the matching -- I'm sorry.  The source does the

9      matching, TrueNCOA or SmartyStreets.

10           Q.   Okay.

11           A.    In this case TrueNCOA first.

12           Q.   Are you familiar with the term "unique

13     identifier" in the context of data matching?

14           A.    Sure.

15           Q.   Are there any common unique identifiers

16     between the voter registration rolls and NCOA

17     lists?

18           A.    Well, that -- not as many as there

19     should be, and that's why we seek to resolve

20     identity first.

21           Q.   Are there any unique identifiers common

22     between those two lists?

Page 121

1      A.   I don't have the Georgia list right off

2    the top of my head.

3      Q.   Do you think that the lack of unique

4    identifiers could affect the accuracy of the

5    lists?

6      A.   Sure.

7      Q.   Am I understanding correctly from your

8    previous answers that the records are matched on

9    partial matching rather than exact matching, these

10   other databases would fill in any partial

11   information?

12     A.   That's not what I said.

13     Q.   Was an exact match required between the

14   data that you provided and the NCOA list?

15     A.   You can never get an exact match.  So

16   when you provide the list to -- when you provide

17   the list to the vendor, whoever it is, TrueNCOA or

18   whoever, they take what you give them.  They

19   perform a little bit of a cleaning process on it.

20   They try to update the addresses.  They run it

21   through CASS.  They try to get it right.  And then

22   they send it back.

Page 122

1       Q.   Could individuals with the same first

2    name and last name, but different middle initials

3    be flagged as a match?

4       A.   That's why you try to verify identity

5    first, but yes.

6       Q.   The answer is, yes, it could be?

7       A.   Of course.

8            And -- but that's why you use fuzzy

9    logic and some of the other things I mentioned

10   earlier.

11           MR. BOPP:  Gregg, no question was

12   pending.

13   BY MR. SHELLY:

14      Q.   Could names be matched if they had

15   different name suffixes, like junior or senior?

16      A.   Sure.  I mean, you could do that.

17      Q.   How many duplicates did you identify

18   where a record in the NCOA registry matched more

19   than one record in the voter file?

20      A.   I have no idea.

21      Q.   Are you aware if any such duplicates

22   were identified?

Page 123

1      A.    I have no idea.

2      Q.    Did you investigate whether there were

3   any such duplicates?

4      A.    I have no idea.  I don't -- it wasn't a

5   topic.

6           MR. SHELLY:  Can we pull up Exhibit C

7   again, the one we just had up.

8   BY MR. SHELLY:

9      Q.    This is page 13 again.  And I have a

10  question about number 6, "OpSec removed from the

11  list any names that did not meet the standards of

12  the Georgia code."

13          What standards do you understand the

14  Georgia code to require?

15     A.    I'm not sure what we were -- what we

16  were referring to there.  I'm not sure what we

17  meant.

18     Q.    Did you take any steps to remove names

19  that did not meet the standards of the Georgia

20  code?

21     A.    I think that was just poorly worded.

22     Q.    Okay.  Do you have any idea how you

Page 124

1    could reword that in a different way?

2        A.   I think it was referring to number 5

3    above.  Because the code -- the relevant code

4    section is pretty clear that any voter can do the

5    challenge against any other voter in the

6    jurisdiction.  And so there's not much room for

7    standard in the word "any."

8        Q.   Okay.  So is it -- am I understanding

9    correctly that you do not think you removed any

10   names that did not meet the standards of the

11   Georgia code?

12       A.   I'm not sure what it means.  It must

13   have been poorly worded.  I'm not sure what that

14   paragraph -- or what that sentence means.

15       Q.   Okay.

16           MR. SHELLY:  You can take this exhibit

17   down.

18   BY MR. SHELLY:

19       Q.   Is it your understanding, Mr. Phillips,

20   that an individual who submits an NCOA, change of

21   address, is no longer eligible to vote?

22       A.   No, that's not correct.

Page 125

1        Q.    What are some reasons you are aware of

2    that someone could submit an address change to the

3    postal service while remaining eligible to vote

4    where they are registered?

5        A.    I have no speculation on that point.

6        Q.    Okay.  Just to clarify, you understand

7    that someone can submit an NCOA list and still be

8    properly registered, but you're not sure in what

9    scenarios that may be the case?

10       A.    I didn't understand that's what you

11   asked.  Is that what you're asking?

12       Q.    So my second question was, what are some

13   reasons you're aware of that someone can submit an

14   address change to the postal office while

15   remaining eligible to vote where they are

16   registered?

17       A.    Maybe they're being deployed in the

18   military.  Maybe -- might have something to do

19   with school.  Those kind of things.

20       Q.    Any other examples you're aware of?

21       A.    Moved inside the county or inside the

22   jurisdiction in which they were registered.

Page 126

1    There's a few.

2         Q.   Is it your understanding that someone

3    who moved for other non-military government

4    service could still be eligible to vote in

5    Georgia?

6         A.   I don't have a perfect list to offer

7    you.  You asked me for some ideas.  Those were

8    three.

9         Q.   And now I'm offering you some more and

10   asking if they're consistent with what you would

11   have understood the requirements to be.

12             So, one, would you have understood

13   someone who moved for non-military government

14   service to remain eligible to vote in Georgia even

15   if they submitted an NCOA?

16        A.   Sure.

17        Q.   And would you understand someone to

18   remain eligible to vote in Georgia if they had a

19   temporary move or a part-time job or to visit

20   family?

21        A.   It depends on the circumstance, but yes.

22        Q.   And would you recognize that someone

Page 127

1    would remain eligible to vote if they forwarded

2    their mail for some mail-specific purpose, for

3    example, if they were on vacation and needed their

4    mail to be forwarded?

5         A.   Yep.

6         Q.   And if someone intended to move and so

7    filed an NCOA request, but did not actually move,

8    you would agree that they would remain eligible to

9    vote in Georgia?

10        A.   It depends on their circumstance.  I

11   can't answer that.

12        Q.   And the question is, if someone is

13   living in Georgia, they intend to move so they

14   file an NCOA request to forward their mail, and

15   then they change their mind and do not actually

16   move, you would agree that they're still eligible

17   to vote in Georgia?

18        A.   Sure.  If they still submitted the

19   permanent move change, yeah.

20        Q.   Okay.  Who was responsible for removing

21   the names of eligible voters such as these from

22   the challenge lists?

Page 128

1        A.   We did our best to -- first of all, the

2    code.  Let's put it that way.

3        Q.   Okay.  To go through those examples

4    again, would the code be able to identify someone

5    who is deployed for military service?

6        A.   As best we can, yes.  We pulled out

7    300,000 voters off the initial query.

8        Q.   Okay.  I'll ask you another question

9    about that in a second, but would the code be able

10   to recognize someone who moved because they were a

11   college student?

12       A.   It might.

13       Q.   How would it do that?

14       A.   If they submitted a permanent change or

15   a temporary change.

16       Q.   Okay.  Would the code --

17       A.   We also --

18       Q.   -- also identify --

19       A.   I'm sorry.  Go ahead.

20       Q.   Go ahead.

21       A.   Go ahead.

22       Q.   Would the code be able to identify

Page 134

1   BY MR. SHELLY:

2        Q.   My question for you --

3        A.   I don't understand the question.

4        Q.   My question for you, when you say that

5   it would not matter, is that because Mr. Williams

6   had access to the hard copies, but any changes to

7   the hard copies would not be reflected in the

8   electronic versions?

9        A.   No, that doesn't mean that.  It means we

10  chose not to mail hard copies.

11       Q.   And Mr. Williams was responsible for the

12  hard copies; is that correct?

13       A.   Printing the hard copies.

14       Q.   Okay.  Did Mr. Williams have access to

15  the electronic copies?

16       A.   He had access to a -- whatever, an Excel

17  spreadsheet or something with them on there, yeah.

18       Q.   Would he have been able to remove

19  addresses that suggested they were military bases?

20       A.   I don't know the circumstance, so I just

21  don't know.  I didn't -- I don't recall.

22       Q.   Okay.  Returning to the Moody Air Force

Page 135

1    Base example, do you know what town Moody Air

2    Force Base is closest to in Georgia?

3         A.    Macon?  I don't know.

4         Q.    I'll represent to you that I believe

5    it's Valdosta.

6         A.    Yeah, that's right.

7         Q.    Did you examine whether any addresses

8    with a Valdosta address could be in the military

9    or family of someone in the military?

10        A.    We probably did, yeah.

11        Q.    Would you have removed those voters?

12        A.    Assuming that it met the matching

13   requirement, sure.

14             MR. SHELLY:  You can take this exhibit

15   down, Mr. White.

16   BY MR. SHELLY:

17        Q.    Mr. Phillips, are you familiar with

18   UOCAVA?

19        A.    Of course.

20        Q.    Did you examine whether any voters on

21   your list had requested a UOCAVA ballot?

22        A.    As best we can.  As you know, UOCAVA

Page 136

1    ballots and postcard ballots in general are not

2    handled by the state; they're handled by the

3    counties individually.

4        Q.   How would you have researched or sought

5    to identify whether an individual had requested a

6    UOCAVA ballot?

7        A.   Almost impossible because the counties

8    don't publicize that.

9        Q.   Okay.  When you say "almost impossible,"

10   so was there anything you did to identify whether

11   a voter had requested a UOCAVA ballot?

12       A.   No, I am not aware of any way to do that

13   effectively.

14       Q.   Did you -- I think you said you did --

15   well, let me just ask the question.

16           Did you take any steps to remove all the

17   names of college or university students who were

18   temporarily away from home?

19       A.   Anyone temporary that had registered the

20   temporary address change, yes.  Permanent address

21   changes, what we tried to do was eliminate the ZIP

22   codes in and around the schools.

Page 137

1      Q.   And how did you identify which ZIP codes

2   were appropriate?

3      A.   I don't recall what our methodology was.

4      Q.   Were you only looking at -- were you

5   looking at ZIP codes in Georgia or out of Georgia

6   or both?

7      A.   I don't know.

8      Q.   Do you think an address in, for example,

9   Notre Dame, Indiana, would suggest the person

10   lives on a college campus?

11      A.   Not necessarily.

12      Q.   Why not?

13      A.   What?

14      Q.   So Notre Dame is a school within the

15   city of South Bend, but if the address said Notre

16   Dame, Indiana, is it your understanding that that

17   person would not be living on a college campus?

18      A.   Did the person submit a permanent change

19   of address out of Georgia?

20      Q.   This question wasn't about whether they

21   would be eligible to vote; it would have been

22   whether they moved to a college campus.

Page 138

 1        A.    I don't have any opinion about moving to

 2    college campuses.

 3        Q.    I didn't hear you.  Could you repeat

 4    that last part.

 5        A.    I don't have any opinion on your

 6    question.

 7        Q.    Is it your understanding that most

 8    students who attend college reside in a dormitory?

 9        A.    I would believe that to be false.

10        Q.    Did you take any steps to remove the

11    names of individuals who were temporarily

12    attending college, but did not live in a

13    dormitory?

14        A.    Did they register as permanent moves

15    from the NCOA?

16        Q.    Am I gathering correctly that your

17    analysis of whether voters were eligible turned on

18    whether they filed a permanent or temporary change

19    of address?

20        A.    It might.  As I said, it's a complex

21    algorithm.  It's 4,000 rows long.  It doesn't --

22    it doesn't work like your brain does.

Page 139

1       Q.   Did you research which colleges Georgia

2    high school students are most likely to attend?

3       A.   No.

4       Q.   Approximately how many names did you

5    identify and remove of individuals you suspected

6    were enrolled in a college or university?

7       A.   I have no idea.

8       Q.   What steps did you take to confirm

9    whether an individual who submitted an NCOA

10   request actually moved?

11      A.   Well, we submitted it to TrueNCOA.  We

12   possibly submitted it to SmartyStreets if it

13   needed more work.  And I think, in Georgia, we

14   submitted the new address.  So we told them where

15   we thought the person went.

16      Q.   Approximately how many -- approximately

17   how many matches did TrueNCOA identify?

18      A.   I don't recall.  It's all part of the

19   equation.  We don't look at it that way.

20      Q.   Approximately how many did you send

21   along to SmartyStreets?

22      A.   I don't know the answer to that either.

Page 140

1       Q.   Do you know what proportion of the

2    original list that TrueNCOA flagged that you would

3    have sent along for further verification?

4       A.   I recall that we probably got -- the

5    initial cut was probably 700,000 or so.  And then

6    it ultimately got down to, what, 360-, so whatever

7    that delta is.

8       Q.   Approximately how much time did you

9    spend reviewing the names that were matched

10   between the voter file and the NCOA registry?  Or

11   am I understanding correctly that the code did all

12   the analysis and you personally did not do any

13   further?

14      A.   There's a little bit of sort of

15   reviewing the quality of reports to ensure that

16   we're within something we consider reasonable on

17   the false positives and false negatives, but an

18   hour maybe.

19      Q.   Okay.  And what would you have

20   considered reasonable?

21      A.   Maybe a standard deviation.

22      Q.   Can you just explain that a little bit

Page 141

1   more?  A standard deviation of what?

2       A.    Relative to the potential error rate

3   that we might expect.  That's the best way to

4   frame it.

5       Q.    Okay.  And what error rate did you

6   expect?

7       A.    Less than one standard deviation.

8       Q.    If you had had more time, would you have

9   done anything more?

10      A.    No.

11      Q.    Did you do anything to correct for

12  potential matches of individuals in the voter file

13  who share a first name, last name and reside at

14  the same address?  Or am I understanding that you

15  relied on TrueNCOA to determine whether that would

16  be a match?

17      A.    I never said that, but the import of

18  verifying identity can't be overstated in this

19  case.  And that would come as a result of helping

20  verify identity.

21      Q.    Okay.  So when you pulled the voter

22  file, there was -- if there were two individuals

Page 142

1    who shared a first name, last name and address,

2    you would have done some further analysis of that

3    at the front end; is that correct?

4         A.   Yes.

5         Q.   And that analysis would be by running it

6    through a code, and they would try to fill in more

7    information to distinguish these individuals?  Or

8    how exactly would you be able to distinguish them?

9         A.   There are elements of risk in any

10   determination.  And eliminating as many of the

11   elements of risk as you can is important.  The

12   absolute verification of identity, again, has to

13   be done by the counties because they have access

14   to the state DMV file.  They have access to other

15   things that citizens and voters don't have.

16              The citizens and voters were compelled

17   to identify -- give a specific reason for why they

18   thought someone was ineligible, and having moved

19   was the reason.  And so our -- our ability to

20   identify -- verify identity is limited by the fact

21   that Georgia only gives year of birth rather than

22   day and month and year of birth.

Page 143

1       Q.   Are you aware that thousands of records

2   in the challenge list do not show a street address

3   in the "moved to" field?

4       A.   Yes.  Because sometimes people move and

5   they don't give their address.  They don't give

6   their forwarding address.

7       Q.   And what is the reason for challenging

8   someone on the basis of residency when you do not

9   have evidence of where the person moved?

10      A.   Because that's the specific -- the law

11  compels a voter to challenge based on a specific

12  reason.  The specific reason is they believe they

13  moved.

14      Q.   How could a voter be notified of a

15  challenge if you do not know the forwarding

16  address?

17      A.   How would a voter be notified?

18      Q.   Yes.

19      A.   Okay.  We don't notify the voters.  The

20  county notifies the voter when they come in to

21  vote.

22      Q.   Okay.

Page 144

1            MR. SHELLY:  Can we pull up Exhibit F.

2            (Phillips Deposition Exhibit 9 was

3     marked for identification and attached to the

4     transcript.)

5     BY MR. SHELLY:

6        Q.   Are you familiar with this table,

7     Mr. Phillips?

8        A.   No, I don't know.  It doesn't ring a

9     bell.  I don't know that I saw it yesterday.  What

10    is it?

11       Q.   This is a document that you -- that

12    OpSec produced in response to our discovery

13    requests.

14       A.   Okay.  What's the question?

15       Q.   Did you create this table?

16       A.   It looks like it was created out of the

17    system.

18       Q.   Why does it only include nine counties?

19       A.   I have no idea, actually.

20       Q.   How would you have used this

21    information?

22       A.   We wouldn't use this information at all.

Page 145

1    It was system-generated.

2              MR. SHELLY:  You can take this down,

3    Mr. White.

4    BY MR. SHELLY:

5         Q.   Mr. Phillips, did you review the

6    challenge lists for instances where the name of

7    the registrant in the challenge file does not

8    match the name in the voter file or the registrant

9    with that registration number?

10        A.   We would have, yes.

11        Q.   And if you had noticed that, would you

12   still -- should that person have been included in

13   the challenge list if their name in the challenge

14   list did not match the name assigned to that

15   registration number in the registration rules?

16        A.   That likely would have been an exception

17   and would have been kicked out, but it's possible

18   it could be included.

19        Q.   Did you review the challenge list for

20   instances where the address an individual is

21   registered at and the address where a registrant

22   moved to are identical?

Page 146

1       A.    There are some anomalies like that, yes.

2       Q.    Should those anomalies have been removed

3   from the challenge list?

4       A.    I would like to think they would, but

5   it's possible they wouldn't.  There are some other

6   reasons why, especially if it was a different

7   name.

8       Q.    Would you review the challenge list to

9   confirm whether an individual reregistered at the

10  address where the NCOA match suggested the

11  individual moved to?

12      A.    That was beyond our capacity.  So in

13  that case, what we would say is submit the

14  challenge and let the county figure it out.

15      Q.    Do you know what it would mean when a

16  record shows a "moved to" street address of

17  general delivery?

18      A.    It could mean a lot of things.  They

19  didn't give an address.  They didn't have an

20  address when they moved.  It's possibly a homeless

21  person.  There are dozens of reasons.

22      Q.    Would you still understand that to

Page 147

1    provide probable cause for a challenge?

2         A.   We don't determine probable cause.  We

3    determine the reason that the voter would make the

4    challenge.  The county determines probable cause.

5         Q.   Did I hear you correctly earlier to

6    suggest that the challenge lists ultimately

7    included approximately 360,000 individuals?

8         A.   We didn't challenge that many.  That's

9    how many we identified.  The counties didn't take

10   up the challenges in most cases.

11        Q.   Okay.  Of that whole list that you had

12   prepared, the 360,000, how many do you think of

13   those individuals were actually ineligible to

14   vote?

15        A.   Well, that would be for the county to

16   determine.  We don't know.

17        Q.   Do you have any anticipation of what

18   that figure would have been?

19        A.   I'm not going to speculate.

20        Q.   Do you accept that some individuals on

21   the challenge list may be eligible to vote?

22        A.   Sure.

Page 148

1       Q.   Did you discuss the potential inaccuracy

2    of the list with anybody?

3       A.   I don't recall.

4       Q.   Do you think that 99 percent of the

5    names on the challenge list were ineligible to

6    vote?

7       A.   As I said, I have no idea.

8       Q.   Are you aware of any challengers who

9    retracted their challenge after concluding that

10   the lists you prepared were unreliable?

11      A.   I'm not, but I wouldn't have had that

12   communication.

13      Q.   Did you use the Social Security Death

14   Index as part of your process?

15      A.   Not in this instance.

16      Q.   "This instance" referring to the Georgia

17   challenge lists?

18      A.   Yes.

19      Q.   Are there any other data sources you

20   believe could have enhanced the accuracy of the

21   challenge lists?

22      A.   Not for the purposes for which we

Page 149

1    were -- we were called to work.

2         Q.   How many counties did you prepare

3    challenge lists for?

4         A.   I think we did them all.

5         Q.   And in how many counties were challenge

6    lists actually submitted?

7         A.   I don't know the answer to that.

8    Catherine can answer that.

9         Q.   Do you know how counties were chosen for

10   lists to be submitted?

11        A.   I believe it's where we found a Georgia

12   voter that lived in the jurisdiction to make the

13   challenge.

14        Q.   After you conducted the initial match,

15   did you analyze demographic information or other

16   characteristics of the individuals you identified?

17        A.   Not until after you sued us.

18             MR. SHELLY:  Can we pull up Exhibit H.

19             (Phillips Deposition Exhibit 10 was

20   marked for identification and attached to the

21   transcript.)

22