Page 20

1          A.    Yes.

2          Q.    Great.

3                MR. NKWONTA:  You can take that

4      down.  And can we pull up Document 75,

5      please.

6                     (Exhibit 75 marked for

7                      identification.)

8  BY MR. NKWONTA:

9          Q.    Ms. Engelbrecht, do you recognize

10  Document 75?  Have you seen this document before?

11         A.    Yes.

12         Q.    And this is a deposition notice

13  issued to you individually; is that correct?

14         A.    Yes.

15         Q.    And do you understand that you are

16  also being deposed today in your individual

17  capacity?

18         A.    Yes.

19         Q.    Okay.  And as we have done with the

20  prior deposition in this case, we will ask that

21  you agree that your answers today will be

22  attributed to you and/or True the Vote, unless we

Page 21

1    specify otherwise, or you specify otherwise in

2    the deposition in response to that question.  Is

3    that fair?

4         A.   Yes.

5              MR. NKWONTA:  And do you agree to

6         that, counsel.

7              MR. BOPP:  Do I agree to what?

8              MR. NKWONTA:  That Ms. Engelbrecht's

9         answers will be attributed to Ms. Engelbrecht

10        and True the Vote, unless she specifies

11        otherwise in response, just as we did

12        yesterday?

13             MR. BOPP:  I assume your questions

14        are directed at her in both capacities.

15             THE VIDEOGRAPHER:  And counsel,

16        sorry.  I apologize.  This is Joe.  I just

17        want to make sure for clarity that

18        Document 75 and 76, will those be entered

19        into as exhibits?

20             MR. NKWONTA:  Yes, those will be

21        entered in as exhibits.

22             I think what might be best is I will

Page 22

1      continue to refer to them throughout the

2      deposition as 75 and 76.  And then we can

3      decide after the fact whether we want to

4      number them sequentially.  Is that fair?

5           THE VIDEOGRAPHER:  Understood.

6   BY MR. NKWONTA:

7      Q.    Ms. Engelbrecht, I want to start

8   with some background questions for you.

9           Where do you currently reside?

10     A.    In Cat Spring, Texas.

11     Q.    Are you a Texas native?

12     A.    Yes.

13     Q.    And what do you do for a living?

14     A.    In addition to my work with True the

15  Vote, I am the co-founder of a healthcare fintech

16  software company.

17     Q.    What is your role with True the

18  Vote?

19     A.    I am both the founder of the

20  organization and its current president.

21     Q.    Sorry, I didn't hear the last bit of

22  your answer.  Do you mind repeating that?

                                                    Page 23

1        A.    So sorry.  Sure, with respect to

2   True the Vote, I am the founder of the

3   organization and its current president.

4              MR. BOPP:  And, Catherine, please

5       don't interrupt him.  Let -- if he needs to

6       say something, just sit tight.  Okay?

7              THE WITNESS:  Sure.

8   BY MR. NKWONTA:

9        Q.    When was True the Vote founded?  You

10  mentioned that you are the founder.

11             When did you launch True the Vote?

12       A.    We started as a organization in late

13  2009 and filed official paperwork for its

14  designation under the IRS rules as a nonprofit in

15  2010, in the summer of 2010.

16       Q.    What was True the Vote's mission

17  when the organization first launched in 2009 or

18  2010?

19       A.    We had learned that there were not

20  enough poll watchers or poll workers broadly.

21  And that seemed like a good project to take on

22  just to encourage people to work in the polls.

Page 24

1    And then from there we became more aware of other

2    challenges in the system.

3         Q.    And what types of activities did

4    True the Vote engage in when it first launched in

5    2009/2010?

6         A.    First, understanding the process

7    where we started which was in Harris County,

8    Texas.

9              So, understanding the process of our

10   elections.  Understanding the need for volunteers

11   and where those volunteers -- how they can be

12   placed and the rules around those placements.

13   And that was the origin of the organization and

14   our activities.

15        Q.    You mentioned assessing the need for

16   volunteers and where those volunteers needed to

17   be placed.

18              In that initial period when you

19   launched True the Vote, where did you, your

20   organization determine the greatest needs were?

21        A.    Well, to make that determination we

22   met with -- in Harris County there is a -- the

Page 35

1    terms of your role with the organization.

2              How many employees did King Street

3    Patriot have when the organization was first

4    launched?

5         A.    Oh, first launched, none.  We didn't

6    have any employees for several years.

7         Q.    And did you ever have employees or

8    did you rely solely on volunteers and outside

9    contractors?

10        A.    We did have, as I recall, one or two

11   employees, but it was far and away run by

12   volunteers.

13        Q.    Were you also in charge of the

14   day-to-day operations with respect to

15   communications including press or other types of

16   media?

17        A.    I would have certainly had a

18   leadership role, or as I commented earlier, would

19   have made it a goal to always look at things that

20   were being published.

21              But it was, with King Street

22   particularly more volunteer oriented and less, or

Page 36

1    less structured.

2         Q.   So, just to be a little bit more

3    specific, if there was a press release issued by

4    King Street Patriots, would that press release

5    have come from an employee or from you, or would

6    it have been something that you would have

7    overseen or supervised?

8         A.   It could have -- really any of those

9    could have been accurate.  It may have been

10   something that a volunteer wrote.  It would

11   certainly have been something that I would have

12   wanted to have seen.

13             Although I can't attest to having

14   seen everything, unfortunately.

15        Q.   The standard practice was to, -- was

16   for you to be able to approve all of the

17   communications and the media that would come out

18   of King Street Patriots, is that fair?

19        A.   That was the goal.  That was the

20   goal.

21        Q.   Have you heard of the organization

22   called Time for a Hero?

Page 37

1          A.    Yes.

2          Q.    And what is your connection to that

3    organization?

4          A.    The organization no longer is

5    active, but that was an organization started by

6    myself and Gregg Phillips.

7                The purpose of that organization was

8    to assist with the needs of Special Forces

9    Veterans.  And it started out sort of broadly

10   looking to support the needs that ultimately

11   turned into sort of a medical missions driven

12   program.

13               And it was --

14         Q.    When did --

15         A.    Sorry, go ahead.

16         Q.    No, you finish your answer.

17         A.    It was -- well, I was about to say

18   I'm not even really -- I don't quite remember

19   when it started or ended.  It was -- I'm sorry,

20   please ask your question.

21         Q.    I was going to ask when it started.

22         A.    Let me think.  20 -- I don't clearly

Page 38

1  remember, is probably my best answer.  2018'ish,

2  2019.  But, I don't clearly remember.

3          Q.    So, after 2015, is that fair to say?

4          A.    Yes, yes.

5          Q.    And is that organization still in

6  existence or still in operation?

7          A.    No.

8          Q.    When did the organization cease

9  to -- cease all operations, I should say?

10          A.    As a practical matter we stopped

11  doing -- we stopped doing activities, I guess, in

12  2020, in late 2019 and early 2020.

13          But then submitted paperwork to the

14  IRS, the final tax filing and so forth in 2020.

15          Q.    And why did the organization cease

16  operations?

17          A.    We had the -- for a variety of

18  reasons.  The hope of the organization was to

19  support the medical needs or certain of the

20  medical needs of Special Forces Veterans with

21  traumatic brain juries.  And that is a tall

22  order.

Page 39

1              There is a lot of things that you

2    don't think about that will come with that.  And

3    so, and there is so many new organizations that

4    were better equipped to, I think, handle that.

5              And you know, we were just doing

6    what we could.  I think we helped other

7    organizations kind of find their footing but then

8    at that point there was no real need for us to

9    continue on.

10        Q.    Sounds like a lot of work.

11        A.    You know, it is, it is a lot.  It is

12   a lot.

13        Q.    What was your role within Time for a

14   Hero?

15        A.    I don't remember the structural --

16   my structural designation in terms of the

17   paperwork.  I don't remember if I was president

18   or vice president.

19              But it was very sort of equally,

20   equally yoked between Greg Phillips and myself.

21   And primarily what I did was support the, support

22   the intake, the review of applications for

Page 43

1    contractor, were both veterans themselves and

2    very single-minded in their desire to

3    communicate.

4              And so they oftentimes just

5    communicated without --

6         Q.    And again --

7         A.    -- clear oversight from the Board.

8         Q.    And would they communicate on their

9    own behalf or on behalf of Time for a Hero?

10        A.    I did not -- I have not seen

11   everything that was ever put out.

12             I would, I would venture to say that

13   it would -- their approach would have found it to

14   be a little bit of both.  That they would have

15   communicated personally with their own

16   experiences and then on behalf of the

17   organization.

18        Q.    And would you have seen all of the

19   communications that have come out from Time for a

20   Hero?

21        A.    No.  No, I would -- I don't think

22   so.

Page 44

1          Q.    Do you have access to any of the

2     organizations' press releases or statements?

3          A.    I may have some.  I don't have all.

4     Certainly I don't have all.  I don't have access

5     to any of the social media stuff anymore.

6          Q.    Did you at any point have access to

7     any of the organizations' social media accounts?

8          A.    I would have known their log-ins.  I

9     never posted anything that I recall.

10              But in the later periods of the

11     organization, the individual who was organizing

12     that or was overseeing the operation used it --

13     changed the passwords and we didn't have them.

14          Q.    So, the two gentlemen that you spoke

15     of who were also involved with the organization,

16     what were their names?

17          A.    The first gentleman who ran the

18     organization for a period was Travis -- I cannot

19     remember his last name.  I apologize.  And then

20     the second gentleman was short lived.  His name

21     escapes me.  I apologize.  I don't recall his

22     name.  I should.  I just don't.  It is not coming

Page 45

1     to me right now.

2          Q.    What was his position?

3               MR. BOPP:  I have to unmute myself.

4     I would like to talk to my client for one

5     minute here.

6               So, if Catherine, you would turn off

7     your video and your audio, I will do the same

8     and I will call you.

9               MR. NKWONTA:  Mr. Bopp --

10              THE WITNESS:  Okay.

11              MR. NKWONTA:  Mr. Bopp, I, I assert

12    an objection to you conferring with your

13    client about a pending question.  As you know

14    that is improper under the federal rules, and

15    I would ask that you allow --

16              MR. BOPP:  You can purport to

17    instruct me however you wish.  Good-bye.

18              THE VIDEOGRAPHER:  Counsel, do you

19    want to go off the record?

20              MS. BRYAN:  Are we still on the

21    record?

22              MR. NKWONTA:  No, I believe Joe said

Page 46

1       we are off the record.

2                MS. BRYAN:  I would recommend that

3       you stay on the record and record the time

4       that Bob left and the time Bob comes back on.

5                MR. NKWONTA:  We can do that, but

6       that will still be reflected on the --

7       whether we are on or off the record, right?

8                MS. BRYAN:  Well, that is true.  You

9       are right.

10               MR. NKWONTA:  So, let's go off the

11      record just to save time.

12               THE VIDEOGRAPHER:  We are now going

13      off the video record, the time is 8:50 a.m.

14               (Recess taken -- 8:50 a.m.)

15               (After recess -- 8:55 a.m.)

16               THE VIDEOGRAPHER:  We are now going

17      back on the video record.  The time is

18      8:55 a.m.

19   BY MR. NKWONTA:

20       Q.   Ms. Engelbrecht, we just took a

21   short break.  Now we are back on the record.

22               Do you recognize that you are still

Page  47

1    under oath?

2          A.    Yes.

3          Q.    During the break, did you discuss

4    with your counsel any of the questions that I

5    asked or the response to the question that I had

6    asked before you took a break?

7                And I'm asking this without

8    disclosing the, what you actually discussed.  I'm

9    asking whether you discussed the content of the

10   question that I asked before we took a break?

11         A.    No.

12         Q.    So, you did not discuss any of my

13   questions about Time for a Hero before we took a

14   break?

15         A.    No.

16         Q.    During that break you did not

17   discuss any of the questions that I asked

18   regarding Time for a Hero with Mr. Bopp?

19         A.    No.

20               MR. NKWONTA:  Okay.  Joe, could we

21      pull up Exhibit 74, please.

22                    (Exhibit 74 marked for

Page 60

1    volunteers working inside of elections.

2                 And the thought behind the outreach

3    was that these were folks that are very good at

4    chain of command, at understanding process.

5                 And in our experience they make

6    great volunteers for these kinds of things,

7    because often when you have people who are very

8    well intended, but they are not as familiar with

9    that construct of, you know, ordered processing

10   and very observant of standards and time periods

11   in which things must be reported in an orderly

12   fashion, that can throw people.

13                And for people that come out of

14   backgrounds that are more oriented towards that

15   chain of command, that works, they do really

16   well.  And so that was the thought behind

17   Continue to Serve.

18                MR. NKWONTA:  Joe, can you pull up

19       Exhibit 65 or Document 65.

20                      (Exhibit 65 marked for

21                       identification.)

22   BY MR. NKWONTA:

Page 61

1          Q.    Ms. Engelbrecht, Document 65 is a

2    transcript of a statement that you made which we

3    had transcribed and which we -- which True the

4    Vote acknowledged in response to one of our

5    requests for admission that this was a correct --

6    it is a true and correct transcript.

7                    MR. NKWONTA:  Joe, can you go to --

8                    MR. BOPP:  I'm sorry, I have a

9          question.  I didn't understand what you just

10         said.

11                   What is the date of this, did you

12         say?

13                   MR. NKWONTA:  The date of this

14         transcript?

15                   MR. BOPP:  Yes.  You gave a date.

16                   MR. NKWONTA:  August 13, 2021.

17                   MR. BOPP:  Okay, all right, thank

18         you.  Sorry, I didn't understand what you

19         said.

20                   MR. NKWONTA:  Joe, can you go to the

21         second page of this transcript.

22    BY MR. NKWONTA:

1/26/2022                Fair Fight, Inc. et al. v. True the Vote, et al.        Catherine Engelbrecht 30(b)(6)
                              Confidential - Pursuant to Protective Order

Page 62

1          Q.    Ms. Engelbrecht, can you read this

2    second paragraph into the record.

3          A.    "Of interest here, we have a new

4    initiative called Continue to Serve which is

5    about recruiting veterans and first responders to

6    work inside the polls.  You want to talk about

7    people who understand and respect law and order

8    and chain of command, you get Seals in the polls.

9                "And they're going to say no, no,

10   that is not -- this is what it says and this is,

11   this is how we're going to play the show.  And

12   that's what we need."

13         Q.    When you were making this statement

14   and when you were referring to Seals in the

15   polls, who did you envision them referring to or

16   interacting with?

17         A.    Well -- I'm sorry.  Can you repeat

18   the question?

19         Q.    Sure.  Who did you envision -- when

20   you were making the statement, who did you

21   envision the Seals interacting with or talking

22   to?

Page 63

1        A.    Depending upon the capacity in which

2    they were working, things can get very confusing

3    in polling places.  And the thought was just the

4    individuals that are, as I say here, familiar

5    with that kind of law of order and chain of

6    command and understanding process are very

7    decisive in their, this is how we need to do

8    this, this is what the rules say.

9              So, I'm familiar with this entire

10   situation and how this came about.  And I would

11   say that, you know, it was taken out of context.

12   That is, what I have just explained to you was

13   the, the rationale behind the comment.

14        Q.    And you anticipate that these Seals

15   would be interacting with people in the polling

16   place including voters or election officials; is

17   that correct?

18        A.    I would say that veterans and first

19   responders, working inside the polls, depending

20   upon their capacity, may interact with voters,

21   also depending upon the state.

22              If they were serving in the capacity

Page 64

1    of poll watcher, they would not engage with

2    anyone.  If they were working as a judge or a

3    clerk, then they may.

4              And certainly with one another as

5    part of the team working at the polls which can

6    get very confusing, they would interact together

7    working with others there at the polling place.

8         Q.    Who is Ed Hiner?  H-I-N-E-R is the

9    last name.

10        A.    He temporarily was the spokesperson

11   for Continue to Serve.

12        Q.    You say temporarily.  Did he stop

13   being a spokesperson at some point?

14        A.    He did, yes.

15        Q.    Why is that?

16        A.    He also had a program that was a

17   leadership program for after school, like after

18   school programs.

19             And that -- in California.  And that

20   really got busy.  And he was also writing a book

21   or had written a book and was promoting that

22   book.  And, you know, the oversight of an effort

Page 65

1   like this is, takes a lot of time.  And he just

2   didn't have that time to devote because there

3   were so many other interests in play for him.

4          Q.    Have you seen or are you familiar

5   with news articles or news reports in which Ed

6   Hiner claimed that he withdrew after realizing

7   how partisan the program had become?

8          A.    No, I'm not aware of that.

9          Q.    Do you have any reason to dispute

10  that those were his reasons for withdrawing?

11         A.    Well, the reasons for his withdrawal

12  were, as I have stated, he didn't have the time.

13                He was shocked by how mean spirited

14  comments can be about these kinds of efforts.

15  And he didn't have any political background and

16  didn't want it to -- he didn't, he didn't want

17  the, the animus that comes oftentimes,

18  unfortunately, with detractors who are looking to

19  try to find a partisan angle here when there is

20  none.  But that is not what the media will

21  report.

22         Q.    And did you discuss Mr. Hiner's

Page 66

1    concerns with him?

2          A.    Yes, I recall that we talked about

3    it and I understand.  I mean it is a lot.

4          Q.    And when you talked about it with

5    him did he relay the concerns about the program

6    being partisan?

7          A.    Not the program.  No, our program

8    was not partisan.  He was shocked at, you know,

9    how could it be that the comments were taken and

10   twisted in a way that made things seem negative.

11   That was a shock to him.

12         Q.    I want to ask you about a different

13   program.  Have you heard or used the phrase,

14   Validate the Vote?

15         A.    Yes.

16         Q.    And where did that phrase come from?

17         A.    It was a recommended name given to,

18   or suggested to me, by a consultant of a donor

19   that had come to us and had suggested, the

20   consultant suggested the name, Validate the Vote,

21   and I have used it.

22         Q.    Is that phrase -- is that name, is

Page 67

1    that specific to True the Vote?

2          A.    I don't know.

3          Q.    Have you heard of any other

4    organizations that have used that phrase for any

5    of their programs?

6          A.    I have.  I have.

7          Q.    Which ones?

8          A.    The consultant who suggested that we

9    use that name went on to start his own

10   organization or had some other affiliation with

11   an organization that was using that name.

12   Whether or not they are still doing anything I

13   don't know.

14          But I recall seeing the -- I was

15   shocked to see that that had occurred.

16          Q.    When did the consultant recommend

17   this name to you?

18          A.    On November the 5th.

19          Q.    What year?

20          A.    Oh, sorry, 2020.

21          Q.    And when did you see the consultant

22   start a different organization and use that same

Page 68

1   phrase?

2         A.    I do not recall.  Shortly

3   thereafter, but I do not recall.

4         Q.    Other than that, do you recall any

5   other instances of organizations announcing sort

6   of Validate the Vote issues?

7         A.    I do -- I cannot give you a specific

8   organization to direct your intentions to, but

9   that term I have seen many times, often with the,

10  you know, with the state attached to it, Validate

11  the Vote in a certain state or something like

12  that.

13             So, my recollection is I have read

14  it and seen it other places, but I can't give you

15  any other specifics about where to look.

16        Q.    And during the 2020 election cycle

17  and the lead up to the 2021, the January 2021

18  runoff in Georgia, was Validate the Vote or the

19  phrase or the name of one of the programs that

20  True the Vote was initiating in Georgia and

21  elsewhere?

22        A.    Validate the Vote was used broadly.

Page 69

1    We had an election integrity hotline, and it

2    didn't have a name so to speak.  So we named it

3    Validate the Vote.

4              And then when the attentions turned

5    towards Georgia, as I recall, we would say

6    Validate the Vote Georgia, but it was still a

7    national effort.

8              Does that answer your question?

9         Q.   Yes, it does.  You have used the

10   word, bounty on fraud, before, correct?  In

11   discussing the Validate the Vote program?

12        A.   I don't -- I have read through this

13   in the preparation for this.  I don't recall

14   saying that but -- I don't recall saying that,

15   but -- well, I will leave it at that.  I don't

16   recall saying it.

17             MR. NKWONTA:  Joe, can you pull up

18        Exhibit 64, please.  And if we can go to

19        Page 3 of Exhibit 64.

20                  (Exhibit 64 marked for

21                   identification.)

22   BY MR. NKWONTA:

1/26/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Catherine Engelbrecht 30(b)(6)
                          Confidential - Pursuant to Protective Order

Page 70

1          Q.     Ms. Engelbrecht, can you look -- can

2    you read into the record that starting with the

3    first full sentence -- or starting on the second

4    line, first full sentence, could you read that

5    sentence into the record?

6          A.     Sure, sure.  "And what Validate the

7    Vote is about is putting a bounty on the fraud.

8    Creating an environment for whistleblowers to

9    come forward and tell the story, make sure that

10   they have protections, make sure that they have

11   compensation, and further, creating a space for

12   people to come and share what they know or share

13   with us what they know and then let us try to

14   aggregate it."

15         Q.     So, Exhibit 64 is a transcript of

16   some remarks you gave during a podcast.

17                Do you recall this podcast?

18         A.     I did host a podcast for a brief

19   period of time.  I absolutely recall that.

20         Q.     When you used the term, Validate the

21   Vote and the Bounty on Fraud here, can you

22   describe what you were referring to?

Page 71

1          A.     Sure.   These were extemporaneous

2     unscripted, just me talking.

3                 And, I used that word for -- clearly

4     it is there.  I don't recall saying it, but

5     clearly it was there.  It was very much just sort

6     of a riff of trying to explain, you know, what

7     Validate the Vote was going to try to do.

8                 And that is the nature of all of the

9     comments, which is just sort of a riff of trying

10    to explain it.

11         Q.     In addition to the protection that

12    you mentioned that you wanted to offer to

13    whistleblowers, did that also include legal

14    support?  Did you also discuss offering legal

15    support to whistleblowers?

16         A.     I do recall in other instances

17    saying that it would be -- you know, legal

18    support would be one of the things that we would

19    hope to be able to offer.

20         Q.     And why did you want to offer legal

21    support to whistleblowers?

22         A.     There were people coming to us and

Page 72

```
 1   just over the years, you know, people that have

 2   information that they would like to share and are

 3   concerned.

 4             And want to not be left hanging if

 5   they say something that, you know, would lead to

 6   a place of needing counsel, you know, needing

 7   some kind of representation.  And, you know, I

 8   can appreciate that.

 9             So we just wanted to create an

10   environment where if they wanted to say something

11   we would, we would be with them.

12        Q.   Did you offer that in order to, in

13   order to encourage whistleblowers to come

14   forward?

15        A.   Is the question did we offer to pay

16   for legal counsel in order to encourage the

17   whistleblowers to come forward?  Is that -- I'm

18   sorry --

19             MR. BOPP:  Catherine, Catherine --

20             THE WITNESS:  Could you repeat it?

21        Could you repeat the question?

22             MR. BOPP:  Excuse me, I am speaking.
```

Page 73

1              MR. NKWONTA:  She is speaking as

2        well, but you have to assert an objection.

3        What is your objection?

4              MR. BOPP:  If you stop talking, I

5        will interpose my objection.

6              My objection is, Catherine, you are

7        not to rephrase the question.  You are to

8        answer the question.

9              If you don't know the -- if you

10       can't answer the question because it is

11       unclear or whatever, then ask him to rephrase

12       the question.  And that is my objection.

13             THE WITNESS:  Could you repeat the

14       question?

15   BY MR. NKWONTA:

16       Q.    Certainly.

17             MR. NKWONTA:  Before I do, I want to

18       state for the record, Mr. Bopp's objections

19       are actually not objections under any

20       definition of the federal rules.  It is

21       actually coaching the witness.

22             So, I object to you coaching your

Page 74

```
 1      witness during the testimony.  And I ask that

 2      you refrain from doing that further in this

 3      deposition.

 4              You have not asserted any objections

 5      to my questions.  You don't get to object to

 6      your witness's own testimony.

 7  BY MR. NKWONTA:

 8      Q.   Ms. Engelbrecht, I will repeat my

 9  question.  Did you offer legal support because

10  you thought it would encourage whistleblowers to

11  come forward?

12      A.   Thank you.  I thought that by making

13  it known that there would be legal support for

14  people who came forward, that it may encourage

15  people who were otherwise concerned about not

16  being able to withstand the whirlwind that these

17  things came to elicit.

18      Q.   So, was it your view that concerns

19  about legal ramifications would keep some

20  whistleblowers from coming forward?

21      A.   I'm sorry, can you repeat the

22  question?
```

Page 75

1       Q.    Sure.  Was it your view that

2  concerns about potential legal ramifications

3  would keep some whistleblowers from coming

4  forward?

5       A.    It was my concern that, or my belief

6  that, in the environment in which we find

7  ourselves, it seems that it doesn't take too much

8  to end up being caught into a lawsuit.

9            And that we have all watched as

10  people who never thought they would find

11  themselves involved in anything like this do.

12  And that keeps a lot of people -- that has a very

13  chilling effect.

14            And so the thought was to try to

15  create an environment, as I say here on this

16  exhibit that is on the screen, to create a space

17  for people to come to and know that they wouldn't

18  be alone.

19       Q.    So, and just to make sure I am fully

20  understanding, I think I am following what you

21  are saying.

22       A.    Sure. Sure.

Page 76

1         Q.    To make sure I'm fully

2   understanding.

3               Was it your concern that without

4   providing that legal support people may not come

5   forward because they were concerned about

6   potential legal ramifications?

7               MR. BOPP:  I object.  Asked and

8         answered now multiple times.  You are

9         harassing the witness.

10              But you may answer if you, you know,

11        and if you -- you may answer.

12              THE WITNESS:  Yeah, I feel like I

13        have answered it.  I feel like I have

14        answered the question.

15              We thought that creating or making

16        it known that if people came forward and

17        needed some kind of legal support that we

18        would help support that.  That was the reason

19        that I said what I said.

20   BY MR. NKWONTA:

21        Q.    I understand that you feel like you

22   have answered the question.  I do, I do want to

Page 77

1   get clarity on your answer.

2           A.    Sure.

3           Q.    Just to make sure that I am

4   following.  And I understand that Mr. Bopp has

5   objected that it is asked and answered.

6                 MR. NKWONTA:  I am willing to take

7       that as a standing objection, unless you want

8       to interject again.

9   BY MR. NKWONTA:

10          Q.    But I want to just ask the question

11  once more and just make sure that I get, I fully

12  understand your answer.

13                The question I'm asking is slightly

14  different, I think.  What I am asking is not just

15  why you offered legal support, but whether you

16  felt like the potential legal ramifications of

17  being a whistleblower or coming forward might

18  prevent people from whistleblowing or from coming

19  forward?

20          A.    I don't want to rephrase the

21  question, but no, that -- as I understand the

22  question again repeated, no, that that was not

Page 79

1      Q.    You make the statement there of the

2   last paragraph.  It says, "That is going to be a

3   standing offer and the dollars will continue to

4   increase as awareness grows."

5            What did you mean by that?

6      A.    Give me one second to read the

7   preceding paragraph.

8      Q.    Sure.

9      A.    Again these were just, you know,

10  riffs, but I, having read the preceding

11  paragraph, when I said that is going to be a

12  standing offer, that would have necessarily tied

13  to my previous comments about how they could

14  reach to the various outlets, the websites, the

15  phone number, support, financial support, legal

16  support.  I used the term, whistleblower

17  immunity.

18            So, so that is what I was referring

19  to.

20      Q.    So, I want to break that down --

21      A.    Oh, I'm sorry -- okay.  Yes, please.

22      Q.    No.  Please continue.

Page 80

1          A.     You also asked about the dollars

2     will continue to grow.

3                 That was a -- the more that these

4     types of services or types of supports are

5     required, the more expensive that would become.

6                 And there was nothing behind that

7     other than to say, you know, more people would be

8     willing to support and donate and help if that

9     became necessary.

10                And that was my opinion and that is

11    I'm sure what was going through my mind at the

12    time.

13         Q.     So, more people would be willing to

14    support and donate to what exactly?

15         A.     It's in the instance that people

16    were sharing information, that lawsuits were, you

17    know, on the radar.  That a broad support was

18    potentially necessary of a variety of types, I

19    would imagine.

20                That the people that support the

21    work that True the Vote does, would have a part

22    for seeing the, you know, the people that came

Page 81

1    forward would be taken care of and not just left.

2         Q.    So, is one way to read this then is

3    that the dollars or the support, the financial

4    support or donations or dollars of True the

5    Vote -- and True the Vote's efforts will increase

6    as awareness of the Validate the Vote program and

7    these other efforts grows.

8              Is that, is that a fair reading?

9         A.    Yes, I think that is fair.

10        Q.    You also had a Validate the Vote

11   program hotline; is that right?

12        A.    Yes.

13        Q.    Was it called a Validate the Vote

14   Program Hotline or was there a specific name for

15   it?

16        A.    Well, not initially.  Every election

17   cycle we host a hotline that is both available

18   online, and then we have a toll free number that

19   people can call and share any manner of things.

20             And that has been consistent over a

21   number of cycles.

22             In the most recent cycle, we had

Page 82

1    started the hotline in late September.  And we

2    didn't begin to use the name Validate the Vote

3    until, as I mentioned, November 5th or 6th,

4    something like that.

5          Q.    But the hotline itself doesn't have

6    a specific name separate from Validate the Vote;

7    is that right?

8          A.    Just the Election Integrity Hotline.

9          Q.    And someone didn't have any ideas

10   for that?

11         A.    No.

12         Q.    Well, it is the Validate the Vote

13   hotline that you initiated, when did that hotline

14   take off for the 2020 election?  Or when was that

15   hotline officially opened?

16         A.    In, in, the hotline itself, just the

17   election integrity hotline, that is actually up

18   on our website right now.  But we added the -- we

19   expanded the use of it for, to host live, live

20   operators taking calls and so forth.  That

21   started in late September of 2020.

22         Q.    So, that hotline started in late

Page 83

1   September 2020, and it is still ongoing or is

2   there a period in which the hotline stopped

3   receiving calls?

4        A.    It is still available.  People still

5   report things.  Certainly the focus is no longer

6   what it was then, but we do still have that up.

7   And it is a useful way for people to help

8   organize their thoughts about their questions and

9   what it is that they are seeking help with.

10       Q.    Did you keep track of the reports

11  that came in through the hotline?

12       A.    As best as we could, yes.

13       Q.    And what did you do with those

14  reports?

15       A.    They were provided to me and to the

16  True the Vote team on a routine basis to review,

17  and I'm sure they have been archived somewhere.

18            MR. NKWONTA:  Joe, can you pull up

19       Document 35 or Exhibit 35.  And we are going

20       to need to blow that up significantly or

21       magnify that so we can look at some of these

22       entries.

Page 84

1                    (Exhibit 35 marked for

2                         identification.)

3    BY MR. NKWONTA:

4         Q.    Do you recognize Exhibit 35,

5    Ms. Engelbrecht?

6         A.    I recognize it from the package of

7    exhibits that was included for the purposes of

8    this deposition.  So, I reacquainted myself.  I

9    couldn't read it myself when I was looking at it

10   but --

11        Q.    Is this one of the -- sorry.  Were

12   you finishing your answer?

13        A.    Yes.

14             THE WITNESS:  Is it possible maybe

15        to enlarge it a little bit more?  Perfect.

16        Can you scroll to the right so I can see the

17        headings?

18             Yes.  I'm sorry.  Could you repeat

19        your question?

20   BY MR. NKWONTA:

21        Q.    I wanted to ask, is this the list of

22   the report of the incidents that you received

Page 92

1        A.    I would have to -- I can't confirm

2   that.  I would have to -- I can't confirm that.

3   It should have just been a, you know, dump out to

4   fulfill the requirement, but I can't confirm it.

5                MR. NKWONTA:  Let's see if we can

6      blow up a document.  That might help.

7                Can we pull up Exhibit 79?

8                (Exhibit 79 marked for

9                  identification.)

10               MR. NKWONTA:  And can you enlarge

11     that a little bit and scroll to Page 8.

12  BY MR. NKWONTA:

13       Q.    Ms. Engelbrecht, Exhibit 79 is the

14  Second Amended Response -- True the Vote's Second

15  Amended Response to Plaintiff's Second Request

16  for Production.

17               Do you recognize this document?

18       A.    Yes.

19       Q.    Now, if you look at the Request

20  Number 18, Request Number 18 seeks, "All

21  documents and communications relating to True the

22  Vote's Election Integrity Hotline as described in

Page 93

1    your responses to Interrogatories 2 and 3,

2    including, but not limited to, all documents and

3    communications surrounding the launch of the

4    hotline, follow-up with users of the hotline,

5    vetted reports, and follow-up with the

6    authorities charged with investigating such

7    claims as described in your response to

8    Interrogatory Number 3."

9                 Is that a correct reading of Request

10   Number 18?

11         A.    That is a correct reading, yes.

12         Q.    And in your response you state that,

13   "The defendant True the Vote has produced the

14   record of all hotline contacts relevant to

15   Georgia during the time frame of the runoff

16   election."  Is that correct?

17         A.    Yes.  And that would be relevant to

18   Georgia at the time of the runoff collection --

19   runoff election, yes.

20         Q.    You also state that, in the second

21   paragraph, "None of these contacts resulted in

22   the need for True the Vote to follow up or report

Page 94

1    the contact information to appropriate

2    authorities."

3                    Is that correct?

4                    THE WITNESS:  Can we -- I apologize.

5         Could we just scroll down so I can see that

6         in the response?

7                    MR. NKWONTA:  Keep scrolling.

8                    THE WITNESS:  I can go -- yes.

9                    MR. NKWONTA:  The next page.

10                   THE WITNESS:  The next page.

11                   MR. NKWONTA:  And then the paragraph

12        starting with None of these concepts.

13                   Can you scroll down a little bit

14        more, Joe?

15                   THE WITNESS:  Yes.  Yes.

16   BY MR. NKWONTA:

17        Q.   Is it accurate that none of the

18   reports to your election integrity hotline or

19   Validate the Vote hotline resulted in the need

20   for True the Vote to report anything to

21   authorities?

22        A.   Specific to this request for

Page 95

1   production around the Georgia runoff and the

2   exhibit that we have looked at, that would be the

3   case, yes.

4              MR. NKWONTA:  You can pull that

5        down, Joe.  I would like to ask about some of

6        your other election related efforts.

7              If we could pull up Exhibit 61.  And

8        can we scroll to the next page.

9                   (Exhibit 61 marked for

10                   identification.)

11  BY MR. NKWONTA:

12       Q.    Do you recognize this document,

13  Ms. Engelbrecht?

14       A.    Yes.

15       Q.    What is it?

16       A.    This was, based on its formatting,

17  this would have been taken from our website.  And

18  it just describes that we launched the Election

19  Integrity Hotline specific to the runoff period.

20       Q.    And this is a press release issued

21  by True the Vote, correct?

22       A.    Yes.  Or a blog post, but yes.

Page 96

1          Q.    Or a blog post?

2          A.    Or a blog post.  I'm not certain

3     that this was a press release, but it most

4     certainly was posted on our website.

5          Q.    Now, this press release makes

6     reference to efforts to provide signature

7     verification along with -- sorry, signature

8     verification training, absentee ballot drop box

9     monitoring, and other nonpartisan election

10    integrity initiatives.

11                Is that correct?

12         A.    Yes.

13         Q.    I want to explore each of those.

14    What signature training did you provide or what

15    signature verification training did you provide?

16         A.    We posted online a signature

17    verification training course.

18                For that program particularly we had

19    worked with a signature verification specialist,

20    someone who is accredited in that field and has

21    worked in law enforcement and even in elections.

22                And so, she led the course, again

Page 97

1    online, but led the course in describing for

2    volunteers who would be potentially working in

3    that capacity what to look for.

4              And, you know, when you are looking

5    at signature verifications, how do you, if you

6    are going to compare two signatures, what are

7    some key traits that to an untrained eye you

8    might want to look at first.  These are people

9    that -- most of them had never worked in that

10   capacity before.

11             So, just some basic understandings

12   of signature verification.  And then the process

13   behind that.

14             So, taking the actual process of

15   looking at the signature and then in the greater

16   context of what that means inside of an election.

17   And the standards particularly in Georgia were

18   changing and how to do as best as you could to,

19   as a volunteer to be useful in that -- for the

20   state in that capacity.

21        Q.    Who provided the training?

22        A.    I do not remember her name.  We

Page 110

1    training what did that entail?

2         A.    How to -- again, recognizing that

3    every state handles this process differently, but

4    a broad overview of the definition of an absentee

5    ballot, what one might expect to experience from

6    the different elements of the absentee ballot.

7              Package from the carrier envelope to

8    the ballot.  Just very high level explanations

9    that the goal of which was to share with the

10   volunteer that, you know, this is probably what

11   happens but every state has their own process.

12        Q.    What was the target audience for the

13   training?

14        A.    Anybody that wanted to take the

15   training.

16        Q.    And what was the purpose of the

17   training?

18        A.    To create a transparency that would

19   encourage volunteers, of which there are not

20   enough, to get a basic understanding of what they

21   might be able to expect, and direction on how

22   they can connect with the locality to serve if

Page 111

1   they so chose.

2        Q.    And in what way would these

3   individuals serve that would allow them to

4   implement this training?

5        A.    They would -- if they had watched

6   the election or the absentee ballot training and

7   they went on to serve in the Absentee Ballot

8   Review Board, that would be, you know, a point of

9   connection or a point of familiarity of the broad

10  process.

11            But there are any number of

12  positions that they may end up working in.

13       Q.    You also referenced monitoring

14  absentee ballot drop boxes in this press release.

15  And I'm still referring to Exhibit 61.

16            What did that entail?

17       A.    I don't recall.  I'm glad to review

18  the exhibit again, but I don't recall.

19            MR. NKWONTA:  One second.  Can we

20       put that exhibit back up, Joe?  That is

21       Exhibit 61.  So, if we can scroll to the last

22       page, to Page 3.

Page 112

1   BY MR. NKWONTA:

2        Q.    Ms. Engelbrecht, can you read that

3   last paragraph, starting with this week, into the

4   record?

5        A.    "The week, True the Vote also

6   announced its partnership with the Georgia

7   Republican party, in addition to the Georgia

8   Election Integrity Hotline.  True the Vote will

9   assist with the Senate runoff election process,

10  including publicly available signature

11  verification training, monitoring absentee ballot

12  drop boxes and other nonpartisan election

13  integrity initiatives."

14       Q.    To cue up my question again, what

15  did monitoring absentee ballot drop boxes entail?

16       A.    We did not do any monitoring of

17  absentee ballot drop boxes for -- that is a

18  misstatement.

19       Q.    And why did True the Vote announce

20  that it was conducting absentee ballot drop

21  boxes -- or absentee ballot drop box monitoring?

22       A.    I do not recall.  There was no

Page 113

1    monitoring of absentee ballot drop boxes.  Just,

2    it is not what volunteers did.

3         Q.   Has True the Vote monitored absentee

4    ballot drop boxes in prior elections or during

5    the 2020 general election or outside of Georgia?

6         A.   No.  No.

7         Q.   Can you think of an instance in the

8    past where True the Vote monitored absentee

9    ballot drop boxes?

10             MR. BOPP:  Excuse me, I object.

11        That goes beyond the six states that are

12        specified in the court's order that you are

13        directed to limit your questions to.

14             It also goes to the history of the

15        world as opposed to being confined to 2012.

16             And I will instruct her not to

17        answer it because that would violate the

18        court order.

19             MR. NKWONTA:  Are you also

20        instructing the witness not to answer in her

21        individual capacity?

22             MR. BOPP:  I have been, no -- well,

Page 114

1      excuse me.  Yes.  Because the -- you are

2      obligated to comply with the court order.

3      You are violating the court order.

4             And so you can't ask about things

5      that are not permitted.  And you are to

6      adhere to the limits of the court's discovery

7      order.

8             MR. NKWONTA:  I think you are

9      actually misreading and violating the court

10     order.  And I also think that regardless of

11     what you feel about the scope of the topics,

12     there are no 30(b)(6) topics for

13     Ms. Engelbrecht in her individual capacity.

14            So, I will ask her -- I understand

15     that you have instructed her not to answer as

16     a 30(b)(6) witness for True the Vote which I

17     will object to as improper.

18            But I will ask Ms. Engelbrecht, in

19     her individual capacity --

20     BY MR. NKWONTA:

21        Q.   Whether you are aware of any

22     instance in which True the Vote or any of its

Page 123

1              Our website is full of nonpartisan

2    information.  There was information around --

3    specific to Georgia, there was information around

4    dates for when you can vote and drop box

5    locations.  And things that you would, you know,

6    just good guidance kinds of stuff.

7              Maybe that is -- would qualify for

8    other initiatives.

9         Q.    Other than materials posted on the

10   True the Vote website, are there any other

11   election integrity initiatives that True the Vote

12   engaged in?

13        A.    Can you define the time frame?  I

14   want to make sure I'm answering properly.

15        Q.    Certainly.  So, the time frame would

16   have been the same time frame in which this press

17   release was issued.  So in that period through

18   the runoff election.  It is between the November

19   general election and the runoff election.

20        A.    Well, the -- we were working on

21   the -- we had, we had had individuals that had

22   requested support for knowing, because they knew

Page 124

1    that the rolls had not been cleaned.

2              So, we were looking at the project

3    around -- during this time we have been looking

4    at the project around the elector challenges.

5         Q.    Which individuals had requested

6    assistance or noted that the rolls had not been

7    cleaned?

8         A.    I mean, it was broadly known that

9    the rolls hadn't been cleaned.  That was well

10   publicized.

11             Just, you know, various people,

12   volunteers, people who follow True the Vote

13   had -- we received e-mails saying could we do

14   anything because the rolls aren't clean.  I mean

15   very loose sort of realizations that people

16   wanted to do something about it.

17        Q.    All right.  Well, let's turn to some

18   of those activities and some of the folks

19   involved with those activities.

20             How do you know Gregg Phillips?

21        A.    Gregg Phillips and I were introduced

22   in late 2013, early 2014, because he -- at the

Page 125

1    time I was undergoing some pretty extensive

2    targeting by the government.

3              And he had had his information, some

4    of his donations released to -- kind of in the

5    same vein.  And so there was an introduction

6    based on that sort of common, this was happening

7    to a lot of people.

8              From -- so then that is how I know

9    him.  I was introduced in that vein of shared,

10   just shared experience.

11        Q.    And when did True the Vote start

12   working with OPSEC Group?

13        A.    It would have been late, late summer

14   of 2020.

15        Q.    And True the Vote had worked with

16   OPSEC Group before the late summer of 2020; is

17   that right?

18        A.    No.

19        Q.    Had True the Vote worked with Gregg

20   Phillips before the late summer of 2020?

21        A.    Yes.

22        Q.    And am I right that True the Vote

Page 126

1    worked with Gregg Phillips to conduct similar

2    data and voter analysis to the landmark election

3    challenge that True the Vote launched in the 2021

4    runoff; is that correct?

5           A.    I'm sorry, could you ask that again?

6           Q.    Sure.  Did True the -- I will

7    rephrase the question.

8                 Did True the Vote work with Gregg

9    Phillips on data analysis and voter analysis

10   before September of -- or the summer of 2020?

11          A.    Yes.

12          Q.    Can you describe the types of voter

13   analysis and data analysis that True the Vote

14   worked with Gregg Phillips on?

15          A.    We reviewed a variety of things

16   including reviewing how the changing laws

17   around -- or changing guidance around the 2020

18   election was impacting voters' engagements, you

19   know, with respect to absentee ballots and so

20   forth.

21                So, that was an example.

22                We have looked at, in the State of

Page 127

1    Texas, we looked at the distinctions between the

2    way that counties managed their rolls or reported

3    actions taken during the election via the voter

4    rolls versus what counties were reporting to the

5    secretaries of state, those kinds of data

6    projects.

7          Q.   Did True the Vote work with Gregg

8    Phillips on identifying voters who may have

9    changed their addresses or who may have filed

10   notices of a change of address with the Postal

11   Service?

12         A.   We did, we worked -- yes, yes.  But

13   it -- yes.  Yes.

14         Q.   When was that?

15         A.   That would have been probably

16   starting the second week of December of 2020.

17         Q.   Before that, had True the Vote done

18   any of that type of work with Gregg Phillips,

19   meaning identifying voters who had moved or who

20   had filed change of address notices?

21         A.   I don't recall.

22         Q.   Let me ask it this way.

Page 128

1                    Was December 2020 the first time

2       that True the Vote had attempted to identify

3       voters who had changed their address or had moved

4       out of their current voting jurisdiction?

5              A.    It was not the first time True the

6       Vote had done that, no.

7              Q.    When had True the Vote done that in

8       the past?

9              A.    In Texas, True the Vote in 2020, had

10      reviewed voter records that -- for that type of

11      disqualification potential.

12                   And done so recognizing the voter

13      challenge that enabled citizens to ask those

14      questions of their counties, encourage their

15      counties to take a look at the record.

16             Q.    When in 2020 did that occur?

17             A.    I'm sorry.  I didn't -- if I said

18      2020 that was a mistake.  I meant 2012.  I

19      apologize.

20             Q.    When True the Vote conducted that

21      analysis in 2012, what did True the Vote do with

22      that information?

Page 139

1    you have been told?

2          A.     That is my personal knowledge.

3          Q.     Have you used Smarty Streets before?

4          A.     Yes.

5          Q.     And did you use Smarty Streets to

6    refine an NCOA list?

7          A.     Yes.

8          Q.     And in what context?  For the

9    Georgia election law challenges?

10         A.     Yes.  I should say, I did not

11   personally do that, but that was my understanding

12   as part of what was being used to, broadly to

13   refine the NCOA list itself.

14         Q.     And you mentioned other databases

15   like the Social Security database and a few

16   others.  Do you know if OPSEC conducted all of

17   those -- all of that analyses internally or

18   whether it outsourced some of that analysis?

19         A.     I do not know.

20         Q.     How did you first get in contact

21   with Mark Williams?

22         A.     Mark Williams is a printer that

Page 140

1    OPSEC was introduced to and that was the extent

2    of my introduction.

3           Q.    Who introduced OPSEC to Mark

4    Williams?

5           A.    I do not know.

6                 MR. NKWONTA:  Could we pull up

7        Document 15.  Could we zoom in a little bit

8        on the document below the redacted portion.

9                      (Exhibit 15 marked for

10                      identification.)

11   BY MR. NKWONTA:

12          Q.    Ms. Engelbrecht, Document 15 or now

13   Exhibit 15 is an e-mail from Mark Williams to

14   Gregg Phillips and you are copied as well.  Is

15   that your e-mail address on the cc line?

16          A.    Yes.

17          Q.    Do you recognize this e-mail?

18          A.    I do not.

19          Q.    But you don't dispute that this was

20   an e-mail that was sent to you, right?

21          A.    No, I don't dispute it.  I just

22   don't recall it.

Page 141

1          Q.    And then in the e-mail below, it is

2     actually forwarding an e-mail or adding you to an

3     e-mail chain below.

4               It says -- the e-mail from below is

5     from Gregg Phillips.  And it says, "Mark, you

6     were referred to us by the chairman of the GOP.

7     We have a large print job for which we need help.

8     Please let me know if you have ten minutes to

9     discuss."

10              Is that a correct reading of the

11    e-mail from Gregg Phillips?

12         A.    Yes.

13         Q.    And the reference to Chairman of

14    GOP -- of the GOP, is that the same individual,

15    David Shafer, whom you spoke with before

16    announcing True the Vote's partnership with the

17    GOP in the press release that we discussed

18    earlier?

19         A.    David Shafer is the Chairman of the

20    GOP, yes.

21         Q.    And that was the same individual

22    that you spoke with before True the Vote

Page 142

1    announced its partnership with the GOP?

2         A.    Yes.

3              MR. NKWONTA:  You can pull that

4      down, Joe.

5    BY MR. NKWONTA:

6         Q.    How did you first get in contact

7    with Mr. James Cooper?

8         A.    James Cooper I have never met.  I

9    have been in e-mail communication with him.  And

10   he was a friend or an acquaintance of Mark

11   Williams.

12        Q.    And how did you first get in contact

13   with James Cooper?

14        A.    I don't recall.

15        Q.    What was James Cooper's role in the

16   Georgia elector challenges?

17              And by the Georgia elector

18   challenges I'm referring to the landmark voter

19   challenge program that True the Vote launched?

20        A.    Sure.  He was interested in

21   participating and was interested in, knew other

22   Georgians who were also interested in

Page 143

1    participating.  That was my connection.

2         Q.    When you say interested in

3    participating, what do you mean by that?

4         A.    Interested in participating in the

5    cleaning of their rolls, locally -- or not

6    cleaning, but the elector challenges, to be more

7    to the point.

8              And was interested in what could be

9    accomplished in that regard.

10        Q.    And he expressed that interest to

11   you?

12        A.    No.  He expressed that interest to

13   Mark Williams which led to that introduction to

14   OPSEC.

15        Q.    And what did you discuss with

16   Mr. Cooper regarding his participation in the

17   elector challenges?

18        A.    I do not specifically recall.

19        Q.    Did you ask him to be a challenger?

20        A.    I don't specifically recall.

21        Q.    How about Ron Johnson, when did you

22   first get connected with Ron Johnson?

Page 144

```
 1           A.    My headphones are going dead so I

 2    may have to -- give me a second if I have to

 3    switch out.

 4                 Same situation, he was an

 5    acquaintance of Mark Williams.  And that was the

 6    extent of my introduction.  He was interested in

 7    participating in the program to look at their

 8    local voter rolls.

 9           Q.    What was Ron Johnson's role in the

10    challenges?

11           A.    He was a challenger.  He was an

12    elector challenger.  And then he, he was very

13    familiar with other people in the state and

14    had -- there was e-mail back and forth between

15    Ron and other -- others.

16           Q.    What was James Cooper's role in the

17    challenges?

18           A.    I do not recall.  I do not recall if

19    he was a challenger.

20           Q.    Do you recall if he had any other

21    role?

22           A.    He was sort of proximate to the
```

Page 145

1   initiative, and as I mentioned, knew other people

2   who had expressed interest in being elector

3   challengers in their county.  I just don't

4   remember if he himself participated.

5           Q.    How did you first get in contact

6   with Derek Somerville?

7           A.    Through OPSEC, through Gregg who had

8   been referred to him.  And then Gregg suggested

9   that I reach out to Derek.

10          Q.    Who referred Gregg to

11  Mr. Somerville?

12          A.    I am not certain; I don't recall.

13          Q.    When was your first communication

14  with Mr. Somerville?

15          A.    I don't recall that either.  Around

16  that time, but I don't recall the date.

17          Q.    Was there a phone call or was there

18  an e-mail or a text?

19          A.    It was a phone call and then we --

20  yes, it was a phone call and then we had dinner.

21          Q.    And what did you discuss with

22  Mr. Somerville at that dinner?

Page 146

1        A.      They were also -- he and another

2    individual were also working through elector

3    challenges and the thought was not to be at cross

4    purposes.  And, you know, that is really the

5    extent of it.

6        Q.      Was that other individual Mark

7    Davis?

8        A.      Yes.

9        Q.      In what way were the challenges

10   potentially at cross purposes?

11       A.      They were doing a much smaller

12   challenge scope that included different -- a

13   different approach to counties that I -- you

14   know, a different approach to counties and a

15   different approach to the registry as a whole,

16   looking at only active voters where we looked at

17   both active and inactive voters.

18       Q.      And in what ways was their challenge

19   effort at cross purposes with True the Vote?

20       A.      I think only inasmuch as the fact

21   that these challenges were going to be submitted

22   around the same time and certainly for the same

Page 147

1    concerns.  And to not cause any undue, you know,

2    consternation or just general confusion, because

3    they had already been at work at, you know, at

4    their project.

5              MR. NKWONTA:  Could we pause for a

6         second maybe to announce a counsel who just

7         joined.

8              MS. SIEBERT:  Good afternoon.  Yeah,

9         my name is Melena Siebert.  I will be

10        representing Ms. Engelbrecht and True the

11        Vote here.

12             MR. NKWONTA:  Hi, Melena.

13             MS. SIEBERT:  Hello.

14   BY MR. NKWONTA:

15        Q.   I will go back to my question,

16   Ms. Engelbrecht.  Was there any potential for

17   confusion between the two challenges?

18             Was that the concern, or were you

19   concerned with confusion among election

20   officials?

21        A.   We were just being observant that

22   what they were doing, we could not, you know,

Page 148

1    attest to or confirm whether or not their

2    methodology was, you know, based upon, for

3    example, the active versus inactive, those kinds

4    of things, because certainly with it all

5    happening so proximate to one another, we were

6    just aware, just broadly aware.

7         Q.    Did you all discuss the differences

8    in methodology?

9         A.    To a limited degree.  I'm not sure

10   exactly how their process worked.

11              But those examples that I gave, I

12   was aware of.

13        Q.    Other than the distinction between

14   inactive and active voters, what other, what

15   other differences in methodology created the

16   different sizes and scope of the challenges that

17   True the Vote submitted versus --

18        A.    I'm not sure other than to say that

19   we reviewed the entire state.  And they, to the

20   best of my understanding, did not review the

21   entire state.

22              I don't have any more information

Page 149

1   about why.

2          Q.    Did you have any concerns about

3   Mr. Somerville's and Mr. Davis's methodology?

4          A.    My observation was that for our

5   purposes the way to be most exacting was to not

6   limit anything.  Any record that was available

7   for review should be reviewed equally.

8                And so, to the extent that any other

9   group did not do that, you know, they -- that was

10  just not our choice.  We wanted to look at

11  everything equally.

12         Q.    In other words you wanted to include

13  as many people as possible within your challenge?

14         A.    We wanted to review as many records,

15  recognizing that the state hadn't cleaned their

16  rolls in two years.  And recognizing all of the

17  new rules around the election process that would

18  have impact.  We wanted to do as much as we could

19  to afford an even review.

20         Q.    And affording that even

21  comprehensive review, that meant including as

22  many records as possible within your challenge?

Page 150

1          A.    Correct.

2          Q.    Did Mr. Somerville or Mr. Davis

3    express any concerns about True the Vote's

4    methodology?

5          A.    They -- as I recall, Mr. Somerville,

6    did want to know the methodology.  But beyond

7    that I don't, I don't believe so.

8          Q.    Other than Mr. Somerville and

9    Mr. Davis, was anyone else at that dinner?

10         A.    It was just Mr. Somerville and

11   myself and Gregg Phillips.

12         Q.    And aside from the methodologies,

13   what else did you discuss at the dinner relating

14   to the challenges?

15         A.    I don't recall anything else.

16         Q.    What role did Mr. Somerville and

17   Mr. Davis take going forward in the challenges?

18         A.    As the challenges began to be

19   submitted, we became aware of some of the

20   volunteers who had, who had indicated they wanted

21   to be a part of challenging the records with the

22   True the Vote project were also working with the

Page 151

1   other projects.

2               So, we were aware of that.  And that

3   caused some need to try to understand how to

4   avoid that.

5               And then beyond that, when the

6   animus around the project became more extreme,

7   and our challengers were being threatened and

8   more confused about what would have seemed to

9   have been a very simple process that took a very

10  different turn, we then were in communication

11  with Derek and Mark as a broader group of, you

12  know, people that were just generally involved in

13  elector challenges and trying to understand what

14  was happening.

15      Q.    What do you mean by a simple process

16  that --

17               MR. BOPP:  Excuse me, excuse me.

18      I'm sorry, I don't mean to interrupt, but I

19      am bowing out.  Melena will take over here

20      and defend the deposition, so good luck and

21      thank you.  And we will -- I will talk to

22      you, Melena after everything is done.  All

Page 152

1     right?

2               MS. SIEBERT:  Sounds good.

3               MR. BOPP:  I am logging off.  Bye

4     Cathy.

5               THE WITNESS:  All right.

6   BY MR. NKWONTA:

7        Q.   Ms. Engelbrecht, could you explain

8    what you meant by what should have been a simple

9    process that, I forget your exact words, but went

10   off the rails or something along those lines?

11       A.   Sure, sure.  Would you like me to

12   describe the process as I understood it should

13   have been conducted?

14       Q.   Yes, please.

15       A.   Okay.  So, the way that the standard

16   reads and what we were expecting was -- and this

17   was informed by a meeting we had with the

18   Secretary of State, which I'm sure we will get

19   to.

20               But the elector challenges should

21   have been taken in by the -- or accepted by the

22   counties.  They should have been reviewed for the

Page 156

1              There is reason for concern that

2     there would be no way to know whether or not an

3     absentee ballot was sent to an inaccurate address

4     because the basic maintenance requirement had not

5     been fulfilled by the state.

6              THE WITNESS:  Give me one second.

7        Hang on guys.

8              MR. NKWONTA:  Can we just take a

9        minute and go off the record while

10       Ms. Engelbrecht changes her headphones.

11             THE VIDEOGRAPHER:  We are now going

12       off the video record.  The time is 12:34 p.m.

13             (Recess taken -- 12:34 p.m.)

14             (After recess -- 12:35 p.m.)

15             THE VIDEOGRAPHER:  We are now going

16       back on the video record.  The time is

17       12:35 p.m.

18     BY MR. NKWONTA:

19        Q.   Ms. Engelbrecht, you took issue with

20     my phrasing according to plan so let me rephrase

21     that.

22             If the challenges had been addressed

Page 157

1    the way you had expected them to, or the way you

2    envisioned they would have been, all 364,000

3    challenged voters would have been required to

4    provide evidence of their residence if they

5    attempted to vote in Georgia.  Is that correct?

6          A.    They would have been expected to

7    show an identification that shows their residence

8    which is also Georgia law, so they wouldn't have

9    had to do anything other than what they would

10   have normally had to have done in casting a

11   ballot.

12         Q.    Well, you just indicated that would

13   not have been required for absentee voters.

14   Absentee voters would not have been required to

15   present identification, right?

16               So, and, and that may not have been

17   required for in-person voters, if their

18   identification was from, you know, from somewhere

19   else.

20               So, let me pose my question again.

21   Not having addressed those sort of underlying

22   assumptions, let me pose my question again.

Page 158

1                    If the challenges had gone according

2      to the way you had envisioned them being

3      addressed, it would have resulted in 364,000-plus

4      challenged voters being required to present

5      evidence of residency before voting in the

6      Georgia runoff elections; is that correct?

7           A.    Well, for those voters that were

8      voting in-person, they would have, by law, been

9      required to show identification that supports

10     their residency.  That is -- that would have been

11     true in any case, whether or not a challenge

12     would have been issued.

13                   You are right, with respect to

14     absentee ballots.  This was a change in standard

15     where the absentee ballot recipient did not have

16     to show any form of identification.

17                   And so, there, what -- that, in that

18     instance, had somebody been challenged.  But it

19     is important to remember that the only records

20     that were challenged were those records that the

21     elector had also notified the United States

22     Postal Service that they had permanently changed

Page 159

1    their residence.

2              So, this was not without, you know,

3    causation.  But yes, then in the case of absentee

4    ballots, that would have been given the curing

5    process -- or resolved during the curing process.

6         Q.    And what would -- we'll return to

7    the specific operation of the curing process and

8    of the challenge process.  I do want to get back

9    to the meeting between you and Mr. Davis and

10   Mr. Somerville.

11             MR. NKWONTA:  Joe, could we pull up

12      Exhibit 19.  And can we enlarge that a little

13      bit as well.  Great.

14                  (Exhibit 19 marked for

15                   identification.)

16   BY MR. NKWONTA:

17        Q.    Do you recognize Exhibit 19,

18   Ms. Engelbrecht?

19        A.    Yes.

20        Q.    What is it?

21        A.    That was a notice that was sent from

22   True the Vote to all the elector challengers who

Page 160

1   we were working with.

2              And this, as I mentioned earlier,

3   was part of the discussions that we had with

4   Derek, because of the confusion and concern that

5   was being experienced by the elector challengers

6   who were a part of our project.

7              And so this was an invitation to

8   participate in a Zoom call where we could talk

9   about what people were experiencing.

10       Q.   And what did you all discuss during

11  those Zoom calls?

12       A.   The process that was to have been

13  followed.  And the people shared their concerns

14  of threats that they were receiving.  And we gave

15  direction as to where to submit those to so that

16  we would have them on record.

17       Q.   And where did you ask them to submit

18  the threats to?

19       A.   I don't recall.  Somewhere, within

20  True the Vote.  I don't recall the specific

21  e-mail address or whatever.

22       Q.   And do you still have a record of

Page 161

1    those threats?

2          A.    Yes.

3                MR. NKWONTA:  Could we pull that

4        down and pull up Exhibit 30.

5                    (Exhibit 30 marked for

6                      identification.)

7                MR. NKWONTA:  And then before I get

8        into this, I will note that I have referred

9        to these documents as either document number

10       or exhibit number interchangeably.

11               We will just say either Document

12       Number 30 or Exhibit Number 30.  I'm

13       referring to the exhibits.

14   BY MR. NKWONTA:

15         Q.    So, Exhibit Number 30 is an e-mail

16   from you Ms. Engelbrecht to Brian Robinson.  And

17   beneath it an e-mail to Senator Williams; is that

18   correct?

19         A.    Yes.

20         Q.    Do you recognize that e-mail?

21         A.    Yes.

22         Q.    And what was the date of that

Page 164

1    the following week I reached out to the

2    Democratic Party.

3                So, it is accurate to say that the

4    introduction to the Georgia Republican Party

5    came, preceded my outreach to the Democratic

6    Party, but we did not initiate that outreach to

7    the Republican Party, sorry.

8                MR. NKWONTA:  Could we pull up

9        Exhibit 81, please.

10                   (Exhibit 81 marked for

11                     identification.)

12   BY MR. NKWONTA:

13       Q.   Ms. Engelbrecht, Exhibit 81 is the

14   response that True the Vote filed to Plaintiffs'

15   First Interrogatories.

16                MR. NKWONTA:  And, Joe, can you go

17       to Page 25.  Can you scroll up a little bit

18       to catch the Interrogatory No. 8?  Scroll up

19       a little bit to the end of Page 24.  Okay.

20   BY MR. NKWONTA:

21       Q.   Ms. Engelbrecht, Interrogatory No. 8

22   says, "Describe your self-proclaimed partnership

Page 165

1    with the Georgia Republican Party to assist with

2    the Senate runoff election process as announced

3    in your December 14, 2020 press release,

4    including but not limited to the names and

5    contact information of each of the entities and

6    individuals with whom True the Vote has been and

7    intends to work with in this partnership and the

8    approximate date when the partnership began and

9    the purpose and/or goals of the partnership."

10             Is that a correct reading of

11   Interrogatory No. 8?

12             THE WITNESS:  Can we advance to the

13      Page 25?

14             Yes.

15   BY MR. NKWONTA:

16        Q.    And the response, the first sentence

17   of the response says, "The partnership with the

18   Georgia Republican Party was announced on

19   December 14, 2020, shortly after a meeting with

20   David Shafer, Executive Director Stewart Bragg,

21   and Florida Elections Day Operations Director

22   Alyssa Gonzalez Specht."

Page 166

1           Is that a correct reading of the

2    first sentence of the response?

3           A.    Yes.

4           Q.    Is it your testimony that that is

5    not outreach to the GOP?

6           A.    We did not -- we were introduced.  I

7    was introduced.  I did not initiate that

8    introduction.

9           Q.    But at some point you would have to

10   have reached out in order to schedule a meeting

11   and conduct a meeting, correct?

12          A.    I mean, yes, we could say it that

13   way, yes.

14          Q.    So, it is fair to say that True the

15   Vote had some outreach with the GOP before

16   reaching out to any Democratic Party official or

17   legislator and announced the partnership with the

18   GOP before reaching out to any Democratic

19   official or legislator?

20          A.    We -- I would say that the outreach

21   consisting of acknowledgment that we would meet

22   or be at a place where these folks were.  And

Page 167

1  inasmuch as partnership meant them, to make them

2  aware of the, of the election integrity

3  initiatives that were already posted on line,

4  then yes.

5              MR. NKWONTA:  You can pull down

6       Exhibit 81.

7  BY MR. NKWONTA:

8       Q.    I would like to talk about True the

9  Vote's coordination with the Secretary of State's

10 office.  Did True the Vote reach out to the

11 Secretary of State's office before launching the

12 challenge effort?

13      A.    Yes.

14      Q.    Can you walk me through how that

15 outreach occurred?

16      A.    We were working with a

17 communications consultant who knew the staff at

18 the Secretary of State's office.

19              And so, through him I asked to set

20 up a meeting.  And we attended that meeting -- or

21 I attended take meeting.

22      Q.    Who was the communications

Page 168

1   consultant?

2           A.    Brian Robinson.

3           Q.    And when you attended that meeting,

4   who was present at the meeting?

5           A.    Jordan Fuchs, Ryan Germany, Brian

6   Robinson, for a brief period of time Secretary

7   Raffensperger, and myself.  And that is all I

8   recall.

9           Q.    When did this meeting occur?

10          A.    I don't recall specifically.  It was

11  in, you know, mid-December, somewhere in there.

12          Q.    How long did it last?

13          A.    I don't recall that, either.

14          Q.    What did you all discuss at this

15  meeting?

16          A.    I went with the express purpose of

17  describing the elector challenge and the wanting

18  to make sure that we understood, as best as we

19  could, what that process would look like at the

20  county level for the electors who wanted to

21  participate in their -- with their counties to

22  avoid any friction or inappropriate process.

Page 169

1                    And, I expressed that I was

2      concerned about the size of the number, how large

3      it was.  And I expressed that, you know, even

4      though we had done what we could to refine the

5      list so to be, you know, as exact as possible,

6      but the number was still large.

7                    Secretary Raffensperger quickly

8      commented that he thought the number was about

9      right because they hadn't been able to clean the

10     list and so people move.  And he did some fast

11     math in his head, yeah, XYZ, it should be about

12     that number.

13                   And I remember the feeling of

14     saying, you know, this is a -- the only way we

15     can see to do this is to run the whole list, and

16     he agreed.

17                   And again it is a process that

18     electors can participate in, and it is afforded

19     in state law.  And that was kind of it. And then

20     we went through the specific steps of what would

21     happen.

22                   Another thing I recall crisply is my

Page 180

1    requires standardization.  That is the reference

2    to ETL.

3              And then you know they indicate here

4    analyses, so that would come back to us over time

5    in the form of analysis.

6              And litigation support, which was

7    another, you know, a manner, a matter of their

8    involvement.

9         Q.   When did this work start?

10        A.   I am not sure.  I don't know.

11        Q.   Did this work start before

12   December 7th?

13        A.   I don't recall.

14        Q.   So, it is possible this work started

15   after December 7th?

16        A.   No, because litigation support would

17   have occurred in November.

18        Q.   What does that term, litigation

19   support, mean?  Litigation support for what

20   exactly?

21        A.   We had served in support of OPSEC's

22   analyses for lawsuits that were filed post the

Page 181

1    general election that were heavily dependent on

2    OPSEC's ability to review data that should have

3    been made available by the state.

4                And, so that was their -- that was

5    their role and we were supporting that effort.

6          Q.    Are you referring to the lawsuits

7    filed in battle ground states like Georgia,

8    Michigan, Pennsylvania, Wisconsin?

9          A.    Yes.

10         Q.    And the lawsuits filed shortly after

11   the November general election?

12         A.    Yes.

13         Q.    So, part of this invoice includes

14   work that was done in connection with lawsuits

15   that were filed shortly after the November

16   presidential election?

17         A.    Yes.

18         Q.    Can you identify other line items

19   that relate to the November general election,

20   aside from litigation support?

21         A.    Well, all of the data acquisition

22   could conceivably have been used for the

Page 182

1   litigation support.

2        Q.    So, this invoice and all of the

3   analysis is not specific to the Georgia runoff

4   election?

5        A.    No.

6        Q.    It is all combined; it is all one

7   invoice?

8        A.    Yeah, just a listing of all manner

9   of things.

10       Q.    But in terms of the work OPSEC was

11   doing for True the Vote, was it sort of all one

12   combined project?

13             In other words, the analyses for the

14   general election or the November presidential

15   election and the analyses for the runoff, was it

16   all one combined project?

17       A.    No, the analyses for the lawsuits

18   that were filed post election would have been in

19   support of those lawsuits specifically.

20             And True the Vote was, you know,

21   the, financially supporting the effort, but it

22   was being used in lawsuits or should have been

Page 183

1    used in lawsuits.

2         Q.    Right.  I'm saying there is no

3    differentiation here between analysis for those

4    lawsuits and the analysis for the Georgia elector

5    challenges suit?

6              So I'm asking whether there was all

7    one project, at least as far as OPSEC was

8    concerned?

9         A.    Yeah, I don't, I don't recall.

10        Q.    So, I understand you may not recall

11   exactly how it was set up.

12             But, the invoice does reflect --

13   they are combined on the invoices; is that

14   correct?

15        A.    Yes.  I mean there is an element of

16   combination here, yes.

17        Q.    What does Eyes on Georgia mean?

18        A.    That was the term that OPSEC had,

19   and I guess they in their system set that up for

20   part of the description.

21        Q.    What were they describing?

22        A.    At that point it would have -- I

Page 184

1    mean their terminology for looking at what could

2    be, what could be addressed in Georgia or what

3    could be -- let me say that a little differently.

4              What could be done to address the

5    concerns of Georgians relative to citizen

6    engagement.  What could be done.  And that is

7    where you see where it says Georgia Code

8    Analysis.  That is kind of the beginning of

9    figuring out, you know, what could we do for

10   citizens.

11        Q.   What other types of analyses did

12   OPSEC conduct aside from generating a list of

13   challenged voters in Georgia?

14        A.   I know that they looked at, looked

15   post the -- sorry guys, post -- my apologies,

16   give me a second.  A rogue pet.  Hang on.

17              They looked at other data

18   elements -- I'm sorry.  Can you repeat the

19   question?

20        Q.   Sure.  What other types of analyses

21   did OPSEC conduct in Georgia aside from preparing

22   challenge lists for the runoff election?

Page 185

1        A.    They looked at other data elements

2   that are tracked in the Georgia file.  When it

3   was mentioned that there was bias, we wanted to

4   see what the records of the state would show, so

5   they did that analysis.

6        Q.    What other analysis did they

7   conduct?

8        A.    Relative to all of this, I don't

9   recall.

10       Q.    Is there anyone from True the Vote

11  who would recall?  Are there any -- sorry, let

12  me -- you were -- I think you were shaking your

13  head but I will let you answer.

14       A.    Sorry, no.  I'm sorry, no.  I'm --

15  that is my thinking nod.  No, I don't think so.

16  No.

17       Q.    Are there any documents that you

18  could review that would help refresh your

19  recollection of any other analyses that you

20  conducted?

21       A.    No.  I don't recall.  I don't think

22  so.

Page 206

1    challenges was to bring to the -- to help

2    electors bring to the attention of their local

3    counties, records that appeared not to comply

4    with eligibility standards.

5              And it is within state law for them

6    to -- for citizens to participate in that way to

7    ask that question.  And that is the extent of the

8    elector challenge.

9         Q.   And if the challenges, as True the

10   Vote claims, does not result in a person be

11   removed, then why go through the effort of

12   scrubbing military addresses?

13        A.   As I have said, it was just a choice

14   that we made to not -- I mean, there are, you

15   know, deployments.  There are different ways in

16   which addresses are identified.

17             And because there is a filter that

18   exists within the expanded NCOA, we just chose to

19   remove them.

20        Q.   You chose to remove them because

21   there are a lot of valid reasons why someone in

22   the military might file a notice of change of

Page 207

1    address even while maintaining permanent

2    residence in Georgia; is that right?

3         A.    No.  To be clear, NCOA is in the

4    database of, that is NCOA is the result of the

5    resident notifying -- ostensibly is the result of

6    the resident notifying the United States Postal

7    Service that they have permanently moved their

8    residence.

9              It is also worth noting that inside

10   of the expanded NCOA you can, you can as a

11   resident or as a reviewer of the data, you can

12   select a temporary move, right, so who moved only

13   temporarily.  And there are classifications

14   around all of that.

15             So, we only looked at permanence.

16   Nonetheless, I just, our recognition that

17   military, because of the nature of the military,

18   can fall outside of some of the stricter

19   standards in postal and in the delivery services,

20   it was really just a choice to not take that --

21   not include them.

22        Q.    So, according to True the Vote's

Page 208

1    claims then, the challenge list would have only

2    included members of the military who indicated or

3    provided a notice of permanent address changes;

4    is that right?

5          A.    That would have been true for the

6    entire list.  That we would have only been given

7    notice based upon our aggregation of the data

8    from USPS as they provide it.

9                They are attestation through that

10   data is that the selection had been made by the

11   resident.  That the move -- the residential move

12   to a new address was permanent.

13         Q.    And that would be true for -- that

14   would be true for members of the military as

15   well, right?

16         A.    For everyone.  According to what we

17   were provided, uh-huh.

18         Q.    So, what I am -- the question I am

19   trying to get at is what prompted the exception

20   for members of the military who had already

21   indicated that their move was permanent?

22         A.    As I said, it is just a -- I think

Page 209

1    being aware of the sensitivities around the

2    military, because they do move so often.  And as

3    I have mentioned, because of the number of

4    elector challenges, because the rolls had not

5    been cleaned in two years, the number was already

6    so large that that seemed like -- and because the

7    filters were available, that seemed like an

8    appropriate action to take.

9          Q.   Did -- what is the difference

10   between a temporary move and a permanent move

11   when it comes to reporting through the NCOA?

12         A.   Um --

13         Q.   Let me rephrase it this way.  I

14   think I can make my question a little bit

15   clearer.

16         A.   Sure.

17         Q.   Am I right that any move that lasts

18   longer than a year is considered a temporary --

19   is considered a permanent move?

20         A.   I'm not certain what time lines are

21   put on the -- I'm not sure what time lines govern

22   the actual input when a resident goes to USPS or

Page 210

1   through some other forum, puts the date in.  I

2   don't know if the year is the governance or not.

3                I think -- I should leave it at

4   that.  I'm not certain.  But there are

5   distinctions between permanent and temporary.

6                We chose only to look at permanent.

7   And we chose only to look at permanent with the

8   date that was at minimum 90 days -- how do I say,

9   90 days pre the generals.  So that it would have

10  been a substantial period of time, so that when

11  we rescreened everything, if there was a change,

12  we would have caught that.

13               I hope that makes sense.  That is

14  confusing.

15       Q.    If an individual wanted to change

16  their address for 18 months, would they be able

17  to do that by filing a temporary address change,

18  or would they be forced to file a permanent

19  address change and then file another address

20  change when they return home?

21       A.    I know that you can submit the dates

22  that you want the change to be effective for.

Page 211

1    I'm not certain what other guidance USPS may

2    follow.

3         Q.   As you sit here today, you can't

4    tell me what definition of a permanent move is

5    according to the USPS guidelines or according to

6    the reporting on the NCOA database?

7         A.   I can't affirm exactly what their

8    statutes or their guidelines say, no.

9         Q.   Did you scrub the challenge list for

10   college students as well who tend to move often?

11        A.   I, I, it was discussed.  I'm not

12   sure whether or not that was done in whole or in

13   part.  I'm not sure.

14        Q.   Has True the Vote participated in

15   challenges involving students in the past in

16   Georgia?

17        A.   Not that I recall.

18             MR. NKWONTA:  Could we pull up

19        Exhibit 46, please.  I would like to show you

20        Exhibit 46 to see if you recall this.

21                   (Exhibit 46 marked for

22                    identification.)

Page 220

1    BY MR. NKWONTA:

2          Q.    Ms. Engelbrecht, do you recognize

3    that e-mail?

4          A.    Can you enlarge --

5          Q.    E-mail in Exhibit 9 from you to

6    Gregg Phillips -- or from you to Mark Williams,

7    copying Gregg Phillips.

8                THE WITNESS:  An you enlarge just a

9       bit.

10               THE VIDEOGRAPHER:  I apologize,

11      Catherine.  It is stuck.  Bear with me for

12      one second.  Sorry.

13               MR. NKWONTA:  Keep scrolling.  Keep

14      scrolling, there we go.

15   BY MR. NKWONTA:

16         Q.    Do you recognize this e-mail,

17   Ms. Engelbrecht?

18         A.    It is my e-mail.

19         Q.    And this was addressed to Mark

20   Williams?

21         A.    Uh-huh, yes.

22         Q.    And Mark Williams is the printer,

Page 221

1    right?  Or he owns the print shop, right?

2         A.    The print, yes.

3         Q.    In the e-mail in the third

4    paragraph, or the third line, fourth line, it

5    says, "Also please remove addresses that would

6    suggest that they are military bases."  And lists

7    some potential military bases; is that correct?

8         A.    Yes.

9         Q.    So, as you were sending the

10   challenge list to the printer, you were also

11   instructing him to remove the addresses that

12   would suggest that they are military bases; is

13   that right?

14        A.    Yes.

15        Q.    That would suggest that they were

16   not scrubbed; is that right?  At least not in the

17   analysis?

18        A.    No, that would have suggested that,

19   if they saw anything that slipped through, just

20   to try to notate it and remove it.

21        Q.    In other words, was it your view

22   that there may have been some military addresses

Page 222

1    or addresses on military bases that still

2    remained on the list when the list went to

3    Mr. Williams?

4           A.    It would -- conceivably, yes.

5                 MR. NKWONTA:  Could we pull up

6        Exhibit 13 now.

7    BY MR. NKWONTA:

8           Q.    Exhibit 13 is Mark's response.  And

9    it says, "We will replace them on our files as we

10   go forward.  It's not going to matter enough on

11   the printed ones to back up and reprint.  Just

12   remove them from the electronic copy as you send

13   them."

14                Do you know whether those military

15   addresses were ever removed?

16          A.    As I stated, we did all of the

17   filtering out on our side and gave Mark notice

18   that if they were to see any, remove them.  That

19   is really all I can attest to.

20                This also has to do with, you know,

21   whether or not anything even needed to be

22   printed.  Whether or not Mark even needed to be

Page 223

1    involved because we have been given indication

2    from the Secretary of State that they didn't need

3    printed copies.

4              So, there is a lot of there is a lot

5    that is inherent within this trying to understand

6    what the process was going to be going forward.

7        Q.   Are you able to testify today that

8    your challenge list did not include voters who

9    lived on military installations?

10       A.   No.  I can testify that we did -- we

11   put the data through all of the filters and

12   followed the process that I have described.

13             But, data is data.  It is possible.

14             MR. NKWONTA:  We can pull down

15       Exhibit 9 -- or Exhibit 13.

16   BY MR. NKWONTA:

17       Q.   Ms. Engelbrecht, how did you go

18   about recruiting challengers to submit these

19   challenges in various counties in Georgia?

20       A.   Some had already -- some Georgians

21   had already come to us which was really the

22   impetus behind the idea that there might be

Page 224

1    something that we could help them with.

2              And Georgia's elector challenge laws

3    are unique in that it did afford an opportunity

4    for citizens to engage in that way.

5              So, there were some that had come to

6    us initially.

7              And our thought was that others that

8    would be interested would either come to us or be

9    referred if that was something that was of

10   interest.

11        Q.    Were some of these voters referred

12   by Republican Party officials?

13        A.    They were referred by, that group of

14   James Cooper and Mark Williams as people that

15   they knew for different counties, but we never

16   did any deeper dives into their affiliations.

17        Q.    Were any of the voters who

18   approached you, were any of them referred by the

19   Republican Party officials?

20        A.    I don't recall.  I don't think so,

21   but I don't recall specifically.

22        Q.    When the voters approached you or

Page 229

1    Williams 374, at the bottom of Page 1 of

2    Exhibit 36.

3              MR. NKWONTA:  Can you scroll down so

4         we can get the full e-mail.  The other way.

5         Great.

6              THE WITNESS:  I'm sorry, could you

7         ask your question again?

8    BY MR. NKWONTA:

9         Q.    Well, I wanted you to take a minute

10   to review the e-mail.

11        A.    Oh, sure.  Okay.

12        Q.    And this is a communication that

13   went to potential challengers, correct?

14        A.    I can't, I can't confirm that -- let

15   me, let me state that differently.

16              I guess if we looked at the address

17   and if that was one of the challengers, but there

18   are some things in this e-mail that give me pause

19   sufficient to not be able to confirm that this

20   came from Amy yet.  I'm not sure.

21        Q.    Okay.  Well, let's scroll down to

22   Page 4 of this exhibit.  And is part of that

Page 230

1    because of the redactions in the e-mail?

2          A.    No.

3                THE WITNESS:  Would you continue to

4       scroll?  This is just a different take on it.

5                MR. NKWONTA:  Yes.  If you could

6       stop there.

7    BY MR. NKWONTA:

8          Q.    It shows on December 17th, 2020, Amy

9    Holsworth wrote, and it shows Amy's e-mail

10   address there.

11               And this document was produced, by

12   the way, by one of the defendants.

13         A.    Yeah, I mean it appears in this, in

14   this exhibit as though it came from Amy's e-mail

15   address.  There are a number of things that stand

16   out to me as not being normal.

17               But, it does appear, according to

18   this, that it came from Amy's e-mail address.

19               MR. NKWONTA:  And can you scroll a

20      little bit so we can see the full e-mail?  I

21      think there are a few more lines down.

22      Perfect.

Page 231

1    BY MR. NKWONTA:

2        Q.    Do you want to take a minute just to

3    read that e-mail?

4        A.    Okay.

5        Q.    How many challengers did the True

6    the Vote reach out to?

7              How many potential challengers did

8    True the Vote reach out to in order to seek

9    assistance in submitting these challenges?

10       A.    I don't know.

11       Q.    Did True the Vote try to recruit

12   challengers in all Georgia counties?

13       A.    We were open to that for sure and

14   prepared the analysis to support that.

15             But as far as the individuals and

16   the voters who wanted to participate that was --

17   you know, as much as people coming to us as it

18   was people being referred that were also coming

19   to us, so --

20       Q.    So this e-mail that went to

21   potential challengers stated that True the Vote

22   has identified over 500,000 people on the Georgia

Page 232

1    voter list that shouldn't be there.

2              Is that correct that True the Vote

3    identified over 500,000 people in the Georgia

4    voter lists?

5         A.    They are in -- yeah, there are a

6    number of things in this e-mail that are not

7    correct which is what is giving me pause, so --

8         Q.    Okay.  So, we will start first with

9    that 500,000 figure.  Is that correct?

10        A.    Sure.  Um, that is not the number

11   that we had for our challenges, no.

12        Q.    And states that the 500,000 people

13   should not be on the challenge list.

14             Is it True the Vote's position that

15   all individuals on those challenges should not be

16   registered in Georgia or should not be on the

17   voter list?

18        A.    It was and is our position that

19   according to the analysis that we provided, or

20   that we supported, records corresponded with

21   individual decisions to permanently change their

22   residence.

Page 233

1                    And therefore it would have made

2    their record ineligible and appropriate in the

3    scope of an elector challenge.

4                    That sentence is -- doesn't indicate

5    those nuances that I think are critical.

6          Q.    At that point had True the Vote

7    concluded that these voters should not be on the

8    voter rolls or that they were not legally

9    registered?

10         A.    Well, again on the basis of our

11   analysis, the, all that is and should have been

12   done was the recognition of the information that

13   was available and the provision of that to the

14   counties.

15                   This is, you know -- this e-mail is,

16   doesn't clearly make those distinctions known or

17   understood.

18         Q.    The e-mail also, I think the fourth

19   paragraph down asked the voter to take a photo of

20   and scan your signature and e-mail it with their

21   voter registration information.

22                   But it doesn't offer the voter an

Page 234

1    opportunity to review the list, does it?

2         A.    This e-mail does not offer that, no.

3         Q.    At the third paragraph from the

4    bottom, in the last sentence of that paragraph,

5    it says, "True the Vote has assured me that the

6    list that they are challenging is 99.9 percent

7    likely to be incorrectly registered."

8              Do you have any way of knowing

9    whether 99.9 percent of your challenge list is

10   incorrectly registered?

11        A.    No.  And my data background would

12   never make that kind of statement.  And the

13   statement itself is odd in the way the sentence

14   is written, "True the Vote has assured me that

15   the list."

16             It seems odd that Amy would have

17   written that because Amy was part of the True the

18   Vote team.  That is a distinction that you

19   probably didn't -- well, you didn't ask for, no.

20             But specific to your inquiry about

21   the 99.9, this data is -- data is data.  You

22   shouldn't make assertions like that.

Page 235

1        Q.    And regardless of who wrote it, you

2    don't dispute that Amy sent it, right?

3        A.    I, according to what I'm looking at

4    on the screen, the markings are there to support

5    it.

6              It just does not --

7        Q.    If Amy testified that she sent it,

8    would you have any reason to --

9        A.    No, if Amy testified that she sent

10   it, if she said she sent it, then she sent it.

11       Q.    And if this document was produced by

12   defendants, would you have any reason to doubt

13   that this was sent by defendants?

14       A.    I mean if they said they did this,

15   then they did this.

16            MR. NKWONTA:  Can we go to Page 16

17       of Exhibit 36.  And can you scroll a little

18       bit so we get that full e-mail below from

19       James Cooper.

20            THE VIDEOGRAPHER:  Sorry, guys.  It

21       is just -- stand by.

22            MR. NKWONTA:  Okay.

Page 236

```
1              THE VIDEOGRAPHER:  And then you said

2      Page 16 of 36?

3              MR. NKWONTA:  Yes, Page 16.

4              THE VIDEOGRAPHER:  Roger that.

5  BY MR. NKWONTA:

6      Q.    And then you see that the e-mail

7  from James Cooper is also on -- in Exhibit 36,

8  and also includes similar language?

9      A.    Yes.

10     Q.    And if you look at the second

11 paragraph, second to the last sentence, there is

12 an additional sentence there that says, "If this

13 very type action" -- I think there is a typo.  I

14 will start again.

15             "If this very type action had been

16 taken back in October, it is very likely Trump

17 would have won Georgia."  Do you see that there?

18     A.    I do.

19     Q.    At the very top, do you see the

20 response from the voter to James Cooper that

21 says, "True the Vote has my permission to use my

22 signature to challenge the illegal votes in Cobb
```

Page 237

1    County."

2              Is that right?

3        A.    That is what it says, yes.

4        Q.    You mentioned that the challenges

5    were not technically meant to remove voters from

6    the voter rolls.

7              But isn't it true that some voters

8    got that impression from the communications that

9    were issued to these voters?

10             MS. SIEBERT:  Objection.  You are

11        asking her to testify about other people's

12        state of mind.

13             Catherine, go ahead.

14             THE WITNESS:  I mean, this is what

15        James Cooper wrote.  It is really all I can

16        say.  It is what somebody else wrote.

17             MR. NKWONTA:  Could we pull up

18        Exhibit 39, please.

19                  (Exhibit 39 marked for

20                   identification.)

21   BY MR. NKWONTA:

22        Q.    Exhibit 39 is a little bit clearer.

Page 238

1   And you will see at the top of Exhibit 39, James

2   Cooper forwards the e-mail chain below to a

3   number of individuals, including yourself.

4              And you can see that the body of the

5   e-mail below that he forwarded is similar; is

6   that right?

7        A.    Yes.

8        Q.    And in response to James Cooper's

9   e-mail, the perspective challenger responds,

10  "James, Here is my," it is redacted.  I'm

11  assuming it is a registration number.

12             "I give True the Vote permission to

13  use my name and signature in the pursuit of

14  purging the rolls of the deceased, nonexistent

15  and nonresidents of my county."

16             Is that a correct reading of the

17  proposed challenger's response?

18             THE WITNESS:  Can you scroll up a

19      little bit, Joe?  Or down.  Sorry.  Yes.

20             So, that is what you just read and

21      that is what the document says, yes.

22  BY MR. NKWONTA:

Page 239

1          Q.    So, you would agree that that

2    proposed challenger was of the belief that he or

3    she was purging the voter rolls?

4          A.    I -- that is what that statement

5    indicates.

6                MR. NKWONTA:  Can we pull that down

7       and pull up Exhibit 38.

8                    (Exhibit 38 marked for

9                     identification.)

10   BY MR. NKWONTA:

11         Q.    Exhibit 38 is an e-mail that was

12   also forwarded to you, Ms. Engelbrecht?

13               Do you see that?

14         A.    Yes.

15         Q.    And do you recognize this exhibit?

16         A.    I don't recall this, but --

17         Q.    Do you dispute that you received

18   this e-mail?

19         A.    I mean, all of the indications in

20   this exhibit would suggest that I would have

21   received this e-mail, yes.

22         Q.    And the response to James Cooper's

Page 240

1    e-mail below, the one that he forwarded to you

2    and others states, the voters name is redacted.

3    "Has agreed to be the designated challenger for

4    Jones County and True the Vote has expressed

5    permission to use her attached digital signature

6    for the limited and specific purpose of

7    challenging voter registrations in Jones County."

8              Is that an accurate reading of the

9    proposed challenger's response?

10        A.    That is what it says.

11        Q.    And this e-mail came from the Jones

12    County GOP Chairman, right?

13              MR. NKWONTA:  Could you scroll to

14       the bottom.

15              THE WITNESS:  To James Cooper, yes.

16              MR. NKWONTA:  Could we take that

17       down and pull up Exhibit 40.

18                  (Exhibit 40 marked for

19                   identification.)

20    BY MR. NKWONTA:

21        Q.    Exhibit 40 is another e-mail that

22    was forwarded to a number of folks, including

Page 241

1    yourself.

2              Do you see that?

3        A.    Yes.

4        Q.    And the response from the proposed

5    challenger or the challenger below says, "True

6    the Vote has my permission to use my name for

7    challenging the voters in my county that I

8    believe voted illegally."

9              And then the voter provides their

10   address.

11             Is that a correct reading of that

12   prospective challenger's response?

13       A.    That is a correct reading, yes.

14             MR. NKWONTA:  Could we take that

15       down and pull up Exhibit 37.

16                  (Exhibit 37 marked for

17                   identification.)

18   BY MR. NKWONTA:

19       Q.    Exhibit 37 is another e-mail that

20   James Cooper forwarded to a number of people,

21   including yourself.

22             MR. NKWONTA:  If you scroll down to

Page 242

1      the response from the prospective challenger.

2   BY MR. NKWONTA:

3          Q.    It says, "James, Please find my

4   digital signature and in the body of this e-mail

5   you will find the necessary information you

6   requested.  You and True the Vote have my

7   permission to use my name, digital signature and

8   other necessary information to challenge voter

9   registrations in my County of Dodge."

10              Is that a correct reading of the

11  prospective challenger's response?

12         A.    Yes.

13         Q.    These prospective challengers that

14  are shown, would you agree that they believed

15  they were either purging voters or asserting

16  challenges to purge voters from the rolls or to

17  accuse voters of voting illegally?

18              MS. SIEBERT:  Again, objection to

19      the extent that you are asking her for

20      somebody's state of mind.

21              But, go ahead, Catherine.

22              THE WITNESS:  Yeah, I mean this

Page 243

1    is -- this is between what James sent out and

2    the response.

3              If those people for whom the, their

4    information has been redacted went on to be

5    associated with, as an elector in their

6    county and work through the True the Vote

7    arrangement, there would have been

8    distinctions throughout.

9              So at this point I can't state to

10   their state of mind, but this is between

11   James Cooper and people, other people.  So, I

12   don't know.

13   BY MR. NKWONTA:

14        Q.   In their responses, they are

15   expressly providing permission to challenge voter

16   registrations, to challenge illegal voting, or to

17   purge the voter rolls; is that correct?

18        A.   That is what these e-mails, you

19   know, how they read, yes.

20              MR. NKWONTA:  We can pull down

21   Exhibit 37.  I want to ask you a little bit

22   about the data analysis once again.  And I

Page 244

1     want to return to Exhibit 8.

2                    (Exhibit 8 marked for

3                     identification.)

4   BY MR. NKWONTA:

5        Q.    I guess this is the first time you

6   are seeing Exhibit 8 in this deposition.

7               Ms. Engelbrecht, do you recognize

8   Exhibit 8?

9        A.    This is the first time I have seen

10  it.

11       Q.    And you have never seen any analysis

12  of any political party breakdown or racial or

13  demographic breakdown of the challenge lists?

14       A.    No, I have seen that.  I have seen

15  that.

16       Q.    Where did you see that?

17       A.    It was provided when there were

18  comments being made of, you know, as I mentioned

19  earlier of bias being entered in.  And because

20  Georgia uniquely tracks those elements, you can

21  run, you know, the data or an analysis around

22  whether or not that was true or whether or not

Page 245

1    the, what the data shows.

2              So, I knew that that had occurred.

3         Q.   Do you know when this analysis was

4    first conducted?

5         A.   The analysis on this exhibit?  Or --

6         Q.   The analysis of the demographic

7    breakdown of the challenge list.

8         A.   I don't know exactly.  It came later

9    as a form of reputation of the assertion that

10   there was -- that that was part of this.

11             But, I don't know the date, no.

12        Q.   True the Vote announced its

13   challenge program on December 18th, 2020; is that

14   correct?

15        A.   I don't recall exactly.  It would

16   have been around then, yes.

17        Q.   And if I told you the date was --

18   the date that had been provided by defendants was

19   December 18th, would you have any reason to

20   dispute that?

21        A.   No real reason to dispute it, no.

22        Q.   And if you look at this file here,

Page 249

1          Q.    And would this analysis have been

2     conducted by Gregg Phillips or OPSEC?

3          A.    Yeah, I would believe so, yes.

4          Q.    Would that have been done at True

5     the Vote's direction?

6          A.    I just, I don't recall.  It is -- I

7     don't recall.  It is possible.  I don't recall.

8               MR. NKWONTA:  We can pull this down.

9     BY MR. NKWONTA:

10         Q.    The text file you were referring to,

11    under what circumstances did you have a chance to

12    review that text file?

13         A.    You asked me if I had ever seen

14    anything.  I'm just saying I recall seeing

15    something like that.  And it would have been -- I

16    mean I just from the recesses of my mind I recall

17    seeing it.

18               And in my, in my background in data

19    and technology, I associate the look of something

20    a little bit different than what I just saw.

21               But, I hope that is helpful.

22               MR. NKWONTA:  I would like to turn

Page 250

1       next to the press release, the launch that we

2       have discussed, the December 18th launch of

3       the elector challenges.  Could we pull up

4       Exhibit 62, please.

5                     (Exhibit 62 marked for

6                      identification.)

7                     MR. NKWONTA:  And could we go to the

8       second page, Exhibit 2 or Exhibit 62.

9    BY MR. NKWONTA:

10         Q.    Ms. Engelbrecht, do you recognize

11   Exhibit 62?

12         A.    Yes.

13         Q.    What is it?

14         A.    A post to our website that describes

15   the challenge of, the elector challenge.

16         Q.    The title of the post says, "True

17   the Vote partners with Georgians in Every County

18   to preemptively challenge 364,541 potentially

19   ineligible voters."

20               When you issued this post, had you

21   in fact partnered with Georgians in Every County

22   to preemptively challenge 364,000-plus voters?

Page 251

 1           A.     No.   This was just the beginnings of

 2      the -- I mean this is the first announcement.   We

 3      had people that had come to us, but we were, you

 4      know, had already -- we were prepared to,

 5      certainly.   But, no.

 6           Q.     So, why does it say True the Vote

 7      partners with Georgians in Every County to

 8      preemptively challenge 364,000 potentially

 9      ineligible voters?

10           A.     Partnering in the sense of capable

11      of partnering with, it is the best I can explain.

12           Q.     Would it be fair to say that it is

13      not accurate?

14           A.     No.   I wouldn't, I wouldn't think

15      that is fair.   This is sort of a forward looking

16      statement of the willingness to partner with

17      Georgians in Every County.

18           Q.     And the next paragraph you state,

19      "We are proud to be working alongside patriots

20      across the Peach State, Derek Sommerville of

21      Forsyth County and Mark Davis of Gwinnett County

22      who have been leading citizen efforts to

Page 252

1    highlight issues in Georgia's voter rolls."

2              And you also mention Mark Williams

3    and Ron Johnson and James Cooper.

4              What did you mean by working

5    alongside these individuals?

6         A.   Just that they were also involved

7    in -- in the case of Derek and Mark Davis, they

8    were -- you know, they were working through their

9    own elector challenges.  And in the case of the

10   other gentlemen, you know, the Mark Williams'

11   support with helping to work on the printing and

12   the fact that he had connected the other

13   gentlemen who were, you know, interested in

14   participating.

15             And frankly, it was a comment meant

16   more to show just support for the engagement of

17   citizens.

18        Q.   So, at the time you issued this

19   press release, is it fair to say that you had not

20   submitted 364,541 elector challenges?

21        A.   That is correct.  We did not do

22   that.

Page 253

1          Q.    And at the time you issued this

2    press release is it fair to say that you had not

3    identified challengers in all 159 counties?

4          A.    Yeah, I think that is fair to say,

5    yes.

6          Q.    How many challengers had you

7    identified at the time True the Vote issued this

8    press release?

9          A.    That I do not recall.

10         Q.    Do you know how many counties or how

11   many challenges True the Vote had submitted at

12   the time that it issued this press release or

13   website post?

14         A.    At this point I don't believe that

15   there had been any submitted.  But I do not --

16   let me rephrase that.

17              I do not specifically recall that.

18   I have a general recollection, but I do not

19   specifically recall.

20         Q.    How many challenges did True the

21   Vote end up filing for the, for the runoff

22   election?

Page 254

1          A.     We ended up with electors that

2     wanted to challenge, totaling 65 total counties.

3     And, so submissions were made in those counties

4     on behalf of those electors.

5          Q.     And why didn't True the Vote file

6     challenges in all 159 counties as it stated in

7     the press release?

8               THE WITNESS:  Guys, I just got a

9          password required notice.  Can you all see

10         that on the screen or is it just me?

11              THE VIDEOGRAPHER:  Sorry, Catherine.

12         This is Joe.  That might be on your end.  I'm

13         not sure what it is relating to.

14              THE WITNESS:  It is, it is.  I

15         apologize.  I just Xed out of it and it is

16         gone.  I apologize.

17              THE VIDEOGRAPHER:  Okay.

18              THE WITNESS:  I'm sorry, could you

19         repeat the question?

20     BY MR. NKWONTA:

21          Q.    Sure.

22              MR. NKWONTA:  Can the court reporter

Page 255

```
 1      read back the question, please.

 2                  (Whereupon, the record was read by

 3      the reporter as requested.)

 4                  THE WITNESS:  Again, I think the

 5      press release was meant to acknowledge that

 6      we had done the analysis to support that.

 7      The reason that we didn't ultimately is

 8      because it wasn't for us to do.

 9                  It was for electors in the, in their

10      respective counties.  And that is just the

11      way the process works.

12  BY MR. NKWONTA:

13      Q.   But True the Vote said it was going

14  to do this in the press release, in the very

15  first line, right?

16      A.   Yeah.  Again, I think that the

17  intent of the line was to suggest that we -- that

18  True the Vote was prepared to do that and do that

19  in every county.

20                  But, you know, we go quickly into

21  the description of an elector challenge.  And it

22  is, you know, the qualifications therein, so that
```

Page 256

1    is, that is what was -- that is how it was meant

2    to be taken.

3            Q.    So, True the Vote did not actually

4    intend to file challenges in all 159 counties?

5            A.    Oh, no.  We were definitely prepared

6    to do that, but it was up to electors.

7                 I mean the reason the True the Vote

8    exists is to help support citizens who want to

9    engage in their process.  And this is a process

10   in Georgia that is afforded to electors and, you

11   know, that is -- we were ready to do that.

12                But, the process is that you only

13   work with electors from their specific counties.

14                MR. NKWONTA:  Can we take a brief

15       five-minute break?

16                THE VIDEOGRAPHER:  We are now going

17       off the record --

18                MR. NKWONTA:  Is that okay with you

19       all?

20                MS. SIEBERT:  Sure.

21                THE VIDEOGRAPHER:  The time is

22       3:00 p.m.

Page 259

1          Q.     Who would be able to confirm whether

2     Time For A Hero has a Facebook page?

3          A.     The last person who ran the

4     organization managed all of the social media, so

5     he would be able to.

6          Q.     And who was that person?

7          A.     I couldn't recall his name earlier,

8     but his name is Ty Bathurst.

9          Q.     How do you spell that?

10         A.     T-Y, B-A-T-H-U-R-S-T.

11         Q.     And do you have any reason to doubt

12    that this is Time for a Hero's Facebook page?

13         A.     Well, Time for A Hero is no longer

14    an organization that I am connected with.  I

15    filed their closing tax return a couple years

16    ago.  If this was still there I, I am -- I can't

17    say that I have reason to doubt it, but I

18    can't -- I don't know about it.

19              MR. NKWONTA:  Can we go to Page 19.

20         But before we do, I noticed some sound issues

21         when Ms. Engelbrecht was responding.  I just

22         want to make sure that we were able to

Page 260

1       capture the response. If there is anything to

2       resolve.

3               THE REPORTER:  I'm happy to read

4       back the answer if you'd like or do you want

5       her -- do you want me to read back what I

6       have?

7               MR. NKWONTA:  Yes, please.

8               (Whereupon, the record was read by

9       the reporter as requested.)

10   BY MR. NKWONTA:

11       Q.    And you have no reason to doubt that

12   Time For A Hero created a Facebook page?  In fact

13   you acknowledged that Time For A Hero created a

14   Facebook page?

15       A.    I, acknowledge that when the

16   organization was active, we had somebody that was

17   managing, or, you know, overseeing social media.

18               And so, it is not outside of the

19   realm of possibility, but I can't confirm it.

20               I mean I can confirm that I'm

21   looking at a document that says Time For A Hero,

22   but I can't confirm anything past that.

Page 261

1            MR. NKWONTA:  Could we go to Page 19

2       of the Facebook page, of Exhibit 72.

3    BY MR. NKWONTA:

4       Q.    Is that -- is that you in that

5    Facebook post from August 8, 2020?

6       A.    That is me, that is me.

7            MR. NKWONTA:  And could we go to the

8       next post on the following page, Page 20.

9    BY MR. NKWONTA:

10      Q.    It says, "Crusade for Freedom coming

11   soon."

12            What is the Crusade for Freedom?

13      A.    I don't, I don't know.  I don't have

14   any affiliation with Crusade for Freedom.

15            I, I guess that Ty was posting some

16   stuff from True the Vote here just to keep stuff

17   on social media.  I don't know about Crusade for

18   Freedom.

19      Q.    So, he was posting stuff from where?

20      A.    From True the Vote.  But, I don't

21   know about this.

22      Q.    Uh-huh.  Have you heard that phrase

Page 262

1    before?

2          A.    Have I heard the phrase, Crusade for

3    Freedom?

4          Q.    Yes.

5          A.    I don't recall.

6          Q.    Have you seen this symbol before?

7          A.    This --

8          Q.    This diagram, this symbol here, this

9    Crusade for Freedom symbol?

10         A.    Not specific to this.  I feel like I

11   have seen it broadly before.  May I ask, is this

12   current?  Is this currently -- I don't know if I

13   can ask that.

14               But, is this currently on Facebook?

15         Q.    Yes, if you look at the top left

16   corner, you will see the download date.

17         A.    I didn't know if that is when it

18   was.

19         Q.    Yes.

20         A.    Okay.  Well, okay.  Thank you.

21               MR. NKWONTA:  So, we can pull down

22        Exhibit 72.  Could we pull up Exhibit 73.

Page 263

1                    (Exhibit 73 marked for

2                       identification.)

3   BY MR. NKWONTA:

4        Q.    And could we go to the second page.

5              Ms. Engelbrecht, do you recognize

6   that tweet in Exhibit 73, the tweet at the top?

7        A.    No.

8        Q.    The Twitter handle and the name on

9   top of it states Crusade for Freedom, right?

10       A.    Uh-huh.

11       Q.    It is the same -- it is the same

12  slogan that was on the Time For A Hero Facebook

13  page; is that right?

14       A.    Yes.

15       Q.    And that symbol, the logo or the

16  symbol for that Twitter handle, that is the same

17  or similar logo that was on the Time For A Hero

18  Facebook page, correct?

19       A.    Yes.

20       Q.    And the tweet says, "We have just

21  prospectively challenged the eligibility of

22  360,000 voters in Georgia."  Is that right?

Page 264

1          A.     That is what it says, yes.

2          Q.     Are you aware of any other groups

3     that challenged the eligibility of approximately

4     360,000 voters in Georgia during the runoff

5     elections?

6          A.     No.

7          Q.     The hashtag, Eyes on Georgia, that

8     was the same slogan that has appeared on several

9     True the Vote documents, I think including that

10    invoice from OPSEC, correct?

11         A.     Yes.

12         Q.     And then the second hashtag,

13    Validate the Vote Georgia, that was the slogan

14    that was recommended to you by the consultant; is

15    that correct?

16         A.     Yes, yes.

17         Q.     And that tweet was followed up by

18    the one right under it.  It says, "If the Georgia

19    counties refuse to handle the challenges of

20    366,000 ineligible voters in accordance with the

21    law, I plan to release the entire list so America

22    can do the QC."

Page 265

1                    Is that a correct reading of the

2    tweet underneath?

3         A.    It is a correct reading of it, yes.

4         Q.    And this tweet also has a Crusade

5    for Freedom Twitter handle name and symbol that

6    appeared on the Time For A Hero page?

7         A.    Yes.

8         Q.    And the hashtags underneath say

9    Validate the Vote Georgia, which is the slogan

10   that is the True the Vote uses, correct?

11                   And Eyes on Georgia, which is

12   another slogan that True the Vote uses, correct?

13        A.    During that period, yes, that is

14   correct.

15        Q.    And this tweet was dated

16   December 20, 2020, correct?

17        A.    Correct.

18        Q.    So, moving on from those tweets, I

19   wanted to ask you specifically about the Validate

20   the Vote program.

21                   And I wanted to explore that in a

22   little bit more depth.

Page 266

1            MR. NKWONTA:  Could we pull up

2     Exhibit 1, please.  Can we -- is there any

3     way to enlarge that a little bit?

4                    (Exhibit 1 marked for

5                     identification.)

6   BY MR. NKWONTA:

7            Q.    Ms. Engelbrecht, do you recognize

8   this document?

9            A.    Yes.

10           Q.    What is it?

11           A.    This is a one-page document that was

12   asked for by, asked to be provided to a donor who

13   had come to True the Vote and wanted a one-page

14   document to describe some of the activities that

15   we were planning to work through.

16           Q.    And did the donor have any requests

17   or any suggestions for activities that True the

18   Vote should engage in?

19           A.    This donor is connected with the

20   consultant that I mentioned earlier.

21                 So, the contribution was to use the

22   name Validate the Vote and to put a one-pager

Page 267

1    together for this donor's use.

2         Q.    And is this, this one pager, is this

3    essentially the framework for the Georgia elector

4    challenge or the activities that occurred in

5    Georgia afterward?

6         A.    I -- no.  This doesn't have any -- I

7    mean, we could look at it.  I would like to look

8    at the whole thing.  But, I don't believe so, no.

9         Q.    So, this document -- let's look at

10   the first sentence underneath which says, "Goal:

11   To ensure the 2020 election returns reflect one

12   vote cast by one eligible voter and therefore

13   protect the right to vote and the integrity of

14   the election."

15              Is that correct?  Does that reflect

16   your understanding?

17        A.    Yes.

18        Q.    And, underneath that, the Problem,

19   it says, "There is significant evidence that

20   there are numerous instances of illegal ballots

21   being cast and counted in the 2020 general

22   election.  Most of these illegal votes are being

Page 268

 1    counted in Democratic counties and are

 2    suppressing legitimate results."

 3             Do you see that first paragraph

 4    underneath Problem?

 5        A.    I do.

 6        Q.    And who wrote that?

 7        A.    Pardon me, sorry.  I don't, I don't

 8    specifically recall.

 9        Q.    But the document came from True the

10    Vote, right?

11        A.    That is correct, yes.

12        Q.    How did True the Vote determine that

13    most of the illegal votes were being counted in

14    Democratic counties?

15        A.    I would not know why that would have

16    been written that way.

17        Q.    This was prepared shortly after the

18    November presidential election, correct?

19        A.    Yes.

20        Q.    Before new results had been

21    published --

22        A.    That's correct.

Page 269

1          Q.     -- or certified I should say; is

2     that correct?

3          A.     That is correct.

4          Q.     And by then True the Vote had

5     indicated in this Validate the Vote document that

6     there is significant evidence of illegal ballots,

7     most of which were being counted in Democratic

8     counties; is that right?

9          A.     That is what this says, yes.

10          Q.     The next paragraph starts with,

11     "This is a result of Democrat official's refusal

12     to obey state election laws and counting illegal

13     votes."  Is that --

14          A.     That is what it says, yes.

15          Q.     How did True the Vote reach that

16     conclusion?

17          A.     I, as a -- you know, as a

18     promotional piece, this was, you know, those --

19     that phraseology was used.  I, you know, I don't

20     really have much more to say about that than

21     that.

22          Q.     The next sentence says, "It is also

Page 270

1      the result of deliberate election fraud."

2                  What evidence did True the Vote have

3      to make that statement?

4          A.    I don't recall.

5          Q.    The next sentence, "The situation

6      has been aided by the Democrat's deliberate

7      effort to radically expand mail-in balloting,

8      creating myriad opportunities for voter fraud

9      that does not exist with in-person voting."

10                 Did True the Vote have any evidence

11     to support that statement?

12         A.    That statement in particular I would

13     say yes in that the -- there was an effort to

14     radically expand mail-in balloting or mail-in

15     voting.

16                 And it has been documented over time

17     that mail-in balloting, mail-in voting does

18     increase the opportunity for vote fraud or

19     election fraud.

20         Q.    Had True the Vote identified any

21     flood of illegal votes as referenced in that

22     following paragraph?

Page 271

1          A.    This was a promotional piece.  I

2   believe that the third paragraph there was to tie

3   to the one above saying that there was a radical

4   expansion and therefore it would precipitate a

5   flood.

6          Q.    It says, "This flood of illegal

7   votes violates the U.S. Constitution's right to

8   vote," and the sentence continues, "by diluting

9   the votes of legitimate voters."

10              But, had True the Vote identified

11  any flood of illegal votes at this point?

12         A.    No, this was a promotional piece

13  that was written.

14         Q.    And then we get to the plan.  It

15  says, "Solicit whistleblower testimonies for

16  those impacted by or involved in election fraud."

17              Did True the Vote obtain those

18  whistleblower testimonies?

19              MS. SIEBERT:  I'm sorry.  I'm just

20        going to object one more time.  And maybe it

21        is just a point of clarification.

22              Are you limiting these questions to

Page 272

1      the six states, the jurisdictions?

2                  MR. NKWONTA:  I don't believe I have

3      to.  This is specifically about the Validate

4      the Vote program which is -- so this is in --

5      in other words I don't read our deposition

6      notice or the court's order to say every

7      single topic is constrained to these six

8      states.

9                  So, if I ask Ms. Engelbrecht, for

10     instance, what Validate the Vote program

11     means, you can't limit her testimony to six

12     states.

13                  MS. SIEBERT:  Well, the court's

14     order says that "True the Vote shall present

15     a witness that is adequately prepared to

16     answer questions relating to topics listed in

17     the plaintiff's respective 30(b)(6)

18     deposition notice with the following

19     limitations:

20                  "Plaintiff shall limit their

21     questions regarding True the Vote's and OPSEC

22     Group LLC's pre and post-election activities

Page 273

1      to 2012, onward, and the following states:

2      Georgia, Texas, Ohio, Pennsylvania, Michigan,

3      Wisconsin."

4              So, the court specifically stated

5      the topics listed in the 30(b)(6) were to be

6      limited and would include that following

7      limitation.

8              So that is directly part of the

9      court's order.

10             MR. NKWONTA:  I understand your

11     point.  I disagree that we cannot ask her

12     about soliciting whistleblower testimonies

13     unless we say soliciting whistleblower

14     testimonies in a specific state, because we

15     are literally asking to explain a document.

16             So, if -- my question to you is are

17     you instructing her not to answer this

18     question with respect to any state outside of

19     the target jurisdictions that we have

20     identified?

21             MS. SIEBERT:  Yes, I am.

22   BY MR. NKWONTA:

Page 274

1        Q.    Ms. Engelbrecht, are you going to

2    follow your counsel's instruction?

3        A.    Yes, I will.

4        Q.    So, can you answer my question with

5    respect to the six target states that we

6    discussed?

7        A.    Can you repeat the question?

8        Q.    Sure.

9             MR. NKWONTA:  Can the court reporter

10        read back the question.

11             (Whereupon, the record was read by

12        the reporter as requested.)

13             THE WITNESS:  We did not obtain any

14        whistleblower testimonies.

15    BY MR. NKWONTA:

16        Q.    The second bullet in the plan says,

17    "Build public momentum through broad publicity."

18             Does that include -- well, why don't

19    you explain to me what type of broad publicity

20    was anticipated.

21        A.    Again, this is the first -- I have

22    seen an orientation of a one-pager like this.

1/26/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Catherine Engelbrecht 30(b)(6)
Confidential - Pursuant to Protective Order

Page 275

1  This is the first time I have seen this one-pager

2  with some of this language.

3            So, I can only respond to -- you

4  know, I mean, to repeat back build public

5  momentum through broad publicity.  We didn't do

6  any advertising of any sort.  I had a podcast, I

7  mean that was it.

8       Q.   Would you consider a press

9  release --

10      A.   Oh, I'm so sorry.  Yes, and if we

11 did press releases, that would be considered in

12 that, in that bullet, yes.

13      Q.   The next bullet, "Galvanize

14 Republican legislative support in key states."

15           Why the focus on Republican

16 legislative support?

17      A.   I, I don't know.  I don't know why

18 that was written that way.

19      Q.   The next is, "Aggregate and analyze

20 data to identify patterns of election

21 subversion."  And that task is assigned to OPSEC

22 group.  Do you see that?

Page 276

1          THE WITNESS:  Can you scroll up, can

2    you scroll a little bit, Joe?

3          That would have been going back to

4    the litigation support for the cases that

5    were being filed shortly after the election.

6  BY MR. NKWONTA:

7          Q.   So, the items that we discussed on

8  that OPSEC invoice including litigation support,

9  that was part of the aggregating and analyzing

10  data to identify patterns of election subversion

11  that we see in this document?

12          A.   I mean I would, aggregate and

13  analyze data to identify patterns full stop.

14  But, that would have been part of that, yes.

15          Q.   "File lawsuits in federal court with

16  capacity to be heard by SCOTUS," the Supreme

17  Court of the United States; is that correct?

18          A.   That is what it says, yes.

19          Q.   And is that referring to the

20  lawsuits that were filed in Georgia,

21  Pennsylvania, Michigan, Wisconsin, Arizona?

22          And also it lists the key states

Page 277

1    here below as well, Arizona, Nevada --

2         A.    Uh-huh.

3         Q.    Are those the lawsuits or legal

4    actions that that plan is referring to?

5         A.    Yes.  Those would have been in that

6    timeline of lawsuits.

7         Q.    And then next it goes on to the

8    legal strategy for the Validate the Vote program.

9              And it states that, "Jim Bopp will

10   file federal suits in the seven closest

11   battleground states to investigate voter fraud,

12   expose it and nullify the results of the state's

13   election so that the presidential electors can be

14   selected in a special election or by the state

15   legislature."

16             Why was the goal to nullify the

17   results of the state's election even before the

18   election had been certified?

19        A.    I do not know why this was -- I

20   don't -- that was not the goal.  Let me answer it

21   that way.  That was not the goal.

22             As we discussed earlier the goal was

Page 283

1                    Is that a correct reading of

2    Paragraph 41?

3          A.    Yes, it is a correct reading.

4          Q.    And other than that link, did True

5    the Vote have any evidence to support the

6    allegation that noncitizens, or as many as

7    70,000-plus noncitizens, voted for Joe Biden in

8    Georgia?

9          A.    I think it was just this link.  No.

10   No.

11         Q.    Are you aware of any analysis or any

12   study that has been done to confirm this or any

13   additional corroborating evidence that has been

14   provided to support this?

15         A.    No.

16         Q.    Do you believe this to be true?

17         A.    I believe that Just Facts wrote that

18   article.  Yes, I would have to look at the

19   underpinnings but I mean that is plausible,

20   certainly.

21         Q.    If we go to the Prayer for Relief,

22   starting on Page 20 and which spills over to

Page 284

1    Page 21.

2                Under Paragraph 65, would you agree

3    that that paragraph seeks to invalidate the

4    defendant counties' presidential election

5    results?

6          A.    That is what that communicates, yes.

7          Q.    And just the counties that were

8    named as defendants in this lawsuit, correct?

9          A.    I apologize.  Can you restate the --

10         Q.    Sure.  So, this request to

11   invalidate the results, this request is to

12   invalidate the results of the counties that were

13   named as defendants in this lawsuit; is that

14   right?

15         A.    Well, the -- what it says is in

16   contested counties or in the state overall.

17               So that the -- oh, so that the

18   counties -- yeah, I, I -- that appears to be what

19   it communicates.  I'm not a lawyer, but that

20   appears to be what it communicates.

21         Q.    The Validate the Vote program

22   document that I showed you earlier made reference

Page 285

1    to targeting Democratic counties.

2              Does this complaint carry out that

3    that strategy?

4         A.   I would have to, I guess look at --

5    I mean I would have to run the numbers to see if

6    the counties were leaning in that way.  I

7    don't -- it is certainly not part of my mindset

8    on any of it, so --

9         Q.   Why is True the Vote focused on

10   enjoining the results of the presidential

11   election in this lawsuit -- let me rephrase.

12        A.   Sure.

13        Q.   There were a number of elections

14   that occurred in November, both elections for

15   president -- both for the presidential race and

16   there were a number of other state and federal

17   races on the same ballot.

18             This lawsuit is focused on the

19   presidential election results only.  Why is that?

20        A.   I don't know.

21        Q.   The Validate the Vote program

22   document that we just discussed, Exhibit 1, would

Page 286

1   you agree that was also focused on overturning

2   the results of the presidential election?

3          A.    That was the language on that page,

4   yes.

5                MR. NKWONTA:  Could we take a quick

6        ten-minute recess, I just want to see how

7        much I have left.

8                THE VIDEOGRAPHER:  We are now going

9        off the video record.  The time is 3:49 p.m.

10               (Recess taken -- 3:49 p.m.)

11               (After recess -- 4:00 p.m.)

12               THE VIDEOGRAPHER:  We are now going

13       back on the video record the time is

14       4:00 p.m.

15  BY MR. NKWONTA:

16          Q.    Ms. Engelbrecht, we just took a

17  short break.  You understand you are still under

18  oath?

19          A.    Yes.

20          Q.    So, before we went on break we

21  discussed the Georgia lawsuit that was filed

22  immediately after the November election.

Page 287

1          Did True the Vote also participate

2   in filing a lawsuit in Pennsylvania shortly after

3   the November general election?

4          A.    Yes.

5          Q.    And in that lawsuit True the Vote

6   sued specific counties, correct?

7          A.    I don't recall.

8          Q.    Do you have any reason to dispute

9   that?

10         A.    No.  I mean the briefing will show

11  it.  So, no, it is whatever the briefing says.

12         Q.    And do you dispute that that lawsuit

13  also sought to enjoin certification of the

14  election results in specific counties?

15         A.    If that is what the brief says,

16  then --

17         Q.    Does True the Vote have or did True

18  the Vote submit any evidence to support the

19  allegations of voter fraud in the Pennsylvania

20  lawsuit?

21         A.    There were a number of --

22               I'm sorry, could you repeat the

Page 288

1    question?  I want to make sure I get it right.

2                    MR. NKWONTA:  Could the court

3         reporter read the question back, please.

4                    (Whereupon, the record was read by

5         the reporter as requested.)

6                    THE WITNESS:  I'm aware that there

7         were points added into the filing that

8         supported the concerns around election fraud

9         so that is what I would say.

10   BY MR. NKWONTA:

11        Q.    Beyond what was written in the

12   actual filings, are you aware of any evidence or

13   have any additional evidence to support the

14   claims of voter fraud in the Pennsylvania

15   lawsuit?

16        A.    At the time, what we had was what

17   was put into the file with the -- yeah, that is

18   at the time it was just what was filed.

19        Q.    Did you obtain any additional

20   evidence since then?

21        A.    For the purposes of the lawsuit, no.

22        Q.    I will ask you the same question

Page 289

1    about Michigan.

2              Did True the Vote participate in

3    filing a lawsuit in Michigan shortly after the

4    November election to challenge the election

5    results or to prevent certain counties from

6    certifying the election results?

7         A.    Yes.

8         Q.    And does True the Vote have any

9    evidence, other than what was written in the

10   filings, to support the claims of voter fraud

11   asserted in the Michigan complaint?

12        A.    What was put in the brief was what

13   we had.

14        Q.    And True the Vote hasn't obtained or

15   does not have any additional evidence beyond?

16        A.    None of the suits were dismissed, so

17   no.

18        Q.    I will ask you the same question for

19   Wisconsin.

20              Did True the Vote participate in the

21   filing of a lawsuit in Wisconsin shortly after

22   the November general election?

Page 290

1        A.    Yes.

2        Q.    And does True the Vote have or did

3   True the Vote collect any additional evidence

4   beyond what was written in the complaints to

5   support the allegations of voter fraud in the

6   Wisconsin lawsuit?

7        A.    No.  Not beyond what was in the

8   filing we didn't -- nothing else was done and

9   then the case was dismissed.

10       Q.    And that case -- those cases that I

11   just mentioned, the Georgia case, the Michigan

12   case, the Pennsylvania case, the Wisconsin case,

13   all of those cases were voluntarily dismissed.

14   Is that correct, by the plaintiffs?

15       A.    Yes, or withdrawn.  I'm not certain

16   what the proper term is.  But, yes.

17       Q.    And those lawsuits were voluntarily

18   dismissed without providing any additional

19   evidence or support to the court; is that

20   correct?

21       A.    Correct.

22       Q.    Why were those lawsuits dismissed

Page 291

1    shortly after they were filed?

2          A.     The data that was necessary to be

3    exacting in the support of the filing or in --

4    not support necessarily but in the ongoing filing

5    and the way that the case would naturally sort of

6    unfold, that data was not available.

7                And that specifically would have

8    been the complete record from the state of voters

9    who actually voted in the 2020 election.  And

10   then we had quite a number of other documents

11   that we were requesting, but most specifically it

12   was the final register of who voted in the 2020

13   election which was not available for months.

14               MR. NKWONTA:  I would like to pull

15      up another exhibit.  Exhibit 71 please.  And

16      I would like to go to Page 246 of Exhibit 71.

17                    (Exhibit 71 marked for

18                      identification.)

19               THE VIDEOGRAPHER:  I'm so sorry, I

20      missed that page.  I apologize.

21               MR. NKWONTA:  Sure.  Page 246.

22   BY MR. NKWONTA:

Page 292

1          Q.    Ms. Engelbrecht, do you recognize

2    this document, Page 246 of Exhibit 71?

3          A.    Yes.

4          Q.    What is it?

5          A.    This was an e-mail sent to me by

6    Fred Eshelman -- excuse me.  This is an e-mail

7    sent to, sent by Fred Eshelman to his consultant

8    and copied me.

9          Q.    And was the e-mail directed to you?

10         A.    I'm not sure.

11              THE WITNESS:  Could we scroll down?

12              I don't know.  It could have been

13        either to me or his consultant who he worked

14        very closely with.

15              MR. NKWONTA:  Okay.  Could you

16        scroll backup to the first e-mail.

17   BY MR. NKWONTA:

18         Q.    So first can you tell me who is Fred

19   Eshelman?

20         A.    Fred Eshelman is someone who, on

21   November the 5th, ostensibly at the behest of his

22   two consultants, Tom Crawford being one, called

Page 293

1    True the Vote, first the consultants and then

2    they put Mr. Eshelman on, in the interests of

3    making a donation.

4              And that was the first time I had

5    ever heard of or spoken with any of the three of

6    them, the two consultants or Mr. Eshelman.

7         Q.    In Mr. Eshelman's e-mail, the second

8    sentence says, "However I do want to know what

9    money is accomplishing and where this is headed

10   and the odds of winning."

11             What is he referring to?

12        A.    I, I don't know specifically.  I

13   will say that his consultants, from what I

14   gathered, had other activities going on that were

15   more political that I don't know, I can't speak

16   to.

17        Q.    Was his goal to overturn the results

18   of the election?

19        A.    I don't know what his goal was.

20        Q.    Did he express to you or to anyone

21   at True the Vote that his interest in overturning

22   the results of the election?

Page 294

1               THE VIDEOGRAPHER:  Catherine, this

2      is Joe.  It is not your -- I don't think it

3      is your headset.  I'm checking your

4      bandwidth.  And when it dips low, you cut

5      out.  I don't think it is anything that you

6      can control, but if you have a new set of

7      headphones, we will try that.

8               Counsel just so everyone knows the

9      bandwidth is dipping quite low and it is

10     cutting her off.

11              THE WITNESS:  Is this any better?

12              THE VIDEOGRAPHER:  You sound great.

13              THE WITNESS:  Okay.  So the answer

14     is not as far as I know with respect to what

15     he communicated to True the Vote, no.

16              Whatever else they had going on, I

17     don't know.

18     BY MR. NKWONTA:

19        Q.   And if you look below at, there are

20     a couple of references to the likelihood of a

21     favorable outcome.  What is that referring to,

22     what outcome?

Page 295

1        A.    I'm going to make sure that I'm

2   tracking with you.  Likelihood of a favorable

3   outcome.

4              I, I don't know.  I would presume

5   this is what he is talking to his consultant

6   about and I'm copied, but I don't specifically

7   know.

8              MR. NKWONTA:  Can we jump to

9       Page 300, please.

10  BY MR. NKWONTA:

11       Q.    Do you recognize the e-mail on

12  Page 300, Ms. Engelbrecht?

13       A.    Yes, yes.

14       Q.    And can you tell me, you know, what

15  is Mr. Eshelman seeking here in this e-mail?

16       A.    He is reaching out to me for

17  information that -- actually let me take another

18  second to read it because it has been a minute

19  since I have seen this.

20       Q.    And actually can I ask that you read

21  the e-mail out loud into the record.

22       A.    Sure. "Catherine, I hope we are all

Page 303

1        A.    I, I don't know.  I don't know if

2   that refers to other activities he had going on

3   with Tom.  I don't know.  Or maybe that he is

4   reacting to the news.  I shouldn't speculate.  I

5   don't know.  I do not know.  That is my answer.

6   I don't know.

7        Q.    If we go to Item Number 3, can you

8   read into the record the action item there under

9   Item Number 3?

10       A.    It says Number 3, "Status of Bopp

11  cases by state, deal with Trump people and

12  details, dates for orders by state, how long to

13  implement.  Who is forensic team deciding bases

14  for tests to prove fraud and present to courts?

15  Strategy still county by county

16  disqualification?"

17       Q.    What does the reference to deal with

18  Trump people and details mean?

19       A.    In this context I -- deal with

20  details -- I don't recall.

21       Q.    Were there any communications or

22  coordinations with the Trump campaign or the

Page 304

1    Trump people relating to this effort?

2         A.   I know that others, you know, were

3    in touch with them.  We were not.

4              So, yeah, I mean, further up in this

5    you can see where there was a comment made that

6    Jim, in his individual capacity, had been on a

7    call, but we were not otherwise engaged in any of

8    that.

9              MR. NKWONTA:  Can we go to Page 314.

10   BY MR. NKWONTA:

11        Q.   Ms. Engelbrecht, do you recognize

12   Page 314?

13        A.   Yes.

14        Q.   What is it?

15        A.   This is an e-mail that I sent to

16   Mr. Eshelman post, post a call that we had.

17        Q.   And this was dated

18   November 16th, 2020?

19        A.   Yes.

20        Q.   Can you read the first paragraph of

21   that e-mail into the record?

22        A.   "Fred, I have attached the budget we

Page 305

1    provided to Tom and Dikran on November 5th.  Our

2    not having full funding was well known and often

3    discussed.  I had written in my 11/14 e-mail to

4    you that it appeared our legal fees would have

5    been covered by the Trump campaign which I

6    described in a statement of our cash position,

7    described as best as possible given the tight

8    timeline with so many moving parts."

9            Q.    What do you mean -- sorry, continue.

10           A.    I didn't know if you wanted me to

11   read the second paragraph.

12           Q.    Sure.

13           A.    Go ahead with your question.

14           Q.    Sure, why don't you read the second

15   paragraph.

16           A.    "We have done a tremendous amount of

17   work in the 11 days since we first met.  Have

18   talked with Tom routinely about status and

19   provided him with access to all comms, press

20   releases and briefings.

21                 "Tom and Dikran both asked that I

22   communicate directly through them and indicated

Page 306

1    that the information was being passed to you.

2    Moving forward I will keep you directly apprised

3    of continued developments in the whistleblower

4    situation unless I hear otherwise from you."

5          Q.    Now going back to the first

6    paragraph and the second sentence, what did you

7    mean that it appears that your legal fees would

8    have been covered by the Trump campaign?

9          A.    Initially we had thought that our

10   lawsuits would be, would, you know, be very

11   expensive and cost -- you know, we had a budget

12   anticipated around those lawsuits.

13               This is, this is a -- that is a

14   ham-handed way of saying that the research was --

15   and I don't understand all of the legal

16   maneuverings or how cases come together

17   necessarily.

18               But that our research was possibly

19   going to be used in the move forward of the cases

20   that would have been part of the Trump defense, I

21   guess, or cases.

22               And, what this was attempting to

Page 307

1  communicate was that there would not be any legal

2  fees.

3              So, when Mr. Eshelman was asking

4  about the budget and so forth, I have -- you

5  know, I had written this to say we would not have

6  those expenses if the research was going to be

7  used in a different direction.  That is all that

8  meant.

9      Q.   So it was your belief that the Trump

10 campaign would pay for True the Vote's legal fees

11 to pursue evidence of voter fraud and to pursue

12 the lawsuits that True the Vote had filed?

13     A.   No, it was, this was just not --

14 this was ill worded, but the intent was to say

15 that we would not have legal expenses for these

16 cases.  The cases wouldn't -- we wouldn't be a

17 part of those anymore.

18              That, the, you know, they would

19 be -- we wouldn't have that expense.

20     Q.   Because the phase would be covered

21 by the Trump?

22     A.   Again, it is a ham-handed way to say

Page 308

1    it, but it was the research that was being done

2    that we were covering the research for, we would

3    no longer be a part of.  If the Trump campaign

4    wanted to use it, they would cover that and we'd

5    be out, so we wouldn't have those expenses.

6            Q.    Why was the Trump campaign

7    interested in covering your fees?

8            A.    Well, it wouldn't be covering our

9    fees.  It would just be -- well, it wouldn't be

10   covering our fees.  It would, we would have not

11   needed to pursue the lawsuits.

12           Q.    And we discussed earlier how the

13   post election effort in Georgia, and when I say

14   post election, I'm referring to post November

15   presidential election, the immediate post

16   election effort in Georgia and the data analysis

17   conducted by OPSEC was combined with the analysis

18   conducted by OPSEC in advance of the, of the

19   elector challenges for the runoff election.

20               Do you recall that?

21           A.    I recall us talking about broadly

22   that in the context of that invoice and what it

Page 313

1   audiences and targeting based on the above."

2        Q.    This seems to be another discussion

3   about upcoming Georgia work.

4             Do you recognize any of that or is

5   any of that related to the work that you did with

6   Gregg Phillips?

7        A.    Absolutely not, no.  This is a --

8   they are referring to -- Mr. Eshelman comes from

9   North Carolina.  I had a sense from conversations

10  with Tom that they had done things in North

11  Carolina.  But, I don't know.  We didn't do

12  anything with them on any of this.

13            MS. SIEBERT:  I'm sorry.  Sorry to

14     interrupt.  What is the exhibit number here?

15     I missed that.

16            MR. NKWONTA:  71.

17            MS. SIEBERT:  Thank you.

18  BY MR. NKWONTA:

19       Q.    Did Mr. Eshelman fund any of the

20  post-election activities that True the Vote

21  engaged in, in Georgia?

22       A.    No.

Page 314

```
 1          Q.     I would like to turn back to True

 2     the Vote's statements about the election and

 3     activity and post election activities.

 4               MR. NKWONTA:  Can we pull this down

 5          and pull up Exhibit 63.

 6                    (Exhibit 63 marked for

 7                      identification.)

 8     BY MR. NKWONTA:

 9          Q.     Ms. Engelbrecht, do you recognize

10     Exhibit 63?

11          A.     That was a blog post to our website.

12          Q.     And is that posted on

13     November 10th, 2020?

14          A.     According to this document, yes.

15          Q.     And that would have been

16     approximately a week after the November election?

17          A.     Yes.

18          Q.     And can you read the third paragraph

19     on Page 2 into the record, starting with, "Never

20     in our history".

21          A.     "Never in our history has there been

22     such blatant disregard for election integrity.
```

Page 315

1    During these pivotal times we refuse to stand on

2    the sidelines.

3                "True the Vote will keep fighting to

4    ensure 2020 election returns reflect the

5    principle of one vote for one voter and to repair

6    our broken elections once and for all."

7          Q.    And following that statement, the

8    release makes reference to the Validate the Vote

9    initiative that True the Vote recently launched;

10   is that correct?

11         A.    Yes.

12         Q.    And that is the same initiative we

13   discussed in Exhibit 1, correct?

14         A.    Yes.  Well, I'm not sure what

15   Exhibit 1 was any longer, but we have discussed

16   that, yes.

17         Q.    But that Validate the Vote document,

18   right?

19         A.    I know the name is the same, yes.

20         Q.    So, True the Vote announces that it

21   is launching this initiative that was described

22   in Exhibit 1, and announces a whistleblower fund

Page 316

1    in excess of $1 million.  Is that correct?

2         A.    Yes.

3         Q.    And was the purpose of that million

4    dollars to reward people that came forward with

5    evidence of voter fraud?

6         A.    The fund was to -- or the idea of

7    the fund was to support people that would come

8    forward, as we discussed previously, to have

9    funds available should they be necessary for

10   their legal support.

11               Also through this we were funding

12   the state election or county election lawsuits.

13        Q.    Did you present any of the evidence

14   that you obtained through this initiative to any

15   of the courts or to -- or to Mr. Eshelman?

16        A.    I don't recall.  I talked to his

17   consultants daily.  I don't recall anything in

18   specific.

19        Q.    Did True the Vote obtain any

20   evidence of -- any credible evidence of criminal

21   malfeasance as referenced in this press release

22   after announcing this initiative?

Page 317

1          A.     We did have some reports that we

2     considered credible.

3          Q.     And did you submit those reports to

4     anyone?

5          A.     Yes.  They have been submitted.

6          Q.     Where did you submit those reports?

7          A.     There are active investigations in

8     Georgia and in Arizona, and I guess, those are

9     the two active states.

10         Q.     What was the criminal malfeasance or

11    misconduct identified in those reports or alleged

12    in those reports?

13         A.     I don't -- I mean those are active

14    investigations and our approach to this point has

15    been that we don't comment on active

16    investigations.

17         Q.     So, you are not willing to disclose

18    or identify the nature of any of the reports of

19    fraud or evidence of fraud that you received?

20                THE WITNESS:  May I consult with

21        counsel and just make sure I am answering the

22        question properly?  I just want to make sure

Page 318

 1      I'm being respectful of all of the

 2      considerations here.

 3              MS. SIEBERT:  Um, okay.  I'm sorry.

 4      I'm coming in -- I came in halfway through

 5      this deposition and so I'm a little bit

 6      behind the eight ball as far as what has been

 7      testified to or not, regarding that before

 8      and the objections made.

 9              MR. NKWONTA:  I can give you a quick

10      playback of where this is coming from.

11              MS. SIEBERT:  Thank you, yes.

12              MR. NKWONTA:  So, Jim and I had

13      several discussions about consulting with the

14      witness regarding a pending question.  And I

15      objected on numerous occasions that it was

16      improper to consult with the witness on a

17      pending question, and I think that is

18      probably where some of this is coming from.

19              But, I will caveat and say if the

20      witness is consulting for the purpose of

21      determining whether privilege applies, then

22      you know, I for this, you know, one instance

Page 321

1    my question to be limited to the jurisdictions

2    identified in the 30(b)(6) notice for True the

3    Vote.

4                And you may answer.  And you can

5    also interpret my question to be limited to

6    evidence obtained before this lawsuit was filed.

7                MS. SIEBERT:  Thank you for that

8        clarification.

9                MR. NKWONTA:  Can the court reporter

10       read back the last question before we went --

11       before we went off the record.

12               (Whereupon, the record was read by

13       the reporter as requested.)

14               THE WITNESS:  Shall I answer?  We

15       have reported to the State of Georgia.  We

16       have filed three complaints about

17       observations and concerns that we have

18       witnessed.

19               But that is the extent of it as we

20       have filed these complaints that are now

21       under active investigation.

22   BY MR. NKWONTA:

Page 322

1          Q.    Are you willing to disclose what

2    those concerns are or what the subject of those

3    complaints are?

4              MS. SIEBERT:  Again, I just want to

5         clarify my objection as far as scope and

6         timeline and limited to the states in

7         question.

8              Is that correct, are we still under

9         that understanding?

10             MR. NKWONTA:  Yes.

11             MS. SIEBERT:  Okay.

12             THE WITNESS:  Okay.  So, to that end

13        I would say that what we -- the basis of our

14        filings were regarding things that, and

15        information post the filing of this lawsuit.

16             MR. NKWONTA:  I would like to turn

17        your attention to Exhibit 47.

18                  (Exhibit 47 marked for

19                   identification.)

20   BY MR. NKWONTA:

21         Q.    This is an article published by Jim

22   Hoft from the Gateway Pundit.  Can you read the

Page 323

1    title of this article?

2         A.    "It's now clear:  Trump will win the

3    election -- Democrats will steal -- True the Vote

4    offers essential tips on what you can do to stop

5    the steal."

6         Q.    Do you recall offering comments or

7    insight on this issue for this article?

8         A.    I do not recall.

9              MR. NKWONTA:  Can you scroll down to

10        Page 2 and to the highlighted paragraph on

11        Page 2 -- or sorry, the paragraph right --

12        third paragraph from the bottom, starting

13        with, "Tonight."

14   BY MR. NKWONTA:

15        Q.    So the article says, "Tonight the

16   Gateway Pundit reached out to Catherine

17   Engelbrecht at True the Vote to offer tips to

18   ordinary Americans to prevent the Democrat plan

19   to steal the election in 2020.  Catherine

20   Engelbrecht wrote back with these essential

21   tips."

22              Do you dispute this characterization

Page 324

1    or this statement from this article?

2         A.    No, it is entirely possible that he

3    called me.

4         Q.    And it is possible that you

5    responded with essential tips?

6         A.    And it is possible that I responded,

7    yes.

8              MR. NKWONTA:  Could we pull up

9        Exhibit 44.

10                  (Exhibit 44 marked for

11                     identification.)

12   BY MR. NKWONTA:

13        Q.    Ms. Engelbrecht, have you stated

14   publicly or elsewhere before that some counties'

15   ballots are counted in Spain?

16        A.    I don't recall.  I'm generally aware

17   of the ballot counting software platforms that

18   are multinational.  But I don't, I don't -- I

19   have never seen this document before and I'm not

20   certain what it might contain.

21        Q.    Have you expressed a view before

22   that some states have their votes counted in

Page 325

1    Spain?

2          A.    I don't recall.

3          Q.    Do you have any reason to dispute

4    this quote in this Brightbart article?

5          A.    I have no context around it.  I'm

6    aware of softwares that are used by states that

7    have, as a practical matter of their structure,

8    server ports in Spain.  That is the extent of

9    what I do know is true, but that is not at all

10   uncommon in software.

11              So, I don't know what this -- you

12   know, what else may be here.  I don't know.

13              MR. NKWONTA:  Can you scroll down to

14       Page 3.

15   BY MR. NKWONTA:

16         Q.    And Page 3 of this article quotes

17   you.  Can you read that quote into the record?

18         A.    "There is a tabulation company

19   called Sidel that does" --, jeez, spelling.

20              "There is a tabulation company

21   called Sidel that does have Cloud, I guess,

22   cold-based servers in Barcelona.  And yes, it is

1/26/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Catherine Engelbrecht 30(b)(6)
                              Confidential - Pursuant to Protective Order

Page 326

1    true that the tabulation of votes occurs in that

2    way in many states that could use that system."

3          Q.    Is that an accurate quote?

4          A.    There is a tabulation company called

5    Sidel that has cloud-based servers in Barcelona,

6    yes, that is true.

7          Q.    And is it your view, based on that

8    that, that some states have their ballots counted

9    in Spain?

10         A.    I think that that is a leap to a

11   conclusion, but it is certainly true that if you

12   are using a company that has cloud-based servers

13   in Spain, and that is in Barcelona, that is a

14   part of a process that may or may not impact the

15   vote count.  But it is part of a process

16   nonetheless.

17         Q.    Briefly I want to return back to the

18   voter challenges.

19               Are you familiar or aware of any

20   challengers who withdrew or asked to withdraw

21   their challenges during the, during the --

22         A.    Yes, I am familiar with one, yes.

Page 327

1    Sorry, sorry.

2         Q.    And who is that challenger that

3    asked to withdraw their challenge?

4         A.    I don't recall his name.

5         Q.    Was it Joe Martin?

6         A.    That does sound familiar, yes.  That

7    sounds correct.

8         Q.    And do you recall why Joe Martin

9    chose to withdraw his challenge?

10        A.    My general recollection is that in

11   looking at names on a challenger list he

12   identified that a couple of them were at long --

13   were residents at long-term care facilities.

14             And he didn't -- for that purpose he

15   didn't want to move forward.  And he notified

16   Amy.  And we notified -- as I understand it, we

17   notified the county.  And that was -- that is the

18   end of it as far as I know or as far as I recall.

19        Q.    And did you determine or make any

20   efforts to determine whether those voters were

21   properly included in the challenge list?

22        A.    We didn't submit the challenge list

Page 328

1    after he declined to participate.  We, on his

2    behalf, just rescinded the challenges, as I

3    recall.

4         Q.    So you submitted the challenges, but

5    then withdrew them after Mr. Martin requested

6    that they be withdrawn; is that correct?

7         A.    I believe that that is correct.  I

8    am not certain, but I believe that that is

9    correct.

10        Q.    Were there any other challengers who

11   requested that their challenges be withdrawn?

12        A.    None that I am aware of or that I

13   recall.

14        Q.    And you submitted, at some point in

15   this case, a True the Vote and other defendants

16   submitted a counterclaim or asserted a

17   counterclaim for voter intimidation.

18              And can you explain -- can you

19   explain what caused that intimidation?

20              MS. SIEBERT:  I'm going to object to

21        that.  That counterclaim has been completely

22        dismissed and it is no longer relevant or a

Page 329

```
 1    part of this complaint.

 2              The court has already dismissed

 3    those claims.  It wouldn't be relevant to any

 4    claim or defense in this case.

 5  BY MR. NKWONTA:

 6         Q.   You may answer, Ms. Engelbrecht.

 7         A.   I will just take advice of counsel

 8  on that.

 9              MS. SIEBERT:  Catherine, you can go

10    ahead and answer.  I'm sorry.  I didn't make

11    that clear.  You can go ahead and answer but

12    that is our objection.

13              THE WITNESS:  Okay.  I'm so sorry.

14    I just want to make -- can you repeat the

15    question again.  I want to make sure I'm

16    framing it properly in my mind.

17  BY MR. NKWONTA:

18         Q.   Sure.  And I will narrow the

19  question a little bit.

20              In what way were -- was True the

21  Vote and perhaps yourself as well intimidated by

22  these legal proceedings?
```

Page 330

1          A.    Well, True the Vote, you know,

2    received e-mails and calls particularly to the

3    election hotline that were, you know, unkind.

4              But that was really not the

5    intimidation.  The intimidation that I was most

6    troubled by was that suffered by the electors who

7    participated, and as a consequence of that had

8    their, there were docs online, had businesses

9    targeted, had threats sent to them in e-mail and

10   calls, you know, to their businesses.

11         Q.    And so you've told me about the

12   electors.

13              And in talking about True the Vote

14   and yourself specifically, were you intimidated

15   by the legal proceedings or by the allegations in

16   the lawsuit?

17              MS. SIEBERT:  Same objections.  I

18         will just make a continuing objection based

19         upon the same -- for this entire line of

20         questioning as earlier.

21              THE WITNESS:  Yeah, was I

22         intimidated by the lawsuit?  No.  I mean, I'm

Page 331

1      just concerned about what was happening to

2      the volunteers.

3              MR. NKWONTA:  And can we take a

4      quick five-minute break.  I think I am just

5      about done.  I just want to make sure that we

6      have covered everything.

7              THE VIDEOGRAPHER:  We are now going

8      off the video record.  The time is 5:04 p.m.

9              (Recess taken -- 5:04 p.m.)

10             (After recess -- 5:09 p.m.)

11             THE VIDEOGRAPHER:  We are now going

12     back on the video record.  The time is

13     5:09 p.m.

14   BY MR. NKWONTA:

15       Q.   Ms. Engelbrecht, we just took a

16   short break.  Do you understand you are still

17   under oath?

18       A.   Yes.

19       Q.   I just have a couple of quick

20   questions remaining.

21             First, can you explain to me the

22   term or have you heard of the term the Photo

Page 332

1    Ernesto Program?

2          A.    Yes.

3          Q.    What is the Photo Ernesto

4    Initiative?

5          A.    That was an initiative we had, True

6    the Vote had for a brief period of time, maybe, I

7    don't recall the years, 2012/2013, somewhere in

8    there.

9                And, it was led by someone.  And her

10   point and focus in the initiative was to --

11   basically everything we did was translated into

12   Spanish and focused on working in Latino

13   communities in that regard.

14               And it was -- and the spokesperson

15   for that was Latina and, you know, was very

16   active in that community and speaking Spanish

17   fluently so it was useful for those folks.

18         Q.    What exactly was True the Vote doing

19   in those Latino communities?

20         A.    Everything from helping to do

21   training for voter registration guides,

22   clarifying on voter registration intake or how to