Submitted: 3/19/2021 9:18 AM
Sue Murphy, District Clerk
Austin County, Texas
By: Sue Murphy, Deputy

## NO. 2021V-0015

| | | |
|---|---|---|
| **FREDRIC N. ESHELMAN,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **Plaintiff,** | § | |
| | § | |
| **v.** | § | |
| | § | |
| **TRUE THE VOTE, INC.; CATHERINE** | § | **AUSTIN COUNTY, TEXAS** |
| **ENGELBRECHT; WILLIAM ENGELBRECHT;** | § | |
| **OPSEC GROUP LLC; GREGG PHILLIPS;** | § | |
| **THE BOPP LAW FIRM, P.C.; JAMES BOPP,** | § | |
| **JR.** | § | |
| | § | |
| **Defendants.** | § | **155th JUDICIAL DISTRICT** |

## PLAINTIFF'S VERFIED APPLICATION FOR TEMPORARY INJUNCTION, APPLICATION FOR APPOINTMENT OF RECEIVER, REQUEST FOR ACCOUNTING, AND MOTION FOR EXPEDITED DISCOVERY

Plaintiff Frederic N. Eshelman files this Verified Application for Temporary Injunction, Application for Appointment of Receiver, Request for Accounting, and Motion for Expedited Discovery against Defendants True the Vote, Inc. ("True the Vote" or "TTV"); Catherine Engelbrecht; OPSEC Group, LLC ("OPSEC"); Gregg Phillips; The Bopp Law Firm, P.C. ("Bopp Law Firm"); and James Bopp, Jr. ("Jim Bopp"), (collectively, "the Defendants") and in support thereof respectfully shows the Court as follows:

### I.      INTRODUCTION

1.      As set forth in detail in his Amended Petition and Application for Appointment of Receiver,[1] Plaintiff Fredric Eshelman lost $2.5 million to the grift of True the Vote and its vendors over the course of 11 days in November 2020. Mr. Eshelman asks this Court to issue a Temporary Injunction to preserve his money from further dissipation and to help track where it has gone. The

---

[1] Plaintiff filed his Amended Petition and Application for Appointment of Receiver on February 23, 2021. Plaintiff incorporates all factual allegations as if fully set forth herein.

need for the requested relief is only underscored by evidence suggesting that True the Vote may be in the zone of insolvency. To help the Court decide this Application for Temporary Injunction efficiently and expeditiously, Mr. Eshelman also files a Motion for Expedited Discovery to allow Plaintiff to send limited, expedited discovery to help Plaintiff determine the location of his money and to build the evidentiary record before the Court at the Temporary Injunction hearing.   In addition, Plaintiff seeks the appointment of a receiver over True the Vote to oversee and manage True the Vote and investigate and account for how Mr. Eshelman's funds were used and to make certain that it is not dissipating assets or engaging in other activity that would limit its ability to satisfy a judgment in favor of Mr. Eshelman.  Plaintiff also seeks requests that an accounting be performed of True the Vote to identify the specific location of the Eshelman Funds.

## A. THE INITIAL PHONE CALL, REPRESENTATIONS MADE, AND TTV'S FAILURE TO FOLLOW THROUGH

2.     On November 5, 2020, Mr. Eshelman and his representatives spoke with Defendant Catherine Engelbrecht, the head of True the Vote. During that call, Plaintiff agreed to fund a plan whereby True the Vote would undertake efforts to unearth potential fraud in the 2020 presidential election. As she has previously admitted, Ms. Engelbrecht memorialized this plan in a one-page summary she circulated to Mr. Eshelman's representatives later that day.[2] Mr. Eshelman then wired $2 million to True the Vote. The plan—which was referred to as, "Validate the Vote 2020"— had four prongs:

(a) Fund rewards for whistleblowers willing to come forward with concrete and actionable allegations of fraud;

(b) File lawsuits to obtain election data;

---

[2] A true and correct copy of the one-page summary of the Validate the Vote 2020 plan that Catherine Engelbrecht provided to Plaintiff is attached hereto as **Exhibit A**.

    (c) Perform complex data analysis on the election data obtained to find large-scale instances of illegal votes; and

    (d) Conduct a robust communications program to highlight the fraud discovered and push back on the mainstream-media narrative that everything was fine (if the data and whistleblowers showed that).

    3.    As Ms. Engelbrecht and Mr. Eshelman both understood, all of this needed to be done in very short order to meaningfully challenge the election results. In fact, just one week later on November 13, 2020, in order to maintain what he thought was momentum, and again in reliance on Catherine Engelbrecht's representations and conversations with Plaintiff regarding their "mutual work" to accomplish the Validate the Vote 2020 goals, Plaintiff agreed to pay and additional $500,000 to True the Vote, subject to the same condition that those funds would be used to fund True the Vote's Validate the Vote 2020 efforts (collectively, the $2.5 million will be referred to as the "Eshelman Payments").

    4.    Unfortunately, True the Vote and its vendors failed to act expeditiously to accomplish those goals:

- *Whistleblowers:* The plan called for True the Vote to use its existing whistleblower hotline to find evidence of fraud. Ms. Engelbrecht has admitted that Mr. Eshelman specifically directed that $1 million of his payment should be used to fund rewards to encourage people to come forward. To Mr. Eshelman's knowledge, no such awards were ever made.

- *Litigation:* Defendants Jim Bopp, and his law firm, Bopp Law Firm, were to file lawsuits based upon allegations of fraud in seven battleground states. One purpose of those lawsuits was to obtain access to voter file information that Defendant OPSEC could use to identify potential instances of fraud. Instead of the seven states originally contemplated, Mr. Bopp filed suit in only four states: Pennsylvania, Michigan, Georgia, and Wisconsin over the course of November 10, 11, and 12, 2020. The complaints look remarkably similar, with

large portions appearing to be copied and pasted boilerplate. Despite filing essentially the same complaint in all four states[3], James Bopp has claimed that his firm incurred fees of $183,601.80 over the course of five to seven days as follows:

- Georgia: 61.30 hours with a value of $18.159.20;

- Michigan: 91.40 hours with a value of $38, 391.60;

- Pennsylvania: 67.30 hours with a value of $39,516.50; and

- Wisconsin: 164.20 hours with a value of $87,534.50.

5.      Mr. Bopp has further claimed that for the three to six days that those complaints were sitting in court, he and his firm also have claimed to have spent an additional 125.80 hours with a value of $97,359.10 to "supervise" them.

6.      After spending in excess of $280,000 to draft and file the nearly-identical complaints in those cases, Mr. Bopp and his law firm then dismissed them all just days later on Monday, November 16, 2020 without even telling Mr. Eshelman until after they dismissed. They did not pursue any other efforts to litigate fraud in connection with the 2020 presidential election.

7.      Not only is the amount charged for these cookie-cutter complaints unconscionable—and likely impossible given the size of his firm (only five attorneys) and the number of hours available—but the goal was actually unachievable. Plaintiff has since learned that the information Mr. Bopp sought through his four lawsuits would not even exist yet by the time that election results would have been certified.

- *Statistical Analysis:* The third prong of the plan was for True the Vote to work with OPSEC to use statistical analysis of the voter rolls to find evidence of fraud or error. It is believed that True the Vote sent OPSEC approximately $350,000 on November 12, 2020. OPSEC's

---

[3] A true and correct copy of a chart comparing all four complaints filed by Mr. Bopp and his law firm and highlighting the substantial similarities across those complaints is attached hereto as **Exhibit B**.

owner has stated that he was traveling all over the country to investigate vote fraud claims. That was not what True the Vote told Plaintiff OPSEC would be doing as part of the Validate the Vote 2020 initiative in its discussions with Plaintiff. If that was what OPSEC was doing, then it should not have been using Mr. Eshelman's money to do so, because True the Vote had claimed to Plaintiff that it had a plan to vet calls to its hotline already in place.

- *Communications:* Finally, True the Vote and Mr. Eshelman had discussed the need for an extensive communications plan. Despite agreeing that $1 million of Mr. Eshelman's payment would be used specifically to fund those communications efforts, they never materialized. Even when Mr. Eshleman's representative met with True the Vote to set up a communications plan, Ms. Engelbrecht refused to execute on it.

## B. FAILURE TO FOLLOW THROUGH WITH REPRESENTATIONS, DEMAND FOR RETURN OF MONEY

8. Mr. Eshelman contacted True the Vote and agreed to fund a limited set of efforts related to the 2020 election. That effort was necessarily time limited given the short window available to unearth evidence of fraud and file the necessary challenges to the election. Mr. Eshelman fully expected his $2.5 million in payments would be fully exhausted as part of that effort and never imagined he would ask for a refund. Unfortunately—and as set forth in greater detail in Mr. Eshelman's Amended Petition—it became clear by November 16, 2020 that True the Vote could not perform on its side of the bargain. Accordingly, on November 17, 2020, Mr. Eshelman instructed True the Vote and Catherine Engelbrecht to stop spending his money, to account for what they had already spent, and to return the rest. True the Vote refused to do so. Instead, they continued spending Mr. Eshelman's money (even after abandoning the Validate the Vote 2020 efforts Mr. Eshelman had specifically agreed to fund).

### C.  TRUE THE VOTE IS IN THE ZONE OF INSOLVENCY.

9.      TTV posted as recently as January 8, 2021 on its Facebook page, "we are uncertain how long we will be here."[4]  Sometime after that TTV completely deleted its Twitter account. Similarly, there has been no activity on TTV's YouTube account since early January, and TTV's Instagram appears to have been dormant since late November.  TTV's website reveals a sudden drop-off in content publication.  According to TTV's website, their last podcast was published in October 2020.  In addition, TTV's last new release was on January 11, 2021 (three days after its Facebook post noting uncertainty about how much longer it would be here).  TTV's last blog-like post was posted on January 30, 2021.  Therefore, it is believed that TTV may imminently no longer actively be operating or filing bankruptcy based on its own representations that it is, "uncertain how long we will be here."

### D.  RISK OF TRUE THE VOTE'S DISSIPATION OF FUNDS ON OTHER, UNRELATED PROJECTS.

10.      The risk that Defendants will dissipate Plaintiff's funds on matters unrelated to the Validate the Vote 2020 initiative during the pendency of this case is not speculative. In fact, based on recent statements by Mr. Bopp, he has already done so.  In fact, it appears that Defendants fully intend to continue spending Mr. Eshelman's money on projects unrelated to the Validate the Vote 2020 effort Mr. Eshelman specifically agreed to fund.  Specifically, Defendants have undertaken to spend Mr. Eshelman's money in connection with litigation related to the 2021 U.S. Senate runoff elections in Georgia, which efforts Mr. Eshelman never agreed to fund. Given that Defendants have continued spending Mr. Eshelman's money (despite his demand that they cease and desist), it is highly likely that Defendants are currently and will continue dissipating Mr. Eshelman's money absent an order from this Court enjoining such conduct.

---

[4] A true and accurate copy of a screenshot of TTV's Facebook page January 8, 2021 entry is attached hereto as **Exhibit C**.

11.     To be clear: Mr. Eshelman is not complaining because True the Vote did not find the evidence he thought it might. Rather, he is complaining because True the Vote failed to use his money to fund the efforts it agreed to pursue in exchange for Mr. Eshelman's payment.  Moreover, True the Vote and Catherine Engelbrecht made fraudulent misrepresentations in order to induce him to pay $2.5 million to True the Vote.

**E.  INJUNCTIVE RELIEF IS NECESSARY.**

12.     This is not a complicated case, but it is essential for the Court to intercede quickly to protect whatever portion of Mr. Eshelman's $2.5 million may be left, and to order Defendants to produce an accounting of how the money was spent so that Mr. Eshelman may more fully understand who currently possesses his money. The need for such relief is all the more acute in light of evidence indicating that True the Vote may be on the brink of insolvency or considering winding up its operations.

13.     In short, Mr. Eshelman is entitled to the requested relief because he will be able to prove the following:

- Mr. Eshelman has a probable right to relief based on his claim for breach of contract. Specifically, True the Vote breached its agreement to use Mr. Eshelman's payments totaling $2.5 million to fund specific projects related specifically to True the Vote's Validate the Vote 2020 initiative.

- Mr. Eshelman has a probable right to relief based on his claims for fraudulent misrepresentation. Specifically, True the Vote and Catherine Engelbrecht made both fraudulent misrepresentations about True the Vote's capabilities in order to induce Mr. Eshelman to pay $2.5 million to True the Vote.

- Mr. Eshelman has a probable right to relief based on his claim for declaratory judgment. Specifically, Mr. Eshelman's payments to True the Vote totaling $2.5 million were conditioned upon their use to support specific projects related to the Validate the Vote 2020. Because True the Vote completely abandoned those efforts, Mr. Eshelman remains the rightful owner of those funds.

- Mr. Eshelman is likely to suffer a probable, imminent, and irreparable injury absent the requested relief. Specifically, Mr. Eshelman may be deprived of a meaningful remedy if the Court does not grant the requested relief because True the Vote appears to be in the zone of insolvency and there is a substantial risk that True the Vote and the other Defendants will continue to dissipate his assets.

14.     Accordingly, Mr. Eshelman respectfully asks this Court to: (1) enter a Temporary Injunction freezing a total of $2.5 million in the accounts of True the Vote, OPSEC, the Bopp Law Firm, Catherine Engelbrecht, Gregg Phillips, and James Bopp and enjoining them from the dissipation of the Eshelman Payments and any amounts paid by TTV after November 5, 2020 to OPSEC, the Bopp Law Firm, Catherine Engelbrecht, Gregg Phillips, and James Bopp (collectively Eshelman Payments and any amounts paid by TTV after November 5, 2020 to the identified Defendants will be referred to as "Eshelman Funds"); (2) appoint a receiver to oversee and manage True the Vote and investigate and account for how Mr. Eshelman's funds were used and to make certain that it is not dissipating assets or engaging in other activity that would limit its ability to satisfy a judgment in favor of Mr. Eshelman; and (3) require an accounting be performed of True the Vote to identify the specific location of the Eshelman Funds.  In anticipation of a hearing on his Application for Temporary Injunction, Mr. Eshelman also asks the Court to grant his Motion for Expedited Discovery to permit him to develop a more complete factual record on these points

that will help the Court decide this Application for Temporary Injunction efficiently and expeditiously.

## II.    APPLICATION FOR TEMPORARY INJUNCTION

15.    Plaintiff re-alleges the foregoing paragraphs and incorporates them here as if fully set forth herein.

16.    Plaintiff seeks a temporary injunction order freezing Defendants' bank accounts, enjoining TTV from using any portion of the $2.5 million and enjoining all other Defendants from using any of the money improperly paid to them by TTV on or after November 5, 2020, to prevent a further depletion of what remains of Plaintiff's payments and placing those funds beyond the reach of this Court.

### A.  TEMPORARY INJUNCTION STANDARD

17.    The purpose of a temporary injunction is to preserve the status quo of the litigation's subject matter pending a trial on the merits. *Butnaru v. Ford Motor Co.*, 84 S.W.3d 198, 204 (Tex. 2002).  To obtain injunctive relief, "the applicant must plead and prove three specific elements: (1) a cause of action against the defendant; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparably injury in the interim." *Id.*

18.    A temporary injunction applicant must plead a cause of action and present some evidence that tends to sustain it to show a probable right of recovery. *Intercontinental Terminals Co., LLC v. Vopak North America, Inc.*, 354 S.W.3d 887, 897 (Tex. App.—Houston [1st Dist.] 2011, no pet.). "[T]he applicant is not required to establish that it will prevail on final trial." *Texas Kidney, Inc. v. ASD Specialty Healthcare*, No. 14-13-01106-CV, 2014 WL 3002425, at *2 (Tex. App.—Houston [14th Dist.] July 1, 2014, no pet.).

**B. THIS COURT SHOULD GRANT A TEMPORARY INJUNCTION FREEZING DEFENDANTS' BANK ACCOUNTS.**

19.     This Court should grant a temporary injunction freezing Defendants' bank accounts up to a total amount of $2.5 million, also referred to as the Eshelman Funds, and enjoining the Defendants from further depleting the Eshelman Funds because Plaintiff meets all requirements for a temporary injunction.   The verified facts supporting this Application for Temporary Injunction show Plaintiff has a probable right to relief on his claims: (1) breach of contract as to TTV; (2) declaratory judgment; (3) fraudulent misrepresentation as to Defendants True the Vote and Catherine Engelbrecht; and (4) money had and received as to all Defendants.[5]  Specifically, TTV has pocketed $2.5 million of Plaintiff's funds and has not used the payments according to the requisite conditions, nor has it returned the money. All other Defendants have improperly retained the Eshelman Funds.  Plaintiff is entitled to recover these funds, and until then, enjoin Defendants from further depleting any portion of the Eshelman Funds.  Moreover, Plaintiff is likely to suffer a probable, imminent and irreparable injury absent a temporary inunction issued by this Court.

**a. Mr. Eshelman Has a Probable Right To Relief on His Causes of Action Against Defendants.**

***i.    Breach of Contract as to TTV***

20.     Plaintiff has a probable right to relief on his breach of contract claim against TTV. To prevail on a breach of contract claim, a plaintiff must show: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach.  *Davis v. Texas Farm Bureau Ins.*, 470 S.W.3d 97, 104 (Tex. App.—Houston [1st Dist.] 2015, no pet.); *B & W Supply, Inc. v. Beckman,* 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Here, on

---

[5] These causes of action are also in Plaintiff's Amended Petition and Application for Appointment of Receiver filed with this Court on February 23, 2021.

November 5 and 13, 2020, the parties agreed Plaintiff would supply TTV with $2.5 million on the condition that Defendant would use the money for the Validate the Vote 2020 initiative. These agreements formed a valid contract, and Plaintiff performed his obligations by providing the $2.5 million. TTV breached the contract by failing to fulfill its promise to engage in certain actions for the Validate the Vote 2020 project. TTV's inaction caused Plaintiff's damages. Thus, Plaintiff has a probable right to recovery on his breach of contract claim.

### ii. *Declaratory Judgment*

21.     Plaintiff has a probable right to relief on his declaratory judgment claim.  Plaintiff seeks an order declaring himself to be the rightful owner of the $2.5 million conditionally paid to TTV and requiring TTV to immediately surrender possession of those funds to him. The Texas Uniform Declaratory Judgment Act gives Texas courts the power to "declare rights, status, and other legal relations whether or not further relief is or could be claimed." TEX. CIV. PRAC. & REM. §37.003(a).  A declaratory-judgment action will lie within the trial court's jurisdiction when a justiciable controversy exists as to the rights and status of the parties before the court for adjudication, and the requested declaration will actually resolve the controversy.  *Brooks v. Northglen Ass'n*, 141 S.W.3d 158, 163-64 (Tex. 2004).  A justiciable controversy is one in which a real and substantial controversy exists involving a genuine conflict of tangible interest and not merely a theoretical dispute.  *Bonham State Bank v. Beadle*, 907 S.W.2d 465, 467 (Tex.1995).

22.     Here, this is a real and substantial controversy between the parties.  The controversy will be fully resolved if the Court determines that the payment from Plaintiff to TTV was conditional, that TTV failed to fulfill the conditions, and that the remaining funds should be returned. Because Plaintiff did not make an unconditional transfer of property to TTV, he did not unconditionally gift the funds to TTV.  A gift is effective only when there is (1) a clear intent by

the donor to make a gift and (2) an immediate and *unconditional* transfer of the property, such that

title passes contemporaneously from the donor to the recipient. *Oadra v. Stegall*, 871 S.W.2d 882,

890 (Tex. App.—Houston [14th Dist.] 1994, no writ) (citing *Wells v. Sansing*, 245 S.W.2d 964,

965 (Tex. 1952).

23.     Although Plaintiff paid $2.5 million to TTV, he did not give TTV the money

unconditionally. Thus, no valid gift was made—and unconditional ownership to the money did not

vest in TTV—because Plaintiff's payment was premised on a condition that did not and will not

occur. *See McClure v. McClure*, 870 S.W.2d 358 (Tex. App.—Fort Worth 1994, no pet.) (holding

"failure of, violation of, or refusal to perform the condition by the donee constitutes good ground

for revocation of the gift by the donor" and that gifted money "remains [the donor's] separate

property" if the donee fails to comply with the condition on the gift)*; Yates v. Blake*, 491 S.W.2d

751, 754 (Tex. App.—Corpus Christi 1973, no writ) (holding that no valid gift was made where

gift was premised upon the giving party's death, even though recipient already had the property in

her possession).   Plaintiff's repeated efforts to reclaim the Eshelman Funds "confirms [his]

intention not to vest unconditional ownership" in TTV. *Id*   Consequently, Plaintiff is still the

owner of any funds TTV failed to use according to his stated conditions.

### iii.   *Fraudulent Misrepresentation as to TTV and Catherine Engelbrecht*

24.     Plaintiff also has a probable right to relief on his fraudulent misrepresentation

claim.  The elements of common law fraudulent misrepresentation are: (1) the defendant made a

material representation to the plaintiff; (2) the representation was false; (3) the defendant knew of

the representation's falsity when it was made; (4) the defendant made the representation with the

intent that the plaintiff act on it; and (5) the plaintiff detrimentally relied on the defendant's

misrepresentation. *Baribeau v. Gustafson*, 107 S.W.3d 52, 58 (Tex. App.—San Antonio 2003, pet. denied) (citing *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 222 (Tex. 1992)).

25.     Multiple times in November 2020, Engelbrecht and TTV made material misrepresentations to Plaintiff that, using Plaintiff's payments, TTV would comply with its stated Validate the Vote 2020 efforts.  But Engelbrecht and TTV knew at the time those representations were false, as they knew they intended to use Plaintiff's payments for other purposes, such as paying off debts TTV owed, for other matters besides the Validate the Vote 2020 project, and not for the manner in which they told Plaintiff they would use the money.  They made these representations intending that Plaintiff rely on them by transferring the Eshelman Payments to TTV.  Plaintiff justifiably relied on Defendants' misrepresentations by making payments to TTV and has suffered $2.5 million in damages.

### iv.   Money Had and Received as to all Defendants

26.     Plaintiff similarly has a probable right to relief on his money had and received claim against Defendants. To prove a claim for money had and received, the plaintiff must establish the defendant holds the money that in equity and good conscience belongs to the plaintiff. *Staats v. Miller*, 243 S.W.2d 686, 687-88 (Tex. 1951).  Whether the defendant acquired the money wrongfully is irrelevant. *Doss v. Homecomings Fin. Network, Inc.*, 210 S.W.3d 706, 711 (Tex. App.—Corpus Christi 2006, pet. denied). Rather, the sole inquiry is whether the defendant received money that rightfully belongs to the plaintiff.  *Staats*, 243 S.W.2d at 687-88.

27.     Here, Defendants hold money that, in equity and good conscience, belongs to Plaintiff. Plaintiff conditionally gave $2.5 million to TTV, in which Defendants Engelbrecht and Phillips are or were officers and/or directors, and in which Defendants Bopp, The Bopp Law Firm, and OPSEC are agents.  Defendants did not meet their obligations to use the money as

contemplated and conditioned by Plaintiff.  As demonstrated above, the non-TTV Defendants received a substantial part of the money Plaintiff conditionally paid to TTV, and are currently holding said funds, all of which in equity and good conscience belongs to Plaintiff.  Thus, Plaintiff has a probable right to relief on his money had and received claim.

### b. Without Injunctive Relief, Mr. Eshelman is Likely to Suffer a Probable, Imminent and Irreparable Injury.

28.     Without immediate relief, Plaintiff will suffer imminent and irreparable harm. With each day that passes, the likelihood that Plaintiff will recover the funds misappropriated through Defendants' actions diminishes because of the actual and substantial likelihood that Defendants will conceal, hide, dissipate, or otherwise improperly expend the funds or assets purchased with those funds increases.

29.     Moreover, TTV posted as recently as January 8, 2021 on its Facebook page, "we are uncertain how long we will be here."[6]  Sometime after that TTV completely deleted its Twitter account.  Similarly, there has been no activity on TTV's YouTube account since early January, and TTV's Instagram appears to have been dormant since late November.  TTV's website reveals a sudden drop-off in content publication.  According to TTV's website, their last podcast was published in October 2020.  In addition, TTV's last new release was on January 11, 2021 (three days after its Facebook post noting uncertainty about how much longer it would be here).  TTV's last blog-like post was posted on January 30, 2021.  Therefore, it is believed that TTV may imminently no longer actively be operating or filing bankruptcy.

30.     The risk that Defendants will dissipate Plaintiff's funds on matters unrelated to the Validate the Vote 2020 initiative during the pendency of this case is not speculative. In fact, based on recent statements by Mr. Bopp, he has already done so.  In fact, it appears that Defendants fully

---

[6] *See* screenshot of TTV's Facebook page January 8, 2021, attached hereto as **Exhibit C**.

intend to continue spending Mr. Eshelman's money on projects unrelated to the Validate the Vote 2020 effort Mr. Eshelman specifically agreed to help fund.   Specifically, Defendants have undertaken to spend Mr. Eshelman's money in connection with litigation related to the 2021 U.S. Senate runoff elections in Georgia, which efforts Mr. Eshelman never agreed to fund. Given that Defendants have continued spending Mr. Eshelman's money (despite his demand that they cease and desist), it is highly likely that Defendants are currently and will continue dissipating Mr. Eshelman's money absent an order from this Court enjoining such conduct.

31.     Further, should Defendants conceal, hide, dissipate, or otherwise expend Plaintiff's funds, it would likely render any judgment entered against Defendants uncollectible.  Accordingly, if the bank accounts of Defendants, to which misappropriated funds have been traced, are not frozen, Plaintiff will not have an adequate remedy at law. *See Texas Black Iron, Inc. v. Arawak Energy Int'l, Ltd*., 527 S.W.3d 579, 586 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("Texas cases hold that a plaintiff does not have an adequate remedy at law if the defendant faces insolvency or becoming judgment proof before trial.").

32.     In the present case, there is a direct, proven connection between TTV's bank account where Plaintiff wired the money and from which TTV in turn wired money to Defendants Catherine Engelbrecht, OPSEC, Greg Phillips, Bopp Law Firm, and James Bopp, and the wrongful conduct of the Defendants. Therefore, Plaintiff requests the Court to freeze a total of $2.5 million of the funds in the bank accounts belonging to Defendants and enjoin them from dissipating the funds that are part of the Eshelman Funds in their bank accounts.  Accordingly, a temporary injunction order freezing $2.5 million in those specific accounts is not only permissible, but necessary. *See Texas Black Iron*, 527 S.W.3d at 587 (explaining injunction is not precluded where the assets at issue in the injunction are at issue in and may be used to satisfy claims in the parties'

dispute); *see also G & H Partners, Ltd. v.* Boer *Goats Int'l Ltd.*, 896 F. Supp. 660, 663 (W.D. Tex. 1995), *aff'd sub nom. G & H Partners v. Boer Goats*, 84 F.3d 432 (5th Cir. 1996) (acknowledging injunctive relief previously granted by the court that "prohibit[ed] the defendants from removing funds located in defendants' account in the Sunburst Bank in Louisiana […] because it contained a $120,000 payment made to defendants for the embryos"); *Janvey v. Alguire*, No. 3:09-CV-724-N, 2010 WL 11626677, at *2 (N.D. Tex. May 28, 2010) (granting injunctive relief where plaintiff "provide[d] evidence that the frozen funds are the product of fraudulent transfer"); *Miller v. K and M P'ship*, 770 S.W.2d 84, 88 (Tex. App.—Houston [1st Dist.] 1989, no writ) (affirming injunctive relief enjoining defendant "selling, assigning, pledging, encumbering, or transferring 800,000 of the 997,500 shares" owed to plaintiff).

33.     The harm to Plaintiff described herein is a direct and proximate result of the acts of Defendants. The requested temporary injunction is appropriate to preserve the status quo until a trial can be held.

34.     To prevent the unjust and inequitable wasting of the misappropriated funds and any assets purchased with those funds that belong to Plaintiff, Plaintiff requests the entry of a Temporary Injunction that would restrain and enjoin Defendants from spending, transferring, or otherwise dissipating any portion of Plaintiff's $2.5 million that can be reasonably traced to them. Plaintiff also asks this Court to order the Defendant's respective financial institutions to freeze those amounts in Defendants' accounts to preserve the Court's ability to render effective judgment in this case. Specifically:

- Because TTV received the full balance of Plaintiff's payments, Plaintiff seeks to freeze and enjoin TTV from spending, transferring, or otherwise dissipating up to $2.5 million of funds in its bank account(s).

- Because it appears Bopp Law Firm received hundreds of thousands of dollars of Eshelman's Payment from TTV in connection with efforts purportedly related to

TTV's Validate the Vote 2020 initiative, Plaintiff seeks to freeze and enjoin The Bopp Law Firm from spending, transferring, or otherwise dissipating up to the same amount of money that Bopp Law Firm has received from TTV in its bank account(s).

- Because it appears OPSEC received hundreds of thousands of dollars of Eshelman's Payment from TTV in connection with efforts purportedly related to TTV's Validate the Vote 2020 initiative, Plaintiff seeks to freeze and enjoin OPSEC from spending, transferring, or otherwise dissipating up to the same amount of money that OPSEC has received from TTV in its bank account(s).

- And because it appears that Catherine Engelbrecht personally paid herself tens of thousands of dollars from the Eshelman Funds, Plaintiff seeks to freeze and enjoin Catherine Engelbrecht from spending, transferring, or otherwise dissipating up to the same amount of money that Catherine Engelbrecht received from TTV in her bank account(s).

35.     Plaintiff files this Verified Application for Temporary Injunction pursuant to general principles of equity, Texas Rules of Civil Procedure 680, *et seq.*, and Texas Civil Practice and Remedies Code section 65.011. Plaintiff is willing to post a bond as required by Texas law in an amount determined by the Court.

36.     Plaintiff requests this Court to set its Application for Temporary Injunction for hearing, and after a hearing, issue a temporary injunction against Defendants.

### VI.    APPLICATION FOR APPOINTMENT OF RECEIVER

37.      Plaintiff incorporates by reference the foregoing allegations as though fully set forth herein.

38.     Pursuant to Texas Civil Practice and Remedies Code Section 64.001(5)–(6), "A court of competent jurisdiction may appoint a receiver . . . (5) for a corporation that is insolvent, is in imminent danger of insolvency, has been dissolved, or has forfeited its corporate rights or (6) in any other case in which a receiver may be appointed under the rules of equity." TEX. CIV. PRAC. & REM. CODE § 64.001.

39.     Texas Courts grant temporary injunctions and appoint a receiver when necessary to protect the property.  *See, e.g, Hall v. Universal C.I.T. Credit Corp.*, 298 S.W.2d 858, 859 (Tex. App.—Eastland 1957) (affirming grant of TI enjoining transfer of auto/title certificate inadvertently delivered to defendant after foreclosure of the same from defendant; receiver appointed to hold the property).

40.     Because Plaintiff conditionally paid $2.5 million to Defendant True the Vote, Plaintiff has a probable interest in the money held by Defendant True the Vote and by the other Defendants to whom True the Vote transferred some or all of that money.

41.     The money is in danger of being lost or removed by Defendants' misappropriation of the funds through, among other improper actions, Defendants' using the monies to pay off other debts or obligations, to pay expenses not related to the Validate the Vote 2020 initiative, or to pay themselves.

42.     Moreover, TTV is in imminent danger of insolvency.  At the time of Mr. Eshelman's payments in November 2020, TTV only had a few hundred thousand dollars.  TTV posted as recently as January 8, 2021 on its Facebook page, "we are uncertain how long we will be here."[7]  Sometime after that, TTV completely deleted its Twitter account.  Similarly, there has been no activity on TTV's YouTube account since early January, and TTV's Instagram appears to have been dormant since late November.  TTV's website reveals a sudden drop-off in content publication.  According to TTV's website, their last podcast was published in October 2020.  In addition, TTV's last new release was on January 11, 2021 (three days after its Facebook post noting uncertainty about how much longer it would be here).  TTV's last blog-like post was posted on January 30, 2021.  In addition to this litigation, TTV is also engaged in significant—and

---

[7] *See* screenshot of TTV's Facebook page January 8, 2021, attached hereto as **Exhibit C**.

presumably expensive—litigation against Fair Fight in connection with its largely baseless challenges to the eligibility of hundreds thousands of voters in the 2021 Georgia Senate runoffs.[8] Therefore, TTV may imminently no longer actively be operating or filing bankruptcy.

43.     The risk that Defendants will dissipate Plaintiff's funds on matters unrelated to the Validate the Vote 2020 initiative during the pendency of this case is not speculative. In fact, based on recent statements by Mr. Bopp, he has already done so.  In fact, it appears that Defendants fully intend to continue spending Mr. Eshelman's money on projects unrelated to the Validate the Vote 2020 effort Mr. Eshelman specifically agreed to fund.  Specifically, Defendants have undertaken to spend Mr. Eshelman's money in connection with litigation related to the 2021 U.S. Senate runoff elections in Georgia, which efforts Mr. Eshelman never agreed to fund. Given that Defendants have continued spending Mr. Eshelman's money (despite his demand that they cease and desist), it is highly likely that Defendants are currently and will continue dissipating Mr. Eshelman's money absent an order from this Court enjoining such conduct.

44.     As such, Plaintiff requests that the Court appoint a Receiver to oversee and manage True the Vote and investigate and account for how Mr. Eshelman's funds were used and to make certain that it is not dissipating assets or engaging in other activity that would limit its ability to satisfy a judgment in favor of Mr. Eshelman.

## VIII.   REQUEST FOR ACCOUNTING

45.     Plaintiff incorporates by reference the foregoing allegations as though fully set forth herein.

46.     Texas courts grant temporary injunctions and order an accounting when necessary to protect the relevant property.  *See, e.g, Harmon v. Harmon*, No. 11-14-00343-CV, 2016 WL

---

[8] That case is styled *Fair Fight, Inc. v. True the Vote, Inc.*, No. 20-cv-302, in the United States District Court for the Northern District of Georgia.

7649298, at *1 (Tex. App.—Eastland Dec. 15, 2016) (noting trial court's entry of a temporary injunction that, in part, ordered Defendant to deposit funds with the court and to make an accounting of all activities of the relevant partnership during the relevant time-period); *In re Cantu de Villarreal*, No. 13-08-00408-CV, 2009 WL 888467, at *1 (Tex. App.—Corpus Christi Apr. 2, 2009) (affirming trial court's order granting motion for a temporary injunction and an accounting based upon an alleged breach of a settlement agreement); *Eichelberger v. Hayton*, 814 S.W.2d 179, 181 (Tex. App.—Houston [1st Dist. 1991, writ denied) (noting trial court granted TI and ordered accounting in divorce proceeding; order was dissolved for failure to set a bond amount).

47.     Plaintiff further requests that in addition to the appointment of a receiver, the Court order that the receiver produce an accounting to be conducted of Defendant True the Vote's books and records to identify where Defendants spent, placed, or paid any part of Plaintiff's $2.5 million in payments.

48.     Specifically, Plaintiff requests that the Court's order appointing the receiver requested above include an order that the receiver retain and direct a forensic accountant to examine the books and records of Defendant TTV and take such other appropriate actions to produce a detailed accounting as to the whereabouts of Mr. Eshelman's $2.5 million, including the financial institution(s) where said funds are on deposit, the name of the person(s) under whose name the funds are on deposit, the signatories on said account, the type of account, the account number, any subsequent recipient of any portion of the Eshelman Funds, and the available back-up for any payments of the Eshelman Funds by TTV.

## IX.     MOTION FOR EXPEDITED DISCOVERY

49.     Plaintiff further requests that that the Court permit Plaintiff to serve, and order that Defendants respond to, written discovery on a shortened, expedited timetable.

50.     Plaintiff must engage in expedited discovery to fully prepare for the evidentiary burden that the Plaintiff must carry at the temporary injunction hearing.

51.     Texas Rule of Civil Procedure 191.1 provides that, "the procedures and limitations set forth in the rules pertaining to discovery may be modified in any suit by agreement of the parties or by court order for good cause." TEX. R. CIV. PROC. 191.1.

52.     "Parties frequently seek, and trial courts order, expedited discovery in the course of proceedings pertaining to temporary restraining orders." *In re Nat'l Lloyds Ins. Co*., No. 13-15-00390-CV, 2015 WL 6759153, at *4 (Tex. App.—Corpus Christi November 3, 2015, orig. proceeding) (holding trial court did not abuse its discretion in granting a motion to expedite discovery in the course of a TRO).  The *In re National Lloyds* Court relied on several examples from courts around Texas where parties obtained expedited discovery in the context of a temporary restraining order or temporary injunction which has the same requirements as a temporary injunction. *See, e.g., In re Tex. Health Res*., No. 05-15-00813-CV, 472 S.W.3d 895, 2015 Tex. App. LEXIS 8988, 2015 WL 5029272, at *2 (Tex. App.—Dallas Aug. 26, 2015, orig. proceeding) ("The trial court ordered that the discovery take place before the expiration of the temporary restraining order."); *In re MetroPCS Commc'ns, Inc*., 391 S.W.3d 329, 332 (Tex. App.—Dallas 2013, orig. proceeding) ("On November 5, 2012, Golovoy filed a 'Motion for a Temporary Restraining Order and an Order Compelling Expedited Discovery.'"); *In re Meyer*, No. 14-14-00833-CV, 2014 WL 5465621, at *1 (Tex. App.—Houston [14th Dist.] Oct. 24, 2014, orig. proceeding) ("On October 14, 2014, Gulfstream filed an original petition, application for temporary restraining order, application for temporary injunction, and motion for expedited discovery against relators in the trial court."); *Miga v. Jensen*, No. 02-11-00074-CV, 2012 WL 745329, at *2 (Tex. App.— Fort Worth Mar. 8, 2012, no pet.) (mem. op.) ("Ten days later, Jensen

filed with the trial court an application for a temporary restraining order, injunction, and expedited discovery.").

53.     Here, good cause for expedited discovery exists because with each day that passes, the likelihood that Plaintiff will recover his payments misappropriated through Defendants' actions diminishes.  The actual and substantial likelihood that Defendants will conceal, hide, dissipate, or otherwise improperly expend the payments or assets purchased with those funds increases.

54.     Specifically, Plaintiff seeks information regarding the $2.5 million payments received by TTV from Plaintiff; portions of those payments that TTV in turn paid to Catherine Engelbrecht, OPSEC, Greg Phillips, The Bopp Law Firm, and James Bopp, Jr.; any other payments made related to the $2.5 million payments; and current location of the $2.5 million funds. *See* proposed expedited discovery attached as **Exhibit D.**

55.     Plaintiff respectfully requests that Defendants' responses to the expedited discovery be due within seven (7) days after service of this Court's order granting the expedited discovery.

## X.     RELIEF REQUESTED

WHEREFORE, Plaintiff Fredric N. Eshelman prays that this Honorable Court would grant the following relief:

1.     A temporary injunction or other injunctive relief to preserve the status quo and to freeze Defendants' bank accounts up to a total amount of $2.5 million and to enjoin Defendants from disbursing any portion that money while this litigation is pending;

2.     An order appointing a Receiver to oversee and manage Defendant True the Vote and investigate and account for how Plaintiff's funds were used and to make certain that True the Vote is not dissipating assets or engaging in other activity that would limit its ability to satisfy a judgment in favor of Plaintiff;

3.     An order directing the appointed Receiver to retain and direct a forensic accountant to examine the books and records of Defendant True the Vote and take other such appropriate action to produce a detailed accounting as to the whereabouts of Mr. Eshelman's $2.5 million, including the financial institutions(s) where said funds

are on deposit, the name of the person(s) under whose name the funds are on deposit, the signatories on said account, the type of account, the account number, any subsequent recipient of an portion of the Eshelman Funds, and the available back-up for any payments of the Eshelman Funds by TTV;

4.   An order granting Plaintiff's Motion for Expedited Discovery requiring: (1) Defendants to respond to Plaintiff's expedited discovery requests attached to **Exhibit D** within **seven days** after service of this order granting the expedited discovery; and

5.   All other relief that the Court deems just and proper.

Dated: March 19, 2021

Respectfully submitted,

*/s/ Douglas A. Daniels*
Douglas A. Daniels
State Bar No. 00793579
Kristin Kruse Lotz
State Bar No. 24043121
Sabrina R. Tour
State Bar No. 24093271
DANIELS & TREDENNICK PLLC
6363 Woodway Dr., Suite 700
Houston, TX 77057-1759
(713) 917-0024 Telephone
(713) 917-0026 Facsimile
Email: doug.daniels@dtlawyers.com
Email: kristin@dtlawyers.com
Email: sabrina@dtlawyers.com

Luis Amadeus Vallejo
State Bar No. 20435600
Law Office of Luis Amadeus Vallejo
Box 340
La Grange, Texas 78495
(713) 922-1768 Telephone
Email: lav@lavlaw.com

Ronald M. Jacobs (*pro hac vice*)
Christopher J. Climo (*pro hac vice*)
Venable LLP
rjacobs@venable.com
600 Massachusetts Avenue, NW
Washington, D.C. 20001

(202) 344-8215 Telephone
(202) 344-8300 Facsimile

*Counsel for Plaintiff Fredric Eshelman*