Page 1

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

```
-------------------------------x
FAIR FIGHT, INC., SCOTT BERSON,:
JOCELYN HEREDIA, and JANE DOE, :
                               :
           Plaintiffs,         :
                               :
       vs.                     :
                               :          Case No.
TRUE THE VOTE, CATHERINE       :
ENGELBRECHT, DEREK SOMERVILLE, : 2:20-cv-00302-SCJ
MARK DAVIS, MARK WILLIAMS,     :
RON JOHNSON, JAMES COOPER, and :
JOHN DOES 1-10,                :
                               :
           Defendants.         :
                               :
FAIR FIGHT ACTION, INC.,       :
                               :
           Counter-Defendant. :
-------------------------------x
```

VIRTUAL VIDEOTAPED DEPOSITION OF JAMES COOPER
Wednesday, September 22, 2021
9:02 a.m. Eastern Standard Time

REPORTER:  Dawn A. Jaques, CSR, CLR

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 2

```
 1    APPEARANCES:
 2    On behalf of the Plaintiffs:
            JOEL J. RAMIREZ, ESQ.
 3          JACOB SHELLY, ESQ.
            Elias Law Group LLP
 4          10 G Street, NE
            Suite 600
 5          Washington, D.C.  20002
            PHONE:   (202) 968-4490
 6          EMAIL:   jramirez@elias.law
 7
 8    Also on behalf of Plaintiffs:
            TORRYN TAYLOR RODGERS, ESQ.
 9          Perkins Coie LLP
            505 Howard Street
10          Suite 1000
            San Francisco, California  94105-3204
11          PHONE:  (415) 344-7000
12          EMAIL:  trodgers@perkinscoie.com
13
14    On behalf of the Defendants:
            LESLIE J. BRYAN, ESQ.
15          Lawrence & Bundy LLC
            1180 West Peachtree Street
16          Suite 1650
            Atlanta, Georgia  30309
17          PHONE:   (404) 400-3350
18          EMAIL:   leslie.bryan@lawrencebundy.com
19
20
21
22
```

Page 3

```
 1   APPEARANCES (Continued):

 2   Also on behalf of the Defendants:

 3          JAMES BOPP, JR., ESQ.

 4          COURTNEY KRAMER, ESQ.

 5          The Bopp Law Firm

 6          1 South Sixth Street

 7          Terre Haute, Indiana  47807-3510

 8          PHONE:  (812) 232-2434   (Mr. Bopp)

 9                  (470) 669-0403   (Ms. Kramer)

10          EMAIL:  jboppjr@aol.com

11                  ckramer@bopplaw.com

12

13   VIDEOGRAPHER AND EXHIBIT TECHNICIAN:

14          Kenzie Guerrero, Digital Evidence Group

15

16

17

18

19

20

21

22
```

```
                                                        Page 4
 1                       I-N-D-E-X
 2    WITNESS:                                       PAGE:
 3    JAMES COOPER
 4         Examination by Mr. Ramirez                  8
 5
 6                    E-X-H-I-B-I-T-S
 7    COOPER DEPOSITION EXHIBIT:                     PAGE:
 8    Exhibit 1  December 16-18, 2020, email
                 chain between Caesar Gonzales
 9               and James Cooper, SUBJECT:
                 True the Vote
10               Def. Cooper 0138 -  0139            34
11    Exhibit 2  December 15, 2020 - March 29,
                 2021, email chain, SUBJECT:
12               Draft challenge numbers by
                 county | Tranche One | 407,000
13               Def Williams 0745 - 0749            56
14    Exhibit 3  December 16, 2020, email chain
                 SUBJECT: Questions I keep getting
15               OPSEC 0052 - 0053                   73
16    Exhibit 4  December 17, 2020, email to
                 James Cooper from Joe Martin
17               SUBJECT: CHALLENGE to Taliaferro
                 County Registrar VOTERS WHO MOVED
18               Def. Cooper 0180                    80
19    Exhibit 5  December 17-20, 2020, email chain
                 SUBJECT: Taliaferro County Missing
20               voters
21               Def. Cooper 0183 - 0184            82
22
```

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 5

1                    INDEX (Continued)

2                    E-X-H-I-B-I-T-S

3  COOPER DEPOSITION EXHIBIT:                  PAGE:

4  Exhibit 6   December 20, 2020, email chain
                SUBJECT: Please Hold on Clair
5               J Martin challenge letters to
                Taliaferro County
6               Def. Cooper 0181 - 0182          90

7  Exhibit 7   December 18-20, 2020, email chain
                SUBJECT: URGENT: For Elector
8               Challenge Project
                Def. Cooper 0187 - 0188          119

9  Exhibit 8   December 16, 2020 - March 29,
                2021, email chain, SUBJECT:
10              Gordon Rhoden (True the Vote)
                Clarke County
11              Def Williams 0854                124

12 Exhibit 9   December 18-20, 2020, email
                chain, SUBJECT: List of counties
13              needing signatures
14              OPSEC 0045 - 0047                131

15

16

17

18

19

20

21

22

Page 6

1              P R O C E E D I N G S

2              THE VIDEOGRAPHER:   This is Tape No. 1

3    in the videotaped deposition of James Cooper, in

4    the matter of Fair Fight, Inc., et al.,

5    Plaintiffs, v. True the Vote, et al., Defendants,

6    and Fair Fight Action, Inc., Counter-Defendants,

7    in the United States District Court for the

8    Northern District of Georgia, Gainesville

9    Division, Case No. 2:20-cv-00302-SCJ.

10             This deposition is being held remotely

11   by Zoom videoconferencing, physical recording in

12   Culpeper, Virginia, on September 22nd, 2021.   The

13   time is 9:02 a.m. Eastern Time.

14             My name is Kenzie Guerrero; I'm a

15   legal videographer from Digital Evidence Group.

16   The court reporter is Dawn Jaques, in association

17   with Digital Evidence Group.

18             Will counsel please introduce

19   themselves for the record?

20             MR. RAMIREZ:   Joel Ramirez for the

21   Plaintiffs.

22             MS. BRYAN:   Leslie Bryan for

Page 7

1   Plaintiffs.

2            MR. BOPP:  Jim Bopp for Defendants.

3            MS. KRAMER:  Courtney Kramer for

4   Defendants.

5            MR. SHELLY:  Jacob Shelly for

6   Plaintiffs.

7            MS. RODGERS:  Torryn Taylor for the

8   Plaintiff.

9            THE REPORTER:  Okay, Mr. Cooper, if

10   you'll raise your right hand to be sworn, please.

11      (The witness was administered the oath.)

12            MR. BOPP:  Joel, do you mind if I ask

13   a procedural question?  You've got 12

14   depositions -- or 12 exhibits.  Did you send those

15   to us, or are we just going to see them?

16            MR. RAMIREZ:  You'll see them here,

17   and they've all been produced by Defendants.

18            MR. BOPP:  Okay, fair enough.

19   Thank you.  You can go ahead, I'm sorry.

20

21

22

Page 8

1    Whereupon,

2                    JAMES COOPER,

3          was called as a witness, after having been

4          first duly sworn by the Notary Public,

5          was examined and testified as follows:

6       EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

7                BY MR. RAMIREZ:

8       Q    Right, okay.  Okay, let's get started.

9            Mr. Cooper, as we begin, I just want

10   to go over a few things about this deposition

11   before we dive into the questions.

12            Does that sound fair?

13      A    Yes.

14      Q    And you can hear me okay?

15      A    Yes.

16      Q    Awesome.  Okay, so first, if I ask a

17   question at any point that you don't understand,

18   if you could let me know, and then I'll do my best

19   to clarify the question so that we have a full

20   understanding.  Does that sound good?

21      A    Yes.

22      Q    Okay.  And correlatively, if you

Page 9

1   answer the question, I will assume that you

2   understand it.  Does that sound good?

3        A    Yes.

4        Q    Okay.  If at any point you want to

5   take a break, let me know.  I'll try to find a

6   good place to stop.

7             The one exception is that if I'm

8   asking a question, then we have to finish

9   answering that question before we can take the

10  break.  Does that sound good?

11       A    Unless I need advice from the counsel.

12       Q    Sounds good, okay.  And as you know,

13  today a court reporter will be recording this

14  session.  The court reporter can only record

15  audible responses, so I will ask that you answer

16  with an audible yes or no.

17            A head shake, for instance, won't come

18  out on the transcript, so we need audible

19  responses.  Does that sound good?

20       A    Yes, sir.

21       Q    Okay.  And finally, if you could

22  please wait until I'm finished asking a question,

Page 10

```
1    that would be great, because otherwise we'll be

2    talking over each other; that way we have a clear

3    record for the Court.  Does that sound good?

4         A    Yes.

5         Q    Okay, great.  All right, so let's dive

6    right in.  So first, what did you do to prepare

7    for today's deposition?

8         A    Nothing.

9         Q    Nothing.  Did you meet with anyone

10   regarding this deposition?

11        A    Counsel yesterday.

12        Q    Okay, yesterday.  And have you

13   discussed this deposition with anyone other than

14   your attorneys?

15        A    No.

16        Q    Okay.  All right, so first I want to

17   get a little personal background.

18             How long have you been a resident of

19   Walton County?

20        A    1998.

21        Q    Since '98.  And are you a registered

22   voter in Walton County?
```

Page 11

1          A     Yes.

2          Q     How long have you been a registered

3     voter there?

4          A     Since I moved in 1998.  I don't recall

5     the exact date.

6          Q     That's fine.

7                And what is your occupation?

8          A     Own a trucking company.

9          Q     Do you also serve as the 3rd Vice

10    Chair for the 10th District of the Georgia

11    Republican Party?

12         A     No longer serve as the 3rd Vice Chair.

13         Q     No longer.  When did you serve as the

14    Vice Chair?

15         A     From the convention of 2019 to the

16    convention of '21.

17         Q     '21, great.  And during that time,

18    what were your duties as the Vice Chair?

19         A     Under our district rules, we have no

20    specific list of duties as a 3rd Vice Chair.

21         Q     Okay.  So then what did you do like on

22    a daily basis when you fulfilled that role?

Page 12

1          A    You're going to have to ask that

2     again.  I'm sorry.

3          Q    Sure, no problem.

4               So there were no set duties.  On a

5     daily basis while you were serving as the

6     Vice Chair, what did you do?

7          A    I did anything that was requested of

8     me by the Chair of the district, as provided in

9     our rules.

10         Q    And who was the Chair of the district

11    at the time?

12         A    The Chair of the district at the time

13    was Karen Schwinn.

14         Q    Can you give me just a few examples of

15    the sorts of things that Karen Schwinn asked you

16    to do as the Vice Chair?

17         A    Developed a GOTV for the January

18    runoff and for the November election, general

19    election last year.

20              I reorganized counties that fell into

21    the unorganized category.

22         Q    Okay.  Did you say GOTV?

Page 13

1          A     Yes, "Get Out The Vote."

2          Q     Okay, thank you.

3                Can you describe what that is?

4          A     It is plans that we do to turn out

5    Republican votes for Republican nominees.

6          Q     And you mentioned two different kinds

7    of counties in the second part of your answer.

8                Can you remind me what those are?

9          A     I'm sorry?

10         Q     You mentioned two different kinds of

11   counties, I believe, in the second part or your

12   answer.  Unorganized I think was one of them.

13               Can you describe what that is?

14         A     Unorganized county is when a county

15   does not have a local county party.  They are

16   considered unorganized within the party structure.

17         Q     Okay.  And part of your role is to get

18   them organized?

19         A     Yes.

20         Q     Okay.  So how long have you been

21   involved in Georgia politics?

22               A     Since 2010.

Page 14

1          Q     2010?  What role did you play in 2010?

2          A     No party role at all.  I volunteered

3    with Congressman -- well, Former Congressman

4    Rob Woodall's original campaign -- or first

5    campaign in 2010 during the primary.

6          Q     Okay.  Have you ever served as an

7    election administrator in Georgia?

8          A     No, sir.

9          Q     No, okay.

10               Have you been involved in election

11   administration in Georgia in the past?

12         A     No, sir.

13         Q     No.  So this election, this most

14   recent election, when you assisted with

15   True the Vote's efforts, can you describe kind of

16   just in general terms what you did?

17         A     In general terms what I did is I would

18   use my network that I had across the state to

19   identify individuals to do individual voter

20   challenges.

21         Q     Okay.  Did you do any poll watching

22   during the runoff election?

Page 15

```
 1          A    I was a statewide poll watcher.  Did

 2    not do -- was not sent out to any poll.

 3          Q    Had you been poll watching before the

 4    runoff election?

 5          A    No, sir.

 6          Q    And are you familiar with Georgia Code

 7    § 21-2-230?  That's the voter challenge law.

 8          A    Somewhat, but it has been a while

 9    since I've read it.

10          Q    Okay.  Have you ever challenged

11    another Georgia voter's eligibility under that

12    law?

13          A    I have not.

14          Q    Before the recent runoff election,

15    have you ever recruited anyone to submit voter

16    challenges under that law?

17          A    I did not.

18          Q    Okay.  So I want to ask a few

19    questions now about your connection to

20    True the Vote, starting with how did you first

21    become aware of them?

22          A    Got a phone call and asked me to meet
```

Page 16

1   with them, and that's where I became aware of

2   them.

3           Q    All right.  Who gave you that phone

4   call?

5           A    Mr. Williams, Mark Williams.

6           Q    And when was this?

7           A    I do not recall exactly when that was.

8           Q    Was it before or after the general

9   election in November?

10          A    After.

11          Q    Was anyone else on that call?

12          A    No, sir.

13          Q    Okay.  And sort of just generally,

14   what did you discuss?

15          A    He said he had some people coming to

16   the office, that he wanted me to come by and

17   listen to what they had to say, and that was

18   pretty much it.

19          Q    Okay.  He didn't give you a preview of

20   what they had to say?

21          A    No, sir.

22          Q    Didn't ask -- didn't tell you sort of

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 17

1    what the issue was about, why they were calling?

2          A    Not particularly, no.

3          Q    But he knew it was related to the

4    runoff election?

5          A    Yes.

6          Q    Before this call, had you ever worked

7    with True the Vote or any of its affiliates?

8          A    No, sir.

9          Q    Did you know of any of their previous

10   activities in elections before that call?

11         A    No, sir.

12         Q    So how did you come to learn about

13   True the Vote's Georgia elector challenges during

14   the runoff election?

15         A    I'm sorry, I'm not sure I quite

16   understand exactly what you're asking.

17         Q    Sure, I can rephrase that.

18              So as you're aware now, True the Vote

19   coordinated several voter challenges during the

20   runoff election, and you were involved with that

21   process.

22              My question is, how did you first come

Page 18

1    to learn about that particular project of

2    True the Vote's?

3          A    In the meeting that I went to at

4    Mark Williams' place of business.

5          Q    And was that before or after this

6    call?

7          A    That was after the call.

8          Q    Okay.  When would you say this was,

9    this meeting?

10         A    It was in November of last year, after

11   the general.

12         Q    Okay.  Do you have a sense of how long

13   after the call the meeting took place, how many

14   days or weeks?

15         A    I do not.  I do not.  It wasn't long.

16         Q    Okay.  This was at Mr. Williams' place

17   of business?

18         A    Yes.

19         Q    Who else was involved in this meeting?

20         A    It was myself, it was Mr. Ron Johnson,

21   Mark Williams, and another gentleman that I can't

22   recall his name.

Page 19

1          Q    Okay.  And what did you guys discuss?

2          A    Just he explained that -- what they

3    were doing -- what they were trying to do, and

4    that under Georgia law, it provided for voter

5    challenges from individuals, and that's what was

6    discussed.

7          Q    Can you elaborate more on what they

8    said they were trying to do?

9          A    They had identified voters that had

10   moved through the National Change of Address

11   Registry that was most likely non-qualified voters

12   to vote in the Georgia election, and if we could

13   help identify people that would be willing to

14   challenge these voters that were identified.

15         Q    So who at the meeting gave you this

16   advice or discussed the National Change of Address

17   Registry?

18         A    I can't remember his name.

19         Q    That was the one other person who was

20   there that --

21         A    Yes.

22         Q    Okay.  And no one from True the Vote

Page 20

1    was at this meeting?

2          A     The gentleman was, but I can't

3    remember his name.

4          Q     Okay.  Okay, give me one second here.

5                So turning back for a second here to

6    the call that you received from Mr. Williams.

7                Did you know him beforehand, before

8    that call was placed to you?

9          A     Yes, sir.  Mark and I have been doing

10   business together for years.

11         Q     And is the business your personal

12   trucking business, or the Georgia

13   Vice President -- sorry, Vice Chair role?

14         A     He does all of my printing for the

15   trucking business.  And anything that I have

16   printed, Mr. Williams prints.

17         Q     Okay.  Did he explain to you on this

18   call or during the meeting how he was associated

19   with True the Vote, or whether he was?

20         A     No, sir.

21         Q     Okay.  At this meeting or on this call

22   with Mr. Williams, when they discussed the -- I'll

Page 21

1    refer to it as the "NCOA," the National Change of

2    Address Registry -- did they describe how they --

3    whether they did any research to identify the

4    voters that were on the NCOA Registry?

5          A    I honestly do not recall everything

6    that was discussed in the meetings.

7          Q    Sure.  Are there any documents that we

8    could -- that you know of or that someone else

9    might have that might help refresh your memory?

10         A    No, sir, there was no documents at the

11   meeting.

12         Q    You didn't take any -- there were no

13   meeting notes that were produced after the meeting

14   to discuss what was --

15         A    No, sir.

16         Q    Okay.  Did anyone at the meeting

17   explain how they -- sort of why they decided to

18   use the NCOA Registry for the voter challenges?

19         A    Not that I recall.

20         Q    Okay.  Did you know what the NCOA was

21   before this meeting?

22         A    National Change of Address Registry?

Page 22

1    Yes.

2          Q     Okay.  How did you know about it?

3          A     I'm not sure that I understand your

4    question there.

5          Q     Sure.  Have you used it yourself

6    before?

7          A     No, sir.

8          Q     No.  Did you know other people who

9    have been placed on the registry before?

10         A     The change of address?

11         Q     Yes, sir.

12         A     Yes.  When I moved here to Walton

13   County, I had to change my address.

14         Q     Okay.  So you were familiar with it

15   because you had been placed on it yourself at one

16   point in time?

17         A     Yes.

18         Q     In that process of yourself using the

19   NCOA, what did you have to do to get on the

20   registry?

21         A     I do not recall.

22         Q     And when was this that you -- you said

Page 23

1    when you moved to Walton County is when you would

2    have used this, the registry?

3           A     When my parents moved to Walton

4    County, all of our mail had to be forwarded.

5           Q     And when was this?

6           A     That would have been in '98.

7           Q     '98, okay.

8                 Had you read anything about the NCOA,

9    or otherwise discussed it with anybody, before

10   this meeting that you had that Mark Williams

11   invited you to?

12          A     I'm sorry, I started to answer before

13   you was finished, so I cut you off.

14                Could you repeat the question?

15          Q     Sure.  Before this meeting with

16   Mark Williams, had you discussed the NCOA or read

17   anything about it with regards the 2020 and 2021

18   elections?

19          A     Had I read anything about the National

20   Change of Address before this election?  Is that

21   the question?

22          Q     Yes, sir.

Page 24

1          A     No, sir.

2          Q     No.

3                MR. BOPP:  Jim, if you would not

4     rephrase his question.  Just let him ask a

5     question.  You're not to be asking questions of

6     yourself.  So if you don't understand the

7     question, just ask him to restate it.

8                BY MR. RAMIREZ:

9          Q     Okay, Mr. Cooper, why did you get

10    involved with True the Vote's Georgia challenges?

11         A     I'd like to consult the attorney on

12    that, please, before I answer.

13                MR. RAMIREZ:  Mr. Bopp, I think you're

14    on mute.

15                MR. BOPP:  I'm sorry.  We will unmute

16    and stop the video, and then we will talk by

17    cell phone, and then we will be back in a moment.

18                MR. RAMIREZ:  You cut off again,

19    Mr. Bopp.

20                MR. BOPP:  So we will be back in a

21    moment.  Sorry about that, Joel.

22                MR. RAMIREZ:  Okay.  Five minutes?

Page 25

1                MR. BOPP:  Or less.  Just as soon as

2      the call is done, we'll be back, okay?

3                MR. RAMIREZ:  Okay, sounds good.

4                MR. BOPP:  Thank you.

5                THE VIDEOGRAPHER:  Off the record?

6                The time is 9:21 a.m.  Off the record.

7                (A break was taken for the witness

8                 to consult with counsel.)

9                THE VIDEOGRAPHER:  The time is

10     9:24 a.m.  Back on the record.

11                BY MR. RAMIREZ:

12          Q    All right, thank you.

13                So Mr. Cooper, I had just asked you

14     why did you get involved with True the Vote's

15     Georgia elector challenges?

16          A    Because I believe there was fraud in

17     the November 3rd general election.

18          Q    And why did you believe that?

19          A    It is just the -- it is -- I mean, to

20     me, it's very clear in my gut that there was fraud

21     in that election.

22          Q    So what sorts of information did you

Page 26

1   use to develop this belief?

2        A    There's publications out there from

3   places that show voters that have voted that no

4   longer live in the state of Georgia.

5             There's just been a multiple -- I

6   mean, I can't recall all the places that I have

7   been able to pull information from over that

8   period of time, but in my gut, I believe there was

9   fraud in the state of Georgia.

10       Q    Okay.  And just to clarify then, these

11  things that you read about the people who no

12  longer live in the state of Georgia, none of these

13  sources contained any discussion of the NCOA?

14       A    I couldn't recall that specifically.

15  I mean, this was last November.

16       Q    Okay.  Did Mr. Williams know that you

17  held this belief?

18       A    I do not know the answer to that.

19       Q    Do you have a sense of why he called

20  you then to invite you to this meeting to discuss

21  the Georgia elector challenges?

22       A    As I had said earlier, we worked -- we

Page 27

1    have used each other's services for many years.

2    We are members of the Republican Party here in

3    Georgia, we have a long-standing relationship, and

4    most of the time we tend to agree.

5          Q    Before getting involved with the

6    True the Vote's Georgia elector challenges, were

7    you acquainted with any of the challengers that

8    ultimately submitted changes through

9    True the Vote?

10         A    Some.

11         Q    Some.  How did you know them?

12         A    You would have to ask specifically --

13   I mean, some of them were county chairs, some of

14   them I knew through the party, some of them I did

15   not know.

16         Q    Okay.  Any of these people that you

17   just referenced, had you worked with any of them

18   on elections or political matters before?

19         A    Political matters, some of them, yes.

20         Q    Are those were the county chairs?

21         A    Correct.

22         Q    And what sorts of political matters,

Page 28

1   just a list that you can give?

2          A    Well, there would be nothing in

3   particular.  As a 3rd Vice Chair, I'm in and out

4   of counties within our district, and just talking

5   in general to the county chairs and the members of

6   their party.  No specific work relation there,

7   unless I actually had organized their county

8   during that time.

9          Q    Got it.  So for any of the challengers

10  that you ended up recruiting, did you discuss with

11  them what the challenges were based on?

12         A    Based on the National Change of

13  Address Registry.  Some I talked to, some I didn't

14  talk to.  Everything I did was virtually through

15  email, which y'all have a record of.

16         Q    All right.  So when you say

17  "talked to" then, do you mean email, or do you

18  mean also on the phone or text?

19         A    Well, I would make -- I would -- it

20  just depends on who it was.  You know, there was

21  text messages, there was emails, there were some

22  phone calls.  I mean, I can't recall who and when

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 29

1   and where.

2          Q     Okay, but you said it depends on who

3   it was.  Were there certain people in particular,

4   then, that you chose to call as opposed to email?

5          A     There were -- there were -- there

6   were -- if I had an email address, I emailed.  If

7   I didn't have an email address and could get a

8   phone number, I would talk.

9          Q     And how did you have this information,

10  either the email or the phone, beforehand?

11         A     Emails typically were people that I

12  already knew, or either were sent through a mutual

13  contact.

14         Q     And phones?

15         A     Phones were people that I already

16  knew; or they would forward emails out that had my

17  contact on it, they'd call me.

18         Q     Okay.  And who are these mutual

19  contacts that connected you with some of the

20  challengers?

21         A     County party chairmen, people just I

22  know in general.  I can't recall specific

Page 30

1   individual names.

2          Q     When you say county party chairman, do

3   you mean one county in particular, or several

4   counties?

5          A     No, there would be -- like I would

6   send -- I would send an email, and basically they

7   would forward it.

8          Q     I'm sorry, can you repeat that last

9   part?

10         A     When I would send emails sometimes,

11  the people would forward the email.

12         Q     And you're talking about county chairs

13  specific here?  If you sent them an email, they

14  would forward it?

15         A     I don't -- no, not all the county

16  chairs would forward the email.

17         Q     Okay.  But some of them did?

18         A     Some.  Yes, I would think some of them

19  did.

20         Q     Okay.  You don't know for sure?

21         A     I do not know for sure.

22         Q     Did any of these county chairs that

Page 31

1    you emailed, did you have any sort of

2    correspondence with them about the email that you

3    had sent, or any calls, any sort of subsequent

4    communication?

5          A    I don't recall.  All my emails were

6    turned over.

7          Q    All of them?

8          A    Yes, sir.

9          Q    Okay.  So sometimes there were no

10   responses to the emails?

11         A    Right.

12         Q    Okay, so it's a good time to ask this

13   then.  So just generally speaking, what was your

14   role in True the Vote's Georgia elector

15   challenges?

16         A    To attempt to recruit people to

17   challenge the voters in the county.

18         Q    And were any of the challengers that

19   you recruited suggested to you?

20         A    I don't recall if any were actually

21   suggested.

22         Q    I believe you mentioned -- did you

Page 32

1    know all of the people that you reached out to

2    recruit?

3          A    No, sir.

4          Q    No.  The ones you did know, other than

5    the county chairs, we discussed that part, but

6    other challengers, how did you know them?

7          A    Some through the party, some just

8    acquaintances.  Some would be party members, some

9    would be just general acquaintances.

10          Q    All right.  And did you work with

11    anyone else to recruit challengers?

12          A    Me personally, did I work with anyone

13    to recruit challengers?  Is that the question?

14          Q    Yes, sir.

15          A    I'm sorry.

16               MR. BOPP:  Yeah.  Jim, if you don't

17    understand the question, don't rephrase it, just

18    tell him you don't understand the question.  He'll

19    be happy to rephrase it so you'll know what it is.

20               THE WITNESS:  So could you rephrase

21    the question for me, please, sir?

22

Page 33

```
 1            BY MR. RAMIREZ:

 2       Q    Surely, sure.

 3            So when you were recruiting

 4   challengers, were you doing that solo?  Were you

 5   doing that with any other people?

 6       A    Myself and Ron Johnson were recruiting

 7   challengers.

 8       Q    Okay.  Like separately at the same

 9   time, or together?

10       A    Separately at the same time.

11       Q    Okay, got it.

12       A    He took basically North Georgia, I

13   took South Georgia.

14       Q    Got it.  And over what period of time

15   did you recruit challengers for the

16   True the Vote's voter challenge effort?

17       A    I don't recall the exact amount of

18   time.

19       Q    Do you have a general sense that you

20   can give me?

21       A    A week and a half to two weeks.

22       Q    Yeah, so end state, start date, if you
```

Page 34

1    can recall?

2          A    I can't recall exact dates.

3          Q    Generally, would the start be before

4    or after the general election?

5          A    It was after the general election.

6          Q    Okay.  And the end dates -- let's see,

7    two or three weeks.  Would that be before or after

8    Christmas?

9          A    It was before Christmas.

10         Q    Before Christmas.

11              You didn't recruit anyone after

12    Christmas?

13         A    No, sir.

14         Q    Okay.  And, Kenzie, are you my

15    hot seater?

16              THE VIDEOGRAPHER:  Yes, I am.

17              MR. RAMIREZ:  Okay.  If we could pull

18    up Tab 1 and mark it as Exhibit 1.

19              (Cooper Exhibit 1 was marked

20               for identification.)

21              BY MR. RAMIREZ:

22         Q    Okay, can you see this, Mr. Cooper?

Page 35

1          A     Yes, sir.

2          Q     And the font might be a little small

3     for you, it is on my screen, but hopefully you can

4     read it.

5                Kenzie, is there a way to scroll

6     between the pages?

7                THE VIDEOGRAPHER:  Yeah.  Do you want

8     side by side, or just one by one?

9                MR. RAMIREZ:  Let's see it side by

10    side, see if it's too small, if that works.

11               MR. BOPP:  I'm sorry, but that is very

12    difficult for me to see.  It's just too small.

13               MR. RAMIREZ:  Can we make it bigger,

14    Kenzie?  And if we can't, then let's go back to

15    one page and make it larger, and then we can

16    scroll.

17               THE VIDEOGRAPHER:  I can make one at a

18    time bigger, if that's what you want.  You want to

19    go back to one page?

20               MR. RAMIREZ:  I think that looks good.

21               Can you see that, Mr. Bopp?

22               MR. BOPP:  I can, thank you.

Page 36

```
 1              MR. RAMIREZ:  Mr. Cooper, can you see

 2     that?

 3              THE WITNESS:  Yes, sir.

 4              BY MR. RAMIREZ:

 5         Q    Okay.  So, Mr. Cooper, do you

 6     recognize this email?

 7         A    I do.

 8         Q    Did you write this email?

 9         A    I did.

10         Q    And to whom did you send it?

11         A    This was generic that I sent out to

12     the people that I had the email contact

13     information for; that would have been to some

14     county chairs, I believe, and general

15     acquaintances and whatnot, as I could obtain email

16     addresses.

17         Q    And this list of people to whom you

18     sent it, that list you developed yourself?  You

19     did not have anyone suggest names to whom to send

20     this email?

21         A    The state party had a PDF -- not a

22     PDF, an Excel spreadsheet on the state website
```

Page 37

1    that was a list of the county chairs.  That had

2    contact information for all the county chairs, and

3    I used that as a resource.

4         Q    All right.  So I know we covered this

5    to some extent, but I don't think I've asked this

6    specific question.

7              This particular email, did you know

8    every person to whom you sent it?

9         A    No.

10        Q    The people you did not know to whom

11   you sent it, how did you obtain their contact

12   information?

13        A    Most of the ones that got this that I

14   did not know were on the state website as county

15   party chairmen.

16        Q    And the people you did know, these

17   were affiliates of yours either through the

18   party or through personal connection?

19        A    Yes, sir.

20        Q    Did you know whether each person to

21   whom you sent this email was a registered Georgia

22   voter?

Page 38

1        A    Yes, sir.  As far as the county, to

2    hold a county party office or a state party

3    office, you're required to be a Georgia voter, so

4    I did know that they were all registered voters.

5             And my acquaintances that were sent

6    this, yes, I knew they were registered voters.

7        Q    Got it.  One second.

8             Kenzie, can we see the higher part of

9    this email where it says To and From and that

10   information?  Awesome, thank you.

11            Okay, just to clarify, Mr. Cooper,

12   your email address there, does ".gop" stand for

13   Republican party?

14       A    No, sir, that's a personal gmail

15   address that I used when I was -- when I got

16   elected as the 3rd Vice Chair, I created that to

17   keep my business and my activity politically

18   separate.

19       Q    Okay.  So what does GOP stand for in

20   the email address?

21       A    Grand Old Party.

22       Q    Sorry, can you repeat that?

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 39

1           A     Grand Old Party.

2           Q     Grand Old Party.

3                 And this is your personal email then?

4           A     Yes, sir.

5           Q     Okay.  And you said you -- what's the

6      word -- started this email address when you were

7      elected as 3rd Vice Chair, but you kept it after

8      you finished your services?

9           A     Yes.

10          Q     Okay.  When you started the email

11     while you were 3rd Vice Chair, was this a personal

12     address or a business related address?

13          A     No.  I started that when I was elected

14     3rd Vice Chair -- actually, let me correct that.

15                I started that email address when I

16     was running for 3rd Vice Chair.

17          Q     Okay.  And up until the time when you

18     concluded your services for 3rd Vice Chair, did

19     this email serve to collect your personal

20     correspondence, or correspondence related to your

21     position as 3rd Vice Chair?

22          A     Other personal correspondence and,

Page 40

1    you know, party correspondence as well.

2          Q    Okay.  Would you say that every person

3    to whom you sent this email in this exhibit was a

4    registered Republican voter?

5          A    Could you rephrase?  Could you restate

6    the question, please?

7          Q    Sure.  Actually, it might be easier

8    to -- Kenzie, can we take down the blowup?

9    Thanks.  So now you can see the whole email again,

10   Mr. Cooper.

11              My question was, this email that you

12   sent, was it sent only to registered Republican

13   voters?

14         A    I can't confirm that.

15         Q    Okay.  You knew that every person to

16   whom you sent the email was a registered Georgia

17   voter; is that correct?

18         A    The people I sent the email to, I did

19   not confirm they were a registered voter, but if

20   they're on our state's list as county chair,

21   they're required to be -- one of the requirements

22   to hold an elected office in the Georgia

Page 41

1    Republican Party is to be a registered voter in

2    the county in which you reside.

3          Q    Okay.  So then is it fair to say that

4    every person to whom you sent this list -- sorry,

5    every person to whom you sent this email that

6    appeared on that list, all those people would have

7    to be registered Republican voters in Georgia?

8          A    I'm not sure that I'm understanding

9    exactly what you're asking, sir.

10          Q    Okay, I can rephrase.

11               So you stated that the one requirement

12    to be on this state list you have for the Georgia

13    Republican Party, to be on that list, you have to

14    be a registered voter in Georgia; is that correct?

15          A    Yes.  To be a county party officer or

16    a state party officer, you have to be a registered

17    voter in the county in which you reside.

18          Q    Okay.  So is it fair to say then, on

19    that list in particular, all those registered

20    voters are registered Republican voters?

21          A    In the --

22          Q    In Georgia.

Page 42

1          A     Georgia is an open primary state.  I

2     don't know if they're registered Republican or

3     not.

4          Q     Okay.  Helpful, thank you.

5                People not on the list that you knew

6     through personal connections, I want to clarify

7     that's the case.

8                If you sent an email to someone -- if

9     you sent this email to someone, and that person's

10    name wasn't on this state county list, you knew

11    about that person because you knew them

12    personally; is that correct?

13         A     Yes, unless this was forwarded to

14    someone from someone else.

15         Q     Right, right.  So anyone to whom you

16    sent this email that wasn't on the list, did you

17    know whether those people were registered

18    Republican voters in Georgia?

19         A     I couldn't confirm that, no.

20         Q     Okay.  This email that you sent -- and

21    I'm sure you can see it, it's the bottom of this

22    chain of emails in this exhibit.

Page 43

1        A    Mm-hmm.

2        Q    Is that the first contact you had with

3   each of the prospective challengers that you

4   recruited or attempted to recruit?

5        A    The initial email -- that would be the

6   initial email that I would send, yes.

7        Q    Any person to whom you sent the email,

8   did you have any prior contact with them about the

9   Georgia elector challenges?

10       A    There were some that I only had a

11  phone number for that I had to call to get an

12  email address.

13       Q    Okay.  And in those conversations, did

14  you discuss the elector challenges at all?

15       A    Basically I would outline what we was

16  doing, just like this initial email, and then get

17  the email address and send them the email.

18       Q    Okay.  Did you have a script for any

19  of these calls?

20       A    Basically you're looking at the

21  script.

22       Q    Okay.  Other than the people who

Page 44

1    forwarded this email, and other than yourself, did

2    anyone else send this email to prospective

3    challengers?

4          A     I do not know the answer to that.

5          Q     How many people replied to your email?

6          A     I couldn't recall the answer to that.

7          Q     I'm sorry, just making sure you were

8    finished.

9                Is there a tracker or perhaps a

10   document that would help refresh your memory on

11   that topic?

12         A     I'm sorry?

13         Q     If you can't recall, is there a

14   tracker or is there a document that would help

15   refresh your memory on that topic, the number of

16   people that responded to this email?

17         A     I mean, I turned over all of the

18   emails that I had.

19         Q     Did anyone call or text you in

20   response to receiving this email?

21         A     I do not recall.  I mean, I don't -- I

22   simply just don't remember.

Page 45

1          Q     Okay.   Then maybe a more useful

2     question would be, after you sent this email, sort

3     of what happened next as part of your recruitment

4     process?

5          A     When I sent this email, if they

6     replied -- if they replied back that they wanted

7     to challenge, I would then forward the email to --

8     oh, my goodness, I can't recall all of the emails,

9     but it was a group of emails.  One was to

10    Mark Williams, one was -- I mean, I'd cc

11    Mark Williams in sending it.

12               Because what I'd do is, once they sent

13    in what True the Vote needed as far as their

14    voter ID, their signature, and statement that they

15    could -- you know, they would challenge the voters

16    or the electors in their county, I would then

17    forward that back to Mark Williams, Ron Johnson,

18    Catherine, there was two other gentlemen, and Amy,

19    a lady named Amy, and I believe that was it.

20               So if they replied back to it with

21    permission, I would forward or send their reply,

22    the whole chain, to that group of individuals.

Page 46

```
1          Q     Is that Amy Holsworth at

2    True the Vote?

3          A     Yes, sir.  Yes, sir, that's correct.

4          Q     How many -- and I know it's been a

5    while, so you may not remember the specific

6    numbers, but sort of generally.

7                When you got responses to this email,

8    how many people gave permission to be challengers

9    or refused?  Do you have a sense of those two

10   groups?

11         A     I honestly couldn't recall.

12         Q     Did more people agree to be

13   challengers than refused?

14         A     I really couldn't -- I really couldn't

15   recall that.  I just -- I didn't have anyone

16   straight out say no.  I had some that preferred

17   not to because of their position in the county.

18         Q     So no one you emailed -- you sent this

19   email -- let me rephrase that.

20                Anyone you sent this email to who

21   refused, did they give reasons for why?

22         A     No, not really, not that I recall.
```

Page 47

```
 1        Q    Just the ones who said they couldn't
 2   because they were -- because of their position in
 3   the county?
 4        A    Right.  Some county chairs passed it
 5   on because they didn't want to do it themselves.
 6        Q    Okay.  And why didn't they want to do
 7   it themselves?
 8        A    They felt like it -- some of them felt
 9   like -- well, I mean, I would be assuming things
10   here.  I can't really answer that.
11        Q    Well, my question is did they tell
12   you?  Did they communicate with you in the emails
13   where they refused, did they say why?  Did they
14   tell you why they didn't want to?
15        A    I don't -- I don't recall the emails,
16   to be honest with you.  I mean, this was in
17   November and Dec- -- this was in December.  I
18   mean, this has been almost 10 months ago now or
19   so, so it would be -- I'm sorry, I don't recall.
20             MR. BOPP:  Joel, can we take a short
21   break?  I need one.  Say for five minutes?
22             MR. RAMIREZ:  Yeah, that sounds fine
```

Page 48

1    to me.

2              MR. BOPP:  Okay, thank you.

3    Appreciate you accommodating me.

4              MR. RAMIREZ:  Of course.

5              THE VIDEOGRAPHER:  Are we going off

6    the record?

7              MR. BOPP:  Yes, please.

8              THE VIDEOGRAPHER:  Okay.  The time is

9    9:52 a.m.  Off the record.

10             (A break was taken.)

11             THE VIDEOGRAPHER:  The time is

12   10:00 a.m.  Back on the record.

13             BY MR. RAMIREZ:

14        Q    Kenzie, can we pull the Exhibit 1 back

15   up, please?  Great, okay.

16             All right, Mr. Cooper, can you hear

17   me?  Can you see the exhibit?

18        A    Yes.

19        Q    Awesome.  All right.

20             Okay, so before we broke, we were

21   talking a little bit about this, and I want to

22   continue with this question.

Page 49

1          Did you maintain a list of the people

2     to whom you sent this email?

3          A    I did not maintain a list here.  There

4     was a shared -- a shared file with the other

5     individuals with True the Vote, Catherine and Amy

6     and Mark.  You know, everybody had a running total

7     of who was challenging in what county.

8          Q    Okay.  So did you maintain a list of

9     the people who responded to this email?

10         A    No, sir, I did not.

11         Q    And that information was not on this

12    shared document you referenced?

13         A    No, sir.  No, sir.

14         Q    Did you send either a list of the

15    names or each name as you sent this email to

16    Mark Williams?

17         A    All I would do is I would -- when I

18    got a response, I would forward the response back

19    to the individuals that I had referenced earlier

20    in the email chain.

21         Q    Got it.  And so you forwarded that to

22    Mark Williams?

Page 50

1          A     It was sent to Mark, Ron, Amy,

2     Catherine, and Ron Johnson.  And there were two

3     other names that I can't recall that I would cc

4     when we would get a response.

5          Q     Got it.  Do you have a sense of how

6     many challengers you recruited in total for the

7     elector challenges?

8          A     I don't recall how many I

9     challenged -- or recruited, no, sir.

10         Q     Were any challengers recruited by

11    someone other than you or Ron Johnson?

12         A     I do not know the answer to that.

13         Q     Okay.  So you mentioned that, after

14    you got a response, you would forward it.

15               Anything else -- did you do anything

16    else after you received a response to this email?

17         A     No, sir.

18         Q     So once you got their permission to be

19    a challenger, you forwarded that, and that was the

20    end of your involvement with the recruitment

21    process?

22         A     Yes, sir.

Page 51

1          Q    Okay.  Did you have any other

2    involvement with the people that you recruited?

3          A    I'm not sure that I understand what

4    you're asking.  Could you rephrase that?

5          Q    Sure.  After forwarding -- so someone

6    who gave permission to be a challenger, you would

7    then forward that permission to the people that

8    you mentioned.  After that, did you have any

9    subsequent communication with the challengers?

10         A    Not that I can recall, unless they

11   sent an email later.

12         Q    Okay.  None of them reached out to you

13   regarding their challenges, like the status of

14   their challenge?

15         A    If they did, I would forward it to Amy

16   and Catherine and them, so I really don't recall.

17         Q    Over what dates did you or

18   True the Vote submit the challenge letters

19   themselves?

20         A    I'm sorry, do what now?

21         Q    Submit the challenge letters

22   themselves.

Page 52

1            I asked you before the date range for

2    the recruitment effort, when you were recruiting,

3    so I'm asking now the date range over which the

4    actual challenges were submitted.

5         A    I'm not sure what you're asking me

6    there.

7         Q    Okay.  How were the challenges

8    submitted for each of the people you recruited?

9         A    I didn't submit the challenges, so I

10   really -- I can't answer that.  I don't know.

11        Q    So what information did the

12   prospective challengers send you?

13        A    They would send me what was -- what I

14   asked for in that email there.  We would ask -- I

15   would ask for their signature, a statement from

16   them stating that True the Vote had their

17   permission to challenge voters in their county

18   using their name, their voter ID number, and their

19   address.

20        Q    Okay, give me one moment.

21             Did you attach anything to this email

22   when you sent it to the people to whom you sent

Page 53

1   this email?

2        A    I don't remember.  I don't remember.

3        Q    Did you send -- for any of the people

4   to whom you sent this email, did you send them the

5   challenge letter you were asking their signature

6   for?

7        A    I don't recall if I did or not.

8        Q    So then you would have -- at least in

9   some situations, you would have been asking for

10  their signature, but they wouldn't have seen what

11  they were going to sign?

12       A    Ask that one more time.

13       Q    So does that mean that you were asking

14  these individuals for their signature, but you had

15  not sent them what they were going to sign?

16       A    Yes, in some cases -- in most cases.

17  I mean, I don't recall sending them an actual

18  letter.

19       Q    Okay.  Sort of generally speaking, and

20  for you, not for like True the Vote, but what was

21  your goal in helping to recruit challengers for

22  this challenge effort?

Page 54

1          A     To make sure our election for the

2     runoff in the senate was accurate and true.

3          Q     Would you say that the Georgia elector

4     challenges were successful?

5          A     I don't know if they were successful

6     or not.

7          Q     Do you think they accomplished your

8     goal?

9          A     I do not know the answer to that.

10          Q     Outside of the Defendants in this

11     case, did you discuss your recruitment work for

12     True the Vote with anyone else?

13          A     I'm sorry, do what now?

14          Q     So your recruitment work with

15     True the Vote in this case, did you discuss that

16     anyone other than Defendants in this case?

17          A     I'm going to turn my audio up here a

18     little bit more because I've got some background

19     noise out in the shop.

20               Could you say that one more time,

21     please, sir?

22          Q     Sure thing.

Page 55

1          So your recruitment work in this case

2     for True the Vote, other than the Defendants in

3     this case, did you discuss that with anyone else?

4          A    I'm unsure about what you're actually

5     asking.

6          Q    So you were involved in helping to

7     recruit challengers for True the Vote during the

8     runoff, right?  Is that correct?

9          A    Yes.

10         Q    Did you discuss that, your role in

11    recruiting challengers for this effort, did you

12    discuss that with anybody -- with anyone?

13         A    With the folks that I was trying to

14    recruit, yes.

15         Q    Okay.  And I assume also with the

16    other Defendants in this case?

17         A    Yes.

18         Q    Anyone else?

19         A    No, not that I'm aware of.

20         Q    Got it.  Okay, give me one moment.

21              Kenzie, can we take this one down and

22    pull up Tab 2 and mark it as Exhibit 2?

Page 56

1              (Cooper Exhibit 2 was marked

2               for identification.)

3              BY MR. RAMIREZ:

4         Q    So this one is a little bit longer.

5    It's a few pages.  Could we blow this up a bit,

6    just the whole page?  Is there a way to do that?

7    Yeah, great, okay.

8              Mr. Cooper, I'll give you a

9    few minutes here to look over this document.

10   There are a few pages here, so I'm not sure if you

11   can scroll.  Looks like I cannot, so, Kenzie, you

12   might have to do that for him.

13             Mr. Cooper, go ahead and review this

14   document, and let me know when you're ready.

15             THE VIDEOGRAPHER:  And you can just

16   let me know when you're done reading, and I'll

17   scroll down for you.

18             THE WITNESS:  Okay, this is starting

19   at the end.  Can we go to the beginning first?

20             THE VIDEOGRAPHER:  This is the last

21   page of this little bit, and then this is the next

22   to last.

Page 57

1           MR. BOPP:  You're going to have to

2    make that bigger because I can't possibly read

3    that.  I'm sorry.  Thank you.

4           THE WITNESS:  Okay, can we go to the

5    bottom of this, please?

6           (Witness reviewing Exhibit 2

7            on Zoom screen.)

8           THE VIDEOGRAPHER:  I believe this is

9    the first page.

10          MR. RAMIREZ:  That's right.

11          Okay, can we blow up the first half of

12   the page?  Yeah, above that, actually.  I want the

13   first email.  Yeah, thank you.

14          THE VIDEOGRAPHER:  You're welcome.

15          BY MR. RAMIREZ:

16   Q    Okay.  All right.

17          So Mr. Cooper, do you see where you've

18   written, "I have not updated any shared files with

19   the counties I have sent in"?

20   A    I have not updated -- I have not

21   updated any files with the counties I have sent

22   in, yes.

Page 58

1          Q     Yes.  So what are those shared files

2     that you're referring to?

3          A     That would be the -- that would be

4     that spreadsheet that was downloaded from the

5     state party's website that would go in, and if it

6     was the county chair that was going to challenge,

7     their information was already there.  And if it

8     was not the county chair, Amy would put in the

9     name of the person that was challenging.

10          Q     And what do you mean by the counties

11     that you have sent in?

12          A     Well, if you go in the order of this

13     email, you will have seen that I had Clarke,

14     Hancock, Dodge, and I don't recall the other

15     counties listed in the email at the beginning of

16     this, but none of those counties were updated, and

17     that's what this email was referring to.

18          Q     Okay.  So "sent in" refers to updating

19     the shared file?

20          A     Correct.

21          Q     Got it.  So this email dated

22     December 17 at 9:40 a.m., do you see that?

Page 59

1         A     Yes, sir.

2         Q     Okay.  By this time, had you finished

3    recruiting challengers for the Georgia elector

4    challenge?

5         A     I don't remember.

6         Q     Can we exit out of this, Kenzie?

7    Thanks.  And then let me see if we can see it.

8    Can we blow up the next email in this thread?

9              THE VIDEOGRAPHER:  Starting with "Good

10   morning everyone"?

11             MR. RAMIREZ:  Yeah.  Great, thank you.

12   Okay.

13             BY MR. RAMIREZ:

14        Q     Mr. Cooper, do you see where

15   this email from James Williams references

16   "final files"?

17        A     Let me move this out of the way so it

18   doesn't cover it up.  Yes.

19        Q     So what does that mean, "final files"?

20        A     I do not know exactly what "final

21   files" mean.  Mr. Williams was the one that was

22   doing the printing of the letters, so I really

Page 60

1    don't know what his final files would be -- would

2    mean.

3          Q     Does it perhaps mean the shared files

4    that you reference in the next email?

5          A     I do not know.

6          Q     Okay.  Did you send Mr. Williams any

7    information regarding the voter challenges after

8    he sent you this email?

9          A     I do not remember.

10          Q     Okay.  Can we take this one down,

11    Kenzie?  Thanks.  And can we actually pull this

12    one down and put Exhibit 1 back up?  Okay.

13               And then can we blow up the last piece

14    of this email where it says "On Wednesday," there

15    to the end?  Great, thanks.

16               Okay, Mr. Cooper, do you see where you

17    write we have identified over 500,000 people in

18    the state of Georgia?

19          A     Yes.

20          Q     How did you come up with that 500,000

21    number?

22          A     That is -- that is what in the meeting

Page 61

1    is what we was -- that's what we was told by

2    True the Vote.

3         Q    This is the meeting with

4    Mark Williams?

5         A    It was at Mark's business there, yes,

6    the initial meeting.

7         Q    Just to confirm, that's the meeting

8    you said that he invited you to on the phone?

9         A    Yes.

10        Q    Right, okay.

11             And you were told this information by

12   True the Vote at the meeting?

13        A    Yes.

14        Q    Okay.  Who at True the Vote told you

15   this information?

16        A    If you can take that down, the big

17   blowup here, the name was in the email there.  I

18   can't remember his name.

19        Q    Kenzie, can we take this down?

20        A    But he was there.

21             Okay, it's not in that email.

22        Q    Might be on the next page.  Can we go

Page 62

1    to the next page and blow that up?

2          A     No, that's not what I'm -- that's not

3    what I'm talking about.

4                The last page where it had, you know,

5    final files, or whatever you were questioning

6    about just a minute ago, had the gentleman's name.

7          Q     Okay.  Can we pull up Exhibit 2 again,

8    Kenzie?

9          A     Gregg Phillips.

10         Q     Gregg Phillips, okay.

11               So Gregg Phillips was at this meeting

12   and gave the 500,000 number?

13         A     It was over 500,000.  I don't remember

14   the exact number.

15         Q     Okay.  And did he say at this meeting

16   where he got that number from?

17         A     The National Change of Address and

18   other means of data collection is what we was

19   told.

20         Q     Okay.  Did he elaborate on what the

21   other means of data collection were?

22         A     No, sir.

Page 63

1        Q    Okay.  Did you have any role in

2    identifying the voters who comprised that 500,000

3    number?

4        A    No.

5        Q    No, okay.  Did Gregg Phillips indicate

6    who had a role in coming up with that number?

7        A    No.

8        Q    Whose idea was it to use the NCOA to

9    create the challenge list?

10       A    I do not know.

11       Q    Gregg Phillips didn't say that it was

12   his idea?

13       A    Not to my recollection.

14       Q    Okay.  Did you submit a voter

15   challenge yourself?

16       A    No, sir.

17       Q    No, okay.  Can I ask why not?

18       A    Sure.  I was willing to do the one

19   here in Walton County, which is my county of

20   residence, but there was another lady that had

21   found out that I was recruiting, and she wanted to

22   do it.

Page 64

1        Q    Okay.  Where are we here?

2             Kenzie, can we put Exhibit 1 back on,

3    please?  Thank you.  And go to the next page.

4    Maybe it's the first page.

5             Okay, in the third paragraph,

6    Mr. Cooper, do you see where it says that

7    "True the Vote has assured me that the list they

8    are challenging is 99.9% likely to be incorrectly

9    registered"?

10        A    Let me move -- let me move the picture

11   of y'all because you're -- let me figure out how

12   to do this.

13             (Discussion off the record regarding

14              Zoom settings.)

15             THE WITNESS:  Okay, now what was the

16   question again?

17             MR. RAMIREZ:  Actually, was that you,

18   Dawn?  Can you repeat that?  Because that would be

19   helpful for me too.

20             (Discussion held off the record.)

21             BY MR. RAMIREZ:

22        Q    Okay, so my question was -- it's

Page 65

1    highlighted now.  Do you see where it says that

2    True the Vote assured you that the list they were

3    challenging is 99.9% likely -- the people on the

4    list are 99.9% likely to be incorrectly

5    registered?

6         A    Correct.

7         Q    Okay.  Can you explain what you mean

8    by that statement?

9         A    Exactly what that statement says.  I

10   was assured by True the Vote that their

11   challenges, based on the National Change of

12   Address and the other data that they was able to

13   use, was going to be 99.9% correct.

14        Q    And who assured you?

15        A    That would have been in that meeting

16   with the gentleman that we went back to that last

17   email.

18        Q    Right.

19        A    And in that same meeting, I failed to

20   mention earlier that Catherine was present by a

21   conference call at that meeting as well.

22        Q    Okay, got it.

Page 66

1             So was it Ms. Engelbrecht then -- or I

2    believe you're referring to Mr. Phillips?

3         A    Yes, Mr. Phillips.

4         Q    Okay.  So was it Mr. Phillips or

5    Ms. Engelbrecht, both of them, neither of them,

6    who assured you that the list was 99.9% likely to

7    be accurate?

8         A    Mr. Phillips.

9         Q    Mr. Phillips did.

10            And how did he assure you of this?

11        A    He just said that he -- you know, he

12   was 99% that -- he assured me that they're 99%

13   certain of their accuracy and this list.

14        Q    Did he say whether he had checked the

15   accuracy of the list?

16        A    I don't recall on that specific

17   discussion.

18        Q    Okay.  Did anyone at True the Vote

19   ever tell you before or after that meeting that

20   they had checked the accuracy of the list?

21        A    They had told me that they were

22   checking the accuracy of the list by canvassing.

Page 67

1                    Did we freeze?

2          Q    No.  The last thing I heard was

3    canvassing.

4          A    I was told that they was checking --

5    you know, confirming the accuracy by canvassing.

6          Q    Can you explain what that means,

7    canvassing?

8          A    Going and asking if the individual

9    lived at the residence is what I would assume.

10         Q    Sorry, can you repeat that, please?

11         A    My assumption is that canvassing would

12   be going to knock on the door and asking if the

13   voter lives there.

14         Q    These are the challenge voters you're

15   referring to?

16         A    Yes.

17         Q    Okay.  And who was involved with the

18   canvassing?

19         A    I do not know.

20         Q    That's a lot of doors to knock on,

21   500,000.  Are you saying that they canvassed a

22   half a million voters?

Page 68

1          A     No, sir.

2          Q     Okay.  So were they canvassing in

3     particular areas?

4          A     I do not know.

5          Q     Did you yourself ever check the

6     accuracy of the list?

7          A     No.

8          Q     Okay.  Did you canvass any of the

9     voters, either the prospective challengers or the

10    challenged voters?

11         A     I did check one here in Walton County,

12    which is my neighbor.

13         Q     And who is that?

14         A     Ms. Brown.  She moved, her and her

15    husband moved to North Georgia.  She was still on

16    the rolls here in Walton County.  They had been

17    moved for over six months, and she was still on

18    our list here in Walton County, but Mr. Brown was

19    not.

20         Q     And this is a different person than

21    the woman you mentioned that was bringing the

22    challenges in Walton County?

Page 69

1      A    Correct.  This was a neighbor of mine

2  that had moved that I knew was on the list from

3  True the Vote, and when I was scrolling through, I

4  came across her, and I knew she had moved.  She

5  had moved six months prior, or even longer than

6  that, and she was still registered here in

7  Walton County.

8      Q    Okay.  So scrolling the list, is that

9  the list that True the Vote provided?

10     A    Yes, it was the Walton County list.

11     Q    Okay.  Were the lists separate by

12  county then?

13     A    I don't know.

14     Q    This list you were scrolling, did it

15  only have Walton County people on it, or did it

16  have all the voters that were planning to be

17  challenged?

18     A    The list that I was scrolling had

19  Walton County on it.

20     Q    Okay.  So then you saw the list of

21  names of people that were going to be challenged

22  in Walton County?

Page 70

1          A    Yes.

2          Q    And was that because you were

3    recruiting a challenger for Walton County?

4          A    It was because I was curious.

5          Q    Okay.  Did you look at any lists for

6    any counties other than Walton?

7          A    I did send out one other list of a

8    challenger that requested to see the list before

9    he agreed to challenge.

10         Q    And who was that?

11         A    Taliaferro County, Mr. Jim Martin.

12         Q    Got it, okay.

13              So Mr. Martin had responded -- did he

14   respond to your email?  Did you email him?

15         A    Yes.

16         Q    Okay.  And did he respond with

17   questions about the challenge, the elector

18   challenges?

19         A    I believe so.  I don't recall the

20   exact email list.

21         Q    Okay.  Did anyone else ask questions

22   about the challenges?

Page 71

```
 1          A     Not that I recall.

 2          Q     Okay.  So when you looked at the

 3     Walton challenge list, does that mean that you

 4     knew the number -- the number of voters that were

 5     going to be challenged in Walton County?

 6          A     Yes, I did.

 7          Q     Did you communicate that information

 8     to the Walton challenger?

 9          A     I did.

10          Q     Okay.  Did she ask for that

11     information?

12          A     I do not remember.

13          Q     How did you communicate that to her?

14     Was it email from --

15          A     That I don't recall.

16          Q     But it wasn't in your initial email,

17     the Exhibit 1 email?

18          A     No, sir.

19          Q     Okay.

20          A     Not that -- not that I recall, not

21     on -- most of the emails that I sent out

22     originally started just as what is up on this
```

Page 72

1    screen right here.

2          Q    Okay.  So at least for the Walton

3    challenger, you emailed her or called her after

4    this email to communicate to her the number of

5    voters that would be challenged in Walton County?

6          A    I don't know if it was in an email or

7    if it was in a phone call.

8          Q    But it was after you sent this initial

9    email?

10         A    Yes.

11         Q    Okay.  Did you have any similar

12   correspondence with other challengers after

13   sending the initial email?

14         A    I don't remember.

15         Q    Well, other than Joe Martin, I assumed

16   that happened after the email was sent?

17         A    What's that now?

18         Q    Joe Martin, though, did you have that

19   correspondence you discussed with Joe Martin after

20   sending this initial email to him?

21         A    I don't know.  Joe Martin's

22   correspondence was in emails.

Page 73

```
 1          Q    Okay.  You never called him?

 2          A    I didn't call him, I don't believe.

 3     Honestly, I couldn't -- I couldn't swear to that.

 4     I really can't remember.

 5          Q    Okay.  All right, Kenzie, can we take

 6     this one down and put up Tab 3 and mark it as

 7     Exhibit 3?

 8               (Cooper Exhibit 3 was marked

 9                for identification.)

10               BY MR. RAMIREZ:

11          Q    How are you doing, Mr. Cooper?  Do you

12     need a break, or we're doing good?

13          A    I'm good.

14          Q    All right, great.  Okay, let's see if

15     we can blow this up.  Is this just one page?  Two

16     pages.

17               THE VIDEOGRAPHER:  Do you want side by

18     side again, or just pull up the first one?

19               MR. RAMIREZ:  Can we blow up the

20     second one, actually.

21               THE VIDEOGRAPHER:  Okay.

22               MR. RAMIREZ:  Great, okay.
```

Page 74

1          BY MR. RAMIREZ:

2          Q    Okay, so Mr. Cooper, the last

3    paragraph, I suppose, of the last email that

4    starts "Another question," do you see that?

5          A    Which -- you're talking about the

6    bottom one, the one that I sent, or the top one

7    where it says, "Mark, can you extract the names

8    for this request?"

9          Q    The bottom one.

10         A    Yes.

11         Q    Okay.  This is another question that

12   you refer to in that paragraph that you're getting

13   from folks.  How are you getting that question?

14   How are they communicating with you?

15         A    This was in reference to Mr. Martin

16   there in Taliaferro County wanting to see the list

17   of names before he agreed to challenge.

18         Q    Just him?

19         A    Yes, sir.

20         Q    Okay.  And you say afterwards --

21         A    Yeah, I went ahead and read that.  Go

22   ahead and ask your question.

Page 75

1          Q     Yeah.  So what does that mean,

2     "afterwards"?  After what?

3          A     I was -- I had some people ask if they

4     could get the list that they challenged after the

5     challenges were made so that they would know if

6     they was to be asked a question who they had

7     challenged.

8          Q     How many people about would you say

9     asked you for this afterwards?

10         A     I don't know the exact number of

11    people that had asked.

12         Q     Ballpark figure?

13         A     Maybe three or four.

14         Q     Okay.  So then for those three or four

15    people, does that mean that the challenges were

16    submitted in their names before they saw the

17    lists?

18         A     Yes.

19         Q     Was that true of all the people you

20    recruited?

21         A     No.  Mr. Martin wanted to see the list

22    before he agreed to challenge.

Page 76

1        Q     Right.  And is he the only one that

2   actually saw the list before submitting

3   challenges?

4        A     To the best of my memory, yes.

5        Q     Okay.  So this first paragraph in the

6   email you sent, "I have one chair in the 10th,"

7   that refers to Mr. Martin?

8        A     Yes, sir.

9        Q     Okay.  And forgive me if this is a

10  stupid question, but what is he the chair of?

11       A     Taliaferro County Republican Party.

12       Q     Okay.  Which is in the 10th --

13       A     10th Congressional District.

14       Q     Okay, got it.

15             And did you know Mr. Martin previously

16  before communicating with him about the Georgia

17  elector challenges?

18       A     I did.

19       Q     How did you know him?

20       A     I was the 3rd Vice Chair of the

21  10th District, and he was the Chair in the

22  10th District.

Page 77

1          Q     Okay.  So does that mean he -- let me

2     just clarify.  I got a little confused.

3                I think you mentioned a Karen Sweeney,

4     is that correct, earlier?

5          A     Chairman Schwinn, Chairwomen Schwinn

6     was the Chair.

7          Q     She was the District Chair of the

8     10th?

9          A     She was the District Chair of the

10    10th.

11         Q     And Mr. Martin was?

12         A     He was the County Chairman of

13    Taliaferro County.

14         Q     Got it, okay.

15               When did you first contact Mr. Martin

16    about the Georgia elector challenges?

17         A     I do not recall the exact date.

18         Q     Was that initial outreach email that

19    we pulled up before in Exhibit 1, was that the

20    first contact you made, or did you contact him

21    before sending that email?

22         A     I don't recall, honestly.

Case 2:20-cv-00302-SCJ   Document 157-1   Filed 05/17/22   Page 78 of 149

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 78

1          Q    If you had contacted him, would it

2     have been by email or phone?

3          A    I don't recall how I contacted him

4     initially.

5          Q    Okay.  But your subsequent

6     communications with him, they were all email?

7          A    Yes, to the best of my recollection.

8          Q    When did Mr. Martin first ask you to

9     see the list of names that he was challenging?

10         A    I don't recall.

11         Q    So this email was dated December 16.

12              Do you see that?

13         A    Yes, sir.

14         Q    Is it fair to say that he asked you to

15    see the list of names before you sent this email?

16         A    Yes, sir.

17         Q    Okay.  This is at 3:25 p.m.

18              Kenzie, can we take this down for a

19    second and put Exhibit 1 back up?  And then can we

20    blow up the last email which starts "On

21    Wednesday"?  Okay.

22              Do you see the date on this email as

Page 79

1    well, Mr. Cooper?

2         A    Wednesday the 16th, mm-hmm.

3         Q    Yes, at 7:03:01 p.m.

4         A    Mm-hmm.

5         Q    This is the initial outreach email you

6    sent to all the people you recruited?

7         A    No.  I sent different emails different

8    days.

9         Q    Okay.  Was this the first one you had

10   sent?

11        A    I do not know.

12        Q    Okay.  Can we take this one down,

13   Kenzie, and put up Exhibit 3 again?  And the

14   second page, the last email again, starting on

15   December -- yeah, that works too, okay.

16             And do you see that date, Mr. Cooper,

17   on the last email, December 16th at 3:25 p.m.?

18        A    Yep.

19        Q    Okay.  So then does that mean that you

20   didn't send Exhibit 1 to Mr. Martin?

21        A    I don't know.

22        Q    Okay.  Do you recall when he asked you

Page 80

1    this question that you refer to in this email, do

2    you recall when he asked this question?

3         A    Do I recall when he asked the

4    question?

5         Q    Yeah, the one that you're referring to

6    in this email.

7         A    No, I don't recall when he asked the

8    question.

9         Q    Okay.  And you don't recall in what

10   form he asked it --

11        A    I do not.

12        Q    -- email or phone?  No?

13        A    I do not.

14        Q    Okay.  Kenzie, can we pull this one

15   down and put up Tab 4 and mark it as Exhibit 4?

16             (Cooper Exhibit 4 was marked

17              for identification.)

18             BY MR. RAMIREZ:

19        Q    I think that's the whole thing.  Can

20   we just pull up the message itself?

21             Okay, Mr. Cooper, do you recognize

22   this email?

Page 81

1          A     Yes, that was sent by Joe Martin.

2          Q     Okay, great.  Who were the people cc'd

3     on this email?

4          A     I do not know.

5          Q     In the last paragraph of the email, do

6     you see where Mr. Martin refers to TC voters who

7     moved, and also attached the Taliaferro Data

8     Listing of the 37 voters still registered?

9                Do you see that, Mr. Cooper?

10         A     I'm reading it.

11         Q     Okay.  Correct me if I'm wrong, I

12    think I might be saying it wrong.  How do you

13    pronouncers Taliaferro?

14         A     "Tolliver."

15         Q     "Tolliver," okay.  Thank you.

16               So TC, that refers to Taliaferro

17    County?

18         A     Yes, sir.

19         Q     Okay.  These 37 voters, were these the

20    voters on the Taliaferro County challenge list?

21         A     Yes, sir.

22         Q     And when was that list provided to

Page 82

1   Mr. Martin?

2        A    I don't -- I don't recall the date

3   that that was sent to Mr. Martin.

4        Q    Okay.  Did you send it to him?

5        A    I believe so.

6        Q    Okay.  Okay, Kenzie, we can actually

7   take this one down, and then pull up Tab 5 and

8   mark it as Exhibit 5.

9             (Cooper Exhibit 5 was marked

10             for identification.)

11            BY MR. RAMIREZ:

12       Q    And then can we go to the second page

13   of this email, and then blow that up?  Thanks,

14   okay.  Mr. Cooper, do you recognize this email?

15       A    Can we take this blowup down for just

16   a moment?

17       Q    Sure.  And then the first page?

18       A    Yes, please.

19       Q    Okay, blow that up, Kenzie.

20       A    I remember this email.

21       Q    Kenzie, can we do this one as a

22   side-by-side?  Yeah, it can be difficult to see

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 83

1    where probably all relate these emails together.

2              At the very bottom of the first email,

3    it looks like -- do you see that, Mr. Cooper?

4    Looks like you wrote "Great, thanks!"

5         A    Yes, I see that.

6         Q    Okay.  Is that in reference to

7    Mr. Martin's email on page 2?

8         A    I do not know.

9         Q    Okay.  Did you provide Mr. Martin any,

10   as he says, input on absentee voters?

11        A    No, sir.

12        Q    No.  Do you know what he's referring

13   to?

14        A    I do not.

15        Q    Who is James?  Is that James Williams?

16        A    I do not know.

17        Q    The absentee voters, though, are those

18   the 37 voters in the challenge list that he was

19   provided?

20        A    I'm sorry, do what now?

21        Q    The absentee voters, are those the

22   voters on the challenge list, the 37 that you said

Page 84

1    had moved out of Taliaferro County?

2        A    All right, I'm sorry about this, but

3    ask the question one more time, please.

4        Q    That's okay.  So you see in the second

5    email where Mr. Martin refers to absentee voters?

6        A    Second email, absentee voters, okay.

7        Q    Are those in reference to the 37

8    voters on the Taliaferro County list that

9    Mr. Martin was provided?

10       A    I don't know.

11       Q    When Mr. Martin asked you for the list

12   of names of voters that he was going to challenge,

13   what did he say specifically?

14       A    I don't recall.

15       Q    Did he ask for the number of voters

16   he'd be challenging?

17       A    I don't remember.

18       Q    Can you tell me what you do recall

19   about that conversation you had with him?

20       A    What I remember is he wanted to -- he

21   wanted to see the list before he agreed.

22       Q    Okay.  And did he say why?

Page 85

1          A    No.

2          Q    No.  Give me one moment here.

3               In any of your conversations with

4    Mr. Martin, were there conversations you had with

5    him that involved people in addition to just the

6    two of you?

7          A    Ask that again, please.

8          Q    In any of your conversations with

9    Mr. Martin, did those conversations involve more

10   individuals than just the two of you?

11         A    What do you mean by "conversation"?

12         Q    Any communication, email, telephone.

13   Any time you spoke with Mr. Martin, was there

14   someone else involved in that conversation, either

15   in the same room, same email thread, same phone

16   conversation, things like that?

17         A    In the email threads, you know, I

18   cc'd -- when he would respond with something, I

19   would send his response back, just like I would

20   all the others, to the individuals who I've

21   already stated: Amy, Catherine, Mark Williams, the

22   art department with Mark's printing company,

Page 86

1    Ron Johnson.  All of the ones in that cc group

2    that was working together, everything got sent.

3          Q    Okay.  Do you see at the top of the

4    first page here it says to James Cooper and

5    John Marsh?

6          A    Yes.

7          Q    Who is Mr. Marsh?

8          A    John Marsh is the 10th District

9    Treasurer.

10         Q    Okay.  Why is Mr. Martin sending this

11   to not only you, but also Mr. Marsh?

12         A    I do not know.

13         Q    Any conversations you had with

14   Mr. Martin, did they also involve Mr. Marsh?  Was

15   he there?

16         A    When you say conversation, what do you

17   mean in conversation?

18         Q    Again, any communication, email,

19   phone, in person, anything.

20         A    Well, he's on this email.

21         Q    Yeah.  Any others?  Did you have any

22   other conversations with Mr. Martin?

Page 87

1          A     I do not -- I do not know.

2          Q     Was Mr. Marsh involved with

3     True the Vote's Georgia elector challenges?

4          A     I do not believe so.

5          Q     You didn't work with him at all in

6     connection with the challenges?

7          A     No.

8          Q     Okay.  We're just hitting 11:00 now,

9     Counsel.  Do we mind taking a break for

10    five minutes?

11               MR. BOPP:  I don't, but I have a

12    question.  If you could take down this document so

13    we can see the video screen.

14               There are 11 people that are on this

15    call, this videoconference, and I don't think all

16    of them have been identified, and I'd like for

17    them to be identified.

18               You can pull up the list, Joel.  You

19    know what I'm talking about?  You can click on

20    "Participants" at the bottom, and then the list

21    pulls up on the right side.

22               Down to Jacob Shelly, who is Jacob

Page 88

1   Shelly?

2          MR. SHELLY:  I'm an attorney with the

3   plaintiff.

4          MR. BOPP:  Okay.  Leslie Bryan?

5          MS. BRYAN:  As am I.

6          MR. BOPP:  Okay.

7          MS. BRYAN:  I entered my appearance on

8   the record and introduced myself to the court

9   reporter before we started.

10          MR. BOPP:  Okay, great.  I just didn't

11   recall, so I'm just clarifying.

12          Torryn Taylor Rodgers, who is that?

13          (No response.)

14          MR. RAMIREZ:  Torryn is an attorney

15   with Perkins Coie, also for Plaintiffs.

16          MS. RODGERS:  My speaker wasn't

17   working.  Yes, I'm an attorney also with

18   Plaintiff.

19          MR. BOPP:  No problem.

20          And I'm sorry, they're now mixing up.

21   So Jacob Shelly, did I ask about that one?

22          MR. SHELLY:  Yes, sir.  I'm with the

Page 89

1   plaintiff.

2           MR. BOPP:  I'm sorry, they all

3   resorted themselves.

4           Video Witness Capture.

5           What is the Hot Seat Backup?  Could

6   somebody advise me on that?

7           THE VIDEOGRAPHER:  That is me.  That's

8   my backup for documents.

9           MR. BOPP:  Oh, okay.

10          THE VIDEOGRAPHER:  I have three on

11  here: one has my name, the videographer; Witness

12  Capture is also me; and the Hot Seat Backup is

13  also me.

14          MR. BOPP:  Okay.  All righty, thanks,

15  appreciate the information.

16          How long would you like to take a

17  break?

18          MR. RAMIREZ:  Just five minutes is

19  fine for me.

20          MR. BOPP:  Okay.  All righty, see you

21  in five.

22          THE VIDEOGRAPHER:  All right, time is

Page 90

1    11:02 a.m.  Off the record.

2                 (A break was taken.)

3                 THE VIDEOGRAPHER:  The time is

4    11:11 a.m.  Back on the record.

5                 MR. RAMIREZ:  Kenzie, can we pull up

6    Tab 6 and mark it as Exhibit 6?  All right,

7    thank you.

8                 (Cooper Exhibit 6 was marked

9                  for identification.)

10                BY MR. RAMIREZ:

11        Q    Can we blow up the like second

12   two-thirds, starting on Sunday, December 20th?

13   Yeah, and the rest of it too.

14                Can you see this okay?

15        A    Yeah.

16        Q    Do you recognize these emails?

17        A    I do.

18        Q    So this email from Mr. Martin, other

19   than this email, did you discuss with Mr. Martin

20   his concerns about the accuracy of the challenge

21   list?

22        A    I don't remember.

Page 91

1          Q    Did you discuss his concerns about the

2    accuracy of the challenge list with anyone at

3    True the Vote?

4          A    I forwarded this email here to the

5    individuals at True the Vote, yes.

6          Q    Seems like Mr. Martin himself sent

7    this email to Ms. Holsworth, and he cc'd you?

8          A    Yes.

9          Q    Did you put Mr. Martin in contact with

10   True the Vote?

11         A    I'm sorry, do what?

12         Q    Did you put Mr. Martin in contact with

13   True the Vote?

14         A    Yes.  When I forwarded all of the --

15   his information as a challenger, I carbon copy,

16   and he then has their information.  I believe

17   that's how it works.

18         Q    Actually, can we pull the blowup down,

19   Kenzie?  Let's see what's the easiest way to do

20   this.  I think we're going to have to look at this

21   one side by side because the email goes onto both

22   pages.  Okay.

Page 92

1                So it seems like Mr. Martin's email

2      spans both pages, Mr. Cooper.  You saw the first

3      part of it that we blew up.  If you want to see

4      that again, let me know, but for now, can we blow

5      up the second part of it, Kenzie?  Thanks, okay.

6                Okay, Mr. Cooper, do you see these

7      names in the email?  We have Beatrice Davis -- and

8      thank you for highlighting this, Kenzie --

9      Clifford Simons, and Melba Ann Carmichael.

10               Do you see these names, Mr. Cooper?

11     A    Yes, sir.

12     Q    And so you had mentioned before that

13     you looked at the -- you scrolled through the

14     Taliaferro challenge list; is that correct?

15          A    No, sir.  I forwarded the Taliaferro

16     County list.

17     Q    Oh, my mistake.

18               Can you remind me which lists you

19     looked through?

20          A    Walton.

21     Q    Walton.  That's the only one?

22          A    Yes, sir.

Page 93

1          Q     Okay.  So then would you know whether

2     these three names appeared on the list of 37 that

3     were sent to Mr. Martin?

4          A     I don't recall.

5          Q     So in this email, is Mr. Martin

6     discussing that he submitted these three names

7     himself?

8          A     Okay, ask -- what was the question

9     again?

10         Q     Sure.  In this email, is Mr. Martin

11    discussing three names that he submitted himself,

12    three challenges that he submitted himself?

13         A     I believe so.

14         Q     And that's not the normal process, is

15    it, that other challengers that you recruited

16    followed?

17         A     No, sir.

18         Q     No.  Did any other challenger you

19    recruited submit names on their own for

20    challenges?

21         A     I do not know.

22         Q     Well, so then none of them

Page 94

1    communicated that to you?

2         A    Correct.

3         Q    Okay.  And none of them communicated

4    that to True the Vote, at least on emails that you

5    were cc'd on?

6         A    I'm sorry, do what now?

7         Q    And so none of them -- none of them

8    communicated that information to True the Vote, at

9    least on emails that you were cc'd on?

10        A    Not that I'm aware of.

11        Q    Okay.  Was this the first indication

12   that you had that Mr. Martin had concerns about

13   the accuracy of the challenge list?

14        A    Repeat that question.

15        Q    Sure.  Was this the first indication

16   that you had that Mr. Martin had concerns about

17   the accuracy of the challenge list?

18        A    I believe so, yes.

19        Q    Okay.  Did Mr. Martin send you this

20   email after you forwarded his response to

21   True the Vote?

22        A    Ask that question again.

Page 95

1       Q    Sure.  Did Mr. Martin send you this

2    email after you had forwarded his response to

3    True the Vote that he would be a challenger?

4       A    I'm not sure which response you're

5    asking about.

6       Q    To your initial email, when he first

7    responded that he would agree to be a challenger,

8    and you said you forwarded those communications to

9    True the Vote.  Is that a correct understanding of

10   how that process worked?

11      A    Yeah.  When the challenger would send

12   me their information, I would forward that to the

13   group of cc'd individuals as mentioned previously.

14      Q    Right.  And so then you followed that

15   process for Mr. Martin as well?

16      A    Yes.

17      Q    Okay.  And did Mr. Martin send you

18   this email after you had done that?

19      A    I don't remember if this is before or

20   after.

21      Q    Okay.  When you sent the emails to

22   True the Vote, or the group of people that were

Page 96

1    cc'd that you forwarded, who submitted the

2    challenges?

3         A    Okay, ask that one more time.

4         Q    Sure.  After you forwarded the

5    information to True the Vote and the people cc'd

6    that we've discussed, after you did that, who

7    actually submitted the challenges?

8         A    I do not know.

9         Q    Was it someone at True the Vote?

10        A    I do not know if it was -- I do not

11   know who actually submitted the challenges.

12        Q    But it wasn't the voter themselves,

13   the challenger themselves, the individual?

14        A    It was submitted on the individual

15   challenger's behalf.

16        Q    Okay.  But is Mr. Martin the only

17   example of someone who submitted it themselves?

18        A    As far as I know, Mr. Martin is the

19   only one that did challenges on his own.

20        Q    Did True the Vote -- or as part of the

21   Georgia elector challenges, did True the Vote

22   submit a challenge to Taliaferro County -- or

Page 97

1    Taliaferro County, excuse me.

2          A    Repeat the question.

3          Q    Did True the Vote submit a challenge

4    to Taliaferro County?

5          A    Mr. Martin requested that the

6    challenge be held.  I sent that request in to

7    True the Vote.  So I do not know if True the Vote

8    issued a challenge in Taliaferro County or not.

9          Q    So I think you're referring to the

10   last part of this email where he says, "Please

11   hold on to any challenge letters to Taliaferro

12   County"?

13         A    Yes.

14         Q    Is that right?  Okay.

15              What challenge letters is he referring

16   to?

17         A    The letters that would be -- my

18   understanding, the way that the process works, is

19   that there's a letter that has to be generated to

20   challenge each voter that is being challenged.

21   That would be what he is referencing there in this

22   email.

Page 98

1          Q     For each individual voter?

2          A     Correct.

3          Q     So did he ask that the challenge

4     letters for these three individuals be held, or

5     for all the individuals be held that he was

6     challenging?

7          A     His email says please hold on to any

8     challenge letters to Taliaferro County.

9          Q     So it would be all 37?

10         A     That would be my understanding, yes.

11         Q     Okay.  Kenzie, can we take down the

12    blowup?  And then can we blow up the first half of

13    the first page?  Okay, thank you.

14               So Mr. Cooper, were those challenges

15    submitted at any point, the three names in this

16    email?

17         A     I believe Mr. Martin challenged the

18    three individuals in the email.

19         Q     Okay.  So when he says hold --

20    I'm sorry, I should have done this earlier.

21    Kenzie, can we take this down again and put up

22    what we just had?  I kind of jumped the shark

Page 99

1    here.  Great, thank you.

2              Okay, so Mr. Cooper, you said that you

3    thought that Mr. Martin had submitted challenges

4    to these three people?

5         A    Yes, it is my understanding that

6    Mr. Martin challenged those three people.

7         Q    Okay.  So if he had already sent those

8    challenges in, when he refers to "hold" in this

9    other sentence highlighted in this email, is he

10   referring to the other challenges, not these three

11   people?

12        A    I do not know.

13        Q    Okay, because otherwise it would be a

14   withdrawal, right, if it's already been submitted?

15        A    Right.

16        Q    Okay.  Did Mr. Martin submit any other

17   individual challenges other than these three?

18        A    I do not know.

19        Q    Did he communicate with you about any

20   other individual challenged voters in Taliaferro

21   County?

22        A    Repeat that question, please.

Page 100

1        Q    Sure.  Did he -- did Mr. Martin

2    communicate with you regarding any other

3    individual voters in Taliaferro County?

4        A    Not to my memory.

5        Q    One moment.  Okay.

6             So Mr. Cooper, were these three

7    challenges withdrawn?

8        A    I do not know.

9        Q    Are you aware of any challenges being

10   withdrawn as part of the True the Vote's Georgia

11   elector challenges?

12       A    I do not know.

13       Q    Do you know if any of the counties to

14   whom the challenges were submitted found probable

15   cause for there being -- for the voters not being

16   eligible to vote in their counties?

17       A    Restate the question one more time,

18   please.

19       Q    Sure.  Actually, Dawn, can you read

20   that back to me?  I'm not sure exactly how I

21   phrased that one.

22             (The reporter read back the

Page 101

1          following question:)

2          THE REPORTER:  Do you know if any of

3     the counties to whom the challenges were

4     submitted found probable cause for the

5     voters not being eligible to vote in their

6     counties?

7          THE WITNESS:  I do not know.

8          BY MR. RAMIREZ:

9     Q    So you had no -- I'm sorry, were you

10   finished, Mr. Cooper?

11        A    Yes, sir.

12        Q    Okay, sorry.

13        So you did not have any communications

14   with any of the challengers regarding the outcome

15   of their challenges?

16        A    I followed the challenges that I could

17   follow, and all of -- and the counties that I was

18   able to follow, they were dismissed.

19        Q    And did you communicate that

20   information to any individual challenger?

21        A    I don't remember.

22        Q    Did you text any of the challengers

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 102

1    regarding their challenges?

2          A    I do not recall.

3          Q    After receiving this email, did you

4    reach out to Taliaferro County?

5          A    I don't remember.

6          Q    Do you recall if anyone at

7    True the Vote reached out to Taliaferro County

8    after receiving this email?

9          A    Well, I got a response back from

10   True the Vote.

11         Q    And can we pull this down for a

12   second, Kenzie, and blow up the first half of the

13   first page?

14              Is that what you're referring to,

15   Mr. Cooper, this email from Ms. Engelbrecht?

16         A    Yes.

17         Q    Did you have any other communication

18   with True the Vote about Mr. Martin's concerns

19   regarding his challenges?

20         A    I don't remember.

21         Q    Ms. Engelbrecht did not discuss with

22   you any information regarding issues with the

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 103

1   challenge list?

2          A     Not that I recall.

3          Q     What was the extent of your

4   communication with Ms. Engelbrecht as part of this

5   challenge effort?

6          A     Email.

7          Q     What did you discuss with her?

8          A     Instances like this where I forwarded

9   the challenge -- this request of Mr. Martin, and

10  all of the challenges that -- or challengers that

11  agreed to challenge, she received the cc's.

12         Q     How often did she respond to the --

13  like this, like email.  How often did she reply by

14  email to the emails that you had forwarded to her?

15         A     I don't remember.

16         Q     Was it for more or less than 50% of

17  the challengers you recruited?

18         A     Honestly, I don't remember.

19         Q     Did you ever have a phone conversation

20  with Ms. Engelbrecht about the elector challenges?

21         A     I don't remember.

22         Q     You mentioned at least one, the

Page 104

1    meeting at Mr. Williams' house where you said she

2    was on the phone.

3          A    Yes, she was on conference call in the

4    initial meeting.

5          Q    Right.  Were there any other instances

6    where Ms. Engelbrecht spoke to you over the phone

7    regarding the elector challenges?

8          A    Not directly, no.

9          Q    What do you mean, not directly?

10         A    I believe there was one Zoom meeting

11   after the -- with the attorneys.

12         Q    Okay.  After what?

13         A    After we received the lawsuit.

14         Q    Got it, okay.

15              So in this email from Ms. Engelbrecht,

16   do you see where she refers to putting together a

17   one-pager to support challengers?

18         A    Yes, sir.

19         Q    Did she ever send that one-pager to

20   you?

21         A    I don't remember.  I don't believe so.

22         Q    Were you ever provided anything from

Page 105

1    True the Vote to send to the challengers you

2    recruited?

3         A    Say that one question one more time,

4    please.

5         Q    Sure.  Were you ever provided anything

6    from True the Vote to send to the challengers you

7    recruited?

8         A    No.

9         Q    No.  So all the communications you had

10   with the challengers, those were -- that wasn't a

11   script or anything?  That was something that you

12   yourself drafted, wrote, sent to them?

13        A    Correct.

14        Q    Okay.  And then do you see in your

15   email here where you state, "I'll look for someone

16   else in Taliaferro county"?

17        A    Yes.

18        Q    Are you referring to another

19   challenger?

20        A    Yes.

21        Q    Did you find another challenger?

22        A    No.

Page 106

1          Q    No.  So to your knowledge, were any

2    challenges submitted in Taliaferro County after

3    you sent this email?

4          A    I do not know.

5          Q    When you were looking for someone

6    else, as it says in this email, what were you

7    doing?

8          A    In looking for a challenger, I

9    basically go back to a list of acquaintances that

10   I know personally, and at the same time that this

11   was going on, I was also recruiting for the

12   other -- the other south portion of the state.

13          So to the best that I can recall, I

14   didn't even attempt to reach out to anyone else in

15   Taliaferro County.

16          Q    Okay.  So if you weren't reaching out

17   to anybody, what were you doing when you were

18   looking for someone else, as that sentence says?

19          A    Well, the sentence states that I will

20   look for someone else.  It didn't say I was going

21   to get someone else.  So I basically focused on

22   other counties.

Page 107

1          Q     Got it, okay.

2                So after you sent this email, you did

3     not attempt to recruit someone else in Taliaferro

4     County?

5          A     Not that I can remember, no.

6          Q     Okay.  The end of this email that you

7     sent, you wrote from having talked to individuals

8     over the weekend.  Do you see that?

9          A     Yes.

10         Q     Were these people that you talked to

11    challengers?

12         A     These people that I was talking to, I

13    was trying to recruit as challengers.

14         Q     Okay.  So they were not challengers

15    yet?  They had not yet given permission?

16         A     Correct.

17         Q     Okay.  Why would those people have

18    been contacted by the counties to make their case?

19         A     It was in the news here in the state

20    of Georgia about the elector challengers, and it

21    was widely known that county election offices was,

22    you know, trying to -- was making people make

Page 108

1    their case.

2              And as I would talk to people, they

3    would ask, "Will I have to do anything?"  I would

4    tell them that some of the counties are requiring

5    you to show up to a hearing and present your case.

6         Q    Did these people just reach out to you

7    out of the blue to ask you what they would have to

8    do if the county --

9         A    No.

10        Q    No?

11        A    This is people that I would contact

12   trying to recruit.

13        Q    Okay.  And that's after sending, for

14   instance, that email that we already looked at,

15   your initial outreach email?

16        A    Correct.

17        Q    Okay.  So you would send that email to

18   prospective challengers, and some of them called

19   you to ask about what to do if the county has

20   contacted them; is that correct?

21        A    Sometimes.  Sometimes I would call

22   people, as I said earlier.  If I had an email

Page 109

1    address, I'd send an email.  If I didn't have an

2    email address, I would look for a phone number.  I

3    would cold call people and answer their questions.

4          Q    Okay.  Did a lot of people call you or

5    otherwise make contact with you to ask about what

6    to do if the county has contacted them?

7          A    I don't remember.

8          Q    Were any counties in particular

9    contacting your prospective challengers to have

10   them make their case?

11         A    What was the question again?

12         Q    So if you see in this last sentence --

13   or I guess last paragraph here, you say

14   "these counties."

15         A    Right.

16         Q    So my question is which counties in

17   particular were reaching out to prospective

18   challengers or were saying that they had to make

19   their case?

20         A    Well, in the case of like Gwinnett

21   County, they was making the challengers come

22   forward.  That was on the news.

Page 110

1            There were several counties.  I don't

2     remember all the counties that were going to make

3     you come appear for your challengers.  I don't

4     remember which counties it was exactly.

5            Q    Okay.  But the voters -- not voters.

6                 The prospective challengers who

7     contacted you, they were concerned about what they

8     were seeing on the news?

9            A    As I would call people and ask them --

10    in trying to recruit people to challenge, and they

11    would ask what it involves, I would tell them that

12    some of the counties were requiring you to come in

13    and make your case of why you was challenging the

14    individuals.

15           Q    Those conversations you just

16    referenced, with anyone else involved in them, or

17    was it just you and the challenger -- prospective

18    challenger, excuse me.

19           A    It would be just me and the prospect.

20           Q    Okay.  Did you discuss those

21    conversations with any defendant in this case?

22           A    Not other than emails that I'm aware

Page 111

1    of.

2          Q    Okay.  So this email, you'll see,

3    Mr. Cooper, at the top says it was sent on

4    December 20th from Ms. Engelbrecht.

5          A    Yes.

6          Q    After she sent you this email, did you

7    have any conversations with the individuals you

8    refer to in your email?

9          A    I'm sorry, do what now?

10         Q    After Ms. Engelbrecht sent you this

11   email on December 20th, did you then have any

12   further communication with the individuals that

13   you reference in your email in this exhibit?

14         A    I don't remember.

15         Q    You didn't follow up with them

16   regarding her advice?

17         A    I don't remember.

18         Q    All right.  Do you see in your email

19   where you say that some folks are running off?

20         A    Yes.

21         Q    All right.  What do you mean by that,

22   "running off"?

Page 112

1          A     That when the counties were making

2     people have to come make their case, that was

3     being put in the news, and it was making

4     recruiting a challenger extremely difficult.

5               They did not want to challenge and

6     have to go make a case, so therefore, they was

7     running.  They was not wanting to do the

8     challenges.

9          Q     Okay.  And what do you mean by "make

10    their case"?

11         A     To sit down and actually challenge the

12    voter of why they believed that they are not

13    eligible voters in their county.

14         Q     You mean each individual voter that's

15    being challenged?

16         A     Correct.

17         Q     Why didn't they want to do that?

18         A     I don't know.

19         Q     They must have told you something.

20    They told you that they didn't want to in some of

21    these communications.  Did they say why?

22         A     I could make all kind of assumptions,

Page 113

1    but I don't know.

2        Q    Yeah, just to be clear, I'm not asking

3    you to make assumptions, just anything that you

4    were told in these conversations.  Did these

5    people explain to you why they didn't want to make

6    their case?

7        A    Not that I remember.

8        Q    No one did?  Did Mr. Martin explain --

9    well, let me take a step back.

10       So you say that -- do you see where

11   you say, "Now that's not the case with Joe"?

12       A    Right.  Mr. Martin's reason for

13   wanting to withdraw is in his email.

14       Q    Okay.  But that means that he

15   didn't -- the reason why he wanted to withdraw is

16   different than the other people you reference in

17   this email; is that correct?

18       A    Correct.

19       Q    Okay.  And when you say that's not the

20   case with Joe, do you mean that he is not running

21   off?

22       A    No.  It means that the reason that he

Page 114

1   is wanting to withdraw is different than the folks

2   that I was trying to recruit.

3          Q    Okay, meaning that Mr. Martin was fine

4   making his case?

5          A    Correct.

6          Q    Okay.  So I'm going to ask a few more

7   questions about this one, but I want to refer back

8   to a different exhibit that we have, Mr. Cooper.

9               So, Kenzie, can we pull this down and

10  put Exhibit 1 back up?  Thanks.  And then just the

11  first half of this exhibit up until -- let's go

12  down to where it says, "Best, Caesar Gonzalez."

13  Yeah, that's great, thanks.

14              So I know we've already seen this

15  exhibit, Mr. Cooper, but I want to just confirm

16  that you recognize this first email as well

17  because I don't think we've talked about it yet.

18         A    Yes.

19         Q    Okay.  So how did you know

20  Mr. Gonzalez?

21         A    He was -- Mr. Gonzalez was referred to

22  me.  I don't remember who he was referred by.

Page 115

1          Q     I just want to make sure I understand.

2                So some of the people you reached out

3    to were referred to you to reach out to?

4          A     Yes.

5          Q     And who referred them to you?

6          A     I don't remember who referred

7    Mr. Gonzalez.

8          Q     Do you have a sense of who it might

9    have been?  Would it be -- would it be one of the

10   county chairs perhaps?

11         A     I don't remember who referred

12   Mr. Gonzalez.

13         Q     Okay.  And you don't know -- how do I

14   phrase this?

15               Any referrals you would have received,

16   would they have been from your professional

17   network, so your capacity as a business owner?

18         A     No.

19         Q     Would it have been through people that

20   know you through your involvement in GOP politics

21   in Georgia?

22         A     Yes.

Page 116

1          Q     Okay.  So in this email to Mr. Cooper,

2     Mr. Gonzalez said he got a call from Douglas

3     County asking how he wants to handle the

4     challenged ballots.  Do you see that?

5          A     Yes.

6          Q     Is this an example of the kind of

7     conversations that you were having in the last

8     exhibit we looked at?

9                We can pull that back up if you need

10    to see it again.

11         A     Yes, I can't remember exactly the

12    call, but he was being requested to come in and

13    present his case.

14         Q     Okay.  So this is after his challenge

15    was submitted?

16         A     Yes.

17         Q     Okay.  And he asks you, "How do I

18    handle this?"  Do you see that?

19         A     Yes.

20         Q     So what did you tell him?

21         A     Yes, I see that now.

22         Q     Okay.  And what did you tell him?

Page 117

1        A     That was -- when I spoke with him, I

2    told him basically the same thing that Catherine

3    had referred in the past email, is that it is not

4    required.

5        Q     Okay.  And did you reply to this email

6    to tell him that?  Did you call him?  How did you

7    tell him that?

8        A     I don't remember.

9        Q     Okay.  Did you ever reply to this

10   email?

11       A     I do not remember.

12       Q     Okay.  So you said you told him

13   essentially what Catherine Engelbrecht told you,

14   that he was not required to show up to make his

15   case; is that correct?

16       A     I'm pretty sure that that's what was

17   told to him.

18       Q     Okay.  Did you give similar advice to

19   the other challengers who talked to you about

20   their concerns that the county is contacting them?

21       A     I don't remember.

22       Q     Well, would it have been the same

                                                        Page 118

1    advice you gave to Mr. Gonzalez?

2          A    If anybody reached out to me about it,

3    it would have been what Catherine had said, that

4    they were not required.

5          Q    So after Mr. Gonzalez sent you this

6    email on December 18, do you see where it says

7    that at the top?

8          A    I do.

9          Q    Okay.  Did you have any subsequent

10   conversations with him about his challenge?

11         A    I don't remember.

12         Q    Well, I mean, you would have at least

13   told him what Engelbrecht said, right?

14         A    Yes, I believe I would have told

15   him -- I believe I would have told him to -- that

16   he didn't have to show up.

17         Q    Okay.  Any other conversations other

18   than that one after he sent this email to you?

19         A    Not that I would -- I don't remember.

20         Q    Okay.  Kenzie, we can take this one

21   down now.  Can we pull up Tab 7 and mark it as

22   Exhibit 7?

Page 119

1                    (Cooper Exhibit 7 was marked

2                     for identification.)

3                    BY MR. RAMIREZ:

4          Q    And then if we blow this one up too

5     after it says "Chairman Taliaferro County GOP,"

6     from that point up.  Great, thank you.

7               This one is a little similar to the

8     one we've seen before, but slightly different.

9               Do you recognize this document,

10    Mr. Cooper?

11         A    Yes.

12         Q    Okay, great.

13              And then I want to draw your attention

14    to the date on this one.  Do you see on the Sent

15    line, it says it was sent on December 20th at

16    9:45 a.m.?

17         A    Yes.

18         Q    Did you recruit any challengers after

19    this time?

20         A    I don't remember.

21         Q    You had mentioned that you -- there

22    was the email we looked at where you said you

Page 120

1    would look for a new challenger in Taliaferro

2    County.  Do you recall that?

3          A    I do.

4          Q    You mentioned that you were focusing

5    on other counties, but not Taliaferro County; is

6    that correct?

7          A    That's correct.

8          Q    Okay.  So at that point in time, were

9    you seeking new challengers?

10         A    There was a point in time when we got

11   down to the point where I had exhausted my

12   contacts.  I don't remember exactly when I had

13   exhausted my contacts, but the time that I would

14   spend on trying to recruit election challengers

15   got to where it was very little during the day.

16         Q    Did you communicate to anyone at

17   True the Vote when you exhausted your contacts?

18         A    I don't remember.

19         Q    Did you have a sort of team meeting

20   when the recruitment challenge was over?

21         A    No.

22         Q    No?  So how did it end then?  Your

Page 121

1   involvement with the project, your conversations

2   with True the Vote, how did the project come to an

3   end?

4          A    For me, on December 24th at 5:30.

5          Q    That's very specific.  Why that time?

6          A    That's when I got served.

7          Q    Okay, I see.

8               So up until that time, you were

9   involved with recruiting challengers?

10         A    I had basically -- it was coming up

11  into Christmas, there was a lot of family things

12  going on, and basically the week of Christmas

13  there, I had not put any time into it.

14         Q    Okay.  And you mentioned you were like

15  sharing the role of recruiting with Ron Johnson;

16  is that right?

17         A    He was -- he was on the cc thread, the

18  email thread.

19         Q    Was he the one who had North Georgia?

20  Am I getting that right?  You had South Georgia,

21  he had North Georgia?

22         A    Yes.

Page 122

1          Q     Did you communicate with him when you

2     were coming up on exhausting your contacts?

3          A     I mean, the way that it basically ran

4     out was I quit sending information in for

5     recruited challengers.

6          Q     When's the last -- what's the last

7     email you sent?  I'm sorry, when was the last

8     thing you sent and dated?  Do you remember when

9     that was?

10         A     I do not remember.

11         Q     Okay.  Did you have any cross talk

12    with Ron Johnson about y'all's recruitment

13    efforts?

14         A     I don't remember.

15         Q     Did he similarly rely on his personal

16    networks to recruit challengers?

17         A     I do not know.

18         Q     After you communicated Mr. Martin's

19    concerns about the challenge list to

20    True the Vote, did he follow up with you?  Did he

21    communicate with you again about them?

22         A     I don't remember.

Page 123

1          Q    Do you know whether these three names,

2    Davis, Simons, and Carmichael, whether any of them

3    were in fact registered voters?

4          A    Which three names?

5          Q    The three on this email, the ones that

6    Mr. Martin submitted himself: Davis, Simons, and

7    Carmichael.  Do you know whether any of them were

8    actually registered voters in their counties?

9          A    I know what the email says.

10          Q    So you never knew the status of this

11    information, whether they -- whether the

12    challenges were accurate for them?

13          A    I do not know.

14          Q    Okay.  All right, Kenzie, can we pull

15    this one down?  Actually, I think we're getting

16    close to the end here.  I know we're coming up on

17    the lunch hour, but I think we can push forward

18    and finish this up in an hour or less, if that

19    sounds good to you guys.

20               MR. BOPP:  I'm good with that.

21               How about you, Jim?  Is that

22    all right?

Page 124

1              THE WITNESS:  That will be fine.

2              MR. RAMIREZ:  Okay.  Can we take a

3     10-minute break then now, and then we'll finish

4     this up?

5              THE WITNESS:  Sure.

6              MR. BOPP:  That would be fine.

7     Thank you.

8              THE VIDEOGRAPHER:  The time is

9     11:56 a.m.  Off the record.

10              (A break was taken.)

11              THE VIDEOGRAPHER:  The time is

12     12:06 p.m.  Back on the record.

13              MR. RAMIREZ:  All right.  Okay,

14     Kenzie, can we pull up Tab 8 and mark it as

15     Exhibit 8?

16              (Cooper Exhibit 8 was marked

17               for identification.)

18              BY MR. RAMIREZ:

19         Q    And can we blow up the last -- or I

20     guess let's blow up the forwarded messages.

21              Okay, Mr. Cooper, do you recognize

22     these emails?

Page 125

1          A     Yes.

2          Q     Okay.  So the To address here,

3     James.onestrategic?

4          A     Uh-huh.

5          Q     It's a little different from the

6     addresses we have from you on the other documents

7     that you produced.

8                Can you explain what this address is?

9          A     Yes.  Gordon Rhoden is a Clarke County

10    Chairman, and I have known Gordon for many years.

11    That is an email address that Gordon had in his

12    data for responding to me.

13         Q     Got it, okay.

14                So did you send Mr. Rhoden your

15    initial outreach email?

16         A     Don't remember.

17         Q     Okay.  Did you send any initial

18    outreach emails through your "onestrategic" email

19    address?

20         A     No, sir.

21         Q     No, okay.  So Mr. Gordon, it looks

22    like his email address is chairman@athensgop.com;

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 126

1    is that right?

2          A    Correct.

3          Q    Okay.  So does that mean Mr. Rhoden is

4    the Chairman of Athens?

5          A    Yes.

6          Q    Okay.  You said you've known him for

7    many years.  How did you know him?

8          A    He has been the Clarke County Chairman

9    for now three terms, so I have known him through

10   the Republican Party for many years.

11         Q    And how did he know to contact you

12   about being a challenger for True the Vote?

13         A    I don't remember.  I don't remember

14   the initial contact with Gordon.

15         Q    Okay.  He knew you were involved with

16   the True the Vote effort though; is that right?

17         A    Correct.

18         Q    Okay.  Did you have any other

19   communication with Mr. Rhoden about the

20   True the Vote elector challenges?

21         A    I don't remember.

22         Q    So a previous email that we

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

Page 127

1    discussed -- not email.

2              Correct me if I'm wrong.  I believe

3    you previously stated now that some of the county

4    chairs that you reached out to forwarded your

5    email because they themselves did not want to be

6    challengers; is that correct?

7         A    Yes, I believe some of the county

8    chairs forwarded the email.

9         Q    Okay.  But it seems like Mr. Rhoden

10   did not have a problem being a challenger, is that

11   also correct?

12        A    That would -- yes, I would say so.

13        Q    Okay.  Did you have any conversations

14   with Mr. Rhoden about why he was comfortable being

15   a challenger, where some other county chairs were

16   not?

17        A    I don't remember any specific

18   conversations.

19        Q    Okay.  Is Mr. Martin also a county

20   chair?

21        A    He is.

22        Q    Okay.  How many county chairs served

Page 128

1   as challengers?

2         A    I don't remember.

3         Q    Do you remember how many that you

4   recruited, how many county chairs that you

5   recruited to be challengers?

6         A    I don't remember how many.

7         Q    Ballpark figure?

8              MR. BOPP:  I object.  You're asking

9   him to speculate.  If he has a specific

10  recollection, which he doesn't, he already

11  answered, he's not to speculate.

12             MR. RAMIREZ:  I'm asking for a general

13  sense.  He doesn't have to know an exact number,

14  but he might know whether it was more or less than

15  five, for instance.

16             MR. BOPP:  You ought to ask it that

17  way then.  I mean, that would be fine.

18             MR. RAMIREZ:  Okay, I'll rephrase

19  then.

20             MR. BOPP:  Okay.

21             BY MR. RAMIREZ:

22        Q    Mr. Cooper, did you -- would you say

Page 129

1    more or less than a dozen of the individuals that

2    you recruited to be challengers were GOP county

3    chairs?

4         A     I really don't know how many county

5    chairs agreed to do the challenges.

6         Q     Similar question:  How many did you

7    reach out to to be challengers?

8         A     I don't remember how many county

9    chairs I reached out to to be challengers.

10        Q     You mentioned that you reached out to

11   people on a list, however, like a state list for

12   the GOP; is that right?

13        A     Yes.

14        Q     Would all the county chairs of the

15   county that you were responsible for in

16   South Georgia, would they all have been on this

17   list?

18        A     No.  The list was not accurate.  The

19   list of the state party had not been maintained

20   properly, so there was a lot of inaccuracy on the

21   list.

22        Q     Every person on the list who was

Page 130

1  listed as a county chair, does that mean then that

2  they were either a current or former county chair?

3        A    Yes, they would have either been a

4  current or former.

5        Q    And did you reach out to all of them?

6        A    No.

7        Q    No.  How did you decide which ones to

8  reach out to?

9        A    I started with ones that I knew

10  vaguely through the party.

11        Q    You said you started with that.  How

12  did you -- and then what?  How did you proceed to

13  keep reaching out?

14        A    Well, I reached out to the ones that I

15  knew or had some connection to on that list.  I

16  did not reach out to everyone on that list.

17        Q    Got it.  So you only reached out to

18  people that you knew?

19        A    That I had some knowledge of or they

20  would have known me through somehow.

21        Q    Got it, okay.  Okay, that's great.

22             Kenzie, can we take this one down?

Page 131

1    Let's put up Tab 9 and mark it as Exhibit 9.

2    Let's see if I can blow this up for myself.

3              (Cooper Exhibit 9 was marked

4               for identification.)

5              BY MR. RAMIREZ:

6        Q    Can we go to the -- Mr. Cooper, you

7    might want to look at the full one before we blow

8    it up.  So, Kenzie, can we start at the bottom on

9    page 3 and blow it up, and then allow Mr. Cooper

10   to review the document.

11             All right, this is the third page,

12   Mr. Cooper.  Let me know when you've had a chance

13   to review the whole exhibit.  It's three pages.

14             (Witness reviewing Exhibit 9

15              on the Zoom screen.)

16       A    Okay.

17       Q    All right.  Kenzie, can we go back to

18   the second page?  And let's see, if we blow up the

19   middle email, starting on December 20th at

20   9:09 a.m.  That's great, thanks.  Okay.

21             So Mr. Cooper, do you recognize the

22   emails in this exhibit?

Page 132

1          A     I have seen these emails, yes.

2          Q     Okay.  In this email where

3    Mr. Williams says in the second paragraph, "So the

4    guys have been plugging away at signing up a

5    challenger in the rest of the counties," is he

6    referring to you?

7          A     I believe he would be referring to me

8    and Ron Johnson.

9          Q     And when he says the rest of the

10   counties, and I think they are getting real close,

11   does that mean that you and Mr. Johnson were

12   successful in recruiting challengers for nearly

13   all of the counties?

14         A     I do not know.  I mean, I would be

15   making an assumption there, so I really don't

16   know.

17         Q     Okay.  I'll ask it a little

18   differently then.

19               You said you were responsible for the

20   counties in South Georgia.  How many counties is

21   that about?

22         A     Oh, Lord, there's 159 counties in the

Page 133

1    state.

2          Q    So how many did you have?

3          A    Mr. Johnson was -- you know, was more

4    familiar with northern counties, I was more

5    familiar with southern counties, so it would be a

6    total -- I don't know.  There was no actual

7    dividing line, you take these, I'm taking those.

8          Q    I got it, okay.

9               For the counties that you did take,

10   were you able to find a challenger for each of

11   them?

12         A    No.

13         Q    No.  Which counties were you not able

14   to find a challenger for?

15         A    I don't remember.

16         Q    And is that including Taliaferro

17   County, or how are you -- how are you considering

18   that one?

19         A    Well, Taliaferro County is in the

20   10th District, I'm in the 10th District, so I took

21   all of the 10th District.

22         Q    Right.

Page 134

1          A     Ron Johnson is not -- he's in the

2     9th District, so he took all of the 9th District.

3          Q     Got it, okay.  So Kenzie, can we take

4     this part of it down, and then let's blow up the

5     bottom email now, the last one on this page.

6                Okay, so at the bottom here,

7     Mr. Cooper, do you see where Mr. Williams writes,

8     "Just an FYI, WE are going to have to change our

9     recorded challenger in Hall."

10         A     Yes.

11         Q     Did you recruit the Hall challenger?

12         A     I did not.

13         Q     Did Mr. Johnson recruit the Hall

14    challenger?

15         A     I do not know.

16         Q     Okay.  Did the Hall challenger

17    withdraw their challenge?

18         A     I don't know.

19         Q     One second here.

20                Do you know who the Hall challenger

21    was?

22         A     I do not.

Page 135

1          Q    Did you know who any of the

2    challengers were other than the ones you

3    recruited?

4          A    No.

5          Q    So bear with me for one second here.

6    I want to be precise with what I'm saying.

7               So for the challengers you recruited,

8    we have Mr. Martin, who asks that his challenges

9    be held.  We have that email.

10              Do you recall seeing that?

11         A    Yes.

12         Q    And we also have the three that he

13   submitted and were withdrawn.

14              Do you also recall that?

15         A    I do.

16         Q    Okay.  So what I want to ask is how

17   many of the challengers that you recruited had

18   their challenges withdrawn?

19         A    The only one that I'm aware that asked

20   to have his challenge withdrawn by True the Vote

21   is Mr. Martin of Taliaferro County.

22         Q    Gotcha, okay.  And did any of the

Page 136

1    challengers you recruited ask for the challenges

2    to be held as opposed to withdrawn?

3         A    The only one that I'm aware of is

4    Taliaferro County.

5         Q    Got it, okay.

6              So you've mentioned that you've

7    contacted some of the county chairs to be

8    challengers.  Did you contact any other members of

9    the Georgia Republican Party to be challengers in

10   the challenge effort?

11        A    I'm going to ask you to rephrase that

12   question, please, because members of the Georgia

13   Republican Party is very vague.

14        Q    Yeah, that's a good point.  I mean

15   officials, elected officials of the Georgia

16   Republican Party, like the county chairs.

17        A    I did reach out to some of the county

18   chairs.  The county chairs would have been the

19   only ones that I would have known would have been

20   elected officials of the party.  I'm not sure who

21   all of the other party officers in each county is.

22        Q    Mm-hmm, okay.

Page 137

1              Did True the Vote instruct you to

2    reach out to those chairs?

3         A    No.

4         Q    Did anyone instruct you to reach out

5    to them?

6         A    No.

7         Q    So at this initial meeting we

8    discussed where -- at Mark Williams' -- I think

9    you said place of business; is that correct?

10        A    Correct.

11        Q    At that meeting, did they ask you to

12   recruit challengers?

13        A    They asked if I would be willing to

14   help recruit challengers, yes.

15        Q    And why did they ask you that?

16        A    I don't know.

17        Q    Did they indicate why they thought you

18   would be a good person to do recruiting?

19        A    I do not know.  Mark Williams called

20   me and asked me to come to the meeting.

21        Q    Did he say why he thought you should

22   be involved in the meeting?

Page 138

```
 1        A    He thought that I would be interested

 2   in what they was going to discuss.

 3        Q    Okay.  But he didn't suggest to you

 4   that you should do recruiting?

 5        A    Prior to the meeting, no.

 6        Q    And at the meeting --

 7        A    At the meeting, I was asked if I would

 8   be willing to recruit.

 9        Q    And who asked you that?

10        A    It would have been -- I can't remember

11   the gentleman's name again.  Oh, Gregg Phillips

12   and Catherine Engelbrecht.

13        Q    And when they asked you to recruit,

14   did they say why they thought you should be the

15   one to do that?

16        A    No.  They just asked if I would be

17   willing to help them in recruiting.

18        Q    Did they -- do you know if they -- did

19   they mention, other than yourself and Ron Johnson,

20   whether they were looking to enlist anyone else to

21   help with the recruitment part of the challenges?

22        A    I don't remember the exact whole
```

Page 139

1    conversation that evening.

2           Q     How long was the conversation?

3           A     I don't remember exactly.

4           Q     Were you aware of any other similar

5    conversations that True the Vote was having with

6    the volunteers in Georgia?

7           A     No.

8           Q     Did you recruit any democratic county

9    chairs to be challengers?

10          A     Not that I'm aware of.

11          Q     Did you attempt to reach out to any of

12   them?

13          A     No.  I do not have access to Democrat

14   Party chairmen's list.

15          Q     Do you know who they are or their

16   contact information?

17          A     I do not.

18          Q     No.  So that's not like on a website

19   where the information for the GOP chairs is?

20          A     I do not know.

21          Q     Do you know if any of the individuals

22   you recruited were registered Democrats?

Page 140

1        A     I do not know.  Georgia is an open

2   primary state, so there's no requirement of

3   registration by party affiliation.

4        Q     Okay.  Kenzie, can we take down this

5   exhibit and pull up Exhibit 1 again?  Great.  And

6   then can we blow up the last email starting "On

7   Wednesday."  Yeah, thank you.  Give me a second

8   here.

9              Okay, Mr. Cooper, do you see at the

10  end of the second paragraph here, starting the

11  sentence, "If this very type action had been taken

12  in October it is very likely Trump would have won

13  Georgia!  We can't look back now we must look

14  forward and save the senate!"

15       A     That's correct.

16       Q     This email comes from your .gop

17  address; is that right?

18       A     Yes.

19       Q     So did you send this email to -- you

20  said you don't know, that Georgia is an open

21  primary state, but do you know specifically

22  whether any individual to whom you sent this email

Page 141

1    was a Democratic voter?

2          A    Do not know.

3          Q    Okay.  What do you mean by "save the

4    senate" here?

5          A    I am a Republican, I vote Republican,

6    and by "saving the senate," I meant exactly save

7    the senate.

8          Q    I'm not sure what you mean, though, by

9    "save the senate."  Can you elaborate?

10         A    Republicans control the senate at this

11   time.  If we lose the two Republican senate seats

12   in the state of Georgia, we lose the senate as

13   Republicans.

14         Q    Okay.  Is it safe to say that one of

15   the goals that you wanted to forward with getting

16   involved with the True the Vote project was to

17   make sure that Republicans won the runoff

18   election?

19         A    Wanted to make sure that the election

20   was fair.

21         Q    Even if that meant that Democrats won?

22         A    Even if that means Democrats win.

Page 142

1          Q     But then you wouldn't have saved the

2     senate, is that accurate?

3          A     That is accurate.

4          Q     Okay.  Okay, I think we can take this

5     one down, Kenzie, and then I think -- give me one

6     second here.  Just a few more questions now,

7     Mr. Cooper.

8                For any individual that was challenged

9     by someone that you recruited, did you know

10    whether that individual voter was eligible to vote

11    in Georgia?

12         A     Restate that question, please.

13         Q     All right.  Dawn, can you read that

14    one back.

15                (The reporter read back the following

16                 question:)

17                THE REPORTER:  For any individual that

18         was challenged by someone that you

19         recruited, did you know whether that

20         individual voter was eligible to vote in

21         Georgia?

22                THE WITNESS:  I do not know.

Page 143

1          BY MR. RAMIREZ:

2          Q    Did you attempt to find that

3    information out for any individual voter?

4          A    Rephrase the question, please.

5          Q    For any voter that was challenged by

6    someone you recruited, did you attempt to find out

7    whether they were eligible to vote in Georgia?

8          A    I didn't -- I did not create the

9    challenge list.

10         Q    I'm not asking about the list,

11   Mr. Cooper.  I'm asking about the individual

12   voters.

13         A    Well, then, I'm not sure that I

14   understand the question.

15         Q    So as opposed to trying to assess the

16   accuracy of the list itself or how it was

17   generated, I'm asking you a different question.

18              I'm asking that for any individual

19   voter on the list, and you've seen some of them,

20   as you've indicated, did you try to find out

21   whether any of those individual voters were

22   eligible to vote in Georgia?

Page 144

1          A     No.

2          Q     Okay.  And that is true both before

3     and after Mr. Martin raised the concerns to you

4     about inaccuracy of the lists; is that correct?

5          A     Repeat that one more time.

6          Q     Sure.  So both before and after

7     Mr. Martin raised his concerns to you about the

8     accuracy of the lists, you did not try to check

9     whether any individual voter was registered to

10    vote in Georgia?

11         A     Are we talking about the people that

12    are challenging, or the challenge list?

13         Q     The challenged people.  So people

14    appearing on the lists could have been the one

15    that Mr. Martin was submitting, or any other.  I

16    know you've seen some of them, but not all of

17    them.

18              What I'm asking is, after Mr. Martin

19    raised the concerns with you, any of those

20    individuals that you had seen, did you attempt to

21    find out whether those individuals were eligible

22    to vote in Georgia?

Page 145

1          A     No.

2          Q     All right, hold one second again.

3                Okay, I think I am done with my

4     questions.

5                MR. BOPP:  I have no questions, and

6     Mr. Cooper would like to review and sign, please.

7                THE VIDEOGRAPHER:  All right, if

8     there's nothing further, the time is 12:35 p.m.

9     This concludes today's deposition, and we are off

10    the record.

11                (Whereupon, at 12:35 p.m. EST the taking

12                 of the deposition was concluded.

13                 Reading and signature were RESERVED.)

14

15

16

17

18

19

20

21

22

9/22/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          James Cooper

```
                                                      Page 146
  1            CERTIFICATE OF NOTARY PUBLIC
  2        I, DAWN A. JAQUES, a Notary Public in and for
     the Commonwealth of Virginia, before whom the
  3  foregoing deposition was taken, do hereby certify
     that witness whose testimony appears in the
  4  foregoing pages was duly sworn by me; that the
     testimony of said witness was taken by me in
  5  shorthand at the time and place mentioned in the
     caption hereof and thereafter reduced to typewriting
  6  under my supervision; that said deposition is a true
     record of the testimony given by said witness; that
  7  I am neither counsel for, related to, nor employed
     by any of the parties to the action in which this
  8  deposition is taken; and, further, that I am not a
     relative or employee of any attorney or counsel
  9  employed by the parties thereto, nor financially or
     otherwise interested in the outcome of the actions.
 10
 11
 12
 13
 14
 15
 16
 17      Dawn A. Jaques, CSR, CLR
 18      Notary Public in and for
 19      the Commonwealth of Virginia
 20  My commission expires:
 21  August 31, 2023
 22  Registration No. 132328
```

9/22/2021             Fair Fight, Inc. et al. v. True the Vote, et al.             James Cooper

```
                                                             Page 147
1       James Cooper, c/o

        The Bopp Law Firm

2       1 South Sixth Street

        Terre Haute, Indiana  47807-3510

3

4       Case: Fair Fight, Inc. et al. v. True the Vote, et al.

        Date of deposition: September 22, 2021

5       Deponent: James Cooper

6

7       Please be advised that the transcript in the above

8       referenced matter is now complete and ready for signature.

9       The deponent may come to this office to sign the transcript,

10      a copy may be purchased for the witness to review and sign,

11      or the deponent and/or counsel may waive the option of

12      signing. Please advise us of the option selected.

13      Please forward the errata sheet and the original signed

14      signature page to counsel noticing the deposition, noting the

15      applicable time period allowed for such by the governing

        Rules of Procedure. If you have any questions, please do

16      not hesitate to call our office at (202)-232-0646.

17

18

19      Sincerely,

        Digital Evidence Group

20      Copyright 2021 Digital Evidence Group

21      Copying is forbidden, including electronically, absent

22      express written consent.
```

Page 148

1      Digital Evidence Group, L.L.C.
       1730 M Street, NW, Suite 812
2      Washington, D.C. 20036
       (202) 232-0646

3

4      SIGNATURE PAGE
       Case: Fair Fight, Inc. et al. v. True the Vote, et al.
5      Witness Name: James Cooper
       Deposition Date: September 22, 2021

6

7      I do hereby acknowledge that I have read
       and examined the foregoing pages
8      of the transcript of my deposition and that:

9

10     (Check appropriate box):
       (  ) The same is a true, correct and
11     complete transcription of the answers given by
       me to the questions therein recorded.
12     (  ) Except for the changes noted in the
       attached Errata Sheet, the same is a true,
13     correct and complete transcription of the
       answers given by me to the questions therein
14     recorded.

15

16

17

18     _____          _____
19       DATE                      WITNESS SIGNATURE

20

21     _____          _____
22       DATE                           NOTARY

Page 149

1        Digital Evidence Group, LLC

2        1730 M Street, NW, Suite 812

3        Washington, D.C.  20036

4        (202)232-0646

5

6                        ERRATA SHEET

7

8        Case: Fair Fight, Inc. et al. v. True the Vote, et al.

9        Witness Name: James Cooper

10       Deposition Date: September 22, 2021

11       Page No.    Line No.      Change

12

13

14

15

16

17

18

19

20

21       _____        _____

22       Signature                           Date