Case 2:20-cv-00302-SCJ   Document 158-1   Filed 05/17/22   Page 1 of 129

9/23/2021        Fair Fight, Inc. et al. v. True the Vote, et al.        Mark Williams

Page 1

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

--------------------------------)
FAIR FIGHT, INC., SCOTT BERSON,   )
JOCELYN HEREDIA, and JANE DOE,    )
                                  )
                 Plaintiffs,      )
v.                                ) Case No.
                                  ) 2:20-CV-00302-SCJ
                                  )
TRUE THE VOTE, INC.,              )
CATHERINE ENGELBRECHT,            )
DEREK SOMERVILLE, MARK DAVIS,     )
MARK WILLIAMS, RON JOHNSON,       )
JAMES COOPER, and JOHN DOES 1-10, )
         Defendants.              )
--------------------------------)

DEPOSITION OF MARK WILLIAMS
APPEARING REMOTELY
September 23rd, 2021
9:00 a.m.


Reported by: Eileen Mulvenna, CSR/RMR/CRR




_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 2

1              REMOTE VIDEOTAPED DEPOSITION of

2      MARK WILLIAMS, a witness on behalf of Defendant in

3      the above-titled action, held on Thursday, September

4      23, 2021, commencing at approximately 9:00 a.m.

5      (Eastern Time), before Eileen Mulvenna, CSR/RMR/CRR,

6      Certified Shorthand Reporter, Registered Merit

7      Reporter, Certified Realtime Reporter, and Notary

8      Public of the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

```
 1   A P P E A R A N C E S:
 2
 3   JACOB SHELLY, ESQUIRE
     Attorneys for Plaintiff
 4   ELIAS LAW GROUP
     10 G Street, NE, Suite 600
 5   Washington, DC  20002
     202.968.4490
 6   jshelly@elias.law
 7   -and-
 8   TORRYN TAYLOR RODGERS, ESQUIRE
     PERKINS COIE LLP
 9   505 Howard Street, Suite 1000
     San Francisco, California 94105-3204
10   415.344.7000
11   -and-
12   MICHELLE L. McCLAFFERTY, ESQUIRE
     LAWRENCE & BUNDY LLC
13   1180 West Peachtree Street, Suite 1650
     Atlanta, Georgia 30309
14   404.400.3350
15
16   COURTNEY KRAMER, ESQUIRE
     Attorneys for Defendants
17   THE BOPP LAW FIRM
     1 South Sixth Street
18   Terre Haute, Indiana 47807-3510
     812.232.2434
19   ckramer@bopplaw.com
20
21   ALSO PRESENT:
22   Kenzie Guerrero, Videographer
```

Case 2:20-cv-00302-SCJ   Document 158-1   Filed 05/17/22   Page 4 of 129

9/23/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

Page 4

1                    I N D E X
2  WITNESS        EXAMINATION BY              PAGE
3  MARK WILLIAMS
4                   MS. TAYLOR                 7
5
6                 E X H I B I T S            PAGE
7  Exhibit 1    Bates Nos. OPSEC 0054,        16
                E-mail Chain
8  Exhibit 2    Bates Nos. Def Williams       25
                0759-780, E-mail Chain
9  Exhibit 3    No Bates numbers, Responses   27
                Interrogatories
10 Exhibit 4    Bates Nos. Def. Coooper       29
                0160-161, Text Messages
11 Exhibit 5    Bates Nos. Def Williams       39
                0613, Invoice
12 Exhibit 6    Bates Nos. Def Williams       43
                0745-749, E-mail Chain
13 Exhibit 7    Bates Nos. OPSEC 0043-44,     54
                E-mail Chain
14 Exhibit 8    Bates Nos. Def William        58
                0708-709, E-mail Chain
15 Exhibit 9    Bates Nos. OPSEC 0055-56,     68
                E-mail Chain
16 Exhibit 10   Bates Nos. Def Williams       71
                0878, E-mail Chain
17 Exhibit 11   Bates Nos. Def Williams       72
                0926-927, E-mail Chain
18 Exhibit 12   Bates Nos. OPSEC 0001-8,      76
                12/21/20 Letter
19 Exhibit 13   Bates Nos. OPSEC 0038-40,     84
                E-mail Chain
20 Exhibit 14   Bates Nos. Def Williams       86
                0298-300, E-mail Chain
21 Exhibit 15   Bates Nos. Def Williams       93
22              0907, E-mail Chain

Page 5

1          E X H I B I T S, CON'T          PAGE

2   Exhibit 16    Bates Nos. Def. Cooper      99
                  0181-182, E-mail Chain

3   Exhibit 17    Bates Nos. OPSEC 0052-53,   103
                  E-mail Chain

4   Exhibit 18    Bates Nos. Def Williams     108
                  0718, E-mail Chain

5   Exhibit 19    Bates Nos. Def Williams     113
                  0855, 12/17/20 Letter

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 6

1            THE VIDEOGRAPHER:  This is Tape No. 1

2       in the videotaped deposition of Mark Williams

3       in the matter of Fair Fight, Inc., et al.,

4       Plaintiffs, v. True the Vote, et al.,

5       Defendants, and Fair Fight Action, Inc.,

6       Counterdefendants, in the United States

7       District Court for the Northern District of

8       Georgia, Gainseville Division.  Case

9       No. 2:20-cv-00302-SCJ.

10           This deposition is being held remotely

11      by Zoom videoconferencing, physical recording

12      in Culpeper, Virginia, on September 23, 2021.

13      The time is 9:08 a.m., Eastern Time.

14           My name is Kenzie Guerrero.  I'm the

15      legal videographer from Digital Evidence

16      Group.  The court reporter is Eileen Mulvenna

17      in association with Digital Evidence Group.

18           Will counsel please introduce

19      themselves for the record.

20           MS. TAYLOR:  Torryn Taylor with

21      Perkins Coie on behalf of the plaintiffs.

22           MS. McCLAFFERTY:  Michelle McClafferty

Page 7

 1          with Lawrence & Bundy, also on behalf of

 2          plaintiffs.

 3                  MR. SHELLY:  Jacob Shelly with Elias

 4          Law Group with plaintiffs.

 5                  MS. KRAMER:  Courtney Kramer with Bopp

 6          Law Firm on behalf of the defendants.

 7                  THE VIDEOGRAPHER:  Will the court

 8          reporter please swear in the witness.

 9     MARK WILLIAMS,

10        having been duly sworn by Eileen Mulvenna,

11        a Notary Public of the State of New York,

12        was examined and testified as follows:

13     EXAMINATION

14     BY MS. TAYLOR:

15          Q.    Good morning, Mr. Williams.

16          A.    Good morning.

17          Q.    My name is Torryn Taylor, as I

18     mentioned, and I'm an attorney with the plaintiff in

19     this case today.

20                  Can you please state your address for

21     the record.

22          A.    3312 Canary Trail, Duluth, Georgia

Page 8

1    30096.

2          Q.     Have you ever been deposed before?

3          A.     Yes.

4          Q.     When were you last deposed?

5          A.     It's been many years.  I don't even

6    recall when or what.  It was probably a divorce case

7    or something.

8          Q.     And just the one time?

9          A.     A couple of times.

10         Q.     A couple of times.  Okay.

11                Before we get started today, I'm just

12   going to go over some ground rules, if that's okay

13   with you, just to make sure that we're on the same

14   page because each deposition runs a little

15   differently.

16         A.     Absolutely.

17         Q.     Great.

18                Just a reminder, as you probably know

19   from your previous deposition, all your testimony

20   you give today is under oath, just as if you were to

21   be testifying in court.

22                For the benefit of everyone and the

Page 9

1    court reporter, especially since we're all remote,

2    if you could make your answers audible so that the

3    court reporter can transcribe it.  Head nods and

4    shakes and stuff won't show up on the transcript.

5              Does that make sense?

6    A.    Yes.

7    Q.    Okay.  Great.

8              If you could allow me to finish my

9    question before answering just so there's no

10   interruptions, that will also be for the benefit of

11   the court reporter and allow us to have a clean

12   transcript, that would be great.

13             And then from time to time, your

14   attorney may make an objection, which is totally

15   allowed.  And you are to answer the question

16   regardless, unless she specifically instructs you

17   not to answer.

18             Does that make sense?

19   A.    Yes.

20   Q.    Great.

21             And if at any point you don't

22   understand a question that I'm asking, please just

Page 10

1    let me know and I'll try and rephrase it so that it

2    makes sense, so that it's clear to you.  And if you

3    do answer the question, I'll assume that you've

4    understood the question; is that fair?

5          A.    Yes.

6          Q.    And then, lastly, if at any time you

7    want to take a break -- we'll try and take semi

8    regular breaks throughout, but if there's any point

9    you need to take a break, just let me know and I can

10   find a place to stop and happy to take one.  The

11   only request I have is if there's a question

12   currently pending, that you answer the question

13   first before we go on to break, but after that, any

14   time is fine.

15               Is that cool?

16         A.    Yep, very good.

17         Q.    Great.  So let's get started.

18               Did you prepare at all to testify

19   today?

20         A.    No.

21         Q.    Okay.  And are you on any medication

22   of any sort that might affect your ability to

Page 11

1   testify today?

2        A.    Blood pressure and stuff like that,

3   but nothing that should affect me in any way.

4        Q.    Nothing that affects your memory or

5   anything like that?

6        A.    No.

7        Q.    Great.

8              So you mentioned you live in Duluth,

9   Georgia; is that correct?

10       A.    Yes.

11       Q.    Is that in Gwinnett County, Georgia?

12       A.    Yes.

13       Q.    How long have you lived there?

14       A.    Gwinnett County, almost all my life.

15       Q.    And what do you do for a living?

16       A.    Printing.

17       Q.    And in what capacity?  Can you

18   elaborate on that a little.

19       A.    It's a family-owned business, Printing

20   Trade Company.  We do printing.

21       Q.    And Printing Trade Company is the name

22   of the business?

Page 12

1          A.      Yes.

2          Q.      And how long have you been doing that?

3          A.      All my life.

4          Q.      Prior to the past general election and

5     runoff elections in Georgia, did you have any

6     experience in election law?

7          A.      No.

8          Q.      What about the Georgia Election Code?

9          A.      No, not really.

10         Q.      Do you have any formal legal training

11    or background?

12         A.      No.

13         Q.      Do you have any -- or have you ever

14    challenged a voter's eligibility before this past

15    runoff in January?

16         A.      No.

17         Q.      And do you have any background or

18    experience in statistics?

19         A.      Yes, but it's to the mail side, things

20    like that, mailings and things like that.  Not

21    statistics as such.

22         Q.      Can you elaborate a little bit on what

Page 13

1    you mean by "mailing statistics."

2          A.     Well, we do mailings and stuff out of

3    here and different type of -- anything to do with

4    printing and stuff.  So we deal with lists and

5    things like that.  I guess that's not statistics as

6    much as it is lists, things like that.

7          Q.     List management, something like that?

8          A.     Yes.

9          Q.     Are you a registered voter in Georgia?

10         A.     Yes.

11         Q.     How long have you been a registered

12   voter in Georgia?

13         A.     A long, long time.  A good part of my

14   life.

15         Q.     Ballpark estimate?

16         A.     '90s.  Somewhere in the '90s.

17         Q.     Fair enough.

18                Gwinnett County the entire time?

19         A.     Yes.

20         Q.     Okay.  Okay.  Great.

21                In your own words, Mr. Williams, can

22   you describe for me -- or tell me what True the Vote

Page 14

```
 1   is?

 2          A.     It's an organization --

 3               MS. KRAMER:  Object to form.  He can't

 4          testify as to what True the Vote is, but if

 5          you could rephrase that question with what he

 6          thinks it is.

 7               MS. TAYLOR:  I'm happy to rephrase.

 8   BY MS. TAYLOR:

 9          Q.     Mr. Williams, can you --

10               MS. KRAMER:  Not a problem at all.

11          Sorry.

12               MS. TAYLOR:  That's okay.

13   BY MS. TAYLOR:

14          Q.     In your own words, can you tell me

15   your understanding of what True the Vote is.

16          A.     My understanding is that they're a

17   group that's trying to make sure that elections are

18   fair and safe or -- I guess that the -- only legal

19   people can vote and no not-legal votes can be done.

20   I think that's what they're trying to accomplish.

21          Q.     Okay.  And how did you first learn

22   about True the Vote?
```

Page 15

1          A.       Somebody sent them to me in a

2     vendor/customer capacity.

3          Q.       Okay.  And about when was that?  Do

4     you recall?

5          A.       Let's see.  I guess it was probably

6     around December of 2000, I think it was.  I think

7     that's right.

8          Q.       The year 2000?

9          A.       I think so.  Is that right?  Yes, I

10    think so.  To the best of my recollection.

11         Q.       You've been working with True the Vote

12    for the past 20 or so years?

13         A.       I'm sorry.  2020.  I'm sorry.

14         Q.       No worries.

15                  So December 2020 is roughly when you

16    first started working with them, just to be clear?

17         A.       Correct.  To the best of my

18    recollection, yes.

19                  MS. TAYLOR:  I'm going to pull up an

20          exhibit now that may help.

21                  Kenzie, can we pull up 0054.

22

Page 16

1    BY MS. TAYLOR:

2         Q.    Mr. Williams, let us know if you can't

3    see this on your phone for any reason.

4              (Exhibit 1, Bates Nos. OPSEC 0054,

5         E-mail Chain, received and marked.)

6              THE WITNESS:  Yes.

7    BY MS. TAYLOR:

8         Q.    Okay.

9         A.    I can.

10        Q.    This looks like it's a December 12th

11   e-mail from 2020 from Gregg Phillips to you.

12             Is this what you were referring to

13   when you said someone referred you to True the Vote

14   around that time?

15        A.    Yes.

16        Q.    And it says, "You were referred to us

17   by the chairman of the GOP.  We have a large print

18   job for which we need help.  Please let me know if

19   you have ten minutes."

20             Did I read that right?

21        A.    It appears that way.

22        Q.    Did you know Gregg Phillips before

Page 17

1     this e-mail?

2             A.      No.

3                     MS. KRAMER:  Counsel, can you guys

4             please zoom in to this e-mail.  Even on my

5             laptop, it's kind of hard to see, if you

6             don't mind.  That's much better.  Thank you.

7     BY MS. TAYLOR:

8             Q.      Mr. Williams, can you still see the

9     exhibit?

10            A.      Yes, I can read it fine on my phone.

11            Q.      Great.

12                    It looks like, from your reply, that

13    Catherine Engelbrecht was cc'd on the e-mail.

14                    Did you know who she was before this

15    e-mail?

16            A.      No.

17            Q.      Okay.  And had you heard of True the

18    Vote before this e-mail?

19            A.      No.

20            Q.      Okay.  So this was your first contact

21    with them or with anyone at True the Vote?

22            A.      Let me clarify that answer.  The

Page 18

```
 1   chairman of the GOP told me that he had given them

 2   my number.  And that's the first I've heard of them.

 3   So this was -- this was a follow-up e-mail to that,

 4   but that was the first I've heard of them.

 5          Q.     Okay.  And who is the chairman of the

 6   GOP that's being referenced here?

 7          A.     David Shafer.

 8          Q.     And is he the chairman of the Georgia

 9   state GOP or county?

10          A.     State.

11          Q.     And how do you know -- how do you know

12   Mr. Shafer?

13          A.     We do a lot of printing with them and

14   things like that, so he knows me as a printer.

15          Q.     Okay.  And do you know what his

16   relationship with True the Vote is?

17          A.     I have no idea.

18          Q.     He just reached out to you and put you

19   in touch -- or let you know that they would be

20   reaching out to you, rather?

21          A.     Correct.

22          Q.     Okay.  And we'll get into this a
```

Page 19

1   little bit more a little later on, but can you just

2   describe for me at a very high level your

3   involvement with True the Vote after this e-mail.

4          A.     I met with Gregg.  And he explained

5   that they were trying to -- they needed to print the

6   letters and explained the job to me.  And I told him

7   what we can do and things along those lines.  So

8   they were bringing that to me.

9          Q.     When you say "letters," are you

10  referring to the challenge letters that True the

11  Vote issued in the January runoff election?

12         A.     Correct.

13         Q.     And who did you generally

14  communicate -- during the scope of this printing

15  project that you were doing with True the Vote, who

16  did you communicate with?

17         A.     I believe it was almost always Gregg.

18  I believe that's correct.

19         Q.     Did you have any other interactions

20  with Catherine Engelbrecht?

21         A.     I spoke with her on the phone a few

22  times, but I think that's about it.

Page 20

1          Q.     What about with James Cooper; did you

2     work with him at all for this project?

3          A.     Vaguely.  Very vaguely.

4          Q.     When you say "vaguely," just so that

5     we're clear, what do you mean by that?

6          A.     I introduced them -- James Cooper to

7     them.  And so -- and so I didn't work with him in

8     any capacity, but I did introduce them.

9          Q.     How do you know James Cooper?

10         A.     I've known him many years through

11    mostly Republican party stuff.

12         Q.     Did you work with a Ron Johnson at

13    all?

14         A.     In the same capacity.

15         Q.     Did you know him previous?

16         A.     Yes, I've known him for a long time,

17    too.

18         Q.     Through your printing company?

19         A.     Through Republican party mostly.

20         Q.     Okay.  And what about Mark Davis?

21         A.     Yes, I know Mark Davis.

22         Q.     And Derek Somerville?

Page 21

1          A.     Met Mark [inaudible] Derek Somerville,

2     I think.

3          Q.     Do you recall working with anyone else

4     at True the Vote during this time?

5          A.     Not -- no, I don't.

6          Q.     How about anyone else at OPSEC?

7          A.     At where?

8          Q.     OPSEC, which was Gregg Phillips'

9     company.

10          A.     No.  No, not at all.

11          Q.     When you were generally communicating

12     with these people, you said mostly you were

13     interacting with Gregg Phillips for this project,

14     was that mostly over e-mail?  Or how were you

15     communicating?

16          A.      It was almost all phone calls just

17     about.  And we didn't have a lot of interaction,

18     just -- it was basically just a customer/vendor

19     relationship.

20          Q.     Okay.  What -- can you broadly

21     describe what those -- what types of customer/vendor

22     interactions you're talking about?

Page 22

1          A.      Well, they brought the project here

2    and we discussed it.  And then once we did, then we

3    produced the job and got it to them.

4          Q.      So what did True the Vote ask you to

5    do with regard to compiling these challenge lists?

6          A.      They sent us lists and we printed

7    them.  They sent us the list -- well, they sent us

8    the individual letters, is what they sent us, files

9    with the individual letters, and we printed them and

10   gave them the copies.

11         Q.      So you printed the letters and then

12   gave them back to True the Vote?

13         A.      Yes.

14         Q.      Did you do anything else?

15         A.      Not that I recall.

16         Q.      Okay.  Why did you agree to work with

17   True the Vote?

18         A.      Well, as I said, it was a

19   customer/vendor relationship.  And when they told me

20   that they were trying to -- that they had intentions

21   of working to challenge a lot of the votes and

22   things, I introduced them to a couple of people,

Page 23

1    which was Ron Johnson and James Cooper.  And then it

2    went from there, so that was it.

3          Q.     Okay.  Did you reach out to anyone to

4    ask them to become a challenger on behalf of True

5    the Vote?

6          A.     Not that I recall.

7          Q.     Okay.  But you did reach out to James

8    Cooper and to Ron Johnson?

9          A.     Correct, to introduce them to Gregg

10   and his group.

11         Q.     Okay.  And do you know what Ron

12   Johnson and James Cooper did for True the Vote?

13         A.     I wasn't involved in that part, so not

14   really.

15         Q.     You have no idea?

16         A.     No idea.

17         Q.     When you introduced them, what were

18   you -- what did you think you were introducing them

19   for?

20         A.     For their connections to people all

21   across the state, that they might be able to help

22   them make connections across the state.

9/23/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

Page 24

1          Q.      Connections for what?

2          A.      To -- I guess to do the challenges.  I

3   just knew that both of these guys were real big in

4   the party and stuff and held positions and things

5   like that.  So I just assumed that they would be

6   able to help them be introduced to people and

7   things.  So I introduced them to them.

8          Q.      Did True the Vote -- or did Gregg ask

9   you to reach out to anybody you might know who might

10  be able to do that?

11         A.      No.  He described what they were

12  doing.  And I thought there was a couple people that

13  might be able to help him, so I just introduced

14  them.

15         Q.      So how did you reach out to Mr. Cooper

16  and to Mr. Johnson in order to introduce them to

17  Mr. Phillips and True the Vote?

18         A.      To the best of my recollection, it was

19  phone calls.

20         Q.      What did you tell them?

21         A.      That I had somebody that they probably

22  should meet and have a discussion with.

Page 25

1          Q.     No other details?

2          A.     Not that I recall.

3          Q.     Did you tell them anything about the

4     project True the Vote was working on?

5          A.     I don't recall.

6          Q.     Okay.  So you just asked them to come

7     meet this guy you knew?

8          A.     Yes.  That they were working on

9     something they might be interested in, I think is

10    what I said.

11               MS. TAYLOR:  Kenzie, can we pull up

12          0759.

13               (Exhibit 2, Bates Nos. Def Williams

14          0759-780, E-mail Chain, received and marked.)

15    BY MS. TAYLOR:

16          Q.    Mr. Williams, this is a very long

17    e-mail thread, unfortunately.  And you're more than

18    welcome to scroll through the whole thing, but I can

19    represent to you today that it's a series of

20    forwarded e-mails that all end up with you at the

21    end.

22               And I'd like to turn your attention to

Page 26

1    the second page.

2              MS. TAYLOR:  If we can go there,

3         Kenzie.  And this e-mail specifically at the

4         top.

5    BY MS. TAYLOR:

6         Q.    Do you recognize this e-mail,

7    Mr. Williams?  You can take a minute to read it.

8              (Document review.)

9              THE WITNESS:  I don't recognize it

10        right offhand.

11   BY MS. TAYLOR:

12        Q.    Do you know what this e-mail was used

13   for?

14        A.    I have no idea.

15        Q.    Why was this e-mail sent to you, then?

16             MS. KRAMER:  Objection; speculation.

17   BY MS. TAYLOR:

18        Q.    You can answer, Mr. Williams.

19        A.    I have no idea.  You know, I'm sure

20   there was a lot of e-mails that were going around.

21   I don't know what I was copied on and what I wasn't,

22   so I have no idea.

Case 2:20-cv-00302-SCJ   Document 158-1   Filed 05/17/22   Page 27 of 129

9/23/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

Page 27

1          Q.     Were you generally copied on e-mails

2     like this?

3          A.     I have no idea.  Maybe.  I get so many

4     e-mails a day, and I usually just click off of most

5     of them that wouldn't pertain to me.  So that was

6     probably what happened here, I assume, because I

7     don't recognize this at all.

8          Q.     So you had no part in drafting this

9     e-mail?  You don't know who drafted it?

10         A.     Not that -- I recall nothing about

11    this e-mail at all.

12         Q.     Fair enough.

13                And you said that you did not reach

14    out to any voters in Georgia --

15         A.     Not that --

16         Q.     -- and ask them to become -- to ask

17    them to become challengers?

18         A.     Not that I recall.

19                MS. TAYLOR:  Okay.  Kenzie, can you

20         please pull up -- it was numbered 9, Tab 9.

21                (Exhibit 3, No Bates numbers,

22         Responses to Interrogatories, received and

Page 28

1          marked.)

2                    MS. TAYLOR:  That works.  Can you

3          scroll, please, to page 8, second-to-last

4          page -- or maybe not the second-to-last page.

5          Thank you.

6     BY MS. TAYLOR:

7          Q.    Mr. Williams, do you recognize this

8     document?

9          A.    Vaguely.

10          Q.    I'll represent to you that these are

11     your interrogatories in this case that you answered.

12          A.    Correct.

13          Q.    Okay.  And so if you look at the last

14     sentence on this page, it says you "contacted

15     various people I knew in Georgia who might be

16     interested in acting as challengers"; is that

17     correct?

18          A.    I believe that's correct, yes.

19          Q.    Does that refresh your recollection at

20     all?  Do you recall having done that now, seeing

21     this?

22          A.    Well, that's -- Ron Johnson and James

Page 29

1   Cooper was the ones I reached out to mainly.  If I

2   did anybody else, I don't recall it.

3              MS. TAYLOR:  Kenzie, you can take that

4         one down and pull up 0160.

5              (Exhibit 4, Bates Nos. Def. Coooper

6         0160-161, Text Messages, received and

7         marked.)

8   BY MS. TAYLOR:

9         Q.    Mr. Williams, can you tell me what

10  this document shows?

11        A.    I'm not sure what you're asking there.

12        Q.    So this document appears to be the

13  text message exchange.

14              Does that sound right, a group text?

15        A.    Okay.

16        Q.    And it looks like it's a conversation

17  between Mr. Cooper, yourself, Mr. Johnson,

18  Mr. Phillips and Catherine Engelbrecht; is that

19  correct?

20        A.    I'll take your word for it.

21        Q.    Okay.  How often did you communicate

22  on this group text message thread?

Page 30

1          A.     I don't recall.

2          Q.     Do you recall this particular

3     conversation?

4          A.     I'm sorry.  Could you repeat that.

5          Q.     Do you recall this particular

6     conversation?

7          A.     Not right offhand, no.

8          Q.     Do you know when you stopped

9     communicating on this text message thread?

10         A.     On this thread here -- like I say, I

11    vaguely remember it, so I couldn't tell you any

12    details about it without what's actually in the

13    thread.

14         Q.     Do you recall if this was a

15    particularly active group conversation?

16         A.     Let me look over this real quick.

17    Hang on a second.

18               (Document review.)

19    BY MS. TAYLOR:

20         Q.     I believe it's two pages also,

21    Mr. Williams.  So you can scroll -- or have Kenzie

22    scroll to the next page if you need --

Page 31

 1        A.      Okay.  Yeah, I think I do recall this.

 2   I think this was when we were -- we were looking for

 3   the data on these to print, is what it was, if I'm

 4   not mistaken.  And I was telling them what we

 5   needed.

 6        Q.      What data are you referring to?

 7        A.      The letters to print.

 8        Q.      The challenge letter?

 9        A.      Yes.

10        Q.      And at the top of the exchange, on

11   December 18th, it looks like you write, "You should

12   have just gotten 3 e-mails."

13                Do you know what three e-mails you're

14   talking about there?

15        A.      I have no idea.  That was probably

16   just -- I'm just thinking that it was to do with the

17   data or the e-mails of what we had and didn't have

18   as far as the vendor/client relationship.

19        Q.      Do you mind explaining that a little

20   bit, what you mean by that statement?

21        A.      Well, what -- when we were doing

22   these, we were getting -- they were providing us

Page 32

1   lists of names and the challengers and who -- and

2   the data of what was going -- where the letters were

3   going.  So that data was to print the letters with.

4   And I believe this was a discussion of, we have

5   these, but we don't have these kind of thing.  So I

6   think that's what that's referring to, is the

7   e-mails where we were discussing that between my

8   company and them, yes.

9          Q.     And then a little further down, you

10  say, "This is a clear picture of where we are.  The

11  third list is what we need to plunge forward on hard

12  guys.  We have nothing in these counties."

13                Did I read that right?

14         A.     Exactly.

15         Q.     Can you explain -- can you explain

16  that.

17         A.     Yeah.  It would be the exact same

18  thing, what I was describing.  We were printing --

19  we were printing the letters, and they were

20  providing us each county.  They were providing us

21  the county.  So it was a discussion of what we had

22  and what we didn't have as far as the letters that

Page 33

1    we needed to print.

2              Because we had the list of what we

3    needed to print, and some of them we didn't have the

4    letters on yet.  So it was a time-sensitive thing.

5    So we were trying to push to get those -- those

6    lists of letters so we could get them printed for

7    them.

8         Q.    When you say you didn't have all of

9    them, what was "all of them"?  Like what were you

10   looking to have?

11        A.    We knew that there was a certain

12   amount of these things, the different counties -- we

13   had a list of all the counties that we were going to

14   be printing, and some of them we didn't have the

15   data for the counties yet.

16        Q.    What data are you referring to?

17        A.    The letters.

18        Q.    Is that for all the counties in

19   Georgia?

20        A.    I don't recall.  We just had a list of

21   a bunch of counties or something that we were

22   working from or something.  I don't even recall.

Page 34

1          Q.     And you say, "This is a clear picture

2     of where we are."

3                 What did you mean by "clear picture"?

4          A.     I believe I was referring to the

5     e-mails that would have come from my company to them

6     saying that we have these lists, but we don't have

7     these kind of things.  I believe that's it.

8          Q.     Like we have -- we have these

9     challenge letters that you sent us, but we're still

10    missing these ones kind of thing?

11         A.     Correct.

12         Q.     Okay.  Do you still have any other

13    text messages from this group conversation thread?

14         A.     Not that I recall.  I pulled together

15    everything that I knew that I had.

16         Q.     Mr. Williams, it looks like we might

17    have lost your video.

18         A.     I'm here.

19         Q.     Thank you.

20                So you said you don't have any other

21    text messages from this thread?

22         A.     Not that I'm aware of.

Page 35

1          Q.     Did you conduct any research yourself

2    to help identify voters for the challenge list?

3          A.     No, not that I recall.

4          Q.     Okay.  Did you participate at all in

5    preparing the challenge list?

6          A.     Not that I recall.

7          Q.     Other than printing them?

8          A.     Yes.  We were just the printer,

9    correct.

10         Q.     But you didn't help with compiling the

11   lists themselves that you were printing?

12         A.     Not that I recall.  Outside the

13   capacity of what you might have seen -- you were

14   just discussing, that text message, that kind of

15   thing.

16         Q.     Just so that I'm clear, we're talking

17   about lists and letters.

18                Were you printing like lists of names

19   in addition to actual challenge letters or one or

20   the other?

21         A.     No.  We were just printing the

22   letters.  And the data was the names that were going

Page 36

1    into the letters.

2          Q.    So you would receive a list of names

3    and you would -- walk me through that, if you could.

4          A.    Well, each letter was an individual

5    letter.  So we had to have -- the name of the

6    challenger and the name of the person that was being

7    challenged was in the data or the lists.  And we

8    would take those and put them into the letter and

9    print them.

10         Q.    So just so that I'm clear, you would

11   have a list of people being challenged and you had a

12   list of people who were doing the challenging; is

13   that correct?

14         A.    Correct.

15         Q.    And you had to take those names from

16   those two lists and put them into one challenge

17   letter, and that's what you printed?

18         A.    Correct.

19         Q.    Was there anything else involved in

20   that process that I'm missing?

21         A.    Not that I'm aware of.

22         Q.    What steps did you take to ensure that

Page 37

1    the challenges you submitted were accurate?

2          A.     None.

3          Q.     You didn't do any verification on your

4    end?

5          A.     No.

6          Q.     Did you edit the lists at all after

7    you received them?

8          A.     Not that I'm aware of in any -- any

9    way, no.

10         Q.     Okay.  I'll return to that a little

11   later on.

12                But why did True the Vote need these

13   challenges printed in hard copy?  Did they tell you?

14         A.     I don't recall if they told me or

15   whatever.  All I know is they brought them and we

16   were to print them.

17         Q.     Did you -- did you -- once you printed

18   the letters, did you give them back to True the Vote

19   or did you mail them somewhere?

20         A.     I don't recall how they were

21   delivered.  I don't recall that part.

22         Q.     Were they sent electronically as well?

Page 38

1       A.      From us, not that I recall anywhere.

2       Q.      Do you know if they were sent

3    electronically from somewhere else?

4       A.      I have no idea.

5       Q.      Okay.  Do you know how much this whole

6    project that you engaged with True the Vote for --

7    how much it cost?

8       A.      I have no idea.  I'd have to dig into

9    that.  I have no idea.

10      Q.      Did you have any kind of contract with

11   True the Vote for this work?

12      A.      I don't recall signing any contracts

13   or anything.  I think it was verbal.

14      Q.      Can you describe for me what the

15   verbal agreement was?

16      A.      Well, they brought the job over and

17   told us what it was.  We printed it and gave it back

18   to them, and that was that kind of thing.

19      Q.      Can you describe for me what they told

20   you the job was?

21      A.      They described the letters and what

22   they would be, that there would be an individual

Page 39

1   letter for each challenge and described how they

2   would come to us and what they needed back.

3        Q.    Was there any discussion of volume or

4   time?

5        A.    It was a very time-sensitive

6   situation; I do recall that.  And we printed -- it

7   was only a couple of copies of each one or something

8   like that.  I don't recall, but something like that.

9        Q.    You had to print multiple copies of

10  each challenge letter?

11       A.    If I recall correctly, I think we

12  printed two copies of each.

13       Q.    And this was all in December of 2020?

14       A.    I believe that's correct.

15            MS. TAYLOR:  Kenzie, can you pull up

16       Document 0613.

17            (Exhibit 5, Bates Nos. Def Williams

18       0613, Invoice, received and marked.)

19  BY MS. TAYLOR:

20       Q.    Mr. Williams, can you see this?

21       A.    Yes.

22       Q.    Can you tell me what this is?

Page 40

1        A.      That appears to be an invoice.

2        Q.      And if you look at the description --

3   under the description, it appears to contain a

4   $40,000 retainer; is that correct?

5        A.      I believe that's correct.

6        Q.      And did that cover your costs?

7        A.      I don't recall.  I don't recall what

8   the final was on this.

9        Q.      Do you know when this --

10       A.      If -- it was somewhere in that area, I

11   do know that.

12       Q.      Okay.  Do you know when this retainer

13   was paid?

14       A.      I have no idea.  Just looking at the

15   date, it was -- it was paid earlier than that.  This

16   was a -- it was definitely paid earlier than that,

17   but I couldn't recall the date or anything like

18   that.

19       Q.      When you say it was "paid earlier than

20   that," what are you referring to?

21       A.      Well, the date of the invoice was -- I

22   think we -- we got the retainer in early on and then

Page 41

1    we just worked off that.  And at some point, we

2    produced this document to reflect that retainer,

3    that we had that retainer.

4          Q.     Are you referring to the March 29,

5    2021, date at the top?

6          A.     Yes.  And I believe that's correct.  I

7    could be -- I'm a little vague on that because it's

8    just normal operating procedure kind of thing, and

9    I'm not sure exactly when and what happened there.

10         Q.     Okay.  Is it typical to produce

11   invoices such as this after the fact?

12         A.     Yes, it happens.

13         Q.     Mr. Williams, under "Quantity," it

14   says, "539,584."

15                What's that in reference to?

16         A.     That would be the amount of letters

17   that were printed.

18         Q.     Okay.

19                (Cross talk.)

20   BY MS. TAYLOR:

21         Q.     That's two letters per challenge; is

22   that correct?

Page 42

1        A.      I believe that's correct.  I believe

2    so.

3        Q.      Do you recall if that covered every

4    county in Georgia?

5        A.      I have no idea what -- we just sent

6    the data that was sent to us, so I have no idea what

7    was the final list.

8        Q.      Had you received any invoices from

9    True the Vote prior to this -- this one?

10       A.      Not that I'm aware of.

11       Q.      Did you submit any after this -- or

12    prior to this one?

13       A.      Not that I'm aware of.

14       Q.      Did you submit any after this one?

15       A.      Yeah, I have no idea.

16       Q.      Okay.  You mentioned you worked

17    directly with Mr. Phillips in connection with the --

18    with this print job; is that correct?

19       A.      Correct.

20       Q.      Can you describe for me what you

21    worked on with him.

22       A.      He provided the -- he came in,

Page 43

1   described the job.  We discussed it.  And then from

2   then on, it was just a matter of, we have this,

3   don't have this, that kind of thing.  And he just

4   provided what we needed or what they needed for the

5   job, and we just produced it.

6          Q.    Did you receive any invoices from

7   Mr. Phillips' company, OPSEC?

8          A.    Not that I'm aware of.

9          Q.    Did you submit any invoices to his

10  company, OPSEC?

11         A.    Not that I'm aware of.

12                MS. TAYLOR:  Okay.  Kenzie, can we

13         pull up 0745.

14                (Exhibit 6, Bates Nos. Def Williams

15         0745-749, E-mail Chain, received and marked.)

16  BY MS. TAYLOR:

17         Q.    And this is also a couple pages long,

18  Mr. Williams, but can you tell me what this document

19  is?  You can take a minute to read it.

20         A.    Let me look it over.

21                (Document review.)

22

Page 44

1    BY MS. TAYLOR:

2          Q.    It's several pages, so you can have

3    Kenzie scroll to the next one when you need.

4          A.    Okay.

5                THE WITNESS:  Yes, scroll to the next

6          page, please.

7                (Document review.)

8                THE WITNESS:  Scroll to the next one,

9          please.

10               Okay.  Another page.

11               Okay.  Next page.

12               Okay.

13               THE VIDEOGRAPHER:  That was the last

14         page.

15               THE WITNESS:  Yes, that was the last

16         page?  Okay.

17               Okay.

18               MS. TAYLOR:  Okay.  And if we could go

19         to the second-to-last page, Kenzie.

20   BY MS. TAYLOR:

21         Q.    First of all, Mr. Williams, can you

22   tell me what this document is, generally?

Page 45

1         A.       To the best of my recollection, it's a

2    discussion of what we had and didn't have as far as

3    lists and stuff and the data again to produce the

4    letters, is what it appears to me.

5         Q.       And by "data," you mean the names of

6    the challengers --

7         A.       Yes.

8         Q.       -- of the challengers and of those

9    individuals being challenged?

10        A.       That's correct.

11        Q.       So on this page, you say, "I've been

12   thinking about this all night because the logistics

13   on my end is A LOT.  This is something that would

14   take a few weeks if I had everything...and we need

15   to turn it in a day or two."

16                 Did I read that correctly?

17        A.       I believe so.

18        Q.       What are you referring to here?

19        A.       The job as described to me and how

20   much it was going to be, it was going to be hard for

21   me to produce in the time they were asking for it.

22   So we were -- I was discussing that we needed to get

Page 46

1  this stuff to me, basically, so I can get it

2  printed.

3          Q.     What are the logistics that are

4  involved in that type of project?

5          A.     Like I say, it's normal operating

6  stuff.  They send the data.  We put it into our

7  systems.  And it merges the data that they sent us

8  into the prepared letter that they had already sent

9  us to put into it, and then it's printed out.

10         Q.     Okay.  What -- when you say this needs

11  to be turned "in a day or two," you're talking about

12  the final product, the printer letters; is that

13  correct?

14         A.     I believe that's correct.

15         Q.     Why would this normally take a few

16  weeks?

17         A.     The volume.

18         Q.     So can you explain to me what you

19  would have done differently had you had a few weeks?

20         A.     Nothing, really, except for the time

21  it was going to take employees to do the job.

22         Q.     So you had to just work employees

Page 47

1    longer in order to get this done on time; is that

2    what you're saying?

3          A.     Correct.  It was a super rush,

4    correct.

5          Q.     But would there be anything different,

6    mechanically speaking, in the actual printing

7    process or the compilation of the data that would be

8    different?

9          A.     I don't believe so.

10          MS. TAYLOR:  Kenzie, if you could go

11          to the page right before this one.

12    BY MS.TAYLOR:

13          Q.     In the middle here, it looks like,

14    Mr. Williams, you write "Gregg, do we have the data

15    for Hancock County so we can set up a test run?"

16          Do you see that?

17          A.     Yes.

18          Q.     What are you referring to when you say

19    "test run"?

20          A.     I believe this was early on when we

21    first started the project that we were trying to get

22    our systems ready -- all our stuff ready on our side

Page 48

1   so that when we started getting these lists, we

2   could just -- we can plug and go.

3            So I was -- I believe, if that's not

4   mistaken, that we were -- we had decided that

5   Hancock County was going to be our first one or

6   something, if I recall it correctly.  And I was

7   asking for that data so we could get something -- so

8   we could practice and make sure that everything we

9   had was ready when all the big files started coming.

10        Q.    Can you explain to me what that

11   entails, getting the systems ready and what a test

12   run would look like?

13        A.    It's basically the guys have to go in

14   and they have to take the data as described, the

15   names of the challengers and the names of the -- I

16   guess challengee or whatever.  And it has to load in

17   a way so that when we go to print, it loads

18   correctly.  So we had -- we needed to get that and

19   make sure that everything was working the way it was

20   supposed to.

21        Q.    Were you able to do that, the test

22   run?

Page 49

1          A.     I believe so.  I believe so.

2          Q.     And did it go smoothly?

3          A.     Apparently so.

4          Q.     Just below that e-mail, Mr. Phillips

5     is writing about coordinating a master challenger

6     list.

7                 Do you see that?

8          A.     Yes.

9          Q.     What's that?

10         A.     I believe that was -- it was on their

11    end.  I think that was just a list of all the

12    counties or whatever it was.  I believe that's what

13    that was.

14         Q.     A list --

15         A.     That wasn't on my end.

16         Q.     I'm sorry.  Say that again.

17         A.     That wasn't on my end.

18         Q.     But you received that list?

19         A.     I guess so.  You're talking about the

20    master challenger list?

21         Q.     Yes.

22         A.     I don't know.  I don't recall.  We had

Page 50

1  a list that we worked from as far as the list of

2  counties and what they were challenging, but as I

3  say, it was just a -- we're waiting on this county

4  or that county or whatever, that kind of thing.

5        Q.    How did you receive the lists that you

6  received, the challenger list and the individuals

7  being challenged?

8        A.    I'm not sure.  I'm just not sure.

9        Q.    Did you -- for example, did you get it

10  in an Excel spreadsheet, handwritten, PDF, e-mail?

11        A.    It would have been in a spreadsheet,

12  but I'm not sure how it came to us, whether it was

13  ZIP drives or e-mails or whatever.  But it was in

14  spreadsheets, correct.

15              MS. TAYLOR:  Okay.  And then if we

16        could go to the first page of this document,

17        please.

18  BY MS. TAYLOR:

19        Q.    There's an e-mail here from James

20  Williams, and he has a printingtradeco.com e-mail

21  address as well.

22              Who is that?

Page 51

1          A.     That's my son and an employee here.

2          Q.     What was his role?

3          A.     He's just an employee.  His role was

4    to just get jobs to the shop.

5          Q.     What did he do specifically for this

6    True the Vote project?

7          A.     He would have managed it through the

8    process.

9          Q.     What does that entail?

10         A.     Basically just getting the job in,

11   getting it written up and getting it into the

12   processes, to make sure that it was in the

13   processes.

14         Q.     What are referring to when you say "in

15   the processes"?

16         A.     We had to get the data in and get it

17   plugged into the machines and things like that.  So

18   it was basically just running the job, getting the

19   job in, getting it into the shop to run.

20         Q.     Okay.  In this e-mail, the second from

21   the top, it says, "Good morning everyone," that

22   e-mail.

Page 52

1                What is James asking in this e-mail?

2          A.     I don't know.  Let's see.  Maybe guess

3    at it, but I don't really know.  Let's see.

4                (Document review.)

5                THE WITNESS:  He was -- the best of my

6                recollection, at this point, he was trying to

7                get the different files in so we could get

8                the job started.  We were trying to get -- we

9                had been described the job and we kind of

10               knew what it entailed, but it appears that we

11               were still waiting on some of the -- a lot of

12               it to get here so we could get it in the

13               process and get it printed.  Because it was

14               very time-sensitive.

15   BY MS.TAYLOR:

16         Q.    It says here, "Please do not make any

17   changes to shared documents from this point

18   forward."

19               What are the shared documents that

20   he's referring to?

21         A.    I wasn't involved in that part, so I'm

22   not positive.  But I would think it was the lists,

Page 53

1    just the list of lists.

2          Q.     Then he says, "If you make [any]

3    changes, they will not reflect in the final files."

4                What types of changes were being made

5    to the shared documents at this point?

6          A.     I have no idea.

7          Q.     You mentioned the list being

8    incomplete still?

9          A.     Well, we didn't have all the lists.

10         Q.     Okay.

11               MS. TAYLOR:  Courtney, I'm good to

12         take a ten-minute break if you are.

13               And, Mr. Williams, would you like to

14         take a ten-minute break?

15               THE WITNESS:  Sure.

16               MS. KRAMER:  That works.

17               THE VIDEOGRAPHER:  The time is

18         10:01 a.m.  Off the record.

19               (Recess from the record.)

20               THE VIDEOGRAPHER:  The time is

21         10:11 a.m.  Back on the record.

22

Page 54

1              MS. TAYLOR:  Can we pull up and mark

2         as the next exhibit 0043.

3              (Exhibit 7, Bates Nos. OPSEC 0043-44,

4         E-mail Chain, received and marked.)

5              MS. TAYLOR:  If we could go to the

6         second page, please.

7  BY MS. TAYLOR:

8         Q.    Mr. Williams, this is an e-mail from

9  Gregg Phillips to you.  And in it he writes they

10 "scrubbed the lists to exclude the military."

11             What does that mean?

12        A.    I have no idea.  I have no idea.  Like

13 I said, we were just waiting on lists and stuff, so

14 what they did on that end, I have no idea.

15        Q.    Okay.  He then writes, "If it's

16 possible to replace by county, this gives a more

17 clean approach."

18             What is he referring to there?

19        A.    Again, my recollection would say

20 that -- that we would get a file in, and then they

21 would make some changes and send a new file.  So

22 this would have been replacing the file for that

Page 55

1   particular county or something along those lines.

2         Q.    So he's sending you new -- new lists;

3   is that right?

4         A.    From reading the e-mail, it appears

5   that that's what that was.  He was sending a new

6   list for a particular county or something along

7   those lines.

8         Q.    Okay.  And what did you do in response

9   to this e-mail?

10        A.    I would imagine that it was -- that

11  was internal workings.  So I don't even know.  I

12  suspect that we as a company replaced the file that

13  we had with the new file.

14        Q.    Okay.

15              MS. TAYLOR:  Can we go to the first

16        page of this e-mail.  That might help.  And

17        you can blow that up.  Thank you.

18  BY MS. TAYLOR:

19        Q.    You say, "We will replace them on our

20  files as we go forward.  It's not going to matter

21  enough on the printed ones to back up and reprint."

22              What did you mean by that statement?

Page 56

1          A.     To the best of my recollection, it

2     would have been just -- I don't think we had many of

3     them printed off at this time.  And when he was

4     sending the new list for the counties, apparently,

5     from this e-mail, missing the military data or

6     something, I think it was just replacing those

7     files.  So I don't think at that point it appears

8     that we had printed a lot yet.  So I was referring

9     to that, I think.

10          Q.     What did you mean by "It's not going

11     to matter enough on the printed ones to back up and

12     reprint"?

13          A.     I believe that was it.  I think that

14     the changes were -- from what I understood at that

15     time, that there wasn't that many that were coming

16     out, so it wasn't going to be a big deal for us

17     to -- for them to do what they need to do with the

18     files that we had already had, that were already

19     printed.

20               I think my thought process there was

21     that they could pull those out by hand once we

22     delivered them.  I believe that's what I was

Page 57

1   thinking at that point.

2   BY MS. TAYLOR:

3          Q.     Did you communicate that to them?

4          A.     I don't remember.  I don't remember

5   much of that.  I just know that that was what was

6   going on at the time.

7          Q.     Do you know if -- those printed ones

8   that didn't get changed, if they were pulled by hand

9   afterwards?

10          A.     I have no idea.

11          Q.     But just to be clear, for the ones you

12   had already printed, you did not go back and reprint

13   those; is that correct?

14          A.     I don't recall, I really don't.

15          Q.     Do you know how many you had already

16   printed at that point, by any chance?

17          A.     I have no idea.

18          Q.     Were there eligible voters on these

19   lists of voters being challenged?

20          A.     I have no idea.  I didn't have

21   anything -- anything to do with compiling the lists.

22                 MS. TAYLOR:  Can we pull up

Page 58

1          Document 0708.

2                    (Exhibit 8, Bates Nos. Def Williams

3          0708-709, E-mail Chain, received and marked.)

4                    MS. TAYLOR:  If we could go to the

5          next page.  I think this is just forwarding.

6     BY MS. TAYLOR:

7          Q.    So this is an e-mail from Catherine

8     Engelbrecht to you; is that correct?

9          A.    I don't see anything.  Wait a minute.

10    There it is.

11                   That appears to be so.

12         Q.    Okay.  She says, "Hi, Mark."

13                   And then in the middle, she says,

14    "Also, please remove addresses that would suggest

15    they are military bases," and she gives some

16    examples of what those are.

17                   What is going on there?

18         A.    I don't really know.  I'm assuming,

19    from looking at this, that that was more towards

20    Gregg Philips than it was to me.  Because we didn't

21    compile those things; we just printed them the data

22    they sent us.  So I don't recall what that would

Page 59

1  have been referring to at the time, and I don't know

2  that it actually did refer to us at all.

3          Q.     Gregg Phillips is copied on the

4  e-mail, but it's addressed to you; is that correct?

5          A.     It appears that way.

6          Q.     But just to be clear, you didn't

7  remove any of these addresses as she requested?

8          A.     To the best of my recollection, no.

9  We usually wouldn't have done something like that.

10  Like I say, we print the data they send us.  We

11  don't really compile the data or manipulate the data

12  in any way.

13          Q.     Okay.  What was -- based on your

14  understanding, why did she send you this e-mail?

15          A.     I have no idea.

16          Q.     Did you do anything in response to

17  this e-mail?

18          A.     Not that I'm aware of.

19          Q.     Did you receive a number of e-mails

20  such as this related to this project -- strike that.

21                 Would you characterize your work for

22  True the Vote as a relatively large project?

Page 60

1          A.     Yes, it was -- it was definitely a

2     large project in such a short period of time.

3          Q.     And notable for that reason?

4          A.     Correct.

5          Q.     Okay.  Did you typically -- or did you

6     frequently during that time receive e-mails, either

7     from Ms. Engelbrecht or Mr. Phillips or anyone at

8     True the Vote, to which you didn't respond or to

9     which you didn't feel applied to you?

10          A.     I don't recall what was going back and

11     forth.  As I said, it was just a customer -- a

12     vendor relationship.  So they were sending us files

13     and things.  So there was -- there was probably

14     e-mails such as this that they were saying that --

15     it didn't really pertain to anything except them

16     getting the data to us.

17          Q.     Okay.  So just to be crystal clear,

18     you replaced files as they gave them to you, but you

19     did not edit those files in any way even if asked at

20     any time; is that correct?

21          A.     Not that I'm aware of.  It would not

22     be our normal process of doing those kind of things,

Page 61

1    and I don't believe we did.  We could do those kind

2    of things, but I don't believe we manipulated any

3    data in any way, if I'm not mistaken.  Not to my

4    knowledge we did.

5          Q.    And that goes for your entire company,

6    right, not just you?

7          A.    Correct.

8          Q.    Did anyone attempt to remove the

9    individuals with military addresses from these

10   lists?

11         A.    Not that I'm aware of.

12         Q.    So as far as you know, did the lists

13   include military addresses when they went to print

14   or did they not?

15         A.    I have no idea.  As I said, we just --

16   we just printed the data they sent us.  I have no

17   idea what was on them.  And we pretty much don't

18   care.  It's not -- it's not something we worry

19   about.  They provide data; we print it.  That's it.

20              So if they call and say, we need to

21   replace that file, then we replace that file for

22   them.  But as far as that goes, we don't typically

Page 62

1   manipulate the data in any shape, form or fashion.

2        Q.    Did you know what you were printing at

3   the time, or were you just printing what they gave

4   you?  Did you know the purpose of the project?

5        A.    I had minimal knowledge of what the

6   project was, but as far as really studying it and

7   figuring out what was what, no.  It was a print job.

8        Q.    Can you describe for me what your

9   understanding of the project was just one more time.

10       A.    My understanding was that they were

11  challenging votes to try and make sure the voter

12  files were correct, was my understanding.

13       Q.    Did you, as the printer, feel any kind

14  of responsibility for making sure that those

15  challenges were accurate in any way?

16       A.    No.  That wouldn't have been our

17  responsibility, no.

18       Q.    Prior to the runoff election in

19  January, had you ever submitted a challenge before?

20       A.    No.

21       Q.    Did you personally challenge anyone in

22  the January runoff election in connection with True

Page 63

1    the Vote?

2          A.     The Gwinnett County was challenged.

3          Q.     You challenged in Gwinnett County?

4          A.     Yes.

5          Q.     Or, rather, you were the challenger

6    for Gwinnett County?

7          A.     I was the challenger for Gwinnett

8    County.

9          Q.     Okay.  How many voters did you

10   challenge?

11         A.     I believe the number was somewhere

12   around 32,000, if I'm not mistaken.

13         Q.     How many of those challenges were

14   successful?

15         A.     None.

16         Q.     What would you consider to have been

17   success?

18         A.     For them to be vetted.

19         Q.     So it's your understanding that none

20   of them were vetted?

21         A.     It was told to me by the elections

22   board that they had no intentions of vetting them at

9/23/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

Page 64

1    all.

2          Q.     Do you -- strike that.

3                 How did True the Vote assist you in

4    preparing your challenge?

5          A.     They provided the data and then that

6    was basically it.  They prepared the data and we had

7    a discussion about that.  That was about it.

8          Q.     What was that discussion?

9          A.     Just that there would be the challenge

10   to the people that had moved and things along those

11   lines and running against NCOA lists, that that was

12   the challenges that we'd be making.

13         Q.     Can you elaborate on that for me.

14                What was your understanding of how the

15   list of challenged voters for Gwinnett County was

16   compiled?

17         A.     My understanding was that they matched

18   it with NCOA lists.  And I'm very familiar with

19   those, and that made a lot of sense to do it that

20   way.

21         Q.     Just so that we're clear for the

22   record, when you say "NCOA," you're referring to the

Page 65

1    National Change of Address registry?

2          A.     Correct.

3          Q.     And can you explain to me your

4    understanding of what you mean -- of what they meant

5    when you say they compared it to that?

6          A.     My understanding was that they ran the

7    voters in the election through the NCOA, the

8    national register list, and these were the names

9    that were kicked out and should have been.  So

10   basically the people that were on these lists were

11   people that had moved and were still voting in a

12   district that they no longer lived in.

13         Q.     Okay.  Did anything else go into

14   compiling those lists other than comparing against

15   the NCOA?

16         A.     I have no idea.  That's the best of my

17   recollection.

18         Q.     So True the Vote put together this

19   challenge list for you.

20                Did you have to do anything else to do

21   challenges in Gwinnett County?

22         A.     Not to my recollection.

Page 66

1          Q.     Did you discuss the accuracy of the

2   challenge list that you were sponsoring in general

3   with anyone at True the Vote or OPSEC?

4          A.     I'm sure I did because that's -- like

5   I say, that's a part of our business, so we

6   understand the NCOA and all that kind of stuff.  So

7   I think there was a couple of questions about that,

8   of the accuracy and things along those lines, with

9   the ones I would be challenging and --

10          Q.     And who did --

11                 (Cross talk.)

12          Q.     I'm sorry.  I didn't mean to interrupt

13   you.

14          A.     That's all right.  Go ahead.

15          Q.     Who did you speak to about that?

16          A.     I'm sure it was Gregg, but, again, I

17   don't recall.

18          Q.     Would that have been over e-mail or a

19   phone call, in person?

20          A.     Probably phone call and in person, I

21   would think, but, again, I'm not positive.

22          Q.     Okay.  And why would you have asked

Page 67

1   these questions about the accuracy of the challenge

2   list for Gwinnett County?

3        A.    Well, I knew I was going to be the one

4   that was challenging them.  And I would have

5   asked -- I say I would have.  I know I did ask how

6   they were compiled and things like that because I

7   was worried about -- not worried, but I was

8   concerned whether the challenge I made would be

9   correct.

10       Q.    And were you satisfied with the

11  response that you received as to the accuracy of the

12  challenge list for Gwinnett County?

13       A.    Apparently so because I did make the

14  challenges.

15       Q.    Okay.  Did you have any concerns about

16  the accuracy of the list?

17       A.    No, but I expected them to be vetted

18  so if there was any inaccuracy, it would be caught

19  in the vetting of them by the elections board.

20       Q.    Do you believe there may have been

21  inaccuracies in the list of voters that you

22  challenged?

Page 68

1          A.     I have no reason to believe that.

2                 MS. TAYLOR:  Can we pull up and mark

3          as the next exhibit 0055.

4                 (Exhibit 9, Bates Nos. OPSEC 0055-56,

5          E-mail Chain, received and marked.)

6    BY MS. TAYLOR:

7          Q.     Mr. Williams, take a look at this

8    document, if you will, and let me know when you've

9    finished the pages.

10                (Document review.)

11                THE WITNESS:  Okay.

12   BY MS. TAYLOR:

13         Q.     So on the second page here, this

14   e-mail -- can you tell me what this is?

15         A.     Let's see.  It appears a cover letter

16   for challenges.

17         Q.     So this is an e-mail that was sent

18   to -- who was this sent to?  Do you know?

19         A.     I'm not sure.  I don't recall this

20   e-mail, to tell you the truth.

21         Q.     Did you send this e-mail?

22         A.     I don't know.  I'm not sure if I did

Page 69

1  or not.

2         Q.     But it's signed by you; is that

3  correct?

4         A.     It appears to be, yes.

5         Q.     Okay.

6         A.     I don't recognize -- I do not

7  recognize this.  Let me put it that way.

8         Q.     Was this e-mail sent in addition to

9  the physical hard copies of the letters that you

10 printed?

11        A.     I have no idea.

12        Q.     Did you send the hard copy challenges

13 for Gwinnett County?

14        A.     Yes.

15               MS. TAYLOR:  If we can go to the first

16        page, please.

17 BY MS. TAYLOR:

18        Q.     You forward this thread to Amy

19 Holsworth, Catherine Engelbrecht and Gregg Phillips;

20 is that correct?

21        A.     It appears that way.

22        Q.     Okay.  It looks like you're forwarding

Page 70

1    a response from a Kristi Royston at Gwinnett County.

2    And you say, "I imagine you got this...but from me."

3                  What do you mean by that?

4         A.     Oh, I believe that -- I believe I

5    remember some of this now.  I believe that when I --

6    after I put my challenges in, Kristi from the --

7    from the county said that they would just file it

8    away and not do the challenges because they had shot

9    down another one similar to it.  And this was going

10   back from me that my challenges should be vetted.  I

11   believe that's what this is.

12        Q.     It looks like you sent Ms. Holsworth,

13   Ms. Engelbrecht and Mr. Phillips a draft response,

14   asking them to review it; is that right?

15        A.     I trust what you say there.

16        Q.     Did you ever get a response from any

17   of [inaudible] to this e-mail?

18        A.     I don't recall.  As far as this, there

19   was -- as far as to Kristi at the board and all,

20   they did set a hearing and didn't invite me to it.

21   After -- after this discussion, she did set up a

22   hearing.

Page 71

1                    MS. TAYLOR:  Can we pull up 0878 and

2          mark it as the next exhibit, please.

3                    (Exhibit 10, Bates Nos. Def Williams

4          0878, E-mail Chain, received and marked.)

5   BY MS. TAYLOR:

6          Q.    This looks like it's an e-mail between

7   you, Heather Long and Catherine Engelbrecht.

8                 Just so we just have a complete

9   record, who is Heather Long?

10         A.    I don't know.

11         Q.    But you sent this e-mail; right?

12         A.    I don't recall it.  Let's see.

13                (Document review.)

14                THE WITNESS:  I don't recall this at

15         all, but -- it appears that I sent it, but I

16         don't recall it.

17  BY MS. TAYLOR:

18         Q.    So you hadn't worked with Ms. Long

19  before?

20         A.    I don't recall who she is at all.

21         Q.    Okay.  And the three of you appear to

22  be coordinating the -- some response to the Gwinnett

Page 72

1    elections board.

2              Is this possibly in the same context

3    as that previous exhibit?

4         A.    I don't recall, but, yes -- I would

5    probably assume that, yes.

6         Q.    For the record, it appears that it's

7    the same date.

8         A.    Yes.

9         Q.    Okay.

10        A.    I did see that.

11        Q.    December 22nd, 2020.

12              MS. TAYLOR:  Let's pull up and mark as

13         the next exhibit 0926.

14              (Exhibit 11, Bates Nos. Def Williams

15         0926-927, E-mail Chain, received and marked.)

16   BY MS. TAYLOR:

17        Q.    This is also dated December 22nd,

18   2020.

19        A.    Okay.

20        Q.    Can you tell us what's going on here?

21        A.    This appears to be the response from

22   Kristi telling me that they would set up a hearing.

Page 73

1          Q.     Okay.  And I think this is actually

2     two pages.

3                 MS. TAYLOR:  Can we go to the second

4          page.  Great.

5     BY MS. TAYLOR:

6          Q.     Was this your response then that --

7     your official response that you ended up sending to

8     Gwinnett County later that day?

9          A.     I don't recall right off, but I would

10    assume so, yes.

11         Q.     In this response, you write, "I do

12    trust the data that I have supplied is to be true

13    and correct."

14                On what basis did you make that

15    statement?

16         A.     Because it was run through the NCOA,

17    and that was what I was using as my basis for the

18    accuracy of the list I was presenting.

19         Q.     Is it your belief that anyone

20    appearing on that NCOA list as it applies to

21    Gwinnett County was ineligible to vote in Gwinnett

22    County?

Page 74

```
 1        A.      It appeared that way, and that's what
 2   my challenge was for.
 3        Q.      You go on to say, "With that being
 4   said, I cannot see how the board can unilaterally
 5   reject my list of challenges, with any legality."
 6                On what basis did you make that
 7   sentence -- or statement?
 8        A.      Well, knowing that the laws allow me
 9   to challenge a voter and challenge the eligibility
10   of a voter and that's what my challenges were.  And
11   they did not vet any of them.  They just threw the
12   whole list out, claiming it was one list.  And I was
13   saying that it wasn't a list.  It was 32,000
14   individual challenges.  And they were just throwing
15   it all out saying, we're not going to do anything
16   with it.
17        Q.      What do you mean when you say they
18   were "claiming it was one list"?
19        A.      They said, you came up and put a
20   challenge up to this list of people, the 32,000.  We
21   don't know where you got that list.
22                I said, no, I didn't.  I gave you
```

Page 75

1   letters and challenged -- had 32,000 individual

2   challenges.  And I wanted each one of them to be

3   vetted out, as they should have been.

4          Q.     So your understanding was that the

5   Board of Elections in Gwinnett County was

6   interpreting your challenges as a whole, as a set of

7   32,000, and your position is that they were

8   individual challenges; is that correct?

9          A.     That's correct.  In the hearing,

10  that's the way they kept categorizing it.  And I

11  kept pulling them back and saying, no, it wasn't one

12  list; it was 32,000 individual challenges.

13         Q.     Then in the last sentence here in your

14  response, you say, "Please see the attached letter

15  which provides further clarification of my

16  position."

17                Unfortunately because of the way these

18  documents were produced, we aren't able to see the

19  attachment to this lower threaded e-mail.

20                Do you recall what those -- what that

21  letter you're referring to is?

22         A.     I have no idea.  I just lost the

Page 76

1    document.  Do you know where it went?  I just hit

2    something.  I don't know what I did.  I can see all

3    you-all, though.

4              THE WITNESS:  Hey, everybody.

5              MS. TAYLOR:  Kenzie, are you able to

6         help Mr. Williams see the document again on

7         his screen?

8              THE VIDEOGRAPHER:  I unfortunately

9         don't -- we lost his -- there he is.  I don't

10        know what it looks like on his phone, so --

11             THE WITNESS:  Oh, I found it.  I got

12        it.  Apparently I clicked -- it's got like

13        five pages or something.  I clicked over one.

14             MS. TAYLOR:  We're actually done with

15        this document, so you can pull it down.  And

16        can you please mark and pull up 0001.

17             (Exhibit 12, Bates Nos. OPSEC 0001-8,

18        12/21/20 Letter, received and marked.)

19   BY MS. TAYLOR:

20        Q.    Mr. Williams, this was a letter that

21   we had in our production.

22             Is it possible that this is the letter

Page 77

1    that you're referring to in your response to

2    Gwinnett County?

3                   (Document review.)

4                   THE WITNESS:  Okay.  What was the

5         question?

6    BY MS. TAYLOR:

7         Q.    Is it possible that this is the letter

8    that you had attached in your response to the

9    Gwinnett County Board of Elections?

10        A.    I don't recall, but it could have

11   been.

12        Q.    Have you seen this letter before?

13        A.    I have.

14        Q.    Did you --

15        A.    I don't recall much of it, but I do

16   remember the letter and when we discussed this, yes.

17        Q.    What did you discuss about the letter

18   and with who?

19        A.    To my recollection, and I'm not sure

20   who, it was a discussion of this is the response

21   that we need to push back when they were denying

22   the -- to vet the letters.  This was a prepared

Page 78

1   document, I believe, that True the Vote had had.

2   And that's my best recollection of it, anyway.

3        Q.    Based on that recollection, it would

4   make sense then that this would be what you attached

5   to that e-mail; right?

6        A.    I assume so.

7        Q.    Okay.  This document is actually two

8   letters.  There's this first letter from Catherine

9   Engelbrecht Bates labeled 0001.

10            MS. TAYLOR:  Kenzie, if we could go to

11            the next page, I believe it's a different

12            letter.

13   BY MS. TAYLOR:

14        Q.    Do you recognize this one,

15   Mr. Williams?

16        A.    I don't recall this one right offhand.

17   I see it, but I don't recall that one right offhand.

18        Q.    Do you know if by any chance you may

19   have attached this to your response to the Gwinnett

20   County Board of Elections?

21        A.    I don't recall.

22        Q.    Okay.  Do you know who wrote each of

Page 79

1    these letters?

2         A.     I don't.

3         Q.     But you didn't help write or research

4    for them, did you?

5         A.     I don't recall much of these letters.

6    I recall the other one as far as it being some kind

7    of a reply we used, but I don't recall this one very

8    much at all.  And so I have no idea how they were

9    prepped.  I just don't recall.

10                MS. TAYLOR:  Can we go back to the

11           first one.

12   BY MS. TAYLOR:

13        Q.     You said that this -- these letters

14   were used to respond to different county boards of

15   elections when they pushed back against the

16   challenges; is that correct?

17        A.     I believe this is one that we used for

18   mine or I used to push back on mine, if I'm not

19   mistaken.

20        Q.     Do you know if these were distributed

21   to other challengers in similar situations?

22        A.     I have no idea.

Page 80

1          Q.      In your capacity as a printer, did you

2     print any of these letters, or were they all

3     electronic?

4          A.      I don't recall printing any of them.

5     I have no idea.

6                  MS. TAYLOR:  Okay.  If we could,

7          Kenzie, go back to 0926, back to that e-mail.

8     BY MS. TAYLOR:

9          Q.      Here Kristi Royston replies to your

10    reply that she'll be in touch as she stated earlier

11    "with the meeting link and info."

12                 Did you get that meeting info and

13    link?

14         A.      I did not.

15         Q.      Did you follow up about it?

16         A.      I did not follow up about it.  I got a

17    phone call saying -- asking if I was on the Zoom

18    call for the hearing that was in place, and then I

19    called in.  But I did not get any notification

20    whatsoever that this meeting was going on or this

21    hearing was going on until someone called me and let

22    me know that I was supposed to be presenting in

Page 81

1   five minutes.

2        Q.    So you knew a meeting would happen,

3   but they didn't tell you when or where until it was

4   already happening; is that correct?

5        A.    I was told that there would be a

6   meeting set up -- a hearing set up and I would be

7   notified of that meeting.  I was never notified of

8   any meeting or hearing.  And then a friend told me

9   that the meeting and the hearing was going on at the

10  time, and I called in to it.  He gave me the

11  information to call in to it.

12       Q.    Okay.  What happened after that, when

13  you called in?

14       A.    Well, at that point, when I did call

15  in, I was muted immediately.  And they spent seven

16  or eight minutes looking for me saying that I wasn't

17  on the call.  And the chairman kept saying, let's

18  give him time and let's -- so finally they found me

19  on the call and gave me a chance to present the

20  letters as a challenge.

21       Q.    What did you present?

22       A.    I just told the story of the letters

Page 82

1    and what they had and my challenges and told them

2    that I did have the 32,000 challenges.  And that was

3    it.  So that's what I presented.

4         Q.     And then what happened after you

5    presented, Mr. Williams?

6         A.     There was a quick push to throw out

7    all my challenges as one lump, and I protested and

8    asked that they be vetted accordingly and they

9    should be vetted individually.  And there was some

10   discussion and a quick push to push this under the

11   rug.

12        Q.     And was that -- was there a final vote

13   or anything or decision made?

14        A.     Yes, there was a vote by the board.

15        Q.     And how did that resolve?

16        A.     They voted to throw all 32,000,

17   roughly, challenges out in one lump.

18        Q.     Did you have any follow-up with the

19   county after that?

20        A.     No.

21        Q.     Did they give a reason for why they

22   rejected your challenges?

Page 83

1        A.      The discussion was that they couldn't

2    do 32,000 challenges and that it was -- and they

3    kind of berated me for trying to challenge 32,000

4    voters.  And, again, I kept pushing back that they

5    were individual challenges, not a challenge of

6    32,000 as a lump.

7                    And they refused to vet it in any way

8    and did a quick vote.  It was a particular board

9    member that kept putting up motions to dismiss this

10   and kept putting in -- and on that note, there was

11   several people that were on the call, that were able

12   to voice their opinion of why my challenges should

13   be shot down or dismissed, that knew about the

14   hearing, knew about everything in it, but I never

15   got any kind of notification whatsoever that there

16   was people that was prepared to voice their opinions

17   of -- that were just individuals and elected

18   officials, that were all able to voice their opinion

19   on why my challenges should be voted down and

20   prepared for that.  And I was not even aware of the

21   hearing.

22        Q.      You mentioned having stressed the

Page 84

1    distinction between the board's understanding of

2    your challenges as being a group of 32,000

3    challenges and your understanding of them having

4    been 32,000 individual challenges.

5              Can you tell me why that distinction

6    is important?

7         A.    Well, I felt it was important because,

8    like I said, the NCOA had kicked out each one of

9    these individuals.  So each one of those was an

10   individual challenge.  The board kept going back to

11   the point that this is just one big challenge of

12   32,000 people as a list.  And I said, no, it's not

13   because each one of these is individual, and it

14   needs to be vetted that way.

15        Q.    I think I understand.  Okay.

16              MS. TAYLOR:  Can we pull up 0038 and

17         mark it as the next exhibit, please.

18              (Exhibit 13, Bates Nos. OPSEC 0038-40,

19         E-mail Chain, received and marked.)

20              MS. TAYLOR:  Can we go to the end of

21         it and just scroll through the pages so

22         Mr. Williams can see it all.

Page 85

1              THE WITNESS:  Okay.

2    BY MS. TAYLOR:

3         Q.    What is this e-mail, Mr. Williams?

4         A.    I had requested a file -- a recording

5    of the meeting.

6         Q.    So that 12/29 special meeting referred

7    to here, that's the meeting you called in to where

8    your challenges were considered; is that correct?

9         A.    Correct.

10         Q.    Then you forwarded it to Catherine

11    Engelbrecht, Courtney Milbank and Gregg Phillips; is

12    that correct?

13         A.    I believe that's correct.

14         Q.    And you say, "start at the :34:00

15    mark."

16              What is that in reference to?

17         A.    I believe that's when I was able to

18    enter the hearing --

19         Q.    So.

20         A.    -- if I'm not mistaken.

21              This was a recording of the whole

22    meeting and the whole hearing.  I believe that's

Page 86

1    where I was entered into the conversation.

2         Q.    And why were you sending them this

3    recording?

4         A.    So they were aware of what happened

5    with these particular challenges.

6              MS. TAYLOR:  Can we pull up

7         Document 0298.

8              (Exhibit 14, Bates Nos. Def Williams

9         0298-300, E-mail Chain, received and marked.)

10             MS. TAYLOR:  Can we also -- this is

11        three pages.  Can we scroll through each of

12        the pages for Mr. Williams.

13             THE VIDEOGRAPHER:  Starting with this

14        page or the last page?

15             THE WITNESS:  Hang on a minute.  Let

16        me read this one for a minute, please.

17             (Document review.)

18             THE WITNESS:  Okay.  Okay.  Okay.

19    BY MS. TAYLOR:

20        Q.    So here you write, "Just an FYI."

21             MS. TAYLOR:  Sorry.  Can you go back

22        to that last page, Kenzie.

Page 87

1    BY MS. TAYLOR:

2          Q.      You write, "Just an FYI.  WE are going

3    to have to change our recorded challenger in Hall.

4    They were...served electronically.  But our

5    challenger is on the election board."

6                  Did I read that correctly?

7          A.      It looks like that to me, yes.

8          Q.      What happened here?

9          A.      I'm not positive, but if I recall it

10   correctly, I think somebody had called me, maybe

11   James or Ron Johnson or something, and told me

12   that -- that the challenger -- the signature on the

13   thing was going to have to change.  So I think I was

14   just alerting everybody, is what it appears to me.

15         Q.      So you weren't the one to have gotten

16   this information directly from the Hall challenger;

17   you got it from either James Cooper or Ron Johnson?

18         A.      I assume that's correct.  I believe

19   that's correct.

20         Q.      Okay.  When you say "They were already

21   served electronically," what do you mean by that?

22         A.      Let's see.  To the best of my

Page 88

1    recollection, there was an electronic service of

2    each of the challenges as well as the hard copies.

3    If I'm not mistaken, they -- they were delivering

4    the -- and it wasn't from us, but I believe True the

5    Vote was providing an electronic version to the

6    county elections boards.  And I believe this had

7    already been sent.  The printed ones had not been

8    sent yet, if I'm not mistaken.

9          Q.    So the challenges had already been

10   issued -- Mr. Williams, I think we lost your video

11   feed.

12         A.    Yeah.

13               MS. TAYLOR:  Or we lost him

14         altogether.

15               THE VIDEOGRAPHER:  Do we need to go

16         off the record?

17               MS. TAYLOR:  Yes, let's go off the

18         record until we're able to get him back.

19               THE VIDEOGRAPHER:  The time is

20         10:56 a.m.  Off the record.

21               (Recess from the record.)

22               THE VIDEOGRAPHER:  The time is

Page 89

1          11:05 a.m.  Back on the record.

2     BY MS. TAYLOR:

3          Q.    Mr. Williams, before we took our last

4     break, we were talking about Document 0298.

5               MS. TAYLOR:  Kenzie, do you mind

6          pulling that one back up for us.  Okay.

7     BY MS. TAYLOR:

8          Q.    And this is the third page of that.

9               So you're explaining, Mr. Williams,

10    how you were relaying information that True the Vote

11    would need a new challenger for Hall County; is that

12    correct?

13         A.    I believe that's correct.

14         Q.    And you were explaining that the

15    challenges had already been issued with that

16    challenger electronically in Hall County, but that

17    they hadn't yet been printed and delivered; is that

18    correct?

19         A.    I believe that's correct.  And that

20    was my understanding at this point.  So I was

21    referring back to that, saying that -- that I

22    believe that's already gone, but we'd have to

Page 90

1    preprint them -- or we'd have to print them still.

2        Q.    And you say the "challenger is on the

3    election board."

4            Why is that a reason why you would

5    have to change the challenger?

6        A.    I have no idea.  Somebody just told me

7    that, and I was just referring to that.

8        Q.    And by "somebody," you're referring to

9    James Cooper or Ron Johnson?

10       A.    I believe that's correct, but not

11   positive.

12       Q.    Were you involved in finding a

13   replacement for Hall County, a replacement

14   challenger?

15       A.    No.

16       Q.    Do you know who was?

17       A.    No, I have no idea.

18       Q.    You say "We are working on getting

19   another challenger now.  It shouldn't be too hard."

20           What did you mean by that?

21       A.    I'm not sure.  I might have had some

22   discussions about somebody that might be up there,

Page 91

1    but I don't recall right offhand.

2              MS. TAYLOR:   Can we go to the second

3         page, Kenzie.

4    BY MS. TAYLOR:

5         Q.    In this e-mail, a little later, you

6    write, "I think total we are at like 320,000 or so."

7              What are you referring to there?

8         A.    That would have been how many letters

9    we had printed up to that point.

10        Q.    So by December 20th, around 9 a.m.,

11   you had printed around 320,000 letters?

12        A.    It appears that way.  It appears that

13   way.

14        Q.    How many did you end up printing in

15   total?

16        A.    I believe -- I believe that invoice

17   showed like 549,000 or something like that, but -- I

18   don't recall right offhand, but I believe it's about

19   549,000, I believe was the number.

20        Q.    And were those -- when were those

21   completed?  Do you recall?

22        A.    I do not.

9/23/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

Page 92

1        Q.     Would they have all been completed on

2    the same day?

3        A.     Over a few days.  Not one day.  It

4    would have taken several days, but they were

5    completed pretty quickly.

6                MS. TAYLOR:  Can we go to the first

7          page of this e-mail.

8    BY MS. TAYLOR:

9        Q.     There's some back-and-forth here with

10   you and Mr. Phillips.  And you write, "Yea...I get

11   that and picked up the urgency shift and why."

12               What are you talking about there?

13               (Document review.)

14               THE WITNESS:  I don't recall.

15   BY MS. TAYLOR:

16       Q.     Could it have something to do with the

17   need to print these letters quickly or on a

18   timetable of some sort?

19       A.     I don't recall that particular

20   reference, of what that reference was, but it was --

21   everything was very urgent.  So I do get that, but

22   I'm not exactly sure exactly what that comment was

Page 93

 1   about.

 2          Q.     Okay.  Mr. Phillips replies, "It will

 3   also help us supporting the challengers and other

 4   True the Vote initiatives."

 5               Do you know what other True the Vote

 6   initiatives he's talking about here?

 7          A.     I have no idea.

 8          Q.     Were you involved in any other True

 9   the Vote initiative?

10          A.     No.

11               MS. TAYLOR:  Can we pull up 0907,

12          please, and mark it as the next exhibit.

13               (Exhibit 15, Bates Nos. Def Williams

14          0907, E-mail Chain, received and marked.)

15   BY MS. TAYLOR:

16          Q.     Mr. Williams, after you have a chance

17   to read this, would you please tell me what this

18   document is.

19               (Document review.)

20               THE WITNESS:  Okay.  This would have

21          been one of the challenges that they needed

22          to put into the list apparently.  Let's see.

Page 94

1          Who sent this?  Kimberly.  James just

2          forwarded that to me.  As the lists were

3          coming up, he forwarded that to me to go into

4          the data of the letters.

5    BY MS. TAYLOR:

6          Q.     Why did -- so James forwarded this to

7    you so that you could update your list for printing;

8    is that right?

9          A.     Well, I think that was his intention,

10   it appears.  But I would have just forwarded it back

11   to True the Vote to get them to put it into their

12   files.  So I don't know what -- there was several

13   things like that.  People were communicating through

14   me because I knew everybody, but I didn't have any

15   wherewithal with that.  So I would just forward them

16   to each other, say, send that to Gregg or call Gregg

17   or whatever.

18         Q.     But you didn't make any edits to the

19   list based on this e-mail; right?  You would have

20   had True the Vote do that?

21         A.     Yes, I wouldn't have done anything

22   with it.

Page 95

1          Q.     And no one at your company would have?

2          A.     Not that I'm aware of.  I mean, we

3     could have and there's a possibility that we might

4     have added a name that they gave us or something

5     like that, but I'm not aware of that happening.  But

6     we could have and would have if they had asked us

7     to.

8                 We were -- there was a challenge with

9     that of trying to get the list as a whole because it

10    could get very confusing.  So we always -- and that

11    was what that other e-mail referred to, was going

12    back to just the -- here's a new file, stop making

13    changes, send us a new file kind of thing.

14         Q.     Are you referring to that e-mail that

15    your son had sent?

16         A.     Correct.

17         Q.     Okay.  Would he be the one to know if

18    any edits or changes to the lists were made at your

19    company?

20         A.     Probably not.  And, again, I assume --

21    we really didn't.  We just referred them back.  They

22    compile the lists and send them to us.  When we got

Page 96

1   something like this, we send it back to them and let

2   them make the changes and send them to us.

3          Q.     Is there anyone in particular at your

4   company that would know if any changes were made to

5   the list on your end?

6          A.     No.

7          Q.     You would be the best person to know?

8          A.     Probably so.

9          Q.     So this e-mail, the second-to-last

10  paragraph here, it says, "Will True the Vote let the

11  county parties, or at least the designated

12  challenger, know about the number and names of

13  specific challenged registrations in their counties?

14  I'd very much like to know!"

15              Did the challengers not know who they

16  were challenging?

17          A.     I have no idea.

18          Q.     You were a challenger for Gwinnett

19  County.

20              Did you know who you were challenging?

21          A.     Yes, I didn't -- as it was presented

22  through the vetting of that list, the individual

Page 97

1   names were put through the NCOA.  And as it was done

2   that way, yes, I was aware.

3          Q.     So you understood the process that

4   True the Vote undertook to create the list, but did

5   you see the list before issuing the challenges?

6          A.     I do understand that process and I did

7   understand that process and trusted that.  So I

8   didn't -- again, I didn't review each name, but I

9   understood and trusted that process that they used

10  to compile that list.

11         Q.     So you didn't ask at any point to see

12  the list in advance?

13         A.     Not -- not in particular, no.

14         Q.     And that was because you trusted the

15  process they undertook to create that list as they

16  explained it to you; is that right?

17         A.     That's correct.

18         Q.     Okay.  And you don't know if any other

19  challengers saw the list for their counties

20  beforehand?

21         A.     I have no idea.  I have no idea.

22         Q.     Do you think it would have been

9/23/2021         Fair Fight, Inc. et al. v. True the Vote, et al.         Mark Williams

Page 98

1   helpful in any way if you had had an opportunity to

2   look at your list before you issued the challenges?

3         A.    No.

4         Q.    Would it have been helpful to see

5   maybe if you recognized any of the names on the

6   list, if you could check people off like, no, this

7   one's wrong, this person is my neighborhood,

8   et cetera, et cetera?

9         A.    Not really, no.  Because it was -- the

10  list -- like I said, I trust the system.  We use

11  NCOA all the time, so I trust that process and know

12  that process well.

13        Q.    Can you explain a little how and in

14  what capacity you use the NCOA list.

15        A.    Well, we do mailings and stuff.  So

16  the way the laws work and everything, every list

17  that we run as far as mailings and stuff, we have to

18  put them through NCOA.  So we use that all the time.

19        Q.    So you never saw your list in advance.

20              Presumably you also didn't make

21  changes to yours?

22        A.    Correct.

Page 99

1          Q.    Do you know if anyone ever followed up

2    with this woman, Ms. Schwartz or Janet Hester

3    Andrews, who sounds like she's the actual challenger

4    for Jones County?  Do you know if anyone ever

5    followed up with either of them about their request?

6          A.    I have no idea.

7          Q.    You didn't respond to them; is that

8    correct?

9          A.    Oh, no.  No, not at all.

10         Q.    Mr. Williams, can you tell me who Joe

11   Martin is?

12         A.    I don't recall.

13               MS. TAYLOR:  Can we pull up and mark

14         as the next exhibit 0181.

15               (Exhibit 16, Bates Nos. Def. Cooper

16         0181-182, E-mail Chain, received and marked.)

17   BY MS. TAYLOR:

18         Q.    Can you tell me what this e-mail is,

19   Mr. Williams?

20         A.    Let's see.

21               (Document review.)

22               THE WITNESS:  I don't recall this at

Page 100

1          all.  I don't know.

2     BY MS. TAYLOR:

3          Q.    It appears to be a forwarded e-mail

4     from Joe Martin to James Cooper and Amy Holsworth.

5     And then James Cooper forwards that e-mail to you,

6     Mr. Phillips and Catherine Engelbrecht; is that

7     right?

8          A.    I trust in what you say there.  I

9     can't guess.

10         Q.    Fair enough.

11               Do you recall any interactions with

12    Joe Martin or Taliaferro County?

13         A.    I don't.

14         Q.    So Mr. Martin writes, in the e-mail

15    that James Cooper forwards you, "My experience with

16    the True the Vote database has not been good."

17               Do you see that?

18         A.    I see that.

19         Q.    And Mr. Cooper, in forwarding that to

20    you, says, "Good afternoon.  This is one of mine.

21    Please hold Mr. Martian's [sic] challenge."

22               Do you see that?

Page 101

1          A.      I see that.

2          Q.      Was Mr. Martin's challenge held?

3          A.      I have no idea.

4          Q.      Why would Mr. Cooper send you this

5     e-mail?

6          A.      I guess he was trying to keep me in

7     the loop of something or something.  I don't know.

8     Again, I had nothing to do with that side of things.

9     So I just assumed he just copied me because I was

10    the one who introduced him.

11         Q.      Well, this is dated December 20th.

12                 And you had previously stated that you

13    had printed a fair number of challenge letters by

14    this point; is that right?

15         A.      I couldn't recall the dates.  I have

16    no idea what dates were what.  I just know that we

17    just got it in real quick.  Everything happened real

18    fast.

19         Q.      Could Mr. Cooper have been forwarding

20    this to you asking you, as the printer, to withhold

21    printing Mr. Martin's challenge so that it doesn't

22    go out?

Page 102

1              MS. KRAMER:  Objection; speculation.

2              THE WITNESS:  Again, I have no idea.

3    BY MS. TAYLOR:

4         Q.    Do you know what happened to

5    Mr. Martin's challenges following this e-mail?

6         A.    I have no idea.

7         Q.    Then Ms. Engelbrecht responds, at the

8    top of this e-mail chain, "We are putting together a

9    one pager to support challenges who are being asked

10   to appear."

11             Did that one-pager ever wind up being

12   created?

13        A.    I have no idea.

14        Q.    Did you ever see it?

15        A.    Not that I'm aware of.

16        Q.    Were you ever asked to print anything

17   along those lines?

18        A.    Not that I recall at all.

19        Q.    Did you receive a copy of this?

20        A.    Not that I'm aware of.

21        Q.    Were you provided with documents from

22   True the Vote in advance of your hearing for

Page 103

1    Gwinnett County?

2          A.     Not that I'm aware of.  I don't recall

3    anything.

4          Q.     And just to be clear -- my question

5    was a little unclear -- I meant any documents to aid

6    in your preparation for your hearing at Gwinnett

7    County.

8          A.     Yes, not that I'm aware of.

9                 I just got a notification my battery

10   is low.  I had no idea, so I'm plugging it in.

11         Q.     Take your time.

12         A.     We're good.

13                MS. TAYLOR:  Can we pull up

14         Document 0052.

15                (Exhibit 17, Bates Nos. OPSEC 0052-53,

16         E-mail Chain, received and marked.)

17   BY MS. TAYLOR:

18         Q.     Can you tell us, Mr. Williams, what

19   this document is?

20                (Document review.)

21                THE WITNESS:  I believe this was in

22         preparation when we were starting to get

Page 104

1          going on the job.  I think I was -- let's

2          see.  Who's this to?  Yeah, I think this was

3          when we were preparing to do the printing.

4          We were trying to get everybody lined up to

5          send us the data and all that kind of stuff.

6          I believe that's what this is referring to.

7                    MS. TAYLOR:  Can you go to the next

8          page of this document, Kenzie.

9     BY MS. TAYLOR:

10          Q.    Does this align with your

11     understanding of the document that you just

12     described, Mr. Williams?  I just want to make sure

13     you saw the whole thing.  I forgot it was two pages.

14                    (Document review.)

15                    THE WITNESS:  That's the best of my

16          recollection.  I really don't recall the

17          timing and what this was, but I believe

18          that's what it was, though.

19     BY MS. TAYLOR:

20          Q.    So Gregg Phillips forwards you this

21     e-mail from James Cooper and asks you to extract the

22     names for the request.  And if you look at the first

Page 105

1   e-mail, the request appears to be the names of the

2   folks that the chair in the 10th is going to be

3   challenging.

4              Do you see that?

5       A.    Okay.

6       Q.    What are you extracting names from?

7       A.    I don't know that that was directed to

8   me.  I'm not sure.  Like I said, I just don't --

9   yeah, I don't recall what that was, but -- again, I

10  just don't recall.

11      Q.    Is this something that Mr. Phillips

12  would have asked you to do, though?

13      A.    Not really.  Again, I'm not sure what

14  that discussion was.  Because we go back to the

15  printer and -- the vendor and client called.  They

16  were providing us lists.  So I'm not sure what that

17  was about.  I have no idea.

18      Q.    Presumably you were able to do it and

19  you did.  It says, "Mark, can you extract the names

20  for this request?"

21              And if you go back to the first page,

22  your response to his e-mail is, "Yes, I can."

Page 106

1                    So do you recall doing that?

2         A.      I don't.  And I don't know what this

3    was.  The timing of this is the early part of this.

4    So I'm not sure what that referred to at all.  I

5    have no idea.

6         Q.      Let's look at the first e-mail.  It

7    says, "I have one chair in the 10th that wants the

8    names of the folks he will be challenging.  He is

9    the Taliaferro County chair.  He said he wants to do

10   it but will not unless he sees the names."

11                   And Mr. Phillips asks you to extract

12   those names, and you say that you can.

13                   Does that make sense to you?

14        A.      I believe -- I think I -- to go back

15   to that, I think that we were saying we could

16   extract names if we needed to, but I don't think we

17   ever did.  I don't think we ever did.  I think what

18   we were saying was that -- I believe what I was

19   saying here was, yes, we can extract names if we

20   need to.  But that was not our role.

21                   Again, this was very early too.  So

22   with that being said, I think that that's what that

Page 107

1    discussion was about.

2          Q.     As far as you recall, you did not

3    actually end up extracting the names for this

4    request.

5          A.     I don't think so.

6          Q.     When you said you could extract the

7    names, do you know -- like did you have some kind of

8    master database set that you could extract those

9    names from?

10          A.     At that point, I don't think -- and

11    this is the best of my recollection.  I don't think

12    we even had the list at this point.  I think it

13    was -- I think we were just compiling them at that

14    point.  And I think that's what had come up, was a

15    discussion about could we extract names if we needed

16    to.  I believe that's what that was about.

17          Q.     Okay.  So this was more of a

18    theoretical in the future, when we get the list, I

19    could extract the names from it if needed; is that

20    right?

21          A.     That's the best that I can recall on

22    it.  I don't recall exactly, but that would be what

Page 108

1    would have been going on at that time.

2          Q.    Do you know who the Taliaferro County

3    chair is?

4          A.    I have no idea.

5          Q.    Do you know why he would have

6    requested the names of the people he was

7    challenging?

8          A.    I have no idea.

9               MS. TAYLOR:  Can we pull up

10              Document 0718.

11              (Exhibit 18, Bates Nos. Def Williams

12              0718, E-mail Chain, received and marked.)

13   BY MS. TAYLOR:

14         Q.    Mr. Williams, what's the context

15   behind this e-mail?

16         A.    Okay.  This was based on a discussion

17   I had had with a couple of friends that were doing

18   something similar to what True the Vote was doing.

19   And they had -- they were putting up challenges

20   pretty similar to what True the Vote was.  And I was

21   just referring that to the group.

22         Q.    Okay.  What other groups are you

Page 109

1    referring to here?

2          A.     I don't know any of the names.

3    Just -- like I said, it was discussions with some

4    friends that were involved in some different efforts

5    going on that were similar to this.

6          Q.     In the state of Georgia?

7          A.     Yes.

8          Q.     Okay.  And it was around the same time

9    that True the Vote was issuing its challenges; is

10   that right?

11         A.     Correct.

12         Q.     Do you know why those other groups

13   were engaged in their initiatives?

14         A.     You know, I can't get in their heads,

15   but I assume it's along the same thoughts that there

16   were -- people were voting in districts they didn't

17   live in.  And they were challenging that and going

18   through the NCOA the same way.

19         Q.     So based on your understanding of

20   these other groups' challenge efforts, they were

21   also challenging voters based on information they

22   obtained from the NCOA registry?

9/23/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

Page 110

1          A.      That's my understanding.

2          Q.      Okay.  How did you learn about these

3     other groups and their efforts?

4          A.      Just some discussion with friends.

5     Just talking with some friends and things.

6          Q.      Were your friends involved in those

7     efforts?

8          A.      I don't know to what degree.

9          Q.      Okay.  You also write, "We are the

10    only ones that Fair Fight is spending 'REAL' efforts

11    and resources on to try to shut us down."

12               Did I read that correct?

13         A.      I believe that's correct, yes.

14         Q.      What did you mean by that?

15         A.      At that point, when I was having

16    discussions with other people, we're the only ones

17    that have been -- that they had filed lawsuits

18    against that I was aware of.

19         Q.      You go on to say, "Now is the time to

20    attack on all fronts.  And let these other groups

21    flank our enemies."

22               What did you mean by that?

Page 111

1          A.       This was an encouragement, that I felt

2     like we were on the right track, with the challenges

3     of me being in Gwinnett County, and True to Vote, as

4     far as their challenges and things.  This was just

5     an encouragement e-mail that I felt like -- that

6     there was more meat to this than I had -- originally

7     had even thought it could be.

8          Q.       And when you say "time to attack on

9     all fronts," what are you attacking?

10         A.       Just to keep true on the challenges.

11    And just like mine, it was shut down and it

12    shouldn't have been.  All of my challenges were as a

13    lump and it shouldn't have been.  So that was my

14    encouragement to keep going.

15         Q.       "We are going to topple this

16    mountain."

17               Can you tell me what "this mountain"

18    is that you're referring to.

19         A.       My thought there would have been that

20    this has been -- there's problems with this election

21    and we're going to expose it.

22         Q.       Can you expand on that a little?  What

Page 112

1   did you believe were the problems with this

2   election?

3          A.     Well, I do believe that there was a

4   lot of votes that were placed that were not -- that

5   shouldn't have been placed.  And the NCOA is the

6   place that it was showing up and exposing that.  And

7   I felt like we were the -- and that's why I agreed

8   to do the Gwinnett County challenge or I chose to do

9   the Gwinnett County challenge, because I felt like

10  it was -- there was some things going on and I

11  wanted it exposed.

12         Q.     Just so that we're clear, are you

13  referring to this happening with the general

14  election in November or with the runoff election in

15  January or both?

16         A.     I would say both.

17         Q.     And did this -- did this feeling you

18  have inform your decision to work with True the Vote

19  for this challenge project?

20         A.     Yes -- well, not for the printing

21  project.  It gave me the -- the want to be the

22  challenger in my county, but as far as working with

9/23/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

Page 113

1    the project, the project itself here was just a

2    printing project.  So that was -- it's almost like

3    two different issues.

4                    MS. TAYLOR:  Can we pull up

5            Document 0855 and mark it as the next

6            exhibit.

7                    (Exhibit 19, Bates Nos. Def Williams

8            0855, 12/17/20 Letter, received and marked.)

9    BY MS. TAYLOR:

10           Q.    Do you recognize this, Mr. Williams?

11           A.    Hold on just a second.  Let me see.

12                 (Document review.)

13                 THE WITNESS:  Yes.

14   BY MS. TAYLOR:

15           Q.    Is this your challenge letter or one

16   of them?

17           A.    Yes.

18           Q.    And is this what all of the challenge

19   letters you would have helped print for True the

20   Vote looked like?

21           A.    Mostly so, yes.

22           Q.    When you say "mostly so," what were

Page 114

1    the variations?

2          A.    I don't know that there was any

3    variations.  I'm just leaving that out there.  But,

4    yes, this should have been what the letters looked

5    like.

6          Q.    Okay.  Save for the name and -- the

7    names of who's being challenged and who's issuing

8    it; correct?

9          A.    Correct.

10         Q.    In this letter, you write, "Based on

11   available data from the United States Postal Service

12   and other commercially available sources."

13               The "data from the US Postal Service,"

14   is that referring to the NCOA registry?

15         A.    Yes.

16         Q.    And what are the other commercially

17   available sources?

18         A.    I believe that's just encompassing.  I

19   don't believe that there was -- and I say this -- I

20   don't know because I didn't actually compile the

21   data myself, but I believe that was just

22   encompassing.

Page 115

1      Q.    So your understanding was the

2  challenges were based solely on the NCOA registry;

3  is that right?

4      A.    I was comfortable with that being the

5  source of the information.

6      Q.    Okay.  What did you hope the effect of

7  these challenges would be, the ones that you issued?

8      A.    Well, I wanted to -- and my personal

9  view was to expose this.  If there was wrongdoing, I

10 wanted to expose it and take it from there.

11     Q.    Can you elaborate on what you mean by

12 "wrongdoing."

13     A.    I believe that a lot of votes were

14 voted in a place where -- in a district where people

15 didn't actually live and weren't allowed to vote.

16     Q.    And you said you challenged roughly

17 32,000 voters; is that right?

18     A.    I believe that's correct.

19     Q.    How do you think your challenges to

20 those voters would have affected those voters?

21     A.    I have no idea how it would have

22 affected them.

Page 116

1        Q.     Well, if your challenges had been

2    accepted, they wouldn't have been eligible to vote;

3    is that right?

4        A.     Yes.  And that was the -- that was the

5    thought there, was that these people voted in an

6    election they're not supposed to be voting in.  Did

7    they vote twice?  Did they vote illegally?  What was

8    the story here?  That was the thought process there.

9        Q.     And do you know what would have

10   happened had the Board of Elections in Gwinnett

11   County at that hearing voted to actually consider

12   your challenges?  Do you know what would have

13   happened to the voters who had been challenged?

14       A.     Well, it would have been vetted.  By

15   the laws set up, it would have been vetted out the

16   way it should have been and it would have been found

17   out if each one had been eligible to vote or not.

18   And if they weren't, their vote would have been

19   pulled out.

20       Q.     What's your understanding of that

21   vetting process?

22       A.     To verify where they lived and where

9/23/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

Page 117

1   they -- and where they were eligible to vote at the

2   time, to verify that and if they did actually vote

3   in an improper place.

4          Q.     Do you know how that would have been

5   verified?

6          A.     I don't know.

7          Q.     Given the chance, would you issue

8   these challenges again?

9          A.     Absolutely.

10          Q.     Is there anything that you would have

11   done differently?

12          A.     As far as the challenges, no.

13          Q.     What's the qualification as far as the

14   challenges?

15          A.     What are you asking there?  What do

16   you mean?

17          Q.     You qualified your answer that you

18   wouldn't have done anything differently as far as

19   the challenges.

20               Are you implying that you would have

21   done something differently as far as something else

22   related to this?

Page 118

1        A.      Oh, as far as the hearing and getting

2    light shed on the hearing, probably would have done

3    something a little bit different there.

4        Q.      What would you have done differently?

5        A.      Shed light on it, made sure that it

6    was exposed -- the hearing itself was exposed and in

7    public view.  Because it was pretty horrendous.

8        Q.      Would you have engaged with True the

9    Vote for the printing project given another chance?

10       A.      Yeah.

11       Q.      Is there anything you would have done

12   differently in that regard?

13       A.      I don't think so.  I think as far as a

14   project and everything, I think it went pretty

15   smooth.

16               MS. TAYLOR:  Okay.  Ms. Kramer, can we

17          go off the record for five minutes?  I

18          probably just have a couple more questions to

19          tie up anything and then we can get out of

20          here.

21               MS. KRAMER:  That works.

22               THE VIDEOGRAPHER:  The time is

Page 119

1          11:42 a.m.  Off the record.

2                  (Recess from the record.)

3                  THE VIDEOGRAPHER:  The time is

4          11:46 a.m.  Back on the record.

5      BY MS. TAYLOR:

6          Q.    Mr. Williams, I just have a couple

7      more questions to follow up with.

8                  I want to return to -- we don't have

9      to pull it up, but I want to return to the invoice

10     that we looked at earlier.

11                 Do you have any documentation other

12     than that invoice showing how that $40,000 retainer

13     was charged?

14         A.    I believe that's all that we had.  And

15     to be honest with you, it's an open document at this

16     point.  In fact, you kind of brought my attention to

17     that, that we never kind of closed that out.  So we

18     need to do that.  So thanks for that.  No, I don't

19     believe there's anything else.

20         Q.    All right.  We're happy to have

21     brought that to your attention.

22         A.    I might have to pay some money back, I

Page 120

1    don't know.

2            Q.     So you're not sure if the 40,000 was

3    fully used or even if maybe you went over that?

4            A.     I'm not sure.  That's what we're

5    referring to there.  I need to go back into that and

6    close that out and figure out where we're at and

7    adjust it accordingly.

8            Q.     Did you charge True the Vote the

9    standard rate you would have charged for such a job?

10           A.     Yes.

11           Q.     Okay.  And what is that standard rate?

12           A.     It's -- it's per job.  It just depends

13   on what it is.  And there's a lot of variables in

14   that such as that right there, the amount of work

15   that it was, the speed that it needed to be done in.

16   All that kind of stuff are just variables.

17                  So I could price that job three

18   different -- the exact same job in three different

19   scenarios and get you three different prices.  So

20   it's not set.

21           Q.     Okay.  When was the last time you

22   spoke to anyone at True the Vote?

Page 121

1          A.      I don't recall.  It's been a while,

2     though.  It's been a while.

3          Q.      Would you say it was, you know, within

4     the last three months, earlier this year, last year?

5          A.      Actually spoken to anybody, no.  I've

6     got e-mails on what was going on with the lawsuits

7     and things, that's about it.  But it's been a little

8     bit too, so that's about it.

9          Q.      Is the same true for your last

10    communications with anyone at OPSEC?

11         A.      Yes.  I don't even know who OPSEC is,

12    except you told me Gregg works there.  So that's

13    about it.  I would say so.

14         Q.      So it remains true for any

15    communications with Gregg Phillips?

16         A.      Correct.

17         Q.      Okay.  And when was the last time you

18    talked to Ron Johnson?

19         A.      Probably about two weeks ago.  He's a

20    friend, so we talk all the time, so -- but it's been

21    a couple of weeks still.

22         Q.      Have you talked to him recently about

Page 122

1    anything surrounding the work you guys did with True

2    the Vote?

3           A.     No, not at all.  He told me that he

4    had gotten notified of a deposition, said he had to

5    respond to that.  And that's -- that is about all we

6    talked about it.

7           Q.     What about with James Cooper; when was

8    the last time you spoke with him?

9           A.     It's been a couple of months.  And he

10   was doing some other work for me, and that was what

11   that was about, but not in this capacity at all.

12          Q.     Okay.  Mentioned talking to Ron

13   Johnson about the deposition.

14                 Did you talk to anybody else about the

15   deposition -- your deposition or theirs?

16          A.     Not that I recall.  Counsel, that's

17   it.

18          Q.     You said you didn't do -- earlier, way

19   at the beginning of this, you said you hadn't done

20   any deposition preparation, but I just want to

21   return to that real quick.

22                 You did meet with counsel?

Page 123

1          A.     I spoke with counsel.

2          Q.     When was that?

3          A.     A couple of times just to -- making

4    sure that I was aware of the deposition and things

5    along those lines and just going over a couple of

6    things as far as that goes, but no content.

7          Q.     And you don't have to tell me the

8    specifics of those communications, but did you guys

9    review any documents together during those meetings?

10         A.     No.

11                THE WITNESS:  I would object to that,

12         Courtney, but it's okay.

13                No.

14   BY MS. TAYLOR:

15         Q.     And then last thing is, you had

16   mentioned you had been -- previously been deposed.

17                That's correct?

18         A.     Correct.

19         Q.     Just can you clarify in what capacity

20   you had been deposed?  Was it a personal matter,

21   something to do with your business?

22         A.      Personal matters and divorce cases,

Page 124

1   things like that.

2        Q.     Okay.  And was it just the one time or

3   had you been deposed previously multiple times?

4        A.     A couple of times.  I don't recall.

5   It's been several years.

6        Q.     Okay.  Have you ever testified in

7   court?

8        A.     Not that I recall.

9        Q.     Not in connection with any of those

10  previous proceedings relating to divorces or what

11  have you?

12       A.     Yeah, I probably did in divorce or

13  something, but it's typical divorce kind of stuff, I

14  think.  Yeah, probably so.

15       Q.     I think you had mentioned that that

16  was likely in the '90s; is that right?

17       A.     Correct, yeah.

18             MS. TAYLOR:  Okay.  I have no further

19        questions.

20             THE WITNESS:  Thank you very much.

21             THE VIDEOGRAPHER:  One moment.  If

22        there's nothing further, the time is

Page 125

1          11:52 a.m.  This concludes today's deposition

2          and we are off the record.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 126

```
 1    STATE OF NEW YORK              )
 2                                   ss:
 3    COUNTY OF WESTCHESTER          )
 4              I, EILEEN MULVENNA, CSR/RMR/CRR, a
      Certified Court Reporter, Registered Merit Reporter,
 5    Certified Realtime Reporter, and Notary Public in
      and for the State of New York, do hereby certify:
 6              That I reported the taking of the
      deposition of the witness, MARK WILLIAMS,
 7    commencing on the 23rd day of September, 2021, at
      the hour of 9:00 a.m.
 8              That prior to being examined, the witness
      was duly sworn by me to testify to the truth, the
 9    whole truth, and nothing but the truth.
10              That I thereafter transcribed my said
      shorthand notes into typewriting and that the
11    typewritten transcript of said deposition is a
      complete, true and accurate transcription of my
12    said shorthand notes taken down at said time, and
      that a request has been made to review the
13    transcript.
14              I further certify that I am not a relative
      or employee of an attorney or counsel of any of the
15    parties, nor a relative or employee of any attorney
      or counsel involved in said action, nor a person
16    financially interested in the action.
17              IN WITNESS WHEREOF, I have hereunto
      set my signature this 6th day of October, 2021.
18
19
20
21
22                Eileen Mulvenna, CSR/RMR/CRR
```

Page 127

1      Mark Williams, c/o

       The Bopp Law Firm

2      1 South Sixth Street

       Terre Haute, Indiana   47807-3510

3

4      Case: Fair Fight, Inc. et al. v. True the Vote, et al.

       Date of deposition: September 23, 2021

5      Deponent: Mark Williams

6

7      Please be advised that the transcript in the above

8      referenced matter is now complete and ready for signature.

9      The deponent may come to this office to sign the transcript,

10     a copy may be purchased for the witness to review and sign,

11     or the deponent and/or counsel may waive the option of

12     signing. Please advise us of the option selected.

13     Please forward the errata sheet and the original signed

14     signature page to counsel noticing the deposition, noting the

15     applicable time period allowed for such by the governing

       Rules of Procedure. If you have any questions, please do

16     not hesitate to call our office at (202)-232-0646.

17

18

19     Sincerely,

       Digital Evidence Group

20     Copyright 2021 Digital Evidence Group

21     Copying is forbidden, including electronically, absent

22     express written consent.

9/23/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

```
                                                      Page 128
 1        Digital Evidence Group, L.L.C.
          1730 M Street, NW, Suite 812
 2        Washington, D.C. 20036
          (202) 232-0646
 3
 4        SIGNATURE PAGE
          Case: Fair Fight, Inc. et al. v. True the Vote, et al.
 5        Witness Name: Mark Williams
          Deposition Date: September 23, 2021
 6
 7        I do hereby acknowledge that I have read
          and examined the foregoing pages
 8        of the transcript of my deposition and that:
 9
10        (Check appropriate box):
          (  ) The same is a true, correct and
11        complete transcription of the answers given by
          me to the questions therein recorded.
12        (  ) Except for the changes noted in the
          attached Errata Sheet, the same is a true,
13        correct and complete transcription of the
          answers given by me to the questions therein
14        recorded.
15
16
17
18        _____        _____
19          DATE                     WITNESS SIGNATURE
20
21        _____        _____
22          DATE                          NOTARY
```

9/23/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Williams

Page 129

1          Digital Evidence Group, LLC

2          1730 M Street, NW, Suite 812

3          Washington, D.C.  20036

4          (202)232-0646

5

6                              ERRATA SHEET

7

8          Case: Fair Fight, Inc. et al. v. True the Vote, et al.

9          Witness Name: Mark Williams

10         Deposition Date: September 23, 2021

11         Page No.    Line No.     Change

12

13

14

15

16

17

18

19

20

21     _____        _____

22         Signature                           Date