Case 2:20-cv-00302-SCJ   Document 159-1   Filed 05/17/22   Page 1 of 118

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

_____

FAIR FIGHT, INC., SCOTT BERSON,      )
JOCELYN HEREDIA, and JANE DOE,       )
                                     )
                    Plaintiffs,      )
                                     ) Case No.
         -against-                   ) 2:20-CV-00302-SCJ
                                     )
TRUE THE VOTE, CATHERINE             )
ENGELBRECHT, DEREK SOMERVILLE,       )
MARK DAVIS, MARK WILLIAMS, RON       )
JOHNSON, JAMES COOPER, and JOHN      )
DOES 1-10,                           )
                                     )
                    Defendants,      )
                                     )
FAIR FIGHT ACTION, INC.,             )
          Counter-Defendant.         )
_____)


VIDEO-RECORDED DEPOSITION OF
JOSEPH MARTIN
Zoom Recorded Videoconference
09/28/2021
9:03 a.m. (EDT)
REPORTED BY: AMANDA GORRONO, CLR
CLR NO. 052005-01

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 2

1                                    09/28/2021

2                                    9:03 a.m. (EDT)

3

4          VIDEO-RECORDED DEPOSITION OF JOSEPH MARTIN,

5    held virtually via Zoom Videoconferencing, before

6    Amanda Gorrono, Certified Live Note Reporter, and

7    Notary Public of the State of New York.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

```
                                                             Page 3
 1    A P P E A R A N C E S
      (Via Zoom Videoconferencing):
 2
 3    ON BEHALF OF PLAINTIFFS:
              Torryn Taylor Rodgers, Esquire
 4            Perkins Coie LLP
              505 Howard Street
 5            Suite 1000
              San Francisco, CA 94105-3204
 6            PHONE:  415.344.7122
              E-MAIL: TTaylor@perkinscoie.com
 7                - AND -
 8            Michelle McClafferty, Esquire
              Lawrence & Bundy LLC
 9            1180 West Peachtree Street NW
              Suite 1650
10            Atlanta, GA 30309
              PHONE:  404-400-1755
11            FAX:  404-609-2504
              E-MAIL:  Michelle.mcclafferty@lawrencebundy.com
12                - AND -
              Joel Ramirez, Esquire
13            Elias Law Group
              10 G Street NE
14            Suite 600
              Washington, DC, 20002-4253
15
16    ON BEHALF OF DEFENDANTS:
              Courtney Kramer, Esquire
17            The Bopp Law Firm
              1 South Sixth Street
18            Terre Haute, Indiana 47807-3510
              PHONE: (812) 232-2434
19            FAX: (812) 235-3685
20
21    ALSO PRESENT:
      Henry Marte, Legal Videographer - Digital Evidence
22    Group
```

Case 2:20-cv-00302-SCJ   Document 159-1   Filed 05/17/22   Page 4 of 118

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 4

```
 1                    I N D E X
 2   WITNESS                EXAMINATION BY        PAGE
 3   JOSEPH MARTIN          MS. TAYLOR              6
 4
 5                  E X H I B I T S
 6   EXHIBIT       DESCRIPTION                    PAGE
 7   Exhibit 1     E-mail String beginning Bates
                   No. Cooper 0088.................  26
 8   Exhibit 2     E-mail String beginning Bates
                   No. OPSEC 0052.................  40
 9   Exhibit 3     List of Names..................  45
10   Exhibit 4     Letter beginning Bates No.
                   Martin 0001....................  58
11   Exhibit 5     Letter beginning Bates No.
                   Martin 0002....................  58
12   Exhibit 6     Letter beginning Bates No.
                   Martin 0003....................  58
13   Exhibit 7     E-mail String Bates No. Martin
                   0005...........................  71
14   Exhibit 8     E-mail String beginning Bates
                   No. Def. Cooper 0181...........  73
15   Exhibit 9     E-mail String beginning Bates
                   No. Def. Cooper 0187...........  74
16   Exhibit 10    Letter beginning Bates No.
                   Def. Cooper 0185...............  90
17   Exhibit 11    Letter Bates No. Def. TTV 1833..  94
18   Exhibit 12    Letter on The Bopp Law Firm
                   letterhead beginning Bates No.
19                 Def TTV 1460...................  104
20   Exhibit 13    True the Vote Letter Bates No.
                   Def TTV 1459...................  105
21
22
```

Page 5

1                    THE TECH:  We are now on the record.

2       My name is Henry Marte.  I am a videographer on

3       behalf of Digital Evidence Group.

4                    Today's date is September 28, 2021,

5       and the time is 9:03 a.m.

6                    This deposition is being held in the

7       matter of Fair Fight, Inc., et al. Versus True the

8       Vote.

9                    The deponent today is Mr. Joe Martin.

10                   All parties to this deposition are

11      appearing remotely and have agreed to the witness

12      being sworn in remotely.

13                   All appearances -- you know what,

14      counsel, please identify themselves for the record.

15                   MS. TAYLOR:  Torryn Taylor with

16      Perkins Coie on behalf of the plaintiffs.

17                   MS. KRAMER:  Courtney Kramer with

18      Bopp Law Firm on behalf of the defendants.

19                   MS. McCLAFFERTY:  Michelle

20      McClafferty with Lawrence & Bundy, also on behalf of

21      plaintiffs.

22                   MR. RAMIREZ:  Joel Ramirez with Elias

Page 6

1   Law Group also on behalf of plaintiffs.

2   JOSEPH MARTIN, called as a witness, having been first

3   duly sworn by a Notary Public of the State of New

4   York, was examined and testified as follows:

5   EXAMINATION

6   BY MS. TAYLOR:

7          Q.     Good morning, Mr. Martin.

8          A.     Good morning.

9          Q.     Good morning.  I'm Torryn Taylor.  As

10  I mentioned, I am an attorney for plaintiffs in this

11  case.

12                Do you mind stating your full name

13  for the record, please?

14         A.     Clare Joseph Martin.

15         Q.     Okay.  And your address, please?

16         A.     3198 Hillman Road North --

17         Q.     And is that?

18         A.     -- Northeast Crawfordville, Georgia

19  30631.

20         Q.     Got it.  And, is that where you are

21  videoing in today from, Mr. Martin?

22         A.     Correct.

Page 7

1      Q.      Great.  And, how are you viewing

2  today's deposition?  Are you on your computer?

3  Tablet?

4      A.      Computer.

5      Q.      Okay.  And, do you have any documents

6  with you today?

7      A.      Could you be -- what does that mean?

8  I mean, I'm in my office here.

9      Q.      Sorry.  That wasn't a very clear

10 question.

11             Do you have any documents that you

12 plan on using, for the purposes of the deposition

13 today?

14     A.      No.  None whatsoever.

15     Q.      Okay.  And, is there anyone in the

16 office with you today, from where you are videoing in

17 from?

18     A.      Nope.

19     Q.      Okay.  And have you ever been deposed

20 before, Mr. Martin?

21     A.      No.

22     Q.      Okay.  Just before we get started

Page 8

1   then, I'm going to go over a couple -- just rules for

2   this deposition, just so that we're on the same page

3   and we know what's going on.

4             Just a reminder that all of the

5   testimony that you give today is under oath, it's

6   just as if you were to be testifying in court.

7             Okay?

8        A.    Yes.

9        Q.    And, for the benefit of everyone and

10  the court reporter, and because we are doing this

11  deposition today remotely, I'd ask that you make all

12  of your answers to my questions audible.  A head nod

13  or head shake won't show up on the transcript.  And

14  it makes it a little more difficult for the court

15  reporter.

16       A.    Okay.

17       Q.    Great.

18            I'd also ask that when I ask a

19  question, you allow me to finish my question before

20  you answer; just so that we're not interrupting each

21  other.  It will also help us have a cleaner

22  transcript.  And I'll do the same and I'll do my best

Page 9

1   to not interrupt you when you are answering.

2              Does that sound fair?

3        A.      Absolutely.

4        Q.      Great.  And, from time to time your

5   attorney, Ms. Kramer here, may make an objection to

6   one of my questions, which is totally fine.  I ask

7   that you still respond to the question, unless she

8   gives you a specific instruction not to.

9              Does that sound fair?

10       A.      I'll follow whatever instructions she

11  gives me.

12       Q.      Okay.  And, because we're taking this

13  deposition remotely today, and I'm not able to be in

14  the same room with you and see what's going on over

15  there, I -- do you understand that it would be

16  appropriate not to tell -- or not to talk with anyone

17  today about how to answer the questions that I ask

18  you?

19       A.      I don't understand what -- who am I

20  supposed to talk to?  There's nobody here.

21       Q.      Well, Mr. Martin, just because we're

22  on video and I can't see what's necessarily going on

Page 10

1    in front of you, for example, it would be

2    inappropriate for you to text somebody or to message

3    somebody, or otherwise attempt to communicate with

4    someone about the answers to the questions that I'm

5    going to ask you today.

6                    Does that make sense?

7         A.      Absolutely except for the attorney,

8    Courtney Kramer.

9         Q.      Right, Mr. Martin.  You're more than

10   welcome to speak with Ms. Kramer during breaks and

11   what have you.  But I ask that when I'm asking you

12   questions, and while a question is pending, before

13   you've given the answer, that you don't communicate

14   with Ms. Kramer; unless she gives you a specific

15   instruction not to respond.

16                   Does that make sense?

17        A.      I guess so.

18        Q.      Okay.

19                   MS. TAYLOR:  Does that sound fair,

20   Ms. Kramer.

21                   MS. KRAMER:  That's fine.  If he has

22   a question for me, then we can go off record though.

Page 11

1              That's fine, Joe.

2              THE WITNESS:  That's my understanding

3    of your representation.

4         Q.    That's fair.  It's just, I ask that

5    if there is a question pending, that you respond to

6    the question before we go off the record; just so

7    that nothing is left hanging in the air.

8              Do you understand?

9         A.    I understand what you are saying.

10        Q.    Okay.  If at any point you don't

11   understand a question that I'm asking, please let me

12   know and I will rephrase that question to try and

13   make it a little clearer.  If you answer a question

14   that I ask, I'll assume that you understand in that

15   scenario.

16             Does that sound fair, Mr. Martin?

17        A.    Absolutely.

18        Q.    Great.

19             And, if at any point during today's

20   deposition you need to take a break, just let me

21   know.  And, we can go off the record and you're

22   certainly welcome to do so.  I'll try and take

Page 12

1   regular breaks every hour or so.  I don't anticipate

2   that this deposition will go all day long.  But, I --

3   just to let you know that -- you're more than welcome

4   to take a break when ever you want.  Just let me know

5   and I'll try to find a good place to stop.

6              All right?

7        A.      Yes.  Thank you.

8        Q.      Okay.  Let's get started then.

9              Mr. Martin, do you know what the case

10  we are deposing you for today is about; in a general

11  sense?

12       A.      In a general, not specifically, no.

13       Q.      Can you tell me at a high level what

14  your understanding of the case is?

15       A.      I've not read any of the -- any

16  documents, court documents or anything.  So I really

17  don't know specifically.

18       Q.      Okay.  Did you prepare to testify

19  today?

20       A.      What does "prepare" mean?  You know.

21       Q.      Did you meet with your attorney in

22  preparation for the deposition today?

Page 13

1          A.      Yes.

2          Q.      Okay.  And, how many times did you

3    meet with your attorneys?

4          A.      On a video, if you call that meeting.

5    Yes, once.

6          Q.      Okay.  And, does the Bopp Law Firm

7    represent you, in today's deposition?

8          A.      I believe so.

9          Q.      Okay.  And, without disclosing any

10   specifics of the conversations from that video

11   meeting you had with them, what -- can you describe

12   for me at a high level what you guys discussed?

13         A.      Yeah, they told me to tell the truth.

14         Q.      Okay.  And, are you on any

15   medications today, Mr. Martin, that might affect your

16   ability to testify?

17         A.      I don't know about ability to

18   testify.  But, at my age, I'm on all kind of

19   medications.

20         Q.      You don't have to disclose all the

21   medications, Mr. Martin.  But, is there anything

22   you're taking that might affect your memory, or your

Page 14

1  ability to testify truthfully today?

2       A.      There is nothing that will affect my

3  ability to testify truthfully.  But, again, at my

4  age, memory is not your strongest suit.

5       Q.      That's fair enough.  And I'm not

6  going to ask you to make things up, if you can't

7  remember.  But just want to be clear you're not

8  taking any medication that has a side effect that

9  you're aware of that affect your memory; is that

10  correct?

11       A.      That is correct.

12       Q.      All right.  Now, Mr. Martin, I -- I

13  believe you mentioned you live in Crawfordville,

14  Georgia; is that right?

15       A.      That is correct.

16       Q.      Is that in Taliaferro County?

17       A.      That is correct.

18       Q.      Okay.  And I want to make sure I'm

19  pronouncing it correctly, because I'm going to be

20  saying it a few times today.  It is pronounced

21  Taliaferro County; is that correct?

22       A.      Correct.

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 15

1          Q.          Okay.  Great.  And, do you know the

2     population of Taliaferro County, by any chance?

3     Roughly?

4          A.          Yeah.  1700 folks.

5          Q.          So, relatively small county?

6          A.          Smallest in Georgia.

7          Q.          Oh, is it?

8                       And, how long have you lived there?

9          A.          Since 2008.

10         Q.          Okay.  And, where were you before

11    that?

12         A.          In Maryland.

13         Q.          Okay.  And, what do you do for a

14    living, Mr. Martin?

15         A.          I'm a retired -- retired.

16         Q.          Okay.  And, what did you do before

17    your retirement?

18         A.          I worked in the defense industry.

19         Q.          Okay.  Until about -- about when did

20    you retire?

21         A.          Well, I retired from the -- about

22    when?  Somewhere around 2009.

Page 16

1        Q.        Okay.  So, after you moved to

2   Taliaferro County?

3        A.        2008.  Sometime in 2008 I believe.

4        Q.        Okay.  And, prior to these past

5   general and runoff elections in Georgia, had you had

6   any experience with the Georgia Election Code?

7        A.        Experience with the code, I would say

8   no.

9        Q.        Okay.  And, do you have any legal

10   training or background?

11        A.        No.

12        Q.        And, are you a registered voter in

13   Georgia?

14        A.        Absolutely.

15        Q.        In Taliaferro County?

16        A.        Absolutely.

17        Q.        And for how long have you been a

18   registered voter there?

19        A.        2008.

20        Q.        Okay.  Mr. Martin, can you explain to

21   me how you first got involved with True the Vote?

22        A.        That's -- I got a call from James

Page 17

1    Cooper.

2         Q.      Okay.  And, how do you know

3    Mr. Cooper?  Or, did you know Mr. Cooper, before he

4    reached out to you?

5         A.      Mr. Cooper was with the GOP, in

6    Georgia.  And, I believe he was associated with the

7    10th District.  And I had met him previously at my

8    residence when he delivered signs.

9         Q.      Okay.  And did you have a

10   relationship with Mr. Cooper beyond that, at that

11   point?

12        A.      No.

13        Q.      And so, you said you received a phone

14   call from him.  Do you recall roughly when that was?

15        A.      No, I don't.  All that, I believe is

16   in my written deposition, which I do not have in

17   front of me.  You know -- to be precise I don't know

18   exactly when -- that would be on the E-mails or the

19   deposition.

20        Q.      Okay.  I believe you're referring to

21   the written discovery responses that you submitted.

22   Is that correct?

Page 18

1        A.        Yes, I believe so.

2        Q.        Okay.  We may cover some things today

3     that are included on that, and it's totally fair if

4     you don't recall, you can -- you can say you don't

5     know or you don't recall.  But, I do want to cover

6     some things that may touch on those discovery

7     responses that you've already submitted responses to,

8     all right?

9        A.        Do you want me to dig up a copy of

10    that so that I can quote that precisely?  I mean, I

11    don't think its --

12       Q.        There's no need, Mr. Martin.  I

13    actually have a copy of that.

14       A.        I mean the dates and even the times

15    on all of those are in that package, somewhere.

16       Q.        That's fair.  And, I actually have a

17    copy of your responses here, that if we need to

18    reference them today, I can mark those as an exhibit

19    and pull them up.

20                 I want to return quickly to the call

21    you received from Mr. Cooper.  Can you give me a

22    ballpark estimate around roughly that may have been

1    just, for the record?  It doesn't have to be precise.

2              MS. KRAMER:  Counsel, can I just

3    clarify for my client real fast?

4              MS. TAYLOR:  Sure.

5              MS. KRAMER:  Joe, if you don't

6    recall, that's -- it's okay to say that.  It's okay.

7    You don't need the papers in front of you right now.

8    Just whatever you remember right now, during this

9    deposition, that's how you should answer.

10             THE WITNESS:  Well, I want to be

11   precise.  And, it's written down, you have the -- I

12   believe you have a specific timeline of any

13   interactions that I had with James, James Cooper.

14   It's, you know.

15        Q.     Mr. Martin, just to be clear, I'm not

16   asking for a precise date.  Just roughly the month,

17   year, even, that you may have spoken with him.  And

18   you mentioned that this was a phone call, for

19   example.

20        A.     It was during the election cycle.

21        Q.     Okay.  And, when you say "election

22   cycle" are you referring to the general election, or

Page 20

1    the runoff election, or both?

2          A.      I believe it was the runoff election.

3          Q.      Okay.  So, the runoff election was in

4    January of 2021.  Would you say you spoke with Mr.

5    Cooper that month?  Or, the month before, perhaps?

6    Roughly speaking.  It doesn't have to be precise.

7          A.      Now, again, it's in the written -- I

8    believe there's a complete timeline in the written

9    documentation.

10          Q.      Okay.  And it's okay if you don't

11    remember, Mr. Martin.

12          A.      I mean if you want to ask me -- if

13    you want to quote what I said in the written

14    documentation, I'll verify that.

15          Q.      Understood, Mr. Martin.  We can move

16    on.

17                  Did -- can you explain to me what

18    you -- what that phone conversation with Mr. Cooper

19    entailed?

20          A.      I believe our initial conversation

21    was he asked me to find a voter who would be willing

22    to challenge out-of-state/out-of-county voters.

Page 21

1        Q.        And by "voters" you mean, voters who

2   are registered in the state and in the county?

3        A.        No, someone who is registered in

4   Taliaferro County.

5        Q.        Okay.  But was actually out of state

6   or out of the county?

7        A.        No.  Someone who was a registered

8   voter, living in Taliaferro County, who would be

9   willing to challenge voters who presumably did not

10  live in the county or in the state.

11       Q.        Okay.  I think we were saying the

12  same thing there, just a little bit differently.

13                 When Mr. Copper reached out to you

14  asking you to identify a voter, did he represent to

15  you that he was affiliated with True the Vote in any

16  way?

17       A.        No.

18       Q.        Okay.  In what capacity did he reach

19  out to you, with this request?

20       A.        I was under the impression he was

21  reaching out to me as a member of the 10th District

22  GOP.

Page 22

```
 1          Q.       Okay.  And are you a member --

 2          A.       On the initial -- on the initial

 3   request.

 4          Q.       And are you a member of the 10th

 5   District GOP as well, Mr. Martin?

 6          A.       At the time I was the chairman of the

 7   Taliaferro County GOP.

 8          Q.       And for how long were you in that

 9   position?

10          A.       Probably four years.

11          Q.       And, you said "at the time."  So, you

12   are no longer the chairman; is that correct?

13          A.       That is correct.

14          Q.       And, when did that tenure end?

15          A.       I guess it was February this year.

16          Q.       Do you have any record of that

17   initial phone call you received from Mr. Cooper?

18          A.       You mean did I record it?  No.

19          Q.       For example, did you take any notes

20   or did he send you any documents?

21          A.       I believe we began corresponding by

22   E-mail after that.
```

Page 23

1          Q.      Okay.

2          A.      And, all of those E-mails are in the

3    package that -- whatever you call it, the written

4    deposition or whatever you call it.

5          Q.      And, can you tell me what the result

6    of that phone call with Mr. Cooper was?

7          A.      Well, at the -- at the time, you

8    know, I felt that he was asking for something that

9    was important.  If there was a presumption that

10   people were voting who do not live in the county, or

11   the state.  So, I told him I thought it was my

12   responsibility to do that, to take any action.

13         Q.      So, you agreed to help Mr. Cooper in

14   finding someone who would be able to challenge voters

15   who --

16         A.      Yes.

17         Q.      Okay.  And, were you able to identify

18   someone to take that role?

19         A.      Yeah, me.

20         Q.      Okay.  And, we'll get into that in a

21   little bit.

22                 You mentioned having received a

Page 24

1   couple of E-mails from Mr. Cooper.  Were any of those

2   E-mails -- I'll say -- an outreach E-mail of sorts?

3   Similar to the phone call that you're describing that

4   you had with him?

5          A.      I don't know what "outreach" means

6   now.

7          Q.      For example, did he follow up that

8   phone call with you with any kind of E-mail outlining

9   what he was asking you to do?

10         A.      Yeah.  Again, all that is in the

11  written testimony.  There's a complete E-mail

12  exchange, you know.  I believe he sent a listing of

13  37 people who had been judged to be out of county or

14  out of state.

15         Q.      And we -- we have a copy of some of

16  those and we will go over them today.  I was just

17  trying to get a high level understanding of this

18  initial interaction that you had with Mr. Cooper.

19                 So, you said your understanding he

20  wasn't affiliated with True the Vote at the time.  At

21  what point did you learn there was a affiliation with

22  True the Vote for this process?

Page 25

 1       A.       At some point in time in

 2    transmitting -- in our discussions.  E-mail

 3    discussions.

 4                 And I believe you'll see that, again,

 5    in the E-mail transcripts.  He clarified that he was

 6    not acting as 10th District GOP.  I guess he was the

 7    third vice chairman or something like that.

 8                 The specifics, again, are in the

 9    documentation.

10       Q.       And had you heard of True the Vote

11    before this?  Before he --

12       A.       No.

13       Q.       -- before he -- okay.

14                 Had you heard of Catherine

15    Engelbrecht?

16       A.       No.

17       Q.       And what about the group OPSEC?

18       A.       Who?

19       Q.       Opsec, O-P-S-E-C.  Are you aware of

20    who that -- what that group is?

21       A.       Nope, never heard of the word before.

22       Q.       Okay.  And, did you work directly

Page 26

1    with anyone at True the Vote, aside from James

2    Cooper, during this process of challenging voters in

3    Taliaferro County?

4          A.      No.

5          Q.      Okay.  Did you work with anyone named

6    Greg Phillips?

7          A.      Never heard of that name before.

8          Q.      Okay.

9                  MS. TAYLOR:  Mr. Marte, can you pull

10   up --

11                 THE WITNESS:  Martin, Martin,

12   M-A-R-T-I-N.

13                 MS. TAYLOR:  Right.  I'm referring to

14   Mr. Marte who's our -- our hot seater today.

15                 Can you pull up Defendant Cooper 0088

16   and mark it as the first exhibit, please.

17                 (Whereupon, Exhibit 1, E-mail String

18   beginning Bates No. Cooper 0088 was marked for

19   identification.)

20   BY MS. TAYLOR:

21         Q.      Can you see that, Mr. Martin?

22         A.      I can.

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 27

1         Q.      Okay.  This is a two-page document.

2    If you could take a look at this document and let me

3    know when you have a chance or when you're finished.

4              THE TECH:  Just let me know when to

5    go to the next page.

6              THE WITNESS:  Next page.

7         A.      Correct.

8         Q.      Okay.  And, if we could return to the

9    first page.

10             MS. TAYLOR:  Also, Henry, is it okay

11   if I call you Henry today; to avoid any confusion

12   with Mr. Martin's last name?

13             THE TECH:  Yeah, never -- you don't

14   have to call me Marte.  It makes me feel old.

15             MS. TAYLOR:  Will do.

16   BY MS. TAYLOR:

17        Q.      Mr. Martin, can you explain to me

18   what's going on in this E-mail?

19        A.      Again, Mr. Cooper asked me to find a

20   registered voter to challenge 37 people -- Taliaferro

21   County registered voter who would challenge 37 folks

22   in Taliaferro County.  And, there was some urgency to

Page 28

1   this.  I believe we were a week into the absentee

2   ballot -- balloting at this time, now that I see the

3   date.

4              I told Mr. Cooper that, you know, as

5   chairman of the Republican party, it would probably

6   be my responsibility to do that.

7        Q.     Okay.

8        A.     So I signed this at the time.

9        Q.     And this is you giving Mr. Cooper

10  permission to use your name as a challenger to those

11  letters?

12       A.     Yes.

13       Q.     Okay.

14       A.     Of the 30 -- of the 37 individuals.

15              Do you have that list of the 37

16  individuals?

17       Q.     I do, Mr. Martin.  And we'll pull it

18  up in a little bit here.  And we can go over that

19  then.

20       A.     Okay.

21       Q.     Did you look for anyone else in

22  particular to serve as the challenger?  Or did you

Page 29

1  volunteer kind of from the get-go to be that person?

2       A.      No, I believed it was my

3  responsibility, and I did not want to put the onus on

4  anyone else.

5       Q.      Okay.  And what --

6       A.      I was not aware of the -- you know,

7  as you asked me earlier, about the election rules.

8  You know, I had not studied Georgia election rules

9  and that sort of stuff.  This just seemed to be the

10  right thing to do.  If people don't live in the

11  county, they probably shouldn't be voting there.

12       Q.      And in that same vein, Mr. Martin,

13  had you served as a challenger to anyone -- to

14  anyone's eligibility to vote before?

15       A.      No.

16       Q.      Okay.  Why did you -- you mentioned

17  that it was -- you felt it was your responsibility to

18  be the challenger.  Can you explain that a little bit

19  to me, what you mean by that statement?

20       A.      I was -- I was chairman of the GOP at

21  that time.

22       Q.      Okay.  And, can you explain to me why

Page 30

1    that fact is important?

2          A.      Well, again, going back to our

3    initial conversation, I believe James -- I was under

4    the impression James was calling me from the GOP, at

5    the time.  And, you know, if people were voting that

6    didn't live here, that was significant.

7          Q.      And --

8          A.      We only have 1,200 voters in the

9    county.  A couple voters -- we've had many elections

10   in the county, where one or two votes make a big

11   difference.

12         Q.      I'll bet.

13         A.      A lot of elections are decided by one

14   or two votes in this county.

15         Q.      You said a couple of times that you

16   were under the impression that Mr. Cooper was calling

17   you on behalf of the GOP.  Did that affect your

18   decision to agree to be a challenger in Taliaferro

19   County at all?

20         A.      Yes.

21         Q.      In other words --

22         A.      But he did -- but he did clarify.  He

Page 31

1    did not -- James Cooper did not say that in the

2    initial discussions.  And he did clarify that.

3    Again, if you look at the document -- the -- the

4    documentation and the timeline, he did clarify that

5    at some point in time, although when -- when he said

6    he was representing True the Vote I didn't know what

7    the heck that was, and that's what caused me to

8    validate the list of 37.  You know, my question was:

9    Well, how did you get this 37; how did you get these

10   people?  And, how do we know this is correct before I

11   do this?  We need to know that there is some, you

12   know, authoritative procedure that, you know, that

13   generated this list.

14        Q.     And you've produced documents to that

15   effect, Mr. Martin.  And we'll get into those in a

16   bit.

17               In other words, though, had you not

18   been under the impression that Mr. Copper was calling

19   you on behalf of the GOP, would you have agreed to

20   serve as a challenger, do you think?

21        A.     Looking at all the trouble that

22   has -- that that has caused, no.

Page 32

1      Q.      So in hindsight, you wouldn't -- you

2   wouldn't have agreed to be a challenger?

3      A.      As -- as -- the documentation that

4   you -- you have put up here shows that on

5   December 17th, I believe, at 3:38, at that moment in

6   time, I said yes.  If you'll -- if you'll look at the

7   documentation, there is a whole discussion in -- in

8   the answer of one of the questions, that explained

9   how I attempted to validate the information that they

10   had provided me, because I asked them for the entire

11   listing of 37 people.  And I don't have the date in

12   front of me when I got that, or the time.  But I

13   attempted to validate myself, that this was

14   worthwhile.  And -- and I took a separate action, and

15   then I retracted this permission at a later date; I

16   believe on the 20th of December.  But again, I'm

17   not -- I'm just trying to recall.  I don't have the

18   timeline in front of me.

19      Q.      Understood.  And I don't -- like I

20   said, we'll get into all of that in a bit.  I don't

21   want to get too far ahead of ourselves, though.  So

22   just returning to your --

Page 33

1          A.       You -- go ahead.

2          Q.       I'm sorry, you can say what you were

3     going to say.

4          A.       No.

5          Q.       I just wanted to return quickly to

6     your initial interaction and agreeance to serve as a

7     challenger in Taliaferro County here for a minute, if

8     we could.  Did you -- what was your understanding of

9     the challenge process at this time when you agreed

10    to -- to serve as the challenger for Taliaferro

11    County?

12         A.       Well, when I agreed to this, I had no

13    idea what it was.

14         Q.       Okay.  Did anyone explain to you,

15    either from True the Vote, or Mr. Cooper himself,

16    about what -- what the process might entail?

17         A.       Again, you know, things were moving

18    very quickly.  And, I probably wasn't as fully

19    informed, myself personally, what it meant.  I know a

20    lot more now.  So, it's a little difficult to

21    separate what I knew at that -- at that moment, from

22    what I know now.

Page 34

1          Q.       That's fair.  Do you recall any

2     conversations with Mr. Cooper explaining to you the

3     process, though?

4          A.       I believe at this point, we were

5     communicating by E-mail.  I don't believe we spoke

6     specifically on the phone.  So again, everything that

7     that -- that he provided me, and everything that I

8     provided him should be in your written documentation.

9          Q.       Okay.  Do you recall --

10          A.       And again, I think there is a

11     timeline in there, a discussion, a specific paragraph

12     that outlines the actions that I took specifically

13     with regards to individuals who did not live in

14     Taliaferro County, do not reside in the state of

15     Georgia, who -- who I had attempted to find out if

16     they had actually voted.  And -- and I took specific

17     actions with regards to three individuals.

18          Q.       Right.

19          A.       And that's outlined in the

20     documentation.

21          Q.       Like I said, Mr. Martin, we will go

22     over those documents.  I'm just -- and we'll go over

Page 35

1   in depth in detail what actions you took.  I'm just

2   trying to get an understanding of what actions

3   Mr. Cooper might have taken in signing you up to do

4   these challenges; or in you agreeing to work with him

5   to submit these challenges.

6              Do you recall discussing the

7   possibility of a challenge hearing, at all, at any

8   time with Mr. Cooper, or with anyone at True the

9   Vote, as a result of issuing these challenges?

10      A.      No.  I became aware of that later on.

11      Q.      And, how did you become aware of that

12   later on?

13      A.      In discussions with the registrar of

14   voting, in Taliaferro County.

15      Q.      Okay.  Did you discuss with Mr.

16   Cooper, or anyone at True the Vote, how to handle any

17   follow-up that you may receive from the County, as a

18   result of issuing these challenges?

19      A.      No.

20      Q.      Did you discuss with Mr. Cooper, or

21   anyone at True the Vote, how to handle any potential

22   media inquiries that you might receive as a result --

Page 36

1          A.      No.

2          Q.      -- of issuing these challenges?

3          A.      No.

4          Q.      Did you discuss anything else in

5     general about -- about the issuance of these

6     challenges, aside from -- and, like I said, we'll get

7     into -- kind of the actions that you took on your own

8     afterwards.  But, in this initial time zone here,

9     where you agreed to serve as at the challenger, did

10    you have any other additional conversations with

11    Mr. Cooper, or anyone at True the Vote, about --

12    about the process, or what it would entail?

13         A.      Again, you're using the word

14    "conversations."  I do not believe we had discussed

15    anything on the phone.  And, all the written

16    documentation would be in the E-mail.  And I believe

17    you have that E-mail traffic in its entirety.

18         Q.      Okay.  And just to be clear, when I

19    reference conversations, I'm including E-mail, any --

20    any kind of communication that you may have had with

21    anyone at True the Vote, or Mr. Cooper.  Does that

22    make sense?

Page 37

1          A.          I did not have any discussions with

2     anyone from True the Vote, except for James Cooper.

3                    Are you done with the text over here?

4          Q.          Yes.

5          A.          Good.  Okay.

6                    MS. TAYLOR:  You can pull that down.

7     Thank you, Henry.

8     BY MS. TAYLOR:

9          Q.          So, can you walk me through the

10     process of issuing the challenges?  And again, not --

11     not getting into, quite yet, the specific individual

12     actions that you took.  But, what it actually

13     entailed, as far as submitting the challenges?

14          A.          Please clarify.  There's -- are you

15     speaking of the challenges that True the Vote sent in

16     regarding to the December 13th letter, that you just

17     had up on the screen?  Is that what you're referring

18     to?

19          Q.          Yes.  Mr. Martin, I believe that was

20     dated December 17th, but --

21          A.          I'm sorry, 17th.

22          Q.          -- Yes.  I'm referring to the

Page 38

1    challenges that you agreed to submit, in your name,

2    in connection with True the Vote, on behalf of

3    Taliaferro County.

4           A.      Okay.  Now -- now let's go back to

5    your specific question.  What specifically were you

6    asking regarding that list of 37 individuals?

7           Q.      I'm -- I'm asking if you could just

8    walk me through what the challenge process was.  How

9    you would go about challenging those 37 individuals?

10          A.      Yes.  I did nothing, with regards to

11   the entirety of the list of 37 people.  I believe

12   it -- it came to -- I attempted to validate that the

13   list was real.  And I took a different path to

14   challenge.

15          Q.      Can you explain that a little bit?

16          A.      Again, it's in the -- it's in the --

17   it's in the -- it's in the written documentation.  I

18   was not comfortable that -- that the -- the list was

19   valid.  How -- how did this list come about?  Where

20   did this list come from?  Who generated the list?

21   And, I asked an individual with the 10th District

22   GOP, I sent him the list and said:  Can you help me

Page 39

1    out here; what's going on?  And again, I believe you

2    have that E-mail.

3                    At that point in time, that

4    individual said three of these people have already

5    voted, have sent in absentee ballots.  Don't ask me

6    how they knew that.  They just said three of these

7    people, which caused an urgency for me; that if it

8    was true that these people did not live in the

9    county, and that they were voting, that seemed to be

10   not right at all.

11        Q.      And, just to clarify what you said

12   just then, who was it that you spoke with; who told

13   you that three of the people on the list had already

14   voted?

15        A.      Again, I don't have his name right in

16   front of me.  It's in the documentation that -- that

17   you should have there.  If you don't have his name

18   there, then I'll have to go offline and try and dig

19   out -- I don't have a copy of the written

20   documentation, and I don't have a recollection of

21   specifically.  I believe he was the treasurer of the

22   10th District GOP.

Page 40

```
 1         Q.       Okay.   That's fair if you don't
 2    recall --
 3         A.       Do you have that name in -- do you
 4    have that name in the paperwork you have there?
 5         Q.       I'm not actually sure that we do.
 6    And, we can go back and look.  But, there's no need
 7    for you to go back and look at everything.  I'm
 8    asking you today is just what you remember sitting
 9    here today about everything that I'm asking you about
10    today.  So, no need for you to go back and look.  And
11    we can certainly go back and look on our side.
12                  MS. TAYLOR:  Henry, can you please
13    pull up and mark as the next exhibit the document
14    Ending in Bates 0052.
15                  (Whereupon, Exhibit 2, E-mail String
16    beginning Bates No. OPSEC 0052 was marked for
17    identification.)
18    BY MS. TAYLOR:
19         Q.       Mr. Martin, can you see this
20    document?
21         A.       I can see it.  Yes, yes.
22         Q.       Okay.  And, I know you're not on this
```

Page 41

1    E-mail thread.  But, if I could turn your attention

2    to the -- to the second page.

3              MS. TAYLOR:  Actually, Henry, if we

4    could.  Yeah, right here.

5    BY MS. TAYLOR:

6         Q.      So, this is an E-mail from James

7    Cooper at the bottom here.  And he says, "I have one

8    chair in the 10th that wants the names of the folks

9    he will be challenging.  He is the Taliaferro county

10   Chair.  He said he wants to do it, but will not

11   unless he sees the names."

12             Did I read that correctly?

13        A.      Correct.

14        Q.      And is that you referring to you,

15   Mr. Martin?  Are you the Taliaferro County Chair?

16        A.      Yes.

17        Q.      Okay.

18        A.      And you see please note -- please

19   note that that sign, the "3rd Vice Chair," the "10th

20   District Republican Party, GOP State Committee," Mr.

21   James Cooper.

22        Q.      Right.  And so, just for the record,

Page 42

1   you're referring to James Cooper's signature in his

2   E-mail; is that correct?

3          A.      In the E-mail where he indicates that

4   I want the list.  Because -- yes.

5          Q.      And is that -- is this E-mail

6   address, jamescooper.gop@gmail.com, is that the

7   E-mail you would have been corresponding with

8   Mr. Cooper on -- with?  As far as you can recall?

9          A.      Yeah.  Again, I'd have to look at my

10  address book right here and see if I have another

11  address for him.  But yes, I mean, I presume so.

12  Look at the E-mails that you have with my name

13  corresponding to him.  Again, you have that

14  documentation.  You're asking me to remember an

15  E-mail address from two years ago, and you have it

16  right in front of you.

17         Q.      That's fair, Mr. Cooper.  I'm just

18  asking what --

19         A.      Martin.

20         Q.      Sorry, Mr. Martin.  I'm just asking

21  what you recall.  And you pointed out that he has

22  that signature below his name in this E-mail.  Why --

Page 43

1    why is it that of note?

2          A.       Well, I'm reemphasizing that it's

3    not -- he didn't sign that as representing True the

4    Vote.  He signed that as Republican Party.  I'm just

5    em- -- just highlighting -- you've highlighted he was

6    referring to me and I said yes.  And I'm saying he's

7    referring to me, but he's signing that as, you know.

8                   MS. KRAMER:  Counsel, do you mind if

9    we take a quick 5, 10-minute break.

10                  MS. TAYLOR:  Yes, that should be

11   fine.

12                  MS. KRAMER:  Okay.  Thank you.

13                  THE TECH:  All right.  Stand by,

14   please.  The time is 9:50 a.m., off the record.

15                  (Recess taken.)

16                  THE TECH:  The time is 10:00 a.m.,

17   back on the record.

18   BY MS. TAYLOR:

19         Q.      So, Mr. Martin, before we went off

20   the record just then, we were looking at an E-mail in

21   which it indicated that you had asked to see the

22   names of the -- the folks you would be challenging,

Page 44

1    correct?  Before you --

2            A.        Correct.

3            Q.        Okay.  And, did you ask to see that

4    list of names before you agreed to serve as the

5    challenger for Taliaferro County?

6            A.        I believe so.  This is dated the

7    16th.  It would be the day before I signed the --

8            Q.        And, you'll see here Mr. Cooper

9    writes, "He said he wants to do it, but will not

10   unless he sees the names."

11                    Does that sound right to you?

12           A.        Say again.

13           Q.        Mr. Cooper writes in this E-mail that

14   "He said he wants to do it, but will not unless he

15   sees the names."

16                    I believe in reference to you?

17           A.        Yes, yes.

18           Q.        That sounds accurate?

19                    Okay.  So, did you ask Mr. Cooper for

20   this list?

21           A.        Yes.  As I explained to you, he is

22   the only person that I communicated with that, yes.

Page 45

1          Q.        Okay.  And, what was his response to

2     that request; when you asked to see the list of

3     names?

4          A.        Well, I eventually got the list of

5     names.  Because I sent it to the -- to the treasurer

6     of the GOP.

7          Q.        Okay.

8               MS. TAYLOR:  Henry, can we pull up

9     and mark as the next exhibit, the document ending in

10     Bates stamp 257.

11               (Whereupon, Exhibit 3, List of Names,

12     was marked for identification.)

13     BY MS. TAYLOR:

14          Q.        Mr. Martin, do you recognize this?

15          A.        Not yet, no.  But I assume if we

16     count down there, and there are 37 names on it, that

17     would be the list that he sent me.

18          Q.        Okay.  And I'll -- I can represent to

19     you today, Mr. Martin, that I have counted.  There

20     are 37 names on this list.  So, is it fair to say

21     that this is the list of names that you received from

22     Mr. Cooper?

Page 46

1          A.          Yes, in some form or other.  It just

2     doesn't look familiar.  But, yes.

3          Q.          Okay.

4          A.          Those are the names.

5          Q.          Yes.  I believe originally this must

6     have been an Excel spreadsheet of some sort.  And

7     it's just been converted into a PDF here; so the

8     formatting might be a little bit different.

9                      When did you see this for the first

10    time?

11         A.          Sometime in December.

12         Q.          And, it was Mr. Copper that showed it

13    to you?

14         A.          Again, Mr. Copper and I were

15    communicating by E-mail.  So, it would have been sent

16    to me by E-mail.

17         Q.          Okay.  And you mentioned having some

18    questions about how this list was generated; is that

19    correct?

20         A.          Yes.  I wanted some, you know,

21    single-source documents are -- in my line of work,

22    when you only have a single source of validation,

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 47

1    you -- you -- you want two sources.  You want to know

2    that it's a good -- how it came about.  Where is

3    the -- what do you call it?  Providence, or how did

4    it come about?  How was it generated?  I didn't get

5    any of that information.  I just got this list.

6                    Here if you have somebody, for

7    example, Beatrice Davis Paterson, Passaic, New

8    Jersey.  Where did that come from?

9                    You know, Larry Ratliff, Grady,

10   Oklahoma.  Well, I knew Larry.  He had moved to

11   Oklahoma.  So that validated -- well, that's somebody

12   that actually moved.  And the next question in my

13   mind was:  Did any of these people vote?  Or, what --

14   what's the process to see that they don't vote?  If

15   they really don't live in Taliaferro County, Georgia.

16        Q.      So, did you ask Mr. Copper how the

17   list was generated?  Or was that something you looked

18   into on your own?

19        A.      Again, I don't recall.  You know --

20   my skepticism of wanting to have it validated and

21   wanting to know before I put my name on something,

22   was, you know, I may have asked him, you saw him ask

Page 48

1   somebody else for the list.

2              So, you know, I didn't know how this

3   was generated.  I didn't know how you would get this

4   information.  I know a lot more now than I did at the

5   time.  But, at the moment when I got the list -- this

6   list, it was just a list.

7        Q.     Do you recall sitting here today

8   whether or not you had a conversation, at any time,

9   with Mr. Copper, about how the list was generated, or

10  where the names came from?

11       A.     Yeah.  Again, I'm -- I may have, it

12  would be in -- if I asked him that question, it would

13  be in the E-mail traffic.

14       Q.     But sitting here today, you don't

15  recall?

16       A.     Well, I'm sure I asked him for the

17  list.  And I'm sure in the process I said, where did

18  you get this?  That may have been when he said, well,

19  he got it from True the Vote.  I don't know.  That

20  may have been when, you know -- that other -- the --

21  the document you just showed me, showed him asking

22  somebody else.  It wasn't even True the Vote.  Wasn't

Page 49

1    it -- was Phillips or somebody.  And it was Austine

2    something.  That other thing.  So, I didn't know any

3    of that.

4         Q.     You anticipated my next question a

5    little bit.

6                Were you told anything about who

7    generated the list?  Were you told it was True the

8    Vote?

9         A.     I would think so.

10        Q.     Okay.  And you mentioned recognizing

11   a couple of names on this list.  Is that right?

12        A.     Right.

13        Q.     That you recognized at the time of

14   your initial review of the list?

15        A.     Correct.

16        Q.     Can you describe for me what other

17   independent research you may have done into the names

18   that appeared on this list, to the extent you did

19   any?

20        A.     Yes.  I sent the list to -- and I

21   don't have the name right off -- but I believe he was

22   the treasurer of the 10th District GOP.  And he

9/28/2021           Fair Fight, Inc. et al. v. True the Vote, et al.           Joseph Martin

Page 50

1   looked at the list and came back to me with three

2   names that he said had already voted.

3          Q.      You also mentioned -- we'll turn to

4   those three names in a second -- but you also

5   mentioned you had concerns with single-source

6   documents.  Can you explain what you meant by that

7   statement?

8          A.      Maybe I used the wrong terminology.

9   But, you know, when somebody sends you something and

10  says, "trust this," and wants you to take action

11  based on that, in my experience of working in the

12  Department of Defense for some 30-some years, I

13  became aware that not all the time what you see on a

14  piece of paper is real.  So, knowing where it came

15  from or how it was generated is important, to give

16  you confidence that you can take action on it.

17         Q.      So, just to be clear, did you get

18  clarity at any time about how this list was generated

19  or where these names came from?  Or you were never --

20         A.      No.

21         Q.      Okay.

22         A.      I mean I researched how that might go

Page 51

1    about since then.  But, at the time, I had no clue.

2    That's why I was asking for the list.

3          Q.     Okay.

4          A.     I certainly wasn't going to go

5    validate it.  I wasn't going to take an effort to

6    look into whether people had moved.

7          Q.     And, when Mr. Cooper provided you

8    this list over E-mail, he didn't explain to you how

9    it was generated at all?

10         A.     Again, Ms. Taylor, the specifics of

11   the transmittals are in the E-mails.  I can't recall

12   what exactly was in there.  You know, I'm trying to

13   be precise.  So, I can't recall exactly what was in

14   the E-mails.  You have the E-mails.  I don't know

15   whether he said here's the list or the list is

16   attached or -- I don't know.

17         Q.     Understood, Mr. Martin.  I'm just --

18   I was just trying to --

19         A.     I just see -- believe you will find

20   that I immediately turned around -- and, I believe I

21   had an E-mail to the chairman of the 10th District.

22   And then I believe she said check with so and so, and

Page 52

1    he's the -- turns out -- I believe he's the treasurer

2    of the 10th District.  I think he still is.  Mr.

3    Cooper is now the chairman of the 10th District, GOP.

4            Q.      Okay.  So, sitting here today, do you

5    know how this list was generated?

6            A.      No.  Specifically, no.

7            Q.      And you didn't at the time?

8            A.      Specifically, at the time, absolutely

9    not.

10           Q.      So, can you -- walk me through

11   chronologically, then, from the issuance of your

12   challenges to the resolution, however that may turn

13   out -- we'll get into it in a second.  Was there a

14   Broad of Elections meeting held, regarding your

15   challenges, at any point?

16           A.      No.  No.  Again, can we take this

17   down so I can see you?  Are you done with this list?

18           Q.      Sure.  We can take this down.

19           A.      Can we just refer to this as "the

20   list of 37"?

21           Q.      Sure.

22           A.      So, let me clarify.  There's a list

Page 53

1    of 37, which -- and you showed earlier a document

2    that said on the 17th of December at 3:38 I signed

3    and said, "okay.  You can challenge."  That was that

4    list of 37.  I was never comfortable that that was a

5    good list.  And I believe, I believe on the 20th of

6    December I retracted, or -- or, at some point in

7    time, I said I don't want to challenge those 37

8    people.  And True the Vote, or somebody retracted

9    that challenge.  And that's in an E-mail that we got

10   later on that has some funny little E-mail address on

11   it, that actually goes to the registrar of the -- you

12   know, the County registrar.

13               So, the challenge to the 37 went in

14   by -- went out -- and I did not find this out until

15   we got all of the documentation, did not even know it

16   was sent in, was sent in by True -- by somebody, and

17   was -- and then I asked them to retract it, or not to

18   do it.  I don't know my exact wording.  And then they

19   retracted it.

20               What I did was -- three names were

21   identified by the treasurer of the 10th District GOP

22   as having already provided absentee ballots.

Page 54

1                    At that point in time, I thought it

2     was important to challenge those three individuals.

3     Because at that point in time, I had this list that

4     said they didn't live here.  And I had the fact that

5     they had already submitted absentee ballots.

6                    I believe you have in your package

7     three letters that I sent to both the superintendent

8     of elections, with a copy to the registrar,

9     identifying, I believe, the individuals' names from

10    this list; and, I believe, the Georgia statute that

11    says that any voter can challenge any person.

12                    At that point in time, as the

13    chairman of the GOP, I felt if these people didn't

14    live in Taliaferro County, they should not be voting

15    in Taliaferro County.

16                    Let us call those challenges "the

17    three challenges," that I personally took.

18         Q.     Okay.

19         A.     Okay.  So, we have two sets of

20    challenges.  37 and three.

21         Q.     Real quick, Mr. Martin.  Just to

22    clarify.  Those three that you took, they are a part

Page 55

1    of the 37; is that correct?

2         A.      They are individuals that are on the

3    list of 37, yes.

4         Q.      Okay.

5         A.      The information that they didn't live

6    in Taliaferro County came from the list of 37.

7         Q.      Understood.  So, you issued a

8    specific challenge to three of the voters that were

9    on the list of 37, apart from the list of 37 names

10   that were being challenged that was issued by True

11   the Vote, with your name?

12        A.      Correct.

13        Q.      Okay.  And, you submitted the

14   names -- or excuse me.  You submitted the challenges

15   to those three specific individuals before or after

16   True the Vote submitted the challenges with your name

17   for the 37 as a whole?

18        A.      Yeah.  Again you're asking me for a

19   timeline.  To my knowledge True the Vote, James

20   Cooper, had not submitted 37 names.  I did not find

21   out they actually transmitted that by E-mail at some

22   point in time.

Page 56

1                    Again, you're talking about over two

2      or three days here, of a lot of activity.  And I was

3      moving in one direction to make sure that illegal

4      votes weren't counted.  Not to be -- and I did not

5      know what True to Vote was doing.  So, and they did

6      not copy me on the -- on the E-mail where they sent

7      the 37 votes -- 37 names in.  And you know, they --

8      and they -- again, it was -- it looked like, when I

9      looked at it in some package somewhere, it's some

10     funny number, 336 something.  You know, it looks like

11     it's a generic E-mail that goes to every county or

12     something.  I couldn't figure out how that worked.

13                    Am I being clear or no?

14         Q.     So you're not -- I think I'm

15     following.  Just a follow-up to make sure that I'm

16     understanding.

17                    You were not copied on the submission

18     of the challenges in your name --

19         A.     Correct.

20         Q.     -- of the 37 voters?

21         A.     Correct.

22         Q.     Okay.  And so, you're not sure

Page 57

1   exactly as to the exact date when that may have

2   happened?

3          A.      Right.

4          Q.      That makes sense.

5          A.      I did not become aware that they

6   actually sent that in until we began the written

7   deposition; when I went back and asked the county

8   registrar under an Open Records Request for all

9   information related to this subject matter.

10          Q.      Okay.

11          A.      And that was way later than anything

12   that occurred.

13                  At that point in time, you know, I

14   was sort of shocked that they had actually sent that

15   in.

16          Q.      And, did Mr. Copper, at any point,

17   tell you that voters who were registered in

18   Taliaferro County but did not live in Taliaferro

19   County weren't eligible to vote there?  Or, how did

20   you come to that understanding?

21          A.      I mean is it not logical?  I mean, if

22   you don't live -- if your -- don't live here, you

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 58

1    shouldn't be voting here, should you?

2          Q.      Okay.  So, you came to that

3    conclusion logically on your own, would you say?

4          A.      Well, I would think so.

5          Q.      Okay.

6                  MS. TAYLOR:  Henry, can we pull up

7    and mark as the next exhibits -- its actually three

8    documents, but we can look at them one at a time.

9    The ones that ends in Bates 0001, 0002 and 0003.

10                 THE TECH:  Okay.  So, should I bring

11   up one first.

12                 MS. TAYLOR:  You can bring up one

13   first.  Yeah.  And then we can just click through

14   them for Mr. Martin.

15                 (Whereupon, Exhibit 4, Letter

16   beginning Bates No. Martin 0001, was marked for

17   identification.)

18                 (Whereupon, Exhibit 5, Letter

19   beginning Bates No. Martin 0002, was marked for

20   identification.)

21                 (Whereupon, Exhibit 6, Letter

22   beginning Bates No. Martin 0003, was marked for

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 59

1    identification.)

2         Q.      Mr. Martin, let Henry know when

3    you've had a chance to look at this and we can click

4    to the next one.

5         A.      Yep.  You see this is dated the 18th.

6    You see the dates on these are -- see?  17th and then

7    this is dated the 18th.

8         Q.      Uh-huh.

9                 And, we'll go through these kind of

10   collectively.  I just want to let you put your eyes

11   on them.

12        A.      Yes.

13                MS. TAYLOR:  Henry, could you go to

14   0002.

15                THE TECH:  Got it.

16                MS. TAYLOR:  And then 0003.

17        Q.      So, I assume the answer is yes.  But,

18   you recognize these letters, Mr. Martin?

19        A.      Yes.  Absolutely.

20        Q.      Okay.  And are -- these are the three

21   individuals that you challenged on your own, separate

22   and apart from the list of 37 that True the Vote

Page 60

1    challenged on your behalf.  Is that correct?

2          A.     Correct.

3          Q.     Okay.  And these are challenges that

4    you also withdraw later?

5          A.     Correct.

6          Q.     Okay.

7          A.     But they -- it was based on the

8    information that Mr. Cooper had provided me that they

9    did -- you'll see all the addresses are from the

10   list -- the previous list of 37.

11         Q.     That's right.

12                So you got these three names from the

13   list of 37?

14         A.     Right.  What was concerning me was

15   these people are already asked for absentee ballots

16   or had already submitted absentee ballots.

17         Q.     Okay.  And, is this your handwriting

18   at the very bottom of the document?

19         A.     Which one?

20         Q.     Well, let's do both.  The -- let's

21   start with the very bottom here.  "I hereby retract

22   this challenge."

Page 61

1                    Is that your handwriting and

2    signature?

3          A.       Absolutely, yes.

4          Q.       Okay.  And then, the handwriting

5    right above that, whose is that?  Do you know?

6          A.       The -- I believe that's Ms. Vivian

7    Miller, the Taliaferro County Voter Registrar.

8          Q.       Okay.  So, can you walk me through

9    the withdrawal process for these challenges?

10                   Let's start with, how you came to the

11   decision to withdraw each of these three?

12         A.       Let's go to 001 first.  So, I gave it

13   to him on the 17th.

14         Q.       Okay.

15         A.       And it was my under -- I didn't know

16   who Beatrice Davis was.  You know, I would never

17   recognize her.  But the list said she was living in

18   Patterson, New Jersey.  And, Georgia Code 22-230 says

19   any person has a right to challenge a person that is

20   not living in the county.  So, I challenged it as

21   chairman of the Georgia Republican Party.  I didn't

22   know whether she was a Republican or a Democrat or

Page 62

1    what.

2          Q.      Okay.

3          A.      And that's my voter ID.  Georgia code

4    says any registered voter -- I'm a registered voter.

5    And I sent it to the superintendent of elections --

6    it probably should have gone directly to the Voter

7    Registrar.  Judge Stevens, who's the superintendent

8    of elections, called up Mrs. Davis.  Said she lives

9    in Taliaferro County.  Ms. Vivian Milner told me

10   that.  You know, who was I to disagree with a judge,

11   who was validating that somebody lived in Taliaferro

12   County.  So I went, oh, and -- and on the 18th

13   retracted the challenge.

14         Q.      Okay.

15         A.      So -- and that definitely made me

16   concerned about the list of 37.

17         Q.      And, at this time, Mr. Martin, you

18   still weren't aware if True the Vote had submitted

19   that list of 37 challenges with your name on it yet,

20   right?

21         A.      I was not aware that True to Vote

22   submitted the list of 37 until an Open Records

                                                        Page 63

1    Request by me sometime in January.  True the Vote

2    never CCed me on anything, nor informed me, to my

3    knowledge, that they had submitted it.

4                    And, in the process of discussing

5    this with Mrs. Milner, she indicated to me, when they

6    received this, probably on the 18th, when -- when we

7    talked about this, she said they would schedule a

8    hearing and I would have to validate that she did not

9    live -- that these people did not live here.  And I

10   said no, that's not what -- then we read Georgia law.

11   Georgia law says it's the registrar's responsibility

12   to validate where somebody lives.  But, since Judge

13   Stevens, on this particular case said they don't live

14   here -- I mean she said they live here.  I was not

15   going to argue with the judge.  Right?  I mean, who's

16   going to argue with a judge.  Right?  So, I retracted

17   the challenge.

18                    And then began to question, oh boy,

19   now what's the list of 37, the validation of the 37.

20                    Do you want to go to 002?  Or do you

21   have any questions about this one?

22        Q.       We can move on to 002.  I have a

Page 64

1   couple of questions about the whole process, but

2   let's get through why you withdrew each of these,

3   specifically first.

4           A.      Sure.   Again, this is Simons and the

5   current residence was Greene County.   So, I

6   challenged that.   If you live in Greene County, you

7   ought to vote in Greene County.   The Taliaferro

8   County tax commissioner, Ms. Milner went to the

9   Taliaferro County tax commissioner, and the tax

10  commissioner said that Mr. Clifford has a homestead

11  exemption on a house in this County.

12              Well, the law says if you have a

13  homestead exemption, that's your residence.   Even

14  though they were living in and residing in Greene

15  County.

16              Well, I wasn't going to argue that

17  the homestead exemption was illegal or inappropriate.

18  So, how could I argue with that?   Even though they

19  were living in a different county.   They had claimed

20  a homestead exemption in Taliaferro County.   The law

21  says that the homestead exemption makes them --

22  that's their residence.   I don't have -- she didn't

Page 65

1   write down the law -- maybe she did.  21-217 of the

2   Georgia code.

3              So, again, here was information

4   provided by True the Vote, that -- okay, yeah, they

5   didn't live here, but -- gee.  Legally you're not

6   going to win this case.  So, I retracted the

7   challenge.

8        Q.      Okay.

9        A.      Are we on the third one?

10              MS. TAYLOR:  Yeah.  Henry, can we

11   pull up 0003, please?

12        Q.      And, the third one.

13        A.      And, I must say, through this process

14   Ms. Milner, the registrar, you know, we were working

15   together.  She was very proactive, you know.  And we

16   were working -- it wasn't an adversarial

17   relationship, so to speak.

18        Q.      Okay.

19        A.      Okay.  Melba Carmichael, again -- the

20   list of 37 showed her living in Wilkes County.  She

21   had actually asked for an absentee ballot in

22   Taliaferro County.  She had lived in Wilkes County.

Page 66

1    Mrs. Milner called her.  She asked that her name be

2    removed from the Taliaferro County list.  And, at

3    this time, her ballot was rejected.  Because she

4    lived out of county, tried to vote in the county

5    and -- but she lived -- she was a resident of Wilkes

6    County.  So, therefore, I was happy with that.  I

7    retracted the challenge.

8        Q.      Just to be clear, you said she asked

9    for the name to be removed.  Are you referring to

10   Ms. Carmichael or Ms. Milner asked --

11       A.      I'm going to read what's -- what

12   Ms. Milner unsigned says, "Voter requested name be

13   removed from Taliaferro County voter registration

14   list.  21-2-232(a)."  I believe that's the Georgia

15   code says if you don't live in the county, you can't

16   vote.  "Ballot voted in 1/5/21 election rejected.

17   21-2-230(g)."

18           So, I believe this is Ms. Milner's

19   writing.  And I believe at that point in time,

20   undated, I withdrew the challenge.  Because I was

21   satisfied that they had taken action, appropriate

22   action.  So 33 percent of the test cases that I've

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 67

1   tested had voted basically illegally, in my mind.

2   And 66 percent of them, in my mind, were

3   questionable.  Two-thirds of the -- of the test cases

4   -- looking at the three test cases, 66 percent of

5   them, in my mind, didn't live in the county, but had

6   voted in the county.  33 percent of them, one-third

7   of them, the ballot, at this point in time was

8   rejected.

9        Q.      Okay.

10       A.      Based on those, not my -- my

11  challenge, but those laws, I believe 21-2-232 and

12  21-2-230, are Georgia laws.  I believe that all that

13  was written by Mrs. Milner, the -- the Taliaferro

14  County voter registrar, chief registrar.

15       Q.      So it was your belief that 66 percent

16  of these three test cases, in other words, two out of

17  the three were people who voted in Taliaferro County

18  but were not residents of Taliaferro County, but the

19  votes were still legal; is that right?

20       A.      No, no, no.  66 percent of the three

21  test cases, in my mind, had voted in Taliaferro

22  County.  And, of those 66 percent -- 66 percent, a

Page 68

1    third of them, one of them was rejected.  The other

2    one, in my mind, shouldn't have voted in Taliaferro

3    County.  But, I didn't have grounds to argue that

4    point.  Because the law says, if you have a homestead

5    exemption, that's your residence.  So, I would have

6    to argue that they didn't have a legal homestead

7    exemption before I could argue that they voted

8    illegally.  So, anybody that has -- say somebody has

9    a house here in Taliaferro County and they moved to

10   anywhere in Georgia; if they maintain a homestead

11   exemption in Taliaferro County, they can vote in

12   Taliaferro County even if they never live here.  The

13   homestead exemption may be inappropriate or illegal;

14   but the law says that that's their residence, as I

15   understand it.

16         Q.      Okay.

17         A.      So, you can see from these, as I call

18   them, test cases, there's a lot of nuances to all of

19   this.  You know, it's not clear-cut.  It's not, yeah,

20   you have an address out of -- you have an address

21   that's not in the county, but it's not clear-cut

22   that -- that the individual has a right to vote in

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 69

1    the county or not to vote in the county.

2          Q.       Right.  And, you mentioned that after

3    having submitted these three test cases and

4    withdrawing them after running down with Ms. Milner

5    and with Judge Stevens, their residencies, that it

6    raised concerns for you about the list of 37 that was

7    provided to you by True the Vote; is that right?

8          A.       Absolutely.

9          Q.       And you've kind of covered this

10   already, but can you just reiterate for me what those

11   concerns were?

12         A.       Well, as we discussed in the first

13   case, you know, there was information from True the

14   Vote that said this person lived in Patterson, New

15   Jersey.  And Judge Stevens called her up in

16   Taliaferro County and talked to her and said she

17   lives in Taliaferro County.  Who's going to argue

18   with a judge?  I mean --

19         Q.       Right.

20         A.       -- that's pretty -- as I said, that's

21   an oh, star, star, star.

22                  MS. TAYLOR:  Henry, you can pull this

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 70

1   exhibit down.  Thank you.

2   BY MS. TAYLOR:

3        Q.    And, so you had these concerns after

4   submitting these test cases.  Did you share those

5   concerns with anyone at the time?

6        A.    Not -- not in specifically because

7   this was over probably a couple of days, you know.

8   And I was working back and forth with Ms. Milner,

9   learning about what it takes to -- you know, were we

10  going to have a hearing for each of these individuals

11  cases?  Was she going to follow the -- the laws to

12  send letters to them?  How was she -- you know, how

13  were we going to work through this?  We had, you

14  know, kind of discussions.  We were both learning.

15  She had never had anybody challenged before.  And I

16  certainly had never challenged anybody.  So, we were

17  both learning how do you go through the process and

18  what's the appropriate way to do that.

19       Q.    Okay.  And, did she mention to you at

20  any time that they had also received challenges from

21  True the Vote with your name on it?

22       A.    No.

Page 71

1        Q.      Okay.

2        A.      Again, that did not become -- I did

3    not become aware of that until an open records

4    request in January, for all the information

5    pertaining to this particular subject.

6        Q.      And while we're on that, can you

7    explain to me why you made that specific open records

8    request in January?

9        A.      Well, wouldn't you want to know

10   what -- you know, I wanted all the information that

11   they had regarding to what we had done; so that I

12   would be accurate in my response.

13       Q.      In your response to --

14       A.      To the, whatever you call it,

15   subpoena, deposition or request that your clients

16   asked of me.

17       Q.      Got it.

18               MS. TAYLOR:  Okay.  Henry, can we

19   pull up 0005, please.

20               (Whereupon, Exhibit 7, E-mail String

21   Bates No. Martin 0005 was marked for identification.)

22   BY MS. TAYLOR:

Page 72

1      Q.      Mr. Martin, take a look at this

2   E-mail for me, if you would.  And let me know once

3   you've had a chance to look at it.

4      A.      Yep.  Okay.

5      Q.      Okay.  So, this looks like it's an

6   E-mail from you to James Cooper and John Marsh on

7   December 20th at 9:13 a.m.?

8      A.      Yes.  Right.  And again, John Marsh,

9   I believe is the -- is, and was, the treasurer of the

10  10th District Georgia GOP.

11     Q.      Okay.  You anticipated one of my

12  questions there.  So, John Marsh was not affiliated

13  with True the Vote; is that correct, as far as you

14  were aware?

15     A.      No.

16     Q.      He's the one who you showed the list

17  to, and told you that these three voters had already

18  voted, in the runoff election?

19     A.      Correct.

20     Q.      Okay.

21     A.      And even at this point, I again did

22  not know who John Marsh was.  I was just directed to

Page 73

1    him by the 10th District GOP as a coordinator.  As

2    you can see, it's jmarsh@prodpartners.com.  There's

3    no way of knowing.  And you see it's

4    jamescooper.gop@gmail.  So, that validates your

5    earlier question.  And I was communicated with him as

6    jamescooper.gop@gmail.com.

7          Q.    But just to clarify, while it wasn't

8    clear at first, at this point, you were aware that

9    James Cooper was working with True the Vote, right?

10         A.    Correct.

11               MS. TAYLOR:  Okay.  Can we pull up

12    and mark as the next exhibit 0181.

13         A.    And just to validate what I -- what

14    is in the -- oh, you've already changed it.

15         Q.    Right.  We're going to go back to

16    that.

17               (Whereupon, Exhibit 8, E-mail String

18    beginning Bates No. Def. Cooper 0181 was marked for

19    identification.)

20    BY MS. TAYLOR:

21         Q.    I just want to show you two more

22    documents that appear to be iterations, if you will,

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 74

1     of the same E-mail that you sent to James Cooper and

2     John Marsh.

3          A.     Okay.

4               MS. TAYLOR:  So, that's this one.

5     And then, also 0187.

6               (Whereupon, Exhibit 9, E-mail String

7     beginning Bates No. Def. Cooper 0187 was marked for

8     identification.)

9               MS. TAYLOR:  Henry, if you can pull

10    that up and mark it as the next exhibit as well.

11              THE WITNESS:  Whoa, whoa.  Do I -- I

12    want to read that because I've never seen that

13    before.

14              MS. TAYLOR:  Sure.  You can go back,

15    Henry.  Sorry.

16              THE TECH:  Sure.  Give me one second.

17              THE WITNESS:  You're going to back

18    up?  May I have time to read this?

19              MS. TAYLOR:  Sure.  And I think it

20    might be on two pages.  So, let Henry know when

21    you're ready to scroll.

22              THE WITNESS:  Oh, so this is a letter

Page 75

1    from me to -- can you go -- I can't see.

2    BY MS. TAYLOR:

3         Q.      Are you able to see both pages of the

4    document side by side?

5         A.      Okay.  Let me -- okay.

6         Q.      Okay.  Mr. Martin, and would you

7    agree that this E-mail that you sent on December 20th

8    at 9:54 a.m. to Amy Holsworth copying James Cooper,

9    it's a version of the same E-mail we just looked at

10   previously; is that correct?

11        A.      Right.

12        Q.      Okay.  And, if we could turn to 0187

13   now --

14        A.      But -- but I do not recall -- I'm

15   certainly clear that it says it's from me; but I do

16   not recall who Amy Holsworth, Amy@truethevote is, or

17   was.

18        Q.      Okay.  This is the next E-mail.  Take

19   a look at it.

20        A.      Right.

21        Q.      Okay.  And, is this also an E-mail

22   similar to the last two?

Page 76

1          A.          Correct.

2          Q.          Okay.  And this one is sent to

3     Catherine Engelbrecht, copying James Cooper on

4     December 20th at 9:45 a.m.; is that right?

5          A.          That's what it looks like.

6          Q.          Okay.  So, these last two E-mails,

7     you sent within the hour of the first one that we

8     looked at.  Do you know why you followed up with

9     these later two E-mails?

10          A.          No.

11          Q.          But you see that they are sent to

12     different people; is that right?

13          A.          Right, and I -- as I said earlier, I

14     was not -- I'm not aware -- I was not aware that I

15     sent anything to True the Vote.

16          Q.          Okay.  Do you know who Catherine

17     Engelbrecht is?

18          A.          She's True the Vote.

19          Q.          And when you say "she's True the

20     Vote," what do you mean by that?

21          A.          Her name, you know, when you get

22     anything from True the Vote, her name is on it.

Page 77

1          Q.       Okay.

2                   MS. TAYLOR:  Let's pull back up the

3     first one, if we could, Henry.  It's 0005.  Just --

4     we'll just go over that one.

5     BY MS. TAYLOR:

6          Q.       In all three of these, Mr. Martin,

7     you write, "Impact of challenges.  Not good!"

8                   What -- what did you mean by that

9     statement?

10          A.       Well, you know, they were --

11     supposedly didn't live in the county.  You know, the

12     data -- again, this is the two-source validation of

13     the data.  You had a list of 37 people.  I tested

14     three of them.  One of them sure didn't look like she

15     lived in Patterson, New Jersey.  The other one didn't

16     live in the county, but she had a homestead exemption

17     here, so that was a little iffy.  And then, the third

18     one, at this point in time, there was no resolution

19     yet.  But in my mind, you know -- but then when we

20     got the resolution of the third one, one-third of the

21     people that were tested did not live in the county

22     but had voted in the county.  So one-third, you know,

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 78

1    I don't know if that's good or bad.  You know, in

2    batting averages, that's pretty good.  But, some

3    other averages, that's not very good.

4                 So, I was just providing feedback

5    that, hey -- you know, I didn't want to be -- I

6    didn't know what the list of 37.  And, after the

7    experience of working with the registrar, I didn't

8    want to put her through the painful process of

9    validating those 37 individuals.

10        Q.     Okay.

11        A.     And believe me, at this point, I did

12   not know they had already submitted 37.

13        Q.     Right.

14        A.     This was my way of checking the list.

15        Q.     Right.  You highlight for Mr. Cooper

16   and Mr. Marsh here, that "Ms. Davis is 100 years old

17   and not living in Patterson, NJ."

18                 And based on that, you retracted the

19   challenge.  Can you just, I know this is very basic,

20   but state for me why that fact was important?

21        A.     Well, the superintendent of elections

22   confirmed -- you know, she called up -- you know, she

Page 79

1    took it personal that I had challenged this lady.

2    And she called her up and said where do you live?

3    And the lady said, you know, I'm not living in

4    Patterson, New Jersey.

5              Q.      Okay.

6              A.      What would you do?  I mean, I

7    retracted the challenge.

8              Q.      But the fact that she was not living

9    in Patterson, New Jersey, what did that mean to you?

10             A.      Well, at that point in time, it made

11   me question the list -- the list of 37.

12             Q.      Because it implied that she was, in

13   fact, living in Taliaferro County and was

14   appropriately registered there?

15             A.      Right, the superintendent of the --

16   the first line, highlight the first line.  Beatrice

17   Davis listed as out of state.  But the superintendent

18   of elections confirmed Mrs. Davis is living in

19   Taliaferro County with a personal phone call to her

20   Taliaferro County address.  How can you argue with

21   that?  I wasn't going to call her up.  I certainly

22   wasn't going to drive by her address to see if she

Page 80

1   was living there.  But the judge did.  The probate

2   judge did.  How could you argue with that?

3        Q.      And then you end that paragraph about

4   Beatrice Davis in parentheses, "(Not sure where the

5   out of state residence information came from.  But it

6   appears incorrect)."

7                Did I read that right?

8        A.      You absolutely read that right.

9        Q.      Okay.  And then in the next

10  paragraph, this kind of summarizes what you found

11  out?

12       A.      Now, remember, these are all people

13  who have already asked for an absentee ballot.

14       Q.      Right, and who had voted, right?  Or

15  had just asked for a ballot?

16       A.      Again, I'd have to look at what

17  Mr. Marsh -- what Mr. Marsh's reply to me -- and I

18  don't know how -- I don't have a clue how he could

19  confirm either one of those.  But, he said these

20  people -- I believe he said they had voted absentee.

21  Whether that meant they had asked for an absentee

22  ballot or they had filed an absentee ballot.  It was

```
                                                      Page 81
 1    obviously that Ms. Carmichael had already voted.  The

 2    other two, I -- you know.

 3          Q.      Not sure.

 4                  But in this -- this next paragraph

 5    about Clifford Simons, it says, "She is living in a

 6    nursing home in Greene County, but still has a house

 7    in Taliaferro County."  And that she has a homestead

 8    exemption; is that right?

 9          A.      Correct.

10          Q.      And again, this is very basic, but

11    why were those facts important to you?

12          A.      The list of 37 said she lived in

13    Greene County.  The registrar, we have a history --

14    Taliaferro County has history of people who do not

15    live here voting.  Or let me use the word "local

16    lore."

17          Q.      Okay.

18          A.      That people and -- and I've been --

19    in a public hearing, a senior government official

20    told me that his sister lives in Augusta, but she

21    votes in Taliaferro County.  This was a number of

22    years ago, when I first moved here.  And he said
```

Page 82

1    that's her home place.  You always vote at your home

2    place.  And I was like, wow, that's something I never

3    heard of before.  Maybe that's the way they do it in

4    Georgia.  But, not where I'm from.

5          Q.     Okay.

6          A.     So, here we have a person who lives

7    in Greene County.  And, you know, we had a

8    discussion, me and -- the registrar and I, whether or

9    not she can vote in Taliaferro County.  And I said, I

10   don't think she can.  So, the chief registrar went to

11   the tax commissioner; found out Ms. Simons has a

12   house, and is paying taxes, and she has a homestead

13   exemption.  The law states, again, 21-2-230, I

14   believe that's in the voter registration law, states

15   that a person who has a homestead advantage, that's

16   presumed to be their residence.  So, I wasn't going

17   to go back and challenge the homestead exemption.

18         Q.     Fair enough.  And then, at the end of

19   this paragraph, you write again, "Again not sure

20   where the out of county residence information came

21   from."

22         A.     Yeah.  Again, the first one was out

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 83

1   of state.  So this was a perfect test case.  One was

2   out of state.  It appeared to be incorrect.  And, you

3   know, I'm kind of going, where did it come from?  The

4   second one was out of county.  Where did the

5   information come from?

6          Q.      And, did you ever receive a response

7   from Mr. Cooper; where this out of state information

8   came from, and the out of county information?

9          A.      Again, not to my recollection.  But,

10  you may have something that will surprise me.

11         Q.      I'm not sure that I do, Mr. Martin.

12  But, after you submitted these first three, as

13  we're -- we've been calling them test challenges; did

14  you go back to the list of 37 and check any more of

15  the names on the list?

16         A.      No.

17         Q.      And, why not?

18         A.      What do I say?  Burned once, your

19  fault; burned twice, my fault.

20         Q.      So, in other words, you identified

21  some concerning areas, or some concerns about the out

22  of state and out of county information already on the

Page 84

1    list; and you did not find it worth your time to --

2    to verify any of the other names at that point?  Is

3    that right?

4          A.     Right.  And at this point in time, I

5    did not know that Carmichael was going to be

6    disqualified.

7          Q.     Right.  It says -- it says for --

8          A.     This was written on the 20th of

9    December.  We were batting 100 percent strikeouts.

10         Q.     All right.  As you mentioned, it says

11   in this E-mail here, "No resolution as of yet," in

12   reference to Ms. Carmichael.  Presumably, that was

13   resolved a couple of days later?  Or?

14         A.     Yeah, I believe it was resolved.  If

15   you go back to 003, I believe it resolved later that

16   day --

17         Q.     Okay.

18         A.     -- but this was 9:00 in the morning.

19   I believe it was resolved.  It's not dated.  But, I

20   withdrew that challenge when her ballot was rejected.

21         Q.     And she requested to be removed from

22   the voter rolls herself, too?

Page 85

1          A.       Correct.

2          Q.       All right.  Okay.  Aside from these

3    three E-mails now, where you have mentioned the

4    impact of the challenge is not good, that you sent

5    around 9:00, 10:00 a.m. on the 20th; did you tell

6    anyone else that you had withdrawn these three

7    challenges?

8          A.       Not that I recall.

9          Q.       Okay.

10                   MS. TAYLOR:  And, Henry, if you could

11   zoom out of this cropped part of the -- yeah, that

12   would be great.

13         Q.       And the bottom E-mail down here,

14   Mr. Martin, it looks like you write on the 17th

15   around 4:00 p.m., "I will be providing these three

16   letters to the Registrar and Superintendent

17   tomorrow."

18                   Are those three letters you're

19   referring to the challenge letters for these three

20   individuals?

21         A.       Yeah, I believe so.  001, 002 and

22   003, if you -- I believe you --

Page 86

1          Q.      Okay.  That makes sense.

2                  MS. TAYLOR:  All right.  Henry, if

3     you could pull up 0181, which is another version of

4     this E-mail that we looked at, Mr. Martin.  This one

5     was the one that you had send to Amy Holsworth

6     copying James Cooper.

7     BY MS. TAYLOR:

8          Q.      In this E-mail, you write at the top,

9     "My experience that the True the Vote database has

10    not been good."

11                 Again, can you just explain to me

12    what you mean by that statement?

13         A.      Yeah, I'll be honest with you, I have

14    no idea why I was communicating with Amy.  I don't

15    know where I got her -- Amy Holsworth, I have no idea

16    where I got her name or -- or why I sent this; unless

17    James Cooper told me to tell her, you know, because

18    at this point in time on the 20th, three days later,

19    I was very concerned with them using my name on the

20    list of 37.

21         Q.      That's all right.

22         A.      So, I was trying to get my -- you

Page 87

1    know, I had given him my signature and said, yeah, go

2    ahead and submit it.  I believe that was on the 17th.

3    But, at this point in time, I was uncomfortable.

4            Q.      And that would explain --

5            A.      Hence, the first statement there.

6            Q.      Yeah --

7            A.      "My experience with the True the Vote

8    data base has not been good."

9            Q.      And the next line that says, "Please

10   hold on to any challenge letters to Taliaferro

11   County"?

12           A.      Yes.

13           Q.      Okay.

14           A.      And, that's at 9 -- that's

15   December 20th, 9:54 in the morning.

16           Q.      That is right.

17           A.      And I said, "Concerns with the

18   quality of your information.  Submitted three

19   challenge letters Thursday evening for individuals on

20   the True the Vote list who had already asked for

21   absentee ballots."

22                   See, that clarifies who had already

Page 88

1    asked for absentee ballots in Taliaferro County.  So,

2    evidently the database was absentee ballots

3    requested, not submitted.

4          Q.     Okay.  As you read just there, it

5    says, "Concerns with the quality of your

6    information."

7               MS. TAYLOR:  And then, Henry, if you

8    go to the next page, where his E-mail continues.

9          Q.     At the top it says, "Indicates a

10   problem with data accuracy and relevance."

11              What were you referring to, just to

12   be clear for the record, when you say "data"?  Are

13   you talking about the names themselves and the

14   addresses?

15         A.     Well, the addresses specifically.

16   The names -- you know, the names -- it appears the

17   names were all Taliaferro County names.  At one point

18   in time they -- they were or are Taliaferro County

19   voters.  But, the data I was referring to is the

20   reference to them being out of state or out of

21   county.  And that reiterates the information -- you

22   know, I'm feeding back realtime data here.  This is

Page 89

1    real -- you know, you sent me a list of 37 names, and

2    this is my results of the test cases; three test

3    cases.  As you can see, I'm uncomfortable.  Please

4    hold onto any challenge letters to Taliaferro County.

5          Q.     Did you receive a response to this

6    E-mail?

7          A.     You know -- if I did, it's in the

8    package that we provided to you.  If not, then it

9    isn't.  I don't -- I don't recall.

10         Q.     Okay.

11         A.     Again, I'll repeat, I was not aware,

12   when True the Vote sent the list of 37 to -- to

13   Taliaferro County.

14         Q.     And like you said, you write again

15   here, "Please hold on to any challenge letters to

16   Taliaferro County."  Were you under the impression,

17   at the time, that your challenge letters to

18   Taliaferro County were being held after you sent this

19   E-mail?

20         A.     I was aware that they had not been

21   sent.  I was not aware -- let me put it the other

22   way.  I was not aware they had been sent.  And I was

Page 90

1   telling them that basically don't put my name on

2   anything that challenges Taliaferro County.

3                   So, I'm saying "Please hold to any

4   challenge letters to Taliaferro County."  Maybe not

5   as clear as it should have been.  But the urgency,

6   the December -- you know, when I initially took

7   actions there was an urgency.  Because of the -- in

8   December 17th -- you know -- you had absentee

9   ballots, people were voting.  You know, the last line

10  really clarifies that "No absentee ballots will be

11  opened until January 5th at 7:00."  So, you had a

12  couple -- you had time.  Basically, I was saying,

13  hey, we kind of have some time to sort this out.

14  This isn't -- you know, your data -- I've said

15  enough.

16                  MS. TAYLOR:  Can we pull up, Henry,

17  the document that ends in 0185.

18                  (Whereupon, Exhibit 10, Letter

19  beginning Bates No. Def. Cooper 0185, was marked for

20  identification.)

21      Q.      Mr. Martin, this appears to be a

22  challenge letter with your name on it, that was sent

Page 91

1    to Judge Stevens, on the 17th of December.

2         A.     No.  I believe that's not correct.

3         Q.     Okay.  Can you tell me what this

4    document is?

5         A.     Well, it's a draft of a letter that

6    would have been responsive to the list of 37.  I

7    believe this was sent to Mr. Copper as a draft of

8    what I was going to send.  But, it's not signed.  It

9    was not sent.

10        Q.     Okay.  So.  This was a draft letter,

11   then, that was never actually sent to the

12   superintendent of elections, challenging those 37

13   voters?

14        A.     Correct.

15        Q.     Okay.  And, this was something that

16   you had drafted?

17        A.     Yes.

18        Q.     Okay.  Did you have any interaction

19   with any other challengers in any other county?

20        A.     No.

21        Q.     Okay.  Were you aware of -- at the

22   time that you raised these concerns about the

Page 92

1    challenge list to True the Vote, which would have

2    been on December 20th, were you aware around that

3    time if any other challenges in other counties that

4    had already submitted their challenges?

5          A.        No.

6          Q.        Did you know if True the Vote, Mr.

7    Copper, or anyone working with them, had taken any

8    steps to address the concerns that you raised?

9          A.        I'm sorry.  I'm not -- I'm still

10   concentrating on this letter that you've got up on

11   the screen.

12                   I'm virtually certain this is an

13   attachment to an E-mail to Mr. Copper.

14         Q.        And that it was never actually sent?

15         A.        Well, I'm sure it's never been sent.

16   But, I want to reiterate that I believe this is an

17   attachment to an E-mail to Mr. Copper.

18                   So, you have it listed as Defendant

19   Copper 0185.  And, I want to reiterate that it's not

20   been signed.  There is an electronic signature on

21   here; but it's not been signed by me.  And, it was

22   not sent.  This letter was not sent by me, to the

Page 93

1    superintendent of elections of Taliaferro County.

2         Q.    Okay.  Yes.  And, I can confirm that

3    this document was produced to us by Mr. Copper.  So,

4    it was in his files somewhere.

5         A.    But, it should be listed as an

6    attachment to my letter to him, asking him if this is

7    what -- if this is appropriate or something.

8         Q.    Right.  And thank you for clarifying

9    that.  It's not -- the way the documents were

10   produced, it wasn't entirely clear that this was an

11   attachment to an E-mail.  So, that's helpful to

12   understand.

13             Do you know -- I'm sorry.  I don't

14   know if we ever got an answer to my previous

15   question.

16             MS. TAYLOR:  We can pull this letter

17   down, Henry.

18        Q.    Do you know, Mr. Martin, if True the

19   Vote took any steps to correct any of the information

20   on their lists; after you raised the concerns that

21   you raised with them, on the 20th of December?

22        A.    No.  Only -- you know -- as I found

Page 94

1    out in the Open Records Request, later in January,

2    they retracted -- they retracted my challenge.

3         Q.      They retracted the challenge of -- to

4    the 37 voters that they had submitted without your

5    knowledge?

6         A.      Correct.  Yes.

7         Q.      Okay.  Are you aware if anyone at

8    True the Vote withdrew challenges in other counties

9    as a result of the concerns you raised?

10        A.      No.  I'm not -- I'm sorry.

11        Q.      Do you need me to repeat the

12   question?

13        A.      I'm not aware of any other challenges

14   that were given or retracted by True the Vote, in any

15   other county.

16        Q.      Okay.  Okay.

17               MS. TAYLOR:  Can we mark, Henry,

18   Document 1833 as the next exhibit.

19               (Whereupon, Exhibit 11, Letter Bates

20   No. Def. TTV 1833, was marked for identification.)

21        Q.      Do you recognize this, Mr. Martin?

22        A.      I do.

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 95

1          Q.      And, can you tell me what this --

2     what this is?

3          A.      It's a letter from -- I can't see the

4     bottom of this -- I can't see the bottom of this.

5     I'm -- I don't recall this.  I don't recall this

6     letter.

7          Q.      Okay.

8          A.      What is -- what is troubling for me,

9     at this point in time, on December 22nd, the E-mail

10    address of the registrar -- what is troubling to me

11    is it says registrars131@yahoo.com.  I did not become

12    aware of that address until the Open Records Request

13    in January.  So, it's troubling to me that I would

14    have dated on December 21st.  I know it's got my name

15    on it.  But, all of my letters that I wrote were to

16    the superintendent of elections -- and another

17    problem that troubles me is -- it says:  "Dear Chief

18    Registrar."  All of my letters that I wrote were to

19    the superintendent of elections, with a copy to the

20    chief registrar -- to the registrar.

21         Q.      Okay.  So, here's what I think may

22    have happened here.  And, you can tell me if you

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 96

1    think it's -- if you think that's reasonable.

2              You mentioned earlier that True the

3    Vote had submitted challenges with your name on it,

4    around this time, and you weren't aware of it yet.

5    And, you had actually asked them to withhold them.

6    But, you weren't sure if they had already been

7    submitted or not.

8         A.     Correct.

9         Q.     Okay.  You then wrote an E-mail to

10   James Cooper, and to a couple individuals at True the

11   Vote, asking them to withhold -- to hold on your

12   challenges.  Is it possible that they had already

13   submitted the challenges, and now drafted this E-mail

14   again on your behalf -- or this letter, again, on

15   your behalf, retracting those submitted challenges?

16        A.     That's a presumption.  That's a

17   presumption that I would make.  I'm not sure that --

18   you know, you can make that presumption because of

19   the dates, looking at the dates.  But, specifically,

20   on the 22nd of December, I cannot recall knowing that

21   E-mail address of the registrars.

22        Q.     Okay.

Page 97

1          A.          I don't know if this is an E-mail or

2     a letter.  So, it's just not -- this does not look

3     like something -- I don't recall preparing this.  I

4     don't recall providing it to you.  I don't recall.

5     You know, I would have to -- I mean, I just don't

6     recall this.  I don't think this is mine.

7          Q.          Fair enough.

8                      And it says, "I submitted written

9     challenges."  It doesn't specify, you know, I

10    submitted three written challenges or I submitted 37?

11         A.          37 or 3, no.

12         Q.          Okay.  All right --

13         A.          And it's -- and it's my -- it's my

14    recollection that the way --

15                     Go ahead.  You do it.

16         Q.          I don't mean to interrupt, Mr.

17    Martin, if you have something to say.

18         A.          No.  Go ahead.

19         Q.          Okay.  So, you don't recall sending

20    this letter or drafting it.  But, do you recall

21    receiving a response to this letter at any time?

22         A.          Nope.

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 98

1          Q.      Okay.

2          A.      And the letter is not signed.

3          Q.      And what does that indicate to you?

4          A.      It indicates to me it was never sent.

5          Q.      Okay.

6                  MS. TAYLOR:  We can pull this --

7          A.      I mean, if I would have sent it, I

8     would have signed it.

9          Q.      Do you know, Mr. Martin, if True the

10    Vote would have sent this on your behalf, if they

11    would have attached your signature or not?

12         A.      I don't know.  Do you have one of

13    those?  I mean, I don't know.  It just does not --

14         Q.      It's just not what, Mr. Martin?

15         A.      You know, I just can't recall where

16    this came from.

17                 MS. TAYLOR:  Okay.  We can pull this

18    down, Henry.  Thank you.

19    BY MS. TAYLOR:

20         Q.      You mentioned earlier today in the

21    deposition, that looking back at all the trouble

22    these challenges caused, that you wouldn't have

Page 99

1    submitted them again; is that correct?

2          A.      Yeah.

3          Q.      And, can you explain that a little

4    more for me?

5          A.      Sure.  Getting a subpoena to provide

6    all of this information.  Being hassled about things

7    like this -- you know -- is aggravating.

8          Q.      And, what about with respect to the

9    accuracy of the list that you were provided?  And the

10   individuals that were identified on that list?

11         A.      Again, it depends on how you look at

12   the list.  If you -- you know, 33 percent of the

13   individuals that voted and didn't live in Taliaferro

14   County.  Is that good?  Or, you know -- I can't make

15   a judgment of that.  When you only have about 800

16   people voting, and a lot of elections are decided by

17   one or two persons, one or two votes makes a huge,

18   huge difference in Taliaferro County, in local

19   politics.  Maybe not in the January 5th election.

20                 So, it's really a judgment call.

21                 Do you want -- do you want voter

22   registration -- should voter registration be of the

Page 100

1    people that live here?  My belief it should be.  It's

2    an opinion.  People from out of the county and out of

3    the state shouldn't be voting in Taliaferro County.

4    But -- and I believe most of the law supports that.

5    But, you know, is it worth the hassle for one or two

6    votes?  Only if you lose the election by one or two

7    votes.  That is a judgment call.

8          Q.      And, Mr. Martin, you acknowledge that

9    two of the three test cases that you submitted had

10   voters that, under Georgia law, as far as you pressed

11   the case at least, were registered appropriately in

12   Taliaferro County.

13              What effect do you think the issuance

14   of challenges against those voters, as exemplified by

15   the two in your three test cases, would have been to

16   have been challenged in -- to have their eligibility

17   to vote challenged?

18         A.      I'm not sure I'm clear what you're

19   asking.  You're asking for an opinion?

20         Q.      Yes.  In your opinion, Mr. Martin,

21   what effect would those challenges have had on those

22   voters who were in fact eligible to vote in

Page 101

1    Taliaferro County?

2          A.      Well, no effect.  They -- they voted.

3    Their vote was counted.  Put it that way.  I believe

4    their vote was -- I never validated that they

5    actually voted.  But, I believe they voted and that

6    their vote counted.

7          Q.      Are you aware, Mr. Martin, if those

8    voters who were challenged would have been made aware

9    that their vote had been challenged; or their

10   eligibility to vote, rather?

11         A.      I'm not aware that -- only Ms. -- I

12   believe it was Carmichael, was aware -- to my

13   knowledge, only Ms. Carmichael was -- and I don't

14   know that she knew she was challenged.  She just got

15   a call from the registrar and asked where she lived.

16   I -- the registrar, and as I said, the superintendent

17   of elections, who's also the probate judge, I don't

18   know what they said.  I have no knowledge of what

19   they said, you know, to Simons and Davis.  Or -- I

20   don't know that Simons was ever contacted.  And I

21   know it was a personal phone call from the

22   superintendent of elections to Ms. Davis.

Page 102

1                    So -- but I don't know what was said

2       there.  And there's no -- as far as I can tell,

3       there's no recording.

4            Q.     And Mr. Martin, you had withdrawn

5       your challenges.  But, had you not withdrawn the

6       challenges and had there been a challenge hearing, do

7       you know if those individual voters who had been

8       challenged would have had to show up at that hearing?

9            A.     Don't know.

10           Q.     Or this in any way?

11           A.     I don't know what the process is for

12      validating residency.

13           Q.     Okay.

14           A.     In fact, that brings up the question

15      of the 37 voters on the list.  Whose responsibility

16      is it really, to validate that those people do live

17      in Taliaferro County?  Is it the registrar's office

18      in Taliaferro County?  Or is it the secretary of the

19      state?  You know, who should be validating that the

20      voter rolls are correct?  I don't know.  It seems to

21      me that the county registrar has a responsibility to

22      do that.  I know for a fact that they are not going

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 103

1    back and looking at those 37 people to see if they

2    live in the county.  They have no intentions of doing

3    that.  They have no intentions of any follow-up.

4          Q.      What do you mean by that last

5    statement, that the registrar doesn't have any

6    intentions of follow up for those 37?

7          A.      Correct.

8          Q.      And, is that because those were

9    withdrawn?  Or --

10         A.      Correct.  And when I asked her

11   informally if they were going to do anything, she

12   said no.  I said okay.

13         Q.      Understood.

14               MS. TAYLOR:  Why don't we take a

15   ten-minute break, if that works for you, Mr. Martin

16   and Ms. Kramer.

17               MS. KRAMER:  That works.

18               Joe, is that --

19               THE TECH:  Give me one second.

20               The time is 11:24 a.m., off the

21   record.

22               (Recess taken.)

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 104

1                    THE TECH:  We are back on the record.

2      The time is 11:41 a.m.

3      BY MS. TAYLOR:

4           Q.     Mr. Martin, we're almost done here

5      and I can let you go.  But, I just have a couple more

6      documents I want to show you, and a few more

7      questions.

8                    MS. TAYLOR:  Henry, if you mark the

9      document that ends in 1460 as the next exhibit,

10     please.  And pull it up.

11                   (Whereupon, Exhibit 12, Letter on The

12     Bopp Law Firm letterhead beginning Bates No. Def TTV

13     1460, was marked for identification.)

14     BY MS. TAYLOR:

15          Q.     Mr. Martin, have you seen this letter

16     before?

17          A.     Can I read it?  I doubt it.  But, let

18     me read it.  Who signed it?

19                   MS. TAYLOR:  Henry, do you mind

20     scrolling through to the end of the letter.

21          A.     Okay.

22          Q.     Do you recognize this letter at all?

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 105

1          A.      No.

2          Q.      Okay.

3          A.      Can I --

4          Q.      Sure.

5          A.      Can I get a copy of it?

6          Q.      I can give you the time to read it

7     right now.  Or else you can reach out to your counsel

8     for a copy of it, if you'd like.  I won't have any

9     further questions on it if you don't recognize this

10    though, Mr. Martin.

11         A.      Second page.  The third page.  Next

12    page.  Next page.  Next page.  Next page.  Great.

13    Thank you.

14         Q.      Mr. Martin, now having read through

15    the letter, can you confirm that you have not seen

16    this letter before?

17         A.      Absolutely.  I have not seen it

18    before.

19         Q.      Okay.

20                 MS. TAYLOR:  Let's mark Document 1459

21    as the next exhibit, please.

22                 (Whereupon, Exhibit 13, True the Vote

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 106

1    Letter Bates No. Def TTV 1459 was marked for

2    identification.)

3    BY MS. TAYLOR:

4          Q.       This is another letter, but it's much

5    shorter.  You can take a look at it, Mr. Martin.

6    But, can you let me know if you recognize this one?

7          A.       No.

8          Q.       Okay.  And, you didn't send this to

9    anybody or receive a copy of it from anybody?

10         A.       Nope.

11         Q.       Great.  Do you want a chance to look

12   at it?  Or can we take it down?

13         A.       Yeah, I want to read it.

14                  Yeah.  No, I haven't seen it.

15         Q.       Okay.

16                  MS. TAYLOR:  You can pull that down,

17   Henry.

18   BY MS. TAYLOR:

19         Q.       Earlier today, Mr. Martin, you

20   mentioned having done your own research into the list

21   of 37 voters that you were provided by Mr. Cooper.

22   Apart from what was already discussed about your

Page 107

1   research into the specific three individuals, as

2   we've been calling them test cases, did you do any

3   other research into the names on that list?

4          A.       Nope.

5          Q.       And, at any point, did you give True

6   the Vote permission to send letters on your behalf;

7   other than the challenge letters you agreed to

8   submit?

9          A.       Not that I recall, no.

10         Q.       What about to Mr. Cooper; did you

11   give him permission at any point to submit letters on

12   your behalf?

13         A.       Except for that E-mail that had my

14   signature on it, not -- not that I recall, no.

15         Q.       Are you referring to the E-mail that

16   we marked as an exhibit earlier?  Where you gave

17   Mr. Cooper and True the Vote --

18         A.       December 17th I believe it was.

19         Q.       -- permission to use your name to

20   submit challenges in Taliaferro County?

21         A.       Uh-huh, uh-huh.

22         Q.       Okay.  And, you mentioned earlier

Page 108

1   also that was all of your communication with Mr.

2   Cooper after that first phone call was by E-mail.  Is

3   that -- is that right?

4          A.     Yes.  Yes.

5          Q.     Okay.  And, do you recall if he was

6   the one that told you to raise your concerns about

7   the -- the list of voters with Amy Holsworth or

8   Catherine Engelbrecht at True the Vote?

9          A.     Again, it's -- I was not aware that I

10  had sent them those E-mails.  I'm sure I did, and I

11  would -- he was the only person that would have

12  provided me with their names and E-mail addresses.  I

13  don't know where else I would have gotten them.

14  So -- but, I do not believe -- I do not believe that

15  was in any of the documentation that we provided in

16  our written statement.  I just don't recall those

17  E-mails.

18         Q.     Okay.

19         A.     I don't recall finding them on my

20  computer.  I don't recall including them in the

21  package that we sent -- provided.

22         Q.     While we're on the topic of you

Page 109

1   gathering materials, et cetera, in response to the

2   subpoena request you received, can you -- can you

3   tell me what you did to prepare those responses?

4          A.      Can I?  I'm sorry, repeat the

5   question.

6          Q.      Sure.  Can you explain to me what you

7   did to prepare the written responses that you

8   provided in response to the subpoena; as well as the

9   documents that you provided?

10         A.      Yeah.  Well, I searched all the

11  documents on my computer that were relevant.  And,

12  any kind of cross-references to those, and provided

13  all of that information to Melena Siebert, I believe

14  was her name, at James Bopp Law Firm, who then

15  prepared a formal response back, that was delivered

16  electronically to -- I guess you call yourselves the

17  plaintiffs?

18         Q.      Uh-huh.  Did you talk to anyone

19  besides attorneys, at the Bopp Law Firm about the

20  facts, or anything to refresh your memory as you

21  prepared those written responses?

22         A.      No.  Only the open records request to

Page 110

1    the Taliaferro County registrar's office and

2    superintendent of elections --

3         Q.     Right, and you had mentioned that.

4         A.     -- to get -- to get any -- which

5    provided a lot of additional information.

6         Q.     Okay.  Do you continue to talk with,

7    or communicate with, in any way, with James Cooper?

8         A.     James Cooper is the -- was elected

9    the chairman of the 10th District GOP in February, at

10   the same time that I retired from that position.  He

11   has been at one of the Taliaferro County GOP

12   meetings.  But, we have not conversed in any -- in

13   any manner about this particular issue.

14        Q.     Okay.  What were the circumstances of

15   him replacing you as the 10th District chair?

16        A.     Well, he -- the 10th District is

17   above the Taliaferro County GOP.  The 10th District

18   is the 10th District, you know, it's a Congressional

19   district, but it's -- it's -- it's multiple counties.

20        Q.     So, he became the chair of that

21   district at the same time that you stepped down; but

22   it wasn't the same position?  Is that right?

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 111

1          A.       Correct.

2          Q.       Okay.

3          A.       Another individual from Taliaferro

4     County took over my position as chair -- chairperson.

5          Q.       And, was that just because your term

6     had ended?  Or, you were ready to step down?

7          A.       I was ready to step down.

8          Q.       Is there anything else about your

9     experience with these challenges in Taliaferro

10    County, or with True the Vote, that we didn't discuss

11    today that we should know about?

12         A.       Yeah, I would just -- I would just

13    reiterate, you know, Taliaferro County is a very

14    small county.  I think I -- I think we have on record

15    that there's about 1700 folks in the county.

16    Somewhere around 1200 people are registered to vote.

17    That's not a large number of people.  The registrar

18    thinks she knows all of them.  In a normal election,

19    you might get 6 or 800 people that vote.  I don't

20    have the numbers for the January 5th thing.  But, one

21    or two people -- we've had a number of elections in

22    the last 5 years, where one vote has made the

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 112

1   difference in a local election.  One vote.  So, every

2   vote, every vote really does count.  It's not a

3   matter of, you know, 37 people have moved out of the

4   county.  Who cares about 37?  One vote does make a

5   difference.

6                  And, as I said, there's this local

7   lore, that people have talked about, that -- you

8   know, there are people that do not live in the

9   county, do not reside in the county, but they vote in

10  the county.  And, you know, this is -- I believe

11  Georgia law gives any registered voter the

12  opportunity to challenge a particular vote.  Not

13  necessarily challenge the registration, but the vote.

14  And, I believe that's what I attempted to do with the

15  three -- three cases that we -- we've talked about

16  here.

17                 And I said -- as I said before, the

18  three cases, the one that -- the one ballot that was

19  rejected, come to find out later, they overruled that

20  objector -- objection and counted the vote.  So, you

21  know, even though the person didn't live in

22  Taliaferro County, they said they gave them an oops,

Page 113

1    and it was okay for them to vote.

2                    I don't know how -- what all of this

3    means.  If you're trying to keep your voter rolls

4    accurate and correct, and if residents are supposed

5    to be voting, that's the way it should be.

6         Q.      Are you referring to the voter that

7    you challenged that had the homestead exemption?

8         A.      Nope.  The other one.

9         Q.      The one who asked to have her ballot

10   retracted?

11        A.      Right.  Right.

12        Q.      Okay.  I believe that was

13   Ms. Carmichael?

14        A.      Yes.

15        Q.      Is there anything else you think we

16   should know?

17        A.      Nope.  No.

18                MS. TAYLOR:  Okay.  I have no further

19   questions.

20                MS. KRAMER:  I have no follow-up

21   questions.

22                THE TECH:  Okay.  Should I go off the

Page 114

1    record?

2                    MS. TAYLOR:  Yes, you can go off the

3    record.

4                    MS. KRAMER:  Thank you.

5                    THE TECH:  The time is 12:00 p.m.,

6    going off the record.

7                    (Time Noted:  12:00 p.m. EDT.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

9/28/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Joseph Martin

Page 115

1      CERTIFICATE OF SHORTHAND REPORTER-NOTARY PUBLIC

2               I, Amanda Gorrono, the officer before
       whom the foregoing deposition was taken, do hereby

3      certify that the foregoing transcript is a true and
       correct record of the testimony given; that said

4      testimony was taken by me stenographically and
       thereafter reduced to typewriting under my direction;

5      and that I am neither counsel for, related to, nor
       employed by any of the parties to this case and have

6      no interest, financial or otherwise, in its outcome.

7               IN WITNESS WHEREOF, I have hereunto
       set my hand this 28th day of September, 2021.

8

9

10

11

12

13

14      _____

15      AMANDA GORRONO, CLR

16      CLR NO:  052005 - 01

17

18      Notary Public in and for the State of New York

19      County of Suffolk

20      My Commission No.  01G06041701

21      Expires:  01/07/2023

22

Page 116

1      Joseph Martin, c/o

       The Bopp Law Firm

2      1 South Sixth Street

       Terre Haute, Indiana  47807-3510

3

4      Case: Fair Fight, Inc. et al. v. True the Vote, et al.

       Date of deposition: September 28, 2021

5      Deponent: Joseph Martin

6

7      Please be advised that the transcript in the above

8      referenced matter is now complete and ready for signature.

9      The deponent may come to this office to sign the transcript,

10     a copy may be purchased for the witness to review and sign,

11     or the deponent and/or counsel may waive the option of

12     signing. Please advise us of the option selected.

13     Please forward the errata sheet and the original signed

14     signature page to counsel noticing the deposition, noting the

15     applicable time period allowed for such by the governing

       Rules of Procedure. If you have any questions, please do

16     not hesitate to call our office at (202)-232-0646.

17

18

19     Sincerely,

       Digital Evidence Group

20     Copyright 2021 Digital Evidence Group

21     Copying is forbidden, including electronically, absent

22     express written consent.

9/28/2021         Fair Fight, Inc. et al. v. True the Vote, et al.         Joseph Martin

Page 117

```
1      Digital Evidence Group, L.L.C.
       1730 M Street, NW, Suite 812
2      Washington, D.C. 20036
       (202) 232-0646
3
4      SIGNATURE PAGE
       Case: Fair Fight, Inc. et al. v. True the Vote, et al.
5      Witness Name: Joseph Martin
       Deposition Date: September 28, 2021
6
7      I do hereby acknowledge that I have read
       and examined the foregoing pages
8      of the transcript of my deposition and that:
9
10     (Check appropriate box):
       (  ) The same is a true, correct and
11     complete transcription of the answers given by
       me to the questions therein recorded.
12     (  ) Except for the changes noted in the
       attached Errata Sheet, the same is a true,
13     correct and complete transcription of the
       answers given by me to the questions therein
14     recorded.
15
16
17
18     _____        _____
19      DATE                      WITNESS SIGNATURE
20
21     _____        _____
22      DATE                          NOTARY
```

9/28/2021            Fair Fight, Inc. et al. v. True the Vote, et al.            Joseph Martin

Page 118

1        Digital Evidence Group, LLC

2        1730 M Street, NW, Suite 812

3        Washington, D.C.  20036

4        (202)232-0646

5

6                        ERRATA SHEET

7

8        Case: Fair Fight, Inc. et al. v. True the Vote, et al.

9        Witness Name: Joseph Martin

10       Deposition Date: September 28, 2021

11       Page No.    Line No.     Change

12

13

14

15

16

17

18

19

20

21       _____        _____

22       Signature                               Date