Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

GAINESVILLE DIVISION

_____

FAIR FIGHT, INC., SCOTT          )

BERSON, JOCELYN HEREDIA,          )

and JANE DOE,          )

          )

     Plaintiffs,          )

          )

v.          )     Case No.

          )  2:20-cv-00302

TRUE THE VOTE, CATHERINE          )     SCJ

ENGELBRECHT, DEREK SOMERVILLE,          )

MARK DAVIS, MARK WILLIAMS,          )

RON JOHNSON, JAMES COOPER,          )

and JOHN DOES 1-10,          )

          )

     Defendants.          )

_____)

Videotaped Deposition of RON JOHNSON

Conducted Remotely via Zoom

Wednesday, September 29, 2021

9:38 a.m. EDT

Reported by Lisa A. Knight, RDR, CRR, RSA

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Case 2:20-cv-00302-SCJ   Document 160-1   Filed 05/17/22   Page 2 of 97

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 2

1                  Pursuant to Notice, the videotaped

2      deposition of RON JOHNSON was conducted

3      remotely via Zoom on behalf of the

4      Plaintiffs, at 9:38 a.m. EDT, on Wednesday,

5      September 29, 2021, reported stenographically

6      by Lisa A. Knight, Realtime Diplomate

7      Reporter, Certified Realtime Reporter, and

8      Realtime Systems Administrator.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 3

```
 1              A P P E A R A N C E S
 2              (All appearing remotely)
 3
 4    COUNSEL FOR THE PLAINTIFFS
          ELIAS LAW GROUP LLP
 5        BY:  CHRISTINA A. FORD, ESQUIRE
              cford@elias.law
 6            JACOB SHELLY, ESQUIRE
              jshelly@elias.law
 7        10 G Street NE
          Suite 600
 8        Washington, DC 20002
          202.968.4490
 9            -and-
10        LAWRENCE & BUNDY LLC
          BY:  LESLIE J. BRYAN, ESQUIRE
11            leslie.bryan@lawrencebundy.com
          1180 West Peachtree Street NW
12        Suite 1650
          Atlanta, Georgia 30309
13        404.400.3350
14
15    COUNSEL FOR THE DEFENDANTS
          THE BOPP LAW FIRM
16        BY:  COURTNEY KRAMER, ESQUIRE
              ckramer@bopplaw.com
17        1 South 6th Street
          Terre Haute, Indiana 47807
18        812.232.2434
19
20    ALSO PRESENT:
21        DANIEL HOLMSTOCK, Videographer
22
```

Page 4

```
 1                    I N D E X
 2                  RON JOHNSON
 3               SEPTEMBER 29, 2021
 4    EXAMINATION OF RON JOHNSON:           PAGE
 5        BY MS. FORD                        8
 6
 7               DEPOSITION EXHIBITS
 8                  RON JOHNSON
 9               SEPTEMBER 29, 2021
10    NUMBER          DESCRIPTION          PAGE
11    Johnson A    Plaintiffs' Notice to    14
                   Take the Deposition of
12                 Defendant Ron Johnson,
                   No Bates
13    Johnson B    E-mail string, top e-mail  37
                   to James Cooper from Amy
14                 Holsworth, 12/17/20,
                   Bates Def Williams 0745
15                 to -749
16    Johnson D    Defendant Ron Johnson's   80
                   Responses to Plaintiffs'
17                 First Interrogatories,
                   No Bates
18    Johnson E    Text Message Log, Bates   48
                   Def Cooper 0160 to -161
19    Johnson G    True the Vote website     52
                   article entitled Video:
20                 Jackson County Board of
                   Elections & Registration
21                 Rejects Call to Verify
                   Problematic Voter
22                 Addresses, No Bates
```

Case 2:20-cv-00302-SCJ  Document 160-1  Filed 05/17/22  Page 5 of 97

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 5

```
 1              DEPOSITION EXHIBITS, CON'T

 2                   RON JOHNSON

 3                SEPTEMBER 29, 2021

 4   NUMBER          DESCRIPTION              PAGE

 5   Johnson H    Letter Re:  Elector          71

                  Challenge, Bates Def

 6                Williams 0859

 7   Johnson I    E-mail string, top e-mail    72

                  to Dara Lindenbaum and

 8                others from Marisa Pyle,

 9                12/21/20, No Bates

10

11

12

13

14

15

16

17

18

19

20

21

22
```

Page 6

1                    PROCEEDINGS

2                    THE VIDEOGRAPHER:  We are now

3          on the record.

4                    This is Video No. 1 in the

5          video-recorded deposition of Ron

6          Johnson.  It is taken in the matter of

7          Fair Fight, Inc., et al., plaintiffs,

8          versus True the Vote, et al.,

9          defendants, and Fair Fight Action,

10         Inc., counter-defendant.

11                   This case is pending before the

12         United States District Court for the

13         Northern District of Georgia,

14         Gainesville Division.  Its case number

15         is 2:20-cv-00302.

16                   This deposition is being

17         conducted by Zoom video remote

18         conferencing, with the physical

19         recording of this deposition taking

20         place at my location here in Culpeper,

21         Virginia.

22                   Today's date is September 29,

Page 7

1      2021.  The time on video screen is

2      9:38 a.m. Eastern Daylight Time.

3             My name is Daniel Holmstock;

4      I'm the legal videographer and digital

5      exhibit technician from Digital

6      Evidence Group.  And our court

7      reporter today is Lisa Knight, also in

8      association with Digital Evidence

9      Group.

10            Now, for the record, unless an

11     objection is stated to the following

12     agreement, all parties to this

13     deposition are appearing remotely and

14     have agreed to the witness being sworn

15     in remotely.

16            And due to the nature of remote

17     reporting, please pause briefly before

18     speaking, to ensure that all parties

19     are heard completely.

20            Counsel, at this point, would

21     you please introduce yourselves and

22     whom you represent, followed by the

Case 2:20-cv-00302-SCJ   Document 160-1   Filed 05/17/22   Page 8 of 97

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 8

1       court reporter administering the oath.

2             MS. KRAMER:  Courtney Kramer,

3       with The Bopp Law Firm, representing

4       the defendants.

5             MS. BRYAN:  Leslie Bryan,

6       Lawrence & Bundy, representing

7       plaintiff.

8             MS. FORD:  This is Christina

9       Ford of Elias Law Group, representing

10      the plaintiffs.  And with me, I also

11      have Jacob Shelly, also of the Elias

12      Law Group, for the plaintiffs.

13                  RON JOHNSON,

14   having been first duly sworn to state the

15   whole truth, testified as follows:

16                  EXAMINATION

17   BY MS. FORD:

18      Q.    Thank you, Mr. Johnson, for

19   being here today.  My name is Christina Ford;

20   and, as you know, I represent the plaintiffs

21   in this case.

22             Would you please state your

Page 9

1   full name for the record.

2        A.      Ronald Fredrick Johnson.

3        Q.      Great.

4                And what is your current

5   permanent addresses?

6        A.      200 Knox Drive, Lavonia,

7   Georgia 30335 [sic].

8        Q.      Thank you.

9                And did I hear correctly

10  before, that you had never testified in a

11  deposition before?

12       A.      That's not true.

13       Q.      Okay.  I'm sorry.

14                So you have done a deposition

15  before?

16       A.      Yeah.

17       Q.      Okay.  How many times have you

18  been deposed before?

19       A.      Numerous times.

20       Q.      Okay.  Given that, I still

21  think it will be a good idea to go over a

22  couple rules for this deposition,

Page 10

1   particularly that this is a remote

2   deposition.

3              If, at any point, you don't

4   understand a question that I'm asking, please

5   let me know, and I will do my best to

6   rephrase or clarify the question.

7              So that means if you answer a

8   question, I will assume that you understand

9   what I was asking.

10             Is that fair?

11      A.     Yes.

12      Q.     Okay.  And if, at any time, you

13   would like a break, please let me know and

14   we'll find a good place to stop.  The only

15   exception is if we're in the middle of a

16   question, I would ask that you answer the

17   question before we take a break.

18             Does that sound fair to you?

19      A.     Yes.

20      Q.     Okay.  And as you know, today

21   the court reporter is reporting this.  And

22   she can only capture on the record verbal

Page 11

1    answers.  So when you answer, please answer

2    audibly and not by shaking your head or

3    making gestures.

4              Does that sound good to you?

5    A.     Yes.

6    Q.     Okay.  And then, finally,

7    please just wait until I finish asking my

8    question before you begin answering so that

9    we're not talking over each other.

10             Does that sound good as well?

11   A.     Yes.

12   Q.     Okay.  Great.

13             Mr. Johnson --

14             MS. KRAMER:  Real fast.

15             The screen right now, it looks

16        as though ya'll are about to put a

17        piece -- like, something on the screen

18        with the Digital Evidence Group.

19             If you can -- there we go.

20        There we go.  Give me one second.  Let

21        me fix the screens really fast.

22             THE VIDEOGRAPHER:  All right.

Page 12

```
 1        I will only have the screen share

 2        enabled when a document is shown.

 3             Ms. Ford, if you no longer want

 4        a document shown, please tell me to

 5        remove it so I can end the share.

 6             MS. FORD:  Will do.  Thanks,

 7        Dan.

 8             MS. KRAMER:  Thank you.

 9             Sorry.  It just makes it easier

10        for him to see who's talking and

11        everything.

12             MS. FORD:  Sure.

13   BY MS. FORD:

14        Q.    Mr. Johnson, what address are

15   you located at for this deposition?

16        A.    I don't know the address.  Oh,

17   yeah, 400 College Avenue -- 440 College

18   Avenue.

19        Q.    Okay.  And what city is that

20   in?

21        A.    Athens.

22        Q.    Okay.  And are you viewing this
```

Case 2:20-cv-00302-SCJ   Document 160-1   Filed 05/17/22   Page 13 of 97

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 13

1    deposition by a laptop?

2         A.     Yes.

3         Q.     Okay.  Do you have any

4    documents in front of you right now?

5         A.     No.

6         Q.     Okay.  And I see that

7    Ms. Kramer is in the room.

8               Is anybody else in the room

9    with you?

10        A.     Nope.

11        Q.     Okay.  And just because I'm not

12   there with you, I may not be able to see what

13   you have in front of you or if anyone enters

14   the room.

15               Can you please let me know if

16   anybody does enter the room?

17        A.     Yeah.  Yes.

18        Q.     Okay.  And, Mr. Johnson, do you

19   understand that you cannot ask your attorney

20   today how to answer a particular question?

21               Obviously, Ms. Kramer may

22   object, but you should answer the questions,

Page 14

1    and you should not look to Ms. Kramer to tell

2    you how to answer.

3          A.     I understand that.

4          Q.     Okay.

5                 MS. FORD:  Dan, can we please

6          put up what's been marked as

7          Exhibit A.

8                 THE VIDEOGRAPHER:  Do you want

9          to retain Exhibit A as the official

10         exhibit number?

11                MS. FORD:  Yes, please.

12                THE VIDEOGRAPHER:  Okay.

13                (Ford Exhibit A, Plaintiffs'

14         Notice to Take the Deposition of

15         Defendant Ron Johnson, No Bates, was

16         marked for identification, as of this

17         date.)

18                MS. FORD:  If we could make

19         this as big as possible for

20         Mr. Johnson.

21    BY MS. FORD:

22         Q.    Mr. Johnson, do you recognize

Page 15

1   this document?

2        A.     (Document[s] reviewed.)

3               Well, actually, I've never

4   opened up the thing that I got thrown at my

5   doorstep.  I still have them in the package

6   they came in.

7        Q.     Okay.  I don't think this would

8   have been sent to you in the mail.  This is

9   just something we sent to your counsel.  That

10  is a notice of your deposition.

11              I just want to confirm that you

12  understand that you are appearing today

13  pursuant to this notice.

14       A.     Oh, I understand that.

15       Q.     Okay.  And are you prepared to

16  testify today?

17       A.     Yes.

18       Q.     Okay.  Thank you.

19              Okay.  I just have a couple of

20  background questions.

21              Mr. Johnson, where do you live

22  in Georgia?

Page 16

```
1       A.      200 Knox Drive, Lavonia,

2   Georgia 30335 [sic].

3       Q.      Okay.  And is that in Jackson

4   County?

5       A.      No, it's not.

6       Q.      Where is that?

7       A.      That's in Hart County.

8       Q.      Where is Hart County in

9   relation to Jackson County?

10      A.      About an hour north of Jackson

11  County.  I recently bought some property

12  there and built a house.

13      Q.      Okay.  Did you used to reside

14  in Jackson County?

15      A.      Yes.

16      Q.      Okay.  And how recently did you

17  move?

18      A.      Oh, six months ago.

19      Q.      Okay.  Prior to that, how long

20  had you lived in Jackson County?

21      A.      Twelve years.

22      Q.      Okay.  Could you please
```

Page 17

1    describe your educational background.

2         A.     I have a high school diploma,

3    I have a bachelor's degree in criminal

4    justice, and I have a master's degree in

5    education.

6         Q.     Okay.  And are you retired now?

7         A.     Yes.

8         Q.     Okay.  What did you do for a

9    living before you retired?

10        A.     I was in the military.

11        Q.     Okay.  Can you expand on that a

12   little bit and just give me some color to

13   what that looked like?

14        A.     I was in the military, and

15   I ended up as a First Sergeant E8.

16               And I think a lot of people

17   know what the military does, so...

18        Q.     Yes.  Okay.  Thank you.  I was

19   looking for rank and whatnot.  Thank you for

20   your service.

21               Okay.  I would just like to ask

22   you a couple of questions about the Jackson

Page 18

```
1    County Board of Elections and the elections

2    office generally.

3              Did you previously serve as --

4    I'm not sure what it's called -- either the

5    chief registrar or the chairman of the

6    Jackson County Board of Elections?

7         A.    For a short period.

8         Q.    Okay.  When did you serve in

9    that role?

10        A.    I really don't remember the

11   dates.  I mean, it was short.

12        Q.    When you say "short," can you

13   give me an estimate?

14        A.    Four, five months.

15        Q.    Okay.  Was it around the time

16   of the 2018 general election?

17        A.    It might have been.  It wasn't

18   this past election or the one before that.

19        Q.    Okay.  And what was your role?

20   What did you do in that role?

21        A.    I was the chairman of that

22   board.
```

Page 19

```
 1         Q.      What were your duties as

 2   chairman?

 3         A.      Basically to hold the election

 4   board meetings.

 5         Q.      And what sort of things did the

 6   election board discuss or decide while you

 7   were there?

 8         A.      Well, we decided that -- you

 9   know, on different election things.  Like

10   somebody that actually came to our county and

11   voted, they were from a different county, and

12   we did provisional votes for them.  And just

13   all of that election board stuff, you know.

14         Q.      Okay.  So while you were on the

15   board, you maybe did some work checking lists

16   of voters, going through provisional ballots,

17   that sort of thing?

18         A.      No.  That wasn't our thing.

19   That was --

20         Q.      Okay.

21         A.      That was the election

22   supervisor and the people that worked on the
```

Page 20

1   election, the election board.

2        Q.     Okay.  The time that you were

3   there, was that a pretty busy time for the

4   office?

5        A.     Not really.  There was only

6   three members at the time.

7        Q.     Okay.  Do you remember if

8   Jackson County received any voter challenges

9   before the 2018 general election?

10       A.     I actually put in a voter

11  challenge -- I wasn't on the board.  I put in

12  a voter challenge.

13       Q.     When was that?

14       A.     After or just before the

15  presidential election.

16       Q.     In this past election or in

17  2016?

18       A.     The past election.

19       Q.     Oh, the past election.  Okay.

20              So you put in a voter challenge

21  in advance of the 2020 general election?

22       A.     Yes.

Page 21

1        Q.      Okay.  Was that to one person

2    or to multiple people?

3        A.      Multiple people.

4        Q.      Approximately how many people?

5        A.      Somewhere around 1400.

6        Q.      Okay.  What was the basis of

7    that challenge?

8        A.      That the people that put change

9    of addresses in had moved out of our county.

10       Q.      Okay.  What did the Jackson

11   County Board of Elections do with those

12   challenges?

13       A.      They did absolutely nothing.

14   They had me come to a meeting, and they did

15   absolutely nothing.

16       Q.      Okay.  So they did not accept

17   the challenges?

18       A.      They didn't do anything with

19   the challenges.

20       Q.      Did they make a finding?

21       A.      Yeah.  They didn't have

22   probable cause to put those in.  But

Page 22

1    I checked them all through the United States

2    Post Office.  And that's probable cause.

3          Q.     Okay.  Okay.

4                 So that was in advance of

5    November 2020, it sounds like.

6          A.     Yes.

7          Q.     Okay.  Do you know specifically

8    when that was?  How many months before?

9          A.     No, I don't.  I don't recall

10   that.

11         Q.     Okay.  That's fine.

12                And when you put that voter

13   challenge list together, is that something

14   you did yourself?

15         A.     No, I did not.

16         Q.     Okay.  Who put that list

17   together then?

18         A.     Multiple people.

19         Q.     Who were those people?

20         A.     Just multiple people that

21   I asked to help.

22         Q.     Well, who are those people?

Page 23

1          A.     Well, I'd rather not say.

2          Q.     Well, Mr. Johnson, I don't

3     think there's any sort of privilege that

4     would protect that, so I would ask that you

5     answer my question.

6          A.     John and Jane Does.

7          Q.     Mr. Johnson, I don't think

8     that's an appropriate answer.  If we later

9     need to get some sort of protective order

10    from the court, that might be something we

11    can do.

12               But, for the moment, you're

13    under oath, and your counsel hasn't objected.

14    So I would ask you, again:  Who helped you

15    put together the list?

16         A.     Well, I had a few people that

17    were people in Jackson County.  And then

18    I got contacted by True the Vote, and

19    I talked to them about giving some names to

20    me and all that, so...

21         Q.     And this is still before the

22    2020 election?

Case 2:20-cv-00302-SCJ   Document 160-1   Filed 05/17/22   Page 24 of 97

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 24

1          A.     Yes.

2          Q.     Okay.  But what are the names

3    of the people who helped you put together the

4    challenge?

5          A.     Basically True the Vote.

6    People that were with them.

7          Q.     Okay.  Would that be, like,

8    Catherine Engelbrecht?

9          A.     Yeah.  I've talked to Catherine

10   once or twice.  That's it.

11         Q.     Did she help put together

12   the -- your challenge before November 2020?

13         A.     I don't have any idea who put

14   that together.  I don't know if she did or

15   not.

16         Q.     Okay.  But today, you're

17   telling me that at least someone affiliated

18   with True the Vote helped you put together

19   the challenge prior to November 2020.

20         A.     Yes.

21         Q.     Okay.  But are you telling me

22   that you do not know who it was from True the

Page 25

1   Vote, or do you know but you just are not

2   telling me right now?

3       A.    I don't recall who put it

4   together.  I don't remember talking to

5   anybody.  I talked to Gregg.  I met Gregg,

6   and I talked to him.

7             Other than Gregg, I have never

8   met anybody from True the Vote.  And I've

9   talked to Catherine twice.

10      Q.    Okay.  Is that Gregg Phillips

11  you're referring to?

12      A.    I didn't know his last name.

13      Q.    Okay.  So I just want to make

14  sure I understand.  So you did not personally

15  put together that list of 1400 people --

16      A.    Actually, that's not true.

17  I put some names on that list because I had a

18  person that was actually registered to vote

19  at my house; and unless she was living in my

20  attic and not coming out of the attic until

21  we were gone, she wasn't living there.

22            And it was -- actually, she was

Page 26

1    registered there.  And that's what got me

2    started on this whole thing.

3        Q.    Okay.  Well, after you

4    discovered that, what did -- what do you mean

5    by "got me started on this whole thing"?

6        A.    I went and -- to the election

7    board and said, "This woman is registered at

8    my house.  And I've owned this house almost

9    three years, and she hasn't lived there in at

10   least the last three years."

11            And they told me they couldn't

12   take her off.  There was a process.  So

13   I started digging into the process.

14       Q.    And what did you do from there?

15       A.    Then when I met Gregg -- I have

16   to say that because I have a friend named

17   Craig.  Gregg.  When I met Gregg and they

18   told me what they were doing, I started to

19   get a little more involved in this.

20       Q.    Okay.  And when you say what

21   Gregg said you -- what Gregg explained what

22   they were doing, what was that that they were

Page 27

1    doing?

2          A.     That they were checking voter

3    registrations and -- through the post office,

4    whether they moved or not.  And I got

5    interested.

6          Q.     And how did you meet Gregg?

7          A.     I was at a friend's business,

8    and Gregg was there doing business with him.

9          Q.     Okay.  All right.

10               So is it fair to say that

11   whatever list you submitted in advance of the

12   2020 general, it sounds like you had some

13   collaboration to develop that list with True

14   the Vote?

15         A.     Well, I asked them if they had

16   a list.

17         Q.     Okay.  And they said yes?

18         A.     Yep.

19         Q.     Okay.  And then they gave you

20   that list?

21         A.     Well, somebody gave me.

22   I don't know who actually sent it to the

Page 28

1    county.  I gave them my electronic signature.

2          Q.    Okay.

3                MS. KRAMER:  Counsel, just a

4          point of clarification.  I just want

5          to clarify that we're talking about

6          before the 2020 general in

7          November and not the 2021 runoff that

8          we just had in January.

9                MS. FORD:  Right.  I understand

10         that.

11               MS. KRAMER:  Right.  Okay.

12               I just want to make sure my

13         client understands that we're talking

14         about before November and not right --

15         not before January.  That time period

16         in between.

17               THE DEPONENT:  Yeah.

18               MS. KRAMER:  Okay.

19               MS. FORD:  Great.  That's my

20         understanding as well.

21               MS. KRAMER:  Okay.  Thank you.

22    ///

Case 2:20-cv-00302-SCJ   Document 160-1   Filed 05/17/22   Page 29 of 97

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 29

1    BY MS. FORD:

2         Q.    Mr. Johnson, before you

3    authorized True the Vote to submit a

4    challenge in your name before the 2020

5    general, did you take a look at that list of

6    1400 voters?

7         A.    Yes, I did.

8         Q.    Okay.  So you physically had

9    seen the list before it was submitted?

10        A.    Yes.

11        Q.    Okay.  To your understanding,

12   was that list solely based off of the Change

13   of Address database?

14        A.    Yes.

15        Q.    Okay.  Was anything else done

16   with the list or it was solely change of

17   address?

18        A.    Oh, I have no idea.  I know

19   mine was change of addresses.

20        Q.    Okay.  All right.  So you said

21   that Jackson County Election Board did not

22   find probable cause for those.  Correct?

Page 30

1          A.     Yep.  At the meeting I was at,

2     they did not find probable cause --

3          Q.     Okay.

4          A.     -- which, according to Georgia

5     law, that is probable cause.

6          Q.     Okay.  Thank you.

7                 A slightly different topic.

8     Did Jackson County use the National Change of

9     Address database while you were on the board?

10         A.     Actually, it was the State of

11    Georgia, Secretary of State's office, used

12    it.  And that -- all the elections go through

13    them.

14         Q.     Okay.  So before, when you said

15    you went to the Jackson County elections

16    office to report this person that you said

17    was registered at your house --

18         A.     Um-hum.

19         Q.     -- and you said they told you

20    there was a process for that.  Right?

21         A.     Right.

22         Q.     There was a process to handle

Page 31

1    that?

2         A.      Yes, they did.

3         Q.      Did they explain what that

4    process was?

5         A.      No, they did not.  They didn't

6    know what the process was.

7         Q.      Okay.  So moving on from 2020

8    more into the runoff election.  Can you tell

9    me how you generally came to be involved with

10   that challenge effort?

11        A.      I wasn't.

12        Q.      You were not involved with the

13   challenge effort?

14        A.      The runoff.

15        Q.      So you had no involvement with

16   that challenge?

17        A.      Not with the runoff.

18        Q.      Did you recruit volunteers to

19   help with the challenge program?

20        A.      No, I did not recruit them.

21   I gave names to somebody -- it wasn't

22   Catherine -- somebody with True the Vote on

Page 32

1    who they might contact.

2         Q.    Okay.  Just to make sure

3    I understand this.  Does that mean that --

4    say -- let me use an example so we're

5    understanding each other.

6               Say there was someone named

7    Bob.  And you thought Bob might potentially

8    be a challenger.  Does that mean you called

9    up Bob to ask, "Will you be a challenger?"

10   Or did you just give True the Vote Bob's

11   name?

12        A.    I just gave True the Vote Bob's

13   name.

14        Q.    Okay.  Thank you.  That's

15   helpful.

16               When were you approached about

17   helping with this project?

18        A.    Actually, I don't recall when.

19   It was sometime after meeting Gregg.

20        Q.    Okay.  And it was -- was it

21   after the 2020 general election?

22        A.    No.  It was before.

Page 33

1          Q.     It was before.  Okay.

2                 Does that mean at the time you

3     started talking about this, you already had

4     the idea in mind to challenge people in the

5     2021 runoff election?

6          A.     Yes, I already had the idea to

7     challenge some of them in Jackson County

8     because of the woman that was registered at

9     my house and didn't live there.

10         Q.     Okay.  So what was your

11    understanding of the goal of the challenges

12    for the runoff election?

13         A.     As a matter of fact, my opening

14    statement to the Jackson County Election

15    Board is, "I'm not here to drop anybody off

16    the voter rolls.  What I'm here for is to

17    make sure the people vote in the county they

18    legally live in."

19         Q.     Okay.  So what were you hoping

20    that the challenge would accomplish then?

21         A.     That we would get the people

22    legally registered in their own counties; and

Page 34

1    the ones that live out of state, not to be

2    registered in Georgia.

3         Q.    Okay.  All right.

4               How many names did you forward

5    to True the Vote?

6         A.    How many names did I?

7         Q.    Yes.

8         A.    Probably 15.

9         Q.    Okay.  And when you were coming

10   up with names, were you looking for any

11   particular kind of person?

12        A.    No.  I was looking for an

13   American.

14        Q.    What do you mean by that?

15        A.    That anybody that lived in

16   America that was legally able to vote.  It

17   didn't matter who they were.

18        Q.    Okay.  And were you given any

19   sort of instructions as to who you should

20   look for?

21        A.    No.

22        Q.    Okay.  Do you remember who

Page 35

1    explicitly asked you to send names over from

2    True the Vote?

3         A.    No, I can't recall that name.

4         Q.    Okay.  Were you asked to send

5    names for any specific counties?

6         A.    No, I was not.

7         Q.    Okay.  And how did you reach

8    out to these -- actually, I'm sorry.

9              So you said you personally did

10   not reach out to any of these potential

11   challengers?

12        A.    No, I did not.

13        Q.    Okay.  So all you did was

14   forward a name to someone at True the Vote

15   and provided contact information for that

16   person?

17        A.    Yes.

18        Q.    Okay.  So at that point, was it

19   then True the Vote's responsibility to go

20   contact that person to see if they would be

21   willing to be a challenger?

22        A.    Yes.

Page 36

1          Q.     Okay.  And, to your knowledge,

2     did True the Vote do that?

3          A.     I'm not -- I don't recall that

4     because I wasn't involved with that part of

5     the process.

6          Q.     Okay.  When you sent True the

7     Vote information of the names, how did you

8     forward that information?

9          A.     I believe I texted it to them.

10         Q.     Okay.

11         A.     To the person I was dealing

12    with.

13         Q.     And who was that person?

14         A.     I've already told you numerous

15    times:  I don't recall that person's name.

16         Q.     After you had done that, did

17    any of the people who you forwarded their

18    information contact you to ask about the

19    challenge program?

20         A.     No, they did not.

21         Q.     Okay.  So just to make sure I'm

22    clear and I understand:  You forwarded these

Page 37

1    names to True the Vote, but you never had any

2    conversations with any of these -- any of

3    these individuals about participating in the

4    challenge program?

5          A.    That's correct.

6          Q.    Okay.

7                MS. FORD:  Dan, can we pull up

8          Exhibit B.

9                (Ford Exhibit B, E-mail string,

10         top e-mail to James Cooper from Amy

11         Holsworth, 12/17/20, Bates Def

12         Williams 0745 to -749, was marked for

13         identification, as of this date.)

14               MS. FORD:  Can we scroll down

15         to page 2.  Scroll down just slightly

16         further to where -- right here is

17         great.  Actually, can you scroll up

18         just a little bit more?  Perfect.

19   BY MS. FORD:

20         Q.    Mr. Johnson, I believe, before,

21   you said -- and I might have misheard you --

22   you recruited, you think -- sorry, not

Page 38

1    "recruited," forwarded 15 names.

2              Here, I have an e-mail.  Is

3    this your e-mail:  Chairman@windstream.net?

4        A.     Yes, it is.

5        Q.     Okay.  Can you just take a

6    moment to read what you've written right

7    here, starting with, "As of this morning..."

8        A.     (Document[s] reviewed.)

9              Yeah, I know the e-mail.  You

10   can take it down.

11       Q.     Okay.  I just want to clarify.

12   Here, you say that you have more than 50.

13             Does that mean you sent -- you

14   believe that to be true, you sent more than

15   50, not 15?

16       A.     That -- I don't recall that.

17   And I don't keep my e-mails, so...

18       Q.     Okay.  So at the time you wrote

19   this, you don't think this was true?

20       A.     It could be true.  I don't

21   know.

22       Q.     Do you know why you would have

Page 39

1    said that if it wasn't true?

2         A.     I might have had a list coming

3    to her that had that many on there, names,

4    just names and phone numbers --

5         Q.     Okay.

6         A.     -- of challengers.  I think...

7              MS. FORD:  Dan, can we actually

8         keep this up here for just a second.

9    BY MS. FORD:

10        Q.     Mr. Johnson, can you explain

11   what you meant by "What I need is the last of

12   the counties that we are actually going to

13   have challenges"?

14        A.     (Document[s] reviewed.)

15              I wanted to get a list of the

16   counties that they already had challenges

17   from, not the challenge -- not the list of

18   the people, the list of the people that I had

19   given their names.

20        Q.     So, Mr. Johnson, when I read

21   this, this sounds to me like you were asking

22   True the Vote for what counties they plan to

Page 40

1    do a challenge in.

2              Is that not your understanding?

3         A.    (Document[s] reviewed.)

4              What I wanted to get with them

5    at the time was the list of the counties that

6    they thought they already had that they were

7    going to challenge in because I wanted to

8    make sure the people I was giving them were

9    getting contacted.

10        Q.    Okay.  Okay.  So does that mean

11   you understood that there was some kind of

12   list of counties that True the Vote wanted to

13   put a challenge in?

14        A.    No, no.  I knew True the Vote

15   was doing 159 of them.  At the time, I was

16   the chairman of all the counties under 80,000

17   in population.  And I wanted to know if the

18   chairmans of those counties were actually

19   doing anything.

20        Q.    Can you explain what you mean

21   by that?

22        A.    By what?

Page 41

1      Q.      "If the chairmans were doing

2    anything."

3      A.      If the chairmans of those

4    counties were actually going to do the

5    challenges.

6      Q.      Okay.  And when you say

7    "chairmans," you mean chairmen of the GOP?

8      A.      Chairmen of the county GOPs.

9      Q.      Okay.  Does that mean that if

10   the county GOP was not planning to do their

11   own challenge, that True the Vote would step

12   in and do the challenge in that county?

13     A.      Absolutely not.  They're not

14   allowed to by law.  It has to be somebody in

15   that county, a registered voter in that

16   county.

17     Q.      Sorry.

18            What I meant by True the Vote

19   is:  Would True the Vote take it upon itself

20   to prioritize finding a challenger for that

21   county if the county GOP was not going to do

22   it?

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 42

1                    MS. KRAMER:  Objection.

2          Speculation.

3          A.      Yeah, I have no idea what their

4    organization does.

5    BY MS. FORD:

6          Q.      Okay.  All right.  So when you

7    were working on recruiting names -- sorry,

8    finding names to forward, was it your

9    understanding that True the Vote planned to

10   submit a challenge in all 159 counties in

11   Georgia?

12         A.      I have no idea what they were

13   going to do.  I assumed that they were

14   probably going to do the big counties, but

15   they might want to do the small counties.

16                  And I wasn't recruiting

17   anybody.  I was giving them a name that was

18   the county chairman of those counties.  I was

19   the chairman of the counties that were

20   under -- that are under 80,000 in population

21   for the Georgia GOP.  I was that chairman.

22   And what I was doing was I forwarded those

Page 43

1    names and how to contact them to True the

2    Vote.

3         Q.     Understood.

4                So --

5         A.     I didn't recruit anybody.

6         Q.     Every name that you forwarded,

7    then, was that person that county's GOP

8    chairman --

9         A.     Yes.

10        Q.     -- or -woman?

11               Yes.  Okay.

12               Is it your understanding today

13   that True the Vote did not challenge --

14   submit a challenge in all 159 counties?

15        A.     I have no idea what they

16   submitted.  I knew they submitted one to

17   Jackson County.  And I know they submitted a

18   couple in other counties because I know those

19   GOP chairmen.

20        Q.     Okay.  Going back to what you

21   said a minute ago, you assumed that True the

22   Vote would submit them or would prioritize

Page 44

1   the big counties.

2              Why did you assume that?

3        A.     Because that's where we have

4   the most problem with voting fraud.

5        Q.     Can you explain what you mean

6   by that?

7        A.     Yeah.  We have ballots that

8   show up three days later to the election

9   office.

10       Q.     What do you mean by "three days

11  later"?

12       A.     Like, I mean, three days later,

13  after the polls close.

14       Q.     And are you telling me that you

15  think that those votes are counted

16  improperly?

17       A.     Actually, that's what I

18  believe.  It doesn't take three days to go

19  from a precinct to the election office

20  anywhere in this state.

21       Q.     And do you think that's less of

22  a problem in the small counties?

Page 45

1          A.      No, I don't.  No, I don't.

2          Q.      Mr. Johnson, the other day --

3     and I realize you weren't here for

4     Mr. Cooper's deposition, but Mr. Cooper

5     testified that there was some sort of shared

6     file or shared list of all the potential

7     challengers.

8                  Does that sound right to you?

9          A.      No.  I didn't get that list.

10         Q.      Okay.  So you never saw, like,

11    some sort of comprehensive list of --

12         A.      No, I didn't.

13         Q.      Okay.

14                 MS. FORD:  Would you mind if we

15         take a five-minute break?  Okay.

16         Great.

17                 THE VIDEOGRAPHER:  All right.

18         Stand by.

19                 The time is 10:17 a.m.  We're

20         going off the record.

21                 (Recess taken.)

22                 THE VIDEOGRAPHER:  The time is

Page 46

1          10:22 a.m., and we're back on the

2          record.

3    BY MS. FORD:

4          Q.    Mr. Johnson, I promise I just

5    have a few more questions on the other

6    challengers and then we can move on.

7                So you said that you forwarded

8    names to True the Vote of county GOP chairmen

9    that you knew who you thought might be

10   interested.

11               And am I correct that you say

12   you do not remember who you forwarded those

13   names to?

14         A.    No, I don't recall that.

15         Q.    Do you think that it was Gregg

16   Phillips?

17         A.    No.  I know it wasn't Gregg

18   Phillips.  I don't recall the person.

19         Q.    Well, I just have some names

20   here to jog your memory.

21               What about Mark Williams?

22         A.    No.  Mark Williams is my

Page 47

1   friend.  I was sitting at his office when

2   I met Gregg.

3        Q.    Okay.  That was the first time

4   you met Gregg?

5        A.    Yeah.  First and only time.

6   I haven't -- maybe I spoke to him once again,

7   but...

8        Q.    And how long ago was that that

9   you first met Gregg?

10       A.    Before the 2020 election.

11       Q.    Okay.

12       A.    And I haven't talked to him

13   since, so...

14       Q.    Do you think you might have

15   forwarded the names to James Cooper?

16       A.    No.  He's another one; he was

17   right here about 15 minutes from me.

18       Q.    Do you think you might have

19   forwarded them to Amy Holsworth?

20       A.    I don't recall that name at

21   all.

22       Q.    What about Catherine

Case 2:20-cv-00302-SCJ   Document 160-1   Filed 05/17/22   Page 48 of 97

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 48

1    Engelbrecht?

2          A.      No, I did not forward anything

3    to Catherine.

4          Q.      Okay.  What about John David

5    Phillips?

6          A.      I don't even know that name.

7          Q.      Okay.  All right.  So you just

8    cannot recall who you sent the names to?

9          A.      (Shook head side to side.)

10         Q.      Okay.

11               MS. FORD:  Dan, can we pull up

12         Exhibit E.

13               (Ford Exhibit E, Text Message

14         Log, Bates Def Cooper

15         0160 to -161, was marked for

16         identification, as of this date.)

17               MS. FORD:  Is this as big as it

18         can get?

19               (Videographer adjusted text

20         size.)

21               MS. FORD:  This is great.

22    ///

Page 49

1    BY MS. FORD:

2        Q.     Mr. Johnson, could you just

3    take a moment to read this text thread,

4    exactly what's on this page, and let me know

5    when you're done.

6        A.     (Document[s] reviewed.)

7               Okay.

8        Q.     So this says from Mark

9    Williams.  "You should have just gotten 3

10   e-mails.  Each contained a list."

11              What were those three e-mails?

12       A.     I have no idea.  If that's a

13   Zoom call -- it looks like that might have

14   been a Zoom call.  You're the very first Zoom

15   call I've ever done in my life.  And I didn't

16   want to do this one.

17       Q.     Well, I appreciate --

18       A.     I'm an in-person guy.

19       Q.     Well, I appreciate that you're

20   here today.

21              So you don't remember what

22   those three e-mails were?

Page 50

1        A.      No.

2        Q.      Okay.  Do you agree that you

3    must have received the e-mail -- well,

4    let's --

5            MS. FORD:  Can we scroll down a

6        bit, Dan?  Actually, let's keep going.

7            THE VIDEOGRAPHER:  Do you mean

8        to the next page, Counsel?

9            MS. FORD:  Yes.  Thank you.

10           THE VIDEOGRAPHER:  Okay.

11   BY MS. FORD:

12       Q.      So, here, Mr. Johnson, you say,

13   "Going over the lists I see a lot in the 9th

14   that I already sent."

15           Would you agree you must have

16   received that e-mail?

17       A.      What does it say?

18           (Document[s] reviewed.)

19           Yeah, I probably did receive

20   it.

21       Q.      Okay.

22       A.      Is that an e-mail?

Page 51

1          Q.     This right here is a text

2     message thread --

3          A.     Okay.

4          Q.     -- that was produced by

5     Mr. Cooper.

6               MS. FORD:  Okay.  We can take

7          this exhibit down.

8     BY MS. FORD:

9          Q.     And, Mr. Johnson, now I'd like

10    to move on to the -- more about the 2021

11    runoff election.

12              So at some point after the 2020

13    general election, who started the

14    conversation about filing more challenges?

15         A.     I wasn't involved with that at

16    all.  I was worried about getting voters out

17    at that time.  And that's what I was working

18    on.

19         Q.     By that, do you mean getting

20    voters out doing Get Out the Vote work?

21         A.     Yeah.

22         Q.     Okay.  But is it true that you

Page 52

1    did submit a challenge for Jackson County in

2    the 2021 runoff election?

3         A.    No, I did not.

4         Q.    You did not submit a challenge

5    to Jackson County?

6         A.    I submitted one challenge to

7    Jackson County, and that was the 2020

8    presidential election.

9              MS. FORD:  Dan, can we pull up

10        Exhibit G.

11             (Ford Exhibit G, True the Vote

12        website article entitled Video:

13        Jackson County Board of Elections &

14        Registration Rejects Call to Verify

15        Problematic Voter Addresses, No Bates,

16        was marked for identification, as of

17        this date.)

18   BY MS. FORD:

19        Q.    So this, Mr. Johnson, is just

20   something that I got off the True the Vote

21   website posted on December 28th, 2020.

22             MS. FORD:  Dan, can we scroll

Page 53

1      down?

2                (Videographer complied.)

3                MS. FORD:   I think this is

4      good, Dan.

5      BY MS. FORD:

6          Q.    Mr. Johnson, could you read

7      this, please.   Just this paragraph.

8          A.    (Document[s] reviewed.)

9                That's from -- yeah, that's

10     actually from the election board meeting that

11     I attended.

12               And we asked for -- I didn't.

13     I mean, I did, but True the Vote didn't.

14     They weren't even there.   They -- I asked for

15     the list of the voters that actually voted

16     that were on the challenge list.

17               But it wasn't for True the

18     Vote; that was for me.   And it was a

19     three-to-two vote on that board.   And that --

20     not to give up the names of that list, which

21     is against the law, by the way.   And the

22     three that voted not to give it up were the

Page 54

1    Democrats on the board.

2          Q.    Okay.  So are you telling me

3    that you, yourself, did not submit a new

4    challenge --

5          A.    No, I did not.  That was -- no,

6    I did not.  That was the list that was

7    originally submitted to them.

8                I wanted -- and so did other

9    people, wanted the names of the voters that

10   were on the original list that actually voted

11   in the election.

12         Q.    Okay.  So when you appeared

13   before Jackson County in December, you were

14   not there to present a new challenge list?

15         A.    No.  No.  I was there to get

16   the names of the ones that actually voted off

17   the original challenge list.

18         Q.    Okay.  At any point before the

19   2021 election, did you authorize True the

20   Vote to submit a challenge in your name -- a

21   new challenge in your name?

22         A.    Before the what election?

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 55

1          Q.     After the 2020 general election

2     but before the 2021 runoff, did you authorize

3     a new challenge in your name?

4          A.     No, I did not.  But I know it

5     was not -- there was not a challenge either.

6     The two members on the board of elections

7     that I actually appointed when I was the

8     chairman of the Jackson County Election Board

9     asked for and could not receive the names of

10    the people that voted in the presidential

11    election that were on that original list.

12    And they still haven't been able to get them.

13         Q.     Okay.  Can you explain --

14    sorry.  Finish your answer.  I'm sorry.

15         A.     No.  That's okay.

16         Q.     Can you explain why this --

17    this press release would then say during this

18    meeting was discussed the challenges that he

19    and True the Vote presented were discussed?

20              MS. KRAMER:  Objection.

21         Speculation.

22              You may answer, but

Case 2:20-cv-00302-SCJ   Document 160-1   Filed 05/17/22   Page 56 of 97

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 56

1          speculation -- objection.

2                    Just note my objection, please.

3          A.    What was the question again?

4    BY MS. FORD:

5          Q.    Mr. Johnson, I'm asking you why

6    this press release would say --

7          A.    Do you have anything -- what's

8    the rest of that article say?

9                    MS. FORD:  Yeah, Dan, are we

10          able to scroll down through this a

11          little bit?

12          A.    (Document[s] reviewed.)

13    BY MS. FORD:

14          Q.    Mr. Johnson, I apologize, but

15    I'm a little confused myself.

16                    I have watched the video of

17    this hearing before the Jackson County

18    Elections Board, and it very much appeared to

19    me that you were presenting a challenge, and

20    the county was deciding whether there was

21    probable cause.

22          A.    That -- I know what article

Page 57

1    that is now.  That came out long after

2    I submitted the original challenge.  I mean,

3    that's got to be close to over a month later

4    that that article came out.

5         Q.    Okay.  So whenever you appeared

6    before the Jackson County Board of Elections

7    to present a challenge, you're telling me

8    that was for the 2020 general election?

9         A.    Yes.  That was in November,

10   before the election, or at the end of

11   October.

12        Q.    Okay.

13        A.    And the video that was taken

14   was taken by the Democrat chair that was at

15   that thing.  And you could probably call him

16   and ask him when he taped it.  Or it's

17   probably on YouTube.

18        Q.    Okay.  So is the information in

19   this press release incorrect, then, that you

20   did not -- you did not go before the Jackson

21   County Board of Elections in December 2020 to

22   present a challenge?

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 58

1          A.     No.  I went before the board

2     of -- and this is what happened when I went

3     before the board of elections.  I went before

4     the regular election, not the primary.

5          Q.     Okay.

6          A.     I had nothing to do with the

7     primary except trying to get voters out.  And

8     I don't even believe that True the Vote

9     submitted a challenge for the primary.

10         Q.     And by "primary," do you mean

11    the runoff or you do mean the primary?

12         A.     No, no.  The general.  I mean

13    the runoff.

14         Q.     Okay.  So you don't believe --

15         A.     This here all happened before

16    the general election.

17         Q.     Okay.  So it's your

18    understanding that True the Vote did not

19    submit a challenge in Jackson County --

20         A.     Absolutely.

21         Q.     -- for the runoff?  Okay.

22                And why did you not submit a

Page 59

1    challenge before the runoff if you had before

2    the general?

3         A.     Because I was busy trying to

4    get voters out.

5         Q.     Okay.  All right.  Well, then

6    let's go back to the challenge list from

7    2020, the 2020 general election that you

8    submitted.

9               So you said that one was based

10   on National Change of Address; correct?

11        A.     Yes.

12        Q.     And do you know of any other

13   data source or anything that was applied to

14   that list other than National Change of

15   Address?

16        A.     I'm not privy to that.  I don't

17   know if they did or not.  I know it was a

18   post office change of address.

19        Q.     Okay.  And who sent you that

20   list?

21        A.     Nobody sent me that list.  It

22   was sent to Jackson County Election Board.

Page 60

1       Q.      I thought that you testified

2    earlier that you looked at the list.

3       A.      I did look at the list.  It

4    didn't get sent to me.

5       Q.      How did you look at it then?

6       A.      I think it was in a text to me,

7    before they submitted it.

8       Q.      You think that someone texted

9    you 1400 names?

10      A.      It might have been in an

11   e-mail.  I don't keep any of that stuff,

12   so...

13              It might have been in an

14   e-mail.  I saw the list.  I was curious to

15   see how many there were on the list.

16      Q.      And did you read all of the

17   names on the list before you submitted that

18   challenge?

19      A.      I went through it real quickly

20   to see who I knew -- that I knew moved out of

21   the county.

22              I also went through it to see

Case 2:20-cv-00302-SCJ   Document 160-1   Filed 05/17/22   Page 61 of 97

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 61

1    if there was any military names on it,

2    because we were taking the military names off

3    because they're legally eligible to vote in

4    their home county.

5          Q.     Okay.  And did you end up

6    taking any names off the list?

7          A.     No, I did not.

8          Q.     Okay.  Did you do any other

9    sort of investigation, such as, you know,

10   going door to door or calling people to see

11   if they still lived there?

12         A.     No, I did not.

13         Q.     Okay.  And is it correct you

14   said you think it's about 1400 voters that

15   were on that list?

16         A.     That were on that list.  And it

17   was about -- I want to say somewhere around

18   600 that were on the list, or less, actually

19   voted so -- in that election.

20         Q.     Okay.  At the time you

21   submitted that list, what did you hope that

22   Jackson County would do with that list?

Page 62

```
 1        A.     I had hoped they'd do the right

 2   thing.

 3        Q.     What do you mean by that?

 4        A.     To check it out.

 5        Q.     And can you just spell out for

 6   me what you mean by "check it out"?

 7        A.     To see if the people actually

 8   lived in the county.  That's what they're

 9   supposed to do.

10        Q.     And how did you think they

11   would do that?

12        A.     Through their process that they

13   have.

14        Q.     And can you just spell that --

15   like, what process were you envisioning they

16   would do?

17        A.     Whatever their process is.

18        Q.     So you don't know the process?

19        A.     The process is they go through

20   the Secretary of State's office, and they --

21   they're supposed to send out a letter in

22   advance of the election to that address to
```

Case 2:20-cv-00302-SCJ   Document 160-1   Filed 05/17/22   Page 63 of 97

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 63

1    see if the people still live there.

2              As a matter of fact, they sent

3    one for that -- after the election, they sent

4    one for this Jessica Bryant that was

5    registered at my address.  And I took it over

6    to them.  And they opened it up, and they

7    said, "Oh, she actually has moved."

8              I said, "Yeah.  I told you that

9    almost three years ago."

10        Q.    Okay.  So you thought there

11   would be a process where the SoS would send a

12   letter to these people, and then I assume

13   either they would respond or they would not

14   respond?

15        A.    Right.

16        Q.    And then verbally they'd come

17   off the list --

18        A.    Right.

19        Q.    -- if they didn't respond?

20        A.    Right.

21        Q.    Okay.  So it sounds like you

22   did not expect Jackson County to personally

Page 64

1      investigate each of these voters themselves?

2           A.     I knew they wouldn't.

3           Q.     Okay.  Because you thought they

4      didn't have the capacity or...

5           A.     Oh, no.  They got the capacity.

6           Q.     You just thought they wouldn't?

7           A.     I was very confident that they

8      would not do the right thing and do their

9      job.

10          Q.     Okay.  Just one moment.

11                 (Pause.)

12                 And at the time -- or after you

13     submitted that challenge, I'll say, did you

14     hear from anybody who said that they were

15     improperly included on that list?

16          A.     No, I did not.

17          Q.     Okay.

18                 THE VIDEOGRAPHER:  Ms. Ford, do

19          you want me to take down this

20          document?

21                 MS. FORD:  Yes.  Can you please

22          download it?

Page 65

1                    Thank you, Dan.

2                    Actually, do you mind if we

3          take five minutes?

4                    THE VIDEOGRAPHER:  Stand by

5          while we go off the record.

6                    The time is 10:43 a.m., and

7          we're going off the record.

8                    (Recess taken.)

9                    THE VIDEOGRAPHER:  The time is

10         10:54 a.m.  We're back on the record.

11    BY MS. FORD:

12         Q.    Okay.  Mr. Johnson, when you

13    submitted the challenge of 1400 voters,

14    I guess we're still talking about the --

15    before the November 2020 election -- I guess

16    I just want you to put in your own words what

17    you hoped would happen.

18         A.    What I hoped would have

19    happened is that the challenges would have

20    been taken up and the right thing, by law,

21    would have been done.  And it didn't matter

22    who the person was.

Page 66

1                    You know, if you live in --

2    I'll use counties around here.  If you lived

3    in and were registered in Gwinnett County and

4    moved to Rabun County, but you were still

5    voting in Gwinnett County, that actually is

6    against the law.  And you should reregister

7    in Rabun County.

8                    Or if you lived in Gwinnett

9    County and you moved to South Carolina and

10   you were still registered in Gwinnett County,

11   you could also, by the way, register in

12   South Carolina because there is no backup to

13   that.

14                   So I would hope that they would

15   have done that and just made everybody that

16   was legally able or eligible to vote to vote.

17                   But, for some reason, they

18   don't do their job when they're supposed to

19   do their job during the years when they --

20   because they get a change of address in.  The

21   state -- Secretary of State and those boards

22   get a change of address submitted to them.

Page 67

1    And they should do the work then and not wait

2    until, oh, it's election time.

3         Q.     Okay.  From your perspective,

4    do you think someone can be less likely to

5    vote, you know, if they appeared on the list

6    saying their eligibility was challenged?

7         A.     No, I don't.  Because you know

8    what?  I actually did -- when I first --

9    probably the second year I was in Jackson

10   County, I became the chairman of the party

11   there.

12                And I actually got involved

13   with the city vote, that 25 people who no

14   longer lived in the city or didn't even live

15   in the city limits -- all they had was the

16   ZIP Code; they should have been registered in

17   the county -- I actually challenged the

18   mayor's race of 25 people.

19                And -- because they did the

20   right thing back then -- that election board

21   did the right thing and investigated it and

22   had the people show up and prove that they

Page 68

1    actually lived in the city limits.

2              Well, most of them didn't show

3    up.  Most of them just sent back the letter

4    and said, "Well, I don't live in the city

5    limits."

6              That's what I actually would

7    want to happen in one of these elections.

8    so this isn't the first time I've done this.

9        Q.    Okay.  And that makes sense.

10             And I just want to make sure

11   I understand you.

12             After the challenge you did

13   in -- I'm sorry, before the November 2020

14   election, you did not submit any further

15   challenges.

16       A.    No.

17       Q.    And --

18       A.    You mean after the 2020

19   election?

20       Q.    Right.

21       A.    Right.  I did not submit

22   another challenge.  And, to my knowledge,

Page 69

1    neither did True the Vote.

2         Q.    Okay.  And you just -- before,

3    it sounded like you just thought it would be

4    pointless to submit a challenge.

5         A.    Yes.  Yeah, I did.  They didn't

6    do anything the first time.  What made me --

7    you know, nothing in my mind thought they

8    would do anything the second time.

9         Q.    Okay.  So you just --

10        A.    I kind of --

11        Q.    -- thought your time was better

12   spent elsewhere?

13        A.    Yeah.

14        Q.    Okay.

15             MS. FORD:  Dan, could you pull

16        up Exhibit H -- actually, I'm sorry,

17        Dan.  No exhibit at this time.

18   BY MS. FORD:

19        Q.    Okay.  So, Mr. Johnson, you

20   were going on with your usual, sounds like,

21   maybe campaign work in advance of the 2021

22   election.  And your only participation in

Page 70

1    True the Vote's challenge program was to

2    forward names.

3          A.    Yes.

4          Q.    Okay.  Did you authorize anyone

5    at True the Vote to submit a challenge list

6    in your name for 2021?

7          A.    Yes.  And I don't recall who

8    that person was, but yes, I did.

9          Q.    In advance of the runoff

10   election?

11         A.    No, no, no.  No.

12         Q.    So only in advance of the

13   2021 --

14         A.    Like I said, to my knowledge,

15   they did not do one in Jackson County for the

16   runoff election.

17         Q.    Okay.  So just so I fully

18   understand, because I was confused, you did

19   not authorize anyone to submit a challenge on

20   your behalf for the 2021 runoff election.

21         A.    Right.

22         Q.    Okay.

Page 71

1              MS. FORD:  Dan, sorry, could we

2        pull up Exhibit H now.

3              THE VIDEOGRAPHER:  What I was

4        going to go to say, Ms. Ford, is:

5        I did not receive an H from you.  I

6        have A through G.

7              MS. FORD:  My colleague, Jacob,

8        would have just uploaded it.

9              THE VIDEOGRAPHER:  Okay.

10             (Discussion off the record.)

11             (Ford Exhibit H, Letter Re:

12       Elector Challenge, Bates Def Williams

13       0859, was marked for identification,

14       as of this date.)

15             THE DEPONENT:  Can you go down

16       so I could see the date of that

17       letter?  Down -- not that way.  Up.

18       Up.  Up.  Up.  Okay.

19  BY MS. FORD:

20       Q.    Mr. Johnson, do you recognize

21  this letter?

22       A.    Go up with it so I -- where I

Page 72

1    can read it.  Hold on a minute.

2              (Document[s] reviewed.)

3              No, I don't remember doing

4    that.

5         Q.    Okay.  Okay.  So you don't

6    remember submitting this?

7         A.    No.

8         Q.    Okay.  And you don't remember

9    telling someone to submit it for you?

10        A.    No.

11        Q.    Okay.

12             MS. FORD:  Dan, would you mind

13        also pulling up the other exhibit you

14        just downloaded.

15             (Ford Exhibit I, E-mail string,

16        top e-mail to Dara Lindenbaum and

17        others from Marisa Pyle, 12/21/20,

18        No Bates, was marked for

19        identification, as of this date.)

20        A.    I have no idea who that person

21    is.

22             MS. FORD:  And, Dan, here, can

Page 73

1          you scroll down, I believe, to the

2          last page.  And make this bigger, if

3          you can.  Scroll up a little bit so we

4          can see the body of the e-mail and the

5          date.

6                    THE VIDEOGRAPHER:  So we're

7          clear:  This is the last page, and

8          this is --

9                    MS. FORD:  I'm so sorry.  That

10         page.  Can we make this bigger,

11         please, so we can see the date?

12                    THE VIDEOGRAPHER:  Sure.

13                    MS. FORD:  Thank you.

14    BY MS. FORD:

15         Q.    So, Mr. Johnson, this is an

16    e-mail that was sent on December 19, 2020,

17    for a challenge attachment of 2300 voters

18    that was sent in your name.

19                    Do you remember submitting

20    this?

21         A.    No, I don't.  But you know

22    what?  That name at the bottom is the --

Page 74

1    Pete Fuller, that's the Democratic chair in

2    Jackson County.

3              MS. FORD:  Can we scroll down

4         now to the last page.  Sorry, Dan.

5    BY MS. FORD:

6         Q.    This letter is signed by you,

7    though.  I believe that Pete Fuller is just

8    forwarding the e-mail, and that's why his

9    name comes up at the bottom.

10             Do you remember authorizing

11   anyone to submit this challenge on your

12   behalf?

13        A.    No, I do not.  No, I do not.

14        Q.    Okay.  So is it a surprise to

15   you --

16             MS. KRAMER:  Let her finish the

17        question.  Just so the court reporter

18        can hear you guys, let her finish

19        first, and then she'll let you

20        respond.

21             THE DEPONENT:  Okay.

22             MS. FORD:  Thank you, Courtney.

Page 75

1    BY MS. FORD:

2         Q.     So is it a surprise to you to

3    learn today that you challenged 2300 voters

4    in Jackson County in December of 2020?

5         A.     Because, yeah, I thought it was

6    1400.  Maybe it was 1400 that they actually

7    found that were still registered.

8                I don't remember the original,

9    but I know 1400.

10        Q.     Okay.  But you do not remember

11   submitting this challenge?

12        A.     No.

13        Q.     Okay.

14        A.     And I wouldn't be surprised if

15   Pete Fuller did it in my name.  That would

16   not surprise me.

17        Q.     Okay.

18               MS. FORD:  Dan, I'm done with

19        this exhibit.  Thank you.

20        A.     Excuse me.  Can I get a copy of

21   that?

22   ///

Page 76

1    BY MS. FORD:

2        Q.      Sure.

3        A.      Okay.

4        Q.      We can send you that after.

5                So you said that you have met

6    Catherine Engelbrecht maybe once?

7        A.      I've never met Catherine

8    Engelbrecht.

9        Q.      You've never.

10               Have you ever talked to her on

11   the phone?

12       A.      And I told you that the first

13   time.

14       Q.      I'm sorry.  I missed the last

15   part of your answer.

16       A.      I said I've never met Catherine

17   Engelbrecht.  And I told you the first time

18   you asked me that.

19       Q.      I'm sorry.  I forgot.

20               Have you ever spoken with her

21   on the phone?

22       A.      Maybe twice.

Page 77

```
 1        Q.    What was discussed during those

 2   conversations?

 3        A.    I was asking her to come speak

 4   to my GOP group.

 5        Q.    And did she do that?

 6        A.    We haven't scheduled it yet.

 7        Q.    Okay.  So this was recently?

 8        A.    Yes.

 9        Q.    Okay.  During the lead-up to

10   this runoff election, did you attend any

11   meetings or calls organized by True the Vote?

12        A.    I believe there might have been

13   one that I actually attended, but they had a

14   Zoom call, and they brought me in on the

15   phone.  I don't do Zoom at all.

16        Q.    Okay.  But you joined a call?

17        A.    Yeah, I joined the call.

18   I could hear what they were saying.

19        Q.    You couldn't hear what they

20   were saying?

21        A.    No.

22              MS. KRAMER:  Counsel, I just
```

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 78

1          want a point of clarification.

2                    Are you talking about True the

3          Vote, as an organization, or the

4          attorneys for this deposition?  I just

5          want to clarify that.

6                    MS. FORD:  I am speaking about

7          True the Vote, the organization, or

8          its leaders.

9          A.     Oh, no.  No.  No.  Then no.

10                   I've talked to the -- Bopp is

11    his last name?

12                   MS. KRAMER:  The attorneys.

13         A.     Yeah.  That's it.

14    BY MS. FORD:

15         Q.     Okay.  No, I'm not asking about

16    that.

17         A.     Okay.  Then no.

18         Q.     Okay.  Just now, you mentioned

19    that you thought it was possible that Pete

20    Fuller submitted that challenge.

21                   You said Pete was affiliated

22    with the Democratic party?

Page 79

1          A.     Yeah, he's the chairman of

2    Jackson County.  And I didn't -- I said it's

3    possible he would do that.  And that's why I

4    wanted a copy of this thing.

5          Q.     Right.  Right.

6                 Why do you think he would do

7    that?

8          A.     We don't have a very good

9    relationship.  Let's just put it that way.

10         Q.     Well, if Pete had submitted

11   that, what would have been his motivation?

12                MS. KRAMER:  Objection.

13         Speculation.

14                THE DEPONENT:  Yeah.

15   BY MS. FORD:

16         Q.     You can answer, if you'd like,

17   Mr. Johnson.

18         A.     No, I'm not going to.  That is

19   speculation.

20         Q.     So -- but do you think he would

21   have done it to get back at you or something?

22                MS. KRAMER:  Objection.

Page 80

1       Speculation.

2       A.      That's also speculation.

3   BY MS. FORD:

4       Q.      Mr. Johnson, even though your

5   counsel is objecting, you may still answer.

6   It's just for the record.

7       A.      I just said I thought that is

8   speculation also.

9       Q.      Okay.  One moment.

10          (Pause.)

11          MS. FORD:  Dan, can we please

12      bring up Exhibit D.

13          (Ford Exhibit D, Defendant Ron

14      Johnson's Responses to Plaintiffs'

15      First Interrogatories, No Bates, was

16      marked for identification, as of this

17      date.)

18          MS. FORD:  And scroll down here

19      just to the start of it.

20  BY MS. FORD:

21      Q.      Mr. Johnson, do you recognize

22  this document?

Case 2:20-cv-00302-SCJ   Document 160-1   Filed 05/17/22   Page 81 of 97

9/29/2021        Fair Fight, Inc. et al. v. True the Vote, et al.        Ron Johnson

Page 81

1          A.      (Document[s] reviewed.)

2                  Oh, yeah.  Yep.

3          Q.      Okay.  So you've seen it

4      before?

5          A.      Yeah.

6                  MS. FORD:  And, Dan, could we

7          scroll down a couple pages.

8                  THE VIDEOGRAPHER:  Any

9          particular paragraph that you're aware

10         of that I can zoom in for you?

11                 MS. FORD:  I want to go to

12         where we have Interrogatory No. 1.

13                 THE VIDEOGRAPHER:  There it is,

14         Interrogatory No. 1.

15                 Do you want me to blow up the

16         question and the response or just the

17         question?

18                 MS. FORD:  Yes.  Yes, please.

19     BY MS. FORD:

20         Q.      Mr. Johnson, I just wanted to

21     take a moment to go through these.

22                 So do you remember reading

Page 82

1     these questions and providing responses to

2     them?

3              A.     Yes, I do.

4              Q.     Okay.  I just want to make sure

5     you agree that your responses are still

6     accurate or, if not, give you a chance to

7     update your response.

8              A.     They're accurate.  And I really

9     object to and am appalled that anybody would

10    put "we targeted voters."

11                    No, we did not.

12             Q.     All right.  Your objection is

13    noted.

14                    MS. FORD:  Can we scroll down

15             to Interrogatory No. 5 and make it

16             large, if you can, Dan.

17    BY MS. FORD:

18             Q.     So, here, Mr. Johnson, we asked

19    you to describe all individuals that were

20    affiliated with True the Vote with whom you

21    communicated regarding the elector

22    challenges.

Page 83

1            And, here, you responded at the

2     bottom, Amy Holsworth, Catherine Engelbrecht,

3     Ron Johnson, Gregg Phillips, I believe the

4     next one says John David Phillips, and the

5     last one says Mark Williams.

6                 Is that accurate?

7       A.     (Document[s] reviewed.)

8                 (Indecipherable conversation

9           between the deponent and Ms. Kramer.)

10    BY MS. FORD:

11      Q.     Mr. Johnson, do you remember

12    reading this response before you signed this

13    document?

14      A.     Yeah, I read it.  I'm

15    refamiliarizing myself with it.  It's been

16    awhile.

17      Q.     Sure.

18             MS. FORD:  Dan, can we scroll

19        up to the bigger part that's

20        highlighted on the previous page?

21             (Videographer complied.)

22             MS. FORD:  Yes.  Perfect.

Page 84

1               Sorry.  I didn't realize you

2        lost the highlighting.

3    BY MS. FORD:

4        Q.     Here, Mr. Johnson, when you

5    said you "communicated with Ron Johnson," did

6    you mean to state that you communicated with

7    someone else?

8        A.     No.  That was me.

9        Q.     You meant to say you

10   communicated with yourself?

11       A.     Yes.

12       Q.     Okay.

13       A.     There was no other Ron Johnson

14   in the Republican Party who I know of.

15              Who's John David?  I did not --

16   we need to take that one out.

17       Q.     Sorry.  We can -- what do you

18   mean, "we can take that one out"?

19       A.     John David Phillips.

20       Q.     Is that not accurate?  You did

21   not communicate with John David Phillips?

22       A.     No, I didn't.

Page 85

1        Q.    Okay.  Do you know why you

2    would have said that?

3        A.    I have no idea at the time.

4        Q.    And did you say earlier you

5    don't actually know who John David Phillips

6    is?

7        A.    I don't.  I did say earlier

8    that, I believe.

9             MS. KRAMER:  Counsel, can we

10        take a five-minute break?

11             MS. FORD:  Sure.

12             MS. KRAMER:  Thank you.

13             THE VIDEOGRAPHER:  Okay.  Stand

14        by.

15             The time is 11:14 a.m.  We're

16        going off the record.

17             (Recess taken.)

18             THE VIDEOGRAPHER:  The time is

19        11:19 a.m.  We're back on the record.

20    BY MS. FORD:

21        Q.    All right.  Mr. Johnson, I just

22    have a few more questions for you.

Page 86

1                    So when we requested documents

2     and communications from you regarding the

3     Georgia election challenges, did you search

4     your e-mail Inbox for any e-mails that might

5     be relevant?

6          A.     Yes, I did.  But I don't keep

7     my e-mails.  So -- I mean, I get 150, 200

8     e-mails a day about what I do with the

9     Republican Party.  So I delete everything

10    every other day.  So I have no e-mails

11    regarding this.

12                   And during the break, I did

13    read this.  And when this lawsuit that was

14    brought against us started, we were getting a

15    lot of communication from our attorneys.  And

16    that's why that is on that.  I realize now,

17    because it was part of an e-mail thread.

18                   So I did have some kind of

19    communication, if you want to call it that,

20    but I've never -- other than that, from the

21    attorneys with John David Phillips, I did it

22    because they were on the e-mail threads.

Page 87

1        Q.      Got it.

2                So that's why you thought you

3    had communicated with John David Phillips, is

4    because you had later communications with him

5    and with Mr. Bopp or with another attorney?

6        A.      It was somebody at Mr. Bopp's

7    office, yeah.  The attorneys.

8        Q.      Okay.  Okay.  So you say you

9    delete your e-mails every other day.

10       A.      Every other day.

11       Q.      How long have you been doing

12   that?

13       A.      Oh, let's see.  I've been a

14   party officer for ten years, so at least that

15   long.

16       Q.      Okay.  And can you just walk me

17   through:  When you say you delete e-mails, do

18   you just click and press the little trash

19   can?

20       A.      No.  I get rid of them

21   completely.

22       Q.      How do you do that?

Page 88

1        A.      On my phone.  It's got a button

2    that I can do that with.  Like empty it out.

3    I empty it out.

4        Q.      So you actually go into your

5    Deleted folder --

6        A.      Yes.

7        Q.      So you go into your Deleted

8    folder and you delete everything in there as

9    well?

10        A.      Yes.

11        Q.      Okay.  And do you do that for

12    all kinds of e-mails that you receive?

13        A.      Everything.  It doesn't matter

14    what it is.

15        Q.      Everything.  Okay.

16                And do you also regularly

17    delete text messages?

18        A.      Yes.  Same thing.

19        Q.      Every other day?

20        A.      Yes.

21        Q.      And how long have you been

22    doing that?

Page 89

1          A.      Oh, ten years or more.

2          Q.      And you do that for all kinds

3    of texts that you receive?

4          A.      Yes.  It doesn't matter who.

5          Q.      Okay.  So does that mean by the

6    time you received this lawsuit, which

7    I believe would have been right before

8    Christmas, you had already deleted all

9    communications about --

10         A.      Yes.

11         Q.      -- these challenge efforts or

12   forwarding names?

13         A.      Yes.

14         Q.      Okay.  Did anyone instruct you

15   to delete any communications you had about

16   this?

17         A.      No, they did not.

18         Q.      Did anyone instruct you to

19   preserve any communications related to this?

20         A.      No, they did not.

21         Q.      Okay.  All right.

22                 I just have a few more

Page 90

1    questions.  Mr. Johnson, do you believe that

2    voter fraud occurred during the 2020 general

3    election?

4          A.    Yes, I believe there was.  I

5    don't believe anything happened with the

6    machines.  I believe it was in the absentee

7    ballot area and harvesting of ballots.

8               I believe that people in other

9    states got ballots.  Our ballots did not have

10   a watermark on them.  Anybody could have

11   printed them up in any print shop in the

12   world.  So I believe that that's what's

13   happening.

14              And I'm working on a bill with

15   some other people and state legislators and

16   state senate with the chain of custody.  So

17   we're going to try to stop that problem from

18   happening.

19              I'm not a conspiracy thinker

20   about the machines or any of that, but I do

21   think something happened with those ballots,

22   so...

Case 2:20-cv-00302-SCJ   Document 160-1   Filed 05/17/22   Page 91 of 97

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 91

1          Q.      And was that part of the

2     motivation of submitting the challenges that

3     you did submit, that you thought there

4     was ballot harvesting?

5          A.      No.  I submitted them

6     beforehand.

7          Q.      Right.  Were you worried

8     about -- were you worried about the potential

9     for ballot harvesting?

10         A.      Absolutely.

11         Q.      Okay.  Just one moment.

12              (Pause.)

13              All right.  And I think maybe

14    my last question is:  For the challenges that

15    you did submit to Jackson County before the

16    general election, do you remember how that

17    was submitted?  Was it sent by mail?  Was it

18    e-mailed?

19         A.      I believe it was -- I really

20    don't know.  I don't know how it was done.

21    I think it was done by e-mail.

22         Q.      Okay.  But someone else sent it

Page 92

1    for you?

2          A.     Yes.

3          Q.     Okay.  And someone affiliated

4    with True the Vote sent it for you?

5          A.     Yes.

6          Q.     Okay.  But you just can't

7    remember who precisely?

8          A.     No.

9          Q.     Okay.

10                Mr. Johnson, are you continuing

11   to delete your text messages and e-mails

12   every other day?

13         A.     Yes.

14         Q.     All right.  So you've continued

15   that practice?

16         A.     Yes.  I will continue to do

17   that practice.

18         Q.     Okay.  And, Mr. Johnson, during

19   the break, did you discuss any of your

20   answers with your counsel?

21         A.     No, I did not.  She actually

22   had to go to the ladies' room.

Page 93

1          Q.     Okay.

2                 MS. FORD:  All right,

3          Mr. Johnson.  Those are all the

4          questions that I have for you today.

5                 THE DEPONENT:  Okay.  Thank

6          you.

7                 MS. KRAMER:  I don't have any

8          questions, Counsel.

9                 THE VIDEOGRAPHER:  All right.

10         So if there's no further statements

11         for the record, we're going to go off.

12                The time is 11:27 a.m.,

13         September 29th, 2021.  We're going off

14         the record, completing today's

15         video-recorded session.

16                (Time noted:  11:27 a.m. EDT)

17

18

19

20

21

22

Case 2:20-cv-00302-SCJ   Document 160-1   Filed 05/17/22   Page 94 of 97

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 94

```
 1                    CERTIFICATE
 2          I, LISA A. KNIGHT, Registered
     Diplomate Reporter and Certified Realtime
 3   Reporter, do hereby certify that prior to the
     commencement of the examination, RON JOHNSON
 4   was duly sworn by me to testify to the truth,
     the whole truth, and nothing but the truth.
 5          I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
 6   testimony as taken stenographically by and
     before me at the time, place, and on the date
 7   hereinbefore set forth, to the best of my
     ability, and that reading and signing was not
 8   requested.
 9          I DO FURTHER CERTIFY that I am
     neither a relative nor employee nor attorney
10   nor counsel of any of the parties to this
     action, and that I am neither a relative nor
11   employee of such attorney or counsel, and
     that I am not financially interested in the
12   action.
13
14
15   _____
16   LISA A. KNIGHT
17   NCRA Registered Diplomate Reporter
18   NCRA Certified Realtime Reporter
19   NCRA Certified LiveNote Reporter
20   NCRA Realtime Systems Administrator
21   Dated:  October 5, 2021
22
```

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 95

```
1       Ron Johnson, c/o

        THE BOPP LAW FIRM

2       1 South Sixth Street

        Terre Haute, Indiana  47807-3510

3

4       Case: Fair Fight, Inc. et al. v. True the Vote, et al.

        Date of deposition: September 29, 2021

5       Deponent: Ron Johnson

6

7       Please be advised that the transcript in the above

8       referenced matter is now complete and ready for signature.

9       The deponent may come to this office to sign the transcript,

10      a copy may be purchased for the witness to review and sign,

11      or the deponent and/or counsel may waive the option of

12      signing. Please advise us of the option selected.

13      Please forward the errata sheet and the original signed

14      signature page to counsel noticing the deposition, noting the

15      applicable time period allowed for such by the governing

        Rules of Procedure. If you have any questions, please do

16      not hesitate to call our office at (202)-232-0646.

17

18

19      Sincerely,

        Digital Evidence Group

20      Copyright 2021 Digital Evidence Group

21      Copying is forbidden, including electronically, absent

22      express written consent.
```

Page 96

1      Digital Evidence Group, L.L.C.
       1730 M Street, NW, Suite 812
2      Washington, D.C. 20036
       (202) 232-0646
3
4      SIGNATURE PAGE
       Case: Fair Fight, Inc. et al. v. True the Vote, et al.
5      Witness Name: Ron Johnson
       Deposition Date: September 29, 2021
6
7      I do hereby acknowledge that I have read
       and examined the foregoing pages
8      of the transcript of my deposition and that:
9
10     (Check appropriate box):
       (  ) The same is a true, correct and
11     complete transcription of the answers given by
       me to the questions therein recorded.
12     (  ) Except for the changes noted in the
       attached Errata Sheet, the same is a true,
13     correct and complete transcription of the
       answers given by me to the questions therein
14     recorded.
15
16
17
18     _____        _____
19        DATE                    WITNESS SIGNATURE
20
21     _____        _____
22        DATE                        NOTARY

9/29/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Ron Johnson

Page 97

1          Digital Evidence Group, LLC

2          1730 M Street, NW, Suite 812

3          Washington, D.C.  20036

4          (202)232-0646

5

6                              ERRATA SHEET

7

8          Case: Fair Fight, Inc. et al. v. True the Vote, et al.

9          Witness Name: Ron Johnson

10         Deposition Date: September 29, 2021

11         Page No.    Line No.    Change

12

13

14

15

16

17

18

19

20

21    _____          _____

22         Signature                              Date