Case 2:20-cv-00302-SCJ   Document 161-1   Filed 05/17/22   Page 1 of 177

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

_____

FAIR FIGHT, INC.,                    )
SCOTT BERSON, JOCELYN HEREDIA,       )
and JANE DOE,                        )
                                     )
        Plaintiffs,                  )
                                     )
v.                                   )       Case No.
                                     )   2:20-cv-00302
TRUE THE VOTE, CATHERINE             )        SCJ
ENGELBRECHT, DEREK SOMERVILLE,       )
MARK DAVIS, MARK WILLIAMS,           )
RON JOHNSON, JAMES COOPER,           )
and JOHN DOES 1-10,                  )
                                     )
        Defendants.                  )
_____  )


Videotaped Deposition of MARK DAVIS
Conducted Remotely via Zoom
Monday, October 4, 2027
9:04 a.m. EDT

Reported by Lisa A. Knight, RDR, CRR, RSA

_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Case 2:20-cv-00302-SCJ   Document 161-1   Filed 05/17/22   Page 2 of 177

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 2

1              DIGITAL EVIDENCE GROUP

2                 Pursuant to Notice, the videotaped

3     deposition of MARK DAVIS was conducted

4     remotely via Zoom on behalf of the

5     Plaintiffs, at 9:04 a.m. EDT, on Monday,

6     October 4, 2021, reported stenographically by

7     Lisa A. Knight, Realtime Diplomate Reporter,

8     Certified Realtime Reporter, and Realtime

9     Systems Administrator.

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

```
 1              A P P E A R A N C E S
 2              (Appearing Remotely)
 3                 *      *      *
 4
 5    COUNSEL FOR THE PLAINTIFFS
           ELIAS LAW GROUP LLP
 6         BY:  JACOB SHELLY, ESQUIRE
                jshelly@elias.law
 7              CHRISTINA A. FORD, ESQUIRE
                cford@elias.law
 8         10 G Street NE
           Suite 600
 9         Washington, DC 20002
10         202.968.4490
11
12         LAWRENCE & BUNDY LLC
           BY:  LESLIE J. BRYAN, ESQUIRE
13              leslie.bryan@lawrencebundy.com
           1180 West Peachtree Street NW
14         Suite 1650
           Atlanta, Georgia 30309
15         404.400.3350
16
17         PERKINS COIE LLP
           BY:  TORRYN TAYLOR, ESQUIRE
18              ttaylor@perkinscoie.com
           505 Howard Street
19         Suite 1000
           San Francisco, California 94105
20         415.344.7122
21
22
```

Page 4

1          A P P E A R A N C E S (Cont.)

2     COUNSEL FOR THE DEFENDANTS

3          THE BOPP LAW FIRM

4          BY:  MELENA S. SIEBERT, ESQUIRE

5               msiebert@bopplaw.com

6               COURTNEY KRAMER, ESQUIRE

7               ckramer@bopplaw.com

8          1 South 6th Street

9          Terre Haute, Indiana 47807

10         812.232.2434

11

12    ALSO PRESENT:

13         HENRY MARTE, VIDEOGRAPHER

14

15

16

17

18

19

20

21

22

Page 5

```
 1                       I N D E X
 2                      MARK DAVIS
 3                    OCTOBER 4, 2021
 4   EXAMINATION OF MARK DAVIS:              PAGE
 5        BY MR. SHELLY                        8
 6        BY MS. SIEBERT                      156
 7
 8                  DEPOSITION EXHIBITS
 9                      MARK DAVIS
10                    OCTOBER 4, 2021
11   NUMBER          DESCRIPTION            PAGE
12   Davis A      Plaintiffs' Notice to      13
                  take the Deposition of
13                Defendant Mark Davis,
                  No Bates
14   Davis B      Affidavit of Mark Davis,   80
                  No Bates
15   Davis C      Mark Davis Facebook Post, 114
                  May 7 at 2:07 p.m.,
16                No Bates
17   Davis D      E-mail string, top e-mail  70
                  to Catherine Engelbrecht
18                from Derek Somerville,
                  12/19/20, No Bates
19   Davis E      Zoom meeting invitation   143
                  (TTV Legal Update),
20                12/27/20, No Bates
21   Davis F      Mark Davis Facebook Post, 142
                  December 17, 2020,
22                No Bates
```

Page 6

1                     DEPOSITION EXHIBITS, CON'T

2                          MARK DAVIS

3                         OCTOBER 4, 2021

4     NUMBER              DESCRIPTION                 PAGE

5     Davis J       Zoom meeting invitation,    144
                    12/30/20 (Georgia Elector
6                   Challenger Townhall),
                    No Bates

7     Davis K       Mark Davis Facebook post    116
                    dated May 7 showing
8                   partial tag list, No
                    Bates

9     Davis L       Printout of Data             19
                    Productions' website,
10                  No Bates

11

12

13

14

15    **REPORTER'S NOTE:  All quotations from

16    exhibits are reflected in the manner in which

17    they were read into the record and do not

18    necessarily indicate an exact quote from the

19    document.

20

21

22

Page 7

1                          PROCEEDINGS

2                    THE VIDEOGRAPHER:  We are now

3        on the record.  My name is Henry

4        Marte; I'm a videographer on behalf of

5        Digital Evidence Group.  Today's date

6        is October 4, 2021; and the time is

7        9:04 a.m.

8               This deposition is being held

9        by remote Zoom in the matter of Fair

10       Fight, Inc., et al., versus True the

11       Vote.  The deponent today is Mr. Mark

12       Davis.  All parties to this deposition

13       are appearing remotely and have agreed

14       to the witness being sworn in

15       remotely.

16               Counsel, please identify

17       themselves for the record, after which

18       the court reporter will administer the

19       oath to the witness.

20               MR. SHELLY:  I'm Jacob Shelly

21       from Elias Law Group representing

22       plaintiffs.

Page 8

1                    MS. BRYAN:  Good morning.  I'm

2          Leslie Bryan with Lawrence & Bundy,

3          representing plaintiffs.

4                    MS. TAYLOR:  Torryn Taylor from

5          Perkins Coie, also with plaintiffs.

6                    MS. FORD:  Christina Ford from

7          Elias Law Group representing

8          plaintiffs.

9                    MS. KRAMER:  Courtney Kramer

10         with Bopp Law Firm representing

11         defendants.

12                   MS. SIEBERT:  Melena Siebert

13         with The Bopp Law Firm representing

14         defendants.

15                   MARK DAVIS,

16     having been first duly sworn to state the

17     whole truth, testified as follows:

18                   EXAMINATION

19     BY MR. SHELLY:

20         Q.    Good morning, Mr. Davis.

21                   Could you just state your

22     record -- your name -- your full name for the

Page 9

1    record once more.

2         A.      Mark Alan Davis.

3         Q.      And your address, for the

4    record.

5         A.      325 Wesfork, W-e-s-f-o-r-k,

6    Way, Suwanee, Georgia 30024.

7         Q.      Thank you.

8                 And I'd like to start by going

9    over some of the ground rules for this

10   deposition, which will overlap slightly about

11   what the stenographer just said, but just to

12   make sure we're all on the same page.

13                All testimony here is under

14   oath just as if you were testifying in court.

15   Does that make sense?

16        A.      It does.

17        Q.      How many times have you been

18   deposed before?

19        A.      Let me think here.

20                (Pause.)

21                I don't recall exactly off the

22   top of my head.  I'd have to think about that

Page 10

1    one for a few minutes.

2         Q.     More than five?

3         A.     No.  Less than five.

4         Q.     But more than one?

5         A.     More than one, yes.

6         Q.     Fair enough.

7                For the benefit of everyone and

8    the court reporter, and especially since we

9    are all remote, please make your answers

10   audible because head shakes and nods are hard

11   to put in the record.

12               Please allow me to finish my

13   question before giving your answer.  That

14   will also help us have a clean transcript for

15   the record.

16               Does that sound good?

17        A.     Yes.

18        Q.     From time to time, your

19   attorney may make an objection -- and that's

20   fine -- but you are to answer it regardless,

21   unless she specifically instructs you not to

22   answer.

Page 11

1                    Does that make sense?

2          A.     Yes.

3          Q.     If at any point you do not

4     understand a question that I am asking, will

5     you please let me know?

6          A.     Yes.

7          Q.     And I will do my best to

8     rephrase or otherwise clarify the question.

9     If you do answer a question, I will assume

10    you understood it.

11                   Is that fair?

12         A.     Yes.

13         Q.     If, at any time, you would like

14    to take a break, please let me know, and I

15    will try to find a good place to stop, and we

16    can go off the record for a few minutes.  The

17    only exception is that if I have asked you a

18    question, I do ask that you answer the

19    question before we take a break.

20                   Is that all right?

21         A.     Understood.

22         Q.     And you gave me your home

Page 12

```
 1   address.  Is that the address you are located

 2   for this deposition?

 3        A.     Yes.

 4        Q.     And how are you viewing this

 5   deposition?  Is this a laptop?  It looks like

 6   a computer of some sort.  I imagine it's not

 7   a phone.

 8        A.     This is a workstation.

 9        Q.     And do you have any documents

10   with you related to this deposition, either

11   hard copies or electronic?

12        A.     In this room or at my disposal?

13        Q.     At your disposal.

14        A.     No.

15        Q.     And is anyone in the room with

16   you?

17        A.     No.  I have a wife upstairs

18   who's doing her own Zoom meeting today.

19        Q.     Okay.  I have a kid home sick,

20   who may be making an appearance at some point

21   as well, but hopefully it's just you and me.

22               Because we are taking your
```

Page 13

1  deposition remotely, I may not always be able

2  to see what you have in front of you or if

3  you [sic] may enter the room while you're

4  testifying.

5          Do you understand it would not

6  be appropriate for your attorney or anyone

7  else to tell you how to answer a particular

8  question I ask?

9     A.    Understood.

10    Q.    And do you agree that while we

11 are testifying today, you will not exchange

12 communications, whether by text, e-mail, or

13 other messaging, about how to answer the

14 questions that I ask?

15    A.    Yes.

16    Q.    Okay.  Great.  Let's get

17 started.

18          MR. SHELLY:  Henry, can you

19      please pull up Exhibit A.

20          (Davis Exhibit A,

21      Plaintiffs' Notice to take the

22      Deposition of Defendant Mark

Page 14

1          Davis, No Bates, was marked for

2          identification, as of this

3          date.)

4    BY MR. SHELLY:

5          Q.    Mr. Davis, do you recognize

6    this document?

7          A.    It appears to be the first

8    page of the lawsuit.

9               MR. SHELLY:  If you can scroll

10         down, Henry.

11   BY MR. SHELLY:

12         Q.    This is the notice about this

13   deposition we're taking right now.

14         A.    Okay.

15         Q.    Have you seen this before?

16         A.    I don't know that I have.

17         Q.    Are you prepared to testify

18   today?

19         A.    I am.

20         Q.    Without disclosing any specific

21   communications you may have had with your

22   lawyers, can you describe at a high level

Page 15

1    what you did to prepare for today?

2        A.    Nothing comes to mind other

3    than discuss it with my attorneys.  You know,

4    I was told generally what you said earlier,

5    about waiting for the full question before

6    answering and so on, so forth.  It basically

7    said about what you said.

8        Q.    Okay.  Great.

9              I would like to start with --

10             MR. SHELLY:  You can take that

11        down, Henry.  Thank you.

12   BY MR. SHELLY:

13       Q.    I would like to start with some

14   brief background about yourself.

15             Can you tell me where you grew

16   up?

17       A.    I grew up in Atlanta, Georgia.

18       Q.    Have you been in Georgia your

19   whole life?

20       A.    All but about a year of it,

21   yes.

22       Q.    And you're registered to vote

Case 2:20-cv-00302-SCJ   Document 161-1   Filed 05/17/22   Page 16 of 177

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 16

1    in Georgia?

2          A.      I am.

3          Q.      In which county?

4          A.      Gwinnett.

5          Q.      And how long have you been

6    registered to vote in Georgia?

7          A.      It would have been since

8    I was -- I believe since I was 18,

9    thereabouts.  I don't remember the exact date

10   that I registered.

11         Q.      That's fine.

12                 Have you ever registered to

13   vote in any other state?

14         A.      No.

15         Q.      Can you tell me a little bit

16   about your educational training.

17         A.      I was a political science major

18   at Georgia State University.  And after that,

19   I have taken some campaign classes, attended

20   the United States Campaign Academy in

21   Washington, which was basically a

22   seminar-type situation.

1        Q.     Have you received any formal

2    training in quantitative analysis or

3    statistics?

4        A.     No.

5        Q.     What do you do professionally?

6        A.     I'm the president of Data

7    Productions, which does marketing for

8    commercial, nonprofit, and political

9    organizations.  And I create an enhanced

10   version of the Georgia Voter Database that

11   candidates and organizations use when they

12   run for office.

13       Q.     How long have you held that

14   role?

15       A.     Data Productions was

16   incorporated in 1991.  Over the years, we

17   merged with another company, and I bought it

18   back.  And it's kind of a long story, but

19   I've been doing this kind of work for

20   approximately 30 years now.

21       Q.     Are you the founder of Data

22   Productions?

Page 18

1          A.      Yes.

2          Q.      How many employees does Data

3    Productions have?

4          A.      Currently, just two.

5          Q.      You and one other or two in

6    addition to you?

7          A.      Myself and my wife.

8          Q.      And give me a brief overview.

9    Can you tell me a little bit more about what

10   services Data Productions provides?

11         A.      We do a lot of direct mail, do

12   a lot of data processing, customer reporting,

13   a lot of data analytics, and project

14   management.

15         Q.      Can you give me an example or

16   two of a typical data processing service you

17   perform?

18         A.      A lot of it is for direct mail

19   campaigns.  I have commercial, nonprofit, and

20   political projects that I take.  And I will

21   manage the data processing, the printing, the

22   mailing, basically the project from soup to

Page 19

1    nuts.

2         Q.     Would you consider data

3    processing to be your strong suit?

4         A.     Yes.

5         Q.     And why is that?

6         A.     I've been admitted to testify

7    as an expert witness in data analytics 5

8    times over the last 20 years in various

9    disputed elections.  I've been working with

10   voter data for longer than most people have.

11   I know it well.  And I'm -- I've testified in

12   court over residency issues and redistricting

13   errors and things like that.

14        Q.     And what happens if a client or

15   you try to perform a project without good

16   data processing?

17        A.     I'm not sure I understand the

18   question.

19        Q.     Sure.

20               MR. SHELLY:  Henry, can you

21        pull up Exhibit L.

22               (Davis Exhibit L,

Page 20

```
1         Printout of Data Productions'

2         website, No Bates, was marked

3         for identification, as of this

4         date.)

5    BY MR. SHELLY:

6         Q.    Mr. Davis, do you recognize

7    this?  This is the website for Data

8    Productions.

9         A.    It appears to be.

10             MR. SHELLY:  Can you scroll

11        down to page 2, Henry?

12   BY MR. SHELLY:

13        Q.    That paragraph right there, in

14   the middle, "Why Data Processing?"  The

15   website says, "Data processing is the dull

16   older cousin to big data.  But without good

17   data processing," it says, "big data is just,

18   well, a big mess."

19             Do you agree with that?

20        A.    To a certain extent, that's

21   fluff that my web developer put in there.

22   But, in general, I would say that I agree
```

10/4/2021         Fair Fight, Inc. et al. v. True the Vote, et al.         Mark Davis

Page 21

1    that data processing is very important.

2         Q.    Fair to say that the quality of

3    processing affects of validity of the

4    conclusions that can be drawn from the data?

5         A.    Yes.

6              MR. SHELLY:  Thank you.  Henry,

7         you can take that one down.

8    BY MR. SHELLY:

9         Q.    Mr. Davis, you mentioned that

10   you perform National Change of Address

11   processing as part of your data processing

12   services.  Is that right?

13        A.    Yes.

14        Q.    And roughly how many times a

15   year would you say you perform NCOA

16   processing?

17        A.    I don't know the answer to that

18   question off the top of my head, but it's

19   often.  It's regular.  I would say I probably

20   will process 50, 60 million records this

21   year.

22        Q.    And when you say "process those

Page 22

1    records," can you describe a little bit about

2    what that process is?

3        A.    I license software that allows

4    me to run CASS certification as well as

5    National Change of Address processing.  And

6    I own -- I buy an annual subscription that

7    allows me to run up to a hundred million

8    records a year.

9        Q.    And so am I to understand that

10   you're matching the NCOA list against some

11   other file?

12       A.    That's not quite the way it

13   works.  That's a bit of an

14   oversimplification.

15            The way it works is the

16   software -- it refers to the needed fields

17   that are in a particular database --

18   transmits that data to an NCOA compiler

19   that's got a special license from the Postal

20   Service to provide those services.

21            They actually do the matching

22   according to very strict USPS compliance

Page 23

1    rules.  And then the information comes back

2    to me, and it's merged back into the original

3    database.

4         Q.     Okay.  And is there one firm,

5    it sounds like, who performs the actual match

6    that you use?

7         A.     In my particular case, it's

8    BCC.  But there are a number of them.

9         Q.     Okay.  And where did you learn

10   to do the part of this process that you do?

11        A.     I forget what year it was, but

12   at some point, the Postal Service mandated

13   compliance with move update requirements for

14   First-Class Mail.  Years later, they also

15   required compliance with move update

16   requirements for Presorted Standard or what

17   we commonly refer to as "bulk mail."

18             So I don't remember exactly

19   what years those were, but it was quite a few

20   ago.

21        Q.     And does the NCOA processing

22   ever produce a false match, where there's --

Page 24

1    two names that are linked are actually

2    different individuals?

3          A.     I suppose it's possible.

4                 In general, I don't recall

5    specific instances of that.  The Postal

6    Service, itself, goes to -- goes into several

7    verification steps to verify NCOA change of

8    address records.

9                 So I personally haven't

10   experienced an instance of that that I

11   recall.

12         Q.     Do you take any affirmative

13   steps to prevent that, or am I correct to

14   understand that you're relying on the NCOA

15   list or perhaps BCC to catch any of those

16   duplicates?

17         A.     Again, I haven't seen instances

18   of that.  A person can file an individual

19   change of address or they can file a family

20   change of address.  And if they file a family

21   change of address, then the people sharing

22   that surname at that address will all have

Page 25

1    their mail forwarded.

2              But if a husband and wife

3    divorce or -- so something like that happens,

4    or a child leaves home, then they would

5    normally file an individual change of

6    address, and only their mail will be

7    forwarded, as opposed to the entire family's.

8       Q.    Okay.  Is there any way to tell

9    from the NCOA list whether an individual has

10   moved temporarily or permanently?

11      A.    According to the Postal

12   Service, if a person files a temporary change

13   of address -- say they want to spend the

14   summer at the beach -- then their mail will

15   be forwarded, but the Postal Service is not

16   going to turn around and send the people who

17   are sending that mail data that indicates

18   they need to update their mailing list

19   address for that person.

20              Now, if a temporary relocation

21   is for over a year, then what people will

22   typically do is file a permanent change of

Page 26

1    address when they leave and another permanent

2    change of address when they come back.

3         Q.    So am I understanding that when

4    an individual files their NCOA request, their

5    mail to be forwarded, there's an option for

6    them to list how long they want the mail to

7    be forwarded?  Or is there an option to just

8    have it indefinitely forwarded?  Is that

9    right?

10        A.    Well, they have the option of

11   filing a temporary change of address or they

12   can file a permanent change of address.

13        Q.    Okay.  But if they file the

14   permanent change of address, it's still

15   possible that it could only be a temporary

16   move.  Is that right?

17        A.    Well, since you can only file a

18   temporary change of address for up to a

19   year -- if you're a student going away to

20   college or a soldier going away for tour of

21   duty -- most of the time those folks will

22   file a permanent change of address when they

Page 27

1    leave and another permanent change of address

2    when they come back.

3         Q.    Got it.

4               Have you ever matched the NCOA

5    list to a voter registration file?

6         A.    Often.

7         Q.    When have you done so?

8         A.    The enhanced version of the

9    motor voter database that I build, I've been

10   running NCOA processing on that data for in

11   excess of 20 years, I believe.

12              It's -- again, it's required by

13   the Postal Service when we do mailings for

14   campaigns or organizations, that kind of

15   thing.

16        Q.    Okay.  And did you perform this

17   matching for the 2020 election?

18        A.    Yes.

19        Q.    Just once or how many times?

20        A.    Off the top of my head, I don't

21   recall how many times I did it for 2020.

22        Q.    More than once?

Page 28

1          A.      At least once.

2          Q.      Is part of the potential

3    confusion that you also ran it for the Senate

4    elections in January, which was around the

5    same time?  Or just that you do it so often

6    that you're not sure how many times?

7          A.      Well, I know I ran NCOA

8    processing when I built the file that

9    candidates were using.  I also ran NCOA on

10   the voter database in November.  I believe it

11   was -- I don't remember the exact date, but

12   it was in November.

13         Q.      After the election?

14         A.      After the election.

15         Q.      Am I understanding correctly,

16   you don't recall running it before the

17   November election?  Or is it possible --

18         A.      I would need to look.  It's

19   something that I do regularly, but I don't

20   want to give an unclear answer, so I'll just

21   say I did it at least once in 2020.

22         Q.      Okay.  Did you publish your

Page 29

1    results?

2         A.    I have given numbers from my

3    results, but I have not published the data

4    from that analysis.

5         Q.    Has there been any other

6    independent verification of the numbers that

7    you produced?

8         A.    I need to take a minute, if I

9    could, and confer with my attorney.

10             MS. SIEBERT:  Mr. Davis, just

11        go ahead and try to answer this.

12        You're in the middle of a question, so

13        we're not going to confer now.

14             THE DEPONENT:  Okay.

15        A.    I did have -- well, myself and

16   Derek Somerville did have another firm run

17   NCOA processing on the data.  Unfortunately,

18   they ran a different type.

19             There's two types of NCOA

20   processes:  one is able to look back 48

21   months and one is able to look back

22   18 months.

Page 30

1            So the two, even though the

2    results were similar, they didn't match up

3    exactly because the company that we had do a

4    double-check didn't run the same kind of NCOA

5    and didn't run it in the same time frame.

6                 National Change of Address

7    processing, whether you use the 18-month

8    window or the 48-month window, is a moving

9    window.  So if I run National Change of

10   Address processing in November and it's

11   repeated a month or two later and especially

12   if it's only an 18-month window, the results

13   will naturally be different.

14   BY MR. SHELLY:

15        Q.    Am I understanding you

16   correctly that you used the 48-month?

17        A.    Yes.

18        Q.    And you checked this against

19   another group or person who's doing this that

20   used that 18-month?

21        A.    Correct.

22        Q.    And who is this other person or

Page 31

1    group?

2         A.     It's a company called SureBill.

3         Q.     And did you get -- you gave

4    your results to them, or I think you may have

5    said Derek Somerville did.

6         A.     I gave them a copy of the voter

7    data and had them independently run NCOA on

8    it to see if they achieved similar results.

9    But since they run a different kind of NCOA,

10   that evaluation was not useful.

11        Q.     Okay.

12             MS. SIEBERT:  Mr. Shelly,

13         I understand you're gathering some

14         professional background on Mr. Davis,

15         and that's fine, but, you know, a lot

16         of specific questions about this, you

17         know, the NCAO [sic] data runs he may

18         or may not do in his professional

19         capacity are outside of the scope of

20         this lawsuit and would be irrelevant.

21             So I'm just going to object to

22         a lot of further questioning on that

Page 32

1          outside of, you know, professional

2          background.

3                MR. SHELLY:  Okay.  I do have

4          some more questions on that, but

5          I appreciate the objection.

6     BY MR. SHELLY:

7          Q.    Mr. Davis, were you ever paid

8     for any of this analysis that you performed

9     for the NCOA matching?

10         A.    That's a broad question.

11         Q.    Sorry.  For the November,

12    specifically, matching that you recall.

13         A.    No.

14         Q.    And can you tell me a little

15    bit about why you performed that matching?

16                MS. SIEBERT:  Objection.  This

17         is irrelevant to the subject matter of

18         the case.  It has nothing to do with

19         the November election.

20                Mark, I'm going to go ahead and

21         instruct you to answer this.  But,

22         again, we're nearing the end.

Page 33

1        A.      I have been seeing residency

2    issues with the Georgia Voter Database for

3    many, many years.  I've seen them just show

4    up in the voter data that I've worked on for

5    various reasons.  They are especially

6    apparent following redistricting and

7    reapportionment.

8                And when I have seen them in

9    the past, especially in some of the cases

10   I've testified in as an expert witness over

11   the years, it became obvious to me that we

12   have major issues here in Georgia with

13   residency.  And in the past few cases where

14   I have seen them, I became curious about what

15   I would see if I performed the kind of

16   analysis I normally do as an expert witness

17   statewide.

18                And so out of curiosity, in

19   November, I ran NCOA processing to ascertain

20   the extent of the issues statewide.

21   BY MR. SHELLY:

22        Q.      Okay.  After you completed that

Page 34

1   matching, who did you talk to about what you

2   had found?

3            MS. SIEBERT:  Again, I'm

4        objecting.  This has nothing -- the

5        November analysis has nothing to do

6        with this lawsuit.  It's beyond the

7        scope.

8            Go ahead and answer this

9        question, Mark.

10       A.    I testified before the Senate

11  Government Oversight Committee.  I've talked

12  to members of the media.  I've talked to

13  activists.  I've talked to friends.  I could

14  not possibly give you a good answer to that

15  question.

16  BY MR. SHELLY:

17       Q.    Okay.

18            Are you familiar with True the

19  Vote?

20       A.    I am.

21       Q.    And how did you find out about

22  True the Vote?

Page 35

1        A.      I became aware of them years

2     ago, I believe, through media reports.

3        Q.      Have you ever worked with

4     anyone affiliated with True the Vote?

5        A.      I know them.  I've not formally

6     worked with them, no.

7        Q.      And did you communicate with

8     Catherine Engelbrecht last year about

9     perceived voting irregularities in Georgia?

10       A.      I did.

11       Q.      And when did you do that?

12       A.      Gregg Phillips and I and Derek

13    Somerville had a phone call about what I was

14    seeing in Georgia.  And I believe at some

15    point, Catherine and I had a phone call.

16    I just don't remember when it was.  But I did

17    make them aware of the issues that I was

18    seeing.

19       Q.      Did you describe the -- can you

20    tell a little bit more about what you

21    described for them?

22       A.      Well, it's clear to me that

Page 36

1    Georgia voters are not updating their voter

2    registration information as they should be,

3    and they're not updating their driver's

4    licenses as they should be.

5                    Georgia law requires you to

6    update your driver's license within 60 days

7    when you move.  And according to the

8    Secretary of State's office, approximately

9    97 percent of Georgia voters hold driver's

10   licenses.

11                   And since we're on the Motor

12   Voter system, if you comply with the state

13   law requiring you to update your driver's

14   license within 60 days, it would

15   automatically trigger an update to your voter

16   registration.

17                   And you can do either online.

18   You can update your driver's license or you

19   can update your registration.  And large

20   numbers of Georgia voters aren't doing that

21   in a timely manner.

22        Q.    Did you describe the NCOA

1    matching that you had performed?

2          A.      Yes.

3          Q.      And what was the response when

4    you shared what you had found?

5          A.      It showed that there were

6    approximately 110,000 Georgia voters who had

7    moved from one county to another more than

8    the 30-day grace period before the election.

9    And it appeared that they had not updated

10   their registration to their new county.

11              And the data also indicated

12   that thousands of them appeared to have

13   returned to their old residence or old county

14   of residence to cast ballots, which state law

15   does not permit outside the grace period.

16         Q.      Did you discuss the idea of

17   challenging some of these Georgia voters who

18   were suspected of having changed their

19   address?

20         A.      I did tell her that I was

21   considering the idea.

22         Q.      Did you raise that idea in the

Page 38

1    first instance?

2         A.     I told her that I thought that

3    if we had these kinds of residency issues in

4    the general, then it was entirely possible

5    we'd have the same issues in the runoff.

6         Q.     And what was her response?

7         A.     I don't recall her exact

8    response.

9         Q.     But she reacted positively to

10   it, that this was something that she would

11   consider?

12        A.     I don't recall her reaction,

13   other than she was glad to be aware of the

14   information.

15               We didn't know each other well

16   at the time, and -- I mean, she really didn't

17   know me from Adam, so I really couldn't

18   characterize her response to it.  I guess

19   that would be a question for her.

20        Q.     Did she ask for your

21   assistance?

22        A.     During the phone call with

Page 39

1    Gregg Phillips, I was invited to consider

2    taking some sort of role here in Georgia with

3    True the Vote.  And I declined that

4    invitation because I just don't have the

5    bandwidth for it.

6          Q.     What was -- what were you being

7    asked to do that you didn't have time for?

8          A.     There was nothing specific.

9    There -- he did mention the possibility -- he

10   mentioned they were seeking to build a team

11   in Georgia and asked if I would consider

12   becoming involved potentially in some sort of

13   a leadership role.  And I declined.  I don't

14   have the time.

15         Q.     Okay.  It does seem to me that

16   the analysis that you ran was relevant to the

17   challenges that are at the heart of this

18   suit, so I would like to ask you a few more

19   questions about those.

20                You mentioned that your NCOA

21   list covered a 48-month period.  I'm looking

22   for what window that would cover.

Page 40

1              MS. SIEBERT:  Again,

2         Mr. Shelly, I'm going to object.

3              Mr. Davis has testified that he

4         ran NCOA data last year related to his

5         business related to the

6         November election.  He has not

7         testified that he ran any data

8         analysis in conjunction with True the

9         Vote or specific to the January runoff

10        election, which is the scope of this

11        lawsuit.  And so this questioning is

12        beyond the scope and is irrelevant.

13             Mark, I'm going to instruct you

14        not to answer this.

15             MR. SHELLY:  Okay.  My

16        understanding of what Mr. Davis shared

17        was that he ran this analysis and

18        shared it with Catherine Engelbrecht

19        and Derek Somerville, who I believe

20        are both defendants in this lawsuit;

21        and that his analysis was influential

22        in resulting in the challenges that

Page 41

1        we're suing over.

2              So I think understanding the

3        basis of his analysis will help us

4        better understand the challenge

5        program, while I do appreciate the

6        distinction, that his analysis did not

7        actually -- we have not yet

8        established that they used his data in

9        the challenges.

10              MS. SIEBERT:  If you would

11        permit me.

12              Mark, can you please clarify:

13        Did you share your actual data

14        analysis with Catherine and Gregg?

15              THE DEPONENT:  I did not share

16        any of my data with Catherine or

17        Gregg.  We talked in generalities

18        about issues that are very known to

19        them.

20              True the Vote has been aware

21        for many, many, many years that every

22        Secretary of State in the nation faces

Page 42

1          issues with the cleanliness of their

2          voter rolls largely due to provisions

3          of the 1993 National Voter

4          Registration Act.

5                I was not telling either of

6          them anything they didn't already know

7          about the problem, in general.  I just

8          simply told them what I was seeing in

9          Georgia.  Neither of them was

10         surprised to hear it.

11               MS. SIEBERT:  Okay.

12               THE DEPONENT:  But I did no

13         data processing for True the Vote at

14         all, and I did no data processing of

15         this nature for the runoff for True

16         the Vote.

17               MS. SIEBERT:  So, Mr. Shelly,

18         I understand from Mr. Davis's

19         testimony just now that he did not

20         perform any data analysis and did not

21         share any specific data analysis with

22         True the Vote.

Page 43

1                  So my objection stands.

2                  MR. SHELLY:  Okay.  Well, how

3          about I get through a few more

4          questions on a different subject, and

5          then depending on the one -- where

6          those lead, we can perhaps revisit

7          this in a bit.

8                  MS. SIEBERT:  That sounds good.

9      BY MR. SHELLY:

10         Q.    Mr. Davis, you mentioned at

11     this initial meeting with Ms. Engelbrecht --

12     well, let me first ask:  Was that your only

13     conversations with Ms. Engelbrecht, the

14     initial discussion that you mentioned with

15     Gregg Phillips and Derek Somerville?

16         A.    That was my initial

17     conversation with anyone with True the Vote.

18              As far as subsequent

19     conversations with Catherine, I don't recall

20     any in specifics.  I do recall participating

21     in a Zoom call, or maybe two, that were

22     general, you know, "everyone's invited" kind

Page 44

1    of broadcast.  And I tuned in to just keep

2    current with what they were doing.

3              But I don't recall other

4    specific conversations.  We may have talked

5    on other occasions.  There was so much

6    activity in November, I just don't recall

7    specifics.

8       Q.    When you say you participated

9    in these conversations where everyone was

10   invited, were those open to the public?  Or

11   what did you mean by that?

12      A.    I believe they were open to

13   basically anyone on True the Vote's list.

14   They may have been open to the public, for

15   all I recall.

16             But it was not a two-way

17   conversation.  I didn't speak in those

18   meetings.  I just tuned in to see what they

19   were up to.

20      Q.    Do you know why you were

21   invited or how you ended up on those calls?

22      A.    I don't.

Page 45

1        Q.      You mentioned Derek Somerville

2    in this call.

3                How do you know him?

4        A.      I met Derek, I believe, in

5    November.  He expressed similar interests

6    about the quality of the voter file.  And we

7    continued to kind of work collaboratively on

8    it.

9                He's a former investigator -- a

10   former special agent with the FBI, and

11   I thought it would be useful to have him dig

12   into some specifics -- specific sort of

13   random samples from the data to see if he

14   could sort of independently verify whether or

15   not there was additional evidence or

16   corroborating evidence on these changes of

17   address that he could find.  And he spent

18   quite a bit of time doing that.

19       Q.      Did you reach out to him in the

20   first instance?

21       A.      No.  We met on a conference

22   call -- I can't remember which conference

Page 46

1    call -- but we established a relationship

2    after that and began to work collaboratively.

3        Q.    Did you discuss challenging

4    voters with him?

5        A.    We did discuss the possibility

6    of doing it not affiliated with True the

7    Vote.

8        Q.    And was that before or after

9    the call with Ms. Engelbrecht that you

10   mentioned?

11       A.    I don't recall.

12       Q.    Okay.  Did he ask for your

13   assistance challenging any Georgia voters?

14       A.    Well, we did discuss creating

15   our own challenges, but not True the Vote's

16   challenges.

17       Q.    And did you pursue that?

18            MS. SIEBERT:  I'm going to

19        object to this question.  Again,

20        beyond the scope.

21            This lawsuit is about the

22        challenges that were, quote, in

Page 47

1          concert with True the Vote.  So this

2          is beyond the scope of this lawsuit.

3               Mark, you can go ahead and

4          answer.

5          A.    I did do data processing for

6     other people to file challenges, not in

7     coordination with True the Vote, not

8     affiliated with True the Vote.  A totally

9     different perspective than True the Vote.

10               I'll stop there.

11     BY MR. SHELLY:

12          Q.    Okay.  And who were these other

13     groups?

14          A.    Excuse me?

15          Q.    What other group were you

16     providing -- were you assisting with voter

17     challenges?

18          A.    No group in particular.

19          Q.    Are there other individuals?

20          A.    They were created to permit

21     other interested individuals to file them if

22     they wished to file them.

Case 2:20-cv-00302-SCJ   Document 161-1   Filed 05/17/22   Page 48 of 177

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 48

1          Q.     And how did you provide your

2     analysis to these other individuals?

3               MS. SIEBERT:  Again, I'm going

4          to object that this is beyond the

5          scope of the litigation.  And same

6          objections as before.

7               Mark, you can go ahead and

8          answer.

9          A.     I generated files for each

10    county and put them -- made them available on

11    the internet for interested parties who

12    wanted to file them to download them.

13    BY MR. SHELLY:

14          Q.     And was that accessible to the

15    public?

16          A.     No.  It was only accessible to

17    people that we provided access to.

18          Q.     And, just ballpark, how many

19    people had access to this?

20               MS. SIEBERT:  Same objection.

21               Mark, go ahead and answer this.

22          But, again, I'm going to shut down

Page 49

1          this line of questioning pretty soon.

2          Beyond the scope.

3          A.     I don't know the answer to that

4    question.  In fact, I don't know who

5    specifically filed what where or anything

6    like that.

7               I did do the data processing.

8    I did create the data to do challenges, but

9    I did not organize them or recruit people to

10   file them or anything of that nature.

11   BY MR. SHELLY:

12          Q.     You mentioned Gregg Phillips

13   was on this initial call with

14   Ms. Engelbrecht.

15               How did you meet Mr. Phillips?

16          A.     I actually did not say that.

17   I said that I had a conference call with him

18   and Derek.

19               I believe that Catherine and

20   Gregg had taken Derek out to dinner one day

21   previous to that and wanted to meet me.  And

22   Catherine was not available for the call, but

Page 50

1    Gregg was, so if I recall correctly, it was

2    just me and Derek and Gregg Phillips on that

3    call.

4          Q.     And what did you discuss on

5    this call?

6          A.     We compared our backgrounds in

7    data processing and data analytics and

8    working with voter data.

9                 He, I believe, comes from

10   Texas, and I'm from Georgia.  We talked about

11   how different states store data differently.

12                And I just basically kind of

13   gave him a little bit of a primer on data

14   that's available from the state, where to get

15   it, what it looks like, what's in it, those

16   kinds of things.

17                They were looking to do their

18   own analysis of the Georgia Voter Database,

19   and I just basically gave them some

20   information about, you know, how to get

21   started.

22          Q.     Did you recommend -- if I

Page 51

1    remember the acronym -- BCC to perform the

2    actual processing?

3          A.    No.   I left it up to them,

4    which provider they wanted to use.   There's

5    several dozen of them.

6          Q.    And did you have any more

7    conversations with Mr. Phillips after this

8    one?

9          A.    Not that I recall.

10         Q.    How about:  Did you communicate

11   with Mr. Mark Williams last year about

12   perceived voting irregularities in Georgia?

13         A.    Not that I recall.  But Mark

14   and I are old friends, and we've talked about

15   those kinds of issues over the years a number

16   of times.  But I don't recall a specific

17   discussion with him last year about it.

18         Q.    Do you recall any discussions

19   specifically about challenging Georgia voters

20   who were suspected of having changed their

21   address?

22         A.    Not that I recall.

Page 52

1        Q.      Did you communicate with a

2    Mr. Ron Johnson last year about perceived

3    voting irregularities in Georgia?

4        A.      Not that I recall.

5        Q.      And how about:  Did you

6    communicate with James Cooper last year about

7    perceived voting irregularities in Georgia?

8        A.      Not that I recall.  However, we

9    do business on occasion.  I suppose it's

10   possible it could have come up in one of

11   those conversations, but I don't recall a

12   specific discussion about that subject.

13       Q.      Did you sit for a

14   video-recorded interview with Mike Crane last

15   November, after the general election?

16       A.      I did.

17       Q.      In this video, you say some

18   friends of yours have investigated voters who

19   showed up on your NCOA match and found those

20   voters to be registered in other states.

21                Which friends were you

22   referring to?

Page 53

1          A.      I don't recall specifically,

2     but I have heard reports of people looking up

3     folks on other My Voter pages in other states

4     and finding them registered in other states

5     there.

6          Q.      Do you know how exactly they

7     performed that investigation?

8          A.      I can only assume they went to

9     that state's My Voter page and looked up a

10    particular voter.

11         Q.      Do you know how many voters

12    they investigated?

13         A.      I don't even recall

14    specifically who I was referring to, so

15    I couldn't speculate.

16         Q.      In the interview, you also say

17    that you "talked to some key people" about

18    the NCOA matching you have been doing.

19              Who were those key people?

20              MS. SIEBERT:  Objection.

21         Again, beyond the scope.

22              Mark, go ahead and answer to

Page 54

1          the best --

2     BY MR. SHELLY:

3          Q.     You may answer.

4          A.     Well, as I said before, I'm an

5     advocate for election integrity and have been

6     for 20 years.

7                 I've been talking to key people

8     about these issues for a very long time.

9     Going back to when Cathy Cox was Secretary of

10    State, I went in and met with her and the

11    Elections Division, the Secretary of State's

12    office, the Voter Fraud Unit at the Burris

13    Institute, the Georgia Technological

14    Authority, and others, and made them aware of

15    these issues.

16                Over the years, I've had

17    numerous legislators and candidates and so

18    on, so forth, that I've worked for.  I've

19    bent their ear about these issues.  I've been

20    talking about these issues for a very long

21    time with a very large number of people.

22          Q.     Other than what we have already

Page 55

1    discussed, within the past year, have you

2    ever shared information, analysis, or ideas

3    with anyone you know to be affiliated with

4    True the Vote?

5          A.     State the question again.

6          Q.     Within the past year, have you

7    ever shared information, analysis, or ideas

8    with anyone you know to be affiliated with

9    True the Vote?

10         A.     That's an extremely broad

11   question.  But, as I said earlier, I did talk

12   with them about some of the NCOA results and

13   residency issues that I was seeing in the

14   data.

15               As far as whether or not anyone

16   else I know or may have discussed these

17   issues with was associated with True the Vote

18   in some way, I don't really know that in

19   particular.

20               True the Vote has a lot of

21   supporters in Georgia, and I know a lot of

22   people, so I really don't know how to answer

Page 56

1    that question.  It's so broad.

2        Q.     When did you find out that

3    people were considering challenging voters in

4    Georgia last year?

5        A.     There were people talking about

6    that even before the general election, much

7    less the runoff.

8             A lot of people in Georgia have

9    become aware that we have major residency

10   issues on our voter file.  And a lot of

11   people have been very concerned about it for

12   a lot of years.  So I'm not sure how to

13   answer that question either.

14       Q.     Are you aware of any challenges

15   that were filed before the November election?

16             MS. SIEBERT:  Again, objection.

17        That's beyond the scope.  This has

18        nothing to do with the November

19        election.

20             Mark, we've gone down this

21        line.  Don't answer that question.

22             MR. SHELLY:  I think it's

Page 57

1        appropriate to make the objection.

2        But "outside the scope" I don't

3        believe is a basis to keep the witness

4        from answering the question.

5              MS. SIEBERT:  I think it is,

6        simply because you've gone down this

7        line so much.  It's been asked and

8        answered.  He's talked about this a

9        lot.  We've discussed that this

10        lawsuit has nothing to do with the

11        November election.

12              MR. SHELLY:  This is all within

13        the span of six weeks to two months,

14        and so I think that the challenge

15        programs that were happening during

16        this time are related to each other,

17        especially if it's the same people

18        participating in them.

19              So I do have a number of

20        questions about this.  And, again,

21        we are free to note your objection,

22        but unless it's privileged in some

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 58

1          way, I would hope that Mr. Davis would

2          answer.

3                    MS. SIEBERT:  All right.  Mark,

4          go ahead.

5          A.     I'm not aware of residency

6     challenges that were filed before the

7     general, but it wouldn't surprise me to learn

8     that there were.  There weren't any that I

9     was involved with.

10    BY MR. SHELLY:

11         Q.     Do I understand correctly that

12    filing these challenges were your idea in the

13    first instance?  Or did someone else first

14    provide that idea?

15         A.     It certainly was not my

16    original idea.  That's been a topic that's

17    been discussed for quite some time.

18                    There have been previous

19    challenges in previous elections filed on

20    residency issues, as far as I'm aware.  It's

21    not a new idea by any stretch.

22         Q.     Did you support these

Page 59

1    challenges -- I'll make this one specific to

2    the post-November challenges that True the

3    Vote filed.  Did you support those

4    challenges?

5         A.     In general, I support any

6    effort to clean up the voter rolls and ensure

7    people don't vote with residency issues

8    because they're casting ballots for people

9    that don't represent them.

10              So to that extent, I would

11   support efforts to prevent people from

12   casting illegal ballots.

13        Q.     And what did you hope the

14   impact of these challenges would be on the

15   voters?

16        A.     I hoped that the counties that

17   accepted challenges would simply give them

18   additional scrutiny to make sure that they

19   retained the eligibility to vote in a

20   particular election.

21              In other words, under Georgia

22   law, if they move from one county to another

Page 60

1    more than 30 days before the election, and

2    that is a permanent change of address, then

3    they lose their residency in their previous

4    county.  And they must be registered in their

5    new county in order to vote lawfully in that

6    county.

7                    Under Georgia law, outside that

8    30-day grace period, we're only permitted to

9    vote in the county we actually live in.

10        Q.     Have you ever filed a voter

11    challenge?

12        A.     No.

13        Q.     Why not?

14        A.     I've never felt the need to.

15        Q.     But you supported the

16    challenges that True the Vote filed?

17        A.     I took exception with some of

18    their logic.  It's not the way I would have

19    done it, but I had no input into the criteria

20    used for their challenges or the data

21    processing they did for their challenges or

22    any of that kind of stuff.

Page 61

1              You know, that was their

2    project; it was not mine.  And I did not

3    participate in it.

4         Q.    What would you have done

5    differently than what they did?

6         A.    I probably would have narrowed

7    the scope.  But other than that, from what

8    I understand about what they did, they

9    identified people they believed to have

10   potential residency issues and wanted the

11   registrars to give them increased scrutiny

12   just to make sure that they did retain the

13   eligibility to vote in a particular election.

14              So in -- as far as that's

15   concerned, I'm all in favor of preserving the

16   integrity of the vote and making sure that

17   people who are properly qualified are able to

18   vote and vote lawfully.

19        Q.    And what do you mean when you

20   say that you wished they had reduced the

21   scope?

22        A.    They did a larger challenge

Page 62

1    than I thought was best.  I would have

2    limited the scope to people that had voted in

3    the general election because, for example,

4    you know, there are over a quarter million

5    people who moved out of Georgia.  And

6    I wouldn't have expected very many of them to

7    cast ballots here.  Thousands of them did.

8                But, at the same time, if they

9    don't live here anymore, then they shouldn't

10   be voting here.  So it's not that I really

11   object to their criteria, but I probably

12   personally wouldn't have done it that way.

13        Q.    And you say you worked with

14   people who had a different perspective than

15   True the Vote.

16                Was that perspective -- are you

17   referring to the scope or were there other

18   areas where their perspectives differed?

19        A.    I don't -- it wasn't my

20   intention to put it quite the way you just

21   did.

22                From what I have since learned

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 63

1    about their challenge, I would have done it

2    differently.  I didn't have any input into

3    their challenge or the logic behind it or

4    their data processing criteria or the way

5    they did it.  That was all up to them.

6         Q.    Is there anything else you

7    would have done differently besides narrowing

8    it to people who had voted in the

9    November election?

10        A.    Not that I can think of off the

11   top of my head.

12        Q.    Did you ever urge anyone to

13   participate in the challenge process?

14        A.    I did have a Facebook post

15   where I encouraged people -- where

16   I basically reposted a post from Derek

17   looking for volunteers.  Other than that,

18   I don't recall urging any specific person.

19        Q.    Did you ever talk with anybody

20   about the methodology for developing a

21   challenge list?

22        A.    I did talk with people about

Page 64

1    the methodology that I used in my own, but

2    not True the Vote's, that I recall.

3              Well, in thinking about that,

4    it's entirely possible I did discuss the

5    differences between the two with people.

6    I just don't recall specifics of who and when

7    and all that kind of stuff.

8         Q.    When you say "the differences

9    between the two," are you referring to the

10   difference between yours and SureBill's?

11        A.    No.

12        Q.    Between yours and True the

13   Vote's?

14        A.    Yes.

15        Q.    And did you discuss those

16   differences with True the Vote?

17        A.    I don't recall.  Like I said,

18   I didn't have input or really attempt to have

19   input that I recall into what they were

20   doing.  That was their business.  I didn't

21   try to tell them what to do.

22              I may have told them what

Page 65

1    I intended to do, but I don't recall telling

2    them what they should do.  That's up to them.

3        Q.    And did anyone affiliated with

4    True the Vote tell you more about the process

5    that they used to develop their challenge

6    lists?

7        A.    There may have been some

8    discussion in one of the Zoom calls that was

9    broadcast.  I don't remember specifics from

10   those calls.  It's possible, but I don't

11   recall specifics.

12       Q.    Was there anything about the

13   methodology that they used that you thought

14   you would do differently?

15       A.    As I said earlier, I probably

16   would have limited the scope to people who

17   voted in the general because a lot of the

18   people that voted in the general did so with

19   potential residency issues that should be

20   investigated.  And I thought that limiting

21   that scope to that group would have been

22   stronger.

Page 66

1          Q.     Are you aware that the vast

2     majority of True the Vote's challenges were

3     rejected?

4          A.     I am aware.

5          Q.     Did that surprise you?

6          A.     It did.

7          Q.     And why is that?

8          A.     From what I read in news

9     reports, there were boards of registration

10    who were calling it so-called list

11    maintenance and claiming that it couldn't be

12    done within 90 days of the election.

13               I didn't agree with that

14    because they were not -229 challenges; they

15    were under 21-2-230, which is an entirely

16    different statute.

17               21-2-229 is a challenge to a

18    person's registration, whereas 21-2-230 is a

19    challenge to their qualifications to vote in

20    a particular election.  So to hear people

21    call that "list maintenance" made no sense to

22    me because no one was trying to get anyone

Page 67

1    removed from a voter roll.

2         Q.     Given that the scope of these

3    challenges was apparently so much broader

4    than you would recommend, do you think it was

5    fair to accept that number of those

6    challenges would not have been accepted?

7         A.     That's up to the individual

8    county board of registration to assess.  But

9    in my view, if someone has a potential

10   residency issue, then I think it's a valid

11   concern to assess whether or not they possess

12   the qualifications to vote in a particular

13   election.

14              MR. SHELLY:  Okay.  We've been

15         going for about an hour.  How about we

16         take a break and meet back up at

17         10:15.

18              MS. SIEBERT:  That sounds

19         great.

20              THE VIDEOGRAPHER:  The time is

21         10:05 a.m.  Going off the record.

22              (Recess taken.)

Page 68

1              THE VIDEOGRAPHER:  The time is

2       10:15 a.m.  Back on the record.

3   BY MR. SHELLY:

4       Q.    Mr. Davis, can you describe to

5   me your understanding of what happens to a

6   voter who has been challenged based on their

7   residency?

8       A.    There's a process that the

9   county goes through to have a hearing to

10  determine that voter's eligibility.

11      Q.    Can you describe for me what

12  steps the voter would need to take in

13  response to a challenge?

14      A.    I would need to go back and

15  review the statute at the time.  I wouldn't

16  try to quote it off the top of my head.

17      Q.    How did you learn about this

18  process generally?

19      A.    I don't even recall.  It's

20  been years.

21      Q.    Are you familiar with Georgia's

22  residency requirements for voting?

Page 69

1        A.    I am.

2        Q.    And how did you learn about

3    those laws?

4        A.    Sorry.  There's someone at my

5    door.  Can I take just a moment?

6        Q.    Sure.

7              (Pause.)

8              THE VIDEOGRAPHER:  Should we go

9        off the record for this?

10             MR. SHELLY:  Yes, please.

11             THE VIDEOGRAPHER:  All right.

12        The time is 10:17 a.m.  Off the

13        record.

14             (Recess taken.)

15             THE VIDEOGRAPHER:  The time is

16        10:17 a.m.  Back on the record.

17    BY MR. SHELLY:

18        Q.    Mr. Davis, I think I was asking

19    you how you learned about Georgia's residency

20    requirements.

21        A.    I've been aware of them for

22    many years.  As I mentioned, I've testified

Page 70

1    in election disputes 5 times over the last

2    20 years.  I don't recall when I wasn't aware

3    of them.

4          Q.    And are you familiar with the

5    National Voter Registration Act, also called

6    the NVRA?

7          A.    I am.

8          Q.    Do you see any conflict from

9    the administration of Georgia's residency

10   laws and the NVRA?

11         A.    It appears to me Georgia's in

12   compliance with the NVRA.

13              MR. SHELLY:  Henry, can you

14         pull up Exhibit D, as in dog.

15              (Davis Exhibit D, E-mail

16         string, top e-mail to Catherine

17         Engelbrecht from Derek Somerville,

18         12/19/20, No Bates, was marked for

19         identification, as of this

20         date.)

21   BY MR. SHELLY:

22         Q.    I'll give you a second.

Page 71

1                Mr. Davis, do you recognize

2    this document?

3         A.    (Document[s] reviewed.)

4                I don't recall seeing this

5    before.

6         Q.    Okay.  Does it appear to be an

7    e-mail from Derek Somerville to individuals

8    who volunteered to submit voter challenges?

9         A.    It looks like an e-mail between

10   Derek and Catherine.

11        Q.    Fair enough.

12               So this is a thread.  I think

13   the bottom e-mail is the one that starts,

14   Good evening Patriots!"  It looks to me like

15   an e-mail from Derek Somerville to people who

16   are receiving this e-mail because they

17   volunteered to submit a Section 230 elector

18   challenge in your county, the second line.

19   And then, at the top, it looks like this was

20   forwarded to Catherine Engelbrecht.

21        A.    Okay.

22               MR. SHELLY:  So, Henry, if we

Page 72

1          could go to the second page, That

2          second paragraph to the bottom,

3          starting with, "I've attached..."

4     BY MR. SHELLY:

5          Q.    I read it to say, "I've

6     attached the 3 certifications from our

7     National Change of Address process.  These

8     documents certified the date we processed the

9     voter file and the specific details of that

10    processing.  The Georgia Voter File is

11    extremely large, so it was broken into 3

12    parts and each part processed individually,

13    thus the 3 separate certifications."

14              And then, "I would present

15    these as evidence to your board that these

16    lists were developed using the same standards

17    as the state.  I am also including Mark

18    Davis's affidavit, which is his sworn

19    testimony that he personally processed these

20    files."

21              Did I read that correctly?

22          A.    Yes, you did.

Page 73

1          Q.     Do you know what affidavit he's

2     referring to?

3          A.     I believe he's referring to an

4     affidavit that I gave to the Senate

5     Government Oversight Committee in advance of

6     my testimony to them.

7          Q.     Do you know how he obtained

8     that affidavit?

9          A.     I probably shared it with him.

10    I shared it with a number of people.

11               Again, that testimony was about

12    issues that we saw with the general -- the

13    general election, not the -- not in

14    particular to the runoff.  I did not perform

15    NCOA processing in particular for the runoff

16    itself, but I had in a review of the general.

17         Q.     Okay.  And so that last bit of

18    highlighting, "these files," do you know what

19    files he's referring to at the end?

20         A.     When I process a file of any

21    kind through National Change of Address

22    processing, there is a processing

Page 74

1    certification document that I can generate in

2    pdf form that details the day it was

3    processed, what the results of the processing

4    show, et cetera.  It's just a standard

5    certification.

6          Q.    I understand that -- for the

7    certification.  Then he says you personally

8    processed these files.

9                Is that your understanding,

10   that those files that you certified you

11   processed were the NCOA matching --

12         A.    Well, as he indicated there,

13   the Georgia Voter File is extremely large.

14   And in order to process it, there's a file

15   size limitation of .14 gigabytes, or

16   something approximating that.

17               And so when I processed the

18   voter database, I typically will break it

19   into three parts in order to do the

20   processing.

21         Q.    Okay.  And this processing was

22   matching the NCOA to the voter registration

Page 75

1    file -- to the Georgia Voter File?

2         A.    That's a simplistic way to put

3    it.

4               As I said earlier, the matching

5    is actually done by a compiler specifically

6    licensed by the United States Postal Service

7    and largely governed by them, in terms of

8    matching criteria.

9               So basically I am an NCOA

10   subscriber, but the actual matching is done

11   by licensees of the Postal Service.  They're

12   specifically licensed and regulated in how

13   they do that process.

14        Q.    So when you say -- this e-mail

15   says that you personally processed these

16   files, you understand that to refer to you

17   collected these files, gave them to someone

18   else who did the actual matching?

19        A.    No.

20              The way that the data

21   processing works -- I think I covered this

22   earlier -- when I open a database in my

Page 76

1   software, it identifies key fields, such as

2   name, address, city, state, ZIP, and

3   transmits only those portions of the data for

4   NCOA processing.  And then it's processed,

5   and it's returned to me.

6               And if there's a match, there

7   is a code in the data that indicates that

8   there was an NCOA match and that a new

9   address was provided.

10       Q.    Okay.  And so then you shared

11   the list of matches with Mr. Somerville?

12       A.    I did share the results of the

13   NCOA processing with him, as I talked about

14   earlier, so that he could go through and kind

15   of pull random samples and put his old

16   investigator hat on and try to shoot holes in

17   the processing.  But what he got was a subset

18   of this data, if that makes sense.

19       Q.    And did you share this with

20   Mr. Somerville by e-mail or a different way?

21       A.    File exchange.

22       Q.    Did you know that these files

Page 77

1    were going to be used to support voter

2    challenges?

3         A.     At the time, we were focused on

4    identifying residency issues that occurred in

5    the general.  That was our primary focus for

6    most of our communications.

7               This processing later was used

8    to do challenges, but that's not the purpose

9    for which it was done.

10        Q.    Okay.  But at some point, did

11   you understand that that information was

12   going to be used to support voter challenges

13   after the November election?

14        A.     That information, per se, was

15   not.  When we did ultimately create

16   challenges, it's a totally different set of

17   circumstances because identifying votes that

18   were cast with potential residency issues and

19   identifying votes to be challenged, that was

20   two very different subjects.

21        Q.    Can you explain that?

22        A.     Well, in one instance, we're

Page 78

1    looking back on voters who may have cast

2    ballots in the general election with

3    residency issues, and in another sense, we're

4    looking forward at voters who may cast

5    ballots in the future with potential

6    residency issues.  And those are two

7    different sets of criteria.

8         Q.    Did you ever consider

9    preemptively challenging votes before the

10   election to assess with any challenge to the

11   election after the vote?

12        A.    Which election are you

13   referring to?

14        Q.    The January runoff.

15        A.    As I said earlier, yes, we did

16   consider doing that because we saw thousands

17   of ballots that are cast in the general

18   election that appeared to have residency

19   issues.  And it appears that there were

20   thousands of voters who returned to the

21   county they previously resided in and cast

22   ballots there.

Page 79

1                    And when a voter moves from

2    county A to county B more than 30 days before

3    the election cycle, goes back to their old

4    county, claims to still live there falsely,

5    that is arguably a felony under OCGA

6    21-2-562.

7                    So, yeah, I had major concerns

8    that if people had already potentially cast

9    unlawful ballots in the general, I certainly

10   didn't want to see that conduct repeated in

11   the runoff.

12        Q.     Is it your understanding that

13   any elector may challenge other voters within

14   their county?

15        A.     Yes.

16        Q.     And given the -- how much of a

17   concern this was for you, can you tell me a

18   little bit more about why you did not choose

19   to file any challenges, given that you did

20   have both the data and the concerns?

21        A.     I was very busy doing analysis

22   and queries and basically investigating the

Page 80

1   data itself and didn't see the need to file a

2   challenge, myself.  Hearing that there were

3   others that did want to file challenges in

4   Gwinnett County that I live in, if Gwinnett

5   is covered, then there's no reason for me to

6   get involved.

7         Q.     Did anyone ever specifically

8   ask if you would be interested in filing a

9   challenge?

10        A.     Not that I recall, no.

11               MR. SHELLY:  Henry, can we take

12        this one down and pull up Exhibit B,

13        as in boy.

14               (Davis Exhibit B, Affidavit

15        of Mark Davis, No Bates, was

16        marked for identification, as of

17        this date.)

18   BY MR. SHELLY:

19        Q.     Do you recognize this document?

20        A.     (Document[s] reviewed.)

21               Can you scroll to the next

22   page?

Page 81

1                    (Videographer complied.)

2          A.      (Document[s] reviewed.)

3                  That appears to be an affidavit

4      that I did early on, following the general.

5          Q.      Did you draft this yourself?

6          A.      Largely.  I believe there were

7      some suggested formatting and things like

8      that, but, yes, I did.

9          Q.      And who were the suggestions

10     from?

11         A.      I don't recall.  It was just

12     paragraphs and things like that, where to

13     break them and things like that.

14                 But, yes, I did write it

15     myself.

16         Q.      And why did you create this?

17         A.      I believe that was for my

18     testimony before the Senate Government

19     Oversight Committee.

20         Q.      Do you understand this to be

21     the affidavit that Mr. Summers --

22     Somerville's e-mail was referring to in the

Page 82

1    document we just looked at?

2          A.     I did more than one version of

3    this affidavit.  I'm not sure which one he's

4    referring to there.  It could have been this

5    one.  I'm not sure.

6          Q.     Was this ever submitted to a

7    court?

8          A.     I don't know the answer to that

9    question.

10         Q.     Was this submitted to the

11   Senate committee that you referenced?

12         A.     Yes.

13         Q.     And so you can see the copy

14   that I have is not signed on the third page,

15   but you did sign a version of this.  Is that

16   correct?

17         A.     Signed and notarized, yes.

18         Q.     Great.

19                And besides creating different

20   versions of this one, have you prepared any

21   other affidavits within the past year?

22         A.     I believe I did a follow-up,

10/4/2021         Fair Fight, Inc. et al. v. True the Vote, et al.         Mark Davis

Page 83

1    where I revised some numbers.  I had done

2    this one just after completing the analysis

3    that I was speaking on.

4              Following that, as I was going

5    through the data, I found that some of the

6    records in there were people changing their

7    residential -- telling the Postal Service

8    they were moving and they were changing their

9    address to a P.O. Box.

10             Of course, you can't be

11   registered at a P.O. Box.  So I ended up

12   going in and stripping those records out.  So

13   the numbers were revised at some point.  And

14   I recall doing a follow-up affidavit to be

15   used for another purpose.  I'm trying to

16   remember what that was.  I can't recall off

17   the top of my head.  I'd have to go back and

18   review my records.

19        Q.    Okay.  I want to ask you a few

20   things about this one in paragraph 5.  You

21   say you create an enhanced version of the

22   Georgia Voter Database, which is something

Page 84

1    that you mentioned a few times earlier today

2    in our conversation.

3              Can you tell me a little bit

4    more about what that enhanced version means,

5    what you did to enhance the Georgia Voter

6    Database?

7         A.    Well, there are subtle

8    differences between the way a voter database

9    must be managed by a Secretary of State and

10   the way that I can manage my version of it

11   for -- that is used primarily for

12   campaign/marketing-type purposes.

13             As an example, when a Secretary

14   of State runs NCOA, they have to go through a

15   verification process that I don't have to go

16   through.

17             If a voter tells the Postal

18   Service that they're moving to a new address,

19   my candidates generally want to mail to them

20   where they want to get their mail.  And so

21   I don't have the restrictions about when I

22   can and can't do an update.  So that's one of

Page 85

1    the distinctions.

2              Another is, you know, the

3    Secretary of State's office may have phone

4    numbers or e-mails or cell phones, that kind

5    of thing, but they don't provide that.  So if

6    I have campaigns who want that information,

7    then I have to go through and append it.

8              The Secretary of State's

9    database is a relational database, meaning

10   that there's a header record and then a

11   series of vote history trailers.  And to make

12   the data simpler for my customers to work

13   with, I tend to take the major elections and

14   insert them into the header records so that

15   it's all in one place and it's easier -- for

16   people that are not real computer savvy or

17   experienced in data processing, it makes it

18   easier for them to work with.

19        Q.    Okay.  In paragraph 6, you say,

20   "Based on that experience, I've become aware

21   of numerous issues regarding residency and

22   redistricting issues, among other concerns

Page 86

1  relating to absentee balloting.  This

2  awareness has caused me to become an advocate

3  for election integrity for the past

4  20 years."

5            When did you -- what were the

6  specific concerns that you developed about

7  voting eligibility?

8        A.     Well, as I testified to

9  earlier, as early as 2002, I went before the

10  State Board of Elections and discussed

11  residency issues, many of them caused by

12  people moving and not updating their data,

13  but many of them also caused by redistricting

14  errors.

15            And I think, at the time, in

16  2002, I gave an example of Gordon County,

17  Georgia.  Gordon County used to be all one

18  House district, all one Senate district, and

19  all one Congressional district.  Over

20  the years, it got split up.

21            The problem was, back in the

22  day, it appeared to me that Gordon County was

Page 87

1    letting people vote pretty much wherever they

2    wanted to.  So if someone worked in town and

3    they'd rather go vote right after work at a

4    precinct in town, from what I understand,

5    they were allowed to do that.  Then when the

6    county was split up, that caused people to be

7    assigned to the wrong districts.  And I was

8    seeing numerous voters that had been

9    improperly redistricted.

10                   And that was just an example.

11   But I was seeing those kinds of issues all

12   over the state.  And I've continued to see

13   those kinds of issues for nearly 20 years

14   since.

15        Q.     And am I understanding

16   correctly from your previous testimony that

17   you discussed voter challenges in regards to

18   these issues previously, but it's your

19   understanding you never recommend that they

20   be made until this past election?

21        A.     Well, challenging voters has

22   long been a remedy for these kinds of issues.

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 88

1    But, to be clear, I have done the kind of

2    analysis that we're talking about in

3    different cases where I was called in to

4    testify.

5                    But November of 2020 was the

6    first time I've actually done that analysis

7    statewide.  It's a whole lot of work, and

8    it's a whole lot of data to process.

9                    So in terms of redistricting

10   and reapportionment, I'm going through that

11   process every ten years.  And it takes the

12   counties quite a bit of time to get that

13   done.  And the candidates that I work with

14   can't wait that long.

15                    So I do what they do with

16   geocoding and digital mapping software.  And

17   then, you know, it's not a perfect science,

18   but it gets us close enough to where the

19   candidates can actually use the data to

20   campaign.

21                    So that addresses redistricting

22   issues there.  But in terms of residency

Page 89

1   issues, in the context of building my

2   enhanced version of the voter database,

3   I have previously run NCOA processing and

4   remapped people where they say they currently

5   live, but as far as redistricting and

6   reapportionment, that's a different process.

7                    In doing that processing,

8   I have never seen the big picture about the

9   people who moved and the impact on their

10  eligibility to vote.

11                   There's really three different

12  issues there.  I call them "tranches."

13  There's people who move outside the state,

14  there are people who move from one county to

15  another, and then there are people who move

16  within the same county.

17                   And from a legal perspective,

18  those are really three different sets of

19  issues -- different sets of issues there, in

20  a way.  But from a campaign perspective, the

21  campaigns that I worked for primarily are

22  concerned with getting their message to the

Page 90

1    voter, wherever it is they currently live.

2    If that makes sense.

3          Q.    You mentioned how big of a

4    project it is to do this processing.

5               Can you -- how long does it

6    take to get the NCOA file and the voter file?

7          A.    Well, before even getting to

8    that point, there's quite a bit of work.

9          Q.    Tell me about that.

10         A.    Well, as I mentioned earlier,

11   the voter file is so large that it's --

12   I split it into three parts.  So that has to

13   be done.

14              Then I have to get it imported

15   into a structure that can be used.  I have to

16   create work fields that I can populate

17   instead of a -- instead of working with

18   addresses that are separated into street

19   numbers, street name, post directional unit

20   number, all that kind of stuff.

21              I've got to concatenate those

22   fields and drop them into a working field

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 91

1    that I can use.  In other words, I have some

2    preparation of the data that I have to do

3    before I can even get it to the point of

4    being ready to run National Change of Address

5    processing.

6              And prior to doing that, I'll

7    usually go through and run CASS certification

8    on it.  As I mentioned before, that's the

9    Coding Accuracy Support System.  That's built

10   into my software.  That's done locally using

11   local data that's built into the software.

12             And what that does is it

13   normalizes the abbreviations used, such as

14   "ST" for street or "RD" for road, those kinds

15   of things.  It assigns the ZIP+4, the

16   delivery point, those kinds of things.

17             Basically, it helps to put the

18   data into a format that's more easily

19   digestible by National Change of Address

20   processing, all of which is done according to

21   USPS standards.

22             And it's an enormous data file.

Page 92

1  Normally, when I'm processing the voter

2  database, I'll run NCOA on the mailing

3  address and the physical address.  So when

4  you're talking about 7.6 million records,

5  you're talking about double that in an NCOA

6  run.

7         Q.     How long does that process

8  take, from start to finish, to do it right?

9         A.     It really depends on the

10  workload that my compiler has at the time.

11  I will typically kick it off on maybe a

12  Friday afternoon and then just forget about

13  it for a day.  When I come back the next day,

14  it's usually done.

15              I don't know about -- exactly

16  how many hours.  It's not like I'm sitting

17  there at my computer having to watch it.

18  Once I start the process, it just runs.

19         Q.    Okay.  Okay.  Returning to this

20  document in paragraph 7, you say you've been

21  brought in as an expert witness in a total of

22  five election disputes, which I think you

Page 93

1    mentioned earlier.

2              Can you tell me about those

3    five cases?

4              MS. SIEBERT:  Again, I'm

5         objecting to relevance.

6         A.    Well, I can't tell you what

7    those cases were off the top of my head.  I'd

8    have to research that.  But off the top of my

9    head, I couldn't tell you the exact document

10   name.

11             Two of them related to a

12   dispute election in House District 1 back in,

13   I believe it was, 2002; two them were related

14   to a dispute in House District 28, I believe

15   in 2018 or 2019, or both -- there was two

16   cases surrounding that one as well; and then

17   the fifth case was in Long County, Georgia,

18   just after the primary of 2020.

19   BY MR. SHELLY:

20        Q.    And was any of your testimony

21   about data processing related to the address

22   of potentially ineligible voters?

Page 94

1          A.     Yes.

2          Q.     In how many of them?

3          A.     All of them.

4          Q.     And were those conclusions as a

5     result of the same processing you've been

6     describing here?

7          A.     Yes and no.

8                 Some residency issues are

9     caused by redistricting or districting

10    issues.  Usually those are errors made by the

11    county.  And some are caused by people

12    moving.  Some are caused just by people

13    straight up being assigned to the wrong

14    county.  Some people claim to live somewhere

15    that they don't.

16                There's any number of issues

17    that can cause residency- or districting-type

18    issues, so I can't really give you a pat

19    answer for all circumstances.

20         Q.     Okay.  Let's skip down to

21    paragraph 14.  I read it to say, "Although

22    our state laws on residency appear to be

Page 95

1   clear, there is obvious conflict between the

2   effective implementation and administration

3   of those laws and the 1993 National Voter

4   Registration Act, as well as some existing

5   Georgia case law which has only made the

6   situation worse."

7              Can you tell me what you meant

8   by "obvious conflict"?

9        A.    Well, as you may be aware, when

10  a Secretary of State gets an NCOA match,

11  they're required to contact the voter to

12  investigate that NCOA match.  Basically ask

13  the voter:  Do you still claim residency at

14  the current address you're registered at or

15  have you moved?

16             You have to send out those

17  letters and investigate that.  And the

18  Secretary of State is prohibited by the

19  1993 National Voter Registration Act from

20  doing so-called list maintenance within

21  90 days of a federal election.

22             And here, in Georgia, 21-2-233

Page 96

1    permits a Secretary of State to run that

2    National Change of Address processing, it

3    appears, pretty much at its discretion.  In

4    fact, I believe that term "discretion" is

5    used.  Yet the 1993 NVRA prohibits what it

6    can actually do with that information.

7              So our Secretary of State is on

8    record blaming the 1993 National Voter

9    Registration Act and its prohibitions,

10   preventing him from preventing some of these

11   votes that have been cast with residency

12   issues.

13             He and his staff have admitted

14   on multiple occasions that such errors do

15   happen, but they claim that the NVRA

16   prohibits them from being able to address

17   them in a meaningful way.

18        Q.    And so you say that voter

19   challenges then is as a way to get around

20   those NVRA restrictions?

21        A.    It's not really --

22             MS. SIEBERT:  Objection --

Page 97

1          A.      -- getting around the NVRA

2     restrictions, because a challenge to a voter

3     under 21-2-230 is not a challenge to their

4     registration; it's a challenge to their

5     eligibility to vote in a particular election.

6                    And it's not the Secretary of

7     State doing it; it is an individual voter

8     filing a challenge, as authorized by Georgia

9     statute.

10    BY MR. SHELLY:

11         Q.      In the last line of this

12    highlighted part, what is the existing

13    Georgia case law that you were referring to

14    made the situation worse?

15         A.      There is existing case law that

16    muddies the water between what the law says

17    and what that case law says.

18                    If I recall correctly -- and

19    I couldn't quote you chapter and verse, but

20    I believe there was a case years ago where

21    there was a county commissioner whose house

22    burnt down, and he had to live somewhere else

Page 98

1    while he was getting it rebuilt.  And someone

2    challenged his residency.

3                    And the court said, Well, you

4    know, it was not his intention to change his

5    address.  He intends to rebuild his house and

6    come back to it.

7                    So they -- they rejected the

8    challenge to his residency.  And so ever

9    since then, when there is a residency issue,

10   the court wants you to prove what the voter's

11   intent was.

12                   So if you're able to subpoena

13   that voter, bring them into court, put them

14   in the witness stand, swear them in and ask

15   them, Did you move from, you know, 123 Main

16   Street to 241 Oak Street?  And they say yes,

17   I did.  Was it your intention to establish a

18   new, permanent residence?  Yes, it was.

19                   In those circumstances, then

20   the judges tend to rule in favor of -- well,

21   let me rephrase that.  The judge will tend to

22   categorize that as an irregular vote, because

Page 99

1    they cast a vote in a district they didn't

2    live in.

3              There was another instance

4    where a woman claimed to reside at a piece of

5    vacant property that she owned.  So I've seen

6    all kinds of issues where we have to litigate

7    issues in court that should be obvious under

8    Georgia law, but tend to get the waters

9    muddied in a courtroom over some of them.

10         Q.    Okay.  And are those examples

11   of what you're referring to in paragraph 16,

12   where it says, "I have only seen judges act

13   on those residency issues when we have

14   succeeded in bringing people into court, have

15   them put on the witness stand under oath, and

16   they have admitted that they did not, in

17   fact, move" -- "that they did, in fact, move

18   with the intention of establishing a new

19   residence"?

20              That sounds like what you were

21   just describing; right?

22         A.    In a situation where you're

Page 100

1    talking about a person who has moved in the

2    context of that particular kind of residency

3    issues, yes, that seems to be the mindset.

4                   As an example, there was one

5    guy in House 28 that I recall finding who had

6    moved from Georgia to North Carolina back in

7    2015.  It appears he sold his house here and

8    moved to North Carolina but kept coming back

9    here to vote for years afterwards.

10                  And, you know, I wanted to

11   challenge that.  The person I was working

12   with told me it's too difficult to subpoena

13   someone out of state and get them into court

14   and all of that.  And, you know, there's no

15   point in really pursuing that.  So we didn't.

16                  So it's often not enough to

17   prove that as a matter of fact, someone did

18   move.  Apparently the courts want you to

19   prove what their intention was.

20                  Now, in my mind, when someone

21   sells their house and factually doesn't live

22   there anymore, in fact, factually doesn't

Page 101

1    live in the state anymore, it would seem to

2    me that that should be evidence that they

3    don't live at that particular residence

4    anymore.

5                    And state law says, you know,

6    if you move to another state and get a

7    driver's license or register to vote,

8    et cetera, you lose your residency here in

9    Georgia.

10                   So, you know, that example sort

11   of sticks out.  But I've seen numerous other

12   examples.  So what tends to happen is in a

13   case where the margin between the candidates

14   is low, that's normally a manageable burden.

15   But when you get into a situation where

16   you're talking about potentially tens of

17   thousands of voters, I guess you could

18   imagine how long it would take to parade tens

19   of thousands of voters through a courtroom,

20   especially in an election-type hearing --

21                   THE DEPONENT:  Excuse me.  I'm

22        getting a spam call.  Let me silence

Page 102

1          my phone.

2                    (Pause.)

3          A.     Elections cases are supposed to

4     move very quickly.  And so in a situation

5     where the number would be extremely large,

6     I would think the only alternative for a

7     plaintiff in a situation like that would be

8     to basically plead systemic irregularities.

9          Q.     So when you say in this

10    paragraph "when we have succeeded in bringing

11    people into court," how many people have you

12    brought into court?

13         A.     I couldn't tell you off the top

14    of my head.

15                    In each of these cases, there

16    are different categories of issues.  Some are

17    redistricting issues; some are residency

18    issues of different type, either caused by

19    someone moving or someone being improperly

20    registered to begin with.

21                    Going back through all those

22    cases, I couldn't tell you exactly how many

Page 103

1     that was off the top of my head.

2          Q.     And are you getting into court

3     through challenges to the election results,

4     is where this comes up, or challenges to

5     these individuals specifically, or to

6     something else?

7               MS. SIEBERT:  Again, I'm just

8          going to object to relevance here.

9          This whole line of questioning has

10         nothing to do with this case.  You're

11         asking him about things from 20 years

12         ago, things from 5 years ago, things

13         from the general.  This -- this is not

14         relevant.

15              MR. SHELLY:  I think the

16         relevance depends, in part, on the

17         answer.  I'm particularly curious if

18         people are being brought into court

19         through the challenges, which --

20              MS. SIEBERT:  But if they were

21         brought into court 20 years ago, it

22         clearly wouldn't be relevant.  I mean,

Page 104

1          that's what he's been testifying

2          about.

3                  I'm just failing to understand

4          the relevance to this case in this

5          whole line of questioning.

6                  MR. SHELLY:  I think the

7          experience with those previous

8          challenges and what the result of them

9          were would inform the propriety of the

10         current challenges.

11                 MS. SIEBERT:  But -- well, the

12         experience he's had with the previous

13         challenge would -- or previous

14         databases, previous work he's done in

15         all of this data, would establish his

16         experience as a professional in this

17         space.  It wouldn't have anything to

18         do with these -- the challenges at

19         issue here.

20                 MR. SHELLY:  Okay.  I am happy

21         to tailor my questions narrowly to the

22         issue of challenges, but I would hope

Page 105

1          to ask him specifically about the

2          challenges.  If there were other cases

3          or the times he ended up in court for

4          issues that were unrelated to that,

5          I'm happy to not probe those.

6                    MS. SIEBERT:  Okay.  So are you

7          saying you're willing to tailor your

8          questions to the challenges that this

9          case is actually about?

10                   MR. SHELLY:  I think I'm

11         interested in discussing all the voter

12         challenges that Mr. Davis has been

13         involved with.

14                   MS. SIEBERT:  Okay.  Then

15         I would object to any continued line

16         of questioning about any challenges

17         that have nothing to do with this case

18         that he's been involved in.

19                   If he was involved in

20         challenges 20 years ago, that has

21         nothing to do with this case and what

22         the challenges were for the runoff

Case 2:20-cv-00302-SCJ   Document 161-1   Filed 05/17/22   Page 106 of 177

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 106

1        election in 2021.

2              MR. SHELLY:  Okay.  I --

3              THE DEPONENT:  Melena, if it's

4        okay, I testified earlier, I've never

5        filed a challenge.  And I'm

6        comfortable answering the question, if

7        it's okay.

8              MS. SIEBERT:  Well, I -- well,

9        my point is -- Mark, I appreciate

10       that.  My point is that you -- this

11       scope goes to his expertise in this

12       space.  But, again, it has nothing to

13       do with the challenges.

14              And he just confirmed, he

15       had -- specifically he's never

16       submitted a challenge.  So if you

17       can't tailor a question to the

18       challenges at hand, it's not relevant.

19              And we've given you a lot of

20       latitude on that, but at some point,

21       that has to end, for goodness sakes.

22              MR. SHELLY:  Yeah, I appreciate

Page 107

1          that.  We disagree on this issue.  My

2          position is we'll have to agree to

3          disagree for now and have Mr. Davis

4          answer the questions and then we can

5          resolve the propriety of those answers

6          after the deposition.

7                    MS. SIEBERT:  Okay.

8                    MR. SHELLY:  Thank you.

9          A.     There is a huge difference

10    between filing a challenge to an individual

11    voter who lives in your county and filing a

12    challenge to an election itself.  Those are

13    completely different statutes and completely

14    different processes.

15                    As I testified earlier, I've

16    never filed a challenge against a voter

17    personally.  I have testified in challenged

18    elections.  There's a big difference there.

19                    You know, after an election is

20    conducted, if a candidate sees illegal or

21    irregular or improperly rejected ballots and

22    they file a legal challenge within the time

Page 108

1    limitation and it goes to court, then, you

2    know, I have gone in and done analysis of

3    those situations, and I've testified about

4    the issues that occurred.

5              But the word "challenge" is

6    used in both situations but in completely

7    different contexts.

8    BY MR. SHELLY:

9         Q.    And that's the distinction

10   I was hoping to understand.  Thank you,

11   Mr. Davis.

12             Can we switch to paragraph 19.

13   Here, it shows as a result of your

14   processing, 267,255 voters is your figure for

15   how many moved out of state.  And then in

16   paragraph 20, you say, "Some of those no

17   doubt will be students and people serving in

18   the military who intend to return to Georgia,

19   and they are, of course, lawfully permitted

20   to vote."

21             Am I understanding that

22   correctly to mean that there was not reason

Page 109

1   to believe that all 267,255 voters you

2   identified were ineligible to vote?

3          A.      Repeat your question.

4          Q.      I just wanted to make sure I'm

5   reading these two paragraphs together to

6   reflect your understanding that not all of

7   these 267,255 voters that you identified were

8   ineligible to vote.

9          A.      Correct.

10                 As I testified earlier, a

11  student or a member of the military or other

12  people leaving the state for over a year

13  cannot file temporary changes of address.

14  They would need to file a permanent change of

15  address.  So, yes, some of those folks would

16  remain eligible to vote here.

17                 And I showed there were roughly

18  15,000 or so who actually did.  I think even

19  the number who did so by absentee who remain

20  registered here I think was even higher, if I

21  recall.

22                 So, yes, so some number of

Page 110

1    those are going to be valid.  And, of course,

2    certainly not anywhere close to that number

3    actually cast ballots in the election.

4         Q.    Do you have any idea how many

5    of those 267,255 voters may have been

6    military or student voters?

7         A.    No, I do not.

8         Q.    In paragraph 24, you calculate

9    122,231 voters who moved across state [sic]

10   lines but within Georgia.

11             Would your methodology have

12   identified all of the registered voters who

13   submitted NCOA notices for an address outside

14   of their county but within Georgia?

15        A.    Well, to start with, as

16   I mentioned earlier, I completed this

17   analysis just before testifying.  And after

18   that testimony, I realized some of those had

19   changed their addresses to P.O. Boxes.  So

20   I would revise that number of 122- to

21   approximately 110-.

22             But, yes, the USPS data shows

Page 111

1    that they moved from one county to another

2    county in Georgia.  And based on the move

3    effective date they gave the Post Office when

4    they filed their change of address, that move

5    effective date was more than 30 days in

6    advance of the election.  But, of course, not

7    all those people cast ballots.

8        Q.    True the Vote calculated this

9    figure in their challenges within state

10   movers to be 124,114.

11              Do you know why there would be

12   a discrepancy?

13       A.    I wasn't involved in their

14   processing.  I couldn't tell you.

15              I would imagine they would have

16   done different dates.  That might be one

17   possible explanation.  Because, as I

18   mentioned earlier, NCOA is a window.  It's

19   either looking back 18 months or it's looking

20   back 48 months.

21              So when you process NCOA, it's

22   a particular snapshot at a particular moment

Page 112

1    in time.  So that, alone, could easily

2    account for the disparity.

3              I just recently ran NCOA again,

4    and, you know, the numbers had gone up

5    considerably as far as the number of hits

6    statewide.  So it's really a moving target.

7              And that's part of the reason

8    for the certification, is one of the primary

9    reasons for the certifications, is in order

10   to be in compliance with United States Postal

11   Service move update requirements, the

12   processing has to be done within a certain

13   amount of time of when you do the mailing or

14   you can risk losing your postage discounts.

15        Q.    And then can we look at

16   paragraph 36.  You refer to the antiquated

17   Voter Registration Act.

18        A.    Yes.

19              I believe the 1993 National

20   Voter Registration Act should be amended so

21   that it's more helpful in keeping our

22   nation's voter rolls cleaner.

Page 113

1                    I would advocate for the use of

2        a national voter data clearinghouse, not

3        federalized elections or federalized voter

4        registration but something similar to or

5        perhaps even ERIC, E-R-I-C, the Electronic

6        Registration Information Clearinghouse.

7                    Somewhere in the neighborhood

8        of half of our states are participating

9        states.  My understanding is it's an NGO, and

10       that each state sends a designee to

11       participate in the governance of ERIC.

12                   And the states will submit

13       voter data with a hatched version of the full

14       date of birth and Social Security number so

15       that that information remained confidential,

16       but at the same time can be matched against

17       other member states.

18                   It's very useful in determining

19       if a voter is registered in more than one

20       state, which happens often.  As an example,

21       the 267,000 that moved out of Georgia, some

22       large number of them probably are registered

Page 114

1    in other states.

2              I'm not privy to the results of

3    the analysis that ERIC does, but I would

4    imagine that they routinely find people who

5    have moved from one state to another.  And

6    when they move to their new state, they got a

7    driver's license and registered to vote and

8    never cancelled their voter registration in

9    Georgia.

10             So, yes, I do believe that, you

11   know, in this day and age, that's nearly a

12   30-year-old law there.  And technology has

13   advanced considerably since those days.

14             Yes, I do believe that we can

15   do better and that we can keep our voter

16   rolls cleaner and we can help ensure people

17   are able to vote and vote lawfully and vote

18   for people who actually represent them.

19             MR. SHELLY:  Henry, can we look

20        at Exhibit C now.

21             (Davis Exhibit C,

22        Mark Davis Facebook Post, May 7 at

Page 115

1        2:07 p.m., No Bates, was marked

2        for identification, as of this

3        date.)

4    BY MR. SHELLY:

5        Q.    Do you recognize this post?

6        A.    Yes, I do.

7        Q.    Can you explain what it is?

8        A.    I'm basically trying to explain

9    residency issues and put it in simpler terms

10   for people to be able to understand more

11   easily.

12       Q.    Did anyone assist in the

13   drafting of this post?

14       A.    No.

15       Q.    Did anyone know you were going

16   to post this before you did?

17       A.    No -- well, not that I recall.

18   Let me think.

19            (Pause.)

20            I do recall several people

21   telling me that the information I've tried to

22   convey is highly technical and that sometimes

Page 116

1    I put it in terms that are not clear to

2    people who are not experienced with this kind

3    of work.

4              And I see what they're saying.

5    So I decided, on my own, to do this because

6    I had heard that kind of feedback.

7         Q.    This shows at the top that you

8    tagged BJ Van Gundy and 24 others.

9              How did you decide who to tag?

10        A.    Off the cuff.  People who I

11   could think of that might be interested in

12   reading it.

13        Q.    Did you tag anyone associated

14   with True the Vote?

15        A.    I don't know.

16        Q.    Okay.

17              MR. SHELLY:  Henry, can we

18        briefly pull up tab K -- or Exhibit K.

19        Sorry.

20              (Davis Exhibit K,

21        Mark Davis Facebook post dated

22        May 7 showing partial tag list, No

Page 117

1        Bates, was marked for

2        identification, as of this

3        date.)

4    BY MR. SHELLY:

5        Q.    Here, it's showing who's

6    tagged.  I'm interested, first, why you

7    tagged Courtney Kramer?  Who's about five

8    names down.

9        A.    Um-hum.

10            MS. SIEBERT:  Objection.

11        Again, relevance.

12            Does this have anything to do

13        with the challenges that were

14        submitted for the January runoff

15        election?

16            MR. SHELLY:  My question is

17        about -- this case is about True the

18        Vote's challenges, so I have questions

19        about the challenges, and I have

20        questions about True the Vote.

21            I understand Ms. Courtney

22        Kramer to be affiliated with True the

Page 118

1          Vote, and so I'm curious why she was

2          tagged here.

3               MS. SIEBERT:  Okay.

4          A.     Was she at the time?  I thought

5     that was a recent development.

6     BY MR. SHELLY:

7          Q.     Can you tell me why you decided

8     to tag her?

9          A.     People on my Friend list who

10    I thought might be interested, for one reason

11    or another.

12         Q.     Okay.  And would that be the

13    same for Derek Somerville?  About six or

14    seven names up from the bottom.

15         A.     Um-hum.

16         Q.     Okay.

17               Can we switch back to the

18    previous exhibit of this Facebook post.

19    I think it was Exhibit C.  And I'm looking

20    for the second-to-the-last paragraph, maybe

21    of the -- the next page.  Yes.

22               "Some of those folks may have

Page 119

1    moved temporarily."  This is referring to

2    your calculations of how many people had

3    moved.  "Maybe they went away to college, to

4    serve a tour of duty in the military, or for

5    some other temporary reason.  If that was the

6    case, they did not lose their residency, and

7    their votes were lawful.

8                   "For that reason," you write,

9    "I will not publish the list of voters.  I

10   will turn over the data only for an official

11   investigation, and I will not accuse John and

12   Jane or any other voter of breaking the law.

13   That isn't my job.  That will be up to law

14   enforcement."

15                   Did I read that correctly?

16        A.     Um-hum.

17        Q.     Again, can you elaborate on

18   your reasoning for not publishing the list of

19   voters you compiled?

20        A.     I think I did there.  Some

21   number of those people may be away at college

22   or on a tour of duty.  And until an

Page 120

1    investigation is done and those people are

2    identified, and those persons who broke the

3    law were identified, you know, it's really up

4    to our elected -- our elections officials and

5    law enforcement to determine who did and

6    didn't break the law.

7                    There is NCOA evidence that

8    indicates that that is a possibility, but

9    that's not a be all end all, without an

10   investigation.  Even when the Secretary of

11   State has actionable NCOA evidence, he has to

12   verify it.

13                   A Board of Elections that

14   accepts a challenge would also investigate.

15   So if the residency of these voters is going

16   to be called into question, it should be done

17   by our elections officials.

18                   I see evidence that quite a few

19   voters may have cast ballots in counties they

20   no longer lived in.  And, you know, that's up

21   to our elections officials and law

22   enforcement to investigate.

Page 121

1        Q.      Were you concerned with

2    protecting the privacy of these individuals

3    before any official determination had been

4    made?

5        A.      I didn't want to name

6    particular voters.  That's not my focus here.

7    I'm not out to embarrass anyone or put anyone

8    on the spot or draw unwarranted attention to

9    them.  I'm just in pursuit of vote integrity.

10       Q.      You say you will "turn the data

11   over for an official investigation."

12               Did you provide this data to

13   anybody official?

14       A.      Secretary of State's office.

15       Q.      And do you know what you did

16   with that data?

17       A.      I turned it over in May for an

18   investigation that is still ongoing.

19       Q.      Okay.

20               MR. SHELLY:  I think another

21           hour has passed.  Would you like to

22           take another ten-minute break?

Page 122

1                    THE DEPONENT:  Yes.

2                    MR. SHELLY:  Great.  We'll come

3          back at 11:25.

4                    THE VIDEOGRAPHER:  The time is

5          11:15 a.m.  We're going off the

6          record.

7                    (Recess taken.)

8                    THE VIDEOGRAPHER:  We are back

9          on the record.  The time is 11:25 a.m.

10   BY MR. SHELLY:

11        Q.    Mr. Davis, are you familiar

12   with the term "unique identifier" as it

13   relates to data processing?

14        A.    That can be a lot of different

15   things, but, in general, I understand what

16   you're referring to.

17        Q.    Can you explain to me your

18   understanding?

19        A.    Well, in the case of the voter

20   registration database, it would be the voter

21   registration number.  And in other

22   applications, it could be the record number,

Page 123

1   a customer ID number.  It could be a lot of

2   different things.

3        Q.     And with that understanding,

4   are there any unique identifiers in the NCOA

5   list?

6        A.     In the context of NCOA, when

7   the data is transmitted to the compiler who

8   actually does the matching, there is a unique

9   identifier built in so that the information

10  is returned to the exact same record that it

11  was submitted from.

12       Q.     Okay.  Could that unique

13  identifier be matched to the voter file or

14  would those be two separate --

15       A.     The voter registration number,

16  per se, isn't a defined NCOA field, but the

17  record ID in the database that it's contained

18  in would be.

19       Q.     If there was someone who was

20  John Smith in the NCOA, they would have this

21  unique identifier that you said the processor

22  would assign.  That John Smith would have a

Page 124

1    voter ID unique identifier in the voter file.

2              But I'm just trying to confirm

3    that there is no common unique identifier

4    that would confirm those are, in fact, the

5    same John Smiths.

6         A.    Well, even if you had a John

7    Smith, Jr., and a John Smith, Sr., that were

8    living at the same address, those two voters

9    would have totally different records.

10             And, as I mentioned earlier,

11   when you run NCOA, there could be different

12   outcomes for those two different individuals.

13             As an example, if John Smith,

14   Jr., is leaving home and establishing their

15   own residence for the first time, the

16   United States Postal Service would advise him

17   to file an individual change of address

18   rather than a family change of address.

19             Because if he files a family

20   change of address, everybody's mail would be

21   forwarded to John Smith, Jr., which is an

22   outcome no one would want.  So he would file

Page 125

1   an individual change of address rather than

2   one for the entire family.

3              Now, if the entire family was

4   moving to a new address, then they would file

5   a family change of address.

6        Q.    Maybe another way of asking

7   this:  Are there any fields that are matched

8   besides the name and address of the

9   individuals in these two files?

10       A.    No.  The matching criteria the

11  Postal Service uses is a name and address

12  combination.  But the way the matching

13  algorithm is built and tested with the NCOA

14  compilers, it should be able to distinguish

15  between a John Smith, Jr., and a John Smith,

16  Sr.

17       Q.    Okay.  The matching would

18  include middle names -- let me ask it this

19  way.  If there's a middle initial in one file

20  and a middle name or no middle initial or

21  name in the other, how would that matching

22  work?

Page 126

1       A.      If they're different, there

2   would be a different criteria for the

3   matching algorithm.   That's governed by the

4   Postal Service.

5                For a licensee to get a

6   license, there's a test deck that the Postal

7   Service requires them to process with a very,

8   very high degree of accuracy in order to get

9   certification to do that processing to begin

10  with.  It's very highly regulated by the

11  United States Postal Service, itself, to

12  ensure that there is accuracy in the process.

13               The whole premise behind the

14  Postal Service requiring NCOA is to reduce

15  undeliverable mail.  So they want it to be as

16  highly accurate as possible.

17      Q.    Okay.  So your understanding is

18  if that -- in the voter registration file,

19  there's a John Adam Smith and then in the

20  NCOA, it's just John Smith or John A. Smith,

21  that the licensee who is doing the

22  processing, would they -- if it was the same

Page 127

1    address, would that be a match or not be

2    flagged as a match?

3         A.     If it makes it through the

4    United States Postal Service as a matching

5    algorithm, it may or may not be a match

6    depending on how it was filed and how the

7    record being presented is entered into the

8    system, whether or not there's any mistakes

9    made by voter registration in entering the

10   information.

11              There's a whole host of factors

12   that could come into play there, which is why

13   it's typical to rely on corroborating

14   evidence when it comes to NCOA.

15              For example, the verification

16   steps that a Secretary of State will go

17   through to mail people, or an investigation,

18   such as the Secretary of State's office is

19   conducting now, or a challenge where a county

20   would investigate a potential residency

21   issue, there's normally other information

22   that comes into play other than just NCOA to

Page 128

1    make sure that you are talking about the

2    right person.

3         Q.    Okay.  And when you were doing

4    these calculations that we just discussed,

5    were you doing any of that corroboration --

6    I think you had 125,000, and then you reduced

7    it to 110,000.

8              Was there any corroboration

9    with those numbers?

10             MS. SIEBERT:  Jacob, again,

11        objection.

12             Are you limiting this to the

13        challenges that are relevant to --

14        he's testified he didn't do any

15        challenges relevant to this lawsuit or

16        any challenges at all.  I --

17             MR. SHELLY:  It looks like

18        there's some exhibits that we

19        discussed in his testimony that his

20        lists were used for some challenges.

21        So I think it's relevant to understand

22        the nature of that.

Page 129

1               MS. SIEBERT:  Okay.  Are you

2       saying that he has testified that his

3       lists were used for True the Vote's

4       challenges, which are the challenges

5       at issue here?

6               MR. SHELLY:  Well, Mr. Davis is

7       a defendant in this case, so I think

8       all the challenges that he's been

9       involved with are going to be

10      relevant.

11              MS. SIEBERT:  So it's your

12      assertion that even though this

13      lawsuit is about challenges that True

14      the Vote or people who acted in

15      concert with True the Vote made, that

16      challenges that didn't have anything

17      to do with acting in concert with True

18      the Vote would be relevant somehow?

19              MR. SHELLY:  So our lawsuit

20      alleges violations of the Civil Rights

21      Act.  And we name half-a-dozen-or-so

22      defendants.  And so I think we can

Page 130

1         explore each of these defendants'

2         actions that may have fallen under

3         that statute.

4                 MS. SIEBERT:  Can you point me

5         into where the Complaint had any

6         allegations against Mr. Davis

7         submitting challenges, doing

8         databases, anything like that --

9                 MR. SHELLY:  Part of the --

10                MS. SIEBERT:  -- not in

11        connection with True the Vote.

12        I mean, I'm just saying, that's not

13        what your Complaint alleges at all.

14                MR. SHELLY:  Well, part of the

15        purpose of the discovery in this

16        deposition are to learn more about his

17        role.  And as we learn more about the

18        things he's been involved with,

19        I would like to follow up on those.

20                MS. SIEBERT:  Okay.

21                MR. SHELLY:  Lisa, could you

22        read back my last question?  I've

Page 131

1       forgotten it.

2               THE STENOGRAPHER:  Yes.

3               (The record was read back as

4       follows:

5               QUESTION:  "Okay.  And when you

6       were doing these calculations that we

7       just discussed, were you doing any of

8       that corroboration -- I think you had

9       125,000, and then you reduced it to

10      110,000.

11              "Was there any corroboration

12      with those numbers?")

13      A.      Well, yes.

14              But to correct that, I believe

15   the number went from 122-, approximately, to

16   approximately 110-.  But not all those people

17   cast ballots.  That number was also a subset

18   of approximately 313,000 or 314,000 who moved

19   within the state of Georgia.

20              So depending on what subset

21   of -- group you're talking about, yes, since

22   the election, tens of thousands of voters

Page 132

1    have come back and they have updated their

2    own voter registration information to the

3    exact same address they gave the Post Office

4    originally when they moved.  In other words,

5    their official address of record now shows

6    the same address they told the Post Office

7    that they were moving to.

8                  Now, the data that the

9    Secretary of State is investigating, there

10   were approximately 10,300 or so that had done

11   that, that had actually cast ballots in the

12   general election.

13                 So just to walk you through

14   that, these were people who filed a change of

15   address more than 30 days before the election

16   and went back and voted, according to the

17   data, in the county they used to live in.

18   And then following the election, updated

19   their own registration to the exact same

20   address they gave to the Postal Service when

21   they moved originally.  So, in my mind, that

22   is definite corroborating evidence.

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 133

1                    Now, that number has continued

2    to climb.  I believe it's now in the

3    neighborhood of 11,300 or so.  But voters

4    continue to come in, as the clock runs, and

5    update their own registration, basically

6    confirming that the information they gave to

7    the Postal Service was accurate.

8    BY MR. SHELLY:

9          Q.    Okay.  Can you tell me if I'm

10   understanding this whole picture correctly:

11   After the November election, you processed

12   matches between the NCOA list and the vote

13   registration file through these other

14   licensees.  They came up with a figure --

15         A.    I'm sorry.  I didn't mean to

16   interrupt.

17         Q.    No.  Why don't we stop there so

18   you can clarify to make sure I am

19   understanding this precisely.

20         A.    What I'm saying is that

21   I compared the NCOA information that I got in

22   November to current voter rolls at various

Page 134

1    times.  And I think the starting number when

2    I did it, I think back in May, was around

3    8,000.  And then I think I did another one --

4          Q.      Was that May 2020?

5          A.      Yeah.

6          Q.      Okay.

7          A.      The last time that I did it was

8    at the end of August.  And that number had

9    risen to 11,300 or so.

10                 So what the data is indicating

11   is we have a huge number of Georgians that

12   appear to not be updating their driver's

13   licenses or their voter registrations in a

14   timely manner.

15                 And then when they finally do

16   get around to it, they're well beyond what

17   they were required to do in order to vote in

18   the general election and what they were

19   required to do as far as their driver's

20   license information.

21                 So, to me, it's clearly an

22   issue that needs to be addressed.  And I'm an

Page 135

1    advocate for doing that.

2        Q.    Okay.  And am I recalling and

3    understanding correctly that earlier in this

4    conversation, you told me you identified some

5    of these potentially ineligible voters.  You

6    put those on the internet that people could

7    use to issue challenges.

8            Is that right?

9        A.    People that were permitted

10   access who wanted to file a challenge could

11   obtain that information.  And, yes, file a

12   challenge so that their county would

13   investigate potential residency issues with

14   voters.

15       Q.    Okay.  And so now my question

16   is:  Of those names that you identified, was

17   that the 300-and-some thousand or was that

18   the 11,000?

19           You mentioned, like, a few

20   different ways you can cut potentially

21   ineligible voters.  So I'm wondering which

22   list was provided.

Page 136

1          A.      That was a different set of

2     criteria for the runoff than what I was

3     looking at from the general because the dates

4     of the elections are different.  The move

5     dates affect the calendar different.

6               For example, if you moved more

7     than 30 days before the general within a new

8     county within the state, then according to

9     the law and the Secretary of State's own

10    website, you have to reregister in your new

11    county.  You're not allowed to continue

12    voting in your old county.

13              The same is true of the runoff,

14    but the runoff date was a different date.  So

15    the criteria for selection was different.

16              So the final list, I believe,

17    wound up being around 40,000-or-so records.

18    And I believe all the people that were on the

19    list had cast a ballot in the general

20    election.  About three-quarters of them

21    already arguably had residency issues when

22    they voted in the general; the rest were in a

Page 137

1    position where they would potentially have

2    residency issues voting in the runoff.

3                  And there were voters who

4    wanted to challenge people in their county

5    that may come back and vote again or for the

6    first time with residency issues.  Because

7    there was so much evidence that that happened

8    in the general election, there were a lot of

9    people interested in helping to ensure that

10   that didn't happen again in the runoff.

11        Q.    And that was approximately

12   40,000 across all 159 counties, or did you

13   focus only on some counties?

14        A.    These issues were absolutely

15   systemic.  They occurred in every county in

16   the state, every House district in the state,

17   every Senate district in the state, every

18   Congressional district in the state.

19                  And of the people who have

20   since updated their own registration to the

21   same address they gave to the Postal Service,

22   the data indicates approximately 94 percent

Page 138

1    of them would have been presented with a

2    ballot with a House district race on it that

3    they don't live in, about 86 percent with a

4    Senate district they don't live in, and about

5    64 percent or so with a Congressional

6    district they don't live in.

7                    They would have been presented

8    with the opportunity to vote for sheriffs,

9    county commissioners, school board members

10   that don't represent them, or even voting for

11   tax increases that they'll never have to pay.

12                   This is the reason the

13   residency laws exist to begin with, as far as

14   my understanding goes, is to ensure that that

15   gets prevented.

16        Q.    For the runoff elections in

17   January, were -- in addition to the statewide

18   Senate elections, were there other

19   down-ballot elections in each county?

20        A.    No.  I'm talking with regard to

21   the general election.

22                   But I think what's important to

Page 139

1    understand, some people, I think, have the

2    mistaken impression that if it's a statewide

3    race, then all these residency requirements

4    should be ignored.

5              I don't have that position for

6    one simple reason:  People who obey those

7    laws and don't cast unlawful ballots

8    obviously don't get to vote.  And people who

9    break those laws and do cast unlawful ballots

10   do get their votes counted.

11             I have a problem with that.

12   I think any reasonable voter should be

13   concerned about that.

14        Q.    And just to confirm:  That

15   40,000 records, that includes people who both

16   moved within the state but out of their

17   county and people who moved out of state?

18        A.    Yes.

19        Q.    Okay.  And so you put this on

20   the internet.  And there was a select number

21   of people who were invited to view it.

22             Is that correct?

Page 140

1      A.     People who wanted to file

2   challenges would access the data for their

3   county and download it and then use it to go

4   file a challenge.

5      Q.     Okay.  And you worked with

6   Mr. Somerville on this?

7      A.     Um-hum.

8      Q.     And anybody else?

9      A.     Depends on your definition of

10  "working with."

11             I mean, obviously the people

12  who filed the challenges were using data that

13  I generated, but I didn't coordinate who was

14  going to file what challenge where or, you

15  know, anything like that.  You know, I was

16  busy doing the data processing and the

17  analysis.  I didn't handle that.

18      Q.     But am I understanding

19  correctly, your understanding was that your

20  data was essentially used for challenges?

21      A.     Yes.  I'm not sure what, if

22  any, counties actually accepted any of those

Page 141

1    challenges, but my understanding is that some

2    of them were filed.

3                   As you mentioned earlier,

4    I believe most were rejected, perhaps even

5    all.  I don't know.

6         Q.    Do you have a ballpark of how

7    many counties your data was used for

8    challenges in?

9         A.    I do not.

10        Q.    Do you know if any were used in

11   Gwinnett County?

12        A.    I don't.  I don't know.

13        Q.    Did you consider filing one in

14   Gwinnett County with your own data?

15        A.    I did not.  I had heard

16   challenges were going to be filed in Gwinnett

17   County.  I didn't know whose challenge.  And

18   I didn't have the time to do it anyway.  And

19   there were plenty of people interested in

20   doing it, so I just -- I stayed uninvolved.

21        Q.    Okay.

22                   MR. SHELLY:  Henry, can we pull

Page 142

1        up Exhibit F.

2                (Davis Exhibit F, Mark

3        Davis Facebook Post, December 17,

4        2020, No Bates, was marked for

5        identification, as of this

6        date.)

7    BY MR. SHELLY:

8        Q.    I think you mentioned this post

9    earlier, Mr. Davis, but are you familiar with

10   this?

11       A.    Yes.

12       Q.    Can you describe it for the

13   record.

14       A.    It's a copy of Derek's post,

15   looking for volunteers who may be interested

16   in filing challenges.

17       Q.    And these were to file

18   challenges with the data that you

19   specifically generated; correct?

20       A.    That's my understanding.

21             He was -- my understanding is

22   also that he was also not involved with True

10/4/2021        Fair Fight, Inc. et al. v. True the Vote, et al.        Mark Davis

Page 143

1    the Vote's challenges.

2         Q.     Okay.  Did any potential

3    volunteers respond to this post?

4         A.     I don't recall any responding

5    to me.  They may have.  And I told them to

6    see Derek if they did.  But I don't recall

7    specific -- if you want to check out those

8    two comments, we might be able to figure that

9    out, but...

10        Q.     Okay.  Okay.

11               And then we'll pull up

12   Exhibit E.

13               (Davis Exhibit E, Zoom

14        meeting invitation (TTV Legal

15        Update), 12/27/20, No Bates,

16        was marked for identification,

17        as of this date.)

18   BY MR. SHELLY:

19        Q.     Are you familiar with this

20   document?

21        A.     (Document[s] reviewed.)

22               It appears to be an invitation

Page 144

1    to a Zoom call.  That may have been the one

2    that I talked about earlier, where they gave

3    everybody an update of some sort.

4         Q.    Okay.  Let's come back to this

5    one.

6              MR. SHELLY:  Can we jump to

7         Exhibit J.

8              (Davis Exhibit J, Zoom

9         meeting invitation, 12/30/20

10        (Georgia Elector Challenger

11        Townhall), No Bates, was marked

12        for identification, as of this

13        date.)

14   BY MR. SHELLY:

15        Q.    This one sounds a little bit

16   more like the group meeting that you're

17   describing.  This is a December 20 [sic]

18   Georgia Elector Challenger Town Hall.

19        A.    If I recall correctly,

20   I thought both were group meetings.  And I

21   can't remember if I went to one or both.

22   I may have done both.  I don't recall.

Page 145

1       Q.      Okay.

2               MS. SIEBERT:  Mr. Shelly, I'm

3       sorry.  Could I clarify?

4               I believe the date on that is

5       December 30th, not December 20th.

6               MR. SHELLY:  Oh.  Small print

7       on mine.  You're right.

8               MS. SIEBERT:  No.  It's fine.

9       I just wanted to make sure the record

10      was clear.  Thank you.

11  BY MR. SHELLY:

12      Q.      Okay.  But, Mr. Davis, fair to

13  say you -- Ms. Engelbrecht invited you to

14  meetings, one on December 27 and one on

15  December 30th.  And you think you attended

16  one or perhaps both of them?

17      A.      Correct.

18      Q.      Okay.  And the previous one,

19  which was Exhibit E --

20              MR. SHELLY:  Is it easy to flip

21      back to that, Henry?

22

Page 146

1    BY MR. SHELLY:

2         Q.     -- it looks like this one was

3    between Ms. Engelbrecht, Mark Davis, and

4    Derek Somerville, and you.

5              To the extent this was a

6    smaller group meeting, does that refresh your

7    memory about what it was about?

8         A.     I don't recall having a meeting

9    that small.  I recall one, possibly two, that

10   were numerous people.

11        Q.     Okay.

12        A.     I could be mistaken, but

13   I don't believe so.

14        Q.     Okay.

15              Mr. Davis, do you have any

16   legal background or formal training?

17        A.     No.  I'm not an attorney.

18   I was raised by one, but I'm not an attorney.

19        Q.     Okay.

20              MR. SHELLY:  I think I'm almost

21        done.  Can we take a short, maybe,

22        five-minute break, just to make sure

Page 147

1            I've asked everything that I have on

2       my list?

3                 MS. SIEBERT:  Sounds good.

4                 THE VIDEOGRAPHER:  The time is

5       11:49 a.m.  Going off the record.

6                 (Recess taken.)

7                 THE VIDEOGRAPHER:  The time is

8       11:54 a.m.  Back on the record.

9   BY MR. SHELLY:

10          Q.    I do have just a few final

11   questions for you, Mr. Davis.  I want to make

12   sure I understand the mechanics of this

13   matching, as I'm calling it, the best I can.

14                Another example:  If a person's

15   last name is hyphenated in one file but not

16   the other, would that show up as a match?

17   Or, my understanding, that that would depend

18   entirely on the algorithm that is being used?

19          A.    It depends on the matching

20   algorithm used by the Postal Service.

21                If there is -- if there's not a

22   match, then I would not be provided with a

Page 148

1    new address, so they wouldn't be on the list

2    to begin with.

3          Q.    Okay.  Your list of

4    approximately 40,000 names that you

5    identified of people who voted in the general

6    or otherwise you were concerned about their

7    eligibility to vote, did that include anyone

8    who was registered or moved to a military

9    base?

10         A.    Derek is also a former Marine,

11   and we did the best that we could to scrub

12   military bases out of there.

13               But, again, as I mentioned

14   earlier, when someone files a permanent

15   change of address when they really intend to

16   go away temporarily, that is something that

17   needs to be addressed with some sort of

18   investigation, either mailing them a letter

19   or a notice, as the Secretary of State does,

20   or sending an investigator to ask that

21   person, you know:  Did you move from this

22   address to that address?  Was it a temporary

Page 149

1    move or a permanent move?  Or an

2    investigation by a county that accepts a

3    challenge.

4              There's additional data to be

5    gathered.  This is a place to begin the

6    process, but it's not the be all end all of

7    any of these processes.

8         Q.    You mentioned -- did

9    Mr. Somerville remove the military names, or

10   is that something that you did yourself?

11        A.    I had him do it because he's

12   aware of where the big military bases are and

13   did his best to scrub any of them out of the

14   data.

15        Q.    Okay.  Do you have -- do you

16   know how many names that removed?

17        A.    I don't recall.

18        Q.    And did you do any similar

19   scrubbing for other reasons?  A person could

20   be in a similar situation?  For example,

21   people who are registered and on a college

22   campus?

1       A.      Not that I recall.  I know

2   there's a very low number of college-age

3   voters on the list.  But, again, those issues

4   are basically the subject of the inquiry,

5   whether that's done through the mail by the

6   Secretary of State or done by the county

7   board of elections in reviewing a challenge

8   or done by the Secretary of State's office as

9   they continue to investigate these issues.

10      Q.      And do you think that the

11  county boards of election could do the proper

12  investigation for 40,000 names before the

13  runoff election?

14      A.      Well, that's a statewide

15  number.  No county has near that total.

16      Q.      But -- so did you think that

17  each county could perform all the

18  investigations they needed to do before the

19  election?

20      A.      I don't know.  That's for the

21  county to determine.  It's up to the county

22  to accept or reject a challenge.  And, as

Page 151

1    you're aware, many of them did reject them.

2                    You know, that was part of the

3    reason that I, you know, limited the scope of

4    the challenges, is because, A, since they had

5    already voted in the general and many of them

6    already with potential residency issues, I

7    felt like that was on stronger footing, as

8    far as the counties go, in their ability to

9    process a challenge as well as and the

10   strength of the challenge itself.

11                   So, yeah, I would agree that

12   the larger the number is, the more difficult

13   it is on the counties.  And, in part, I think

14   that may be part of the reason that some of

15   the counties rejected challenges, because

16   they just didn't want to deal with it.

17                   And then part of the other

18   reason is the threat of a lawsuit backed by

19   an organization with millions of dollars

20   behind them.  A lot of voters were

21   intimidated and a lot of counties were

22   intimidated.

Page 152

1      Q.     Do you intend to file any

2    challenges in the future?

3      A.     I hope that I don't have to.

4    I hope that these issues will be addressed by

5    our elected officials.

6           I do intend to keep researching

7    these issues in the future and identifying

8    and calling attention to these issues as I've

9    done for 20 years.  I intend to remain an

10   advocate for election integrity, yeah.

11          I don't think it's okay for

12   people to vote in districts they don't live

13   in for people who don't represent them.

14   I think all Americans should view it that

15   way.  Voting for our representatives is the

16   bedrock of our Constitutional republic.

17   I don't think it's acceptable that we have

18   people casting unlawful ballots.

19     Q.     A second ago you mentioned that

20   this process has resulted in the intimidation

21   of a lot of voters.

22          Can you elaborate on what you

Page 153

1    meant by that?

2         A.    I'm talking about the lawsuits

3    from Fair Fight as well as the lawsuits

4    against the county from -- what's the other

5    organization?  I forget the name of the other

6    organization, but I think your firm

7    represents them as well.

8         Q.    But am I correct to understand

9    you intend to continue running the similar

10   calculations to what you've been doing?  And

11   if you receive similar results, you would

12   support similar challenges in the future?

13        A.    If necessary, I would say that

14   there's a likelihood that I will continue to

15   participate in election integrity efforts

16   along these lines.  With that said, as I said

17   before, I would hope that our state will take

18   action to help address this problem.

19              One obvious solution is for the

20   Secretary of State to proactively run the

21   same analysis that I did ahead of an

22   election, identify voters with potential

Page 154

1    residency issues, and then advocate, as he

2    always does, for voters to jump online, take

3    a few minutes and update their registration

4    and make sure that it's current so that they

5    can vote.  They can vote lawfully, and they

6    can vote for the people who actually

7    represent them.

8              I don't see a conflict with the

9    NVRA over that.  Again, I'm not a lawyer, but

10   advocating that they keep their own

11   registration information current I don't

12   think violates the NVRA.

13             In fact, in the NVRA itself,

14   when a Secretary of State is performing their

15   own routine list maintenance and they

16   encounter a voter who has changed

17   jurisdictions -- which, in our case, is a

18   county or municipality -- they're actually

19   required to tell that voter what they need to

20   do to update the registration.

21             So I don't see any inherent

22   conflict in addressing these issues

Page 155

1    proactively.  And I would advocate that we

2    do.

3                  While we may be able to

4    discover how many people voted illegally,

5    I don't think we'll ever know how many people

6    would have voted if they didn't have to break

7    the law to do it.

8                  So I'm in favor of -- all the

9    110,000 or so that may have had these issues,

10   I'm in favor of them all correcting those

11   issues ahead of an election, having their

12   current addresses on file, and voting

13   lawfully.

14                  MR. SHELLY:  I appreciate your

15        time, Mr. Davis.  That's all I have

16        for you this morning.

17                  THE DEPONENT:  Okay.

18                  MR. SHELLY:  Ms. Siebert, any

19        from you?

20                  MS. SIEBERT:  Yeah, I have some

21        follow-ups.

22

Page 156

```
 1                     EXAMINATION

 2   BY MS. SIEBERT:

 3        Q.    Mr. Davis, you had said lots of

 4   voters are intimidated.  And Mr. Shelly asked

 5   you a follow-up question on that.

 6               When you -- in that sentence,

 7   when you said "lots of voters were

 8   intimidated," were you referring to the

 9   voters who were challenged or the voters who

10   submitted challenges?

11        A.    I'm talking about the voters

12   who submitted challenges or perhaps would

13   have.

14               You know, when a law firm with

15   tens of millions of dollars behind them comes

16   after an individual, it is intimidating.

17   And, you know, when a county gets the message

18   loud and clear that if they accept a

19   challenge, they may also become a target,

20   I do think that is intimidating.

21               And I do think that is a --

22   does have a major chilling effect on our
```

Page 157

1   First Amendment right to petition our

2   government for the redress of grievances as

3   -229 and -230 are intended to permit under

4   state law.

5        Q.     Thank you.

6               Was your data that you

7   compiled/used used in any challenge in which

8   True the Vote was involved in?

9        A.     As far as I'm aware, no, there

10  was no overlap.  You were either going to

11  file a True the Vote challenge or you were

12  going to file somebody else's challenge.  And

13  there were a lot of different challenges in

14  this election.  Some were filed individually,

15  some were filed collectively.

16              I'm not aware of every

17  challenge that was filed in Georgia or who

18  was behind it or who the players were or any

19  of that kind of stuff.  But, no, I do not

20  believe that any of my data was filed to

21  challenge in any county on behalf of True the

22  Vote.  That would have been their own.

Page 158

1          Q.     Okay.  What is your

2    understanding -- and I understand you've

3    testified you're not an attorney, but what is

4    your understanding of the challenge process

5    under Section 230 in Georgia?

6          A.     I'd have to go back and review

7    the statute to really get into it, but, in

8    general, my understanding is that a county

9    can consider whether or not they wish to

10   accept the challenge.  And then there's

11   procedures set forth for how they go about

12   conducting an investigation into the

13   challenge and contacting voters to verify

14   residency and so on, so forth.

15               And I believe -- if I'm not

16   mistaken, I believe the recent law may have

17   changed that a little.  I'd have to go back

18   and read it and make sure that I'm current on

19   what it was and what it is.

20         Q.     Is it your understanding if I

21   turn up on a challenge list in Gwinnett

22   County, does that mean I'm not allowed to

Page 159

1    vote?

2        A.       No, it does not.

3                 My understanding is it just

4    means increased scrutiny as to whether or not

5    you're truly eligible.

6                 You know, despite the rhetoric

7    out there, a -230 challenge is not a

8    challenge to a voter's ability to be on the

9    rolls; it's a challenge to their

10   qualifications to vote in a particular

11   election.

12                And, you know, there's a clear

13   distinction there.  And there's a reason that

14   there's two completely different statutes,

15   and there's a reason people specifically said

16   21-2-230 as grounds for a challenge rather

17   than citing 21-2-229.

18                Now, I'm not saying nobody

19   submitted any -229 challenges.  But as far

20   as I'm aware, True the Vote relied on

21   21-230 [sic], and so did many of the other

22   challenges.

Page 160

1                    Could there be one under -229

2     somewhere out there by somebody?  I don't

3     know.

4          Q.    So what's your understanding of

5     what happens when a challenged voter, under

6     Section 230 -- let's just assume that.  When

7     a Section 230 challenged voter shows up to

8     vote or sends back an absentee ballot, what

9     happens?

10         A.    Well, I think there's a field

11    in the -- in E-Net or ElectioNet that flags a

12    voter that may have been challenged.

13                   As far as the specifics,

14    I believe that they are contacted and

15    interviewed before they cast the ballot,

16    rather than after they've cast the ballot.

17    In fact, I believe once they've already cast

18    the ballot, it's too late to challenge them.

19                   I may have that wrong, but

20    that's my understanding.

21         Q.    Thank you.

22                   If a Section 230-challenged

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 161

1    voter shows up to vote at a county board of

2    election location and they've been

3    challenged, are they allowed to cast a vote?

4    Are they allowed to cast what's known as a

5    provisional ballot?

6               What's your understanding of

7    that?

8         A.    Let me get you to repeat that.

9         Q.    Yeah.  Sorry.  I had a lot of

10   comments there.

11              If a Section 230-challenged

12   voter shows up to vote at a county

13   election -- board of election, are they

14   allowed to cast a ballot?  Is the ballot

15   provisional?

16              What is your understanding of

17   that?

18        A.    Well, if the county turned down

19   the challenge, I don't see anything

20   preventing them from voting.  If the county

21   accepted the challenge, again, if they've

22   already cast a ballot, then it's too late.

Page 162

```
1                   But if they have not and the
2       challenge can be conducted before they have,
3       then I guess it would depend on the outcome
4       of the county's review of the challenge for
5       that particular voter and what information
6       they learn from the voter.
7                   If the voter says, you know,
8       I'm a soldier.  I've been away on a tour of
9       duty, or I'm a student, I still live at that
10      address, I'm just temporarily out of the
11      state or out of the county or what have you,
12      then I would assume the county would permit
13      them to vote, as they should.
14                  But if the person says, Well,
15      yeah, I did move to California or I did move
16      to New Jersey or, you know, I did move from
17      Cobb County the middle of last year, then
18      I would assume they would inform them that
19      they can only vote via provisional ballot.
20          Q.     What's your understanding of
21      what a provisional ballot is and how that is
22      counted or not counted within the whole
```

Page 163

1    process of voting?

2         A.     I believe they're done for a

3    variety of reasons, but my understanding is

4    they occur when a voter believes they have

5    the qualifications to cast a ballot, and the

6    county has concerns that they may not.

7              And so a provisional ballot is

8    recorded in case some judge somewhere rules

9    that they are, in fact, able to cast that

10   ballot.

11             I'll end there.

12        Q.     Okay.  So if somebody casts a

13   provisional ballot, does that mean that their

14   vote doesn't -- automatically does not count?

15        A.     No.

16        Q.     Okay.

17        A.     In fact, in 2018, in the

18   Democrat Party versus Crittenden, I think

19   there was an argument made that statewide

20   provisional ballots should have been counted.

21   There were several thousand of them.

22             And I believe the federal judge

Page 164

1    that heard that ruled that he wasn't going to

2    overrule the county's decision on those.

3              And they were cast with

4    apparent residency issues similar to this.

5    And I believe he did not allow those ballots

6    to be counted in the governor's race.

7         Q.    Okay.  But that went through a

8    process.  That wasn't an automatic, that as

9    soon as they cast the --

10        A.    Right.

11        Q.    -- provisional ballot, it just

12   didn't count --

13        A.    Right.

14        Q.    -- there was a process after

15   that.

16             Okay.  All right.

17             Do you know if -- when

18   challenges are submitted in any particular

19   county, do those challenge lists become

20   public -- does the county publish those

21   challenge voter lists?

22        A.    My understanding is that they

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 165

1   would be subject to an open records request,

2   but it would be the county providing them, as

3   such.

4              I'm not aware of challengers

5   who put them out on the internet or published

6   them in a newspaper or, you know, anything

7   like that.  I don't see any real reason that

8   that needs to be done.

9        Q.    Okay.

10             When you're -- and I understand

11  earlier you testified that there was a

12  difference in the data analysis -- well, let

13  me ask it in the form of a question.

14             My understanding of your

15  earlier testimony is that, in general,

16  there's a difference between the data

17  analysis your company runs when you're doing

18  work for a campaign or for some sort of

19  marketing or mass mailing and the data

20  analysis it does on a voter integrity kind of

21  issue.

22        A.    Yes.

Page 166

1        Q.        Is that correct?

2        A.        Yes --

3        Q.        Okay.

4        A.        -- it's quite different.

5        Q.        Okay.  So thinking about within

6   that -- within that scope of the data

7   analysis that you have ever done in voter

8   integrity issues, so discounting campaign,

9   discounting any other kind of marketing or

10  mass mail data analysis that you've done, so

11  in the voter integrity data analysis that

12  you've done, have you ever done any data

13  analysis where you focused on any particular

14  demographic of the individuals?

15        A.        Well, it depends on how you

16  define the word "demographic."

17        Q.        Race, sex, things like that.

18        A.        No.

19        Q.        Okay.

20        A.        The analysis that I did for

21  challenges, there were Republicans that were

22  challenged, there were Democrats that were

Page 167

1    challenged.  There were people of all race,

2    male and female and I guess other or -- there

3    was no criteria by any of that stuff that

4    comes to mind that was used.

5                    I mean, at the end of the day,

6    a vote is either a lawful ballot or an

7    unlawful ballot, whether you're talking about

8    a Democrat or a Republican.

9         Q.     So in the voting integrity

10   analysis data that you've done, is it fair to

11   say that you are agnostic as far as race,

12   gender, sex, even political party?

13        A.     I deliberately avoided making

14   decisions along those lines.

15                   Now, subsequent to all of this,

16   my understanding is the Secretary of State's

17   office chose, on their own, to run some

18   background on voting histories of some of

19   these voters that were -- that they're

20   investigating.  But I didn't even want to

21   look.

22                   So what they came up with, what

Page 168

1    they showed, is that this was not a highly

2    partisan group of voters that were not --

3    there were -- there was some primary vote

4    history.

5                   And in some of these voters'

6    background, but compared to your average

7    general election voter, most of these folks

8    appeared to be low-interest voters or

9    less-involved voters, in terms of voting

10   every time in every election or in every

11   primary or what have you.

12        Q.    And, again, was that across the

13   spectrum of political party, race, gender,

14   all of that kind of thing, or --

15        A.    Based on what the Secretary of

16   State's office saw, I recall seeing some

17   primary vote history.  I don't recall seeing

18   them do any kind of racial breakdown on it.

19   That's something that I can do.  It's

20   something that I haven't done, but, you know,

21   I do obviously have the data to be able to do

22   that.

Page 169

1                   But as far as challenges go,

2      there was no racial motivation here.  Blue

3      counties and red counties weren't treated

4      differently.  There was no -- none of that

5      going on.

6           Q.    I'm just thinking for a second

7      to see if I have any other follow-ups on

8      that.

9                   (Pause.)

10                  How is it possible, in Georgia,

11     to do any kind of -- whether it be an

12     advanced or -- would it be possible in

13     Georgia to do some sort of data analysis on

14     the basis of race compared to other rolls?

15          A.    Yes.  There are categories for

16     race on the voter database.  There's

17     African-American voters, there's white

18     voters, there's other.  I believe Native

19     Americans.  There's a number of different

20     categories, so it would be possible to do a

21     study of these voters by race.

22                  I would not expect the numbers

Page 170

1    there to be considerably out of whack with

2    the general population's numbers.  But,

3    again, I haven't done that so I couldn't tell

4    you.

5         Q.     Do you understand -- does

6    every -- do you know, do other states track

7    voter data connected with race in things like

8    that or not?

9              In other words, if I live in

10   Ohio -- I don't even know, honestly.  I live

11   in Ohio.

12        A.     Yeah, I really have not worked

13   with much voter data outside of Georgia.

14        Q.     Okay.

15        A.     I believe that I did do a

16   little work in North and South Carolina at

17   one point, and I don't recall what was or

18   wasn't on their database.

19              I know that, you know, some

20   states manage things fairly similarly and

21   others very differently.  So, I mean, at the

22   end of the day, they all have to be in

10/4/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark Davis

Page 171

1    compliance with the NVRA.  But other than

2    that, I have not worked with a lot of voter

3    data outside of our own state.

4          Q.     That's fair.  That's fair.

5                 To your knowledge or your

6    understanding, when somebody does -- an

7    individual decides to make a Section 230

8    challenge in their county, is the process

9    that they would -- that that individual would

10   then go knock on somebody's door and say,

11   Hey, I don't think you're eligible to vote in

12   Gwinnett County?

13         A.     No.  I see no reason to do

14   that.

15         Q.     Okay.

16         A.     In fact, I would -- if I were

17   asked about it, I would encourage people to

18   avoid any kind of contact with these voters

19   unless it's done by an elected official or a

20   county official or someone conducting an

21   official investigation.

22                As an example, I would hope

Page 172

1    that the investigation the Secretary of State

2    is doing now, you know, I hope there are

3    investigators asking people where they lived

4    on what date and trying to establish, you

5    know, how many violations of law did occur.

6                    And it's not that I'm

7    particularly interested in pursuing these

8    people, but what I am interested in is

9    establishing the magnitude of the problem so

10   that there is motivation, hopefully

11   bipartisan motivation, to take steps to

12   correct this.

13                    I would hope both parties and

14   every interested voter would have an interest

15   in making sure people are voting in the

16   districts that they belong in.

17        Q.    Do you know of anything -- any

18   instance outside of election officials or

19   some sort of official investigation that may

20   or may not have happened, do you know of any

21   instances in which a challenger personally

22   contacted a person that was being challenged

Page 173

1    and tried to do their own ad hoc

2    investigation outside of those challenges?

3         A.     Not that I'm aware of, no.

4         Q.     Okay.  Anywhere in Georgia, is

5    that what your testimony is?

6         A.     I'm not aware of anybody

7    contacting individual voters and doing

8    anything like that.  That's not their job.

9         Q.     Okay.  All right.

10             MS. SIEBERT:  I think that's

11        all the follow-up I have at this

12        point.

13             MR. SHELLY:  I don't have

14        anything further.

15             THE DEPONENT:  Okay.

16             THE VIDEOGRAPHER:  Okay.  Going

17        forward.  The time is 12:21 p.m.  Off

18        the record.

19             (Recess:  12:21 p.m. EDT)

20                   -  -  -

21

22

Page 174

```
 1                    CERTIFICATE
 2           I, LISA A. KNIGHT, Registered
    Diplomate Reporter and Certified Realtime
 3  Reporter, do hereby certify that prior to the
    commencement of the examination, MARK DAVIS
 4  was duly sworn by me to testify to the truth,
    the whole truth, and nothing but the truth.
 5           I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
 6  testimony as taken stenographically by and
    before me at the time, place, and on the date
 7  hereinbefore set forth, to the best of my
    ability, and that reading and signing was not
 8  requested.
             I DO FURTHER CERTIFY that I am
 9  neither a relative nor employee nor attorney
    nor counsel of any of the parties to this
10  action, and that I am neither a relative nor
    employee of such attorney or counsel, and
11  that I am not financially interested in the
    action.
12
13
14
15  _____
16  LISA A. KNIGHT
17  NCRA Registered Diplomate Reporter
18  NCRA Certified Realtime Reporter
19  NCRA Certified LiveNote Reporter
20  NCRA Realtime Systems Administrator
21  Dated:  October 8, 2021
22
```

Page 175

1       Mark Davis, c/o

        THE BOPP LAW FIRM

2       1 South Sixth Street

        Terre Haute, Indiana  47807-3510

3

4       Case: Fair Fight, Inc. et al. v. True the Vote, et al.

        Date of deposition: October 4 2021

5       Deponent: Mark Davis

6

7       Please be advised that the transcript in the above

8       referenced matter is now complete and ready for signature.

9       The deponent may come to this office to sign the transcript,

10      a copy may be purchased for the witness to review and sign,

11      or the deponent and/or counsel may waive the option of

12      signing. Please advise us of the option selected.

13      Please forward the errata sheet and the original signed

14      signature page to counsel noticing the deposition, noting the

15      applicable time period allowed for such by the governing

        Rules of Procedure. If you have any questions, please do

16      not hesitate to call our office at (202)-232-0646.

17

18

19      Sincerely,

        Digital Evidence Group

20      Copyright 2021 Digital Evidence Group

21      Copying is forbidden, including electronically, absent

22      express written consent.

Page 176

1          Digital Evidence Group, L.L.C.
           1730 M Street, NW, Suite 812
2          Washington, D.C. 20036
           (202) 232-0646
3
4          SIGNATURE PAGE
           Case: Fair Fight, Inc. et al. v. True the Vote, et al.
5          Witness Name: Mark Davis
           Deposition Date: October 4, 2021
6
7          I do hereby acknowledge that I have read
           and examined the foregoing pages
8          of the transcript of my deposition and that:
9
10         (Check appropriate box):
           (  ) The same is a true, correct and
11         complete transcription of the answers given by
           me to the questions therein recorded.
12         (  ) Except for the changes noted in the
           attached Errata Sheet, the same is a true,
13         correct and complete transcription of the
           answers given by me to the questions therein
14         recorded.
15
16
17
18         _____          _____
19           DATE                     WITNESS SIGNATURE
20
21         _____          _____
22           DATE                          NOTARY

Page 177

1          Digital Evidence Group, LLC

2          1730 M Street, NW, Suite 812

3          Washington, D.C.  20036

4          (202)232-0646

5

6                            ERRATA SHEET

7

8          Case: Fair Fight, Inc. et al. v. True the Vote, et al.

9          Witness Name: Mark Davis

10         Deposition Date: October 4, 2021

11         Page No.    Line No.      Change

12

13

14

15

16

17

18

19

20

21    _____        _____

22         Signature                                Date