Case 2:20-cv-00302-SCJ   Document 162-1   Filed 05/17/22   Page 1 of 163

10/6/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville
                        Confidential - Pursuant to Protective Order

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

------------------------------------x
FAIR FIGHT, INC.,
SCOTT BERSON,
JOCELYN HEREDIA,
and JANE DOE,
                Plaintiffs,


            v.
TRUE THE VOTE,
CATHERINE ENGELBRECHT,
DEREK SOMERVILLE,
MARK DAVIS,
MARK WILLIAMS,
RON JOHNSON,
JAMES COOPER,
and JOHN DOES 1-10,
                Defendants,
FAIR FIGHT ACTION, INC.,
                Counter-Defendant.
------------------------------------x
Case No. 2:20-CV-00302-SCJ
------------------------------------x


 *** CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER ***
                REMOTE DEPOSITION OF
                  DEREK SOMERVILLE
                Wednesday, October 6, 2021

_____
                DIGITAL EVIDENCE GROUP
                1730 M Street, NW, Suite 812
                Washington, D.C. 20036
                  (202) 232-0646

Page 2

1                      October 6, 2021

2                           9:17 a.m. Eastern Daylight Time

3

4             Remote video deposition of DEREK

5     SOMERVILLE, taken by Plaintiffs, pursuant to

6     Notice, dated September 23, 2021, before Brandon

7     Rainoff, a Federal Certified Realtime Reporter

8     and Notary Public of the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

```
 1   A P P E A R A N C E S:
 2   ELIAS LAW GROUP LLP
 3   Attorneys for Plaintiffs
             10 G Street, Northeast
 4           Suite 600
             Washington, D.C.  20002
 5           202.968.4490
     BY:   CHRISTINA A. FORD, ESQ.
 6           202.968.4558
             cford@elias.law
 7           JOEL J. RAMIREZ, ESQ.
             202.968.4499
 8           jramirez@elias.law
 9
10   LAWRENCE & BUNDY LLC
     Attorneys for Plaintiffs
11           1180 West Peachtree Street Northwest
             Suite 1650
12           Atlanta, Georgia  30309
             404.400.3350
13   BY:   MICHELLE L. McCLAFFERTY, ESQ.
             404.400.1755
14           michelle.mcclafferty@lawrencebundy.com
15
16   THE BOPP LAW FIRM, PC
     Attorneys for Defendants
17           1 South Sixth Street
             Terre Haute, Indiana 47807-3510
18           812.232.2434
     BY:   COURTNEY KRAMER, ESQ.
19           ckramer@bopplaw.com
20
21   ALSO PRESENT:
     ALICIA HOLMSTOCK, Legal Videographer
22   ALEX RENNICK, Digital Document Technician
```

Page 4

1    I N D E X   O F   E X A M I N A T I O N

2    Witness:

3    Derek Somerville

4

5    Examination:

6    By Ms. Ford..........................Page 9

7

8          I N D E X   O F   E X H I B I T S

9     Exhibit A ...............................Page 13

     Four-page document entitled: Plaintiffs Notice to

10   Take the Deposition of Defendant Derek Somerville,

     dated September 23, 2021 (no Bates Nos.)

11

12    Exhibit B ...............................Page 35

     Document Bates stamped Def. Somerville 0004,

13   single-page SMS message From: Catherine Englebrecht,

     To: Derek Somerville, Date: December 17, 2020

14

15    Exhibit D ...............................Page 41

     Multipage document bearing heading on first page:

16   Derek Somerville (no Bates Nos.)

17

18    Exhibit C ...............................Page 62

     Three-page email chain, top email From: Derek

19   Somerville, To: Catherine Engelbrecht, Subject: RE:

     FW: Elector Challenge Follow-Up Items, Sent: December

20   19, 2020 (no Bates Nos.)

21

22

Page 5

```
 1        I N D E X   O F   E X H I B I T S, CON'T

 2     Exhibit E ................................Page 94
       Three-page document entitled: True The Vote Partners
 3     With Georgians in Every County to Preemptively
       Challenge 364,541 Potentially Ineligible Voters (no
 4     Bates Nos.)

 5

 6     Exhibit F ................................Page 115
       Single-page email From: Catherine Engelbrecht, To:
 7     Amy Holsworth, Subject: Citizen Challenge Q&A Zoom
       call Sunday night at 6p et, Sent: December 19, 2020
 8     (no Bates No.)

 9

10     Exhibit I ................................Page 125
       Single-page document bearing heading: Jim Flenniken
11     (no Bates No.)

12

13     Exhibit G ................................Page 138
       Multipage document entitled: Defendant Derek
14     Somerville's Responses to Plaintiffs' First
       Interrogatories, dated March 15, 2021 (no Bates Nos.)

15

16     Exhibit J ................................Page 145
       Multipage document entitled: Defendant Derek
17     Somerville's Responses to Plaintiffs' First Requests
       for Production, dated March 15, 2021 (no Bates Nos.)

18

19     Exhibit L ................................Page 149
       Two-page document entitled: True The Vote Launches
20     Georgia Election Integrity Hotline as Part of the
       Most Comprehensive Ballot Security Effort in Georgia
21     History, dated December 15, 2020 (no Bates Nos.)

22
```

Page 6

1          I N D E X   O F   E X H I B I T S, CON'T

2     Exhibit M ...............................Page 151

    Three-page document entitled: True The Vote Launches

3    "Validate the Vote" Initiative and Whistleblower Fund

    to Ensure Election Validity, Process Integrity, dated

4    November 6, 2020 (no Bates Nos.)

5

6     Exhibit K ...............................Page 152

    Single-page document bearing heading: Derek

7    Somerville, dated November 15, 2020 (no Bates No.)

8

9

10              (All exhibits were provided

11          electronically to the reporter.)

12

13

14

15

16

17

18

19

20

21

22

Page 7

1                    *     *     *

2                P R O C E E D I N G

3              Wednesday, October 6, 2021

4                 Remote Deposition

5          9:17 a.m. Eastern Daylight Time

6                    *     *     *

7              THE VIDEOGRAPHER:  We are now on the

8     record.  This is tape No. 1 of the videotape

9     deposition of Derek Somerville, in the matter of

10    Fair Fight, Inc., et al., plaintiffs v. True The

11    Vote, et al., defendants, and Fair Fight Action,

12    Inc., counter-defendant, in the United States

13    District Court for the Northern District of

14    Georgia, Gainesville Division, Case No.

15    2:20-CV-00302-SCJ.

16              This deposition is being held remotely

17    by Zoom conferencing.  Video recording is in

18    Olympia, Washington, on October 6, 2021.

19              The time on the video screen is 9:17

20    Eastern Time.

21              My name is Alicia Holmstock.  I am the

22    legal videographer from Digital Evidence Group.

Page 8

1    The court reporter is Brad Rainoff, in

2    association with Digital Evidence Group.

3              All parties to this deposition are

4    appearing remotely and have agreed to the

5    witness being sworn in remotely unless an

6    objection is stated to this agreement.

7              Due to the nature of remote reporting,

8    please pause briefly before speaking to ensure

9    all parties are heard completely.

10             Will counsel please introduce

11   themselves and who they represent for the

12   record?

13             MS. FORD:  My name is Christina Ford.

14   I represent the plaintiffs, and I'm here from

15   Elias Law Group.

16             MS. KRAMER:  Courtney Kramer with Bopp

17   Law firm representing the defendants.

18             MS. McCLAFERTY:  This is Michelle

19   McClafferty with Lawrence Bundy, also on behalf

20   of plaintiffs.

21             MR. RAMIREZ:  This is Joel Ramirez

22   with the Elias Law Group on behalf of

Page 9

1    plaintiffs.

2              THE VIDEOGRAPHER:  Will the court

3    reporter please swear in the witness?

4    DEREK SOMERVILLE,

5              having been duly sworn, was examined and

6              testified as follows:

7    EXAMINATION

8    BY MS. FORD:

9         Q.    Good morning, Mr. Somerville.  Thank

10   you for being here today.  My name is Christina,

11   Christina Ford, and I represent the plaintiffs

12   in this case.

13              Will you please state your home

14   address for the record?

15        A.    5130 Saddlebred Lane, Cumming,

16   Georgia, 30028.

17        Q.    Right.

18              And where are you located today?

19        A.    I'm located in Roswell, Georgia.

20        Q.    Okay.

21              Just generally, what location are you

22   in today?

Page 10

```
 1                 Is it a law firm?

 2        A.     I'm in the offices of my counsel at

 3     821 Atlanta, Roswell, Georgia.

 4        Q.     Thank you.

 5                 Mr. Somerville, I just want to go over

 6     a couple ground rules for this deposition,

 7     particularly because we are appearing remotely,

 8     so that we all have the same understanding.

 9                 If at any point you do not understand

10     a question I'm asking, will you please let me

11     know?  And then I will do my best to rephrase or

12     clarify the question.

13                 Does that sound good?

14        A.     It does.

15        Q.     At any time you would like to take a

16     break, please let me know.  I'll try to find a

17     good stopping point.

18                 The only thing I would ask is if we

19     are in the middle of a line of questioning, that

20     we resolve that line before taking a break.

21                 Will you let me know if you need or

22     want a break?
```

Page 11

1       A.      Understood.

2       Q.      Today as you know, the court reporter

3   is recording the questions and answers.  But the

4   reporter can only take down verbal answers, so

5   please answer with an audible "yes" or "no."

6               Does that sound good?

7       A.      Yes.

8       Q.      Great.

9               Finally, as the court reporter

10  mentioned, please wait until I finish asking my

11  question before you begin answering; and I will

12  do my very best to let you finish so that we are

13  not talking over each other.

14              Does that sound good?

15      A.      Yes.

16              MS. KRAMER:  Counsel, I hate to

17  interrupt, but do we mind taking the exhibit

18  screen off until we need them? -- until we use

19  them?

20              MS. FORD:  That's fine with me.

21              MS. KRAMER:  Okay.  Perfect.

22              MS. FORD:  Okay.  Great.

Page 12

1    BY MS. FORD:

2         Q.    Mr. Somerville, you said you are

3    viewing this deposition by laptop today?

4         A.    Yes.

5         Q.    Do you have any documents with you in

6    the room? -- either hard copies or electronic?

7         A.    I do not.

8         Q.    Is anyone else in the room with you

9    other than Ms. Kramer?

10        A.    There is not.

11        Q.    Just because I am obviously not

12   present with you today, I cannot tell what you

13   have in front of you or if anyone else enters

14   the room.

15             Do you agree do let me know if anyone

16   else enters today?

17        A.    Yes.

18        Q.    Okay.  Great.

19             Do you agree to let me know if you put

20   any other -- any documents in front of you? --

21   either hard copy or electronic?

22        A.    Yes.

Page 13

1        Q.    All right.  Two last points here.

2              Do you understand it would not be

3     appropriate for your attorney or anyone else to

4     tell you how to answer a particular question

5     that I ask today?

6        A.    Yes.

7        Q.    Do you agree that while you are

8     testifying today, you will not exchange

9     communications -- whether in-person or

10    electronic -- about how to answer questions

11    asked?

12       A.    Yes.

13       Q.    Great.

14             MS. FORD:  Could we please put up

15    Exhibit A and mark it as Exhibit A?

16             (Exhibit A, Four-page document

17    entitled: Plaintiffs Notice to Take the

18    Deposition of Defendant Derek Somerville, dated

19    September 23, 2021 (no Bates Nos.), marked for

20    identification)

21             (Pause)

22

Page 14

1    BY MS. FORD:

2         Q.    Mr. Somerville, this is just the

3    notice of deposition for today's deposition.

4              Do you recognize this document?

5         A.    Yes.

6         Q.    Great.

7              Are you prepared to testify today?

8         A.    Yes.

9              MS. FORD:  We can take this down.

10   BY MS. FORD:

11        Q.    Mr. Somerville, just some brief

12   background about yourself.

13             Where do you live in Georgia?

14        A.    At the address I provided earlier,

15   5130 Saddlebred Lane.

16        Q.    What county is that in?

17        A.    Fulton County.

18        Q.    Okay.

19             How long have you lived there?

20        A.    Roughly nine years.

21        Q.    Before that, did you also live in

22   Georgia?

Page 15

1        A.     Yes.

2        Q.     Could you please describe your

3    educational background in general terms?

4        A.     I have a Bachelor's degree.

5        Q.     What is the Bachelor's degree in?

6        A.     Political science.

7        Q.     What do you do for a living?

8        A.     I'm the CEO of an energy and utility

9    consulting firm.

10       Q.     What generally do you do in that role?

11       A.     Generally speaking, it's the strategic

12   leadership of my organization.

13       Q.     Can you speak a little bit more about

14   what your organization does?

15       A.     We provide consulting services to the

16   energy and utility industry, specifically with

17   the technology that is used in that industry.

18   And that occurs across a number of functions

19   within a utility company.

20              So broadly speaking, we are a

21   technology firm that specializes in energy and

22   utility clients.

10/6/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville
Confidential - Pursuant to Protective Order

Page 16

1          Q.     Have you ever worked in election

2     administration?

3          A.     No.

4          Q.     How did you first come to learn about

5     True The Vote, the organization?

6          A.     I was unfamiliar with True The Vote

7     leading up to this past election.

8               And I don't recall the first time that

9     I learned about them.  I don't recall the first

10    time that I learned about them, but I was

11    unfamiliar with them up until -- until this

12    election.

13         Q.     Okay.

14               And by "this election" -- just to

15    clarify -- you mean the 2020 general election --

16         A.     Correct.

17         Q.     -- or the -- okay.

18               What was your impression of the

19    organization when you learned about them?

20         A.     I don't recall forming an impression

21    of them as the -- I don't recall forming an

22    impression about them.

Page 17

1              There was an awful lot of activity at

2       that time and my learning of them was pretty

3       unremarkable.

4          Q.    So before, say, October, November,

5       2020, you hadn't spoken with anyone affiliated

6       with True The Vote, at least to your knowledge?

7          A.    Not to my knowledge.

8          Q.    Okay.

9              How were you first connected then to

10      True The Vote around this time, around the

11      general election?

12         A.    My recollection is I was introduced to

13      them by Ron Johnson.

14         Q.    Who is Ron Johnson?

15         A.    Ron Johnson is a friend of mine from

16      north Georgia, and involved in the general

17      political arena in north Georgia.

18         Q.    Why did he make that connection?

19         A.    I can't speak to Ron's motivations.  I

20      believe that he was simply making the

21      introduction because -- I honestly don't know

22      why Ron made the introduction.

Page 18

```
 1          Q.    Okay.

 2                Well, when you were connected with

 3     True The Vote, who did you speak with?

 4          A.    I first spoke with Catherine

 5     Engelbrecht -- I believe is how you pronounce

 6     it.

 7          Q.    And what did you discuss that first

 8     time?

 9          A.    Catherine -- and forgive me, I'm

10     trying to recall it.  Again, these were pretty

11     unremarkable exchanges.

12                But Catherine advised that they were

13     involved in election integrity work in the

14     state, and we had conversations regarding --

15     vaguely regarding the same.

16          Q.    Okay.

17                Around -- when was this?

18          A.    I'm not very good with dates.  I know

19     I provided this in my response to

20     interrogatories.  And those would be accurate --

21          Q.    Okay.  Well, I can go off those, if

22     that's helpful.
```

Page 19

1        A.     Yeah, they would be accurate.  I

2    apologize.  I just -- again, these were very

3    brief encounters, you know, almost a year ago.

4        Q.     Sure.

5               So you mentioned you attended a dinner

6    with Catherine Engelbrecht and Gregg Phillips on

7    December 15.

8               Was that the first time you had met

9    either of them?

10       A.     Yes.

11       Q.     Where was that dinner?

12       A.     It was in -- again, forgive me.

13              It was at a restaurant closer in to

14   downtown.  I live about 45 minutes north of

15   Atlanta, so I'm not terribly familiar with the

16   restaurants down there, so I don't recall the

17   name.  And frankly, I don't remember the exact

18   location --

19       Q.     Okay --

20       A.     -- it was closer to the Atlanta area.

21       Q.     Was anyone else in attendance at that

22   dinner?

Page 20

```
 1          A.     No, ma'am.

 2          Q.     So just you, Catherine, and Gregg?

 3          A.     Myself, Catherine, and Gregg.

 4          Q.     What was the purpose of that dinner?

 5          A.     That wasn't immediately evident to me.

 6                 They invited me and I thought that was

 7    polite.  I assumed the reason they invited me is

 8    I have some level of involvement in local

 9    politics in north Georgia.  And based on the

10    evening, my assumption is that they were trying

11    to get a better understanding of the political

12    environment in Georgia, of which I have

13    opinions.

14          Q.     Okay.

15                 Did you discuss anything other than

16    the general political environment?

17          A.     Not with any measure of specificity.

18                 I was aware, of course, that they had

19    concerns about the election, but it was very

20    much a cordial first meeting.

21                 Bear in mind I had never spoken with

22    these people, other than the conversations that
```

Page 21

1   led to the invite for dinner.  I had very

2   limited knowledge whatsoever of who they are,

3   what they do, where they did it.  So it was very

4   much a introductory, almost like a business

5   meeting.

6       Q.    Okay, you said they mentioned they had

7   concerns about the election.

8             Can you elaborate on that?

9       A.    Not with a terrible degree of

10  specificity.

11            There was an awful lot of chatter at

12  that time about the election.  And there was an

13  awful lot of people expressing concerns,

14  certainly inside of the ecosystem that I live

15  in.

16            So I don't recall anything unique

17  about what they were sharing with me.  So

18  forgive me.  It all blends together.

19      Q.    Sure.

20            Well, let me ask a more specific

21  question, then.

22            Were the concerns generally either

Page 22

1    that the election results in Georgia maybe were

2    not accurate?

3         A.    I believe that would be the general

4    tone.

5         Q.    Or that some sort of fraud had

6    potentially occurred in the election?

7         A.    I don't recall a discussion of fraud.

8               I do recall the discussion of

9    irregularity.

10        Q.    Okay.  Thank you.

11              At that dinner, did you or anyone, I

12   would say, at the dinner discuss any plans to

13   file elector challenges in Georgia?

14        A.    I do recall discussion around

15   electoral challenges at that dinner.

16        Q.    What specifically did you discuss?

17        A.    I believe that was largely just it --

18   the subject line.

19              My recollection is that they had

20   intended to file some measure of challenges, but

21   the detail behind that, I don't have a

22   recollection of.

Page 23

```
 1                I do recall at the time that it was

 2      largely a significant effort.

 3                But, again, I had not met them up

 4      until that point, so I didn't have a terrible

 5      amount of understanding, frankly, of who exactly

 6      they were.  I just knew they were out of state.

 7         Q.    You mentioned they were out of the

 8      state.

 9                So were they seeking clarity from you

10      on how to file challenges?

11         A.    No.

12         Q.    So they were seeking from you maybe

13      more information about the general political

14      environment that you mentioned?

15         A.    I suspected as much.

16                And then in certain parts of the

17      state, I have some name recognition, so it's not

18      unusual for people to reach out to me and ask to

19      align with me in order to leverage some level of

20      that name recognition.

21         Q.    Okay.

22                Well, whether at that dinner or after
```

Page 24

1    that dinner, did you talk in more detail with

2    True The Vote about their plan to challenge

3    voters in Georgia?

4         A.    In a limited capacity, yes.

5         Q.    What is your best understanding of

6    what their general plan was?

7         A.    So I have no recollection of an actual

8    plan, other than I recall the scale of it was

9    large.

10        Q.    What do you mean by "the scale was

11   large"?

12        A.    As I recall, the number of challenges

13   that they had intended to issue was large.

14             Again, per my responses in the

15   interrogatories, I have never had any visibility

16   into how they compiled what they compiled, why

17   they compiled, the actual numbers, or strategy.

18             I just recall leaving that discussion

19   and either that evening or subsequently -- I

20   don't recall if it was that evening or

21   subsequent to that -- of the impression that it

22   was a very large effort they were undertaking.

Page 25

```
 1        Q.    Okay.

 2              Did the size of the scale surprise

 3    you?

 4        A.    Not within the context of the

 5    population.

 6              And by that, I mean with seven-plus

 7    million individuals in our voter rolls, it

 8    doesn't take a very significant degree of error

 9    to accumulate a large number.

10              So I don't -- I don't believe I was

11    surprised.

12              I just believe the impression that I

13    had was:  That's a large number.

14        Q.    Okay.

15              So it appeared to you to be a large

16    undertaking to accomplish.

17              Is that fair to say?

18        A.    That's my recollection.

19        Q.    Okay.

20              Did you convey that general impression

21    to True The Vote?

22        A.    I don't recall.
```

Page 26

1      Q.    What is your best understanding of

2    what True The Vote's goal was in filing these

3    challenges?

4      A.    My understanding -- which is somewhat

5    limited, as I was, as I have shared, very much

6    outside of the effort -- is that they were

7    seeking to highlight individuals who may have

8    been ineligible as a consequence of -- of a

9    move.

10     Q.    What do you mean by "highlight"?

11     A.    My understanding is they were bringing

12   attention to the fact that there were

13   individuals within our voter rolls, whether or

14   not they voted -- I have no idea what their

15   criteria was for highlighting or drawing

16   attention to those individuals -- that may not

17   have resided in the county in which they were

18   registered -- to vote.  I'm sorry.

19          (Pause)

20     Q.    When you heard about this general

21   plan, did you think that the challenges were a

22   good idea?

Page 27

1      A.     I don't believe I arrived at a good or

2    bad idea.

3            I did feel it was reasonable to try to

4    understand whether or not individuals

5    participated in the election that were

6    ineligible, whether or not they were aware of it

7    or not, given the unique consequences that

8    surrounded the election.

9            Whether it was a good or bad idea, I

10   don't -- I don't recall making such a judgment.

11     Q.     Did you ever make a general judgment

12   about whether it was reasonable to file

13   challenges against, say, 300,000 or 400,000

14   people?

15     A.     I don't believe I made any statements

16   to that effect to anybody.

17     Q.     Whether or not you made any

18   statements, have you arrived at a judgment now?

19     A.     My -- my personal perspective is that

20   that was a very broad effort.

21            I tend to deal in detail, and that was

22   a very broad -- broad, sweeping effort, in my

Page 28

1    estimation.

2            But, again, I'm not -- I don't know

3    what their motives were, and I don't know how

4    they arrived at those numbers.

5            It just felt to me like a very large

6    number.

7        Q.    Okay.

8            And when you say "very broad," from

9    your perspective, does that introduce the

10   possibility of error?

11       A.    I don't think that specifically

12   introduces the possibility of error.

13           I think the -- the sheer effort -- an

14   effort involving numbers of that magnitude, and

15   that what I would consider the mobility behind

16   those numbers -- meaning people do move, there

17   is a lot of variables at play -- I think it's an

18   imperfect science.

19           But I do think it's one that is

20   accurate enough to be pursued.

21           And I think --

22       Q.    And --

```
                                                      Page 29
 1        A.    -- and to -- to -- I'm sorry.  I

 2    didn't meaning to speak over you.

 3              And I think it can be pursued with a

 4    relative degree of accuracy.

 5        Q.    Were you asked to help with True The

 6    Vote's challenges in any way?

 7        A.    I was not.

 8        Q.    Did you volunteer to help in any way?

 9        A.    I did not.

10        Q.    You mentioned that you participated in

11    a call on December 16 with Mark Davis and Gregg

12    Phillips.

13              Is that correct?

14        A.    Yes.

15        Q.    Who proposed having that call?

16        A.    I don't recall.

17        Q.    What was the general purpose of the

18    call?

19        A.    An introduction between Mark and

20    Gregg.

21        Q.    Is it your understanding that was the

22    first time Mark and Gregg had met?
```

Page 30

1        A.    Yes.

2        Q.    And you were facilitating that

3    introduction?

4        A.    Yes.

5        Q.    So the title of that meeting was:

6    Elector challenge alignment.

7              Can you help me understand what was

8    meant by "alignment"?

9        A.    My understanding -- my recollection is

10   that, in my understanding -- because I have

11   not -- I have no way of validating this -- that

12   Mark Davis has been involved in voter data for

13   quite some time, potentially decades.

14             It was also my understanding that

15   Gregg -- and forgive me, I don't recall his last

16   name -- that Gregg also had a passion for data.

17             And so my understanding in that call

18   was to bring those two together -- excuse me --

19   so that they could discuss the nuances of the

20   data in our Georgia election files.

21       Q.    Okay. I just want to drill down that,

22   and make sure I understand here.

Page 31

1              So did "alignment" then mean alignment

2      of methodology? --

3          A.    No.

4          Q.    -- in compiling a list?

5          A.    No.

6          Q.    No?  Okay.

7              Did it mean alignment of the voters

8      who would appear on the list?

9          A.    No.

10         Q.    Did it mean alignment of the timing of

11     challenges?

12         A.    No.

13         Q.    Can you help me understand, then, more

14     of what you mean?

15         A.    It meant the alignment of the data

16     definitions and general election data universe

17     in Georgia.

18             So to give a little more definition

19     there, large datasets are unique.  And one data

20     field in one dataset in one state doesn't

21     necessarily mean the same thing as it means in

22     another state.

Page 32

1          So part of it was to bring the two

2     together so that they could have a technical

3     discussion between the two of them about data,

4     which is not my forte.

5          And the other was just me trying to

6     make introductions in two people that seemed to

7     be professionals in a similar space.

8     Q.    Okay.

9          I mean, at the time of this call, it

10    seems that True The Vote was already

11    contemplating doing their challenge effort, as

12    you mentioned.

13         Were you and Mark separately

14    considering a challenge effort?

15    A.    Mark and I were separately

16    investigating a similar -- similar matter --

17    right? -- similar scope in terms of the --

18    whether or not people had cast votes that were

19    ineligible.

20         But -- so you might want to restate

21    your question.

22         But, yes, Mark and I were absolutely

Page 33

1    investigating the data at that time independent

2    of True The Vote, independent of True The Vote's

3    data, independent of their people, their

4    resources -- completely independent of them.

5         Q.    Sure.

6               You say you were investigating.

7               At the time of this call, though, were

8    you both already contemplating that you might

9    file challenges?

10              Or help file challenges?

11        A.    We were considering our options, yes.

12        Q.    Okay.

13              And did you share that with True The

14   Vote?

15              Was that apparent to either True The

16   Vote or Gregg Phillips by the time of that call?

17        A.    I don't recall.

18        Q.    At any point in time, did you share

19   with True The Vote that you and Mark were

20   contemplating doing your own challenges?

21        A.    I don't recall the specifics of doing

22   so, but it's reasonable to assume that we would

Page 34

1    have discussed that.

2         Q.    Was anyone else on that call other

3    than you, Mark, and Gregg?

4         A.    No, ma'am.

5         Q.    Were any particular decisions made on

6    that call?

7         A.    None at all.  It was an introductory

8    discussion between two people that had never

9    met, and myself who had met Gregg the night

10   before.

11        Q.    So how did that call end?

12        A.    I don't recall any after action or

13   follow-up that resulted from that call.

14             My recollection is it was a nice

15   introduction; and two individuals with technical

16   backgrounds had a conversation that largely rose

17   beyond me.

18             MS. FORD:  Switching to a different

19   topic, can we please pull up Exhibit B and Mark

20   it as Exhibit B?

21

22

Page 35

1              (Exhibit B, Document Bates stamped

2      Def. Somerville 0004, single-page SMS message

3      From: Catherine Englebrecht, To: Derek

4      Somerville, Date: December 17, 2020, marked for

5      identification)

6              (Pause)

7    BY MS. FORD:

8        Q.    Mr. Somerville, are you able to read

9    this?

10       A.    Yes.

11       Q.    This appears to be a text from Ms.

12   Engelbrecht to you on December 17 about a

13   meeting that she had with the Georgia Secretary

14   of State office.

15            Do you recognize this?

16       A.    I do.

17       Q.    And prior to receiving this text, had

18   you discussed with Ms. Engelbrecht either she or

19   True The Vote in general meeting with the

20   Georgia Secretary of State's office?

21       A.    I do recall some conversation about

22   that.

Page 36

```
 1        Q.    Okay.

 2              Would that have maybe occurred at that

 3    dinner?

 4        A.    I don't recall.

 5        Q.    What is your understanding of what the

 6    purpose of that meeting was?

 7        A.    I don't recall that either.  I

 8    don't -- I don't recall what the purpose of that

 9    meeting would have been.  I don't believe that I

10    was ever -- it was ever shared with me what the

11    purpose of that meeting was.

12        Q.    Well, when you got this text, did you

13    understand what Ms. Engelbrecht was referring

14    to?

15        A.    Well, I think it was -- so I

16    understood that they had intended to meet with

17    the Secretary of State.

18              But I don't recall how that fit into

19    what their plans were, because I didn't

20    understand their plans at the time.

21              So I'm not entirely certain -- I think

22    she was keeping me aware of what they were doing
```

Page 37

1      in the state, but I don't recall -- I don't know

2      the Secretary of State, and so I don't know -- I

3      really don't recall why I was kept in the loop

4      on that.

5          Q.    So when Catherine writes here she "got

6      some guidance that is changing our process a

7      bit," what did you understand that to be a

8      reference to?

9          A.    I don't -- I understood it to be a

10     reference to their efforts in the state, but I

11     don't know specifically what she was referring

12     to.

13         Q.    Do you know what the guidance was that

14     she received from the Georgia Secretary of State

15     office?

16         A.    I do not.

17              (Pause)

18         Q.    And here Ms. Engelbrecht also

19     mentions:  The plan now is to send the release

20     probably late today along with the digital

21     files.

22              This release -- is that a press

Page 38

1    release to the public that she is referencing

2    here?

3        A.    I would assume that's what that means,

4    but I don't -- I don't know the general context

5    of that -- that statement.

6             But there was a press release drafted,

7    and that may be what she is referring to.

8        Q.    Okay.

9             Do you know what the digital files are

10   that she is referring to?

11            Is that a challenge list?

12            Or something else?

13       A.    I do not know.

14       Q.    Then finally, Ms. Engelbrecht

15   mentions:  As soon as I get to a stopping point,

16   I'll send you a release for your review.

17            Is that the a same press release you

18   just mentioned you thought it might be?

19       A.    Yeah -- within that context, that

20   would be the press release.

21       Q.    Why was she sending it to you?

22       A.    Because she intended to include myself

Page 39

1    and Mark's names in it.

2        Q.    Okay.

3              And did she send that to you?

4        A.    I believe she did.

5        Q.    Okay.

6              Did you --

7        A.    -- she did.  I'm sorry.  Yes, I

8    recall.  So she did, yes.

9        Q.    Okay.

10             Did you review it?

11       A.    I did.

12       Q.    Did you propose any changes to the

13   release?

14       A.    I did.

15       Q.    What were those changes?

16       A.    To my recollection -- is I encouraged

17   them to include Mark.

18             But beyond that -- and I don't recall

19   the other details other than how we were

20   characterized.

21             But I don't -- again, this was a long

22   time ago, so I don't recall the specifics of

Page 40

1    what I asked of her.

2        Q.    Then you would have sent it back to

3    her?

4        A.    Yes.

5        Q.    Did she respond to that at all?

6        A.    I don't recall.

7        Q.    Okay.

8             MS. FORD:  We can take this down.

9             Thank you.

10   BY MS. FORD:

11       Q.    Mr. Somerville, so what is your best

12   understanding of what was involved in developing

13   the challenge list that True The Vote submitted?

14       A.    I was never consulted on the

15   development of the list, so I have no

16   understanding of how it was developed, who

17   participated in it, or any other degree of that

18   list at all.  I have no knowledge of it.

19       Q.    Okay.

20             MS. FORD:  Can we pull up Exhibit D,

21   please, and Mark it with Exhibit D?

22

Page 41

```
 1                (Exhibit D, Multipage document bearing

 2       heading on first page: Derek Somerville (no

 3       Bates Nos.), marked for identification)

 4                (Pause)

 5    BY MS. FORD:

 6         Q.    Mr. Somerville, do you maintain a

 7       Facebook account?

 8         A.    I do.

 9         Q.    Is this your account?

10         A.    It appears so.

11         Q.    The Mark Davis that is tagged in this

12       post right here -- is that the same Mark Davis

13       that is your co-defendant in this case?

14         A.    Yes.

15                MS. FORD:  Can we scroll to page 2,

16       please?

17    BY MS. FORD:

18         Q.    So here on December 19, you shared an

19       article titled:  True The Vote Partners with

20       Georgians to Challenge Allegedly Ineligible

21       Voters.

22                Then you wrote in a comment to Sam
```

Page 42

1    Thomas:  I did not have visibility into the

2    details of True The Vote's challenge, only

3    collaborated on methodology.

4              Did you write this?

5         A.    I believe I did.

6         Q.    What do you mean by -- when you said

7    you "collaborated on methodology"?

8         A.    I don't recall.

9              The only collaboration that took place

10   is, again, the discussions that we had on data

11   definitions, or the general political arena.

12             So I don't -- I don't believe there is

13   a lot behind the term "methodology" in that

14   response.

15        Q.    Mr. Somerville, can you just help me

16   explain why you would say you collaborated on

17   methodology if today you are saying you didn't?

18        A.    Well, I think the methodology is the

19   data definitions that I just shared, and then

20   the general political arena inside the state of

21   Georgia.

22             Beyond that, there was absolutely no

Page 43

1    collaboration on their list, on how it was

2    compiled, on whether it was quality assured,

3    their numbers, how they delivered it, where they

4    delivered it.  There was no collaboration

5    whatsoever on any of that.

6        Q.    Okay.

7              Then just to go back to when you said

8    you shared information on general political

9    environment, what do you mean by that?

10       A.    As any general political discussion

11   would be, the state of our political

12   environment.

13             It was a very -- there is a lot of

14   activity going on at that time.  There was a lot

15   of passion around the election on all sides and

16   on countless topics.  It was a very complex

17   time.

18             So it was just a simple discussion of,

19   "Well, this is Georgia, and here is what I

20   believe is going on in Georgia" -- the kind of

21   conversation you would have with anybody that is

22   unfamiliar with your state and wants to talk

Page 44

1    about your state.

2        Q.    Did they say that to you? -- that they

3    were unfamiliar with Georgia?

4            Or was that just your impression?

5        A.    I don't remember their specific words.

6        Q.    All right.

7            So sitting here today, you are not

8    able to tell me anything more about True The

9    Vote's methodology in creating the list?

10       A.    No.

11           As I said before, they're -- literally

12    had no visibility into, knowledge of,

13    participation with any -- any stage of their

14    compiling their list, or what they did with it

15    afterwards.

16       Q.    Okay.

17           MS. FORD:  We can take this down.

18    Thank you.

19  BY MS. FORD:

20       Q.    So, then, separately from True The

21    Vote, you testified that you and Mark Davis at

22    least investigated and at least considered a

Page 45

1    separate set of elector challenges in advance of

2    the runoff election.

3            Did you decide to move forward on

4    that?

5        A.    We did.

6        Q.    When did you decide to do that?

7        A.    I don't recall.  Mark and I --

8        Q.    Was it -- sorry.  Please answer.

9        A.    Mark and I were looking at the impact

10   of address change on the database well before

11   True The Vote showed up in the state.

12       Q.    Did you decide to move forward around

13   this same time when you were meeting with True

14   The Vote in -- in mid-December?

15       A.    I don't recall a firm decision to move

16   forward, as you state it.

17       Q.    Okay.

18       A.    At the time, Mark and I were looking

19   at the data and trying to see what the data was

20   telling us.

21            That -- that was the extent of the

22   effort.

Page 46

```
 1          Q.    Okay.

 2                What was the data telling you?

 3          A.    That due to a confluence of issues --

 4    largely related to the pandemic, and a very

 5    large turnout in absentee voting, and a very --

 6    and 6.9 million mailers sent by the Secretary of

 7    State's office -- that it was highly probable

 8    that individuals voted in counties where they no

 9    longer resided -- is what the data suggested --

10          Q.    Okay.

11          A.    -- which I believe is not terribly

12    atypical in an election.

13          Q.    What were you hoping the challenges

14    would accomplish?

15                And here I mean your own, not True The

16    Vote's.

17          A.    Well, the effort in any such effort is

18    always about the integrity of the process.

19                So without any regard to political

20    affiliation, geography, any -- any metric on the

21    individual, the fundamental question is:  Was

22    there a flaw in the process that was exacerbated
```

Page 47

1    by circumstances surrounding the election?  And

2    did that, in turn, result in a number of votes

3    that may have been ineligible? -- regardless of

4    who cast them, regardless of where they were

5    cast, or regardless by whom.

6             There was no visibility on any of that

7    data.

8             It's just simply whether or not the

9    address on record with the Secretary of State

10   was inconsistent with the -- an address that the

11   individual may have been -- suggested they moved

12   to.

13            That was -- the only hope was to

14   identify whether or not there was a data

15   integrity issue.

16       Q.    Okay.

17            What did you hope that counties would

18   do with the challenges?

19       A.    Well, I would hope any challenge would

20   be received on its merit for the law, and would

21   be considered as it should be; that -- again, to

22   stress this -- there is no hope for an outcome.

Page 48

1                    The hope is that a process is

2          followed, by which we can help ensure the

3          integrity of the process.  It's about the data,

4          not the outcome.

5               Q.     Sure.

6                    Well, I'm sure -- or I assume -- that

7          you hoped something would happen when the

8          challenges were filed.

9                    And I'm trying to understand what --

10          regardless of outcome, what did you hope or

11          expect would happen when the challenges were

12          filed with each county?

13               A.     Well, I'm not aware of what was

14          necessarily filed all throughout the state.

15                    But, again, I guess my hope would be

16          that, if there was probable cause to believe

17          that a vote may have been cast in an ineligible

18          fashion -- which may very well happen

19          unbeknownst to the person who cast that vote --

20          that that would be looked into by the local

21          boards and remedied accordingly.

22                    There is no consideration for how that

Page 49

1    impacts the results of an election, or if it

2    would, for that matter.

3              It's a simple function of the state

4    law reads as it reads.  And it's incumbent upon

5    citizens to play an active role and ensure those

6    laws are upheld.

7              That's the motive.

8         Q.    Okay.

9              When you say you hoped the counties

10   would look into it, can you walk me through what

11   you mean by that?

12        A.    Well, I hope that's self-evident.

13             The boards of elections are

14   responsible for upholding the statutory process

15   for our elections.  And the hope is that all 159

16   counties in the state would do precisely that.

17             We have a law on our books that

18   permits a challenge of a voter's eligibility

19   based on very defined criteria, as I understand

20   it.  And individuals should exercise their

21   rights under the law.

22             That's the extent of the hope.  There

Page 50

1    is -- it wasn't an outcome-driven effort.

2        Q.    So Mr. Somerville, let me make plain

3    what I'm trying to get at.  Maybe that will help

4    us.

5            You know, these challenges are being

6    filed approximately two weeks before the runoff

7    election.

8            What I'm asking you is:  In about two

9    weeks with Christmas and New Year's, what did

10   you logistically expect would happen in those

11   two weeks, or be able to be accomplished in

12   those two weeks before the runoff to verify

13   residency?

14       A.    I understand your question.

15            I had no expectation.

16            Efforts such as these are based upon

17   the law and the merit of what you are proposing.

18            I have no idea why the government does

19   what the government does, the timeline it does

20   it under, how it would receive, if it would

21   receive.

22            And again, I understand your question.

Page 51

1            But I don't believe I had any

2     expectation of anything.

3            I was simply trying to, like many

4     people, to understand whether or not there were

5     anomalies within the election that had occurred.

6        Q.    Okay.

7            Just so that I understand, when you

8     say you had no expectation, do you mean you

9     had -- you did not expect the counties to

10    investigate the challenge?

11           Or do you mean --

12       A.    Well --

13       Q.    -- sorry.

14           Please explain what you mean.

15       A.    I didn't mean to interrupt.  I'm

16    sorry.

17           Do --

18       Q.    I just don't want to -- I don't want

19    to put words in your mouth.

20           So -- here is, I think, the two

21    different ways I could interpret that.

22           Are you saying you had no -- no

Page 52

1    expectation the counties would investigate?

2              Or are you saying you hoped they would

3    investigate, but you did not know how they would

4    go about doing that?

5         A.    I'm not saying either.

6         Q.    Okay.

7         A.    I'm saying I have been in the state

8    long enough to acknowledge that I have no idea

9    why our government does what it does, and when

10   it does.

11              I only know that I have an

12   understanding of what our rights are, and I

13   encourage people to exercise those rights.

14              The consequences of those rights --

15   meaning whether or not they are responded to,

16   acted upon by the government -- that's a

17   calculus that, so far, has eluded me.

18        Q.    Is it fair to say, though, given that

19   you went through the effort to put these lists

20   together, that you hoped something would be done

21   with them?

22        A.    It's fair to say that we believe we

Page 53

1    highlighted a number of individuals that no

2    longer resided where they were casting votes.

3              It's fair to say that our expectation

4    would have been that the election officials

5    would have reviewed those.

6              But your question relies on the word

7    "hope" and I don't know that I would

8    characterize that as hope.

9              To me, it's a very practical matter of

10   data that explains that an individual likely did

11   not reside in the county where they cast a vote;

12   and that, under certain circumstances, is not

13   legal in our state.

14             But I don't think "hope" is the right

15   word to characterize what we were doing.

16             In efforts like this, it's a function

17   of following data, and only that.

18             If the data produced no anomalies that

19   suggested that there were a number of these

20   individuals, then that's what it would have

21   produced.

22             It's a very unemotional -- and I know

Page 54

1    that's difficult to get across during a time

2    when people were very emotional.  I'm not wired

3    that way.

4              My interest was rising above all of

5    the vitriol, all the noise, all the -- all of

6    it, and to see if there was a practical issue

7    that needed to be addressed within our state to

8    the benefit of all citizens in our state.

9        Q.    Okay.

10             At the time that you and Mark were

11   working on putting these lists together, did you

12   think that it was feasible that these -- all of

13   these residency issues could be resolved before

14   the runoff election?

15             (Pause)

16       A.    I don't recall, because, again, it

17   really wasn't ours to determine how this was

18   going to be handled by the government.

19             I also don't believe that I had any

20   expectation that that -- that was going to have

21   a short-term impact.

22             I think the effort was really to

Page 55

1    highlight a very real issue with the integrity

2    of our voter file, not necessarily to effect an

3    outcome in any short order, if that makes sense.

4        Q.    I think so.

5              You mean you thought potentially

6    long-term this would just highlight issues with

7    the voter rolls.

8              Is that fair?

9        A.    Yes.

10             To expand, I'm well aware there were

11   people in our state and certainly throughout the

12   country that wanted to see a different outcome

13   in our election, and that wanted to participate

14   in reversing the course of the results of the

15   election.

16             That was not one of my motives at any

17   point in time, ever.

18             For me, it was then, and continues to

19   be, and will always be, around the integrity of

20   the overall process, as it benefits everybody in

21   our state.

22             I take a very practical approach to

Page 56

1    literally everything that I do, and this was no

2    exception.

3              There were procedural deficiencies

4    that were highlighted largely as a consequence

5    to the large number of absentee ballot requests

6    that were sent out.  And we believed there were

7    a number of people that inadvertently cast a

8    ballot and may not have updated their address.

9              So this was much more about

10   highlighting a procedural vulnerability than it

11   was affecting an outcome that was consistent

12   with much of what was being pressed around the

13   media at that time -- if that gives you

14   additional clarity.

15        Q.    It does.  Thank you.

16              How did you think the voters on these

17   lists would react?

18        A.    Well, it wasn't evident to me that

19   voters on these lists would ever be aware they

20   were on the list.

21              So I don't suspect that there was a

22   great -- I don't -- plus, I think that, as I

Page 57

1    understand the process, the -- an appropriate

2    reaction would be to simply demonstrate that you

3    did not move; that you still are a legal

4    resident of the county.

5              So I viewed this then, and I view the

6    challenge as it's provided for under our laws, a

7    very benign process that encourages citizens to

8    participate in the effort to ensure election

9    integrity.

10             I didn't see anything hostile or

11   aggressive about it whatsoever.

12             MS. FORD:  Could we pull up Exhibit D

13   again, please, and go to page 2?

14             (Pause)

15             MS. FORD:  We might want to make it

16   bigger -- the paragraph -- the first paragraph

17   starting:  Yesterday afternoon.

18   BY MS. FORD:

19        Q.   So here you say:  Starting yesterday

20   afternoon, and with the support of countless

21   Georgians across the state who demand

22   transparency and integrity in our elections, we

Page 58

1    began submitting formal challenges to dozens of

2    county election boards.

3              Did you write this?

4        A.    I did.

5        Q.    Who is the "we" in the sentence, "we

6    began submitting formal challenges"?

7        A.    It's probably, you know -- I mean,

8    "we" is a broad term.  There were individuals in

9    Georgia that were submitting challenges across

10   boards of elections throughout the state.  I'm

11   not aware of all of them.  I'm not aware of

12   which boards received challenges -- all the

13   boards that did.

14             I think "we" is a statement of

15   citizens, but not a defined team of people.

16             Again, you know, some of this is

17   written knowing there is a fair amount of public

18   access to that, and so it's drafted under the

19   context of citizens being actively engaged.

20       Q.    Okay.

21             Just to make sure we are 100% clear on

22   this, so this was a list you prepared.

Page 59

1              When you say you are submitting -- I'm

2    sorry -- "we are submitting formal challenges,"

3    this is an effort that is entirely separate from

4    True The Vote?

5         A.    I can't make it clear enough.  This is

6    completely unrelated to True The Vote,

7    absolutely unrelated to True The Vote.

8              MS. FORD:  We can pull this down.

9    Thank you.

10        A.    Now, you know, we are aware that True

11   The Vote was doing -- was launching challenges.

12             But I -- I don't know that -- I don't

13   know when they did those relative to the

14   December 18 time stamp on that post, so -- but

15   completely independent of what they were doing.

16        Q.    Following up on that, if you are were

17   aware that True The Vote was filing challenges,

18   and your general hope -- sorry, I won't say

19   "hope" -- maybe motivation in working on this

20   was to highlight data issues, election integrity

21   issues, why move forward with your own at all?

22        A.    I don't understand your question.

Page 60

1        Q.    So you said your challenges were not

2    outcome-oriented.

3              Is that correct?

4        A.    Not outcome as it relates to the

5    general fervor of the day around election

6    results.

7              "Outcome" in terms of highlighting

8    issues with procedural vulnerabilities in our

9    process.  That's an outcome.

10             But I think, generally speaking, when

11   people talk about outcome -- outcomes of the

12   election -- they are talking about which

13   candidates won and which ones did not.  That was

14   not a motivation.

15       Q.    Sure.

16             What I'm trying to ask is:  If your

17   goal was to highlight issues in the data to say,

18   "We might have a problem here," and you already

19   knew that other groups were filing challenges,

20   why was it important to you to move forward with

21   your own?

22       A.    Being uninvolved with the other

Page 61

1      challenges, they were inconsequential with our

2      efforts.  I do not have visibility into what

3      they did, how they did, why they did, not having

4      any authorship over it.  The effort was

5      completely independent.

6              And what Mark and I had been scouring

7      through and auditing was independent of what

8      they were doing.

9              So I have -- I guess I struggle with

10     the question because I don't see that -- that

11     any -- that -- anybody else's efforts being

12     relevant.

13             If citizens have concerns, my hope is

14     that they would use lawful means to petition

15     their government.

16     Q.     That's fair enough.

17     A.     Okay.

18             MS. FORD:  Can we pull up Exhibit C,

19     please, and mark it as Exhibit C?

20

21

22

Page 62

1                    (Exhibit C, Three-page email chain,

2        top email From: Derek Somerville, To: Catherine

3        Engelbrecht, Subject: RE: FW: Elector Challenge

4        Follow-Up Items, Sent: December 19, 2020 (no

5        Bates Nos.), marked for identification)

6                    (Pause)

7                    MS. FORD:  Let's go to the middle of

8        the page, if we can scroll down to this -- yes,

9        this right here is perfect.

10   BY MS. FORD:

11       Q.    Starting with "Good evening Patriots,"

12       this appears to be an email you wrote explaining

13       background on the challenges that you helped

14       organize.

15                    Do you recognize this?

16       A.    I do.

17       Q.    I just want to read a paragraph here

18       for the record, since it won't be on the record

19       otherwise.

20                    This says:  I have attached the three

21       certifications from our National Change of

22       Address process.  These documents certify the

                                                    Page 63

 1    date we process the voter file and the specific

 2    details of that processing.  The Georgia Voter

 3    File is extremely large, so it was broken into

 4    three parts and each part processed

 5    individually, thus the three separate

 6    certifications.  I would present these as

 7    evidence to your board that these lists were

 8    developed using the same standards as the state.

 9    I am also including Mark Davis' affidavit, which

10    is his sworn testimony that he personally

11    processed the files.

12            MS. FORD:  And I'm sorry.  I am

13    realizing now this is not on this page.  Can we

14    scroll to the next page?

15            Scroll down a bit further.

16            I apologize.  I'm reading from the

17    email myself in front of me.

18    BY MS. FORD:

19        Q.   Mr. Somerville, what did you mean when

20    you said Mark Davis personally processed the

21    files?

22        A.   Yeah -- Mark is in the business --

Page 64

1      Mark has a business that -- and I believe I have

2      this right -- Mark is in the business of doing

3      large volume print work for his customers.

4                  I have familiarity with large volume

5      print from a prior job where I was responsible

6      for very large number of monthly documents to be

7      mailed that had to go to the individuals that

8      they are being mailed to, so I understood that

9      Mark understood -- understands the NCOA

10     processing that's available for those large

11     lists, as I understand it very well as well.

12                 And so I believe by "certification," I

13     would have meant that Mark had processed those

14     through the U.S. Postal Service's national

15     change of address and received them back as

16     certified from the U.S. Postal Service.

17         Q.    Do you still have those three

18     certifications?

19         A.    I don't -- I don't recall that I do.

20                 These are large files, so I don't

21     suspect that I would have retained them or -- I

22     just don't recall that I do.

Page 65

1               And I've got to look at this a little

2      closer, too, and make sure that I -- I know

3      exactly what we are referring to here.

4               But it would have been the U.S. Postal

5      Services NCOA -- you know what?

6               So I don't think those are files.

7               I think they are actual documents that

8      indicate from the national change of address

9      processor certifying that the files were ran

10     through their processing -- is what I believe

11     that means.

12         Q.    Okay --

13         A.    And those -- I'm sorry.

14         Q.    Sorry.  If you had something to say,

15     you can finish it.

16               Okay.

17               What do you mean here when you say you

18     used the same standards as the state?

19         A.    So what's implied here is the national

20     change of address process is not -- is performed

21     by companies that have access to the U.S. Postal

22     Services' national change of address database.

Page 66

```
 1      That's a standard process that, regardless who

 2      has it done, it's performed in a uniform way,

 3      depending on the vendor that actually performs

 4      it.

 5             So in this instance, my understanding

 6      would be that Mark has a vendor that he would

 7      use to run his addresses through a national

 8      change of address to see if somebody -- that

 9      individual at that address -- had filed a change

10      of address.

11             That would be the same process that is

12      permitted under the NVRA, and that the state

13      would perform as well on, I think, a biannual

14      basis at that point.

15             So I think the point of that is that

16      the NCOA process that was used to validate or to

17      scrub the voter files is the same process that

18      the state would use.

19      Q.    Okay.

20             So when you say "same standards," this

21      is generally meant to convey:  The state uses

22      NCOA, we used NCOA.
```

Page 67

1               Is that fair?

2        A.     Exactly.

3               And the implication is to ensure that

4    it's an unbiased process that is uniform to what

5    the state would have done, or that's a best

6    practice in the industry.

7               Frankly, this is not new technology.

8    It's widely used.

9               And so I think this was intended to

10   convey to those that don't understand that this

11   is not something that you sit in your basement

12   and you do on your computer.

13              It's an actual company that has the

14   U.S. Postal Service's national change of address

15   database; and that you have that file scrubbed

16   through that -- through that -- that vendor, if

17   you will.

18       Q.     That's helpful.  Thank you.

19              MS. FORD:  We can pull this down.

20   BY MS. FORD:

21       Q.     Mr. Somerville, did you participate in

22   an interview with Mike Crane in December of

Page 68

1        2020?

2        A.    With Mike -- can you repeat the name?

3        Q.    Mike Crane?

4        A.    Mike Crane, yes.

5        Q.    What did you speak about?

6        A.    At that time, all anybody wanted to

7   hear about was election integrity.  So I don't

8   recall the specifics of what we discussed, but

9   I'm certain it's on record; and I'm certain it

10  involved the election integrity discussions that

11  were going on at that time.

12       Q.    That's fair.

13             You mentioned something in your

14  interview with Mike Crane that I would like

15  clarity on.

16             You said:  What we do is we take the

17  voter file and take the absentee file and then

18  take all that information and process it through

19  the U.S. Postal Service's national change of

20  address database.

21             I would like to take this

22  step-by-step.

Page 69

1              What did you mean when you say, "We

2     take the voter file"?

3              MS. KRAMER:  Objection, relevance.

4              Are you asking as it relates to True

5     The Vote and why we are here today?

6              Or him and his own challenges that he

7     did?

8              I would just ask that we keep this

9     line of questioning just related to True The

10    Vote and why Derek is testifying today.

11             MS. FORD:  Ms. Kramer, this is

12    following up on Mr. Somerville's explanation

13    that he did not work with True The Vote, so I'm

14    exploring what he did on his own.

15             MS. KRAMER:  Okay.  I would still

16    object to relevance in that same manner that

17    what he did on his own is not related to why he

18    is here today.

19             But I'll allow him to answer.

20             But I just want to note my objection

21    for the record, please.

22             MS. FORD:  Okay.  That is noted.

Page 70

1      Thank you.

2    BY MS. FORD:

3        Q.     Mr. Somerville, so what did you mean

4    when you said that you "take the voter file"?

5               What does that mean?

6        A.     Well, I think it's self-evident.  It's

7    indicating that the voter file was processed.

8               If you want clarity on the verb

9    "take," I don't think there is any meaning

10   behind that at all.

11              I think the intent is that to express

12   that the voter file was processed through the

13   national change of address database.

14       Q.    Okay.

15              What did you mean by "take the

16   absentee file"?

17       A.    The absentee file would be those

18   voters that cast an absentee vote.

19       Q.    Okay.

20              Here I have, I guess, specific

21   questions.

22              So was that a file of those who voted

Page 71

1     in the general election in 2020?

2          A.    I don't recall, because I did not

3     secure that file.

4          Q.    Okay.

5                I guess what I was trying to

6     understand -- maybe you do not know -- is

7     whether it was a file of those that had

8     previously voted absentee?

9                Or a file of those who had requested

10    an absentee for the runoff election?

11         A.    I don't recall.

12               But I don't believe that the runoff

13    election -- I don't recall -- I -- I'm sorry.  I

14    simply -- I don't recall because I -- I did not

15    order that voter file, so I don't -- I don't

16    know the particular parameters of that file.

17         Q.    The challenge list that you and Mark

18    Davis collaborated to put together -- did that

19    include only voters who were absentee voters?

20         A.    No, I don't believe so.

21         Q.    Okay.

22               So it would have included voters who

Page 72

1      voted in-person in the 2020 general election?

2          A.    Again, this is entirely independent of

3      any actions by True The Vote.

4                But I believe that if an individual

5      cast a vote and they appeared on the national

6      change of address database as having moved

7      outside of their county, then they were probably

8      included in that file, with some tolerances for

9      military bases, electronic -- votes, etc.

10         Q.    Okay.

11               We can get to that now so you can walk

12     me through it.

13               MS. FORD:  Can we pull Exhibit D back

14     up and go to page 2 again?

15               (Pause)

16               MS. FORD:  Yes.  Can we make this

17     bigger?  Thank you.

18     BY MS. FORD:

19         Q.    Going to this third paragraph here,

20     you mention here there are roughly 40,000 voters

21     on your list across all 159 counties that you

22     believed were worth filing before the runoff

Page 73

1    election.

2             Is that correct?

3             THE WITNESS:  I need to read.

4             MS. FORD:  Sure.

5       A.    That's what I wrote.

6       Q.    Okay.

7             Can you walk me through how you

8    arrived at that roughly 40,000 number?

9             (Pause)

10            MS. KRAMER:  I'm going to object again

11   to scope.

12            Honestly, this is -- he's made it very

13   clear, counsel, that this has nothing to do with

14   True The Vote.

15            And I just would ask that we please

16   keep the line of questioning related to the

17   witness as it relates to True The Vote, and just

18   True The Vote.

19            MS. FORD:  Counsel, I think this

20   lawsuit is about more than just True The Vote.

21            And Mr. Somerville has testified that

22   he helped file challenges in the runoff

Page 74

1    election, which is the primary thrust of this

2    lawsuit.  So I think that these questions are

3    relevant and worth exploring.

4              MS. KRAMER:  Again, counsel, I still

5    object to scope.  That's still outside the scope

6    of why he is here today.

7              I will allow him to answer you, but

8    let's, please, just remember this is -- he's

9    here as it relates to True The Vote, not him in

10   his, you know, capacity of what he did outside

11   of his communications with True The Vote.

12   That's not why we are here.

13             MS. FORD:  Ms. Kramer, that -- we did

14   seek questioning in discovery about his

15   communications with True The Vote, but he is

16   separately named as a defendant in this lawsuit,

17   so we intend to explore that whether or not he

18   worked with True The Vote.

19             MS. KRAMER:  I understand.  I

20   understand.

21             But he made it very clear that what

22   we're -- what you are pointing to right now --

Page 75

1    he made it very clear that this has nothing to

2    do with True The Vote.

3              Like I said, noting my objection to

4    scope, I will let him answer.

5              But I just want to -- the line of

6    questioning -- let's just -- as it pertains to

7    True The Vote, please.

8              MS. FORD:  Okay.

9    BY MS. FORD:

10        Q.    Mr. Somerville, can you walk me

11    through how you generally arrived at that 40,000

12    number?

13        A.    Yeah.

14              And I would share, too, at this point

15    in time, there were literally hundreds of people

16    in the state that are trying to find a way to

17    contribute to the discussion on voter integrity.

18              So I'm happy to answer this question.

19              But if the premise is that anybody and

20    everybody in the state of Georgia that did

21    anything whatsoever to try to uphold the laws in

22    the state, the list is going to get extremely

Page 76

1    long extremely quickly.

2              Our motivations for this effort here

3    were truly, truly benign, and I think it's

4    evident in these posts.

5              When we went through the data, we

6    identified a number of individuals that had

7    indicated that they had moved.

8              Then, exercising an abundance of

9    caution, we went out of our way to make sure

10   that, as it states here, we removed individuals

11   that appeared to be either serving in the

12   military, or even remotely located near a

13   military base in case the dependent -- or

14   dependents were caught up in that.

15             Anyone that was and inactive record,

16   as it says here, that we removed; anybody who

17   voted electronically, we removed; anybody who

18   submitted a change of address within the prior

19   18 months, which I believe is the statute in the

20   state, we removed.

21             We erred on the side of the voter over

22   and over again until we arrived at -- and I

Page 77

1    think it's roughly 40 -- it's less than that, if

2    my recollection -- that spanned all 159

3    counties, be them Republican, Democratic --

4    Democrat -- a mix.  This effort was independent

5    of all of that.

6              And that -- the idea was to highlight

7    the fact that it appears that a significant

8    number of people may have cast ballots out of

9    the improper county.

10   Q.    What do you mean -- sorry.

11             Scratch that.

12             Why was it important to you to err on

13   the side of the voter?

14   A.    Well, I think the general doctrine is

15   also to make sure that we are not doing more

16   damage than good in our effort, independent of

17   what you are doing.

18             If the effort is truly benign, then

19   your motive should be to do the most amount of

20   good.

21             If the process in any way was going to

22   create harm, then you don't undertake it.

Page 78

1             In this case, this is a very binary

2     effort.  It simply says:  If these conditions

3     are met, then there is probable cause to believe

4     that a vote might have been cast ineligibly, and

5     that should be remedied.

6             And "remedied" does not necessarily

7     mean they don't vote.

8             It simply means ensuring they vote in

9     the proper county.

10        Q.    Understood.

11            And what do you mean by "it could do

12    more damage than good" if too many voters were

13    on the list?

14        A.    I didn't say it would be too -- it

15    would do more damage than good if too many

16    voters were on the list.  I was explaining --

17        Q.    Sorry.

18            Please put it in your own words, then.

19        A.    I was explaining the general doctrine

20    that would suggest that:  What's the likely

21    outcome of your effort?  And if it's going

22    to end -- if it's going to harm people, then you

Page 79

1    should give great consideration to whether or

2    not that's something you want to do.

3              Had there been any belief that this

4    would be harmful, I would never have

5    participated in it.

6              Just the opposite -- there was an

7    awful lot of harmful speak and activity going on

8    during this election that I found very

9    objectionable.

10             But I was motivated to be part of a

11   discussion where there was a tangible and

12   measurable deficiency in our process that, for

13   future elections, may be shored up.

14             That was our motivation.

15             Whether it was going to be 40,000 or

16   four or none was not the effort.  There was no

17   target.

18             I was trying to be very responsible,

19   exercise our rights within the law, encourage

20   others to do so, which might inadvertently

21   encourage them not to exercise behaviors that

22   would have been detrimental to the process --

Page 80

1    of which I think we can all agree, there was no

2    shortage.

3         Q.    You say here:  We removed individuals

4    who did not vote in our most recent general

5    election.

6              Did you, in fact, do that?

7         A.    That would be my understanding.

8         Q.    How was that done?

9         A.    The voter file, as I understand it,

10   indicates when the person last voted.

11             So if there was an individual that

12   indicated they moved and they didn't vote in the

13   last election, there was a good chance that they

14   moved and they are not trying to vote in the

15   election, and everything worked as it's supposed

16   to.

17             That would actually be a very normal

18   scenario.  Somebody moved.  It shows up on the

19   national change of address, and they no longer

20   vote in their county or the state.

21        Q.    Okay.

22             So my understanding is you just

Page 81

1     thought:  Those voters -- there was not a need

2     to challenge them, because you didn't think they

3     would vote again at their old address?

4          A.     There is nothing to challenge because

5     they didn't vote.

6          Q.     Do you know if True The Vote did the

7     same with their list? -- remove people who had

8     not voted in the 2020 general election?

9          A.     I have no idea what True The Vote did

10    with their list.

11         Q.     Okay.

12                You say here:  We removed records of

13    those serving in the military and those who may

14    be their dependents.

15                Did you, in fact, do that?

16         A.     To the best of our ability, yes.

17         Q.     How did you identify those serving in

18    the military?

19         A.     It was a rather exhaustive effort that

20    just erred on the side of anybody in geographies

21    where there were military bases, number one --

22    of which there are many throughout the country.

Page 82

1    So anybody that resided within a general

2    proximity to a U.S. city that housed a military

3    base were excluded.

4         Q.    Is that the same process you used for

5    potential dependents because they were residing

6    in that geographic area?

7         A.    It's one and the same.  Anybody within

8    a -- anybody within a general vicinity of a

9    military base would have been removed from the

10   list.

11        Q.    Why did you think that was important

12   to do?

13        A.    As I previously stated, the aim here

14   was to be as accurate as possible and exercising

15   a probable cause that an individual had moved

16   without -- and voted outside of the eligible

17   requirements for the state.

18             And obviously, those serving in the

19   military have an eligible excuse for voting --

20   for having an address in the county here and

21   residing in a different state.

22        Q.    I take it you were not aware --

Page 83

1    personally aware -- of whether True The Vote did

2    that with their list?

3         A.    I am unaware of anything they did with

4    their list.

5         Q.    You say here:  We removed inactive

6    records.

7              Can you explain what that means?

8         A.    An inactive record in the state of

9    Georgia is a record in the voter file from

10   individual that is no longer an active voter,

11   which means, to my understanding -- and I'm not

12   the expert by the way -- but my understanding is

13   that they are not an eligible voter, and that's

14   just legacy data that has not been cleaned up by

15   the state.

16        Q.    Okay.

17             What was the purpose of removing those

18   from the list?

19        A.    If they are not an active voter in the

20   state, what's the purpose of challenging their

21   eligibility in the state?

22        Q.    By that, do you mean if someone showed

Page 84

1    up to vote, their county would already tell

2    them, "You are an inactive voter, you cannot

3    vote regardless of any challenge"?

4         A.    Well, I can't say what the county

5    would say.

6              But if they showed up as an inactive

7    voter, they would be afforded the opportunity to

8    demonstrate that they are an eligible voter.

9              However, that was beyond the purview

10   of what we are trying to demonstrate, which was

11   a very disciplined approach to data integrity

12   within in our -- within our Georgia data file.

13             An inactive voter is someone who is

14   not participating in our elections -- again, to

15   my understanding.

16        Q.    You say:  We removed those who voted

17   electronically.

18             Why did you do that?

19        A.    Well, based on my understanding, if

20   you are voting electronically, you are almost

21   assuredly a deployed member of the U.S. Armed

22   Forces or a member of a diplomatic core.

Page 85

1              But I believe that's a process -- and

2      again, I'm not an expert.  That's reserved for

3      individuals with very defined criteria, so those

4      clearly fell outside of the concern.

5          Q.    Okay.

6              Was that -- you were able to see that

7      on the voter file? -- whether they had

8      previously voted electronically?

9          A.    Yes.

10         Q.    And you were not personally aware of

11     whether True The Vote did that with their list?

12         A.    I'm unaware of anything that True The

13     Vote did with their list.

14         Q.    Okay.

15             We are getting to the end here.

16             You say that:  We include only those

17     whose change of address requests were submitted

18     within the prior 18 months.

19             Why did you do that?

20         A.    As I understand it -- my recollection

21     may be a bit fuzzy here.

22             One was to restrain the scope of the

Page 86

1     effort which was around the integrity of the

2     data.  So I believe the prevailing logic was

3     that the change of address process has a maximum

4     period under which mail will be forwarded.  And

5     I believe the maximum period -- again, I could

6     be mistaken here -- was 18 months.

7               In other words, if it's beyond that,

8     then the record is probably no longer active and

9     mail is no longer being forwarded.

10              That's my recollection.

11     Q.    And you don't know the time period

12     that True The Vote used, I assume?

13     A.    I do not.

14     Q.    Then finally here, you say:  We

15     continued to fine tune our list until we arrived

16     at roughly 40,000 across all 159 counties we

17     believe need to be verified by county election

18     boards before the January 5th, 2020 runoff.

19              What do you mean by "fine tune the

20     list"?

21     A.    As I previously indicated, accuracy

22     matters.  And it was very important for the

Page 87

1    effort -- for Mark and I, two individuals --

2    that we be very disciplined in approach, and

3    that we don't take any steps that inadvertently

4    advances inaccurate information.

5              The entire objective is to promote

6    accuracy within the data file.

7              So if we weren't fine tuning and

8    constantly checking, rechecking our work, it

9    would have been at counter-purposes to advance a

10   number of records that appear inaccurate only to

11   find that our work was actually inaccurate.

12             So I believe the "fine tune" is just

13   the disciplined approach of making sure that

14   everything we are doing is as accurate as we

15   possibly can be.

16        Q.    Okay.

17             By the end when you had arrived at

18   this, you know, roughly 40,000 list, did you

19   have confidence in that list?

20             And in that methodology?

21        A.    I have tremendous confidence that

22   those individuals filed a change of address for

Page 88

1    one reason or the other, and that there was and

2    continues to be cause for each county election

3    board to confirm that those individuals are

4    still eligible voters within their county.

5          Q.    If you could go back and do it again,

6    are there any improvements you would make?

7          A.    Our motivation was consistent

8    throughout, which was around trying to encourage

9    the integrity of the file, which benefits every

10   voter, period.  So I don't believe our

11   motivation would change.

12               I believe our methodology was solid.

13               I believe that we probably would not

14   have done a whole lot different with respect to

15   our efforts.  No, I don't believe so.

16         Q.    Okay.

17               Did you and Mark ultimately have

18   challenges filed in all 159 counties?

19         A.    No.  By no stretch of the imagination

20   did we have challenges in 159 counties.

21         Q.    How many counties would you estimate,

22   then?

Page 89

1          A.     And the number is not actually known

2     to us because we made these files generally

3     available to those that wanted to participate in

4     the process, so it would be conjecture on my

5     part.

6               But I know it was not a significant

7     number.

8               I think a takeaway from this certainly

9     was that there -- it was much more complicated a

10    process than we estimated.

11              But I don't believe it was very many.

12    And most of them were -- to my knowledge --

13    were -- smaller rural counties in the north side

14    of the state are the only ones I can vaguely

15    recall.

16              There was an awful lot going on at

17    that time.  And we can't submit a challenge

18    outside of county that we live in.  So our --

19    our activity is somewhat limited to -- to the

20    counties that we are in.

21         Q.    Okay.

22               What do you mean when you say you:

Page 90

1      Made the files generally available?

2          A.    Well, as is evident with my Facebook

3      post, people were aware that we were working on

4      this.

5                And individuals would reach out and

6      say:  Hey, I would like to participate.  How can

7      I help?

8                And if they are in a county that had

9      individuals identified, then -- if we are able

10     to get back to everybody, we would have

11     encouraged them to submit the challenge in their

12     own counties.

13               But it wasn't -- you know, I can't --

14     I need to be very clear here.  There was not an

15     organization around this.

16               Things were moving very quickly.

17               We were more motivated around the data

18     integrity than anything.

19               So by the time we realized that there

20     was a substantial number of records within the

21     voter file that needed closer examination, you

22     know, the days were ticking by.

Page 91

1               And so it -- I would love to tell you

2       it was a more coordinated effort, but it wasn't.

3               So I don't -- I don't know how many.

4       Q.    That's fair.

5               So if someone expressed interest in

6       helping out, did you email the list for that

7       specific county?

8       A.    So some were emailed.  Some -- but --

9       and I believe we had a Dropbox that people can

10      access.

11              Again, there was no meaningful way to

12      manage other people's activities through this.

13      It wasn't our core focus.

14              So I'm sure we exercised a number of

15      means to communicate lists to people.

16      Q.    Okay.

17              So was the general thrust of this:

18      Someone indicated they were interested; you sort

19      of guided them to the list; and then it was

20      their challenge from that point on?

21      A.    That's the general thrust, and it was

22      an unimpressive level of engagement.

Page 92

1        Q.    An unimpressive?

2        A.    It was an unimpressive.

3              In other words, there was not a

4    wide-scale level of engagement.

5        Q.    Okay.

6              When you say "this ended up being much

7    more complicated than you anticipated," what do

8    you mean by that?

9        A.    The data file is very large.  And

10   it's, by my estimation, not well-maintained by

11   the state.

12             And so, as is evident in the paragraph

13   that you have up, it required a significant

14   amount of data massaging in order to make sure

15   that individuals weren't inadvertently looped

16   into this that appeared to not fall within the

17   scope of the effort, which was to identify

18   people that didn't live in their counties and

19   voted in their counties.

20             So, you know, certainly not being an

21   expert with the data file, I didn't appreciate

22   how large that file is, and how complicated that

Page 93

1    file is, and, frankly, how poorly-managed by the

2    state, to the detriment of all citizens, that it

3    is.

4         Q.    Do you know how many counties accepted

5    challenges that -- of the lists that you and

6    Mark put together?

7         A.    I don't.

8               But I think we would have heard it --

9    you know, heard a fair amount about it if there

10   were.

11              I don't believe that there -- to my

12   knowledge, I'm not sure that any county accepted

13   a challenge.

14              I have no recollection of any county

15   accepting a challenge.

16        Q.    Did that surprise you that no county

17   accepted them?

18        A.    I don't know if I was surprised.

19              Again, I think we opened with a

20   discussion around, you know, what the government

21   does and doesn't do remains a mystery to me.

22              You know, I think that there was a

Page 94

1    very appropriate effort that was engaged in with

2    a tremendous amount of care; and certainly

3    didn't imply that anybody had done anything

4    wrong, but rather there were anomalies within

5    the data file.

6              And upon reflection, I would expect

7    there to be more interest in that by the

8    government.

9              But I wouldn't characterize it as

10   surprised.

11        Q.   Okay.

12             MS. FORD:  Can we take this down,

13   please, and pull up Exhibit E, and mark it as

14   Exhibit E?

15             (Exhibit E, Three-page document

16   entitled: True The Vote Partners With Georgians

17   in Every County to Preemptively Challenge

18   364,541 Potentially Ineligible Voters (no Bates

19   Nos.), marked for identification)

20   BY MS. FORD:

21        Q.   Mr. Somerville, this is a press

22   release from True The Vote which names you among

Page 95

1    other people as someone working on election

2    integrity efforts in Georgia.

3              Do you recognize this?

4         A.   I do.

5         Q.   Is this the press release that we

6    spoke about earlier that Ms. Engelbrecht sent to

7    you, and you maybe did some clarification about

8    you, or maybe added Mark's name?

9         A.   Yes, it is.

10        Q.   It says here that True The Vote

11   planned to bring challenges to approximately

12   364,000 voters in Georgia.

13             That is significantly more than the

14   approximately 40,000 voters you came up with,

15   correct?

16        A.   I think mathematically you are

17   correct.

18        Q.   Can you remind me? -- did you ever ask

19   True The Vote why they were challenging so many

20   voters?

21        A.   I don't recall asking their motivation

22   for it, no.

Page 96

1      Q.    Did you have confidence in True The

2  Vote's methodology?

3      A.    I was unfamiliar with their

4  methodology, so there was -- I had no opinion on

5  it.

6           Again, it was a quick meeting of

7  people I had never heard of before, and I had no

8  visibility into how they got to their number.

9  To this day, I don't know how they got to that

10  number.  So --

11      Q.    Why didn't your list have 360,000

12  people on it?

13      A.    Well, I don't know why theirs did, so

14  I don't know how to draw a comparison between

15  the difference in volumes.

16           I only know what we did, which I

17  described as a very disciplined, very careful

18  process that excluded individuals from that for

19  a myriad of reasons.

20      Q.    Okay.

21           If your list of approximately 40,000

22  voters was disciplined, do you believe a list of

Page 97

1     almost 400,000 voters -- ten times as many -- is

2     not disciplined?

3          A.    If their methodology sought to include

4     that volume and they executed it with

5     discipline, then theirs was a disciplined

6     process.

7               So I can't speak to how they --

8     whether they executed with discipline.

9               I understand the spirit of the

10    question, but it's evident that we used a

11    different process because the numbers are so --

12    so different.

13         Q.    Sure.

14              MS. FORD:  We can pull this down.

15    Thank you.

16              Can we pull Exhibit D back up and go

17    to page 22, please?

18              (Pause)

19              MS. FORD:  And just make this purple

20    box bigger, please?

21    BY MS. FORD:

22         Q.    This is a post from December 17 in

Page 98

1    which you write:  Volunteers needed from each

2    county for a voter-integrity project!  15-minute

3    effort, performed from home.  PM me if

4    interested.

5          Do you recognize this?

6    A.    I do.

7    Q.    Was this the post essentially

8    recruiting individuals to submit elector

9    challenges to specific counties?

10   A.    Yeah -- I recall, yes.  This would

11   have been an effort to involve individuals in

12   their counties with these challenges,

13   independent of True The Vote.

14         This is not related to True The Vote

15   at all.

16   Q.    Okay.

17         So no one here who reached out to

18   you -- sorry.

19         I was about to put multiple double

20   negatives there.

21         Did you forward any of these

22   individuals who were interested to True The

Page 99

1    Vote?

2        A.    No.

3        Q.    What exactly were you asking these

4    volunteers to do?

5        A.    Well, it's been a bit, but I suspect

6    this was about -- as we mentioned before --

7    identifying individuals that wanted to

8    participate with their local board of election

9    with this eligibility effort that we were

10   underway.

11            We could -- we could only submit

12   challenges in our own counties.  We can't submit

13   them in other counties.  So this was a largely

14   unsuccessful effort to identify individuals that

15   wanted to participate in the action.

16            Again, there -- you know, the context

17   of the day was there was an awful lot of

18   activity going on, but this is wholly unrelated

19   to True The Vote, and was largely unsuccessful.

20       Q.    Why do you categorize it as

21   unsuccessful?

22       A.    As I indicated earlier, we did not

Page 100

1      have a lot of people participate.

2          Q.    So you just didn't have a lot of

3      volunteers who offered to submit a challenge?

4          A.    That's correct.

5          Q.    Do you know why?

6                Do you have a guess why?

7          A.    I don't know why.

8                I think it's a lot of people want to

9      be involved but -- but there is apathy.  There

10     was certainly a lot of interest in the topic

11     matter, but -- largely because it involved

12     election integrity.

13               But I don't -- I don't know why.  Some

14     of it is just timing.  It was almost Christmas,

15     you know.  It's just that time of year.

16         Q.    Okay.

17               Did you, yourself, submit any

18     challenges under your own name?

19         A.    I did not.

20         Q.    Why not?

21         A.    My understanding in my county, someone

22     completely independent of all this had submitted

Page 101

1    a challenge.  I'm not sure who it was, but I was

2    told that challenges had been submitted in my

3    county, so there was no point in submitting one.

4         Q.    I just want to understand that.

5              Because before, you said didn't matter

6    to you that True The Vote was submitting their

7    own.  You thought it was important to do your

8    own thing.

9              But on your own data, why was that not

10   important in Fulton?

11        A.    Can you clarify your question?

12        Q.    Yeah.

13             I guess before what I understood is

14   you didn't care what other people were doing and

15   you thought it was important to do your own list

16   separate from True The Vote.

17             So why would you not submit your own

18   challenge, even though other groups were doing

19   theirs?

20        A.    You are conflating the development of

21   the list with the submittal of a challenge.

22             So our focus on our list was not

Page 102

1     influenced by anybody.  We had a process and it

2     was important that we do our own work.

3               As far as the submittal of challenges,

4     we had no visibility into what other people were

5     doing.

6               But in my own county, if a list had

7     been -- if a challenge had been submitted, I

8     would only be encumbering the process by

9     submitting yet another one.  So there was no

10    motivation to do that because, as I understood,

11    our board of election had received a challenge

12    list.  And I don't know who from, but I was told

13    they already were working on that.

14        Q.    Okay.

15              Did Mark Davis submit a challenge?

16        A.    I don't know if Mark did or not.

17              (Pause)

18              MS. FORD:  We can take this down,

19    thank you.

20              Can we pull up Exhibit C, please?

21              And we have already marked.

22              (Pause)

Page 103

1               MS. FORD:  Trying to see where this

2       is.  Looking for something that starts on

3       December 19.  Or -- sorry.  I'm sorry.  I have

4       got something confused.

5   BY MS. FORD:

6       Q.     You mentioned in your discovery

7       responses that:  On December 19, 2020, I sent an

8       email to Catherine Engelbrecht which contained

9       talking points for elector challenges that I

10      constructed on my own accord.

11              Is in the email that containing

12      talking points that you are referring to?

13      A.     I believe so.

14      Q.     Okay.

15              In your discovery responses, you

16      mentioned that you assumed True The Vote had

17      legal resources who would review my assumptions

18      in the talking points.

19              What assumptions are you referring to?

20      A.     It's pretty -- well, it's just as you

21      have stated.  I shared those talking points

22      which I had drafted on my own accord with

Page 104

1   Catherine.

2          But my understanding is they are a

3   large organization, so my assumption is that --

4   that at the time, and even now -- that my

5   talking points might have been of little value,

6   but I wanted to share them.

7          (Pause)

8          MS. FORD:  Can we take a five-minute

9   break, please?  Is that fine with you?

10          MS. KRAMER:  That's fine.

11          THE VIDEOGRAPHER:  The time is 10:57

12   a.m. and we are now off the record.

13          (Recess from 10:57 a.m. to 11:03

14   Eastern Daylight Time)

15          THE VIDEOGRAPHER:  The time is 11:03

16   a.m. and we are back on the record.

17   BY MS. FORD:

18      Q.    Mr. Somerville, you testified just now

19   that you did not submit your own challenge in

20   Fulton County because someone else had submitted

21   a challenge in Fulton County.

22          Is that correct?

Page 105

1          A.     No, I did not testify that.  I live in

2     Forsyth County, not in Fulton County.

3          Q.     I apologize.

4                 Forsyth.  Forsyth?

5          A.     Correct.

6          Q.     Okay.

7                 I apologize.

8                 Then did you testify that you did not

9     submit a challenge in Forsyth County because

10    someone else did?

11         A.     I don't know that that is the sole

12    reason I didn't file a challenge in Forsyth

13    County, but I was aware that one had been

14    submitted prior to me submitting my own.

15                As I indicated earlier, the real

16    effort was to work through the data and

17    highlight the data integrity anomalies that we

18    found.

19                So I can't say with certainty that I

20    had a plan to submit it myself in Forsyth

21    County, but I do know that one was submitted

22    prior to me submitting one, if I wanted to.

Page 106

1          Q.    Do you know who submitted the other

2     challenge in Forsyth County?

3          A.    Not with certainty, no.

4          Q.    So is it fair to say you -- you don't

5     know the methodology that went into the other

6     challenge list that was submitted in your

7     county?

8          A.    I don't even know who completed the

9     list in my county, so I don't know the

10    methodology, or the individuals who put it

11    together, or when it was submitted, or why.  I

12    am unfamiliar with it.

13         Q.    Okay.

14              Mr. Somerville, to be candid, I am

15    struggling to understand, again, why, if you

16    felt it was important to develop your own list,

17    have an accurate list, you would not want to

18    move forward with what you believed to be an

19    accurate list on your own.

20         A.    Well, I'm not sure you understand all

21    of our motivation.

22              One big motivator for me was to take

10/6/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville
Confidential - Pursuant to Protective Order

Page 107

1     attention away from a lot of vitriol, a lot of

2     the unproductive discourse, that was underway

3     around that election and draw people's attention

4     to very real opportunities to improve the

5     integrity of our elections across the entire

6     state for all voters.

7                    Whether or not the challenges were

8     submitted, and whether or not they were heard,

9     and whether or not they were consequential at

10    the county level was tertiary to trying to

11    demonstrate that there are laws in the state

12    that empower citizens to be involved; that our

13    voter file is managed by state officials, and

14    potentially not very well.

15                   And I wanted to demonstrate that there

16    were very real opportunities to improve the

17    overall integrity of our elections in the state

18    and encourage other people to participate in

19    that effort.

20                   So I think the disconnect is that

21    everybody wants to connect this to a desired

22    outcome, likely connected to the election

Page 108

1    results.

2              The outcome I was looking for was to

3    demonstrate the importance of integrity -- data

4    integrity and data hygiene within that voter

5    file, which was arguably very, very poor at the

6    time of the election.

7              That -- my passion surrounded the

8    integrity of the data, not the outcome of the

9    election.

10        Q.   Okay.

11             You say you wanted to draw attention

12   to the issue.

13             How did you plan to do that if you

14   were not going to file any challenges?

15        A.   Well, I would argue by virtue of being

16   deposed right now, I drew attention to the

17   issue.

18        Q.   That's fair.

19             I guess what I'm saying is:  If it was

20   important to you to do the diligence, develop

21   this list, then be able to say, "Hey we've

22   identified these 40,000 that we think deserve

10/6/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville
                        Confidential - Pursuant to Protective Order

                                                                    Page 109

1      attention," and that was sufficient for you, why

2      then did you encourage other volunteers to

3      submit challenges in their own counties?

4          A.    Well, as I just stated, part of the

5      effort was to encourage people to participate in

6      a lawful process.

7                I also believed at the time -- and

8      maybe I have an inflated sense of where I fit in

9      this state -- but I was of the belief that

10     elected officials were paying attention to what

11     we were doing, and that our effort might

12     influence discussions, and push them in a more

13     productive place.

14               It's my fundamental belief that

15     individuals in the state, in all counties,

16     across all political affiliations, encompassing

17     all ethnicities, were damaged by the lack of

18     hygiene in our voter file.

19               And the effort was to go straight to

20     the source of the matter and try to draw

21     attention to the voter file.

22               The challenges are a part of that.

Page 110

1              But the challenges then pushed the

2     counties to take a more proactive role in making

3     sure their voter files are accurate.

4              There is only so much we could do.

5     But what we could do is spend some time and try

6     to audit that voter file and bring attention to

7     it.  And I think that's what we did, and I hope

8     to the betterment of all the voting citizens of

9     the state.

10        Q.    Okay.

11             Am I understanding you correctly that

12    you were trying to draw attention to the need

13    for list maintenance?

14        A.    That's a fair statement.

15        Q.    Okay.

16             And that there were just -- from what

17    you believed to be outdated data on the -- on

18    the voter rolls?

19        A.    My primary supposition about what we

20    discovered was that the voter file had not been

21    maintained well by the Secretary of State; and

22    that that was unacceptable; that it was damaging

Page 111

1    the overall confidence across the state in the

2    results of our elections; and that fundamentally

3    that was hurtful to every single voter in the

4    state.

5           And so the remedy was to try to take

6    attention away from, frankly, all the nonsense

7    that was being spewn about at that time and draw

8    attention to something that could be measured.

9    It was tangible.  It was a lawful practice that

10   encourages citizen participation.  It was a

11   nonpartisan effort, and one that I felt -- and

12   feel now -- was a very good thing to undertake

13   at a time when people really needed to be

14   focused on the real opportunities in the state

15   to improve the overarching processes of our

16   elections.

17          So I will finish this by saying:  It

18   is difficult today to make people understand

19   that our effort -- which was completely

20   independent of True The Vote's, completely

21   independent -- was not motivated by the outcome

22   that I think was the prevailing narrative of the

Page 112

1    time.

2              And I think the effort was successful

3    because I know the legislature took up this

4    discussion.

5              I do believe that the Secretary of

6    State's office took a closer look at the data

7    hygiene.  I believe that they have probably

8    acted on it since then.

9              And we know a reasonable number of the

10   folks that we identified in our list have since

11   gone back and updated their addresses to the

12   address of record that we suggested that they

13   were at -- or at least we believed at.

14             So very few of these were actually

15   submitted to county boards.

16        Q.   Okay.

17             Just now, you said that you were not

18   motivated by outcome.

19             Do you have any reason to believe that

20   True The Vote's challenge effort was motivated

21   by outcome?

22        A.   Well, to clarify, I think what I said

Page 113

1    was I wasn't motivated by an outcome that was

2    consistent with the hyperbolic narrative that

3    was surrounding the election.

4              Our outcome motivation was data

5    hygiene.

6              I'm completely unaware of what True

7    The Vote's motivation was.

8              What I would hope, it was the same.

9    Q.    Okay.

10             Just now, you also mentioned that, you

11   know, you hoped this would be real and tangible

12   and in contrast to the nonsense that was

13   surrounding the election.

14             What do you mean by "nonsense"?

15   A.    How much time did we schedule for

16   today?

17   Q.    Give me a brief summary.

18   A.    Well, I hope by "nonsense," that's

19   self-evident.  But, you know, to coin the common

20   words, the discussions of crackin'; you know,

21   this -- these theories that were running

22   rampant; everybody on the Internet trying to

Page 114

1     come up with their own theory about why events

2     transpired the way they do.

3                 Frankly, none of that was productive

4     for the citizens of the state.  It wasn't

5     productive for our democracy.  It wasn't

6     productive for real opportunities to continue to

7     improve our -- the integrity of our elections in

8     the state which is a never-ending process that

9     needs to take place continually.

10                So I think any measure of the vitriol

11    that was going on -- I had no interest in any of

12    that; and I saw that as disenfranchising

13    everybody in the state; and wanted to be an

14    active participant in making things better.

15                But I certainly didn't want to be an

16    active participant in advancing the type of

17    rhetoric that was dividing people, and I think

18    taking our attention away from the very real

19    opportunities to collaborate on the improvement

20    of our elections.

21                So I view myself as relatively

22    disciplined and we kind of just ignored all that

Page 115

1    noise and stayed focused on data hygiene.

2              MS. FORD:  Could we please pull up

3    Exhibit F and Mark it as Exhibit F?

4              (Exhibit F, Single-page email From:

5    Catherine Engelbrecht, To: Amy Holsworth,

6    Subject: Citizen Challenge Q&A Zoom call Sunday

7    night at 6p et, Sent: December 19, 2020 (no

8    Bates No.), marked for identification)

9              (Pause)

10   BY MS. FORD:

11        Q.    This is an email invitation from Ms.

12   Engelbrecht about a challenger town hall

13   meeting.

14              Do you recognize this?

15        A.    I don't necessarily recognize the

16   email, but I do recognize the town hall meeting

17   that you reference, yes.

18        Q.    Did you attend that meeting?

19        A.    I did.

20        Q.    Before we get to that, Ms. Engelbrecht

21   here calls you a:  Fellow challenger.

22              What exactly did she mean by that?

Page 116

```
 1                Or did you take it to mean?

 2       A.    Well, I don't -- I don't believe that

 3   this email was particularly impactful to me, so

 4   I don't even recall that language.

 5                I see it there.

 6                I don't know why she chose the

 7   language she chose, but I never issued a

 8   challenge, so --

 9       Q.    Have you ever issued an elector

10   challenge?

11       A.    I have not.

12       Q.    So you did attend this call?

13       A.    I did attend this call.

14       Q.    Did you speak on the call?

15       A.    I'm sure I spoke, yes.  But I did not

16   lead this call.

17                If I'm not mistaken, I was driving in

18   the rain and -- but I was not -- I was not a,

19   you know, a stated part of the agenda, if you

20   will.

21       Q.    What did you say on the call?

22       A.    I don't recall exactly.
```

Page 117

1           But because there were fellow

2    Georgians on the call, I'm sure I offered my

3    encouragement.

4        Q.    What do you mean by "encouragement"?

5        A.    Well, I think it's good any time that

6    our citizens involve themselves productively.

7           So, again, I don't recall my exact

8    language at all, but I think just encouragement

9    in the general sense.

10       Q.    What was generally discussed on the

11   call?

12       A.    As I indicated, I was driving in the

13   pouring rain, so it was very difficult for me to

14   track the nature of the call.  So I had --

15   again, I had a very difficult time understanding

16   what was being said and by whom.

17           So I don't have a particularly

18   remarkable recollection of this call.

19           I believe I was spending more time

20   trying to keep my car on the road.

21       Q.    Do you know approximately how many

22   people were on in call?

Page 118

1          A.     I do not.

2          Q.     More than a handful?

3          A.     I have no recollection.  I don't know

4     how many people were on the call.  I don't know

5     if it was more than a handful or not.

6          Q.     Okay.

7                 But did the general topic include the

8     elector challenges that True The Vote was

9     filing?

10         A.     Based on the email, that would be my

11    recollection.

12                But, again, it just -- it wasn't a

13    very big activity for me because I wasn't

14    directly involved with what they were doing.  I

15    just don't have a very detailed recollection of

16    that call.

17         Q.     Okay.

18                MS. FORD:  We can pull this down.

19    BY MS. FORD:

20         Q.     In December of 2020, were you already

21    familiar with -- sounds like you were already

22    familiar with the concept of list maintenance.

Page 119

1            Is that right?

2       A.    Yeah -- well, with the national change

3    of address process, yes.

4       Q.    Were you familiar with the National

5    Voter Registration Act, or NVRA for short?

6       A.    Not in the summer of 2020, no.  I

7    hadn't researched it as carefully as I had

8    later.

9       Q.    By December of 2020, were you familiar

10   with the NVRA?

11      A.    Yes.

12      Q.    What is your understanding of how NCOA

13   data is used under the NVRA?

14      A.    I believe, if I'm not mistaken, it's

15   section 8 that articulates the use of NCOA as a

16   reasonable means for identifying individuals

17   that may have moved.

18            I believe there is safe harbor

19   language with that respect as well.

20            But it's my understanding that NCOA is

21   explicitly cited as a reasonable means of

22   identifying individuals that may have moved.

Page 120

1             And if I'm not mistaken, it's within

2     the general confines of the guidance that's

3     provided for the removal of individuals from

4     lists as well.

5         Q.    What do you mean by "safe harbor

6     language"?

7         A.    Well, I'm surrounded by attorneys, but

8     I'm not one.

9             So my understanding is that language

10    is provided to give the states, you know, again,

11    the ability to use NCOA as a means to identify

12    people that -- as a reasonable means to identify

13    probable cause that somebody has moved their

14    primary residence.

15        Q.    And you understand the NVRA, after

16    someone is identified on the NCOA list -- that

17    the state would send a notice to the voter?

18        A.    Is that a statement?

19            Or a question?

20        Q.    It's a question.

21            Is that your general understanding of

22    how it works?

Page 121

1          A.    Yeah -- my general understanding is

2      the NVRA provides a very thorough process for

3      protecting the voter to ensure that -- that

4      there is multiple occasions of engaging that

5      voter to verify that -- their address.

6                So more specifically -- and I know

7      that there are those on this call that are very

8      familiar with NVRA -- but that it's a

9      multitiered process that expands over a

10     significant amount of time from notifications,

11     as well as lack of involvement in elections.

12                So -- and by my understanding, that's

13     a process that can transpire over a number of

14     years -- six or seven years, if I'm not

15     mistaken.

16          Q.    Okay.

17                So it's your understanding that that's

18     not a process that could be accomplished in a

19     short amount of time.

20                Is that right?

21          A.    No.   It is absolutely my

22     understanding -- and appropriately so -- that

Page 122

1    it's a process that takes a considerable amount

2    of time, and I'm happy that it was.

3        Q.    Did Georgia use that process in

4    advance of the 2020 runoff election?

5        A.    I suspect they did not, because I

6    believe that NVRA also further stipulates

7    periods -- blackout periods -- where you can't

8    engage in any of that activity within a certain

9    proximity of an election.

10            But I'm also not aware of what the

11    Secretary of State's office was or wasn't doing.

12        Q.    Okay.

13            What is your understanding of the

14    purpose of the blackout period?

15        A.    Well, again, I think that's reasonably

16    self-evident.

17            We all have a vested interest in our

18    laws not being exploited to affect a desired

19    outcome in an election.

20            And so -- and I don't know the

21    motivation for those that drafted or passed the

22    NVRA.

Page 123

1          But I would hope their motivation was

2     to create a buffer so that we don't see

3     brinkmanship within the electoral process

4     inadvertently permitted by federal statute.

5          So I think the process that requires a

6     significant amount of due diligence, significant

7     amount of interaction with the voter, and

8     provides for some blackout periods within

9     certain proximities of elections is a very, very

10    good thing.

11         Q.    Okay.

12         And just to put a fine point on that,

13    so I am sure that I understand you, is the point

14    of that need for interaction with the voter a

15    fact that just appearing on the NCOA list does

16    not mean that someone is ineligible to vote?

17         And that investigation is needed?

18         A.    Yeah -- that's a very -- very specific

19    fine point that you have put on there, but it's

20    one of many points.  There is a number of

21    variables that could influence why an individual

22    may or may not be an eligible voter.

Page 124

```
 1                 So my assumption is that that's a

 2     process to ensure that we are not wholly relying

 3     on any one piece of information.

 4                 You know, my understanding and my

 5     belief that the NCOA is -- it is an indicator

 6     that there may be an anomaly, but then that

 7     needs to be substantiated through subsequent

 8     diligence.

 9                 That's my understanding of how it

10     works in the state -- that at no point would any

11     of these challenges prevent an eligible voter

12     from voting.  That's not the intent.

13                 The intent is to identify if there is

14     a data anomaly, then put in motion a process

15     that ultimately, when fully adjudicated,

16     identifies whether or not an individual -- with

17     their participation, hopefully -- whether or not

18     they are eligible or not.

19                 I firmly believe -- and I -- I don't

20     mean to go long here -- that there are

21     individuals that are unaware that they are still

22     registered at their own county.  So this is a
```

Page 125

1    good process to notify people that there is a

2    process in place to ensure that you can vote and

3    vote eligibly.

4          Q.    Okay.

5                MS. FORD:  Can we please pull up

6    Exhibit I and mark it as Exhibit I?

7                (Exhibit I, Single-page document

8    bearing heading: Jim Flenniken (no Bates No.),

9    marked for identification)

10                (Pause)

11                MS. FORD:  Could we make the comment

12    by Mr. Somerville a little bit bigger so we all

13    can read, please?

14   BY MS. FORD:

15          Q.    This is a comment from your Facebook

16    page in which you appear to write:  There are

17    literally thousands of individuals that

18    legitimately used NCOA to forward their mail out

19    of the county/state but remain legal residents.

20                Did you write this?

21          A.    Yes, I did.

22          Q.    I assume you believed that to be true

Page 126

1     at the time you wrote it?

2          A.     I believe that to be true at the time,

3     and I believe that to be true now.

4          Q.     Here you write back to Mr.

5     Flenniken -- I believe his name is -- that there

6     is a process in place to make sures his wife

7     wasn't taken off the rolls improperly, as he had

8     noted in his comment to you.

9               You say:  At some point if your wife

10    filed an NCOA, the state will send her a note

11    and ask her to verify if she is still a

12    resident.  She would, of course, indicate she is

13    and the matter would end there.

14              But since that process hasn't been run

15    by the state since early 2019, and given the

16    unprecedented reliance on -- this cycle on

17    mail-in ballots, our challenges sought to force

18    that verification.

19              And I assume you wrote this as well?

20         A.     I did.

21         Q.     Were you speaking about the challenges

22    that you helped organize in December when you

Page 127

1    said, "Our challenges sought to force that

2    verification"?

3        A.    Well, I think I was speaking more

4    broadly on the data integrity effort.  I think

5    the word "challenge" just became common

6    vernacular.

7              As it turned out, not that many were

8    ultimately submitted.

9              But I think this captures well the

10   point, which was that there is a process to

11   protect voters, but that process needs to be

12   undertaken in order to identify those votes that

13   are not eligible and would otherwise

14   disenfranchise the very voters that we're trying

15   to protect.

16       Q.    Here you seem to be recognizing that

17   the NVRA traditional NCOA process was not going

18   to occur in the few months or weeks before the

19   runoff election.

20             Is that correct?

21       A.    I don't -- I don't know if that's what

22   I was acknowledging.

Page 128

```
 1              I think -- I think what I was trying

 2     to indicate here is that there is a process and

 3     we should follow it; and that our data file,

 4     based on our estimation from looking at it, had

 5     not been maintained in a very long time; and

 6     that that was creating a significant number of

 7     anomalies.

 8              But those people that were eligible

 9     voters are well-protected under the current laws

10     and current processes; and I didn't see a high

11     probability that anybody that -- that appeared

12     on an NCOA file but did not, in fact, legally

13     change a resident would be prevented from

14     voting.  I still confidently believe that.

15              And I think --

16     Q.    Okay.

17     A.    -- and to go further -- I know you

18     didn't -- well, that's okay.

19     Q.    I'm sorry.  I don't mean to cut you

20     off.

21     A.    Well, I guess my point is I think the

22     thrust of this response was to also make a
```

Page 129

1    distinction between the concept of a purge,

2    which this effort was also not about.

3         Q.    Okay.

4              I do want more clarity on when you say

5    you wanted to force that verification.

6              Does that simply mean you wanted

7    election officials to do the investigation that

8    they hadn't done in several years on NCOA

9    individuals?

10        A.    Well, I think more accurately, what I

11   learned after combing through this data, what I

12   believed then and what I believe now is that

13   they had not run the NCOA on that file in such a

14   long period of time that it created significant

15   issues that compromised the confidence of the

16   entire state in the election outcomes; and that

17   that can be simply remedied by them running that

18   NCOA process per the NVRA more frequently.

19              And if permitted to do so -- again,

20   I'm not establishing policy for the state,

21   nobody in the Secretary of State's office cares

22   what I think -- but as soon as they could run

Page 130

1     the NCOA on it, they were going to see the same

2     numbers that we saw.

3          But this exchange is wholly

4     independent of True The Vote.

5     Q.     I understand that.

6          Mr. Somerville, I think what I'm

7     confused on is when you generated these lists,

8     did you expect they would be given to the

9     counties and, like you say here, they would do

10    the verification that they hadn't done in the

11    past couple years?

12         Is that the expectation or hope?

13    A.     So when we -- I can't say we.

14         When I started looking at the file, I

15    don't know what other people were thinking, I

16    actually didn't contemplate the challenge -- the

17    section 230 challenge -- I think if I have got

18    the codes right -- I wasn't aware of it.  I

19    didn't know it existed.

20         So at the time, my sole interest was

21    just trying to understand the state of our voter

22    files.  I think I've indicated it in several of

Page 131

1     my responses.

2              There is a point at which I thought

3     that I had the ability to submit a challenge

4     statewide.

5              And so -- and then over time, my

6     understanding of the actual provision obviously

7     fine tuned, and I recognized that it had to be

8     done at the county level.

9              And certainly any effort that was

10    going to bring attention to these anomalies

11    within the data file, to me, I viewed favorably.

12             How that was going to happen, or if

13    that was going to happen -- difficult at the

14    time to put too much time around that because --

15    again, as I indicated in the beginning and

16    earlier testimony -- I don't know what the

17    government does, or why they do it, or if they

18    would do it, or if these challenges were

19    unprecedented, or if it was common.

20             My overarching objective -- and I

21    believe throughout, it never waned -- was trying

22    to draw attention to this; and then try to play

Page 132

1      an active role in helping remedy the issue.

2             And the issue was the voter fraud.

3      Q.    Were you hoping to remedy anything --

4      I mean, you say here you were hoping to do it on

5      an earlier exhibit.  You thought this

6      verification needed to be done before the

7      January 5th, 2021 runoff.

8             So, I mean, that doesn't sound like a

9      long-term vision there.  That sounds like

10     something you wanted to be done before the date

11     of the runoff election.

12            Is that fair?

13     A.    Well, I think it's one line in

14     thousands of words that I wrote, or spoke to

15     lots of people about the effort, so I don't know

16     that that was an overarching motive.

17            But I do believe that the idea was we

18     need to correct the hygiene issues within this

19     file so that we only have eligible people

20     participating in our elections, be them whoever

21     they are, as soon as we possibly can.

22            Whether or not that fell within the

Page 133

1    blackout periods of the NVRA, I'm not an

2    elections attorney.  You know, I'm not.  So I

3    don't entirely know whether or not that was

4    possible or feasible.

5            But I think urgency around this matter

6    was important.  I still think that.

7        Q.    Okay.

8            (Pause)

9            MS. FORD:  Give me one second here.

10           We can go ahead and take this down,

11   though.

12   BY MS. FORD:

13       Q.    Before, you mentioned -- you agreed at

14   least that just appearing on the NCOA list did

15   not mean that someone was ineligible to vote.

16           Is that correct?

17       A.    Not only is that correct, but I made a

18   very focused effort whenever and wherever

19   possible to indicate that we did not -- I say

20   we -- I did not believe that that was an

21   indication of anybody knowingly doing anything

22   wrong, or knowingly violating any law, or

Page 134

1     potentially violating any law.

2              It was simply a series of data

3     constructs that flagged a record as being

4     possibly that of an ineligible voter and

5     required closer attention, which I believe is

6     the spirit of the law.

7          Q.    So fair to say you would not have

8     wanted the list of 40,000 to go out to the

9     counties and for the county to unilaterally

10    cross them off the list of voters, without any

11    investigation?

12         A.    That's remarkably fair to say.

13             It would be illegal to do so; it would

14    be improper to do so; and it would be counter to

15    the purposes of the effort and, frankly, my core

16    values.

17             This effort has been and continues to

18    be about restoring some degree of confidence in

19    our elections to the benefit of every voter; and

20    to make sure that nobody is disenfranchised due

21    to individuals who may have knowingly or

22    unwittingly participated in an election.

Page 135

1          And we know it occurred.

2          So, yes, that's very fair to say.

3     Q.    So, I mean, here is my question, Mr.

4    Somerville, and I'm going to be very candid with

5    you, is:  You said you recognize that the NVRA

6    process -- and I realize this was not an NVRA

7    process -- takes a lot of time.  It's a

8    multitiered effort.  It takes significant

9    investigation.

10          And if you recognize you can't just

11   take a list of NCOA individuals and blanket make

12   them ineligible, you have to have understood

13   that some investigation would be required and it

14   would be required within a two-week period.

15          Is that fair to say?

16     A.    No.  It's not.

17          What you are suggesting is you are

18   making a leap between identifying records of

19   individuals that appeared on an NCOA and tying

20   that to their purging or removal from voter

21   files.

22          I don't believe anywhere in my

Page 136

1    testimony I have suggested that anybody would be

2    moved to inactive or removed from a voter file.

3              As I understand it -- and again, I'm

4    not a lawyer, I'm a citizen, but I'm a citizen

5    that I believe was exercising a state law

6    written for me as a citizen -- is we are trying

7    to highlight individuals that may have voted in

8    a county that they no longer resided in.

9              The process of highlighting them and

10   bringing them to the attention of the county

11   does not nullify their registration with the

12   state.  It doesn't even begin to do anything

13   that closely approximates removing them from the

14   files.

15             It simply identifies and -- to the

16   county as an individual that may have -- may no

17   longer reside in the county.

18             Then there is a process from this

19   point forward which is strictly governed, as I

20   understand it, by federal and state law.

21             So I think it's -- I think it's a

22   stretch to suggest that we are trying to make

Page 137

1    something happen in two weeks.

2              What we are trying to do is bring this

3    matter to the attention.

4              And I don't believe that there is any

5    provision that precludes you from submitting an

6    elector challenge.  In fact, if I'm not

7    mistaken, the very language of the law permits

8    you to make that challenge to the board of

9    election at any time.

10             I think the provision that we are

11   discussing -- or at least that's implied around

12   the NVRA -- is what process is required before

13   you can remove an individual -- individual from

14   your voter role; and that's a multiyear process.

15             So to be candid with you, I think

16   those items are being conflated and they

17   shouldn't be.  That's -- that's not at all the

18   motive.

19             Urgency was the motive, and

20   highlighting the issue urgently was the motive.

21   Q.    Okay.

22             MS. FORD:  Can we go to Exhibit G,

Page 138

1    please?

2              (Exhibit G, Multipage document

3    entitled: Defendant Derek Somerville's Responses

4    to Plaintiffs' First Interrogatories, dated

5    March 15, 2021 (no Bates Nos.), marked for

6    identification)

7              (Pause)

8    BY MS. FORD:

9        Q.   Mr. Somerville, this is interrogatory

10   responses that we requested and that you

11   responded to.

12             Do you recognize this?

13       A.   I do.

14       Q.   And you remember reading these and

15   providing responses to them?

16       A.   I do remember.

17       Q.   Okay.

18             And you remember signing the document?

19       A.   I do remember signing the document.

20       Q.   I would like to just go through a

21   couple of these to make sure they are still

22   accurate, or give you a chance to update your

Page 139

1    response if you have any clarifications.

2              MS. FORD:  Can we scroll down to

3    interrogatory No. 1?  That will be a couple

4    pages in.

5              (Pause)

6              MS. FORD:  I'm sorry.  This would be

7    definition No. 1.  We are looking for

8    interrogatory No. 1.  I apologize that I didn't

9    write the page down.

10             MS. KRAMER:  It's on page 7,

11   counsel --

12             MS. FORD:  Thank you.  Yeah, this

13   right here.

14             MS. KRAMER:  Sorry.

15             MS. FORD:  I appreciate it.

16   BY MS. FORD:

17       Q.   So for this interrogatory, when we ask

18   you to describe your role or involvement in

19   compiling any list of targeted voters for the

20   purpose of Georgia elector challenges, you

21   stated you had no role or involvement in

22   compiling any list of targeted voters for the

Page 140

1      purposes of the Georgia elector challenges.

2              Is that still accurate?

3      A.     That is accurate.

4      Q.     Did you interpret this question to

5      refer only to challenges that were filed in

6      conjunction with True The Vote?

7      A.     Well, I believe that that is the

8      definition that was presented in this same

9      document -- that the Georgia elector challenges

10     were challenges that were -- and I'm

11     paraphrasing -- prepared for -- prepared by and

12     submitted by True The Vote, yes.

13     Q.     Would your answer be different if you

14     were responding to challenges that you,

15     yourself, were involved in without the

16     assistance of True The Vote?

17     A.     I'm sorry.  Can you state that

18     question again?

19     Q.     Yes.

20             If you -- would your answer be

21     different if you were responding to this

22     question regarding your own challenges on the

Page 141

1    list that you prepared?

2              MS. KRAMER:  I'm going to object real

3    fast -- sorry -- to relevance and scope.

4              These interrogatories -- you are

5    asking him to speculate on what he might have

6    done if that were the case right now, but that's

7    not what this in is -- that's not what this is

8    about.

9              MS. FORD:  Ms. Kramer, the

10   interrogatory, when it defined Georgia elector

11   challenges, did not refer to challenges that

12   solely True The Vote prepared.

13   BY MS. FORD:

14       Q.    It asked about challenges that you

15   prepared as well.

16              So I'm asking if this answer is

17   different if it is not contemplating True The

18   Vote.

19       A.    So my response was under the

20   understanding that this was a lawsuit brought

21   against True The Vote and their activities.  And

22   then there was a number of individuals that are

Page 142

1    cited under assumption that they worked in

2    conjunction with True The Vote for those

3    challenges.

4              It was further my understanding that

5    the only reason I was even involved was because

6    I appeared in a press release.

7              Had the question either been asked

8    differently, or if I was asked whether or not I

9    participated in compiling any list of targeted

10   voters, or rather for challenges, then I would

11   have answered in the affirmative.

12             But that was not my understanding of

13   this interrogatory.

14        Q.    So was that your understanding for all

15   the interrogatories? -- is that they were only

16   asking about your efforts with True The Vote

17   challenges?

18        A.    Yes, ma'am.

19        Q.    Okay.

20             And your answers would have been

21   different if you had been answering about your

22   own work with Mark Davis?

Page 143

1          A.    Well, I can't speculate because -- how

2     I would respond because I don't know how the

3     question would be formulated.

4                But if the -- if the scope was beyond

5     what I understand this case to be, then my

6     answers may have been different, yes.

7          Q.    Okay.

8                MS. FORD:  For interrogatory No. 5 --

9     could we go to that one, please?

10               (Pause)

11               MS. FORD:  Okay.

12    BY MS. FORD:

13         Q.    Here we've asked you to describe all

14    individuals affiliated with True The Vote with

15    whom you communicated and -- I apologize?

16               MS. FORD:  Could we actually go to the

17    next page of this answer?

18               Yeah, that -- that paragraph right

19    there.

20    BY MS. FORD:

21         Q.    You say:  On December 17, you received

22    "a text message from Catherine Engelbrecht,

Page 144

1     informing me that TTV had a meeting with the

2     Georgia Secretary of State's office.  I never

3     had any further conversation with request Ms.

4     Engelbrecht about that meeting, nor did that

5     text lead to any coordination between TTV and

6     myself."

7          Is that still accurate?

8     A.    That's my recollection.  I don't

9     recall any further conversations regarding their

10    meeting with the Secretary of State's office.

11    Q.    Okay.

12          But today you did testify that you

13    remained in communication with True The Vote and

14    Ms. Engelbrecht after December 17, correct?

15    A.    I have had communication with them,

16    but that we remained in communication probably

17    implies more communication than that has taken

18    place.

19    Q.    Okay.

20          MS. FORD:  We can take this down.

21          And can we please pull up Exhibit J

22    and mark it as Exhibit J?

Page 145

1                    (Exhibit J, Multipage document

2          entitled: Defendant Derek Somerville's Responses

3          to Plaintiffs' First Requests for Production,

4          dated March 15, 2021 (no Bates Nos.), marked for

5          identification)

6     BY MS. FORD:

7          Q.    Mr. Somerville, these are just the

8          requests for production.

9                    Do you remember seeing this before and

10         reading through this?

11         A.    I do remember that.

12         Q.    I guess I have the same -- same

13         question here as:  When we asked you to -- for

14         documents and communications discussing --

15         analyzing the Georgia elector challenges, you

16         produced a single document.

17                   Did you similarly interpret these

18         questions only to refer to challenges that were

19         filed with True The Vote?

20         A.    Yes.

21         Q.    Okay.

22                   Would you have had more documents to

Page 146

1    produce if you were responding to challenges you

2    had filed on your own?

3         A.    Without seeing the request, I don't

4    know.

5         Q.    Okay.

6               MS. FORD:  We can take this down.

7    Thank you.

8               I just have a few more questions.

9    BY MS. FORD:

10        Q.    Have you been speaking to local GOP

11   groups in the past few months about election

12   integrity?

13        A.    I have.

14        Q.    What do those presentations generally

15   discuss?

16        A.    Well, I think they are all out there

17   and on the record.

18               The general theme is:  We need to move

19   beyond the conspiracies and vitriol and move

20   towards cogent strategies, number one, for

21   ensuring the integrity of our elections, but

22   also for the political party itself.

Page 147

```
 1        Q.    Okay.

 2              And would you say conspiracies and

 3     vitriol was a theme in Georgia after the 2020

 4     general election?

 5        A.    Could you restate that question?

 6        Q.    Would you say that conspiracies and

 7     vitriol were a theme after the 2020 general

 8     election in Georgia?

 9        A.    Yes.

10        Q.    Okay.

11              Just conspiracies about some sort of

12     fraud in the election?

13              Or democrats stealing the election?

14              Is that the general -- or you tell me.

15              What were the general conspiracies or

16     vitriol swirling around?

17        A.    Well, I think they are relatively

18     known to all.

19              I don't know that I would necessarily

20     view them in the partisan light as you just

21     characterized it, but I think there was an awful

22     lot of discussion and there was conspiracies
```

Page 148

1    ranging from shoot-outs in warehouses in

2    Germany.  There is dozens, and dozens, and

3    dozens.

4              And what I have been trying to do --

5    and I am invite only, I'm not offering my time,

6    but people invite me to come speak -- is I'm

7    trying to return those conversations to a

8    common-sense discussion around election

9    integrity.

10             I'm also speaking out directly against

11   those conspiracies.

12             And, again, there is any number of

13   them that surface, or I am confronted with when

14   I go to these counties.

15        Q.   From your perspective, did those

16   theories get a little out of hand after the

17   general election?

18        A.   By my estimation, they got entirely

19   out of hand, to everybody's detriment.

20        Q.   After the 2020 general election, were

21   you aware in Georgia that some election

22   officials had been accused of fraud?

Page 149

1       A.    I'm not aware of any specific

2    allegations.

3            But I know the -- you know, election

4    fraud was a -- was a -- became a dial tone, if

5    you will.  It was constantly swirling around in

6    every venue.

7            But I'm not aware of any specific

8    allegations.  I don't, at least, recall any.

9            MS. FORD:  Can we please pull up

10   Exhibit L and mark it as Exhibit L?

11           (Exhibit L, Two-page document

12   entitled: True The Vote Launches Georgia

13   Election Integrity Hotline as Part of the Most

14   Comprehensive Ballot Security Effort in Georgia

15   History, dated December 15, 2020 (no Bates

16   Nos.), marked for identification)

17           (Pause)

18  BY MS. FORD:

19       Q.    So this is a press release from True

20   The Vote that was released on December 15, 2020,

21   which I believe would have been the same day

22   that you had dinner with Ms. Engelbrecht and

Page 150

1     Gregg.

2               And this press release discusses a

3     24/7 hotline to report voter fraud that True The

4     Vote had just launched.

5               Have you seen this before?

6       A.    I have not.

7       Q.    Have you ever discussed this hotline

8     with True The Vote?

9       A.    I have not.

10      Q.    Were you aware that True The Vote had

11    launched this hot line?

12      A.    I don't have any recollection of it.

13    If it was shared with me, I don't have any

14    recollection of it at all.

15      Q.    Okay.

16              We can go to it, or you can just take

17    my word for it -- that this release also

18    mentions plans to -- quote -- "monitor absentee

19    ballot drop boxes."

20              Is that something you ever discussed

21    with True The Vote?

22      A.    No, it was not.

Page 151

1          Q.     Okay.

2                 And were you aware of these plans?

3          A.     No, I was not.

4                 MS. FORD:  Can we pull up Exhibit M

5     and mark it as Exhibit M?

6                 (Exhibit M, Three-page document

7     entitled: True The Vote Launches "Validate the

8     Vote" Initiative and Whistleblower Fund to

9     Ensure Election Validity, Process Integrity,

10    dated November 6, 2020 (no Bates Nos.), marked

11    for identification)

12    BY MS. FORD:

13         Q.     This is a press release from True The

14    Vote that was released in November, 2020,

15    discussing True The Vote's whistleblower fund

16    for those who reported instances of voter fraud

17    or election fraud.

18                Have you seen this before?

19         A.     I don't believe I have.

20         Q.     Did you ever discuss this

21    whistleblower fund with True The Vote?

22         A.     I did not.

Page 152

1        Q.    Were you aware they had launched this

2    fund?

3        A.    I don't have any recollection of it,

4    no.

5              MS. FORD:  We can take this down,

6    thank you.

7              Can we please pull up Exhibit K and

8    mark it as Exhibit K?

9              (Exhibit K, Single-page document

10    bearing heading: Derek Somerville, dated

11    November 15, 2020 (no Bates No.), marked for

12    identification)

13             (Pause)

14             MS. FORD:  Can we scroll up, please?

15             Or actually, I'm sorry.  It's there.

16    BY MS. FORD:

17        Q.    This is a snapshot from your Facebook,

18    in which you write on November 15, 2020:  This

19    is what we are up against.  600,000 mail ballots

20    and counting.

21             Did you write this?

22        A.    It appears I did, yes.

Page 153

```
 1        Q.    Who is the "we" in "this is what we

 2    are up against"?

 3        A.    I believe the context would be that

 4    "we" is the people of Georgia.

 5             The issue is, as I indicated earlier,

 6    that the larger the amount of mail-in ballots,

 7    the more exaggerated the affect of a bad voter

 8    file.

 9             So to me, the intent here is to

10    highlight the fact that we have a reliance on

11    mail-in ballots that's greater than ever -- is

12    how I would understand it.

13             It was a year ago, but that -- that I

14    believe is the context; and that is what I

15    believe today is the primary issue.

16        Q.    Okay.

17             So you -- you thought it was

18    concerning that so many mail ballots are being

19    either requested or cast?

20        A.    Well, I think I've continued to

21    maintain that the primary issue that we have

22    with respect to the quality of the election in
```

Page 154

1    Georgia was that we had an unprecedented level

2    of mail-in ballots that not only taxed the

3    system, but truly magnified the data errors

4    within our voter file.

5              So for me, that's a concerning number

6    because we have neither the infrastructure

7    and -- at least at the time that this was

8    written, I don't know if the Secretary of State

9    has taken any action since then -- but the voter

10   file itself is problematic.

11        Q.   So did you have a concern that out of

12   this 600,000, that some of those would not be

13   residents of Georgia?

14        A.   Yes, that's -- that's fair.

15        Q.   Okay.

16        A.   And that's --

17        Q.   I mean --

18        A.   -- one of many.

19             Sorry.

20        Q.   Sorry.  What were the other --

21        A.   Yeah, I'm sorry --

22        Q.   -- the other reasons --

Page 155

1        A.      -- to --

2        Q.      -- for the concern, then?

3        A.      Sorry.  I feel bad for the

4    stenographer.

5                Yeah, the -- so it's a function of

6    both the data file, but it's also the system had

7    already shown its relative inability to handle

8    the volume once already.

9                And the fundamental -- and maybe

10   rhetorical -- question is whether or not

11   improvements were made to enhance the

12   reliability of that process, as it is going to

13   be a theme going forward --

14       Q.      Okay.

15       A.      -- the reliance on mail-in ballots.

16       Q.      So you mentioned before that you

17   thought it was possible there were voters who

18   had moved, say, either -- you know, maybe to a

19   different county that didn't know that they

20   weren't eligible any more, right?

21       A.      Yes.

22       Q.      Did you think that, you know, these

Page 156

1    challenges would potentially make a voter who

2    had moved to another county, sort of, like,

3    think twice about voting in their original

4    county or state?

5         A.    I believe what I thought was that it

6    would alert individuals that they needed to

7    update their registration so that they could

8    participate in the election.

9         Q.    Was it your hope or expectation that

10   the voters who were identified in your process

11   would be notified, as there might be a problem

12   here?

13        A.    Ultimately, that's the process that

14   would have been undertaken, and has probably

15   been undertaken if the state themselves ran the

16   NCOA.  I believe that's their processes -- to

17   notify the voter and then afford them an

18   opportunity to either clarify or update their

19   registration.

20             Again, the objective here is to ensure

21   everybody that is eligible can vote.

22             And I would maintain that there is a

Page 157

1    significant number of people that were unaware,

2    due to circumstances, that they may have cast a

3    vote in a county that they are no longer

4    eligible to vote in.  And I believe the NCOA

5    process was the only way to meaningfully alert

6    the voters that that was a condition.

7        Q.    Mr. Somerville, do you have any

8    regrets about working with True The Vote in

9    December of 2020?

10       A.    Well, I don't think you can

11   characterize what I did was work with them.

12            I met them.  I spoke with them.  I

13   have been cordial to them, as I would be

14   anybody.  So I didn't work with them, so I don't

15   have regrets working with them.

16            Admittedly, our motivation for effort

17   was benign.  It was governed by the laws in this

18   state, and it was driven by a passion to bring a

19   sensible discussion around:  How we can improve

20   the overall environment for everybody?

21            And our association with True The Vote

22   has, I think, skewed that a little bit.

Page 158

1            I don't know how people view True The

2       Vote.  They are not a regular discussion point

3       for me.

4            But certainly I think it's fair to say

5       this is not particularly pleasant experience,

6       and that was never our intention.

7       Q.   When you say that your motivation was

8       benign, do you have any reason to believe that

9       True The Vote's motivation was not benign?

10      A.   I have no reason to believe that.

11           MS. FORD:  That's all the questions

12      that I have for you today.

13           MS. KRAMER:  And I do not have any

14      follow-up questions.

15           MS. FORD:  Great.

16           Mr. Somerville, thank you for being

17      here today.

18           THE VIDEOGRAPHER:  The time is 11:59

19      a.m., October 6, 2021, and this concludes

20      today's deposition.  We are now off the record.

21                     *     *     *

22

10/6/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville
                        Confidential - Pursuant to Protective Order

                                                                        Page 159

1                    E N D   O F   P R O C E E D I N G

2          Time noted 11:59 a.m. Eastern Daylight Time

3                          *       *       *

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 160

```
 1                   C E R T I F I C A T E

 2

 3              I, BRANDON RAINOFF, a Federal Certified
     Realtime Reporter and Notary Public within and for
 4   the State of New York, do hereby certify:

 5              That  DEREK SOMERVILLE, the witness
     whose  deposition is hereinbefore set forth, was duly
 6   sworn by me and that such deposition is a true record
     of the testimony given by the witness.

 7              I further certify that I am not related
     to any of the parties to this action by blood or
 8   marriage, and that I am in no way interested in the
     outcome of this matter.

 9              IN WITNESS WHEREOF, I have hereunto set
     my hand this 6th day of October, 2021.

10

11

12

13

14

15

16

17

18

19

20
                  _____
21                BRANDON R. RAINOFF, RMR, CRR, RPR, FCRR

22
```

```
                                                     Page 161
1         Derek Somerville, c/o

          THE BOPP LAW FIRM

2         1 South Sixth Street

          Terre Haute, Indiana  47807-3510

3

4         Case: Fair Fight, Inc. et al. v. True the Vote, et al.

          Date of deposition: October 6, 2021

5         Deponent: Derek Somerville

6

7         Please be advised that the transcript in the above

8         referenced matter is now complete and ready for signature.

9         The deponent may come to this office to sign the transcript,

10        a copy may be purchased for the witness to review and sign,

11        or the deponent and/or counsel may waive the option of

12        signing. Please advise us of the option selected.

13        Please forward the errata sheet and the original signed

14        signature page to counsel noticing the deposition, noting the

15        applicable time period allowed for such by the governing

          Rules of Procedure. If you have any questions, please do

16        not hesitate to call our office at (202)-232-0646.

17

18

19        Sincerely,

          Digital Evidence Group

20        Copyright 2021 Digital Evidence Group

21        Copying is forbidden, including electronically, absent

22        express written consent.
```

Page 162

1        Digital Evidence Group, L.L.C.
         1730 M Street, NW, Suite 812
2        Washington, D.C. 20036
         (202) 232-0646
3
4        SIGNATURE PAGE
         Case: Fair Fight, Inc. et al. v. True the Vote, et al.
5        Witness Name: Derek Somerville
         Deposition Date: October 6, 2021
6
7        I do hereby acknowledge that I have read
         and examined the foregoing pages
8        of the transcript of my deposition and that:
9
10       (Check appropriate box):
         (  ) The same is a true, correct and
11       complete transcription of the answers given by
         me to the questions therein recorded.
12       (  ) Except for the changes noted in the
         attached Errata Sheet, the same is a true,
13       correct and complete transcription of the
         answers given by me to the questions therein
14       recorded.
15
16
17
18       _____          _____
19         DATE                    WITNESS SIGNATURE
20
21       _____          _____
22         DATE                        NOTARY

Page 163

1          Digital Evidence Group, LLC

2          1730 M Street, NW, Suite 812

3          Washington, D.C.  20036

4          (202)232-0646

5

6                          ERRATA SHEET

7

8          Case: Fair Fight, Inc. et al. v. True the Vote, et al.

9          Witness Name: Derek Somerville

10         Deposition Date: October 6, 2021

11         Page No.    Line No.     Change

12

13

14

15

16

17

18

19

20

21     _____        _____

22         Signature                              Date