Case 2:20-cv-00302-SCJ   Document 164-1   Filed 05/17/22   Page 1 of 99

1/17/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Amy Holsworth

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

GAINESVILLE DIVISION

_____

FAIR FIGHT, INC., SCOTT BERSON,          )

JOCELYN HEREDIA, AND JANE DOE,           )

                        PLAINTIFFS, )

                                         )

              v.                         )CASE NO.

                                         )220-CV-00302-SCJ

TRUE THE VOTE, INC., CATHERINE           )

ENGELBRECHT, DEREK SOMERVILLE,           )

MARK DAVIS, MARK WILLIAMS,               )

RON JOHNSON, JAMES COOPER, AND           )

JOHN DOES 1-10,                          )

                        DEFENDANTS.  )

_____)


VIDEOTAPED DEPOSITION OF AMY HOLSWORTH

TAKEN REMOTELY VIA ZOOM VIDEOCONFERENCE

WEDNESDAY, JANUARY 12, 2022



Reported by Audra E. Cramer, CSR No. 9901



_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Case 2:20-cv-00302-SCJ  Document 164-1  Filed 05/17/22  Page 2 of 99

1/17/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Amy Holsworth

Page 2

1          VIDEOTAPED DEPOSITION OF AMY HOLSWORTH,

2     TAKEN REMOTELY VIA ZOOM ON BEHALF OF THE PLAINTIFFS,

3     AT 9:27 A.M. CST, WEDNESDAY, JANUARY 12, 2022, BEFORE

4     AUDRA E. CRAMER, CSR NO. 9901, PURSUANT TO NOTICE.

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

```
 1    APPEARANCES OF COUNSEL
 2    FOR PLAINTIFFS:
              ELIAS LAW GROUP
 3            BY:  JACOB SHELLY, ESQUIRE
                   JOEL J. RAMIREZ, ESQUIRE
 4                 TINA MENG, ESQUIRE
              700 13TH STREET NW, SUITE 600
 5            WASHINGTON, DC 20005
              (202) 968-4490
 6            jshelly@elias.law
              jramirez@elias.law
 7            tmeng@elias.law
 8                      AND
              LAWRENCE & BUNDY LLC
 9            BY:  LESLIE J. BRYAN, ESQUIRE
              1180 WEST PEACHTREE STREET NW, SUITE 1650
10            ATLANTA, GEORGIA 30309
              (404) 400-3350
11            leslie.bryan@lawrencebundy.com
12
13    FOR DEFENDANTS:
              THE BOPP LAW FIRM
14            BY:  MELENA S. SIEBERT, ESQUIRE
              1 SOUTH SIXTH STREET
15            TERRE HAUTE, INDIANA 47807
              (812) 232-2434
16            msiebert@bopplaw.com
17
18    ALSO PRESENT:
19            HENRY MARTE, VIDEOGRAPHER/HOTSEATER
20
21
22
```

Page 4

```
 1                        I N D E X
 2   WITNESS
     AMY HOLSWORTH
 3
 4   EXAMINATION                      PAGE
     BY MR. SHELLY                      6
 5   BY MS. SIEBERT                    90
 6
 7                      E X H I B I T S
 8   NO.        PAGE       DESCRIPTION
 9   Exhibit 1  11         NOTICE OF DEPOSITION
10   Exhibit 2  16         PRESS RELEASE LABELED
                           EXHIBIT 3
11   Exhibit 3  29         PRESS RELEASE LABELED
                           EXHIBIT 4
12   Exhibit 4  34         PRESS RELEASE LABELED
                           EXHIBIT 1
13   Exhibit 5  38         EMAIL CHAIN DEF WILLIAMS
                           0303
14   Exhibit 6  58         EMAIL CHAIN DEF WILLIAMS
                           0759 THRU 0780
15   Exhibit 7  63         EMAIL CHAIN DEF TTV 1443
16   Exhibit 8  72         SPREADSHEET "TTV CHALLENGER
                           IDENTITIES" (NATIVE)
17
18
19       REPORTER'S NOTE:  All quotations from exhibits are
20   reflected in the manner in which they were read into the
21   record and do not necessarily indicate an exact quote
22   from the document.
```

Page 5

1          REMOTELY VIA ZOOM VIDEOCONFERENCE

2       WEDNESDAY, JANUARY 12, 2022, 9:27 A.M. CST

3

4          THE VIDEOGRAPHER:  Okay.  We are now on

5    the record.  My name is Henry Marte, the

6    videographer on behalf of Digital Evidence

7    Group.  Today's date is January 12, 2022, and

8    the time is 9:27 a.m.

9          This deposition is being held by remote

10   Zoom in the matter of Fair Fight, Inc., et al.

11   versus True the Vote.  The deponent today is Amy

12   Holsworth.

13         All parties to this deposition are

14   appearing remotely and have agreed to the

15   witness being sworn in remotely.

16         Will counsel please identify themselves

17   for the record, after which the court reporter

18   will administer the oath to the witness.

19         MR. SHELLY:  I'm Jacob Shelly with

20   Elias Law Group on behalf of the Plaintiffs.

21         MS. BRYAN:  I'm Leslie Bryan,

22   Lawrence & Bundy, on behalf of Plaintiffs.

Page 6

1          MS. MENG:  I'm Tina Meng on behalf of

2     the Plaintiffs, with Elias Law Group as well.

3          MR. RAMIREZ:  Joel Ramirez on behalf of

4     Plaintiffs, with Elias Law Group.

5          MS. SIEBERT:  Melena Siebert on behalf

6     of Defendants, with the Bopp law firm.

7

8                    AMY HOLSWORTH,

9          having been first duly sworn, was

10         examined and testified as follows:

11

12                    EXAMINATION

13    BY MR. SHELLY:

14    Q.   Good morning, Ms. Holsworth.  I'm Jacob

15    Shelly, and I --

16    A.   Jacob, I am so sorry.  I have a phone

17    call coming in that I have to take.  It'll take,

18    like, 30 seconds.

19    Q.   That's fine.

20    A.   I'm so sorry.

21         THE VIDEOGRAPHER:  Okay.  Let me take

22    us off the record.

1/17/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Amy Holsworth

Page 7

1          The time is 9:28 a.m.  Going off the

2    record.

3              (Pause in the proceedings.)

4              THE VIDEOGRAPHER:  The time is

5    9:30 a.m.  We are back on the record.

6    BY MR. SHELLY:

7       Q.   Good morning, Ms. Holsworth.  I'm Jacob

8    Shelly, and I represent plaintiffs in this case.

9              Can you repeat your full name for the

10   record.

11      A.   Amy Holsworth.

12      Q.   And will you state your address for the

13   record.

14      A.   9131 Monarch Mist Lane, Houston, Texas

15   77070.

16      Q.   And is that where you are right now?

17      A.   Correct.

18      Q.   Have you ever been deposed before?

19      A.   Yes.

20      Q.   How many times?

21      A.   I don't recall.  Several.

22      Q.   In what kinds of cases?

Page 8

1     A.   Divorce.

2     Q.   And when was that, if I may ask?

3     A.   Starting 2012 to about 2016, '17.

4     Q.   Okay.  Have you ever been deposed on a

5     web platform before like this?

6     A.   No, sir.

7     Q.   Okay.  It's mostly the same but a

8     little bit different.  So I'd like to go over a

9     few of the ground rules so we all have the same

10    understanding.

11         All testimony today is under oath just

12    as if you were testifying in court.

13         Does that make sense?

14    A.   Yes, sir.

15    Q.   If at any point you do not understand a

16    question that I'm asking, will you please let me

17    know?

18    A.   Yes, sir.

19    Q.   And I'll do my best to rephrase or

20    otherwise clarify.

21         If you do answer a question, I'll

22    assume you understand it.

Page 9

1          Is that fair?

2      A.   Yes, sir.

3      Q.   If at any time you would like to take a

4    break, please let me know, and I'll try to find

5    a good place to stop, and we can go off the

6    record for a few minutes.  The only exception is

7    that if I've asked a question, I would like you

8    to answer it before we take the break.

9          Does that sound good?

10     A.   Yes, sir.

11     Q.   In this deposition, just like any

12   other, the court reporter will be recording my

13   questions and your answers.  The court reporter

14   can only record verbal answers, so please answer

15   with an audible yes or no instead of a head

16   shake.

17          Does that sound good?

18     A.   Yes.

19     Q.   And please wait until I finish asking

20   my question before you begin answering so that

21   we're not talking over each other.

22          Agreed?

Page 10

1      A.   Yes.

2      Q.   For the record, can you explain how

3   you're viewing this deposition?

4           I understand you're viewing it by phone

5   and by laptop.

6      A.   Yes, sir.

7      Q.   Okay.  Do you have any documents with

8   you, either hard copies or electronic?

9      A.   No, sir.

10     Q.   Is anyone else in the room with you?

11     A.   No, sir.

12     Q.   Because we are taking your deposition

13  remotely, I may not always be able to see what

14  you have in front of you or who may enter the

15  room while you're testifying.

16          Do you understand that it would not be

17  appropriate for anyone to tell you how to answer

18  a particular question that I ask?

19     A.   Yes, sir.

20     Q.   And do you agree that while you are

21  testifying today, you will not exchange

22  communications, whether by text, email or other

Page 11

1   messaging, about how to answer the questions

2   that I ask?

3        A.   Yes, sir.

4        Q.   What did you do to prepare for today's

5   deposition?

6        A.   Spoke with Ms. Siebert yesterday for an

7   hour about rules of the deposition.

8        Q.   Did you have any conversations with any

9   of the Defendants in this case regarding the

10  deposition?

11       A.   No.

12            MR. SHELLY:  All right.  Let's test out

13  the screening sharing.

14            Henry, can you pull up Exhibit A and

15  mark it as Exhibit 1.

16                 (Whereupon, Exhibit 1 was

17              marked for identification.)

18            THE WITNESS:  May I correct?

19            I believe Catherine called me at some

20  point and said that [garbled].

21            (The reporter requested clarification.)

22            THE WITNESS:  Yes.  I'm sorry.  Let me

1/17/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Amy Holsworth

Page 12

1    correct.

2          I think at some point when this

3    started, I think Catherine had called me and

4    said that I would be depositioned.  That's the

5    only communication we had.  So I just wanted to

6    correct that.

7    BY MR. SHELLY:

8      Q.   Approximately when was that?

9      A.   You know, I don't really recall.

10     Q.   Like, in the past few weeks or several

11   months ago?

12     A.   Maybe several months.

13     Q.   Okay.  Are you able to see this exhibit

14   on the screen?

15     A.   Yes, sir.

16     Q.   Do you recognize this document?

17     A.   Yes, sir.

18     Q.   This is the deposition notice for this

19   morning.

20          Are you prepared to testify today?

21     A.   Yes, sir.

22     Q.   Okay.  Great.

Page 13

1           Henry, you can take that down.

2           And I'd like to start with a few

3    background questions about yourself,

4    Ms. Holsworth.

5           What is your current job?

6      A.   Consulting.  Independent contracting.

7      Q.   Okay.  And how long have you been in

8    that position?

9      A.   I've been doing it several years.

10     Q.   Okay.  And who are some of your clients

11   that you consult for?

12     A.   Some political clients.  I just started

13   for a law firm that I'm starting tomorrow or the

14   next day that I start.  So...

15     Q.   Congratulations.

16     A.   Thank you.

17     Q.   Do you currently work for True the

18   Vote?

19     A.   No, sir.

20     Q.   Have you are previously worked for

21   True the Vote?

22     A.   Yes, sir.

Page 14

1      Q.   And was that in your position as a

2    consultant, or was that different?

3      A.   No.  Contracting.

4      Q.   Contracting.  Sorry.

5           You worked for them as a contractor?

6      A.   Yes, sir.

7      Q.   Okay.  And do you still -- are you

8    still under contract with them?

9      A.   No, sir.

10     Q.   Okay.  When did your contract for work

11   with them begin and end?

12     A.   Started, I believe, September --

13   October or September of 20- -- let me see.  Was

14   it 2020?  And then ended, I believe, in June of

15   this year or July, I believe.

16     Q.   Of 2021 I assume you mean?

17     A.   Yeah, I'm sorry.  Yeah, 2021.

18     Q.   I still write the wrong date.

19          MS. SIEBERT:  None of us are used to it

20   being a new date yet.

21   BY MR. SHELLY:

22     Q.   Okay.  And how did you come to work for

Page 15

1    True the Vote in that position?

2        A.    I believe somebody who was working with

3    them had recommended -- I think Catherine was

4    looking for someone to fill that position, and

5    they recommended me, and...

6        Q.    And what kinds of tasks were you

7    responsible for?

8        A.    Mainly my job was the -- doing the

9    voter -- the hotline, fielding calls for that

10   when they came through.  Also one of the

11   things -- you know, collect data and information

12   from other states about their voting laws and

13   their updating laws and rules of, you know, the

14   voting process.

15       Q.    And who was your supervisor?

16       A.    It was Catherine.

17       Q.    Did she give you all your assignments?

18       A.    Catherine did, and then at some point

19   Mrs. Courtney Kramer.

20       Q.    Is it that they both gave you

21   assignments off and on or that for a while

22   Ms. Engelbrecht gave you assignments and then at

Page 16

1    some point you began to receive assignments from

2    Ms. Kramer?

3        A.   Mrs. -- Catherine at first, and then,

4    you know, she hired an executive director,

5    Mrs. Kramer, who then --

6        Q.   Okay.  Do you recall approximately when

7    that was?

8        A.   Approximately February/March-ish maybe

9    of 2021.

10       Q.   Okay.  So during fall 2020 and winter,

11   your assignments would have come from

12   Ms. Catherine Engelbrecht?

13       A.   Correct.

14       Q.   You mentioned the hotline.

15            Henry, can you pull up Exhibit B and

16   mark it as Exhibit 2.

17                 (Whereupon, Exhibit 2 was

18              marked for identification.)

19            MR. SHELLY:  And can you scroll down.

20       Q.   Are you familiar with this press

21   release, Ms. Holsworth?

22       A.   Yes.

Page 17

1      Q.   This is a press release that True the

2   Vote published announcing the Georgia election

3   integrity hotline; is that right?

4           And feel free to ask if you need Henry

5   to scroll down so you can see the whole thing.

6           THE WITNESS:  Yeah, can you please

7   scroll down.  I apologize.

8           Can you scroll back up, please.

9           You know, I don't recall specifically

10  if I saw that one.

11  BY MR. SHELLY:

12      Q.   Okay.  Do you know who drafted this?

13      A.   No, sir.

14      Q.   Did you assist in the creation of this

15  press release?

16      A.   No, sir.

17          MR. SHELLY:  Henry, you can take that

18  down.

19      Q.   Ms. Holsworth, when did you first hear

20  the idea of a hotline discussed?

21      A.   This would be the national hotline or

22  the Georgia hotline?

Page 18

1       Q.    Georgia.

2       A.    The national hotline started when I

3    came on, because they already had a hotline -- a

4    hotline number, so it was already kind of in

5    place for the general election.  And, yeah, I

6    don't recall exactly when -- it would be after

7    the general election.  The Georgia election, I

8    think it just kind of morphed over to that.

9       Q.    Okay.  And why was the Georgia hotline

10   created, if there was already a national

11   hotline?

12      A.    I don't recall.  I wasn't in on that.

13   I don't know.

14      Q.    Okay.  You understand that the hotlines

15   were for the same kinds of information, or were

16   they requesting different kinds of information?

17      A.    Requesting the same type of

18   information.

19      Q.    Okay.  What were the reasons for

20   providing the Georgia hotline?

21      A.    I don't know.

22      Q.    Did you ever hear discussions about the

1    reasons for the hotline from Ms. Engelbrecht?

2        A.    No.

3        Q.    Before the hotline was created, how

4    could Georgia residents report unlawful election

5    activity?

6        A.    Several ways.  I mean, they could call

7    our hotline; they could call their secretary of

8    state; their local election officials.

9        Q.    Because there were other methods,

10   what's your understanding for why the hotline

11   was necessary?

12       A.    My opinion or my...

13       Q.    Sure, yes, start with your personal

14   understanding.

15       A.    Yeah, I just believe it's good, you

16   know, to promote, you know, people's right and

17   ability to vote that they have, you know,

18   multiple ways of connecting with somebody who

19   was willing to help them with their issue and

20   help them vote.

21       Q.    Okay.  And did you ever have

22   discussions about the hotline generally with

Page 20

1    anyone affiliated with True the Vote?

2        A.   We discussed them with Catherine and,

3    you know, other -- maybe our comms person.  I

4    don't recall.  There were various.

5        Q.   What's the name of the comms person?

6        A.   Genevieve.

7        Q.   Who staffed the hotline?

8        A.   I don't know.

9        Q.   Did I hear correctly that you said

10   you -- that one of your tasks was to answer the

11   hotline?

12       A.   There was a company, I believe in

13   Washington or somewhere, that actually fielded

14   the calls, and then they were sent to me because

15   of the volume.

16       Q.   Do you know the name of that company?

17       A.   No, sir.

18       Q.   And when you say they were sent to you,

19   can you tell me more about that.

20            They'd forward all the calls that the

21   hotline received, and you would review them, or

22   something different?

Page 21

1      A.   I believe the process was they would --

2   this is like a phone-banking situation, and then

3   document the questions that they had or the

4   issues that they wanted, and then they would

5   send them to me.  Then I would look at them at

6   that point.

7      Q.   Okay.  So my understanding, you weren't

8   necessarily listening to the calls, but you

9   would review notes about the calls?

10      A.   Correct.

11      Q.   Okay.  How many calls did the hotline

12   receive?

13      A.   I believe in the end it was probably

14   six or seven thousand.

15      Q.   And when you say "at the end," how long

16   was the Georgia hotline in operation?

17      A.   Oh, we're talking specifically Georgia

18   or --

19      Q.   Sorry.

20      A.   Yeah, I apologize.  You know, I have no

21   idea actually correctly of how much the Georgia

22   hotlines -- I don't know specifically.

Page 22

1      Q.   Okay.  The six to seven thousand was

2   for the national hotline?

3      A.   I believe so, yes.

4      Q.   Okay.  And was the same company in

5   Washington handling both the national hotline

6   and the Georgia hotline?

7      A.   I believe so, yes.

8      Q.   Okay.  And when they sent you the notes

9   of these calls, were they -- was there a

10   distinction between which hotline they were a

11   part of, or were you just reviewing the notes of

12   all the calls that came in to both hotlines?

13      A.   Actually, there was just such a volume

14   of calls coming -- you know, things coming to my

15   attention that I didn't really differentiate

16   which one it was.  I just opened them up and

17   addressed whatever needed to be addressed.

18   So...

19      Q.   Okay.  Did True the Vote operate other

20   hotlines besides the national hotline and the

21   Georgia hotline?

22      A.   I don't know if they did.  I don't...

Page 23

1      Q.    Okay.  And what kinds of things did

2   callers report?

3      A.    There were a lot of calls.  One of the

4   major things would be, you know, they were

5   worried about their, you know, loved ones maybe

6   in a nursing facility, if they were being able

7   to vote or not and that process.

8            There were people calling claiming that

9   they had received multiple blots or receiving

10  ballot applications or ballots in other areas

11  that they had moved to another state or another

12  voting locality, another, you know, county -- I

13  mean county or city or whatever, and they were

14  still receiving ballots -- you know, from one

15  state or the other they were receiving both

16  applications or ballots and things of that

17  nature.

18           There were people that would call

19  wanting to track their ballot by mail.  They

20  wanted to know what that process was and worried

21  that it wasn't showing back up at the -- at

22  the -- you know, at their election office to be

Page 24

1    counted.  Things of that nature.

2        Q.   How many instances of election fraud,

3    manipulation or illegal activity did you

4    identify through the hotline?

5        A.   You know, I don't -- I don't think I

6    can answer that, because, you know, I didn't

7    make the determination whether it was one or the

8    other; that it was just something that was maybe

9    amiss that needed to be investigated further or

10   helped with.

11       Q.   So when you received these notes about

12   the calls from the Washington company, what did

13   you do with them after you reviewed the call

14   notes you received?

15       A.   Yes.

16       Q.   So my question is what did you -- were

17   you trying to -- did you -- sorry.  Strike that.

18   Trying to think of my question.

19            Did you pass along any of those call

20   notes to anybody else at True the Vote?

21       A.   Catherine.

22       Q.   And did you pass along all the notes,

Page 25

1    or you selected specific ones that she might be

2    interested in?

3        A.   At one point I passed along all of

4    them.  But if there was something, I would pass

5    on, you know, select ones.

6        Q.   And what kinds of things were you

7    looking for for the select ones to highlight?

8        A.   You know, ones where people really were

9    having an issue casting their ballot that it

10   could be done correctly.  And things that needed

11   a -- because -- you know, a time, because there

12   was such a pressed time it needed to be done,

13   x amount.

14          So just those type of things and issues

15   upon -- you know, if somebody had received, you

16   know, two actual ballots or something and -- you

17   know, I'd pass that along.

18       Q.   Did you highlight any reports of

19   illegal activity to Ms. Engelbrecht?

20       A.   What are we calling -- I mean -- I

21   mean, illegal as -- I mean, I don't think I can

22   call it illegal.  But things that were you know

Page 26

1   amiss, I would --

2       Q.   Sorry.  I missed that last part.  Could

3   you repeat it, please.

4       A.   Yeah.  Things that were -- that seemed

5   to be an issue with the voting process or that

6   the voter was having an issue, I would highlight

7   those.

8            As far as calling them illegal, I'm not

9   a legal counsel or a prosecutor, so, you know --

10      Q.   Okay.  Are there any instances of

11  alleged voter fraud that you highlighted on

12  these calls?

13      A.   I don't -- I don't -- I would not call

14  it myself voter fraud.  I'm not an attorney or

15  prosecutor.  That's something I think would have

16  to be determined.  I mean, I did highlight

17  issues that were things that voters were having

18  an issue with.

19      Q.   Okay.  So just to rephrase to make sure

20  that I'm understanding correctly, the things

21  that you would highlight on this calls from the

22  hotline were voters who needed assistance voting

1   or for clarity about how to vote, not --

2        A.   And the issues where there were things

3   that were brought to our attention from the

4   voters that, you know, things were amiss, like,

5   you know, maybe double ballots or, you know,

6   receiving information or receiving a ballot from

7   a previous address or instances where they now

8   lived at an address and were registered voters

9   and they were receiving election information,

10  ballot information, what have you, of previous

11  people that had lived there and had since, you

12  know, moved for several years.

13       Q.   Okay.

14       A.   No longer residing.

15       Q.   Okay.  Just to confirm one more time,

16  my understanding is that you did not -- do not

17  recall any calls from the hotline or pass any

18  calls along to Ms. Engelbrecht that reported --

19  where the caller reported somebody else

20  potentially participating in illegal election

21  activity; is that correct?

22            MS. SIEBERT:  I'm going to object to

Page 28

1   this.  Asked and answered.

2        MR. SHELLY:  Okay.

3        MS. SIEBERT:  But go ahead and answer,

4   Amy.

5        THE WITNESS:  Go ahead.  I'm sorry.

6   BY MR. SHELLY:

7     Q.   Just to confirm, I'm not asking you to

8   make a judgment about whether it was against the

9   law or not.  I'm just trying to get a whole

10  picture of the kinds of things that were passed

11  along.

12    A.   Well, you know, things were passed

13  along that could be, you know, fraud -- you

14  know, fraud; that were issues that would be

15  fraud if it was found, you know, to be fraud.

16    Q.   Okay.  Okay.  And how many instances of

17  those were there?

18    A.   I don't recall.

19    Q.   Can you give me the approximate range

20  that would include the number?

21    A.   I really don't recall.

22    Q.   Can you tell me more or less than 10?

Page 29

1     A.   More.

2     Q.   Can you tell me more or less than 100?

3     A.   I believe there's more than that.

4     Q.   Okay.  And once you passed those

5   allegations to Ms. Engelbrecht, what happened

6   next?

7     A.   Yeah, I don't know --

8     Q.   Are you aware --

9     A.   -- as far as what happened.

10    Q.   Are you aware of whether any of those

11  reports were -- True the Vote was ever able to

12  confirmed that fraud was committed from these

13  reports that were given to the hotline?

14    A.   I don't know what happened.  I don't

15  know.

16         MR. SHELLY:  Okay.  Henry, can we pull

17  up Exhibit C and mark it as Exhibit No. 3.

18              (Whereupon, Exhibit 3 was

19            marked for identification.)

20         MR. SHELLY:  And scroll down.

21    Q.   This is another press release

22  announcing the whistleblower compensation fund.

Page 30

1          Are you familiar with this press

2     release, Ms. Holsworth?

3          THE WITNESS:  Would you mind scrolling

4     down for me, please.

5          Yeah, I saw that one.

6     BY MR. SHELLY:

7     Q.   Do you know who drafted this press

8     release?

9     A.   No.

10    Q.   Did you assist in the creation of the

11    press release?

12    A.   No, sir.

13    Q.   When did you first hear the idea of a

14    whistleblower compensation fund discussed?

15    A.   I don't recall.

16    Q.   Did you discuss the whistleblower

17    compensation fund with anyone at True the Vote?

18    A.   Yes.

19    Q.   Who did you discuss it with?

20         And Henry, you can take this down.

21    Thank you.

22         THE WITNESS:  I'm trying -- there was a

Page 31

1    discussion, I believe, with maybe Catherine and

2    the comms person, and I'm not recalling who else

3    was on the line at the time.

4    BY MR. SHELLY:

5        Q.   And the comms person is the Genevieve

6    you mentioned earlier; is that correct?

7        A.   Correct.

8        Q.   And besides who was on these calls, can

9    you tell me what was discussed on these calls

10   about the compensation fund?

11       A.   I don't recall.

12       Q.   Given that thousands of people were

13   already calling into the hotline, why was an

14   additional compensation fund necessary?

15       A.   I don't know.

16       Q.   You never heard any reasons for the

17   compensation fund discussed by people affiliated

18   with True the Vote?

19       A.   No.

20       Q.   How was the $1 million amount decided

21   on?

22       A.   I don't know.

Page 32

1      Q.   Where would the $1 million have come

2   from?

3      A.   I believe it was a donor.  I don't

4   know.  That's not an issue -- I was not in on --

5   that was not -- I was not a part of that.

6      Q.   Is it your understanding that a donor

7   offered to specifically pay for the

8   whistleblower compensation fund?

9      A.   I don't know what he specifically --

10  what that conversation was and what he

11  specifically donated that money for.  I don't

12  know.

13     Q.   And what was the name of that donor?

14     A.   I don't know.

15     Q.   How was the compensation fund

16  advertised?

17     A.   Things I personally saw or that I -- I

18  mean, I -- you know, I guess it just went off on

19  our website.  I don't -- I don't know exactly

20  what all they did to advertise it.

21     Q.   Okay.  So we saw the press release.

22  Presumably the press release was put on the

Page 33

1    website.

2            Do you know if it was sent to anybody

3    else?

4        A.   I don't know who it -- no, I don't

5    know.

6        Q.   Did reports of illegal activity

7    increase after the fund was established?

8        A.   I don't recall.

9        Q.   How many instances of election fraud or

10   illegal activity did True the Vote identify

11   after the fund was established?

12       A.   I don't know.

13       Q.   Did anyone ever request a payout from

14   the fund?

15       A.   I don't know.

16       Q.   Were any payouts from the fund ever

17   made?

18       A.   I don't know.

19       Q.   Are you aware of any discussions that

20   the fund would incentivize inaccurate reports?

21       A.   I'm not aware of any of that.

22       Q.   Okay.  I would like to ask a few

Page 34

1    questions about the challenge list that True the

2    Vote generated and submitted.

3              Henry, can you pull up Exhibit D and

4    mark it as Exhibit 4.

5                        (Whereupon, Exhibit 4 was

6                   marked for identification.)

7    BY MR. SHELLY:

8        Q.   Are you familiar with this press

9    release, Ms. Holsworth?

10             THE WITNESS:  Could you please scroll

11   up, please.

12             Yes.

13   BY MR. SHELLY:

14       Q.   Do you know who drafted it?

15       A.   No, sir.

16       Q.   Did you assist in the creation of it?

17       A.   No, sir.

18             MR. SHELLY:  You can take this down,

19   Henry.  Thank you.

20       Q.   Ms. Holsworth, when did you first hear

21   the idea of voter challenges discussed?

22       A.   I don't recall the date.

Page 35

1     Q.   Can you tell me approximately?

2     A.   No.  Actually, no.  I don't recall.

3     Q.   Do you know if it was before or after

4     the November 2020 election?

5     A.   I don't recall.

6     Q.   Who did you discuss the voter challenge

7     program with at True the Vote?

8     A.   With Catherine and whoever else was

9     working at that time.

10    Q.   Who else do you recall working at that

11    time?

12    A.   We had a person that was doing the

13    emails.  I don't recall a name at the moment.

14    Q.   And when you say "the person who was

15    doing the emails," can you explain that.

16    A.   Yeah.  I believe she had -- there

17    were -- she would help sending out maybe the

18    Constant Contact, I believe, for some of them.

19    The newsletter, I think.

20    Q.   And who was she sending that to?

21    A.   Our subscribers --

22    Q.   Okay.

Case 2:20-cv-00302-SCJ   Document 164-1   Filed 05/17/22   Page 36 of 99

1/17/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Amy Holsworth

Page 36

1       A.    -- of True the Vote.

2       Q.    Did you hear discussions at True the

3   Vote about why the voter challenges were

4   necessary?

5       A.    Yes.

6       Q.    And who did you have those discussions

7   with?

8       A.    With Catherine and -- yeah, Catherine.

9       Q.    And what were the reasons given for why

10  the voter challenges were necessary?

11      A.    That there, you know, appeared to be

12  issues with the voter roll and maybe about the

13  accuracy of that.

14      Q.    And do you know how the methodology to

15  identify challenged voters was chosen?

16      A.    I don't know.

17      Q.    Do you know what methodology was used?

18      A.    I don't know.

19      Q.    Did you ever hear anyone affiliated

20  with True the Vote raise questions or objections

21  related to the accuracy of the methodology for

22  the lists that were produced?

1     A.    No.

2     Q.    Did you ever hear anyone not affiliated

3  with True the Vote raise questions or objections

4  about the methodology?

5     A.    No.

6     Q.    To your knowledge, who all reviewed the

7  county challenge lists that True the Vote

8  produced?

9     A.    I'm sorry.  I don't -- the -- I'm

10  sorry.  What is your question about the...

11     Q.    Maybe just take a step back.

12         Am I correct that True the Vote

13  produced lists of voters to be -- whose right to

14  vote would be challenged?

15     A.    Yes, sir.

16     Q.    And my question is who all reviewed

17  those lists?

18     A.    I don't know who would review those at

19  True the Vote.

20         MR. SHELLY:  Okay.  We've been going

21  about an hour since the start time.  I'm happy

22  to keep going, because we started late, but if

Page 38

1    you would like a break, this would be a good

2    stopping point.

3          Would you like to take a break or keep

4    going?

5          THE WITNESS:  We can just keep going, I

6    guess.

7          MR. SHELLY:  Okay.  Ms. Siebert --

8    okay.

9          Can we pull up Exhibit E and mark it as

10   Exhibit 5.

11                (Whereupon, Exhibit 5 was

12             marked for identification.)

13   BY MR. SHELLY:

14      Q.   Ms. Holsworth, are you familiar with

15   this email?

16      A.   I apologize.  I don't know if I can --

17   what does it say?

18      Q.   This looks like an email sent from you

19   on December 18, sharing a file called "Georgia

20   Challenge List Approved as Per Cathy Latham."

21          Do you see that?

22      A.   Yes.

Page 39

1      Q.   Who is Cathy Latham?

2      A.   She is someone in Georgia.

3      Q.   And what was her role with the

4   challenge lists?

5      A.   She is someone who had supplied a list

6   of people that she thought would be -- to

7   contact.

8      Q.   Did I hear that correctly that

9   Ms. Latham supplied a list to True the Vote of

10   people to be challenged?

11      A.   No.  I'm sorry.  I'm just -- I'm not

12   understanding the question.  I apologize.

13      Q.   My question is what Ms. Cathy Latham's

14   role with the Georgia challenge list was?

15      A.   I don't -- I don't know.  I mean...

16      Q.   Okay.  Do you see that you sent this

17   email to mark@printingtradeco.com?

18      A.   Correct.

19      Q.   And who is that at that email address?

20      A.   Mark was the person that was printing

21   out the hard copies -- the hard copies of the

22   challenge letters for the -- the challengers.

Page 40

1      Q.    And that's Mark Williams; is that

2    right?

3      A.    Not for the challengers, but the

4    challenged -- yes.

5      Q.    And did you say that's Mark Williams?

6      A.    I believe that was his last name.

7      Q.    Okay.  And so my understanding from

8    this email is that Ms. Latham sent challenge

9    lists to you that then you sent to Mr. Williams?

10     A.    I'm -- by "challenge list," I don't

11   understand what...

12     Q.    I'm just reading that from this email.

13           Do you know what the Georgia challenge

14   lists are that Cathy Latham approved?

15     A.    In my memory -- I would have to see the

16   actual -- what I sent.  I don't recall what I

17   was referring to at that point.

18     Q.    Okay.  How was Ms. Latham affiliated

19   with True the Vote?

20     A.    I don't believe she is affiliated with

21   True the Vote.

22     Q.    How were you introduced to her?

Page 41

1    A.   I'm trying to recall.  I don't really

2    recall.

3    Q.   Were you surprised to receive a

4    challenge list from her that she approved?

5    A.   I don't remember -- okay.  I don't

6    recall -- no, I was not.

7    Q.   Okay.  Does that refresh your

8    recollection about the role that she was

9    playing?

10    A.   Okay.  Can we back it up, and can we

11    start the questions, you know, again?  I'm kind

12    of -- yeah.

13    Q.   Sure.

14         So I understood you to say that you

15    were not surprised to receive this challenge

16    list that she approved, and so I'm wondering if

17    you remember now what her role was.

18    A.   I don't actually -- this is -- I don't

19    actually know what her -- her, quote/unquote,

20    role.  She would -- I believe she was somebody

21    in Georgia that was interested in the voter

22    challenges.  I don't know.

Page 42

1      Q.    Did you provide Georgia challenge lists

2   to her for her approval?

3      A.    Can I have clarification on -- when you

4   say "challenge list," are you referring to the

5   people who were challenging the voter roll

6   itself or the actual names of the people that

7   were being challenged?

8      Q.    I am just reading that from this email.

9            So I guess my question for you is which

10   one would you understand that to refer to when

11   it says "Georgia Challenge List Approved as Per

12   Cathy Latham"?

13      A.    I understand that to be the names of

14   the people who had volunteered to challenge.

15      Q.    Okay.  And why were they provided to

16   Ms. Latham for her approval?

17      A.    I don't recall.

18      Q.    Did Ms. Latham review a list of all the

19   volunteers who were going to submit challenges?

20      A.    No.

21      Q.    Which subset of the volunteers did she

22   review?

Page 43

1      A.   My recollection of the events were that

2   she had provided personal -- people that she

3   knew that were interested in doing the challenge

4   and that had agreed to do it.

5      Q.   Okay.  So it's your understanding that

6   she created this list of volunteers herself and

7   sent it to you, or was a preexisting list sent

8   to her for her review --

9      A.   I don't know.

10      Q.   -- or something else?

11      A.   I don't know.

12      Q.   Were there any volunteers who

13   Ms. Latham did not approve?

14      A.   I believe that my heading is probably

15   wrong on this.  I don't think she had -- she had

16   no decision-making -- she did not approve our

17   challengers, you know, who they were, who they

18   were not.  She did not have any approval ability

19   to do that.  That was not the process.

20      Q.   Okay.  Then what's your understanding

21   of why this file was called "Georgia Challenge

22   List Approved as Per Cathy Latham"?

Page 44

1      A.    I don't recall.

2      Q.    Did anyone besides Ms. Latham review

3    the list of volunteers?

4      A.    I don't know.

5            MR. SHELLY:  Okay.  Henry, you can take

6    this one down.

7      Q.    Ms. Holsworth --

8      A.    Can I --

9      Q.    Sorry?

10      A.    Can I have a break?

11      Q.    Yeah.  Sure.

12            THE VIDEOGRAPHER:  The time is

13    10:13 a.m.  Going off the record.

14                (Recess taken.)

15            THE VIDEOGRAPHER:  The time is

16    10:22 a.m.  We are back on the record.

17    BY MR. SHELLY:

18      Q.    Ms. Holsworth, are you familiar with

19    what I'm referring to when I refer to the

20    True the Vote Georgia challenge list program?

21      A.    Yes.

22      Q.    Okay.  What was your role in that

Page 45

1    challenge list program?

2        A.    Take the people that wanted to

3    challenge and make sure they had their -- you

4    know, had agreed to it.  So we wanted -- and

5    then get the challenge lists together and send

6    them to the county officials, the voting

7    officials.

8        Q.    For that first part, how did you decide

9    which individuals to reach out to as potential

10   challengers?

11       A.    We had people that had called in and

12   had agreed to or wanted to do that.

13       Q.    They called in on the hotline, or was

14   this a separate call-in?

15       A.    I believe there was a -- I don't

16   remember how they -- I don't recall.

17       Q.    And am I understanding that the people

18   reached out after the press release we just

19   looked at; would that be correct?

20       A.    I don't know what prompted them to

21   reach out.

22       Q.    Okay.  How many people, approximately,

Page 46

1    reached out to you or True the Vote to

2    participate in the program?

3        A.    I don't recall.

4        Q.    More or less than 50?

5        A.    I don't recall.

6        Q.    Did you reach out to any potential

7    challengers who had not contacted True the Vote

8    first to volunteer, or did you only use people

9    who had affirmatively volunteered?

10       A.    [Inaudible.]  I had reached out to

11   [garbled].

12       Q.    I think we lost part of your audio.

13   Could you repeat that.

14          MS. SIEBERT:  Amy, I think they need

15   you to repeat.

16          THE WITNESS:  Oh.  I thought somebody

17   had popped in.

18          I'm sorry.  Can you repeat the

19   question.

20          MR. SHELLY:  Audra, could you read it

21   back.

22

Page 47

```
 1                    (Record read as follows:

 2                    "Question:  Did you reach

 3               out to any potential challengers

 4               who had not contacted True the

 5               Vote first to volunteer, or did

 6               you only use people who had

 7               affirmatively volunteered?")

 8               THE WITNESS:  Thank you.

 9               I had reached out to people that

10      were -- that were suggested that may have

11      some -- would like to do this.

12      BY MR. SHELLY:

13          Q.   And who did those suggestions come

14      from?

15          A.   I don't recall.

16          Q.   Did Ms. Engelbrecht instruct you to

17      reach out to certain individuals?

18          A.   I don't recall.

19          Q.   Did you receive these instructions to

20      reach out by email or in person?

21          A.   I don't recall.

22          Q.   How many people were recommended for
```

Page 48

1    you to reach out to?

2        A.    I don't recall.

3        Q.    Can you give me an estimate?

4        A.    Sorry.  I can't.

5        Q.    Approximately when did you reach out to

6    these potential volunteers?

7        A.    I don't recall.

8        Q.    Do you know if it was before or after

9    the November 2020 election?

10       A.    I don't recall.

11             THE VIDEOGRAPHER:  Mr. Shelly, I don't

12   know if it's your audio, but does everybody else

13   hear that?

14             MR. SHELLY:  What do you hear?  Sorry.

15             THE VIDEOGRAPHER:  So it sounds like

16   your audio is crackling.  It's almost cracking,

17   and we're losing a little bit.

18             Audra, are you picking that up as well?

19             MR. SHELLY:  I could try to find

20   headphones.  Maybe would that help?

21             THE VIDEOGRAPHER:  Yeah, we can try

22   that.

Page 49

1          (Discussion held off the record.)

2          THE VIDEOGRAPHER:  Let's go off the

3     record?

4          MR. SHELLY:  All right.

5          THE VIDEOGRAPHER:  It's 10:28 a.m.

6     Going off the record.

7               (Recess taken.)

8          THE VIDEOGRAPHER:  The time is

9     10:39 a.m.  Back on the record.

10    BY MR. SHELLY:

11       Q.   Ms. Holsworth, did you reach out to any

12    potential volunteers for the challenge program

13    who declined to participate?

14       A.   I don't recall.

15       Q.   Of the individuals you reached out to,

16    did anyone initially agree and then change their

17    mind?

18       A.   I believe there was perhaps one.

19       Q.   And what did that person communicate to

20    you?

21       A.   I don't recall.

22       Q.   What county was that person in?

Case 2:20-cv-00302-SCJ   Document 164-1   Filed 05/17/22   Page 50 of 99

1/17/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Amy Holsworth

Page 50

1      A.    I don't recall.

2      Q.    You don't have any recollection about

3   why that person asked not to participate?

4      A.    I don't have a specific recollection of

5   why.

6      Q.    Were they concerned about the

7   methodology that was used?

8      A.    I don't -- no, I don't recall -- no,

9   that was not -- I don't recall why.  I don't --

10  yeah.

11     Q.    Did any of the individuals you reached

12  out to ask any questions about the methodology

13  that was used to generate the challenge lists?

14     A.    Yes, I -- you know, they did ask about

15  the -- how that was generated.

16     Q.    And what did you tell them?

17     A.    I believe Catherine had either sent

18  them something or had a -- I believe we had a

19  Zoom call or something in which she explained

20  the process from their end.

21     Q.    Approximately how many of the

22  volunteers raised questions about the

Page 51

1  methodology?

2      A.   I don't recall.

3      Q.   Can you tell me more or less than five?

4      A.   I don't really recall.

5      Q.   What information would you provide to

6  challengers about who they would be challenging?

7      A.   I'm sorry.  Can you repeat the

8  question.

9      Q.   What information did you provide to

10  challengers about -- to the volunteers about who

11  they would be challenging?

12      A.   We provided them a list of the people

13  that would be challenging their -- that they

14  would be challenging, yes.

15      Q.   Did you provide that list to all of the

16  volunteers?

17      A.   Everyone that had asked for it.  I

18  believe -- my recollection is I did send out

19  that list to -- I believe I got all of them.  I

20  believe so.

21      Q.   And did you send out those lists

22  initially when they were ready or only after

Page 52

1    people requested them?

2        A.   You know, I don't -- I don't recall.

3        Q.   Did any of the challengers

4    affirmatively request a list of the people they

5    would be challenging?

6        A.   They all -- my understanding -- my

7    recollection is they wanted to see them and --

8    you know, because they wouldn't sign anything

9    without, you know -- can you ask the question

10   again.

11           Can you ask the question again, please.

12       Q.   I think my question was did any of the

13   challengers request a list of the names that

14   they would be challenging?

15       A.   I'm trying to remember the -- I believe

16   when we -- when they -- because we did -- they

17   all had a list, my recollection of that.

18       Q.   Did you operate the email address

19   gaelectorchallenge@truethevote.org?

20       A.   I believe that one, yes.

21       Q.   Who else had access to that email

22   account?

Page 53

1      A.   I don't recall.

2      Q.   Did anyone else read or send emails

3   from that account?

4      A.   I don't recall.

5      Q.   And what did you use this account for?

6      A.   If I remember, I believe that's the one

7   that we did the Georgia challenges on, I

8   believe.

9      Q.   Who would you have communicated with

10   from that account?

11      A.   The challenger, I guess.  And the

12   counties, I believe.

13      Q.   Did you create a personal password for

14   that account, or would other people have known

15   the password?

16      A.   I don't believe I -- that was not one I

17   had a personal.  That was -- I'm trying to

18   remember.  I don't recall.

19      Q.   Did you ever receive correspondence or

20   communications from any individuals who had been

21   challenged?

22      A.   From any that had been challenged?  Any

Case 2:20-cv-00302-SCJ   Document 164-1   Filed 05/17/22   Page 54 of 99

1/17/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Amy Holsworth

Page 54

1    voters?

2         Q.    Right.

3         A.    No.  I mean, not to my knowledge, no.

4         Q.    How many counties did you submit

5    challenges to?

6         A.    I think it was -- I would have to

7    guess.  I don't remember off the top of my head

8    the exact number.

9         Q.    A guess is fine.

10        A.    Yeah.  I -- I wouldn't -- yeah, I don't

11   recall.

12        Q.    Was it all 159 counties in Georgia?

13        A.    No.

14        Q.    But more than 10?

15        A.    Yes.

16        Q.    Okay.  You don't remember with any more

17   specificity than that?

18        A.    It was quite a few.  I don't recall,

19   you know, exactly how many.

20        Q.    How were these counties selected?

21        A.    There wasn't, like, a selection

22   process.  It was -- no, there wasn't a selection

Page 55

1    process.

2        Q.   Well, I understand you didn't submit to

3    all the counties.

4             So how did you decide which counties to

5    submit to?

6        A.   It was a time issue, having somebody

7    wanting a challenge and then do it, you know, in

8    the timeframe that it had to be done.

9        Q.   And what was the timeframe?

10       A.   Well, I believe there's a -- you know,

11   a specific time that this was to be done.

12       Q.   So, for example, did Ms. Engelbrecht

13   say that you had a certain window to get

14   volunteers, then that window closed and you were

15   done, or was there a different process?

16       A.   I think -- no, not a window, per se,

17   but I, you know, this was a -- yeah, I don't

18   recall.

19       Q.   After the initial batch of volunteers

20   who reached out -- and I understand you

21   affirmatively reached out to some other

22   potential challengers -- well, first of all, let

Page 56

1    me confirm that I understand that part right.

2              There was a group of people who reached

3    out to True the Vote and asked to be volunteers,

4    and then there were other people that were

5    suggested to you to reach out to be volunteers;

6    is that right?

7         A.   I don't know how that process worked,

8    other than what I did.  I don't know who reached

9    out to True the Vote and/or vice versa as far

10   as -- as that pertains to.

11        Q.   And what correspondence did you receive

12   from counties after submitting the challenges?

13        A.   There would be -- if it was received --

14   if it was accepted or if there was going to

15   be -- some of the counties would set up a

16   hearing or -- some type of hearing about the

17   challenges.

18        Q.   Did you submit all the challenges on

19   the same day, or were they sent out in batches?

20        A.   They were sent out in batches.

21        Q.   And how was the sequence decided?

22        A.   There was not really a decision

Page 57

1   process.  It was just when they were done and

2   ready to go.

3       Q.   Did you continue to send out challenges

4   in later batches after challenges in previous

5   batches had been denied?

6       A.   I don't -- I can't recall when the

7   denials came back from the -- and when we sent

8   them out.  I don't know.

9       Q.   When you solicited individuals to serve

10  as challengers, how confident were you in the

11  accuracy of the challenge lists?

12      A.   I was very confident in the accuracy of

13  the challenge lists.

14      Q.   And what was that confidence based on?

15      A.   Based on my personal knowledge of

16  Ms. Engelbrecht's integrity and the process

17  which she had said that they had gone through to

18  verify that these were correct.

19      Q.   And how would she explain -- how had

20  she explained the verification process?

21      A.   That it was multiple sources and data

22  that they had -- my understanding, had done, and

Page 58

1    I had complete confidence in Mrs. -- in

2    Catherine's integrity and ability to do that.

3        Q.   Did you think that every person on the

4    challenge lists was ineligible to vote?

5        A.   No.  I mean, I believe that when you

6    challenge, it's not -- you're just challenging

7    that there is a probable reason that needs to be

8    looked at.

9            MR. SHELLY:  Henry, can we pull up

10   Exhibit F and mark it as Exhibit 6.

11                   (Whereupon, Exhibit 6 was

12              marked for identification.)

13   BY MR. SHELLY:

14       Q.   So this is a series of emails that were

15   produced feel free to take a look to get your

16   bearings.  I'm interested in the one that starts

17   on page 2.

18            THE WITNESS:  Can you scroll down,

19   please.

20            THE VIDEOGRAPHER:  Let me know when you

21   want to go to the next page.

22            THE WITNESS:  Would you mind scrolling

Page 59

1    down a little bit, please.

2           THE VIDEOGRAPHER:  I'm going to zoom in

3    for you because I realize it's small front.

4    Just let me know when you want to scroll down.

5           THE WITNESS:  Okay.  I appreciate that.

6           Can you scroll down a little bit,

7    please.  That's fine.

8    BY MR. SHELLY:

9       Q.   I think this particular exhibit may go

10   on for some pages, and you're welcome to get

11   your bearings, but it's that email that we just

12   looked at that I actually want to ask about.

13      A.   Okay.

14           Can you scroll down a little bit.

15           Can you scroll down, please, a little

16   bit.

17           That's fine.

18           Make it bigger.  Can you make it bigger

19   on my screen, on -- yes.  Thank you.

20           Okay.  Okay.  Can you scroll down a

21   little bit I'm sorry.

22           Okay.  Okay.

Page 60

1          Okay.  I've read it.  Thank you.

2          MR. SHELLY:  Okay.  Can we go back up

3     to that page 2 email.  I'm looking for the one

4     that was sent on September 17, I think maybe

5     right above this.

6          Yes.

7     Q.   And you're familiar with this email,

8     Ms. Holsworth?

9     A.   Yes.  That looks familiar.

10    Q.   This is an email from you on

11    December 17 recruiting potential challengers; is

12    that correct?

13    A.   Yes.

14    Q.   Did you compose this email yourself?

15    A.   No.  Well -- no.

16    Q.   Who composed it?

17    A.   James had sent one out similar to

18    that -- Cooper is his last name -- and I had

19    taken parts of that and edited some things out.

20    I don't recall what that was.

21    Q.   Okay.  Did -- what was the process for

22    deciding who Mr. Cooper would send this to and

Page 61

1    who you would send it to?

2       A.   We -- I had -- Ms. Latham had supplied

3    a -- people that she had thought would be

4    interested in doing that, and I sent those --

5    this to those persons -- people on her list.

6       Q.   Do you recall approximately how many

7    people that was?

8       A.   I don't recall.

9            MR. SHELLY:   Henry, can you just scroll

10   down a few lines to the signature box.

11      Q.   I see your name is misspelled there,

12   but --

13      A.   Yeah.

14      Q.   -- to your knowledge, did you send this

15   yourself, or did somebody else send this and

16   misspell your name?

17      A.   No, I sent that.   And I don't know why

18   that was -- what had happened there.

19      Q.   Okay.   Do you see the third paragraph

20   from the bottom says, "True the Vote has assured

21   me that the list is 99 percent likely" -- just a

22   second.

Page 62

1          "True the Vote has assured me that the

2     list they are challenging is 99 percent likely

3     to be incorrectly registered."

4          Do you see that line?

5     A.   [No audible response.]

6     Q.   When did you receive this assurance?

7     A.   Yeah, I don't recall.

8     Q.   Who would that assurance have come

9     from?

10    A.   I don't recall.

11    Q.   What was that assurance based on?

12    A.   Their methodology that they used that

13    they were likely to be incorrect.

14         MS. SIEBERT:  Jacob?

15         MR. SHELLY:  Yep.

16         MS. SIEBERT:  Could we take a

17    one-minute break?  My dog needs to go outside

18    and is driving me crazy.

19         MR. SHELLY:  Fine with me.

20         THE VIDEOGRAPHER:  The time is

21    11:01 a.m.  Going off the record.

22         (Pause in the proceedings.)

Page 63

1          THE VIDEOGRAPHER:  All right.  The time

2    is 11:04 a.m.  We are back on the record.

3          MR. SHELLY:  Henry, can we pull up

4    Exhibit G and mark it as Exhibit 7.

5                    (Whereupon, Exhibit 7 was

6              marked for identification.)

7          THE WITNESS:  I'm having trouble

8    hearing.

9    BY MR. SHELLY:

10     Q.   Sorry.  I asked for Exhibit G for Henry

11   to pull up.

12          THE VIDEOGRAPHER:  Amy, can you hear

13   us?

14          THE WITNESS:  I can't hear anything.

15          THE VIDEOGRAPHER:  You can't hear me at

16   all right now?

17          I think the witness is having issues

18   with her audio.  Should we go off the record?

19          MR. SHELLY:  Sure.

20          THE VIDEOGRAPHER:  All right.  The time

21   is 11:05 a.m.  Going off the record.

22          (Discussion held off the record.)

Page 64

1          THE VIDEOGRAPHER:  The time is

2     11:07 a.m.  Going back on the record.

3          MR. SHELLY:  And I think where we left

4     off, you had just pulled up Exhibit G to mark as

5     Exhibit 7.

6          Q.   This is a shorter -- I think maybe only

7     two pages of emails, Ms. Holsworth.  You're

8     welcome to review, and then I'll ask you a few

9     questions.

10         A.   Okay.  Thank you.

11              Can you make it bigger.  Yeah.  Thank

12     you.

13              Okay.  All right.  Can you scroll down.

14              THE VIDEOGRAPHER:  So I see that this

15     is just a one-page document.

16              MR. SHELLY:  Okay.  Yeah.

17              THE WITNESS:  All right.

18              MR. SHELLY:  Okay.  Can you scroll up

19     to the first set of -- I'm looking at -- yeah,

20     it's December 30 at 3:19 a.m. from

21     Ms. Holsworth.

22         Q.   It looks like, Ms. Holsworth, you asked

Page 65

1    Ms. Engelbrecht about the elector challenge that

2    was filed before the November election and

3    denied.

4            Do you see that?

5      A.   Yeah.

6      Q.   What elector challenge was that

7    referring to?

8      A.   I don't recall.  This is the -- I

9    probably meant the -- I don't recall.

10     Q.   Well, sitting here today, what elector

11   challenges are you familiar with that occurred

12   before the November 2020 election?

13     A.   That was probably -- I probably meant

14   the January one.  It was written at 3:00 a.m.  I

15   probably misspoke, because I don't recall any

16   sitting here right now.

17     Q.   Was True the Vote involved in any

18   elector challenges before the November 2020

19   election?

20     A.   Not to my knowledge.

21     Q.   Does it refresh your recollection if I

22   told you there was a challenge in Fulton County

Page 66

1    in around August or September 2020 that was

2    denied?

3        A.   That was probably when I first came

4    onto the group, so I don't know how much

5    knowledge I would have remembered about that or

6    known.

7        Q.   You're not sure if that's the challenge

8    you're referring to in this email?

9        A.   Right.  I don't recall.

10          MS. SIEBERT:  Jacob, what's the Bates

11   number on this?  I'm sorry.  I missed it.

12          MR. SHELLY:  It should be at the

13   bottom.

14          MS. SIEBERT:  Yeah, I just couldn't see

15   it there.  Thank you.

16   BY MR. SHELLY:

17       Q.   So I quoted the first half of this

18   sentence.  The second half says, "Do we have

19   that list from the lawsuit?"

20          Are you familiar with any lawsuits that

21   were filed related to challenges before the

22   November 2020 election?

Page 67

1      A.   I don't recall even what I'm referring

2   to in this, honestly.  I don't recall.

3      Q.   Okay.  Are you aware of any discussions

4   among the Defendants in this case or other

5   people affiliated with True the Vote about

6   challenges in Georgia before the 2020 election?

7      A.   I don't recall.

8      Q.   Okay.  In this email do you see where

9   you propose checking the list of previously

10   challenged individuals against a list of people

11   who voted in November?

12      A.   Yes.

13      Q.   How many fraudulent votes were

14   identified by that cross-check?

15      A.   You know, I don't recall.

16      Q.   Do you know if that cross-check was

17   performed?

18      A.   I don't recall.  I don't know.

19      Q.   Okay.  A couple questions about the

20   series of emails at the bottom of this page.

21      A.   Sure.

22            MR. SHELLY:  Yes.  Can you scroll down.

Page 68

1            Great.  Yeah, right there.  Yeah,

2    exactly.

3        Q.   Do you see where Ms. Engelbrecht

4    informs you that "As of yesterday approximately

5    88,000 people on our challenge list have voted"?

6            See that at the very bottom?

7            THE WITNESS:  Can you scroll up a wee

8    bit, please.

9            Thank you.

10           I'm sorry.  Can you scroll -- I don't

11   see what you're referring to.

12           MR. SHELLY:  It's at the very bottom,

13   the other direction.

14           THE WITNESS:  Yeah.  A little bit

15   higher, please.  Do you mind?

16           THE VIDEOGRAPHER:  So that's the bottom

17   of the page of emails.

18           THE WITNESS:  Where she says that

19   Catherine wouldn't say that, is that what you --

20   BY MR. SHELLY:

21       Q.   I was asking about the next sentence,

22   but that email, yes.

Page 69

1      A.   Okay.

2      Q.   So when she told you that approximately

3   88K people on the challenge list have voted, you

4   respond --

5      A.   Yes.

6      Q.   -- "Ugh."

7           Can you tell me what that suggested to

8   you that people on the challenge list had voted?

9      A.   I believe -- I'm trying to think.

10          I was referring to the -- no, I don't

11   recall.  I don't know.

12     Q.   And was it your understanding that all

13   88,000 people had cast an unlawful vote?

14     A.   No.

15     Q.   Did you think there was possibly --

16     A.   It was --

17     Q.   Sorry.  Go ahead.

18     A.   I'm sorry.

19     Q.   Was it your understanding then that

20   there -- that many of those 88,000 people were

21   eligible to cast a vote?

22     A.   It was my understanding that there was

Page 70

1  an issue and that certain counties didn't check

2  the challenge.  So -- I'm sorry.  Can you repeat

3  the question.

4      Q.   I believe I asked you if your

5  understanding was that those 88,000 people on

6  the challenge list who voted, if they all cast a

7  vote unlawfully, and I heard you to say no.

8          And so I was asking you to confirm that

9  your understanding, then, was that some of these

10  people on the challenge list were eligible to

11  vote.

12      A.   My understanding was everybody on the

13  challenge list had -- from their -- had some

14  issue with their registration that should, you

15  know -- that should be challenged.

16      Q.   Are you aware of any efforts that were

17  taken by True the Vote to confirm the

18  eligibility of voters who were challenged and

19  subsequently voted?

20      A.   I'm sorry.  No, I'm not.

21      Q.   In all of the counties where a

22  challenge list was submitted and the challenge

Page 71

1    was denied, how many instances of illegal voting

2    by challenged voters are you aware?

3        A.   I'm not aware -- I don't know.

4        Q.   Did you just say that you're not aware

5    of any instances of illegal --

6        A.   I don't recall -- I don't recall any --

7    I don't have any present recollection.

8        Q.   Okay.  To make sure I understand what

9    you're not recollecting --

10       A.   Yeah.

11       Q.   -- you do not remember any instances of

12   illegal voting being confirmed for individuals

13   who were challenged; is that correct?

14       A.   I -- well, let me clarify.  I believe

15   there were some.  I just don't remember the

16   number or who they were.

17       Q.   Where did you hear about the some that

18   you do remember?

19       A.   I don't recall.

20       Q.   Are you aware of anyone who researched

21   that question?

22       A.   I'm -- I don't know.

Page 72

1            MR. SHELLY:  Okay.  Can we pull up

2     Exhibit H and mark it as Exhibit 8.

3                    (Whereupon, Exhibit 8 was

4              marked for identification.)

5            THE WITNESS:  Okay.  Thank you.

6     BY MR. SHELLY:

7        Q.   Are you familiar with this document?

8        A.   Yes.

9        Q.   Can you describe what it is?

10           THE WITNESS:  Can you scroll back up to

11    the...

12           I believe it's the -- it's a list of

13    the counties that were challenged and the

14    challengers that were sent out to the counties.

15    BY MR. SHELLY:

16       Q.   Did you create this document?

17       A.   I don't recall if that's one of the

18    ones I created --

19       Q.   Who else could have --

20       A.   -- if that's --

21       Q.   Sorry?

22       A.   Go ahead.

Page 73

1      Q.    Who else could have created this

2    document besides you?

3      A.    There was -- I can't remember her

4    name -- a lady that had originally helped

5    sending out the challenges to the -- that the

6    county -- to the individual counties.  She

7    may -- I don't remember who created this

8    specific document.

9      Q.    Was this other person who assisted, was

10    she an employee of True the Vote?

11      A.    I don't know what her actual

12    relationship was.  I don't know.

13      Q.    How were you introduced to her?

14      A.    She was someone who had been working --

15    I believe she had done some emails -- their

16    emails -- their website emails and things like

17    that.

18      Q.    Could this have been the Genevieve you

19    mentioned earlier or somebody else?

20      A.    No, not Genevieve.

21            There were so many.  I can't remember

22    the name off the top of my head.

Page 74

1       Q.   And where would this document that

2   we're looking at have been saved?

3            Was there like a common -- like a

4   hardware drive for anyone that True the Vote

5   could access, or did you save it on your

6   personal computer or something else?

7       A.   I don't know where that would have been

8   saved.  I don't know.

9       Q.   Who else would have access to a

10  document like this?

11      A.   Whoever it was shared with, I guess.

12      Q.   Did I hear you say, "Whoever it would

13  have been shared with"?

14      A.   Yes.  If it were shared, I would

15  assume.  So I don't know.

16      Q.   Okay.  Who might you have shared this

17  list with?

18      A.   I don't recall who I did.

19      Q.   So I see in Column M, there are several

20  of these that say "done-ah."

21           Did you fill in that column?

22      A.   Correct.

Page 75

1       Q.   And did you fill in information in

2    other columns?

3       A.   I don't recall who generated this sheet

4    to begin with, so I don't know.  I may have.

5       Q.   Can you explain the color coding to me?

6            If you can scroll down, because there's

7    some various colors.  But here clearly there's

8    some that are in green and some that are not

9    something highlighted.  As Henry scrolls down,

10   there's some in yellow.  There's some -- I don't

11   know what you'd call that.  Light brown?

12           So what would it mean if a row was

13   highlighted in green?

14           THE WITNESS:  Scroll down.

15           Oh, the ones in green were the ones

16   that had the -- all the correct, the photo ID

17   number to send out, so it had all the

18   information.

19   BY MR. SHELLY:

20      Q.   Okay.  And so when you added "done" and

21   your initials in Column M, what had been done?

22      A.   I don't recall.

Page 76

1      Q.   Could that have meant that you had sent

2  a challenge list from that county to the county

3  board?

4      A.   Possibly.  I don't recall.

5      Q.   And we saw some rows highlighted in

6  yellow.

7           What would the yellow refer to?

8      A.   I don't know what that would refer to.

9      Q.   How about that -- I can't tell if it's

10  pink or brown, but the "unorganized," what does

11  "unorganized" mean?

12     A.   I don't know.

13     Q.   And how about the rows without any

14  highlighting at all?

15     A.   I don't know.

16          MR. SHELLY:  All right.  You can take

17  this one down, Henry.

18          I am nearing the end.  How about we

19  take one more break where I can check over my

20  notes.  Maybe meet back in five minutes?

21          THE VIDEOGRAPHER:  All righty.  The

22  time is 11:28 a.m.  Going off the record.

Page 77

1              (Recess taken.)

2              THE VIDEOGRAPHER:  All right.  The time

3       is 11:42 a.m.  We are back on the record.

4              MR. SHELLY:  Thank you.

5          Q.   The last thing I would like to do,

6       Ms. Holsworth is just go through some of the

7       questions I asked that you didn't recall to see

8       if our discussion over the past almost three

9       hours now has refreshed your recollection for

10      any of these.

11         A.   Okay.

12         Q.   Can you tell me do you recall now if

13      there was any reason given for why the Georgia

14      hotline was created?

15         A.   No.  I don't recall.

16         Q.   And do you know who staffs the hotline?

17         A.   No.  I don't recall.

18         Q.   Were there any reports from the hotline

19      that were confirmed to be unlawful voting?

20         A.   I don't recall.

21         Q.   Do you know what happened when you

22      passed along reports that came on the hotline to

Page 78

1   Ms. Engelbrecht?

2       A.   I don't -- I don't know.  I don't

3   recall.

4       Q.   Do you know why the compensation fund

5   was created, given that the hotline was already

6   receiving thousands of calls?

7       A.   I don't.  I don't recall.

8       Q.   And how about the name of the donor who

9   funded the compensation fund?

10      A.   No, I don't.  I don't recall.

11      Q.   Do you know how the compensation fund

12  or hotline were advertised?

13      A.   I do know it was -- I do recall in the

14  newsletter and I believe possibly on their

15  Facebook page.  I do recall that.  And maybe

16  their social media.

17      Q.   Great.  Thank you.

18           Did reports of illegal activity

19  increase after the compensation fund was

20  established and advertised?

21      A.   I believe calls in general increased.

22      Q.   And can you recall any instances of

1    election fraud, manipulation or illegal action

2    after the compensation fund was established?

3        A.   I don't recall.

4        Q.   And do you recall now whether anyone

5    requested a payout from the fund?

6        A.   I don't know if anyone did.

7        Q.   And presumably, then, you don't know if

8    any payouts were made?

9        A.   I don't know.

10       Q.   Do you remember when the challenge list

11   was first discussed and, more specifically,

12   whether it was discussed before or after the

13   November 2020 elections?

14       A.   I don't recall.

15       Q.   Do you know who reviewed the county

16   challenge lists?

17       A.   I don't -- I don't know.  I don't

18   recall.

19       Q.   Do you remember now who Ms. Cathy

20   Latham is?

21       A.   Not -- no, I don't recall.  Not

22   specifically, no.

Page 80

1      Q.    And do you know what her role was with

2     the Georgia challenge lists?

3      A.    I don't know.

4      Q.    Do you know how you were introduced to

5     her?

6      A.    I don't recall.

7      Q.    Do you know why challenge lists were

8     provided to Ms. Latham for approval?

9      A.    I don't recall.

10     Q.    Do you know why the file that you

11    emailed was titled "GA Challenge List Approved

12    as Per Cathy Latham"?

13     A.    I don't recall.

14     Q.    Did anyone else review challenge lists

15    besides Ms. Latham?

16     A.    Any -- I -- I don't -- I'm trying to

17    remember at the -- I don't recall.

18     Q.    How many people volunteered to be

19    challengers before you solicited additional

20    assistance?

21     A.    I don't recall.

22     Q.    And do you know what prompted people to

Page 81

1    volunteer?

2        A.   I can't recall.

3        Q.   You mentioned that, in addition to the

4    volunteers who called in, you affirmatively

5    reached out to people.

6             Do you know where those suggestions of

7    people to reach out to came from?

8        A.   They did -- I think they -- yeah, they

9    came from -- I think Cathy Latham is who they

10   came from.

11       Q.   Okay.  And did you reach out to all of

12   the individuals that she recommended?

13       A.   I don't -- I don't think -- me

14   personally, I did not, no.

15       Q.   Did you or do you know if anyone else

16   at True the Vote did any screening of the names

17   that were recommended to learn more about those

18   individuals?

19       A.    I don't have any knowledge of what

20   True the Vote would have done on their end.  So

21   I don't know.

22       Q.   Do you know how many people were on the

Page 82

1    list that Ms. Latham suggested?

2         A.   I don't recall.

3         Q.   And how about when you reached out to

4    those potential volunteers?

5         A.   I don't -- I don't know.  I don't

6    recall.

7         Q.   You said that you -- you told me that

8    there was at least one individual who initially

9    agreed to be a challenger and then changed their

10   mind.

11              Do you remember now what that person

12   communicated to you?

13        A.   Not off -- no, I don't recall.

14        Q.   Do you remember what county that person

15   was from?

16        A.   No, sir.

17        Q.   Were they concerned about the

18   methodology?

19        A.   I don't recall what their concern was.

20        Q.   Did you send the challenge lists, the

21   names of the people who would be challenged, to

22   everyone who was going to be a challenger when

Page 83

1    they first signed up, or did you only send a

2    list of challenged names to people who requested

3    them?

4        A.    I don't recall the process.

5        Q.    Do you remember now who else had he

6    access to the gaelectorchallenge@truethevote.org

7    email account?

8        A.    Off the top of my -- I don't remember

9    her name, who the contractor was -- or whoever

10   it was -- in New Jersey.  I just remember I

11   think she was from New Jersey.

12       Q.    Okay.  This was a person who could also

13   read and send emails from the account?

14       A.    Yeah, I believe when it started.  And

15   then I think Ms. Kramer could at some point read

16   and send things, but I don't think she -- yeah.

17       Q.    In addition to you and potentially this

18   woman from New Jersey, how many other

19   contractors did True the Vote have during the

20   time that you worked with them?

21       A.    I don't know.

22       Q.    Are you aware of any others?

1    A.   Just -- I know the person doing the

2    comms, and I know that they had some volunteers.

3    I don't recall.

4    Q.   I believe you mentioned someone by the

5    name of Genevieve did comms.

6         Was she a contractor as well?

7    A.   For some time -- for a while, I

8    believe.

9    Q.   Okay.  Did you continue to submit

10   challenges to county boards after previous

11   challenges had been denied?

12   A.   I don't recall.

13   Q.   Who did you communicate with on a

14   day-do-day basis when you were with True the

15   Vote?

16   A.   I don't think we would communicate

17   anything.  Catherine or -- yeah, mostly

18   Catherine and then the lady in New Jersey and

19   then -- sorry -- and then some volunteers for

20   other things.

21   Q.   We looked at an email that you sent to

22   potential challengers.  You told me that you and

Page 85

1    Mr. Cooper each sent some to some challengers.

2            Do you remember now how many people you

3    sent that email to?

4        A.   No, sir, I don't recall.

5        Q.   We looked at the line where True the

6    Vote assured you that the list was 99 percent --

7    that the people on the challenge list were

8    99 percent likely to be incorrectly registered.

9            Do you remember now when you received

10   this assurance?

11       A.   Yeah.  I remember that at one point

12   Catherine had me on conference -- a Zoom meeting

13   of some sort with the people that were doing her

14   data -- I don't remember the actual names -- and

15   they went through and explained the process by

16   which they were doing and the confidence at

17   which they had in the data, and they were

18   confident that it was correct.

19       Q.   And did you communicate with Mark

20   Davis?

21       A.   The printer?  Mark Davis --

22       Q.   I believe Mark Williams was the

Page 86

1    printer, and there was another Mark who was

2    involved named Mark Davis.

3         A.   I don't -- I don't recall specifically

4    who a Mark Davis would be.

5         Q.   How about Derek Somerville?

6         A.   I don't -- possibly.  I don't remember

7    who that would be.  I don't recall.

8         Q.   We looked at an email that referenced

9    election challenges that were filed before the

10   November election and denied.

11        Do you have any election now about

12   which challenges that was referring to?

13        A.   I don't.  I can't recall.

14        Q.   Are you aware of any discussions among

15   Defendants in this case or other people

16   affiliated with True the Vote about challenges

17   before the 2020 election?

18        A.   I don't recall.

19        Q.   Did you work on any voter challenges

20   before the 2020 election?

21        A.   Before the 2020 election?  I don't

22   recall if I did or not.

Page 87

1      Q.   There was an email that referred to a

2   cross-check of individuals who had been

3   challenged before the November election and then

4   voted.

5           Is it still the case that you do not

6   remember any such cross-check confirming that

7   any of those voters voted unlawfully?

8      A.   I'm sorry.  Can you repeat the

9   question.

10      Q.   Do you recall the email that we looked

11   at where you suggested checking --

12   cross-checking the list of people who had been

13   challenged against the people who had voted?

14      A.   Uh-huh.

15      Q.   And am I correct that you do not recall

16   any -- that that cross-check identified any

17   people who voted unlawfully?

18      A.   I don't recall.

19      Q.   And do you know if that cross-check was

20   performed?

21      A.   Can I see what -- can I put my dog in

22   the -- she's -- there's an issue.

Page 88

```
 1     Q.   Okay.

 2     A.   Do you mind?

 3     Q.   No, that's fine.

 4          (Pause in the proceedings.)

 5          THE WITNESS:  Can you hear me?  I don't

 6   know what's going on there.

 7          MR. SHELLY:  Yeah.  We're almost done

 8   here.

 9          THE WITNESS:  Can I just have a

10   break -- one more break real quick?  Just five

11   minutes?  Do you mind?

12          MR. SHELLY:  All right.  That's fine.

13          THE WITNESS:  Okay.

14          THE VIDEOGRAPHER:  The time is

15   11:57 a.m.  Off the record.

16                (Recess taken.)

17          THE VIDEOGRAPHER:  All right the time

18   is 12:02 p.m.  We are back on the record.

19   BY MR. SHELLY:

20     Q.   Ms. Holsworth, do you still not recall

21   any instances in counties where challenges were

22   submitted and denied of any instances where
```

Page 89

1    illegal voting was identified by True the Vote?

2        A.   I don't recall.

3        Q.   Do you recall the last document we

4    looked at with the -- it was a spreadsheet of

5    potential volunteers?

6        A.   Yes, sir.

7        Q.   Do you recall now who created that

8    document?

9        A.   I do -- I think it was -- I don't

10   recall who.

11       Q.   Do you know who that list might have --

12   that spreadsheet might have been shared with?

13       A.   I don't recall.

14       Q.   Then we looked at that -- I believe it

15   was Column M and the work done and your

16   initials, do you know what that signified?

17       A.   I believe it was challenges that had

18   been sent.

19       Q.   And do you remember what the color

20   coding referred to?

21       A.   I don't, no.

22            MR. SHELLY:   Okay.   I appreciate your

Page 90

1    time this morning and everybody's patience.

2    That's all that I've got for you today.

3            THE WITNESS:  Okay.

4            MS. SIEBERT:  I have just a couple

5    quick follow-ups.

6            Does anyone need another break?

7            (Discussion held off the record.)

8

9                   EXAMINATION

10   BY MS. SIEBERT:

11       Q.   Amy, there was a line of questioning

12   regarding donor funding for the compensation

13   fund.

14       A.   Yeah.

15       Q.   And I believe that you testified you

16   didn't know much about who the donor was; is

17   that correct?

18       A.   Correct.

19       Q.   Were you privy to any of the

20   conversations or -- with donors?  Were you part

21   of any of those conversations?

22       A.   I've not spoken directly to the -- I

Page 91

1    have not spoken to the donors, yeah.

2        Q.   I'm sorry.  Can you repeat that one

3    more time.

4        A.   I'm sorry.  No, I did not speak

5    directly to donors.

6        Q.   Okay.  And you weren't part of any

7    conversation that anybody else was speaking --

8    were you part of any conversation that anybody

9    else was speaking to a donor that you know of?

10       A.   That I know of -- there was, I believe,

11   a conversation with somebody that we -- well, I

12   don't know who -- I'm going to say I don't know,

13   because I don't -- there was a meeting with, I

14   think, a representative of him that I was

15   attending, but I've never met the donor or

16   spoken to him.

17       Q.   And you don't recall that donor's name?

18       A.   I don't off the top of my head, no,

19   ma'am.

20       Q.   Okay.  Thank you.

21            And then I know you've testified that

22   you don't recall who Cathy Latham was, but I

Case 2:20-cv-00302-SCJ   Document 164-1   Filed 05/17/22   Page 92 of 99

1/17/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Amy Holsworth

Page 92

1    believe in some follow-up that you indicated

2    that -- can you clarify what you know about

3    Cathy Latham.

4         A.   What I recall is it's somebody who I

5    believe Catherine had met on the ground in

6    Georgia who was a name that -- that I was

7    connected with through that.  But I don't know

8    her -- I don't know her relationship to her or

9    how she --

10        Q.   Are you familiar professionally with

11   anyone in Georgia?

12        A.   No, ma'am.

13        Q.   Okay.  Mr. Shelly had asked in his

14   follow-up questions toward the end if you

15   recalled any instances after the challenges were

16   submitted where there were instances of illegal

17   voting, and I believe you testified that you

18   didn't recall; is that correct?

19        A.   That is correct.  I --

20        Q.   Okay.

21        A.   I --

22        Q.   Okay.  I'd like to just clarify

Page 93

1    something if you wouldn't mind.

2        A.   Okay.

3        Q.   When you say you don't recall any

4    instances of illegal voting, is it that -- it's

5    an either/or:  Is it you just don't recall

6    whether there were instances of illegal voting

7    or not, or you don't recall any follow-up about

8    that at all?

9        A.   Well, I don't -- well, I was not

10   keeping aware of the follow-up of what happened

11   after that, after I, you know, did my part,

12   which is what I was contracted to do, to do the

13   work in that.  When I was no longer with

14   True the Vote, I honestly did not keep track of

15   what the results of those challenges were,

16   because I'd moved on to other things.

17       Q.   Sure.  Okay.  Thank you.

18       A.   Yes.

19       Q.   Okay.  The only other -- there was a

20   December 30 email exchange, and I don't have the

21   exhibit number -- I'm guessing it might have

22   been Exhibit G -- where -- it was that 3:30 a.m.

Page 94

1    email --

2         A.   Uh-huh, yeah.

3         Q.   -- where you referred to the elector

4    challenge of the November election.  I want to

5    clarify -- because I recall you testifying that

6    you likely, because of the time, misspoke and

7    you were referring to the January election.  But

8    I don't want to put words in your mouth, so I

9    just wanted to clarify what your recollection of

10   that was.

11        A.   Yeah, my recollection -- I don't recall

12   what I was -- I don't recall what that was

13   about.  I don't know.

14        Q.   Okay.  That's fair.

15        A.   I don't know.

16        Q.   Thank you.

17             That's all I have.

18             MR. SHELLY:  I don't have anything

19   further.

20             THE VIDEOGRAPHER:  Okay.  Should I go

21   off the record?

22             MR. SHELLY:  Yes.

Page 95

1              THE VIDEOGRAPHER:  Please stand by.

2              This marks the end of today's

3      deposition.  The time is 12:10 p.m.

4                    (At 12:10 p.m. CST the

5                    deposition of AMY HOLSWORTH was

6                    adjourned.)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 96

1   STATE OF CALIFORNIA          )

2   COUNTY OF LOS ANGELES        )   SS.

3

4        I, AUDRA E. CRAMER, CSR No. 9901, in and for the
     State of California, do hereby certify:

5        That, prior to being examined, the witness named
     in the foregoing deposition was by me duly sworn to

6    testify the truth, the whole truth and nothing but the
     truth;

7        That said deposition was taken down by me in
     shorthand at the time and place therein named, and

8    thereafter reduced to typewriting under my direction,
     and the same is a true, correct and complete transcript

9    of said proceedings;

         I further certify that I am not interested in the

10   event of the action.

         Witness my hand this 25th day of January, 2022.

11

12

13

14

15

16

17

18

19                             Certified Shorthand

20                             Reporter for the

21                             State of California

22

Case 2:20-cv-00302-SCJ   Document 164-1   Filed 05/17/22   Page 97 of 99

1/17/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Amy Holsworth

1        Amy Holsworth, c/o

         THE BOPP LAW FIRM

2        1 South Sixth Street

         Terre Haute, Indiana  47807-3510

3

4        Case: Fair Fight, Inc. et al. v. True the Vote, et al.

         Date of deposition: January 12, 2022

5        Deponent: Amy Holsworth

6

7        Please be advised that the transcript in the above

8        referenced matter is now complete and ready for signature.

9        The deponent may come to this office to sign the transcript,

10       a copy may be purchased for the witness to review and sign,

11       or the deponent and/or counsel may waive the option of

12       signing. Please advise us of the option selected.

13       Please forward the errata sheet and the original signed

14       signature page to counsel noticing the deposition, noting the

15       applicable time period allowed for such by the governing

         Rules of Procedure. If you have any questions, please do

16       not hesitate to call our office at (202)-232-0646.

17

18

19       Sincerely,

         Digital Evidence Group

20       Copyright 2021 Digital Evidence Group

21       Copying is forbidden, including electronically, absent

22       express written consent.

1/17/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Amy Holsworth

Page 98

1          Digital Evidence Group, L.L.C.
           1730 M Street, NW, Suite 812
2          Washington, D.C. 20036
           (202) 232-0646
3
4          SIGNATURE PAGE
           Case: Fair Fight, Inc. et al. v. True the Vote, et al.
5          Witness Name: Amy Holsworth
           Deposition Date: January 12, 2022
6
7          I do hereby acknowledge that I have read
           and examined the foregoing pages
8          of the transcript of my deposition and that:
9
10         (Check appropriate box):
           (  ) The same is a true, correct and
11         complete transcription of the answers given by
           me to the questions therein recorded.
12         (  ) Except for the changes noted in the
           attached Errata Sheet, the same is a true,
13         correct and complete transcription of the
           answers given by me to the questions therein
14         recorded.
15
16
17
18         _____          _____
19          DATE                      WITNESS SIGNATURE
20
21         _____          _____
22          DATE                             NOTARY

Page 99

1          Digital Evidence Group, LLC

2          1730 M Street, NW, Suite 812

3          Washington, D.C.  20036

4          (202)232-0646

5

6                              ERRATA SHEET

7

8          Case: Fair Fight, Inc. et al. v. True the Vote, et al.

9          Witness Name: Amy Holsworth

10         Deposition Date: January 12, 2022

11         Page No.    Line No.       Change

12

13

14

15

16

17

18

19

20

21         _____          _____

22         Signature                                Date