Case 2:20-cv-00302-SCJ  Document 165-1  Filed 05/17/22  Page 1 of 214

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

-------------------------------x
FAIR FIGHT, INC., SCOTT BERSON,:
JOCELYN HEREDIA, and JANE DOE, :
                               :
          Plaintiffs,          :
                               :
     vs.                       :
                               :          Case No.
TRUE THE VOTE, CATHERINE       :
ENGELBRECHT, DEREK SOMERVILLE, : 2:20-cv-00302-SCJ
MARK DAVIS, MARK WILLIAMS,     :
RON JOHNSON, JAMES COOPER, and :
JOHN DOES 1-10,                :
                               :
          Defendants.          :
                               :
FAIR FIGHT ACTION, INC.,       :
                               :
          Counter-Defendant. :
-------------------------------x


VIRTUAL VIDEOTAPED DEPOSITION OF
MARK A. DAVIS
Wednesday, January 19, 2022
9:05 a.m. Eastern Standard Time

REPORTER:  Dawn A. Jaques, CSR, CLR

_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

```
 1   APPEARANCES:
 2   On behalf of the Plaintiffs:
             TINA MENG, ESQ.
 3           CHRISTINA FORD, ESQ.
             JOEL RAMIREZ, ESQ.
 4           UZOMA NKWONTA, ESQ.
             Elias Law Group LLP
 5           10 G Street, NE
             Suite 600
 6           Washington, D.C.  20002
             PHONE:   (202) 968-4592   (Ms. Meng)
 7                    (202) 968-4558   (Ms. Ford)
             EMAIL:   tmeng@elias.law
 8                    cford@elias.law
                      jramirez@elias.law
 9                    unkwonta@elias.law
10   -and-
11           MAIA COGEN, ESQ.
             Lawrence & Bundy LLC
12           1180 West Peachtree Street
             Suite 1650
13           Atlanta, Georgia  30309
             PHONE:   (404) 400-3346
14           EMAIL:   maia.cogen@lawrencebundy.com
15
16   On behalf of the Defendants:
             MELENA S. SIEBERT, ESQ.
17           The Bopp Law Firm
             1 South Sixth Street
18           Terre Haute, Indiana  47807-3510
             PHONE:   (812) 232-2434
19           EMAIL:   msiebert@bopplaw.com
20
21   VIDEOGRAPHER AND EXHIBIT TECHNICIAN:
22           Mitchell Mahon, Digital Evidence Group
```

Case 2:20-cv-00302-SCJ   Document 165-1   Filed 05/17/22   Page 3 of 214

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 3

 1                      I-N-D-E-X

 2    WITNESS:                                    PAGE:

 3    MARK A. DAVIS

 4        Examination by Ms. Meng   ........ 7, 189

 5        Examination by Ms. Siebert   ....... 161

 6

 7                    E-X-H-I-B-I-T-S

 8    DAVIS DEPOSITION EXHIBIT:                   PAGE:

 9    Exhibit 1   Notice of Deposition            11

10    Exhibit 2   Plaintiffs' First Requests for
                  Production to Mark Davis         12

11    Exhibit 3   Plaintiffs' Second Requests for
                  Production to Mark Davis         13

12    Exhibit 4   November 26, 2020, email chain
                  SUBJECT: Independent Verification

13                (No Bates)  (4 pages)           23

14    Exhibit 5   December 14, 2020, email chain
                  SUBJECT: FYI - From the Georgia

15                Voter Guide
                  (No Bates)  (2 pages)           34

16    Exhibit 6   December 15, 2020, email chain
                  SUBJECT: County Count

17                (No Bates)  (2 pages)           38

18    Exhibit 7   Somerville text exchanges with
                  Mark Davis

19                (No Bates)  (261 pages)         49

20    Exhibit 8   December 22-23, 2020, email chain
                  SUBJECT: Citizen Challenges:

21                Update and Encouragement

22                (No Bates)  (3 pages)           53

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

```
                                              Page 4
 1                    INDEX (Continued)
 2                    E-X-H-I-B-I-T-S
 3   DAVIS DEPOSITION EXHIBIT:                   PAGE:
 4   Exhibit 9   November 29-30, 2020,
                 Facebook posts
 5                 (No Bates)  (2 pages)          61
 6   Exhibit 10  December 4, 2020, Facebook post
                 (No Bates)  (5 pages)           66
 7   Exhibit 11  December 5, 2020, Derek Somerville
                 Facebook post
 8                 (No Bates)  (22 pages)         75
 9   Exhibit 12  December 16, 2020, email chain
                 SUBJECT: Georgia Elector
10               Challenge Instructions/Materials
                 (No Bates)  (2 pages)           96
11   Exhibit 13  December 19-20, 2020, email chain
                 SUBJECT: Citizen Challenge Q&A
12               Zoom call Sunday night at 6pm et
                 (No Bates)  (2 pages)           98
13   Exhibit 14  December 28-29, 2020, email chain
                 SUBJECT: Elector Challenge Access
14               (No Bates)  (3 pages)          153
15
16
17
18
19
20
21
22
```

Page 5

1                    P R O C E E D I N G S

2              THE VIDEOGRAPHER:  We are going on the

3    record.  This is Tape No. 1 of the videotaped

4    deposition of Mark Davis, taken by Plaintiffs in

5    the matter of Fair Fight, Inc., et al., vs. True

6    the Vote, in the United States District Court for

7    the Northern District of Georgia, Gainesville

8    Division, Case No. 2:20-cv-00302-SCJ.

9              This deposition is being held remotely

10   over Zoom videoconference on January 19th, 2022.

11   The time on the video screen is 9:05 a.m.

12             My name is Mitchell Mahon; I am the

13   legal videographer from DEG.  The court reporter

14   is Dawn Jaques, in association with Digital

15   Evidence Group.

16             Will counsel please introduce

17   themselves for the record?

18             MS. MENG:  Good morning, everyone.  My

19   name is Tina Meng on behalf of Plaintiffs, Elias

20   Law Group.

21             MS. FORD:  I'm Christina Ford, also

22   with Elias Law Group on behalf of Plaintiffs, but

Page 6

1     I will not be speaking today.

2               THE VIDEOGRAPHER:  Will the court

3     reporter please swear in the witness?

4               MS. SIEBERT:  Melena Siebert on behalf

5     of Defendants today.  And I believe there is one

6     more attorney for Plaintiffs.

7               THE VIDEOGRAPHER:  They might be

8     muted.

9               THE REPORTER:  Ms. Cogen, did she

10    state hers?

11              MS. COGEN:  Yes, Maia Cogen for

12    Plaintiffs today.

13              THE REPORTER:  Would you raise your

14    right hand to be sworn, please?

15       (The witness was administered the oath.)

16    Whereupon,

17                    MARK A. DAVIS,

18         was called as a witness, after having been

19         first duly sworn by the Notary Public,

20         was examined and testified as follows:

21

22

Page 7

1          EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

2                    BY MS. MENG:

3          Q    Good morning, Mr. Davis.  How are you?

4          A    Good morning.  I'm all right.  How

5     about yourself?

6          Q    Good.  So my name is Tina Meng, as I

7     said before, and I represent the Plaintiffs in

8     this case.

9                    Just for the record, would you state

10    your full name and address?

11         A    Mark Allen Davis, 325 Wesfork,

12    W-E-S-F-O-R-K -- there's no T in there -- Way,

13    Suwanee, Georgia, S-U-W-A-N-E-E, 30024.

14         Q    Great.  And I know, you know, this is

15    the second time that you've been deposed for this

16    case, but just as a refresher, I'd like to go over

17    some of the ground rules for the deposition so

18    we're all on the same page.

19                    All the testimony today is under oath

20    just as you were testifying in court.

21                    Does that make sense to you?

22         A    Yes, it does.

Page 8

1          Q    Great.  So for the benefit of everyone

2     and the court reporter, especially since we're all

3     remote, please make sure to answer audibly.  Head

4     shakes and nods are hard to put on the record, so

5     a yes or no or a spoken answer would be most

6     helpful.

7                Please allow me to finish my question

8     before giving your answer, and I'll do the same

9     when you're responding.  Again, this is for a

10    clear transcript and for the record.

11               Does that sound good to you?

12         A    Mm-hmm.  Yes, it does.

13         Q    Great.  From time to time, your

14    attorney may make an objection to a question that

15    I ask, and that's fine, but you are to answer

16    unless she specifically instructs you not to

17    answer based on a topic of privilege.

18               Does that make sense as well?

19         A    Yes, it does.

20         Q    Great.  So if at any point you do not

21    understand a question that I'm asking, will you

22    please let me know?

Page 9

1        A     Yes, I will.

2        Q     Okay.  I will do my best to rephrase

3    or otherwise clarify, and I will assume that if

4    you answer a question, the question makes sense to

5    you.  Is that fair?

6        A     Yes.

7        Q     Great.  Now, if at any time you'd like

8    a break, please let me know.  I'll try to find a

9    good place to stop and we can go off the record

10   for a few minutes.

11             The only exception to that is if I've

12   asked you a question, I please just ask that you

13   answer the question before taking a break.

14             Sound good?

15       A     Yes.

16       Q     Now, what address are you located at

17   for this deposition?

18       A     325 Wesfork Way, Suwanee, Georgia

19   30024.

20       Q     Okay.  And how are you viewing this

21   deposition?  Is it by laptop, or monitor with a

22   video camera?

Page 10

```
1         A    I have a desktop with two screens.  So

2    if you see me looking left and right, that's why.

3         Q    Sure.  And do you have any documents

4    with you, either hard copies or electronic?

5         A    I do not.  The only thing on my desk

6    is some paperwork and some unopened mail.

7         Q    Sounds good.

8              And is anyone in the room with you

9    right now?

10        A    No.  I do have a wife working

11   upstairs, and a stepdaughter who I believe is

12   asleep in her bedroom.

13        Q    Great.  We'll try not to bother her

14   then.

15             Because we're taking the deposition

16   remotely, I may not always be able to see who is

17   entering the room or in front of you, so do you

18   understand that it would not be appropriate for

19   you -- for your attorney or anyone else to tell

20   you how to answer a question I ask you today?

21        A    Yes.

22        Q    Great.  And do you agree that while
```

Page 11

1    you're testifying, you will not exchange

2    communications -- whether by text, email, or other

3    messaging -- to anyone else about how to answer a

4    question today?

5          A    Yes.

6          Q    Great.  If you don't have any other

7    questions for me, I think we can get started.

8          A    Okay.

9          Q    Great.  Mitch, do you mind pulling up

10   Exhibit A and mark it as Exhibit 1 for me?

11              (Davis Exhibit 1 was marked

12               for identification.)

13              BY MS. MENG:

14         Q    Mr. Davis, do you recognize this

15   document?

16         A    I don't, but it appears to be notice

17   of this deposition.

18         Q    Yes.  I believe this is a notice to

19   take the deposition of you, noted for

20   January 19th, 2022, to begin at 9:00 a.m.

21              Are you prepared to testify today?

22         A    I am.

Page 12

1          Q    Great.  Now, without disclosing any

2    specific communications you may have had with your

3    lawyers, can you describe at a high level what you

4    did to prepare for today?

5          A    Reviewed discovery documents that I

6    provided to you.  That's all I can think of

7    really.

8          Q    Okay.  Mitch, you can take that

9    exhibit down.

10              So Mr. Davis, I'd like to ask you a

11   few questions about the process to search and

12   produce documents for today.

13              So, Mitch, if you could pull up

14   Exhibit B, which we can mark as Exhibit 2.

15              (Davis Exhibit 2 was marked

16               for identification.)

17              BY MS. MENG:

18         Q    Great, thank you.

19              Mr. Davis, do you recognize this

20   document?

21         A    Yes.

22         Q    Okay.  And you've seen it before?

Page 13

1          A     Yes.

2          Q     So just to identify this, do you agree

3     that this is a Plaintiffs' First Requests for

4     Production to you?

5          A     I'd have to go back and compare them,

6     but it appears to be.

7          Q     Yeah.  So just for the record, I think

8     in the title of the document it says "First

9     Requests."  Do you see that at the top there?

10         A     Excuse me?

11         Q     At the top, I think it says

12    "Plaintiffs' First Requests for Production to

13    Defendant Mark Davis," the title of the document.

14         A     Okay.

15         Q     Great.  Thank you, Mitch.  Can you

16    pull up Exhibit C and mark it as Exhibit 3?

17               (Davis Exhibit 3 was marked

18                for identification.)

19               BY MS. MENG:

20         Q     So Mr. Davis, do you recognize this

21    document?

22         A     Yes.

Page 14

1          Q     Okay.  And you've seen it before?

2          A     I believe so.

3          Q     Okay.  And this, according to the

4     title of the document, do you agree that it's the

5     Plaintiffs' Second Requests for Production to you,

6     Mark Davis?

7          A     That's what it appears to be.

8          Q     Okay.  Great, thank you.

9                Mitch, you can take that exhibit down.

10    Thank you.

11               Now, Mr. Davis, how did you search for

12    and identify documents that were responsive to the

13    two requests for production that you just saw?

14         A     I thought through the requests, went

15    over them with my attorney, and then with whatever

16    was appropriate, I went looking for responsive

17    documents to provide.

18         Q     Okay.  And when did you undertake the

19    search for documents?

20         A     It's been some time.  I don't recall

21    specifically.

22         Q     Okay.  And do you remember how long

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 15

1   the search took in terms of hours, days, weeks?

2        A    It depends on which search we're

3   talking about.  The way that certain requests were

4   defined in the original request, there was a lot

5   that didn't appear relevant.

6             There was language used in the

7   definitions linking the requests to being in the

8   context of True the Vote, and there was later a

9   hearing with the judge to determine how that was

10  to be interpreted, I suppose.

11            And then this latest hearing that we

12  had, the judge, I believe, ruled that a lot of the

13  stuff that we did not think was within the scope

14  of the original requests should be viewed in that

15  context, and I was asked to go back and redo some

16  of that stuff.

17            I wasn't given a great deal of time to

18  do that, and I had a lot of work to do and we had

19  holidays going on, so I devoted as much time as I

20  could to it, but I really didn't have a lot of

21  time available to devote to it, so I did the best

22  that I could to try to deliver responsive

Page 16

1    documents to you.

2         Q     That makes sense.

3               And can you just briefly describe the

4    process you took in terms of, you know, where you

5    might have looked for documents?

6         A     Depends on the question.  Some of

7    those questions were very broad, and I did the

8    best that I could to review computer files,

9    databases, source files from various places,

10   emails, et cetera.

11              It really depends on the question, I

12   suppose.

13        Q     Great, okay.  But in general, you

14   looked at your computer, devices that you have,

15   things that you had access to and communicate on;

16   is that correct?

17        A     I looked wherever was appropriate in

18   the context of the question.

19        Q     Okay.  And did anyone else help you in

20   any way with searching for documents?

21        A     No.

22        Q     Okay.  Have you withheld any documents

Page 17

1    for any reason from production?

2         A    It depends, again, on the context of

3    the question.

4         Q    And by question, you're referring to

5    the requests for production?

6         A    Each of the requests, right.

7         Q    Okay.  And can you just elaborate a

8    little bit on, you know, what the general

9    parameters were that you might have withheld

10   documents based on the production requests?

11        A    Some weren't relevant to the question

12   asked.  And again, as I said earlier, a lot of the

13   definitions that were in the original requests

14   asked for, for example, communications relating to

15   the challenge that I and True the Vote worked on,

16   and we didn't -- we didn't get involved with

17   True the Vote's challenge.  They did that all on

18   their own.  That was their own effort.

19              So a lot of the questions, the way the

20   definitions were provided and the way the

21   questions were asked, there were some documents

22   that just didn't have anything to do with

Page 18

1   answering that question in the context in which it

2   was asked.

3        Q    Okay.  Were there any documents,

4   records, or communications that you believed were

5   covered by the requests for production that

6   perhaps you couldn't find?

7        A    Yes.  There were some -- there were

8   some text messages that I deleted prior to the

9   lawsuit, and then after the judge's most recent

10  interpretation of the scope of the requests, I did

11  go looking for some that I recalled in my mind

12  that I could not locate.  So there were some.

13            Some of those have been produced from

14  other sources, so they are available now, but

15  there were a couple that come to mind.

16            One was a text message thread between

17  Derek Somerville and I, and another was a text

18  message exchange between Catherine at

19  True the Vote that I could not locate either.

20            I get a lot of junk texts and a lot of

21  junk email, and I do my best to try to keep that

22  cleaned out on a regular basis, otherwise it piles

Page 19

1    up and just gets unmanageable, and it's possible

2    that I may have accidentally deleted those when I

3    was cleaning out text messages at some point last

4    year.  I'm not sure.  All I know is I could not

5    locate some of them.

6         Q    Okay.  And so you referred to two

7    specific communications that you don't recall --

8    or that you weren't able to find.

9              Could you just explain or elaborate,

10   based on your memory of those communications, what

11   were contained in those text messages?

12        A    Well, there was a thread between Derek

13   Somerville and I that touched on a lot of topics,

14   and I'm aware that it's been disclosed, so I would

15   imagine that we'll be reviewing that today.

16             There was also a text message that I

17   had exchanged with Catherine in relation to the

18   launch of a website that was being discussed, and

19   I believe that that text exchange led to a phone

20   call, a brief phone call, where I expressed those

21   concerns.

22             Those are the only two that

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 20

1    immediately come to mind.

2         Q    Okay.  And do you know when that phone

3    call took place?

4         A    I don't recall, but I believe that

5    that may be in the text messages between Derek and

6    I, which I think you guys have a copy of.

7         Q    Okay.  So soon thereafter about that

8    text message did --

9         A    Around that time that the text message

10   occurred.

11        Q    Okay.  And you had mentioned that you

12   routinely delete communications, emails, texts and

13   things like that.

14             On what regular basis are you deleting

15   things on devices?

16        A    I don't have any set schedule.  Well,

17   I get a lot of texts and emails that are -- for

18   example, there are certain accounts, when I log

19   in, I get a confirmation, text message or email.

20             When I process National Change of

21   Address processing for a customer, I'll get

22   notices that it's been received and been returned,

Page 21

1   and when I log in to different places, I'll get

2   confirmations.  And I try to almost immediately

3   clean those out when they come in because there's

4   just no reason for me to keep them.

5              Or as another example, if I get an

6   email from somebody or a text message from

7   somebody saying, hey, can you give me a call when

8   you get a minute?  You know, as soon as I pick up

9   the phone and do that, I'll normally just delete

10  the text because it's no longer needed.

11             So I don't have any real set schedule

12  or anything, but I do try to keep junk cleaned out

13  as much as I can because it stacks up and gets

14  into the hundreds or thousands if I don't.

15       Q    Okay.  And can you describe how the

16  text message thread with Mr. Davis might have

17  fallen into that criteria for how you clear out

18  your messages?

19       A    You mean Mr. Somerville?

20       Q    Oh, yes, sorry.

21       A    Well, the messages that we exchanged

22  early on, at some point I just didn't feel like

Page 22

1    they were relevant and I just, you know, wiped

2    them out.  I didn't think I would need them again

3    in the future.

4                The rest of the thread that happened

5    after that point, I can only assume that I may

6    have deleted it by accident at some point last

7    summer or last fall, because when I went to look

8    for it, it was not there.

9         Q    And so just to clarify, do you use a

10   phone device for your text messages?

11        A    I do.

12        Q    And is there like a trash folder or a

13   deleted messages part of --

14        A    Not that I'm aware of.

15        Q    Sorry?

16        A    Not that I'm aware of.

17        Q    Okay.  And do you recall, I know you

18   had said that perhaps some of these messages were

19   deleted by accident.

20                Do you recall a time frame by which

21   you would have gone into your phone and deleted

22   things, and messages might have gotten erased that

Page 23

1    you didn't mean to?

2          A    As I said, I think sometime last

3    summer or last fall, I would imagine.  I'm not at

4    all sure.  I just don't know.

5          Q    Okay.  And what about messages on

6    other social media platforms, do you routinely go

7    through and clear those out or delete them?

8          A    Typically not.

9          Q    Okay.  So Mr. Davis, I'd like to ask

10   you a couple follow-up questions about how you

11   conducted your analysis of the Georgia voter files

12   last year.

13              Mitch, could you pull up Exhibit D and

14   mark it as Exhibit 4, please?

15              (Davis Exhibit 4 was marked

16               for identification.)

17              MS. SIEBERT:  If possible, I'd like to

18   lodge just a continuing objection, just for the

19   record, to questions related to Mr. Davis's work

20   that was not in conjunction with True the Vote,

21   either for the runoff election or for the November

22   election, just for the record.

Page 24

1           Of course, we'll instruct him to

2    answer, but if okay with you, I'd like to just

3    lodge a continuing objection for the record.

4           MS. MENG:  Thank you, Melena, that's

5    noted.  And I would say that these questions are

6    based off of documents that were produced, and

7    so --

8           MS. SIEBERT:  No, of course.  Of

9    course.

10          BY MS. MENG:

11      Q    So Mr. Davis, could you just take a

12   moment a take a look at this document in front of

13   you.  I believe it's an email chain, and it may be

14   multiple pages, but I'd like to just focus you on

15   the first page for now.

16      A    Sorry, did you ask for a response?

17      Q    Oh, no.  I just wanted you to review

18   it, and let me know when you've had a chance to

19   look it over.

20      A    I recall this email.

21      Q    Okay.  And do you agree that this is

22   an e-mail chain between you and Mr. Somerville

Page 25

1    about some efforts to begin analyzing data?

2         A    Yes.  A discussion was had early on

3    about replicating my work elsewhere, which is hard

4    to do because not a lot of people do the kind of

5    voter data analytics that I typically get involved

6    with, but this effort was basically to try to

7    replicate the NCOA processing that I did from

8    another source just to give it added credibility,

9    and this I believe was one of the initial emails

10   where that was discussed.

11        Q    Great.  So at the bottom of the first

12   page, in the last two paragraphs, you write, "Our

13   purpose here is to identify voters who moved

14   across county lines."

15             And then in the paragraph following,

16   you say, "This investigation has also revealed

17   many out of state voters, presumably mostly

18   students, military, but some of those are probably

19   also illegitimate."

20             Did I read that correctly?

21        A    Yes.

22        Q    Okay.  And Mr. Davis, why did you

Page 26

1    single out military voters here?

2          A     Well, when you file a National Change

3    of Address with the Postal Service, you have the

4    option of classifying it as temporary or

5    permanent, and when you're going to the beach for

6    the summer or something like that, you know, say

7    for six months, you can file a temporary change of

8    address, and when you do that, they will forward

9    your mail to the beach for you, but they won't

10   turn around and tell the folks sending you that

11   mail to update their database to your new address

12   because it's filed as a temporary change of

13   address.

14               So what tends to happen is, because

15   you can't file a temporary change of address for

16   longer than one year, people who are moving

17   temporarily for longer than one year end up filing

18   those changes of address as permanent changes of

19   address when they leave, and then typically they

20   will file another permanent change of address when

21   they come back.

22               So a student going away for four years

Page 27

1    of college or a member of the military going away

2    for a tour of duty likely would file permanent

3    changes of address when they leave and permanent

4    changes of address when they come back, which

5    makes them difficult to distinguish in the data.

6         Q    Okay.  And you mentioned students as

7    well, so --

8         A    I'm sorry?

9         Q    You mentioned students as well in this

10   sentence and the answer that you just gave, so

11   could you just clarify?  When you noted that,

12   presumably, mostly students and military are

13   out-of-state voters, but some of those are

14   probably also illegitimate, were you trying to

15   convey that these student and military voters

16   would be legitimate voters despite them being out

17   of state?

18        A    No.  In the situation where a person

19   leaves the state temporarily, even if it does

20   exceed the one year allowed by the Postal Service

21   to file as a temporary change of address,

22   a student or a member of the military who leaves

Page 28

1    for some period of time intending to return,

2    there's no issue with them voting.

3         Q    Okay.  So in the eventual list of

4    about 40,000 voter challenges that you and

5    Mr. Somerville pulled together, were the names of

6    voters who forwarded their -- were the names of

7    voters who forwarded their mail to an address on a

8    military base therefore excluded?

9         A    Well, the number you're quoting --

10   based on the number you're quoting, I think I need

11   to draw some distinctions here.

12             That initial list that I output of

13   40,100 something, I'd have to look at the count,

14   that list I don't think is really relevant to this

15   case.  That list was produced basically for the

16   Trump attorneys and for me to continue as a

17   starting point to work with.  That was not used to

18   challenge voters in the runoff election.

19             The selection criteria for that file,

20   and the processing that I did for that file, were

21   different.  So I just want to draw that

22   distinction.

Page 29

1          Q     Sure.   Thank you for that

2     clarification.

3              So in the list that you eventually did

4     pull together for voter challenges, did you

5     exclude names of military voters?

6          A     Well, in the absentee voter database,

7     there are UOCAVA voters in there, and those are

8     military typically, or subject to the Act, so

9     basically military and their families, so those

10    were dropped.

11              And Derek Somerville, being

12    ex-military, is pretty familiar with where

13    military bases are, so to what extent we could, we

14    did attempt to suppress as much as possible what

15    could likely be members of the military.  But at

16    the end of the day, ferreting out those kinds of

17    issues is what investigations are for.

18              So, you know, the number of records

19    was quite large, wasn't really possible for

20    private citizens like us to do those kinds of

21    investigations, so it's up to our county elections

22    officials or state elections officials, whatever

Page 30

1    the case may be, to take on that task.

2          Q    Okay.  And Mr. Davis, you mentioned

3    that there was different criteria for this list of

4    about 40,000 voter names that were pulled together

5    for the Trump attorneys, but you had referenced

6    before, that criteria was different than the list

7    of voters that you and Mr. Somerville worked

8    together to pull for voter challenges.

9               Can you just elaborate on how that

10   criteria was different?

11         A    Well, for one thing, after I output

12   the initial list, it was basically just a down and

13   dirty first draft or first look at those issues.

14              And one of the things that I noticed

15   within a couple days, I believe, of generating

16   that file was that it contained some changes of

17   address that were to P.O. Boxes, so almost

18   immediately I wound up dropping about 5,000

19   records out of there.

20              And the other important distinction to

21   make is in the selection criteria, because if a

22   person moved more than 30 days -- moved to another

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 31

1   county more than 30 days before the general

2   election, that would indicate potential residency

3   issues for voting in the general, but for the

4   runoff, that date range is obviously quite

5   different.

6              So, for example, if someone had moved

7   with a Move Effective Date in October or November

8   of 2020, we would want to suppress all of those

9   because they're either within the grace period of

10  30 days or irrelevant; whereas the date for the

11  runoff was obviously a couple months later, and so

12  the selection criteria for that would have been

13  different.

14             And we also did some other

15  suppressions when we generated the challenge list.

16  For example, in our analysis of the voter data, it

17  appeared that the Secretary of State had done list

18  maintenance in 2019, and so we assumed that

19  changes of address that were from that time period

20  probably would have already been through their

21  NCOA process and subsequent list maintenance

22  activities, so we limited the scope to changes of

Page 32

1  address that were beyond that time.

2              We did what we could to suppress

3  military, and I'm trying to think what other

4  suppressions we did.

5              Well, I assume we're probably going to

6  go through some additional communications here

7  that will help refresh my memory on this, but

8  there were a number of suppressions that we did

9  for the runoff file that shouldn't be conflated

10  with analysis that we did for the general

11  election, and I think this is an issue that keeps

12  coming up.

13              Analysis that I did for the general

14  election and for issues related to the general

15  election is different from analysis that I did for

16  potential issues related to the runoff.  So that

17  distinction needs to be made.

18              And the list that you're referencing,

19  the 40,219, or whatever that final count was, that

20  particular file I don't think is particularly

21  relevant here to the issues at hand in this case,

22  but that's my opinion, so ...

Page 33

1          Q    Okay, that's helpful.  Thank you,

2     Mr. Davis.

3               And just to ask a follow-up question

4     to your point about this list that was provided to

5     the Trump attorneys, when was that list put

6     together, or when did that analysis begin?

7          A    Well, the NCOA run that I did I

8     believe was November 25th, if I'm not mistaken,

9     and an initial copy of that analysis would have

10    gone to them in some period not long thereafter.

11              Had that case continued, I certainly

12    would have revisited that file and refined it

13    more.  That was just an initial draft, an initial

14    look, but it ended up not going farther, so that's

15    where it sat.

16         Q    And when you say "case," can you

17    clarify what you mean by that?  Was it a lawsuit

18    or --

19         A    Well, there was a challenge filed by

20    the Trump attorneys and Republican Party Chairman

21    David Shafer that I had been in communication with

22    a number of attorneys about that case, and they

Page 34

1    had asked for my analysis.

2              There were a number of analysts that

3    they were in discussions with at the time

4    regarding various issues that different people had

5    raised.

6              Residency issues are in my lane, so to

7    speak, so I was asked to submit what I was aware

8    of that were issues with regard to those as they

9    related specifically to the general election.

10        Q    Okay.  And you had said before that

11   that list was about 40,205 voters, correct?

12        A    The initial version of it was roughly

13   40,000 voters, a little more than that.

14        Q    Okay.

15        A    You have a copy of it, by the way.

16        Q    Okay, thank you.

17              So, Mitch, if you could pull up

18   Exhibit E for us and label it as Exhibit 5.

19              (Davis Exhibit 5 was marked

20               for identification.)

21              BY MS. MENG:

22        Q    Mr. Davis, could you take a moment

Page 35

1    just to take a look at this email communication,

2    and let me know when you've been able to skim it

3    over.

4        A    Yeah, I think -- I do recognize this,

5    and I think we basically just went over that.

6             Again, we had assumed that changes of

7    address that the Secretary of State likely picked

8    up when they did their list maintenance activities

9    in 2019, we didn't want to recover that same old

10   ground.

11            O.C.G.A. § 21-2-234 requires the

12   Secretary of State to do list maintenance in the

13   first six months of every odd year, so they would

14   have done list maintenance activities, unless

15   prevented by some sort of special election or

16   something like that.

17            They would have done their list

18   maintenance activities in the first six months of

19   2019, so I recall limiting our challenged voters

20   to the period beyond that.

21       Q    Okay.  And at the top here, you see a

22   message that Mr. Somerville sent you that said,

Page 36

1    "Done.  No way to catch them all, but I'm sure I

2    removed a few thousand records."

3              Do you see that?

4         A    I think he's talking about the

5    military scrub I asked him to do.

6         Q    Okay.  And just to clarify the time

7    frame here, these e-mails were sent in the middle

8    of December, so based on what you were saying with

9    the previous list that you did for the general

10   election, would this list have been for -- this

11   analysis have been for the runoff election; is

12   that correct?

13        A    Yes.

14        Q    Okay.  And what did you believe

15   Mr. Somerville meant by there's no way to catch

16   them all?

17        A    Well, the scrub he did would have been

18   military bases, people living on base, but there's

19   also people who live off base, some closer than

20   others.

21              So I think what he was saying is he

22   did his best effort to suppress as much military

Page 37

1    as possible, but there's no way to catch them all.

2              At the end of the day, as I said, you

3    know, that's what investigations are for, and so

4    it's a best efforts kind of situation.  We made a

5    good-faith effort to do what we could with regard

6    to the military.

7         Q    Okay.  And how confident were you in

8    how accurate your analyses were in capturing or

9    removing the data that you were seeking to remove?

10        A    As far as the military or --

11        Q    Military, or any other type of

12   category, like student voters, et cetera.

13        A    Well, I have a lot of experience doing

14   this kind of work, and I gave my best efforts to

15   the cause as well.

16             Our goal was to produce legitimate

17   challenges as much as possible.  We didn't want to

18   inconvenience people unnecessarily, but at the

19   same time, it appears to me, or at least the data

20   indicates, that there likely were a lot of

21   unlawful votes that were cast in the general

22   election, and because we were seeing that, we were

Page 38

1    making an effort to try to prevent the same from

2    happening in the runoff.

3              So I have a lot of experience doing

4    this kind of stuff, and I gave it my best effort,

5    so I'm confident that I did the best that I could.

6         Q    Okay.  Mitch, do you mind pulling up

7    Exhibit F, and we can mark that as Exhibit 6.

8              (Davis Exhibit 6 was marked

9               for identification.)

10             BY MS. MENG:

11        Q    Mr. Davis, if you could take just a

12   moment to look over this email communication.

13        A    I recognize it.

14        Q    Okay.  And this appears to be an email

15   sharing an analysis of challenged voters by

16   categories related to votes in the presidential

17   election, partisan affiliation, and I believe

18   geographic proximity to Atlanta; is that correct?

19        A    I don't think it has to do with

20   partisan affiliation.

21             There was an email, I believe -- well,

22   not an email, but a text message from Derek asking

Page 39

1    if I happened to have a count by county, and I

2    just did a quick SQL query and generated one and

3    sent it to him because he had asked for it.  And

4    then, of course, the count by county was based on

5    our final challenge list for the runoff.

6              And so having that, for whatever

7    reason, this is an analysis that he did.  I didn't

8    particularly see the reason for it, but apparently

9    he did, so, you know, it would probably be best to

10   ask him about it.

11        Q    Okay.  And this grand total number of

12   39,941, would you say that's the number of voter

13   names that you had put together for challenges

14   related to the runoff election?

15        A    I'd have to look for the exact number,

16   but it was in that range for sure.  That more than

17   likely is the correct number.  I don't have it in

18   front of me, so I can't --

19        Q    Sure.

20        A    I can't say that definitively.

21        Q    So I guess posed another way, is the

22   county count and the number -- the analysis that

Page 40

1    Mr. Somerville is referring to here related to

2    voter names from the runoff as opposed to --

3          A     No.

4          Q     -- anything we discussed before?  No?

5          A     No.  I think what he's talking about

6    here -- and again, I'm not real sure where he was

7    going with this.

8                I had produced a count by county, so

9    basically 159 separate counts, one for each

10   county, indicating how many voters were being

11   challenged in each county.  I believe the average

12   was less than 250.  If I recall off the top of my

13   head properly, I think it was like 146 or

14   something per county was the average.

15               And I'm not sure why he asked for that

16   count, but it was an aggregate level number.  I

17   feel confident that none of this here refers to

18   partisanship with regard to any particular voter.

19               The production of the challenge list

20   was not done based on partisanship or race, or any

21   kind of criteria like that.  The count that he

22   produced this from was an aggregate level count of

Page 41

1    how many were being challenged per county, and for

2    whatever reason, it appears he did some sort of

3    workup based on which of those counties were red

4    and blue.  And I'm not sure what the point of this

5    was, but I would encourage you to ask him.

6          Q    Okay.  And what's your understanding

7    of the reference to red and blue in this analysis?

8          A    I can only assume that he's referring

9    to the counties that voted either Democrat or

10   Republican.  Again, I'd encourage you to ask him.

11         Q    Sure.  Is it fair to say, then, that

12   you and Mr. Somerville didn't discuss this

13   analysis further?

14         A    I don't recall if we did or didn't.

15   Quite frankly, when I saw it, I didn't really see

16   the point of it.

17         Q    And do you know if this analysis was

18   shared with anyone else?

19         A    I don't know.

20         Q    And so just to clarify for my own

21   understanding, and apologies if you've already

22   said this, but you said that you had sent

Page 42

1    Mr. Somerville a count by county of voter changes

2    that you had put together, and that totaled

3    39,141; is that right?

4        A    I think I said I'm not certain of that

5    exact number.  It wouldn't surprise me if that is

6    the exact number, and if it was produced off the

7    count I did by county, it should be the exact

8    number.  And again, I --

9        Q    Oh, sorry, go ahead.

10       A    I think it's likely that you probably

11   have a copy of that count by county, so we may be

12   able to compare it to that and look at a total off

13   of that.

14            All I can say is that it looks like

15   the approximate number.  Since I don't have the

16   exact number in front of me, I can't really give

17   you a definitive answer on that, so ...

18       Q    Sure.  But the county count that you

19   had put together, putting aside the total number

20   for a second, what was the purpose or the context

21   for which that county count was produced?  Was it

22   for the purpose of voter changes?

Page 43

1        A     Well, once the final database was

2    established for the challenges, he had asked me

3    for a count by county, and I just did a quick

4    SQL query and spit it out to an Excel spreadsheet

5    and gave him the count by county, just gave him

6    what he asked for.

7               I didn't know why he was asking for

8    it.  I wasn't particularly concerned about it.  So

9    I gave him the count by county, and then he

10   produced this.  Again, I didn't really see the

11   point, so I'd encourage you to ask him about it.

12       Q     Okay.  Great, thank you.

13              Now, Mr. Davis, I'm going to ask you a

14   few questions related to the NCOA analysis that

15   you had referred to a few times.  And, Mitch, you

16   can take the exhibit down.  Thank you.

17              So Mr. Davis, did you and

18   Mr. Somerville ever seek an NCOA data

19   certification while you were doing your analysis

20   in 2020?

21       A     Well, I produced certifications for

22   the NCOA run, if that's what you're referring to,

Page 44

1  and I think they've been disclosed.

2      Q    Okay. And can you just elaborate a

3  little bit about what you mean by producing

4  certifications for NCOA data?

5      A    Well, when I run NCOA, I have the

6  option to produce a certification report that I

7  can save to a PDF or I can print out, and because

8  of the nature of the processing I was doing, and

9  because I felt that it would be helpful, I went

10  ahead and wrote out a copy of those

11  certifications, and I believe they've been

12  disclosed. If they weren't, I can certainly give

13  them to you.

14      Q    Okay. And how did you and

15  Mr. Somerville ever utilize the NCOA data

16  certifications?

17      A    What do you mean by "utilize"?

18      Q    You know, what was your motivation for

19  wanting to produce a certification every time you

20  ran the NCOA?

21      A    Well, I've testified in court as an

22  expert witness a number of times in disputed

Page 45

1  elections cases, and any time it's possible to

2  produce certifications, it's a helpful thing to

3  do.

4            So I'm in the habit of doing that so

5  that I can -- if nothing else, I can show what

6  data file was processed, what day it was

7  processed, what the counts looked like from the

8  results of the processing, which compiler did the

9  processing.

10           There's a lot of information in there

11 that ends up being enshrined in that document, and

12 it's just generally helpful to have it rather than

13 not have it.

14      Q    Okay.  And do you know if those data

15 certifications that you produced were shared with

16 anyone else other than Mr. Somerville?

17      A    Oh, yes, they were.  They were made

18 available to the folks filing challenges so that

19 they could show evidence of the NCOA processing,

20 the date it was run, the company that did it, all

21 of that kind of stuff.

22           So we made those certifications

Page 46

1    generally available basically to help support the

2    challenges that were issued.

3         Q    Okay.  And are you aware if anyone at

4    True the Vote might have had access, as you had

5    said, because the certifications were publicly

6    available?

7         A    Well, they were available to the

8    challengers.  I don't believe we published it to

9    the public, but certainly members of the public

10   could have obtained them from an Open Records

11   Request from any of the counties where they were

12   filed, but I don't recall us publishing it to the

13   general public.  I wouldn't see any reason to do

14   that.

15             Can you repeat your question?  I

16   forget the original context.

17        Q    Yeah.  I was just asking if you knew

18   if the NCOA certifications were ever disclosed to

19   anyone at True the Vote?

20        A    Not that I'm aware of.  I suppose it's

21   possible.  I don't know why it would be relevant

22   to True the Vote.  Their effort was their effort,

Page 47

1    our effort was our effort.

2              By now, with all the evidence that's

3    on the table, it should be pretty clear to

4    everyone that their challenge was not our

5    challenge, and our challenge was not their

6    challenge.  That should be obvious to anybody by

7    now.

8         Q    Okay.  And are you aware of any

9    programs that you or anyone else might have used

10   to analyze NCOA voter data?

11        A    I'm not entirely sure what you mean.

12   I analyzed the data using queries, and visually

13   inspecting it, and tying vote history trailers to

14   it, and that kind of thing.

15             I'm not aware of any programs written

16   specifically to analyze voter data in the context

17   of NCOA processing.

18        Q    Okay.  Have you ever heard of AccuZIP?

19        A    Yes.

20        Q    Okay.  Do you understand how AccuZIP

21   works?

22        A    I do.  In fact, one of the companies

Page 48

 1    that attempted to duplicate the NCOA processing

 2    used AccuZIP, I believe.

 3         Q    Okay.  And do you know how someone

 4    might get access to AccuZIP?

 5         A    Well, you purchase a license to use

 6    the software, and I assume that you would also pay

 7    them to do NCOA processing, although I don't know

 8    how that works.  I know how it works with my

 9    compiler.

10              But I don't believe -- I don't believe

11    it's difficult to obtain.  Anybody willing to pay

12    for it I think can get ahold of it.

13         Q    Okay, great.  So we're coming up at

14    the hour mark, Mr. Davis.  Would you like to take

15    a break now, or do you want to go through a few

16    more questions?

17         A    I would.

18         Q    Okay.

19              THE VIDEOGRAPHER:  Just one second.

20              MS. MENG:  All right.

21              THE VIDEOGRAPHER:  We are going off

22    the record.  The time is 9:56 a.m.

Page 49

1              (A break was taken.)

2              THE VIDEOGRAPHER:  We are going back

3    on the record.  The time is 10:05 a.m.

4              MS. MENG:  Great.  Mitch, do you mind

5    pulling up Tab I and marking it as Exhibit 7,

6    please?

7              (Davis Exhibit 7 was marked

8               for identification.)

9              BY MS. MENG:

10        Q    Now, Mr. Davis, can you take a moment

11   to look at this?  It's over 200 pages, and so I

12   won't ask you to skim it all right now, but does

13   this look familiar to you?

14        A    Yes.  I've actually gone through this.

15        Q    Great.  And this appears to be a copy

16   of a text message conversation between you and

17   Mr. Somerville; is that correct?

18        A    It does.

19        Q    Okay.  Mitch, do you mind going to

20   page 85?  Do you mind pulling up 85 and 86,

21   actually?  Okay, great.

22              So Mr. Davis, in this text message

Page 50

1    conversation beginning on December 6th, it looks

2    like Mr. Somerville texts you that he keeps

3    getting calls about the under 18 voters, and then

4    he states he simply doesn't believe it, not sure

5    how they're getting their information -- getting

6    that information.

7            Do you see that message?

8       A    I do.

9       Q    Okay.  And then it's sort of towards

10   the bottom of page 86, but you'll see that you

11   responded, "I am skeptical."  Do you see that?

12      A    Yes.

13      Q    Okay.  Can you clarify who you

14   believed "they" was that Mr. Somerville was

15   referring to in those text messages?

16      A    I don't know who "they" are.  I heard

17   discussions quite often myself about those claims,

18   and I think, as I mentioned before, there were a

19   number of different data analysts that were

20   providing information to the Trump legal team at

21   the time, and some of those I was aware of and

22   some I weren't.

Page 51

1              Those claims and that data did not

2       come from me, and I had reason to be skeptical of

3       them.

4         Q    Okay.  Mitch, can you go to page 88,

5       please?  Okay.

6              And Mr. Davis, on this same topic, at

7       the top you'll see Mr. Somerville texts you a

8       message, and then in that following message he

9       says, "I think the claim is being made to inflate

10      distrust."

11             What was your understanding of that

12      comment?

13        A    I'd have to see it in context, but if

14      that's referring to the claims regarding underage

15      voters, that would make sense.

16             What was the preceding page?

17        Q    Sure.  So, Mitch, if you could just

18      scroll up.  Yeah, so you'll see at the top of 87,

19      it's a continuation of the conversation where you

20      had said you're skeptical.

21        A    Okay.  And then back down, please.

22             So Derek is saying, "I think the claim

Page 52

1   is being made to inflate distrust."

2               I'm not certain of that.  I think

3   whoever made the claim may have genuinely believed

4   it, but I have trouble -- I have trouble figuring

5   out how that was -- how that was done.

6               The state quit providing month and day

7   of birth several years back, so I don't know how

8   they would have had access to date of birth

9   information, unless perhaps someone had it

10  appended by a compiler somewhere.

11              So it's not a claim that I made.  It's

12  not a claim that, to my knowledge, Derek made.  We

13  were both expressing skepticism regarding those

14  claims.

15              Is there anything else you want to

16  know about that, or ...

17      Q    Yeah.  And so just to clarify -- you

18  had said this before, but just so it's clear on

19  the record -- who do you believe or do you believe

20  Derek was receiving these -- or, you know, hearing

21  these claims from?

22      A    Well, I think the claim was made by

Page 53

1    one of the other analysts providing input to the

2    Trump attorneys, and like I said, there were

3    several.  I'm not sure which particular one had

4    made that claim.

5              I do know there was a lot of buzz

6    generally about the claim, and I think both of us

7    were just expressing our skepticism of the claim

8    in general.

9         Q    Okay, thank you.

10             Mitch, if you could pull up Exhibit J

11   and mark it as Exhibit 8, please.

12             (Davis Exhibit 8 was marked

13              for identification.)

14             BY MS. MENG:

15        Q    Mr. Davis, if you could take just a

16   quick moment to skim through this email.

17        A    What can I help with?

18        Q    Have you seen this before?

19        A    I believe I have.  It looks familiar.

20        Q    Okay.  And do you agree that this

21   appears to be an email from someone named Mikey

22   Tuck to a series of individuals?

Page 54

1        A    I think it's Mickey, Mickey Tuck.

2        Q    Mickey Tuck, thank you for that

3    correction, about Floyd County; is that correct?

4        A    Appears to be.

5        Q    Okay.  And who is Mickey Tuck?

6        A    I recognize the name.  I don't really

7    know this person.  I've seen the name a number of

8    times.  I think this person is probably well known

9    within the Republican Party, but not well known to

10   me.

11       Q    Okay.  And do you know if Mickey is

12   someone who agreed to file challenges from the

13   lists that you and Mr. Somerville had put

14   together?

15       A    I don't know.

16       Q    Okay.  And do you know the context for

17   this email from him?

18       A    Well, he or she appears to be

19   expressing discontent with the way things went in

20   Floyd County when they filed whichever challenge

21   they filed, and I don't know which one that was.

22            So I'm not sure exactly what's gone on

Page 55

1    here, and I don't recall paying particular

2    attention to it.

3         Q    Okay.  And at the bottom of the email,

4    and maybe Mitch can help with this, the last few

5    lines it says, "If they were sincere about the

6    integrity of Floyd County elections they could

7    have at least said that this list of voters would

8    be reviewed after the election."

9              Do you see that portion towards the

10   bottom there?

11        A    Yes, I see it.

12        Q    Okay.  And if Mitch could just help

13   us -- there we go.

14             And so this person goes on to write,

15   "[L]ist of voters would be reviewed after the

16   election and that if any of those voters on the

17   list voted illegally they would be criminally

18   charged.  Putting that statement out there could

19   have at least discouraged anyone voting illegally

20   in Floyd County to not do so."

21             Do you see that statement?

22        A    I do.

Page 56

1          Q    And what did you understand Mr. Tuck

2     to be saying there?

3          A    I couldn't tell you, other than the

4     law does require that we cast our ballots in the

5     county where we reside -- the county and

6     municipality in which we reside.

7               I am also aware that both the

8     GA § 21-2-562 appears to make it a felony to

9     willfully lie about where you live in order to

10    cast a ballot in a county you don't reside in, but

11    I can't really assume what this person that I

12    don't really know might have meant when they made

13    that statement.

14         Q    Did you agree with the sentiment that

15    Mr. or Mrs. Tuck was conveying in this message?

16         A    If I'm interpreting it correctly, I

17    can understand the sentiment, but again, I don't

18    have any direct knowledge of this.

19         Q    As we've reviewed in the context of

20    this email, this statement made by this individual

21    was in the context of electoral challenges filed

22    in Floyd County.

Page 57

1           Would you have any understanding -- or

2    did you understand Mr. or Mrs. Tuck's goal in

3    filing these challenges to be that it would lead

4    to criminal prosecution of voters?

5        A    I really can't speak to someone else's

6    motives here.  My motive was to attempt to prevent

7    unlawful votes from being cast.

8           As far as determining who may or may

9    not have committed any kind of crime, that's

10   really not my job.  That's really the job of our

11   election officials and law enforcement.

12          So again, I don't really know this

13   person.  I can't really speculate on what their

14   particular motives were.

15       Q    Okay.  And have you ever had any

16   discussions with anyone about electoral challenges

17   leading to criminal prosecution?

18       A    I don't recall specific discussions,

19   but in general, as I said, the law does require us

20   to vote in the county and municipality where we

21   reside, with one exception I'm aware of, which is

22   the 30-day grace period.

Page 58

1              In other words, if you've moved to a

2    new county within a month of the election, you can

3    still vote in your old county; or if you have

4    moved temporarily and intend to return to your old

5    county where you're registered, those are two

6    instances that come to mind where such a vote

7    would be lawfully permitted.

8              Otherwise, the law requires us to vote

9    in the county and municipality where we live.  And

10   the Secretary of State explains this pretty well

11   on his voter registration website as well.

12             So that's all I know about that, I

13   suppose.

14        Q    Sure.  And did you have any

15   discussions with others about the threat of

16   criminal prosecution leading to the discouraging

17   of anyone voting illegally?

18        A    Well, I mean, I would hope any voter

19   would be discouraged from casting an unlawful

20   ballot.  I wouldn't classify that as intimidation.

21             I mean, it's like if you're going to

22   go rob a liquor store, you should be intimidated

Page 59

1    by the prospect of prosecution.  It should be

2    obvious.  If you're aware that what you're doing

3    is unlawful, you shouldn't do it.

4         Q    Okay.  And was it ever your goal to

5    partake in efforts that would lead to the criminal

6    prosecution of voters?

7         A    My primary motivation was to prevent

8    illegal votes from being cast.  It's the job of

9    our election officials and law enforcement to

10   determine who may or may not have committed a

11   crime.

12              I've tried to make a point of not

13   accusing any particular voter of violating the

14   law, even though they may have.  I'll leave it

15   there.

16        Q    So, Mitch, could you pull up Exhibit 7

17   again?

18              MS. SIEBERT:  Ms. Meng, I'm sorry,

19   what exhibit number was this email?  I missed it.

20              MS. MENG:  It was Exhibit 8.

21              MS. SIEBERT:  Thank you.

22              MS. MENG:  Mm-hmm.

Page 60

1          BY MS. MENG:

2          Q    Mitch, do you mind scrolling to pages

3    221 and 222, please?  Great, thank you.

4               So Mr. Davis, just to confirm, this is

5    the text message thread between you and

6    Mr. Somerville that we had reviewed previously,

7    correct?

8          A    Yes.

9          Q    Okay.  And at the top of the

10   screenshot on page 222 here, it looks like you and

11   Mr. Somerville are discussing the SoS, which I

12   presume to be Secretary of State's office,

13   conducting some investigation.

14              Do you see that?

15         A    Yes.

16         Q    Can you elaborate on what type of

17   investigations the two of you were discussing?

18         A    In May, I had received an update to

19   the voter file, and when I compared the NCOA

20   processing that I did in November to the May copy

21   of the voter file, there were over 10,000 voters

22   that had voted in the general election who had

Page 61

1    since updated their own registrations to the exact

2    same addresses that they gave to the United States

3    Postal Service when they moved originally.

4              And since that count had gotten up so

5    high, I decided it was probably about time for the

6    Secretary of State to go ahead and open an

7    official investigation into those issues, and I

8    did ask for that investigation, and they did

9    commit to doing it if I would provide the data for

10   them to do the investigation, which I did do at

11   some point in May.  I don't remember the exact

12   date.

13        Q    Okay.  Mitch, do you mind pulling up

14   Exhibit K?  And this is marked as Exhibit 9.

15             (Davis Exhibit 9 was marked

16              for identification.)

17             BY MS. MENG:

18        Q    Mr. Davis, do you recognize this

19   document?

20        A    Can you zoom in on it?  It's really

21   small.  Yes, I recognize it.

22        Q    Okay.  And can you explain what it is?

Page 62

1          A    Can you scroll down to the bottom

2     part?  Okay, what can I help with?

3          Q    Sure.  And Mitch might have to scroll

4     up again, but did you publish this -- sorry.

5               Is this a Facebook post that you

6     published?

7          A    I think so, yes.

8          Q    Okay.  And was it published on

9     November 30th, 2020?

10         A    It appears to have been.  I don't

11    know.  I don't have Facebook in front of me, so

12    I -- I don't have any reason to dispute that.

13         Q    Okay.  And so if we go to the bottom

14    of the page -- keep going, Mitch.  Perfect,

15    thank you.

16               At the bottom of the page, it looks

17    like someone by the name Doug Deal commented, "Can

18    we start turning people in for election fraud?  I

19    have a list of a few people who should be made

20    sorry they voted in two states."

21               Do you see that?

22         A    I do.

Page 63

1          Q     And what was your reaction when you

2     saw Mr. Deal's post?

3          A     I don't recall.

4          Q     Okay.  Did you agree with Mr. Deal

5     that people should be turned in for election

6     fraud?

7          A     I do think if people committed

8     election fraud, our election officials should

9     investigate and determine if that's actually the

10    case.  He seems to be indicating that he found

11    people who voted in two states.

12         Q     Now, Mitch, if you just scroll a

13    little bit to -- or just drag the document a

14    little bit to the left -- sorry, the other way.

15    Yeah, perfect, and if you could zoom out a little

16    bit.

17              So Mr. Davis, this box on the side is

18    a hover of those five thumbs up on Mr. Deal's

19    post.  Do you see your name there?

20         A     I do.

21         Q     And do you recall liking Mr. Deal's

22    post?

Page 64

1        A    I don't, but I wouldn't doubt it.  I

2    know Doug Deal.  I agree that our elections

3    officials should investigate election fraud.  When

4    they find it and it's deliberate on the part of

5    the voter, I believe they should consider

6    prosecuting that voter.

7        Q    Okay.  And can you explain what you

8    understood Mr. Deal to be saying when he said

9    there are a few people that should be made sorry?

10       A    Well, he seems to be indicating that

11   he found people who voted in more than one state,

12   and if so, perhaps they should be sorry they did

13   that.  It's not lawful, as far as I'm aware.

14       Q    And Mr. Davis, did you testify in

15   front of the Georgia senate election hearing on

16   December 3rd, 2020?

17       A    I did.

18       Q    Okay.  And during your testimony, I

19   believe you said, quote, "I know they're going to

20   be having investigators look at the rules and

21   whatnot."

22            Do you recall saying that, or

Page 65

1   something to that effect?

2        A    I don't recall my exact language or

3   what I said there.  It is on video that we can

4   review.

5        Q    Okay.  And do you remember who "they"

6   were that you might have been referring to in

7   relation to investigations?

8        A    I don't recall specifically.  I'd have

9   to take a look at the video and the context in

10  which it was said and what question had been

11  asked, so on and so forth.

12       Q    Okay.  And during your testimony, you

13  also said, quote, "We can see who registered

14  recently, and we can give them increased scrutiny,

15  and I think we should."

16            Do you remember saying that?

17       A    I don't recall that context.  I think

18  I was being asked about multiple registrations at

19  the same address, if I'm not mistaken, but I don't

20  want to sit here and speculate.

21            If you want to review the video, I'd

22  be happy to do that with you.

Page 66

```
 1        Q    Sure.  What did you mean by "increased

 2   scrutiny"?  If I could just ask that question.

 3        A    Well, at the end of the day, when

 4   there's evidence that a person may have voted with

 5   residency issues, because of what the law says

 6   about where we're supposed to vote, which is,

 7   again, the county and municipality that we live

 8   in, if votes happen outside of that for whatever

 9   reason, I think they do warrant increased

10   scrutiny.

11             You know, if someone is within the

12   grace period or someone has moved away temporarily

13   and intends to return, then, you know, those are

14   lawful votes, but if that's not the case, then

15   I think the situation does warrant increased

16   scrutiny.

17        Q    Mitch, do you mind pulling up

18   Exhibit L?  Mark that as Exhibit 10.

19             (Davis Exhibit 10 was marked

20              for identification.)

21             BY MS. MENG:

22        Q    Mr. Davis, could you just take a look
```

Page 67

1    at this?  And Mitch will blow it up for you.

2    Thank you.

3          A     I remember this one.

4          Q     And can you explain what it is?

5          A     Well, we found quite a number of

6    voters that were registered to vote at commercial

7    mail receiving agencies, and in many instances,

8    the fact that their residence that they're

9    claiming appears to be an 8 x 8 inch box in a

10   UPS store, or whatever they measure, many times

11   was disguised as an apartment number or a unit

12   number instead of a P.O. Box number.

13          Again, Georgia law requires us to be

14   registered where we actually reside.  One of the

15   obvious problems with people registering at a

16   UPS store is that we're assigned our voting

17   districts for house, senate, congressional, county

18   commission, school board, any number of election

19   districts, and if you're registered at a

20   UPS store, you might live miles away in completely

21   different districts, and you may be casting

22   ballots in voting districts that you don't live

Page 68

1    in.

2            So there's obvious problems with that,

3    and quite frankly, I was astounded to find that in

4    the data.  There are obvious ways to identify

5    those registrations in the CASS™ certification

6    process, and in my view, our Secretary of State

7    and/or the counties can and should be addressing

8    those concerns.

9        Q    Okay.  And here, this is a post where

10   it looks like you've reposted something that

11   Mr. Somerville had posted and labeled with you,

12   which I know is perhaps something that the social

13   media website allows you to do.  Is that correct?

14       A    Yeah, he posted it and tagged me in

15   the post.

16       Q    Okay.  Now, Mitch, if we could go to

17   the bottom of the page.  So right there, the last

18   paragraph we see that this post said, "We need to

19   identify the abusers, start throwing people in

20   jail, and close the loopholes."

21            Do you see that, Mr. Davis?

22       A    I do.

Page 69

1          Q     Okay.  And can you elaborate on this

2     sentiment?

3          A     That appears to be Derek's sentiment.

4               Personally, my main concern would be

5     getting the problem corrected.  As far as

6     prosecuting anybody, you know, that's, again, up

7     to our elections officials and law enforcement.

8               Again, as Georgia law says, we're

9     supposed to be voting where we actually reside,

10    and in the county and municipality where we

11    actually reside, and undoubtedly, many of these

12    voters that were registered at the UPS store,

13    obviously, none of them actually live in the

14    UPS store.  We don't know where they live.

15              They may or may not be voting in the

16    right voting districts.  They may or may not be

17    voting in the right county.  They may or may not

18    be voting in the right municipality.

19              I don't believe what's being done is

20    lawful, but I'm not in law enforcement and I'm not

21    an elections official.  It would be up to

22    elections officials and law enforcement to

Page 70

1    determine violations of law.  My main concern is

2    correcting the problem.

3          Q    Did you agree with the sentiment that

4    Mr. Somerville wrote here with this sentence?

5          A    I think I just expressed my sentiment

6    on the matter.  That's his.  I would ask him about

7    it.

8          Q    Okay.  But it is true that you were

9    tagged in this post, and you then reposted it; is

10   that correct?

11         A    Correct.

12         Q    Okay.  And what did you -- why did you

13   decide to share the post?

14         A    Excuse me?

15         Q    Why did you decide to share the post?

16         A    I think it's important for people to

17   understand that this kind of stuff and this kind

18   of trash is in our voter database, and no one

19   seems to be doing anything about the issue.

20         Q    And what did you hope would be the

21   reaction of someone reading this post?

22         A    Well, I would hope our elections

Page 71

1   officials would sit up and take notice of this and

2   work towards resolving the issue, but I would just

3   about bet money that if I were to go into the last

4   copy of the voter database that I received and do

5   yet another analysis of this issue, I'd still

6   find tons of people registered to vote at

7   commercial mail receiving agencies that they don't

8   live at.  I mean, this is -- this should be an

9   obvious and completely nonpartisan issue here.

10          Q    Did you think the comment that you

11   shared that we just reviewed here might make

12   someone think twice about voting?

13          A    I would hope it would make people

14   aware that they can't register to vote anywhere

15   other than where they actually live, and no one

16   lives in a UPS store that I'm aware of.

17          Q    Okay.  And how do you think this post

18   might have affected someone who is an out-of-state

19   voter?

20          A    I'm not sure I understand your

21   question.

22          Q    Let me rephrase that.

Page 72

1            You had said that, you know, you

2    shared this post with certain motivations in mind.

3    What motivations did you have along -- strike

4    that.

5            We can move on to page 3, Mitch, if

6    you will.

7            MS. SIEBERT:  Ms. Meng, what exhibit

8    is this?  I'm so sorry again.

9            MS. MENG:  This is Exhibit 10.

10           MS. SIEBERT:  Thank you.

11           BY MS. MENG:

12      Q    So, Mitch, if you could go towards the

13   bottom of the page.  Yep, right there, thanks.

14           So Mr. Davis, directing your attention

15   to the bottom of the page, there's a comment made

16   by someone by the name Kent Byers, and it reads,

17   "I think a search warrant is in order here and all

18   other UPS Stores statewide."  Do you see that?

19      A    Yes.

20      Q    Okay.  And then you responded below

21   that, "Great idea!"  And then Mr. Byers then says,

22   "[W]ould it be an SoS investigator job?  Or a

Page 73

1    sheriff job?"  Do you see that?

2          A    Yes.

3          Q    What did Mr. Byers mean?

4          A    Well, Kent Byers is retired law

5    enforcement, and I think he was saying that, in

6    his opinion, an investigation should be had.

7               I agree that an investigation should

8    be done.  It should start with our elections

9    officials, and if they find violations of the law,

10   then if they choose to involve law enforcement and

11   search warrants or whatever else, that's up to

12   them.  I think he's making these comments as

13   former law enforcement himself.

14         Q    Okay.  And what did you think was the

15   value in seeking out search warrants?

16         A    He seems to believe it would be

17   useful, and I assume -- I assume those businesses

18   would have the actual addresses where the owners

19   of those boxes actually reside.  I would think in

20   an investigation of this nature, that would be

21   useful to law enforcement.

22         Q    Mitch, do you mind scrolling to

Page 74

1    page 4, please?  Okay.

2              And the third post on this page is by

3    someone by the name Robert Cromlish.  Do you see

4    that?  Sorry, it's Roberta Cromlish, yes, right

5    there.  Do you see that --

6         A    I do.

7         Q    -- post, Mr. Davis, right in the

8    middle?  Okay.

9              And it looks like this individual

10   says, "Let's see if any one has the balls to

11   prosecute to the max or if they will just get a

12   hand slap!"  Do you see that?

13        A    I do.

14        Q    Did you agree with -- I presume it's a

15   Ms. -- Ms. Cromlish's comment here?

16        A    I don't know that I necessarily agreed

17   with it, but I certainly am curious about whether

18   or not any of our elections officials or law

19   enforcement will actually get involved with this

20   very legitimate set of issues and actually take

21   any kind of action at all.

22        Q    And what did you think would be the

Page 75

1    reaction of someone reading this comment?

2         A    I hope by now, reading this entire

3    thread and becoming aware of the issue, I would

4    hope folks are cognizant of the fact that you

5    can't register to vote at a UPS store when you

6    live elsewhere.

7         Q    And do you believe this comment might

8    have impacted a voter's willingness to vote?

9         A    Well, if a voter is registered

10   anywhere other than where they actually live, and

11   they're violating the law, perhaps there should be

12   concern.

13        Q    Mitch, can you go to -- could you pull

14   up Exhibit M and mark that as Exhibit 13?  Sorry,

15   Exhibit 11.

16             (Davis Exhibit 11 was marked

17              for identification.)

18             BY MS. MENG:

19        Q    And can you just blow up the first

20   part of that for Mr. Davis so he can see?  Great,

21   thank you.

22             Mr. Davis, can you take a moment to

Page 76

1   review this?

2          A    All right.  How can I help?

3          Q    Do you recognize this post?

4          A    I think I do, yes.

5          Q    And is this a joint post between you

6   and Mr. Somerville on December 5th, 2020?

7          A    It appears to be one that he tagged me

8   in.

9          Q    Okay.  And it's a post about a voter

10  who you guys have a named "Dave"?

11         A    Appears to be.

12         Q    Okay.  Mitch, do you mind scrolling to

13  page 4?  And at the top there -- yeah, if you can

14  go back to that view of just the first half.

15  Thanks.

16              Mr. Davis, you'll see there's a post

17  from you tagging Mr. Brandon Bramlett on

18  contemplating the idea of filing a challenge to

19  these voters.  "If nothing else, once they've been

20  flagged in the system, it should result in

21  increased scrutiny."  Do you see that?

22         A    Yes.

Page 77

1          Q     And can you elaborate on what you

2     meant here?

3          A     It appears I'm talking about the idea

4     of challenging voters in the runoff election, and

5     doing that sort of puts the Secretary of State and

6     State Board of Elections and everybody else on

7     notice about these issues before the election.

8                And if the runoff election had

9     resulted in a very narrow -- what's the word -- a

10    very narrow margin between the candidates, and

11    there were some quantifiable number of unlawful

12    votes that met or exceeded that spread, or

13    evidence of systemic irregularities, then, of

14    course, under the law, an election can be

15    challenged.

16                And so I think documenting these

17    issues before an election is helpful in

18    strengthening a potential contest, should one have

19    developed following the election.  That didn't end

20    up being the case, but I think that's what I was

21    referring to.

22          Q     So in this latter half of your comment

Page 78

1    where you say "also bolster any legal challenge to

2    the election," can you elaborate on that?

3         A    I think I just did, didn't I?

4         Q    So just to clarify, you're referring

5    to legal challenges as they relate to contesting

6    an election; is that correct?

7         A    Correct.

8         Q    Okay, thanks.

9              Mitch, could you go to page 6, please,

10   in the middle of the page?  Yes, right there.

11             So Mr. Davis, do you see a post or a

12   comment by someone named Chuck Martin?

13        A    Yes.

14        Q    And here he says, "Just curious why

15   hide 'Dave's' identity?"  Do you see that post?

16        A    Yes.

17        Q    Okay.  And then later on in that same

18   comment he says, "[H]as this been turned over for

19   criminal prosecution?"  Do you see that?

20        A    Yes.

21        Q    Okay.  And then, Mitch, do you mind

22   scrolling down a little bit?  Perfect, right

Page 79

1    there.

2              And so, Mr. Davis, you respond to

3    Mr. Martin at the bottom.  Do you see that?

4         A    Yes.

5         Q    And there you're referring to turning

6    over data to the SoS and DOJ, which I presume to

7    be the Secretary of State and Department of

8    Justice investigators; is that correct?

9         A    I was contemplating that at the time,

10   yes.

11        Q    Okay.  And who is the "we" you refer

12   to in the beginning part of that sentence?

13        A    It's been a while, but I think it's

14   likely I was talking about Derek and I.

15        Q    Okay.  And can you explain what you

16   were referring to here?  Later on in the -- sorry.

17             So to clarify, later on in that

18   comment you say, "I think it's best right now to

19   avoid naming real names of individual voters."

20             Can you clarify what you meant there?

21        A    Yeah.  As we've discussed before,

22   there are circumstances where long-term temporary

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 80

1    movers can appear in the data processing because

2    many of them actually file permanent changes of

3    address for what technically is a long-term

4    temporary move, and for that reason, I don't like

5    to talk much about individual voters by name.  I

6    don't think that's a smart thing to do.

7              And I certainly don't support

8    publishing any of this analysis or putting people

9    on the spot, and, you know, we avoided doing that

10   with these efforts.

11        Q    And why is it that you didn't want to,

12   as you had said, put people on the spot or publish

13   information?

14        A    I think I just explained that not all

15   of these are actual permanent changes of address.

16              There's going to be some in the mix

17   where a person may have gone out of the state or

18   to another county for some temporary purpose, even

19   though it may be a long-term temporary change of

20   address, classed as a permanent change of address

21   by the Postal Service.

22        Q    Okay.  And what was the concern that

Page 81

1   you and/or Mr. Somerville shared about publicizing

2   information about voters?

3        A    Well, we certainly don't want to start

4   naming names of people that may not have been

5   guilty of casting ballots, you know, in a location

6   other than their county or municipality of

7   residence as required by the law.

8             I think I've said that several times

9   now.  I don't know what else you're looking for.

10       Q    Okay.  And did you ever turn over

11  information to the Secretary of State and the DOJ

12  as you refer to here?

13       A    I did open an investigation with the

14  Secretary of State's office, not the DOJ.  I think

15  we've discussed that previously.

16       Q    And that was about, as you had said,

17  if I recall, around May of 2021; is that correct?

18       A    Yes.

19       Q    Okay.  And, Mitch, can you scroll to

20  page 12?  Yeah, right at the top there.

21            So Mr. Davis, in response to -- or

22  perhaps, Mitch, what you can do is, can you show

Page 82

1    the bottom of the page right before it, and then

2    this page?  Just scroll a little bit.  Thank you.

3              So here, Mr. Davis, you're responding

4    to someone by the name Joseph Michael Yates, and

5    again you referred here to the Secretary of State

6    and DOJ investigators.  You then proceed to say

7    that not everyone on the list --

8         A    Are we talking about the same --

9    I'm sorry, I didn't mean to interrupt.

10        Q    No worries.  Do you see that post that

11   Mitch I think is about to highlight right there?

12        A    I do.  My question is are we still on

13   the same Facebook post we were on?

14        Q    We are, yes, it's just later on in the

15   thread.  And if you would like to confirm that,

16   you can have Mitch scroll up a little bit.

17        A    I'll take your word for it.

18        Q    Okay.  So I know we had covered this

19   before, but just to clarify, so your concern about

20   publishing information about voters is that you

21   didn't, as you had said here, you were not in

22   favor of making public accusations against

Page 83

1    particular individuals; is that right?

2          A     That's right.

3          Q     Okay.  Mitch, do you mind going to

4    page 20 in this document?

5                At the top there, someone by the name

6    John Cassard says --

7          A     "KA/SARD."

8          Q     "Cassard," thank you.

9                "I remember you saying before that

10   none of the perpetrators are ever REALLY

11   punished."  Do you see that?

12         A     I do.

13         Q     Okay.  And then he proceeds to say,

14   "Maybe if they know they'll get popped, they'll

15   stop.  Crime, punishment, and deterrence."

16               Did I read that correctly?

17         A     It appears so.

18         Q     Okay.  And how did you interpret this

19   comment when you saw it?

20         A     John is an old friend from high

21   school, and at one point I had told him that, over

22   the last 20 years, I've testified as an expert

Page 84

1  witness in five different elections cases, and

2  over and over and over and over again, I have

3  watched voters take the stand and admit to

4  violations of the law.  I have yet to see the

5  first one prosecuted.

6              I believe I also told him about the

7  double voting scandal I uncovered down in

8  Long County, which resulted in a statewide

9  investigation that identified, I think it was over

10 1700 more, and that may be an undercount, and

11 quite frankly, may be just the tip of the iceberg.

12 I have yet to see any of those voters prosecuted.

13             I did see the Secretary of State come

14 out and assert that he was going to prosecute

15 voters who knowingly cast ballots twice.

16             I think one of the things that tends

17 to happen is a lot of people make claims about the

18 lack of vote fraud when often it's there, it's

19 just often not prosecuted.  Even when it's

20 identified, a lot of times law enforcement and our

21 elections officials take a pass on doing anything

22 about it.

Page 85

1        Q    And what did you take his comment to

2    mean when he said "if they know they'll get

3    popped"?

4        A    I mean, I guess that'd be a question

5    for him, but the way I would interpret that is if

6    voters are aware that if they violate election

7    laws, knowingly violate election laws or willfully

8    lie to elections officials about where they live,

9    if they're aware there's consequences for

10   violating the law, he's apparently saying they'll

11   stop.

12       Q    Okay.  And what did you think would be

13   the reaction of someone reading this comment?

14       A    Well, if they're knowingly violating

15   election law, perhaps they'll stop.

16       Q    And did you believe this comment might

17   impact a voter's willingness to vote?

18       A    I would hope it might impact a voter's

19   willingness to vote illegally.  But if that voter

20   is a lawful voter, lawfully registered, and voting

21   where they should be voting, I don't know why that

22   would even apply to them.

Page 86

1          Q    And so did you agree with this comment

2     that -- agree with this comment and the sentiment

3     that voters should be punished if they are, as you

4     said, voting illegally?

5          A    Well, as I said before, if a voter --

6     and we can pull up the law and read the plain

7     language of it, but I'm paraphrasing here, but my

8     understanding of O.C.G.A. § 21-2-562 is that if a

9     voter willfully misleads elections officials about

10    where they live so they can cast an unlawful

11    ballot, it appears to me to say that that is a

12    felony.

13              Now, as far as who should and

14    shouldn't be prosecuted and all of that, that's up

15    to our elections officials and law enforcement.

16              Quite frankly, I don't expect to see a

17    whole lot of that because I so seldom see them

18    take any kind of meaningful action when voter

19    fraud is uncovered and admitted to on the record

20    in a courtroom.  I don't see much activity going

21    on there.

22              So again, my primary motivation is to

Page 87

1  effect change that would help prevent unlawful

2  votes from being cast and effect changes in policy

3  to help identify and thwart unlawful voting.

4           You know, one of the issues that I

5  have raised before in my prior deposition here is

6  that, in the general election, the data seems to

7  indicate there were over 100,000 voters who had

8  moved from the county they were registered in to a

9  new county more than 30 days before the election.

10          The vast majority of those voters did

11  not attempt to cast unlawful ballots in a county

12  they no longer live in, but it appears that the

13  same data indicates that tens of thousands may

14  have done precisely that.  And if that's the case,

15  that means the voters that obeyed the law didn't

16  get to have their votes counted, and folks who

17  broke the law did, and any of us should have an

18  issue with that.

19          MS. SIEBERT:  Ms. Meng, for just a

20  second, my dog needs to be let in my office.  I'm

21  just going to go off camera for 5 seconds and let

22  her in so she doesn't drive me crazy.

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 88

1              MS. MENG:  Sure, I'll wait for you to

2      come back.

3              MS. SIEBERT:  I'm back.  Sorry.

4              MS. MENG:  No worries.

5              BY MS. MENG:

6         Q    Mitch, if we could just go back to

7      page 6 of this PDF.

8              So Mr. Davis, for your awareness,

9      we're still on the same Facebook post, we're just

10     scrolling through some of the comments were made.

11             And towards the bottom of page 6,

12     Mitch, if you will.  Great, thank you.

13             So Mr. Davis, you'll see that at the

14     bottom of the page, going back to a comment you

15     had made, "I think it's best right now to avoid

16     naming real names of individual voters so neither

17     Derek or I has to spend a small fortune on

18     lawsuits."  Do you see that?

19        A    Yes.

20        Q    What lawsuits were you concerned about

21     facing?

22        A    I think we've covered this.

Page 89

 1                    If someone moved temporarily, even

 2      though it was filed as a permanent change of

 3      address, if it was actually a long-term temporary

 4      change of address, and someone accuses them of

 5      committing a crime, then, yeah, I mean, they could

 6      consider a lawsuit.

 7                    I certainly have no interest in being

 8      involved in such a situation.  So just in general,

 9      you know, I try to avoid naming individual voters,

10      and I'm reluctant to even address instances

11      regarding individual voters.

12                    There have been a couple that have

13      popped up from time to time, but that's when

14      they've made themselves an issue.  But in general,

15      I tend to avoid doing that.

16                    Again, as I said before, I think it's

17      up to our elections officials and law enforcement

18      to determine who has or hasn't committed a crime.

19          Q    Okay.  And when you refer to law

20      enforcement, can you specify or clarify what you

21      mean by that?  Are you referring to police or --

22          A    Well, the State Board of Elections I

Page 90

1    believe generally refers violations of election

2    law to the Attorney General's Office of Georgia,

3    but it's also my understanding that county

4    district attorneys can hold grand jury hearings.

5    You know, so I think that, in general, that can

6    take a number of different forms.

7              That's not really my issue.  You know,

8    if a county identifies some sort of unlawful

9    voting and refers it for prosecution to their

10   county district attorney, I believe that would be

11   an appropriate venue for that.  But again, I'm not

12   a lawyer, but based on what I am aware of, that's

13   my opinion.

14             But again, my primary motivation is to

15   thwart illegal voting in the first place.  As far

16   as any consequences, I'm not super optimistic that

17   anyone is going to get prosecuted.  Even if they

18   have committed a felony, I'd be surprised.

19   Because I so often see obvious vote fraud go

20   unpunished, I'm not optimistic that it's going to

21   happen simply because it's been identified.

22             I'll leave it there.

Page 91

1          Q    Okay.  And one final question on this

2     post here.  Is it fair to say that you were

3     concerned about lawsuits brought against you for

4     defamation?

5          A    Not particularly, because I don't

6     believe I've defamed anyone.

7          Q    Okay.  Then what was the nature of the

8     lawsuit that you were concerned about?

9               I know you've described sort of what

10    would motivate a voter to potentially sue you, but

11    what's the nature of the claim that you were

12    particularly concerned about?

13         A    There isn't one.  I certainly don't

14    want one.

15         Q    Okay.  So Mr. Davis, I'd like to ask

16    you now a few questions about your interactions

17    with True the Vote.  And, Mitch, you can take this

18    exhibit down.  Thank you.

19              So Mr. Davis, how many times -- oh,

20    would you like to take a break?

21         A    I just noticed we're on the hour mark.

22    I was going to ask if that's possible.

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

                                                                Page 92

 1          Q     Sure.  Let's take a five-minute break

 2    and come back at around 11:05, 11:06.

 3          A     Thank you so much.

 4                THE VIDEOGRAPHER:  We're going off the

 5    record.  The time is 11:01.

 6                (A break was taken.)

 7                THE VIDEOGRAPHER:  We're going back on

 8    the record.  The time is 11:08 a.m.

 9                BY MS. MENG:

10          Q     So Mr. Davis, I'd like to ask you a

11    couple of questions about your interactions with

12    True the Vote.

13                How many times would you say you've

14    been on calls with True The Vote or any

15    representative from True the Vote?

16          A     I recall two.  It's been a while.

17                I had just met -- well, I've never

18    actually met True the Vote people in person, but I

19    had been introduced to True the Vote shortly

20    before all of this started following the general

21    election.  I had not known them for very long.

22          Q     So sorry, just to clarify that

Page 93

1   timeline, you said that you met them before the

2   general election; is that correct?

3        A    I had a phone call with Gregg Phillips

4   following the general election; and then there was

5   a -- it was a Zoom meeting that Catherine

6   Engelbrecht had hosted; and then I think there was

7   one occasion where I ended up speaking with her on

8   the phone at one point that I had forgotten about

9   until recently when it came up.

10       Q    Okay.  And so you'd say that you've

11  communicated directly with Ms. Engelbrecht on the

12  phone about one time that you can recall; is that

13  correct?

14       A    I recall one.  I'm not discounting the

15  possibility there could have been others.  There

16  was so much activity going on following the

17  general election, it's kind of a blur, but my best

18  recollection is one, but I'm not going to sit here

19  and say there might not have been others.

20       Q    Okay.  And do you -- have you ever

21  texted, messaged, or contacted Ms. Engelbrecht

22  directly in a non-phone conversation context?

Page 94

1          A      There was a message that I sent her

2     during a Zoom call that she hosted, and then there

3     was another occasion that I recall texting her

4     with a concern about some activity that they were

5     going to be -- or they had proposed doing on the

6     web.

7          Q      Okay.  And have you ever had any

8     disagreements with anyone at True the Vote?

9          A      Quite a few.

10         Q      Okay.  Can you just briefly describe

11    what some of those are?  We may get into some

12    detail about that later, but if you could just

13    give a brief overview.

14         A      I was not on board with the philosophy

15    surrounding their challenge.  I felt it was too

16    broad.  From my own perspective, I wanted mine to

17    be more legitimate, more smaller.  I wanted our

18    challenge to be focused.

19                As I think I mentioned before, I think

20    our average number of challenged voters per county

21    was under 250.  Of course, the larger counties

22    with larger staffs would have received larger

Page 95

1   challenges, and some of the smallest counties

2   might have received very, very few.  So I had a

3   disagreement in terms of the scope.

4              One of the issues that popped up early

5   on was my desire to make sure everyone was aware

6   that our challenge was not True the Vote's, and

7   vice versa, and I wanted people to be aware of the

8   difference in the philosophies surrounding the

9   challenges.

10             And then the other instance that I

11   recall was there was some talk about publishing

12   voter data on the website, and I think I may have

13   misunderstood what they were doing, and I had

14   expressed a concern about what I thought their

15   plans to be, but I think it turns out some of my

16   concerns were unfounded.

17        Q    Okay.  And you had referred to,

18   you know, wanting your challenges to be more

19   legitimate.  Can you elaborate on what you mean by

20   "legitimate"?

21        A    I don't mean to imply that theirs were

22   illegitimate.  Theirs was broader than the one

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 96

1    that I contemplated.

2              I felt like my approach was the

3    correct approach.  I mean, obviously, that's why

4    we pursued ours the way that we did and with the

5    philosophy that we pursued it.

6              Does that answer your question?

7         Q    Sure, it does.

8              So, Mitch, can we pull up Exhibit N?

9    And this will be labeled as Exhibit 12, please.

10             Mitch, are you there?  Oh, okay.

11   Thank you.  Sorry about that.

12             THE VIDEOGRAPHER:  I'm sorry, N or M?

13             MS. MENG:  N as in Nancy.

14             THE VIDEOGRAPHER:  I gotcha.  My bad.

15             There you go.

16             MS. MENG:  And we'll mark this as

17   Exhibit 12.

18             (Davis Exhibit 12 was marked

19              for identification.)

20             BY MS. MENG:

21        Q    So Mr. Davis, are you familiar with

22   this document?

Page 97

1          A     It looks familiar.

2                What can I help with?

3          Q     Okay.  And is this an e-mail chain

4     between you and Mr. Somerville about some matters

5     related to elector challenges?

6          A     Yes.

7          Q     Okay.  And at the top you'll see

8     Mr. Somerville sent an email to you saying,

9     "[T]his went to a few key people to start getting

10    it to the broader networks."

11               Did I read that correctly?

12         A     It appears you have.

13         Q     Okay.  And are you aware of who the

14    few key people are that Mr. Somerville is

15    referring to here?

16         A     I'm not.

17         Q     Okay.  Do you know if the key people

18    here at all included anyone from True the Vote?

19         A     I don't know.

20         Q     Mitch, do you mind pulling up

21    Exhibit O, which we will label as Exhibit 13.

22

Page 98

1                    (Davis Exhibit 13 was marked

2                     for identification.)

3                    BY MS. MENG:

4          Q    Mr. Davis, can you take a moment just

5    to look over this?

6          A    I think that may be referring to the

7    Zoom call that we referred to earlier.  I'm not

8    certain of that, but I believe that may be the

9    case.

10         Q    Okay.  And in the email towards the

11   middle, Mr. Somerville states that we'll be

12   taking -- we'll be talking about next steps.

13                    Do you see that part?

14         A    Yes.

15         Q    Okay.  And in response you said, "I'll

16   be ready," at the top.  Do you see that?

17         A    Yes.

18         Q    What were you referring to in saying

19   that you would be ready?

20         A    I don't recall specifically.  I assume

21   I was basically saying that I'll be ready for the

22   call in general.

Page 99

1          Q    Okay.  And was there anything you were

2    preparing in particular in relation to the call?

3          A    Not that I recall.

4          Q    Did you end up attending the call?

5          A    As I said, I think this is referring

6    to the Zoom call that I was on that was kind of a

7    general town hall that Catherine had hosted, and I

8    attended it just to see what was going on.

9               Again, you know, our challenge was not

10   their challenge, but, you know, I was interested

11   in keeping up with what they were up to and what

12   they were doing.

13              To give you an analogy, there's a lot

14   of groups that are out there to help the homeless,

15   but they're in different groups for reasons.

16   Similarly, I'm generally supportive of election

17   integrity efforts, although they may not fit my

18   own philosophy to a tee.

19         Q    Okay.  And here Mr. Somerville implied

20   that there was going to be a conversation about

21   next steps.  Do you recall what next steps were

22   discussed on this call?

Page 100

```
 1        A    I don't recall much about the call in

 2   general.  It was quite some time ago.

 3             I do recall asking to be able to

 4   clarify the differences in the challenges and

 5   basically getting shut down.

 6             I do recall it seemed like Catherine

 7   didn't even know who I was and wasn't interested

 8   in what I had to say, and I recall quitting the

 9   call in anger because of that.  I was pretty

10   ticked off.

11        Q    Okay.  And what was the basis -- you

12   had mentioned that it didn't seem like

13   Ms. Engelbrecht even knew who you were.

14             What was the basis or context in which

15   she would have known who you were?

16        A    Well, my initial introduction to

17   True the Vote came after Derek had dinner with her

18   and Gregg Phillips.  Subsequent to that, there was

19   a conference call arranged that Catherine was

20   supposed to have attended, but didn't, so it wound

21   up being just me and Derek and Gregg Phillips, and

22   it was kind of a general get-to-know-you kind of
```

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 101

1   situation.  And Gregg and I sort of compared our

2   backgrounds and our decades in working with voter

3   data and all of that, and we found a lot of common

4   ground and common experiences.

5               At one point in the conversation, he

6   had brought up the possibility of me becoming

7   involved with True the Vote in a formal way, and

8   perhaps in a leadership role, and I explained to

9   him that I really don't have the bandwidth, and

10  that I was going to have to decline, but that I

11  wished them all the best, and that was kind of

12  where that was left.

13              I sort of expected that he would have

14  briefed Catherine on those discussions; that

15  didn't appear to have happened.  She, again,

16  didn't seem to even really know who I was or why I

17  was on the call, didn't seem interested in what I

18  had to say, and as I said, I wound up quitting the

19  call before it ended.  I was kind of angry that I

20  wasn't given the opportunity to draw the clear

21  distinctions between the challenges.

22         Q    Okay.  So, Mitch, if you don't mind

Page 102

1    pulling up Exhibit 7, and if you could go to pages

2    158 and 159.  Okay.

3              So Mr. Davis, just to confirm, this is

4    again the text message conversation between you

5    and Mr. Somerville that we've gone back to a

6    few times; is that right?

7         A    Yes.

8         Q    Okay.  And is it correct to say that

9    the text messages on the screen here refer to the

10   Zoom call that you were just speaking about?

11        A    I'd want to compare the dates, but I

12   believe that does, yes.

13        Q    Okay.  And I believe we've covered

14   this a little bit, but can you tell me who was on

15   the call?  It sounded like it was you,

16   Ms. Engelbrecht.  Who else was on the call?

17        A    There were a whole lot of folks on the

18   call.  I believe it was kind of a general

19   town hall type situation for True the Vote's

20   volunteers.

21             I certainly am not a True the Vote

22   volunteer, but again, I generally am supportive of

Page 103

1    efforts involving voter integrity -- or election

2    integrity, rather.

3              So I attended just to kind of keep up

4    with what they were doing.  And again, I had hoped

5    to be able to draw a distinction between the

6    challenges, and I wasn't permitted to do that, and

7    I was pretty ticked.

8         Q    Were you aware -- I know you had made

9    the analogy before of multiple groups being

10   involved in helping homeless people.

11             Were you aware of other individuals or

12   groups that were on this call that were also doing

13   voter challenges outside of the True the Vote

14   challenges?

15        A    Derek had told me that some of the

16   volunteers were also our volunteers.  I didn't

17   handle that.  You know, I'm a voter data analyst,

18   and I kind of had my head down in the data and

19   handling what was in my purview, and organizing

20   who was filing what where and coordinating all

21   that stuff, I pretty much left that to Derek.

22             But I think at some point, I don't

Page 104

1    remember if it was before or after the call, you

2    know, he had told me that some of our volunteers

3    were also volunteers for True the Vote.

4              I assumed that I knew that before the

5    call, which is why I would have wanted to draw a

6    clear distinction between the efforts, but again,

7    I wasn't allowed to do that.

8         Q    Okay.  So putting aside voter

9    challengers and putting aside the True the Vote

10   representatives that were on the call, are you

11   aware of any other individuals in your capacity,

12   which you had described as voter analysts, who

13   might have been on that call as well?

14        A    I assume Gregg Phillips was on the

15   call, but I don't remember that specifically.

16   It's difficult for me to imagine that he wasn't,

17   but I don't for sure know that he was.

18        Q    And so taking a look at page 159 here,

19   you sent a text message -- it's timestamped here

20   at 5:50 p.m. to Mr. Somerville stating that you

21   left when it became pretty clear that they didn't

22   want to hear from Derek's team.

Page 105

1                    What did you mean by that?

2          A    If I recall correctly, I believe

3    Catherine referred to "Derek's team," and I guess

4    assumed that I must have been a member of Derek's

5    team.

6          Q    Okay.  And what about that reference

7    motivated you to log off or leave the call?

8          A    It became clear to me that she not

9    only wasn't interested in what I had to say, but

10   didn't really even recognize who I was, because,

11   I mean, I guess if you were to use the term

12   "Derek's team," that would refer to Derek and I,

13   unless someone is trying to be inclusive of people

14   that Derek might have recruited to file

15   challenges.

16         Q    So, Mitch, can you scroll to page 160

17   for us?  Great, thank you.

18              So Mr. Davis, here you'll see this

19   captures some of what you had discussed before,

20   but you said to Mr. Somerville, "Derek it honestly

21   sounded to me like she didn't even know who I

22   was."

Page 106

1              Is the "she" you're referring to here

2     Ms. Dalbrecht [sic]?

3          A    Excuse me?

4          Q    Ms. Engelbrecht, sorry.

5          A    Yes.

6          Q    Okay.  And then just to clarify, you

7     had said before that you had assumed she would

8     know who you are because you had met with

9     Gregg Phillips and assumed that he had updated her

10    on discussions that you had had, correct?

11         A    Well, Derek had met with her and

12    Gregg Phillips.  I met Gregg on a conference call,

13    not in person.  I've never met either of them in

14    person.

15         Q    Okay.  So those two conversations were

16    the basis by which you believe she would know who

17    you are.

18              Are there any other interactions that

19    you had with her, directly or indirectly, that

20    would have led you to that belief that she would

21    know who you are?

22         A    I don't immediately recall any, but

1    yes, I definitely did expect she would know who I

2    was.

3         Q    Okay.  And what about the fact that

4    she didn't know who you were were you bothered by

5    on this call?

6         A    I objected to the attempt to -- I

7    hesitate to use the word "hijack," but, you know,

8    I felt like she was trying to roll the efforts

9    that Derek and I were involved in into

10   True the Vote's efforts, when they were really

11   completely separate efforts.

12             You know, again, I used the analogy

13   earlier about two different organizations that

14   want to help the homeless, but there's reasons

15   they're two separate organizations.  If they were

16   in agreement on everything, you know, they might

17   as well be just one organization, but ...

18             And, you know, I think I was generally

19   ticked off that it appeared that -- perhaps the

20   better word to use would be "co-opted" or

21   something.  I felt like -- I felt like our efforts

22   were sort of being co-opted, and I objected to

Page 108

1    that strongly.

2         Q    And can you clarify or elaborate on

3    what was being said that you felt was, you know,

4    Ms. Engelbrecht's attempt to roll everything

5    together?

6         A    I don't recall what it was that set me

7    off, but something in that meeting -- I don't

8    recall specifically what it was, but over the

9    course of the meeting, it became clear to me that

10   there weren't distinctions being made between the

11   two challenges, and I wanted those distinctions

12   made, and wasn't permitted to make those

13   distinctions, and rather than continue on with the

14   call, I just quit.  I just checked out and left.

15        Q    And why was it important for you for

16   those distinctions to be made or for you not to be

17   associated with the True the Vote organization?

18        A    I mean, I don't mind people knowing

19   that I'm generally supportive of their efforts

20   regarding election integrity.  I think they've

21   done some good work.

22             But I did object to the feeling that I

Page 109

1   had that there was an attempt to sort of co-opt us

2   rather than allow a discussion about why these

3   were separate efforts and why the philosophy

4   behind the challenges were different, and what the

5   reasons for that were, and so on and so forth.

6          I would have -- I would have preferred

7   for the folks on the call to understand those

8   differences, and I wasn't able to make that

9   happen.

10     Q   And what was True the Vote's

11  philosophy that you've been referring to that you

12  disagreed with?

13     A   Well, as we've discussed previously,

14  their challenges were very broad.

15          You know, there's three tranches when

16  it comes to change of address issues: there's

17  changes of address to out-of-state addresses,

18  there's changes of address from one county to

19  another within the state, and then there's changes

20  of address inside the same county.

21          And from what I understand about their

22  challenges, they challenged folks who had filed a

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 110

1    change of address to an address outside the state

2    of Georgia, and they had also challenged people

3    who had filed changes of address from one Georgia

4    county to another more than 30 days before the

5    election.

6              So they were basically doing two out

7    of the three tranches in general, whether or not

8    people had cast ballots in the general election or

9    not, whether they had already been through review

10   by the Secretary of State.

11             And, you know, we had made a lot of --

12   a lot of cuts to our list to try to get it more

13   narrowly focused that they weren't doing.  Their

14   challenge was broader than ours.

15             And again, it's not that I necessarily

16   disagree with their philosophy in terms of some

17   major problem with it, it's just that the way they

18   were approaching things and the way we were

19   approaching things was totally different, and I

20   just wanted everyone to understand why that was

21   the case, and I wasn't allowed to make that

22   distinction.

Page 111

1          Q     So did Ms. Engelbrecht refer to the

2     challenges that you and Mr. Somerville were

3     working on on that call?

4          A     Unless she did it in the context of

5     "Derek's team," or something like that, I don't

6     specifically recall -- I don't specifically recall

7     the conversation that occurred.  It's been some

8     time, and I'm very blurry on the details of the

9     call, so I don't want to speculate on what that

10    was, but I will say I was dissatisfied with any

11    distinction being drawn between the challenges,

12    and I think distinctions clearly should have been

13    made and weren't.

14         Q     Okay.  And in this text message you

15    say that you PMed her, which I assume is

16    Ms. Engelbrecht, and said you wanted to talk about

17    the challenges, which I think you've referred to

18    before.

19              What was the content of that message

20    that you sent to her?  Was it just that you wanted

21    an opportunity to speak, or was it something else?

22         A     For clarity, that was a private

Page 112

1   message within Zoom, so I'm unaware of any way

2   that I could produce that for discovery.

3              And I don't recall the exact language

4   that I used, so I'm going to just sort of

5   paraphrase here, but in general, I think the gist

6   of it was, hey, I think it's important everybody

7   understand the differences between the challenges

8   and why they're different.  And I believe, if I'm

9   recalling it correctly, the response was, "No, we

10  can have that conversation offline," or something

11  to that effect.

12        Q    And did you ever have that

13  conversation offline?

14        A    No.

15        Q    Have you or Derek ever talked to

16  Ms. Engelbrecht or anyone at True the Vote about

17  how you disagreed with the philosophy that you

18  were referring to before?

19        A    I don't know if he has or not.  He had

20  more -- he interfaced with them more than I did.

21              I assume he may have had that

22  conversation.  I don't recall specifically if he

Page 113

1    did or didn't.

2              I don't recall having that

3    conversation other than the message that I sent in

4    the call itself.

5         Q    Okay.  And here you say, "I want to

6    make sure everyone understands why."

7              Can you elaborate on who you meant by

8    "everyone"?

9         A    In that context, I believe I was

10   talking about the folks on the call, but there

11   probably are folks not on the call that I would

12   have wanted to know the differences.

13             There were a lot of folks that wanted

14   to help, and, you know, I wanted any of those

15   folks to know the differences between the

16   challenges.  And if they wanted to file one in

17   their county, I wanted them to be able to have the

18   understanding to choose the one they agreed with

19   the most.

20        Q    Okay.  Mitch, could you go to page 161

21   and 162?

22             MS. SIEBERT:  Ms. Meng, can we take a

Page 114

1    short five-minute break, please?  If you'd like to

2    finish this question, that's fine, but --

3              MS. MENG:  That's okay.  I have a few

4    questions off of these two pages, so ...

5              MS. SIEBERT:  Okay.  Yeah, that'd be

6    great.  Thank you.

7              THE VIDEOGRAPHER:  We are going off

8    the record.  The time is 11:37.

9              (A break was taken.)

10             (Joel Ramirez has joined.)

11             THE VIDEOGRAPHER:  We are going back

12   on the record.  The time is 11:45.

13             BY MS. MENG:

14        Q    So, Mitch, do you mind just bringing

15   up Exhibit 7, pages 161 to 162?  Thank you.

16             So Mr. Davis, as we've been

17   discussing, this is a text message spread between

18   you and Mr. Somerville, and you'll see that on

19   page 161, both of you characterize your reaction

20   to the call as being pissed.

21             Do you see that?

22        A    Yes.

Page 115

1        Q    Now, I know you've covered sort of

2    your feelings about the call.  What do you recall

3    about Mr. Somerville's reaction that he was also

4    angry about this call?

5        A    I recall he was also annoyed by the

6    use of "Derek's team," and he seemed to share my

7    displeasure with the fact that I wasn't allowed to

8    draw the distinction between the efforts.

9        Q    Okay.  And you'll see that between --

10   on the text message that spans 161 and 162, you

11   say, "Our challenge is actually in the Trump

12   lawsuit.  Theirs is not and under GA law cannot

13   be."

14           Can you elaborate on what you were

15   referring to here?

16       A    I don't think I stated that very well.

17   I probably should have said my analysis is

18   actually in the Trump lawsuit.  That would have

19   been the better way to put it.  And, of course, in

20   context, that analysis was in the context of the

21   general election, not the challenge.

22           The analysis -- even though those were

Page 116

1  two separate databases, the analysis underlying

2  them, in terms of identifying people with

3  residency issues, was consistent within

4  limitations between the two.

5            I guess what I was trying to say there

6  is the philosophy behind the analysis that I've

7  done is contained in the Trump lawsuit, whereas

8  the philosophy underlying True the Vote's isn't,

9  and can't be, because not everybody on

10 True the Vote's challenge actually cast ballots in

11 the general election, and/or the runoff election

12 hadn't happened yet, so ...

13      Q    Okay.  And here you also say, "[S]he

14 literally didn't want to let me even speak and I

15 asked twice.  Once privately and once publicly."

16            Are you referring privately to the

17 private message that you had sent her, and

18 publicly referring to on the call?  On the broader

19 call, you asked to be heard?

20      A    Yeah.  I had private messaged her

21 wanting to talk about it, and when that didn't

22 work out, I asked again publicly, hoping that it

Page 117

1  would prompt a discussion.  And if I recall

2  correctly, I think she responded by saying, "We

3  can discuss that offline," or something to that

4  effect, but I got shut down, basically.

5       Q    Okay.  And so going back to something

6  that you had said about True the Vote's

7  methodology or philosophy that you were just

8  speaking about, you referred to sort of like the

9  three categories of voters, and that

10  True the Vote's analysis was different because

11  they didn't filter out people who had already been

12  through Secretary of State reviewer investigation.

13            Can you elaborate on what you meant

14  there?

15       A    Well, there were a number of -- as

16  we've discussed ad nauseam here, there were a

17  number of different categories of folks that we

18  eliminated from our challenges that I'm not aware

19  of True the Vote eliminating.  Perhaps they did.

20  I don't know.

21            I didn't participate in creating their

22  challenge, I didn't have any input into their

Page 118

1   challenge, I didn't -- I wasn't kept in the loop

2   when they developed their challenges, so I don't

3   know what they did or didn't do.

4            I do know what we did and didn't do,

5   and there were clear differences between the two,

6   and I just felt like people should be aware of

7   those differences.

8       Q    And what specifically was the category

9   related to Secretary of State review and

10  investigation that you believe you took out of

11  your analysis that True the Vote did not?

12      A    Well, it's important to know from the

13  get-go that the investigation that I gave to the

14  Secretary of State's office was focused

15  specifically on the general election and not the

16  runoff election.  So there's clear differences

17  there in terms of the selection criteria for who

18  would be on there.

19           Also, with regard to the investigation

20  that I gave the Secretary of State's office for

21  the general election, I did not include changes of

22  address to out of state -- let me rephrase that.

Page 119

1              I didn't include people who had filed

2     changes of address to addresses outside of the

3     state of Georgia at all in that data that I gave

4     them to investigate.

5              One of the reasons for that is because

6     they don't really have the ability to investigate

7     voters outside of the state of Georgia unless,

8     perhaps, they get data back from ERIC on those

9     voters, and I wasn't sure when they planned on

10    doing another data processing run with ERIC, and I

11    didn't include those.

12             And in answering your question, I'm

13    assuming you're aware of what ERIC is?

14        Q    I'm not.  If you could just clarify

15    for me, that would be great.

16        A    ERIC is the Election Registration

17    Information Center.  My understanding is that it

18    is an NGO that was created by the Pew Foundation,

19    and the member states submit data to ERIC, and

20    when they do -- well, Georgia has become a member

21    after Brad Raffensperger was elected.

22             And when they submit data to ERIC,

1/19/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Mark A. Davis

Page 120

1   there's a hashed version or an encrypted version

2   of the voter's full date of birth, and I believe

3   Social Security number is in there, perhaps

4   driver's license data.  I'm not entirely sure

5   about that, but basically it helps ERIC compare

6   voter rolls from the member states to find people

7   who may be registered and/or voting in two

8   different states or three different states or five

9   different states, or whatever the case may be.

10           As far as I'm aware, that's the only

11  vehicle that the Secretary of State has for

12  identifying those voters, and for that reason --

13  and since I do have confidence that those checks

14  are being done, I did not include people who filed

15  changes of address to addresses outside of the

16  state of Georgia at all in that investigation.

17       Q    Okay.  And your discussion of this

18  information previously, were you suggesting that

19  that information was left in with True the Vote's

20  challenges that they had put together?

21       A    Well, I think that it's really

22  important to be keenly aware of the context here.

Page 121

1               Asking the Secretary of State's office

2      to investigate votes cast in the general election

3      with potentially serious residency issues is not

4      the same thing as challenging voters.  That's a

5      completely different process with its own set of

6      statutes governing those challenges.

7          Q    Sure, but the identification of

8      individuals with potential residency issues is

9      common with investigating the general election and

10     looking at voters that you might challenge for the

11     runoff; is that correct?

12         A    Well, the investigation of the data

13     that I gave the Secretary of State's office would

14     be conducted by the Secretary of State's office,

15     whereas when a voter files a challenge in the

16     county that they live in, that's handled by county

17     elections officials, if they accept the challenge

18     at all.

19               So in my mind, they're very different

20     processes, and since the dates of those elections

21     were different and the context these elections

22     officials were being asked to investigate were

Page 122

1   very different, you know, I view those as very

2   separate and distinct efforts.

3        Q    Okay.  And we've discussed the fact

4   that, you know, on this call, and in other

5   contexts, you were aware that the voter challenges

6   that you and Mr. Somerville had been working on

7   were different than what True the Vote had been

8   working on.

9             What's your basis of understanding the

10  analytical differences between those two sets of

11  challenges?

12       A    I don't recall where it was that I

13  heard what the model was for their challenges.  It

14  may have been on that phone call, but at some

15  point it became my understanding that they were

16  challenging voters who had filed changes of

17  address to addresses outside the state of Georgia,

18  and challenging voters who had filed challenges of

19  address to another county more than 30 days before

20  the election.

21            My understanding may be correct or

22  incorrect, but that was the understanding that I

Page 123

1    recall having at the time.

2         Q    And did anyone, either Ms. Engelbrecht

3    or Gregg, or anyone that you had been in

4    communication with, at any point let you know that

5    their methodology was different than what you had

6    just conveyed?

7         A    I don't recall hearing anything along

8    those lines from anyone.

9         Q    Okay.  Mitch, do you mind pulling up

10   pages 149 and 150 in this text message?

11             So Mr. Davis, you'll see this is still

12   the text conversation between you and

13   Mr. Somerville.  If I could direct your attention

14   to a message that Mr. Somerville sent in the

15   middle of page 149, "I just read the True the Vote

16   press release and I'm pretty pissed."

17             Do you see that?

18        A    I do.

19        Q    And then he says, "Trying to get you

20   in there, but also to have it characterize our

21   work differently."

22             Did I read that correctly?

Page 124

1        A     It appears so.

2        Q     Okay.  And then on the following page,

3    you respond about, you know, I'll leave that to

4    you, and you talk about credit.

5              Can you elaborate on what you and

6    Mr. Somerville were discussing in terms of what

7    credit you were seeking or hoping to receive or

8    not receive?

9        A     My understanding is that what he was

10   referring to was a previous version of the press

11   release other than the one that was published.

12   I've never seen that.  I don't know what was in

13   it.  I wasn't particularly concerned about it one

14   way or the other.  I trusted Derek to handle it

15   appropriately, and just kind of went on.

16              You know, as I said, I wasn't real

17   concerned about who does and doesn't get credit

18   for this, that, and the other.  I really wasn't.

19   I didn't want to be mischaracterized, and I

20   trusted that Derek would see to it that that

21   wasn't going to happen, but I also had expressed

22   to him previous that, you know, I didn't want our

Page 125

1  efforts co-opted because they were completely

2  different efforts.

3          So I guess what I was basically saying

4  there is, you know, I trust you to handle it.

5  Take care of it, you know.  So that's where it was

6  left.

7      Q    And was the credit that you two are

8  referring to here for doing analysis, or for

9  putting together challenge lists?  What was the

10  context of the credit?

11     A    I really wasn't even concerned about

12  credit.  For whatever reason, Derek seemed to be,

13  and I was content to just leave that issue in his

14  hands and let him deal with it.

15     Q    Mitch, do you mind going to page 172

16  and 173?

17          Mr. Davis, in the middle of page 172,

18  do you see a text exchange where you ask for the

19  name of the True the Vote lady?

20     A    Yeah.

21     Q    Can you elaborate on why you were

22  asking for her name?

Page 126

1          A     I don't remember, but for whatever

2     reason, her name had escaped me.  Her last name

3     escaped me during this deposition for a minute or

4     two, and I referred to her in a different context.

5                    But for whatever reason, at that

6     particular moment, it had escaped my memory, and I

7     wanted it for some reason, so I asked.

8                    I know it seems like a silly question,

9     but that's how little -- I really was not heavily

10    involved with these people.  It's not like her

11    name was on the tip of my tongue every day, or we

12    talked often, or interfaced a lot.  We just

13    didn't.

14                   He, Derek, primarily dealt with her,

15    and anybody else related to True the Vote, if he

16    dealt with them at all.

17         Q     You then go on to say, "Please call

18    when you can."  Do you remember speaking to

19    Mr. Somerville after this text exchange?

20         A     I don't.  You know, obviously, if you

21    go through this entire thread, there's a whole lot

22    of "please call when you can" because apparently

Page 127

1    there was something either he or I wanted to

2    discuss in depth and didn't want to sit there and

3    type it all into a text message.  There's a lot of

4    that all the way through these text messages.

5              I would assume we spoke.  I don't

6    recall specifically if we spoke.  I can't

7    really --

8         Q    And do you recall -- okay.

9              And do you recall the content, if you

10   had had a call, what that would have been about?

11        A    I don't.  I'm sorry.

12        Q    At the top of the screenshot on

13   page 173, there's a text message from

14   Mr. Somerville referring to a call scheduled for

15   10:00 a.m. that was postponed.

16              Were you on that call?

17        A    I don't know what call that

18   references, or who it was with, or really anything

19   about it.

20        Q    Okay.  Mitch, can you go to page 180

21   and 181?  So Mr. Davis, you'll see at the bottom

22   of 180, extending onto 181, you say, "Derek, I am

Page 128

1    telling you you need to send me Catherine's

2    contact info and get us on a cal [sic] ASAP."

3              Do you see that?

4         A    Did you have a question or --

5         Q    Yeah.  I just wanted to see if you had

6    located the text message I was speaking about.

7         A    I see it, yes.

8         Q    Okay.  Why did you urgently need

9    Ms. Engelbrecht's contact information?

10        A    I don't remember.  It may have been

11   about my concerns about the website.  I just don't

12   recall specifically what that was about.  It's

13   been quite some time.

14        Q    And you refer here to a call that you

15   were requesting between the three of you ASAP.

16             Do you remember if a call ever

17   resulted from your text message here?

18        A    I don't recall having a call.  I

19   suppose it may have been possible that we did, but

20   I don't recall any specifics about any call.

21        Q    Mitch, can you go to page 189 and 190?

22   Actually, Mitch, can you just scroll up a little

Page 129

1    bit on 189 to the previous page to get a time and

2    date stamp?  Okay, perfect.

3              So Mr. Davis, you see this a text

4    conversation starting on December 30th?

5         A    Okay.

6         Q    Okay.  And you send Mr. Somerville a

7    text that reads, "Derek we need to stop this.  If

8    they publish they will be flooded with defamation

9    complaints."  Do you see that on page 189?

10        A    I do, yes.

11        Q    So when did you first hear about this

12   publishing effort that you referred to?

13        A    I don't remember when or where or what

14   the context was, but I had heard there was going

15   to be a website launched that voter data was to be

16   loaded into that was going to collect information

17   from the public to be used for challenges, and my

18   perception at the time was that the complaints for

19   the public were going to be public as well.

20              Since that time, I've actually gotten

21   on that website, and they have a flowchart on

22   there about how it works, and I believe I may have

Page 130

1    misunderstood what they were doing.

2                   It does not appear that -- while it

3    does appear publicly available voter data is being

4    used, it doesn't appear to indicate that

5    complaints from the general public are going to be

6    published to the public.  It indicates instead

7    that those concerns would be compiled into

8    challenges for elections officials, which would be

9    the proper venue for those concerns.

10                  So my panic, if you will, over that

11   may have been misplaced.  My concerns may have

12   been misplaced.

13        Q    And so who did you hear about this

14   publication effort from in the first instance?

15                  MS. SIEBERT:  And I'm just going to

16   object again to this line of questioning as

17   irrelevant.

18                  Mark, you can go ahead and answer, but

19   I just wanted to assert that objection over this

20   line of questioning.

21                  THE WITNESS:  I honestly don't

22   remember.  I think you asked that previously, and

Page 131

1    I don't remember where I heard about it.  It's

2    been quite some time, and I just can't recall.

3              BY MS. MENG:

4         Q    And you previously stated that you've

5    been on this website before.

6              Do you know the URL address or the

7    name of the website?

8         A    I went just the other day on the

9    True the Vote website, and it was under one of the

10   categories, and I had found it, and I read the

11   information that was contained on the website, and

12   I saw their flowchart, and I was definitely very

13   concerned about the approach that they were taking

14   when I first heard about it, but I may have

15   misunderstood what their intentions for the

16   website were.

17        Q    So I think you previously stated the

18   website would publicize names and information of

19   voters; is that correct?

20        A    My understanding is that they intended

21   to load the voter file in there, and of course,

22   the voter database is public record.  So if that's

Page 132

1   the extent of the information that they're

2   publishing, if it's publicly available data, I

3   don't see anything to be concerned with.

4          I would be concerned if the input from

5   the public into someone's residency or status or

6   what have you, you know, if input, or for lack of

7   a better word, allegations were made from someone

8   in the public and were published, I'd be concerned

9   about that.  The proper venue for those kinds of

10  concerns would be local or state elections

11  officials, but it doesn't appear to be the case.

12         So again, I think my initial concerns

13  about that whole effort may have been misplaced.

14     Q    And so what was the nature of your

15  concern about the fact that those allegations, as

16  you had called them, might be public?

17         MS. SIEBERT:  I believe -- objection,

18  and asked and answered.  Mark, go ahead.

19         THE WITNESS:  Well, let's say John Doe

20  is listed at 123 Main Street, and another voter

21  says John moved to Alaska five years ago, he lives

22  there now, and that wound up not being the case,

Page 133

1    that would be a concern.

2              Or if somebody popped off and said

3    Jane Doe has been voting illegally for three

4    years.  You know, if those allegations aren't

5    accurate, I'd definitely have concerns about them

6    being published.

7              You know, the proper venue for those

8    kinds of concerns would be our elections

9    officials.

10             BY MS. MENG:

11        Q    Okay.  And can you provide a little

12   bit more information about your statement here

13   about them being flooded with defamation

14   complaints?

15        A    Well, if you accuse someone of a crime

16   and they haven't committed a crime, that's

17   defamation, isn't it?

18        Q    And what was your understanding of the

19   motivation behind True the Vote creating this

20   website?

21             MS. SIEBERT:  Objection.  You're

22   asking him to testify to somebody else's

Page 134

1    motivation.

2              THE WITNESS:  Yeah, I really wouldn't

3    want to speculate on what they were trying to

4    accomplish.

5              It appears that they were trying to

6    provide information on the voter rolls to the

7    public so that the public could review it for

8    potential personal knowledge they may have with

9    regard to voters that are on the list.

10             In my neighborhood, for example, you

11   know, I have personal knowledge about people who

12   sold their home and moved elsewhere and things of

13   that nature.  I wouldn't want to publish

14   information on a specific voter to the general

15   public.

16             If I had residency concerns about one

17   of my neighbors, the appropriate venue for that,

18   like I said before, would be our elections

19   officials.

20             BY MS. MENG:

21        Q    And so did you ever speak to

22   Ms. Engelbrecht about this website?

Page 135

1        A    I had sent her a text message that I

2    quoted in this thread, and if I recall correctly,

3    she responded by picking up the phone to discuss

4    it.  And I did not disclose that call previously

5    because, until I saw this, I had completely

6    forgotten about it.

7        Q    And did she communicate anything to

8    you about the purpose of the website?

9        A    I probably shouldn't get into that.

10   Let me think about that one for a minute.

11            She did mention that it had all been

12   vetted with the lawyers, and I don't think --

13   I think if I say anything else, I start treading

14   on attorney-client privilege type stuff.

15       Q    So Mr. Davis, I'm simply asking you

16   what Ms. Engelbrecht said to you.  That

17   information is not privileged, the fact that she

18   communicated that to you --

19       A    She said that it had all been --

20   I'm sorry to interrupt.

21       Q    I was just going to say the fact that

22   she communicated it to you as a third party means

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 136

1   that she waived whatever privileges applies.

2        A    I recall her assuring me that their

3   plans had been vetted with legal counsel.

4        Q    Sure, but did she say anything about

5   the motivations or the purpose of the website?

6        A    Well, my understanding generally of

7   the purpose of the website was that it was to help

8   make voter data public so that it could be easily

9   accessed by the public and reviewed by the public,

10  so that if the public saw issues with the voter

11  rolls, they could provide comments to

12  True the Vote that could be compiled together and

13  used to file challenges with the local elections

14  officials, if there were issues that needed to be

15  addressed.

16            That was my general understanding from

17  the get-go.  I don't recall specifics of the

18  conversation, but I would imagine she reiterated

19  those goals.

20       Q    Mitch, if you could scroll and put 190

21  and 191 on the screen.

22            So Mr. Davis, do you see here you, in

Page 137

1    relaying a copy of a text message to

2    Mr. Somerville, you say, "You can do it after the

3    election with a short list of guaranteed

4    defensible examples.  I can help with that."

5              Do you see that?

6         A    Yes.

7         Q    So can you elaborate on what you meant

8    by a short list of guaranteed defensible examples?

9         A    Well, if she, through the website,

10   identifies voters that may have voted illegally,

11   and those voters get referred to the Secretary of

12   State's office for an investigation, and that

13   investigation concludes that they did vote

14   illegally and they're referred to the

15   Attorney General for prosecution, that's public

16   record.  That's what I had in mind in those

17   comments.

18        Q    Okay.  And can you give us a little

19   bit more detail on your offering to help with

20   that?

21        A    Well, I assume that she knows how to

22   submit a challenge, and she knows that she can

Page 138

1   also request an investigation from the Secretary

2   of State's office, and if she needed to contact

3   people to do that with, I could have given that to

4   her.

5              I didn't mean that I was going to get

6   involved and do all the heavy lifting, but I

7   certainly could offer her some of my advice on how

8   to proceed on those things.

9              But I think the point I was trying to

10  make there is that it's important to be pretty

11  careful before you start making public allegations

12  against any particular individual voter, and it's

13  best not to do that.  As we've discussed

14  previously, the appropriate venue for those

15  complaints would be our elections officials rather

16  than taking it public.

17     Q    Okay.  And on page 191, that text

18  message states, "But if you do it now you're

19  literally making good on one of the 'Threats'

20  alleged in their complaint."

21              Do you see that?

22     A    Right.

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

                                                        Page 139

1          Q     What complaint are you referring to?

2          A     Yours.

3          Q     The one in this case, correct?

4          A     Yes.

5          Q     Okay.  And did you believe the

6     publishing of voter challenge or allegation

7     information would be threatening?

8          A     Well, we did not publish challenge

9     information on particular voters.  That

10    information went to the appropriate venue.

11              Now, the public can request -- you

12    know, file an Open Records Request and obtain that

13    information, but that's not us publishing it.

14         Q     Okay.  And so, therefore, you had no

15    concerns if that information ended up being

16    public, as long as you yourself was not publishing

17    it?

18         A     I don't have any control over Open

19    Records Requests to county governments.

20              I don't know what else to say.

21         Q     And so in this message when you're

22    referring to the threats and the public

Page 140

1    information, you're referring to what exactly?

2    The information that you believed at the time

3    would be revealed on this website?

4         A    Well, your organization has alleged

5    that True the Vote and myself has intimidated

6    voters.  I'm not aware of any contact that we've

7    engaged in that would constitute intimidation of

8    any particular voter.

9              Challenging a voter on its face I

10   don't think is voter intimidation.  That is a

11   First Amendment petition to your government for

12   redress of grievances, and it is specifically

13   protected under Georgia law in 21-2-230.  A

14   challenge is a lawful vehicle for petitioning your

15   government for redress of grievances.  I don't

16   believe that constitutes voter intimidation.  I

17   guess we're going to see what the court system

18   believes on that.

19             But as long as challenges are handled

20   appropriately, and we're not publishing them to

21   the public or trying to intimidate voters, I don't

22   see any issue with them.  It seemed perfectly

Page 141

1    lawful to me.

2         Q    And so just focusing on -- putting

3    aside challenges and just focusing on what at the

4    time you had described your understanding of what

5    would be made public on this particular website,

6    what information specifically did you perceive to

7    be making good on the threats in the Complaint in

8    this case that would have appeared on that

9    website?

10        A    I feel like we've been over this

11   repeatedly, but I'll state it again.

12             My initial understanding of the

13   website was that it was going to be publishing

14   voter data, which is public record, and collecting

15   allegations against individual voters from the

16   public, and my fear was that those were going to

17   be published on the website as well.

18             Since that time, I've come to believe

19   that my concerns were misplaced and that's not

20   actually going to be happening because the website

21   seems to be indicating that those issues with any

22   particular voter are going to be gathered and

Page 142

1   turned into a challenge that would go to the

2   appropriate venue, which would be elections

3   officials.

4        Q    And so just to be perfectly clear,

5   there's two types of information that would be on

6   the website.  One is voter information, which is

7   public, and you have expressed no concerns about.

8             But the second is the allegations, and

9   that is what you had concerns about, correct?

10       A    If those kinds of allegations were

11  published on the website, I'd have concerns, yes.

12            I wouldn't do it.

13       Q    Okay.  And so from this communication

14  thread, it looks like you sent a message to

15  Ms. Engelbrecht, Mr. Somerville, and of course you

16  were copied on that as well, correct?

17       A    That particular -- what's the word?

18  That particular comment there that we're talking

19  about here was where I had cut and paste a text

20  message that I sent to Catherine.

21            So from "Catherine please reconsider

22  this launch of the website" on down, that's

Page 143

1    exactly what I said to Catherine, and then Derek

2    responded, "You texted me bud."  And I said,

3    "Copied you bud."

4                You know, in other words, I was

5    letting him know that I didn't misfire that text.

6    I had actually sent that text, and then copied

7    that text so Derek could read it.

8         Q    I see.  And I believe you stated

9    before Ms. Engelbrecht called you.  Did she at all

10   respond to your text message that you had stated

11   here that you had sent her?

12        A    I don't recall, but having seen this,

13   my memory was refreshed, and I do recall a brief

14   conversation that we had following that text

15   message where she assured me that they had gotten

16   legal input on the launch of the website and the

17   plans for the website and it was all okay.

18                That's pretty much where that got

19   left.  I don't know if I really have more to add

20   on that.

21        Q    Okay.  Mitch, can we go to pages 192

22   and 193?  Okay.

Page 144

1              Directing your attention, Mr. Davis,

2      to page 193, it says here, "[T]hey're literally

3      sitting there defending a challenge that didn't

4      even come from True the Vote."

5              Do you see that?

6      A    Yes.

7      Q    Okay.  And can you clarify who the

8      "they" you're referring to in this text is?

9      A    I don't remember, but what I do

10     remember is that the -- that I was referring to

11     the challenge down in Muscogee, and that challenge

12     didn't come from either True the Vote or me and

13     Derek, so I think that was the point I was making,

14     and I really don't recall who the "they" was in

15     that part of the message.

16     Q    Okay.  So pivoting now to another

17     topic, Mr. Davis, what discussions, if any, have

18     you had with officials or individuals in the

19     Secretary of State's office regarding voter

20     challenges and list maintenance?

21             I know you've before referred to the

22     May 2011 conversations about investigations, but

Page 145

1    putting that aside, what other conversations have

2    you had?

3          A    Specifically relating to the

4    challenges in the runoff?

5          Q    Let's start with that, yes.

6          A    Other than my Open Records Request and

7    problems with that Open Records Request, I don't

8    recall any.  And even in that context, the

9    discussions were referencing obtaining the data,

10   and then a subsequent problem with the data that I

11   did obtain.

12              I don't recall getting into why I

13   needed the data with anyone, but does that answer

14   your question?

15         Q    Sure.  So did you ever have any

16   conversations about list maintenance specifically

17   with anyone in the Secretary of State's office?

18         A    Oh, yeah.  Many, many, over decades.

19              MS. SIEBERT:  I'm sorry, Ms. Meng,

20   just to reiterate, we would object to the scope of

21   this as far as timing.  You know, Mr. Davis has

22   testified he's been involved in this for decades,

Page 146

1   in this election integrity and voter integrity

2   effort, and so we would object to anything beyond

3   the scope of this actual lawsuit here.

4             BY MS. MENG:

5        Q    Sure.  So Mr. Davis, let's just

6   specifically ask in relation to the 2020 runoff,

7   did you have any conversations about list

8   maintenance with the Secretary of State's office?

9        A    Let me highlight one in context, and

10  then address the rest of your question.

11            Early on, I filed an Open Records

12  Request for a certified copy of the official

13  qualified list of electors for the runoff.  I

14  filed that pretty early on hoping that I would be

15  one of the first to obtain a file.

16       Q    Mm-hmm.

17       A    When I received a response to that

18  Open Records Request, which was far too late to

19  have been useful for the challenges, one of the

20  key fields in the voter data was missing, and

21  quite frankly, appeared to have been edited out,

22  and I had a major concern about that, and I

Page 147

1   brought it to their attention, and they promptly

2   replaced the file.  So I have it.  Was never

3   actually able to use it, but I do have a copy of

4   it.

5            Other than that, I don't recall

6   interfacing with the Secretary of State's office

7   over the runoff election at all.  I suppose I

8   could be wrong.  There was a lot going on at the

9   time.  There may be something I have forgotten,

10  but nothing comes to mind.

11       Q    Okay.  And what was the category that

12  was missing in that record?

13       A    Date last changed.  And the reason

14  that's important is because what I usually will do

15  is I'll build an index on that field, and then

16  I'll drop down to the bottom to try to see the

17  date of the last change that was made to the file.

18            If it's out of scope for the Open

19  Records Request, even if the list comes with

20  certification, I'd have major problems, and I was

21  highly suspicious when it was edited.

22            My Open Records Request for the

Page 148

1    certified copy of the voter file for the general

2    election was just hideously screwed up by the

3    Secretary of State's office, and for whatever

4    reason, they chose to quickly correct the

5    problem -- the one problem that I found with the

6    qualified list of electors -- certified copy of

7    the qualified list of electors for the runoff.

8    They quickly corrected the one issue I identified

9    there, but the numerous issues that happened with

10   the file for the general election, to this day,

11   have never been addressed.

12            So anyway, other than problems with my

13   Open Records Request, I don't remember talking

14   with anybody at the Secretary of State's office

15   about the runoff at all.

16       Q    Okay.  Mitch, if we could stay on this

17   exhibit and go to page 16.  Thank you.

18            So Mr. Davis, you see that this is

19   still the text message thread with you and

20   Mr. Somerville; is that correct?

21       A    Yes.

22       Q    Okay.  And this is a text message from

Page 149

1    around -- or on November 26, 2020?

2          A     Mm-hmm.

3          Q     And here you state that you're having

4    doubts about, quote, "this Morgan guy."

5                Who is Morgan?

6          A     He's an activist that I heard from

7    fairly early on, Morgan Warstler, if I'm

8    pronouncing his last name correctly.  I don't know

9    much about the guy, but he was hosting a call, and

10   that was the call where I met Derek.

11               Anyway, I guess I was expressing that

12   I began to have concerns about what his motives

13   were.  He seemed to be involved in a lot of

14   efforts that seemed more business oriented than

15   anything else to me, and I started to question his

16   motivation, I suppose.

17         Q     And you state in this message that you

18   realized he was attached to the Trump attorneys.

19               What about that was concerning to you?

20         A     Well, I said, "Suddenly realizing he's

21   attached to just one of the 'Trump attorneys,'" in

22   quotes, there were so many Trump attorneys that I

Page 150

1   heard from around that time period, they all began

2   to run together, and I don't even recall now who I

3   was talking about there.

4             But I was basically communicating to

5   Derek that I wanted to start putting some distance

6   between he and I and this Morgan guy.

7        Q    Okay.  Mitch, can we go to page 23 and

8   24?  So Mr. Davis, directing your attention to

9   these text messages, it looks like you and

10  Mr. Somerville are discussing getting in touch --

11  or you having been in touch with Lin Wood and

12  Sidney Powell.  Do you see that?

13       A    Well, I had heard from a lawyer

14  working with the two of them, and at the time,

15  neither Lin Wood or Sidney Powell had been what I

16  considered discredited, and I was not really

17  opposed to reading them in on the residency issues

18  that we had identified, and I think I did give her

19  a copy of that initial analysis that I had done,

20  and that was where that got left.

21            I don't recall anything more until

22  later both Lin Wood and Sidney Powell gave Derek

Page 151

1    and I a reason to quickly part company with both

2    of them.  They reached out a number of times, and

3    we weren't interested.

4          Q    Mitch, can you go to 67 and 68?

5              So Mr. Davis, it seems like here you

6    and Mr. Somerville are discussing Powell's team

7    again, and it says that -- Mr. Somerville says

8    that the individual or contact at Powell's team

9    was going to be calling back in a minute, and he

10   said that he would tell them to pack sand.

11             Can you just elaborate a little bit

12   about the context for that text?

13         A    I don't remember all this super

14   clearly, but as I said, originally, I didn't have

15   a problem with either Lin Wood or Sidney Powell,

16   but at some point, they sort of started going off

17   the rails and saying a lot of things that Derek

18   and I had super huge problems with, and we

19   basically decided that we wanted nothing to do

20   with either one of them.

21             And they had made repeated attempts or

22   overtures at trying to get us involved in their

Page 152

1   activities, and he was basically saying, you know,

2   he's going to tell them to pack sand, which I was

3   in total agreement with.

4          Q    Mitch, if you go to 69 and 70.

5               So here, Mr. Davis, you'll see at the

6   top of page 69, Mr. Somerville says, "told

7   Lin Wood's team no.  They weren't happy.  F' em."

8               Do you see that?

9          A    Yep.

10         Q    So is that a continuation of the

11  sentiment that you were just describing?

12         A    Yes.

13         Q    Okay.  And are you aware if anyone at

14  True the Vote had any contact with the Trump team

15  in any of these conversations that you guys had?

16         A    Not that I'm aware of, and I kind of

17  doubt there would have been because their interest

18  was in the residency issues uncovered in regards

19  to the general election.

20              Their focus was the general election,

21  whereas True the Vote was more focused on the

22  runoff election that was coming up.

Page 153

1                    So I don't know if they made overtures

2      to True the Vote or not, frankly.  It's difficult

3      for me to imagine that they would have.

4           Q    So, Mitch, do you mind pulling up

5      Exhibit P?  And we'll mark that as Exhibit 14.

6                    (Davis Exhibit 14 was marked

7                     for identification.)

8                    BY MS. MENG:

9           Q    Mitch, if you could just zoom in on

10     the top half, that would be perfect.  Great.

11                   So Mr. Davis, can you just take a

12     minute to skim over this document?

13          A    Okay.

14          Q    So the two of you mentioned some

15     frustration or unhappiness about the Christmas Eve

16     call.  Can you describe or elaborate on what that

17     call was about and what was discussed?

18          A    Well, first of all, as far as I

19     recall, it wasn't actually Christmas Eve, it was

20     Christmas Day eve -- in other words, the evening

21     of Christmas Day.  And off the top of my head, I

22     don't remember what I was even calling about, but

Page 154

1   I must have caught him in a bad mood, and he

2   popped off at me for some reason, and I was like,

3   whoa.  You know, so I just -- he was obviously in

4   a bad mood, and I just left him alone.

5            But we talked about it a day or two

6   later and sort of patched everything up over it.

7   I apologized for bothering him on Christmas Day,

8   and he accepted my apology, and we moved on.

9        Q    And it was just the two of you on that

10  call?

11       A    Yes.

12       Q    Okay.  And do you have any memory of

13  what the topic might have been that you guys

14  disagreed about or that set him off?

15       A    It wasn't anything that we in

16  particular disagreed over.  He just, for whatever

17  reason, was very unhappy that I called him on

18  Christmas Day eve.  It wasn't actually

19  Christmas Eve.

20       Q    The night of Christmas?

21       A    It was the night of Christmas Day,

22  so ...

Page 155

1            I didn't really think anything about

2    calling him; we had talked on Thanksgiving.  So I

3    don't know why he took exception to me calling,

4    maybe he was in the middle of doing something with

5    his family and didn't want to be interrupted,

6    maybe he was just in a bad mood that day, I don't

7    know, but, you know, stuff happens like that and,

8    you know, you can either get over it and move on

9    or not, so ...

10           MS. SIEBERT:  Ms. Meng, could we take

11   a five-minute break, please?

12           MS. MENG:  Sure.  I was actually going

13   to suggest we take a ten-minute break because I

14   know we've been going for a while, if that works

15   for everyone.

16           MS. SIEBERT:  Even better.  Thank you.

17           THE WITNESS:  So we'll be back at

18   12:50?

19           MS. MENG:  Yes.

20           THE VIDEOGRAPHER:  We're going off the

21   record.  The time is 12:39.

22                (A break was taken.)

Page 156

1                (Uzoma Nkwonta has joined.)

2                THE VIDEOGRAPHER:  We are going back

3      on the record.  The time is 12:55.

4                BY MS. MENG:

5          Q    Mitch, could you pull up Exhibit 7 one

6      more time for us?  Thank you.  And if you could go

7      to pages 110 and 111.

8                Mr. Davis, you can take a moment to

9      skim through this conversation, but I believe this

10     is the text message conversation with you and

11     Mr. Somerville that we've been referring to today;

12     is that correct?

13         A    Yes.

14         Q    Okay, thank you.

15               And at the top of page 110, you'll see

16     in a text from December 9th, you say, "Patrick

17     called and wants to take another run at an

18     agreement everyone can live with."

19               Did I read that correctly?

20         A    Yes.

21         Q    Okay, so a few things here.

22               First, can you tell me who Patrick is?

Page 157

1          A     Patrick Witt.

2          Q     And how did you know Mr. Witt?

3          A     He was an attorney, and I believe he

4    at the time was working with the RNC and was

5    assigned to work with state party at the time.

6          Q     Okay.  And how were you introduced to

7    him?

8          A      If I recall correctly, I had told

9    Chairman Shafer that I was having a great deal of

10   difficulty with my Open Records Request to a state

11   party, which I thought was very, very important,

12   and I think, if I recall correctly, Chairman

13   Shafer had had Patrick call me to see if he could

14   assist.

15         Q     Okay.  So what's the nature of the

16   agreement that you're referring to in this

17   message?

18         A     Well, as I mentioned earlier, I had

19   been talking with a number of folks on the Trump

20   legal team, one of which was Ray Smith, who works

21   with the Hebert Law Firm, and they were trying to

22   get me to sign an agreement to testify in that

Page 158

1    case, and I had problems with the way that

2    agreement was written.  We had gone round and

3    round a number of times over the terms of the

4    agreement, and I still had problems with it.

5          Q    Okay.  And so in that second part of

6    the text message, you said, "I told him if we

7    can't work it out I will tell them how to do what

8    I did."  Can you elaborate on what you're

9    referring to in terms of what you did?

10         A    I had told them if we couldn't work

11   out an agreement that I could live with, then I

12   would basically just walk them through how to do

13   the same analysis that I did so they could do it

14   themselves.  And if my Open Records Request

15   finally was complied with in a meaningful way, I'd

16   be happy to give them a copy of it so they didn't

17   have to go through all the mess of getting it that

18   I went through.

19         Q    And that Open Records Request would

20   have given you the certified list you're referring

21   to in this message?

22         A    The Open Records Request was for a

Page 159

1    certified copy of the qualified list of electors

2    for the general election, and to this day, that

3    Open Records Request has not been complied with in

4    a meaningful way.

5          Q    Okay, and one last question on this.

6               What was your motivation for still

7    wanting to convey information about your

8    methodology even if you weren't able to come to an

9    agreement?

10         A    Well, the fact that I didn't like the

11   agreement that they were asking me to sign doesn't

12   mean that those issues weren't there.  They were,

13   and they were legitimate issues, and they had

14   already discussed those issues in their complaint,

15   and I didn't want to hamstring them, even though I

16   wasn't going to be involved.

17              I was content to tell them how to

18   replicate my work.  They did have another -- a

19   number of other analysts that were involved, some

20   of which were cable of replicating the data

21   processing that I did.

22              I didn't have a problem with sharing

Page 160

1    evidence with them or anything along those lines,

2    but the agreement they asked me to sign was not

3    something that I could stomach.

4         Q    And so what was in that agreement that

5    you didn't agree with?

6         A    I can't remember all of it, but there

7    was stuff in there that would have transferred

8    ownership of my work to the Hebert Law Firm, and

9    rights to the TV and movie stuff.  It was all kind

10   of stuff in there that I just thought was patently

11   absurd, and it would have put a muzzle on me.  I

12   wouldn't have been able to even discuss my own

13   research without permission.

14             There just was a lot of stuff in that

15   agreement I just wasn't interested in doing, and

16   they had tried several different iterations of the

17   agreement, and what was ostensibly the final one

18   was still something that I wasn't going to sign,

19   and that was where that got left.

20        Q    Okay.  If I could just have a minute

21   just to make sure I don't have any other

22   questions.  We don't have to go off the record.

Page 161

1              (Pause in the proceedings.)

2              MS. MENG:  Okay, I think those are all

3     the questions I have for you, Mr. Davis, today.

4              THE WITNESS:  Okay.

5              MS. SIEBERT:  I have some follow-up

6     questions.  Do you need a break?  I know we just

7     took one, but just in case.  Okay.

8         EXAMINATION BY COUNSEL FOR DEFENDANTS

9              BY MS. SIEBERT:

10        Q    Mitchell, would you mind -- well,

11    actually, first, Mr. Davis, I know this was a

12    while ago, but toward the beginning of this

13    deposition, counsel questioned you regarding the

14    independent investigation that you and Derek were

15    interested in having on your data analysis.

16             Do you recall that, generally

17    speaking?

18        A    Yes.

19        Q    Okay.  And in several of the answers

20    within that section of the deposition, you

21    referred generally to types of data that you would

22    suppress, or that we would want to suppress those,

Page 162

1    or there would be suppressions, okay?

2              For a non-data person like myself, can

3    you maybe better clarify by what you meant by

4    "suppressions" in that context?

5         A    A similar word would be exclude, or

6    not used, or something along those lines.

7         Q    Okay.  All right.  So in that context,

8    you weren't referring to any kind of, as is

9    relevant to this case, any kind of voter

10   suppression?

11        A    Oh, no, and thank you for the

12   question.  No, absolutely not.

13        Q    Okay.

14        A    This effort was not about suppressing

15   anyone's vote.  This was about ensuring that legal

16   votes were cast.

17        Q    Okay.

18        A    So, yeah, thank you for the question.

19        Q    Sure.  I thought it was clear from the

20   context, but I just wanted to make sure we were

21   all on the same page there.

22              Mitchell, can you please pull up

Page 163

1    Plaintiff's Exhibit 5?  Could you make it a little

2    bit larger?  Sorry.

3              Mr. Davis, does this look again

4    familiar to you?

5         A    Yes.

6         Q    Okay.  Within the context of this

7    email, as well as several other exhibits that

8    Plaintiffs submitted here in this deposition, you

9    spoke and testified regarding several of the items

10   of the post challenge data analysis that you

11   performed and submitted to the Secretary of State.

12             For instance, the post challenge data

13   analysis, I believe you testified back in May of

14   2021 you submitted to the Secretary of State,

15   correct?

16        A    Correct.

17        Q    Okay.  And so that data analysis that

18   you would have performed, that was after the data

19   analysis that you did related to the challenges to

20   the runoff elections; is that correct?

21        A    That's correct.  And although there

22   could be some overlap, that database for that

Page 164

1    investigation was specifically related to votes

2    that were cast in the general election.

3         Q    Okay.  So would any of this post

4    challenge data analysis have had any impact on the

5    challenges themselves?

6         A    Say that again.

7         Q    Would any of the post challenge data

8    analysis that you performed have any impact on the

9    challenges themselves that had already been

10   submitted in some form?

11        A    Some of the names on the list would

12   have been in common, but the selection criteria

13   for the challenge and the selection criteria for

14   the SoS investigation were different.

15             The investigation that I asked for

16   from the Secretary of State's office related to

17   the general election and to votes cast in the

18   general election with residency issues.

19             And one of the primary reasons that I

20   asked for it was because thousands and thousands

21   of voters were coming in after the election and

22   officially updating their own registration

Page 165

1   addresses to the exact same addresses that they

2   gave to the Postal Service when they originally

3   moved, and that seemed to me to be pretty solid

4   corroborating evidence that the NCOA information

5   was accurate, and if that proved accurate, why

6   would we doubt the Move Effective Dates that they

7   had given to the Post Office when they originally

8   moved.

9         Q    Okay.  So let me give you an example

10   just to make sure I'm understanding what you were

11   just testifying about, okay?

12              Jane Doe -- not the Jane Doe that's

13   named as a plaintiff here, but just a Jane Doe --

14   submits a permanent change of address record to

15   the Post Office in, let's say, June of 2020, okay?

16              That would have showed up on your --

17   you know, the data analysis that you did, correct?

18         A    Yes.

19         Q    Okay.  And then Jane Doe then, let's

20   say, voted in the -- and she had moved -- she had

21   submitted and moved either outside of the county

22   where she was registered, either to another state

Page 166

1   or another county in Georgia.  That's the

2   assumption that I'm making, okay?

3           So then let's say Jane Doe voted in

4   the county in which she was registered at.  That

5   would have shown up in your data analysis,

6   correct?

7       A    Well, to be clear --

8           MS. MENG:  Sorry, just to interject, I

9   just want to object to this hypothetical.  It

10  assumes facts that aren't in the evidence, and

11  it's a leading question as well.

12          BY MS. SIEBERT:

13      Q    And I understand that, and I'm not --

14  let me clarify.  Let me rephrase this, Mr. Davis,

15  because I'm just trying to understand.  I am just

16  trying to understand why the testimony you just

17  gave about the dates of the NCOA addresses and

18  confirmation are important, okay, and trying to

19  put it in a real-world example, but maybe that's

20  not the best way to do it.

21          So somebody who -- what you're -- take

22  me through the specific timeline of that type of

Page 167

1    person that would have -- the type of voter that

2    would have put you on alert in May when you did

3    that post election data analysis, and specifically

4    why the timeline is important.

5         A    Okay.  So when I ran NCOA on the voter

6    database, the records that had NCOA matches were

7    flagged in the data, and then I pulled those into

8    a file called "moved."

9              From that, I excluded any changes of

10   address from October and November of 2020, October

11   because those would have been occurring within the

12   grace period under O.C.G.A. § 21-2-217 -- or,

13   actually, I believe 218 -- that defines the 30-day

14   grace period.  So I excluded any from October

15   because they were in the grace period, or at least

16   the vast majority were, and then I excluded

17   November because they were irrelevant.

18             So what remained in that file was

19   approximately 580,000, and all of those changes of

20   address, the Move Effective Dates would have been

21   before the grace period.

22             And I also want to clarify that none

Page 168

```
1    of the records that I gave the Secretary of

2    State's office to investigate involved voters who

3    moved outside the state.  They were only people

4    who moved within the state, where the data

5    indicated that they had moved from one county to

6    another county more than 30 days before the

7    election.

8              So in May, I received an update to the

9    voter file, and when I compared the data from

10   November to the data from May, there were over

11   10,000 voters who had since updated their own

12   registration to the exact same address that they

13   had originally given to the Postal Service when

14   they filed their changes of address.

15             So the reason that I did that was

16   because, to me, that seems to be pretty strong

17   corroborating evidence that the person did, in

18   fact, move to the address they gave to the Postal

19   Service; and since the Move Effective Date they

20   gave to the Postal Service was more than 30 days

21   before the election, they should have updated

22   their registration to their new county, as
```

Page 169

1    required, and they should have cast their ballots

2    in their new county.

3              And one of the major reasons this is

4    important is because, when I compared the two and

5    the addresses matched, I was also able to pull

6    over the person's new county and the person's new

7    voting districts, and when I compared the voting

8    districts to their previous voting districts, what

9    it showed me is that people that returned to their

10   old county to cast a ballot, 94% of them would

11   have been offered a ballot with a state house race

12   on it that they don't live in, about 86.5% would

13   have been offered a chance to vote in a state

14   senate district that they no longer lived in, and

15   approximately 64% would have been offered the

16   chance to cast a ballot in a congressional

17   district that they no longer lived in.

18             They also could have cast ballots for

19   county sheriff, district attorney, school board,

20   county commission, could have even voted on tax

21   increases that they will never have to pay because

22   they no longer live there.

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 170

1              So I think that's the primary reason

2      that I asked the Secretary of State to

3      investigate.  However, they did state that they

4      wanted the entire list, not just the 10,000.

5      I think actually the number was about 10,300, if I

6      recall correctly, but they wanted to investigate

7      even the ones that had not updated their addresses

8      yet.

9              Now, since that time, in subsequent

10     comparisons, that number continued to climb to

11     nearly 12,000, and I have not given them those

12     names to investigate because, quite frankly, I

13     don't get the impression that they are serious

14     about that investigation at all.  I have seen them

15     be dismissive of it, I have seen them spin it, and

16     I've seen them try to explain it away.

17             Our Secretary of State is currently

18     campaigning for reelection, and I think the last

19     thing he wants to do is prove himself incorrect on

20     his claims made about the election.  It doesn't

21     seem to be in his political interest to do so, and

22     I do not expect that investigation to conclude

Page 171

1    before his primary election.

2        Q    Is the timeline on the initial change

3    of address form and the voting, and then the later

4    confirmation via the change of voter registration,

5    important?

6        A    I think it's important.  The data

7    seems to confirm that their change of address

8    filing was accurate, and the Post Office itself

9    has a number of different ways to verify changes

10   of address that people file.

11            They get confirmation letters in the

12   mail, they get emails, they get codes they can use

13   to change or cancel their change of address

14   information if they wish to.

15            And so when they came back and updated

16   their own registration to the same address they

17   gave to the Post Office, that seems to prove that

18   to be accurate; and if their Move Effective Dates

19   they gave were also accurate, and they did in fact

20   move to that new residence when they told the

21   Post Office they were moving to that new

22   residence, then there's abundance of probable

Page 172

1    cause for an investigation.

2         Q    And Mr. Davis, it's your testimony

3    that a certain percentage of those people that

4    fall in that category where they had, outside of

5    the 30-day grace window, submitted an NCOA, change

6    of address, and then later confirmed that change

7    of address to the same address via a voter

8    registration change, is it your testimony that a

9    certain percentage of those people actually did

10   cast ballots in either the general or the runoff

11   election in Georgia for their old county?

12        A    The data indicates the county they

13   were registered in, and the Secretary of State's

14   own vote history trailers have a field in them to

15   indicate what county they cast the ballot in, and

16   when the county number of their registration and

17   the county number on the vote history trailers

18   both indicate the same county, to me, that's

19   indicative of them casting a ballot in their old

20   county, not the one they currently live in -- or

21   at the time currently lived in.

22        Q    Okay.  Who do you think -- who or what

Page 173

1   entity do you think should be responsible for

2   investigating potential issues with voter

3   integrity or election fraud?

4        A     The state elections board would be the

5   proper entity.  I don't have a lot of faith in our

6   Secretary of State doing a good job of handling

7   this investigation.

8              I fully supported Brad when he ran for

9   Secretary of State.  I spoke with him at length

10  about these issues.  I went and met with him

11  shortly after he was elected, and I discussed two

12  major issues with him: number one, residency

13  issues, such as these; number two, different types

14  of residency issues, such as improper

15  redistricting and those kinds of issues.

16             And they asked me to write him a white

17  paper on both issues, which I did and got to them,

18  and it appears they promptly ignored everything I

19  had to say.  I feel like I got nothing but lip

20  service from him, and I'm disappointed in the way

21  he's conducted himself as Secretary of State, and

22  I'm disappointed in the way he has handled some of

Page 174

1    these issues.

2              I know he wrote a book, I think it's

3    call "Integrity Matters," or something like that,

4    but I have real doubts about whether or not that

5    investigation actually is going to be handled with

6    integrity.

7              Of course, I'm not a lawyer, but I

8    have been told that a county district attorney

9    could basically take a subset of that data and

10   hand it off to a grand jury to do an investigation

11   on a county level, but other than that, I don't

12   know where it goes from here.

13             I would like to see these issues

14   addressed.  One way that I think that could be

15   done is the Secretary of State could get

16   proactive, do the same analysis that I did ahead

17   of an election, and if there's an indication that

18   a voter has moved to a new county or a new

19   jurisdiction or a new municipality, perhaps they

20   could contact that voter and encourage them to

21   take five minutes and jump online to the Secretary

22   of State's site and make sure that their

Page 175

1   registration is updated so that they can cast a

2   lawful ballot and actually vote for the people who

3   actually represent them.

4          Q    Do you think that the laws in Georgia

5   that require people to vote in the municipality,

6   county, and even precinct in which they reside,

7   makes sense?

8          A    I do.  Clearly, the goal of those laws

9   is to ensure people are voting in the right

10  districts, and it is a bedrock foundation of our

11  republic that we vote on the representatives who

12  actually represent us.  And if you're voting in

13  districts that you don't live in, you're diluting

14  the votes of the people who do live there.

15               And not only that, but as I stated

16  earlier, there were large numbers of people

17  similarly situated going into the general

18  election.  The voters who obeyed the law, knowing

19  they weren't properly registered in their current

20  county, didn't get to vote, but apparently many

21  voters who were in that situation chose to go vote

22  in their old county.

Page 176

1                    Now, the Secretary of State's office

2       has said that 86% or so of the folks on that list

3       that they're investigating had actually gone and

4       voted in person, so that would imply that the rest

5       of them voted absentee, either by mail or --

6       pardon me -- either by mail or absentee in-person,

7       also known as early voting.

8                    So in thinking through that, for

9       somebody to do that, if they showed up at their

10      old county and showed them a driver's license that

11      hadn't been updated that still had their old

12      address on it, and claimed to live at that address

13      when they don't, we're warned when we sign in to

14      vote or when we ask for an absentee ballot, there

15      are warnings advising voters not to violate

16      21-2-562 by giving false information.

17                    It would seem to me that folks would

18      not have been allowed to cast ballots in their old

19      county had they not deliberately misled elections

20      officials about where they lived.  I think the

21      word used in the statute is "willingly."

22                    So, yeah, I do have real reservations

Page 177

1   about that kind of conduct.  I would expect our

2   Secretary of State to have the same, but he seems

3   to keep using the 1993 NVRA as some sort of an

4   excuse for violating state-level voting laws, when

5   really what he's doing there is justifying why he

6   can't keep the rolls in shape the way that he

7   would prefer to.

8              And I trust that he means that, but I

9   don't think that excuses people who knowingly went

10  to a county they know they no longer live in to

11  cast ballots, so --

12             MS. MENG:  I'm sorry, Mr. Davis, I

13  thought you were finished.

14             THE WITNESS:  I think I am.  Go ahead.

15             MS. MENG:  I just wanted to note an

16  objection to the foundation of Mr. Davis's

17  testimony to the extent it seeks to offer an

18  opinion about the law in which he hasn't been

19  offered as an expert.

20             MS. SIEBERT:  Thank you.

21             BY MS. SIEBERT:

22        Q    Mr. Davis, your opinion that you just

Page 178

1    expressed regarding my question -- answering the

2    question about whether those laws to you make

3    sense, were you testifying as an attorney or as a

4    citizen?

5         A    As a citizen.  I'm not an attorney.

6         Q    Thank you.  Could you please pull up;

7    exhibit 10, Mitchell?  Would you mind blowing that

8    up?  Mitchell, could you scroll down to the

9    comments on this post?  Keep scrolling, sorry.

10   Okay, if you could stop.  I'm sorry, Mitchell,

11   could you scroll back up?  Okay.

12             Do you recall this Facebook --

13   testifying regarding this Facebook post earlier,

14   Mr. Davis?

15        A    Yes.

16        Q    Okay.  And in general, this Facebook

17   post, what in general did this refer to?

18        A    It refers to large numbers of voters

19   that are registered at commercial mail receiving

20   agencies, and Georgia law requires that we

21   register where we actually reside, and nobody

22   resides in a box in a Mail Boxes Etc., or a

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 179

1    UPS store, or anything of that nature.

2               So it does not appear that the laws

3    are being complied with or enforced, and it's

4    really quite simple to identify these locations.

5               During CASS™ certification, there is a

6    field called DPVCMRA.  DPV refers to the 11-digit

7    ZIP code, which is composed of the 5-digit

8    delivery point -- I'm sorry, the 5-digit delivery

9    unit, the 4-digit ZIP plus four code, and the

10   2-digit delivery point.

11              All combined, those point to a

12   particular location, and the Postal Service

13   maintains a database of those locations, and the

14   ones that are commercial mail receiving agencies

15   are flagged as such.

16              So during CASS™ certification, the

17   CASS™ certification software will append a code

18   call DPVCRMA -- of course, people can rename that

19   field to whatever they want if they wish, but the

20   data that's appended to the file will indicate if

21   a particular location is a commercial mail

22   receiving agency or not.

Page 180

1              Now, I have heard people try to excuse

2    people voting at those locations if they're in the

3    bottom of a condominium building or an apartment

4    building or something like that, but even then,

5    the law requires us to register at our residence.

6    So even in those circumstances, normally those

7    apartments or condominiums will still have an

8    address for the actual condo or apartment.

9              I don't know why people try to excuse

10   people registering in a commercial mail receiving

11   agency because they don't live there.

12             And not only that, but a lot of the

13   customers of those commercial mail receiving

14   agencies don't live in the building above it.  And

15   even if they're just a mile away or 2 miles away

16   or 3 miles away, they may be in different voting

17   districts; and if they are, they are being given

18   the opportunity on their ballots to vote for

19   people who don't represent them.

20        Q    Okay.  Speaking as a citizen, do you

21   agree generally with the sentiment that people who

22   break laws should receive the legal consequence of

Page 181

1   their action?

2        A    Generally, yes.  I know that some

3   illegal voting activity that I've seen was done

4   very deliberately; some was done by people who

5   didn't realize they were violating the law; some

6   was caused by incompetent elections officials.

7             There's various causes for it, so I

8   would not, in general, say everybody who breaks an

9   election law should be locked up or anything of

10  that nature, but I think it's important that we

11  recognize the violations of the law that occur.

12  I think we should get to the bottom of the root

13  causes.  I think we should craft public policy

14  that helps prevent those kinds of things from

15  happening, and I think it's very important.

16             I've testified in cases that were

17  decided by very narrow margins.  There was one

18  that was decided by 67 votes, there was one that

19  was decided by 9 votes, there was one that was

20  decided by 2 votes, and I've seen candidates have

21  to come out of pocket to the tune of tens of

22  thousands of dollars, on up into even six figures

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 182

1    sometimes, trying to get a fair election because

2    of issues that happened sometimes due to

3    incompetent elections officials that didn't manage

4    their election properly, sometimes due to

5    residency issues of some sort, sometimes due to

6    double voting, due to any number of different

7    issues that can occur.

8              And like I said, in all the cases that

9    I've ever been involved in and all the times I've

10   seen people take the stand and admit to violating

11   the law, I don't see much actually done about it.

12             And until these issues reach such a

13   scale, as they did recently, I didn't see a whole

14   lot of interest from elected officials in trying

15   to get those issues resolved.

16             And even the new elections bill that

17   was passed, I didn't see anything in there that

18   would adequately address preventing these kinds of

19   residency issues from occurring, and I think it's

20   important that we recognize that they do occur,

21   and that our elected officials take steps to

22   address them and try to help clean up the problem

Page 183

1    because they affect way too many races.

2              In this particular circumstance, these

3    kinds of problems happen in every single county in

4    the state, these kinds of issues happen in every

5    house district, every senate district, every

6    congressional district.  Virtually, any election

7    district you can name had issues like this

8    happening.  If that's not systemic irregularities,

9    I'd invite somebody to tell me what is.

10        Q    If someone registers as -- say in

11   Georgia, if they're registered at a Georgia

12   address, but they're temporarily out of state

13   serving in the military.  Is it your testimony

14   that they are still legally able to vote in

15   Georgia?

16        A    Yes.

17        Q    Okay.  Assuming they have not

18   registered at a UPS store, that their voting

19   address is not a UPS store --

20        A    Correct.  Even if somebody is serving

21   a tour of duty or they're off at college and it's

22   temporary, they should be registered at their

Page 184

1   residential address, what they consider to be

2   their residence.

3          Q    Do you view a person in a situation

4   like that, serving in the military somewhere else

5   that's properly registered and able to vote, as

6   analogous to someone who -- to a registration

7   that's at a UPS store, a voter registration?

8          A    No.

9          Q    Okay.

10         A    Not unless they're registered at one,

11  but no.

12         Q    Okay.  Can you think of any objective

13  reason why a post from somebody who discussed this

14  issue of people who registered to vote at a

15  UPS store, which is not according to law, but

16  who -- you know, a person who was serving in the

17  military and who was legally allowed to vote in

18  Georgia, can you think of any objective reason why

19  that military person would be intimidated by this

20  post regarding this issue of people registering at

21  UPS stores?

22         A    If they're not registered at a

Page 185

1    UPS store, I don't know why they would be

2    intimidated.

3              Now, somebody who is registered at a

4    UPS store I hope would learn that that's not

5    proper and take immediate steps to correct their

6    registration.

7         Q    Okay.  Was it ever in anything that

8    you did with this data analysis, either you, in

9    connection with -- you and Derek Somerville, was

10   it ever your intention to intimidate somebody that

11   was legally able to vote in Georgia --

12        A    Not at all.

13        Q    -- to prevent them from doing that?

14        A    Not at all.

15        Q    Okay.  Did you ever in your data

16   analysis take into account someone's race?

17        A    No, that was not part of it, and it's

18   pretty easy to demonstrate.  And if you want, I'll

19   walk how to do that, in case Fair Fight would like

20   to follow along.  I'd be happy to demonstrate

21   that.

22        Q    Why don't you do that.

Page 186

1        A     Okay.  So you have the databases that

2    I gave you for discovery, you have files M voter

3    1, 2 and 3.  In those files, there's a field

4    called DLV_Code.  If you run a count of the ones

5    with an M in that field, your count will come up

6    to over 600,000.

7              But if you then exclude any changes of

8    address with a Move Effective Date in October of

9    2020 or November of 2020, then you're going to

10   drop down to the same count that you see in the

11   data file called "Moved."

12             And then in the data file called

13   "Moved," if you go through there and count the

14   records where the COA state equals Georgia, and

15   the county name field does not equal the new

16   county field, and the new county field is not

17   blank, and the voted field is not empty, then you

18   will come out with almost the same count as the --

19   oh, and it's not a P.O. box -- well, let me back

20   up.  Strike that last part.  Leave the P.O. Boxes

21   in for now, you'll come up with a count that's

22   virtually identical to the file called "Issues."

Page 187

1                   Now, I subsequently removed the

2     P.O. Boxes, and that dropped the count down to

3     around 35,000.  So it's not difficult to

4     demonstrate that there were no partisan influences

5     or racial influences on the selection criteria.

6                   And I went so far with the challenge

7     data, after it was cast in stone and the challenge

8     efforts had concluded and all of that, I took the

9     certified copy of the qualified list of electors

10    for the runoff election, and I actually did a

11    query by race, and then I compared it to a query

12    by race that I did on the challenge list, and the

13    percentages -- the racial percentages in the

14    challenge list differed very little from the

15    racial percentages in the qualified list of

16    electors that were able to vote in the runoff in

17    total.

18                  So I don't think it's very difficult

19    to show that there were not any racial or partisan

20    motivations for the challenge.  There were

21    Republicans challenged, there were Democrats

22    challenged, there were people of all the different

Page 188

1  racial codes that were challenged.

2          The criteria was objective, and none

3  of that was involved, despite the claims that have

4  been made to the contrary.

5      Q   If 100% of the people -- speaking as a

6  citizen, if 100% of the people in Georgia who are

7  legally able to vote, whether they be serving in

8  the military somewhere else or students somewhere

9  else or voting properly in the district they're

10  registered in, let's just assume 100% of the

11  people who are registered to vote correctly do so,

12  so you have 100% turnout, would you have any

13  problem at all with 100% of the people who are

14  legally allowed to vote in Georgia voting?

15      A   If they do it lawfully, I don't have

16  an issue with it.  I'd love to see it.

17      Q   What if -- if that happened, would you

18  have a problem with it if that resulted in

19  whatever your political preferences are never

20  winning another election?

21      A   No, that actually is a fair fight.

22      Q   I'm just making sure I don't have any

Page 189

1    other questions.

2              I don't have any other questions.

3              MS. MENG:  So I just have a few

4    follow-ups for you, Mr. Davis.

5    FURTHER EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

6              BY MS. MENG:

7         Q    Working backwards here, so you just

8    spoke about having run a query on the challenge

9    list based on race, right?

10        A    After the fact, correct.  Not when it

11   was being created.  There was no racial or

12   partisan data used to create the list.

13        Q    Okay.  And what prompted you to do the

14   analysis after the fact?

15        A    Well, reading your Complaint and all

16   the talk about the KKK and all of this stuff, it

17   sure came across like you were trying to make the

18   claim that there was some sort of racial

19   motivation to it all, and the data disproves that

20   pretty frankly, pretty solidly.

21              You know, if I profiled the entirety

22   of the qualified list of electors for the runoff

Page 190

1    election by race and calculate those percentages,

2    and I do the same for the challenge list, there's

3    not much difference between them.

4         Q    Okay.  And you had testified that

5    there was no racial disparities in the challenge

6    lists.  If there were racial disparities in other

7    challenge lists, what would your reaction be to

8    that analysis?

9         A    Well, correlation is not causation.

10   If it were, we would all know that a lack of

11   pirates causes global warming, so I'd want to know

12   why there was a disparity.

13             But the fact that the racial makeup of

14   the challenge database and the racial makeup of

15   the voting list in general for the runoff differs

16   so little seems to indicate that there was no

17   racial or partisan motivation used in creating the

18   challenge lists, so that's why --

19        Q    So when -- oh, sorry, go ahead.

20        A    That's why I did that comparison.  And

21   that was done just recently, long after the

22   challenge from December of 2020.

Page 191

1          Q    And so just to clarify, the queries

2     that you did on race, what specifically was the

3     challenge list you conducted that analysis on?

4          A    You have a copy of it.  It was

5     disclosed recently in the request for production.

6          Q    So I --

7          A    I don't believe -- excuse me?

8          Q    Sorry.  So I was clarifying, the

9     analysis was done on the challenge lists that you

10    and Mr. Somerville had worked on, correct?

11         A    Correct.

12         Q    Because I know there's multiple

13    challenges, okay.

14         A    So, yes, based on the challenge that

15    we did, the racial makeup of the challenge closely

16    reflects the racial makeup of the qualified list

17    of electors for the primary runoff election in

18    general.

19         Q    Okay.  And so putting aside your

20    challenge lists that you worked on personally, if

21    there were racial disparities that were identified

22    in other challenge lists, what would your reaction

Page 192

1    have been to what that would indicate?

2          A    I'd be interested in finding out

3    why -- well, first of all, how much of a racial

4    disparity is there?  And are there any organic

5    causes for the racial disparity that aren't being

6    taken into account?

7                As I said, correlation doesn't

8    necessarily prove causation, but the fact that the

9    data indicates that our challenge had very, very

10   little racial disparity when compared to the

11   overall voter list indicates that there was no

12   racial motivation in the creation of the list,

13   despite some of the rhetoric that's been used.

14         Q    Sure.  So again putting aside your

15   challenge specifically, would it have been a cause

16   for concern if you had identified or if there were

17   identified racial disparities in challenge lists

18   that were not yours?

19         A    I think I've already answered that.

20   I'd want to know what underlying factors there

21   were that may have caused that.  Is there an

22   organic reason why that may have been the case?

Page 193

1          Q     Sure.  So I believe you're answering

2     the question of what might have motivated that

3     change, but is it a cause for concern that that

4     disparity exists?

5          A     Well, if we were to learn that --

6     for example, if we were to learn that

7     more African-Americans moved from one county to

8     another, that would explain why there was more on

9     the list, would it not?

10         Q     Right.  So putting aside whatever the

11    explanations could be for the reasons --

12         A     How could you --

13         Q     Mr. Davis, I'm just asking for you to

14    answer the question of whether or not the

15    identification of a racial disparity would be a

16    cause for concern, putting aside whatever might

17    explain that disparity?

18         A     Why would I put aside whatever might

19    explain the disparity?  If I saw a disparity, I'd

20    want to know why that disparity was there, but

21    again, it's as simple as this: if more

22    African-Americans move from County A to County B,

Page 194

1    that right there alone would explain any

2    disparity.  But in the challenge list that I did,

3    I'm not seeing much difference, very little.

4        Q    So again, I just want to ask because I

5    don't believe you're answering the question here.

6             If you saw a disparity in a challenge

7    list, would that be a cause of concern for you

8    about the composition of that challenge list?

9        A    As I said, I would want to know what

10   caused it.

11       Q    So I move to strike Mr. Davis's answer

12   as nonresponsive to the question.

13            MS. SIEBERT:  I object to that.  He

14   responded.

15            BY MS. MENG:

16       Q    So Mr. Davis, you stated that you

17   would want -- you know, if you saw that disparity,

18   you would want to take a look at what might cause

19   that.

20            What's the reasons for why you would

21   want to take a closer look at that?

22       A    It seems obvious to me.  If you're

Page 195

1    talking about a list of people who move from

2    County A to County B more than 30 days before the

3    election, but traveled back to their old county to

4    cast ballots, then if more African-Americans or

5    more Latinos, or whatever racial classification

6    we're talking about, if more of those folks

7    actually filed changes of address and actually

8    moved, that right there explains any disparity,

9    does it not?

10        Q    But Mr. Davis, you believe it would be

11   relevant that there's a disparity noted in that

12   analysis, correct?

13            Or phrased another way, you stated

14   that the challenges and query that you did on race

15   for your challenges did not result in a disparity,

16   but if that same query was run on a challenge list

17   that did reveal disparities, would that be

18   something that would raise a red flag to you?

19        A    I've tried to get this question

20   answered in a way that will come across, so let me

21   try it a different way.

22            If 28% of the folks who moved from

Page 196

1    County A to County B more than 30 days before the

2    election, but returned to their old county to

3    ballots, if 28% of those folks were

4    African-American, I would expect to see 28% of

5    those folks on the challenge list.  Those numbers

6    should be reflective of one another.

7               I don't think there's any need to

8    complicate this any farther than that.

9        Q    Okay.  And so just to clarify, if you

10   saw a disparity, you would not ignore the

11   disparity, correct?  You would examine it further?

12   That's a simple question.

13       A    Yes.

14       Q    Okay, thank you.

15              So Ms. Siebert had previously asked

16   about military voters or UOCAVA voters on the

17   challenge lists, and your intention as it relates

18   to challenge lists, and you I believe testified

19   that it was never your intention, you know,

20   especially with respect to the Facebook post, that

21   those voters would choose not to vote if they saw

22   your post.

Page 197

1            Did you at any point hope that those

2    who you believe would be ineligible to vote would

3    take notice of a post similar to the one that you

4    and Mr. Somerville were posting about and think

5    twice about voting?

6        A    Well, to clarify, any UOCAVA voters on

7    the absentee voter file were removed from the

8    challenge, so they're not in there.  Those are

9    easy to identify.

10            Just set a relation between the voter

11   database and the absentee voter file based on

12   registration number, and if they're a UOCAVA

13   voter, go ahead and remove them from the

14   challenge.

15            I wish identifying all members of the

16   military were so simple, but it's not,

17   unfortunately.

18            But to answer your question, I didn't

19   intend for any information we shared with the

20   public to intimidate any lawful voter from casting

21   a ballot.  Voters that may be having a

22   registration at a UPS store, if those posts caused

Page 198

1   them to become aware that the law doesn't permit

2   you to do that, I view that as a good thing and as

3   a service to the community.

4              I don't understand why the Secretary

5   of State's office hasn't reached out to all these

6   voters to explain to them why they need to be

7   registered at their actual residence address

8   rather than a UPS store.

9              And having the knowledge that people

10  can come from miles to get to a UPS store,

11  you know, if their registration is based on the

12  address of that UPS store, they may not even be

13  properly districted into their correct voting

14  districts and may not be voting for the right

15  candidates for office at all.

16      Q    So I move to strike Mr. Davis's

17  response as nonresponsive to the question, and I

18  can repeat my question so that you can answer it,

19  which is that of those voters on the challenge

20  lists that you believe to be ineligible based on

21  your analysis, was it ever your intent that a post

22  like yours would make those ineligible voters

Page 199

1    think twice about voting, the ones that you had

2    deemed to be ineligible?

3         A    If a voter knows they're ineligible to

4    cast a lawful ballot, perhaps they should think

5    twice about violating the law.

6              But if a voter is properly registered,

7    there's no reason for any voter to be intimidated

8    by a post talking about people who aren't.

9         Q    So Mr. Davis, I want to again move to

10   strike your answer as nonresponsive and ask you to

11   answer the simple question that was it your intent

12   in making the Facebook post to make voters think

13   twice about voting based on whether or not you

14   thought they were ineligible?

15        A    I don't seek to intimidate any lawful

16   voter, period.  If you consider that an invalid

17   response to that question, I don't know what else

18   to say.

19             Voters that knowingly cast ballots

20   unlawfully should be concerned.  I don't know what

21   else to tell you there.

22        Q    So did you want ineligible voters to

Page 200

1    think that they should be concerned and think

2    twice before voting?

3         A    If a voter is knowingly ineligible, if

4    they know that they live in a county other than

5    the one they intend to travel to to cast an

6    unlawful ballot, perhaps they should be

7    intimidated, because if they go and lie to those

8    elections officials, they're arguably committing a

9    felony.

10        Q    And so was it your hope that for those

11   voters that you just mentioned, when they saw your

12   post, they would think twice about voting?

13        A    My hope was if they plan on voting

14   unlawfully in a county they know they don't live

15   in by giving a false address to elections

16   officials, they should be concerned about that.

17        Q    And so was that your goal in writing

18   the Facebook post that we reviewed today?

19        A    My goal with a lot of the Facebook

20   posts that we've discussed is simply to educate

21   folks on the issues that are going out in our

22   voter rolls.

Page 201

1                    Our voter rolls are mismanaged, they

2      contain a lot of faulty registrations, and there's

3      a lot of issues going on in this state with voting

4      that people need to be aware of.

5                    My goal primarily was to help educate

6      the public on those issues, and hopefully effect

7      some change and some public policy reforms to help

8      correct a lot of those issues.

9           Q    So who would you say was the target

10     audience of those Facebook posts?

11          A    Primarily voters that are concerned

12     with election integrity.

13          Q    Okay.  And so Mr. Davis, earlier when

14     Ms. Siebert was asking you a few questions, you

15     had mentioned that -- you I believe were

16     discussing voter names that were handed over to

17     the Secretary of State for certain investigations.

18                    Do you recall that discussion?

19          A    I do.

20          Q    Okay.  And I believe you had mentioned

21     that a little more than 10,000, I think you had

22     stated ten thousand three hundred thousand [sic]

Page 202

1    names out of about 500,000 you had handed over to

2    the Secretary of State, correct?

3         A    No.  You have a copy of that database.

4    It's maybe 100 or 200 shy of 35,000.

5              So of the folks that have since

6    updated their own addresses to the same address

7    they gave to the Post Office, that's approximately

8    a third or so of those voters.

9         Q    Sorry, a third of which set of voters?

10        A    In your Requests for Production of

11   Documents, there's a folder -- or at least there

12   was, I don't know what form you received it in --

13   but there was a folder called "SoS Investigation,"

14   and in that folder is a copy of the data that went

15   to the Secretary of State's office.

16             About a third of those folks, they'll

17   have a -- I believe it's a "Y" in the field called

18   "Confirmed," which means they have confirmed their

19   NCOA information by updating their own

20   registration to the same exact address they gave

21   the Post Office when they moved.

22        Q    And so I apologize I don't have the

Page 203

1    dataset in front of me, but how many names were on

2    that big list that you're referring to?

3         A    I'd have to look to get you the exact

4    count, but it was maybe 100 or 200 records shy of

5    35,000, if memory serves me.

6              We're not talking about 500,000

7    records here at all.  We're talking about 34,800

8    or so, somewhere in that range.  I don't remember

9    the exact number.

10        Q    Okay.  And so of those records, it's

11   your view that all of them should have been

12   investigated; is that correct?

13        A    I would like to see the Secretary of

14   State investigate all of those records.  No doubt

15   there will be some long-term temporary moves in

16   there, and when they do their NCOA run and they

17   subsequently mail people to investigate their

18   changes of address, they should receive

19   information that would be very helpful in that

20   investigation.

21             Last I heard, they went through that

22   process on or about November the 8th of just this

Page 204

1    last year.  In other words, a couple months back,

2    they went through that process.  So by now, they

3    will have received a great deal of information on

4    that entire database.

5              There will be people that will confirm

6    their changes of address; there will be people who

7    say, no, I moved temporarily, I still reside at

8    the address that I'm registered at; there will be

9    people who don't respond; there will be returned

10   mail; there will likely be a whole bunch of those

11   voters who end up on inactive status for failing

12   to respond at all.

13             So the Secretary of State's office

14   apparently has recently gone through that entire

15   adjudication process, and all that information

16   that they collected should be enormously

17   beneficial to them in that investigation, assuming

18   that they're actually interested in pursuing that

19   investigation.  I kind of doubt it.  We will see,

20   but it seems like our Secretary of State is far

21   more interested in getting himself re-elected than

22   he is in pursuing that investigation with

Page 205

1    integrity.

2          Q    If you guys will give me just one

3    minute to make sure I don't have any other

4    questions.

5               (Pause in the proceedings.)

6               BY MS. MENG:

7          Q    So Mr. Davis, based on the information

8    that you have, would you be able to say that 99%

9    of those voters that you were just referring to

10   are ineligible to vote?

11         A    Well, no.  As I just said, about a

12   third of them have since updated their

13   registration to where they actually do live, so at

14   least a third of them, in theory, should be

15   completely eligible to vote now.

16              But if you're asking about were they

17   when the general election took place, that's not

18   really a knowable number; that's what

19   investigations are for.  But I would say that a

20   large number of those voters probably did travel

21   back to their old counties to cast their ballots.

22              We've got over 10,000, like I said,

Page 206

1    who have since updated their addresses to the same

2    one they gave the Post Office when they moved

3    originally, so their address information on their

4    NCOA was correct.  If their Move Effective Date is

5    also correct, that's pretty solid corroborating

6    evidence that they need to be investigated for

7    whether or not they cast a lawful ballot in an

8    election.

9              As far as what the total number that

10   the Secretary of State may deem to have been

11   improper or irregular or illegal or what have you,

12   I don't know.  I mean, that's for them to

13   determine.  I've given them the information to

14   investigate.

15             I hope they take it serious, and I

16   hope that they actually conduct that investigation

17   and don't leave it for whoever Brad's successor is

18   to do, but, obviously, I don't have any control

19   over that.

20        Q    Okay.  So putting aside the about

21   10,000 voters that have updated their registration

22   now, would you ever represent to the public the

Page 207

1    original list before that, before those

2    registrations were confirmed, would you ever

3    represent to the public that 99% of them are

4    ineligible to vote -- sorry, 99% of them were

5    ineligible to vote?

6         A     When I speak about that database, I

7    use the term "residency issues" to describe

8    concerns about their residency.  I don't make any

9    claim that even one individual voter on that list

10   voted illegally.  That's not for me to determine;

11   that's up to our elections officials.

12              So I try to be really clear on the

13   language that I use when I refer to those folks.

14   I would not ever allege that 99% of them voted

15   illegally.  That's not for me to determine, that's

16   not something that I have any way of knowing for

17   sure.

18              That is something that an

19   investigation can reveal, assuming the

20   investigation is actually done.

21        Q     So would you say that of -- that the

22   state is really the only body there that has the

Page 208

1    ability to confirm whether or not voters are

2    eligible to vote?

3         A    I've had attorneys tell me that if a

4    subsection of that list for a particular county

5    were handed off to a district attorney, it could

6    be presented to a grand jury.  But other than

7    that, I would say either local officials or the

8    Secretary of State's office would be the

9    appropriate venue to investigate.

10             I'm aware that following the 2020

11   election, there were so many issues that needed to

12   be investigated, the GBI was called into it.

13   Since this investigation is as large as it is, I

14   would welcome that to happen, again, if they were

15   interested enough in it to do that.  But other

16   than that, that's for you lawyers and law

17   enforcement folks to argue over.

18             I've done my part in presenting the

19   investigation to the Secretary of State's office,

20   and I gave them the voters that I think warrant

21   investigation.  Beyond that, I don't really care

22   to speculate about what percentage were or were

Page 209

1    not legal and all of that kind of stuff.  That's

2    not for me to determine.

3         Q    And just to clarify, what's your

4    concern or why are you careful about avoiding any

5    statements about what specific percentage of

6    voters might be eligible or ineligible to vote?

7         A    Well, as I've said several times

8    repeatedly, we don't know how many of those folks

9    were long-term temporary changes of address.

10   That's not something that's knowable.

11            I wish that the National Change of

12   Address process would be reformed so that a person

13   could file a temporary change of address that is

14   long term, the same way they do with a permanent

15   change of address.  That would be enormously

16   helpful.  Or even better, if they could file a

17   temporary change of address with a beginning and

18   ending date, that would be very helpful.

19            You know, we get the Move Effective

20   Date.  If it were a temporary change of address

21   and we could be provided with an end date for that

22   temporary change of address, that would be helpful

Page 210

1    as well.

2            I think there's a lot of policy

3    changes that could be made that would be very

4    helpful in keeping our voter rolls clean,

5    including a national registry, such as the

6    ERIC system, if all states were mandated to

7    participate.

8            I think there's a lot that we can do

9    to reform the process.

10       Q    Okay, I think those are all the

11   questions I had.  Thank you, Mr. Davis.

12       A    Thank you.  I appreciate the pleasant

13   exchange.

14           THE VIDEOGRAPHER:  This concludes the

15   deposition of Mr. Mark Davis.  The time is

16   2:10 p.m.

17           (Whereupon, at 2:10 p.m., the taking

18            of the deposition was concluded.

19            Reading and signature were RESERVED.)

20

21

22

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 211

1              CERTIFICATE OF NOTARY PUBLIC

2          I, DAWN A. JAQUES, a Notary Public in and for
   the Commonwealth of Virginia, before whom the

3   foregoing deposition was taken, do hereby certify
   that witness whose testimony appears in the

4   foregoing pages was duly sworn by me; that the
   testimony of said witness was taken by me in

5   shorthand at the time and place mentioned in the
   caption hereof and thereafter reduced to typewriting

6   under my supervision; that said deposition is a true
   record of the testimony given by said witness; that

7   I am neither counsel for, related to, nor employed
   by any of the parties to the action in which this

8   deposition is taken; and, further, that I am not a
   relative or employee of any attorney or counsel

9   employed by the parties thereto, nor financially or
   otherwise interested in the outcome of the actions.

10

11

12

13

14

15

16

17                  _____
                     Dawn A. Jaques, CSR, CLR
18                   Notary Public in and for
                     the Commonwealth of Virginia
19

20   My commission expires:

21   August 31, 2023

22   Registration No. 132328

Page 212

```
 1        Mark A. Davis, c/o

          THE BOPP LAW FIRM

 2        1 South Sixth Street

          Terre Haute, Indiana  47807-3510

 3

 4        Case: Fair Fight, Inc. et al. v. True the Vote, et al.

          Date of deposition: January 19, 2022

 5        Deponent: Mark A. Davis

 6

 7        Please be advised that the transcript in the above

 8        referenced matter is now complete and ready for signature.

 9        The deponent may come to this office to sign the transcript,

10        a copy may be purchased for the witness to review and sign,

11        or the deponent and/or counsel may waive the option of

12        signing. Please advise us of the option selected.

13        Please forward the errata sheet and the original signed

14        signature page to counsel noticing the deposition, noting the

15        applicable time period allowed for such by the governing

          Rules of Procedure. If you have any questions, please do

16        not hesitate to call our office at (202)-232-0646.

17

18

19        Sincerely,

          Digital Evidence Group

20        Copyright 2022 Digital Evidence Group

21        Copying is forbidden, including electronically, absent

22        express written consent.
```

1/19/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Mark A. Davis

Page 213

1       Digital Evidence Group, L.L.C.
        1730 M Street, NW, Suite 812
2       Washington, D.C. 20036
        (202) 232-0646
3
4       SIGNATURE PAGE
        Case: Fair Fight, Inc. et al. v. True the Vote, et al.
5       Witness Name: Mark A. Davis
        Deposition Date: January 19, 2022
6
7       I do hereby acknowledge that I have read
        and examined the foregoing pages
8       of the transcript of my deposition and that:
9
10      (Check appropriate box):
        (  ) The same is a true, correct and
11      complete transcription of the answers given by
        me to the questions therein recorded.
12      (  ) Except for the changes noted in the
        attached Errata Sheet, the same is a true,
13      correct and complete transcription of the
        answers given by me to the questions therein
14      recorded.
15
16
17
18      _____          _____
19       DATE                     WITNESS SIGNATURE
20
21      _____          _____
22       DATE                         NOTARY

Page 214

1        Digital Evidence Group, LLC

2        1730 M Street, NW, Suite 812

3        Washington, D.C.  20036

4        (202)232-0646

5

6                         ERRATA SHEET

7

8        Case: Fair Fight, Inc. et al. v. True the Vote, et al.

9        Witness Name: Mark A. Davis

10       Deposition Date: January 19, 2022

11       Page No.    Line No.      Change

12

13

14

15

16

17

18

19

20

21       _____      _____

22       Signature                          Date