Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

GAINESVILLE DIVISION

_____

FAIR FIGHT, INC.,                    )
SCOTT BERSON, JOCELYN HEREDIA,       )
and JANE DOE,                        )
    Plaintiffs,                    )
                                     )
v.                                   )    Case No.
                                     ) 2:20-cv-00302
TRUE THE VOTE, CATHERINE             )      SCJ
ENGELBRECHT, DEREK SOMERVILLE,       )
MARK DAVIS, MARK WILLIAMS,           )
RON JOHNSON, JAMES COOPER,           )
and JOHN DOES 1-10,                  )
    Defendants.                    )
_____)


Videotaped Deposition of DEREK SOMERVILLE

Conducted Remotely via Zoom

Thursday, January 20, 2022

8:02 a.m. CST


Reported by Lisa A. Knight, RDR, CRR, RSA

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 2

1                 Pursuant to Notice, the videotaped

2     deposition of DEREK SOMERVILLE was conducted

3     remotely via Zoom on behalf of the

4     Plaintiffs, at 8:02 a.m. CST, on Thursday,

5     January 20, 2022, reported stenographically

6     by Lisa A. Knight, Realtime Diplomate

7     Reporter, Certified Realtime Reporter, and

8     Realtime Systems Administrator.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

```
 1                A P P E A R A N C E S
 2                (All appearing remotely)
 3
 4    COUNSEL FOR THE PLAINTIFFS
          ELIAS LAW GROUP LLP
 5        BY:  CHRISTINA A. FORD, ESQUIRE
               cford@elias.law
 6             JACOB SHELLY, ESQUIRE
               jshelly@elias.law
 7             TINA MENG, ESQUIRE
               tmeng@elias.law
 8        10 G Street NE
          Suite 600
 9        Washington, District of Columbia 20002
          202.968.4490
10    -and-
11        LAWRENCE & BUNDY LLC
          BY:  MAIA COGEN, ESQUIRE
12             maia.cogen@lawrencebundy.com
          1180 West Peachtree Street NW
13        Suite 1650
          Atlanta, Georgia 30309
14        404.400.3350
15
16    COUNSEL FOR THE DEFENDANTS
          THE BOPP LAW FIRM
17        BY:  MELENA S. SIEBERT, ESQUIRE
               msiebert@bopplaw.com
18        1 South 6th Street
          Terre Haute, Indiana 47807
19        812.232.2434
20
21    ALSO PRESENT:
22        MITCHELL MAHON, Videographer
```

```
                                                        Page 4
 1                      I N D E X

 2                   DEREK SOMERVILLE

 3                   JANUARY 20, 2022

 4    EXAMINATION OF DEREK SOMERVILLE:

 5         BY MS. FORD                          8

 6         BY MS. SIEBERT                     183

 7

 8                DEPOSITION EXHIBITS

 9                 DEREK SOMERVILLE

10                 JANUARY 20, 2022

11    NUMBER            DESCRIPTION          MARKED

12    Somerville 1   Plaintiffs' Notice to     12

                     Take the Deposition of

13                   Derek Somerville

14    Somerville 2   E-mail string            18

15    Somerville 3   E-mail string            24

16    Somerville 4   E-mail string            29

17    Somerville 5   Text string, Bates Def   38

                     Somerville 000714 to

18                   -719

19    Somerville 6   E-mail string            42

20    Somerville 7   E-mail string            43

21    Somerville 8   Text string, Bates Def   45

                     Somerville 000182

22                   to -442
```

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 5

1                    DEPOSITION EXHIBITS, CON'T

     NUMBER              DESCRIPTION              MARKED

2    Somerville 9   E-mail string                 51

3    Somerville 10  Facebook post                 75

4    Somerville 11  Facebook post                 78

5    Somerville 12  E-mail string                 96

6    Somerville 13  E-mail string                 98

7    Somerville 14  E-mail                        120

8    Somerville 15  E-mail string                 125

9    Somerville 16  Facebook Messenger            141
                    printout, Bates Def
10                  Somerville 000162 to
                    -163

11   Somerville 17  Facebook Messenger            145
                    printout, Bates Def
12                  Somerville 000160 to
                    -161

13   Somerville 18  Text string, Bates Def        148
                    Somerville 000720 to
14                  -727

15   Somerville 19  Text string, Bates Def        166
                    Somerville 000731 to
16                  -733

17   Somerville 20  Text string, Bates Def        176
                    Somerville 000172 to
18                  -175

19   Somerville 21  E-mail string                 179

20

     **REPORTER'S NOTE:  All quotations from exhibits
21   are reflected in the manner in which they were
     read into the record and do not necessarily
22   indicate an exact quote from the document.

Page 6

1              PROCEEDINGS

2              THE VIDEOGRAPHER:  We are going

3      on the record.  This is Tape No. 1 of

4      the videotaped deposition of Derek

5      Somerville taken by plaintiffs in the

6      matter of Fair Fight, Inc., et al.,

7      versus True the Vote, et al., in the

8      United States District Court for the

9      Northern District of Georgia,

10     Gainesville Division, Case No.

11     2:20-cv-00302-SCJ.

12             This deposition is being held

13     remotely over Zoom videoconference on

14     January 20, 2022.  The time is 8:02

15     Central.

16             My name is Mitchell Mahon; I'm

17     the legal videographer from Digital

18     Evidence Group.  The court reporter is

19     Lisa Knight, in association with

20     Digital Evidence Group.

21             Will counsel please introduce

22     themselves for the record.

Page 7

1          MS. FORD:  This is Christina

2     Ford from Elias Law Group for the

3     plaintiffs.  And with me today, I have

4     Tina Meng and Jacob Shelly, and then

5     also Maia Cogen from Lawrence & Bundy.

6          MS. SIEBERT:  Melena Siebert

7     for defendants.

8          THE VIDEOGRAPHER:  And will the

9     court reporter please ask for

10    stipulations.

11         THE STENOGRAPHER:  The

12    attorneys participating in this

13    deposition acknowledge that I am not

14    physically present in the deposition

15    room, and that I will be reporting

16    this deposition remotely.

17         They further acknowledge that

18    in lieu of an oath administered in

19    person, I will administer the oath

20    remotely.  The parties also agree that

21    the witness has verified that he is,

22    in fact, Derek Somerville.

Page 8

1            The parties and their counsel

2       further agree that the witness may be

3       in a state where I am not a notary and

4       stipulate to the witness being sworn

5       in by an out-of-state notary.

6            If any party has an objection

7       to this manner of proceeding, please

8       state so now.

9            MS. FORD:  We have no

10      objection.

11           MS. SIEBERT:  None.  No

12      objection.

13           THE STENOGRAPHER:  Thank you.

14            DEREK SOMERVILLE,

15   having been first duly sworn to state the

16   whole truth, testified as follows:

17                 EXAMINATION

18   BY MS. FORD:

19      Q.   Mr. Somerville, thank you again

20   for being here today.  I know it took a great

21   deal of effort.  We'll endeavor to do this as

22   quickly as possible.

Page 9

1          A.     I appreciate that.

2          Q.     Can you please just state your

3     full name for the record.

4          A.     My name is Derek Somerville.

5          Q.     And where is your home address?

6          A.     My home address is

7     5130 Saddlebred Lane, Cumming, Georgia.

8          Q.     And where are you giving this

9     deposition from today?

10          A.     I'm presently in Murray,

11     M-u-r-r-a-y, Kentucky.

12          Q.     Okay.  Thank you.

13                And I know we covered this

14     before, but I just -- as a refresher, I

15     wanted to go through a couple of the ground

16     rules for this deposition so that we have the

17     same understanding.

18                All testimony today is under

19     oath, just as if you were testifying in

20     court.  Does that make sense?

21          A.     It does.

22          Q.     Great.

Page 10

1                    And for the benefit of

2       everyone, and especially for the court

3       reporter, please make sure your answers are

4       audible today.

5                    Please also allow me to finish

6       my question before giving your answer, and I

7       will do my very best to let you completely

8       finish your answer before I ask another

9       question.

10                   Does that sound good?

11          A.      Yes.

12          Q.      And from time to time, your

13      attorney may make an objection to my

14      question.  And that's fine, but you are to

15      answer unless she specifically instructs you

16      not to answer on the basis that a topic is

17      privileged.

18                   Does that make sense?

19          A.      Yes.

20          Q.      Great.

21                   And if, at any point, you do

22      not understand a question that I'm asking,

Page 11

1    please let me know, and I will do my best to

2    rephrase or clarify a question.  So if you

3    answer a question, I will assume that you

4    understood it.

5              Is that fair?

6    A.    Yes.

7    Q.    Okay.  And if, at any time, you

8    would like a break, please let me know, and

9    we can find a good place to stop and go off

10   the record.

11             Does that also sound good?

12   A.    Yes.

13   Q.    Great.

14             Mr. Somerville, I just have to

15   ask a couple of questions because I'm

16   obviously not in the room with you.

17             Do you have any documents with

18   you, either hard copies or electronic?

19   A.    I do not.

20   Q.    Okay.  And is anyone else in

21   the room with you?

22   A.    There is no one else in here

Page 12

1    but me.

2          Q.    Okay.  And do you understand

3    that it would not be appropriate for your

4    attorney, or for anyone else, to tell you how

5    to answer a particular question that I ask

6    you?

7          A.    I do.

8          Q.    Okay.  And do you agree that

9    while you're testifying today, you will not

10   exchange communications with anyone about how

11   to answer questions?

12         A.    I agree to that.

13         Q.    Okay.  Excellent.

14               MS. FORD:  Mitchell, can we

15         please pull up Exhibit [sic] A?  And

16         we can mark that as Exhibit 1.

17               (Somerville Exhibit 1,

18         Plaintiffs' Notice to Take the

19         Deposition of Derek Somerville,

20         was marked for identification, as

21         of this date.)

22   ///

Page 13

1   BY MS. FORD:

2        Q.     And this is just the deposition

3   notice for today.

4               Mr. Somerville, do you

5   recognize this?

6        A.     I do.

7        Q.     Okay.  Great.  So you're

8   prepared to testify pursuant to this notice?

9        A.     I'm present.

10        Q.     Okay.  Without disclosing any

11   specific communications you may have had with

12   your attorneys, can you describe at a high

13   level what you did to prepare for today?

14        A.     I did not prepare for today,

15   other than a procedural call with my counsel

16   yesterday.

17        Q.     Okay.

18               MS. FORD:  And, Mitch, we can

19        take this down.  Thank you.

20   BY MS. FORD:

21        Q.     And, Mr. Somerville, I would

22   just like to ask you a couple questions about

Page 14

1    the process that was undertaken to search and

2    produce documents for this case.

3          A.     (Nodded head up and down.)

4          Q.     I'm not going to bring these

5    up, because I think we talked about them last

6    time, but, Mr. Somerville, you remember

7    receiving, I assume, requests for production

8    in this case?

9          A.     I do.

10         Q.     Can you describe at a high

11   level how you searched for and identified

12   documents that were responsive to those

13   requests?

14         A.     Yeah.  At a high level or a low

15   level, the definition is probably the same,

16   I scoured through normal search criteria any

17   area that I might have had communication, be

18   that text, e-mail, and then social media

19   platforms.

20         Q.     Okay.  How long did that search

21   take?

22         A.     I don't recall the specific

Page 15

1   amount of time, but I dedicated a significant

2   amount of time to it.

3        Q.    And did anyone help you with

4   searching for documents that were responsive

5   to the requests?

6        A.    I recall reaching out to a

7   couple of individuals, where I did not retain

8   the e-mail, and asked if they could forward

9   them back to me.  And so I -- a few that

10  I did reach out for that.

11            But in terms of actually

12  searching my own materials, nobody helped me

13  with that.

14       Q.    Okay.  Just so I understand

15  that:  It sounds like you had some

16  communications that you no longer -- you

17  didn't have in your own possession but you

18  knew were probably out there, so you --

19       A.    That is correct.  By a matter

20  of standard practice, any large files

21  associated with e-mails, I tend not to retain

22  those e-mails.  That's in my professional and

Case 2:20-cv-00302-SCJ   Document 166-1   Filed 05/17/22   Page 16 of 201

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 16

1   personal practice as well.

2              So where I had any belief that

3   I had sent any, I reached out to folks that

4   they may have them.  And I had some success

5   with that.

6        Q.   Okay.  Were there documents

7   that you knew at one point you possessed that

8   were responsive that you could not find?

9        A.   I don't have any recollection

10  of that.  No.

11       Q.   Okay.  And when you say you --

12  of, like, the large files that you no longer

13  have or possessed, at what point did you

14  delete those files?

15       A.   I don't recall.

16       Q.   Was it after the start of this

17  litigation?

18       A.   I don't recall.

19       Q.   Do you have a memory of whether

20  you deleted those files in December 2020,

21  when you were undertaking this initial

22  investigation and sort of challenge effort?

Page 17

1          A.      Again, I don't recall.  It's a

2    regular maintenance practice of mine.  And

3    these would have been extremely large files,

4    particularly the voter files.  And that's

5    typically the normal practice.

6               Often, it would be shortly

7    after having that piece of communication.

8    But I don't recall a specific date.

9          Q.      Okay.  And have you withheld

10   any documents that you thought were

11   responsive but that you did not produce to

12   us?

13         A.      No.

14         Q.      Okay.  Mr. Somerville, I would

15   like to ask you a couple of follow-up

16   questions about how you conducted your

17   analysis of the Georgia voter files last

18   year.

19         A.      Okay.

20               MS. SIEBERT:  Ms. Ford, I just

21         want to lodge a continuing objection.

22               Of course, Mr. Somerville can

Page 18

1          answer, but a continuing objection to

2          any line of questioning regarding the

3          scope of anything Mr. Somerville might

4          have done with voter files not in

5          conjunction with True the Vote, our

6          continuing objection for the record.

7                    MS. FORD:  Okay.  Understood.

8                    MS. SIEBERT:  Thank you.

9                    MS. FORD:  Thanks, Melena.

10                   Mitch, can we pull up

11         Exhibit [sic] D.  We're just skipping

12         B and C.

13                   THE STENOGRAPHER:  And you want

14         to mark this as Exhibit 2?

15                   MS. FORD:  Yes.  Thank you.

16                   (Somerville Exhibit 2,

17         E-mail string, was marked for

18         identification, as of this

19         date.)

20    BY MS. FORD:

21         Q.    All right.  Let's see.  Derek,

22    are you able to see this -- Mr. Somerville?

Page 19

1          A.     I am.  It's small, but yes.

2          Q.     Okay.  Great.  We might be able

3    to make it bigger throughout points.

4                 Can you just take a second to

5    review this to refresh your recollection.

6          A.     (Document[s] reviewed.)

7                 MS. FORD:  And, Mitch, if you

8          could just scroll down so

9          Mr. Somerville can see the bottom.

10                (Complied.)

11         A.     (Document[s] reviewed.)

12   BY MS. FORD:

13         Q.     Mr. Somerville, do you

14   recognize this communication?

15         A.     I mean, I recognize it.

16   I don't -- I didn't commit it to memory, but,

17   sure, I recognize it.

18         Q.     Right.  Sure.

19                This appears to be an e-mail

20   chain between you and Mr. Davis about efforts

21   to begin analyzing the state's voter

22   registration data.

Page 20

1                    Do you agree with that?

2         A.     I do.

3         Q.     Okay.  At the bottom of this

4    first page --

5                    MS. FORD:  So, Mitch, if you

6         can scroll down.

7    BY MS. FORD:

8         Q.     -- Mr. Davis writes, "Our

9    purpose here is to identify voters who moved

10   across county lines more than 30 days before

11   the election but voted unlawfully in their

12   county.  The investigation has also revealed

13   many out-of-state voters, presumably mostly

14   students, military, et cetera, but some of

15   those are probably also illegitimate."

16                   Did I read that correctly?

17        A.     You did.

18        Q.     Okay.  And, Mr. Somerville, why

19   do you believe Mr. Davis singled out military

20   voters here?

21        A.     Well, I don't interpret him as

22   singling out military voters.  I think what

Case 2:20-cv-00302-SCJ   Document 166-1   Filed 05/17/22   Page 21 of 201

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 21

1   Mark was providing was examples of legitimate

2   reasons why an individual may be registered

3   in a county that they do not reside in.

4   Military being one example of it.

5        Q.     Okay.  And students being

6   another example?

7        A.     And "et cetera," as he

8   indicates there.  There are several scenarios

9   under which that might be legitimate.  Yes.

10       Q.     Okay.  And under that

11  "et cetera" category, who would fall in that

12  category, in your opinion?

13       A.     Well, in my opinion, I guess

14  anybody that our state law and our federal

15  laws permit to live in an area other than

16  where they're registered to vote.

17              So I think the predominance of

18  those, of course, would be, as Mark has

19  indicated here -- which I think is also

20  Mark's -- Mark very clearly stating his

21  intent, which is to not ensnare individuals

22  that are legitimately voting into his

Page 22

1    effort -- but students, military, individuals

2    that have temporarily moved, for temporary

3    purposes.  For example, those that would

4    spend the winter down in Florida might be a

5    good example.

6           Q.    Okay.  And I know we talked

7    about military voters last time, so I won't

8    retread that territory.

9                 But for student voters -- in

10   the list of voter challenges that you and

11   Mr. Davis pulled together, were student

12   voters excluded?

13          A.    To the extent that we were able

14   to identify that they were likely student

15   voters, yes.

16                So obviously there's no record

17   in the voter file that indicates somebody's a

18   student, but where we saw a large number of

19   files from the NCOA that came back to common

20   addresses, you could identify those addresses

21   as being on or near campuses.  And so those

22   were excluded, to my recollection.

Page 23

1          Q.     Okay.  So just to put that in

2     maybe, like, concrete terms:  If you saw an

3     address that looked like a dorm, are you

4     saying that you would have removed that from

5     the challenge list?

6          A.     That's my recollection.  Yes.

7          Q.     Okay.  And who was removing

8     that?  You or Mr. Davis?

9          A.     Well, I'm not aware of all of

10    Mark's activities, but anytime I came across

11    records that appeared to fall within those

12    categories, I removed them as well.

13         Q.     Okay.  And what about

14    individuals, as you mentioned, who

15    temporarily moved?  How did you remove those

16    individuals from the list?

17         A.     Well, I'm not sure we would

18    have clarity into those.  And, again, that's

19    the importance of this process, is our lists

20    were not aimed at removing anybody's ability

21    to vote.  They were aimed at encouraging

22    local boards of elections to confirm that

Page 24

1    those individuals still resided in the county

2    in which they were registered.

3            So this process wasn't a

4    function of trying to remove people, it was a

5    function of trying to engage a process that's

6    already used by the State.

7        Q.    Okay.

8            MS. FORD:  We can take this

9        down, Mitch.  Thank you.

10           And could we please put up

11       Exhibit 5 -- I'm sorry, Exhibit [sic]

12       E.  And I guess that's going to be

13       marked as Exhibit 3.

14           (Somerville Exhibit 3,

15       E-mail string, was marked for

16       identification, as of this

17       date.)

18   BY MS. FORD:

19       Q.    Mr. Somerville, can you read

20   this document?

21       A.    It would help if it got

22   enlarged.  Okay.

Page 25

1          Q.     And this is the only part

2     that's relevant.

3               Are you familiar with this

4     e-mail communication?

5          A.     Again, not committed to memory,

6     but it looks familiar.

7          Q.     Sure.

8               This, to me, appears to be a

9     similar e-mail about analysis that you were

10     engaging in on the lists.

11          A.     Um-hum.

12          Q.     And here, Mr. Davis asked you

13     to do another military scrub.  And in

14     response, you write, at the very top, "Done.

15     No way to catch them all..."

16               Do you see that?

17          A.     I do.

18          Q.     And what did you mean by that?

19          A.     Well, I'm acknowledging the

20     imperfect nature of data files, meaning

21     that -- and by "catch them all" would mean

22     identifying the records that we were looking

Page 26

1    for.

2              For military purposes, for

3    example, and I know that we covered this in

4    the last deposition, we did our best to

5    identify geographies that were associated

6    with military bases.  But there's no way to

7    know if somebody lives -- there's a military

8    person that is assigned to a location that's

9    not associated with a military base.

10             So this is acknowledging that

11   we put forth our best effort.  As we said

12   countless times in public forums, we erred on

13   the side of the voter.  If it looked even

14   remotely close, in this case, to a military

15   record, we excluded them.

16             But certainly there's a

17   military individual that's living somewhere

18   not near a base, assigned to, you know, a

19   military function that we would not have been

20   able to associate with a base.  It's

21   imperfect.  It's data.

22        Q.    And at the end -- by the time

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 27

1   you had finished and pulled together your

2   universe, how confident were you that you had

3   excluded all military voters?

4          A.     Well, "all" is an absolute

5   term.  So I think we just established that

6   it's impossible to work in absolutes with

7   this data.  But I was very satisfied, if not

8   proud, of the lengths we went to make sure

9   that we mitigated as much of those records as

10  we could.

11         Q.     Okay.  Thank you.

12                And why did you think it was

13  important to mitigate it?

14         A.     Well, the intent of this effort

15  from the inception was to highlight data

16  issues inside our voter files, especially --

17  or specifically as it relates to addresses

18  and the failure of the State to maintain that

19  voter file.

20                So one thing we were very

21  cognizant of throughout the effort -- and we

22  were public about this -- is we did not want

Page 28

1    to play into the fervor of the voter fraud

2    narrative at that point in time.

3                We wanted to direct attention

4    to a meaningful and disciplined effort around

5    our voter file, which is something Mark has

6    been studying for 30 years, I believe, maybe

7    more.

8                And we certainly did not want

9    to allege or assert that anybody had done

10   anything illegal.  And we were very public

11   about that.  And I believe every single

12   e-mail that I sent to every volunteer

13   stipulated the same.

14               And so the care and diligence

15   that we took with this data was exceptionally

16   important to us.  Exceptionally important to

17   us.

18        Q.    At the end of the day, you

19   know, by the time you had finalized your

20   universe, can you put a number on how

21   confident you were about your lists putting

22   forward individuals who were registered to

Page 29

1   vote in, essentially, what you contend is the

2   wrong location?

3                 Would you say that your list --

4   it was 99 percent accurate?

5         A.     I would say that we would not

6   have allowed records to be on the list if we

7   were not highly confident.

8                 Again, our guiding principle

9   was to err on the side of the voter.  So

10  I would say that we were into the 90s.  But,

11  again, you know, the reason this effort was

12  necessary, this data is inherently difficult

13  to maintain.  So we know we can't get to

14  100 percent.  But we felt highly confident.

15                MS. FORD:  Mitch, we can take

16        this down.  And could you please pull

17        up Exhibit [sic] F, which I think

18        we'll mark as Exhibit 4.

19                (Somerville Exhibit 4,

20        E-mail string, was marked for

21        identification, as of this

22        date.)

Case 2:20-cv-00302-SCJ  Document 166-1  Filed 05/17/22  Page 30 of 201

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 30

1    BY MS. FORD:

2          Q.     Mr. Somerville, can you please

3    take a moment to look over this document?

4          A.     (Document[s] reviewed.)

5                 Okay.

6          Q.     And have you seen this before?

7          A.     Well, it appears to be my

8    e-mail.  So, yes.

9          Q.     Okay.  And can you explain what

10   this is?

11         A.     Yeah.  It looks like a

12   breakdown of the challenge file based on

13   voter behavior.  And it looks like we

14   identified the Atlanta counties as well.

15         Q.     Okay.  And when you say "a

16   breakdown," are you referring to the

17   challenge universe that you and Mr. Davis put

18   together?

19         A.     Based on the numbers in this

20   e-mail, yes.

21         Q.     Okay.  And that's the -- just

22   to confirm -- 39,141?

Page 31

1          A.      Yes.

2          Q.      Okay.  Whose idea was it to

3    conduct this analysis?

4          A.      Well, it appears to be my

5    analysis.

6          Q.      Okay.  And what was the purpose

7    of conducting this analysis?

8          A.      I carved that data up a

9    thousand different ways.  And so there's a

10   couple of guiding principles -- or several

11   guiding principles when we engaged in this

12   effort.

13               Number one is it was

14   nonpartisan.  So I wanted to make sure that

15   as we compiled our data, that our data was

16   distributed and driven by the conditions that

17   we set forth, which was the change of

18   address, and that there wasn't any particular

19   bias regarding any other factor other than

20   the data.

21               But I'm certainly interested,

22   throughout the process, on how that data fell

Page 32

1    through:  Was it more prevalent in our

2    more -- the NCOA process, was it more

3    prevalent in our more dense counties?  Was it

4    more prevalent in counties that voted one

5    way, voted another way?

6              Again, PivotTables in Excel are

7    very simple, and I wanted to carve that data

8    up and understand it as many different ways

9    as I possibly could.

10             But I -- this is a post facto

11   review.  This is not anything that happened

12   prior to the data, as obviously it's

13   reviewing the final product, which was those

14   39,000 records.  It's informative.

15        Q.    What other -- you mentioned you

16   ran it across a number of dimensions.  What

17   other dimensions did you examine?

18        A.    Well, effectively, with Excel

19   PivotTables, you can cross-reference anything

20   in the file.

21             So we would have run it to

22   check for multiple records.  We would have

Page 33

1    run it -- oh, probably -- that's probably the

2    extent of it.  There's not a lot of other

3    data in there.  Multiple names, multiple

4    records is probably the one that I remember

5    the most.

6              But, again, it's just data.

7    And in my normal professional life, I carve

8    data all the time.  So there's nothing

9    exceptional about this at all.  And this is

10   probably a 10- to 15-minute effort with

11   Excel, at best.

12        Q.    From this e-mail, it seems like

13   you shared this analysis with Mr. Davis.  Did

14   you run tables like this and share other

15   analyses like this with Mr. Davis?

16        A.    I don't recall.

17              And as I look at this e-mail

18   more, you know, again, one of the concerns

19   that we had is we did not want this work to

20   be politicized.  And so had we run this

21   analysis and saw a tremendous lopsidedness in

22   any one direction, that would have been a

Page 34

1    warning flag.  We would have looked deeper

2    into that.

3              So, to me, this -- just running

4    this basic Excel PivotTable would be the

5    normal course of reviewing the data for

6    integrity.

7         Q.     What about conducting this sort

8    of analysis would make you confident in the

9    integrity of the data?

10        A.     Well, this is an Excel

11   PivotTable of the file itself.  So this is

12   just another way of looking at the data and

13   see how it's distributed.

14             I think if we looked at the

15   population in Georgia -- and I suspect

16   I would have compared -- if 55 percent of

17   those challenges are in the counties that

18   comprise Atlanta, that would have allowed us

19   to look:  Does 55 percent of the population

20   in Georgia live in the counties -- in the

21   Atlanta counties?

22             So it gives us anchor points to

Page 35

1    see whether or not there were skewed

2    distributions in one way or the other.

3         Q.     Okay.  And is it fair to say

4    that the voter file itself does not contain

5    this information?  Is that correct?

6         A.     Which information?

7         Q.     Sure.  I'll be more specific.

8              So the voter file, my

9    understanding -- you understand it better

10   than I do, I think -- would contain

11   information about -- obviously about a

12   voter's residency.  But the voter file itself

13   does not tell you how a particular county

14   voted.  Correct?

15        A.     I don't believe it does.

16        Q.     So to produce this sort of

17   analysis, were you bringing in another data

18   set to lay it on top of?

19        A.     I suspect we may have.  Again,

20   this is a long time ago, and I don't recall.

21   I know that the county voter performance is

22   posted -- those files are posted on the

Page 36

1    Secretary of State's office.

2              And so we may very well have

3    balanced that against those.  That would make

4    sense because I don't recall there being --

5    well, there isn't voter behavior data in that

6    voter file, to my knowledge.

7         Q.    Okay.  And how was this

8    analysis used after it was conducted?

9         A.    I believe it was just

10   informative.

11             Again, if there was a

12   significant skew -- for example, if we saw

13   90 percent of these challenges are in, you

14   know, the five or six immediate counties in

15   Atlanta, I would have paused and taken a look

16   at that.  Why would that be?  Why is that

17   disproportionate to the population in the

18   state?

19             So I don't believe that there's

20   any action past this.  This is just

21   informative.  Again, it's very easy to run

22   these cross-tabulated reviews of the data.

Page 37

1      Q.    And was this analysis ever

2   shared with anyone?

3      A.    No, I don't believe so.   There

4   would be no reason to.   Again, this is just

5   after the files are done, just validating the

6   data.

7      Q.    Okay.   And in going back to

8   what you said a moment ago about, you know,

9   that you looked to other dimensions, did you

10  or Mark ever run an analysis on this -- on

11  the racial data, on how it hit across voters

12  by race in Georgia?

13     A.    I'm not aware of Mark's

14  activities, but I did not.

15     Q.    Okay.

16     A.    I'm not aware that the racial

17  data is available, to be perfectly frank.

18     Q.    If you had seen racial

19  disparities, would that have concerned you?

20     A.    It most certainly would have

21  concerned me.   Absolutely.

22     Q.    And so would that have made you

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 38

1    pause before proceeding with the challenge?

2         A.      What it would have made me do

3    is double down and check the data.  At the

4    end of the day, it's a series of conditions

5    in the data that -- what qualified, if you

6    will, for a challenge list.

7                 An individual's ethnicity

8    should not put somebody on or take them off

9    of that list.  But if there was a

10   tremendous -- if there was a deviation from

11   the normal racial distribution in the state

12   that was meaningful, I would have absolutely

13   paused on that, yes.

14        Q.     Okay.  Thank you.

15             MS. FORD:  Mitch, we can take

16        this down.

17             And can we please put up

18        Exhibit [sic] G.  I think this is

19        going to be Exhibit 5.

20             (Somerville Exhibit 5,

21        Text string, Bates Def Somerville

22        000714 to -719, was marked for

Page 39

1          identification, as of this

2          date.)

3    BY MS. FORD:

4          Q.     Mr. Somerville, I believe you

5    produced this, so I believe you've seen it

6    before.  But can you tell me what this is?

7          A.     So that is a text message with

8    a state representative in Georgia,

9    Representative Jodi Lott, I believe.

10         Q.     Okay.

11                MS. FORD:  And, Mitch, can we

12         please scroll to page 6.

13    BY MS. FORD:

14         Q.     Okay.  So in the middle of the

15    page here, Jodi asks, "What was the NCOA data

16    that you sent the other day demonstrating?"

17                And in response, you wrote,

18    "Certifies the date that NCOA process was

19    run; counters the argument of 'you must prove

20    you actually ran NCOA on those addresses.'"

21                Can you explain what NCOA

22    certification you're referring to here?

Page 40

1          A.        My recollection is fuzzy, but

2     I believe that Mark provided a

3     certification -- a physical certification

4     document that validated the NCOA run, the

5     date, the files that were -- the file size.

6                    There's metrics in there, when

7     you run an NCOA on data, that says that you

8     did, in fact, run it and here is, for lack of

9     a better word, a receipt that that occurred.

10                   I believe that that's what I'm

11    referencing here, that we demonstrated that

12    the data that's in question, that the NCOA

13    was certified.  And that certification,

14    I think, again is -- and it may be just a

15    one-pager, but I believe it's a document that

16    Mark provided to demonstrate that the NCOA

17    did, in fact, happen.

18          Q.        Okay.  So just so I understand

19    it:  The point is not just to say that you

20    did an NCOA analysis, it's to sort of prove

21    that you did?

22          A.        Yeah.  To me, it would be

Page 41

1   insufficient to -- for somebody to simply

2   say, "We ran NCOA."  Well, you need to prove

3   that you actually ran.  This is an important

4   process.

5                     Again, it was a very

6   disciplined effort.  And the NCOA results

7   were the basis of our effort.  And so we need

8   to be able to prove that that NCOA process

9   was conducted, it was conducted properly, and

10  it was conducted by an organization that

11  actually does this for a living.

12      Q.    Okay.  And so it sounds like

13  those NCOA certifications were shared with

14  individuals who agreed to submit a challenge?

15  Is that correct?

16      A.    That sounds reasonable, but

17  I don't specifically recall who requested

18  certification and who didn't.  But I believe

19  they were made available.

20      Q.    Okay.  And -- actually, I think

21  that's all my questions here.  We can take

22  this down.

Page 42

1            MS. FORD:  Mitch, can we please

2       pull up Exhibit [sic] H, which will be

3       Exhibit 6.

4            (Somerville Exhibit 6,

5       E-mail string, was marked for

6       identification, as of this

7       date.)

8   BY MS. FORD:

9       Q.    And here, I just have a simple

10   question for you, Mr. Somerville.

11       A.    Um-hum.

12       Q.    This references something

13   called AccuZIP.

14            Are you familiar with the

15   program AccuZIP?

16       A.    Not intimately, no.

17       Q.    Okay.  Can you explain your

18   general understanding of how it works, or are

19   you not familiar?

20       A.    My understanding is there are

21   several platforms out there for conducting

22   NCOA and CASS certification.  And AccuZIP is

Page 43

1    one of those platforms/computer applications,

2    if you will, to simplify the terminology.

3                And it's further my

4    understanding that the organization here that

5    this e-mail exchange is with uses AccuZIP as

6    their method for NCOA and CASS certification.

7        Q.    Okay.  Okay.  That's my only

8    question here.  Thank you.

9                MS. FORD:  Can we please pull

10           up Exhibit [sic] I, and mark as

11           Exhibit 7.

12               (Somerville Exhibit 7,

13           E-mail string, was marked for

14           identification, as of this

15           date.)

16   BY MS. FORD:

17       Q.    Mr. Somerville, have you seen

18   this before?  Or do you recognize it.

19       A.    I don't immediately recognize

20   it, no.

21       Q.    Okay.  Why don't you just take

22   10 seconds to skim it, to make sure --

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 44

1          A.     I have.

2          Q.     Okay.  So this looks like an

3    e-mail chain where someone named Chris Deedy

4    has forwarded you some communications that he

5    had with a USPS representative, Ms. Jackson.

6                 Do you agree with that?

7          A.     That appears to be the case.

8          Q.     Okay.  Who is Chris Deedy?

9          A.     Chris Deedy owns a company

10   called Envelopes & Forms.  And so they

11   perform NCOA and CASS certification on

12   millions of pieces, and they do this every

13   day.

14                So I would consider Chris an

15   expert in large-format mailings and, as a

16   consequence of that, in the use of NCOA and

17   CASS certification.

18         Q.     And what information were you

19   or Mr. Deedy trying to get clarity on in

20   reaching out to USPS?

21         A.     I don't recall.  I'm encouraged

22   that we were engaging the Postal Service.

Page 45

1    But if we were, then it would have been

2    around postal codes, postal detail.

3              But I don't know Brenda

4    Jackson, and I don't recall the specific

5    detail of what we were trying to -- it looks

6    like there's a link in there that might have

7    some additional data, but I don't recall.

8         Q.    Okay.

9              MS. FORD:  Mitch, can we just

10         scroll down to the second page.

11              I'm trying to refresh my own

12         recollection about what is down here.

13         Okay.  So just a fact sheet.

14              Okay.  Mitch, we can take this

15         down.  And can we please pull up

16         Exhibit [sic] J.  And I think this

17         will be Exhibit 8.

18              (Somerville Exhibit 8,

19         Text string, Bates Def Somerville

20         000182 to -442, was marked for

21         identification, as of this

22         date.)

Page 46

1    BY MS. FORD:

2          Q.      Mr. Somerville, is this your

3    production of texts between yourself and

4    Mr. Davis?

5          A.      It appears so.

6          Q.      Okay.

7                  MS. FORD:  And, Mitch, can we

8          do what we did yesterday and put two

9          texts up on the screen.  I'd like to

10         go to two pages.  I'd like to go to

11         page 85 and 86.

12                 (Complied.)

13                 MS. FORD:  Thank you.

14   BY MS. FORD:

15         Q.      And, here, Mr. Somerville,

16   I think you can see a part of the

17   conversation gets cut off, but we continue on

18   the next page.

19                 In this text conversation

20   beginning on December 6th, you sent a text to

21   Mr. Davis stating that you keep getting calls

22   about the under-18 voters and claims that

Page 47

1   there are 60K of them.  And you say you

2   simply don't believe it, and you're not sure

3   how they would get that info.

4             Can you explain just what you

5   meant by this?

6        A.    Well, first, Counselor, I'm

7   disappointed that you didn't point out that

8   I called Mark a stud in the first text, which

9   I did.

10             But to your question, there

11   were so many allegations going around during

12   that time, if you recall from our prior

13   deposition.  I found that extremely

14   concerning, the allegations that were running

15   around.  And I thought and believed then, as

16   I believe now, they were largely baseless,

17   and they were detrimental to the entire

18   state.

19             There were claims at some

20   point -- and I believe these may have

21   surfaced in testimony from individuals down

22   at the Capitol, if my recollection -- again,

Page 48

1    this is some time ago -- that there were, you

2    know, tens of thousands of underage voters.

3              And, number one, I didn't

4    believe it was true, but I simply don't think

5    it's a feasible effort to try to organize

6    tens of thousands of underage voters to vote.

7    But, secondly, the data that I know that was

8    available to the public wouldn't have

9    revealed this kind of information.

10             So, for example, in our data

11   file, we don't have specific birth dates.  We

12   don't have the ability to triangulate in on

13   this.  So I found that claim of the underage

14   voters, then, as I do now, suspicious, at

15   best.

16        Q.    Okay.  Thank you.

17             MS. FORD:  And, Mitch, can we

18        bring up, on the same one, just

19        page 87 and 88.  Should be right after

20        this.

21             (Complied.)

22             MS. FORD:  Thank you, Mitch.

Page 49

1   BY MS. FORD:

2        Q.     So on the same topic:  At the

3   top of the page, it looks like you sent a

4   text message to Mr. Davis saying that you

5   think it's bullshit and that you think that

6   the claim is being made to inflate distrust.

7             Can you explain what you meant

8   by that?  Specifically the part about it

9   being made to inflate distrust.

10       A.     Well, I was suspicious of the

11  motivations of a lot of the actors that were

12  coming into the state and/or were capturing

13  air time and spreading theories about the

14  election issues in the state.

15            And as I indicate here in this

16  text to Mark, I obviously didn't hold those

17  opinions in very high regard.  I believe the

18  motives were self-serving.  I believe

19  individuals were trying to fundraise off of

20  these allegations.  I believe they were

21  perhaps trying to effect political outcomes.

22            Perhaps they were just

Page 50

1   narcissistic, enjoyed the limelight, but

2   I thought that it was dishonorable what so

3   many people were doing.

4               And that's why it was so

5   important to the effort that Mark and I were

6   engaged in, that we were methodical, that we

7   were diligent, that we were mindful of the

8   impact of the work, of the law.

9               But the type of allegations

10  that we're referencing here, underage voters

11  being, you know, just one of many, I thought

12  were absurd.  And I was very frustrated to

13  see it happening.

14      Q.      And these actors that you

15  mentioned, do you include True the Vote as

16  one of those actors?

17      A.      I do not.

18      Q.      Who do you include in that

19  category?

20      A.      Well, the standouts to me would

21  be Lin Wood and the allegations that he was

22  making; Sidney Powell and the allegations

Page 51

1   that she was making; and then there was a

2   whole host of Georgians and grassroots that

3   were spewing theories from shootouts in

4   warehouses in Germany to Italian espionage.

5                 And I found it all sad and

6   embarrassing, frankly.

7        Q.    Okay.  Thank you.

8              MS. FORD:  Mitch, we can take

9        this down.  And can we please put up

10       Exhibit [sic] K.  I think it will be

11       Exhibit 9.

12             THE STENOGRAPHER:  Yes.

13             (Somerville Exhibit 9,

14       E-mail string, was marked for

15       identification, as of this

16       date.)

17             MS. FORD:  Yes, so this

18       definitely will have to be bigger for

19       Mr. Somerville.

20   BY MS. FORD:

21       Q.    So, Mr. Somerville, this

22   appears to me to be an e-mail from someone

Page 52

1    named Mickey Tuck to a group of volunteer

2    challenges about -- generally about

3    challenges that Mr. Tuck made in Floyd

4    County.

5              Do you agree with that

6    interpretation?

7         A.    I don't recall ever seeing this

8    e-mail, so...

9         Q.    Okay.

10        A.    I'm reticent to agree with the

11   interpretation because there's a lot of

12   context -- there's a lot of text in this

13   e-mail.

14        Q.    Sure.

15        A.    But it does -- I'm sorry.

16        Q.    Sorry.  I did not mean to cut

17   you off.

18        A.    I was simply agreeing, that it

19   does appear to be an e-mail from one Mickey

20   Tuck to a number of individuals.  But I don't

21   recognize it.

22        Q.    Okay.  Do you know who Mickey

Page 53

1    Tuck is?

2          A.     I do not.

3          Q.     Okay.  Do you know if Mickey

4    was someone who agreed to file challenges

5    from the list that you and Mr. Davis had

6    prepared?

7          A.     I do not.

8          Q.     Okay.  Do you know why he would

9    have e-mailed you?

10         A.     I do not.  It appears he

11   e-mailed a lot of people in that list, but

12   I don't recognize the name.  I'm sorry.

13         Q.     Okay.

14               MS. FORD:  And, Mitch, can we

15         just scroll down to the second page.

16         I would like Mr. Somerville to see

17         what this was in response to.

18               (Complied.)

19               MS. FORD:  Perfect.  Thank you,

20         Mitch.

21   BY MS. FORD:

22         Q.     So, Mr. Somerville, my

Page 54

1    understanding is that Mr. Tuck was responding

2    to an e-mail that you sent to citizen

3    challengers.

4          A.     Okay.

5          Q.     Do you agree that's what this

6    e-mail is?

7          A.     It appears so, yes.

8          Q.     Okay.  How would someone have

9    gotten on this list of recipients?

10         A.     The most, I guess, logical way

11   is that they would have volunteered to

12   participate in a challenge.

13         Q.     Okay.  And can you think

14   about -- do you know of any other reasons why

15   someone would have been on this list?

16         A.     No.  And he's clearly

17   responding to an e-mail.  There's a lot of

18   e-mails in that To list.  And I'm

19   specifically referencing the individuals that

20   I e-mailed that I don't necessarily recognize

21   those e-mail addresses.  But clearly, he's

22   responding to an e-mail that I sent.

Page 55

1        Q.      Okay.

2                MS. FORD:  And, Mitch, can we

3        scroll back up to the first page,

4        please.

5                (Complied.)

6                MS. FORD:  And the last

7        paragraph of this e-mail, if we can

8        make it bigger, Mitch.

9    BY MS. FORD:

10       Q.      Mr. Tuck writes the

11   following -- and, here, I believe he's

12   talking about the Board of Elections -- "If

13   they were sincere about the integrity of

14   Floyd elections, they could have at least

15   said this list of voters would be reviewed

16   after the election and that if any of these

17   voters on the list voted illegally, that they

18   would be criminally charged.

19                "Putting that statement out

20   there could have at least discouraged anyone

21   voting illegally in Floyd County to not do

22   so."

Page 56

1                    Do you agree with that

2     sentiment?

3          A.      Which sentiment?

4                    Can you be specific in which

5     sentiment?

6          Q.      Sure.

7          A.      There's several points that he

8     makes in this sentence.

9          Q.      Yes.  That is a fair question.

10                    Do you agree with the sentiment

11    that the Boards of Election should have put

12    statements out that if any of the voters in

13    the list voted illegally, that they should be

14    criminally charged?  Or that they would be?

15         A.      No, I don't think I agree with

16    that sentiment.

17                    I think there's a tremendous

18    amount of nuance in the application of the

19    law.  And I think each of these incidences

20    are an individual case and need to be looked

21    at unto the merit of the individual incident.

22                    So I do believe that the County

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 57

1    Elections Board should have minimally

2    reviewed these lists, because I think they

3    were prepared in good faith and under, you

4    know, strict color of law, but I don't think

5    a blanket statement suggesting criminal

6    prosecution of individuals that potentially

7    voted outside of their -- of the county where

8    they're registered is appropriate, by any

9    stretch of the imagination.

10                   I'm absolutely confident --

11   I shared this multiple times, publicly,

12   privately, and certainly in the materials

13   that I've turned over as part of these

14   proceedings, that I'm confident there are

15   plenty of individuals that were unaware that

16   this happened and that a lot of this is a

17   consequence of actions taken by the Secretary

18   of State that drew confusion into the state.

19                   So, again, that's a long-winded

20   way of saying I agree that the boards should

21   have looked at these lists and considered

22   them, but I don't believe in the concept of

Page 58

1    blanket prosecution in pretty much any

2    scenario, I believe.

3         Q.    Okay.  And was it ever your

4    goal to partake in efforts that would lead to

5    the criminal prosecution of any voters?

6         A.    Well, I think there's a

7    spectrum of potential outcomes to this.  The

8    primary one was to draw attention to the data

9    hygiene issues and the impact that they can

10   have.  But where there was a willful and

11   deliberate effort to vote illegally,

12   I absolutely would support that.

13              Again, that disenfranchises

14   every voter in the state.  But, again, those

15   are nuanced efforts.  They need to be looked

16   at individually to understand the actual

17   action.

18              So I don't believe there's a

19   blanket answer to that.  I think each

20   incident needed to be reviewed on its own

21   merit.

22         Q.    Okay.  And just the second

Page 59

1    statement here by Mr. Tuck, that putting that

2    statement out there could have at least

3    discouraged anyone voting illegally not to do

4    so:  Do you agree with that sentiment?

5          A.     Well, I don't know if

6    I understand your question.

7                 So what you're asking me is:

8    If I -- well, let me ask you -- can you

9    restate that question, because I want to make

10   sure that we're very specific about this.

11         Q.     Yes.  Of course I can.

12                And maybe let me rephrase the

13   question entirely.

14                In putting these challenge

15   lists out there, do you think that it would

16   have discouraged anyone who was planning to

17   vote from voting -- actually, let me rephrase

18   that question entirely again.

19                To the extent there were people

20   who planned to vote and should not have been

21   doing so in Georgia, do you think appearing

22   on this list would have discouraged them from

Page 60

1   voting?

2        A.      It's impossible to get into the

3   mind of what -- of an individual who intends

4   to break a state or federal law.

5              So, frankly, I don't -- and

6   that was never our intent.  It was never part

7   of our calculus.  So -- I don't believe so.

8   I believe people -- and this is based on my

9   experience investigating as a federal agent.

10  Right?  I believe people that are committed

11  to breaking the law are going to break the

12  law.

13             But that was not the effort

14  here.  We were looking at data that happened

15  in hindsight.  We were trying to get it

16  addressed as quickly as we could.

17             So I believe this is a

18  statement of a passionate individual in a

19  county, whom I do not know, but I don't

20  necessarily agree with it.

21       Q.    Okay.  Thank you.

22             MS. FORD:  Mitch, we can take

Page 61

1        this down.

2              And can we go back to bring up,

3        I think, what's now been marked as

4        Exhibit 8.

5              THE VIDEOGRAPHER:  I'm sorry.

6        Do you know which letter --

7              MS. FORD:  Yeah, sure.  I think

8        it should be J.

9              THE VIDEOGRAPHER:  I do have

10       the list here as well.  I just didn't

11       see that one.

12             MS. FORD:  And can we go to

13       page 221 and 222.

14   BY MS. FORD:

15       Q.    And, Mr. Somerville, do you

16   agree this is the same text thread message

17   with Mr. Davis that we discussed earlier?

18       A.    It appears so.

19       Q.    Okay.  And at the top of

20   page 222, the second one here, you and

21   Mr. Davis appear to be conducting -- or,

22   sorry, appear to be discussing an

Page 62

1    investigation that the Secretary of State's

2    office is conducting.

3              Can you elaborate on what

4    investigation you're referring to here?

5         A.    I don't recall.  I'm sorry.

6    I don't recall the specific -- and I'm -- let

7    me read this text real quick and see if I can

8    recall.

9         Q.    Sure.  And this is dated

10   May 8th, if that is helpful.

11        A.    Okay.

12             (Document[s] reviewed.)

13             I do not recall the specific

14   investigation that we're discussing here.

15        Q.    Okay.  Is there a universe of

16   possible investigations that you are aware of

17   that this could refer to?

18        A.    Well, it's a very broad

19   question.

20             I'm trying very hard to recall,

21   and, I apologize, I don't -- I just don't

22   recall.  And I'm trying to think of the

Page 63

1   context of May, Christina, and I don't

2   recall.  I'm sorry.

3        Q.    That's okay.  It's been a long

4   year, and very fast at the same time.

5             Have you and Mr. Davis asked

6   the Secretary of State's office to conduct

7   any particular investigations?

8        A.    I'm unaware of Mark's -- you

9   know, what he's requested or what he hasn't

10  requested of the Secretary of State's office.

11            I had some cursory exchanges

12  with a couple of members there, but

13  I don't -- I have never filed a formal

14  request for investigation at all.  So I don't

15  have any -- to my recollection, I don't have

16  any requests, other than that I know that

17  they're very aware of the work that we were

18  doing on the NCOA.

19            And I'm also aware that

20  they -- because of the CASS certification

21  process, which highlights certain conditions

22  around addresses, for example, those that are

Page 64

1    commercial mail-receiving agencies, which are

2    expressly forbidden in our state code, I

3    believe that they were aware of that work as

4    well.

5              But I'm not aware, again, to

6    reiterate, what specifically Mark had

7    requested of the Secretary of State.  And

8    I don't have any formal request of them

9    either.

10        Q.    Have you made any informal

11   requests?

12        A.    I had conversations with the

13   Deputy Secretary of State, but I did not

14   request anything of her.  I had a

15   conversation with the chief investigator but

16   never made any request of her.

17             And I would have had some

18   conversation with at least one investigator

19   in the office, but I don't believe I ever

20   made any requests.  I may have shared data.

21   I'm just trying to recall some of those

22   exchanges.

Page 65

1          Q.      And the chief investigator that

2      you mentioned, what was the content of the

3      conversation with him or her?

4          A.      So it's a her.  And I don't

5      recall her name.  Apologies.  But she reached

6      out to me proactively, in response -- as

7      directed by someone else.  So I believe

8      that -- I don't know who had her reach out to

9      me, but she got my contact information and

10     had requested the data that Mark and I were

11     working on.

12                 I informed her that the data

13     was their data, that the voter file comes

14     from them.  So we had, you know, a brief

15     conversation, but there was never any

16     follow-up or action to it.

17         Q.      Okay.  And just while we have

18     this up, one more question:  In the second

19     page here, you say, "Between the two of us,

20     we've rattled a lot of trees."

21                 And can you explain what you

22     meant by that?

Page 66

1        A.      Yeah.  I'm trying to remember.

2    So is the blue me and -- or is the blue Mark?

3        Q.      The blue -- I believe you

4    produced this, so the blue should be you and

5    the black should be Mark.

6        A.      Okay.  I got it.  I see the

7    word "dude" in blue.  That is most certainly

8    me.

9              Well, let me read this again.

10   One moment.

11              (Document[s] reviewed.)

12              Yeah, again, so if this is me,

13   I don't recall what we're talking about

14   investigating.  But at this point, we would

15   have brought a lot of attention to the data

16   issues in the voter file, most certainly,

17   which were, frankly, not flattering on the

18   performance of the Secretary of State's

19   office.

20              And through the same process,

21   we would have drawn attention to

22   registrations at places I mentioned; for

Page 67

1    example, commercial mail-receiving agencies

2    that are forbidden by law and those kind of

3    conditions underneath Georgia law.  We would

4    have drawn a fair amount of attention to

5    that.

6              So, again, this is recollection

7    that I'm trying to develop while we're

8    speaking, but I suspect what I'm talking

9    about is just the attention that we were

10   trying to bring to this issue, which I feel

11   we did a fairly good job of bringing

12   attention to, to the issues in the voter

13   file.

14        Q.    Okay.  Thank you.

15             MS. FORD:  And, Mitch, can we

16        go to page 137 and 138 of the same

17        exhibit.

18             (Complied.)

19   BY MS. FORD:

20        Q.    Mr. Somerville, I realize we're

21   skipping around, so I do want to orient you.

22   We're back in December 2020, December 15th

Page 68

1   specifically.

2        A.      Right.

3        Q.      And here, Mark says, "The

4   challenge files are out there."

5             And you respond, "10-4.  I have

6   had no luck with our election super.  What

7   was the total count for all the challenge

8   files?"

9             Mark responds, "39,141."

10            And you respond, "10-4.  Let's

11  touch when you're able to discuss next steps,

12  sharing with the public, et cetera."

13            And just to clarify:  This is

14  talking about the challenges that you and

15  Mr. Davis prepared; correct?

16        A.      Correct.

17        Q.      Okay.  Can you explain what you

18  meant by discussing next steps and sharing

19  with the public?

20        A.      Well, again, this is looking

21  back on a conversation in December.  So

22  I don't have a specific recollection of what

Page 69

1    was precisely on my mind at the time, but,

2    you know, we were sharing publicly, you

3    know -- I say "publicly," through social

4    media, that this effort was underway, which,

5    again, I know you're well aware of, as we've

6    produced all of those -- all of that

7    information.

8              And so I suspect that just is

9    how do we -- you know, how do we -- again, at

10   that time -- so we have to remember the

11   context, too; right?

12             So there's a tremendous amount

13   of noise regarding the election at that time.

14   How do we properly frame our effort, if asked

15   about it?  You know, how do we equip others

16   who are engaged, again, like the folks that

17   volunteered, to properly discuss it?

18             I suspect that that's what

19   I intended by that.

20        Q.    And just to --

21        A.    Christina, if I can just add.

22        Q.    Sure.

Page 70

```
 1        A.     You know, we can't overstate

 2   how much vitriol was being spewed at that

 3   point in time.  And I know Mark didn't, and

 4   I certainly didn't, want our effort to be

 5   looped into any of that.

 6               So all of our conversations

 7   about this in the public, you know, I think

 8   needed to be subject to the same level of

 9   discipline as the work itself.

10        Q.     To follow up on that --

11   I completely understand, you know, you -- you

12   were trying to make sure you were not part of

13   the vitriol.

14               Did you have a concern that

15   someone would take this and run with it and

16   it would become part of that narrative?

17        A.     No, no, because I didn't think

18   that we left any room for that.  But, again,

19   there was so much -- it was such a loud

20   period, if that makes sense.

21               And I'm cognizant of the forum

22   here, so I'm trying to be very specific.  But
```

Page 71

1    it was just such a loud forum, and we just

2    didn't want to be part of that.  And we

3    rejected any overtures from anybody who tried

4    to enlist us to be part of any of that.

5              So I think we were very

6    sensitive about how our work was conducted

7    and how it was going to be perceived and how

8    it would be used.

9         Q.    Okay.  And just one more

10   follow-up here, and then I think we might be

11   ready for a break.

12             But here when you say you want

13   to discuss sharing with the public, I just

14   want to better understand what was on your

15   mind here.

16             Was it ever an option to you

17   that you and Mark would just release the list

18   of 39,141 names to the public?

19        A.    No, that's not what is intended

20   here at all.  I don't believe that would have

21   been our intent at any point in time.

22             I think the most likely

Page 72

1    interpretation of this is that we were trying

2    to put pressure on the Secretary of State's

3    office.  The media certainly is one way to do

4    that.  And that might have been part of that

5    discussion.

6              But in terms of -- and I'm not

7    sure I understand what you mean by "release."

8    But I don't have any recollections of any --

9    and I can't imagine we would ever have wanted

10   to, per se, "release."

11             Now, file -- individual county

12   files were made available to individual

13   challengers.  But I don't know that I

14   understand what you mean by "release."

15             But by "public," I think,

16   again, it just comes back to, you know, how

17   we frame our effort and how that effort is

18   used during a time when there's an awful lot

19   of noise in the air.

20        Q.    Sure.

21             And by "release," I just meant,

22   you know, instead of doing a Facebook post

Page 73

1    that says we found 39,000 individuals who we

2    think there should be more investigation of,

3    I mean, you know, you go on Facebook and you

4    actually list the 39,000 individual names.

5                    So that's not something you

6    ever contemplated?

7         A.      There is no scenario under

8    which I would have either contemplated or

9    agreed to anything, nor would have Mark.

10   That would have been too inflammatory, and it

11   would have been counter to the intent of the

12   effort.

13                   So, no, there's no scenario

14   under which we would have considered that.

15        Q.      Okay.  And can you just explain

16   what you mean by "that would have been

17   inflammatory"?

18        A.      Well, I would draw your

19   attention back to, you know, prior testimony

20   and testimony in this deposition.  We readily

21   acknowledged that there were individuals on

22   that list that did not intend to do anything

Page 74

1  wrong.  We also acknowledged that due to the

2  volume and nature of data, it's imperfect.

3  You can't get 100 percent.

4           So there would be no purpose

5  served by putting these names out there.  It

6  would not -- it doesn't fit to any part of

7  what we were trying to do, what we were

8  trying to draw attention to whatsoever.

9           I just -- I don't know what end

10 that would serve with respect to what we were

11 trying to accomplish.

12      Q.    Okay.  Thank you.

13           MS. FORD:  We're a little bit

14      past the hour.  Would now be a good

15      time for a five-minute break for

16      everyone?

17           (No response.)

18           MS. FORD:  Great.

19           Mr. Somerville --

20           MS. SIEBERT:  That's fine.

21           MS. FORD:  -- if you would like

22      more than that, just let me know.

Page 75

1                  THE DEPONENT:  No.  Thank you.

2                  MS. FORD:  Great.

3                  So maybe we'll come back at

4          10:10?

5                  THE VIDEOGRAPHER:  It would be

6          9:10 your time.

7                  MS. FORD:  Sorry.  Thanks.

8                  THE VIDEOGRAPHER:  All right.

9          We're going off the record.  The time

10         is 9:04.  Thanks.

11                 (Recess taken.)

12                 THE VIDEOGRAPHER:  We are going

13         back on the record.  The time is

14         9:12 a.m.

15                 MS. FORD:  Mitch, could we

16         please bring up Exhibit [sic] L.

17                 THE STENOGRAPHER:  This will be

18         marked as Exhibit 10.

19                 (Somerville Exhibit 10,

20         Facebook post, was marked for

21         identification, as of this

22         date.)

Page 76

1              MS. FORD:  If we could make

2         this as big as possible.

3    BY MS. FORD:

4         Q.    So, Mr. Somerville, I assume

5    you'll need a second to review this, so

6    please just take a moment to read it.

7         A.    (Document[s] reviewed.)

8              I recall this.

9         Q.    Okay.  So did you publish this

10   original post on -- it looks like, on

11   December 4, 2020?

12        A.    I did.

13        Q.    Okay.

14             MS. FORD:  And, Mitch, if we

15        can scroll down to the bottom.  Great.

16   BY MS. FORD:

17        Q.    At the bottom of this post, you

18   say, "We need to identify the abusers, start

19   throwing people in jail, and close the

20   loopholes."

21             Did I read that correctly?

22        A.    You did.

Page 77

 1      Q.     Can you elaborate on that

 2   sentiment?

 3      A.     Yeah.  That's probably a little

 4   hyperbole for the platform that it was on.

 5           But I think -- and I think the

 6   statement is pretty clear.  The reality is

 7   that we know that there were tremendous

 8   numbers of these registrations, and often, in

 9   cases, they were drafted in a way to make it

10   appear as if they were apartments, for

11   example.

12           So they would call the mailbox

13   "apartment number," when it most certainly

14   wasn't.  That's a willful act.  That's done

15   deliberately.

16           But, again, that statement,

17   I think, is just more in-the-moment bluster

18   than anything.  Obviously we can't start

19   throwing people into jail.  But it's

20   Facebook.

21      Q.     Did you think your comment

22   might make someone think twice about voting,

Page 78

1    who fell into this category?

2         A.      No, not at all.  Yeah, I don't

3    have that kind of reach.

4         Q.      So this was just shared with

5    your personal friends and audience on

6    Facebook?

7         A.      Well, I don't know how the

8    Facebook algorithms work, so I don't entirely

9    understand, you know, where this stuff goes.

10   But I can tell by the interaction, it doesn't

11   go very far.  I'm not a particularly

12   important person in this discussion.

13            But, again, that's just

14   Facebook bluster.

15        Q.    Okay.

16            MS. FORD:  Can we please pull

17        up Exhibit [sic] M.

18            THE STENOGRAPHER:  That will be

19        marked Exhibit 11.

20            (Somerville Exhibit 11,

21        Facebook post, was marked for

22        identification, as of this

Page 79

1        date.)

2   BY MS. FORD:

3        Q.    And, Mr. Somerville, this

4   appears to be a Facebook post from

5   December 5, 2020.

6              Do you recognize this one?

7        A.    I recognize that I posted it,

8   yeah.  I have to reread a lot of it, but I do

9   recognize it.

10       Q.    Okay.  And here, you appear to

11  be referring to a voter that you've given the

12  name Dave.

13             Does that seem right to you?

14       A.    That does seem right to me.

15       Q.    Okay.

16             MS. FORD:  Can we please scroll

17       to page 3.  I believe we want to keep

18       going.  Okay.

19  BY MS. FORD:

20       Q.    So here, Mr. Somerville,

21  I believe you've written a comment on your

22  own post, and I'll just read it for the

Page 80

1    record, since it won't be on the record

2    otherwise.

3              "P.S.  This is just one guy,

4    one abuser, but we find them everywhere we

5    look.  And because of that, we're going to

6    keep looking.  I believe there are some

7    extremely committed investigators with the

8    SoS's office who are as committed as they

9    come, but the sheer volume of these abuses,

10   coupled with weak laws and weaker

11   enforcement, often ties their hands.

12             "Citizens can help, though.

13   Perhaps we should start outing these abusers

14   by name?"

15             And what was your purpose in

16   writing this comment?

17        A.    Well, I think I need to read --

18   I would have to read what I was responding

19   to, number one, to know what my purpose was.

20             It looks like I'm defending the

21   Secretary of State's office, because I know

22   they were getting a lot of heat.

Page 81

1              I clearly make a statement that

2    there's good people in the Secretary of

3    State's office investigating, when I don't

4    know any of them personally.  So I'm giving

5    them an awful lot of benefit.

6              And I'm just engaging in banter

7    with somebody that I'm not even sure I know

8    who they are, which I don't actually know

9    that person.

10             So can you be more specific?

11   Because there's a number of sentences in

12   there that speak to different things.

13        Q.    Yeah.  Sure.

14             So I'm specifically interested

15   in the -- maybe these last two sentences:

16   "Citizens can help them," referring to the

17   Secretary of State's office.  "Perhaps we

18   should start outing these abusers by name?"

19             What did you mean when you

20   said, "...we should start outing these

21   abusers by name?"

22        A.    I don't think I said we should

Page 82

1    start outing these -- I said, "Perhaps we

2    should start outing these abusers by name?"

3              I think what's instructive is

4    we've never outed anybody by name.  So this

5    is back-and-forth banter, the tone of which

6    it's hard to determine, at what time of day,

7    what was going on, what was happening.

8              Obviously we didn't believe in

9    outing people by name because we never outed

10   anybody by name.  It's also posed as a

11   question.  So I don't -- I don't believe it's

12   anything.

13        Q.    So --

14        A.    Banter on Facebook.

15        Q.    At the end of the day, do you

16   think it would be inappropriate to out voters

17   by name?

18        A.    Well, I think my actions have

19   answered that question already.  We've never

20   done it; we never intended to do it.

21        Q.    So why publish this, then?

22        A.    Publish what, Christina?

Page 83

1        Q.      Publish this comment, which, in

2   my interpretation, at least, is not to one

3   person, but it's just you elaborating on your

4   initial post.

5        A.      Well, the abusers, number one,

6   that I think I'm referencing are the ones

7   that are specifically manipulating the

8   system.  And that's with reference to those

9   commercial mail-receiving agencies.  So

10  that's number one.

11              Number two is it's posed as a

12  question; it's not posed as a statement.  I'm

13  not saying we should.  I'm simply saying

14  perhaps we should.

15              Again, this is -- there's a lot

16  of context here.  There are a lot of things

17  that you say in those contexts that don't

18  necessarily reveal a fundamental base

19  opinion.

20              We've got thousands upon

21  thousands upon thousands of lines of material

22  out there.  You've drawn attention to one

Page 84

1    line in, literally, tens of thousands of

2    pages of context, I'm sure, that posed as a

3    rhetorical question of:  Should we out these

4    abusers by name?

5                    We've never done it, not once.

6    So clearly we didn't think that was the right

7    thing to do.  It's just a rhetorical question

8    in a stream of comments in Facebook.

9    Obviously didn't guide our process because we

10   never did that, nor would we.

11                   MS. FORD:  Can we please scroll

12           to the next page, Mitch.

13                   (Complied.)

14                   MS. FORD:  Sorry.  Actually,

15           can we scroll up just a little bit

16           more?

17   BY MS. FORD:

18       Q.    Mr. Somerville, I know you say

19   you were being hyperbolic here and it was a

20   rhetorical question, but, you know, a

21   response from someone named Kristel Kretchmer

22   is, "Yes!  Out the abusers by name."

Page 85

1          Do you agree it seems that some

2    people took that suggestion seriously?

3          A.    Well, based on what I'm looking

4    at, three people did.  And that's one

5    person's opinion that -- I don't doubt that

6    there's plenty of people that think that all

7    these people should be -- that -- I don't

8    doubt there are people throughout the state

9    that have any myriad of opinions on how

10   things should be handled.  That's not what

11   guided our effort.

12          So I, frankly, don't put a

13   great deal of weight in that exchange.  But

14   I certainly don't know who Kristel is.  And

15   I don't agree with outing the abusers.

16          What's -- at the end of the

17   day, that's not what we did, that's not what

18   we would have done.

19          Q.    Okay.

20          A.    It's hyperbolic.  Exactly.

21   That's exactly what it is.

22          Q.    And, Mr. Somerville, further

Page 86

1    down, about the middle of the way down, you

2    respond to someone named Brandon.

3              And you say, "As Mark states, I

4    would anticipate formal challenges being

5    filed in all counties for those voters who

6    appear ineligible.  If that happens as

7    planned, all documentation will be public."

8              So did you think there was

9    value in publicizing voter information

10   through formal challenges?

11        A.    Well, I'm not sure how you're

12   interpreting that statement.

13             So what I intended by that, and

14   how I interpret it now, is that any challenge

15   that we do -- anytime you engage the

16   government, that material is going to become

17   public record.

18             Now, how the government treats

19   that is beyond our purview, it's beyond our

20   influence.  But I would imagine that any

21   challenge that was filed, obviously that data

22   has to be made public, at least be made

Page 87

1    accessible to people who want it.

2              Certainly I didn't think that

3    the Boards of Elections were going to nail

4    these lists on the front door, and I don't

5    know that they did that.  But I think all

6    exchange with the government ultimately needs

7    to be public.

8         Q.    Did you have any concerns that

9    once these lists became part of the public

10   record, that some of the individuals who

11   engaged in more of the vitriol that you've

12   talked about would take some of these names

13   and run with it?

14        A.    No.  Maybe I'm giving too much

15   benefit to humanity.

16              But, no, I -- number one is

17   what's being -- what's being communicated to

18   the Board of Elections in these challenge

19   files is that an individual has a National

20   Change of Address record.  That's -- that

21   doesn't indicate anything other than there's

22   probable cause to believe that they may have

Page 88

1    moved.

2               So I don't think, number one,

3    that being on that list is inflammatory or

4    incendiary or would incite any type of

5    punitive response, because it's simply -- you

6    know, as much as these proceedings try to

7    have -- you know, use the word "targeted"

8    over and over and over again, there's no

9    people targeted here.

10              Data conditions are targeted,

11   and that is that there's probable cause to

12   believe, as provided for under the NVRA and

13   in our state code, that the individual may

14   have moved.

15              And we have a very, very

16   balanced and very measured process for the

17   Board of Elections to use to follow up with

18   those individuals and determine whether or

19   not they have, in fact, moved.

20              So I've never viewed the

21   Section 230 challenges as an incendiary

22   process, if you will.  And, in fact, I'm not

Page 89

1    quite certain how anybody would know, nor

2    care to know, why somebody was on a challenge

3    list, because the process is benign.

4              It's -- you know, they don't

5    throw people in jail for being on that list,

6    that I'm aware of.  You get a card from the

7    Board of Election that asks you whether or

8    not you moved.

9              So -- and, you know -- and I

10   want to make sure we're not conflating two

11   different issues.  There's the CASS

12   certification that identified addresses that

13   were not legal addresses in Georgia.

14             That's different than the NCOA

15   list that indicated that people had moved on

16   the challenge list, which I believe is the

17   sole basis for the 39,000 individuals that we

18   challenged.

19             But, again, to conclude on this

20   piece:  Going in, finding an individual line,

21   reasonably, you know, as you say, hyperbolic

22   exchange with a complete stranger on

Page 90

1    Facebook, I don't think that's demonstrative

2    of our intent or expectations of outcome.

3    I think our work product speaks for itself.

4         Q.    Okay.  Thank you.

5              MS. FORD:  Mitch, we can take

6         this down.  We finally won't have

7         exhibits for a minute.

8    BY MS. FORD:

9         Q.    Mr. Somerville, I'd like to ask

10   you a couple of questions about your

11   interactions with True the Vote.

12             How many times would you say

13   you've been on calls with True the Vote or

14   any representatives from True the Vote?

15             And I should clarify.  By

16   "calls," I mean a Zoom call, a -- you know...

17        A.    If you will permit me just to

18   think, here.

19        Q.    Sure.

20        A.    It's an impressively low

21   number.

22             (Pause.)

Page 91

1              I can't imagine I've had more

2     than a dozen calls, per se.  And likely much

3     less.  Very limited interaction, in my

4     definition.

5         Q.    And how many times have you

6     directly communicated with Ms. Engelbrecht?

7         A.    Again, an impressively low

8     number of times.

9              I've met once with her in

10    person.  I believe in terms of conference

11    calls, which include related to these

12    proceedings, three -- two or three, maybe.

13    Very few.  And then in terms of one-on-one

14    conversations on the phone, half a dozen,

15    maybe.

16        Q.    And I just want to clarify

17    that.

18             You're not speaking about

19    talking to her in the context of this

20    specific lawsuit; right?

21        A.    No.  I mean at one point, she

22    called and said, you know, "You're going to

Page 92

1    see that you've been named in a lawsuit."

2    You know -- so prior to these proceedings

3    going underway.

4         Q.     Right.

5                Have you spoken with her one on

6    one since then?

7         A.     I don't believe I have, no.

8         Q.     Okay.  Have you ever had any

9    disagreements with anyone at True the Vote?

10        A.     Well, can we clarify "anyone"?

11   Or would you like me to?

12               I'm aware of two people at True

13   the Vote.

14        Q.     So I would include

15   Ms. Engelbrecht in this category.  I would

16   include Ms. Holsworth in this category.  And

17   I guess I can separately ask about Gregg

18   Phillips, who was affiliated but, my

19   understanding is, not officially.

20        A.     Okay.  So, for the record, I do

21   not know that second name.  It's not familiar

22   to me at all.

Page 93

1              So the only interactions I've

2    had with anybody at True the Vote -- and I'm

3    now learning that Gregg is affiliated with

4    but not part of -- is I've spoken with

5    Ms. Engelbrecht and I've spoken with Gregg

6    Phillips.

7              In terms of disagreements --

8    and I'm not trying to be difficult here --

9    can you further qualify here what you mean by

10   "disagreement"?

11       Q.    Sure.

12             Did you ever have differences

13   of opinion on things they did or approaches

14   they were taking, I would say, specifically

15   about the voter challenge effort, you know,

16   starting in the fall/winter of 2020 and

17   onward?

18       A.    Okay.  Thank you for that.

19             You know -- well, I think,

20   first, as is evidenced by our work, we took

21   fundamentally different paths in our approach

22   to the NCOA effort.

Page 94

1                    I think prior testimony,

2     I indicated that we were unaware that True

3     the Vote was engaged in the effort in

4     Georgia, and learned about it kind of at the

5     last minute.  And if my memory serves me

6     correctly, literally maybe the day before the

7     press release.

8                    So we did not have the benefit

9     of understanding nor influencing their

10    methodology.

11                   So that said, with specific

12    kind of regard to your question:  I felt at

13    the time -- I've indicated it in prior

14    testimony and I shared with Catherine, I'm

15    sure -- that I thought that their strategy

16    was broad, in terms of the record count.

17                   Obviously we started with,

18    I think, you know, 580,000, or north of half

19    a million hits on the NCOA, and we whittled

20    that down to 39,000.  And I believe that our

21    approach was the right approach for what we

22    were trying to accomplish.

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 95

1                    It's not the approach that True

2     the Vote took.  So -- but I'm not also

3     privileged to what they were trying to

4     accomplish.

5                    So I guess that's a roundabout

6     way of saying that had we to do this effort

7     over again, we would employ the same level of

8     discipline and same process.  We would not

9     have adopted the approach that True the Vote

10    took.

11         Q.    Okay.  And I guess separate

12    from the challenge lists, in terms of, you

13    know, a strategy for publicity or media, did

14    you ever have any disagreements with them?

15         A.    The only conversation we ever

16    had about media was the press release that

17    they were -- that Mark and I were included

18    in.  But "disagreement" is probably strong.

19    It was just the -- well, let me answer your

20    question first.

21                    So other than that press

22    release where Mark and my name appear, we

Page 96

1   never had any discussion around any other

2   press activities, to my recollection.

3          Q.    Okay.  Thank you.

4                MS. FORD:  Mitch, could we

5          please pull up Exhibit [sic] N.

6                THE STENOGRAPHER:  This will be

7          marked Exhibit 12.

8                (Somerville Exhibit 12,

9          E-mail string, was marked for

10         identification, as of this

11         date.)

12  BY MS. FORD:

13         Q.    Mr. Somerville, this appears to

14  be an e-mail you sent to Mr. Davis.  And

15  I just want you to take a few seconds to

16  refresh your recollection.  And let me know

17  when you're finished.

18         A.    (Document[s] reviewed.)

19               Okay.  For the parts that I can

20  see, I'm good.

21         Q.    Okay.  Great.

22               So this appears to me to be --

Page 97

1    let's start with the first e-mail that you

2    sent on December 16th at 10:22 p.m.

3                    It appears to be an e-mail that

4    you sent to -- we actually don't -- the

5    recipients are blocked out, but it's a

6    message about thanking people for helping

7    with the elector challenges and giving some

8    instructions.

9                    And it appears to me that you

10   forward this to Mr. Davis.  And you said,

11   "FYI, this went out to a few key people to

12   start getting it into the broader networks."

13                   Do you agree with that summary?

14        A.    I do.

15        Q.    Okay.  Can you elaborate on who

16   the few key people were?

17        A.    I'm sorry.  I don't recall who

18   those would have been, nor is there any

19   reason -- I must have just cut this into that

20   document.  I don't -- I don't know who those

21   would have been.  I apologize.  It may come

22   to me as we discuss, but I don't recall.

Page 98

1        Q.      Okay.  And what did you mean by

2    "getting it into the broader networks"?  What

3    networks was that in reference to?

4        A.      Again, this is, you know,

5    over-a-year-old recollection.  I suspect "the

6    broader networks" means the individuals

7    within the counties that intended to

8    volunteer to conduct a challenge.

9        Q.      Okay.

10       A.      Yeah, that "networks" is not

11   media.  Let me be crystal clear, if that's

12   where you're headed.  "The broader networks"

13   would be just the network of, largely,

14   grassroots individuals that wanted to

15   participate in the challenge process.

16       Q.      Okay.

17              MS. FORD:  Mitch, we can take

18          this down.  And if we could pull up

19          Exhibit [sic] 0 and mark this as

20          Exhibit 13.

21              (Somerville Exhibit 13,

22          E-mail string, was marked for

Page 99

1          identification, as of this

2          date.)

3     BY MS. FORD:

4          Q.     Mr. Somerville, if you could

5     just take a few seconds to review.  And let

6     me know when you've at least skimmed it.

7          A.     (Document[s] reviewed.)

8                 Okay.  Thank you.

9          Q.     Okay.  This appears to be an

10    e-mail conversation between you and Mr. Davis

11    about an upcoming True the Vote Zoom call.

12                 Do you agree with that summary?

13         A.     I do.

14         Q.     Okay.  And in this e-mail, you

15    state to Mr. Davis that the call is to talk

16    about next steps.

17                 And what next steps were you

18    referring to?

19         A.     Well, I don't know that I would

20    have actually known what specific next steps.

21    I think, literally, it would have meant

22    learning about what the next steps were.

Page 100

1                    So I'm not entirely certain

2     that we knew what those next steps were.

3          Q.     Okay.   That makes sense.

4     That's a fair point.

5          A.     And, I'm sorry, that sounds

6     like an -- evasive, but it's not.  I don't

7     know.  I think that's probably why we wanted

8     to be on that call.

9                    And if my memory serves me

10    correct, I don't know that we were on the

11    original -- again, we may have learned about

12    the call late.  I just don't recall.  I do

13    recall the call, but I don't recall this

14    specifically.

15         Q.     And here, you say, the call

16    will be attended -- "Will be largely attended

17    as they invited all of their volunteers (many

18    of which were also our volunteers)."

19                    I understand that to mean, at

20    the point of going into the call, you already

21    had some visibility into the fact that the

22    two groups shared at least some volunteer

Page 101

1    challengers.  Is that accurate?

2         A.    That is accurate.  We would not

3    have known what those numbers were, nor did

4    we know the extent of True the Vote's reach,

5    in terms of the number of volunteers.  We

6    just knew that there was some degree of

7    overlap.

8         Q.    Okay.  And when Mark responded,

9    "I'll be ready" to this e-mail, what was

10   he -- I mean, I realize you can't read into

11   Mark's mind, but what did you understand him

12   to be saying he would be ready for?

13        A.    Have you deposed Mark Davis?

14        Q.    I personally have not, but

15   someone else has.

16        A.    Okay.  I'm sorry.  You would

17   understand why I asked that question.

18             Mark Davis is the most ready

19   person I know.  Mark is extremely into data.

20   He's extremely into facts and figures.  And

21   so there's no way for me to scope or frame

22   what he meant by "I'll be ready," other than

Page 102

1    that he'd be on the call.

2           Q.     Okay.

3           A.     And that was my attempt to put

4    some levity into this, and so it failed

5    miserably.

6                  But Mark's a very prepared guy.

7           Q.     And was it your understanding

8    that you would be talking or presenting

9    information on this call?

10          A.     The nature of who I am tends to

11   mean that if I'm on a call, I'm going to have

12   some degree of forum.

13                 So I assumed that I would

14   have -- I would be contributing in some

15   format, but I don't have any recollection

16   that that was -- there was any agenda.

17   I don't have any recollection of having an

18   agenda or knowing exactly what was going to

19   be covered going into that call.

20          Q.     And did you end up attending

21   that call?

22          A.     Yeah, I remember this

Page 103

1   specifically because, number one, I think

2   it's the only conference call that

3   I attended, and likely Mark as well.  I was

4   in my vehicle driving out of state in just

5   pouring rain, so I do remember being on that

6   call.

7          Q.     And what was discussed on that

8   call?

9          A.     Again, it was difficult for me

10   to track because of the environment that I

11   was in at the time.  But my recollection is

12   just general updates about what they were

13   doing.  There was a fair amount of, you know,

14   encouragement, I suppose, Q&A.

15          I don't -- it's too far ago for

16   me to remember the very specifics of the

17   content of the conversation, but it had that

18   general theme.  It wasn't a particularly

19   remarkable call.  It was a pretty standard

20   call that you have a number of people on.

21          Nor do I remember how many

22   people were on it, but I don't think it was a

Page 104

1   very large number.  But I don't have -- but

2   I don't recall entirely.

3        Q.     Okay.  And did you end up

4   speaking on that call?

5        A.     Yeah, I hate to say I would

6   have definitely spoke on the call.  So the

7   short answer is yes.

8        Q.     And what did you speak about,

9   generally?

10       A.     I don't remember the specifics,

11  but I suspect I would have just shared a

12  positive message to those people that were

13  willing to hold their government accountable.

14  But I believe that's probably the extent of

15  what I would have shared.

16       Q.     And can you describe the "next

17  steps" that came out of that call?

18       A.     I don't have any recollection

19  of any next steps that impacted Mark or I.

20              And, again, I think at this

21  point, as I look at the date, December 19,

22  you know, we're still learning who these

Page 105

1   individuals are and what they were doing.  So

2   it was probably more informative for us

3   because, as I've indicated before, you know,

4   we did not influence or participate in what

5   they did.  And I don't recall us having any

6   meaningful next steps with True the Vote.

7                And what I'm looking at,

8   Counselor, is whether or not I lifted

9   language out of Catherine's e-mail on next

10  steps.  But I don't believe Mark and I took

11  any next steps out of this call.

12         Q.    And, I mean, if there were not

13  next steps for you and Mark, were there next

14  steps discussed for other individuals on the

15  call, for other challengers with True the

16  Vote, that you can recall?

17         A.    Well, I don't have any specific

18  recollection, so that's important.  But I'm

19  going to make the same assumption, as I'm

20  sure most would, that the call was

21  informative.  Whether or not it gave people,

22  quote, unquote, marching orders, I don't have

Page 106

1    a recollection of that.

2         Q.    Okay.  Sounds good.

3               And I certainly can sympathize

4    with being on a conference call while driving

5    and trying to keep up.

6               MS. FORD:  We can take this

7         down.  And can we please put back up

8         Exhibit [sic] J, which I think is 8.

9         And can we please bring up pages 158

10        and 159.

11              (Complied.)

12   BY MS. FORD:

13        Q.    So here, Mr. Somerville, these

14   texts are, once again, the ones between you

15   and Mr. Davis.  And these are dated Sunday,

16   December 20th, the same day as the Zoom call

17   we just discussed.

18              Does that seem right to you?

19        A.    Yes, ma'am.

20        Q.    Okay.  And in this particular

21   excerpt, Mark says, "I left the call when it

22   became pretty clear the" -- I think he meant

Page 107

1    "they" -- "didn't want to hear from 'Derek's

2    team,' unless that means you."

3              And you respond, "Yup.  Give me

4    a call.  I didn't care for the tone of it,

5    and I'm sure you know I've never presented

6    any of the work as 'Derek's team.'"

7              And can you elaborate on what

8    Mark is referring to here in your response?

9        A.     I can.  And I remember this

10   specifically.

11             So at a high level, feelings

12   got hurt.  And what I recall -- because,

13   again, I'm driving down the road in the

14   pouring rain.  My recollection is that -- so

15   Mark was on that call.

16             Mark has been working inside

17   Georgia voter data for over three decades.

18   He's extremely passionate about it, he's

19   extremely knowledgeable about it.  And he has

20   a very impressive comprehension that is

21   balanced against the history of that file.

22             And so Mark's a very, very

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 108

1   credible individual.  In fact, by every

2   definition, an expert when it comes to the

3   Georgia voter file.

4               So if Mark is going to be

5   invited to a call that is going to discuss

6   challenges to the integrity of the voter

7   file, if Mark is not asked to speak, I think

8   that's an oversight.  And that's what

9   occurred on this call.

10              And so my recollection is Mark

11  wanted to make a couple points clear on that.

12  And that, number one, was -- and maybe

13  there's one primary one.  So one is:  The

14  fact that he wasn't asked to discuss anything

15  about the voter file that he's been looking

16  at for, you know, over 30 years, I think

17  offended him.

18              I think that, clearly, there

19  was a reference to "Derek's team," which

20  would have implied that he was in a

21  subordinate role to me, which he most

22  certainly is not.  Mark is an expert and I'm

Page 109

1  not, on that data.  Not at his level.

2          But I also think Mark wanted to

3  make clear that there was a distinction

4  between the work that True the Vote was doing

5  and the work that Mark and I was doing, and

6  he wasn't given a forum to do so.  And my

7  recollection is he got frustrated and got off

8  the call prematurely.

9          And then I spent the rest of

10  the night trying to get him to answer the

11  phone and let him know that he's appreciated.

12  I mean, fundamentally, his feelings were

13  hurt, and he was angry.

14     Q.     And why was it important to you

15  and Mr. Davis to make that distinction

16  between your work?

17     A.     Well, I hope that would be

18  evident.

19          We -- the work we were

20  performing was the work we were performing.

21  We had met True the Vote -- and really, by

22  "we," I had met True the Vote only a

Page 110

1    couple days before this, I believe.

2                    And so not having any influence

3    over their work product, not knowing the

4    individuals, not knowing the methodology,

5    versus all the time and effort that we put,

6    all the diligence, they were two distinct

7    efforts that, again, just because of a

8    handful of people in the state, there were

9    some overlap in the volunteers.  Otherwise,

10   we never would have met True the Vote.

11                   So I think Mark was

12   appropriately protective of his work and

13   didn't want it casually mingled in with

14   anybody else's.

15                   And that's not an indictment on

16   True the Vote; it's just I don't think he

17   would have cared to have that work casually

18   mingled in with anybody else's work.  And

19   I agree with him.

20        Q.    Okay.

21              MS. FORD:  And can we just,

22         Mitch, flip to the next two pages.

Page 111

1          I think that would be -- actually, 161

2          and 162 might be...

3    BY MS. FORD:

4          Q.     And here, Mr. Somerville --

5    I think this is likely more of the same, but

6    here, you're just describing that Mr. Davis,

7    you know, says he's pissed as a result of the

8    call and you say you are too.

9                Did you have any other reason

10   for leaving that call pissed off?

11         A.     No.   And I was trying to be

12   sympathetic.   Mark is a -- has a lot of

13   pride, and he's a sensitive guy.   And he's a

14   very, very, very good man.

15               And so that he felt slighted by

16   that call would have been upsetting to me.

17   But it probably was not the right forum,

18   professionally, to try to stop the

19   proceeding, if you will, and say, Hey, Mark

20   Davis wants to be heard.

21               So this is me trying to make

22   him understand that he's appreciated.

Page 112

1   I haven't read the rest of it, but I remember

2   being very sensitive to it.

3              THE DEPONENT:  Counselor, would

4         you mind?  It is 50 degrees in this

5         room.  I have a thermostat on the wall

6         right here.

7              MS. FORD:  Sure.  Yep.  Go for

8         it.

9              THE DEPONENT:  I need to warm

10        this room up.

11             (Pause.)

12             THE DEPONENT:  I think the

13        hotel is trying to send me a message.

14             MS. SIEBERT:  I'm a 54-year-old

15        woman.  I think 50 degrees sounds like

16        the perfect temperature for any room.

17             MS. FORD:  And, Mitch, can we

18        go to page 163.

19   BY MS. FORD:

20        Q.    And so here -- this is kind of

21   circling back to things we discussed before.

22             Here, you say -- and I'm

Page 113

1    looking at the first page here -- "...it's

2    why I was so pissed when I saw their press

3    release and it's also why I was concerned

4    when they shared with me their numbers."

5              And I would just ask you to

6    elaborate on what you meant by why you were

7    concerned when they shared numbers with you.

8         A.    Yeah, sure.

9              And obviously in that post, I'm

10   sure there's -- in that same message, there's

11   other context with respect to Mark and how he

12   felt.  But the initial press release that I

13   received did not acknowledge Mark at all.

14             So that was issue number one,

15   because, again, it's -- it is -- this is

16   Mark's -- I know I stressed this already, but

17   this is Mark's life passion.  This is what he

18   does.  He's incredibly good at it.

19             And I was highly sensitive to

20   the idea -- and it's not necessarily True the

21   Vote's fault.  They would not have known

22   that.  But they met with me, so I become the

Page 114

1    face of the effort.  And that was not my

2    intent.  And I was very concerned about that.

3                  And I was probably using a

4    little bit of heightened language here to

5    show Mark empathy.  But I was certainly

6    concerned -- I mean, not upset.  I'm a combat

7    veteran.  I don't upset the way most people

8    upset.  But I was concerned about the press

9    release mentioning -- excuse me -- me and not

10   Mark.

11                 And, of course, we've never

12   adopted the methodology that everybody should

13   have been included in the challenge list that

14   showed up on the NCOA, although I don't

15   know -- I mean, so many of those are inactive

16   individuals, to begin with, that haven't --

17   you know, again, so I don't know the

18   consequence of that.

19                 It just wasn't the methodology

20   that we would have implemented, and obviously

21   not one we agreed with or we would have done

22   that ourselves.

Page 115

1                    But I think, if you don't mind,

2     as you read into that same text bubble, if

3     you will, meaning that's the same context

4     that I shared with those two messages, is

5     making sure that -- as I say here, that I've

6     been a good vehicle to work that he's done.

7                    So, you know, this is really

8     kind of an effort to empathize with Mark, to

9     calm him down and let him know that, Hey,

10    I appreciate what you do.  I appreciate your

11    expertise.  They may not have understood that

12    or recognized that, and it upset me as well.

13         Q.    That makes sense.

14         A.    And if I may, Christina, I know

15    I'm -- I hate to continue to add to this.

16                    I don't think that that was --

17    I think that was entirely inadvertent, that

18    Mark was -- felt -- you know, that I think

19    Mark was not permitted to speak.

20                    So I don't believe that that

21    was deliberate, by any stretch of the

22    imagination.  I think these are individuals

Page 116

1    that, you know -- that all of us had known

2    each other, literally, for a couple days at

3    that point.

4              So I do want to go on record as

5    saying I don't think that was deliberate.

6         Q.    And by that, you just mean

7    Catherine allowing Mr. Davis to speak on the

8    call, or acknowledgment of his work?

9         A.    Yeah.  Correct.  I don't

10   believe that was deliberate.

11        Q.    Okay.  And can you explain what

12   you meant at the very end of this text when

13   you say, "We're simply pawns to them here in

14   Georgia"?

15        A.    Yeah.  You know, there is a

16   feeling, especially in the -- when you

17   initially meet organizations that come in

18   from out of town, that -- and this is not

19   specific to True the Vote.  I need to stress

20   that.

21              This is the general feeling

22   that I had about this time, where we had all

Page 117

1   of these actors coming in from out of state

2   telling us about our data, telling us about

3   our problems.

4             And I was reasonably suspicious

5   of anybody and everybody that was popping

6   into Georgia all of a sudden to have

7   conversations about the integrity of our

8   elections, when we've been mindful of those

9   for years and years.  And, indeed, Mark has

10  for three decades.

11            And so, you know, there's very

12  much a sense -- and that comment isn't

13  necessarily directed at True the Vote, but

14  just the broader sense of organizations

15  coming in.  They're going to do their thing,

16  they're going to leave, and we're going to be

17  left behind.  And that's just how it is.

18            So that's the spirit in which

19  that was shared.  And I'm probably -- again,

20  you know, I'm taking a bit of a poke at them

21  to empathize with Mark, to get him talking,

22  because he was pretty upset.

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 118

1        Q.     Thank you.

2               MS. FORD:   And, Mitch, can we

3        please go to page 192 and 193.

4    BY MS. FORD:

5        Q.     And, Mr. Somerville, for

6    context, this is a December 31st -- I believe

7    this to be 2020, which is the same date of

8    the preliminary injunction hearing in this

9    case, at the very beginning.

10              Did you watch that hearing?

11       A.     I did.

12       Q.     Okay.  And I just want to read

13   this into the record so that the record

14   reflects what we're speaking about.

15              Here, you say, "I always felt

16   the size of the TTV challenge was too big and

17   was going to invite the argument the

18   opposition is now using to call this

19   systemic."

20              And Mark responds, "The hell of

21   it is they're literally sitting there

22   defending a challenge that didn't even come

Page 119

1    from True the Vote."

2                    And my primary question for you

3    is:  What do you understand Mark to mean when

4    he said "they're sitting there defending a

5    challenge that didn't even come from True the

6    Vote"?

7          A.     Boy, I tell you, these -- I

8    feel old when I start trying to think back

9    just a year-plus.

10                   My recollection is this was

11   related to the challenge maybe in Muscogee

12   County, that there was an effort for an

13   injunction, unrelated to these proceedings as

14   I understand it, and that that challenge was

15   attributed to True the Vote but did not --

16   was not True the Vote's challenge.

17                   That's my recollection, that

18   there are all these cross -- you can't

19   enter -- I'm sorry.  I'm talking with my

20   hands; that doesn't do you any good for the

21   record.  That there's a lot of activity, and

22   it wasn't evident, I think, at the time, to a

Page 120

1    lot of people, who was doing what.

2                 And I believe -- and, again,

3    this is subject to kind of the degradation of

4    my memory over time here -- that this was in

5    relationship to a challenge that was being

6    attributed to True the Vote, and for which an

7    injunction was being sought, but was not True

8    the Vote's challenge.  If that makes sense.

9        Q.    It does.  I know that there

10   were a lot of people filing challenges around

11   this time.

12                Do you know who did file those

13   challenges that Mark was speaking about?

14       A.    I do not.

15       Q.    Okay.

16                MS. FORD:  And can we please

17       pull up Exhibit [sic] P.

18                THE STENOGRAPHER:  This will be

19       marked Exhibit 14.

20                (Somerville Exhibit 14,

21       E-mail, was marked for

22       identification, as of this

Page 121

1        date.)

2     BY MS. FORD:

3        Q.     Mr. Somerville, this is a

4     version of an e-mail we've seen before today,

5     the subject line of which is:  Citizen

6     Challenges:  Update and Encouragement.

7               And you appear to be providing,

8     although we can't see it, some talking points

9     and some background and instructions on the

10    challenges.

11              Does that seem right to you?

12       A.     It does.

13       Q.     Okay.  And in the recipient

14    line, you appear to have included

15    Ms. Engelbrecht.  Do you agree with that?

16       A.     Let me -- we're a size 2 font

17    right now.  Forgive me.

18       Q.     And I'm not talking about the

19    To line.  I'm talking about the CC line.

20       A.     Okay.  I do see her on the copy

21    line, yes.

22       Q.     Okay.  Great.

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 122

1                    Can you explain why

2    Ms. Engelbrecht was included on this e-mail?

3         A.       Absolutely.  I felt then, as I

4    feel now, that we had engaged in a very

5    disciplined process.  And I felt like our

6    messaging, our instruction, and our tone was

7    very responsible, given the environment at

8    the time.  And so I would have copied

9    Catherine to try to influence their tone as

10   well.

11                    And some of these talking

12   points, you know -- unfortunately, I can't

13   scroll down there.  But, you know, there is

14   several points in this e-mail that I thought

15   were important for people that were not from

16   Georgia to read.

17                    THE DEPONENT:  Thank you for

18        that.

19        A.       You know, as you go through

20   there -- because you get the tone of this

21   e-mail, which is, number one, they're

22   permitted by law -- right? -- that this is

Page 123

1    your process.  You know, that the Secretary

2    of State's office themselves had challenged

3    voters during this time who had moved out

4    based on, you know, NCOA.

5                 I make very clear in the point

6    that we have gone to great lengths to

7    mitigate the impact on the military.  And

8    that -- finally, that the victory really is

9    in challenging the government to perform at a

10   higher standard.

11                Those are all -- the tone and

12   text and content of that, as an overarching

13   theme for our challenges, was very important

14   to me.  And I would have copied anybody that

15   I thought that sentiment might influence.

16       Q.     And when you say you were

17   trying to influence the tone here, did you

18   have concerns about True the Vote's tone in

19   relation to the challenges?

20       A.     I didn't, only because we

21   didn't have enough time to understand -- you

22   know, again, I don't -- if you can scroll up

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 124

1    to the date.  I'm sure this came out -- if

2    you don't mind scrolling up to the date.

3                    I mean, by this point -- again,

4    you know, we have literally met

5    Catherine days prior.  And so, you know, my

6    tendency in business, as well, is if we're

7    engaged in something that I think is a good

8    effort, I want to spread that as far as I

9    can, independent of a concern or not.

10                    So I didn't have any concerns,

11   per se, maybe with their tone, but I didn't

12   fully -- to this day, I still don't fully

13   understand the organization or how they

14   operate.

15                    I did think, as indicated

16   before, the size of their challenge was not

17   as targeted -- I don't like that word, so I

18   shouldn't use that word -- wasn't as specific

19   as ours.  And I didn't agree with that, but

20   I've made that perfectly clear.

21                    But I think proactively

22   influencing individuals is as important, you

Page 125

1   know, as responding to concerns.

2          Q.     Okay.  Thank you.

3                 MS. FORD:  And can we pull up

4          Exhibit [sic] Q now.

5                 (Somerville Exhibit 15,

6          E-mail string, was marked for

7          identification, as of this

8          date.)

9   BY MS. FORD:

10         Q.     I promise, Mr. Somerville,

11  we're getting -- there's not an endless

12  number of exhibits.

13         A.     I don't believe you.

14         Q.     We'll see if I can redeem

15  myself.

16                Mr. Somerville, can you just

17  take a moment to skim this and refresh your

18  recollection.

19         A.     Yeah.  Thank you.

20                (Document[s] reviewed.)

21                Okay.  Thank you.

22         Q.     Great.

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 126

1                MS. FORD:  And, Mitch, can you

2          just scroll down so that

3          Mr. Somerville can see the original

4          e-mail.  I think it will be on the

5          second page.  Or third page.

6    BY MS. FORD:

7          Q.    So I just, Mr. Somerville,

8    wanted to orient you to this -- the original

9    e-mail was the "Citizen Challenger" e-mail

10   you sent on the 22nd.

11         A.    Understood.  Thank you.

12               MS. FORD:  Mitch, can you go

13         back to the first page.

14   BY MS. FORD:

15         Q.    So this appears to me to be an

16   e-mail chain between someone named Marci

17   McCarthy and Ms. Engelbrecht about

18   Ms. McCarthy's challenge efforts in DeKalb

19   County.  And you were included on this e-mail

20   chain.

21               Is that accurate?

22         A.    It appears so, yes.

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 127

1       Q.      Okay.  Ms. Engelbrecht mentions

2    at the bottom of her e-mail back to Marci,

3    "...we should all connect either later this

4    afternoon or in the morning to discuss next

5    steps."

6               Was there a call between this

7    group about next steps?

8       A.      Can you clarify what "group"

9    means?

10      Q.      Sure.  Between you, Catherine,

11   and Marci.

12      A.      Thank you.

13              Yeah, and I ask that only

14   because I saw the number of recipients on

15   that e-mail, on the following, was a large

16   number of people.

17              I don't recall being on a phone

18   call with both Ms. McCarthy and

19   Ms. Engelbrecht at the same time.  I have no

20   recollection of that.

21      Q.      Were you ever on a call with

22   Marci?

Page 128

1        A.      Absolutely.

2        Q.      Okay.  And what was discussed

3    on that call?

4        A.      Well, I've had several calls

5    with Marci.  Marci is an active individual in

6    the state, and so she -- we've had

7    conversations on a myriad of topics unrelated

8    to this, just for clarification.  So I do

9    know who Marci McCarthy is.

10             I don't recall if the challenge

11   she's referencing was ours or was True the

12   Vote's, number one.  I don't have any

13   recollection of that.  And I do recall having

14   a conversation with her only because, again,

15   I was out of the state, as is often the case,

16   and she was very upset with how the hearing

17   was handled.

18             I don't remember the exact

19   specifics of it.  Marci is a very passionate

20   person, so it's easy to remember that I had

21   that conversation, but I don't recall the

22   specifics of it.  And I don't recall any --

Page 129

1    ever taking any future actions.

2              And one of the realities of

3    what was transpiring at this time is, you

4    know, individuals were calling or updating

5    me, but it doesn't -- didn't necessarily

6    indicate that there's anything I could do

7    other than just listen.

8         Q.    Okay.  Thank you.

9              And do you remember if there

10   was a sort of individual call with

11   Ms. Engelbrecht after this -- following up on

12   this?

13        A.    I don't have any memory of

14   that.

15        Q.    Okay.

16             MS. SIEBERT:  Ms. Ford, can we

17        take a five-minute break, please?

18             MS. FORD:  Sure.

19             MS. SIEBERT:  Okay.  Thank you.

20             THE VIDEOGRAPHER:  We are going

21        off the record.  The time is 10:04.

22             (Recess taken.)

Page 130

```
 1                THE VIDEOGRAPHER:  We're going
 2         back on the record.  The time is
 3         10:09.
 4                MS. FORD:  Thank you, Mitch.
 5  BY MS. FORD:
 6         Q.    Mr. Somerville, I don't think
 7  I have more than one more hour of questions.
 8                MS. FORD:  Mitch, could we
 9         please go back to Exhibit 8.  That's J
10         for you.
11  BY MS. FORD:
12         Q.    Mr. Somerville, these are just
13  text messages you've seen before, between you
14  and Mr. Davis.
15                MS. FORD:  Can we please go to
16         page 149 here.  149 and 150, go ahead
17         and bring up.
18  BY MS. FORD:
19         Q.    And, Mr. Somerville, I know
20  we've already talked a little bit about this
21  press release, so I don't want to spend too
22  much time on this.
```

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

1                    Here, you say, "I just read the

2     True the Vote press release and I'm pretty

3     pissed.  Trying to get you in there, but also

4     to have it characterize our work

5     differently."

6                    Did I read that correctly?

7          A.     You did.

8          Q.     So in this context, were you

9     aware that True the Vote was going to release

10    a press release beforehand?  Before it was

11    released to the public is what I mean.

12         A.     I was.

13         Q.     Okay.  And what did you mean

14    when you were saying you were trying to get

15    Mr. Davis in there?

16         A.     So I think as we had -- you

17    know, as in previous testimony, Catherine had

18    shared the -- their intended press release,

19    again, if my memory serves me correct, and

20    had added my name in there.  As, of course,

21    there are other Georgians in there.

22                    And I understand why they

Page 132

1    wanted to have the names of Georgians in

2    there, but Mark was conspicuously absent.

3    And I had felt, given the amount of work and

4    his knowledge and his expertise, that that

5    was an oversight.  And "pissed" is probably a

6    strong word at the time, so I'm not quite

7    sure why I chose that word.

8                    But it was important to me that

9    Mark -- if they were trying to acknowledge

10   the work of Georgians that were attempting,

11   you know, to contribute to the integrity --

12   the effort of voter integrity, that Mark

13   Davis's most certainly should have been in

14   there.

15                    And I don't recall how our work

16   was originally characterized, so I don't

17   understand -- you know, I don't recall --

18   I don't recall how they originally

19   characterized it, but clearly, I made that

20   comment as well.

21                    But, yeah, to the extent that

22   I didn't agree with the content, that's what

Page 133

1    I was communicating to Mark.

2          Q.     Do you remember any suggestions

3    that you made to Catherine to change about

4    the press release, other than to put Mark's

5    name in there?

6          A.     You know, I think I gave them

7    guidance or suggestions on how to -- on --

8    not on any of their content, but on adding

9    Mark, you know, what county he would have

10   been from, and the language, you know, that

11   references he and I.

12              I don't remember the specific

13   suggestion I made, but I didn't have

14   contribution to the rest of it.  It just

15   would have been strictly around Mark and

16   myself.

17         Q.     Okay.  And on this next page,

18   150, Mr. Davis responds that he doesn't care

19   about getting credit.  And you say, "Some

20   credit is important because it motivates

21   other citizens."

22              What did you mean by that?

Page 134

1          A.      I believe passionately that

2     citizens need to hold their government

3     accountable.  And I think anytime that you

4     engage in a -- again, a disciplined process

5     and you conduct yourself appropriately, you

6     can encourage other people that are motivated

7     by good intent to do the same.

8                    And so, you know, I wanted to

9     make sure, as I always do, that we're

10    cognizant of the fact that you can inspire

11    other people to engage.  And that's exactly

12    what was needed here; it's needed in a myriad

13    of topics relative to the government.

14                    So that's pretty consistent

15    with just my general take on how to conduct

16    yourself publicly and why you should get

17    involved and the impact that that can have on

18    other people.

19          Q.      And just to follow up:  Here,

20    in the first part of your text, you write,

21    "They are challenging 400K records."

22                    What was the purpose of

Page 135

1    mentioning that figure in this discussion

2    about the press release and who was getting

3    credit?

4         A.     Well, I don't think that

5    that -- so I think that those were

6    independent -- completely independent

7    thoughts.

8              "They are challenging 400 [sic]

9    records" is probably just letting Mark know

10   that, you know -- I mean, that's kind of

11   probably a wow moment.  Wow, that's much

12   larger than, you know, what we had intended

13   to do.

14             I think that's independent of

15   the "some credit."  I think, that, I'm

16   addressing his quote that he put in his

17   e-mail -- which is attributed to the wrong

18   person, but that's okay -- around how he

19   didn't want any credit.

20             I think those are two

21   completely independent thoughts.

22        Q.    Okay.

Page 136

```
 1              MS. FORD:  Mitch, can we please

 2         go to 189 and 190.

 3   BY MS. FORD:

 4         Q.    Mr. Somerville, would it be

 5   helpful if you had the date here?

 6         A.    It would be a little helpful,

 7   yes.

 8         Q.    Okay.

 9         A.    Thank you.

10              MS. FORD:  Can we go back until

11         we find a date.

12              THE DEPONENT:  There you go.

13   BY MS. FORD:

14         Q.    December 30.

15         A.    Thank you.

16         Q.    Great.

17              So here, Mark writes to you,

18   "Derek, we need to stop this.  If they

19   publish, they will be flooded with defamation

20   complaints.  It will" -- "it with exhaust

21   their resources and they aren't unlimited.

22   We can do this after the election with a
```

Page 137

1    limited lists once we're literally sure of

2    our research."

3              And you say, "Call her," and

4    provide Catherine Engelbrecht's number.

5         A.    Um-hum.

6         Q.    Can you explain what this

7    conversation is about.

8         A.    Okay.  And, again, this is

9    subject to some degradation over time.  But

10   my recollection is at some point -- and I'm

11   going to be -- you know, again, I don't

12   have -- I don't recall all the specifics.

13   I think this is a very brief moment in time.

14             But I believe at some point an

15   idea was surfaced by True the Vote to create

16   a website that would put all of the voter

17   data file in there, all of the -- again, this

18   is subject to my recollection, so this may

19   not be 100 percent accurate.

20             But to put all the voter file

21   data in there -- which is publicly available,

22   but NCOA data and other data -- and equip

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 138

1   citizens to go in there and investigate, you

2   know -- basically do what we were doing.  But

3   just hand everything over to everybody and

4   give them an easy platform to check on their

5   neighbors, for example, is kind of what my

6   recollection of it is.

7                  And, you know, obviously in the

8   testimony from this and the prior deposition,

9   you know, make this clear, that that's not a

10  strategy that's consistent with any of the

11  methodologies that we believed in or that we

12  thought would add value.

13                 And so I know Mark had a great

14  deal of concern about this.  And, again,

15  because it's completely counter to what we

16  were trying to accomplish.  And he wanted to

17  make sure that Catherine knew that he was

18  extremely concerned about that.

19                 I do not know if that concept

20  ever manifested into anything tangible.  So

21  I don't know if a website was ever created.

22  I don't know if it was ever done.  I don't

Page 139

1   know -- I don't recall if that was just a

2   crazy idea, as throwing up ideas that were

3   horrible ideas is fine, as long as you don't

4   act on them.

5               I don't recall that, but I do

6   know that it -- Mark had some significant

7   concern about it, and thus, I said, Well,

8   then call her and talk to her.

9       Q.     And how did you first learn

10  about this possible website?

11      A.     I don't recall.  But I feel

12  like, you know -- you'll note in the text,

13  there's no buildup to it in the text message.

14  So, you know, I suspect that Mark and I were

15  on the phone.  And I feel that I may have

16  learned about it from Mark.

17              I don't entirely recall, but if

18  you look at the tone in that text -- and

19  there's nothing preceding it that says, Hey,

20  they're thinking about doing that -- very

21  clearly, we must have been in a conversation.

22  And he ruminated on it and then sent me that

Page 140

1    text in some relative proximity to that

2    conversation.

3              But I feel like that might have

4    been something I learned from Mark, but

5    I don't recall.

6        Q.    And did you ever discuss this

7    website idea with True the Vote?

8        A.    I don't believe I did.

9        Q.    Okay.  So since this

10   conversation with Mr. Davis, have you ever

11   had a follow-up conversation about the idea

12   for this website, or the website itself, with

13   anyone?

14       A.    No.

15       Q.    Okay.

16       A.    Not to my recollection.

17   I don't -- this -- again, as I stated, this

18   feels like it was a very brief flash.  So

19   I don't recall anything beyond this, nor ever

20   having any conversation with anybody else

21   about this.

22       Q.    Okay.  And just to -- I

Page 141

1    understand that you don't know very much

2    about this website, but was your

3    understanding that it was going to be used to

4    publish the names of individuals that True

5    the Vote had already challenged or that its

6    function would be to take the voter file --

7    the full voter file and allow individuals to

8    run their own queries on it?

9          A.    That would be complete

10   conjecture on my part.  I don't have any

11   recollection of how this was going to work,

12   what it was purported to do.

13               Yeah, I'm sorry, but I just

14   don't have any recollection of it.

15         Q.    Okay.

16               MS. FORD:  We can take this

17         down.  And, Mitch, could we pull up,

18         please, Exhibit [sic] R, which I think

19         will be 16.

20               (Somerville Exhibit 16,

21         Facebook Messenger printout, Bates

22         Def Somerville 000162 to -163, was

Page 142

1         marked for identification, as of

2         this date.)

3              MS. FORD:  Yes, we'll

4         definitely have to make this bigger.

5         A.     Thank you.  I can see it.  It's

6    small, but I can see it.

7    BY MS. FORD:

8         Q.     So, Mr. Somerville, this

9    appears to me to be a private Facebook

10   Messenger conversation with someone named

11   Rebeckah Bennett.  Is that correct?

12        A.     Yes, ma'am.

13              MS. FORD:  And can we scroll

14        down to page 2.  Okay.  Thank you.

15   BY MS. FORD:

16        Q.     And here, in the middle

17   message, the blue message that you wrote,

18   Mr. Somerville, I'm just going to read it in

19   for the record.

20              Here, you write to Rebeckah,

21   "The GOP was supposed to help us..."

22              And can you elaborate what you

Page 143

1   meant by that?

2        A.     So the -- a critical part of

3   our process was actually identifying

4   volunteers in individual counties that would

5   want to participate in these challenges, as

6   is required by law.

7             The GOP that I'm referencing,

8   I believe, is the 9th District of Georgia's

9   GOP, who had offered -- who I already had a

10  pretty familiar -- I'm not a member of, but I

11  have a familiarity of the number of people.

12  It's the part of Georgia that I live in.

13            And they were going to help

14  identify individuals to participate in those

15  challenges.

16       Q.     And did they ultimately provide

17  that help?

18       A.     No.

19       Q.     Okay.  And here -- sorry.  Let

20  me find it.  I read these a while ago.

21            In this same message, you

22  mention -- I'll just read the full thing for

Page 144

1   the record.  "The GOP was supposed to help

2   us, but True the Vote was doing a similar

3   effort.  I think people got confused and many

4   committed to helping the out-of-town group,

5   and we got left a bit empty-handed.

6             "We coordinated with True the

7   Vote, so they didn't mean to do it, and

8   they're good people, but it happened."

9             And what did you mean here when

10  you said "We coordinated with True the

11  Vote..."?

12      A.    I think that we just talked to

13  them and realized that wires had been

14  crossed.  You know, "coordinated" is a very

15  strong term, and I don't know the date on

16  this, but obviously I had literally met with

17  Catherine once, probably, by the time that

18  this communication happened.

19             And so "coordinated" -- this

20  was acknowledging talking to them and

21  realizing:  Okay.  You guys are here, which

22  we didn't know.  You have a bunch of

Page 145

1    volunteers that we thought were going to be

2    our volunteers.  Okay.  Now what?

3              That's the extent of it.

4        Q.    Okay.

5              MS. FORD:  We can take this

6         down.  And can we please pull up

7         Exhibit [sic] S.  I think it will be

8         17.

9              (Somerville Exhibit 17,

10        Facebook Messenger printout, Bates

11        Def Somerville 000160 to -161, was

12        marked for identification, as of

13        this date.)

14             MS. FORD:  And if we can make

15        this bigger as well.

16             THE DEPONENT:  Thank you,

17        Ms. Ford.

18             MS. FORD:  I can't read this

19        either.

20             THE DEPONENT:  Okay.

21   BY MS. FORD:

22        Q.    Mr. Somerville, this appears to

Page 146

1    me to be a similar private Facebook Messenger

2    conversation with somebody named Pamela

3    Reardon.

4                Does that seem right to you?

5         A.    It does.

6         Q.    Okay.

7                MS. FORD:  And can -- is there

8         a second page to this, Mitch?

9    BY MS. FORD:

10        Q.    So here -- on December 18th,

11   2020, here, you write to Ms. Reardon, "True

12   the Vote will be dropping a big challenge

13   soon too.  This is likely to overwhelm the

14   boards."

15               Can you explain how you were

16   aware that True the Vote was planning on

17   dropping challenges, as you say?

18        A.    Well, again, I don't remember

19   the specific -- I can see the date there,

20   December 18th, 2020.

21               I'm assuming, by then, I had

22   met with Catherine and Gregg, which I don't

Page 147

1   remember the exact date, but I think happened

2   a couple days before then.

3               And I would have learned in

4   that meeting -- well, number one, I learned

5   that they were dropping challenges -- by

6   "dropping challenges," I mean producing

7   elector challenges.

8               By December 18th, I would have

9   already known that because I had already been

10  introduced to Catherine.

11      Q.     Okay.  And what did you mean

12  when you said "This is likely to overwhelm

13  the boards"?

14      A.     The idea that you -- well,

15  I meant that literally, that those boards

16  couldn't possibly be equipped to work through

17  that many allegations.  Even now, I'm not

18  sure how they would have done that.

19      Q.     And was that impression based

20  on your personal experience with filing

21  challenges or just, like, kind of common

22  sense to you?

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 148

 1        A.     No.   Just a common sense.

 2    400,000 challenges is a lot.   And so, yeah,

 3    there's no science behind that.   That's just

 4    an observation that that's an overwhelming

 5    amount of work.

 6        Q.     Okay.

 7               MS. FORD:   We can take this

 8        down, Mitch.

 9               And can we please pull up

10        Exhibit [sic] T, which I think will be

11        Exhibit 18.

12               (Somerville Exhibit 18,

13        Text string, Bates Def Somerville

14        000720 to -727, was marked for

15        identification, as of this

16        date.)

17    BY MS. FORD:

18        Q.     And, Mr. Davis, I'd like to --

19    I'm sorry.

20               Mr. Somerville, I'd like to

21    switch to just kind of an entirely different

22    topic here, which is your communication with

Page 149

1    the Secretary of State's office and

2    employees.

3          A.     Um-hum.

4          Q.     So this is a message with

5    someone named Jordan.  Is that Jordan Fuchs?

6          A.     That is -- yeah, Deputy

7    Secretary of State Jordan Fuchs.

8          Q.     Okay.  And this is from -- it's

9    a little blurry, but it looks like

10   December 6th, 2020?

11         A.     That looks -- I see the same

12   thing.

13         Q.     Okay.  How did you first get in

14   touch with Ms. Fuchs?

15         A.     I don't recall.

16                So by the nature of, you

17   know -- well, I don't even know how to

18   explain this.  I know a lot of people in my

19   state.  And I know a lot of elected officials

20   in my state, and a lot of those elected

21   officials know me, and probably for pretty

22   good reason.

Page 150

1                       And I suspect that -- again,

2      I don't -- I would not have initiated contact

3      with Jordan Fuchs.  So I don't believe I did.

4      I believe that she reached out to me, but

5      I don't have the exact recollection of the

6      genesis of our interaction.

7           Q.     Okay.

8                  MS. FORD:  Can we scroll down

9           to the second page, I believe.

10          Thanks, Mitch.

11     BY MS. FORD:

12          Q.     So, here, Jordan is talking

13     about list maintenance, how it was highly

14     regulated.

15          A.     Right.

16          Q.     So it sounds like you had --

17     had you had a prior conversation with her

18     about list maintenance in the state?

19          A.     I'm sure we did, because I know

20     I had at least -- I know I had at least one

21     telephone conversation with her.

22                 So -- and in that same text

Page 151

1   message you're saying, you know, "the

2   opportunity to discuss our side of things."

3   So I took Jordan to be defensive of the

4   Secretary of State's office, when we were

5   very clearly and very publicly critical of

6   the Secretary of State's office.

7            And my recollection is that's

8   the -- that's the context surrounding that

9   message to me.

10      Q.    Okay.  And just to back up,

11  even outside of these texts.

12            So were you having

13  conversations with the Secretary of State's

14  office in December 2020 about the issues that

15  you've identified in this litigation about

16  list maintenance?

17      A.    I don't -- well, so no formal.

18  As we had indicated in the onset of today's

19  deposition, I don't recall any formal

20  conversations with the Secretary of State's

21  office at all.

22            And I believe that Ms. Fuchs

Page 152

1    became aware of what we were doing through

2    social media, because I suspect that she was

3    following me at the time.  And -- but

4    I don't -- and she was well aware that we

5    were highly critical of the State of that

6    voter file and that it reflected upon her

7    administration.

8                    But I didn't have any --

9    I don't recall any formal -- we never sat

10   down, we never met, we never presented data.

11   We never had any type of proceeding with them

12   at all.

13        Q.    Okay.  And here, when she says,

14   "I welcome the opportunity to show the public

15   what we can and cannot do related to clean

16   voter rolls," what do you take that to mean?

17        A.    I mean, I view that now as I

18   did then.  I view that as being defensive.

19                    I still question the Secretary

20   of State's office's experience and competency

21   on this topic.  Ms. Fuchs has no prior

22   experience working in that sort of forum with

Page 153

1   that volume of data, nor does the Secretary

2   of State.

3              So I'm sure she would have

4   welcomed the opportunity to show the public

5   what they can and cannot do, but the reality

6   is:  What we were engaged in was fully

7   supported by both federal and state law.

8              So I view this as -- I view the

9   exchanges with Jordan as her effort -- her

10  political effort to defend the office.

11       Q.    Okay.

12            MS. FORD:  And can we scroll

13        down to the fourth page, please.

14  BY MS. FORD:

15       Q.    And, Mr. Somerville, if you'd

16  like to go back to page 3 for context, just

17  let me know.

18       A.    Okay.

19            MS. FORD:  I think we might

20        want to go one more page.  Or perhaps

21        not.  Here, let me bring up -- sorry.

22        Let me bring up my own copy, and then

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 154

1       I can tell you what page I'm looking

2       for.  One second.

3               (Pause.)

4               MS. FORD:  Okay.  I'm sorry.

5       Page -- oh, it is page 4 on a PDF, but

6       it is not the fourth text.

7               Mitch, if you can scroll, I

8       can -- make this larger and scroll, I

9       can find it.

10              (Complied.)

11              MS. FORD:  Okay.  Keep going.

12      Sorry about this.

13              Keep going.  Okay.  Perfect.

14   BY MS. FORD:

15      Q.    So here, your conversation with

16   Ms. Fuchs, you say, "I remain concerned about

17   the NCOA results but do not trust all these

18   other numbers and intend to start speaking

19   out against them."

20              Can you just clarify what NCOA

21   results that you were referring to?

22      A.    Yeah.  So the NCOA results that

Page 155

1    form the basis for all of Mark and my effort,

2    the change of address files.  And part of our

3    analysis of the Georgia data -- or the

4    Georgia voter file suggested that the NCOA

5    process had not been run for quite some time,

6    which we found very concerning.

7                    I think if you'll recall from

8    previous testimony, you know, it was our

9    position that COVID and the impact it had on

10   the use of absentee ballots and the Secretary

11   of State's office's decision to send, you

12   know, 6.9 million unsolicited absentee ballot

13   request forms through the data file that had

14   not been cleansed in some time created a

15   tremendous amount of confusion.

16                   And I thought it was

17   unnecessary and reckless and could have been

18   avoided.  And it did create a great deal of

19   confusion; it did overwhelm the system.

20                   And so the NCOA results would

21   have been referencing, in a very limited

22   number of words, that entire ecosystem of

Page 156

1    issues that the Secretary of State's office,

2    I felt, was responsible for.

3        Q.    Okay.  And when you said you do

4    not trust all these other numbers, what was

5    that a reference to?

6        A.    Yeah.  That is a reference to

7    the utter lunacy of allegations that were

8    being made by the individuals I reference.

9            Giuliani's team is referenced

10   further down in that text message, as you can

11   see.  Lin Wood's team, Sidney Powell's.

12           And it's worth noting, all

13   those groups reached out to us, made contact

14   with us, and tried to enlist us into their

15   efforts, and we found none of their work

16   credible.  We didn't find their motivations

17   credible.

18           And I started taking a very

19   unpopular stance as a Republican in my

20   state -- a very moderate one, I would say --

21   to go and publicly speak out against what

22   these individuals were saying about the

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 157

1   election.

2              And obviously I'm going on

3   record with the Secretary of State's office,

4   telling them that we did not agree with

5   the -- what was being said again.  So that

6   specific reference to the underage voters,

7   specific reference to the compromised machine

8   theories or uncompromised machines and

9   foreign involvement.

10             And if you don't mind, for the

11  record, earlier in that exact same text

12  bubble, so within the same stream of

13  discussion, explaining to the Secretary --

14  the Deputy Secretary of State that we have no

15  interest in being recklessly inflammatory or

16  controversial.

17             So, yeah, that's what we meant.

18  All of that vitriol and divisive language

19  that wasn't ultimately supporting the

20  election integrity in the context of what's

21  right for the entire state of Georgia, that's

22  specifically what I meant.

Page 158

1          Q.     Okay.  Thank you.

2                 And I don't think we need to

3     find the text, but later on down, Ms. Fuchs

4     asks for a time to chat with you.

5                 Did you ever have a follow-up

6     call with her?

7          A.     I did not.

8          Q.     Okay.  So you haven't spoken to

9     her separately from these text messages,

10    since?

11         A.     No.  As I indicated before, we

12    had a couple of brief phone conversations,

13    but nothing of significant -- you know,

14    nothing of significance.

15                I think there were efforts to

16    coordinate.  I also think that there were

17    efforts for, you know, again, the Deputy

18    Secretary of State to kind of feel me out, if

19    you will.  But there was never any follow-up

20    to any of it.

21         Q.     Okay.  And what do you -- can

22    you just explain what you mean by "efforts to

Page 159

1  coordinate"?

2       A.    Well, as I indicated earlier,

3  we were being, and continued to be, highly

4  critical of the decisions that were made by

5  that office, and their execution.  And so

6  I think it's Politics 101 to try to figure

7  out, you know, why are these people being

8  adversarial and can they get ahead of it.

9            That's how I interpreted those

10  overtures.

11       Q.    And did you or Mark make the

12  Secretary of State's office aware about your

13  intention to file challenges before you did

14  so?

15       A.    I can't speak for Mark because

16  I'm not aware of the interaction that he had

17  with the Secretary of State's office, and

18  I don't have any recollection of it.

19            I know he's got relationships

20  with individuals there that I do not, but

21  I don't have any recollection of Mark's

22  activities with the Secretary of State's

Page 160

1    office.

2              I'm quite certain, though,

3    that -- and I don't ever recall, by the way,

4    indicating to them that we were going to file

5    challenges, but I'm certain they were aware.

6         Q.   Okay.  Let me see if I have any

7    more questions on this.

8              (Pause.)

9              MS. FORD:  Can we please,

10        Mitch, go to 119 and 120 of the same

11        exhibit -- I'm sorry, not this

12        exhibit, Exhibit 8, or J, the text

13        between Mr. Davis and Somerville.  And

14        we're looking for 119 and 120.

15             Thank you.

16   BY MS. FORD:

17        Q.   So here, Mr. Somerville,

18   I interpret this to be a text with Mr. Davis

19   in response to a conversation you had with

20   the Secretary of State's office saying they

21   really want to meet.

22             Is that a correct

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 161

1    interpretation of that?

2        A.    I'd have to look at the dates

3    to see if they align.  So I'm not comfortable

4    affirming that interpretation because I don't

5    know if the dates align.  But I would have

6    certainly informed him that -- and I'm

7    reading as I'm talking -- that she was

8    reaching out to me.

9              You know, in page 119, it looks

10   like Mark, in very colorful language, is

11   referencing an open records request that he

12   had made.  And I know that he was frustrated

13   because they kept dragging their feet on it.

14             So it's reasonable, in that

15   context, to assume that I was letting him

16   know that she -- and that would be Jordan

17   Fuchs, but I'd probably have to reacquaint

18   myself with more context.

19       Q.    Sure.

20             And just so -- I realize this

21   is small, so we've all read it.  Here, it

22   looks like you've screen-shotted something

Page 162

1    from Ms. Fuchs that says, "Looks like we all

2    keep missing each other.  Derek, can you nail

3    down a time and day when you can come into

4    the office to discuss your findings?"

5         A.    Yep.  My apologies --

6         Q.    No, that's okay.

7         A.    -- Ms. Ford, I did not see that

8    at all.  So that's precisely what I did --

9         Q.    Okay.

10        A.    -- because there's the text.

11   So thank you for that.

12        Q.    Okay.  Great.

13             And what findings was she

14   referencing here that she wanted you to come

15   in and discuss?

16        A.    Well, so I don't know, because

17   I can't get into her head.  But as has been

18   produced as part of these proceedings to you

19   and your team, we were publicly sharing data

20   anomalies that we were finding in that file

21   along the way.

22             So I can only assume that what

Page 163

1   she's referring to as "findings" is what we

2   were finding in the data file.  Significant

3   NCOA numbers, commercial mail-receiving

4   agencies that we spoke about earlier,

5   anomalies like that.

6       Q.    Okay.  So essentially the same

7   concerns that motivated your NCOA

8   investigation and compilation of the

9   challenge list.

10      A.    Again, my reticence to answer

11  in the affirmative is I don't know what she

12  was specifically referencing to.  I don't

13  know if she followed all of our materials or

14  some, if she was interested in all or some.

15  But, very clearly, she was interested in what

16  we were doing.

17            And, again, then, as I do now,

18  I interpret that more as the Secretary of

19  State's office trying to engage in damage

20  control, because we were being critical of

21  their work.

22      Q.    Okay.  And it sounds like, to

Page 164

1    me at least, you were sort of hesitant to

2    meet with her.  Is that fair?

3          A.      I questioned what value was

4    going to come from it, because the data that

5    we were reviewing is provided to us by them.

6    So I found it somewhat ironic that they were

7    asking for our help to review data that they,

8    in fact, produce.

9                  So I was cynical, at best, of

10   what their intentions were or what was going

11   to come from it.  And time being as valuable

12   as it is.  And then, of course, schedules,

13   you know, honestly were not lining up.  I was

14   out of the state an awful lot.

15                 And, thus, I think, too, in

16   that same context, now -- and, again,

17   I appreciate the opportunity to read this

18   because it brings back some memories.

19                 You know, Mark was waiting for

20   an open records request that had been in for

21   quite some time.  The content of that

22   request, I don't -- I didn't have visibility

Page 165

1   into.  And so I think that we were a little

2   bit suspect of what their intents were and

3   what good can come from a meeting anyways.

4        Q.    Okay.  And out of my own

5   curiosity, when you say that "Let's send Clay

6   to the meeting," who is Clay?

7        A.    Clay -- well, so for the

8   record, it's absolutely irrelevant to all of

9   this.  It's an inside joke between myself and

10  Mark about a specific politician who conducts

11  himself a certain way.  And we would joke

12  about sending Clay.

13            It's -- it was an inside joke.

14  Clay probably would not like it; I will tell

15  that you much.

16       Q.    Okay.  Sounds good.

17            So did you ever have this

18  meeting with the Secretary of State's office

19  or have a call with them?

20       A.    No.  No, ma'am.

21       Q.    Okay.  And did you ever have a

22  conversation with the Secretary of State's

Page 166

1    office, anyone there, about True the Vote's

2    challenges?

3          A.    I did not.

4          Q.    Okay.

5                MS. FORD:  We can take this

6          down.

7                And, Mitch, can we please pull

8          up Exhibit [sic] U.

9                THE STENOGRAPHER:  That will be

10         marked Exhibit 19.

11               (Somerville Exhibit 19,

12         Text string, Bates Def Somerville

13         000731 to -733, was marked for

14         identification, as of this

15         date.)

16   BY MS. FORD:

17         Q.    Mr. Somerville, this is a

18   separate thread that you produced that has

19   Jordan Fuchs, yourself, but an unidentified

20   third person.  And I was just wondering if

21   you could clarify who the third person was in

22   this message chain.

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 167

1        A.        Yeah.  So -- and I only

2    recognize this because this is -- you had a

3    follow-up that referenced this that drew my

4    attention to it.  And so -- and I was unaware

5    of this conversation, had no recollection of

6    it, in our first effort to produce.

7                I have no idea who that third

8    person is.  And the number on there, as

9    I indicated to my counsel when I was looking

10   at this, doesn't come up associated with any

11   contact in my phone.  So I have no idea who

12   that third person was.

13       Q.        Okay.

14       A.        But I believe, just again, for

15   the record, that this was a text message

16   initiated by Ms. Fuchs.  So she would have

17   included that phone number.  But I don't know

18   who that -- I don't know who that was.

19       Q.        Okay.

20                MS. FORD:  Thank you, Mitch.

21       You can take this down.

22                And could we please go back to

Page 168

1          Exhibit [sic] J and pull up page 23

2          and 24.

3     BY MS. FORD:

4          Q.     And, Mr. Somerville, I don't

5     intend to ask you a lot of questions about

6     this, but here, Mr. Davis is referencing that

7     he heard from Lin Wood and Sidney Powell and

8     had started a conversation with them.

9               And it sounds like you

10    responded, "Excellent.  I was lining up the

11    Sidney path, so glad it's already in place."

12              And what was your goal in

13    making that connection?

14         A.     Well, I don't know that we had

15    a goal.  And then I would need some date for

16    context here, because we pretty readily -- we

17    came to the quick conclusion that these

18    people did not have the best intent for

19    Georgia in mind.

20              So I don't know that we would

21    have had -- so I don't have any recollection

22    of what the goal is.  I can tell you that, in

2/20/2022         Fair Fight, Inc. et al. v. True the Vote, et al.         Derek Somerville

Page 169

1   no uncertain terms, we made it perfectly

2   clear to all of these actors that we wanted

3   nothing to do with them.

4              I specifically had a

5   conversation with a representative of Lin

6   Wood's group, and told them that I was wholly

7   offended by the work they were doing and they

8   need not call me ever again.  I remember that

9   conversation very specifically.  But we never

10  engaged with any of these people.

11             So, again, if we had the

12  ability to scroll back and get a date, my --

13  what I suspect is this was early -- yeah,

14  very early, November 27.

15             THE DEPONENT:  Thank you.

16      A.    Yeah, no, it didn't take us

17  long to realize that these were not anybody

18  that we wanted any association with

19  whatsoever.

20  BY MS. FORD:

21      Q.    And can you just spell out why?

22  What concerned you about working with them?

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 170

1          A.      I can.

2                  I spent 30-plus years of my

3    life being fully committed to integrity in

4    nearly everything that I do.  And hopefully

5    everything that I do.

6                  I have defended the human and

7    civil rights of others going back now

8    30 years, in combat zones in other people's

9    country, where my life was literally put on

10   the line in defense of those core beliefs.

11   I have defended the civil rights and

12   liberties of individuals in downtown

13   St. Louis who were subject to true

14   violations.

15                  And I've fought very hard,

16   I think, in the right forums over the course

17   of my lifetime to defend the ideals of

18   voting, of democracy, and of the underlying

19   constitutional rights that people have.  It's

20   never occurred to me over the course of those

21   30 years to exploit that for personal gain,

22   for monetary gain, or for political gain.

Page 171

1                    And what I saw were individuals

2    coming into the conversation that were

3    encouraging people not to vote.  They were

4    deliberately sewing seeds of distrust against

5    processes, against political parties, against

6    any manner of things that, in my estimation,

7    over the last now almost -- what? -- year and

8    a half, was only to raise funds to promote

9    themselves, to promote their political

10   standing.

11                   And they did so, and continue

12   to do so, at the peril of an ideal that I've

13   held since I joined the Marine Corps 30-plus

14   years ago.

15                   So, you know, with any

16   effort -- and you and your team are no

17   different -- you want to understand all the

18   resources available to you to pursue those

19   ideals that you believe in.  But if you learn

20   that those resources are counter to what you

21   believe in, you would shed them quickly.

22                   And at this point, I had never

Page 172

1   even heard of these two people prior to the

2   election issues.

3                    So, you know, coming back to

4   your question:  I am happy to work with

5   anybody and everybody who maintains those

6   core ideals, who maintains the importance of

7   individuals' rights under our Constitution,

8   and can do so in a nonpartisan way that

9   doesn't aggrandize or otherwise create wealth

10  for themselves.

11                   But I don't have any time for

12  people that do anything other.  And I've

13  lived, literally, the last 30 years as

14  public -- at times, by the way, more public

15  than I would like to be, but I've lived by

16  those ideals.  And this effort was no

17  exception.

18                   I want nothing to do with

19  anybody that conduct themselves like these

20  people did, for the reasons that they did.

21  And, no, I'm very glad that we rejected

22  overtures from all of them.  And we did.

Page 173

1    Literally, all of them.

2        Q.    And are you aware of whether

3    True the Vote ever worked with the Trump

4    legal team on these efforts?

5        A.    I'm not aware of any of their

6    activities outside of Georgia.  Let me

7    rephrase that, because you're asking about

8    questions inside of Georgia.

9            No, I'm not aware of any of

10   their activities beyond Mark and myself and

11   what they did here in Georgia.  I don't have

12   any idea.

13       Q.    Okay.  I think I just have a

14   few more questions for you, and then -- just

15   give me one moment.

16           (Pause.)

17           MS. FORD:  Mitch, can we go to

18       page 125 and 126.

19           And can we -- Mitch, can we

20       just scroll up so we can get a date

21       for context here.

22           THE DEPONENT:  Got it.

Page 174

1        A.      December 12th?

2    BY MS. FORD:

3        Q.      Great.  Thank you.

4                So here, I believe you're

5    texting with Mr. Davis again about the

6    challenges and submitting the challenges.

7    And at the end of this, going on to the

8    second page, you say, "...this will help fire

9    up the voters."

10                And can you explain what you

11    meant by that?

12        A.      Would you mind if I just

13    read -- let me read through this.

14        Q.      Absolutely.  Yes.  And if you

15    want to scroll up to the --

16        A.      No, I think this is good.

17        Q.      -- beginning...

18        A.      (Document[s] reviewed.)

19                Well, I don't immediately

20    recall what I meant by that.  But, you know,

21    I think I indicated earlier in this

22    deposition that, you know, we're cognizant of

Page 175

1    the fact that we can inspire other people to

2    act, to get involved, to challenge, you

3    know -- to challenge their government as well

4    as they, and we, should all do.

5                    And I suspect that's the

6    context of that.  I don't -- but I don't

7    have -- I don't have an immediate -- as

8    I look at this, I'm just trying to read this

9    to see if it comes back to me, but I don't

10   have any real recollection of "fire up the

11   voters."

12                   I mean, we certainly want

13   participation, and I want participation.  I

14   want people to vote.

15                   Again, in the previous line of

16   questioning, you asked why I objected to Lin

17   Wood people, and Sidney specifically.  But

18   Lin was because I went and fought for a

19   number of fundamental rights, one of which is

20   to participate in our democracy, to vote.

21                   I want voters to vote.  I want

22   people to register to vote.  I want them to

Page 176

1    participate in our elections.  And so

2    I suspect that was the general intent or

3    motive behind that comment.

4        Q.    Okay.  And just to clarify:

5    When you say "fire up the voters," it sounds

6    like that's more of a reference to the

7    individuals who would be helping with the

8    challenge.

9        A.    I'm sorry.  I just -- I don't

10   know.  That's logical.  I just don't -- I'm

11   sorry.  I don't recall.  I've read it now

12   three times.  I don't recall.

13       Q.    Okay.

14             MS. FORD:  And can we pull up

15       my very last exhibit.  This will be W.

16             THE STENOGRAPHER:  This will be

17       marked Exhibit 20.

18             (Somerville Exhibit 20,

19       Text string, Bates Def Somerville

20       000172 to -175, was marked for

21       identification, as of this

22       date.)

Page 177

1   BY MS. FORD:

2        Q.     So, Mr. Somerville, this is a

3   text message thread with someone named David

4   Clark.

5               Who is David Clark?

6        A.     That's -- that is State

7   Representative David Clark, who I've known

8   for quite some time.  He's a fellow veteran.

9        Q.     Okay.  And did Mr. Clark

10  volunteer to submit a challenge from the list

11  that you and Mr. Davis created?

12       A.     He did.

13       Q.     Okay.  And on the -- I believe

14  it's the second or third page here, you

15  invite Mr. Clark to a strategy Zoom call with

16  True the Vote.  And I'm just curious what the

17  purpose of inviting him to the call was.

18       A.     Well, first, looking at the

19  date, I'm assuming that that's the

20  December 20 Zoom call that we spoke of

21  earlier in today's deposition.

22       Q.     Yeah, I would assume the same.

Page 178

1          A.      Okay.  Well, David is a member

2      of the state legislature.  At least he was.

3      I think he's finished his term out and did

4      not run for reelection.

5                   So David was a member of the

6      state legislature.  If I would have invited

7      him, probably because there would have been

8      value in having individuals like David

9      understanding what's happening in the state.

10                   And certainly if he was going

11     to lend his name to a challenge in Gwinnett,

12     you know, there's probably value in him

13     having a good sense of what was going on.

14     And to this day, there's an awful lot of

15     discussion around what's going on in the

16     state with respect to voter integrity.

17                   So I suspect that's the -- that

18     was the motive.  I don't believe he attended

19     that call, by the way.  I don't have any

20     recollection of that.  But there was no

21     downside to me inviting him, if he wanted to

22     attend.

Page 179

1        Q.     Okay.  Thank you.

2               And I'm sorry.  I have one

3    more, and I promise I'm done.

4               MS. FORD:  Mitch, can you pull

5          up Exhibit [sic] V.  I think it will

6          be 21.

7               (Somerville Exhibit 21,

8          E-mail string, was marked for

9          identification, as of this

10         date.)

11   BY MS. FORD:

12       Q.     And, Mr. Somerville, I don't

13   intend to ask you a lot of questions about

14   this.

15              But it's clear to me, reading

16   through this, that at some point you and

17   Mr. Davis had some sort of disagreement on a

18   call that took place around Christmas Eve in

19   2020.  And I'm curious if you could tell us

20   what that disagreement was about.

21       A.     Yeah.  Do you mind if I just

22   have a quick minute to read this?

2/20/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Derek Somerville

Page 180

1        Q.      Yeah.  Absolutely.

2        A.      (Document[s] reviewed.)

3                Okay.  So there's actually a

4    lot to unpackage in there.  So do you mind

5    restating your question, and then I'll go --

6    I'll track your line of questioning?

7        Q.      Sure.

8                So it's clear to me from this

9    exchange that you had a disagreement at some

10   point with Mr. Davis.

11       A.      Yes.

12       Q.      And I was curious what the

13   nature of that disagreement was.

14       A.      Well, to be perfectly blunt, we

15   were served with this lawsuit on Christmas

16   Eve, while I was with my family.  And

17   I thought that was in horrible form.

18   I thought it was intentional.  And I thought

19   it, frankly, was unnecessary.

20               Those moments are very rare.

21   And we were going through a loss in our

22   family at that time from a few days earlier.

Page 181

1   And it upset me tremendously.

2              Mark, in his nature, wanted to

3   talk.  He tends to want to call late.  And

4   I did not want to talk to him.  And I think

5   I took his call and abruptly said, "I don't

6   have time to talk."

7              So I think that he caught me at

8   a moment where I was not in a very good mood

9   and I did not want to speak with him, and

10  I think he was sensitive to that.

11       Q.    Okay.  And here, Mr. Davis

12  mentions something about taking the files

13  down.  What is that a reference to?

14       A.    My recollection is those would

15  be the challenge files that were made

16  available to the volunteers that wanted to

17  challenge in their counties.

18       Q.    Okay.  So he just believed it

19  was prudent to take them down?

20       A.    Well, I think there are a

21  couple of things.  So one is -- as he

22  indicates down there, that, one, because of

Page 182

1    the lawsuit, and -- but number two is because

2    we believed people were done accessing them.

3                 But at that point in time, we

4    did not feel that those files, or even our

5    actions, were intended in this lawsuit.  It

6    didn't occur to us that that was intended, as

7    we felt we were just looped in because our

8    names were on a press release.

9                 So it made sense at that point

10   to put some security around those files.  And

11   I think Mark restored them since then.

12       Q.     Okay.  Thank you.

13                 And, Mr. Somerville, I do just

14   want you to know that we did not

15   intentionally aim to serve you on Christmas

16   Eve, and it was just the nature of the time

17   when this all happened, when we filed the

18   Complaint.  And we're required to serve you.

19       A.     Okay.

20       Q.     So I apologize that it occurred

21   on that date, but it was not intentional.

22       A.     I truly appreciate that,

Page 183

1    Ms. Ford.  Thank you.

2              MS. FORD:  And those are all

3         the questions that I have.

4              MS. SIEBERT:  I have just a few

5         follow-up.  I don't think it will take

6         long.

7              Mr. Somerville, do you need to

8         take a break or anything before?

9         I mean, I anticipate, like, ten

10        minutes.

11             THE DEPONENT:  No, ma'am.

12             MS. SIEBERT:  Okay.

13             THE DEPONENT:  I'm good to go.

14             MS. SIEBERT:  All right.  Very

15        good.

16                  EXAMINATION

17   BY MS. SIEBERT:

18        Q.    In general terms, what were the

19   goals that you and Mr. Davis had in doing

20   this data analysis and enabling people to

21   submit challenges as a result?

22        A.    The reality is Mark and I are

Page 184

1    kind of nerds.  So maybe Mark a little more

2    than me.

3                    And we had a number of motives.

4    Number one is, I found the discourse of the

5    day, the theories that were being strewn

6    about and the conduct of people on all sides

7    of the political spectrum absolutely

8    unacceptable and detrimental to all the

9    things that I fundamentally believe in.

10   Period.

11                   I think those that know me know

12   that I'm most critical of the political party

13   that I most closely associate with.  I'm very

14   hard on that party.  And, in fact, the only

15   individual I've ever, quote, unquote,

16   targeted in my state is the Republican head

17   of our legislature.

18                   And so, you know, when we

19   started seeing this type of language, and me

20   and Mark both -- and I, of course, only met

21   Mark as a consequence of this -- I thought it

22   was fundamentally undermining citizen

Page 185

1  participation in our elections.  And that

2  concerned me greatly.  Number one.

3            Number two is, I believe in

4  data, and I believe in the use of empirical

5  data.  And there was immediate evidence that

6  some measure of neglect had occurred with our

7  Georgia voter file.  And I believed then, as

8  I believe now, that that neglect negatively

9  impacts all voters across the state.  Period.

10            That there's a certain level of

11  responsibility that the Secretary of State's

12  office has to protect, to preserve, and to

13  maintain that voter file.  And that's also

14  enumerated under the NVRA and in our state

15  laws.

16            And I've always believed very

17  passionately that it's our job to hold

18  elected officials accountable.  The simple

19  fact of the matter is -- and I won't get on a

20  big stump here -- is that competency is not a

21  requirement to get elected into office.

22            And so the mere idea that

Page 186

1    somebody is the Secretary of State doesn't

2    mean that they have any experience whatsoever

3    dealing with datasets the magnitude of which

4    our Georgia voter file is.

5                     And so when I met Mark,

6    I thought that this was an individual with

7    whom I could partner with, who was

8    nonpartisan, who was passionate about voter

9    integrity.  Not to effect a political

10   outcome, but for the sake of voter integrity.

11                     And that we could engage in an

12   honest effort driven by the data, apply some

13   expertise.  Because both of us have some

14   experience with the NCOA process.  Mark, a

15   significant amount.

16                     And I thought we could drive

17   clarity -- or at least bring some clarity to

18   some of the issues facing the state with

19   respect to voter participation, with respect

20   to processes, and the handling of that voter

21   file that were actually relevant to the day.

22                     I believe we did achieve that.

Page 187

1   And then the tertiary effect of that, as

2   I discuss, is, you know, you want to coach

3   people around you, that are watching you, in

4   how to engage in these efforts.

5                    Not through, you know, again,

6   hyperbolic rhetoric, which we're all prone to

7   at times, and not to baseless allegations,

8   not to baseless theories that might actually

9   scare people from participating in an

10  election or participating in holding their

11  government accountable, but actually

12  encouraging people to participate in a

13  meaningful way.

14                   I've spoken countless times on

15  this topic, when invited.  And I know that's

16  all there, so it's easy to watch.  And

17  I maintain the same message to everybody:

18  Those processes and that data belongs to all

19  of us, the people.

20                   So not only do we have a right

21  to ensure that those processes are followed,

22  but I think we have an obligation.  And,

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 188

1   again, that goes all the way back to my

2   taking the oath as a U.S. Marine and, again,

3   as an FBI agent.

4            So our motive certainly wasn't

5   to effect a specific outcome.  We have real

6   concerns -- that's why we did an analysis --

7   to make sure that the data didn't -- couldn't

8   be used by anybody in a partisan way.

9            Our motives were good.  Mark

10  Davis is a very, very good man, a very

11  knowledgeable guy.  And I hope I'm considered

12  in the same light by others.  And I feel very

13  good about the work that we did.

14            I will tell you I -- and I know

15  this is not counsel's intent, but this is

16  profoundly insulting to have been

17  characterized as someone who would

18  participate in a racist activity, when I've

19  literally put my life on the line to defend

20  people that do not share my ethnicity.  And

21  I've carved out a life that's made that a

22  perfectly clear priority of mine.

Page 189

1              So I'm -- I don't want to use

2     this as a forum for that, but that was our

3     intent, Ms. Siebert.

4          Q.    Mr. Somerville, if somebody

5     ended up on your challenge list who turned

6     out to be legally allowed to vote in Georgia,

7     for instance, one of those military voters

8     that you discussed that might have lived far

9     enough outside of a base that you didn't --

10    you know, that the data didn't catch it, and

11    so it turns out that that person on the list

12    was legally allowed to vote in Georgia, would

13    you have any problem with that person casting

14    a vote in Georgia?

15         A.    The whole intent of the process

16    is to ensure that legitimate, legal voters

17    don't have their vote cancelled out by an

18    ineligible voter.

19              And so not only would we not

20    have a problem with that, that would be a

21    victory.  The process, as I understand it, is

22    specifically designed so that you are

Page 190

1    presenting evidence to a board of probable

2    cause.

3                 You're not suggesting that

4    somebody did vote ineligibly.  You're not

5    suggesting they broke the law.  You're not

6    suggesting any of that.  You're asking the

7    Board of Elections to engage in a lawful

8    process that's enumerated under both federal

9    and state law to ensure that the integrity of

10   that voter file is intact.

11                If you challenge an individual

12   and the Board of Elections invokes that very

13   rigid process and that individual

14   substantiates that they're a legitimate

15   voter, then the process worked just as good

16   as if you challenged a voter and it was

17   determined that they were ineligible.

18                So, you know, I think there's a

19   lot of -- there's a lot of misinformation

20   around that process, or what the intent is,

21   but it certainly is never to purge anybody.

22   That word gets used an awful lot.  It's to

Page 191

1    invoke a process.

2                So I would hope that -- no.

3    Rephrase that.  So we're thrilled with

4    anybody who casts a vote.  Absolutely.

5        Q.    Okay.

6                MS. SIEBERT:  Mitchell, could

7        you pull up -- I think it was

8        Exhibit 12, if I recall correctly.

9                Yeah, this is it.  If you could

10        scroll down just a bit.

11    BY MS. SIEBERT:

12        Q.    Mr. Somerville, you just

13    testified -- and I'm paraphrasing here --

14    that it wasn't your intention ever to, you

15    know, unjustly accuse anybody of voting

16    illegally or anything like that.

17                And so just to refresh your

18    recollection of this, I believe this is an

19    e-mail that you sent with some lists of kind

20    of talking points about this process.

21                Does that align with your

22    recollection?

Page 192

1          A.      It does.

2          Q.      Okay.  I'm going to read into

3     the record a part that's bolded here within

4     this e-mail.

5               It says, "To be clear, the

6     people named on these lists are not accused

7     of committing election fraud or any other

8     crime.  These are simply individual instances

9     in which probable cause suggests a possible

10    residency issue with respect to the current

11    voter registration.

12               "This challenge is a lawful

13    process for scrutinizing the quality of our

14    voter rolls and ensuring integrity in our

15    election."

16               What was your purpose of

17    including that paragraph within this e-mail?

18         A.      Well, number one, I wanted to

19    make perfectly clear to everybody what our

20    motivations were and are.  I'm perfectly

21    aware that there are no shortage of

22    individuals out there that are not similarly

Page 193

1    motivated.  I'm obviously not naive, based on

2    my background.

3                     So I wanted to make it

4    perfectly clear.  And that, to your point,

5    was bolded.  And the word "not" accused,

6    "not" was underlined.  I wanted everybody to

7    understand that this is an effort, as precise

8    as it says, to ensure that our voter rolls

9    are properly maintained and, thus, we're

10   supporting the integrity of our election.

11                    I was not interested in

12   engaging with anybody who was simply out

13   there trying to accuse people of trying to

14   overthrow an election.  I didn't want to be

15   part of that narrative.  And I know Mark did

16   not want to either.

17                    So, you know, I think that

18   paragraph speaks very clearly for itself.

19   And that was a message that was sent to,

20   I believe, every person -- of which there

21   weren't, you know, a whole lot of them, by

22   the way.  But anyone who volunteered to

Page 194

1    participate in our challenges, I believe

2    every single one of those individuals

3    received this document.

4              And I stand by those words to

5    this point.  At no point were we ever trying

6    to accuse anybody of election fraud at all.

7         Q.    Thank you.

8              I believe earlier in your

9    testimony, you called on your experience in

10   law enforcement and the military.  And you

11   called on that experience and essentially

12   testified that, in your opinion, people who

13   are intent on breaking the law will do so.

14             Do you recall that, in

15   general --

16        A.    Yeah.

17        Q.    -- in your testimony?

18        A.    I do.  And that was in the

19   context of deterrence.

20        Q.    Sure.  Sure.

21             So, in your experience, then,

22   does holding people accountable who do, in

Page 195

1    fact, break the law, intimidate those who

2    follow the law?

3          A.     Not in my experience.

4          Q.     Okay.  In your opinion, is

5    there any objective reason why somebody who

6    was legally allowed to vote in Georgia would

7    be intimidated by your data analysis or this

8    challenge process?

9          A.     To state the question

10   differently, if I may, back at you:  There's

11   no reason to be intimidated that somebody

12   gets pulled over for a DUI, if you're not, in

13   fact, driving under the influence.  There's

14   no reason to be intimidated that someone is

15   arrested for homicide when you, in fact, are

16   not engaged in the act of homicide.

17                There's no reason whatsoever to

18   be intimidated by the lawful enforcement,

19   through lawful processes, of our laws.

20   There's no reason to whatsoever.  And I think

21   any assertion of that is absurd.

22                And certainly as it connects to

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 196

1   our effort, there's no reason for anybody to

2   be intimidated by the fact that we have laws

3   that govern our elections, that there's an

4   expectation that you follow those laws, and

5   that if you don't, that there are systems in

6   place to highlight that fact and, frankly,

7   give you the opportunity to resolve the

8   issues.

9              Because we have all moved

10  before.  We have all had to change addresses,

11  and we've all dealt with the complexities of

12  moving, one of which is your voter

13  registration.

14             So in my opinion, I can't see

15  any meaningful way -- any meaningful reason

16  why somebody would be intimidated by the

17  lawful execution of our laws.  No.

18             What would the alternative be?

19     Q.    That's a good question.  But

20  I'm not testifying, so I won't try to answer

21  it.

22             MS. SIEBERT:  But,

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 197

1          Mr. Somerville, thank you.  I don't

2          have any other questions.

3               MS. FORD:  And I do not as

4          well.  So, Mr. Somerville, you have

5          the rest of your day back.

6               Thank you for appearing today.

7               THE DEPONENT:  All right.

8          Thank you for your time.

9               THE VIDEOGRAPHER:  This

10          concludes the deposition of Derek

11          Somerville.  The time is 11:13 a.m.

12               (Time noted:  11:13 a.m. CST)

13                    -  -  -

14

15

16

17

18

19

20

21

22

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 198

1                      CERTIFICATE

            I, LISA A. KNIGHT, Registered
2    Diplomate Reporter and Certified Realtime
     Reporter, do hereby certify that prior to the
3    commencement of the examination, DEREK
     SOMERVILLE was duly sworn by me to testify to
4    the truth, the whole truth, and nothing but
     the truth.
5            I DO FURTHER CERTIFY that the
     foregoing is a verbatim transcript of the
6    testimony as taken stenographically by and
     before me at the time, place, and on the date
7    hereinbefore set forth, to the best of my
     ability, and that reading and signing was not
8    requested.
             I DO FURTHER CERTIFY that I am
9    neither a relative nor employee nor attorney
     nor counsel of any of the parties to this
10   action, and that I am neither a relative nor
     employee of such attorney or counsel, and
11   that I am not financially interested in the
     action.
12
13
14
15   _____
16   LISA A. KNIGHT
17   NCRA Registered Diplomate Reporter
18   NCRA Certified Realtime Reporter
19   NCRA Certified LiveNote Reporter
20   NCRA Realtime Systems Administrator
21   Dated:  January 31, 2022
22

Page 199

1        Derek Somerville, c/o

         THE BOPP LAW FIRM

2        1 South 6th Street

         Terre Haute, Indiana  47807-3510

3

4        Case: Fair Fight, Inc. et al. v. True the Vote, et al.

         Date of deposition: January 20, 2022

5        Deponent: Derek Somerville

6

7        Please be advised that the transcript in the above

8        referenced matter is now complete and ready for signature.

9        The deponent may come to this office to sign the transcript,

10       a copy may be purchased for the witness to review and sign,

11       or the deponent and/or counsel may waive the option of

12       signing. Please advise us of the option selected.

13       Please forward the errata sheet and the original signed

14       signature page to counsel noticing the deposition, noting the

15       applicable time period allowed for such by the governing

         Rules of Procedure. If you have any questions, please do

16       not hesitate to call our office at (202)-232-0646.

17

18

19       Sincerely,

         Digital Evidence Group

20       Copyright 2022 Digital Evidence Group

21       Copying is forbidden, including electronically, absent

22       express written consent.

Page 200

1        Digital Evidence Group, L.L.C.
         1730 M Street, NW, Suite 812
2        Washington, D.C. 20036
         (202) 232-0646
3
4        SIGNATURE PAGE
         Case: Fair Fight, Inc. et al. v. True the Vote, et al.
5        Witness Name: Derek Somerville
         Deposition Date: January 20, 2022
6
7        I do hereby acknowledge that I have read
         and examined the foregoing pages
8        of the transcript of my deposition and that:
9
10       (Check appropriate box):
         (  ) The same is a true, correct and
11       complete transcription of the answers given by
         me to the questions therein recorded.
12       (  ) Except for the changes noted in the
         attached Errata Sheet, the same is a true,
13       correct and complete transcription of the
         answers given by me to the questions therein
14       recorded.
15
16
17
18       _____          _____
19         DATE                       WITNESS SIGNATURE
20
21       _____          _____
22         DATE                            NOTARY

Case 2:20-cv-00302-SCJ   Document 166-1   Filed 05/17/22   Page 201 of 201

2/20/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville

Page 201

1          Digital Evidence Group, LLC

2          1730 M Street, NW, Suite 812

3          Washington, D.C.  20036

4          (202)232-0646

5

6                              ERRATA SHEET

7

8          Case: Fair Fight, Inc. et al. v. True the Vote, et al.

9          Witness Name: Derek Somerville

10         Deposition Date: January 20, 2022

11         Page No.    Line No.      Change

12

13

14

15

16

17

18

19

20

21    _____      _____

22         Signature                            Date