Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 1 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

--------------------------------X
FAIR FIGHT, INC., SCOTT BERSON,   :
JOCELYN HEREDIA, AND JANE DOE,    :
             Plaintiffs,     :
  v.                              : Case No.:
                               : 2:20-CV-00302-SCJ
TRUE THE VOTE, INC., CATHERINE    :
ENGELBRECHT, DEREK SOMERVILLE,    :
MARK DAVIS, MARK WILLIAMS,        :
RON JOHNSON, JAMES COOPER, AND    :
JOHN DOES 1-10,                   :
             Defendants.     :
--------------------------------X

Deposition of GREGG PHILLIPS, as the corporate
representative of OpSec Group LLC and individually
Conducted Virtually
Tuesday, January 25, 2022
10:02 a.m. ET

Reported by: Matthew Goldstein, RMR, CRR

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 2

1       Deposition of GREGG PHILLIPS, conducted

2    virtually:

3       Pursuant to Notice, before Matthew Goldstein,

4    RMR, CRR, Notary Public in and for the State of

5    Maryland.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

```
                                                              Page 3

 1                  A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
     JACOB SHELLY, ESQUIRE
 3   ELIAS LAW GROUP
     700 13th Street, NW
 4   Suite 600
     Washington, D.C. 20005
 5   202.434.1609
 6
 7   ON BEHALF OF THE PLAINTIFFS:
     LESLIE J. BRYAN, ESQUIRE
 8   LAWRENCE & BUNDY LLC
     1180 West Peachtree Street NW
 9   Suite 1650
     Atlanta, Georgia 30309
10   404.400.3350
11
12   ON BEHALF OF THE DEFENDANTS:
     JAMES BOPP, ESQUIRE
13   THE BOPP LAW FIRM
     1 S 6th Street
14   Terre Haute, Indiana 47807
     812.232.2434
15
16   ALSO PRESENT:
17   DESHAWN WHITE - VIDEOGRAPHER/EXHIBIT
18                 TECHNICIAN
19   TINA MENG, ELIAS LAW GROUP
20
21
22
```

Page 4

1                    C O N T E N T S

2    EXAMINATION OF GREGG PHILLIPS                    PAGE

3    By MR. SHELLY                                       8

4

5                    E X H I B I T S

6                    (Attached)

7    PHILLIPS        DEPOSITION EXHIBIT              PAGE

8     Exhibit 1    Plaintiffs' Notice of Rule          12
                   30(B)(6) Deposition of OpSec
9                  Group LLC

10    Exhibit 2    Plaintiffs' Notice to Take the      14
                   Deposition of Gregg Phillips

11    Exhibit 3    PolitiFact Fact-check Did 3         26
                   million undocumented immigrants
12                 vote in this year's election

13    Exhibit 4    CNN.com - Transcripts              41

14    Exhibit 5    Def TTV 288, Invoice INV-0007      57

15    Exhibit 6    OpSec's Amended Responses to       76
                   Plaintiffs' Request for
16                 Production

17    Exhibit 7    Def Davis 005266 through Def      102
                   Davis 00527, NCOALink
18                 Processing Summary Report

19    Exhibit 8    OPSEC 0032 through OPSEC 0033,    132
                   December 16, 2020, E-mail
20                 Correspondence

21    Exhibit 9    OPSEC 0051, Spreadsheet Table     144

22

Page 5

```
 1               E X H I B I T S, CON'T
 2                    (Attached)
 3    PHILLIPS        DEPOSITION EXHIBIT                PAGE
 4     Exhibit 10   OPSEC 0009 through OPSEC 0029,      149
                    TrueAppend Report
 5     Exhibit 11   OPSEC 60, Excel Spreadsheet         156
 6     Exhibit 12   OPSEC 0031, December 15, 2020,      158
                    E-mail Correspondence
 7     Exhibit 13   OPSEC 0045 through OPSEC 0047,      159
                    December 20, 2020, E-mail
 8                  Correspondence
 9     Exhibit 14   Def TTV 1439 through Def TTV        161
                    1439 through Def TTV 1441,
10                  December 28, 2020, E-mail
                    Correspondence
11     Exhibit 15   OPSEC 61, Excel Spreadsheet         163
12     Exhibit 16   OPSEC 0049 through OPSEC 0050,      164
                    DataWalk Screenshot
13     Exhibit 17   OPSEC 0059, Voter History Files     165
                    Screenshot
14     Exhibit 18   Crusade4Freedom Screenshot          167
15     Exhibit 19   OPSEC 0041, Notes                   168
16
17
18
19
20
21
22
```

Page 6

1            THE VIDEOGRAPHER:  This is Tape Number 1

2     for the videotaped deposition of Gregg Phillips in

3     the matter of Fair Fight, Incorporated, et al.,

4     versus True the Vote in the United States District

5     Court for the Northern District of Georgia, the

6     Gainesville Division.  Case

7     Number 2:20-CV-00302-SCJ.

8            This deposition is being held by Zoom

9     video remote conferencing, the physical recording

10    in Fredericksburg, Virginia, on January 25th,

11    2022.

12           The time on the video screen is

13    10:02 a.m. Eastern Time.

14           My name is DeShawn White.  I am the

15    legal videographer from Digital Evidence Group.

16           The court reporter is Matthew Goldstein

17    in association with Digital Evidence Group.

18           Will counsel please introduce themselves

19    for the record.

20           MR. SHELLY:  I'm Jacob Shelly with Elias

21    Law Group on behalf of the plaintiffs.

22           MS. BRYAN:  Good morning.  Leslie Bryan,

Page 7

1    Lawrence & Bundy, on behalf of the plaintiffs.

2              MS. MENG:  Hi.  This is Tina Meng with

3    Elias Law Group on behalf of plaintiffs as well.

4              MR. BOPP:  I'm done with your counsel

5    being introduced.  Thank you.

6              James Bopp, attorney for defendants, and

7    here Gregg Phillips and his company.

8              THE VIDEOGRAPHER:  Will the court

9    reporter please swear in the witness.

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 8

1                    P R O C E E D I N G S

2    Whereupon,

3                    GREGG PHILLIPS,

4    being first duly sworn or affirmed to testify to

5    the truth, the whole truth, and nothing but the

6    truth, was examined and testified as follows:

7       EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

8    BY MR. SHELLY:

9        Q.    Thank you.

10             Good morning, Mr. Phillips.  I'm Jacob

11   Shelly and I represent the plaintiffs in this

12   case.

13             Can you repeat your full name for the

14   record.

15       A.    Gregg Alan Phillips.

16       Q.    And your address for the record?

17       A.    1752 Coates Pass, Birmingham, Alabama

18   35242.

19       Q.    Is that where you are right now?

20       A.    Yes.

21       Q.    Have you ever been deposed before?

22       A.    Yes.

Page 9

1       Q.   How many times?

2       A.   Many.

3       Q.   In what kinds of cases?

4       A.   Mostly related to my various work as a

5   government employee.

6       Q.   When was the most recent?

7       A.   I don't know.

8       Q.   Have you ever been deposed over a web

9   platform before?

10      A.   No.

11      Q.   Okay.  So I'd like to start by going

12  over a few ground rules for the deposition so that

13  we all have the same understanding.

14           All testimony today is under oath just

15  as if you were testifying in court.

16           Does that make sense?

17      A.   Yes.

18      Q.   For the benefit of everyone and the

19  court reporter, and especially since we are all

20  remote, please make your answers audible.  Head

21  shakes and nods are hard to put on the record.

22  Okay?

Page 10

1        A.    Yes.

2        Q.    Please allow me to finish my question

3   before giving your answer.  That will help us have

4   a clean transcript for the record.

5              Sound good?

6        A.    Yes.

7        Q.    From time to time, your attorney may

8   make an objection to my question.  And that's

9   fine, but you are to answer regardless unless he

10  specifically instructs you not to answer.

11             Does that make sense?

12       A.    Yes.

13       Q.    If at any point you do not understand a

14  question that I'm asking, please let me know and I

15  will do my best to rephrase or clarify.  And if

16  you do answer, I will assume you understood the

17  question.

18             Is that fair?

19       A.    Yes.

20       Q.    If at any time you would like to take a

21  break, please let me know and I'll try to find a

22  good place to stop and we can go off the record

Page 11

1   for a few minutes.  The only exception is that if

2   I asked you a question, I ask that you answer the

3   question before we take a break.  Okay?

4        A.   Okay.

5        Q.   How are you viewing this deposition?

6   Are you on a laptop or phone?

7        A.   Laptop.

8        Q.   Do you have any documents with you,

9   either hard copies or electronic?

10       A.   No.

11       Q.   Is anyone else in the room with you?

12       A.   No.

13       Q.   Because we are taking your deposition

14   remotely, I may not always be able to see what you

15   have in front of you, who enters the room while

16   you are testifying.  You understand that it would

17   not be appropriate for your attorney or anyone

18   else to tell you how to answer a particular

19   question that I ask?

20       A.   Yes.

21       Q.   And you agree that while you are

22   testifying today, you will not exchange

Page 12

1   communications, whether by text, e-mail or other

2   messaging, about how to answer the questions that

3   I ask?

4        A.   Yes.

5        Q.   All right.  What did you do to prepare

6   for today's deposition?

7        A.   Read through documents.  Read the --

8   looked at the law, looked at files, looked at some

9   of your filings -- or the filings.

10       Q.   And besides your counsel, did you talk

11  to anybody about today's deposition?

12       A.   No.

13            MR. SHELLY:  Can we pull up Exhibit A

14  and mark it as Exhibit 1.

15            (Phillips Deposition Exhibit 1 was

16  marked for identification and attached to the

17  transcript.)

18  BY MR. SHELLY:

19       Q.   Do you recognize this document,

20  Mr. Phillips?  There's a few pages.  We can scroll

21  through.

22       A.   Yes.

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 13

1       Q.    Do you understand that you have been

2    designated as a representative to answer questions

3    on behalf of OpSec Group LLC?

4       A.    Yes.

5       Q.    And are you prepared to testify about

6    all the topics in Exhibit A, which we can scroll

7    to if that would be helpful?  It's a few pages

8    down.

9            MR. BOPP:  I think this is a time for me

10   to interject an objection.  We of course want to

11   preserve the objections we have made to the scope

12   of the subject matters that you are intending to

13   ask.  And in order to expedite this, we would like

14   to make a continuing objection, with your

15   agreement; otherwise we'll just object to every

16   one or whatever.

17           And the continuing objections would be

18   any questions regarding any activities of the

19   deponent prior to the 2016 election, any

20   activities of the deponent in any other place

21   other than Georgia, any activities of the deponent

22   except for voter eligibility challenges

Page 14

1    preelection in the Georgia runoff election, and

2    any questions regarding the activities of King

3    Street Patriots.  So we'd like to have a

4    continuing objection to that, with your agreement,

5    to expedite this.

6            MR. SHELLY:  Yes, I agree to that.

7            MR. BOPP:  Thank you.

8    BY MR. SHELLY:

9        Q.   So, Mr. Phillips, my question is, those

10   objections having been heard, are you otherwise

11   prepared to testify to each of the topics in

12   Exhibit A?

13       A.   Yes.

14           MR. SHELLY:  Can we pull up Exhibit B.

15           (Phillips Deposition Exhibit 2 was

16   marked for identification and attached to the

17   transcript.)

18   BY MR. SHELLY:

19       Q.   And do you recognize this document?

20       A.   Yes.

21       Q.   Do you understand that you are also

22   being deposed in your individual capacity?

Page 15

1      A.   Yes.

2      Q.   And, similarly, to make this as

3   efficient as possible, to save us the trouble of

4   asking and answering all my questions twice, do

5   you agree that your answers this morning may be

6   attributed to you and OpSec unless specified

7   otherwise?

8      A.   Yes.

9      Q.   Great.

10         MR. SHELLY:  You can take that down.

11   BY MR. SHELLY:

12      Q.   And I'd like to start with just some

13   brief background.

14         Where did you grow up, Mr. Phillips?

15      A.   I was a military brat and grew up all

16   over the world.

17      Q.   Okay.  Where did you go to college?

18      A.   University of Alabama.

19      Q.   And what was your major?

20      A.   Commerce and business administration.

21      Q.   Did you complete any course work in

22   econometrics or statistics?

Page 16

1      A.    Yes.

2      Q.    Can you describe that course work?

3      A.    I don't recall specifically, but it was

4   part of the degree program.

5      Q.    Okay.  Did you go to graduate school?

6      A.    No.

7      Q.    Have you received any other training in

8   data analysis?

9      A.    I've taken many courses and supporting

10   training for tools that we use in our work.

11      Q.    What kind of course work?

12      A.    Training to use the tools that we use.

13      Q.    And who provided that training?

14      A.    The vendors generally.

15      Q.    And what did you do after college?

16      A.    Went to work.

17      Q.    Just a high-level overview of some of

18   the positions you've had, the kind of work that

19   you've done.

20      A.    I've worked in dozens of political

21   campaigns.  I've worked for parties.  I've worked

22   for governments, candidates.  I've worked -- I

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 17

1    don't know if that's enough.

2          Q.    Sure.

3                What kinds of tasks did you provide for

4    the campaigns and candidates that you worked for?

5          A.    Everything, maintaining.

6          Q.    Did you provide data analysis

7    specifically?

8          A.    Occasionally.

9          Q.    Okay.  What political party did the

10   candidates you worked and volunteered for belong

11   to?

12         A.    Generally the Republican Party.

13         Q.    Have you ever supported Democrats?

14         A.    Yes.

15         Q.    Have you ever worked for a Democrat?

16         A.    Yes.

17         Q.    Which one?

18         A.    I'm not at liberty to say.  We do

19   research for a lot of folks.

20         Q.    When is the last presidential election

21   that you think a Democrat won fairly?

22                MR. BOPP:  I object.  It couldn't be

Page 18

1   more irrelevant what his opinion about that

2   subject is.

3          But you may answer if you know.

4          THE WITNESS:  I don't have an opinion.

5   BY MR. SHELLY:

6      Q.   Do you have an opinion about whether

7   President Biden was elected fairly?

8          MR. BOPP:  Same objection.  And

9   furthermore, it is beyond the scope of the subject

10  matters and therefore I instruct him not to

11  answer.

12         MR. SHELLY:  Okay.  I'll ask this

13  question specifically in his individual capacity.

14         THE WITNESS:  I don't have an opinion.

15  BY MR. SHELLY:

16     Q.   I'd like to ask you a few questions

17  about your work with True the Vote.

18         When did you first meet Catherine

19  Engelbrecht?

20     A.   Sometime 2014 maybe.

21     Q.   Okay.  And how were you introduced to

22  her?

Page 19

1       A.    A mutual friend.

2       Q.    Why were you introduced to her?

3       A.    She had been targeted by the United

4   States Government and several agencies of the

5   government.  I'd had a similar experience.  And

6   the mutual friend thought it would be wise for us

7   to meet and talk.

8       Q.    Okay.  Did you decide to work for her at

9   that time?

10      A.    I've never worked for her.

11      Q.    Okay.  What did you know about True the

12  Vote at that time?

13      A.    I don't know.

14      Q.    And when did you become aware of True

15  the Vote?

16      A.    Like a lot of people, probably in 2018

17  maybe.  I don't recall specifically.

18      Q.    Okay.  You were familiar with True the

19  Vote before you met Ms. Engelbrecht?

20      A.    Yes.

21      Q.    Okay.  What made you -- were you

22  interested in the work that True the Vote was

Page 20

1    doing?

2          A.    Yes.

3          Q.    And why was that?

4          A.    I don't understand the question.

5          Q.    What about True the Vote's work were you

6    interested in?

7          A.    I have a high level of interest in free

8    and fair elections.

9          Q.    Did you think that voter fraud was a

10   problem 2010 to 2014?

11              MR. BOPP:  I object.  It goes -- it's

12   irrelevant and it's also beyond the scope of the

13   subject matter, so I instruct him not to answer.

14   BY MR. SHELLY:

15         Q.    Okay.  I'll ask you in your individual

16   capacity.

17              Why did you -- did you think that voter

18   fraud was a problem?

19              MR. BOPP:  I object, but he can answer

20   on the grounds that I mentioned.

21              THE WITNESS:  I think that broadly our

22   elections are not free and not fair.

Page 21

1   BY MR. SHELLY:

2       Q.   And why is that?

3       A.   The process is established in such a way

4   to prevent it.

5       Q.   And what about the process do you think

6   needs to be changed?

7            MR. BOPP:  I object to the question.  It

8   goes beyond the scope of the subject matter, so I

9   instruct him not to answer.

10  BY MR. SHELLY:

11      Q.   Are you aware of any federal elections

12  where fraudulent voting has affected the outcome?

13           MR. BOPP:  I object to the question

14  being beyond the scope of the subject matter and

15  instruct him not to answer.

16  BY MR. SHELLY:

17      Q.   I'll ask you in your individual

18  capacity.

19      A.   I don't recall the question.  I'm sorry.

20      Q.   Are you aware of any federal elections

21  where fraudulent voting has affected the outcome?

22      A.   Yes.

Page 22

1        Q.    Which ones?

2        A.    Dozens.  All that we've looked at.

3        Q.    Can you name a few for me?

4        A.    No.

5        Q.    Why not?

6        A.    I don't -- I don't have any right off

7    the --

8              MR. BOPP:  I object to the question as

9    going beyond the scope of the subject matter.

10   You've asked, you know, a question regarding the

11   history of the world and therefore instruct him

12   not to answer.

13   BY MR. SHELLY:

14       Q.    I'm asking in your individual capacity.

15   This is about trying to prevent fraud in an

16   election.  And so I'm asking you to name an

17   example where fraud has affected the outcome of an

18   election.

19       A.    You want me to pick one out?  I'm sorry.

20   I just don't understand what you're asking.

21       Q.    Yes.

22             Can you pick one out?

Page 23

1        A.    Chief Justice Perry Hooper in Alabama

2    ran for chief justice in the Alabama Supreme Court

3    in 1994 and fraud affected the outcome of the

4    election.  And it took the United States Supreme

5    Court eight months to finally get him seated.

6        Q.    My question was actually, are you aware

7    of any federal elections?

8        A.    I don't have one right off the top of my

9    head.

10        Q.    Okay.  When did you first agree to work

11    with True the Vote?

12        A.    2014.

13        Q.    And what did you agree to do?

14        A.    Help them as needed.  I served on the

15    board for a few years.

16        Q.    And when were you on the board?

17        A.    I don't recall the exact years.  I think

18    2014 through 2018 maybe, maybe 2017.  I don't

19    recall when I left.

20        Q.    Okay.  And why did you leave the board?

21        A.    I had other work that I was involved in.

22        Q.    And I think you said something like you

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 24

1    did all kinds of tasks.

2            Can you be more specific about what you

3    did for True the Vote?

4        A.   Assisted with some of their technology

5    work, their queries, their preparation of data for

6    use in their systems.

7        Q.   What kinds of data?

8        A.   Election registration data.

9        Q.   And what did you do with the

10   registration data?

11       A.   We just helped them load it.

12       Q.   How did they need help?

13       A.   It's called an extract transfer and

14   load.  It's a process through which you take a

15   source file and get it loaded into a separate

16   system or separate database.

17       Q.   And what was that data used for?

18       A.   I don't know.

19       Q.   When did you first analyze election data

20   for signs of fraud?

21           MR. BOPP:  I object to the question.  It

22   goes beyond the scope of the subject matters,

Page 25

1    therefore, and instruct him not to answer.

2    BY MR. SHELLY:

3        Q.   I'm asking you in your individual

4    capacity.

5            MR. BOPP:  I also object.  It goes

6    beyond the court's order and it goes beyond -- as

7    well that is limited to 2012 and instruct him not

8    to answer.

9            MR. SHELLY:  Fair enough.

10   BY MR. SHELLY:

11       Q.   Have you -- did you analyze election

12   data for signs of fraud --

13           MR. BOPP:  I object.  Your question is

14   going beyond the scope of the court's order.

15           MR. SHELLY:  I am not -- I have not

16   completed my question yet.  I'm sorry.

17           MR. BOPP:  Oh, I'm sorry about that.

18   BY MR. SHELLY:

19       Q.   I'll go ahead and move on.

20           In 2016, Mr. Phillips, did you tweet

21   from the handle @JumpVote?

22       A.   Yes.

Page 26

1            MR. SHELLY:  Can we pull up Exhibit Q.

2            (Phillips Deposition Exhibit 3 was

3    marked for identification and attached to the

4    transcript.)

5            THE VIDEOGRAPHER:  Counsel, did I miss

6    something?  Are you waiting for something?

7            MR. SHELLY:  Can you pull up Exhibit Q,

8    please.

9            THE VIDEOGRAPHER:  Yes, my apologies.

10           You said Q?

11           MR. SHELLY:  Yes, as in queen.

12           Okay.  The formatting on this is not

13   great, but can you scroll down to a heading that

14   starts with "Where's the report?" in bold?  It

15   will be a few pages.  Right there.  Up.  Up.

16   Right there.  Thank you.  Yes.  Yes.

17   BY MR. SHELLY:

18       Q.  So these were screenshots that didn't

19   keep all the formatting when I saved them, but

20   you'll see there's these tweets in the middle on

21   November 13th, 2016.

22           Did you tweet "We have verified more

Page 27

1    than three million votes cast by non-citizens.  We

2    are joining @TrueTheVote to initiate legal action.

3    #unrigged"?

4              MR. BOPP:  What -- I'm sorry.  What is

5    the date of this?

6              MR. SHELLY:  This is November 13th,

7    2016.

8              THE WITNESS:  There's some false stuff

9    in here.  I don't even know what VoteFraud.org is.

10   I don't even know what some of this stuff is.

11   BY MR. SHELLY:

12       Q.   My question isn't about the source.  It

13   was just to present these tweets from @JumpVote.

14             And my question is simply, is this your

15   tweet from November 13th?

16       A.   I have no idea.  I'm not on Twitter

17   anymore.  I don't recall.

18       Q.   Did you tweet about 3 million votes

19   being cast by non-citizens after the November 2016

20   election?

21             MR. BOPP:  I object to the question.  It

22   goes beyond the scope of the subject matter, which

Page 28

1    are limited to five states under the court's

2    order.  And this goes way beyond that and,

3    therefore, instruct him not to answer.

4    BY MR. SHELLY:

5        Q.   Okay.  I'll ask you in your individual

6    capacity.

7             MR. BOPP:  Same objection, but I won't

8    instruct him not to answer.

9             THE WITNESS:  What was the question?

10   BY MR. SHELLY:

11       Q.   Did you tweet about -- my question was,

12   did you tweet about 3 million votes being cast by

13   non-citizens after the November 2016 election?

14            MR. BOPP:  I'm sorry.  Even in his

15   personal capacity, the court order is "Plaintiffs

16   shall limit the questions regarding True the Vote

17   and OpSec pre and post election to 2012 onward and

18   the following states," five states.  So this goes

19   beyond the court's order.  I instruct him not to

20   answer.

21   BY MR. SHELLY:

22       Q.   After the November 2016 election, did

Page 29

1    you analyze whether any non-citizens voted in

2    Georgia?

3         A.   I don't recall specifically.

4         Q.   Were there some states that you did not

5    look into whether non-citizens voted after the

6    November 2016 election?

7              MR. BOPP:  I object.  That goes beyond

8    the court's order limited to the five states, and

9    I instruct him not to answer.

10             MR. SHELLY:  Well, it appears to me that

11   he analyzed non-citizen voting in all 50 states.

12   And so which -- would at least cover the five

13   states that the court has allowed us to answer on.

14   So I'm trying to see is there an exception for

15   those five states.  If he did not analyze any data

16   in those five states, I'll move on, but my

17   question is to confirm whether he picked out those

18   five states and did not do any of the analysis in.

19             THE WITNESS:  I don't recall.

20   BY MR. SHELLY:

21        Q.   You do not recall if there were states

22   that you did not analyze non-citizen voting in

Page 30

1    after the November 2016 election?

2            MR. BOPP:  I object to the question.  It

3    goes beyond the five specified targeted states.  I

4    instruct him not to answer.

5            MR. SHELLY:  Mr. Bopp, can you remind me

6    what the five states are?  I don't want to ask a

7    question and to guess wrong.

8            MR. BOPP:  Sure.  It is in your --

9            MR. SHELLY:  I can find it.

10           MR. BOPP:  -- but I'll help you.  Sure.

11   Georgia, Texas, Ohio, Pennsylvania, Michigan and

12   Wisconsin.  And actually --

13           MR. SHELLY:  Thank you.  I appreciate

14   that.

15           MR. BOPP:  That's actually six states,

16   so I misspoke.

17           MR. SHELLY:  I think five in addition to

18   Georgia.

19           MR. BOPP:  Yes, right, exactly.

20           MR. SHELLY:  Okay.

21           MR. BOPP:  I guess that is how we used

22   it.  Fair enough.

Page 31

1          MR. SHELLY:  I appreciate that.

2     BY MR. SHELLY:

3          Q.   So to just make my question specific for

4     you, Mr. Phillips.

5               After the 2016 election, did you analyze

6     non-citizen voting in Georgia, Texas, Ohio,

7     Pennsylvania, Michigan or Wisconsin?

8          A.   I just don't recall the scope of the

9     look.

10         Q.   Is it possible that you analyzed

11    non-citizen voting in those states?

12         A.   I just don't recall.

13         Q.   Okay.  But do you agree that you

14    analyzed non-citizen voting after the

15    November 2016 election?

16              MR. BOPP:  I object to the question.  It

17    goes beyond the scope of the subject matter and

18    beyond the scope of the court's order to you to

19    limit your questions to six states and instruct

20    him not to answer.

21              MR. SHELLY:  My understanding is that

22    Judge Jones provided that unless it's privileged,

Page 32

1    that counsel should not instruct him not to

2    answer, that those disputes can be taken up with

3    him directly, that the depositions should proceed.

4              MR. BOPP:  I've made my objection.

5              MS. BRYAN:  But specifically, Mr. Bopp,

6    the judge's order of December 22nd says, "Defense

7    counsel shall not" --

8              MR. BOPP:  I object to any other counsel

9    participating in this deposition.  You get one

10   person.  You don't get a team.  And I am not going

11   to have this deponent subject to more than one

12   lawyer.  So I made my objection.  You know, you

13   can -- Jacob can, of course, respond for the

14   record, but I made my objection.

15             MR. SHELLY:  Okay.  The court's

16   order provides --

17             (Unintelligible cross-talk.)

18             MS. BRYAN:  -- and it's on page 2 of the

19   judge's order.

20             MR. SHELLY:  Mr. Bopp, I understand that

21   you made the objection for the record, and that's

22   been noted, but our understanding of the judge's

Page 33

1  order is that defense counsel shall not instruct

2  individual and Rule 30(b)(6) witnesses to not

3  answer questions.  And that's on page 2 of his

4  order.

5          MR. BOPP:  I'm not going to debate you.

6  I've made my objection.

7          MR. SHELLY:  Okay.  So you're going to

8  permit your witness to answer the question?

9          MR. BOPP:  No, I've instructed him not

10 to answer.

11         MR. SHELLY:  Okay.  Let's take a

12 five-minute recess, please.

13         THE VIDEOGRAPHER:  The time is

14 10:33 a.m.  We are now off the record.

15         (Recess from the record.)

16         THE VIDEOGRAPHER:  The time is

17 10:45 a.m.  We are now on the record.

18         MR. SHELLY:  Okay.  So what we intend to

19 do is that I'm going to ask the questions that I

20 had intended.  If -- Mr. Bopp, if you intend to

21 continue to make your objections, we'd like to get

22 those all on the record and then we will take it

Page 34

1    up with Judge Jones.

2    BY MR. SHELLY:

3         Q.   So my question for you, Mr. Phillips,

4    is, did you analyze non-citizen voting after the

5    2016 election?

6              MR. BOPP:   I object to the question as

7    going beyond the scope of the six states the judge

8    ordered you to limit your questions to, and

9    therefore I instruct him not to answer.

10   BY MR. SHELLY:

11        Q.   Okay.  And for the 30(b)(6) topics, just

12   to put on the record that Topic Number 2 requested

13   your background and familiarity with data analysis

14   and record linkage related to OpSec's activities

15   in the targeted states from 2012 onwards.

16             Number 8 asks about your communication

17   and coordination with True the Vote, Catherine

18   Engelbrecht, Derek Somerville, Mark Davis, Mark

19   Williams, Ron Johnson, James Cooper, and other

20   persons to conduct voter and election-related

21   activities in any of the targeted states from 2012

22   onwards.

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 35

1          And I would further clarify that I am

2    asking in your individual capacity.  And so we do

3    not believe those same limitations would apply

4    about being outside the scope of the questions in

5    the 30(b)(6) notice.

6          MR. BOPP:  I've made my objection and

7    instructed the witness not to answer, including in

8    his individual capacity because it violates the

9    court order limiting the questions.

10   BY MR. SHELLY:

11       Q.   Okay.  Mr. Phillips, did you obtain a

12   record of everyone who voted in the 2016 election?

13          MR. BOPP:  I object.  It goes beyond the

14   scope of both the subject matter and the court's

15   order limiting it to six states, and I instruct

16   him not to answer.

17   BY MR. SHELLY:

18       Q.   Mr. Phillips, how did you verify the

19   citizenship status of individuals who had voted in

20   the six states in the 2016 election?

21       A.   We have a -- we have compiled a database

22   over the years of research and access to our

Page 36

1    database and made a match.

2        Q.   And where do you get citizenship data

3    from?

4        A.   We have -- we have --

5             MR. BOPP:  Excuse me.

6             I object to the question.  It goes

7    beyond the scope of the subject matter which, with

8    respect to the two states, are limited to data

9    analysis and record linkage, in number 2, and

10   voter registry and research in number 3.

11            So you are beyond the scope of your

12   subject matter specification, so I instruct him

13   not to answer.

14   BY MR. SHELLY:

15       Q.   Mr. Phillips, what year was OpSec

16   founded?

17       A.   The company --

18       Q.   Yes.

19       A.   -- was founded in 2020.

20       Q.   Okay.  So for these questions that are

21   before OpSec was created, these will be questions

22   in your individual capacity without regard to the

Page 37

1    topics that were in Exhibit A.

2            MR. BOPP:  Okay.  If you want to ask a

3    question in the individual capacity, go ahead and

4    I'll determine whether or not to object.  Thank

5    you.

6    BY MR. SHELLY:

7        Q.   Where do you obtain citizenship data

8    from?

9            MR. BOPP:  I object.  It goes beyond the

10   court's order limiting it to 2012 forward and in

11   the six specified states.  I instruct him not to

12   answer.

13   BY MR. SHELLY:

14       Q.   Okay.  And one of the tweets that we

15   looked at -- we can pull it up again if it's

16   necessary to refresh your recollection -- you

17   tweeted, "We are joining hashtag [sic] TrueTheVote

18   to initiate legal action."

19           My question is, who had you discussed

20   this with at True the Vote?

21           MR. BOPP:  I object.  The -- that goes

22   beyond the court's order, which limits your

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 38

1    questions to 2012 onward and the six states.  And

2    you're not limiting it to that, and I instruct him

3    not to answer.

4              MR. SHELLY:  Your objection is related

5    to the six states, and my question was who he

6    discussed this with at True the Vote.  So it

7    doesn't pertain to any particular states.

8              MR. BOPP:  Then you're asking about all

9    states or every country in the world, and that

10   goes beyond the court's order limiting your

11   questions to six states.  So I instruct him not to

12   answer.

13             MR. SHELLY:  Okay.  I'll limit my

14   question to the six states.

15             MR. BOPP:  All right.

16   BY MR. SHELLY:

17        Q.   My question is, who did you speak with

18   at True the Vote about your allegations of

19   non-citizen voting after the 2016 election?

20             MR. BOPP:  Regarding the six states?

21             MR. SHELLY:  Regarding the six states.

22             MR. BOPP:  Thank you.  All right.

Page 39

1          THE WITNESS:  What's the question?  I'm

2     sorry.

3     BY MR. SHELLY:

4          Q.   In your November 2016 tweet, you

5     tweeted --

6          A.   I'm sorry.  I don't see that I wrote

7     those tweets.  There's some misinformation in

8     there, and I don't -- I don't recall those exact

9     words, and I'm not certain that I actually tweeted

10    them.

11         Q.   Did you speak with anyone at True the

12    Vote about non-citizen voting in the six target

13    states after the November 2016 election?

14         A.   Not specifically the six states.

15         Q.   Did you speak with True the Vote about

16    analysis that would have included those six

17    states?

18         A.   You need to clarify the question.  I

19    mean, I don't know whether you're talking about

20    before or after.  I mean, you're -- I just can't

21    answer a question that I don't understand.

22         Q.   Did you speak to True the Vote in

Page 40

1   November 2016 about non-citizen voting?

2          A.   When?

3          Q.   In November 2016.

4          A.   Probably not.

5          Q.   Did you discuss initiating legal action

6   with True the Vote related to non-citizen voting

7   in the 2016 election?

8          A.   At some point post November probably,

9   but not in November.

10          Q.   Who did you discuss this with at True

11   the Vote?

12          A.   I don't recall specifically.

13          Q.   Did you or True the Vote ever initiate

14   legal action related to your findings?

15          A.   No.

16          Q.   Why not?

17          A.   Because we were threatened and my family

18   was threatened and we decided that it just wasn't

19   appropriate to take action and put us in further

20   danger.

21          Q.   Okay.

22               MR. SHELLY:  Mr. White, can you pull up

Page 41

1    Exhibit R.

2            (Phillips Deposition Exhibit 4 was

3    marked for identification and attached to the

4    transcript.)

5    BY MR. SHELLY:

6        Q.   Mr. Phillips, did you conduct an

7    interview with CNN in January 2017 about

8    allegations of non-citizen voting in the 2016

9    election?

10       A.   Yes.

11           MR. SHELLY:  Can we go to page 10.

12   Great.

13   BY MR. SHELLY:

14       Q.   This is the third paragraph down

15   starting with "Obviously."  Reading ahead a few

16   sentences, you say, "When we complete this

17   analysis, we're going [to] lay it out to the

18   public.  We're going to lay out our methodologies.

19   We're going to lay out our hypothesis.  We're

20   going to lay out our outputs.  We're going to lay

21   out the raw data for everyone to see."

22           Did I read that correctly?

Page 42

1        A.    Yes, but I don't recall the exact words.

2    You read what's on the screen.

3        Q.    Okay.  And do you agree that this was in

4    the context of analysis of non-citizen voting in

5    the 2016 election?

6        A.    I don't recall --

7              MR. BOPP:  I object.  The question goes

8    beyond the limit of the six states and, therefore,

9    you're violating the court's order, and I instruct

10   him not to answer.

11             MR. SHELLY:  This is an interview that

12   he gave with CNN.  I'm not asking about Oregon or

13   any state that's not among the six states.  I'm

14   just asking him about what he told CNN related to

15   the 2016 election.

16             MR. BOPP:  I've made my objection to

17   your question.

18             MR. SHELLY:  And I understand you're

19   instructing him not to answer in his 30(b)(6) or

20   his individual capacity?

21             MR. BOPP:  I did instruct him not to

22   answer because your --

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 43

1            MR. SHELLY:  Okay.  I just want to make

2     sure that I heard correctly.  I will continue with

3     my questions.

4     BY MR. SHELLY:

5         Q.   When did you complete this analysis,

6     Mr. Phillips?

7         A.   I don't recall.

8            MR. BOPP:  Same --

9            Gregg, you need to pause for just a

10    second so I can enter -- because, you know, half

11    of his questions are completely in violation of

12    the court order, so I need to be able to interject

13    with an objection.

14           So I object.  Your question goes beyond

15    the court's limitation on your questions.  And it

16    needs to be the six states and also be 2012

17    forward.  I instruct him to not answer.

18    BY MR. SHELLY:

19        Q.   And what did you find when you completed

20    your analysis?

21           MR. BOPP:  Same objection and same

22    instruction.

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 44

1    BY MR. SHELLY:

2         Q.   Did you ever release your methodology?

3              MR. BOPP:  Same objection.  Same

4    instruction.

5    BY MR. SHELLY:

6         Q.   Did you ever release your raw data?

7              MR. BOPP:  Same objection.  Same

8    instruction.

9    BY MR. SHELLY:

10        Q.   Do you plan to release your analysis,

11   methodology or raw data?

12             MR. BOPP:  Same objection.  Same

13   instruction.

14   BY MR. SHELLY:

15        Q.   Did any independent third party ever

16   confirm your allegations related to the 2016

17   election?

18             MR. BOPP:  Same objection.  Same

19   instruction.

20             MR. SHELLY:  You can take this down,

21   Mr. White.

22             THE VIDEOGRAPHER:  My apologies.  What?

Page 45

1              MR. SHELLY:  I'm all done with this

2      exhibit.  You can take it down.  Thank you.

3              THE VIDEOGRAPHER:  Okay.

4      BY MR. SHELLY:

5          Q.   Mr. Phillips, what do you do for a

6      living now?

7          A.   I own a technology company.

8          Q.   Is that OpSec?

9          A.   No.

10         Q.   What's the name of the company?

11         A.   CoverMe Services.

12         Q.   Did you found OpSec?

13         A.   Yes.

14         Q.   Are you the managing partner at OpSec?

15         A.   Yes.

16         Q.   And these are positions that you

17     continue to hold today?

18         A.   Yes.

19         Q.   Okay.  Just to clean up the previous

20     section about the 2016, Mr. Phillips, can you just

21     confirm that you intend to follow your attorney's

22     instruction not to answer?

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 46

1      A.   Yes, I intend to follow my attorney's

2  instructions.

3      Q.   Thank you.

4           What services does OpSec perform?

5      A.   Research, election intelligence

6  gathering, some operational activities.

7      Q.   And what kinds of operational

8  activities?

9      A.   It depends on the situation.

10     Q.   I think you told me that OpSec was

11 founded in 2020.

12          Do you remember when in 2020 it was

13 founded?

14     A.   Formally founded in 2020, yes.

15     Q.   Was that -- do you know what part of the

16 year?

17     A.   I don't.

18     Q.   Before the fall elections?

19     A.   Yes.

20     Q.   How many employees does OpSec have?

21     A.   No legitimate employee.  No full-time

22 employees beyond me.  We hire contractors.

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 47

1        Q.    How many contractors?

2        A.    We've had dozens.

3        Q.    And what formal training do these

4     contractors have in data analysis?

5        A.    It depends on the project.

6        Q.    How many clients does OpSec have?

7        A.    Half a dozen.

8        Q.    Are they all related to politics and

9     campaigns?

10       A.    No.

11       Q.    How many of them are related to politics

12    and campaigns?

13       A.    I don't know.

14       Q.    When did you first discuss having OpSec

15    perform work for True the Vote?

16       A.    I don't recall.  The fall of 2020.

17       Q.    So soon after OpSec was formed?

18       A.    Yes.

19       Q.    Had you discussed OpSec partnering with

20    True the Vote before it was formally created?

21            MR. BOPP:  I object to the question.

22    You're not limiting it to the six states.  Your

Page 48

1   question does not limit the matter.  The question

2   is not limited to the six states once again.  And

3   so I instruct him not to answer.

4   BY MR. SHELLY:

5        Q.   Has OpSec done any work with True the

6   Vote related to Wisconsin?

7        A.   Yes.

8        Q.   Can you describe that work?

9        A.   No.

10       Q.   Why not?

11       A.   Because we didn't start doing it until

12   after -- until 2021.

13            MR. BOPP:  And I object to the question,

14   that it asks for information regarding 2021.

15   BY MR. SHELLY:

16       Q.   Okay.  I'll repeat the same question in

17   individual capacity.

18       A.   What's the question?

19       Q.   Have you performed any work with True

20   the Vote related to Wisconsin?

21       A.   Yes.

22            MR. BOPP:  And I -- I object because it

Page 49

1   goes beyond -- because you're not confining it to

2   2012 through the 2020 election.

3           MR. SHELLY:  Do you instruct him not to

4   answer?

5           MR. BOPP:  Yeah, I do.

6   BY MR. SHELLY:

7       Q.   Have you performed any work with True

8   the Vote in Michigan since 2012?

9           MR. BOPP:  The same objection.  It needs

10  to be confined to 2020 -- through 2020.

11  BY MR. SHELLY:

12      Q.   Have you performed any work with True

13  the Vote in Michigan from 2012 to 2020?

14      A.   No.

15      Q.   Have you performed any work with True

16  the Vote in Pennsylvania from 2012 to 2020?

17      A.   No.

18      Q.   Have you performed any work with True

19  the Vote in Ohio from 2012 to 2020?

20      A.   No.

21      Q.   Have you performed any work with True

22  the Vote in Texas from 2012 to 2020?

Page 50

1        A.    No.

2        Q.    But fair to say you have done work with

3    True the Vote in Georgia between 2012 and 2020?

4        A.    Yes.

5        Q.    And when did you first discuss doing

6    work in Georgia with True the Vote?

7        A.    I don't recall the specific day.

8        Q.    Was it before OpSec was founded in the

9    fall of 2020?

10       A.    I don't recall.

11       Q.    Did you perform any work for True the

12   Vote in Georgia before the November general

13   election?

14       A.    November what year?

15       Q.    2020.  Sorry.

16            THE WITNESS:  Jim, I need to talk to you

17   about how to answer that.  I'm not sure --

18   BY MR. SHELLY:

19       Q.    I'm going to instruct you to answer the

20   question.

21            MR. BOPP:  We will click off both our

22   video and audio and I will consult with my client.

Page 51

```
1              THE VIDEOGRAPHER:  Counsel, do you want
2    to go off the record?  Mr. Shelly?
3              MR. SHELLY:  Yes.
4              THE VIDEOGRAPHER:  Did you want to go
5    off the record?
6              MR. SHELLY:  Sure.
7              THE VIDEOGRAPHER:  The time is
8    11:05 a.m.  We are now off the record.
9              (Pause from the record.)
10             THE VIDEOGRAPHER:  Okay.  The time is
11   11:06 a.m.  We are now on the record.
12             MR. SHELLY:  Mr. Goldstein, can you read
13   back my last question.
14             (Record read.)
15   BY MR. SHELLY:
16        Q.   This was 2020.
17        A.   We ran a nationwide election integrity
18   hotline on behalf of True the Vote.  And we may
19   have received some calls to the hotline from
20   Georgia.  But specific work in Georgia, no.
21        Q.   What was your role with the hotline?
22        A.   We established it and operated it, hired
```

Page 52

1    the contractors to run it.

2          Q.   Did you or anyone at OpSec field calls?

3          A.   No.  We had a contractor.

4          Q.   Okay.  And when the contractors fielded

5    the calls, what were they instructed to do with

6    that information?

7          A.   It depended on the information.  I mean,

8    most of it was people just wanting to talk about

9    what was going on and they were frustrated.  And

10   they were instructed to talk to them and that was

11   it.

12         Q.   Okay.

13              MR. SHELLY:  This may have been jumbled.

14   I think there was a little bit of cross talk

15   before the recent break, but just for the clean

16   record, I want to repeat that I objected to going

17   off the record while the question was still

18   pending.

19   BY MR. SHELLY:

20         Q.   What instructions did you give to

21   contractors related to the hotline?

22         A.   I don't recall.

Page 53

1      Q.   Did the contractors provide information

2   about the calls they received to you?

3      A.   Not to me directly, no.

4      Q.   Who did they provide the information to?

5      A.   I think probably to True the Vote.

6      Q.   Okay.  What was OpSec paid for its work

7   related to the hotline?

8      A.   I don't recall.

9      Q.   Who gave you the instructions related to

10  the hotline?

11     A.   I don't understand the question.  How to

12  run it?  I don't know what you mean.

13     Q.   My understanding is that you created the

14  hotline, you set it up and hired the contractors.

15  I'm asking who that request came from.

16     A.   Me.

17     Q.   Okay.  And my understanding is you did

18  this in conjunction with True the Vote?

19     A.   Yes.

20     Q.   But the hotline was your idea, not

21  someone at True the Vote's?

22     A.   I don't recall whose idea it was.

Page 54

1        Q.   When did you first discuss generating

2   lists of registered Georgia voters to be

3   challenged for change of residency?  And I'll

4   refer to these lists as "challenge lists" for

5   simplicity.

6        A.   Can you repeat your question.

7             MR. BOPP:  I object unless it's limited

8   to one of the six states and a particular

9   election.

10            MR. SHELLY:  So my question referenced

11  Georgia specifically, but I will further clarify

12  that I am referring to the challenge program that

13  occurred in December -- in between the general and

14  runoff elections in Georgia spanning from end of

15  2020 to beginning of 2021.

16            MR. BOPP:  Okay.

17  BY MR. SHELLY:

18       Q.   My question is, when did you first

19  discuss generating lists of registered Georgia

20  voters to be challenged for change of residency?

21       A.   Approximately the beginning of December.

22       Q.   And whose idea was that?

Page 55

1       A.   I don't recall specifically.  Possibly

2   mine.

3       Q.   Who did you discuss it with?

4       A.   Mrs. Engelbrecht.

5       Q.   Anybody else?

6       A.   When?  I'm sorry.  You're being a little

7   vague.

8       Q.   My understanding is that possibly you

9   came up with this idea in December 2020, and I'm

10  asking who you shared this idea with.

11      A.   And I said Mrs. Engelbrecht.

12      Q.   My question was, anybody else?

13      A.   When?  There were subsequent

14  conversations, but are you talking about in its

15  infancy?

16      Q.   Yes.

17      A.   You have to be more specific.

18      Q.   In the infancy, was anyone else

19  participating in the conversations you had with

20  Ms. Engelbrecht?

21      A.   No.

22      Q.   What was her response -- well, what did

Page 56

1   you propose to do to Ms. Engelbrecht in

2   December 2020?

3        A.   I don't recall making a proposal.  I

4   recall discussing the generalities of a section of

5   the Georgia code that allowed citizens, voters to

6   challenge other voters in their counties and

7   municipality, but I don't recall the specifics of

8   it.

9        Q.   How did you become familiar with that

10   section of the Georgia code?

11        A.   Reading it.

12        Q.   Had you heard about that section from

13   anybody else?

14        A.   I'm familiar with challenge laws in most

15   states.

16        Q.   All right.  How did you decide on the

17   fee that OpSec would be paid for work on this

18   challenge program?

19        A.   I don't recall.

20        Q.   How much were you paid?

21        A.   I don't recall specifically about this.

22   We were doing a number of projects.

Page 57

1          MR. SHELLY:  Mr. White, can you pull up

2    Exhibit N, as in Nancy.

3          (Phillips Deposition Exhibit 5 was

4    marked for identification and attached to the

5    transcript.)

6    BY MR. SHELLY:

7      Q.   Do you recognize this document,

8    Mr. Phillips?

9      A.   It looks like an invoice, yeah.

10     Q.   Yes.

11          I believe this is an invoice from OpSec

12   to True the Vote for $400,000.  And it reflects

13   that you had been paid the entire amount by

14   December 7th, 2020.

15          Does that look right to you?

16     A.   I don't recall the specifics of the

17   payments, but that's what it says.

18     Q.   Does this invoice cover your work

19   generating challenge lists?

20     A.   This goes way beyond that.  There's a

21   lot more to this than that.

22     Q.   Okay.  But it includes that and goes

1/25/2022         Fair Fight, Inc. et al. v. True the Vote, et al.         Gregg Phillips

Page 58

1    beyond it; is that right?

2         A.   It might.  I don't know.  It doesn't

3    seem as specific as it might have been.  I don't

4    know.

5         Q.   Okay.  Looking under the column titled

6    "Description," can you explain to me what -- what

7    is "Eyes on Georgia"?

8         A.   It was an internal working name for our

9    broad work in Georgia.

10        Q.   And what-all work did that include?

11        A.   Data acquisition, analysis, preparation

12   of lists, supporting True the Vote in their work,

13   ETL.

14        Q.   What is "ETL"?

15        A.   Extract, transfer and load.

16        Q.   And would that have been related to the

17   challenge lists or were you doing other

18   extractions, transfers and loads?

19        A.   We were doing many others.

20        Q.   And what is another reason you were

21   doing that for, in addition to the challenge

22   lists?

Page 59

1          A.    Other research.

2          Q.    What kinds of research?

3                MR. BOPP:  I object to the question.  It

4     goes beyond the scope of the subject matter and --

5     but I'll let him answer.

6                THE WITNESS:  It notes some of it down

7     near the bottom, where it says "Analysis –

8     identity/residency analysis, time-based analysis,

9     Georgia code analysis, [and] litigation support."

10    BY MR. SHELLY:

11         Q.    So identity/residency analysis, I

12    understand that that was related to the challenge

13    program, but are you suggesting you did

14    identity/residency analysis that was not related

15    to a challenge program?

16         A.    That's a false assumption.

17         Q.    My question is, did you do identity and

18    residency analysis unrelated to the challenge

19    program?

20         A.    Yes.

21         Q.    Can you describe that for me?

22         A.    No.

Page 60

1       Q.    Why not?

2       A.    Because it was a nationwide project we

3   were working on.

4       Q.    Did that project include work in Texas,

5   Ohio, Pennsylvania, Michigan or Wisconsin?

6       A.    I don't recall.

7       Q.    Did you do any identity or residency

8   analysis in Georgia unrelated to the challenge

9   program?

10      A.    Probably, yes.

11      Q.    And what would that have been related

12  to?

13      A.    I don't -- I don't recall specifics.

14      Q.    So just to be clear, you recall that it

15  was not related to the challenge program, but you

16  do not recall what it was related to?

17      A.    Right.

18      Q.    Okay.  How about the time-based

19  analysis; can you describe the scope of that work

20  in Georgia?

21      A.    It had nothing to do with the work we

22  were doing.

Page 61

1      Q.    And what did it have to do with?

2      A.    We did geospatial analysis as a company

3  and it was related to that.

4      Q.    And what were you analyzing?

5      A.    We were developing -- we weren't

6  analyzing anything at the time.  We were working

7  on the development of a process.

8      Q.    What was the process?

9           MR. BOPP:  I object.  The question is

10  going beyond the six states --

11          MR. SHELLY:  My question here is just

12  about Georgia.

13          MR. BOPP:  Okay.  Fair enough.

14          THE WITNESS:  Nothing in 2020.

15  BY MR. SHELLY:

16      Q.    I just want to make sure I'm reading

17  this invoice right.

18          In December 2020, you invoiced True the

19  Vote for a project called Eyes on Georgia that

20  included time-based analysis --

21      A.    That's not true.

22      Q.    Can you clarify what I got wrong?

Page 62

1        A.    Yeah.   Read the invoice.   Eyes on

2    Georgia was the top part and analysis was the

3    secondary piece.

4        Q.    Okay.

5        A.    You're conflating the two.

6        Q.    So the section from "Ground Data"

7    through "ETL" was in Georgia and the section

8    "Analysis" through "Litigation Support" was

9    nationwide?

10       A.    Partly.

11       Q.    Am I understanding that correctly?

12       A.    Partly, but it also didn't have

13   necessarily anything to do with the Eyes on

14   Georgia project.

15       Q.    Okay.   Then let me ask about the Eyes on

16   Georgia project.

17             What ground data did you collect?

18             MR. BOPP:   I'm sorry.   Can you repeat

19   the question.

20   BY MR. SHELLY:

21       Q.   My question was, what ground data did

22   you collect?   But it was in the context -- I can

Page 63

1    spell it out -- within the Eyes on Georgia project

2    in 2020.

3              MR. BOPP:  Okay.  I object.  It goes

4    beyond the scope of the subject matter which you

5    limited to data analysis and data linkage and

6    voter registration research.  You did not specify

7    data collection and therefore I object to the

8    question and instruct him not to answer.  It's

9    going beyond the scope of the subject matter.

10             MR. SHELLY:  Topic number 8 asks about

11   OpSec's coordination with True the Vote to conduct

12   voter and election-related activities in any of

13   the targeted states from 2022 onwards.  And so if

14   the answer is that the ground data was not

15   election-related activity, I'll move on.  So let

16   me just ask that.

17   BY MR. SHELLY:

18        Q.   Is the ground data related to elections

19   in Georgia?

20             MR. BOPP:  Your question goes beyond the

21   scope of number 8 also because your -- that is

22   limited to communication and coordination with

Page 64

1    these specified people.

2          MR. SHELLY:  This is an invoice to True

3    the Vote.  And so I think the natural assumption,

4    if this is work that OpSec was doing for True the

5    Vote, then that's coordination.

6          MR. BOPP:  You can answer if you can.

7          THE WITNESS:  You're making a false

8    assumption.  "Ground" is the name of our database.

9    BY MR. SHELLY:

10       Q.   Okay.  Then am I reading correctly that

11   what comes below "Ground Data," that was data that

12   you housed in the Ground database?

13       A.   Not necessarily.

14       Q.   Okay.  Can you explain for me how this

15   section from "Ground Data" through "ETL" applies

16   to work you were performing in Georgia in 2020?

17       A.   You're going to have to be more

18   specific.  That's a non-answerable question.

19       Q.   I'm trying to get a sense of what work

20   you performed for True the Vote in Georgia in

21   2020.  This invoice lists several activities, and

22   I'm asking you to explain what these activities

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 65

1    were.

2            MR. BOPP:  Go ahead and ask a question

3    if you have a question.  He's only required to

4    answer your questions, not have you state

5    generally what you'd like to know and then require

6    him to just, what, spill his guts?  No.  You have

7    to ask a question.  And then he's -- and then

8    you're entitled to an answer to the question

9    unless it's objectionable.

10   BY MR. SHELLY:

11       Q.   Can you explain what "Ground Data"

12   refers to?

13       A.   Data acquisition.

14       Q.   And what data did you acquire?

15           MR. BOPP:  I object.  That goes beyond

16   the scope of the specification of the subject

17   matter, and I instruct him not to answer.

18   BY MR. SHELLY:

19       Q.   Did you acquire election-related data?

20           MR. BOPP:  I object to the question as

21   going -- same objection and same instruction.

22           MR. SHELLY:  Can you clarify for me how

Page 66

1   you think -- which part of the topic you think

2   that doesn't relate to?

3           MR. BOPP:  Are you asking me?

4           MR. SHELLY:  Yes.  I'm trying to

5   understand your objection, if there's a way the

6   question needs to be rephrased or if you just

7   don't want me asking about Ground data in Georgia

8   for the 2020 election, the work that he did for

9   True the Vote.

10          MR. BOPP:  The way this works, I don't

11  have to answer your questions.  And I've made my

12  objection to your question and I stand by it.

13          MR. SHELLY:  Your objection is it's

14  outside of the scope of the 30(b)(6) topics?

15          MR. BOPP:  Your question was, yes.

16          MR. SHELLY:  Okay.

17  BY MR. SHELLY:

18      Q.   Mr. Phillips, my question for you is,

19  were you acquiring election data -- well, first

20  let me just preface.

21          The questions that I'm asking about this

22  topic underneath "Eyes on Georgia," all my

Page 67

1    questions are about in Georgia for the 2020

2    election.

3              And so my question is, were you

4    acquiring election data?

5              MR. BOPP:  And my objection is that goes

6    beyond the scope of the subject matters.  Data

7    acquisition is not specified in your subject

8    matter notice, so I instruct him not to answer.

9    BY MR. SHELLY:

10        Q.   Can you tell me what "Political Lists"

11   refers to in the context of your work for True the

12   Vote in Georgia at the 2020 election?

13        A.   Again, data acquisition.

14        Q.   And was that election-related data?

15             MR. BOPP:  Go ahead.

16   BY MR. SHELLY:

17        Q.   Are you thinking of your answer,

18   Mr. Phillips?

19        A.   No.  I didn't know you asked me a

20   question.  I'm sorry.

21        Q.   My question was -- you told me that the

22   "Political Lists" in this invoice refers to data

Page 68

1    acquisition.

2             My question is if that was

3    election-related.

4        A.   What do you mean, election-related?

5        Q.   I simply mean was the data related to an

6    election or election activities?

7             MR. BOPP:  I object to your -- your

8    asking details about data acquisition that goes

9    beyond the scope of your subject matter

10   designation, and I instruct him not to answer.

11   BY MR. SHELLY:

12       Q.   What does "GA Updates" refer to in the

13   context of work you provided for True the Vote in

14   Georgia related to the 2020 election?

15       A.   Same answer.

16       Q.   And what's that answer?

17       A.   Data acquisition.

18       Q.   And what data were you acquiring?

19            MR. BOPP:  I object.  It goes beyond the

20   specification of the subject matter and instruct

21   him not to answer.

22

Page 69

1    BY MR. SHELLY:

2         Q.    What does "Cell based" refer to in the

3    context of your work for True the Vote in Georgia

4    for the 2020 election?

5         A.    Data acquisition.

6         Q.    And what data were you acquiring?

7               MR. BOPP:  Same objection.  Same

8    instruction.

9    BY MR. SHELLY:

10        Q.    And what did you do with that data?

11              MR. BOPP:  Same objection -- oh, no.  Go

12   ahead.

13              THE WITNESS:  What did we do with it?

14   BY MR. SHELLY:

15        Q.    Yes.

16        A.    We used it for analysis and research.

17        Q.    What did you analyze?

18        A.    I don't recall a specific topic.

19        Q.    Can you tell me generally what you

20   recall?

21        A.    No.

22        Q.    Why not?

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 70

1        A.    Because you keep asking the same

2    question, but these are about data acquisition and

3    research.  If you look down below, you'll see some

4    of the things that we do with the data and

5    analysis.

6        Q.    Okay.  Can you describe what Ad based"

7    means?

8        A.    Data acquisition.

9        Q.    And what data did you acquire?

10       MR. BOPP:  Same objection.  Same

11    instruction.

12    BY MR. SHELLY:

13       Q.    What did you do with this data?

14       A.    Analyzed it.

15       Q.    What did you analyze it for?

16       A.    I don't even understand your questions.

17    You're going to have to be more specific.  What

18    did I analyze it for?  That's not even a sentence.

19       Q.    You told me that "Ad based" refers to

20    data acquisition.  You said you analyzed that

21    data.

22            I'm asking you, what was the purpose of

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 71

1   that analysis?

2        A.   Because that's what we were hired by

3   True the Vote to do.

4        Q.   And what did that analysis show?

5        A.   It depends on the topic.

6        Q.   What topics were you asked to analyze?

7        A.   I don't have a specific list.

8        Q.   Can you give me some examples?

9        A.   Ineligible voters.

10       Q.   And what did you find?

11       A.   What did I find about what?

12       Q.   When you analyzed the data.

13       A.   We found that there were ineligible

14  voters on the voter roll.  Isn't that why --

15       Q.   In addition to the challenge lists --

16       A.   I didn't say --

17       Q.   You didn't say what?

18            MR. BOPP:  I'm sorry, Jacob.

19            Gregg, you need to wait until the end of

20  the question before you answer, please.

21  BY MR. SHELLY:

22       Q.   Did you use that analysis for your --

Page 72

1    for the challenge lists?

2        A.   We used some of this analysis for the

3    challenge lists, yes.

4        Q.   Did you use the analysis for anything

5    else?

6        A.   Yes.

7        Q.   What else did you use it for?

8        A.   We used it for a lot of things and we're

9    still using it.  We have active analysis happening

10   today.

11       Q.   Can you give me some examples of what

12   else you used it for and are using it for?

13            MR. BOPP:  I object.  That goes beyond

14   the scope of the time frame, which is 2020, and

15   goes beyond the scope of the -- that's sufficient.

16            MR. SHELLY:  Are you instructing him to

17   not answer?

18            MR. BOPP:  No.

19   BY MR. SHELLY:

20       Q.   You may answer, Mr. Phillips.

21       A.   I don't recall the question.

22            MR. SHELLY:  Can you read back the last

Page 73

1    question.

2              (Record read.)

3              THE WITNESS:  Past 2020?

4    BY MR. SHELLY:

5        Q.   Yes.

6              MR. BOPP:  Okay.  I'll instruct him not

7    to answer.  That goes beyond the scope of the

8    questions you're permitted to ask.

9              MR. SHELLY:  I do not understand the --

10   if your objection is related to the time span, I

11   do not understand the court's order to be limited

12   to 2020.  It says from 2012 and onwards.

13             MR. BOPP:  Do you really think that he

14   meant until hell freezes over, you know?  Surely

15   not.  And because this case was about 2020 and the

16   November election -- I mean, the runoff, so...

17             MR. SHELLY:  Yes, I do understand that

18   order to include up to the present.

19             MR. BOPP:  I don't understand it that

20   way, so I made my objection.

21             MR. SHELLY:  Do I recall that you did

22   not instruct him not to answer this question?

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 74

1          MR. BOPP:  I instruct him not to answer

2     the question.

3     BY MR. SHELLY:

4         Q.   Mr. Phillips, how many times -- how many

5     other times has OpSec submitted an invoice for

6     400,000 or more to a client over the past two

7     years?

8          MR. BOPP:  I object.  That is totally

9     irrelevant, would invade his businesses and his

10    own personal financial dealings with other people

11    unrelated to this situation.  And I think

12    financial information like that is confidential,

13    and so I'll instruct him not to answer.

14         MR. SHELLY:  We do have a protective

15    order in this case, and so I would recognize that

16    the protective order would apply to that

17    information.  Does that change your objection?

18         MR. BOPP:  It doesn't affect the

19    relevance of this.  And, you know, you're not

20    entitled to, in my opinion, ask him questions

21    about other clients, which you are asking.  You

22    didn't say from True the Vote or -- you said from

Page 75

1   anybody.

2          MR. SHELLY:  I think that I am trying to

3   put his work with True the Vote in the context of

4   what OpSec does.  So I'm trying to find out if

5   this work for True the Vote was ordinarily within

6   the course of what OpSec did or if this was

7   unusual in some way.

8          MR. BOPP:  Well, that's fine and may be

9   your intent, but you've asked a question that's

10  too broad, in my opinion.  So if you focus your

11  question, you can get an answer to that.

12  BY MR. SHELLY:

13      Q.   Mr. Phillips, did -- in 2020, did -- was

14  True the Vote OpSec's highest-paying client?

15      A.   I doubt it, but I couldn't tell you

16  exactly.

17          MR. SHELLY:  We can take this exhibit

18  down, Mr. White.  Mr. White, you can take this

19  exhibit down.

20  BY MR. SHELLY:

21      Q.   Mr. Phillips, did you meet with

22  representatives from the Georgia Secretary of

Page 76

1    State's Office regarding the 2020 challenge

2    program in Georgia?

3        A.   No.

4             MR. SHELLY:  Can we pull up Exhibit C.

5             (Phillips Deposition Exhibit 6 was

6    marked for identification and attached to the

7    transcript.)

8             MR. SHELLY:  Can you scroll down.

9    BY MR. SHELLY:

10       Q.   This is OpSec's amended responses to

11   plaintiffs' request for production.

12            Are you familiar with these responses?

13   And there's several pages if you need Mr. White to

14   scroll through.

15       A.   Yeah, I'm familiar with them.

16       Q.   Okay.  Did you write these yourself?

17       A.   Probably, yeah.

18       Q.   How did you search for and identify

19   documents responsive to plaintiffs' discovery

20   requests?

21       A.   Searching my computer, my e-mail, that

22   kind of thing.

Page 77

1      Q.   Okay.  Let me make sure I direct you to

2   the right page.

3           Can you go to page 12.  You see number 2

4   at the bottom, "OpSec's representatives met with

5   the Georgia Secretary of State's representatives

6   to confirm the accuracy of its methodology"?

7           Do I understand you to say -- excuse me?

8           MR. BOPP:  You have to wait, Gregg.  You

9   have to wait for a question.

10  BY MR. SHELLY:

11     Q.   Did you meet with the Secretary of

12  State's representatives?

13     A.   No.

14     Q.   Which OpSec representatives did?

15     A.   Brian Robinson.

16     Q.   Did I catch the first name was Wayne?

17     A.   Brian.

18     Q.   Brian.

19          And what was his role with OpSec?

20     A.   He was a contractor to help with

21  communications.

22     Q.   Did you give him instructions related to

Page 78

1   this meeting?

2          A.    No.

3          Q.    He met with the Secretary of State on

4   his own initiative?

5          A.    No, he went with Catherine Engelbrecht.

6          Q.    Did OpSec initiate that meeting or did

7   Ms. Engelbrecht or somebody else?

8          A.    I don't recall.

9          Q.    When did this meeting occur?

10         A.    I don't recall.

11         Q.    Do you think it would be fair to say it

12  was after the November 2020 election?

13         A.    Yes.

14         Q.    And would it have been before you

15  produced the challenge lists?

16         A.    Likely, yes.

17         Q.    And who are the Secretary of State's

18  representatives?

19         A.    I don't know.  I wasn't there.

20         Q.    Was this an in-person meeting?

21         A.    Yes.

22         Q.    Where did it occur?

Page 79

1          A.    I don't know.

2          Q.    Just so I'm not making any assumptions,

3     your understanding -- am I correct to understand

4     that Mr. Robinson and Ms. Engelbrecht discussed

5     the methodology of the challenge program with the

6     Secretary of State's representatives?

7          A.    I have no idea.

8          Q.    Okay.  But it's my understanding that

9     that's what you wrote for number 2 here at the

10    bottom.

11         A.    As I said -- I mean, that was my

12    recollection of it, but I don't know what was

13    said.  I wasn't in the meeting.

14         Q.    Do you know what the Secretary of

15    State's representatives said in response to the

16    methodology that was described?

17         A.    I have no idea.

18         Q.    Did you or anyone affiliated with OpSec

19    have any further contact with the Secretary of

20    State's Office after this meeting?

21         A.    No.

22              MR. SHELLY:  You can take this one down,

Page 80

1    Mr. White.

2    BY MR. SHELLY:

3         Q.   Are you familiar with the procedures

4    prescribed by the National Voter Registration Act

5    for states to identify individuals who have

6    changed residency and to remove them from voter

7    registration lists?

8         A.   Yeah.

9         Q.   Can you describe to me your

10   understanding of those procedures?

11        A.   The law is pretty clear.  What do you

12   want?

13        Q.   How do you understand that the NVRA

14   permits states to identify individuals who have

15   changed residency and remove them from the

16   registration lists?

17             MR. BOPP:  I object.  His knowledge or

18   understanding of the law is completely irrelevant.

19             But you may answer.

20             THE WITNESS:  There are proscribed

21   rules, in essence, and states are compelled to

22   follow those rules.

Page 81

1   BY MR. SHELLY:

2       Q.   Is it your understanding that states may

3   not remove voters for change of residency unless

4   they send formal notice and wait for two federal

5   election cycles?

6           MR. BOPP:  I object.  His knowledge or

7   understanding of legal requirements cannot be more

8   irrelevant, honestly.  But he may answer if he

9   knows.

10          THE WITNESS:  What was the question?

11  BY MR. SHELLY:

12      Q.   Is it your understanding that states may

13  remove voters from the registration list for

14  change of residency only after sending formal

15  notice and waiting for two federal election

16  cycles?

17      A.   It's more complex than that because you

18  have to add inactive -- the inactive portion of

19  the rolls, but broadly that's true.

20      Q.   And what is your understanding of why

21  states are required to wait two federal election

22  cycles before removing voters that they have

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 82

1   identified?

2        A.   I don't -- what's the question?  I'm

3   sorry.

4        Q.   What is your understanding of why states

5   are required to wait two federal election cycles

6   before removing voters that they have identified

7   who have potentially changed residency?

8        A.   Why?

9        Q.   Yes.

10       A.   Because the states' processes are so

11  diverse and so flawed in their application, some,

12  like Georgia, contract with companies like ERIC,

13  others don't.  And even then, it's -- you know,

14  it's not a perfect process and it's flawed.

15       Q.   Is it your understanding that states can

16  use NCOA data to identify voters who have

17  potentially moved?

18       A.   In part, sure.

19       Q.   Do you have reason to believe that

20  Georgia has failed to follow this NVRA process for

21  identifying voters who have potentially moved and

22  removing them from the rolls?

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 83

1          A.    Yes.

2                MR. BOPP:   I object.   His opinion on

3    whether or not they follow the federal statute

4    cannot be more irrelevant.   But you can burn up

5    your time on stuff like this, I guess.

6                Go ahead.   You can answer.

7    BY MR. SHELLY:

8          Q.    I understood you to answer yes, that

9    Georgia has failed to follow the NVRA process; is

10   that correct?

11         A.    Yes.

12         Q.    How do you understand your methodology

13   to be similar to or different from the Secretary

14   of State's methodology for list maintenance?

15         A.    For list maintenance?   That's --

16         Q.    For identifying voters who -- for

17   identifying individuals on the voter rolls who may

18   have changed residency.

19         A.    We don't engage in list maintenance.

20   OpSec doesn't engage in list maintenance

21   activities.

22         Q.    I'm asking how your methodology compared

Page 84

1   to the list maintenance that the Secretary of

2   State does.

3          But specifically I'm asking you, how

4   does your methodology, using NCOA data to identify

5   individuals on the voter rolls who may have moved

6   out of state, differ from your understanding of

7   the Secretary of State's methodology for doing the

8   same?

9      A.   I don't know that it does differ.

10     Q.   So why did OpSec need to perform a task

11  that you do not understand to differ from what the

12  Secretary of State was doing?

13     A.   We didn't.  We weren't doing list

14  maintenance.

15     Q.   Were you identifying individuals on the

16  voter rolls who you suspected of having moved out

17  of state?

18     A.   For the challenges, yes.

19     Q.   Right.

20          And I'm asking you how your process for

21  identifying those individuals -- how you

22  understand that to have differed from the

Page 85

1     Secretary of State's process.

2          A.   The Secretary of State hadn't cleaned

3     the rolls in two years.  They hadn't executed at

4     all.  So the difference is 100 percent.  If you

5     have one group that hasn't done it and you have

6     another group that's working on identifying the

7     folks, then that's the answer.  It's a 100 percent

8     difference if one party isn't executing.

9          Q.   If the Secretary of State had undertook

10    this analysis to identify voters who may have

11    moved out of state, individuals on the

12    registration lists who may have moved out of

13    state, it's your understanding that the Secretary

14    of State would have been able to remove those

15    voters from the registration rolls in

16    December 2020?

17         A.   No.

18         Q.   Your understanding is that the Secretary

19    of State would not be permitted to remove those

20    voters; am I understanding that correctly?

21         A.   Right.

22         Q.   And why is that?

Page 86

1        A.    Because that's list maintenance, and you

2    can't do list maintenance that close to an

3    election.

4        Q.    Who else are you aware of that was

5    analyzing the Georgia voter rolls or election

6    results after the November 2020 election?

7        A.    I don't recall.  I mean, there were a

8    lot of people looking at it.  I don't know.

9        Q.    Can you name some for me?

10        A.    Derek Somerville.

11        Q.    Anybody else?

12        A.    I think he had a guy working with him

13    named Mark Davis, but...

14        Q.    Anybody else?

15        A.    Not off the top of my head.

16        Q.    Are you aware that there were others,

17    but you can't remember their names, or you can't

18    remember if there were others?

19        A.    I just don't recall.

20        Q.    You don't recall if there were others?

21        A.    Either.

22        Q.    Okay.  Did you meet with Mr. Somerville

Page 87

1    or Mr. Davis?

2         A.   I've never met Mr. Davis.  I met with

3    Mr. Somerville at some point -- a dinner sometime

4    during December.

5         Q.   And how were you introduced?

6         A.   I think -- I think a gentleman named

7    Mark Williams introduced us.

8         Q.   And how did you meet Mark Williams?

9         A.   I don't recall.  I lived in Georgia for

10   a number of years and likely knew him from that

11   time.

12        Q.   And what was the purpose of your meeting

13   with Mr. Somerville?

14        A.   To see if there were some commonalities

15   in methodology that would allow us to work with

16   them to try to refine the list.

17        Q.   Is there anybody else -- was this an

18   in-person meeting with you and Mr. Somerville and

19   Mr. Williams?

20        A.   No.  I didn't meet them together.  I met

21   Mr. Williams and he gave me Mr. Somerville's name.

22        Q.   Thank you.

Page 88

1          And you met Mr. Somerville in person in

2    December 2020; am I understanding that correctly?

3       A.   Yes.

4       Q.   And was it only the two of you at this

5    meeting?

6       A.   No.  Mrs. Engelbrecht was there.

7       Q.   So it sounds like you were describing

8    one meeting in particular.

9            Was there more than one?

10      A.   Not that I'm aware of.

11      Q.   Okay.  I understood you to say you've

12   never met Mr. Davis.

13           Have you ever spoken to Mr. Davis?

14      A.   Once.

15      Q.   And when was that -- I'm sorry.  Let me

16   rephrase that.

17           Was that meeting before or after your

18   meeting with Mr. Somerville?

19      A.   After.

20      Q.   Okay.  In your meeting with

21   Mr. Somerville and Ms. Engelbrecht, how did you

22   describe your methodology?

Page 89

1       A.    How did we describe it?

2       Q.    Yes.

3       A.    I don't recall the specific words.

4       Q.    How did Mr. Somerville describe his

5    methodology?

6       A.    I don't remember all of it.  The couple

7    things that jumped out at us that -- one was they

8    wanted to target certain counties.  And we didn't

9    feel like that was appropriate, to target any

10   county.

11         And the other thing that I recall from

12   the conversation was they didn't want to include

13   inactive voters in the challenge list.  And our

14   view was that we needed to challenge those

15   inactive voters as long as we were challenging the

16   others.

17      Q.    Why did Mr. Somerville want to only

18   target certain counties?

19      A.    I don't know.

20      Q.    My understanding is he's -- tell me if

21   I'm misunderstanding this -- that he understood --

22   you were describing your methodologies for

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 90

1   generating these lists, Mr. Somerville said he was

2   only going to target certain counties, you wanted

3   to create lists for all counties in Georgia.

4          Is that part correct?

5     A.   That's what I recall, yes.

6     Q.   Okay.  And was there an exchange of

7   views about why lists should be made one way or

8   another?

9     A.   Not that I recall specifically.

10    Q.   Do you know which counties

11  Mr. Somerville made a list for?

12    A.   No, sir, I don't.

13    Q.   Why did you disagree with

14  Mr. Somerville's methodology of not including

15  inactive voters?

16    A.   I'm sorry.  Not including?

17    Q.   Not including inactive voters.

18    A.   I'm sorry.  What's the question?  I want

19  to be certain --

20    Q.   My understanding is that another

21  difference between your methodology and

22  Mr. Somerville's was that you included inactive

Page 91

1    voters in your lists.

2              And so my question is, why did you

3    disagree with Mr. Somerville about that?

4         A.   We just -- we felt like -- that some of

5    the challenges -- or some -- misused word -- some

6    of the issues that were causing people to be

7    concerned were about inactive voters, not just the

8    active voters.

9         Q.   Did you discuss the possibility that

10   including inactive voters could increase the

11   chance that your challenge list would include

12   people who were properly registered?

13        A.   Were properly registered --

14        Q.   Yes.

15        A.   -- or improperly?  I couldn't

16   understand.

17        Q.   My question is that if you are

18   increasing the magnitude of the challenge lists by

19   including inactive voters, did you discuss the

20   possibility that that breadth could sweep in

21   voters who were properly registered?

22        A.   No.

Page 92

1          MR. SHELLY:  We've been going close to

2     two hours.  How about we take a ten-minute break

3     here?

4          MR. BOPP:  All right.  It is noon and

5     I'd prefer to eat lunch.  But it also depends on

6     how long you think you need.  I mean, if we could

7     wrap up in an hour, you know, with the permission

8     of the recorder, court reporter and all that --

9     but, you know, it's up to you.  I'm just saying.

10    Otherwise, rather than a ten-minute break, we

11    should adjourn for lunch if we're going to go for

12    a couple more hours.

13          MR. SHELLY:  Yeah.  Unfortunately at the

14    pace we're going, I have more than an hour left.

15    So are you proposing --

16          MR. BOPP:  Fair enough.

17          MR. SHELLY:  Thirty minutes or what

18    would you like?

19          MR. BOPP:  Thirty minutes I think would

20    be okay with me.

21          How about you, Gregg?

22          THE WITNESS:  It's fine.

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 93

1             MR. SHELLY:  Okay.  Return at

2    12:30 Eastern.

3             MR. BOPP:  Okay.  Great.  Thank you.

4             THE VIDEOGRAPHER:  The time is

5    11:57 a.m.  We're now off the record.

6             (Recess from the record.)

7             THE VIDEOGRAPHER:  Okay.  The time is

8    12:31 p.m.  We are now on the record.

9    BY MR. SHELLY:

10       Q.   Okay.  Mr. Phillips, I would like to ask

11   you some questions now about the challenge lists

12   that you generated in Georgia for the 2021 runoff

13   election.

14            What data files did you use to generate

15   the challenge lists?

16       A.   The underlying data file, the state

17   voter registration file.

18       Q.   And presumably the NCOA list as well?

19       A.   We used NCOA.  We used several other

20   USPS products.  We use the CASS system, the Coding

21   Accuracy Support System.  We use Delivery Point

22   Verification.  We use several different

Page 94

1    components.  We also have a proprietary algorithm

2    that we used to help verify identity.

3         Q.   Okay.  To make sure I understood that,

4    my understanding is that NCOA has a list of people

5    who submit to the USPS that they want their mail

6    to be forwarded.  There's a list of names in the

7    voter rolls and there was the list of names who

8    submitted NCOA requests.

9              I understand you used various databases,

10   algorithms to perform the match, but am I correct

11   that the NCOA list of individuals and the voter

12   file list of individuals -- that those were the

13   two lists you used?

14        A.   No, that's an oversimplification.

15        Q.   Okay.  Can you explain what other

16   information you used?

17        A.   Yes.  I just did.  We used Advanced Data

18   Hygiene, as you guys and others have argued is the

19   correct way to go.  We agree.  We also used other

20   types of databases to help us -- help us verify

21   identity as best we can.

22        Q.   Okay.  What other lists of individuals

Page 95

1    besides the NCOA list did you use to identify

2    individuals who had moved?

3         A.    There's lots of different possibilities

4    out there, what we used specifically in the query.

5    I mean, the algorithms that we used access Oracle

6    queries so that we can basically consolidate all

7    the data we need and eliminate all the data we

8    don't need to, you know, eliminate false positives

9    and false negatives as best we can.

10        Q.    And what else could a person do to

11   indicate that they had changed residency that you

12   looked at besides sending a mail-forwarding

13   request to the post office?

14        A.    We look at other state data

15   registrations.  We look at a lot of things.  It

16   depends on the situation.  This one was pretty

17   simple, but it depends on the situation.  We could

18   access five or six different data sources.

19        Q.    Understood.

20              And I'm just asking specifically for the

21   Georgia challenge lists that you created.

22              Did I understand you to --

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 96

1            (Unintelligible cross-talk.)

2      Q.    Sorry?

3      A.    We used proprietary lists.  I mean, we

4   used some of the lists on the invoice you saw.  We

5   gather all sorts of data to help verify identity.

6   Because if you don't verify identity, then

7   residency is really -- you know, it has some risk

8   in determining the residency.

9            So we seek to identify -- verify

10  identity first.  And we -- I don't know who else

11  does that, but we do it.

12     Q.    And did I hear you correctly to say that

13  you matched Georgia's voter registration list to

14  voter registration rolls in other states to create

15  the challenge lists at issue in this case?

16     A.    Not only, but you asked me were there

17  other data sources.  And that was one, yes.

18     Q.    That was one you used.  Okay.

19           So besides requesting their mail to be

20  forwarded to the post office, besides registering

21  to vote in another state, is there anything else

22  that a registered Georgia voter could do to have

Page 97

1    ended up on your list?

2         A.    Sure.  You can look at all kinds of

3    things.  You can look at tax records to see if

4    people sold their house and moved.  You can look

5    at all kinds of things.

6         Q.    I'm asking specifically, what did you

7    look at to create --

8         A.    Those are some of the things that we

9    did.

10        Q.    You looked at tax records as well?

11        A.    In some cases, yes.

12        Q.    Which cases did you decide to look at

13   tax records for?

14        A.    I don't recall specifically.

15        Q.    Which tax records did you look at?

16        A.    We would look at county tax records.

17        Q.    And what are you looking at

18   specifically, whether an individual paid taxes in

19   the county where they're registered or something

20   different?

21        A.    No, to see if they moved.

22        Q.    Okay.  Anything else that you looked at

Page 98

1    specifically to create the Georgia challenge

2    lists?

3        A.    Not that I recall.

4        Q.    Okay.  What date did you obtain a copy

5    of Georgia's voter file to conduct the analysis to

6    generate the challenge lists?

7        A.    I don't recall.  It was mid December I

8    think when the Secretary of State put out their

9    final list for the runoffs.

10       Q.    Is OpSec a United States Postal Service

11   licensee?

12       A.    No.

13       Q.    How did you obtain the NCOA file?

14       A.    There are a number of access points that

15   we use to gain access.

16       Q.    And what were those access points?

17       A.    I don't know which one we used.

18   TrueNCOA likely, but there are a number.

19       Q.    How did you choose them?

20       A.    Experience.

21       Q.    Your previous experience with them or

22   their previous experience doing this kind of work?

Page 99

1        A.    I don't know what their experience is,

2    but our previous experience working with them and

3    others.

4        Q.    Is OpSec CASS certified?

5        A.    TrueNCOA is.  And if that's what we

6    used, then they are CASS certified, yes.

7        Q.    Okay.  And what date did TrueNCOA obtain

8    a copy of the NCOA registry for use in the

9    challenge lists?

10        A.    I don't know.

11        Q.    Do you know when must an individual have

12    submitted an NCOA request to be included in the

13    data you received?  In other words, what is the

14    window that was captured by the NCOA list?

15        A.    Well, as you're probably aware, they

16    update their files regularly.  So are you asking

17    when they updated their file, TrueNCOA, if that's

18    who we used?  I don't know the answer to that,

19    when they updated their file.  They update

20    regularly.

21        Q.    So just to clarify, so if TrueNCOA

22    received the NCOA file on December 15th, would

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 100

1  that include people who submitted their NCOA

2  request the previous January?  Or how far back

3  would that cover?

4      A.   Well, it depends.  That's not quite the

5  way it works.  What we were trying to ascertain

6  was whether or not people still lived in the

7  jurisdiction in which they were registered to

8  vote.  That's it.

9      Q.   Okay.  Am I correct to assume that the

10  NCOA list doesn't include everyone who has moved

11  out of -- submitted a mail-forwarding request to

12  the post office for the past like five years?

13  There was probably some shorter window; right?

14      A.   Sure, but that would be a false

15  negative, not a false positive.

16      Q.   Okay.

17      A.   That would be excluding someone who

18  should have been included rather than including

19  someone that shouldn't have been.

20      Q.   So my question is simply, do you know

21  what the window is that someone could have

22  submitted that request to have been included in

Page 101

1    the file that was used?

2        A.   I don't know right off the top of my

3    head, no.

4        Q.   Is that something you looked into in

5    preparation for this deposition?

6        A.   No, just because that's not what we were

7    doing.  You're asking about data cleanliness.  And

8    what we were trying to do is ascertain whether

9    people still lived in the jurisdiction or not.

10   And we were compelled to assist the challenging

11   voters to give a specific reason.

12            And it's up to the counties to determine

13   reasonable suspicion or probable cause or whatever

14   it is in Georgia.  A challenger has to give a

15   specific reason.  The specific reason is they

16   don't live in the jurisdiction anymore.

17       Q.   If your window for including people who

18   submitted an NCOA request goes back in time far

19   enough, is there a possibility that they could

20   have moved back to Georgia, but would still be on

21   your list because of their previous move out of

22   state?

Page 102

1      A.   Sure.  It's possible.

2      Q.   But I'm understanding you're not sure

3   how far back those requests would have been

4   included for your lists?

5      A.   No.  It's not relevant.

6      Q.   Okay.

7           MR. SHELLY:  Can we pull up Exhibit S.

8           (Phillips Deposition Exhibit 7 was

9   marked for identification and attached to the

10   transcript.)

11           MR. SHELLY:  You can scroll down a page

12   or two.

13   BY MR. SHELLY:

14      Q.   So this is an NCOALink processing

15   summary report that was produced by Mr. Davis, who

16   attempted to match the Georgia voter file with

17   NCOA data.

18           Take a look at this and tell me, was

19   anything like this produced during your matching

20   process?

21      A.   We don't use this particular tool.  And

22   no.  It's irrelevant.

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 103

1      Q.    Okay.

2            MR. SHELLY:  Can you go to bottom of

3     page 5 of this document, Mr. White.

4     BY MR. SHELLY:

5      Q.    Do you see here, at the bottom left

6     corner, there are some counts for insufficient

7     data, address not found, multiple responses?

8      A.    Yeah.

9      Q.    Am I understanding correctly that you

10    did not develop any similar counts for your

11    analysis?

12     A.    No, my guess is he didn't use either

13    CASS or DPV.  And I would suggest that he didn't

14    clean the rolls as it relates to identity

15    verification first or he wouldn't have had this.

16    This is bad process.

17     Q.    Okay.  What should Mr. Davis have done?

18            MR. BOPP:  Excuse me.  I need to talk to

19    my client for a second, so we will go off.

20            THE VIDEOGRAPHER:  Do you want to go off

21    the record, Counsel?

22            MR. SHELLY:  I just want to reiterate my

Page 104

1    objection to conferring between the witness and

2    counsel about how to answer my questions.

3              (Pause from the record.)

4              MR. BOPP:  Okay.  We're back.  You can

5    resume your questioning.

6    BY MR. SHELLY:

7        Q.   Mr. Phillips, you were telling me that

8    there was -- that this document illustrates that

9    Mr. Davis used a bad process.

10             Can you explain what you meant by that?

11       A.   I was just speculating.  It was not

12   appropriate.  We don't do it this way.

13       Q.   What does this document indicate was not

14   done that should have been done?

15       A.   I really can't speculate.  I'm sure that

16   Mr. Davis is doing a good job.

17       Q.   Is this -- is your answer informed by

18   off-the-record discussions you just had with

19   counsel?

20       A.   No.

21       Q.   Did you discuss your testimony with

22   counsel during that recess?

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 105

1             MR. BOPP:  You know, your Honor -- I

2    mean, your Honor -- Jacob, there was no pending

3    question when I sought to consult with my client.

4    There was no pending question, no pending answer.

5    So --

6             But go ahead, Gregg, you can answer.

7             THE WITNESS:  No, I don't -- I don't --

8    I'm not as aware of Mr. Davis' process as I should

9    be to make a comment, so I don't know.

10            MR. SHELLY:  You can take this exhibit

11   down.

12   BY MR. SHELLY:

13        Q.   For complex record linkage, do you think

14   it is important that fields used to link records

15   in different databases conform with respect to

16   data format and data type?

17        A.   What was the question?

18        Q.   For complex record linkage, do you think

19   it is important that fields used to link records

20   in different databases conform with respect to

21   data format and data type?

22        A.   Sure.

Page 106

1      Q.   So would you agree that it's

2   important --

3      A.   So assuming that you're performing an

4   actual linkage, yes.

5      Q.   Did you perform an actual linkage?

6      A.   Can you define what you mean by

7   "linkage."

8      Q.   Well, I'm repeating the term that you

9   just used.

10          What do you understand that to mean?

11     A.   No, that's not true.  You just said

12   "linkage."

13          What do you mean by "linkage"?

14     Q.   Is that not the term that you just used?

15     A.   You asked me a question about linkage.

16   Read the question.

17     Q.   Did you attempt to link information

18   between Georgia's voter rolls and other data sets?

19     A.   What do you mean by "link"?

20     Q.   Match.

21     A.   Match?  Sure.

22     Q.   When you performed that matching, do you

Page 107

1    agree that it's important that the fields conform

2    with respect to data format and data type?

3         A.   Yes.

4         Q.   Do you agree that it would be important

5    that both databases used for the match use

6    standardized abbreviations?

7         A.   We have a separate approach that we use

8    for that because we verify identity first.

9         Q.   Okay.  Can you tell me about how you

10   verify the identity?

11        A.   No.

12        Q.   Why not?

13        A.   Because it's a proprietary service that

14   my company used.

15        Q.   Okay.  This case has a protective order

16   in place specifically so we can understand these

17   questions.

18        A.   It's a 4,000-row algorithm.

19             What do you want to know?

20        Q.   I want to know what you do to verify the

21   identities before you perform the matching.

22        A.   Assessing -- assessing identity involves

Page 108

1    a complex series of mostly common algorithms,

2    things like dissimilarity indexes, similarity

3    indexes.  We use some fuzzy logic.  We use a

4    number of different things.  That's my answer.

5        Q.   Okay.  What is fuzzy logic?

6        A.   Fuzzy logic is a set of -- in identity

7    is a set of algorithms that's designed to

8    ascertain whether something similar is near

9    similar enough to assume that identity is

10   accurate.  And if it's not, then it assigns a risk

11   factor to it.

12       Q.   And is this something that you developed

13   yourself or you used an outside vendor for it?

14       A.   Yes.  I developed --

15       Q.   Which one?  Is that something --

16       A.   I developed it myself in 2006.

17       Q.   Okay.  Has its accuracy ever been

18   analyzed by anybody else?

19       A.   Its accuracy.  We use it every day in

20   our business.  So it's used in practice, and we've

21   done 43 million cases, so its accuracy is pretty

22   well known.

Page 109

1      Q.   Has it been independently verified by

2   anybody else?

3      A.   Nope.

4      Q.   Who performed the match between the

5   voter rolls and the other lists that you were

6   analyzing?

7      A.   What individual?

8      Q.   That's my question, yes.

9           Are you thinking of an answer or was my

10   question unclear?

11      A.   I answered you.

12      Q.   Who was the individual?

13      A.   Me.

14      Q.   Oh.

15           Did anybody else assist with that

16   matching effort?

17      A.   Not that I recall.

18      Q.   Approximately on what date was the match

19   completed?

20      A.   Mid December.

21      Q.   Can you tell me a few examples -- can

22   you give me a complete list of all of the

Page 110

1    technology that you used to perform that match?

2         A.   No -- I mean, yeah, I can tell you.  It

3    was co-done by me and my company.

4         Q.   Okay.  What was -- I believe you said

5    you used a vendor called TrueNCOA?

6         A.   That's one of the ones we used, yes.

7         Q.   Can you tell me what their role was

8    exactly?

9         A.   Their role wouldn't be anything other

10   than just being the group that performed -- that

11   made the match.

12             MR. BOPP:  I'm sorry, Jacob.  I need to

13   take this call for a second.  Do you mind if we

14   suspend for just a second?

15             MR. SHELLY:  Sure.  That's fine.

16             MR. BOPP:  Yeah.

17             MR. SHELLY:  You can go off the record.

18             THE VIDEOGRAPHER:  Okay.  The time is

19   12:53 p.m.  We are now off the record.

20             (Recess from the record.)

21             THE VIDEOGRAPHER:  The time is 1:13 p.m.

22   We are now on the record.

Page 111

1    BY MR. SHELLY:

2         Q.   Mr. Phillips, I understood at one point

3    you said that you personally performed the match,

4    I also understood you to say that TrueNCOA

5    performed the match.

6              Can you clarify anything that I may have

7    misunderstood with that?

8         A.   I thought you meant the person that

9    uploaded it.  I uploaded it.  I'm sorry.

10        Q.   You uploaded -- you uploaded it to

11   TrueNCOA?

12        A.   And -- we wouldn't do just one.  There

13   were probably more.  SmartyStreets is one that we

14   used sometimes.  I mean, there are others.

15        Q.   SmartyStreets is in addition to

16   TrueNCOA?

17        A.   At times.  Depending on the results we

18   get back, we can use both.

19        Q.   So you would upload it to TrueNCOA.  You

20   would get a match back, and then sometimes you

21   would provide match data to SmartyStreets?

22        A.   It might not go in that direction.  I

Page 112

1  mean, we would use them as oracles.  And when the

2  algorithm needs information, it would seek the

3  information from one, the other or both.

4       Q.   What kind of information would it need?

5       A.   The address information that TrueNCOA

6  and SmartyStreets provide.

7       Q.   Were there any others that you used

8  besides TrueNCOA and SmartyStreets?

9       A.   Not for addresses.

10       Q.   For any other forms of data that were

11  relevant to the challenge lists?

12       A.   What's the question?

13       Q.   I asked if there were any other programs

14  similar to what TrueNCOA and SmartyLinks [sic]

15  provides.  And you said not related to addresses.

16       A.   No.

17       Q.   Can you clarify what I got wrong?

18       A.   You didn't get it wrong.  You asked me

19  if there were any more.  I said no.

20       Q.   Understood.

21            What queries did you use in producing

22  the challenge list?

Page 113

1        A.    What queries did we use?  What do you

2     mean?

3              MR. SHELLY:  Can we pull up Exhibit C.

4     And go to the top of page 13.

5     BY MR. SHELLY:

6        Q.    I have some questions about number 4

7     here at the top.  It says, "OpSec compared, using

8     algorithms, queries, and various regression

9     techniques" --

10       A.    Yeah.

11       Q.    -- "the addresses in the registration

12    file to government and commercially available

13    information in order to identify people who have

14    either moved out of the county in which they are

15    registered or who live outside the State of

16    Georgia."

17       A.    Right.

18       Q.    So I'll just start at the beginning, I

19    guess.

20              Can you tell me all of the algorithms

21    you used?

22       A.    As I said, we have a proprietary

Page 114

1    algorithm that my company owns that we use

2    primarily for the identity and residency

3    resolution.

4        Q.   Okay.  Are you willing to produce that

5    algorithm or provide it in a format that we can

6    review?

7        A.   No.

8        Q.   Okay.  And in the same context, can you

9    tell me what queries you used?

10       A.   Well, the query would be a query against

11   the True- -- in this case, TrueNCOA and possibly

12   SmartyStreets.  So they would -- they would pass

13   it through their CASS system to clean it up,

14   perform some hygiene on it.  They'd look at

15   delivery point verifications and those kind of

16   things.  If we found some anomalies, we might

17   access another system like a SmartyStreets, but

18   that's it.  That's the query.

19       Q.   So when you say you performed "hygiene,"

20   can you give me a concrete example of what it

21   would mean to provide hygiene to a piece of data

22   that you analyzed here?

Page 115

1        A.    Well, I think the USPS definition of

2    "CASS" is pretty clear.  I mean, I think they --

3    you know, it basically standardizes -- goes

4    through and standardized addresses, finds missing

5    things, kind of rearranges, fixes it up.  Like it

6    might add a ZIP plus four.

7            You know, if there was a typo in the --

8    maybe a lowercase in an address, they might make

9    it upper case.  So they perform that

10   data-cleansing process and then produce the list.

11           And then we would go through and -- or

12   they would go through and push it through another

13   one of their queries for -- you know, to see if

14   the address was -- they could validate the

15   delivery point, so could an address actually be

16   delivered on that.  And that might push us off

17   into something else, to maybe look for something

18   else.

19       Q.    Okay.

20       A.    But it was done in a matter of minutes.

21   This wasn't a lengthy process.

22       Q.    So if there was an -- if a voter had an

Page 116

1    address, say, 123 Main, in a city that had a Main

2    Street and a Main Avenue, how would know the CASS

3    system know or SmartyStreets -- would either of

4    those systems know how to complete it?  Or what

5    would it do in that situation?

6         A.   You would have to ask them how they

7    would do it.  To us, I mean, again, it's a

8    function of whether or not it's likely to be the

9    same person, organization or street.  And then it

10   assigns sort of a risk score to it.  And then it's

11   processed differently.

12          That might be a case where we would go

13   and look at, say, a SmartyStreets to see if we can

14   ascertain what the situation is.  In the cases

15   where we cannot, we would kick it out and not

16   include it.

17        Q.   Okay.  And when you say it would assign

18   a "risk score," is that like a scale of 1 to 10?

19   Or what kind of risk score can be given?

20        A.   We have risk scoring built into our

21   scoring mechanisms inside of our algorithms.

22        Q.   So I'm trying to figure out what's

Page 117

1    the -- will it tell you that this is high risk,

2    medium risk, low risk or is that like 1 to 100?

3         A.   It would likely give you a number.

4         Q.   And what would the scale be?

5         A.   On this, I don't know what was used.  So

6    zero to 100, likely.

7         Q.   Okay.  And 100 would mean very, very

8    high risk?

9         A.   No, low risk.

10        Q.   Low risk.  Okay.

11             And so how low would the number need to

12   be?  In other words, how high would the risk need

13   to be for you to perform further analysis?  If it

14   returns a risk score of like 2, would you perform

15   further analysis on that?

16        A.   We might depending on what it is.

17   Again, verifying identity is important.  The

18   problem in places like Georgia is that they don't

19   give you all the info you need to get a good

20   perfect verification on identity, but that too has

21   risk to it as well.  So you look at risk across

22   the board with the data.

Page 118

1      Q.   Were you able to eliminate the risk?

2      A.   You can never eliminate all of the risk.

3      Q.   Did you analyze every piece of data that

4    was flagged as a risk of potential inaccuracies?

5      A.   The quality control algorithms would,

6    yes, in seeking to remove any false positives or

7    false negatives that might be in the system.

8      Q.   And that's something that you did

9    in-house or that's something that TrueNCOA would

10   have done or something different?

11     A.   No, that's something our algorithm does.

12     Q.   And you run the data through your

13   algorithm on the back end after you -- after

14   TrueNCOA performs the match; is that correct?

15     A.   Yes.

16     Q.   And do you know how TrueNCOA or these

17   others assign risk?

18     A.   How they assign risk?  I have no idea.

19     Q.   Moving on to the next clause in this

20   answer, what regression techniques did you use?

21     A.   Our modeling is pretty significant.  We

22   use some k-means modeling.  We use a variety of

Page 119

1   different techniques in our scoring.  And then we

2   use a model management process to identify the

3   regression technique most likely to produce an

4   accurate result.

5        Q.   And in what stage in the process were

6   you running these regressions?

7        A.   They're run through the process.  It's

8   all baked into the system.  Again, this whole

9   thing took a few minutes.

10       Q.   Am I understanding that you did these

11  regressions after you received the preliminary

12  match back from TrueNCOA, and then you're

13  providing your own further analysis on it?

14       A.   I didn't say that.

15       Q.   Can you clarify what I misunderstood?

16       A.   The formulas and algorithms that we use

17  execute.  As they need information, they pull

18  information in from an outside entity, say,

19  TrueNCOA or whatever.  It feeds it into the system

20  and then it continues to process it and keeps

21  working to solve -- solve for the risk.  And

22  ultimately we come up with a list.

Page 120

1              MR. SHELLY:  Okay.  You can take this

2    exhibit down, Mr. White.

3    BY MR. SHELLY:

4         Q.   When you were matching the voter

5    registration rolls to the NCOA list, what fields

6    were matched between those files?

7         A.   We just uploaded the file.  CASS does

8    the matching -- I'm sorry.  The source does the

9    matching, TrueNCOA or SmartyStreets.

10        Q.   Okay.

11        A.    In this case TrueNCOA first.

12        Q.   Are you familiar with the term "unique

13   identifier" in the context of data matching?

14        A.   Sure.

15        Q.   Are there any common unique identifiers

16   between the voter registration rolls and NCOA

17   lists?

18        A.   Well, that -- not as many as there

19   should be, and that's why we seek to resolve

20   identity first.

21        Q.   Are there any unique identifiers common

22   between those two lists?

                                                    Page 121

1        A.    I don't have the Georgia list right off

2    the top of my head.

3        Q.    Do you think that the lack of unique

4    identifiers could affect the accuracy of the

5    lists?

6        A.    Sure.

7        Q.    Am I understanding correctly from your

8    previous answers that the records are matched on

9    partial matching rather than exact matching, these

10   other databases would fill in any partial

11   information?

12       A.    That's not what I said.

13       Q.    Was an exact match required between the

14   data that you provided and the NCOA list?

15       A.    You can never get an exact match.  So

16   when you provide the list to -- when you provide

17   the list to the vendor, whoever it is, TrueNCOA or

18   whoever, they take what you give them.  They

19   perform a little bit of a cleaning process on it.

20   They try to update the addresses.  They run it

21   through CASS.  They try to get it right.  And then

22   they send it back.

Page 122

1      Q.   Could individuals with the same first

2   name and last name, but different middle initials

3   be flagged as a match?

4      A.   That's why you try to verify identity

5   first, but yes.

6      Q.   The answer is, yes, it could be?

7      A.   Of course.

8           And -- but that's why you use fuzzy

9   logic and some of the other things I mentioned

10  earlier.

11          MR. BOPP:  Gregg, no question was

12  pending.

13  BY MR. SHELLY:

14     Q.   Could names be matched if they had

15  different name suffixes, like junior or senior?

16     A.   Sure.  I mean, you could do that.

17     Q.   How many duplicates did you identify

18  where a record in the NCOA registry matched more

19  than one record in the voter file?

20     A.   I have no idea.

21     Q.   Are you aware if any such duplicates

22  were identified?

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 123

1        A.    I have no idea.

2        Q.    Did you investigate whether there were

3    any such duplicates?

4        A.    I have no idea.  I don't -- it wasn't a

5    topic.

6              MR. SHELLY:  Can we pull up Exhibit C

7    again, the one we just had up.

8    BY MR. SHELLY:

9        Q.    This is page 13 again.  And I have a

10   question about number 6, "OpSec removed from the

11   list any names that did not meet the standards of

12   the Georgia code."

13             What standards do you understand the

14   Georgia code to require?

15       A.    I'm not sure what we were -- what we

16   were referring to there.  I'm not sure what we

17   meant.

18       Q.    Did you take any steps to remove names

19   that did not meet the standards of the Georgia

20   code?

21       A.    I think that was just poorly worded.

22       Q.    Okay.  Do you have any idea how you

Page 124

1    could reword that in a different way?

2         A.   I think it was referring to number 5

3    above.  Because the code -- the relevant code

4    section is pretty clear that any voter can do the

5    challenge against any other voter in the

6    jurisdiction.  And so there's not much room for

7    standard in the word "any."

8         Q.   Okay.  So is it -- am I understanding

9    correctly that you do not think you removed any

10   names that did not meet the standards of the

11   Georgia code?

12        A.   I'm not sure what it means.  It must

13   have been poorly worded.  I'm not sure what that

14   paragraph -- or what that sentence means.

15        Q.   Okay.

16             MR. SHELLY:  You can take this exhibit

17   down.

18   BY MR. SHELLY:

19        Q.   Is it your understanding, Mr. Phillips,

20   that an individual who submits an NCOA, change of

21   address, is no longer eligible to vote?

22        A.   No, that's not correct.

Page 125

1      Q.   What are some reasons you are aware of

2   that someone could submit an address change to the

3   postal service while remaining eligible to vote

4   where they are registered?

5      A.   I have no speculation on that point.

6      Q.   Okay.  Just to clarify, you understand

7   that someone can submit an NCOA list and still be

8   properly registered, but you're not sure in what

9   scenarios that may be the case?

10     A.   I didn't understand that's what you

11   asked.  Is that what you're asking?

12     Q.   So my second question was, what are some

13   reasons you're aware of that someone can submit an

14   address change to the postal office while

15   remaining eligible to vote where they are

16   registered?

17     A.   Maybe they're being deployed in the

18   military.  Maybe -- might have something to do

19   with school.  Those kind of things.

20     Q.   Any other examples you're aware of?

21     A.   Moved inside the county or inside the

22   jurisdiction in which they were registered.

Page 126

1    There's a few.

2         Q.   Is it your understanding that someone

3    who moved for other non-military government

4    service could still be eligible to vote in

5    Georgia?

6         A.   I don't have a perfect list to offer

7    you.  You asked me for some ideas.  Those were

8    three.

9         Q.   And now I'm offering you some more and

10   asking if they're consistent with what you would

11   have understood the requirements to be.

12             So, one, would you have understood

13   someone who moved for non-military government

14   service to remain eligible to vote in Georgia even

15   if they submitted an NCOA?

16        A.   Sure.

17        Q.   And would you understand someone to

18   remain eligible to vote in Georgia if they had a

19   temporary move or a part-time job or to visit

20   family?

21        A.   It depends on the circumstance, but yes.

22        Q.   And would you recognize that someone

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 127

1    would remain eligible to vote if they forwarded

2    their mail for some mail-specific purpose, for

3    example, if they were on vacation and needed their

4    mail to be forwarded?

5          A.   Yep.

6          Q.   And if someone intended to move and so

7    filed an NCOA request, but did not actually move,

8    you would agree that they would remain eligible to

9    vote in Georgia?

10         A.   It depends on their circumstance.  I

11   can't answer that.

12         Q.   And the question is, if someone is

13   living in Georgia, they intend to move so they

14   file an NCOA request to forward their mail, and

15   then they change their mind and do not actually

16   move, you would agree that they're still eligible

17   to vote in Georgia?

18         A.   Sure.  If they still submitted the

19   permanent move change, yeah.

20         Q.   Okay.  Who was responsible for removing

21   the names of eligible voters such as these from

22   the challenge lists?

Page 128

1      A.   We did our best to -- first of all, the

2   code.  Let's put it that way.

3      Q.   Okay.  To go through those examples

4   again, would the code be able to identify someone

5   who is deployed for military service?

6      A.   As best we can, yes.  We pulled out

7   300,000 voters off the initial query.

8      Q.   Okay.  I'll ask you another question

9   about that in a second, but would the code be able

10  to recognize someone who moved because they were a

11  college student?

12     A.   It might.

13     Q.   How would it do that?

14     A.   If they submitted a permanent change or

15  a temporary change.

16     Q.   Okay.  Would the code --

17     A.   We also --

18     Q.   -- also identify --

19     A.   I'm sorry.  Go ahead.

20     Q.   Go ahead.

21     A.   Go ahead.

22     Q.   Would the code be able to identify

Page 129

1   someone who moved for non-military government

2   service?

3        A.   Possibly.  And it depends, again, how

4   they submitted their NCOA and if they sold their

5   house or -- you're making suppositions that can't

6   be made.  It's not a one piece or another; it's

7   the aggregate of it.

8        Q.   Okay.  So I understand that the code

9   cannot identify the purpose that someone submitted

10  an NCOA request, but your answer is you think you

11  can infer it from other sources of data?

12       A.   As best we can.  And then when the

13  challenge is made, the probable cause has to be

14  identified by the county.  And they are the ones

15  with the capability of doing that.

16       Q.   What steps did you take specifically to

17  remove the names of individuals who live on or

18  near a military base?

19       A.   We have a list of ZIP codes that include

20  all the military bases.  We also use some of the

21  military designators, FPO, that kind of thing.

22  And we pull those directly from -- in the initial

Page 130

1    query, rather than waiting till the end.

2        Q.   When you say "we" --

3             (Unintelligible cross-talk.)

4        Q.   -- was anyone else responsible for that

5    besides you?

6             (Unintelligible cross-talk.)

7        Q.   But there was no other person

8    responsible for removing these names besides you?

9        A.   No.

10       Q.   If a person moved to an address, for

11   example, Camp Lejeune, North Carolina, would that

12   suggest to you that the person lives on a military

13   base?

14       A.   Potentially.

15       Q.   What about an address on Andrews Air

16   Force Base?

17       A.   Potential.

18       Q.   Barksdale Air Force Base?

19       A.   Moved to or from?  What's the question?

20       Q.   To.  To.

21       A.   It depends.  It depends on what their

22   submission said to the post office.  So is it

Page 131

1    permanent?  Is it TDY?  Is it a permanent-duty

2    station?  What is it?

3        Q.   If someone submitted a permanent change

4    of address to Dover Air Force Base, would you

5    understand that that person was no longer eligible

6    to vote in Georgia?

7        A.   I don't know.  It depends.  I mean, not

8    really because military situations are different.

9    Because even if their permanent-duty station is

10   somewhere, they can still be -- their permanent

11   residency can still be in the state in which they

12   register.  So it's much more complicated.

13       Q.   What further analysis did you perform to

14   identify if military voters who moved to a base

15   can retain their eligibility in Georgia?

16       A.   We didn't.

17       Q.   Do you recall that Ms. Engelbrecht asked

18   you to remove addresses associated with Moody Air

19   Force Base?

20       A.   I don't recall.

21       Q.   Okay.

22            MR. SHELLY:  Can we pull up Exhibit D,

Page 132

1   as in dog?

2          (Phillips Deposition Exhibit 8 was

3   marked for identification and attached to the

4   transcript.)

5          MR. SHELLY:  And scroll down to the next

6   page.  Can we make this a little bit bigger.

7   BY MR. SHELLY:

8       Q.   Okay.  So this is an e-mail from

9   Ms. Engelbrecht on December 16th to Mark, and you

10  are cc'd.  And the e-mail, maybe three paragraphs

11  down, says, "Also, please remove addresses that

12  would suggest they are military bases

13  (Ft. Benning, Moody Air Force Base...)."

14          First, this e-mail was to "Mark."

15          Am I correct in referring this is Mark

16  Williams?

17      A.   I have no idea.

18      Q.   You're not sure who

19  mark@printingtradeco.com is?

20      A.   That might be Mark, but may be not.

21  There could be more than one Mark.  I have no idea

22  if that's Mark Williams.

Page 133

1      Q.   Okay.  Was Mark Williams responsible for

2   removing any military voters from the list?

3      A.   According to this, yes.

4      Q.   Do you know if he did so?

5      A.   I don't know.

6      Q.   Did you ever ask him to do so?

7      A.   It didn't matter because we ultimately

8   chose not to mail the hard copies out.  We sent

9   electronic copies, so ultimately this didn't

10   matter.

11      Q.   Is that because Mark Williams would have

12   had access to the hard copies so any changes he

13   made would not have been reflected in the

14   electronic copies?

15      A.   I'm not sure I understand the question.

16      Q.   I'm trying to understand why you said

17   that it would not matter if Mark Williams made

18   changes because you only sent electronic versions.

19           So my --

20      A.   An electronic -- okay.

21           MR. BOPP:  There's no question pending,

22   Gregg.

Page 134

1  BY MR. SHELLY:

2      Q.   My question for you --

3      A.   I don't understand the question.

4      Q.   My question for you, when you say that

5  it would not matter, is that because Mr. Williams

6  had access to the hard copies, but any changes to

7  the hard copies would not be reflected in the

8  electronic versions?

9      A.   No, that doesn't mean that.  It means we

10  chose not to mail hard copies.

11      Q.   And Mr. Williams was responsible for the

12  hard copies; is that correct?

13      A.   Printing the hard copies.

14      Q.   Okay.  Did Mr. Williams have access to

15  the electronic copies?

16      A.   He had access to a -- whatever, an Excel

17  spreadsheet or something with them on there, yeah.

18      Q.   Would he have been able to remove

19  addresses that suggested they were military bases?

20      A.   I don't know the circumstance, so I just

21  don't know.  I didn't -- I don't recall.

22      Q.   Okay.  Returning to the Moody Air Force

Page 135

1    Base example, do you know what town Moody Air

2    Force Base is closest to in Georgia?

3          A.    Macon?  I don't know.

4          Q.    I'll represent to you that I believe

5    it's Valdosta.

6          A.    Yeah, that's right.

7          Q.    Did you examine whether any addresses

8    with a Valdosta address could be in the military

9    or family of someone in the military?

10         A.    We probably did, yeah.

11         Q.    Would you have removed those voters?

12         A.    Assuming that it met the matching

13   requirement, sure.

14              MR. SHELLY:  You can take this exhibit

15   down, Mr. White.

16   BY MR. SHELLY:

17         Q.    Mr. Phillips, are you familiar with

18   UOCAVA?

19         A.    Of course.

20         Q.    Did you examine whether any voters on

21   your list had requested a UOCAVA ballot?

22         A.    As best we can.  As you know, UOCAVA

Page 136

1   ballots and postcard ballots in general are not

2   handled by the state; they're handled by the

3   counties individually.

4        Q.   How would you have researched or sought

5   to identify whether an individual had requested a

6   UOCAVA ballot?

7        A.   Almost impossible because the counties

8   don't publicize that.

9        Q.   Okay.  When you say "almost impossible,"

10  so was there anything you did to identify whether

11  a voter had requested a UOCAVA ballot?

12       A.   No, I am not aware of any way to do that

13  effectively.

14       Q.   Did you -- I think you said you did --

15  well, let me just ask the question.

16            Did you take any steps to remove all the

17  names of college or university students who were

18  temporarily away from home?

19       A.   Anyone temporary that had registered the

20  temporary address change, yes.  Permanent address

21  changes, what we tried to do was eliminate the ZIP

22  codes in and around the schools.

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 137

1      Q.   And how did you identify which ZIP codes

2   were appropriate?

3      A.   I don't recall what our methodology was.

4      Q.   Were you only looking at -- were you

5   looking at ZIP codes in Georgia or out of Georgia

6   or both?

7      A.   I don't know.

8      Q.   Do you think an address in, for example,

9   Notre Dame, Indiana, would suggest the person

10  lives on a college campus?

11     A.   Not necessarily.

12     Q.   Why not?

13     A.   What?

14     Q.   So Notre Dame is a school within the

15  city of South Bend, but if the address said Notre

16  Dame, Indiana, is it your understanding that that

17  person would not be living on a college campus?

18     A.   Did the person submit a permanent change

19  of address out of Georgia?

20     Q.   This question wasn't about whether they

21  would be eligible to vote; it would have been

22  whether they moved to a college campus.

Page 138

1       A.    I don't have any opinion about moving to

2    college campuses.

3       Q.    I didn't hear you.  Could you repeat

4    that last part.

5       A.    I don't have any opinion on your

6    question.

7       Q.    Is it your understanding that most

8    students who attend college reside in a dormitory?

9       A.    I would believe that to be false.

10       Q.    Did you take any steps to remove the

11    names of individuals who were temporarily

12    attending college, but did not live in a

13    dormitory?

14       A.    Did they register as permanent moves

15    from the NCOA?

16       Q.    Am I gathering correctly that your

17    analysis of whether voters were eligible turned on

18    whether they filed a permanent or temporary change

19    of address?

20       A.    It might.  As I said, it's a complex

21    algorithm.  It's 4,000 rows long.  It doesn't --

22    it doesn't work like your brain does.

Page 139

1      Q.   Did you research which colleges Georgia

2   high school students are most likely to attend?

3      A.   No.

4      Q.   Approximately how many names did you

5   identify and remove of individuals you suspected

6   were enrolled in a college or university?

7      A.   I have no idea.

8      Q.   What steps did you take to confirm

9   whether an individual who submitted an NCOA

10  request actually moved?

11     A.   Well, we submitted it to TrueNCOA.  We

12  possibly submitted it to SmartyStreets if it

13  needed more work.  And I think, in Georgia, we

14  submitted the new address.  So we told them where

15  we thought the person went.

16     Q.   Approximately how many -- approximately

17  how many matches did TrueNCOA identify?

18     A.   I don't recall.  It's all part of the

19  equation.  We don't look at it that way.

20     Q.   Approximately how many did you send

21  along to SmartyStreets?

22     A.   I don't know the answer to that either.

Page 140

1        Q.   Do you know what proportion of the

2   original list that TrueNCOA flagged that you would

3   have sent along for further verification?

4        A.   I recall that we probably got -- the

5   initial cut was probably 700,000 or so.  And then

6   it ultimately got down to, what, 360-, so whatever

7   that delta is.

8        Q.   Approximately how much time did you

9   spend reviewing the names that were matched

10  between the voter file and the NCOA registry?  Or

11  am I understanding correctly that the code did all

12  the analysis and you personally did not do any

13  further?

14       A.   There's a little bit of sort of

15  reviewing the quality of reports to ensure that

16  we're within something we consider reasonable on

17  the false positives and false negatives, but an

18  hour maybe.

19       Q.   Okay.  And what would you have

20  considered reasonable?

21       A.   Maybe a standard deviation.

22       Q.   Can you just explain that a little bit

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 141

1    more?  A standard deviation of what?

2          A.    Relative to the potential error rate

3    that we might expect.  That's the best way to

4    frame it.

5          Q.    Okay.  And what error rate did you

6    expect?

7          A.    Less than one standard deviation.

8          Q.    If you had had more time, would you have

9    done anything more?

10         A.    No.

11         Q.    Did you do anything to correct for

12   potential matches of individuals in the voter file

13   who share a first name, last name and reside at

14   the same address?  Or am I understanding that you

15   relied on TrueNCOA to determine whether that would

16   be a match?

17         A.    I never said that, but the import of

18   verifying identity can't be overstated in this

19   case.  And that would come as a result of helping

20   verify identity.

21         Q.    Okay.  So when you pulled the voter

22   file, there was -- if there were two individuals

Page 142

1   who shared a first name, last name and address,

2   you would have done some further analysis of that

3   at the front end; is that correct?

4       A.   Yes.

5       Q.   And that analysis would be by running it

6   through a code, and they would try to fill in more

7   information to distinguish these individuals?  Or

8   how exactly would you be able to distinguish them?

9       A.   There are elements of risk in any

10  determination.  And eliminating as many of the

11  elements of risk as you can is important.  The

12  absolute verification of identity, again, has to

13  be done by the counties because they have access

14  to the state DMV file.  They have access to other

15  things that citizens and voters don't have.

16            The citizens and voters were compelled

17  to identify -- give a specific reason for why they

18  thought someone was ineligible, and having moved

19  was the reason.  And so our -- our ability to

20  identify -- verify identity is limited by the fact

21  that Georgia only gives year of birth rather than

22  day and month and year of birth.

Page 143

1       Q.   Are you aware that thousands of records

2   in the challenge list do not show a street address

3   in the "moved to" field?

4       A.   Yes.  Because sometimes people move and

5   they don't give their address.  They don't give

6   their forwarding address.

7       Q.   And what is the reason for challenging

8   someone on the basis of residency when you do not

9   have evidence of where the person moved?

10       A.   Because that's the specific -- the law

11   compels a voter to challenge based on a specific

12   reason.  The specific reason is they believe they

13   moved.

14       Q.   How could a voter be notified of a

15   challenge if you do not know the forwarding

16   address?

17       A.   How would a voter be notified?

18       Q.   Yes.

19       A.   Okay.  We don't notify the voters.  The

20   county notifies the voter when they come in to

21   vote.

22       Q.   Okay.

Page 144

1          MR. SHELLY:  Can we pull up Exhibit F.

2          (Phillips Deposition Exhibit 9 was

3    marked for identification and attached to the

4    transcript.)

5    BY MR. SHELLY:

6          Q.   Are you familiar with this table,

7    Mr. Phillips?

8          A.   No, I don't know.  It doesn't ring a

9    bell.  I don't know that I saw it yesterday.  What

10   is it?

11         Q.   This is a document that you -- that

12   OpSec produced in response to our discovery

13   requests.

14         A.   Okay.  What's the question?

15         Q.   Did you create this table?

16         A.   It looks like it was created out of the

17   system.

18         Q.   Why does it only include nine counties?

19         A.   I have no idea, actually.

20         Q.   How would you have used this

21   information?

22         A.   We wouldn't use this information at all.

Page 145

1    It was system-generated.

2          MR. SHELLY:  You can take this down,

3    Mr. White.

4    BY MR. SHELLY:

5          Q.   Mr. Phillips, did you review the

6    challenge lists for instances where the name of

7    the registrant in the challenge file does not

8    match the name in the voter file or the registrant

9    with that registration number?

10         A.   We would have, yes.

11         Q.   And if you had noticed that, would you

12   still -- should that person have been included in

13   the challenge list if their name in the challenge

14   list did not match the name assigned to that

15   registration number in the registration rules?

16         A.   That likely would have been an exception

17   and would have been kicked out, but it's possible

18   it could be included.

19         Q.   Did you review the challenge list for

20   instances where the address an individual is

21   registered at and the address where a registrant

22   moved to are identical?

Page 146

1        A.    There are some anomalies like that, yes.

2        Q.    Should those anomalies have been removed

3    from the challenge list?

4        A.    I would like to think they would, but

5    it's possible they wouldn't.  There are some other

6    reasons why, especially if it was a different

7    name.

8        Q.    Would you review the challenge list to

9    confirm whether an individual reregistered at the

10   address where the NCOA match suggested the

11   individual moved to?

12       A.    That was beyond our capacity.  So in

13   that case, what we would say is submit the

14   challenge and let the county figure it out.

15       Q.    Do you know what it would mean when a

16   record shows a "moved to" street address of

17   general delivery?

18       A.    It could mean a lot of things.  They

19   didn't give an address.  They didn't have an

20   address when they moved.  It's possibly a homeless

21   person.  There are dozens of reasons.

22       Q.    Would you still understand that to

Page 147

1    provide probable cause for a challenge?

2         A.   We don't determine probable cause.  We

3    determine the reason that the voter would make the

4    challenge.  The county determines probable cause.

5         Q.   Did I hear you correctly earlier to

6    suggest that the challenge lists ultimately

7    included approximately 360,000 individuals?

8         A.   We didn't challenge that many.  That's

9    how many we identified.  The counties didn't take

10   up the challenges in most cases.

11        Q.   Okay.  Of that whole list that you had

12   prepared, the 360,000, how many do you think of

13   those individuals were actually ineligible to

14   vote?

15        A.   Well, that would be for the county to

16   determine.  We don't know.

17        Q.   Do you have any anticipation of what

18   that figure would have been?

19        A.   I'm not going to speculate.

20        Q.   Do you accept that some individuals on

21   the challenge list may be eligible to vote?

22        A.   Sure.

Page 148

1        Q.    Did you discuss the potential inaccuracy

2    of the list with anybody?

3        A.    I don't recall.

4        Q.    Do you think that 99 percent of the

5    names on the challenge list were ineligible to

6    vote?

7        A.    As I said, I have no idea.

8        Q.    Are you aware of any challengers who

9    retracted their challenge after concluding that

10   the lists you prepared were unreliable?

11       A.    I'm not, but I wouldn't have had that

12   communication.

13       Q.    Did you use the Social Security Death

14   Index as part of your process?

15       A.    Not in this instance.

16       Q.    "This instance" referring to the Georgia

17   challenge lists?

18       A.    Yes.

19       Q.    Are there any other data sources you

20   believe could have enhanced the accuracy of the

21   challenge lists?

22       A.    Not for the purposes for which we

Page 149

1    were -- we were called to work.

2         Q.   How many counties did you prepare

3    challenge lists for?

4         A.   I think we did them all.

5         Q.   And in how many counties were challenge

6    lists actually submitted?

7         A.   I don't know the answer to that.

8    Catherine can answer that.

9         Q.   Do you know how counties were chosen for

10   lists to be submitted?

11        A.   I believe it's where we found a Georgia

12   voter that lived in the jurisdiction to make the

13   challenge.

14        Q.   After you conducted the initial match,

15   did you analyze demographic information or other

16   characteristics of the individuals you identified?

17        A.   Not until after you sued us.

18             MR. SHELLY:  Can we pull up Exhibit H.

19             (Phillips Deposition Exhibit 10 was

20   marked for identification and attached to the

21   transcript.)

22

Page 150

1   BY MR. SHELLY:

2       Q.   This is a TrueAppend document.  We can

3   scroll through it several pages.  Once you have a

4   sense, can you tell me if you're familiar with

5   this document.  Feel free to ask Mr. White to

6   scroll directly.

7       A.   Yes, I am familiar with it.

8       Q.   Can you describe what it is for me?

9       A.   It is a quality check on numbers.

10      Q.   Do you know when this document was

11  created?  It looks like it says December 16th.

12      A.   Probably before we sent the challenges

13  out.

14      Q.   Okay.  And do you know why it was

15  created?

16      A.   Yes, quality control.  Trying to pull --

17  remove voters that would be a false positive or

18  false negative.

19      Q.   Okay.

20          MR. SHELLY:  Can you scroll to the next

21  page, Mr. White.  Next page.

22

Page 151

1   BY MR. SHELLY:

2       Q.   How would you have used age information

3   for your quality control?

4       A.   We wouldn't.  This was -- this is part

5   of the report that comes back from TrueAppend.

6            MR. SHELLY:  Next page.

7   BY MR. SHELLY:

8       Q.   How would you have used business owner

9   information?

10      A.   We don't.  It's part of the report that

11  comes back from TrueAppend.

12      Q.   Which parts of this report did you use?

13      A.   Probably just looked at the overall

14  numbers and then tried to assess whether or not

15  there was some accuracy -- noticeable accuracy

16  issues.  And we don't use this product anymore,

17  but that would be it.

18      Q.   Why don't you use this project anymore?

19      A.   Product.

20           It's not effective.  We have automated

21  testing tools now that we did not have.

22      Q.   Do you know how much OpSec paid for this

Page 152

1    report?

2         A.    Probably nothing.  Twenty bucks --

3         Q.    TrueAppend provided it for free?

4         A.    -- forty bucks?  I don't know.  I don't

5    know how much...

6         Q.    Would you make any changes to the

7    challenge lists after reviewing -- after reviewing

8    information in this report?

9         A.    Not that I recall.

10         MR. SHELLY:  You can take this one down,

11   Mr. White.

12   BY MR. SHELLY:

13        Q.    Mr. Phillips, once a voter has been

14   challenged, what is your understanding of what

15   that voter must do to be able to cast a ballot and

16   have that ballot counted?

17        A.    Prove who they were -- or prove where

18   they lived.  Excuse me.  Sorry.

19        Q.    Did you consider the burden this process

20   could impose over the Christmas holidays on voters

21   who were temporarily outside of Georgia for a

22   legitimate reason?

Page 153

1    A.    No.

2    Q.    Do you think it would be harder for some

3    eligible voters than others to respond to a

4    challenge?

5    A.    No.

6    Q.    It would be equally hard for all voters?

7    A.    It would be equally easy for all voters.

8    Q.    It would be equally easy for voters who

9    were temporarily out of state as it was for voters

10   who remained in state?

11   A.    To do what?  Vote?

12   Q.    To prove their address.

13   A.    That's irrelevant to the issue.  The

14   issue is we had to give a reason why the voter

15   wanted to make the challenge.

16   Q.    Did you consider the burden --

17   A.    The counties themselves, by the way,

18   lifted that burden.  The few that took them up

19   actually did the work themselves to figure out

20   whether the person was properly registered or not.

21   Q.    Did you consider the burden this process

22   would impose on election administrators who were

Page 154

1    asked to resolve hundreds of thousands of

2    challenges in the weeks before an election?

3         A.   No.  And they didn't do it, so it was

4    irrelevant.  They have a burden under the law --

5    they hold the burden to prove probable cause, not

6    the voters.

7         Q.   Did you care one way or the other which

8    candidates won the Georgia Senate runoff

9    elections?

10        A.   It's irrelevant to this.

11        Q.   But did you care?

12        A.   Sure.

13        Q.   Which candidates did you support?

14        A.   I didn't support any.  I don't vote

15   there.

16        Q.   Which candidates did you want to win?

17        A.   The ones who care about free and fair

18   elections.

19        Q.   So Senator Warnock and Ossoff?

20        A.   It's irrelevant.  I'm not answering your

21   questions.  I have a right to privacy for my vote

22   and my opinion.

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 155

1          Q.   Did you expect the voter challenges to

2     have an impact on the election results?

3          A.   We hoped that they would be taken up,

4     and we hoped that they would be taken seriously,

5     but we continue in that effort well past the

6     election.

7          Q.   Did you ever discuss the impact the

8     challenges were expected to have on the election

9     results with any defendants in this case?

10         A.   I have no idea.

11         Q.   Do you believe Senators Warnock and

12    Ossoff won the January elections fairly?

13              MR. BOPP:  I object.  You're getting so

14    ridiculously far afield of the subject matters,

15    and I instruct him not to answer.

16    BY MR. SHELLY:

17         Q.   Mr. Phillips, are you following your

18    attorney's instruction not to answer?

19         A.   Yes.

20         Q.   Do you think Democrats are more likely

21    than Republicans to vote illegally?

22              MR. BOPP:  I object.  This is way beyond

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 156

1   the scope of the subject matter, and I instruct

2   him not to answer.

3   BY MR. SHELLY:

4        Q.   Are you following that instruction?

5        A.   Yes.

6        Q.   Do you think there is more voter fraud

7   in urban areas than rural areas?

8             MR. BOPP:  I object.  It goes way beyond

9   the scope of the subject matter and instruct him

10  not to answer.

11  BY MR. SHELLY:

12       Q.   Okay.  I have a few questions to make

13  sure I understand some of the other documents that

14  were produced in discovery.

15            MR. SHELLY:  Mr. White, can you pull up

16  Exhibit I.

17            (Phillips Deposition Exhibit 11 was

18  marked for identification and attached to the

19  transcript.)

20            THE VIDEOGRAPHER:  Give me one moment.

21  BY MR. SHELLY:

22       Q.   Are you familiar with this document?

1/25/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Gregg Phillips

Page 157

1       A.    No.

2       Q.    This is another document that was

3   produced by OpSec, but I understand that you have

4   not seen this document before?

5       A.    I'm not familiar with it.  I don't

6   recall it.

7       Q.    Do you know who Richard Sobczak is?

8       A.    No.

9       Q.    Do you know why this document might have

10  been created?

11      A.    No idea.

12      Q.    Okay.

13            MR. SHELLY:  You can pull this down.

14  BY MR. SHELLY:

15      Q.    Just to have clarity on a previous

16  question that I asked, when I asked who you

17  supported in the Georgia Senate runoff elections,

18  you told me that you had a right to a secret

19  ballot.

20            I just wanted to clarify that because

21  you're not a Georgia voter, I'm not asking who you

22  voted for.  I'm asking who you supported.

Page 158

1        A.    But you're asking for my opinion.

2              MR. BOPP:  I object to you asking for

3    his opinion about who he'd like to see elected.

4    It's totally irrelevant and beyond the scope of

5    the subject matter.  I instruct him not to answer.

6    BY MR. SHELLY:

7        Q.    Are you following that instruction,

8    Mr. Phillips?

9        A.    Yes.

10             MR. SHELLY:  Mr. White, can you pull up

11   Exhibit J.

12             (Phillips Deposition Exhibit 12 was

13   marked for identification and attached to the

14   transcript.)

15             MR. SHELLY:  Okay.  Can you zoom in on

16   this page.

17   BY MR. SHELLY:

18       Q.    So here at the bottom is a December 15th

19   e-mail from you.  It looks like Mr. Williams and

20   Ms. Engelbrecht are on this e-mail chain.  And you

21   ask, "Can y'all hop on a call late afternoon today

22   to discuss our progress and any blockers we may

Page 159

1    have?"

2            Do you see that?

3    A.   Yes.

4    Q.   What are the "blockers" that you

5    reference in this e-mail?

6    A.   I was inquiring are there any.

7    Q.   I see.

8            And were there any?

9    A.   Not that I recall.

10   Q.   Okay.

11           MR. SHELLY:  Can you pull up Exhibit K.

12           (Phillips Deposition Exhibit 13 was

13   marked for identification and attached to the

14   transcript.)

15           MR. SHELLY:  Okay.  Can we go to the

16   next page.  Scroll down.  I'm not sure if there's

17   more on this page.  Yeah, I'm looking at this

18   bottom paragraph.  Sorry.  Can you reverse that

19   highlighting.  There's a different section I'm

20   looking for.  Okay.  Right above that.  The e-mail

21   from Mr. Phillips, yes.

22           THE VIDEOGRAPHER:  Sorry.  My apologies.

Page 160

1              MR. SHELLY:  It's just -- I'm squinting

2     on the screen, but what I want is actually at the

3     top of page 2, which is why I wasn't seeing it.

4     And the date line is actually right above this

5     page.  It might be helpful context.  It's the

6     first line of the previous page.  It shows this

7     was a December 20th e-mail.

8     BY MR. SHELLY:

9         Q.   Mr. Phillips, you write, "Because these

10    are supplemental to the electronic filing, we

11    don't really have a huge need to get these shipped

12    out immediately.  If we drop ship across the next

13    week or so, can you get us a cost estimate?  There

14    is some strategy at play here and we are adjusting

15    tactics to compensate."

16             And as you can see, this is an e-mail

17    string with Mark Williams.

18             Do you see what I'm referring to?

19        A.   Yes.

20        Q.   Okay.  My question is, what is the

21    "strategy at play" that you are referencing?

22        A.   Whether or not we were going to ship

Page 161

1    both the hard copy in addition to the electronic

2    copy which was being shipped.

3         Q.   Okay.  And how did you adjust tactics?

4         A.   We ended up not shipping them to the

5    counties.

6         Q.   Okay.  And why was that decision made?

7         A.   Cost, among other things, but the

8    counties were okay with just getting them

9    electronically, and they didn't want the boxes

10   dumped on their doorstep.

11        Q.   Got it.

12             MR. SHELLY:  Can we pull up Exhibit L.

13             (Phillips Deposition Exhibit 14 was

14   marked for identification and attached to the

15   transcript.)

16   BY MR. SHELLY:

17        Q.   At the top here, this is December 28th,

18   you e-mail Roberta, "Can you please purchase the

19   newest GA voter filer?  I think it is $250.  We

20   need to have it expedited if possible."

21             Who is Roberta?

22        A.   She's a volunteer that used to work for

Page 162

1   Mrs. Engelbrecht.

2       Q.   Okay.  And why did you need the Georgia

3   file on December 28th after the challenges had

4   been submitted?

5       A.   We are -- this would have been one of

6   likely hundreds that went out.  We were constantly

7   acquiring new data.

8       Q.   Okay.

9       A.   It's not related to the challenges

10  likely.

11      Q.   Okay.

12           MR. SHELLY:  Can you go down to page 2.

13  BY MR. SHELLY:

14      Q.   And then right here in the middle of the

15  page, you e-mail, "Sorry guys.  I was cutting a

16  corner.  We will take care of this."

17           My question is, what did you mean when

18  you said you were cutting a corner?

19      A.   I have no idea out of context like that.

20      Q.   Okay.  Feel free to take a look at the

21  rest of this e-mail chain for context.

22      A.   I have no idea.  I was probably trying

Page 163

1    to get -- I was probably trying to get the file.

2    There are two files in Georgia.  One file has

3    history on it and one file has the actual voter

4    registrations.  And they're linked by the UVID.

5    And I was probably trying to get one file before

6    the other one was done, is what I was probably

7    trying to do.

8            MR. SHELLY:  Can we pull up Exhibit M.

9            (Phillips Deposition Exhibit 15 was

10   marked for identification and attached to the

11   transcript.)

12   BY MR. SHELLY:

13       Q.   Are you familiar with this spreadsheet?

14       A.   I'm not.  And I know you guys are saying

15   that I submitted these, but I don't use Excel.

16   And I'm a little unclear on -- you're saying I

17   submitted this in Excel, and that's -- that just

18   doesn't ring true to me.  I'm not sure.  But I'm

19   familiar with the numbers, so...

20       Q.   Okay.  So this looks to me like a

21   spreadsheet of racial data.

22            Do you know when this --

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 164

1      A.   No idea.

2      Q.   -- spreadsheet would have been created?

3      A.   No idea.

4      Q.   Okay.  But you did not create this and

5  you have not seen this; is that correct?

6      A.   I may have seen it after the -- I mean,

7  as I said, we probably looked after we were sued,

8  but not before.  I have no idea.

9      Q.   Okay.

10      A.   It's not relevant.

11           MR. SHELLY:  Will you put up Exhibit O.

12           (Phillips Deposition Exhibit 16 was

13  marked for identification and attached to the

14  transcript.)

15  BY MR. SHELLY:

16      Q.   Are you familiar with this document?

17      A.   I am.

18      Q.   Can you explain what it is?

19      A.   It's a screenshot from a product called

20  DataWalk.  It's an intelligence community and law

21  enforcement product that they use to link data.

22      Q.   And how did you use this?

Page 165

1          A.    We used it, and use it regularly, to do

2     a type of regression analysis and data linkage.

3          Q.    Was it used to generate the challenge

4     lists?

5          A.    No.

6          Q.    Okay.

7               MR. SHELLY:  Can we pull up Exhibit P.

8               (Phillips Deposition Exhibit 17 was

9     marked for identification and attached to the

10    transcript.)

11    BY MR. SHELLY:

12         Q.    Are you familiar with this document?

13         A.    It doesn't ring a bell, but it looks a

14    little bit like a DataWalk document.  I can barely

15    see it.  It's too small to see, but I assume it's

16    a DataWalk document.

17         Q.    Mr. --

18         A.    Let me rephrase that.

19               I don't know.  We don't usually look at

20    this.

21               MR. SHELLY:  Mr. White, can you zoom in

22    on, say, the top circle?

Page 166

1           THE WITNESS:  Yeah, that's a DataWalk

2      document.

3      BY MR. SHELLY:

4           Q.   Did you use this in relation to the

5      challenge lists?

6           A.   No.

7           Q.   What would you have used this for?

8           A.   Just looking at different linkages

9      between different files and checking to see what

10     we can find.  In this particular -- if we used it,

11     we used it to exclude.  Because we typically don't

12     get into the whole deceased voter thing that

13     people talk about.

14          Q.   You say you typically do not research

15     whether there are deceased voters?

16          A.   We will occasionally look when we are

17     asked, but it's not a topic -- it was not a topic

18     for the challenges and not a topic in Georgia.

19          Q.   Okay.

20          MR. SHELLY:  You can take that one down,

21     Mr. White.

22

Page 167

1   BY MR. SHELLY:

2        Q.   Mr. Phillips are you familiar with the

3   Crusade for Freedom?

4        A.   No.

5        Q.   Are you familiar with the Twitter

6   account @Crusade4Freedom?

7             MR. BOPP:  I object.  I mean, if you

8   think this is relevant, you can tell me why, but,

9   otherwise, I'm going to object.  There's no

10  foundation laid.  This isn't relevant at all to

11  anything.

12            MR. SHELLY:  Can we --

13            MR. BOPP:  And it's way beyond the scope

14  of the subject matter.  But, I mean, if you want

15  to tell me, fine; if you don't, I'll just stand on

16  my objection.

17            MR. SHELLY:  Can we pull up Exhibit T.

18            (Phillips Deposition Exhibit 18 was

19  marked for identification and attached to the

20  transcript.)

21  BY MR. SHELLY:

22       Q.   So these are tweets.  The first one

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 168

1    says, "We just prospectively challenged the

2    eligibility of 360,000 voters in Georgia.  Largest

3    single election challenge in Georgia and American

4    history."

5              Does this refresh your recollection

6    about what the Crusade for Freedom is?

7        A.    No.  I'm not on Twitter so...

8        Q.    Okay.  Fair to say that you do not know

9    who tweets under this account?

10       A.    No, I don't know.

11       Q.    Okay.

12             MR. SHELLY:  Can you pull up Exhibit U.

13             (Phillips Deposition Exhibit 19 was

14   marked for identification and attached to the

15   transcript.)

16   BY MR. SHELLY:

17       Q.    Are you familiar with this document?

18       A.    Yes.

19       Q.    Can you explain what it is?

20       A.    It's sort of a brain dump when I was

21   first kind of working through some of the ideas

22   and how we might be able to put it together.  It

Page 169

1   was sort of -- not much more than just a planning

2   thing.

3        Q.   So you created this yourself?

4        A.   That's my handwriting, yes.

5        Q.   And do you know when you would have

6   created this?

7        A.   I don't.

8        Q.   At the very top, what is "IV3"?

9        A.   IV3 is independent vote, validation and

10   verification.

11        Q.   And is that something you developed

12   or --

13        A.   Yes.

14        Q.   Okay.  And can you -- we touched briefly

15   on this on the invoice, but can you tell me more

16   about what Eyes on Georgia is.

17        A.   It's just a working name for the overall

18   projects we were working on.

19        Q.   Projects just in Georgia?

20        A.   Initially, yes, but ultimately beyond.

21        Q.   Is the Eyes on Georgia program still

22   continuing?

Page 170

1        A.    No.   It was never really a program.   It

2    was just how we were bucketing all the work we

3    were doing.

4        Q.    And this is work related to the Senate

5    runoff election or more than that?

6        A.    Mostly the Senate runoff election.

7        Q.    Okay.  Here about halfway down, there's

8    "Ops (OPSEC)" and then it lists a few things.

9             What hardware did you provide?

10       A.    I have a data center.

11       Q.    Okay.  And what software did you

12   provide?

13       A.    The Ground -- it was mostly referring to

14   data, but the Ground database primarily.

15       Q.    Okay.  And then can you explain what the

16   "Team" in quotation marks refers to?

17       A.    I don't know.

18       Q.    Okay.  And the "Hotline" is the hotline

19   that we discussed at the beginning of the call --

20   at the deposition that you created; is that

21   correct?

22       A.    Yes, sir.

Page 171

```
1       Q.   Just a few other questions.

2            Here kind of in the middle on the right,

3   there are two names.  The first is "Eric."

4            Who is Eric?

5       A.   I don't know.  I don't have anyone

6   working for me named Eric.

7       Q.   Do you know anyone who worked on Eyes on

8   Georgia named Eric?

9       A.   I do not.

10      Q.   And how about the name right below that

11  that starts with an "M"?

12      A.   I don't know what that even says.

13      Q.   Okay.

14      A.   I'm uncertain.

15      Q.   And below that, there's a little section

16  for "Budget."

17           What was the total budget for this

18  project?

19      A.   This was well before the budget and we

20  were just -- I was just writing things down.  This

21  was just a working document.  There was no magic

22  to this.
```

Page 172

1      Q.   What did you anticipate the budget would

2   be?

3      A.   I don't know that we even looked at it

4   in the context of just the -- just the runoff.  We

5   have a lot of activity that we're involved in.

6      Q.   Was there any discussion on what the

7   budget would be for the runoff?

8      A.   Not really.

9      Q.   Under "Budget" are "Ads."

10          Were ads ever purchased for the Eyes on

11   Georgia project?

12     A.   No.

13          MR. SHELLY:  All right.  We can take

14   this one down.

15   BY MR. SHELLY:

16     Q.   Since December 2020, have you matched

17   the Georgia voter file to NCOA data?

18     A.   Since December of 2020?

19          THE WITNESS:  You know, Jim, we've

20   done -- I'm not -- I thought this was through the

21   2020 election.

22          MR. BOPP:  Good point --

Page 173

1          (Unintelligible cross-talk.)

2          MR. BOPP:  -- questions regarding after

3    the 2020 election.

4          MR. SHELLY:  Okay.  Well, for the

5    record, I will ask these questions.

6    BY MR. SHELLY:

7       Q.   For whom have you matched the Georgia

8    voter files to NCOA data since December 2020?

9          MR. BOPP:  I object.  It goes beyond the

10   court order and the subject matter for the

11   30(b)(6) deposition, and I instruct him not to

12   answer.

13   BY MR. SHELLY:

14      Q.   And why have you matched the Georgia

15   voter file to NCOA data after December 2020?

16          MR. BOPP:  Same objection and same

17   instruction.

18   BY MR. SHELLY:

19      Q.   Mr. Phillips, are you following your

20   counsel's instruction for each of those questions?

21      A.   Yes.

22      Q.   Are you currently -- strike that.

Page 174

1              Have you assisted in any other efforts

2       to challenge Georgia voters besides in

3       December 2020?

4              MR. BOPP:  You mean previously or

5       subsequently?

6              MR. SHELLY:  Either.

7              MR. BOPP:  Okay.  I'll object to the

8       subsequently as beyond the scope of the subject

9       matter and the court's order.

10             You can answer as to previously, you

11      know, previously starting at 2016.

12             THE WITNESS:  No.

13      BY MR. SHELLY:

14         Q.   Besides the efforts we discussed related

15      to Mr. Davis and Mr. Somerville, are you aware of

16      any other efforts to challenge Georgia voters?

17         A.   No.

18             MR. BOPP:  Which election?  In the

19      history of the world?  I object.  It violates the

20      court order because it goes before 2012.  It also

21      violates the court order as going after 2020.

22             MR. SHELLY:  So I'll break that into two

Page 175

1   questions.

2   BY MR. SHELLY:

3       Q.   Are you aware of any other efforts to

4   challenge voters in Georgia between 2012 and 2020

5   in addition to the effort you were involved with

6   and the effort that Mr. Davis and Mr. Somerville

7   were involved with?

8       A.   No.

9       Q.   And are you aware of any efforts since

10  December 2020 to challenge voters in Georgia?

11          MR. BOPP:  You can answer that.

12          THE WITNESS:  Since 2020?

13  BY MR. SHELLY:

14      Q.   Yes.

15      A.   To challenge voters?

16      Q.   Yes.

17      A.   No.

18      Q.   Do you plan to assist in any efforts to

19  challenge Georgia voters in the future?

20          MR. BOPP:  Object.  Goes beyond the

21  scope of the subject matter and the court order,

22  and I instruct him not to answer.

Page 176

1   BY MR. SHELLY:

2        Q.   Is True the Vote planning to coordinate

3   Georgia voter challenges again in the future?

4             MR. BOPP:  Same objection.  Same

5   instruction.

6   BY MR. SHELLY:

7        Q.   Mr. Phillips, are you following your

8   counsel's instructions for each of those

9   questions?

10       A.   Yes.

11       Q.   Okay.  Did you previously head the

12  Mississippi Department of Human Services?

13            MR. BOPP:  I'm sorry.  What was the

14  question about Mississippi?

15  BY MR. SHELLY:

16       Q.   I asked if you previously headed the

17  Mississippi Department of Human Services.

18            MR. BOPP:  You're talking about --

19            Okay.  Go ahead.

20            THE WITNESS:  Not since 2012.

21  BY MR. SHELLY:

22       Q.   Okay.  In that position, were you

Page 177

1    investigated for a conflict of interest in

2    connection with that role?

3             MR. BOPP:  Oh, I object.  Jiminy

4    Christmas.  Way beyond the scope of the court

5    order and the subject matter, and I instruct him

6    not to answer.

7    BY MR. SHELLY:

8        Q.   And my next question was, was that

9    conflict of interest related to a contract that

10   the department gave to a company that you

11   subsequently went to work for?

12            MR. BOPP:  Same objection.  Same

13   instructions.

14   BY MR. SHELLY:

15       Q.   Mr. Phillips, were you previously the

16   deputy Health and Human Services commissioner in

17   Texas?

18            MR. BOPP:  Since 2012 --

19            MR. SHELLY:  Yes.

20            MR. BOPP:  You can answer.

21   BY MR. SHELLY:

22       Q.   Was your answer no?

Page 178

1        A.    Since 2012, no.

2        Q.    Were you previously employed by the

3    State of Texas?

4        A.    Not since 2012.

5        Q.    Were you investigated for a conflict of

6    interest in connection with that role?

7             MR. BOPP:  Object.  It goes beyond the

8    scope of the subject matter, the deposition, and

9    I'll instruct him not to answer.

10            MR. SHELLY:  Okay.  So just to review, I

11   asked questions related to Mr. Phillips' 2016

12   analysis of non-citizen voting, the nature of data

13   acquisition that he performed for True the Vote,

14   some of his personal views about voter fraud, and

15   his previous employment history.

16            I understand that, Mr. Bopp, you are

17   instructing counsel [sic] not to answer any of

18   those questions.  It's our position that that is

19   in violation of the Federal Rules and the court

20   order.

21            So I would repeat our request one more

22   time that he be instructed to answer each of those

Page 179

1   questions or else we will take up those issues

2   with Judge Jones.

3           MR. BOPP:  I'm standing on my objection.

4           MR. SHELLY:  Okay.

5           Let's take another ten minutes, but I

6   think we are getting close to the end here.

7           MR. BOPP:  All righty then.

8           THE VIDEOGRAPHER:  The time is 2:31 p.m.

9   We are now off the record.

10          (Recess from the record.)

11          THE VIDEOGRAPHER:  The time is 2:47 p.m.

12  We are now on the record.

13          MR. SHELLY:  Okay.  I just wanted to go

14  back on the record to confirm that I didn't have

15  any other questions for Mr. Phillips.

16          MR. BOPP:  All righty.  I have no

17  questions.  We would like to have Mr. Phillips

18  review the transcript and sign.

19          THE VIDEOGRAPHER:  Counsel, does this

20  conclude for today's deposition?

21          MR. SHELLY:  Yes, it does.

22          THE VIDEOGRAPHER:  All right.  This

Page 180

1   concludes for today's deposition.  The date is

2   January 25th, 2022.  The time is 2:47 p.m.  We are

3   now off the record.

4           (Off the record at 2:47 p.m. ET)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 181

1    STATE OF MARYLAND        )

2                             ss:

3    COUNTY OF MONTGOMERY     )

4

5          I, Matthew Goldstein, Notary Public
     within and for the State of Maryland, do hereby
6    certify:

           That I reported the proceedings in the
7    within entitled matter, and that the within
     transcript is a true record of said proceedings.

8          I further certify that I am not related
     to any of the parties to the action by blood or
9    marriage, and that I am in no way interested in
     the outcome of this matter.

10         IN WITNESS WHEREOF, I have hereunto set
     my hand this 7th day of February, 2022.

11

12

13

14

15

16

17

18

19

20    _____

21         Matthew Goldstein, RPR

22

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 182

1     Gregg Phillips, c/o

      THE BOPP LAW FIRM

2     1 S 6th Street

      Terre Haute, Indiana 47807

3

4     Case: Fair Fight, Inc. et al. v. True the Vote, et al.

      Date of deposition: January 25, 2022

5     Deponent: Gregg Phillips

6

7     Please be advised that the transcript in the above

8     referenced matter is now complete and ready for signature.

9     The deponent may come to this office to sign the transcript,

10    a copy may be purchased for the witness to review and sign,

11    or the deponent and/or counsel may waive the option of

12    signing. Please advise us of the option selected.

13    Please forward the errata sheet and the original signed

14    signature page to counsel noticing the deposition, noting the

15    applicable time period allowed for such by the governing

      Rules of Procedure. If you have any questions, please do

16    not hesitate to call our office at (202)-232-0646.

17

18

19    Sincerely,

      Digital Evidence Group

20    Copyright 2022 Digital Evidence Group

21    Copying is forbidden, including electronically, absent

22    express written consent.

Page 183

1      Digital Evidence Group, L.L.C.
       1730 M Street, NW, Suite 812
2      Washington, D.C. 20036
       (202) 232-0646
3
4      SIGNATURE PAGE
       Case: Fair Fight, Inc. et al. v. True the Vote, et al.
5      Witness Name: Gregg Phillips
       Deposition Date: January 25, 2022
6
7      I do hereby acknowledge that I have read
       and examined the foregoing pages
8      of the transcript of my deposition and that:
9
10     (Check appropriate box):
       (  ) The same is a true, correct and
11     complete transcription of the answers given by
       me to the questions therein recorded.
12     (  ) Except for the changes noted in the
       attached Errata Sheet, the same is a true,
13     correct and complete transcription of the
       answers given by me to the questions therein
14     recorded.
15
16
17
18     _____          _____
19      DATE                      WITNESS SIGNATURE
20
21     _____          _____
22      DATE                            NOTARY

Page 184

1        Digital Evidence Group, LLC

2        1730 M Street, NW, Suite 812

3        Washington, D.C.  20036

4        (202)232-0646

5

6                              ERRATA SHEET

7

8        Case: Fair Fight, Inc. et al. v. True the Vote, et al.

9        Witness Name: Gregg Phillips

10       Deposition Date: January 25, 2022

11       Page No.    Line No.      Change

12

13

14

15

16

17

18

19

20

21       _____        _____

22       Signature                                Date

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 185 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 185

**A**

**a.m** 1:15 6:13
33:14,17 51:8
51:11 93:5
**abbreviations**
107:6
**ability** 142:19
**able** 11:14 43:12
85:14 118:1
128:4,9,22
134:18 142:8
152:15 168:22
**absent** 182:21
**absolute** 142:12
**accept** 147:20
**access** 35:22
95:5,18 98:14
98:15,16
114:17 133:12
134:6,14,16
142:13,14
**account** 167:6
168:9
**accuracy** 77:6
93:21 108:17
108:19,21
121:4 148:20
151:15,15
**accurate** 108:10
119:4
**acknowledge**
183:7
**acquire** 65:14,19
70:9
**acquiring** 66:19
67:4 68:18
69:6 162:7
**acquisition**
58:11 65:13
67:7,13 68:1,8
68:17 69:5
70:2,8,20
178:13
**Act** 80:4
**action** 27:2
37:18 40:5,14
40:19 181:8

**active** 72:9 91:8
**activities** 13:18
13:20,21 14:2
34:14,21 46:6
46:8 63:12
64:21,22 68:6
83:21
**activity** 63:15
172:5
**actual** 106:4,5
163:3
**Ad** 70:6,19
**add** 81:18 115:6
**addition** 30:17
58:21 71:15
111:15 161:1
175:5
**address** 8:16
103:7 112:5
115:8,14,15
116:1 124:21
125:2,14
130:10,15
131:4 135:8
136:20,20
137:8,15,19
138:19 139:14
141:14 142:1
143:2,5,6,16
145:20,21
146:10,16,19
146:20 153:12
**addresses** 112:9
112:15 113:11
115:4 121:20
131:18 132:11
134:19 135:7
**adjourn** 92:11
**adjust** 161:3
**adjusting** 160:14
**administration**
15:20
**administrators**
153:22
**ads** 172:9,10
**Advanced** 94:17
**advise** 182:12

**advised** 182:7
**affect** 74:18
121:4
**affiliated** 79:18
**affirmed** 8:4
**afield** 155:14
**afternoon**
158:21
**age** 151:2
**agencies** 19:4
**aggregate** 129:7
**agree** 11:21 14:6
15:5 23:10,13
31:13 42:3
94:19 106:1
107:1,4 127:8
127:16
**agreement** 13:15
14:4
**ahead** 25:19
37:3 41:15
65:2 67:15
69:12 83:6
105:6 128:19
128:20,21
176:19
**Air** 130:15,18
131:4,18
132:13 134:22
135:1
**al** 6:3 182:4,4
183:4,4 184:8
184:8
**Alabama** 8:17
15:18 23:1,2
**Alan** 8:15
**algorithm** 94:1
107:18 112:2
114:1,5 118:11
118:13 138:21
**algorithms**
94:10 95:5
108:1,7 113:8
113:20 116:21
118:5 119:16
**allegations**
38:18 41:8

44:16
**allow** 10:2 87:15
**allowed** 29:13
56:5 182:15
**amended** 4:15
76:10
**American** 168:3
**amount** 57:13
**analysis** 16:8
17:6 29:18
34:13 36:9
39:16 41:17
42:4 43:5,20
44:10 47:4
58:11 59:7,8,8
59:9,11,14,18
60:8,19 61:2
61:20 62:2,8
63:5 69:16
70:5 71:1,4,22
72:2,4,9 85:10
98:5 103:11
117:13,15
119:13 131:13
138:17 140:12
142:2,5 165:2
178:12
**analyze** 24:19
25:11 29:1,15
29:22 31:5
34:4 69:17
70:15,18 71:6
118:3 149:15
**analyzed** 29:11
31:10,14 70:14
70:20 71:12
108:18 114:22
**analyzing** 61:4,6
86:5 109:6
**and/or** 182:11
**Andrews** 130:15
**anomalies**
114:16 146:1,2
**answer** 10:3,9
10:10,16 11:2
11:18 12:2
13:2 18:3,11

20:13,19 21:9
21:15 22:12
25:1,8 28:3,8
28:20 29:9,13
30:4 31:20
32:2 33:3,8,10
34:9 35:7,16
36:13 37:12
38:3,12 39:21
42:10,19,22
43:17 45:22
48:3 49:4
50:17,19 59:5
63:8,14 64:6
65:4,8,17
66:11 67:8,17
68:10,15,16,21
71:20 72:17,20
73:7,22 74:1
74:13 75:11
80:19 81:8
83:6,8 85:7
99:18 104:2,17
105:4,6 108:4
109:9 118:20
122:6 127:11
129:10 139:22
149:7,8 155:15
155:18 156:2
156:10 158:5
173:12 174:10
175:11,22
177:6,20,22
178:9,17,22
**answered**
109:11
**answering** 15:4
154:20
**answers** 9:20
15:5 121:8
183:11,13
**anticipate** 172:1
**anticipation**
147:17
**anybody** 12:11
55:5,12 56:13
75:1 86:11,14

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 186 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 186

87:17 108:18
109:2,15 148:2
**anymore** 27:17
101:16 151:16
151:18
**apologies** 26:9
44:22 159:22
**appears** 29:10
**applicable**
182:15
**application**
82:11
**applies** 64:15
**apply** 35:3 74:16
**appreciate** 30:13
31:1
**approach** 107:7
**appropriate**
11:17 40:19
89:9 104:12
137:2 183:10
**approximately**
54:21 109:18
139:4,16,16,20
140:8 147:7
**areas** 156:7,7
**argued** 94:18
**ascertain** 100:5
101:8 108:8
116:14
**asked** 11:2 22:10
67:19 71:6
75:9 96:16
106:15 112:13
112:18 125:11
126:7 131:17
154:1 157:16
157:16 166:17
176:16 178:11
**asking** 10:14
15:4 22:14,16
22:20 25:3
35:2 38:8
42:12,14 53:15
55:10 64:22
66:3,7,21 68:8
70:1,22 74:21

83:22 84:3,20
95:20 97:6
99:16 101:7
125:11 126:10
157:21,22
158:1,2
**asks** 34:16 48:14
63:10
**assess** 151:14
**assessing** 107:22
107:22
**assign** 116:17
118:17,18
**assigned** 145:14
**assigns** 108:10
116:10
**assist** 101:10
109:15 175:18
**assisted** 24:4
174:1
**associated**
131:18
**association** 6:17
**assume** 10:16
100:9 108:9
165:15
**assuming** 106:3
135:12
**assumption**
59:16 64:3,8
**assumptions**
79:2
**Atlanta** 3:9
**attached** 4:6 5:2
12:16 14:16
26:3 41:3 57:4
76:6 102:9
132:3 144:3
149:20 156:18
158:13 159:13
161:14 163:10
164:13 165:9
167:19 168:14
183:12
**attempt** 106:17
**attempted**
102:16

**attend** 138:8
139:2
**attending**
138:12
**attorney** 7:6
10:7 11:17
**attorney's** 45:21
46:1 155:18
**attributed** 15:6
**audible** 9:20
**audio** 50:22
**automated**
151:20
**available** 113:12
**Avenue** 116:2
**aware** 19:14
21:11,20 23:6
86:4,16 88:10
99:15 105:8
122:21 125:1
125:13,20
136:12 143:1
148:8 174:15
175:3,9

────────────
**B**
────────────
**B** 4:5 5:1 14:14
**back** 51:13
72:22 100:2
101:18,20
102:3 104:4
111:18,20
118:13 119:12
121:22 151:5
151:11 179:14
**background**
15:13 34:13
**bad** 103:16
104:9
**baked** 119:8
**ballot** 135:21
136:6,11
152:15,16
157:19
**ballots** 136:1,1
**barely** 165:14
**Barksdale**

130:18
**base** 129:18
130:13,16,18
131:4,14,19
132:13 135:1,2
**based** 69:2 70:6
70:19 143:11
**bases** 129:20
132:12 134:19
**basically** 95:6
115:3
**basis** 143:8
**beginning** 54:15
54:21 113:18
170:19
**behalf** 3:2,7,12
6:21 7:1,3 13:3
51:18
**believe** 35:3
57:11 82:19
110:4 135:4
138:9 143:12
148:20 149:11
155:11
**bell** 144:9
165:13
**belong** 17:10
**Bend** 137:15
**benefit** 9:18
**Benning** 132:13
**BERSON** 1:3
**best** 10:15 94:21
95:9 128:1,6
129:12 135:22
141:3
**beyond** 18:9
20:12 21:8,14
22:9 24:22
25:6,6,14
27:22 28:2,19
29:7 30:3
31:17,18 34:7
35:13 36:7,11
37:9,22 38:10
42:8 43:14
46:22 49:1
57:20 58:1

59:4 61:10
63:4,9,20
65:15 67:6
68:9,19 72:13
72:15 73:7
146:12 155:22
156:8 158:4
167:13 169:20
173:9 174:8
175:20 177:4
178:7
**Biden** 18:7
**bigger** 132:6
**Birmingham**
8:17
**birth** 142:21,22
**bit** 52:14 121:19
132:6 140:14
140:22 165:14
**blockers** 158:22
159:4
**blood** 181:8
**board** 23:15,16
23:20 117:22
**bold** 26:14
**Bopp** 3:12,13
7:4,6 13:9 14:7
17:22 18:8
20:11,19 21:7
21:13 22:8
24:21 25:5,13
25:17 27:4,21
28:7,14 29:7
30:2,5,8,10,15
30:19,21 31:16
32:4,5,8,20
33:5,9,20 34:6
35:6,13 36:5
37:2,9,21 38:8
38:15,20,22
42:7,16,21
43:8,21 44:3,7
44:12,18 47:21
48:13,22 49:5
49:9 50:21
54:7,16 59:3
61:9,13 62:18

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 187 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 187

63:3,20 64:6
65:2,15,20
66:3,10,15
67:5,15 68:7
68:19 69:7,11
70:10 71:18
72:13,18 73:6
73:13,19 74:1
74:8,18 75:8
77:8 80:17
81:6 83:2 92:4
92:16,19 93:3
103:18 104:4
105:1 110:12
110:16 122:11
133:21 155:13
155:22 156:8
158:2 167:7,13
172:22 173:2,9
173:16 174:4,7
174:18 175:11
175:20 176:4
176:13,18
177:3,12,18,20
178:7,16 179:3
179:7,16 182:1
**bottom** 59:7
77:4 79:10
103:2,5 158:18
159:18
**box** 183:10
**boxes** 161:9
**brain** 138:22
168:20
**brat** 15:15
**breadth** 91:20
**break** 10:21
11:3 52:15
92:2,10 174:22
**Brian** 77:15,17
77:18
**brief** 15:13
**briefly** 169:14
**broad** 58:9
75:10
**broadly** 20:21
81:19

**Bryan** 3:7 6:22
6:22 32:5,18
**bucketing** 170:2
**bucks** 152:2,4
**budget** 171:16
171:17,19
172:1,7,9
**built** 116:20
**Bundy** 3:8 7:1
**burden** 152:19
153:16,18,21
154:4,5
**burn** 83:4
**business** 15:20
108:20 151:8
**businesses** 74:9

─────────
**C**
─────────

**C** 3:1 4:1 8:1
76:4 113:3
123:6
**c/o** 182:1
**call** 110:13
158:21 170:19
182:16
**called** 24:13
61:19 110:5
149:1 164:19
**calls** 51:19 52:2
52:5 53:2
**Camp** 130:11
**campaigns**
16:21 17:4
47:9,12
**campus** 137:10
137:17,22
**campuses** 138:2
**candidates**
16:22 17:4,10
154:8,13,16
**capability**
129:15
**capacity** 14:22
18:13 20:16
21:18 22:14
25:4 28:6,15
35:2,8 36:22

37:3 42:20
48:17 146:12
**captured** 99:14
**care** 154:7,11,17
162:16
**Carolina** 130:11
**case** 1:5 6:6 8:12
73:15 74:15
96:15 107:15
114:11 115:9
116:12 120:11
125:9 141:19
146:13 155:9
182:4 183:4
184:8
**cases** 9:3 97:11
97:12 108:21
116:14 147:10
**CASS** 93:20
99:4,6 103:13
114:13 115:2
116:2 120:7
121:21
**cast** 27:1,19
28:12 152:15
**catch** 77:16
**Catherine** 1:7
18:18 34:17
78:5 149:8
**cause** 101:13
129:13 147:1,2
147:4 154:5
**causing** 91:6
**cc'd** 132:10
**Cell** 69:2
**center** 170:10
**certain** 39:9
89:8,18 90:2
90:19
**certified** 99:4,6
**certify** 181:6,8
**chain** 158:20
162:21
**challenge** 54:4
54:12 56:6,14
56:18 57:19
58:17,21 59:12

59:15,18 60:8
60:15 71:15
72:1,3 76:1
78:15 79:5
89:13,14 91:11
91:18 93:11,15
95:21 96:15
98:1,6 99:9
112:11,22
124:5 127:22
129:13 143:2
143:11,15
145:6,7,13,13
145:19 146:3,8
146:14 147:1,4
147:6,8,21
148:5,9,17,21
149:3,5,13
152:7 153:4,15
165:3 166:5
168:3 174:2,16
175:4,10,15,19
**challenged** 54:3
54:20 152:14
168:1
**challenger**
101:14
**challengers**
148:8
**challenges** 13:22
84:18 91:5
147:10 150:12
154:2 155:1,8
162:3,9 166:18
176:3
**challenging**
89:15 101:10
143:7
**chance** 91:11
**change** 54:3,20
74:17 81:3,14
124:20 125:2
125:14 127:15
127:19 128:14
128:15 131:3
136:20 137:18
138:18 184:11

**changed** 21:6
80:6,15 82:7
83:18 95:11
**changes** 133:12
133:18 134:6
136:21 152:6
183:12
**characteristics**
149:16
**check** 150:9
183:10
**checking** 166:9
**chief** 23:1,2
**choose** 98:19
**chose** 133:8
134:10
**chosen** 149:9
**Christmas**
152:20 177:4
**circle** 165:22
**circumstance**
126:21 127:10
134:20
**citizens** 56:5
142:15,16
**citizenship**
35:19 36:2
37:7
**city** 116:1
137:15
**clarify** 10:15
35:1 39:18
54:11 61:22
65:22 99:21
111:6 112:17
119:15 125:6
157:20
**clarity** 157:15
**clause** 118:19
**clean** 10:4 45:19
52:15 103:14
114:13
**cleaned** 85:2
**cleaning** 121:19
**cleanliness**
101:7
**clear** 60:14

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 188 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 188

80:11 115:2
124:4
click 50:21
client 50:22 74:6
75:14 103:19
105:3
clients 47:6
74:21
close 86:2 92:1
179:6
closest 135:2
CNN 41:7 42:12
42:14
CNN.com 4:13
co-done 110:3
Coates 8:17
code 56:5,10
59:9 123:12,14
123:20 124:3,3
124:11 128:2,4
128:9,16,22
129:8 140:11
142:6
codes 129:19
136:22 137:1,5
Coding 93:20
collect 62:17,22
collection 63:7
college 15:17
16:15 128:11
136:17 137:10
137:17,22
138:2,8,12
139:6
colleges 139:1
column 58:5
come 119:22
141:19 143:20
182:9
comes 64:11
151:5,11
comment 105:9
Commerce
15:20
commercially
113:12
commissioner

177:16
common 108:1
120:15,21
commonalities
87:14
communication
34:16 63:22
148:12
communicatio...
12:1 77:21
community
164:20
companies 82:12
company 7:7
36:17 45:7,10
61:2 107:14
110:3 114:1
177:10
compared 83:22
113:7
compelled 80:21
101:10 142:16
compels 143:11
compensate
160:15
compiled 35:21
complete 15:21
41:16 43:5
109:22 116:4
182:8 183:11
183:13
completed 25:16
43:19 109:19
completely
43:11 80:18
complex 81:17
105:13,18
108:1 138:20
complicated
131:12
components
94:1
computer 76:21
CON'T 5:1
concerned 91:7
conclude 179:20
concludes 180:1

concluding
148:9
concrete 114:20
conduct 34:20
41:6 63:11
98:5
conducted 1:14
2:1 149:14
conferencing 6:9
conferring 104:1
confidential
74:12
confined 49:10
confining 49:1
confirm 29:17
44:16 45:21
77:6 139:8
146:9 179:14
conflating 62:5
conflict 177:1,9
178:5
conform 105:15
105:20 107:1
conjunction
53:18
connection
177:2 178:6
consent 182:22
consider 140:16
152:19 153:16
153:21
considered
140:20
consistent
126:10
consolidate 95:6
constantly 162:6
consult 50:22
105:3
contact 79:19
context 42:4
62:22 67:11
68:13 69:3
75:3 114:8
120:13 160:5
162:19,21
172:4

continue 33:21
43:2 45:17
155:5
continues
119:20
continuing
13:14,17 14:4
169:22
contract 82:12
177:9
contractor 52:3
77:20
contractors
46:22 47:1,4
52:1,4,21 53:1
53:14
control 118:5
150:16 151:3
conversation
89:12
conversations
55:14,19
Cooper 1:8
34:19
coordinate
176:2
coordination
34:17 63:11,22
64:5
copies 11:9
133:8,9,12,14
134:6,7,10,12
134:13,15
copy 98:4 99:8
161:1,2 182:10
Copying 182:21
Copyright
182:20
corner 103:6
162:16,18
corporate 1:13
correct 79:3
83:10 90:4
94:10,19 100:9
118:14 124:22
132:15 134:12
141:11 142:3

164:5 170:21
183:10,13
correctly 41:22
43:2 62:11
64:10 85:20
88:2 96:12
103:9 121:7
124:9 138:16
140:11 147:5
Corresponden...
4:20 5:6,8,10
cost 160:13
161:7
counsel 6:18 7:4
8:7 12:10 26:5
32:1,7,8 33:1
51:1 103:21
104:2,19,22
178:17 179:19
182:11,14
counsel's 173:20
176:8
counted 152:16
counties 56:6
89:8,18 90:2,3
90:10 101:12
136:3,7 142:13
144:18 147:9
149:2,5,9
153:17 161:5,8
country 38:9
counts 103:6,10
county 89:10
97:16,19
113:14 125:21
129:14 143:20
146:14 147:4
147:15 181:3
couple 89:6
92:12
course 13:10
15:21 16:2,11
32:13 75:6
122:7 135:19
courses 16:9
court 1:1 6:5,16
7:8 9:15,19

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 189 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 189

23:2,5 28:15
29:13 35:9
43:12 92:8
173:10 174:20
174:21 175:21
177:4 178:19
court's 25:6,14
28:1,19 29:8
31:18 32:15
35:14 37:10,22
38:10 42:9
43:15 73:11
174:9
cover 29:12
57:18 100:3
CoverMe 45:11
create 90:3
96:14 97:7
98:1 144:15
164:4
created 36:21
47:20 53:13
95:21 144:16
150:11,15
157:10 164:2
169:3,6 170:20
cross 52:14
cross-talk 32:17
96:1 130:3,6
173:1
CRR 1:18 2:4
181:22
Crusade 167:3
168:6
Crusade4Free...
5:14 167:6
currently 173:22
cut 140:5
cutting 162:15
162:18
cycles 81:5,16,22
82:5

_____

D

D 8:1 131:22
D.C 1:21 3:4
183:2 184:3

Dame 137:9,14
137:16
danger 40:20
data 16:8 17:6
24:5,7,8,10,17
24:19 25:12
29:15 34:13
36:2,8 37:7
41:21 44:6,11
47:4 58:11
62:6,17,21
63:5,5,7,14,18
64:11,11,15
65:11,13,14,19
66:7,19 67:4,6
67:13,14,22
68:5,8,17,18
69:5,6,10 70:2
70:4,8,9,13,20
70:21 71:12
82:16 84:4
93:14,16 94:17
95:7,7,14,18
96:5,17 99:13
101:7 102:17
103:7 105:16
105:16,21,21
106:18 107:2,2
111:21 112:10
114:21 117:22
118:3,12
120:13 121:14
129:11 148:19
162:7 163:21
164:21 165:2
170:10,14
172:17 173:8
173:15 178:12
data-cleansing
115:10
database 24:16
35:21 36:1
64:8,12 170:14
databases 94:9
94:20 105:15
105:20 107:5
121:10

DataWalk 5:12
164:20 165:14
165:16 166:1
date 27:5 98:4
99:7 109:18
160:4 180:1
182:4 183:5,19
183:22 184:10
184:22
Davis 1:8 4:17
4:17 34:18
86:13 87:1,2
88:12,13
102:15 103:17
104:9,16
174:15 175:6
Davis' 105:8
day 50:7 108:19
142:22 181:10
dealings 74:10
Death 148:13
debate 33:5
deceased 166:12
166:15
December 4:19
5:6,7,10 32:6
54:13,21 55:9
56:2 57:14
61:18 85:16
87:4 88:2 98:7
99:22 109:20
132:9 150:11
158:18 160:7
161:17 162:3
172:16,18
173:8,15 174:3
175:10
decide 19:8
56:16 97:12
decided 40:18
decision 161:6
Def 4:14,17,17
5:9,9,9
defendants 1:10
3:12 7:6 155:9
defense 32:6
33:1

define 106:6
definition 115:1
degree 16:4
delivered 115:16
delivery 93:21
114:15 115:15
146:17
delta 140:7
Democrat 17:15
17:21
Democrats
17:13 155:20
demographic
149:15
department
176:12,17
177:10
depended 52:7
depending
111:17 117:16
depends 46:9
47:5 71:5 92:5
95:16,17 100:4
126:21 127:10
129:3 130:21
130:21 131:7
deployed 125:17
128:5
deponent 13:19
13:20,21 32:11
182:5,9,11
deposed 8:21 9:8
14:22
deposition 1:13
2:1 4:7,8,10
5:3 6:2,8 9:12
11:5,13 12:6
12:11,15 14:15
26:2 32:9 41:2
57:3 76:5
101:5 102:8
132:2 144:2
149:19 156:17
158:12 159:12
161:13 163:9
164:12 165:8
167:18 168:13

170:20 173:11
178:8 179:20
180:1 182:4,14
183:5,8 184:10
depositions 32:3
deputy 177:16
Derek 1:7 34:18
86:10
describe 16:2
48:8 59:21
60:19 70:6
80:9 88:22
89:1,4 150:8
described 79:16
describing 88:7
89:22
Description 58:6
DeShawn 3:17
6:14
designated 13:2
designation
68:10
designators
129:21
designed 108:7
details 68:8
determination
142:10
determine 37:4
101:12 141:15
147:2,3,16
determines
147:4
determining
96:8
develop 103:10
developed
108:12,14,16
169:11
developing 61:5
development
61:7
deviation 140:21
141:1,7
differ 84:6,9,11
differed 84:22
difference 85:4

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 190 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 190

85:8 90:21
**different** 83:13
  93:22 95:3,18
  97:20 105:15
  105:20 108:4
  118:10 119:1
  122:2,15 124:1
  131:8 146:6
  159:19 166:8,9
**differently**
  116:11
**Digital** 1:20 6:15
  6:17 182:19,20
  183:1 184:1
**dinner** 87:3
**direct** 77:1
**direction** 111:22
**directly** 32:3
  53:3 129:22
  150:6
**disagree** 90:13
  91:3
**discovery** 76:19
  144:12 156:14
**discuss** 40:5,10
  47:14 50:5
  54:1,19 55:3
  91:9,19 104:21
  148:1 155:7
  158:22
**discussed** 37:19
  38:6 47:19
  79:4 170:19
  174:14
**discussing** 56:4
**discussion** 172:6
**discussions**
  104:18
**disputes** 32:2
**dissimilarity**
  108:2
**distinguish**
  142:7,8
**District** 1:1,1
  6:4,5
**diverse** 82:11
**Division** 1:2 6:6

**DMV** 142:14
**document** 12:19
  14:19 57:7
  103:3 104:8,13
  144:11 150:2,5
  150:10 156:22
  157:2,4,9
  164:16 165:12
  165:14,16
  166:2 168:17
  171:21
**documents** 11:8
  12:7 76:19
  156:13
**DOE** 1:3
**dog** 132:1
**doing** 20:1 48:11
  50:5 56:22
  58:17,19,21
  60:22 64:4
  84:7,12,13
  98:22 101:7
  104:16 129:15
  170:3
**doorstep** 161:10
**dormitory** 138:8
  138:13
**doubt** 75:15
**Dover** 131:4
**dozen** 47:7
**dozens** 16:20
  22:2 47:2
  146:21
**DPV** 103:13
**drop** 160:12
**duly** 8:4
**dump** 168:20
**dumped** 161:10
**duplicates**
  122:17,21
  123:3

————————
**E**
**E** 3:1,1 4:1,5 5:1
  8:1,1
**e-mail** 4:19 5:6,7
  5:10 12:1

76:21 132:8,10
  132:14 158:19
  158:20 159:5
  159:20 160:7
  160:16 161:18
  162:15,21
**earlier** 122:10
  147:5
**Eastern** 6:13
  93:2
**easy** 153:7,8
**eat** 92:5
**econometrics**
  15:22
**effective** 151:20
**effectively**
  136:13
**efficient** 15:3
**effort** 109:16
  155:5 175:5,6
**efforts** 174:1,14
  174:16 175:3,9
  175:18
**eight** 23:5
**either** 11:9
  86:21 103:12
  113:14 116:3
  139:22 174:6
**elected** 18:7
  158:3
**election** 4:12
  13:19 14:1
  17:20 22:16,18
  23:4 24:8,19
  25:11 27:20
  28:13,17,22
  29:6 30:1 31:5
  31:15 34:5
  35:12,20 38:19
  39:13 40:7
  41:9 42:5,15
  44:17 46:5
  49:2 50:13
  51:17 54:9
  66:8,19 67:2,4
  67:12 68:6,6
  68:14 69:4

73:16 78:12
  81:5,15,21
  82:5 86:3,5,6
  93:13 153:22
  154:2 155:2,6
  155:8 168:3
  170:5,6 172:21
  173:3 174:18
**election-related**
  34:20 63:12,15
  65:19 67:14
  68:3,4
**elections** 20:8,22
  21:11,20 23:7
  46:18 54:14
  63:18 154:9,18
  155:12 157:17
**electronic** 11:9
  133:9,14,18,20
  134:8,15
  160:10 161:1
**electronically**
  161:9 182:21
**elements** 142:9
  142:11
**Elias** 3:3,19 6:20
  7:3
**eligibility** 13:22
  131:15 168:2
**eligible** 124:21
  125:3,15 126:4
  126:14,18
  127:1,8,16,21
  131:5 137:21
  138:17 147:21
  153:3
**eliminate** 95:7,8
  118:1,2 136:21
**eliminating**
  142:10
**employed** 178:2
**employee** 9:5
  46:21
**employees** 46:20
  46:22
**employment**
  178:15

**ended** 97:1
  161:4
**enforcement**
  164:21
**engage** 83:19,20
**Engelbrecht** 1:7
  18:19 19:19
  34:18 55:4,11
  55:20 56:1
  78:5,7 79:4
  88:6,21 131:17
  132:9 158:20
  162:1
**enhanced**
  148:20
**enrolled** 139:6
**ensure** 140:15
**enter** 43:10
**enters** 11:15
**entire** 57:13
**entitled** 65:8
  74:20 181:7
**entity** 119:18
**equally** 153:6,7
  153:8
**equation** 139:19
**Eric** 82:12 171:3
  171:4,6,8
**errata** 182:13
  183:12 184:6
**error** 141:2,5
**especially** 9:19
  146:6
**ESQUIRE** 3:2,7
  3:12
**essence** 80:21
**established** 21:3
  51:22
**estimate** 160:13
**et** 1:15 6:3 180:4
  182:4,4 183:4
  183:4 184:8,8
**ETL** 58:13,14
  62:7 64:15
**evidence** 1:20
  6:15,17 143:9
  182:19,20

183:1 184:1
exact 23:17 39:8
  42:1 121:9,13
  121:15
exactly 30:19
  75:16 110:8
  142:8
EXAMINATI...
  4:2 8:7
examine 135:7
  135:20
examined 8:6
  183:7
example 22:17
  114:20 127:3
  130:11 135:1
  137:8
examples 71:8
  72:11 109:21
  125:20 128:3
Excel 5:5,11
  134:16 163:15
  163:17
exception 11:1
  29:14 145:16
exchange 11:22
  90:6
exclude 166:11
excluding
  100:17
excuse 36:5 77:7
  103:18 152:18
execute 119:17
executed 85:3
executing 85:8
exhibit 4:7,8,10
  4:11,13,14,15
  4:17,19,21 5:3
  5:4,5,6,7,9,11
  5:12,13,14,15
  12:13,14,15
  13:6 14:12,14
  14:15 26:1,2,7
  37:1 41:1,2
  45:2 57:2,3
  75:17,19 76:4
  76:5 102:7,8

105:10 113:3
  120:2 123:6
  124:16 131:22
  132:2 135:14
  144:1,2 149:18
  149:19 156:16
  156:17 158:11
  158:12 159:11
  159:12 161:12
  161:13 163:8,9
  164:11,12
  165:7,8 167:17
  167:18 168:12
  168:13
expect 141:3,6
  155:1
expected 155:8
expedite 13:13
  14:5
expedited
  161:20
experience 19:5
  98:20,21,22
  99:1,2
explain 58:6
  64:14,22 65:11
  94:15 104:10
  140:22 164:18
  168:19 170:15
express 182:22
extract 24:13
  58:15
extractions
  58:18
Eyes 58:7 61:19
  62:1,13,15
  63:1 66:22
  169:16,21
  171:7 172:10

--- F ---
F 144:1
fact 142:20
Fact-check 4:11
factor 108:11
failed 82:20 83:9
fair 1:3 6:3

10:18 20:8,22
  25:9 30:22
  50:2 61:13
  78:11 92:16
  154:17 168:8
  182:4 183:4
  184:8
fairly 17:21 18:7
  155:12
fall 46:18 47:16
  50:9
false 27:8 59:16
  64:7 95:8,9
  100:14,15
  118:6,7 138:9
  140:17,17
  150:17,18
familiar 19:18
  56:9,14 76:12
  76:15 80:3
  120:12 135:17
  144:6 150:4,7
  156:22 157:5
  163:13,19
  164:16 165:12
  167:2,5 168:17
familiarity
  34:13
family 40:17
  126:20 135:9
far 100:2 101:18
  102:3 155:14
February
  181:10
federal 21:11,20
  23:7 81:4,15
  81:21 82:5
  83:3 178:19
fee 56:17
feeds 119:19
feel 89:9 150:5
  162:20
felt 91:4
field 52:2 143:3
fielded 52:4
fields 105:14,19
  107:1 120:5

Fight 1:3 6:3
  182:4 183:4
  184:8
figure 116:22
  146:14 147:18
  153:19
file 24:15 93:16
  93:17 94:12
  98:5,13 99:17
  99:19,22 101:1
  102:16 113:12
  120:7 122:19
  127:14 140:10
  141:12,22
  142:14 145:7,8
  162:3 163:1,2
  163:3,5 172:17
  173:15
filed 127:7
  138:18
filer 161:19
files 5:13 12:8
  93:14 99:16
  120:6 163:2
  166:9 173:8
filing 160:10
filings 12:9,9
fill 121:10 142:6
final 98:9
finally 23:5
financial 74:10
  74:12
find 10:21 30:9
  43:19 71:10,11
  75:4 166:10
findings 40:14
finds 115:4
fine 10:9 75:8
  92:22 110:15
  167:15
finish 10:2
FIRM 3:13
  182:1
first 8:4 18:18
  23:10 24:19
  47:14 50:5
  54:1,18 66:19

77:16 96:10
  103:15 107:8
  120:11,20
  122:1,5 128:1
  132:14 141:13
  142:1 160:6
  167:22 168:21
  171:3
five 28:1,18 29:8
  29:12,15,16,18
  30:3,6,17
  95:18 100:12
five-minute
  33:12
fixes 115:5
flagged 118:4
  122:3 140:2
flawed 82:11,14
focus 75:10
folks 17:19 85:7
follow 45:21
  46:1 80:22
  82:20 83:3,9
following 28:18
  155:17 156:4
  158:7 173:19
  176:7
follows 8:6
forbidden
  182:21
Force 130:16,18
  131:4,19
  132:13 134:22
  135:2
foregoing 183:7
formal 47:3 81:4
  81:14
formally 46:14
  47:20
format 105:16
  105:21 107:2
  114:5
formatting
  26:12,19
formed 47:17
forms 112:10
formulas 119:16

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 192 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 192

forty 152:4
forward 37:10
  43:17 127:14
  182:13
forwarded 94:6
  96:20 127:1,4
forwarding
  143:6,15
found 45:12
  71:13 103:7
  114:16 149:11
foundation
  167:10
founded 36:16
  36:19 46:11,13
  46:14 50:8
four 115:6
FPO 129:21
frame 72:14
  141:4
fraud 20:9,18
  22:15,17 23:3
  24:20 25:12
  156:6 178:14
fraudulent
  21:12,21
Fredericksburg
  6:10
free 20:7,22
  150:5 152:3
  154:17 162:20
Freedom 167:3
  168:6
freezes 73:14
friend 19:1,6
front 11:15
  142:3
frustrated 52:9
Ft 132:13
full 8:13
full-time 46:21
function 116:8
further 35:1
  40:19 54:11
  79:19 117:13
  117:15 119:13
  131:13 140:3

140:13 142:2
  181:8
furthermore
  18:9
future 175:19
  176:3
fuzzy 108:3,5,6
  122:8

─────────
        G
─────────
G 8:1
GA 68:12
  161:19
gain 98:15
Gainesville 1:2
  6:6
gather 96:5
gathering 46:6
  138:16
general 50:12
  54:13 136:1
  146:17
generalities 56:4
generally 16:14
  17:12 65:5
  69:19
generate 93:14
  98:6 165:3
generated 93:12
generating 54:1
  54:19 57:19
  90:1
gentleman 87:6
Georgia 1:1 3:9
  6:5 13:21 14:1
  29:2 30:11,18
  31:6 50:3,6,12
  51:20,20 54:2
  54:11,14,19
  56:5,10 58:7,9
  59:9 60:8,20
  61:12,19 62:2
  62:7,14,16
  63:1,19 64:16
  64:20 66:7,22
  67:1,12 68:14
  69:3 75:22

76:2 77:5
  82:12,20 83:9
  86:5 87:9 90:3
  93:12 95:21
  96:22 98:1
  101:14,20
  102:16 113:16
  117:18 121:1
  123:12,14,19
  124:11 126:5
  126:14,18
  127:9,13,17
  131:6,15 135:2
  137:5,5,19
  139:1,13
  142:21 148:16
  149:11 152:21
  154:8 157:17
  157:21 162:2
  163:2 166:18
  168:2,3 169:16
  169:19,21
  171:8 172:11
  172:17 173:7
  173:14 174:2
  174:16 175:4
  175:10,19
  176:3
Georgia's 96:13
  98:5 106:18
geospatial 61:2
getting 155:13
  161:8 179:6
give 52:20 71:8
  72:11 77:22
  101:11,14
  109:22 114:20
  117:3,19
  121:18 142:17
  143:5,5 146:19
  153:14 156:20
given 116:19
  183:11,13
gives 142:21
giving 10:3
go 10:22 15:17
  16:5 25:19

37:3 41:11
  51:2,4 65:2
  67:15 69:11
  77:3 83:6
  92:11 94:19
  103:2,19,20
  105:6 110:17
  111:22 113:4
  115:11,12
  116:12 128:3
  128:19,20,21
  159:15 162:12
  176:19 179:13
goes 20:11 21:8
  24:22 25:5,6
  27:22 28:2,18
  29:7 30:3
  31:17 35:13
  36:6 37:9,21
  38:10 42:7
  43:14 49:1
  57:20,22 59:4
  63:3,20 65:15
  67:5 68:8,19
  72:13,15 73:7
  101:18 115:3
  156:8 173:9
  174:20 175:20
  178:7
going 9:11 22:9
  25:14 32:10
  33:5,7,19 34:7
  41:17,18,19,20
  41:20 50:19
  52:9,16 61:10
  63:9 64:17
  65:21 70:17
  90:2 92:1,11
  92:14 147:19
  160:22 167:9
  174:21
Goldstein 1:18
  2:3 6:16 51:12
  181:5,22
good 6:22 8:10
  10:5,22 104:16
  117:19 172:22

governing
  182:15
government 9:5
  19:4,5 113:12
  126:3,13 129:1
governments
  16:22
graduate 16:5
great 15:9 26:13
  41:12 93:3
Gregg 1:13 2:1
  4:2,10 6:2 7:7
  8:3,15 43:9
  71:19 77:8
  92:21 105:6
  122:11 133:22
  182:1,5 183:5
  184:9
grew 15:15
ground 9:12
  62:6,17,21
  63:14,18 64:8
  64:11,12,15
  65:11 66:7
  170:13,14
grounds 20:20
group 1:13,20
  3:3,19 4:9 6:15
  6:17,21 7:3
  13:3 85:5,6
  110:10 182:19
  182:20 183:1
  184:1
grow 15:14
guess 30:7,21
  83:5 103:12
  113:19
guts 65:6
guy 86:12
guys 94:18
  162:15 163:14

─────────
        H
─────────
H 4:5 5:1 149:18
half 43:10 47:7
halfway 170:7
hand 181:10

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 193 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 193

handle 25:21
handled 136:2,2
handwriting 169:4
happening 72:9
hard 9:21 11:9 133:8,12 134:6 134:7,10,12,13 153:6 161:1
harder 153:2
hardware 170:9
hashtag 37:17
Haute 3:14 182:2
head 9:20 23:9 86:15 101:3 121:2 176:11
headed 176:16
heading 26:13
Health 177:16
hear 96:12 138:3 147:5
heard 14:10 43:2 56:12
held 6:8
hell 73:14
help 10:3 23:14 24:12 30:10 77:20 94:2,20 94:20 96:5
helped 24:11
helpful 13:7 160:5
helping 141:19
HEREDIA 1:3
hereunto 181:10
hesitate 182:16
Hi 7:2
high 20:7 117:1 117:8,12 139:2
high-level 16:17
highest-paying 75:14
highlighting 159:19
hire 46:22
hired 51:22

53:14 71:2
history 5:13 22:11 163:3 168:4 174:19 178:15
hold 45:17 154:5
holidays 152:20
home 136:18
homeless 146:20
honestly 81:8
Honor 105:1,2
Hooper 23:1
hop 158:21
hoped 155:3,4
hotline 51:18,19 51:21 52:21 53:7,10,14,20 170:18,18
hour 92:7,14 140:18
hours 92:2,12
house 97:4 129:5
housed 64:12
huge 160:11
Human 176:12 176:17 177:16
hundreds 154:1 162:6
hygiene 94:18 114:14,19,21
hypothesis 41:19

———— I ————
idea 27:16 53:20 53:22 54:22 55:9,10 79:9 79:17 118:18 122:20 123:1,4 123:22 132:17 132:21 139:7 144:19 148:7 155:10 157:11 162:19,22 164:1,3,8
ideas 126:7 168:21
identical 145:22

identification 12:16 14:16 26:3 41:3 57:4 76:6 102:9 132:3 144:3 149:20 156:18 158:13 159:13 161:14 163:10 164:13 165:9 167:19 168:14
identified 82:1,6 122:22 129:14 147:9 149:16
identifier 120:13
identifiers 120:15,21 121:4
identify 76:18 80:5,14 82:16 84:4 85:10 95:1 96:9 113:13 119:2 122:17 128:4 128:18,22 129:9 131:14 136:5,10 137:1 139:5,17 142:17,20
identifying 82:21 83:16,17 84:15,21 85:6
identities 107:21
identity 59:17 60:7 94:2,21 96:5,6,10 103:14 107:8 107:10,22 108:6,9 114:2 117:17,20 120:20 122:4 141:18,20 142:12,20
identity/reside... 59:8,11,14
illegally 155:21
illustrates 104:8
immediately

160:12
immigrants 4:11
impact 155:2,7
import 141:17
important 105:14,19 106:2 107:1,4 117:17 142:11
impose 152:20 153:22
impossible 136:7,9
improperly 91:15
in-house 118:9
in-person 78:20 87:18
inaccuracies 118:4
inaccuracy 148:1
inactive 81:18 81:18 89:13,15 90:15,17,22 91:7,10,19
include 58:10 60:4 73:18 89:12 91:11 100:1,10 116:16 129:19 144:18
included 39:16 61:20 90:22 99:12 100:18 100:22 102:4 145:12,18 147:7
includes 57:22
including 35:7 90:14,16,17 91:10,19 100:18 101:17 182:21
Incorporated 6:3
increase 91:10
increasing 91:18

independent 44:15 169:9
independently 109:1
Index 148:14
indexes 108:2,3
Indiana 3:14 137:9,16 182:2
indicate 95:11 104:13
individual 14:22 18:13 20:15 21:17 22:14 25:3 28:5 33:2 35:2,8 36:22 37:3 42:20 48:17 97:18 99:11 109:7,12 124:20 136:5 139:9 145:20 146:9,11
individually 1:13 136:3
individuals 35:19 80:5,14 83:17 84:5,15 84:21 85:11 94:11,12,22 95:2 122:1 129:17 138:11 139:5 141:12 141:22 142:7 147:7,13,20 149:16
ineligible 71:9 71:13 142:18 147:13 148:5
infancy 55:15,18
infer 129:11
info 117:19
information 48:14 52:6,7 53:1,4 74:12 74:17 94:16 106:17 112:2,3 112:4,5 113:13 119:17,18

121:11 142:7
144:21,22
149:15 151:2,9
152:8
**informed** 104:17
**initial** 128:7
129:22 140:5
149:14
**Initially** 169:20
**initials** 122:2
**initiate** 27:2
37:18 40:13
78:6
**initiating** 40:5
**initiative** 78:4
**inquiring** 159:6
**inside** 116:21
125:21,21
**instance** 148:15
148:16
**instances** 145:6
145:20
**instruct** 18:10
20:13 21:9,15
22:11 25:1,7
28:3,8,19 29:9
30:4 31:19
32:1 33:1 34:9
35:15 36:12
37:11 38:2,11
42:9,21 43:17
48:3 49:3
50:19 63:8
65:17 67:8
68:10,20 73:6
73:22 74:1,13
155:15 156:1,9
158:5 173:11
175:22 177:5
178:9
**instructed** 33:9
35:7 52:5,10
178:22
**instructing**
42:19 72:16
178:17
**instruction**

43:22 44:4,8
44:13,19 45:22
65:21 69:8
70:11 155:18
156:4 158:7
173:17,20
176:5
**instructions**
46:2 52:20
53:9 77:22
176:8 177:13
**instructs** 10:10
**insufficient**
103:6
**integrity** 51:17
**intelligence** 46:5
164:20
**intend** 33:18,20
45:21 46:1
127:13
**intended** 33:20
127:6
**intending** 13:12
**intent** 75:9
**interest** 20:7
177:1,9 178:6
**interested** 19:22
20:6 181:9
**interject** 13:10
43:12
**internal** 58:8
**interview** 41:7
42:11
**introduce** 6:18
**introduced** 7:5
18:21 19:2
87:5,7
**INV-0007** 4:14
**invade** 74:9
**investigate**
123:2
**investigated**
177:1 178:5
**invoice** 4:14
57:9,11,18
61:17 62:1
64:2,21 67:22

74:5 96:4
169:15
**invoiced** 61:18
**involved** 23:21
172:5 175:5,7
**involves** 107:22
**irrelevant** 18:1
20:12 74:9
80:18 81:8
83:4 102:22
153:13 154:4
154:10,20
158:4
**issue** 96:15
153:13,14
**issues** 91:6
151:16 179:1
**IV3** 169:8,9

_____

**J**

**J** 3:7 158:11
**Jacob** 3:2 6:20
8:10 32:13
71:18 105:2
110:12
**James** 1:8 3:12
7:6 34:19
**JANE** 1:3
**January** 1:14
6:10 41:7
100:2 155:12
180:2 182:4
183:5 184:10
**Jim** 50:16
172:19
**Jiminy** 177:3
**job** 104:16
126:19
**JOCELYN** 1:3
**JOHN** 1:9
**Johnson** 1:8
34:19
**joining** 27:2
37:17
**Jones** 31:22 34:1
179:2
**judge** 31:22 34:1

34:7 179:2
**judge's** 32:6,19
32:22
**jumbled** 52:13
**jumped** 89:7
**JumpVote** 25:21
27:13
**junior** 122:15
**jurisdiction**
100:7 101:9,16
124:6 125:22
149:12
**justice** 23:1,2

_____

**K**

**K** 159:11
**k-means** 118:22
**keep** 26:19 70:1
**keeps** 119:20
**kick** 116:15
**kicked** 145:17
**kind** 16:11,18
76:22 98:22
112:4 114:15
115:5 116:19
125:19 129:21
168:21 171:2
**kinds** 9:3 17:3
24:1,7 46:7
59:2 97:2,5
**King** 14:2
**knew** 87:10
**know** 9:7 10:14
10:21 17:1
18:3 19:11,13
22:10 24:18
27:9,10 32:12
39:19 43:10
46:15 47:13
53:12 58:2,4
65:5 67:19
73:14 74:19
78:19 79:1,12
79:14 82:13
84:9 86:8
89:19 90:10
92:7,9 95:8

96:7,10 98:17
99:1,10,11,18
100:20 101:2
105:1,9 107:19
107:20 115:3,7
115:13 116:2,3
116:4 117:5
118:16 131:7
133:4,5 134:20
134:21 135:1,3
135:22 137:7
139:22 140:1
143:15 144:8,9
146:15 147:16
149:7,9 150:10
150:14 151:22
152:4,5 157:7
157:9 163:14
163:22 165:19
168:8,10 169:5
170:17 171:5,7
171:12 172:3
172:19 174:11
**knowledge**
80:17 81:6
**known** 108:22
**knows** 81:9

_____

**L**

**L** 161:12
**L.L.C** 183:1
**lack** 121:3
**laid** 167:10
**laptop** 11:6,7
**Largest** 168:2
**late** 158:21
**law** 3:3,13,19
6:21 7:3 12:8
80:11,18
143:10 154:4
164:20 182:1
**Lawrence** 3:8
7:1
**laws** 56:14
**lawyer** 32:12
**lay** 41:17,18,19
41:20,20

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 195 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 195

leave 23:20
left 23:19 92:14
   103:5
legal 6:15 27:2
   37:18 40:5,14
   81:7
legitimate 46:21
   152:22
Lejeune 130:11
lengthy 115:21
Leslie 3:7 6:22
Let's 33:11
   128:2 179:5
level 20:7
liberty 17:18
licensee 98:11
lifted 153:18
limit 28:16
   31:19 34:8
   38:13 42:8
   48:1
limitation 43:15
limitations 35:3
limited 25:7
   28:1 29:8 36:8
   48:2 54:7 63:5
   63:22 73:11
   142:20
limiting 35:9,15
   37:10 38:2,10
   47:22
limits 37:22
line 160:4,6
   184:11
link 105:14,19
   106:17,19
   164:21
linkage 34:14
   36:9 63:5
   105:13,18
   106:4,5,7,12
   106:13,15
   165:2
linkages 166:8
linked 163:4
list 71:7 81:13
   83:14,15,19,20

84:1,13 86:1,2
   87:16 89:13
   90:11 91:11
   93:18 94:4,6,7
   94:11,12 95:1
   96:13 97:1
   98:9 99:14
   100:10 101:21
   109:22 112:22
   115:10 119:22
   120:5 121:1,14
   121:16,17
   123:11 125:7
   126:6 129:19
   133:2 135:21
   140:2 143:2
   145:13,14,19
   146:3,8 147:11
   147:21 148:2,5
lists 54:2,4,4,19
   57:19 58:12,17
   58:22 64:21
   67:10,22 71:15
   72:1,3 78:15
   80:7,16 85:12
   90:1,3,7 91:1
   91:18 93:11,15
   94:13,22 95:21
   96:3,4,15 98:2
   98:6 99:9
   102:4 109:5
   112:11 120:17
   120:22 121:5
   127:22 145:6
   147:6 148:10
   148:17,21
   149:3,6,10
   152:7 165:4
   166:5 170:8
litigation 59:9
   62:8
little 52:14 55:6
   121:19 132:6
   140:14,22
   163:16 165:14
   171:15
live 101:16

113:15 129:17
   138:12
lived 87:9 100:6
   101:9 149:12
   152:18
lives 130:12
   137:10
living 45:6
   127:13 137:17
LLC 1:13 3:8
   4:9 13:3 184:1
load 24:11,14
   58:15
loaded 24:15
loads 58:18
logic 108:3,5,6
   122:9
long 89:15 92:6
   138:21
longer 124:21
   131:5
look 29:5 31:9
   57:15 70:3
   95:14,15 97:2
   97:3,4,7,12,15
   97:16 102:18
   114:14 115:17
   116:13 117:21
   139:19 162:20
   165:19 166:16
looked 12:8,8,8
   22:2 37:15
   95:12 97:10,22
   101:4 151:13
   164:7 172:3
looking 58:5
   86:8 97:17
   137:4,5 159:17
   159:20 166:8
looks 57:9
   144:16 150:11
   158:19 163:20
   165:13
lot 17:19 19:16
   57:21 72:8
   86:8 95:15
   146:18 172:5

lots 95:3
low 117:2,9,10
   117:11
lowercase 115:8
lunch 92:5,11

─────────────
        M
─────────────
M 1:21 163:8
   171:11 183:1
   184:2
Macon 135:3
magic 171:21
magnitude
   91:18
mail 94:5 96:19
   127:2,4,14
   133:8 134:10
mail-forwardi...
   95:12 100:11
mail-specific
   127:2
Main 116:1,1,2
maintaining
   17:5
maintenance
   83:14,15,19,20
   84:1,14 86:1,2
major 15:19
making 56:3
   64:7 79:2
   129:5
management
   119:2
managing 45:14
mark 1:8,8
   12:14 34:18,18
   86:13 87:7,8
   132:9,14,15,20
   132:21,22
   133:1,11,17
   160:17
mark@printi...
   132:19
marked 12:16
   14:16 26:3
   41:3 57:4 76:6
   102:9 132:3

144:3 149:20
   156:18 158:13
   159:13 161:14
   163:10 164:13
   165:9 167:19
   168:14
marks 170:16
marriage 181:9
Maryland 2:5
   181:1,5
match 36:1
   94:10 102:16
   106:20,21
   107:5 109:4,18
   110:1,11 111:3
   111:5,20,21
   118:14 119:12
   121:13,15
   122:3 141:16
   145:8,14
   146:10 149:14
matched 96:13
   120:6 121:8
   122:14,18
   140:9 172:16
   173:7,14
matches 139:17
   141:12
matching 102:19
   106:22 107:21
   109:16 120:4,8
   120:9,13 121:9
   121:9 135:12
matter 6:3 20:13
   21:8,14 22:9
   27:22 31:17
   35:14 36:7,12
   48:1 59:4 63:4
   63:9 65:17
   67:8 68:9,20
   115:20 133:7
   133:10,17
   134:5 156:1,9
   158:5 167:14
   173:10 174:9
   175:21 177:5
   178:8 181:7,9

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 196 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 196

182:8
**matters** 13:12
18:10 24:22
67:6 155:14
**Matthew** 1:18
2:3 6:16 181:5
181:22
**mean** 39:19,20
52:7 53:12
68:4,5 73:16
79:11 86:7
92:6 95:5 96:3
105:2 106:6,10
106:13,19
110:2 111:14
112:1 113:2
114:21 115:2
116:7 117:7
122:16 131:7
134:9 146:15
146:18 162:17
164:6 167:7,14
174:4
**means** 70:7
124:12,14
134:9
**meant** 73:14
104:10 111:8
123:17
**mechanisms**
116:21
**medium** 117:2
**meet** 18:18 19:7
75:21 77:11
86:22 87:8,20
123:11,19
124:10
**meeting** 78:1,6,9
78:20 79:13,20
87:12,18 88:5
88:8,17,18,20
**Meng** 3:19 7:2,2
**mentioned** 20:20
122:9
**messaging** 12:2
**met** 19:19 77:4
78:3 87:2,2,20

88:1,12 135:12
**methodologies**
41:18 89:22
**methodology**
44:2,11 77:6
79:5,16 83:12
83:14,22 84:4
84:7 87:15
88:22 89:5
90:14,21 137:3
**Michigan** 30:11
31:7 49:8,13
60:5
**mid** 98:7 109:20
**middle** 26:20
122:2 162:14
171:2
**military** 15:15
125:18 128:5
129:18,20,21
130:12 131:8
131:14 132:12
133:2 134:19
135:8,9
**million** 4:11
27:1,18 28:12
108:21
**mind** 110:13
127:15
**mine** 55:2
**minutes** 11:1
92:17,19
115:20 119:9
179:5
**misinformation**
39:7
**missing** 115:4
**Mississippi**
176:12,14,17
**misspoke** 30:16
**misunderstan...**
89:21
**misunderstood**
111:7 119:15
**misused** 91:5
**model** 119:2
**modeling** 118:21

118:22
**moment** 156:20
**MONTGOM...**
181:3
**month** 142:22
**months** 23:5
**Moody** 131:18
132:13 134:22
135:1
**morning** 6:22
8:10 15:5
**move** 25:19
29:16 63:15
101:21 126:19
127:6,7,13,16
127:19 143:4
**moved** 82:17,21
84:5,16 85:11
85:12 95:2
97:4,21 100:10
101:20 113:14
125:21 126:3
126:13 128:10
129:1 130:10
130:19 131:14
137:22 139:10
142:18 143:3,9
143:13 145:22
146:11,16,20
**moves** 138:14
**moving** 118:19
138:1
**multiple** 103:7
**municipality**
56:7
**mutual** 19:1,6

_____
**N**
_____

**N** 3:1 4:1,1 8:1
57:2
**name** 6:14 8:13
22:3,16 45:10
58:8 64:8
77:16 86:9
87:21 122:2,2
122:15 141:13
141:13 142:1,1

145:6,8,13,14
146:7 169:17
171:10 183:5
184:9
**named** 86:13
87:6 171:6,8
**names** 86:17
94:6,7 122:14
123:11,18
124:10 127:21
129:17 130:8
136:17 138:11
139:4 140:9
148:5 171:3
**Nancy** 57:2
**National** 80:4
**nationwide**
51:17 60:2
62:9
**natural** 64:3
**nature** 178:12
**NCOA** 82:16
84:4 93:18,19
94:4,8,11 95:1
98:13 99:8,12
99:14,22 100:1
100:10 101:18
102:17 120:5
120:16 121:14
122:18 124:20
125:7 126:15
127:7,14 129:4
129:10 138:15
139:9 140:10
146:10 172:17
173:8,15
**NCOALink** 4:17
102:14
**near** 59:7 108:8
129:18
**necessarily**
62:13 64:13
137:11
**necessary** 37:16
**need** 24:12
39:18 43:9,12
50:16 71:19

76:13 84:10
92:6 95:7,8
103:18 110:12
112:4 117:11
117:12,19
119:17 160:11
161:20 162:2
**needed** 23:14
89:14 127:3
139:13
**needs** 21:6 43:16
49:9 66:6
112:2
**negative** 100:15
150:18
**negatives** 95:9
118:7 140:17
**never** 19:10 87:2
88:12 118:2
121:15 141:17
170:1
**new** 139:14
162:7
**newest** 161:19
**nine** 144:18
**nods** 9:21
**non-answerable**
64:18
**non-citizen**
29:11,22 31:6
31:11,14 34:4
38:19 39:12
40:1,6 41:8
42:4 178:12
**non-citizens**
27:1,19 28:13
29:1,5
**non-military**
126:3,13 129:1
**noon** 92:4
**Nope** 109:3
**North** 130:11
**Northern** 1:1
6:5
**Notary** 2:4
181:5 183:22
**noted** 32:22

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 197 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 197

183:12
**notes** 5:15 59:6
**notice** 2:3 4:8,10
  35:5 67:8 81:4
  81:15
**noticeable**
  151:15
**noticed** 145:11
**noticing** 182:14
**notified** 143:14
  143:17
**notifies** 143:20
**notify** 143:19
**noting** 182:14
**Notre** 137:9,14
  137:15
**November** 26:21
  27:6,15,19
  28:13,22 29:6
  30:1 31:15
  39:4,13 40:1,3
  40:8,9 50:12
  50:14 73:16
  78:12 86:6
**number** 6:1,7
  34:12,16 36:9
  36:10 56:22
  63:10,21 77:3
  79:9 87:10
  98:14,18 108:4
  113:6 117:3,11
  123:10 124:2
  145:9,15
**numbers** 150:9
  151:14 163:19
**NVRA** 80:13
  82:20 83:9
**NW** 1:21 3:3,8
  183:1 184:2

——————————
          **O**
——————————
**O** 4:1 8:1 164:11
**oath** 9:14
**object** 13:15
  17:22 20:11,19
  21:7,13 22:8
  24:21 25:5,13

27:21 29:7
30:2 31:16
32:8 34:6
35:13 36:6
37:4,9,21 42:7
43:14 47:21
48:13,22 54:7
59:3 61:9 63:3
63:7 65:15,20
68:7,19 72:13
74:8 80:17
81:6 83:2
155:13,22
156:8 158:2
167:7,9 173:9
174:7,19
175:20 177:3
178:7
**objected** 52:16
**objection** 10:8
  13:10,14 14:4
  18:8 28:7 32:4
  32:12,14,21
  33:6 35:6 38:4
  42:16 43:13,21
  44:3,7,12,18
  49:9 65:21
  66:5,12,13
  67:5 69:7,11
  70:10 73:10,20
  74:17 104:1
  167:16 173:16
  176:4 177:12
  179:3
**objectionable**
  65:9
**objections** 13:11
  13:17 14:10
  33:21
**obtain** 35:11
  37:7 98:4,13
  99:7
**Obviously** 41:15
**occasionally**
  17:8 166:16
**occur** 78:9,22
**occurred** 54:13

**off-the-record**
  104:18
**offer** 126:6
**offering** 126:9
**office** 76:1 79:20
  95:13 96:20
  100:12 125:14
  130:22 182:9
  182:16
**oh** 25:17 69:11
  109:14 177:3
**Ohio** 30:11 31:6
  49:19 60:5
**okay** 9:11,22
  11:3,4 15:17
  16:5 17:9
  18:12,21 19:8
  19:11,18,21
  20:15 23:10,20
  26:12 28:5
  30:20 31:13
  32:15 33:7,11
  33:18 34:11
  35:11 36:20
  37:2,14 38:13
  40:21 42:3
  43:1 45:3,19
  48:16 51:10
  52:4,12 53:6
  53:17 54:16
  57:22 58:5
  60:18 61:13
  62:4,15 63:3
  64:10,14 66:16
  70:6 73:6
  76:16 77:1
  79:8 86:22
  88:11,20 90:6
  92:20 93:1,3,7
  93:10 94:3,15
  94:22 96:18
  97:22 98:4
  99:7 100:9,16
  102:6 103:1,17
  104:4 107:9,15
  108:5,17 110:4
  110:18 114:4,8

115:19 116:17
117:7,10 120:1
120:10 123:22
124:8,15 125:6
127:20 128:3,8
128:16 129:8
131:21 132:8
133:1,20
134:14,22
136:9 140:19
141:5,21
143:19,22
144:14 147:11
150:14,19
156:12 157:12
158:15 159:10
159:15,20
160:20 161:3,6
161:8 162:2,8
162:11,20
163:20 164:4,9
165:6 166:19
168:8,11
169:14 170:7
170:11,15,18
171:13 173:4
174:7 176:11
176:19,22
178:10 179:4
179:13
**once** 48:2 88:14
  150:3 152:13
**ones** 22:1 110:6
  129:14 154:17
**onward** 28:17
  38:1
**onwards** 34:15
  34:22 63:13
  73:12
**operated** 51:22
**operational** 46:6
  46:7
**opinion** 18:1,4,6
  18:14 74:20
  75:10 83:2
  138:1,5 154:22
  158:1,3

**Ops** 170:8
**OpSec** 1:13 4:8
  4:19,19,21 5:4
  5:4,5,6,7,7,11
  5:12,12,13,15
  13:3 15:6
  28:17 36:15,21
  45:8,12,14
  46:4,10,20
  47:6,14,17,19
  48:5 50:8 52:2
  53:6 56:17
  57:11 64:4
  74:5 75:4,6
  77:14,19 78:6
  79:18 83:20
  84:10 98:10
  99:4 113:7
  123:10 144:12
  151:22 157:3
  170:8
**OpSec's** 4:15
  34:14 63:11
  75:14 76:10
  77:4
**option** 182:11,12
**Oracle** 95:5
**oracles** 112:1
**order** 13:13 25:6
  25:14 28:2,15
  28:19 29:8
  31:18 32:6,16
  32:19 33:1,4
  35:9,15 37:10
  37:22 38:10
  42:9 43:12
  73:11,18 74:15
  74:16 107:15
  113:13 173:10
  174:9,20,21
  175:21 177:5
  178:20
**ordered** 34:8
**ordinarily** 75:5
**Oregon** 42:12
**organization**
  116:9

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 198 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 198

original 140:2
182:13
Ossoff 154:19
155:12
outcome 21:12
21:21 22:17
23:3 181:9
outputs 41:20
outside 35:4
66:14 108:13
113:15 119:18
152:21
overall 151:13
169:17
oversimplifica...
94:14
overstated
141:18
overview 16:17
owner 151:8
owns 114:1

————————
P
P 3:1,1 8:1 165:7
p.m 93:8 110:19
110:21 179:8
179:11 180:2,4
pace 92:14
page 4:2,7 5:3
32:18 33:3
41:11 77:2,3
102:11 103:3
113:4 123:9
132:6 150:21
150:21 151:6
158:16 159:16
159:17 160:3,5
160:6 162:12
162:15 182:14
183:4 184:11
pages 12:20 13:7
26:15 76:13
150:3 183:7
paid 53:6 56:17
56:20 57:13
97:18 151:22
paragraph

41:14 124:14
159:18
paragraphs
132:10
part 16:4 46:15
62:2 66:1
82:18 90:4
138:4 139:18
148:14 151:4
151:10
part-time
126:19
partial 121:9,10
participating
32:9 55:19
particular 11:18
38:7 54:8 88:8
102:21 166:10
parties 16:21
181:8
Partly 62:10,12
partner 45:14
partnering
47:19
parts 151:12
party 17:9,12
44:15 85:8
pass 8:17 114:12
Patriots 14:3
pause 43:9 51:9
104:3
payments 57:17
Peachtree 3:8
pending 52:18
105:2,4,4
122:12 133:21
Pennsylvania
30:11 31:7
49:16 60:5
people 19:16
52:8 64:1
74:10 86:8
91:6,12 94:4
97:4 100:1,6
101:9,17
113:13 143:4
166:13

percent 85:4,7
148:4
perfect 82:14
117:20 126:6
perform 46:4
47:15 50:11
84:10 94:10
106:5 107:21
110:1 114:14
115:9 117:13
117:14 121:19
131:13
performed
48:19 49:7,12
49:15,18,21
64:20 106:22
109:4 110:10
111:3,5 114:19
178:13
performing
64:16 106:3
performs 118:14
period 182:15
permanent
127:19 128:14
131:1,3,10
136:20 137:18
138:14,18
permanent-duty
131:1,9
permission 92:7
permit 33:8
permits 80:14
permitted 73:8
85:19
Perry 23:1
person 32:10
88:1 95:10
111:8 116:9
130:7,10,12
131:5 137:9,17
137:18 139:15
143:9 145:12
146:21 153:20
personal 28:15
74:10 178:14
personally 111:3

140:12
persons 34:20
pertain 38:7
Phillips 1:13 2:1
4:2,7,10 5:3
6:2 7:7 8:3,10
8:15 12:15,20
14:9,15 15:14
25:20 26:2
31:4 34:3
35:11,18 36:15
41:2,6 43:6
45:5,20 57:3,8
66:18 67:18
72:20 74:4
75:13,21 76:5
93:10 102:8
104:7 111:2
124:19 132:2
135:17 144:2,7
145:5 149:19
152:13 155:17
156:17 158:8
158:12 159:12
159:21 160:9
161:13 163:9
164:12 165:8
167:2,18
168:13 173:19
176:7 177:15
179:15,17
182:1,5 183:5
184:9
Phillips' 178:11
phone 11:6
physical 6:9
pick 22:19,22
picked 29:17
piece 62:3
114:21 118:3
129:6
place 10:22
13:20 107:16
places 117:18
plaintiffs 1:4 3:2
3:7 4:8,10 6:21
7:1,3 8:7,11

28:15
plaintiffs' 4:15
76:11,19
plan 44:10
175:18
planning 169:1
176:2
platform 9:9
play 160:14,21
please 6:18 7:9
9:20 10:2,14
10:21 26:8
33:12 71:20
132:11 161:18
182:7,12,13,15
plus 115:6
point 10:13 40:8
87:3 93:21
111:2 114:15
115:15 125:5
172:22
points 98:14,16
political 16:20
17:9 67:10,22
politics 47:8,11
PolitiFact 4:11
poorly 123:21
124:13
portion 81:18
position 176:22
178:18
positions 16:18
45:16
positive 100:15
150:17
positives 95:8
118:6 140:17
possibilities 95:3
possibility 91:9
91:20 101:19
possible 15:3
31:10 102:1
145:17 146:5
161:20
possibly 55:1,8
114:11 129:3
139:12 146:20

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 199 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 199

post 28:17 40:8
95:13 96:20
100:12 130:22
postal 98:10
125:3,14
postcard 136:1
potential 118:4
130:17 141:2
141:12 148:1
potentially 82:7
82:17,21
130:14
practice 108:20
pre 28:17
preelection 14:1
preface 66:20
prefer 92:5
preliminary
119:11
preparation
24:5 58:11
101:5
prepare 12:5
149:2
prepared 13:5
14:11 147:12
148:10
prescribed 80:4
present 3:16
27:13 73:18
preserve 13:11
President 18:7
presidential
17:20
presumably
93:18
pretty 80:11
95:16 108:21
115:2 118:21
124:4
prevent 21:4
22:15
previous 45:19
98:21,22 99:2
100:2 101:21
121:8 157:15
160:6 178:15

previously 174:4
174:10,11
176:11,16
177:15 178:2
primarily 114:2
170:14
Printing 134:13
prior 13:19
privacy 154:21
privileged 31:22
probable 101:13
129:13 147:1,2
147:4 154:5
probably 19:16
40:4,8 53:5
60:10 76:17
99:15 100:13
111:13 135:10
140:4,5 150:12
151:13 152:2
162:22 163:1,5
163:6 164:7
problem 20:10
20:18 117:18
Procedure
182:15
procedures 80:3
80:10
proceed 32:3
proceedings
181:6,7
process 21:3,5
24:14 61:7,8
82:14,20 83:9
84:20 85:1
102:20 103:16
104:9 105:8
115:10,21
119:2,5,7,20
121:19 148:14
152:19 153:21
processed
116:11
processes 82:10
processing 4:18
102:14
produce 114:4

115:10 119:3
produced 78:15
102:15,19
144:12 156:14
157:3
producing
112:21
product 151:16
151:19 164:19
164:21
production 4:16
76:11
products 93:20
program 16:4
54:12 56:18
59:13,15,19
60:9,15 76:2
79:5 169:21
170:1
programs
112:13
progress 158:22
project 47:5
60:2,4 61:19
62:14,16 63:1
151:18 171:18
172:11
projects 56:22
169:18,19
properly 91:12
91:13,21 125:8
153:20
proportion
140:1
proposal 56:3
propose 56:1
proposing 92:15
proprietary 94:1
96:3 107:13
113:22
proscribed
80:20
prospectively
168:1
protective 74:14
74:16 107:15
prove 152:17,17

153:12 154:5
provide 17:3,6
53:1,4 111:21
112:6 114:5,21
121:16,16
147:1 170:9,12
provided 16:13
31:22 68:13
121:14 152:3
provides 32:16
112:15
providing
119:13
public 2:4 41:18
181:5
publicize 136:8
pull 12:13 14:14
26:1,7 37:15
40:22 57:1
76:4 102:7
113:3 119:17
123:6 129:22
131:22 144:1
149:18 150:16
156:15 157:13
158:10 159:11
161:12 163:8
165:7 167:17
168:12
pulled 128:6
141:21
purchase 161:18
purchased
172:10 182:10
purpose 70:22
87:12 127:2
129:9
purposes 148:22
Pursuant 2:3
push 115:12,16
put 9:21 34:12
40:19 75:3
98:8 128:2
164:11 168:22

_____
Q
_____
quality 118:5

140:15 150:9
150:16 151:3
queen 26:11
queries 24:5
95:6 112:21
113:1,8 114:9
115:13
query 95:4
114:10,10,18
128:7 130:1
question 10:2,8
10:14,17 11:2
11:3,19 14:9
18:13 20:4
21:7,13,19
22:8,10 23:6
24:21 25:13,16
27:12,14,21
28:9,11 29:17
30:2,7 31:3,16
33:8 34:3,6
36:6 37:3,19
38:5,14,17
39:1,18,21
42:7,17 43:14
47:21 48:1,1
48:13,16,18
50:20 51:13
52:17 53:11
54:6,10,18
55:12 59:3,17
61:9,11 62:19
62:21 63:8,20
64:18 65:2,3,7
65:8,20 66:6
66:12,15,18
67:3,20,21
68:2 70:2
71:20 72:21
73:1,22 74:2
75:9,11 77:9
81:10 82:2
90:18 91:2,17
100:20 105:3,4
105:17 106:15
106:16 109:8
109:10 112:12

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 200 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 200

122:11 123:10
125:12 127:12
128:8 130:19
133:15,21
134:2,3,4
136:15 137:20
138:6 144:14
157:16 160:20
162:17 176:14
177:8
**questioning**
104:5
**questions** 12:2
13:2,18 14:2
15:4 18:16
28:16 31:19
33:3,19 34:8
35:4,9 36:20
36:21 38:1,11
43:3,11,15
65:4 66:11,21
67:1 70:16
73:8 74:20
93:11 104:2
107:17 113:6
154:21 156:12
171:1 173:2,5
173:20 175:1
176:9 178:11
178:18 179:1
179:15,17
182:15 183:11
183:13
**quite** 100:4
**quotation**
170:16

**R**

**R** 3:1 8:1 41:1
**racial** 163:21
**ran** 23:2 51:17
**rate** 141:2,5
**raw** 41:21 44:6
44:11
**read** 12:7,7
41:22 42:2
51:12,14 62:1

72:22 73:2
106:16 183:7
**reading** 41:15
56:11 61:16
64:10
**ready** 182:8
**really** 73:13 96:7
104:15 131:8
160:11 170:1
172:8
**rearranges**
115:5
**reason** 58:20
82:19 101:11
101:15,15
142:17,19
143:7,12,12
147:3 152:22
153:14
**reasonable**
101:13 140:16
140:20
**reasons** 125:1,13
146:6,21
**recall** 16:3 19:17
21:19 23:17,19
27:17 29:3,19
29:21 31:8,12
39:8 40:12
42:1,6 43:7
47:16 50:7,10
52:22 53:8,22
55:1 56:3,4,7
56:19,21 57:16
60:6,13,14,16
69:18,20 72:21
73:21 78:8,10
86:7,19,20
87:9 89:3,11
90:5,9 97:14
98:3,7 109:17
131:17,20
134:21 137:3
139:18 140:4
148:3 152:9
157:6 159:9
**received** 16:7

51:19 53:2
99:13,22
119:11
**recess** 33:12,15
93:6 104:22
110:20 179:10
**recognize** 12:19
14:19 57:7
74:15 126:22
128:10
**recollection**
37:16 79:12
168:5
**record** 6:19 8:14
8:16 9:21 10:4
10:22 32:14,21
33:14,15,17,22
34:12,14 35:12
36:9 51:2,5,8,9
51:11,14 52:16
52:17 73:2
93:5,6,8
103:21 104:3
105:13,18
110:17,19,20
110:22 122:18
122:19 146:16
173:5 179:9,10
179:12,14
180:3,4 181:7
**recorded** 183:11
183:14
**recorder** 92:8
**recording** 6:9
**records** 97:3,10
97:13,15,16
105:14,19
121:8 143:1
**refer** 54:4 68:12
69:2
**reference** 159:5
**referenced**
54:10 182:8
**referencing**
160:21
**referring** 54:12
123:16 124:2

132:15 148:16
160:18 170:13
**refers** 65:12
67:11,22 70:19
170:16
**refine** 87:16
**reflected** 133:13
134:7
**reflects** 57:12
**refresh** 37:16
168:5
**regard** 36:22
**regarding** 13:18
14:2 22:10
28:16 38:20,21
48:14 76:1
173:2
**regardless** 10:9
**register** 131:12
138:14
**registered** 54:2
54:19 91:12,13
91:21 96:22
97:19 100:7
113:15 125:4,8
125:16,22
136:19 145:21
153:20
**registering**
96:20
**registrant** 145:7
145:8,21
**registration**
24:8,10 63:6
80:4,7,16
81:13 85:12,15
93:17 96:13,14
113:11 120:5
120:16 145:9
145:15,15
**registrations**
95:15 163:4
**registry** 36:10
99:8 122:18
140:10
**regression** 113:8
118:20 119:3

165:2
**regressions**
119:6,11
**regularly** 99:16
99:20 165:1
**reiterate** 103:22
**relate** 66:2
**related** 9:4
34:14 38:4
40:6,14 42:14
44:16 47:8,11
48:6,20 52:21
53:7,9 58:16
59:12,14 60:11
60:15,16 61:3
63:18 68:5,14
73:10 77:22
112:15 162:9
170:4 174:14
177:9 178:11
181:8
**relates** 103:14
**relation** 166:4
**Relative** 141:2
**release** 44:2,6,10
**relevance** 74:19
**relevant** 102:5
112:11 124:3
164:10 167:8
167:10
**relied** 141:15
**remain** 126:14
126:18 127:1,8
**remained**
153:10
**remaining** 125:3
125:15
**remember** 46:12
86:17,18 89:6
**remind** 30:5
**remote** 6:9 9:20
**remotely** 11:14
**remove** 80:6,15
81:3,13 85:14
85:19 118:6
123:18 129:17
131:18 132:11

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 201 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 201

134:18 136:16
138:10 139:5
150:17
removed 123:10
124:9 135:11
146:2
removing 81:22
82:6,22 127:20
130:8 133:2
repeat 8:13
48:16 52:16
54:6 62:18
138:3 178:21
repeating 106:8
rephrase 10:15
88:16 165:18
rephrased 66:6
report 4:18 5:4
26:14 102:15
151:5,10,12
152:1,8
reported 1:18
181:6
reporter 6:16
7:9 9:19 92:8
reports 140:15
represent 8:11
135:4
representative
1:13 13:2
representatives
75:22 77:4,5
77:12,14 78:18
79:6,15
Republican
17:12
Republicans
155:21
request 4:15
53:15 76:11
95:13 99:12
100:2,11,22
101:18 127:7
127:14 129:10
139:10 178:21
requested 34:12
135:21 136:5

136:11
requesting 96:19
requests 76:20
94:8 102:3
144:13
require 65:5
123:14
required 65:3
81:21 82:5
121:13
requirement
135:13
requirements
81:7 126:11
reregistered
146:9
research 17:19
35:22 36:10
46:5 59:1,2
63:6 69:16
70:3 139:1
166:14
researched
136:4
reside 138:8
141:13
residency 54:3
54:20 59:18
60:7 80:6,15
81:3,14 82:7
83:18 95:11
96:7,8 114:2
131:11 143:8
resolution 114:3
resolve 120:19
154:1
respect 36:8
105:15,20
107:2
respond 32:13
153:3
response 55:22
79:15 144:12
responses 4:15
76:10,12 103:7
responsible
127:20 130:4,8

133:1 134:11
responsive 76:19
rest 162:21
result 119:4
141:19
results 86:6
111:17 155:2,9
resume 104:5
retain 131:15
retracted 148:9
Return 93:1
Returning
134:22
returns 117:14
reverse 159:18
review 114:6
145:5,19 146:8
178:10 179:18
182:10
reviewing 140:9
140:15 152:7,7
reword 124:1
Richard 157:7
ridiculously
155:14
right 8:19 12:5
22:6 23:8
26:15,16 30:19
38:15,22 56:16
57:15 58:1
60:17 61:17
77:2 84:19
85:21 92:4
100:13 101:2
113:17 121:1
121:21 135:6
154:21 157:18
159:20 160:4
162:14 171:2
171:10 172:13
179:22
righty 179:7,16
ring 144:8
163:18 165:13
risk 96:7 108:10
116:10,18,19
116:20 117:1,2

117:2,8,9,10
117:12,14,21
117:21 118:1,2
118:4,17,18
119:21 142:9
142:11
RMR 1:18 2:4
181:22
Roberta 161:18
161:21
Robinson 77:15
79:4
role 51:21 77:19
110:7,9 177:2
178:6
roll 71:14
rolls 81:19 82:22
83:17 84:5,16
85:3,15 86:5
94:7 96:14
103:14 106:18
109:5 120:5,16
Ron 1:8 34:19
room 11:11,15
124:6
rows 138:21
Rule 4:8 33:2
rules 9:12 80:21
80:22 145:15
178:19 182:15
run 52:1 53:12
118:12 119:7
121:20
running 119:6
142:5
runoff 14:1
54:14 73:16
93:12 154:8
157:17 170:5,6
172:4,7
runoffs 98:9
rural 156:7

─────────
S
─────────
S 3:1,13 4:1,5
5:1 8:1 102:7
182:2

save 15:3
saved 26:19
saw 96:4 144:9
saying 92:9
163:14,16
says 32:6 57:17
59:7 73:12
113:7 132:11
150:11 168:1
171:12
scale 116:18
117:4
scenarios 125:9
school 16:5
125:19 137:14
139:2
schools 136:22
scope 13:11 18:9
20:12 21:8,14
22:9 24:22
25:14 27:22
31:8,17,18
34:7 35:4,14
36:7,11 59:4
60:19 63:4,9
63:21 65:16
66:14 67:6
68:9 72:14,15
73:7 156:1,9
158:4 167:13
174:8 175:21
177:4 178:8
score 116:10,18
116:19 117:14
scoring 116:20
116:21 119:1
SCOTT 1:3
screen 6:12 42:2
160:2
screenshot 5:12
5:13,14 164:19
screenshots
26:18
scroll 12:20 13:6
26:13 76:8,14
102:11 132:5
150:3,6,20

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 202 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 202

159:16
search 76:18
Searching 76:21
seated 23:5
second 43:10
  103:19 110:13
  110:14 125:12
  128:9
secondary 62:3
secret 157:18
Secretary 75:22
  77:5,11 78:3
  78:17 79:6,14
  79:19 83:13
  84:1,7,12 85:1
  85:2,9,13,18
  98:8
section 45:20
  56:4,10,12
  62:6,7 64:15
  124:4 159:19
  171:15
Security 148:13
see 11:14 26:20
  29:14 39:6
  41:21 70:3
  77:3 87:14
  97:3,21 103:5
  115:13 116:13
  158:3 159:2,7
  160:16,18
  165:15,15
  166:9
seeing 160:3
seek 96:9 112:2
  120:19
seeking 118:6
seen 157:4 164:5
  164:6
selected 182:12
Senate 154:8
  157:17 170:4,6
Senator 154:19
Senators 155:11
send 81:4 121:22
  139:20
sending 81:14

95:12
senior 122:15
sense 9:16 10:11
  64:19 150:4
sent 133:8,18
  140:3 150:12
sentence 70:18
  124:14
sentences 41:16
separate 24:15
  24:16 107:7
series 108:1
seriously 155:4
served 23:14
service 98:10
  107:13 125:3
  126:4,14 128:5
  129:2
services 45:11
  46:4 176:12,17
  177:16
set 53:14 108:6,7
  181:10
sets 106:18
shakes 9:21
share 141:13
shared 55:10
  142:1
sheet 182:13
  183:12 184:6
Shelly 3:2 4:3
  6:20,20 8:8,11
  12:13,18 14:6
  14:8,14,18
  15:10,11 18:5
  18:12,15 20:14
  21:1,10,16
  22:13 25:2,9
  25:10,15,18
  26:1,7,11,17
  27:6,11 28:4
  28:10,21 29:10
  29:20 30:5,9
  30:13,17,20
  31:1,2,21
  32:15,20 33:7
  33:11,18 34:2

34:10 35:10,17
  36:14 37:6,13
  38:4,13,16,21
  39:3 40:22
  41:5,11,13
  42:11,18 43:1
  43:4,18 44:1,5
  44:9,14,20
  45:1,4 48:4,15
  49:3,6,11
  50:18 51:2,3,6
  51:12,15 52:13
  52:19 54:10,17
  57:1,6 59:10
  61:11,15 62:20
  63:10,17 64:2
  64:9 65:10,18
  65:22 66:4,13
  66:16,17 67:9
  67:16 68:11
  69:1,9,14
  70:12 71:21
  72:16,19,22
  73:4,9,17,21
  74:3,14 75:2
  75:12,17,20
  76:4,8,9 77:10
  79:22 80:2
  81:1,11 83:7
  92:1,13,17
  93:1,9 102:7
  102:11,13
  103:2,4,22
  104:6 105:10
  105:12 110:15
  110:17 111:1
  113:3,5 120:1
  120:3 122:13
  123:6,8 124:16
  124:18 131:22
  132:5,7 134:1
  135:14,16
  144:1,5 145:2
  145:4 149:18
  150:1,20 151:1
  151:6,7 152:10
  152:12 155:16

156:3,11,15,21
  157:13,14
  158:6,10,15,17
  159:11,15
  160:1,8 161:12
  161:16 162:12
  162:13 163:8
  163:12 164:11
  164:15 165:7
  165:11,21
  166:3,20 167:1
  167:12,17,21
  168:12,16
  172:13,15
  173:4,6,13,18
  174:6,13,22
  175:2,13 176:1
  176:6,15,21
  177:7,14,19,21
  178:10 179:4
  179:13,21
ship 160:12,22
shipped 160:11
  161:2
shipping 161:4
shorter 100:13
show 71:4 143:2
shows 146:16
  160:6
sic 37:17 112:14
  178:17
sign 179:18
  182:9,10
signature 182:8
  182:14 183:4
  183:19 184:22
signed 182:13
significant
  118:21
signing 182:12
signs 24:20
  25:12
similar 19:5
  83:13 103:10
  108:8,9 112:14
similarity 108:2
similarly 15:2

simple 95:17
simplicity 54:5
simply 27:14
  68:5 100:20
Sincerely 182:19
single 168:3
sir 90:12 170:22
situation 46:9
  74:11 95:16,17
  116:5,14
situations 131:8
six 30:15 31:19
  34:7 35:15,20
  37:11 38:1,5
  38:11,14,20,21
  39:12,14,16
  42:8,13 43:16
  47:22 48:2
  54:8 61:10
  95:18
small 165:15
SmartyLinks
  112:14
SmartyStreets
  111:13,15,21
  112:6,8 114:12
  114:17 116:3
  116:13 120:9
  139:12,21
Sobczak 157:7
Social 148:13
software 170:11
sold 97:4 129:4
solve 119:21,21
somebody 78:7
Somerville 1:7
  34:18 86:10,22
  87:3,13,18
  88:1,18,21
  89:4,17 90:1
  90:11 91:3
  174:15 175:6
Somerville's
  87:21 90:14,22
soon 47:17
sorry 21:19
  22:19 25:16,17

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 203 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page  203

27:4 28:14
39:2,6 50:15
55:6 62:18
67:20 71:18
82:3 88:15
90:16,18 96:2
110:12 111:9
120:8 128:19
152:18 159:18
159:22 162:15
176:13
sort 116:10
140:14 168:20
169:1
sorts 96:5
sought 105:3
136:4
Sound 10:5
sounds 88:7
source 24:15
27:12 120:8
sources 95:18
96:17 129:11
148:19
South 137:15
span 73:10
spanning 54:14
speak 38:17
39:11,15,22
specific 24:2
31:3 50:7
51:20 55:17
58:3 64:18
69:18 70:17
71:7 89:3
101:11,15,15
142:17 143:10
143:11,12
specifically
10:10 16:3
17:7 18:13
19:17 29:3
32:5 39:14
40:12 54:11
55:1 56:21
84:3 90:9 95:4
95:20 97:6,14

97:18 98:1
107:16 129:16
specification
36:12 65:16
68:20
specifics 56:7
57:16 60:13
specified 15:6
30:3 37:11
64:1 67:7
specify 63:6
speculate 104:15
147:19
speculating
104:11
speculation
125:5
spell 63:1
spend 140:9
spill 65:6
spoken 88:13
spreadsheet
4:21 5:5,11
134:17 163:13
163:21 164:2
squinting 160:1
ss 181:2
stage 119:5
stand 66:12
167:15
standard 124:7
140:21 141:1,7
standardized
107:6 115:4
standardizes
115:3
standards
123:11,13,19
124:10
standing 179:3
start 9:11 15:12
48:11 113:18
starting 41:15
174:11
starts 26:14
171:11
state 2:4 42:13

65:4 78:3 84:2
84:6,12,17
85:2,9,11,13
85:14,19 93:16
95:14 96:21
98:8 101:22
113:15 131:11
136:2 142:14
153:9,10 178:3
181:1,5
State's 76:1 77:5
77:12 78:17
79:6,15,20
83:14 84:7
85:1
states 1:1 6:4
19:4 23:4 28:1
28:18,18 29:4
29:8,11,13,15
29:16,18,21
30:3,6,15
31:11,19 34:7
34:15,21 35:15
35:20 36:8
37:11 38:1,5,7
38:9,11,14,20
38:21 39:13,14
39:17 42:8,13
43:16 47:22
48:2 54:8
56:15 61:10
63:13 80:5,14
80:21 81:2,12
81:21 82:4,15
96:14 98:10
states' 82:10
station 131:2,9
statistics 15:22
status 35:19
statute 83:3
steps 123:18
129:16 136:16
138:10 139:8
stop 10:22
strategy 160:14
160:21
street 1:21 3:3,8

3:13 14:3
116:2,9 143:2
146:16 182:2
183:1 184:2
strike 173:22
string 160:17
student 128:11
students 136:17
138:8 139:2
stuff 27:8,10
83:5
subject 13:12
18:2,9 20:13
21:8,14 22:9
24:22 27:22
31:17 32:11
35:14 36:7,12
59:4 63:4,9
65:16 67:6,7
68:9,20 155:14
156:1,9 158:5
167:14 173:10
174:8 175:21
177:5 178:8
submission
130:22
submit 94:5
125:2,7,13
137:18 146:13
submits 124:20
submitted 74:5
94:8 99:12
100:1,11,22
101:18 126:15
127:18 128:14
129:4,9 131:3
139:9,11,12,14
149:6,10 162:4
163:15,17
subsequent
55:13
subsequently
174:5,8 177:11
sued 149:17
164:7
sufficient 72:15
suffixes 122:15

suggest 103:13
130:12 132:12
137:9 147:6
suggested
134:19 146:10
suggesting 59:13
Suite 1:21 3:4,9
183:1 184:2
summary 4:18
102:15
supplemental
160:10
support 59:9
62:8 93:21
154:13,14
supported 17:13
157:17,22
supporting 16:9
58:12
suppositions
129:5
Supreme 23:2,4
sure 17:2 30:8
30:10 43:2
50:17 51:6
61:16 77:1
82:18 94:3
97:2 100:14
102:1,2 104:15
105:22 106:21
110:15 120:14
121:6 122:16
123:15,16
124:12,13
125:8 126:16
127:18 132:18
133:15 135:13
147:22 154:12
156:13 159:16
163:18
Surely 73:14
suspected 84:16
139:5
suspend 110:14
suspicion 101:13
swear 7:9
sweep 91:20

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

sworn 8:4
system 24:16
  93:20,21
  114:13,17
  116:3 118:7
  119:8,19
  144:17
system-genera...
  145:1
systems 24:6
  116:4

———— T ————
T 4:1,1,5 5:1
  167:17
table 4:21 144:6
  144:15
tactics 160:15
  161:3
take 4:10 10:20
  11:3 15:10
  24:14 33:11,22
  40:19 44:20
  45:2 75:17,18
  79:22 92:2
  102:18 105:10
  110:13 120:1
  121:18 123:18
  124:16 129:16
  135:14 136:16
  138:10 139:8
  145:2 147:9
  152:10 162:16
  162:20 166:20
  172:13 179:1,5
taken 16:9 32:2
  155:3,4
talk 12:10 19:7
  50:16 52:8,10
  52:14 103:18
  166:13
talking 39:19
  55:14 176:18
Tape 6:1
target 39:12
  89:8,9,18 90:2
targeted 19:3

30:3 34:15,21
  63:13
task 84:10
tasks 17:3 24:1
tax 97:3,10,13
  97:15,16
taxes 97:18
TDY 131:1
team 32:10
  170:16
TECHNICIAN
  3:18
technique 119:3
techniques
  113:9 118:20
  119:1
technology 24:4
  45:7 110:1
tell 11:18 67:10
  69:19 75:15
  89:20 102:18
  107:9 109:21
  110:2,7 113:20
  114:9 117:1
  150:4 167:8,15
  169:15
telling 104:7
temporarily
  136:18 138:11
  152:21 153:9
temporary
  126:19 128:15
  136:19,20
  138:18
ten 179:5
ten-minute 92:2
  92:10
term 106:8,14
  120:12
Terre 3:14 182:2
testified 8:6
testify 8:4 13:5
  14:11
testifying 9:15
  11:16,22
testimony 9:14
  104:21

testing 151:21
Texas 30:11
  31:6 49:22
  60:4 177:17
  178:3
text 12:1
Thank 7:5 8:9
  14:7 26:16
  30:13 37:4
  38:22 45:2
  46:3 87:22
  93:3
They'd 114:14
thing 76:22
  89:11 119:9
  129:21 166:12
  169:2
things 70:4 72:8
  89:7 95:15
  97:3,5,8 108:2
  108:4 114:16
  115:5 122:9
  125:19 142:15
  146:18 161:7
  170:8 171:20
think 13:9 17:21
  20:9,17,21
  21:5 23:17,22
  30:17 46:10
  52:14 53:5
  64:3 66:1,1
  73:13 74:11
  75:2 78:11
  86:12 87:6,6
  92:6,19 98:8
  105:13,18
  115:1,2 121:3
  123:21 124:2,9
  129:10 136:14
  137:8 139:13
  146:4 147:12
  148:4 149:4
  153:2 155:20
  156:6 161:19
  167:8 179:6
thinking 67:17
  109:9

third 41:14
  44:15
Thirty 92:17,19
thought 19:6
  111:8 139:15
  142:18 172:20
thousands 143:1
  154:1
threatened
  40:17,18
three 27:1 126:8
  132:10
till 130:1
time 6:12,13
  10:7,7,20 13:9
  19:9,12 33:13
  33:16 51:7,10
  61:6 72:14
  73:10 83:5
  87:11 93:4,7
  101:18 110:18
  110:21 140:8
  141:8 178:22
  179:8,11 180:2
  182:15
time-based 59:8
  60:18 61:20
times 9:1 74:4,5
  111:17
Tina 3:19 7:2
titled 58:5
today 9:14 11:22
  45:17 72:10
  158:21
today's 12:6,11
  179:20 180:1
told 42:14 46:10
  67:21 70:19
  139:14 157:18
tool 102:21
tools 16:10,12
  151:21
top 23:8 62:2
  86:15 101:2
  113:4,7 121:2
  160:3 161:17
  165:22 169:8

topic 34:12
  63:10 66:1,22
  69:18 71:5
  123:5 166:17
  166:17,18
topics 13:6
  14:11 34:11
  37:1 66:14
  71:6
total 171:17
totally 74:8
  158:4
touched 169:14
town 135:1
training 16:7,10
  16:12,13 47:3
transcript 10:4
  12:17 14:17
  26:4 41:4 57:5
  76:7 102:10
  132:4 144:4
  149:21 156:19
  158:14 159:14
  161:15 163:11
  164:14 165:10
  167:20 168:15
  179:18 181:7
  182:7,9 183:8
transcription
  183:11,13
Transcripts 4:13
transfer 24:13
  58:15
transfers 58:18
tried 136:21
  151:14
trouble 15:3
true 1:7 6:4
  18:17 19:11,14
  19:18,22 20:5
  23:11 24:3
  28:16 34:17
  37:20 38:6,18
  39:11,15,22
  40:6,10,13
  47:15,20 48:5
  48:19 49:7,12

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 205 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 205

49:15,18,21
50:3,6,11
51:18 53:5,18
53:21 57:12
58:12 61:18,21
63:11 64:2,4
64:20 66:9
67:11 68:13
69:3 71:3
74:22 75:3,5
75:14 81:19
106:11 163:18
176:2 178:13
181:7 182:4
183:4,10,12
184:8
True- 114:11
TrueAppend 5:4
150:2 151:5,11
152:3
TrueNCOA
98:18 99:5,7
99:17,21 110:5
111:4,11,16,19
112:5,8,14
114:11 118:9
118:14,16
119:12,19
120:9,11
121:17 139:11
139:17 140:2
141:15
TrueTheVote
27:2 37:17
truth 8:5,5,6
try 10:21 87:16
121:20,21
122:4 142:6
trying 22:15
29:14 64:19
66:4 75:2,4
100:5 101:8
116:22 133:16
150:16 162:22
163:1,5,7
TTV 4:14 5:9,9
5:9

Tuesday 1:14
turned 138:17
tweet 25:20
26:22 27:15,18
28:11,12 39:4
tweeted 37:17
39:5,9
tweets 26:20
27:13 37:14
39:7 167:22
168:9
Twenty 152:2
twice 15:4
Twitter 27:16
167:5 168:7
two 36:8 62:5
74:6 81:4,15
81:21 82:5
85:3 88:4 92:2
94:13 102:12
120:22 141:22
163:2 171:3
174:22
type 105:16,21
107:2 165:2
types 94:20
typically 166:11
166:14
typo 115:7

———————
U
U 168:12
ultimately
119:22 133:7,9
140:6 147:6
169:20
uncertain
171:14
unclear 109:10
163:16
underlying
93:16
underneath
66:22
understand
10:13 11:16
13:1 14:21

20:4 22:20
32:20 39:21
42:18 53:11
59:12 66:5
70:16 73:9,11
73:17,19 77:7
79:3 80:13
83:12 84:11,22
91:16 94:9
95:22 106:10
107:16 123:13
125:6,10
126:17 129:8
131:5 133:15
133:16 134:3
146:22 156:13
157:3 178:16
understanding
9:13 31:21
32:22 53:13,17
55:8 62:11
79:3,8 80:10
80:18 81:2,7
81:12,20 82:4
82:15 84:6
85:13,18,20
88:2 89:20
90:20 94:4
102:2 103:9
119:10 121:7
124:8,19 126:2
137:16 138:7
140:11 141:14
152:14
understood
10:16 83:8
88:11 89:21
94:3 95:19
111:2,4 112:20
126:11,12
undertook 85:9
undocumented
4:11
Unfortunately
92:13
Unintelligible
32:17 96:1

130:3,6 173:1
unique 120:12
120:15,21
121:3
United 1:1 6:4
19:3 23:4
98:10
university 15:18
136:17 139:6
unrelated 59:18
60:8 74:11
unreliable
148:10
unrigged 27:3
unusual 75:7
UOCAVA
135:18,21,22
136:6,11
update 99:16,19
121:20
updated 99:17
99:19
Updates 68:12
upload 111:19
uploaded 111:9
111:9,10,10
120:7
upper 115:9
urban 156:7
use 16:10,12,12
24:6 71:22
72:4,7 82:16
93:14,20,21,22
95:1 98:15
99:8 102:21
103:12 107:5,7
108:3,3,19
111:18 112:1
112:21 113:1
114:1 118:20
118:22,22
119:2,16 122:8
129:20 144:22
148:13 151:12
151:16,18
163:15 164:21
164:22 165:1

166:4
USPS 93:20 94:5
115:1
usually 165:19
UVID 163:4

———————
V
v 1:5 182:4
183:4 184:8
vacation 127:3
vague 55:7
Valdosta 135:5
135:8
validate 115:14
validation 169:9
variety 118:22
various 9:4 94:9
113:8
vendor 108:13
110:5 121:17
vendors 16:14
verification
93:22 103:15
117:20 140:3
142:12 169:10
verifications
114:15
verified 26:22
109:1
verify 35:18
94:2,20 96:5,6
96:9 107:8,10
107:20 122:4
141:20 142:20
verifying 117:17
141:18
versions 133:18
134:8
versus 6:4
video 6:9,12
50:22
videographer
6:1,15 7:8 26:5
26:9 33:13,16
44:22 45:3
51:1,4,7,10
93:4,7 103:20

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 206 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 206

110:18,21
156:20 159:22
179:8,11,19,22
**VIDEOGRAP...**
3:17
**videotaped** 6:2
**view** 89:14
**viewing** 11:5
**views** 90:7
178:14
**violates** 35:8
174:19,21
**violating** 42:9
**violation** 43:11
178:19
**Virginia** 6:10
**virtually** 1:14
2:2
**visit** 126:19
**volunteer**
161:22
**volunteered**
17:10
**vote** 1:7 4:12 6:4
18:17 19:12,15
19:19,22 23:11
24:3 28:16
34:17 37:20
38:6,18 39:12
39:15,22 40:6
40:11,13 47:15
47:20 48:6,20
49:8,13,16,19
49:22 50:3,6
50:12 51:18
53:5,18 57:12
58:12 61:19
63:11 64:3,5
64:20 66:9
67:12 68:13
69:3 71:3
74:22 75:3,5
75:14 96:21
100:8 124:21
125:3,15 126:4
126:14,18
127:1,9,17

131:6 137:21
143:21 147:14
147:21 148:6
153:11 154:14
154:21 155:21
169:9 176:2
178:13 182:4
183:4 184:8
**Vote's** 20:5
53:21
**voted** 29:1,5
35:12,19
157:22
**VoteFraud.org**
27:9
**voter** 5:13 13:22
20:9,17 34:20
36:10 63:6,12
71:14 80:4,6
83:17 84:5,16
86:5 93:17
94:7,11 96:13
96:14,22 98:5
102:16 106:18
109:5 115:22
120:4,16
122:19 124:4,5
136:11 140:10
141:12,21
143:11,14,17
143:20 145:8
147:3 149:12
152:13,15
153:14 155:1
156:6 157:21
161:19 163:3
166:12 172:17
173:8,15 176:3
178:14
**voters** 54:2,20
56:5,6 71:9,14
81:3,13,22
82:6,16,21
83:16 85:10,15
85:20 89:13,15
90:15,17 91:1
91:7,8,10,19

91:21 101:11
127:21 128:7
131:14 133:2
135:11,20
138:17 142:15
142:16 143:19
150:17 152:20
153:3,6,7,8,9
154:6 166:15
168:2 174:2,16
175:4,10,15,19
**votes** 27:1,18
28:12
**voting** 21:12,21
29:11,22 31:6
31:11,14 34:4
38:19 39:12
40:1,6 41:8
42:4 178:12

———————
**W**
**wait** 71:19 77:8
77:9 81:4,21
82:5
**waiting** 26:6
81:15 130:1
**waive** 182:11
**want** 13:10
22:19 30:6
37:2 43:1 51:1
51:4 52:16
61:16 66:7
80:12 89:12,17
90:18 94:5
103:20,22
107:19,20
154:16 160:2
161:9 167:14
**wanted** 89:8
90:2 153:15
157:20 179:13
**wanting** 52:8
**Warnock** 154:19
155:11
**Washington**
1:21 3:4 183:2
184:3

**wasn't** 40:18
78:19 79:13
115:21 123:4
137:20 160:3
**way** 21:3 28:2
57:20 66:5,10
73:20 75:7
90:7 94:19
100:5 104:12
124:1 128:2
136:12 139:19
141:3 153:17
154:7 155:22
156:8 167:13
177:4 181:9
**Wayne** 77:16
**we'll** 13:15
**we're** 41:17,18
41:19,19,20
72:8 92:11,14
93:5 104:4
140:16 172:5
**we've** 22:2 47:2
92:1 108:20
172:19
**web** 9:8
**week** 160:13
**weeks** 154:2
**went** 16:16 78:5
139:15 162:6
177:11
**weren't** 61:5
84:13
**West** 3:8
**what-all** 58:10
**WHEREOF**
181:10
**White** 3:17 6:14
40:22 44:21
57:1 75:18,18
76:13 80:1
103:3 120:2
135:15 145:3
150:5,21
152:11 156:15
158:10 165:21
166:21

**Williams** 1:8
34:19 87:7,8
87:19,21
132:16,22
133:1,11,17
134:5,11,14
158:19 160:17
**willing** 114:4
**win** 154:16
**window** 99:14
100:13,21
101:17
**Wisconsin** 30:12
31:7 48:6,20
60:5
**wise** 19:6
**witness** 7:9 18:4
18:14 20:21
27:8 28:9
29:19 33:8
35:7 39:1
50:16 59:6
61:14 64:7
69:13 73:3
80:20 81:10
92:22 104:1
105:7 166:1
172:19 174:12
175:12 176:20
181:10 182:10
183:5,19 184:9
**witnesses** 33:2
**won** 17:21 154:8
155:12
**word** 91:5 124:7
**worded** 123:21
124:13
**words** 39:9 42:1
89:3 99:13
117:12
**work** 9:4 15:21
16:2,10,11,16
16:18 18:17
19:8,22 20:5
23:10,21 24:5
47:15 48:5,8
48:19 49:7,12

Case 2:20-cv-00302-SCJ   Document 167-1   Filed 05/17/22   Page 207 of 208

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 207

49:15,18,21
50:2,6,11
51:20 53:6
56:17 57:18
58:9,10,12
60:4,19,21
64:4,16,19
66:8 67:11
68:13 69:3
75:3,5 87:15
98:22 138:22
139:13 149:1
153:19 161:22
170:2,4 177:11
**worked** 16:20,21
16:21,22 17:4
17:10,15 19:10
171:7
**working** 58:8
60:3 61:6 85:6
86:12 99:2
119:21 168:21
169:17,18
171:6,21
**works** 66:10
100:5
**world** 15:16
22:11 38:9
174:19
**wouldn't** 103:15
110:9 111:12
144:22 146:5
148:11 151:4
**wrap** 92:7
**write** 76:16
160:9
**writing** 171:20
**written** 182:22
**wrong** 30:7
61:22 112:17
112:18
**wrote** 39:6 79:9

_____
**X**
_____
**X** 1:2,11 4:5 5:1
_____
**Y**
_____

**y'all** 158:21
**yeah** 49:5 57:9
62:1 76:15,17
80:8 92:13
103:8 110:2,16
113:10 127:19
134:17 135:6
135:10 159:17
166:1
**year** 36:15 46:16
50:14 142:21
142:22
**year's** 4:12
**years** 23:15,17
35:22 74:7
85:3 87:10
100:12
**Yep** 127:5
**yesterday** 144:9

_____
**Z**
_____
**zero** 117:6
**ZIP** 115:6
129:19 136:21
137:1,5
**zoom** 6:8 158:15
165:21

_____
**0**
_____
**0009** 5:4
**0029** 5:4
**0031** 5:6
**0032** 4:19
**0033** 4:19
**0041** 5:15
**0045** 5:7
**0047** 5:7
**0049** 5:12
**0050** 5:12
**0051** 4:21
**005266** 4:17
**00527** 4:17
**0059** 5:13

_____
**1**
_____
**1** 3:13 4:8 6:1
12:14,15
116:18 117:2

182:2
**1-10** 1:9
**1:13** 110:21
**10** 5:4 41:11
116:18 149:19
**10:02** 1:15 6:13
**10:33** 33:14
**10:45** 33:17
**100** 85:4,7 117:2
117:6,7
**102** 4:17
**11** 5:5 156:17
**11:05** 51:8
**11:06** 51:11
**11:57** 93:5
**1180** 3:8
**12** 4:8 5:6 77:3
158:12
**12:30** 93:2
**12:31** 93:8
**12:53** 110:19
**123** 116:1
**13** 5:7 113:4
123:9 159:12
**132** 4:19
**13th** 3:3 26:21
27:6,15
**14** 4:10 5:9
161:13
**1439** 5:9,9
**144** 4:21
**1441** 5:9
**149** 5:4
**15** 5:6,11 163:9
**156** 5:5
**158** 5:6
**159** 5:7
**15th** 99:22
158:18
**16** 4:19 5:12
164:12
**161** 5:9
**163** 5:11
**164** 5:12
**165** 5:13
**1650** 3:9
**167** 5:14

**168** 5:15
**16th** 132:9
150:11
**17** 5:13 165:8
**1730** 1:21 183:1
184:2
**1752** 8:17
**18** 5:14 167:18
**19** 5:15 168:13
**1994** 23:3

_____
**2**
_____
**2** 4:10 14:15
32:18 33:3
34:12 36:9
77:3 79:9
117:14 160:3
162:12
**2:20-CV-0030...**
1:6 6:7
**2:31** 179:8
**2:47** 179:11
180:2,4
**20** 5:7
**20005** 3:4
**20036** 1:21
183:2 184:3
**2006** 108:16
**2010** 20:10
**2012** 25:7 28:17
34:15,21 37:10
38:1 43:16
49:2,8,13,16
49:19,22 50:3
73:12 174:20
175:4 176:20
177:18 178:1,4
**2014** 18:20
20:10 23:12,18
**2016** 13:19
25:20 26:21
27:7,19 28:13
28:22 29:6
30:1 31:5,15
34:5 35:12,20
38:19 39:4,13
40:1,3,7 41:8

42:5,15 44:16
45:20 174:11
178:11
**2017** 23:18 41:7
**2018** 19:16
23:18
**202** 1:22 183:2
**202)-232-0646**
182:16
**202)232-0646**
184:4
**202.434.1609** 3:5
**2020** 4:19 5:6,7
5:10 36:19
46:11,12,14
47:16 49:2,10
49:10,13,16,19
49:22 50:3,9
50:15 51:16
54:15 55:9
56:2 57:14
61:14,18 63:2
64:16,21 66:8
67:1,12 68:14
69:4 72:14
73:3,12,15
75:13 76:1
78:12 85:16
86:6 88:2
172:16,18,21
173:3,8,15
174:3,21 175:4
175:10,12
**2021** 48:12,14
54:15 93:12
**2022** 1:14 6:11
63:13 180:2
181:10 182:4
182:20 183:5
184:10
**20th** 160:7
**22nd** 32:6
**232-0646** 1:22
183:2
**25** 1:14 182:4
183:5 184:10
**250** 161:19

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

**25th** 6:10 180:2
**26** 4:11
**28** 5:10
**288** 4:14
**28th** 161:17
  162:3

___

**3**

**3** 4:11,11 26:2
  27:18 28:12
  36:10
**30(b)(6)** 4:8 33:2
  34:11 35:5
  42:19 66:14
  173:11
**300,000** 128:7
**30309** 3:9
**35242** 8:18
**360-** 140:6
**360,000** 147:7,12
  168:2

___

**4**

**4** 4:13 41:2
  113:6
**4,000** 138:21
**4,000-row**
  107:18
**400,000** 57:12
  74:6
**404.400.3350**
  3:10
**41** 4:13
**43** 108:21
**47807** 3:14
  182:2

___

**5**

**5** 4:14 57:3
  103:3 124:2
**50** 29:11
**57** 4:14

___

**6**

**6** 4:15 76:5
  123:10
**60** 5:5
**600** 3:4

**61** 5:11
**6th** 3:13 182:2

___

**7**

**7** 4:17 102:8
**700** 3:3
**700,000** 140:5
**76** 4:15
**7th** 57:14 181:10

___

**8**

**8** 4:3,19 34:16
  63:10,21 132:2
**812** 1:21 183:1
  184:2
**812.232.2434**
  3:14

___

**9**

**9** 4:21 144:2
**99** 148:4