Page 1

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

```
-------------------------------X
FAIR FIGHT, INC., SCOTT BERSON,)
JOCELYN HEREDIA, and JANE DOE, )
          Plaintiffs,          )
                               )
     vs.                       )Case No.
                               )2:20-cv-00302-SCJ
TRUE THE VOTE, CATHERINE       )
ENGELBRECHT, DEREK SOMERVILLE, )
MARK DAVIS, MARK WILLIAMS,     )
RON JOHNSON, JAMES COOPER, and )
JOHN DOES 1-10.                )
          Defendants.          )
                               )
FAIR FIGHT ACTION, INC.,       )
          Counter-Defendant.   )
-------------------------------X
```

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
30(b)(6) VIDEOTAPED DEPOSITION OF
CATHERINE ENGELBRECHT
APPEARING REMOTELY
Wednesday, January 26, 2022
8:05 a.m. Central Time

Reported by:  Lori J. Goodin, RPR, CLR, CRR
RSA, California CSR #13959

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

```
                                                          Page 2
 1               REMOTE APPEARANCES
 2
 3   FOR PLAINTIFFS:
         ELIAS LAW GROUP
 4       UZOMA N. NKWONTA, ESQUIRE
         MARCOS MOCINE-MCQUEEN, ESQUIRE
 5       JACOB SHELLY, ESQUIRE
         JOEL RAMIREZ, ESQUIRE
 6       10 G Street, Northeast
         Suite 600
 7       Washington, D.C.  20002
         202-968-4490
 8       unkwonta@elias.law
         mmcqueen@elias.law
 9       jshelly@elias.law
         jramirez@elias.law
10   AND CO-COUNSEL:
         LAWRENCE & BUNDY LLC
11       LESLIE J. BRYAN, ESQUIRE
         1180 West Peachtree Street
12       Suite 1650
         Atlanta, Georgia  30309
13       404-400-3350
         leslie.bryan@lawrencebundy.com
14   AND CO-COUNSEL:
         SANDLER REIFF LAMB ROSENSTEIN
15       & BIRKENSTOCK, P.C.
         DARA LINDENBAUM, ESQUIRE
16       1090 Vermont Avenue, Northwest
         Suite 750
17       Washington, D.C.  20005
         202-479-1111
18       lindenbaum@sandlerreiff.com
19
20
21
22
```

Page 3

```
 1               REMOTE APPEARANCES CONTINUED

 2

 3   FOR DEFENDANTS:

 4      THE BOPP LAW FIRM, PC

 5      JAMES BOPP, JR., ESQUIRE

 6      MELENA SIEBERT, ESQUIRE

 7      1 South 6th Street

 8      Terre Haute, Indiana  47807

 9      812-232-2434

10      jboppjr@aol.com

11      msiebert@bopplaw.com

12

13   Also present:

14      Joe Cerda, video/document technician

15

16

17

18

19

20

21

22
```

Page 4

1                    INDEX TO EXAMINATION

2    WITNESS:  CATHERINE ENGELBRECHT

3    EXAMINATION BY                              PAGE

4    MR. NKWONTA                                  10

5    MS. SIEBERT                                 337

6

7                    INDEX TO EXHIBITS

8                 CATHERINE ENGELBRECHT

9       Fair Fight, Inc., et al. v. True the Vote

10              Wednesday, January 26, 2022

11            Lori J. Goodin, RPR, CLR, CRR,

12              RSA, California CSR #13959

13   EXHIBIT    DESCRIPTION                      PAGE

14   Exhibit  1  Validate the Vote 2020 document  266

15   Exhibit  1A Crawford e-mail, 11/21/20        333

16   Exhibit  8  TrueAppend Report, 12/16/20      244

17   Exhibit  9  Engelbrecht e-mail, 12/16/20     219

18   Exhibit 13  Williams e-mail, 12/18/20        219

19   Exhibit 15  Williams e-mail, 12/12/20        140

20   Exhibit 16  Count by Race and Party          248

21   Exhibit 19  True the Vote invitation

22              to join a Zoom call, 12/19/20     159

Page 5

```
 1                    INDEX TO EXHIBITS

 2                  CATHERINE ENGELBRECHT

 3        Fair Fight, Inc., et al. v. True the Vote

 4                Wednesday, January 26, 2022

 5              Lori J. Goodin, RPR, CLR, CRR,

 6               RSA, California CSR #13959

 7    EXHIBIT     DESCRIPTION                    PAGE

 8    Exhibit 20  Engelbrecht text, 12/17/20      173

 9    Exhibit 21  True the Vote invoice, 12/7/20  178

10    Exhibit 25  Holsworth e-mail, 12/30/20      197

11    Exhibit 26  E-mail chain, 12/28/20          201

12    Exhibit 30  Engelbrecht e-mail, 12/21/20    161

13    Exhibit 35  Reports from the Voter Integrity

                  Hotline                          84

14    Exhibit 36  E-mail chain, 12/18/20          226

15    Exhibit 37  Cooper e-mail, 12/15/20         241

16    Exhibit 38  Cooper e-mail, 12/18/20         239

17    Exhibit 39  Cooper e-mail, 12/15/20         237

18    Exhibit 40  Cooper e-mail, 12/19/20         240

19    Exhibit 44  Brightbart article              324

20    Exhibit 46  IPS article, 11/5/12            211

21    Exhibit 47  Gateway Pundit article, 9/24/20 322

22
```

Page 6

 1                    INDEX TO EXHIBITS

 2                   CATHERINE ENGELBRECHT

 3      Fair Fight, Inc., et al. v. True the Vote

 4                Wednesday, January 26, 2022

 5             Lori J. Goodin, RPR, CLR, CRR,

 6               RSA, California CSR #13959

 7    EXHIBIT     DESCRIPTION                        PAGE

 8    Exhibit 61  True the Vote press release about
                  the Georgia Election Integrity
 9                Hotline                            95

10    Exhibit 62  True the Vote press release       252

11    Exhibit 63  True the Vote blog post,
                  11/10/20                           314

12    Exhibit 64  Audio transcript from True the
                  Vote Live                          69

13    Exhibit 65  Audio transcript of Seals in the
                  Polls, 8/13/21                     60

14    Exhibit 66  Georgia lawsuit, 11/11/20         280

15    Exhibit 71  Eshelman e-mail, 5/11/20          291

16    Exhibit 72  Time for a Hero Facebook page     258

17    Exhibit 73  Crusade for Freedom tweet         263

18    Exhibit 74  990EZ for Time for a Hero, 2019   47

19    Exhibit 75  Notice of Deposition for
                  Catherine Engelbrecht             20

20    Exhibit 76  30(b)(6) Notice issued to
                  True the Vote                     18

21    Exhibit 79  True the Vote's Second
                  Amended Response                  92

22

```
                                                       Page 7
 1                    INDEX TO EXHIBITS

 2                  CATHERINE ENGELBRECHT

 3        Fair Fight, Inc., et al. v. True the Vote

 4                Wednesday, January 26, 2022

 5              Lori J. Goodin, RPR, CLR, CRR,

 6              RSA, California CSR #13959

 7    EXHIBIT    DESCRIPTION                     PAGE

 8    Exhibit 81  True the Vote, Inc.'s Responses

 9                to Plaintiffs' First

10                Interrogatories                164

11    Exhibit 84  True the Vote, Inc.'s Amended

12                Responses to Plaintiffs' First

13                Request for Admission          162

14

15

16

17                (All exhibits were provided

18                electronically to the reporter.)

19

20

21

22
```

Page 8

1          WEDNESDAY, JANUARY 26, 2022, 8:05 A.M.

2

3                    PROCEEDINGS

4                    THE VIDEOGRAPHER:  We are now

5          beginning this video deposition.  Today's

6          date is January 26, 2022.  The time on the

7          video record is 8:05 a.m.

8                    This is the deposition of Catherine

9          Engelbrecht, taken in the matter of Fair

10         Fight, Inc. versus True the Vote.

11                   Will counsel please identify

12         themselves for the record and whom they

13         represent.

14                   MR. NKWONTA:  Good morning.  My name

15         is Uzoma Nkwonta, and I represent the

16         plaintiffs in this case.  I am joined with

17         co-counsel.  I will let them represent

18         themselves -- or introduce themselves, I

19         should say, I'm sorry.

20                   MS. BRYAN:  Good morning.  This is

21         Leslie Bryan from Lawrence and Bundy.  I

22         represent the plaintiffs.

Page 9

```
 1              MS. LINDENBAUM:  Good morning.  This
 2       is Dara Lindenbaum from Sandler Reiff Lamb
 3       Rosenstein & Birkenstock, also representing
 4       the plaintiffs.
 5              MR. SHELLY:  Jacob Shelly with Elias
 6       Law Group with plaintiffs.
 7              MR. RAMIREZ:  Joel Ramirez with
 8       Elias Law Group with plaintiffs.
 9              MR. MOCINE-MCQUEEN:  Marcos
10       Mocine-McQueen, Elias Law Group with the
11       plaintiffs.
12              THE VIDEOGRAPHER:  Okay.  Counsel,
13       and before we swear in the witness, do all
14       parties agree or stipulate to the witness
15       being sworn in remotely through Zoom?
16              MR. NKWONTA:  Yes, plaintiffs agree.
17              MR. BOPP:  And I don't think I
18       entered my appearance.  I am James Bopp,
19       representing the defendants and both -- and
20       representing both deponents in this action --
21       in this matter here today.
22              And, Melena Siebert will probably be
```

```
                                                    Page 10
 1     joining us later, who is also counsel for the

 2     defendants.  And we consent to remote

 3     deposition.

 4              THE VIDEOGRAPHER:  Okay, counsel.

 5     With that being said, we will swear in the

 6     witness, thanks.

 7                       *   *   *

 8  Whereupon,

 9              CATHERINE ENGELBRECHT,

10  a witness called for examination, having been

11  first duly sworn, was examined and testified as

12  follows:

13                       *   *   *

14                    EXAMINATION

15  BY MR. NKWONTA:

16         Q.    Morning, Ms. Engelbrecht.

17         A.    Good morning.

18         Q.    My name is Uzoma Nkwonta.  As I

19  mentioned before, I represent the plaintiffs in

20  this case.

21              And, my understanding is that you

22  are appearing today in your personal capacity and
```

1/26/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Catherine Engelbrecht 30(b)(6)
Confidential - Pursuant to Protective Order

Page 11

1   as the representative of True the Vote.  Is that

2   correct?

3          A.   Yes.

4          Q.   Great.  Ma'am, I just want to ask

5   you a few preliminary questions before we get

6   into the mechanics of the deposition.

7               Have you been deposed before?

8          A.   No.

9          Q.   So, this is your first time?

10         A.   It is.  Yes.

11         Q.   In that case, I would like to go

12  over a few ground rules for the deposition just

13  so that we all proceed with the same

14  understanding.

15              So, the testimony today, all of your

16  testimony today, as you have heard is under oath

17  just as if you were testifying in court.  Is that

18  fair?

19         A.   Yes.

20         Q.   And if at any point you don't

21  understand a question that I'm asking, just let

22  me know.  I will do my best to rephrase the

Page 12

1   question or be a little bit clearer.

2              And if you do answer the question,

3   then I will assume that you understood the

4   question.  Is that fair?

5        A.    Yes.

6        Q.    Okay.  And for the benefit of

7   everyone and the court reporter, I would ask that

8   you continue to do as you are doing now and

9   answer audibly with yeses or nos, rather than

10  head nods or head shakes or gestures so that the

11  court reporter can keep an accurate record.  Does

12  that sound good?

13       A.    Yes.

14       Q.    During the deposition, I would ask

15  that you allow me to finish my question before

16  giving your answer and I will do the same.  And

17  that will help us have a clean transcript at the

18  end.  Is that fair?

19       A.    Yes.

20       Q.    From time to time your attorney may

21  make an objection to my question.  And that is

22  fine.

Page 13

1                  You are okay to answer the question

2     unless your attorney instructs you not to answer

3     the question after he makes his objection.

4                  Is that fair?

5          A.    Yes.

6          Q.    If there is any time with which you

7     would like to take a break, just let me know.

8     And I will find a good place to stop the

9     questioning so you can take a break.

10                 I would only ask that if I am in the

11    middle of a question or if there is a question

12    pending that you would answer the question before

13    taking a break.

14                 Is that fair?

15         A.    Yes.

16         Q.    And I know you mentioned this

17    earlier, I'm not sure if it was on the record or

18    off the record.

19                 But would you mind repeating where

20    you were located for this deposition?

21         A.    Cat Spring, Texas.

22         Q.    And could you give me the address of

Page 14

1    where you are located for this deposition?

2         A.    Sure.  The full address?

3         Q.    Yes, please.

4         A.    Yes, okay.  Sure.  13909 Track Road

5    in Cat Spring, Texas.

6         Q.    And how are you viewing this

7    deposition?  Are you on a laptop or are you on a

8    phone or some other device?

9         A.    I am on laptop.

10        Q.    And is there anyone in the room with

11   you currently?

12        A.    No.

13        Q.    And do you have any documents with

14   you currently?

15        A.    No.

16        Q.    Do you have any devices with

17   electronic copies of documents with you?

18        A.    No.  I have my -- I mean this is

19   probably too extreme, but I have my phone and I

20   have my headphone cases and that is it and a cup

21   of coffee.

22        Q.    All right.  So, because we are

Page 15

```
 1   taking this deposition remotely, I may not be

 2   able to see what you have in front of you or who

 3   may enter the room.

 4              And I just want to clarify that it

 5   would not be appropriate for your attorney or

 6   anyone else to tell you how to answer a specific

 7   question that I ask.

 8              And ask you to agree not to exchange

 9   any communication with anyone whether by text or

10   e-mail related to the questions that I ask during

11   the deposition.  Is that fair?

12        A.    Yes.

13        Q.    Great.  So, we will get into some of

14   my additional preliminary questions now that we

15   have set those ground rules.

16              How did you prepare to testify

17   today?

18        A.    Spoke with my attorney.  Reviewed

19   all of the documents that we had submitted

20   heretofore.  Reviewed the questions that were

21   outlined as being the primary subject matters for

22   today's review.  And I guess that is really about
```

Page 16

 1    it.

 2          Q.    Okay.  And when did you speak with

 3    your attorney, without disclosing what you

 4    discussed?

 5          A.    Yesterday -- or, no.  Monday,

 6    Monday.

 7          Q.    And approximately how much time

 8    would you say you spent preparing for this

 9    deposition, again without disclosing the

10    specifics of what you have discussed?

11          A.    Five or six hours.  Six hours.

12          Q.    All right.  And are you on any

13    medication today that would affect your ability

14    to testify truthfully or to respond truthfully to

15    any of my questions?

16          A.    No.

17          Q.    Excellent.

18          MR. NKWONTA:  Could we pull up

19      Exhibit 76, please.  Or Document 76.

20          MR. BOPP:  This might be a good

21      time, as I did yesterday.  I would like to,

22      with your agreement, enter a, enter a

Page 17

1      continuing objection.  And the continuing

2      objection means I won't have to object

3      repeatedly over the same things that have

4      already been decided by the court which we

5      understand, but we want to preserve our

6      objections.

7             We object to any questions

8      concerning activities before the 2016

9      election, meaning in previous elections prior

10     to 2016.

11            Any questions regarding any

12     activities other than in the State of

13     Georgia, any activities other than voter

14     eligibility challenges, preelection to the

15     Georgia runoff, and any questions regarding

16     the activities of King Street Patriots.

17            MR. NKWONTA:  Understood.  And so my

18     understanding is that will be your standing

19     objection.

20            To clarify on our end, will you be

21     instructing your witness not to answer

22     questions in light of those objections or

Page 18

```
 1      subject to those objections?

 2                  MR. BOPP:  No, if -- no.  And as I

 3      did -- I just didn't.  I -- as long as they

 4      are within the subject matter and within the

 5      court orders, the parameters of this court

 6      order, she will be permitted to answer for

 7      sure.

 8                  MR. NKWONTA:  All right.  So, I

 9      think that means we can proceed.

10                  MR. BOPP:  And if it ever occurs, I

11      mean I would do it if the question -- at the

12      time of the question.  I'm not giving a

13      blanket, you know, advice to my client on how

14      to handle questions.  Those would have to

15      arise, if they arose.

16                  MR. NKWONTA:  Understood.  I

17      appreciate that.  So, I think we are all set

18      to proceed.

19                      (Exhibit 76 marked for

20                       identification.)

21  BY MR. NKWONTA:

22      Q.   Ms. Engelbrecht, the document that
```

Page 19

1    has just been shared with you, and I guess with

2    everyone on the Zoom call, is Exhibit 76, or

3    Document 76, which is the 30(b)(6) Notice issued

4    to True the Vote.

5              Have you seen this document before?

6         A.   Yes.

7         Q.   And do you understand that you have

8    been designated as a representative to answer

9    questions on behalf of True the Vote, Inc.  or

10   True the Vote?

11        A.   Yes.  Yes.

12             MR. NKWONTA:  Can we scroll down a

13      few pages to Exhibit A, please.

14             Sorry, next page.  The page right

15      after.

16   BY MR. NKWONTA:

17        Q.   And have you reviewed these topics

18   in Exhibit A of the 30(b)(6) Notice?

19        A.   Yes.

20        Q.   Are you prepared to testify about

21   all of these topics in Exhibit A of the 30(b)(6)

22   Notice?

Page 20

 1        A.    Yes.

 2        Q.    Great.

 3              MR. NKWONTA:  You can take that

 4        down.  And can we pull up Document 75,

 5        please.

 6                    (Exhibit 75 marked for

 7                     identification.)

 8   BY MR. NKWONTA:

 9        Q.    Ms. Engelbrecht, do you recognize

10   Document 75?  Have you seen this document before?

11        A.    Yes.

12        Q.    And this is a deposition notice

13   issued to you individually; is that correct?

14        A.    Yes.

15        Q.    And do you understand that you are

16   also being deposed today in your individual

17   capacity?

18        A.    Yes.

19        Q.    Okay.  And as we have done with the

20   prior deposition in this case, we will ask that

21   you agree that your answers today will be

22   attributed to you and/or True the Vote, unless we

Page 21

1    specify otherwise, or you specify otherwise in

2    the deposition in response to that question.  Is

3    that fair?

4          A.    Yes.

5               MR. NKWONTA:  And do you agree to

6        that, counsel.

7               MR. BOPP:  Do I agree to what?

8               MR. NKWONTA:  That Ms. Engelbrecht's

9        answers will be attributed to Ms. Engelbrecht

10       and True the Vote, unless she specifies

11       otherwise in response, just as we did

12       yesterday?

13              MR. BOPP:  I assume your questions

14       are directed at her in both capacities.

15              THE VIDEOGRAPHER:  And counsel,

16       sorry.  I apologize.  This is Joe.  I just

17       want to make sure for clarity that

18       Document 75 and 76, will those be entered

19       into as exhibits?

20              MR. NKWONTA:  Yes, those will be

21       entered in as exhibits.

22              I think what might be best is I will

Page 22

1      continue to refer to them throughout the

2      deposition as 75 and 76.  And then we can

3      decide after the fact whether we want to

4      number them sequentially.  Is that fair?

5                 THE VIDEOGRAPHER:  Understood.

6      BY MR. NKWONTA:

7           Q.    Ms. Engelbrecht, I want to start

8      with some background questions for you.

9                 Where do you currently reside?

10          A.    In Cat Spring, Texas.

11          Q.    Are you a Texas native?

12          A.    Yes.

13          Q.    And what do you do for a living?

14          A.    In addition to my work with True the

15     Vote, I am the co-founder of a healthcare fintech

16     software company.

17          Q.    What is your role with True the

18     Vote?

19          A.    I am both the founder of the

20     organization and its current president.

21          Q.    Sorry, I didn't hear the last bit of

22     your answer.  Do you mind repeating that?

Page 23

1        A.    So sorry.  Sure, with respect to

2    True the Vote, I am the founder of the

3    organization and its current president.

4              MR. BOPP:  And, Catherine, please

5         don't interrupt him.  Let -- if he needs to

6         say something, just sit tight.  Okay?

7              THE WITNESS:  Sure.

8    BY MR. NKWONTA:

9        Q.    When was True the Vote founded?  You

10   mentioned that you are the founder.

11             When did you launch True the Vote?

12       A.    We started as a organization in late

13   2009 and filed official paperwork for its

14   designation under the IRS rules as a nonprofit in

15   2010, in the summer of 2010.

16       Q.    What was True the Vote's mission

17   when the organization first launched in 2009 or

18   2010?

19       A.    We had learned that there were not

20   enough poll watchers or poll workers broadly.

21   And that seemed like a good project to take on

22   just to encourage people to work in the polls.

Page 24

1   And then from there we became more aware of other

2   challenges in the system.

3          Q.    And what types of activities did

4   True the Vote engage in when it first launched in

5   2009/2010?

6          A.    First, understanding the process

7   where we started which was in Harris County,

8   Texas.

9                So, understanding the process of our

10  elections.  Understanding the need for volunteers

11  and where those volunteers -- how they can be

12  placed and the rules around those placements.

13  And that was the origin of the organization and

14  our activities.

15         Q.    You mentioned assessing the need for

16  volunteers and where those volunteers needed to

17  be placed.

18               In that initial period when you

19  launched True the Vote, where did you, your

20  organization determine the greatest needs were?

21         A.    Well, to make that determination we

22  met with -- in Harris County there is a -- the

Page 25

1    county clerk and the tax assessor collector

2    shared the -- used to.  This is no longer the

3    case.

4                   But, back then they shared the

5    responsibility of management of the elections

6    process.

7                   So, through meeting with them and

8    understanding where the gaps typically were, and

9    then thinking through that in consideration

10   with -- and with respect to where the would-be

11   volunteers live and then the time in which they

12   can be placed outside of where they live, in

13   other words in a different precinct or so forth.

14                  That became sort of the formula for

15   where we -- as volunteers came in, where we would

16   be able to recognize that there was need.

17                  But in the end, and this is I think

18   a super important point, all True the Vote could

19   do and still does is helps to train volunteers.

20   That then those volunteers go to work on behalf

21   of the county directly or the municipality or the

22   party or the candidate of their choice.

Page 26

```
 1                But True the Vote can't actually

 2    place volunteers or any election worker or poll

 3    watcher.

 4         Q.   We will come back to True the Vote's

 5    activities a little bit later.

 6                I would like to get a little bit of

 7    a better understanding of who exactly works for

 8    True the Vote.  So, you mentioned yourself as the

 9    founder of True the Vote.

10                Are there any other officers in True

11    the Vote?

12         A.   We have a Board of Directors so

13    those would be additional officers.  And then --

14    sorry, is that the question, the officers?

15         Q.   Yes.

16         A.   So I do have two additional people

17    on the Board, yes.

18         Q.   And who are those individuals?

19         A.   Pardon me.  Aaron Tim is one and

20    Diane Josephs is another.

21         Q.   And those are the only two current

22    officers of True the Vote?
```

Page 27

1          A.    Yes.  Yes.

2          Q.    Does True the Vote have any

3    employees?

4          A.    Currently we have just hired one

5    employee, yes.

6          Q.    Has True the Vote had more than one

7    employee in the past or is this the first

8    employee that you have hired?

9          A.    We have had employees in the past.

10   And over the years we have, you know, we have

11   gone from having no employees to having a

12   handful.  We have never had many.  Now we have

13   one.

14         Q.    Through the 2020 election cycle, how

15   many employees did True the Vote have?

16         A.    Through 2020, you mean just the

17   calendar year of 2020?

18         Q.    The calendar year of 2020 and let's

19   say through the runoff election in January of

20   2021.

21         A.    We did not have any employees during

22   the 2020 through 2021 years.

Page 28

1        Q.    So, everything was on your shoulders

2   during that entire period?

3        A.    Yes.  And we worked with contractors

4   and the host of volunteers, but we did not have

5   any employees.

6        Q.    So, for tasks like press releases

7   for instance, who handles the press releases for

8   True the Vote?

9        A.    It can be a combination.  Sometimes

10  I will handle those.  And sometimes in the past,

11  we don't currently, but in the past we would have

12  had a communications, either individual or a firm

13  we have used also.

14        Q.    And do you oversee that process,

15  that communications process?

16        A.    Yes.  Yes.

17        Q.    You mentioned press releases, does

18  that include social media as well?

19        A.    Handled by different individuals or

20  different firms, just depending.  But, yes, the

21  same construct is accurate.

22                  I oversee it as best I can.

Page 29

1        Q.     And does that mean that you are able

2    to review all of the communications or

3    publications before they are issued?

4        A.     I try to.  There are certain --

5    certainly in the social side of things, there are

6    certain things I have not seen.  I try not to let

7    that happen, though.

8              But it is standard that I do want to

9    review everything of what goes out.

10       Q.     And that includes all forms of media

11   including press releases, social media, Twitter,

12   Facebook, et cetera.  Is that correct?

13       A.     It is correct with the caveat that I

14   am aware that in 2020 there were things that went

15   out that I did not see initially.  Just for a

16   variety of, just, you know, confusion over

17   process.  But, nonetheless it is my goal to

18   always look at things, yes.

19       Q.     Are you familiar with the

20   organization King Street Patriots?

21       A.     Yes.

22       Q.     And what is your connection to the

Page 30

1    King Street Patriots?

2         A.    I started the King Street Patriots

3    in roughly the same time period, shortly before

4    True the Vote.

5         Q.    Can you tell me a little bit about

6    that organization and what that organization

7    does?

8         A.    So, King Street Patriots is no

9    longer in existence, but during the time that it

10   was, the thought was that King Street would be a

11   great -- we used to have weekly meetings or they

12   were open to the public, but meetings for lack of

13   a better term.  And we would talk about all

14   manner of things.

15             It would, you know, anything from

16   education to, you know, in Harris County, oil and

17   gas and energy policy was always of interest.

18             So, it was just broader.  And then

19   that was really the function of that.  We did

20   volunteer work on a variety of fronts through

21   King Street.  And then ultimately King Street was

22   organized as a 501(c)(4) and then True the Vote

Page 31

1   as a 501(c)(3) to keep them, to keep them

2   separate.

3          Q.     Why was King Street organized as a

4   501(c)(4) and True the Vote a 501(c)(3)?

5                 In other words, why did you make the

6   decision to designate King Street the 501(c)(4)

7   and True the Vote the 501(c)(3)?

8          A.     Well, it was on the advice of

9   financial counsel at the time.  And I think that

10  the -- because of the focus on, with True the

11  Vote on election integrity and on work that would

12  qualify for tax exempt donations, that it made

13  sense, because when you write -- you know, for

14  grants or the like, often you need to be a (c)(3)

15  to qualify.

16                And so, because that was our

17  mission, it just seemed appropriate and we needed

18  to separate them clearly.  So, that was the

19  thought.

20         Q.     And did you remain the founder of

21  King Street Patriots for the duration of that

22  organization's life?

Page 32

1          A.    Yes, I was always the founder, yes.

2          Q.    And did you remain a principal

3    officer of King Street Patriots for the duration

4    of that organization's existence?

5          A.    Yes.

6          Q.    Were there any other officers that

7    were part of King Street Patriots?

8          A.    Yes.

9          Q.    How many other officers?

10         A.    I believe there were three

11   additional officers.

12         Q.    Who were they?

13         A.    Bryan Engelbrecht, my former

14   husband, Lynn Lasher, who was a friend, and then

15   Diane Josephs, also was a director.

16         Q.    What does the name King Street

17   Patriots mean by the way?

18         A.    We were looking for a name that was

19   symbolic of a way that we were trying to organize

20   as a group.  And King Street in Boston was the

21   road that patriots would walk down.  It was sort

22   of the site of the Tea Party Rebellion.

Page 33

1                  It was where the Liberty Tree was.

2      It was historic on that front.  And there are

3      many King Streets all over the country that tend

4      to be in historic areas, so we just thought that

5      was a good name.

6           Q.    And was the organization affiliated

7      or at least identified with the Tea Party?

8           A.    I mean it was definitely identified

9      with the Tea Party.  I didn't have any political

10     background at the time and didn't really

11     understand at the time how things become quickly

12     identified, you know, with the overarching media

13     that tends to put things together.

14                 So, I would say yes, it was

15     identified as a Tea Party group at the time.

16          Q.    And what is the status of that

17     organization now?

18          A.    We closed True the Vote -- True the

19     Vote.

20                 We closed King Street.  We stopped

21     having any type of organizational functions in

22     late 2013 early 2014.  We closed it as a

Page 34

1    corporation in 2014 into 2015.  I'm sorry, I

2    don't know the exact date.

3              And then only recently learned that

4    in the State of Texas our paperwork showed as it

5    being active, so that was recently being taken

6    care of.  But notice was given to the IRS back in

7    2015.

8         Q.    I will ask you a similar question

9    about True the Vote.  What does True the Vote

10   mean?

11        A.    True the Vote is -- it is actually

12   from my grandfather.  My grandfather was a farmer

13   and he used to talk about -- the term he would

14   use to indicate making things correct was to true

15   it up.  So, we are going to true up the roads, or

16   we are going to true up any number of things.

17             And so, in trying to think about

18   what it was that we were trying to accomplish,

19   that came to me as a good turn of phrase.

20        Q.    Understood.  Now going back to King

21   Street Patriots, I want to ask you some of the

22   same questions I have about True the Vote in

Page 35

1    terms of your role with the organization.

2              How many employees did King Street

3    Patriot have when the organization was first

4    launched?

5         A.    Oh, first launched, none.  We didn't

6    have any employees for several years.

7         Q.    And did you ever have employees or

8    did you rely solely on volunteers and outside

9    contractors?

10        A.    We did have, as I recall, one or two

11   employees, but it was far and away run by

12   volunteers.

13        Q.    Were you also in charge of the

14   day-to-day operations with respect to

15   communications including press or other types of

16   media?

17        A.    I would have certainly had a

18   leadership role, or as I commented earlier, would

19   have made it a goal to always look at things that

20   were being published.

21              But it was, with King Street

22   particularly more volunteer oriented and less, or

Page 36

1    less structured.

2         Q.    So, just to be a little bit more

3    specific, if there was a press release issued by

4    King Street Patriots, would that press release

5    have come from an employee or from you, or would

6    it have been something that you would have

7    overseen or supervised?

8         A.    It could have -- really any of those

9    could have been accurate.  It may have been

10   something that a volunteer wrote.  It would

11   certainly have been something that I would have

12   wanted to have seen.

13           Although I can't attest to having

14   seen everything, unfortunately.

15        Q.    The standard practice was to, -- was

16   for you to be able to approve all of the

17   communications and the media that would come out

18   of King Street Patriots, is that fair?

19        A.    That was the goal.  That was the

20   goal.

21        Q.    Have you heard of the organization

22   called Time for a Hero?

Page 37

1       A.    Yes.

2       Q.    And what is your connection to that

3    organization?

4       A.    The organization no longer is

5    active, but that was an organization started by

6    myself and Gregg Phillips.

7             The purpose of that organization was

8    to assist with the needs of Special Forces

9    Veterans.  And it started out sort of broadly

10   looking to support the needs that ultimately

11   turned into sort of a medical missions driven

12   program.

13            And it was --

14      Q.    When did --

15      A.    Sorry, go ahead.

16      Q.    No, you finish your answer.

17      A.    It was -- well, I was about to say

18   I'm not even really -- I don't quite remember

19   when it started or ended.  It was -- I'm sorry,

20   please ask your question.

21      Q.    I was going to ask when it started.

22      A.    Let me think.  20 -- I don't clearly

Page 38

1    remember, is probably my best answer.  2018'ish,

2    2019.  But, I don't clearly remember.

3          Q.    So, after 2015, is that fair to say?

4          A.    Yes, yes.

5          Q.    And is that organization still in

6    existence or still in operation?

7          A.    No.

8          Q.    When did the organization cease

9    to -- cease all operations, I should say?

10         A.    As a practical matter we stopped

11   doing -- we stopped doing activities, I guess, in

12   2020, in late 2019 and early 2020.

13               But then submitted paperwork to the

14   IRS, the final tax filing and so forth in 2020.

15         Q.    And why did the organization cease

16   operations?

17         A.    We had the -- for a variety of

18   reasons.  The hope of the organization was to

19   support the medical needs or certain of the

20   medical needs of Special Forces Veterans with

21   traumatic brain juries.  And that is a tall

22   order.

Page 39

```
 1                    There is a lot of things that you

 2       don't think about that will come with that.  And

 3       so, and there is so many new organizations that

 4       were better equipped to, I think, handle that.

 5                    And you know, we were just doing

 6       what we could.  I think we helped other

 7       organizations kind of find their footing but then

 8       at that point there was no real need for us to

 9       continue on.

10            Q.    Sounds like a lot of work.

11            A.    You know, it is, it is a lot.  It is

12       a lot.

13            Q.    What was your role within Time for a

14       Hero?

15            A.    I don't remember the structural --

16       my structural designation in terms of the

17       paperwork.  I don't remember if I was president

18       or vice president.

19                    But it was very sort of equally,

20       equally yoked between Greg Phillips and myself.

21       And primarily what I did was support the, support

22       the intake, the review of applications for
```

Page 40

1    individuals who were requesting seeking help.

2    Talking with those individuals and their

3    families, trying to connect them to appropriate

4    medical resources.

5              And then in the instances where they

6    were, the assistance included travel, I would

7    coordinate the travel for themselves and their

8    partner and oversee all of that and make sure

9    that they were taken care of as best as I could.

10             MR. NKWONTA:  Just a quick aside

11        here.

12             Joe, do you mind taking down

13        Exhibit 75.  There we go.  Much better.

14             So, I forgot that was still up

15        there.  I was wondering why everyone was so

16        small.

17   BY MR. NKWONTA:

18        Q.   So, did you have volunteers at Time

19   for a Hero like you did with King Street Patriots

20   and True the Vote?

21        A.   Yes.

22        Q.   Approximately how many volunteers

Page 41

1    would you say you had between 2018 and 2020?

2          A.     Over that time, five or ten.  Not

3    many.

4          Q.     Any employees?

5          A.     We did have -- we did have someone

6    who served as the executive director for a brief

7    period of time.  I do not recall if he was

8    treated as a contractor or an employee.  I

9    apologize.

10         Q.     And who was in charge of Time for a

11   Hero's communications?

12         A.     I handled many of them, most of

13   them.  We had, depending upon the nature of the

14   communication, we had doctors who volunteered and

15   helped write some of the more specific things.

16   Veterans oftentimes -- the wives of the veterans

17   were very interested in helping to reach out to

18   their communities and so forth.

19         Q.     So, for things like press releases

20   or social media posts, things like that that

21   weren't sort of technical documents, would you

22   have been the point person for those types of

Page 42

1    communications?

2         A.    I, I have never done much with

3    social media, just broadly.

4              We did have a volunteer and then

5    later, as I mentioned, the gentleman who ran the

6    organization -- it was actually two different

7    ones.  One was a volunteer.  One was either an

8    employee or a contractor.

9              And those two gentlemen for the most

10   part ran all of the social media.  And then I

11   did, you know, we did -- I wrote, like I wrote a

12   report on the nature of TBIs in combat and things

13   like that.

14             But we didn't do much other than

15   that.

16        Q.    Was the setup similar such that all

17   of the communications would have to go through

18   either you or one of the officers or employees at

19   Time for a Hero?

20        A.    In that instance, I would say no.

21   The two gentlemen who were -- that led different

22   ones -- one was a volunteer, and I think a

Page 43

1    contractor, were both veterans themselves and

2    very single-minded in their desire to

3    communicate.

4              And so they oftentimes just

5    communicated without --

6         Q.    And again --

7         A.    -- clear oversight from the Board.

8         Q.    And would they communicate on their

9    own behalf or on behalf of Time for a Hero?

10        A.    I did not -- I have not seen

11   everything that was ever put out.

12             I would, I would venture to say that

13   it would -- their approach would have found it to

14   be a little bit of both.  That they would have

15   communicated personally with their own

16   experiences and then on behalf of the

17   organization.

18        Q.    And would you have seen all of the

19   communications that have come out from Time for a

20   Hero?

21        A.    No.  No, I would -- I don't think

22   so.

Page 44

1          Q.    Do you have access to any of the

2    organizations' press releases or statements?

3          A.    I may have some.  I don't have all.

4    Certainly I don't have all.  I don't have access

5    to any of the social media stuff anymore.

6          Q.    Did you at any point have access to

7    any of the organizations' social media accounts?

8          A.    I would have known their log-ins.  I

9    never posted anything that I recall.

10          But in the later periods of the

11   organization, the individual who was organizing

12   that or was overseeing the operation used it --

13   changed the passwords and we didn't have them.

14          Q.    So, the two gentlemen that you spoke

15   of who were also involved with the organization,

16   what were their names?

17          A.    The first gentleman who ran the

18   organization for a period was Travis -- I cannot

19   remember his last name.  I apologize.  And then

20   the second gentleman was short lived.  His name

21   escapes me.  I apologize.  I don't recall his

22   name.  I should.  I just don't.  It is not coming

Page 45

1    to me right now.

2          Q.    What was his position?

3                MR. BOPP:  I have to unmute myself.

4    I would like to talk to my client for one

5    minute here.

6                So, if Catherine, you would turn off

7    your video and your audio, I will do the same

8    and I will call you.

9                MR. NKWONTA:  Mr. Bopp --

10               THE WITNESS:  Okay.

11               MR. NKWONTA:  Mr. Bopp, I, I assert

12   an objection to you conferring with your

13   client about a pending question.  As you know

14   that is improper under the federal rules, and

15   I would ask that you allow --

16               MR. BOPP:  You can purport to

17   instruct me however you wish.  Good-bye.

18               THE VIDEOGRAPHER:  Counsel, do you

19   want to go off the record?

20               MS. BRYAN:  Are we still on the

21   record?

22               MR. NKWONTA:  No, I believe Joe said

Page 46

 1      we are off the record.

 2            MS. BRYAN:  I would recommend that

 3      you stay on the record and record the time

 4      that Bob left and the time Bob comes back on.

 5            MR. NKWONTA:  We can do that, but

 6      that will still be reflected on the --

 7      whether we are on or off the record, right?

 8            MS. BRYAN:  Well, that is true.  You

 9      are right.

10            MR. NKWONTA:  So, let's go off the

11      record just to save time.

12            THE VIDEOGRAPHER:  We are now going

13      off the video record, the time is 8:50 a.m.

14            (Recess taken -- 8:50 a.m.)

15            (After recess -- 8:55 a.m.)

16            THE VIDEOGRAPHER:  We are now going

17      back on the video record.  The time is

18      8:55 a.m.

19   BY MR. NKWONTA:

20      Q.   Ms. Engelbrecht, we just took a

21   short break.  Now we are back on the record.

22            Do you recognize that you are still

Page 47

1    under oath?

2         A.    Yes.

3         Q.    During the break, did you discuss

4    with your counsel any of the questions that I

5    asked or the response to the question that I had

6    asked before you took a break?

7                 And I'm asking this without

8    disclosing the, what you actually discussed.  I'm

9    asking whether you discussed the content of the

10   question that I asked before we took a break?

11        A.    No.

12        Q.    So, you did not discuss any of my

13   questions about Time for a Hero before we took a

14   break?

15        A.    No.

16        Q.    During that break you did not

17   discuss any of the questions that I asked

18   regarding Time for a Hero with Mr. Bopp?

19        A.    No.

20                 MR. NKWONTA:  Okay.  Joe, could we

21      pull up Exhibit 74, please.

22                      (Exhibit 74 marked for

Page 48

 1                    identification.)

 2   BY MR. NKWONTA:

 3         Q.    Ms. Engelbrecht, do you recognize

 4   Exhibit 74?

 5         A.    Yes.

 6         Q.    What is it?

 7         A.    It is the 990EZ for Time for a Hero.

 8         Q.    For which tax year?

 9         A.    For 2019.

10         Q.    And in 2019, Time for a Hero was

11   still in operation; is that correct?

12         A.    Yes.

13               MR. NKWONTA:  Could we go to the

14      second page of this document, please.

15   BY MR. NKWONTA:

16         Q.    If you look to Part 4,

17   Ms. Engelbrecht, it states list of officers

18   directors, trustees and key employees.  And it

19   says list each one even if not compensated.  Is

20   that correct?

21         A.    Yes.

22         Q.    And could you read into the record

Page 49

1   the individuals listed there as officers,

2   directors, trustees and key employees, whether

3   paid or unpaid?

4        A.    Catherine Engelbrecht, Executive

5   Director, and Greg Phillips, Director.

6        Q.    And would you say that this form was

7   accurate?

8        A.    I think that the hours per week was

9   an understatement.  But beyond that we were not

10  compensated.  So that part is accurate, yes.

11       Q.    So, aside from the average hours per

12  week, would you say the performance is accurate?

13       A.    Yes.

14            MR. NKWONTA:  You can pull this

15      down, Joe.

16  BY MR. NKWONTA:

17       Q.    Is there any relationship between

18  Time for a Hero and King Street Patriots and True

19  the Vote?

20       A.    No.

21       Q.    And you say that because they are

22  all separate entities?

Page 50

1          A.    They are all separate entities, that

2     is true, but also there was no -- it was very,

3     very, very different.

4          Q.    Are you familiar with the Ohio Voter

5     Integrity Project?

6          A.    I think I -- I don't recall.

7          Q.    Have you heard of --

8          A.    I just don't want to be wrong.

9     There are so many groups that have such similar

10    names.  And if we are referring -- well, I just,

11    I don't recall.

12                I'm sure as you ask me questions it

13    will become clear.

14         Q.    Have you heard the name, Ohio Voter

15    Integrity Project, before?

16         A.    I have heard that name, yes.

17         Q.    Where have you heard that name

18    before?

19         A.    There are groups now with that name

20    that I have heard.  There was a group many years

21    ago that used that name that I was aware of.

22         Q.    Do you know -- let me rephrase that

Page 51

1    question.

2             Who is Mary Siegel?

3       A.    I believe that Mary Siegel was

4    affiliated or was from Ohio.

5             I do not know if she was affiliated

6    with the organization or not, but I do believe

7    she was from Ohio.

8       Q.    How do you know Mary Siegel?

9       A.    She attended a True the Vote summit

10   that we held in 2011 as I -- and participated in

11   some of the webinars and so forth that we hosted.

12      Q.    What other interactions have you had

13   with Mary Siegel?

14      A.    We hosted a -- True the Vote hosted

15   a conference, a meeting, the open meeting in Ohio

16   that she attended.

17      Q.    Have you done any work with Mary

18   Siegel?

19      A.    If in by work you mean did they

20   participate in webinars --

21           MR. BOPP:  Catherine, Catherine, not

22      proper for you to rephrase the question.

                                                        Page 52

 1                   If you don't understand the

 2       question, you tell him please rephrase it or

 3       clarify it.  And that is his job, not your

 4       job.

 5                   Because then, because otherwise you

 6       are asking questions --

 7                   MR. NKWONTA:  Counsel, are you

 8       asserting an objection?  I'm not sure what is

 9       going on here, is this an objection?  Because

10       if it is not I don't know what you are doing

11       exactly.

12                   MR. BOPP:  I am objecting.

13                   MR. NKWONTA:  What is your

14       objection?

15                   MR. BOPP:  You are not entitled to

16       ask questions of me.

17                   MR. NKWONTA:  I'm actually entitled

18       under the rules to ask you the nature of your

19       objection, because the rules give me the

20       right to cure my question.  So, what is the

21       nature of your objection?

22                   MR. BOPP:  I will accommodate you

Page 53

1        this time.  My objection is that she is,

2        rather than answering the question, she is

3        rephrasing the question.  And that is

4        improper.  As I said, it is improper for the

5        witness to phrase questions herself to answer

6        herself.  That is your job.  Not her job.

7                 MR. NKWONTA:  So, you are objecting

8        to your witness's answer?

9                 MR. BOPP:  You have heard my

10       objection.

11   BY MR. NKWONTA:

12       Q.    You may answer my question,

13   Ms. Engelbrecht.

14       A.    Would you repeat the question,

15   please.

16       Q.    Sure.  Have you worked with Mary

17   Siegel?

18       A.    I have not directly worked with Mary

19   Siegel.  She, I recall her as a volunteer or as

20   someone who participated in events that we

21   posted.

22       Q.    Have you been involved with any of

Page 54

1    Mary Siegel's, I believe you called it voter

2    integrity work or vice versa?  Or has she been

3    involved with any of your voter integrity work or

4    any of your organizations' voter integrity work?

5          A.    I meant to try to be more precise in

6    this.  Could you define what you mean by

7    involved?

8          Q.    Has she participated?

9          A.    So, she has participated in programs

10   that True the Vote made available, just broadly.

11          But what she did in her individual

12   capacities or with other organizations, I don't

13   know.  Or it was not a part of what True the Vote

14   does.

15          Q.    Have you or anyone from True the

16   Vote or King Street Patriots participated in any

17   of Mary Siegel's, as you would call it, voter

18   integrity work?

19          A.    We have not participated, no.

20          Q.    Have you followed any or are you

21   aware of Mary Siegel's voter integrity work?

22          A.    I am aware, yes.

Page 55

1          Q.    And how are you aware of Mary

2     Siegel's voter integrity work?

3          A.    There was an instance in which Mary

4     submitted information to her county regarding

5     voter registrations that she was questioning.

6                And, while we were not aware of

7     that, the media certainly made the attachment to

8     us.  And so, you will see where I, you know, made

9     comments about the intent of the program and the

10    intent of the effort.

11               But, I didn't know what they were

12    doing.  And so, you know, that is kind of the net

13    of it.

14         Q.    I see.  So you learned about it

15    after it happened; is that fair?

16         A.    Yes.  Yes.

17         Q.    And are you referring to the 422

18    challenges in Hamilton County based on the Postal

19    Service change of address registry?

20         A.    I am -- I am referring to the

21    challenges.  I do not know on what basis they

22    submitted those challenges.  I just know it was

Page 56

1    attributed to us.

2              But I don't know anything more about

3    those.

4         Q.    And the articles that you reviewed,

5    did you see any reference to address changes or

6    change of address in the challenges?

7         A.    I saw references to address, yes.

8         Q.    So, did you learn at some point

9    after, did you learn that the challenges involved

10   addresses of voters or residency?

11        A.    I did, yes.

12        Q.    And did you learn that the

13   challenges involved information from the Postal

14   Service?

15        A.    I don't know where they got the

16   information upon which they based their

17   challenges.

18        Q.    You just know that they were based

19   on changes of address?

20        A.    Just, in preparation for today and

21   in reading, knowing that Ohio was named, I went

22   back to see what it might have been.  And that is

Page 57

1    really the extent of my recollection around all

2    of this.

3                 It was just being asked about it by

4    the press.

5         Q.    And, but around the time

6    contemporaneously or shortly after it happened,

7    you were aware of it because you were asked about

8    it by the press and you had read about it; is

9    that right?

10        A.    Yes, yes.  Yes.

11        Q.    And you were also aware that those

12   challenges were rejected; is that right?

13        A.    Actually, in my reading just last

14   evening, actually, I read that of those

15   challenges, some were rejected and some were not.

16                 But, that is again based upon just

17   my, my reading recently.  I didn't know at the

18   time what any particular outcome was.

19        Q.    At the time, were you aware of any

20   of the challenges that had succeeded or that were

21   upheld?

22        A.    I don't recall.

Page 58

1          Q.    Are you familiar with the

2    organization Verify the Vote?

3          A.    No.

4          Q.    Have you ever heard the name, Verify

5    the Vote?

6          A.    I have, yes.  I have heard the name.

7    I just, I don't know -- I have heard the name,

8    yes.

9          Q.    Where have you heard the name?

10         A.    I have heard the use of that name in

11   just over the years in -- there are so many

12   groups named so many similar things.

13               I have read the name somewhere, but

14   I don't have any other -- well, that is where I

15   have heard it.

16         Q.    Have you ever commented on Verify

17   the Vote or any of the group's activities?

18         A.    I do not recall.

19         Q.    All right.  I would like to move on

20   to some of True the Vote's election monitoring

21   activities that you alluded to earlier.

22               And I want to start with one of the

Page 59

1    activities that I would like you to explain and

2    describe which is Seals to the Polls.  Have you

3    heard that term used before?

4           A.    I have not heard that term.  But --

5    I mean, I have not heard that term, no.

6           Q.    Have you discussed or considered

7    initiatives to bring Navy Seals to serve as poll

8    watchers or Navy Seals to the polls?

9           A.    In 2020, we had an initiative called

10   Continue to Serve that was directed towards

11   veterans and first responders working in the

12   polls or volunteering to work in the polls.

13              And for a brief period that effort

14   was led by a Former Navy Seal.  And so he was

15   quick to, you know, refer to the Seals, but yes.

16          Q.    Was that ever one of the goals or

17   the targets to ensure that, or to get Navy Seals

18   to serve as poll monitors?

19          A.    Well, it was the goal to encourage

20   veterans and first responders to participate,

21   because we need everybody -- the entire process

22   needs more volunteers.  There are just not enough

Page 60

1    volunteers working inside of elections.

2              And the thought behind the outreach

3    was that these were folks that are very good at

4    chain of command, at understanding process.

5              And in our experience they make

6    great volunteers for these kinds of things,

7    because often when you have people who are very

8    well intended, but they are not as familiar with

9    that construct of, you know, ordered processing

10   and very observant of standards and time periods

11   in which things must be reported in an orderly

12   fashion, that can throw people.

13             And for people that come out of

14   backgrounds that are more oriented towards that

15   chain of command, that works, they do really

16   well.  And so that was the thought behind

17   Continue to Serve.

18             MR. NKWONTA:  Joe, can you pull up

19       Exhibit 65 or Document 65.

20                 (Exhibit 65 marked for

21                  identification.)

22   BY MR. NKWONTA:

Page 61

1          Q.    Ms. Engelbrecht, Document 65 is a

2    transcript of a statement that you made which we

3    had transcribed and which we -- which True the

4    Vote acknowledged in response to one of our

5    requests for admission that this was a correct --

6    it is a true and correct transcript.

7                MR. NKWONTA:  Joe, can you go to --

8                MR. BOPP:  I'm sorry, I have a

9        question.  I didn't understand what you just

10       said.

11               What is the date of this, did you

12       say?

13               MR. NKWONTA:  The date of this

14       transcript?

15               MR. BOPP:  Yes.  You gave a date.

16               MR. NKWONTA:  August 13, 2021.

17               MR. BOPP:  Okay, all right, thank

18       you.  Sorry, I didn't understand what you

19       said.

20               MR. NKWONTA:  Joe, can you go to the

21       second page of this transcript.

22    BY MR. NKWONTA:

Page 62

```
 1          Q.    Ms. Engelbrecht, can you read this

 2     second paragraph into the record.

 3          A.    "Of interest here, we have a new

 4     initiative called Continue to Serve which is

 5     about recruiting veterans and first responders to

 6     work inside the polls.  You want to talk about

 7     people who understand and respect law and order

 8     and chain of command, you get Seals in the polls.

 9               "And they're going to say no, no,

10     that is not -- this is what it says and this is,

11     this is how we're going to play the show.  And

12     that's what we need."

13          Q.    When you were making this statement

14     and when you were referring to Seals in the

15     polls, who did you envision them referring to or

16     interacting with?

17          A.    Well -- I'm sorry.  Can you repeat

18     the question?

19          Q.    Sure.  Who did you envision -- when

20     you were making the statement, who did you

21     envision the Seals interacting with or talking

22     to?
```

Page 63

 1        A.    Depending upon the capacity in which

 2   they were working, things can get very confusing

 3   in polling places.  And the thought was just the

 4   individuals that are, as I say here, familiar

 5   with that kind of law of order and chain of

 6   command and understanding process are very

 7   decisive in their, this is how we need to do

 8   this, this is what the rules say.

 9              So, I'm familiar with this entire

10   situation and how this came about.  And I would

11   say that, you know, it was taken out of context.

12   That is, what I have just explained to you was

13   the, the rationale behind the comment.

14        Q.    And you anticipate that these Seals

15   would be interacting with people in the polling

16   place including voters or election officials; is

17   that correct?

18        A.    I would say that veterans and first

19   responders, working inside the polls, depending

20   upon their capacity, may interact with voters,

21   also depending upon the state.

22              If they were serving in the capacity

Page 64

1    of poll watcher, they would not engage with

2    anyone.  If they were working as a judge or a

3    clerk, then they may.

4              And certainly with one another as

5    part of the team working at the polls which can

6    get very confusing, they would interact together

7    working with others there at the polling place.

8         Q.    Who is Ed Hiner?  H-I-N-E-R is the

9    last name.

10        A.    He temporarily was the spokesperson

11   for Continue to Serve.

12        Q.    You say temporarily.  Did he stop

13   being a spokesperson at some point?

14        A.    He did, yes.

15        Q.    Why is that?

16        A.    He also had a program that was a

17   leadership program for after school, like after

18   school programs.

19              And that -- in California.  And that

20   really got busy.  And he was also writing a book

21   or had written a book and was promoting that

22   book.  And, you know, the oversight of an effort

Page 65

1   like this is, takes a lot of time.  And he just

2   didn't have that time to devote because there

3   were so many other interests in play for him.

4          Q.    Have you seen or are you familiar

5   with news articles or news reports in which Ed

6   Hiner claimed that he withdrew after realizing

7   how partisan the program had become?

8          A.    No, I'm not aware of that.

9          Q.    Do you have any reason to dispute

10  that those were his reasons for withdrawing?

11         A.    Well, the reasons for his withdrawal

12  were, as I have stated, he didn't have the time.

13               He was shocked by how mean spirited

14  comments can be about these kinds of efforts.

15  And he didn't have any political background and

16  didn't want it to -- he didn't, he didn't want

17  the, the animus that comes oftentimes,

18  unfortunately, with detractors who are looking to

19  try to find a partisan angle here when there is

20  none.  But that is not what the media will

21  report.

22         Q.    And did you discuss Mr. Hiner's

Page 66

1    concerns with him?

2         A.    Yes, I recall that we talked about

3    it and I understand.  I mean it is a lot.

4         Q.    And when you talked about it with

5    him did he relay the concerns about the program

6    being partisan?

7         A.    Not the program.  No, our program

8    was not partisan.  He was shocked at, you know,

9    how could it be that the comments were taken and

10   twisted in a way that made things seem negative.

11   That was a shock to him.

12        Q.    I want to ask you about a different

13   program.  Have you heard or used the phrase,

14   Validate the Vote?

15        A.    Yes.

16        Q.    And where did that phrase come from?

17        A.    It was a recommended name given to,

18   or suggested to me, by a consultant of a donor

19   that had come to us and had suggested, the

20   consultant suggested the name, Validate the Vote,

21   and I have used it.

22        Q.    Is that phrase -- is that name, is

Page 67

1    that specific to True the Vote?

2         A.    I don't know.

3         Q.    Have you heard of any other

4    organizations that have used that phrase for any

5    of their programs?

6         A.    I have.  I have.

7         Q.    Which ones?

8         A.    The consultant who suggested that we

9    use that name went on to start his own

10   organization or had some other affiliation with

11   an organization that was using that name.

12   Whether or not they are still doing anything I

13   don't know.

14             But I recall seeing the -- I was

15   shocked to see that that had occurred.

16        Q.    When did the consultant recommend

17   this name to you?

18        A.    On November the 5th.

19        Q.    What year?

20        A.    Oh, sorry, 2020.

21        Q.    And when did you see the consultant

22   start a different organization and use that same

Page 68

1    phrase?

2         A.    I do not recall.  Shortly

3    thereafter, but I do not recall.

4         Q.    Other than that, do you recall any

5    other instances of organizations announcing sort

6    of Validate the Vote issues?

7         A.    I do -- I cannot give you a specific

8    organization to direct your intentions to, but

9    that term I have seen many times, often with the,

10   you know, with the state attached to it, Validate

11   the Vote in a certain state or something like

12   that.

13              So, my recollection is I have read

14   it and seen it other places, but I can't give you

15   any other specifics about where to look.

16        Q.    And during the 2020 election cycle

17   and the lead up to the 2021, the January 2021

18   runoff in Georgia, was Validate the Vote or the

19   phrase or the name of one of the programs that

20   True the Vote was initiating in Georgia and

21   elsewhere?

22        A.    Validate the Vote was used broadly.

Page 69

1     We had an election integrity hotline, and it

2     didn't have a name so to speak.  So we named it

3     Validate the Vote.

4              And then when the attentions turned

5     towards Georgia, as I recall, we would say

6     Validate the Vote Georgia, but it was still a

7     national effort.

8              Does that answer your question?

9         Q.   Yes, it does.  You have used the

10    word, bounty on fraud, before, correct?  In

11    discussing the Validate the Vote program?

12        A.   I don't -- I have read through this

13    in the preparation for this.  I don't recall

14    saying that but -- I don't recall saying that,

15    but -- well, I will leave it at that.  I don't

16    recall saying it.

17              MR. NKWONTA:  Joe, can you pull up

18        Exhibit 64, please.  And if we can go to

19        Page 3 of Exhibit 64.

20                   (Exhibit 64 marked for

21                    identification.)

22    BY MR. NKWONTA:

Page 70

1        Q.    Ms. Engelbrecht, can you look -- can

2   you read into the record that starting with the

3   first full sentence -- or starting on the second

4   line, first full sentence, could you read that

5   sentence into the record?

6        A.    Sure, sure.  "And what Validate the

7   Vote is about is putting a bounty on the fraud.

8   Creating an environment for whistleblowers to

9   come forward and tell the story, make sure that

10  they have protections, make sure that they have

11  compensation, and further, creating a space for

12  people to come and share what they know or share

13  with us what they know and then let us try to

14  aggregate it."

15       Q.    So, Exhibit 64 is a transcript of

16  some remarks you gave during a podcast.

17             Do you recall this podcast?

18       A.    I did host a podcast for a brief

19  period of time.  I absolutely recall that.

20       Q.    When you used the term, Validate the

21  Vote and the Bounty on Fraud here, can you

22  describe what you were referring to?

Page 71

1          A.     Sure.   These were extemporaneous

2     unscripted, just me talking.

3                 And, I used that word for -- clearly

4     it is there.  I don't recall saying it, but

5     clearly it was there.  It was very much just sort

6     of a riff of trying to explain, you know, what

7     Validate the Vote was going to try to do.

8                 And that is the nature of all of the

9     comments, which is just sort of a riff of trying

10    to explain it.

11         Q.     In addition to the protection that

12    you mentioned that you wanted to offer to

13    whistleblowers, did that also include legal

14    support?  Did you also discuss offering legal

15    support to whistleblowers?

16         A.     I do recall in other instances

17    saying that it would be -- you know, legal

18    support would be one of the things that we would

19    hope to be able to offer.

20         Q.     And why did you want to offer legal

21    support to whistleblowers?

22         A.     There were people coming to us and

Page 72

1    just over the years, you know, people that have

2    information that they would like to share and are

3    concerned.

4              And want to not be left hanging if

5    they say something that, you know, would lead to

6    a place of needing counsel, you know, needing

7    some kind of representation.  And, you know, I

8    can appreciate that.

9              So we just wanted to create an

10   environment where if they wanted to say something

11   we would, we would be with them.

12        Q.   Did you offer that in order to, in

13   order to encourage whistleblowers to come

14   forward?

15        A.   Is the question did we offer to pay

16   for legal counsel in order to encourage the

17   whistleblowers to come forward?  Is that -- I'm

18   sorry --

19              MR. BOPP:  Catherine, Catherine --

20              THE WITNESS:  Could you repeat it?

21       Could you repeat the question?

22              MR. BOPP:  Excuse me, I am speaking.

Page 73

1          MR. NKWONTA:  She is speaking as

2     well, but you have to assert an objection.

3     What is your objection?

4          MR. BOPP:  If you stop talking, I

5     will interpose my objection.

6          My objection is, Catherine, you are

7     not to rephrase the question.  You are to

8     answer the question.

9          If you don't know the -- if you

10    can't answer the question because it is

11    unclear or whatever, then ask him to rephrase

12    the question.  And that is my objection.

13          THE WITNESS:  Could you repeat the

14    question?

15  BY MR. NKWONTA:

16     Q.    Certainly.

17          MR. NKWONTA:  Before I do, I want to

18    state for the record, Mr. Bopp's objections

19    are actually not objections under any

20    definition of the federal rules.  It is

21    actually coaching the witness.

22          So, I object to you coaching your

Page 74

1       witness during the testimony.  And I ask that

2       you refrain from doing that further in this

3       deposition.

4               You have not asserted any objections

5       to my questions.  You don't get to object to

6       your witness's own testimony.

7    BY MR. NKWONTA:

8       Q.   Ms. Engelbrecht, I will repeat my

9    question.  Did you offer legal support because

10   you thought it would encourage whistleblowers to

11   come forward?

12      A.   Thank you.  I thought that by making

13   it known that there would be legal support for

14   people who came forward, that it may encourage

15   people who were otherwise concerned about not

16   being able to withstand the whirlwind that these

17   things came to elicit.

18      Q.   So, was it your view that concerns

19   about legal ramifications would keep some

20   whistleblowers from coming forward?

21      A.   I'm sorry, can you repeat the

22   question?

Page 75

1        Q.    Sure.   Was it your view that

2   concerns about potential legal ramifications

3   would keep some whistleblowers from coming

4   forward?

5        A.    It was my concern that, or my belief

6   that, in the environment in which we find

7   ourselves, it seems that it doesn't take too much

8   to end up being caught into a lawsuit.

9              And that we have all watched as

10  people who never thought they would find

11  themselves involved in anything like this do.

12  And that keeps a lot of people -- that has a very

13  chilling effect.

14             And so the thought was to try to

15  create an environment, as I say here on this

16  exhibit that is on the screen, to create a space

17  for people to come to and know that they wouldn't

18  be alone.

19       Q.    So, and just to make sure I am fully

20  understanding, I think I am following what you

21  are saying.

22       A.    Sure. Sure.

Page 76

1          Q.    To make sure I'm fully

2     understanding.

3                Was it your concern that without

4     providing that legal support people may not come

5     forward because they were concerned about

6     potential legal ramifications?

7                MR. BOPP:  I object.  Asked and

8          answered now multiple times.  You are

9          harassing the witness.

10               But you may answer if you, you know,

11         and if you -- you may answer.

12               THE WITNESS:  Yeah, I feel like I

13         have answered it.  I feel like I have

14         answered the question.

15               We thought that creating or making

16         it known that if people came forward and

17         needed some kind of legal support that we

18         would help support that.  That was the reason

19         that I said what I said.

20    BY MR. NKWONTA:

21         Q.    I understand that you feel like you

22    have answered the question.  I do, I do want to

Page 77

1    get clarity on your answer.

2         A.    Sure.

3         Q.    Just to make sure that I am

4    following.  And I understand that Mr. Bopp has

5    objected that it is asked and answered.

6              MR. NKWONTA:  I am willing to take

7         that as a standing objection, unless you want

8         to interject again.

9    BY MR. NKWONTA:

10        Q.    But I want to just ask the question

11   once more and just make sure that I get, I fully

12   understand your answer.

13             The question I'm asking is slightly

14   different, I think.  What I am asking is not just

15   why you offered legal support, but whether you

16   felt like the potential legal ramifications of

17   being a whistleblower or coming forward might

18   prevent people from whistleblowing or from coming

19   forward?

20        A.    I don't want to rephrase the

21   question, but no, that -- as I understand the

22   question again repeated, no, that that was not

Page 78

1    the impetus for my comments about offering legal

2    support.

3         Q.    You made a comment about the

4    environment that we are currently in.  Do you

5    think that environment deters people from coming

6    forward?

7         A.    Yes.

8         Q.    And by environment, I mean sort of

9    the atmosphere that has been created especially

10   during the post-election period, especially

11   during the run-up to the 2021 runoff election.

12             Do you feel like that atmosphere and

13   that environment could have deterred people from

14   coming forward?

15        A.    Yes.

16        Q.    Moving on to Page 4.

17             MR. NKWONTA:  Sorry, can you blow

18        that up a little bit more?

19             And at the very bottom of Page 4,

20        can we go, scroll down a little bit more,

21        Joe.  At the very bottom of Page 4.

22   BY MR. NKWONTA:

Page 79

```
 1          Q.    You make the statement there of the

 2    last paragraph.  It says, "That is going to be a

 3    standing offer and the dollars will continue to

 4    increase as awareness grows."

 5                What did you mean by that?

 6          A.    Give me one second to read the

 7    preceding paragraph.

 8          Q.    Sure.

 9          A.    Again these were just, you know,

10    riffs, but I, having read the preceding

11    paragraph, when I said that is going to be a

12    standing offer, that would have necessarily tied

13    to my previous comments about how they could

14    reach to the various outlets, the websites, the

15    phone number, support, financial support, legal

16    support.  I used the term, whistleblower

17    immunity.

18                So, so that is what I was referring

19    to.

20          Q.    So, I want to break that down --

21          A.    Oh, I'm sorry -- okay.  Yes, please.

22          Q.    No.  Please continue.
```

```
                                              Page 80

 1         A.    You also asked about the dollars

 2    will continue to grow.

 3               That was a -- the more that these

 4    types of services or types of supports are

 5    required, the more expensive that would become.

 6               And there was nothing behind that

 7    other than to say, you know, more people would be

 8    willing to support and donate and help if that

 9    became necessary.

10               And that was my opinion and that is

11    I'm sure what was going through my mind at the

12    time.

13         Q.    So, more people would be willing to

14    support and donate to what exactly?

15         A.    It's in the instance that people

16    were sharing information, that lawsuits were, you

17    know, on the radar.  That a broad support was

18    potentially necessary of a variety of types, I

19    would imagine.

20               That the people that support the

21    work that True the Vote does, would have a part

22    for seeing the, you know, the people that came
```

Page 81

1    forward would be taken care of and not just left.

2          Q.    So, is one way to read this then is

3    that the dollars or the support, the financial

4    support or donations or dollars of True the

5    Vote -- and True the Vote's efforts will increase

6    as awareness of the Validate the Vote program and

7    these other efforts grows.

8                Is that, is that a fair reading?

9          A.    Yes, I think that is fair.

10         Q.    You also had a Validate the Vote

11   program hotline; is that right?

12         A.    Yes.

13         Q.    Was it called a Validate the Vote

14   Program Hotline or was there a specific name for

15   it?

16         A.    Well, not initially.  Every election

17   cycle we host a hotline that is both available

18   online, and then we have a toll free number that

19   people can call and share any manner of things.

20               And that has been consistent over a

21   number of cycles.

22               In the most recent cycle, we had

Page 82

1    started the hotline in late September.  And we

2    didn't begin to use the name Validate the Vote

3    until, as I mentioned, November 5th or 6th,

4    something like that.

5          Q.    But the hotline itself doesn't have

6    a specific name separate from Validate the Vote;

7    is that right?

8          A.    Just the Election Integrity Hotline.

9          Q.    And someone didn't have any ideas

10   for that?

11         A.    No.

12         Q.    Well, it is the Validate the Vote

13   hotline that you initiated, when did that hotline

14   take off for the 2020 election?  Or when was that

15   hotline officially opened?

16         A.    In, in, the hotline itself, just the

17   election integrity hotline, that is actually up

18   on our website right now.  But we added the -- we

19   expanded the use of it for, to host live, live

20   operators taking calls and so forth.  That

21   started in late September of 2020.

22         Q.    So, that hotline started in late

Page 83

1    September 2020, and it is still ongoing or is

2    there a period in which the hotline stopped

3    receiving calls?

4         A.    It is still available.  People still

5    report things.  Certainly the focus is no longer

6    what it was then, but we do still have that up.

7    And it is a useful way for people to help

8    organize their thoughts about their questions and

9    what it is that they are seeking help with.

10        Q.    Did you keep track of the reports

11   that came in through the hotline?

12        A.    As best as we could, yes.

13        Q.    And what did you do with those

14   reports?

15        A.    They were provided to me and to the

16   True the Vote team on a routine basis to review,

17   and I'm sure they have been archived somewhere.

18            MR. NKWONTA:  Joe, can you pull up

19        Document 35 or Exhibit 35.  And we are going

20        to need to blow that up significantly or

21        magnify that so we can look at some of these

22        entries.

Page 84

1                    (Exhibit 35 marked for

2                       identification.)

3    BY MR. NKWONTA:

4        Q.    Do you recognize Exhibit 35,

5    Ms. Engelbrecht?

6        A.    I recognize it from the package of

7    exhibits that was included for the purposes of

8    this deposition.  So, I reacquainted myself.  I

9    couldn't read it myself when I was looking at it

10   but --

11       Q.    Is this one of the -- sorry.  Were

12   you finishing your answer?

13       A.    Yes.

14              THE WITNESS:  Is it possible maybe

15        to enlarge it a little bit more?  Perfect.

16        Can you scroll to the right so I can see the

17        headings?

18              Yes.  I'm sorry.  Could you repeat

19        your question?

20   BY MR. NKWONTA:

21       Q.    I wanted to ask, is this the list of

22   the report of the incidents that you received

Page 85

1    through the Voter Integrity Hotline?

2         A.    This is consistent with the layout

3    of the rollup report that came to us, yes.

4         Q.    And this is a document that True the

5    Vote produced, correct?

6         A.    Yes.

7         Q.    And this should reflect the reports

8    from the Voter Integrity Hotline or whatever the

9    hotline is called; is that right?

10        A.    Yes.

11        Q.    What did True the Vote do to vet

12   these reports?

13        A.    As they came in, the reports came in

14   either via phone or via e-mail.  If they came in

15   via phone and the report was something that was

16   easily answered, that could be directed back to

17   either the individual's location and therefore

18   their own municipality's website for certain

19   questions or concerns, then that instruction was

20   given.

21                   If there were reports of some type

22   of impropriety or malfeasance, or something that

Page 86

1    seemed beyond just a standard, you know, I didn't

2    get my ballot, I got two ballots, where can I

3    vote, those kinds of things, the things that rose

4    beyond that, then those would be reviewed and

5    either forwarded to the appropriate authorities

6    or further vetted.  And, you know, determined

7    whether or not it would be appropriate to have

8    additional support in verifying the information

9    that had been provided.

10         Q.    Does this document reflect all of

11   the reports that you recorded from the Voter

12   Integrity Hotline?

13         A.    If this is the first page of the

14   document then, from the Election Integrity

15   Hotline, it would not have been because that

16   started in the end of September.

17         Q.    Let me rephrase my question then and

18   limit it to the runoff election.

19         A.    Sure.

20         Q.    For the runoff election in Georgia,

21   does this, does this spreadsheet capture all of

22   the reports from the Voter Integrity Hotline?

Page 87

1          A.     I cannot attest to that.  The dates

2     seem to be consistent.  I don't know if there are

3     additional pages.  About that I am not sure.

4                But it would have been a standard

5     download to provide to you, you know, for the

6     purposes of the document production.

7                So, I just don't know if this is --

8     I did not prepare this document production.

9     Someone else from our team did.

10                So, I -- but it is consistent in its

11     formatting.

12          Q.     Are you aware of any reports to the

13     Voter Integrity Hotline during the runoff

14     election that are not included in Exhibit 35?

15          A.     I'm not aware of any, no.

16                MR. NKWONTA:  Joe, can we go to the

17        second to the last entry there?

18     BY MR. NKWONTA:

19          Q.     So, some of these reports -- and I

20     will ask the question again, as to what True the

21     Vote did to vet these reports.

22                MR. NKWONTA:  Can you scroll to the

Page 88

```
 1      right, Joe?  Okay.  And you can stop there.

 2      Or scroll down to the left.  All right.  You

 3      can stop there.

 4  BY MR. NKWONTA:

 5      Q.    Can you read that second last row

 6  entry, Ms. Engelbrecht?

 7      A.    The second -- are you referring to

 8  the democrats are winning?

 9      Q.    Yes.

10      A.    Sure.  The one that was reported by

11  Donald Trump, yes.

12            "The Democrats are winning.  That is

13  not supposed to happen, so I hope you will file a

14  lawsuit to overturn their victory.  In the USA

15  only Republicans can be allowed to win

16  elections!"

17            That is what was captured by, I

18  don't know if this was a call-in or onto the

19  website.

20      Q.    So, someone at True the Vote or

21  someone working for True the Vote input this into

22  the Voter Integrity Hotline database?
```

Page 89

1          A.     No.   This would have -- the form was

2     an auto capture form.   So, the individual would

3     have come to the, if they -- if we scroll over,

4     if we really want to get technical, we can, I

5     believe, see the way it came in.

6               But, in any event if it came in

7     online, that form is an active form.   They would

8     have typed in whatever they typed in and hit

9     submit and it becomes part of the record.

10              Similarly, if they called in to the

11    toll free number, they would have said whatever

12    they wanted to say and that would have been

13    transcribed.

14              And then we didn't -- you know,

15    certainly this is a, one of many of these types

16    of, you know, outrageous things that get put in.

17         Q.   So, this is probably not the only

18    one.   There are probably more outrageous entries

19    that come in?

20         A.   Oh, I'm sure of it.   That I am sure

21    of, yes.

22         Q.   And am I right that none of these

Page 90

1    contacts resulted in any reports to the

2    authorities?  At least reports relating to voter

3    fraud or any, any other illegal conduct?

4          A.    I don't -- I can't attest to that.

5    I would have to look at each one individually

6    which we can do, but I would have to look at each

7    one individually.

8               MR. NKWONTA:  I think this is about

9         a good time to take a ten-minute break.  Is

10        that good with you all?

11              MR. BOPP:  Sounds good to me.

12              THE VIDEOGRAPHER:  Okay.  We are now

13        going off the video record.  The time is

14        9:55 a.m.

15              (Recess taken -- 9:55 a.m.)

16              (After recess -- 10:07 a.m.)

17              THE VIDEOGRAPHER:  We are now going

18        back on the video record.  The time is

19        10:07 a.m.

20   BY MR. NKWONTA:

21        Q.    Ms. Engelbrecht, we are back on the

22   record and we took a quick break.  Do you

Page 91

1    understand that you are still under oath?

2         A.    Yes.

3         Q.    Before we took a break we were

4    looking at Exhibit 35, which was the spreadsheet

5    that lists the reports of alleged voter fraud

6    received through True the Vote's Election

7    Integrity Hotline; is that correct?

8         A.    They were reports received on a

9    manner of things, some, you know, more related to

10   concerns of fraud and some just basic questions,

11   but they were received by us, yes.

12        Q.    And these reports came through the

13   True the Vote hotline, whether they came in

14   through on the phone or via the web, but they

15   came in through True the Vote's hotline; is that

16   right?

17        A.    Yes, sir.

18        Q.    And I believe the question that I

19   asked before we took a break is whether the

20   reports in this document consist of all of the

21   report or every report you received from the

22   hotline during the runoff election period?

Page 92

```
 1          A.    I would have to -- I can't confirm

 2    that.  I would have to -- I can't confirm that.

 3    It should have just been a, you know, dump out to

 4    fulfill the requirement, but I can't confirm it.

 5               MR. NKWONTA:  Let's see if we can

 6       blow up a document.  That might help.

 7                    Can we pull up Exhibit 79?

 8                    (Exhibit 79 marked for

 9                       identification.)

10               MR. NKWONTA:  And can you enlarge

11       that a little bit and scroll to Page 8.

12    BY MR. NKWONTA:

13          Q.    Ms. Engelbrecht, Exhibit 79 is the

14    Second Amended Response -- True the Vote's Second

15    Amended Response to Plaintiff's Second Request

16    for Production.

17                    Do you recognize this document?

18          A.    Yes.

19          Q.    Now, if you look at the Request

20    Number 18, Request Number 18 seeks, "All

21    documents and communications relating to True the

22    Vote's Election Integrity Hotline as described in
```

Page 93

1    your responses to Interrogatories 2 and 3,

2    including, but not limited to, all documents and

3    communications surrounding the launch of the

4    hotline, follow-up with users of the hotline,

5    vetted reports, and follow-up with the

6    authorities charged with investigating such

7    claims as described in your response to

8    Interrogatory Number 3."

9              Is that a correct reading of Request

10   Number 18?

11        A.    That is a correct reading, yes.

12        Q.    And in your response you state that,

13   "The defendant True the Vote has produced the

14   record of all hotline contacts relevant to

15   Georgia during the time frame of the runoff

16   election."  Is that correct?

17        A.    Yes.  And that would be relevant to

18   Georgia at the time of the runoff collection --

19   runoff election, yes.

20        Q.    You also state that, in the second

21   paragraph, "None of these contacts resulted in

22   the need for True the Vote to follow up or report

Page 94

1    the contact information to appropriate

2    authorities."

3                    Is that correct?

4                    THE WITNESS:  Can we -- I apologize.

5         Could we just scroll down so I can see that

6         in the response?

7                    MR. NKWONTA:  Keep scrolling.

8                    THE WITNESS:  I can go -- yes.

9                    MR. NKWONTA:  The next page.

10                   THE WITNESS:  The next page.

11                   MR. NKWONTA:  And then the paragraph

12        starting with None of these concepts.

13                   Can you scroll down a little bit

14        more, Joe?

15                   THE WITNESS:  Yes.  Yes.

16   BY MR. NKWONTA:

17        Q.    Is it accurate that none of the

18   reports to your election integrity hotline or

19   Validate the Vote hotline resulted in the need

20   for True the Vote to report anything to

21   authorities?

22        A.    Specific to this request for

Page 95

1    production around the Georgia runoff and the

2    exhibit that we have looked at, that would be the

3    case, yes.

4              MR. NKWONTA:  You can pull that

5         down, Joe.  I would like to ask about some of

6         your other election related efforts.

7              If we could pull up Exhibit 61.  And

8         can we scroll to the next page.

9                   (Exhibit 61 marked for

10                   identification.)

11   BY MR. NKWONTA:

12        Q.   Do you recognize this document,

13   Ms. Engelbrecht?

14        A.   Yes.

15        Q.   What is it?

16        A.   This was, based on its formatting,

17   this would have been taken from our website.  And

18   it just describes that we launched the Election

19   Integrity Hotline specific to the runoff period.

20        Q.   And this is a press release issued

21   by True the Vote, correct?

22        A.   Yes.  Or a blog post, but yes.

Page 96

1          Q.    Or a blog post?

2          A.    Or a blog post.  I'm not certain

3    that this was a press release, but it most

4    certainly was posted on our website.

5          Q.    Now, this press release makes

6    reference to efforts to provide signature

7    verification along with -- sorry, signature

8    verification training, absentee ballot drop box

9    monitoring, and other nonpartisan election

10   integrity initiatives.

11               Is that correct?

12         A.    Yes.

13         Q.    I want to explore each of those.

14   What signature training did you provide or what

15   signature verification training did you provide?

16         A.    We posted online a signature

17   verification training course.

18               For that program particularly we had

19   worked with a signature verification specialist,

20   someone who is accredited in that field and has

21   worked in law enforcement and even in elections.

22               And so, she led the course, again

Fair Fight, Inc. et al. v. True the Vote, et al.
                             Confidential - Pursuant to Protective Order

1   online, but led the course in describing for

2   volunteers who would be potentially working in

3   that capacity what to look for.

4              And, you know, when you are looking

5   at signature verifications, how do you, if you

6   are going to compare two signatures, what are

7   some key traits that to an untrained eye you

8   might want to look at first.  These are people

9   that -- most of them had never worked in that

10  capacity before.

11             So, just some basic understandings

12  of signature verification.  And then the process

13  behind that.

14             So, taking the actual process of

15  looking at the signature and then in the greater

16  context of what that means inside of an election.

17  And the standards particularly in Georgia were

18  changing and how to do as best as you could to,

19  as a volunteer to be useful in that -- for the

20  state in that capacity.

21        Q.    Who provided the training?

22        A.    I do not remember her name.  We

Page 98

1    worked only -- with her only on that one effort

2    or one training program.  I believe it is all in

3    the training which is still I believe all online.

4         Q.    Were you able to --

5               Are you still able to obtain that

6    information if it is still online, the identity

7    of the trainer?

8         A.    Yes.

9         Q.    Is that something you would be

10   willing to provide if we requested it?

11        A.    Yes.

12              MR. BOPP:  Excuse me.  Any requests

13       for anything after this deposition including

14       production of documents, you can make in

15       writing to us.

16              And after the deposition, we will

17       then consider whether or not that request is

18       proper and determine whether or not, under

19       the rules and under the court's scheduling

20       orders, we will respond.

21              The witness, you know, is not -- I

22       mean, she is represented by counsel.  There

Page 99

1      is a legal aspect to this.  Okay.  And that

2      is what we would like for you to do so that

3      we know what requests you are making by

4      putting it in writing, and then we can

5      respond appropriately.

6              MR. NKWONTA:  Understood.  And we

7      wouldn't direct the request to her.  It was

8      more so just trying to understand access to

9      the information.  But, yes, understood.  We

10     will -- we would send any request to you and

11     counsel, of course.

12             MR. BOPP:  Thank you.

13  BY MR. NKWONTA:

14     Q.    Ms. Engelbrecht, am I right that the

15  training -- from what I understood, the training

16  was actually a link online provided on your

17  website that others could access, or was this a

18  set in-person training?

19     A.    No, this is all online.

20             We used a training platform called

21  Teachable which is -- it allows for both the

22  support of a slide deck and audio or video and

Page 100

1   then supporting curriculum.

2          So that depending upon the training,

3   the volunteer or the participant would

4   potentially have a workbook to work from.  And in

5   this instance there were some exhibits that were

6   a part of that platform.

7          Q.    And how would one access this

8   training?

9          A.    We have a, on our website, there is

10  a training page.  And during this period of time

11  that training along with the absentee ballot

12  review training and the basic election worker

13  overview training would have been posted as

14  links.

15         And so, what would have happened is,

16  if someone was interested, they would go and sign

17  up, and automatically they get a log-in to

18  Teachable and then they can take the courses.  It

19  doesn't cost anything.  Yes.

20         Q.    And you mentioned there is election

21  worker training.

22         Aside from signature verification,

Page 101

1    was there any other type of training relating to

2    the election that you posted online?

3         A.    There was absentee ballot training.

4    That I recall.  There -- those are the only two

5    that are specific to Georgia that I recall.

6         Q.    What was the absentee ballot

7    training for, what did it entail specifically?

8         A.    Sure.  The process for -- well, most

9    people don't even know that you can volunteer to

10   help review absentee ballots.  And given the

11   great influx of mail ballots in the 2020

12   election, our thought was more people that can

13   help volunteer to support this, the better the

14   throughput, the better overall accuracy of the

15   process.

16                And so, in light of that, the

17   absentee ballot -- and every state runs their

18   process a little different, everything from how

19   you engage, who you talk with to even find out if

20   there is a, you know, a need, or how you would go

21   about connecting yourself with the appropriate

22   individuals to even find your way toward being a

Page 102

1    volunteer.

2              That would have been a part of what

3    was included in the training.  And then typically

4    a very dry recitation of state law and process to

5    give people some indication of what to expect so

6    that they feel more comfortable in volunteering.

7         Q.    Is that training still available

8    publicly?

9         A.    I do not think it is still posted

10   live on our website but it is still available.

11        Q.    Can you clarify.  So, if it was not

12   posted live on your website, how is it available?

13        A.    Sure.  That is a great.  It is an

14   important distinction I believe.

15             Well, historically what we have done

16   is kept some links up that are more universal in

17   nature and just keep those up year round, but

18   then those are more that are more specific and

19   are more rule dependent that we only feature

20   during the appropriate election cycle.

21             So, we certainly do not want to have

22   information up that is no longer correct.  And

Page 103

1   there are so many different standards for

2   signature verification, standards for processing

3   that were unique to 2020, that it would not be

4   appropriate to continue to post it once those

5   rules had changed.  And we hadn't created a new

6   one.

7                  MR. BOPP:  I need to talk to my

8        client for a moment.  So, Catherine, if you

9        will log off your video and your audio.

10                 THE VIDEOGRAPHER:  Do we want to go

11       off the record?

12                 MR. NKWONTA:  Yes, I guess we can go

13       off the record.

14                 Is there a way to mark when counsel

15       went off the record to consult with his

16       client in the transcript?

17                 THE VIDEOGRAPHER:  Yes, yes.

18                 MR. NKWONTA:  Okay.  So let's mark

19       that and then go off the record and then mark

20       when they return.

21                 (Whereupon, counsel for the

22       defendant requests to go off the record.)

Page 104

1               THE VIDEOGRAPHER:  We are now going

2        off the video record, the time is 10:23 a.m.

3               (Recess taken -- 10:23.)

4               (After recess -- 10:26.)

5               THE VIDEOGRAPHER:  We are now going

6        back on the video record.  The time is

7        10:26 a.m.

8    BY MR. NKWONTA:

9        Q.    Ms. Engelbrecht, we just took a

10   short break while you conferred with Mr. Bopp.

11   And we are now back on the record.

12               Do you recognize that you are still

13   under oath?

14       A.    Yes.

15       Q.    What did you discuss with Mr. Bopp

16   while we were off the record?

17               MR. BOPP:  I object.  That invades

18        attorney/client privilege.

19               MR. NKWONTA:  Are you instructing

20        the witness not to answer, Mr. Bopp?

21               MR. BOPP:  That question for sure,

22        yes.  And I am shocked that you asked it.

Page 105

1           MR. NKWONTA:  I'm shocked that you

2      conferred with your client in the middle of a

3      deposition, because that, that -- our

4      position is that that conferral was not

5      covered by a privilege unless you meet the

6      requirements of the federal rules and unless

7      the conferral is for the purposes of

8      ascertaining whether the privilege applies.

9           Other than that, the privilege does

10     not apply if you are conferring with a client

11     in the middle of my questioning.

12          MR. BOPP:  It was not in the middle

13     of your questioning.  There was no pending

14     question.  And if you think I can't confer

15     with my client when it is appropriate, you

16     are wrong.  And I will.

17          But, anyway, but you can make your

18     objection.  It doesn't matter.  Go ahead.

19          MR. NKWONTA:  Certainly, you have

20     made your record.  We have made ours.  We

21     will proceed.

22  BY MR. NKWONTA:

Page 106

1          Q.    We were talking about the training,

2     Ms. Engelbrecht, that was available publicly

3     during the 2020 election and the runoff period.

4     And you had mentioned that the training is no

5     longer publicly available but it is still

6     available.

7               And you had explained that there

8     were some aspects of the training that were

9     unique to 2020, or the 2020 election period and

10    maybe the runoff election that needed to be

11    changed.  So, that is why they are no longer

12    publicly available.

13              If someone wanted to access those

14    trainings, how would they have to access them?

15         A.    They would -- is my audio working?

16         Q.    Yes.

17         A.    Okay.  They would, if the training

18    is no longer posted on our website, then they

19    would -- if they were already registered with the

20    Teachable platform, they would be able to see the

21    trainings.

22              The enrollment should be set to

Page 107

1    closed so that nobody else would be participating

2    or going through the training, but they could

3    still see that the training existed.

4          Q.    What were the unique aspects of the

5    signature verification --

6                Or what aspects of signature

7    verification were unique to the 2020 election

8    cycle?

9          A.    It was unique for us because it was

10   our first signature verification training that we

11   had posted.  What was unique for -- with the

12   extension to that, what was unique was the

13   process that Georgia was -- had indicated that

14   they would be following which was a lessening of

15   review standards.

16               And so that created confusion for

17   would-be volunteers who didn't really know what

18   to expect.  So, yeah, that was something that we

19   tried to address in the training.

20         Q.    Okay.  When you mentioned you tried

21   to address that in the training, are you

22   suggesting you tried to address or tried to teach

Page 108

1   those attending the training how to conduct

2   signature verification in accordance with the

3   standard -- the Georgia election law standards?

4        A.   It would have been more to the point

5   of recognizing that each state, in this instance

6   Georgia, had their standards that must be adhered

7   to, but that there are some practical aspects of

8   signature verification that are absolute slants

9   and loops and things that are useful.

10            And so that was a -- that was sort

11  of a core of what this instructor was sharing in

12  the training.

13       Q.   Okay.  What portion of the training

14  was specific to Georgia?

15       A.   I do not recall.

16       Q.   What specific signature verification

17  standards are specific to Georgia?

18       A.   Georgia signed some emergency rules

19  in, just proceeding the 2020 general election

20  that gave additional leeway of what they were

21  going to be reviewing.

22            It was enough for us to be able to

Page 109

1    say that the states will be conducting the

2    verification or the absentee ballot review that

3    it would include signature verification in

4    whichever way they instruct.  But there are some,

5    you know, some basics that would be appropriate

6    in any case.

7              So, that would have been all we

8    would have said.

9         Q.   So, the training in that was not

10   tailored toward any Georgia specific standards.

11   It was just sort of signature matching training?

12        A.   Right.  Basic signature verification

13   with the recognition that every state has a

14   different process that will be held to for the

15   purposes of their verification.  Different

16   softwares, different throughput.

17        Q.   And was this training limited to

18   those who would be conducting signature

19   verification, or was it open to just anyone who

20   clicked on the link?

21        A.   It was open to anyone.

22        Q.   And for your absentee ballot

Page 110

1    training what did that entail?

2         A.    How to -- again, recognizing that

3    every state handles this process differently, but

4    a broad overview of the definition of an absentee

5    ballot, what one might expect to experience from

6    the different elements of the absentee ballot.

7              Package from the carrier envelope to

8    the ballot.  Just very high level explanations

9    that the goal of which was to share with the

10   volunteer that, you know, this is probably what

11   happens but every state has their own process.

12        Q.    What was the target audience for the

13   training?

14        A.    Anybody that wanted to take the

15   training.

16        Q.    And what was the purpose of the

17   training?

18        A.    To create a transparency that would

19   encourage volunteers, of which there are not

20   enough, to get a basic understanding of what they

21   might be able to expect, and direction on how

22   they can connect with the locality to serve if

Page 111

1    they so chose.

2         Q.    And in what way would these

3    individuals serve that would allow them to

4    implement this training?

5         A.    They would -- if they had watched

6    the election or the absentee ballot training and

7    they went on to serve in the Absentee Ballot

8    Review Board, that would be, you know, a point of

9    connection or a point of familiarity of the broad

10   process.

11              But there are any number of

12   positions that they may end up working in.

13        Q.    You also referenced monitoring

14   absentee ballot drop boxes in this press release.

15   And I'm still referring to Exhibit 61.

16              What did that entail?

17        A.    I don't recall.  I'm glad to review

18   the exhibit again, but I don't recall.

19              MR. NKWONTA:  One second.  Can we

20        put that exhibit back up, Joe?  That is

21        Exhibit 61.  So, if we can scroll to the last

22        page, to Page 3.

Page 112

1   BY MR. NKWONTA:

2        Q.   Ms. Engelbrecht, can you read that

3   last paragraph, starting with this week, into the

4   record?

5        A.   "The week, True the Vote also

6   announced its partnership with the Georgia

7   Republican party, in addition to the Georgia

8   Election Integrity Hotline.  True the Vote will

9   assist with the Senate runoff election process,

10  including publicly available signature

11  verification training, monitoring absentee ballot

12  drop boxes and other nonpartisan election

13  integrity initiatives."

14       Q.   To cue up my question again, what

15  did monitoring absentee ballot drop boxes entail?

16       A.   We did not do any monitoring of

17  absentee ballot drop boxes for -- that is a

18  misstatement.

19       Q.   And why did True the Vote announce

20  that it was conducting absentee ballot drop

21  boxes -- or absentee ballot drop box monitoring?

22       A.   I do not recall.  There was no

Page 113

1    monitoring of absentee ballot drop boxes.  Just,

2    it is not what volunteers did.

3         Q.    Has True the Vote monitored absentee

4    ballot drop boxes in prior elections or during

5    the 2020 general election or outside of Georgia?

6         A.    No.  No.

7         Q.    Can you think of an instance in the

8    past where True the Vote monitored absentee

9    ballot drop boxes?

10             MR. BOPP:  Excuse me, I object.

11        That goes beyond the six states that are

12        specified in the court's order that you are

13        directed to limit your questions to.

14             It also goes to the history of the

15        world as opposed to being confined to 2012.

16             And I will instruct her not to

17        answer it because that would violate the

18        court order.

19             MR. NKWONTA:  Are you also

20        instructing the witness not to answer in her

21        individual capacity?

22             MR. BOPP:  I have been, no -- well,

Page 114

1     excuse me.  Yes.  Because the -- you are

2     obligated to comply with the court order.

3     You are violating the court order.

4              And so you can't ask about things

5     that are not permitted.  And you are to

6     adhere to the limits of the court's discovery

7     order.

8              MR. NKWONTA:  I think you are

9     actually misreading and violating the court

10    order.  And I also think that regardless of

11    what you feel about the scope of the topics,

12    there are no 30(b)(6) topics for

13    Ms. Engelbrecht in her individual capacity.

14             So, I will ask her -- I understand

15    that you have instructed her not to answer as

16    a 30(b)(6) witness for True the Vote which I

17    will object to as improper.

18             But I will ask Ms. Engelbrecht, in

19    her individual capacity --

20  BY MR. NKWONTA:

21       Q.    Whether you are aware of any

22  instance in which True the Vote or any of its

Page 115

1    volunteers monitored absentee ballot drop boxes?

2              MR. BOPP:  Same objection.  Same

3         instruction.  You are violating the court

4         order.

5    BY MR. NKWONTA:

6         Q.    I will ask one more question related

7    to that.  Ms. Engelbrecht, now I'm asking in your

8    capacity both as a representative of True the

9    Vote and in your individual capacity.

10             And my questions from now on will be

11   directed to both capacities unless I state

12   otherwise.

13             Ms. Engelbrecht, with respect to the

14   specific jurisdictions that our 30(b)(6) notice

15   is limited to, are you aware of any instance in

16   which True the Vote conducted monitoring of

17   absentee ballot drop boxes?

18             MR. BOPP:  And I don't understand

19        the question.  Are you limiting it to 2012

20        and forward and the six states?  Is that what

21        you are --

22             MR. NKWONTA:  Yes, yes.

Page 116

1              MR. BOPP:  Okay.  Well, you can ask

2         regarding 2012 forward, and the six states,

3         of course.

4    BY MR. NKWONTA:

5         Q.    Ms. Engelbrecht, you may answer.

6         A.    Can you repeat the question?

7         Q.    Sure.  With the multiple caveats

8    Mr. Bopp has asserted, from 2012 onward, within

9    the jurisdiction set forth in our 30(b)(6)

10   notice, are you aware of any instance in which

11   True the Vote or any of its volunteers monitored

12   absentee ballot drop boxes?

13        A.    No.

14        Q.    Next I wanted to ask about your

15   partnership with the Georgia Republican Party

16   which is outlined in red in Exhibit 61.

17              What does that mean?

18        A.    That was meant to denote that there

19   had been a -- I had interacted with the Chairman

20   of the Republican Party; I had been introduced.

21   And the outcome of that conversation was my

22   suggestion that hey, we've got these different

Page 117

1    programs that are open.

2              And if that would be of use, you

3    know, to anybody, they are there for the offering

4    and they are there for the use.

5              And that was characterized in this

6    ill-written sentence as a, as a partnership with

7    the party.  That is what that was.

8         Q.    When were you introduced to the

9    Chairman of the Republican Party?

10        A.    I don't recall.

11        Q.    And which Republican Party are you

12   referring to?  Can you be more specific in

13   describing which Republican Party entity that you

14   are talking about?

15        A.    I was specifically introduced to

16   David Shafer.  So, I don't even -- I think he'd

17   be Chairman, but I don't know what that is

18   actually called but Chairman of that party.

19        Q.    Beyond that discussion with David

20   Shafer, what other communications did you have

21   with the Republican Party or any Republican Party

22   officers regarding your election-related efforts?

Page 118

```
 1          A.    Shortly after this press release
 2   came out, there was a complaint filed that David
 3   Shafer reached out to me about to understand what
 4   the -- what I thought of it.  And to the best of
 5   my recollection that is the only other
 6   conversation we had with anybody from the party.
 7          Q.    When you say complaint, are you
 8   referring to a court complaint?
 9          A.    Uh-huh -- well, it was an FEC
10   complaint that alleged, based on this ill-written
11   sentence, that we had worked with the party.
12          Q.    When did this press release get
13   issued?
14          A.    I don't -- whatever the date would
15   be at the top I would imagine.  I don't recall.
16          Q.    Do you know when the complaint was
17   filed?
18          A.    I don't.  I mean shortly thereafter.
19          Q.    And at the time that you issued this
20   press release, had you had any communications
21   with any Democratic Party officials?
22          A.    Not at this time, no.
```

Page 119

```
 1          Q.    How did you get introduced to

 2    Mr. Shafer?

 3          A.    I actually thought about this.  I do

 4    not recall.

 5          Q.    How did you communicate with

 6    Mr. Shafer?

 7          A.    We were at an event -- or not an

 8    event, but at a meeting where we both were that

 9    was in-person.

10          Q.    And did you have any further

11    communications after that meeting?

12          A.    Only the one I referred to about the

13    other complaint that got filed.

14          Q.    Did True the Vote engage in any poll

15    watcher training in Georgia?

16          A.    No.

17          Q.    And when I say poll watcher, I also

18    mean poll monitor or poll observer, whatever

19    iteration, whatever you want to use?

20          A.    We had posted election worker

21    training online, but that was the intent of

22    anything we did.
```

Page 120

1          Q.    Are you familiar with the title,

2    Election Integrity 101?

3          A.    Yes.

4          Q.    Is that one of your trainings?

5          A.    I believe so, yes.

6          Q.    And what was the target audience for

7    that training?

8          A.    Like any training, it was just open

9    to the public.  So anybody that looked at it

10   would be -- you know, no distinctions.

11         Q.    It wasn't specifically for election

12   workers or for poll monitors or poll observers?

13         A.    Not, no.  Just basic background of

14   events.

15         Q.    Has True the Vote conducted poll

16   watcher trainings in Texas?

17         A.    Yes.

18         Q.    And did True the Vote conduct poll

19   watcher trainings in Texas during the 2020

20   election cycle?

21         A.    No.  The training was posted online.

22         Q.    When was the last time True the Vote

Page 121

1      conducted a poll watcher training in Texas that

2      was not simply just posted online?  In other

3      words, a live training?

4            A.    Right.  I do not recall.

5            Q.    Are you familiar with an official --

6                  Or have you used a Harris County

7      Republican official in Texas to conduct your poll

8      watcher trainings in the past?

9                  MR. BOPP:  My assumption is you are

10          talking from 2012.

11                 MR. NKWONTA:  Yes, from 2012,

12          onward.

13                 MR. BOPP:  Okay, thank you.

14                 THE WITNESS:  I don't recall.

15     BY MR. NKWONTA:

16           Q.    Has True the Vote ever instructed

17     any volunteers or any trainees to follow judges

18     after voting has ended to ensure that they

19     deliver ballots to the correct authority?

20           A.    True the Vote has never recommended

21     that.  No.

22           Q.    Are you aware of anyone recommending

Page 122

1   that request?

2        A.   I am aware of someone who has said

3   that in the past.

4        Q.   Who was that person?

5        A.   The person I am aware of who has

6   said that is Alan Vera.

7        Q.   And what is your connection to Alan

8   Vera?

9        A.   Alan was a volunteer who did

10  participate in some of our trainings back in 2012

11  and that is the affiliation.

12            MR. NKWONTA:  Turning back to

13       Exhibit 61 and turning back to that last

14       paragraph.

15  BY MR. NKWONTA:

16       Q.   We have discussed the signature

17  verification training, the monitoring absentee

18  ballot drop boxes.  What other nonpartisan

19  election integrity initiatives did True the Vote

20  engage in?

21       A.   I don't recall any of the -- let me

22  restate that.

Page 123

1              Our website is full of nonpartisan

2      information.  There was information around --

3      specific to Georgia, there was information around

4      dates for when you can vote and drop box

5      locations.  And things that you would, you know,

6      just good guidance kinds of stuff.

7              Maybe that is -- would qualify for

8      other initiatives.

9         Q.    Other than materials posted on the

10     True the Vote website, are there any other

11     election integrity initiatives that True the Vote

12     engaged in?

13        A.    Can you define the time frame?  I

14     want to make sure I'm answering properly.

15        Q.    Certainly.  So, the time frame would

16     have been the same time frame in which this press

17     release was issued.  So in that period through

18     the runoff election.  It is between the November

19     general election and the runoff election.

20        A.    Well, the -- we were working on

21     the -- we had, we had had individuals that had

22     requested support for knowing, because they knew

Page 124

1    that the rolls had not been cleaned.

2              So, we were looking at the project

3    around -- during this time we have been looking

4    at the project around the elector challenges.

5         Q.    Which individuals had requested

6    assistance or noted that the rolls had not been

7    cleaned?

8         A.    I mean, it was broadly known that

9    the rolls hadn't been cleaned.  That was well

10   publicized.

11             Just, you know, various people,

12   volunteers, people who follow True the Vote

13   had -- we received e-mails saying could we do

14   anything because the rolls aren't clean.  I mean

15   very loose sort of realizations that people

16   wanted to do something about it.

17        Q.    All right.  Well, let's turn to some

18   of those activities and some of the folks

19   involved with those activities.

20             How do you know Gregg Phillips?

21        A.    Gregg Phillips and I were introduced

22   in late 2013, early 2014, because he -- at the

Page 125

1    time I was undergoing some pretty extensive

2    targeting by the government.

3              And he had had his information, some

4    of his donations released to -- kind of in the

5    same vein.  And so there was an introduction

6    based on that sort of common, this was happening

7    to a lot of people.

8              From -- so then that is how I know

9    him.  I was introduced in that vein of shared,

10   just shared experience.

11        Q.    And when did True the Vote start

12   working with OPSEC Group?

13        A.    It would have been late, late summer

14   of 2020.

15        Q.    And True the Vote had worked with

16   OPSEC Group before the late summer of 2020; is

17   that right?

18        A.    No.

19        Q.    Had True the Vote worked with Gregg

20   Phillips before the late summer of 2020?

21        A.    Yes.

22        Q.    And am I right that True the Vote

Page 126

1    worked with Gregg Phillips to conduct similar

2    data and voter analysis to the landmark election

3    challenge that True the Vote launched in the 2021

4    runoff; is that correct?

5          A.    I'm sorry, could you ask that again?

6          Q.    Sure.  Did True the -- I will

7    rephrase the question.

8                Did True the Vote work with Gregg

9    Phillips on data analysis and voter analysis

10   before September of -- or the summer of 2020?

11         A.    Yes.

12         Q.    Can you describe the types of voter

13   analysis and data analysis that True the Vote

14   worked with Gregg Phillips on?

15         A.    We reviewed a variety of things

16   including reviewing how the changing laws

17   around -- or changing guidance around the 2020

18   election was impacting voters' engagements, you

19   know, with respect to absentee ballots and so

20   forth.

21                So, that was an example.

22                We have looked at, in the State of

Page 127

1  Texas, we looked at the distinctions between the

2  way that counties managed their rolls or reported

3  actions taken during the election via the voter

4  rolls versus what counties were reporting to the

5  secretaries of state, those kinds of data

6  projects.

7          Q.    Did True the Vote work with Gregg

8  Phillips on identifying voters who may have

9  changed their addresses or who may have filed

10  notices of a change of address with the Postal

11  Service?

12          A.    We did, we worked -- yes, yes.  But

13  it -- yes.  Yes.

14          Q.    When was that?

15          A.    That would have been probably

16  starting the second week of December of 2020.

17          Q.    Before that, had True the Vote done

18  any of that type of work with Gregg Phillips,

19  meaning identifying voters who had moved or who

20  had filed change of address notices?

21          A.    I don't recall.

22          Q.    Let me ask it this way.

Page 128

1                    Was December 2020 the first time

2     that True the Vote had attempted to identify

3     voters who had changed their address or had moved

4     out of their current voting jurisdiction?

5          A.    It was not the first time True the

6     Vote had done that, no.

7          Q.    When had True the Vote done that in

8     the past?

9          A.    In Texas, True the Vote in 2020, had

10    reviewed voter records that -- for that type of

11    disqualification potential.

12                    And done so recognizing the voter

13    challenge that enabled citizens to ask those

14    questions of their counties, encourage their

15    counties to take a look at the record.

16         Q.    When in 2020 did that occur?

17         A.    I'm sorry.  I didn't -- if I said

18    2020 that was a mistake.  I meant 2012.  I

19    apologize.

20         Q.    When True the Vote conducted that

21    analysis in 2012, what did True the Vote do with

22    that information?

Page 129

```
 1          A.    We would have only recommended to

 2   voters that were interested in reporting the

 3   records that seemed to meet a standard of

 4   ineligibility, we would have referred them to the

 5   state standard that in Texas is the -- is the

 6   process for reporting those.

 7                So, effectively a registered voter

 8   would recognize -- would document what the

 9   concern was about the record, the ineligibility,

10   the ineligible factor and then submit that to the

11   county.

12          Q.    But True the Vote conducted the

13   analysis that the voter would then use to submit

14   to the county, correct?

15          A.    True the Vote would have made the

16   county level voter roll available.  Then the

17   volunteer or the participant would have been able

18   to, if they had personal knowledge or if they had

19   some other form of confirmation, they would have

20   made that assessment.

21          Q.    So, I want to make sure I'm

22   understanding.
```

Page 130

1          True the Vote provided the entire

2     county voter roll to individuals?  Or did True

3     the Vote conduct any analysis to identify

4     individuals who had likely moved or likely

5     changed their address?

6          A.    In 2020 -- excuse me, I'm sorry.  In

7     2012, we would have only had the county voter

8     rolls.  And that would have been available only

9     to people who lived within the county because you

10    can't file a challenge if you don't -- you know,

11    if you are not registered in the county.

12          But, at that time, we were not using

13    anything beyond the additional research that

14    volunteers would bring to the, to that process

15    themselves.

16          Q.    What are some examples of that

17    additional research?

18          A.    Certainly personal knowledge.

19    People registered at P.O. boxes, as their

20    residential address.  People that -- or records

21    that weren't known to volunteers as being either

22    commercial or in other ways nonstandard, for

Page 131

1    example, vacant lots and so forth.

2              Those would then be reported to the

3    county for review.

4         Q.    What was the result of these

5    challenges?

6         A.    The challenges, according to state

7    law are -- and every state has a different

8    standard. But in Texas, they are required to

9    review the challenges and then determine whether

10   or not there is cause to note the record for, you

11   know, further review.

12        Q.    And how many counties did you submit

13   these challenges in -- or how many counties did

14   you provide the materials to allow voters to

15   submit these challenges?

16        A.    I don't recall.

17        Q.    Do you recall which counties or can

18   you name some of the counties?

19        A.    I mean, certainly Harris, Fort Bend.

20        Q.    Any others?

21        A.    Not that I specifically recall.

22        Q.    How did Harris County address the

Page 132

1   challenges?

2        A.    Appropriately.  They would look at

3   the challenges.  Of course, these were submitted

4   by citizens.

5            So, these were not things that we

6   necessarily had full, you know, insight into.

7            But, they would review them and take

8   appropriate action.  And that would just depend

9   upon the nature of the, of the filing by the

10  volunteer depending upon what they were asking or

11  notifying the county of.

12       Q.    What action did Harris County take?

13       A.    They would either follow up with the

14  voter.  Or if they were unable to reach the

15  voter, they may put the record into an inactive

16  status.  But they -- to be clear, they follow a

17  process, as does every state, for citizen

18  challenges to be, to be reviewed and then, you

19  know, procedurally responded to.

20       Q.    If Harris County had determined that

21  the voter had in fact moved or was incorrectly

22  registered at a specific address, what would have

Page 133

1    been the result of that challenge?

2        A.    For our purposes and, you know, we

3    would just be notified that the challenge had

4    been received.

5              For the county's purposes, they

6    would have followed through with the state

7    process for notifying a voter that they -- that

8    they had information that the address had been

9    changed.  Or whatever state that record was in,

10   if the record was already in an inactive state,

11   there may be a different process to that at that

12   point.

13             But we didn't have any -- there is

14   no, no further action that anyone can take beyond

15   what the state follows.

16       Q.    Do you have any information as to

17   what specific action Harris County took with

18   respect to any of those challenges?

19       A.    No.

20       Q.    What about Fort Bend County?

21       A.    No.

22       Q.    Aside from those challenges in Texas

Page 134

1    in 2012, has True the Vote attempted to identify

2    voters with address issues and registration

3    records elsewhere?

4              MR. BOPP:  I assume the question is

5         limited to 2012, and onward, and the six

6         states?

7              MR. NKWONTA:  Yes.

8              MR. BOPP:  Okay, thank you.

9              THE WITNESS:  Thinking.  I'm trying

10        to be thorough here.

11             Other than clearly what we are here

12        to discuss in Georgia, I don't, I don't

13        recall.

14   BY MR. NKWONTA:

15        Q.    Well, turning to Georgia, what is

16   your understanding of how the list of potentially

17   ineligible voters, as you described, was created?

18        A.    We started with the most recent

19   Georgia voter roll.  And then using a variety,

20   which we can go into any level of specificity,

21   but using a variety of databases and filters, we

22   evaluated from the rolls what records showed up

Page 135

1    on the NCOA standard given additional filters

2    like the cash filter and DPV filter.

3                What records indicated -- or what

4    records were indicated at the NCOA USPS level

5    that the resident at that address, with the

6    matching name, had indicated to USPS that they

7    had permanently changed their residence.  And

8    that is how we derived the list.

9                MR. BOPP:  It is, it is after noon

10       and I've got a conference call at 12:15.  I

11       assumed that we would be -- I'm sorry, I kind

12       of lost track of time here.

13                So, can we -- can we adjourn for

14       lunch?

15                MR. NKWONTA:  Sure.  We can do that.

16       How long have we been on the record so far,

17       Joe?

18                THE VIDEOGRAPHER:  I can get that

19       calculation for you real quick.  Do you want

20       to stand by?

21                MR. NKWONTA:  Sure.  It is 11

22       central time, but it would be just an early

Page 136

```
1      lunch for Ms. Engelbrecht.

2              THE VIDEOGRAPHER:  Two hours and

3      46 minutes as of right now.

4              MR. NKWONTA:  Okay.  When do you

5      want to return from lunch?  Should we say is

6      half an hour enough?

7              MR. BOPP:  Well, I never seem to be

8      able to get my lunch rustled up and eaten in

9      a half an hour.

10             So, if you wouldn't mind doing it

11     until one then we will be off to the races.

12             MR. NKWONTA:  Okay, that is fine.

13             THE VIDEOGRAPHER:  We are going off

14     the record, the time is 11:11 a.m.

15             (Recess taken -- 11:11 a.m.)

16             (After recess -- 12:07 p.m.)

17             THE VIDEOGRAPHER:  We are now going

18     back on the record.  The time is 12:07 p.m.

19     BY MR. NKWONTA:

20         Q.   Good afternoon, Ms. Engelbrecht.  We

21     just came back from a one-hour lunch break.

22             Do you understand that you are still
```

Page 137

1    under oath?

2         A.    Yes.

3         Q.    Before the break we were discussing

4    your understanding of the NCOA challenge listed

5    that were prepared in advance of the January 2021

6    runoff election.

7              I have a quick follow-up question to

8    that.

9              Did you conduct any of the analyses

10   that went into identifying the voters who

11   appeared on the challenges?

12        A.    I did not, no.

13        Q.    And you mentioned that other

14   databases were incorporated in creating the

15   matching lists and filtering the matching lists.

16             Were some of those databases or some

17   of those filtering methods, were some of those

18   outsourced to outside companies?

19        A.    Yes.

20        Q.    And were they outsourced to

21   companies other than OPSEC Group?

22        A.    We outsourced to OPSEC and then

Page 138

 1    OPSEC followed their process.

 2            Q.    Do you know what OPSEC's process is?

 3            A.    I do.  So, OPSEC used TrueNCOA and

 4    Smarty Streets.  And the reasons that those two

 5    were chosen, particularly NCOA, was because of

 6    the accreditations that they bring with them.

 7            Q.    What is Smarty Streets?

 8            A.    It is a web-based app that is used

 9    by corporations, those corporations that are

10    needing to -- for purposes of distribution

11    needing to resolve, needing to resolve addresses

12    and it was being used in supplement.

13            Q.    And how does Smarty Streets

14    supplement the NCOA database exactly?

15            A.    Well, so, there is -- Smarty Streets

16    and TrueNCOA uses the NCOA as a basis.  And then

17    on top of that with other filters like the cast

18    filter, DPV filter that helps to better refine

19    the NCOA list.

20            Q.    And is your understanding in your

21    description, is that coming from your personal

22    knowledge or is that coming from something that

Page 139

1    you have been told?

2         A.    That is my personal knowledge.

3         Q.    Have you used Smarty Streets before?

4         A.    Yes.

5         Q.    And did you use Smarty Streets to

6    refine an NCOA list?

7         A.    Yes.

8         Q.    And in what context?  For the

9    Georgia election law challenges?

10        A.    Yes.  I should say, I did not

11   personally do that, but that was my understanding

12   as part of what was being used to, broadly to

13   refine the NCOA list itself.

14        Q.    And you mentioned other databases

15   like the Social Security database and a few

16   others.  Do you know if OPSEC conducted all of

17   those -- all of that analyses internally or

18   whether it outsourced some of that analysis?

19        A.    I do not know.

20        Q.    How did you first get in contact

21   with Mark Williams?

22        A.    Mark Williams is a printer that

Page 140

1    OPSEC was introduced to and that was the extent

2    of my introduction.

3         Q.    Who introduced OPSEC to Mark

4    Williams?

5         A.    I do not know.

6              MR. NKWONTA:  Could we pull up

7       Document 15.  Could we zoom in a little bit

8       on the document below the redacted portion.

9                   (Exhibit 15 marked for

10                   identification.)

11   BY MR. NKWONTA:

12        Q.    Ms. Engelbrecht, Document 15 or now

13   Exhibit 15 is an e-mail from Mark Williams to

14   Gregg Phillips and you are copied as well.  Is

15   that your e-mail address on the cc line?

16        A.    Yes.

17        Q.    Do you recognize this e-mail?

18        A.    I do not.

19        Q.    But you don't dispute that this was

20   an e-mail that was sent to you, right?

21        A.    No, I don't dispute it.  I just

22   don't recall it.

Page 141

1          Q.    And then in the e-mail below, it is

2    actually forwarding an e-mail or adding you to an

3    e-mail chain below.

4               It says -- the e-mail from below is

5    from Gregg Phillips.  And it says, "Mark, you

6    were referred to us by the chairman of the GOP.

7    We have a large print job for which we need help.

8    Please let me know if you have ten minutes to

9    discuss."

10              Is that a correct reading of the

11   e-mail from Gregg Phillips?

12         A.    Yes.

13         Q.    And the reference to Chairman of

14   GOP -- of the GOP, is that the same individual,

15   David Shafer, whom you spoke with before

16   announcing True the Vote's partnership with the

17   GOP in the press release that we discussed

18   earlier?

19         A.    David Shafer is the Chairman of the

20   GOP, yes.

21         Q.    And that was the same individual

22   that you spoke with before True the Vote

Page 142

1    announced its partnership with the GOP?

2          A.    Yes.

3                MR. NKWONTA:  You can pull that

4       down, Joe.

5    BY MR. NKWONTA:

6          Q.    How did you first get in contact

7    with Mr. James Cooper?

8          A.    James Cooper I have never met.  I

9    have been in e-mail communication with him.  And

10   he was a friend or an acquaintance of Mark

11   Williams.

12         Q.    And how did you first get in contact

13   with James Cooper?

14         A.    I don't recall.

15         Q.    What was James Cooper's role in the

16   Georgia elector challenges?

17                And by the Georgia elector

18   challenges I'm referring to the landmark voter

19   challenge program that True the Vote launched?

20         A.    Sure.  He was interested in

21   participating and was interested in, knew other

22   Georgians who were also interested in

Page 143

1    participating.  That was my connection.

2          Q.    When you say interested in

3    participating, what do you mean by that?

4          A.    Interested in participating in the

5    cleaning of their rolls, locally -- or not

6    cleaning, but the elector challenges, to be more

7    to the point.

8                And was interested in what could be

9    accomplished in that regard.

10         Q.    And he expressed that interest to

11   you?

12         A.    No.  He expressed that interest to

13   Mark Williams which led to that introduction to

14   OPSEC.

15         Q.    And what did you discuss with

16   Mr. Cooper regarding his participation in the

17   elector challenges?

18         A.    I do not specifically recall.

19         Q.    Did you ask him to be a challenger?

20         A.    I don't specifically recall.

21         Q.    How about Ron Johnson, when did you

22   first get connected with Ron Johnson?

Page 144

1          A.   My headphones are going dead so I

2     may have to -- give me a second if I have to

3     switch out.

4               Same situation, he was an

5     acquaintance of Mark Williams.  And that was the

6     extent of my introduction.  He was interested in

7     participating in the program to look at their

8     local voter rolls.

9          Q.   What was Ron Johnson's role in the

10    challenges?

11         A.   He was a challenger.  He was an

12    elector challenger.  And then he, he was very

13    familiar with other people in the state and

14    had -- there was e-mail back and forth between

15    Ron and other -- others.

16         Q.   What was James Cooper's role in the

17    challenges?

18         A.   I do not recall.  I do not recall if

19    he was a challenger.

20         Q.   Do you recall if he had any other

21    role?

22         A.   He was sort of proximate to the

Page 145

1   initiative, and as I mentioned, knew other people

2   who had expressed interest in being elector

3   challengers in their county.  I just don't

4   remember if he himself participated.

5          Q.    How did you first get in contact

6   with Derek Somerville?

7          A.    Through OPSEC, through Gregg who had

8   been referred to him.  And then Gregg suggested

9   that I reach out to Derek.

10          Q.    Who referred Gregg to

11  Mr. Somerville?

12          A.    I am not certain; I don't recall.

13          Q.    When was your first communication

14  with Mr. Somerville?

15          A.    I don't recall that either.  Around

16  that time, but I don't recall the date.

17          Q.    Was there a phone call or was there

18  an e-mail or a text?

19          A.    It was a phone call and then we --

20  yes, it was a phone call and then we had dinner.

21          Q.    And what did you discuss with

22  Mr. Somerville at that dinner?

Page 146

```
 1          A.    They were also -- he and another

 2    individual were also working through elector

 3    challenges and the thought was not to be at cross

 4    purposes.  And, you know, that is really the

 5    extent of it.

 6          Q.    Was that other individual Mark

 7    Davis?

 8          A.    Yes.

 9          Q.    In what way were the challenges

10    potentially at cross purposes?

11          A.    They were doing a much smaller

12    challenge scope that included different -- a

13    different approach to counties that I -- you

14    know, a different approach to counties and a

15    different approach to the registry as a whole,

16    looking at only active voters where we looked at

17    both active and inactive voters.

18          Q.    And in what ways was their challenge

19    effort at cross purposes with True the Vote?

20          A.    I think only inasmuch as the fact

21    that these challenges were going to be submitted

22    around the same time and certainly for the same
```

Page 147

1    concerns.  And to not cause any undue, you know,

2    consternation or just general confusion, because

3    they had already been at work at, you know, at

4    their project.

5              MR. NKWONTA:  Could we pause for a

6         second maybe to announce a counsel who just

7         joined.

8              MS. SIEBERT:  Good afternoon.  Yeah,

9         my name is Melena Siebert.  I will be

10        representing Ms. Engelbrecht and True the

11        Vote here.

12             MR. NKWONTA:  Hi, Melena.

13             MS. SIEBERT:  Hello.

14   BY MR. NKWONTA:

15        Q.    I will go back to my question,

16   Ms. Engelbrecht.  Was there any potential for

17   confusion between the two challenges?

18             Was that the concern, or were you

19   concerned with confusion among election

20   officials?

21        A.    We were just being observant that

22   what they were doing, we could not, you know,

Page 148

1   attest to or confirm whether or not their

2   methodology was, you know, based upon, for

3   example, the active versus inactive, those kinds

4   of things, because certainly with it all

5   happening so proximate to one another, we were

6   just aware, just broadly aware.

7        Q.   Did you all discuss the differences

8   in methodology?

9        A.   To a limited degree.  I'm not sure

10  exactly how their process worked.

11            But those examples that I gave, I

12  was aware of.

13       Q.   Other than the distinction between

14  inactive and active voters, what other, what

15  other differences in methodology created the

16  different sizes and scope of the challenges that

17  True the Vote submitted versus --

18       A.   I'm not sure other than to say that

19  we reviewed the entire state.  And they, to the

20  best of my understanding, did not review the

21  entire state.

22            I don't have any more information

Page 149

1   about why.

2          Q.    Did you have any concerns about

3   Mr. Somerville's and Mr. Davis's methodology?

4          A.    My observation was that for our

5   purposes the way to be most exacting was to not

6   limit anything.  Any record that was available

7   for review should be reviewed equally.

8                And so, to the extent that any other

9   group did not do that, you know, they -- that was

10  just not our choice.  We wanted to look at

11  everything equally.

12         Q.    In other words you wanted to include

13  as many people as possible within your challenge?

14         A.    We wanted to review as many records,

15  recognizing that the state hadn't cleaned their

16  rolls in two years.  And recognizing all of the

17  new rules around the election process that would

18  have impact.  We wanted to do as much as we could

19  to afford an even review.

20         Q.    And affording that even

21  comprehensive review, that meant including as

22  many records as possible within your challenge?

Page 150

1          A.    Correct.

2          Q.    Did Mr. Somerville or Mr. Davis

3    express any concerns about True the Vote's

4    methodology?

5          A.    They -- as I recall, Mr. Somerville,

6    did want to know the methodology.  But beyond

7    that I don't, I don't believe so.

8          Q.    Other than Mr. Somerville and

9    Mr. Davis, was anyone else at that dinner?

10          A.    It was just Mr. Somerville and

11    myself and Gregg Phillips.

12          Q.    And aside from the methodologies,

13    what else did you discuss at the dinner relating

14    to the challenges?

15          A.    I don't recall anything else.

16          Q.    What role did Mr. Somerville and

17    Mr. Davis take going forward in the challenges?

18          A.    As the challenges began to be

19    submitted, we became aware of some of the

20    volunteers who had, who had indicated they wanted

21    to be a part of challenging the records with the

22    True the Vote project were also working with the

Page 151

1    other projects.

2              So, we were aware of that.  And that

3    caused some need to try to understand how to

4    avoid that.

5              And then beyond that, when the

6    animus around the project became more extreme,

7    and our challengers were being threatened and

8    more confused about what would have seemed to

9    have been a very simple process that took a very

10   different turn, we then were in communication

11   with Derek and Mark as a broader group of, you

12   know, people that were just generally involved in

13   elector challenges and trying to understand what

14   was happening.

15        Q.    What do you mean by a simple process

16   that --

17              MR. BOPP:  Excuse me, excuse me.

18        I'm sorry, I don't mean to interrupt, but I

19        am bowing out.  Melena will take over here

20        and defend the deposition, so good luck and

21        thank you.  And we will -- I will talk to

22        you, Melena after everything is done.  All

Page 152

1      right?

2                MS. SIEBERT:  Sounds good.

3                MR. BOPP:  I am logging off.  Bye

4        Cathy.

5                THE WITNESS:  All right.

6    BY MR. NKWONTA:

7            Q.    Ms. Engelbrecht, could you explain

8    what you meant by what should have been a simple

9    process that, I forget your exact words, but went

10   off the rails or something along those lines?

11           A.    Sure, sure.  Would you like me to

12   describe the process as I understood it should

13   have been conducted?

14           Q.    Yes, please.

15           A.    Okay.  So, the way that the standard

16   reads and what we were expecting was -- and this

17   was informed by a meeting we had with the

18   Secretary of State, which I'm sure we will get

19   to.

20                But the elector challenges should

21   have been taken in by the -- or accepted by the

22   counties.  They should have been reviewed for the

Page 153

1    determination by the boards, whether or not they

2    wanted to move those challenges forward.

3              If they wanted to move the

4    challenges forward or to review them, then what

5    would have -- let me say that differently.

6              Not to review them but to accept

7    them, what would have happened would have been

8    they would have taken or should have taken the

9    spreadsheets that were provided electronically,

10   submitted those to the state.  The state then

11   therefore the rolls would have flagged the

12   record.

13             And if the voter that had a flagged

14   record did choose to vote, then if they voted in

15   person and their record was challenged, they,

16   they would at the point of -- in the polling

17   place they would show their ID which of course is

18   a Georgia standard anyway.

19             If the challenge was incorrect then

20   the challenge would have been resolved

21   immediately.

22             And if they voted in-person and

Page 154

```
 1   didn't have ID that showed their correct address

 2   or the address as it was listed on the

 3   registration, then they would have voted a

 4   provisional ballot and then been given the

 5   opportunity in the extended hearing window to

 6   resolve that so they could still vote and cast a

 7   regular ballot.

 8              And then the last example would have

 9   been if someone had voted via absentee, the -- as

10   that came in and before they were separated, the

11   security envelope, the carrier envelope from the

12   ballot, there would have been a designation of

13   challenge.

14              And then similarly they would have

15   been given the opportunity to cure if they, the,

16   the indication inside the ballot was that the

17   address was in fact different.

18              And, that it should have been -- it

19   should have been a very organized process.

20        Q.   An organized process that would have

21   resulted in all 364,000 challenged voters having

22   to present evidence of residency if they
```

Page 155

1    attempted to vote in Georgia; is that right?

2          A.    It should have been organized

3    inasmuch as the flow of steps.  That should have

4    been resolved -- resolvable easily.

5          Q.    And in your view, in True the Vote's

6    view, if everything went according to plan, all

7    364,000-plus challenged voters would have to

8    submit evidence of residency if they attempted to

9    vote in Georgia during the runoff; is that

10   correct?

11         A.    I would not -- I would not use the

12   terminology that you chose, all according to

13   plan.  Our view was that the registry had not

14   been maintained over a two-year period.

15               That people move.  And that

16   particularly in the 2020 election, where we saw

17   the influx of absentee ballots with no

18   requirement for submitting proof of

19   identification, that where -- and that was true

20   for both active and inactive voters, that there

21   was reason for concern that -- oh, gosh my

22   headphones are going to go dead any second, guys.

Page 156

1            There is reason for concern that

2    there would be no way to know whether or not an

3    absentee ballot was sent to an inaccurate address

4    because the basic maintenance requirement had not

5    been fulfilled by the state.

6            THE WITNESS:  Give me one second.

7        Hang on guys.

8            MR. NKWONTA:  Can we just take a

9        minute and go off the record while

10       Ms. Engelbrecht changes her headphones.

11           THE VIDEOGRAPHER:  We are now going

12       off the video record.  The time is 12:34 p.m.

13           (Recess taken -- 12:34 p.m.)

14           (After recess -- 12:35 p.m.)

15           THE VIDEOGRAPHER:  We are now going

16       back on the video record.  The time is

17       12:35 p.m.

18   BY MR. NKWONTA:

19       Q.   Ms. Engelbrecht, you took issue with

20   my phrasing according to plan so let me rephrase

21   that.

22           If the challenges had been addressed

Page 157

1    the way you had expected them to, or the way you

2    envisioned they would have been, all 364,000

3    challenged voters would have been required to

4    provide evidence of their residence if they

5    attempted to vote in Georgia.  Is that correct?

6          A.    They would have been expected to

7    show an identification that shows their residence

8    which is also Georgia law, so they wouldn't have

9    had to do anything other than what they would

10   have normally had to have done in casting a

11   ballot.

12         Q.    Well, you just indicated that would

13   not have been required for absentee voters.

14   Absentee voters would not have been required to

15   present identification, right?

16               So, and, and that may not have been

17   required for in-person voters, if their

18   identification was from, you know, from somewhere

19   else.

20               So, let me pose my question again.

21   Not having addressed those sort of underlying

22   assumptions, let me pose my question again.

Page 158

1                    If the challenges had gone according

2      to the way you had envisioned them being

3      addressed, it would have resulted in 364,000-plus

4      challenged voters being required to present

5      evidence of residency before voting in the

6      Georgia runoff elections; is that correct?

7           A.    Well, for those voters that were

8      voting in-person, they would have, by law, been

9      required to show identification that supports

10     their residency.  That is -- that would have been

11     true in any case, whether or not a challenge

12     would have been issued.

13                   You are right, with respect to

14     absentee ballots.  This was a change in standard

15     where the absentee ballot recipient did not have

16     to show any form of identification.

17                   And so, there, what -- that, in that

18     instance, had somebody been challenged.  But it

19     is important to remember that the only records

20     that were challenged were those records that the

21     elector had also notified the United States

22     Postal Service that they had permanently changed

Page 159

1  their residence.

2           So, this was not without, you know,

3  causation.  But yes, then in the case of absentee

4  ballots, that would have been given the curing

5  process -- or resolved during the curing process.

6      Q.   And what would -- we'll return to

7  the specific operation of the curing process and

8  of the challenge process.  I do want to get back

9  to the meeting between you and Mr. Davis and

10  Mr. Somerville.

11           MR. NKWONTA:  Joe, could we pull up

12      Exhibit 19.  And can we enlarge that a little

13      bit as well.  Great.

14               (Exhibit 19 marked for

15                identification.)

16  BY MR. NKWONTA:

17      Q.   Do you recognize Exhibit 19,

18  Ms. Engelbrecht?

19      A.   Yes.

20      Q.   What is it?

21      A.   That was a notice that was sent from

22  True the Vote to all the elector challengers who

Page 160

1    we were working with.

2              And this, as I mentioned earlier,

3    was part of the discussions that we had with

4    Derek, because of the confusion and concern that

5    was being experienced by the elector challengers

6    who were a part of our project.

7              And so this was an invitation to

8    participate in a Zoom call where we could talk

9    about what people were experiencing.

10        Q.    And what did you all discuss during

11   those Zoom calls?

12        A.    The process that was to have been

13   followed.  And the people shared their concerns

14   of threats that they were receiving.  And we gave

15   direction as to where to submit those to so that

16   we would have them on record.

17        Q.    And where did you ask them to submit

18   the threats to?

19        A.    I don't recall.  Somewhere, within

20   True the Vote.  I don't recall the specific

21   e-mail address or whatever.

22        Q.    And do you still have a record of

Page 161

1    those threats?

2          A.    Yes.

3                MR. NKWONTA:  Could we pull that

4       down and pull up Exhibit 30.

5                     (Exhibit 30 marked for

6                       identification.)

7                MR. NKWONTA:  And then before I get

8       into this, I will note that I have referred

9       to these documents as either document number

10      or exhibit number interchangeably.

11               We will just say either Document

12      Number 30 or Exhibit Number 30.  I'm

13      referring to the exhibits.

14   BY MR. NKWONTA:

15         Q.    So, Exhibit Number 30 is an e-mail

16   from you Ms. Engelbrecht to Brian Robinson.  And

17   beneath it an e-mail to Senator Williams; is that

18   correct?

19         A.    Yes.

20         Q.    Do you recognize that e-mail?

21         A.    Yes.

22         Q.    And what was the date of that

Page 162

1    e-mail?

2          A.    The date of the e-mail to Senator

3    Williams was the 21st.

4                The date of the e-mail to Brian

5    Robinson was the 28th.

6          Q.    And is it your understanding that

7    Senator Williams is a Democratic senator?

8          A.    That was my understanding, yes.

9          Q.    And was that your understanding when

10   you reached out to Senator Williams?

11         A.    Yes.

12         Q.    Was this your first attempt to reach

13   out to the Democratic Party official or --

14         A.    Yes.

15         Q.    -- or legislator?

16         A.    Yes.

17               MR. NKWONTA:  Can you pull this

18      down, Joe, and pull up Exhibit 84.

19               (Exhibit 84 marked for

20                identification.)

21   BY MR. NKWONTA:

22         Q.    Ms. Engelbrecht, Exhibit 84 is True

Page 163

1    the Vote's Response or Amended Responses to

2    Plaintiff's First Request For Admissions.

3              Are you familiar with this document?

4       A.    Yes.

5              MR. NKWONTA:  And can we scroll to

6       Request Number 17.  So, Request Number 17

7       says, "Admit that in December 2020 you

8       reached out to and announced a partnership

9       with the Georgia Republican Party before

10      reaching out to the Democratic Party of

11      Georgia."

12             Is that an accurate reading?

13      A.    That is an accurate reading of that

14   statement, yes.

15      Q.    And is that an accurate statement?

16      A.    As I can see there, we denied that

17   statement, but on its face I would say it is

18   inaccurate.

19      Q.    And why is it inaccurate?

20      A.    We did not reach out to the Georgia

21   Republican Party.  I was introduced and a

22   conversation came from that.  And the first of

Page 164

1    the following week I reached out to the

2    Democratic Party.

3                So, it is accurate to say that the

4    introduction to the Georgia Republican Party

5    came, preceded my outreach to the Democratic

6    Party, but we did not initiate that outreach to

7    the Republican Party, sorry.

8                MR. NKWONTA:  Could we pull up

9        Exhibit 81, please.

10                   (Exhibit 81 marked for

11                    identification.)

12   BY MR. NKWONTA:

13       Q.   Ms. Engelbrecht, Exhibit 81 is the

14   response that True the Vote filed to Plaintiffs'

15   First Interrogatories.

16                MR. NKWONTA:  And, Joe, can you go

17       to Page 25.  Can you scroll up a little bit

18       to catch the Interrogatory No. 8?  Scroll up

19       a little bit to the end of Page 24.  Okay.

20   BY MR. NKWONTA:

21       Q.   Ms. Engelbrecht, Interrogatory No. 8

22   says, "Describe your self-proclaimed partnership

Page 165

1    with the Georgia Republican Party to assist with

2    the Senate runoff election process as announced

3    in your December 14, 2020 press release,

4    including but not limited to the names and

5    contact information of each of the entities and

6    individuals with whom True the Vote has been and

7    intends to work with in this partnership and the

8    approximate date when the partnership began and

9    the purpose and/or goals of the partnership."

10          Is that a correct reading of

11   Interrogatory No. 8?

12          THE WITNESS:  Can we advance to the

13     Page 25?

14          Yes.

15   BY MR. NKWONTA:

16     Q.   And the response, the first sentence

17   of the response says, "The partnership with the

18   Georgia Republican Party was announced on

19   December 14, 2020, shortly after a meeting with

20   David Shafer, Executive Director Stewart Bragg,

21   and Florida Elections Day Operations Director

22   Alyssa Gonzalez Specht."

Page 166

1          Is that a correct reading of the

2   first sentence of the response?

3          A.    Yes.

4          Q.    Is it your testimony that that is

5   not outreach to the GOP?

6          A.    We did not -- we were introduced.  I

7   was introduced.  I did not initiate that

8   introduction.

9          Q.    But at some point you would have to

10  have reached out in order to schedule a meeting

11  and conduct a meeting, correct?

12         A.    I mean, yes, we could say it that

13  way, yes.

14         Q.    So, it is fair to say that True the

15  Vote had some outreach with the GOP before

16  reaching out to any Democratic Party official or

17  legislator and announced the partnership with the

18  GOP before reaching out to any Democratic

19  official or legislator?

20         A.    We -- I would say that the outreach

21  consisting of acknowledgment that we would meet

22  or be at a place where these folks were.  And

Page 167

1    inasmuch as partnership meant them, to make them

2    aware of the, of the election integrity

3    initiatives that were already posted on line,

4    then yes.

5                    MR. NKWONTA:  You can pull down

6         Exhibit 81.

7    BY MR. NKWONTA:

8         Q.    I would like to talk about True the

9    Vote's coordination with the Secretary of State's

10   office.  Did True the Vote reach out to the

11   Secretary of State's office before launching the

12   challenge effort?

13        A.    Yes.

14        Q.    Can you walk me through how that

15   outreach occurred?

16        A.    We were working with a

17   communications consultant who knew the staff at

18   the Secretary of State's office.

19                    And so, through him I asked to set

20   up a meeting.  And we attended that meeting -- or

21   I attended take meeting.

22        Q.    Who was the communications

Page 168

1    consultant?

2         A.    Brian Robinson.

3         Q.    And when you attended that meeting,

4    who was present at the meeting?

5         A.    Jordan Fuchs, Ryan Germany, Brian

6    Robinson, for a brief period of time Secretary

7    Raffensperger, and myself.  And that is all I

8    recall.

9         Q.    When did this meeting occur?

10        A.    I don't recall specifically.  It was

11   in, you know, mid-December, somewhere in there.

12        Q.    How long did it last?

13        A.    I don't recall that, either.

14        Q.    What did you all discuss at this

15   meeting?

16        A.    I went with the express purpose of

17   describing the elector challenge and the wanting

18   to make sure that we understood, as best as we

19   could, what that process would look like at the

20   county level for the electors who wanted to

21   participate in their -- with their counties to

22   avoid any friction or inappropriate process.

Page 169

```
 1                    And, I expressed that I was

 2   concerned about the size of the number, how large

 3   it was.  And I expressed that, you know, even

 4   though we had done what we could to refine the

 5   list so to be, you know, as exact as possible,

 6   but the number was still large.

 7                    Secretary Raffensperger quickly

 8   commented that he thought the number was about

 9   right because they hadn't been able to clean the

10   list and so people move.  And he did some fast

11   math in his head, yeah, XYZ, it should be about

12   that number.

13                    And I remember the feeling of

14   saying, you know, this is a -- the only way we

15   can see to do this is to run the whole list, and

16   he agreed.

17                    And again it is a process that

18   electors can participate in, and it is afforded

19   in state law.  And that was kind of it. And then

20   we went through the specific steps of what would

21   happen.

22                    Another thing I recall crisply is my
```

Page 170

1    conversation exchange with Ryan Germany, where I

2    wanted to understand if this was a burden on

3    counties and what that would look like and the

4    timing, because they were beginning to prepare

5    to -- for the early opening of absentee ballot

6    applications.

7              And Mr. Germany saying that it would

8    be a very simple process, that counties could

9    forward on the spreadsheet to the state.  The

10   state would forward it to their vendor.  And it

11   would be flagged as I have described in previous

12   comments.

13             So, the, the -- our understanding,

14   my understanding leaving that meeting was

15   following the process would be a, a smooth way to

16   support these electors who had, you know, come to

17   us with concern, out of concern for the fact that

18   the rolls weren't being maintained.

19        Q.    You mentioned you were concerned

20   about the size of the challenges and how large it

21   was.  Why were you concerned about the size of

22   the challenges?

Page 171

```
1          A.    It is just because it is a big

2    number.  It is a big number.  But when you don't

3    clean the rolls for two years and, you know,

4    13 percent of the population moved, it is just

5    going to be a big number, but it's a lot.

6          Q.    So, what concerns did that create

7    for you, the fact that the number was big.

8                Why was that concerning to you?

9          A.    Because of the recognition that it

10   was going to draw attention, as it should,

11   because it is a -- it is worthy of attention that

12   our rolls would ever be that bad.

13               But I also knew that it would draw

14   negative attention in which I didn't want.

15               But, you know, were we to do less,

16   my feeling was we would have been potentially

17   accused of targeting or trying to be selective,

18   and that is not what we wanted either.

19               So, we just applied the same

20   standard statewide.

21         Q.    In that meeting what information did

22   you provide the Secretary of State's office?
```

Page 172

1          A.     I described what we had done and,

2     you know, with our -- with respect to the

3     methodology.  And beyond that I remember that I

4     offered -- we have, I said at the time, that we

5     thought that we might keep in accord with state

6     process or standards, that we might need to

7     actually physically print all of these

8     challenges.

9               And so we, I say we, I asked whether

10    or not that would be necessary or how we would

11    need to be in compliance.  Would I need to

12    provide a copy straight to the state or would the

13    county provide that?  We talked about that.

14              And then the other things I have

15    described, the little bits of the conversation,

16    but it was wholly about the elector challenges.

17         Q.    You didn't provide them with a

18    challenge list, did you?

19         A.    I don't, I don't think so.  I don't

20    recall, but I don't think so.

21         Q.    You didn't provide them with any

22    written description or summary of the

Page 173

1   methodology, did you?

2          A.    Nothing, I don't recall.  I don't

3   think so.  No.

4          Q.    Okay.  Did you provide any other

5   written materials to the Secretary of State's

6   office or anyone in that meeting?

7          A.    I don't recall.

8               MR. NKWONTA:  I would like to pull

9      up Exhibit 20, please.

10                   (Exhibit 20 marked for

11                    identification.)

12   BY MR. NKWONTA:

13          Q.    Ms. Engelbrecht, do you recognize

14   Exhibit 20?

15          A.    A text from me to Derek, yes.

16          Q.    And do you recall sending this text?

17          A.    I don't recall it, but I,  clearly I

18   did.

19          Q.    Is this text referring to the same

20   meeting with the Secretary of State and other

21   individuals that you just described?

22          A.    I'm sorry.  Can you -- I was -- I'm

Page 174

1    sorry.  I was reading that.

2              Could you restate your question?

3        Q.    Sure.  Is this text describing the

4    meeting with the Secretary of State's office that

5    we were just discussing?

6        A.    I believe so, yes.

7        Q.    You mentioned that you got some

8    guidance in that text message.

9              What guidance were you referring to?

10       A.    Specifically that would have been

11   the guidance that we don't have to actually

12   print, didn't have to actually print all of the

13   challenges.

14       Q.    Any other guidance?

15       A.    Not that I recall.  No, not that I

16   recall.

17       Q.    Do you know if --

18       A.    Actually, let me -- there was,

19   because we went through the process.  And I

20   explained as I -- according to my read and

21   sometimes, you know, as standards are written,

22   they are not practically applied in that way.

Page 175

1              So, I wanted to understand the flow

2    of, as I mentioned, their observation that

3    digital physical files would be sent to them and

4    to their vendor so that kind of guidance was

5    offered as well.

6         Q.   Do you know if the Secretary of

7    State's office ever analyzed your challenge

8    lists?

9         A.   I do not know.

10        Q.   Or ever reviewed your challenge

11   lists?

12        A.   I do not know.

13        Q.   And why did you share this

14   information with Mr. Somerville?

15        A.   Because they were also doing elector

16   challenges, and as I mentioned earlier we did not

17   want to cause confusion.

18             And so my comments would have been

19   oriented towards, you know, our timing so as to

20   not cause confusion.

21        Q.   I notice this text message came from

22   your phone but was produced by Mr. Somerville.

Page 176

1    Is there a reason why it was not produced from

2    you directly?

3          A.    I do not keep texts.

4          Q.    How often do you delete your texts?

5          A.    It varies, but generally I just

6    every once and again go in and clean them, wipe

7    them out.  So, I couldn't tell you.

8          Q.    When is the last time that you

9    cleaned your texts?

10         A.    I don't recall.

11         Q.    Would it have been within the past

12   six months?

13         A.    I, given that this lawsuit was in

14   place I wouldn't have, probably not.  I would

15   have to look.

16               But, I would not have -- knowing

17   that these things would have needed to have been

18   preserved, I wouldn't have gotten rid of them

19   during this period.

20         Q.    So, in other words are you saying

21   that you have not deleted any of -- you have not

22   wiped your texts since this lawsuit was filed?

Page 177

1     A.    I have not -- I have not wiped my

2   texts since it was any of these records related

3   to anything related to this lawsuit; that is

4   true.

5     Q.    So, you should still have this text,

6   right?

7     A.    I'm not sure when the lawsuit was

8   filed, but, you know, that was a year ago, over a

9   year ago.

10     Q.    Fair enough.  But any text relating

11   to the challenge efforts or your, or these types

12   of communications, you would not have deleted.

13   You would still have them, you know, as long as

14   they existed since the lawsuit was filed; is that

15   correct?

16     A.    After the lawsuit was filed and I

17   was notified to preserve documents, I preserved

18   documents.

19          But between the time that this text

20   occurred and the lawsuit was filed, I, it is

21   entirely possible that I cleaned my texts.

22          MR. NKWONTA:  You can pull that

Page 178

```
 1      down.  I want to turn next to your work with

 2      OPSEC Group -- or turn back to your work with

 3      OPSEC Group.

 4                  Can we pull up Exhibit 21, please.

 5                      (Exhibit 21 marked for

 6                       identification.)

 7   BY MR. NKWONTA:

 8          Q.    Ms. Engelbrecht, do you recognize

 9   Exhibit 21?

10          A.    Yes.

11          Q.    What is it?

12          A.    That was an invoice presented to

13   True the Vote from OPSEC.

14          Q.    And you have reviewed this invoice

15   before, correct?

16          A.    Yes.

17          Q.    And did you have a chance to review

18   this invoice before paying it?

19          A.    Before payment, oh, absolutely, yes.

20          Q.    When was the invoice issued?

21          A.    It appears to have been issued

22   December 7th.
```

Page 179

1     Q.     And when was payment made?

2     A.     I don't know.

3     Q.     The invoice shows an amount due of

4   zero.

5            Was the payment made before the

6   invoice was issued or at some point after?

7     A.     I don't know.

8     Q.     Is there someone else within True

9   the Vote who would know?

10    A.     I mean I would know if I looked at

11  the records.  I just don't recall.

12    Q.     When was the work for which this

13  invoice was related completed?

14    A.     Well, this was -- most of this

15  was -- almost all of this was about data

16  acquisition.  So that was a, you know, an ongoing

17  concerns for all manner of things.

18    Q.     Oh, this invoice was just for data

19  acquisition?

20    A.     Data acquisition and then the

21  subsequent data management, like the

22  normalization of data across disparate databases

Page 180

1    requires standardization.  That is the reference

2    to ETL.

3              And then you know they indicate here

4    analyses, so that would come back to us over time

5    in the form of analysis.

6              And litigation support, which was

7    another, you know, a manner, a matter of their

8    involvement.

9         Q.    When did this work start?

10        A.    I am not sure.  I don't know.

11        Q.    Did this work start before

12   December 7th?

13        A.    I don't recall.

14        Q.    So, it is possible this work started

15   after December 7th?

16        A.    No, because litigation support would

17   have occurred in November.

18        Q.    What does that term, litigation

19   support, mean?  Litigation support for what

20   exactly?

21        A.    We had served in support of OPSEC's

22   analyses for lawsuits that were filed post the

Page 181

1    general election that were heavily dependent on

2    OPSEC's ability to review data that should have

3    been made available by the state.

4                And, so that was their -- that was

5    their role and we were supporting that effort.

6         Q.    Are you referring to the lawsuits

7    filed in battle ground states like Georgia,

8    Michigan, Pennsylvania, Wisconsin?

9         A.    Yes.

10        Q.    And the lawsuits filed shortly after

11   the November general election?

12        A.    Yes.

13        Q.    So, part of this invoice includes

14   work that was done in connection with lawsuits

15   that were filed shortly after the November

16   presidential election?

17        A.    Yes.

18        Q.    Can you identify other line items

19   that relate to the November general election,

20   aside from litigation support?

21        A.    Well, all of the data acquisition

22   could conceivably have been used for the

Page 182

1    litigation support.

2         Q.    So, this invoice and all of the

3    analysis is not specific to the Georgia runoff

4    election?

5         A.    No.

6         Q.    It is all combined; it is all one

7    invoice?

8         A.    Yeah, just a listing of all manner

9    of things.

10        Q.    But in terms of the work OPSEC was

11   doing for True the Vote, was it sort of all one

12   combined project?

13             In other words, the analyses for the

14   general election or the November presidential

15   election and the analyses for the runoff, was it

16   all one combined project?

17        A.    No, the analyses for the lawsuits

18   that were filed post election would have been in

19   support of those lawsuits specifically.

20             And True the Vote was, you know,

21   the, financially supporting the effort, but it

22   was being used in lawsuits or should have been

Page 183

1    used in lawsuits.

2         Q.    Right.  I'm saying there is no

3    differentiation here between analysis for those

4    lawsuits and the analysis for the Georgia elector

5    challenges suit?

6              So I'm asking whether there was all

7    one project, at least as far as OPSEC was

8    concerned?

9         A.    Yeah, I don't, I don't recall.

10        Q.    So, I understand you may not recall

11   exactly how it was set up.

12             But, the invoice does reflect --

13   they are combined on the invoices; is that

14   correct?

15        A.    Yes.  I mean there is an element of

16   combination here, yes.

17        Q.    What does Eyes on Georgia mean?

18        A.    That was the term that OPSEC had,

19   and I guess they in their system set that up for

20   part of the description.

21        Q.    What were they describing?

22        A.    At that point it would have -- I

Page 184

1    mean their terminology for looking at what could

2    be, what could be addressed in Georgia or what

3    could be -- let me say that a little differently.

4              What could be done to address the

5    concerns of Georgians relative to citizen

6    engagement.  What could be done.  And that is

7    where you see where it says Georgia Code

8    Analysis.  That is kind of the beginning of

9    figuring out, you know, what could we do for

10   citizens.

11        Q.    What other types of analyses did

12   OPSEC conduct aside from generating a list of

13   challenged voters in Georgia?

14        A.    I know that they looked at, looked

15   post the -- sorry guys, post -- my apologies,

16   give me a second.  A rogue pet.  Hang on.

17              They looked at other data

18   elements -- I'm sorry.  Can you repeat the

19   question?

20        Q.    Sure.  What other types of analyses

21   did OPSEC conduct in Georgia aside from preparing

22   challenge lists for the runoff election?

Page 185

```
1          A.    They looked at other data elements

2     that are tracked in the Georgia file.  When it

3     was mentioned that there was bias, we wanted to

4     see what the records of the state would show, so

5     they did that analysis.

6          Q.    What other analysis did they

7     conduct?

8          A.    Relative to all of this, I don't

9     recall.

10         Q.    Is there anyone from True the Vote

11    who would recall?  Are there any -- sorry, let

12    me -- you were -- I think you were shaking your

13    head but I will let you answer.

14         A.    Sorry, no.  I'm sorry, no.  I'm --

15    that is my thinking nod.  No, I don't think so.

16    No.

17         Q.    Are there any documents that you

18    could review that would help refresh your

19    recollection of any other analyses that you

20    conducted?

21         A.    No.  I don't recall.  I don't think

22    so.
```

Page 186

1          Q.     What does Political Lists mean?

2          A.     I believe that that was made, or was

3     a reference to a list called L2 that can be

4     referred to as a political list because L2 tracks

5     the voter turnout by party.

6               And so, that would have stood to

7     reason on this invoice because we did have L2

8     data just to see what they were reporting as a

9     supplemental source.

10         Q.     Why did OPSEC want to analyze voter

11    turnout by party?

12         A.     It was -- L2 has really good

13    visualization, and so to be able to show in the

14    early election periods how many people had

15    already voted.  And just the broad, the broad

16    sort of filling in of counties.

17               It is just a really good visual.

18    And we use that sometimes in the podcast just to

19    show, you know, how people were turning out.

20         Q.     Why was it important to show those

21    data points by party or to identify those data

22    points by party?

Page 187

```
 1          A.    It would -- I mean, it is not.  That

 2   is just how L2 is known.  But for our purposes it

 3   was just of interest because they do a great

 4   visualization.

 5               And also -- and they visualize

 6   according to a variety of substrates.  I mean,

 7   you know, by age, by whether or not people

 8   normally voted absentee ballot.

 9               It is just a very strong

10   visualization platform and database.

11          Q.    And in those -- going back to those

12   lawsuits that OPSEC provided support for or

13   litigation support for, those lawsuits sought to

14   enjoin election results or a certification of

15   election results in specific counties; is that

16   correct?

17          A.    Yes.

18          Q.    And why did True the Vote seek that

19   relief?  Or why did True the Vote support those

20   losses?

21          A.    We supported the, the plaintiffs,

22   the citizens of those counties, of those states,
```

Page 188

1    in counties where there appeared to have been

2    unequal application of election standards made,

3    made more pronounced by the changes to election

4    law that were occurring, you know, throughout the

5    process.

6              And that position -- our position

7    was that many of those changes were in fact

8    unconstitutional.  And so the thought was to use

9    data sources to try to support that position.

10   That is what OPSEC would have been doing in the

11   lawsuits.

12        Q.   So, OPSEC was retained by True the

13   Vote to use data analysis to try to identify the

14   counties to sue; is that correct?

15        A.   Not the counties to sue.  OPSEC

16   would have been -- we had an extensive list of

17   data requests of the states to afford a really

18   good look at the accuracy of the rolls, because

19   in most of these states they had all manner of

20   inaccuracies.

21              And so that is what they were being

22   retained to do.

Page 189

1        Q.    How did True the Vote identify the

2   counties to sue in these lawsuits?

3        A.    Based on the residency of the

4   plaintiffs.

5        Q.    I'm not sure I understand, because

6   there is some --

7        A.    So --

8        Q.    I will finish and then I will let

9   you speak.

10        A.    Sure.

11        Q.    There is some cases in which the

12   plaintiffs did not reside in any of the counties

13   that were sued.

14              So, and we can get into that in more

15   detail with exhibits, et cetera.

16              But I wanted to sort of get your

17   explanation on behalf of True the Vote, how True

18   the Vote identified the counties that were named

19   as defendants in those lawsuits.

20        A.    I don't recall the specifics around

21   that.

22        Q.    Is there anyone at True the Vote who

Page 190

1    would recall the specifics?

2          A.    No.

3          Q.    Are there any documents that

4    would -- that you can review that would inform

5    you of that?

6          A.    No, other than to, you know, review

7    again the briefings themselves, no.

8          Q.    The amount of this invoice, 400,000,

9    is that -- have you paid an outside vendor that

10   amount for data analysis before?

11         A.    For data analysis?  No.

12         Q.    Or for the type of analysis that

13   OPSEC conducted here?

14         A.    In -- if we were to have gone and

15   purchased this type of data individually from,

16   you know, from a number of print third parties

17   then, if that is your question then yes, the data

18   is, you know, particularly nationwide data is

19   very expensive.

20         Q.    My question was slightly different

21   which is, has True the Vote ever spent this

22   amount on the type of data analysis that OPSEC

Page 191

1    conducted here as reflected in this invoice?

2         A.    It has been a year, I don't recall.

3         Q.    Approximately when did True the Vote

4    start working on its landmark election challenge

5    in Georgia?

6         A.    Can you expand on what you mean by

7    working on?

8         Q.    Approximately when did True the Vote

9    start preparing its landmark election challenge

10   in Georgia?

11        A.    It would have been that first or

12   second week of December.

13        Q.    Were there any additional invoices

14   that followed this December 7th invoice from

15   OPSEC?

16        A.    We have been invoiced by OPSEC for

17   things since, yes.  Is that what you are -- could

18   you rephrase your --

19        Q.    I missed that last part.  Could you

20   repeat your answer?

21        A.    I mean, we have worked with OPSEC in

22   a variety of fronts, you know, post some of these

Page 192

1    things, if that is -- I'm not sure if that is

2    what you are asking.

3          Q.    Sure.  I will rephrase the question.

4                Did True the Vote receive any other

5    invoices from OPSEC relating to data analysis in

6    Georgia for the 2020 presidential election or the

7    runoff election?

8          A.    Related to the elector challenges,

9    no.

10         Q.    Did OPSEC continue to conduct

11   analysis for True the Vote after the 2021 runoff

12   election -- after the January 2021 runoff

13   election?

14         A.    Yeah, we continued to work together,

15   yes.

16         Q.    And did OPSEC -- or was OPSEC

17   continuing to analyze the voter registration list

18   and prepare lists of voters who have potentially

19   changed their address?

20         A.    Yes.

21         Q.    Has True the Vote issued any

22   challenges since the landmark elector challenge

Page 193

1     effort in advance of the January 2021 runoff

2     election?

3          A.     Could you repeat that one more time?

4          Q.     Sure.  Since the January 2021 --

5          A.     No.

6          Q.     -- has True the Vote issued any

7     challenges in Georgia?

8          A.     No.

9          Q.     Has True the Vote or OPSEC provided

10    any data to any challengers since the

11    January 2021 runoff election?

12              MS. SIEBERT:  I'm going to object

13         and maybe I don't need to object, but are you

14         speaking specifically in Georgia?  It is a

15         little unclear about --

16              MR. NKWONTA:  Yes.

17              MS. SIEBERT:  Okay.  Then I withdraw

18         my objection.  Thank you.

19              THE WITNESS:  I, I'm not sure that I

20         understand exactly what you are asking.

21              We have not done any other

22         challenges.  There has not been any other

Page 194

1      information provided for challenges.

2                    There were -- you know, there has

3      been correspondence that is about what has

4      happened with the challenges, you know, that,

5      that did occur.

6                    Did that answer the question?

7    BY MR. NKWONTA:

8        Q.    I think so.  And just to clarify my

9    question a little bit more, in prior discovery

10   responses, True the Vote has indicated that True

11   the Vote itself does not actually issue

12   challenges.  It supports voters to issue

13   challenges.

14                   So, I was trying to be a little bit

15   more precise in my question asking you whether

16   True the Vote has provided any analysis or any

17   information to others to file challenges in

18   Georgia since the January 2020 election?

19       A.    Oh, I think I understand.  No.  No.

20       Q.    And has True the Vote provided any

21   data analysis or any lists of potential

22   nonresidence to any election officials in Georgia

Page 195

1    or any counties in Georgia since the January 2021

2    runoff election?

3          A.    No.

4          Q.    So, the additional analysis that

5    OPSEC has been conducting during the January 2021

6    runoff election, what has come of that analysis?

7    What has it been used for?

8          A.    OPSEC has helped us develop some

9    additional programs that will be -- that are

10   available for citizens to look at their local

11   voter rolls, to understand the process of just

12   broadly their election process.

13              OPSEC has been helpful in organizing

14   that, organizing our, just data broadly.

15              We have worked with OPSEC on a

16   project to identify whether or not there were

17   abuses of drop box locations and processes.  And

18   OPSEC has been involved in that.

19         Q.    You mentioned something earlier

20   about allowing citizens to use or look at voter

21   rolls.  And I wanted you to expand on that a

22   little bit.

Page 196

1          MS. SIEBERT:  I'm going to object to

2     this, if it is outside the scope of -- if we

3     are speaking about a nationwide effort as

4     beyond the scope of the court's order to

5     limit to this six states.

6          And instruct Ms. Engelbrecht not to

7     answer beyond those states and the court's

8     order.

9 BY MR. NKWONTA:

10     Q.   And you can interpret my question,

11 Ms. Engelbrecht, as limited to the six states.

12     A.   Can you repeat the question?

13     Q.   Sure.

14          MR. NKWONTA:  Actually it might be

15     better if the court reporter could read the

16     question back, please.

17          (Whereupon, the record was read by

18     the reporter as requested.)

19          THE WITNESS:  Okay, thank you.  To

20     clarify, did you want me to explain the

21     process of how a citizen that wants to look

22     at their local rolls would go about that with

Page 197

1      True the Vote?  Is that -- or is there

2      another way you would like me to frame, to

3      consider that question?

4  BY MR. NKWONTA:

5          Q.    I should probably clarify.

6                Does that program entail allowing

7  citizens to review lists of voters who have

8  potentially moved or who have potentially changed

9  their addresses?

10         A.    No.

11               MR. NKWONTA:  I would like to ask

12     you to take a look at Exhibit 26.  If you

13     could pull this down.  Pull up Exhibit 26 --

14               Actually before that I'm sorry,

15     could we pull up Exhibit 25, first.

16                    (Exhibit 25 marked for

17                     identification.)

18  BY MR. NKWONTA:

19         Q.    Ms. Engelbrecht, do you recognize

20  Exhibit 25?

21         A.    Yes.

22         Q.    And is that an e-mail from Amy

Page 198

 1   Holsworth to you?

 2          A.      Yes.

 3          Q.      And is Amy Holsworth an employee of

 4   True the Vote?

 5          A.      No.

 6          Q.      What is her position within True the

 7   Vote?

 8          A.      She is no longer with True the Vote.

 9          Q.      What was her position at the time

10   she sent this e-mail?

11          A.      She was, I guess, a support

12   personnel.  She helped with managing all of the

13   incoming inquiries from the Election Integrity

14   Hotline.

15          Q.      So, she was an employee at the time?

16          A.      She was a contractor at the time.

17          Q.      So, in that e-mail, which was sent

18   Wednesday, December 30th, says, "I'm sure you all

19   have thought of this, but the elector challenge

20   that was filed before the November election and

21   denied, do we have that list from the lawsuit?

22   Can we sort it against the list of people that

Page 199

1    voted and find matches, et cetera, and determine

2    if they were valid votes?

3              "Then check that list against our

4    new list to see if any that could -- that

5    couldn't or shouldn't have voted are still on the

6    voter lists of challenge voters we have."

7              Is that a correct reading of Amy

8    Holsworth's e-mail to you?

9         A.    Yes.

10        Q.    What is the challenge that she is

11   referring to from before the November election?

12        A.    I do not -- I do not know.

13        Q.    If you scroll down to your response.

14   You respond, "Yes, absolutely doing it!"

15        A.    Uh-huh.

16        Q.    So it seems like you knew what she

17   was referring to then.

18        A.    Yes, I did.  There could have

19   been -- because we did not file any elector

20   challenges.

21              And it, in all likelihood was a

22   mischaracterization of that term.  But just, you

Page 200

1    know, in casual conversation thinking I knew what

2    Amy was referring to, I responded in that way.

3              But, I'm not -- in this moment, it

4    could have been -- there is so many things

5    happening in so many states that we were not a

6    part of but observant of, that it really could

7    have been a number of things.

8         Q.    Were you aware of any other

9    challenges filed in Georgia before the November

10   election?

11        A.    No.  But I'm also not sure that this

12   is even about Georgia.

13        Q.    Well, it was produced in this case.

14   And if it is not about --

15        A.    It is -- I'm sorry.

16        Q.    What other jurisdictions could this

17   e-mail have been referring to?

18        A.    It could have been Wisconsin.  To

19   clarify, we did not file anything in Wisconsin,

20   but there were -- and again this is, I believe,

21   an incorrect use of the term, elector challenge.

22              But there were subsets that were

Page 201

1    being, in many states, were being challenged in

2    court that could have been used for analysis.

3              I don't recall the specifics any

4    longer about what this exchange specifically was.

5              MR. NKWONTA:  Okay.  Let's pull this

6       down and pull up Exhibit 26.  And could you

7       enlarge Exhibit 26 a little bit?

8                    (Exhibit 26 marked for

9                     identification.)

10   BY MR. NKWONTA:

11       Q.   Ms. Engelbrecht, do you recognize

12   Exhibit 26?

13       A.   Yes.

14       Q.   What is it?

15       A.   This was an e-mail that began as

16   comments and clarifications that I had sent to

17   the elector challengers, who we were working

18   with.

19              And then Amy forwarded this to James

20   Cooper and then James Cooper responded back.

21              MR. NKWONTA:  And can you scroll

22       down to the second e-mail.  Great.

1/26/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Catherine Engelbrecht 30(b)(6)
Confidential - Pursuant to Protective Order

Page 202

1    BY MR. NKWONTA:

2          Q.    And, it includes talking points that

3    were shared by you, according to Amy.  That

4    e-mail says, "Good afternoon.  Here is an excerpt

5    from an e-mail in which a few talking points were

6    shared by Catherine Engelbrecht.  Hope this

7    helps."

8                Is that a correct reading of that

9    second e-mail from Amy Holsworth?

10         A.    Yes.

11         Q.    And do you agree that the talking

12   points that follow were shared by you or came

13   from you?

14         A.    Yes.

15         Q.    And looking at those talking points,

16   you describe sort of the process of the NCOA

17   matching.

18                I wanted to ask you specifically

19   about the enhanced NCOA search to identify

20   military addresses.  What does that mean?

21         A.    When you are using NCOA link with

22   the filters that I referred to earlier, the, the

Page 203

1    DPV, the delivery point, the verification, and --

2    well specifically that.

3              And then the NCOA link version gives

4    you the opportunity to filter out any recognized

5    military address.

6              And then further, there were efforts

7    made to recognize the standard zip codes,

8    orientations of bases that have certain -- the

9    way that the address looks, you can tell that it

10   was a military base and so those were filtered

11   out.  And that is what it meant.

12        Q.   And to be clear you are referencing

13   the enhanced NCOA search to remove identifiable

14   military addresses.  That appears on Page 2 of

15   the PDF or Bates Number TTV 1453; is that

16   correct?

17              MR. NKWONTA:  If you could scroll

18       down, Joe, to the next page, so

19       Ms. Engelbrecht can see that.

20              THE WITNESS:  Yes.

21              MR. NKWONTA:  You might scroll down

22       a little bit more.  There we go.  It is Item

Page 204

1          Number 1 on TTV 1453.  Right.

2                    THE WITNESS:  Uh-huh.

3     BY MR. NKWONTA:

4          Q.    Who conducted the scrub of the list

5     for military addresses specifically?

6          A.    That was through OPSEC.

7          Q.    And why did you think it was

8     important to scrub the military addresses from

9     the list?

10         A.    Just due to the sensitivity around

11    military addresses broadly.  It was just -- the

12    numbers were already so large and it was just

13    not -- we thought it would be, you know, better

14    to just not even have include that to the best of

15    our ability.

16         Q.    When you say sensitivity around

17    military addresses, what do you mean by that?

18         A.    I mean that the military is --

19    people move very often.  There is a lot --

20    oftentimes having worked with veterans groups and

21    veterans for an extended period of time, mail is

22    just always sensitive.

Page 205

1               It is typically lagging.  It is just

2      an area that we would want to, not -- that we

3      recognize is not as exacting as more typical

4      residential filter.

5           Q.    Your challenges as True the Vote has

6      acclaimed, your challenges did not lead to any,

7      you know, challenged person being removed.

8               That is, I believe, True the Vote's

9      claim; is that correct?

10          A.    Right.  Our elector challenges were

11     in accordance with the code which had never led

12     to anybody.  You said it differently.

13              Our, the standard, the 230 standard

14     was not about removing anybody from the rolls but

15     rather asking the county to confirm the

16     eligibility of the record.

17              And then they follow their process

18     that we have nothing to do with, clearly.

19          Q.    And True the Vote has also claimed

20     that the purpose of the challenge is just to get

21     the counties to confirm residency, right?

22          A.    Well, just the purpose of the

Page 206

1    challenges was to bring to the -- to help

2    electors bring to the attention of their local

3    counties, records that appeared not to comply

4    with eligibility standards.

5              And it is within state law for them

6    to -- for citizens to participate in that way to

7    ask that question.  And that is the extent of the

8    elector challenge.

9         Q.    And if the challenges, as True the

10   Vote claims, does not result in a person be

11   removed, then why go through the effort of

12   scrubbing military addresses?

13        A.    As I have said, it was just a choice

14   that we made to not -- I mean, there are, you

15   know, deployments.  There are different ways in

16   which addresses are identified.

17             And because there is a filter that

18   exists within the expanded NCOA, we just chose to

19   remove them.

20        Q.    You chose to remove them because

21   there are a lot of valid reasons why someone in

22   the military might file a notice of change of

Page 207

1    address even while maintaining permanent

2    residence in Georgia; is that right?

3          A.    No.  To be clear, NCOA is in the

4    database of, that is NCOA is the result of the

5    resident notifying -- ostensibly is the result of

6    the resident notifying the United States Postal

7    Service that they have permanently moved their

8    residence.

9                It is also worth noting that inside

10   of the expanded NCOA you can, you can as a

11   resident or as a reviewer of the data, you can

12   select a temporary move, right, so who moved only

13   temporarily.  And there are classifications

14   around all of that.

15               So, we only looked at permanence.

16   Nonetheless, I just, our recognition that

17   military, because of the nature of the military,

18   can fall outside of some of the stricter

19   standards in postal and in the delivery services,

20   it was really just a choice to not take that --

21   not include them.

22         Q.    So, according to True the Vote's

Page 208

1    claims then, the challenge list would have only

2    included members of the military who indicated or

3    provided a notice of permanent address changes;

4    is that right?

5          A.    That would have been true for the

6    entire list.  That we would have only been given

7    notice based upon our aggregation of the data

8    from USPS as they provide it.

9                They are attestation through that

10   data is that the selection had been made by the

11   resident.  That the move -- the residential move

12   to a new address was permanent.

13         Q.    And that would be true for -- that

14   would be true for members of the military as

15   well, right?

16         A.    For everyone.  According to what we

17   were provided, uh-huh.

18         Q.    So, what I am -- the question I am

19   trying to get at is what prompted the exception

20   for members of the military who had already

21   indicated that their move was permanent?

22         A.    As I said, it is just a -- I think

Page 209

1  being aware of the sensitivities around the

2  military, because they do move so often.  And as

3  I have mentioned, because of the number of

4  elector challenges, because the rolls had not

5  been cleaned in two years, the number was already

6  so large that that seemed like -- and because the

7  filters were available, that seemed like an

8  appropriate action to take.

9          Q.    Did -- what is the difference

10  between a temporary move and a permanent move

11  when it comes to reporting through the NCOA?

12          A.    Um --

13          Q.    Let me rephrase it this way.  I

14  think I can make my question a little bit

15  clearer.

16          A.    Sure.

17          Q.    Am I right that any move that lasts

18  longer than a year is considered a temporary --

19  is considered a permanent move?

20          A.    I'm not certain what time lines are

21  put on the -- I'm not sure what time lines govern

22  the actual input when a resident goes to USPS or

Page 210

1    through some other forum, puts the date in.  I

2    don't know if the year is the governance or not.

3              I think -- I should leave it at

4    that.  I'm not certain.  But there are

5    distinctions between permanent and temporary.

6              We chose only to look at permanent.

7    And we chose only to look at permanent with the

8    date that was at minimum 90 days -- how do I say,

9    90 days pre the generals.  So that it would have

10   been a substantial period of time, so that when

11   we rescreened everything, if there was a change,

12   we would have caught that.

13             I hope that makes sense.  That is

14   confusing.

15        Q.    If an individual wanted to change

16   their address for 18 months, would they be able

17   to do that by filing a temporary address change,

18   or would they be forced to file a permanent

19   address change and then file another address

20   change when they return home?

21        A.    I know that you can submit the dates

22   that you want the change to be effective for.

Page 211

1    I'm not certain what other guidance USPS may

2    follow.

3         Q.    As you sit here today, you can't

4    tell me what definition of a permanent move is

5    according to the USPS guidelines or according to

6    the reporting on the NCOA database?

7         A.    I can't affirm exactly what their

8    statutes or their guidelines say, no.

9         Q.    Did you scrub the challenge list for

10   college students as well who tend to move often?

11        A.    I, I, it was discussed.  I'm not

12   sure whether or not that was done in whole or in

13   part.  I'm not sure.

14        Q.    Has True the Vote participated in

15   challenges involving students in the past in

16   Georgia?

17        A.    Not that I recall.

18             MR. NKWONTA:  Could we pull up

19        Exhibit 46, please.  I would like to show you

20        Exhibit 46 to see if you recall this.

21                  (Exhibit 46 marked for

22                   identification.)

Page 212

1              MR. NKWONTA:  Can you scroll to the

2         second page, please.  And can you start

3         reading from the -- could you scroll down a

4         little bit more, Joe.

5    BY MR. NKWONTA:

6         Q.    So, the fourth line from the bottom

7    says -- and this is an article by the way.  Inter

8    Press Service article from November 5th, 2012.

9    It says, "True the Vote has challenged some

10   people at the Atlanta University Center and

11   saying they couldn't vote because they were

12   students and were out of state."

13              Do you recall that?

14        A.    Not in any way, no.

15        Q.    Are you aware of any other

16   challenges that True the Vote has been involved

17   in, in any of the target jurisdictions that we

18   have discussed that are directed towards

19   students?

20        A.    No -- can you repeat your question?

21        Q.    Sure.  Are you aware of any other

22   challenges that True the Vote has participated in

Page 213

1    or been involved in that alleged or that asserted

2    that students were ineligible to vote for

3    nonresidence?

4          A.    Sorry, can you hear me?

5          Q.    You are coming in and out.  Do you

6    mind repeating your answer?

7          A.    No.  I'm going to switch again, but

8    my answer was --

9                MR. NKWONTA:  Can we please briefly

10        go off the record while we sort out the sound

11        issues.

12               THE VIDEOGRAPHER:  We are now going

13        off the video record.  The time is 1:56 p.m.

14               (Recess taken -- 1:56 p.m.)

15               (After recess -- 1:58 p.m.)

16               THE VIDEOGRAPHER:  We are now going

17        back on the video record.  The time is

18        1:58 p.m.

19    BY MR. NKWONTA:

20         Q.    Ms. Engelbrecht, would you agree

21    that students who go out of state or out of their

22    county to attend school do not lose their

Page 214

1    residency?

2           A.    I mean, it is their choice.  They

3    can choose to move their residency.

4           Q.    Would you agree that students who

5    attend school out of state or out of their county

6    do not automatically lose their residency by

7    changing their address for school?

8           A.    I'm trying to think through your

9    question.  I would agree that it does not

10   automatically occur, but it is their choice.

11          Q.    What is their choice?

12          A.    If they choose to move their

13   residency.

14          Q.    Right.  But, they don't lose their

15   residency by attending school outside of their

16   county or outside of their state.  Is that right?

17                In other words, if they are actively

18   attending school outside of one's county, outside

19   of one's state is not enough to deprive one's

20   residency in their home state; is that correct?

21          A.    That is correct.  But it is a choice

22   if they choose to move their residency.

Page 215

```
 1          Q.    I think I asked you this earlier,

 2    but I just want to make sure I get a clear

 3    answer.

 4               Did True the Vote scrub the

 5    challenge list or do anything to remove students

 6    from the challenge lists?

 7          A.    There were discussions about

 8    removing certain zip codes and potentially

 9    addresses that looked as though they were

10    dormitories of sorts.

11               But beyond that I couldn't comment.

12          Q.    Why did True the Vote consider

13    removing certain zip codes or addresses that

14    looked like they were dormitories?

15          A.    For the very reason you just pointed

16    out.  That it is like military.  Those are just

17    two groups that are perceived as being in a state

18    of transit that is not a normal, you know,

19    long-term residential.

20               Even though again the only way they

21    would have appeared on their list is their choice

22    to indicate that the change of permanent
```

Page 216

1   residence is just for -- the numbers already

2   being as large as they were, we tried to exclude

3   groups that, you know, would cause conflict.

4        Q.    And they made the same choice to

5   enter a change of address to receive mail where

6   they are located, they made the same choice that

7   the members of the military did to enter the

8   change of addresses as well; is that right?

9        A.    The only way they would have been on

10  the list, the NCOA list, certainly after the

11  additional advanced hygiene filters were applied,

12  would have been if they would have, or should

13  have been if they were -- if they had indicated a

14  permanent change of residence.

15            MR. NKWONTA:  Could we pull up

16      Exhibit 84, please.

17  BY MR. NKWONTA:

18       Q.    Ms. Engelbrecht, I have shown you

19  Exhibit 84 before.  And I wanted to pull it up

20  again to direct you to RFA Number 14 on Page 6.

21            MR. NKWONTA:  Would you scroll down

22      to Page 6.

Page 217

1    BY MR. NKWONTA:

2         Q.    RFA Number 14 says, "Admit that your

3    challenge lists include voters who are enrolled

4    in universities in other states."

5              To which True the Vote responded,

6    "Denied."  Is that an accurate response,

7    Ms. Engelbrecht?

8         A.    Give me one second to fully read the

9    response here.

10             That response is a little muddled.

11   I mean, the -- I -- I don't know if you have a

12   question beyond that.  Or actually could you

13   restate your question and let me make sure I'm

14   addressing it?

15        Q.    Yes.  So, Request for Admission

16   Number 14 says, "Admit that your challenge lists

17   include voters who are enrolled in universities

18   in other states."

19             The first word in the response is,

20   "Denied".

21        A.    I mean we would have no way of

22   knowing --

Page 218

```
 1         Q.    That is not, that is not accurate,

 2    is it?

 3         A.    Well, we would have no way of

 4    knowing.

 5         Q.    You don't have any information to

 6    deny that, correct?

 7         A.    I mean, we would have no way of

 8    knowing.  I appreciate the remainder of that

 9    response which I think tries to clarify.

10               But, specifically the admittance, we

11    have no way of knowing.  And then you get into,

12    you know, enrolled in online universities.

13               I mean we could take this to, you

14    know, the extremity.  We would not know where

15    people are enrolled.

16         Q.    So, as you are testifying today, you

17    would not be able to deny that statement; is that

18    right?

19         A.    As I am testifying today --

20         Q.    If I were to ask you today whether

21    your challenge lists include voters who are

22    enrolled in universities in other states, would
```

Page 219

1   you be able to respond no?

2        A.   I couldn't admit that they were.  I

3   also couldn't admit that they weren't.  I don't

4   know.  And I couldn't admit that they were.

5             MR. NKWONTA:  If you would pull down

6        Exhibit 84 for me now.  I want to turn to

7        communications with potential challengers

8        next, but sorry before we do that, can we

9        pull up Exhibit 13.

10                      (Exhibit 13 marked for

11                        identification.)

12             MR. NKWONTA:  And, yes, thank you.

13        Zoom in on the unredacted portion.

14                  And can we pull up Exhibit 9

15        actually first before we go to 13.

16                      (Exhibit 9 marked for

17                        identification.)

18             MR. NKWONTA:  And do you mind

19        zooming in or enlarging the unredacted

20        portion?  And could we scroll all the way

21        down to the bottom of the -- well, the last

22        e-mail on the second page.

Page 220

```
 1   BY MR. NKWONTA:

 2         Q.    Ms. Engelbrecht, do you recognize

 3   that e-mail?

 4         A.    Can you enlarge --

 5         Q.    E-mail in Exhibit 9 from you to

 6   Gregg Phillips -- or from you to Mark Williams,

 7   copying Gregg Phillips.

 8               THE WITNESS:  An you enlarge just a

 9       bit.

10               THE VIDEOGRAPHER:  I apologize,

11       Catherine.  It is stuck.  Bear with me for

12       one second.  Sorry.

13               MR. NKWONTA:  Keep scrolling.  Keep

14       scrolling, there we go.

15   BY MR. NKWONTA:

16         Q.    Do you recognize this e-mail,

17   Ms. Engelbrecht?

18         A.    It is my e-mail.

19         Q.    And this was addressed to Mark

20   Williams?

21         A.    Uh-huh, yes.

22         Q.    And Mark Williams is the printer,
```

Fair Fight, Inc. et al. v. True the Vote, et al.    Catherine Engelbrecht 30(b)(6)
Confidential - Pursuant to Protective Order

Page 221

1   right?  Or he owns the print shop, right?

2        A.    The print, yes.

3        Q.    In the e-mail in the third

4   paragraph, or the third line, fourth line, it

5   says, "Also please remove addresses that would

6   suggest that they are military bases."  And lists

7   some potential military bases; is that correct?

8        A.    Yes.

9        Q.    So, as you were sending the

10  challenge list to the printer, you were also

11  instructing him to remove the addresses that

12  would suggest that they are military bases; is

13  that right?

14       A.    Yes.

15       Q.    That would suggest that they were

16  not scrubbed; is that right?  At least not in the

17  analysis?

18       A.    No, that would have suggested that,

19  if they saw anything that slipped through, just

20  to try to notate it and remove it.

21       Q.    In other words, was it your view

22  that there may have been some military addresses

Page 222

1    or addresses on military bases that still

2    remained on the list when the list went to

3    Mr. Williams?

4           A.    It would -- conceivably, yes.

5                 MR. NKWONTA:  Could we pull up

6        Exhibit 13 now.

7    BY MR. NKWONTA:

8           Q.    Exhibit 13 is Mark's response.  And

9    it says, "We will replace them on our files as we

10   go forward.  It's not going to matter enough on

11   the printed ones to back up and reprint.  Just

12   remove them from the electronic copy as you send

13   them."

14                Do you know whether those military

15   addresses were ever removed?

16          A.    As I stated, we did all of the

17   filtering out on our side and gave Mark notice

18   that if they were to see any, remove them.  That

19   is really all I can attest to.

20                This also has to do with, you know,

21   whether or not anything even needed to be

22   printed.  Whether or not Mark even needed to be

Page 223

1   involved because we have been given indication

2   from the Secretary of State that they didn't need

3   printed copies.

4            So, there is a lot of there is a lot

5   that is inherent within this trying to understand

6   what the process was going to be going forward.

7        Q.   Are you able to testify today that

8   your challenge list did not include voters who

9   lived on military installations?

10       A.   No.  I can testify that we did -- we

11  put the data through all of the filters and

12  followed the process that I have described.

13           But, data is data.  It is possible.

14           MR. NKWONTA:  We can pull down

15      Exhibit 9 -- or Exhibit 13.

16  BY MR. NKWONTA:

17       Q.   Ms. Engelbrecht, how did you go

18  about recruiting challengers to submit these

19  challenges in various counties in Georgia?

20       A.   Some had already -- some Georgians

21  had already come to us which was really the

22  impetus behind the idea that there might be

Page 224

1   something that we could help them with.

2              And Georgia's elector challenge laws

3   are unique in that it did afford an opportunity

4   for citizens to engage in that way.

5              So, there were some that had come to

6   us initially.

7              And our thought was that others that

8   would be interested would either come to us or be

9   referred if that was something that was of

10  interest.

11       Q.    Were some of these voters referred

12  by Republican Party officials?

13       A.    They were referred by, that group of

14  James Cooper and Mark Williams as people that

15  they knew for different counties, but we never

16  did any deeper dives into their affiliations.

17       Q.    Were any of the voters who

18  approached you, were any of them referred by the

19  Republican Party officials?

20       A.    I don't recall.  I don't think so,

21  but I don't recall specifically.

22       Q.    When the voters approached you or

Page 225

1    when you identified whether you were going to

2    submit challenges, what did True the Vote tell

3    these voters about the challenge process and

4    about the lists and what it meant to challenge a

5    voter?

6          A.    We described the project.  And we

7    had a, an agreement of sorts that kind of

8    outlined what the process was in the state, what

9    the outcome would be which would have been just

10   essentially asking the county to look at the

11   records.

12              We had them sign indicating what

13   they understood what the project was going to be

14   about, if they were to participate.  And did our

15   best to work them -- you know, work with them

16   through that process.

17              But, is that your question?

18         Q.    Yes.  And I have a follow-up

19   question to that.

20         A.    Sure.

21         Q.    Was there an agreed upon

22   communication to propose challengers or agreed

Page 226

1    upon language to propose challengers to inform of

2    the process?

3           A.    There was agreed upon language in

4    that we provided a standard online document that

5    everybody could read and understand what it was

6    that a citizen, that an elector challenge in

7    Georgia consisted of.  And what the steps

8    following would be if that was something that

9    they wanted to do.

10                MR. NKWONTA:  Could we pull up

11       Exhibit 36.

12                     (Exhibit 36 marked for

13                       identification.)

14                MR. NKWONTA:  And can we scroll down

15       to Page 9 of Exhibit 36.

16   BY MR. NKWONTA:

17          Q.    Ms. Engelbrecht this is a long

18   e-mail chain in which your e-mail address is

19   included, and several e-mails have been sort of

20   forwarded here or responded to, but if you scroll

21   down a bit further to the following page,

22   Page 10, Bates Number Williams 383, you will see

Page 227

1    the original e-mail from James Cooper.

2              And the first thing I want to ask

3    you about is James Cooper's address is James

4    Cooper GOP at Gmail dot com.

5              Were you aware that James Cooper was

6    a Republican Party official -- or let me ask it

7    differently.

8              What is James Cooper's affiliation

9    with the Republican Party?

10        A.   I have no clue.  Clearly something

11   but I have no clue.  I have never even met James

12   Cooper.

13        Q.   Okay.  And this e-mail that James

14   Cooper wrote, would you agree that it is similar

15   to the e-mail that Amy Holsworth wrote as well

16   and that others wrote to potential challengers?

17              And if you want to scroll through

18   the e-mail chain, we can do that as well.

19        A.   Sure, that would be helpful.  I

20   would have to look at Amy's.  This is not --

21              MR. NKWONTA:  Could we go to Page 1?

22   BY MR. NKWONTA:

Page 228

1          Q.    And you will see there Amy's e-mail

2    at the bottom of Page 1, starting at the bottom

3    of Page 1 and goes to Page 2.

4          A.    Uh-huh.

5                MR. NKWONTA:  And can you scroll to

6        the next page?

7                THE WITNESS:  Can you scroll over.

8                MR. NKWONTA:  Could you scroll

9        slightly -- oh, sorry.  Could you scroll up

10       just slightly so that we can see the e-mail

11       address that it came from.  Just slightly to

12       the very bottom of Page 1.  No.  The other

13       way.  All right.

14               So, if we scroll down or scroll -- I

15       guess scroll up, sorry.  Scroll up.  And then

16       keep scrolling up.

17   BY MR. NKWONTA:

18         Q.    So at the bottom it is signed by

19   Amy.  And the e-mail above came -- it shows sent

20   from Amy at True the Vote dot org on

21   December 17th, 2020.

22               And that is at the bottom of

Page 229

1    Williams 374, at the bottom of Page 1 of

2    Exhibit 36.

3              MR. NKWONTA:  Can you scroll down so

4         we can get the full e-mail.  The other way.

5         Great.

6              THE WITNESS:  I'm sorry, could you

7         ask your question again?

8    BY MR. NKWONTA:

9         Q.   Well, I wanted you to take a minute

10   to review the e-mail.

11        A.   Oh, sure.  Okay.

12        Q.   And this is a communication that

13   went to potential challengers, correct?

14        A.   I can't, I can't confirm that -- let

15   me, let me state that differently.

16             I guess if we looked at the address

17   and if that was one of the challengers, but there

18   are some things in this e-mail that give me pause

19   sufficient to not be able to confirm that this

20   came from Amy yet.  I'm not sure.

21        Q.   Okay.  Well, let's scroll down to

22   Page 4 of this exhibit.  And is part of that

Page 230

1    because of the redactions in the e-mail?

2         A.    No.

3              THE WITNESS:  Would you continue to

4    scroll?  This is just a different take on it.

5              MR. NKWONTA:  Yes.  If you could

6    stop there.

7    BY MR. NKWONTA:

8         Q.    It shows on December 17th, 2020, Amy

9    Holsworth wrote, and it shows Amy's e-mail

10   address there.

11              And this document was produced, by

12   the way, by one of the defendants.

13        A.    Yeah, I mean it appears in this, in

14   this exhibit as though it came from Amy's e-mail

15   address.  There are a number of things that stand

16   out to me as not being normal.

17              But, it does appear, according to

18   this, that it came from Amy's e-mail address.

19              MR. NKWONTA:  And can you scroll a

20   little bit so we can see the full e-mail?  I

21   think there are a few more lines down.

22   Perfect.

Page 231

1    BY MR. NKWONTA:

2        Q.    Do you want to take a minute just to

3    read that e-mail?

4        A.    Okay.

5        Q.    How many challengers did the True

6    the Vote reach out to?

7              How many potential challengers did

8    True the Vote reach out to in order to seek

9    assistance in submitting these challenges?

10       A.    I don't know.

11       Q.    Did True the Vote try to recruit

12   challengers in all Georgia counties?

13       A.    We were open to that for sure and

14   prepared the analysis to support that.

15             But as far as the individuals and

16   the voters who wanted to participate that was --

17   you know, as much as people coming to us as it

18   was people being referred that were also coming

19   to us, so --

20       Q.    So this e-mail that went to

21   potential challengers stated that True the Vote

22   has identified over 500,000 people on the Georgia

Page 232

1    voter list that shouldn't be there.

2              Is that correct that True the Vote

3    identified over 500,000 people in the Georgia

4    voter lists?

5        A.    They are in -- yeah, there are a

6    number of things in this e-mail that are not

7    correct which is what is giving me pause, so --

8        Q.    Okay.  So, we will start first with

9    that 500,000 figure.  Is that correct?

10       A.    Sure.  Um, that is not the number

11   that we had for our challenges, no.

12       Q.    And states that the 500,000 people

13   should not be on the challenge list.

14             Is it True the Vote's position that

15   all individuals on those challenges should not be

16   registered in Georgia or should not be on the

17   voter list?

18       A.    It was and is our position that

19   according to the analysis that we provided, or

20   that we supported, records corresponded with

21   individual decisions to permanently change their

22   residence.

Page 233

1              And therefore it would have made

2       their record ineligible and appropriate in the

3       scope of an elector challenge.

4              That sentence is -- doesn't indicate

5       those nuances that I think are critical.

6           Q.   At that point had True the Vote

7       concluded that these voters should not be on the

8       voter rolls or that they were not legally

9       registered?

10          A.   Well, again on the basis of our

11      analysis, the, all that is and should have been

12      done was the recognition of the information that

13      was available and the provision of that to the

14      counties.

15             This is, you know -- this e-mail is,

16      doesn't clearly make those distinctions known or

17      understood.

18          Q.   The e-mail also, I think the fourth

19      paragraph down asked the voter to take a photo of

20      and scan your signature and e-mail it with their

21      voter registration information.

22             But it doesn't offer the voter an

Page 234

1    opportunity to review the list, does it?

2          A.    This e-mail does not offer that, no.

3          Q.    At the third paragraph from the

4    bottom, in the last sentence of that paragraph,

5    it says, "True the Vote has assured me that the

6    list that they are challenging is 99.9 percent

7    likely to be incorrectly registered."

8                Do you have any way of knowing

9    whether 99.9 percent of your challenge list is

10   incorrectly registered?

11         A.    No.  And my data background would

12   never make that kind of statement.  And the

13   statement itself is odd in the way the sentence

14   is written, "True the Vote has assured me that

15   the list."

16               It seems odd that Amy would have

17   written that because Amy was part of the True the

18   Vote team.  That is a distinction that you

19   probably didn't -- well, you didn't ask for, no.

20               But specific to your inquiry about

21   the 99.9, this data is -- data is data.  You

22   shouldn't make assertions like that.

Page 235

1      Q.   And regardless of who wrote it, you

2   don't dispute that Amy sent it, right?

3      A.   I, according to what I'm looking at

4   on the screen, the markings are there to support

5   it.

6           It just does not --

7      Q.   If Amy testified that she sent it,

8   would you have any reason to --

9      A.   No, if Amy testified that she sent

10   it, if she said she sent it, then she sent it.

11      Q.   And if this document was produced by

12   defendants, would you have any reason to doubt

13   that this was sent by defendants?

14      A.   I mean if they said they did this,

15   then they did this.

16           MR. NKWONTA:  Can we go to Page 16

17       of Exhibit 36.  And can you scroll a little

18       bit so we get that full e-mail below from

19       James Cooper.

20           THE VIDEOGRAPHER:  Sorry, guys.  It

21       is just -- stand by.

22           MR. NKWONTA:  Okay.

Page 236

1              THE VIDEOGRAPHER:  And then you said

2       Page 16 of 36?

3              MR. NKWONTA:  Yes, Page 16.

4              THE VIDEOGRAPHER:  Roger that.

5    BY MR. NKWONTA:

6        Q.    And then you see that the e-mail

7    from James Cooper is also on -- in Exhibit 36,

8    and also includes similar language?

9        A.    Yes.

10       Q.    And if you look at the second

11   paragraph, second to the last sentence, there is

12   an additional sentence there that says, "If this

13   very type action" -- I think there is a typo.  I

14   will start again.

15             "If this very type action had been

16   taken back in October, it is very likely Trump

17   would have won Georgia."  Do you see that there?

18       A.    I do.

19       Q.    At the very top, do you see the

20   response from the voter to James Cooper that

21   says, "True the Vote has my permission to use my

22   signature to challenge the illegal votes in Cobb

Page 237

1    County."

2                    Is that right?

3         A.    That is what it says, yes.

4         Q.    You mentioned that the challenges

5    were not technically meant to remove voters from

6    the voter rolls.

7                    But isn't it true that some voters

8    got that impression from the communications that

9    were issued to these voters?

10                   MS. SIEBERT:  Objection.  You are

11        asking her to testify about other people's

12        state of mind.

13                   Catherine, go ahead.

14                   THE WITNESS:  I mean, this is what

15        James Cooper wrote.  It is really all I can

16        say.  It is what somebody else wrote.

17                   MR. NKWONTA:  Could we pull up

18        Exhibit 39, please.

19                       (Exhibit 39 marked for

20                        identification.)

21    BY MR. NKWONTA:

22        Q.    Exhibit 39 is a little bit clearer.

Page 238

1    And you will see at the top of Exhibit 39, James

2    Cooper forwards the e-mail chain below to a

3    number of individuals, including yourself.

4              And you can see that the body of the

5    e-mail below that he forwarded is similar; is

6    that right?

7         A.    Yes.

8         Q.    And in response to James Cooper's

9    e-mail, the perspective challenger responds,

10   "James, Here is my," it is redacted.  I'm

11   assuming it is a registration number.

12             "I give True the Vote permission to

13   use my name and signature in the pursuit of

14   purging the rolls of the deceased, nonexistent

15   and nonresidents of my county."

16             Is that a correct reading of the

17   proposed challenger's response?

18             THE WITNESS:  Can you scroll up a

19        little bit, Joe?  Or down.  Sorry.  Yes.

20             So, that is what you just read and

21        that is what the document says, yes.

22   BY MR. NKWONTA:

Page 239

1      Q.   So, you would agree that that

2  proposed challenger was of the belief that he or

3  she was purging the voter rolls?

4      A.   I -- that is what that statement

5  indicates.

6           MR. NKWONTA:  Can we pull that down

7     and pull up Exhibit 38.

8               (Exhibit 38 marked for

9                identification.)

10 BY MR. NKWONTA:

11     Q.   Exhibit 38 is an e-mail that was

12 also forwarded to you, Ms. Engelbrecht?

13           Do you see that?

14     A.   Yes.

15     Q.   And do you recognize this exhibit?

16     A.   I don't recall this, but --

17     Q.   Do you dispute that you received

18 this e-mail?

19     A.   I mean, all of the indications in

20 this exhibit would suggest that I would have

21 received this e-mail, yes.

22     Q.   And the response to James Cooper's

Page 240

1    e-mail below, the one that he forwarded to you

2    and others states, the voters name is redacted.

3    "Has agreed to be the designated challenger for

4    Jones County and True the Vote has expressed

5    permission to use her attached digital signature

6    for the limited and specific purpose of

7    challenging voter registrations in Jones County."

8              Is that an accurate reading of the

9    proposed challenger's response?

10          A.    That is what it says.

11          Q.    And this e-mail came from the Jones

12   County GOP Chairman, right?

13              MR. NKWONTA:  Could you scroll to

14       the bottom.

15              THE WITNESS:  To James Cooper, yes.

16              MR. NKWONTA:  Could we take that

17       down and pull up Exhibit 40.

18                  (Exhibit 40 marked for

19                   identification.)

20   BY MR. NKWONTA:

21          Q.    Exhibit 40 is another e-mail that

22   was forwarded to a number of folks, including

Page 241

1    yourself.

2                    Do you see that?

3         A.    Yes.

4         Q.    And the response from the proposed

5    challenger or the challenger below says, "True

6    the Vote has my permission to use my name for

7    challenging the voters in my county that I

8    believe voted illegally."

9                    And then the voter provides their

10   address.

11                   Is that a correct reading of that

12   prospective challenger's response?

13        A.    That is a correct reading, yes.

14              MR. NKWONTA:  Could we take that

15       down and pull up Exhibit 37.

16                    (Exhibit 37 marked for

17                     identification.)

18   BY MR. NKWONTA:

19        Q.    Exhibit 37 is another e-mail that

20   James Cooper forwarded to a number of people,

21   including yourself.

22              MR. NKWONTA:  If you scroll down to

Page 242

1    the response from the prospective challenger.

2  BY MR. NKWONTA:

3        Q.    It says, "James, Please find my

4  digital signature and in the body of this e-mail

5  you will find the necessary information you

6  requested.  You and True the Vote have my

7  permission to use my name, digital signature and

8  other necessary information to challenge voter

9  registrations in my County of Dodge."

10            Is that a correct reading of the

11  prospective challenger's response?

12        A.    Yes.

13        Q.    These prospective challengers that

14  are shown, would you agree that they believed

15  they were either purging voters or asserting

16  challenges to purge voters from the rolls or to

17  accuse voters of voting illegally?

18            MS. SIEBERT:  Again, objection to

19      the extent that you are asking her for

20      somebody's state of mind.

21            But, go ahead, Catherine.

22            THE WITNESS:  Yeah, I mean this

Page 243

1          is -- this is between what James sent out and

2          the response.

3                    If those people for whom the, their

4          information has been redacted went on to be

5          associated with, as an elector in their

6          county and work through the True the Vote

7          arrangement, there would have been

8          distinctions throughout.

9                    So at this point I can't state to

10         their state of mind, but this is between

11         James Cooper and people, other people.  So, I

12         don't know.

13    BY MR. NKWONTA:

14         Q.    In their responses, they are

15    expressly providing permission to challenge voter

16    registrations, to challenge illegal voting, or to

17    purge the voter rolls; is that correct?

18         A.    That is what these e-mails, you

19    know, how they read, yes.

20               MR. NKWONTA:  We can pull down

21         Exhibit 37.  I want to ask you a little bit

22         about the data analysis once again.  And I

Page 244

```
 1      want to return to Exhibit 8.

 2                     (Exhibit 8 marked for

 3                      identification.)

 4   BY MR. NKWONTA:

 5          Q.    I guess this is the first time you

 6   are seeing Exhibit 8 in this deposition.

 7                 Ms. Engelbrecht, do you recognize

 8   Exhibit 8?

 9          A.    This is the first time I have seen

10   it.

11          Q.    And you have never seen any analysis

12   of any political party breakdown or racial or

13   demographic breakdown of the challenge lists?

14          A.    No, I have seen that.  I have seen

15   that.

16          Q.    Where did you see that?

17          A.    It was provided when there were

18   comments being made of, you know, as I mentioned

19   earlier of bias being entered in.  And because

20   Georgia uniquely tracks those elements, you can

21   run, you know, the data or an analysis around

22   whether or not that was true or whether or not
```

Page 245

1    the, what the data shows.

2              So, I knew that that had occurred.

3         Q.    Do you know when this analysis was

4    first conducted?

5         A.    The analysis on this exhibit?  Or --

6         Q.    The analysis of the demographic

7    breakdown of the challenge list.

8         A.    I don't know exactly.  It came later

9    as a form of reputation of the assertion that

10   there was -- that that was part of this.

11             But, I don't know the date, no.

12        Q.    True the Vote announced its

13   challenge program on December 18th, 2020; is that

14   correct?

15        A.    I don't recall exactly.  It would

16   have been around then, yes.

17        Q.    And if I told you the date was --

18   the date that had been provided by defendants was

19   December 18th, would you have any reason to

20   dispute that?

21        A.    No real reason to dispute it, no.

22        Q.    And if you look at this file here,

Page 246

1    it says create date, 12/16/2020.

2              Is that what you see there on OPSEC

3    Number 9?

4         A.    Uh-huh, I do see that.

5              MR. NKWONTA:   And if we scroll down

6         to the chart, I just want to make sure that

7         you have a chance to look at the charts in

8         here.

9              If you scroll to Page 18 of this

10        PDF, for instance.

11   BY MR. NKWONTA:

12        Q.    Have you seen this chart before?

13        A.    I don't think that I have, no.

14        Q.    Do you know why OPSEC would have

15   created this chart?

16        A.    I knew that there were, in the

17   TrueNCOA, they have an extension that is part of

18   their platform called TrueAppend that

19   automatically prints these out.

20              So, I read about this in the

21   exhibits.

22              MR. NKWONTA:   Could we go to Page 8.

Fair Fight, Inc. et al. v. True the Vote, et al.     Catherine Engelbrecht 30(b)(6)
Confidential - Pursuant to Protective Order

Page 247

1   BY MR. NKWONTA:

2        Q.    Have you seen this chart or this

3   breakdown before?

4        A.    I don't recall seeing the chart, no.

5        Q.    Have you seen any demographic

6   breakdowns of the challenge list in any other

7   form, maybe not in this chart but in another

8   format?

9        A.    I have seen a sort of a TXT file

10   that had just the very -- the elements,

11   categorical elements contained in the Georgia

12   voter registry that were tracking of

13   identification by race and identification by

14   primary preference.

15             And of course, you know, those are

16   loosely defined by the state because you,

17   Number 1, don't have to indicate that.  And then

18   there are also, you know, undisclosed, undefined.

19             So, but I do remember seeing what

20   appeared to be sort of a text, like a text chunk

21   that include that information.

22             MR. NKWONTA:  Could we pull down

Page 248

1          Exhibit 8 and pull up Exhibit 16.

2                          (Exhibit 16 marked for

3                           identification.)

4     BY MR. NKWONTA:

5          Q.    Ms. Engelbrecht, Exhibit 16 is based

6     as OPSEC 61.  Is this the text file that you are

7     referring to?

8          A.    No, this looks more -- this is sort

9     of a classic dot TXT presentation of the

10    information looks like it would have been that,

11    but it is not that, as I recall.  That looks like

12    more of an Excel or standard spreadsheet format.

13         Q.    Have you seen this breakdown before?

14         A.    I can't attest to the absolute

15    numbers but broadly, something broken down by the

16    race that is tracked inside of the state rolls,

17    yes.

18         Q.    And when was this analysis

19    conducted?

20         A.    I could not tell you except to say

21    that it was post the elector challenge effort or

22    initiative.

Page 249

1          Q.    And would this analysis have been

2     conducted by Gregg Phillips or OPSEC?

3          A.    Yeah, I would believe so, yes.

4          Q.    Would that have been done at True

5     the Vote's direction?

6          A.    I just, I don't recall.  It is -- I

7     don't recall.  It is possible.  I don't recall.

8               MR. NKWONTA:  We can pull this down.

9     BY MR. NKWONTA:

10          Q.    The text file you were referring to,

11     under what circumstances did you have a chance to

12     review that text file?

13          A.    You asked me if I had ever seen

14     anything.  I'm just saying I recall seeing

15     something like that.  And it would have been -- I

16     mean I just from the recesses of my mind I recall

17     seeing it.

18               And in my, in my background in data

19     and technology, I associate the look of something

20     a little bit different than what I just saw.

21               But, I hope that is helpful.

22               MR. NKWONTA:  I would like to turn

Page 250

1      next to the press release, the launch that we

2      have discussed, the December 18th launch of

3      the elector challenges.  Could we pull up

4      Exhibit 62, please.

5                    (Exhibit 62 marked for

6                     identification.)

7                    MR. NKWONTA:  And could we go to the

8      second page, Exhibit 2 or Exhibit 62.

9   BY MR. NKWONTA:

10         Q.    Ms. Engelbrecht, do you recognize

11   Exhibit 62?

12         A.    Yes.

13         Q.    What is it?

14         A.    A post to our website that describes

15   the challenge of, the elector challenge.

16         Q.    The title of the post says, "True

17   the Vote partners with Georgians in Every County

18   to preemptively challenge 364,541 potentially

19   ineligible voters."

20              When you issued this post, had you

21   in fact partnered with Georgians in Every County

22   to preemptively challenge 364,000-plus voters?

Page 251

1        A.    No.  This was just the beginnings of

2    the -- I mean this is the first announcement.  We

3    had people that had come to us, but we were, you

4    know, had already -- we were prepared to,

5    certainly.  But, no.

6        Q.    So, why does it say True the Vote

7    partners with Georgians in Every County to

8    preemptively challenge 364,000 potentially

9    ineligible voters?

10       A.    Partnering in the sense of capable

11   of partnering with, it is the best I can explain.

12       Q.    Would it be fair to say that it is

13   not accurate?

14       A.    No.  I wouldn't, I wouldn't think

15   that is fair.  This is sort of a forward looking

16   statement of the willingness to partner with

17   Georgians in Every County.

18       Q.    And the next paragraph you state,

19   "We are proud to be working alongside patriots

20   across the Peach State, Derek Sommerville of

21   Forsyth County and Mark Davis of Gwinnett County

22   who have been leading citizen efforts to

Page 252

1    highlight issues in Georgia's voter rolls."

2              And you also mention Mark Williams

3    and Ron Johnson and James Cooper.

4              What did you mean by working

5    alongside these individuals?

6         A.    Just that they were also involved

7    in -- in the case of Derek and Mark Davis, they

8    were -- you know, they were working through their

9    own elector challenges.  And in the case of the

10   other gentlemen, you know, the Mark Williams'

11   support with helping to work on the printing and

12   the fact that he had connected the other

13   gentlemen who were, you know, interested in

14   participating.

15             And frankly, it was a comment meant

16   more to show just support for the engagement of

17   citizens.

18        Q.    So, at the time you issued this

19   press release, is it fair to say that you had not

20   submitted 364,541 elector challenges?

21        A.    That is correct.  We did not do

22   that.

Page 253

1          Q.    And at the time you issued this

2    press release is it fair to say that you had not

3    identified challengers in all 159 counties?

4          A.    Yeah, I think that is fair to say,

5    yes.

6          Q.    How many challengers had you

7    identified at the time True the Vote issued this

8    press release?

9          A.    That I do not recall.

10          Q.    Do you know how many counties or how

11    many challenges True the Vote had submitted at

12    the time that it issued this press release or

13    website post?

14          A.    At this point I don't believe that

15    there had been any submitted.  But I do not --

16    let me rephrase that.

17                I do not specifically recall that.

18    I have a general recollection, but I do not

19    specifically recall.

20          Q.    How many challenges did True the

21    Vote end up filing for the, for the runoff

22    election?

1/26/2022                Fair Fight, Inc. et al. v. True the Vote, et al.          Catherine Engelbrecht 30(b)(6)
                            Confidential - Pursuant to Protective Order

Page 254

1          A.     We ended up with electors that

2     wanted to challenge, totaling 65 total counties.

3     And, so submissions were made in those counties

4     on behalf of those electors.

5          Q.     And why didn't True the Vote file

6     challenges in all 159 counties as it stated in

7     the press release?

8               THE WITNESS:  Guys, I just got a

9          password required notice.  Can you all see

10         that on the screen or is it just me?

11              THE VIDEOGRAPHER:  Sorry, Catherine.

12         This is Joe.  That might be on your end.  I'm

13         not sure what it is relating to.

14              THE WITNESS:  It is, it is.  I

15         apologize.  I just Xed out of it and it is

16         gone.  I apologize.

17              THE VIDEOGRAPHER:  Okay.

18              THE WITNESS:  I'm sorry, could you

19         repeat the question?

20     BY MR. NKWONTA:

21          Q.     Sure.

22              MR. NKWONTA:  Can the court reporter

Page 255

1      read back the question, please.

2                    (Whereupon, the record was read by

3      the reporter as requested.)

4                    THE WITNESS:  Again, I think the

5      press release was meant to acknowledge that

6      we had done the analysis to support that.

7      The reason that we didn't ultimately is

8      because it wasn't for us to do.

9                    It was for electors in the, in their

10     respective counties.  And that is just the

11     way the process works.

12   BY MR. NKWONTA:

13        Q.    But True the Vote said it was going

14   to do this in the press release, in the very

15   first line, right?

16        A.    Yeah.  Again, I think that the

17   intent of the line was to suggest that we -- that

18   True the Vote was prepared to do that and do that

19   in every county.

20                   But, you know, we go quickly into

21   the description of an elector challenge.  And it

22   is, you know, the qualifications therein, so that

Page 256

1    is, that is what was -- that is how it was meant

2    to be taken.

3              Q.    So, True the Vote did not actually

4    intend to file challenges in all 159 counties?

5              A.    Oh, no.  We were definitely prepared

6    to do that, but it was up to electors.

7                    I mean the reason the True the Vote

8    exists is to help support citizens who want to

9    engage in their process.  And this is a process

10   in Georgia that is afforded to electors and, you

11   know, that is -- we were ready to do that.

12                   But, the process is that you only

13   work with electors from their specific counties.

14                   MR. NKWONTA:  Can we take a brief

15       five-minute break?

16                   THE VIDEOGRAPHER:  We are now going

17       off the record --

18                   MR. NKWONTA:  Is that okay with you

19       all?

20                   MS. SIEBERT:  Sure.

21                   THE VIDEOGRAPHER:  The time is

22       3:00 p.m.

Page 257

1                    (Recess taken -- 3:00 p.m.)

2                    (After recess -- 3:07 p.m.)

3                    THE VIDEOGRAPHER:  We are now going

4         back on the video record.  The time is

5         3:07 p.m.

6    BY MR. NKWONTA:

7         Q.    Ms. Engelbrecht, we just took a

8    short break.  Do you understand that you are

9    still under oath?

10        A.    Yes.

11        Q.    Has True the Vote ever discussed or

12   considered publishing the list of challenged

13   voters in Georgia?

14        A.    No.

15        Q.    Has True the Vote issued the list of

16   challenged voters to the challengers, for

17   instance, who requested them?

18        A.    Yes.  If an elector asked for the

19   list, given that they had already signed off on

20   our, you know, agreement and terms that this is,

21   you know, to be, to be used for review purposes

22   and so forth.  And, but, yes.

1/26/2022        Fair Fight, Inc. et al. v. True the Vote, et al.        Catherine Engelbrecht 30(b)(6)
Confidential - Pursuant to Protective Order

Page 258

1        Q.    I want to go back to an organization

2    that we discussed earlier in this deposition,

3    Time For A Hero.  That was the organization that

4    you ran with Gregg Phillips; is that right?

5        A.    Uh-huh.

6              MR. NKWONTA:  Could we pull up

7        Exhibit 72.

8                   (Exhibit 72 marked for

9                    identification.)

10   BY MR. NKWONTA:

11       Q.    Do you recognize Exhibit 72?  Is

12   that Time for a Hero's Facebook page?

13       A.    I really don't -- I can't confirm

14   that.

15       Q.    Well, does it say Time For A Hero on

16   that Facebook page?

17       A.    It does, it does say Time For A

18   Hero.

19       Q.    And does Time For A Hero have a

20   Facebook page?

21       A.    I can't confirm that.  I don't know.

22   I never did any of this.

Page 259

```
1          Q.    Who would be able to confirm whether

2    Time For A Hero has a Facebook page?

3          A.    The last person who ran the

4    organization managed all of the social media, so

5    he would be able to.

6          Q.    And who was that person?

7          A.    I couldn't recall his name earlier,

8    but his name is Ty Bathurst.

9          Q.    How do you spell that?

10         A.    T-Y, B-A-T-H-U-R-S-T.

11         Q.    And do you have any reason to doubt

12   that this is Time for a Hero's Facebook page?

13         A.    Well, Time for A Hero is no longer

14   an organization that I am connected with.  I

15   filed their closing tax return a couple years

16   ago.  If this was still there I, I am -- I can't

17   say that I have reason to doubt it, but I

18   can't -- I don't know about it.

19              MR. NKWONTA:  Can we go to Page 19.

20         But before we do, I noticed some sound issues

21         when Ms. Engelbrecht was responding.  I just

22         want to make sure that we were able to
```

Page 260

1     capture the response. If there is anything to

2     resolve.

3             THE REPORTER:  I'm happy to read

4     back the answer if you'd like or do you want

5     her -- do you want me to read back what I

6     have?

7             MR. NKWONTA:  Yes, please.

8             (Whereupon, the record was read by

9     the reporter as requested.)

10  BY MR. NKWONTA:

11      Q.    And you have no reason to doubt that

12  Time For A Hero created a Facebook page?  In fact

13  you acknowledged that Time For A Hero created a

14  Facebook page?

15      A.    I, acknowledge that when the

16  organization was active, we had somebody that was

17  managing, or, you know, overseeing social media.

18             And so, it is not outside of the

19  realm of possibility, but I can't confirm it.

20             I mean I can confirm that I'm

21  looking at a document that says Time For A Hero,

22  but I can't confirm anything past that.

Page 261

1                MR. NKWONTA:  Could we go to Page 19

2        of the Facebook page, of Exhibit 72.

3     BY MR. NKWONTA:

4        Q.    Is that -- is that you in that

5     Facebook post from August 8, 2020?

6        A.    That is me, that is me.

7                MR. NKWONTA:  And could we go to the

8        next post on the following page, Page 20.

9     BY MR. NKWONTA:

10        Q.    It says, "Crusade for Freedom coming

11     soon."

12                What is the Crusade for Freedom?

13        A.    I don't, I don't know.  I don't have

14     any affiliation with Crusade for Freedom.

15                I, I guess that Ty was posting some

16     stuff from True the Vote here just to keep stuff

17     on social media.  I don't know about Crusade for

18     Freedom.

19        Q.    So, he was posting stuff from where?

20        A.    From True the Vote.  But, I don't

21     know about this.

22        Q.    Uh-huh.  Have you heard that phrase

Page 262

1    before?

2          A.    Have I heard the phrase, Crusade for

3    Freedom?

4          Q.    Yes.

5          A.    I don't recall.

6          Q.    Have you seen this symbol before?

7          A.    This --

8          Q.    This diagram, this symbol here, this

9    Crusade for Freedom symbol?

10         A.    Not specific to this.  I feel like I

11   have seen it broadly before.  May I ask, is this

12   current?  Is this currently -- I don't know if I

13   can ask that.

14               But, is this currently on Facebook?

15         Q.    Yes, if you look at the top left

16   corner, you will see the download date.

17         A.    I didn't know if that is when it

18   was.

19         Q.    Yes.

20         A.    Okay.  Well, okay.  Thank you.

21               MR. NKWONTA:  So, we can pull down

22      Exhibit 72.  Could we pull up Exhibit 73.

Page 263

1                    (Exhibit 73 marked for

2                         identification.)

3   BY MR. NKWONTA:

4         Q.    And could we go to the second page.

5               Ms. Engelbrecht, do you recognize

6   that tweet in Exhibit 73, the tweet at the top?

7         A.    No.

8         Q.    The Twitter handle and the name on

9   top of it states Crusade for Freedom, right?

10        A.    Uh-huh.

11        Q.    It is the same -- it is the same

12  slogan that was on the Time For A Hero Facebook

13  page; is that right?

14        A.    Yes.

15        Q.    And that symbol, the logo or the

16  symbol for that Twitter handle, that is the same

17  or similar logo that was on the Time For A Hero

18  Facebook page, correct?

19        A.    Yes.

20        Q.    And the tweet says, "We have just

21  prospectively challenged the eligibility of

22  360,000 voters in Georgia."  Is that right?

Page 264

1          A.    That is what it says, yes.

2          Q.    Are you aware of any other groups

3    that challenged the eligibility of approximately

4    360,000 voters in Georgia during the runoff

5    elections?

6          A.    No.

7          Q.    The hashtag, Eyes on Georgia, that

8    was the same slogan that has appeared on several

9    True the Vote documents, I think including that

10   invoice from OPSEC, correct?

11         A.    Yes.

12         Q.    And then the second hashtag,

13   Validate the Vote Georgia, that was the slogan

14   that was recommended to you by the consultant; is

15   that correct?

16         A.    Yes, yes.

17         Q.    And that tweet was followed up by

18   the one right under it.  It says, "If the Georgia

19   counties refuse to handle the challenges of

20   366,000 ineligible voters in accordance with the

21   law, I plan to release the entire list so America

22   can do the QC."

Page 265

1          Is that a correct reading of the

2  tweet underneath?

3          A.    It is a correct reading of it, yes.

4          Q.    And this tweet also has a Crusade

5  for Freedom Twitter handle name and symbol that

6  appeared on the Time For A Hero page?

7          A.    Yes.

8          Q.    And the hashtags underneath say

9  Validate the Vote Georgia, which is the slogan

10  that is the True the Vote uses, correct?

11          And Eyes on Georgia, which is

12  another slogan that True the Vote uses, correct?

13          A.    During that period, yes, that is

14  correct.

15          Q.    And this tweet was dated

16  December 20, 2020, correct?

17          A.    Correct.

18          Q.    So, moving on from those tweets, I

19  wanted to ask you specifically about the Validate

20  the Vote program.

21          And I wanted to explore that in a

22  little bit more depth.

Page 266

1              MR. NKWONTA:  Could we pull up

2       Exhibit 1, please.  Can we -- is there any

3       way to enlarge that a little bit?

4                   (Exhibit 1 marked for

5                    identification.)

6   BY MR. NKWONTA:

7       Q.    Ms. Engelbrecht, do you recognize

8   this document?

9       A.    Yes.

10      Q.    What is it?

11      A.    This is a one-page document that was

12  asked for by, asked to be provided to a donor who

13  had come to True the Vote and wanted a one-page

14  document to describe some of the activities that

15  we were planning to work through.

16      Q.    And did the donor have any requests

17  or any suggestions for activities that True the

18  Vote should engage in?

19      A.    This donor is connected with the

20  consultant that I mentioned earlier.

21              So, the contribution was to use the

22  name Validate the Vote and to put a one-pager

Page 267

1    together for this donor's use.

2         Q.    And is this, this one pager, is this

3    essentially the framework for the Georgia elector

4    challenge or the activities that occurred in

5    Georgia afterward?

6         A.    I -- no.  This doesn't have any -- I

7    mean, we could look at it.  I would like to look

8    at the whole thing.  But, I don't believe so, no.

9         Q.    So, this document -- let's look at

10   the first sentence underneath which says, "Goal:

11   To ensure the 2020 election returns reflect one

12   vote cast by one eligible voter and therefore

13   protect the right to vote and the integrity of

14   the election."

15            Is that correct?  Does that reflect

16   your understanding?

17        A.    Yes.

18        Q.    And, underneath that, the Problem,

19   it says, "There is significant evidence that

20   there are numerous instances of illegal ballots

21   being cast and counted in the 2020 general

22   election.  Most of these illegal votes are being

Page 268

1    counted in Democratic counties and are

2    suppressing legitimate results."

3              Do you see that first paragraph

4    underneath Problem?

5         A.    I do.

6         Q.    And who wrote that?

7         A.    Pardon me, sorry.  I don't, I don't

8    specifically recall.

9         Q.    But the document came from True the

10   Vote, right?

11        A.    That is correct, yes.

12        Q.    How did True the Vote determine that

13   most of the illegal votes were being counted in

14   Democratic counties?

15        A.    I would not know why that would have

16   been written that way.

17        Q.    This was prepared shortly after the

18   November presidential election, correct?

19        A.    Yes.

20        Q.    Before new results had been

21   published --

22        A.    That's correct.

1/26/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Catherine Engelbrecht 30(b)(6)
Confidential - Pursuant to Protective Order

Page 269

```
 1          Q.    -- or certified I should say; is

 2   that correct?

 3          A.    That is correct.

 4          Q.    And by then True the Vote had

 5   indicated in this Validate the Vote document that

 6   there is significant evidence of illegal ballots,

 7   most of which were being counted in Democratic

 8   counties; is that right?

 9          A.    That is what this says, yes.

10          Q.    The next paragraph starts with,

11   "This is a result of Democrat official's refusal

12   to obey state election laws and counting illegal

13   votes."  Is that --

14          A.    That is what it says, yes.

15          Q.    How did True the Vote reach that

16   conclusion?

17          A.    I, as a -- you know, as a

18   promotional piece, this was, you know, those --

19   that phraseology was used.  I, you know, I don't

20   really have much more to say about that than

21   that.

22          Q.    The next sentence says, "It is also
```

Page 270

1    the result of deliberate election fraud."

2             What evidence did True the Vote have

3    to make that statement?

4        A.    I don't recall.

5        Q.    The next sentence, "The situation

6    has been aided by the Democrat's deliberate

7    effort to radically expand mail-in balloting,

8    creating myriad opportunities for voter fraud

9    that does not exist with in-person voting."

10            Did True the Vote have any evidence

11    to support that statement?

12       A.    That statement in particular I would

13    say yes in that the -- there was an effort to

14    radically expand mail-in balloting or mail-in

15    voting.

16            And it has been documented over time

17    that mail-in balloting, mail-in voting does

18    increase the opportunity for vote fraud or

19    election fraud.

20       Q.    Had True the Vote identified any

21    flood of illegal votes as referenced in that

22    following paragraph?

Page 271

1          A.     This was a promotional piece.  I

2     believe that the third paragraph there was to tie

3     to the one above saying that there was a radical

4     expansion and therefore it would precipitate a

5     flood.

6          Q.     It says, "This flood of illegal

7     votes violates the U.S. Constitution's right to

8     vote," and the sentence continues, "by diluting

9     the votes of legitimate voters."

10               But, had True the Vote identified

11     any flood of illegal votes at this point?

12          A.     No, this was a promotional piece

13     that was written.

14          Q.     And then we get to the plan.  It

15     says, "Solicit whistleblower testimonies for

16     those impacted by or involved in election fraud."

17               Did True the Vote obtain those

18     whistleblower testimonies?

19               MS. SIEBERT:  I'm sorry.  I'm just

20          going to object one more time.  And maybe it

21          is just a point of clarification.

22               Are you limiting these questions to

Page 272

1      the six states, the jurisdictions?

2                  MR. NKWONTA:  I don't believe I have

3      to.  This is specifically about the Validate

4      the Vote program which is -- so this is in --

5      in other words I don't read our deposition

6      notice or the court's order to say every

7      single topic is constrained to these six

8      states.

9                  So, if I ask Ms. Engelbrecht, for

10     instance, what Validate the Vote program

11     means, you can't limit her testimony to six

12     states.

13                 MS. SIEBERT:  Well, the court's

14     order says that "True the Vote shall present

15     a witness that is adequately prepared to

16     answer questions relating to topics listed in

17     the plaintiff's respective 30(b)(6)

18     deposition notice with the following

19     limitations:

20                 "Plaintiff shall limit their

21     questions regarding True the Vote's and OPSEC

22     Group LLC's pre and post-election activities

Page 273

1      to 2012, onward, and the following states:

2      Georgia, Texas, Ohio, Pennsylvania, Michigan,

3      Wisconsin."

4              So, the court specifically stated

5      the topics listed in the 30(b)(6) were to be

6      limited and would include that following

7      limitation.

8              So that is directly part of the

9      court's order.

10             MR. NKWONTA:  I understand your

11     point.  I disagree that we cannot ask her

12     about soliciting whistleblower testimonies

13     unless we say soliciting whistleblower

14     testimonies in a specific state, because we

15     are literally asking to explain a document.

16             So, if -- my question to you is are

17     you instructing her not to answer this

18     question with respect to any state outside of

19     the target jurisdictions that we have

20     identified?

21             MS. SIEBERT:  Yes, I am.

22   BY MR. NKWONTA:

Page 274

```
 1          Q.    Ms. Engelbrecht, are you going to

 2   follow your counsel's instruction?

 3          A.    Yes, I will.

 4          Q.    So, can you answer my question with

 5   respect to the six target states that we

 6   discussed?

 7          A.    Can you repeat the question?

 8          Q.    Sure.

 9                MR. NKWONTA:  Can the court reporter

10       read back the question.

11                (Whereupon, the record was read by

12       the reporter as requested.)

13                THE WITNESS:  We did not obtain any

14       whistleblower testimonies.

15   BY MR. NKWONTA:

16          Q.    The second bullet in the plan says,

17   "Build public momentum through broad publicity."

18                Does that include -- well, why don't

19   you explain to me what type of broad publicity

20   was anticipated.

21          A.    Again, this is the first -- I have

22   seen an orientation of a one-pager like this.
```

Page 275

1    This is the first time I have seen this one-pager

2    with some of this language.

3                So, I can only respond to -- you

4    know, I mean, to repeat back build public

5    momentum through broad publicity.  We didn't do

6    any advertising of any sort.  I had a podcast, I

7    mean that was it.

8          Q.    Would you consider a press

9    release --

10         A.    Oh, I'm so sorry.  Yes, and if we

11   did press releases, that would be considered in

12   that, in that bullet, yes.

13         Q.    The next bullet, "Galvanize

14   Republican legislative support in key states."

15               Why the focus on Republican

16   legislative support?

17         A.    I, I don't know.  I don't know why

18   that was written that way.

19         Q.    The next is, "Aggregate and analyze

20   data to identify patterns of election

21   subversion."  And that task is assigned to OPSEC

22   group.  Do you see that?

Page 276

 1              THE WITNESS:  Can you scroll up, can

 2      you scroll a little bit, Joe?

 3              That would have been going back to

 4      the litigation support for the cases that

 5      were being filed shortly after the election.

 6  BY MR. NKWONTA:

 7      Q.    So, the items that we discussed on

 8  that OPSEC invoice including litigation support,

 9  that was part of the aggregating and analyzing

10  data to identify patterns of election subversion

11  that we see in this document?

12      A.    I mean I would, aggregate and

13  analyze data to identify patterns full stop.

14  But, that would have been part of that, yes.

15      Q.    "File lawsuits in federal court with

16  capacity to be heard by SCOTUS," the Supreme

17  Court of the United States; is that correct?

18      A.    That is what it says, yes.

19      Q.    And is that referring to the

20  lawsuits that were filed in Georgia,

21  Pennsylvania, Michigan, Wisconsin, Arizona?

22              And also it lists the key states

Page 277

1    here below as well, Arizona, Nevada --

2         A.    Uh-huh.

3         Q.    Are those the lawsuits or legal

4    actions that that plan is referring to?

5         A.    Yes.  Those would have been in that

6    timeline of lawsuits.

7         Q.    And then next it goes on to the

8    legal strategy for the Validate the Vote program.

9              And it states that, "Jim Bopp will

10   file federal suits in the seven closest

11   battleground states to investigate voter fraud,

12   expose it and nullify the results of the state's

13   election so that the presidential electors can be

14   selected in a special election or by the state

15   legislature."

16             Why was the goal to nullify the

17   results of the state's election even before the

18   election had been certified?

19        A.    I do not know why this was -- I

20   don't -- that was not the goal.  Let me answer it

21   that way.  That was not the goal.

22             As we discussed earlier the goal was

Page 278

1   to recognize counties that had, that had been

2   caught in the crossfire of unequal application of

3   the election laws and processes.  And that is

4   what we were focused on.

5          Q.    You would agree that that is not

6   what the document says?

7          A.    I would agree that that is not what

8   this document says, yes.

9          Q.    And Step 1 of this legal strategy

10  is, "A federal civil rights lawsuit will be filed

11  in each targeted state.  This will provide the

12  vehicle to serve subpoenas on state election

13  officials to produce critical election data."

14             THE WITNESS:  Could you scroll down

15     more.  Up a little bit more.  Okay.

16             Yes, that is what that says.

17  BY MR. NKWONTA:

18         Q.    And essentially the purpose of this

19  is to have the state's election results

20  overturned.  That is what it appears in this

21  strategy; is that correct?

22         A.    I can say that the thought behind

Page 279

1    the lawsuits that we had -- that were filed was

2    to look at the county-by-county status.  But I

3    mean that is different than what this indicates.

4    But that was, in fact, if you look at the

5    lawsuits what the orientation of the suits were.

6              MR. NKWONTA:  We can pull this

7       document down for now.

8    BY MR. NKWONTA:

9         Q.   Ms. Engelbrecht, you agreed this

10   document was distributed, correct?

11        A.   I agree that the -- I mean the

12   document has the format of a one-pager that we

13   have and has the logo on it.

14             So -- and to the extent that we

15   provided it, it has been, you know, it has been

16   distributed.

17        Q.   You mentioned earlier that you

18   prepared materials for a donor or a funder.

19             Did True the Vote commit to seeking

20   to overturn the results or attempting to overturn

21   the results of the 2020 election to this donor?

22        A.   No.  We committed absolutely nothing

Page 280

1    to the donor except our continued existence, I

2    guess.

3          Q.    Did True the Vote have any contact

4    with the Trump campaign regarding the specific

5    actions that it was taking to try to overturn the

6    results of the 2020 election?

7          A.    I don't think so.  I don't recall.

8    That was a lot of people in and out of the time

9    that I just -- I don't recall.

10         Q.    So it is possible that those

11   communications occurred?

12         A.    I don't think so.  I don't think so.

13   I don't recall any.

14         Q.    Let's talk a little bit about the

15   lawsuits themselves that were referenced in this

16   strategy document.

17              MR. NKWONTA:  I would like to start

18      with the Georgia lawsuit, Exhibit 66.

19                  (Exhibit 66 marked for

20                   identification.)

21   BY MR. NKWONTA:

22         Q.    Do you recognize Exhibit 66?

Page 281

1        A.    I do not know.

2              MR. NKWONTA:  Maybe if we scroll

3     down.

4     BY MR. NKWONTA:

5        Q.    Well, I will represent to you

6     Exhibit 66 was a lawsuit filed in the U.S.

7     District Court for the Southern District of

8     Georgia.  It is file stamped -- it is filed on

9     November 11, 2020.

10             And if we go down to Page 22 of that

11    complaint, you see it is signed by a number of

12    attorneys.  And then it is also signed by

13    Mr. Bopp and Ms. Siebert.  And underneath it says

14    True the Vote, Inc.

15             Was this one of the lawsuits that

16    True the Vote supported in the immediate

17    aftermath of the November election?

18       A.    Yes.

19       Q.    And what was True the Vote's

20    involvement in this lawsuit?

21       A.    We were providing support for the

22    plaintiffs as named, and with the concern both

Page 282

1    in -- well, in Georgia and in our other states

2    that counties were executing election processes

3    without equal application statewide.

4            Q.    And is it your understanding that

5    this lawsuit was filed against a number of

6    counties within the state of Georgia?

7            A.    I don't know if it was with counties

8    or county, specifically.  I mean, we can scroll

9    back up, you know, we will see it for certain.

10                But, I can't tell you without

11   looking at it.

12           Q.    I want to draw your attention to an

13   allegation from this lawsuit in Paragraph 41,

14   which appears on Page 14.  This is still in

15   Exhibit 66.

16                It says, "Just Facts conducted a

17   study using data from the Census Bureau past

18   surveys in which noncitizens admitted they were

19   registered to vote and did in fact vote and other

20   data driven analysis to arrive at an estimate

21   that as many as 73,975 votes were cast for Joe

22   Biden in Georgia by noncitizens."

Page 283

```
 1              Is that a correct reading of

 2    Paragraph 41?

 3         A.    Yes, it is a correct reading.

 4         Q.    And other than that link, did True

 5    the Vote have any evidence to support the

 6    allegation that noncitizens, or as many as

 7    70,000-plus noncitizens, voted for Joe Biden in

 8    Georgia?

 9         A.    I think it was just this link.  No.

10    No.

11         Q.    Are you aware of any analysis or any

12    study that has been done to confirm this or any

13    additional corroborating evidence that has been

14    provided to support this?

15         A.    No.

16         Q.    Do you believe this to be true?

17         A.    I believe that Just Facts wrote that

18    article.  Yes, I would have to look at the

19    underpinnings but I mean that is plausible,

20    certainly.

21         Q.    If we go to the Prayer for Relief,

22    starting on Page 20 and which spills over to
```

Page 284

1    Page 21.

2              Under Paragraph 65, would you agree

3    that that paragraph seeks to invalidate the

4    defendant counties' presidential election

5    results?

6         A.    That is what that communicates, yes.

7         Q.    And just the counties that were

8    named as defendants in this lawsuit, correct?

9         A.    I apologize.  Can you restate the --

10        Q.    Sure.  So, this request to

11   invalidate the results, this request is to

12   invalidate the results of the counties that were

13   named as defendants in this lawsuit; is that

14   right?

15        A.    Well, the -- what it says is in

16   contested counties or in the state overall.

17             So that the -- oh, so that the

18   counties -- yeah, I, I -- that appears to be what

19   it communicates.  I'm not a lawyer, but that

20   appears to be what it communicates.

21        Q.    The Validate the Vote program

22   document that I showed you earlier made reference

Page 285

1    to targeting Democratic counties.

2              Does this complaint carry out that

3    that strategy?

4         A.   I would have to, I guess look at --

5    I mean I would have to run the numbers to see if

6    the counties were leaning in that way.  I

7    don't -- it is certainly not part of my mindset

8    on any of it, so --

9         Q.   Why is True the Vote focused on

10   enjoining the results of the presidential

11   election in this lawsuit -- let me rephrase.

12        A.   Sure.

13        Q.   There were a number of elections

14   that occurred in November, both elections for

15   president -- both for the presidential race and

16   there were a number of other state and federal

17   races on the same ballot.

18              This lawsuit is focused on the

19   presidential election results only.  Why is that?

20        A.   I don't know.

21        Q.   The Validate the Vote program

22   document that we just discussed, Exhibit 1, would

Page 286

1   you agree that was also focused on overturning

2   the results of the presidential election?

3        A.    That was the language on that page,

4   yes.

5              MR. NKWONTA:  Could we take a quick

6        ten-minute recess, I just want to see how

7        much I have left.

8              THE VIDEOGRAPHER:  We are now going

9        off the video record.  The time is 3:49 p.m.

10             (Recess taken -- 3:49 p.m.)

11             (After recess -- 4:00 p.m.)

12             THE VIDEOGRAPHER:  We are now going

13       back on the video record the time is

14       4:00 p.m.

15  BY MR. NKWONTA:

16        Q.    Ms. Engelbrecht, we just took a

17   short break.  You understand you are still under

18   oath?

19        A.    Yes.

20        Q.    So, before we went on break we

21   discussed the Georgia lawsuit that was filed

22   immediately after the November election.

Page 287

1              Did True the Vote also participate

2    in filing a lawsuit in Pennsylvania shortly after

3    the November general election?

4         A.    Yes.

5         Q.    And in that lawsuit True the Vote

6    sued specific counties, correct?

7         A.    I don't recall.

8         Q.    Do you have any reason to dispute

9    that?

10        A.    No.  I mean the briefing will show

11   it.  So, no, it is whatever the briefing says.

12        Q.    And do you dispute that that lawsuit

13   also sought to enjoin certification of the

14   election results in specific counties?

15        A.    If that is what the brief says,

16   then --

17        Q.    Does True the Vote have or did True

18   the Vote submit any evidence to support the

19   allegations of voter fraud in the Pennsylvania

20   lawsuit?

21        A.    There were a number of --

22              I'm sorry, could you repeat the

Page 288

1    question?  I want to make sure I get it right.

2              MR. NKWONTA:  Could the court

3         reporter read the question back, please.

4              (Whereupon, the record was read by

5         the reporter as requested.)

6              THE WITNESS:  I'm aware that there

7         were points added into the filing that

8         supported the concerns around election fraud

9         so that is what I would say.

10   BY MR. NKWONTA:

11        Q.    Beyond what was written in the

12   actual filings, are you aware of any evidence or

13   have any additional evidence to support the

14   claims of voter fraud in the Pennsylvania

15   lawsuit?

16        A.    At the time, what we had was what

17   was put into the file with the -- yeah, that is

18   at the time it was just what was filed.

19        Q.    Did you obtain any additional

20   evidence since then?

21        A.    For the purposes of the lawsuit, no.

22        Q.    I will ask you the same question

Page 289

1    about Michigan.

2              Did True the Vote participate in

3    filing a lawsuit in Michigan shortly after the

4    November election to challenge the election

5    results or to prevent certain counties from

6    certifying the election results?

7         A.    Yes.

8         Q.    And does True the Vote have any

9    evidence, other than what was written in the

10   filings, to support the claims of voter fraud

11   asserted in the Michigan complaint?

12        A.    What was put in the brief was what

13   we had.

14        Q.    And True the Vote hasn't obtained or

15   does not have any additional evidence beyond?

16        A.    None of the suits were dismissed, so

17   no.

18        Q.    I will ask you the same question for

19   Wisconsin.

20              Did True the Vote participate in the

21   filing of a lawsuit in Wisconsin shortly after

22   the November general election?

Page 290

1          A.    Yes.

2          Q.    And does True the Vote have or did

3    True the Vote collect any additional evidence

4    beyond what was written in the complaints to

5    support the allegations of voter fraud in the

6    Wisconsin lawsuit?

7          A.    No.  Not beyond what was in the

8    filing we didn't -- nothing else was done and

9    then the case was dismissed.

10          Q.    And that case -- those cases that I

11    just mentioned, the Georgia case, the Michigan

12    case, the Pennsylvania case, the Wisconsin case,

13    all of those cases were voluntarily dismissed.

14    Is that correct, by the plaintiffs?

15          A.    Yes, or withdrawn.  I'm not certain

16    what the proper term is.  But, yes.

17          Q.    And those lawsuits were voluntarily

18    dismissed without providing any additional

19    evidence or support to the court; is that

20    correct?

21          A.    Correct.

22          Q.    Why were those lawsuits dismissed

Page 291

1    shortly after they were filed?

2         A.    The data that was necessary to be

3    exacting in the support of the filing or in --

4    not support necessarily but in the ongoing filing

5    and the way that the case would naturally sort of

6    unfold, that data was not available.

7              And that specifically would have

8    been the complete record from the state of voters

9    who actually voted in the 2020 election.  And

10   then we had quite a number of other documents

11   that we were requesting, but most specifically it

12   was the final register of who voted in the 2020

13   election which was not available for months.

14             MR. NKWONTA:  I would like to pull

15        up another exhibit.  Exhibit 71 please.  And

16        I would like to go to Page 246 of Exhibit 71.

17                  (Exhibit 71 marked for

18                   identification.)

19             THE VIDEOGRAPHER:  I'm so sorry, I

20        missed that page.  I apologize.

21             MR. NKWONTA:  Sure.  Page 246.

22   BY MR. NKWONTA:

Page 292

1          Q.    Ms. Engelbrecht, do you recognize

2    this document, Page 246 of Exhibit 71?

3          A.    Yes.

4          Q.    What is it?

5          A.    This was an e-mail sent to me by

6    Fred Eshelman -- excuse me.  This is an e-mail

7    sent to, sent by Fred Eshelman to his consultant

8    and copied me.

9          Q.    And was the e-mail directed to you?

10         A.    I'm not sure.

11               THE WITNESS:  Could we scroll down?

12               I don't know.  It could have been

13        either to me or his consultant who he worked

14        very closely with.

15               MR. NKWONTA:  Okay.  Could you

16        scroll backup to the first e-mail.

17    BY MR. NKWONTA:

18         Q.    So first can you tell me who is Fred

19    Eshelman?

20         A.    Fred Eshelman is someone who, on

21    November the 5th, ostensibly at the behest of his

22    two consultants, Tom Crawford being one, called

Page 293

1  True the Vote, first the consultants and then

2  they put Mr. Eshelman on, in the interests of

3  making a donation.

4            And that was the first time I had

5  ever heard of or spoken with any of the three of

6  them, the two consultants or Mr. Eshelman.

7       Q.   In Mr. Eshelman's e-mail, the second

8  sentence says, "However I do want to know what

9  money is accomplishing and where this is headed

10  and the odds of winning."

11           What is he referring to?

12      A.   I, I don't know specifically.  I

13  will say that his consultants, from what I

14  gathered, had other activities going on that were

15  more political that I don't know, I can't speak

16  to.

17      Q.   Was his goal to overturn the results

18  of the election?

19      A.   I don't know what his goal was.

20      Q.   Did he express to you or to anyone

21  at True the Vote that his interest in overturning

22  the results of the election?

Page 294

```
 1              THE VIDEOGRAPHER:  Catherine, this
 2       is Joe.  It is not your -- I don't think it
 3       is your headset.  I'm checking your
 4       bandwidth.  And when it dips low, you cut
 5       out.  I don't think it is anything that you
 6       can control, but if you have a new set of
 7       headphones, we will try that.
 8              Counsel just so everyone knows the
 9       bandwidth is dipping quite low and it is
10       cutting her off.
11              THE WITNESS:  Is this any better?
12              THE VIDEOGRAPHER:  You sound great.
13              THE WITNESS:  Okay.  So the answer
14       is not as far as I know with respect to what
15       he communicated to True the Vote, no.
16              Whatever else they had going on, I
17       don't know.
18  BY MR. NKWONTA:
19       Q.    And if you look below at, there are
20  a couple of references to the likelihood of a
21  favorable outcome.  What is that referring to,
22  what outcome?
```

Page 295

1        A.    I'm going to make sure that I'm

2   tracking with you.  Likelihood of a favorable

3   outcome.

4              I, I don't know.  I would presume

5   this is what he is talking to his consultant

6   about and I'm copied, but I don't specifically

7   know.

8              MR. NKWONTA:  Can we jump to

9       Page 300, please.

10  BY MR. NKWONTA:

11       Q.    Do you recognize the e-mail on

12  Page 300, Ms. Engelbrecht?

13       A.    Yes, yes.

14       Q.    And can you tell me, you know, what

15  is Mr. Eshelman seeking here in this e-mail?

16       A.    He is reaching out to me for

17  information that -- actually let me take another

18  second to read it because it has been a minute

19  since I have seen this.

20       Q.    And actually can I ask that you read

21  the e-mail out loud into the record.

22       A.    Sure. "Catherine, I hope we are all

Page 296

1    fighting hard and spending precious resources on

2    the most important thing for our democracy

3    probably since World War II.  Everyone is full

4    out on this.  Mr. Bopp thinks he has the right

5    track on legal but needs data and communications

6    support.

7              "Dialogue is open with Senator

8    Graham, Hannity, and other senators.  They are

9    not getting ahead of this until they see/verify

10   whistleblowers and see the data.

11             "Tom has got all kinds of comms set

12   up (as we all agreed) but can't go any further

13   without real information.  I am funding this but

14   can't get any real information.  Please, this has

15   to stop for the good of our effort and what we're

16   trying to accomplish for the country.

17             "I am beseeching you to give the

18   data/whistleblower information to Senator Graham,

19   Mr. Bopp, Tom and myself, and then let Tom handle

20   the comms end of it.  We can do this together but

21   not divided.

22             "Thank you for considering my

Page 297

1    assessment and request.  I look forward to the

2    detailed report that has been promised on at

3    least two occasions.  We are trying to support

4    the effort, not compete with you."

5              Q.    And can you explain what he is

6    seeking there?  It appears that he is seeking

7    evidence to support the claims of voter fraud in

8    the 2020 November presidential election; is that

9    correct?

10             A.    I would agree that that is what this

11   indicates.  This was a very unusual situation in

12   which Mr. Eshelman's consultants were the only

13   source of contact I was to have with

14   Mr. Eshelman.

15                   And so when this e-mail came, I was

16   surprised to see some of these details that I had

17   no clue about, making things very awkward.

18             Q.    Were you able to provide or did you

19   provide any evidence in response to this request

20   from him?

21             A.    I don't recall.  Post this

22   communication, very shortly after that he -- we

Page 298

1   parted ways.  So, I don't recall.

2          Q.    And this e-mail was sent on

3   November 15th at 12:43 p.m., right?

4          A.    Yes.

5                MR. NKWONTA:  Can we jump to

6       Page 301.  And let's go to the e-mail below.

7   BY MR. NKWONTA:

8          Q.    And this e-mail appears later in the

9   day November 15th at 4:18 p.m.

10               And can you read Mr. Eshelman's

11  e-mail to you -- first, do you recognize this

12  e-mail as well?

13         A.    Yes.

14         Q.    Can you read Mr. Eshelman's response

15  to you into the record?

16         A.    He writes, "Thank you for your

17  response.  I would like to get on the phone

18  tomorrow and get granularity on whistleblowers

19  and exactly what validated data we have on vote

20  fraud.  Just citing registration data won't get

21  it done as you know.  After we talk may I suggest

22  that we get on the phone with Tom and Jim and

Page 299

1    really sort this out.

2              "I'm not trying to be difficult, but

3    like all the folks who can make this happen, I

4    need details.  Please let me know what is

5    convenient for you tomorrow."

6         Q.    What is Mr. Eshelman seeking

7    granularity on?  Is he referring to evidence of

8    election fraud or voter fraud?

9         A.    It is difficult to know because this

10   was a very unusual situation.  I can only read

11   what he has written here to get granularity on

12   whistleblowers and validated data.

13             But again, with the exception of a

14   very few exchanges of e-mail, all my

15   communication was coordinated through his

16   consultant, and I'm not sure what was being

17   shared or not shared.

18             MR. NKWONTA:  Can we jump to

19       Page 310.

20   BY MR. NKWONTA:

21        Q.    Ms. Engelbrecht, do you recognize

22   Page 310 and the e-mail there that was sent to

Page 300

1    you and others?

2         A.    Yes.

3         Q.    And it appears as a list of topics

4    from upcoming meeting or a list of action items;

5    is that correct?

6         A.    Yes.

7         Q.    So, the first action item, Data

8    Whistleblowers.  Can you read that action item

9    into the record?

10             THE WITNESS:  Please scroll down a

11        bit.

12             This was from Mr. Eshelman.

13        "Data/Whistleblowers.  Specific, detailed,

14        granular report on exactly what data we have

15        and where.  Is it voter/votes data or just

16        registration data?  Have we actually shown

17        fraud anywhere?  Which ones of the nine

18        attributes are we using to screen?

19             "Specific detailed report on exactly

20        who the whistleblowers are, where they are,

21        what real info they have, status of vetting.

22        Reward program being used or advertised -- or

Page 301

1      used/advertised?

2             "Understand that some of this has

3      been shown to Republican AGs and they did not

4      act.  These steps are crucial and rate

5      limiting to other steps/efforts and

6      ultimately the outcome."

7  BY MR. NKWONTA:

8      Q.   Now, the question posed in the third

9  sentence, "Have we actually shown fraud

10 anywhere?"  What was the response to that?

11     A.   I don't recall what the response

12 would have been.  This is, you know, days after

13 this person and his consultants ever, you know,

14 contacted me for the very first time.  So, I

15 don't recall what the answer would have been

16 there at that point.

17     Q.   It was about 11 days after True the

18 Vote filed its lawsuits to overturn election

19 results in a few states.

20            Do you see the date,

21 November 16, 2020?  And at that time what was

22 your response to this, have we actually shown

Page 302

1    fraud anywhere?

2          A.    I don't recall what the response

3    was.

4          Q.    Do you recall providing any

5    evidence?

6          A.    Well, as a practical matter, this

7    e-mail was sent but not, not followed on the

8    call.

9                So, yeah.  I was to report to Tom,

10   his consultant, also the suggester of the name

11   Validate the Vote, and not to have contact with

12   Mr. Eshelman.  And so I don't know what he had

13   been or not provided at the time.

14         Q.    Did you provide anyone with evidence

15   of fraud?

16         A.    Not -- no.  I mean we were just

17   beginning the research.

18         Q.    And there is another reference there

19   at the last line under Data/Whistleblowers.  It

20   says, "Understand that some of this has been

21   shown to Republican AGs and they did not act."

22                Why the focus on Republican AGs?

Page 303

1          A.    I, I don't know.  I don't know if

2     that refers to other activities he had going on

3     with Tom.  I don't know.  Or maybe that he is

4     reacting to the news.  I shouldn't speculate.  I

5     don't know.  I do not know.  That is my answer.

6     I don't know.

7          Q.    If we go to Item Number 3, can you

8     read into the record the action item there under

9     Item Number 3?

10         A.    It says Number 3, "Status of Bopp

11    cases by state, deal with Trump people and

12    details, dates for orders by state, how long to

13    implement.  Who is forensic team deciding bases

14    for tests to prove fraud and present to courts?

15    Strategy still county by county

16    disqualification?"

17         Q.    What does the reference to deal with

18    Trump people and details mean?

19         A.    In this context I -- deal with

20    details -- I don't recall.

21         Q.    Were there any communications or

22    coordinations with the Trump campaign or the

Page 304

1   Trump people relating to this effort?

2          A.   I know that others, you know, were

3   in touch with them.  We were not.

4               So, yeah, I mean, further up in this

5   you can see where there was a comment made that

6   Jim, in his individual capacity, had been on a

7   call, but we were not otherwise engaged in any of

8   that.

9               MR. NKWONTA:  Can we go to Page 314.

10  BY MR. NKWONTA:

11         Q.   Ms. Engelbrecht, do you recognize

12  Page 314?

13         A.   Yes.

14         Q.   What is it?

15         A.   This is an e-mail that I sent to

16  Mr. Eshelman post, post a call that we had.

17         Q.   And this was dated

18  November 16th, 2020?

19         A.   Yes.

20         Q.   Can you read the first paragraph of

21  that e-mail into the record?

22         A.   "Fred, I have attached the budget we

Page 305

1    provided to Tom and Dikran on November 5th.  Our

2    not having full funding was well known and often

3    discussed.  I had written in my 11/14 e-mail to

4    you that it appeared our legal fees would have

5    been covered by the Trump campaign which I

6    described in a statement of our cash position,

7    described as best as possible given the tight

8    timeline with so many moving parts."

9         Q.    What do you mean -- sorry, continue.

10        A.    I didn't know if you wanted me to

11   read the second paragraph.

12        Q.    Sure.

13        A.    Go ahead with your question.

14        Q.    Sure, why don't you read the second

15   paragraph.

16        A.    "We have done a tremendous amount of

17   work in the 11 days since we first met.  Have

18   talked with Tom routinely about status and

19   provided him with access to all comms, press

20   releases and briefings.

21             "Tom and Dikran both asked that I

22   communicate directly through them and indicated

Page 306

1    that the information was being passed to you.

2    Moving forward I will keep you directly apprised

3    of continued developments in the whistleblower

4    situation unless I hear otherwise from you."

5         Q.    Now going back to the first

6    paragraph and the second sentence, what did you

7    mean that it appears that your legal fees would

8    have been covered by the Trump campaign?

9         A.    Initially we had thought that our

10   lawsuits would be, would, you know, be very

11   expensive and cost -- you know, we had a budget

12   anticipated around those lawsuits.

13             This is, this is a -- that is a

14   ham-handed way of saying that the research was --

15   and I don't understand all of the legal

16   maneuverings or how cases come together

17   necessarily.

18             But that our research was possibly

19   going to be used in the move forward of the cases

20   that would have been part of the Trump defense, I

21   guess, or cases.

22             And, what this was attempting to

Page 307

1  communicate was that there would not be any legal

2  fees.

3              So, when Mr. Eshelman was asking

4  about the budget and so forth, I have -- you

5  know, I had written this to say we would not have

6  those expenses if the research was going to be

7  used in a different direction.  That is all that

8  meant.

9         Q.   So it was your belief that the Trump

10 campaign would pay for True the Vote's legal fees

11 to pursue evidence of voter fraud and to pursue

12 the lawsuits that True the Vote had filed?

13        A.   No, it was, this was just not --

14 this was ill worded, but the intent was to say

15 that we would not have legal expenses for these

16 cases.  The cases wouldn't -- we wouldn't be a

17 part of those anymore.

18              That, the, you know, they would

19 be -- we wouldn't have that expense.

20        Q.   Because the phase would be covered

21 by the Trump?

22        A.   Again, it is a ham-handed way to say

1/26/2022                    Fair Fight, Inc. et al. v. True the Vote, et al.        Catherine Engelbrecht 30(b)(6)
                              Confidential - Pursuant to Protective Order

Page 308

1    it, but it was the research that was being done

2    that we were covering the research for, we would

3    no longer be a part of.  If the Trump campaign

4    wanted to use it, they would cover that and we'd

5    be out, so we wouldn't have those expenses.

6         Q.    Why was the Trump campaign

7    interested in covering your fees?

8         A.    Well, it wouldn't be covering our

9    fees.  It would just be -- well, it wouldn't be

10   covering our fees.  It would, we would have not

11   needed to pursue the lawsuits.

12        Q.    And we discussed earlier how the

13   post election effort in Georgia, and when I say

14   post election, I'm referring to post November

15   presidential election, the immediate post

16   election effort in Georgia and the data analysis

17   conducted by OPSEC was combined with the analysis

18   conducted by OPSEC in advance of the, of the

19   elector challenges for the runoff election.

20             Do you recall that?

21        A.    I recall us talking about broadly

22   that in the context of that invoice and what it

Page 309

1    meant, yes.

2                MR. NKWONTA:   Could we jump to

3        Page 797.

4    BY MR. NKWONTA:

5        Q.    Now this is an e-mail between Tom

6    Crawford and Fred Eshelman.  But I wanted you to

7    read the, both paragraphs.

8                They are fairly short.  And I have a

9    couple of follow-up questions about what is going

10   on in that discussion.

11       A.    Sure.  This is from Tom Crawford to

12   Fred Eshelman.

13               "Gregg reached out to Dikran.  He

14   was very upset with Catherine and Bopp.  He said

15   what they conveyed was not the way events had

16   unfolded and he gave clarification.  I will relay

17   when we speak.

18               "He has a plan for something he

19   could help us with in Georgia, keeping the state

20   from doing their mail-out program to the entire

21   state.  It is worth a listen.  He has agreed to

22   speak with us tomorrow without Catherine.  He

Fair Fight, Inc. et al. v. True the Vote, et al.
Confidential - Pursuant to Protective Order

1   also said he supports getting your money back to

2   you.  I think we can get a sense of what really

3   exists if we can get him in the phone alone."

4        Q.    What is that plan that Gregg was

5   referring to?  Is it at all related to the work

6   that he was doing post election on that, that is

7   reflected in that invoice?

8        A.    I don't -- I can't comment on this.

9   I can't comment on whether or not there was even

10   a real call.  I have no clue.  That doesn't even

11   make sense.

12        Q.    The invoice for $400,000, was any of

13   that paid with the funds that you received from

14   Mr. Eshelman?

15        A.    Probably not, because if I recall

16   that was on the 7th.  I don't know.  I don't

17   recall.

18        Q.    So, they are discussing an alternate

19   plan or additional plan in Georgia in November,

20   on November 16th, or at least that is what is

21   referenced in this e-mail.

22        A.    Uh-huh.

Page 311

1        Q.    But you can't say one way or another

2    whether that was related to the Georgia elector

3    challenges or any of the work that Gregg Phillips

4    conducted in Georgia?

5        A.    What I can say is that I have

6    absolutely no knowledge of any plan to keep the

7    state from doing their mail-out program to the

8    entire state.

9              We had no -- True the Vote had no

10   involvement in that, I've never, other than this

11   e-mail.  I -- this was a very strange situation.

12   I don't know anything about that plan.

13              MR. NKWONTA:  Can we jump to

14        Page 799.  And can you scroll to the second

15        e-mail.

16   BY MR. NKWONTA:

17        Q.    So, this is another e-mail between

18   Tom Crawford and Fred Eshelman.  Just for clarity

19   who is Tom Crawford?

20        A.    He is, as I understand it -- I have

21   also never met Tom Crawford.

22              But he is Mr. Eshelman's consultant

Page 312

1    or affiliate of some type.  They worked very

2    closely together.  That is really all I know.

3         Q.    And Fred Eshelman is a donor,

4    correct?

5         A.    Yes.

6         Q.    Can you read the second paragraph --

7    well, the first paragraph says, "Okay.  Let's

8    shoot for 5 to give you time to settle at home.

9    I will try to have things organized by then.  I'm

10   on the fence about speaking to Gregg.  Let me

11   know your thoughts here."

12              I'm assuming that is referring to

13   Gregg Phillips from OPSEC Group.  Can you read

14   the second paragraph into the record?

15        A.    Tom Crawford writes to Fred

16   Eshelman, "I have been looking into Georgia.  We

17   would identify low propensity voters through a

18   few methods -- looking at primary voters over

19   20 years; working from lists like licensed

20   hunters and concealed carry permit holders,

21   veterans and blacks that hit our North Carolina

22   targeting criteria; and, 3, data work to segment

Page 313

1   audiences and targeting based on the above."

2        Q.    This seems to be another discussion

3   about upcoming Georgia work.

4             Do you recognize any of that or is

5   any of that related to the work that you did with

6   Gregg Phillips?

7        A.    Absolutely not, no.  This is a --

8   they are referring to -- Mr. Eshelman comes from

9   North Carolina.  I had a sense from conversations

10  with Tom that they had done things in North

11  Carolina.  But, I don't know.  We didn't do

12  anything with them on any of this.

13            MS. SIEBERT:  I'm sorry.  Sorry to

14     interrupt.  What is the exhibit number here?

15     I missed that.

16            MR. NKWONTA:  71.

17            MS. SIEBERT:  Thank you.

18  BY MR. NKWONTA:

19       Q.    Did Mr. Eshelman fund any of the

20  post-election activities that True the Vote

21  engaged in, in Georgia?

22       A.    No.

Page 314

1          Q.    I would like to turn back to True

2    the Vote's statements about the election and

3    activity and post election activities.

4              MR. NKWONTA:  Can we pull this down

5        and pull up Exhibit 63.

6                   (Exhibit 63 marked for

7                    identification.)

8    BY MR. NKWONTA:

9          Q.    Ms. Engelbrecht, do you recognize

10   Exhibit 63?

11         A.    That was a blog post to our website.

12         Q.    And is that posted on

13   November 10th, 2020?

14         A.    According to this document, yes.

15         Q.    And that would have been

16   approximately a week after the November election?

17         A.    Yes.

18         Q.    And can you read the third paragraph

19   on Page 2 into the record, starting with, "Never

20   in our history".

21         A.    "Never in our history has there been

22   such blatant disregard for election integrity.

Page 315

1    During these pivotal times we refuse to stand on

2    the sidelines.

3                "True the Vote will keep fighting to

4    ensure 2020 election returns reflect the

5    principle of one vote for one voter and to repair

6    our broken elections once and for all."

7          Q.    And following that statement, the

8    release makes reference to the Validate the Vote

9    initiative that True the Vote recently launched;

10   is that correct?

11         A.    Yes.

12         Q.    And that is the same initiative we

13   discussed in Exhibit 1, correct?

14         A.    Yes.  Well, I'm not sure what

15   Exhibit 1 was any longer, but we have discussed

16   that, yes.

17         Q.    But that Validate the Vote document,

18   right?

19         A.    I know the name is the same, yes.

20         Q.    So, True the Vote announces that it

21   is launching this initiative that was described

22   in Exhibit 1, and announces a whistleblower fund

Page 316

1    in excess of $1 million.  Is that correct?

2         A.    Yes.

3         Q.    And was the purpose of that million

4    dollars to reward people that came forward with

5    evidence of voter fraud?

6         A.    The fund was to -- or the idea of

7    the fund was to support people that would come

8    forward, as we discussed previously, to have

9    funds available should they be necessary for

10   their legal support.

11             Also through this we were funding

12   the state election or county election lawsuits.

13        Q.    Did you present any of the evidence

14   that you obtained through this initiative to any

15   of the courts or to -- or to Mr. Eshelman?

16        A.    I don't recall.  I talked to his

17   consultants daily.  I don't recall anything in

18   specific.

19        Q.    Did True the Vote obtain any

20   evidence of -- any credible evidence of criminal

21   malfeasance as referenced in this press release

22   after announcing this initiative?

Page 317

1          A.    We did have some reports that we

2     considered credible.

3          Q.    And did you submit those reports to

4     anyone?

5          A.    Yes.  They have been submitted.

6          Q.    Where did you submit those reports?

7          A.    There are active investigations in

8     Georgia and in Arizona, and I guess, those are

9     the two active states.

10         Q.    What was the criminal malfeasance or

11    misconduct identified in those reports or alleged

12    in those reports?

13         A.    I don't -- I mean those are active

14    investigations and our approach to this point has

15    been that we don't comment on active

16    investigations.

17         Q.    So, you are not willing to disclose

18    or identify the nature of any of the reports of

19    fraud or evidence of fraud that you received?

20              THE WITNESS:  May I consult with

21        counsel and just make sure I am answering the

22        question properly?  I just want to make sure

Page 318

1     I'm being respectful of all of the

2     considerations here.

3          MS. SIEBERT:  Um, okay.  I'm sorry.

4     I'm coming in -- I came in halfway through

5     this deposition and so I'm a little bit

6     behind the eight ball as far as what has been

7     testified to or not, regarding that before

8     and the objections made.

9          MR. NKWONTA:  I can give you a quick

10    playback of where this is coming from.

11         MS. SIEBERT:  Thank you, yes.

12         MR. NKWONTA:  So, Jim and I had

13    several discussions about consulting with the

14    witness regarding a pending question.  And I

15    objected on numerous occasions that it was

16    improper to consult with the witness on a

17    pending question, and I think that is

18    probably where some of this is coming from.

19         But, I will caveat and say if the

20    witness is consulting for the purpose of

21    determining whether privilege applies, then

22    you know, I for this, you know, one instance

Page 319

1       I will not object.

2               I did have a continuous and

3       consistent objection to every time they

4       consulted and I believe that is sort of what

5       is driving this here.

6               MS. SIEBERT:  Okay.

7               MR. NKWONTA:  If you want to consult

8       with the witness to determine whether there

9       is a privilege there to assert, I will not

10      prevent that.

11              MS. SIEBERT:  Give me one moment.  I

12      will consult and we will limit to that topic.

13              MR. NKWONTA:  Thank you.

14              THE VIDEOGRAPHER:  Do you want to go

15      off the record?

16              MR. NKWONTA:  Yes, let's go off the

17      record but let's also mark where they stopped

18      to consult.

19              (Whereupon the witness consulted

20      with counsel.)

21              THE VIDEOGRAPHER:  Yes, sir.  We are

22      now going off the video record.  The time is

Page 320

1      4:46 p.m.

2                  (Recess taken -- 4:46 p.m.)

3                  (After recess -- 4:49 p.m.)

4                  THE VIDEOGRAPHER:  We are now going

5      back on the video record.  The time is

6      4:49 p.m.

7                  MS. SIEBERT:  Thank you.  Okay.  As

8      to your last line of questioning, counsel, we

9      are not objecting as to privilege.

10                 I am objecting as to the 30 -- the

11     scope of the court's order and the 30(b)(6)

12     subject matters, not only limited to those

13     jurisdictions but limited to time frame and

14     so forth.

15                 It would make no sense to testify

16     regarding things that happened post, after

17     this lawsuit was filed, as that wouldn't be

18     relevant to defenses or claims asserted in

19     this lawsuit and would not be logically part

20     of the court's order.

21  BY MR. NKWONTA:

22     Q.   Ms. Engelbrecht, you can interpret

Page 321

1    my question to be limited to the jurisdictions

2    identified in the 30(b)(6) notice for True the

3    Vote.

4              And you may answer.  And you can

5    also interpret my question to be limited to

6    evidence obtained before this lawsuit was filed.

7              MS. SIEBERT:  Thank you for that

8        clarification.

9              MR. NKWONTA:  Can the court reporter

10       read back the last question before we went --

11       before we went off the record.

12             (Whereupon, the record was read by

13       the reporter as requested.)

14             THE WITNESS:  Shall I answer?  We

15       have reported to the State of Georgia.  We

16       have filed three complaints about

17       observations and concerns that we have

18       witnessed.

19             But that is the extent of it as we

20       have filed these complaints that are now

21       under active investigation.

22   BY MR. NKWONTA:

Page 322

1          Q.   Are you willing to disclose what

2     those concerns are or what the subject of those

3     complaints are?

4               MS. SIEBERT:  Again, I just want to

5          clarify my objection as far as scope and

6          timeline and limited to the states in

7          question.

8               Is that correct, are we still under

9          that understanding?

10               MR. NKWONTA:  Yes.

11               MS. SIEBERT:  Okay.

12               THE WITNESS:  Okay.  So, to that end

13          I would say that what we -- the basis of our

14          filings were regarding things that, and

15          information post the filing of this lawsuit.

16               MR. NKWONTA:  I would like to turn

17          your attention to Exhibit 47.

18                    (Exhibit 47 marked for

19                     identification.)

20     BY MR. NKWONTA:

21          Q.   This is an article published by Jim

22     Hoft from the Gateway Pundit.  Can you read the

Page 323

1     title of this article?

2          A.    "It's now clear:  Trump will win the

3     election -- Democrats will steal -- True the Vote

4     offers essential tips on what you can do to stop

5     the steal."

6          Q.    Do you recall offering comments or

7     insight on this issue for this article?

8          A.    I do not recall.

9               MR. NKWONTA:  Can you scroll down to

10        Page 2 and to the highlighted paragraph on

11        Page 2 -- or sorry, the paragraph right --

12        third paragraph from the bottom, starting

13        with, "Tonight."

14    BY MR. NKWONTA:

15         Q.    So the article says, "Tonight the

16    Gateway Pundit reached out to Catherine

17    Engelbrecht at True the Vote to offer tips to

18    ordinary Americans to prevent the Democrat plan

19    to steal the election in 2020.  Catherine

20    Engelbrecht wrote back with these essential

21    tips."

22               Do you dispute this characterization

Page 324

1   or this statement from this article?

2          A.    No, it is entirely possible that he

3   called me.

4          Q.    And it is possible that you

5   responded with essential tips?

6          A.    And it is possible that I responded,

7   yes.

8              MR. NKWONTA:  Could we pull up

9      Exhibit 44.

10                 (Exhibit 44 marked for

11                    identification.)

12   BY MR. NKWONTA:

13         Q.    Ms. Engelbrecht, have you stated

14   publicly or elsewhere before that some counties'

15   ballots are counted in Spain?

16         A.    I don't recall.  I'm generally aware

17   of the ballot counting software platforms that

18   are multinational.  But I don't, I don't -- I

19   have never seen this document before and I'm not

20   certain what it might contain.

21         Q.    Have you expressed a view before

22   that some states have their votes counted in

Page 325

1   Spain?

2          A.    I don't recall.

3          Q.    Do you have any reason to dispute

4   this quote in this Brightbart article?

5          A.    I have no context around it.  I'm

6   aware of softwares that are used by states that

7   have, as a practical matter of their structure,

8   server ports in Spain.  That is the extent of

9   what I do know is true, but that is not at all

10  uncommon in software.

11              So, I don't know what this -- you

12  know, what else may be here.  I don't know.

13              MR. NKWONTA:  Can you scroll down to

14      Page 3.

15  BY MR. NKWONTA:

16          Q.    And Page 3 of this article quotes

17  you.  Can you read that quote into the record?

18          A.    "There is a tabulation company

19  called Sidel that does" --, jeez, spelling.

20              "There is a tabulation company

21  called Sidel that does have Cloud, I guess,

22  cold-based servers in Barcelona.  And yes, it is

Page 326

1  true that the tabulation of votes occurs in that

2  way in many states that could use that system."

3          Q.    Is that an accurate quote?

4          A.    There is a tabulation company called

5  Sidel that has cloud-based servers in Barcelona,

6  yes, that is true.

7          Q.    And is it your view, based on that

8  that, that some states have their ballots counted

9  in Spain?

10         A.    I think that that is a leap to a

11  conclusion, but it is certainly true that if you

12  are using a company that has cloud-based servers

13  in Spain, and that is in Barcelona, that is a

14  part of a process that may or may not impact the

15  vote count.  But it is part of a process

16  nonetheless.

17         Q.    Briefly I want to return back to the

18  voter challenges.

19               Are you familiar or aware of any

20  challengers who withdrew or asked to withdraw

21  their challenges during the, during the --

22         A.    Yes, I am familiar with one, yes.

Page 327

1    Sorry, sorry.

2         Q.    And who is that challenger that

3    asked to withdraw their challenge?

4         A.    I don't recall his name.

5         Q.    Was it Joe Martin?

6         A.    That does sound familiar, yes.  That

7    sounds correct.

8         Q.    And do you recall why Joe Martin

9    chose to withdraw his challenge?

10        A.    My general recollection is that in

11   looking at names on a challenger list he

12   identified that a couple of them were at long --

13   were residents at long-term care facilities.

14              And he didn't -- for that purpose he

15   didn't want to move forward.  And he notified

16   Amy.  And we notified -- as I understand it, we

17   notified the county.  And that was -- that is the

18   end of it as far as I know or as far as I recall.

19        Q.    And did you determine or make any

20   efforts to determine whether those voters were

21   properly included in the challenge list?

22        A.    We didn't submit the challenge list

Page 328

1  after he declined to participate.  We, on his

2  behalf, just rescinded the challenges, as I

3  recall.

4          Q.    So you submitted the challenges, but

5  then withdrew them after Mr. Martin requested

6  that they be withdrawn; is that correct?

7          A.    I believe that that is correct.  I

8  am not certain, but I believe that that is

9  correct.

10         Q.    Were there any other challengers who

11  requested that their challenges be withdrawn?

12         A.    None that I am aware of or that I

13  recall.

14         Q.    And you submitted, at some point in

15  this case, a True the Vote and other defendants

16  submitted a counterclaim or asserted a

17  counterclaim for voter intimidation.

18               And can you explain -- can you

19  explain what caused that intimidation?

20               MS. SIEBERT:  I'm going to object to

21      that.  That counterclaim has been completely

22      dismissed and it is no longer relevant or a

Fair Fight, Inc. et al. v. True the Vote, et al.
Confidential - Pursuant to Protective Order

Page 329

1     part of this complaint.

2             The court has already dismissed

3     those claims.  It wouldn't be relevant to any

4     claim or defense in this case.

5   BY MR. NKWONTA:

6         Q.    You may answer, Ms. Engelbrecht.

7         A.    I will just take advice of counsel

8   on that.

9             MS. SIEBERT:  Catherine, you can go

10    ahead and answer.  I'm sorry.  I didn't make

11    that clear.  You can go ahead and answer but

12    that is our objection.

13            THE WITNESS:  Okay.  I'm so sorry.

14    I just want to make -- can you repeat the

15    question again.  I want to make sure I'm

16    framing it properly in my mind.

17  BY MR. NKWONTA:

18        Q.    Sure.  And I will narrow the

19  question a little bit.

20            In what way were -- was True the

21  Vote and perhaps yourself as well intimidated by

22  these legal proceedings?

1/26/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Catherine Engelbrecht 30(b)(6)
Confidential - Pursuant to Protective Order

Page 330

1          A.    Well, True the Vote, you know,

2    received e-mails and calls particularly to the

3    election hotline that were, you know, unkind.

4               But that was really not the

5    intimidation.  The intimidation that I was most

6    troubled by was that suffered by the electors who

7    participated, and as a consequence of that had

8    their, there were docs online, had businesses

9    targeted, had threats sent to them in e-mail and

10   calls, you know, to their businesses.

11          Q.    And so you've told me about the

12   electors.

13              And in talking about True the Vote

14   and yourself specifically, were you intimidated

15   by the legal proceedings or by the allegations in

16   the lawsuit?

17              MS. SIEBERT:  Same objections.  I

18       will just make a continuing objection based

19       upon the same -- for this entire line of

20       questioning as earlier.

21              THE WITNESS:  Yeah, was I

22       intimidated by the lawsuit?  No.  I mean, I'm

Page 331

1     just concerned about what was happening to

2     the volunteers.

3              MR. NKWONTA:  And can we take a

4     quick five-minute break.  I think I am just

5     about done.  I just want to make sure that we

6     have covered everything.

7              THE VIDEOGRAPHER:  We are now going

8     off the video record.  The time is 5:04 p.m.

9              (Recess taken -- 5:04 p.m.)

10             (After recess -- 5:09 p.m.)

11             THE VIDEOGRAPHER:  We are now going

12    back on the video record.  The time is

13    5:09 p.m.

14  BY MR. NKWONTA:

15       Q.   Ms. Engelbrecht, we just took a

16  short break.  Do you understand you are still

17  under oath?

18       A.   Yes.

19       Q.   I just have a couple of quick

20  questions remaining.

21             First, can you explain to me the

22  term or have you heard of the term the Photo

Page 332

1    Ernesto Program?

2         A.    Yes.

3         Q.    What is the Photo Ernesto

4    Initiative?

5         A.    That was an initiative we had, True

6    the Vote had for a brief period of time, maybe, I

7    don't recall the years, 2012/2013, somewhere in

8    there.

9              And, it was led by someone.  And her

10   point and focus in the initiative was to --

11   basically everything we did was translated into

12   Spanish and focused on working in Latino

13   communities in that regard.

14              And it was -- and the spokesperson

15   for that was Latina and, you know, was very

16   active in that community and speaking Spanish

17   fluently so it was useful for those folks.

18        Q.    What exactly was True the Vote doing

19   in those Latino communities?

20        A.    Everything from helping to do

21   training for voter registration guides,

22   clarifying on voter registration intake or how to

Page 333

1    fill out voter registration applications.

2              And speaking to the spokesperson

3    that was a part of the initiative, speaking to

4    groups that were oriented towards Latino

5    interests.  It was just an outreach program,

6    short lived.

7         Q.   Did it also involve efforts to

8    prevent voter fraud?

9         A.   I can't recall anything specifically

10   other than just broadly True the Vote's program,

11   and recognizing accuracy and data and working in

12   election -- another aspect of this encouraging

13   the participation of bilingual poll workers, poll

14   watchers, that kind of thing.

15        Q.   And I want to return to the Validate

16   the Vote document.  I recall that you mentioned

17   that you hadn't seen that document before.

18              MR. NKWONTA:  Can we pull up

19        Exhibit 1 A.

20              (Exhibit 1A marked for

21               identification.)

22              MR. NKWONTA:  And can you scroll

Page 334

1     down to the second e-mail or expand -- sorry.

2     Can you scroll back to the first page and

3     expand so we can see the second -- great.

4  BY MR. NKWONTA:

5          Q.    Do you recognize that e-mail,

6  Ms. Engelbrecht?  It looks like it is coming from

7  your e-mail account to Dikran at Storylift dot

8  com?

9          A.    Yes.

10         Q.    And underneath that e-mail address

11  it says, "Please see attached overview of plan.

12  True the Vote funding information is also

13  attached."  Do you see that?

14         A.    Yes.

15             MR. NKWONTA:  And if we scroll down.

16     Let me see attachments next.  Can we scroll

17     down a little bit.  Sorry, the other way.

18             Next page.  Then you will see the,

19     some attachments there.  And can you scroll

20     to the next page, which is followed by this

21     Validate the Vote document.

22  BY MR. NKWONTA:

Page 335

1          Q.    So, it looks like this was attached

2     to the e-mail that you sent.  Is that correct?

3          A.    This is the format that I am

4     familiar with around what we call Validate the

5     Vote.

6                I just, I don't remember some of

7     these words.  But, you know, I just don't

8     remember some of this approach, these, the way

9     that this is being -- the way that this is

10    worded.

11               But, it -- you know, this is -- if

12    this is what was provided, then this is what was

13    provided.

14         Q.    Do you dispute that it was attached

15    to an e-mail that you sent or it appears to be

16    attached to an e-mail that you sent on

17    November 5th?

18         A.    Well, there are -- I am familiar

19    with another version that does not have this

20    language.  And I am familiar with that version.

21    I just, I just cannot recall this version of it.

22    Not -- I mean, that is all I can say.

Page 336

1         Q.    Your e-mail address is Catherine at

2    True the Vote dot org, correct?

3         A.    Yes.

4         Q.    So you don't dispute that this came

5    from your e-mail?

6         A.    Or that an attachment called

7    Validate the Vote or whatever it was, Validate

8    the Vote 2020, I -- some of this language is not

9    anything I, I recall, the best I can say.

10              This is not a typical.

11        Q.    I guess my question is, you don't

12   dispute that this was attached to an e-mail that

13   you sent, correct?

14        A.    I, I don't dispute that there was an

15   attachment called Validate the Vote or Validate

16   the Vote 2020.

17              Whether or not this document is in

18   fact that attachment, I'm just not -- I'm not

19   sure.  I just can't confirm that.

20        Q.    And you don't dispute sending a plan

21   of some sort to Mr. Eshelman, correct?

22        A.    I definitely did send a plan that

Page 337

1    they requested.  So, I definitely recall that.

2          Q.    And do you recall providing a budget

3    for that effort?

4          A.    I recall that there were budget

5    numbers included along that right-hand column of

6    the document that I provided.

7          Q.    And is there any reason why this

8    document was not produced in response to our

9    discovery requests?

10         A.    Not that I am -- no, not that I'm

11   aware of.

12               MR. NKWONTA:  That is all of the

13      questions I have for you at the moment,

14      Ms. Engelbrecht.  Thank you for your time.

15               THE WITNESS:  Thanks very much.

16               MS. SIEBERT:  Okay.  I just have a

17      couple of follow-up questions.

18                       EXAMINATION

19   BY MS. SIEBERT:

20         Q.    Ms. Engelbrecht, do you recall

21   testifying regarding the Time for a Hero

22   Facebook, that line of questioning?

Page 338

1          A.    Yes.

2          Q.    And do you recall that on the --

3    that you testified that on the Time for a Hero

4    Facebook page, apparently they had shared or that

5    Facebook page had posted a video from True the

6    Vote.  Do you recall that?

7          A.    Yes.

8          Q.    Okay.  Did you control who from Time

9    for a Hero could share that video on your

10   Facebook page?

11         A.    No.

12         Q.    Okay.  Do you recall that later on

13   that Facebook page, counsel showed you a post

14   that appeared to be from somebody -- or an

15   account called Crusade for Freedom?

16         A.    Yes.

17         Q.    Okay.  Does True the Vote or do you

18   personally have any association with Crusade for

19   Freedom?

20         A.    No.

21         Q.    Do you recall later in testimony,

22   counsel asked you regarding some tweets that were

Page 339

```
1    apparently sent by an account called Crusade for

2    Freedom?

3              Can you answer verbally?  I'm sorry.

4         A.   I'm sorry.  Yes, yes, yes, yes.

5         Q.   And do you recall that that Crusade

6    for Freedom Twitter account appeared to have the

7    same logo as the Crusade for Freedom account that

8    was on the Time for a Hero Facebook page?

9         A.   Yes.

10        Q.   Okay.  And do you recall testifying

11   or seeing that that, the tweets used hashtags

12   Eyes on Georgia and Validate the Vote Georgia?

13        A.   Yes.

14        Q.   The Crusade for Freedom tweets?

15        A.   Yes.

16        Q.   Do you have any control over who can

17   post something on Twitter using those hashtags?

18        A.   No.

19        Q.   Okay.  Do you recall testimony

20   regarding the, I believe it is the December 14th

21   press release that True the Vote put out that

22   discussed the effort in Georgia for, related to
```

Page 340

1     the runoff election challenges?

2          A.    Yes.

3          Q.    Do you recall that press release?

4     Okay.

5               Was part of the purpose of the press

6     release to assist True the Vote in recruiting

7     potential volunteer challengers?

8          A.    I think that is, recruiting or just

9     making aware that it was an opportunity for

10    citizens to participate in.

11         Q.    Okay.  All right.  There was a line

12    of questioning that counsel asked you, a whole

13    line of questioning regarding the target -- the

14    states that are listed in the court's order

15    regarding the November 2020 -- the litigation

16    following the November 2020 election that True

17    the Vote was involved in.

18              Do you recall that, those lines of

19    questioning?

20         A.    Uh-huh.

21         Q.    Okay.  And do you recall testifying

22    that those suits were voluntarily dismissed?

Page 341

1        A.    Yes.

2        Q.    Okay.  Do you recall testifying that

3    the data from the voter rolls that would have

4    been relevant to that litigation would not have

5    been available for months and that was one of the

6    reasons why those suits were dismissed?

7        A.    Yes, yes.

8        Q.    Okay.  Would that data, had it been

9    produced in that time frame, quickly after the

10   election, would that data have been the type of

11   data that would have been critical for True the

12   Vote to assess, to determine whether there was

13   evidence of election fraud that could be further

14   substantiated?

15             MR. NKWONTA:  Objection, calls for

16        speculation.

17             MS. SIEBERT:  I'm sorry?

18             MR. NKWONTA:  Objection, calls for

19        speculation.

20             THE WITNESS:  I still answer,

21        correct?

22   BY MS. SIEBERT:

Page 342

1          Q.    Let me rephrase.  Based upon your

2    experience and knowledge of election data

3    analysis, would the type of data that would

4    have -- that partially would have been sought by

5    those lawsuits, i.e. the voter rolls, the voter

6    records that you testified to earlier.

7                Based upon your experience in this

8    election data space, would that type of data have

9    been critical and used to assess whether there

10   was further evidence of election fraud?

11         A.    Yes.

12               MR. NKWONTA:  Objection, calls for

13      speculation.

14   BY MS. SIEBERT:

15         Q.    Was it ever True the Vote's intent

16   for -- I'm speaking now for the Georgia

17   challengers for the runoff election.

18               Was it ever True the Vote's intent

19   to -- through those helping with those challenges

20   or working with people to submit those

21   challenges, to have people removed from the voter

22   registration rolls in Georgia?

Page 343

1          A.    No.

2          Q.    Was the purpose of those challenges

3   ever to prevent somebody who was legally allowed

4   to vote in Georgia from doing so?

5          A.    No.  No.

6               MS. SIEBERT:  I think that is all I

7      have.

8               THE VIDEOGRAPHER:  Any redirect.

9               MR. NKWONTA:  Nothing further.

10              THE VIDEOGRAPHER:  Okay.  With that

11      we are now ending the deposition.  The time

12      on record is 5:25 p.m.

13      (Whereupon, signature not having been waived,

14   the deposition suspended at 5:25 p.m.)

15                        *   *   *

16

17

18

19

20

21

22

Page 344

```
 1              CERTIFICATE OF COURT REPORTER
 2           I, LORI J. GOODIN, RPR, CLR, CRR,
    CA CSR # 13959, the reporter before whom the
 3  foregoing deposition was taken, do hereby certify
    that the witness whose testimony appears in the
 4  foregoing deposition was sworn by me; that the
    testimony of said witness was taken by me in
 5  machine shorthand and thereafter transcribed by
    computer-aided transcription; that said
 6  deposition is a true record of the testimony
    given by said witness; that I am neither counsel
 7  for, related to, nor employed by any of the
    parties to the action in which this deposition was
 8  taken; and, further, that I am not a relative or
    employee of any attorney or counsel employed by
 9  the parties hereto, or financially or otherwise
    interested in the outcome of this action.
10
11
12  _____
13  LORI J. GOODIN, RPR, CLR, CRR
14  Notary Public in and for:
15  STATE OF FLORIDA, COUNTY OF SARASOTA
    Notary Commission Number:  GG987804
16  My Commission expires:  May 12, 2024
    STATE OF CALIFORNIA, CA CSR# 13959
17  My Commission expires:  February 22, 2023
    STATE OF MARYLAND, COUNTY OF ANNE ARUNDEL
18  My Commission expires:  August 2, 2025
    DISTRICT OF COLUMBIA, WASHINGTON DC
19  My Commission expires:  May 31, 2026
    COMMONWEALTH OF VIRGINIA, COUNTY OF FAIRFAX
20  My Commission expires:  February 28, 2022
    STATE OF DELAWARE:  COUNTY OF KENT
21  My Commission expires:  October 9, 2023
22  STATE OF PENNSYLVANIA, COUNTY OF LEHIGH
```

Case 2:20-cv-00302-SCJ   Document 168-1   Filed 05/17/22   Page 345 of 347

1/26/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Catherine Engelbrecht 30(b)(6)
Confidential - Pursuant to Protective Order

Page 345

1        Catherine Engelbrecht 30(b)(6), c/o

         THE BOPP LAW FIRM

2        1 South Sixth Street

         Terre Haute, Indiana  47807-3510

3

4        Case: Fair Fight, Inc. et al. v. True the Vote, et al.

         Date of deposition: January 26, 2022

5        Deponent: Catherine Engelbrecht 30(b)(6)

6

7        Please be advised that the transcript in the above

8        referenced matter is now complete and ready for signature.

9        The deponent may come to this office to sign the transcript,

10       a copy may be purchased for the witness to review and sign,

11       or the deponent and/or counsel may waive the option of

12       signing. Please advise us of the option selected.

13       Please forward the errata sheet and the original signed

14       signature page to counsel noticing the deposition, noting the

15       applicable time period allowed for such by the governing

         Rules of Procedure. If you have any questions, please do

16       not hesitate to call our office at (202)-232-0646.

17

18

19       Sincerely,

         Digital Evidence Group

20       Copyright 2022 Digital Evidence Group

21       Copying is forbidden, including electronically, absent

22       express written consent.

Page 346

1        Digital Evidence Group, L.L.C.

         1730 M Street, NW, Suite 812

2        Washington, D.C. 20036

         (202) 232-0646

3

4        SIGNATURE PAGE

         Case: Fair Fight, Inc. et al. v. True the Vote, et al.

5        Witness Name: Catherine Engelbrecht 30(b)(6)

         Deposition Date: January 26, 2022

6

7        I do hereby acknowledge that I have read

         and examined the foregoing pages

8        of the transcript of my deposition and that:

9

10       (Check appropriate box):

         (  ) The same is a true, correct and

11       complete transcription of the answers given by

         me to the questions therein recorded.

12       (  ) Except for the changes noted in the

         attached Errata Sheet, the same is a true,

13       correct and complete transcription of the

         answers given by me to the questions therein

14       recorded.

15

16

17

18       _____          _____

19        DATE                    WITNESS SIGNATURE

20

21       _____          _____

22        DATE                         NOTARY

Page 347

1      Digital Evidence Group, LLC

2      1730 M Street, NW, Suite 812

3      Washington, D.C.  20036

4      (202)232-0646

5

6                          ERRATA SHEET

7

8      Case: Fair Fight, Inc. et al. v. True the Vote, et al.

9      Witness Name: Catherine Engelbrecht 30(b)(6)

10     Deposition Date: January 26, 2022

11     Page No.    Line No.     Change

12

13

14

15

16

17

18

19

20

21     _____        _____

22     Signature                           Date