Case 2:20-cv-00302-SCJ   Document 171-1   Filed 05/24/22   Page 1 of 62

1/25/2022         Fair Fight, Inc. et al. v. True the Vote, et al.         Gregg Phillips

UNITED STATES DISTRICT COURT FOR THE

NORTHERN DISTRICT OF GEORGIA

GAINESVILLE DIVISION

--------------------------------X

FAIR FIGHT, INC., SCOTT BERSON,   :

JOCELYN HEREDIA, AND JANE DOE,    :

             Plaintiffs,   :

  v.                            : Case No.:

                              : 2:20-CV-00302-SCJ

TRUE THE VOTE, INC., CATHERINE    :

ENGELBRECHT, DEREK SOMERVILLE,    :

MARK DAVIS, MARK WILLIAMS,        :

RON JOHNSON, JAMES COOPER, AND    :

JOHN DOES 1-10,                   :

            Defendants.     :

--------------------------------X

Deposition of GREGG PHILLIPS, as the corporate

representative of OpSec Group LLC and individually

Conducted Virtually

Tuesday, January 25, 2022

10:02 a.m. ET

Reported by: Matthew Goldstein, RMR, CRR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Case 2:20-cv-00302-SCJ   Document 171-1   Filed 05/24/22   Page 2 of 62

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 2

1       Deposition of GREGG PHILLIPS, conducted

2   virtually:

3       Pursuant to Notice, before Matthew Goldstein,

4   RMR, CRR, Notary Public in and for the State of

5   Maryland.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

```
 1              A P P E A R A N C E S
 2   ON BEHALF OF THE PLAINTIFFS:
     JACOB SHELLY, ESQUIRE
 3   ELIAS LAW GROUP
     700 13th Street, NW
 4   Suite 600
     Washington, D.C. 20005
 5   202.434.1609
 6
 7   ON BEHALF OF THE PLAINTIFFS:
     LESLIE J. BRYAN, ESQUIRE
 8   LAWRENCE & BUNDY LLC
     1180 West Peachtree Street NW
 9   Suite 1650
     Atlanta, Georgia 30309
10   404.400.3350
11
12   ON BEHALF OF THE DEFENDANTS:
     JAMES BOPP, ESQUIRE
13   THE BOPP LAW FIRM
     1 S 6th Street
14   Terre Haute, Indiana 47807
     812.232.2434
15
16   ALSO PRESENT:
17   DESHAWN WHITE - VIDEOGRAPHER/EXHIBIT
18                   TECHNICIAN
19   TINA MENG, ELIAS LAW GROUP
20
21
22
```

Page 4

1                       C O N T E N T S

2    EXAMINATION OF GREGG PHILLIPS                       PAGE

3    By MR. SHELLY                                          8

4

5                       E X H I B I T S

6                       (Attached)

7    PHILLIPS          DEPOSITION EXHIBIT                 PAGE

8     Exhibit 1     Plaintiffs'  Notice of Rule        12
                    30(B)(6) Deposition of OpSec
9                   Group LLC

10    Exhibit 2     Plaintiffs' Notice to Take the      14
                    Deposition  of Gregg Phillips

11    Exhibit 3     PolitiFact Fact-check Did 3         26
                    million undocumented immigrants
12                  vote in this year's election

13    Exhibit 4     CNN.com - Transcripts               41

14    Exhibit 5     Def TTV 288, Invoice INV-0007       57

15    Exhibit 6     OpSec's Amended Responses to        76
                    Plaintiffs' Request for
16                  Production

17    Exhibit 7     Def Davis 005266 through Def       102
                    Davis 00527, NCOALink
18                  Processing Summary Report

19    Exhibit 8     OPSEC 0032 through OPSEC 0033,     132
                    December 16, 2020, E-mail
20                  Correspondence

21    Exhibit 9     OPSEC 0051, Spreadsheet Table      144
22

Page 5

```
 1                E X H I B I T S, CON'T
 2                     (Attached)
 3    PHILLIPS        DEPOSITION EXHIBIT              PAGE
 4    Exhibit 10    OPSEC 0009 through OPSEC 0029,   149
                    TrueAppend Report
 5    Exhibit 11    OPSEC 60, Excel Spreadsheet      156
 6    Exhibit 12    OPSEC 0031, December 15, 2020,   158
                    E-mail Correspondence
 7    Exhibit 13    OPSEC 0045 through OPSEC 0047,   159
                    December 20, 2020, E-mail
 8                  Correspondence
 9    Exhibit 14    Def TTV 1439 through Def TTV     161
                    1439 through Def TTV 1441,
10                  December 28, 2020, E-mail
                    Correspondence
11    Exhibit 15    OPSEC 61, Excel Spreadsheet      163
12    Exhibit 16    OPSEC 0049 through OPSEC 0050,   164
                    DataWalk Screenshot
13    Exhibit 17    OPSEC 0059, Voter History Files  165
                    Screenshot
14    Exhibit 18    Crusade4Freedom Screenshot       167
15    Exhibit 19    OPSEC 0041, Notes                168
16
17
18
19
20
21
22
```

Page 6

1              THE VIDEOGRAPHER:  This is Tape Number 1

2     for the videotaped deposition of Gregg Phillips in

3     the matter of Fair Fight, Incorporated, et al.,

4     versus True the Vote in the United States District

5     Court for the Northern District of Georgia, the

6     Gainesville Division.  Case

7     Number 2:20-CV-00302-SCJ.

8              This deposition is being held by Zoom

9     video remote conferencing, the physical recording

10    in Fredericksburg, Virginia, on January 25th,

11    2022.

12              The time on the video screen is

13    10:02 a.m. Eastern Time.

14              My name is DeShawn White.  I am the

15    legal videographer from Digital Evidence Group.

16              The court reporter is Matthew Goldstein

17    in association with Digital Evidence Group.

18              Will counsel please introduce themselves

19    for the record.

20              MR. SHELLY:  I'm Jacob Shelly with Elias

21    Law Group on behalf of the plaintiffs.

22              MS. BRYAN:  Good morning.  Leslie Bryan,

Page 7

1    Lawrence & Bundy, on behalf of the plaintiffs.

2              MS. MENG:  Hi.  This is Tina Meng with

3    Elias Law Group on behalf of plaintiffs as well.

4              MR. BOPP:  I'm done with your counsel

5    being introduced.  Thank you.

6              James Bopp, attorney for defendants, and

7    here Gregg Phillips and his company.

8              THE VIDEOGRAPHER:  Will the court

9    reporter please swear in the witness.

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 39

1              THE WITNESS:  What's the question?  I'm

2      sorry.

3      BY MR. SHELLY:

4          Q.   In your November 2016 tweet, you

5      tweeted --

6          A.   I'm sorry.  I don't see that I wrote

7      those tweets.  There's some misinformation in

8      there, and I don't -- I don't recall those exact

9      words, and I'm not certain that I actually tweeted

10     them.

11         Q.   Did you speak with anyone at True the

12     Vote about non-citizen voting in the six target

13     states after the November 2016 election?

14         A.   Not specifically the six states.

15         Q.   Did you speak with True the Vote about

16     analysis that would have included those six

17     states?

18         A.   You need to clarify the question.  I

19     mean, I don't know whether you're talking about

20     before or after.  I mean, you're -- I just can't

21     answer a question that I don't understand.

22         Q.   Did you speak to True the Vote in

Page 40

1   November 2016 about non-citizen voting?

2        A.   When?

3        Q.   In November 2016.

4        A.   Probably not.

5        Q.   Did you discuss initiating legal action

6   with True the Vote related to non-citizen voting

7   in the 2016 election?

8        A.   At some point post November probably,

9   but not in November.

10       Q.   Who did you discuss this with at True

11  the Vote?

12       A.   I don't recall specifically.

13       Q.   Did you or True the Vote ever initiate

14  legal action related to your findings?

15       A.   No.

16       Q.   Why not?

17       A.   Because we were threatened and my family

18  was threatened and we decided that it just wasn't

19  appropriate to take action and put us in further

20  danger.

21       Q.   Okay.

22            MR. SHELLY:  Mr. White, can you pull up

Page 41

1    Exhibit R.

2              (Phillips Deposition Exhibit 4 was

3    marked for identification and attached to the

4    transcript.)

5    BY MR. SHELLY:

6        Q.   Mr. Phillips, did you conduct an

7    interview with CNN in January 2017 about

8    allegations of non-citizen voting in the 2016

9    election?

10       A.   Yes.

11             MR. SHELLY:  Can we go to page 10.

12   Great.

13   BY MR. SHELLY:

14       Q.   This is the third paragraph down

15   starting with "Obviously."  Reading ahead a few

16   sentences, you say, "When we complete this

17   analysis, we're going [to] lay it out to the

18   public.  We're going to lay out our methodologies.

19   We're going to lay out our hypothesis.  We're

20   going to lay out our outputs.  We're going to lay

21   out the raw data for everyone to see."

22             Did I read that correctly?

Page 42

1        A.   Yes, but I don't recall the exact words.

2   You read what's on the screen.

3        Q.   Okay.  And do you agree that this was in

4   the context of analysis of non-citizen voting in

5   the 2016 election?

6        A.   I don't recall --

7             MR. BOPP:  I object.  The question goes

8   beyond the limit of the six states and, therefore,

9   you're violating the court's order, and I instruct

10  him not to answer.

11            MR. SHELLY:  This is an interview that

12  he gave with CNN.  I'm not asking about Oregon or

13  any state that's not among the six states.  I'm

14  just asking him about what he told CNN related to

15  the 2016 election.

16            MR. BOPP:  I've made my objection to

17  your question.

18            MR. SHELLY:  And I understand you're

19  instructing him not to answer in his 30(b)(6) or

20  his individual capacity?

21            MR. BOPP:  I did instruct him not to

22  answer because your --

Page 43

1              MR. SHELLY:  Okay.  I just want to make

2      sure that I heard correctly.  I will continue with

3      my questions.

4      BY MR. SHELLY:

5          Q.   When did you complete this analysis,

6      Mr. Phillips?

7          A.   I don't recall.

8              MR. BOPP:  Same --

9              Gregg, you need to pause for just a

10     second so I can enter -- because, you know, half

11     of his questions are completely in violation of

12     the court order, so I need to be able to interject

13     with an objection.

14             So I object.  Your question goes beyond

15     the court's limitation on your questions.  And it

16     needs to be the six states and also be 2012

17     forward.  I instruct him to not answer.

18     BY MR. SHELLY:

19         Q.   And what did you find when you completed

20     your analysis?

21             MR. BOPP:  Same objection and same

22     instruction.

Page 44

1   BY MR. SHELLY:

2        Q.   Did you ever release your methodology?

3             MR. BOPP:  Same objection.  Same

4   instruction.

5   BY MR. SHELLY:

6        Q.   Did you ever release your raw data?

7             MR. BOPP:  Same objection.  Same

8   instruction.

9   BY MR. SHELLY:

10       Q.   Do you plan to release your analysis,

11   methodology or raw data?

12            MR. BOPP:  Same objection.  Same

13   instruction.

14  BY MR. SHELLY:

15       Q.   Did any independent third party ever

16  confirm your allegations related to the 2016

17  election?

18            MR. BOPP:  Same objection.  Same

19  instruction.

20            MR. SHELLY:  You can take this down,

21  Mr. White.

22            THE VIDEOGRAPHER:  My apologies.  What?

Page 45

1           MR. SHELLY:  I'm all done with this

2      exhibit.  You can take it down.  Thank you.

3           THE VIDEOGRAPHER:  Okay.

4      BY MR. SHELLY:

5           Q.   Mr. Phillips, what do you do for a

6      living now?

7           A.   I own a technology company.

8           Q.   Is that OpSec?

9           A.   No.

10          Q.   What's the name of the company?

11          A.   CoverMe Services.

12          Q.   Did you found OpSec?

13          A.   Yes.

14          Q.   Are you the managing partner at OpSec?

15          A.   Yes.

16          Q.   And these are positions that you

17      continue to hold today?

18          A.   Yes.

19          Q.   Okay.  Just to clean up the previous

20      section about the 2016, Mr. Phillips, can you just

21      confirm that you intend to follow your attorney's

22      instruction not to answer?

Page 46

1       A.   Yes, I intend to follow my attorney's

2   instructions.

3       Q.   Thank you.

4            What services does OpSec perform?

5       A.   Research, election intelligence

6   gathering, some operational activities.

7       Q.   And what kinds of operational

8   activities?

9       A.   It depends on the situation.

10      Q.   I think you told me that OpSec was

11  founded in 2020.

12           Do you remember when in 2020 it was

13  founded?

14      A.   Formally founded in 2020, yes.

15      Q.   Was that -- do you know what part of the

16  year?

17      A.   I don't.

18      Q.   Before the fall elections?

19      A.   Yes.

20      Q.   How many employees does OpSec have?

21      A.   No legitimate employee.  No full-time

22  employees beyond me.  We hire contractors.

Page 101

1    the file that was used?

2        A.    I don't know right off the top of my

3    head, no.

4        Q.    Is that something you looked into in

5    preparation for this deposition?

6        A.    No, just because that's not what we were

7    doing.  You're asking about data cleanliness.  And

8    what we were trying to do is ascertain whether

9    people still lived in the jurisdiction or not.

10   And we were compelled to assist the challenging

11   voters to give a specific reason.

12            And it's up to the counties to determine

13   reasonable suspicion or probable cause or whatever

14   it is in Georgia.  A challenger has to give a

15   specific reason.  The specific reason is they

16   don't live in the jurisdiction anymore.

17       Q.    If your window for including people who

18   submitted an NCOA request goes back in time far

19   enough, is there a possibility that they could

20   have moved back to Georgia, but would still be on

21   your list because of their previous move out of

22   state?

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 102

1      A.    Sure.   It's possible.

2      Q.    But I'm understanding you're not sure

3    how far back those requests would have been

4    included for your lists?

5      A.    No.   It's not relevant.

6      Q.    Okay.

7             MR. SHELLY:   Can we pull up Exhibit S.

8             (Phillips Deposition Exhibit 7 was

9    marked for identification and attached to the

10   transcript.)

11            MR. SHELLY:   You can scroll down a page

12   or two.

13   BY MR. SHELLY:

14      Q.    So this is an NCOALink processing

15   summary report that was produced by Mr. Davis, who

16   attempted to match the Georgia voter file with

17   NCOA data.

18            Take a look at this and tell me, was

19   anything like this produced during your matching

20   process?

21      A.    We don't use this particular tool.   And

22   no.   It's irrelevant.

Page 103

1      Q.    Okay.

2            MR. SHELLY:  Can you go to bottom of

3      page 5 of this document, Mr. White.

4      BY MR. SHELLY:

5      Q.    Do you see here, at the bottom left

6      corner, there are some counts for insufficient

7      data, address not found, multiple responses?

8      A.    Yeah.

9      Q.    Am I understanding correctly that you

10     did not develop any similar counts for your

11     analysis?

12     A.    No, my guess is he didn't use either

13     CASS or DPV.  And I would suggest that he didn't

14     clean the rolls as it relates to identity

15     verification first or he wouldn't have had this.

16     This is bad process.

17     Q.    Okay.  What should Mr. Davis have done?

18           MR. BOPP:  Excuse me.  I need to talk to

19     my client for a second, so we will go off.

20           THE VIDEOGRAPHER:  Do you want to go off

21     the record, Counsel?

22           MR. SHELLY:  I just want to reiterate my

Page 104

1    objection to conferring between the witness and

2    counsel about how to answer my questions.

3              (Pause from the record.)

4              MR. BOPP:  Okay.  We're back.  You can

5    resume your questioning.

6    BY MR. SHELLY:

7        Q.   Mr. Phillips, you were telling me that

8    there was -- that this document illustrates that

9    Mr. Davis used a bad process.

10             Can you explain what you meant by that?

11       A.   I was just speculating.  It was not

12   appropriate.  We don't do it this way.

13       Q.   What does this document indicate was not

14   done that should have been done?

15       A.   I really can't speculate.  I'm sure that

16   Mr. Davis is doing a good job.

17       Q.   Is this -- is your answer informed by

18   off-the-record discussions you just had with

19   counsel?

20       A.   No.

21       Q.   Did you discuss your testimony with

22   counsel during that recess?

Page 105

1          MR. BOPP:  You know, your Honor -- I

2     mean, your Honor -- Jacob, there was no pending

3     question when I sought to consult with my client.

4     There was no pending question, no pending answer.

5     So --

6          But go ahead, Gregg, you can answer.

7          THE WITNESS:  No, I don't -- I don't --

8     I'm not as aware of Mr. Davis' process as I should

9     be to make a comment, so I don't know.

10          MR. SHELLY:  You can take this exhibit

11     down.

12     BY MR. SHELLY:

13          Q.   For complex record linkage, do you think

14     it is important that fields used to link records

15     in different databases conform with respect to

16     data format and data type?

17          A.   What was the question?

18          Q.   For complex record linkage, do you think

19     it is important that fields used to link records

20     in different databases conform with respect to

21     data format and data type?

22          A.   Sure.

Page 106

1      Q.   So would you agree that it's

2    important --

3      A.   So assuming that you're performing an

4    actual linkage, yes.

5      Q.   Did you perform an actual linkage?

6      A.   Can you define what you mean by

7    "linkage."

8      Q.   Well, I'm repeating the term that you

9    just used.

10          What do you understand that to mean?

11     A.   No, that's not true.  You just said

12   "linkage."

13          What do you mean by "linkage"?

14     Q.   Is that not the term that you just used?

15     A.   You asked me a question about linkage.

16   Read the question.

17     Q.   Did you attempt to link information

18   between Georgia's voter rolls and other data sets?

19     A.   What do you mean by "link"?

20     Q.   Match.

21     A.   Match?  Sure.

22     Q.   When you performed that matching, do you

Page 107

1    agree that it's important that the fields conform

2    with respect to data format and data type?

3          A.   Yes.

4          Q.   Do you agree that it would be important

5    that both databases used for the match use

6    standardized abbreviations?

7          A.   We have a separate approach that we use

8    for that because we verify identity first.

9          Q.   Okay.  Can you tell me about how you

10   verify the identity?

11         A.   No.

12         Q.   Why not?

13         A.   Because it's a proprietary service that

14   my company used.

15         Q.   Okay.  This case has a protective order

16   in place specifically so we can understand these

17   questions.

18         A.   It's a 4,000-row algorithm.

19              What do you want to know?

20         Q.   I want to know what you do to verify the

21   identities before you perform the matching.

22         A.   Assessing -- assessing identity involves

Page 108

1   a complex series of mostly common algorithms,

2   things like dissimilarity indexes, similarity

3   indexes.  We use some fuzzy logic.  We use a

4   number of different things.  That's my answer.

5        Q.   Okay.  What is fuzzy logic?

6        A.   Fuzzy logic is a set of -- in identity

7   is a set of algorithms that's designed to

8   ascertain whether something similar is near

9   similar enough to assume that identity is

10  accurate.  And if it's not, then it assigns a risk

11  factor to it.

12       Q.   And is this something that you developed

13  yourself or you used an outside vendor for it?

14       A.   Yes.  I developed --

15       Q.   Which one?  Is that something --

16       A.   I developed it myself in 2006.

17       Q.   Okay.  Has its accuracy ever been

18  analyzed by anybody else?

19       A.   Its accuracy.  We use it every day in

20  our business.  So it's used in practice, and we've

21  done 43 million cases, so its accuracy is pretty

22  well known.

Page 109

1       Q.    Has it been independently verified by

2    anybody else?

3       A.    Nope.

4       Q.    Who performed the match between the

5    voter rolls and the other lists that you were

6    analyzing?

7       A.    What individual?

8       Q.    That's my question, yes.

9             Are you thinking of an answer or was my

10   question unclear?

11      A.    I answered you.

12      Q.    Who was the individual?

13      A.    Me.

14      Q.    Oh.

15            Did anybody else assist with that

16   matching effort?

17      A.    Not that I recall.

18      Q.    Approximately on what date was the match

19   completed?

20      A.    Mid December.

21      Q.    Can you tell me a few examples -- can

22   you give me a complete list of all of the

Page 110

1   technology that you used to perform that match?

2        A.    No -- I mean, yeah, I can tell you.  It

3   was co-done by me and my company.

4        Q.    Okay.  What was -- I believe you said

5   you used a vendor called TrueNCOA?

6        A.    That's one of the ones we used, yes.

7        Q.    Can you tell me what their role was

8   exactly?

9        A.    Their role wouldn't be anything other

10   than just being the group that performed -- that

11   made the match.

12          MR. BOPP:  I'm sorry, Jacob.  I need to

13   take this call for a second.  Do you mind if we

14   suspend for just a second?

15          MR. SHELLY:  Sure.  That's fine.

16          MR. BOPP:  Yeah.

17          MR. SHELLY:  You can go off the record.

18          THE VIDEOGRAPHER:  Okay.  The time is

19   12:53 p.m.  We are now off the record.

20          (Recess from the record.)

21          THE VIDEOGRAPHER:  The time is 1:13 p.m.

22   We are now on the record.

Page 111

1   BY MR. SHELLY:

2       Q.   Mr. Phillips, I understood at one point

3   you said that you personally performed the match,

4   I also understood you to say that TrueNCOA

5   performed the match.

6            Can you clarify anything that I may have

7   misunderstood with that?

8       A.   I thought you meant the person that

9   uploaded it.  I uploaded it.  I'm sorry.

10      Q.   You uploaded -- you uploaded it to

11  TrueNCOA?

12      A.   And -- we wouldn't do just one.  There

13  were probably more.  SmartyStreets is one that we

14  used sometimes.  I mean, there are others.

15      Q.   SmartyStreets is in addition to

16  TrueNCOA?

17      A.   At times.  Depending on the results we

18  get back, we can use both.

19      Q.   So you would upload it to TrueNCOA.  You

20  would get a match back, and then sometimes you

21  would provide match data to SmartyStreets?

22      A.   It might not go in that direction.  I

Page 114

1  algorithm that my company owns that we use

2  primarily for the identity and residency

3  resolution.

4       Q.   Okay.  Are you willing to produce that

5  algorithm or provide it in a format that we can

6  review?

7       A.   No.

8       Q.   Okay.  And in the same context, can you

9  tell me what queries you used?

10      A.   Well, the query would be a query against

11  the True- -- in this case, TrueNCOA and possibly

12  SmartyStreets.  So they would -- they would pass

13  it through their CASS system to clean it up,

14  perform some hygiene on it.  They'd look at

15  delivery point verifications and those kind of

16  things.  If we found some anomalies, we might

17  access another system like a SmartyStreets, but

18  that's it.  That's the query.

19      Q.   So when you say you performed "hygiene,"

20  can you give me a concrete example of what it

21  would mean to provide hygiene to a piece of data

22  that you analyzed here?

Page 115

1      A.   Well, I think the USPS definition of

2   "CASS" is pretty clear.  I mean, I think they --

3   you know, it basically standardizes -- goes

4   through and standardized addresses, finds missing

5   things, kind of rearranges, fixes it up.  Like it

6   might add a ZIP plus four.

7           You know, if there was a typo in the --

8   maybe a lowercase in an address, they might make

9   it upper case.  So they perform that

10  data-cleansing process and then produce the list.

11          And then we would go through and -- or

12  they would go through and push it through another

13  one of their queries for -- you know, to see if

14  the address was -- they could validate the

15  delivery point, so could an address actually be

16  delivered on that.  And that might push us off

17  into something else, to maybe look for something

18  else.

19      Q.   Okay.

20      A.   But it was done in a matter of minutes.

21  This wasn't a lengthy process.

22      Q.   So if there was an -- if a voter had an

Page 116

1   address, say, 123 Main, in a city that had a Main

2   Street and a Main Avenue, how would know the CASS

3   system know or SmartyStreets -- would either of

4   those systems know how to complete it?  Or what

5   would it do in that situation?

6        A.   You would have to ask them how they

7   would do it.  To us, I mean, again, it's a

8   function of whether or not it's likely to be the

9   same person, organization or street.  And then it

10  assigns sort of a risk score to it.  And then it's

11  processed differently.

12           That might be a case where we would go

13  and look at, say, a SmartyStreets to see if we can

14  ascertain what the situation is.  In the cases

15  where we cannot, we would kick it out and not

16  include it.

17       Q.   Okay.  And when you say it would assign

18  a "risk score," is that like a scale of 1 to 10?

19  Or what kind of risk score can be given?

20       A.   We have risk scoring built into our

21  scoring mechanisms inside of our algorithms.

22       Q.   So I'm trying to figure out what's

Page 117

1    the -- will it tell you that this is high risk,

2    medium risk, low risk or is that like 1 to 100?

3         A.   It would likely give you a number.

4         Q.   And what would the scale be?

5         A.   On this, I don't know what was used.  So

6    zero to 100, likely.

7         Q.   Okay.  And 100 would mean very, very

8    high risk?

9         A.   No, low risk.

10        Q.   Low risk.  Okay.

11             And so how low would the number need to

12   be?  In other words, how high would the risk need

13   to be for you to perform further analysis?  If it

14   returns a risk score of like 2, would you perform

15   further analysis on that?

16        A.   We might depending on what it is.

17   Again, verifying identity is important.  The

18   problem in places like Georgia is that they don't

19   give you all the info you need to get a good

20   perfect verification on identity, but that too has

21   risk to it as well.  So you look at risk across

22   the board with the data.

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 118

1       Q.    Were you able to eliminate the risk?

2       A.    You can never eliminate all of the risk.

3       Q.    Did you analyze every piece of data that

4    was flagged as a risk of potential inaccuracies?

5       A.    The quality control algorithms would,

6    yes, in seeking to remove any false positives or

7    false negatives that might be in the system.

8       Q.    And that's something that you did

9    in-house or that's something that TrueNCOA would

10   have done or something different?

11      A.    No, that's something our algorithm does.

12      Q.    And you run the data through your

13   algorithm on the back end after you -- after

14   TrueNCOA performs the match; is that correct?

15      A.    Yes.

16      Q.    And do you know how TrueNCOA or these

17   others assign risk?

18      A.    How they assign risk?  I have no idea.

19      Q.    Moving on to the next clause in this

20   answer, what regression techniques did you use?

21      A.    Our modeling is pretty significant.  We

22   use some k-means modeling.  We use a variety of

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 119

1   different techniques in our scoring.  And then we

2   use a model management process to identify the

3   regression technique most likely to produce an

4   accurate result.

5        Q.   And in what stage in the process were

6   you running these regressions?

7        A.   They're run through the process.  It's

8   all baked into the system.  Again, this whole

9   thing took a few minutes.

10       Q.   Am I understanding that you did these

11  regressions after you received the preliminary

12  match back from TrueNCOA, and then you're

13  providing your own further analysis on it?

14       A.   I didn't say that.

15       Q.   Can you clarify what I misunderstood?

16       A.   The formulas and algorithms that we use

17  execute.  As they need information, they pull

18  information in from an outside entity, say,

19  TrueNCOA or whatever.  It feeds it into the system

20  and then it continues to process it and keeps

21  working to solve -- solve for the risk.  And

22  ultimately we come up with a list.

Page 120

1            MR. SHELLY:  Okay.  You can take this

2      exhibit down, Mr. White.

3      BY MR. SHELLY:

4            Q.   When you were matching the voter

5      registration rolls to the NCOA list, what fields

6      were matched between those files?

7            A.   We just uploaded the file.  CASS does

8      the matching -- I'm sorry.  The source does the

9      matching, TrueNCOA or SmartyStreets.

10           Q.   Okay.

11           A.   In this case TrueNCOA first.

12           Q.   Are you familiar with the term "unique

13     identifier" in the context of data matching?

14           A.   Sure.

15           Q.   Are there any common unique identifiers

16     between the voter registration rolls and NCOA

17     lists?

18           A.   Well, that -- not as many as there

19     should be, and that's why we seek to resolve

20     identity first.

21           Q.   Are there any unique identifiers common

22     between those two lists?

Page 121

1       A.   I don't have the Georgia list right off

2   the top of my head.

3       Q.   Do you think that the lack of unique

4   identifiers could affect the accuracy of the

5   lists?

6       A.   Sure.

7       Q.   Am I understanding correctly from your

8   previous answers that the records are matched on

9   partial matching rather than exact matching, these

10  other databases would fill in any partial

11  information?

12      A.   That's not what I said.

13      Q.   Was an exact match required between the

14  data that you provided and the NCOA list?

15      A.   You can never get an exact match.  So

16  when you provide the list to -- when you provide

17  the list to the vendor, whoever it is, TrueNCOA or

18  whoever, they take what you give them.  They

19  perform a little bit of a cleaning process on it.

20  They try to update the addresses.  They run it

21  through CASS.  They try to get it right.  And then

22  they send it back.

Page 122

1      Q.   Could individuals with the same first

2   name and last name, but different middle initials

3   be flagged as a match?

4      A.   That's why you try to verify identity

5   first, but yes.

6      Q.   The answer is, yes, it could be?

7      A.   Of course.

8           And -- but that's why you use fuzzy

9   logic and some of the other things I mentioned

10  earlier.

11          MR. BOPP:  Gregg, no question was

12  pending.

13  BY MR. SHELLY:

14     Q.   Could names be matched if they had

15  different name suffixes, like junior or senior?

16     A.   Sure.  I mean, you could do that.

17     Q.   How many duplicates did you identify

18  where a record in the NCOA registry matched more

19  than one record in the voter file?

20     A.   I have no idea.

21     Q.   Are you aware if any such duplicates

22  were identified?

Page 123

1      A.    I have no idea.

2      Q.    Did you investigate whether there were

3  any such duplicates?

4      A.    I have no idea.  I don't -- it wasn't a

5  topic.

6           MR. SHELLY:  Can we pull up Exhibit C

7  again, the one we just had up.

8  BY MR. SHELLY:

9      Q.    This is page 13 again.  And I have a

10  question about number 6, "OpSec removed from the

11  list any names that did not meet the standards of

12  the Georgia code."

13           What standards do you understand the

14  Georgia code to require?

15      A.    I'm not sure what we were -- what we

16  were referring to there.  I'm not sure what we

17  meant.

18      Q.    Did you take any steps to remove names

19  that did not meet the standards of the Georgia

20  code?

21      A.    I think that was just poorly worded.

22      Q.    Okay.  Do you have any idea how you

Page 124

1   could reword that in a different way?

2       A.   I think it was referring to number 5

3   above.  Because the code -- the relevant code

4   section is pretty clear that any voter can do the

5   challenge against any other voter in the

6   jurisdiction.  And so there's not much room for

7   standard in the word "any."

8       Q.   Okay.  So is it -- am I understanding

9   correctly that you do not think you removed any

10  names that did not meet the standards of the

11  Georgia code?

12      A.   I'm not sure what it means.  It must

13  have been poorly worded.  I'm not sure what that

14  paragraph -- or what that sentence means.

15      Q.   Okay.

16          MR. SHELLY:  You can take this exhibit

17  down.

18  BY MR. SHELLY:

19      Q.   Is it your understanding, Mr. Phillips,

20  that an individual who submits an NCOA, change of

21  address, is no longer eligible to vote?

22      A.   No, that's not correct.

Page 125

1      Q.   What are some reasons you are aware of

2   that someone could submit an address change to the

3   postal service while remaining eligible to vote

4   where they are registered?

5      A.   I have no speculation on that point.

6      Q.   Okay.  Just to clarify, you understand

7   that someone can submit an NCOA list and still be

8   properly registered, but you're not sure in what

9   scenarios that may be the case?

10      A.   I didn't understand that's what you

11   asked.  Is that what you're asking?

12      Q.   So my second question was, what are some

13   reasons you're aware of that someone can submit an

14   address change to the postal office while

15   remaining eligible to vote where they are

16   registered?

17      A.   Maybe they're being deployed in the

18   military.  Maybe -- might have something to do

19   with school.  Those kind of things.

20      Q.   Any other examples you're aware of?

21      A.   Moved inside the county or inside the

22   jurisdiction in which they were registered.

Case 2:20-cv-00302-SCJ   Document 171-1   Filed 05/24/22   Page 39 of 62

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

1    There's a few.

2         Q.   Is it your understanding that someone

3    who moved for other non-military government

4    service could still be eligible to vote in

5    Georgia?

6         A.   I don't have a perfect list to offer

7    you.  You asked me for some ideas.  Those were

8    three.

9         Q.   And now I'm offering you some more and

10   asking if they're consistent with what you would

11   have understood the requirements to be.

12            So, one, would you have understood

13   someone who moved for non-military government

14   service to remain eligible to vote in Georgia even

15   if they submitted an NCOA?

16        A.   Sure.

17        Q.   And would you understand someone to

18   remain eligible to vote in Georgia if they had a

19   temporary move or a part-time job or to visit

20   family?

21        A.   It depends on the circumstance, but yes.

22        Q.   And would you recognize that someone

Page 127

1  would remain eligible to vote if they forwarded

2  their mail for some mail-specific purpose, for

3  example, if they were on vacation and needed their

4  mail to be forwarded?

5       A.   Yep.

6       Q.   And if someone intended to move and so

7  filed an NCOA request, but did not actually move,

8  you would agree that they would remain eligible to

9  vote in Georgia?

10      A.   It depends on their circumstance.  I

11 can't answer that.

12      Q.   And the question is, if someone is

13 living in Georgia, they intend to move so they

14 file an NCOA request to forward their mail, and

15 then they change their mind and do not actually

16 move, you would agree that they're still eligible

17 to vote in Georgia?

18      A.   Sure.  If they still submitted the

19 permanent move change, yeah.

20      Q.   Okay.  Who was responsible for removing

21 the names of eligible voters such as these from

22 the challenge lists?

Page 128

1          A.    We did our best to -- first of all, the

2    code.  Let's put it that way.

3          Q.    Okay.  To go through those examples

4    again, would the code be able to identify someone

5    who is deployed for military service?

6          A.    As best we can, yes.  We pulled out

7    300,000 voters off the initial query.

8          Q.    Okay.  I'll ask you another question

9    about that in a second, but would the code be able

10   to recognize someone who moved because they were a

11   college student?

12         A.    It might.

13         Q.    How would it do that?

14         A.    If they submitted a permanent change or

15   a temporary change.

16         Q.    Okay.  Would the code --

17         A.    We also --

18         Q.    -- also identify --

19         A.    I'm sorry.  Go ahead.

20         Q.    Go ahead.

21         A.    Go ahead.

22         Q.    Would the code be able to identify

Page 129

1   someone who moved for non-military government

2   service?

3        A.   Possibly.  And it depends, again, how

4   they submitted their NCOA and if they sold their

5   house or -- you're making suppositions that can't

6   be made.  It's not a one piece or another; it's

7   the aggregate of it.

8        Q.   Okay.  So I understand that the code

9   cannot identify the purpose that someone submitted

10   an NCOA request, but your answer is you think you

11   can infer it from other sources of data?

12        A.   As best we can.  And then when the

13   challenge is made, the probable cause has to be

14   identified by the county.  And they are the ones

15   with the capability of doing that.

16        Q.   What steps did you take specifically to

17   remove the names of individuals who live on or

18   near a military base?

19        A.   We have a list of ZIP codes that include

20   all the military bases.  We also use some of the

21   military designators, FPO, that kind of thing.

22   And we pull those directly from -- in the initial

Page 130

1    query, rather than waiting till the end.

2          Q.    When you say "we" --

3                (Unintelligible cross-talk.)

4          Q.    -- was anyone else responsible for that

5    besides you?

6                (Unintelligible cross-talk.)

7          Q.    But there was no other person

8    responsible for removing these names besides you?

9          A.    No.

10         Q.    If a person moved to an address, for

11   example, Camp Lejeune, North Carolina, would that

12   suggest to you that the person lives on a military

13   base?

14         A.    Potentially.

15         Q.    What about an address on Andrews Air

16   Force Base?

17         A.    Potential.

18         Q.    Barksdale Air Force Base?

19         A.    Moved to or from?  What's the question?

20         Q.    To.  To.

21         A.    It depends.  It depends on what their

22   submission said to the post office.  So is it

Page 131

1  permanent?  Is it TDY?  Is it a permanent-duty

2  station?  What is it?

3       Q.   If someone submitted a permanent change

4  of address to Dover Air Force Base, would you

5  understand that that person was no longer eligible

6  to vote in Georgia?

7       A.   I don't know.  It depends.  I mean, not

8  really because military situations are different.

9  Because even if their permanent-duty station is

10  somewhere, they can still be -- their permanent

11  residency can still be in the state in which they

12  register.  So it's much more complicated.

13       Q.   What further analysis did you perform to

14  identify if military voters who moved to a base

15  can retain their eligibility in Georgia?

16       A.   We didn't.

17       Q.   Do you recall that Ms. Engelbrecht asked

18  you to remove addresses associated with Moody Air

19  Force Base?

20       A.   I don't recall.

21       Q.   Okay.

22            MR. SHELLY:  Can we pull up Exhibit D,

Page 132

1   as in dog?

2          (Phillips Deposition Exhibit 8 was

3   marked for identification and attached to the

4   transcript.)

5          MR. SHELLY:  And scroll down to the next

6   page.  Can we make this a little bit bigger.

7   BY MR. SHELLY:

8      Q.   Okay.  So this is an e-mail from

9   Ms. Engelbrecht on December 16th to Mark, and you

10  are cc'd.  And the e-mail, maybe three paragraphs

11  down, says, "Also, please remove addresses that

12  would suggest they are military bases

13  (Ft. Benning, Moody Air Force Base...)."

14         First, this e-mail was to "Mark."

15         Am I correct in referring this is Mark

16  Williams?

17     A.   I have no idea.

18     Q.   You're not sure who

19  mark@printingtradeco.com is?

20     A.   That might be Mark, but may be not.

21  There could be more than one Mark.  I have no idea

22  if that's Mark Williams.

Page 133

1     Q.   Okay.  Was Mark Williams responsible for

2  removing any military voters from the list?

3     A.   According to this, yes.

4     Q.   Do you know if he did so?

5     A.   I don't know.

6     Q.   Did you ever ask him to do so?

7     A.   It didn't matter because we ultimately

8  chose not to mail the hard copies out.  We sent

9  electronic copies, so ultimately this didn't

10  matter.

11     Q.   Is that because Mark Williams would have

12  had access to the hard copies so any changes he

13  made would not have been reflected in the

14  electronic copies?

15     A.   I'm not sure I understand the question.

16     Q.   I'm trying to understand why you said

17  that it would not matter if Mark Williams made

18  changes because you only sent electronic versions.

19          So my --

20     A.   An electronic -- okay.

21          MR. BOPP:  There's no question pending,

22  Gregg.

Page 138

1      A.   I don't have any opinion about moving to

2   college campuses.

3      Q.   I didn't hear you.  Could you repeat

4   that last part.

5      A.   I don't have any opinion on your

6   question.

7      Q.   Is it your understanding that most

8   students who attend college reside in a dormitory?

9      A.   I would believe that to be false.

10     Q.   Did you take any steps to remove the

11   names of individuals who were temporarily

12   attending college, but did not live in a

13   dormitory?

14     A.   Did they register as permanent moves

15   from the NCOA?

16     Q.   Am I gathering correctly that your

17   analysis of whether voters were eligible turned on

18   whether they filed a permanent or temporary change

19   of address?

20     A.   It might.  As I said, it's a complex

21   algorithm.  It's 4,000 rows long.  It doesn't --

22   it doesn't work like your brain does.

Page 139

1       Q.   Did you research which colleges Georgia

2   high school students are most likely to attend?

3       A.   No.

4       Q.   Approximately how many names did you

5   identify and remove of individuals you suspected

6   were enrolled in a college or university?

7       A.   I have no idea.

8       Q.   What steps did you take to confirm

9   whether an individual who submitted an NCOA

10  request actually moved?

11      A.   Well, we submitted it to TrueNCOA.  We

12  possibly submitted it to SmartyStreets if it

13  needed more work.  And I think, in Georgia, we

14  submitted the new address.  So we told them where

15  we thought the person went.

16      Q.   Approximately how many -- approximately

17  how many matches did TrueNCOA identify?

18      A.   I don't recall.  It's all part of the

19  equation.  We don't look at it that way.

20      Q.   Approximately how many did you send

21  along to SmartyStreets?

22      A.   I don't know the answer to that either.

Page 140

1      Q.   Do you know what proportion of the

2    original list that TrueNCOA flagged that you would

3    have sent along for further verification?

4      A.   I recall that we probably got -- the

5    initial cut was probably 700,000 or so.  And then

6    it ultimately got down to, what, 360-, so whatever

7    that delta is.

8      Q.   Approximately how much time did you

9    spend reviewing the names that were matched

10   between the voter file and the NCOA registry?  Or

11   am I understanding correctly that the code did all

12   the analysis and you personally did not do any

13   further?

14     A.   There's a little bit of sort of

15   reviewing the quality of reports to ensure that

16   we're within something we consider reasonable on

17   the false positives and false negatives, but an

18   hour maybe.

19     Q.   Okay.  And what would you have

20   considered reasonable?

21     A.   Maybe a standard deviation.

22     Q.   Can you just explain that a little bit

Page 141

1    more?  A standard deviation of what?

2         A.   Relative to the potential error rate

3    that we might expect.  That's the best way to

4    frame it.

5         Q.   Okay.  And what error rate did you

6    expect?

7         A.   Less than one standard deviation.

8         Q.   If you had had more time, would you have

9    done anything more?

10        A.   No.

11        Q.   Did you do anything to correct for

12   potential matches of individuals in the voter file

13   who share a first name, last name and reside at

14   the same address?  Or am I understanding that you

15   relied on TrueNCOA to determine whether that would

16   be a match?

17        A.   I never said that, but the import of

18   verifying identity can't be overstated in this

19   case.  And that would come as a result of helping

20   verify identity.

21        Q.   Okay.  So when you pulled the voter

22   file, there was -- if there were two individuals

Page 142

1    who shared a first name, last name and address,

2    you would have done some further analysis of that

3    at the front end; is that correct?

4          A.    Yes.

5          Q.    And that analysis would be by running it

6    through a code, and they would try to fill in more

7    information to distinguish these individuals?  Or

8    how exactly would you be able to distinguish them?

9          A.    There are elements of risk in any

10   determination.  And eliminating as many of the

11   elements of risk as you can is important.  The

12   absolute verification of identity, again, has to

13   be done by the counties because they have access

14   to the state DMV file.  They have access to other

15   things that citizens and voters don't have.

16               The citizens and voters were compelled

17   to identify -- give a specific reason for why they

18   thought someone was ineligible, and having moved

19   was the reason.  And so our -- our ability to

20   identify -- verify identity is limited by the fact

21   that Georgia only gives year of birth rather than

22   day and month and year of birth.

Page 143

1      Q.   Are you aware that thousands of records

2   in the challenge list do not show a street address

3   in the "moved to" field?

4      A.   Yes.  Because sometimes people move and

5   they don't give their address.  They don't give

6   their forwarding address.

7      Q.   And what is the reason for challenging

8   someone on the basis of residency when you do not

9   have evidence of where the person moved?

10     A.   Because that's the specific -- the law

11   compels a voter to challenge based on a specific

12   reason.  The specific reason is they believe they

13   moved.

14     Q.   How could a voter be notified of a

15   challenge if you do not know the forwarding

16   address?

17     A.   How would a voter be notified?

18     Q.   Yes.

19     A.   Okay.  We don't notify the voters.  The

20   county notifies the voter when they come in to

21   vote.

22     Q.   Okay.

Page 144

1           MR. SHELLY:  Can we pull up Exhibit F.

2           (Phillips Deposition Exhibit 9 was

3      marked for identification and attached to the

4      transcript.)

5      BY MR. SHELLY:

6           Q.   Are you familiar with this table,

7      Mr. Phillips?

8           A.   No, I don't know.  It doesn't ring a

9      bell.  I don't know that I saw it yesterday.  What

10     is it?

11          Q.   This is a document that you -- that

12     OpSec produced in response to our discovery

13     requests.

14          A.   Okay.  What's the question?

15          Q.   Did you create this table?

16          A.   It looks like it was created out of the

17     system.

18          Q.   Why does it only include nine counties?

19          A.   I have no idea, actually.

20          Q.   How would you have used this

21     information?

22          A.   We wouldn't use this information at all.

Page 145

1    It was system-generated.

2          MR. SHELLY:  You can take this down,

3    Mr. White.

4    BY MR. SHELLY:

5          Q.   Mr. Phillips, did you review the

6    challenge lists for instances where the name of

7    the registrant in the challenge file does not

8    match the name in the voter file or the registrant

9    with that registration number?

10         A.   We would have, yes.

11         Q.   And if you had noticed that, would you

12   still -- should that person have been included in

13   the challenge list if their name in the challenge

14   list did not match the name assigned to that

15   registration number in the registration rules?

16         A.   That likely would have been an exception

17   and would have been kicked out, but it's possible

18   it could be included.

19         Q.   Did you review the challenge list for

20   instances where the address an individual is

21   registered at and the address where a registrant

22   moved to are identical?

Page 146

1      A.   There are some anomalies like that, yes.

2      Q.   Should those anomalies have been removed

3   from the challenge list?

4      A.   I would like to think they would, but

5   it's possible they wouldn't.  There are some other

6   reasons why, especially if it was a different

7   name.

8      Q.   Would you review the challenge list to

9   confirm whether an individual reregistered at the

10  address where the NCOA match suggested the

11  individual moved to?

12     A.   That was beyond our capacity.  So in

13  that case, what we would say is submit the

14  challenge and let the county figure it out.

15     Q.   Do you know what it would mean when a

16  record shows a "moved to" street address of

17  general delivery?

18     A.   It could mean a lot of things.  They

19  didn't give an address.  They didn't have an

20  address when they moved.  It's possibly a homeless

21  person.  There are dozens of reasons.

22     Q.   Would you still understand that to

1/25/2022         Fair Fight, Inc. et al. v. True the Vote, et al.         Gregg Phillips

Page 147

1   provide probable cause for a challenge?

2         A.   We don't determine probable cause.  We

3   determine the reason that the voter would make the

4   challenge.  The county determines probable cause.

5         Q.   Did I hear you correctly earlier to

6   suggest that the challenge lists ultimately

7   included approximately 360,000 individuals?

8         A.   We didn't challenge that many.  That's

9   how many we identified.  The counties didn't take

10  up the challenges in most cases.

11        Q.   Okay.  Of that whole list that you had

12  prepared, the 360,000, how many do you think of

13  those individuals were actually ineligible to

14  vote?

15        A.   Well, that would be for the county to

16  determine.  We don't know.

17        Q.   Do you have any anticipation of what

18  that figure would have been?

19        A.   I'm not going to speculate.

20        Q.   Do you accept that some individuals on

21  the challenge list may be eligible to vote?

22        A.   Sure.

Page 148

1      Q.   Did you discuss the potential inaccuracy

2   of the list with anybody?

3      A.   I don't recall.

4      Q.   Do you think that 99 percent of the

5   names on the challenge list were ineligible to

6   vote?

7      A.   As I said, I have no idea.

8      Q.   Are you aware of any challengers who

9   retracted their challenge after concluding that

10   the lists you prepared were unreliable?

11      A.   I'm not, but I wouldn't have had that

12   communication.

13      Q.   Did you use the Social Security Death

14   Index as part of your process?

15      A.   Not in this instance.

16      Q.   "This instance" referring to the Georgia

17   challenge lists?

18      A.   Yes.

19      Q.   Are there any other data sources you

20   believe could have enhanced the accuracy of the

21   challenge lists?

22      A.   Not for the purposes for which we

Page 149

1    were -- we were called to work.

2         Q.   How many counties did you prepare

3    challenge lists for?

4         A.   I think we did them all.

5         Q.   And in how many counties were challenge

6    lists actually submitted?

7         A.   I don't know the answer to that.

8    Catherine can answer that.

9         Q.   Do you know how counties were chosen for

10   lists to be submitted?

11        A.   I believe it's where we found a Georgia

12   voter that lived in the jurisdiction to make the

13   challenge.

14        Q.   After you conducted the initial match,

15   did you analyze demographic information or other

16   characteristics of the individuals you identified?

17        A.   Not until after you sued us.

18             MR. SHELLY:  Can we pull up Exhibit H.

19             (Phillips Deposition Exhibit 10 was

20   marked for identification and attached to the

21   transcript.)

22

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 181

1    STATE OF MARYLAND        )

2                            ss:

3    COUNTY OF MONTGOMERY  )

4

5          I, Matthew Goldstein, Notary Public
     within and for the State of Maryland, do hereby
6    certify:

           That I reported the proceedings in the
7    within entitled matter, and that the within
     transcript is a true record of said proceedings.

8          I further certify that I am not related
     to any of the parties to the action by blood or
9    marriage, and that I am in no way interested in
     the outcome of this matter.

10         IN WITNESS WHEREOF, I have hereunto set
     my hand this 7th day of February, 2022.

11

12

13

14

15

16

17

18

19

20                                   _____

21

22                             Matthew Goldstein, RPR

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 182

1    Gregg Phillips, c/o

     THE BOPP LAW FIRM

2    1 S 6th Street

     Terre Haute, Indiana 47807

3

4    Case: Fair Fight, Inc. et al. v. True the Vote, et al.

     Date of deposition: January 25, 2022

5    Deponent: Gregg Phillips

6

7    Please be advised that the transcript in the above

8    referenced matter is now complete and ready for signature.

9    The deponent may come to this office to sign the transcript,

10   a copy may be purchased for the witness to review and sign,

11   or the deponent and/or counsel may waive the option of

12   signing. Please advise us of the option selected.

13   Please forward the errata sheet and the original signed

14   signature page to counsel noticing the deposition, noting the

15   applicable time period allowed for such by the governing

     Rules of Procedure. If you have any questions, please do

16   not hesitate to call our office at (202)-232-0646.

17

18

19   Sincerely,

     Digital Evidence Group

20   Copyright 2022 Digital Evidence Group

21   Copying is forbidden, including electronically, absent

22   express written consent.

Page 183

1          Digital Evidence Group, L.L.C.
           1730 M Street, NW, Suite 812
2          Washington, D.C. 20036
           (202) 232-0646
3
4          SIGNATURE PAGE
           Case: Fair Fight, Inc. et al. v. True the Vote, et al.
5          Witness Name: Gregg Phillips
           Deposition Date: January 25, 2022
6
7          I do hereby acknowledge that I have read
           and examined the foregoing pages
8          of the transcript of my deposition and that:
9
10         (Check appropriate box):
           (  ) The same is a true, correct and
11         complete transcription of the answers given by
           me to the questions therein recorded.
12         (  ) Except for the changes noted in the
           attached Errata Sheet, the same is a true,
13         correct and complete transcription of the
           answers given by me to the questions therein
14         recorded.
15
16
17
18    _____          _____
19      DATE                    WITNESS SIGNATURE
20
21    _____          _____
22      DATE                           NOTARY

1/25/2022          Fair Fight, Inc. et al. v. True the Vote, et al.          Gregg Phillips

Page 184

1        Digital Evidence Group, LLC

2        1730 M Street, NW, Suite 812

3        Washington, D.C.  20036

4        (202)232-0646

5

6                          ERRATA SHEET

7

8        Case: Fair Fight, Inc. et al. v. True the Vote, et al.

9        Witness Name: Gregg Phillips

10       Deposition Date: January 25, 2022

11       Page No.    Line No.      Change

12

13

14

15

16

17

18

19

20

21       _____        _____

22       Signature                           Date