**United States District Court**
**Northern District of Georgia**
**Gainesville Division**

| | |
|---|---|
| **Fair Fight, Inc., Scott Berson, Jocelyn Heredia,** and **Jane Doe**, | |
| *Plaintiffs,* | |
| *v.* | **Civ. No. 2:20-cv-00302-SCJ** |
| **True the Vote, Inc., Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, James Cooper,** and **John Does 1-10**, | **Hon: Steve C. Jones** |
| *Defendants.* | |

**Defendants' Response in Opposition to Plaintiffs' Motion for Summary Judgment**

Defs.' Resp. to Pls.'
Mot. for Summ. J.

# Table of Contents

Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. The Plaintiffs produced no evidence that Named Defendants intimidated them in
   violation of § 11(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    A.    Scott Berson lacks Article III standing because Named Defendants
   did not submit voter challenges against him in Muscogee County. . . 4

    B.    Jocelyn Heredia's claims of intimidation are unsupported by evidence
   sufficient to substantiate an § 11(b) violation. . . . . . . . . . . . . . . . . . 7

    C.    The anonymous Plaintiffs' claims are unsubstantiated in the record
   and do not support an § 11(b) violation claim. . . . . . . . . . . . . . . . . . 10

    D.    Fair Fight has not provided any evidence that Named Defendants had
   any contact with any Fair Fight agent in violation of § 11(b). . . . . . 12

II. Plaintiffs' allegations that Named Defendants' Challenges were frivolous are
   without merit. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.    TTV's work related to the presidential election is immaterial and did
   not violate § 11(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B.    Named Defendants; work related to Georgia's runoff election did not
   violate § 11(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        1.    TTV never offered bounties for reports of fraud. . . . . . . . . . . 15

        2.    TTV never advocated for, or recruited, former Navy SEALs to
   "patrol" polling places. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

        3.    Named Defendants did not encourage and amplify threats of
   election-related vigilantism on social media. . . . . . . . . . . . . . 18

    C.    The Named Defendants' Challenges were not frivolous. . . . . . . . . . 20

        1.    NCOA data is properly considered. . . . . . . . . . . . . . . . . . . . . 20

        2.    Dr. Mayer's conclusions are unsupported in the record. . . . . 22

        3.    Mr. Martin's withdrawal of challenges does not support the
   claim TTV's challenges were frivolous. . . . . . . . . . . . . . . . . 24

Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# Table of Authorities

## Cases

*Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283 (11th Cir. 2010) . . . . . . . . . . . 15

*Democratic Nat. Comm. v. Republican Nat. Comm.*, 671 F. Supp. 2d 575 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 18

*Husted v. A. Philip Randolf Inst.*, 138 S.Ct. 1833 (2018) . . . . . . . . . . . . . . . . . . . 20

*Husted v. A. Philip Randolf Inst.*, 138 S.Ct. 1833 (2018) . . . . . . . . . . . . . . . . . . . 20

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020) . . . . . . . . . . . . . 4

*Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020) . . . . . . . . . . . . . 4

*League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, (S.D.N.Y. 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

## Introduction

After nearly sixteen months of litigation, Plaintiffs are no closer today to proving that Defendants True the Vote, Inc. ("**TTV**"), Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, and James Cooper (collectively, "**Named Defendants**") violated Section 11(b) of the Voting Rights Act of 1965 ("**§ 11(b)**") than they were when this Court denied their Motions for a Temporary Restraining Order and/or Preliminary Injunction. Order, ECF No. 29 (finding the "evidence provided to date does not show Defendants have harassed or intimidated voters"). *Id.* at 26. The same is true today—Plaintiffs have not provided sufficient (or any) evidence to "connect intimidation or harassment (real or attempted) to Defendants." *Id.*

The undisputed facts show Named Defendants never contacted Challenged Voters directly; they carefully analyzed the data underlying their Voter Challenges, and they submitted Voter Challenges in accordance with Georgia law. They never sought to remove any voter from the voter registration lists. They never threatened legal, economic, or physical harm to any Challenged Voter. Plaintiffs failed to meet their burden of proof. Named Defendants' Motion for

Summary Judgment should be granted.

## Argument

### I. The Plaintiffs produced no evidence that Named Defendants intimidated them in violation of § 11(b).

Plaintiffs state that threats or intimidation "can appear in several forms, and subtler, nonviolent voter-related harm can give rise to a Section 11(b) violation." Pls.' Br. in Supp. of Pls.' Mot. for Summ. J., ECF No. 156-1 at 9. ("**Pls.' MSJ**"). Named Defendants acknowledged such in their Motion for Summary Judgment. *See* Defs.' Br. in Supp. of Defs.' Mot. for Summ. J. ("**Defs.' MSJ**"), ECF No. 155-1 at 4 (citing *Nat'l Coal. on Black Civic Participation v. Wohl ("Wohl I")*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020)). Named Defendants provided many examples where courts found § 11(b) violations, but they all had two things in common: (1) the defendants made direct contact with voters or those attempting to help voters; and/or (2) the defendants acted in an unlawful manner. *See* Defs.' MSJ at 4-7 (detailing cases where defendants' § 11(b) violations found).

Plaintiffs' additional case citations don't support their assertions either. In the first, the defendants published a written report to national media, after being warned by election officials not to do so, that included voter information, titled

"Alien Invasion I," which accused voters of committing felonies. *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.* ("**LULAC**"), No. 1:18-CV-00423, 2018 WL 3848404 at *1 (E.D. Va. Aug. 13, 2018). LULAC bears no relation to the undisputed facts here—it is undisputed that Named Defendants did not publicly publish any of the Challenge lists submitted to county election boards. TTV Tr. 257:11-14, ECF No. 155-7; Second Somerville Tr. 71:16-72:19; 72:21-73:14, ECF No. 155-14; Second Davis Tr. 46:3-14; 80:7-10, ECF No. 155-17 (collectively, "**No Publication Citations**").

The second case involved a political party allegedly intimidating voters on Election Day by posting off-duty sheriffs and policemen—some of whom were wearing equipment normally associated with law enforcement personnel such as two-way radios and firearms—at polling places in minority precincts. *Democratic Nat. Comm. v. Republican Nat. Comm.*, 671 F. Supp. 2d 575, 579 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012). Plaintiffs have provided no evidence that Named Defendants advocated for placing armed off duty law enforcement personnel at any polling place, let alone polling places in minority precincts (Plaintiffs' allegations that TTV wanted to have Navy SEALs "patrol" polling

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                3

places is unsupported by evidence, *infra*, at Part II.B.2.).

 In short, Plaintiffs cannot cite to even one controlling precedent which sustains their allegation that submitting challenges allowed under state law, without any communication between Named Defendants and voters, without any Named Defendants' publication of the Challenges, and without any Named Defendant threatening any voter with physical, legal, or economic harm if they voted, can support a claim of an § 11(b) violation. The undisputed facts are clear—Named Defendants did not participate in any action which is analogous to any actions where § 11(b) violations have been found. Named Defendants' Motion for Summary Judgment should be granted.

**A.      Scott Berson lacks Article III standing because Named Defendants did not submit voter challenges against him in Muscogee County.**

A plaintiff bears the burden of proof on the threshold jurisdictional question of standing and must prove each of the following standing elements: "(1) an injury in fact that (2) is fairly traceable to the challenged action of the defendant and (3) is likely to be redressed by a favorable decision." *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1245 (11th Cir. 2020).

Scott Berson was a challenged voter in Muscogee County. Plaintiff Scott

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                    4

Berson's Responses to Defendants' First Set of Interrogatories (Jun. 23, 2021)

("**Berson Resp. to Interrogs.**"), ECF No. 155-23, Resp. No. 3. Mr. Berson was

never contacted directly by any Challenger, including any Named Defendant. *Id.* at

Resp. No. 14. Mr. Berson read in the paper that challenges had been filed and he

"figured [he] was probably on the list." *Id.* at Resp. No. 6. He subsequently

"received a phone call from a community organizer" informing him he had been

challenged, but he doesn't know the identity of the person who called him. *Id.* Mr.

Berson cast a provisional ballot in the run-off election, which was subsequently

counted after he verified his eligibility with Muscogee County election officials.

*Id.* at Resp. Nos. 12, 13. Mr. Berson describes having to find suitable

identification and proof of residency after changing mailing addresses as

"extremely frustrating and burdensome." *Id.* at Resp. No. 8. Mr. Berson never

provided admissible evidence or testimony that he was intimidated or threatened

by the Challenge.

TTV did not submit any Challenge in Muscogee County. TTV's Amended

Responses to Plaintiffs' First Requests for Production (Mar. 24, 2021) ("**TTV Am.**

**Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used the

Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee County. Second Davis Tr. 144:7-15.[1]

Plaintiffs have shown no evidence that Mr. Berson suffered an injury in fact that is traceable to any Named Defendant. First, Mr. Berson has not provided any testimony that he was intimidated, threatened, or even contacted by any Challenger. Mr. Berson's vote was accepted after he provided the Muscogee County officials with proof of residency, so he suffered no harm. Even if Mr. Berson was harmed by being required to prove his residency, he has not shown evidence causally linking this (alleged) harm was due to any action of a Named Defendant. Therefore, Mr. Berson lacks Article III standing because he has no injury in fact that is traceable to a Named Defendant in this case. Because he lacks standing, this Court should grant Named Defendants' motion for summary judgment, as related to his claims.

---

[1] Plaintiffs offered declarations by Stephanie Pfeiffer Stinetorf, ECF No. 156-20, and Gamaliel Warren Turner, Sr., ECF No. 156-21 in support of their Motion for Summary Judgment. Both Ms. Stinetorf and Mr. Turner are registered to vote in Muscogee County. Since the undisputed evidence shows no Named Defendant submitted a challenge in Muscogee County, these declarations are immaterial to Plaintiffs' claims and should not be considered by this Court as any of their alleged injuries are not traceable to Named Defendants.

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                    6

**B.      Jocelyn Heredia's claims of intimidation are unsupported by evidence sufficient to substantiate an § 11(b) violation.**

Ms. Heredia was a Challenged Voter in Banks County. Transcript Excerpts of Deposition of Jocelyn Heredia (Oct. 15, 2021) ("**Heredia Tr.")**, ECF No. 155-24, 20:13-21:7. TTV submitted a Challenge in Banks County, but Banks County did not process it because it found it did not have probable cause to do so. Banks County Board Minutes, ECF No. 155-26. A volunteer used the Davis/Somerville Challenge List to submit a Challenge in Banks County. ECF No. 156-35. However, Mr. Davis and Mr. Somerville did not "act in concert" with TTV, which forms the basis of the complaint against them. *See* Defs.' MSJ 13-17 (detailing citations to the record showing Mr. Davis and Mr. Somerville had no knowledge of TTV methodology, process, or analysis). Therefore, any Challenge based upon the Davis/Somerville Challenge List was independent from TTV, *id.*, and is irrelevant to the claims asserted in this case. *See* Defs.' MSJ*, Part I.B.

However, if this Court finds relevant Mr. Davis' and Mr. Somerville's Banks County Challenge, or finds that TTV's mere submission of a Challenge (although unconsidered) is relevant, Ms. Heredia's claims of intimidation are still unsupported by evidence. Ms. Heredia testified she was never contacted by the

**Defs.' Resp. to Pls.'
Mot. for Summ. J.**                                      7

person who submitted the Challenge. Heredia Tr. 49:4-50:2. Ms. Heredia testified that Banks County, not any Challenger, published her name on its website. *Id.* at 31:22-32:3. Ms. Heredia did submit a change of address form. *Id.* at 13:1-13.

Ms. Heredia testified that no one said anything to her while she was standing in line to vote that intimidated her or targeted her. *Id.* at 48:16-49:3. However, Ms. Heredia testified she felt "intimidated from the get-go," as soon as she got to the polling location because she was the only Hispanic person in line to vote in a predominantly Republican county. *Id.* at 48:1-9. Ms. Heredia testified that she did not know she was Challenged until later, when she got into the polling location. *Id.* at 49:4-50:2. Ms. Heredia testified her feeling of intimidation increased when she learned she had been Challenged based upon her change of address. *Id.* at 48:10-15.

Ms. Heredia testified that because she was Challenged, election officials asked her to fill out a paper ballot and explained to her that if she provided the requisite proof of residency at her voter registration address, her paper ballot would be counted. *Id.* at 23:22-24:13. She provided them with proof of residency and submitted the paper ballot. *Id.* at 24:8-13.

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                    8

None of the Named Defendants contacted Ms. Heredia directly. TTV Resp. to First Rogs. No. 5; Somerville Am. Resp. and Obj. 2d Interrogs., Resp. No. 7; First Davis Tr. 171:4-21; Williams Tr. 63:2-64:1; Johnson Resp. to First Interrogs. Resp. No. 5; Cooper Resp. to First Interrogs. Resp. No. 5; Cooper Tr. 45:1-9; 50:13-22 (collectively, "**No Contact Citations**"). Ms. Heredia herself testified that no one said anything intimidating to her or targeted her while she was standing in line to vote. Heredia Tr. 48:16-49:3. She testified to a subjective feeling of intimidation even before knowing she was a Challenged Voter, but she provided no evidence of any acts of intimidation or threats directed to her by anyone, let alone directed to her by any Named Defendants, that would have turned that subjective feeling into an objective reason to feel intimidated. *Id.* at 48:1-9; 49:4-50:2;48:10-15. She was able to cast a provisional ballot, and she verified her address to the Banks County election officials. *Id.* at 24:8-13. No one prevented her from voting. No one tried to prevent her from voting—a § 230 Challenge does not prevent someone from voting—it simply requires a Challenged Voter, in some contexts, to provide proof of eligibility to vote at a specific polling location. The undisputed facts on the record do not support Ms. Heredia's claim of an § 11(b)

violation by any Named Defendant, and their Motion for Summary Judgment

should be granted, as related to her claims.

**C.    The anonymous Plaintiffs' claims are unsubstantiated in the record and do not support an § 11(b) violation claim.**

Plaintiffs John Doe and Jane Doe submitted declarations, which this Court

reviewed *in camera*, to support their claims. ECF No. 26. Jane Doe's declaration

states she is a registered voter in Clarke County, Georgia. ECF No. 156-19, ¶ 2.

TTV submitted a challenge in Clarke County. TTV Am. Resp. First RFP, Resp.

No. 2. The Davis/Somerville Challenge List was not submitted in Clarke County.

ECF No. 156-35. John Doe's county of registration was redacted. See ECF No. 26,

so Named Defendants don't know if John Doe was Challenged by a TTV

submission or by a volunteer using the Davis/Somerville Challenge List. Mr.

Davis and Mr. Somerville did not "act in concert" with TTV, which forms the

basis of the complaint against them. *See* Defs.' MSJ 13-17. Therefore, any

Challenge based upon the Davis/Somerville Challenge List was independent from

TTV, and is irrelevant to the claims asserted in this case. *See* Defs.' MSJ 13-17.

Assuming, *arguendo*, that the Doe Plaintiffs are registered in a county

where TTV submitted Challenges, or this Court considers Challenges rooted in the

Davis/Somerville Challenge List to be relevant, the Doe Plaintiffs still have not

met their burden of proving an § 11(b) violation. Doe Plaintiffs both declared that

they learned of their Challenge when they "read a story in the local paper." ECF

No. 26, ¶ 5. Doe Plaintiffs assert "Defendants published a list with my address on

it," *id.* at ¶ 8, but no evidence in the record supports this assertion. The Named

Defendants did not publicly publish any Challenge Lists. No Publication Citations.

The Doe Plaintiffs do not assert that they were contacted by any Named

Defendant. *See* ECF No. 26. The Named Defendants did not contact any

Challenged Voter. No Contact Citations. The Doe Plaintiffs assert they were

"extremely upset" when they learned their eligibility to vote had been challenged.

ECF No. 26, ¶ 5. The Doe Plaintiffs declared that the Challenge would not prevent

either one of them from voting in the run-off election, but they feared they "could"

become the target of harassment "from Defendants and their supporters." ECF No.

26, ¶ 8.

Both Doe Plaintiffs declared they would vote in the run-off election.

Again—a § 230 Challenge does not prevent someone from voting—it simply

requires a Challenged Voter, in some contexts, to provide proof of eligibility to

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                11

vote at a specific polling location. The Doe Plaintiffs provide no evidence that they were asked to provide such proof of eligibility by any county election official.

Doe Plaintiffs declared a subjective fear of harassment that "could"—not "did," not even would be "likely to"—just that they feared, subjectively, such harassment could happen at some theoretical point in the future. But the record does not provide any evidence of any acts of intimidation or threats directed to Doe Plaintiffs by anyone, let alone directed to them by any Named Defendants, that would have turned that subjective feeling about a theoretical, future possibility into an objective reason to feel intimidated. As this Court noted, it is critical that Plaintiffs "connect intimidation or harassment (real or attempted) to Defendants." Order, ECF No. 29 at 26. Doe Plaintiffs have failed to provide any such evidence connecting intimidation or harassment to any Named Defendant.

The undisputed facts on the record do not support Doe Plaintiffs' claims of an § 11(b) violation by any Named Defendant, and their Motion for Summary Judgment should be granted, as related to their claims.

**D.    Fair Fight has not provided any evidence that Named Defendants had any contact with any Fair Fight agent in violation of § 11(b).**

This Court held Fair Fight has standing based upon a diversion of resources

and that if Plaintiffs showed Named Defendants violated § 11(b) (thereby

unlawfully causing Fair Fight's diversion of resources), an injunction would

redress Fair Fight's injury. *See* Order at 19.

However, Fair Fight is not a Challenged Voter, and its diversion of

resources does not support its underlying § 11(b) violation claim—§ 11(b) has a

private right of action, but the statutory language requires plaintiffs to show

threats or intimidation against voters or those who are helping people vote. 52

U.S.C. § 10307(b). Fair Fight does not allege any Named Defendant attempted to

stop it from proceeding with its efforts to assist voters, so it does not allege Named

Defendants violated § 11(b) through any intimidation or harassment of Fair Fight

or its agents.

Because the Plaintiffs have not produced any evidence that Named

Defendants intimidated them in violation of § 11(b), their motion for summary

judgment should be granted.

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                13

## II. Plaintiffs' allegations that Named Defendants' Challenges were frivolous are without merit.

### A.     TTV's work related to the presidential election is immaterial and did not violate § 11(b).

The sole issue before this Court is whether Named Defendants violated § 11(b). Am. Compl., ECF No. 73, ¶¶ 77-80 (single cause of action). Plaintiffs attempt to make much of the fact that TTV assisted in efforts to pursue litigation regarding the 2020 presidential election results. To support their criticism of this effort, Plaintiffs focus on two things: (1) a promotional piece drafted regarding this litigation, ECF No. 156-4; and (2) claims in federal lawsuits that allegedly lack evidentiary support. Pls.' MSJ at 13.

Fair Fight contends it's an undisputed fact that TTV "launched a nationwide effort to gin up evidence of voter fraud" in its Validate the Vote 2020 program. TTV's promotional piece was clear—the three options described regarding the presidential election were based upon the condition that "*if sufficient election fraud is proven*, making the results of the election doubtful, the lawsuits will seek to have the state's election results overturned." *Id.* (emphasis added). Not only does the promotional piece acknowledge that sufficient proof would be necessary

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                    14

for litigation (such measured language cannot be considered a call to "gin up evidence"), TTV's work surrounding the presidential election is immaterial to the question of whether Named Defendants violated § 11(b) by submitting lawful voter challenges related to the Georgia runoff election.

Fair Fight asserts that TTV never "mustered *any* proof of ineligible voting in *any* of the lawsuits it filed . . . [and] voluntarily dismissed all four cases just days after filing." Complaints do not have to provide evidence of allegations, they have to meet the *Twombly-Iqbal* plausibility standard. *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1290 (11th Cir. 2010). Fair Fight's counsel must surely be aware of this as this Court did not dismiss Fair Fight's *complaint* when it dismissed their motion for a TRO based upon lack of evidence. Order at 26-28. The lawsuits were voluntarily dismissed in accordance with federal rules before any discovery occurred, which obviously means they were dismissed before any evidence was collected regarding the claims.

**B.     Named Defendants; work related to Georgia's runoff election did not violate § 11(b).**

**1.     TTV never offered bounties for reports of fraud.**

In conjunction with its work on the Challenge List, TTV established a

support fund to provide legal support for people who reported information primarily to head off the chilling effect of the threat of legal action against challengers or those with information. TTV Tr. 71:11-19, 71:22-72:1, 74:8-17, 75:5-18, 76:15-19. Ms. Engelbrecht testified that when she stated "Validate the Vote is about is putting a bounty on the fraud" during a podcast, she was "riffing" on what Validate the Vote was trying to do, but she then specified that the support fund was used to provide legal support, if and when needed. TTV Tr. 69:9-75:18.

As a result of the initiative associated with the fund, TTV received credible reports of criminal malfeasance that it submitted to authorities. TTV Tr. 316:19-317:5. Plaintiffs have provided no evidence—because none exists—that anyone was ever paid money from TTV's support fund based solely upon their report of a potential election issue to the voter integrity hotline. Offering to pay for legal support after someone reports a potential issue to TTV and then gets sued for doing so is not offering a "bounty" for reports of fraud. Dr. Burton's examples of intimidating rewards were all examples of blanket offers to pay for information about crimes or offering rewards for such information. See Burton Rpt. ECF No. 156-17 at 26. Plaintiffs have offered no evidence that Named Defendants offered

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                    16

any such reward or incentive for simply reporting election fraud—the only financial support TTV offered was in the form of paying for legal assistance if a "whistelblower" was harassed or sued.

### 2. TTV never advocated for, or recruited, former Navy SEALs to "patrol" polling places.

In 2020, TTV had an initiative called "Continue to Serve" that was directed towards veterans and first responders working in the polls or volunteering to work in the polls. TTV Tr. 59:9-12. This initiative was started in recognition that states often struggle to get enough volunteers working at polls[2] and that veterans and first responders are very good at understanding a chain of command and understanding process, so those skill sets translate well to volunteering at polls. *Id.* at 59:19-60:17. Ms. Engelbrecht testified that the interactions between these volunteers and voters or other poll workers would depend on what capacity they volunteered in and what the state process was for various poll volunteer functions. *Id.* at 62:13-64:7.

---

[2]*See* Secretary of State for the State of Georgia, *Brad Raffensperger Calls on Local Groups to Commit to Poll Working: Launches Poll Worker Recruitment Tools*, https://sos.ga.gov/news/brad-raffensperger-calls-local-groups-commit-poll-working-launches-poll-worker-recruitment (August 4, 2020).

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                    17

Plaintiffs try to draw a comparison between recruiting former military members to serve as lawful volunteers at polling places, to the practice of placing off-duty armed police at polling places in minority districts. Pls.' MSJ 25-26. Plaintiffs' comparison is as factually inaccurate as it is insulting. The off-duty armed police in New Jersey were not volunteering as poll workers, as is allowed and required under state law—they were standing at polling places wearing armbands that read "National Ballot Security Task Force." *Democratic Nat. Comm.*, 671 F. Supp. 2d 575, 579. Plaintiffs have provided no evidence—because none exists, that TTV wanted to recruit former Navy SEALs to "patrol" polling places. The undisputed evidence shows that TTV wanted to assist in recruiting former military members and first responders to be poll workers, under the supervision and training of state officials.

### 3.   Named Defendants did not encourage and amplify threats of election-related vigilantism on social media.

Plaintiffs claim that Named Defendants "used or expressed support for threatening rhetoric on social media." Pls.' MSJ at 28. They compare this "threatening and intimidating rhetoric" to the placing armed guards or law enforcement officials at polling locations. *Id.* at 29. But Plaintiffs fail to provide

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                18

evidence that Named Defendants used or expressed support for threatening or intimidating rhetoric.

Plaintiffs assert a Facebook thread posted by Mr. Davis and Mr. Somerville is an example of threatening rhetoric. This thread detailed one problem they found after compiling the Davis/Somerville Challenge List: namely, the list contained quite a number of voters who were registered to vote at commercial mail receiving agencies (such as UPS stores), rather than at their residence. Second Davis Tr. 67:5-68:8; 70:22-71:16. They hoped election officials would notice this issue and work towards resolving it. *Id.*

Plaintiffs claim "an organization affiliated with Ms. Engelbrecht and True the Vote publicly threatened to publish the names of all challenged voters." Pls.' MSJ at 29. This claim refers to a tweet by "Crusade for Freedom" and a Facebook post by "Time for a Hero." TTV is not associated with either Crusade for Freedom or Time for a Hero. TTV Tr. 259:1-18; 338:2-339:18. Although these tweets used hashtags for Validate the Vote Georgia, TTV does not control who uses hashtags on Twitter. 339:10-18.

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                    19

**C.      The Named Defendants' Challenges were not frivolous.**

**1.      NCOA data is properly considered.**

The NCOA is used by thirty-six states in required list maintenance to trigger sending a National Voting Rights Act ("**NVRA**") "return card," which is designed to ascertain the putative voter's current address and explains the procedures for affirming residence. *Husted v. A. Philip Randolf Inst.*, 138 S.Ct. 1833, 1839-40 (2018). The practice of using the NCOA data for this purpose was pronounced as "undisputably lawful" by the United States Supreme Court. *Id.*

 The process TTV used (through OpSec) to compile the Challenge List process was not limited to matching NCOA data to a voter file but used additional databases, including other state registrations, proprietary lists, county tax records, and voter registration rolls in other states allowing for broader comparisons and more accurate matching than is generally attained by using NCOA and a voter list alone. OpSec Tr. 94:17-21; 95:3-9, 17-18; 95:14-18; 96:3-17. Mr. Davis' and Mr. Somerville's data analysis included running CASS & NCOA processing of voter-provided move status, geocoding to verify move locations, and extensive work to remove military and student voters, who they knew were likely to be eligible to

vote. First Davis Tr. 21; Davis Interrog. Resp. Ct. Order Resp. No. 2.

If NCOA data is "undisputably lawful" as a trigger point for list maintenance in accordance with the NVRA, it can hardly be considered "frivolous" to begin with the NCOA to analyze data for possible inclusion on challenge lists, and the challenges here were based on more rigorous analysis than is required for list maintenance. Despite Plaintiffs' assertions, the challenges at issue would not have required election officials to remove any voter from the registration list. Pls.' MSJ at 4. Georgia law requires two things before the election officials can remove someone from the list of electors based upon a § 230 Challenge: (1) the challenge has to be based upon the grounds that the elector is not qualified to remain on the list of electors; and (2) the election officials have to determine, after a hearing, that the challenged elector is in fact, not legally eligible to remain on the list of electors for that county. O.C.G.A. § 21-2-30(h).

None of the § 230 Challenges were "based upon the grounds that the elector is not qualified to remain on the list of electors." Rather, all the § 230 Challenges were based upon whether the elector was eligible to vote in the runoff election—in order to protect the rights, and prevent vote dilution, of all the eligible voters who

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                    21

legally cast ballots. TTV Tr. 342:15-343:1; TTV's Resp. First Interrogs. Resp. No. 5; First Somerville Tr. 124:1-12; 127:9-15; Second Davis Tr. 59:7-8l 86:22-87:3; 90:14-21.

### 2.    Dr. Mayer's conclusions are unsupported in the record.

The proprietary process resulting in the Challenge List used a sophisticated algorithm to draw in information from other databases in making a match, used regression modeling to substantially cut the risk of a mismatch, and reviewed the results of matching names to ensure that it was reasonable with respect to false positives and false negative to within one standard deviation of the potential error that might be expected. OpSec Tr. 108:8-11 113:6-17, 118:11-119:22, 140:8-141:7 141:11-20.

In several instances, Plaintiffs cite supposed weaknesses in data in the Challenge List. *See*, *e.g.*, Mayer Rep. 24-25. But the challenge file was the *result* of analysis, not a source of data, OpSec. Tr. 93:14-94:2, and is not evidence of what was considered in compiling the challenge list. Plaintiffs argue that Named Defendants challenge lists did not reliably match NCOA data to a voter file because the NCOA registry does not include any unique identifier, like a social

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                 22

security number or other identification number that is unique to each voter. Mayer

Rep. at 6; 15-16. But the combination of data—full name, address, and year of

birth is itself a unique identifier, and the proprietary process used to create the

Challenge List mitigates a lack of unique identifiers between voter registration

rolls and NCOA lists by resolving for identity first, OpSec Tr. 120:12-20, using

data from other lists to help verify identity of voters that have moved. OpSec Tr.

96:3-8; *id.* 96:12. The additional databases include other state registrations,

proprietary lists, county tax records, and voter registration rolls in other states

allowing for broader comparisons and more accurate matching than is generally

attained by using NCOA and a voter list alone. OpSec Tr. 94:17-21; 95:3-9, 17-18;

95:14-18; 96:3-17 (duplicate entries in voter file is not material because the

presence of duplicate records in the voter file was accounted for by OpSec's

process); *see also* OpSec Tr. 94:9-14; (process was not limited to NCOA and voter

file list); *id.* 113:6-17 (process compared voter file information to commercially

available information).

  Dr. Mayer asserts that 22,956 registrants on the challenge file moved to an

address on a military installation, but cites only 397 registrants who are listed as

actually living on a military installation. Mayer Rep. at 30. OpSec used NCOA

filters to exclude recognized military addresses. TTV Tr. 202:18-203:11, 204:4-6;

TTV 1453 (TTV Dep. Ex, 26). 300,000 voters were excluded from the initial

query as identified as, among other things, deployed for military service. OpSec

Tr. 128:3-7. The proprietary process checked databases other than NCOA and the

voter file list to identify persons who had permanently moved, OpSec Tr. 94:17,

95:3-9, including other state registrations, *id.* 95:14-15; 96:12-17, and "five or six

other data sources." OpSec Tr. 95:17-18.

### 3.    Mr. Martin's withdrawal of challenges does not support the claim TTV's challenges were frivolous.

Joseph Martin volunteered to serve as TTV's challenger in Taliaferro

County. TTV Resp. to 2d Interrog. Resp. No. 11. Mr. Martin learned that three out

of the 37 names on that challenge list had submitted absentee ballots, so he used

those as his "test" cases. Martin Tr. 39:3-10. One of the three test cases lived in

Wilkes County, but cast an absentee ballot in Taliaferro County and that voter

later asked for her name to be removed from Taliaferro County's registration.

Martin Tr. 65:19-7; 66:8-17. The second test case did not reside in Taliaferro

County, but was able to vote there due to a homestead exemption. *Id.* at 64:4-65:7.

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                    24

So the information on TTV's list about that person's change of address was accurate. The local judge verified the third test case lived in Taliaferro County. *Id.* at 62:3-13. Mr. Martin testified that as far as the accuracy of the list he was provided, "it depends on how you look at the list" because one or two votes can make a difference in Taliaferro County. *Id.* at 99:11-19. He asked his challenge to be withdrawn because he didn't want to put the registrar through the "painful process of validating those 37 individuals." Martin Tr. 78:4-9. TTV withdrew his challenges on December 21, 2021. TTV Resp. to 2d Interrog. Resp. No. 11.

Plaintiffs presented no evidence about the other 34 people on this challenge list, but in two out of three test cases, TTV's data was accurate—and the system worked. One voter realized she was registered in the wrong county and withdrew her ballot; another proved he was still legally allowed to vote there due to a homestead exemption; in another TTV's data apparently inaccurate. Plaintiffs have no evidence showing there were any other inaccuracies.

## Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted.

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**                    25

Dated: June 6, 2022                           Respectfully Submitted,

_/s/ David F. Guldenschuh_                   _/s/ James Bopp, Jr._
David F. Guldenschuh                    James Bopp, Jr.,* IN # 2838-84
GA Bar No. 315175                       jboppjr@aol.com
David F. Guldenschuh P.C.            Jeffrey P. Gallant,* VA # 46876
P.O. Box 3                              jgallant@bopplaw.com
Rome, Georgia 30162-0333           Courtney Turner Milbank,* IN#
Telephone: 706-295-0333             32178-29
Email: dfg@guldenschuhlaw.com     cmilbank@bopplaw.com
_Local Counsel for Defendants_        Melena Siebert,* IN # 35061-15
                                     msiebert@bopplaw.com
                                   THE BOPP LAW FIRM, PC
                                   1 South 6th Street
                                   Terre Haute, Indiana 47807
                                   Telephone: (812) 232-2434
                                   Facsimile: (812) 235-3685
                                   _Lead Counsel for Defendants_
                                   *Admitted Pro hac vice

**Defs.' Resp. to Pls.'**
**Mot. for Summ. J.**            26

# Certificate of Compliance

The undersigned counsel certifies that the foregoing has been prepared in

Times New Roman (14 point) font, as required by the Court in Local Rule 5.1(B).

Respectfully submitted on June 6, 2022

*/s/ James Bopp, Jr.*
James Bopp, Jr.
*Lead Counsel for Defendants*
