**United States District Court**
**Northern District of Georgia**
**Gainesville Division**

| | |
|---|---|
| **Fair Fight, Inc., Scott Berson, Jocelyn Heredia,** and **Jane Doe**, <br><br> *Plaintiffs,* <br><br> *v.* <br><br> **True the Vote, Inc., Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, James Cooper,** and **John Does 1-10**, <br><br> *Defendants.* | **Civ. No. 2:20-cv-00302-SCJ** <br><br> **Hon: Steve C. Jones** |

### DEFENDANTS' RESPONSE TO PLAINTIFFS' CORRECTED STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendants True the Vote, Inc. ("**TTV**"), Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, and James Cooper (collectively, "**Named Defendants**"), by and through counsel, offer the following responses to Plaintiffs' Corrected Statement of Undisputed Material Facts:

I.       **The Plaintiffs**

A.      **Fair Fight**

1. Plaintiff Fair Fight, Inc. is a is a political action committee with a non-contribution account, commonly known as a Hybrid PAC, registered with the Federal Election Commission, the Georgia Government Transparency and Campaign Finance Commission, and various state campaign finance regulators. Ex. 15, Fair Fight Declaration ("Decl.") ¶ 3.

**Response:** Undisputed, but this fact is immaterial to the sole issue before this Court—that is whether Named Defendants engaged in activities that were objectively likely to intimidate voters in violation of §11(b) of the Voting Rights Act. *See* Order, ECF No. 29 at 2-3.

2. Part of Fair Fight's mission is to secure the voting rights of Georgians, which includes advocating for voter engagement and voter turn-out, particularly among young people and people of color. *Id.* ¶ 4.

**Response:** Undisputed, but this fact is immaterial to the sole issue before this Court—that is whether Named Defendants engaged in activities that were objectively likely to intimidate voters in violation of §11(b) of the Voting Rights

Act. *See* Order, ECF No. 29 at 2-3.

3. Fair Fight's voter engagement activities include efforts to support and elect pro-voting rights progressive leaders. To encourage voter participation, Fair Fight also conducts programmatic activities including the preparation and sponsorship of digital advertising, mailings, phone banks and calls, and text messaging. *Id.* ¶ 5.

**Response:** Undisputed, but this fact is immaterial to the sole issue before this Court—that is whether Named Defendants engaged in activities that were objectively likely to intimidate voters in violation of §11(b) of the Voting Rights Act. *See* Order, ECF No. 29 at 2-3.

4. Fair Fight also raises money and provides funding for voter engagement activities. *Id.* ¶ 5.

**Response:** Undisputed, but this fact is immaterial to the sole issue before this Court—that is whether Named Defendants engaged in activities that were objectively likely to intimidate voters in violation of §11(b) of the Voting Rights Act. *See* Order, ECF No. 29 at 2-3.

5. For the 2020 general election and the runoff election conducted on

January 5, 2021, Fair Fight engaged in voter participation work including educating voters about the voting process, engaging in get-out-the-vote activities, monitoring long lines at polling locations, and helping voters navigate the absentee ballot process. *Id.* ¶ 6.

**Response:** Undisputed, but this fact is immaterial to the sole issue before this Court—that is whether Named Defendants engaged in activities that were objectively likely to intimidate voters in violation of §11(b) of the Voting Rights Act. *See* Order, ECF No. 29 at 2-3.

6. On December 14, 2020, the first day of early voting, Fair Fight learned from a True the Vote press release that True the Vote and the Georgia Republican Party were partnering to engage in what they termed as "the most comprehensive ballot security initiative in Georgia history." *Id.* ¶ 7.

**Response:** Undisputed.

7. On December 18, Fair Fight learned from a True the Vote press release that True the Vote, and groups of individuals working in concert with True the Vote, including the other Defendants in this case, intended to mount challenges to the eligibility of hundreds of thousands of Georgians to cast their votes in the

runoff election. *Id.* ¶ 8.

**Response:** TTV admits that the December 18, 2020 press release announced TTV's intention to submit Challenges on behalf of voters in all 159 counties. ECF No. 156-25. TTV's press release stated, "We are proud to work alongside patriots from across the Peach State; Derek Somerville of Forsyth county and Mark Davis of Gwinett county who have been leading citizen efforts to highlight issues in Georgia's voter rolls, Mark Williams of Gwinett county who coordinated among eight print shops to get written challenges printed and delivered within 48 hours, and Ron Johnson of Jackson County and James Cooper of Walton County, who led the charge in recruiting hundreds of volunteer challengers across the state." *Id.*

Mr. Somerville did not help or volunteer to help with TTV's Challenges in any way, including methodology of analysis, compiling a list of Challenges, or timing of any Challenges. Transcript Excerpts of First Deposition of Derek Somerville (Oct. 6, 2021) ("**First Somerville Tr.**"), Ex. I, 29:5-31:17;  40:11-18; 42:15-43:9; Defendant Derek Somerville's Responses and Objections to Plaintiffs' Interrogatories Pursuant to Court Order (Dec. 17, 2021) ("**Somerville Interrog. Resp. Ct. Order**"), Ex. J, Resp. No. 1.  Mr. Somerville had fairly minimal contact

with TTV, and none of his contact resulted in substantive cooperation or

coordination between the Davis/Somerville Challenge List and the TTV Challenge

List efforts. First Somerville Tr. 103:6-13; 157:7-15; Somerville Interrog. Resp.

Ct. Order Resp. Nos. 1,4.

Mr. Davis did not act in concert with, or cooperate with TTV, TTV's data

analysis, or its voter challenge efforts for the January 2021 Runoff. First Davis Tr.

38:22-39:14; 41:10-42:16; 46:12-47:10; Transcript Excerpts of Deposition of

Mark Davis (Jan. 19, 2022) ("**Second Davis Tr.**"), Ex. N 95:4-9;  Defendant Mark

Davis' Responses and Objections to Plaintiffs' Interrogatories Pursuant to Court

Order (Dec. 14, 2021) ("**Davis Interrog. Resp. Ct. Order**"), Ex. O, Resp. No. 1.

Mark Williams owns a printing company, and his company printed the §

230 Challenges for TTV. Transcript Excerpts of Deposition of Mark Williams

(Sept. 23, 2021) ("**Williams Tr.**"), Ex. P, 19:4-18; 21:11-22:15; Defendant Mark

Williams's Responses to Plaintiffs' First Interrogatories (March 15, 2021)

("**Williams Resp. to First Interrogs.**"), Ex. Q, Resp. No. 1. Mr. Williams did not

help compile the TTV Challenge Lists. Williams Tr. 35:4-15. This supports the

statement regarding Mr. Williams in TTV's press release.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**                6

Ron Johnson contacted eligible Georgia voters he knew to ask if they would be interested in bringing a § 230 Challenges in the county in which they live. He gave TTV the contact information for any Georgia voter who expressed an interest in participating in these Challenges. Defendant Ron Johnson's Responses to Plaintiffs' First Interrogatories (March 15, 2021) (" **Johnson Resp. to First Interrogs.**"), Ex. R, Resp. No. 5. Mr. Johnson did not help compile the TTV Challenge Lists. Johnson Resp. to First Interrogs. Resp. Nos. 1-4. This supports the statement regarding Mr. Johnson in TTV's press release.

James Cooper contacted eligible Georgia voters he knew to ask if they would be interested in bringing a § 230 Challenges in the county in which they live. He prepared a "form" email to send to potential Challengers, which described the potential Challenges. He gave TTV the contact information for any Georgia voter who expressed an interest in participating in these Challenges. Defendant James Cooper's Responses to Plaintiffs' First Interrogatories (March 15, 2021) (" **Cooper Resp. to First Interrogs.**"), Ex. S, Resp. No. 5. Mr. Cooper did not help compile the TTV Challenge Lists. Cooper Resp. to First Interrogs. Resp. Nos. 1-4. this supports the statement regarding Mr. Cooper in TTV's press release.

8. Upon learning about Defendants' challenges, Fair Fight was forced to redirect efforts of its staff and volunteers to combat Defendants' actions targeted at limiting ballot access. *Id.* ¶ 10.

**Response:** Fair Fight may have chosen to redirect its efforts "to combat Dedendants' actions," but it has provided no evidence in the record showing it was forced to do so by anyone. Nor has it produced any evidence in the record showing any communication between any Named Defendant and Fair Fight. This redirection of efforts is immaterial to the question of whether Named Defendants violated § 11(b) as Fair Fight does not even allege that any of the Named Defendants did anything that intimidated Fair Fight or any of its agents. Nor has Fair Fight produced any evidence of any § 11(b) violation directed toward Fair Fight or any of its agents.

9. Specifically, Fair Fight reallocated staff from its voter mobilization activities described above to instead monitoring Georgia's 159 counties to determine which counties received challenges that Defendants were supporting. That monitoring included in some instances physically attending the Board of Elections hearings on Defendants' challenges, attempting to learn which voters

were being challenged, advocating against those challenges, reporting back to Fair

Fight the results of those challenges, and, through a phonebank, and then

attempting to inform challenged voters of their rights. *Id.* ¶ 11.

**Response:** Undisputed that Fair Fight reallocated staff as described in ¶ 9, but

such reallocation is immaterial to the question of whether Named Defendants

violated § 11(b) as Fair Fight does not even allege that any of the Named

Defendants did anything that intimidated Fair Fight or any of its agents. Nor has

Fair Fight produced any evidence of any § 11(b) violation directed toward Fair

Fight or any of its agents.

10. During this time, Fair Fight expended additional financial resources in

promoting the Voter Protection Hotline so that voters could obtain assistance if

they were challenged, and but for Defendants' actions, Fair Fight would not have

expended as many financial resources to this effort and otherwise could have

allocated these funds to its get out the vote program. *Id.* ¶ 12.

**Response:** Undisputed that Fair Fight expended resources as described in ¶ 10,

but such expenditures are immaterial to the question of whether Named

Defendants violated § 11(b) as Fair Fight does not even allege that any of the

Named Defendants did anything that intimidated Fair Fight or any of its agents. Nor has  Fair Fight produced any evidence of any § 11(b) violation directed toward Fair Fight or any of its agents.

11. Fair Fight also expended significant financial and staff resources to collect and analyze the challenge lists, some of which they obtained only from attending these Board of Elections challenge hearings. *Id.* ¶ 13.

**Response:** Undisputed that Fair Fight expended resources as described in ¶ 11, but such expenditures are immaterial to the question of whether Named Defendants violated § 11(b) as Fair Fight does not even allege that any of the Named Defendants did anything that intimidated Fair Fight or any of its agents. Nor has  Fair Fight produced any evidence of any § 11(b) violation directed toward Fair Fight or any of its agents.

11. In addition to committing Fair Fight's paid staff to track and respond to Defendants efforts, Fair Fight also redirected its volunteers' time. Fair Fight had organized a large group of volunteers to gather information about general voting logistics, including confirming with counties their early voting locations, dates, and hours for runoff elections. During this time, Fair Fight volunteers were also

advocating for extending early voting opportunities, but because of Defendants'
challenges, Fair Fight was forced to redirect the above-described efforts of its
volunteers to, instead, reaching out to voters on Defendants' challenge lists and
attending Boards of Elections meetings, some in-person, across the state. That re-
direction of effort required extensive Fair Fight staff involvement coordinate
volunteers and took staff away from their voter engagement activities. *Id.* ¶ 14.

**Response:**   Fair Fight may have chosen to redirect its volunteers' time, but it has
provided no evidence in the record showing it was forced to do so by anyone. Nor
has it produced any evidence in the record showing any communication between
any Named Defendant and Fair Fight's volunteers. This redirection of efforts is
immaterial to the question of whether Named Defendants violated § 11(b) as Fair
Fight does not even allege that any of the Named Defendants did anything that
intimidated Fair Fight or any of its agents or volunteers. Nor has  Fair Fight
produced any evidence of any § 11(b) violation directed toward Fair Fight or any
of its agents or volunteers.

12. Because True the Vote and other Defendants in this action have
indicated they will continue to file similar challenges in the future, after the

Runoff Election, Fair Fight turned its challenge tracking effort into an operational program called Democracy Watch, in order to respond to unlawful voter challenges if and when they are filed, advocate on the voters' behalf, and educate voters about their rights if they are challenged. *Id.* ¶ 15.

**Response:** Fair Fight has chosen to begin an operational program called Democracy Watch as described in ¶ 13, but it has provided no evidence in the record showing it was forced to do so by anyone. This is a strategic choice made by Fair Fight—every organization makes strategic decisions and plans based upon its current objectives. Fair Fight's strategic choice is immaterial to the question of whether Named Defendants violated § 11(b) as Fair Fight does not even allege that any of the Named Defendants did anything that intimidated Fair Fight or any of its agents or volunteers. Nor has  Fair Fight produced any evidence of any § 11(b) violation directed toward Fair Fight or any of its agents or volunteers.

13. Democracy Watch is now operational in 31 Georgia counties. By August 2022, it will be operational in 50 counties. *Id.* ¶ 16.

**Response:** Undisputed, but the number of counties Democracy Watch is operating in now or in the future is immaterial to the question before this Court of whether

Named Defendants violated § 11(b).

14. Democracy Watch is monitored and overseen by Fair Fight's Research and Voter Protection Staff, and it requires a substantial number of Fair Fight volunteers to operate. To run Democracy Watch, Fair Fight has had to hire two additional staff members and has fully allocated five staff members to oversee the program. These staff hires command a significant portion of Fair Fight's resources. *Id.* ¶ 17. If Fair Fight's Research Staff did not have to oversee the Democracy Watch program, Fair Fight would allocate their time to educating voters about election administration changes, researching better methods to turn out voters, and counteracting election disinformation efforts. *Id.* ¶ 18.

**Response:** Named Defendants do not dispute the monitoring and oversight as described in ¶ 15, but such monitoring and staffing decisions were not forced upon Fair Fight—it strategically chose to begin Democracy Watch operations. Fair Fight has provided no evidence in the record showing it was forced to do so by anyone. This is a strategic choice made by Fair Fight—every organization makes strategic decisions and plans based upon its current objectives. Fair Fight's strategic choice is immaterial to the question of whether Named Defendants

**Defs.' Resp. To**
**Pls.' Corrected SUMF**               13

violated § 11(b) as Fair Fight does not even allege that any of the Named

Defendants did anything that intimidated Fair Fight or any of its agents or

volunteers. Nor has  Fair Fight produced any evidence of any § 11(b) violation

directed toward Fair Fight or any of its agents or volunteers.

15. Similarly, if Fair Fight's volunteers were not asked to participate in

Democracy Watch, Fair Fight would be able to redirect their time to more

traditional voter engagement activities, such voter mobilization and voter

education. To date, Fair Fight has limited its voter education efforts to the State of

Georgia due to limited volunteer capacity. Absent the drain on its resources caused

by Defendants' challenges, Fair Fight would expand its voter education efforts to

other states. *Id.* ¶ 19.

**Response:** Named Defendants do not dispute they asked volunteers to participate

in Democracy Watch as described in ¶ 16, but that decision was not forced upon

Fair Fight—it strategically chose to begin Democracy Watch operations. Fair

Fight has provided no evidence in the record showing it was forced to do so by

anyone. This is a strategic choice made by Fair Fight—every organization makes

strategic decisions and plans based upon its current objectives. Fair Fight's

strategic choice is immaterial to the question of whether Named Defendants

violated § 11(b) as Fair Fight does not even allege that any of the Named

Defendants did anything that intimidated Fair Fight or any of its agents or

volunteers. Nor has Fair Fight produced any evidence of any § 11(b) violation

directed toward Fair Fight or any of its agents or volunteers.

16. Fair Fight has also been forced to direct additional funds to promote and

educate the public about the Voter Protection Hotline, which voters can call if they

find themselves the subject of a voter challenge. This promotion has cost Fair

Fight hundreds of thousands of dollars. If Fair Fight did not have to expend these

funds on directing voters to resources, should they be challenged, they would have

allocated them towards their get out the vote program. *Id.* ¶ 20.

**Response:** Named Defendants do not dispute it directed funds to a Voter

Protection Hotline as described in ¶ 16, but that decision was not forced upon Fair

Fight—it strategically chose to do so. Fair Fight has provided no evidence in the

record showing it was forced to do so by anyone. This is a strategic choice made

by Fair Fight—every organization makes strategic decisions and plans based upon

its current objectives. Fair Fight's strategic choice is immaterial to the question of

whether Named Defendants violated § 11(b) as Fair Fight does not even allege that any of the Named Defendants did anything that intimidated Fair Fight or any of its agents or volunteers. Nor has Fair Fight produced any evidence of any § 11(b) violation directed toward Fair Fight or any of its agents or volunteers.

17. Unless and until this litigation is successful, Fair Fight will continue to divert significant staff resources, volunteer time, and money combating True the Vote and its cooperators' efforts to intimidate voters and restrict access to the polls. *Id.* ¶ 21.

**Response:** The undisputed material facts show that none of the Named Defendants sought to intimidate voters or restrict access to the polls. Named Defendants had no direct contact with Challenged Voters at all. TTV Resp. to First Interrogs. No. 5; Somerville Am. Resp. and Obj. 2d Interrogs., Resp. No. 7; First Davis Tr. 171:4-21; Williams Tr. 63:2-64:1; Johnson Resp. to First Interrogs. Resp. No. 5; Cooper Resp. to First Interrogs. Resp. No. 5; Cooper Tr. 45:1-9; 50:13-22. Named Defendants did not publicly publish any list of Challenged Voters. TTV Tr. 257:11-14; Second Somerville Tr. 71:16-72:19; 72:21-73:14; Second Davis Tr. 46:3-14; 80:7-10. TTV did not create a "bounty" in order to incentivize

Challenges or accusations of voter fraud. TTV Tr. 71:11-19, 71:22-72:1, 74:8-17, 75:5-18, 76:15-19; TTV Tr. 316:3-12; TTV Tr. 316:19-317:5; First Somerville Tr. 150:15-152:4. TTV did not create a hotline in order to intimidate voters—it turned over any credible accusation of voter irregularities to the proper government authorities. TTV Tr. 81:16-21; TTV Tr. 85:21-86:9;TTV Tr. 82:18-21; TTV Tr. 68:16-69:7; *id.* 81:22-82:4; TTV Tr. 85:13-20; TTV Tr. 93:17-95:3; TTV Am. Resp. 2d RFP Resp. No. 18; First Somerville Tr. 150:15-152:4. Named Defendants analyzed data and/or submitted Challenges to government election officials based upon that data as permitted under Georgia law. O.C.G.A. § 21-2-230.  Most of those Challenges were rejected and not pursued in any way by county boards of elections. *See* Def TTV 1838; First Somerville Tr. 93:11-15.

19. The actions that Fair Fight has to take to counteract Defendants' challenges and intimidation are not actions Fair Fight has taken in the past, and as described above, such actions are necessitated by, Defendants' wrongdoing at the center of this case. *See supra* ¶¶ 1-18.

**Response:** As noted above, Fair Fight has chosen to take certain actions - no one has forced it to do so. As demonstrated in Named Defendants' Responses to ¶¶ 1-

18, Fair Fight's actions, reallocations, and strategic decisions are immaterial to the question of whether Named Defendants violated § 11(b) as Fair Fight does not even allege that any of the Named Defendants did anything that intimidated Fair Fight or any of its agents or volunteers. Nor has Fair Fight produced any evidence of any § 11(b) violation directed toward Fair Fight or any of its agents or volunteers.

### B.    Jocelyn Heredia

18. Plaintiff Jocelyn Heredia is a resident and registered voter in Banks County Georgia. Ex. 8, Jocelyn Heredia Dep. Tr. ("Heredia Tr.") at 11:19-25.

**Response:**   Undisputed.

19. In January of 2020, Ms. Heredia submitted a change of address form to USPS when she moved temporarily from her residence in Banks County to be closer to Atlanta for a job. *Id.* 12:17-25.

**Response:** In January of 2020, Ms. Heredia submitted a permanent change of address form (one without an end date) to the USPS. Heredia Tr., Ex. L. Around March of 2021, Ms. Heredia submitted another change of address form with the USPS to reflect that "she got another apartment in West Midtown." Heredia Tr.

43:1-8. Around September of 2021, Ms. Heredia submitted another change of address form to Banks County. *Id.* 43:5-11.

20. She returned to her Banks County residence in March 2020, where she has resided ever since. *Id.*

**Response:** Ms. Heredia "got another apartment in West Midtown" around March of 2021.  *Id.* 43:1-8.

21. Ms. Heredia learned that her vote was being challenged when she went to cast her in-person ballot for the runoff election in January 2021. She felt intimidated that she was being targeted in this way, particularly as a person of color in a predominantly white county. *Id.* 44:12-45:8.

**Response:** Ms. Heredia testified that no one said anything to her while she was standing in line to vote that intimidated her or targeted her. Heredia Tr. 48:16-49:3. Ms. Heredia testified she felt "intimidated from the get-go," as soon as she got to the polling location because she was the only Hispanic person in line to vote in a predominantly Republican county. Heredia Tr. 48:1-9. Ms. Heredia testified that she did not know she was Challenged until later, when she got into the polling location. Heredia Tr. 49:4-50:2.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**                    19

22. When Ms. Heredia was pulled aside at her polling location because of Defendants' challenge, she was one of only two persons of color in polling place line, and the second person of color was pulled aside as well. *Id.* 44:21-45:8.

**Response:**   TTV disputes that Banks County election officials asked Ms. Heredia to provide proof of her eligibility to vote in Banks County on the basis of the challenge it submitted on behalf of its Banks County volunteer, Jerry Boling. TTV filed an open records request with Banks County regarding its Challenge there, Banks County ORR, Ex. V, Def TTV 1836-37; the County responded with minutes from a meeting that showed it dismissed the Challenge List because no one requested a probable cause hearing. Banks County Board Minutes, Ex. W, Def TTV 1838.

Ms. Heredia testified that a woman "of Asian descent" was also in the separate line to file a provisional ballot, but she does not know if that woman was a Challenged Voter or was filing a provisional ballot for some other reason. Heredia Tr. 45:9-14. Plaintiffs have offered no evidence that the woman of Asian descent was challenged on the basis of any Named Defendants' Challenge, or even if she was challenged at all.

**Defs.' Resp. To
Pls.' Corrected SUMF**                    20

23. Ms. Heredia was also listed as a "challenged voter" on Banks County's website for at least six months. *Id.* 31:24-32:3; 61:17-62:20.

**Response:** Ms. Heredia testified that Banks County, not any Challenger, published her name on its website. Heredia Tr. 31:22-32:3.

24. Ms. Heredia felt intimidated throughout her voting experience both because the legal implications of being challenged were unclear to her, and she also felt she was being targeted as a person of color. *Id.* 44:12-45:8.

**Response:**   Named Defendants dispute that Ms. Heredia felt intimidated "throughout her voting experience because the legal implications of being challenged were unclear to her, and she also felt she was being targeted as a person of color."

Ms. Heredia testified that no one said anything to her while she was standing in line to vote that intimidated her or targeted her. Heredia Tr. 48:16-49:3. Ms. Heredia testified she felt "intimidated from the get-go," as soon as she got to the polling location because she was the only Hispanic person in line to vote in a predominantly Republican county. Heredia Tr. 48:1-9. She testified that she was at the polling location for three to four hours, but only found out she was

challenged after entering inside the polling location. *Id.* 47:3-25. She testified she was only inside the polling location for about twenty minutes out of those three to four hours. *Id.* Ms. Heredia testified that she only felt intimidated *based on the Challenge* until she was inside the polling location and learned of the Challenge. *Id.* at 49:4-9 (emphasis added).

Rather than the legal implications being unclear, Ms. Heredia testified that after she learned her eligibility to vote in Banks County had been challenged, an election worker told her that she could cast her ballot on paper [provisional ballot], then she needed to provide two forms of identification with her Banks County mailing address. *Id.* 23:22-24:7. The election worker told Ms. Heredia her provisional ballot would be counted when she produced the two forms of identification. *Id.* 24:18-23. Ms. Heredia provided those two forms of identification to the election worker. *Id.* 24:8-10.

25. According to the challenge list obtained from the Banks County website, Ms. Heredia was challenged by both Jerry Boling and Dan Gassaway. Ex. 30, Banks County Challenge List. Jerry Boling was True the Vote's challenge volunteer for Banks County, *see* Ex. 31, True the Vote County Challenger List,

and Dan Gassaway was a volunteer challenger who submitted Mr. Davis and Mr. Somerville's challenge lists. Ex. 32, Davis and Somerville County Challenger List.

**Response:**   TTV disputes that Banks County election officials asked Ms. Heredia to provide proof of her eligibility to vote in Banks County on the basis of the challenge it submitted on behalf of Jerry Boling. TTV filed an open records request with Banks County regarding its Challenge there, Banks County ORR, Ex. V, Def TTV 1836-37; the County responded with minutes from a meeting that showed it dismissed the Challenge List because no one requested a probable cause hearing. Banks County Board Minutes, Ex. W, Def TTV 1838.

Plaintiffs provided no evidence that either Mr. Boling or Mr. Gassaway spoke to, or contacted, Ms. Heredia.

**C.    Jane Doe**

26. Plaintiff Jane Doe is a resident and registered voter in Clarke County, Georgia. Ex. 16, Jane Doe Decl. ¶ 2.

**Response:**   Undisputed.

27. While Jane Doe's permanent residence is in Georgia, and Jane Doe is presently located in Georgia, in 2020, Jane Doe split her time between Georgia

and another state where her spouse had accepted a short-term career opportunity.

*Id.* ¶ 3.

**Response:** Undisputed.

30.     To ensure she would not miss any mail while she was away, Jane Doe completed a USPS change of address form to forward her mail to her spouse's out of-state address. *Id.* ¶ 4.

**Response:** Undisputed, but material to the Challenge Lists, the change of address form Ms. Doe submitted was "permanent," not temporary.

31.     Jane Doe never intended to give up her residency in Georgia—she still owns a home there, pays taxes in Georgia, and worked in Georgia. *Id.*

**Response:**   Undisputed.

32.     Jane Doe's name and address appeared on a challenge list prepared by True the Vote and submitted by one of its volunteers named Gordon Rhoden. *Id.* ¶ 5.

**Response:** Since Jane Doe is anonymous, TTV has no way to know if her name appears on the challenge list submitted by Gordon Rhoden.

33.     When Jane Doe learned of the challenge, she was extremely upset

because it felt like someone was trying to deprive her of her right to vote—in a very public way. *Id.*

**Response:**   Named Defendants dispute that the Challenges sought to deprive Ms. Doe of her right to vote. *See* TTV Tr. 152:15-154:19; *id.* 169:22-170:18; Second Davis Tr. 199:9-18. Named Defendants never published the Challenge list publicly. TTV Tr. 257:11-14; Second Somerville Tr. 71:16-72:19; 72:21-73:14; Second Davis Tr. 46:3-14; 80:7-10.

34.     Because Defendants claimed that Jane Doe is not eligible to vote, and because Defendants' list containing Jane Doe's name and address had been published online, Jane Doe feared that Defendants and their supporters would subject her to harassment for voting. This fear was based on her own observations of events that occurred in Georgia following the November 2020 election, including reports of the state's election workers getting harassed, threatened, and doxed. *Id.* ¶¶ 7-8.

**Response:**   Disputed. Named Defendants did not publish Clarke County's challenge list online. TTV Tr. 257:11-14; Second Somerville Tr. 71:16-72:19; 72:21-73:14; Second Davis Tr. 46:3-14; 80:7-10. It is undisputed that Named

Defendants never contacted or communicated with Ms. Doe. TTV Resp. to First

Rogs. No. 5; Somerville Am. Resp. and Obj. 2d Interrogs., Resp. No. 7; First

Davis Tr. 171:4-21; Williams Tr. 63:2-64:1; Johnson Resp. to First Interrogs.

Resp. No. 5; Cooper Resp. to First Interrogs. Resp. No. 5; Cooper Tr. 45:1-9;

50:13-22. It is undisputed that none of the Named Defendants harassed,

threatened, or doxed Ms. Doe. *Id.*

35.    Even though Jane Doe was able to vote in the Runoff Election, the

experience of being challenged was stressful. She feared that she could—or her

family could—become the next target of harassment from True the Vote and their

supporters for having voted, especially because her name and address had been

published online and she had been publicly identified as a challenged voter. Id. ¶

9.

**Response:**   Disputed. Plaintiffs have not provided any evidence that Ms. Doe, or

Ms. Doe's family was harassed, or contacted in any way by Named Defendants.

TTV Resp. to First Rogs. No. 5; Somerville Am. Resp. and Obj. 2d Interrogs.,

Resp. No. 7; First Davis Tr. 171:4-21; Williams Tr. 63:2-64:1; Johnson Resp. to

First Interrogs. Resp. No. 5; Cooper Resp. to First Interrogs. Resp. No. 5; Cooper

Tr. 45:1-9; 50:13-22.  Named Defendants did not publish Ms. Doe's name online. TTV Tr. 257:11-14; Second Somerville Tr. 71:16-72:19; 72:21-73:14; Second Davis Tr. 46:3-14; 80:7-10.

36.     Although Jane Doe has been fully settled back in Georgia since July 2021, even today her name can be found online as a challenged voter in Clarke County, and she thus fears that she will be challenged again in future elections and that her eligibility to vote will be questioned. *Id.* ¶¶ 10-11.

**Response:**   Disputed. Ms. Doe testified that Clarke County accepted and counted Ms. Doe's vote. Jane Doe Decl. ¶ 9. Plaintiffs have provided no evidence connecting any harassment or intimidation, or threat of such, to any Named Defendant. TTV Resp. to First Rogs. No. 5; Somerville Am. Resp. and Obj. 2d Interrogs., Resp. No. 7; First Davis Tr. 171:4-21; Williams Tr. 63:2-64:1; Johnson Resp. to First Interrogs. Resp. No. 5; Cooper Resp. to First Interrogs. Resp. No. 5; Cooper Tr. 45:1-9; 50:13-22.

37.     Jane Doe believes that she should not have to worry about being targeted or facing retribution for exercising her right to vote. *Id.* ¶ 12.

**Response:** Disputed. Ms. Doe has provided no evidence that she will face any

retribution for exercising her right to vote.

## II.   Defendants collaborated with True the Vote to implement its Validate the Vote scheme in Georgia, and coordinated the largest mass challenge effort in Georgia history.

38.   True the Vote is a Texas-based organization founded by Catherine Engelbrecht, who is also its current president. Ex. 12, True the Vote / Catherine Engelbrecht Dep. Tr. ("TTV/Engelbrecht Tr.") 22:17-20. True the Vote describes itself as a 501(c)(3) organization, but has frequently collaborated with Republican party officials to monitor polling places and challenge voters, among other activities. *See, e.g.*, TTV/Engelbrecht Tr. 112:2-13. True the Vote has been accused of voter intimidation dating back to 2012, including members of Congress Ex. 33, Elijah Cummings 2012 Letter.

**Response:**   Undisputed, but immaterial to the sole issue before this Court—that is whether Named Defendants engaged in activities that were objectively likely to intimidate voters in violation of §11(b) of the Voting Rights Act. *See* Order, ECF No. 29 at 2-3.

39.   Derek Somerville is a resident of Georgia who, in the weeks leading up to Georgia's January 2021 runoff, was also involved in analyzing voter address

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          28

information and coordinating efforts to challenge the eligibility of tens of
thousands of voters across the state of Georgia. Ex. 10, Derek Somerville
Reopened Dep. Tr. ("Somerville II Tr.") 68:3-16. Over several weeks, Mr.
Somerville participated in around a dozen calls with True the Vote, and
participated in two or three calls with Ms. Engelbrecht. *Id.* 91:5-12. Mr.
Somerville also personally met with Ms. Engelbrecht on at least one occasion, and
had half a dozen conversations with Ms. Engelbrecht on the phone on a
one-on-one basis. *Id.* 91:9-15. Mr. Somerville also admits that he had, on at least
one occasion, told Ms. Engelbrecht that he thought True the Vote's challenge
strategy was broad, *id.* 94:11-16, and had copied Ms. Engelbrecht on emails he
sent out about voter challenges in an attempt to influence True the Vote's tone on
this topic, *id.* 122:8-10.

**Response:**   Disputed. Mr. Somerville met with Ms. Engelbrecht exactly one time.
Somerville II Tr. 91:9-10. Mr. Somerville testified he directly communicated with
Ms. Engelbrecht "an impressively low number of times." Somerville II Tr. at 91:7-
8. He met with her exactly once in person. *Id.* at 91:9-10. He participated in
conference calls, which included calls related to these proceedings, two or three

times. *Id.* at 91:10-13. He had "maybe" half a dozen one-on-one conversations with Ms. Engelbrecht on the phone. *Id.* at 91:13-15.

Mr. Somerville does not dispute that he testified he thought TTV's challenge strategy was broad, but that is immaterial to the issue at hand—whether Named Defendants violated § 11(b).

Mr. Somerville disputes that he copied Ms. Engelbrecht in an email to try to influence her tone on the topic of whether TTV's challenge strategy was broad. Mr. Somerville testified that he copied Ms. Engelbrecht on an email to influence TTV's tone on a the process overall, including that the challenges were permitted by law, that the Secretary of State's office had challenged voters during this time based upon the NCOA, that they had gone to great lengths to mitigate the impact on the military, and that "victory really is in challenging the government to perform at a higher standard." *Id.* at 122:1-123:10. Mr. Somerville testified that he did not have specific concerns about TTV's "tone in relation to the challenges." *Id.* at 123:16-124:14.

40.    Mark Davis worked collaboratively with Mr. Somerville in analyzing voter data and coordinating efforts to challenge the eligibility of tens of thousands

of voters. *Id.* 68:3-16; Ex. 6, Mark Davis First Dep. Tr. ("Davis I Tr.") 45:1-8. At some point, Mr. Davis had a phone call with Mr. Gregg Phillips where Mr. Davis provided Mr. Phillips with a primer on voter data in Georgia and gave Mr. Phillips information to "get started" with analysis into challenges. Davis I Tr. 49:12-50:21.

**Response:**   Undisputed.

41.    Mark Williams is also a Georgia resident who assisted with the printing of challenge letters that True the Vote would then send to individual counties in support of True the Vote's voter challenges. Ex. 3, Mark Williams Dep. Tr. ("Williams Tr.") 19:4-12. In particular, True the Vote would send Mr. Williams compiled lists of challenged voters, and Mr. Williams would print individual letters for the challenges. *Id.* 22:4-13. Mr. Williams also introduced True the Vote to other individuals who collaborated on the challenges, including Ron Johnson and James Cooper. *Id.* 22:19-23:2.

**Response:**   Mr. Williams printed TTV's challenge letters as part of a customer/vendor relationship. Williams Tr. 22:18-19. Otherwise, undisputed.

42.    Ron Johnson was previously the Georgia GOP chairman for all counties with less than a population of 80,000 people, and also assisted True the

Vote with its efforts in Georgia, specifically in forwarding the names of individuals to True the Vote that could serve as potential challengers in various counties across the state. Ex. 5, Ron Johnson Dep. Tr. ("Johnson Tr.") 35:13-17; 42:18-43:2. Many of these challengers were chairmen of their respective county Republican Party. *Id.* 41:6-8; 42:16-21; 43:6-9.

**Response:**   Undisputed.

43.   James Cooper, who previously served as the 3rd Vice Chair for the 10th District of the Georgia Republican Party, Ex. 2, James Cooper Dep. Tr. ("Cooper Tr.) 11:9-17, was similarly involved in recruiting challengers for True the Vote across the state. *Id.* 28:2-15; 31:12-17.

**Response:**   Undisputed.

**A.   True the Vote's "Validate the Vote" initiative started as a coordinated scheme to overturn presidential election results in Georgia and other battleground states.**

44.   Shortly after the November 2020 election, conservative donor Fred Eshelman contacted Catherine Engelbrecht seeking True the Vote's assistance in overturning the results of the presidential election. TTV/Engelbrecht Tr. 266:11–15, 285:21–286:4, 292:20–293:3.

**Response:**   Disputed and immaterial to the issue of whether TTV's voter

challenges during the Georgia runoff election violated § 11(b). Ms. Engelbrecht

testified that Mr. Eshelman did not express to TTV his interest in overturning the

results of the presidential election. TTV/Engelbrecht Tr. 293:17 - 295:7.

45.   True the Vote hatched a plan to identify "illegal voters and illegal

votes," "build public momentum" and "[g]alvanize Republican legislative support

in key states," including in Georgia, "to have the state's election results

overturned."Ex. 1, *Eshelman v. TTV-* Validate the Vote 2020 ("Validate the Vote

2020") at 582. A consultant for True the Vote funder, Fred Eshleman,

recommended the name "Validate the Vote," which True the Vote adopted.

TTV/Engelbrecht Tr. 66:12-67:20.

**Response:**   Undisputed that the quoted words appear on the Validate the Vote

promotional piece. Disputed as to context and purpose. Under the heading, "Plan,"

this piece designated TTV as being responsible to "build public momentum

through broad publicity" and to "galvanize Republican legislative support in key

states." ECF No. 156-4. Under the heading, "Legal Strategy," Step 2 was defined

as "Along with publicly available data, the produced election data will be analyzed

to identify both illegal voters and illegal votes." *Id.* Step 3 under Legal Strategy stated, "If sufficient election fraud is proven, making the results of the election doubtful, the lawsuit will seek to have the state's election results overturned, leading to a special election, to selection of Presidential Elector by the state legislature, or to the selection the President by the U.S. House of Representatives." *Id.*

Disputed as to materiality on the issue before the Court of whether Named Defendants violated § 11(b).

46.     On November 5, 2020, two days after the general election, True the Vote shared a proposal summarizing its strategy for implementing the "Validate the Vote" scheme and overturning the presidential election results. The proposal sought to highlight the purported "[p]roblem" of "Democrat officials" and "deliberate election fraud" resulting from the "counting [of] illegal votes," and included a five-part plan:

■    Solicit whistleblower testimonies from those impacted by or involved in elections fraud;

■    Build public momentum through broad publicity;

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          34

- Galvanize Republican legislative support in key states;

- Aggregate and analyze data to identify patterns of election subversion; and

- File lawsuits in Federal Court with capacity to be heard by the Supreme Court of the United States.

Validate the Vote 2020 at 1.

**Response:**   Disputed as to context and materiality on the issue of whether Named Defendants violated § 11(b) by submitting lawful voter challenges related to the Georgia runoff election.

On this proposal, under the heading "Problem," the proposal stated, "There is significant evidence that there are numerous instances of illegal ballots being cast and counted in the 2020 general election. Most of these illegal votes are being counted in Democrat counties and are suppressing legitimate results. This is a result of Democrat officials refusal to obey state election laws and counting illegal votes. It is also the result of deliberate election fraud. This situation has been aided by the Democrat's deliberate effort to radically expand mail-in balloting, creating myriad opportunities for voter fraud that does not exist with in-person voting.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**                35

Furthermore, this flood of illegal votes violates the U.S. Constitution's right to vote by diluting the votes of legitimate voters." *Id.*

47.     The proposal also identified OPSEC Group, LLC, and its founder and President, Gregg Phillips, as the Data and Research team. *Id.*

**Response:**   Undisputed but immaterial to the question of whether Named Defendants violated § 11(b) by submitting lawful voter challenges related to the Georgia  runoff election.

48.     True the Vote even assured its donor that the Trump campaign would "cover" True the Vote's legal fees. TTV/Engelbrecht Tr. 305:3–305:8.

**Response:** Disputed. Factually, TTV did not "assure" its donor that the Trump campaign would cover TTV's legal fees. TTV stated it "had written in my 11/14 e-mail to you that it appeared our legal fees would have been covered by the Trump campaign which I described in a statement of our cash position, described as best as possible given the tight timeline with so many moving parts." TTV/Engelbrecht Tr. 305:3-8. This is immaterial to the question of whether Named Defendants violated § 11(b) by submitting lawful voter challenges related to the Georgia runoff election.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          36

49.     True the Vote did not have any evidence that the "problem" described in its proposal existed; rather, Ms. Engelbrecht repeatedly described the language used in the Validate the Vote proposal as "promotional." *See* TTV/Engelbrecht Tr. 269:17–271:13. Nor could Ms. Engelbrecht explain why True the Vote wanted to challenge the results of only the presidential election, despite promoting that voter fraud was widespread. *Id.* at 285:13–20. However, Engelbrecht had been engaged in conversations with the Trump campaign, Ex. 41, Email from F. Eshelman, and as noted above, she believed at one point that the campaign would pay True the Vote's fees. *See, e.g.*, Ex. 40, Email from C. Engelbrecht.

**Response:**   Disputed. Ms. Engelbrecht testified that the effort to radically expand mail-in balloting or mail-in voting was well documented and that over time, mail-in balloting, mail-in voting does increase the opportunity for vote fraud and election fraud. TTV/Engelbrecht Tr. 270:12-19. This is immaterial to the question of whether Named Defendants violated § 11(b) by submitting lawful voter challenges related to the Georgia  runoff election.

50.     Consistent with its Validate the Vote scheme, True the Vote launched a nationwide effort to gin up evidence of voter fraud with the ultimate goal of

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          37

forcing one of three scenarios: (1) a "special election" in which voters would choose new electors, (2) state legislatures, rather than voters, would select presidential electors, or (3) the next president would be selected by the U.S. House of Representatives. Validate the Vote 2020 at 1. The organization also enlisted OPSEC to "aggregate and analyze data to identify patterns of election subversion." *Id.*

**Response:**   Disputed. TTV never launched any effort to "gin up evidence of voter fraud." The three options described regarding the presidential election were based upon the condition that "*if sufficient election fraud is proven*, making the results of the election doubtful, the lawsuits will seek to have the state's election results overturned." *Id.* (emphasis added). This is immaterial to the question of whether Named Defendants violated § 11(b) by submitting lawful voter challenges related to the Georgia  runoff election.

51.   One of the first steps in the plan was to pursue litigation in battleground states. Days after the 2020 election True the Vote filed lawsuits in Michigan, Wisconsin, Georgia, and Pennsylvania in which they promised to deliver to the court evidence of, among other offenses, "votes by ineligible

voters." *See, e.g.,* Compl. ¶ 45, *Brooks v. Mahoney*, No. 4:20-cv-00281-RSB-CLR

(S.D. Ga. Nov. 11, 2020); Compl. ¶ 73, *Bally v. Whitmer*, No.

1:20-cv-01088-JTN-PJG (W.D. Mich. Nov. 11, 2020); Compl. ¶¶ 34, 44,

*Langenhorst v. Pecore*, No. 1:20-cv-01701-WCG, (E.D. Wisc. Nov. 12, 2020);

Compl. ¶ 26, *Pirkle v. Wolf*, No. 4:20-cv-02088-MWB, (M.D. Pa. Nov. 10, 2020).

**Response:**   Undisputed but immaterial to the question of whether Named

Defendants violated § 11(b) by submitting lawful voter challenges related to the

Georgia  runoff election.

52.    True the Vote promised a "sophisticated and groundbreaking

analysis" using, among other tools "United States Postal Service records"; the

same type of records True the Vote would use when challenging the eligibility of

hundreds of thousands of Georgia voters. *See Brooks*, Compl. ¶ 45; *Bally*, Compl.

¶ 73; *Langenhorst*, Compl. ¶¶ 34, 44; *Pirkle*, Compl. ¶ 26. But True the Vote

never provided the courts with any such evidence. Days later, on November 16,

2020, True the Vote filed motions to voluntarily dismiss all four the cases.[1]

---

[1]True  the Vote was not alone in bringing such suits and some even
depended on Postal Service records. None of the suits challenging Georgia's
election results were deemed meritorious. *Wood v. Raffensperger*, No.

**Response:**   Undisputed but immaterial to the question of whether Named

Defendants violated § 11(b) by submitting lawful voter challenges related to the

Georgia  runoff election.

53.    None of the promised research or evidence—including the analysis of

Postal Service records—materialized, even after its funder repeatedly implored the

organization to provide "real evidence." Ex. 39, Email from N. Howard;

TTV/Engelbrecht Tr. 288:11-290:9.[2] Just days after filing these four lawsuits, the

Vote abandoned them, voluntarily dismissing the cases.

_____

2020-CV-342959 (Ga. Super. Ct., Fulton Cnty. Dec. 8, 2020) (dismissing case
alleging tens of thousands of out-of-state residents illegally voted in Georgia's
General Election); *Boland v. Raffensperger*, No. 2020-CV-343018 (Ga. Super. Ct.,
Fulton Cnty. Dec. 8, 2020) (dismissing case and finding plaintiffs' claim that tens
of thousands of people illegally voted in Georgia based on the National Change of
Address registry was based on "speculation rather than duly pled facts"); *Pearson
v. Kemp*, No. 1:20-cv04809-TCB, ECF No. 74 (N.D. Ga. Dec. 7, 2020)
(dismissing case alleging the National Change of Address registry showed over
20,000 ineligible voters cast ballots in Georgia's general election).

[2] True the Vote's funder, Fred Eshelman, would eventually sue the
organization, defense counsel James Bopp, the Bopp Law Firm, OpSec, and Gregg
Phillips for breach of contract, fraudulent misrepresentation, and conversion.
Eshelman alleged that True the Vote misspent his donation on efforts he never
agreed to fund, like the "*largely baseless challenges to the eligibility of hundreds
of thousands of voters in the 2021 Georgia Senate runoffs*." Ex. 42, Mar. 19, 2021
Verified App. for Temp.

**Defs.' Resp. To
Pls.' Corrected SUMF**          40

**Response:**   Disputed that Mr. Eshelman was the "funder" as he made an

unconditional donation to TTV, a 501(c)(3) organization, but this is also

immaterial to the question of whether Named Defendants violated § 11(b) by

submitting lawful voter challenges related to the Georgia  runoff election.

Undisputed that the four lawsuits were dismissed, but that is immaterial to the

question of whether Named Defendants violated § 11(b) by submitting lawful

voter challenges related to the Georgia  runoff election.

54.     In connection with the Validate the Vote scheme, True the Vote also

planned to "[g]alvanize Republican legislative support in key states," including

Georgia. Validate the Vote 2020 at 1. Indeed, Ms. Engelbrecht had previously

called for "more collaboration among conservative groups, suggesting that

participants at the meeting work with groups like the Republican National

Lawyers Association to formulate plans to challenge registrations and disqualify

voters." Ex. 14, Dr. Vernon Burton Expert Report ("Burton Rep.") at 23 (citation

omitted).

**Response:**   The use of the word scheme is an editorial comment. Validate the

Vote 2020 was related to the presidential election and is therefore immaterial to

the question of whether Named Defendants violated § 11(b) by submitting lawful

voter challenges related to the Georgia  runoff election.

Dr. Burton's quote attributed to Ms. Engelbrecht allegedly made is from an

article from The Intercept, which is not authenticated or verified.

**B.     As the Georgia runoff elections approached, "Validate the Vote" became "Validate the Vote Georgia."**

55.     When "attentions turned towards Georgia" for the Senate runoff

election, "Validate the Vote" became "Validate the Vote Georgia."

TTV/Engelbrecht Tr. 69:4–7. True the Vote "simply took the logo and put the

word 'Georgia' in the center of the logo. TTV then made all the resources [it] had

available for the national election available in Georgia for the Run-off Election."

Ex. 19, TTV Resp. to Interrogatory No. 3 at 17. But Validate the Vote Georgia

remained part of True the Vote's national effort. TTV/Engelbrecht Tr. 69:4–7.

**Response:**   Undisputed, but the efforts TTV took regarding the presidential

election are immaterial to the issue of whether Named Defendants violated §

11(b).

56.     The donor's consultant, who originally proposed the name "Validate

the Vote," also coined the phrase "Validate the Vote Georgia" for True the Vote's

**Defs.' Resp. To
Pls.' Corrected SUMF**                42

activities directed toward the runoff election. *Id.* at 264:12–16.

**Response:** Undisputed.

57.     True the Vote enlisted OPSEC for its efforts in Georgia as well. The invoice that OPSEC issued to True the Vote listed only a single item—"Eyes on Georgia"— an umbrella project which included both OPSEC's analysis for True the Vote's Georgia Elector Challenges and its work to gather and analyze data to overturn the presidential election, *id.* at 182:6–183:20; *see also* Def TTV 288; Ex. 21, Dec. 14, 2020 True the Vote Press Release.

**Response:**   Undisputed that OPSEC included in one invoice work it did for TTV in relation to the presidential election and work it did related to the Georgia runoff election.

### C. Defendants launched mass voter challenges.

58.     On December 18, 2020, True the Vote issued a press release announcing that it had "partner[ed] with Georgians in every county to preemptively challenge 364,541 potentially ineligible voters." Ex. 22, Dec. 18, 2020 True the VotePress Release. The press release also touted that True the Vote was "working alongside patriots across the Peach State," including Defendants

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          43

Somerville, Davis, Williams, Johnson, and Cooper. TTV/Engelbrecht Tr. at 251:18–252:14.

**Response:**   Undisputed.

59.   The press release also stated that True the Vote had "probable cause" to suspect that the 364,151 individuals being challenged did "not meet the qualifications legally required to cast a ballot." Ex. 22, Dec. 18 Press Release.

**Response:**   Disputed. The December 18 Press Release stated that "It [O.C.G.A. § 21-2-230] allows a voter to challenge the eligibility of any other voters in his or her county if probable cause exists to show that the challenged voter does not meet the qualifications legally required to cast a ballot."

60.   The challenge lists were constructed by matching the Georgia voter registration database of all registered voters ("voter file") to the USPS's National Change of Address ("NCOA") registry, which lists the names and addresses of individuals who have requested the United States Postal Service to forward their mail to a different address. *See* Ex. 20, TTV Am. Resp. Pls' First Req. for Admission ("TTV RFA") Nos. 12-13; Williams Tr. 114:10-115:5; Ex. 13, Dr. Ken Mayer Expert Report ("Mayer Rep.") at 16.

**Response:**   Disputed that only the NCOA data was used. The process employed by OPSEC was not limited to matching NCOA data to a voter file but used additional databases, including other state registrations, proprietary lists, county tax records, and voter registration rolls in other states allowing for broader comparisons and more accurate matching than is generally attained by using NCOA and a voter list alone. OpSec Tr. 94:17-21; 95:3-9, 17-18; 95:14-18; 96:3-17.

61.   Defendants Mark Davis and Derek Somerville used a similar methodology to prepare 39,141 challenges against Georgia voters. Mark Davis Reopened Dep. Tr. ("Davis II Tr.") 41:20-17; Davis I Tr. 22:9-23:3; Sommerville II 94:18-20;

**Response:**   Mr. Davis' and Mr. Somerville's data analysis included running CASS & NCOA processing of voter-provided move status, geocoding to verify move locations, and extensive work to remove military and student voters, who they knew were likely to be eligible to vote. First Davis Tr. 21; Davis Interrog. Resp. Ct. Order Resp. No. 2.

62.   Ron Johnson and James Cooper—Georgia Republican Party

officials—recruited Georgia Republican Party county chairs to lend their names to True the Vote's mass challenges. See Cooper Tr. 31:13–17, 57:17–58:9; Johnson Tr. 34:4-8. Ron Johnson also volunteered to be a challenger himself. Johnson Tr. 91:13-21; TTV/Engelbrecht Tr. 144:9-15.

**Response:**   Undisputed.

63.    Defendant Mark Williams was referred to True the Vote by David Shafer, "the Chairman of the GOP," Ex. 34, Dec. 12, 2020 M. Williams Email; *see also* TTV/Engelbrecht 141:13–142:2,3[3] and printed True the Vote's challenges and assisted with finalizing the challenge lists, *see* TTV/Engelbrecht Tr. 222:8–19, 252:9–14.

**Response:**   Undisputed that Mr. Williams was referred by David Shafer and that he printed the TTV challenges. Disputed to the extent "finalizing the challenge lists" implies more than printing the lists. No evidence on the record supports Mr. Williams' involvement in the methodology or analysis of the lists—just that he

---

[3]David Shafer is also the GOP official with whom True the Vote spoke before announcing it was partnering with the GOP to bring its Georgia Elector Challenges. *See* TTV/Engelbrecht Tr. 141:19–142:2; *see also* Dec. 14 Press Release.

printed them.

64.     True the Vote and Mr. Davis and Mr. Somerville also had significant

contact and collaboration throughout this whole time period. *See* Somerville II Tr.

91:1-15 (Mr. Somerville admitting having several conversations with True the

Vote, and around half a dozen one-on-one conversations with Ms. Engelbrecht);

*id.* at 94:11-16 (Mr. Somerville admitting he shared with Ms. Engelbrecht

concerns about the broadness of True the Vote's challenge list strategy); *id.* at

104:3-15 (Mr. Somerville admitting he "definitely spoke on the [December 20]

call" hosted by True the Vote to update volunteers about the challenge efforts); *id.*

at 115:17–116:11 (Mr. Somerville admitting he copied Ms. Engelbrecht on emails

about challenge lists to "try to influence their tone").

**Response:**   Disputed. Mr. Somerville met with Ms. Engelbrecht exactly one time.

Somerville II Tr. 91:9-10. Mr. Somerville testified he directly communicated with

Ms. Engelbrecht "an impressively low number of times." Somerville II Tr. at 91:7-

8. He met with her exactly once in person. *Id.* at 91:9-10. He participated in

conference calls, which included calls related to these proceedings, two or three

times. *Id.* at 91:10-13. He had "maybe" half a dozen one-on-one conversations

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          47

with Ms. Engelbrecht on the phone. *Id.* at 91:13-15. Mr. Davis spoke with Gregg

Phillips once on the phone, and he spoke with Catherine Engelbrecht on the

phone. First Davis Tr. 35: 12-18.

65.     True the Vote ultimately submitted challenges against 250,783

registrants across 65 counties. Mayer Rep. at 1, 14.

**Response:**   Undisputed.

### 1. Defendants' challenges were frivolous.

66.     Defendants knew their challenge lists included eligible Georgia

voters who were properly registered, and they knew that their challenges would

burden registrants. *See, e.g.*, Ex. 11, OPSEC Group, LLC / Gregg Phillips Dep. Tr.

("OPSEC/Phillips Tr." 147:20–22, Ex. 9, Davis II Tr. 35:21–37:1;

TTV/Engelbrecht Tr. 208:18–209:2 (explaining the importance of not challenging

military voters).

**Response:**   This SOF includes two statements. The first is not supported by the

evidence cited: OpSec did not know of any individual's registration status or

eligibility to vote; OpSec merely "accept[ed] that some individuals on the

challenge list may be eligible to vote," OpSec Tr. 148:20-21. The statement is not

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          48

material because, even if true, it is irrelevant and/or would not demonstrate that the challenge was frivolous and would not otherwise affect the outcome of the suit. The second statement is not supported by the evidence cited: there, TTV explained that because military personnel move often and inaccurately file "permanent" address changes, and the preliminary list was so large, that it chose to exclude military personnel. TTV Tr. 207:16-21; *id.* 208:22-209:8.

67.    "NCOA data are not error-free, and the companies that conduct NCOA matching note that false positives occur "on a regular basis," which will invariably produce errors in the challenge list. Mayer Rep. at 33.

**Response:**   The statement of what companies "note" is hearsay. To the extent that this statement refers to admissible evidence, it is a statement about the reliability of the NCOA, which, as a legal matter, is sufficient for the purposes on which it is relied by Defendants. In addition, the process employed was not limited to matching NCOA data to a voter file but used additional databases, including other state registrations, proprietary lists, county tax records, and voter registration rolls in other states allowing for broader comparisons and more accurate matching than is generally attained by using NCOA and a voter list alone. OpSec Tr. 94:17-21;

95:3-9, 17-18; 95:14-18; 96:3-17.

68.    Even where the NCOA entries are accurate, the NCOA registry does not provide sufficiently specific or unique information to reliably match NCOA data to a voter file because the NCOA registry does not include any unique identifier, like a social security number or other identification number that is unique to each voter. Mayer Rep. at 6.

**Response**: The statement that the NCOA does not provide sufficiently specific or unique information to produce a reliable match is editorial comment[4] or a legal conclusion. The process used to compile the Challenge List process was not limited to matching NCOA data to a voter file but used additional databases, including other state registrations, proprietary lists, county tax records, and voter registration rolls in other states allowing for broader comparisons and more accurate matching than is generally attained by using NCOA and a voter list alone. OpSec Tr. 94:17-21; 95:3-9, 17-18; 95:14-18; 96:3-17.

---

[4]*See  Hobirn, Inc. v. Aerotek, Inc.*, No. 10-61144-civ, 2012 WL 13005347, at *1 n.2 (S.D. Fla. July 25, 2012) (recognizing and discounting editorial commenting in statements of fact).

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          50

69.     Even where it is certain that a registered voter submitted a change of
address request, that does not mean the individual changed or abandoned their
prior residence. The registrant may be forwarding their mail to a friend's house, or
they may need access to their mail while on vacation. Voting eligibility is not
affected, of course, where no move occurred. *Id.* at 14.

**Response:**   Admitted, with clarifications: the Challenge List used only NCOA
data in which the person indicated a permanent address change, not a temporary
change of address. In addition, the process used to compile the Challenge List
process was not limited to matching NCOA data to a voter file but used additional
databases, including other state registrations, proprietary lists, county tax records,
and voter registration rolls in other states allowing for broader comparisons and
more accurate matching than is generally attained by using NCOA and a voter list
alone. OpSec Tr. 94:17-21; 95:3-9, 17-18; 95:14-18; 96:3-17. Among the persons
that OpSec's proprietary process is designed to identify are persons who have
deployed for military service, OpSec Tr. 128:3-7; persons that, intending to move,
file an NCOA request and then change their mind, *id.* 127:12-128:2; persons that
forward their mail because they were on vacation, *id.* 126:22-127:5, 128:1-2;

persons that moved for non-military government service and submit an NCOA, *id.*
126:9-16, 128:1-2; persons submitting an address change for purposes of attending
school, *id.* 125:17-19, 128:1-2; persons that have moved inside the county or
jurisdiction in which they were registered, *id.* 125:2.

70.     Individuals who submit a change of address request do not thereby
forfeit their eligibility to vote. *See, e.g.,* TTV RFA at 1; Ex. 7, Derek Somerville
First Dep. Tr. ("Somerville I Tr.") at 125:16-126:3 ("There are literally thousands
of individuals that legitimately used NCOA to forward their mail out of the
county/state but remain legal residents.").

**Response:**   The statement is a legal conclusion based on assumed facts that it
does not present. An individual that submits a change of address request because
they have changed domiciles does forfeit eligibility to vote in the former
jurisdiction.

71.     Defendants had no way of knowing whether voters who had filed a
permanent change of address had moved away permanently, or just temporarily for
a period longer than 12 months. TTV/Engelbrecht Tr. 209:17–211:8; Davis II Tr.
26:2–27:5.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**                52

**Response:**   Defendants used only NCOA records in which the voter themselves indicated a permanent move. TTV Tr. 208:1-12. The process used to compile the Challenge List process was not limited to matching NCOA data to a voter file but used additional databases, including other state registrations, proprietary lists, county tax records, and voter registration rolls in other states allowing for broader comparisons and more accurate matching than is generally attained by using NCOA and a voter list alone. OpSec Tr. 94:17-21; 95:3-9, 17-18; 95:14-18; 96:3-17.

72.     True the Vote's goal was to create a presumption that all voters identified in its challenge lists would not be permitted vote absent further evidence proving their eligibility. TTV/Engelbrecht Tr. 158:1-159:5; Ex. 28, Email from M. Williams to A. Holsworth.

**Response:**   Plaintiffs' statement of TTV's goal is not a statement of fact and "creat[ing] a presumption" is editorial comment about a legal fact. All in-person votes would have to show identification that proved their eligibility, meaning that the Challenge changed nothing for them, TTV Tr. 158:7-12, and the Challenge would require, as the statute provides, that absentee voters newly excused from

identification would confirm their residency in the curing process. *Id*. 158:13-159:5.

73.     Defendants also fundamentally oppose the NVRA's safeguards; they view the NVRA as "antiquated." Davis I Tr. 112:16-22.

**Response:**   Plaintiffs' statement of Defendants' "fundamental oppos[ition] is editorial comment. In context, the cited evidence states that Mr. Davis thought that the NVRA "should be amended so that it's more helpful in keeping our nation's voter rolls cleaner." Plaintiffs' characterization of this as opposing safeguards is editorial comment.

74.     True the Vote explained to its volunteers the challenge process that it hoped to see implemented: "[w]hen the challenge letter is received at your election office[, election officials] are required by G[eorgia] law to not let a ballot be cast or counted until the individual that has been challenged comes in and proves they are not dead, or they still live in the same location." Ex. 28, Email from M. Williams to A. Holsworth.[5]

---

[5]Mr. Cooper testified that this explanation was "basically . . . the script" used to educate volunteers about the basis for True the Vote's challenges and the challenge process. Cooper Tr. 42:20–43:21. Yet Ms. Engelbrecht admitted that

**Response:**   Admitted as to the substance of the email; the characterization of "hope" is editorial comment. The evidence cited in the footnote does not support the statement that "critical nuances" were omitted, but only that the number of voters subject to challenge was overestimated in the email. The "critical nuances" mentioned by TTV were that individuals permanently changing their residence were "appropriate in the scope of an elector challenge." TTV. Tr. 233:1-3.

75. Ms. Engelbrecht confirmed this understanding, testifying that if the challenge process had gone the way she envisioned it, all 360,000-plus voters on its challenge lists would be required to show proof of their residency before being allowed to vote in the runoff election, *see* TTV/Engelbrecht Tr. 158:1–159:5.

**Response:**   To say what Defendant envisioned is editorial comment. As noted above, TTV pointed out that all in-person votes would have to show identification that proved their eligibility, meaning that the Challenge changed nothing for them, TTV Tr. 158:7-12, and the Challenge would require, as the statute provides, that absentee voters newly excused from identification would confirm their residency

---

this script contains "a number of things . . . that are not correct" and omits critical nuances about True the Vote's challenges. TTV/Engelbrecht Tr. 231:20–232:5.

during the curing process. *Id*. 158:13-159:5.

76. True the Vote's voter challenge list did "not come anywhere close to what would be required for valid practices in academic studies of election administration." Mayer Rep. at 2.

**Response:**   This statement is editorial comment. To the extent that a comparison to "academic studies" is a fact, is not material because, as a matter of law, whether the challenge list was created using "practices in academic studies of election administration" is irrelevant and will not affect the outcome of the suit. The challenge list was created using NCOA, CASS, and DPV, OpSec Tr. 93:14-22, which is generally accepted advanced date hygiene and, additionally, uses other types of databases in a proprietary process to help verify identity, OpSec Tr. 94:1-2, 17-21.

77. True the Vote's own allies—Defendants Mark Davis and Derek Somerville—warned that the scope of the challenge program was entirely too broad. See Davis I Tr. 61:19-62:7; Somerville II Tr. 94:11-95:2.

**Response:**   Description of Defendants as allies and the assertion of their position

as a warning and the "challenge program" as *"entirely* too broad" are editorial

comment. Mr. Davis opined that he would have challenged only those that had

voted in the general election, Davis I Tr. 61:22-62:3, because he did not expect as

many people that had moved to vote, and noted that "[t]housands of them did,"

and that those that "don't live here any more . . . shouldn't be voting here." *Id.*

62:5-10

> **2. The data used to construct the challenge file, and the methods
> used to identify registrants who have allegedly moved, were
> unreliable and generated tens of thousands of obvious errors.**

78. True the Vote retained and collaborated with OPSEC Group, LLC and

its founder, Gregg Phillips, to review data files and prepare lists of voters to

challenge in each county in Georgia. TTV/Engelbrecht Tr. at 125:22-126:11.

**Response:**   "Collaborated" is editorial commentary. Defendants admit that TTV

hired OpSec to analyze publicly available data to create a list of registered Georgia

voters to be challenged under O.G.C.A. § 21-2-230 as having changed their

residency.   OpSec Tr. Ex. F 54:21; 57:11-21.


79. Mr. Phillips gained notoriety after the 2016 presidential election when

he claimed, without any basis, that more than three million votes were cast by non-citizens. OPSEC/Phillips Tr. 41:6-10; Ex. 29, G. Phillips CNN Interview Tr. at 8. But this allegation was obviously fabricated, as it came before statewide voter records were even available for review, and Mr. Phillips steadfastly refused to provide his data or methodology for outside verification. *See* Phillips CNN Interview Tr. at 8.

**Response:**   Each sentence of this statement is or contains editorial comment. To the extent that any fact is stated, they are not material because no event or comment surrounding a 2016 election is relevant to the question of how the

80. Dr. Mayer's review of the challenge file prepared by OPSEC and True the Vote uncovered missing data, missing values in key fields, anomalous values and obvious errors, lack of adequate data preparation, challenge file addresses near or on military installations, challenge file addresses in municipalities with universities, and other inadequate data practices for which Defendants are unable to provide any justification. *See infra* ¶¶ 81-111.

**Response:**   This statement is not supported by citation to evidence but to other

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          58

statements. Responses to these statements are provided below.

### i.    Mismatches between data files

81.    The databases Defendants used do not allow for foolproof matching, as the Georgia voter file contains only one unique identifier—the voter registration number—for each registered voter. Mayer Rep. 16. The remaining information included in the voter file—a person's name, address, birth year, race, gender, registration date, and date last voted—is not necessarily exclusive to any one person. *Id.* at 16. And the voter file does not include any other potential unique identifiers, such as social security numbers or driver's license numbers. *Id.* at 15-16.

**Response:**   The first sentence includes editorial comment; "foolproof" is not the applicable standard here or for any legal test. The process used to create the Challenge List was not limited to depending on the voter registration number to identify voters that have moved. OpSec Tr. 94:9-14; (process was not limited to NCOA and voter file list); *id.* 113:6-17 (process compared voter file information to commercially available information). The proprietary process gathers data from other lists to help verify identity of voters that have moved. OpSec Tr. 96:3-8; *id.*

**Defs.' Resp. To**
**Pls.' Corrected SUMF**              59

96:12. The combination of data—full name, address, and year of birth is itself a unique identifier and the proprietary process used to create the Challenge List mitigates a lack of unique identifiers between voter registration rolls and NCOA lists by resolving for identity first, which, among other things, works to eliminate a false match between persons with the same first and last name but a different middle initial. OpSec Tr. 120:12-20.

82.    The NCOA registry also does not include a person's voter registration number or any other unique identifier. *Id.* at 16-17. Nor does a person's voter registration number appear in any other database that could have been matched to the voter file to establish non-residency. *Id.* Thus, the only common fields between the voter file and NCOA registry are a person's name and address, which cannot—and certainly did not—dependably identify a unique individual. *Id.* at 16.

**Response:**   The statement is a legal conclusion. The combination of data—full name, address, and year of birth is itself a unique identifier and the proprietary process used to create the Challenge List mitigates a lack of unique identifiers between voter registration rolls and NCOA lists by resolving for identity first, which, among other things, works to eliminate a false match between persons with

the same first and last name but a different middle initial. OpSec Tr. 120:12-20. The analysis resulting in the Challenge List was not limited to depending on the voter registration number to identify voters that have moved. OpSec Tr. 94:9-14; (process was not limited to NCOA and voter file list); *id.* 113:6-17 (process compared voter file information to commercially available information). The proprietary process gathers data from other lists to help verify identity of voters that have moved. OpSec Tr. 96:3-8; *id.* 96:12.

83. In preparing the challenge lists, OPSEC accepted partial matches, where individuals in the voter file and NCOA registry had the same first and last names but *different* middle initials or *different* name suffixes (e.g., Jr. or Sr.). OPSEC/Phillips Tr. at 117:5-9, 17-19.

**Response:**   OpSec stated that partial matches with names with different middle initials or  name suffixes were possible but that its proprietary process of verifying identity first ameliorates or mitigates these partial matches. OpSec Tr. 122:4-16.

84. True the Vote and OPSEC refused to provide concrete information about how these matching errors were reduced or identified. *See* Mayer Rep. 20-23; OPSEC/Phillips Tr. 109:9-12.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          61

**Response:**   This statement contains editorial comment. OpSec's process is

proprietary process—meaning that it is protected as intellectual property or trade

secret—the heart of which is a 4000-row algorithm developed by Gregg Phillips

that has, through use, demonstrated its accuracy. OpSec Tr. 107:13-108:4; 113:22-

114:3. OpSec Tr. 108:16-22. OpSec has provided information sufficient to

describe how any "matching errors were reduced or identified."

85. As OPSEC admits, "the import of verifying identity can't be overstated

in this case." OPSEC/Phillips Tr. 141:17-19; *see also* Davis I Tr. 21:2-5.

**Response:**   In context, OpSec's statement was that *because its proprietary*

*process works to verify identity* apart from and in addition to simply matching data

between the NCOA list and a voter list, it was superior to the matching data

method that it is commonly used. OpSec Tr. 120:12-20. For example, OpSec's

proprietary process of verifying identity is a means of and is used to correct

potential matches of individuals in the voter file sharing a first and last name and

address. OpSec Tr. 96:3-11; 141:11-20. t method and was not subject to the

criticisms

   ii.  **Missing data**

**Defs.' Resp. To**
**Pls.' Corrected SUMF**   62

86. True the Vote's challenge file does not include several sources of identification found in the voter file, including middle name or middle initial, maiden name, suffix, or birth year. Mayer Rep. at 24. Instead, the only fields that appear to have been matched between the voter file and the NCOA registry are first name, last name, and address. *Id.* at 24-25.

**Response:**   The challenge file was the result of analysis, not a source of data, OpSec. Tr. 93:14-94:2, and is not evidence of what was considered in compiling the challenge list. The proprietary process does not depend exclusively on matches between the voter file and NCOA registry. OpSec Tr. 94:9-14; (process was not limited to NCOA and voter file list); *id.* 113:6-17.

87.   Because name and address combinations are far from unique in the voter file, this resulted in obvious errors. *Id.* at 25. Dr. Mayer found that there were 85,219 records in the Georgia voter file that had at least one duplicate entry with the same first name, last name, street address, apartment number, city, and zip code. *Id.* Dr. Mayer also found 1,375 entries in True the Vote's challenge file, where one entry in the NCOA database was linked to multiple individuals who share the same name and address, meaning that at least some of those individuals

from the voter file were misidentified and had not submitted a change of address form at all. *Id.* at 26.

**Response:**   Named Defendants dispute whether the 1375 entries that Dr. Mayer describes are misidentified individuals that had not submitted a change of address form. The observation that the Georgia voter file contains duplicate entries is not material because the presence of duplicate records in the voter file is irrelevant to the question of how the Challenge List was created or any other question affecting the outcome of the suit. The process used to compile the Challenge List process was not limited to matching a voter file to NCOA data but used additional databases, including other state registrations, proprietary lists, county tax records, and voter registration rolls in other states and provided broader comparisons and more accurate matching than is attained by using NCOA and a voter list alone. OpSec Tr. 94:17-21; 95:3-9, 17-18; 95:14-18; 96:3-17.

88. This error, moreover, had a disparate racial effect: Black voters comprise 27.3% of all individuals in the challenge file, but among the individuals in duplicated records, 40.3% are Black. *Id.*

**Response:**   Defendants dispute whether the 1375 entries that Dr. Mayer describes are misidentified individuals that had not submitted a change of address form. Defendants neither consulted nor used demographic information in creating the Challenge List. OpSec Tr. 150:16-18, 151:13-16, 152:6-9; TrueAppend Doc., Ex. G; OpSec Tr. 163:13-164:8; 149:14-17; TTV Tr. 244:17-245:10, 248:13-22 Second Somerville Tr. 30:6-32:14; 188:4-22.

### iii.   Missing values in key fields

89.   Dr. Mayer found 15,360 records in the challenge file that failed to show any street address in the "moved to" address fields. Mayer Rep. at 26-27. Another 27 records show the "moved to" street address as "general delivery," *id.* at 27, which Mr. Phillips admitted could mean "dozens" of things, including that the voter "didn't have an address when they moved" or was homeless. OPSEC/Phillips Tr. 141:10-16.

**Response:**   The Challenge List displayed what the NCOA file shows, which includes what the resident provided to the U.S.P.S. Defendants dispute any implication that there are records in the Challenge List for which the City, State, and Zip code were all missing. Defendants also dispute the implication that a voter

not having a "moved to" street address when they moved means that the voter has not moved or could unequivocally validly vote based on the "moved from" address. Whether a record is missing a "moved to" street address is not a material fact because compiling an accurate list of moved voters does not depend on having a "moved to" street address. The proprietary process used to create the Challenge List, in addition to address information, used a sophisticated algorithm to draw in information from other databases in identifying the individual first, used regression modeling to substantially cut the risk of a mismatch, and reviewed the results of matching names to ensure that it was reasonable with respect to false positives and false negative to within one standard deviation of the potential error that might be expected. OpSec Tr. 108:8-11 113:6-17, 118:11-119:22, 140:8-141:7 141:11-20.

90.     The lack of a "moved to address" is important because this means the challenge lists included thousands of Georgia votes who may not have permanently moved out of their county—indeed, who may not have moved at all. Mayer Rep. at 26-27.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          66

**Response:**   Defendants dispute the implication that the Challenge List includes records for which the City, State, and Zip code are all missing. Whether a record is missing one component of a "moved to" street address is not material because the proprietary process resulting in the Challenge List did not rely solely on complete address information but used a sophisticated algorithm to draw in information from other databases in making a match, used regression modeling to substantially cut the risk of a mismatch, and reviewed the results of matching names to ensure that it was reasonable with respect to false positives and false negative to within one standard deviation of the potential error that might be expected. OpSec Tr. 108:8-11 113:6-17, 118:11-119:22, 140:8-141:7 141:11-20.

### iv. Anomalous values and obvious errors

91.   Apart from fields that were entirely missing from the challenge files, there were also fields that were completed incorrectly and inconsistently, exemplified by all of the 9,270 records in the Henry County challenge list containing erroneous zip code data. Mayer Rep. at 27.

**Response:**   Defendants dispute the implication that the Challenge List includes records for which the City, State, and Zip code are all missing. In the case of the

Henry County, the city and zip code fields were transposed in the export of the

voter record, causing "city" to display twice, but this is not material because

NCOA data was "cleaned" using CASS and DPV in the analysis producing the

Challenge List for Henry County and every other county. OpSec Tr. 114:10-14;

115:1-18. Moreover, the proprietary process does not depend exclusively on

matches between the voter file and NCOA registry. OpSec Tr. 94:9-14; *id.* 113:6-

17. Instead, it used a sophisticated algorithm to draw in information from other

databases in making a match, used regression modeling to substantially cut the

risk of a mismatch, and reviewed the results of matching names to ensure that it

was reasonable with respect to false positives and false negative to within one

standard deviation of the potential error that might be expected. OpSec Tr. 108:8-

11 113:6-17, 118:11-119:22, 140:8-141:7 141:11-20.

92.     Additionally, city spellings and abbreviations differ arbitrarily—for

example, Dauphin Island, Alabama is only sometimes abbreviated to "Dauphin

Isl," and San Juan Capistrano, California is only sometimes abbreviated to "San

Juan Capo." *Id.* at 28.

**Response:**   The Challenge List provided the spelling and abbreviations returned

from the NCOA, which was run through CASS, OpSec Tr. 114:10-14, which

provides standardized abbreviations, OpSec Tr. 115:1-10, that were used in the

matching analysis via the proprietary process. OpSec Tr. 93:19-94:2. The raw

NCOA data to which this statement refers is not the data used to create the

Challenge List.

93.   None of these errors or abbreviations exist in the voter file, further

confirming True the Vote settled for approximate matches in putting together their

challenge files. *Id.*

**Response:**   The "errors" Plaintiffs have previously asserted were with respect to

zip codes were not are not material because that data was not the data used to

create the Challenge List. NCOA data was "cleaned" using CASS and DPV in the

analysis producing the Challenge List for Henry County and every other county.

OpSec Tr. 114:10-14; 115:1-18. Similarly, the spelling and abbreviations the

Challenge List provided were from the raw NCOA, which was run through CASS,

OpSec Tr. 114:10-14, which provides standardized abbreviations, OpSec Tr.

115:1-10, that were used in the matching analysis via the proprietary process.

OpSec Tr. 93:19-94:2. The raw NCOA data to which this statement refers is not the data used to create the Challenge List. Moreover, the proprietary process does not depend exclusively on matches between the voter file and NCOA registry. OpSec Tr. 94:9-14; *id.* 113:6-17 and resulting "matches" provided in the Challenge List were reviewed to ensure that it was reasonable with respect to false positives and false negative to within one standard deviation of the potential error that might be expected. OpSec Tr. 140:8-141:7.

94.    Dr. Mayer also found 263 examples where the name of the registrant in the challenge file does not match the name in the voter file under the voter registration number provided. *Id.*

**Response:**   The process used proprietary analyses and lists to help verify identity of individuals listed in the raw data, a process that may be unique, that is, above and beyond what is conventionally done for matching. OpSec Tr. 96:311. Absolute verification of identity has to be done by the counties using their access to DMV and other files that are not available to citizens and voters. OpSec Tr. 142:9-15.

95.     Dr. Mayer found five examples where the registration address and "moved to" address in the challenge file were identical, indicating that the voter had not, in fact, moved at all, "rais[ing] further questions about the validity of the NCOA matching process used, as well as the lack of quality control in reviewing the results (to the extent they were reviewed at all)." *Id.*

**Response:**   This statement contains editorial comment and offers an assessment of the entire Challenge List based on five errors in raw data. This discrepancy appears to be due to two cities being associated in the NCOA with the wrong counties. The proprietary process used to generate the Challenge List is rigorous and is designed to identify persons who have deployed for military service, OpSec Tr. 128:3-7; persons that, intending to move, file an NCOA request and then change their mind, *id.* 127:12-128:2; persons that forward their mail because they were on vacation, *id.* 126:22-127:5, 128:1-2; persons that moved for non-military government service and submit an NCOA, *id.* 126:9-16, 128:1-2; persons submitting an address change for purposes of attending school, *id.* 125:17-19, 128:1-2; persons that have moved inside the county or jurisdiction in which they were registered, *id.* 125:2.

96.     Gregg Phillips (OPSEC) admitted that he knew these errors were in the challenge file and that they should have been removed. OPSEC/Phillips Tr. 146:2-5.

**Response:**   The citation does not support the statement made. Gregg Phillips said that mismatched names were possible, that the Lists were reviewed for such errors, that matches with such errors would "likely . . . have been an exception and . . . kicked out, but it's possible that it could be included." OpSec Tr. 145:5-18. Mr. Phillips said that there were matches in which the registered address and the "moved to" address were the same, and that it is possible that this could be valid matches, "especially if it was a different name." OpSec Tr. 146: 1-7.

97.     Mr. Phillips knew that registrations remain valid where a voter moves within the same county, but nonetheless, voters who changed their address to another address within the same county were still included in the challenge lists. *Id.* at OPSEC/Phillips Tr. 125:12-22.

**Response:**   The conclusion of this statement is not supported by the evidence cited.  Mr. Phillips opined that a person might submit an address change to move within the same county and still be eligible in the registered jurisdiction. OpSec

Tr. 125:21-22.

98.     Dr. Mayer found 145 instances where a targeted individual's registration address and "moved to" address was in the same county. Mayer Rep. at 28.

**Response:**   A possible discrepancy of 145 records among over 350,000 is not material to the question of how the Challenge List was created or any other question affecting the outcome of the suit. Among the persons that OpSec's proprietary process is designed to identify are persons that have moved inside the county or jurisdiction in which they were registered, OpSec Tr. 125:2. Because the process consulted records other than address records, the process could infer that some one had, in fact moved. OpSec Tr. 129:8-15 (whether someone moved is inferred by the aggregate of data considered).

99.     Dr. Mayer also found 6,377 examples where individuals had already re-registered at their "new" address, indicating that True the Vote inexplicably challenged the eligibility of voters who were registered at the address that True the Vote believe to be their home. Mayer Rep. at 29.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          73

**Response:**   Defendants dispute whether the individuals re-registering were identical with the individuals that submitted the change of address in the NCOA. OpSec Tr. 146:8-11 (asking about individuals re-registering at the address the NCOA match "suggested" the individual moved to where the NCOA).

100.   Mr. Phillips admitted that "[reviewing for this error] was beyond our capacity so in that case what we would say is submit the challenge and let the county figure it out." OPSEC/Phillips Tr. 146:8-14.

**Response:**   Admitted with the clarification that this statement was made with respect only to cases where the individual appeared to have re-registered at the address "the NCOA match suggested the individual moved to." OpSec Tr. 146:8-11

101.   Finally, Dr. Mayer found 336 examples where challenged individuals were not registered to vote in Georgia at all, meaning they were wrongfully accused of being registered or voting unlawfully. Mayer Rep. at 29.

**Response:**   Defendants dispute whether 336 individuals on the Challenge List were not and/or never had been registered to vote in Georgia. No accusation was made by Defendants of any person identified on the Challenge List TTV Resp. to

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          74

First Interrogs. No. 5. Defendants never publicized the List. TTV Tr. 257:11-14,

ECF No. 155-7; Second Somerville Tr. 71:16-72:19; 72:21-73:14, ECF No.

155-14; Second Davis Tr. 46:3-14; 80:7-10, ECF No. 155-17.

### v.   Lack of adequate data preparation

102.   Because True the Vote use any unique identifiers conduct its match, it

was especially important to regularize the fields that were matched so that they

have a common format. Mayer Rep. at 29.

**Response:**   Defendants dispute the premise of this statement and the conclusion.

The combination of data—full name, address, and year of birth is itself a unique

identifier and the proprietary process used to create the Challenge List mitigates a

lack of unique identifiers between voter registration rolls and NCOA lists by

resolving for identity first, OpSec Tr. 107:4-8, which, among other things, works

to eliminate a false match between persons with the same first and last name but a

different middle initial. OpSec Tr. 120:12-20.

103.   But the address fields in the challenge file do not match the address

fields in the voter file. *Id.* The challenge list provides two fields for a street

address and apartment or unit number, while the voter file provides four separate

fields for house number, street name, street suffix, and apartment or unit number. *Id.*

**Response:**   Defendants dispute the conclusion that a difference in the display of address fields in the Challenge List means that there was a difference in data that would affect analysis.

104.   Dr. Mayer found that of the 41,691 records in the challenge file that have a value in the apartment or unit number field, several are not valid: five are recorded as missing rather than blank, one is recorded as either a spreadsheet cell reference or a typographical error ("=g16"), one is recorded as an en dash ("-"), and another is recorded as "Null." *Id.*

**Response:**   The address information in the Challenge List was supplied by the NCOA data. NCOA data was "cleaned" using CASS and DPV in the analysis producing the Challenge List.  OpSec Tr. 114:10-14; 115:1-18. The raw NCOA data to which this statement refers is not the data used to create the Challenge List. Moreover, the proprietary process does not depend exclusively on matches between the voter file and NCOA registry. OpSec Tr. 94:9-14; *id.* 113:6-17 and resulting "matches" provided in the Challenge List were reviewed to ensure that it

was reasonable with respect to false positives and false negative to within one

standard deviation of the potential error that might be expected. OpSec Tr. 140:8-

141:7.

> ### vi.  Challenge file included addresses near or on military installations

105.  Defendants knew that Georgia residents who temporarily relocate due

to military service remain eligible to vote in Georgia. *See, e.g.*, TTV Resp. to First

Interrogatories No. 7 at 24; OPSEC/Phillips Tr. 125:12-18.

**Response:**  Admitted with the clarification that an individual *temporarily*

relocated for military service remains *eligible* to vote in the previous jurisdiction.

A person that permanently moves, whether in the military or not, would not

eligible to vote in the "moved from" jurisdiction. TTV Tr. 232:18-22.

106.  Dr. Mayer found 22,956 registrants who, according to the challenge

file, moved to an address on a military installation, including 397 registrants who

are listed as actually living *on a military installation*. Mayer Rep. at 30. For

example, the challenge list includes 41 registrants with an address on Fort Knox,

KY; 35 on Fort Bragg, NC; 29 on Fort Campbell, KY; 23 on Joint Base Lewis

McChord, WA; 16 on Fort Stewart, GA; 15 on Fort Meade, MD; 14 on Eglin Air

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          77

Force Base, FL; 13 on Fort Irwin, CA; 12 on Camp Lejeune, NC; and nine at the United States Air Force Academy, CO. *Id.*

**Response:**   Defendants dispute the implication that *all* individuals moving to an address on a military installation remain eligible to vote in the previous jurisdiction. Defendants note that this statement provides a basis for considering whether, at most, 397 individuals on the Challenge List were on a military installation, while it alleges that 22,956 were in fact living on a military installation. OpSec used NCOA filters to exclude recognized military addresses. TTV Tr. 202:18-203:11, 204:4-6; TTV 1453 (TTV Depo. Exh 26). 300,000 voters were excluded from the initial query as identified as, among other things, deployed for military service. OpSec Tr. 128:3-7. The proprietary process checked databases other than NCOA and the voter file list to identify persons who had permanently moved, OpSec Tr. 94:17, 95:3-9, including other state registrations, *id.* 95:14-15; 96:12-17, and "five or six other data sources." OpSec Tr. 95:17-18. Among the persons that OpSec's proprietary process is designed to identify are persons who have deployed for military service, OpSec Tr. 128:3-7; persons submitting an address change for purposes of attending school, *id.* 125:17-19, 128:1-2; persons

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          78

that have moved inside the county or jurisdiction in which they were registered, *id.*
125:2

107.   Gregg Phillips (OPSEC) was aware that voters who submit even a
permanent change of address form to USPS listing their new duty station remain
eligible to vote in the state where they registered. OPSEC/Phillips Tr. 131:7-12.
However, when asked what further analysis was performed to identify whether
military voters who moved to a base retained their eligibility to vote in Georgia,
Mr. Phillips admitted "[w]e didn't." OPSEC/Phillips Tr. 131:13-16.

**Response:**   Defendants dispute the first sentence of this statement. It implies that
Defendant agrees that in all cases an individual retains eligibility to vote in a
previous jurisdiction when filing a permanent change of address to a new duty
station. OpSec used NCOA filters to exclude recognized military addresses. TTV
Tr. 202:18-203:11, 204:4-6; TTV 1453 (TTV Depo. Exh 26). 300,000 voters were
excluded from the initial query as identified as, among other things, deployed for
military service. OpSec Tr. 128:3-7. The proprietary process checked databases
other than NCOA and the voter file list to identify persons who had permanently
moved, OpSec Tr. 94:17, 95:3-9, including other state registrations, *id.* 95:14-15;

96:12-17, and "five or six other data sources." OpSec Tr. 95:17-18. Among the

persons that OpSec's proprietary process is designed to identify are persons who

have deployed for military service, OpSec Tr. 128:3-7.

> ### vii.   Challenge file included addresses in municipalities with universities.

108.   Defendants also knew that students remain eligible to vote at

their original residence when attending school out of state (or out of county). *See,*

*e.g.*, TTV Resp. to First Interrogatories No. 7 at 24; OPSEC/Phillips Tr.

125:12-19.

**Response:**   Defendants dispute this statement. It implies that Defendant agrees

that in all cases an individual retains eligibility to vote in a previous jurisdiction

when filing a permanent change of address for reasons having to do with school.

The proprietary process checked databases other than NCOA and the voter file list

to identify persons who had permanently moved, OpSec Tr. 94:17, 95:3-9,

including other state registrations, *id.* 95:14-15; 96:12-17, and "five or six other

data sources." OpSec Tr. 95:17-18.

109.   Dr. Mayer found 35,056 registrants in the challenge file with a "new"

address in a city containing academic institutions that Georgia residents regularly

**Defs.' Resp. To**
**Pls.' Corrected SUMF**            80

attend. Mayer Report at 31. As one example, the small town of Dahlonega is home to the University of North Georgia, as well as the Army base Camp Merrill. *Id.* at 50. From this town of 7,500 people, True the Vote challenged 273 individuals. *Id.*

**Response:**   This statement contains an implicit legal conclusion that in all cases an individual retains eligibility to vote in a previous jurisdiction when filing a permanent change of address for reasons having to do with school. The individuals at issue have themselves filed an NCOA record of a permanent address change. TTV Tr. 135:3-8; OpSec Tr. 128:8-15. The proprietary process also considers databases other than NCOA and the voter file list to identify persons who have permanently moved, OpSec Tr. 94:17, 95:3-9, including other state registrations, *id.* 95:14-15; 96:12-17, and "five or six other data sources." OpSec Tr. 95:17-18. Among the persons that OpSec's proprietary process is designed to identify are persons submitting an address change for purposes of attending school, *id.* 125:17-19, 128:1-2.

110.   In all, 57,534 registrants in the challenge file—or 22.9% of the entire list—are alleged to have moved to or near a military installation, or to a municipality with a college or university. *Id.* at 32.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**        81

**Response:**   This statement contains an implicit legal conclusion that in all cases an individual retains eligibility to vote in a previous jurisdiction when filing a permanent change of address for reasons having to do with a new military duty station or school. Defendants' data begins with an NCOA record of a permanent address change filed by the individual at issue. TTV Tr. 135:3-8; OpSec Tr. 128:8-15. The proprietary process also considers databases other than NCOA and the voter file list to identify persons who had moved, OpSec Tr. 94:17, 95:3-9, including other state registrations, *id.* 95:14-15; 96:12-17, and "five or six other data sources." OpSec Tr. 95:17-18. Among the persons that OpSec's proprietary process is designed to identify are persons submitting an address change for purposes of attending school, *id.* 125:17-19, 128:1-2; and persons who have deployed for military service, OpSec Tr. 128:3-7.

111.   Dr. Mayer concluded that the "matching process ostensibly used by True the Vote does not adhere to standard practice in political science." *Id.* at 32. Because Defendants did not "ensure that data fields were conforming, that missing and anomalous values were identified and corrected, and that implausible matches

(such as duplicates and name changes) were either removed or investigated further to identify possible errors," their validation process was "wholly inadequate." *Id.*

**Response:**   This statement is editorial comment. To the extent that a comparison to "standard practice in political science" is a fact, it is not material because, as a matter of law, whether the challenge list was created using such practices is irrelevant and will not affect the outcome of the suit. Defendants dispute the statement's implying that the practices were required for purposes of the relevant state or federal statute or other law and the conclusion that the process employed was therefore "wholly inadequate." The process used to create the Challenge List was not limited to depending on the voter registration number to identify voters that have moved. OpSec Tr. 94:9-14; (process was not limited to NCOA and voter file list); *id.* 113:6-17 (process compared voter file information to commercially available information). The proprietary process gathers data from other lists to help verify identity of voters that have moved. OpSec Tr. 96:3-8; *id.* 96:12. The proprietary process uses a 4000-row algorithm, involving a complex series of mostly common algorithms, such as dissimilarity and similarity indexes and fuzzy logic. OpSec Tr. 107:13-108:4; 113:22-114:3. The fuzzy logic used in OpSec's

**Defs.' Resp. To**
**Pls.' Corrected SUMF**            83

proprietary process is designed to ascertain whether similar information is similar enough to assume that an identity is accurate. If it is not, then it assigns a risk factor to it. OpSec Tr. 108:8-11. OpSec's proprietary process utilizes regression modeling including a model management process to identify the regression technique most likely to produce an accurate result. OpSec Tr. 118:19-119:22. Regressions are run throughout the proprietary process. OpSec Tr. 119:5-9. The combination of data—full name, address, and year of birth is itself a unique identifier and the proprietary process used to create the Challenge List mitigates a lack of unique identifiers between voter registration rolls and NCOA lists by resolving for identity first, which, among other things, works to eliminate a false match between persons with the same first and last name but a different middle initial. OpSec Tr. 120:12-20. The proprietary process checked databases other than NCOA and the voter file list to identify persons who had permanently moved, OpSec Tr. 94:17, 95:3-9, including other state registrations, *id.* 95:14-15; 96:12-17, and "five or six other data sources." OpSec Tr. 95:17-18.

### viii.   Volunteer challengers and fellow defendants warned  True the Vote of obvious errors.

112.   True the Vote's regular practice was to submit challenges from a True

the Vote email account under a volunteer's name without telling the volunteer who was being challenged. *See* Cooper Tr. 75:3-76:4. However, when Joe Martin, Chair of the Taliaferro County Republican Party, was identified as a registered voter willing to submit True the Vote's challenge list in his county, Ex. 4, Joseph Martin Dep. Tr. ("Martin Tr.") 20:17-22, he requested the challenge list for Taliaferro County to submit himself. *Id.* 43:19-44:2.

**Response:**   Disputed as to the implication that TTV refused to show volunteers the list in advance—there is no evidence on the record that TTV refused to show volunteers the challenge lists if requested to do so. Mr. Martin asked to see the list before he agreed to volunteer. Cooper Tr. 75:21-22.

113.   After receiving True the Vote's list of 37 names, Mr. Martin asked:"How did this list come about? Where did this list come from? Who generated the list?" Martin Tr. 38:19-20. Martin expressed that he believed standard practice required providing two sources for the allegation that a voter had changed residency, and nothing about the challenge lists reflected that multiple sources had been consulted. *Id.* 46:20-47:5.

**Response:**   Disputed to the extent that Mr. Martin testified he believed standard

practice required providing two sources for the allegation that a voter had changed residency. Mr. Martin testified "in my line of work [he is retired from the defense industry, Martin Tr. 15:18] when you only have a single source of validation, you - you - you want two sources." *Id.* at 46:20-47:2.

114.    Martin was "not comfortable" that the list he received "was valid," id.38:17-19, and so rather than challenge all 37 individuals on True the Vote's Taliaferro County list, Mr. Martin winnowed the list himself and chose to submit letters challenging only the three registrants on the list who had requested an absentee ballot for the runoff elections. *Id.* 55:7-12.

**Response:**   Undisputed.

115.    But Martin soon discovered that even this limited subset was faulty. According to county elections officials: (1) the first person he challenged did not live in New Jersey, as his challenge letter alleged, and instead was a 100-year-old woman living in Taliaferro County, (2) the second person he challenged lived in a nursing home and maintained a permanent residence in Taliaferro County, and (3) the third person he challenged also lived in a nursing home. Martin Tr. 61:12–66:7.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          86

**Response:**   The first sentence contains an editorial comment. Disputed as to

results of the three test cases. One of the three test cases lived in Wilkes County,

but cast an absentee ballot in Taliaferro County and that voter later asked for her

name to be removed from Taliaferro County's registration. Martin Tr. 65:19-7;

66:8-17. The second test case did not reside in Taliaferro County, but was able to

vote there due to a homestead exemption. *Id.* at 64:4-65:7. So the information on

TTV's list about that person's change of address was accurate. The local judge

verified the third test case lived in Taliaferro County. *Id.* at 62:3-13.

116.   As a result, Martin promptly withdrew all of his challenges and

updated True the Vote about the issues he encountered: "My experience with the

True the Vote data base has not been good," he wrote in an email, because of

"[c]oncerns with the quality of your information." *Id.* 87:4–8, 87:16–18. After

summarizing the relevant events, he repeated again, "Impact of 3 challenges. Not

good! Indicates problem with data accuracy and relevance." *Id.* 77:6–78:9;

83:20–84:9.[6]

---

[6]Notably, Mr. Martin—the only challenger who requested to see the list of
individuals to be challenged in his county, Cooper Tr. 75:3–76:4—was also the
one challenger to request that his challenges be withdrawn. *See* TTV/Engelbrecht

**Response:**   Undisputed that he sent that message to TTV. But disputed as to full context. He also testified   that as far as the accuracy of the list he was provided, "it depends on how you look at the list" because one or two votes can make a difference in Taliaferro County. *Id.* at 99:11-19. He asked his challenge to be withdrawn because he didn't want to put the registrar through the "painful process of validating those 37 individuals." Martin Tr. 78:4-9.

117.   Shortly after Martin shared that his desire to withdraw his challenges, Defendant Cooper emailed Ms. Engelbrecht that he would immediately look for a replacement challenger in Taliaferro County to resubmit the list. Cooper Tr. 105:14-20.

**Response:**   Undisputed.

118.   True the Vote also proceeded with challenges to all 37 individuals on the Taliaferro County challenge list under Martin's name but without telling Martin it was doing so. Martin Tr. 56:4-57:9.6.[7]

Response: Disputed. TTV withdrew his challenges on December 21, 2021. TTV

_____

Tr. 328:4–13.

[7]Mr. Martin was "shocked" when he later learned from open records requests that True the Vote had done this. Martin Tr. 57:5–15, 62:21–63:3.

Resp. to 2d Interrog. Resp. No. 11.

119.   Defendant Mark Davis also took "exception" to the logic of True the Vote's challenge methodology. Davis I Tr. 60:15-18.

**Response:**   Disputed. Mr. Davis testified he took exception to some of TTV's logic. First Davis Tr. 60:17-18. He later testified, "it's not that I really object to their criteria, but I probably personally wouldn't have done it that way." *Id.* at 62:10-12. Disagreements between TTV and Mr. Davis on the specific processes chosen by each are immaterial to the question of whether Named Defendants violated § 11(b).

120.   Mr. Davis specifically objected that he "was not on board with the philosophy surrounding [TTV's] challenge," as he "felt it was too broad," and that he wanted his challenges to "be more legitimate, more smaller." *Id.* ; Davis II Tr. 94:14-17.

**Response:** Disputed. Mr. Davis testified, "it's not that I really object to their criteria, but I probably personally wouldn't have done it that way." *Id.* at 62:10-12. Disagreements between TTV and Mr. Davis on the specific processes chosen by each are immaterial to the question of whether Named Defendants violated §

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          89

11(b).

121.   Ms. Engelbrecht and True the Vote, however, were intent on "including as many records as possible within [True the Vote's] challenge." Engelbrecht/TTV Tr. 149:20-150:1.

**Response:**   Undisputed on content, but disputed as to lack of context. Ms. Engelbrecht testified, "[w]e wanted to review as many records, recognizing that the state hadn't cleaned their rolls in two years. And recognizing all of the new rules around the election process that would have impact. We wanted to do as much as we could to afford an even review." TTV Tr. 149:14-19.

122.   Mr. Davis also recognized that many registrants who file a "permanent" change of address form with the postal service only intend to relocate temporarily, and filing a "permanent" change of address form does not indicate that the individual has moved permanently. A "permanent" change of address form is required for mail forwarding that lasts longer than a year; thus, if the registrant is a student or member of the military whose temporary relocation is expected to last longer than one year, they must complete a permanent change of address form to ensure mail forwarding for the duration of their temporary relocation. Davis II

Tr. 26:14-27:5.

**Response:**   Undisputed.

123.   True the Vote did not conduct any such investigation to determine whether voters who filed a "permanent" change of address were students or otherwise away temporarily; instead, Mr. Phillips spent "an hour maybe" reviewing the challenge file to ensure the number of errors looked "reasonable" relative to his expectations, and he deemed that sufficient. OPSEC/Phillips Tr. 140:8-141:10.

**Response:**   Disputed. OpSec used NCOA filters to exclude recognized military addresses. TTV Tr. 202:18-203:11, 204:4-6; TTV 1453 (TTV Dep. Ex, 26). 300,000 voters were excluded from the initial query as identified as, among other things, deployed for military service. OpSec Tr. 128:3-7. The proprietary process checked databases other than NCOA and the voter file list to identify persons who had permanently moved, OpSec Tr. 94:17, 95:3-9, including other state registrations, *id.* 95:14-15; 96:12-17, and "five or six other data sources." OpSec Tr. 95:17-18.

124.   Unfortunately, Mr. Davis himself also failed to perform the necessary

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          91

analysis on his own challenge file of 40,000 registrants. He asked Mr. Somerville to manually remove names with addresses that might be affiliated with military bases, but not remove college students or other potentially eligible voters. Davis I Tr. 149:18-150:1.

**Response:**   Disputed as to the word "manually." Mr. Davis testified that Mr. Somerville "was aware of where the big military bases are and did his best to scrub them out of the data." First Davis Tr. 149:11-14.

125.   While Mr. Davis and Mr. Phillips (OPSEC) were each disinterested in the problems with their own challenge lists, they had no trouble recognizing each other's flaws. See OPSEC/Phillips Tr. 103:13-16. Mr. Phillips specifically criticized Mr. Davis's approach for failing to verify the identity of individuals on the voter rolls before matching to the NCOA, and assessed Mr. Davis's methodology bluntly by stating: "This is bad process." *Id.*

**Response:**   The first sentence contains editorial comment. Disputed, Mr. Phillips testified that "my guess" is Mr. Davis did "clean the rolls as it relates to identity verification first or he wouldn't have had this. This is bad process." OPSEC Tr. 103:12-16. Mr. Phillips' opinions or guesses as to Mr. Davis' processes is

immaterial to the question of whether any Named Defendants violated § 11(b).

### 3. True the Vote made good on its call to collaborate and galvanize support from Republicans by coordinating its Validate the Vote scheme with Georgia Republican Party officials.

126.   True the Vote also partnered with and "galvanize[d] support" from Republicans in Georgia. In a December 14, 2020 press release, True the Vote announced that it was "partner[ing]" with the Georgia Republican Party to help them "implement the most comprehensive ballot security initiative in Georgia history." Dec. 14 Press Release.

**Response:**   Undisputed.

127.   For its mass elector challenges, True the Vote recruited challengers solely through two Georgia Republican Party officials, Defendants James Cooper and Ron Johnson, who in turn relied on Republican Party contacts to recruit challengers, several of whom were GOP party officials themselves. Cooper Tr. 33:3–13; 36:11–37:19; 115:15–22; Johnson Tr. 34:4–8; TTV/Engelbrecht Tr. 239:22–240:15; *see also* Cooper Tr. 139:8–14.

**Response:**   Disputed as to implication TTV was unwilling to work with Democrats. TTV sent a letter to Georgia State Senator Nikema Williams, a

**Defs.' Resp. To**
**Pls.' Corrected SUMF**                   93

Democrat, offering "our assistance to the Democratic Party of Georgia for the
Senate Runoff. Def TTV 1497.

128.  Mr. Cooper testified that True the Vote ran its recruitment process
from the Georgia GOP spreadsheet, recruiting Republican county chairs, and then
recruiting a different challenger if a current or former Republican county chair did
not want to be a challenger. *See* Cooper Tr. 58:3–9; 129:22–130:4.

**Response:** Disputed. Mr. Cooper testified that he used a spreadsheet the GOP had
on the state [party's] website. Cooper Tr. 36:17-37:3.

129.  Joe Martin—the volunteer who ultimately requested that his
challenge be withdrawn (and Chair of the Taliaferro County Republican
Party)—even thought that Mr. Cooper had recruited him on behalf of the Georgia
Republican Party, as Cooper signed his True the Vote recruitment email as coming
from the "3rd Vice Chair 10th District Republican Party." Williams 0377.7.[8]

---

[8] Although True the Vote denied Plaintiffs' Request for Admission No. 17
that it reached out to the Georgia Republican Party before reaching out to the
Democratic Party of Georgia, that denial was false. As Ms. Engelbrecht testified in
her deposition on behalf of True the Vote, she reached out to and partnered with
the Georgia Republican Party before attempting to contact the Democratic Party of
Georgia. *See*TTV/Engelbrecht Tr. 166:14–167:4.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          94

**Response:** Undisputed.

130.   True the Vote's press release announcing its partnership with the Georgia Republican Party was just one of many designed to further the Validate the Vote scheme—specifically, the plan to "[b]uild public momentum through broad publicity." Validate the Vote 2020 at 1; TTV/Engelbrecht Tr. 274:16–275:12.

**Response:**   Disputed as to the editorial comment contained in the word "scheme." Undisputed that TTV planned to "build public momentum through broad publicity," which included press releases. Disputed as to the editorial comment implied by the use of "many."

>   **4.   Defendants' public statements stoked fears, accused hundreds of thousands of Georgians of acting unlawfully, and exaggerated its efforts to build momentum for its Validate the Vote scheme.**

131.   True the Vote's December 18, 2020 press release announcing its mass challenges stated that it had "partner[ed] with Georgians in every county to preemptively challenge 364,541 potentially ineligible voters," Ex. 22, Dec. 18 Press Release. In fact, it had not. *See* TTV/Engelbrecht Tr. 252:18–22. Instead, Ms. Engelbrecht testified that this language was intended to signal "willingness"

to partner with Georgians in every county. *Id.* 251:14–17.

**Response:**    Undisputed.

132.    Ms. Engelbrecht testified that the point of the press release was "more to show just support for the engagement of citizens," *id.* 252:16–17, *i.e.*, to build the public momentum necessary to accomplish Validate the Vote's goals.

**Response:**    Undisputed as to the quote from Ms. Engelbrecht, disputed as to the editorial comment contained in the second clause.

133.    The press releases had another goal: to elicit donations. Ms. Engelbrecht hoped that as awareness of the Validate the Vote program and its other efforts increased, so too would financial support or donations to True the Vote. *See* TTV/Engelbrecht Tr. 81:2–9. Indeed, True the Vote anticipated having its "legal fees . . . covered by the Trump campaign" because the campaign was going to use its research collected from the Validate the Vote scheme. *Id.* 305:3–8, 306:18–21.

**Response:**    Undisputed as to the first sentence. Disputed as to the second. The question of legal fees surrounding the presidential election is immaterial as to the issue of whether Named Defendants violated § 11(b).

134.   Ms. Engelbrecht has also publicly "offer[ed] tips to ordinary Americans to prevent the Democrat plan to steal the election in 2020," see id. 323:15–324:3—a plan referenced in True the Vote's Validate the Vote proposal that Ms. Engelbrecht admits was "promotional," *id.* 269:17–271:13.

**Response:**   Disputed, but immaterial as to the  issue of whether Named Defendants violated § 11(b).

135.   Despite True the Vote's assertions that the Georgia Elector Challenges did not accuse any voter of "act[ing] improperly" or seek to "remove people . . . from the voter rolls," TTV Resp. to Interrogatories No. 5 at 22, its recruitment email stated it was 99.9 percent certain that over 500,000 people on the Georgia voter rolls shouldn't be there. Williams 0375. But in her deposition, Ms. Engelbrecht stated that the 500,000 number was incorrect and that it had no way of knowing whether the 99.9 percent figure was correct. *See* TTV/Engelbrecht Tr. 232:5–234:15.

**Response:**   Disputed. Ms. Engelbrecht testified that "[i]t was and is our position that according to the analysis we provided, or that we supported, records correspond with individual decisions to permanently change their residence. And

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          97

therefore it would have made their record ineligible and appropriate in the scope of an elector challenge. TTV Tr. 232:18-233:3.

136.   One of the recruiting emails for the True the Vote challenges claimed that if the challenges had occurred in October, "it is very likely Trump would have won Georgia." Williams 0389.

**Response:**   Undisputed.

137.   True the Vote's volunteers also believed they were removing people from the voter rolls and that the challenged voters were violating the law. Volunteers responded to recruiting emails stating that True the Vote could use their names and signatures to "challenge the illegal votes." *See, e.g.*, Ex. 35, Dec. 15, 2020 Dodge County Challenger Email; Ex. 36, Dec. 18, 2020 Jones County Challenger Email; Ex. 37, Dec. 15, 2020 Barrow County Challenger Email; Ex. 38, Dec. 19, 2020Calhoun County Challenger Email; *see also* TTV/Engelbrecht Tr. 236:6–243:19.

**Response:**   Undisputed that some challengers wrote that in emails, but disputed as to whether a challenge to anyone's registration was ever submitted.

138.   True the Vote did not correct these Responses they furthered its

mission of building "public momentum" and were consistent with True the Vote's

assertions that "illegal" voting was rampant and those votes were being counted

due to the malfeasance of Democratic officials. Validate the Vote 2020 at 1.

**Response:** This is not a statement of fact, but an editorial opinion.

139.   On November 29, 2020, Defendants Mark Davis and Derek

Somerville published a Facebook post about a scenario in which a voter dubbed

"Dave" was alleged to have illegally voted in Georgia despite living in New York.

In response,  one individual wrote: "[c]an we start turning people in for election

fraud? I have a list of a few people who should be made sorry they voted in two

states," Ex. 25, Nov. 30, 2020 Davis Facebook Post at 1, of which Mr. Davis

expressed support by "liking" the message.

**Response:**   Undisputed as to the Facebook post and comment. Disputed as to the

editorial comment that Mr. Davis "expressed support" as that is a conclusory

statement.

140.   Several days later, on December 4, 2020, Mr. Somerville and Mr.

Davis published another post about voters registered with UPS store P.O. boxes,

and someone commented "I think a search warrant is in order here," to which Mr.

Davis responded, "great idea!" Ex. 26, Dec. 4, 2020 Davis and Somerville

Facebook Post at 3. Another individual commented on this post: "[l]et's see if any

one has the balls to prosecute to the max or if they will just get a hand slap!" *Id.* at

4. Yet another individual commented: "Hang that prick!!!" Ex. 27, Dec. 5, 2020

Davi and Somerville Facebook Post at 6.

**Response:**    Undisputed.

141.    On December 20, 2020—shortly after True the Vote submitted the

bulk of its Georgia Elector Challenges—a group called "Crusade for Freedom"

posted: "We just prospectively challenged the eligibility of 360,000 voters in GA.

Largest single election challenge in Georgia and American history." Ex. 23,

Crusade for Freedom Tweets. Two days later, Crusade for Freedom tweeted: "If

the Georgia counties refuse to handle the challenges of 366,000 ineligible voters

in accordance with the law, I plan to release the entire list so America can do the

QC." *Id.*; TTV/Engelbrecht Tr. 264:17–265:3. Both tweets contained the hashtags

#eyesonGA and #validatethevoteGA. *Id.*

**Response:**    Undisputed.

142.    Ms. Engelbrecht admitted that these hashtags mirrored the slogans

appearing on several True the Vote documents, an internal invoice between

OPSEC and True the Vote. See TTV/Engelbrecht Tr. 264:7–16. Ms. Engelbrecht

also admitted that she was not aware of any groups other than True the Vote that

challenged the eligibility of approximately 366,000 voters in Georgia during the

runoff elections. *Id.* 264:2–6. And she admitted that Crusade for Freedom's logo

in its tweets matched the logo in a Facebook post from an organization named

Time for a Hero—which was founded by Ms. Engelbrecht and Mr. Phillips, *id.*

37:4–6—that stated, "Crusade for Freedom coming soon," *id.* 261:10–11.

**Response:**   Disputed. TTV is not associated with either Crusade for Freedom or

Time for a Hero. TTV Tr. 259:1-18; 338:2-339:18. Although these tweets used

hashtags for Validate the Vote Georgia, TTV does not control who uses hashtags

on Twitter. 339:10-18.

143.   About a week later, on December 30, 2020, Mr. Davis texted Mr.

Somerville, "Derek, we need to stop this. If they publish they will be flooded with

defamation complaints." Davis II Tr. 129:3-10; 129:11-19 (Mr. Davis describing

his concern that complaints were going to be made public).

**Response:**   Disputed. This comment was completely unrelated to the § 230

Challenges, and is therefore immaterial. This comment was related to a mistaken impression that Mr. Davis had about another website TTV was considering. Second Davis Tr. 129:11-130:12.

144.    Mr. Davis further explained that publishing the names would "literally mak[e] good on one of the 'Threats' alleged in [Plaintiffs'] complaint." Somerville 371. Mr. Davis texted Ms. Englebrecht to implore her not to publish the names.

**Response:**   Disputed. This comment was completely unrelated to the § 230 Challenges, and is therefore immaterial. This comment was related to a mistaken impression that Mr. Davis had about another website TTV was considering. Second Davis Tr. 129:11-130:12.

> **D.    True the Vote threatened to place a bounty on fraud and SEALS at polling places.**

145.    True the Vote also created a "hotline," which it used to gather information or data that OPSEC would aggregate for use in overturning electoral results. TTV/Engelbrecht Tr. 70:11–14. Yet Ms. Engelbrecht was "troubled" by the "intimidation" suffered by electors who received threats to themselves and their businesses, TTV/Engelbrecht Tr. 330:4–10, and recognized the "chilling

effect" such an environment could have. *Id.* 75:13.

**Response:**   Disputed that TTV would aggregate the information from the hotline for "overturning election results" as that statement is not in the quote from Ms. Engelbrecht's transcript. TTV established a support fund to provide legal support for people who reported information primarily to head off the chilling effect of the threat of legal action against challengers or those with information. TTV Tr. 71:11-19, 71:22-72:1, 74:8-17, 75:5-18, 76:15-19.

146.   True the Vote then announced a whistleblower fund in excess of $1 million, TTV/Engelbrecht Tr. 315:20–316:2.

**Response:**   Disputed as to the implication the fund was a reward or bounty program. Ms. Engelbrecht testified the fund "was to support people that would come forward, as we discussed previously, to have funds available should they be necessary for their legal support." TTV Tr. 316:6-10.

147.   Historically, bounties in the voting context have been "used to direct suspicion around minority voters" by "incentivizing individuals to create or suspect fraud where there may have been none." Burton Rep. at 26.

**Response:**   Disputed as to editorial comment.

**Defs.' Resp. To
Pls.' Corrected SUMF**          103

148.   Nevertheless, Ms. Engelbrecht promoted the bounty in press releases and on her podcast, stating that "Validate the Vote is about [] putting a bounty on the fraud." Ex. 43, Engelbrecht Podcast Transcript; TTV/Engelbrecht Tr. 70:6–7.

**Response:**   Disputed. Ms. Engelbrecht testified that when she stated "Validate the Vote is about is putting a bounty on the fraud" during a podcast, she was "riffing" on what Validate the Vote was trying to do, but she then specified that the support fund was used to provide legal support, if and when needed. TTV Tr. 69:9-75:18.

149.   True the Vote did not report any of the tips submitted to the Validate the Vote Georgia hotline to state authorities for action or investigation. See id. 94:17–95:3.

**Response:**   Undisputed.

150.   With respect to the Georgia Senate runoffs, True the Vote characterized its Validate the Vote scheme as part of "the most comprehensive ballot security effort in Georgia history." Dec. 14 Press Release.

**Response:**   Disputed as to editorial comment contained in "scheme." Undisputed as to the quote from the press release.

151.   That "ballot security" effort also involved soliciting Georgia voters to

act as "citizen watchdogs" by reporting "election fraud, manipulation or illegal action taking place." *Id.* True the Vote targeted specific citizens to serve as "watchdogs": it launched a "Continue to Serve" initiative that recruited veterans and first responders, including Navy SEALS, to monitor polling places. *See* Ex. 24, Seals at the Polls Podcast Tr. As Ms. Engelbrecht explained, polling places "need[ed] people who were unafraid to call it like they see it," and if "[y]ou want to talk about people who understand and respect law and order and chain of command, you get some S[EALS] in those polls." Ms. Engelbrecht explained how the SEALS could "interact with voters," TTV/Engelbrecht Tr. 63:18–21, and election officials: "no, no, that is not—this is what it says and this is, this is how we're going to play the show," *id.* 62:9–12.

**Response:**    Disputed. In 2020, TTV had an initiative called "Continue to Serve" that was directed towards veterans and first responders working in the polls or volunteering to work in the polls. TTV Tr. 59:9-12. This initiative was started in recognition that states often struggle to get enough volunteers working at polls[9]

---

[9]*See* Secretary of State for the State of Georgia, *Brad Raffensperger Calls on Local Groups to Commit to Poll Working: Launches Poll Worker Recruitment Tools*,

and that veterans and first responders are very good at understanding a chain of command and understanding process, so those skill sets translate well to volunteering at polls. *Id.* at 59:19-60:17. Ms. Engelbrecht testified that the interactions between these volunteers and voters or other poll workers would depend on what capacity they volunteered in and what the state process was for various poll volunteer functions. *Id.* at 62:13-64:7.

>       **E.    Defendants' actions were objectively intimidating, and, in fact, intimidated voters.**

152.    "[V]oters whose eligibility is challenged may perceive a legal risk if they vote, which again dramatically increases the cost of voting and discourages turnout even if the individual is eligible." Mayer Rep. at 41.

**Response:**   Disputed as to editorial comment and opinion, not statement of fact.

153.    This risk is particularly acute for low-information voters or voters of lower socioeconomic status who may lack the resources to navigate the law or understand whether they are still eligible to vote. Mayer Rep. at 39-41.

**Response:**   Disputed as to editorial comment and opinion, not statement of fact.

---

https://sos.ga.gov/news/brad-raffensperger-calls-local-groups-commit-poll-working-launches-poll-worker-recruitment (August 4, 2020).

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          106

154.   "[V]oters may be reasonably hesitant to arrive at the polls to 'prove' their eligibility if it has been challenged," particularly in a state, like Georgia, that has for the past decade "launched numerous investigations into voters accused of wrongdoing," particularly minority voters. Burton Rep. at 17–20, 25.[10]

**Response:** Disputed as to editorial comment and opinion, not statement of fact.

155.   When Plaintiff Jane Doe first learned that her eligibility to vote had been challenged by Defendants by reading a local paper that publicly disclosed her name, she feared that she or her family could become the target of harassment

---

[10]Georgia's "Elector Challenge" provision, O.C.G.A. § 21-2-230, was enacted over 100 years ago, the Elector Challenge provision was, like True the Vote's Validate the Vote scheme, "[g]rounded on unsubstantiated claims of voter fraud" and "the pretext of purifying elections." Burton Rep. at 8. Designed to disenfranchise Black voters, it was used with devastating effect for decades in mass challenges to suppress Black voting power and steal elections for white supremacists, most famously Eugene Talmadge and Marvin Griffin in 1946. *See id.* 8–14. The Talmadge and Griffin mass challenges were the largest in Georgia history—until True the Vote's. *See id.* 24–25. The Talmadge and Griffin challenges were brought shortly before election day and curbed the ability of Black Georgians, who had just gained access to vote in primaries, the ability to exert influence over the primary process. *See* Burton Rep. at 24. Likewise, True the Vote brought its mass challenges not months before the election, but mere days before Georgia elected its first Black Senator to the United States Congress. See *id.* at 24–25.

from Defendants and their supporters if she voted. Jane Doe Decl. ¶¶ 5, 7, 9.

**Response:**   Undisputed.

156.   Jane Doe was especially concerned because she had seen reports of Georgia's elections workers being harassed, threatened, and doxed after the general election. *Id.* ¶ 7.

**Response:**   Undisputed.

157.   Jane Doe's information still remains publicly online to this day, and she fears she will be challenged again in future elections and that her eligibility to vote will be questioned again. *Id.* ¶ 11.

**Response:** Undisputed.

158.   Similarly, Plaintiff Jocelyn Heredia testified that she felt intimidated when she was challenged by Defendants. Heredia Tr. 44:21-45:8. Heredia was also publicly listed as a "challenged voter" on Banks County's website for six months. *Id.* 31:24-32:3, 61:17-62:21. For Ms. Heredia, the challenge was an intimidating experience, both because of the unclear legal implications and because she felt she was being targeted as a person of color in a predominantly white county. *Id.* 44:12-45:8.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          108

**Response:**   Disputed. Ms. Heredia testified that no one said anything to her while she was standing in line to vote that intimidated her or targeted her. Heredia Tr. 48:16-49:3.  Ms. Heredia testified she felt "intimidated from the get-go," as soon as she got to the polling location because she was the only Hispanic person in line to vote in a predominantly Republican county. Heredia Tr. 48:1-9. Ms. Heredia testified that she did not know she was Challenged until later, when she got into the polling location. *Id.* at 49:4-50:2. Ms. Heredia testified her feeling of intimidation increased when she learned she had been Challenged based upon her change of address. *Id.* at 48:10-15.

Ms. Heredia testified that because she was Challenged, election officials asked her to fill out a paper ballot and explained to her that if she provided the requisite proof of residency at her voter registration address, her paper ballot would be counted. *Id.* at 23:22-24:13. She provided them with proof of residency and submitted the paper ballot. *Id.* at 24:8-13.

159.   Stephanie Pfeiffer Stinetorf is another voter who experienced anxiety about her ability to participate in the Georgia runoff elections in January 2021 after she was challenged by Defendants. *See infra* ¶¶ 160-166.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          109

**Response:**   Disputed. Named Defendants did not submit challenges in Muscogee County. TTV did not submit any Challenge in Muscogee County. TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24, 2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee County. Second Davis Tr. 144:7-15.

160.   Stinetorf moved to Georgia in 2018, and registered to vote at the time. Ex. 17, Stinetorf Decl. ¶ 2. She is a civilian employee of the United States Department of Defense, and as part of her job, received military orders to move to Germany in August 2020, at which time she submitted a change of address form to ensure she would continue to receive mail. *Id.* ¶¶ 3-4.

**Response:**   Undisputed, but immaterial as Ms. Stinetorf is a registered voter in Muscogee County. TTV did not submit any Challenge in Muscogee County. TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24, 2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee County. Second Davis Tr. 144:7-15.

161.    When Stinetorf learned that her absentee ballot for the January 2021 runoff election had been challenged, she became "very confused and concerned." *Id.* ¶¶ 6-8.

**Response:**    Undisputed, but immaterial as Ms. Stinetorf is a registered voter in Muscogee County. TTV did not submit any Challenge in Muscogee County. TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24, 2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee County. Second Davis Tr. 144:7-15.

162.    Stinetorf immediately emailed and called the county registrar to get more information about the challenge, and her "anxiety grew" when she did not hear back for several days. *Id.* ¶ 10.

**Response:**    Undisputed, but immaterial as Ms. Stinetorf is a registered voter in Muscogee County. TTV did not submit any Challenge in Muscogee County. TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24, 2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee

County. Second Davis Tr. 144:7-15.

163.    Given the demands of Ms. Stinetorf's job and the time difference
between the U.S. and Germany, she was not sure that she could remedy the
problem or participate in any challenge hearings to protect her right to vote, which
caused her significant amount of stress. *Id.* ¶ 9.

**Response:**    Undisputed but immaterial as Ms. Stinetorf is a registered voter in
Muscogee County. TTV did not submit any Challenge in Muscogee County.
TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24,
2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used
the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee
County. Second Davis Tr. 144:7-15.

164.    Several days after Stinetorf initially found out her ballot had been
challenged, she learned that a court order prevented her county from discarding
her ballot unless the challenger was able to present further information about her
ineligibility. *Id.* ¶ 11.

**Response:**    Undisputed but immaterial as Ms. Stinetorf is a registered voter in
Muscogee County. TTV did not submit any Challenge in Muscogee County.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**              112

TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24, 2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee County. Second Davis Tr. 144:7-15.

165.   Even though these issues were eventually resolved, Stinetorf found the process of trying to figure out why she had been challenged and how she could prove her eligibility to vote in Georgia was "difficult and confusing," and she is not sure she could have personally resolved the issue if not for the intervening order allowing her ballot to be counted. *Id.* ¶ 12.

**Response:**   Undisputed but immaterial as Ms. Stinetorf is a registered voter in Muscogee County. TTV did not submit any Challenge in Muscogee County. TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24, 2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee County. Second Davis Tr. 144:7-15.

166.   Stinetorf is also concerned about the impact on her and her husband, who is also a Georgia voter stationed in Germany, of any future challenges and the

time and energy it would take for them to defend their right to vote. *Id.* ¶ 13.

**Response:**   Undisputed but immaterial as Ms. Stinetorf is a registered voter in

Muscogee County. TTV did not submit any Challenge in Muscogee County.

TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24,

2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used

the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee

County. Second Davis Tr. 144:7-15.

167.   Another voter, Gamaliel Warren Turner, Sr., is a 68-year-old retired

veteran and lifelong Georgia resident who is registered to vote in Muscogee

County. Ex. 18, Turner Decl. ¶ 2.

**Response:**   Undisputed but immaterial as Mr. Turner is a registered voter in

Muscogee County. TTV did not submit any Challenge in Muscogee County.

TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24,

2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used

the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee

County. Second Davis Tr. 144:7-15.

168.   Turner registered to vote when he was 18 and has voted in almost

every election over the past 50 years. *Id.* ¶ 2.

**Response:**   Undisputed but immaterial as Mr. Turner is a registered voter in

Muscogee County. TTV did not submit any Challenge in Muscogee County.

TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24,

2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used

the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee

County. Second Davis Tr. 144:7-15.

169.   Turner is employed as a government contractor with the United States

Navy, and in October 2019 had to temporarily relocate to Camarillo, California for

his job. *Id.* ¶ 3. Turner thus submitted a postal service change of address form to

avoid missing mail deliveries while away on temporary work assignment;

however, he always intended to return to Georgia and thus never registered to vote

in California or changed his citizenship or residence from Georgia to another state.

*Id.* ¶¶ 3-4.

**Response:**   Undisputed but immaterial as Mr. Turner is a registered voter in

Muscogee County. TTV did not submit any Challenge in Muscogee County.

TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24,

2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee County. Second Davis Tr. 144:7-15.

170.   Turner voted by absentee ballot in the 2020 primary and general election, and requested that the registrar mail his ballot to his California address for the runoff election. *Id.* ¶ 6.

**Response:**   Undisputed but immaterial as Mr. Turner is a registered voter in Muscogee County. TTV did not submit any Challenge in Muscogee County. TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24, 2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee County. Second Davis Tr. 144:7-15.

171.   However, Turner was one of 4,000 voters who had been challenged by Defendants in Muscogee County. *Id.* ¶ 7.

**Response:**   Disputed. Named Defendants did not submit challenges in Muscogee County. TTV did not submit any Challenge in Muscogee County. TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24, 2021) ("**TTV Am.**

**Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used the

Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee

County. Second Davis Tr. 144:7-15.

    172.  As a result of the challenges, Turner became worried about the

legality of his participation in the January runoff elections. And while he

successfully sued the Muscogee County Board of Elections to ensure his ballot

would be counted, the "entire experience was scary, confusing, and intimidating,"

as he did not know how he would resolve the situation in time to vote. *Id.* ¶¶ 8-9.

Turner also had to pay an extra charge to send his ballot via FedEx for expedited

delivery. *Id.* ¶ 10.

**Response:**  Undisputed but immaterial as Mr. Turner is a registered voter in

Muscogee County. TTV did not submit any Challenge in Muscogee County.

TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24,

2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used

the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee

County. Second Davis Tr. 144:7-15.

    173.  As a Black voter and veteran growing up in the segregation era, he

**Defs.' Resp. To**
**Pls.' Corrected SUMF**      117

found the challenge process discouraging, and "[t]hinking back to the senseless difficulty of [his] voting experience in the January runoff elections gives [him] PTSD." *Id.* ¶¶ 11-12.

**Response:**   Undisputed but immaterial as Mr. Turner is a registered voter in Muscogee County. TTV did not submit any Challenge in Muscogee County. TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24, 2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee County. Second Davis Tr. 144:7-15.

174.   Turner wonders "if it is even worth trying to vote again given the trouble that the voter challenge has caused [him]." *Id.* ¶ 11.

**Response:**   Undisputed but immaterial as Mr. Turner is a registered voter in Muscogee County. TTV did not submit any Challenge in Muscogee County. TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24, 2021) ("**TTV Am. Resp. First RFP**"), ECF No. 155-6, Resp. No. 2. No one used the Davis/Somerville Challenge List to submit a § 230 Challenge in Muscogee County. Second Davis Tr. 144:7-15.

**Defs.' Resp. To**
**Pls.' Corrected SUMF**          118

Dated: June 6, 2022

Respectfully Submitted,

*/s/ David F. Guldenschuh*
David F. Guldenschuh
GA Bar No. 315175
David F. Guldenschuh P.C.
P.O. Box 3
Rome, Georgia 30162-0333
Telephone: 706-295-0333
Email: dfg@guldenschuhlaw.com
*Local Counsel for Named Defendants*

*/s/ James Bopp, Jr.*
James Bopp, Jr.,* IN # 2838-84
 jboppjr@aol.com
Jeffrey P. Gallant,* VA # 46876
 jgallant@bopplaw.com
Courtney Turner Milbank,* IN#
32178-29
 cmilbank@bopplaw.com
Melena Siebert,* IN # 35061-15
 msiebert@bopplaw.com
THE BOPP LAW FIRM, PC
1 South 6th Street
Terre Haute, Indiana 47807
Telephone: (812) 232-2434
Facsimile: (812) 235-3685
*Lead Counsel for Named Defendants*
**Admitted Pro hac vice*

**Defs.' Resp. To
Pls.' Corrected SUMF**          119

**Certificate of Compliance**

The undersigned counsel certifies that the foregoing has been prepared in

Times New Roman (14 point) font, as required by the Court in Local Rule 5.1(B).

Respectfully submitted on June 6, 2022

> _/s/ James Bopp, Jr._
> James Bopp, Jr.
> Lead Counsel for Named Defendants