Page 1

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

------------------------------X

FAIR FIGHT, INC., SCOTT BERSON,)
JOCELYN HEREDIA, and JANE DOE, )
        Plaintiffs,     )
                      )
        vs.            )Case No.
                      )2:20-cv-00302-SCJ
TRUE THE VOTE, CATHERINE    )
ENGELBRECHT, DEREK SOMERVILLE, )
MARK DAVIS, MARK WILLIAMS,    )
RON JOHNSON, JAMES COOPER, and )
JOHN DOES 1-10.          )
        Defendants.    )
                      )
FAIR FIGHT ACTION, INC.,    )
        Counter-Defendant. )

------------------------------X

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
30(b)(6) VIDEOTAPED DEPOSITION OF
CATHERINE ENGELBRECHT
APPEARING REMOTELY
Wednesday, January 26, 2022
8:05 a.m. Central Time

Reported by:  Lori J. Goodin, RPR, CLR, CRR
RSA, California CSR #13959

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 2

```
 1              REMOTE APPEARANCES
 2
 3   FOR PLAINTIFFS:
         ELIAS LAW GROUP
 4       UZOMA N. NKWONTA, ESQUIRE
         MARCOS MOCINE-MCQUEEN, ESQUIRE
 5       JACOB SHELLY, ESQUIRE
         JOEL RAMIREZ, ESQUIRE
 6       10 G Street, Northeast
         Suite 600
 7       Washington, D.C.  20002
         202-968-4490
 8       unkwonta@elias.law
         mmcqueen@elias.law
 9       jshelly@elias.law
         jramirez@elias.law
10   AND CO-COUNSEL:
         LAWRENCE & BUNDY LLC
11       LESLIE J. BRYAN, ESQUIRE
         1180 West Peachtree Street
12       Suite 1650
         Atlanta, Georgia  30309
13       404-400-3350
         leslie.bryan@lawrencebundy.com
14   AND CO-COUNSEL:
         SANDLER REIFF LAMB ROSENSTEIN
15       & BIRKENSTOCK, P.C.
         DARA LINDENBAUM, ESQUIRE
16       1090 Vermont Avenue, Northwest
         Suite 750
17       Washington, D.C.  20005
         202-479-1111
18       lindenbaum@sandlerreiff.com
19
20
21
22
```

Page 3

1               REMOTE APPEARANCES CONTINUED

2

3    FOR DEFENDANTS:

4        THE BOPP LAW FIRM, PC

5        JAMES BOPP, JR., ESQUIRE

6        MELENA SIEBERT, ESQUIRE

7        1 South 6th Street

8        Terre Haute, Indiana  47807

9        812-232-2434

10       jboppjr@aol.com

11       msiebert@bopplaw.com

12

13   Also present:

14       Joe Cerda, video/document technician

15

16

17

18

19

20

21

22

```
                                                            Page 4
 1                    INDEX TO EXAMINATION

 2     WITNESS:  CATHERINE ENGELBRECHT

 3     EXAMINATION BY                            PAGE

 4     MR. NKWONTA                                10

 5     MS. SIEBERT                               337

 6

 7                    INDEX TO EXHIBITS

 8                 CATHERINE ENGELBRECHT

 9        Fair Fight, Inc., et al. v. True the Vote

10                 Wednesday, January 26, 2022

11               Lori J. Goodin, RPR, CLR, CRR,

12                 RSA, California CSR #13959

13     EXHIBIT     DESCRIPTION                   PAGE

14     Exhibit  1  Validate the Vote 2020 document  266

15     Exhibit  1A Crawford e-mail, 11/21/20       333

16     Exhibit  8  TrueAppend Report, 12/16/20      244

17     Exhibit  9  Engelbrecht e-mail, 12/16/20     219

18     Exhibit 13  Williams e-mail, 12/18/20        219

19     Exhibit 15  Williams e-mail, 12/12/20        140

20     Exhibit 16  Count by Race and Party          248

21     Exhibit 19  True the Vote invitation

22                 to join a Zoom call, 12/19/20    159
```

```
                                                        Page 5
 1                   INDEX TO EXHIBITS

 2                 CATHERINE ENGELBRECHT

 3         Fair Fight, Inc., et al. v. True the Vote

 4                Wednesday, January 26, 2022

 5              Lori J. Goodin, RPR, CLR, CRR,

 6              RSA, California CSR #13959

 7     EXHIBIT    DESCRIPTION                      PAGE

 8     Exhibit 20  Engelbrecht text, 12/17/20      173

 9     Exhibit 21  True the Vote invoice, 12/7/20  178

10     Exhibit 25  Holsworth e-mail, 12/30/20      197

11     Exhibit 26  E-mail chain, 12/28/20          201

12     Exhibit 30  Engelbrecht e-mail, 12/21/20    161

13     Exhibit 35  Reports from the Voter Integrity

                   Hotline                          84

14     Exhibit 36  E-mail chain, 12/18/20          226

15     Exhibit 37  Cooper e-mail, 12/15/20         241

16     Exhibit 38  Cooper e-mail, 12/18/20         239

17     Exhibit 39  Cooper e-mail, 12/15/20         237

18     Exhibit 40  Cooper e-mail, 12/19/20         240

19     Exhibit 44  Brightbart article              324

20     Exhibit 46  IPS article, 11/5/12            211

21     Exhibit 47  Gateway Pundit article, 9/24/20 322

22
```

Page 6

```
 1                  INDEX TO EXHIBITS
 2                CATHERINE ENGELBRECHT
 3      Fair Fight, Inc., et al. v. True the Vote
 4               Wednesday, January 26, 2022
 5             Lori J. Goodin, RPR, CLR, CRR,
 6             RSA, California CSR #13959
 7    EXHIBIT    DESCRIPTION                   PAGE
 8    Exhibit 61  True the Vote press release about
                  the Georgia Election Integrity
 9                Hotline                      95
10    Exhibit 62  True the Vote press release    252
11    Exhibit 63  True the Vote blog post,
                  11/10/20                     314
12    Exhibit 64  Audio transcript from True the
                  Vote Live                    69
13    Exhibit 65  Audio transcript of Seals in the
                  Polls, 8/13/21               60
14    Exhibit 66  Georgia lawsuit, 11/11/20    280
15    Exhibit 71  Eshelman e-mail, 5/11/20     291
16    Exhibit 72  Time for a Hero Facebook page  258
17    Exhibit 73  Crusade for Freedom tweet    263
18    Exhibit 74  990EZ for Time for a Hero, 2019  47
19    Exhibit 75  Notice of Deposition for
                  Catherine Engelbrecht        20
20    Exhibit 76  30(b)(6) Notice issued to
                  True the Vote                18
21    Exhibit 79  True the Vote's Second
                  Amended Response             92
22
```

Page 7

1              INDEX TO EXHIBITS

2            CATHERINE ENGELBRECHT

3     Fair Fight, Inc., et al. v. True the Vote

4              Wednesday, January 26, 2022

5            Lori J. Goodin, RPR, CLR, CRR,

6            RSA, California CSR #13959

7   EXHIBIT    DESCRIPTION                    PAGE

8   Exhibit 81  True the Vote, Inc.'s Responses

9              to Plaintiffs' First

10             Interrogatories                164

11  Exhibit 84  True the Vote, Inc.'s Amended

12             Responses to Plaintiffs' First

13             Request for Admission          162

14

15

16

17             (All exhibits were provided

18             electronically to the reporter.)

19

20

21

22

Page 8

```
 1           WEDNESDAY, JANUARY 26, 2022, 8:05 A.M.

 2

 3                    PROCEEDINGS

 4              THE VIDEOGRAPHER:  We are now

 5      beginning this video deposition.  Today's

 6      date is January 26, 2022.  The time on the

 7      video record is 8:05 a.m.

 8              This is the deposition of Catherine

 9      Engelbrecht, taken in the matter of Fair

10      Fight, Inc. versus True the Vote.

11              Will counsel please identify

12      themselves for the record and whom they

13      represent.

14              MR. NKWONTA:  Good morning.  My name

15      is Uzoma Nkwonta, and I represent the

16      plaintiffs in this case.  I am joined with

17      co-counsel.  I will let them represent

18      themselves -- or introduce themselves, I

19      should say, I'm sorry.

20              MS. BRYAN:  Good morning.  This is

21      Leslie Bryan from Lawrence and Bundy.  I

22      represent the plaintiffs.
```

Page 9

1             MS. LINDENBAUM:  Good morning.  This

2     is Dara Lindenbaum from Sandler Reiff Lamb

3     Rosenstein & Birkenstock, also representing

4     the plaintiffs.

5             MR. SHELLY:  Jacob Shelly with Elias

6     Law Group with plaintiffs.

7             MR. RAMIREZ:  Joel Ramirez with

8     Elias Law Group with plaintiffs.

9             MR. MOCINE-MCQUEEN:  Marcos

10    Mocine-McQueen, Elias Law Group with the

11    plaintiffs.

12            THE VIDEOGRAPHER:  Okay.  Counsel,

13    and before we swear in the witness, do all

14    parties agree or stipulate to the witness

15    being sworn in remotely through Zoom?

16            MR. NKWONTA:  Yes, plaintiffs agree.

17            MR. BOPP:  And I don't think I

18    entered my appearance.  I am James Bopp,

19    representing the defendants and both -- and

20    representing both deponents in this action --

21    in this matter here today.

22            And, Melena Siebert will probably be

Page 10

1       joining us later, who is also counsel for the

2       defendants.  And we consent to remote

3       deposition.

4                   THE VIDEOGRAPHER:  Okay, counsel.

5       With that being said, we will swear in the

6       witness, thanks.

7                         *   *   *

8    Whereupon,

9                   CATHERINE ENGELBRECHT,

10   a witness called for examination, having been

11   first duly sworn, was examined and testified as

12   follows:

13                        *   *   *

14                   EXAMINATION

15   BY MR. NKWONTA:

16       Q.    Morning, Ms. Engelbrecht.

17       A.    Good morning.

18       Q.    My name is Uzoma Nkwonta.  As I

19   mentioned before, I represent the plaintiffs in

20   this case.

21                   And, my understanding is that you

22   are appearing today in your personal capacity and

Page 11

1    as the representative of True the Vote.  Is that

2    correct?

3          A.    Yes.

4          Q.    Great.  Ma'am, I just want to ask

5    you a few preliminary questions before we get

6    into the mechanics of the deposition.

7                Have you been deposed before?

8          A.    No.

9          Q.    So, this is your first time?

10         A.    It is.  Yes.

11         Q.    In that case, I would like to go

12   over a few ground rules for the deposition just

13   so that we all proceed with the same

14   understanding.

15               So, the testimony today, all of your

16   testimony today, as you have heard is under oath

17   just as if you were testifying in court.  Is that

18   fair?

19         A.    Yes.

20         Q.    And if at any point you don't

21   understand a question that I'm asking, just let

22   me know.  I will do my best to rephrase the

Page 12

1    question or be a little bit clearer.

2              And if you do answer the question,

3    then I will assume that you understood the

4    question.  Is that fair?

5         A.    Yes.

6         Q.    Okay.  And for the benefit of

7    everyone and the court reporter, I would ask that

8    you continue to do as you are doing now and

9    answer audibly with yeses or nos, rather than

10   head nods or head shakes or gestures so that the

11   court reporter can keep an accurate record.  Does

12   that sound good?

13        A.    Yes.

14        Q.    During the deposition, I would ask

15   that you allow me to finish my question before

16   giving your answer and I will do the same.  And

17   that will help us have a clean transcript at the

18   end.  Is that fair?

19        A.    Yes.

20        Q.    From time to time your attorney may

21   make an objection to my question.  And that is

22   fine.

Page 13

1           You are okay to answer the question

2     unless your attorney instructs you not to answer

3     the question after he makes his objection.

4           Is that fair?

5     A.    Yes.

6     Q.    If there is any time with which you

7     would like to take a break, just let me know.

8     And I will find a good place to stop the

9     questioning so you can take a break.

10          I would only ask that if I am in the

11    middle of a question or if there is a question

12    pending that you would answer the question before

13    taking a break.

14          Is that fair?

15    A.    Yes.

16    Q.    And I know you mentioned this

17    earlier, I'm not sure if it was on the record or

18    off the record.

19          But would you mind repeating where

20    you were located for this deposition?

21    A.    Cat Spring, Texas.

22    Q.    And could you give me the address of

Page 14

1    where you are located for this deposition?

2         A.    Sure.   The full address?

3         Q.    Yes, please.

4         A.    Yes, okay.   Sure.   13909 Track Road

5    in Cat Spring, Texas.

6         Q.    And how are you viewing this

7    deposition?  Are you on a laptop or are you on a

8    phone or some other device?

9         A.    I am on laptop.

10        Q.    And is there anyone in the room with

11   you currently?

12        A.    No.

13        Q.    And do you have any documents with

14   you currently?

15        A.    No.

16        Q.    Do you have any devices with

17   electronic copies of documents with you?

18        A.    No.  I have my -- I mean this is

19   probably too extreme, but I have my phone and I

20   have my headphone cases and that is it and a cup

21   of coffee.

22        Q.    All right.  So, because we are

Page 15

1   taking this deposition remotely, I may not be

2   able to see what you have in front of you or who

3   may enter the room.

4            And I just want to clarify that it

5   would not be appropriate for your attorney or

6   anyone else to tell you how to answer a specific

7   question that I ask.

8            And ask you to agree not to exchange

9   any communication with anyone whether by text or

10  e-mail related to the questions that I ask during

11  the deposition.  Is that fair?

12       A.    Yes.

13       Q.    Great.  So, we will get into some of

14  my additional preliminary questions now that we

15  have set those ground rules.

16            How did you prepare to testify

17  today?

18       A.    Spoke with my attorney.  Reviewed

19  all of the documents that we had submitted

20  heretofore.  Reviewed the questions that were

21  outlined as being the primary subject matters for

22  today's review.  And I guess that is really about

Page 16

1    it.

2         Q.    Okay.  And when did you speak with

3    your attorney, without disclosing what you

4    discussed?

5         A.    Yesterday -- or, no.  Monday,

6    Monday.

7         Q.    And approximately how much time

8    would you say you spent preparing for this

9    deposition, again without disclosing the

10   specifics of what you have discussed?

11        A.    Five or six hours.  Six hours.

12        Q.    All right.  And are you on any

13   medication today that would affect your ability

14   to testify truthfully or to respond truthfully to

15   any of my questions?

16        A.    No.

17        Q.    Excellent.

18             MR. NKWONTA:  Could we pull up

19       Exhibit 76, please.  Or Document 76.

20             MR. BOPP:  This might be a good

21       time, as I did yesterday.  I would like to,

22       with your agreement, enter a, enter a

Page 17

1      continuing objection.  And the continuing

2      objection means I won't have to object

3      repeatedly over the same things that have

4      already been decided by the court which we

5      understand, but we want to preserve our

6      objections.

7               We object to any questions

8      concerning activities before the 2016

9      election, meaning in previous elections prior

10     to 2016.

11              Any questions regarding any

12     activities other than in the State of

13     Georgia, any activities other than voter

14     eligibility challenges, preelection to the

15     Georgia runoff, and any questions regarding

16     the activities of King Street Patriots.

17              MR. NKWONTA:  Understood.  And so my

18     understanding is that will be your standing

19     objection.

20              To clarify on our end, will you be

21     instructing your witness not to answer

22     questions in light of those objections or

Page 18

1      subject to those objections?

2                MR. BOPP:  No, if -- no.  And as I

3      did -- I just didn't.  I -- as long as they

4      are within the subject matter and within the

5      court orders, the parameters of this court

6      order, she will be permitted to answer for

7      sure.

8                MR. NKWONTA:  All right.  So, I

9      think that means we can proceed.

10               MR. BOPP:  And if it ever occurs, I

11     mean I would do it if the question -- at the

12     time of the question.  I'm not giving a

13     blanket, you know, advice to my client on how

14     to handle questions.  Those would have to

15     arise, if they arose.

16               MR. NKWONTA:  Understood.  I

17     appreciate that.  So, I think we are all set

18     to proceed.

19                    (Exhibit 76 marked for

20                      identification.)

21   BY MR. NKWONTA:

22        Q.   Ms. Engelbrecht, the document that

Page 19

1    has just been shared with you, and I guess with

2    everyone on the Zoom call, is Exhibit 76, or

3    Document 76, which is the 30(b)(6) Notice issued

4    to True the Vote.

5              Have you seen this document before?

6        A.   Yes.

7        Q.   And do you understand that you have

8    been designated as a representative to answer

9    questions on behalf of True the Vote, Inc.  or

10   True the Vote?

11       A.   Yes.  Yes.

12             MR. NKWONTA:  Can we scroll down a

13      few pages to Exhibit A, please.

14             Sorry, next page.  The page right

15      after.

16   BY MR. NKWONTA:

17       Q.   And have you reviewed these topics

18   in Exhibit A of the 30(b)(6) Notice?

19       A.   Yes.

20       Q.   Are you prepared to testify about

21   all of these topics in Exhibit A of the 30(b)(6)

22   Notice?

```
                                                    Page 20

 1          A.    Yes.

 2          Q.    Great.

 3                MR. NKWONTA:  You can take that

 4      down.  And can we pull up Document 75,

 5      please.

 6                      (Exhibit 75 marked for

 7                        identification.)

 8   BY MR. NKWONTA:

 9          Q.    Ms. Engelbrecht, do you recognize

10   Document 75?  Have you seen this document before?

11          A.    Yes.

12          Q.    And this is a deposition notice

13   issued to you individually; is that correct?

14          A.    Yes.

15          Q.    And do you understand that you are

16   also being deposed today in your individual

17   capacity?

18          A.    Yes.

19          Q.    Okay.  And as we have done with the

20   prior deposition in this case, we will ask that

21   you agree that your answers today will be

22   attributed to you and/or True the Vote, unless we
```

Page 21

1    specify otherwise, or you specify otherwise in

2    the deposition in response to that question.  Is

3    that fair?

4          A.    Yes.

5                MR. NKWONTA:  And do you agree to

6        that, counsel.

7                MR. BOPP:  Do I agree to what?

8                MR. NKWONTA:  That Ms. Engelbrecht's

9        answers will be attributed to Ms. Engelbrecht

10       and True the Vote, unless she specifies

11       otherwise in response, just as we did

12       yesterday?

13               MR. BOPP:  I assume your questions

14       are directed at her in both capacities.

15               THE VIDEOGRAPHER:  And counsel,

16       sorry.  I apologize.  This is Joe.  I just

17       want to make sure for clarity that

18       Document 75 and 76, will those be entered

19       into as exhibits?

20               MR. NKWONTA:  Yes, those will be

21       entered in as exhibits.

22               I think what might be best is I will

Page 56

1    attributed to us.

2              But I don't know anything more about

3    those.

4         Q.    And the articles that you reviewed,

5    did you see any reference to address changes or

6    change of address in the challenges?

7         A.    I saw references to address, yes.

8         Q.    So, did you learn at some point

9    after, did you learn that the challenges involved

10   addresses of voters or residency?

11        A.    I did, yes.

12        Q.    And did you learn that the

13   challenges involved information from the Postal

14   Service?

15        A.    I don't know where they got the

16   information upon which they based their

17   challenges.

18        Q.    You just know that they were based

19   on changes of address?

20        A.    Just, in preparation for today and

21   in reading, knowing that Ohio was named, I went

22   back to see what it might have been.  And that is

Page 57

1    really the extent of my recollection around all

2    of this.

3                 It was just being asked about it by

4    the press.

5          Q.    And, but around the time

6    contemporaneously or shortly after it happened,

7    you were aware of it because you were asked about

8    it by the press and you had read about it; is

9    that right?

10         A.    Yes, yes.  Yes.

11         Q.    And you were also aware that those

12   challenges were rejected; is that right?

13         A.    Actually, in my reading just last

14   evening, actually, I read that of those

15   challenges, some were rejected and some were not.

16                But, that is again based upon just

17   my, my reading recently.  I didn't know at the

18   time what any particular outcome was.

19         Q.    At the time, were you aware of any

20   of the challenges that had succeeded or that were

21   upheld?

22         A.    I don't recall.

Page 58

1          Q.    Are you familiar with the

2    organization Verify the Vote?

3          A.    No.

4          Q.    Have you ever heard the name, Verify

5    the Vote?

6          A.    I have, yes.  I have heard the name.

7    I just, I don't know -- I have heard the name,

8    yes.

9          Q.    Where have you heard the name?

10         A.    I have heard the use of that name in

11   just over the years in -- there are so many

12   groups named so many similar things.

13               I have read the name somewhere, but

14   I don't have any other -- well, that is where I

15   have heard it.

16         Q.    Have you ever commented on Verify

17   the Vote or any of the group's activities?

18         A.    I do not recall.

19         Q.    All right.  I would like to move on

20   to some of True the Vote's election monitoring

21   activities that you alluded to earlier.

22               And I want to start with one of the

1/26/2022                    Fair Fight, Inc. et al. v. True the Vote, et al.           Catherine Engelbrecht 30(b)(6)
                              Confidential - Pursuant to Protective Order

Page 59

1    activities that I would like you to explain and

2    describe which is Seals to the Polls.  Have you

3    heard that term used before?

4          A.    I have not heard that term.  But --

5    I mean, I have not heard that term, no.

6          Q.    Have you discussed or considered

7    initiatives to bring Navy Seals to serve as poll

8    watchers or Navy Seals to the polls?

9          A.    In 2020, we had an initiative called

10   Continue to Serve that was directed towards

11   veterans and first responders working in the

12   polls or volunteering to work in the polls.

13              And for a brief period that effort

14   was led by a Former Navy Seal.  And so he was

15   quick to, you know, refer to the Seals, but yes.

16         Q.    Was that ever one of the goals or

17   the targets to ensure that, or to get Navy Seals

18   to serve as poll monitors?

19         A.    Well, it was the goal to encourage

20   veterans and first responders to participate,

21   because we need everybody -- the entire process

22   needs more volunteers.  There are just not enough

Page 60

1    volunteers working inside of elections.

2              And the thought behind the outreach

3    was that these were folks that are very good at

4    chain of command, at understanding process.

5              And in our experience they make

6    great volunteers for these kinds of things,

7    because often when you have people who are very

8    well intended, but they are not as familiar with

9    that construct of, you know, ordered processing

10   and very observant of standards and time periods

11   in which things must be reported in an orderly

12   fashion, that can throw people.

13             And for people that come out of

14   backgrounds that are more oriented towards that

15   chain of command, that works, they do really

16   well.  And so that was the thought behind

17   Continue to Serve.

18             MR. NKWONTA:  Joe, can you pull up

19       Exhibit 65 or Document 65.

20                  (Exhibit 65 marked for

21                   identification.)

22   BY MR. NKWONTA:

Page 61

1          Q.    Ms. Engelbrecht, Document 65 is a

2    transcript of a statement that you made which we

3    had transcribed and which we -- which True the

4    Vote acknowledged in response to one of our

5    requests for admission that this was a correct --

6    it is a true and correct transcript.

7                    MR. NKWONTA:  Joe, can you go to --

8                    MR. BOPP:  I'm sorry, I have a

9          question.  I didn't understand what you just

10         said.

11                   What is the date of this, did you

12         say?

13                   MR. NKWONTA:  The date of this

14         transcript?

15                   MR. BOPP:  Yes.  You gave a date.

16                   MR. NKWONTA:  August 13, 2021.

17                   MR. BOPP:  Okay, all right, thank

18         you.  Sorry, I didn't understand what you

19         said.

20                   MR. NKWONTA:  Joe, can you go to the

21         second page of this transcript.

22    BY MR. NKWONTA:

Page 62

1        Q.    Ms. Engelbrecht, can you read this

2   second paragraph into the record.

3        A.    "Of interest here, we have a new

4   initiative called Continue to Serve which is

5   about recruiting veterans and first responders to

6   work inside the polls.  You want to talk about

7   people who understand and respect law and order

8   and chain of command, you get Seals in the polls.

9              "And they're going to say no, no,

10  that is not -- this is what it says and this is,

11  this is how we're going to play the show.  And

12  that's what we need."

13       Q.    When you were making this statement

14  and when you were referring to Seals in the

15  polls, who did you envision them referring to or

16  interacting with?

17       A.    Well -- I'm sorry.  Can you repeat

18  the question?

19       Q.    Sure.  Who did you envision -- when

20  you were making the statement, who did you

21  envision the Seals interacting with or talking

22  to?

Page 63

1          A.    Depending upon the capacity in which

2     they were working, things can get very confusing

3     in polling places.  And the thought was just the

4     individuals that are, as I say here, familiar

5     with that kind of law of order and chain of

6     command and understanding process are very

7     decisive in their, this is how we need to do

8     this, this is what the rules say.

9               So, I'm familiar with this entire

10    situation and how this came about.  And I would

11    say that, you know, it was taken out of context.

12    That is, what I have just explained to you was

13    the, the rationale behind the comment.

14          Q.    And you anticipate that these Seals

15    would be interacting with people in the polling

16    place including voters or election officials; is

17    that correct?

18          A.    I would say that veterans and first

19    responders, working inside the polls, depending

20    upon their capacity, may interact with voters,

21    also depending upon the state.

22               If they were serving in the capacity

Page 64

1    of poll watcher, they would not engage with

2    anyone.  If they were working as a judge or a

3    clerk, then they may.

4              And certainly with one another as

5    part of the team working at the polls which can

6    get very confusing, they would interact together

7    working with others there at the polling place.

8        Q.    Who is Ed Hiner?  H-I-N-E-R is the

9    last name.

10       A.    He temporarily was the spokesperson

11   for Continue to Serve.

12       Q.    You say temporarily.  Did he stop

13   being a spokesperson at some point?

14       A.    He did, yes.

15       Q.    Why is that?

16       A.    He also had a program that was a

17   leadership program for after school, like after

18   school programs.

19             And that -- in California.  And that

20   really got busy.  And he was also writing a book

21   or had written a book and was promoting that

22   book.  And, you know, the oversight of an effort

Page 65

1    like this is, takes a lot of time.  And he just

2    didn't have that time to devote because there

3    were so many other interests in play for him.

4         Q.    Have you seen or are you familiar

5    with news articles or news reports in which Ed

6    Hiner claimed that he withdrew after realizing

7    how partisan the program had become?

8         A.    No, I'm not aware of that.

9         Q.    Do you have any reason to dispute

10   that those were his reasons for withdrawing?

11        A.    Well, the reasons for his withdrawal

12   were, as I have stated, he didn't have the time.

13             He was shocked by how mean spirited

14   comments can be about these kinds of efforts.

15   And he didn't have any political background and

16   didn't want it to -- he didn't, he didn't want

17   the, the animus that comes oftentimes,

18   unfortunately, with detractors who are looking to

19   try to find a partisan angle here when there is

20   none.  But that is not what the media will

21   report.

22        Q.    And did you discuss Mr. Hiner's

Case 2:20-cv-00302-SCJ   Document 173-3   Filed 06/06/22   Page 32 of 52

1/26/2022            Fair Fight, Inc. et al. v. True the Vote, et al.        Catherine Engelbrecht 30(b)(6)
                        Confidential - Pursuant to Protective Order

Page 66

1    concerns with him?

2         A.    Yes, I recall that we talked about

3    it and I understand.  I mean it is a lot.

4         Q.    And when you talked about it with

5    him did he relay the concerns about the program

6    being partisan?

7         A.    Not the program.  No, our program

8    was not partisan.  He was shocked at, you know,

9    how could it be that the comments were taken and

10   twisted in a way that made things seem negative.

11   That was a shock to him.

12        Q.    I want to ask you about a different

13   program.  Have you heard or used the phrase,

14   Validate the Vote?

15        A.    Yes.

16        Q.    And where did that phrase come from?

17        A.    It was a recommended name given to,

18   or suggested to me, by a consultant of a donor

19   that had come to us and had suggested, the

20   consultant suggested the name, Validate the Vote,

21   and I have used it.

22        Q.    Is that phrase -- is that name, is

Page 67

1    that specific to True the Vote?

2         A.    I don't know.

3         Q.    Have you heard of any other

4    organizations that have used that phrase for any

5    of their programs?

6         A.    I have.  I have.

7         Q.    Which ones?

8         A.    The consultant who suggested that we

9    use that name went on to start his own

10   organization or had some other affiliation with

11   an organization that was using that name.

12   Whether or not they are still doing anything I

13   don't know.

14              But I recall seeing the -- I was

15   shocked to see that that had occurred.

16        Q.    When did the consultant recommend

17   this name to you?

18        A.    On November the 5th.

19        Q.    What year?

20        A.    Oh, sorry, 2020.

21        Q.    And when did you see the consultant

22   start a different organization and use that same

Page 68

1    phrase?

2         A.   I do not recall.  Shortly

3    thereafter, but I do not recall.

4         Q.   Other than that, do you recall any

5    other instances of organizations announcing sort

6    of Validate the Vote issues?

7         A.   I do -- I cannot give you a specific

8    organization to direct your intentions to, but

9    that term I have seen many times, often with the,

10   you know, with the state attached to it, Validate

11   the Vote in a certain state or something like

12   that.

13             So, my recollection is I have read

14   it and seen it other places, but I can't give you

15   any other specifics about where to look.

16        Q.   And during the 2020 election cycle

17   and the lead up to the 2021, the January 2021

18   runoff in Georgia, was Validate the Vote or the

19   phrase or the name of one of the programs that

20   True the Vote was initiating in Georgia and

21   elsewhere?

22        A.   Validate the Vote was used broadly.

Page 69

1    We had an election integrity hotline, and it

2    didn't have a name so to speak.  So we named it

3    Validate the Vote.

4              And then when the attentions turned

5    towards Georgia, as I recall, we would say

6    Validate the Vote Georgia, but it was still a

7    national effort.

8              Does that answer your question?

9         Q.   Yes, it does.  You have used the

10   word, bounty on fraud, before, correct?  In

11   discussing the Validate the Vote program?

12        A.   I don't -- I have read through this

13   in the preparation for this.  I don't recall

14   saying that but -- I don't recall saying that,

15   but -- well, I will leave it at that.  I don't

16   recall saying it.

17             MR. NKWONTA:  Joe, can you pull up

18        Exhibit 64, please.  And if we can go to

19        Page 3 of Exhibit 64.

20                  (Exhibit 64 marked for

21                   identification.)

22   BY MR. NKWONTA:

Page 200

1    know, in casual conversation thinking I knew what

2    Amy was referring to, I responded in that way.

3              But, I'm not -- in this moment, it

4    could have been -- there is so many things

5    happening in so many states that we were not a

6    part of but observant of, that it really could

7    have been a number of things.

8         Q.    Were you aware of any other

9    challenges filed in Georgia before the November

10   election?

11        A.    No.  But I'm also not sure that this

12   is even about Georgia.

13        Q.    Well, it was produced in this case.

14   And if it is not about --

15        A.    It is -- I'm sorry.

16        Q.    What other jurisdictions could this

17   e-mail have been referring to?

18        A.    It could have been Wisconsin.  To

19   clarify, we did not file anything in Wisconsin,

20   but there were -- and again this is, I believe,

21   an incorrect use of the term, elector challenge.

22              But there were subsets that were

Page 201

1   being, in many states, were being challenged in

2   court that could have been used for analysis.

3                   I don't recall the specifics any

4   longer about what this exchange specifically was.

5                   MR. NKWONTA:  Okay.  Let's pull this

6       down and pull up Exhibit 26.  And could you

7       enlarge Exhibit 26 a little bit?

8                   (Exhibit 26 marked for

9                    identification.)

10  BY MR. NKWONTA:

11       Q.    Ms. Engelbrecht, do you recognize

12  Exhibit 26?

13       A.    Yes.

14       Q.    What is it?

15       A.    This was an e-mail that began as

16  comments and clarifications that I had sent to

17  the elector challengers, who we were working

18  with.

19                  And then Amy forwarded this to James

20  Cooper and then James Cooper responded back.

21                  MR. NKWONTA:  And can you scroll

22      down to the second e-mail.  Great.

Page 202

1   BY MR. NKWONTA:

2        Q.    And, it includes talking points that

3   were shared by you, according to Amy.  That

4   e-mail says, "Good afternoon.  Here is an excerpt

5   from an e-mail in which a few talking points were

6   shared by Catherine Engelbrecht.  Hope this

7   helps."

8             Is that a correct reading of that

9   second e-mail from Amy Holsworth?

10       A.    Yes.

11       Q.    And do you agree that the talking

12  points that follow were shared by you or came

13  from you?

14       A.    Yes.

15       Q.    And looking at those talking points,

16  you describe sort of the process of the NCOA

17  matching.

18             I wanted to ask you specifically

19  about the enhanced NCOA search to identify

20  military addresses.  What does that mean?

21       A.    When you are using NCOA link with

22  the filters that I referred to earlier, the, the

Page 203

1    DPV, the delivery point, the verification, and --

2    well specifically that.

3              And then the NCOA link version gives

4    you the opportunity to filter out any recognized

5    military address.

6              And then further, there were efforts

7    made to recognize the standard zip codes,

8    orientations of bases that have certain -- the

9    way that the address looks, you can tell that it

10   was a military base and so those were filtered

11   out.  And that is what it meant.

12        Q.   And to be clear you are referencing

13   the enhanced NCOA search to remove identifiable

14   military addresses.  That appears on Page 2 of

15   the PDF or Bates Number TTV 1453; is that

16   correct?

17              MR. NKWONTA:  If you could scroll

18        down, Joe, to the next page, so

19        Ms. Engelbrecht can see that.

20              THE WITNESS:  Yes.

21              MR. NKWONTA:  You might scroll down

22        a little bit more.  There we go.  It is Item

Page 204

1        Number 1 on TTV 1453.  Right.

2                    THE WITNESS:  Uh-huh.

3     BY MR. NKWONTA:

4        Q.    Who conducted the scrub of the list

5     for military addresses specifically?

6        A.    That was through OPSEC.

7        Q.    And why did you think it was

8     important to scrub the military addresses from

9     the list?

10       A.    Just due to the sensitivity around

11    military addresses broadly.  It was just -- the

12    numbers were already so large and it was just

13    not -- we thought it would be, you know, better

14    to just not even have include that to the best of

15    our ability.

16       Q.    When you say sensitivity around

17    military addresses, what do you mean by that?

18       A.    I mean that the military is --

19    people move very often.  There is a lot --

20    oftentimes having worked with veterans groups and

21    veterans for an extended period of time, mail is

22    just always sensitive.

Page 205

1                   It is typically lagging.  It is just

2      an area that we would want to, not -- that we

3      recognize is not as exacting as more typical

4      residential filter.

5          Q.    Your challenges as True the Vote has

6      acclaimed, your challenges did not lead to any,

7      you know, challenged person being removed.

8                   That is, I believe, True the Vote's

9      claim; is that correct?

10         A.    Right.  Our elector challenges were

11     in accordance with the code which had never led

12     to anybody.  You said it differently.

13                  Our, the standard, the 230 standard

14     was not about removing anybody from the rolls but

15     rather asking the county to confirm the

16     eligibility of the record.

17                  And then they follow their process

18     that we have nothing to do with, clearly.

19         Q.    And True the Vote has also claimed

20     that the purpose of the challenge is just to get

21     the counties to confirm residency, right?

22         A.    Well, just the purpose of the

Page 206

1    challenges was to bring to the -- to help

2    electors bring to the attention of their local

3    counties, records that appeared not to comply

4    with eligibility standards.

5                    And it is within state law for them

6    to -- for citizens to participate in that way to

7    ask that question.  And that is the extent of the

8    elector challenge.

9         Q.    And if the challenges, as True the

10   Vote claims, does not result in a person be

11   removed, then why go through the effort of

12   scrubbing military addresses?

13        A.    As I have said, it was just a choice

14   that we made to not -- I mean, there are, you

15   know, deployments.  There are different ways in

16   which addresses are identified.

17                    And because there is a filter that

18   exists within the expanded NCOA, we just chose to

19   remove them.

20        Q.    You chose to remove them because

21   there are a lot of valid reasons why someone in

22   the military might file a notice of change of

Page 257

```
 1                 (Recess taken -- 3:00 p.m.)

 2                 (After recess -- 3:07 p.m.)

 3                 THE VIDEOGRAPHER:  We are now going

 4       back on the video record.  The time is

 5       3:07 p.m.

 6  BY MR. NKWONTA:

 7            Q.    Ms. Engelbrecht, we just took a

 8  short break.  Do you understand that you are

 9  still under oath?

10            A.    Yes.

11            Q.    Has True the Vote ever discussed or

12  considered publishing the list of challenged

13  voters in Georgia?

14            A.    No.

15            Q.    Has True the Vote issued the list of

16  challenged voters to the challengers, for

17  instance, who requested them?

18            A.    Yes.  If an elector asked for the

19  list, given that they had already signed off on

20  our, you know, agreement and terms that this is,

21  you know, to be, to be used for review purposes

22  and so forth.  And, but, yes.
```

Page 258

1       Q.   I want to go back to an organization

2    that we discussed earlier in this deposition,

3    Time For A Hero.  That was the organization that

4    you ran with Gregg Phillips; is that right?

5       A.   Uh-huh.

6            MR. NKWONTA:  Could we pull up

7       Exhibit 72.

8                 (Exhibit 72 marked for

9                  identification.)

10   BY MR. NKWONTA:

11      Q.   Do you recognize Exhibit 72?  Is

12   that Time for a Hero's Facebook page?

13      A.   I really don't -- I can't confirm

14   that.

15      Q.   Well, does it say Time For A Hero on

16   that Facebook page?

17      A.   It does, it does say Time For A

18   Hero.

19      Q.   And does Time For A Hero have a

20   Facebook page?

21      A.   I can't confirm that.  I don't know.

22   I never did any of this.

Page 259

1          Q.     Who would be able to confirm whether

2     Time For A Hero has a Facebook page?

3          A.     The last person who ran the

4     organization managed all of the social media, so

5     he would be able to.

6          Q.     And who was that person?

7          A.     I couldn't recall his name earlier,

8     but his name is Ty Bathurst.

9          Q.     How do you spell that?

10         A.     T-Y, B-A-T-H-U-R-S-T.

11         Q.     And do you have any reason to doubt

12    that this is Time for a Hero's Facebook page?

13         A.     Well, Time for A Hero is no longer

14    an organization that I am connected with.  I

15    filed their closing tax return a couple years

16    ago.  If this was still there I, I am -- I can't

17    say that I have reason to doubt it, but I

18    can't -- I don't know about it.

19              MR. NKWONTA:  Can we go to Page 19.

20         But before we do, I noticed some sound issues

21         when Ms. Engelbrecht was responding.  I just

22         want to make sure that we were able to

Page 260

```
 1     capture the response. If there is anything to

 2     resolve.

 3              THE REPORTER:  I'm happy to read

 4     back the answer if you'd like or do you want

 5     her -- do you want me to read back what I

 6     have?

 7              MR. NKWONTA:  Yes, please.

 8              (Whereupon, the record was read by

 9     the reporter as requested.)

10   BY MR. NKWONTA:

11     Q.    And you have no reason to doubt that

12   Time For A Hero created a Facebook page?  In fact

13   you acknowledged that Time For A Hero created a

14   Facebook page?

15     A.    I, acknowledge that when the

16   organization was active, we had somebody that was

17   managing, or, you know, overseeing social media.

18              And so, it is not outside of the

19   realm of possibility, but I can't confirm it.

20              I mean I can confirm that I'm

21   looking at a document that says Time For A Hero,

22   but I can't confirm anything past that.
```

Page 261

1              MR. NKWONTA:  Could we go to Page 19

2       of the Facebook page, of Exhibit 72.

3    BY MR. NKWONTA:

4         Q.    Is that -- is that you in that

5    Facebook post from August 8, 2020?

6         A.    That is me, that is me.

7              MR. NKWONTA:  And could we go to the

8       next post on the following page, Page 20.

9    BY MR. NKWONTA:

10        Q.    It says, "Crusade for Freedom coming

11   soon."

12              What is the Crusade for Freedom?

13        A.    I don't, I don't know.  I don't have

14   any affiliation with Crusade for Freedom.

15              I, I guess that Ty was posting some

16   stuff from True the Vote here just to keep stuff

17   on social media.  I don't know about Crusade for

18   Freedom.

19        Q.    So, he was posting stuff from where?

20        A.    From True the Vote.  But, I don't

21   know about this.

22        Q.    Uh-huh.  Have you heard that phrase

Page 336

1          Q.    Your e-mail address is Catherine at

2     True the Vote dot org, correct?

3          A.    Yes.

4          Q.    So you don't dispute that this came

5     from your e-mail?

6          A.    Or that an attachment called

7     Validate the Vote or whatever it was, Validate

8     the Vote 2020, I -- some of this language is not

9     anything I, I recall, the best I can say.

10               This is not a typical.

11         Q.    I guess my question is, you don't

12    dispute that this was attached to an e-mail that

13    you sent, correct?

14         A.    I, I don't dispute that there was an

15    attachment called Validate the Vote or Validate

16    the Vote 2020.

17               Whether or not this document is in

18    fact that attachment, I'm just not -- I'm not

19    sure.  I just can't confirm that.

20         Q.    And you don't dispute sending a plan

21    of some sort to Mr. Eshelman, correct?

22         A.    I definitely did send a plan that

Page 337

1    they requested.  So, I definitely recall that.

2         Q.    And do you recall providing a budget

3    for that effort?

4         A.    I recall that there were budget

5    numbers included along that right-hand column of

6    the document that I provided.

7         Q.    And is there any reason why this

8    document was not produced in response to our

9    discovery requests?

10        A.    Not that I am -- no, not that I'm

11   aware of.

12             MR. NKWONTA:  That is all of the

13       questions I have for you at the moment,

14       Ms. Engelbrecht.  Thank you for your time.

15             THE WITNESS:  Thanks very much.

16             MS. SIEBERT:  Okay.  I just have a

17       couple of follow-up questions.

18                        EXAMINATION

19   BY MS. SIEBERT:

20        Q.    Ms. Engelbrecht, do you recall

21   testifying regarding the Time for a Hero

22   Facebook, that line of questioning?

Page 338

1          A.     Yes.

2          Q.     And do you recall that on the --

3    that you testified that on the Time for a Hero

4    Facebook page, apparently they had shared or that

5    Facebook page had posted a video from True the

6    Vote.  Do you recall that?

7          A.     Yes.

8          Q.     Okay.  Did you control who from Time

9    for a Hero could share that video on your

10   Facebook page?

11         A.     No.

12         Q.     Okay.  Do you recall that later on

13   that Facebook page, counsel showed you a post

14   that appeared to be from somebody -- or an

15   account called Crusade for Freedom?

16         A.     Yes.

17         Q.     Okay.  Does True the Vote or do you

18   personally have any association with Crusade for

19   Freedom?

20         A.     No.

21         Q.     Do you recall later in testimony,

22   counsel asked you regarding some tweets that were

Page 339

1    apparently sent by an account called Crusade for

2    Freedom?

3              Can you answer verbally?  I'm sorry.

4        A.    I'm sorry.  Yes, yes, yes, yes.

5        Q.    And do you recall that that Crusade

6    for Freedom Twitter account appeared to have the

7    same logo as the Crusade for Freedom account that

8    was on the Time for a Hero Facebook page?

9        A.    Yes.

10       Q.    Okay.  And do you recall testifying

11   or seeing that that, the tweets used hashtags

12   Eyes on Georgia and Validate the Vote Georgia?

13       A.    Yes.

14       Q.    The Crusade for Freedom tweets?

15       A.    Yes.

16       Q.    Do you have any control over who can

17   post something on Twitter using those hashtags?

18       A.    No.

19       Q.    Okay.  Do you recall testimony

20   regarding the, I believe it is the December 14th

21   press release that True the Vote put out that

22   discussed the effort in Georgia for, related to

Page 340

```
 1    the runoff election challenges?

 2         A.    Yes.

 3         Q.    Do you recall that press release?

 4    Okay.

 5               Was part of the purpose of the press

 6    release to assist True the Vote in recruiting

 7    potential volunteer challengers?

 8         A.    I think that is, recruiting or just

 9    making aware that it was an opportunity for

10    citizens to participate in.

11         Q.    Okay.  All right.  There was a line

12    of questioning that counsel asked you, a whole

13    line of questioning regarding the target -- the

14    states that are listed in the court's order

15    regarding the November 2020 -- the litigation

16    following the November 2020 election that True

17    the Vote was involved in.

18               Do you recall that, those lines of

19    questioning?

20         A.    Uh-huh.

21         Q.    Okay.  And do you recall testifying

22    that those suits were voluntarily dismissed?
```