**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | |
|---|---|
| FAIR FIGHT, INC., SCOTT BERSON, JOCELYN HEREDIA, and JANE DOE, | |
| | **Civil Action No.** |
| Plaintiffs, | **2:20-cv-00302-SCJ** |
| v. | |
| TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1-10, | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................1

ARGUMENT .........................................................................................2

I. Defendants' conduct violates Section 11(b)........................................3

    A. Direct contact between Defendants and challenged voters is not required to establish voter intimidation. ..................................................3

    B. Defendants' challenges urged election officials to violate state and federal law. .....................................................................................5

    C. Section 11(b) does not require proof of intent. .........................8

    D. Defendants' voter challenges were frivolous. ...........................9

       1. True the Vote's challenges were riddled with obvious errors. ............9

       2. Defendants Davis and Sommerville's challenges were frivolous.......11

    E. Defendants' voter challenges attempted to induce county officials to violate the NVRA. ................................................................14

    F. Defendants Somerville and Davis's violated Section 11(b). .................18

II. Section 11(b) of the Voting Rights Act is not unconstitutional.........................20

    A. Judicial enforcement of Section 11(b) does not violate the First Amendment. ...................................................................................20

    B. Judicial enforcement of Section 11(b) does not violate the right to petition under the First Amendment.........................................21

    C. Judicial Enforcement of Section 11(b) does not unconstitutionally dilute Defendants' right to vote. ...........................................................22

    D. Section 11(b) is not unconstitutionally vague. ........................23

CONCLUSION....................................................................................25

# TABLE OF AUTHORITIES

Page(s)

Cases

*Arcia v. Fla. Sec'y of State*,
  772 F.3d 1335 (11th Cir. 2014) .........................................................................15

*Ga. Pac. Corp. v. Occupational Safety & Health Rev. Comm'n*,
  25 F.3d 999 (11th Cir. 1994) ...............................................................................24

*LULAC-Richmond Region Council 4614 v. Pub. Int. Legal Found.*,
  No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018).................21

*Mont. Democratic Party v. Eaton*,
  581 F. Supp. 2d 1077 (D. Mont. 2008).........................................................16, 17

*NAACP v. Button*,
  371 U.S. 415 (1963)............................................................................................21

*Nat'l Coal. on Black Civic Participation v. Wohl*,
  498 F. Supp. 3d 457 (S.D.N.Y. 2020) ......................................................*passim*

*Otto v. City of Boca Raton*,
  981 F.3d 854 (11th Cir. 2020) ............................................................................20

*United States v. Bowker*,
  372 F.3d 365 (6th Cir. 2004), *vacated on other grounds*, 543 U.S.
  1182 (2005)..........................................................................................................24

*United States v. Jin Fuey Moy*,
  241 U.S. 394 (1916)..............................................................................................7

*United States v. McLeod*,
  385 F.2d 734 (5th Cir. 1967) ..........................................................................7, 22

*United States v. Shrader*,
  675 F.3d 300 (4th Cir. 2012), *cert. denied*, 568 U.S. 1049 (2012) ...................24

*United States v. Tan Duc Nguyen*,
  673 F.3d 1259 (9th Cir. 2012) ................................................................4

Statutes

52 U.S.C. § 10101 ....................................................................................8

52 U.S.C. § 10307 ....................................................................................1

52 U.S.C. § 20507 ........................................................................6, 15, 16

O.C.G.A. § 21-2-224 ................................................................................6

O.C.G.A. § 21-2-230 .......................................................................4, 5, 17

Other Authorities

Fed. R. Evid. 701-02 ..............................................................................10

H. Rep. No. 89-439 (1965) ......................................................................9

*Hearings on S. 1564 Before the S. Comm. on the Judiciary*, 89th
  Cong. 16 (1965) ...................................................................................8

**INTRODUCTION**

The undisputed evidence shows that Defendants launched a massive, multifaceted campaign of voter intimidation in advance of Georgia's 2021 United States Senate runoff elections.[1] Section 11(b) of the Voting Rights Act makes it a violation of federal law to "intimidate, threaten, or coerce," any person for the purpose of interfering with the right to vote, or attempting to do the same. 52 U.S.C. § 10307(b). And that is precisely what Defendants did in their quest to influence the outcome of two critical elections. They accused hundreds of thousands of Georgians of voting illegally, citing flawed and inconclusive evidence, and asked election officials to take actions barred by federal law; they repeatedly boasted of deploying former Navy SEALS to polling places and offered a $1 million bounty on fraud; they repeatedly publicized their efforts to the widest possible audience, at a time when false accusations of election subversion reached a fever pitch and election officials were receiving death threats; and, importantly, voters were intimidated.

Defendants offer no credible evidence to refute these facts, but instead insist they did not personally contact voters, or subjectively intend to intimidate, or violate any other state or federal laws. Even if true, none of that is exculpating. Section 11(b)

---

[1] For a full accounting of the ways in which Defendants violated Section 11(b), see Plaintiffs' Summary Judgment Motion and accompanying exhibits. ECF No. 156.

requires neither proof of subjective intent nor personal confrontation to establish liability. And while the absence of a separate state law or NVRA violation is no defense to a Section 11(b) claim, Defendants in this case lobbied election officials to take actions that would have violated both.

Finally, Defendants do not explain the spectacular failure of the challenge lists to reliably identify ineligible voters, nor do they dispute that their actions actually intimidated voters—the crux of a voter intimidation claim. Their motion instead doubles down on a hodgepodge of affirmative defenses, none of which constrains the Court's authority to enforce Section 11(b). The VRA protects voters, not those who seek to deny the franchise to fellow citizens, and there is no constitutional right to intimidate. Defendants' motion for summary judgment should be denied.

## ARGUMENT

Section 11(b) of the Voting Rights Act prohibits any person from intimidating, threatening, or coercing anyone for voting or attempting to vote, and courts have interpreted the statute's operative terms in accordance with their familiar definitions. TRO Order at 22 (Jan. 1, 2021), ECF No. 29 (citing *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020)). To intimidate "means to 'make timid or fearful,' or to 'inspire or affect with fear'"; to "'threaten' means to 'utter threats against' or 'promise punishment, reprisal, or other

distress.'" *Wohl*, 498 F. Supp. 3d at 477. In other words, Section 11(b) outlaws both violent voter-related harms and subtler forms of non-violent intimidation. TRO Order at 22.

Defendants' Motion bypasses the VRA's plain language and invents new elements that are unsupported by case law and incompatible with the statutory text. Their arguments, however, offer no defense under the governing standards for Section 11(b) claims. The undisputed evidence, including testimony from Defendants themselves, demonstrates that their multifaceted attack on the electoral process intimidated voters and thus falls squarely within the categories of conduct prohibited by Section 11(b)—none of which is constitutionally protected.

## I.   Defendants' conduct violates Section 11(b).

### A. Direct contact between Defendants and challenged voters is not required to establish voter intimidation.

Despite clear evidence that their actions intimidated voters, Defendants suggest that liability under Section 11(b) attaches only when the intimidator communicates directly to the voter. *See* Br. In Supp. of Defs.' Mot. for Summ. J. ("Defs.' Br.") at 6 (May 16, 2022), ECF No. 155-1. But the cases they cite say nothing of the sort, and some even imposed liability against defendants who acted through third parties. In *National Coalition on Black Civic Participation v. Wohl*, for example, the court found that the plaintiffs were likely to succeed on their Section

11(b) claim even where the defendants did not directly contact voters but instead hired a "nonparty California company to electronically place" intimidating robocalls. 498 F. Supp. 3d at 466. Likewise in *United States v. Tan Duc Nguyen*, 673 F.3d 1259, 1261-62 (9th Cir. 2012), the defendant used a third party to send intimidating letters but did not otherwise communicate directly with voters. In each instance, it was the substance of the message and the impact on voters—not the means of transmission—that triggered liability.

The same is true here. Defendants co-opted county election boards to complete their scheme by filing mass challenges to voters' registration, knowing that those challenges would be conveyed by the local officials to voters. *See* O.C.G.A. § 21-2-230. Rather than standing for the proposition that a defendant violates Section 11(b) only when "directly communicat[ing] . . . to the voters themselves," Defs.' Br. at 6, these cases illustrate that defendants are liable if they cause other actors to intimidate voters.

Defendants' argument, moreover, ignores the communications Defendants publicly directed squarely at Georgia voters through media and True the Vote's own press releases, all of which contributed to a climate that even Defendants acknowledged was intimidating. Pls.' Statement of Undisputed Material Facts ("SUMF") ¶ 145 (May 16, 2022), ECF No. 156-2. When True the Vote and

Catherine Engelbrecht announced the Validate the Vote program, including the whistleblower and bounty fund, they did so in public forums that were intended to be distributed broadly for promotional purposes. *Id.* ¶¶ 49, 148. And when Defendants announced their landmark elector challenge program, they did so through a press release directed at all Georgians and beyond. *See, e.g.*, *id.* ¶¶ 58-59, 145-151. That voters learned through election officials, rather than from Defendants themselves, that they were among the subjects of Defendants' baseless challenges is a distinction without a difference.

**B. Defendants' challenges urged election officials to violate state and federal law.**

Defendants repeatedly suggest (without supporting authority) that their compliance with state law shields them from liability under Section 11(b). Not only is that theory flawed, it rests on a false premise—in fact, Defendants' challenges violated state *and* federal law.

O.C.G.A. § 21-2-230—the challenge procedure invoked by Defendants—allows a registered voter to challenge another elector's eligibility to vote and, where the challenge successfully questions whether the elector is qualified to be registered, requires election officials to remove them from the registration rolls. *See id*. §§ 21-2-230(f), (g). Defendants' allegations that voters had moved out of the county, by definition, rested on grounds that the voters were no longer qualified to be on the

5

voter rolls—being out of the county is no barrier to voting unless the voter is also improperly registered. The NVRA, however, requires election officials to comply with detailed notice procedures before purging voters based on an alleged address change, none of which could possibly occur within the two- to three-week window between the submission of Defendants' challenges and the runoff election. *See* 52 U.S.C. § 20507(d)(1); *see also infra* Section I.E. By pursuing challenges that would require county officials to remove voters from the rolls with insufficient time to complete the federally mandated notice procedures, Defendants invited county officials to violate the federal law.

Perhaps recognizing that the NVRA barred the removal of challenged voters just weeks before the runoff election, Defendants argue that they sought only to contest the challenged electors' ability to vote, not to remove them from the rolls. This too is impermissible under Georgia law. Section 224(h) states that "[a]ll persons whose names appear on the list of electors placed in the possession of the managers in each precinct . . . *shall* be allowed to deposit their ballots according to [the] law at the precinct in which they are registered." O.C.G.A. § 21-2-224(h) (emphasis added). In other words, a voter whose name appears on the list of electors *must* be allowed to vote. *Id*. And a challenge based on an elector's residence that does not also seek their removal from the rolls has no legal effect—because the elector is

entitled to vote as long as they remain on the rolls. By imploring county officials to disenfranchise electors who would remain registered, Defendants' stated goal would have violated state law. All of this demonstrates that Defendants' challenges could have achieved no lawful outcome and were legally flawed from the get-go.[2]

But even if the challenges complied with state law, that would not absolve Defendants from liability under Section 11(b). "[A]cts otherwise entirely within the law may violate the statute if they have the proscribed effect and purpose," *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967), and courts regularly find Section 11(b) violations for acts that may be lawful in other contexts. In *Wohl*, for example, the court did not find that robocalls violated state law, but rather that defendants issued robocalls in a manner that might "cause reasonable Black voters to resist voting out of fear." 498 F. Supp. 3d at 483. Similarly, evicting tenants, sending letters, or restricting access to private property are lawful acts that nonetheless violate Section 11(b) when employed for voter intimidation. *See* Defs.' Br. at 5-6 (citing cases). Voter challenges are no different.

---

[2] Furthermore, Section 230 requires that a challenger "specify distinctly the grounds of such challenge," a clause which should be construed to require that those grounds be non-frivolous. *See United States v. Jin Fuey Moy*, 241 U.S. 394, 401 (1916).

**C. Section 11(b) does not require proof of intent.**

As this Court previously explained, "Section 11(b) has no intent requirement. In other words, a plaintiff need not show animus or an intent to harass or intimidate in order to succeed on a Section 11(b) claim." TRO Order at 23 (citing the statue's plain text, history, and precedent). While the VRA's predecessor voter intimidation statute, the Civil Rights Act of 1957 ("CRA"), prohibited any person from intimidating or attempting to intimidate voters "*for the purpose* of interfering with [the right to vote]," 52 U.S.C. § 10101(b) (emphasis added), Congress removed this purpose requirement when it passed Section 11(b). During testimony before the Senate Judiciary Committee, then-Attorney General Katzenbach explained that Section 11(b) "represents a substantial improvement over [the Civil Rights Act]" because "under [the VRA] no subjective 'purpose' need be shown, in either civil or criminal proceedings, in order to prove intimidation . . . Rather, defendants *would be deemed to intend the natural consequences of their acts*." Voting Rights, Part 1: *Hearings on S. 1564 Before the S. Comm. on the Judiciary*, 89th Cong. 16 (1965).

It is thus immaterial—even if it were true—that "Defendants did not seek to prevent [any voter] from casting his or her ballot," Defs.' Br. at 12, or consider "racial or other demographic data," *id*. at 23. Plaintiffs do not need to show that Defendants were motivated by "animus" or discriminatory intent. TRO Order at 23.

8

Congress enacted Section 11(b) pursuant to its authority under the Elections Clause, not the Fifteenth Amendment, which provides further confirmation that "[t]he prohibited acts of intimidation [under the VRA] need not be racially motivated." H. Rep. No. 89-439 at 30-31 (1965). What *is* material is that Defendants' frivolous mass challenge effort objectively and predictably intimidated voters. *See, e.g*., Pls.' SUMF ¶¶ 155-174 (recounting experiences of Plaintiff Heredia, Plaintiff Jane Doe, and other challenged Georgia voters).

**D. Defendants' voter challenges were frivolous.**

**1.  True the Vote's challenges were riddled with obvious errors.**

Defendants fail to offer any coherent justification for the staggering number of errors in True the Vote's challenge file. *See* Decl. of Dr. Kenneth Mayer ("Mayer Rep.") at 6 (May 16, 2022), ECF No. 156-16. First, True the Vote suggests that its analysis could not have been frivolous because it relied on NCOA data, which the NVRA authorizes *states* to use as part of their voter list maintenance. Defs.' Br. at 19. But the NVRA imposes strict limitations on states' use of NCOA data, precisely because that data is prone to generating false matches and is incapable of determining whether an individual's change of address is intended to be permanent. *See infra* at I.E. States may use NCOA data only to "flag voters who may have moved and begin the process to confirm their address," and not to "affirmatively

establish[] that a voter has [changed their residence]." TRO Order at 13 n.7. The NVRA's strict procedures for official list maintenance do not authorize private attempts to engineer much broader disenfranchisement any more than official eminent domain powers would authorize a private person to bulldoze their neighbor's house.

Second, True the Vote argues that its approach could not have been frivolous because OPSEC used a "proprietary process" that was supposed to reduce errors to "within one standard deviation of the potential error that might be expected." Defs.' Br. at 21-22. This is obfuscation, not explanation. Despite multiple requests, Defendants refused to describe OPSEC's process in any meaningful detail. *See* Mayer Rep. at 3; Statement of Additional Material Facts ("SAMF") ¶¶ 13-14. And their motion is equally vague, and rife with technical jargon and improper inferences that fail to comply with the applicable rules of evidence. *See* Fed. R. Evid. 701-02. Notably, True the Vote failed to designate an expert witness under Rule 26(a)(2).

The results of OPSEC's "analysis" speak for themselves. Despite warnings from True the Vote's allies, OPSEC produced a massive challenge list based on sloppy techniques that resulted in "tens of thousands of obvious errors." Pls.' SUMF ¶¶ 77-78, 116; Mayer Rep. 6. Tellingly, Defendants do not dispute that these errors

occurred or offer any direct response to Dr. Mayer's specific findings. *See* Mayer Rep. 14-32; Pls.' Br. in Supp. of Mot. Summ. J. (Pls.' Br.), ECF 156-1, at 16-21.

### 2. Defendants Davis and Sommerville's challenges were frivolous.

True the Vote's own in-house analyst, Gregg Phillips, characterized Defendants Davis and Somerville's data analysis succinctly: "This is bad process." Pls.' SUMF ¶ 125. Davis and Somerville's only defense is self-serving and uncorroborated "research" that has never been produced, would tend to confirm the frivolity of their approach even if true, is inadmissible under the Federal Rules of Evidence, and likely reflects a significant exaggeration.

Defendants represent (again, without citing any credible evidence) that barely "37% of the voters who indicated a change of address within Georgia have updated their voter registration addresses to the same addresses shows in the NCOA data." Defs.' Br. at 23. Because Defendants have not disclosed Davis or Somerville as experts in this case, they may not offer opinion testimony based on technical and specialized knowledge of data analysis. *See* Fed. R. Civ. P. 26(a)(2)(A), 37(c); Fed. R. Evid. 701, 702. Even crediting that figure—which would be inappropriate for the additional reasons explained below—this concession confirms that Davis and Somerville's challenges were deeply flawed. Plaintiffs do not claim that *every* registrant on the challenge lists remained a permanent Georgia resident, but that

11

Defendants' methods were clearly unreliable. Challenging 40,000 registrants with a 37% accuracy rate is frivolous.

Even that figure is likely an embellishment. Defendants divine the 37% statistic from research they refer to as "SOS Analysis," as if it were somehow verified by state officials. *Id.* at 22. But this semantic sleight of hand obscures that Defendants are merely citing to Davis's characterization of his own internal analysis. *See* Davis Ct. Order Interrog. Resp. No. 3. And Davis's additional unproduced data analysis is no defense against the claim that he employed sloppy methods to produce his challenge file.

Additionally, while Defendants tout their submission of Davis's data analysis to the Secretary of State, they are conspicuously silent about whether any of Davis's figures or methods were verified by the state's chief elections official. In fact, the opposite occurred. After Davis provided his spreadsheet of alleged non-resident voters to the Secretary of State's office, Ryan Germany, the Secretary's General Counsel, provided a factual and legal "analysis of the issue Mark Davis is pushing regarding in-state moves." SAMF ¶ 8. First, Germany explained that "determining whether someone who moved from one county to another should have been eligible to vote" requires applying federal and state law "to each individual's factual scenario. *A spreadsheet listing voters' names doesn't come close to meeting that*

*standard*." *Id.* ¶ 9. (emphasis added). Germany further explained, "The NVRA requires individualized inquiry into each voter's situation. *Calling these voters 'illegal voters' without doing that individualized inquiry is a disservice.*" *Id.* ¶ 10 (emphasis added).

Turning to the spreadsheet of voters that Davis claimed to be ineligible, Germany did not find that 37% were improperly registered—he found that *0%* were improperly registered: "86% of the voters Mark Davis identified . . . showed up in person at the location where they were registered, showed their photo ID, executed a voter certificate saying they resided where they are registered, and then they were allowed to vote. The other 14% voted absentee by mail, submitting an absentee ballot application saying that they still resided where they were registered." *Id.* ¶ 11. This accounts for the entirety of names on Davis's list.

Additional analysis by the Secretary's office further undermines Davis's challenge list. After the November 2020 election, Frances Watson, the Secretary's Chief Investigator, mailed surveys to "voters that had filed a National Change of Address form (NCOA) and also requested an Absentee Ballot emailed to the out of state address[.]" SAMF ¶ 15. She received 1,066 responses to the questionnaire and determined that 99% of the individuals she identified on the NCOA list remained eligible to vote in Georgia. *Id.* ¶ 16. Only 13 voters—1.2195%—reported relocating

in the months before the November 2020 elections. *Id.* ¶¶ 17-18 [3] Most of the surveyed voters never changed residency at all—they forwarded their mail because they were active military, visiting family, temporarily traveling for a job assignment, or for other innocuous reasons. *Id.* ¶ 19.

### E. Defendants' voter challenges attempted to induce county officials to violate the NVRA.

Defendants' argument that their challenges "did not violate the National Voter Registration Act," Defs.' Br. at 31, is no defense at all; Plaintiffs do not allege violations of the NVRA, and the fact that Defendants did not directly violate one federal statute is not a safe harbor against proof that they violated the VRA. The relevance of the NVRA, as this Court has already explained at length, is not that Defendants violated it themselves, but that Defendants attempted to induce county boards to disenfranchise voters in contravention of the "purpose and plain language of the statutory safeguards Congress included in the NVRA." TRO Order at 12. Section 8 of the NVRA restricts election officials from removing a registrant from the voter rolls for non-residency unless the registrant confirms the change of residence in writing or fails to vote in two federal elections after receiving formal

---

[3] And among those few individuals, "[m]any reported that due to COVID they were having difficulty getting appointments to obtain their driver's license in the new state and believed they needed the new driver's license in order to complete their registration in the new state." SAMF ¶ 18 n.3.

notice with a postage prepaid and pre-addressed return card. 52 U.S.C. § 20507(d)(1). Defendants did not restrict their challenges to the eligibility of registrants who satisfied either requirement.

Even if Defendants had limited their challenges to registrants who were properly removable for change of residency—which they did not even attempt—the NVRA still would have prevented counties from taking the immediate action that Defendants demanded. State officials must complete "any program the purpose of which is to systematically remove the names of ineligible voters from the official lists" within 90 days of the election. *Id.* § 20507(c)(2)(A). This protection reflects Congress's judgment that removals "based on individual correspondence or rigorous individualized inquiry [have] a smaller chance for mistakes" relative to systematic removals, such as those that use "a mass computerized data-matching process to compare the voter rolls" with other databases." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344, 1346 (11th Cir. 2014). As this Court recognized, Defendants' "broad-strokes" challenges to hundreds of thousands of voters' eligibility "based only on the NCOA can be categorized as a systematic attempt to identify ineligible voters." TRO Order at 14-15. Because these challenges were filed mere weeks before the Senate runoff elections, county officials could not have acted on them.

Nor is it an excuse that Defendants intended counties to conduct further investigation before removing targeted individuals from the rolls. The NVRA does not supply a loophole that voters may be systematically disenfranchised within 90 days of an election for change of residency if state officials extemporize an investigation short of mailing "a postage prepaid and pre-addressed return card, sent by forwardable mail, on which the registrant may state his or her current address, together with a notice" that includes "information concerning how the registrant can continue to be eligible to vote." 52 U.S.C. § 20507(d)(2). Even if counties had issued these notices, they would have had to wait *four years* before taking action against any registrant who failed to respond. *Id.* § 20507(d)(1)(B). Defendants' stated goal, however, was to influence the imminently approaching January 5, 2021, senate runoff elections. *See, e.g.*, Pls.' SUMF ¶ 75.[4]

If permitted, Defendants' attempt to circumvent the NVRA's requirements through mass challenges would invite all sorts of foul play. In *Montana Democratic Party v. Eaton*, 581 F. Supp. 2d 1077 (D. Mont. 2008), the court adjudicated NVRA

---

[4] Defendants' attempt to offload responsibility for verifying the accuracy of their challenge lists onto county officials further discredits their approach. Between the 360,000 challenges prepared by True the Vote and the 40,000 challenges planned by Davis and Somerville, it was simply inconceivable that local boards of registrars would be able to adjudicate every challenge with the time and attention necessary to prevent erroneous removals. Defendants knew that to be the case. *See* SAMF ¶ 5.

claims resulting from Republican Party operatives' residency-based challenges to 6,000 voters shortly before an election. The court recognized that while the private party defendants were not themselves liable for NVRA violations, "[a]nything other than an unqualified rejection of the challenge would violate" the NVRA. *Id.* at 1083. The court's warning foreshadowed exactly what happened here:

> One can imagine the mischief an immature political operative could inject into an election cycle were he to use the [challenge] statutes, not for their intended purpose of protecting the integrity of the people's democracy, but rather to execute a tawdry partisan ploy. **Voters might be intimidated, confused, or even discouraged from voting** upon receiving notice that their right to vote—the most precious right in a government of, by, and for the people—has been challenged.

*Id.* at 1079 (emphasis added).

In moments of candor, Defendants acknowledge that they would prefer the NVRA not say what it says. *See* SAMF ¶ 3 (recognizing an "obvious conflict" between his preferred administration of Georgia's residency requirements and the NVRA, and noting "existing Georgia case law" cuts against his preferred approach); *id.* ¶ 4 (referring to the NVRA as "antiquated"). Defendants concocted a scheme they believed could evade the NVRA's requirements, which "lends support to Plaintiffs' argument that Defendants' § 21-2-230 challenges are frivolous." TRO Order at 15. And "[t]he frivolity of such voter challenges," the evidence shows,

"support[s] Plaintiffs' contentions that these challenges result only in voter harassment and intimidation." *Id.* at 28.

**F. Defendants Somerville and Davis's violated Section 11(b).**

Defendants' primary defense of Somerville and Davis rests on the idea that they cannot be liable under Section 11(b) because they did not play a leading role in True the Vote's challenge effort or broader Validate the Vote scheme. But it is no defense that Somerville and Davis, already aware that True the Vote planned to challenge hundreds of thousands of Georgians, decided to file tens of thousands of additional challenges.

First, Defendants Somerville and Davis did assist in True the Vote's own challenge effort. *See, e.g.*, Pls.' SUMF ¶ 64. Somerville and Davis, for example, participated in strategy discussions with Defendants Engelbrecht and Phillips before True the Vote filed its challenges, SAMF ¶ 12, and attended meetings with True the Vote and its analyst, Gregg Phillips, *id*. Somerville was noted as a "fellow . . . challenger" by Engelbrecht in True the Vote emails, *id.*; spoke at those True the Vote's challenger meetings to offer "encouragement" to elector challenge volunteers, *id.*; and edited True the Vote's public communications about the challenges before they were released, voluntarily including himself and Davis on True the Vote's press release announcing the challenges*, id*. When True the Vote

announced its mass challenge program, Somerville publicly praised the effort, explained that he "collaborated on methodology," and touted that he was "honor[ed] to be a part of the fight." *Id*.

Additionally, Somerville and Davis's own additional challenge effort against nearly 40,000 Georgians is sufficient to establish liability. Pls.' SUMF ¶ 61. They prepared their challenge lists with full knowledge that the NVRA precluded the state from removing voters in advance of the election. SAMF ¶ 2. Instead of launching a general awareness campaign or speaking with their elected officials to achieve their stated goal of publicizing election integrity, *see id.* ¶ 7, Somerville and Davis instead recruited their friends to file mass challenges without even knowing whether it was "possible or feasible" to verify these voters' eligibility before the runoff election. *Id.* ¶ 5. In doing so, they needlessly spotlighted tens of thousands of voters, including Plaintiff Jocelyn Heredia, who was pulled out of line at her voting location and forced to prove her eligibility to vote, a process she understandably found intimidating. Pls.' SUMF ¶¶ 20-27, 151.

Finally, for the reasons described above, it is immaterial to the Section 11(b) analysis whether or not these Defendants had direct contact with individual voters, *see supra* at Section I.A., nor does the evidence demonstrate their challenges were "careful" and meritorious ones, *see supra* Section I.D.2.

19

II.    **Section 11(b) of the Voting Rights Act is not unconstitutional.**

   A. **Judicial enforcement of Section 11(b) does not violate the First Amendment.**

   Defendants' argument that penalizing intimidating speech would violate the First Amendment forgets that several categories of speech, including true threats of nonviolent or nonbodily harm and defamation, have been carved out from constitutional protection. *See* TRO Order at 17; *Wohl*, 498 F. Supp. 3d at 478, 480; *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th Cir. 2020). Additionally, as this Court has previously stated, the interest in "preventing voter intimidation" is sufficiently compelling to survive even strict scrutiny. TRO Order at 17 (citing *Burson v. Freeman*, 504 U.S. 191, 206 (1992)).

   As discussed above, Section 11(b) does not require that a voter must be directly contacted by Defendants to be intimidated. *See supra* Section I.A. Additionally, as Plaintiffs have established in detail, voters did in fact experience fear and apprehension that they would no longer be able to exercise their right to vote, just as is required to find that speech constitutes a threat. Pls.' SUMF ¶¶ 152-174. This sense of apprehension manifested from Defendants' voter challenges as well as from the broader Validate the Vote scheme and all of the other actions taken to drum up publicity and fear through vigilantism and the patrolling of polling locations by former military combat veterans. Pls.' Br. at 24, 28.

Defendants' actions also fall outside of First Amendment protections where they involved deliberate efforts to publicize false accusations against voters through social media posts and press releases highlighting the voter challenges across various platforms. *Id.* at 26-27, 29-31; *see LULAC-Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) (finding condemnations of unlawful voter registration, which led to "adverse publicity, intimidation, embarrassment, [or] fear of harassment associated with their participation in the electoral process" constituted voter intimidation under Section 11(b)). The Constitution does not give Defendants license to intimidate voters.

**B. Judicial enforcement of Section 11(b) does not violate the right to petition under the First Amendment.**

While the First Amendment protects advocacy against governmental intrusion, such advocacy must be through "lawful ends." *NAACP v. Button*, 371 U.S. 415, 429 (1963). Defendants admit that a petition to the government is only protected absent "some sort of 'wrongfulness.'" Defs.' Br. at 28 (citing *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743 (1983)). But actions that violate Section 11(b), by definition, cannot constitute "lawful ends" for advocacy.

As Plaintiffs have described, Defendants' voter challenges, in combination with all their other activities targeted at Georgia voters, were unlawful. First, the challenges themselves were plainly frivolous. *See* Pls.' Br. at 15-23. Second,

21

Defendants engaged in various other election-related acts that constitute intimidation. *See McLeod*, 385 F.2d at 741-44; *Wohl*, 498 F. Supp. 3d at 485. Third, these actions were put in motion just two weeks before the January runoff election, and there was no reasonable expectation that elections officials could resolve hundreds of thousands of voter challenges in this short period of time. Pls.' Br. at 6. These facts, when taken together, demonstrate that there could be no lawful objective to Defendants' actions and the resulting intimidation was a natural and foreseeable consequence of such conduct. *Id*. at 31-33. Because Defendants' actions were unlawful, judicial enforcement of Section 11(b) cannot, in turn, violate Defendants' First Amendment right to petition.

### C. Judicial Enforcement of Section 11(b) does not unconstitutionally dilute Defendants' right to vote.

Defendants propose that they are immune from the VRA's requirements because a limitation on their ability to intimidate voters would "unconstitutionally violate[]" Defendants' "right to vote via vote dilution." Defs.' Br. at 29. This up-is-down approach to voting rights, where Defendants claim that those who would prevent others from voting are the real victims, has no basis in law. *See* Order Dismissing Defs. Countercls. at 16-17 (Aug. 17, 2021), ECF No. 111 (dismissing Defendants' counterclaim that *Plaintiffs* had somehow violated Section 11(b)).

As this Court has already explained, "while vote dilution can be the basis for

a voting rights lawsuit and is a legal principle that is found in the case law, there appears to be an absence of authority that provides a direct example of a case proceeding to the merits" where the claim concerns prophylactic measures to prevent or deter fraudulent voting. *Id.* at 16 n.9. In addition, the Court continued, "as correctly noted by [Plaintiffs], [Defendants'] theory of vote dilution is based upon a premise that the Eleventh Circuit and other courts have declined to uphold in other contexts on generalized grievance standing grounds." *Id.* at 16-17 n.9. The United States Constitution does not license Defendants to take whatever measures they see fit to mitigate hypothetical unlawful voting. Enforcing the VRA to prevent voter intimidation *enhances* the right to vote.[5]

### D. Section 11(b) is not unconstitutionally vague.

Finally, while Defendants invoke the Due Process Clause to argue that judicial enforcement of Section 11(b) is "unconstitutionally vague under . . . the Fifth or Fourteenth Amendments," Defs.' Br. at 30, they do not identify any particular aspect of Section 11(b) that violates this doctrine. Courts have routinely concluded that the terms "intimidate," "threaten," or "coerce" in Section 11(b) are not ambiguous. *See, e.g.*, *United States v. Shrader*, 675 F.3d 300, 310 (4th Cir. 2012) ("'Harass' and

---

[5] Besides, Defendant Catherine Engelbrecht is a resident of Texas—it is inconceivable that actions she took to deter non-resident voting in Georgia could have saved her own vote from dilution in Texas.

'intimidate' are not obscure words."), *cert. denied*, 568 U.S. 1049 (2012); *United States v. Bowker*, 372 F.3d 365, 383 (6th Cir. 2004), *vacated on other grounds*, 543 U.S. 1182 (2005) (concluding in criminal context that the words "threaten" and "harass" have generally accepted and easily ascertained meanings). This is not a case in which a person "of common intelligence must necessarily guess" as to whether a specific act is proscribed by statute. *Ga. Pac. Corp. v. Occupational Safety & Health Rev. Comm'n*, 25 F.3d 999, 1005 (11th Cir. 1994).

Defendants also argue that judicial enforcement of Section 11(b) in this context would make it difficult for Georgians to understand how many challenges one can file without running afoul of Section 11(b), *see* Defs.' Br. at 30, but the number of challenges at issue is not, and has never been, the sole basis for Section 11(b) liability.[6] As Plaintiffs have described in detail, the problems with Defendants' challenges go well beyond quantity, and include their extremely shoddy matching methodology, the false premise that a mail forwarding request jeopardizes voting eligibility, and the attempt to disenfranchise voters in violation of multiple NVRA requirements. These many errors contributed to the challenge file bloat, but it is the

---

[6] Here, Plaintiffs understand Defendants to be making an overbreadth argument, rather than a vagueness argument. But regardless of the label for Defendants' defense, judicial enforcement of Section 11(b) is neither unconstitutionally vague nor overbroad.

frivolousness of the challenges—rather than the size of the challenge files alone—that resulted in unlawful intimidation. Defendants' challenges also constituted only one component of a much broader "Validate the Vote" scheme. Pls.' Br. at 10-15. These actions occurred during a contentious post-2020 election period, in a state that repeatedly saw its election results attacked and election officials threatened over false claims of widespread voter fraud. Pls.' SUMF ¶ 156. This is precisely the manner of intimidating conduct that Section 11(b) was enacted to prohibit.

## CONCLUSION

Defendants' motion for summary judgment should be denied.

Respectfully submitted, this 6th day of June, 2022.

Allegra J. Lawrence
Georgia Bar No. 439797
Leslie J. Bryan
Georgia Bar No. 091175
Maia Cogen
Georgia Bar No. 832438
LAWRENCE & BUNDY LLC
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-
hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com

Dara Lindenbaum
Georgia Bar No. 980780
SANDLER REIFF LAMB ROSENSTEIN
& BIRKENSTOCK, P.C.
1090 Vermont Avenue, NW, Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

*/s/ Uzoma N. Nkwonta*
Marc E. Elias*
Uzoma N. Nkwonta*
Christina A. Ford*
Tina Meng*
Marcos Mocine-McQueen*
Joel J. Ramirez*
Jacob Shelly*
ELIAS LAW GROUP LLP
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
melias@elias.law
unkwonta@elias.law
cford@elias.law
tmeng@elias.law
mmcqueen@elias.law
jramirez@elias.law
jshelly@elias.law

*Counsel for Plaintiffs*
*Admitted pro hac vice*

26

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), N.D. Ga., I hereby certify that the foregoing ***Plaintiffs' Opposition to Defendants' Motion for Summary Judgment*** has been prepared in accordance with the font type and margin requirements of LR 5.1, N.D. Ga., using a font type of Times New Roman and a point size of 14.

This 6th day of June, 2022                    *<u>/s/ Uzoma N. Nkwonta</u>*
                                                              Uzoma N. Nkwonta
                                                              *Counsel for Plaintiffs*


## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the within and foregoing *Plaintiffs' Opposition to Defendants' Motion for Summary Judgment* with the Clerk of Court using the CM/ECF system, which will automatically send-e-mail notification to all counsel of record.

This 6th day of June, 2022.

                                                              *<u>/s/ Uzoma Nkwonta</u>*
                                                              Uzoma Nkwonta
                                                              *Counsel for Plaintiffs*