**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | |
|---|---|
| FAIR FIGHT, INC., SCOTT BERSON, JOCELYN HEREDIA, and JANE DOE,<br><br>     Plaintiffs,<br><br>     v.<br><br>TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1-10,<br><br>     Defendants. | Civil Action No. 2:20-cv-00302-SCJ |

**PLAINTIFFS' RESPONSE TO DEFENDANTS'
STATEMENT OF UNDISPUTED MATERIAL FACTS**

**True the Vote, Inc./Catherine Engelbrecht Statement of Facts**

1.      True the Vote, Inc. ("TTV") compiled a challenge list encompassing all 159 counties in Georgia ("Challenge List") and intended to submit challenges on behalf of challengers in all of them. In order to do so, TTV needed eligible voters to volunteer to serve as challengers in each of these counties. TTV's Responses to Plaintiffs' Second Interrogatories (June 7, 2021) ("TTV Resp. to 2d Interrog."), Resp. No. 14, Ex. A.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider that "True the Vote, Inc. ('TTV') compiled a challenge list encompassing all 159 counties in Georgia" or that "TTV needed eligible voters to volunteer to serve as challengers in each of these counties" for purposes of the summary judgment motion. Plaintiffs dispute the statement that TTV "intended to submit challenges on behalf of challengers in all of them." Catherine Engelbrecht testified that TTV did not identify challengers in all 159 counties, offered no clear explanation for why TTV submitted challenges in only a portion of the counties in Georgia, and TTV has offered no evidence of attempts to recruit challengers in the remaining 94 counties in which TTV did not submit a challenge. Ex. 50, Second Excerpt of True the Vote/Catherine Engelbrecht Deposition Transcript ("TTV Tr.") 254:5-255:11.

2.     On the day that TTV's press release announcing this was issued, Attorney Mark [sic] Elias sent letters to the Boards of Elections in several Georgia counties. TTV 1455-57 (Letter from Marc Elias to Kristi L. Royston (Dec. 18, 2020)), Ex. B.

**RESPONSE:** Plaintiffs object that correspondence between Marc Elias and boards of elections is immaterial to any claims or defenses in this case.

3.     Several people serving as challengers started receiving intimidating and harassing messages via email and social media. TTV Resp. to 2d Interrog. Resp. No. 14.

**RESPONSE:** Plaintiffs object that Paragraph 3 is inadmissible hearsay. Fed. R. Evid. 801(c), 802. *Macuba v. Deboer*, 193 F.3d 1316, 1322-25 (11th Cir. 1999). Plaintiffs further object that the assertions regarding challengers are immaterial to any claims or defenses in this case.

4.     As the Run-off election neared and the intimidation and harassment of challengers increased, TTV did not receive authorization to submit the challenge list from a registered voter in every Georgia county. *Id.*

**RESPONSE:** Plaintiffs object that the assertion that "the intimidation and harassment of challengers increased" is inadmissible hearsay. Fed. R. Evid. 801(c), 802; *Macuba* at 1322-25. The cited evidence does not support a causal relationship

between alleged harassment and TTV's failure to submit challenges in all counties and stops short of confirming that TTV actually *requested* authorization from (or even solicited) challengers in every Georgia county. This assertion is also contradicted by Defendants' own admission that the purpose of the Validate the Vote scheme was to address perceived "illegal votes" in "Democrat counties" and to use "micro-targeting in key counties" as part of a broad effort "to have the state's election results overturned." Pls.' Mot. Summ. J. Ex. 1 ("Validate the Vote 2020") 1, ECF No. 156-4. The selection of counties in which TTV submitted challenges was also skewed towards counties with higher percentages of Black registrants. The 65 selected counties include: (1) the three counties with the highest percentage of Black registrants across the state; (2) ten of the 20 counties with the highest percentage of Black registrants; and (3) only four of the 20 counties with the smallest percentage of Black registrants. Expert Report of Dr. Kenneth Mayer ("Mayer Rep.") 34-35.

5.     Therefore, TTV did not submit challenges in all of Georgia's 159 counties as originally planned, but only submitted challenges in the counties noted in TTV's Amended Responses to Plaintiffs' First Requests for Production (Mar. 24, 2021) ("TTV Am. Resp. First RFP"), Resp. No. 2, Ex. C. The counties in which TTV submitted Challenges is as follows: Appling Bacon Baldwin Banks Barrow Ben Hill Bibb Bleckley Brooks Butts Calhoun Charlton Cherokee Clarke Clayton

Cobb Coffee Columbia Coweta Crawford Crisp Dawson DeKalb Dodge Dooly Dougherty Douglas Fayette Franklin Fulton Gwinnett Habersham Hall Hancock Hart Henry Houston Jackson Jasper Jefferson Johnson Jones Lamar Lee Madison McDuffie McIntosh Oconee Oglethorpe Rockdale Sumter Taliaferro Tattnall Terrell Thomas Tift Toombs Towns Union Walton Webster Wheeler White Wilcox Wilkes. *Id.* (reordered alphabetically).

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this list of counties in which challenges were submitted for purposes of the summary judgment motion. The cited evidence makes no mention of the reason challenges were filed only in select counties and so does not support the assertion of a causal relationship between the alleged experiences of challengers and the targeting of voters in specific counties.

6.    TTV prepared analysis for all 159 counties but challenges were ultimately submitted in 65 counties because those were the counties for which individual electors committed to filing the challenges. Transcript Excerpts of Deposition of Catherine Engelbrecht, TTV 30(b)(6) (Jan. 26, 2022) ("TTV Tr."), Ex. D, 255:4- 256:13.

**RESPONSE:** Plaintiffs do not dispute that the court may consider that "TTV prepared analysis for all 159 counties but challenges were ultimately submitted in

65 counties" for purposes of the summary judgment motion. Defendants' assertion that counties were targeted "because those were the counties in for which individual electors committed to filing the challenges" is unsupported by evidence and contradicted by Defendants' own admission the Validate the Vote scheme would use "micro-targeting in key counties" in its efforts "to have the state's election results overturned." Validate the Vote 2020 at 1. The selection of counties in which TTV submitted challenges was also skewed towards counties with higher percentages of Black registrants. The 65 selected counties include: (1) the three counties with the highest percentage of Black registrants across the state; (2) ten of the 20 counties with the highest percentage of Black registrants; and (3) only four of the 20 counties with the smallest percentage of Black registrants. Mayer Rep. 34-35.

7.      Based on its understanding of the governing statute and the process it outlined, and a meeting with the Georgia Secretary of State, TTV expected the challenge process to be orderly and organized and not burdensome to a challenged individual. TTV Tr. 152:15-154:19; 169:22-170:18.

**RESPONSE:** Plaintiffs do not dispute that the court may consider that "Defendants had a meeting with the Georgia Secretary of State" for purposes of the summary judgment motion.

Plaintiffs dispute the description of Ryan Germany's statements made in TTV Tr. 170:7-12 because it is inadmissible hearsay. Fed. R. Evid. 801(c), 802. *Macuba* at 1322-25. Furthermore, the cited evidence makes no reference to the burden placed on voters but instead discusses burdens placed on counties. TTV Tr. 170:1-3 ("I wanted to understand if this was a burden on counties").

Finally, the assertion of Defendants' "understanding" of the burden does not comply with LR 56.1(B)(1) because it is an argument rather than a matter of fact.

8.     TTV had communications with individual challengers to discuss the process to have been followed and the threats that were being experienced, and TTV directed them where to submit information on the threats. TTV Tr. 159:21- 161:2.

**RESPONSE:** Plaintiffs object to the statements in Paragraph 8 as inadmissible hearsay. Fed. R. Evid. 801(c), 802. *Macuba* at 1322-25. Furthermore, the statements in Paragraph 8 are immaterial to the claims and defenses of this case.

9.     TTV had a meeting with the Secretary of State in mid-December to describe the Challenge and help understand the process in the counties to avoid friction or inappropriate process. TTV Tr. 168:5-22.

**RESPONSE:** Plaintiffs do not dispute that TTV "had a meeting with the Secretary of State in mid-December," but Plaintiffs object to the remainder of Paragraph 9 as inadmissible hearsay. Fed. R. Evid. 801(c), 802. *Macuba* at 1322-25.

10.    In that meeting, the Secretary of State commented that because the voter registration list had not been cleaned and considering the normal rate of moves that the number of names on the Challenge List was "about right." TTV Tr. 169:1-12; 171:1-5.

**RESPONSE:** Plaintiffs object that Paragraph 10 is inadmissible hearsay. Fed. R. Evid. 801(c), 802; *Macuba* at 1322-25.

11.    The impetus behind the Challenges was in part that electors had contacted TTV about challenges in Georgia, and the challenge statute afforded an opportunity for citizens to engage in that way. TTV Tr. 223:17-224:6.

**RESPONSE:** Defendants' assertion that contact was initiated by electors rather than by Defendants is contradicted by the fact that Defendants partnered with political party officials to recruit challengers. *See, e.g.*, Ex. 49, Second Excerpt of Joseph Martin Deposition Transcript ("Martin Tr.") 16:20-17:1, 20:20-22.

Defendants' explanation of "[t]he impetus behind the Challenges" is contradicted by TTV's own admission that the purpose of the Validate the Vote scheme was to address perceived "illegal votes" in "Democrat counties" and to use "micro-targeting in key counties" as part of a broad effort "to have the state's election results overturned." Validate the Vote 2020 at 1.

12.    The purpose of the Challenges was to help electors bring to the attention of the counties those records that showed voters that appeared not to comply with eligibility standards for the runoff election. TTV Tr. 206:1-4.

**RESPONSE:** Defendants' statement in Paragraph 12 is contradicted by TTV's own admission that the purpose of the Validate the Vote scheme was to address perceived "illegal votes" in "Democrat counties" and to use "micro-targeting in key counties" as part of a broad effort "to have the state's election results overturned." Validate the Vote 2020 at 1.

13.    The intent of TTV and the purpose of the Challenges was not to have people removed from voter registration rolls in Georgia, but for the county boards to confirm with the Challenged Voters whether they had moved. TTV Tr. 342:15-343:1; TTV Resp. to First Interrogs, Ex. E, Resp. No. 5.

**RESPONSE:** Plaintiffs dispute the assertions in Paragraph 13 because the statute governing Defendants' challenges mandates the removal of voters where a registrant's qualifications are successfully challenged, O.C.G.A. 21-2-230(g), (h), (i), and, for purposes of Section 11(b), defendants are "deemed to intend the natural consequences of their acts." *See Hearings on S. 1564 Before the S. Comm. on the Judiciary*, 89th Cong. 16 (1965). Furthermore, TTV's communications with its

prospective challengers indicated that the parties sought to purge voters. *See*, *e.g.*, Pls.' SUMF ¶ 135, TTV Tr. 231:20-235:5, 237:22-238:21.

14.     Neither TTV nor any of the individual volunteers had any contact with the Challenged Voters. TTV Resp. to First Interrogs. Resp. No. 5.

**RESPONSE:** Plaintiffs object that the statements in Paragraph 14 are not material to any claims or defenses in this matter. Furthermore, the cited evidence does not support the assertion that no "volunteers had any contact with the Challenged Voters." The cited evidence speaks only to the training volunteers received and makes no reference to whether any TTV volunteers actually contacted voters..

15.     TTV never considered releasing the Challenge List to the public. TTV Tr. 257:11-14.

**RESPONSE:** The assertion is contradicted by evidence in the record. A Facebook account with links to Defendants declared, "If the Georgia counties refuse to handle the challenges of 366,000 ineligible voters in accordance with the law, I plan to release the entire list so America can do the QC." Pls.' Mot. Summ. J. Ex. 23. Defendants Davis and Somerville exchanged texts about TTV stating that "if they publish they will be flooded with defamation complaints." Pls.' SUMF ¶ 143, Ex. 6; Tr. Second Dep. Mark Davis ("Davis II Tr. ") 129:3-10; 129:11-19.

16.    TTV was also involved in litigation in several states regarding possibly illegal ballots cast in the 2020 general election ("Validate the Vote"). The Validate the Vote name was created by a consultant of a donor in early November 2020. TTV Tr. 66:12-21, 67:16-20.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

17.    The name Validate the Vote was used with respect to these national litigation efforts in connection with the 2020 general election and sometimes included the name of the state in which the litigation efforts were directed. TTV Tr. 69:4-7.

**RESPONSE:** Plaintiffs dispute Paragraph 17 insofar as it suggests Validate the Vote was used solely in connection with the 2020 general election. Validate the Vote was also used in connection with the Georgia runoff election. TTV Tr. 69:4-7; Pls.' SUMF ¶ 55, Ex. 19.

18.    The counting of illegal ballots in Democratic counties in several states was the subject of publicity regarding Validate the Vote, not the challenges in Georgia. TTV Tr. 267:6-268:2, 268:17-22, 276:3-5, 276:19-277:2, 277:3-5.

**RESPONSE:** Paragraph 18 is contradicted by the fact that the challenge of voters in Georgia was the subject of nationwide publicity. *See*, *e.g.*, Ex. 62, Mark

Niesse, *Eligibility of 364,000 Georgia voters challenged before Senate runoff*, The Atlanta Journal-Constitution, Dec. 22, 2020; Ex. 63, Kyle Cheney & Josh Gerstein, *Judge blocks voter purge in 2 Georgia counties*, Politico, December 28, 2020. None of the cited evidence excludes Georgia as a "subject of publicity regarding Validate the Vote." Defendants stated a goal of "build[ing] momentum through broad publicity" in key states, which included Georgia. Validate the Vote 2020 at 1. Defendants publicized their Georgia challenges in press releases on December 14, 2020. Pls.' Mot. For Summ. J. Ex. 21 ("True the Vote Partners With Georgia GOP to Ensure Transparent, Secure Ballot Effort for Senate Runoff Elections"). Defendants again publicized their Georgia efforts on December 18, 2020. Pls.' Mot. For Summ. J. Ex. 22 (True the Vote Partners with Georgians in Every County to Preemptively Challenge 364,541 Potentially Ineligible Voters).

Finally, Defendants provide no evidence for the assertion that there was "counting of illegal ballots in Democratic counties in several states."

19.     TTV hired OpSec Group LLC ("OpSec") to analyze publicly available data to create a list of registered Georgia voters to be challenged under O.G.C.A. § 21-2-230 as having changed their residency. Transcript Excerpts of Deposition of Gregg Phillips (Jan. 25, 2022) ("OpSec Tr."), Ex. F 54:21; 57:11-21.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 19 for purposes of the summary judgment motion.

20.    TTV contracted with OpSec to prepare analysis for all Georgia counties, and the challenges were limited by the residency of electors willing to mount a challenge in their county. TTV Tr. 231:11-19.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider that "TTV contracted with OpSec to prepare analysis for all Georgia counties" as a fact for purposes of the summary judgment motion. Plaintiffs object that the cited evidence offers no support for the statement that "challenges were limited by the residency of the electors willing to mount a challenge in their county."

21.    TTV received or viewed data from the TrueAppend on December 19, 2020; the data was not used in creating the Challenge Lists, TTV Tr. 244:17- 245:10, 248:13-22, and the demographic information, which is automatically included, was reviewed as a result of claims that the List exhibited bias. TTV Tr. 185:1-5.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider the non-exclusive statement that racial data was reviewed after accusations of bias as evidence for purposes of the summary judgment motion. Plaintiffs object that the assertion that "the data was not used in creating the Challenge Lists" is not supported by the cited evidence. Defendants state in TTV Tr. 248:13-22 that analysis

13

containing demographic data was created after the challenges; however, the report to which Paragraph 21 refers was created on December 16, 2020, two days before TTV announced its challenge of voters. TTV Tr. 245:22-246:4.

22.    Consistently over a number of election cycles, TTV hosts a hotline that is available online and uses a toll free number. TTV Tr. 81:16-21.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

23.    Reports of impropriety or malfeasance or reports of missing ballots or extra ballots were reviewed and either forwarded to the appropriate authorities or further vetted. TTV Tr. 85:21-86:9.

**RESPONSE:** Plaintiffs dispute this statement in part. TTV has admitted that none of "the hotline contacts relevant to Georgia during the time frame of the runoff" resulted in the need for True the Vote to follow up or report the contact information to appropriate authorities." TTV Tr. 92:19-95:3.

24.    The election integrity hotline had live operators taking calls starting in late September of 2020. TTV Tr. 82:18-21.

**RESPONSE:** Plaintiffs do not dispute Paragraph 24, but it is immaterial to the claims and defenses in this case.

25.    During the 2020 election cycle TTV's national election integrity hotline came to be associated with Validate the Vote. TTV Tr. 68:16-69:7; 81:22-82:4.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 25 for purposes of the summary judgment motion.

26.    TTV referred easily answered questions or concerns to the official websites of the relevant government entities. TTV Tr. 85:13-20.

**RESPONSE:** Plaintiffs do not dispute Paragraph 26, but it is immaterial to the claims and defenses of this case.

27.    The purpose of the election integrity hotline was to gather information regarding potential violations that had already occurred and though TTV did report some incidents to authorities no reports received relevant to Georgia at the time of the runoff resulted in the need to follow up or report contact information to appropriate authorities. TTV Tr. 93:17-95:3; TTV's Amended Responses to Plaintiffs' Second Requests for Production (Jun. 18, 2021) ("TTV Am. Resp. 2d RFP"), Ex. G, Resp. No. 18.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider the statement that "no reports received relevant to Georgia at the time of the runoff resulted in the need to follow up or report contact information to appropriate authorities" as fact for purposes of the summary judgment motion. Plaintiffs object

15

that the cited evidence provides no support for the assertion that "TTV did report some incidents to authorities."

28. During the runoff period, TTV made available training for signature verification and absentee ballot training. TTV Tr. 96:5-102:6.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 28 for purposes of the summary judgment motion.

29. In conjunction with its work on the Challenge List, TTV established a fund to provide legal support for people who reported information primarily to head off the chilling effect of the threat of legal action against challengers or those with information. TTV Tr. 71:11-19, 71:22-72:1, 74:8-17, 75:5-18, 76:15-19.

**RESPONSE:** The statement that the fund was established "primarily to head off the chilling effect of the threat of legal action against challengers" does not comply with LR 56.1(B)(1) because it presents legal argument rather than a statement of fact.

30. The fund was also used to support litigation in several states in regard to the November 2020 presidential election. TTV Tr. 316:3-12.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 30 for purposes of the summary judgment motion.

31.    As a result of the initiative associated with the fund, TTV received credible reports of criminal malfeasance that it submitted to authorities. TTV Tr. 316:19-317:5.

**RESPONSE:** Paragraph 31 does not comply with LR 56.1(B)(1) because statements regarding the credibility of any reports present legal arguments rather than statements facts. Furthermore, TTV admitted that none of "the hotline contacts relevant to Georgia during the time frame of the runoff" resulted in the need for True the Vote to follow up or report the contact information to appropriate authorities." TTV Tr. 92:19-95:3. Additionally, the contents of these reports are inadmissible hearsay. Fed. R. Evid. 801(c), 802; *Macuba* at 1322-25.

Plaintiffs further object that the cited evidence does not support the assertion that "TTV received credible reports." The cited evidence only expresses TTV's opinion that it considered the reports credible.

32.    Claire Joseph Martin was the only Georgia volunteer serving as a challenger who withdrew or attempted to withdraw a Georgia Elector Challenge in his or her name. TTV Resp. to 2d Interrog. Resp. No. 11.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 32 for purposes of the summary judgment motion.

33.   Mr. Martin gave permission to submit Challenges on his behalf in Taliaferro County. Before the Taliaferro County Challenge List was submitted on his behalf, he submitted challenges to three of the voters on the List and who had requested absentee ballots. TTV Resp. to 2d Interrog. Resp. No. 11.

**RESPONSE:** Plaintiffs dispute this statement in part. Mr. Martin consented to participate TTV's challenges in some fashion but was "shocked" to learn that TTV had submitted challenges on his behalf. Martin Tr. 57:13-15.

34.   On December 20, 2020, he asked to "hold" the Challenge on his behalf and noted that two of the three challenges were residents in long-term care and were eligible to vote in Taliaferro County. TTV Resp. to 2d Interrog. Resp. No. 11; TTV Tr. 327:10-15.

**RESPONSE:** Plaintiffs do not dispute that the Court may Paragraph 34 for purposes of the summary judgment motion.

35.   TTV submitted the withdrawal of the Challenge in Taliaferro County on Dec. 21. TTV Resp. to 2d Interrog. Resp. No. 11.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

36.   Mr. Martin later reported that Taliaferro County Chief Registrar confirmed with him that one of the three people on his challenge list did not live in

Taliaferro County and the absentee ballot for that voter was rejected. TTV Resp. to 2d Interrog. Resp. No. 5.

**RESPONSE:** Plaintiffs object that cited evidence is inadmissible hearsay. Fed. R. Evid. 801(c), 802; *Macuba* at 1322-25.

37. TTV knows of no other instance in which TTV or a challenger learned that a voter whose name appeared on a Challenge List was in fact a resident of the County in which they were registered to vote. TTV Resp. to 2d Interrog. Resp. No. 12.

**RESPONSE:** Plaintiffs do not dispute Paragraph 37, but it is immaterial to the claims and defenses of this case.

### OpSec/Gregg Phillips Statement of Facts

38. OpSec was founded in 2020. OpSec Tr. 36:19.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 38 for purposes of the summary judgment motion.

39. True the Vote contracted with OpSec to analyze publicly available data to create TTV's Challenge List. OpSec Tr. 54:21, 57:11-21.

**RESPONSE:** Plaintiffs dispute, and the citations do not establish, that the data OpSec analyzed was publicly available.

40.     OpSec prepared lists for all the counties in Georgia. OpSec Tr. 149:2-4. TTV Tr. 231:11-13 (Analysis was prepared for all Georgia Counties); TTV Tr. 255:6 ("we had done the analysis to support [challenges in all 159 counties].")

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 40 purposes of the summary judgment motion.

41.     The counties for which challenges were submitted were those counties for which a Georgia voter lived in the jurisdiction and wished to file a challenge. OpSec Tr. 149:9-13; TTV Tr. 253:20-254:4; 255:7-11; 256:7-13.

**RESPONSE:** Plaintiffs dispute this fact. The selection of counties in which TTV submitted challenges was also skewed towards counties with higher percentages of Black registrants. The 65 selected counties include: (1) the three counties with the highest percentage of Black registrants across the state; (2) ten of the 20 counties with the highest percentage of Black registrants; and (3) only four of the 20 counties with the smallest percentage of Black registrants. Mayer Report at 34-35. For purposes of Section 11(b), defendants are "deemed to intend the natural consequences of their acts." *See Hearings on S. 1564 Before the S. Comm. on the Judiciary*, 89th Cong. 16 (1965).

42.     In creating the Challenge List OpSec used the Georgia official voter registration file, the NCOA, the Coding Accuracy Support System ("CASS"),

20

Delivery Point Validation ("DPV") and proprietary algorithms ("proprietary process") to help verify identity. OpSec Tr. 93:16-94:2.

**RESPONSE:** Plaintiffs dispute Paragraph 42. While Mr. Phillips claimed to have used each of these sources to create the Challenge List, the only component that Mr. Phillips testified was used to "help verify identify" was the "proprietary algorithm." Defendants' citation does not support the fact that OpSec used the Georgia official voter registration file, the NCOA, the Coding Accuracy Support System, or Delivery Point Validation to help verify identity.

43.    In matching information from Georgia's voter rolls and other data, OpSec used fields that conformed with respect to data format and data type. OpSec Tr. 106:22-107:3.

**RESPONSE:** Paragraph 43 is inadmissible under Fed. R. Evid. 701(c) (lay witness testimony is limited to that which is "not based on scientific, technical, or other specialized knowledge with the scope of rule 702"), and Fed. R. Evid. 702 (allowing a witness to testify to their "scientific, technical, or other specialized knowledge" only if they have been qualified as an expert witness).[1]

---

[1] Defendants have not designated any testifying experts in this matter or made any disclosures pursuant to Fed. R. Civ. P. 26(a)(2).

Furthermore, Paragraph 43 is vague and ambiguous in its use of the phrases "other data" and "fields that conformed with respect to data format and data type," which have not been adequately explained and thus lack foundation.

Finally, Paragraph 43 is not supported by Defendants' citation. Mr. Phillips testified that he agreed that it is "*important* that the fields conform with respect to data format and data type." OpSec Tr. 106:22-107:3 (emphasis added). He did not testify that he, in fact, used field that conform. Additionally, this asserted fact is disputed by Plaintiffs' expert. *See* Mayer Rep. 4-5, 32.

44.    OpSec's proprietary process compared the addresses in the registration file to government and commercially available information in order to identify people who had either moved out of the county in which they were registered or live outside the State of Georgia. OpSec Tr. 113:6-17.

**RESPONSE:** Paragraph 44 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" identified people who had moved out of their county or out of state, and any inferences drawn from its resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Plaintiffs further dispute that OpSec's process reliably identified people who had moved out of the county in which they were registered or live outside the State

of Georgia. *See* Mayer Rep. 6, 24-34. Additionally, Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Additionally, Plaintiffs object to Paragraph 44 as vague and ambiguous in its use of the phrases "proprietary process" and "government and commercially available information," which have not been adequately explained and thus lack foundation.

23

45.     OpSec's proprietary process was developed by Gregg Phillips in 2006 and through use has demonstrated its accuracy. OpSec Tr. 108:16-22.

**RESPONSE:** Plaintiffs do not dispute the year that OpSec's process was developed, but they do dispute that "through use [the process] has demonstrated its accuracy." *See* OpSec Tr. 109:1-3 ("Q. Has [the process] been independently verified by anybody else? A. Nope."). Plaintiffs also object to Paragraph 46 as vague and ambiguous in its use of the phrase "proprietary process," which has not been adequately explained and thus lacks foundation.

46.     OpSec used its proprietary process in addition to regular address matching to produce the Challenge List. OpSec Tr. 118:11-15.

**RESPONSE:** Plaintiffs do not dispute that OpSec used its "proprietary process" to produce the Challenge List. Defendants' citation does not reference "regular address matching." Plaintiffs object to Paragraph 46 as vague and ambiguous in its use of the phrases "proprietary process" and "regular address matching," which have not been adequately explained and thus lack foundation.

47.     OpSec's proprietary process is designed to infer, from consulting other sources of data, the purpose for which the person has submitted an NCOA request. OpSec Tr. 129:8-12.

**RESPONSE:** Paragraph 47 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" operates, and any inferences it produces, requires technical and specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Additionally, Plaintiffs dispute this fact because the results of OpSec's matching process are entirely inconsistent with Defendants' characterization of the process's design. *See* Mayer Rep. 24-34. Further, Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific

perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 47 as vague and ambiguous in its use of the phrases "proprietary process" and "other sources of data," which have not been adequately explained and thus lack foundation.

48. Among the persons that OpSec's proprietary process is designed to identify are persons who have deployed for military service, OpSec Tr. 128:3-7; persons that, intending to move, file an NCOA request and then change their mind, *Id.* 127:12-128:2; persons that forward their mail because they were on vacation, *Id.* 126:22-127:5, 128:1-2; persons that moved for non-military government service and submit an NCOA, *Id.* 126:9-16, 128:1-2; persons submitting an address change for purposes of attending school, *Id.* 125:17-19, 128:1-2; persons that have moved inside the county or jurisdiction in which they were registered, *Id.* 125:2.

**RESPONSE:** Paragraph 48 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" operates, and any inferences drawn from its resulting analysis, including which individuals it is "designed to identify" and how it does so, requires technical and specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Plaintiffs further dispute this fact because the results of OpSec's matching process are entirely inconsistent with Defendants' characterization of the process's design. *See* Mayer Rep. 24-34. Additionally, Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 48 as vague and ambiguous in its use of the phrase "proprietary process," which has not been adequately explained and thus lacks foundation.

49.    OpSec's proprietary process does not consider as dispositive whether or not a person filed a permanent or temporary address change. OpSec Tr. 138:16-22.

**RESPONSE:** Paragraph 49 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" operates, and any inferences draw from its resulting analysis, including what factors is will "consider as dispositive," requires technical and specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Further, Defendants' citation does not support this fact. Additionally, Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure

the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 49 as vague and ambiguous in its use of the phrase "proprietary process," which has not been adequately explained and thus lacks foundation.

50.     OpSec's proprietary process seeks to verify the identity of an individual before considering residency by comparing to data gathered from a combination of lists. OpSec Tr. 96:3-11.

**RESPONSE:** Paragraph 50 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" operates, including if and how it might "verify the identity of an individual," and any inferences drawn from its resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 50 as vague and ambiguous in its use of the phrases "proprietary process" and "comparing to data gathered from a combination of lists," which have not been adequately explained and thus lack foundation.

51.    OpSec used databases other than NCOA and the voter file list to identify persons who had moved, OpSec Tr. 94:17, 95:3-9, including other state

registrations, *Id.* 95:14-15; 96:12-17, and "five or six other data sources." OpSec Tr. 95:17-18.

**RESPONSE:** Paragraph 51 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" operates, including its methodology for identifying "persons who had moved," and any inferences drawn from its resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Plaintiffs further dispute that OpSec reliably identified persons who had moved. *See* Mayer Rep. 24-34. Additionally, Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary

process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 51 as vague and ambiguous in its use of the phrases "databases other than NCOA" and "five or six other data sources," which have not been adequately explained and thus lack foundation.

52.    To the extent that it is needed for the proprietary process, OpSec's proprietary algorithm also uses the address information from TrueNCOA and SmartyStreets. OpSec Tr. 112:1-9; 119:16-22.

**RESPONSE:** Paragraph 52 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" operates, including the use of "TrueNCOA and SmartyStreets," and any inferences drawn from its resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Further, Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the

Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 52 as vague and ambiguous in its use of the phrases "proprietary algorithm" and "TrueNCOA and SmartyStreets," which have not been adequately explained and thus lack foundation.

53.    In producing the Challenge List, OpSec used, among other things, county tax records. OpSec Tr. 97:2-4.

**RESPONSE:** Paragraph 53 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" operates, including how it might use county tax records, and any inferences drawn from its resulting analysis,

33

requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Further, Defendants' characterization of OpSec's "proprietary process" should not be credited where Plaintiffs subpoenaed OpSec to produce "All documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3, and "All documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4, and OpSec failed to produce documents reflecting the design of the proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 53 as vague and ambiguous in stating that OpSec used county tax records. Defendants have not explained how OpSec used

county tax records or for what purpose; thus this statement lacks foundation, and Defendants have not demonstrated its relevance.

54.     OpSec's proprietary process mitigates a lack of unique identifiers between voter registration rolls and NCOA lists by resolving for identity first, which, among other things, works to eliminate a false match between persons with the same first and last name but a different middle initial. OpSec Tr. 120:12-20.

**RESPONSE:** Paragraph 54 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" mitigates the absence of unique identifiers or eliminates false matches, and any inferences drawn from its resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Further, Plaintiffs dispute that OpSec reliably "resolv[ed] for identity" or "eliminate[d] a false match between persons with the same first and last name but a different middle initial." *See* Mayer Rep. 24-32. Additionally, Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis

for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 54 as vague and ambiguous in its discussion of OpSec's "proprietary process" and its purported ability to eliminate false matches. These "processes" have not been adequately explained (or even disclosed) and thus lack foundation.

55.    OpSec's proprietary process of verifying identity is a means of and is used to correct potential matches of individuals in the voter file sharing a first and last name and address. OpSec Tr. 141:11-20.

**RESPONSE:** Paragraph 55 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" "corrects potential matches of individuals in the voter file sharing a first and last name and address,"

and any inferences drawn from its resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.* Furthermore, Defendants' citation does not support this fact.

Plaintiffs also dispute that OpSec's process reliably corrected potential matches of individuals in the voter file sharing a first and last name and address. *See* Mayer Rep. 25-26 (finding 1,375 records in the challenge file duplicated on the first name, last name, and address triplet). Additionally, Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific

perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 55 as vague and ambiguous in its discussion of OpSec's "proprietary process" and its purported ability to "correct potential matches of individuals in the voter file sharing a first and last name and address." These "processes" have not been adequately explained (or even disclosed) and thus lack foundation.

56.    OpSec's approach of verifying identity and residency is a proprietary process that uses a 4000-row algorithm, involving a complex series of mostly common algorithms, such as dissimilarity and similarity indexes and fuzzy logic. OpSec Tr. 107:13-108:4; 113:22-114:3.

**RESPONSE:** Paragraph 56 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" verifies identity and residency using a complex series of algorithms, and any inferences drawn from its resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Further, Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents

38

and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 56 as vague and ambiguous in its discussion of OpSec's "proprietary process" and its use of a "4000-row algorithm, involving a complex series of mostly common algorithms, such as dissimilarity and similarity indexes and fuzzy logic" to verify identity and residency. These "processes" have not been adequately explained (or even disclosed) and thus lack foundation.

57.    The fuzzy logic used in OpSec's proprietary process is designed to ascertain whether similar information is similar enough to assume that an identity is accurate. If it is not, then it assigns a risk factor to it. OpSec Tr. 108:8-11.

39

**RESPONSE:** Paragraph 57 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" uses "fuzzy logic" to verify identity, and any inferences drawn from its resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Further, Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

40

Plaintiffs also object to Paragraph 57 as vague and ambiguous in its discussion of OpSec's "proprietary process" and its use of "fuzzy logic" to verify identity. These "processes" have not been adequately explained (or even disclosed) and thus lack foundation.

58.    In seeking to remove false positives or false negatives, OpSec's proprietary processing includes a quality control algorithm that evaluates every piece of data flagged as having a risk of being potentially inaccurate. OpSec Tr. 118:3-11.

**RESPONSE:** Paragraph 58 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" removes false positives or false negatives or uses quality control algorithms, and any inferences drawn from its resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Further, Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Repsonse No. 3; and "documents and communications that you

reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 58 as vague and ambiguous in its discussion of OpSec's "proprietary process," and its removal of false negatives or false positives using a "quality control algorithm." These "processes" have not been adequately explained (or even disclosed) and thus lack foundation.

59.    The formulas and algorithms "execute," meaning that they pull in information from outside sources, using that information to process and resolve the risk assigned by the quality control algorithm. OpSec Tr. 119:16-22.

**RESPONSE:** Paragraph 59 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which the unspecified "formulas and algorithms 'execute,'" and any inferences drawn from the resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Additionally, Defendants' characterization of OpSec's "formulas and algorithms" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its formulas and algorithms. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 59 as vague and ambiguous in discussing the operation of unspecified formulas and algorithms. These "processes" have not been adequately explained (or even disclosed) and thus lack foundation.

60.     OpSec's proprietary process further processes flagged questions of whether it's likely to be the same person, organization or street to attempt to resolve the question. OpSec Tr. OpSec Tr. 119:16-22. If the question cannot be resolved, a match based on the information would have been kicked out and not included, *Id.* 116:12-16.

**RESPONSE:** Paragraph 60 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" flags and resolves identity-related questions, and any inferences drawn from the resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Plaintiffs further dispute that OpSec's process "kicked out" unreliable matches. *See* Mayer Rep. 24-32. Additionally, Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the

reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 60 as vague and ambiguous in its use of the phrase "proprietary process" and its discussion of how that process flags and resolves identity-related questions. These "processes" have not been adequately explained (or even disclosed) and thus lack foundation.

61.    OpSec's proprietary process utilizes regression modeling including a model management process to identify the regression technique most likely to produce an accurate result. OpSec Tr. 118:19-119:22.

**RESPONSE:** Paragraph 61 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which "OpSec's proprietary process" utilizes regression modeling, and any inferences drawn from its resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Further, Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 61 as vague and ambiguous in its discussion of OpSec's "proprietary process" and its use of "regression modeling." These "processes" have not been adequately explained (or even disclosed) and thus lack foundation.

62.     Regressions are run throughout the proprietary process. OpSec Tr. 119:5-9.

**RESPONSE:** Paragraph 62 is inadmissible as testimony by a lay witness. Fed. R. Evid. 701(c); 702. The manner in which "OpSec's proprietary process" operates, including the use of "regressions," and any inferences drawn from its resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Defendants' characterization of OpSec's "proprietary process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific

perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 62 as vague and ambiguous in its discussion of OpSec's "proprietary process" and its use of "regressions." These "processes" have not been adequately explained (or even disclosed) and thus lack foundation.

63.    The names of individuals using military addresses were removed by identifying zip codes including military bases, FPO and other military designations, OpSec Tr. 129:16-130:1.

**RESPONSE:** Plaintiffs dispute this fact. *See* Mayer Rep. 30 (identifying 397 registrants in the challenge file who are listed as living on a military installation, and 22,956 registrants who, according to the challenge file, submitted an NCOA with an address on or near one of 189 military installations).

64.    UOCAVA ballots and postcard ballots in general are handled by counties and counties don't make public that information. OpSec Tr. 135:20-136:8.

**RESPONSE:** Plaintiffs dispute this fact. Defendant Davis's testimony establishes that military and UOCAVA voters can be identified and "dropped" from a challenge list. *See* Ex. 9, Davis II Tr. 29:3-10, ECF No. 156-12.

65.    OpSec reviewed the results of matching names in the voter files and the NCOA registry to ensure that it was reasonable with respect to false positives and

false negative to within one standard deviation of the potential error that might be expected. OpSec Tr. 140:8-141:7.

**RESPONSE:** This fact is immaterial—in addition to being vague and ambiguous—without any reference to what degree of error OpSec expected, which OpSec refused to explain in any meaningful detail. *See* OpSec Tr. 140:19-141:7. For the same reasons, Paragraph 65 lacks foundation.

66.    The process reviewed for instances where the name does not match the name in the voter file or the name associated with that registration number and that name would likely have been "kicked out" as an exception, but it's possible that the name could be included in the Challenge List. OpSec Tr. 145:5-18.

**RESPONSE:** Plaintiffs do not dispute that errors were included in the Challenge List.

Paragraph 66 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which OpSec's proprietary "process" operates, including instances in which it "reviewed and "kicked out" specific records, and any inferences drawn from its resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Further, Plaintiffs dispute that Defendants' process "kicked out" instances where an individual's name did not match the name in the voter file or the name associated with the registration number. Mayer Rep. 28-29.

Additionally, Defendants' characterization of OpSec's "process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 66 as vague and ambiguous in its discussion of OpSec's "process" and its review of non-matching records. These "processes" have not been adequately explained (or even disclosed) and thus lack foundation.

67.    The process reviewed for instances where the registered address and the addressed to which the registrant moved are the same and it is possible that those names would appear on the Challenge List, especially if a different name was associated with the two addresses. OpSec Tr. 145:19-146:7.

**RESPONSE:** Paragraph 67 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which OpSec's proprietary "process" operates, including instances in which it "reviewed" registration addresses, and any inferences drawn from its resulting analysis, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Further, Defendants' citation does not support the fact that OpSec's process reviewed for the described instances. Plaintiffs do not dispute that the challenge file reflects instances where a challenged individual's registration address and the address to which the registrant allegedly moved are the same. Plaintiffs do dispute that Defendants reliably attempted to correct for this mistake. *See* Mayer Rep. 28-29.

Additionally, Defendants' characterization of OpSec's "process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

Plaintiffs also object to Paragraph 67 as vague and ambiguous in its discussion of OpSec's "process" and its review of registration addresses. These "processes" have not been adequately explained (or even disclosed) and thus lack foundation.

68.    The process cannot confirm whether an individual re-registered at the address to which the NCOA suggested the individual moved. OpSec Tr. 146:8-14.

**RESPONSE:** Plaintiffs do not dispute that Defendants did not confirm whether a challenged individual re-registered at the address to which the NCOA allegedly suggested the individual moved. Plaintiffs do dispute that Defendants could not review for this error. *See* Mayer Rep. 29 (reviewing for this error). Additionally, Defendants' characterization of OpSec's "process" should not be credited given Defendants' and OpSec's failure to produce information about these processes in response to Plaintiffs' requests for: "documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OpSec RFP Response No. 3; and "documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OpSec RFP Response No. 4. OpSec also failed to produce documents reflecting the design of its proprietary process. *See* Mayer Rep. 3-4, 19-24 (describing why True the Vote's descriptions of its matching methodology are "entirely inadequate from an academic or scientific perspective and provably incorrect"); s*ee also* OpSec Tr. 114:4-7 (refusing to produce the algorithm used to create the Challenge List).

69.     OpSec used a TrueAppend document as a quality check on numbers by looking at the overall number of moved provided in that report as a check to see if there were noticeable accuracy issues with the result of its analysis; the report includes age and other demographic information that was not relevant, and OpSec does not believe that any changes were made to the Challenge List after reviewing the report. OpSec Tr. 150:16-18, 151:13-16, 152:6-9; TrueAppend Doc., Ex. G

**RESPONSE:** Defendants' citations do not support the fact that OpSec "used a TrueAppend document as a quality check on numbers by looking at the overall number of moved provided in the report." Plaintiffs do not dispute that the report includes demographic information that was not relevant to an individual's eligibility to vote.

70.     Hard copies of the Challenge List were not sent to counties in addition to electronic copies because it would have been unnecessary and the counties did not want them to be sent. OpSec Tr. 160:9-161:10.

**RESPONSE:** This fact is not material to any claim or defense in this case.

71.     If OpSec considered demographic and other characteristics of individuals on the Challenge List at all, it was only after and in response to Plaintiffs' suit, OpSec Tr. 163:13-164:8; 149:14-17, in which it is claimed, directly or

indirectly, that the Challenges were aimed particularly at certain demographics, Amended Complaint ¶¶ 4, 16, 30.

**RESPONSE:** Plaintiffs dispute this fact. The selection of counties in which TTV submitted challenges was skewed towards counties with higher percentages of Black registrants. The 65 selected counties include: (1) the three counties with the highest percentage of Black registrants across the state; (2) ten of the 20 counties with the highest percentage of Black registrants; and (3) only four of the 20 counties with the smallest percentage of Black registrants. Mayer Report 34-35. The TrueAppend document prepared by OpSec analyzed racial demographic and other characteristics of individuals included on the  challenge list, and this report was prepared *before* Plaintiffs filed this lawsuit. Ex. 58, Dec. 16, 2020 TrueAppend Report.

72.    OpSec uses DataWalk to do a type of regression analysis and data linkage but DataWalk was not used to generate the Challenge List. OpSec Tr. 164:18-165:5.

**RESPONSE:** This fact is not material to any claim or defense in this case.

73.    OpSec might also use DataWalk to look at linkages between files denoting deceased persons in order to exclude them, but does not typically crosscheck with such files. OpSec Tr. 166:1-18.

**RESPONSE:** This fact is not material to any claim or defense in this case.

74.     Neither OpSec nor Gregg Phillips know who tweets under the account Crusade for Freedom. OpSec Tr. 167:22-168:10.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 74 for purposes of the summary judgment motion.

75.     OpSec's analysis found that there were ineligible voters on the Georgia voter roll. OpSec Tr. 71:13.

**RESPONSE:** Plaintiffs dispute that OpSec reliably identified ineligible voters on the Georgia voter roll. *See* Mayer Rep. 24-34.

## Derek Somerville Statement of Facts

76.     Mr. Somerville did not help or volunteer to help with TTV's Challenges in any way, including methodology of analysis, compiling a list of Challenges, or timing of any Challenges. Transcript Excerpts of First Deposition of Derek Somerville (Oct. 6, 2021) ("First Somerville Tr."), Ex. I, 29:5-31:17; Defendant Derek Somerville's Responses and Objections to Plaintiffs' Interrogatories Pursuant to Court Order (Dec. 17, 2021) ("Somerville Interrog. Resp. Ct. Order"), Ex. J, Resp. No. 1,

**RESPONSE:** Plaintiffs dispute that Mr. Somerville "did not help or volunteer to help with TTV's challenges in any way." *See, e.g.*, Pls.' SUMF ¶ 64. Mr.

Somerville, for example, met with Defendant Engelbrecht and Mr. Phillips just days before True the Vote filed its challenges, where Mr. Somerville learned of True the Vote's plan to challenge hundreds of thousands of voters and Mr. Somerville described to True the Vote how Georgia's challenge process worked. Ex. 45, Additional Transcript Excerpts of First Deposition of Derek Somerville (Oct. 6, 2021) ("Somerville Tr. I")19:4-23:21. Mr. Somerville later attended a meeting with Mr. Davis and Mr. Phillips to discuss the challenges, Somerville Tr. I 29:10-34:17; spoke at True the Vote's challenger meeting to "encourage" True the Vote's elector challenge volunteers, Somerville Tr. I 115:2-117:9; Ex. 54, Dec. 19, 2020 C. Engelbrecht Email; and edited True the Vote's public communications about the challenges before they were released, voluntarily including himself and Mr. Davis on True the Vote's press release announcing the challenges, Somerville Tr. I at 37:7-40:7; Ex. 52, Dec. 17, 2020 D. Somerville Text. When True the Vote's challenges were released, Mr. Somerville publicly praised the effort, admitted that he "collaborated on methodology," and touted that he was "honor[ed] to be a part of the fight." Ex. 53, Dec. 18, 2020 Somerville Facebook Post at 1.

77.    Mr. Somerville and Mr. Davis worked together, independently from TTV, to run a separate data analysis for the Runoff election, which eventually was used by volunteers working with Mr. Somerville and Mr. Davis to submit voter

challenges in various Georgia counties. ("Davis/Somerville Challenge List") Somerville Tr. I at 32:20-33:4; 45:3-11; Somerville Interrog. Resp. Ct. Order Resp. No. 1.

**RESPONSE:** Plaintiffs do not dispute that Mr. Somerville and Mr. Davis generated a separate challenge list and that the Court may consider Paragraph 77 for purposes of the summary judgment motion.

78.    Mr. Davis took the lead in researching and identifying voters to include on the Davis/Somerville Challenge List. Based upon his review of this research and his discussions with Mr. Davis, Mr. Somerville understood the research and identification process to be as follows:

a. Split the input voter data into 3 parts for processing so the databases would not exceed the dbase file size limitation of 2.14 gigabytes.

b. Imported the data into 3 dbase structures with processing fields appended (added) to the structure.

c. Copied the residence addresses into the "COA" (Change of address) fields created for CASS (Coding Accuracy Support System) and NCOA (National Change of Address) processing.

d. Ran CASS & NCOA processing & saved the processing certifications.

e. Created an empty table called "Moved" and imported the records that received an updated address during NCOA processing.

f. Set a relation on the voter registration number into the vote history trailer data and flagged the voters in the "Moved" table who voted in the general election.

g. Geocoded (assigned latitude & longitude) & digitally mapped the "Moved" table to assign the county of the new address.

h. Copied out a file of voters who cast ballots in the General Election with changes of address to a new state or to a new county in Georgia more than 30 days before the general and/or the runoff elections. This yielded a file of voters with a change of address to another state, as well as in state voters who, based on the month of their "Move Effective Dates", appeared to have had residency issues when they voted in the General Election, along with voters who voted in the General who appeared to have similar residency issues heading into the Runoff Election.

i. Removed changes of address to PO Boxes.

j. Eliminated UOCAVA (Military) voters by matching against the absentee voter data.

k. Mr. Davis sent Mr. Somerville a copy of the file so that I could remove as many voters at military bases as possible.

l. Mr. Somerville sent the semi-final challenge list to Mr. Davis

m. Output a "Final" challenge list removing voters with changes of address prior to June of 2019 as we believed they would have already been through the Secretary of State's NCOA processing, subsequent verification inquiries, and associated list maintenance activities.

n. Created a report format for printed lists of challenged voters.

o. Output a PDF list for each county.

p. Output an Excel file for each county.

q. Did an SQL query to get a count by county. The final count was 39,141 voters and the average number of challenged voters per county was 246.

r. Mr. Davis uploaded the Davis/Somerville Challenge List to Google drive for Mr. Somerville to distribute to challengers. Somerville Interrog. Resp. Ct. Order Resp. No. 2.

**RESPONSE:** Paragraph 78 contains testimony that is inadmissible under Fed. R. Evid. 701(c) and 702. Any inferences about the accuracy of the challenge lists drawn from Davis's process, including sub-parts b-h and j-r, requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.* Additionally, this Paragraph's representations of what Mr. Somerville was told in "discussions with Mr. Davis" is inadmissible hearsay.

79.    Mr. Somerville received no assistance from TTV in helping to prepare the Davis/Somerville Challenge List. Somerville Interrog. Resp. Ct. Order Resp. No. 4.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 79 for purposes of the summary judgment motion.

80.    Mr. Somerville had no knowledge of how the TTV Challenge List was developed, who participated in it, the methodology TTV used, or any other degree of knowledge pertaining to the TTV Challenge List. Somerville Tr. I 40:11-18; 42:15-43:9; Somerville Interrog. Resp. Ct. Order Resp. No. 1.

**RESPONSE:** Plaintiffs dispute Mr. Somerville "had no knowledge of how the TTV Challenge List was developed, who participated in it, the methodology TTV used, or any other degree of knowledge pertaining to the TTV Challenge List." *See, e.g.,* Pls.' SUMF ¶ 64 and Pls.' Response to Defendants' Paragraph 76, contained herein.

81.    The Davis/Somerville Challenge List was completely unrelated to the TTV Challenge List. First Somerville Tr. 59:1-7.

**RESPONSE:** Plaintiffs do not dispute that the Davis/Somerville challenge list was developed separately from True the Vote challenge list and that the Court may consider this assertion for purposes of the summary judgment motion. Plaintiffs

dispute that the Davis/Somerville challenge list was "completely unrelated" to the TTV challenge list, as seen by the shared conversations between them, same use of NCOA data, and even shared use of volunteers to submit both challenge lists. *See* Pls.' SUMF ¶¶ 27, 39-40, 64; Ex. 46, Additional Transcript Excerpts Derek Somerville Reopened Deposition (Jan. 20, 2022) ("Somerville Tr. II") at 100:15-101:7.

82.   Mr. Somerville's hope was that the Davis/Somerville Challenge List would be used by counties to determine whether "there was a flaw in the process that was exacerbated by circumstances surrounding the election[.] And did that, in turn, result in a number of votes that may have been ineligible? - regardless of who cast them, regardless of where they were cast, or regardless by whom." In other words, whether the Georgia voter rolls had a "data integrity issue." Somerville Tr. I 46:15-47:15.

**RESPONSE:** Paragraph 82 does not comply with LR 56.1(B)(1) because what Mr. Somerville intended to do is an argument rather than a statement of fact.

83.   Mr. Somerville's intent in working with Mr. Davis on the Davis/Somerville Challenge List was to encourage people to hold their government accountable by participating in a meaningful way—his intent was never to scare people away from participating in an election. Transcript Excerpts of Second

Deposition of Derek Somerville (Feb. 2, 2022) ("Second Somerville Tr."), Ex. K

187:5-13.

**RESPONSE:** The assertion of Mr. Somerville's "intent" does not comply

with LR 56.1(B)(1) because it is an argument rather than a statement of fact.

Additionally, Plaintiffs dispute that Mr. Somerville's only intention was to

"encourage people to hold their government accountable." Rather, at least one of his

goals was to "force the verification" of NCOA voters that the state had failed to do,

in his view. See Ex. 55, D. Somerville Facebook Post ("Since [the NCOA] process

hasn't been run by the state since early 2019, and given the unprecedented reliance

this cycle on mail-in ballots, our challenges sought to force that verification.").

84.    At times, Mr. Somerville made public statements in general about

issues surrounding voter integrity in Georgia—but none of those statements called

for physical violence or threatened harm to any Plaintiff. *See* Second Somerville Tr.

75:1-84:10.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this

evidence for purposes of the summary judgment motion.

85.    Mr. Somerville testified that it "wasn't evident" to him that voters on

the Davis/Somerville Challenge List "would ever be aware they were on the list."

But if these voters were asked to verify their residency by a county board, they

simply had to show, through a benign process, they had not permanently moved from that county and were still eligible to vote there. First Somerville Tr. 56:18-57:11.

**RESPONSE:** Plaintiffs do not dispute that Mr. Somerville testified that it was not evident to him that voters would be aware that they were challenged and that he testified that he believed the challenge process to be benign. Plaintiffs dispute that the challenge process was benign or unharmful to voters, as demonstrated, for example, by the fact that Plaintiff Heredia had to spend 3-4 hours at her polling location in her attempt to resolve the challenge, provide identification, and cast a provisional ballot, Ex. 48, Second Excerpt of Jocelyn Heredia Deposition Transcript ("Heredia Tr.") 45:15-47:25, and that many voters felt intimidated by the challenges, *see* Pls.' SUMF ¶¶ 155-174, ECF No. 156-2 (recounting experiences of Plaintiff Heredia, Plaintiff Jane Doe, and other challenged Georgia voters). Finally, whether the process required to regain one's right to vote was simple or "benign" does not comply with LR 56.1(B)(1) because it is an argument rather than a statement of fact.

86.    Mr. Somerville hoped that "if there was probable cause to believe that a vote may have been cast in an ineligible fashion – which may very well happen unbeknownst to the person who cast that vote – that that would be looked into by the local boards and remedied accordingly." "'Remedied' does not necessarily mean they don't vote, or that the voter is "purged" from the voter rolls. It simply means

ensuring they vote in the proper county." First Somerville Tr. 48:15-21; 78:6-9; Second Somerville Tr. 189:4-191:1.

**RESPONSE:** Plaintiffs do not dispute that Mr. Somerville testified that this is what he believed would happen to challenged voters. Plaintiffs dispute these facts to the extent they are purporting to state a legal conclusion of the effect of a challenge. Plaintiffs further object that what Mr. Somerville "hoped" does not comply with LR 56.1(B)(1) because it is an argument rather than a statement of fact.

87.    Mr. Somerville did not believe that the Davis/Somerville Challenge List would have any short term impact; the effort was "really to highlight a very real issue with the integrity of the voter file, not necessarily to effect an outcome in any short order." First Somerville Tr. 54:16-55:9.

**RESPONSE:** Plaintiffs dispute the fact that Mr. Somerville did not believe that the Davis/Somerville challenge list would have any short-term impact. *See* Ex. 53, Dec. 18, 2020 Somerville Facebook Post at 2 ("[we believed] roughly 40,000 [registered voters] across all 159 counties [] need[ed] to be verified by county Election Boards BEFORE the January 5, 2020 Senate run-off") (emphasis in original). Furthermore, Mr. Davis and Mr. Somerville arranged to bring challenges under a statute that requires boards of election to consider the accusations

challengers have made. O.C.G.A. § 21-2-230 ("Upon the filing of such challenge, the board of registrars shall immediately consider such challenge").

88.    The Davis/Somerville Challenge List was developed and used to highlight the fact that "the larger the amount of mail-in ballots, the more exaggerated the affect of a bad voter file." First Somerville Tr. 153:1-12.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

89.    In recognition that military service in another county or state did not make a voter ineligible to cast a ballot in their home county, Mr. Somerville and Mr. Davis "went out of [their] way to make sure that . . . [they] removed individuals that appeared to be either serving in the military, or even remotely located near a military base in case the dependent – or dependents were caught up in that." First Somerville Tr. 76:8-14; Second Somerville Tr. 20:18-21:4;26:10-21.

**RESPONSE:** Plaintiffs dispute that Mr. Somerville and Davis were able to remove all military voters from their challenge list because they did not personally know the individuals that they were challenging. As Mr. Somerville explained, "there's no way to know if [] there's a military person that is assigned to a location that's not associated with a military base . . . It's imperfect. It's data." Somerville Tr. II at 26:2-21.

90.    In recognition that students away from their home address were also likely eligible voters in their home counties, Mr. Somerville and Mr. Davis also made efforts to exclude them from the Davis/Somerville Challenge List, including identifying and removing students connected to addresses being on or near campuses. Somerville II Tr. 22:16-24:8.

**RESPONSE:** Plaintiffs do not dispute that Mr. Somerville and Mr. Davis acknowledged that student voters are one of the categories of voters who "may be registered in a county that they do not reside in" but still be a legitimate voter. Somerville Tr. II at 20:8-21:9. Plaintiffs dispute that Mr. Somerville and Mr. Davis were able to remove all of these voters; as Mr. Somerville acknowledged, "obviously there's no record in the voter file that indicates somebody's a student." Somerville Tr. II at 22:16-18. They removed student voters "to the extent that we were able to identify that they were likely student voters." Somerville Tr. II at 22:6-15.

91.    The Davis/Somerville Challenge List consisted of "roughly 40,000 [registered voters] across all 159 counties [they] believed need[ed] to be verified by county election boards before the January 5, 2020, runoff." First Somerville Tr. 86:14-18.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 91 for purposes of the summary judgment motion.

92.    Mr. Somerville had "tremendous confidence" that the voters on the Davis/Somerville Challenge List "filed a change of address for one reason or another, and that there was and continues to be cause for each county election board to confirm that those individuals are still eligible voters within their county." First Somerville Tr. 87:21-88:4.

**RESPONSE:** The assertion of Mr. Somerville's "tremendous confidence" does not comply with LR 56.1(B)(1) because it is an argument rather than a statement of fact. The statement that "there was and continues to be cause for each county election board to confirm that those individuals are still eligible voters within their county" does not comply with LR 56.1(B)(1) because it is an argument and legal conclusion rather than a statement of fact.

93.    Mr. Somerville, primarily through social media, asked if voters would be willing to submit voter challenges in their county, using the appropriate Davis/Somerville Challenge List. If a voter expressed interest, Mr. Somerville made that county's list available to that Challenger, via email or Dropbox. The Challenger then was responsible for submitting the Challenge based upon the Davis/Somerville Challenge List to the appropriate county. Somerville I Tr. 89:22-15; 97:22-99:19; Somerville Interrog. Resp. Ct. Order Resp. No. 1.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 93 for purposes of the summary judgment motion.

94.     The Davis/Somerville Challenge List was never released to the public. Second Somerville Tr. 71:16-72:19; 72:21-73:14.

**RESPONSE:** Plaintiffs dispute that the Davis/Somerville Challenge list was never released to the public. In Banks County, for example, the Davis/Somerville challenge list was posted online for six months. Pls.' SUMF ¶ 158. And, as noted in Paragraph 93, Davis and Somerville provided the challenge lists to voters that expressed interest.

95.     Mr. Somerville had no contact with any Challenged Voter regarding the Challenges. Defendant Derek Somerville's Amended Responses and Objections to Plaintiffs' Second Interrogatories (Oct. 28, 2021) ("Somerville Am. Resp. 2d Interrog."), Ex. L, Resp. No. 7.

**RESPONSE:** Paragraph 95, insofar as it refers to Mr. Somerville having direct contact with a voter, is immaterial to the claims and defenses of this case.

96.     To Mr. Somerville's knowledge, no county board of election accepted any Challenge submitted on the basis of the Davis/Somerville Challenge List. First Somerville Tr. 93:11-15.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 96 for purposes of the summary judgment motion.

97.     Mr. Somerville's understanding of TTV's press release in December of 2020, was that TTV was trying to generally acknowledge the "work of Georgians" who were attempting to contribute to the effort of voter integrity, which is why his and Mr. Davis' names were included. Second Somerville Tr. 132:8-14.

**RESPONSE:** Plaintiffs do not dispute that Mr. Somerville testified that he believed Mark Davis's name should be included in the press release if True the Vote was acknowledging the "work of Georgians." Defendants' citation provides no evidence for the assertion that his belief was correct.

98.     Mr. Somerville had fairly minimal contact with TTV, and none of his contact resulted in substantive cooperation or coordination between the Davis/Somerville Challenge List and the TTV Challenge List efforts. First Somerville Tr. 103:6-13; 157:7-15; Somerville Interrog. Resp. Ct. Order Resp. Nos. 1,4.

**RESPONSE:** Plaintiffs dispute Mr. Somerville "had fairly minimal contact with TTV and none of his contract resulted in substantive cooperation or coordination [with TTV]." *See, e.g.,* Pls.' SUMF ¶ 64 and Pls.' Response to Defendants' Paragraph 76, contained herein.

Furthermore, an assertion regarding the "substantive cooperation or coordination between" defendants does not comply with LR 56.1(B)(1) because it is an argument and a legal conclusion rather than a statement of fact.

99.   Mr. Somerville understood that the Davis/Somerville Challenge List would not prevent any eligible voter from voting, it would simply start a process undertaken by proper county authorities, which was designed to protect voters by identifying "those votes that are not eligible and would otherwise disenfranchise the very voters that [they were] trying to protect." First Somerville Tr. 124:1-12; 127:9-15.

**RESPONSE**: An assertion regarding what Mr. Somerville "understood" would happen does not comply with LR 56.1(B)(1) because it is an argument rather than a statement of fact.

100.   Mr. Somerville did not discuss with TTV, nor did he have any knowledge of, TTV's 24/7 hotline or the "whistleblower fund" described in TTV's November 6, 2020, press release. First Somerville Tr. 150:15-152:4.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 100 for purposes of the summary judgment motion.

101.   After the Davis/Somerville Challenge List was compiled, Mr. Somerville ran several analyses on the data, including a breakdown of the file based

on voter behavior. Mr. Somerville's intent on this post facto review was to ensure that the data did not contain any particular bias regarding any other factor other than the data reflecting an address change the voter had submitted to the USPS. Second Somerville Tr. 30:6-32:14.

**RESPONSE:** Plaintiffs do not dispute that Mr. Somerville "ran several analyses on the data." Mr. Somerville, for example, ran an analysis to determine how many of the challenged voters on his list were Democrats, *see* Ex. 56, Dec. 15, 2020 D. Somerville Email. The assertion of Mr. Somerville's "intent" does not comply with LR 56.1(B)(1) because it is an argument rather than a statement of fact.

102.   Mr. Somerville never considered race, sex, voting preference, or any other demographic characteristic of the voters when working to compile the Davis/Somerville Challenge List. Second Somerville Tr. 30:6-32:14; 188:4-22.

**RESPONSE:** The cited testimony does not support the statement in Paragraph 102 because it makes reference only to whether preparation of Mr. Somerville's challenge list included consideration of *partisanship*; it does not address whether there was consideration of race, sex, or other demographic characteristics.

**Mark Davis Statement of Facts**

103.   Mark Davis is the president of Data Productions, which does marketing for commercial, nonprofit, and political organizations. Transcript Excerpts of First Deposition of Mark Davis (Oct. 4, 2021) ("First Davis Tr."), Ex. M 17:6-9.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 103 for purposes of the summary judgment motion.

104.   Mr. Davis has been admitted to testify as an expert witness in data analytics five times over the last 20 years in disputed elections, including in matters involving residency issues and redistricting errors. First Davis Tr. 19:6-13.

**RESPONSE:** Mr. Davis has not been offered as an expert in this case and so this assertion is immaterial to the claims and defenses of this case.

105.   As part of his work with Data Productions, Mr. Davis processed between 50-60 million records in 2021, using a variety of data tools, including the USPS NCOA (National Change of Address) and CASS certification (Coding Accuracy Support System). Davis I Tr. 21:14-21.

**RESPONSE:** Plaintiffs do not dispute that Mr. Davis testified that as part of his business, he processed 50-60 million records in 2021. However, Defendants' citation does not support the fact that Mr. Davis used "a variety of data tools,

including the USPS NCOA (National Change of Address) and CASS certification (Coding Accuracy Support System)."

106.   Mr. Davis has matched the NCOA data with voter registration files for over 20 years, including during the 2020 election cycle. First Davis Tr. 27:4- 28:21.

**RESPONSE:** To the extent that Paragraph 106 describes the activity of comparing data sets but not the accuracy of those efforts, Plaintiffs do not dispute that the Court may consider Paragraph 106 for purposes of the summary judgment motion.

107.   Mr. Davis noticed "residency issues with the Georgia Voter Database for many, many years." First Davis Tr. 32:11-33:17.

**RESPONSE:** Plaintiffs do not dispute that Mr. Davis testified that he noticed that there were residency issues in the Georgia Voter Database for many years. Plaintiffs dispute that this citation is sufficient to demonstrate that there have in fact been residency issues with the Georgia Voter Database for many years.

108.   Because of Mr. Davis' observations of residency issues with the Georgia Voter Database, he ran NCOA processing in November of 2020 to "ascertain the extent of the issues statewide." First Davis Tr. 33:18-20.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider the assertion that Mr. Davis "ran NCOA processing in November of 2020" for purposes

of the summary judgment motion. An assertion of Mr. Davis's motivations or goals does not comply with LR 56.1(B)(1) because it is an argument rather than a statement of fact.

109.   Mr. Davis did not act in concert with, or cooperate with TTV, TTV's data analysis, or its voter challenge efforts for the January 2021 Runoff. First Davis Tr. 38:22-39:14; 41:10-42:16; 46:12-47:10; Transcript Excerpts of Deposition of Mark Davis (Jan. 19, 2022) ("Second Davis Tr."), Ex. N 95:4-9; Defendant Mark Davis' Responses and Objections to Plaintiffs' Interrogatories Pursuant to Court Order (Dec. 14, 2021) ("Davis Interrog. Resp. Ct. Order"), Ex. O, Resp. No. 1.

**RESPONSE:** Plaintiffs dispute that Mr. Davis "did not act in concert with . . . TTV." *See, e.g.*, Pls.' SUMF ¶ 64. First, it is clear that Mr. Davis and Mr. Somerville worked closely with each other regarding challenge efforts in the January 2021 Runoff. *See, e.g.*, Defs.' Ex. O, Davis Interrog. Resp. Ct. Order, Resp. Nos. 1, 3. Mr. Davis had a phone call with Mr. Phillips where Mr. Davis provided Mr. Phillips with a primer on voter data in Georgia and gave Mr. Phillips information to "get started" with analysis into challenges. Pls.' SUMF ¶ 40. It is also clear that Defendant Somerville, with whom Defendant Davis worked closely, was involved extensively with True the Vote's challenges, *see* Pls.' Response to Defendants' Paragraph 76, contained herein.

110.   Mr. Davis supports efforts "to clean up voter rolls and ensure people don't vote with residency issues because they're casting ballots for people who don't represent them" and diluting the votes of eligible voters. First Davis Tr. 58:22-59:9; Second Davis Tr. 175:4-14.

**RESPONSE:** Plaintiffs do not dispute that Mr. Davis testified that he supports efforts to clean up the voter rolls. An assertion about his motivation for doing so does not comply with LR 56.1(B)(1) because it is an argument rather than a statement of fact.

111.   When the residency of a voter is called into question via a voter challenge, the Board of Elections would be responsible for investigating any challenges it accepts. First Davis Tr. 120:7-22.

**RESPONSE:** Plaintiffs object to Paragraph 111 because it offers a legal conclusion about the Board of Elections' responsibilities.

112.   Mr. Davis ran data analysis on the Georgia voter rolls after the November 2020 election. ("Davis November Analysis") First Davis Tr. 28:7-14; Second Davis Tr. 28:3-18.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 112 for purposes of the summary judgment motion.

113.   Mr. Davis ran a separate data analysis for the Runoff Election; voters then volunteered to submit voter challenges in counties using this list. ("Davis/Somerville Challenge List") Second Davis Tr. 28:19-32:17.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 113 for purposes of the summary judgment motion.

114.   Mr. Davis took the lead in researching and identifying voters to include on the Davis/Somerville Challenge List. Mr. Davis' research included the following steps: a. Split the input voter data into 3 parts for processing so the databases would not exceed the dbase file size limitation of 2.14 gigabytes. b. Imported the data into 3 dbase structures with processing fields appended (added) to the structure. c. Copied the residence addresses into the "COA" (Change of address) fields created for CASS (Coding Accuracy Support System) and NCOA (National Change of Address) processing. d. Ran CASS & NCOA processing & saved the processing certifications. e. Created an empty table called "Moved" and imported the records that received an updated address during NCOA processing. f. Set a relation on the voter registration number into the vote history trailer data and flagged the voters in the "Moved" table who voted in the general election. g. Geocoded (assigned latitude & longitude) & digitally mapped the "Moved" table to assign the county of the new address. h. Copied out a file of voters who cast ballots in the General Election with changes of

address to a new state or to a new county in Georgia more than 30 days before the general and/or the runoff elections. This yielded a file of voters with a change of address to another state, as well as in state voters who, based on the month of their "Move Effective Dates", appeared to have had residency issues when they voted in the General Election, along with voters who voted in the General who appeared to have similar residency issues heading into the Runoff Election. i. Removed changes of address to PO Boxes. j. Eliminated UOCAVA (Military) voters by matching against the absentee voter data. k. Mr. Davis sent Mr. Somerville a copy of the file so that he could remove as many voters at military bases as possible. l. Mr. Somerville then sent the semi-final challenge list to Mr. Davis. m. Output a "Final" challenge list removing voters with changes of address prior to June of 2019 as we believed they would have already been through the Secretary of State's NCOA processing, subsequent verification inquiries, and associated list maintenance activities. n. Created a report format for printed lists of challenged voters. o. Output a PDF list for each county. p. Output an Excel file for each county. q. Did an SQL query to get a count by county. The final count was 39,141 voters and the average number of challenged voters per county was 246. r. Mr. Davis uploaded the Davis/Somerville Challenge List to Google drive for Mr. Somerville to distribute to challengers. Davis Interrog. Resp. Ct. Order Resp. No. 2.

**RESPONSE:** Paragraph 114 is inadmissible under Fed. R. Evid. 701(c) and 702. The manner in which Mr. Davis conducted his analysis, and any inferences about the accuracy of the challenge lists drawn from Davis's process, requires technical and specialized knowledge that can be offered only by a qualified expert witness. *Id.*

115.   After the Run-off Election, Mr. Davis continued to analyze data related to Georgia voters. This data indicates that some voters who appeared to have residency issues (i.e., moved to another county more than 30 days before the election) voted in the General Election. Mr. Davis provided this data analysis to the Georgia Secretary of State in May of 2021 ("SOS Analysis"). Davis Interrog. Resp. Ct. Order Resp. No. 3.

**RESPONSE:** Plaintiffs do not dispute that Mr. Davis continued to analyze data related to Georgia voters after the runoff election, or that he provided data analysis to the Georgia Secretary of State in May of 2021, but the citation does not support the fact that the data actually identified voters with residency issues. Additionally, Paragraph 115 is inadmissible under Fed. R. Evid. 701(c) and 702. What data related to Georgia voters "indicates" requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.* Finally, any assertion that some voters "appeared to have residency issues" does not comply with

LR 56.1(B)(1) because it is an argument and a legal conclusion rather than a statement of fact.

116.   The SOS Analysis showed that out of the 39,141 voters on the Davis/Somerville Challenge List, 26,854 had changes of address within the state of Georgia, and since the runoff, 9,950 voters (37.05%) have updated their voter registration addresses to the same addresses shown in the NCOA data provided to the USPS when they moved originally. These voters have provided post-election, self-confirmation to the Secretary of State or their county's board of elections that the information on the Davis/Somerville Challenge List was accurate at the time Mr. Davis compiled it. Davis Interrog. Resp. Ct. Order Resp. No. 3; *see also* First Davis Tr. 132:8-22; Second Davis Tr. 60:16-61:3; 164:19-165:9; 166:21-168:14.

**RESPONSE:** Paragraph 116 is inadmissible under Fed. R. Evid. 701(c) and 702. What data related to Georgia voters "showed" requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Plaintiffs further object that Paragraph 116 is inadmissible hearsay. Fed. R. Evid. 801(c), 802. *Macuba v. Deboer*, 193 F.3d 1316, 1322-25 (11th Cir. 1999).

Additionally, Plaintiffs dispute Mr. Davis's assertion that his analysis demonstrates that "37.05% . . . [of] voters have provided post-election, self-confirmation" that the Davis/Somerville Challenge List was accurate at the time Mr.

Davis compiled it. After Mr. Davis provided his lists to the Secretary of State's office, Ryan Germany, the Secretary of State's General Counsel, provided a factual and legal analysis that is inconsistent with Mr. Davis's representations. Mr. Germany did not find that 37% were improperly registered—he found that 0% were improperly registered: "86% of the voters Mark Davis identified . . . showed up in person at the location where they were registered, showed their photo ID, executed a voter certificate saying they resided where they are registered, and then they were allowed to vote. The other 14% voted absentee by mail, submitting an absentee ballot application saying that they still resided where they were registered." Ex. 61, July 13, 2021 R. Germany Email at 1. Mr. Germany's analysis accounted for the entirety of names on Mr. Davis's list.[2]

117.   In addition, the SOS Analysis shows 18,202 voters of the 26,854 voters (67.8%) who submitted a change of address within the State of Georgia voted in the Run-off election. Of those 67.8% of voters, the data indicates 3,556 voters (19.5%) cast ballots for the Run-off Election in their old county, but have since updated their

---

[2] These statements are admissible under the government records exception to the hearsay rule because they represent "factual findings that are based upon the knowledge or observations of the preparer of the report" and are based on "a legally authorized investigation." *Crawford v. ITW Food Equip. Grp., LLC*, 977 F.3d 1331, 1348 (11th Cir. 2020).

registration addresses to the same address they gave the USPS when they moved, which is in a different county than the one in which they voted. Since the Run-off Election, the Georgia Secretary of State has removed 1,486 of the voters on the Independent Run-off List. Of those, 403 (27%) voted in the Runoff Election. Davis Interrog. Resp. Ct. Order Resp. No. 3.

**RESPONSE:** Paragraph 117 is inadmissible under Fed. R. Evid. 701(c) and 702. What data related to Georgia voters "shows" and "indicates" requires technical or specialized knowledge that can be offered only by a qualified expert witness. *Id.*

Plaintiffs object that Paragraph 117 is inadmissible hearsay. Fed. R. Evid. 801(c), 802. *Macuba v. Deboer*, 193 F.3d 1316, 1322-25 (11th Cir. 1999).

Additionally, Plaintiffs dispute the accuracy of Mr. Davis's representation that the "SOS analysis" demonstrates that 19.5% of voters who submitted a change of address within the State of Georgia and cast ballots for the runoff election did so in their old county, but then updated their registration addresses to the same address they gave the USPS when they moved, which is in a different county than the one in which they voted. Mr. Germany did not find any voters on Mr. Davis's challenge list to be improperly registered. Ex. 61, July 13, 2021 R. Germany Email ("86% of the voters Mark Davis identified . . . showed up in person at the location where they were registered, showed their photo ID, executed a voter certificate saying they

resided where they are registered, and then they were allowed to vote. The other 14%

voted absentee by mail, submitting an absentee ballot application saying that they

still resided where they were registered."). Mr. Germany's analysis accounted for

the entirety of names on Mr. Davis's list.

118.   Of the voters described in the SOS Analysis, "94% of them would have

been offered a ballot with a state house race on it that they don't live in, about 86.5%

would have been offered a chance to vote in a state senate district that they no longer

lived in, and approximately 64% would have been offered the chance to cast a ballot

in a congressional district they no longer lived in." Second Davis Tr. 169:10-17.

**RESPONSE:** Paragraph 118 is inadmissible under Fed. R. Evid. 701(c) and

702. Analysis of data related to Georgia voters requires technical or specialized

knowledge that can be offered only by a qualified expert witness. *Id.*

Additionally, Plaintiffs dispute the representation about the percentages of

voters who live in a different district than the one they voted in. Mr. Germany's

analysis of Mr. Davis's data found 0% of voters on Mr. Davis's challenge list were

improperly registered. Ex. 61, July 13, 2021 R. Germany Email at 1.

119.   Neither the Davis November Analysis nor the Davis/Somerville

Challenge List took into account race, sex, or party affiliation. First Davis Tr. 166:5-

168:22; Second Davis Tr. 40:19-41:5; 185:15-188:4.

**RESPONSE:** Plaintiffs dispute Paragraph 119. Mr. Somerville, for example, ran an analysis to determine how many of the challenged voters on his list were Democrats, *see* Ex. 56, Dec. 15, 2020 D. Somerville Email.

120.   Mr. Davis had no contact with any individual voters with potential residency issues according to his data analysis, nor did he encourage anyone else to contact individual voters with potential residency issues. First Davis Tr. 171:4- 21. Mr. Davis and Mr. Somerville removed members of the military, to the best of their ability, from their list of voters with potential residency issues. Second Davis Tr. 29:1-17; 36: 14-37:6.

**RESPONSE:** Plaintiffs dispute that Mr. Somerville and Mr. Davis were able to reliably remove members of the military. As Mr. Somerville explained, "there's no way to know if [] there's a military person that is assigned to a location that's not associated with a military base . . . It's imperfect. It's data." Somerville Tr. II at 26:2- 21. Plaintiffs further object that the assertion that Mr. Davis and Mr. Somerville acted "to the best of their ability" does not comply with LR 56.1(B)(1) because it is an argument rather than a statement of fact. The assertion regarding Mr. Davis's lack of contact with voters is not material to any claim or defense in this case.

121.   Mr. Davis and Mr. Somerville did not publish the Davis/Somerville Challenge List to the general public. Second Davis Tr. 46:3-14; 80:7-10.

**RESPONSE:** Plaintiffs dispute that Mr. Davis and Mr. Somerville did not publish their Challenge List. Davis and Somerville provided the challenge lists to voters that expressed interest. Somerville I Tr. at 89:22-91:22; 97:22-99:19. Plaintiffs also dispute that the Davis/Somerville Challenge list was never released to the public. In Banks County, for example, the Davis/Somerville challenge list was posted online for six months. Heredia Tr. at 31:22-32:3.

122.   Mr. Davis' "primary motivation" in compiling the list of voters with potential residency issues was "to prevent illegal votes from being cast." Second Davis Tr. 59:7-8; 86:22-87:3; 90:14-21.

**RESPONSE:** Paragraph 122's assertion regarding Mr. Davis's "primary motivation" does not comply with LR 56.1(B)(1) because it is an argument rather than a statement of fact.

123.   Mr. Davis believes it is the job of election officials and law enforcement to determine who may or may not have committed a crime as it relates to casting unlawful votes. Second Davis Tr. 59:8-11.

**RESPONSE:** Mr. Davis's belief about who is responsible for determining who committed a crime does not comply with LR 56.1(B)(1) because it is an argument and legal conclusion rather than a statement of fact. Further, it is immaterial to the claims and defenses of this case.

124.   The Davis/Somerville Challenge List contained quite a number of voters who were registered to vote at commercial mail receiving agencies (such as UPS stores), rather than at their residence; he hoped election officials would notice this issue and work towards resolving it. Second Davis Tr. 67:5-68:8; 70:22-71:16.

**RESPONSE:** Defendants' assertion that the challenge lists contain "quite a number of voters" who were registered to vote at commercial mail receiving agencies lacks foundation. The assertion that such registrations are an "issue" does not comply with LR 56.1(B)(1) because it is a legal conclusion rather than a statement of fact. Finally, an assertion regarding what Mr. Davis "hoped" would occur does not comply with LR 56.1(B)(1) because it is an argument rather than a statement of fact.

125.   Mr. Davis denies challenging a voter with a potential residency issue is voter intimidation. Second Davis Tr. 140:4-22.

**RESPONSE:** Paragraph 125 does not comply with LR 56.1(B)(1) because it is an argument and a legal conclusion rather than a statement of fact.

126.   The challenge in Muscogee County, Georgia did not come from the Davis/Somerville List. Second Davis Tr. 144:7-15.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 126 for purposes of the summary judgment motion.

86

127.   Mr. Davis did not seek to intimidate any lawful voter. Second Davis Tr. 199:9-18.

**RESPONSE:** Paragraph 127 does not comply with LR 56.1(B)(1) because it is an argument and a legal conclusion rather than a statement of fact.

### Mark Williams Statement of Facts

128.   Mark Williams owns a printing company, and his company printed the § 230 Challenges for TTV. Transcript Excerpts of Deposition of Mark Williams (Sept. 23, 2021) ("Williams Tr."), Ex. P, 19:4-18; 21:11-22:15; Defendant Mark Williams's Responses to Plaintiffs' First Interrogatories (March 15, 2021) ("Williams Resp. to First Interrogs."), Ex. Q, Resp. No. 1.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 128 for purposes of the summary judgment motion.

129.   Mr. Williams introduced Ron Johnson and James Cooper to Gregg Phillips. Williams Tr. 23:3-24:7.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 129 for purposes of the summary judgment motion.

130.   Mr. Williams did not help compile the TTV Challenge Lists. Williams Tr. 35:4-15.

**RESPONSE:** Plaintiffs dispute Paragraph 130. *See* Ex. 57, Dec. 17, 2020 M. Williams Email (Email from C. Engelbrecht to M. Williams, requesting "please remove addresses that would suggest they are military bases").

131.   Mr. Williams volunteered to be the TTV Challenger in Gwinnett County. He submitted the Challenges to the Gwinnett Board with the hopes that the Board would vet the list, but he was told the Board would not vet them at all. Williams Tr. 63:2-64:1.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider that Mr. Williams "volunteered to be the TTV Challenger in Gwinnett County" for purposes of the summary judgment motion. An assertion regarding Mr. Williams's "hopes" does not comply with LR 56.1(B)(1) because it is an argument rather than a statement of fact.

### Ron Johnson Statement of Facts

132.   Ron Johnson contacted eligible Georgia voters he knew to ask if they would be interested in bringing a § 230 Challenges in the county in which they live. He gave TTV the contact information for any Georgia voter who expressed an interest in participating in these Challenges. Defendant Ron Johnson's Responses to Plaintiffs' First Interrogatories (March 15, 2021) ("Johnson Resp. to First Interrogs."), Ex. R, Resp. No. 5.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

133. Mr. Johnson communicated with the volunteers to get their signed permission for TTV to submit the Challenges in there [sic] name. *Id.*

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

134. Mr. Johnson did not help compile the TTV Challenge Lists. Johnson Resp. to First Interrogs. Resp. Nos. 1-4.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

### James Cooper Statement of Facts

135. James Cooper contacted eligible Georgia voters he knew to ask if they would be interested in bringing a § 230 Challenges in the county in which they live. He prepared a "form" email to send to potential Challengers, which described the potential Challenges. He gave TTV the contact information for any Georgia voter who expressed an interest in participating in these Challenges. Defendant James Cooper's Responses to Plaintiffs' First Interrogatories (March 15, 2021) (" Cooper Resp. to First Interrogs."), Ex. S, Resp. No. 5.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

136.   Mr. Cooper communicated with the volunteers to get their signed permission for TTV to submit the Challenges in there [sic] name. Cooper Resp. to First Interrogs. Resp. No. 5.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

137.   Mr. Cooper did not help compile the TTV Challenge Lists. Cooper Resp. to First Interrogs. Resp. Nos. 1-4.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

## Scott Berson Statement of Facts

138.   Alton Russell submitted a § 230 Challenge in Muscogee County, which included Plaintiff Scott Berson. Plaintiff Scott Berson's Responses to Defendants' First Set of Interrogatories (Jun. 23, 2021) ("Berson Resp. to Interrogs."), Ex. T, Resp. No. 3.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

139.   Mr. Berson was never contacted directly by any Challenger, including any Named Defendant. Berson Resp. to Interrogs., Resp. No. 14.

**RESPONSE:** Plaintiffs object that whether Mr. Berson was contacted directly by a challenger is immaterial to the claims and defenses in this case.

140.   Mr. Berson "read in the Columbus Ledger-Enquirer that challenges had been filed against people with out-of-state mailing addresses and I figured I was probably on the list." Berson Resp. to Interrogs., Resp. No. 6.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

141.   He subsequently "received a phone call from a community organizer" informing him he had been challenged, but he doesn't know the identity of the person who called him. Berson Resp. to Interrogs., Resp. No. 6.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

142.   Mr. Berson cast a provisional ballot in the run-off election, which was subsequently counted after he verified his eligibility with Muscogee County election officials. Berson Resp. to Interrogs., Resp. No. 12, 13.

**RESPONSE:** Defendants' citations do not support the fact that Plaintiff Berson's vote was counted after he verified his "eligibility" with Muscogee County.

Mr. Berson was, however, asked to "provide his residency," which he did when he sent an election official a copy of his automobile insurance bill. Def.'s Ex. T, Berson Resp. to Interrogs., Resp. No. 12 ("Elections Director Nancy Boren told me I had been . . . and told me I would have to prove my *residency* at a later time . . . A few days later I called the Muscogee County Board of Elections and asked a staff member where I should send *proof of residency*.") (emphasis added).

143.   Mr. Berson describes having to find suitable identification and proof of residency after changing mailing addresses as "extremely frustrating and burdensome." Berson Resp. to Interrogs., Resp. No. 8.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

### Jocelyn Heredia Statement of Facts

144.   Ms. Heredia was a Challenged Voter in Banks County. Transcript Excerpts of Deposition of Jocelyn Heredia (Oct. 15, 2021) ("Heredia Tr."), Ex. U, 20:13-21:7.

**RESPONSE**: Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

145.   TTV filed an open records request with Banks County regarding its Challenge there, Banks County ORR, Ex. V, Def TTV 1836-37; the County

responded with minutes from a meeting that showed it dismissed the Challenge List because no one requested a probable cause hearing. Banks County Board Minutes, Ex. W, Def TTV 1838.

**RESPONSE:** Plaintiffs do not dispute that Defendant True the Vote filed an open records request with Banks County or that Banks County ultimately dismissed the challenge list. Plaintiffs dispute the implication that Plaintiff Heredia was not affected by the challenge because Banks County dismissed the challenge. Defendants' exhibit demonstrates that Banks County did not dismiss the challenge until February 4, 2021, nearly a month after the Runoff Election, see Defs.' Ex. W, and Plaintiff Heredia testified that she was pulled out of line at her polling location for being a challenged voter and required to show supplemental documentation of her residence, a process which took 3-4 hours in total. Heredia Tr. at 45:15-47:25.

146.   Ms. Heredia testified that Banks County, not any Challenger, published her name on its website. Heredia Tr. 31:22-32:3.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

147.   Ms. Heredia did submit a change of address form. Heredia Tr. 13:1-13.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

148.   Ms. Heredia testified that no one said anything to her while she was standing in line to vote that intimidated her or targeted her. Heredia Tr. 48:16- 49:3.

**RESPONSE:** Plaintiffs object that whether Ms. Heredia was directly intimidated by another person while standing in line to vote is immaterial to the claims and defenses in this case.

149.   However, Ms. Heredia testified she felt "intimidated from the get-go," as soon as she got to the polling location because she was the only Hispanic person in line to vote in a predominantly Republican county. Heredia Tr. 48:1-9.

**RESPONSE:** Defendants' citations do not support the fact that Plaintiff Heredia was intimidated only because she was the only Hispanic person in line to vote in a predominantly Republican county. Plaintiff Heredia did testify that she was initially intimidated because she was the only "non-white" voter that she initially saw at her polling location. Heredia Tr. at 48:8-10. Plaintiff Heredia further testified that she felt intimidation "when they told me my vote was being challenged." *Id.* at 48:10-15.

150.   Ms. Heredia testified that she did not know she was Challenged until later, when she got into the polling location. Heredia Tr. 49:4-50:2.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

94

151.   Ms. Heredia testified her feeling of intimidation increased when she learned she had been Challenged based upon her change of address. Heredia Tr. 48:10-15.

**RESPONSE:** Plaintiffs do not dispute that Plaintiff Heredia's intimidation increased when she learned her right to vote had been challenged, but Defendants' citation does not support the fact that Plaintiff Heredia was told that the challenge was based on a change of address.

152.   Ms. Heredia testified that because she was Challenged, election officials asked her to fill out a paper ballot. Heredia Tr. 23:22-24:7.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 152 for purposes of the summary judgment motion.

153.   The election officials explained to Ms. Heredia that if she provided the requisite proof of residency at her voter registration address, her provisional ballot would be counted. Heredia Tr. 23:22-24:13.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 153 for purposes of the summary judgment motion.

154.   Ms. Heredia testified that she submitted the provisional ballot and provided the election officials with proof of her residency in Banks County. Heredia Tr. 24:8-13.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider Paragraph 154 for purposes of the summary judgment motion.

155. Ms. Heredia testified that a woman "of Asian descent" was also in the separate line to file a provisional ballot, but she does not know if that woman was a Challenged Voter or was filing a provisional ballot for some other reason. Heredia Tr. 45:9-14.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

### Doe Plaintiffs Statement of Facts

156. Doe Plaintiffs both declared that they learned of their Challenge when they "read a story in the local paper about True the Vote's challenges and saw my name and address had been published online." ECF No. 26, ¶ 5.

**RESPONSE**: Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

157. Doe Plaintiffs assert "Defendants published a list with my address on it." *Id.* at ¶ 8.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

158.   The Doe Plaintiffs assert they were "extremely upset" when they learned their eligibility to vote had been challenged. *Id.* at ¶ 5.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

159.   The Doe Plaintiffs declared that the Challenge would not prevent either one of them from voting in the run-off election, but they feared they "could" become the target of harassment "from Defendants and their supporters." *Id.* at ¶ 8.

**RESPONSE:** Plaintiffs do not dispute that the Court may consider this evidence for purposes of the summary judgment motion.

Respectfully submitted, this 6th day of June, 2022.

Allegra J. Lawrence
Georgia Bar No. 439797
Leslie J. Bryan
Georgia Bar No. 091175
Maia Cogen
Georgia Bar No. 832438
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-
hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com

Dara Lindenbaum
Georgia Bar No. 980780
**SANDLER REIFF LAMB
ROSENSTEIN & BIRKENSTOCK,
P.C.**
1090 Vermont Avenue, NW, Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

*/s/ Uzoma N. Nkwonta*
Marc E. Elias*
Uzoma N. Nkwonta*
Christina A. Ford*
Tina Meng*
Marcos Mocine-McQueen*
Joel J. Ramirez*
Jacob Shelly*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
melias@elias.law
unkwonta@elias.law
cford@elias.law
tmeng@elias.law
mmcqueen@elias.law
jramirez@elias.law
jshelly@elias.law

*Counsel for Plaintiffs*
*Admitted *pro hac vice*

98

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that I have this day served a copy of the within and foregoing ***Plaintiffs' Response to Defendants' Statement of Undisputed Material Facts*** with the Clerk of Court using the CM/ECF system, which will automatically send-e-mail notification to all counsel of record.

This 6th day of June, 2022.


<u>*/s/ Uzoma Nkwonta*</u>
Uzoma Nkwonta
*Counsel for Plaintiffs*