# Exhibit 45

Page 1

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

-----------------------------------x
FAIR FIGHT, INC.,
SCOTT BERSON,
JOCELYN HEREDIA,
and JANE DOE,

              Plaintiffs,


         v.

TRUE THE VOTE,
CATHERINE ENGELBRECHT,
DEREK SOMERVILLE,
MARK DAVIS,
MARK WILLIAMS,
RON JOHNSON,
JAMES COOPER,
and JOHN DOES 1-10,

              Defendants,

FAIR FIGHT ACTION, INC.,

              Counter-Defendant.

-----------------------------------x
Case No. 2:20-CV-00302-SCJ
-----------------------------------x


*** CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER ***
REMOTE DEPOSITION OF
DEREK SOMERVILLE
Wednesday, October 6, 2021

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 2

1                     October 6, 2021

2                     9:17 a.m. Eastern Daylight Time

3

4          Remote video deposition of DEREK

5     SOMERVILLE, taken by Plaintiffs, pursuant to

6     Notice, dated September 23, 2021, before Brandon

7     Rainoff, a Federal Certified Realtime Reporter

8     and Notary Public of the State of New York.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Page 3

```
 1   A P P E A R A N C E S:
 2   ELIAS LAW GROUP LLP
 3   Attorneys for Plaintiffs
            10 G Street, Northeast
 4          Suite 600
            Washington, D.C.  20002
 5          202.968.4490
     BY:    CHRISTINA A. FORD, ESQ.
 6          202.968.4558
            cford@elias.law
 7          JOEL J. RAMIREZ, ESQ.
            202.968.4499
 8          jramirez@elias.law
 9
10   LAWRENCE & BUNDY LLC
     Attorneys for Plaintiffs
11          1180 West Peachtree Street Northwest
            Suite 1650
12          Atlanta, Georgia  30309
            404.400.3350
13   BY:    MICHELLE L. McCLAFFERTY, ESQ.
            404.400.1755
14          michelle.mcclafferty@lawrencebundy.com
15
16   THE BOPP LAW FIRM, PC
     Attorneys for Defendants
17          1 South Sixth Street
            Terre Haute, Indiana 47807-3510
18          812.232.2434
     BY:    COURTNEY KRAMER, ESQ.
19          ckramer@bopplaw.com
20
21   ALSO PRESENT:
     ALICIA HOLMSTOCK, Legal Videographer
22   ALEX RENNICK, Digital Document Technician
```

Page 4

1    I N D E X   O F   E X A M I N A T I O N

2    Witness:

3    Derek Somerville

4

5    Examination:

6    By Ms. Ford..........................Page 9

7

8          I N D E X   O F   E X H I B I T S

9     Exhibit A ...............................Page 13
      Four-page document entitled: Plaintiffs Notice to

10    Take the Deposition of Defendant Derek Somerville,
      dated September 23, 2021 (no Bates Nos.)

11

12    Exhibit B ...............................Page 35
      Document Bates stamped Def. Somerville 0004,

13    single-page SMS message From: Catherine Englebrecht,
      To: Derek Somerville, Date: December 17, 2020

14

15    Exhibit D ...............................Page 41
      Multipage document bearing heading on first page:

16    Derek Somerville (no Bates Nos.)

17

18    Exhibit C ...............................Page 62
      Three-page email chain, top email From: Derek

19    Somerville, To: Catherine Engelbrecht, Subject: RE:
      FW: Elector Challenge Follow-Up Items, Sent: December

20    19, 2020 (no Bates Nos.)

21

22

Page 5

1        I N D E X   O F   E X H I B I T S, CON'T

2     Exhibit E .................................Page 94
     Three-page document entitled: True The Vote Partners
3     With Georgians in Every County to Preemptively
     Challenge 364,541 Potentially Ineligible Voters (no
4     Bates Nos.)

5

6     Exhibit F .................................Page 115
     Single-page email From: Catherine Engelbrecht, To:
7     Amy Holsworth, Subject: Citizen Challenge Q&A Zoom
     call Sunday night at 6p et, Sent: December 19, 2020
8     (no Bates No.)

9

10     Exhibit I .................................Page 125
     Single-page document bearing heading: Jim Flenniken
11     (no Bates No.)

12

13     Exhibit G .................................Page 138
     Multipage document entitled: Defendant Derek
14     Somerville's Responses to Plaintiffs' First
     Interrogatories, dated March 15, 2021 (no Bates Nos.)

15

16     Exhibit J .................................Page 145
     Multipage document entitled: Defendant Derek
17     Somerville's Responses to Plaintiffs' First Requests
     for Production, dated March 15, 2021 (no Bates Nos.)

18

19     Exhibit L .................................Page 149
     Two-page document entitled: True The Vote Launches
20     Georgia Election Integrity Hotline as Part of the
     Most Comprehensive Ballot Security Effort in Georgia
21     History, dated December 15, 2020 (no Bates Nos.)

22

Page 6

1          I N D E X   O F   E X H I B I T S, CON'T

2     Exhibit M ...............................Page 151

   Three-page document entitled: True The Vote Launches

3     "Validate the Vote" Initiative and Whistleblower Fund

   to Ensure Election Validity, Process Integrity, dated

4     November 6, 2020 (no Bates Nos.)

5

6     Exhibit K ...............................Page 152

   Single-page document bearing heading: Derek

7     Somerville, dated November 15, 2020 (no Bates No.)

8

9

10              (All exhibits were provided

11           electronically to the reporter.)

12

13

14

15

16

17

18

19

20

21

22

```
                                                    Page 7

 1                    *       *       *

 2                P R O C E E D I N G

 3              Wednesday, October 6, 2021

 4                  Remote Deposition

 5          9:17 a.m. Eastern Daylight Time

 6                    *       *       *

 7              THE VIDEOGRAPHER:  We are now on the

 8      record.  This is tape No. 1 of the videotape

 9      deposition of Derek Somerville, in the matter of

10      Fair Fight, Inc., et al., plaintiffs v. True The

11      Vote, et al., defendants, and Fair Fight Action,

12      Inc., counter-defendant, in the United States

13      District Court for the Northern District of

14      Georgia, Gainesville Division, Case No.

15      2:20-CV-00302-SCJ.

16              This deposition is being held remotely

17      by Zoom conferencing.  Video recording is in

18      Olympia, Washington, on October 6, 2021.

19              The time on the video screen is 9:17

20      Eastern Time.

21              My name is Alicia Holmstock.  I am the

22      legal videographer from Digital Evidence Group.
```

Page 8

```
 1     The court reporter is Brad Rainoff, in

 2     association with Digital Evidence Group.

 3               All parties to this deposition are

 4     appearing remotely and have agreed to the

 5     witness being sworn in remotely unless an

 6     objection is stated to this agreement.

 7               Due to the nature of remote reporting,

 8     please pause briefly before speaking to ensure

 9     all parties are heard completely.

10               Will counsel please introduce

11     themselves and who they represent for the

12     record?

13               MS. FORD:  My name is Christina Ford.

14     I represent the plaintiffs, and I'm here from

15     Elias Law Group.

16               MS. KRAMER:  Courtney Kramer with Bopp

17     Law firm representing the defendants.

18               MS. McCLAFERTY:  This is Michelle

19     McClafferty with Lawrence Bundy, also on behalf

20     of plaintiffs.

21               MR. RAMIREZ:  This is Joel Ramirez

22     with the Elias Law Group on behalf of
```

Page 9

1    plaintiffs.

2              THE VIDEOGRAPHER:  Will the court

3    reporter please swear in the witness?

4    DEREK SOMERVILLE,

5              having been duly sworn, was examined and

6              testified as follows:

7    EXAMINATION

8    BY MS. FORD:

9       Q.    Good morning, Mr. Somerville.  Thank

10   you for being here today.  My name is Christina,

11   Christina Ford, and I represent the plaintiffs

12   in this case.

13             Will you please state your home

14   address for the record?

15      A.    5130 Saddlebred Lane, Cumming,

16   Georgia, 30028.

17      Q.    Right.

18             And where are you located today?

19      A.    I'm located in Roswell, Georgia.

20      Q.    Okay.

21             Just generally, what location are you

22   in today?

Page 19

1          A.    Yeah, they would be accurate.  I

2     apologize.  I just -- again, these were very

3     brief encounters, you know, almost a year ago.

4          Q.    Sure.

5               So you mentioned you attended a dinner

6     with Catherine Engelbrecht and Gregg Phillips on

7     December 15.

8               Was that the first time you had met

9     either of them?

10         A.    Yes.

11         Q.    Where was that dinner?

12         A.    It was in -- again, forgive me.

13              It was at a restaurant closer in to

14    downtown.  I live about 45 minutes north of

15    Atlanta, so I'm not terribly familiar with the

16    restaurants down there, so I don't recall the

17    name.  And frankly, I don't remember the exact

18    location --

19         Q.    Okay --

20         A.    -- it was closer to the Atlanta area.

21         Q.    Was anyone else in attendance at that

22    dinner?

Page 20

```
 1          A.     No, ma'am.

 2          Q.     So just you, Catherine, and Gregg?

 3          A.     Myself, Catherine, and Gregg.

 4          Q.     What was the purpose of that dinner?

 5          A.     That wasn't immediately evident to me.

 6                 They invited me and I thought that was

 7   polite.  I assumed the reason they invited me is

 8   I have some level of involvement in local

 9   politics in north Georgia.  And based on the

10   evening, my assumption is that they were trying

11   to get a better understanding of the political

12   environment in Georgia, of which I have

13   opinions.

14          Q.     Okay.

15                 Did you discuss anything other than

16   the general political environment?

17          A.     Not with any measure of specificity.

18                 I was aware, of course, that they had

19   concerns about the election, but it was very

20   much a cordial first meeting.

21                 Bear in mind I had never spoken with

22   these people, other than the conversations that
```

Page 21

1    led to the invite for dinner.  I had very

2    limited knowledge whatsoever of who they are,

3    what they do, where they did it.  So it was very

4    much a introductory, almost like a business

5    meeting.

6        Q.    Okay, you said they mentioned they had

7    concerns about the election.

8              Can you elaborate on that?

9        A.    Not with a terrible degree of

10   specificity.

11             There was an awful lot of chatter at

12   that time about the election.  And there was an

13   awful lot of people expressing concerns,

14   certainly inside of the ecosystem that I live

15   in.

16             So I don't recall anything unique

17   about what they were sharing with me.  So

18   forgive me.  It all blends together.

19       Q.    Sure.

20             Well, let me ask a more specific

21   question, then.

22             Were the concerns generally either

Page 22

1    that the election results in Georgia maybe were

2    not accurate?

3         A.    I believe that would be the general

4    tone.

5         Q.    Or that some sort of fraud had

6    potentially occurred in the election?

7         A.    I don't recall a discussion of fraud.

8              I do recall the discussion of

9    irregularity.

10        Q.    Okay.  Thank you.

11             At that dinner, did you or anyone, I

12   would say, at the dinner discuss any plans to

13   file elector challenges in Georgia?

14        A.    I do recall discussion around

15   electoral challenges at that dinner.

16        Q.    What specifically did you discuss?

17        A.    I believe that was largely just it --

18   the subject line.

19             My recollection is that they had

20   intended to file some measure of challenges, but

21   the detail behind that, I don't have a

22   recollection of.

Page 23

1            I do recall at the time that it was

2    largely a significant effort.

3            But, again, I had not met them up

4    until that point, so I didn't have a terrible

5    amount of understanding, frankly, of who exactly

6    they were.  I just knew they were out of state.

7        Q.    You mentioned they were out of the

8    state.

9            So were they seeking clarity from you

10   on how to file challenges?

11       A.    No.

12       Q.    So they were seeking from you maybe

13   more information about the general political

14   environment that you mentioned?

15       A.    I suspected as much.

16            And then in certain parts of the

17   state, I have some name recognition, so it's not

18   unusual for people to reach out to me and ask to

19   align with me in order to leverage some level of

20   that name recognition.

21       Q.    Okay.

22            Well, whether at that dinner or after

Page 29

1        A.     -- and to -- to -- I'm sorry.  I

2   didn't meaning to speak over you.

3               And I think it can be pursued with a

4   relative degree of accuracy.

5        Q.     Were you asked to help with True The

6   Vote's challenges in any way?

7        A.     I was not.

8        Q.     Did you volunteer to help in any way?

9        A.     I did not.

10       Q.     You mentioned that you participated in

11  a call on December 16 with Mark Davis and Gregg

12  Phillips.

13              Is that correct?

14       A.     Yes.

15       Q.     Who proposed having that call?

16       A.     I don't recall.

17       Q.     What was the general purpose of the

18  call?

19       A.     An introduction between Mark and

20  Gregg.

21       Q.     Is it your understanding that was the

22  first time Mark and Gregg had met?

Page 30

1        A.     Yes.

2        Q.     And you were facilitating that

3    introduction?

4        A.     Yes.

5        Q.     So the title of that meeting was:

6    Elector challenge alignment.

7               Can you help me understand what was

8    meant by "alignment"?

9        A.     My understanding -- my recollection is

10   that, in my understanding -- because I have

11   not -- I have no way of validating this -- that

12   Mark Davis has been involved in voter data for

13   quite some time, potentially decades.

14               It was also my understanding that

15   Gregg -- and forgive me, I don't recall his last

16   name -- that Gregg also had a passion for data.

17               And so my understanding in that call

18   was to bring those two together -- excuse me --

19   so that they could discuss the nuances of the

20   data in our Georgia election files.

21       Q.     Okay. I just want to drill down that,

22   and make sure I understand here.

Page 31

1                So did "alignment" then mean alignment

2     of methodology? --

3          A.    No.

4          Q.    -- in compiling a list?

5          A.    No.

6          Q.    No?  Okay.

7                Did it mean alignment of the voters

8     who would appear on the list?

9          A.    No.

10         Q.    Did it mean alignment of the timing of

11    challenges?

12         A.    No.

13         Q.    Can you help me understand, then, more

14    of what you mean?

15         A.    It meant the alignment of the data

16    definitions and general election data universe

17    in Georgia.

18               So to give a little more definition

19    there, large datasets are unique.  And one data

20    field in one dataset in one state doesn't

21    necessarily mean the same thing as it means in

22    another state.

Page 32

1           So part of it was to bring the two

2      together so that they could have a technical

3      discussion between the two of them about data,

4      which is not my forte.

5           And the other was just me trying to

6      make introductions in two people that seemed to

7      be professionals in a similar space.

8      Q.    Okay.

9           I mean, at the time of this call, it

10     seems that True The Vote was already

11     contemplating doing their challenge effort, as

12     you mentioned.

13           Were you and Mark separately

14     considering a challenge effort?

15     A.    Mark and I were separately

16     investigating a similar -- similar matter --

17     right? -- similar scope in terms of the --

18     whether or not people had cast votes that were

19     ineligible.

20           But -- so you might want to restate

21     your question.

22           But, yes, Mark and I were absolutely

Page 33

1    investigating the data at that time independent

2    of True The Vote, independent of True The Vote's

3    data, independent of their people, their

4    resources -- completely independent of them.

5         Q.    Sure.

6               You say you were investigating.

7               At the time of this call, though, were

8    you both already contemplating that you might

9    file challenges?

10              Or help file challenges?

11        A.    We were considering our options, yes.

12        Q.    Okay.

13              And did you share that with True The

14   Vote?

15              Was that apparent to either True The

16   Vote or Gregg Phillips by the time of that call?

17        A.    I don't recall.

18        Q.    At any point in time, did you share

19   with True The Vote that you and Mark were

20   contemplating doing your own challenges?

21        A.    I don't recall the specifics of doing

22   so, but it's reasonable to assume that we would

Page 34

1    have discussed that.

2         Q.    Was anyone else on that call other

3    than you, Mark, and Gregg?

4         A.    No, ma'am.

5         Q.    Were any particular decisions made on

6    that call?

7         A.    None at all.  It was an introductory

8    discussion between two people that had never

9    met, and myself who had met Gregg the night

10   before.

11        Q.    So how did that call end?

12        A.    I don't recall any after action or

13   follow-up that resulted from that call.

14              My recollection is it was a nice

15   introduction; and two individuals with technical

16   backgrounds had a conversation that largely rose

17   beyond me.

18              MS. FORD:  Switching to a different

19   topic, can we please pull up Exhibit B and Mark

20   it as Exhibit B?

21

22

Page 37

1   in the state, but I don't recall -- I don't know

2   the Secretary of State, and so I don't know -- I

3   really don't recall why I was kept in the loop

4   on that.

5        Q.    So when Catherine writes here she "got

6   some guidance that is changing our process a

7   bit," what did you understand that to be a

8   reference to?

9        A.    I don't -- I understood it to be a

10  reference to their efforts in the state, but I

11  don't know specifically what she was referring

12  to.

13       Q.    Do you know what the guidance was that

14  she received from the Georgia Secretary of State

15  office?

16       A.    I do not.

17            (Pause)

18       Q.    And here Ms. Engelbrecht also

19  mentions:  The plan now is to send the release

20  probably late today along with the digital

21  files.

22            This release -- is that a press

Page 38

1     release to the public that she is referencing

2     here?

3          A.    I would assume that's what that means,

4     but I don't -- I don't know the general context

5     of that -- that statement.

6               But there was a press release drafted,

7     and that may be what she is referring to.

8          Q.    Okay.

9               Do you know what the digital files are

10    that she is referring to?

11              Is that a challenge list?

12              Or something else?

13         A.    I do not know.

14         Q.    Then finally, Ms. Engelbrecht

15    mentions:  As soon as I get to a stopping point,

16    I'll send you a release for your review.

17              Is that the a same press release you

18    just mentioned you thought it might be?

19         A.    Yeah -- within that context, that

20    would be the press release.

21         Q.    Why was she sending it to you?

22         A.    Because she intended to include myself

Page 39

1    and Mark's names in it.

2        Q.    Okay.

3              And did she send that to you?

4        A.    I believe she did.

5        Q.    Okay.

6              Did you --

7        A.    -- she did.  I'm sorry.  Yes, I

8    recall.  So she did, yes.

9        Q.    Okay.

10             Did you review it?

11       A.    I did.

12       Q.    Did you propose any changes to the

13   release?

14       A.    I did.

15       Q.    What were those changes?

16       A.    To my recollection -- is I encouraged

17   them to include Mark.

18             But beyond that -- and I don't recall

19   the other details other than how we were

20   characterized.

21             But I don't -- again, this was a long

22   time ago, so I don't recall the specifics of

Page 40

1     what I asked of her.

2          Q.     Then you would have sent it back to

3     her?

4          A.     Yes.

5          Q.     Did she respond to that at all?

6          A.     I don't recall.

7          Q.     Okay.

8                 MS. FORD:  We can take this down.

9                 Thank you.

10    BY MS. FORD:

11         Q.     Mr. Somerville, so what is your best

12    understanding of what was involved in developing

13    the challenge list that True The Vote submitted?

14         A.     I was never consulted on the

15    development of the list, so I have no

16    understanding of how it was developed, who

17    participated in it, or any other degree of that

18    list at all.  I have no knowledge of it.

19         Q.     Okay.

20                MS. FORD:  Can we pull up Exhibit D,

21    please, and Mark it with Exhibit D?

22

Page 72

1     voted in-person in the 2020 general election?

2         A.    Again, this is entirely independent of

3     any actions by True The Vote.

4               But I believe that if an individual

5     cast a vote and they appeared on the national

6     change of address database as having moved

7     outside of their county, then they were probably

8     included in that file, with some tolerances for

9     military bases, electronic -- votes, etc.

10        Q.    Okay.

11              We can get to that now so you can walk

12    me through it.

13              MS. FORD:  Can we pull Exhibit D back

14    up and go to page 2 again?

15              (Pause)

16              MS. FORD:  Yes.  Can we make this

17    bigger?  Thank you.

18    BY MS. FORD:

19        Q.    Going to this third paragraph here,

20    you mention here there are roughly 40,000 voters

21    on your list across all 159 counties that you

22    believed were worth filing before the runoff

Page 73

1      election.

2                  Is that correct?

3                  THE WITNESS:  I need to read.

4                  MS. FORD:  Sure.

5          A.    That's what I wrote.

6          Q.    Okay.

7                  Can you walk me through how you

8      arrived at that roughly 40,000 number?

9                  (Pause)

10                 MS. KRAMER:  I'm going to object again

11     to scope.

12                 Honestly, this is -- he's made it very

13     clear, counsel, that this has nothing to do with

14     True The Vote.

15                 And I just would ask that we please

16     keep the line of questioning related to the

17     witness as it relates to True The Vote, and just

18     True The Vote.

19                 MS. FORD:  Counsel, I think this

20     lawsuit is about more than just True The Vote.

21                 And Mr. Somerville has testified that

22     he helped file challenges in the runoff

Page 89

1          A.      And the number is not actually known

2      to us because we made these files generally

3      available to those that wanted to participate in

4      the process, so it would be conjecture on my

5      part.

6               But I know it was not a significant

7      number.

8               I think a takeaway from this certainly

9      was that there -- it was much more complicated a

10     process than we estimated.

11              But I don't believe it was very many.

12     And most of them were -- to my knowledge --

13     were -- smaller rural counties in the north side

14     of the state are the only ones I can vaguely

15     recall.

16              There was an awful lot going on at

17     that time.  And we can't submit a challenge

18     outside of county that we live in.  So our --

19     our activity is somewhat limited to -- to the

20     counties that we are in.

21         Q.     Okay.

22              What do you mean when you say you:

Page 90

1      Made the files generally available?

2          A.    Well, as is evident with my Facebook

3      post, people were aware that we were working on

4      this.

5               And individuals would reach out and

6      say:  Hey, I would like to participate.  How can

7      I help?

8               And if they are in a county that had

9      individuals identified, then -- if we are able

10     to get back to everybody, we would have

11     encouraged them to submit the challenge in their

12     own counties.

13              But it wasn't -- you know, I can't --

14     I need to be very clear here.  There was not an

15     organization around this.

16              Things were moving very quickly.

17              We were more motivated around the data

18     integrity than anything.

19              So by the time we realized that there

20     was a substantial number of records within the

21     voter file that needed closer examination, you

22     know, the days were ticking by.

Page 91

 1                   And so it -- I would love to tell you

 2      it was a more coordinated effort, but it wasn't.

 3                   So I don't -- I don't know how many.

 4          Q.     That's fair.

 5                   So if someone expressed interest in

 6      helping out, did you email the list for that

 7      specific county?

 8          A.     So some were emailed.  Some -- but --

 9      and I believe we had a Dropbox that people can

10      access.

11                   Again, there was no meaningful way to

12      manage other people's activities through this.

13      It wasn't our core focus.

14                   So I'm sure we exercised a number of

15      means to communicate lists to people.

16          Q.     Okay.

17                   So was the general thrust of this:

18      Someone indicated they were interested; you sort

19      of guided them to the list; and then it was

20      their challenge from that point on?

21          A.     That's the general thrust, and it was

22      an unimpressive level of engagement.

Page 97

1    almost 400,000 voters -- ten times as many -- is

2    not disciplined?

3         A.    If their methodology sought to include

4    that volume and they executed it with

5    discipline, then theirs was a disciplined

6    process.

7              So I can't speak to how they --

8    whether they executed with discipline.

9              I understand the spirit of the

10   question, but it's evident that we used a

11   different process because the numbers are so --

12   so different.

13        Q.    Sure.

14              MS. FORD:  We can pull this down.

15   Thank you.

16              Can we pull Exhibit D back up and go

17   to page 22, please?

18              (Pause)

19              MS. FORD:  And just make this purple

20   box bigger, please?

21   BY MS. FORD:

22        Q.    This is a post from December 17 in

Page 98

1    which you write:  Volunteers needed from each

2    county for a voter-integrity project!  15-minute

3    effort, performed from home.  PM me if

4    interested.

5              Do you recognize this?

6         A.   I do.

7         Q.   Was this the post essentially

8    recruiting individuals to submit elector

9    challenges to specific counties?

10        A.   Yeah -- I recall, yes.  This would

11   have been an effort to involve individuals in

12   their counties with these challenges,

13   independent of True The Vote.

14              This is not related to True The Vote

15   at all.

16        Q.   Okay.

17              So no one here who reached out to

18   you -- sorry.

19              I was about to put multiple double

20   negatives there.

21              Did you forward any of these

22   individuals who were interested to True The

Page 99

1     Vote?

2          A.     No.

3          Q.     What exactly were you asking these

4     volunteers to do?

5          A.     Well, it's been a bit, but I suspect

6     this was about -- as we mentioned before --

7     identifying individuals that wanted to

8     participate with their local board of election

9     with this eligibility effort that we were

10    underway.

11              We could -- we could only submit

12    challenges in our own counties.  We can't submit

13    them in other counties.  So this was a largely

14    unsuccessful effort to identify individuals that

15    wanted to participate in the action.

16              Again, there -- you know, the context

17    of the day was there was an awful lot of

18    activity going on, but this is wholly unrelated

19    to True The Vote, and was largely unsuccessful.

20         Q.     Why do you categorize it as

21    unsuccessful?

22         A.     As I indicated earlier, we did not

Page 107

1    attention away from a lot of vitriol, a lot of

2    the unproductive discourse, that was underway

3    around that election and draw people's attention

4    to very real opportunities to improve the

5    integrity of our elections across the entire

6    state for all voters.

7              Whether or not the challenges were

8    submitted, and whether or not they were heard,

9    and whether or not they were consequential at

10   the county level was tertiary to trying to

11   demonstrate that there are laws in the state

12   that empower citizens to be involved; that our

13   voter file is managed by state officials, and

14   potentially not very well.

15             And I wanted to demonstrate that there

16   were very real opportunities to improve the

17   overall integrity of our elections in the state

18   and encourage other people to participate in

19   that effort.

20             So I think the disconnect is that

21   everybody wants to connect this to a desired

22   outcome, likely connected to the election

Page 108

```
 1    results.

 2              The outcome I was looking for was to

 3    demonstrate the importance of integrity -- data

 4    integrity and data hygiene within that voter

 5    file, which was arguably very, very poor at the

 6    time of the election.

 7              That -- my passion surrounded the

 8    integrity of the data, not the outcome of the

 9    election.

10         Q.   Okay.

11              You say you wanted to draw attention

12    to the issue.

13              How did you plan to do that if you

14    were not going to file any challenges?

15         A.   Well, I would argue by virtue of being

16    deposed right now, I drew attention to the

17    issue.

18         Q.   That's fair.

19              I guess what I'm saying is:  If it was

20    important to you to do the diligence, develop

21    this list, then be able to say, "Hey we've

22    identified these 40,000 that we think deserve
```

Page 109

1    attention," and that was sufficient for you, why

2    then did you encourage other volunteers to

3    submit challenges in their own counties?

4        A.    Well, as I just stated, part of the

5    effort was to encourage people to participate in

6    a lawful process.

7             I also believed at the time -- and

8    maybe I have an inflated sense of where I fit in

9    this state -- but I was of the belief that

10   elected officials were paying attention to what

11   we were doing, and that our effort might

12   influence discussions, and push them in a more

13   productive place.

14            It's my fundamental belief that

15   individuals in the state, in all counties,

16   across all political affiliations, encompassing

17   all ethnicities, were damaged by the lack of

18   hygiene in our voter file.

19            And the effort was to go straight to

20   the source of the matter and try to draw

21   attention to the voter file.

22            The challenges are a part of that.

Page 115

1    noise and stayed focused on data hygiene.

2              MS. FORD:  Could we please pull up

3    Exhibit F and Mark it as Exhibit F?

4              (Exhibit F, Single-page email From:

5    Catherine Engelbrecht, To: Amy Holsworth,

6    Subject: Citizen Challenge Q&A Zoom call Sunday

7    night at 6p et, Sent: December 19, 2020 (no

8    Bates No.), marked for identification)

9              (Pause)

10   BY MS. FORD:

11       Q.    This is an email invitation from Ms.

12   Engelbrecht about a challenger town hall

13   meeting.

14              Do you recognize this?

15       A.    I don't necessarily recognize the

16   email, but I do recognize the town hall meeting

17   that you reference, yes.

18       Q.    Did you attend that meeting?

19       A.    I did.

20       Q.    Before we get to that, Ms. Engelbrecht

21   here calls you a:  Fellow challenger.

22              What exactly did she mean by that?

Page 116

1                    Or did you take it to mean?

2          A.    Well, I don't -- I don't believe that

3     this email was particularly impactful to me, so

4     I don't even recall that language.

5                    I see it there.

6                    I don't know why she chose the

7     language she chose, but I never issued a

8     challenge, so --

9          Q.    Have you ever issued an elector

10     challenge?

11          A.    I have not.

12          Q.    So you did attend this call?

13          A.    I did attend this call.

14          Q.    Did you speak on the call?

15          A.    I'm sure I spoke, yes.  But I did not

16     lead this call.

17                    If I'm not mistaken, I was driving in

18     the rain and -- but I was not -- I was not a,

19     you know, a stated part of the agenda, if you

20     will.

21          Q.    What did you say on the call?

22          A.    I don't recall exactly.

Page 117

1                But because there were fellow

2    Georgians on the call, I'm sure I offered my

3    encouragement.

4        Q.    What do you mean by "encouragement"?

5        A.    Well, I think it's good any time that

6    our citizens involve themselves productively.

7                So, again, I don't recall my exact

8    language at all, but I think just encouragement

9    in the general sense.

10       Q.    What was generally discussed on the

11   call?

12       A.    As I indicated, I was driving in the

13   pouring rain, so it was very difficult for me to

14   track the nature of the call.  So I had --

15   again, I had a very difficult time understanding

16   what was being said and by whom.

17               So I don't have a particularly

18   remarkable recollection of this call.

19               I believe I was spending more time

20   trying to keep my car on the road.

21       Q.    Do you know approximately how many

22   people were on in call?

Page 118

1          A.     I do not.

2          Q.     More than a handful?

3          A.     I have no recollection.  I don't know

4     how many people were on the call.  I don't know

5     if it was more than a handful or not.

6          Q.     Okay.

7                 But did the general topic include the

8     elector challenges that True The Vote was

9     filing?

10         A.     Based on the email, that would be my

11    recollection.

12                But, again, it just -- it wasn't a

13    very big activity for me because I wasn't

14    directly involved with what they were doing.  I

15    just don't have a very detailed recollection of

16    that call.

17         Q.     Okay.

18                MS. FORD:  We can pull this down.

19    BY MS. FORD:

20         Q.     In December of 2020, were you already

21    familiar with -- sounds like you were already

22    familiar with the concept of list maintenance.

Page 119

1          Is that right?

2     A.    Yeah -- well, with the national change

3     of address process, yes.

4     Q.    Were you familiar with the National

5     Voter Registration Act, or NVRA for short?

6     A.    Not in the summer of 2020, no.  I

7     hadn't researched it as carefully as I had

8     later.

9     Q.    By December of 2020, were you familiar

10    with the NVRA?

11    A.    Yes.

12    Q.    What is your understanding of how NCOA

13    data is used under the NVRA?

14    A.    I believe, if I'm not mistaken, it's

15    section 8 that articulates the use of NCOA as a

16    reasonable means for identifying individuals

17    that may have moved.

18          I believe there is safe harbor

19    language with that respect as well.

20          But it's my understanding that NCOA is

21    explicitly cited as a reasonable means of

22    identifying individuals that may have moved.

Page 120

1               And if I'm not mistaken, it's within

2       the general confines of the guidance that's

3       provided for the removal of individuals from

4       lists as well.

5           Q.    What do you mean by "safe harbor

6       language"?

7           A.    Well, I'm surrounded by attorneys, but

8       I'm not one.

9               So my understanding is that language

10      is provided to give the states, you know, again,

11      the ability to use NCOA as a means to identify

12      people that -- as a reasonable means to identify

13      probable cause that somebody has moved their

14      primary residence.

15          Q.    And you understand the NVRA, after

16      someone is identified on the NCOA list -- that

17      the state would send a notice to the voter?

18          A.    Is that a statement?

19              Or a question?

20          Q.    It's a question.

21              Is that your general understanding of

22      how it works?

10/6/2021          Fair Fight, Inc. et al. v. True the Vote, et al.          Derek Somerville
Confidential - Pursuant to Protective Order

Page 121

1          A.     Yeah -- my general understanding is

2     the NVRA provides a very thorough process for

3     protecting the voter to ensure that -- that

4     there is multiple occasions of engaging that

5     voter to verify that -- their address.

6               So more specifically -- and I know

7     that there are those on this call that are very

8     familiar with NVRA -- but that it's a

9     multitiered process that expands over a

10    significant amount of time from notifications,

11    as well as lack of involvement in elections.

12              So -- and by my understanding, that's

13    a process that can transpire over a number of

14    years -- six or seven years, if I'm not

15    mistaken.

16         Q.    Okay.

17              So it's your understanding that that's

18    not a process that could be accomplished in a

19    short amount of time.

20              Is that right?

21         A.    No.  It is absolutely my

22    understanding -- and appropriately so -- that

Page 122

1    it's a process that takes a considerable amount

2    of time, and I'm happy that it was.

3         Q.    Did Georgia use that process in

4    advance of the 2020 runoff election?

5         A.    I suspect they did not, because I

6    believe that NVRA also further stipulates

7    periods -- blackout periods -- where you can't

8    engage in any of that activity within a certain

9    proximity of an election.

10              But I'm also not aware of what the

11   Secretary of State's office was or wasn't doing.

12        Q.    Okay.

13              What is your understanding of the

14   purpose of the blackout period?

15        A.    Well, again, I think that's reasonably

16   self-evident.

17              We all have a vested interest in our

18   laws not being exploited to affect a desired

19   outcome in an election.

20              And so -- and I don't know the

21   motivation for those that drafted or passed the

22   NVRA.

Page 132

1    an active role in helping remedy the issue.

2              And the issue was the voter fraud.

3        Q.    Were you hoping to remedy anything --

4    I mean, you say here you were hoping to do it on

5    an earlier exhibit.  You thought this

6    verification needed to be done before the

7    January 5th, 2021 runoff.

8              So, I mean, that doesn't sound like a

9    long-term vision there.  That sounds like

10   something you wanted to be done before the date

11   of the runoff election.

12             Is that fair?

13       A.    Well, I think it's one line in

14   thousands of words that I wrote, or spoke to

15   lots of people about the effort, so I don't know

16   that that was an overarching motive.

17             But I do believe that the idea was we

18   need to correct the hygiene issues within this

19   file so that we only have eligible people

20   participating in our elections, be them whoever

21   they are, as soon as we possibly can.

22             Whether or not that fell within the

Page 133

1    blackout periods of the NVRA, I'm not an

2    elections attorney.  You know, I'm not.  So I

3    don't entirely know whether or not that was

4    possible or feasible.

5              But I think urgency around this matter

6    was important.  I still think that.

7         Q.    Okay.

8              (Pause)

9              MS. FORD:  Give me one second here.

10             We can go ahead and take this down,

11   though.

12   BY MS. FORD:

13        Q.    Before, you mentioned -- you agreed at

14   least that just appearing on the NCOA list did

15   not mean that someone was ineligible to vote.

16             Is that correct?

17        A.    Not only is that correct, but I made a

18   very focused effort whenever and wherever

19   possible to indicate that we did not -- I say

20   we -- I did not believe that that was an

21   indication of anybody knowingly doing anything

22   wrong, or knowingly violating any law, or