# Exhibit 50

Page 1

UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

-------------------------------X
FAIR FIGHT, INC., SCOTT BERSON,)
JOCELYN HEREDIA, and JANE DOE, )
       Plaintiffs,     )
                     )
       vs.          )Case No.
                     )2:20-cv-00302-SCJ
TRUE THE VOTE, CATHERINE    )
ENGELBRECHT, DEREK SOMERVILLE, )
MARK DAVIS, MARK WILLIAMS,    )
RON JOHNSON, JAMES COOPER, and )
JOHN DOES 1-10.           )
       Defendants.     )
                     )
FAIR FIGHT ACTION, INC.,    )
       Counter-Defendant. )
-------------------------------X

CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER
30(b)(6) VIDEOTAPED DEPOSITION OF
CATHERINE ENGELBRECHT
APPEARING REMOTELY
Wednesday, January 26, 2022
8:05 a.m. Central Time

Reported by:  Lori J. Goodin, RPR, CLR, CRR
RSA, California CSR #13959

_____
DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

```
                                                              Page 2
 1                    REMOTE APPEARANCES
 2
 3    FOR PLAINTIFFS:
          ELIAS LAW GROUP
 4        UZOMA N. NKWONTA, ESQUIRE
          MARCOS MOCINE-MCQUEEN, ESQUIRE
 5        JACOB SHELLY, ESQUIRE
          JOEL RAMIREZ, ESQUIRE
 6        10 G Street, Northeast
          Suite 600
 7        Washington, D.C.  20002
          202-968-4490
 8        unkwonta@elias.law
          mmcqueen@elias.law
 9        jshelly@elias.law
          jramirez@elias.law
10    AND CO-COUNSEL:
          LAWRENCE & BUNDY LLC
11        LESLIE J. BRYAN, ESQUIRE
          1180 West Peachtree Street
12        Suite 1650
          Atlanta, Georgia  30309
13        404-400-3350
          leslie.bryan@lawrencebundy.com
14    AND CO-COUNSEL:
          SANDLER REIFF LAMB ROSENSTEIN
15        & BIRKENSTOCK, P.C.
          DARA LINDENBAUM, ESQUIRE
16        1090 Vermont Avenue, Northwest
          Suite 750
17        Washington, D.C.  20005
          202-479-1111
18        lindenbaum@sandlerreiff.com
19
20
21
22
```

Page 3

```
 1              REMOTE APPEARANCES CONTINUED

 2

 3   FOR DEFENDANTS:

 4      THE BOPP LAW FIRM, PC

 5      JAMES BOPP, JR., ESQUIRE

 6      MELENA SIEBERT, ESQUIRE

 7      1 South 6th Street

 8      Terre Haute, Indiana   47807

 9      812-232-2434

10      jboppjr@aol.com

11      msiebert@bopplaw.com

12

13   Also present:

14      Joe Cerda, video/document technician

15

16

17

18

19

20

21

22
```

Page 4

1                    INDEX TO EXAMINATION

2    WITNESS:  CATHERINE ENGELBRECHT

3    EXAMINATION BY                                PAGE

4    MR. NKWONTA                                   10

5    MS. SIEBERT                                   337

6

7                    INDEX TO EXHIBITS

8                 CATHERINE ENGELBRECHT

9       Fair Fight, Inc., et al. v. True the Vote

10              Wednesday, January 26, 2022

11             Lori J. Goodin, RPR, CLR, CRR,

12                RSA, California CSR #13959

13   EXHIBIT     DESCRIPTION                       PAGE

14   Exhibit  1  Validate the Vote 2020 document  266

15   Exhibit  1A Crawford e-mail, 11/21/20         333

16   Exhibit  8  TrueAppend Report, 12/16/20       244

17   Exhibit  9  Engelbrecht e-mail, 12/16/20      219

18   Exhibit 13  Williams e-mail, 12/18/20         219

19   Exhibit 15  Williams e-mail, 12/12/20         140

20   Exhibit 16  Count by Race and Party           248

21   Exhibit 19  True the Vote invitation

22               to join a Zoom call, 12/19/20     159

Page 5

1                    INDEX TO EXHIBITS

2                  CATHERINE ENGELBRECHT

3       Fair Fight, Inc., et al. v. True the Vote

4                Wednesday, January 26, 2022

5             Lori J. Goodin, RPR, CLR, CRR,

6              RSA, California CSR #13959

7    EXHIBIT     DESCRIPTION                    PAGE

8    Exhibit 20  Engelbrecht text, 12/17/20      173

9    Exhibit 21  True the Vote invoice, 12/7/20  178

10   Exhibit 25  Holsworth e-mail, 12/30/20      197

11   Exhibit 26  E-mail chain, 12/28/20          201

12   Exhibit 30  Engelbrecht e-mail, 12/21/20    161

13   Exhibit 35  Reports from the Voter Integrity

                 Hotline                         84

14   Exhibit 36  E-mail chain, 12/18/20          226

15   Exhibit 37  Cooper e-mail, 12/15/20         241

16   Exhibit 38  Cooper e-mail, 12/18/20         239

17   Exhibit 39  Cooper e-mail, 12/15/20         237

18   Exhibit 40  Cooper e-mail, 12/19/20         240

19   Exhibit 44  Brightbart article              324

20   Exhibit 46  IPS article, 11/5/12            211

21   Exhibit 47  Gateway Pundit article, 9/24/20 322

22

Case 2:20-cv-00302-SCJ  Document 174-9  Filed 06/06/22  Page 7 of 29

1/26/2022           Fair Fight, Inc. et al. v. True the Vote, et al.        Catherine Engelbrecht 30(b)(6)
                         Confidential - Pursuant to Protective Order

Page 6

1                    INDEX TO EXHIBITS

2                   CATHERINE ENGELBRECHT

3        Fair Fight, Inc., et al. v. True the Vote

4                 Wednesday, January 26, 2022

5             Lori J. Goodin, RPR, CLR, CRR,

6               RSA, California CSR #13959

7    EXHIBIT     DESCRIPTION                       PAGE

8    Exhibit 61  True the Vote press release about
                 the Georgia Election Integrity
9                Hotline                           95

10   Exhibit 62  True the Vote press release       252

11   Exhibit 63  True the Vote blog post,
                 11/10/20                          314

12   Exhibit 64  Audio transcript from True the
                 Vote Live                         69

13   Exhibit 65  Audio transcript of Seals in the
                 Polls, 8/13/21                    60

14   Exhibit 66  Georgia lawsuit, 11/11/20         280

15   Exhibit 71  Eshelman e-mail, 5/11/20          291

16   Exhibit 72  Time for a Hero Facebook page     258

17   Exhibit 73  Crusade for Freedom tweet         263

18   Exhibit 74  990EZ for Time for a Hero, 2019   47

19   Exhibit 75  Notice of Deposition for
                 Catherine Engelbrecht             20

20   Exhibit 76  30(b)(6) Notice issued to
                 True the Vote                     18

21   Exhibit 79  True the Vote's Second
                 Amended Response                  92

22

Case 2:20-cv-00302-SCJ   Document 174-9   Filed 06/06/22   Page 8 of 29

1/26/2022                    Fair Fight, Inc. et al. v. True the Vote, et al.            Catherine Engelbrecht 30(b)(6)
                                  Confidential - Pursuant to Protective Order

Page 7

1                    INDEX TO EXHIBITS

2                  CATHERINE ENGELBRECHT

3         Fair Fight, Inc., et al. v. True the Vote

4                  Wednesday, January 26, 2022

5               Lori J. Goodin, RPR, CLR, CRR,

6                RSA, California CSR #13959

7      EXHIBIT     DESCRIPTION                      PAGE

8      Exhibit 81  True the Vote, Inc.'s Responses

9                  to Plaintiffs' First

10                 Interrogatories                  164

11     Exhibit 84  True the Vote, Inc.'s Amended

12                 Responses to Plaintiffs' First

13                 Request for Admission            162

14

15

16

17                 (All exhibits were provided

18                 electronically to the reporter.)

19

20

21

22

Page 8

1          WEDNESDAY, JANUARY 26, 2022, 8:05 A.M.

2

3                    PROCEEDINGS

4               THE VIDEOGRAPHER:  We are now

5      beginning this video deposition.  Today's

6      date is January 26, 2022.  The time on the

7      video record is 8:05 a.m.

8               This is the deposition of Catherine

9      Engelbrecht, taken in the matter of Fair

10     Fight, Inc. versus True the Vote.

11              Will counsel please identify

12     themselves for the record and whom they

13     represent.

14              MR. NKWONTA:  Good morning.  My name

15     is Uzoma Nkwonta, and I represent the

16     plaintiffs in this case.  I am joined with

17     co-counsel.  I will let them represent

18     themselves -- or introduce themselves, I

19     should say, I'm sorry.

20              MS. BRYAN:  Good morning.  This is

21     Leslie Bryan from Lawrence and Bundy.  I

22     represent the plaintiffs.

Page 9

 1                    MS. LINDENBAUM:  Good morning.  This

 2        is Dara Lindenbaum from Sandler Reiff Lamb

 3        Rosenstein & Birkenstock, also representing

 4        the plaintiffs.

 5                    MR. SHELLY:  Jacob Shelly with Elias

 6        Law Group with plaintiffs.

 7                    MR. RAMIREZ:  Joel Ramirez with

 8        Elias Law Group with plaintiffs.

 9                    MR. MOCINE-MCQUEEN:  Marcos

10        Mocine-McQueen, Elias Law Group with the

11        plaintiffs.

12                    THE VIDEOGRAPHER:  Okay.  Counsel,

13        and before we swear in the witness, do all

14        parties agree or stipulate to the witness

15        being sworn in remotely through Zoom?

16                    MR. NKWONTA:  Yes, plaintiffs agree.

17                    MR. BOPP:  And I don't think I

18        entered my appearance.  I am James Bopp,

19        representing the defendants and both -- and

20        representing both deponents in this action --

21        in this matter here today.

22                    And, Melena Siebert will probably be

```
                                                   Page 10

 1      joining us later, who is also counsel for the

 2      defendants.  And we consent to remote

 3      deposition.

 4              THE VIDEOGRAPHER:  Okay, counsel.

 5      With that being said, we will swear in the

 6      witness, thanks.

 7                      *   *   *

 8   Whereupon,

 9              CATHERINE ENGELBRECHT,

10   a witness called for examination, having been

11   first duly sworn, was examined and testified as

12   follows:

13                      *   *   *

14                   EXAMINATION

15   BY MR. NKWONTA:

16          Q.    Morning, Ms. Engelbrecht.

17          A.    Good morning.

18          Q.    My name is Uzoma Nkwonta.  As I

19   mentioned before, I represent the plaintiffs in

20   this case.

21              And, my understanding is that you

22   are appearing today in your personal capacity and
```

Page 69

1   We had an election integrity hotline, and it

2   didn't have a name so to speak.  So we named it

3   Validate the Vote.

4              And then when the attentions turned

5   towards Georgia, as I recall, we would say

6   Validate the Vote Georgia, but it was still a

7   national effort.

8              Does that answer your question?

9        Q.   Yes, it does.  You have used the

10  word, bounty on fraud, before, correct?  In

11  discussing the Validate the Vote program?

12       A.   I don't -- I have read through this

13  in the preparation for this.  I don't recall

14  saying that but -- I don't recall saying that,

15  but -- well, I will leave it at that.  I don't

16  recall saying it.

17              MR. NKWONTA:  Joe, can you pull up

18        Exhibit 64, please.  And if we can go to

19        Page 3 of Exhibit 64.

20                   (Exhibit 64 marked for

21                    identification.)

22  BY MR. NKWONTA:

Page 92

1          A.    I would have to -- I can't confirm

2    that.  I would have to -- I can't confirm that.

3    It should have just been a, you know, dump out to

4    fulfill the requirement, but I can't confirm it.

5                 MR. NKWONTA:  Let's see if we can

6       blow up a document.  That might help.

7                 Can we pull up Exhibit 79?

8                 (Exhibit 79 marked for

9                   identification.)

10                MR. NKWONTA:  And can you enlarge

11      that a little bit and scroll to Page 8.

12   BY MR. NKWONTA:

13         Q.    Ms. Engelbrecht, Exhibit 79 is the

14   Second Amended Response -- True the Vote's Second

15   Amended Response to Plaintiff's Second Request

16   for Production.

17                Do you recognize this document?

18         A.    Yes.

19         Q.    Now, if you look at the Request

20   Number 18, Request Number 18 seeks, "All

21   documents and communications relating to True the

22   Vote's Election Integrity Hotline as described in

Page 93

1  your responses to Interrogatories 2 and 3,

2  including, but not limited to, all documents and

3  communications surrounding the launch of the

4  hotline, follow-up with users of the hotline,

5  vetted reports, and follow-up with the

6  authorities charged with investigating such

7  claims as described in your response to

8  Interrogatory Number 3."

9              Is that a correct reading of Request

10 Number 18?

11      A.    That is a correct reading, yes.

12      Q.    And in your response you state that,

13 "The defendant True the Vote has produced the

14 record of all hotline contacts relevant to

15 Georgia during the time frame of the runoff

16 election."  Is that correct?

17      A.    Yes.  And that would be relevant to

18 Georgia at the time of the runoff collection --

19 runoff election, yes.

20      Q.    You also state that, in the second

21 paragraph, "None of these contacts resulted in

22 the need for True the Vote to follow up or report

Page 94

1    the contact information to appropriate

2    authorities."

3                    Is that correct?

4                    THE WITNESS:  Can we -- I apologize.

5        Could we just scroll down so I can see that

6        in the response?

7                    MR. NKWONTA:  Keep scrolling.

8                    THE WITNESS:  I can go -- yes.

9                    MR. NKWONTA:  The next page.

10                   THE WITNESS:  The next page.

11                   MR. NKWONTA:  And then the paragraph

12       starting with None of these concepts.

13                   Can you scroll down a little bit

14       more, Joe?

15                   THE WITNESS:  Yes.  Yes.

16   BY MR. NKWONTA:

17       Q.    Is it accurate that none of the

18   reports to your election integrity hotline or

19   Validate the Vote hotline resulted in the need

20   for True the Vote to report anything to

21   authorities?

22       A.    Specific to this request for

Page 95

1   production around the Georgia runoff and the

2   exhibit that we have looked at, that would be the

3   case, yes.

4                    MR. NKWONTA:  You can pull that

5         down, Joe.  I would like to ask about some of

6         your other election related efforts.

7                    If we could pull up Exhibit 61.  And

8         can we scroll to the next page.

9                         (Exhibit 61 marked for

10                         identification.)

11  BY MR. NKWONTA:

12        Q.    Do you recognize this document,

13  Ms. Engelbrecht?

14        A.    Yes.

15        Q.    What is it?

16        A.    This was, based on its formatting,

17  this would have been taken from our website.  And

18  it just describes that we launched the Election

19  Integrity Hotline specific to the runoff period.

20        Q.    And this is a press release issued

21  by True the Vote, correct?

22        A.    Yes.  Or a blog post, but yes.

Page 170

1   conversation exchange with Ryan Germany, where I

2   wanted to understand if this was a burden on

3   counties and what that would look like and the

4   timing, because they were beginning to prepare

5   to -- for the early opening of absentee ballot

6   applications.

7                And Mr. Germany saying that it would

8   be a very simple process, that counties could

9   forward on the spreadsheet to the state.  The

10  state would forward it to their vendor.  And it

11  would be flagged as I have described in previous

12  comments.

13                So, the, the -- our understanding,

14  my understanding leaving that meeting was

15  following the process would be a, a smooth way to

16  support these electors who had, you know, come to

17  us with concern, out of concern for the fact that

18  the rolls weren't being maintained.

19        Q.    You mentioned you were concerned

20  about the size of the challenges and how large it

21  was.  Why were you concerned about the size of

22  the challenges?

Page 231

1    BY MR. NKWONTA:

2         Q.    Do you want to take a minute just to

3    read that e-mail?

4         A.    Okay.

5         Q.    How many challengers did the True

6    the Vote reach out to?

7               How many potential challengers did

8    True the Vote reach out to in order to seek

9    assistance in submitting these challenges?

10        A.    I don't know.

11        Q.    Did True the Vote try to recruit

12   challengers in all Georgia counties?

13        A.    We were open to that for sure and

14   prepared the analysis to support that.

15              But as far as the individuals and

16   the voters who wanted to participate that was --

17   you know, as much as people coming to us as it

18   was people being referred that were also coming

19   to us, so --

20        Q.    So this e-mail that went to

21   potential challengers stated that True the Vote

22   has identified over 500,000 people on the Georgia

Page 232

1    voter list that shouldn't be there.

2              Is that correct that True the Vote

3    identified over 500,000 people in the Georgia

4    voter lists?

5        A.    They are in -- yeah, there are a

6    number of things in this e-mail that are not

7    correct which is what is giving me pause, so --

8        Q.    Okay.  So, we will start first with

9    that 500,000 figure.  Is that correct?

10       A.    Sure.  Um, that is not the number

11   that we had for our challenges, no.

12       Q.    And states that the 500,000 people

13   should not be on the challenge list.

14             Is it True the Vote's position that

15   all individuals on those challenges should not be

16   registered in Georgia or should not be on the

17   voter list?

18       A.    It was and is our position that

19   according to the analysis that we provided, or

20   that we supported, records corresponded with

21   individual decisions to permanently change their

22   residence.

Page 233

1               And therefore it would have made

2     their record ineligible and appropriate in the

3     scope of an elector challenge.

4               That sentence is -- doesn't indicate

5     those nuances that I think are critical.

6          Q.   At that point had True the Vote

7     concluded that these voters should not be on the

8     voter rolls or that they were not legally

9     registered?

10         A.   Well, again on the basis of our

11    analysis, the, all that is and should have been

12    done was the recognition of the information that

13    was available and the provision of that to the

14    counties.

15              This is, you know -- this e-mail is,

16    doesn't clearly make those distinctions known or

17    understood.

18         Q.   The e-mail also, I think the fourth

19    paragraph down asked the voter to take a photo of

20    and scan your signature and e-mail it with their

21    voter registration information.

22              But it doesn't offer the voter an

Page 234

1    opportunity to review the list, does it?

2           A.    This e-mail does not offer that, no.

3           Q.    At the third paragraph from the

4    bottom, in the last sentence of that paragraph,

5    it says, "True the Vote has assured me that the

6    list that they are challenging is 99.9 percent

7    likely to be incorrectly registered."

8                 Do you have any way of knowing

9    whether 99.9 percent of your challenge list is

10   incorrectly registered?

11          A.    No.  And my data background would

12   never make that kind of statement.  And the

13   statement itself is odd in the way the sentence

14   is written, "True the Vote has assured me that

15   the list."

16                It seems odd that Amy would have

17   written that because Amy was part of the True the

18   Vote team.  That is a distinction that you

19   probably didn't -- well, you didn't ask for, no.

20                But specific to your inquiry about

21   the 99.9, this data is -- data is data.  You

22   shouldn't make assertions like that.

Page 235

1          Q.    And regardless of who wrote it, you

2     don't dispute that Amy sent it, right?

3          A.    I, according to what I'm looking at

4     on the screen, the markings are there to support

5     it.

6                It just does not --

7          Q.    If Amy testified that she sent it,

8     would you have any reason to --

9          A.    No, if Amy testified that she sent

10    it, if she said she sent it, then she sent it.

11         Q.    And if this document was produced by

12    defendants, would you have any reason to doubt

13    that this was sent by defendants?

14         A.    I mean if they said they did this,

15    then they did this.

16                MR. NKWONTA:  Can we go to Page 16

17       of Exhibit 36.  And can you scroll a little

18       bit so we get that full e-mail below from

19       James Cooper.

20                THE VIDEOGRAPHER:  Sorry, guys.  It

21       is just -- stand by.

22                MR. NKWONTA:  Okay.

Page 236

1             THE VIDEOGRAPHER:  And then you said

2        Page 16 of 36?

3             MR. NKWONTA:  Yes, Page 16.

4             THE VIDEOGRAPHER:  Roger that.

5    BY MR. NKWONTA:

6        Q.    And then you see that the e-mail

7    from James Cooper is also on -- in Exhibit 36,

8    and also includes similar language?

9        A.    Yes.

10       Q.    And if you look at the second

11   paragraph, second to the last sentence, there is

12   an additional sentence there that says, "If this

13   very type action" -- I think there is a typo.  I

14   will start again.

15            "If this very type action had been

16   taken back in October, it is very likely Trump

17   would have won Georgia."  Do you see that there?

18       A.    I do.

19       Q.    At the very top, do you see the

20   response from the voter to James Cooper that

21   says, "True the Vote has my permission to use my

22   signature to challenge the illegal votes in Cobb

Page 237

1    County."

2              Is that right?

3        A.    That is what it says, yes.

4        Q.    You mentioned that the challenges

5    were not technically meant to remove voters from

6    the voter rolls.

7              But isn't it true that some voters

8    got that impression from the communications that

9    were issued to these voters?

10             MS. SIEBERT:  Objection.  You are

11        asking her to testify about other people's

12        state of mind.

13             Catherine, go ahead.

14             THE WITNESS:  I mean, this is what

15        James Cooper wrote.  It is really all I can

16        say.  It is what somebody else wrote.

17             MR. NKWONTA:  Could we pull up

18        Exhibit 39, please.

19                  (Exhibit 39 marked for

20                   identification.)

21   BY MR. NKWONTA:

22        Q.    Exhibit 39 is a little bit clearer.

Page 238

1    And you will see at the top of Exhibit 39, James

2    Cooper forwards the e-mail chain below to a

3    number of individuals, including yourself.

4              And you can see that the body of the

5    e-mail below that he forwarded is similar; is

6    that right?

7         A.   Yes.

8         Q.   And in response to James Cooper's

9    e-mail, the perspective challenger responds,

10   "James, Here is my," it is redacted.  I'm

11   assuming it is a registration number.

12             "I give True the Vote permission to

13   use my name and signature in the pursuit of

14   purging the rolls of the deceased, nonexistent

15   and nonresidents of my county."

16             Is that a correct reading of the

17   proposed challenger's response?

18             THE WITNESS:  Can you scroll up a

19        little bit, Joe?  Or down.  Sorry.  Yes.

20             So, that is what you just read and

21        that is what the document says, yes.

22   BY MR. NKWONTA:

Page 245

1    the, what the data shows.

2              So, I knew that that had occurred.

3         Q.   Do you know when this analysis was

4    first conducted?

5         A.   The analysis on this exhibit?  Or --

6         Q.   The analysis of the demographic

7    breakdown of the challenge list.

8         A.   I don't know exactly.  It came later

9    as a form of reputation of the assertion that

10   there was -- that that was part of this.

11             But, I don't know the date, no.

12        Q.   True the Vote announced its

13   challenge program on December 18th, 2020; is that

14   correct?

15        A.   I don't recall exactly.  It would

16   have been around then, yes.

17        Q.   And if I told you the date was --

18   the date that had been provided by defendants was

19   December 18th, would you have any reason to

20   dispute that?

21        A.   No real reason to dispute it, no.

22        Q.   And if you look at this file here,

Page 246

1    it says create date, 12/16/2020.

2              Is that what you see there on OPSEC

3    Number 9?

4         A.    Uh-huh, I do see that.

5              MR. NKWONTA:   And if we scroll down

6       to the chart, I just want to make sure that

7       you have a chance to look at the charts in

8       here.

9              If you scroll to Page 18 of this

10      PDF, for instance.

11   BY MR. NKWONTA:

12        Q.    Have you seen this chart before?

13        A.    I don't think that I have, no.

14        Q.    Do you know why OPSEC would have

15   created this chart?

16        A.    I knew that there were, in the

17   TrueNCOA, they have an extension that is part of

18   their platform called TrueAppend that

19   automatically prints these out.

20              So, I read about this in the

21   exhibits.

22              MR. NKWONTA:   Could we go to Page 8.

Page 254

1          A.    We ended up with electors that

2    wanted to challenge, totaling 65 total counties.

3    And, so submissions were made in those counties

4    on behalf of those electors.

5          Q.    And why didn't True the Vote file

6    challenges in all 159 counties as it stated in

7    the press release?

8               THE WITNESS:  Guys, I just got a

9        password required notice.  Can you all see

10       that on the screen or is it just me?

11              THE VIDEOGRAPHER:  Sorry, Catherine.

12       This is Joe.  That might be on your end.  I'm

13       not sure what it is relating to.

14              THE WITNESS:  It is, it is.  I

15       apologize.  I just Xed out of it and it is

16       gone.  I apologize.

17              THE VIDEOGRAPHER:  Okay.

18              THE WITNESS:  I'm sorry, could you

19       repeat the question?

20   BY MR. NKWONTA:

21         Q.    Sure.

22              MR. NKWONTA:  Can the court reporter

Page 255

1      read back the question, please.

2                  (Whereupon, the record was read by

3      the reporter as requested.)

4                  THE WITNESS:  Again, I think the

5      press release was meant to acknowledge that

6      we had done the analysis to support that.

7      The reason that we didn't ultimately is

8      because it wasn't for us to do.

9                  It was for electors in the, in their

10     respective counties.  And that is just the

11     way the process works.

12 BY MR. NKWONTA:

13     Q.    But True the Vote said it was going

14 to do this in the press release, in the very

15 first line, right?

16     A.    Yeah.  Again, I think that the

17 intent of the line was to suggest that we -- that

18 True the Vote was prepared to do that and do that

19 in every county.

20                 But, you know, we go quickly into

21 the description of an elector challenge.  And it

22 is, you know, the qualifications therein, so that