United States District Court
Northern District of Georgia
Gainesville Division

| | |
|---|---|
| **Fair Fight, Inc., Scott Berson, Jocelyn Heredia,** and **Jane Doe**, <br><br> *Plaintiffs,* <br><br> v. <br><br> **True the Vote, Inc., Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, James Cooper,** and **John Does 1-10**, <br><br> *Defendants.* | Civ. No. 2:20-cv-00302-SCJ <br><br> Hon: Steve C. Jones |

# DEFENDANTS' RESPONSE TO PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS

Pursuant to Rule 56 of the Federal Rules of Civil Procedure and Local Rule 56.1, Defendants True the Vote, Inc. ("**TTV**"), Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, and James Cooper (collectively, "**Named Defendants**"), by and through counsel, offer the following responses to Plaintiffs' Statement of Additional Material Facts:

## Mark Davis and Derek Somerville

2. Defendants Somerville and Davis prepared challenge lists of roughly 40,000 voters, and organized the submission of those challenge lists in advance of the January 2021 runoff election with full knowledge that the processes under the National Voter Registration Act ("NVRA") precluded the state from removing voters in advance of the election. Ex. 45, Second Excerpt of Derek Somerville First Deposition Transcript ("Somerville I Tr.") 72:19-73:5; 119:12-122:2.

**Response:** The first citation supports the statement that (1) the list prepared by Defendants Somerville and Davis included roughly 40,000 voters; the second citation supports the statements that (2) Defendant Somerville understood that it is permissible to rely on NCOA data to initiate the NVRA-mandated process for removal of individuals from voter lists and that (3) the NVRA-mandated process for removal of individuals from voter lists took "six or seven years." Somerville I Tr. 121:12-15. That the list included 40,000 names is not material because the number of names challenged is irrelevant to any claim and therefore cannot affect the outcome of the case. The third statement is not material because Defendants' challenge under O.C.G.A. § 21-2-230 does not entail the action proscribed by the

NVRA and the NVRA is not at issue in this case and therefore this "fact" cannot affect the outcome of this case. The second statement—that Defendant Somerville understood that it is permissible to rely on NCOA data to initiate the NVRA-mandated process for removal of individuals from voter lists—cuts against Plaintiffs' claim that the Davis/Somerville Challenge List was frivolous or inaccurate.

      3. Mr. Davis previously recognized an "obvious conflict" between his preferred administration of Georgia's residency requirements and the NVRA, and noted that "existing Georgia case law" cuts against his preferred approach of cleaning the voter rolls by purging voters. Ex. 51, Mark Davis Affidavit ¶ 14.

**Response:** The citation does not support this statement. Mr. Davis testified that he understands the NVRA to require state officials to address "voters who have name and address records which matched against . . . [NCOA] records," Ex. 51. Mark Davis Affidavit ¶¶ 8,9. Describing this as his "preferred approach" is misleading editorial commentary. Moreover, the "conflict" of which Mr. Davis spoke was between "effective implementation and administration" of Georgia *residency* law and the NVRA requirement to address voters matching NCOA records—i.e.,

**Defs.' Resp. To
Pls.' Add'l. Facts**                                                3

voters that have moved. Mr. Davis's opinion that there is a conflict between Georgia residency law and the NVRA[1] is not material because it is irrelevant to the Georgia law at issue here—O.C.G.A. § 21-2-230—or the question of how any challenge list was created and will not affect the outcome of the suit.

4. Mr. Davis has also referred to the NVRA as "antiquated," *id.* ¶ 36, and, from his perspective, at odds with ensuring clean voter rolls. Ex. 47, Second Excerpt of Mark Davis First Deposition Transcript ("Davis Tr. I") 112:19-22, 114:10-18.

**Response:** The citations do not support this statement. There, Mr. Davis opined that the NVRA "should be amended so that it's more helpful in keeping our nation's voter rolls cleaner," Davis Tr. I 112:20-22, and suggested that a voter data

---

[1] In context, Mr. Davis's testimony opines that the Georgia residency law makes difficult the NVRA requirement to identify voters that have changed address because Georgia cases have interpreted "residency" such that "evidence indicating a voter has in fact moved, even many years ago, is insufficient to prove that they intended to establish a new residence," Davis Aff. ¶ 15, the "net effect" of which is that the "Georgia database always contains hundreds of thousands of people who have filed changes of address with the USPS, stating they have moved away from the addresses shown on their voter registration records . . . ." *Id.* ¶ 17. In sum, Mr. Davis's testimony is that Georgia residency law "conflicts" with the NVRA's requirement of voter list maintenance, which is irrelevant to any question raised in this case.

clearinghouse, which would cross check voters' identifying information to determine, among other things, "if a voter is registered in more than one state." *Id.* 113:18-19. Mr. Davis opined that advances in technology had made such a project feasible, *id.* 114: 10-13, and the result was in keeping with the purposes of the NVRA, *id.* 114:14-18. This does not characterize the NVRA as "at odds" with "ensuring clean voter rolls" (both phrases are editorial comment) but that its purposes, which include list maintenance, could be improved.

5. At the time they filed the challenges, Mr. Davis and Mr. Somerville did not know whether it was "possible or feasible" to verify voters' eligibility before the runoff election. Somerville Tr. I at 132:22-133:4; *see also* Davis I Tr. 151:11-13 (admitting that the larger the number of voter challenges, the harder it is for counties to deal with them).

**Response:** The conclusion implied in this statement—that Messrs. Davis and Somerville were at least indifferent to whether eligibility for challenged voters could be verified before voting—is not material, because the challenge procedure did not require that voters' eligibility be verified before any election. *See*, *e.g.*, Berson Resp. To Interrogs, ECF No. 155-23 Nos. 12, 13 (Plaintiff Berson cast a

provisional ballot that was later counted after eligibility was verified).

6. And as Mr. Somerville described, "[w]hether or not the challenges were submitted, whether or not they were heard, and whether they were consequential at the county level was tertiary to trying to demonstrate that there are laws in the state that empower citizens to be involved; that our voter file is managed by state officials, and potentially not very well." Somerville Tr. I at 107:7-14.

**Response:**  The implied conclusion in this statement is not material or supports Defendants. Whether or not Mr. Somerville sought to bring attention to what he saw as a problem with data integrity in voter lists, Somerville Tr. I at 105:15-18, is immaterial to any issue in this case and would not affect the outcome of the suit. Moreover, Mr. Somerville testified that his purpose in the challenge was to "bring attention to . . . anomalies within the data file," Somerville Tr. I at 131:9-11, caused by Georgia's failure to "run[ ] that NCOA process per the NVRA more frequently," *id.* 129:16-18. This purpose coincides with the purposes of both the NVRA and of O.C.G.A. § 21-2-230.

7. Mr. Somerville stated that he and Mr. Davis believed that "election officials were paying attention to what we were doing, and that our effort might

**Defs.' Resp. To
Pls.' Add'l. Facts**                                6

influence discussions," and "the effort was to go straight to the source of the matter and try to draw attention to the voter file." *Id.* at 109:9-12, 109:19-21.

**Response:** The conclusion invited by this statement either supports Defendants or is immaterial. If Messrs. Somerville and Davis sought to garner attention to their position that the voter file needed the "hygiene" prescribed by the NVRA, Somerville Tr. I. at 109:14-18; 66:11-18 (Somerville and Davis used the same process as was provided by the NVRA), that describes no state of mind or circumstances from which it can be inferred that Defendants sought to do anything that was objectively likely to intimidate voters in violation of §11(b) of the Voting Rights Act.

8. After Mr. Davis provided his spreadsheet of alleged non-resident voters to the Secretary of State's office, Ryan Germany, the Secretary of State's General Counsel, provided a factual and legal "analysis of the issue Mark Davis is pushing regarding in-state moves." Ex. 61, July 13, 2021 R. Germany Email at 1.

**Response:** Admitted with clarifications: First, the email says that legal analysis was also provided by Sarah Beck insofar as she "helped [Mr. Germany] find the relevant state laws," R. Germany Email at 1, because deciding the relevance of a

"complicated array of . . . state law," *id.*, is legal analysis. Second, Mr. Germany admits that the analysis was "quick," R. Germany Email at 1, and this must be considered in weighing its value in deciding the issues presented in this case.

      9. SOS Counsel Germany explained in his email that "determining whether someone who moved from one county to another should have been eligible to vote" requires applying federal and state law "to each individual's factual scenario. A spreadsheet listing voters' names doesn't come close to meeting that standard." *Id.*

**Response:** Defendants admit that those words appear in the email as submitted by Plaintiffs. Both the statement about what is required to determine the effect of a move on voting eligibility and the assessment of "the spreadsheet" are not statements of fact but are legal conclusions and/or editorial comment.

      10. SOS Counsel Germany further explained: "The NVRA requires individualized inquiry into each voter's situation. Calling these voters 'illegal voters' without doing that individualized inquiry is a disservice." *Id.*

**Response:** Defendants admit that those words appear in the email as submitted by the Plaintiffs, noting that other sources attribute the statement to a spokesman for

**Defs.' Resp. To
Pls.' Add'l. Facts**                            8

the Secretary of State's office. The statement of what the NVRA requires is a legal conclusion and not a statement of fact. The description of Mr. Davis's statement is editorial comment and is based on the legal conclusion that precedes it.

11. Additionally, 100% of the voters on Mr. Davis's list verified their residency before voting, with specifically (1) 86% of the voters identified by Mr. Davis showed up in person at the location where they were registered, showed their photo ID, executed a voter certificate saying they resided where they are registered, and then were allowed to vote, and (2) the other 14% voted absentee by mail, submitting an absentee ballot application saying that they still resided where they were registered. *Id.*

**Response:** Defendants admit that those words appear in the email. Mr. Germany's factual assessments are not supported by citation to data or evidence in the record and are result of what Mr. Germany describes as "quick analysis," R. Germany Email at 1, and this must be considered in weighing their value in deciding the issues presented in this case. Moreover, the statements have been controverted insofar as they are offered to infer that the Davis/Somerville Challenge List was frivolous or inaccurate. Defendants have offered evidence that over 3500 voters

who had submitted changes of address outside the statutory grace period cast ballots in their old county—as Mr. Germany's statements allege---and *then* updated their voter registration to their new county after the January run-off election. Davis Interrog. Resp. Ct. Order Resp. No. 3. The evidence showed that 37% of the voters who indicated a change of address within Georgia have updated their voter registration addresses to the same addresses shown in the NCOA data used by Defendants, providing self-confirmation that the information on the Davis/Somerville Challenge List was accurate when it was compiled. *Id.* In short, after voters filed a change of address, they cast ballots in the old counties and then, after the election, registered in a new county, many in the very county to which the Davis/Somerville Challenge List indicated they'd moved to. Mr. Germany's statements do not counter this.

12. In addition to the approximately 40,000 voter challenges that they coordinated, Defendants Somerville and Davis also engaged in the following actions:[2] **(1) participated in strategy discussions with Defendants Engelbrecht**

---

[2]To aid clarity of responses to Additional Fact 12, Defendants provide them after each subpoint rather than at the end. Both the statement being responded to and the initial indicator of "Response" has been bolded for clarity as well.

**Defs.' Resp. To
Pls.' Add'l. Facts**                                10

**and OPSEC's Gregg Phillips before True the Vote ("TTV") filed its challenges, Somerville Tr. I 19:5-23:2; Davis Tr. I at 35:3-38:19; 49:12-50:21;** Response: "Strategy discussions" is editorial commentary and the inference that there were discussions of how to conduct challenges under O.C.G.A. § 21-2-230 is not supported by the material cited. As the evidence cited provides, Mr. Somerville met with TTV and OpSec for dinner once, Somerville Tr. I 19:5-20:5, at which they discussed the general election, *id.* 21:9-18, including "irregularity," *id.* 22:7-9, discussed electoral challenges *id.* 22:10-22, generally discussed the general political environment in Georgia, *id.* 23:12-15, and did not discuss "clarity on how to file challenges," *id.* 23: 9-11; Mr. Davis had a phone call with Messrs. Somerville and Phillips about his observations of "voting irregularities," specifically, that Georgia voters were not updating voter registration and driver's licenses and that he had evidence that moved voters had voted in their old counties in the general election Davis Tr. I at 35:12-37:15. Mr Davis declined Greg Phillips's invitation for "taking a role in Georgia with True the Vote," *id.* 38:22-39:5; **(2) attended meetings with TTV and its analyst, Phillips, Somerville Tr. I 29:10-34:17; Response**:  the evidence cited describes a phone conversation

**Defs.' Resp. To
Pls.' Add'l. Facts**               11

between Messrs. Somerville, Davis, and Phillips and offers no support for the statement that Mr. Somerville attended a meeting with TTV and Mr. Phillips and supports no inference that there was any sharing strategies or coordinating efforts; **(3) Mr. Somerville spoke at TTV's challenger meeting to offer "encouragement" to the elector challenge volunteers, Somerville Tr. I at 115:2-117:9; Response**: The evidence at the citation supports that Mr. Somerville "attended" the call-in meeting, did not lead it, and was not on "the agenda." Somerville Tr. I at 116:12-22. Mr. Somerville did not recall what he said, but said that "I'm sure that I offered my encouragement," *id.* at 117:1-4, which he described as "encouragement in the general sense," *id.* at 117:7-9, because he "think[s] it's good any time that . . . citizens involve themselves productively." *Id.* at 117:5-6;  **(4) Mr. Somerville edited TTV's public communications about the challenges before they were released, voluntarily including himself and Mr. Davis on TTV's press release announcing the challenges, Somerville Tr. I 37:7-40:7; Ex. 52, Dec. 17, 2020 D. Somerville Text; Reponse**: The evidence cited supports only that after TTV met with the Georgia Secretary of State, *see* TTV Tr. 168:5-22, TTV sent Mr. Somerville a text alerting him of changes to the

**Defs.' Resp. To
Pls.' Add'l. Facts**                                       12

planned press release announcing TTV's challenge in which TTV "intended to include [Somerville's] and Mark [Davis's] names." Somerville Tr. I 37:13-39:1. Mr. Somerville did not recall whether Mrs. Engelbrecht responded to his edits. Somerville Tr. I 39:3-40:6 and; **(5) when TTV announced its mass challenge program, Mr. Somerville publicly praised the effort, explained that he "collaborated on methodology," and touted that he was "honor[ed] to be a part of the fight." Ex. 53, Dec. 18, 2020 Somerville Facebook Post. Mr. Somerville was also noted as a "fellow . . . challenger" by Ms. Engelbrecht in TTV emails. Ex. 54, Dec. 19, 2020 C. Engelbrecht Email. Response**: In his deposition, when questioned about the Facebook post, Mr. Somerville testified that the only collaboration was "discussions . . . on data definitions, or the general political arena, Somerville Tr. I 42:9-11, and that "there was absolutely no collaboration on their list, on how it was compiled, on whether it was quality assured, their numbers, how they delivered it, where they delivered it. There was no collaboration whatsoever on any of that." *Id.* 42:22-43:5. The cited evidence of a "fellow . . . challenger" is of one email announcing the call discussed *supra* Additional Statement subpart (3) and offers no support for the inference that Mr.

**Defs.' Resp. To
Pls.' Add'l. Facts**                     13

Somerville participated in any challenge.

## OPSEC and True the Vote Challenge

13. Despite multiple requests to OPSEC to produce or explain the underlying data or analysis underpinning its challenge lists, OPSEC refused to do so, both during written discovery and depositions. Specifically, Plaintiffs subpoenaed OPSEC to produce "All documents and communications relating to the methodology you relied upon in producing the Challenge List or any other list of Targeted Voters prepared in connection with the Elector Challenges, and the basis for identifying any of the Targeted Voters," Ex. 59, OPSEC RFP Response No. 3, and "All documents and communications that you reviewed to assess or ensure the reliability or accuracy of the Challenge List or any other list of Targeted Voters that were submitted with the Elector Challenges," Ex. 59, OPSEC RFP Response No. 4. But OPSEC failed to produce documents reflecting the design of its proprietary process. *See* Ex. 11, OPSEC Tr. 114:4-7, ECF No. 156-14 (refusing to produce the algorithm used to create the Challenge List).

**Response:** This is not a statement of fact but a legal argument. Insofar as it includes facts, Defendants dispute that the record supports the statement that

OpSec failed to produce or explain the underlying data or analysis underpinning the challenge lists. As the evidence cited provides, OpSec provided a detailed description of its methodology both in response to interrogatories and in deposition. In Ex. 59, OpSec RFP Response No. 3, provided a detailed description, including the data consulted, and objected only to the production of trade secrets, proprietary information, or information subject to confidentiality agreements. *Id.* Plaintiffs have been on notice since at least then that certain aspects of OpSec's process were proprietary and would not be divulged. Even so, in OpSec's deposition, some months later, Gregg Phillips answered all of Plaintiffs' questions about the methodology, divulging, among other things, that it is based on a proprietary process that uses a 4000-row algorithm, involving a complex series of mostly common algorithms, such as dissimilarity and similarity indexes and fuzzy logic. OpSec Tr. 107:13-108:4; 113:22-114:3. Plaintiffs should not now be heard to complain that some core proprietary information has not been revealed, when they have been told that it would not be revealed since the outset of discovery. Moreover, the information that Plaintiffs claim to need is not material because it is not needed to demonstrate that the challenge was not

**Defs.' Resp. To**
**Pls.' Add'l. Facts**                     15

frivolous and will not otherwise affect the outcome of the suit.

14. Mr. Phillips also refused to describe in any meaningful detail the kind of accuracy that could be expected based on his proprietary process. *See id.* 140:14-141:7.

**Response:** "Meaningful detail" and "accuracy that could be expected" are editorial commentary and/or subjective standards. Defendants dispute any inference that there is no evidence of expected accuracy. OpSec has testified that the proprietary process used a sophisticated algorithm to draw in information from other databases, and used regression modeling to substantially cut the risk of a mismatch, and reviewed the results of matching names to ensure that it was reasonable with respect to false positives and false negative to within one standard deviation of the potential error that might be expected. OpSec Tr. 108:8-11 113:6-17, 118:11-119:22, 140:8-141:7 141:11-20.

### Additional SOS Investigation

15. After the November 2020 election, Frances Watson, the Georgia Secretary of State's Chief Investigator, mailed surveys to "voters that had filed a National Change of Address form (NCOA) and also requested an Absentee Ballot

emailed to [an] out of state address[.]" Ex. 60, Apr. 6, 2021 F. Watson Email at 1.

**Response:** Defendants admit that Mr. Watson mailed surveys to voters that had filed an NCOA and also requested an Absentee Ballot to an out of state address. The facts to be inferred from this survey are of limited value and materiality because this survey was not comparable with the process, scale, and methods used to produce the voter challenge lists at issue in this case. The survey was of only 8000 voters, addressed only out-of-state absentee voters, relied on self-reporting, and gleaned 1066 responses. Ex. 60, Apr. 6, 2021 F. Watson Email at 1.

16. Ms. Watson received 1,066 responses to the questionnaire. *Id.*

**Response:** Defendants admit that the evidence cited so provides.

17. From those surveys, 99% of the individuals she identified on the NCOA list remained eligible to vote in Georgia. *Id.*

**Response:** Defendants admit that the evidence cited so provides, but dispute the inference that a similar percentage of all the voters filing an NCOA change of address would or did remain eligible to vote in Georgia or that Ms. Watson's survey was designed or carried out to allow such an inference to be made.

18. Only 13 voters (1.2195%) reported relocating in the months before the

November 2020 elections. *Id.*

**Response:** Defendants admit that the evidence cited so provides, but dispute the inference that a similar percentage of all the voters filing an NCOA change of address would or did remain eligible to vote in Georgia or that Ms. Watson's survey was designed or carried out to allow such an inference to be made.

19. Most of the surveyed voters forwarded their mail because they were active military, visiting family, temporarily traveling for a job assignment, or for other innocuous reasons, but had not moved. *Id.*

**Response:** Defendants admit that the evidence cited so provides, but dispute the inference that similar circumstance apply to all the voters filing an NCOA change of address or that Ms. Watson's survey was designed or carried out to allow such an inference to be made.

Dated: June 21, 2022                              Respectfully Submitted,

*/s/ David F. Guldenschuh*                        */s/ James Bopp, Jr.*
David F. Guldenschuh                              James Bopp, Jr.,* IN # 2838-84
GA Bar No. 315175                                 jboppjr@aol.com
David F. Guldenschuh P.C.                         Jeffrey P. Gallant,* VA # 46876
P.O. Box 3                                        jgallant@bopplaw.com
Rome, Georgia 30162-0333                          Courtney Turner Milbank,* IN#
Telephone: 706-295-0333                           32178-29
Email: dfg@guldenschuhlaw.com                     cmilbank@bopplaw.com
*Local Counsel for Named Defendants*              Melena Siebert,* IN # 35061-15
                                                  msiebert@bopplaw.com
                                                  THE BOPP LAW FIRM, PC
                                                  1 South 6th Street
                                                  Terre Haute, Indiana 47807
                                                  Telephone: (812) 232-2434
                                                  Facsimile: (812) 235-3685
                                                  *Lead Counsel for Named Defendants*
                                                  **Admitted Pro hac vice*

## Certificate of Compliance

The undersigned counsel certifies that the foregoing has been prepared in Times New Roman (14 point) font, as required by the Court in Local Rule 5.1(B). Respectfully submitted on June 21, 2022.

*/s/ James Bopp, Jr.*
James Bopp, Jr.
Lead Counsel for Named Defendants
