**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA GAINESVILLE DIVISION**

FAIR FIGHT, INC., SCOTT BERSON, JOCELYN HEREDIA, and JANE DOE,

Plaintiffs,

v.

TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1-10,

Defendants.

Civil Action No. 2:20-cv-00302-SCJ

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

INTRODUCTION ..... 1

ARGUMENT ..... 2

I. Undisputed evidence confirms Plaintiffs were intimidated by Defendants' election-related schemes. ..... 2

A. Defendants intimidated Jocelyn Heredia. ..... 2

B. Defendants intimidated Jane Doe. ..... 4

C. Defendants intimidated Scott Berson, Stephanie Stinetorf, and Gamaliel Turner. ..... 6

D. Defendants' conduct required Fair Fight to divert resources. ..... 7

II. Defendants' election-related schemes were objectively intimidating. ..... 8

A. Defendants' multifaceted campaign violated Section 11(b). ..... 8

B. Defendants' voter challenges were frivolous. ..... 12

CONCLUSION ..... 15

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*,
557 F.3d 1177 (11th Cir. 2009) ....................8

*Democratic National Committee v. Republican National Committee*,
671 F. Supp. 2d 575 (D.N.J. 2009) ....................11

*Fla. State Conf. of N.A.A.C.P. v. Browning*,
522 F.3d 1153 (11th Cir. 2008) ....................8

*Husted v. A. Philip Randolph Institute*,
138 S. Ct. 1833 (2018) ....................14

*Irby v. Bittick*,
44 F.3d 949 (11th Cir. 1995) ....................12

## Statutes

52 U.S.C. § 10307(b) ....................*passim*

52 U.S.C. § 20507(d) ....................15

O.C.G.A. § 21-2-216(a)(4) ....................15

## Other Authorities

Fed. R. Evid. 701 ....................13

*Hearings on S. 1564 Before the S. Comm. on the Judiciary*, 89th
Cong. 16 (1965) ....................5

## INTRODUCTION

The undisputed facts are dispositive: Defendants unleashed a statewide wave of frivolous voter challenges and an accompanying multi-media blitz, leaving lawful Georgia voters fearful that they could not, or should not, cast a ballot.

Defendants do not dispute that they promoted a plan to identify "illegal voters" and "build public momentum" in Georgia and other targeted states "to have the state's election results overturned." Defs.' Resp. to Pls.' Corrected Statement of Undisputed Material Facts ("Defs.' Resp. SUMF") ¶¶ 45, 130, ECF 173-1. They do not deny threatening widespread voter challenges in press releases, *id*. ¶ 58, publishing social media posts that drummed up anger at imaginary illegal voters, *id*. ¶ 139, or filing press-garnering lawsuits, including in Georgia, which advanced false claims of widespread election fraud without any supporting evidence, *id*. ¶¶ 51-53; *see also* TTV Tr. 287:17-290:9, ECF 168-1. Nor do they dispute that they launched an unprecedented challenge against more than a quarter of a million Georgia registrants' right to vote, Defs.' Resp. SUMF ¶ 65, or that their lists of challenged voters were riddled with errors, *id*. ¶ 100. And Defendants do not dispute that qualified Georgia voters grew fearful upon learning that they had been challenged, even worrying that they or their families might be harassed. *Id*. ¶ 155.

Unable to dispute these dispositive facts, Defendants distort the law—asserting, for example, that alleged compliance with state law absolves them from liability under the Voting Rights Act ("VRA"), or that the VRA itself is unconstitutional, both arguments this Court has already rejected. TRO Order 15-18, ECF 29.

Ultimately, the Court need only take Defendants at their word. They expressly promised to broadcast and "promot[e]" evidence-free accusations of fraud in a media blitz to raise the ire of an already inflamed public. Pls.' SUMF ¶¶ 49, 134, ECF 156-2. They delivered on that promise with blustery proclamations and mass unfounded challenges. And they intimidated lawful Georgia voters (including Plaintiffs) who were made to ponder what punishment might await their attempts to vote.

## ARGUMENT

### I. Undisputed evidence confirms Plaintiffs were intimidated by Defendants' election-related schemes.

#### A. Defendants intimidated Jocelyn Heredia.

Defendants do not contest that *both* True the Vote ("TTV") and Defendants Somerville and Davis challenged Ms. Heredia's eligibility to vote in the 2021 senate runoff election. Defs.' Resp. SUMF ¶ 25. Nor do they contest that Ms. Heredia has standing to challenge their actions under Section 11(b) of the VRA. Defendants instead contest the merits of Ms. Heredia's claim, arguing that they cannot be liable

under Section 11(b) because Ms. Heredia was neither prevented from voting nor contacted directly by Defendants. Defs.' Resp. in Opp'n to Pls.' Mot. for Summ. J. ("Defs.' Opp'n Br.") 9-10, ECF 173-2. For all the reasons Plaintiffs have already explained, Section 11(b) does not require proof of either. Pls.' Mot. for Summ. J. ("Pls.' MSJ") 8-9, ECF 156-1; Pls.' Resp. in Opp'n to Defs.' Mot. for Summ. J. ("Pls.' Opp'n Br.") 3-5, ECF 174.

While Defendants imply that their challenge had no effect on Ms. Heredia, the record speaks for itself. After voting in person in Banks County in November 2020 without any issue, Heredia Tr. 18:6-19:13, ECF 163-1, Ms. Heredia's experience was much different in the runoff election just weeks later, after Defendants filed their challenges. Pls.' SUMF ¶¶ 21-25. As Ms. Heredia testified, while she was a little anxious about being the only Hispanic voter at her predominantly white voting location, it was not until she was told by a poll worker that her "vote was being challenged" that she felt true alarm. *See* Heredia Tr. 48:1-15. As Ms. Heredia explained:

> I'm relatively new to voting. And I thought it would be a super-easy process; you know, just get in line and you cast your vote. But it ended up being a longer process for me. I -- I learned that my vote was being challenged as I was there, and I actually didn't know what that even meant. And -- and when I was challenged, I was the only Hispanic there voting. . . . I put it -- you know, I connected the two, and I thought that they were -- people of color were being challenged. And that made me feel intimidated. And like I said, I didn't know what [being challenged]

> even was, and I didn't even know if it was legal. So that made me feel intimidated.

*Id*. 44:12-45:8. Because of Defendants' baseless challenge, the voting process took Ms. Heredia "three to four hours": it wasn't until after standing in line to vote that she learned her vote was challenged; she then had to search her car for sufficient identification to overcome the challenge (which she was lucky enough to have with her at the time); and she then had to go to "the back of the line" where she "wait[ed] in line again" to provide the identification necessary to cast a provisional ballot. *Id*. 45:15-46:7. These consequences were wholly foreseeable by Defendants, and it is disingenuous to imply that their challenges had no effect on Ms. Heredia simply because they were ultimately dismissed a month after the runoff election. *See* Defs.' Opp'n Br. 7 (Banks County challenges were not dismissed until February).

**B. Defendants intimidated Jane Doe.**

Defendants similarly attack the merits of Jane Doe's Section 11(b) claim, but they fail to cite *any* evidence to dispute Jane Doe's statements that she was intimidated.[1] Defendants do not dispute that Jane Doe was on TTV's Clarke County challenge list. *See* Defs.' Opp'n Br. 10; Pls.' MSJ Ex. 16, Doe Decl. ¶ 5, ECF 156-

---

[1] John Doe is no longer a plaintiff in this case. *See generally* First Am. Compl., ECF 73. Thus, Plaintiffs only respond to Defendants' arguments about the "Doe Plaintiffs" as they relate to Jane Doe.

19 (Gorden Rhoden submitted Doe's challenge); Pls.' MSJ Ex. 31 at 2, ECF 156-34 (TTV enlisted Gordon Rhoden as a challenger). Defendants also do not dispute that Georgia's election workers were being "harassed, threatened, and doxxed" as a "consequence[] of claims of voter fraud," Doe Decl. ¶ 7, claims that naturally evolved out of TTV's intentionally constructed Validate the Vote scheme. *See* Pls.' MSJ 23-33; *see infra* Section II.A. Doe was accordingly "extremely upset" when she learned she had been challenged, Doe Decl. ¶ 5, and "feared" she could become "the next target of harassment from True the Vote and their supporters." *id.* ¶¶ 8-9.

Because Defendants cannot dispute these facts, they instead discount Doe's experience. To hear Defendants tell it, Doe could not have felt intimidated because Defendants did not publish the challenge lists or contact Doe directly. This is misleading as a matter of fact and incorrect as a matter of law. It is undisputed that Defendants repeatedly published information about their various election-related efforts in Georgia, including through TTV's own press releases about their voter challenges. Pls.' Opp'n Br. 4-5. And where defendants are "*deemed to intend the natural consequences of their acts*," Voting Rights, Part 1: *Hearings on S. 1564 Before the S. Comm. on the Judiciary*, 89th Cong. 16 (1965), Defendants cannot now avoid legal consequences by distancing themselves from the very conduct they touted would "[b]uild public momentum through broad publicity." Pls.' MSJ Ex. 1

at 1, ECF 156-4. Doe's feelings of intimidation were both objectively reasonable and the natural, foreseeable consequences of Defendants' acts. Defendants' arguments to the contrary should be rejected.

### C. Defendants intimidated Scott Berson, Stephanie Stinetorf, and Gamaliel Turner.

Defendants deny that they intimidated Muscogee County voters Scott Berson, Stephanie Stinetorf, and Gamaliel Turner by claiming that "TTV did not submit any Challenge in Muscogee County," Defs.' Opp'n Br. 5, but again they ignore undisputed evidence. First, Plaintiffs do not claim that TTV "submit[ted]" any challenges itself—in Defendants' own words, Ron Johnson and James Cooper "led the charge in recruiting hundreds of volunteer challengers across the state." Defs.' Resp. SUMF ¶ 7. There is no legitimate dispute that Mr. Berson, Ms. Stinetorf, and Mr. Turner were all challenged by TTV recruit Alton Russell: TTV lists Russell as the challenger for Muscogee County on its master challenger volunteer list, *see* Pls.' MSJ Ex. 31 at 5; Russell is the Muscogee County Republican Chair, Berson ROG Resp. No. 3, ECF 155-23, which is consistent with TTV's admission that it specifically recruited Republican county chairs to submit challenges, Defs.' Resp. SUMF ¶ 42; and Defendants admit that Russell challenged Mr. Berson, Ms. Stinetorf, and Mr. Turner in Muscogee County. Defs.' SUMF ¶ 138, ECF 155-2.

Notably, Defendants do not dispute that the Muscogee County challenge intimidated these voters. *See* Defs.' Resp. SUMF ¶¶ 159-74. So even if the Court accepts Defendants' improbable assertion that they were not involved in the Muscogee County challenge—and the evidence shows that they were—the undisputed testimony of Ms. Stinetorf and Mr. Turner demonstrates the objectively intimidating effect that wrongful challenges impose.

### D. Defendants' conduct required Fair Fight to divert resources.

In December 2020, this Court concluded Fair Fight had standing to challenge Defendants' actions because it diverted resources in response to the mass challenges. *See* TRO Order 19-20. In support of its Motion for Summary Judgment, Fair Fight provided even more detailed evidence of its diverted resources, including volunteer time and finances, to counteract the effect of mass challenges in the months following the 2021 runoff election and through the present day—none of which Defendants dispute. *See* Defs.' Resp. SUMF ¶¶ 8-16. Defendants argue that Fair Fight "was not forced" to deploy those resources, *see id.* ¶¶ 15-16, but that argument is legally and factually incorrect: one of Fair Fight's missions is to secure the voting rights of Georgians, which includes enhancing voter turnout and engagement among young voters and people of color. Pls.' SUMF ¶ 2. Defendants' frivolous mass challenge to hundreds of thousands of Georgia voters directly threatened Fair Fight's

mission and forced the organization to divert resources in response, at the expense of its other voter engagement activities. *Id*. ¶¶ 8-18. Defendants' attempt "to draw a distinction between an act or law negating the efforts of an organization . . . and an act or law merely causing the organization to voluntarily divert resources in response to the law" is meaningless, "finds no support in the law," and "misses the point." *Fla. State Conf. of N.A.A.C.P. v. Browning,* 522 F.3d 1153, 1166 (11th Cir. 2008).

Finally, Defendants do not contest that at least two individual plaintiffs—Ms. Heredia and Ms. Doe—have standing to bring this lawsuit. As long as one plaintiff has standing, the Court has jurisdiction and need not even consider the remaining objections to standing. *See ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009).

## II. Defendants' election-related schemes were objectively intimidating.

### A. Defendants' multifaceted campaign violated Section 11(b).

The Court should reject Defendants' attempt to distance the mass Georgia challenges from TTV's Validate the Vote program—the "promotional" plan to launch widespread accusations of voter fraud and systematically undermine election results. *See* Pls.' MSJ Ex. 1 at 1. The Georgia mass challenges were simply a continuation of TTV's Validate the Vote program. To put it in TTV's own words: "when the 'attentions turned toward Georgia,'" Validate the Vote became "Validate

the Vote Georgia." Pls.' SUMF ¶ 55. TTV "simply took the logo and put the word 'Georgia' in the center of the logo. TTV then made all the resources [it] had available for the national election available in Georgia for the Run-off Election." *Id*.

Attempting to elide their responsibility for the Validate the Vote program, Defendants do little more than cherry-pick from the record and engage in wordplay. First, Defendants argue that TTV did not "gin up" evidence of voter fraud because TTV's promises to overturn the presidential election results were "condition[al]." Defs.' Opp'n Br. 14-15. This is a non-sequitur: whether TTV could successfully overturn the election's results is not germane to whether it sought to gin up evidence in support of that effort. Indeed, Defendants do not dispute that TTV sought to build public momentum and galvanize support for subverting the election, promising "significant evidence" that numerous "illegal ballots" were being counted "in Democrat counties" due to "Democrat officials [sic] refusal to obey state election laws." Defs.' Resp. SUMF ¶ 46.

Second, Defendants do not dispute that TTV never mustered *any* proof of ineligible voting in the federal lawsuits it filed and voluntarily dismissed. They even *admit* that the lawsuits were never supported by any evidence: all were dismissed "before any evidence was collected." *Id*. These lawsuits—like the voter

challenges—served no purpose other than to perpetuate baseless accusations of unlawful conduct.

Third, Defendants now insist that TTV was not offering a "bounty" for reports of fraud because Ms. Engelbrecht was "riffing" when she said that "Validate the Vote is about . . . putting a bounty on the fraud." TTV Tr. 70:6-7; Defs.' Opp'n Br. 16. But Ms. Engelbrecht's subjective state of mind is immaterial—at no point did she communicate to the public that she was merely "riffing." TRO Order 23 ("Section 11(b) has no intent requirement."). Similarly, Defendants argue that the bounty TTV offered was not *really* a bounty because it was only intended to cover the legal expenses of "whistleblowers" who came forward. Defs.' Opp'n Br. 16-17. But again, that's not what TTV expressed in public statements. Ms. Engelbrecht was clear: the bounty was offered not only to fund "protections" for individuals reporting voter fraud, but also to provide "compensation" for their reports. TTV Tr. 70:10-11.[2]

Fourth, Defendants ignore that Ms. Engelbrecht expressly called for "get[ting] some S[EALS]" to "work inside the polls," where the SEALs would call the shots.

[2] TTV claims it "received credible reports of criminal malfeasance that it submitted to authorities" as a result of the bounty. Defs.' Opp'n Br. 16 (citing TTV Tr. 69:9-75:18). But no support for this statement can be found in TTV's citation. By contrast, the record reflects that TTV referred *zero* reports of voter fraud to authorities for the Georgia senate runoff election because every one of them was "general or vague," "made no allegation that" an individual "had attempted to vote improperly in Georgia," or was "obviously false." TTV RFP Resp. No. 18, ECF 155-11.

*Id*. 62:6-12. Offering a sanitized rendition of the Continue to Serve initiative, Defendants claim that TTV merely sought to recruit former military members and first responders to serve as poll workers "under the supervision and training of state officials." Defs.' Opp'n Br. 18. But the record tells a different story—that Ms. Engelbrecht did not envision her recruits following orders, but rather giving them:

> Of interest here, we have a new initiative called Continue to Serve which is about recruiting veterans and first responders to work inside the polls. You want to talk about people who understand and respect law and order and chain of command, you get S[EALS] in the polls. And they're going to say no, no, that is not . . . what it says and . . . this is how we're going to play the show. And that's what we need.

TTV Tr. 62:3-12. In other words, Ms. Engelbrecht anticipated that her military volunteers would directly interface with poll workers or voters, confront them with disagreements about voting procedures, and order them to follow the process Ms. Engelbrecht's recruits thought best.[3]

Fifth, Defendants fail to offer any evidence disputing that they encouraged threats of election-related vigilantism on social media. Hiding behind Mr. Davis and

---

[3] TTV attempts to distinguish *Democratic National Committee v. Republican National Committee*, 671 F. Supp. 2d 575 (D.N.J. 2009), by arguing that the off-duty sheriffs and policemen recruited in that case were "standing at polling places" rather than "volunteering." Defs.' Opp'n Br. 18. But there is no basis for finding that such a distinction would matter here: TTV did not envision volunteers who would follow directions from election officials and avoid impeding voters; to the contrary, TTV anticipated that its recruits would be directly confronting poll workers or voters and telling them how to "play the show." TTV Tr. 62:3-12.

Mr. Somerville's Facebook thread about voters registering at commercial mail-receiving agencies, *see* Defs.' Opp'n Br. 19, Defendants conspicuously do not dispute the threatening and even violent comments posted in that thread, some for which Defendants expressed support, *see* Pls.' MSJ 28. Similarly, Defendants hide behind TTV's bare assertion that it is not affiliated with Crusade for Freedom, all while failing to explain how Crusade for Freedom came to use hashtag phrases recommended to TTV in *private* conversations with a donor's consultant and appearing on *internal* invoices between TTV and OPSEC, *see id*. 30, and a logo that previously appeared in a Facebook post by one of Ms. Engelbrecht's prior organizations, TTV Tr. 263:15-19. Because Defendants have failed to put forth any "significant, probative evidence" sufficient to cast doubt on Plaintiffs' claims, *Irby v. Bittick*, 44 F.3d 949, 953 (11th Cir. 1995), they cannot avoid summary judgment.

**B. Defendants' voter challenges were frivolous.**

Dr. Mayer methodically catalogued error after error apparent in *every step* of OPSEC's process of generating challenge lists for TTV: bad assumptions, bad data, bad matching, bad quality control. *See* Pls.' MSJ Ex. 13, Mayer Rep. 3-7, ECF 156-16. "The results" of this process, in Dr. Mayer's expert opinion, "do not come anywhere close to what would be required for valid practices in academic studies of election administration." Mayer Rep. 2. These findings remain entirely unrebutted.

Defendants declined to offer any expert testimony of their own to dispute Dr. Mayer's conclusions (and lay witness testimony about what Defendants characterize as a "sophisticated" technical process is no substitute). *See* Defs' Resp. SUMF ¶¶ 89, 90, 91; Pls.' Mot. in Limine, ECF 172. Instead, Defendants' entire defense boils down to: "Just trust us." Trust that Georgia voter records were reliably matched to some "additional databases." Defs.' Opp'n Br. 23. Trust that these additional databases could determine voter eligibility. Trust that OPSEC's undisclosed "4000-row algorithm" was competently composed. Defs.' Resp. SUMF ¶ 84. And on and on. None of these claims are admissible evidence because the Court cannot draw inferences from lay witness testimony about the reliability (or even the existence) of so-called "sophisticated" techniques and database algorithms. *See* Fed. R. Evid. 701; *see also* Pls.' Mot. in Limine. Much more is required to avoid summary judgment.

Defendants concede many of the errors that Dr. Mayer identified and imply that hundreds of obvious mistakes is an ordinary outcome for mass challenges like theirs. *See, e.g.*, Defs.' Resp. SUMF ¶¶ 95, 98, 106; Defs.' Opp'n Br. 25. Again, they offer no competent testimony to support this claim. But, in any event, Defendants violate Section 11(b) if they intimidate only a single "person." 52 U.S.C. § 10307(b). Here, there were *tens of thousands* of errors. Mayer Rep. 10. Defendants' only substantive response—inflating a meaningless distinction between

military voters who live on a military installation and those who live in an immediately adjacent town, Defs.' Opp'n Br. 23-24; Defs' Resp. SUMF ¶ 106—should not be credited. Additionally, the frivolity of the challenge list is not a function of the number of errors Plaintiffs identify relative to the entire challenge list. Rather, the number of errors should be compared to the number of challenged voters deemed to be ineligible by county officials. As Defendants admitted, not a single challenge was accepted. *See* Defs.' Resp. SUMF ¶ 18.

Having failed to dispute Plaintiffs' facts, Defendants try to confuse the law. For example, they cite *Husted v. A. Philip Randolph Institute*, 138 S. Ct. 1833 (2018), for the notion that voters can be blocked from voting if they are matched to NCOA data. Defs.' Opp'n Br. 20. That is wrong. *Husted* reiterated that registrants matched to NCOA data may be removed from the rolls only if they subsequently "do not return [an official preaddressed, postage prepaid] card *and* fail to vote in any election for four more years." 138 S. Ct. at 1838 (emphasis in original). All of these statutory safeguards must be satisfied before a voter is removed: just as *Husted* recognized "a State violates the [NVRA] if it removes registrants for no reason other than their failure to vote," *id.* at 1842; the NVRA would equally be violated if a registrant were removed for no reason other than their alleged inclusion in NCOA data. Defendants' assertion that they also relied on other databases is no substitute

for the federally mandated process. Because Defendants did not challenge individuals who were matched to NCOA data *and* failed to respond to official notice *and* failed to vote in two subsequent federal elections, the NVRA prohibited election officials from taking the adverse action against the challenged individuals that Defendants sought to compel. *See* 52 U.S.C. § 20507(d).

As a last resort, Defendants play semantics. They say their challenges were "based on whether the elector was eligible to vote," not "upon the grounds that the elector is not qualified to remain on the list of electors." Defs.' Opp'n Br. 21. This Court has already dispensed with this sophistry. *See* TRO Order 11-15. Defendants challenged voters for alleged non-residence; if successful, the registrant would necessarily be unqualified to vote, O.C.G.A. § 21-2-216(a)(4), and thus "shall be removed from the list of electors," *id.* §§ 21-2-230(h), (i).[4] Defendants' mass challenges were a frivolous effort to circumvent federal voter protections that resulted in unlawful voter intimidation.

**CONCLUSION**

Plaintiffs' Motion for Summary Judgment should be granted.

---

[4] By contrast, a challenge that is *not* based on a voter's qualifications—and thus, if successful, would not require anyone to be removed from the registration rolls—could include a challenge alleging that a person has already voted or that a person was attempting to vote under a false name.

Respectfully submitted, this 21st day of June, 2022.

Allegra J. Lawrence
Georgia Bar No. 439797
Leslie J. Bryan
Georgia Bar No. 091175
Maia Cogen
Georgia Bar No. 832438
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com

Dara Lindenbaum
Georgia Bar No. 980780
**SANDLER REIFF LAMB ROSENSTEIN & BIRKENSTOCK, P.C.**
1090 Vermont Avenue, NW, Suite 750
Washington, DC 20005
Telephone: (202) 479-1111
Fax: 202-479-1115
lindenbaum@sandlerreiff.com

*/s/ Uzoma N. Nkwonta*
Marc E. Elias*
Uzoma N. Nkwonta*
Christina A. Ford*
Tina Meng*
Marcos Mocine-McQueen*
Joel J. Ramirez*
Jacob Shelly*
**ELIAS LAW GROUP LLP**
10 G Street NE, Suite 600
Washington, D.C. 20002
Telephone: (202) 968-4490
melias@elias.law
unkwonta@elias.law
cford@elias.law
tmeng@elias.law
mmcqueen@elias.law
jramirez@elias.law
jshelly@elias.law

*Counsel for Plaintiffs*
*Admitted *pro hac vice*

**CERTIFICATE OF COMPLIANCE**

Pursuant to LR 7.1(D), N.D. Ga., I hereby certify that the foregoing ***Plaintiffs' Reply in Support of their Motion for Summary Judgment*** has been prepared in accordance with the font type and margin requirements of LR 5.1, N.D. Ga., using a font type of Times New Roman and a point size of 14.

This 21st day of June, 2022

*/s/ Uzoma N. Nkwonta*
Uzoma N. Nkwonta
*Counsel for Plaintiffs*

**CERTIFICATE OF SERVICE**

I hereby certify that I have this day served a copy of the within and foregoing ***Plaintiffs' Reply in Support of their Motion for Summary Judgment*** with the Clerk of Court using the CM/ECF system, which will automatically send-e-mail notification to all counsel of record.

This 21st day of June, 2022

*/s/ Uzoma Nkwonta*
Uzoma Nkwonta
*Counsel for Plaintiffs*