**United States District Court**
**Northern District of Georgia**
**Gainesville Division**

| | |
|---|---|
| **Fair Fight, Inc., Scott Berson, Jocelyn Heredia,** and **Jane Doe,** | |
| *Plaintiffs,* | |
| *v.* | **Civ. No. 2:20-cv-00302-SCJ** |
| **True the Vote, Inc., Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, James Cooper,** and **John Does 1-10,** | **Hon: Steve C. Jones** |
| *Defendants.* | |

**Defendants' Supplemental Briefing Pursuant to Court Order**

## Introduction

Plaintiffs[1] alleged Defendants True the Vote, Inc. ("**TTV**"), Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, and James Cooper (collectively, "**Named Defendants**") violated the Voting Rights Act of 1965, 52 U.S.C. § 10307(b) ("**Section 11(b)**") by submitting 364,541 voter challenges under O.C.G.A. § 21-2-230 ("**§ 230 Challenges**").

The day after they filed their Complaint, Challenged Voters filed a Motion for a Temporary Restraining Order. ECF No. 11. This Court denied Challenged Voters' TRO because the evidence they presented did not show they were likely to succeed on the merits. TRO Order, ECF No. 29, at 26. Namely, this Court found that Challenged Voters had not provided evidence that Named Defendants "harassed or intimidated voters," and while the Challenged Voters were "shocked and distressed" and "fear[ed] potential harassment" by the § 230 Challenges, there was insufficient evidence to "connect intimidation or harassment (real or attempted) to Defendants." *Id.* Likewise, this Court found third party actors'

---

[1] Plaintiffs will be collectively referred to as "**Challenged Voters**" throughout this brief.

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                                    2

reactions to the Named Defendants' actions "is not directly attributable to Defendants without clearer connections borne out by evidence." *Id.* at 27. After discovery and full briefing on their respective motions for summary judgment, Challenged Voters are not any closer now to providing evidence of intimidation than they were two years ago. Challenged Voters still have no evidence connecting intimidation or harassment to Named Defendants, nor are any of their other claims (i.e., TTV's alleged "bounty") supported by evidence.

In advance of the upcoming hearing on the motions for summary judgment, this Court has asked for supplemental briefing on several legal questions foundational to its consideration of the motions, which Named Defendants now respectfully submit:

**I. Using the ordinary rules of statutory interpretation (i.e., ordinary-meaning, statutory context, legislative history, interpretations of similar Civil Rights statutory provisions, etc.), how should Section 11(b) of the Voting Rights Act be interpreted?**

Section 11(b) prohibits anyone from intimidating, threatening, or coercing another's voting or attempt to vote. Using the ordinary rules of statutory interpretation, Section 11(b) requires a direct connection between the person claiming to be intimidated and the alleged perpetrator of intimidation. No such

direct connection exists between the Challenged Voters and the Named

Defendants. Part I.

**II. Does the Supreme Court's decision in *Virginia v. Black*, 538 U.S. 343, 359 (2003)—narrowing true threats to "statements where the speaker means to communicate a serious *expression of intent to commit an act of unlawful violence*" and clarifies that the "prohibition on true threats protect[s] individuals from fear of *violence*" (emphasis added) (quotations and citations omitted)—preclude application of the true threat exception when the alleged threatening behavior is non-violent but aimed at inhibiting a fundamental right?**

Yes, the *Black* decision precludes application of the true threat exception

when the alleged behavior is non-violent but aimed at inhibiting a fundamental

right. Named Defendants did not threaten Challenged Voters with violence. Part

II. Nor is their alleged behavior aimed at unlawfully inhibiting a fundamental

right.

**III. Assuming without deciding that Defendants' §230 challenges are First Amendment protected petitions, what legal standard should be used to determine the petitions were baseless or frivolous?**

To be considered frivolous, First Amendment Petitions must be without

arguable legal merit. Named Defendants' §230 Challenges were meritorious in

both law and fact and cannot be considered "frivolous" petitions. Part III.

**IV. Please elaborate on the use of vote dilution as a defense to a Section 11(b) claim.**

Precedent has defined vote dilution to include a wide range of activities—from stuffing the ballot box with illegal ballots to changing of representative districts in certain situations. Named Defendants' § 230 Challenges were designed to ensure that the power of legal votes were not diluted by any illegal votes. Therefore, applying Section 11(b) to Named Defendants' § 230 Challenges would prohibit them from protecting their vote from vote dilution. Part IV.

**V. Are the aforementioned constitutional defenses asserted as facial or as-applied challenges to Section 11(b)?**

As applied. Part V.

**Argument**

**I. Using the ordinary rules of statutory interpretation (i.e., ordinary-meaning, statutory context, legislative history, interpretations of similar Civil Rights statutory provisions, etc.), how should Section 11(b) of the Voting Rights Act be interpreted?**

Section 11(b) prohibits anyone from intimidating, threatening, or coercing another for voting or attempting to vote. Using the ordinary rules of statutory interpretation, Section 11(b) requires a direct connection between the intimidator

and the person being intimidated. No such direct connection exists here between the Challenged Voters and the Named Defendants.

## A.     Statutory Text/Ordinary Meaning does not support Challenged Voters' interpretation of Section 11(b).

The court's duty in "interpreting written law . . . is to determine the ordinary public meaning of the provision at issue." *Heyman v. Cooper*, 31 F.4th 1315, 1319 (11th Cir. 2022) (cleaned up). "[W]here . . .  the statutory text is not ambiguous, only the most extraordinary showing of contrary intentions in the legislative history will justify a departure from the statutory language." *Barrientos v. CoreCivic, Inc.*, 951 F.3d 1269, 1278 (11th Cir. 2020) (cleaned up).

Like the phrase the "use . . .  of physical force," *Leocal v. Ashcroft*, the ordinary public meaning of intimidate, threaten, or coerce "requires active employment." 543 U.S. 1, 9 (2004). Just as "we would not ordinarily say a person uses physical force against another by stumbling and falling into him," *id.*, we would not ordinarily say that a person intimidates, threatens, or coerces another when the only connection between them is a legal process that results in a query from third parties who are statutorily authorized to do so.

Challenged Voters' interpretation of the terms not only eschews contact

between two persons, it *creates* ambiguity because it insists that the terms intimidate, threaten, or coerce can be based on a subjective perception by another. This casts aside the idea of "ordinary public meaning" altogether, as "ordinary public" necessarily depends on commonality in the public at large. Moreover, even if a person can be "deemed to intend the natural consequences of their acts," Pls.' Reply Supp. Summ. J., ECF No. 177 at 5—a proposition that Defendants do not concede—to this "natural consequences" construction Challenged Voters add the possibility that it is another that decides what those "natural consequences" are. It would be difficult to imagine a more ambiguous construction of the statute.

This Court recognized this need to "connect Defendants directly to intimidation" when it found Challenged Voters provided no evidence of such a connection in their Motion for a TRO. TRO Order, 26-27.[2] The uncontested evidence still shows Named Defendants did not have any contact with Challenged Voters. *See* Defs.' MSJ Br., ECF No. 155-1.[3] Moreover, the uncontested evidence

---

[2]All previous briefing or evidence cited are fully incorporated herein.

[3]In order to provide greater readability for the Court and in order to avoid needless repetition, Named Defendants use the following string citation designations in this brief: **(1)** Named Defendants did not contact any Plaintiff, "**No Contact Citations**"; *see* TTV Resp. to First Rogs. No. 5; Somerville Am. Resp.

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                    7

does not show Named Defendants published any Challenged Voters' name (No Publication Citations); TTV did not create a bounty to incentivize voter challenges or accusations of voter fraud (No Bounty Citations); TTV's hotline was not created to intimidate voters (No Hotline Intimidation); and TTV did not recruit anyone to "patrol" polling places (No Patrol Citations). The context of the enactment of the VRA also does not support such subjective, ambiguous application to the terms intimidate, threaten, or coerce.

---

and Obj. 2d Interrogs., Resp. No. 7; First Davis Tr. 171:4-21; Williams Tr. 63:2-64:1; Johnson Resp. to First Interrogs. Resp. No. 5; Cooper Resp. to First Interrogs. Resp. No. 5; Cooper Tr. 45:1-9; 50:13-22; **(2)** Named Defendants did not publish any Challenge list, "**No Publication Citations**"; TTV Tr. 257:11-14; Second Somerville Tr. 71:16-72:19; 72:21-73:14; Second Davis Tr. 46:3-14; 80:7-10; **(3)** TTV did not create a "bounty" in order to incentivize Challenges or accusations of voter fraud; "**No Bounty Citations**"; TTV Tr. 71:11-19, 71:22-72:1, 74:8-17, 75:5-18, 76:15-19; TTV Tr. 316:3-12; TTV Tr. 316:19-317:5; First Somerville Tr. 150:15-152:4; **(4)** TTV did not create a hotline in order to intimidate voters—it turned over any credible accusation of voter irregularities to the proper government authorities; ("**No Hotline Intimidation**"); TTV Tr. 81:16-21; TTV Tr. 85:21-86:9;TTV Tr. 82:18-21; TTV Tr. 68:16-69:7; *id.* 81:22-82:4; TTV Tr. 85:13-20; TTV Tr. 93:17-95:3; TTV Am. Resp. 2d RFP Resp. No. 18; First Somerville Tr. 150:15-152:4; **(5)** TTV did not advocate or recruit for anyone to "patrol" polling places; "**No Patrol Citations**"; TTV Tr. 59:9-12; 59:19-60:17; 62:13-64:7.

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                    8

**B.    Statutory Context/Legislative History does not support Challenged Voters' interpretation of Section 11(b).**

The VRA was passed in 1965, in response to the enormous, direct, and systematic threats minorities faced in this country when attempting to exercise their right to vote.[4] *See United States v. McLeod*, 385 F.2d 734, 737-38 (5th Cir. 1967) (direct intimidation by law enforcement officials at voter registration meetings); *see also United States v. Beaty*, 288 F.2d 653, 654-57 (6th Cir. 1961) (eviction of sharecroppers as punishment for registering to vote); *United States v. Bruce*, 353 F.2d 474, 476-77 (5th Cir. 1965) (landowner restricting access to property for voter registration). The VRA eliminated literacy tests for voter registration and directed the Attorney General to challenge the use of poll taxes in state and local elections. *See generally* 52 U.S.C. § 10101; § 10306.

The Voting Rights Act had an immediate impact. By the end of 1965, a

---

[4]Named Defendants have previously analyzed the legislative history. *See* Defs.' Opp. to TRO, ECF No. 21, 14-17. Challenged Voters do not provide an "extraordinary showing of contrary intentions in the legislative history" to justify their interpretation of Section 11(b). The legislative history in no way justifies reading a "general intent" requirement into the terms, let alone one untethered to any objective standard. Indeed, it can as easily be read to *narrow* their application by requiring a showing of discriminatory intent. *Id.*

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                                    9

quarter of a million new Black voters had been registered. By the end of 1966, only four out of 13 southern states had fewer than 50 percent of African Americans registered to vote.[5] Fast forward to 2022—88 percent of African American registered voters cast ballots in the midterm elections in Georgia.[6]

The VRA was passed within the historical context of objectively intimidating acts by people who directed their intimidating actions towards specific voters. This context supports the necessity of connecting Named Defendants directly to acts that are objectively intimidating.

Given the disjunct between Challenged Voters' construction and the ordinary public meaning of the terms used, it is not surprising that, as Named Defendants have already demonstrated in prior briefing, the great body of courts addressing the meaning of "intimidate, threaten or coerce" in Section 11(b) have not embraced the definition Challenged Voters would need to prevail in their claims here. *See*, *e.g.*, Defs.' Br. Supp. Summ. J., ECF No.155-1 at 4-7 (collecting

---

[5] https://www.archives.gov/milestone-documents/voting-rights-act#:~:text=The%20use%20of%20poll%20taxes,in%20state%20and%20local%20elections.

[6] https://sos.ga.gov/election-data-hub

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                    10

cases). In short, there is no precedent for holding "intimidate, threaten or coerce" in Section 11(b) to encompass what happened here—asking appropriate government authorities to ensure that people who have reported a move out of a voting district are, in fact, still eligible to vote in that district.

**II. Does the Supreme Court's decision in *Virginia v. Black*, 538 U.S. 343, 359 (2003)—narrowing true threats to "statements where the speaker means to communicate a serious *expression of intent to commit an act of unlawful violence*" and clarifies that the "prohibition on true threats protect[s] individuals from fear of *violence*" (emphasis added) (quotations and citations omitted)—preclude application of the true threat exception when the alleged threatening behavior is non-violent but aimed at inhibiting a fundamental right?**

Yes, the *Black* decision precludes application of the true threat exception when the alleged behavior is non-violent but aimed at inhibiting a fundamental right (which Named Defendants did not do).

First Amendment protections are not absolute, and courts "have long recognized that the government may regulate certain categories of expression consistent with the Constitution[,]" and one such category is "true threats." *Black*, 538 U.S. at 358-59 (2003) (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 (1942)).

**A.     The Eleventh Circuit has interpreted "True Threats," described in *Black,* as only involving violent "threats."**

No basis can be found in Eleventh Circuit for supposing that nonviolent threats can "qualify" as a "true threat" described in *Black*. The Eleventh Circuit has never found *Black*'s "true threat" exception to First Amendment protection applicable to nonviolent threats. Where this Circuit has addressed *Black*, it has been to show the intent required to convict someone of crimes involving threats of violence or to analyze the behavior sufficient to show an intent to threaten *violence*.[7]

First, the Eleventh Circuit has addressed the particular intent *Black* requires to be shown to convict of particular crimes involving threats of ***violence. See*** *United States v. Castillo*, 564 F. App'x 500, 504 (11th Cir. 2014) (citing *Black*, holding no requirement to show intent to commit violent act or even to have intended to threaten violence to sustain conviction); *United States v. Martinez*, 736

---

[7] The Eleventh Circuit has also cited to *Black* to recognize or distinguish protected expressive conduct and speech generally. *See Burns v. Town of Palm Beach*, 999 F.3d 1317, 1338 (11th Cir. 2021) (distinguishing house design from "protected expressive conduct" addressed in *Black*), *cert. denied*, 142 S. Ct. 1361 (2022).

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                          12

F.3d 981, 988 (11th Cir. 2013) (holding, in the context of 18 U.S.C. § 18(c), "that *Black* does not require a subjective-intent analysis for all true threats"), *cert. granted*, *judgment vacated*, 576 U.S. 1001 (2015), *United States v. Martinez*, 800 F.3d 1293 (11th Cir. 2015) *on remand* (holding "that failure to allege *mens rea* rendered indictment fatally deficient")

Second, the Eleventh Circuit has used *Black* to analyze the behavior sufficient to show an intent to threaten **violence**. *See United States v. Rivera-Rodriguez*, No. 21-10082, 2022 WL 1234675, at *2 (11th Cir. Apr. 27, 2022) (upholding conviction where government offered "more than tenuous evidence to prove . . . threats . . . were communicated with knowledge that they would be viewed as such."); *United States v. Fleury*, 20 F.4th 1353, 1366, 1373 (11th Cir. 2021) (*Black*'s "true threat" includes messages that create the fear of **violence** "within the context of [an] entire course of conduct" ); *Watkins v. Cent. Broward Reg'l Park*, 799 F. App'x 659, 667 (11th Cir. 2020) (upholding qualified immunity where defendant sang lyrics "advocat[ing] violence against gay people"); *United States v. Springer*, 753 F. App'x 821, 828 (11th Cir. 2018) (allowing evidence to show "true threats—statements where the speaker means to

communicate a serious expression of an intent to commit an act of unlawful violence" (cleaned up)); *United States v. Villanueva*, 315 F. App'x 845, 848 (11th Cir. 2009) (citing *Black* for the principle that threats of *violence* are not protected by First Amendment).

Likewise, other circuits have applied *Black* to situations involving threats of ***violence***. *See, e.g.*, *U.S. v. Elonis*, 730 F.3d 321, 329 (3rd Cir. 2013) (overruled on other grounds *Elonis v. U.S.,* 575 U.S. 723, 740 (2015) (analyzing *violent* online threats); *U.S. v. White,* 670 F.3d 498, 507 (4th Cir. 2012) (analyzing reasonable recipient test in context of violent threats); *U.S. v. Jeffries*, 692 F.3d 473, 478 (6th Cir. 2012) (analyzing statute involving threat to injure the person of another); *U.S. v. Mabie*, 663 F.3d 322, 333 (8th Cir. 2011) (finding *Black* protected listeners from the fear of violence)*;U.S. v. Heineman*, 767 F.3d 970, 978 (10th Cir. 2014) (finding *Black* required recipient to believe speaker intends to act *violently*).

The Southern District of New York is an outlier on the application of *Black* to nonviolent threats, and it did so by reading a broad expansion of the law into Second Circuit precedent. *Nat'l Coalition on Black Civic Participation v. Wohl*, 498 F.Supp.3d 457, 479 (S.D.N.Y. 2020) (finding Second Circuit "[did] not

interpret the Supreme Court's analysis in *Black* to suggest that the government can ban only threats of harm."). In support of this proposition, the *Wohl* Court stated that the "Second Circuit has indicated that threats of serious nonphysical harm are true threats unprotected by the First Amendment" (citing *U.S. v. Turner*, 720 F.3d 411, 421 (2nd Cir. 2013)). That court also noted *Turner* "approvingly cited constitutional law scholar and legal philosopher Kent Greenawalt for the proposition that . . . a legislature could reasonably decide to make it criminal for a person with apparent firmness of purpose to threaten a specific legal wrong grave enough to be likely [ ] to cause substantial emotional disturbance." *Id.* at 479-480 (quoting Kent Greenawalt, Speech, Crime and the Uses of Language 91 (1989)). There's only one problem with the *Wohl* Court's analysis—the Second Circuit did not extend or "indicate" that *Black*'s analysis could be used to remove First Amendment protection from nonviolent threats, nor did it use Mr. Greenawalt's supposition to do so.

     *Turner* involved not a nonviolent threat but an explicit call for violence—in the form of death threats against judges. 720 F.3d at 413, 421 (analyzing blog post stating certain appellate judges deserved to die). After continuing with very

specific, violent threats, Mr. Turner then posted photographs, work addresses, and room numbers for these judges, along with a map and photograph of where they worked which pointed out "Anti-truck bomb barriers." *Id.* at 414.

The Second Circuit's opinion in *Turner* does not support the proposition that threats of non-violence are unprotected by the First Amendment. The Second Circuit recognized that while some threats may be wholly implicit in nature—like the cross burnings in *Black*—those implicit threats *of violence* within certain contexts may still be considered "true threats" that do not receive First Amendment protection. "Prohibitions on true threats –even where the speaker has no intention of carrying them out–protect individuals from the *fear of violence* and from the disruption that fear engenders." *Id.* (quoting *Black*, 538 U.S. at 360); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 388 (1992)) (emphasis added). Nor did the *Turner* Court use the Greenawalt passage to support the notion that nonviolent threats could be removed from constitutional protection. *Turner*, 720, F.3d at 420 (citing Greenawalt as extra weight to show *because* prohibition on true threats protects individual from the fear of violence, they are "fully consistent with the First Amendment").

Controlling precedent supports precluding application of *Black* to non-violent threats. The only case that suggests that non-violent threats can fall under the true threats exception is uncontrolling authority from the Southern District of New York, was wrongly decided, and, at best, has minimal persuasive value. Furthermore, the case and authority it cites for removing First Amendment protection from non-violent "threats" actually precludes application of the true threats constitutional doctrine to non-violent threats.

**B.**   ***Black* precludes application of the True Threats exception to non-violent threats.**

"The hallmark of the protection of free speech is to allow free trade in ideas–even ideas that the overwhelming majority of people might find distasteful or discomforting." *Black*, 538 U.S. at 358 (quoting *Abrams v. U.S.*, 250 U.S. 16, 630 (1919) (Holmes, J., dissenting); *see also Texas v. Johnson* 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable")).

 The Court removed First Amendment protection for true threats of violence. *Black*, 538 U.S. at 359. The Court reasoned that "a prohibition on true

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                           17

threats protects individuals from the *fear of violence* and from the disruption *that fear* engenders." *Id.* at 360 (emphasis added) (internal citations omitted). The Court further reasoned that removing First Amendment protection from true threats would protect people "from the possibility that the *threatened violence* will occur." *Id.* (emphasis added) (citations omitted). It did so because threats of violence, speech likely to provoke violence, and speech likely to incite imminent unlawful use of force is "of such slight social value" that the social values at stake outweigh the constitutional concerns *Id.* 358-59. The Court's reasoning in *Black* would simply not apply to non-violent threats—even distasteful speech that might engender some subjective fear of non-violence supports the larger societal goal of allowing the free exchange of ideas. To include a broad swath of speech that might induce a subjective fear of non-violence would leave that speech constitutionally unprotected in contradiction to the principles underlying First Amendment jurisprudence. Therefore, *Black* precludes the application of the true threats exception to non-violent threats.

C.   **"True Threats" and fundamental rights**

The court's calculation does not change when an alleged "threat" could be

seen as an attempt to prevent a person from exercising a fundamental right. The question courts ask is not whether the "threat" is inhibiting a fundamental right, but rather, whether "a reasonable person would foresee that the listener will believe he will be subjected to *physical violence* upon his person." *Planned Parenthood of Columbia/Willamette, Inc. v. American Co.*, 290 F.3d 1058, 1075 (9th Cir. 2002) ("*Willamette*") (emphasis added) (internal citations omitted). *See also New York v. Griepp*, 991 F.3d 81, 113 (2nd Cir. 2021)*; Corales v. Bennett*, 567 F.3d 554, 563-64 (9th Cir. 2009); *U.S. v. Dillard*, 795 F.3d 1191, 1199 (9th Cir. 2015); *Arizona All. for Retired Americans v. Clean Elections USA*, CV-22-01823-PHX-MTL, 2022 WL 15678694 (D. Ariz. Oct. 28, 2022). *Arizona Alliance* is somewhat analogous to the allegations made by Challenged Voters in this litigation, although it differs substantially in underlying facts.[8]

---

[8]*Willamette, Dillard,* and *Griepp* all involved alleged threats to either abortion providers or women seeking abortions. These courts all analyzed not whether the alleged threat inhibited the right of someone to receive an abortion but whether the alleged threat was a true threat not receiving any First Amendment protections. *Willamette*, 290 F.3d at 1075; *Dillard*, 795 F.3d at 1199; *Griepp*, 991 F.3d at 113 (all decided before *Dobbs v. Jackson Women's Health Organization*, 142 S.Ct. 228 (2022) held there is no fundamental federal constitutional right to abortion). Likewise, the *Corales* Court asked whether alleged threats by a principal against protesting students was "a serious expression of an intent to commit an act of *unlawful violence*"—i.e., a true threat. *Id.* at 563.

In *Arizona Alliance* various voting rights organizations brought suit against Clean Elections USA alleging a violation Section 11(b). *Id.* at *1. Clean Elections had stationed volunteers around drop boxes to deter ballot mules from "collecting fraudulent absentee ballots and . . . depositing them in early voting drop boxes." *Id.* However, just because the alleged threat was alleged to be aimed at inhibiting a fundamental right (the right to vote) the court did not automatically find a true threat. "Having established that the conduct at issue here is subject to the protections of the First Amendment, the Court must analyze whether any well-established exception applies." *Id.* at *4. The court acknowledged the true threats exception, but stated that "[t]rue threats are statements where the speaker means to communicate a serious expression of an intent to commit an act of *unlawful* violence." *Id.* (emphasis in original) (quoting *Black*, 538 U.S. at 359). From that, the court found the plaintiffs had not provided evidence that Clean Elections' conduct "constitute[d] a true threat." *Id.* at *5. And the actions at issue here are yet a step removed from those of Arizona Alliance—Named Defendants had no contact with any Challenged Voters. No Contact Citations.

---

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                          20

Furthermore, the Named Defendants actions were not directed at inhibiting a fundamental right. They sought to petition their government—asking it to ensure that voters who were ineligible under the law to cast a ballot be prevented from doing so—in order to protect the rights, and prevent vote dilution, of all the eligible voters who legally cast ballots. TTV Tr. 342:15-343:1 TTV's Resp. First Interrogs. Resp. No. 5; First Somerville Tr. 124:1-12; 127:9-15; Second Davis Tr. 59:7-81; 86:22-87:3; 90:14-21. Part IV.

No controlling authority exists which holds that non-violent threats can fall within the "true threats" exception, and *Black* precludes the application of "true threats" to nonviolent threats. Further, this calculation does not change even when the alleged threat is to prevent the exercise of a fundamental right, which it was not here. Thus, for an alleged threat to fall under the true threat exception it must be a threat of violence since the true threat exception is designed to protect against violence, the fear of violence, or the fear that violence engenders.

**D.    None of the alleged "Threats" arise to the level of violent threats.**

None of the alleged "threats" that Challenged Voters cite rise anywhere near the level of violent threats or threats that instill a deep "fear of violence." Nor do

Challenged Voters even attempt to argue that these are violent threats. *See* Pl's Reply ISO MSJ, Doc. 177, 2-12. Rather, Challenged Voters argue they felt subjective intimidation. *Id.* Challenged Voters never alleged, let alone provided evidence supporting the contention that they felt a "fear of violence" or experienced "the disruption that fear engenders." *Id.*

### 1.   Alleged Threats against Plaintiff Jocelyn Heredia were not violent.

The alleged "threat" against Ms. Heredia is the challenge itself. *See id* at 2-4. Stating that "when I was challenged . . . that made me feel intimidated." *Id.* at 3 (quoting Heredia Tr. 44:12-45:8). Ms. Heredia testified that because she was challenged, it "took Ms. Heredia three to four hours" to vote and required her to show identification to overcome the challenge. *Id.* at 4.

Ms. Heredia faced a § 230 Challenge as allowed under Georgia law. Not one of the Defendants contacted her directly nor did they publish the fact that she was challenged. No Contact Citations; No Publication Citations. She testified she felt intimated because "she didn't know what being challenged even was." *Id.* at 3-4. She never testified, and Challenged Voters provided no evidence that Ms. Heredia ever was afraid of violence on the basis of the § 230 Challenge.

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                 22

**2.      Alleged Threats against Plaintiff Jane Doe were not violent.**

Challenged Voters allege that Ms. Doe was "extremely upset when she learned she had been challenged.**"** *Id.* at 5 (citing Doe Decl. ¶ 5). Ms. Doe claims to have feared that she would "become the next target of harassment from True the Vote and their supporters." *Id.* However, neither Challenged Voters nor Ms. Doe can point to any evidence of True the Vote participating in any form of harassment. *See id.* They claim harassment and doxxing arose "as a consequence of claims of voter fraud." *Id.* Challenged Voters acknowledge that any intimidation Ms. Doe would have felt was not a result of True the Vote threatening Ms. Doe but as a result of them "publish[ing] information about their various election-related efforts." *Id.* But Challenged Voters can provide no evidence that any Named Defendant published Ms. Doe's information specifically. No Publication Citations. Ms. Doe's generalized, subjective fears do not support the Section 11(b) claims, and general communications by Named Defendants, such as press releases, are not targeted or specific enough to support such claims either. *See* Defs.' Reply ISO MSJ, 1-5.

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                        23

### 3. Alleged Threats against Challenged Voters Scott Berson, Stephanie Stinetorf, and Gamaliel Turner were not violent.

Named Defendants never submitted any Challenge in Muscogee County. *See* Defs. Br. ISO MSJ, 6-6 (citing evidence). There is no connection to Named Defendants, let alone any alleged threat of violence, against Challenged Voters Berson, Stinetorf, and Turner.

### 4. § 230 Challenges and other actions were not violent.

Challenged Voters argue that Named Defendants § 230 Challenges were "objectively intimidating." *See* Pls. Reply ISO MSJ at 8. They argue that the challenges themselves were intimidating, the use of "bounties," the hiring of SEALs, and Facebook posts were intimidating. *Id.* at 8-12.

First, if the § 230 Challenges could be called violent for the purposes of true threats, then the Court would have to find *all* challenges under the Georgia statute to be true threats. No reasonable person would believe that *just the making of a challenge*, as allowed under Georgia law, could be a threat of violence necessary for it to fall under the true threat exception.

Second, the evidence shows that True the Vote never offered "bounties" for reports of voter fraud. No Bounty Citations.

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                      24

Third, TTV's "call[] for getting some SEALS to work inside the polls" was not for the purpose of "intimidating or threatening" voters and/or workers, but for the purpose of helping understaffed polling places since veterans and first responders are very good at understanding a chain of command and understanding process. Pls. Reply ISO MSJ at 10-11; *see* Defs. Resp. Opp'n to Pls MSJ, Doc. 173, at 17. Further, the interactions between the volunteers and voters would depend on the capacity in which they volunteered and the state process for various poll volunteer functions. TTV Tr. 62:13-64:7. Challenged Voters have presented no evidence that the call for volunteers was in any way meant to intimidate or threaten voters, rather than a legitimate effort to support the need for poll volunteers. Nor have they presented any evidence that any former SEALs were "recruited" by any Named Defendants, or that they served as poll volunteers.

Finally, Challenged Voters argue that Facebook posts, made by a third party not any Named Defendants, were threatening. Pls. Reply ISO MSJ at 11-12. Mr. Somerville and Mr. Davis posted information about voters who had registered to vote using an UPS store address (which is prohibited by Georgia law). Defs. Opp. to Pls.' MSJ, 19. Challenged Voters do not argue that the posts themselves are

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                              25

intimidating or threatening. *See id; see also* Pls. Reply ISO MSJ at 11-12. Rather, they argue that comments on that post, made by third parties, were threatening, *id*, and that "Defendant's expressed support." *Id.* However, Challenged Voters can point to only *one* comment for which Mr. Somerville and Mr. Davis expressed any inkling of support. *Id.* That comment read "I think a search warrant is in order here," which Mr. Davis responded with "great idea," *id.*—a call for a search warrant to be executed by proper legal authorities is not a call for violence. The only comment which could be considered threatening is one which reads "Hang that prick." *Id.* However, nothing in the evidence suggests any Named Defendant had anything to do with that comment, expressed support, or even encouraged it. As this Court found, "[h]ow third-party actors react to Defendants' actions is not directly attributable to Defendants without clearer connections borne out by evidence." TRO Order, 27. Challenged Voters have provided no such evidence because it does not exist.

Named Defendants simply filed § 230 Challenges, allowed under Georgia law. Not one of the Challenged Voters were contacted directly by a Named Defendant, nor was any violent action (or threat thereof) taken by a Named

Defendant. Thus, Named Defendants' conduct is protected under the First

Amendment as it does not fall within the true threat exception under *Black*.

### III. Assuming without deciding that Defendants' §230 challenges are First Amendment protected petitions, what legal standard should be used to determine the petitions were baseless or frivolous?

To be considered frivolous, First Amendment petitions must be without

arguable legal merit. That is, they must be without merit in law or fact. "Without

arguable legal merit" is the legal standard used to evaluate claims or defenses not

only in the context of litigation, but also in a variety of contexts for First

Amendment protected petitions, including administrative actions. The Defendants'

§230 Challenges were meritorious in both law and fact and cannot be considered

"frivolous" petitions.

### A.    "Without arguable legal merit" is the legal standard used to evaluate whether a First Amendment petition is baseless or frivolous.

"The right to petition is one of the most precious liberties safeguarded by

the Bill of Rights." *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 517 (2002). The

Eleventh Circuit has held that a claim is frivolous if it is without arguable merit

either in law or fact. *Cranford v. Bayer*, 147 F. App'x 947, 948 (11th Cir. 2005);

*see also Bilal v. Driver*, 251 F.3d 1346, 1349 (11th Cir. 2001) (finding frivolous

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                27

claims include claims 'describing fantastic or delusional scenarios . . . .'") (quoting *Neitzke v. Williams*, 490 U.S. 319, 328 (1989)); *Carroll v. Gross*, 984 F.2d 392, 393 (11th Cir.1993); *Battle v. Central State Hospital*, 898 F.2d 126, 129 (11th Cir.1990).

The Eleventh Circuit has stressed that to determine whether a claim is frivolous, a court "must focus on the question whether the case is so lacking in arguable merit as to be groundless or without foundation rather than whether the claim was ultimately successful." *Beach Blitz Co. v. City of Miami Beach*, Fla., 13 F.4th 1289, 1302 (11th Cir. 2021) (citing *Jones v. Tex. Tech Univ.*, 656 F.2d 1137, 1145 (5th Cir. 1981). Even if a plaintiff's allegations are ultimately dismissed or found to be insufficient to stand trial, that alone is not enough to render the plaintiff's cause of action "groundless" or "without foundation." *Hughes v. Rowe*, 449 U.S. 5, 15-16 (1980).

The Eleventh Circuit identified several factors to consider when evaluating frivolity: "(1) whether the plaintiff established a prima facie case; (2) whether the defendant offered to settle; and (3) whether the trial court dismissed the case prior to trial or had a full-blown trial on the merits." *Sullivan v. Sch. Bd. of Pinellas*

*County*, 773 F.2d 1182, 1189 (11th Cir. 1985). The *Sullivan* Court noted these factors are "general guidelines only, not hard and fast rules." *Id.*

In addition these, this Circuit has recognized a fourth consideration that is "particularly important": whether there was enough support for the claim to warrant close attention by the court. *Beach Blitz Co.*, 13 F.4th at 1302.

The Eleventh Circuit's holdings regarding frivolity are, of course, consistent with those of the Supreme Court, but several key Court cases illuminate both the importance of protecting a First Amendment right at issue as well as applying objective standards in questioning frivolity in order to protect that right.

The Court has analyzed the question of frivolity in the context of labor relations and antitrust scenarios. *See Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 740-41 (1983); *see also Prof. Real Est. Inv'rs, Inc. v. Columbia Pictures Industries, Inc.*, 508 U.S. 49, 60 (1993); *BE & K Const. Co.*, 536 U.S. at 516. In those scenarios, the Court recognized the importance of considering a litigant's First Amendment right to petition, even when important competing interests such as labor or competitive business rights were at issue.

The Court found that the First Amendment is advanced by reasonable

petitions, even if they are ultimately unsuccessful, because: (1) the genuineness of grievances does not turn on whether they succeed; (2) they allow for public airing of disputed facts; (3) they raise matters of public concern; (4) they promote evolution of the law by supporting the development of legal theories that may not gain acceptance the first time around; and (5) the ability to lawfully prosecute even unsuccessful suits adds legitimacy to court system as a designated alternative to force. *BE & K Const. Co.*, 536 U.S. at 532. Because the right to petition is so fundamental to our system of governance, and because the underlying purposes of the First Amendment are advanced by reasonable petitions, finding a petition to be baseless or frivolous requires a rigorous objective legal standard.

The Court outlined a two-part test to determine whether litigation was a "sham" prohibited by antitrust law. First, the lawsuit must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof. Real Est. Inv'rs, Inc.*, 508 U.S. at 60. Second, only if the challenged litigation is found to be objectively meritless may a court consider the litigant's subjective motivation. *Id.* The Court emphasized that probable cause to institute civil proceedings requires "no more than a reasonable belief that there is a chance

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                          30

that a claim may be held valid upon adjudication" and that the existence of this probable cause is an absolute defense against allegations of frivolity. *Id.* at 63. (cleaned up). The Court also recognized that it had rejected contentions that an attempt "to influence the passage and enforcement of laws" might lose immunity to action under antitrust laws merely because the lobbyists' "sole purpose was to destroy [their] competitors." *Id.* at 57-58 (citing *E. R. R. Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 138 (1961)).

In an NRLB case, the Court reasoned that as long as a "plaintiff's purpose is to stop conduct he reasonably believes is illegal, petitioning is genuine both objectively and subjectively." *BE & K Const. Co.*, 536 U.S. at 534 (rejecting contention that evidence of animus means the underlying litigation was not "genuine"). The Court also noted it had based its interpretation of the nexus between antitrust laws and the right to petition "in part on the principle that we would not 'lightly impute to Congress an intent to invade . . . freedoms' protected by the Bill of Rights, such as the right to petition." *Id.* at 525 (citation omitted). The Court made it explicit that "the right to petition extends to all departments of

the Government[,]" not just access to courts.[9] *Id.* (citation omitted).

Because the holding of *BE & K* was relatively narrow, courts have generally extended the *Professional Real Estate Investors* test to contexts outside of antitrust, by requiring a finding that the petitioning activity is "objectively baseless," before subjective intent is considered. *Bryant v. Mil. Dept. of Mississippi*, 597 F.3d 678, 691 (5th Cir. 2010). The Challenges brought were not frivolous because they had arguable legal merit. They had objective merit in both law and fact, regardless of whether the Challengers were successful in their efforts.

**B.   Defendants' §230 Challenges were objectively meritorious in law.**

Given the precedent, this Court must ask whether the Challenges were so objectively baseless that no reasonable litigant could realistically expect success on the merits—that is, so lacking in arguable merit as to be groundless or without foundation in law. *Prof. Real Est. Inv'rs, Inc.*, 508 U.S. at 60; *see also Beach Blitz Co.*, 13 F.4th at 1302. The § 230 Challenges were not objectively baseless in law

---

[9]The Court's reasoning in *BE & K* regarding extending this right to all departments of the government supports the presumption before this Court that the Challenges were First Amendment-protected petitions.

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                          32

as they were explicitly provided for by Georgia statute.[10]

Georgia law permits challenges to an elector's right to vote in a particular election. O.C.G.A. § 21-2-230. Under Georgia law, a person may not vote in a county or municipality unless he or she resides in that same county or municipality. O.C.G.A. § 21-2-216(a). It is important to recognize that Georgia law permits two distinctly different challenges to the ability of an ineligible elector to vote. The presence of the elector on the list of electors (called under federal law "voter registration lists") can be challenged under O.C.G.A. § 21-2-229. The Challenges at issue in this case were not brought under this section since the Challenges did not question the Challenged Voters' presence on the list of electors and § 230 specifically recognizes that if a Challenge is "based on the ground that the elector is not qualified to remain on the list of electors," the relevant board must consider the Challenge under §229, not §230. *See* O.C.G.A. § 21-2-230(d)(e)(f)(g).

---

[10] Detailed explanation of § 230 and the factual application and data analysis performed for the Challenges at issue here have been fully briefed to this Court and are incorporated and summarized herein. *See* Defs.' Br. in Supp. of Mot. for Summ. J., ECF No. 155-1, 9-13; *see also* Defs.' Resp. in Opp. to Pls.' Mot. for Summ. J., ECF No. 173, 20 - 22; Defs.' Reply in Supp. of Mot. for Summ. J., ECF No. 176, 7 - 10.

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                33

A § 230 Challenge does not result in automatic disqualification of the challenged voter—it simply triggers a process at the county board of registrars, including determining probable cause, notification to precinct poll officers, notification to the Challenged Voter, and opportunities for the Challenged Voter to answer the Challenge (and then vote or cast a provisional ballot). *Id.* at (b)(c)(h)(i). Submitting § 230 Challenges in accordance with the letter and spirit of Georgia law cannot, by definition, be objectively baseless under the law. Georgia law provided the Challengers with a reasonable expectation of success on the merits of the Challenges. The Eleventh Circuit made clear in *Beach Blitz Co.* that ultimate success of a claim is not the determining factor of whether a petition has arguable merit, 13 F.4th at 1302. While some counties did not sustain the Challenges (and so those Challenged Voters had no reason to even know they were on a Challenge List), other counties did.

For example, the legal ability of Jocelyn Heredia, a Plaintiff in this case, to vote in the Runoff Election was challenged in Banks County. Transcript Excerpts of Deposition of Jocelyn Heredia (Oct. 15, 2021) ("**Heredia Tr.**"), ECF No. 155-24, 20:13-21:7. Banks County followed the proper procedure for a Challenged

Voter by asking Ms. Heredia to complete a paper ballot and explaining to her that if she provided proof of residency at her voter registration address, her ballot would be counted. *Id.* at 23:22-24:13. She provided the officials with proof of residency and submitted her paper ballot. *Id.* at 24:8-13.

The Court reasoned that as long as a "plaintiff's purpose is to stop conduct he reasonably believes is illegal, petitioning is genuine both objectively and subjectively." *BE & K Const. Co.*, 536 U.S. at 534. Here, the Named Defendants had just such a purpose. They sought to petition their government—asking it to ensure that voters who were ineligible under the law to cast a ballot be prevented from doing so—in order to protect the rights, and prevent vote dilution, of all the eligible voters who legally cast ballots. TTV Tr. 342:15-343:1 TTV's Resp. First Interrogs. Resp. No. 5; First Somerville Tr. 124:1-12; 127:9-15; Second Davis Tr. 59:7-81; 86:22-87:3; 90:14-21.

The Court found that the ability for the public to raise matters of public concern and promote the evolution of the law advances the First Amendment, even if a petition is unsuccessful. *BE & K Const. Co.*, 536 U.S. at 532. Changes to Georgia's election code, made after the Challenges at issue in this suit, affirmed

the ability for a voter to challenge an elector's right to vote in a particular election and made it clear that the number of challenges allowed under the law is not limited. O.C.G.A. § 21-2-230 (Effective March 25, 2021) ("There shall not be a limit on the number of persons whose qualifications such elector may challenge."). This supports the conclusion that the Challenges helped to raise a matter of public concern that later promoted evolution in the law.

Georgia law, both at the time in question and now, permits Challenges to a person's eligibility to vote in a particular election. Named Defendants had every objective legal right to bring the Challenges they did. They did so for the purpose of preventing those who were not legally permitted to cast ballots in the Runoff Election from diluting the votes of those Georgia citizens who were legally permitted to do so. In addition to protecting their existing rights, the Challengers also served the purpose of advancing the law, confirmed by the most recent changes to Georgia's election law allowing an unlimited number of § 230 Challenges. Therefore, the §230 Challenges were objectively meritorious in law and not baseless or frivolous.

**C.      Defendants' §230 Challenges were objectively meritorious in fact.**

The Eleventh Circuit has held that a claim is frivolous if it is without

arguable merit either in law or fact. *Cranford*, 147 F. App'x at 948. Just as the

§230 Challenges were objectively meritorious in law, so were they in fact. Of the

*Sullivan* factors used to evaluate frivolity, several weigh in favor of the Named

Defendants here.[11]

First, the §230 Challenges established a prima facie "case." *Sullivan*, 773

F.2d at 1189. Any elector may submit a challenge, but that challenge "shall be in

writing and specify distinctly the grounds for such challenge." O.C.G.A. § 21-2-

230(a). Each Challenge was submitted in writing to each county election board.

*See, e.g.*, Banks County Challenge, Def. TTV 1748, Ex. A. The written letter

stated that the Challenges were based upon "[a]vailable data from the [NCOA] and

other commercially available sources [and] demonstrate[ ] probable cause to

believe these individuals no longer reside where they are registered to vote. . . .

[and] appear to have permanently established other residence." Because the

Challenges were submitted in writing and stated the grounds for the challenge,

---

[11]One *Sullivan* factor, whether the defendant offered to settle, is not relevant here.

they satisfied the prima facie *Sullivan* test for frivolity.

Second, the *Sullivan* Court stated a factor to consider could be whether the trial court dismissed the case prior to trial or had a full-blown trial on the merits. *Sullivan*, 773 F.2d at 1189. While a motion to dismiss and a trial on the merits isn't directly relevant here, at least some counties considered the Challenges and asked Challenged Voters to provide verifying information, according to Georgia law. While the ultimate success of the Challenges is not dispositive, *Beach Blitz Co.*, 13 F.4th at 1302, that some counties considered the Challenges supports the supposition that the Challenges were not objectively meritless in fact.

Third, the Eleventh Circuit recognizes it is particularly important to consider whether there was enough support for the claim to warrant close attention of the court. *Id.* Again, some of the counties gave the Challenges "close attention" by requiring Challenged Voters to verify their residency information. In addition, this litigation is now entering its third year. Not only did some of the counties in question give the Challenges close attention, this Court has closely considered the claims of Challenged Voters and the defenses asserted by Named Defendants, which all directly concern analysis and consideration of the § 230 Challenges.

Further, the processes Named Defendants used to compile the Challenge Lists were not frivolous. The process TTV used (through OpSec) to compile the Challenge List process was not limited to matching NCOA data to a voter file but used additional databases, including other state registrations, proprietary lists, county tax records, and voter registration rolls in other states allowing for broader comparisons and more accurate matching than is generally attained by using NCOA and a voter list alone. OpSec Tr. 94:17-21; 95:3-9, 17-18; 95:14-18; 96:3-17. Mr. Davis' and Mr. Somerville's data analysis included running CASS & NCOA processing of voter-provided move status, geocoding to verify move locations, and extensive work to remove military and student voters, who they knew were likely to be eligible to vote. First Davis Tr. 21; Davis Interrog. Resp. Ct. Order Resp. No. 2. A claim must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof. Real Est. Inv'rs, Inc.*, 508 U.S. at 60. Named Defendants had reasonable expectations that their concerns could be addressed by election officials.[12] The total number of

---

[12]In addition, to the expectations implicated in the § 230 Challenges themselves, Named Defendants had the reasonable expectation that the § 230 Challenges would alert state election officials to a problem inherent in the system,

**Defs.' Suppl. Br.**
**MSJ Hr'g.**          39

challenges were broken down and submitted to separate counties. If the County Boards found probable cause to proceed with the § 230 Challenges, it would notify the poll officers of the challenged elector's precinct (a further subdivision of the total number per county). O.C.G.A. § 21-2-230(b). The Named Defendants' § 230 Challenges did not require a small group of election officials to handle multiple thousands of challenges. Poll officials simply had to follow the fairly minimal process required under statute for only those challenged voters who showed up to vote or who cast an absentee ballot. *Id.* at (c)(e).

The § 230 Challenges included all the information required under Georgia law, and so met the prima facie standard for submission. Some counties did consider and adjudicate the Challenges submitted. Those counties, and this Court, have carefully considered the Challenges. And the Challengers had an objectively reasonable expectation of the success of the Challenges, given the orderly and fairly minimal process required by precinct poll workers to adjudicate the small subset of challenged voters who showed up to vote or who cast an absentee ballot. Therefore, the § 230 Challenges were not without arguable merit in fact.

in hopes they would address the issues before the next election. Second Somerville Tr. 187:5-13; First Somerville Tr. 153:1-12.

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                                    40

Because the § 230 Challenges were not without arguable merit in either law or fact, relevant precedent requires this Court to find that the § 230 Challenges were not baseless or frivolous.

### IV. Please elaborate on the use of vote dilution as a defense to a Section 11(b) claim.

"Undeniably the Constitution of the United States protects the right of all qualified citizens to vote, in state as well as in federal elections" and to have that vote counted, *Reynolds*, 377 U.S. at 554. Once granted the right to vote on equal terms, the right cannot be later be devalued. *Bush v. Gore*, 531 U.S. 98, 104 (2000).

The right to vote includes protection from being denied the right to vote outright, having votes destroyed by alteration of ballots, and legal votes being diluted by ballot-box stuffing. *Reynolds*, 377 U.S. at 555. "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Id.* (internal citations omitted).  The right to vote includes more than just the right to mark a ballot and drop it in a box. *South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., Dissenting). The right includes the right to have the vote counted,

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                          41

and counted at full value without dilution or discount. *Id.*

Named Defendants' § 230 Challenges were brought to protect their right to vote. They brought the § 230 Challenges to ensure that the right to vote would not be infringed through vote dilution by ensuring that only legal votes were cast and counted. *See* TTV Tr. 342:15-343:1; TTV's Resp. First Interrogs. Resp. No. 5; First Somerville Tr.124:1-12; 127:9-15; Second Davis Tr. 59:7-81; 86:22-87:3; 90:14-21. Challenged Voters presented no evidence that Named Defendants did not seek to prevent vote dilution.

Challenged Voters argue that just bringing of these challenges violates Section 11(b). *See* Pls. Br. ISO MSJ, ECF 156-1, 15-21. Such a finding by this Court would ensure that Named Defendants would be unable to protect their right to vote by filing § 230 Challenges to protect against vote dilution. Challenged Voters characterized Named Defendants vote dilution defense,[13] as "a limitation

---

[13]Article III standing is not at issue in Defendants' *defense*. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), as revised (May 24, 2016) (finding plaintiff bears burden to establish standing). Defendants have not made a *claim* that rejecting their § 230 Challenges was a violation of their right to vote via vote dilution. If they had, those claims might have been rejected for lack of standing. *See Wood v. Raffensperger*, 981 F.3d 1307 (11th Cir. 2020), *cert denied*, 141 S.Ct. 1379 (2021).

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                42

on their ability *to intimidate voters* [that] would unconstitutionally violate Defendants right to vote via vote dilution." *See* Pls. Opp'n to Defs' MSJ, ECF 174, 22. (emphasis added). This is a gross mischaracterization. First, Named Defendants did not file the § 230 Challenges to intimidate anyone. Second, Challenged Voters have not shown that any Named Defendants had directed, intimidating contact with Challenged Voter. Third, Named Defendants never attempted to stop *legal* votes from being cast, but rather used the Georgia challenge process, as was intended, to ensure that *only legal votes* were cast and counted and that none of those votes were diluted by *illegal votes*. Illegal voting is not protected by the constitutional right to vote. 90 A.L.R. 1362 (Originally published in 1934) (collecting cases).

   *U.S. v. Saylor* may be the most extreme example of vote dilution. 322 U.S. 385, 386 (1944). There, state election officials were charged with taking blank, unvoted ballots, marking them, and then inserting the false ballots into the ballot box—those false votes diluted the voting power of the real votes. *Id.* The *Saylor* Court held the action of the election officials violated § 19 of the Criminal Code which provided "[i]f two or more persons conspire to injure, oppress, threaten, or

intimidate any citizen in the free exercise or enjoyment of any right or privilege secured to him by the Constitution or laws of the United States." *Id.* 386, 390.

Vote dilution can also include diluting the voting power of a group by changing the number of representatives for minority districts. *Johnson v. De Grandy*, 512 U.S. 997, 1006-1007 (1994). Either in a single-member district or multi-member district, in order to show vote dilution a minority group must be "sufficiently large and geographically compact to constitute a majority in a [] district; that it be politically cohesive; and the [] majority vote sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* (quoting *Thornburg v. Gingles*, 478 U.S. 30, 50-51(1986)).

Courts have found that vote dilution can occur in widely disparate circumstances—from literally stuffing the ballot box with fake votes to changing the makeup of representative districts in certain situations. What the § 230 Challenges sought to prevent follows more closely to the fake ballot-stuffing scheme in *Saylor* as people voting in Georgia without the legal authority to do so are, by definition, casting illegal ballots that should not be counted. The § 230 Challenges were designed to ensure that only legal votes were counted and to

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                    44

ensure that each legal vote's power was not diluted by any illegal votes

cast—applying Section 11(b) to Named Defendants' § 230 Challenges would

prohibit their ability to protect that right from vote dilution.

## V. Are the aforementioned constitutional defenses asserted as facial or as-applied challenges to Section 11(b)?

As-applied. Named Defendants have briefed their as-applied constitutional

defenses previously. *See, e.g.*, Defs.' Reply in Supp. of Mot. for Summ. J., ECF

No. 176, 10-15.

If this Court were to adopt Plaintiffs' interpretation of Section 11(b) and

find that Named Defendants' speech and conduct was encompassed by Section

11(b), the statute would be rendered unconstitutional as applied on several

grounds. First, Section 11(b) would be unconstitutional as applied under the First

Amendment since Named Defendants' speech does not contain true threats outside

of First Amendment protection and since Named Defendants' § 230 Challenges

are lawful actions to petition the government. *See* Parts II. III. Second, Section

11(b) would be unconstitutional as applied under the First Amendment as

violating Named Defendants' right to protect their right to vote from vote dilution.

Part IV. And third, Section 11(b) would be unconstitutional as applied to Named

**Defs.' Suppl. Br.**
**MSJ Hr'g.**                             45

Defendants under the Due Process Clause of the Fourteenth Amendment since it would be rendered unconstitutionally vague.

The undisputed facts show Named Defendants did not engage in any conduct that was objectively intimidating. *See* Part II.D.1-4. Nor have the Challenged Voters provided evidence that there was the type of direct connection between Named Defendants and the Challenged Voters and any objective intimidation. *See* TRO Order, 26-27. If simply bringing "mass challenges" can form the basis of an § 11(b) violation, no "man of common intelligence" in Georgia would know which, or how many, voter challenges—allowed under Georgia law—would be considered a violation of Section 11(b). Such a finding by this Court would chill Georgians' First Amendment activity out of the fear of liability stemming from confusion over exactly what petitions to government would be permitted under such a holding. As a result, Section 11(b) would be rendered unconstitutionally vague as applied to Named Defendants.

## Conclusion

For the foregoing reasons, Named Defendants' Motion for Summary Judgment should be granted.

Dated: January 17, 2023                    Respectfully Submitted,

*/s/ David F. Guldenschuh*                  */s/ James Bopp, Jr.*
David F. Guldenschuh                       James Bopp, Jr.,* IN # 2838-84
GA Bar No. 315175                            jboppjr@aol.com
David F. Guldenschuh P.C.                  Jeffrey P. Gallant,* VA # 46876
P.O. Box 3                                   jgallant@bopplaw.com
Rome, Georgia 30162-0333                   Courtney Turner Milbank,* IN#
Telephone: 706-295-0333                    32178-29
Email: dfg@guldenschuhlaw.com                cmilbank@bopplaw.com
*Local Counsel for Defendants*             Melena Siebert,* IN # 35061-15
                                             msiebert@bopplaw.com
                                           THE BOPP LAW FIRM, PC
                                           1 South 6th Street
                                           Terre Haute, Indiana 47807
                                           Telephone: (812) 232-2434
                                           Facsimile: (812) 235-3685
                                           *Lead Counsel for Defendants*
                                           *Admitted Pro hac vice

# Certificate of Compliance

The undersigned counsel certifies that the foregoing has been prepared in

Times New Roman (14 point) font, as required by the Court in Local Rule 5.1(B).

Respectfully submitted on January 17, 2023.


*/s/ David F. Guldenschuh*
David F. Guldenschuh
*Local Counsel for Defendants*