IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

FAIR FIGHT, INC., *et al.*,

        Plaintiffs,

        v.

TRUE THE VOTE, INC., *et al.*,

        Defendants.

Case No. 2:20-cv-0302-SCJ

**BRIEF OF THE UNITED STATES ON THE CONSTITUTIONALITY AND
INTERPRETATION OF SECTION 11(B) OF THE VOTING RIGHTS ACT**

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ...................................................................1

FACTUAL AND PROCEDURAL BACKGROUND ...............................................1

ARGUMENT ..............................................................................................3

    I.  Section 11(b) of the Voting Rights Act Prohibits Voter Intimidation, Threats, and Coercion.................................................................3

        A. Section 11(b) Prohibits Any Conduct That Attempts to or Does Intimidate, Threaten, or Coerce Voters. .............................................4

        B. Section 11(b) Does Not Require Challenged Conduct Be Directed by Defendants Toward Specific Voters or Subgroups of Voters. ..........9

        C. Voter Challenges May Constitute Intimidation, Threats, or Coercion Under Section 11(b)..........................................................................13

    II.  Section 11(b) Does Not Violate the First Amendment, Either Facially or As-Applied..............................................................................20

        A. Section 11(b)'s Prohibition on Intimidation, Threats, and Coercion Is Consistent with the First Amendment. ........................................21

        B. Section 11(b) Prohibits Improper Voter Challenges Consistent with the Free Speech Clause....................................................................24

        C. Even if Section 11(b) Does Implicate First Amendment Rights, Section 11(b) Survives Any Level of Scrutiny................................29

        D. Section 11(b) Is Consistent with the Petition Clause of the First Amendment....................................................................................32

    III.  Section 11(b) Is Not Unconstitutionally Vague.....................................36

    IV.  Prohibiting Intimidation, Threats, and Coercion of Voters Does Not Unconstitutionally Dilute Votes.........................................................39

CONCLUSION .........................................................................................42

# TABLE OF AUTHORITIES

**Cases**

*Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL 2223772  (M.D.N.C. June 2, 2021) ..................................................................................................10, 18

*Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014) ............................9, 16

*Ariz. All. for Retired Americans v. Clean Elections USA*, No. CV-22-01823-PHX-MTL, 2022 WL 15678694 (D. Ariz. Oct. 28, 2022) ...................................................8

*Ariz. All. for Retired Americans v. Clean Elections USA*, No. CV-22-01823-PHX-MTL, 2022 WL 17088041 (D. Ariz. Nov. 1, 2022) .........................................10, 11

*Bartlett v. Strickland*, 556 U.S. 1 (2009) ...................................................................29

*Beaumont Chapters of the NAACP v. Jefferson Cnty.*, No. 1:22-CV-00488, ECF No. 14 (E.D. Tex. Nov. 7, 2022)..................................................................................20

*Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731 (1983)............................33

*Borough of Duryea v. Guarnieri*, 564 U.S. 379 (2011).........................32, 33, 35, 36

*Brown v. Hartlage*, 456 U.S. 45 (1982)....................................................................31

*Burson v. Freeman*, 504 U.S. 191 (1992).................................................................29

*Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508 (1972) .............34, 35

*CISPES (Comm. in Solidarity with People of El Salvador) v. FBI*, 770 F.2d 468 (5th Cir. 1985)..........................................................................................................37

*Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213 (11th Cir. 2009) ...............................................................................................29, 30, 32

*Council on Am.-Islamic Rels. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371 (D. Minn. 2020) ................................................................................................................22

*Daschle v. Thune*, No. 4:04-cv-4177, ECF No. 6 (D.S.D. Nov. 1, 2004) ...10, 17, 22

*Democratic Nat. Comm. v. Republican Nat. Comm.*, 673 F.3d 192 (3d Cir. 2012) ...................................................................................................................12, 17

*Edwards v. South Carolina*, 372 U.S. 229 (1963) ....................................................36

*Evenwel v. Abbott*, 578 U.S. 54 (2016) ....................................................................40

*Federal Election Comm'n v. Akins*, 524 U.S. 11 (1998) ..........................................11

*Frisby v. Schultz, 487 U.S. 474 (1988)* ....................................................................30

*FW/PBS, Inc. v. Dallas*, 493 U.S. 215 (1990) ........................................................21

*Herndon v. Comm'r of Internal Revenue*, 758 F. App'x 857 (11th Cir. 2019) .......34

*Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557 (1995) .................................................................................................................23

*Illinois ex rel. Madigan v. Telemarketing Associates, Inc.,* 538 U.S. 600 (2003)...27

*Int'l Soc. for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809 (5th Cir. 1979) ................................................................................................................38

*League of United Latin Am. Citizens-Richmond Region Council 4614 v. Public Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ("*LULAC*") ....................................................................................................6, 7, 19

*Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301 (11th Cir. 2009) ....................................................................................................37

*Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 512 F. Supp. 3d 1354 (M.D. Ga. 2021) ................................................................................................16, 17

*McDonald v. Smith*, 472 U.S. 479 (1985) .................................................33

*Minn. Voters All. v. Mansky*, 138 S. Ct. 1876 (2018) ........................................29, 30

*Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077 (D. Mont. 2008) ............14

*NAACP v. Button*, 371 U.S. 415 (1963) ...............................................34

*Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457 (S.D.N.Y. 2020) ("*Wohl I*") .....................................................................*passim*

*Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500 (S.D.N.Y. 2021) ("*Wohl II*") .....................................................................*passim*

*Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569 (1998) ...............................21

*N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16CV1274, 2016 WL 6581284  (M.D.N.C. Nov. 4, 2016).......................................................16

*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) ................................................27

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126 (11th Cir. 2022) .......................................................27, 28

*Paganucci v. City of New York*, 785 F. Supp. 467 (S.D.N.Y. 1992)......................34

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) ................................................14

v

*Reynolds v. Sims,* 377 U.S. 533 (1964)....................................................26

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ...................................40

*Rumsfeld v. Forum for Acad. & Institutional Rts.*, 547 U.S. 47 (2006) ...........22, 23

*United States v. Alvarez*, 567 U.S. 709 (2012) ......................................24, 25, 26, 27

*United States v. Beaty*, 288 F.2d 653 (6th Cir. 1961)...........................................8, 22

*United States v. Bowker*, 372 F.3d 365 (6th Cir. 2004)...........................................38

*United States v. Buttorff*, 572 F.2d 619 (8th Cir. 1978)...........................................26

*United States v. Eckhardt*, 466 F.3d 938 (11th Cir. 2006) ...................................37

*United States v. Fleury*, 20 F.4th 1353 (11th Cir. 2021) ...................................23, 39

*United States v. Glaub*, 910 F.3d 1334 (10th Cir. 2018)...........................................25

*United States v. Hoffert*, 949 F.3d 782 (3d Cir. 2020)...........................................25

*United States v. Kaplowitz*, 201 F. App'x 659 (11th Cir. 2006) ...........................26

*United States v. Lucky*, 239 F. Supp. 233 (W.D. La. 1965)...................................18

*United States v. McElveen*, 180 F. Supp. 10 (E.D. La.) ...........................................18

*United States v. McLeod*, 385 F.2d 734 (5th Cir. 1967)...................................*passim*

*United States v. Nguyen*, 673 F.3d 1259 (9th Cir. 2012)...........................................20

*United States v. Quinn,* 514 F.2d 1250 (5th Cir. 1975)...........................................28

*United States v. Ring*, 706 F.3d 460 (D.C. Cir. 2013) ..............................................34

*United States v. Shrader*, 675 F.3d 300 (4th Cir. 2012) ..........................................37

*United States v. Williams*, 553 U.S. 285 (2008) ..........................................37, 38, 39

*United States v. Wood*, 295 F.2d 772 (5th Cir. 1961)..............................................18

*Virginia v. Black*, 538 U.S. 343 (2003) ....................................................................3

*Warshauer v. Solis*, 577 F.3d 1330 (11th Cir. 2009)..................................................4

*Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442 (2008)...*passim*

*We the People Found. v. United States*, 485 F.3d 140 (D.C. Cir. 2007)................35

*Weaver v. Bonner*, 309 F.3d 1312 (11th Cir. 2002) ..........................................24, 31

*Whatley v. City of Vidalia*, 399 F.2d 521 (5th Cir. 1968)........................................18

*Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245 (2022).....................40

*Wright v. DeArmond*, 977 F.2d 339 (7th Cir. 1992)..........................................35, 36

**Statutes**

28 U.S.C. § 2403(a) .................................................................................................2

52 U.S.C. § 10101(b) ...............................................................................................6

52 U.S.C. § 10307(b) ...............................................................................................3

52 U.S.C. § 10310(c)(1) ........................................................................5

52 U.S.C. § 20501(a)(3) ......................................................................19

Ga. Code § 21-2-230 ...........................................................................27

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) ..............................................15

H.R. Rep. No. 89-439 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437 ..........6, 10

Nicolas Riley, Brennan Center for Justice, *Voter Challengers* (2012) ..................19

Theodore Z. Wyman, *Litigation of Voter Intimidation Law*, 174 Am. Jur. Trials 385 (Nov. 2022) ................................................................................30

*Voting Rights Act of 1965: Hearing Before the H. Comm. on the Judiciary, 89th Cong.* (statement of Att'y Gen. Nicholas Katzenbach) ................................7, 11, 19

*Webster's Third New International Dictionary* (1966) .......................................5, 15

## PRELIMINARY STATEMENT

The United States intervened to defend the constitutionality of Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b).  Section 11(b) prohibits conduct that intimidates, threatens, or coerces voters or attempts to do so, without exception.  This prohibition reaches intimidation, threats, and coercion effected through abuse of state voter challenge procedures.  Section 11(b) is constitutional on its face, and this Court may apply Section 11(b) to the conduct at issue consistent with the First Amendment.

The United States takes no position on any factual dispute before the Court nor on any legal question other than those described herein related to Section 11(b).

## FACTUAL AND PROCEDURAL BACKGROUND

Plaintiffs allege that during True the Vote's "Validate the Vote" campaign, undertaken in the weeks preceding the Georgia 2021 U.S. Senate runoff, Defendants intimidated and threatened voters in violation of Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b).  Plaintiffs' allegations include that Defendants filed baseless mass voter challenges, stoked public fears of voter fraud

that implicated voters who had been wrongfully challenged, organized surveillance of polling locations, and incentivized vigilante election policing efforts. *See* Compl. at 28, ECF No. 1; *see also* Pls.' Mem. Supp. Mot. Summ. J. (hereinafter "Pls.' Br.") at 15–33, ECF No. 156-1.

The Parties have filed cross-motions for summary judgment.  In their briefing, Defendants raise four constitutional defenses, asserting that applying Section 11(b) to their conduct would violate: (1) the First Amendment right to free speech; (2) the First Amendment right to petition the government; (3) the individual defendants' right to vote via vote dilution; and (4) the Fifth Amendment's prohibition on vague laws.  Defs.' Mem. Supp. Mot. Summ. J. (hereinafter "Defs.' Br.") at 24–31, ECF No. 155-1.  The Court then sought the United States' position on intervention to defend the constitutionality of Section 11(b) pursuant to 28 U.S.C. § 2403(a).  *See* Certification Order at 1, ECF No. 182. On December 19, 2022, the United States filed its Notice of Intervention.  U.S. Interv. Notice, ECF No. 187.

In advance of its February 1, 2023, summary judgment hearing, the Court invited supplemental briefing on five specific issues: (1) how Section 11(b) should be interpreted under the ordinary rules of statutory interpretation; (2) whether

2

*Virginia v. Black*, 538 U.S. 343 (2003), "preclude[s] application of the true threat[s] exception [to the First Amendment] when the alleged threatening behavior is non-violent but aimed at inhibiting a fundamental right"; (3) assuming Defendants' voter challenges were First Amendment-protected petitions, what legal standard should be used to determine whether they were baseless or frivolous; (4) how vote dilution operates as a defense to a Section 11(b) claim; and (5) whether "the aforementioned constitutional defenses" are "asserted as facial or as-applied challenges to Section 11(b)."  Supp. Br. Order at 2–3, ECF No. 184. The United States addresses questions one and four in this brief, as well as the arguments regarding the constitutionality of Section 11(b).

## ARGUMENT

### I.    Section 11(b) of the Voting Rights Act Prohibits Voter Intimidation, Threats, and Coercion.

This Court has asked the Parties to submit briefing regarding the proper interpretation of Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), "[u]sing the ordinary rules of statutory interpretation."  Supp. Br. Order at 2.  The plain meaning of the statute, its context, and its history make clear that Section 11(b) offers broad protections predicated on only one central question as relevant here: does the challenged conduct attempt to or actually intimidate, threaten, or

3

coerce any person for voting or attempting to vote?[1]  Defendants, however, argue

the law should be further limited in two ways: first, that a challenged "action or

communication [must] be directed toward specific voters," Defs.' Reply Supp.

Mot. Summ. J. (hereinafter "Defs.' Reply") at 3, ECF No. 176; and second, that

voter challenges "as permitted under [state] law" cannot violate Section 11(b),

Defs.' Br. at 8–13.  But these proffered limitations on the scope of Section 11(b)

have no basis in its text, history, or precedent.

A. *Section 11(b) Prohibits Any Conduct That Attempts to or Does Intimidate, Threaten, or Coerce Voters.*

The statutory language, legislative history, and relevant case law all

demonstrate that Section 11(b) prohibits any conduct that attempts to or actually

would intimidate, threaten, or coerce a reasonable voter, regardless of the means by

which such activities are carried out.

"The starting point in statutory interpretation is the language of the statute

itself."  *Warshauer v. Solis*, 577 F.3d 1330, 1335 (11th Cir. 2009) (citation

---

[1] Section 11(b) of the Voting Rights Act also prohibits intimidation, threats, and coercion of any person for urging or aiding any person to vote or attempt to vote or exercising powers or duties under specific provisions of the Voting Rights Act. *See* 52 U.S.C. § 10307(b).  Given the facts and allegations at issue here, the United States limits its discussion of Section 11(b) to violations regarding voting or attempting to vote.

4

omitted).  Section 11(b) holds that "[n]o person, whether acting under color of state law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote[.]"  52 U.S.C. § 10307(b).  Intimidation, threats, and coercion are categories of conduct defined largely by their impact rather than the specific means by which they are executed. *See Webster's Third New International Dictionary* 1183 (1966) (defining "intimidate" as to "make timid or fearful," or to "inspire or affect with fear," especially "to compel to action or inaction (as by threats)"); *id.* at 2381 (defining "threaten" as to "utter threats against" or "promise punishment, reprisal, or other distress"); *id.* at 438 (defining "coerce" as to "restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation)").  The plain language of the statute provides no limitations or exceptions to the statute's core prohibition on intimidation, threats, and coercion. Moreover, the term "vote" is defined broadly to encompass "all action necessary to make a vote effective."  52 U.S.C. § 10310(c)(1).

As this Court has recognized, Section 11(b) does not require a subjective intent to intimidate, threaten, or coerce.  *See* TRO Order at 23, ECF No. 29; *see also League of United Latin Am. Citizens-Richmond Region Council 4614 v.*

5

*Public Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) ("*LULAC*"); *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 485 (S.D.N.Y. 2020) ("*Wohl I*").[2]  On this point, Section 11(b)'s text contrasts with that of its predecessor provision in the Civil Rights Act of 1957, Section 131(b), which makes it illegal to "intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person *for the purpose of* interfering with the right of such other person to vote."  52 U.S.C. § 10101(b) (emphasis added); *see also* H.R. Rep. No. 89-439, at 30 (1965), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462 (noting "no subjective purpose or intent need be shown" under Section 11(b), unlike Section 131(b), "which requires proof of a 'purpose' to interfere with the right to vote").

Legislative history further confirms Section 11(b)'s intentionally broad reach.  In detailing how Section 11(b) would improve upon its predecessor statute, Attorney General Nicholas Katzenbach, the author of the Voting Rights Act,

---

[2] As Defendants also acknowledge, Defs.' Br. at 5; Defs.' Reply at 4–5, Section 11(b) does not focus on whether a defendant's actions subjectively intimidated or coerced a particular voter.  Rather, it forbids any "messages that a reasonable recipient familiar with the context of the message would interpret as a threat of injury tending to deter individuals from exercising their voting rights."  *Wohl I*, 498 F. Supp. 3d at 477.

testified before Congress that the drafters removed the "very onerous burden of proof of 'purpose'" to ensure Section 11(b) could reach clear violent threats as well as more "subtle forms of pressure" including through abuse of legal processes and economic retaliation. *Voting Rights Act of 1965: Hearing Before the H. Comm. on the Judiciary*, 89th Cong. 12 [hereinafter Katzenbach Statement], https://perma.cc/N9S4-KH2P.

Consistent with the plain text of the statute and its history, courts have recognized that Section 11(b) "sweeps broadly" to cover all conduct, violent and non-violent, that constitutes voter intimidation, threats, or coercion. *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021) ("*Wohl II*") (interpreting Section 11(b) to encompass violent and non-violent intimidation and not require showings of specific intent); *see also, e.g.*, *LULAC*, 2018 WL 3848404, at *4 (finding the omission of a specific intent requirement "suggest[s] § 11(b)'s deliberately unqualified reach").

Because "threats, intimidation or coercion may take on many forms," Section 11(b) requires fact- and context-specific legal analysis.[3]  *Wohl I*, 498 F.

---

[3] While legal and historical precedent concerning specific categories of intimidating, threatening, or coercive conduct analogous to those at issue may be

Supp. 3d at 482–83 (quoting *United States v. Beaty*, 288 F.2d 653, 654 (6th Cir. 1961)).  Challenged "acts cannot be viewed in isolation," but must be considered as a whole and "against the background of contemporaneous events[.]"  *United States v. McLeod*, 385 F.2d 734, 740 (5th Cir. 1967) (discussing Section 131(b) of the Civil Rights Act of 1957).  In the context of threats and intimidation, "courts have concluded that conduct putting others 'in fear of harassment and interference with their right to vote'" is "'sufficient' to support a Section 11(b) claim."  *Wohl I*, 498 F. Supp. 3d at 480 (quoting *LULAC*, 2018 WL 3848404, at *4); *see also Ariz. All. for Retired Americans v. Clean Elections USA*, No. CV-22-01823-PHX-MTL, 2022 WL 15678694, at *3 (D. Ariz. Oct. 28, 2022) (same).  Although relevant precedent is limited, in the context of coercion, conduct restraining, controlling, or nullifying the individual's will to vote or attempt to vote would be sufficient to support a Section 11(b) claim.  *See Wohl II*, 512 F. Supp. 3d at 509–10; *Beaty*, 288 F.2d at 656–57 (finding that evicting or denying credit to sharecropper tenants who attempted to vote constituted coercion).

---

instructive, such precedent is not necessary to support a finding of liability, contrary to Defendants' urging.  *See* Defs.' Mem. Opp. Summ. J. at 4, ECF No. 173 (discussing Plaintiffs' alleged failure to identify analogous "controlling precedent" showing that certain specific conduct can violate Section 11(b)).

Finally, Section 11(b) does not require proof that a defendant caused a voter to refrain from casting a ballot or to vote contrary to their preferences. Intimidating or coercive conduct can impact voters beyond those who are directly affected. *McLeod*, 385 F.2d at 741 ("[T]he failure of . . . coercive acts to intimidate a few persons does not negative their general coercive effect."). Section 11(b) also applies equally to prohibit an "*attempt* to intimidate, threaten, or coerce" as it does to the completed act. 52 U.S.C. § 10307(b) (emphasis added); *see Wohl II*, 512 F. Supp. 3d at 516. In other words, the statute constrains successful, unsuccessful, and in-progress attempts to coerce, intimidate, or threaten alike.

B. *Section 11(b) Does Not Require Challenged Conduct Be Directed by Defendants Toward Specific Voters or Subgroups of Voters.*

Defendants' argument that a challenged "action or communication [must] be directed toward specific voters," Defs.' Reply at 3, is not consistent with the plain text of Section 11(b), which proscribes intimidation, threats, and coercion against "*any* person." 52 U.S.C. § 10307(b) (emphasis added).

"[W]hen Congress does not add any language limiting the breadth of that word, 'any' means all." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1344 (11th Cir. 2014). Thus, for instance, courts have affirmed that Section 11(b) does not

limit its protections only to voters who are targeted because of their race.  *See*

*Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL 2223772, at *7 (M.D.N.C.

June 2, 2021) (finding no need to show that the conduct at issue was racially

motivated to prove a Section 11(b) claim, because "nothing in § 11(b) mentions

race or color"); *see also* H.R. Rep. No. 89-439, at 30 (1965), *as reprinted in* 1965

U.S.C.C.A.N. 2437, 2462 ("The prohibited acts of intimidation need not be racially

motivated[.]").  Here, then, "any person" has an unlimited reach, covering all

people who are intimidated, threatened, or coerced for voting or attempting to

vote—or who are subjected to attempts at such—regardless of whether they were

specifically targeted.

    While evidence that challenged conduct targeted specific voters or classes of

voters can bolster a claim under Section 11(b), *see, e.g.*, *Daschle v. Thune*,

No. 4:04-cv-4177, ECF No. 6 (D.S.D. Nov. 2, 2004) (enjoining "intimidation

particularly targeted at Native American voters"); *Wohl I*, 498 F. Supp. 3d at 485,

488 (issuing a temporary restraining order after finding that defendants "intended

the robocall to harm Democrats by suppressing turnout among Black voters"), such

evidence is not a prerequisite to a liability finding, *see Ariz. All. for Retired*

*Americans v. Clean Elections USA*, No. CV-22-01823-PHX-MTL, 2022 WL

10

17088041, at *2 (D. Ariz. Nov. 1, 2022) (enjoining activities associated with broad-scale ballot drop box monitoring).  Moreover, an intimidation campaign may cast a wide net while nonetheless targeting specific voters.  *Cf. Federal Election Comm'n v. Akins*, 524 U.S. 11, 24 (1998) (stating that "where a harm is concrete, though widely shared"—including "where large numbers of voters suffer interference with voting rights conferred by law"—the Supreme Court "has found 'injury in fact'" for standing purposes).

Nor can defendants avoid liability under Section 11(b) simply because they had their message delivered through third parties.  *See* Katzenbach Statement at 12 (noting that, under Section 11(b) "defendants would be deemed to intend the natural consequences of their acts").  *Arizona Alliance for Retired Americans v. Clean Elections USA*, 2022 WL 17088041, may be instructive.  In that case, Plaintiffs alleged that an out-of-state defendant used online platforms to encourage third-party poll monitoring in Arizona to catch "ballot mules"—people who allegedly fraudulently returned multiple absentee ballots—without acknowledging that state law permitted return of multiple ballots under certain circumstances.  Complaint ¶ 3, *League of Women Voters of Ariz. v. Lions of Liberty LLC*, No. 3:22-cv-8196 (D. Ariz. Oct. 25, 2022) (later consolidated with *Ariz. All. of Retired*

11

*Americans*).  The district court held an evidentiary hearing and reviewed evidence

showing that unidentified poll monitors were harassing voters and accusing them

of fraud for returning multiple ballots.  Transcript of Evidentiary Hearing, *Ariz.*

*All. for Retired Americans v. Clean Elections USA*, 2022 WL 17088041, ECF No.

70 (D. Ariz. Nov. 1, 2022).  The court then enjoined the defendant from

disseminating false information about Arizona's absentee ballot law and

organizing or encouraging certain poll monitoring activities.  *Id.* (finding that

plaintiffs were likely to succeed on their Section 11(b) claim); *see also Ariz. All.*

*For Retired Americans*, 2022 WL 17088041 at *1–2.

Other courts, too, have found violations of Section 11(b) in cases where

defendants relied on third parties to fully effectuate their conduct.  *See Wohl II*,

512 F. Supp. 3d at 505 (finding plaintiffs stated a claim under Section 11(b) for a

robocall campaign executed by a third-party communications company); *see also*

*Democratic Nat. Comm. v. Republican Nat. Comm.*, 673 F.3d 192, 196 (3d Cir.

2012) (discussing enforcement of consent decree resolving Section 11(b) claims

that proscribed discriminatory voter challenge campaigns conducted through third

parties, among other conduct).  Similarly, that voter challenges are transmitted

indirectly, through government officials, rather than "directly" from challengers to

voters, does not mean they cannot be considered intimidating, threatening, or coercive.[4]  To the contrary, the use of government officials to facilitate intimidation or coercion through improper voter challenges may exacerbate the impact of such conduct because governmental communications carry the official imprimatur of the state, and because formal governmental processes can raise the specter of administrative difficulties and even adverse legal consequences.

By its terms, Section 11(b) places no limitations on the categories of voters who are entitled to its protections, nor does it require a particular level of "directness" from intimidating, threatening, or coercive conduct.

### C. *Voter Challenges May Constitute Intimidation, Threats, or Coercion Under Section 11(b).*

Voter challenges may violate Section 11(b).  A legitimate voter challenge submitted on the basis of credible evidence would not violate Section 11(b). However, filing knowingly or recklessly false voter challenges or filing challenges in an intimidating, threatening, or coercive manner would violate the statute.

---

[4] Defendants initially appeared to argue that voter challenge activities could not violate Section 11(b) because the authority to determine the final outcome of such challenges "rests solely with the appropriate government officials," Defs.' Br. at 12, but Defendants have since admitted that Section 11(b) violations can "occur by communications through third parties," Defs.' Reply at 2.

13

Further, a broader course of conduct that includes voter challenges may violate Section 11(b) if the defendant's activities are intimidating, threatening, or coercive when considered as a whole.

Voter challenges lodged in an intimidating, threatening, or coercive manner are likely to put voters in reasonable fear of harassment, intimidation, coercion, or interference with their voting rights in violation of the law. For example, submitting voter challenges with the knowledge that some voters are in fact eligible or with reckless disregard to the eligibility of challenged voters can constitute intimidation or coercion under Section 11(b). Although intent is not necessary to establish a violation of Section 11(b), *see supra* Part I.A, individuals who file such challenges lack any plausible intent to legitimately enforce state law. Rather, they are most easily understood as intending the natural consequences of their actions: to cast baseless suspicion on eligible voters, add administrative burdens to those voters' voting experience, dissuade voters from going to the polls, and increase the risk of erroneous disenfranchisement. *See* TRO Order at 15–17 & n.9; *see also Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1079 (D. Mont. 2008), *as amended* (Oct. 10, 2008) (discussing "the mischief" a defendant who abuses voter challenge laws "could inject into an election cycle"); *Purcell v.*

14

*Gonzalez*, 549 U.S. 1, 4–5 (2006) (discussing how "voter confusion" can create a "consequent incentive to remain away from the polls").  In other words, knowingly or recklessly false voter challenges seek to coerce voters away from voting by "nullifying individual will or desire" of eligible voters to vote.  *Webster's Third New International Dictionary* 438.[5]  Such challenges may also have the long-term effect of intimidating or coercing challenged voters from voting again.

While the National Voter Registration Act ("NVRA") may not be directly at issue here, its protections and animating rationale illustrate the potential harms of bad-faith or reckless mass voter challenges, as alleged in this case.  For example, the NVRA prohibits states from effecting error-prone "systematic removals" in the 90 days before an election when the "risk of disenfranchising eligible voters is

---

[5] Recklessness is defined as when a person "foresees the possibility" of harmful consequences "and consciously takes the risk."  *Black's Law Dictionary* (11th ed. 2019).  In *McLeod*, 385 F.2d at 745, the pre-split Fifth Circuit held that "indiscriminate mass arrests of persons violating a valid law, together with baseless or unconstitutional arrests of others engaged in the same voting-related activity shows the purpose to interfere" with voting rights under Section 131(b).  Likewise, filing indiscriminate voter challenges with recklessness as to whether those challenged are actually ineligible to vote may constitute at least a prohibited attempt to intimidate, threaten, or coerce under Section 11(b).

15

greatest."[6]  *Arcia*, 772 F.3d at 1346 (finding "[e]ligible voters removed days or weeks before Election Day will likely not be able to correct the State's errors in time to vote").  Late-stage mass or systematic voter challenges, as well as those based on unreliable second-hand information, conjecture, or no information at all, risk this precise outcome.  *See N.C. State Conf. of the NAACP v. N.C. State Bd. of Elections*, No. 1:16CV1274, 2016 WL 6581284, at *6 (M.D.N.C. Nov. 4, 2016) (finding that eligible voters were "at risk of being erroneously disenfranchised," because of "large scale voter challenges [] close to an election" based on data that "was unverified and of unknown reliability"); *see also Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 512 F. Supp. 3d 1354, 1371 (M.D. Ga. 2021) (describing the risk of "disenfranchising thousands of voters" due to mass voter challenges lodged less than a month before an election based on change-of-address data without any "individualized inquiry or finding of probable cause").[7]  Such

---

[6] The Eleventh Circuit has defined "systematic" removals as those that "use[] a mass computerized datamatching process" or other second-hand information, as Defendants allegedly did here, rather than "individualized information or investigation."  *Arcia*, 772 F.3d at 1344.

[7] Relying solely on the National Change of Address ("NCOA") registry to bring voter challenges may be problematic for this reason.  As this Court and others have recognized, "people may appear on the NCOA list for any number of reasons that do not affect their eligibility to vote."  TRO Order at 15 n.8; *see also Majority Forward*, 512 F. Supp. 3d at 1369–70.

challenges may violate Section 11(b)'s prohibition on intimidation and coercion by attempting to or actually inflicting the specific harms the NVRA works to prevent: causing voter confusion, disenfranchisement, and strains on election administration that impede voting.  *See* TRO Order, at 17 n.9; *see also Majority Forward*, 512 F. Supp. 3d at 1373 (finding that inaccurate late-stage mass challenges could cause eligible voters to be "intimidated or discouraged from voting altogether" or force them to "go extraordinary lengths . . . in order to have their vote counted").[8]

Similarly, voter challenges that target voters based on race or ethnicity are likely to be perceived as particularly intimidating or coercive and therefore violate Section 11(b).  *See, e.g.*, *Daschle*, No. 4:04-cv-4177, ECF No. 6 at 1–2 (enjoining campaign workers from following and writing down license plate numbers of Native American voters); *Democratic Nat. Comm.*, 673 F.3d at 196 (discussing a Section 11(b) consent decree that proscribed voter challenge campaigns targeting precincts with a high percentage of racial or ethnic minorities).

---

[8] Moreover, intent to coerce may be inferred if a defendant submits voter challenges despite being aware of the NVRA's requirements.  As with defendants who submit false challenges, defendants who attempt to use private action to remove voters who would ordinarily be safeguarded against such removals by the NVRA's protections are best understood as intending to subject eligible voters to administrative burdens and erroneous disenfranchisement, or at least as being reckless in their disregard of these dangers.

17

More broadly, courts must engage in a holistic analysis to determine if the specific conduct at issue in a case, taken together and in its context, constitutes intimidation, threats, or coercion within the meaning of the statute.  In analyzing voter intimidation claims, courts are often called upon to determine when otherwise lawful activities are being used for unlawful ends.  *See, e.g.*, *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (holding that "spurious prosecutions" of those aiding voter registration fell within the scope of Section 11(b)); *Allen v. City of Graham*, 2021 WL 2223772 at *7 (finding that plaintiffs sufficiently stated a Section 11(b) claim by alleging that police tactics at a march to the polls intimidated voters and prevented voting); *see also United States v. Wood*, 295 F.2d 772, 781 (5th Cir. 1961) (noting Section 131(b)'s application to "where the state criminal processes are used as instruments for the deprivation of constitutional rights"); *United States v. Lucky*, 239 F. Supp. 233, 239 (W.D. La. 1965) (finding private parties liable for discriminatory voter challenges under Section 131(a) of the Civil Rights Act of 1957); *United States v. McElveen*, 180 F.

18

Supp. 10, 13–14 (E.D. La.), *aff'd in part sub nom. United States v. Thomas*, 362

U.S. 58 (1960) (same).[9]

Such a totality-of-circumstances review may also reveal that a broad course

of intimidating, threatening, or coercive conduct that includes voter challenges

runs afoul of Section 11(b).  For example, courts have found liability where

defendants used invasive tactics to investigate or challenge voters or threatened to

subject voters to adverse consequences such as harassment, "public opprobrium,"

and baseless allegations of felonious conduct.  *See LULAC*, 2018 WL 3848404, at

*4 (finding plaintiffs stated a claim under Section 11(b) alleging that defendants

---

[9] For this reason, compliance with state law and procedure is not sufficient to inoculate otherwise unlawful voter challenges from liability under Section 11(b), contrary to Defendants' suggestion.  Defs.' Br. at 12.  Section 11(b) was designed to provide a remedy against government officials and others who weaponized state law to intimidate and coerce voters with conduct ranging from baseless arrests and prosecutions to abuse of voter registration laws, challenges, and purges.  *See* 52 U.S.C. § 10307(b) ("No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce . . ."); *see also* Katzenbach Statement at 8–9 (discussing the failure of predecessor statutes to address voter intimidation by officials including sheriffs, a grand jury, and local election officials).  Today's voter challenge statutes remain susceptible to similar abuses.  *See* Nicolas Riley, Brennan Center for Justice, *Voter Challengers* 7–10 (2012), https://perma.cc/LXA3-6YD7; *see also* 52 U.S.C. § 20501(a)(3) (Congressional findings for the NVRA determining that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial minorities").

19

had published voters' names and personal information in "a report condemning

felonious voter registration in a clear effort to subject the named individuals to

public opprobrium"); *Beaumont Chapters of the NAACP v. Jefferson Cnty.*, No.

1:22-CV-00488, ECF No. 14 (E.D. Tex. Nov. 7, 2022) (enjoining election workers

and volunteers from improperly observing voters and requesting voters recite

secondary proof of eligibility aloud); *United States v. Nguyen*, 673 F.3d 1259,

1265 (9th Cir. 2012) (finding that a letter sent to Latino voters that warned "if they

voted in the upcoming election their personal information would be collected . . .

[and] provided to organizations who are 'against immigration'" constituted voter

intimidation under California law); *Wohl II*, 512 F. Supp. 3d at 511 (noting that

"the threat of dissemination of personal information alone could plausibly support

a Section 11(b) claim").

Accordingly, voter challenges that constitute intimidation, threats, or

coercion may violate Section 11(b).

## II.    Section 11(b) Does Not Violate the First Amendment, Either Facially or As-Applied.

On its face, Section 11(b) proscribes intimidating, threatening, and coercive

*conduct*, which the First Amendment generally does not protect.  And even when

20

applied to protected speech or expressive conduct, it survives any level of scrutiny.

The same holds true as applied to the facts of this case: this Court may, consistent

with the First Amendment, apply Section 11(b) to intimidating, threatening, or

coercive conduct or speech integral to unlawful conduct, including when such

conduct accompanies or animates voter challenges.  Knowingly or recklessly false

challenges, in addition, fall outside the First Amendment's scope, just as

defamatory and perjured statements do.

> A. *Section 11(b)'s Prohibition on Intimidation, Threats, and Coercion Is Consistent with the First Amendment.*

The Court should reject any facial challenge to Section 11(b)'s

constitutionality under the Free Speech Clause.  The Supreme Court has repeatedly

emphasized that "facial challenges to legislation are generally disfavored."

*FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 223 (1990); *see also Nat'l Endowment for

the Arts v. Finley*, 524 U.S. 569, 580 (1998) (noting facial invalidation "has been

employed by the Court sparingly and only as a last resort" (citation

omitted)); *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450

(2008).  Traditionally, "a plaintiff can only succeed in a facial challenge by

'establish[ing] that no set of circumstances exists under which the Act would be

valid,' i.e., that the law is unconstitutional in all of its applications."  *Wash. State*

21

*Grange*, 552 U.S. at 449 (alteration in original) (citation omitted).  Even in cases alleging "arguable overbreadth" under the First Amendment, defendants must establish that the provision is "impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep."  *Id.* at 449 n.6 (internal quotation marks omitted).

Defendants cannot meet this heavy burden.  Section 11(b)'s "plainly legitimate sweep" prohibits *conduct* that intimidates, threatens, or coerces voters and is not "inherently expressive."  *Rumsfeld v. Forum for Acad. & Institutional Rts.*, 547 U.S. 47, 66 (2006).  Prohibited conduct includes armed monitoring of polling locations, *Council on Am.-Islamic Rels. v. Atlas Aegis*, 497 F. Supp. 3d 371, 379 (D. Minn. 2020); following voters and recording their license plate numbers, *Daschle*, No. 4:04-cv-4177, ECF No. 6 at 1–2; arresting and prosecuting those who attended voter registration meetings, *McLeod*, 385 F.2d at 740 (finding a violation under Section 131(b)); and evicting and denying credit to those who registered to vote, *Beaty*, 288 F.2d at 656 (same).  Such conduct falls outside the scope of the First Amendment's protection.[10]

---

[10] While the First Amendment protects conduct that is "inherently expressive," conduct cannot be "labeled 'speech' whenever the person engaging in the conduct

22

Further, Section 11(b)'s "plainly legitimate sweep" also encompasses true threats, which lack First Amendment protection. True threats are one of the "well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *United States v. Fleury*, 20 F.4th 1353, 1365 (11th Cir. 2021) (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 571–72 (1942)). Whether a statement constitutes a true threat is a fact-intensive inquiry. *See id.* at 1366 (considering "the context of [the defendant's] entire course of conduct" to determine whether his statements constitute a true threat).

---

intends thereby to express an idea." *Rumsfeld*, 547 U.S. at 65–66 (citation omitted). And even though expressive conduct is not required to have "a narrow, succinctly articulable message" to be protected, *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 569 (1995), it must still be recognizable as inherently expressive by reference to "the conduct itself" rather than "the speech that accompanies it," *Rumsfeld*, 547 U.S. at 66 (explaining that message expressed by requiring military interviews to be held outside of law school campuses was not "overwhelmingly apparent"). For example, someone who observes a person approaching a voter in a menacing way near a ballot drop box location would "ha[ve] no way of knowing," *id.*, what message the accoster is trying to send— whether the person disapproves of the particular voting method, is specifically targeting the voter, is expressing disapproval of the United States or democracy in general, or is attempting to express some other message entirely.

23

Because Section 11(b) lacks a "substantial number" of unconstitutional applications compared to its "legitimate sweep," *Wash. State Grange*, 552 U.S. at 449 n.6, it is facially constitutional under the Free Speech Clause.

### B. Section 11(b) Prohibits Improper Voter Challenges Consistent with the Free Speech Clause.

Congress may proscribe voter challenges that intimidate, threaten, or coerce voters without violating the Free Speech Clause, and Section 11(b)'s application to knowingly or recklessly false voter challenges would be consistent with the Free Speech Clause.

"[F]alse statements are not entitled to the same level of First Amendment protection as truthful statements." *Weaver v. Bonner*, 309 F.3d 1312, 1319 (11th Cir. 2002). Accordingly, courts have steadily rejected First Amendment challenges to laws that prohibit knowingly or recklessly false speech—such as perjury, defamation, and fraud statutes—where such speech inflicts "legally cognizable harm." *See United States v. Alvarez*, 567 U.S. 709, 719 (2012) (plurality op.); *see also id*. at 734 (Breyer, J., concurring in the judgment) (acknowledging constitutionality of statutes prohibiting false speech that inflicts "particular and specific harm"); *id*. at 739 (Alito, J., dissenting) (same).

24

In delineating what "legally cognizable harm" may entail, the plurality in *Alvarez* explained that perjured statements lack First Amendment protection because "[p]erjury undermines the function and province of the law and threatens the integrity of judgments that are the basis of the legal system." *Id.* at 720–21 (citing *United States v. Dunnigan*, 507 U.S. 87, 97 (1993)); *see also id.* at 734–35 (Breyer, J., concurring in the judgment) (describing statutes that prohibit lying to a government official where the "lie is likely to work particular and specific harm by interfering with the functioning of a government department"). Further, a witness under oath is aware that "his or her statements will be the basis for official governmental action, action that often affects the rights and liberties of others." *Id.* at 721. Under the same reasoning, courts have rejected First Amendment challenges to prohibitions on filing false claims, liens, judgments, and tax forms. *See, e.g.*, *United States v. Glaub*, 910 F.3d 1334, 1338 (10th Cir. 2018) (finding no First Amendment protection for submitting a false claim to the government "to effect a fraud or secure moneys or other valuable considerations" (quoting *Alvarez*, 567 U.S. at 723)); *United States v. Hoffert*, 949 F.3d 782, 790 (3d Cir. 2020) (denying First Amendment protection to filing false liens, partly because false liens "allow the perpetrator to 'file the lien with relative ease' while

25

requiring the victim to 'go through a complicated ordeal, such as to seek judicial action, in order to remove the lien'" (citation omitted)); *United States v. Kaplowitz*, 201 F. App'x 659, 661–62 (11th Cir. 2006) (finding no First Amendment protection for filing false judgments in the public record); *United States v. Buttorff*, 572 F.2d 619, 624 (8th Cir. 1978) (denying First Amendment protection to speeches advising people how to file false tax forms).

The same considerations apply to knowingly or recklessly false voter challenges. First, such challenges inflict legally cognizable harm by depriving eligible voters' right to vote, "a fundamental political right" that is "preservative of other basic civil and political rights." *Reynolds v. Sims,* 377 U.S. 533, 562 (1964). False challenges "undermine[] the function and province of the law" by abusing voter challenge laws to intimidate, coerce, and disenfranchise voters and "threaten[] the integrity" of critical election administration functions. *Alvarez*, 567 U.S. at 721. Moreover, individuals submitting voter challenges know that their challenges "will be the basis for official governmental action, action that often affects the rights and liberties of others": knowingly or recklessly false voter challenges trigger official governmental actions that, at a minimum, impose unwarranted administrative hurdles that may coerce eligible voters away from

26

voting and, worse, risk erroneous disenfranchisement. *Id.*; *see* Ga. Code § 21-2-230 (specifying administrative procedures for responding to voter challenges, including a hearing for challenged voters). Finding that knowingly or recklessly false voter challenges violate Section 11(b) by intimidating or coercing voters therefore does not run afoul of the First Amendment.

Moreover, Section 11(b)'s application to Defendants' conduct likely falls within the First Amendment exception for speech integral to illegal conduct. "The Supreme Court has long acknowledged that making 'a course of conduct illegal' is not 'an abridgment of freedom of speech . . . merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed.'" *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1135 (11th Cir. 2022) (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978)). Under that logic, courts have rejected First Amendment challenges to statutes prohibiting intimidation, fraud, or extortion. *See, e.g.*, *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 617–18 (1969) (finding an employer's "threat of retaliation based on misrepresentation and coercion" is "without the protection of the First Amendment"); *Illinois ex rel. Madigan v. Telemarketing Associates, Inc.*, 538 U.S. 600, 611 (2003) ("The First

27

Amendment protects the right to engage in charitable solicitation. . . . But the First Amendment does not shield fraud." (internal citations omitted)); *United States v. Quinn,* 514 F.2d 1250, 1268 (5th Cir. 1975) ("[E]xtortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which is no protection at all.").

Applied here, finding that a defendant's course of action constitutes intimidation or coercion under Section 11(b) focuses on the unlawful *conduct*, such as: lodging voter challenges in an intimidating, threatening, or coercive manner; submitting false voter challenges; or combining voter challenges with other intimidating, threatening, or coercive conduct. Because Section 11(b) focuses on illegal courses of conduct, any resulting prohibition on speech that initiated or carried out such illegal conduct is consistent with the First Amendment. *See Norwegian Cruise Line*, 50 F.4th at 1136 (explaining that the "focal point" of anti-discrimination statutes is "on the *act* of discriminating" and that such statutes thus do not violate the First Amendment (alteration in original) (quoting *Hurley*, 515 U.S. at 572)).

Accordingly, Section 11(b) comports with the Free Speech Clause as applied to voter challenges that intimidate, threaten, or coerce voters.

28

###### C. *Even if Section 11(b) Does Implicate First Amendment Rights, Section 11(b) Survives Any Level of Scrutiny.*

Even if the conduct or speech targeted by Section 11(b) were to fall within the First Amendment's scope, Section 11(b) survives any level of scrutiny. Section 11(b) safeguards "one of the most fundamental rights of our citizens: the right to vote." *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009). "Casting a vote is a weighty civic act, akin to a jury's return of a verdict, or a representative's vote on a piece of legislation." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1887 (2018). As a result, the Supreme Court has long held that "protecting voters from confusion and undue influence" in the voting process is a "compelling interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality op.); *see id.* at 217–18 (Stevens, J., dissenting) (stating that protecting "orderly access to the polls" is "a compelling state interest"); *see also Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1219 (11th Cir. 2009) (reaffirming that "protecting voters from confusion and undue influence" and "preserving the integrity of the election process" are compelling governmental interests). In *Browning*, the Eleventh Circuit held that a 100-foot no-solicitation zone around polling locations was necessary to further those compelling governmental interests, based on "our country's long history of election regulation, the consensus emerging from that

29

history, and the practical need to keep voters and voting undisturbed." *Id.* at 1221. In finding that the solicitation ban was reasonable and did not significantly impinge on constitutionally protected rights, and was therefore narrowly tailored, the court explained that "the State need not wait for actual interference or violence or intimidation to erupt near a polling place" to take "precautions to protect and to facilitate voting." *Id.* at 1220–21.

Applying Section 11(b) to the conduct at hand amply satisfies the standard set out in *Browning*. Forty-nine states, the District of Columbia, and the federal government all proscribe voter intimidation, threats, and/or coercion, reflecting a universally shared understanding that protecting voters from undue influence is a compelling state interest and that proscribing voter intimidation is necessary to further that interest. *See* Theodore Z. Wyman, *Litigation of Voter Intimidation Law* §§ 7–8, 174 Am. Jur. Trials 385 (Nov. 2022). This "broadly shared judgment is entitled to respect." *Mansky*, 138 S. Ct. at 1888. And if this Court finds that, based on the totality of the circumstances, Defendants' course of conduct was intimidating, threatening, or coercive, it may issue a remedy wherein "each activity within the proscription's scope is an appropriately targeted evil," thereby satisfying the narrow tailoring requirement. *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

30

Finding that Section 11(b) prohibits knowingly or recklessly false challenges, for example, would be narrowly tailored to further the compelling interest of protecting the right to vote. A prohibition on intimidating or coercing voters through knowingly or recklessly false voter challenges would have no chilling effect on legitimate voter challenges submitted in accordance with state law, as it leaves the "requisite breathing space" for inadvertent falsehoods. *Brown v. Hartlage*, 456 U.S. 45, 61 (1982) (holding that nullifying a political candidate's electoral victory for false statements made in good faith was inconsistent with the First Amendment) (internal quotation marks omitted); *see Weaver*, 309 F.3d at 1319–20 (finding "restrictions on candidate speech during political campaigns must be limited to false statements that are made with knowledge of falsity or with reckless disregard as to whether the statement is false" in order to be narrowly tailored). Likewise, enjoining Defendants from threatening to publish personal information of voters who were subject to voter challenges would be narrowly tailored. In fact, such an injunction would be far more narrowly tailored than the solicitation-free zone endorsed in *Browning*, as it targets the exact harm— intimidation, threats, and coercion—the compelling governmental interest seeks to prevent, instead of prohibiting facially legitimate activities as a precautionary

31

measure against "interference or violence or intimidation" of voters. *Browning*, 572 F.3d at 1220.

> ### D. Section 11(b) Is Consistent with the Petition Clause of the First Amendment.

Section 11(b) is constitutional under the Petition Clause, both on its face and as applied to intimidating, threatening, or coercive voter challenges. "[T]he Petition Clause protects the rights of individuals to appeal to courts and other forums established by the government for resolution of legal disputes." *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011). As illustrated above, the vast majority of conduct to which Section 11(b) applies does not involve any governmental petition. Defendants therefore cannot show that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep" under the Petition Clause. *Wash. State Grange*, 552 U.S. at 449 n.6 (internal quotations omitted); *see supra* Part II.A.

Section 11(b) also is consistent with the Petition Clause as applied to intimidating, threatening, or coercive voter challenges.[11] First, although the Petition and Speech Clauses are not identical, they are "cognate rights" that "share

---

[11] Defendants appear to agree that a "petition . . . made with some sort of 'wrongfulness'" would be unprotected by the Petition Clause. Defs.' Br. at 28.

substantial common ground." *Borough of Duryea*, 564 U.S. at 388 (internal

quotation marks omitted). Only "where the special concerns of the Petition Clause

would provide a sound basis for a distinct analysis" is it possible that "the rules and

principles that define the two rights might differ in emphasis and formulation." *Id.*

at 389; *see also McDonald v. Smith*, 472 U.S. 479, 485 (1985) (finding "there is no

sound basis for granting greater constitutional protection to statements made in a

petition to the President than other First Amendment expressions").

The Supreme Court has recognized that such divergence is unnecessary in

cases involving false speech. *See McDonald*, 472 U.S. at 484 (finding the right to

petition does not "include an unqualified right to express damaging falsehoods in

exercise of that right"). As such, baseless voter challenges are not constitutionally

protected, just as "baseless litigation is not immunized by the First Amendment

right to petition": voter challenges based on knowing or reckless falsehoods "do[]

not involve a bona fide grievance," which puts them outside the ambit of the right

to petition. *Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 743 (1983);

*see also McDonald*, 472 U.S. at 484 ("[P]etitions to the President that contain

intentional and reckless falsehoods 'do not enjoy constitutional protection.'").

33

Even if a separate analysis under the Petition Clause were necessary here, the result would be the same. At its core, the Clause protects "lawful means to achieve legitimate political ends." *NAACP v. Button*, 371 U.S. 415, 429 (1963). "[I]llegal and reprehensible practice which may corrupt the administrative or judicial processes . . . cannot acquire immunity by seeking refuge under the umbrella of 'political expression.'" *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972). For that reason, courts have found that the Petition Clause is not offended by sanctions for unethical or illegal conduct in administrative or legal proceedings, tax collection from those who withhold payment under the guise of a tax policy petition, or lobbying and political ethics restrictions. *See, e.g.*, *id.* at 512 (noting that "unethical conduct in the setting of the adjudicatory process often results in sanctions" without violating the First Amendment); *Paganucci v. City of New York*, 785 F. Supp. 467, 479 (S.D.N.Y. 1992) (finding that the Petition Clause allows Rule 11 sanctions where attorney failed to meet "test of objective reasonableness"), *aff'd*, 993 F.2d 310 (2d Cir. 1993); *Herndon v. Comm'r of Internal Revenue*, 758 F. App'x 857, 859 (11th Cir. 2019) (finding no Petition Clause violation for requiring income tax payment); *United States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013) (upholding honest-

34

services fraud conviction after finding that the First Amendment interest in gifting officials "things of value" and "hockey tickets" was de minimis); *Wright v. DeArmond*, 977 F.2d 339, 348 (7th Cir. 1992) (finding that the Petition Clause permitted prohibition against public officials engaging in settlement negotiations in an official capacity to obtain personal benefits). Defendants who bring intimidating, threatening, or coercive voter challenges cannot avoid Section 11(b) liability simply because they "couch[] their [conduct] in constitutional terms." *We the People Found. v. United States*, 485 F.3d 140, 143 (D.C. Cir. 2007).

Moreover, to determine how the Petition Clause may apply, courts often consider the degree to which a challenged restriction impairs the core right the Clause affords—i.e., the ability to seek redress of a grievance from the government. *See, e.g.*, *Borough of Duryea*, 564 U.S. at 392 (discussing alternative means of filing grievances); *Wright*, 977 F.2d at 348 (noting that the Petition Clause prohibits the enforcement of laws that deny the "opportunity to participate in [] legitimate effort[s] to obtain a favorable change in the law"). And Section 11(b) does not constrain one's ability to bring lawful voter challenges; rather, it ensures that voter challenges are not used as a vehicle for intimidation, threats, or coercion. *Cal. Motor Transp. Co.*, 404 U.S. at 515 ("First Amendment rights may

35

not be used as the means or the pretext for achieving 'substantive evils' which the legislature has the power to control." (internal citation omitted)).

Finally, the Petition Clause, "[l]ike other aspects of freedom of expression, [] never has been considered an absolute right but, rather, has been considered subject to reasonable limitations in the face of very important government interests." *Wright*, 977 F.2d at 345–46; *see also Edwards v. South Carolina*, 372 U.S. 229, 236 (1963) (noting that right of petition may be subject to "evenhanded application of a precise and narrowly drawn regulatory statute evidencing a legislative judgment that certain specific conduct be limited or proscribed"); *Borough of Duryea*, 564 U.S. at 386 (balancing the plaintiff's petition rights against the State's interests in the public employment context). As discussed *supra* Part II.A & II.B, Section 11(b)'s restriction on the use of voter challenges to intimidate or coerce voters is narrowly tailored to further a well-recognized compelling state interest and would therefore survive any level of scrutiny.

## III.    Section 11(b) Is Not Unconstitutionally Vague.

Section 11(b) is not unconstitutionally vague on its face or as applied to intimidating, threatening, or coercive voter challenges. A statute is void for vagueness only if it "fails to provide a person of ordinary intelligence fair notice of

36

what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). Section 11(b) is a civil statute, and the Supreme Court has "expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe." *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1310 (11th Cir. 2009) (internal quotation marks omitted). As such, "a civil statute is unconstitutionally vague only if it is so indefinite as really to be no rule or standard at all." *Id.* (internal quotation marks omitted).

As with the First Amendment challenges, Defendants cannot clear this high bar. Defendants do not point to any particular part of Section 11(b) as unconstitutionally vague. In any event, courts have rejected vagueness challenges involving Section 11(b)'s operative words—intimidate, threaten, and coerce— because they are common legal terms that "have been used and applied in numerous United States statutes." *CISPES (Comm. in Solidarity with People of El Sal.) v. FBI*, 770 F.2d 468, 476–77 (5th Cir. 1985) (discussing several such statutes, including Section 131(b)); *see also United States v. Eckhardt*, 466 F.3d 938, 944 (11th Cir. 2006) ("intimidate"); *United States v. Shrader*, 675 F.3d 300,

310–11 (4th Cir. 2012) ("intimidate"); *United States v. Bowker*, 372 F.3d 365, 381,

383 (6th Cir. 2004) ("intimidate" and "threaten"), *judgment vacated on other*

*grounds*, 543 U.S. 1182 (2005); *Int'l Soc'y for Krishna Consciousness of Atlanta v.*

*Eaves*, 601 F.2d 809, 831 (5th Cir. 1979) ("coerce").

Defendants appear to argue that applying Section 11(b) to this case would

mean a person of ordinary intelligence would not know how many voter challenges

he or she may submit without violating Section 11(b). *See* Defs.' Br. at 30–31.

But such a bright-line rule is not required to avoid a vagueness challenge: "[w]hat

renders a statute vague is not the possibility that it will sometimes be difficult to

determine whether the incriminating fact it establishes has been proved; but rather

the indeterminacy of precisely what that fact is." *Williams*, 553 U.S. at 306.

Section 11(b) applies to conduct that constitutes intimidation, threats, or coercion

based on a context-dependent, totality-of-circumstances inquiry, rather than via

mechanical application of formulas. *See, e.g.*, *McLeod*, 385 F.2d at 744–46

(drawing inferences based on "all of the surrounding facts" and considering the

context of "Selma's history of systematic racial discrimination" to conclude that

baseless prosecution of a person aiding voter registration constituted voter

intimidation); *Wohl I*, 498 F. Supp. 3d at 482–83, 485 (finding a Section 11(b)

violation after considering "[t]he context in which Defendants' message was communicated" and "Defendants' prior conduct and expressed goals"); *see also Fleury*, 20 F.4th at 1366 (considering "the context of [the defendant's] entire course of conduct" to determine whether his statements constituted a true threat under the First Amendment).  A wide range of factual evidence therefore could establish a Section 11(b) violation, including evidence of knowingly or recklessly false voter challenges; evidence of other activities intended to intimidate or coerce; or evidence of conduct that a reasonable voter may perceive as intimidating, threatening, or coercive without proof of Defendants' subjective intent.  *See supra* Part I.A & I.C.  But "the mere fact that close cases can be envisioned" is insufficient to "render[] a statute vague."  *Williams*, 553 U.S. at 305–06.[12]

## IV. Prohibiting Intimidation, Threats, and Coercion of Voters Does Not Unconstitutionally Dilute Votes.

The Court has asked the Parties to address how vote dilution operates as a defense to Section 11(b).  *See* Supp. Br. Order at 3.  It does not.

---

[12] To the extent that Defendants intended to raise a First Amendment overbreadth claim, rather than a vagueness claim, because Section 11(b) may apply to "constitutionally protected activity" of submitting voter challenges, Defs.' Br. at 30, such a claim also fails.  *See supra* Part II.A & II.B.

In their opening brief on summary judgment, Defendants asserted that Section 11(b) "violates Named Defendants'[] right to vote via vote dilution" because Defendants sought to prevent ineligible voters from diluting the weight of Defendants' votes. Defs.' Br. at 29. But in their summary judgment reply brief, Defendants instead characterized their defense as an assertion that Section 11(b) cannot constitutionally prohibit "Named Defendants' lawful petition to their state government to protect their right to vote from vote dilution." Defs.' Reply at 13.

Neither formulation passes muster. There are no "First Amendment protections" against vote dilution. Defs.' Br. at 29; *cf. Rucho v. Common Cause*, 139 S. Ct. 2484, 2504–06 (2019) (rejecting First Amendment claim against allegedly dilutive districting plans). Rather, litigants can make vote-dilution arguments only under Article I, Section 2 of the United States Constitution, the Reconstruction Amendments, or the Voting Rights Act. *See Wis. Legislature v. Wis. Elections Comm'n*, 142 S. Ct. 1245, 1248 (2022) (per curiam) (challenging redistricting plans under the Voting Rights Act); *Evenwel v. Abbott*, 578 U.S. 54, 59 (2016) (challenging reapportionment under Article I, Section 2 and Fourteenth Amendment). In any event, constitutional vote dilution claims cannot be used as a defense to a Section 11(b) claim, because determining whether someone has

40

intimidated, threatened, or coerced a voter has no relation to reapportionment, redistricting, or any other circumstance that could give rise to an affirmative vote dilution claim. Section 11(b) certainly does not lead to "unconstitutional" vote dilution "in all of its applications." *Wash. State Grange*, 552 U.S. at 449.

Nor is Section 11(b) unconstitutional as applied to Defendants' behavior, if their activities are determined to violate Section 11(b). Defendants acknowledge that they would not have standing to make an affirmative vote dilution claim, i.e., that their votes have actually been diluted. *See* Defs.' Reply at 13. Vote dilution also cannot function as a valid *defense* to Plaintiffs' Section 11(b) claim here. Defendants have lawful means available to challenge any perceived problem of vote dilution, including lawful exercise of state challenge laws and filing suits alleging violations of the Voting Rights Act or the Constitution; this Court's adjudication of Plaintiffs' Section 11(b) claim would not affect Defendants' right to bring a proper vote dilution claim or to bring a voter challenge in a way that does not intimidate, threaten, or coerce voters. A claim of vote dilution therefore does not excuse unlawful voter intimidation.[13]

---

[13] Alternatively, if Defendants instead make another Petition Clause argument, that defense fails for the reasons already discussed. *See supra* Part II.D.

## CONCLUSION

For the foregoing reasons, this Court should reject Defendants' challenges to the constitutionality of Section 11(b) of the Voting Rights Act.

Date:  January 17, 2023

Respectfully submitted,

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia

KRISTEN CLARKE
Assistant Attorney General

ELISE C. BODDIE
Principal Deputy Assistant
Attorney General

*/s/ Aileen Bell Hughes*
AILEEN BELL HUGHES
Georgia Bar No. 375505
Assistant U.S. Attorney
Office of the United States Attorney
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
Phone: (404) 581-6000
Fax: (404) 581-6181

*/s/ Jennifer J. Yun*
T. CHRISTIAN HERREN, JR.
TIMOTHY F. MELLETT
DANA PAIKOWSKY
JENNIFER J. YUN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
chris.herren@usdoj.gov
timothy.f.mellett@usdoj.gov
dana.paikowsky@usdoj.gov
jennifer.yun@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on January 17, 2023, I electronically filed the foregoing with the clerk of the court using the CM/ECF system, which will send notification of this filing to counsel of record.

*/s/ Jennifer J. Yun*
JENNIFER J. YUN
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice

43