**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

| | |
|---|---|
| FAIR FIGHT, INC., SCOTT BERSON, JOCELYN HEREDIA, and JANE DOE, | |
| Plaintiffs, | Civil Action No. 2:20-cv-00302-SCJ |
| v. | |
| TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1-10, | |
| Defendants. | |

**PLAINTIFFS' SUPPLEMENTAL BRIEF
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

I. **Using the ordinary rules of statutory interpretation (i.e., ordinary-meaning, statutory context, legislative history, interpretations of similar Civil Rights statutory provisions, etc.), how should Section 11(b) of the Voting Rights Act be interpreted?** ...................................................1

   A. The ordinary meaning of the key words in Section 11(b) demonstrates that the provision broadly prohibits nonviolent actions that would prevent voters from voting, and does not require an intent to intimidate, threaten, or coerce. .....................................................................................................2

   B. The evolution of federal voter intimidation statutes demonstrates an expanding remedial scope. ...........................................................................4

   C. The legislative history of Section 11(b) demonstrates that it was deliberately enacted to broaden the scope and efficacy of federal laws protecting the right to vote............................................................................7

      1. Section 11(b) does not require an intent to intimidate. .........................8

      2. Section 11(b) does not require actions to be racially motivated. ..........10

      3. Section 11(b) was intended to protect voters from a wide array of intimidating activities. ........................................................................11

         a. Section 11(b) applies to nonviolent intimidation............................11

         b. Section 11(b) does not require that prohibited acts occur through direct contact with voters. .............................................................15

   D. Analogous civil rights statutes protect against non-violent intimidation....18

II. **Does the Supreme Court's decision in *Virginia v. Black*, 538 U.S. 343, 359 (2003)—narrowing true threats to "statements where the speaker means to communicate a serious *expression of intent to commit an act of unlawful violence*" and clarifies that the "prohibition on true threats protect[s] individuals from the fear of *violence*" (emphasis added) (quotations and citations omitted)—preclude application of the true threat exception when the alleged threatening behavior is non-violent but aimed at inhibiting a fundamental right?** ........................................................................20

   A.  *Virginia v. Black* did not extend First Amendment protection to all threats of nonviolent harm.......................................................................20

   B.  Defendants' conduct falls outside the First Amendment's protections because it is defamatory. ...............................................................25

**III. Assuming without deciding that Defendants' section 230 challenges are First Amendment protected petitions, what legal standard should be used to determine the petitions were baseless or frivolous?**.................................28

**IV. Please elaborate on the use of vote dilution as a defense to a Section 11(b) claim.** .............................................................................................31

**V. Are the aforementioned constitutional defenses asserted as facial or as-applied challenges to Section 11(b)?** .............................................36

   A.  Defendants' purported First Amendment defense is a facial challenge to Section 11(b)...............................................................................37

   B.  Defendants' purported vote dilution defense is a facial challenge to Section 11(b).......................................................................................39

   C.  Defendants' various vagueness defenses are facial challenges to Section 11(b).......................................................................................39

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AFSCME Council 79 v. Scott*,
   717 F.3d 851 (11th Cir. 2013) ..........................................................................37

*Allen v. City of Graham*,
   Nos. 1:20-CV-997, 1:20-CV-998, 2021 WL 2223772 (M.D.N.C.
   June 2, 2021) .............................................................................................38

*Animal Legal Def. Fund v. U.S. Dep't of Agric.*,
   789 F.3d 1206 (11th Cir. 2015) ...........................................................................7

*Ariz. All. for Retired Ams. v. Clean Elections USA*,
   No. CV-22-01823-PHX-MTL, 2022 WL 17088041 (D. Ariz. Nov.
   1, 2022) ......................................................................................................24

*Arizona Alliance for Retired Americans v. Clean Elections USA*,
   No. CV-22-01823-PHX-MTL, 2022 WL 15678694 (D. Ariz. Oct.
   28, 2022) ...........................................................................................23, 24

*Artis v. District of Columbia*,
   138 S. Ct. 594 (2018)..........................................................................................2

*Beauharnais v. People of State of Ill.*,
   343 U.S. 250 ....................................................................................................25

*In re BFW Liquidation, LLC*,
   899 F.3d 1178 (11th Cir. 2018) ...........................................................................4

*Bolus v. Boockvar*,
   No. 3:20-CV-01882, 2020 WL 6880960 (M.D. Pa. Oct. 27, 2020)..................34

*Bowyer v. Ducey*,
   506 F.Supp.3d 699 (D. Ariz. 2020) ..................................................................34

*Bucklew v. Precythe*,
   139 S. Ct. 1112 (2019)......................................................................................37

*Burson v. Freeman*,
   504 U.S. 191, 206 (1992)............................................................................22, 24

*Bush v. Gore*,
   531 U.S. 98 (2000)..................................................................................................36

*Charles H. Wesley Educ. Found., Inc. v. Cox*,
   408 F.3d 1349 (11th Cir. 2005) ........................................................................28

*Citizens United v. FEC*,
   558 U.S. 310 (2010)..............................................................................................37

*Council on Am.-Islamic Rels.—Minn. v. Atlas Aegis, LLC*,
   497 F. Supp. 3d 371 (D. Minn. 2020)................................................................37

*Ctr. for Individual Freedom v. Madigan*,
   697 F.3d 464 (7th Cir. 2012) ............................................................................37

*Donald J. Trump for President, Inc. v. Boockvar*,
   493 F. Supp. 3d 331 (W.D. Pa. 2020)..............................................................34

*Donald J. Trump for President, Inc. v. Cegavske*,
   488 F. Supp. 3d 993 (D. Nev. 2020)..................................................................34

*Donald J. Trump for President, Inc. v. Way*,
   No. CV2010753MASZNQ, 2020 WL 6204477 (D.N.J. Oct. 22,
   2020).........................................................................................................................35

*FDIC v. Main Hurdman*,
   655 F. Supp. 259 (E.D. Cal. 1987) ..................................................................33

*Feehan v. Wis. Elections Comm'n*,
   No. 20-CV-1771-PP, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020) ................35

*Gertz v. Robert Welch, Inc.*,
   418 U.S. 323 (1974)..............................................................................................27

*Halprin v. Prairie Single Fam. Homes of Dearborn Park Ass'n*,
   388 F.3d 327 (7th Cir. 2004) ............................................................................21

iv

*United States ex rel. Hunt v. Cochise Consultancy, Inc.*,
   887 F.3d 1081 (11th Cir. 2018) .......................................................... 7

*Int'l Stamp Art, Inc. v. U.S. Postal Serv.*,
   456 F.3d 1270 (11th Cir. 2006) (per curiam) .................................... 32

*King v. Whitmer*,
   505 F. Supp. 3d 720 (E.D. Mich. 2020) ............................................ 34

*Koch Foods, Inc. v. Sec'y, U.S. Dep't of Lab.*,
   712 F.3d 476 (11th Cir. 2013) ............................................................ 4

*League of United Latin Am. Citizens - Richmond Region Council 4614*
   *v. Pub. Int. Legal Found.*,
   No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018) ........ 7, 23, 38

*League of Women Voters of N.C. v. North Carolina*,
   769 F.3d 224 (4th Cir. 2014) ............................................................ 28

*Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*,
   263 F.3d 208 (2d Cir. 2001) ............................................................. 18

*Madsen v. Women's Health Ctr., Inc.*,
   512 U.S. 753 (1994) .......................................................................... 28

*Martel v. Condos*,
   487 F. Supp. 3d 247 (D. Vt. 2020) .................................................... 34

*McCullen v. Coakley*,
   573 U.S. 464 (2014) .......................................................................... 22

*McDonald v. Smith*,
   472 U.S. 479 (1985) ...................................................................... 28, 29

*Moore v. Circosta*,
   494 F. Supp. 3d 289 (M.D.N.C. 2020) ............................................... 35

*N.Y. Times Co. v. Sullivan*,
   376 U.S. 254 (1964) .......................................................................... 29

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    498 F. Supp. 3d 457 (S.D.N.Y. 2020) ..........................................................*passim*

*Nat'l Coal. on Black Civic Participation v. Wohl*,
    512 F. Supp. 3d 500 (S.D.N.Y. 2021) ....................................................19, 23, 38

*Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla.*
    *Dep't of Health*,
    50 F.4th 1126 (11th Cir. 2022) .............................................................................8

*O'Rourke v. Dominion Voting Sys. Inc.*,
    No. 20-CV-03747-NRN, 2021 WL 1662742 (D. Colo. Apr. 28,
    2021) .........................................................................................................................34

*Ohio Democratic Party v. Ohio Republican Party*,
    No. 16-CV-02645, 2016 WL 6542486 (N.D. Oh. 2016) ...................................38

*Paher v. Cegavske*,
    457 F. Supp. 3d 919 (D. Nev. 2020)....................................................................34

*People Helpers, Inc. v. City of Richmond*,
    789 F. Supp. 725 (E.D. Va. 1922) .............................................................18, 19

*Peyton v. Rowe*,
    391 U.S. 54 (1968)...................................................................................................19

*Prickett v. DeKalb Cnty.*,
    349 F.3d 1294 (11th Cir. 2003) ...........................................................................19

*Reid v. Viacom Int'l Inc.*,
    Civ. Action No. 1:14-CV-1252-MHC, 2017 WL 11634619 (N.D.
    Ga. Sept. 22, 2017) ...............................................................................................30

*Reynolds v. Sims*,
    377 U.S. 533, 545 (1964)......................................................................................35

*Rhodes v. Siver*,
    No. 19-12550, 2021 WL 1565137 (E.D. Mich., Feb. 1, 2021) .........................38

*Schirmer v. Edwards*,
    2 F.3d 117 (5th Cir. 1993) ...................................................................................22

*Smith v. Vencare, Inc.*,
  519 S.E.2d 735 (Ga. App. Ct. 1999)............................................................26, 29

*Soudelier v. Dep't of State Louisiana*,
  No. CV 22-2436, 2022 WL 17283008 (E.D. La. Nov. 29, 2022).....................34

*South Carolina v. Katzenbach*,
  383 U.S. 301 (1966)...........................................................................................19

*Spokeo, Inc. v. Robins*,
  578 U.S. 330 (2016)...........................................................................................33

*StopLoss Specialists, LLC v. VeriClaim, Inc.*,
  340 F. Supp. 3d 1334 (N.D. Ga. 2018)..............................................................25

*Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc.*,
  576 U.S. 519 (2015)...........................................................................................11

*United States v. Bd. of Comm'rs of Sheffield*,
  435 U.S. 110 (1978).............................................................................................9

*United States v. Clark*,
  249 F. Supp. 720 (S.D. Ala. 1965) ....................................................................38

*United States v. N.C. Republican Party*,
  92-161-CIV-5-F (E.D.N.C. Feb. 27, 1992) .......................................................23

*United States v. Nguyen*,
  673 F.3d 1259 (9th Cir. 2012) ...........................................................................23

*United States v. Stevens*,
  559 U.S. 460 (2010)...........................................................................................25

*United States v. Williams*,
  553 U.S. 285 (2008)...........................................................................................41

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
  455 U.S. 489 (1982)...........................................................................................40

*Virginia v. Black*,
  538 U.S. 343 (2003)......................................................................................20, 21

*Walker v. City of Lakewood*,
   272 F.3d 1114 .................................................................................18, 19

*Washington Election Integrity Coal. United v. Anderson*,
   No. 3:21-CV-05726-LK, 2022 WL 4598503 (W.D. Wash. Sept.
   30, 2022) ..........................................................................................34

*Washington Election Integrity Coal. United v. Kimsey*,
   No. 3:21-CV-05746-LK, 2022 WL 4598507 (W.D. Wash. Sept.
   30, 2022) ..........................................................................................34

*Whatley v. City of Vidalia*,
   399 F.2d 521 (5th Cir. 1968) ..........................................................7, 9

*Willingham v. Cnty. of Albany*,
   593 F. Supp. 2d 446 (N.D.N.Y. 2006)............................................9, 10

*Wood v. Raffensperger*,
   981 F.3d 1307 (11th Cir. 2020) ...........................................................34

*Wood v. Raffensperger*,
   No. 1:20-CV-5155-TCB, 2020 WL 7706833 (N.D. Ga. Dec. 28,
   2020) ..................................................................................................34

*Wood v. Raffensperger*,
   No. 20-14813, 2021 WL 3440690 (11th Cir. Aug. 6, 2021)..............34

*Yick Wo v. Hopkins*,
   118 U.S. 356 (1886).............................................................................22

**Statutes**

18 U.S.C. § 594.......................................................................................4, 15

42 U.S.C. § 3617....................................................................................18, 19

42 U.S.C. § 12203(b).............................................................................18, 19

52 U.S.C. § 10101(b) .........................................................................*passim*

52 U.S.C. § 10307(b) .......................................................................1, 2, 4

O.C.G.A. § 21-2-561 ................................................................26

O.C.G.A. § 21-2-571 ................................................................26

O.C.G.A. § 51-5-4(a)(1), (b) ....................................................26

O.C.G.A. § 51-5-7(4) ..........................................................26, 29

**Other Authorities**

Ga. Sec'y of State, *Secretary of State Brad Raffensperger Protects Runoffs from Out of State Voters* (Dec. 21, 2020), https://sos.ga.gov/news/secretary-state-brad-raffensperger-protects-runoffs-out-state-voters ....................................................26

H. Rep. No. 89-439, 89th Congress, 1st Sess. 32 (1965) ............................9, 10, 16

H. Rep. No. 89-711, 89th Congress, 1st Sess. 32 (1965) ......................................17

*Hr'gs on H.R. 6400 Before the H. Subcomm. No. 5 on the Judiciary*, 89th Cong. 9 (1965) ................................................................*passim*

U.S. Const. art. I, sec. 4 ..............................................................10

U.S. Dep't of Just., *Federal Prosecution of Election Offenses* (8th ed. 2017), https://www.justice.gov/criminal/file/1029066/download........4, 5, 11, 15

On October 26, 2022, the Court invited supplemental briefing on five questions related to the parties' cross-motions for summary judgment. Plaintiffs hereby submit this supplemental brief in response.

**I.     Using the ordinary rules of statutory interpretation (i.e., ordinary-meaning, statutory context, legislative history, interpretations of similar Civil Rights statutory provisions, etc.), how should Section 11(b) of the Voting Rights Act be interpreted?**

All the ordinary statutory interpretation rules suggest that Section 11(b) should be interpreted broadly to encompass Defendants' coordinated campaign of mass voter challenges and accompanying elements of its Validate the Vote scheme, which included offering bounties for reports of voter fraud and recruiting former Navy SEALs to patrol polling stations. *See* Pls.' Mot. Summ. J. at 10–31, ECF No. 156-1.

Section 11(b) of the Voting Rights Act ("VRA") states, in relevant part: "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for urging or aiding any person to vote or attempt to vote . . . ." 52 U.S.C. § 10307(b) ("Section 11(b)"). The ordinary meaning of this provision, as well as the evolution of federal voter intimidation statutes and the

legislative history of the VRA, demonstrates that Section 11(b) was intentionally drafted to operate as a more effective tool than precursor statutes for preventing more subtle forms of nonviolent voter intimidation, including the intimidation of those who facilitate or encourage others to vote, without requiring any proof of intent or racial motivation. The VRA's broad remedial scope also aligns with judicial interpretations of analogous civil rights statutes.

A.  **The ordinary meaning of the key words in Section 11(b) demonstrates that the provision broadly prohibits nonviolent actions that would prevent voters from voting, and does not require an intent to intimidate, threaten, or coerce.**

In determining the meaning of a statutory provision, courts "look first to its language, giving the words used their ordinary meaning." *Artis v. District of Columbia*, 138 S. Ct. 594, 603 (2018). As Plaintiffs show below, Section 11(b)'s plain language prohibits nonviolent actions that have the effect of intimidating, threatening, or coercing voters from engaging in the act of voting.

The scope of Section 11(b) is defined by three key words: "intimidate," "threaten," and "coerce." 52 U.S.C. § 10307(b). These words "have familiar and somewhat overlapping definitions." *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020) ("*Wohl I*"). To "intimidate" means to "make timid or fearful," or to "inspire or affect with fear," especially "to compel

to action or inaction (as by threats)." *Id.* (quoting Webster's Third New International Dictionary ("Webster's Dictionary") at 1183 (1966)). To "threaten" means to "utter threats against" or "promise punishment, reprisal, or other distress." *Id.* (quoting Webster's Dictionary at 2381). And to "coerce" means to "restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation)." *Id.* (quoting Webster's Dictionary at 438).

While Section 11(b) does not specifically define a list of prohibited activities, by the statute's plain terms, Congress sought to bring within Section 11(b)'s wide ambit both violent and nonviolent conduct—or attempts to engage in such conduct—that has the effect of imposing hardships on individuals seeking to exercise their right to vote. This scope would certainly cover Defendants' coordinated attempt to purge hundreds of thousands of voters from the voter rolls across Georgia just weeks before the state's 2021 U.S. Senate runoff elections, which was part of a broader public campaign to encourage (and monetarily incentivize) citizens to report and monitor voters and election officials for alleged fraudulent activity. *See* Pls.' Mot. Summ. J. at 23–31. These actions, taken together, were likely to systematically overcome voters' ability and will to cast a ballot by subjecting them to intimidating harassment, abuse, and bureaucracy. Defendants' actions therefore run afoul of Section 11(b).

Additionally, the plain text of Section 11(b) does not require an intent to intimidate, threaten, or coerce, as the language of the provision specifically does not include the words "intent" or "purpose." 52 U.S.C. § 10307(b). Thus, to read in such a prerequisite would conflict with the text of the statute.

**B.    The evolution of federal voter intimidation statutes demonstrates an expanding remedial scope.**

The scope and operation of Section 11(b) must be understood in the context of how voter intimidation statutes have evolved and broadened at the federal level over time. *See In re BFW Liquidation, LLC*, 899 F.3d 1178, 1190–1192 (11th Cir. 2018) (recognizing statutory history, existence of predecessor statutes, and "statutory development" bolstered court's interpretation of statutory text); *Koch Foods, Inc. v. Sec'y, U.S. Dep't of Lab.*, 712 F.3d 476, 483 (11th Cir. 2013) (analyzing statutory history as part of statutory interpretation). The phrase "intimidate, threaten, or coerce" first appeared in the voter intimidation context in the Hatch Act of 1939, which imposed criminal penalties on anyone who "intimidate[d], threaten[ed], coerce[d]," or attempted to do so, "for the purpose of interfering with the right of such other person to vote" in a federal election. *See* 18 U.S.C. § 594; *see also* Richard Pilger, Pub. Integrity Section of U.S. Dep't of Just., *Federal Prosecution of Election Offenses* at 52 (8th ed. 2017),

https://www.justice.gov/criminal/file/1029066/download ("Fed. Prosecution of Election Offenses"). These terms were included to prohibit "the blatant economic coercion used during the 1930s to force federal employees and recipients . . . to perform political work and to vote for and contribute to the candidates supported by their supervisors." Fed. Prosecution of Election Offenses at 52. The congressional debates on the Hatch Act demonstrate that these terms were chosen to address not only "Congress's concern over the use of threats of economic loss to induce political activity," but also "conduct which interferes, or attempts to interfere, with an individual's right to vote by placing him or her in fear of suffering other kinds of tangible and intangible losses." *Id.* Thus, the phrase "intimidate, threaten, or coerce" originated from a need to create federal laws that targeted nonviolent acts aimed at discouraging or preventing a voter from casting a ballot.

Almost two decades later, in 1957, Congress incorporated the same operative set of three key words—"intimidate, threaten, or coerce"—into a new voter intimidation provision in the Civil Rights Act ("CRA") of 1957, which provides that "[n]o person . . . shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person for the purpose of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate[.]" *See* 52 U.S.C. § 10101(b) ("Section 131(b)").

5

After the CRA's enactment, the Department of Justice ("DOJ") began to rely on Section 131(b) to address a range of voter intimidation activities across the country. Over time, however, DOJ found that there were serious weaknesses in Section 131(b)'s effectiveness against voter intimidation. As Attorney General Katzenbach testified during congressional consideration of the VRA, "despite [the DOJ's] most vigorous efforts in the courts, there has been case after case of slow or ineffective relief" for Section 131(b) claims. *See Hr'gs on H.R. 6400 Before the H. Subcomm. No. 5 on the Judiciary*, 89th Cong. 9 (1965) (statements of Att'y Gen. Katzenbach). In recommending ways to strengthen federal voter intimidation laws, Attorney General Katzenbach said that "[w]hat is necessary, what is essential, is a new approach, an approach which goes beyond the tortuous, often-ineffective pace of litigation" under the CRA so that litigants have the legal tools to defeat forms of intimidation that go beyond "beatings [and] arrests" to include more subtle forms of intimidation such as "lost jobs, lost credit, and *other forms of pressure*[.]" *Id.* (emphasis added).

In light of these observed shortcomings of Section 131(b), Congress enacted Section 11(b) of the VRA, a provision that again incorporated the identical phrase "intimidate, threaten, or coerce" but was explicitly intended to operate as a broader, more robust and effective tool at countering voter intimidation. *See id.* at 11 (Att'y

6

Gen. Katzenbach explaining that Section 11(b) "represent[s] a deliberate and . . . constructive departure from the language and construction of [Section 131(b)]"); *see also Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (concluding Congress "broadened the law in 1965 by adopting [Section 11(b)]"); *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) ("*LULAC*") (describing Section 11(b) of the VRA's "deliberately unqualified reach" in comparison to its predecessor counterpart in the CRA). Because Section 11(b) was deliberately formulated to remedy weaknesses that Attorney General Katzenbach, the DOJ, and Congress had identified under the CRA, the contours of Section 11(b) must be interpreted consistently with this clear intent to extend the availability and effectiveness of federal protections against voter intimidation.

C. **The legislative history of Section 11(b) demonstrates that it was deliberately enacted to broaden the scope and efficacy of federal laws protecting the right to vote.**

"Legislative history may prove helpful when the statutory language remains ambiguous after considering 'the language itself, the specific context in which that language is used, and the broader context of the statute as a whole.'" *United States ex rel. Hunt v. Cochise Consultancy, Inc.*, 887 F.3d 1081, 1089 (11th Cir. 2018) (quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997)). Courts "look to the

legislative history of the statute to determine whether Congress provided any guidance concerning its intent." *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 789 F.3d 1206, 1218 (11th Cir. 2015) (quoting *United States v. Fields*, 500 F.3d 1327, 1330 (11th Cir. 2007)). Legislative history "is often used" to ensure that a statute serves a constitutional purpose. *Norwegian Cruise Line Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1146 (11th Cir. 2022) (collecting cases). Consistently with Section 11(b)'s plain text, the relevant legislative history here illuminates Congress's intent and confirms the statute's constitutional purpose.

### 1.     Section 11(b) does not require an intent to intimidate.

The "most serious inadequacy" that Section 11(b) sought to remedy was that pursuant to the plain language of Section 131(b), "some district courts . . . require[d] the Government to carry a very onerous burden of proof of 'purpose'" to intimidate, threaten, or coerce voters. *See Hr'gs on H.R. 6400 Before the H. Subcomm. No. 5 on the Judiciary*, 89th Cong. 11 (1965) (Statement by Att'y Gen. Katzenbach). But as Attorney General Katzenbach explained during hearings for the VRA, "many types of intimidation . . . involve subtle forms of pressure," and thus the need to demonstrate that an action was taken for the *purpose* of intimidating, threatening, or coercing voters rendered the CRA provisions largely ineffective. *Id.* To ensure that litigation could be successful, Attorney General Katzenbach—who was one of the

principal drafters of the VRA, *id.* at 163, and the chief executive branch official charged with enforcing the VRA upon its enactment—explained before Congress that, "under [the VRA] no subjective 'purpose' need be shown, in either civil or criminal proceedings, in order to prove intimidation . . . . Rather, defendants would be deemed to intend the natural consequences of their acts." *Id.* at 11. Attorney General Katzenbach noted that the VRA's intimidation provision "represents a deliberate and . . . constructive departure from the language and construction of [Section 131(b)]." *Id.* Today, Attorney General Katzenbach's "contemporaneous administrative construction of the [VRA] is persuasive evidence of the [statute's] original understanding, especially in light of the extensive role the Attorney General played in drafting the statute and explaining its operation to Congress." *United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 131 (1978).

Congress echoed Attorney General Katzenbach's goals in passing the VRA. The House Report explained that, "unlike [the CRA] (which requires proof of a 'purpose' to interfere with the right to vote) no subjective purpose or intent need be shown" under Section 11(b). *See* H. Rep. No. 89-439 at 30, 89th Congress, 1st Sess. 32 (1965). Courts that have assessed this legislative history have recognized that Congress intended to broaden Section 11(b) beyond the confines of the original CRA by eliminating any requirement that plaintiffs prove the "purpose" or "intent" of the

defendant. *See Whatley*, 399 F.2d at 526; *Willingham v. Cnty. of Albany*, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006) ("[U]nlike [Section 131(b)] (which requires proof of a 'purpose' to interfere with the right to vote), no subjective purpose or intent need be shown" under Section 11(b)) (quoting H.R. Rep. No. 89-439, at 30 (1965)). In analyzing Plaintiffs' motion for summary judgment, therefore, this Court need not find that Defendants specifically intended to discourage Georgians from voting before determining Section 11(b) liability.

> **2.    Section 11(b) does not require actions to be racially motivated.**

Congress also removed any requirement for a Section 11(b) litigant to show that the intimidating, threatening, or coercive actions were racially motivated. In enacting Section 11(b), Congress specifically invoked the Elections Clause (art. I, sec. 4) of the U.S. Constitution—not the Fifteenth Amendment—and the implied power of Congress to protect federal elections against corrupt influences. *See* H. Rep. No. 89-439 (1965) at 30. Its purpose in doing so was to rely on sources of power that did not "require[] a nexus with race." *Id.* As one court has explained, "[w]hile the purpose of the VRA was to eliminate racial discrimination in voting, Section 11(b) of the act does not explicitly require proof that racial discrimination motivated the intimidation, threats, or coercion. Thus, a plain reading of Section 11(b) refutes the contention . . . that proof of racial discrimination as a motive must

10

be shown to establish a claim under this provision." *Willingham*, 593 F. Supp. 2d at 462. For this reason, in analyzing Plaintiffs' motion for summary judgment, this Court need not consider whether Defendants' actions were racially motivated.

### 3.   Section 11(b) was intended to protect voters from a wide array of intimidating activities.

The legislative history of Section 11(b) also demonstrates that the provision was meant to be interpreted broadly to cover myriad forms of intimidation, including intimidation that is nonviolent and that does not involve direct contact with voters.

### a.   Section 11(b) applies to nonviolent intimidation.

As shown above, the statute's key terms ("intimidate," "threaten," and "coerce"), as originally introduced in the Hatch Act of 1939, were intended to prohibit nonphysical and nonviolent methods of compelling individuals to participate (or not participate) in the elections process. *See* Fed. Prosecution of Election Offenses at 52. These very words had been interpreted to proscribe broad forms of intimidation for almost 20 years by the time the CRA was enacted. *See Tex. Dep't of Hous. & Cmty. Affs. v. Inclusive Cmtys. Project, Inc*., 576 U.S. 519, 536–37 (2015) ("If a word or phrase has been . . . given a uniform interpretation by inferior courts . . . , a later version of that act perpetuating the wording is presumed to carry forward that interpretation.") (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 322 (2012)).

11

Those same words were incorporated into the CRA, and the legislative record for Section 131(b) similarly demonstrates that legislators again sought to proscribe more subtle forms of intimidation. One notable form of disenfranchisement motivating the CRA's passage was the purging of Black voters from the voter rolls. During hearings for the CRA, witnesses described a scheme in Mississippi to purge Black voters from the rolls "to halt an overload of Negro voting." *Hr'gs Before the S. Comm. on the Judiciary*, 84th Cong. 114 (1956). The scheme worked as follows: "The [citizens] council obtains names of Negroes registered from the circuit court clerk. If [those individuals] are working for someone sympathetic to the council's views . . . their employer tells them to take a vacation. Then if the names are purged from the registration books they are told that the vacation is over and they can return to work." *Id.* As another witness described, these tactics were devastatingly effective: In a single year, "the White Citizens Councils, through the registrar, purged about 12,000 Negroes off the registration books" through various schemes. *Hr'gs Before the S. Comm. on the Judiciary*, 85th Cong. 532 (1957).

As Burke Marshall, head of the Civil Rights Division of DOJ, further affirmed in a statement to the U.S. Commission on Civil Rights, the CRA was the first "serious, sustained, and broad effort to deal with" the disenfranchisement of Black voters, including addressing the reality that in many states, Black voters "were not

permitted to register to vote and those who already registered were purged from the rolls." *Hr'gs Before the S. Comm. on the Judiciary*, 89th Cong. 304 (1965) (Ex. 69, Statement of Burke Marshall submitted to the U.S. Comm'n on C.R., February 18, 1965, submitted for inclusion in the hearing record). These voter purges mirror one of Defendants' key intimidation tactics used to scare voters away from the polls.

After Section 131(b) was enacted, the DOJ brought several voter intimidation cases involving nonviolent threats such as economic harm or legal consequences. For example, Attorney General Katzenbach discussed one case where a grand jury attempted to block the operation of the DOJ's Civil Rights Division, and another case where the local council published an advertisement encouraging citizens to actively disenfranchise voters by interfering with sit-ins, marches, and voter registration drives. *See Hr'gs Before the S. Comm. on the Judiciary*, 89th Cong. 8 (1965). Additionally, a 1964 status report prepared by the DOJ's Civil Rights Division and submitted for consideration during the hearings on the VRA also mentioned numerous voter intimidation cases involving threats of non-physical harm. *Id.* at 1290–92 (documenting, for example, a case under Section 131(b) where white citizens of Haywood County, Tennessee, circulated a list of Black citizens to be threatened with eviction, loss of jobs, and denial of credit after they began registering to vote). That same report stated that cases brought under the CRA

13

involved "intimidation by private individuals [that] may include[,] besides physical violence, forms of economic reprisal, [such] as (1) loss of employment and failure to be rehired on seasonal jobs, (2) cancellation of insurance policies, (3) cancellation of commercial agreements, refusal to trade, or withdrawal or refusal to extend credit, and (4) evictions, or refusals to renew leases." *Id.* at 1360.

This history demonstrates that the federal voter intimidation statutes were never intended to proscribe only those acts of intimidation achieved through physical violence, but instead reached as far as public ads encouraging private citizens to block voters' efforts to participate in the franchise. Such public voter intimidation campaigns are akin to True the Vote campaigning for Georgians to report fellow voters for engaging in voter fraud in exchange for a $1 million bounty, Pls.' Mot. Summ. J. at 24–25, recruiting former combat-trained veterans to patrol polling places precisely because of their intimidating presence, *id.* at 25–26, issuing press releases promoting the filing of hundreds of thousands of frivolous voter challenges, *id.* at 26–27, and publicly promoting and encouraging threats of election-related vigilantism on social media, *id.* at 28–31.

Eight years later, when Congress sought to strengthen federal voter intimidation statutes even further with Section 11(b), the drafters made no indication that they wished to weaken the VRA by limiting its reach to violent forms of

14

intimidation. To the contrary, the VRA was written to secure voters even greater protections than previously available under the CRA. *See supra*, Section I.C.3.b.

The entire evolution of federal voter intimidation statues makes clear that the scope of the operative phrase "intimidate, threaten, and coerce" was always intended to apply broadly to nonphysical and nonviolent acts. The legislative history of both the CRA and VRA, moreover, demonstrate that Congress has only ever sought to *broaden* the scope of these federal protections; it has never attempted to constrict them. *See also* Fed. Prosecution of Election Offenses at 52 n.27 ("The civil counterparts to Section 594, 52 U.S.C. §§ 10101(b) and 10307(b), may also be used to combat non-violent voter intimidation"). For these reasons, in analyzing Plaintiffs' motion for summary judgment, this Court should interpret Section 11(b) broadly to encompass Defendants' actions.

> **b.    Section 11(b) does not require that prohibited acts occur through direct contact with voters.**

A final weakness of Section 131(b) that Attorney General Katzenbach identified in the CRA, and that Section 11(b) addressed, was that Section 131(b) was ill-equipped to address intimidation occurring one step removed from voters. For instance, in November 1963, the DOJ brought an intimidation lawsuit under Section 131(b) alleging that a local grand jury sought to obstruct the operation of the DOJ's Civil Rights Division, thus intimidating potential Black voters who looked to the

DOJ for assistance and action. *See Hr'gs on H.R. 6400 Before the H. Subcomm. No. 5 on the Judiciary*, 89th Cong. 8 (1965). Despite introducing substantial proof in support of these allegations, the district court rejected the evidence, and the case languished on appeal. *Id.*

In support of an expanded voter intimidation statute, Attorney General Katzenbach cited this and other cases as a reason for why the existing voter intimidation framework in the CRA was ineffective for helping vindicate the right to vote in courts. *Id.* at 9. Thus, the House version of the VRA specifically included language for Section 11(b) that would "extend[] coverage to prohibit intimidation of those who engage in activities to encourage others to vote[.]" H. Rep. No. 89-439 at 7, 89th Congress, 1st Sess. 32 (1965). The House Report further explained that the provision included a prohibition on intimidation, threats, or coercion of those "*aiding* any person to vote or attempt to vote," *id.* at 30 (emphasis added), to capture intimidation against actions designed to help voters register and learn about voting requirements. During reconciliation between the House and Senate versions of the bill, Congress chose to include within the parameters of Section 11(b) a prohibition on intimidating persons helping voters engage in the act of voting. Specifically, the Conference Report provides that "Section 11(b) of the House bill prohibits, whereas the Senate bill does not, intimidation of a person 'for urging or aiding' any person

16

to vote. The Senate receded, and the conference report adopts the House version with the addition of certain clarifying language." H. Rep. No. 89-711 at 13, 89th Congress, 1st Sess. 32 (1965) (Conf. Report).

This legislative history conveys that Congress specifically contemplated and chose to incorporate language intended to cover actions that had the natural consequence of intimidating voters, even if these actions did not qualify as "direct" intimidation of voters. *See Hr'g before the H. Comm. on the Judiciary*, 89th Cong. 12 (1965) (Statement by Att'y Gen. Katzenbach). Thus, Defendants cannot evade Section 11(b) simply by asserting that they did not have contact with voters. *See* Defs.' Mot. Summ. J. at 17–19, ECF No. 155-1. It is indisputable that Section 11(b) was explicitly intended to cover circumstances like those present in this case, where Defendants intimidated voters not by contacting them directly but by recruiting challengers to file frivolous challenges and creating an intimidating environment. *See Hr'gs on H.R. 6400 Before the H. Subcomm. No. 5 on the Judiciary*, 89th Cong. 8 (1965). Thus, Defendants' actions fall clearly within the confines of Section 11(b). To conclude otherwise would directly conflict with the VRA's legislative history.

**D.      Analogous civil rights statutes protect against non-violent intimidation.**

Judicial interpretations of other civil rights statutes, such as the Fair Housing Act ("FHA") and Americans with Disabilities Act ("ADA"), confirm Section 11(b) encompasses acts of nonviolent intimidation. Both the FHA and the ADA, like the VRA, make it unlawful for any person to intimidate others who attempt to exercise federally protected rights. *See* 42 U.S.C. § 3617 (FHA); 42 U.S.C. § 12203(b) (ADA). Courts have repeatedly found that one can violate these provisions through nonviolent actions. *See, e.g.*, *Walker v. City of Lakewood*, 272 F.3d 1114, 1128 & 1129 n.5 (9th Cir. 2001) (holding FHA provision "does not require a showing of force or violence for coercion, interference, intimidation, or threats to give rise to liability" and instead explaining intimidation could be shown if one's activities "had generated fear"); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d 208, 223 (2d Cir. 2001) (holding jury could find defendant had intimidated or threatened plaintiff in violation of ADA by sending letter stating that if plaintiff continued her behavior, defendant would "have no choice but to address [her] behavior through legal channels"); *People Helpers, Inc. v. City of Richmond*, 789 F. Supp. 725 (E.D. Va. 1922) (finding violation of FHA where person threatened investigations against protected individual). These interpretations of the ADA and FHA make sense: as

remedial statutes, they "should be liberally construed." *Peyton v. Rowe*, 391 U.S. 54, 65 (1968); *see also Prickett v. DeKalb Cnty.*, 349 F.3d 1294, 1296 (11th Cir. 2003) (confirming remedial statutes should receive liberal construction). The VRA, of course, also warrants liberal construction—indeed, it is the *ultimate* remedial statute. *See, e.g.*, *South Carolina v. Katzenbach*, 383 U.S. 301, 316 (1966).

Given the shared civil rights context and similarity of language among these statutes, courts interpreting Section 11(b) of the VRA have previously relied on judicial interpretations of the FHA and ADA in considering the proper scope of the VRA. *See, e.g.*, *Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 510 (S.D.N.Y. 2021) ("*Wohl II*"). This Court should do the same. As in *Lovejoy* and *People Helpers*, Defendants' challenges threatened legal consequences for those who sought to exercise their rights, and as in *Walker*, "generated fear" in those who were the subject of challenges. Nothing more is required to find a violation of Section 11(b).

II.   **Does the Supreme Court's decision in *Virginia v. Black*, 538 U.S. 343, 359 (2003)—narrowing true threats to "statements where the speaker means to communicate a serious *expression of intent to commit an act of unlawful violence*" and clarifies that the "prohibition on true threats protect[s] individuals from the fear of *violence*" (emphasis added) (quotations and citations omitted)—preclude application of the true threat exception when the alleged threatening behavior is non-violent but aimed at inhibiting a fundamental right?**

No, *Virginia v. Black*'s characterization of "true threats" does not provide a First Amendment defense for Defendants' conduct. Intimidation that threatens nonviolent harm may be restricted consistently with the Constitution, especially where the harm alleged inhibits a fundamental right or attempts to do so. And even if the "true threats" exception does not apply, Defendants' conduct falls squarely within the defamation exception to protected speech.

A.   ***Virginia v. Black* did not extend First Amendment protection to all threats of nonviolent harm.**

*Black*—a case that rejected a First Amendment defense to the anti-intimidation statute at issue there—does not favor Defendants. In *Black*, the Supreme Court held that individuals convicted of burning a cross with the intent to intimidate could be subject to criminal penalties because the Constitution does not protect "true threats." 538 U.S. at 355. Notably, the Court did not *limit* true threats to warnings of violence; it simply recognized that true threats "encompass" those statements, which was sufficient to uphold the ban on intimidation in that context.

20

*Id.* at 359. Because cross burning is inextricably intertwined with the Ku Klux Klan's history of terrorizing violence, *see id.* at 356, the opinion's language predictably focused on fears of physical harm. But the *Black* Court had no occasion to provide an exhaustive accounting of every other conceivable threat or intimidating statement that could fall outside the Constitution's bounds, and neither the context nor the language of that decision supports a rigid limitation on governments' ability to regulate in this area. *See also Halprin v. Prairie Single Fam. Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004) (holding whether challenged conduct "is far less ominous, frightening, or hurtful than burning a cross in a neighbor's front yard or assaulting the neighbor physically . . . cannot be the test" of constitutionality because there "are other, less violent but still effective, methods by which a person can be" harmed).

Even if it were the case that the First Amendment generally permits governments to criminalize speech for putting victims in fear only when that fear is connected to violence—and Defendants have not identified any case holding as much—the distinct constitutional interest that the Voting Rights Act protects requires a distinct analysis. There is no constitutional right to be free from fear in one's daily life, but United States citizens do enjoy a constitutional right to vote, and that right is entitled to the highest protection. As the Supreme Court has long

21

recognized, the right to vote is "a fundamental political right, because [it is] preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886).

Given voting's primacy in the constellation of constitutional rights, the Supreme Court has upheld statutory voting protections against entirely nonviolent forms of intimidation, threats, and coercion. In *Burson v. Freeman*, for example, the Court rejected a First Amendment challenge to a Tennessee law that imposed criminal penalties on the display and distribution of campaign materials—conduct that had *nothing* to do with violence or personal injury, but still fell within "the States' compelling interests in preventing voter intimidation." 504 U.S. 191, 206 (1992). Where "the exercise of free speech rights conflicts with another fundamental right, [specifically] the right to cast a ballot in an election free from the taint of intimidation," the Court held, the franchise right prevails. *Id.* at 211.[1]

_____

[1] While heightened scrutiny is inapplicable where, as here, challenged conduct is categorically outside the First Amendment's scope, *Burson*'s recognition of states' compelling interest in preventing voter intimidation confirms that Section 11(b)'s application would satisfy even strict scrutiny. *See* 504 U.S. at 206; *see also id.* at 199–200 (recognizing the state "obviously" has a compelling interest in "protecting the right of its citizens to vote freely for the candidates of their choice"); *Schirmer v. Edwards*, 2 F.3d 117, 122 (5th Cir. 1993) (recognizing "the state's compelling interest" in regulation "is called to greater heights" where there is evidence of "voter harassment or intimidation"). Section 11(b) is narrowly tailored to serve that interest because it specifically prohibits voter intimidation and nothing else. Plaintiffs' requested injunction is narrowly tailored, too, because it "focuses on the precise individuals and the precise conduct causing a particular problem." *McCullen v. Coakley*, 573 U.S. 464, 493 (2014).

Consistent with *Burson*'s command, courts have repeatedly recognized that nonviolent intimidation is subject to Section 11(b)'s bar. *See, e.g., LULAC*, 2018 WL 3848404, at *4 (finding plaintiffs stated a claim for a violation of Section 11(b) by alleging that defendants published voters' personal information in "a report condemning felonious voter registration in a clear effort to subject the named individuals to public opprobrium"); *Wohl II*, 512 F. Supp. 3d at 511 (noting "the threat of dissemination of personal information alone could plausibly support a Section 11(b) claim"); *see also United States v. Nguyen*, 673 F.3d 1259, 1265 (9th Cir. 2012) (finding letter sent to Latino voters that warned "if they voted in the upcoming election their personal information would be collected . . . [and] provided to organizations who are 'against immigration'" constituted voter intimidation under California law); Consent Decree, *United States v. N.C. Republican Party*, 92-161-CIV-5-F (E.D.N.C. Feb. 27, 1992) (enjoining defendants who mailed over 100,000 postcards falsely claiming that voters must have lived in their current precinct for more than 30 days to vote and that they would be asked at the polling place to state the length of their current residence).[2]

---

[2] An outlier provisional opinion from an Arizona district court is unpersuasive and inapplicable here. In *Arizona Alliance for Retired Americans v. Clean Elections USA*, No. CV-22-01823-PHX-MTL, 2022 WL 15678694 (D. Ariz. Oct. 28, 2022) ("*Arizona Alliance I*"), plaintiffs brought a Section 11(b) claim against defendants

Devising a new constitutional right to engage in nonviolent voter intimidation would have shocking consequences. Even where statutes explicitly proscribe the behavior, individuals wishing to reduce turnout in select areas or select elections could threaten to splash embarrassing details about targeted voters' private lives on a town billboard; banks could decline loans to accountholders based on their voting history; or employers could even threaten to fire any employee who casts a ballot. Far from approving schemes like these, the Supreme Court recounted similar intimidation as "evils" that infected the electoral process in previous, unregulated eras. *Burson,* 504 U.S. at 200–01 & n.7. The upshot is clear: when it comes to voting rights, the *method* of intimidation is less significant than the *effect* of the intimidation. Where that effect—whether intended or objectively foreseeable—is to deter or discourage a person from exercising their constitutional right to vote, it is constitutionally proscribable.

---

who were aggressively surveilling early voting drop box locations. The district court initially denied a motion for a temporary restraining order on First Amendment grounds, *id.* at *4, but days later entered a slightly different TRO on nearly identical facts in a consolidated case. *See Ariz. All. for Retired Ams. v. Clean Elections USA*, No. CV-22-01823-PHX-MTL, 2022 WL 17088041 (D. Ariz. Nov. 1, 2022) ("*Arizona Alliance II*"). In any event, the present case does not turn on a "First Amendment Right to film matters of public interest." *Arizona Alliance I,* 2022 WL 15678694, at *4 (quotation omitted).

**B.** **Defendants' conduct falls outside the First Amendment's protections because it is defamatory.**

Defendants' conduct is also unprotected by the First Amendment for an additional reason—it is defamatory. Threats are only one form of expression existing outside the Constitution's ambit; others include obscenity, incitement, and, as relevant here, defamation. *See United States v. Stevens*, 559 U.S. 460, 468 (2010); *see also Beauharnais v. People of State of Ill.*, 343 U.S. 250, 266 ("Libelous utterances [are not] within the area of constitutionally protected speech").

Under Georgia law, defamation has four elements: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1346 (N.D. Ga. 2018) (quoting *Smith v. DiFrancesco*, 341 Ga. App. 786, 787–88, 802 S.E.2d 69, 72 (2017)). This framework closely tracks Defendants' communications to third parties that targeted electors were ineligible to vote under Georgia law due to a residency change despite obvious indicators that the purported evidence of residency changes was unreliable.

*First*, these accusations were false: many of the individuals targeted by

Defendants, including Plaintiffs Jocelyn Heredia and Jane Doe, resided in the county where they were registered. *See* Pls.' Corrected Statement of Undisputed Material Facts ("SUMF"), ECF No. 171, ¶¶ 20, 28. *Second*, these accusations were published to county officials and to individuals participating in the challenge process. *See id.* ¶¶ 58, 65. While Georgia law recognizes a privilege for "[s]tatements made in good faith as part of an act in furtherance of the person's or entity's right of petition or free speech," O.C.G.A. § 51-5-7(4), "the failure to exercise ordinary care to reasonably ascertain the truth or accuracy of the statement may show a lack of good faith when the facts and circumstances require such exercise." *Smith v. Vencare, Inc.*, 519 S.E.2d 735, 741 (Ga. App. Ct. 1999). By ignoring blaring warning signs that their sloppy data analysis was misidentifying eligible registrants, *see* SUMF ¶¶ 66–77, Defendants demonstrated a recklessness—or worse—that refutes any good faith defense and easily satisfies the *third* element of defamation.

Regarding the *fourth* element, an individual who "imput[es] to another a crime punishable by law" is liable for defamation per se, and harm is inferred. O.C.G.A. § 51-5-4(a)(1), (b). In Georgia, individuals who attempt to vote without possessing the requisite qualifications—the substance of Defendants' accusations—commit a felony. *See id.* §§ 21-2-561, 21-2-571; *see also* Ga. Sec'y of State, *Secretary of State Brad Raffensperger Protects Runoffs from Out of State Voters* (Dec. 21, 2020),

https://sos.ga.gov/news/secretary-state-brad-raffensperger-protects-runoffs-out-state-voters (noting that, shortly after Defendants lodged their challenges, Secretary of State Raffensperger mailed notices to 8,000 Georgia registrants whose names appeared in the National Change of Address database warning that non-resident voting is punishable by up to 10 years in jail and a $100,000 fine). The Supreme Court has also explicitly recognized that the Constitution provides no refuge for individuals who falsely accuse a private individual of criminal conduct. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 326, 348 (1974) (rejecting First Amendment defense in libel action where "[t]he implication that petitioner had a criminal record was false").

Of course, Plaintiffs did not bring a claim for defamation, and so they bore no burden to plead or prove these precise elements. Rather, the conspicuous overlap between Defendants' conduct and what Georgia's defamation laws forbid confirms that the challenged conduct is not entitled to constitutional protection. Just as defamation law seeks to prevent false accusations from being communicated in a way that injures a private individual's reputation, the VRA seeks to prevent false accusations (or other intimidating speech) from being communicated in a way that interferes with an individual's right to vote. Because the right to vote—unlike the right to a clean reputation—is grounded in the Constitution, there can be no question

that statutory voting protections are even safer from First Amendment challenge than the state defamation laws that the Court has consistently blessed.[3]

### III. Assuming without deciding that Defendants' section 230 challenges are First Amendment protected petitions, what legal standard should be used to determine the petitions were baseless or frivolous?

The Supreme Court has made clear that the right to petition is not "absolute," and "there is no sound basis for granting greater constitutional protection to statements made in a petition . . . than other First Amendment expressions." *McDonald v. Smith*, 472 U.S. 479, 484–85 (1985). Thus, expression that is categorically unprotected under the First Amendment does not become protected when it is made in a petition. *See id.* Where false accusations do fall within the First Amendment's scope, Plaintiffs may be required to prove actual malice, just like defamation plaintiffs—that is, that Defendants' voter challenges were lodged "with

---

[3] The presumption against prior restraints in defamation cases does not apply here. As the Supreme Court has explained, Plaintiffs' requested injunction is not a prior restraint because the requested injunction will apply only after this Court's determination of Defendants' "prior unlawful conduct," and Defendants "are not prevented from expressing their message in any one of several different ways." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 763 n.2 (1994). Second, injunctive relief is the *only* available remedy in this context because voting rights violations, unlike defamation, cannot be remedied by damages. *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (finding voting rights injuries are irreparable because "once the election occurs, there can be no do-over and no redress"); *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005) (similar).

knowledge" that they were false "or with reckless disregard of whether" they were false. *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964). As discussed above, this heightened mens rea standard also matches Georgia's protection for speech made in furtherance of the constitutional right to petition. *See* O.C.G.A. § 51-5-7(4); *Smith*, 519 S.E.2d at 741. But the petitioning context does not impose a higher standard than that. *See McDonald*, 472 U.S. at 484–85.

The First Amendment does not license baseless, frivolous challenges targeted at eligible voters; at most, it provides a buffer against liability for mistaken allegations made in good faith. *See N.Y. Times Co.*, 376 U.S. at 282 n.21 (recognizing conditional privilege for "honest misstatements of fact"). If Defendants had challenged only registrants who, based on a thorough investigation, reasonably appeared to be removable from the voter rolls under state and federal law, those challenges might be protected *even if* the registrants were in fact entitled to vote and the challenges were based on hidden errors in the underlying records. But while challengers should not be held liable for third-party mistakes that could not have been discovered through ordinary diligence, the facts of this case tell a very different story and are entitled to no protection.

Defendants were not the victims of difficult-to-detect, third-party mistakes; they used a flagrantly inadequate methodology conducted by partisan activists with

29

a history of publicizing deceitful claims about voter eligibility, all in an effort to strip
Georgia registrants of protections guaranteed by the National Voter Registration Act
and burden their ability to cast a ballot. *See, e.g.*, SUMF ¶¶ 66–111. Defendants *knew*
their mass challenges were vastly overinclusive, ensnaring innocent victims whose
only "fault" was enrolling in college, or joining the military, or sharing a name with
someone who moved. *See, e.g.*, *id.* ¶¶ 66 (admitting Defendants knew challenges to
military voters would impose burden), 85 (admitting Defendants knew the
imperative of verifying identity for voter challenges), 96 (admitting Defendants
knew data errors were included in the challenge file and should have been removed),
97 (admitting Defendants knew that validly registered voters were included in the
challenge file), 100 (admitting Defendants chose not to carefully review the
challenge file for errors), 107, (admitting Defendants did not perform necessary
analysis to remove military voters from challenge file), 108 (admitting students
remain eligible to vote at their original resident), 109 (finding overwhelming
likelihood that students were wrongfully included in the challenge file), 112–25
(cataloging warnings Defendants received from allies of the challenge file's
unreliability). At the very least, Defendants recklessly disregarded whether each of
the more than 250,000 registrants targeted by their challenge program was, in fact,
ineligible to vote under Georgia law. *See Reid v. Viacom Int'l Inc.*, Civ. Action No.

1:14-CV-1252-MHC, 2017 WL 11634619, *4 (N.D. Ga. Sept. 22, 2017) (holding a finding of reckless disregard "can be made if the objective evidence establishes 'obvious reasons to doubt the veracity of the informant or the accuracy of his reports'") (quoting *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968)).  Whatever good faith mistakes the First Amendment may excuse, it cannot save the systematic carelessness—and worse—exhibited here.

## IV.   Please elaborate on the use of vote dilution as a defense to a Section 11(b) claim.

No court has ever recognized vote dilution as a defense to a Section 11(b) claim, for good reason: any interest individuals maintain in preventing the dilution of their own voting power by the counting of unlawful ballots cannot possibly justify the intimidation of eligible voters whose ballots are entirely lawful. And that is the crux of Plaintiffs' claim, proved by undisputed evidence: Defendants' course of conduct was objectively intimidating to *lawful Georgia voters* such as Jocelyn Heredia and Jane Doe, who could not have "diluted" anyone's vote in any cognizable way. Whether individuals have a right to intimidate *ineligible* voters, as Defendants appear to propose, is immaterial. That counterfactual scenario has nothing to do with the facts at hand.

Additionally, "vote dilution" is not some self-enforcing incantation that

immunizes voting-rights violators from legal liability—if it were a real affirmative defense, it would have to be proven. *See Int'l Stamp Art, Inc. v. U.S. Postal Serv.*, 456 F.3d 1270, 1274 (11th Cir. 2006) (per curiam) ("If the movant bears the burden of proof on an issue, because, as a defendant, it is asserting an affirmative defense, it must establish that there is no genuine issue of material fact as to any element of that defense."). Here, Defendants do not identify a single element of the putative defense, let alone marshal evidence to establish that all of its elements are uncontested. Their motion for summary judgment offers only three conclusory sentences, without any citation to evidence, for the notion that Defendants have a right to disenfranchise other voters in service of maximizing the weight of their own ballots. *See* Defs.' Mot. Summ. J. at 29, ECF No. 155-1. Their statement of supporting facts, meanwhile, offers only a solitary reference to dilution in the irrelevant contention that "Mr. Davis supports efforts 'to clean up voter rolls and ensure people don't vote with residency issues because they're casting ballots for people who don't represent them' and diluting the votes of eligible voters." Defs.' Statement of Undisputed Facts ¶ 110, ECF No. 155-2. Such paltry contentions are not remotely sufficient to make out an affirmative defense.

In addition, for Defendants to pursue a vote dilution defense, they would have to establish standing, which they concede they do not have. Where a defendant

"raises a true affirmative defense seeking to litigate questions not encompassed by plaintiff's case-in-chief . . . defendant's posture is wholly analogous to that of a plaintiff in a typical standing dispute." *FDIC v. Main Hurdman*, 655 F. Supp. 259, 269 (E.D. Cal. 1987). "There appears to be no reason in logic not to require a defendant who seeks to litigate the lawfulness of the government's conduct in such a context to demonstrate its right to obtain a judicial determination of its contention." *Id.*; *see also id.* (noting "in criminal cases where the government is the plaintiff, defendants must demonstrate standing to raise issues, even issues of constitutional dimension").

Here, Defendants expressly challenge government conduct, asserting that "[j]udicial enforcement of § 11(b)" will violate their "right to vote via vote dilution." Defs.' Mot. Summ. J. at 29. But as they concede in their reply brief, any claim for vote dilution would need to be "rejected for lack of standing." Defs.' Reply in Supp. of Mot. Summ. J. ("Defs.' Reply") at 13.[4] They are exactly right: courts have made clear again and again that a voter's generalized grievances about unlawful voting are

---

[4] Seeking to mitigate this apparent defect, Defendants miscite *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016), for the notion that only plaintiffs can be required to establish standing. Defs.' Reply at 13. But *Spokeo* merely reiterated that the burden falls on "the party invoking federal jurisdiction." 578 U.S. at 338. As *Main Hardman* explains, in the context of an affirmative defense challenging government conduct, that burden passes to defendants. 655 F. Supp. at 269.

not entitled to any legal redress, "even if the error might have a mathematical impact on the final tally and thus on the proportional effect of every vote." *Wood v. Raffensperger*, 981 F.3d 1307, 1314 (11th Cir. 2020) (internal quotations omitted); *see also Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 389 (W.D. Pa. 2020) (rejecting "inverted theory of vote dilution" as a matter of standing and on the merits). Since the 2020 election, dozens of parties have brought versions of Defendants' "vote dilution via fraud" argument, which courts across the nation have consistently and resoundingly rejected.[5] Because Defendants assert nothing

---

[5] *E.g.*, *Wood v. Raffensperger*, No. 20-14813, 2021 WL 3440690 (11th Cir. Aug. 6, 2021), *cert. denied,* 212 L. Ed. 2d 218 (Feb. 28, 2022); *Soudelier v. Dep't of State Louisiana*, No. CV 22-2436, 2022 WL 17283008, *3 (E.D. La. Nov. 29, 2022); *Washington Election Integrity Coal. United v. Anderson*, No. 3:21-CV-05726-LK, 2022 WL 4598503, *5 (W.D. Wash. Sept. 30, 2022); *Washington Election Integrity Coal. United v. Kimsey*, No. 3:21-CV-05746-LK, 2022 WL 4598507, *4 (W.D. Wash. Sept. 30, 2022); *O'Rourke v. Dominion Voting Sys. Inc.*, No. 20-CV-03747-NRN, 2021 WL 1662742, *14 (D. Colo. Apr. 28, 2021), *aff'd,* No. 21-1161, 2022 WL 1699425 (10th Cir. May 27, 2022), *cert. denied,* No. 22-305, 2022 WL 17408191 (U.S. Dec. 5, 2022); *Wood v. Raffensperger*, No. 1:20-CV-5155-TCB, 2020 WL 7706833, *3-*5 (N.D. Ga. Dec. 28, 2020); *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 376-410 (W.D. Pa. 2020); *Bowyer v. Ducey*, 506 F.Supp.3d 699, 711-713 (D. Ariz. 2020); *Donald J. Trump for President, Inc. v. Cegavske*, 488 F. Supp. 3d 993 (D. Nev. 2020); *Paher v. Cegavske*, 457 F. Supp. 3d 919 (D. Nev. 2020); *Bolus v. Boockvar*, No. 3:20-CV-01882, 2020 WL 6880960, *4 (M.D. Pa. Oct. 27, 2020), *report and recommendation adopted,* No. 3:20-CV-1882, 2020 WL 6882623 (M.D. Pa. Nov. 23, 2020); *King v. Whitmer*, 505 F. Supp. 3d 720, 734-35 (E.D. Mich. 2020); *Martel v. Condos*, 487 F. Supp. 3d 247, 253 (D.

more than that potentially ineligible voters might have registered a mathematical impact on the final tally, their defense necessarily fails.

In addition to this fundamental doctrinal flaw, Defendants' invocation of a vote dilution defense involves a series of case-specific gaffes. The notion that Defendants' votes might be diluted presupposes that they themselves are eligible and actual voters. But Defendants have not established this obvious threshold requirement, and at least some of them will not be able to: True the Vote, Inc., for instance, is not a natural person and thus is not eligible to vote in any election; and Catherine Engelbrecht, a Texas resident, is ineligible to vote in Georgia. *See* Pls.' SUMF ¶ 38. To have a complete defense, Defendants would also have to show that all the voters they challenged were actually ineligible—something they have not done and cannot do because many of the challenged voters, including Plaintiffs in this case, have been lawful Georgia voters the entire time.

Defendants' lone citations reveal just how untethered this "defense" is to any legal precedent. *See* Defs.' Mot. Summ. J. at 29. In *Reynolds v. Sims*, Alabama failed

---

Vt. 2020); *Moore v. Circosta*, 494 F. Supp. 3d 289 (M.D.N.C. 2020); *Feehan v. Wisconsin Elections Comm'n*, No. 20-CV-1771-PP, 2020 WL 7250219 (E.D. Wis. Dec. 9, 2020); *Donald J. Trump for President, Inc. v. Way*, No. CV2010753MASZNQ, 2020 WL 6204477, *6 (D.N.J. Oct. 22, 2020).

to reapportion its electoral districts for 60 years, resulting in state senate districts with population deviations of 41:1. 377 U.S. 533, 545 (1964).[6] In that specific context, the Supreme Court found vote dilution cognizable. Here, in stark contrast, Defendants posit that their hunch that some non-residents might have intended to vote in Georgia's January 2021 Senate runoff elections authorized frivolous challenges against actual Georgia residents. Under this principle, a vigilante would be entitled to menace every perceived immigrant on election day on the suspicion that some of the immigrants might be ineligible non-citizens. Such a theory is offensive to every notion of American democracy, which is why Congress expressly outlawed it in Section 11(b) of the VRA. "Vote dilution" simply does not exist as an affirmative defense to this claim. And even if it did, Defendants have done nothing to prove it.

## V. Are the aforementioned constitutional defenses asserted as facial or as-applied challenges to Section 11(b)?

The distinction between facial constitutional challenges and as-applied challenges goes to the breadth of the remedy employed by the court, not what must

---

[6] Defendants also cite without explanation *Bush v. Gore*, 531 U.S. 98 (2000). *See* Defs.' Mot. Summ. J. at 29. *Bush*, a case about uniform standards for a statewide election recount, quotes *Reynolds* in an introductory paragraph about voting rights. 531 U.S. at 105. It does not mention—let alone support—vote dilution as a defense in a Section 11(b) case.

be pleaded by a party. *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). Where a party argues that a "law or policy at issue is unconstitutional in all its applications," the challenge is facial. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1127 (2019). And "where the [challenge] and the relief that would follow reach beyond the particular circumstances of the [party] they must satisfy the standards for a facial challenge to the extent of that reach." *Ctr. for Individual Freedom v. Madigan*, 697 F.3d 464, 475 (7th Cir. 2012) (internal quotations omitted); *AFSCME Council 79 v. Scott*, 717 F.3d 851, 863 (11th Cir. 2013). Because Defendants' constitutional defenses, if successful, would invalidate Section 11(b) in virtually all of its applications, they are functionally facial challenges, whatever Defendants may call them.

### A. Defendants' purported First Amendment defense is a facial challenge to Section 11(b).

Defendants describe their First Amendment defense as an "as-applied" challenge, but in substance it is a facial challenge because, if granted, it would render all meaningful applications of Section 11(b) unconstitutional.

Many cases in which relief has been granted under Section 11(b) involved speech or other expressive conduct. Courts have granted relief against defendants for making public statements about sending armed private security guards to polling places, *Council on Am.-Islamic Rels.—Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371 (D. Minn. 2020), publishing a report accusing voters of committing crimes and

illegally registering to vote, *LULAC*, 2018 WL 3848404, using robocalls that suggested voting records would be used to track down people with outstanding warrants or debts, *Wohl I*, 498 F. Supp. 3d at 457, *see also, Wohl II*, 512 F. Supp. 3d at 500 , and urging political supporters to monitor "certain areas" for voter fraud, *Ohio Democratic Party v. Ohio Republican Party*, No. 16-CV-02645, 2016 WL 6542486 (N.D. Oh. 2016). In each case speech or expressive conduct was at issue and in each case the court issued an injunction limiting that speech or conduct. Defendants' assertion of a First Amendment defense to Section 11(b) claims would reach all such cases, making it effectively a facial challenge.

To accept Defendants' First Amendment defense would also leave Section 11(b) entirely redundant with existing laws. The few Section 11(b) cases that did not exclusively involve speech or expressive conduct involved acts that would be patently unlawful independent of Section 11(b), like mob attacks and unlawful arrests, *United States v. Clark*, 249 F. Supp. 720 (S.D. Ala. 1965), physically blocking a voter from entering a polling place, *Rhodes v. Siver*, No. 19-12550, 2021 WL 1565137 (E.D. Mich., Feb. 1, 2021) [magistrate judge's report & recommendation], and pepper spray attacks on citizens walking to polling places, *Allen v. City of Graham*, Nos. 1:20-CV-997, 1:20-CV-998, 2021 WL 2223772

(M.D.N.C. June 2, 2021). Thus, accepting Defendants' defense would leave Section 11(b) with no independent significance.

## B. Defendants' purported vote dilution defense is a facial challenge to Section 11(b).

Defendants' vote dilution defense is also a facial challenge. Defendants have failed to offer any evidence specific to this case in support of their vote dilution claim, even using their own tortured definition of vote dilution. In particular, Defendants offer no evidence of actual vote dilution, *supra* Part IV, and the undisputed facts show that Defendants knew their allegations of unlawful voting were faulty, *supra* Part II.b. Rather, Defendants argue only that their actions *could have* prevented unlawful votes. Were the Court to accept Defendants' hypotheticals, however, such a defense would be available to any defendant in a Section 11(b) case, because Defendants will always argue that they are trying to prevent ineligible voters from voting. As a result, Defendants' vote dilution defense amounts to a facial challenge to Section 11(b).

## C. Defendants' various vagueness defenses are facial challenges to Section 11(b).

Finally, Defendants' assertion that Section 11(b) is vague represents a facial challenge because Defendants do not argue that the statute's applicability to their actions—launching a quarter of a million baseless challenges accompanied by a

blaring media campaign—is in any way vague. None of the facts or hypotheticals offered by Defendants reflect their own circumstances. Defendants point to the General Assembly's adoption of language stating that there would be no limit on the number of § 230 challenges, but that law was passed well after Defendants launched their challenges. Defs.' Mot. Sum. J. at 30-31. Defendants' ask hypothetically whether "One? Ten? [or] 20?" challenges might be intimidating but ignore the fact that the primary problem with the challenges here was not merely their magnitude but their *utter frivolity*. *Id.* at 31. As with the arguments above, Defendants' purported vagueness defense reaches beyond the circumstances of their case and so must meet the standards for a facial challenge.

Not only do these arguments render the challenge facial, they also ignore the fact that in the context of the Fifth and Fourteenth Amendments, on which Defendants rely, Defs.' Mot for Sum. J. at 30, "[a] [challenger] who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 495 (1982). After initially asserting their vagueness defense under the Fifth and Fourteenth Amendments, Defendants again try to prop up their argument by invoking the First Amendment, Defs.' Mot. For Summ. J. at 31, where the Supreme Court has slightly relaxed this rule. But even when challenged under

the First Amendment, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *United States v. Williams*, 553 U.S. 285, 304 (2008). Because Defendants engaged in behavior plainly proscribed by Section 11(b), their vagueness defense—whether characterized as facial or as-applied—necessarily fails.

Respectfully submitted, this 17th day of January, 2023.


Allegra J. Lawrence
Georgia Bar No. 439797
Leslie J. Bryan
Georgia Bar No. 091175
Maia Cogen
Georgia Bar No. 832438
Michelle L. McClafferty
Georgia Bar No. 161970
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-
hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com
michelle.mcclafferty@lawrencebundy.com

*/s/ Uzoma N. Nkwonta*
Marc E. Elias*
Uzoma N. Nkwonta*
Christina A. Ford*
Tina Meng*
Marcos Mocine-McQueen*
Joel J. Ramirez*
Jacob D. Shelly*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
melias@elias.law
unkwonta@elias.law
cford@elias.law
tmeng@elias.law
mmcqueen@elias.law
jramirez@elias.law
jshelly@elias.law


*Counsel for Plaintiffs*
*Admitted pro hac vice

## CERTIFICATE OF COMPLIANCE

Pursuant to LR 7.1(D), N.D. Ga., I hereby certify that the foregoing ***Plaintiffs'*** ***Supplemental Briefing on Cross-Motions for Summary Judgment*** has been prepared in accordance with the font type and margin requirements of LR 5.1, N.D. Ga., using a font type of Times New Roman and a point size of 14.

This 17th day of January, 2023          */s/ Uzoma N. Nkwonta*

                                                    Uzoma N. Nkwonta
                                                    *Counsel for Plaintiffs*


## CERTIFICATE OF SERVICE

I hereby certify that I have this day served a copy of the within and foregoing ***Plaintiffs' Supplemental Briefing on Cross-Motions for Summary Judgment*** with the Clerk of Court using the CM/ECF system, which will automatically send-e-mail notification to all counsel of record.

This 17th day of January, 2023

                                                    */s/ Uzoma N. Nkwonta*

                                                    Uzoma N. Nkwonta
                                                    *Counsel for Plaintiffs*