## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| FAIR FIGHT, INC., SCOTT BERSON, JOCELYN HEREDIA, and JANE DOE, | |
| Plaintiffs, | |
| v. | |
| TRUE THE VOTE, CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1-10, | Case No. 2:20-cv-00302-SCJ |
| Defendants. | |

## BRIEF OF *AMICUS CURIAE* PROTECT DEMOCRACY PROJECT IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. ii

AMICUS CURIAE'S IDENTITY, INTERESTS, & AUTHORITY TO FILE .1

CORPORATE DISCLOSURE STATEMENT ....................................................2

INTRODUCTION....................................................................................2

ARGUMENT AND CITATION OF AUTHORITY ............................................3

I.   Neither *Mens Rea* nor Causation is a Required Element of a Section 11(b) Claim ...............................................................................3

  A. Section 11(b) has no *mens rea* requirement, and prohibits defaming voters, making false statements about the consequences of electoral participation, and harassing and intrusive monitoring of voters .............................................................4

  B. Section 11(b) has no direct causation requirement; instead, it prohibits both direct and indirect forms of intimidation ...............9

II.  Defendants' conduct may well constitute true threats; moreover, the true threats exception does not encompass all types of conduct that can be constitutionally regulated by Section 11(b) ........................................11

  A. True threats need not threaten physical violence .........................12

  B. Even if Defendants' conduct does not constitute a true threat, the true threats exception does not determine the outer boundaries for applying Section 11(b) constitutionally .....................................14

  C. Section 11(b) is narrowly tailored to achieve compelling governmental interests ....................................................................17

CONCLUSION....................................................................................23

# TABLE OF AUTHORITIES

## CASES

*Allen v. City of Graham*
2021 WL 2223772 (M.D.N.C. June 2, 2021) ..........................................................5

*Andrews v. D'Souza*
No. 1:22-CV-4259-SDG (N.D. Ga.). .........................................................................1

*Arizona Alliance v. Clean Elections*
2022 WL 17088041 (D. Ariz. Nov. 1, 2022)..........................................1,7,8,16, 17

*Broadrick v. Oklahoma*
413 U.S. 601 (1973).............................................................................................22

*Burson v. Freeman*
504 U.S. 191 (1992)....................................................................................17,18,21

*Citizens for Police Accountability Pol. Comm. v. Browning*
572 F.3d 1213 (11th Cir. 2009) ...........................................................................18

*Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC*
497 F. Supp. 3d 371 (D. Minn. 2020).....................................................................9

*Giboney v. Empire Storage & Ice Co.*
336 U.S. 490 (1949)..............................................................................................15

*Gertz v. Robert Welch, Inc.*
418 U.S. 323 (1974)..............................................................................................15

*Illinois v. Telemarketing Assocs., Inc.*
538 U.S. 600 (2003)..............................................................................................15

*Katzenbach v. Original Knights of the Ku Klux Klan,*
250 F. Supp. 330 (E.D. La. 1965)..........................................................................6

*King v. Cook*
298 F. Supp. 584 (N.D. Miss. 1969) ........................................................................10

*League of United Latin American Citizens v. Public Interest*
2018 WL 3848404 (E.D. Va. Aug. 13, 2018) .........................................................1,5

*Minn. Voters All. v. Mansky*
138 S. Ct. 1876 (2018) .............................................................................................16

*Munro v. Socialist Workers Party*
479 U.S. 189 (1986) .................................................................................................22

*National Coalition v. Wohl*
498 F. Supp. 3d 457 (S.D.N.Y. 2020) ..............................................................7,13,18

*New York ex rel. Spitzer v. Cain*
418 F. Supp. 2d 457 (S.D.N.Y. 2006) .....................................................................14

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc.,*
547 U.S. 47 (2006) .....................................................................................................4

*Sosa v. Alvarez-Machain*
542 U.S. 692 (2004) .................................................................................................11

*Thunder Studios, Inc. v. Kazal*
13 F.4th 736 (9th Cir. 2021) ....................................................................................12

*United States v. Alaboud*
347 F.3d 1293 (11th Cir. 2003) ...............................................................................12

*United States v. Alvarez*
567 U.S. 709 (2012) .................................................................................................16

*United States v. Beaty*
288 F.2d 653 (6th Cir. 1961) .....................................................................................6

*United States v. Bd. of Educ.*
332 F.2d 40 (5th Cir. 1964) .....................................................................................19

iii

*United States v. Bruce*
353 F.2d 474 (5th Cir. 1965) ...................................................................6

*United States v. Martinez*
736 F.3d 981 (11th Cir. 2013) ...............................................................12

*United States v. Nguyen*
673 F.3d 1259 (9th Cir. 2012) ...............................................................13

*United States v. N.C. Republican Party*
No. 92-161-CIV-5-F (E.D.N.C. Feb. 26, 1992) ...................................7,8

*United States v. Stevens*
559 U.S. 460 (2010) ...........................................................................14,15

*United States v. Turner*
720 F.3d 411 (2d Cir. 2013)...................................................................13

*Virginia v. Black*
538 U.S. 343 (2003) ...............................................................................12

*Virginia v. Hicks*
539 U.S. 113 (2003) ...............................................................................22

*Williams-Yulee v. Fla. Bar*
575 U.S. 433 (2015) ...........................................................................18,21

## STATUTES

52 U.S.C. § 10307(b) ......................................................................*passim*

18 U.S.C. § 594 .......................................................................................6

52 U.S.C. § 10101(b) ......................................................................*passim*

**OTHER AUTHORITIES**

Jen Fifield, *Dropbox watchers in Arizona connected to national effort from "2000 Mules" creators*, Votebeat (Oct. 27, 2022) ............................................................17

Kent Greenawalt, Speech, Crime, and the Uses of Language (1989) .....................14

Richard Hasen, *Drawing the Line Between False Election Speech and False Campaign Speech*, Knight First Am. Instit. (Oct. 21, 2021) ...................................16

H.R. Report No. 89-439 (1965) ........................................................................3,5,21

Richard C. Pilger, *Federal Prosecution of Election Offenses* (8th ed. 2017) ...........6

Report of the U.S. Comm'n on Civil Rights (1959)................................................21

1964 Status Report of the Civil Rights Division of the Department of Justice: Hearing Before the S. Comm. on the Judiciary, 89th Cong. 1175 (1965) ..............10

Voting Rights Act of 1965: Hearing Before the H. Comm. on the Judiciary, 89th Cong. (1965) ...................................................................................................5,19,20

U.S. Comm'n on Civil Rights Report, *Voting* (1961) .....................................*passim*

U.S. Comm'n on Civil Rights Report, *Civil Rights '63* (1963)..............................20

U.S. Comm'n on Civil Rights Report, *Voting in Mississippi* (1965) ...............*passim*

**AMICUS CURIAE'S IDENTITY, INTERESTS, & AUTHORITY TO FILE**

The Protect Democracy Project is a nonpartisan, nonprofit organization dedicated to preventing our democracy from declining into a more authoritarian form of government. It engages in litigation and other nationwide advocacy to protect free and fair elections, and has brought several actions with claims under Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b). Protect Democracy thus is interested in assisting courts in correctly interpreting the statutory provision and the legal issues concerning it. *See, e.g.*, *League of United Latin American Citizens - Richmond Region Council 4614 v. Public Interest Legal Foundation* ("*LULAC*"), No. 1:18-CV-00423, 2018 WL 3848404, at *1 (E.D. Va. Aug. 13, 2018) (counsel for plaintiffs); *Arizona All. for Retired Ams. v. Clean Elections USA*, No. 22-1823, 2022 WL 17088041, at *2 (D. Ariz. Nov. 1, 2022) (counsel for plaintiff League of Women Voters Arizona). And Protect Democracy has a strong interest in this Court's interpretation of Section 11(b) because it represents plaintiffs in a Section 11(b) claim against some of the Defendants in this case in another matter in this District, *Andrews v. D'Souza*, No. 1:22-CV-4259-SDG (N.D. Ga.).

Plaintiffs consent to *Amicus Curiae* Protect Democracy Project filing this brief. Defendants' counsel responded to Amicus's request for consent as follows:

"Defendants object as this brief is not timely and would be filed after we have an opportunity to respond." The United States responded that it takes no position.[1]

## CORPORATE DISCLOSURE STATEMENT

The Protect Democracy Project is a nonprofit organization with no parent corporation and in which no person or entity owns stock. *See* Amicus's contemporaneously-filed Certificate of Interested Persons and Corporate Disclosure Statement.

## INTRODUCTION

In this Court's order inviting supplemental briefing, it inquired into several discrete issues, including the proper interpretation of Section 11(b) and the categorical "true threats" exception to the First Amendment. Dkt. 184. Amicus submits this brief to make two points regarding these topics:

- Under the ordinary rules of statutory interpretation, Section 11(b) should be interpreted to have no *mens rea* requirement and to cover non-violent conduct that deters or seeks to deter electoral participation.

- "True threats" are not limited to threats of physical violence, but encompass a broader range of threats that cause emotional disturbance. Further, the true

---

[1] No party or party's counsel authored any part of this brief or made a monetary contribution intended to fund the preparation or submission of this brief.

threats exception is merely one among several categorical exceptions to the First Amendment; it alone does not encompass all types of conduct that Section 11(b) may constitutionally regulate. Thus, even if this Court concludes that certain of Defendants' acts do not amount to true threats, other constitutional paths remain available to impose liability under Section 11(b).

Amicus takes no position on the underlying factual allegations in the case, except to note that the allegations—if proven—would establish a violation of Section 11(b) that would be unprotected by the First Amendment.

## ARGUMENT AND CITATION OF AUTHORITY

### I. Neither *Mens Rea* nor Causation is a Required Element of a Section 11(b) Claim

Section 11(b) of the Voting Rights Act prohibits any person from intimidating, threatening, or coercing any other person—or attempting to do so—for voting, attempting to vote, or urging or aiding another person to vote or attempt to vote. Section 11(b) does not require "subjective purpose or intent." H.R. Rep. No. 89-439, at 30 (1965). Nor is it limited to threats of violence, or, as Defendants suggest, to actions or communications involving direct contact with voters.

### A. Section 11(b) has no *mens rea* requirement, and prohibits defaming voters, making false statements about the consequences of electoral participation, and harassing and intrusive monitoring of voters

As the Supreme Court has instructed, courts should not adopt interpretations of statutes that presume that Congress has engaged in "a largely meaningless exercise." *Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 57–58 (2006) ("*FAIR*"). Thus, when interpreting the text of Section 11(b), it is vital to compare it to its predecessor statute passed just eight years earlier: Section 131(b) of the Civil Rights Act of 1957 (now codified at 52 U.S.C. § 10101(b)).

In Section 131(b), Congress banned *intentional* voter intimidation in federal elections. The provision stated:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person *for the purpose of* interfering with the right of such other person to vote or to vote as he may choose . . . .

71 Stat. 634, 637 (emphasis added). Just eight years later, Congress saw a need to return to the topic and passed a broader ban on voter intimidation in Section 11(b) of the Voting Rights Act of 1965 (now codified at 52 U.S.C. 10307(b)), which states:

> No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote, or intimidate,

> threaten, or coerce, or attempt to intimidate, threaten, or coerce any
> person for urging or aiding any person to vote or attempt to vote . . . .

Then-Attorney General Nicholas Katzenbach, who helped write the 1965 Act,

explained how Section 11(b) would address the inadequacies of its predecessor

statute. He noted that "many types of intimidation, particularly economic

intimidation," proved hard to prosecute under Section 131(b) because of its textual

proof-of-intent requirement. Voting Rights Act of 1965: Hearing Before the H.

Comm. on the Judiciary, 89th Cong. 12 (1965) (statement of Nicholas deB.

Katzenbach, Att'y Gen. of the U.S.), https://perma.cc/N9S4-KH2P. Hence, the

intent requirement was scrapped, *see, e.g.*, H.R. Rep. No. 89-439, at 30 (1965), and

plaintiffs bringing Section 11(b) claims need not prove an intent to intimidate, *see,
e.g.*, *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub.
Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *3-4 (E.D. Va. Aug.

13, 2018) ("*LULAC*"); *cf. Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL

2223772, at *8 (M.D.N.C. June 2, 2021) (Section 11(b) "does not directly mention

intent").

But while the statutory text regarding *mens rea* changed from Section 131(b)

to Section 11(b), the statutory text specifying what was prohibited—namely

actions that "intimidate, threaten, or coerce"—stayed the same. Thus, because

Section 131(b) was already understood at the time to ban non-violent forms of intimidation, Section 11(b) should be interpreted to do the same.[2]

Taking both points together, Section 11(b) should be interpreted to ban at least three categories of nonviolent conduct—regardless of defendants' intent—that may be implicated here should Plaintiffs prove their case:

**First, falsely stating or implying that lawful voters are unlawful voters can constitute illegal voter intimidation.** For example, in *LULAC*, a federal district court recognized that publishing a report with lawful voters' personally identifying information and wrongly identifying them as potential felons stated a claim under Section 11(b). *See* 2018 WL 3848404 at *1, 4; *cf. Katzenbach v. Original Knights of the Ku Klux Klan*, 250 F. Supp. 330, 342 (E.D. La. 1965) (Wisdom, J.) (noting, of the Klan's intimidation tactics in the 1960s, "sometimes

---

[2] The phrase "intimidate, threaten, or coerce" comes from the Hatch Act of 1939, *see* 18 U.S.C. § 594, which was understood to apply to non-violent conduct such as economic coercion. *See* Richard C. Pilger, *Federal Prosecution of Election Offenses* 52 (8th ed. 2017) (explaining that the Hatch Act "applies to conduct which interferes, or attempts to interfere, with an individual's right to vote by placing him or her in fear of suffering other kinds of tangible and intangible losses"). Courts apply this language in Section 131(b) the same way. *See, e.g.*, *United States v. Bruce*, 353 F.2d 474, 476-77 (5th Cir. 1965) (landowners invoking state trespass law to bar an insurance collector who had registered to vote from their property); *United States v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961) (evicting or canceling contracts with individuals who register to vote).

the attempted intimidation is by threat of violence, sometimes by character assassination"). And more recently, in *Arizona Alliance for Retired Americans. v. Clean Elections USA*, a federal district court issued a temporary restraining order enjoining the defendants and their agents from publicly posting photographs of Arizona voters online and baselessly implying that they are ballot "mules" casting illegal ballots. *See* No. 22-1823, 2022 WL 17088041, at *1-2 (D. Ariz. Nov. 1, 2022).

**Second, making false statements about the consequences of voting or false suggestions that voters could be penalized for voting.** In *National Coalition on Black Civic Participation v. Wohl* ("*Wohl I*"), to pick a recent example, the district court entered a temporary restraining order halting defendants from engaging in robocalls falsely informing would-be mail-in voters that voting by mail would get them placed on lists for warrant checks, credit checks, and mandatory vaccinations. 498 F. Supp. 3d 457, 465 (S.D.N.Y. 2020).[3]  Likewise, in *United States v. North Carolina Republican Party*, the United States alleged that the North Carolina Republican Party violated Section 11(b) when they sent

---

[3] Courts have similarly interpreted state laws prohibiting voter intimidation to prohibit such conduct.  *See United States v. Nguyen*, 673 F.3d 1259, 1261, 1265 (9th Cir. 2012).

postcards to voters falsely warning them that they were not eligible to vote in an upcoming election. *See* Compl. ¶¶ 29–31, *United States v. N.C. Republican Party*, No. 92-161-CIV-5-F (E.D.N.C. Feb. 26, 1992), Dkt. No. 1. That case ultimately settled with a consent decree. *See id.* Dkt. No. 2.

**Third, monitoring voting locations and voter registration activities in intimidating or threatening fashion, particularly when coupled with harassing conduct directed at individual voters.** The United States has a long and sordid history of intimidating and harassing voter surveillance,[4] which district courts have enjoined under Section 11(b). In *Daschle v. Thune*, for instance, a federal court enjoined individuals acting on behalf of a Senate candidate from following voters from a polling place and copying their license plates. *See* No. 04-cv-4177, Dkt. 6, at 2 (D.S.D. Nov. 2, 2004). And again, in *Arizona Alliance*, the district court enjoined defendants and their associates from showing up armed and in military-style tactical gear to monitor voting locations, proclaiming that they are hunting "mules," asking voters if they are mules, and photographing and filming

---

[4] *See, e.g.*, *Original Knights of Ku Klux Klan*, 250 F. Supp. at 341(describing members of the Klan showing up in Franklinton, Louisiana, to observe Black individuals registering to vote as part of an unlawful intimidation campaign); *see also infra* nn. 5,17 (noting variations of monitoring tactics in other states that deterred electoral participation).

voters and their license plates. 2022 WL 17088041, at *1-2; *see also Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 379, 381 (D. Minn. 2020) (granting preliminary injunction under Section 11(b) against deploying armed guards at polls).

As applicable here, if Plaintiffs were to establish that Defendants (1)(a) made false statements about either the eligibility of particular voters *or* (1)(b) the consequences of electoral participation, *or* (2) engaged in harassing or intimidating monitoring tactics, and such conduct would have intimidated reasonable voters, Plaintiffs would have established a violation of Section 11(b) regardless of Defendants' intent in taking those actions.

### B. Section 11(b) has no direct causation requirement; instead, it prohibits both direct and indirect forms of intimidation

Defendants urge that Section 11(b) applies only where "the action or communication [at issue is] directed toward specific voters." Dfs.' Reply, Dkt. 176, at 3. In "virtually all" cases involving violations of Section 11(b) and other voter intimidation statutes, Defendants argue, "the defendants directly communicated the intimidating message, or acted in an intimidating manner, to the voters themselves or to people attempting to register voters." Dfs.' MSJ Br., Dkt. 155-1, at 6.

Defendants cite no statutory text to support their argument and are wrong on the case law. *LULAC*, for example, involved no direct contact with intimidated voters. Rather, the defendants in that case issued a publication containing defamatory statements to the media and the public at large. *See* 2018 WL 3848404 at *1. Moreover, intimidation schemes based on publication of voter information—and not necessarily involving direct contact—were both widespread and recognized as effective at deterring electoral participation at the time Section 11(b) was drafted.[5] There's no reason to assume that the drafters of Section 11(b)—who sought to use every legislative tool available to create a functioning democracy for

_____

[5] *See, e.g.*, *King v. Cook*, 298 F. Supp. 584, 587 (N.D. Miss. 1969) (noting how Mississippi law requiring publication of potential registrants deterred voter registration efforts); 1964 Status Report of the Civil Rights Division of the Department of Justice: Hearing Before the S. Comm. on the Judiciary, 89th Cong. 1175, 1291–92 (1965) (documenting, for example, a case under Section 131(b) where white citizens of Haywood County, Tennessee, circulated a list of Black citizens to be threatened with eviction, loss of jobs, and denial of credit after they began registering to vote), *available at* https://www.google.com/books/edition/Hearings/abnSKGQrdhMC?hl=en; U.S. Comm'n on Civil Rights Report, *Voting in Mississippi*, 61 (1965) (explaining how Mississippi law intimidates voters by requiring the publication of the name and address of any applicant), *available at* https://www.google.com/books/edition/Voting_in_Mississippi/uXjjvQEACAAJ; U.S. Comm'n on Civil Rights Report, *Voting*, 67 (1961) (explaining how Black Americans "who went to register in Madison Parish in July 1960 were referred to the sheriff—a not-too-subtle form of intimidation"), *available at* https://www.crmvet.org/docs/ccr_61_voting.pdf.

all Americans—intended to create such an easily exploitable extratextual loophole that would allow a common and effective method of voter intimidation and disenfranchisement to continue unabated.

Defendants also provide no reason why routine proximate cause analysis should not apply in determining whether a defendant caused a voter to be intimidated. Under that calculus, Defendants can fairly be held liable for the unlawful intimidation that they set in motion. To be *a* proximate cause, Defendants "need not be . . . the exclusive proximate cause of harm." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 704 (2004). Rather, they can be held liable for harms that were neither "different in kind" from the harm one would have expected nor "extraordinary . . . in view of the circumstances" at the outset of their course of conduct. Restatement (Second) of Torts § 442.

## II. Defendants' conduct may well constitute true threats; moreover, the true threats exception does not encompass all types of conduct that can be constitutionally regulated by Section 11(b).

This Court's request for supplemental briefing inquired as to the breadth of the true threats exception to the First Amendment. Amicus writes to highlight two points. First, constitutional true threats are not limited to threats of physical violence, but encompass a broader range of threats that prompt emotional disturbance in the recipient. Second, the true threats exception—merely one of

several categorical exceptions to the First Amendment—does not circumscribe the types of conduct that Section 11(b) may constitutionally regulate. Thus, even if this Court concludes that Defendants' conduct does not constitute a true threat, that determination does not carry with it automatic constitutional immunity from Section 11(b) liability.

### A. True threats need not threaten physical violence

The First Amendment does not protect "true threats." *Virginia v. Black*, 538 U.S. 343, 359-60 (2003); *United States v. Martinez*, 736 F.3d 981, 988 (11th Cir. 2013), *cert. granted, judgment vacated on other grounds*, 576 U.S. 1001 (2015). The constitutional carveout for true threats "protects individuals from the fear of violence and from the disruption that fear engenders, in addition to protecting people from the possibility that the threatened violence will occur." *Black*, 538 U.S. at 360 (internal quotation marks and alteration omitted). In the Eleventh Circuit, true threats are determined based on an objective analysis of the relevant communication; neither "the specific intent to carry [the threat] out" nor "the specific intent to cause fear in another" is required. *Martinez*, 738 F.3d at 988.

To determine whether words and actions constitute true threats, courts look not only at specific statements, but also at "the surrounding events and reaction of the listeners." *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 746 (9th Cir. 2021);

*see also United States v. Alaboud*, 347 F.3d 1293, 1298 (11th Cir. 2003), *overruled on other grounds by United States v. Martinez*, 800 F.3d 1293, 1298 (11th Cir. 2015) (surveying sister circuits and agreeing that "the recipient's belief that the statements are a threat is relevant in the inquiry of whether a reasonable person would perceive the statements as a threat"). In short, context matters.[6]

True threats extend beyond threats of imminent bodily harm. In *Black*, the Court held only that the First Amendment exception "encompass[es]" such threats, not that it is limited to them. 538 U.S. at 359; *see Wohl I*, 498 F. Supp. 3d at 479. For instance, the Ninth Circuit has held that a letter telling would-be voters that their information could be obtained by hostile groups or used against them in deportation proceedings falls within the true threats exception. *United States v. Nguyen*, 673 F.3d 1259, 1266 (9th Cir. 2022). *See also United States v. Turner*, 720 F.3d 411, 420 (2d Cir. 2013) (categorizing as a type of "true threat" threats of "a specific legal wrong grave enough to be likely either to cause substantial emotional disturbance in the person threatened or to require the employment of

---

[6] The fact that context matters can narrow as well as broaden the true threats exception, ensuring that statements that might sound like threats when detached from context are not captured when, in context, they could not have been perceived as such. For example, depending on context, the statement, "I'll kill you for this," can be a threat or a joke.

substantial resources for investigation or prevention" (quoting Kent Greenawalt,

Speech, Crime, and the Uses of Language 91 (1989))).

Nor must true threats be communicated verbally. *Black*, 538 U.S. at 360

("Respondents do not contest that some cross burnings fit within this meaning of

intimidating speech, and rightly so."). For example, conspicuously taking down

license-plate information can amount to a true threat. *E.g.*, *New York ex rel. Spitzer*

*v. Cain*, 418 F. Supp. 2d 457, 477 (S.D.N.Y. 2006) (noting that when a hostile

protestor "makes a show of noting the license plate of a car, a car owner would

reasonably interpret the gesture as intended to communicate an intent to track the

owner down and harm her"). Accordingly, were Plaintiffs to prove their

allegations, they would have a plausible case that a range of Defendants'

conduct—such as offering bounties to report citizens for alleged fraud while also

preparing and circulating baseless mass challenge lists, Pls.' MSJ Br., Dkt. 156-1

at 15, 24, and encouraging and amplifying threats of election vigilantism on social

media, *id.* at 26-28—constituted true threats.

### B. Even if Defendants' conduct does not constitute a true threat, the true threats exception does not determine the outer boundaries for applying Section 11(b) constitutionally

True threats are just one of several recognized categorical exceptions to the

First Amendment that could apply in a Section 11(b) case. *Cf. United States v.*

*Stevens*, 559 U.S. 460, 468 (2010) (listing recognized categorical exceptions).

Thus, a determination by this Court that certain of Defendants' conduct does not

constitute a true threat would not necessarily establish that that conduct was

protected by the First Amendment.

For example, defamation can constitute unlawful voter intimidation in

violation of Section 11(b), *see, e.g.*, *LULAC*, 2018 WL 3848404, at *4, *6, and is

also categorically excluded from the protections of the First Amendment, *see*

*Stevens*, 559 U.S. at 468; *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974). Thus, a

defendant engaged in voter intimidation through defamation would have no First

Amendment defense for their actions regardless of whether the defamation also

constituted a true threat. Similarly, a defendant who intimidated voters through

either fraud (such as knowingly making false accusations of unlawful voting for

the purpose of misleading potential donors)[7] or speech incidental to a course of

independently proscribable criminal or tortious conduct[8] should have no First

---

[7] *See, e.g.*, *Stevens*, 559 U.S. at 468; *Illinois v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 612 (2003) ("[T]he First Amendment does not shield fraud.").

[8] *See, e.g.*, *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949) ("[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed."); *FAIR*, 547 U.S. at 62.

Amendment defense regardless of whether their conduct also constituted a true threat. Thus, for example, should Plaintiffs ultimately show that Defendants' conduct was defamatory (by knowingly or recklessly or, in the case of private figures, negligently stating that lawful voters were committing election crimes) or fraudulent (by using false statements and deception to procure monetary gain), that conduct could incur Section 11(b) liability without triggering any First Amendment concerns, even if it does not also constitute a true threat.

As another example, the Supreme Court has recognized that the government may regulate—consistent with the First Amendment—"messages intended to mislead voters about voting requirements and procedures." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1889 n.4 (2018); *see also* Richard Hasen, *Drawing the Line Between False Election Speech and False Campaign Speech*, Knight First Am. Instit. (Oct. 21, 2021).[9] It makes sense to permit restrictions on intentional or reckless falsehoods about voter eligibility because such speech poses similar risks to perjury and impersonations of government officials. It undermines the functioning and integrity of government processes, elections, and the law. *Cf. United States v. Alvarez*, 567 U.S. 709, 721 (2012) (explaining why prohibitions on

---

[9] *Available at* https://knightcolumbia.org/blog/drawing-the-line-between-false-election-speech-and-false-campaign-speech.

perjury and lying to or impersonating government officials are consistent with the First Amendment). As a result, in *Arizona Alliance*, the district court entered a temporary restraining order under Section 11(b) against a defendant reported to be working with True the Vote,[10] even though the court had stated in a prior opinion that plaintiffs there had not shown that such conduct constituted a true threat.[11] So, as with defamation and fraud, were Plaintiffs to establish that Defendants are promulgating false information about voter eligibility to mislead voters, the First Amendment would present no bar to Section 11(b) liability for such actions.

### C. Section 11(b) is narrowly tailored to achieve compelling governmental interests

Finally, one last point is worth emphasizing: when engaging in First Amendment analysis, *even direct restrictions on speech are nonetheless*

---

[10] *See* Jen Fifield, *Dropbox watchers in Arizona connected to national effort from "2000 Mules" creators*, Votebeat (Oct. 27, 2022), *available at* https://arizona.votebeat.org/2022/10/27/23427525/clean-elections-usa-drop-box-watchers-voter-intimidation.

[11] *Compare Arizona Alliance for Retired Ams. v. Clean Elections USA*, No. 22-1823, 2022 WL 15678694, at *5 (D. Ariz. Oct. 28, 2022) (denying temporary restraining order and observing "Plaintiffs have not provided the Court with any evidence that Defendants' conduct constitutes a true threat"), *with Arizona Alliance for Retired Am. v. Clean Elections USA*, No. 22-1823, 2022 WL 17088041, at *2 (D. Ariz. Nov. 1, 2022) (granting temporary restraining order requiring defendants "cease and desist making false statements about Arizona Revised Statutes § 16-1005 immediately through the close of voting on Election Day 2022").

*constitutional* if they survive review under the relevant level of constitutional scrutiny. *See, e.g.*, *Burson v. Freeman*, 504 U.S. 191, 198-99 (1992) (plurality opinion) (upholding direct regulation on political speech under strict scrutiny). And restrictions aimed at safeguarding elections and the right to vote can survive even strict scrutiny. *See, e.g.*, *Williams-Yulee v. Fla. Bar*, 575 U.S. 433 (2015) (restricting solicitation of campaign funds). That includes regulations that guard against voter intimidation. *Burson*, 504 U.S. at 198–99, 206; *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1219 (11th Cir. 2009) (restricting solicitation about non-ballot issue in proximity to polling locations); *Wohl I*, 498 F. Supp. 3d at 486 n.29.

Applications of Section 11(b) can survive even strict scrutiny analysis because the statute is "narrowly tailored to advance compelling government interests." *Wohl I*, 498 F. Supp. 3d at 486 n.29.[12] It has long been established that preventing voter intimidation is a compelling state interest, *see, e.g.*, *Burson*, 504

---

[12] To be clear, this is no concession that Section 11(b) is as a content-based restriction on speech. Section 11(b) arguably constitutes a content-neutral regulation on conduct that incidentally burdens speech in order to protect the integrity of federal elections. Amicus respectfully suggests that the Court need not address the issue—which admittedly is complex—given the historical record demonstrating that Section 11(b) would survive even strict scrutiny.

18

U.S. at 206, that is "essential to the successful working of this government," *Ex Parte Yarbrough*, 110 U.S. 651, 666-67 (1884).

The narrow tailoring inquiry is no harder given the historical record. In particular, Defendants may try to argue that Section 11(b) is not narrowly tailored because Congress could have drafted Section 11(b) more narrowly to cover only subjective attempts to intimidate. But history has disproved that contention: Congress had tried that solution eight years before Section 131(b), which failed to address Congress's compelling interest in preventing voter intimidation.

As noted above, Congress banned subjective attempts to intimidate voters in Section 131(b) of the Civil Rights Act of 1957. *See* 52 U.S.C. § 10101(b). But Section 131(b) failed to end voter intimidation precisely because its subjective intent requirement thwarted effective enforcement.[13] Indeed, Section 131(b) was so

---

[13] Voting Rights Act of 1965: Hearing Before the H. Comm. on the Judiciary, 89th Cong. 12 (1965) (statement of Nicholas deB. Katzenbach, Att'y Gen. of the U.S.) ("The litigated cases amply demonstrate the inadequacy of present statutes prohibiting voter intimidation. . . . [P]erhaps the most serious inadequacy results from the practice of . . . courts to require the Government to carry a very onerous burden of proof of 'purpose.' Since many types of intimidation, particularly economic intimidation, involve subtle forms of pressure, this treatment of the purpose requirement has rendered the statute largely ineffective.").

ineffective that the United States couldn't even protect its *own witnesses* in voting

rights suits from voter intimidation.[14]

As a result, voter registration numbers remained dismally low throughout the

South even after the passage of Section 131(b).[15] That failure was traced in

significant part to the ineffectiveness of then-current law to prevent voter

intimidation.[16] And, perhaps unsurprisingly, we can find echoes of the intimidation

tactics alleged here—the creation and publication of lists of voters for public

review (and potential retaliation) as well as reporting such "suspicious" voters to

---

[14] *See, e.g.*, *United States v. Bd. of Educ. of Greene Cnty.*, 332 F.2d 40, 44–46 (5th Cir. 1964); *id.* at 46–47 (Rives, J., specially concurring).

[15] *See* Judiciary Comm. Hr'g, 89th Cong., *supra* n.13, 3-4 (statement of Nicholas deB. Katzenbach, Att'y Gen. of the U.S.).

[16] *See, e.g.*, *Voting in Mississippi*, *supra* n.5, at 56-57 ("[I]t is not surprising that the existence of [Section 131(b)] has failed to allay fears of . . . reprisal for attempted registration or voting . . . . Experience over the past eight years. . . has demonstrated that judicial remedies have not proved effective in eliminating . . . the effects of intimidation . . . ."); U.S. Comm'n on Civil Rights Report, *Civil Rights '63,* 26 (1963) ("The conclusion is inevitable that present legal remedies for voter discrimination are inadequate. In many instances, litigation has not secured to qualified American citizens the right to vote. Further, the narrowly drawn commands of voting decrees often are evaded. In other instances, private intimidation—both before and after registration—frustrates the ultimate exercise of the right."), *available at* https://www.crmvet.org/docs/ccr_63_civil_rights.pdf; *see also id.* at 15 (noting relationship between intimidation and low rate of increase in Black registration despite efforts of federal government); *Voting* (1961), *supra* n.5, at 136 (noting how intimidation efforts helped to deny right to vote to Black citizens.)

the authorities—being used to disenfranchise voters in the period before the enactment of the Voting Rights Act.[17]

Thus, in the Voting Rights Act of 1965, Congress made another attempt to prevent voter intimidation. This time, however, Congress eliminated the subjective intent requirement that thwarted their prior attempts to eliminate voter intimidation. *See* H.R. Rep. No. 89-439, at 30 (1965). And even under a strict scrutiny analysis, that choice was acceptable.

Strict scrutiny requires a law to "be narrowly tailored, not . . . perfectly tailored," to achieve the government's compelling objective. *Williams-Yulee*, 575 U.S. at 454 (cleaned up). Moreover, given the government's compelling interest in preventing voter intimidation (as well as the First Amendment interest in doing so), the Supreme Court "never has held" the government "'to the burden of demonstrating empirically the objective effects on political stability that [are] produced' by the voting regulation in question." *Burson*, 504 U.S. at 208 (quoting

---

[17] *See, e.g.*, *Voting in Mississippi*, *supra* n.5, at 22 (efforts to photograph registrants deterred registration), 39 (publishing lists of voters and photographing them led to intimidation), 61 (same); *Voting* (1961), *supra* n.5, at 67 (referral of Black voters to the sheriff resulted in intimidation), 93 (opponents of Black registration circulated lists of names of registrants for potential retaliation); *cf.* Report of the U.S. Comm'n on Civil Rights, at 64 (1959) (circulation of Black registrants' names resulted in intimidation), *available at* https://www.crmvet.org/docs/ccr_rights_us_6100.pdf.

*Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986)). Thus, Congress's choice in Section 11(b) to eliminate the subjective intent requirement after watching Section 131(b)'s narrower prohibition on voter intimidation fail was an appropriately tailored response to its continued failure to protect the right to vote. Indeed, enduring nearly a decade of failure was more than Congress had to do to survive strict scrutiny. *See, e.g.*, *id.* at 209 (courts should not require a "political system" to "sustain some level of damage before the legislature could take corrective action" under strict scrutiny analysis).

Any overbreadth challenge against Section 11(b) would also fail. The overbreadth doctrine is "strong medicine" meant to be "sparingly" applied and "only as a last resort." *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). Thus "a law's application to protected speech" must "be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications" before it may be invalidated for overbreadth. *Virginia v. Hicks*, 539 U.S. 113, 119-20 (2003) (Scalia, J.) (cleaned up). And "rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)." *Id.*  Under that standard, any overbreadth challenge to Section 11(b) is doomed because Section 11(b) has a wide breadth of plainly

legitimate applications to conduct not necessarily associated with speech, such as preventing political violence and murder.

*      *      *

In short, true threats are not limited to threats of violence, so if Plaintiffs can prove their allegations, at least some of Defendants' conduct may be plausibly characterized as a true threat. But even if the Court concludes that certain of Defendants' conduct did not constitute a true threat, that conduct may still be proscribable under the First Amendment because, *first*, it may fall within another category of unprotected speech; and *second*, Section 11(b) can survive any level of constitutional scrutiny.

## CONCLUSION

The Court should decide the motions for summary judgment in accord with the legal frameworks set forth above.

Dated: January 17, 2023                   Respectfully submitted,

                                          **KREVOLIN & HORST, LLC**

                                          **/s/ Adam M. Sparks**
                                          Adam M. Sparks
                                          Georgia Bar No. 341578
                                          One Atlantic Center
                                          1201 West Peachtree Street, NW
                                          Suite 3250
                                          Atlanta, Georgia 30309

23

Telephone: (404) 888-9700
Facsimile: (404) 888-9577
Email: sparks@khlawfirm.com

John Paredes* (NY Bar No. 5225412)
Protect Democracy Project
82 Nassau Street, #601
New York, NY 10038
P: (202) 579-4582
F: 929-777-8428
john.paredes@protectdemocracy.org

Cameron Kistler* (DC Bar No. 1008922)
Protect Democracy Project
2020 Pennsylvania Ave. NW, Suite #
163 Washington, D.C. 20006
T: (202) 579-4582
F: (929) 777-8428
cameron.kistler@protectdemocracy.org

Benjamin L. Berwick* (MA Bar No.
679207)
Protect Democracy Project
15 Main Street, Suite 312
Watertown, MA 02472
T: (202) 579-4582
F: (929) 777-8428
ben.berwick@protectdemocracy.org

*Counsel for Amicus Curiae Protect
Democracy Project*

* Motion for admission *pro hac vice*
forthcoming.

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGa, using font type of Times New Roman and a point size of 14.

Dated: January 17, 2023

**/s/ Adam M. Sparks**
Adam M. Sparks
*Counsel for Amicus Curiae Protect
Democracy Project*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: January 17, 2023

**<u>/s/ Adam M. Sparks</u>**
Adam M. Sparks
*Counsel for Amicus Curiae Protect Democracy Project*