```
1                     UNITED STATES DISTRICT COURT
                    FOR THE NORTHERN DISTRICT OF GEORGIA
2                            ATLANTA DIVISION

3

4    FAIR FIGHT, INC., ET AL.,        )
                                      )
5                   PLAINTIFFS,       )
                                      )  DOCKET NO. 2:20-CV-0302-SCJ
6         -VS-                        )
                                      )
7    TRUE THE VOTE, INC., ET AL.,     )
                                      )
8                   DEFENDANTS.       )
     _____
9
              TRANSCRIPT OF SUMMARY JUDGMENT PROCEEDINGS
10               BEFORE THE HONORABLE STEVE C. JONES
                    UNITED STATES DISTRICT JUDGE
11                  WEDNESDAY, FEBRUARY 1, 2023

12

13   APPEARANCES:

14   ON BEHALF OF THE PLAINTIFFS:
       ALLEGRA J. LAWRENCE-HARDY, ESQ.
15     LESLIE J. BRYAN, ESQ.
       UZOMA NKWONTA, ESQ.
16     JACOB SHELLY, ESQ.

17

18   ON BEHALF OF THE DEFENDANTS:
       JAMES BOPP, JR., ESQ.

19

     ON BEHALF OF INTERVENOR (USA):
20     JENNIFER KEEN, ESQ.
       DANA PAIKOWSKY, ESQ.
21     JENNIFER J. YUN, ESQ.
       TIM MELLETT, ESQ.

22

23          VIOLA S. ZBOROWSKI, RDR, FAPR, CMR, CRR, RPR, CRC
         OFFICIAL COURT REPORTER TO THE HONORABLE STEVE C. JONES
24                  UNITED STATES DISTRICT COURT
                         ATLANTA, GEORGIA
25                         404-215-1479
                  VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
```

```
 1                    (HELD IN OPEN COURT AT 10 A.M.)

 2            THE COURT:  Good morning you all can be seated.  Okay.

 3   New faces and old -- not old faces, familiar faces.  I will never

 4   call you old.

 5            All right.  Thank you-all for being here this morning.

 6   We got have some decisions out, but I will tell you up front that

 7   I will probably violate some of my own procedures.  Okay?

 8            With that, Ms. Wright, if you will call the case for the

 9   day.

10            THE DEPUTY CLERK:  Yes, sir.  The Court calls the matter

11   of Fair Fight, Inc., and others vs.  True The Vote and others

12   defendants.  Civil Action No. 2:20-cv-302.

13            THE COURT:  If plaintiffs counsel will stand first, lead

14   counsel, and introduce yourself and who is with you.  Good

15   morning, Ms. Lawrence-Hardy.

16            MS. LAWRENCE-HARDY:  Good morning, Your Honor.  And I

17   was reminded to make sure that we do all of our speaking into the

18   mic in this courtroom.

19            THE COURT:  Yes.  That will keep me out of trouble with

20   Ms. Viola.

21            MS. LAWRENCE-HARDY:  Indeed.  Your Honor, it is good to

22   see you again.

23            THE COURT:  Good to see you.  Hope you had a good

24   holiday.

25            MS. LAWRENCE-HARDY:  I did.  I hope you did as well,
```

 1  Your Honor.

 2          THE COURT:  Georgia won.  I did.

 3          MS. LAWRENCE-HARDY:  There was a lot of rejoicing in

 4  this state.

 5          THE COURT:  That's true.

 6          MS. LAWRENCE-HARDY:  I am pleased to be here on behalf

 7  of the plaintiffs and pleased to introduce the other members of

 8  our team that you met before that is here with us today.

 9          THE COURT:  All right.

10          MS. LAWRENCE-HARDY:  We have to Uzoma Nkwonta who will

11  be here as lead counsel and making the arguments for the Court.

12          THE COURT:  All right.

13          MS. LAWRENCE-HARDY:  We also have Jacob Shelly, as well

14  as Christina Ford.

15          THE COURT:  I met Ms. Ford before.  I almost knocked her

16  down coming out of the elevator here this morning.

17          MS. LAWRENCE-HARDY:  So you met Ms. Ford before.

18          THE COURT:  Yes.

19          MS. LAWRENCE-HARDY:  That's who is at counsel table,

20  Your Honor.  We also have additional members of our team in the

21  audience, as well as Cianti Stewart-Reid who is the executive

22  director of Fair Fight also came with us to Gainesville today.

23          THE COURT:  Okay.  Good to see you this morning, ma'am.

24          MS. LAWRENCE-HARDY:  Thank you.

25          THE COURT:  And, of course, Ms. Bryan.

```
 1              MS. BRYAN:  Good morning.

 2              MS. LAWRENCE-HARDY:  And, of course, Leslie Bryan who is

 3    here -- not at counsel table, but active and ready at any time.

 4              THE COURT:  Good to see you-all here this morning.

 5              For the United States?

 6              MS. KEEN:  Good morning, Your Honor.  Jennifer Keen on

 7    behalf of the United States at government's counsel table, and

 8    joined by three attorneys from the Department of Justice voting

 9    rights section, and I'll let them introduce themselves

10    individually.

11              MS. PAIKOWSKY:  Good morning, Your Honor.  Dana

12    Paikowsky for the United States.

13              THE COURT:  Good morning, Ms. Paikowsky.

14              MS. YUN:  Jennifer Yun on behalf of the United States.

15              MR. MELLETT:  Tim Mellett on behalf of the United

16    States.  And Jennifer Yun will be arguing for us today.

17              THE COURT:  Welcome to Georgia, and I hope everybody's

18    flights were nice and smooth coming in.

19              For the defense?  How you are you doing this morning?

20              MR. BOPP:  Very well, Your Honor.  Thank you.  Jim Bopp.

21    I am here representing all of the defendants.

22              THE COURT:  Mr. Bopp, I will say the same thing to you

23    as I said to Ms. Lawrence-Hardy, I hope you had a good holiday and

24    still celebrating the only victory we should be celebrating, is

25    Georgia.
```

1          MR. BOPP:  I didn't have a lot at stake in that one,

2     Your Honor, but I won't say anything about that here.

3          THE COURT:  Well, you had me worried there a little bit.

4     Thank you, sir.

5          Here's how we're going to proceed this morning.

6     Plaintiffs have filed a motion for summary judgment.  Plaintiffs

7     will come forward.  You have 15 minutes to argue.  You can use all

8     15 or reserve part for rebuttal.

9          Once you finish, defense will come forward and you will

10    have to use all of your 15 minutes to respond to the plaintiff's

11    motion for summary judgment -- followed by the United States, you

12    can use all of your 15 minutes regarding your response to the

13    plaintiff's motion for summary judgment.  If the plaintiffs

14    reserves any time, the plaintiffs -- we'll come back to the

15    plaintiffs, and the plaintiffs will use its last remaining time.

16    Ms. Wright will keep up with time.

17          As I indicated this morning, I have some questions.  I'm

18    going to try to let you-all get into your presentations first.  Do

19    not get too worried or tense if you look at the clock and you have

20    one minute left.  If I'm asking you a lot of questions, then I'm

21    going to give you some extra time.  But the clock won't stop just

22    because I'm asking you questions.  But if I -- I'm not going to --

23    I don't have a clock.  Let's just say I have five questions for

24    you and the other side I have three questions.  So three may be

25    more detailed than the five.  I'll say, let's give them another

1  five minutes to finish out.

2          Then we'll come to the defendant, the defendant will

3  make your presentation or argument, excuse me, on your motion for

4  summary judgment.  Again, you can use all 15 minutes or you can

5  use part of it and reserve time for rebuttal.  We'll then come to

6  plaintiffs.  You will have to use your entire 15 minutes to

7  respond to the defendant's motion for summary judgment, and,

8  again, the United States you will have to use your whole 15

9  minutes.

10          Once we're done and the defendant has time left for

11  rebuttal, then you will have rebuttal.  Then we'll come to the

12  United States.  You will make your argument regarding the 11B, and

13  you can use your entire 15 minutes and you can save time for

14  rebuttal.  Plaintiff will then respond, use the whole 15 minutes.

15  The defendant will respond, use your whole 15 minutes, and if you

16  reserve any time for rebuttal, then you get the last word.

17          As far as breaks, this is not a test of endurance.  So

18  if anybody at any time wants a break, we'll do it.  I've been

19  known sometimes -- Ms. Bryan is smiling -- to just keep going.  So

20  just raise your hand for a break.  If Ms. Viola gives me a look,

21  we're going to take a break.  I really don't run the courtroom.

22          So, again, I don't want you just comfortable.  I want

23  you at your best to make your argument.  I think we're going to

24  come right up to the lunch hour.  I tell you like I always tell

25  you, if someone has a medical condition that says you've got to

1  eat lunch at a certain period of time or a certain food at a

2  certain time, we're going to do that.  Again, if we're going to

3  take a lunch break, it is usually one hour.  My goal is to get as

4  much information as I can.  You-all did briefs, told me a lot, but

5  I have some questions from your briefs.  But there are a couple of

6  things we need to follow-up on.  So that's why you're here.  Most

7  lawyers will tell you, Judge Jones does not do a lot of oral

8  argument summary judgment.  So the mere fact that you're sitting

9  here, tells you right now I have some questions and some concerns.

10 Okay.

11          With that stated, plaintiffs counsel may proceed.

12          MR. NKWONTA:  Good morning, Your Honor.

13          THE COURT:  Good morning.

14          MR. NKWONTA:  My name is Uzoma Nkwonta.

15          Before I get started, Your Honor, I have a couple of

16 quick housekeeping matters.  The first is, we have a collection of

17 exhibits that we filed with our motion for summary judgment that

18 we may refer to throughout today's hearing.  We have courtesy

19 copy.  We have given this to all the parties, and I have a copy

20 for the Court as well.

21          May I approach the bench?

22          THE COURT:  Yes.

23          MR. NKWONTA:  And second, I would like to reserve three

24 minutes for rebuttal.

25          THE COURT:  All right.

```
 1          MR. NKWONTA:  May it please the Court, for almost 60

 2   years the Voting Right Act has fiercely protected the right to

 3   participate in the political process free of intimidation.  But by

 4   the late 2020, forces and conflicts that animated the NVRA were on

 5   full display before this Court.

 6          True The Vote and their allies asserted baseless

 7   accusations of voter fraud and unlawful voting and what they term

 8   as the largest mass challenge in Georgia history involving

 9   challenges to hundreds of thousands of voters who are accused of

10   unlawfully voting and being improperly registered.

11          They issued threats to send combat trained Navy SEALs to

12   on polling places.  They made references and talked about imposing

13   bounties to entice accusations of voter fraud.  And when all of

14   that was said and done, their actions left Georgians wondering

15   whether it was all worth it, whether it was worthwhile to exercise

16   their right to vote.  And that is precisely the evil that Congress

17   sought to avoid when Congress enacted 11B's robust protections.

18          Now, there are very few facts that are legitimately in

19   dispute here because the defendants failed to refute most of the

20   evidence that we have submitted.

21          THE COURT:  Well, they are saying, though, that they had

22   nothing to do with some of the things, like, sending people

23   notices or actually recruiting Navy SEALs to go to polling places.

24   There are some minor differences, though.

25          MR. NKWONTA:  There are some minor difference.  Now, the
```

 1  reason why I said there are no legitimate disputes, legitimate

 2  factors, because we allege that defendants threatened to send Navy

 3  SEALs to polling places.  And that's exactly what they did.  We

 4  submitted a transcript of Catherine Engelbrecht stating exactly

 5  that, that she wanted to send Navy SEALs to polling places.  And

 6  that the reason she wanted to send Navy SEALs to polling places,

 7  not police officers, not volunteers, but Navy SEALs, the reason is

 8  because she -- her impression of Navy SEALs and what they would be

 9  doing at polling places, that they would inject themselves in

10  conversation between voters and poll workers and tell the voters

11  and poll workers this is how it is going to play out, this is how

12  it is going to be.  And we submitted that transcript.

13         THE COURT:  My response to that, if I remember

14  correctly, is that based on -- the reason why, the Navy SEAL could

15  not be trained as a poll worker like anyone else.  Then

16  they dispute the fact that they'd be going in in uniforms,

17  tactical gear; and they would go in in a suit, regular clothing,

18  get the required training, no big deal.  What do you say about

19  that?

20         MR. NKWONTA:  Well, there was not a single reference in

21  the transcript that we submitted, the transcript of the podcast,

22  there was not a single reference to the Navy SEALs serving as poll

23  workers.  And the reason, the reason why that the Navy SEALs were

24  mentioned was specifically because of their reputation.  And that

25  same reputation, whether you're calling it stereotypes or

1  well-earned reputation, that is what Ms. Engelbrecht latched upon

2  in explaining why she wanted to have Navy SEALS at polling places.

3      THE COURT:  Were these Navy SEALs together with -- told

4  the people they were challenging?  In other words, did anybody say

5  there will be Navy SEALs there to check you out?  In other words,

6  11B is about intimidation.  Okay?  But in order to be intimidated,

7  don't you have to know?

8      MR. NKWONTA:  Yes, and the way people would know is the

9  fact that this was broadcast on a podcast that was available to

10  anyone who was -- who was willing to listen.

11      THE COURT:  But don't you have to go to the podcast?  I

12  want to tell you something, this morning -- my clerk is going to

13  cringe when I tell people this, but I don't think I've ever

14  listened to a podcast.

15      MR. NKWONTA:  That's fair enough, but people do listen

16  to podcasts.  And so the fact that one person may not listen to a

17  podcast or some segment of the population may not listen to

18  podcasts, does not make the statements any less intimidating for

19  Section 11B, because the standard is whether a reasonable person

20  familiar with the context would take the statement as

21  intimidating.  And that -- that is a standard, a reasonable

22  podcast familiar with the context.

23      THE COURT:  The argument 11B requires direct connection

24  between the person claiming to be intimidated and the alleged

25  perpetrator.  And there is no such direct connection to challenge

1   voters by the named defendants.

2            MR. NKWONTA:  If we're talking about the voter

3   challenges now, the mass challenges, that is just -- one, it's

4   false that there was no direct connection between the challenged

5   voters and --

6            THE COURT:  Well, do you agree with them that 11B

7   requires direct connection between the person -- the alleged

8   perpetrator and the person they're trying to intimidate?  In other

9   words, this says 11B requires direct connection between the person

10  claiming to be intimidated and the alleged perpetrator of

11  intimidation.

12           MR. NKWONTA:  I don't agree with that statement, Your

13  Honor.  And to be honest, it's unclear what that means.  The term

14  or phrase "direct connection" is quite vague.

15           THE COURT:  Well, the United States is going to argue, I

16  think they did in their briefs, that's not necessary.  The

17  third-party could make that direct connection.  I could be wrong.

18  They could argue something else.

19           MR. NKWONTA:  Absolutely.  So what I was saying about

20  why it's not clear what they mean by direct connection, it's

21  unclear whether they mean the challenger or the intimidator needs

22  to be right in front of the person that's intimidated.  But there

23  has never been any such requirements under the case law.  In fact,

24  the cases law suggests the exact opposite.

25           We cited the *National Coalition on Black Participation*

1    *v. Wohl*, the individuals who were charged with voter intimidation,

2    they were not the ones making the robocalls to voters encouraging

3    them not to vote by mail, yet they were held accountable for --

4    for intimidation under Section 11(b).  And there are numerous

5    instances in which attempts to engage in large-scale voter

6    intimidation, will require some type of intermediary.

7            THE COURT:  In this case, tell me where is the direct

8    connection -- what way is there a connection for these voters to

9    be intimidated?

10           MR. NKWONTA:  The connection comes in several different

11   ways:

12           First, they started a chain of events, and elicited a

13   process that they knew would result in voters being confronted,

14   whether they would be confronted at a polling place like Jocelyn

15   Heredia was or whether they would be confronted after the fact and

16   to be forced to participate in a hearing.

17           THE COURT:  Okay, which leads to one of my central

18   questions.  21-2-229 to 21-2-230, if I understand the decision

19   correctly, an elector in that municipality or county challenges an

20   individual, the right to be on that electrical list or to vote,

21   they then -- they take it to the Board of Elections of that county

22   and they say, Steve Jones, Simone, Madison, all can't vote.  Okay?

23   The Board of Elections then looks at it and they say we disagree.

24   We're not going to do anything.  They don't contact Steve Jones

25   until they say, I think there is probable cause that he might not

1  be eligible to vote.  He might not.  He should be on this list.

2  However, if the Board of Elections decides that they're not going

3  to contact Steve Jones, I would never know they challenged me.

4  The only way they know if they say, there is probable cause to

5  believe that Steve Jones should not be on this list.  Then they

6  contact Steve Jones.

7        Well, the defendant is arguing, in a way, that the Board

8  of Elections is the filter.  That is not frivolous.  You make a

9  strong argument that the way they go about doing it, plaintiff's

10  counsel makes a strong argument, it's reckless.  The way they're

11  electing these people is reckless.  It does not even follow the

12  proper procedure.

13        But the argument being made by the defense, well, we

14  don't contact these voters.  It is the Board of Elections after

15  they decide that this is probable cause, which means the frivolous

16  argument and the reckless argument they say leaves.  Once that

17  Board of Elections says, we think there is probable cause so the

18  frivolous and the reckless part leaves.  Do you agree with that?

19        MR. NKWONTA:  No, Your Honor, and I have three quick

20  responses to that.

21        THE COURT:  All right.  And, Kit, you vote as well.

22  They're challenge the four of us.

23        MR. NKWONTA:  So three quick responses to that.

24        First, to the extent that the board finds no probable

25  cause, that is by definition finding frivolousness because the

```
 1   Supreme Court has defined frivolousness is the lack of probable
 2   cause.  So they are admitting that they're -- challenges were
 3   frivolous.
 4            THE COURT:  Well, I sort of agree with that argument,
 5   but where do I get intimidated at if I don't even know I've been
 6   challenged?
 7            MR. NKWONTA:  So a voter who doesn't know they've been
 8   challenged may not be intimidated by that challenge.  But I'll
 9   direct the Court to our claims and our plaintiffs, and we have
10   named three individuals who knew they were challenged and who were
11   contacted and who had to defend themselves and was intimidated as
12   a result.
13            THE COURT:  But Cobb County, though, did note learn
14   through any actions of the defendant, did they?  Did they not
15   learn some other way they had been challenged?
16            MR. NKWONTA:  They learned through the actions of
17   defendant, because defendant issued the challenge itself.  The
18   fact that there is an intermediary does not eliminate the chain of
19   causation that resulted in Section 11(b).  And this is why we know
20   that, because dating back to the history of the Voting Rights Act
21   and even the Civil Rights Act, voter intimidate has taken many
22   forms, both complex and simple.  One of the complex forms involves
23   prosecution of individuals who were near and around polling
24   places.
25            Now, there was an intermediary, the grand jury, the fact
```

1  finder, the prosecutor.  But in United States v. McLeod, for

2  instance, in the Fifth Circuit case, the Court said -- the Court

3  made clear that the fact that it makes no difference that the

4  state criminal proceedings may result in acquittal or reversal of

5  convictions on appeal.  Harassment has worked, for the most part,

6  not by final judgments or convictions, but by the process.  It can

7  be stopped only by federal remedy as wrought as the evil itself.

8  In other words, the result of the board's analysis and the result

9  of the actual challenges themselves.  That is not the only thing

10 that causes the intimidation.  That may be a small part of it, but

11 the intimidation is caused by the process -- by the process that

12 Jocelyn Heredia went through when she was pulled out of line in

13 front a crowd of public voters and told that she was challenged

14 and she had to provide evidence, the process that Gamaliel Turner

15 went through.

16         THE COURT:  That is corrupt -- I can see somebody

17 arguing it's intimidation and harassment if they pull you out and

18 you can't vote.  Okay?  However, is that the fault of the elected

19 challenging person or is that the fault of the Board of Elections

20 for failing to contact that person ahead of time?  Which leads to

21 another problem/concern I have, the way it has been done.  But

22 he'll get his turn in a few minutes.  But who is at fault, in

23 other words?  Specifically, one I remember distinctly, the person

24 out in Cobb County, but there's another person as well.  You

25 pulled out of line.  That's embarrassing, it can be harassment, it

1   could be intimidation.  Okay?  Who's at fault, is it?

2           MR. NKWONTA:  Two quick responses to that.

3           First, to respond to your question directly, that is

4   True the Vote's fault and True the Vote and their allies.  The

5   reason why these voters could not be contacted ahead of time was

6   because they launched these challenges so close to the election

7   that there wasn't -- there was insufficient time to even process

8   these challenges properly.

9           But number two, when you're challenging --

10          THE COURT:  It's strange that the State of Georgia has a

11  statute that says -- 21-2-233.  It says, list of maintenance

12  activities pursuant to this code section shall be completed not

13  later than 90 days prior to the general primary or general

14  election.  And they base that on the federal code that does not

15  allow you to state:  A state should complete not later than 90

16  days prior to the date of primary or general election of a federal

17  office, any program the purpose of which systematically removes

18  the names of any eligible voters from the official list.  Yet

19  Georgia 21-2-229 and 21-2-230 allows a challenge even a week

20  before a general election.  And yet there are 300,000 people --

21  within that 90-day period.  So is it your argument that that could

22  be intimidation itself?

23          MR. NKWONTA:  Yes, potentially.

24          Now, I will caution the Court that the finding of

25  intimidation as most courts have found is content based.  So it

 1   doesn't always lend itself to meet hypotheticals.  Right?  And we

 2   ask that you examine the context around each challenge.  And the

 3   context around this challenged process demonstrates that it was

 4   intimidating and it was frivolous and it was issued in a way that

 5   had no possibility of a lawful resolution.  And I -- I see that my

 6   time is up.

 7              THE COURT:  Go ahead.  Remember, I'm the timekeeper.

 8              MR. NKWONTA:  Now, I want to talk a little bit about

 9   that context, and why that context is important here.

10              First, these challenges were announced in the aftermath

11   of a presidential election, Marxist seditious attempts to nullify

12   the votes of Georgia residents in order to overturn the results of

13   the presidential race.  That was the context.  Between the general

14   election and the runoff, accusations of voter fraud during

15   elections reached a fever pitch in Georgia, everyone is aware.

16              But True The Vote was one of the key architects in

17   constructing that house of lies.  Shortly after Election Day, they

18   drafted a proposal laying out a multistep plan to do just that,

19   and that is Exhibit 1 of our motion for summary judgment.  A

20   multi-step plan called "Value the Vote" to publicize accusations

21   of election subversion and galvanize public support.  They pitched

22   it to donors with the explicit goal of overturning the election in

23   favor of Donald Trump.  The donor gave them millions of dollars to

24   do just that.  They aligned themselves with the Trump campaign,

25   claiming the Trump campaign may even pay their fees.

1          Next came the baseless accusations in Georgia.  They

2    filed a lawsuit in Georgia with fantastical allegations claiming

3    that 73,000 noncitizens voted for Joe Biden -- not just voted, but

4    voted for Joe Biden.  Somehow they were able to figure out how

5    those people voted.  They claim that they were using NCOA data,

6    National Change of Address Registry.  The same type of data they

7    used in these challenges.  They claimed they were going to use

8    that to show unlawful residents voting.  They never presented that

9    evidence to the court.  Instead, they voluntarily dismissed their

10   lawsuit.  Another element of frivolity, but I'll get to that in

11   some of the next sessions.

12          And days later they withdrew and dismissed their case in

13   Georgia and several other states, and in the meanwhile the rancor

14   continued to grow.  News reports emerged of the main voter

15   contractor accused of treason.  A noose was found outside of his

16   home.  Gabriel Sterling, chief operating officer in the Georgia

17   Secretary of State's office and one of Secretary Raffensperger's

18   deputies warned publicly somebody is going to get hurt.  Somebody

19   is going to get shot.  Somebody is going to get killed.  This was

20   on December 2.

21          Approximately two weeks later, after this warning, True

22   The Vote issued a press release talking about Validate the Vote

23   Program, Validate the Vote Georgia, where you've heard that

24   before, that same proposal.

25          And then shortly after a press release announcing the

1  largest challenge in Georgia history challenging -- where they

2  claim to challenge over 300,000 voters.  In actuality, they

3  challenged maybe two-thirds of that number.  But they kept

4  publicizing and amplifying their efforts, fanning the flames.

5  Then Twitter accounts, threatened to publish the names of the

6  challenged voters.  Social media.  We submitted evidence of social

7  media responses to these challenges.

8          THE COURT:  Is Twitter giving the names of these

9  challenged voters, can that be attributed back to the defendants?

10 Is that that connection?

11         MR. NKWONTA:  We submitted evidence that it can.

12 Because the Twitter account that made that threat, the logo on

13 that Twitter account is the exact same logo of an organization run

14 by Kathryn Engelbrecht and the leader of OPSEC, Mr. Phillips, and

15 it's called A Time for a Hero.  And we presented evidence that the

16 logo on that Twitter account is the exact same logo of that

17 organization.

18         Now, even if we did not make that connection, even if

19 that evidence did not exist, it is still evidence of the context

20 of the environment, of the atmosphere of intimidation.  So even

21 under normal circumstances, these challenges would have been

22 intimidating and they would have been unlawful.  But this is a

23 perfect storm of attempted voter suppression, intimidation, and

24 everything in between.  And it matters that the defendants were

25 not mere bystanders to this increased tension descended upon

1  Georgia shortly after the 2020 election.  They contributed to it

2  in a very are deliberate way, and they chose to fan the flames of

3  inflammatory rhetoric, specious allegations, frivolous challenges

4  that put voters in fear of harassment and interference with the

5  Constitutional rights of the voters.  And these voters have

6  testified to that.  Their testimony is unrefuted.

7            So this Court, with all of that information, manned with

8  all of that context, which numerous courts have made clear it is

9  relevant and should be taken into account, this Court should hold

10  defendants accountable and grant plaintiff's motion for summary

11  judgment.

12            THE COURT:  Two questions and we'll save you three

13  minutes.

14            Question number one, though.  The defendant -- one of

15  their defenses is the State of Georgia says we can do this by

16  these statutes.

17            MR. NKWONTA:  That's incorrect.  The State of Georgia

18  did not say they could challenge hundreds of thousands of voters

19  based solely on NCOA data.

20            THE COURT:  Now, where does it -- you said the State of

21  Georgia does not allow them to do it based on NCOA data?

22            MR. NKWONTA:  Correct.  Because the NCOA data is by

23  itself, is inclusive.

24            THE COURT:  But the State of Georgia doesn't indicate

25  where you have to get your information from.  It says in 229 and

1  230 that you can challenge the Georgia Board of Elections.

2            MR. NKWONTA:  So you can assert a challenge -- so you

3  can assert a challenge under Section 229 and 230.  But what you

4  cannot do is assert a bogus challenge -- assert a bogus challenge

5  that is unlawful and has no chance of success and has no chance of

6  being adjudicated properly.  There is no way election official

7  conducted --

8            THE COURT:  What is the test -- I want you -- what's the

9  test that I should use to determine what is frivolous and bogus?

10  In other words, the State of Georgia allows you to add the

11  sanction -- it's sort of strange that I entered an order in this

12  case I think, Ms. Bryan, in December of 2020.  The general

13  statement comes back and they had a section that says, there is no

14  limit on the number of people you can challenge.  So the state

15  does allow you to challenge as many people as you found to

16  challenge.

17            So what's the test this Court should say, okay, this is

18  frivolous, this is bogus?  One of the arguments being made by the

19  defendant is that this is a violation of our First Amendment

20  rights to not be allowed to do this.  You argued, the First

21  Amendment does not give you the right to do things that intimidate

22  people, even if it's non-violent.

23            So what's the test for this Court to determine when it

24  is frivolous and bogus and reckless?

25            MR. NKWONTA:  So I'll start with an easy test that would

1  apply in this case.

2           THE COURT:  Okay.

3           MR. NKWONTA:  If what you're seeking to do is illegal,

4  if what you're seeking to do would violate federal law, I think

5  the Court's inquiry could stop there.  Because even in the

6  cases -- even in the cases that defendant cite that recognize our

7  right to petition, even in the Bob's Restaurant case --

8           THE COURT:  That's straightforward if it is illegal.  In

9  other words, when we talk about true threats out of the Black

10 case -- I don't know if I told the defendant -- the defendant

11 argued that the Eleventh Circuit requires violence or something

12 that leads to violence.  I don't think the Black case says that.

13 I think it could be non-violent.  I think it would non-violent and

14 it says intimidating.  But this is why I bring this up.  It's not

15 quite as relevant if it's illegal.  They're saying it's simple.

16 It's not -- it's never that straightforward.

17           In this case we have now, I don't believe I've seen

18 anything that they've done -- told is illegal.  I think there are

19 some things that may -- may, I'm not saying they have done, may

20 fall under nonviolent things that can be intimidating.  So this is

21 where it's at, it's not really that straightforward.

22           MR. NKWONTA:  Well, so I'll elaborate on my answer a

23 little bit, and I'll also talk about the true threats question

24 that you raise.

25           So when I say illegal, what they sought to do violated

1    NVRA; right?  And I think that by itself is an indication --

2             THE COURT:  How did it violate the NVRA?

3             MR. NKWONTA:  It violates the NVRA, because the NVRA

4    does not allow election officials to remove voters on the basis of

5    residency, unless the election officials conducts and follows a

6    two-step process that carefully --

7             THE COURT:  Does that apply to 229 and 230?  I don't

8    think that applies to 229 and 230.  If it did, I have a whole lot

9    easier decision here.  But I don't think that -- what I just read

10   I'll tell you, the State of Georgia -- Ms. Lawrence-Hardy and Ms.

11   Bryan have been with me a lot -- they purged as much as 200,000

12   cases at one time; right?  But they couldn't do it within a 90-day

13   period between the general or primary election.  Okay?  NVRA.  But

14   I don't think NVRA applies when you're talking about 229 and 230.

15            MR. NKWONTA:  It absolutely does apply, and here is how

16   the NVRA applies.

17            THE COURT:  Well, if that applies, then the State of

18   Georgia -- taking your argument, if that applies to the challenges

19   that were made in this case and the other cases, what would be

20   illegal on this next part?  So you're not, therefore, challenging

21   what the named defendants are doing, you're challenging what the

22   State of Georgia is doing.  You're in a sense saying the State of

23   Georgia may have an unconstitutional statute.

24            MR. NKWONTA:  Not necessarily, Your Honor, because --

25            THE COURT:  If the State of Georgia is allowing the

1   named defendants to challenge people within 90 days, the NVRA does

2   not allow that.

3           MR. NKWONTA:  See, Your Honor, what I meant was illegal,

4   it's not the actual challenge itself, it is what the state does

5   with the challenge.  So, in other words, if the state removes

6   voters for a change in residency without the voter affirmatively

7   agreeing or affirmative notifying the state that they changed

8   their residence, then that potentially violates Section 8(b) of

9   the NVRA that requires a two-step process.  In other words, the

10  defendants could have submitted their challenge based on

11  residency, and election officials could have conducted the process

12  that the NVRA generally requires.  That process would have taken

13  at least 30 days to wait for the voter to confirm notification,

14  and then -- and the NVRA does not allow immediate removal for

15  residency.  And Section 229 and 230 also does not sanction

16  immediate removal for residency.  And I can go through what

17  Section 229 and 230 allows at another time.  But I believe you

18  want to get to the standard and the true fix.

19          So the standard here has to be either defendants were

20  aware that their challenges were flawed and were incorrect or

21  unlawful or they were reckless and recklessly disregarded that

22  fact.  And that is the standard, especially when you take into

23  account other cases that have applied that standard and analogous

24  cases apply that standard, like defamation cases or *Burson v.*

25  *Freeman* --

1          THE COURT:  But you-all are not filing a defamation

2     claim, you're not making that argument; right?

3          MR. NKWONTA:  We didn't file a defamation claim, but I

4     think those cases are still instructive.  And *Burson v. Freeman*

5     also is instructive, because those cases require the Court to

6     reconcile the First Amendment rights at stake that were plausibly

7     being restricted with the Constitutional right to vote, which is,

8     perhaps, the most important in preserving all of the

9     Constitutional rights.

10         And I want to quickly touch on the reference to true

11    threats.  You mention that the Eleventh Circuit has found that

12    true threats is limited or applies to violent conduct or threats

13    of violence.  And I'm not sure that I agree with that, Your Honor,

14    respectfully.

15         THE COURT:  *United States v. Castillo*, 564 F. App'x 500

16    (2014), *United States v. Martinez*, 736 F.3d 981 (2013).

17         MR. NKWONTA:  In all of those cases, Your Honor,

18    including the cases that the defendants cite, the actual alleged

19    conduct, the actual crime was a threatening violent conduct.  So

20    those courts never had the occasion to test the limits of the true

21    threats theory, and never had the occasion to test the limits of

22    the statement in Black.

23         In fact, the Eleventh Circuit makes that clear, the

24    *United States v. Fleury*, another case cited by the defendants.  In

25    the *United States v. Fleury* the Court says, the full sentence in

1  Black from which Fleury admitted the key word reads, true threats

2  encompasses those statements where the speaker may communicate a

3  serious expression of intent to commit an act of unlawful violence

4  as to a particular group.

5       By the way, the Court emphasized the word "encompass."

6  And then the Court goes on to say, as such the Court never stated

7  that the category of true threats is limited to such statements,

8  only that the category encompasses that.

9       That is what the Eleventh Circuit said in *U.S. v.*

10 *Fleury*, 20 F.4th 1353, specifically, page 1373.  And that is the

11 argument that we've made, and that the Supreme Court said true

12 threats encompasses statements and threats of violence but does

13 not -- is not limited to statements -- those statements of

14 violence.  And the Eleventh Circuit acknowledged that.

15      And by the way, going back to what I mentioned about

16 true threats, about the cases even Your Honor cited.  The cases

17 Your Honor cited only involve individuals that were engaged in

18 violence or threatening violence.  The defendants have not cited a

19 single case --

20      THE COURT:  I'm give you this much, I think a

21 non-violent act can be intimidating.  I don't think it needs to be

22 violent.  I'll tell the defendant right now, unless they can show

23 me otherwise, it does not have to be a violent act for it to be

24 intimidating.

25      MR. NKWONTA:  And also doesn't have to be a violent act

1    to be a true threat.  In fact, plaintiffs are the only ones who

2    have cited cases that have interpreted threats --

3              THE COURT:  I mentioned that as well.

4              MR. NKWONTA:  That would be the Wohl case and *U.S. v*

5    *Nguyen* in the Ninth circuit also recognized that intimidation even

6    in the form of letters is a true threat.

7              THE COURT:  Well, the *Virginia v. Black* case says it is

8    an exception.  It says, true threats exception is when the alleged

9    threatening behavior is non-violent but aimed at intimidating a

10   fundamental right.  So a fundamental right is a right to vote.  So

11   a non-violent act that's intended to inhibit a fundamental right

12   can be found as intimidating under 11(b).  Thank you.

13             MR. NKWONTA:  Thank you, Your Honor.

14             THE COURT:  Mr. Bopp, you have three minutes for

15   rebuttal when you are getting ready to come back.

16             MR. BOPP:  Thank you, Your Honor.

17             May it please the Court, I think it is important to put

18   this case into context.  The context is, is that the defendants

19   were exercising their Constitutional protected right to petition

20   the government through a lawful process established by Georgia.

21             Secondly, they are engaged in First Amendment speech

22   about elections, which are at the core of the First Amendment

23   protection.

24             THE COURT:  Does the First Amendment give you the right

25   to say something even non-violent that leads to intimidation?

 1          MR. BOPP:  Well, according to the Eleventh Circuit and

 2   Black, those threats have to be threats of violence.

 3          THE COURT:  Well, that's -- the plaintiff disagrees with

 4   you on that.

 5          MR. BOPP:  Your Honor, there is a good reason for that.

 6   When you're -- when you're punishing people by federal laws for

 7   engaging in petition and speech activities, you have to have a

 8   bright line, you have to have -- and that punishment of that

 9   activity has to be justified by compelling governmental interest

10   and narrowly tailored.  So --

11          THE COURT:  I don't know if *Black v. Virginia* says,

12   actually says -- again, it points out that there is an exception.

13   Again, it says, precludes the application of a true threat

14   exception when the alleged threatening behavior is non-violent but

15   aimed at inhibiting a fundamental right.

16          I don't think you can use the First Amendment as a

17   defense under that circumstance?

18          MR. BOPP:  Well, you've heard their argument.

19          THE COURT:  Well, let's go back.

20          MR. BOPP:  Where is the bright line?  Where is --

21          THE COURT:  Well, let's go back to what I just asked you

22   about.  Are you still arguing that you have a First Amendment

23   protection when you're using non-violent statement that inhibits a

24   fundamental right?  The right to vote is a fundamental right.  Are

25   you making that argument that you still have First Amendment

1  protection?

2          MR. BOPP:  No, it's not our position that that's okay,

3  and nor have we ever done so.

4          THE COURT:  All right.

5          MR. BOPP:  But the legal task here must be bright lines.

6  And, of course, you heard his explanation of all of the nuances

7  and -- and contingencies that are simply endless that would cast

8  11(b) liability on people who talked about illegal voting or

9  voting, you know -- the integrity of our elections.  I mean, come

10  on.  There used to be a bipartisan consensus that *Reynolds v. Sims*

11  was correct.  *Reynolds v. Sims* said that the right to vote has two

12  parts:  One is an unjustified abridgment of the right to vote, and

13  the other is ballot stuffing.  And I say that word because that's

14  their word, quote, ballot stuffing, end quote.  Either one of

15  those violates the right to vote, doing either one.  And, of

16  course, here the defendants are exercising their petition right to

17  raise a question that would require the government, if

18  justified -- in other words with probable cause -- to confirm that

19  the person is a lawful voter.

20          THE COURT:  I think both the United States and the

21  plaintiff agree with you that a legitimate question by an elector

22  regarding the voter or person on the list that has basis, there's

23  nothing wrong with that.

24          Their argument is that the way the named defendants in

25  this case proceeded was reckless, frivolous -- I'm looking at what

 1  they're saying -- and they also say that is where you go off --

 2  the violation comes.  This side disagrees with you that a person

 3  under 229 or 230, that legitimately has a solid reason to

 4  challenge someone, should be able to do it.

 5          But the question is that can you say that -- of course,

 6  it states in 229 and 230, that you use that defense, that that is

 7  a defense regardless?

 8          MR. BOPP:  That what?

 9          THE COURT:  Do you acknowledge that the state law cannot

10  provide a complete defense?  In other words, you-all argued that

11  you have the right to do these challenges under 229 and 230.

12          MR. BOPP:  Not 229.

13          THE COURT:  230.

14          MR. BOPP:  230.

15          THE COURT:  Is that a complete defense?

16          MR. BOPP:  No, because the frivolous inquiry has no

17  arguable basis in law and in fact.  Well, the law -- the law is

18  checked by 230.  Okay?  It's sitting right there.  It's a legal

19  procedure that is available.  The question then is the fact.

20  Okay?  Now, so let me address that.

21          They started with the National -- National Change of

22  Registry, the voter registry.  That list is used in HAVA, a

23  federal law, as one of the steps to clean voter rolls.  And the

24  U.S. Supreme Court said that is undeniably legal to use that

25  list --

1           THE COURT:  That is correct.

2           MR. BOPP:  -- to trigger a procedure.

3           THE COURT:  That's correct.  But there is one step,

4    also, that is required that you leave out of your brief and your

5    argument, is that a notice has to be sent to individuals --

6           MR. BOPP:  Yes.

7           THE COURT:  -- giving notice.

8           MR. BOPP:  That triggers --

9           THE COURT:  It's not that you get your name off of the

10   National Change of Address and you automatically send it to the

11   Bureau of Elections.

12          MR. BOPP:  Correct.

13          THE COURT:  Well, what is being argued, I think you-all

14   have a system -- that's one way you come up with the name.  You're

15   right, they do that.  The State of Georgia does -- I think all 50

16   states use that list, but there is a requirement of notice.  But a

17   person may say, no, I still live here.  I didn't move.  I'm still

18   here.  In this case --

19          MR. BOPP:  230 provides for notice.

20          THE COURT:  Well, the argument that I want you to

21   address is the plaintiff's argument that is it intimidation

22   because you-all are directly or through a third-party making these

23   individuals names known.

24          MR. BOPP:  We don't do that.  We didn't publish any

25   list.  We complied with the statute.

1      THE COURT:  How did this tweet get out?  I made a note

2  that the plaintiffs' counsel argued that there was a tweet that

3  was released that had the names of the challenged voters.  How

4  does Twitter -- how does Twitter know the names of the challenged

5  voters?

6      MR. BOPP:  People can go into the courthouse and get the

7  challenges, get the list of challenges.  It's a public record.

8  Okay?  Then if they -- you know, we're not responsible for that.

9  And, you know, and we are not responsible for what third-parties

10  do.  The robocall example that they gave, the robocall caller was

11  hired by the defendant to make the calls.  So the robocall caller

12  was an agent of the defendant, and that's the reason that the

13  defendant is responsible for what his agent was doing.  All right?

14  They were paying him to do that.  All right?  So it's got to be,

15  you know, it's got to be True The Vote or people who are, you

16  know, agents of theirs.

17      The communication has to be direct to people that would

18  be -- would be -- then objectively intimidated.  It's got to be

19  objective, not subjective.  All right?

20      And then the final element is -- it's a true threat.

21  And, of course, you acknowledge that, and I agree, it is a

22  preliminary injunction ruling, but Footnote 10 quotes the Eleventh

23  Circuit saying that basically.  Saying that the speaker needs to

24  communicate a serious expression of intent to commit an act of

25  unlawful violence to a particular individual or group of

 1  individuals.

 2         So several of the elements I just gave that I think are

 3  necessary for the communication to be in violation of 11(b), are

 4  contained right here in the Eleventh Circuit in your --

 5         THE COURT:  I guess my concern is, is that if it's

 6  reckless in a sense -- you know, you get all these names and you

 7  do it within a 90-day period that as I indicated in that same

 8  order I have problems with, is that not in a sense a form of

 9  intimidation?  In other words, I get a notice one week before I'm

10  supposed to -- before I can go cast my absentee ballot or cast my

11  ballot --

12         MR. BOPP:  What kind of threat of harm, punishment are

13  you talking about because of the timing here?  The procedure --

14  the filing of the challenges does nothing other than if the board

15  decides there is probable cause, then it triggers notice and a

16  hearing and an opportunity for the voter to -- to provide proof

17  that they continue to be eligible.  And come on, what are we

18  talking amount?  We're talking about a list that each individual

19  person goes to the government, fills this out, and says, I'm

20  moving.  That's what this is.  It says, I'm moving.  Well, we all

21  know once you change your residence address, then, you know,

22  you're no longer validly registered --

23         THE COURT:  That's not --

24         MR. BOPP:  -- and eligible to vote.

25         THE COURT:  That's not all the people that have been

1    affected here.  Even you-all acknowledge when it came to military

2    voters and students in college, that your system was not that

3    solid.  That you-all had a number of military people that were

4    being challenged that shouldn't have been challenged.  Students in

5    college.  The ones that go out, moving from Georgia to South

6    Carolina, Alabama, whatever, yeah, I can see your argument there.

7    All right?  But the military ones, and particularly college ones

8    where they were, you know -- I don't know about anybody in the

9    University of Georgia, but let's say you decided you wanted to go

10   to the University of Virginia, but you don't change your home

11   address.

12          MR. BOPP:  That's the reason it is not conclusive to

13   file a challenge.  It's not conclusive.  It does nothing.  It

14   requires a procedure if the initial complaint meets a probable

15   cause standard, then there's notice, a hearing, an opportunity.

16   And, of course, that happened here.  One of the plaintiffs was,

17   you know, went into vote and they said, well, you know, we have a

18   challenge, and -- so she provided proof, okay, right then and

19   there and then she voted.  Okay?  I mean, you know, if it were

20   that this is conclusive, obviously, there would be a higher

21   standard.  Okay?  But this is not conclusive.

22          THE COURT:  Would it be fair to say then that part of

23   your position is that the Board of Elections is the filter?

24          MR. BOPP:  No question, it is.

25          THE COURT:  And also we're going to assume that all 159

```
 1   counties of the Board of Elections are properly following this
 2   procedure?
 3          MR. BOPP:  They're what?
 4          THE COURT:  There are 159 counties in Georgia, okay, and
 5   you can file this challenge, what you're saying is that, A, the
 6   filter is the Board of Elections?  In other words, we just send --
 7   giving names to the Board of Elections, and if the Board of
 8   Elections doesn't think there is a probable cause, they don't
 9   contact anyone.  If the Board of Elections thinks there is
10   probable cause, they send notice to the person.  And you're making
11   an assumption that all 159 counties are properly following that
12   procedure, that nobody said here's a list being challenged, just
13   contact people.
14          MR. BOPP:  Well, I don't know -- I don't know of any
15   evidence that procedures weren't followed.
16          THE COURT:  Which leads to my next question is that --
17   the argument being made regarding reckless, coming up with these
18   names being reckless does cause some concern.  229 and 230, it is
19   what it is.  They're not challenging 229 and 230.  So that's the
20   law of Georgia.  Okay?  229 and 230 is not in.  It's the law of
21   Georgia.  But if the names are given, if they got them in a
22   reckless manner or a manor that is not following procedure -- and
23   I'm not saying they're illegal.  I'm just saying they got these
24   names from NCOA or from an algorithm that is done and they're
25   given.
```

1            Is your argument that once -- it doesn't matter how we

2  get it, once we give it to them it's up to the Board of Elections?

3  It is your argument that it's makes no difference how you obtained

4  the names, it's up to the Board of Elections after that?

5            MR. BOPP:  Well, there is no legal requirement that I

6  know of.

7            THE COURT:  That's true.

8            MR. BOPP:  But there is, you know, under Georgia law.

9            THE COURT:  Well, hold on.  I don't know if that's true

10  or not.  I going to take that back.  I don't know if there is a

11  legal argument.  Is it?  Could be.  In Georgia, there is no

12  requirement, no legal requirement how you obtain these names that

13  give you to the Board of Elections.

14            MR. BOPP:  It could be defamatory.  So that could impose

15  legal limits on your ability to make these statements.  Right?

16            THE COURT:  True, true.

17            MR. BOPP:  So, I mean, maybe it was that regulated --

18  there was nothing to regulate it.  They leave it merely to the

19  board to determine if -- if the information has sufficient merit.

20  Okay?  I mean, it's like somebody -- and probably they were

21  thinking about things like this.  A neighbor, you know, hasn't

22  seen the person next door for eight months or ten months and

23  starts to wonder do they still live here and notifies the Board of

24  Elections -- maybe they're fighting over a fence.  Right?  And

25  notifies the Board of Elections and says, look, I haven't seen

 1    this person for all these years or all these months.  So they may

 2    not be -- they may have moved and they may not be eligible.

 3    That's the kind of thing.  That person isn't an insurer that or

 4    required that this be conclusive or -- like, do all sorts of

 5    investigation to find out whether or not this is true.

 6            And by the way, True The Vote did do additional

 7    investigations.  It is not true, as he just said, that they only

 8    used the registry.  They took those names to cull out false

 9    positives, all right, by running that list against other states'

10    registration lists, proprietary lists, county tax records, voting

11    records in other states, and they did take into account and try to

12    minimize the possibility that someone who moved to a city that

13    contains a university or a military facility, was doing it for

14    that purpose.  But come on?  Indianapolis has a military base.

15    Okay?  So people moved to Indianapolis.  All right?  What does

16    that mean?  Okay.

17            So this is not perfect.  But that's the whole construct

18    of the system is it's not conclusive.

19            THE COURT:  Which, basically, I have two final questions

20    for you.  This is the question I asked plaintiffs' counsel.

21            Should this Court have a test in determining what is

22    reckless?

23            MR. BOPP:  No, because that's not the standard.  I think

24    the standard is frivolous.

25            THE COURT:  Determine what's frivolous then.

1          MR. BOPP:  That's what I mentioned earlier, the Eleventh

2    Circuit's standard is no arguable basis in law or in fact.  Law or

3    in fact; both.  No arguable basis.

4          THE COURT:  Last question.

5          MR. BOPP:  Okay.

6          THE COURT:  As I asked the plaintiffs' counsel, I'm

7    going to ask you, too.  The State of Georgia in 21-2-233 does not

8    allow under the list they concede to, any purging or challenges

9    within 90 days of a primary or a general election.  Under 230,

10   though, you can challenge as many people as you like as close to

11   the election as you like.

12         MR. BOPP:  They're not removed from the voter roll.

13   They are simply prevented from voting in that election.  The very

14   next election they're still on the voter roll, they can show up.

15   The requirement of -- that you're referring to has to do with

16   taking people off the voter rolls so they can't vote in any

17   election ever until they reregister, if they qualify.  Right?

18   That is not at all what this procedure is.

19         THE COURT:  But can't -- can't -- I know this is true

20   because it happened in the case I had, again, can't the people

21   still show that they are eligible to vote still?  In other words,

22   if the state says we're going to purge 289,000 people and then the

23   other side shows there's 89,000 people that they have them wrong

24   but they don't take those 89,000 people off the voting list, do

25   they?

```
1              MR. BOPP:  Well, if that's unlawful, I'm sure a federal
2    judge will tell them so.
3              THE COURT:  One did.
4              MR. BOPP:  What?
5              THE COURT:  One did.
6              MR. BOPP:  Then fair enough.  People have to comply with
7    the law.  The point is 229 and the federal law you're referring to
8    has to do with lists of registered voters.  It does not have to do
9    with what 230 has to do with, is a registered voter not being able
10   to vote in a particular election.  So they just simply are -- it's
11   just simply a different scheme.  I know you may disagree.  I've
12   read your PI order, of course, but I -- we've looked at it again,
13   and I'm convinced of this, that this is the case.
14             THE COURT:  All right.  Thank you, Mr. Bopp.
15             MR. BOPP:  Is my time up?
16             THE COURT:  Yes.  Thank you.  Counsel.
17             MR. BOPP:  Thank you, Your Honor.
18             MS. YUN:  May I proceed?
19             THE COURT:  Yes, ma'am.
20             MR. BOPP:  Thank you, Your Honor.
21             The United States does not take a position on whether
22   the plaintiffs' motion for summary judgment should be granted.
23   However, I wanted to address, perhaps, four of the legal
24   questions --
25             THE COURT:  Say that again.  I didn't hear you.
```

 1          MR. BOPP:  Sorry.

 2          MS. YUN:  However, I would like to address four of the

 3   legal questions that have come up during the discussions earlier.

 4          THE COURT:  All right.

 5          MS. YUN:  First, I would like to address the question of

 6   directness.

 7          So as explained in our brief, the relevant question is

 8   whether defendants caused the intimidation or caused the issue,

 9   not how directly they caused it.  Defendants may not avoid

10   liability simply because they had their message delivered through

11   a third-party.

12          And the plaintiff's counsel mentioned the Wohl case, and

13   I would like to also point Your Honor to the case of *Clean*

14   *Elections U.S.A.*, the Second District of Arizona a case from

15   November of last year, where the district court there found that

16   plaintiffs were likely to succeed on the merits of their 11(b)

17   claim when an out-of-state defendant encouraged and organized

18   third-parties to conduct valid DropBox monitoring activities in

19   Arizona.  In that the Court found that the defendants were likely

20   to be liable under Section 11(b) and enjoined those activities of

21   organizing and encouraging others to do the actual activity that

22   was intended, deemed to be intended --

23          THE COURT:  Would that be equivalent to what the named

24   defendants are doing here, where they were contacted by and

25   provided names to electors in counties and municipalities?

1          MS. YUN:  We think conceptually, although, we do not

2   take any position on the factual allegations or the veracity of

3   those allegations.  We think that that is conceptually similar,

4   and I think that is actually a good segue to talk about what is

5   the role of the state here or the Board of Elections who receives

6   these challenges.

7          So -- so Your Honor mentioned that, of course, the board

8   has to find probable cause in order to proceed with these

9   challenges.  But requiring a finding of probable cause by a county

10  still may mean that many eligible voters would still be challenged

11  and be forced to jump through administrative hurdles in order to

12  vote, and especially -- and that may have a greater course of

13  impact on those voters, especially if they have very little time

14  to fix those administrative errors as well as reprove their

15  eligibility.

16         And I would like to also raise related to that that

17  Section 11(b) prohibits not just intimidation but also coercion.

18  And coercion is defined by the Court in *Wohl* as nullifying

19  someone's -- someone's will or desire to do something.  And in

20  this case, as indicated in the -- the NVRA's provision on systemic

21  removals within 90 days of an election, you can see that Congress'

22  rationale there was that forcing folks to jump through all these

23  hurdles so close to the election, may have much greater impact on

24  those voters because they may not have as much time.

25         THE COURT:  Let's say this.  I'm a defendant and I say

1   to you, the State of Georgia allows me to -- through 21-2-230 to

2   make them jump through those hoops even a week before an election,

3   the State of Georgia allows me within 90 days to challenge them.

4   And that's my defense.

5         MS. YUN:  Right.  So it is true that Section 230 does

6   allow -- does not have any time limitation the way that the NVRA

7   does.  But I think as Your Honor mentioned earlier that -- and I

8   think defendants also agree that compliance with state law and

9   procedure is not -- is not sufficient to inoculate otherwise

10  unlawful conduct, and if the voter challenges that are being

11  submitted within a week or two -- so close to an election, have,

12  of course, an effect on voters, then that would -- that is likely

13  to lead to a violation under 11(b).

14        THE COURT:  You're argument is that Ms. Primson

15  (phonetic) calls, you're saying if what the State of Georgia is

16  doing is a violation, then they can't -- they can't do that or

17  allow that?

18        MS. YUN:  I don't think so, Your Honor.  Our position is

19  not that Section 230 violates any law.  It is just that when

20  section -- when the voter challenge laws are being abused in order

21  to intimidate or coerce voters and, therefore, violates Section

22  11(b) --

23        THE COURT:  Well, how can you argue it is being abused

24  if the state allows it?  If the State of Georgia allows these

25  challenges within 90 days, mass challenges, in other words -- go

1  ahead.  I was looking at the statute this morning.

2          MS. YUN:  I think allowing something doesn't necessarily

3  mean that it cannot be abused.  For example, in the *McLeod* case

4  that was mentioned earlier, of course the sheriffs were allowed to

5  arrest people for traffic violations, but they were abusing that

6  process in order to intimidate voters who were around polling

7  places.

8          THE COURT:  So what happens when the sheriff is doing

9  this, what happens with the sheriff?  What happens?  What

10 happened?

11         MS. YUN:  Well, the United States brought a lawsuit

12 under Section 11(b), and the defendants in that case were found to

13 have violated -- to have committed voter intimidation.

14         THE COURT:  So even though 230 allows this, it still can

15 be intimidation and coercion?

16         MS. YUN:  Correct.

17         THE COURT:  But how do you address that?  In other

18 words, if I'm the plaintiff, are you saying the only way they can

19 address is through means of a lawsuit that says you can't do that?

20         MS. YUN:  Sure.  I believe that this -- this Court may

21 issue a -- an injunction or may find that defendants who even

22 though they followed state laws and procedures violated federal

23 law, Section 11(b) of the Voting Rights Act and, therefore, they

24 may not engage in the -- in the process of intimidating or --

25         THE COURT:  What happens if the state is not following

 1  what the federal government or the federal statute says they

 2  should be following?

 3          MS. YUN:  I'm sorry, Your Honor?

 4          THE COURT:  What happens when a state does not follow a

 5  federal statute or what the federal government thinks they should

 6  be following, what normally happens?

 7          MS. YUN:  Well, this is not a challenge of Section 230,

 8  but I think Your Honor is asking that it would be -- that if state

 9  law is inconsistent with federal law, then it would be preempted.

10  But that is not -- I do not believe this case to be a challenge of

11  Section 230, it is just a --

12          THE COURT:  Federal law does not allow you to make a

13  challenge unless -- under Purcell -- a side issue -- does not

14  allow you to make a challenge, does it, within 90 days of

15  election?  Does it?

16          MS. YUN:  No, that is not -- no, we're not proposing

17  any, per se, rules here that Georgia citizens may not -- may not

18  lodge a challenge within 90 days.  We are just pointing out the

19  NVRA provision to talk about the corrosive effect that it may have

20  when it's close to an election.  And just to be clear, that we are

21  proposing a totality of circumstances analysis.  There is no

22  one-factor or two-factor test or a checklist of things that should

23  be -- should be followed.  So the timing or the lack of

24  individualized inquiry, those are all factors that animated the

25  NVRA, but those are -- and, therefore, would be very probative in

1  your analysis, in Your Honor's final analysis of whether

2  defendant's conduct as a whole violated the statute.

3       THE COURT:  I'll agree with you.  I have a concern that

4  if you are challenging someone so close to an election, that could

5  act as an intimidating factor.  I'm agreeing with you there.  But

6  my question is the same question that I asked of the other two

7  attorneys before you is that if there is a state statute that

8  allows it, then I would have to say to someone -- you know, even

9  looking at the totality of it, that I would have to, basically,

10  say anything that occurs within so many days is intimidation.  In

11  other words, I can't think of anything worse than I'm off at

12  school at the University of Southern California and I'm still a

13  Georgia resident and I get this notice from the Fulton County

14  Board of Elections saying you've been challenged, I only have a

15  week to get back to Georgia to correct this and I've got final

16  exams next week.  Well, I probably would say, well, I'm not going

17  to be able to vote.  Tell me what does Steve Judge Jones do with

18  that situation when 230 says I can't.  You're saying, well, Judge,

19  it is the totality of the situation.  That could be intimidation.

20  Okay.  I'm not disagreeing with you.  But where is the cutoff?

21  Where is the cutoff?  Do I cut it off at one week, 30 days?  Where

22  the state doesn't cut it off at all.

23       MS. YUN:  So I agree with Your Honor, it would depend on

24  the totality of circumstances.  And while I'm not in a position to

25  propose a bright line rule about where is the cutoff, is it 60

1  days, is it 90 days, is it 30 days?  However, I believe that

2  also -- and another factor that would be helpful for your analysis

3  would be the lack of individualized inquiry that is at issue here.

4  So if -- if the NVRA only prohibits systematic removals as opposed

5  to removals based on individualized inquiry or personal knowledge.

6  And I think other factors that existing case law has provided,

7  such as abusing governmental authority can be a particularly

8  salient factor in finding intimidation or coercion, as two Fifth

9  Circuit cases found in the *McLeod* and *Whatley v. City of Vidalia*.

10  And I think there are also other conduct other than the voter

11  challenge that you can consider in the this totality of

12  circumstances inquiry.  For example, public accusations or a

13  announcements of criminal conduct by voters, such as voter fraud

14  can, be probative in analyzing how did -- how would a reasonable

15  voter react when they receive a voter challenge in this atmosphere

16  or in this context of a lot of accusations of criminal conduct.

17  And that was considered to be salient in the *Duryea* case and then

18  the *Clean Elections* case that I discussed earlier.

19       And lastly, even though intent is not required under the

20  statute as Your Honor already knows, finding of intent can be

21  probative.  Or if intent can be inferred, can be especially

22  probative in proving whether someone's conduct constituted

23  attempt, which is equally prescribed under the statute.

24       So I think there was an earlier discussion about

25  whether -- I don't know that I was ever challenged, how is that --

 1  how is there intimidation, I think the answer to that is, of

 2  course, it depends on the totality of the circumstances.  And you

 3  know, if it was one voter who never knew that they were

 4  challenged, that may not rise to a violation.  But in this

 5  instance, if intent to coerce voters away from voting can be

 6  inferred, then that could be an extremely salient factor in your

 7  analysis of whether did defendants attempt to intimidate even if

 8  the effected voter did not know or did not yield to those -- those

 9  efforts, as was the Court's analysis in the McLeod case where

10  there were -- there was evidence that some voters were not

11  intimidated.  But the Fifth Circuit said, well, that does not --

12  that does not negate the general corrosive effect of the whole

13  situation.

14          So I'm simply saying that, well, here are three voters

15  who were not intimidated, and they were there, was not sufficient

16  to avoid liability.

17          THE COURT:  Thank you.

18          MS. YUN:  Unless the Court has any other questions?

19          THE COURT:  There is no other questions at this time.

20          It is roughly 11:15.  We are getting ready now to hear

21  the summary judgment from the defendant.  Does anyone need a

22  break?

23          MR. NKWONTA:  Your Honor, I believe I have three

24  minutes.

25          THE COURT:  I'm sorry.  I want you to take your three

1  minutes, please.

2          MR. NKWONTA:  Thank you, Your Honor.

3          I just want to make three quick points in response to

4  defendant's arguments.

5          First, Your Honor mentioned Section 230 may allow some

6  challenges within 90 days of election.  And that may be true, just

7  the same way that in the 1950s or '60 where share croppers were

8  lawfully removed from their contracts, and in the same way

9  landowners had the authority to eliminate contracts with share

10 croppers.

11         Yet in *U.S. v. Beaty*, the Fifth Circuit found that

12 removing share croppers or cancelling contracts with share

13 croppers -- I'm sorry, the Sixth Circuit found that cancelling

14 contracts with share croppers that were registered to vote was a

15 form of voter intimidation.

16         And that is true not just in the share cropping context,

17 but it's true in the voter challenge context as well.  We're not

18 breaking any new ground here.  There are a number of other courts

19 that have found or have recognized that voter challenges, even

20 though permitted by law, can be forms of intimidation.  Can be

21 corrosive.  And just to give you an example, the Montana

22 Democratic Party case, which Your Honor is aware of, the Court

23 recognized in that case that when voter challenges, even voter

24 challenges permitted by law when they we're used in certain

25 context, they can create intimidation and they can create --

1          THE COURT:  In that case did the voters know that they
2     were being challenged before the particular election board there
3     contacted them?
4          MR. NKWONTA:  So that case was actually an NVRA case,
5     and that case did not address Section 11(b).  It addressed whether
6     the NVRA was being violated.  But in discussing the NVRA, the
7     Court recognized and noted that challenges may also violate --
8          THE COURT:  The person being challenged, did they know
9     they were being challenged?
10          MR. NKWONTA:  I'm not sure, Your Honor.  I'm not sure if
11     the facts delved into that as part of the NVRA discussion.  But I
12     would also --
13          THE COURT:  Would it be good to know if the person
14     didn't know they were being challenged, how could they be
15     intimidated?
16          MR. NKWONTA:  So people who were not challenged and
17     people who don't know that they're being challenged, some of them
18     may not be intimidated, but some of them may be intimidated by
19     defendants' broad campaign stating --
20          THE COURT:  So how can they be intimidated if they don't
21     know they're being challenged?
22          MR. NKWONTA:  Well, we pointed to several statements
23     that the defendants had made in the media about sending Navy SEALs
24     to polling places, about bounties, and a challenged program to
25     challenging hundreds of thousands in Georgia.  So it is possible

1    that some people may have been intimidated.

2            But that's note the basis of our case.  The basis of our

3    case and the plaintiffs' are people who knew they were

4    challenged --

5            THE COURT:  I agree with you.  I agree with you.

6            MR. NKWONTA:  -- and they were intimidated.  And the

7    challenges, the notion that challenges can be a form of

8    intimidation, that was also one of the fundamental underpinnings

9    of the Republican National Committee's consent degree.

10           THE COURT:  Ms. Wright says your time is up.  Thank you.

11   Thank you.

12           Does anyone need a break or are you ready to proceed

13   with the defense's motion for summary motion.

14           MS. YUN:  May we have a 10-minute break?

15           THE COURT:  We'll take a 10-minute break.  We'll start

16   back at 11:30.

17           (Recess taken from 11:18 a.m., to 11:33 a.m.)

18           THE COURT:  Mr. Bopp, are you ready?

19           MR. BOPP:  I am.

20           THE COURT:  Come on up, sir.

21           MR. BOPP:  Thank you, Your Honor.

22           This, of course, is my initial presentation on the

23   motion for summary judgment.

24           THE COURT:  Yes, sir.

25           MR. BOPP:  And, obviously, there is a lot of factors

1  that have already been discussed, will be discussed that apply to

2  this.

3          I want to focus on the examination of the evidence and

4  what has happened before.  But before I do that, I mentioned in my

5  statement previously that since First Amendment activity is being

6  punished under 11(b), then there has to be bright lines.  And,

7  furthermore, people have to know in advance whether their conduct

8  will violate those limitations.

9          THE COURT:  All right.

10         MR. BOPP:  And, of course, the U.S. Government just

11  sends chills down my spine as a First Amendment lawyer for 50

12  years, when they talk about the totality of circumstances test or

13  when they talked about, you know, mass challenges.  I mean, talk

14  about classic unconstitutional vagueness.  Who in the world would

15  have ever known whether their conduct would be viewed and they

16  would be held in account with those sorts of standards.  They are

17  purposely undefined, and puts every individual's First Amendment

18  rights of speech and petition at the mercy of the U.S. Government

19  to bring an action against them and all that -- you know, at that

20  point they just hope, you know, a judge will apply the First

21  Amendment properly and let them off the hook.  In the meantime,

22  they're ruined.

23         So, you know, this is serious, serious stuff.  And we

24  are talking about speech and petition at the core of the First

25  Amendment.  You know, nude dancing and all that, that's out here.

1  Okay?  This is what they were thinking about right here right now

2  is the activities that True The Vote were involved in.  And to

3  make one side out of bounds on the question, which is what they

4  would do if you adopted these tests, to question the integrity of

5  our elections or to question whether or not there is voter fraud,

6  we could not do anything more to undermined faith in our democracy

7  than to prohibit by law and government action and punish people

8  who raise questions about whether or not our elections are being

9  conducted fairly.  But that's exactly the spectre that they have

10  raised.

11         Now, you issued a preliminary injunction.  And as to the

12  communications being made or the actions being made by True The

13  Vote, nothing has changed between then and now.  There's no, after

14  18 months of discovery, no smoking gun, no e-mail to some

15  challenged voter threatening them with, you know, prosecution if

16  they illegally vote.  I mean there is nothing.  There is just

17  nothing that even approaches the standards that you applied

18  correctly to those facts, because those facts really haven't

19  changed.

20         Now, the other thing that hasn't changed is that this

21  canard about Navy SEALs and bounties.  Now, both of those were

22  subject to discovery.  In other words, what did you mean when you

23  said "put a bounty on voter fraud"?  They didn't say, you know --

24  what did you mean by that?  And what they meant by that, which is

25  not contested, is that if a whistleblower who reports on fraud or

1   whatever it is, irregularities, if they are sued, they'll provide

2   a defense.  Not that they're going to give them a payment for

3   making the report.  Uncontested.

4           Secondly, Navy SEALs.  Let me start with this.  They're

5   throwing around Navy SEALs as if they're evil people that we've

6   got to be afraid are around our polling places.  Can you believe

7   that?  These are people that have risked their lives in the

8   defense of our country who are patriots.  I would trust them as a

9   judge at a polling place maybe above anybody.  I would put first

10  responders in that category, too.

11          So there is nothing evil about these people that True

12  The Vote was encouraging to become involved -- not to patrol the

13  polling place, uncontested, but to volunteer as a poll worker,

14  work at the polls under the supervision of the Election Board and

15  be trained -- not to patrol.  That was never said by her any time,

16  anywhere, and it didn't happen.  There were no patrols.  And

17  that's just a canard.  And, of course, it then takes you to the

18  question of relevance, doesn't it?  I mean, even if it were true,

19  why is that relevant?  Their challenge is to the -- is True The

20  Vote availed itself through electors in Georgia of the 230

21  procedure.  All right?

22          THE COURT:  Right.

23          MR. BOPP:  Patrolling poll sites has nothing to do with

24  it.

25          THE COURT:  That's true.

1           MR. BOPP:  Okay?  And, of course, in your PI order, in

2    my view, what we've already argued to you, that you faithfully

3    applied the Eleventh Circuit standards on what kind of speech and

4    conduct can be considered to be punished under 11(b).  And believe

5    you me, if somebody did what I understand to be a violation of

6    11(b), I'll be the first one to have them punished.

7           THE COURT:  Could the plaintiffs, though, argue that it

8    is a disputed fact on the interpretation of this Eleventh Circuit

9    definition?

10          MR. BOPP:  Is there a disputed fact on what?

11          THE COURT:  On the interpretation of the Eleventh

12   Circuit definition?  Could the plaintiffs argue that?

13          MR. BOPP:  Well, you get to reconcile the questions of

14   law, okay, and then apply that law to -- to the facts as you find

15   them.

16          And this is one of the things about the pleadings by

17   both the government and the plaintiffs.  I mean, they talk

18   ad nauseam, in my opinion, about the Wohl case, Southern District

19   of New York.  In the U.S. brief it's impassive for the two

20   opinions there.

21          But to try to find First -- Eleventh Amendment precedent

22   on point, it's really hard to find.  In fact, they don't try to

23   distinguish your Footnote 10, which was a very faithful quote, in

24   my opinion, to the Eleventh Circuit position.  They don't try to

25   reconcile that with Wohl.  I mean -- and, you know, I mean, that's

1   a really slim reading to be basing a decision on unless -- I mean,

2   they haven't met their burden of persuasion, it seems to me,

3   because that would have necessitated them to explain why the

4   Eleventh Circuit -- this -- what Wohl did and the standards it

5   used would be permissible under Eleventh Circuit precedent.  They

6   didn't even try to do that.  In fact, they didn't even cite to

7   any in their briefing, at least.

8            So nothing has changed.  You applied the correct

9   standards.  So what we have, though, found out?  Well, we have

10  found out that -- that none of the plaintiffs have an 11(b)

11  injury.  Every one of them fell under at least one or more of

12  these categories.

13           One, the challenge was not made by True The Vote at all.

14  Either no challenge was made or it was made by someone else, such

15  as Mark Davis and Mr. Somerville who were doing their own thing,

16  completely independent.

17           THE COURT:  So they got no information whatsoever from

18  True The Vote?

19           MR. BOPP:  No one involved them in their projects.

20  Okay?  And they were -- they were doing their thing.  In fact, you

21  know -- I mean -- I mean some of them like their own thing, and

22  thought it was a better thing than True The Vote was doing, and

23  that's fine.  So they were doing their own thing.  They were not

24  in, you know, in any kind of concert or cooperation that could

25  cast liability on True The Vote for whatever they do.

1              Well, several of these people, there was no True The

2       Vote challenge.  So how can True The Vote be responsible?

3              Second is there was no publication of any list by True

4       The Vote.  And certainly not even this tweet regarding any of the

5       plaintiffs.  So, you know, that doesn't apply.

6              THE COURT:  Let me ask you this, Mr. Bopp.  Mr. Bopp,

7       let me ask you some other questions.

8              MR. BOPP:  Yes.

9              THE COURT:  I think it's Banks County, I may be wrong,

10      there's a lot of information in this case.  Did they not publish

11      the list of the challenged people?

12             MR. BOPP:  I have a recollection that there was some

13      election board that did that.

14             THE COURT:  I hate to say the names.  I've got people

15      here, you know, writing about this.  Let me just say, I'm not

16      saying it was Banks County.  So, guys, don't need write Banks

17      County down.  It was a county, okay --

18             MR. BOPP:  Right.

19             THE COURT:  -- that published the list.

20             MR. BOPP:  That's my recollection, too.  We're not for

21      that.  We didn't do that.  And we wouldn't actually want that.  I

22      mean --

23             THE COURT:  Could --

24             MR. BOPP:  Maybe they thought they were doing a public

25      service to give people notice.  I don't know.

 1          THE COURT:  Let me ask you this question.

 2          MR. BOPP:  Yes.

 3          THE COURT:  I may be misinterpreting the plaintiff's

 4  argument here.  But the plaintiff's is somewhat saying you are

 5  responsible for that.

 6          MR. BOPP:  Yeah, and as a result we're responsible for

 7  everything that happens in the world.  Right?

 8          THE COURT:  They're not saying that.

 9          MR. BOPP:  At least everything that happened in Georgia

10  after the November election.  True The Vote, by their standards,

11  is responsible for everything that happened in Georgia.

12          THE COURT:  I don't know about that.

13          MR. BOPP:  Well, how do you know that that is not the

14  case?  I mean, they are talking about things that other people

15  were doing that True The Vote have nothing to do with, didn't

16  participate.  They peddled the conspiracy theories.

17          THE COURT:  I don't think they hold True The Vote

18  responsible for all elections situations in Georgia.

19          MR. BOPP:  I would hope not, and but -- you know, that's

20  the problem.  The problem is where are we drawing the line,

21  because they were arguing --

22          THE COURT:  Well, they argued this point -- excuse me

23  for interrupting you.

24          MR. BOPP:  That's okay.

25          THE COURT:  I think they're saying the names that were

1  given in this particular county came from True The Vote.

2        MR. BOPP:  In some cases, that is correct.  It came from

3  True The Vote.

4        THE COURT:  And that this particular county published

5  the names and, therefore -- therefore, the process of not -- the

6  names not coming out to us is a probable cause decision made by

7  the Board of Elections, and they just came out before then and

8  there are people that -- the Board of Elections may not have found

9  probable cause for the challenge.

10        MR. BOPP:  Well, what would be the legal theory that

11  would -- an independent third-party making its own decision about

12  doing something?

13        THE COURT:  See, that's where the United States, if I

14  read their brief correctly, they say, yeah, you probably have to

15  be responsible for what third parties do.

16        MR. BOPP:  Then bingo.  Where is the stopping point?

17        THE COURT:  Well, that's what I want you tell me.  Is

18  there a stopping point?  Are they correct?  Why are they wrong?

19        MR. BOPP:  No, they're wrong.  It has to be an agent.  I

20  mean, there are legal standards, okay, already existing in the law

21  on whether or not that would establish liability under certain

22  circumstances for someone else doing something that you could be

23  liable for.  And there are standards for that.  Agency, you know,

24  and not the independent decision by an independent group, which is

25  what the election board is.  You know, they decided.  And there

1   was nothing wrongful about True The Vote providing them the

2   information.  It was in conformance with statute.  They complied

3   with the statute.  I mean, it wasn't, you know, stolen stuff, you

4   know, that was given to somebody.  And so, you know, that's the

5   problem.

6           Every time we talk about the bright lines -- I think you

7   applied in your PI, I argued for, every time we talk about those,

8   they want to go over here, you know, out, farther, farther.  And

9   as soon as they start doing that, then we have no idea where we're

10  going with this.  Okay?  Or what it means.  Know in advance.  What

11  is a mass challenge?  They do think a mass challenge is inherently

12  intimidating.  Well, is that five in one city or is that if you

13  file five but you file them in different cities, is that mass?

14  What -- I mean, you know -- and we're talking about core First

15  Amendment activity here that must have bright lines and rigorous

16  standards in order to impinge on that very important matter.

17          THE COURT:  Well, doesn't it say that in a sense in

18  Virginia v. Black, somewhat establishes that yellow line?

19          MR. BOPP:  It did what?

20          THE COURT:  Doesn't Virginia v. Black establish that

21  yellow line?

22          MR. BOPP:  It did.  It did.

23          THE COURT:  It's still a law, isn't it?

24          MR. BOPP:  I think it is.

25          THE COURT:  It's not past tense.

1          MR. BOPP:  Eleventh Circuit seemed to following it

2     pretty rigorously, and in multiple -- on pages 9 through 12 of our

3     supplemental is listed, you know, there is 8 or 10 or 6 to 8

4     Eleventh Circuit cases following Black.  We applied them in

5     various situations.  And then, you know -- then this is a whole

6     bunch of other circuits doing the same thing.  So, you know, this

7     Southern District of New York case is really an outlier and

8     arguably not even in compliance with its own circuit precedent,

9     but is very thin.

10          You know, none of the plaintiffs were contacted by any

11     of the defendants at all.  None.  There was -- there was only

12     subjective fear or subjective intimidation by Jocelyn, who is

13     Hispanic, who said I was in line, okay, and I felt intimidated.

14     Why?  I'm the only Hispanic standing in this line with probably a

15     bunch of Republicans because of where she lives.  All right?  That

16     was her intimidation statement.  Okay?

17          Well, subjective can't -- is not the standard.  And, of

18     course, finally, they all voted.  I mean, she went in -- into the

19     polling place.  Somebody had filed, not True The Vote but one with

20     respect to her, and they said, you know, well, you need to give us

21     proof of your residence.  She did, and she voted.  Off she went.

22     Okay?

23          So these are the horror stories that -- no, these

24     aren't, are they?  These aren't horror stories.  In fact, none of

25     them are horror stories for the plaintiff.  The horror stories are

1   all these other things.  What did Trump do?  Okay?  I mean, what
2   would were -- you know, I mean, argument by adjective and
3   accusation.  I mean, they've used some very strong words here and
4   attributed all of this to one group.

5          I mean, how many people were running around Georgia
6   complaining about the situation and whether or not there was voter
7   fraud?  Who thinks True The Vote had a bigger microphone than did
8   Donald Trump and his allies?  Okay.  And they had nothing to do
9   with them.  True The Vote had nothing to do with what they were
10  doing.  Nothing.  They did this.  All right?  They also brought
11  suit.  I know something about that as counsel, and those were
12  dismissed because our claim was if there was sufficient proof of
13  voter fraud that the election could be -- it was drawn into doubt,
14  then there needs to be a remedy.  If.  That if, as we explained,
15  was dependent on getting the voter rolls of who actually voted,
16  which would have then been analyzed to see if there were
17  ineligible voters who voted.  And then and only then if there was
18  enough of those to draw the election into doubt, then a remedy
19  would have been pursued.

20          Well, it became obvious we weren't going to get those in
21  time.  They weren't publicly available.  The Court wasn't
22  expediting our case as we asked them to do, and so we dismissed.
23  I mean, we ought to be praised for that.  Not, oh, this is another
24  one of those suspicious conspiracy theories behind this.  I mean,
25  that was the truth.  That's what happened.

1          So anyway we -- now, I had mentioned the irrelevant

2     things which are, of course, the bounty, the Navy SEALs, the

3     presidential election litigation, which I just described.  What

4     does that have to do with 230?  I mean, those cases were dismissed

5     before the 230 challenges were filed, before the -- long before,

6     actually -- or at the time it seemed long.  It's probably short.

7     The vote on the two senate races.  And then encouraging and -- I

8     mean, they use these big words, encouraging and amplifying

9     threats.  The only threat they mentioned that I made a note of, is

10    in a thread it was mentioned that there are a number of voters who

11    were registered at a commercial mail -- mail recovery agency, you

12    know, you can have a box.

13          THE COURT:  I think your time is up.  Is there one thing

14    you can express in one minute to close it out?

15          MR. BOPP:  Yeah, I do want to talk about one of the

16    other things, that is, the Crusade For freedom was not associated.

17    There is no dispute of that.  They did not -- anything that they

18    said or did is -- they're responsible for, not True The Vote.

19    Thank you.

20          THE COURT:  Thank you, Ms. Bopp.

21          Let me say this to anyone here representing the

22    newspaper media.  I'm not saying that Banks County is the county,

23    again, that did this.  There was a county in -- I probably have

24    250, 300 pages of briefs.  So I don't want to say it was Banks

25    County or it wasn't, because I drive through Banks County and I

1    want to continue to drive through Banks County.  It was a county.

2              Thank you, Mr. Bopp.

3              MR. BOPP:  Thank you.

4              THE COURT:  All right.  Does plaintiff's counsel want to

5    respond?

6              MR. NKWONTA:  Thank you, Your Honor.

7              THE COURT:  What's the disputed fact here as far as

8    defense counsel say there is no disputed fact, Judge?  What are

9    you saying?

10             MR. BOPP:  I did it again.  Sorry.

11             THE COURT:  Mr. Bopp said there is no disputed facts.

12   What are the claims for the disputed facts?

13             MR. NKWONTA:  Your Honor, plaintiffs don't believe there

14   are disputed material facts in this case either, and that's why

15   plaintiffs believe they are entitled to -- we are entitled to

16   summary judgment.  And I'm going to walk through some of the

17   evidence, some of the legal evidence that Mr. Bopp made.

18             But first I want to talk about what is the line and what

19   is the stopping point.  And the line is the standard, which is

20   that challengers or individuals accused of voting intimidation

21   under Section 11(b) are responsible for the natural consequences

22   of their actions.  That is a standard that has been set forth in

23   the case law, and that was discussed by Attorney General

24   Katzenbach when the statute was being considered in Congress.

25             So the question is what are the natural consequences of

1   filing a challenge against hundreds of thousands of voters, and

2   accusing hundreds of thousands of voters of being unlawfully

3   registered and potentially voting unlawfully mere weeks, less than

4   about two weeks before the election or before the runoff.  What is

5   the natural consequence of forcing those voters or some of those

6   voters to have to prove their -- their eligibility within that

7   short period of time between the challenge and between the runoff?

8           And we talked earlier about how the, you know,

9   intimidation is not just necessarily just the outcome.  And it

10  doesn't necessarily matter if someone is successful in proving

11  their innocence as in the McLeod case.  Even the opportunity for

12  potential acquittal is not necessarily -- does not eliminate

13  liability for intimidation.  It's the process that can be

14  burdensome and intimidating.  It's the process that can be

15  corrosive.

16          And just to give you an example of that process, Ms.

17  Jocelyn Heredia, who Mr. Bopp was just talking about, the process

18  for her when she was pulled aside lasted three to four hours.

19  That's unrefuted testimony.  It took three to four hours at the

20  poll standing there in December pulled away from her fellow voters

21  to resolve her challenge.  That is the process that these voters

22  are being subjected to because of this last minute challenge of

23  hundreds of thousands of individuals.  That in itself is

24  intimidation.  That in itself is corrosive.

25          And another question that I will pose, a rhetorical

```
 1   question because I'll give you in the answer, what is the natural
 2   consequences of issuing this challenge with a list of names of
 3   hundreds of thousands of voters to counties around Georgia
 4   knowing, as Mr. Bopp admitted earlier in his previous argument,
 5   knowing that these are public records which means that these lists
 6   will get out?
 7           Your Honor mentioned that at least one county published
 8   a list.  Yes, that is how Ms. Jocelyn Heredia found her name
 9   online and she testified to that.  That testimony is unrefuted.
10   But that's not the only county.  There are other challenged voters
11   who saw their name and information and who were listed as
12   challenged voters.
13           Jane Doe testified that she saw her information listed
14   as a challenged voter online.  That should come as no surprise.
15   As Your Honor knows, as Mr. Bopp knows, again, it is a public
16   record.  So what are the natural consequences of putting this
17   information in the hands of an entity that you know is required to
18   disclose it as a public record?  And then we talked earlier, Your
19   Honor, about whether individuals who do not know that they were
20   challenged can be intimidated.  And we talked earlier about that.
21   And even though there are no such individuals in this lawsuit,
22   because all of the plaintiffs knew they were challenged, even if
23   there were individual that did not know they were challenged, that
24   does not absolve True The Vote and its allies from liability.  And
25   the reason that's the case is because Section 11(b) does not just
```

1  prescribe intimidation and coercion and threats, it also

2  prescribes attempts to intimidate.

3         So when defendants launched this voter challenge effort

4  to challenge hundreds of thousands of voters, the purpose of that

5  was to -- as defendants have admitted, was to have the counties

6  conduct these hearings, to have the counties confront these voters

7  and force these voters to prove their eligibility.  That was the

8  purpose.  That's what they attempted to do.

9         So the fact that somebody did not know that they were

10  targeted because the county stepped in, it does not mean that they

11  did not attempt to have this process create a burden and

12  intimidate the voter.

13         And I'm not saying intent is required -- look, they did

14  attempt to do exactly what happened to Jocelyn Heredia, what

15  happened to Galileo Turner, Scott Berson and Jane Doe among

16  others.  They attempted to do that with many other voters, some

17  who found out about it, others did not.  In both cases it is a

18  Section 11(b) violation because of the attempt.

19         It is also a Section 11(b) violation because

20  intimidation is determined based on an objective standard.  So

21  it's not a subjective assessment of whether this individual was

22  actually intimidated.  That might be relevant evidence and we

23  submitted that evidence, but it's also an objective assessment.

24  And if a reasonable person who is aware of the context, aware of

25  the context surrounding these challenges would feel intimidated,

```
 1   then that is voter intimidation.  And that is what we've
 2   demonstrated here.  Not just through the testimony of plaintiffs
 3   and other voters, but we have done that definitively and it's all
 4   unrefuted, including from Mr. Galileo Turner who expressed
 5   scepticism about whether he would vote again or whether he would
 6   be willing to go on through that process again because it was so
 7   intimidating.  And this is a life-long voter who has spent a lot
 8   of time exercising his right to vote in Georgia.
 9           So it's not just his testimony that tells us this is
10   objectively intimidating, but it's also unrefuted testimony from
11   experts like Dr. Ken Mayer who explained that under the cost of
12   voting theory that efforts like these that impose additional
13   burdens and impose additional hoops that voters have to jump
14   through the last minute right before an election, these types of
15   efforts increase the cost of voting and create scenarios where
16   some voters will opt not to jump through these hoops and will not
17   have the resources necessary to manage those costs.
18           THE COURT:  But what if it is legitimate?  What if it is
19   a legitimate challenge and the person's name is published by this
20   County A, but the person shouldn't be voting in that county,
21   shouldn't have their name on the list?
22           MR. NKWONTA:  If it is a legitimate lawful challenge,
23   then it's not necessarily voter intimidation.  I know I mentioned
24   it is context specific, but --
25           THE COURT:  That comes back to the question I need to
```

1    ask you.  How do I determine that aspect of it?  Do I wait, do I

2    say, well, if the Board of Election finds probably cause, it is

3    legitimate?  But if they don't -- in other words, I read about

4    this county because those names were published.  I think you-all

5    put it in your briefs; were published before the county made a

6    probable cause determination.  Okay?  But it's possible -- it's

7    possible somebody had that list probably, maybe legitimately

8    should not have been voting in that county.  How do I handle that?

9            MR. NKWONTA:  Your Honor, the fact that there may have

10   been one person who should not have been voting on the list, does

11   not eliminate the obvious intimidation that occurred for all of

12   the others who were improperly targeted.  And there are a couple

13   of reasons why that's true.

14           One, you know, even if the -- it's not possible under

15   federal law to make that determination within the amount of time

16   that the defendants had allotted for their challenge.  They just

17   simply did not assert these challenges within enough time to

18   actually make that determination in a way that would comply with

19   federal law.  That's number one.

20           Number two, we've introduced extensive evidence that the

21   challenges as a whole were frivolous and were lacking both legally

22   and factually.  And so there may have been a few that -- that

23   could have been supportable.  But as a whole they were lacking

24   factually.  And I can go --

25           THE COURT:  Does 230 say what is a privilege?

1          MR. BOPP:  230 does not, to my knowledge, define what is

2   an unlawful challenge.  And nor do I think it needs to, because,

3   again, compliance as we've discussed, compliance with the state

4   law does not absolve them of liability.  Just as the same way

5   courts have recognized that, you know -- following a state law but

6   doing so in a way that intimidates voters, you can still violate

7   federal law.

8          Now, how do we know that these challenges lack merit?

9   How do we know that they were unlawful and they were reckless?  We

10  know because there is unrefuted evidence that True The Vote's own

11  associates kept telling them that these challenges were reckless

12  and these challenges were frivolous.

13         James Martin their volunteer challenger from Talbot

14  County said that True the Vote -- my experience with True The

15  Vote's database has not been good.  Concerns with the quality of

16  the information, impact of the challenges not good.  Indicates

17  problems with data accuracy and the relevance.  They don't

18  distribute that statement.

19         James Martin was the only challenger who actually did

20  due diligence on the list that True The Vote provided and

21  submitted his name and immediately withdrew his challenges because

22  of that.  He immediately noticed and told True The Vote.  True The

23  Vote persisted with this information.

24         Mark Davis, a codefendant who True The Vote listed in

25  their press release as working with them on these challenges, he

1   testified that he took exception to True The Vote's logic and he

2   was not on board with True The Vote's philosophy.  He felt it was

3   too broad.  This is their associate and codefendant.  True The

4   Vote's own funder, Fred Eshelman, the one who provided the funding

5   for a lot of their efforts in the post election, he called the

6   Georgia challenges largely baseless, and then he accused True the

7   Vote of squandering his money on these challenges.

8           The Georgia Secretary of State reviewed the challenge

9   lists submitted by Mr. Davis and Mr. Somerville and found that

10  they lacked merit.  And our expert report and our expert

11  declaration from Ken Mayer, which is unrefuted, also highlighted

12  very obvious errors.  There were literally voters whose addresses

13  were on military installations on those challenges.  There were

14  voters who were not even registered on that challenge.  There were

15  voters who were registered at that new address where True The Vote

16  claimed they moved to.  They were registered at their new address,

17  and they were challenged.  There were voters who were

18  misidentified because of the recklessness method of the preparing

19  those lists.

20          And so given the amount of information, given the

21  sloppiness of the list, given the fact that so many of their

22  associates were telling them that these lists were unreliable and

23  were flawed and were misidentifying people, and given the fact of

24  what they sought to accomplish was legally impossible, whatever

25  standard the Court wants to adopt for frivolity or for whether the

1    challenges were baseless, this passes this test.  This is not one

2    of these instances where we're on the margins.  And because it

3    passes that test, liability under Section 11(b) is the natural

4    consequence and has been recognized as the natural resolve by a

5    number of courts.

6            As I mentioned before, for 27 years RNC was under a

7    consent decree because of, among other things, voter challenges

8    that -- that were intimidating, and sending off-duty police

9    officers to polling places.  They are analyzed between those two

10   actions here.  And while it was the consent decree, which is an

11   agreement between the parties, the Court, as Your Honor knows, the

12   Court has to accept the consent degree, has to be determine that

13   it entered in good faith.  And there is a substantive issue there

14   that gives rise to the consent decree.  And that consent decree

15   was in place for almost 27 years.

16           So it's not unprecedented.  In fact, the courts have

17   recognized, as I mentioned before, that voter challenges even when

18   authorized by the law, can be intimidating, and they were in this

19   case.

20           And so going to proposing counsel's discussion about the

21   First Amendment and the impact on -- on First Amendment freedoms,

22   I want to remind this Court that the Supreme Court and other

23   federal courts have had no problem restricting whatever opposing

24   counsel calls protected speech when it runs headlong into the

25   right to vote.  And whenever -- when the Court is confronted with

1   the need to reconcile the Constitutional rights to vote with the

2   right to speech or the right to engage in political speech, you

3   know, the Court has protected the right to vote.

4          In *Burson v. Freeman* the Supreme Court noted that the

5   restricted activity can proceed within 100 feet of a polling place

6   presented a trifecta of protected speech.  It was political

7   speech, content-based restriction, and a public forum on streets

8   and sidewalks where you traditionally expect that type of speech,

9   and yet the Court enjoined the -- the Court enjoined speech within

10  a hundred feet of a polling place, the Court enjoined campaigners

11  from approaching voters within 100 feet of the polling place

12  specifically because of the history of voter intimidation that has

13  occurred when voters are challenged to test their ballots within

14  that zone.

15         And so the same should apply here.  The Court should

16  look at the history of voter intimidation, the declaration by Dr.

17  Vernon Burden demonstrates how some of the activities that we see

18  today have been historically used to intimidate voters to suppress

19  the vote and pass.  There is ample evidence of that.  And the

20  Court should reconcile the Constitutional right to vote and the

21  robust protections of Section 11(b) with whatever First Amendment

22  protection that True The Vote claims, and it should apply and

23  enforce the Constitutional right to vote just like the Supreme

24  Court in Burson did.  Thank you.

25         THE COURT:  Counsel.

 1          MS. YUN:  Thank you, Your Honor.  I would like to just

 2   pick up on the First Amendment prong.

 3          So I believe the contention was that we need bright line

 4   rules and that that may be too vague.  So I would just remind this

 5   Court that the test for unconstitutional vagueness within the

 6   Eleventh Circuit is whether the statute is so indefinite that

 7   there is no rule or standard at all.  So that is the threshold

 8   standard, it is not whether there are bright line rules.

 9          And the fact that we are -- the fact that the statute

10   calls for a totality of circumstances inquiry, passes that test.

11   The test is whether the conduct is intimidating or threatening or

12   corrosive based on the totality of circumstances presented.  And

13   this Court may -- district courts around the country engage in

14   that totality of circumstances analysis all the time.  It's not

15   some test that is only applicable to the statute.

16          And I would also, as we discussed in our brief, that the

17   terms, the operative terms of 11(b) intimidating, corrosive, or

18   threatening those are all terms that have been used in other parts

19   of the United States Code, courts have applied it many times over

20   the course of our history.  So Section 11(b) amply satisfied that

21   vagueness standard.

22          In terms of the First Amendment considerations, Section

23   11(b) as applied here prescribes intimidating or course of conduct

24   rather than speech.  So to the extent that any speech is involved

25   in order to carryout that conduct, it is still prescribable as

1   speech and unlawful conduct.  And also even if it was speech, the
2   First Amendment allows prescribing knowingly or recklessly false
3   speech, and that is what the Supreme Court held in the United
4   States v. Alvarez, when knowingly or recklessly false speech
5   inflates the legally cognizable harm such as jeopardizing
6   someone's right to vote or in cases of defamation or perjury,
7   these are all categories of false speech that can be prescribed
8   consistent with the First Amendment.

9          And as plaintiff's counsel mentioned, even if none of
10  those things were to apply, which we believe they apply, balancing
11  this First Amendment right against the right to vote, the courts
12  have done that.

13         I would just also point you to, in addition to *Burson v.*
14  *Freeman*, the Eleventh Circuit case in *Citizens for Police*
15  *Accountability v. Browning*, which found that -- in the Burson case
16  that was a plurality opinion, but the Eleventh Circuit adopted
17  that plurality reading in Browning saying that, yes, it is okay,
18  we're trying to balance between people's right to solicit
19  signatures outside of polling locations with people's right to
20  vote free of intimidation.  And the Eleventh Circuit found that
21  you could -- you could prohibit facially legitimate activities
22  like soliciting votes in order to prevent voter intimidation.

23         And I would like to move on to something that was
24  brought up earlier in the proceeding about relevance of, you know,
25  the allegations of Navy SEALs patrolling poll sites and the

1    allegation of putting a bounty.  I would just point out that those

2    activities are relevant -- may be relevant here even though we

3    don't take a position on the factual allegations, those positions

4    may be relevant in the court's analysis because they impact the

5    context in which voters would perceive other conduct by the

6    defendants, such as broader challenges.

7           So if those other activities are going on, it would

8    affect a reasonable voter and voters in general, their perception

9    of what is happening to their eligibility and what is happening at

10   the polling location based on -- based on the context.  And, also,

11   it would inform this Court's analysis of whether there was

12   unlawful intent.

13          So if -- because this Court is called to analyze the

14   full course of the defendant's conduct, if the same actors were

15   engaging in those sort of public accusations of criminal conduct

16   or sort of testing aspirations on voters at the same time lodging

17   recklessly false challenges, that would be -- those two things

18   would be both probative in the analysis of -- the Court's analysis

19   of the full course of the defendant's conduct.

20          Lastly, I would like to briefly touch on the notion that

21   -- that our position is unnatural and is inherently intimidating.

22   That is not our position.  We are not proposing any, per se, rule

23   here about whether -- however you define mass would be

24   intimidating.

25          Our point -- my earlier point simply is that the lack of

1  individualized inquiry can be -- can be a factor in the Court's

2  analysis of whether this as a whole was intimidating.  And under

3  the NVRA, you may remove voters from the voter rolls on a

4  systematic basis, you just can't do it within 90 days.  And the

5  NVRA acknowledged that mass removals may happen as part of their

6  ordinary list maintenance activities.  And you can also within

7  those 90 days challenge or remove voters under the NVRA with a

8  particular -- particular's knowledge.

9          So it is not true that you cannot have mass challenges

10  under the NVRA or that we don't believe that they are inherently

11  intimidating, it's just those other factors within the NVRA that

12  would inform the totality of circumstances analysis.

13          And one last point I would mention is that we were

14  talking about, like, where is the line, how do we decide what is

15  -- what is intimidating.  I would note that, and especially if it

16  complies with state law, the department has throughout -- lawsuits

17  against challenged activities.  They're not under 11(b) but under

18  Section 2 of the Voting Rights Act for mass challenges that were

19  not based on any sort of individualized inquiry or credible

20  evidence that were targeting racial minorities, and that was the

21  case in our 2006 Southern District of Georgia case, *United States*

22  *v. Long County*, as well as a case in Michigan, *United States v.*

23  *City of Hamtramck* where mass challenges were lodged and minority

24  voters were subject to additional procedures at the polling place.

25          So there are other factors that Your Honor may consider

1  in figuring out whether -- whether compliance with state law is

2  sufficient.

3       THE COURT:  Thank you.  We'll now move forward because

4  you're next.  Mr. Bopp used all of his time in his presentation

5  for his summary judgment, and the plaintiff used their time.  So

6  now we'll move to the United States' argument that 11(b) is not

7  unconstitutional.

8       MS. YUN:  Your Honor, if I may, I would like to reserve

9  three minutes for rebuttal.

10      THE COURT:  So be it.

11      Mr. Bopp has indicated that if the Court finds -- not

12 exactly -- finds against him, the named defendants, then that

13 11(b) should be unconstitutional.

14      MS. YUN:  Yes.  So I would like to address some of those

15 Constitutional questions more -- in addition to what I mentioned

16 earlier about the First Amendment.

17      So as applied to the allegations in this case, Section

18 11(b) is consistent with the free speech clause and the petition

19 clause and is not unconstitutionally vague and no vote dilution

20 defense is available.

21      First, if this court finds that the defendants' voter

22 challenges were knowingly or recklessly false, such conduct falls

23 outside of the scope of the free speech clause.  The free speech

24 clause allows prohibiting false speech that inflicts legally

25 cognizable harm, such as jeopardizing an eligible voter's ability

1   to vote, and the harm inflicted by knowingly or recklessly false

2   challenges has been well established as evident in the NVRA's

3   protections and rationale against last minute systematic removals.

4   More broadly, any intimidating, threatening or course of conduct

5   and/or any speech that carries out such conduct is unprotected

6   under the First Amendment as discussed earlier.

7        And the Court was asking about the true threats

8   exception.  So while we agreed with the plaintiff's position that

9   *Virginia v. Black* does not preclude this Court from finding that a

10  nonviolent threat may be a true threat, we believe that Section

11  11(b) is Constitutional under the first amendment for other

12  reasons as well, such as the speech in the role to unlawful

13  conduct exception and because more broadly because Section 11(b)

14  prohibits conduct rather than speech.

15       So we do not believe that this Court actually needs to

16  reach that question of whether the true threat exception allows

17  nonviolent threats to be included.  And the Eleventh Circuit cases

18  that Your Honor and counsel were talking about earlier, all came

19  up in -- I would note they all came up in the criminal context,

20  and that we do not have case law in the Eleventh Circuit saying

21  that nonviolent threats cannot be included or that it applies to

22  this context of civil statutes.

23       THE COURT:  Does it make any difference that the defense

24  being put forth by the defendant was an applied challenge or a

25  facial challenge?

1          MS. YUN:  Sure.  We believe that it is an applied

2    challenge here, and -- but as we mentioned in our brief, we also

3    believe that 11(b) is Constitutional on its face as well, because

4    the question is whether the legitimate sweep of the statute is

5    compared to its potential illegitimate application is so small

6    that it does not -- it would have to overcome that pretty high

7    standard in order for it to be facial.  But we do not take this

8    case as concerning a facial challenge of Section 11(b).

9          Just to go back to where we're discussing the First

10   Amendment, and as we mentioned in terms of the *Browning* case and

11   the *Burson* case, even if this Court finds that there is protected

12   speech or expressive conduct here, imposing a narrowly-tailored

13   remedy to enjoin only the intimidating course of conduct would

14   survive any level of scrutiny.

15         Second, the same analysis would apply under the petition

16   clause, that is, any knowingly or recklessly false challenges are

17   not lawful means to achieve legitimate political ends and,

18   therefore, are not protected by the petition clause.

19         Third, under the vagueness issue, we already -- I

20   already sort of covered this earlier, which is that all of the

21   operative terms have been used in other parts of the U.S. Code and

22   they have not been deemed unconstitutionally vague.  And even if

23   close cases can be envisioned under the totality of circumstances

24   inquiry, that should not be conflated with being

25   unconstitutionally vague, because the Constitutional vagueness

 1  test is different from whether this is a hard case.  Those are two

 2  distinct concepts.

 3          And lastly, vote dilution cannot function as a defense

 4  here because finding liability in this case would not hamper

 5  defendant's ability to bring an affirmative dilution case or their

 6  ability to submit a legitimate voter challenge.

 7          I'll be happy to take any questions at this time.

 8          THE COURT:  I think I've given you a proper amount of

 9  questions.  I don't have any right now.  So we'll move forward.

10  Thank you.

11          MS. YUN:  Thank you.

12          THE COURT:  Does plaintiff's counsel want to address

13  this?  We're talking about whether 11(b) could be found

14  unconstitutional in this matter.

15          MR. NKWONTA:  Thank you, Your Honor.  And I'll be brief.

16          I want to echo what counsel for the United States

17  discussed about the First Amendment violations.

18          As we mentioned earlier, there is no First Amendment

19  violation here, not only are these true threats as demonstrated in

20  the *Wohl* case and in *U.S. v. Nguyen* where both courts spoke for

21  the Southern District of New York and Ninth Circuit that such

22  conduct could be contemplated as true threats.

23          Also, there is no First Amendment protection for the

24  type of conduct that we have alleged here, and opposing counsel

25  has not pointed to case law suggesting otherwise.

1          Second, there is no Constitutional violation of the

2   right to vote.  To the extent that defendants are claiming that

3   they have a Constitutional right to vote that allows them to

4   intimidate voters, well, that is unprecedented and that is a

5   breathtaking expansion of the Supreme Court's ruling --

6          THE COURT:  How do you argue against that again?

7          MR. NKWONTA:  Well, to the extent that defendants claim

8   that they have a Constitutional right to vote and to protect their

9   right to vote from dilution that allows them to intimidate voters,

10  that is an unprecedented theory and is a breathtaking expansion of

11  the Supreme Court's ruling in *Reynolds* and other cases.  There has

12  been no vote dilution and -- nor can anyone prove vote dilution by

13  pointing to someone who may have voted unlawfully.  That is not

14  the definition of vote dilution.  No one's vote has been made less

15  powerful or afforded less strength than anyone else's vote.  And

16  even if there was some argument of vote dilution to be made here,

17  that is not a defense to violating federal law, intimidating

18  voters.  So vote dilution cannot constitute a defense in this

19  case.

20          Without any Constitutional challenges to Section 11(b),

21  I would point the Court again to the evidence we submitted that

22  threats/challenges were not only reckless, they swept in a

23  significant number of voters into a process that burdened and

24  intimidated them and coerced them, and they had no possible path

25  to any lawful relief.  It was a publicity stunt, and it was a

1  stunt that harmed voters and caused them to question whether they

2  wanted to participate in the political process.  And we ask that

3  you grant plaintiffs' motion for summary judgment.  And I'm

4  willing to take any questions you may have.

5          THE COURT:  Just this one.  What would be to -- how

6  would I evaluate whether the First Amendment petition here is

7  baseless or frivolous?  I think you indicated, I want to make sure

8  I have this down right, whether it is illegal or not?

9          MR. NKWONTA:  So in determining whether the -- in

10  determining whether the petition is frivolous, I think that

11  assumes, Your Honor, that assumes that the frivolousness standard

12  applies here.  So, first, we argue that it does not actually apply

13  here.  Because this is -- this case is distinguishable from the

14  cases that have applied that frivolousness standard to First

15  Amendment petitions.  This case here, we're not just arguing that

16  the filing of challenges just by itself and nothing else is

17  intimidating.  It's the content.  It's what they said in those

18  challenges.

19          THE COURT:  So if this is without merit or fact it could

20  be found to be frivolous?

21          MR. NKWONTA:  Sorry.  Can you repeat that, Your Honor?

22          THE COURT:  If it is without merit or fact, it can be

23  found frivolous?

24          MR. NKWONTA:  Yes.  It can be found frivolous if it's

25  without merit or fact.  It can also be found frivolous if it was

1   followed with reckless disregard of its falsity.  And that

2   standard comes from *McDonald v. Smith,* U.S. Supreme Court case

3   which analyzed the First Amendment right to petition within the

4   context of the defamation case.  And so the standard there was

5   even less forgiving for the defendant who sent the defamatory

6   letter.  And that standard should apply here, because the First

7   Amendment right to petition does not allow litigants and it does

8   not allow defendants to -- to violate federal law or put material

9   that violates federal law in a petition in order to protect that

10  material.  Accusing voters en mass of unlawful conduct violates

11  Section 11(b) in this context, whether they put it in a petition

12  or in a letter or in some other format.

13          THE COURT:  The reason why I ask this question, and I've

14  asked it a number of times, not that I can't remember my last

15  question, it is because if you look at the Eleventh Circuit -- you

16  know I'm bound by the Eleventh Circuit and the Supreme Court,

17  okay, they -- here's a statement that they put out.  Even if a

18  plaintiff's allegations are ultimately dismissed or found to be

19  insufficient to stand trial, that alone is not enough to render

20  the plaintiffs' cause of action groundless or without foundation,

21  Hughes v. Rowe, 449 U.S. 5.  It sounds like the bar is not that

22  high for the person bringing the challenge.

23          MR. NKWONTA:  So the bar that you are referring to,

24  again, is contextual.  When we're -- when we're discussing

25  antitrust cases where the corresponding right is the right to be

1 | free from anticompetitive behavioral or we're talking about NLR,
2 | National Labor Relations Act cases, where the corresponding right
3 | is the right to engage in protected trade practices, right, the
4 | bar is not -- may not be that high.  But when we're talking about
5 | the right to vote, then it's a different bar.  It's a different
6 | standard.  And we've demonstrated that in the *Burson v. Freeman*
7 | case.  The *McDonald* case is another one where the Court did not
8 | apply that bar.

9 | But even if you apply that bar in this case, it's
10 | conclusive that the vast majority, virtually all of the counties
11 | that received these challenges found they lacked probable cause.
12 | And even in those cases involving antitrust, even the cases
13 | involving the NRLA, they -- even those cases which impose
14 | standards that we don't think apply, even those cases recognize
15 | the lack of probable cause is -- affirmatively establishes
16 | frivolous.

17 | THE COURT:  And that's what concerns me.  In other
18 | words, I took the position earlier as I looked through this, if
19 | probable cause is not found by the Board of Elections, then it's
20 | probably frivolous, that's why they didn't do anything.

21 | MR. NKWONTA:  That's correct.

22 | THE COURT:  But if I take the Eleventh Circuit's -- I
23 | don't want to say test, statement that even if it's groundless,
24 | without foundation, then it's not established as frivolous.

25 | MR. NKWONTA:  Those are not conflicting statements.  The

1   Eleventh Circuit's took its test from the Supreme Court cases.

2           THE COURT:  Yeah, *Hughes v. Row*, 449 U.S. 5.  Here's the

3   test -- well, this is not all of it.  They apply several factors

4   to look at to determine frivolity, but it's not in this list here.

5   Whether the plaintiff says we lost the case, whether the plaintiff

6   offered to settle or dismiss the case prior to trial, rule on the

7   trial of merits, the genuineness of the grievance does not turn on

8   whether they succeeded, they allow for public errors, disputed

9   facts, matters of public concern, the evolution of law theories --

10  these things might be done by the defendant even though if you

11  find that it is not probable cause to go forward.  In other words,

12  two months, three months -- the last election was in November.

13  This is February.  Four months.  I think in Cobb County -- Cobb

14  County Board of Elections threw out 500 of these challenges.

15  We're not even going to contact the voters.  But I would have

16  thought, well, that's probable cause that might actually be

17  frivolous.  I may be reading this wrong.  That's why I raised this

18  question to you-all is that -- let's say the Eleventh Circuit is

19  saying, even though you're throwing them out, it doesn't mean it's

20  frivolous.

21          MR. NKWONTA:  So I think the response to that would be

22  the specific language in the Supreme Court cases that you've

23  mentioned, including, you know, Professional Realtors and the

24  Bob's Restaurant case, the specific language that ties probable

25  cause to frivolousness.  Right?  And that's where the Eleventh

1  Circuit got its standard from.  So if the vast majority of these

2  counties found that these challenges lacked probable cause, then

3  by definition they found that they were frivolous.  That's number

4  one.

5        But, number two, the frivolousness inquiry and the

6  probable cause inquiry is just the first step.

7        So what probable cause means in the context of these

8  challenges, is not that these challenges are meritorious.  It just

9  means that these challenges could then be considered at another

10  separate meeting or at a separate hearing.

11        In other words, this is the lowest of the lowest rung of

12  consideration.  And if they're challenges could not even meet the

13  probable cause standard -- if the majority of counties did not

14  even think their challenges had probable cause, there's no room to

15  find that they were anything but frivolous, and that they were

16  anything but unmeritorious because they did not even make it to

17  the fact-finding stage.  So it's not just the dismissal, it's

18  actually worse than a dismissal.

19        THE COURT:  I raise this question also because one of

20  the defenses of the defendant is the First Amendment.  What we've

21  been talking about here this morning and this afternoon, is that

22  there is not a First Amendment protection from reckless, false,

23  even nonviolent statements.

24        But if I'm -- I might be reading the Eleventh Circuit

25  wrong.  I'm going to go back and look at it.  They're saying,

1    well, Judge Jones, just because it's groundless doesn't mean they

2    still don't have First Amendment protection.  You see where I'm

3    coming from here?

4           MR. NKWONTA:  Yes.  And I would like to go back to the

5    evidence that points to show that it's more than just groundless,

6    it's -- it's the fact that their associates told them that this

7    information was false and they were misidentifying voters.  It's

8    more than just groundless.  It's the fact that these counties

9    thought that it was not even worthy of review, and they knew that.

10   And it's more than just groundlessness, but even -- even under the

11   heightened standard that was applied to antitrust cases and the

12   NRL cases, even the heightened standards, a groundless case can be

13   frivolous.

14          Now, in those cases that may not be the only factor.

15   The Court may also want to consider the subjective motivations.

16   But a groundless case can be frivolous, and the courts recognize

17   this.

18          THE COURT:  Here is the question, not so much of you but

19   for learned counsel here to come back on, would it not then be

20   maybe that 11(b) is curtailed even if a reckless groundless

21   statement is protected?  The basis, that could be grounds for

22   coercion and intimidation.  Something to think when you come back

23   up.

24          MR. NKWONTA:  And I will remind the Court, it's not an

25   absolute protection.  Right?

1          Again, this Court must do something that the Eleventh

2    Circuit did not do in the case you're referencing and the Supreme

3    Court did not do in the cases you're referencing, this Court must

4    reconcile the constitutional right to vote which Section 11(b)

5    protects, and that distinguishes this case from the ones we've

6    just mentioned, and that puts this case more in line with *Burson*

7    *v. Freeman*.

8          THE COURT:  But as you know, I said it before, it's not

9    so much what Steve Jones, the District Court judge, thinks or

10   wants or desires, it's what the Eleventh Circuit and the Supreme

11   Court thinks and says should be desired.

12         MR. NKWONTA:  Fair enough.  But I will leave you with

13   this last statement about what the Supreme Court thinks, and

14   something I referenced before in *Burson v. Freeman*, which is, that

15   even when you have a trifecta of First Amendment -- the trifecta

16   of the highest First Amendment protections, content-based

17   restriction in a public space involving political speech -- in

18   other words, these are areas in which the First Amendment

19   protections are at their apex, and yet that is insufficient and

20   must yield to the Constitutional rights to vote, particularly when

21   intimidation is involved.

22         Thank you, Your Honor.

23         THE COURT:  You closed on a strong point.

24         Mr. Bopp.

25         MR. BOPP:  Thank you, Your Honor.  I appreciate you

 1  going through lunch.  To an extent, I'm still hopeful to make my

 2  plane.

 3          THE COURT:  You're going to make your plane.  The place

 4  I like to eat lunch at usually stops at around 1:30.  So we're out

 5  of here.

 6          MR. BOPP:  I'm out of here.  Thank you.  All right.

 7          You know, within the rubric of the damage that would be

 8  done in 11(b) if these extravagant tests that are being argued for

 9  were adopted.  I think we should start with what plaintiffs'

10  counsel just said about the liability of anybody that submits

11  information challenging a voter's eligibility if it doesn't meet

12  probable cause.  He said that's ipso facto liable under 11(b),

13  ipso facto.

14          Now, let's start with this.  Probable cause -- I mean, I

15  like to explain to lay people, you know, preponderance of the

16  evidence is, like, 51 percent, you know; beyond a reasonable doubt

17  is, like, 80, percent; probable cause is, like, 40 percent; good

18  faith is like 10 percent.

19          THE COURT:  Now, you're going to get a jury charge out

20  of that, but go ahead.

21          MR. BOPP:  So, you know, making people liable if

22  probable cause isn't met is an extraordinarily brutal standard,

23  and I've been thinking as he was talking about that, I was trying

24  -- I was thinking about this procedure, because it is different.

25  Okay?  But then I started to think about witnesses to a crime.

1    All right?  Prosecutor or police interviews a witness to a crime

2    and they say, well, I saw this, I saw that, et cetera.  What

3    happens if that's false?  Okay.  I mean, let's start with this.

4    No, let's start with this.  What happens if it is true, that the

5    prosecutor decides not to prosecute so he didn't find probable

6    cause?  According to these folks, that witness is liable for

7    whatever he or she said.  Right?

8         Now, isn't that what we're doing here?  In other words,

9    the procedure for challenging a voter seems like it's similar to a

10   prosecutor's situation.  In other words, a person comes forward

11   with what they know; right?  And, you know, they -- and they say

12   X, Y and Z.  Now they have -- then we have a public official that

13   decides whether or not that meets the standard of probable cause,

14   which, of course, is the standard to bring criminal cases by a

15   prosecutor.  All right?  That's sufficient.  So -- but nobody

16   thinks that any witness to a crime where a crime is a fraud is

17   liable for what he or she said.  I mean, there are some limited

18   circumstances, I understand, false police reports and all that.

19   But, you know, they don't want bright lines.  They have been

20   adamant, you know, we want facts and circumstances, we want

21   totality, and they mention things like mass filings, you know,

22   whatever.

23        And, of course, they just recently were talking about,

24   well, within -- right before an election.  Well, when is that?

25   Okay.  When is right before an election?  You know, I mean, these

1 are the standards they want to apply and create federal liability

2 under 11(b).

3          THE COURT:  Let me ask you this, Mr. Bopp, before you go

4 to your next point.

5          MR. BOPP:  I'm sorry?

6          THE COURT:  Let me ask you this question before you go

7 to your next point.

8          MR. BOPP:  Sure.

9          THE COURT:  When does your right -- I'm not asking about

10 you, per se -- but when is the right for the person to exercise

11 their First Amendment rights when that right possibly inhibits the

12 right of another person's fundamental right to vote?  How do I --

13 how do I say where the cutoff is at?  In other words, the person

14 says I want to exercise my First Amendment right here to

15 challenge.

16          MR. BOPP:  True threat.  The communication has to have a

17 true threat.  In other words, and -- and -- and, you know, look,

18 it could be that it's not "I'm going to beat the crap out of you,"

19 but it could be "I'm going to ruin your business."  Okay?

20          THE COURT:  But can it be something lesser than that?

21          MR. BOPP:  Excuse me?

22          THE COURT:  Can it be something less than I'm going to

23 ruin your business?

24          MR. BOPP:  Yeah, and that's what I'm saying.  But the

25 Supreme Court may eventually say, save it.  I don't know.  It's

1  hard to find any cases that say that now, other than the one in

2  New York.  All right?  But conceptually I can understand that.

3  But that's light years from where they are and what their position

4  is.

5          For instance, they say that a knowingly or recklessly

6  false voter challenge is a violation of 11(b).  Now, wait a

7  second.  Why is a false challenge inherently or meet the standard

8  of -- of threat, coercion, or intimidation?

9          THE COURT:  Good question.

10         MR. BOPP:  Okay?  So in other words, there is something

11  more there.  Right?  In other words, it isn't every false,

12  reckless whatever statement.  There is something more there.

13         THE COURT:  Then you will be prepared for what I'm going

14  to ask you question about.  What is the more?  What does this

15  Court say is the more?

16         MR. BOPP:  Well, in my view it is not inherent in that.

17  Okay?

18         THE COURT:  Let's say I agree with you.

19         MR. BOPP:  So there has to be other evidence of

20  statements, okay, that are -- and those would be the intimidating,

21  corrosive -- or corrosive actions.  Okay?  That case is a

22  corrosive action.  Okay?  You know, you throw the share cropper

23  off his land because he voted.  Okay?  That's a corrosive action,

24  that's not a speech at all.

25         Now, to put this into context of the First Amendment,

1    there is also the concept of overbreadth.  If you have a statute

2    whose scope includes enough First Amendment protected speech that

3    it cannot be prohibited by this statute, okay, if there is enough

4    -- and that's 20 or 30 percent, then the whole statute is --

5    violates the First Amendment because of the overbreadth of this.

6    So -- and vagueness is a little bit different analysis, I agree

7    with that.  But overbreadth is -- is the other leg of the stool,

8    if you will, of challenges to statutes under the First Amendment.

9    You just can't -- we are not going to sacrifice First Amendment

10   protected speech by an overbroad statute that would encompass

11   enough of that, you know.  And that's -- you know, we're not

12   talking most of it.  We're talking about a fraction of it.  All

13   right?

14          And, of course, that's why these tests that they're

15   proposing threaten.  I mean, whatever, you know, mass -- right

16   before an election and all that.

17          Now, of course, then they also switch back to per se.

18   And I think the plaintiffs more than the U.S. government are most

19   enthusiastic about the idea.  These challenges are per se illegal

20   under 11(b).  Per se.  Don't worry about when or how many or any

21   of that stuff.  Because their arguments, one, well, the

22   information could get out.  Remember?  It's part of the deal is it

23   is a public record, it could get out.  That's enough.  Okay?  This

24   procedure inherently violates 11(b).

25          Then they say, well, there's a burden?  You know, that

1  when the voter is asked to provide documentation, you know, she

2  may have to go home to get it and come back, and, you know, they

3  said it could take an hour or two, and this is an example of that.

4  Okay?  Well, of course, there's going to be some time if you're

5  going to have a hearing and ask somebody to produce something,

6  particularly if you don't tell them ahead of time, they should,

7  but if you don't, you know -- so per se violate also 11(b).

8       THE COURT:  They can pull somebody out of the line

9  getting ready to vote, would you not say they don't have a whole

10  lot of time?

11       MR. BOPP:  Of course, and that's a problem too.  Of

12  course, the procedure in Georgia is provisional.  Okay?  So you

13  can vote and set it aside and then you can later on provide the

14  evidence.

15       Then they say that it is -- that being asked to justify

16  that you are an eligible voter is itself intimidating.  Just to be

17  asked.  To be required.  Well, that is -- so any effort at all by

18  anyone including the government to require a voter to prove his or

19  her eligibility at any time ever is -- violates federal law.

20  That's what that position means.  If it is inherently intimidating

21  to be asked to justify, for you to provide, you know, evidence of

22  your residency, then that is inherently intimidating and,

23  therefore, violate also 11(b).  Okay?

24       So this doesn't just blow up the consensus -- I mean,

25  this makes unlawful and punishes, one side of the equation.  If

1  there are unjustified restrictions on the right to vote, that

2  we'll protect.  Okay.  We'll knock those down if they are

3  unjustified, and that's a good thing.  I'm for that.

4          If the vote dilution -- if the right to vote is violated

5  under *Reynolds v. Sims* for ballot stuffing, that's just simply,

6  you know, a colorful term that they use to describe illegal

7  voting.  You know, people who are not eligible to vote.  You can

8  never, ever try to do anything to figure out if somebody is

9  eligible.

10          Well, I'm sorry, my vote is equally cancelled if I can't

11  vote or somebody who is ineligible votes, I'm equally cancelled.

12  And -- so, I mean, I feel like this is pretty radical.  Okay?

13  That we're going really far afield.

14          And surely nobody would have ever thought that

15  protecting the right to vote from threats, coercion, and

16  intimidation means you can never ask a voter to prove his or her

17  eligibility, because that's what they're saying.  That was their

18  final point.

19          So, yes, the First Amendment requires bright lines.

20          Yes, the First Amendment and the right to petition means

21  that you cannot have an overbroad statute.

22          And, yes, that would mean that 11(b) is unconstitutional

23  as applied if it would be applied to this situation.  Okay?

24          THE COURT:  Thank you.

25          MR. BOPP:  And that's our argument.  Thank you.

1          THE COURT:  Thank you, Mr. Bopp.

2          You get the last word.  How much time does she have

3    left?

4          THE DEPUTY CLERK:  10 minutes and 23 seconds.

5          MS. YUN:  Thank you, Your Honor.

6          I would like to just briefly echo what Your Honor --

7    what Your Honor was describing regarding the petition clause and

8    how to define frivolous.

9          So we do not -- we do not -- our brief does not define

10   what frivolous means, but I believe that knowing recklessly and

11   false challenges, that category provide a guidepost for this Court

12   to analyze whether it can resolve this claim without -- without

13   running afoul of the First Amendment.

14         And in terms of the standards or tests that Your Honor

15   was mentioning and defense counsel was advocating for, the sham

16   litigation doctrine is limited to the antitrust cases and the NRA

17   cases, as plaintiffs' counsel mentioned.  And I would just echo

18   that because in those cases the right to petition companies or

19   employers is being balanced against the federal government's

20   interest in enforcing the antitrust laws and the National Labor

21   laws.  The balancing query is fundamentally different here because

22   we're talking about the right to petition versus the right to

23   vote.

24         And also the sham litigation doctrine is based on a

25   concern that prohibiting companies from using the court system or

1   lobbying government agencies would deprive business entities of an

2   opportunity to participate in a legitimate effort to obtain a

3   favorable change in the law.  Here, there are alternative

4   legitimate means available to people who would like to use voter

5   challenges and resolving this claim under Section 11(b,) would not

6   stop -- would not foreclose those other avenues of bringing

7   legitimate voter challenges.

8          And I would also point the Court to pages 34 to 35 of

9   our brief that -- where the case law suggests that the right to

10  petition is not absolute and conduct -- unethical conduct can be

11  regulated despite the right to petition in the context of

12  imposing -- specially in the context of declaratory processes.  So

13  Rule 11 sanctions, as this Court knows, can be imposed even though

14  counsel has the right to petition, or, in particular political

15  ethics cases, often the right to petition is there, but it can be

16  limited in order to make sure that those obligatory processes are

17  not abused.

18         And I would also point to the Supreme Court's case that

19  was mentioned earlier, *McDonald v. Smith,* where false speech was

20  subject to the same inquiry as whether it was in a Government's

21  petition or whether it was in a letter.  It did not make a

22  difference.  And it is because it is not an unlimited right.

23         And as mentioned in the *Burson* case, because -- because

24  Section 11(b) as applied here would survive any level of scrutiny,

25  the same analysis under *Burson v. Freeman* and the *Browning* case

1   would apply under the petition clause.

2          And to go to the overbreadth argument under the First

3   Amendment.  The test under the overbreadth argument is also

4   extremely hard to meet, and we do not believe it is met here,

5   which this is from the Supreme Court's case, Washington State,

6   which is that whether the provision is impermissibly overbroad

7   because of a substantial number of its applications are

8   unconstitutional judged in relation to the statute's claim of

9   legitimate sweep, and we believe that the statute's plainly

10  legitimate sweep prescribes conduct.  So the First Amendment is

11  not implicated in the vast first majority of its applications.

12         And lastly to go back to a few point that are not

13  necessarily related to the Constitutional questions.

14         False challenges are corrosive -- there was a question

15  whether -- how are false challenges corrosive.  So knowingly or

16  recklessly false voter challenges, the falsity of those challenges

17  allows the court to draw an inference that the challengers lacked

18  any plausible attempt to enforce state law -- state law, and

19  rather the intent of those people submitting false challenges

20  should be understood as intending the natural consequences of

21  those actions, which is imposing -- accusing eligible voters of

22  committing crimes, and imposing additional hurdles for them to

23  jump through, and then increasing the risk of erroneous

24  disenfranchisement.  And that's where that inference of intent,

25  bad intent is what distinguishes knowingly or recklessly false

1  challenges from merely negligent -- merely misstating challenges

2  or the state asking to -- asking a voter to reprove their

3  eligibility because they think that he moved.

4          So the inference that Your Honor can draw distinguishes

5  those innocuous administrative burdens of having to reprove your

6  eligibility because the state asked you base on credible evidence

7  versus knowingly or recklessly false challenges.

8          Your Honor, I do not have anything further, unless the

9  Court has any questions.

10         THE COURT:  The Court doesn't have any questions.  I

11  think I asked all of the ones I have.  Thank you.

12         MS. YUN:  Thank you.

13         THE COURT:  First, thank you for being well-prepared

14  with your arguments this morning and this afternoon.

15         A couple of housekeeping things.  There was an amicus

16  brief that was filed.  The Court is going to consider it.  I'm

17  allowing the defense counsel to respond to it.  I entered an order

18  today indicating that I'm going to consider it.  But in your

19  motion for me not to consider it, you indicated that you did not

20  have a chance to respond to it.  So I'm going to give you a chance

21  to respond to it.  I filed an order probably about 30 minutes

22  before we started the hearing at 10 o'clock this morning, and that

23  order indicates how many pages I'm allowing you and how long you

24  have to respond back to the Court.  So you will have a chance to

25  respond.

```
 1              Do you have any questions about that?
 2              MR. BOPP:  I think you asked me how much time we want?
 3              THE COURT:  No, my order tells you how much time you
 4    have to respond.
 5              MR. BOPP:  Oh.  I kind of figured that would be the
 6    case.
 7              THE COURT:  It also tells you how many pages you can
 8    have.  I think it's 15 pages, and I think you will have until the
 9    13th of February to respond.  But I am going to consider the
10    brief.
11              MR. BOPP:  Thank you.
12              THE COURT:  To the plaintiffs, if you all want to sit --
13    in order for you-all to respond to it, basically it says a lot of
14    things that you-all are saying, but I want to be fair, I'm giving
15    the defendant a chance to respond to it.  If you-all need a chance
16    to respond to it, the same thing, 15 days.  By the 13th of
17    February.
18              MS. LAWRENCE-HARDY:  Thank you, Your Honor.
19              THE COURT:  All right.  And you-all aren't a part of it.
20              Thank you-all.
21              Ladies, did I cover everything?  No, what did I miss?
22              The government filed a supplemental brief standing in
23    opposition to it.  The government filed -- the United States filed
24    a supplemental brief.  Is there an opposition to that brief being
25    considered by the Court?
```

1           MR. BOPP:  They did?

2           THE COURT:  An amended brief.

3           MR. BOPP:  Oh, the amended.  No, no, not at all.  As I

4    understood, it was just some sites that needed to be corrected or

5    whatever.  No problem.

6           MR. NKWONTA:  No opposition from the plaintiffs, Your

7    Honor.

8           THE COURT:  Thank you-all.  Have a great rest of the

9    day.  I hope I didn't keep you too hungry.  I will be in touch as

10   soon as possible.  Great seeing you again.  Thanks.

11          (The hearing concluded at 1 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                         C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6       I do hereby certify that the foregoing pages are a true and

7   correct transcript of the proceedings taken down by me in the case

8   aforesaid.

9       This the 1st day of February, 2023.

10

11

12

13

14                          /s/Viola S. Zborowski _____
                            VIOLA S. ZBOROWSKI,
15                          RDR, FAPR, CMR, CRR, RPR, CRC
                            OFFICIAL COURT REPORTER TO
16                          THE HONORABLE STEVE C. JONES

17

18

19

20

21

22

23

24

25

──────UNITED STATES DISTRICT COURT OFFICIAL CERTIFIED TRANSCRIPT──────