# IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA GAINESVILLE DIVISION

| | |
|---|---|
| FAIR FIGHT, INC., SCOTT BERSON, JOCELYN HEREDIA, and JANE DOE, | |
| Plaintiffs, | Civil Action No. 2:20-cv-00302-SCJ |
| v. | |
| TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1-10, | |
| Defendants. | |

## PLAINTIFFS' RESPONSE TO PROTECT DEMOCRACY'S AMICUS BRIEF

# TABLE OF CONTENTS

I.    Defendants' mass voter challenges violated Section 11(b). .............................1

    A.    Defendants' challenges could not achieve any lawful purpose. ...........1

    B.    Defendants' challenges were intimidating. .............................................6

II.   Defendants' challenges are not immunized by the First Amendment. ...........8

    A.    Defendants' challenges are categorically unprotected speech. .............9

    B.    The First Amendment right to petition does not shield acts of voter intimidation. .......................................................................................11

    C.    Even if Defendants' challenges are protected, Congress may regulate them to safeguard the fundamental right to vote...............................14

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ariz. All. for Retired Ams. v. Clean Elections USA*,
No. CV-22-01823-PHX-MTL, 2022 WL 15678694 (D. Ariz. Oct. 28, 2022).........................9

*Burson v. Freeman*,
504 U.S. 191 (1992)..............................................................................................9, 14, 15

*Cal. Motor Transport Co. v. Trucking Unlimited*,
404 U.S. 508 (1972)...............................................................................................11, 12, 13

*Citizens for Police Accountability Pol. Comm. v. Browning*,
572 F.3d 1213 (11th Cir. 2009) ....................................................................................14

*City of Columbia v. Omni Outdoor Advert., Inc.*,
499 U.S. 365 (1991)........................................................................................................12

*Hughes v. Rowe*,
449 U.S. 5 (1980)........................................................................................................2, 3

*League of United Latin Am. Citizens–Richmond Region Council 4614 v. Pub.
Interest Legal Found.*,
No. 1:18-CV-00423, 2018 WL 3848404 (E.D. Va. Aug. 13, 2018)..........................................2

*McDonald v. Smith*,
472 U.S. 479 (1985)........................................................................................................8, 13

*Nat'l Coal. On Black Civic Participation v. Wohl*,
512 F. Supp. 3d 500 (S.D.N.Y. 2021)...............................................................................9, 10

*NLRB v. Ins. Agents' Int'l Union, AFL-CIO*,
361 U.S. 477 (1960)........................................................................................................10

*Prof. Real Est. Inv'rs, Inc. v. Columbia Pictures Indus., Inc.*,
508 U.S. 49 (1993).......................................................................................................12, 13

*United States v. Castillo*,
564 F. App'x 500 (11th Cir. 2014) .................................................................................11

*United States v. Dingwall*,
6 F.4th 744 (7th Cir. 2021) ............................................................................................10

*United States v. Fleury*,
    20 F.4th 1353 (11th Cir. 2021) ...........................................................................10

*United States v. Martinez*,
    736 F.3d 981 (11th Cir. 2013) ............................................................................11

*United States v. Tan Duc Nguyen*,
    673 F.3d 1259 (9th Cir. 2012) ...........................................................................10

*United States v. Washington*,
    810 F. App'x 478 (8th Cir. 2020) ......................................................................10

*Virginia v. Black*,
    538 U.S. 343 (2003) ...........................................................................................10

**Statutes**

52 U.S.C. § 10307(b) .................................................................................................6

52 U.S.C. § 20507 .........................................................................................3, 4, 5, 13

O.C.G.A. § 21-2-230......................................................................................3, 4, 13

## SUPPLEMENTAL RESPONSE

On February 1, 2023, at the close of the summary judgment hearing, the Court invited the parties to respond to the brief submitted by Amicus Protect Democracy, ECF No. 208 ("Amicus Br."). Plaintiffs hereby submit their response.

## I.   Defendants' mass voter challenges violated Section 11(b).

Through multiple rounds of briefing and oral argument, Defendants do not seriously dispute that their challenged actions intimidated voters—nor could they. Their mass challenge campaign could achieve no lawful outcome because it invited county officials to violate federal law, leaving voter intimidation as the only plausible outcome. As Protect Democracy correctly explains, "falsely stating or implying that lawful voters are unlawful voters can constitute illegal voter intimidation," Amicus Br. at 6, and Defendants did exactly that: their challenges intimidated Georgia residents, leaving some questioning whether voting was worth it.  Defendants' challenges were not only false, they were frivolous.

### A.   Defendants' challenges could not achieve any lawful purpose.

This Court has recognized that "[t]he frivolity of [Defendants'] voter challenges . . . may tend to support Plaintiffs' contentions that these challenges result only in voter harassment and intimidation." TRO Order at 28, ECF No. 29. Defendants' challenges were frivolous in two independent ways.

*First*, Defendants' challenges were frivolous because they lacked even probable cause—let alone merit—and were lodged with reckless disregard as to the falsity of their allegations. Pls.' Corrected Statement of Undisputed Material Facts ¶¶ 66–125, ECF No. 171 ("Pls.' SUMF"). As Protect Democracy notes, courts have found that even the mere publication of false accusations that voters were ineligible is sufficient to support a finding of intimidation under Section 11(b). *See* Amicus Br. at 6 (citing *League of United Latin Am. Citizens–Richmond Region Council 4614 v. Pub. Interest Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *1 (E.D. Va. Aug. 13, 2018)). As in *LULAC*, the suggestion that more is needed to support a finding of intimidation under Section 11(b) "is untenable." *LULAC*, 2018 WL 3848404, at *1.

While the Court correctly noted at oral argument that the mere dismissal of a suit does not mean it was groundless or brought without foundation, *see Hughes v. Rowe*, 449 U.S. 5, 14 (1980), Defendants' mass challenges were frivolous not simply because they were ultimately rejected, but because they were carelessly constructed, suffused with obvious errors, premised on a faulty methodology, and recklessly submitted. *See* Pls.' Mot. Summ. J. at 15–23, ECF No. 156-1. *Hughes*, moreover, addressed frivolousness in determining whether to award attorney's fees upon dismissing a *pro se* prisoner complaint—a unique context with "less stringent"

pleading standards. 449 U.S. at 9 (quotation omitted). No such lenient standard is afforded to Defendants' mass challenges.

*Second*, Defendants' challenges were frivolous because they sought to compel the disenfranchisement and subsequent removal of voters from the registration rolls on a basis forbidden by the National Voter Registration Act ("NVRA") *and* during a pre-election window when the NVRA bars efforts to systematically remove names from the official list of eligible voters. 52 U.S.C. § 20507(c)(2)(A), (d)(1); *see also* TRO Order at 11–16 (detailing the Court's "extreme[] concern[s] that Defendants' actions are an attempt to circumvent the requirements of the [NVRA]").

Defendants lodged their challenges under Section 21-2-230 of Georgia's Code, which distinguishes between challenges "based upon grounds that the challenged elector is not qualified to remain on the list of electors," and challenges "based upon grounds other than the qualifications of the elector to remain on the list of electors." *Compare* O.C.G.A. § 21-2-230(d), (e), *with id.* §§ 21-2-230(f), (g). If a challenge to a registrants' qualifications is successful, then Georgia law requires that "the name of the challenged elector *shall be removed* from the list of electors." *Id.* § 21-2-230(g) (emphasis added); *see also id.* §§ 21-2-230(f), 21-2-229(d) (same). Because residence is a qualification to vote, *id.* § 21-2-216(a)(4), Defendants' allegations—claiming that hundreds of thousands of Georgians were no longer

3

residents of their voting jurisdictions—by definition challenged the registrants' qualifications. Defendants' insistence that they did not try to remove voters from the voter rolls with their challenges is sophistry. Georgia law would have required these voters to be removed from the voter rolls *if the challenges were successful*. *Id.* § 21-2-230(g).

Thankfully they were not, in part because the NVRA expressly prohibits officials from removing registrants from the list of electors on the basis of non-residency unless: (A) the registrant confirms the change of residency to the State in writing, or (B) the registrant receives official notice from the State and fails to respond or to vote in two subsequent federal elections. 52 U.S.C. § 20507(d). The NVRA also prohibits "systematic[]" removals from the voter rolls within 90 days of a federal election. *Id.* § 20507(c)(2)(A). These protections reflect Congress's determination that the risk of wrongful disenfranchisement is too high when voters are removed from the rolls en masse shortly before an election, or when a registrant's legal residency is questioned without clear proof that the relocation is permanent.

This case does not, however, present a direct conflict between Georgia's voter challenge statutes and the NVRA. Indeed, many of the challenges authorized by Section 21-2-230 are unlikely to implicate the NVRA at all. For example, a challenge might allege a registrant: (i) has already voted; (ii) will not reach 18 years of age by

the election; or (iii) does not reside in their county of registration. The first example does not challenge the registrants' qualifications, so it does not implicate the NVRA. The second does challenge the registrants' qualifications and would implicate the NVRA only if the challenger filed mass—or systematic—challenges that were not based on *individualized* inquiries within 90 days of an election. The third example directly implicates the NVRA, and officials could remove the challenged registrant from the rolls only if the registrant had confirmed their residency change in writing or had received formal notice and failed to vote in two subsequent elections.

In other words, it is not Georgia's challenge statute, but Defendants' abuse of the challenge process and their frivolous attempt to adjudicate the residency of over 250,000 voters just weeks before an election, that implicates federal law. By challenging hundreds of thousands of registrants based on residency right before a federal election, without any evidence that the registrants had confirmed their relocation to the State in writing or had received formal notice and failed to vote in two elections, Defendants sought to evade *both* of the NVRA's critical protections.

Their scheme could have succeeded only by inducing counties to flout federal law. That is the quintessence of frivolity.[1]

### B.   Defendants' challenges were intimidating.

Protect Democracy also correctly explains that Section 11(b) prohibits behavior that is reasonably likely to intimidate or coerce voters from participating in the electoral process—an objective test that does not depend on Defendants' private intentions. *See* Amicus Br. at 4–9. That test is satisfied here, where Plaintiffs have produced evidence establishing not only that challenged voters likely *would* have been intimidated, *see* Pls.' SUMF ¶¶ 152–54 (unrebutted expert testimony confirming that Defendants' actions were objectively intimidating), but also that the targets of Defendants' scheme in fact *were* intimidated.

Plaintiff Jocelyn Heredia, for example, who was challenged both by True the Vote's challengers and by Mr. Somerville and Mr. Davis, testified that she felt intimidated and targeted, and spent nearly *four hours* proving her residency at her polling location. *See id.* ¶¶ 23, 26, 27, 158. The same was true of Gamaliel Turner,

---

[1] Defendants are not exonerated merely because their scheme may have been stymied by counties that immediately rejected their challenges. Plaintiffs identified voters who were intimidated notwithstanding their counties' eventual dismissal of the challenges, and Section 11(b) proscribes both actual and *attempted* voter intimidation. 52 U.S.C. § 10307(b). Defendants' attempt, it cannot be disputed, was for counties to treat their challenges as actionable.

a retired veteran, who testified that the "entire experience [of being challenged shortly before the election] was scary, confusing, and intimidating," *id.* ¶ 172; that "[t]hinking back to the senseless difficulty of [his] voting experience in the January runoff elections gives [him] PTSD," *id.* ¶ 173; and that he wonders "if it is even worth trying to vote again given the trouble that the voter challenge has caused," *id.* ¶ 174. Defendants' speculation that other voters may not have known they were challenged does not rebut this evidence and cannot defeat summary judgment.

Defendants also cannot escape liability merely because many counties rejected their challenges. Defendants do not dispute that their challenge lists, as public records in each county, were publicized widely. *See* Pls.' Resp. to Defs.' Statement of Undisputed Material Facts ("Resp. to Defs.' SUMF") ¶ 93, ECF No. 174-1; Tr. of Feb. 1, 2023 Hr'g at 32:6–8 (Defendants' counsel admitting, "People can go into the courthouse and get the challenges, get the list of challenges. It's a public record."). This publication had consequences for voters regardless of whether their county accepted Defendants' challenges. *See* Pls.' SUMF ¶¶ 34, 36 (Plaintiff Jane Doe's identity was published online even though county did not accept Defendants' challenge); *id.* ¶ 25 (Plaintiff Heredia was identified as a challenged voter on her county's website for six months after the election).

For each of these voters and hundreds of thousands of others, Defendants publicly promoted that they had "probable cause" to suspect that these individuals were not eligible to vote. *Id.* ¶ 59. In this way, Defendants' actions were not meaningfully different from the cases discussed in Protect Democracy's brief, where courts have found violations of Section 11(b) based on the proliferation of false statements about voters' eligibility. *See* Amicus Br. at 6–7. And here, Defendants went even further, amplifying their challenges with a request for citizen watchdogs to report any suspected fraud to Defendants' hotline and for Navy SEALs to patrol polling places. Pls.' SUMF ¶ 145; *see also* Amicus Br. at 14 (emphasizing that Defendants' combined actions, including "offering bounties to report citizens for alleged fraud while also preparing and circulating baseless mass challenge lists . . . and encouraging and amplifying threats of election vigilantism on social media," amount to a clear violation of Section 11(b)). The reasonable and natural consequence of Defendants' actions was to intimidate voters.

## II.   Defendants' challenges are not immunized by the First Amendment.

As Protect Democracy emphasizes, Defendants may not escape Section 11(b) liability by characterizing their frivolous voter challenges as protected speech. First, the *content* of Defendants' challenges is categorically excluded from First Amendment protection. *See McDonald v. Smith*, 472 U.S. 479, 484 (1985). But even

if Defendants' challenges were protectable, their First Amendment defense fails because the right to political expression under these circumstances must yield to the fundamental right to vote. *See Burson v. Freeman*, 504 U.S. 191, 211 (1992).

## A. Defendants' challenges are categorically unprotected speech.

Defendants' attempt to invoke the First Amendment fails under the true threats doctrine, which strips First Amendment protections from messages that a "reasonable recipient . . . would interpret [] as a threat of injury, physical or not." *Nat'l Coal. On Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 514 (S.D.N.Y. 2021). As Plaintiffs have noted, voters reasonably interpreted Defendants' challenges as threats to deprive them of their vote, Pls.' SUMF ¶ 33, threats of harassment, *id.* ¶ 34, and threats of legal harm, *id.* ¶ 26.[2]

Recognizing that true threats are unprotected by the First Amendment, Defendants have attempted to cabin the doctrine to threats of physical violence but cite no persuasive authority applying such limitations.[3] As Protect Democracy

---

[2] Plaintiffs have also argued that the challenges were defamatory, a point Defendants did not contest but which provides an independent reason why their conduct is not entitled to any First Amendment protection. *See* ECF No. 193 at 25–27.

[3] Defendants' primary illustration of this argument has since been vacated. *See Ariz. All. for Retired Ams. v. Clean Elections USA*, No. CV-22-01823-PHX-MTL, 2022 WL 15678694 (D. Ariz. Oct. 28, 2022), *opinion vacated,* No. 22-16689, 2023 WL 1097766 (9th Cir. Jan. 26, 2023).

correctly notes, in *Virginia v. Black*, 538 U.S. 343, 359 (2003), the Supreme Court stated that true threats merely "encompass," but do not begin and end with, threats of physical violence.[4] *See also* Amicus Br. at 13. The Eleventh Circuit agrees; it recently acknowledged that "the [Supreme] Court never stated that the category of true threats is limited to such statements, only that the category 'encompass[es]' them." *United States v. Fleury*, 20 F.4th 1353, 1373 (11th Cir. 2021).

Consistent with this interpretation, at least two courts have found nonviolent forms of voter intimidation may amount to true threats. *See United States v. Tan Duc Nguyen*, 673 F.3d 1259, 1266 (9th Cir. 2012) (finding letters threatening to disseminate voters' personal information likely intimidated voters under California law, and the law's restrictions were "consistent with the state's power to regulate true threats"); *Wohl*, 512 F. Supp. 3d at 514 (finding robocalls that put voters in fear of non-physical injury were true threats). In other contexts, courts have similarly recognized that true threats extend beyond physical violence. *See, e.g.*, *NLRB v. Ins. Agents' Int'l Union, AFL-CIO*, 361 U.S. 477, 505 (1960) (considering "'economic' violence"); *United States v. Dingwall*, 6 F.4th 744, 759 (7th Cir. 2021) (recognizing "physical" and "psychological" violence separately); *United States v. Washington*,

---

[4] "Encompass" is defined as "include, comprehend" and "envelop." *Encompass*, merriam-webster.com (last visited Feb. 13, 2023).

810 F. App'x 478 (8th Cir. 2020) (recognizing "physical" and "emotional" violence separately).

Defendants' only response is to recite language from court decisions applying the true threats doctrine in cases alleging threats of physical injury. *See*, *e.g.*, *United States v. Castillo*, 564 F. App'x 500, 501 (11th Cir. 2014) (considering threats to murder the President); *United States v. Martinez*, 736 F.3d 981 (11th Cir. 2013) (considering school shooting threats), *cert. granted, judgment vacated*, 576 U.S. 1001 (2015). These rulings say little about the scope of the doctrine because the courts in question had no occasion to apply true threats outside the context of physical violence. But courts have repeatedly applied the doctrine when confronted with allegations of nonviolent threats. *See supra* at 10. And Defendants have identified no case in the Eleventh Circuit or elsewhere in which a court has strictly limited the true threats exception to physical acts.

**B.    The First Amendment right to petition does not shield acts of voter intimidation.**

Just as the First Amendment's free speech protections do not extend to baseless challenges that seek to unlawfully disenfranchise voters, the right to petition provides no defense to defamatory accusations that intimidate voters in violation of federal law. The Supreme Court has made clear that even when seeking to influence government action, "[i]t is well settled" that the right to petition does not immunize

11

"conduct which violates a valid statute." *Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972).

For instance, in the antitrust context, the Supreme Court has held that sham petitions filed to deprive competitors access to adjudicatory or administrative decisionmakers do not enjoy First Amendment protection. The "classic" example is when a competitor files "frivolous objections to the license application of" another competitor, "with no expectation of achieving denial of the license but simply in order to impose expense and delay." *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 380 (1991). The Supreme Court has also recognized that "baseless" petitions, including petitions filed "without probable cause" that hijack a "governmental process" to produce an illegal result, fall outside the First Amendment's ambit. *Prof. Real Est. Inv'rs, Inc. v. Columbia Pictures Indus., Inc.* ("*PREI*"), 508 U.S. 49, 58–59, 61 (1993); *see also Cal. Motor*, 404 U.S. at 513 (concluding "abuse" of governmental processes that produces "an illegal result" "cannot acquire immunity by seeking refuge under the umbrella of 'political expression'").[5]

---

[5] While Plaintiffs believe that these "sham" petition cases provide guidance in determining whether Defendants' mass challenges were frivolous, Plaintiffs do not

That is precisely what happened here. Defendants' mass challenges were frivolous: they lacked probable cause, were riddled with obvious errors, were filed with reckless disregard for the falsity of their allegations, and could only result in violations of the NVRA. With no hope of a meritorious resolution, Defendants could not have relied on the "outcome" of any challenge to achieve their ends; rather, Defendants' "use of the governmental process"—here, O.C.G.A. § 21-2-230—itself produced an illegal result: intimidating voters in violation of Section 11(b). *PREI*, 508 U.S. at 61; *see supra* Part I.B; Pls.' SUMF ¶¶ 159–66. Because "First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' which the legislature has the power to control," *Cal. Motor*, 404 U.S. at 515 (cleaned up), Defendants may not use baseless mass challenges to end-run federal voting protections—a tactic that featured prominently in Georgia's long and sordid history of discrimination. *See* Pls.' SUMF ¶ 154 n.8; *see also McDonald*, 472 U.S. at 484 (recognizing that libel, defamation, and baseless litigation do not enjoy First Amendment protection merely because they appear in the form of a

---

contend that *PREI*'s two-part test is directly applicable here. *See* 508 U.S. at 60–61. That test demands proof of subjective intent in the antitrust context, where courts must balance First Amendment rights against anticompetitive behavior. By contrast, this case requires the Court to reconcile the right to petition with the constitutional right to vote, and Congress expressly *rejected* a subjective-intent test in enacting Section 11(b). *See* Pls.' Supp. Br. at 18–20; Amicus Br. at 4–6.

petition); Amicus Br. at 15–16 (discussing same with regard to defamation and statements made in the course of a fraud). For these reasons, Defendants' First Amendment defense fails.

### C. Even if Defendants' challenges are protected, Congress may regulate them to safeguard the fundamental right to vote.

Finally, even if the content of Defendants' challenges were protected speech, the First Amendment *still* would not immunize Defendants from liability under Section 11(b). As Protect Democracy correctly observes, even direct restrictions on speech are constitutional if they survive review under the appropriate level of scrutiny. Amicus Br. at 24 (citing *Burson*, 504 U.S. at 198–99). Section 11(b) survives under any level.

The Supreme Court's ruling in *Burson* illustrates why Section 11(b) easily passes constitutional muster. There, the Court upheld a content-based restriction on political speech, in a public forum—within 100 feet of a polling place—in order to safeguard the fundamental right to vote from intimidation and coercion. *See* 504 U.S. at 198. Because of the special importance that the right to vote occupies in our Constitution, the plurality determined that the challenged restriction "was sufficiently tailored if it was 'reasonable' and did not 'significantly impinge on constitutionally protected rights.'" *Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1219 (11th Cir. 2009) (quoting *Burson*, 504 U.S. at 209).

14

Applying that test, the plurality held that even where the challenged law implicates political speech in a quintessential public forum, and thus triggers the First Amendment's strongest protections, "the right to cast a ballot in an election free from the taint of intimidation and fraud" must prevail. *Burson*, 504 U.S. at 211.

Section 11(b) serves the same compelling interest as Tennessee's prohibition on electioneering—protecting voters from intimidation—and is similarly the product of historical experience and consensus. As Protect Democracy explains, history demonstrates that Congress could not have drafted the statute more narrowly while still achieving its goal of preventing voter intimidation. Amicus Br. at 25–27. And as the United States points out, forty-nine states, the District of Columbia, and the federal government proscribe voter intimidation, reflecting a consensus that preventing voter intimidation is critical to safeguard the right to vote. U.S. Br. on Section 11(b) at 38,  ECF No. 192 ("DOJ Br."). Thus, even political expression may be regulated to ensure that Georgians can freely exercise the constitutional right to vote, which is preservative of all rights and resides "at the heart of our democracy." *Burson*, 504 U.S. at 198, 211.[6]

For all these reasons, the Court should grant Plaintiffs summary judgment.

---

[6] The Court may satisfy the narrow tailoring requirement in this case by crafting a remedy tailored to prohibiting Defendants' unlawful conduct. *See* DOJ Br. at 30.

Respectfully submitted, this 13th day of February, 2023.

Allegra J. Lawrence
Georgia Bar No. 439797
Leslie J. Bryan
Georgia Bar No. 091175
Maia Cogen
Georgia Bar No. 832438
Michelle L. McClafferty
Georgia Bar No. 161970
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-
hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com
michelle.mcclafferty@lawrencebundy.com

*/s/ Uzoma N. Nkwonta*
Marc E. Elias*
Uzoma N. Nkwonta*
Christina A. Ford*
Tina Meng Morrison*
Marcos Mocine-McQueen*
Joel J. Ramirez*
Jacob D. Shelly*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave. NW, Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
melias@elias.law
unkwonta@elias.law
cford@elias.law
tmengmorrison@elias.law
mmcqueen@elias.law
jramirez@elias.law
jshelly@elias.law

*Counsel for Plaintiffs*
*Admitted pro hac vice

## <u>CERTIFICATE OF COMPLIANCE</u>

Pursuant to LR 7.1(D), N.D. Ga., I hereby certify that the foregoing ***Plaintiffs' Response to Amicus*** has been prepared in accordance with the font type and margin requirements of LR 5.1, N.D. Ga., using a font type of Times New Roman and a point size of 14.

This 13th day of February, 2023             */s/ Uzoma N. Nkwonta*

                                                        Uzoma N. Nkwonta
                                                        *Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I have this day served a copy of the within and foregoing ***Plaintiffs' Response to Amicus*** with the Clerk of Court using the CM/ECF system, which will automatically send-e-mail notification to all counsel of record.

This 13th day of February, 2023

                                                        */s/ Uzoma N. Nkwonta*

                                                        Uzoma N. Nkwonta
                                                        *Counsel for Plaintiffs*

17