## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

FAIR FIGHT INC., SCOTT BERSON,
JOCELYN HEREDIA, and JANE DOE,

   Plaintiffs,

v.

TRUE THE VOTE, CATHERINE
ENGELBRECHT,
DEREK SOMERVILLE, MARK DAVIS,
MARK WILLIAMS, RON JOHNSON,
JAMES COOPER, and JOHN DOES
1-10,

Defendants,

|  |
|---|
| **CIVIL ACTION FILE** |
| **No. 2:20-CV-00302-SCJ** |

## <u>ORDER</u>

This matter appears before the Court on the Parties' Cross Motions for

Summary Judgment. [1] Doc. Nos. [155-1] (Defendants' Motion for Summary

Judgment); [156-1] (Plaintiffs' Motion for Summary Judgment). For the foregoing

---

[1] All citations are to the electronic docket unless otherwise noted, and all page numbers are those imprinted by the Court's docketing software.

reasons, the Court **GRANTS IN PART** Plaintiffs' motion. Plaintiffs are entitled to summary judgment on Defendants' affirmative defenses of vote dilution and unconstitutional vagueness. The Court **DENIES** Plaintiffs' motion on the remaining issues, namely Plaintiffs' Section 11(b) claim and Defendants' First Amendment defenses. The Court further **GRANTS IN PART** Defendants' motion as it relates to arguments of Muscogee County voter intimidation based on Defendants' Section 230 challenges, but otherwise **DENIES** Defendants' motion.

## I.    BACKGROUND

The Court begins by addressing the relevant background of this case. The Court first will outline some preliminary facts and the Parties at issue, and then give a summary of each Party's factual account of this case. The Court subsequently will give a brief account of the case's procedural history.

### A.    Preliminary Factual Overview

This case involves a claim brought under the Voting Rights Act (VRA), specifically Section 11(b) which, generally speaking, makes liable any person who intimidates, coerces, or threatens another person's right to vote. 52 U.S.C. § 10307(b). As specified in greater detail below, Plaintiffs contend that

2

Defendants violated Section 11(b) by amassing a large number of challenges to registered voters' eligibility under Georgia law, O.C.G.A. § 21-2-230 (hereinafter, "Section 230 challenges" or "voter challenges"), and engaging in other intimidating conduct toward voters in the weeks leading up to the Senate run-off elections in 2021.[2]

Plaintiffs consist of the organization Fair Fight, and individuals Jane Doe, Scott Berson, and Jocelyn Heredia. The individual Plaintiffs are Georgia voters who had their voter eligibility challenged by Defendants despite being properly registered to vote in their respective counties.

Defendants are the organization True the Vote, and individuals Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, James Cooper, and John Does 1–10. Individual Defendant Catherine Engelbrecht founded and is the executive director of True the Vote. Individual Defendants

---

[2] At the time Defendants mounted these voter challenges, O.C.G.A. § 21-2-230(a) (2019) provided that "[a]ny elector of the county or municipality may challenge the right of any other elector of the county or municipality, whose name appears on the list of electors, to vote in an election." After a challenge had been filed, the board of registrars was required to "immediately consider such challenge and determine whether probable cause exists to sustain such challenge." Id. § 21-2-230(b). The statute furthermore affords a challenged voter opportunity to prove his or her voting eligibility, even in the face of a probable cause finding by the board of registrars. See, e.g., id. § 21-2-230(b), (c), (e).

Mark Williams, Ron Johnson, and James Cooper worked with True the Vote to coordinate the voter challenges. Defendants Somerville and Davis also made a list of voters to challenge across Georgia, with a similar motivation as True the Vote (*i.e.*, to ensure only eligible voters were voting in the run-off election).[3]

### B.   Plaintiffs' Account of the Factual Background

Plaintiffs contend that Defendant True the Vote's mass Section 230 challenges of properly registered voters throughout Georgia[4] constituted an attempt to intimidate[5] these voters from voting in the 2021 Georgia Senate run-off

---

[3] The connection between Defendant True the Vote's and Defendants Somerville's and Davis's voter challenge efforts is disputed. See, e.g., Doc. No. [173-1] (Defendants' Response to Plaintiffs' Corrected Statement of Material Facts), 28–30, ¶¶ 39–40. The Parties, nevertheless, do not always clearly distinguish between Defendant True the Vote's efforts and Defendants Davis's and Somerville's efforts.

The Court also has a growing concern about a potential conflict of interest between Defendant True the Vote and Defendants Davis and Somerville. All Defendants are currently represented by the same counsel, but it unclear if the Defendants' interests in their respective defenses continue to be aligned. See, e.g., Doc. No. [210] (Feb. 1 Hearing Tr.) Tr. 55:13–16 (Defense counsel defending True the Vote by arguing that True the Vote did not make voter challenges themselves, but that challenges were "made by someone else, *such as Mark Davis and Mr. Somerville* who were doing their own thing, completely independent." (emphasis added)).

[4] While Plaintiffs allege that True the Vote's efforts to intimidate voters occurred nationwide (Doc. No. [156-1], 6–7), this case solely involves the Georgia elections and voters and thus the Court will only consider the acts and evidence pertaining to Defendants' activities in Georgia.

[5] Section 11(b) prohibits acts of intimidation, threats, *and* coercion. To remain succinct,

4

election. Doc. No. [156-1], 6. Specifically, Plaintiffs argue that Defendants submitted a mass number of voter challenges under Georgia law, O.C.G.A. § 21-2-230, two-weeks before the election that were knowingly frivolous and intimidating to voters. Id. at 15–22. Plaintiffs submit an expert report detailing how Defendants' challenges failed to account for deficiencies in the data sets and ultimately led to an over-inclusive, discriminatory, and unreliable list of voters to challenge. Id. at 17–21. Plaintiffs further contend that Defendants based these challenges on unreliable data from the U.S. Postal Service's National Change of Address (NCOA) database. Id. at 16–17. Plaintiffs submit evidence that insiders to Defendants' voter challenge efforts criticized Defendants' methods and challenger lists. Id. at 21–22. One of Defendants' recruited challengers even retracted his challenges when he discovered errors in the lists provided. Id.

According to Plaintiffs, the public nature of the challenges, along with the other actions that led to and combined with the challenges, show that Defendants' actions intimidated voters. Doc. No. [174], 9. Plaintiffs argue that

_____

the Court may refer to Section 11(b)'s prohibitions as only "intimidation" (or "coercion," or "threats") with the understanding that when one prohibited act is referenced, the Court is implicating Section 11(b) broadly.

Defendants harassed voters by offering a "bounty" for reports of voter fraud and recruiting Navy SEALS to accost voters and poll workers. Doc. No. [156-1], 24–26. Defendants Somerville and Davis furthermore engaged with the public on social media, including responding to one post about obtaining a search warrant against a voter and being tied to a thread that made a violent comment toward ineligible voters, to which Davis and Somerville did not respond. Doc. No. [156-1], 33. Plaintiffs also connect Defendants to efforts by a Twitter account "Crusade for Freedom" to publish the names of challenged voters on the internet, an act specifically decried in conversations between Defendants Somerville and Davis as going too far. Id. at 34–36.

Thus, in Plaintiffs' view, Defendants violated Section 11(b) by intimidating voters through making frivolous and discriminatory voter challenges under Section 230, initiating a bounty for voter challengers, recruiting Navy SEALS to intimidatingly oversee polling places, and publishing challenged voters' names.

### C.   Defendants' Account of the Factual Background

Defendants denounce that they attempted to intimidate voters. They claim instead that their actions leading up to the 2021 run-off election were for the "clear and lawful" purpose to "alert the proper government officials" that not all

voters may be eligible to vote. Doc. No. [155-1], 8. Defendants argue that the data they used to formulate the voter challenge lists was "carefully analyzed" (Doc. No. [173], 4) and that the "proprietary process" used protected against large-scale erroneous challenges (Id. at 23–27). Defendants maintain that they were careful in their calculations and that any unintended errors in their data sets were reasonable. Id. at 27–28.

Defendants furthermore contend that they never contacted any voter directly and that any challenge made was in accordance with Georgia law. Id. at 4. Defendants expressly disclaim that there was any bounty offered for reporting fraudulent voters, but instead that the money available was a "legal defense fund" put into place to assist whistleblowers with any legal issues arising as a result of being part of the voter challenges. Id. at 18–19. Defendants also maintain that they did not recruit veterans to "patrol" polling places (Id. at 20–21), or encourage any "election-related vigilantism on social media" (Id.).

In sum, in Defendants' view, they were making lawful challenges under Georgia law to potentially ineligible voters, who had been identified through a careful vetting process. Defendants offered financial resources for its voter challengers who faced legal complications from making challenges and

7

attempted to increase order at polling places by recruiting veteran volunteers. Defendants moreover deny that they were part of any efforts to publish challenge voters' names or encourage violence toward challenged voters.

### D.   Procedural Background

Plaintiffs filed their complaint, alleging Defendants' actions violated Section 11(b) of the Voting Rights Act, on December 23, 2020. Doc. No. [1]. They then filed a motion for a temporary restraining order on December 29, 2020. Doc. No. [11]. The Court denied the TRO request, concluding that Plaintiffs had not shown a likelihood of success on the merits of their claim, but also acknowledged that it was "deeply concerned" about the legality of Defendants' voter challenges and that "Plaintiffs may yet prove their Section 11(b) claim." Doc. No. [29], 21–28.

After the close of discovery, on May 16, 2022, both Parties filed their motions for summary judgment. Doc. Nos. [155-1]; [156-1]. Plaintiffs also filed a motion in limine to exclude improper expert testimony offered by OpSec's Gregg Phillips[6] and Defendants Davis and Somerville. Doc. No. [172]. The Court has

---

[6] True the Vote worked with OpSec to create the lists of challenged voters in Georgia.

8

granted this motion in limine in a previous order and will address the summary judgment evidence in the light of this exclusion. Doc. No. [221].

The Court ordered a hearing on the cross-motions for summary judgment and directed the Parties to file supplemental briefing responding to several questions. Doc. Nos. [184]; [186]. The Court also issued a certification order notifying the United States Government of the constitutional challenges to Section 11(b). Doc. No. [182]. The Government noticed its intent to intervene. Doc. No. [187]. Thereafter, the Parties, the Government, and an amicus curiae in support of Plaintiffs' position filed supplemental briefing.[7] Doc. Nos. [191]; [192]; [193]; [194]. The Court held a hearing on the cross-motions for summary judgment on February 1, 2023. Having considered the arguments made, the Court now turns to the merits of the Parties' motions.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

---

[7]   The Court granted the amici's request to file a brief and gave each Party an opportunity to respond. Doc. Nos. [207]; [208]; [216]; [218].

R. Civ. P. 56(a). A factual dispute is genuine if the evidence would allow a reasonable jury to find for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact is "material" if it is "a legal element of the claim under the applicable substantive law which might affect the outcome of the case." Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).

The moving party bears the initial burden of showing, by reference to materials in the record, that there is no genuine dispute as to any material fact that should be decided at trial. Hickson Corp. v. N. Crossarm Co., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986)). The moving party's burden can be discharged either by showing an absence of evidence to support an essential element of the nonmoving party's case or by showing the nonmoving party will be unable to prove their case at trial. Celotex, 477 U.S. at 325; Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1115 (11th Cir. 1993). In determining whether the moving party has met this burden, the court must consider the facts in the light most favorable to the nonmoving party. See Robinson v. Arrugueta, 415 F.3d 1252, 1257 (11th Cir. 2005).

Once the moving party has adequately supported its motion, the non-movant then has the burden of showing that summary judgment is improper

by coming forward with specific facts showing a genuine dispute. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). There is no "genuine [dispute] for trial" when the record as a whole could not lead a rational trier of fact to find for the nonmoving party. Id.; see also Nebula Glass Int'l, Inc. v. Reichhold, Inc., 454 F.3d 1203, 1210 (11th Cir. 2006) (the nonmoving party cannot survive summary judgment by pointing to "a mere scintilla of evidence"). All reasonable doubts, however, are resolved in the favor of the nonmoving party. Fitzpatrick, 2 F.3d at 1115.

The filing of cross motions for summary judgment "does not give rise to any presumption that no genuine issues of material fact exist." 3D Medical Imaging Sys., LLC v. Visage Imaging, Inc., 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017). Rather, cross motions for summary judgement "must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Id. (citing Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004)).

### III.   ANALYSIS

The Court proceeds as follows: (A) the Court will determine what standard governs a Section 11(b) claim and if either Party is entitled to summary judgment thereunder, and (B) the Court will address Defendants' constitutional affirmative defenses. As is clear from the Court's above discussion of each Party's account of this case, there is not much factual agreement between the Parties. Ultimately, these factual disputes are material to most of the claims and defenses at issue, and accordingly, summary judgment is not appropriate for either Party on the Section 11(b) claim (with one exception, <u>see</u> *infra* Section (III)(A)(2)(b)(3)(b)) or the First Amendment speech and petition defenses. Given the lack of evidence supporting Defendants' vote dilution and constitutional vagueness defenses, the Court, however, grants Plaintiffs summary judgment on these defenses.

### A.   <u>Section 11(b)</u>

Before turning to the facts of this case, the Court must first determine what test or standard should be applied to a Section 11(b) claim. This task is not a clear or easy given the overall shortage of law interpreting Section 11(b). The Court however determines that for their Section 11(b) claim, Plaintiffs must show direct

action toward voters that caused or could have caused voters to feel reasonably intimidated.

### 1.    *Test or Standard Governing Section 11(b)*

Section 11(b) provides, in relevant part that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote . . . ." 52 U.S.C. § 10307(b). Black's Law Dictionary currently defines "intimidation" as "[u]nlawful coercion; extortion"; "threat" as "[a] communicated intent to inflict harm or loss on another . . . "; and "coerce" as "compel[ling] by force or threat." INTIMIDATION, THREAT, COERCE, Black's Law Dictionary (11th Ed. 2019). Another district court articulated that at the time Congress passed Section 11(b), "[i]ntimidate mean[t] to 'make timid or fearful' or 'inspire or affect with fear,' especially 'to compel action or inaction (as by threats).' Threaten mean[t] to 'utter threats against' or 'promise punishment, reprisal, or other distress.'" Ariz. All. for Retired Ams. v. Clean Elections USA, No. CV-22-01823-PHX-MTL, 2022 WL 15678694, at *3 (D. Ariz. Oct. 28, 2022) (some internal quotation marks excluded) (quoting Webster's Third New International Dictionary 1183, 2381(1966)) vacated and dismissed as moot Ariz.

13

<u>All. for Retired Ams. v. Clean Elections USA</u>, No. 22-16689, 2023 WL 1097766, at

*1 (9th Cir. Jan. 26, 2023). While "instructive," <u>id.</u>, the Court overall finds the

statutory text and its relevant definitions largely unhelpful to guide its

assessment of Section 11(b) in the light of this case's particular facts.

The clearest articulation of a Section 11(b) test is in <u>National Coalition on</u>

<u>Black Civic Participation v. Wohl</u>, 512 F. Supp. 3d 500 (S.D.N.Y. 2021). There, the

district court determined, "intimidation includes messages that a reasonable

recipient, familiar with the context of the message, would interpret as a threat of

injury—whether physical or nonviolent—intended to deter individuals from

exercising their voting rights." 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021). The <u>Wohl</u>

court went on to explain that these illegal acts "may take on many forms," and

can include "actions or communications that inspire fear of economic harm, legal

repercussions, privacy violations, and even surveillance can constitute unlawful

threats or intimidation under the statute."[8] <u>Id.</u> (citing <u>United States v. Beaty</u>,

288 F.2d 653, 656 (6th Cir. 1961)).

_____

[8] Another district court, relying on a Ninth Circuit decision, determined that "to succeed on [a Section 11(b) claim], a plaintiff must show both an act of intimidation or attempt to intimidate, and that the act was done with the specific intent to intimidate or attempt to intimidate." <u>Parson v. Alcorn</u>, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016). A

At the Court's instruction, the Parties and the Government proposed standards to govern Section 11(b). Doc. Nos. [191]; [192]; [194]; [208].  Plaintiffs contend that intimidation under Section 11(b) can be non-violent if it prevents someone from voting, does not require intent or racial animus, and does not require direct contact. Doc. No. [193], 12–29. Defendants conversely argue that intimidation requires a direct connection between the intimidator and the one being intimidated. Doc. No. [191], 3–4. The Government suggests that the Court ask, using a totality of the circumstances analysis, if the conduct attempted to or actually intimidated any person from voting or trying to vote. Id. at 12–17. Moreover, the Government acknowledges Section 11(b) requires some direct

---

specific intent requirement, however, has been rejected by several courts who have determined that there is no specific intent requirement in 11(b) cases, namely by relying on Section 11(b)'s different statutory language from prior voter intimidation statutes. See, e.g., Wohl, 498 F. Supp. 3d at 476–77 ("A plaintiff need not show racial animus or discrimination to establish a violation of Section 11(b). First, the statutory text prohibits intimidation, threats, and coercive conduct, without any explicit or implicit reliance on the motivation of the actor. Indeed, the legislative history makes clear that the prohibited acts of intimidation need not be racially motivated." (alteration adopted) (quotation and citation omitted)); see also Nicholas Katzenbach, U.S. Attorney General, Statement before the House Judicial Committee on the Proposed Voting Rights Act of 1965 (March 18, 1965) (henceforth "Katzenbach, House Judiciary Statement"). For similar reasons, the Court finds Parson to be an unpersuasive interpretation of Section 11(b).

15

connection between the intimidator and the voter, but concedes that this connection may be supplied by a third-party.[9] Doc. No. [192], 17–21.

In the light of the statutory text, the Parties' submissions, and the prior cases interpreting the statute, the Court agrees with the Government insofar as finding that intimidation requires considering the totality of the circumstances. Furthermore, nothing about intimidation suggests that it must be violent or made personally by the intimidator. Accordingly, the Court will consider non-violent conduct and third-party actions that have been directed by the Defendants. To alleviate any concern about all-encompassing or unforeseeable liability, the Court further determines that the intimidation felt or threatened must also be objectively reasonable.

In short, the Court concludes that for Plaintiffs to succeed in their Section 11(b) claims against Defendants, they must show that (1) Defendants' actions directly or through means of a third-party in which they directed, (2) caused, or

---

[9] The amicus curiae argues that Section 11(b) does not have an intent requirement, covers non-violent conduct, and does not have a direct causation requirement. Doc. No. [208], 10–12, 15–17. It specifically counsels the Court to ban three categories of non-violent intimidation: (1) false statements or implications that lawful voters are unlawful voters, (2) falsely stating consequences of voting or suggesting falsely that a person could be penalized for voting, and (3) monitoring voting activities in a harassing manner, especially if directed at individual voters. Id. at 12–15.

could have caused[10], (3) any person to be reasonably be intimidated, threatened, or coerced from voting or attempting to vote.[11] To assess these required showings, the Court will use a totality of relevant circumstances inquiry.

### 2.   *Section 11(b) in the Present Case*

With this framework in mind, the Court turns to the Parties' arguments. The Court will address each element in turn: (A) if Defendants (or their agents) *directly* engaged with voters, (B) whether Defendants' actions *caused* or *could have caused* voters' fear, (C) if the voters' potential or experienced intimidation was *reasonable*.

---

[10]  The Court includes the "could have caused" alternative with the understanding that Section 11(b) also attaches liability for *attempts* to intimidate, coerce, or threaten voters. 52 U.S.C. § 10307(b) ("No person, whether acting under color of law or otherwise, shall . . . *attempt* to intimidate, threaten, or coerce any person for voting or attempting to vote . . . ." (emphasis added); cf. also ATTEMPT, Black's Law Dictionary (11th ed. 2019) (defining "attempt" as "the act or an instance of making an effort to accomplish something.").

[11]  The Court acknowledges that this test does not clearly apply to an organization like Plaintiff Fair Fight, which itself does not possess the capacity to vote. However, Fair Fight, has in part, argued that it has organizational standing to assert these claims because it diverted funds to address Defendants' purported practices. Doc. No. [29], 19–20. To that end, the Court adds that for Plaintiff Fair Fight to be successful, it must show how the framework applies to voters and how Defendants' actions injured Fair Fight.

The Parties dispute every element, and nearly every fact raised. They disagree broadly whether Defendants directed action at voters and caused (or could have caused) these voters to feel intimidated. The Parties further disagree about the following factors that bear, at the very least, on the reasonableness of voters' felt intimidation: (1) the relevance of the proximity of Defendants' challenges to the run-off election, (2) the frivolity of the challenges made, (3) the intent to target specific voters or demographics of voters, (4) the bounty (or legal defense fund) created to incentivize challengers, (5) the recruitment of Navy SEALS to guard (or work) polling places, and (6) the publication of challenged voter's names.

The Court proceeds by discussing each element: directness, causation, and reasonable intimidation. Given that the Court announces this standard governing Plaintiffs' Section 11(b) claim for the first time in this Order, the Court acknowledges that the Parties' arguments do not neatly fit into these categories. The Court does its best to situate each argument (and its relevant evidence) within its framework, though many of the facts at issue implicate more than one

element. For example, the Court discusses the six factors mentioned above under the reasonableness analysis, but most factors also present causation issues.[12]

### a)   Directness of Defendants' actions toward voters

The first element identified by the Court for a Section 11(b) claim requires that the Defendants' directed their actions at voters, or directed the actions of a third-party toward voters, in an intimidating fashion. The basis for this requirement is supported by Section 11(b)'s caselaw where direct contact—violent or non-violent—has affected prior decisions on whether a violation has occurred. See, e.g., Wohl, 498 F. Supp. 3d at 485 (making robocalls to voters by means of a third party agent); Ariz. Democratic Party v. Ariz. Republican Party, No. CV-16-03752-PHX-JJT, 2016 WL 8669978, at *6–8 (D. Ariz. Nov. 4, 2016) (facilitating poll watchers over polls where voters would be voting); Daschle v. Thune, No. 4:04-cv-04177 2004 WL 3650153 *5–6 (D.S.D. Nov. 1, 2004) (following Native American voters at polling places "ostentatiously making notes," tracking their license plate numbers, and having "loud conversation[s] in

---

[12]  Indeed, to avoid any risk that the Court's focus on reasonable fear in this Order might send the wrong signal to the Parties, the Court now emphasizes that it has significant questions regarding causation in this case. The Court encourages Plaintiffs (who bear the burden) to particularly address this element at trial.

19

a polling place . . . about Native Americans who were prosecuted for voting illegally . . . ."), <u>TRO granted</u> <u>Daschle v. Thune</u>, No. 4:04-cv-04177, Doc. 6 (Nov. 2, 2004); <u>Willingham v. Cty. of Albany</u>, 593 F. Supp. 2d 446, 462–63 (N.D.N.Y. 2006) (going to voters' homes and disseminating false information about the absentee ballot process).

The Court again emphasizes that the direct contact with voters need not be made by the named Defendants themselves. Certainly, a person cannot escape liability by doing indirectly through another what he or she would be liable for directly doing themselves. As long as Plaintiffs are able to show that the named Defendants engaged a third-party to make direct contact with voters, this element can be satisfied. <u>See</u>, <u>e.g.</u>, <u>Wohl</u>, 498 F. Supp. 3d at 485; <u>Willingham</u>, 593 F. Supp. 2d at 462–63.

Another question is whether the acts of intimidation must be violent. The Court hereby joins the courts who have considered sufficiently intimidating non-violent conduct in Section 11(b) claims. <u>See</u>, <u>e.g.</u>, <u>Wohl</u>, 498 F. Supp. 3d at 484 ("It is true that the robocalls were not themselves violent and are not as egregious as the physical acts of intimidation seen in some of the case law . . . There is no requirement—in the statutory text or the case law—that intimidation be violent

20

or physical."). Thus, while violent direct contact might more readily present a scenario of illegal voter intimidation, non-violent conduct may also support liability under Section 11(b).

The evidence of Defendants' direct contact with voters in this case is disputed. Plaintiffs maintain that Defendants' manner of making the voter challenges[13], setting up the bounty for challengers, and recruiting of Navy SEALS for poll-watching is sufficient contact to have intimidated voters. The Court finds that the recruitment of Navy SEALS and payment of the bounty to challengers as Plaintiffs contend occurred here might constitute Defendants' acting directly—through means of a third-party—in a manner that would intimidate voters. The Court further, at this stage, accepts that Defendants' mass voter challenges as described by Plaintiffs could constitute direct contact with voters. Thus, to the extent that Plaintiffs have submitted evidence that voters felt or could have felt intimidated by being, or possibly being, challenged by Defendants via their county challengers, this element would be satisfied.

─────────────────

[13] When the Court discusses Defendants' voter challenges, the Court is discussing the Defendants' physical challenges to voter qualifications, Defendant True the Vote's efforts to recruit Georgia electors to challenge other voters' qualifications, and Defendants Sommerville's and Davis's efforts to recruit Georgia electors to challenge other voters' qualifications.

21

Defendants however contest these actions. Broadly, Defendants submit that "Plaintiffs provided no evidence" that Defendants (or their agents) contacted any other voter. See, e.g., Doc. No. [173-1], 23 (showing no contact with Plaintiff Heredia specifically). They cite to interrogatory responses and deposition testimony from organizers of the challengers that prove they made no contact, nor directed or endorsed any contact, with voters. Doc. Nos. [155-8], 21–23 ("TTV never counsels or trains volunteers to confront or approach individuals who are attempting to vote with any concerns that may arise. TTV always trains and counsels its volunteers to work through the proper authorities with any questions or concerns . . . TTV did not accuse, either directly or indirectly, any voter of acting improperly, and it certainly did not seek to prevent those legally authorized to vote from doing so."); [155-15], 13 ("I [Somerville] have had no communications with any Targeted Voter determined to be a resident of the county in which they were registered."); [161-1] (Davis Dep. Tr. 1) Tr. 171:17–21 ("I would encourage people to avoid any kind of contact with these voters unless it's done by an elected official or a county official or someone conducting an official investigation."). Defendants also dispute Plaintiffs' characterization of the "bounty" (instead contending it to be a "legal defense fund") and the recruitment

of veterans and first responders to work polling places in close contact with voters in an intimidating fashion. See *infra* Section (III)(A)(2)(c)(4)–(5).

Ultimately, given these factual disputes about Defendants' direct actions toward voters, summary judgment is inappropriate on the direct contact element.

### b)   Causation

The Court also determines that Section 11(b) requires a causal link between Defendants' action and whether voters' felt intimidation. In this section, the Court will first discuss the legal basis for this requirement, and then address Plaintiffs' evidence that Defendants caused or could have caused intimidation in the broad voter population[14] or in the specific voters identified in this case.

### (1)   *Legal basis for causation element*

To intimidate, coerce, or threaten implicitly requires that the actions at issue lead to the adverse effect of intimidation on the voter. The caselaw, while

---

[14]  The Parties need to also address at trial the more fundamental question of whether any of the Plaintiffs have asserted an injury on behalf of the broad voter population. Plaintiff Fair Fight asserted a personal injury (not a grievance on behalf of all Georgia voters) in the TRO proceedings, which constituted sufficient injury for standing purposes. Doc. No. [29], 19–20. Because such consideration does not affect the Court's conclusion that summary judgment should be denied, for purposes of this Order, the Court will briefly address whether Defendants' conduct could have intimidated the broader voter population.

23

not overt in naming a causation requirement, supports that Defendants' actions must have some connection to the voters' alleged intimidation. Cf. Wohl, 498 F. Supp. 3d at 480 ("[C]ourts have concluded that conduct *putting others* 'in fear of harassment and interference with their right to vote' constitutes intimidation 'sufficient' to support a Section 11(b) claim." (emphasis added) (citing League of United Latin Am. Citizens-Richmond Region Council 4614 v. Pub. Interest Legal Found. ("LULAC"), No. 18 Civ. 423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018)); cf. also id. at 482 (comparing Section 11(b) intimidation to Fair Housing Act intimidation, which requires "a showing that the [defendant's] activities *had generated* fear in the [plaintiff]" (alteration in original) (emphasis added) (quoting Walker v. City of Lakewood, 272 F.3d 1114, 1129 n.4 (9th Cir. 2001)). Moreover, Section 11(b) generally attributes to Defendants the *natural consequences* of their actions, which also implies a causation requirement.[15] Cf. e.g., Katzenbach, House Judiciary Statement ("[D]efendants [are] deemed to intend the natural consequences of their acts.").

---

[15] While legislative speeches are no basis alone to interpret a statute, Section 11(b) text supports Katzenbach's account of the legislative history given the lack of intent requirement, especially in contrast to prior Civil Rights statutes. Thus, the Court finds Katzenbach's speech persuasive as it is supported by Section 11(b)'s text and legislative context.

24

Thus, the Court determines that there must be some connection between Defendants' conduct and the intimidation that is reasonably felt or could be reasonably felt by a voter. The Court however does not believe that this causation requirement needs to be onerous. Defendants' actions need only be connected to the voters feeling (or potentially feeling) intimidated. Cf. Wohl, 498 F. Supp. 3d at 480. Put differently, the Defendants' conduct must generate the possibility that voters would feel threatened, intimidated, or coerced. Cf. id. at 482.

> **(2)** *Causation evidence that Defendants' actions intimidated the broad voter population*

Here, for the broad voter population, the evidence supporting causation largely repeats the evidence already discussed for Defendants' direct actions toward voters, including the allegations and evidence that Defendants issued, encouraged, or enabled frivolous mass voter challenges, recruited Navy SEALS as poll watchers, and created a bounty for challengers. Also relevant is Defendants' role or foreknowledge of the publication of challenged voters' names. The Court reserves its more thorough discussion of these facts for the reasonableness inquiry. See *infra* Section (III)(A)(2)(c)(2), (4)–(6). Clearly, however, there are material disputes of fact precluding summary judgment.

25

(3)     *Causation evidence that Defendants' actions intimidated specific voters*

For evidence pertaining to specific voters in this case, Defendants also raise causation issues that require further discussion. Plaintiffs seem to submit evidence of intimidation felt by three named Plaintiffs (Ms. Heredia, Ms. Jane Doe, and Mr. Berson), and two non-Plaintiff-voters (Ms. Stinetorf and Mr. Turner). Ultimately, for Plaintiff-voters Heredia and Jane Doe, the Court determines that questions of fact regarding causation preclude summary judgment on their claims. For Plaintiff Berson and the two non-Plaintiff voters, however, the Court determines that summary judgment is appropriate for Defendants as it pertains to intimidation based on *Defendants making Section 230 voter challenges* given the undisputed evidence that causation is lacking. Because other methods of intimidation (*e.g.*, publication of challenged voters' names) present questions of fact, however, summary judgment overall is inapposite.

(a)     **Plaintiffs Heredia and Jane Doe**

Plaintiff Heredia testified to feeling afraid while voting once she discovered the challenge to her voting eligibility and was required to provide additional proof of eligibility to vote. Doc. No. [163-1] (Heredia Dep. Tr.) Tr.

26

24:3–23. Specifically, she cited the "longer process" she underwent to vote (ultimately taking 3-4 hours) and the fact that, as one of the only minority voters at the polling place, she "fel[t] intimidated" by the challenge. Id. at 44:19–45:8. While no one directly spoke to her, Heredia contended that "people can talk with their eyes," which contributed to her feeling intimidated. Id. at 48:19–21. She also testified to being afraid when she discovered that she had been published on the county's website as a challenged voter. Id. at 31:24–32:3. Heredia concluded, that during the process of voting, "I felt very intimidated. Like even when I went home, I was still shocked." Id. at 47:23–25.

Defendants dispute that Heredia was actually intimidated by having her voter eligibility challenged. Defendants cite to Heredia's deposition testimony that she "felt intimidated from the get-go, as soon as I was there [at the polling place]. Because . . . I'm the only Hispanic coming to vote at a predominantly Republican county; I'm the only non-white; so from there, I felt intimidated." Id. at 48:6–10. Defendants thus argue that it was not the voter challenge, but other circumstances at her polling place (unrelated to Defendants) that caused her to be afraid. Doc. No. [173], 10–13. Defendants also maintain, as discussed *infra* Section (III)(A)(2)(c)(6), that they had no role in publishing the names of

challenged voters. Accordingly, there are disputes of fact on whether Defendants' conduct caused Heredia to be intimidated.

Similar arguments were made regarding Plaintiff Jane Doe. Jane Doe claims that she was "extremely upset when [she] learned that [her] eligibility to vote had been challenged by True the Vote . . . when [she] read a story in the local paper about True the Vote's challenges and saw her name and address had been published online." Doc. No. [156-19], ¶ 5. She claims the "challenge [was] upsetting" because "it felt like someone was trying to deprive my right to vote, and in a public way." Id. at ¶ 6. Other than the challenge being "stressful," she also "feared that [she or her family] could become the next target of harassment from True the Vote and their supporters." Id. at ¶ 9. She fears future challenges and questioning of her eligibility to vote. Id. at ¶ 11.

Defendants dispute that their conduct caused Jane Doe's fear. Again, as discussed in greater detail *infra* Section (III)(A)(2)(c)(6), they dispute that they directly published or had a role in pushing her name. Doc. Nos. [168-1] (TTV Dep. Tr.) Tr. 257:11:–14; [166-1] (Somerville Dep. Tr. 2) Tr. 73:7–14; [165-1] (Davis Dep. Tr. 2) Tr. 46:7–14, 80:4–10. Defendants also dispute that they had any direct contact with Jane Doe, let alone contact that would have put her in fear of voting

or of future harassment. Doc. Nos. [155-8], 21–2; [155-15], 13. Finally, Defendants dispute that any of their actions deprived, or were intended to deprive, Jane Doe's right to vote as an eligible voter. Doc. Nos. [168-1] (TTV Dep. Tr.) Tr. 152:15–54:19, 170:7–18; [165-1] (Davis Dep. Tr. 2) Tr. 199:15–21. The dispute between the Parties comes down to weighing the facts and assessing Jane Doe's credibility. Consequently, the Court cannot grant summary judgment for either Plaintiffs or Defendants on Jane Doe's claim.

(b) **Muscogee County voters: Stinetorf, Turner, Plaintiff Berson**

Plaintiffs also submit declarations by two non-Plaintiff voters, Stephanie Stinetorf and Gamaliel Turner, who were registered to vote in Muscogee County with legitimate reasons for temporarily relocating, which did not affect their eligibility to vote in Muscogee County. Stinetorf and Turner each submitted statements about the fear and intimidation they felt given the challenges to their voting eligibility. Doc. Nos. [156-20], ¶¶ 7–13 (discussing Stinetorf's anxiety after voting absentee and learning that her vote had been challenged and blocked by a court order); [156-21], ¶¶ 7–12 (discussing Turner's voter challenge which

29

resulted in him suing the Muscogee County Board of Elections and paying for expedited shipping of his absentee ballot).

Defendants do not dispute Stinetorf's and Turner's experiences but argue the voter challenges made against them cannot be attributed to Defendants because Defendants' efforts did not lead to any Section 230 challenges being made in Muscogee County. Doc. Nos. [155-6], 7–8 (listing counties where True the Vote made challenges—which does not include Muscogee County—and representing that "TTV submitted no other challenges"); [165-1] (Davis Dep. Tr. 2) Tr. 144:9–15 (discussing how the Somerville and Davis lists did not result in challenges in Muscogee County). The same applies to Berson, who is also a challenged voter from Muscogee County. Doc. No. [155-23], 2, 6.

Plaintiffs do not dispute that Defendants Davis and Somerville did not make Section 230 challenges in Muscogee County. Doc. No. [174-1], 86. Likewise, the evidence is uncontroverted that Defendant True the Vote did not make voter challenges through its agents in Muscogee County. Doc. No. [155-6], 7–8.

Thus, based on the undisputed facts, the Court concludes that the Section 230 challenges against Stinetorf, Turner, and Berson were not caused by

Defendants. In short, no evidence connects the Muscogee County voters' intimidation based on voter challenges with the Defendants.

This determination, however, does not mean that Section 11(b) does not apply to these voters. The Section 230 voter challenges are only one basis of intimidation alleged by Plaintiffs against Defendants. Plaintiffs also allege, for example, that Defendants intimidated voters by recruiting Navy SEALS and publishing lists of challenged voters. Discussed *infra* Section (III)(A)(2)(c)(5)–(6), these actions, independent of the voter challenges, could cause a person to be reasonably intimidated in exercising his or her right to vote. Thus, the Court determines that Defendants are entitled to summary judgment on Plaintiffs' claims *relating to Section 230 voter challenges in Muscogee County*, but the Section 11(b) claim nevertheless survives summary judgment for all voters because of other factual disputes of allegedly intimidating conduct.

### c)    Objectively reasonable intimidation

Finally, the Court addresses whether Defendants' actions reasonably could have intimidated or did actually intimidate voters. Every claim of intimidation will be different, and thus a totality of the circumstances test allows Section 11(b)'s scope to manifest across evolving norms and discrete situations.

In this case, there are numerous disputed facts relevant to the reasonableness inquiry that preclude summary judgment for either Party. The Parties present six-factors for the Court to consider in in determining whether Defendants' actions might have or did cause reasonable intimidation in this case: (1) the proximity of the challenges to the election, (2) the frivolity of challenges, (3) Defendants' motivation in making the challenges, (4) the bounty (or legal defense fund) to incentivize challengers, (5) the recruitment of Navy SEALS to watch (or work) polling places, and (6) the publication of challenged voters' names. Again, the Parties dispute nearly every factor, and thus summary judgment is still inapposite.[16]

### (1) *Proximity of the voter challenges to the run-off election*

The Court first considers the proximity of Defendants' challenges. Defendants disclosed their intent to make Section 230 voter challenges in mid-December 2020 in anticipation of the January 5, 2021 run-off election.

_____

[16] Given there is a dispute on most every factor, the Court reserves any consideration on the weight to accord these factors until it has heard the evidence presented and is able to make credibility and factual determinations as the trier of fact.

32

The Court finds there is a federal interest in not purging voter rolls close to an election. Congress clearly expressed this interest in the National Voter Registration Act (NVRA), 52 U.S.C. § 20507, when it prohibited states from mass removals of voters' names from voting registration lists less than 90-days before an election. Such removals can only occur within the 90-day period "(1) at the request of the registrant; (2) as provided by State law, by reason of criminal conviction or mental incapacity; [or] (3) upon death of the registrant." Arcia v. Fla. Sec'y of State, 772 F.3d 1335, 1345 (11th Cir. 2014). Thus, "individualized removals are safe to conduct at any time," but "[f]or programs that systematically remove voters . . . Congress decided to be more cautious." Id. at 1346.

While cautious heavily rely on the NVRA in this case,[17] the Court considers the NVRA's prohibitions on mass removals of voters from registration lists close

_____

[17] This statement is admittedly in some tension with the Court's expressed concern in the TRO about Defendants' actions circumventing the NVRA's requirements and limitations. Doc. No. [29], 11–15. The Court maintains its concern about Defendants' motivation, but also must limit its decision to the Section 11(b) claim and its standards governing the instant motion for summary judgment. And, here, the NVRA is not at issue. Plaintiffs do not bring a claim under the NVRA. Nor do Defendants have authority over a state's voter registration list—which is primarily what the NVRA protects against. The Court moreover is not faced with deciding if any state or county entity who received these mass challenges could have removed the challenged voters from their registration lists without violating the NVRA. At least one sister district court, in a case involving Section 230 voter challenges brought against a county board of

to an election in assessing the reasonableness of Defendants' challenges which were made within weeks of an election. This consideration is especially relevant since Defendants' actions *could* implicate the NVRA by forcing many voters to prove their voting eligibility or risk being removed from a voter roll within 90-days of an election. Because Congress has established that no major changes to the voter rolls should occur within 90-days of an election, the Court will use 90-days as a baseline for determining the relative closeness of the challenge to the election. Thereby, given that Defendants do not contest that they made these voter challenges within 30-days of the January 5, 2021 run-off election, this factor

_____

registrars, has determined through a "fair reading," that Section 230 challenges are not preempted by the NVRA. <u>Majority Forward v. Ben Hill Cty. Bd. of Elections</u>, 512 F. Supp. 3d 1354, 1368–69 (M.D. Ga. 2021). In short, the NVRA's role in this case is limited.

The Court further notes that the NVRA's the 90-day bar on mass removals of voters and the additional procedures required to verify NCOA information, in context, are within statutory requirements to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters from the official lists of eligible voters by reason of (A) the death of the registrant; or (B) a change in the residence of the registrant [in accordance with the remaining statutorily limitations.]" 52 U.S.C. § 20507(a)(4); <u>see also</u>, <u>e.g.</u>, <u>id</u>. § 20507(c)(1) ("A State may meet the requirement of subsection (a)(4) by establishing a program [where NCOA data is used and verified]."). The interplay the NVRA's countervailing concerns (*i.e.*, mandating states remove ineligible voters and protecting eligible voters from the states' removal programs) is lost in a case claiming voter intimidation against a private party.

is undisputed, and weighs in favor of finding that the challenges reasonably could have resulted in voter intimidation.

### (2) *Frivolity of challenges*

Plaintiffs also argue that Defendants' voter challenges were frivolous. The Court will first address some preliminary considerations regarding frivolity as a factor in this Section 11(b) case, and then will turn to the evidence presented and arguments made by the Parties.

### (a) <u>preliminary considerations</u>

Plaintiffs' argument connecting the frivolity of Defendants' challenges to voter intimidation is still somewhat unclear. The Court construes Plaintiffs to argue that a frivolous challenge can be reasonably intimidating because such challenge has no chance of stopping an ineligible voter, and thereby only has the effect of deterring (*i.e.*, coercing) eligible voters from trying to vote. The Court recognizes that, with the right proof under the totality of the circumstances, this theory might support a Section 11(b) claim against Defendants.

The Court has, however, an open question about how to assess if a challenge was frivolous or not.[18] Plaintiffs assert simply that frivolity is a lack of probable cause. Doc. No. [210] (Feb. 1 Hearing Tr.) Tr. 13:24–14:3. In other words, if a county determines there is no probable cause to pursue whether a voter is eligible to vote, then the challenge was frivolous. Defendants conversely argue that frivolity ought to be determined only if the challenge lacks a basis in law and fact. Id. at 30:16–19.

At this time, the Court does not determine an exact standard for frivolity in reference to Section 11(b) intimidation in this case. The purpose of assessing frivolity in the Section 11(b) analysis is to determine if Defendants' challenges reasonably contributed to voters feeling (or potentially feeling) threatened in exercising their right to vote. In this Court's estimation, the intimidating *effect* of a potentially frivolous challenge does not necessarily require the challenge itself

---

[18] This question is further complicated by the fact that Plaintiffs use "frivolity" in two distinct arguments—(1) the instant issue regarding whether Defendants challenges intimidated voters, and (2) in response to Defendants' First Amendment petition defense, where Plaintiffs argue that frivolous petitions are not constitutionally protected. Doc. Nos. [156-1], 15; [174], 25–26. The Court requested supplemental briefing on frivolity in reference to the petition defense (Doc. No. [184]), and addresses both issues of frivolity in this Order. It need not (and does not), however, determine as a legal matter if frivolity for a Section 11(b) intimidation analysis and the petition defense require the same proof.

36

meet any specific standard of frivolousness. Put somewhat differently, at issue for Section 11(b) purposes is the perceived effect of the challenges, not whether the challenges were actually frivolous.

Nevertheless, the Court's forthcoming analysis more closely resembles Defendants' proposed test. The Court is unpersuaded that every instance where a county does not pursue a Section 230 voter challenge means that the challenge is frivolous. Given that the Court has accepted Plaintiffs' argument that frivolous challenges may cause reasonable intimidation, Plaintiffs' probable cause standard could mean that every failed challenge would support Section 11(b) liability. This result cannot be. The bar for frivolity, thereby, in this Court's view must be higher than the county's mere failure to determine probable cause.[19]

_____

[19] Probable cause, although not a high bar, is a higher bar than frivolity. "Probable cause to institute civil proceedings requires no more than a 'reasonabl[e] belie[f] that there is a chance that [a] claim may be held valid upon adjudication.'" DeMartini v. Town of Gulf Stream, 942 F.3d 1277, 1300–01 (11th Cir. 2019) (quoting Pro. Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 62–63 (1993); Restatement (Second) of Torts § 675, cmt. E (Am. Law Inst. 1977)). "Therefore, 'it is not necessary to show that the instigator of a lawsuit was certain of the outcome of the proceeding, but rather that he had a reasonable belief, based on the facts and circumstances known to him, in the validity of the claim.'" Id. at 1301 (quoting Mee Indus. v. Dow Chem. Co., 608 F.3d 1202, 1211 (11th Cir. 2010)). By comparison, a frivolous claim has been defined as being "so lacking in arguable merit as to be groundless or without foundation." Sullivan v. Sch. Bd. of Pinellas Cty., 773 F.2d 1182, 1188 (11th Cir. 1985) (citing Jones v. Texas Tech Univ., 656 F.2d 1137, 1145 (5th Cir. 1981)).

In short, whether a voter challenge was "legitimate" or merely "frivolous" might affect the reasonableness of a voters' feelings of fear or intimidation. It might also bear on Defendants' motivation in making the challenges, how serious the board of registrars (or the public more generally) should have taken the challenges, and whether any burden felt by a challenged voter was necessary or proper. All of these implications might have an effect on whether Defendants' actions could have or did cause reasonable voter intimidation.[20]

### (b)   <u>evidence presented of frivolity</u>

With these preliminary considerations in mind, the Court turns to the Parties' substantive arguments. Plaintiffs assert several arguments that Defendants' methods of compiling the lists of voters to challenge lacked rigor, was incomplete, and ultimately incorrect. Doc. No. [156-1], 15–23. Plaintiffs contend that the following evidence support the Court finding as a matter of law that Defendants' challenges were frivolously made and reasonably caused voter intimidation: (i) True the Vote's data used bad data sets and analytics, (ii) True

---

[20] By considering the challenges with an emphasis on the challenges' *effect* on voters, the Court also need not resolve any issues of Section 11(b) preempting Georgia's Section 230 voter challenges. The Court has considered the preemption question a great deal, but ultimately determines that further assessment is not required here.

the Voter's data was criticized by insiders to its voter challenge initiative, (iii) the exclusive use of the NCOA data set makes the challenges frivolous as a matter of federal law, and (iv) Davis's and Somerville's lists were poorly formulated. Id. Defendants contest each piece of this evidence. Doc. No. [173], 14–28. Ultimately, the Court concludes that disputes of material fact preclude summary judgment based on the frivolity of the Defendants' challenges.

> i)    True the Vote's data sets and analytics

Plaintiffs submit expert testimony from Dr. Kenneth Mayer who assessed the adequacy of Defendants' data and methodology, and concluded they were inadequate. Doc. No. [156-16], 5. Mayer's conclusion relies on True the Vote's data not having a "unique identifier" or a matching process to ensure the persons who submitted NCOA requests reflected the same voters on the registration lists. Id. at 6–11. Mayer further opined about a number of blatant and significant errors in True the Vote's challenge list, including missing fields of information, wrong zip codes, and inconsistent abbreviations and spellings. Id. Mayer also relied on Defendants' lists containing likely eligible voters who had legitimately relocated for military service or higher education.  Id. at 35 ("In total, I identified 57,534

registrants in the challenge file who appear to have moved to or near a military installation, or to a municipality with a college or university. This constitutes 22.9% of the registrants in the challenge file.").

Defendants dispute that their methodology was inadequate. Defendants cite heavily to the deposition testimony of Greg Phillips, the spokesperson of OpSec, who created the algorithms and completed the data analysis True the Vote used to craft its lists of voters to challenge. Phillips testified, contrary to Plaintiffs' contention, that Defendants used multiple data files (not just the NCOA data) and algorithms to create the list of voters to be challenged. Doc. Nos. [167-1] (OpSec Dep. Tr.) Tr. 95:10–96:17; [168-1] (TTV Dep. Tr.) Tr. 134:21–135:1 (indicating True the Vote used "a variety of databases and filters [and] evaluated from the rolls what records showed up on the NCOA standard given additional filters."). Phillips further outlined OpSec's data cleansing process (to cure the incomplete or mismatched data) and verification of "identity" (to reduce the number and severity of potential mistakes).[21] Doc. No. [167-1] (OpSec Dep. Tr.) Tr. 115:1–18, 94:1–2.

_____

[21] According to Phillips, "verifying" or "resolving identity" is OpSec's proprietary process that reduces the inherent risk of voter data, the lack of unique identifier in data

Phillips also discussed that the algorithms were intended removed eligible military and student voters from the lists. Doc. Nos. [167-1] (OpSec Dep. Tr.) Tr. 128:1–15; [168-1] (TTV Dep. Tr.) Tr. 203:3–11 ("NCOA link versions gives you the opportunity to filter out any recognized military address" and also "efforts [were] made to recognize the standard zip codes, orientations of bases [addresses]" and that "those were filtered out."). True the Vote recognized specifically that military members relocate with greater frequency and that their change of address data, thereby is more "sensitive." Doc. No. [168-1] (TTV Dep. Tr.) Tr. 104:16–22.

Philips candidly admits that there will be voters on the challenge list that are eligible to vote and reiterates that the final decision regarding voter eligibility (or the need to prove such) belongs to the county, not the challengers. Doc. Nos. [167-1] (OpSec Dep. Tr.) Tr. 129:8–15; [168-1] (TTV Dep. Tr.) Tr. 232:19–22. ("[A]ccording to the analysis that we provided, or that we supported, records

_____

sets, and problems relating to shared (or duplicate) names and addresses among voters. Doc. No. [167-1] (OpSec Dep. Tr.) Tr. 107:9–108:4. Per the Court's order on Plaintiffs' motion in limine (Doc. No. [221]), however, the Court will not consider any technical opinions rendered by this lay witness, which in this case includes any lay witness's assessment of the reliability of these processes in reducing risk.

[informing the voter challenges] corresponded with individual decisions to permanently change their residence.").

Given the conflicting factual accounts, the Court determines that there are material disputes of fact regarding what data True the Vote used to make their challenges and its attentiveness in ensuring eligible voters were removed from its lists. Accordingly, a trier of fact must weigh this evidence, and it cannot be a basis for summary judgment.

### ii)    criticisms of True the Vote's lists

Plaintiffs also cite Joseph Martin's and Mark Davis's testimony as evidence that True the Vote's challenge lists were inadequate. Martin volunteered as a True the Vote challenger, but ultimately retracted his challenges when two voters he challenged were proven eligible to vote. Doc. No. [159-1] (Martin Dep. Tr.) Tr. 77:10–78:12, 62:7–16, 64:4–20, 65:19–66:17. Martin thereafter raised his concerns about the True the Vote's lists.[22] Id. at 83:20–84:6, 87:7–21.

---

[22] The Parties also appear to disagree about whether True the Vote submitted the challenges under Martin's name without his consent. Doc. Nos. [159-1] (Martin Dep. Tr.) Tr. 56:5–57:15; [157-1] (Cooper Dep. Tr.) Tr. 75:8–76:4. While there is a dispute, the Court does not find it material for purposes of summary judgment on the claims at issue as presented in the Parties' arguments.

For his part, Davis "took exception with some of [True the Vote's] logic" and indicated that their methodology and strategy in compiling the challenger lists was "not the way I would have done it," specifically stating that he "probably would have narrowed the scope" of the challenges made.[23] Doc. No. [161-1] (Davis Dep. Tr. 1) Tr. 60:17–19, 61:6–7. Plaintiffs argue that these criticisms of True the Vote's list compiling methodology by persons close to its initiative supports Plaintiffs' argument that True the Vote knowingly asserted frivolous challenges. Doc. No. [156-1], 21–23.

Defendants argue that Martin retracted his challenges because he did not want to put the voting registrar through the "painful process of validating" the rest of the challenged voters. Doc. No. [159-1] (Martin Dep. Tr.) Tr. 78:6–9. Defendants further maintain that of the 37 people on Martin's lists, only 3 voters are discussed and 2 of them in fact did not live in the county they were registered in: one voter was registered in the wrong county and another did not live in the county but remained eligible to vote through the homestead exemption. Doc.

---

[23]  True the Vote admits that they "wanted to review as many records, recognizing that the state hadn't cleaned their rolls in two years . . . ." Doc. No. [168-1] (TTV Dep. Tr.) Tr. 149:12–19.

Nos. [173], 27–28; [159-1] (Martin Dep. Tr.) Tr. 64:4–66:7. Defendants further argue that Mark Davis's actual statement was not a criticism, but a difference of opinion on the right strategy to take in challenging voters. Doc. No. [173-1], 56–57, ¶ 77.

Because the Parties put forth different interpretations of these statements and the circumstances giving rise to them, a credibility determination is required. Such determination must be made by a trier of fact and is not proper for summary judgment resolution.

iii)   *exclusive use of NCOA data*

Plaintiffs next rely on the NVRA's prohibition on removing a voter from a voting list based on change of address (NCOA) data alone. The NVRA requires a state either "confirm[] in writing that the registrant has changed residence . . . outside the jurisdiction" or has failed to receive a response "to a notice [sent], and has not voted or appeared to vote . . . in an election" in the two federal general elections since the date of the notice. 52 U.S.C. § 20507(d)(1). Thus, according to Plaintiffs, if Defendants only relied only on NCOA data, then the challenges could not have been used to remove voters as a matter of federal law. Doc. No. [156-1], 21–22.

44

Defendants respond with both a legal argument and a factual argument. Legally, Defendants contend that initiating a voter eligibility determination with the NCOA data is "undisputedly lawful." Doc. No. [173], 23–24 (citing Husted v. A. Philip Randolf Inst., 138 S.Ct. 1833, 1839-40 (2018)). Factually, Defendants argue that they used multiple data files and algorithms to create the list of voters to be challenged, not just NCOA data. Doc. No. [167-1] (OpSec Dep. Tr.) Tr. 95:10–96:17. True the Vote specifically testified that it used "a variety of databases and filters [and] evaluated from the rolls what records showed up on the NCOA standard given additional filters . . . ." Doc. No. [168-1] (TTV Dep. Tr.) Tr. 134:21–135:1.

The Court agrees with Defendants' contention that using the NCOA data can be a proper starting point for assessing voter eligibility. The NVRA clearly conceives of a situation where NCOA data prompts state investigation into a voter's eligibility. See 52 U.S.C. § 20507(c)(1), (d)(1). Thus, Defendants use of the NCOA data as a basis for their voter challenges does not *per se* require a finding that the challenges were frivolous. If, however, Defendants only used the NCOA data to make their lists, then such fact might weigh in favor of finding that the challenges were frivolous because a change of address alone is not sufficient to

45

remove a voter from the voting rolls. Because the Parties dispute whether, and to what extent, Defendants used other data sets to form their challenge lists, summary judgment cannot be granted on this basis.

*iv)*   ***Davis's and Somerville's lists***

Plaintiffs also claim that Mark Davis and Derek Somerville's lists led to frivolous voter challenges. Davis testified that he did not recall how many voters they "scrub[bed]" who lived near military bases, nor did he remember "scrubbing" voters who were on college campuses. Doc. No. [161-1] (Davis Dep. Tr. 1) Tr. 149:9–150:3. Plaintiffs further cite Phillips' OpSec testimony that Davis and Somerville used "bad process" in making their lists. Doc. No. [167-1] (OpSec Dep. Tr.) Tr. 103:16.

Defendants recall Phillips' full statement, which was a "*guess*" that Davis did not use proper procedures and algorithms. Id. at 103:12–15 (emphasis added). Davis defends his lists. In his belief, the types of issues Plaintiffs raise were better left to a board of registrars' probable cause review, or the Secretary of State's office investigation into the challenged voter. Doc. No. [161-1] (Davis Dep. Tr. 1) Tr. 150:3–9.

While the Court reads Phillips' statement to plainly criticize the methods used by Davis and Somerville,[24] it does not find Plaintiffs' evidence sufficient to say conclusively that Davis's and Somerville's methods resulted in a frivolous list of voters. Nor does it find Davis's and Somerville's non-expert, lay testimony sufficient to say their challenges were non-frivolous. In short, this evidence presents a question of fact and credibility inappropriate for summary judgment resolution.

**(c)** **disputes of fact preclude summary judgment based on voter challenges being frivolous**

Here, the Court clearly is faced with two drastically different accounts of True the Vote's process of making the challenged voter lists. Thus, the care (or lack thereof) with which Defendants ensured challenged voters on their lists were potentially ineligible is not a factor that can be resolved on summary

---

[24] The Court also acknowledges Plaintiffs' objection to this section of Phillips' deposition testimony where Phillips confers with his lawyer before seemingly retracting the force of his criticism. Doc. No. [156-1], 28 n. 7. Given that summary judgment must be denied for both Parties, the Court will defer a ruling on this objection, but Plaintiffs may reraise the issue in a pre-trial motion.

judgment, for any Defendants, given the credibility and factual determinations that must be made.

### (3)    *Motivation in challenging voters*

Plaintiffs further argue that Defendants intended to intimidate voters, specifically minority voters. Both Parties agree that Section 11(b) does not impose an intent requirement and that Section 11(b) does not require Defendants act with racial animus. See, e.g., Allen v. City of Graham, No. 1:20-CV-997, 2021 WL 2223772, at *7 (M.D.N.C. June 2, 2021); Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC, 497 F. Supp. 3d 371, 375 (D. Minn. 2020); Wohl, 498 F. Supp. 3d at 476–77.

The Court agrees that there is no intent requirement in Section 11(b) cases. In other cases, however, courts have looked at intent as a factor for determining if intimidation has occurred. Moreover, it is commonly cited in Section 11(b) cases that "'normally' a person 'is presumed to have intended the natural consequences of his deeds.'" Id. at 485 (citing Washington v. Davis, 426 U.S. 229, 253, (1976) (Stevens, J., concurring)); Katzenbach, House Judiciary Statement ("[U]nder the language of [Section 11(b)], no subjective 'purpose' need be shown . . . in order to prove intimidation under the proposed bill. Rather

48

defendants would be *deemed to intend the natural consequences of their* acts."
(emphasis added)). To determine if Defendants' actions reasonably caused or
could have reasonably caused intimidation, the Court will thereby assess
Defendants' (a) intent to intimidate voters broadly, and (b) intent to intimidate
minority voters specifically.

### (a)      <u>intent to intimidate voters broadly</u>

Plaintiffs' argument and submissions regarding intent are unclear.
Plaintiffs certainly put forth evidence (and Defendants do not dispute) that
Defendants intended to make the mass number of Section 230 challenges before
the election. <u>See</u>, <u>e.g.</u>, Doc. No. [156-31] (recruiting challengers from counties in
Georgia to make the challenges). Plaintiffs also seem to argue that Defendants
intended for these challenges to have the effect of burdening challenged voters
to prove eligibility to vote. Again, Defendants do not appear to contest that they
intended, as a natural consequence of the challenges, that once a challenge was
made, then the challenged voter would be forced to prove their eligibility. <u>See</u>,
<u>e.g.</u>, Doc. Nos. [156-25] (indicating that "filing the challenges . . . will help ensure
only legal, eligible votes are counted . . . ."); [156-4], 1 (indicating a goal of the
Validate the Vote effort was "[t]o ensure the 2020 election returns reflect one vote

cast by one eligible voter and thereby protect the right to vote and the integrity of the election."); [165-1] (Davis Dep. Tr. 2) Tr. 37:17–18 (acknowledging the "inconvenience" of being challenged).

Plaintiffs' argument therefore must be that intending the burden of proving eligibility constitutes intent to intimidate. In support, Plaintiffs cite to Mayer's expert report in which he states that "voters whose eligibility is challenged may perceive a legal risk if they vote, which again dramatically increases the cost of voting and discourages turnout even if the individual is eligible." Doc. No. [156-16], 44. Another of Plaintiffs' expert witnesses further testifies that "voters may be reasonably hesitant to arrive at the polls to 'prove' their eligibility if it has been challenged, even if the voter is in fact eligible to vote." Doc. No. [156-17], 27. Defendants dispute that the burden of being challenged means Defendants' intended to intimidate eligible voters. In fact, they maintain there is clear evidence to the contrary . Doc. Nos. [165-1] (Davis Dep. Tr. 2) Tr. 37:16–18 ("Our goal was to produce legitimate challenges as much as possible. We didn't want to inconvenience people unnecessarily . . . ."); [156-4] (stating the goal of Validate the Vote was "[t]o ensure the 2020 election returns

reflect one vote cast by one eligible voter and thereby protect the right to vote and the integrity of the election.").

The Court acknowledges Mayer's expert conclusion that the burdens imposed could have the effect of threatening a voter from voting, and reiterates that "[D]efendants [are] deemed to intend the natural consequences of their acts." Katzenbach, House Judiciary Statement. Because the issue of intent ultimately requires weighing credibility, the Court determines that this factor cannot support summary judgment for either Party.

**(b)**    **intent to intimidate minority voters specifically**

Intent to intimidate "a particular group or groups" has further been a factor that other courts have considered in a Section 11(b) analysis. Atlas Aegis, 497 F. Supp. 3d at 375. Exemplary is Daschle v. Thune, where the specific targeting of Native American voters led the district court to grant a TRO under Section 11(b). 2004 WL 3650153 *5–6. The Court likewise will consider any evidence that Defendants specifically targeted minorities in their voter challenges to determine if the alleged intimidation felt was reasonable.

51

Plaintiffs' expert, Dr. Mayer, concludes that True the Vote's challenges were skewed toward counties with higher percentages of Black voters. Doc. No. [156-16], 37–40. Specifically, Mayer finds that of the 65 counties where Defendants submitted voter challenges, 3 had the highest percentage of Blacks in Georgia, that 10 of the 20 counties with the highest percentage of Blacks in Georgia were challenged, and that only 4 of the 20 counties with the lowest percentages of Blacks were challenged. Id. at 37. Mayer furthermore stated that "27.3% of individuals overall in the challenge file [were] African American, [but] 40.3% of the individuals in duplicated records are African American." Id. at 29. Plaintiffs rely on this evidence to assert that Defendants specifically targeted challenges toward counties with a greater minority presence.

Defendants contend that they did not assess any demographic data until after Plaintiffs filed this lawsuit. Doc. Nos. [167-1] (OpSec Dep. Tr.) Tr. 149:14–17 (declaring that they did not "analyze demographic information or other characteristics of the individuals" challenged "until after [Plaintiffs] sued"), 163:13–164:10 (discussing an excel spreadsheet with demographic data, specifically racial data, that Defendants claim they "probably looked at after we were sued, but not before"); [168-1] (TTV Dep. Tr.) Tr. 248:13–22 (indicating that

the racial analysis occurred "post the elector challenge effort or initiative); [166-1] (Somerville Dep. Tr. 2) Tr. 31:14–20 ("I wanted to make sure that as we compiled our data, that our data was distributed and driven by the conditions that we set forth, which was the change of address, and that there wasn't any particular bias regarding any other factor other than the data."); [156-25], 2 (declaring in a press release about the challenges that "True the Vote's research was performed uniformly across all counties, without regard to any demographic or voting history.").

Plaintiffs' expert report indicates that there is a statistical basis for concluding Defendants targeted racial minorities in their challenges, and Defendants dispute this conclusion with testimonial evidence that they did not consider demographics when making voter challenges. Thus, there is a credibility determination that must be decided by a trier of fact. Thereby, the Court cannot weigh this factor on summary judgment.

### (4)   *The bounty (or legal defense fund)*

Plaintiffs argue that Defendants' creation of a bounty to incentivize challengers contributed to reasonable voter intimidation. Plaintiffs raise statements made by Defendant Catherine Engelbrecht that the True the Vote

campaign was "putting a bounty on the fraud" and going to create "an environment for whistleblowers to come forward and . . . mak[e] sure that they have protections, mak[e] sure that they have compensation . . . ." Doc. No. [156-46] (True the Vote Podcast Tr.) Tr. 3:2–6.

Defendants dispute that the funds were a bounty. Instead, Defendants submit that it was a legal defense fund to assist any challengers who might incur legal expenses on account of the challenges asserted (*e.g.*, defending defamation claims). Engelbrecht's deposition testimony explained what she meant when she said that there would be a "bounty on the fraud," specifically that there would be funds available to provide "legal support" as a means of "encourag[ing] people who were otherwise concerned" about legal implications of challenging voters. Doc. No. [168-1] (TTV Dep. Tr.) Tr. 74:13–15; see also Doc. No. [168-1] (TTV Dep. Tr.) Tr. 75:7–18  ("[I]t doesn't take too much to end up being caught into a lawsuit . . . that has a very chilling effect. And so the thought was to try to create an environment . . . for people to come to and know they wouldn't be alone."), 76:15–19 ("We thought that creating or making it known that if people came forward and needed some kind of legal support that we would help support that. That was the reason that I said what I said."). The podcast

contextually also somewhat supports the idea that the bounty could have been a legal defense fund, given Engelbrecht's statement that True the Vote "will give [whistleblowers] not only support, financial support, but legal support, and whistleblower immunity where appropriate." Doc. No. [156-46] (True the Vote Podcast Tr.) Tr. 4:14–16.

While the Court is aware of no other Section 11(b) cases with similar conduct (*i.e.*, setting up a financial incentive for third-parties to purportedly threaten the rights of others to vote), the Court finds that if Defendants indeed created a bounty for challengers, then this could reasonably intimidate voters.[25] Ultimately, however, whether Engelbrecht's explanation of the "bounty on the fraud" statement is a truthful and effective explanation of the potentially intimidating conduct is a credibility determination. Thus, the Court cannot weigh this factor for purposes of summary judgment.

### (5)     *Recruitment of Navy SEALS*

Plaintiffs also allege that Defendants' recruitment of former Navy SEALS to watch polling places constituted intimidation. Plaintiffs cite to another podcast

---

[25] The "bounty" determination could also affect the directness and causation elements.

statement where Engelbrecht discussed a different True the Vote campaign ("Continue to Serve") which she described as "recruiting veterans and first responders to work inside the polls." Doc. No. [156-27] (Seal the Polls Tr.) Tr. 2:8–9. Engelbrecht explains that True the Vote encouraged the recruitment of veterans and first responders because they were "people who understand the respect law and order and chain of command . . . people who were unafraid to call it like they see it all the way down the line." Id. at 2:10–17. Plaintiffs contend the presence of these former Navy SEALS—especially because they would be, per Defendants' instructions, directly engaging with voters—could reasonably constitute voter intimidation.

Defendants dispute the conclusion that the presence of Navy SEALS would cause an intimidating atmosphere for voters. They maintain that these veterans and first responders were to serve as mere poll workers. Doc. No. [168-1] (TTV Dep. Tr.) Tr. 63:2–7 ("[T]hings can get very confusing in polling places. And the thought was just the individuals that are . . . familiar with that kind of law of order and chain of command and understanding process are very decisive . . . ."). Moreover, Defendants dispute that the SEALS would be in direct contact with voters, specifically stating that veteran's contact would depend on the role

assigned. Id. at 63:22–64:3 ("If they were serving in the capacity of poll watcher, they would not engage with anyone. If they were working as a judge or a clerk, then they may.").

Several other Section 11(b) cases have involved poll watchers and armed guards. Generally, poll watchers watching or partaking in non-disruptive activities at polling places without any (or very limited) voter contact has not been found to be "impermissible" intimidation. Pa. Democratic Party v. Republican Party of Pa., No. CV 16-5664, 2016 WL 6582659, at *6 (E.D. Pa. Nov. 7, 2016); see also Ariz. All., 2022 WL 15678694, at *3–5 (finding that there was no likelihood of success on a Section 11(b) claim based on merely watching ballot drop-off locations when, among other factors, the volunteers were directed to follow all applicable laws and not directly engage voters); Ariz. Democratic Party, 2016 WL 8669978, at *11 (finding no intimidation in conducting exit polls that followed applicable laws and were non-disruptive).

Conversely, stationing private armed guards at polling places has been determined "certainly likely to intimidate voters." Atlas Aegis, 497 F. Supp. 3d at 375. Further, people following closely behind Native American voters, taking

notes and being disruptive was also found to create an intimidating and threatening environment. Daschle, 2004 WL 3650153 *5–6.

The Court cannot conclude that the mere presence of veterans would in and of itself contribute to creating an intimidating or threatening environment for voters.[26] Because, however, as presented on the summary judgment record, the actual role of these recruited veterans is unclear, the Court finds that there is a factual question of if Defendants' recruitment of Navy SEALS, veterans, or other first responders would reasonably cause a voter to feel intimidated.[27] Thereby, the Court cannot resolve these disputes on summary judgment and this factor must be decided by a trier of fact.

### (6) Publication of challenged voters' names

Finally, the Court addresses the fact that Plaintiffs Jane Doe, Berson, and Heredia, discovered their names had been published as challenged voters. As has

---

[26] Being a Navy SEAL or United States veteran is an honorable distinction. The Court agrees with Defendants that the mere fact someone is a former Navy SEAL—or other classification of United States veteran—does not automatically make him or her intimidating.

[27] These facts implicate the directness and causation elements as well. Specifically, the Court has yet to see any connection between the threat of recruiting veterans and intimidation of voters in this case.

been alleged, non-governmental parties publishing the names of challenged voters to the public can constitute reasonable intimidation. See, e.g., Wohl, 512 F. Supp. 3d at 511 ("Indeed, the threat of dissemination of personal information alone could plausibly support a Section 11(b) claim."); LULAC, 2018 WL 3848404, at *1, 4 (discussing published reports of voters who had committed felonies, which included "the names, home addresses, and telephone numbers of the alleged felons," in determining that plaintiffs adequately pleaded voter intimidation).

While there does not appear to be a dispute that Heredia, Berson, and Jane Doe's names were published, Defendants dispute that *they* published or directed the publications of challenged voters' names. Doc. No. [173], 6, 14. Defendants submit the depositions of Engelbrecht, Somerville, and Davis, all three of which testify that they did not wish, and even expressly counseled against, voters names being published. Doc. Nos. [168-1] (TTV Dep Tr.) Tr. 257:11–14 ("Q: Has True the Vote ever discussed or considered publishing the list of challenged voters in Georgia? A. No."); [166-1] (Somerville Dep. Tr. 2) Tr. 73:7–14 ("There is no scenario under which I would have either contemplated or agreed to anything [like publishing the names on social media], nor would have Mark. That would

have been too inflammatory, and it would have been counter to the intent of the effort. So, no, there's no scenario under which we would have considered that."); [165-1] (Davis Dep. Tr. 2) Tr. 46:12–14 ("I don't recall us publishing it to the general public. I wouldn't see any reason to do that."), 80:4–10 ("I don't like to talk much about individual voters by name. I don't think that's a smart thing to do. And I certainly don't support publishing any of this analysis or putting people on the spot, and, you know, we avoided doing that with these efforts.").

Plaintiffs, however, assert that Defendants had a role in publishing the names of challenged voters. They submit a social media post made by an organization named "Crusade for Freedom," which states, "[i]f the Georgia counties refuse to handle the challenges of 366,000 ineligible voters in accordance with the law, I plan to release the entire list . . . ." Doc. No. [156-26], 2. Plaintiffs connect Crusade for Freedom to True the Vote and Catherine Engelbrecht through (1) the post's hashtags ("validatethevoteGA" and "#eyesonGA"), (2) a lack of evidence that any other group was conducting mass voter challenges in Georgia during this time period, and (3) the similarities between Crusade for Freedom's logo and another organization founded by Engelbrecht and Phillips. Doc. No. [168-1] (TTV Dep. Tr.) Tr. 264:2–16, 260:11–261:18. Defendants,

however, maintain that there is no affiliation between True the Vote and Crusade for Freedom, and that Engelbrecht was no longer affiliated with the other organization at the time of True the Vote's challenges. Id. at 261:12–14, 259:11–18, 338:17–20.

Plaintiffs also cite conversations between Davis and Somerville, expressing concern about being "flooded with defamation complaints" upon hearing of a forthcoming webpage with voter data, and Davis's "perception" that voter challenges made "were going to be public as well." Doc. No. [165-1] (Davis Dep. Tr. 2) Tr. 129:6–19. Plaintiffs submit Somerville's testimony that he and Davis recruited volunteers to challenge voters, and that voter lists were distributed to interested challengers via email or Dropbox with "no meaningful way to manage other people's activities . . . .". Doc. No. [162-1] (Somerville Dep. Tr. 1) Tr. 98:7–99:15, 91:5–13. Plaintiffs attribute the publication of the Davis and Somerville Banks County voter list to these recruiting efforts. Doc. No. [174-1], 85.

There is a dispute of fact over whether the publication of voters' names can be attributed to Defendants. Because of these disputes and required credibility

determinations, the Court cannot consider the publication of challenged voters' names as a factor on summary judgment.[28]

### 3.    Summation: Section 11(b)

In the above discussion, the Court has determined that factual disputes preclude summary judgment on all three elements of the Section 11(b) claim. Particularly, the Court has found disputes over the frivolity of the voter challenges, Defendants' direct action toward voters, the creation of a whistleblower bounty (or legal defense fund), Defendants' recruitment of Navy SEALS to guard (or volunteer at) polling places, Defendants' role in publishing voter names, and others. A trier of fact must make these determinations, and thus summary judgment for either Party must be denied on the Section 11(b) claim.

However, the Court finds that no causal link exists between Defendants' Section 230 challenges and the Muscogee County voters, thus summary

---

[28] In addition to these disputed facts, the Court is also concerned about the possibility of names being obtained from Defendants' lists on the basis of an open records request—a possibility that Davis expressly acknowledges. Doc. No. [165-1] (Davis Dep. Tr. 2) Tr. 46:9–12 ("[C]ertainly members of the public could have obtained [a list of challenged voters] from an Open Records Request from any of the counties where they were filed."). This possibility, Defendants' knowledge of it, and any efforts by Defendants to indirectly publish the challenged voters names, would all be considerations the Court would weigh at trial.

judgment is granted on this issue for these voters, and Plaintiffs are precluded from arguing otherwise at trial.

### B.    <u>Affirmative Defenses</u>

Defendants also raise several affirmative defenses, arguing that finding them liable under Section 11(b) would violate their rights to free speech, rights to petition, and rights to vote. Doc. No. [155-1], 32–35. Defendants also contend that Section 11(b) would be unconstitutionally vague if applied against them. <u>Id</u>. at 36–37. Plaintiffs disagree with all of Defendants' affirmative defenses. Doc. No. [174], 24–29. The Government, moreover, argues as an intervenor that Section 11(b) is not unconstitutional, on its face or as would be applied to voter challenges in this case. Doc. No. [198-1]. The Court will address in turn: (1) Defendants' First Amendment speech defense, (2) Defendants' First Amendment petition defense, (3) Defendants' Fourteenth Amendment vote dilution defense, and (4) Defendants' defense that Section 11(b) as applied in this case would be unconstitutionally vague or overbroad.

### 1.    *First Amendment Speech Defense*

Defendants first argue that if Section 11(b) is applied against them, then such application would violate their right to free speech. Doc. No. [155-1], 32–34.

Plaintiffs respond that Defendants' speech is not protected by the First Amendment's because "true threats of nonviolent or nonbodily harm and defamation, have been carved out from constitutional protection." Doc. No. [174], 24–25.

The Court ordered supplemental briefing specifically on the true threat exception applying to non-violent speech. Following this supplemental briefing, the Court has distilled Defendants' First Amendment speech defense into two issues: (1) if Defendants' conduct here constitutes expressive conduct protected by the First Amendment, and (2) assuming Defendants' conduct is expressive conduct, if it constitutes a true threat or defamation excepted from First Amendment protection.[29] Ultimately, the Court determines questions of fact preclude summary judgment adjudication of these two issues.

───────────────

[29] Because the Court denies summary judgment on the issue of whether Defendants' conduct in this case constitutes First Amendment protected speech (and alternatively, a true threat or defamation exception to the First Amendment), the Court will not address in this Order the less than fully briefed issue of whether Section 11(b) regulation of the Defendants' conduct meets the level of scrutiny required to not be a First Amendment violation. See Doc. No. [198-1], 38–41 (Government's discussion of scrutiny analysis).

### a)     Expressive conduct

The first issue that the Court must address is whether imposing Section 11(b) liability would violate Defendants' First Amendment speech rights. "To determine 'whether particular conduct possesses sufficient communicative elements to bring the First Amendment into play,' the two-part <u>Johnson</u> test asks: (1) 'whether [a]n intent to convey a particularized message was present,' and (2) whether 'the likelihood was great that the message would be understood by those who viewed it.'" <u>Burns v. Town of Palm Beach</u>, 999 F.3d 1317, 1336–37 (11th Cir. 2021) (alteration in original) (internal quotation marks omitted) (quoting <u>Texas v. Johnson,</u> 491 U.S. 397, 404, (1989)).

The Court first specifies what conduct is at issue for this defense. In Defendants' motion for summary judgment, they initially only mention their Section 230 challenges as protected First Amendment speech. Doc. No. [155-1], 30–31. Later, in the true threat discussion, Defendants broadly allude to the other alleged intimidating acts being protected. <u>Id</u>. at 33 (arguing the true threat exception did not apply because the voters challenged were not the direct recipients of Defendants' actions). In the additional briefing, moreover, other alleged acts of intimidation have been generally raised in relation to the

65

First Amendment speech defense. See, e.g., Doc. No. [198-1], 37 (listing as intimidating conduct "lodging voter challenges in an intimidating, threatening, or coercive manner; submitting false voter challenges; or combining voter challenges with other intimidating, threatening, or coercive conduct."). Thus, for purposes of assessing the First Amendment defense raised (and the exceptions to that defense), the Court will assess the totality of Defendants' conduct at issue in the Section 11(b) claim  to determine if it implicates the First Amendment.[30]

"Constitutional protection for freedom of speech 'does not end at the spoken or written word.'" Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale, 901 F.3d 1235, 1240 (11th Cir. 2018) (quoting Johnson, 491 U.S. at 404). The Eleventh Circuit articulates the requirements for expressive conduct to be protected by the First Amendment: (1) the communicator intended "to convey a particularized message" and (2) a "great" "likelihood" that others would understand a message was being communicated. Burns, 999 F.3d at 1336 (quoting

_____

[30] The Court will assess Defendants' conduct in the aggregate to determine if it is First Amendment protected. While the Court is unaware of any legal rule explicitly endorsing aggregate treatment, other cases involving numerous distinct acts have treated all acts together to determine if the conduct is First Amendment protected. Cf., e.g., Fort Lauderdale, 901 F.3d at 1242–43 (discussing multiple "food sharing" events and different communicative conduct present in the events, such as inviting the public and distributing pamphlets, setting up tables, and having banners).

66

Johnson, 491 U.S. at 404). This second determination, however, does not require that viewers perceive the *specific* message intended, but rather only that *a* message was being communicated. See id. 1336–37.

### (1)    Intent to communicate a message

In the most recent Eleventh Circuit cases, the first requirement for expressive conduct has not been at issue because it has either been stipulated to or it was obvious that the speaker intended to communicate a message. See, e.g., id. at 1337 ("Palm Beach [the opposing party] conceded to the magistrate judge, and does not dispute on appeal, that Burns had the intent to convey a message."); Fort Lauderdale, 901 F.3d at 1240 ("[W]e have no doubt that FLFNB intended to convey a certain message.").

While not presented with a clear stipulation, the Court concludes that Defendants intended to communicate a particularized message—even if the factual disputes inhibit determining what that intended message was. From the Plaintiffs' perspective, Defendants intended their conduct to communicate a threat to all voters. By Defendants' account, they intended to communicate to ineligible voters that they should not be voting and to the wider public that elections were free from ineligible voters casting ballots. Either way, Defendants'

conduct at issue sufficiently communicated a particularized message for the Court to hold dismissal of their First Amendment defense on summary judgment is not appropriate on the first element of the expressive conduct analysis.

### (2) *Perception that a message was being communicated*

The second requirement to find expressive conduct—that there is a great likelihood of viewers' perceiving a message was being communicated by Defendants' conduct—has received much more recent attention. "Expressive conduct has a 'communicative' element, but only insofar as it, 'in context, would reasonably be understood by the viewer to be communicative.'" Burns, 999 F.3d at 1337 (quoting Clark v. Cmty. for Creative Non-Violence, 468 U.S. 288, 294 (1984)). In general, "[t]he 'circumstances surrounding an event' help a reasonable observer discern the dividing line between expressive conduct and everyday conduct." Burns, 999 F.3d at 1343 (quoting Fort Lauderdale, 901 F.3d at 1241).

The Eleventh Circuit has identified five factors to consider in this analysis: (1) if the conduct at issue is distinguishable from actions in everyday life, such as "set[ting] up tables and [a] banner, and distribut[ing] literature," (2) if the public had access to the conduct, (3) the location of the acts, such as in a public city park

or other traditional public forum, (4) if the conduct involved "an issue of concern in the community," and (5) if the conduct historically has been a type that communicates a message. Id. at 1343–44 (quoting and citing Fort Lauderdale, 901 F.3d at 1242–43). However, "[t]here may be other factors . . . relevant to whether [specific conduct] is expressive conduct protected by the First Amendment." Id. at 1346. Again, "[t]he circumstances surrounding an event often help set the dividing line between activity that is sufficiently expressive and similar activity that is not." Fort Lauderdale, 901 F.3d at 1241.

Expressive conduct is not protected by the First Amendment, moreover, when the conduct's message is provided by other speech. In other words, when the "[t]he expressive component of [an action] is not created by the conduct itself but by the speech that accompanies it." Rumsfeld v. F. for Acad. & Institutional Rts., Inc., 547 U.S. 47, 66 (2006). This limitation is informed by the fear that "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it." Id. The Government specifically relies on this limitation in its argument that Defendants' conduct in this case is not First Amendment protected expressive conduct. Doc. No. [198-1], 32 n. 10.

69

Here, "the circumstances surrounding" Defendants' conduct present numerous clear disputes of fact that preclude summary judgment determination of whether the public would have viewed Defendants' conduct as communicating a message. Among other determinations, a trier of fact's conclusions on Defendants' direct engagement with voters, role in publishing the challenged voters' names to the public, and connection to Crusade for Freedom's social media posts would impact the decision regarding if an observer would perceive a message to be communicated. As already indicated, however, these are disputed facts that prohibit summary judgment. <u>See</u> *supra* Section (III)(A)(2)(a)–(c).

In short, the Court cannot grant summary judgment on the issue of whether Defendants' conduct in this case constitutes expressive conduct protected by the First Amendment. While certainly a threshold issue for the affirmative defense, there are material disputes of fact precluding summary judgment resolution. Thus, the Court denies summary judgment on the First Amendment speech defense for both Parties.

**b)** **True threats and defamation**

The Court alternatively denies summary judgment on Defendants' First Amendment defense because issues of fact also inhibit determining if Defendants' conduct constituted a true threat or defamation unprotected by the First Amendment. For purposes of this section, the Court will assume Defendants engaged in First Amendment protected expressive conduct, and assess if Defendants' conduct is exempted from the First Amendment. United States v. Fleury, 20 F.4th 1353, 1365 (11th Cir. 2021) (discussing "well-defined and narrowly limited classes of speech" for which "content-based restrictions are permitted," including defamation and true threats).

The Supreme Court has said that true threats "encompass those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individual." Virginia v. Black, 538 U.S. 343, 359 (2003). There need not be any intent to act on the threat, however. Id. at 360 ("[A] prohibition on true threats 'protects individuals from the *fear of violence'* and 'from the *disruption that fear engenders*,' in addition to protecting people 'from the possibility that the threatened violence will occur.'" (alteration adopted) (emphasis added) (quoting

71

R.A.V. v. City of St. Paul, 505 U.S. 377, 388 (1992) In the context of cross-burning, which placed the victim "in fear of bodily harm or death," the Supreme Court articulated that "[i]ntimidation in the constitutionally proscribable sense of the word is a type of true threat . . . ." Id. at 359.

Nevertheless, there is still an open question of whether *non-violent* intimidation can be a true threat. Compare Aubin v. Columbia Cas. Co., 272 F. Supp. 3d 828, 834 (M.D. La. 2017) ("Threatening to take non-violent action does not constitute a 'true threat.'") and Seals v. McBee, No. CV 16-14837, 2017 WL 3252673, at *4 (E.D. La. July 31, 2017), aff'd, 898 F.3d 587 (5th Cir. 2018), as revised (Aug. 9, 2018) ("Threats to take lawful, non-violent action are not 'true threats' or any other category of speech that has not historically been protected by the First Amendment.") with Wohl, 498 F. Supp. 3d at 479 ("This Court does not interpret the Supreme Court's analysis in Black to suggest that the government can ban only threats of physical harm. The threat of severe nonbodily harm can engender as much fear and disruption as the threat of violence.").

A further complication is that many of the cases invoking the true threat exception to the First Amendment involve *criminalized* acts or threats, which

72

almost necessarily require some form of harmful or violent threat. See, e.g., Fleury, 20 F.4th at 1361 (discussing the constitutional challenges and true threat exception to a criminal prosecution under 18 U.S.C. § 2261A(2)(B), which requires "the intent to kill, injure, harass, intimidate, or place under surveillance with intent to kill, injure, harass, or intimidate another person"); United States v. Castillo, 564 F. App'x 500, 501 (11th Cir. 2014) (prosecuting the criminal defendant under 18 U.S.C. § 871(a) for "making a threat to injure or kill the President of the United States"). Given the caselaw's largely criminal context, the Court declines to read precedent as implicitly limiting true threats to violent conduct or threats.

Neither has the Eleventh Circuit issued clear guidance on whether non-violent conduct can constitute a true threat outside the protection of the First Amendment. Indeed, a few cases suggest a more expansive application of the true threat exception—one that would be inclusive of non-violent threats. In United States v. Tapanes, 284 F. App'x 617, 620 (11th Cir. 2008), the Eleventh Circuit concluded that an obscene hand gesture during a sentencing was not protected by the First Amendment because it was a true threat. While certainly in the context of a criminal sentencing this gesture is threatening, it is

not "violent" in the traditional sense of threatening imminent physical harm. In

Everett v. Cobb Cty., 823 F. App'x 888, 892 (11th Cir. 2020), the Eleventh Circuit

held that a speaker's "obscene communications intended to harass and frighten

the recipient" were not covered by the First Amendment.[31] (alteration adopted).

Again, while not perfect examples or clear rules of law endorsing non-violent

true threats, these cases at least suggest that non-violent expressive conduct or

speech may fall outside First Amendment protections as true threats.

Moreover, the Southern District of New York's treatment of Black did not

read the Supreme Court "to suggest that the government can ban only threats of

physical harm." Wohl, 498 F. Supp. 3d at 479. It persuasively reasoned that the

Supreme Court used the language "*encompass[ed]*" when describing "unlawful

violence" as a manifestation of true threats, and thus did not make any ruling on

whether "*only* threats of unlawful violence are true threats." Id. (emphasis

---

[31] Admittedly, the speech involved in Everett was more aggressive and verged on physical threats, though the Court sees no indication in the facts described that Everett ever actually threatened physical violence. 823 F. App'x at 892 (discussing the relevant facts as "(1) demand[ing] an apology using threatening language; (2) warn[ing] that she planned to visit [the victim's] place of work because she 'needed to see [her] cry'; (3) repeatedly describ[ing] the [basis for the threats, which was a sexual affair between her husband and the victim] in detail; (4) threaten[ing] to upend [the victim's] personal and professional life; and (5) follow[ing] through on that threat").

added) (quoting <u>Black</u>, 538 U.S. at 359). The <u>Wohl</u> court further analyzed that a "threat of severe nonbodily harm can engender as much fear and disruption as the threat of violence." <u>Id</u>.

The Court agrees. Threats of nonviolent harm may be exempted from First Amendment's speech protections as true threats. <u>Cf</u>. <u>Black</u>, 538 U.S. at 360 ("Intimidation in the constitutionally proscribable sense of the word is a type of true threat."). This conclusion is reinforced by the context in this case where the alleged intimidation would potentially interfere with another's constitutionally and statutorily protected right to vote free of such intimidation.

Thus, the question becomes whether Defendants' actions in this case constituted true threats outside First Amendment protection. Plaintiffs' account of Defendants' conduct, if factually supported, could be intimidation, that is "a serious expression of an intent to commit an act of unlawful [non-]violence" against voters. <u>Id</u>. at 359. Outstanding disputes of fact (*i.e.*, the publication of voters' names, use of Navy SEALS, etc.) however must be resolved before the Court can make a final determination. Summary judgment is thereby inapposite.

Plaintiffs also raise a defamation exception to Defendants' speech being protected. The voter challenges and the publication of the challenged voters'

names might be defamation of the challenged voters' reputations by falsely suggesting that these voters are attempting to vote unlawfully.[32] As discussed in the Section 11(b) analysis *supra*, however, these facts are disputed. Thus, the Court also denies summary judgment on the defamation exception to Defendants' First Amendment affirmative defense.

### 2. *First Amendment Petition*

Defendants next raise a First Amendment petition defense to Section 11(b) liability. Doc. No. [155-1], 34. The right to petition is constitutionally guaranteed, but not absolute. Cf. Borough of Duryea v. Guarnieri, 564 U.S. 379, 386 (2011).

Generally, "the Petition Clause protects people's rights to make their wishes and interests known to government representatives in the legislature, judiciary, and executive branches." Biddulph v. Mortham, 89 F.3d 1491, 1496 (11th Cir. 1996). "Interpretation of the Petition Clause must be guided by the objectives and aspirations that underlie the right. A petition conveys the special

---

[32] The Court has grappled with the implications of Plaintiffs' failure to specifically raise a defamation claim. The Court has treated defamation as an exception to the First Amendment, regardless of whether a claim of defamation has been brought, because defamation is commonly listed as a First Amendment exception without any qualification that a separate defamation claim must be brought to invoke the exception. See, e.g., Fleury, 20 F.4th at 1365.

concerns of its author to the government and, in its usual form, requests action by the government to address those concerns." Guarnieri, 564 U.S. at 388–89. "The right to petition is in some sense the source of other fundamental rights, for petitions have provided a vital means for citizens to request recognition of new rights and to assert existing rights against the sovereign." Id. at 397.

The Court does not doubt that Defendants' Section 230 voter challenges are petitions. In these challenges, Defendants are "mak[ing] their wishes and interests known to government representatives . . . ." Biddulph, 89 F.3d at 1496. On the summary judgment record, however, Defendants' other conduct involved in the Section 11(b) intimidation inquiry would not be protected by the Petition Clause because it is not activity directed at a governmental entity.[33] Accordingly, the Court will only assess the First Amendment petition defense in the light of Defendants' voter challenges.

---

[33] While the Court will not address Defendants' other actions in this Order, if the evidence of other petitions is presented at trial, then the Court will consider it for this affirmative defense.

The Court also encourages the Parties to address at trial how the First Amendment petition defense applies to the out-of-state Defendants, True the Vote and Catherine Engelbrecht, in the light of the fact that only Georgia residents may institute a Section 230 challenge. See O.C.G.A. § 21-2-230(a) ("Any elector of the county or municipality may challenge the right of any other elector . . . to vote in an election.").

The primary argument made against the First Amendment petition defense is that Defendants' voter challenges were frivolous and thus cannot be protected by the Petition Clause. Doc. Nos. [174], 25–26; [193], 39–41. In supplemental briefing, the Court inquired into the standard to apply to determine a "frivolous" petition outside First Amendment protection. Plaintiffs did not propose any specific test in their briefing, but instead reiterated that "[t]he First Amendment does not license baseless, frivolous challenges targeted at eligible voters; at most, it provides a buffer against liability for mistaken allegations made in good faith." Doc. No. [193], 39. At the summary judgment hearing, however, Plaintiffs specified that a frivolous challenge would be one that lacked probable cause—*i.e.*, when the board of registrars did not act on a challenge. Doc. No. [210] (Feb. 1 Hearing Tr.) Tr. 13:24–14:3.

Defendants argued that a frivolous petition was one without any basis in law or fact. Doc. No. [191], 28–32. Drawing on the antitrust context specifically, Defendants contend the Court should ask if the challenge was "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits" and then, if objectively unreasonable, if the challenger has a

"reasonable belief that there is a chance that a claim may be held valid upon adjudication." Id. at 30–31 (quoting Pro. Real Est. Inv'rs, 508 U.S. at 60).

The Government argues that the right to petition should not and cannot protect "illegal and reprehensive practice[s]."[34] Doc. No. [198-1], 43 (quoting Cal. Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 513 (1972)). Moreover, the Government encouraged the Court to "consider the degree to which a challenged restriction impairs the core right the [Petition] Clause affords" and any reasonable limits on the right in the face of the governmental interests in the regulation. Doc. No. [198-1], 44–45.

Taking a cue from other contexts where petition rights are at issue, the Court agrees in part with Defendants (and seemingly the Government) that there must be more than a lack of probable cause for voter challenge petitions to be frivolous, i.e., outside First Amendment protection. Again, a county's treatment of a Section 230 challenge cannot be the sole basis for finding a challenge was

---

[34] The Court is unconvinced by the Government's position that the speech analysis can resolve the petition defense in this case. Doc. No. [198-1], 42–43. While the Court agrees that it would be unlikely to find unprotected speech (i.e., a true threat or defamation) to be protected by the Petition Clause, conduct constituting a petition is further subject to a frivolity limitation. Thus, at the least, the Petition Clause defense requires a separate frivolity analysis.

79

frivolous, unprotected by the First Amendment, and potentially creating liability under Section 11(b). See *supra* Section (III)(A)(2)(c)(2)(a).

The Court furthermore is persuaded by the comparisons made between Defendants' Section 230 voter challenges and cases involving baseless litigation. As the Supreme Court noted in the public employment context, "[w]hen a petition takes the form of a lawsuit against the government employer, it may be particularly disruptive. Unlike speech of other sorts, a lawsuit demands a response." Guarnieri, 564 U.S. at 390. The Court went on, drawing on non-public employment situations, and noted that the First Amendment petition right did "not protect 'objectively baseless' litigation that seeks to 'interfere directly with the business relationships of a competitor.'" Id. (quoting Real Est. Inv'rs, 508 U.S. at 60–61). Thus, in these latter cases, it appears that a "baseless" claim is one that is "objectively baseless" and "interfere[s] directly" with another person, namely (but perhaps not exclusively) through "consum[ing] time and resources" by "demand[ing] a response." Guarnieri, 564 U.S. at 390.

Here, the voter challenges demanded a response from the board of registrars in each county where challenges were made. These challenges thus compelled at least *some* action and started a process that might have required a

80

challenged voter to prove his or her voter eligibility. However, Defendants' Section 230 challenges are disputed as it relates to objective reasonableness, directness, and causation. See *supra* Section (III)(A)(2)(a)–(c). These disputes therefore preclude summary judgment on Defendants' First Amendment petition defense for either Party.

### 3.   *Right to Vote via Vote Dilution*

Defendants' next raise the "right to vote via vote dilution" as a defense to Section 11(b) liability. Defendants first argued their activities were protected because they sought to "prevent vote dilution by ensuring that all the people listed as eligible voters were legally eligible to cast votes." Doc. No. [155-1], 35. Later, they articulated the protection as "preventing the dilution of their own voting power by the counting of unlawful ballots." Doc. No. [193], 41.

The Court will not linger on this amorphous defense. Even after additional briefing, the Court still is unsure about the legal basis for Defendants' argument, or if the law even supports vote dilution being raised as an affirmative defense.[35]

---

[35] Vote dilution ordinarily arises as a statutory claim under the Voting Rights Act Section 2, or as an Equal Protection Claim under the Fourteenth Amendment. Here, Defendants raise a constitutional defense, and thus the Fourteenth Amendment vote dilution law must apply.

81

Nonetheless, even assuming that vote dilution can be raised as a defense, Defendants have not met the high evidentiary requirements of proving vote dilution. Accordingly, summary judgment must be granted for Plaintiffs.

When asserting vote dilution under the Fourteenth Amendment, Defendants must prove not only the requirements of a Voting Rights Act Section 2 vote dilution case but must also show discriminatory intent. Johnson v. DeSoto Cty. Bd. of Comm'rs, 204 F.3d 1335, 1344 (11th Cir. 2000) ("[T]he Supreme Court, historically, has articulated the same general standard, governing the proof of injury, in both section 2 and constitutional vote dilution case . . . ."); Lowery v. Deal, 850 F. Supp. 2d 1326, 1331 (N.D. Ga. 2012) ("[T]he primary difference between vote-dilution claims brought under § 2 and similar claims brought under the Equal Protection Clause is that the Equal Protection Clause requires a showing of discriminatory intent, while § 2 does not . . . the requirements to establish that vote dilution has occurred (separate from any discriminatory intent) are the same under both provisions.").

Thus, for Defendants to successfully assert a vote dilution defense they must show: "(1) that the minority group is 'sufficiently large and geographically compact to constitute a majority in a single-member district;' (2) that the minority

group is 'politically cohesive;' and (3) that sufficient racial bloc voting exists such that the white majority usually defeats the minority's preferred candidate." Wright v. Sumter Cty. Bd. of Elections & Registration, 979 F.3d 1282, 1288 (11th Cir. 2020) (quoting Solomon v. Liberty Cty. Comm'rs, 221 F.3d 1218, 1225 (11th Cir. 2000)). After these proofs, the Court then must assess a totality of the circumstances "to determine whether members of a racial group have less opportunity" than other groups. Id. at 1289 (listing factors).

Again, assuming that a constitutional vote dilution claim is legally available, Defendants have not made any effort to argue or prove these requirements. Nor have Defendants shown that Plaintiffs intended to deprive them of their right to vote for a constitutional vote dilution defense (in fact, Plaintiffs' claim the opposite—that Defendants' actions sought to deprive voters of the right to vote). Thus, as the proponent of the affirmative defense, Defendants have not submitted the required proofs to even create a dispute of fact. Consequently, Plaintiffs are entitled to summary judgment on Defendants' vote dilution defense.

### 4.   *Unconstitutional Vagueness*

Finally, Defendants assert that Section 11(b), if applied to their Section 230 voter challenges, would be unconstitutionally vague because such liability would be based on a "mass" Section 230 challenge, and it is unclear what would constitute a "mass" challenge moving forward. Doc. No. [155-1], 36. Defendants contend that this uncertainty would "chill" the exercise of the First Amendment rights. Id. Plaintiffs disagree and argue that Defendants improperly limit the Section 11(b) issue to be the mass challenges when Plaintiffs' "problems with Defendants' challenges go well beyond quantity." Doc. No. [174], 28. The Government echoes Plaintiffs' submission that "[a] wide range of factual evidence therefore could establish a Section 11(b) violation . . . But 'the mere fact that close cases can be envisioned' is insufficient to 'render[] a statute vague.'" Doc. No. [198-1], 48 (alteration in original) (quoting United States v. Williams, 553 U.S. 285, 305–06 (2008)).

No disputes of fact affect the Court's determination on this Due Process defense, and the Court dismisses the defense because Section 11(b), if applied to Defendants, is not unconstitutionally vague or overbroad. "Unconstitutionally vague laws fail to provide fair warning of what the law requires, and they

encourage arbitrary and discriminatory enforcement by giving government officials the sole ability to interpret the scope of the law." <u>Dream Defs. v. Governor of the State of Fla.</u>, 57 F.4th 879, 890 (11th Cir. 2023) (internal quotations omitted) (quoting <u>Keister v. Bell</u>, 29 F.4th 1239, 1258 (11th Cir. 2022)). While there is a heightened concern in cases implicating the First Amendment of a vague statute, the Court finds that Section 11(b) presents no such concern of unconstitutional vagueness. Section 11(b) uses terms often used in statutes—intimidate, threaten, and coerce. <u>United States v. Eckhardt</u>, 466 F.3d 938, 944 (11th Cir. 2006) (discussing the terms "intimidate" and "harass" as not unconstitutionally vague). If "the meaning of the words used to describe the [impermissible] conduct can be ascertained fairly by reference to judicial decisions, common law, dictionaries, and the words themselves because they possess a common and generally accepted meaning" then there is no vagueness concern. <u>Id</u>. While the facts of every voter intimidation case may vary, the terms and standards governing liability do not rise to the level of being unconstitutionally vague.

Neither is Section 11(b) overbroad. "A statute is overly broad if it 'punishes a substantial amount of protected free speech, judged in relation to the statute's

plainly legitimate sweep.'" <u>Dream Defs.</u>, 57 F.4th at 890–91 (quoting <u>Virginia v. Hicks</u>, 539 U.S. 113, 118–19 (2003)). Again, any totality of the circumstances inquiry is fact and context specific, but the terms that inform Section 11(b) liability are well known in caselaw and statute, thus inherently limit the potential for making a "sweep" of otherwise lawful and protected conduct, unlawful. Thus, Section 11(b) is not overbroad. Summary judgment for Plaintiffs is granted on Defendants' Due Process defense.

## IV.   CONCLUSION

For the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** both Plaintiffs' and Defendants' Motions for Summary Judgment (Doc. Nos. [155-1]; [156-1]). The Court **GRANTS** Plaintiffs' summary judgment on Defendants' vote dilution and unconstitutional vagueness defenses. The Court **GRANTS** Defendants' summary judgment on the narrow issue of Section 11(b) liability for Muscogee County voters as it pertains to the Section 230 voter challenges only—the undisputed facts show there is no causation evidence between the voter challenges in Muscogee County and Defendants. On all other issues raised by both Parties, the Court **DENIES** summary judgment. Pursuant

to Local Rule 16.4, NDGa, the consolidated pretrial order shall be filed within

**THIRTY DAYS** of the entry of this Order.

IT IS SO ORDERED this ___9th___ day of March, 2023.

HONORABLE STEVE C. JONES
UNITED STATES DISTRICT JUDGE

87