### IN THE UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF
### GEORGIA ATLANTA DIVISION

FAIR FIGHT, INC., SCOTT BERSON, JOCELYN HEREDIA, and JANE DOE,

     Plaintiffs,

v.

TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1-10,

     Defendants.

**Civil Action No.
2:20-cv-00302-SCJ**

## ATTACHMENT D – DEFENDANTS' STATEMENT OF THE CASE

### I.    Somerville and Davis Embark on a Public-Spirited Mission

    Derek Somerville, a Marine Corps veteran and former FBI Special Agent, the CEO of an energy and utility consulting firm, an expert in mass mailings during his time as VP of Customer Finance for a large bottled-water company, and devoted critic of the Georgia Secretary of State's inaction in cleaning up Georgia's out-of-date voter registration files, was already motivated to improve the accuracy of those voter files when he began to hear out-of-state actors like Rudy Guiliani, Lin Wood, and Sidney Powell throwing around baseless elections conspiracy allegations he viewed as harmful to

democracy in Georgia.

"We're simply pawns to them here in Georgia," he thought. "We had all of these actors coming in from out of state telling us about our data, telling us about our problems." And there were "dozens and dozens" of conspiracies, including supposed shootouts at warehouses in Germany, of all places, or an imaginary 60,000 under-18 Georgia voters, and even "Italian espionage." Somerville was appalled. Such claims were "bullshit," meant to "inflate distrust." He wanted the conversation to return to some common sense.

He made his mission clear in his second deposition, saying, "I spent 30-plus years of my life being fully committed to integrity in nearly everything that I do. . . . I have defended the human and civil rights of others going back now 30 years, in combat zones in other people's country, where my life was literally put on the line in defense of those core beliefs. I have defended the civil rights and liberties of individuals in downtown St. Louis who were subject to true violations. And I've fought very hard, I think, in the right forums over the course of my lifetime to defend the ideals of voting, of democracy, and of the underlying constitutional rights that people have. It's never occurred to me over the course of those 30 years to exploit that for personal gain, for monetary gain, or for political gain."

But what he saw, after the General Election of 2020, "were individuals

coming into the conversation that were encouraging people not to vote. They were deliberately sowing seeds of distrust against processes, against political parties, against any manner of things . . . only to raise funds to promote themselves, and their political standing. And they did so, and continue to do so, at the peril of an ideal that I've held since I joined the Marine Corps 30-plus years ago."

Though his views meant he was taking a very unpopular stance as a Republican in his state, he spoke to many GOP groups in Georgia about the need to move beyond the conspiracies and vitriol and move towards cogent strategies for ensuring the integrity of our elections, but also for the political party itself. Somerville was not new to criticism of Georgia politics, particularly the GOP, of which he was a member. He led the effort to challenge a former Georgia Speaker of the House on his grossly unethical behavior – an act that further earned him the ire of people in his own party.

In November, 2020, Somerville met Mark Davis, the president of Data Productions, which does mail marketing for commercial, nonprofit, and political organizations. Davis was an expert with over 30 years of experience with the National Change of Address (NCOA) registry, a man of integrity, and someone who was, crucially, non-partisan. Mark has been working inside Georgia voter data for over three decades. He's extremely passionate about it,

and he's extremely knowledgeable about it. Mr. Davis testified in disputed

elections as an expert witness in data analytics five times over the last 20 years,

including in matters involving residency issues and redistricting errors.

As part of his work with Data Productions, Mr. Davis processed 50-60

million records in 2021, using a variety of data tools, including the USPS

NCOA (National Change of Address) and CASS certification (Coding

Accuracy Support System). Mr. Davis has matched the NCOA data with voter

registration files for over 20 years, including during the 2020 election cycle. He

had long noticed serious residency issues in the Georgia Voter Database.

Because of Mr. Davis' observations of residency issues with the Georgia Voter

Database, he ran NCOA processing in November of 2020 to "ascertain the

extent of the issues statewide."

In November, 2020, the two men began comparing Georgia's voter

registration files with the NCOA registry to determine how out of date it was.

In a contemporaneous private email to Davis, Somerville wrote, "Our purpose

here is to identify voters who moved across county lines more than 30 days

before the election but voted unlawfully in their county. The investigation has

also revealed [] many out-of-state voters, presumably mostly students, military,

et cetera, but some of them are probably also illegitimate."

As a result of Davis's and Somerville's analyses, they grew alarmed by

what the data told them: people were voting in counties in which they no longer resided. Worse, it was clear that the Georgia Secretary of State had not run an NCOA process in as many as 17 months, notwithstanding that the state was heading into pandemic-era elections that would feature unprecedented levels of mail-dependent voting and was already posting the mail-in ballot numbers that would result in a 634% increase in mail-in ballots in an untested system. (By contrast, Somerville, who was responsible for ensuring 1.3 million monthly invoices for bottled water made it to the right customer for his former employer, ran a comprehensive NCOA check *every month*). The two men also saw that voters were improperly listing addresses at commercial mail-receiving agencies ("CMRAs"). They decided to bring the poor state of the files to light and to "take attention away from, frankly, all the nonsense that was being spewed about at that time and draw attention to something that could be measured," encourage "citizen participation," and non-partisanship. The men shared a passion for data integrity and a sense of civic responsibility – one they wanted to share and encourage in others. At the time, Somerville was not even aware of the Section 230 challenge procedure; he would learn about it from a member of the State Legislature, and when he did, he saw it as a means for citizens to hold the Secretary of State accountable for the proper care and maintenance of the state's voter rolls.

The two men had an undeniably lawful purpose: because they were not interested in changing the outcome of any election, nor did they believe they would effect any meaningful change in the voter rolls prior to the Georgia Run-Off Election in January 2021, their goal was simply to engage in a civic process that would ultimately both bring short-term attention to the state of the voter rolls and benefit the long-term accuracy of the voter rolls of the State of Georgia. Davis supported efforts "to clean up voter rolls and ensure people don't vote with residency issues because they're casting ballots for people who don't represent them" and diluting the votes of eligible voters.

"To be clear," Somerville wrote in an email to interested parties, "the people named on these lists are not accused of committing election fraud or any other crime. They are simply individual instances in which probable cause suggests a possible residency issue with respect to the current voter registration. This challenge is a lawful process," he added, "for scrutinizing the quality of our voter rolls and ensuring integrity in our election." Somerville and Davis knew that challenges could take years to resolve, and properly so. A voter's appearance on an NCOA list didn't mean ineligibility to vote, just that local boards of election should conduct a brief investigation "There is a process to protect voters," Somerville explained, "but that process needs to be undertaken in order to identify those votes that are not eligible and would

otherwise disenfranchise the very voters that we're trying to protect."

In preparing a list of voter registrations that could, potentially, be brought to the attention of county election boards, they began by refining a list of about 580,000 registered voters who appeared to have moved out of the county in which they were registered, with key exceptions such as those who had addresses near military bases, inactive voters, voters who had not voted in 2020, voters who voted electronically, and student voters. They also included only voters who had filed a change-of-address request in the prior 18 months. Somerville later ran a pivot-table analysis to ensure the list was non-partisan and contained no racial disparities. In short, they attempted at every turn to "err on the side of the voter," to do the most good and the least harm. The goal: to ensure that voters voted, but in the right county. The resulting list of about 40,000 voters would become the "Davis/Somerville Challenge List". Crucially, (1) neither Somerville nor Davis would ever submit a challenge to a voter registration or (2) interact with any voter in their list, or (3) make public any names on their list, while (4) the Davis/Somerville Challenge List intended to carefully comply with Georgia Code 21-2-230 and follow the process already employed by the state; that is, utilize NCOA to identify voters with an active change-of-address on file with the US Postal Service and use a process detailed under NVRA to confirm the voter's residency.

Somerville learned in mid-December 2020 that an organization called True the Vote (TTV) was also working with Georgia voter rolls as well, and that TTV was planning to facilitate challenges to ineligible voters. Somerville met for dinner with Catherine Engelbrecht, Executive Director of TTV, along with Gregg Phillips, the owner of OPSEC Group LLC (OpSec), a data analytics contractor hired by TTV. As Somerville would put his and Davis' goals in a subsequent email to Engelbrecht, "We're attempting to set-up the next conversation regarding those efforts, which is less about the 40k challenges (which we whittled down from 580k NCOA records) to the negligence within the Secretary of State's office."

## II.   Catherine Engelbrecht Leads True the Vote in an Independent Effort to Highlight and Clean Up Voter Rolls

In the aftermath of the November 2020 election, TTV had received thousands of requests from Georgia voters asking the organization to help them do whatever was within their power to ensure Georgia elections were as fair and accurate as possible. TTV decided to help Georgia electors file challenges to potentially problematic voter registrations based on the elector challenge process defined in state law. TTV believed that, according to Georgia state law, the challenge process should have been very orderly and discreet. If a challenged voter cast a vote, he or she should have been asked to show valid ID confirming that the address on their voter registration is their current address.

Because the law requires that voters show a valid form of photo ID as part of the check-in process at a poll, TTV believed a challenged voter should experience no additional burden.

It was also TTV's understanding that, whether a voter's record was challenged, if the voter could not show a valid form of ID, the law required them to vote via a provisional ballot. A provisional ballot is kept separate from other completed ballots. The voter is given a set time period (generally a few days) in which to provide valid ID. If the voter doesn't provide valid ID, the vote is not counted. If the voter does provide ID, the vote is counted. To TTV, it seemed simple. Similarly, if a mail-in ballot was received from a "challenged" voter record, the same process should have been followed.

The process would not remove records from the voter roll, nor would it prevent any voter from voting, but would ask the county boards to confirm with the Challenged Voters whether they had moved. In fact, the only use of an elector challenge would be to notify county officials of potentially ineligible records so that the records could be flagged as "challenged".

TTV screened for challenges based on invalid residency – that is, where voters had likely moved permanently away from the county in which they had registered to vote to a county in which they were not registered to vote. But whereas Davis and Somerville reviewed only select records, TTV believed that

if it used such a methodology, it could be accused of targeting. Thus, TTV prepared an analysis for the entire state. And while Engelbrecht understood Davis and Somerville to be looking into only active voters, TTV looked at both active and inactive voters.

Engelbrecht traveled to Georgia to meet with Secretary of State Brad Raffensperger and his staff to discuss TTV's plan to present challenges. When Engelbrecht stated that TTV's analysis showed over 500,000 potentially ineligible voter records, Secretary Raffensperger affirmed the number. He thought the number was about right because the Secretary of State hadn't been able to clean the list in a long time, and he knew Georgia voters kept moving. He agreed that TTV should, as Engelbrecht recalled, "run the whole list." Her understanding was further affirmed by other staffers in the meeting, who agreed that the number sounded right, and who mentioned their own hands had been tied because of a recent lawsuit against the Secretary. Soon after the meeting, Engelbrecht, in a text to Somerville, confirmed her reliance on the guidance of the Secretary of State, saying, "Had a really solid meeting with the SoS office this morning and got some guidance that's changing our process a bit, but I feel better about it. The plan now is to send the [press] release probably late today along with digital files etc. As soon as I get to a stopping point I'll send you a release for your review."

Engelbrecht also relied on TTV's counsel, James Bopp Jr., who provided TTV with a legal opinion on the list of potential challenges, saying they were "based on detailed research identifying 124,114 registered voters, who no longer reside in the county of record, and 240,427 voters, who no longer reside in the state of Georgia, according to the United States Postal Service National Change of Address ('NCOA') and other supporting commercial databases, and your research was performed uniformly across all counties, without regard to any demographic or voting history. As a result, probable cause exists here for such challenges and each county election board is required to fulfill their duties as detailed in O.C.G.A. § 21-2-230(c)-(I), to determine whether each challenged elector is currently eligible to vote in the run-off election. These required activities must be done before their votes are counted."

## III.    OpSec's Process and the TTV Challenge List

In creating the TTV Challenge List, OpSec used the Georgia official voter registration file, the NCOA, the Coding Accuracy Support System ("CASS"), Delivery Point Validation ("DPV") and proprietary algorithms ("Proprietary Process") to help verify identity. To identify people who had moved, OpSec used databases other than NCOA and the voter file list, including other state voter registration databases, county tax records, and a

half-dozen other data sources. OpSec's Proprietary Process was developed by Gregg Phillips in 2006 and he shared with TTV that the process had demonstrated its accuracy over the years. OpSec's Proprietary Process compared the addresses in the registration file to government and commercially available information in order to identify people who had either moved out of the county in which they were registered or live outside the State of Georgia. The process was designed to infer, from consulting other sources of data, the purpose for which the person has submitted an NCOA request, including military and government service, student moves, people who changed their mind or forwarded their mail because they were on lengthy vacations; and people moved merely inside the county or jurisdiction in which they were registered.

OpSec's approach of verifying identity and residency is a proprietary process that uses a 4000-row algorithm, involving a complex series of mostly common algorithms, such as dissimilarity and similarity indexes and "fuzzy logic". The "fuzzy logic" used in OpSec's Proprietary Process is designed to ascertain whether similar information is similar enough to assume that an identity is accurate. If it is not, then it assigns a risk factor to it.

## IV.     TTV and OpSec Did Not Collaborate with Somerville and Davis

Somerville and Davis knew little about TTV or Engelbrecht, and

nothing about Phillips and OpSec, either at the time of the challenges or for months after the challenges were made, and had no insight into how they had been developing their own challenge list. Nothing illustrates the lack of coordination better than the fact that within 3 days of the first and only in-person, dinner meeting between only two of the individual defendants, which took place on December 15, Engelbrecht, on the morning of December 17, independently traveled to meet met with the Georgia Secretary of State and, on December 18, issued TTV's press release announcing various Georgia voter challenge efforts.

Indeed, the parties' lack of meaningful coordination was further made manifest in their inadvertent competition for challengers: TTV's independent efforts interfered with and reduced the number of challengers available to Davis and Somerville. What's more, TTV was sufficiently unaware of Davis (and his longtime expertise with Georgia voting records) that, though he was the primary architect of the Davis-Somerville Challenge List, TTV left him off the initial draft of their press release about the Georgia challenge efforts.

The parties did agree that the state of Georgia's voter registration rolls was a matter of serious concern. True the Vote, using its own criteria and methodology, was independently compiling a potential challenge list encompassing up to 364,000 ineligible voters in all 159 counties in Georgia

("the **TTV Challenge List**") and intended to submit challenges on behalf of challengers in counties where challengers could be recruited. The Davis-Somerville List included about 40,000 potential challenges, which were also dependent on volunteers for the challenges to reach county election boards. The two groups of challenge-makers discussed some data definitions, but otherwise did not meaningfully collaborate on or influence the creation, criteria, quality assurance, or methodology of the other's challenge lists.

In order to file their challenges, the parties independently sought eligible voters to volunteer to serve as challengers in each of Georgia's counties. In the end, neither TTV nor Davis-Somerville were able to recruit challengers for more than a few dozen of Georgia's 159 counties. The sole determinant of which county a challenge was issued in was whether a volunteer who lived in that county came forward to issue it. In other words, the counties were challenger-selected; TTV did not "select for" or "target" the counties in which challenges occurred, as Plaintiffs' expert Dr. Mayer appears to assume. *See* Expert Report of Kenneth R. Mayer, PhD at 7-8 ("True the Vote's challenges were *targeted toward* counties with disproportionately higher minority populations") (emphasis added).

## V.    True the Vote Responds to the Concerns of Volunteers and Elections Boards

On the day that TTV's press release announcing the challenge effort

was issued, attorney Mark Elias, of Perkins Coie, sent letters to the Boards of Elections in several Georgia counties threatening them with legal action if they improperly challenged any voters. Several people who had volunteered to serve as challengers began to receive intimidating and harassing messages via email and social media. TTV scheduled a conference call, offered suggestions, and spoke with potential challengers to discuss the challenge process and where to report threats. As the Run-off election neared and the intimidation and harassment of challengers increased, TTV did not receive authorization to submit the challenge list from a registered voter in every Georgia county.

TTV had dealt with such matters before, and so had previously responded with efforts such as a nationwide election integrity hotline. TTV continued this hotline for the use of Georgia residents. Engelbrecht also announced a TTV-sponsored fund to provide legal support for people who reported information. Its goal was primarily to head off the chilling effect of the threat of legal action against challengers or those with information about election fraud. It was also used to support litigation in several states regarding November 2020 presidential election. Engelbrecht also brainstormed the possibility of inviting Navy SEALs to volunteer to help out at polling stations, but she did not pursue the matter and nothing came of it.

## VI.    The Actual Challenges Made

Somerville and Davis provided challengers with a form called "ELECTOR CHALLENGE HEARING TALKING POINTS". It included the following language: "I am not alleging any voter has acted improperly, only that probable cause as established under both Federal and State law exists to believe the voter (elector) has changed their residence. Further, I am not asking the Board of Elections to remove the people on my list from the voter rolls, only to confirm with each voter whether they have moved." The Davis/Somerville Challenge List was never released to the public. Somerville and Davis did not discuss with TTV, nor did he have any knowledge of, TTV's 24/7 hotline or the "whistleblower fund" described in TTV's November 6, 2020, press release.

Somerville believed their challenges involved "a largely successful effort to identify individuals that wanted to participate" in the civic action of the challenges, even if "we didn't have a lot of people participate." He didn't know how many challenges were made because the list was made available to actual challengers, their behavior wasn't tracked, and the counties had no reason to respond to him because he was not a challenger. It was "not a significant number". Most were rural counties in the north of Georgia.

Somerville and Davis attained several useful outcomes: the legislature took up the issue, the Secretary of State paid attention to their efforts,

communicated with them about it, and took a closer look (and may have acted on it), and some challenged voters updated their addresses. At times, Mr. Somerville made public statements in general about issues surrounding voter integrity in Georgia—but none of those statements called for physical violence or threatened harm to any Plaintiff.

After the Davis/Somerville Challenge List was compiled, Somerville and Davis ran several analyses on the data, including a breakdown of the file based on voter behavior. They wanted to assure themselves that their list of potential challenges had not contained bias regarding any other factor other than the data reflecting an address change the voter had submitted to the USPS.

Approximately four months after the Run-off Election, Mr. Davis also analyzed data related to Georgia 2020 General-Election voters ("Davis General Election Analysis"). Davis analyzed 34,869 records of Georgia voters who submitted a US Postal Service change-of-address request more than 30-days *prior to* casting their vote in the 2020 General Election and whose US Postal Service a change-of-address was to a new Georgia county and thus a new voting jurisdiction. Of these voters, approximately 10,300 updated their voter registration address with the Secretary of State *after* the general election to the same address shown on the US Postal Service change-of-address filed more than 30-days *prior to* the election. These same voters cast votes in the General

Election from their *former* county. In short, some number of the voters had only moved temporarily, but some had moved permanently and thus voted in the wrong county. Mr. Davis provided this analysis to senior officials within the Georgia Secretary of State's office in May of 2021.

The Davis General Election Analysis also indicated that of the over 10,300 who updated their voter registration address with the Secretary of State *after* the general election to the same address shown on the US Postal Service change-of-address filed more than 30-days *before* the election, "94% of them would have been offered a ballot with a state house race on it that they don't live in, about 86.5% would have been offered a chance to vote in a state senate district that they no longer lived in, and approximately 64% would have been offered the chance to cast a ballot in a congressional district they no longer lived in."

Davis also analyzed the 39,141 voters on the Davis/Somerville Challenge List ("Davis Challenge List Analysis"), comparing them to updated publicly available Georgia voter files as prepared by the Georgia Secretary of State's office. Of the Davis/Somerville Challenge List voters, 26,854 filed a US Postal service change-of-address more than 30-days prior to the election requesting their mail be forwarded to a new county within the state of Georgia and thus to a new voting jurisdiction. Of those 26,854 voters, 18,180 cast a vote

in the January 2021 special election runoff. At the time of the original analysis (approx. November 2021), 9,950 of these voters subsequently updated their voter registration addresses to the *same* addresses shown in the NCOA data upon which the Davis/Somerville Challenge List was based. That number has since increased to 10,542. An additional 1,119 voters on the Davis/Somerville Challenge List who filed an in-state change-of-address to a new county and voted in the special election runoff have since been inactivated by the Secretary of State's office for reason of 'NCOA'. An inactive reason of 'NCOA' indicates the Secretary of State's office ran NCOA on the voter file and identified change-of-addresses to new counties or states for these voters. When this occurs, voters receive a form from the Secretary of State asking, "Are you still a Georgia resident?" If the voter fails either to update their registration or respond within 30 days, they are inactivated with a reason code of 'NCOA'. Yet another 457 of these voters were inactivated by the Georgia Secretary of State because correspondence sent by Secretary of State's office to the voter was returned by the US Postal Service as undeliverable. In all, publicly available Georgia voter data confirmed that more than 66% of the voters on the Davis/Somerville Challenge List did in fact have voter residency issues as confirmed by either the Georgia Secretary of State's actions, the voter's inactions, or the voter's self-confirmation of address change to the Secretary of

19

State or their county's board of elections. The information on the Davis/Somerville Challenge List was accurate at the time Mr. Davis compiled it. Neither the Davis November Analysis nor the Davis/Somerville Challenge List took into account race, sex, or party affiliation.

### Mark Williams Statement of Facts

Mark Williams owns a printing company, and his company printed the Section 230 Challenges for TTV. Williams introduced Ron Johnson and James Cooper to Gregg Phillips. Williams did not help compile the TTV Challenge List or the Davis-Somerville Challenge List. Williams volunteered to be the TTV Challenger in Gwinnett County. He submitted some number of challenges to the Gwinnett Board with the hopes that the Board would vet the list, but he was told the Board would not vet them at all.

### Ron Johnson Statement of Facts

Ron Johnson contacted eligible Georgia voters he knew to ask if they would be interested in bringing Section 230 Challenges in the county in which they live. He gave TTV the contact information for any Georgia voter who expressed an interest in participating in these Challenges. Johnson communicated with the volunteers to get their signed permission for TTV to submit the Challenges in their name. Johnson did not help compile the TTV Challenge List or the Davis-Somerville Challenge List.

**James Cooper Statement of Facts**

James Cooper contacted eligible Georgia voters he knew to ask if they would be interested in bringing Section 230 Challenges in the county in which they live. He prepared a form email to send to potential Challengers, which described the potential Challenges. He gave TTV the contact information for any Georgia voter who expressed an interest in participating in these Challenges. Cooper communicated with the volunteers to get their signed permission for TTV to submit the Challenges in their name. Cooper did not help compile the TTV Challenge List or the Davis-Somerville Challenge List.