## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

| | |
|---|---|
| FAIR FIGHT, INC., SCOTT BERSON, JOCELYN HEREDIA, and JANE DOE, | |
| Plaintiffs, | **Civil Action No.** **2:20-cv-00302-SCJ** |
| v. | |
| TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1-10, | |
| Defendants. | |

## ATTACHMENT E (PLAINTIFFS' PROPOSED STIPULATED FACTS)[1]

---

[1] On May 16, 2023, Plaintiffs circulated a list of proposed stipulated facts, consisting mostly of statements that were either undisputed by Defendants at the summary judgment stage or in many cases proposed by Defendants themselves. *See* Defs.' Resp. to Pls.' Corrected Statement of Undisputed Material Facts, ECF No. 173-1; Defs.' Statement of Undisputed Material Facts, ECF No. 155-2; Defs.' Resp. to Pls.' Statement of Additional Facts, ECF No. 176-1. In response, Defendants provided an entirely separate list of proposed facts, ignoring multiple requests to respond to Plaintiffs' proposals until just a few hours before this filing, when Defendants provided generalized objections to Plaintiffs' "desired narrative." Yet to date, Defendants still have not identified a single fact proposed by Plaintiffs to which they are willing to agree—not even the facts Defendants had initially proposed in connection with their summary judgment filings. Accordingly, this attachment *combines* Plaintiffs' proposed stipulated facts with the entries from Defendants' proposed facts to which Plaintiffs are willing to agree.

**Fair Fight**

1.     Plaintiff Fair Fight, Inc. is a political action committee with a non-contribution account, commonly known as a Hybrid PAC, registered with the Federal Election Commission, the Georgia Government Transparency and Campaign Finance Commission, and various state campaign finance regulators. [Pls.' MSJ Ex. 15, Fair Fight ("FF") Declaration ("Decl.") ¶ 3, ECF No. 156-18]

2.     Part of Fair Fight's mission is to secure the voting rights of Georgians, which includes advocating for voter engagement and voter turnout, particularly among young people and people of color. [*Id*. ¶ 4]

3.     Fair Fight's voter engagement activities include efforts to support and elect pro-voting rights progressive leaders. To encourage voter participation, Fair Fight also conducts programmatic activities including the preparation and sponsorship of digital advertising, mailings, phone banks and calls, and text messaging. [*Id*. ¶ 5]

4.     Fair Fight also raises money and provides funding for voter engagement activities. [*Id*. ¶ 5]

5.     For the 2020 general election and the runoff elections conducted on January 5, 2021, Fair Fight engaged in voter participation work including educating voters about the voting process, engaging in get-out-the-vote activities,

monitoring long lines at polling locations, and helping voters navigate the absentee ballot process. [*Id*. ¶ 6]

6.      On December 14, 2020, Georgia held its first day of early voting for the 2021 Senate runoff elections.

7.      That same day, True the Vote ("TTV") issued a press release announcing that it was partnering with the Georgia Republican Party to engage in "the most comprehensive ballot security initiative in Georgia history." [Pls.' MSJ Ex. 21, ECF No. 156-24]

8.      On December 18, 2020, TTV issued a press release announcing TTV's intention to submit voter challenges in all 159 counties. [Pls.' MSJ Ex. 22, ECF No. 156-25]

9.      Upon learning about Defendants' voters challenges, Fair Fight redirected efforts of its staff and volunteers to combat these efforts. [FF Decl. ¶ 10]

10.     Fair Fight reallocated staff from its voter mobilization activities to monitoring Georgia's 159 counties for voter challenges. That monitoring included attending the Boards of Elections hearings on Defendants' challenges, learning which voters were being challenged, advocating against those challenges, monitoring the results of those challenges, and, through a phonebank, informing challenged voters of their rights. [*Id*. ¶ 11]

11.    Fair Fight also expended financial resources to promote a voter protection hotline so that voters could obtain assistance if they were challenged. These resources otherwise would have been allocated to Fair Fight's get-out-the-vote program. [*Id*. ¶ 12]

12.    Fair Fight also expended significant financial and staff resources to collect and analyze the challenge lists, some of which they obtained from attending Board of Elections challenge hearings. [*Id*. ¶ 13]

13.    As part of its regular election year activities, Fair Fight traditionally organizes a large group of volunteers to gather information about general voting logistics, including confirming with counties their early voting locations, dates, and hours for runoff elections. Fair Fight also advocates for extending early voting opportunities. But as a result of Defendants' voter challenges, Fair Fight redirected the above-described efforts of its volunteers to reaching out to voters on Defendants' challenge lists and attending Boards of Elections meetings across the state. This required extensive Fair Fight staff involvement to coordinate volunteers and took staff away from their voter engagement activities. [*Id*. ¶ 14]

14.    Because Defendants indicated they will continue to file similar challenges in the future, after the 2021 runoff election, Fair Fight turned its voter challenge tracking effort into an operational program called Democracy Watch

dedicated to responding to unlawful voter challenges if and when they are filed, advocating on the voters' behalf, and educating voters about their rights if they are challenged. [*Id*. ¶ 15]

15.     Democracy Watch is monitored and overseen by Fair Fight's Research and Voter Protection staff and requires a substantial number of Fair Fight volunteers to operate. To run Democracy Watch, Fair Fight hired two additional staff members and has fully allocated five staff members to oversee the program. These staff command a significant portion of Fair Fight's resources. [*Id.* ¶ 17]

16.     If Fair Fight's Research staff did not have to oversee the Democracy Watch program, Fair Fight would redirect resources from that program to educating voters about election administration changes, researching better methods to turn out voters, and counteracting election disinformation efforts. [*Id*. ¶ 18]

17.     Because of the need to dedicate resources to the Democracy Watch program, Fair Fight has limited its voter education efforts to the State of Georgia due to limited volunteer capacity. Absent the drain on its resources caused by Defendants' challenges, Fair Fight would expand its voter education efforts to other states. [*Id*. ¶ 19]

18.     Fair Fight has also redirected additional funds to promote and educate the public about a Voter Protection Hotline, which voters can call if they find

themselves the subject of a voter challenge. This promotion has cost Fair Fight hundreds of thousands of dollars. If Fair Fight did not have to expend these funds on directing voters to resources, should they be challenged, they would have allocated them towards their get-out-the-vote program. [*Id.* ¶ 20]

19.     Unless and until this litigation is successful, Fair Fight will continue to divert significant staff resources, volunteer time, and money combatting Defendants' voter challenge efforts. [*Id.* ¶ 21]

**Jocelyn Heredia**

20.     Plaintiff Jocelyn Heredia is a resident and registered voter in Banks County, Georgia. [Heredia Tr. 11:12–15, ECF No. 163-1]

21.     Ms. Heredia submitted a change of address form in January 2020 when she moved temporarily from her residence in Banks County to be closer to Atlanta for a job. [*Id.* 12:17–25]

22.     Ms. Heredia's voter status was challenged in Banks County during the January 2021 runoff election. [*Id.* 20:13-21:7; *see* Defendants' Statement of Undisputed Material Facts ("Defs.' SUMF"), ECF No. 174–1 ¶ 144]

23.     As soon as she arrived at her polling location, Ms. Heredia felt uneasy because she was the only Hispanic person in line to vote in a predominantly white, Republican county. [*Id.* 48:1–10; Defs.' SUMF ¶ 149]

6

24.    Ms. Heredia learned at her polling location that her vote was being challenged. [*Id*. 44:12–45:8; Defs.' SUMF ¶ 150]

25.    Ms. Heredia did not understand what it meant to be challenged, and because of the challenge, her feeling of intimidation increased. [Heredia Tr. 44:12–45:8, 48:10–15]

26.    Because a challenge had been submitted against her, Ms. Heredia was pulled aside at her polling location, and she was asked to fill out a provisional ballot. [*Id.* 23:22–24:7]

27.    Ms. Heredia was also asked to provide proof of residency at her registration address for her provisional ballot to be counted. [*Id*. 24:4–24:13]

28.    Ms. Heredia was challenged by both Jerry Boling, a volunteer for TTV, and Dan Gassaway, a volunteer for Mark Davis and Derek Somerville. [Pls.' MSJ Ex. 30, ECF No. 156-33; Pls.' MSJ Ex. 31, ECF No. 156-34; Pls.' MSJ Ex. 32, ECF No. 156-35]

29.    Banks County published Ms. Heredia's name on its website as a challenged voter. [Heredia Tr. 31:22–32:3]

30.    Her name appeared on the Banks County website for at least six months. [*Id*. 32:2–32:3]

**Jane Doe**

31.   Plaintiff Jane Doe is a resident of and registered voter in Clarke County, Georgia. [Pls.' MSJ Ex. 16, Jane Doe Decl. ¶ 2, ECF No. 156-19]

32.   Jane Doe's permanent residence is in Georgia, and Jane Doe is presently located in Georgia. [*Id.*]

33.   In 2020, however, Jane Doe split her time between Georgia and another state where her spouse had accepted a short-term career opportunity. [*Id.* ¶ 3]

34.   At that time, Jane Doe completed a USPS change of address form to forward her mail to her spouse's out-of-state address. [*Id.* ¶ 4]

35.   Jane Doe never gave up her residency in Georgia—she still owns a home there, pays taxes in Georgia, and works in Georgia. [*Id.* ¶ 2]

36.   Jane Doe's name can be found online as a challenged voter in Clarke County. [*Id.* ¶ 11]

37.   Due to reports of Georgia's election workers being harassed, threatened, and doxed after the general election, the challenges made Jane Doe fear that she and/or her family could also become the target of harassment if she voted. [*Id.* ¶¶ 5, 7, 9]

**Scott Berson**

38.     Alton Russell submitted § 230 Challenges against voters in Muscogee County; these voters included Plaintiff Scott Berson, Stephanie Stinetorf, and Gamaliel Turner. [Defs.' SUMF ¶ 138; Defs' MSJ Ex. T, Berson Resp. to Interrogs. No. 3, ECF No. 155-23]

39.     Mr. Berson read in the Columbus Ledger-Enquirer that challenges had been filed against people with out-of-state mailing addresses and he figured he was probably on the list. [Defs.' SUMF ¶ 140]

40.     When Mr. Berson was challenged, he was in the process of graduating from a Master's program in Alabama, moving back to his residence in Georgia, and applying for new jobs. [Berson Resp. to Interrogs, Resp. No. 7]

41.     Because he had been temporarily away from Georgia for school, Mr. Berson did not have easy access to the usual documents to show residency, such as a utility bill or rent statement. [*Id.*]

42.     Due to the voter challenge, Mr. Berson was only allowed to cast a provisional ballot. [*Id.* Resp. No. 12, 13]

43.     After casting his provisional ballot, Mr. Berson was required to present evidence of his eligibility. [*Id.* Resp. No. 12]

44.     Gathering such documents imposed a burden on Mr. Berson because

it is difficult for him to find and provide the necessary proof of residence each time he moves. [*Id*. Resp. No. 8]

**Stephanie Stinetorf**

45.     Stephanie Stinetorf moved to Georgia in 2018 and registered to vote. [Pls.' MSJ Ex. 17, Stinetorf Decl. ¶ 2, ECF No. 156-20]

46.     Ms. Stinetorf is a civilian employee of the United States Department of Defense, and as part of her job, received military orders to move to Germany in August 2020, at which time she submitted a change of address form to ensure she would continue to receive mail. [*Id.* ¶¶ 3–4]

47.     When Ms. Stinetorf learned that her absentee ballot for the January 2021 runoff election had been challenged, she became "very confused and concerned." [*Id.* ¶¶ 6–8]

48.     Ms. Stinetorf immediately emailed and called the county registrar to get more information about the challenge, but the county did not respond for several days. [*Id.* ¶ 10]

49.     Given the demands of Ms. Stinetorf's job and the time difference between the U.S. and Germany, she was not sure that she could remedy the problem with her voting status or participate in any challenge hearings to protect her right to vote, which caused her a significant amount of stress. [*Id.* ¶ 9]

50.    Several days after Ms. Stinetorf initially found out her ballot had been challenged, she learned that a court order prevented her county from discarding her ballot unless the challenger was able to present further information about her ineligibility. [*Id.* ¶ 11]

51.    Despite the court's intervention, these challenges burdened and confused Ms. Stinetorf because her professional and personal situation made it difficult for her to resolve the challenges in time to vote. [*Id.* ¶ 12]

52.    Because Ms. Stinetorf and her husband remain overseas military employees, she continues to worry about the time and energy that will be required to overcome any future challenges lodged against registrants who forward mail outside of Georgia. [*Id.* ¶ 13]

**Gamaliel Turner**

53.    Gamaliel Warren Turner, Sr. is a 68-year-old retired veteran and lifelong Georgia resident who is registered to vote in Muscogee County. [Pls.' MSJ, Ex. 18, Turner Decl. ¶ 2, ECF No. 156-21]

54.    Turner registered to vote when he was 18 and has voted in almost every election over the past 50 years. [*Id.* ¶ 2]

55.    Turner is employed as a government contractor with the United States Navy, and in October 2019 had to temporarily relocate to Camarillo, California for

his job. [*Id.* ¶ 3]

56.     Turner never registered to vote in California or changed his citizenship or residence from Georgia to another state. [*Id.* ¶¶ 3–4]

57.     Turner voted by absentee ballot in the 2020 primary and general election and requested that the registrar mail his ballot to his California address for the runoff election. [*Id.* ¶ 6]

58.     As a Black voter and veteran growing up in the segregation era, Mr. Warner found the challenge process discouraging, and "[t]hinking back to the senseless difficulty of [his] voting experience in the January runoff elections gives [him] PTSD." [*Id.* ¶¶ 11–12]

59.     Turner wonders "if it is even worth trying to vote again given the trouble that the voter challenge has caused [him]." [*Id.* ¶ 12]

**True the Vote**

60.     TTV is a Texas-based organization founded by Catherine Engelbrecht, who is also its current president. [Ex. 12, TTV/Engelbrecht Tr. 22:17–20, ECF No. 168-1]

61.     TTV is a 501(c)(3) organization but has frequently collaborated with Republican party officials to monitor polling places and challenge voters, among other activities. [*Id.* 112:2–13]

62.     TTV has previously been accused of voter intimidation, including by at least one member of Congress. [Pls.' MSJ Ex. 33, Elijah Cummings 2012 Letter, ECF No. 156-36]

**Mark Davis and Derek Somerville**

63.     Derek Somerville is a resident of Georgia who, in the weeks leading up to Georgia's January 2021 runoff, analyzed voter change-of-address information and coordinated efforts to challenge voter eligibility across the state of Georgia. [Somerville II Tr. 9:5–7; 68:3–16, ECF No. 166-1]

64.     Mr. Somerville is a Marine Corps veteran, former FBI Special Agent, and the CEO of an energy and utility consulting firm. He assisted with mass mailings during his time as VP of Customer Finance for a large bottled-water company.

65.     Mark Davis, also a citizen of Georgia, is the president of Data Productions, which does mail marketing for commercial, nonprofit, and political organizations. [Defs.' SUMF ¶ 103]

66.     Mr. Somerville and Mr. Davis met in November 2020.

67.     "We're simply pawns to [out of state actors like Rudy Giuliani, Lin Wood, and Sidney Powell] here in Georgia," Mr. Somerville believed. "We had all of these actors coming in from out of state telling us about our data, telling us

about our problems." [Somerville II Tr. 116:22, 117:1-3] And there were "dozens and dozens" of conspiracies, including supposed shootouts at warehouses in Germany, [Somerville I Tr. 147:22, 148:1-3], or an imaginary 60,000 under-18 Georgia voters, [Somerville II 46-49], and even "Italian espionage," [*id*. 51:4]. Somerville was appalled. Such claims were "bullshit," meant to "inflate distrust." [*Id*. 49:4-6]

68.    After the General Election of 2020, Mr. Somerville saw "individuals coming into the conversation that were encouraging people not to vote. They were deliberately sowing seeds of distrust against processes, against political parties, against any manner of things . . . only to raise funds to promote themselves, and their political standing." [*Id.* 171:1–10]

69.    Mr. Davis worked collaboratively with Mr. Somerville to analyze voter change-of-address data and coordinate volunteers to submit challenges to the eligibility of tens of thousands of voters in various Georgia counties (the "Davis/Somerville Challenge List"). [*Id.* 68:3–16; Davis I Tr. 45:1–8, ECF No. 161-1; Somerville Tr. I 32:20–33:4, 45:3–11, ECF No. 162-1; Somerville Interrog. Resp. Ct. Order Resp. No. 1]

70.    Mr. Somerville and Mr. Davis did not believe they would achieve any meaningful change to the voter rolls prior to the January 2021 runoff elections.

They recognized that removing people from voter lists as a result of challenges would be illegal.

71.     Mr. Somerville and Mr. Davis, primarily through social media, asked if voters would be willing to submit voter challenges in their county, using the Davis/Somerville challenge list for their county. When a voter expressed interest, Mr. Somerville and Mr. Davis provided those challengers with the challenge lists and information on how to submit the challenges to the appropriate county election officials. This information was transmitted via email and file share. [Somerville I Tr. 89:22-15; 97:22-99:19; Somerville Interrog. Resp. Ct. Order Resp. No. 1; Defs.' SUMF ¶ 93]

72.     According to Mr. Somerville, challenges brought using the Davis/Somerville Challenge List "sought to force [the] verification" of voters appearing on the NCOA registry. [Pls.' MSJ Opp'n Ex. 55, ECF No. 174-14]

73.     Specifically, the Davis/Somerville Challenge List consisted of "roughly 40,000 [registered voters] across all 159 counties [] need[ed] to be verified by county Election Boards BEFORE the . . . Senate run-off." [Pls.' MSJ Opp'n Ex. 53, ECF No. 174-12 (emphasis in original)]

74.     Mr. Davis took the lead in researching and identifying voters to include on the Davis/Somerville challenge list. He prepared a PDF list and an

Excel file for each county.

75.     Mr. Davis uploaded the Davis/Somerville challenge list to Google drive for Mr. Somerville to provide access to potential challengers. Mr. Somerville and Mr. Davis recognized that the challenge list should not include individuals that appeared to be either serving in the military, or even remotely located near a military base in case the person is a dependent of a person serving in the military.

76.     Mr. Somerville and Mr. Davis also recognized that students away from their home address were likely eligible voters in their home counties.

77.     Mr. Somerville, primarily through social media, asked if voters would be willing to submit voter challenges in their county using the appropriate Davis/Somerville challenge list. If a voter expressed interest, Mr. Somerville made that county's list available to the challenger via email or Dropbox. The challenger was then responsible for submitting the challenge based upon the Davis/Somerville challenge list to the appropriate county.

78.     At the time they filed the challenges, Mr. Davis and Mr. Somerville did not know whether it was "possible or feasible" to verify voters' eligibility before the runoff election. [Somerville Tr. I 132:22-133:4; Davis I Tr. 151:11-13]

79.     In fact, to Mr. Somerville's knowledge, no county board of election accepted any challenge submitted on the basis of the Davis/Somerville Challenge

List. [Somerville Tr. I 93:11–15]

80.    Mr. Somerville did not submit any challenges under his own name.
[*Id.* 100:17–19]

81.    Approximately four months after the 2021 runoff election, Mr. Davis
analyzed data related to Georgia 2020 general election voters. Mr. Davis provided
this analysis, including a spreadsheet of alleged non-resident voters, to senior
officials within the Secretary of State's office. Ryan Germany, the Secretary of
State's General Counsel, provided a factual and legal "analysis of the issue Mark
Davis is pushing regarding in-state moves." [Pls.' MSJ Opp'n Ex. 61, ECF No.
174-20]

82.    Mr. Germany explained in his email that "determining whether
someone who moved from one county to another should have been eligible to
vote" requires applying federal and state law "to each individual's factual scenario.
A spreadsheet listing voters' names doesn't come close to meeting that standard."
[*Id.*]

83.    Mr. Germany further explained: "The NVRA requires individualized
inquiry into each voter's situation. Calling these voters 'illegal voters' without
doing that individualized inquiry is a disservice." [*Id.*]

**Other Defendants**

84.    Mark Williams owns a printing company in Georgia, and TTV sent Mr. Williams compiled lists of challenged voters that Mr. Williams printed along with individual letters for the challenges. [Williams Tr. 22:4–13, ECF No. 158-1]

85.    Mr. Williams introduced TTV to other individuals who subsequently collaborated on the challenges, including Ron Johnson and James Cooper. [*Id.* 22:19–23:2]

86.    Mr. Williams also introduced Ron Johnson and James Cooper to Gregg Phillips. [*Id.* 23:7–10]

87.    Mr. Williams volunteered to be, and served as, a TTV challenger in Gwinnett County. [*Id.* 63:2–15; Defs.' SUMF ¶ 131]

88.    Ron Johnson was previously the Georgia GOP chairman for all counties with less than a population of 80,000 people. [Johnson Tr. 35:13–17, 42:18–43:2, ECF No. 160-1]

89.    Mr. Johnson contacted Georgia voters he knew to ask if they would be interested in bringing § 230 challenges in the county in which they lived, and passed along the names of volunteers to TTV. [Defs.' SUMF ¶ 132; Defs' MSJ Ex. R, Johnson Resp. to First Interrogs. No. 5, ECF No. 155-21]

90.    Many of these challengers were chairmen of their respective county

Republican Party. [Johnson Tr. 41:6–8, 42:16–21, 43:6–9]

91.    Mr. Johnson communicated with the volunteers to get their signed permission for TTV to submit the challenges in their name. [*Id.* 42:6–42:2; Defs.' SUMF ¶ 133]

92.    Mr. Johnson also volunteered to be a challenger himself. [Johnson Tr. 91:13–21; TTV/Engelbrecht Tr. 144:9–15]

93.    James Cooper, who previously served as the 3rd Vice Chair for the 10th District of the Georgia Republican Party, was similarly involved in recruiting challengers for TTV across the state. [Cooper Tr. 11:9–17, 28:2–15, 31:12–17, ECF No. 157-1]

94.    Mr. Cooper contacted eligible Georgia voters he knew to ask if they would be interested in bringing § 230 challenges in the county in which they live. [Defs.' SUMF ¶ 135; Defs' MSJ, Ex. S, Cooper Resp. to First Interrogs. No. 5, ECF No. 155-2]

95.    Mr. Cooper also prepared a "form" email, which described the potential challenges, to send to potential challengers. [Cooper Resp. to First Interrogs. No. 5; Defs.' SUMF ¶ 135]

96.    Every person Mr. Cooper initially contacted to be a challenger was either a current or former Republican county chair in Georgia. [Cooper Tr. 36:11–

37:3, 128:22–130:20]

97.    Mr. Cooper gave TTV the contact information for any Georgia voter who expressed an interest in participating in these challenges. [*Id.* 45:1–22; Defs.' SUMF ¶ 135]

98.    Mr. Cooper communicated with the volunteers to get their signed permission for TTV to submit the challenges in their name. [*Id.* 45:1–22; Defs.' SUMF ¶ 136]

## 2020 Election Response

99.    Days after the 2020 election, TTV filed lawsuits in Michigan, Wisconsin, Georgia, and Pennsylvania in which they promised to deliver to the court evidence of, among other offenses, "votes by ineligible voters." *See, e.g.,* Compl. ¶ 45, *Brooks v. Mahoney*, No. 4:20-cv-00281-RSB-CLR (S.D. Ga. Nov. 11, 2020); Compl. ¶ 73, *Bally v. Whitmer*, No.1:20-cv-01088-JTN-PJG (W.D. Mich. Nov. 11, 2020); Compl. ¶¶ 34, 44, *Langenhorst v. Pecore*, No. 1:20-cv-01701-WCG, (E.D. Wisc. Nov. 12, 2020); Compl. ¶ 26, *Pirkle v. Wolf*, No. 4:20-cv-02088-MWB, (M.D. Pa. Nov. 10, 2020).

100.  TTV promised a "sophisticated and groundbreaking analysis" using, among other tools "United States Postal Service records"—the same type of records TTV would use when challenging the eligibility of hundreds of thousands

of Georgia voters. *See Brooks*, Compl. ¶ 45; *Bally*, Compl. ¶ 73; *Langenhorst*, Compl. ¶¶ 34, 44; *Pirkle*, Compl. ¶ 26.

101.   TTV never provided the courts with any such evidence, and on November 16, 2020, TTV moved to voluntarily dismiss all four of the cases it had filed.

102.   None of the suits challenging Georgia's election results in the 2020 general election, including those based on Postal Service records, were deemed meritorious. *Wood v. Raffensperger*, No. 2020-CV-342959 (Ga. Super. Ct., Fulton Cnty. Dec. 8, 2020) (dismissing case alleging tens of thousands of out-of-state residents illegally voted in Georgia's General Election); *Boland v. Raffensperger*, No. 2020-CV-343018 (Ga. Super. Ct., Fulton Cnty. Dec. 8, 2020) (dismissing case and finding plaintiffs' claim that tens of thousands of people illegally voted in Georgia based on the National Change of Address registry was based on "speculation rather than duly pled facts"); *Pearson v. Kemp*, No. 1:20-cv04809-TCB, ECF No. 74 (N.D. Ga. Dec. 7, 2020) (dismissing case alleging the National Change of Address registry showed over 20,000 ineligible voters cast ballots in Georgia's general election).

**Voter Challenges**

103.   TTV prepared voter challenges for the entire state of Georgia. And

while Ms. Engelbrecht understood Mr. Davis and Mr. Sommerville to be challenging only active voters, TTV prepared to challenge both active and inactive voters.

104.   In its December 18, 2020 press release, TTV announced that it had "partner[ed] with Georgians in every county to preemptively challenge 364,541 potentially ineligible voters." [Pls.' MSJ Ex. 22, ECF No. 156-25]

105.   The press release stated, "We are proud to be working alongside patriots from across the Peach State; Derek Somerville of Forsyth county [sic] and Mark Davis of Gwinnett county [sic] who have been leading citizen efforts to highlight issues in Georgia's voter rolls, Mark Williams of Gwinnett County who coordinated among eight print shops to get written challenges printed and delivered within 48 hours, and Ron Johnson of Jackson County and James Cooper of Walton County, who led the charge in recruiting hundreds of volunteer challengers across the state." [*Id.*]

106.   It was TTV's understanding that, when a voter's record was challenged, if the voter could not show a valid form of ID, the law required them to vote via a provisional ballot. A provisional ballot is kept separate from other completed ballots. The voter is given a set time period (generally a few days) in which to provide a valid ID. If the voter does not provide a valid ID, the vote is not

22

counted. If the voter does provide ID, the vote is counted. Similarly, TTV believed that if a mail-in ballot was received from a "challenged" voter record, the same process should have been followed.

107.   Some counties published the list of challenged voters and the names of the submitting electors.

**OPSEC Methodology**

108.   TTV hired OPSEC in 2020 to create a list of registered Georgia voters to be challenged under O.G.C.A. § 21-2-230 as having changed their residency. [Defs.' SUMF ¶ 19, ECF 155-2] TTV contracted with OpSec to prepare analysis for all Georgia counties.

109.   OPSEC was founded in 2020 by Gregg Phillips. [OpSec/Phillips Tr. 36:17–19, ECF No. 167-1; Defs.' SUMF ¶ 38]

110.   There are multiple reasons why an individual who has not changed their residence may nonetheless submit a change of address form through the United States Postal Service.

111.   For example, Defendants knew that Georgia residents who temporarily relocate due to military service remain eligible to vote in their previous jurisdiction in Georgia. [TTV Resp. to First Interrogatories, No. 7; OPSEC/Phillips Tr. 125:12–18]

112.   In preparing the challenge lists, OPSEC accepted partial matches, where individuals in the voter file and NCOA registry had the same first and last names but *different* middle initials or *different* name suffixes (e.g., Jr. or Sr.). [OPSEC/Phillips Tr. 122:1–16]

113.   OpSec's process could not confirm whether an individual re-registered at the address to which the NCOA suggested the individual forwarded mail.

114.   No records in TTV's challenge file show registrant middle names or name suffixes.

115.   TTV's challenge file included 1,325 records that link to multiple voters in the voter file with the same first name, last name, street address, apartment number, city, and zip code.

116.   TTV's challenge file included 15,360 records that do not list an address where the registrant is believed to have moved to.

117.   TTV's challenge file included 9,270 records that list a city name in the ZIP code field for a registrant's address.

118.   TTV's challenge file included 263 records where the registrant's name does not match a name in the voter file.

119.   TTV's challenge file included at least 6,377 registrants who

subsequently re-registered at their new address.

120.   TTV's challenge file included 145 registrants who were not alleged to have moved to a different county.

121.   TTV's challenge file included 397 registrants alleged to move moved to a new address on a military installation.

122.   TTV's challenge file included 22,956 registrants alleged to have moved to a city near a military installation.

123.   TTV's challenge file included at least 34,578 registrants alleged to have moved to a city with a college or university.

124.   TTV's challenge file included at least 336 individuals who were not registered to vote in Georgia.

125.   Not all of the Defendants agreed with TTV's methodology; for instance, Mr. Davis told Gregg Phillips while they were planning their respective voter challenge lists that he "was not on board with the philosophy surrounding [TTV's] challenge," as "it was too broad," and Mr. Davis sought to make the Davis/Somerville Challenge list "more legitimate, more smaller." [Davis II Tr. 94:14–17]

**Joe Martin**

126.   Joe Martin, Chair of the Taliaferro County Republican Party, volunteered to submit TTV's challenge in his county. [Martin Tr. 20:17–22:7]

127.   TTV's challenge list for Taliaferro County contained 37 names. [*Id.* 60:7–14]

128.   Mr. Martin requested to see the list before any challenges were submitted. [*Id.* 43:19–44:6]

129.   On December 17, 2020, Mr. Martin submitted letters challenging only three registrants from TTV's list; each had requested an absentee ballot for the runoff elections. [*Id.* 55:7–12, 59:20–60:16; Martin 0001; Martin 0002; Martin 0003]

130.   On December 18, 2020, TTV submitted challenges to all 37 voters on the Taliaferro County challenge list in Mr. Martin's name. [TTV 1833; Martin Subpoena Resp. No. 5; Martin Tr. 52:22–53:4]

131.   Mr. Martin was not aware that TTV had submitted challenges to the full list of 37 voters in his name and, upon learning of this at a later date, was "shocked" to learn that TTV had proceeded without his permission. [Martin Tr. 57:13–15]

132.   On December 18, 2020, Mr. Martin withdrew his challenges to two of

the three registrants he personally challenged; he withdrew the third challenge on December 22, 2020. [Martin 0001; Martin 0002; Martin 0003]

133.   On December 20, 2020, Mr. Martin asked TTV to "hold" challenging in his name the full list of 37 voters on TTV's challenge list for Taliaferro County. [TTV Resp. to 2d Interrog. Resp. No. 11; Engelbrecht/TTV Tr. 327:10–15] He noted that two of the three challengers were residents in long-term care and were eligible to vote in Taliaferro County.

134.   Mr. Martin also withdrew his challenges to the subset of three voters he had initially challenged to avoid putting the registrar through the "painful process of validating" any other individuals on TTV's Taliaferro County challenge list. [Martin Tr. 78:4–9]

135.   On December 21, 2020, TTV withdrew the challenge to 37 registrants in Taliaferro County that it had submitted in Mr. Martin's name on December 18. [TTV Resp. to 2d Interrog. Resp. No. 11; Defs.' SUMF ¶ 35]

**Additional SOS Investigation**

136.   After the November 2020 election, Frances Watson, the Georgia Secretary of State's Chief Investigator, mailed surveys to "voters that had filed a National Change of Address form (NCOA) and also requested an Absentee Ballot emailed to [an] out of state address[.]" [Pls.' Opp'n MSJ Ex. 60, ECF No. 174-19]

137.   Ms. Watson received 1,066 responses to the questionnaire. [*Id.*]

138.   From those surveys, the SOS found that 99% of the individuals in this survey remained eligible to vote in Georgia. [*Id.*]

139.   Only 13 voters (1.2195%) reported relocating in the months before the November 2020 election. [*Id.*]

140.   Based on the SOS's analysis, most of the surveyed voters forwarded their mail because they were active military, visiting family, temporarily traveling for a job assignment, or for other innocuous reasons, but had not moved. [*Id.*]

**Publicity and Collaboration**

141.   In its December 14, 2020 press release, TTV announced a partnership with the Georgia GOP. [Pls.' MSJ Ex. 21, ECF No. 156-24]

142.   One of the recruiting emails for the TTV challenges claimed that if the challenges had occurred in October, "it is very likely Trump would have won Georgia." [Def Williams 0389]

143.   Volunteers responded to recruiting emails stating that TTV could use their names and signatures to "challenge the illegal votes." [Pls.' MSJ Ex. 35, Dec.15, 2020, ECF No. 156-38; Pls.' MSJ Ex. 36, ECF No. 156-39; Pls.' MSJ Ex. 37, ECF No. 156-40; Ex. 38, ECF No. 156-41; *see also* TTV/Engelbrecht Tr. 236:6–243:19]

144.   On November 29, 2020, Mr. Davis and Mr. Somerville published a Facebook post about a scenario in which a voter dubbed "Dave" was alleged to have illegally voted in Georgia despite living in New York. In response, one individual wrote: "Can we start turning people in for election fraud? I have a list of a few people who should be made sorry they voted in two states." [Pls.' MSJ Ex. 25, ECF No. 156-28]

145.   Mr. Davis "liked" the message. [*Id.*]

146.   On December 4, 2020, Mr. Somerville and Mr. Davis published another post about voters registered with UPS store P.O. boxes. [Pls.' MSJ Ex. 26, ECF No. 156-29]

147.   Someone commented, "I think a search warrant is in order here," to which Mr. Davis responded, "great idea!" [*Id.*]

148.   A second individual commented on this post: "Let's see if anyone has the balls to prosecute to the max or if they will just get a hand slap!" [*Id.* at 4]

149.   A third individual commented on a post which contained allegations about another voter, also dubbed "Dave," who was allegedly voting in both Georgia and North Carolina: "Hang that prick!!!" [Pls.' MSJ Ex. 27, ECF No. 156-30]

150.   On about December 15, 2020, Mr. Johnson notified Mr. Somerville

29

that True the Vote was also working with Georgia voter rolls, and it was planning to facilitate voter challenges. That same day, Somerville spoke briefly with Ms. Engelbrecht and they agreed to meet for dinner, along with Gregg Phillips.

151.   At dinner, Ms. Engelbrecht revealed that TTV was compiling a challenge list encompassing voters in all 159 counties in Georgia and intended to submit challenges on behalf of challengers in all of them.

152.   Mr. Somerville saw that TTV's planned challenges were to be on a significant scale, of several hundred thousand voters. The two groups of challenge-makers discussed some data definitions.

153.   On December 20, 2020, a group called "Crusade for Freedom" posted: "We just prospectively challenged the eligibility of 360,000 voters in GA. Largest single election challenge in Georgia and American history." [Pls.' MSJ Ex. 23, ECF No. 156-26]

154.   Two days later, Crusade for Freedom tweeted: "If the Georgia counties refuse to handle the challenges of 366,000 ineligible voters in accordance with the law, I plan to release the entire list so America can do the QC." [*Id.*; TTV/Engelbrecht Tr. 264:17–265:3]

155.   Both   tweets   contained   the   hashtags   #eyesonGA   and #validatethevoteGA. [Pls.' MSJ Ex. 23, ECF No. 156-26]

**Other TTV Programs**

156.   Consistently over a number of election cycles, TTV has hosted a hotline that is available online and uses a toll-free number. TTV Tr. 81:16-21.The election integrity hotline had live operators taking calls starting in late September of 2020. TTV Tr. 82:18-21.

157.   During the 2020 election cycle TTV's national election integrity hotline came to be associated with Validate the Vote. TTV Tr. 68:16-69:7; 81:22-82:4.

158.   TTV referred easily answered questions or concerns to the official websites of the relevant government entities. TTV Tr. 85:13-20.

159.   TTV received no reports relevant to Georgia at the time of the runoff that required follow-up or reporting contact information to appropriate authorities. TTV Tr. 93:17-95:3; TTV's Amended Responses to Plaintiffs' Second Requests for Production (Jun. 18, 2021) ("TTV Am. Resp. 2d RFP"), Ex. G, Resp. No. 18.

160.   During the runoff period, TTV made available training for signature verification and absentee ballot training. TTV Tr. 96:5-102:6.

161.   In conjunction with its work on the Challenge List, TTV established a "bounty" to compensate people who reported information.

162.   The funds were also used to support litigation in several states in regard to the November 2020 presidential election. TTV Tr. 316:3-12.