# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| FAIR FIGHT, INC., SCOTT BERSON, JOCELYN HEREDIA, and JANE DOE,<br><br>Plaintiffs,<br><br>v.<br><br>TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1-10,<br><br>Defendants. | **Civil Action No.**<br>**2:20-cv-00302-SCJ** |

## DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR DISCOVERY SANCTIONS

Defendants submit their Opposition to Plaintiffs' Motion for Discovery Sanctions (Dkt. 242; hereafter, "Motion" or "Mot."). While neither Defendants nor the undersigned condone the conduct of Defendants' prior counsel during the depositions of Defendants Engelbrecht and Phillips, there are sound reasons to deny Plaintiff's Motion, including because the adverse inferences Plaintiffs seek (1) relate to evidence irrelevant in this case, which should be minimized at trial for reasons of judicial economy in any event, (2) improperly seek to prejudice Defendants who were *not* responsible for or even involved in the allegedly offending deposition

1

conduct, (3) lack the required corroboration from independent evidence, (4) are speculative and illogical and thus will not advance any finding of fact in this matter; and (5) seek not just the customary adverse inference that a witness' testimony "*would be unfavorable,*" but in violation of the First Amendment seek to force words into those witnesses' mouths.

## INTRODUCTION

Plaintiff's grievances over the conduct of prior counsel may be understandable. Their citations may be well-taken. It's only in the final pages that Plaintiffs' Motion goes off the rails, as they ask to spend their equitable cash on the legal equivalent of cotton candy.

Plaintiffs seek adverse inferences on three mixed questions of law and fact, some of them, impermissibly, matters of "ultimate fact". The first seeks an adverse inference (hereafter, "**Phillips' Forced Speech**" or "#1") that not only forces the words "invalid and unreliable" into Defendant Phillips' mouth but also seeks to prejudice two innocent bystanders to prior counsel's deposition hijinks – Defendants Davis and Somerville.

The second wrangles an inference about the source of the @Crusade4Freedom tweet (hereafter, "**Tweets' Arbitrary Source**" or "#2") that is no more likely than several alternatives and that is irrelevant where no Plaintiff is alleged to have seen it and been intimidated. And the third proposed inference (hereafter, "**TTV's Forced**

**Coordination**" or "#3") seeks to elevate the historical opposition research of Plaintiffs' lawyers, regarding Mr. Phillips' statements in 2016 about that year's presidential election, into a highly specific, tendentious inference (that he "coordinated" with TTV about claims "lacking foundation") that prejudices a corporate defendant, True the Vote, lacking vicarious liability for his statements, and seeks a legal conclusion about the foundation of certain Defendants' speech that's not at issue here.

And one more thing is clear: Plaintiffs can simply ask their questions at trial, and leave to this Court, as fact finder, whether Defendants' responses are credible. That's all inferences can do in a bench trial anyway – weigh on credibility.[1] Given the many fatal defects with each requested adverse inference, it is helpful to lay out their manifold deficiencies in a table, Table 1:

|  | **#1 Phillips' Forced Speech** | **#2 Tweets' Arbitrary Source** | **#3 TTV's Forced Coordination** |
|---|:---:|:---:|:---:|
| Not relevant, esp. where lawyers are only witnesses | ✔ | ✔ | ✔ |

---

[1] "The instruction itself is a standard charge on credibility". *United Broad. Co. v. Armes*, 506 F.2d 766, 770 (5th Cir. 1975) (noting adverse inferences are limited to saying unspoken testimony "would have been unfavorable to").

The Federal Jury Practice and Instructions, § 105:10, on "Effect of refusal of witness to answer, state, "The fact a witness refuses to answer a question after being instructed by [the judge] to answer it [at trial] may be considered by the jury as one of the factors in determining *the credibility of the witness and the weight his or her testimony deserves*." 3 Fed. Jury Prac. & Instr. § 105:10 (6th ed.) (emphasis added) (citing also 1A Fed. Jury Prac. & Instr. § 15:11 (6th ed.) (§ 15:11. Credibility of witnesses—The refusal of witness or defendant to answer).

| | | | |
|---|---|---|---|
| Exceeds "would be unfavorable" to make tendentious inference | ✓ | ✓ | ✓ |
| Forces speech into witness' mouth | ✓ | | ✓ |
| Prejudices innocent bystanders | ✓ | | ✓ |
| Less plausible than alternatives | ✓ | ✓ | ✓ |
| Not corroborated by other evidence | ✓ | ✓ | ✓ |

## ARGUMENT

### I. The Historical Research by Plaintiffs' Lawyers into the TTV Defendants' Prior Speech (#1-3) is Irrelevant to Plaintiffs' Claims of Intimidation, and It Would Be Unconstitutional as Applied.

Federal Rule of Evidence 402 provides that "[i]rrelevant evidence is not admissible." By the same token, a party who seeks an adverse inference must, first, show that the inference would be relevant. *See Klipsch Grp., Inc. v. ePRO E-Commerce Ltd.*, 880 F.3d 620 (2d Cir. 2018) (citations omitted) (holding, in analogous case in which a party seeks discovery sanctions on the basis of spoliation of evidence, the moving party must show "that the destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of fact could find that it would support that claim or defense"); *S.E.C. v. Monterosso*, 746 F. Supp. 2d 1253, 1263 (S.D. Fla. 2010) ("Any inferences drawn must also be relevant").

Plaintiffs simply assume, without showing, that Phillips' statements about the 2016 election (#1), the @Crusade4Freedom tweet (#2), and TTV's "coordinating" on claims of election fraud (#3) all constitute relevant evidence of intimidation, notwithstanding that no Plaintiffs or other voters are alleged to have known of the statements. Plaintiffs have built much of their case on such historical opposition research, which rests on the shaky constitutional ground of statements witnessed only by their lawyers: (1) statements about selected Defendants' prior *speech*; (2) some of the speech occurred well before the 2020 election or wasn't directed at Georgia's voters or both, (3) the speech was unearthed by Plaintiffs' attorneys *after* the alleged intimidation here took place, and, crucially, (4) the speech is not alleged to have been witnessed by a single voter, let alone by the voter-Plaintiffs (collectively, "Historical Lawyers' Research"). But historical speech, dug up by Plaintiffs' lawyers and not proven to have been witnessed by anyone but them, is irrelevant to Plaintiffs' claims of intimidation, is divorced from any intimidation allegation against Defendants, and thus would be unconstitutionally vague and overbroad if applied to impose Section 11 (b) liability onto these facts. Any such inferences should be rejected.

This is not a historians' competition. It is a legal action subject to due process safeguards and considerations, as well as the rules of evidence. The problems with factoring in Historical Lawyers' Research in determining whether a party has

established causation are obvious, and the absurdity of treating such research as "evidence" becomes clear, when we ask, *When did the intimidation arising out of the Historical Lawyers' Research occur, exactly? Did the intimidation happen the moment Plaintiffs' lawyers unearthed the fact during their research? Or were Plaintiffs only intimidated when their lawyers informed them of the historical speech, or when the Plaintiffs read about it in the Complaint?*

Moreover, the Historical Lawyers' Research purports to uncover general statements Defendants or others made without reference to Plaintiffs - or any other voter, and thus Plaintiffs have failed to allege the necessary scienter – that is, reckless disregard of a substantial risk of harm – that *Counterman v. Colorado,* 600 U.S. ----, 143 S.Ct. 2106 (2023)*,* now requires of restrictions on speech that is not a true threat:

> the First Amendment may still demand a subjective mental-state requirement shielding some true threats from liability. The reason relates to what is often called a chilling effect. Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not.

*Counterman,* 143 S. Ct. at 2115. *Counterman* holds that the required "subjective mental-state requirement" for restrictions on speech is recklessness, which is "morally culpable conduct, involving a deliberate decision to endanger another." *Id.* at 2117 (citation omitted). "In the threats context, it means that a speaker is aware

that others could regard his statements as threatening violence and delivers them anyway." *Id*. (citation omitted). *Counterman*'s requirement applies to speech in both civil and criminal actions.[2] Defendants' prior speech contained in the Historical Lawyers' Research fails to meet these requirements. Under F.R.E. 402, evidence not relevant to a matter should be excluded, not elevated into presumed fact.

## II. All Three Adverse Inferences (#1-3) Must Be Limited to an Inference that a Factual Lacuna "Would Not Be Favorable".

Plaintiffs seek inferences they've tailored into specific sentences that they might plug into their arguments of law and ultimate fact. But an adverse inference simply means an inference that a thing is not in a party's favor. That is, *We infer you did not answer the deposition question because, adversely to you, the answer would have been unfavorable*. An adverse inference does not go on to put words in the

---

[2] While *Counterman* analyzes a criminal statute, its standard applies with full force to civil actions. In language as applicable to Section 11(b) as to true threats, the Court explained, "Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. Or he may simply be concerned about the expense of becoming entangled in the legal system. The result is 'self-censorship' of speech that could not be proscribed—a 'cautious and restrictive exercise' of First Amendment freedoms." *Id*. at 2116 (citations omitted).

The dissent by Justice Barrett also makes clear that "this case is about the scope of the First Amendment, not the interpretation of a criminal statute. Accordingly, the Court's holding affects the civil consequences for true threats just as much as it restricts criminal liability." *Id*. at 2140. Moreover, in this case, as in a criminal case, Plaintiff is exercising the power of the state against Defendants. Indeed, Plaintiff here is asserting1 little more than a general interest in seeing "that the Nation's laws are faithfully enforced." *See Steel Co. v. Citizens for Better Env't.*, 523 U.S. 83, 107 (1998). Plaintiff is effectively acting as an arm of the executive branch.

silent witness's mouth, especially where, as here, the deposition context doesn't support the inferences.

Even when an adverse inference isn't putting words into a party's mouth, it still does not exceed its proper role — a thumb on the scale of credibility — to become a specific *statement*, like "Mr. Phillips believes Mr. Davis' process to be invalid and unreliable", "TTV is responsible for the @Crusade4Freedom tweets," or "Mr. Phillips coordinated with TTV to make baseless claims of election fraud back in 2016." The cases Plaintiffs cite show that, far from putting in parties' mouths tailor-made sentences that are *non sequiturs* or otherwise not supported by either the context of a statement in a deposition or corroborating evidence, adverse inferences are far more general: they simply establish that a deponent's testimony "***would not have been favorable***." *See United States v. A Single Fam. Residence & Real Prop. Located at 900 Rio Vista Blvd.*, 803 F.2d 625, 630 n.4 (11th Cir. 1986) (concluding "[t]he district court drew a permissible inference" from deponent's failure to testify "that [deponent's] testimony *would not have been favorable* to the claim") (emphasis added). For example, in *VirnetX Inc. v. Cisco Sys., Inc.*, No. 6:10-CV-417, 2012 WL 7997962, at *6 (E.D. Tex. Aug. 8, 2012), the court outlined an adverse inference instruction to the jury, adverse to Apple, that would simply say "that had Apple's counsel not terminated [the] deposition, the testimony provided *would have been unfavorable* to Apple." (emphasis added). Similarly, "the accepted rule is that failure

to explain facts and circumstances warrants the inference that his testimony *would have been adverse.*" *N. Sims Organ & Co. v. Sec. & Exch. Comm'n*, 293 F.2d 78, 80–81 (2d Cir. 1961) (emphasis added); *see also* 19 C.F.R. § 210.33 (providing that for "[f]ailure to make or cooperate in discovery", administrative law judge may "[i]nfer that the admission, testimony, documents, or other evidence *would have been adverse* to the party") (emphasis added).[3]

---

[3] *See also Kronisch v. U.S.,* 150 F.3d 112 (2d Cir. 1998) ("a party's destruction of evidence which it has reason to believe may be used against it in litigation suggests that the evidence was harmful to the party responsible for its destruction"); *SEC v. N. Am. Plan. Corp.*, No. 72 CIV. 3158, 1975 WL 4509, at *7 (S.D.N.Y. Sept. 25, 1975) ("where Fish remained absent from the hearing after being advised that the Trustee desired his testimony, an inference is permitted that examination of Fish by the Trustee *would have tended to support* the Trustee's objection to the $4,000 payment") (emphasis added); *Rad Services, Inc. v. Aetna Casualty & Surety Co., 808* F.2d 271 (3d Cir. 1986) (making clear the limited nature of an adverse inference jury instruction where the "district court instructed the jury that it could, but need not, infer that the witnesses *would have answered Aetna's questions adversely* to RAD") (emphasis added); *United States ex rel. Fesenmaier v. The Cameron-Ehlen Grp.*, 13-cv-3003 (WMW/DTS) (D. Minn. Jan. 22, 2023) (noting "a reasonable factfinder could conclude that Tiffany's invocation [of the Fifth Amendment] makes it *more probable* that Tiffany was engaged in the activities described in other testimony admitted during trial") (emphasis added); *U.S. v. Colasuonno*, No. 05 Cr. 1110 (AKH) (S.D.N.Y. Oct. 24, 2006) ("I hold that the witness may testify may on direct; that the defendants may ask questions on cross-examination that elicit the witness's assertion of his Fifth Amendment rights; and that if this occurs, the jury is entitled to an adverse inference instruction *explaining what it may, but is not required to, infer* from the witness's refusal to answer certain questions").

Similarly, "when a party fails to produce evidence which it is peculiarly within his power to give, one (be he layman or hearing officer) is justified in inferring that the evidence *would not be favorable* to its withholder." *Vlisidis v. Holland*, 150 F. Supp. 678, 683 (E.D. Pa.), aff'd, 245 F.2d 812 (3d Cir. 1957) (emphasis added). "The basis of the 'missing witness' inference is that, where a party fails to call an available witness whose testimony could be expected to favor him, a natural inference arises that that witness would have exposed facts Unfavorable to that party." *United States v. Busic*, 587 F.2d 577, 586 (3d Cir. 1978), rev'd, 446 U.S. 398 (1980) (citing *Graves v. United States*, 150 U.S. 118, 121 (1893); *Burgess v. United States*, 440 F.2d 226 (1970); 2 Wigmore, Evidence, 162 s 289 (3d Ed. 1940)).

Plaintiffs cite no case law indicating adverse inferences may consist of specific statements formulated by a party, such as that another party's process is "invalid and unreliable." Adverse inferences generally relate to the burden of proof, not to specific findings of fact created by a party's lawyers. *See, e.g., Sec. & Exch. Comm'n v. Calmes*, No. 09-80524-CIV, 2010 WL 11505260, at *4 (S.D. Fla. Nov. 19, 2010) (finding it "appropriate to instruct the jury that it may draw adverse inferences *with respect to* the four areas of inquiry set forth above that were posed to Shulman during his deposition and to which he invoked the Fifth Amendment", without attempting to conclude what those inferences would say). While the court in *Sagax Dev. Corp. v. ITrust, S.A.*, 2021 WL 5360121 (S.D.N.Y. 2021) agreed to several more specific adverse inferences, they were grounded in substantial corroborating evidence based on the terms of the parties' written agreement, and were justified where the party representative had, unlike Defendants here, ignored a "clear and ambiguous" court order; had himself engaged in bad faith; and had made clear to the court that his company would "not participate in discovery 'regardless of any sanctions imposed.'" Whereas the court there noted "[i]t is axiomatic that a court may not punish without finding misconduct that merits the punishment," *id.* at *9, Defendants here have not been credibly accused of such misconduct. Only their lawyer has.

Justice Brandeis' maxim about the probative value of silence — "Silence is often evidence of the most persuasive character," *U.S. ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 154-55 (1923) — makes clear that it is the silence itself that is probative. Nothing need be, or should be, added to silence to turn silent witnesses into mouthpieces for a party. *See LiButti v. United States*, 107 F.3d 110, 124 (2d Cir.1997) (holding that "the weight to be accorded to adverse inferences" lies in the witness' silence); *Monterosso*, 746 F. Supp. 2d at 1263 (applying adverse inferences to witness' silence without specifying manufactured content).

Put differently, an adverse inference is akin to the factual inferences a court must view as "in a light most favorable" to the non-moving party on summary judgment. *See Frederick v. Sprint/United Mgmt. Co*., 246 F.3d 1305, 1309 (11th Cir. 2001) (setting forth standard). At most, an adverse inference would hold that a party had not done something the party was obliged to do but about which he had refused to answer. *See Reckitt Benckiser Inc. v. Tris Pharma, Inc.*, No. CIV.A. 09-3125 FLW, 2011 WL 4962221, at *3 (D.N.J. Oct. 18, 2011) (discussing "imposing an adverse inference" that certain work regarding a patent "was never conducted").

### III. Three Inferences (#1-3) Must Fail Because Plaintiffs Have Failed to Provide the Necessary Corroborating Evidence.

The court in *Kontos v. Kontos*, (S.D.Ind. 1997), 968 F. Supp. 400, 409 (S.D. Ind. 1997) could have been describing Plaintiffs here when it observed, "Plaintiff asks the court to substitute speculation for evidence." That is because a court may

draw an adverse inference only if there is independent evidence corroborating it. *See The Learning Experience Sys. v. Collins*, 20-CV-2504 (MKB), at *20 (E.D.N.Y. Sep. 7, 2023) (requiring "independent, corroborative evidence of wrong-doing"); *Me Tech., Inc. v. Brownstein,* No. 20-61508-CIV, 2020 WL 5803486, at *3; (S.D. Fla. Sept. 14, 2020)*, report and recommendation adopted,* No. 20-61508-CIV, 2020 WL 5800998 (S.D. Fla. Sept. 29, 2020)*; U.S. ex rel. DRC, Inc. v. Custer Battles, LLC*, 415 F. Supp. 2d 628, 636 (E.D. Va. 2006) (granting "those few [adverse inferences] that related to the heart of the alleged fraud, and which have the most reliable basis"). There can be no adverse inference against a party where the available facts are silent on the topic:

> [A]n adverse inference can be drawn when silence is countered by *independent evidence* of the fact being questioned, but that same inference cannot be drawn when, for example, silence is the answer to an allegation contained in a complaint. In such instances, when there is no corroborating evidence to support the fact under inquiry, *the proponent of the fact must come forward with evidence to support the allegation, otherwise no negative inference will be permitted.*

*Akers v. Prime Succession of Tenn., Inc.*, 387 S.W.3d 495, 506 (Tenn. 2012) (emphases added).

So adverse inferences aren't just made up, willy-nilly and off-the-cuff, to suit a party's narrative. They're a cherry on top of corroborating evidence the party already has.

In the analogous criminal context, the Supreme Court in *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976), explained adverse inferences were acceptable when a party "refuse[s] to testify *in response to probative evidence offered against them*." (emphasis added). Adverse inferences aren't automatic awards penalizing another party's declining to testify: they must be founded on "other evidence." *See In re Justice*, No. 20-5479, at \*15 (6th Cir. Aug. 26, 2021) (holding "if some other evidence the Board presented *corroborated a fact* that Justice refused to speak to, the Hearing Panel could take Justice's silence as evidence for that fact. The Hearing Panel *could not ... automatically take an adverse inference* against Justice … for declining to testify") (emphases added).

In a detailed opinion examining the constitutional necessity of corroborating evidence for an adverse inference in the similar criminal context, the court in *Kontos*, 968 F. Supp. at 408-09, cited numerous cases[4] for a proposition well-explained by the Seventh Circuit stated in *LaSalle Bank Lake View v. Seguban*:

> Thus, although "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them," an analysis of that evidence is nonetheless required. *Silence is a relevant factor to be considered in light of the proffered evidence*, but the direct inference of guilt from silence is forbidden.

---

[4] *See, e.g., United States v. Stelmokas,* 100 F.3d 302, 311 (3rd Cir. 1996); *United States v. Incorporated Village of Island* Park, 888 F. Supp. 419, 445 (E.D.N.Y. 1995) (the government may rely on a defendant's assertion of his privilege against self-incrimination to show intent only if that inference is supported by independent evidence).

54 F.3d 387, 390 (7th Cir. 1995) (emphasis added) (quoting *Baxter,* 425 U.S. at 318, 96 S.Ct. at 1558). Consequently, "the entry of judgment based only on the invocation of the privilege and 'without regard to other evidence' exceeds constitutional bounds." *Seguban,* 54 F.3d at 391 (quoting *Baxter,* 425 U.S. at 318).54 F.3d at 391 (quoting *Baxter,* 425 U.S. at 318).

For example, in *United States v. Hernandez*, 18-20783-CIV-ALTONAGA/GOODMAN, at *10 (S.D. Fla. June 30, 2023), the court addressed a situation, like Plaintiffs' here, where the adverse inference sought would be the *only* evidence for a fact. The court rejected allowing an adverse inference in such a case, saying, "if an adverse inference were to be applied against Hernandez, then *it could be the only evidence against him* on this allegation. If that were to occur, then it would run afoul of the rule that a court should draw an adverse inference only if there is independent evidence corroborating it."

A paradigmatic example comes from *In re Breedlove*, Case No. 04-11096-R, Adv. No. 04-1116-R (Bankr. N.D. Okla. Jul. 9, 2007), where the court began by listing the corroborating evidence – "The Court concludes that the Bank presented sufficient evidence that the vehicles listed on Breedlove Exhibit 15 were sold and that proceeds were not paid to the Bank" – and only then added on top of it the adverse inference that supported the corroborating evidence: "and the Court further

draws an adverse inference from Breedlove's failure to deny that the sales occurred and failure to deny that the proceeds were not paid to the Bank."

Moreover, "a plaintiff must present corroborating evidence regarding *the specific fact* to which the defendant refuses to answer." *Akers*, 387 S.W.3d at 506-07 (citing cases). Here, Plaintiffs seek easy wins on propositions for which they have adduced no corroborating evidence. Regarding Mr. Phillips' Forced Speech, it's clear that evidence of his opinion of Mr. Davis' process, irrelevant and prejudicial as it may be, is solely contained in the excerpted deposition testimony. There is no other source of what he may think or believe that can substitute for the deposition testimony. Regarding his "coordination" with TTV in talking about election fraud, there's no other evidence Mr. Phillips conspired with TTV (to use Plaintiffs' randomly-chosen party) to talk about election fraud, and there's certainly no other evidence in this case to say that any such claims "lacked foundation," as Plaintiffs would have it. Finally, Plaintiffs have produced and can produce no corroborating evidence the @Crusade4Freedom tweets were made by TTV as opposed to any other party, plaintiff or defendant, or a third party, or even an automated bot. When Plaintiffs can't say whether the author of the tweets was even a human, we know we're not in the truth-finding territory of appropriate adverse inferences. *Cf.* "The overarching concern is fundamentally whether the adverse inference is trustworthy under all of the circumstances and will advance the search for the truth." *New*

*Hampshire Ins. Co. v. Blue Water Off Shore, LLC*, No. CIV.A. 07-0754WSM, 2009

WL 792530, at *8 (S.D. Ala. Mar. 23, 2009) (quoting *LiButti* 107 F.3d at 124).

## IV. Plaintiffs Seek to Make Phillips' Forced Speech (#1) Inference Do Things No Inference Can Do.

Plaintiffs' desired inference forcing words about Mr. Davis' process into Mr.

Phillips' mouth suffers from even more flaws than the three above.

### A. Phillip's Forced Speech (#1) Improperly Concludes a Matter of Law

Adverse inferences should be matters of fact, not law. *See In re Classicstar*

*Mare Lease Litig.*, MDL No. 1877, at *4-5 (E.D. Ky. Apr. 9, 2012) (distinguishing

between sanctioned party being "estopped from introducing evidence which is

contrary to the factual assertions set forth by [the movant] while remaining free "to

make argument with respect to the legal conclusions to be drawn from those facts").

At least absent extreme misconduct by a party (as opposed to their lawyer), adverse

inferences should also not be made, prejudicially, on ultimate issues of fact. *Eagle*

*Hosp. Physicians, LLC v. SRG Consulting, Inc.*, 561 F.3d 1298, 1304 (11th Cir.

2009) ("[A] dismissal following the invocation of a party's Fifth Amendment

privilege 'violates the Constitution where the inferences drawn from Fifth-

Amendment-protected silence are treated as a substitute for the need for evidence on

an ultimate issue of fact'") (citing *Avirgan v. Hull*, 932 F.2d 1572, 1580 (11th Cir.

1991)). But Mr. Phillips' statement from the deposition, which the Court may

appreciate in its full context, is the relevant fact, while Plaintiffs' proffer of Mr.

Phillips' revised and reductive opinion (that an entire process is "invalid and unreliable") is a matter of law or ultimate fact.

Whether Mr. Davis' process is "invalid and unreliable" is clearly a matter of law or ultimate fact, not something that Plaintiffs can request be deemed by fiat, whether from this Court or Mr. Phillips' imaginary words. Plaintiffs are not entitled to force a conclusion of law onto a party, nor do the Rules of Evidence care about the resulting conclusion, which is clearly irrelevant. But the forcing of speech is its own problem, and one we believe is independently fatal to Plaintiffs' effort to make an inference beyond "would not have been favorable."

### B. Forcing Phillips to Testify to Something Very Different From What He Said or Believes (#1) Would Violate His First Amendment Right to Be Free of Speech Mandated by the Government

Forcing an adverse inference upon a party beyond what he has said or believes is nothing less than compelled speech. Forcing Mr. Phillips to say that what he meant by "That's bad process" is "That process is invalid and unreliable" is compelled speech. In the criminal context, compelled speech in the form of improperly constituted adverse inferences is unconstitutional on grounds it is "self-incriminating" by the defendant into whose mouth the admission of guilt is placed. "The Fifth Amendment to the Constitution of the United States provides that no person shall 'be compelled in any criminal case to be a witness against himself.'" *Akers*, 387 S.W.3d at 505 (quoting U.S. Const. amend. V). For the same reason,

forcing a witness to "testify" to specific words and beliefs, whether in a criminal or civil context, is a violation of the First Amendment prohibition on the government "abridging the freedom of speech." Compelled speech comprised of made-up words like "invalid and unreliable" violates this prohibition. "[F]reedom of speech includes both the right to speak freely and the right to refrain from speaking at all.'" *Reed v. Long*, 506 F. Supp. 3d 1322 (M.D. Ga. 2020) (quoting *Janus v. Am. Fed'n of State, Cty., & Mun. Emps., Council 31*, ⸻ U.S. ⸻, 138 S. Ct. 2448, 2463 (2018) (quotation marks and citations omitted); *Agency for Int'l Development v. Alliance for Open Society*, 591 U.S. ----, 140 S. Ct. 2082, 2091 (2020) (striking down a government rule that "requires recipients to espouse a government message"); *Wilkins v. Daniels*, 744 F.3d 409, 414 (6th Cir. 2014) ("As the First Amendment protects freedom of association and the corollary right not to associate, so too does it protect freedom of speech and the corollary right not to speak"); *Planned Parenthood of Ind. Inc. v. Comm'r of the Ind. State Dep't of Health*, 794 F. Supp. 2d 892 (S.D. Ind. 2011) (holding unconstitutional a requirement that medical practitioners involved in abortions services inform women seeking abortions that "objective scientific information shows that a fetus can feel pain at or before twenty weeks of postfertilization age" and that "human physical life begins when a human ovum is fertilized by a human sperm"); *Miller v. Mitchell*, 598 F.3d 139, 148 (3d Cir. 2010) (striking down "education program's required essay explaining how

[students'] actions were wrong" when the students didn't believe they were wrong).

Phillips' Force Speech inference should be denied for this *fifth* independent reason.

### C. Turning Defendant Phillips' Speculations About Mr. Davis' Process Into an Adverse Inference Has No Probative Value

Plaintiffs ask that this Court "find that Mr. Phillips considered Mr. Davis' challenge process to be invalid and unreliable." Mot. at 21. To be candid, Defendants are of two minds about this inference. Even if it were granted, it would amount to nothing: it is not probative, of anything, what Mr. Phillips thought about Mr. Davis' processes, and there can thus be no real prejudice to Defendants. But, while lack of relevance is grounds enough to deny an adverse inference, this one suffers from many defects that render it unsuitable as evidence worthy of this Court's time.

From the start of this case, Plaintiffs have attempted to yoke Defendants Davis and Somerville (for no apparently relevant reason) to the TTV Defendants. Plaintiffs began by performing no more due diligence on Davis, Somerville, and the other non-TTV Defendants, before filing suit against them, than to ask whether TTV had named them in its press release. TTV had, so Plaintiffs sued every person whom TTV thanked in its press release, copying their names directly into the Complaint without even changing the order of their names from the press release. And here we are again, with Plaintiffs arguing that Mr. Phillips' thoughts about Mr. Davis' methods are somehow more relevant than those of any person selected at random from the general population.

Mr. Phillips' speculations about just one of the many activities Mr. Davis undertook to build his independent challenge list can have no probative value as to whether the *entirety* of Mr. Davis' process was reasonable, or non-reckless. If an expert witness speculated about what a party was doing, based on obviously incomplete information, his speculation would be grounds for a valid objection. Plaintiffs laid no foundation for whether Mr. Phillips had experience using NCOA and its tools, such as CASS and DPV (Delivery Point Validation). But Mark Davis has made a living for decades using NCOA, *see, e.g.,* First Davis Tr. at 27.

Thus, Plaintiffs are simply overreaching here, attempting to foreclose matters of genuine debate with blanket "inferences" unrelated to the content of the pertinent deposition statements. For example, why infer that Mr. Phillips believed Mr. Davis' process was "invalid and unreliable" as opposed to, say, *confusing* to Mr. Phillips or *different from* Mr. Phillips' process? Why add "invalid"? Why interpose "unreliable"? Obviously, Plaintiffs are not creating a logical inference, one with a speck of corroborating evidence, but, rather, machine-tooling a tendentious inference to suit their case. This isn't how inferences, or the Federal Rules of Evidence, work.

But even if Mr. Phillips had an adequate foundation regarding Mr. Davis' process, his off-the-cuff comment about it would still have no probative value: Plaintiffs have not shown Mr. Phillips to be an expert on the process Mr. Davis

followed. Indeed, it was Plaintiffs themselves who moved this Court for a ruling that Mr. Phillips should be prohibited from opining on the reliability or accuracy of challenge lists on grounds he is not an expert. *See* Order, Dkt 221 at 4 ("Plaintiffs contend that the testimony offered by Phillips, Davis, and Somerville about the reliability of the algorithms used to make the voter challenge lists is impermissible lay witness testimony").[5] The Court agreed, saying, "Lay witnesses . . . *cannot make conclusions* on matters that would be specialized or require technical expertise." *Id.* at 5 (emphasis added). And the Court concluded Mr. Phillips "cannot testify about the accuracy or reliability of the data processes performed or the accuracy or reliability of the results obtained," *id.* at 6, which is exactly what Plaintiffs wish him to do about Mr. Davis' "unreliable" process.

Worse, the deposition transcript to which Plaintiffs point clearly show *Mr. Phillips had no knowledge of Mr. Davis' methods*, a lack of foundation that should destroy the evidentiary value of his speculations. There is no indication in the referenced deposition transcript that Mr. Phillips had any idea what Mr. Davis' *multi-step* "process" consisted of. The relevant exchange begins at page 102 (lines

---

[5] Plaintiffs also broadcast Mr. Phillips' lack of expertise on their website, *see* https://fairfight.com/ttv/ (publicizing Court's granting of motion in limine to "exclude improper expert testimony from Gregg Phillips" … "regarding the reliability of the algorithms used to make Defendants' voter challenge lists. The Court agreed with Plaintiffs that … the individuals could not testify as experts") and further denigrated his expertise in their own Motion, dismissing his "checkered employment history." Mot. at 13.)

14-22) of Mr. Phillips' deposition, where Plaintiffs' counsel, Mr. Shelly, shows him a NCOALink CASS processing summary report that followed what Mr. Shelly had characterized as Mr. Davis' "attempt to match the Georgia voter file with NCOA data". Mr. Phillips answered that he did not "use this particular tool" and thought it "irrelevant", though to what is not made clear.

```
13   BY MR. SHELLY:
14       Q.   So this is an NCOALink processing
15   summary report that was produced by Mr. Davis, who
16   attempted to match the Georgia voter file with
17   NCOA data.
18           Take a look at this and tell me, was
19   anything like this produced during your matching
20   process?
21       A.   We don't use this particular tool.  And
22   no.  It's irrelevant.
```

At page 103, Mr. Shelley shows Mr. Phillips a part of the NCOALink CASS certification report listing "counts for [the number of addresses with] insufficient data, address not found, multiple responses," and asks Mr. Phillips if he had "develop[ed] any similar counts" for his analysis. Mr. Phillips then expressly speculates, saying, "***my guess is*** he didn't user either CASS or DPV", although all the corroborating evidence says that Mr. Davis *did* employ CASS (which includes DPV). *See, e.g.*, First Davis Tr. at 22, 91-92. Mr. Phillips then "***suggests***" that

perhaps Mr. Davis "didn't clean the rolls as it relates to identity verification first or he wouldn't have this." (Emphases added).

```
 5        Q.   Do you see here, at the bottom left
 6   corner, there are some counts for insufficient
 7   data, address not found, multiple responses?
 8        A.   Yeah.
 9        Q.   Am I understanding correctly that you
10   did not develop any similar counts for your
11   analysis?
12        A.   No, my guess is he didn't use either
13   CASS or DPV.  And I would suggest that he didn't
14   clean the rolls as it relates to identity
15   verification first or he wouldn't have had this.
16   This is bad process.
17        Q.   Okay.  What should Mr. Davis have done?
```

In short, Mr. Phillips' subsequent statement about "bad process" does not refer to Mr. Davis' (and Mr. Somerville's) actions in compiling a potential challenge list at all, but to his "guess" about whether Mr. Davis might have *first performed identity verification*, whatever that is. Moreover, Plaintiffs aren't entitled to any inferences about Mr. Davis' use of NCOALink reports when, over the course of two depositions, they never asked him a single question about them. Where is the required corroboration?

As Mr. Phillips' reference to "guessing" makes clear, he was plainly speculating about what Mr. Davis *might* have done, based on incomplete information. It's also illogical to "infer" that Mr. Phillips personally believes Mr. Davis' process to be "invalid and unreliable" when Mr. Phillips never used anything

like those conclusory words. Speaking only of identity verification, he used a term considerably more pedestrian, vague, and less useful to Plaintiffs: "bad". Whatever that may mean. Plaintiffs are free to explain it to us in their closing argument.

Just as Plaintiffs plainly do not understand what Mr. Davis was doing or why, they did not show Mr. Phillips enough for him to gain such an understanding, and he inevitably speculated about it. Plaintiffs thus seek to turn one party's speculation into prejudice against other parties on an ultimate question in this case: whether Mr. Davis' process in facilitating the expressive speech of Section 230 petitions was so invalid and unreliable as to amount to recklessness under *Counterman v. Colorado*.

### D. Because Plaintiffs Clearly Misunderstand the Certifications Mr. Davis Used, Their Inference is Not Just Illogical But False

It is obvious that Plaintiffs do not understand Mr. Davis' process, including specifically the process of getting, from NCOALink's CASS certification, "counts for insufficient data, address not found, multiple responses": any voter address associated with error messages from CASS – the definitive Coding Accuracy Support System for U.S. addresses – *did not make it into his challenge file*. That is because where a CASS certification states that an address has insufficient data, or is not found, or suffers from multiple possible variations (or "responses"), that means a forwardable change of address match cannot be made. In building their challenge list, Davis and Somerville chose only NCOALink results in which the DLV_code equalled "M", which stands for "Forwardable Move" and evidences a valid domestic

address match.[6] All of the move-to addresses of those voters whom Mr. Davis identified as having moved passed CASS certification. As a result, there is no voter on the Davis-Somerville challenge list who did not file a change of address to a valid location.

Thus, when NCOALink returns errors like those cited by Plaintiffs, ***the associated addresses cannot and do not get on the challenge list***.[7] This is exactly how Mr. Davis responded: by not using the problematic addresses in his challenge file. Mr. Davis' use of CASS *removed* non-forwardable addresses from any challenge list, and thus was conservative. This is indisputably a valid and reliable process. In short, Plaintiffs' proposed adverse inference has gotten the truth exactly backwards, making it particularly inappropriate.

To the extent Plaintiffs are unable to grasp what Mr. Davis told them in his deposition, or what he did in his process, or why, the meaning of his actions is clearly too unclear to justify an inference of any kind. Plaintiffs should be required to question Mr. Davis and make their points at trial, and not on the thin record of their sparse deposition questions of a different party.

---

[6] *See* https://kb.blackbaud.com/knowledgebase/Article/51903 (accessed Sept. 12, 2023).

[7] Indeed, the existence of NCOALink errors also proves there were address issues in the voter file. That is, Mr. Davis ran CASS/DPV certification and then NCOA processing on the voter data *as it came from the Secretary of State's office*. He did not alter the underlying in any way. Thus, any record that failed CASS certification did so because it was problematic in the voter file.

**E. Phillips' Forced Speech Would Prejudice Other Parties.**

Plaintiffs have produced no case law holding that a court can, let alone should, use adverse inferences to penalize other parties, like Defendants Davis and Somerville. *Cf. United States ex rel. DRC, Inc. v. Custer Battles, LLC*, 415 F.Supp.2d 628, 634 (E.D. Vir. 2006) "Any adverse inferences must be relevant, reliable, and not unfairly prejudicial, confusing, or cumulative." Outcome-determinative sanctions that would establish key elements against an innocent party are simply improper. *See Peterson v. Aaron's, Inc*., No. 1:14-CV-1919-TWT, 2017 WL 385923, at *4 (N.D. Ga. Jan. 25, 2017) (finding "it would be inequitable to [a non-offending party] to order such outcome determinative sanctions" by barring other parties from presenting evidence); *see also United States v. Fifty Five Thousand Five Hundred Twenty Six ($55,526) Dollars In U.S. Currency*, No. 2:06-CV-997-MEF, 2007 WL 4365467, at *2 (M.D. Ala. Dec. 11, 2007) (denying adverse inference where it "necessarily would result in an adverse judgment against [the non-moving party] rather than merely stripping him of his most effective defense").

Plaintiffs' request that inferences be drawn against other parties who *did* answer deposition questions is much like one recently rejected by the court in *United States v. Hernandez*, 18-20783-CIV-ALTONAGA/GOODMAN, at *1 (S.D. Fla. June 30, 2023), where the United States had asked the court to "reach a permissive adverse inference against *both* Gimenez and Hernandez, based on Gimenez's

repeated invocation of the Fifth Amendment privilege" even though Hernandez, like

Defendants Davis and Somerville, had "fully testified. (emphasis added).

### V.  An Unknown Twitter Account's Use of a Defunct Organization's Logo and Common Hashtags Cannot Logically Be Construed to Mean *True the Vote* Made the Tweets (#2)

Plaintiffs have decided that Defendant Engelbrecht's following her former

counsel's instruction not to answer questions about the organization Time for a Hero,

which she formerly ran, must require the illogical inference that Defendant *True the

Vote,* of all entities, was "responsible for" tweets from a Twitter account, *unrelated

to Time for a Hero*, called @Crusade4Freedom. Plaintiffs' chain of inferences rests

on the perplexing grounds that the unknown person(s) or bots behind

@Crusade4Freedom (1) recycled Time for a Hero's logo, *see* Engelbrecht Tr. at 263,

and (2) used the same Twitter hashtags while engaging in speech in the same

Twittersphere of hashtags. *See* Exhibit A (employing @EyesonGeorgia) and B

(employing  @ValidatetheVote).  Plaintiffs'  desired  inference  that  TTV  was

responsible for the tweets is no more likely than that any of the citizen petitioners

not sued here were responsible for the tweets, or left-leaning provocateurs, or any of

the Internet's countless automated bots and other merry pranksters.

Inferences must be plausible, logical, and corroborated by other evidence. But

Plaintiffs' inference doesn't just lack corroboration but has no relationship to the

question that was pending. Plaintiffs' counsel's original question was "Have you

27

done any work with Mary Siegal?" *See* Mot at 17. However, the only plausible inference to be drawn from a non-response to "Have you done any work with Mary Siegal" is not "True the Vote tweeted from a particular Twitter account" but "Catherine Engelbrecht may have worked with Mary Siegal."

Plaintiffs' desired inference is no more likely than that third-party pranksters or provocateurs were pretending to have some role in the TTV Defendants' challenges. Plaintiffs may as well have demanded an inference that Gregg Phillips made the tweets, or that Defendant Ron Johnson (to pick a defendant at random, as Plaintiffs are doing) did. Indeed, Plaintiffs' desired inference that TTV was behind the Twitter account is no more likely than that parties allied with Plaintiffs were attempting to build a case of more Historical Lawyers' Research. To hold as a matter of ultimate fact that *TTV* made the tweets is no less absurd.

Plaintiffs point to the dangers of allowing deponents to escape questioning and instead to be coached in their correct answers. Fair enough. But Plaintiffs' concern makes no sense in the case of @Crusade4Freedom. It's simply implausible that, if Defendant Engelbrecht were associated with that Twitter account, she wouldn't have known (without counsel interrupting her) that admitting to it would harm her case. In other words, any coaching couldn't have been the but-for cause of her not admitting TTV engineered the tweets. Whether TTV did or not is a question

she may still be asked at trial, and her credibility assessed in light of any other corroborating evidence.

## VI. The Inference that Defendant Phillips Coordinated with Defendant TTV on Claims of Voter Fraud (#3) is Illogical, Unsupported, and Improperly Prejudicial to TTV

Plaintiffs' most confounding *non sequitur* holds that because Mr. Phillips did not answer questions about his claims of fraud in the 2016 election – claim that are not alleged to have been known to any voter-Plaintiff – the Court should simply "find that Mr. Phillips coordinated with TTV" – again, of all the people or entities – after that election, "to publicize allegations of illegal voting that lacked foundation." One must scratch one's head here. Clearly, Plaintiffs aim to use non-responses from two individual defendants to manufacture inferences helpful in creating liability for *TTV*. But TTV was not responsible for or connected to Mr. Phillips' deposition and cannot be punished as if it were without a violation of its due process rights. And Plaintiffs overreach by asking that this Court decide a matter of law mixed with fact that's also neither at issue nor the subject of the trial here: whether Mr. Phillips', or TTV's, opinions about election fraud "lacked foundation". That is not even a matter contemplated for trial.

## VII.  Levying Costs on Defendants Who Followed Instructions of Counsel Would Be Unjust

As explained above, Plaintiffs have overstepped here, in countless ways, and they've filed a largely meritless and therefore time-wasting Motion for Discovery Sanctions. On that ground alone, their request for fees should be denied.

In addition, under Federal Rule 37(a)(5)(A), a court must not order payment of attorney's fees if: "(i) the movant filed the motion before attempting in good faith to obtain the disclosure or discovery without court action; ... or (iii) other circumstances make an award of expenses unjust." Both quoted factors (i and iii) apply here to negate any payment of attorneys' fees by Defendants. First, while Plaintiffs did seek, long ago, a discovery order regarding the general temporal and geographic scope of the deposition questions, Defendants have seen no evidence Plaintiffs conferred with Defendants regarding any of the specific questions that are the subject of their Motion for Sanctions, per Rule 37(a)(1).

Moreover, Rule 37(A)(5)(a) makes clear that even if the Court were to decide a payment of costs were appropriate, that payment is not automatically to be made by the deponent whose attorney is accused of improper conduct. Rather, it may be made, at the Court's discretion, by the "attorney advising that conduct." Here, it is not appropriate to charge Ms. Engelbrecht or Mr. Phillips as the culpable parties. Unlike in Plaintiffs' cited case of *Sagax*, there is neither evidence nor allegation here that their following of their attorney's counsel was done in bad faith.

As an equitable matter, an award of expenses payable by Defendants, as a penalty for following the advice of legal counsel, would be unjust. It is important to note that the Defendants Engelbrecht and Phillips did not of their own volition refuse to answer questions. Rather, in each case, they followed the advice of counsel, whom they believed to possess the requisite knowledge and expertise. As between Defendants and their counsel, it was Defendants' counsel who possessed the (far) greater knowledge of the rules of the road in deposition, and who willfully violated those rules dozens of times. As between Defendants and their prior counsel, it was the experienced attorney who was subject to rules of legal ethics and to Rule 26(g) of the Federal Rules of Civil Procedure, which imposes on counsel and parties an affirmative duty to conduct pretrial discovery in a responsible manner. Accordingly, pursuant to Rule 37(a)(5)(A), the court should, after giving Defendants' prior counsel an opportunity to be heard, require him, as the "attorney advising that conduct" "to pay the movant's reasonable expenses incurred in making the motion, including attorney's fees."

## CONCLUSION

In conclusion, Plaintiffs' desired inferences should be denied, and their request that Defendants Engelbrecht and Phillips pay their costs should be denied.

Defendants seek such other and further relief to which the Court determines they should be justly entitled.

Respectfully submitted,

By: */s/ Jake Evans*　　　　　　
Jake Evans, Esq.
GA Bar No. 797018
GREENBERG TRAURIG, LLP
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
P: (678) 553-2100
F: (678) 553-2212
Jake.Evans@gtlaw.com
*Local Counsel for Defendants*

By: */s/ Michael J. Wynne*　　　　　
Michael J. Wynne*
TX Bar No. 785289
mwynne@gwafirm.com
Cameron Powell*
DC Bar No. 459020
cpowell@gwafirm.com
GREGOR WYNNE ARNEY, PLLC
909 Fannin Street, Suite 3800
Houston, TX 77010
Telephone: (281) 450-7403
*Counsel for Defendants*

*Admitted Pro Hac Vice*

## CERTIFICATE OF COMPLIANCE

I certify the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGA, using font type of Times New Roman and point size of 14.

Dated: September 13, 2023

By: /s/ *Michael J. Wynne**
Michael J. Wynne
*Counsel for Defendants*

## CERTIFICATE OF CONFERENCE

I have conferred with counsel for Plaintiffs and Intervenor the United States and that all are opposed to this motion.

By: /s/ *Michael J. Wynne**
Michael J. Wynne
*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I certify that today I filed a copy of the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of filing to all counsel of record.

Dated: September 13,  2023

By: /s/ *Michael J. Wynne*
Michael J. Wynne
*Counsel for Defendants*