**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION**

FAIR FIGHT, INC., SCOTT BERSON,
and JANE DOE,

      Plaintiffs,

      v.

TRUE THE VOTE, INC., CATHERINE
ENGELBRECHT, DEREK
SOMERVILLE, MARK DAVIS,
MARK WILLIAMS, RON JOHNSON,
and JAMES COOPER,

      Defendants.

Civil Action No.
2:20-cv-00302-SCJ

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR
DISCOVERY SANCTIONS IN THE FORM OF ADVERSE INFERENCES**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

I.      Plaintiffs' requested inferences follow directly from the obstructed
        questions. ...................................................................................1

II.      Plaintiffs' requested inferences are probative of disputed elements. .............7

III.    Plaintiffs' requested inferences are necessary to prevent Defendants from
        enjoying an unjust windfall from sabotaging critical depositions..................9

IV.    Plaintiffs are entitled to costs and attorney's fees. ........................................14

CONCLUSION .....................................................................................15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Hilger v. Velazquez*,
   613 F. App'x 775 (11th Cir. 2015) ........................................................9

*Lara v. G&E Fla. Contractors, LLC*,
   No. 15-20306-CIV-MORENO/O'SULLIVAN, 2016 WL 8740318
   (S.D. Fla. Feb. 10, 2016)........................................................................8

*Link v. Wabash Railroad Co.*,
   370 U.S. 626 (1962)..........................................................................9, 10

*Ryan v. C.I.R.*,
   568 F.2d 531 (7th Cir. 1977) ...............................................................14

*Sagax Development Corp. v. ITrust, S.A.*,
   No. 19-CV-3386 (RA) (KNF), 2021 WL 5360121 (S.D.N.Y. Nov.
   17, 2021) ...............................................................................................12

*VirnetX Inc. v. Cisco Systems, Inc.*,
   No. 6:10-CV-417, 2012 WL 7997962 (E.D. Tex. Aug. 8, 2012).......11

**Other Authorities**

D. Emery, *Three Million Votes in Presidential Election Cast by
   'Illegal Aliens'?*, Snopes (Nov. 16, 2016),
   https://www.snopes.com/fact-check/three-million-votes-in-
   presidential-election-cast-by-illegal-aliens/.........................................5

Fed. R. Civ. P. 37(c)(1)............................................................................8

J. Ryan, *Trump-cited study author (still) refuses to show proof of
   voter fraud*, CNN (Jan. 17, 2017),
   https://www.cnn.com/2017/01/27/politics/gregg-phillips-voter-
   fraud-donald-trump-cnntv/index.html .................................................4

K. Forster, *Donald Trump's false claim about illegal votes 'based on unverified tweet posted on conspiracy website*, Independent (Nov. 28, 2016), https://www.independent.co.uk/news/world/americas/donald-trump-millions-illegal-aliens-voted-greg-phillips-three-million-tweet-infowars-alex-jones-a7443006.html ...........................................................4

P. Svitek, *Trump's unsupported claim of voter fraud appears to have Texas roots*, Tex. Tribune (Nov. 28, 2016), https://www.texastribune.org/2016/11/28/trumps-unsupported-claim-voter-fraud-has-texas-roo/ ...........................................................4

S. Sturgis, *The conservative activist behind Trump's bogus 'millions of illegal voters' claim*, Facing South (Nov. 30, 2016), https://www.facingsouth.org/2016/11/conservative-activist-behind-trumps-bogus-millions-illegal-voters-claim ...........................................................4

U.S. Const. amend. V ...........................................................14

# INTRODUCTION

Defendants do not contest that the behavior described in Plaintiffs' motion for discovery sanctions is, in fact, sanctionable, as the governing rules were "willfully violated . . . dozens of times." Defs.' Resp. in Opp'n to Pls.' Mot. for Discov. Sanctions ("Defs.' Br.") at 21, ECF No. 245. But even as Defendants recognize Plaintiffs' considerable "equitable cash," *id.* at 2, they suggest that balance cannot be tendered for any equitable remedy. Defendants are mistaken. Plaintiffs' narrow and modest requested inferences follow naturally from the questions that were obstructed and are strongly corroborated by evidence, including testimony from Defendants themselves. The requested inferences are also probative of disputed elements of the claims and defenses to be tried in this case. Accordingly, the requested inferences should be granted to limit the unjust windfall that Defendants would receive if they are permitted to sabotage critical depositions with impunity. And because Defendants and their prior attorneys were jointly responsible for the discovery violations, they should be jointly and severally responsible for costs and attorney fees related to this dispute.

## I.   Plaintiffs' requested inferences follow directly from the obstructed questions.

Each of Plaintiffs' three requested inferences is strongly corroborated by the witnesses' testimony and other relevant evidence.

1

*First*, Plaintiffs request an inference that True the Vote was responsible for @Crusade4Freedom tweets about Georgia voter challenges in 2020. The authorship of these tweets is corroborated by extensive circumstantial evidence. As Plaintiffs recounted with citations in their summary judgment filings, *see* ECF No. 171 ¶¶ 141–42, two days after True the Vote declared that it had challenged over 360,000 Georgia registrants, the "Crusade4Freedom" Twitter account posted: "We just prospectively challenged the eligibility of 360,000 voters in GA. Largest single election challenge in Georgia and American history. #eyesonGA #validatethevoteGA." *See* ECF 156-26. Two days later, Crusade for Freedom tweeted: "If the Georgia counties refuse to handle the challenges of 366,000 ineligible voters in accordance with the law, I plan to release the entire list so America can do the QC. #validatethevoteGA #eyesonGA." *Id.*

Ms. Engelbrecht admitted that these hashtags mirrored the slogans appearing on several True the Vote documents and an internal invoice between OpSec and True the Vote. *See* TTV/Engelbrecht Tr. 264:7–16, ECF No. 168-1. Ms. Engelbrecht also admitted that she was not aware of any groups other than True the Vote that challenged the eligibility of approximately 360,000 voters in Georgia during the runoff elections. *Id.* 264:2–6. And she admitted that Crusade for Freedom's logo in its tweets matched the logo in a Facebook post from an organization named Time

for a Hero—which was founded by Ms. Engelbrecht and Mr. Phillips, *id.* 37:4–6—that stated, "Crusade for Freedom coming soon," *id.* 261:10–11.

Plaintiffs were obstructed from pursuing questioning that would elicit direct evidence about who controlled the @Crusade4Freedom account, and now Defendants hypothesize that the account might be the creation of "citizen petitioners," "left-leaning provocateurs, or any of the Internet's countless automated bots and other merry pranksters." Defs.' Br. at 27. That is not plausible.

The @Crusade4Freedom account was created in October 2010—less than one year after True the Vote's Twitter account was created—and restricted public access after this litigation commenced. *See* Ex. A. Social media provocateurs and pranksters do not plot their hijinks a decade in advance, and automated bots do not curtail circulation of their own output by restricting public viewership. The tweets at issue *announced responsibility for True the Vote's voter challenges* in the first person, ECF No. 156-26 ("*We* just prospectively challenged the eligibility of 360,000 voters in GA. . . . If the Georgia counties refuse to handle the challenges . . . *I* plan to release the entire list[.]"), and they included hashtags that only someone familiar with Ms. Engelbrecht's organizational branding would know. Thus, there is more than enough evidence to reasonably infer that True the Vote bore responsibility for these tweets, but Plaintiffs' attempt to confirm that conclusion with direct evidence was unjustifiably thwarted in Ms. Engelbrecht's deposition.

*Second*, Plaintiffs request an inference that Mr. Phillips coordinated with True the Vote to publicize allegations of illegal voting that lacked foundation after the 2016 presidential election. This fact is not subject to reasonable dispute. On November 13, 2016, while serving on True the Vote's board of directors, *see* OpSec/Phillips Tr. 23:10–18, ECF No. 167-1, Mr. Phillips tweeted, "We have verified more than three million votes cast by non-citizens. We are joining .@TrueTheVote to initiate legal action. #unrigged."[1] This fantastical allegation received widespread national attention, including publicity from President-elect Trump.[2] That attention evolved into scrutiny, as experts concluded that Mr. Phillips's assertion was wildly exaggerated, and then into ridicule, as Mr. Phillips reneged time and again on his promise to publicize his data and methodology.[3]

---

[1] *See* P. Svitek, *Trump's unsupported claim of voter fraud appears to have Texas roots*, Tex. Tribune (Nov. 28, 2016), https://www.texastribune.org/2016/11/28/trumps-unsupported-claim-voter-fraud-has-texas-roo/ (reposting tweet and reporting True the Vote's affiliation with and support for Mr. Phillips's allegations).

[2] *Id.*

[3] *See, e.g., id.*; J. Ryan, *Trump-cited study author (still) refuses to show proof of voter fraud*, CNN (Jan. 17, 2017), https://www.cnn.com/2017/01/27/politics/gregg-phillips-voter-fraud-donald-trump-cnntv/index.html; S. Sturgis, *The conservative activist behind Trump's bogus 'millions of illegal voters' claim*, Facing South (Nov. 30, 2016), https://www.facingsouth.org/2016/11/conservative-activist-behind-trumps-bogus-millions-illegal-voters-claim; K. Forster, *Donald Trump's false claim about illegal votes 'based on unverified tweet posted on conspiracy website*, Independent (Nov. 28, 2016), https://www.independent.co.uk/news/world/americas/donald-trump-millions-illegal-aliens-voted-greg-phillips-three-million-tweet-infowars-alex-jones-

Thus, True the Vote is not a "randomly-chosen party," Defs.' Br. at 15, in this scheme. Mr. Phillips was a member of True the Vote's leadership, and he explicitly tagged the organization in his infamous tweet. The fact that Mr. Phillips' allegation lacked foundation is also a matter of public record. Mr. Phillips has repeatedly ducked and dissembled when pressed by journalists to validate his figures. *See, e.g.*, CNN Interview Tr. at 8, ECF No. 156-32. When required to answer questions under oath in deposition, Mr. Phillips evaded accountability once again by refusing to respond, in direct defiance of the federal rules and this Courts' discovery order. Candid answers to questions about the circumstances and validity of Mr. Phillips's 2016 allegation surely would have proven the inference that his contention of three million non-citizen votes in the presidential election was bogus. His steadfast refusal to answer those questions is most naturally understood to confirm that the inference is correct.

*Third*, Plaintiffs request an inference that Gregg Phillips considered Mark Davis's challenge process to be invalid and unreliable. The fact that Mr. Phillips was critical of Mr. Davis's approach to generating his challenge file is undeniable from the deposition testimony. Mr. Phillips testified to meeting with Derek Somerville in

---

a7443006.html; D. Emery, *Three Million Votes in Presidential Election Cast by 'Illegal Aliens'?*, Snopes (Nov. 16, 2016), https://www.snopes.com/fact-check/three-million-votes-in-presidential-election-cast-by-illegal-aliens/ ("The 'three million non-citizens' figure may just as well have been plucked out of thin air.").

person in December 2020 to compare True the Vote's methodology for developing its challenge list with the methodology employed by Mr. Somerville and Mr. Davis. OpSec/Phillips Tr. 88:1–88:10. Reflecting on the Somerville/Davis approach, Mr. Phillips said he "didn't feel like [their approach] was appropriate." *Id.* 89:4–10. After Plaintiffs' counsel showed Mr. Phillips an NCOALink processing summary produced by Mr. Davis in response to a request for materials demonstrating his methodology, *see* Ex. B, Mr. Phillips testified that the document indicated that Mr. Davis "didn't use either CASS or DPV. And I would suggest that he didn't clean the rolls as it relates to identity verification first or he wouldn't have had this. This is bad process." OpSec/Phillips Tr. 102:14–103:16.

Defendants feign ignorance about what "bad process" might mean, *see* Defs.' Br. at 24, but clearly Mr. Phillips was troubled by Mr. Davis's methodology—which is the only conceivable explanation for why defense counsel interjected to prevent Mr. Phillips from elaborating on his criticism. The fact that Defendants chose not to designate Mr. Phillips as an expert witness in this litigation, which precludes him from offering expert opinions in *defense* of Defendants' methodologies, does not mitigate the probative value of statements-against-interest disparaging the approach pursued by True the Vote's co-defendants and close collaborators. The fact that Mr. Davis and Mr. Somerville continued with their approach despite the explicit disagreements of their allies is also probative of their recklessness.

6

## II.   Plaintiffs' requested inferences are probative of disputed elements.

Lacking compelling arguments that Plaintiffs' requested inferences are irrelevant, on the one hand, or dispositive of ultimate issues, on the other, Defendants seek to mask the flaws in each approach by presenting them together. *See, e.g.*, Defs.' Br. at 19 ("candid[ly]" admitting "Defendants are of two minds" about how to argue their defense). The contradiction is self-refuting. Plaintiffs' requested inferences are probative of disputed elements—no more, no less.

*First*, one of the @Crusade4Freedom tweets containing indicia of True the Vote's authorship threatened to publish the names of challenged voters. Because the Court has recognized that "publishing the names of challenged voters to the public can constitute reasonable intimidation," *see* Order on Mots. for Summ. J. ("MSJ Order") at 59, ECF No. 222, True the Vote's threat to do so is probative of its Section 11(b) violation. *Second*, Mr. Phillips's public, unsubstantiated allegations about 2016 illegal voting while he was on True the Vote's board of directors tend to show that True the Vote was reckless when it contracted with him to generate its challenged list. *See* Defs.' Br. at 6 (arguing for recklessness standard). *Third*, the requested inference drawn from Mr. Phillips's criticism of Mr. Davis's process tends to show that even Mr. Davis's own allies recognized significant flaws in his approach, and yet Mr. Davis and Mr. Somerville persisted, demonstrating the

reckless indifference that this Court has recognized bears on Plaintiffs' Section 11(b) claim and Defendants' First Amendment defense. *See* MSJ Order at 38, 79.

None of these inferences would resolve "ultimate issues of fact." *Contra* Defs.' Br. at 16. Defendants are free to attempt to rehabilitate Mr. Davis's challenge process—including, as Defendants suggest, by confirming that Mr. Phillips lacks "experience using NCOA and its tools, such as CASS and DVP (Delivery Point Validation)," Defs.' Br. at 20—and True the Vote's care in selecting a contractor to generate its challenge file. Similarly, Defendants could attempt to rebut Plaintiffs' inference drawn from the @Crusade4Freedom tweets by identifying contrary admissible evidence about True the Vote's actual or intended publication of voter names.

The biggest hurdle Defendants encounter is not the inference itself, but their inability to muster *admissible* evidence to refute it. Having failed to explain the methodology behind Mr. Phillips's 2016 conspiracy theory despite multiple requests from Plaintiffs, Defendants cannot provide previously withheld information for the first time at trial. Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information [in response to relevant discovery requests], the party is not allowed to use that information . . . to supply evidence" at trial.); *cf. Lara v. G&E Fla. Contractors, LLC*, No. 15-20306-CIV-MORENO/O'SULLIVAN, 2016 WL 8740318, *2–*3 (S.D. Fla. Feb. 10, 2016) (holding any evidence that was "in existence prior to the

close of discovery, but not produced, may not be used at trial by the party that failed to timely produce"). And the never-before-disclosed explanation of Mr. Davis's methods that Defendants provide across pages of briefing without a single citation, *see* Defs.' Br. at 24–25, is inadequate and impermissible. *See Hilger v. Velazquez*, 613 F. App'x 775, 777 (11th Cir. 2015) (recognizing "statements by lawyers are not evidence").

The fact that Defendants may be hard pressed to generate contrary admissible evidence does not render the requested inferences impermissibly "dispositive"—it simply corroborates that the inferences are appropriate and necessary to prevent Defendants from profiting from the unearned advantage of discovery violations.

**III.   Plaintiffs' requested inferences are necessary to prevent Defendants from enjoying an unjust windfall from sabotaging critical depositions.**

With little basis to contest the accuracy or relevance of Plaintiffs' requested inferences, Defendants resort to a grab bag of miscellaneous—and dubious— equitable and constitutional arguments.

First, on the equities: Defendants seek to avoid any consequences for violating Court rules and retain their unearned advantage by scapegoating their own prior counsel. The Supreme Court has made clear that "there is certainly no merit" to this defense. *Link v. Wabash Railroad Co.*, 370 U.S. 626, 633 (1962). In *Link*, a plaintiff appealed sanctions resulting in dismissal and judgment arising out of his attorney's failure to attend a scheduled pretrial conference, complaining that punishing him

"because of his counsel's unexcused conduct imposes an unjust penalty on the client." *Id.* But the Court observed that plaintiff voluntarily chose its attorney as its representative in the action and "cannot now avoid the consequences of the acts or omissions of this freely selected agent." *Id.* at 633–34. "Any other notion would be wholly inconsistent with our system of representative litigation, in which each party is deemed bound by the acts of his lawyer-agent and is considered to have 'notice of all facts, notice of which can be charged upon the attorney.'" *Id.* at 634 (quoting *Smith v. Ayer*, 101 U.S. 320, 326 (1879)). The Court recognized that the consequences of this rule are often severe—much more so than the modest inferences requested here—and "if an attorney's conduct falls substantially below what is reasonable under the circumstances, the client's remedy is against the attorney in a suit for malpractice." *Id.* at 326 n.10. But allowing blatant misconduct to go unpunished "would be visiting the sins of [that party's] lawyer upon the [opposing party]." *Id.*[4]

This commonsense rule forecloses Defendants' efforts to evade responsibility for the discovery violations. And unlike in *Link*, where counsel's failure to appear at the pretrial conference was beyond the party's control, here Defendants were active participants in the rule violations. Mr. Phillips and Ms. Engelbrecht promised to

---

[4] As further analogy, the Court noted, "if counsel files a petition for certiorari out of time, we attribute the delay to the petitioner and do not request an explanation from the petitioner before acting on the petition." 370 U.S. at 326 n.10.

answer questions without conferring with counsel, heard Plaintiffs' counsel's explanation of the rules when disputes arose, and affirmatively chose not to answer the questions asked of them. *See, e.g.*, OpSec/Phillips Tr. 11:1–4, 11:13–12:4, 155:17–19, 156:4–5, 158:7–9; 173:19–21, 176:7–10; TTV/Engelbrecht Tr. 13:10–15, 15:4–12. In fact, Mr. Phillips initiated the first mid-question conferral when asked about work he performed for True the Vote before the November 2020 general election, announcing that he would confer with counsel "about how to answer that." OpSec/Phillips Tr. 50:11–22.

It is also perfectly ordinary for inferences from one witness's testimony to be used against the witness's principal or other aligned parties. *See, e.g.*, *VirnetX Inc. v. Cisco Systems, Inc.*, No. 6:10-CV-417, 2012 WL 7997962 (E.D. Tex. Aug. 8, 2012) (using inferences from deposition of Apple employee against Apple). This is especially appropriate here, where all Defendants and affiliated witnesses remain represented by the same counsel, despite this Court's concerns, *see* MSJ Order at 4 n.3, indicating they continue to see their interests as fully aligned. And because Plaintiffs' requested inferences are not outcome determinative and do not seek to mistakenly attribute one party's Fifth Amendment invocation to a different party, Defendants' citations to cases from those contexts are inapplicable. *See* Defs.' Br. at 26–27.

Defendants' objection that Plaintiffs' requested inferences are too "specific," in turn, is refuted by their own citation to *Sagax Development Corp. v. ITrust, S.A.*, No. 19-CV-3386 (RA) (KNF), 2021 WL 5360121 (S.D.N.Y. Nov. 17, 2021). *See* Defs.' Br. at 10. In that case, the court sanctioned a party's refusal to participate in discovery by entering very explicit outcome-determinative findings, including:

> (1) the parties entered into an enforceable agreement whereby ITrust promised Sagax a 2.5% equity stake in ITrust and/or its subsidiary in exchange for Sagax securing investments into those entities; (2) Sagax performed under the agreement and secured $2 million in investments for ITrust and/or its subsidiary; (3) ITrust is required to compensate Sagax under the Agreement; (4) ITrust failed to compensate Sagax under the Agreement; and (5) ITrust owes Sagax an amount equal to 2.5%, which is, at a minimum, $499,221.00, plus statutory interest and costs.

*Sagax Dev. Corp.*, 2021 WL 5360121, *10. Those inferences are more detailed— and more severe—than what Plaintiffs request here. Additionally, Defendants discuss adverse inferences only in the context of jury trials, where courts sometimes instruct juries on the nature of the inference to be drawn while preserving the jury's ultimate fact-finding prerogative. *See* Defs.' Br. at 3 n.1, 8–10.  In this bench trial, the Court will be making findings, and both parties' trial preparation would benefit from a clear understanding of which facts may no longer be subject to dispute.

Defendants' blithe suggestion that "Plaintiffs can simply ask their questions at trial," Defs.' Br. at 3, is a nonstarter. Mr. Phillips has already been coached how to respond when asked about his views of Mr. Davis's process. When Plaintiffs'

counsel sought to press this line of questioning after the wrongful obstruction, Mr. Phillips retreated to lawyered non-answers about his inability to form an opinion. *See* OpSec/Phillips Tr. 103:9–105:9. Similarly, Ms. Engelbrecht's refusal to identify individuals involved with her organizations' social media accounts prevented Plaintiffs from generating and pursuing leads to identify the specific tweeter behind @Crusade4Freedom. Revealing these potential leads at trial—long after discovery has closed—will serve no purpose. Finally, Mr. Phillips's refusal to discuss his 2016 allegations in deposition cannot be ameliorated by trial questioning. The notion that witnesses can refuse to answer deposition questions and save relevant testimony for trial is entirely antithetical to our federal system of civil adjudication.

Turning to Defendants' constitutional arguments, Defendants fill pages of their brief with examples of cases granting adverse inferences, confirming the appropriateness and regularity of the sanction. *None* of these cases hold that adverse inferences violate the First Amendment right against compelled speech (and none of Defendants' compelled speech cases are drawn from the context of litigation sanctions or factfinding, *see* Defs.' Br. at 17–19). Indeed, the requested inferences do not require any person to stand in court and say anything: they *interpret* what Mr. Phillips naturally meant when he criticized Mr. Davis's "bad process"; they establish the hidden @Crusade4Freedom account author's *affiliation* with True the Vote; and

they *confirm* that Mr. Phillips's allegation of illegal voting in 2016 is as unfounded as it appears.

Defendants' invocation of the Fifth Amendment is even more outlandish. The irrelevance of a person's right not to "be compelled in any criminal case to be a witness against himself," U.S. Const. amend. V, is right there in the text—this is not a criminal case. If the Fifth Amendment provides a right for witnesses in civil suits to ignore deposition questions that may elicit damaging testimony if answered honestly, then virtually every civil verdict entered in this country would be contaminated. *But see Ryan v. C.I.R.*, 568 F.2d 531, 541–42 (7th Cir. 1977) ("By its own terms, [the Fifth Amendment] applies only to criminal cases.").

## IV.   Plaintiffs are entitled to costs and attorney's fees.

Finally, Defendants fail to meaningfully dispute Plaintiffs' entitlement to costs and fees related to this motion. They complain that Plaintiffs failed to conduct a meet-and-confer before seeking discovery sanctions, but Rule 37(b) imposes no such requirement. *See Acosta v. Austin Electric Servs. LLC*, 325 F.R.D. 322, 324–25 (D. Ariz. 2018) (explaining motions for sanctions under Rule 37(b), unlike motions to compel discovery under Rule 37(a), do not require party conferral). Even so, Plaintiffs did meet and confer with Defendants in advance of the depositions of Mr. Phillips and Ms. Engelbrecht because defense counsel's instructions not to answer questions had posed problems in previous depositions, and defense counsel

14

made clear that those instructions would continue. In response, Plaintiffs sought and received an order from this Court that "Defense Counsel shall not instruct individual and Rule 30(b)(6) witnesses to not answer questions absent compliance with applicable discovery rules and law." Order at 2, ECF No. 142. Defendants' violation of that Order could not be remedied by further conferral. Because of the nature of Defendants' violations, Plaintiffs are not seeking further discovery, or to reopen depositions, or any other relief that Defendants can supply. Plaintiffs seek an adverse inference, which only this Court—as factfinder—can provide.

Additionally, the fact that Defendants' violations were facilitated by prior counsel does not render a fee award unjust. As already explained, parties are necessarily responsible for their attorneys' conduct, and here Mr. Phillips and Ms. Engelbrecht were active participants in the obstruction. *See supra* at 9–11. Rule 37 sanctions are "intended to 1) compensate the court and other parties for the added expense caused by discovery abuses, 2) compel discovery, 3) deter others from engaging in similar conduct, and 4) penalize the offending party or attorney." *Wouters v. Martin Cnty.*, 9 F.3d 924, 933 (11th Cir.1993). The appropriate way to fulfill these goals is to order Defendants and prior counsel jointly liable for the joint obstruction.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion should be granted.

Respectfully submitted, this 27th day of September, 2023.

Allegra J. Lawrence
Georgia Bar No. 439797
Leslie J. Bryan
Georgia Bar No. 091175
Maia Cogen
Georgia Bar No. 832438
Michelle L. McClafferty
Georgia Bar No. 161970
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com
michelle.mcclafferty@lawrencebundy.com

*/s/ Uzoma N. Nkwonta*
Marc E. Elias*
Uzoma N. Nkwonta*
Christina A. Ford*
Tina Meng Morrison*
Marcos Mocine-McQueen*
Joel J. Ramirez*
Jacob D. Shelly*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave., Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
melias@elias.law
unkwonta@elias.law
cford@elias.law
tmengmorrison@elias.law
mmcqueen@elias.law
jramirez@elias.law
jshelly@elias.law

*Counsel for Plaintiffs*
*Admitted *pro hac vice*

## **CERTIFICATE OF COMPLIANCE**

Pursuant to LR 7.1(D), N.D. Ga., I hereby certify that the foregoing brief has been prepared in accordance with the font type and margin requirements of LR 5.1, N.D. Ga., using a font type of Times New Roman and a point size of 14.

This 27th day of September, 2023         */s/ Uzoma N. Nkwonta*
                                          Uzoma N. Nkwonta

## **CERTIFICATE OF SERVICE**

I hereby certify that I have this day served a copy of the within and foregoing brief with the Clerk of Court using the CM/ECF system, which will automatically send-e-mail notification to all counsel of record.

This 27th day of September, 2023

                                          */s/ Uzoma Nkwonta*
                                          Uzoma Nkwonta
                                          *Counsel for Plaintiffs*