## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

FAIR FIGHT, INC., SCOTT BERSON,
and JANE DOE,

     *Plaintiffs*,

v.

TRUE THE VOTE, INC., CATHERINE
ENGELBRECHT, DEREK
SOMERVILLE, MARK DAVIS, MARK
WILLIAMS, RON JOHNSON, and
JAMES COOPER,

     *Defendants*.

CIVIL ACTION FILE

NO. 2:20-cv-00302-SCJ

## **DEFENDANTS' TRIAL BRIEF**

## **TABLE OF CONTENTS**

Page

I.   A Plain-English Introduction……………………………………………..1

   A.   Plaintiffs Have Proven *De Minimis*, Even Zero, Impact to Any Voter...3

   B.   Plaintiffs Certainly Created a Dramatic Narrative……………………..4

   C.   Plaintiffs Seek to Restrict Core Speech on the Basis of
        Conclusory Claims of Intimidation-by-Speech and Alleged
        Negligence in Petitions………………………………………………9

   D.   Plaintiffs Urge Bad Precedent, Bad Policy, and Unconstitutional
        Vagueness and Overbreadth……………………………………………10

   E.   Shorn of Drama, Plaintiffs' Case Doesn't Amount to
        Intimidation Caused by Reckless Speech……………………………13

II.  Defendants' Speech and Petitions Had — and Achieved — Many Lawful
     Civic Purposes…………………………………………………………...15

III. Plaintiffs Overreached with Baseless Allegations and Weak Claims of
     Attenuated Intimidation………………………………………………16

   A.   Plaintiffs Have Failed to Prove Any Voters Were Aware of
        Defendants' Prior Speech as Compiled in Plaintiffs'
        Historical  Lawyers' Research…………………………………....17

   B.   There Were Neither Patrolling SEALs nor Threats of Them
        (Not is There Anything Inherently Wrong with Navy SEALs –
        They're Generally the Good Guys)…………………………………..18

   C.   Plaintiffs' Allegation of "Bounties" Was Hyperbolic and
        Meritless……………………………………………………………..19

   D.   Plaintiffs' Tsunami of "Mass Challenges" Was in Reality
        a Trickle………………………………………………………………...20

i

IV.   Speech-as-Intimidation Claims Must Prove (1) The Alleged Feeling
      of Intimidation Was Reasonable and (2) Defendants Were Reckless in
      Causing It………………………………………………………………..22

      A.   Plaintiffs Cannot Show They Reasonably Felt Intimidated
           By Actions of Defendants……………………………………………...22

      B.   Plaintiffs Are Required to Show Defendants Were Reckless
           in Their Pure Speech and Expressive Speech………………………….23

           1.   *Counterman* Addressed Potentially Intimidating or Distressing
                Speech……………………………………………………………..24

           2.    A Defendant Accused of Problematic Speech Must Be Aware
                of or Recklessly Disregard His Speech's Impact…………………24

           3.   *Counterman* Applies to Civil Cases Involving Speech…………..26

      C.   Defendants' Facilitation of Section 230 Petitions is Protected
           by the First Amendment……………………………………………….27

           1.   This Court Has Already Concluded Defendants Intended to
                Convey a Particularized Message…………………………………29

           2.   Defendants Clearly Communicated Messages to Others…………29

           3.   Plaintiffs' Interpretation of Section 11(b) as Lacking
                Scienter is Constitutionally Both Overbroad and Vague
                as Applied………………………………………………….…..33

                a.  Plaintiff's Interpretation is Unconstitutionally Vague…………35

                b.  Plaintiff's Interpretation is Unconstitutionally Overbroad…….37

           4.   Citizens Require the Breathing Room of Reasonable Reliance
                on Their Government's Statutory Language and Process…………38

V.    Defendants Did Not Act Recklessly, Amounting to Any Intimidation by
      Indirectly Encouraging or Supporting Petitions to Local Boards of
      Election…………………………………………………………………..40

A.      Post-election Analysis of Both Challenge Lists Shows the
        Spreadsheets' Predictions that Voters Had Moved Out of County
        Were Largely Meritorious……………………………………………40

  1. Private Citizens are Incapable of Violating the NVRA, or Trying
     to…………………………………………………………………...43

     a.  Even in States' *Removal* of Voters, the NCOA Requires only
         "Reasonable Efforts" – Not Perfection – to Identify Changed
         Residency…………………………………………………………..45

     b.  Even for the More Serious Removal of Voters, Use of the
         NCOA Alone Constitutes a "Reasonable Effort" to Identify
         Movers…………………………………………………………46

  2. While Defendants Could Have Used the NCOA Alone Without
     Being Deemed Reckless, They Went Beyond the NCOA………….48

 B.      The Petitions Satisfied the *Prima Facie* Standard: Not Baseless or
         Frivolous……………………………………………………………50

VI.  Conclusion……………………………………………………………54

Defendants hereby submit this briefing as a guide for the Court at trial.

## I.  A Plain-English Introduction

We were promised Navy SEALs.

They'd be rappelling into a nearby polling station soon, we were told, if this Court didn't issue an emergency temporary restraining order. But the SEALs, like most of Plaintiffs' overly dramatic narrative, never showed up. Those AWOL SEALs are a fitting metaphor for all of Plaintiffs' never-proven but scary-sounding allegations of intimidation in voting.

This Court must decide whether (1) any individual Defendant attempted to intimidate a Plaintiff (whose intimidation would have been reasonable) through (2) some combination of First-Amendment-protected speech and petitions that no voter-Plaintiff was aware of, and, if so, (3) whether that speech was recklessly made, per *Counterman v. Colorado*, 600 U. S. 66 (2023), and those petitions were "both objectively baseless and subjectively motivated by an unlawful purpose", *BE & K Const. Co. V. N.L.R.B.*, 536 U.S. 516, 531 (2002).

These are extraordinarily high bars, as they should be in the realm of alleged *attempts* to cause harm through mere *speech*. Plaintiffs will simply not be able to prove that any Defendants spoke out recklessly, nor that they baselessly and with unlawful purpose engaged in petition activities based on their reasonable interpretation of a state *statute*. Indeed, learned counsel for Plaintiffs and Defendants

1

have submitted a lot of briefing about *their* complex interpretations of Section 230 within the First Amendment context, but Plaintiffs have failed to make any case that the lay Defendants' interpretations of their rights were reckless, baseless, or made with an unlawful purpose. Defendants' interpretations of Section 230, and use of the only tools available to them to assess possible residency changes, were not even unreasonable, particularly as part of an NCOA-centric process (1) sanctioned by the State of Georgia, (2) used by many secretaries of state and validated by the Supreme Court, (3) personally encouraged by its Secretary of State and several of its legislators, (4) approved by legal counsel, and (5) made to allegedly affect voters only by the intervening action of county Boards of Election (also BOEs).

Plaintiffs, in a hurry, feverish from the "fever pitch" of the time,[1] got key facts wrong from the start. Most fatefully, they got themselves alarmed by a promotional press release from TTV that mentioned large numbers of voter records the Spreadsheet Defendants[2] had merely *sitting in spreadsheets* – 364,000! 39,000! -- and the number of counties in Georgia – 159! – in which they *hoped* to facilitate

---

[1] *See* Plfs' Initial Discl. at 2.

[2] We will sometimes call Defendants True the Vote, Catherine Engelbrecht, Mark Davis, and Derek Somerville the *Spreadsheet Defendants* for convenience, and also because, considering (1) the collapse of Plaintiffs' narrative about Navy SEALs, bounties, and "mass challenges directly against voters", and (2) the unconstitutionality of imposing liability for the rest of Defendants' prior, non-reckless speech, *spreadsheet-making* is largely what this case is now about.

citizens' Section 230 petitions. Plaintiffs accepted as true every statement of intent in a *press release* — and those intentions were not borne out in reality.

## A. Plaintiffs Have Proven *De Minimis*, Even Zero, Impact to Any Voter

This case now appears to be about alleged intimidation of no voter identified by Plaintiffs[3]. Thus, the case appears to be about *attempted* intimidation, of no person identified by Plaintiffs, who *may* have been asked to provide confirmation during voting that they had not moved away permanently (as their submission of a permanent change of address to the same NCOA relied upon by every state to predict permanent moves indicated they had), and that they were in the right place to vote.

---

[3] Plaintiffs bolstered their Motion for a TRO, Complaint, and Motion for Summary Judgment with affidavits from Gamaliel Turner, Stefanie Stinetorf, and Plaintiff Scott Berson, but Plaintiffs have simply recycled these allegedly affected persons from a different case *and a different challenger*. It was Ralph (aka Alton) Russell who filed the "Russell Challenge" against "six voters" in Muscogee County, including Turner, Berson, and Stinetorf. *See Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 512 F. Supp. 3d 1354, 1363 (M.D. Ga. 2021). From the exhibits in that case we can see he sent his challenge on December 14, 2020, before any Defendants began to facilitate challenges. He used his own letter rather than the templates provided to challengers by either set of Defendants, and he sent the challenge by FedEx, whereas TTV's facilitated challenges were sent from TTV emails and Davis-Somerville's by email as well. (The Court has already recognized there is no evidence Davis and Somerville submitted a challenge in Muscogee County that was accepted by a Board of Election. *See* Order on Motion to Reconsider, Doc No [235] n.2.) Thus, there does not appear to be any evidence Turner, Berson, or Plaintiff Jane Doe was challenged by anyone working with any of the Defendants. Ms. Stinetorf, having had a military APO address, was simply excluded from the two challenge lists prepared by the respective Spreadsheet Defendants.

Section 11(b) provides, in relevant part, that "No person . . . shall intimidate . . . or attempt to intimidate . . . any person for voting or attempting to vote, or intimidate . . . or attempt to intimidate . . . any person for urging or aiding any person to vote or attempt to vote." But no "person" among Defendants is alleged to have been involved in the challenges BOEs made to Plaintiff Scott Berson, affiants Gamaliel Turner and Stefanie Stinetorf, or any other resident of Muscogee County, or, for that matter, any other voter identified by Plaintiffs. Plaintiffs recycled these voters from another case. So it's unclear how Plaintiffs have stated a claim for either intimidation or its attempt, and in any event there's not much of an impact here: an unclear, but certainly small, number of people, asked a question, initiated by none of the Defendants, by a local election board. And so Plaintiffs had to add what can only be termed drama.

## B. Plaintiffs Certainly Created a Dramatic Narrative

A *de minimis* harm not proven to have emanated from Defendants' exercise of protected speech and petition rights, to a small number of people at most, explains why Plaintiffs have gone to great lengths to ratchet things up here:

- **The History of Voter Suppression**. Plaintiffs hired an expert to frame a story for this case out of the admittedly tragic history of voter suppression in this country, *see* Report of Dr. Burton [Dkt. 156-17], particularly of

African Americans. *Id*. at 4-5, 9-21, 24, 26-29, 31, 34, 37, 38, 40-43, 53, 57, 60. But none of this related to these Defendants.

- **Pure Speculation That Went Nowhere**. Then Plaintiffs tried to tie that unfortunate history to this case with purely speculative innuendo about "racial targeting", *see id*., non-existent "poll-watching"[4], and the acts of unrelated third parties.[5]

- **Lawyers Research Unseen By Any Voter**. Inspired by prior cases' mention of "context" [Dkt. 156-1, Plfs. Mot. Summ.J at 10], and Attorney General Katzenbach's vague statement about "the natural consequences of actions," Plaintiffs' lawyers then leapt to the Internet to scrape *contextual*

---

[4] Plaintiffs exercising rights of speech and association said Defendants must be stopped from "Participating in any *poll-watching*, *poll-monitoring*, or *election-observing activities*; recruiting and training individuals for these activities; or advertising these activities; and *Photographing or video recording voters* or election workers during the course of voting or working at the polls." Motion for TRO at 2 (emphases added). None of which Plaintiff credibly alleged in 2020 or at any time since.

[5] For example, Plaintiffs attached to their early pleadings entirely unrelated news reports about lawyers Lin Wood and Sidney Powell, activities in Ohio, and threats against Georgia election officials that Plaintiffs never alleged were made by any Defendant nor seen by any voter-Plaintiff. But the Court has noted, "[h]ow third-party actors may have reacted to Fair Fight's actions is not directly attributable to Fair Fight without clearer, plausible connections/allegations in the pleadings." *Id*. at 19.

5

examples of Defendants' *speech* that *no voter-Plaintiff or voter is alleged to have seen* (the "Historical Lawyers Research"):

- o Defendant Engelbrecht's solitary mention of "bounties"[6] where her next sentence *immediately* made clear she meant "whistleblower support fund".

- o Defendant Engelbrecht's mention of seeking volunteer help at polls from veterans who were proven to be dedicated to honest principles and worked hard, such as, she suggested, Navy SEALs.

- o Defendant TTV's financial support of election-related litigation, brought by third parties, and statements from a Congressmember, in 2012, and a third party, Gregg Phillips, in 2016.

- o Speech by Defendants Somerville and Davis posted on their personal Facebook accounts made as part of encouraging voter participation and election integrity in general.

- **Unidentified Twitter Account.** This Court has ruled on Plaintiffs' speculations about an anonymous Twitter account, saying Plaintiffs "provide no evidence to confirm that these tweets were made on behalf of, in association with, or at the encouragement of TTV." TRO Order at 25.

---

[6] *See* Dkt. 156-1, Plfs. Mot. for Summ.J. at 23-24.

There remains no evidence or basis for a plausible inference TTV had anything to do with the tweets.

- **The Expressive Speech of Government Petitions**. Because what they have is so thin, Plaintiffs tried with no success to add some meat, heaping on claims that although Defendants' reliance on the NCOA to predict permanent moves would have been non-reckless, the **Spreadsheet Defendants** were "negligent" in creating spreadsheets that were to be used (but most often were abandoned) to submit Section 230 petitions to Georgia Boards of Election that could and did exercise their own judgment to filter which challenges to consider. The BOEs were the arbiters. Plaintiffs piled on evidence-bare and legally baseless speculation that Defendants somehow hoped to force the state to violate the NVRA by removing voters from rolls and that such an attempt, invisible to any voter, is somehow relevant to a voter's actual feelings of intimidation. That is simply not the case.

- **Three Minor Roles**. Finally, Plaintiffs allege that three Defendants who had little or no role in any of these activities are somehow nonetheless liable for recklessly engaging in intimidation, or "a serious expression of an intent to commit an act of unlawful non-violence against voters," Order on Summ. J. at 75, by:

7

o Serving as a vendor (printer) who dealt mostly with Gregg Phillips, a non-party, in case the TTV Defendants wished to print documents for BOEs and to submit challenges that reached no voters **(Defendant Mark Williams)**.

o Helping TTV locate some potential challengers in south Georgia, including by sending an email to Republican party chairs he was already personally familiar with, and referring interested parties to TTV **(Defendant James Cooper)**.

o Helping, after learning a voter had registered using his own address, TTV locate some potential challengers in north Georgia, and authorizing TTV to submit challenges in Jackson County in his name, based on NCOA out-of-county moves, that reached no voter **(Defendant Ron Johnson).**

In short, Plaintiffs *wanted* to analogize this case about Defendants' speech and petitions to cases that featured police dogs and fire hoses. But the end product bears no resemblance to the Amended Complaint's narrative. And the individual Plaintiffs have not shown *they* were intimidated by actions of Defendants. Plaintiffs cannot, without resort to unconstitutional vagueness and overbreadth, argue that all the "context" in the case, collected in their Historical Lawyers Research, *would have* intimidated some composite "reasonable person" who was somehow given timely

access to all the information Plaintiffs' lawyers have collected over time. Defendants object to the introduction of all such materials.

## C. Plaintiffs Seek to Restrict Core Speech on the Basis of Conclusory Claims of Intimidation-by-Speech and Alleged Negligence in Petitions

Plaintiffs have thus come to the end of this adventure empty-handed of facts, and the few facts that *are* supported by evidence all consist of speech and allegedly negligent petitions, not intimidating conduct like following people at the polls or evicting voters. But there are two fatal problems with Plaintiffs' negligence claim. First, negligence is too low a bar to overcome Defendants' First Amendment rights. As we discuss below, consistent with caselaw requiring that allegedly abusive legal process be "*both* objectively baseless *and* subjectively motivated by an unlawful purpose", *BE & K Const. Co. V. N.L.R.B.*, 536 U.S. 516, 531 (2002) (emphases added), and public officials alleging defamation must "prove by clear and convincing evidence that false statements were made with knowledge or reckless disregard for their falsity," *id.* (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964), the Supreme Court in *Counterman v. Colorado* required not just that a plaintiff be reasonable in feeling intimidated by objectionable speech but that defendants accused of intimidating *speech* were reckless.

Here, that means each Defendant must have been reckless when he or she uttered each First-Amendment-protected statement, and facilitated First-Amendment petitions baselessly and with unlawful purpose, through the mediating

filter of county boards of election, that used NVRA-approved NCOA records (and more) to suggest there was probable cause to think a voter had moved out of their county of registration. Second, the intervention of a governmental third party, such as a Board of Election solely authorized to determine probable cause sufficient to challenge a voter, cuts off a recklessness claim.

### D. Plaintiffs Urge Bad Precedent, Bad Policy, and Unconstitutional Vagueness and Overbreadth

Plaintiffs' vague and overbroad interpretation that Historical Lawyers Research and facilitation of Section 230 petitions can constitute "intimidation" under Section 11(b) ("Plaintiffs' Interpretation") would not require any defendant to be shown to have acted with any level of *mens rea* to be held liable for intimidating speech, even speech from the distant past that no voter, let alone voter-Plaintiff, was aware of. Plaintiffs' Interpretation thus urges the Court to eschew principles of causation, proximate cause, and agency to run aground on these and future defendants' First Amendment right to petition, association, and speech.

The question that remains is this: under what circumstances could a person empowered by any of many states' voter eligibility challenge statutes *not* recklessly "intimidate" another voter by initiating a government-sanctioned, government-mediated conversation about whether that voter is at the right address, voting the right ballot? Is the request to confirm residency somehow not intimidating when the *state* initiates it, rather than a citizen? Does it matter that even a confirmation request

*accurately* sent to a permanently-relocated voter has *exactly* the same capacity to intimidate? If it's necessarily and always subjectively scary for a voter to be asked to provide a document at a polling station, as Plaintiffs would have this Court find, then does "intimidation" happen *even when the voter is in fact in the wrong place?*

Worse, in complaining of petitions facilitated at scale, and necessarily imperfectly,[7] Plaintiffs are effectively arguing for a nationally mandated standard of one voter challenge per challenger. But aside from ignoring Defendants' right to rely on Georgia state statutes lacking such limits without their doing so being reckless or even negligent, such a limit is just bad policy. And there's no evidence (and it's highly unlikely) that's what Congress could have intended when it drafted and passed the NVRA in the context of the preexisting VRA. Plaintiffs also want a legal precedent that says if voters in any state initiate a process of address verification similar to what the NVRA expressly lets the states do (based on a permanent change of address in the NCOA[8]), even if citizens-challengers utilize the filtering

---

[7] In addition to the fact that some people check "Permanent" on the change of address form when they mean "Temporary," the NCOA database features a time lag between when a change of address is filed and when it appears in the NCOA database, and its currency further depends on how often a given Postal Service vendor updates their data from the Postal Service.

[8] Though as we will see, Defendants, before finalizing their list of potential challenges, did more than rely on NCOA, as the NVRA allows states to do in the context of address verification.

11

intermediaries of county election boards, then their inevitably imperfect challenges (especially if combined with historical speech collected by a plaintiff) render them liable under Section 11(b) of the VRA.

Confirming that you're voting in the right place after you've filed a permanent change of address is a pretty reasonable request. Plaintiffs have tried to make it scary that the big bad state yanks people out of line at polling stations as trained killers patrol nearby or humiliates them by asking for added proof of county residency already required of every voter. But if you have taken actions to give someone probable cause to believe you *have* moved permanently, like filing a *permanent* change of address, it's reasonable for someone to ask you to confirm you *haven't*. And the NVRA expressly recognizes the validity of using the NCOA to do so. It's not an "accusation" of a "felony," in Plaintiffs' language.[9] Section 230, like its counterparts in dozens of states, gives county BOEs in Georgia the quite reasonable assignment of making sure voters are *at the right address*.

In their petitions, Defendants merely suggested, to BOEs, there was "reason to believe" (in the language of the emails to BOEs proposed by Davis and Somerville) there was "probable cause" to *believe* specified voters had permanently moved out of their counties of registration. "Probable" as in *probably* — not

---

[9] Plfs Mot. for SummJ at 31.

definitely, not certainly, not surely, and not without error.[10] Defendants thus clear the bar of not having "recklessly" spent weeks compiling potential petition lists, especially where it appears no voters have been shown to have been impacted by them. We are thus in a very different world from the threatening or bad-faith (or "baseless") employment of legal process against voters that has historically, and rightly, subjected other genuinely deserving defendants to Section 11(b) liability in the undeniable and tragically unfortunate past.

### E. Shorn of Drama, Plaintiffs' Case Doesn't Amount to Intimidation Caused by Reckless Speech

These layers of added drama try to obscure the benignity of all that's really happening, which is: *Are you sure you're in the right place to vote today, citizen?* Plaintiffs keep trying to make this simple, civil, democratic conversation sound nefarious, aggressive, and scary. See, they say, *in the context* of this country's sad history of people trying to keep people from voting, it's reasonable that *still-unidentified* voters felt intimidated upon being asked to confirm they were in the appropriate venue.

Except.

---

[10] DOJ describes the standard as whether "it appears" a person has moved, and not "if you have proven beyond a reasonable doubt.": "If it appears from the NCOA information that the person has moved to a different residence in the same registrar's jurisdiction, the registrar . . . sends the registrant a notice of the change . . . by which the registrant may verify or correct the address information." *See* https://www.justice.gov/crt/national-voter-registration-act-1993-nvra

*Except* that no voter-Plaintiffs or voters have been alleged, let alone shown, to have known of the history contained in the Historical Lawyers' Research (or even of the real intimidation catalogued in Dr. Burton's report). They're both sufficiently hazy that Fair Fight had to, respectively, scour the Internet and hire an expert to cherry-pick and take entirely out of context various articles and posts and such in an effort to tell the Court about it — an education to which no allegedly intimidated voter had privy.[11]

*Except* that since Plaintiffs filed their intimidation complaint, the Supreme Court has made clear that any restrictions on pure or expressive speech cannot be made without considering the defendant-speaker's intent. After *Counterman,* in any case seeking restrictions on speech, even true threats, it's clearer than ever that a Section 11(b) defendant's state of mind in exercising her right to free speech or

---

[11] The Court recognized many of these weaknesses from the start, from the complained-of actions of third parties or county Boards of Election to the news articles in the Historical Lawyers Research. In its Order on the TRO (p. 26-27), the Court stated that "the other evidence Plaintiffs have attached to their Complaint and Motion fails to show that *Defendants* have harassed or intimidated voters by facilitating or directly undertaking the O.G.C.A. § 21-2-230 challenges. The news articles Plaintiffs provide . . . do not connect Defendants directly to intimidation suffered by the voters who are the subject of the O.G.C.A. § 21-2-230 challenges. The social media account postings likewise . . . do not show that *Defendants* have intimidated or threatened voters in violation of Section 11(b). How third- party actors react to Defendants' actions is not directly attributable to Defendants without clearer connections borne out by evidence."

14

petition must have been reckless, ignoring a substantial risk of a known harm to a voter. This is not a narrative Plaintiffs can sustain. Here's why.

## II. Defendants' Speech and Petitions Had — and Achieved — Many Lawful Civic Purposes

In contrast to Plaintiffs' speculation that Defendants "had no lawful purpose"[12], Defendants had in mind, and achieved, many legitimate and indeed laudable ends, including but not limited to the following:

1. exercise of their First Amendment Rights of Speech and Association
2. engage and recruit county-specific citizens as petitioners
3. facilitate petitions to county Boards of Election
4. influence Georgia elected officials
5. get the attention of Georgia's Secretary of State and legislature
6. engage local and national media
7. inject sanity and something productive into a toxic political conversation
8. raise public awareness about the real and significant problem of inaccurate voter rolls in the state of Georgia, and
9. change Georgia's law and practices in dealing with its voter rolls

Defendants Engelbrecht, Davis, and Somerville spoke publicly on the issues of election integrity and responsible voter-list maintenance, before citizen groups and the Georgia state legislature, on social media, and in podcasts. Defendants got the attention of the Georgia Secretary of State, county Boards of Election, the Georgia state legislature, and the national media. Ms. Engelbrecht's efforts earned her an in-person meeting with the Secretary of State and a high-level team from his

---

[12] Plfs Mot. for SummJ at 4-5.

office. Mr. Davis, who has a decades-long reputation as an expert in Georgia's voter rolls, was invited to testify to the Georgia state legislature about his and Mr. Somerville's findings. Mr. Somerville, whose previous experience as a citizen investigator effected real change through similar volunteer efforts, met with state senators and representatives, some of whom even submitted challenges.

Defendants thus initiated conversations with exactly the governmental bodies capable of improving Georgia voter rolls — the Secretary of State and the Georgia state legislature. Defendants Engelbrecht and Davis also engaged journalists who wrote articles on Georgia's voter rolls, as well as citizens on social media and in county elections. Finally, Defendants' effort to stand in the Secretary of State's shoes and generate challenges at scale, without limitation, was codified in S.B. 202 in ways *directly* applicable to their efforts here. S.B. 202, now part of Section 230, makes clear there's no limit on the number of challenges (even though some must fail). Defendants' voter residency confirmation project thus helped to raise a matter of public concern that later fostered evolution in the law on this subject.

## III.   Plaintiffs Overreached with Baseless Allegations and Weak Claims of Attenuated Intimidation

Congress chose the concepts expressed by the words "intimidation" and "coercion" during a time of police dogs and water hoses, lunch counter threats and rogue sheriffs. Defendants abhor these kinds of things, like any reasonable person in this day and age, and make no excuse for those who perpetrated or condoned such

16

conduct. But this is an entirely different case, one involving highly protected speech and government petitions and innocent citizens trying their best to remedy an issue they feel is important.

### A. Plaintiffs Have Failed to Prove Any Voters Were Aware of Defendants' Prior Speech as Compiled in Plaintiffs' Historical Lawyers' Research

Much of Plaintiffs' case has been built on the Historical Lawyers Research dutifully performed on selected Defendants' prior speech, some of it well beyond any statute of limitations[13] suggesting Plaintiffs seek what amounts to a Lifetime Liability Policy for any speech that may be tied to voting. After Plaintiffs' lawyers researched Google and Facebook, they found the confirmation bias they were looking for: "atmospheres of intimidation" [156-1 Plfs Mot. Summ.J at 23-24] in which the Spreadsheet Defendants were allegedly (1) engaging in speech that (2) Plaintiffs failed to allege any individual voter-Plaintiff was aware of, let alone was intimidated by. And then, to bolster the minimal or non-existent impact on any identifiable voters,[14] Plaintiff stitched these Defendants' prior speech into a

---

[13] *See, e.g.*, Plfs Mot. for SummJ at 14 - citing SUMF ¶ 79. For example, Plaintiffs' proposed stipulations of fact considered it probative that a now-deceased member of Congress once, in 2012, accused TTV of "intimidation", and that, in 2016, Gregg Phillips, who is not a defendant here, made claims about election fraud.

[14] Specifically, Scott Berson (Muscogee voter), Gamaliel Turner (in Muscogee, where no Defendant submitted a successful challenge), Stefanie Stinetorf (removed from both lists), and the still-unidentified "Jane Doe".

Frankennarrative of manufactured drama. In a clear case of First Amendment overreach, Plaintiffs themselves have been notably quiet about when any individual plaintiff is supposed to have *become aware* of the Historical Lawyers Research and breathed in any "atmospheres of intimidation." The only plausible intimidation Plaintiffs have identified of any identifiable voter is the challenge procedure itself — and even then Plaintiffs haven't identified a challenged voter affected by *Defendants*.

There are clear problems here of proximate cause and causation. As we discuss in Section IV(C)(3), the use of such prior speech to find liability under Section 11(b) also suffers from its constitutional vagueness and overbreadth. In sum, the fruits of the Historical Lawyers' Research can show neither that any voter-Plaintiff was reasonable in feeling intimidated nor that Defendants were reckless when they spoke.

## B. There Were Neither Patrolling SEALs nor Threats of Them (Nor is There Anything Inherently Wrong with Navy SEALs – They're Generally the Good Guys).

Ms. Engelbrecht has explained, without rebuttal, that her single mention of SEALs was simply an idea she floated to have veterans who knew how to follow directions act as volunteer poll workers. TTV Tr. 59:9-12. Though her mere ideation is truly irrelevant to intimidation, Ms. Engelbrecht testified that the idea came from her experience that state and local governmental entities often struggle

18

to get enough volunteers working at polls:

```
 7              Of interest here, we have a new initiative
 8   called "Continue to Serve," which is about recruiting
 9   veterans and first responders to work inside the polls.
10   You want to talk about people who understand and
11   respect law and order and chain of command, you get
12   some Seals in those polls.  And they're going to say,
13   "No, no, this is what it says and this is what -- this
14   is how we're going to play this show."
```

And there were no SEALs who showed up at the polls. There was also no *threat* of people in military attire appearing at the polls. Plaintiffs' prosecution of Ms. Engelbrecht's mere ideation is nothing less than an attempt to police thought — and of course pure speech — itself. And as this Court pointed out, about actual poll watchers, "watching or partaking in non-disruptive activities at polling places without any (or very limited) voter contact has not been found to be 'impermissible' intimidation." Order on Summ.J. at 57-58 (citing cases).

## C. Plaintiffs' Allegation of "Bounties" Was Hyperbolic and Meritless

Plaintiffs also cried that Defendant Engelbrecht threatened to put "bounties" on people's heads. To add drama to what would become a non-fact, they brought in an expert, Dr. Burton, to offer examples of historically intimidating rewards for

information about crimes.[15] But we can see "bounty" was a mis-chosen word uttered once in a single, live podcast.[16] What's more, Ms. Engelbrecht *defined* what she was getting at — a whistleblower support fund — *in the very next breath*, making any "intimidation" from her malapropism highly unreasonable:

```
2    Vote."  And what Validate the Vote is about, is putting
3    a bounty on the fraud.  Creating an environment for
4    whistleblowers to come forward and tell the story,
5    making sure that they have protections, making sure
6    that they have compensation, and further, creating a
7    space for people to come and share what they know, or
8    share with us what they know, and then let us try to
9    aggregate it.
```

"Bounty", in addition to being a word no Plaintiff here heard, amounted to nothing so close to a program with the potential for intimidation as to justify penalizing Ms. Engelbrecht for imprecise, but non-reckless, speech.

### D. Plaintiffs' Tsunami of "Mass Challenges" Was in Reality a Trickle

Plaintiffs have built their entire narrative around the idea that the TTV Defendants did *something that matters*, in the real world, with around 364,000 names in spreadsheets, and that Davis and Somerville *did something that matters,* in the real world, with around 39,000 names in spreadsheets. This is a false narrative.

---

[15] *See* Burton Rpt. ECF No. 156-17 at 26.

[16] See Dkt. 156-46 at 3 (transcript of True the Vote Live with Catherine Engelbrecht)

First, Plaintiffs have failed to show that either the TTV or Davis-Somerville lists of potentially ineligible voters were even submitted to more than a fraction of Georgia's Boards of Election.

Second, as we've pointed out, Plaintiffs have failed to show that more than a handful of petitions made it through the filter of a BOE to reach an actual voter. OCGA 21-2-226(a) makes it clear that, contrary to the argument of Plaintiffs, it is not the petitioner's job to determine the eligibility of a voter; it is the responsibility of the Board of Elections "to determine the eligibility of each person applying to register to vote in such county." It was not reckless, or even negligent, as a matter of law, for Defendants to rely on the counties to do what only the counties were legally authorized to do.

Defendants were thus not reckless in expecting that the county BOEs, particularly after being sent threats of lawsuits by Plaintiffs' attorneys,[17] would act as a powerful filter in the adjudication of probable cause. Based on the available evidence, the BOEs simply ignored or rejected *en masse* — without making any findings — the vast majority of the petitions. But petitions to governmental bodies

---

[17] Even though those threatening letters mis-stated the law. *See* Def TTV 1455, where Mr. Elias cited *Schmitz v. Fulton Cnty. Bd. of Registration & Elections*, 2020CV339337 (Super. Ct. Ga. Oct. 1, 2020), which says nothing whatsoever about the NCOA or probable cause, and *Black Voters Matter Fund v. Raffensperger*, 508 F.Supp.3d 1283 (N.D. Ga. 2020) which also did not claim that the NCOA failed to meet § 21-2-230's probable cause standard.

that never reach a voter are no more attempted intimidation than they are attempted hijacking. And petitions that did reach a voter's record were allowed to do so only by a BOE's finding of probable cause – a *prima facie* finding of merit that belies any recklessness on Defendants' part.[18] That's how, in reality, the alleged tsunami of "mass challenges" that Plaintiffs have relied upon to show Defendants' negligence was, in reality, just a trickle. The legal term is *de minimis*. When the alleged impact is *de minimis*, the required degree of recklessness must be high indeed, in order not to chill speech, petitions, and association.

## IV. Speech-as-Intimidation Claims Must Prove (1) The Alleged Feeling of Intimidation Was Reasonable and (2) Defendants Were Reckless in Causing It.

### A. Plaintiffs Cannot Show They Reasonably Felt Intimidated by Actions of Defendants.

This Court has defined intimidation as "'a serious expression of an intent to commit an act of unlawful non-violence' against voters." Order on Summ. J. at 75 (citation omitted). As the term "serious expression" conveys, intimidation claims cannot be proven simply by uttering the words "I was intimidated" – at least not without inviting constitutionally impermissible vagueness and over-breadth.

---

[18] At the same time, the fact that some BOEs did not bother to evaluate the probable cause of petitions submitted to them, or rejected the petitions (with or without meaningful consideration) does not mean probable cause was lacking, *see BE & K Const.*, 536 U.S. at 531 ("the genuineness of a grievance does not turn on whether it succeeds"), especially where many of those Boards of Elections received threatening letters *before* the challenges were filed and the probable-cause determination was to be made, unquestionably "chilling" many of them.

Intimidation also cannot be measured by such a low and vague bar as a plaintiff's *discomfort* or *annoyance,* which is a more accurate term for what the voter-Plaintiffs and affiants here say they experienced upon being asked to confirm they were in the right place. The constitutional difficulty with using such a loose, vague standard, based on parroting words from a statute, is not just its subjectivity, but that it invites witness coaching.

Set aside all the drama Plaintiffs' attorneys have attempted to inject into the *possibility* that Defendants' actions led to one voter-Plaintiff being asked to confirm he or she was voting in the proper precinct, shortly after he or she knowingly filed a permanent change of address and a governmental body agreed the move was probably permanent. This is not a case alleging the request burdened a fundamental right; rather, Plaintiffs claim the request was "intimidating." But the fact is that any such voter was merely asked, without cruelty or aggression, to confirm a current address. This is a very low ask in exchange for a democracy.

### B. Plaintiffs Are Required to Show Defendants Were Reckless in Their Pure Speech and Expressive Speech

Plaintiffs have long seemed to know Defendants' purpose and intent do have a role here. We know this because Plaintiffs built much of their case from the statements by the Spreadsheet Defendants about their cause. Plaintiffs have also repeatedly hammered at their key argument, contradicted by all available evidence, that Defendants had "no lawful purpose," and *therefore,* in the absence of lawful

23

intent, the "only [] possible result" was "voter intimidation." Plfs Mot. for Summ J at 4-5. In short, it appears that Plaintiffs anticipated the logic of *scienter* — though fatal to their case — in *Counterman v. Colorado*, 600 U. S. 66 (2023).

### 1. *Counterman* Addressed Potentially Intimidating or Distressing Speech

In *Counterman*, the defendant was charged under a statute, strikingly similar to Section 11(b), aside from the latter's connection to voting, making it unlawful to communicate with another person in "a manner that would cause a reasonable person to suffer serious emotional distress." In other words, the Court in *Counterman* considered a statute employing the same objective "reasonable plaintiff" standard, without regard to the defendant's awareness or *mens rea*, that Plaintiffs advance for Section 11(b). In *Counterman*, the Court observed that the plaintiff "never noticed" the defendant engaging in action beyond speech *Id*. at 71 n.1. Thus, the charge against Counterman was based solely on his "communications". *Id*. The same is true here.

### 2. A Defendant Accused of Problematic Speech Must Be Aware of or Recklessly Disregard His or Her Speech's Impact

But the defendant in *Counterman* argued that the First Amendment required that his statements were not only objectively threatening, *but also that he was aware of (or recklessly disregarded) their threatening nature*. The Supreme Court agreed, though it acknowledged that insistence on a "subjective element" in unprotected speech cases could come at a cost: "It will shield some otherwise proscribable (here,

24

threatening) speech" because it's difficult to prove "what the defendant thought." *Id.* at 75. But the Court balanced the competing rights at issue in favor of more speech, holding that a subjective standard for the alleged perpetrator is still required lest legal action chill too much protected expression. *Id*. at 75, 78, 80. In language as applicable to Plaintiffs' Section 11(b) claims as to state action that could chill non-political speech, the Court explained: "The speaker's fear of mistaking whether a statement is a threat; his fear of the legal system getting that judgment wrong; his fear, in any event, of incurring legal costs — all may lead a speaker to swallow words that are in fact not true threats." *Id.* at 78.

The Court acknowledged that the existence of a threat generally depends not on "the mental state of the author," but on "what the statement conveys" to the person on the receiving end. *Id*. at 74. But the Court reasoned that "the First Amendment may still demand a subjective mental-state requirement . . . because bans on speech have the potential to chill, or deter, speech outside their boundaries." And an important tool to prevent chilled speech—even in the less protectable, non-political context of actual threats — "is to condition liability on … a culpable mental state." *Id*. at 75.

What standard should this Court use to evaluate Defendants' many separate acts of speech? The Supreme Court held that in cases of speech alleged to be problematic, the appropriate *mens rea* is a recklessness standard—*i.e.,* a showing

that a person "consciously disregards a *substantial and unjustifiable risk* that the conduct will cause harm to another." *Id.* at 79 (citation omitted; cleaned up). "[R]ecklessness is morally culpable conduct, involving a 'deliberate decision to endanger another.'" *Id.* at 79. "In the threats context, it means that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Id.* (citing *Elonis v. United States*, 575 U.S. 723 at 746 (2015) (Alito, J., concurring in part and dissenting in part)). In the voting intimidation context, it would mean that defendants accused of intimidating speech were aware at the time of each act of speech that relevant voters could regard the speech as intimidating with respect to voting and delivered it anyway.

### 3. *Counterman* Applies to Civil Cases Involving Speech

In language equally applicable to Section 11(b), the Court explained, "Prohibitions on speech have the potential to chill, or deter, speech outside their boundaries. A speaker may be unsure about the side of a line on which his speech falls. Or he may worry that the legal system will err, and count speech that is permissible as instead not. Or he may simply be concerned about the expense of becoming entangled in the legal system. The result is 'self-censorship' of speech that could not be proscribed—a 'cautious and restrictive exercise' of First Amendment freedoms." *Id.* at 75 (citations omitted).

26

"Given the ambiguities inherent in the definition of obscenity," the Court went on, "the First Amendment required proof of *scienter* to avoid the hazard of self-censorship." *Id.* Proof of *scienter* is equally relevant to the well-known "ambiguities inherent in the definition of" *intimidation,* which Section 11(b) does not even define. And proof of *scienter* is of even more relevance where (1) plaintiffs press claims unmoored from causation or agency, (2) few people are even allegedly impacted, (3) Plaintiffs (here Fair Fight, et al.) are exercising the power of the state against Defendants, and (4) especially in cases of political speech, which has higher value under tha law than defamatory or purely threatening speech, incitement, or obscene speech. This Court must set precedent that accounts for "the ordinary citizen's predictable tendency to steer wide of the unlawful zone."

## C. Defendants' Facilitation of Section 230 Petitions is Protected by the First Amendment

Within the First Amendment right to free speech, citizens have a right to "petition the government for a redress of grievances." U.S. Const. amend. I. Defendants' facilitated petitions constituted speech on core political matters: here, the controversial State of Georgia's much-litigated voter rolls. Accordingly, what counts as protected speech must be defined in broad terms, such as:

- "the expression of a desire for political change" - present here
- "communication of information" - present here
- "dissemination and propagation of views and ideas" about the electoral process - present here

27

*Meyer v. Grant*, 486 U.S. 414, 421, 422 n.5 (1988) (citing *Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980)). Defendants maintain the petitions at issue here regarding address changes were not mere conduct but petitions expressly protected by the First Amendment, but even if they could be considered conduct, they were *inherently expressive*, as we show next.

The First Amendment "literally forbids the abridgement only of speech," but its protection is not limited to just spoken or written words. *Texas v. Johnson*, 491 U.S. 397, 404 (1989). Conduct that is "sufficiently imbued with elements of communication"—known as "inherently expressive" conduct—falls within the scope of the First and Fourteenth Amendments. *Id.*; *see also Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006). The test to determine whether conduct is sufficiently communicative to warrant First Amendment protection was originally articulated in two seminal free-speech cases, *Spence v. Washington*, 418 U.S. 405 (1974), and *Texas v. Johnson*.

The two-part *Johnson* test asks: (1) whether an intent to convey a particularized message was present, and (2) whether the likelihood was great that the message would be understood by those who viewed it." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336–37 (11th Cir. 2021) (cleaned up) (internal quotation marks omitted) (quoting *Johnson*, 491 U.S. at 404).

1.  **This Court Has Already Concluded Defendants Intended to Convey a Particularized Message**

The Court has already concluded that "Defendants intended to communicate a particularized message." Order on Summ. J. at 10. Defendants maintain that their trying to facilitate Section 230 petitions conveyed a particularized message about the problems with Georgia's voter rolls, to the Georgia Secretary of State, Georgia's legislature, the media, volunteer petitioners, Boards of Election, and the registered voters implicated in those petitions.

2.  **Defendants Clearly Communicated Messages to Others**

There's no question Defendants communicated a particularized message to others. There is nothing inherently wrong with that. (Defendants discuss their communicated message in Section II.) Indeed, Plaintiffs devote a good deal of their case to complaining about petition-related messages of Defendants Engelbrecht, Somerville, and Davis, which were made in social media posts and comments, podcasts, and support of litigation, as well as about the messages' effects on others. If, as Plaintiffs have argued, even not voting is "a political message," *Fair Fight Action, Inc. v. Raffensperger*, 413 F.Supp.3d 1251, 1272 (N.D. Ga. 2019), then asking that voters vote only in the right county is clearly a political message. So is arguing that the Secretary of State has been delinquent, and that Georgia needs to change its voter roll policies. Expressive speech need not communicate a specific message, *see Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir.

2004) (looking to whether "reasonable person would interpret [a display] as *some sort of message*, not whether an observer would necessarily infer a *specific message*") (emphases added), but Defendants' pure and expressive speech alike clearly did communicate messages about the undesirable state of the Georgia voter rolls.

This is enough to establish inherently expressive speech, but in the interest of banishing any doubt, we can examine the circumstances that could "help a reasonable observer discern the dividing line between expressive conduct and everyday conduct." *Burns*, 999 F.3d 1317 at 1343 (quoting *Fort Lauderdale Food Not Bombs v. City of Fort Lauderdale*, 901 F.3d 1235, 1240 (11th Cir. 2018)). Here, the circumstances were clear – a weeks-long initiative to remedy Georgia's inaccurate voter rolls, inaccurate because everyone knows people are more mobile these days. Courts look at several factors in examining the circumstances of speech. *Id*. at 1343–44 (quoting and citing *Fort Lauderdale*, 901 F.3d at 1242–43).

First, was the conduct at issue distinguishable from actions in everyday life, such as "set[ting] up tables and [a] banner, and distribut[ing] literature"? *Id.* at 1344. Yes, here it was. Over several weeks' time, in several communications, Defendants made public announcements and facilitated the work of dozens of volunteers in doing something they'd never done "in everyday life" before, utilizing a Georgia statute to submit emails and letters to local Boards of Election, and stating there was

probable cause to believe voters identified in accompanying attachments were registered to vote in the wrong county.

Second, did the public have access to the conduct? Yes. Defendants announced their work on Facebook and in press releases. The county Boards of Election then made their hearings public, and some streamed them. Third, what was the location of the acts, such as in a public city park or other traditional public forum? The public forums involved here included state-sanctioned petition processes, public speaking, legislative testimony, county government hearings, mainstream media, and social media.

Fourth, is the conduct involved "an issue of concern in the community"? Yes. Defendants' petitioning involved voter roll integrity, the state's voter-list, and trust in elections. Fifth, has the conduct historically has been a type that communicates a message? Yes. Public speech, association with other citizens, and petitions to one's government are all quintessential means of communicating messages. Sixth, are there other factors specific to a case? *Burns*, 999 F.3d at 1346. Here, Defendants' expressive speech was *understood as such* by commenters on social media, journalists, legislators, boards of election, volunteer petitioners, and of course Plaintiffs' lawyers, who relied on the TTV Defendants' speech in a press release. Plaintiffs' lawyers used their understanding of Defendants' speech to threaten every BOE in Georgia and pattern this lawsuit precisely on the names contained in that

31

press release, even listing them in the same order. People understood very well what Defendants' message was, even if they didn't like it.

The Supreme Court has already made clear that citizens use petitions to advocate and express speech. Even distributing citizen petitions is expressive. *Meyer*, 486 U.S. at 421; *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182 at 192 (1999). Petitions are expressive even when they might have an effect on other parties, like Plaintiffs. *John Doe No. 1 v. Reed*, 561 US. 186 at 195 (2010) (having an administrative effect in the electoral process does not "somehow deprive[] that activity of its expressive component, taking it outside the scope of the First Amendment"; "Petition signing remains expressive even when it has legal effect in the electoral process").

In the nearly identical context of a petition supporting a referendum, the Supreme Court held that an "individual's signature will express the view that the law subject to the petition should be overturned," or "if the signer is agnostic as to the merits of the underlying law, his signature still expresses the political view that the question should be considered 'by the whole electorate,'" thus "implicating a First Amendment right." *Doe*, 561 US. 186, 195 (2010) (citing *Meyer*, 486 U.S. at 421). Defendants here expressed their political views through their promotion of the petitions, their association with and education of the petitioners, and the signatures themselves. Defendants communicated their message even more clearly than the

prevailing party in *VoteAmerica*, where some voters who received advance voting applications from that party (the plaintiff) submitted them, and the Court determined their submission "strongly suggests that Kansans not only understood plaintiff's pro-advance mail voting message but also acted on its encouragement." Similarly, in this case, petitioners acted on Defendants' message to submit petitions utilizing still more of Defendants' speech, and BOEs that received the Section 230 challenges acted on them too: some found probable cause, while others heard politically charged messages.

### 3. Plaintiffs' Interpretation of Section 11(b) as Lacking Scienter is Constitutionally Both Overbroad and Vague as Applied

In its Order ruling upon the parties' summary judgment motions, this Court granted summary judgment to Plaintiffs on Defendants' Due Process defense that Section 11(b) is unconstitutionally vague or overbroad. *See* Order on Summ. J. at 84-5. However, it is not clear whether the Court, which focused both its vagueness and overbreadth analyses on Section 11(b)'s statutory "terms," as in a facial challenge, meant to rule on an *as-applied* challenge. In addition, the court discussed only the potential for vagueness in "mass challenges" under Section 230, and not the rest of the allegations in what we will characterize as Plaintiffs' Interpretation. Finally, *Counterman* has arguably altered the applicable analysis. For all these reasons, Defendants present the following argument for why Plaintiffs' Interpretation of Section 11(b) — *as applied* — is both unconstitutionally overbroad

and vague. Plaintiffs' Interpretation holds as follows:

- Liability for speech may be based on Historical Lawyers Research even without evidence any voter-Plaintiffs were aware of any of the allegations in it. Such a standard, if upheld, will invite all future plaintiffs in intimidation cases (and more probably their lawyers) to use AI-based bots to scrape the Internet and social media for speech by defendants, of any vintage, that can be deemed "atmospheres of intimidation" in past and likely unrelated events;
- Liability for speech may be imposed, *Pinkerton*-style, on account of the actions of third parties lacking either agency or privity with defendants;
- Liability for speech may be based on lack of proximate cause or even foreseeability, such as mere "natural consequences"; and
- Liability for speech may be based on mere negligence, such as in compiling spreadsheets that include voter records that may be of concern.

That brings us to a key difference between this case and those brought in the era in which the VRA was enacted. In the pre-Internet, pre-social-media era, there was little opportunity for any defendant-to-plaintiff interaction aside from the up-close-and-personal. Modern cases under Section 11(b) are becoming markedly different. This is because with the ease of publication and sharing on social media, citizens (and would-be defendants) can more easily speak. And the existence of the resulting speech means greater potential for *plaintiffs' lawyers* to compile those citizens' speech, perhaps over a lifetime, if Plaintiffs' complaints about Gregg Phillips' speech in 2016 is any indication, and to argue that such speech creates illegal "atmospheres of intimidation" — even if no plaintiff is alleged to have heard them, seen them, or breathed them in. Courts should be wary of giving too much weight to such "contexts."

### a. Plaintiffs' Interpretation is Unconstitutionally Vague

Plaintiffs' Interpretation is *vague* because it does not clearly define what speech or petitioning is prohibited, which will lead individuals to steer far clear of the uncertain boundaries of the law, thereby chilling lawful speech. "Under due-process principles, a law is void for vagueness if its prohibitions are not clearly defined":

> Unconstitutionally vague laws *fail to provide fair warning* of what the law requires, and they *encourage arbitrary and discriminatory enforcement* by giving government officials [or professional plaintiffs] the sole ability to interpret the scope of the law. *The First Amendment context amplifies these concerns* because an unconstitutionally vague law can chill expressive conduct by causing citizens to steer far wider of the unlawful zone to avoid the law's unclear boundaries.

*Dream Defs. v. Governor of the State of Fla.*, 57 F.4th 879, 890 (11th Cir. 2023) (emphases added; cleaned up).

The Supreme Court explained the reasons why Defendants are entitled to an Section 11(b) interpretation tracking its legislative and historical purpose that provides fair warning and explicit standards. "First, because we assume that man is free to steer between lawful and unlawful conduct, *we insist that laws give the person of ordinary intelligence a reasonable opportunity to know what is prohibited*, so that he may act accordingly. Vague laws may trap the innocent by not providing fair warning. Second, if arbitrary and discriminatory enforcement is to be prevented, laws *must provide explicit standards* for those who apply them. A vague law

impermissibly delegates basic policy matters to policemen, judges, and juries for resolution on an ad hoc and subjective basis, with the attendant dangers of arbitrary and discriminatory applications." *Grayned v. City of Rockford,* 408 U.S. 104, 108–109 (1972) (footnotes omitted, emphasis added).

The Supreme Court has added that "[w]hat renders a statute vague is not the possibility that it will sometimes be difficult to determine whether the incriminating fact it establishes has been proved; but rather *the indeterminacy of precisely what that fact is.* Thus, we have struck down statutes that tied criminal culpability to whether the defendant's conduct was 'annoying' or 'indecent'—wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *United States v. Williams*, 553 U.S. 285, 306 (2008) (emphasis added).

Plaintiffs' Interpretation of "intimidating" relies on no statutory definition of "intimidation" offered by the VRA and certainly no "narrowing context" – in fact, Plaintiffs *broadened* the supposedly probative context to include: (1) pure speech (a) some of it years before the events, (b) not directed at Georgia or even voters, (2) unpredictable acts of third parties, such as specific speech of commenters on social media and decisions of county Election Boards, (3) Defendants' alleged *intentions* in submitting clearly-stated petitions that followed the express terms of state statutes on process, timing, and sufficiency of evidence, and (4) reliance on state law and government intermediaries.

36

If aspiring to bring "mass challenges" to an intermediary governmental body can form the basis of a Section 11(b) violation, even where that governmental body affirms the few challenges that reach voters had "probable cause," or if citizens' prior speech scraped from obscure corners of the Internet and seen by no one can create a lifetime of potential liability, then no "man of common intelligence" would know which, or how many, voter petitions are allowed under Georgia law, or which statements made over years of time would be considered a violation of Section 11(b). Such a finding by this Court would chill Americans' First Amendment activity by making them fearful of liability stemming from confusion over exactly what petitions to government would be permitted, or what they can say in 2023 to avoid liability in 2034.

### b.  Plaintiffs' Interpretation is Unconstitutionally Overbroad

Plaintiffs' interpretation is ***overbroad*** because it would prohibit a substantial amount of protected speech — especially petitions to governments — over and above the conduct Section 11(b), as informed by *Counterman's* recklessness standard, may prohibit. When making an overbreadth claim based on First Amendment scrutiny, the challenger must show the interpretation in question, like Plaintiffs' here, "punishes a substantial amount of protected speech, judged in relation to the statute's plainly legitimate sweep." *Virginia v. Hicks*, 539 U.S. 113,118-19 (2004).

Here, Plaintiffs' Interpretation would prohibit *all* petitions issued in error, even if a government intermediary approves them, meaning that "many of [the Interpretation's] potential applications involve protected speech." *United States v. Hernandez-Calvillo*, 39 F.4th 1297, 1311 (10th Cir. 2022). It would also punish speech from long ago, speech not witnessed by a plaintiff, and speech not reasonably directed toward those who would assume the mantle of Plaintiff, as well as punish Defendants for *any* speech of others, so long as it was "foreseeable" measured by some undefined standard and perspective. Such an interpretation would "create a real danger that the statute will chill First Amendment expression." *Id.* at 1300. This is, of course, exactly why the Supreme Court in *Counterman* mandated that a defendant must be shown to have spoken with a knowing or reckless state of mind.

### 4. Citizens Require the Breathing Room of Reasonable Reliance on Their Government's Statutory Language and Process

In balancing fundamental rights, the Court should hold that petitioners must be able to rely on authorities ranging from duly-enacted statutes and state officials to advice of counsel. Thus, Plaintiffs' charge that the timing of the Section 230 challenges was frivolous because nothing could have been accomplished before the Runoff must be canceled out by the Georgia legislature's *enacted view* that "Such challenge may be made at any time prior to the [challenged] elector . . . voting," "or, if such elector cast an absentee ballot, prior to 5:00 P.M. on the day before the

election". If petitions are filed in the way contemplated by an entire state legislature and a state's governor, can we really say they were reckless? Finding in the affirmative would impose liability on grounds of constitutionally impermissible vagueness and chill the efforts of the citizens in the future.

In addition, before pursuing the effort further, Defendant Engelbrecht, unlike any litigant to be found in the caselaw on abuse of legal process, met with Georgia's Secretary of State himself, and his staff, in person, to confirm TTV's intended process, including the use of NCOA and the plan to facilitate challenges at scale. While the opinions of the Secretary of State create no safe harbor, they do lend credence to the argument that the TTV Defendants were not reckless in relying on the predictive power of the NCOA.

Finally, advice of counsel similarly encouraged the TTV Defendants in their view of the reasonableness of what they were doing: TTV attorney James Bopp Jr. wrote a December 21, 2020 opinion letter attesting that the counties were required to accept the challenges, and that the "process will not result in any voters being removed from the rolls, and will not deny the right to vote of any legal voter. A challenged voter can vote a challenged ballot, with that vote counted once eligibility is confirmed." His letter was shared among all Defendants, the volunteer petitioners, and every Board of Election with regard to which TTV endeavored to support a challenge. *See* James Bopp Letter [Def TTV 1254-1260].

To hold that citizens may not rely on *reasonable* interpretations of statutes and advice of counsel, to say nothing of an actual Secretary of State, would chill the efforts of good citizens to help their governmental servants maintain up-to-date voter rolls that inspire trust in the voters of their respective states. This may be a side issue to some. But it is an endeavor Defendants have embraced. Plaintiffs' Interpretation would chill the First Amendment right to petition of future such citizens. When citizens undertake to make eligibility challenges up-to-date, even if they make an innocent mistake or two; and when they rely on advice of counsel; and when they rely on Boards of Election to properly carry out their statutory function, it would certainly chill the exercise of their right of petition were the law to be interpreted to require such petitions must be flawlessly executed.

## V. Defendants Did Not Act Recklessly, Amounting to Any Intimidation by Indirectly Encouraging or Supporting Petitions to Local Boards of Election

Setting aside the dearth of evidence that any Plaintiff or other voter was impacted by the pure or expressive speech of any *Defendant*, we now turn to the good-faith, and the value, of Defendants' efforts to facilitate and support Section 230 petitions to governmental bodies.

### A. Post-election Analysis of Both Challenge Lists Shows the Spreadsheets' Predictions that Voters Had Moved Out of County Were Largely Meritorious

The willingness to build something imperfect, like a petition initiative, is the *sine qua non* of all innovation or progress. If non-reckless error is punished, people

cease to become willing to try, to experiment, to innovate — to speak out. In that context, post-election analysis suggests the Defendants' efforts to identify residency issues were substantially on target. They non-recklessly used the NCOA Registry of permanent changes-of-address to establish the "probable" cause that a voter has *probably* become ineligible to vote in a former county of residence.

Mr. Somerville's recent comparison of the entire 39,141-voter Davis-Somerville List with an official copy of the Georgia Voter File, secured directly from the Georgia Secretary of State's office in mid-August 2023, revealed the following:

- 8% or 3,096 of voters from the Davis/Somerville challenge file have been REMOVED from the voter rolls by the Secretary of State;

- 25% or 9,639 of voters have been moved to a status of INACTIVE

  - of these 9,639, 54% were inactivated due to NCOA, 24% due to a change of state, 22% due to returned mail, and less than 1% due to no contact.

- 27% or 10,624 of voters updated their voter registration address with the Secretary of State to the same address returned by the US Postal Service NCOA[link] database, indicating the NCOA returns of these voters in the Davis/Somerville challenge list were accurate and residency was indeed in question.

- An additional 9,592 voters have since changed their registration address with the Secretary of State.

- In all, only 15.8% of the voter records both remain in ACTIVE status and list the same voter registration address of record as when the Davis/Somerville challenge list was produced.

Similarly, the TTV Defendants' analysis indicates that, in Georgia's November 2020 elections, 67,284 votes were cast using ineligible voter registration credentials, based on invalid residency. Of those, 19,077 votes were associated with records of voters who no longer lived in Georgia, and 48,207 votes were assigned to voters who had moved to a different county within Georgia. The state of Georgia mailed ballots to 16,986 address locations where voters no longer lived, yet the votes were still cast and counted. Additionally, 8984 of these votes were correlated with inactive voter registration records.

The State of Georgia's inactivation of the registrations of **_two of the Plaintiffs in this case_** shows just how reasonable a predictor the NCOA really is. Banks County sent a communication to then-Plaintiff Jocelyn Heredia on the basis of the same NCOA registry with which Defendants Davis and Somerville began their own process of identifying her as someone who had probably permanently moved. She didn't respond to the communication, which was sent to the Banks County address at which they did not believe she lived, and her voter registration was inactivated in

February 2022. (Plaintiffs recently decided to dismiss her from this case, well after she was deposed and well after they listed her on their witness list). Plaintiff Scott Berson also moved out of his county of voter registration, as predicted by the NCOA. He, too, had his voter registration inactivated by reason of NCOA in early 2022.

### 1. Private Citizens are Incapable of Violating the NVRA, or Trying to

Fresh off their employment of the NVRA against a state actor[19] – the only party the NVRA applies to – Plaintiffs' counsel early on confused the issues here by (1) attempting to contort the NVRA to apply to *private* defendants and (2) *speculating* that Defendants *wanted* to do something impossible: to somehow "force" county Boards of Election to violate the NVRA by trying to recruit petitioners to send the BOEs emails. Plaintiffs' argument here relies on both arguments being correct, but neither one is.

When Defendants studied the NVRA prior to the submissions, it was clear that (1) Congress expressly permitted states to use the USPS change-of-address database, the NCOA, to identify potential residential movement, 52 USCA § (c)(1), as did the State of Georgia, in Section 233,[20] (2) proper list maintenance is a compelled

---

[19] *Ben Hill Cty Bd. of Elections*, 512 F.Supp.3d 1354, held that the *county's* direct challenges violated the National Voter Registration Act ("NRVA").

[20] Section 21-2-233 states, "If it appears from the change of address information supplied by the licensees of the United States Postal Service [i.e., NCOA] that an elector whose name appears on the official list of electors has moved to a different

requirement expected of each state, (3) Section 230 challenges would preclude no eligible voter from voting, regardless of their change of address, and (4) registrant information correction was permitted up to the day of voting.

It should be clear the NVRA does not apply to, and cannot be used by, citizens, like Defendants, who cannot remove anyone from voter rolls within 90 days of an election. This is part of why the conclusion of the court in *Majority Forward,* regarding the same challenges (to Berson, Turner, and Stinetorf) which Plaintiffs recycle here, arguably does not apply in this case.

First, the party enjoined in that case was the county that both made the probable cause determination and removed voters from the rolls, not a citizen challenger who made a mere proposal, in the exercise of First Amendment petition rights. Second, unlike Defendants here, the challenger in that case expressly stated in his challenge letter that his challenge was "based on grounds that the challenged elector is not qualified to remain *on the list of electors,*" 512 F.Supp.3d at 1368 (emphasis added), and removal of voters from the voter rolls is what the county did. Third, if the court in that case interpreted Section 230 properly in the context of a suit against a county, it's clear that a contrary interpretation is available to Defendants in a very different context: their non-reckless exercise of First

---

address outside of the boundaries of the county or municipality in which the elector is presently registered, such elector shall be sent a confirmation notice ..."

Amendment rights. The *Majority Forward* court quoted language from subsection (i) that says "If the registrars uphold the challenge, the name of the challenged elector shall be removed from the list of electors," but the preceding text in subsection (i) confusingly mentions both (1) challenges "based upon the grounds that the challenged elector is not qualified to remain on the list of electors," and (2) challenges "based on other grounds." In the case of "other grounds," such as the grounds of ineligibility to vote in a particular election that Defendants cited in the facilitated petitions, "*no further action shall be required by the registrars*." (emphasis added). That means Defendants' understanding was not unreasonable, let alone reckless.

Finally, being asked to confirm residence, when there is probable cause to suspect a permanent move, and being allowed to vote a provisional ballot even if one cannot confirm residence, is many steps removed from any preclusion from voting. Confirmation of residence based on the NCOA is also indisputably allowed under the plain language of the NVRA and Georgia state law.

### a. Even in States' *Removal* of Voters, the NVRA Requires Only "Reasonable Efforts" – Not Perfection – to Identify Changed Residency

To "protect electoral integrity" and "maintenance of the voter rolls," the NVRA requires that states "conduct a general program of list maintenance that makes a ***reasonable effort*** to remove voters who become ineligible on account of . .

45

. *change of residence.*" *Bellitto v. Snipes*, 935 F.3d 1192, 1194 (11th Cir. 2019) (emphases added). Thus the NVRA empowers states, as Section 233 does Georgia's Secretary of State and Section 230 does its citizens, to make "reasonable efforts" — not cost-prohibitive or perfect efforts — to identify voters who have "changed residence".[21] The Eleventh Circuit has recognized there will, inevitably, be some mistakes. *See Arcia v. Fla. Sec'y of State*, 772 F.2d 1335, 1346 (11th Cir. 2014) (recognizing there's a "chance for mistakes" even in individualized inquiry). Defendants did not seek to remove voters from the voter rolls, but the standard for voter *removal* is certainly no lower than that of voter *address correction*, and arguably higher.

### b. Even for the More Serious Removal of Voters, Use of the NCOA Alone Constitutes a "Reasonable Effort" to Identify Movers

The NVRA provides that states "may meet the requirement" of identifying voters who have changed residence "by establishing a program under which (A)

---

[21] *See* § 20507(a)(3)–(4); *see also* 52 U.S.C. §§ 20901–21145 (2012) (the Help America Vote Act of 2002, in which Congress mandated that states create computerized statewide voter registration lists, 52 U.S.C. § 21083, and conduct maintenance of the statewide voter registration list by utilizing "[a] system of file maintenance that makes a ***reasonable effort to remove*** registrants who are ineligible to vote from the official list of eligible voters," *id.* § 21083(a)(4)(A)) (emphasis added).

But even the states, who must send federally mandated (NVRA) postcards to those who appear on their NCOA runs, do not know for certain that someone has *permanently* moved. No entity (private or public) engaged in voter file maintenance can achieve anything resembling perfection.

*change-of-address information supplied by the Postal Service through its licensees*
[*NCOA*] is used to *identify registrants whose addresses may have changed*." 52
U.S.C. § 20507(c)(1) (emphasis added). In reviewing the state of Ohio's use of
NCOA to identify voters who had moved, "the Supreme Court found that it complies
with the NVRA." *Fair Fight*, 413 F.Supp.3d at 1290 (citing *Husted v. A. Philip
Randolph Inst*., 138 S.Ct. 1833 (2018) (holding "undisputedly lawful," under the
NVRA, the state's utilization of a process that "sends notices to registrants whom
the Postal Service's 'national change of address service' identifies as having
moved)); *see also Bellitto,* 935 F.3d at 1205 (holding "the NCOA Process, at a
minimum, constitutes a reasonable effort at identifying voters who have changed
their addresses"). Indeed, Defendants were aware that the state of Georgia itself uses
NCOA to identify voters who have likely moved and that the state sends them notices
to confirm their address.[22]

   Accordingly, there is no legal basis for Plaintiffs' assertion that private parties
may not rely on the NCOA as part of a "reasonable" — that is, non-negligent and
non-reckless — effort merely to "identify voters who have changed their address."

---

[22]  *See* https://sos.ga.gov/news/raffensperger-continues-comprehensive-year-list-maintenance-effort#:~:text=Atlanta%20%2D%20Georgia%20Secretary%20of%20State,list%2Dmaintenance%20effort%20across%20Georgia (noting "county election offices mailed notices to Georgia voters who have filed a National Change of Address (NCOA) form with the US Postal Service") (accessed October 11, 2023).

Nor were the Defendants negligent in asking Boards of Election to ask voters who had filed permanent changes of address forms to confirm their residence, and they were certainly not negligent or reckless in leaving the issue of actually contacting any voter up to the various Boards of Election.

### 2. While Defendants Could Have Used the NCOA Alone Without Being Deemed Reckless, They Went Beyond the NCOA

Plaintiffs argue that the Spreadsheet Defendants' effort go above and beyond the NCOA, though not required in the first place, was also negligent, and they should be liable for intimidation for not fully succeeding in an optional effort. Far from harboring negligent, let alone reckless states of mind, the Spreadsheet Defendants spent weeks removing from the challenge list people whose *permanent* address change *might* not actually be permanent. They were not legally required to chip away at the NCOA; they did so out of an abundance of caution – to "err on the side of the voter," as Defendant Somerville stated publicly of his and Defendant Davis' effort. They decided to remove categories of voters (1) whom they suspected sometimes filed permanent COAs without meaning to move permanently and (2) who could be reasonably if imperfectly identified. For example, snowbirds are relatively hard to

identify using available tools, but one can try to remove addresses on college campuses or military bases.[23]

Critically, Defendants did not have all the tools available to the state to carry out the same function as the state, such as driver's license records. But they did use the tools available to them. They narrowed their lists despite knowing that by removing some false positives (that is, merely temporary moves identified by the NCOA as permanent), they would also incorrectly remove some number of voters who did actually move away permanently, such as the one-quarter of college students who graduate every year. The two groups of Spreadsheet Defendants utilized various filters to go above and beyond the NCOA:

|  | TTV Defendants | Defendants Davis and Somerville |
|---|---|---|
| Excluded voters who filed temporary changes of address | YES | YES |
| Excluded voters who filed changes of address more than 18 months prior | YES | YES |
| Excluded voters who did not vote in the General Election | NO | YES |

---

[23] Plaintiffs' Dr. Mayer has suggested that Defendants should have removed all challenges in even the vicinity of a campus or base, a standard that is both unworkable in practice and, especially in cities, would obviously eliminate too many true positives of actually permanent moves to be of use.

| | | |
|---|---|---|
| Excluded inactive voters | NO | YES |
| Attempted to identify and exclude likely servicemembers who filed permanent COAs | YES | YES |
| Attempted to identify and exclude likely students who filed permanent COAs | YES | YES |
| Removed electronic voters | NO | YES |

## B. The Petitions Satisfied the *Prima Facie* Standard: Not Baseless or Frivolous

Unlike legal process directed toward a person, Section 230 petitions are submitted to county governments, and may never come to the attention of a voter. When they do, the but-for cause is the intervention of the county and its independent finding of probable cause. The question here is whether Defendants were reckless in interpreting Section 230.  The answer is that they were not.

First, Defendants saw that subsection (a) allows "any elector" to challenge the right of "any other elector . . . to vote in *an* election." Second, the same subsection informed Defendants that challenges would not be reckless if they were "in writing and specif[ied] distinctly the grounds" of the challenge. The challenges supported by both the TTV Defendants and Defendants Davis and Somerville used writings (cover emails) that specified the challenge — concerning eligibility to vote in an

50

election — and the grounds: a change of residency.[24] Because the petitions were made in writing and included the grounds for the challenge, they satisfied the *prima facie Sullivan* test measuring frivolity. While the ultimate success of the petition process is not dispositive, *Beach Blitz Co. v. City of Miami Beach*, 13 F.4th 1289, 1302 (11th Cir. 2021) (citations omitted), that some counties accepted the challenges shows they were not objectively meritless in fact.

Third, the statute itself rendered non-reckless the timing of Defendants' challenges, which "may be made at any time prior to the [challenged] elector . . . voting at the elector's polling place or, if such elector cast an absentee ballot, prior to 5:00 P.M. on the day before the election." Moreover, while Section 8 of the NVRA says that *states* may not *remove* a voter from the rolls within 90 days of an election, in neither the NVRA nor Section 230 does any such time prohibition apply to the *correction of a registered voter's information*. The U.S. Department of Justice

---

[24] The TTV Defendants provided petitioners with a cover letter for the petitions stating: "Available data from the [NCOA] and other commercially available sources demonstrates ***probable cause to believe these individuals no longer reside where they are registered to vote*** . . . [and] appear to have permanently established other residence." *See* Def TTV 1274. Meanwhile, Defendant Somerville, in a December 19, 2020 email to the petitioners, made clear that they should say, "***I am not asking the Board of Elections to remove the people on my list from the voter rolls, only to confirm with each voter whether they have moved***." *See* Somerville Depo. Ex. C (emphasis added); *see also* Johnson Depo. Ex. 1. Somerville recommended petitioners tell BOEs, "I [am] not alleging any voter has acted improperly, *only that probable cause as established under both Federal and State law exists to believe the voter (elector) has changed their residence*." That is a very limited and appropriate First Amendment purpose.

confirms this guidance on its website.   https://www.justice.gov/crt/national-voter-registration-act-1993-nvra, in paragraph 37: "This 90 day deadline does not, however, preclude correction of a registrant's information".

Fourth, subsection (b) makes clear it is the Boards of Election that decide whether there is "probable cause" to believe that an out-of-county move was a permanent one. So, it is only through those Boards of Election that any voter knows about any challenge, merited or not. Fifth, subsection (c) provides the challenged voter (if the Board accepts the challenge in its sole discretion), with notice and an opportunity to be heard. Finally, the language of the statute distinguishes between a challenge under Section 229, referring to challenges on grounds regarding "the qualifications of the elector to remain on the list of electors", and Defendants' Section 230 challenges, which did not reference the language of Section 229 or anyone's qualifications "to remain on the list of electors." They were not "trying" to remove voters, and it was a physical impossibility for them to have somehow forced a BOE to do so.

The First Amendment is advanced by reasonable acts of petitioning, even if the petitions are ultimately unsuccessful, because, much like in the litigation context, (1) the genuineness of grievances does not turn on whether the petitions succeed; (2) petitions allow for airing of disputed facts in a civil forum; (3) petitions raise matters of public concern; (4) petitions promote evolution of the law by supporting the

development of legal theories that may not gain acceptance the first time around; and (5) petitioners' ability to lawfully make even unsuccessful proposals adds the legitimacy of an alternative to force. *BE & K Const. Co.*, 536 U.S. at 532. Because the right to petition is so fundamental to our system of governance, and because the underlying purposes of the First Amendment are advanced by reasonable petitions, finding a petition to be reckless, baseless, requires a rigorous objective legal standard.

Just as *Counterman* requires a defendant to have been found to have been reckless in engaging in unprotected speech, the Supreme Court, in the similar context of antitrust litigation, has adopted a *mens rea* requirement as part of a two-part test to determine whether litigation was a "sham" lacking First Amendment protection. First, the lawsuit must be "objectively baseless in the sense that *no reasonable litigant could realistically expect success on the merits*." *Prof. Real Est. Inv'rs v. Columbia Pictures Indus., Inc.* 508 U.S. 49 at 50 (1993) (emphasis added). Defendants were not unrealistic or unreasonable, as explained above.

Second, did the petitioning party have an "unlawful purpose"? *BE & K Constr.,* 536 U.S. at 531. In *BE & K*, the Court reasoned that as long as a "plaintiff's purpose is to stop conduct he *reasonably believes is illegal*, petitioning is genuine both objectively and subjectively." *Id.* at 534 (emphasis added).

Here, it cannot be "frivolous," reckless, or baseless for Defendants to follow state law. Moreover, Defendants' motivations were (and will prove to be at trial) legitimate and realistic, per *Dept. of Mississippi*, and each Defendant did express, in late 2020, the reasonable belief that the petitions might well remedy problems with voter eligibility issues, in alignment with *BE & K*. Finally, Defendants' belief that the petitions would "be held valid" and effect positive change, under *Professional Real Estate*, was also not reckless. And to the extent any challenge made its way to any actual voters, that happened because governmental intermediaries agreed with the challenge – which is an "absolute defense" to allegations of frivolity.

## VI. Conclusion

Because Defendants' Section 230 challenges involve their First Amendments rights to free speech and petition, Section 11(b) must be construed narrowly, to avoid infringement upon those fundamental constitutional rights.

We intend to show all of this is indeed so at trial and following trial ask the Court to accept Defendants' proposed findings of fact and conclusions of law, which they will submit consistent with the Court's order.

Dated: October 18, 2023

54

By: */s/ Jake Evans*
Jake Evans, Esq.
GA Bar No. 797018
**GREENBERG TRAURIG, LLP**
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
P: (678) 553-2100
F: (678) 553-2212
Jake.Evans@gtlaw.com

*Local Counsel for Defendants*

By*: /s/ Michael J. Wynne*
Michael J. Wynne*
TX Bar No. 785289
Cameron Powell*
DC Bar No. 459020
**GREGOR WYNNE ARNEY, PLLC**
909 Fannin Street, Suite 3800
Houston, TX 77010
P: (281) 450-7403
mwynne@gwafirm.com
cpowell@gwafirm.com
*\*Admitted Pro Hac Vice*

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE WITH L.R. 5.1C

I HEREBY CERTIFY that the foregoing document was prepared in Times New Roman, 14-point font, as approved by Local Rule 5.1C.

By: */s/ Michael J. Wynne*
Michael J. Wynne*

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

FAIR FIGHT, INC., SCOTT BERSON,
and JANE DOE,

     *Plaintiffs*,

v.

TRUE THE VOTE, INC., CATHERINE
ENGELBRECHT, DEREK
SOMERVILLE, MARK DAVIS, MARK
WILLIAMS, RON JOHNSON, and
JAMES COOPER,

     *Defendants*.

CIVIL ACTION FILE

NO. 2:20-cv-00302-SCJ

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have filed a true and correct copy of the foregoing with the Clerk of the Court via the CM/ECF system, which will automatically serve electronic notification of same upon all counsel of record.

Respectfully submitted this 18th day of October, 2023.

By: */s/ Michael J. Wynne*
Michael J. Wynne*

56