## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

FAIR FIGHT, INC., SCOTT BERSON,
and JANE DOE,

     *Plaintiffs*,

v.

TRUE THE VOTE, INC., CATHERINE
ENGELBRECHT, DEREK
SOMERVILLE, MARK DAVIS, MARK
WILLIAMS, RON JOHNSON, and
JAMES COOPER,

     *Defendants*.

CIVIL ACTION FILE

NO. 2:20-cv-00302-SCJ

## **<u>DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTIONS IN LIMINE</u>**

Defendants do not plan to go into any discussion of Gasaway's case at trial. Docket Entry No. 260 is moot.

Defendants do plan to present evidence consistent with rules governing the admission of testimony by lay witnesses of matters within their personal knowledge. In this regard, Defendants ask the Court to deny the relief requested in Docket Entry No. 263.

Finally, Defendants do not intend to pry into Ms. Heredia's private life as Plaintiffs insinuate. Defendants ask the Court to deny the relief requested in Docket Entry No. 262.

I.    **Defendants Have to be Able to Present Their Own Case.**

Not every issue that requires subject matter knowledge is an expert issue. Defendants compiled spreadsheets. They used those spreadsheets. They made inferences and drew conclusions from those spreadsheets. Yet what Plaintiffs are asking for here amounts to asking the Court to keep itself less informed than it could or should be and strips Defendants of a chance to explain themselves. At the same time, Plaintiffs offer no rationale and no authority to support what they are asking the Court to do. The Court is faced with a complex factual scenario involving Defendants' *mens rea* and underlying intentions and motivations. But in a case in which Plaintiffs seek to restrict Defendants' speech on the basis of their state of mind, Defendants' knowledge and beliefs could not be more relevant. One cannot assess that without looking at what they were looking at. On the stand, in response to the question, "Why did you do what they allege you did?" Defendants should not have to say, "I sure would like to answer that, but I am barred from telling you at this point." That's nothing short of a Kafkaesque result.

And particularly considering Supreme Court rulings requiring that defendants accused of unlawful speech or petitions must have acted with and reckless, unrealistic, and unlawful *mens rea* before their First Amendment rights might be restricted, Defendants' freedom to testify about their exercise of fundamental speech rights should be downright robust. Plaintiffs seek instead a blanket prior restraint

without slowing down to explain what exactly they are concerned Defendants wish to say – **_in their own defense_**. That makes Plaintiffs' motions in *limine* premature at the very best.

Plaintiffs seek to restrain Defendants from defending their First Amendment rights in spite of (1) Plaintiffs not offering any specificity about what might be objectionable about their testimony; (2) this being a bench trial, with no fact-finder likely to get confused; (3) there being no hint of prejudice to Plaintiffs; (4) Defendants' states of mind and beliefs, in a case where Plaintiffs have alleged their negligence and unlawful purpose, being most helpful; and (5) Plaintiffs having every opportunity to cross-examine the witnesses. In a bench trial, motions in *limine* do not serve their ordinary function.

## A. Defendants Do Not Intend to Offer Opinions Requiring Specialized Expertise, in Algorithms or Otherwise.

First, Plaintiffs, unclear what Defendants might say, appear simply to assume Defendants will offer opinions, and that those opinions will be based on scientific or technical knowledge. Because Plaintiffs title their motion a "Renewed" motion and refer to their prior motion's concern about "algorithms, regressions, and computer codes," Renewed Mot. in Limine at 3, (citing Plfs' Mot. in Limine, ECF 172-1 at 7), it appears Plaintiffs are mostly concerned about opinions on "algorithms, regressions, and computer codes".

3

That makes this motion an easy one to deny, subject to Plaintiffs' right to raise the matter when and if it ever becomes ripe: Defendants have no plans to discuss undisclosed algorithms, regressions, or computer codes they used. They do plan to discuss large but rudimentary spreadsheets into which they themselves input numbers and which they relied upon in deciding to do what they are accused in this lawsuit of doing.

**B. Parties are Entitled to Offer Opinions Within Their Perception and Experience If They are Helpful, Not Prejudicial, and Opposing Parties May Cross-Examine the Witnesses**

Particularly when they have been alleged to have been negligent and to have harbored an "unlawful purpose" in preparing spreadsheets listing potential voter-eligibility challenges, Defendants are entitled to discuss those spreadsheets and their reasoning in creating them, even though some of them Defendants (e.g., Davis, Somerville) have used spreadsheets a lot, enjoy them, and are conversant speaking in some depth about them. Defendants accused of negligently facilitating challenges based on the NCOA Registry have to have the chance to explain to this Court their experience with NCOA and mass mailing, and why they were doing what they were doing – in exercising their First Amendment rights.

Defendants Davis and Somerville are adept at the things they will testify to, including the use of spreadsheets, but those things are not "technical" in a way that is beyond lay understanding. Among hundreds of millions of other office workers,

college students, and high school students[1], Defendants have learned how to use databases and spreadsheets, much as we all have learned how to use email and how to send text messages or add someone to a conference call. In short, Defendants understand basic products that have been offered by companies like Microsoft and used by hundreds of millions of people since the 1980s. There are no degrees conferring recognition for specialized expertise in these matters. Defendants have been sued. They have been placed in a position where they need to talk about these things. Plaintiffs have not offered to explain how whatever they believe Defendants wish to talk about (Plaintiffs are unavoidably vague) is "scientific" or "technical" in a way that should somehow move the Court to prevent Defendants from defending themselves, particularly on the *mens rea* issue. Defendants do not seek to opine on matters outside the expertise of administrative office workers throughout the world.

Defendant Davis works with the Georgia voter file, NCOA, and mass mailings for a living. "[O]pinion testimony by business owners and officers is one of the prototypical areas intended to remain undisturbed" by Rule 701(c)'s limitation on "technical" testimony. *Tampa Bay Shipbuilding & Repair Co. v. Cedar Shipping Co.*,

---

[1] 51% of high school students nationally offer computer science programs, which feature training in databases and spreadsheets. *See* https://www.house.mn.gov/comm/docs/MKTaYdcidEqxRllsmEooqg.pdf#:~:text=Nationally%2C%20just%2051%%20of%20high%20schools%20offer,schools%20to%20lack%20even%20a%20single%20course. Large numbers of students also take classes that offer similar training in accounting, finance, business, entrepreneurship, and technology classes.

320 F.3d 1213, 1222 (11th Cir. 2003) (noting that in response to objections to the proposed Rule 701(c) from the Department of Justice, the Advisory Committee clarified the rule was not intended to "prohibit lay witness testimony on *matters of common knowledge that traditionally had been the subject of lay opinions*"). It is also not, and should not be considered to be, rocket science to locate and retain the services of a USPS-accredited provider of NCOA and CASS services. Why would a court want to restrict people from talking about what they do and why they do it, particularly when their state of mind is central to the Plaintiffs' case?

FRE 701 expressly permits lay opinion when it is "rationally based on the witness's perception," "is helpful to a clear understanding of the witness' testimony or the determination of the fact in issue" and is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." F.R. E. 701. "Notably, 'Rule 701 does not prohibit lay witnesses from testifying based on ***particularized knowledge gained from their own personal experiences***.'" *United States v. Jeri*, 869 F.3d 1247, 1265 (11th Cir. 2017) (emphasis added) (citing *United States v. Hill*, 643 F.3d 807, 841 (11th Cir. 2011) (witnesses with knowledge of the underlying information may even respond to hypotheticals). "Lay witnesses may draw on their ***professional experiences*** to guide their opinions without necessarily being treated as expert witnesses." *Id*. (emphasis added) There is no problem with testimony "based upon [] particularized knowledge ***garnered from years of experience within***

*the field*." *Tampa Bay,* 320 F.3d at 1223 (emphasis added). Indeed, "just because a lay witness's position and experience could have qualified him for expert witness status does not mean that any testimony he gives at trial is considered 'expert testimony.'" *Id*. (financial lay witnesses may answer hypothetical questions and even testify to the reasonableness of amounts billed when their testimony is based on their personal experience) (citing *United States v. LeCroy*, 441 F.3d 914, 927 (11th Cir. 2006)); *see also Ga. Operators Self-Insurers Fund v. PMA Mgmt. Corp*., 143 F. Supp. 3d 1317, 1338 (N.D. Ga. 2015) (finding testimony proffered by company's accountant did not constitute expert evidence because the witness "presented simple, grade-school level arithmetic based on the data contained in the actuarial reports" and "engaged in nothing more than clear addition and division exercises").

Even non-parties may speak on matters based on their perception and experience without any need to be disclosed and admitted as experts, especially when they were present at the scene. *Handley*, 596 F.Supp.3d at 1353; *United States v. Novaton,* 271 F.3d 968 (11th Cir. 2001). Lay testimony is especially unproblematic when, as here, it is not prejudicial. *United States v. Hamaker*, 455 F.3d 1316, 1331-32 (11th Cir. 2006). In *Hamaker*, an experienced financial analyst did not need to be certified as an expert when, as Defendants Davis and Somerville have done, he "simply added and subtracted numbers . . . and then compared those numbers in a straightforward fashion". Lay testimony is even less problematic when the opposing

side knew the witness would testify, the witness played a substantial role in the case, *Jeri*, 869 F.3d at 1266, and any alleged issues with technical bases may be "exposed on cross-examination," *Handley v. Werner Enterp., Inc.*, 596 F.Supp.3d 1353, 1358 (M.D. Ga. 2022).

Indeed, a lay witness' "personal knowledge of, or involvement with" parties or data in a case is by definition *not* "technical". *Handley,* 596 F.Supp.3d at 1351-52 (distinguishing between "specialized technical knowledge" and "personal knowledge"). Moreover, "lay opinion ... [does not] automatically become an expert opinion simply because it involves knowledge that preexisted the investigation in the present case," *id.* at 1358 (citing *United States v. Williams*, 865 F.3d 1328, 1342 (11th Cir. 2017) (cleaned up)), such as Defendants' knowledge of NCOA and mass mailing. A lay witness also does not start offering "expert" testimony simply because he has "expertise" and his "use of computer software may have made him more efficient at reviewing records." *Hamaker*, 455 F.3d 1331-32. Indeed, "according to the advisory committee notes to rule 701, 'the distinction between lay and expert witness testimony is that lay testimony results from ***a process of reasoning familiar in everyday life***, while expert testimony results from a process of reasoning which can be mastered only by specialists in the field." *Gallagher Benefit Services, Inc. v. Campbell*, 528 F. Supp. 3d 1326, 1350 (N.D. Ga. 2021) (noting advisory committee's notes that most courts allow owners or officers of a business to testify to the value

or projected profits of the business without being qualified as an accountant, appraiser, or similar expert) (emphasis added). Defendants intend to offer not just "processes of reasoning familiar in everyday life," but processes of reasoning *in which they engaged during exactly the petitioning of which Plaintiffs complain.*

And it is common sense that lay witnesses may base their opinion on their review of documents, even when, unlike here, "the witness was not involved in the activity about which he testified." *United States v. Jayyousi*, 657 F.3d 1085, 1102 (11th Cir. 2011); *United States v. Thomas*, 631 Fed.Appx. 847, 850 (11th Cir. 2015) (noting requirement of lay witness' opinion being "rationally related to his perception is satisfied where his perception is based on a review of relevant documents, both in and not in evidence"). Defendants may discuss -- and might be encouraged to discuss -- their own spreadsheets, with columns and rows of data *they created,* along with summaries, especially because those things are "within the capacity of any reasonable lay person." *Id*. To this end, the *Hamaker* court approvingly cited a witness's testifying as a lay witness "even where his testimony 'summarized business records and client lists and presented them in condensed form." *Id*. (citing *United States v. Caballero*, 277 F.3d 1235, 1247 (10th Cir. 2002)). In *United States v. Batista*, 558 Fed. Appx. 874 (11th Cir. 2014), the Eleventh Circuit held there was nothing wrong with a lay witness using a parties'

> cell phone records along with the phone companies' records of where their
> cell phone towers were located, to plot on a map which towers connected with

which cell phone at a particular point in time. In order to produce the maps, the agent had to (1) read the cell phone records to determine which cell tower was used at a particular time, (2) look up the latitude and longitude of that cell tower in the companies' records, and (3) mark the intersection of the latitude and longitude on a map.

The *Batista* Court also held there was nothing wrong with allowing another witness to testify "regarding (1) the entries for precipitation on a government weather report, and (2) the distance, using maps, from the weather station to the road in specific cities." *Id*. Defendants are not going to testify about anything more "technical" than these types of things, things within their perception and experience, based on common knowledge and arithmetic.

## C. The Court May Best Rule on Admissibility When the Testimony is Offered – Not Before and Devoid of Context

Practically all if not all the cases cited above involved juries. In a bench trial, the judge is quite rightly presumed to be able to disregard inadmissible evidence at the time it is presented, and therefore motions in *limine* are generally unnecessary. *Mokris v. United States*, 2:20-cv-34-JES-MRM (M.D. Fla. Mar. 11, 2022). "The rationale underlying pre-trial motions in *limine* does not apply in a bench trial, where it is presumed the judge will disregard inadmissible evidence and rely only on competent evidence. When an action proceeds as a bench trial, the pretrial consideration of such motions weighs heavily in favor of denying the motions in

*limine* and addressing the issues if and when they come up at trial." *Id*. at *3 (citations omitted; cleaned up).

"A motion in *limine* is not the proper vehicle to resolve substantive issues, to test issues of law, or to address or narrow the issues to be tried." *McHale v. Crown Equip. Corp.*, No. 8:19-cv-707-VMC-SPF, 2021 WL 4527509, at *1, at *3 (M.D. Fla. Oct. 1, 2021) (citing *LSQ Funding Grp. v. EDS Field Servs.*, 879 F.Supp.2d 1320, 1337 (M.D. Fla. 2012)). "Nor may a party use a motion in *limine* to sterilize the other party's presentation of the case." *Harris v. Wingo*, No. 2:18-CV-17-FTM-29MRM, 2021 WL 5028201, at *1 (M.D. Fla. Oct. 29, 2021) (cleaned up).

Plaintiffs here seek to restrict Defendants' First Amendment rights largely on grounds they conceived and used *spreadsheets* negligently (from Plaintiffs' perspective).  Those defendants are justified in explaining what they understood the state of Georgia itself has done in similar situations (including its use of NCOA), what their experience in mass mailing has taught them about the NCOA as a powerful predictor of permanent moves, what they believed in good faith Georgia's laws allowed them to do, what they therefore did, and why they think it was non-reckless (in Defendants' view of the standard) to have done so. This is all relevant to *scienter*, which Plaintiffs must prove to restrict Defendants' right to petition. In fact, there is practically no other way to examine whether the necessary element of *scienter* has been met. In a suit alleging Defendants' negligence in identification of

11

potential petitions, and where baselessness and unlawful purpose are actually required, Defendants are entitled to talk about the care they took and the purposes they had.

Defendants expect the Court is willing to hear them out as they explain their reasoning process as they created non-biased challenges based on their understanding of state law, and Defendants believe the Court is in the best position to decide how much to weight to give any piece of evidence. For that matter, this testimony and any demonstration will be subject to cross examination, the great equalizer.

### D. Defendants Will Offer Rule 1006 Charts, Summaries, and Calculations Based on the Otherwise Admissible Spreadsheets Plaintiffs Have Placed at the Heart of Their Case

To refute Plaintiffs' case in chief, Defendants are prepared to walk the Court through a real-time demonstration of the spreadsheets Defendants themselves assembled. And if the court decides those spreadsheets cannot "conveniently be examined in court" through a witness's operating a computer real-time in the courtroom, Defendants might then seek to offer the charts, summaries, and calculations based on them -- in the form of admissible spreadsheets.

"[C]ourts in this Circuit have routinely admitted chart summaries or data compilations as exceptions to the prohibition against hearsay." *Schultz v. Am. Airlines, Inc*., 449 F. Supp. 3d 1301 (S.D. Fla. 2020), *aff'd*, 855 Fed. Appx. 656 (11th

Cir. 2021) (citing *Democratic Republic of the Congo v. Air Capital Grp.*, LLC, No. 12-20607-CIV, 2014 WL 11429051, at *5 (S.D. Fla. Mar. 19, 2014), aff'd, 614 F. App'x 460 (11th Cir. 2015) (summary chart of otherwise admissible evidence, including business records and invoices, was admissible); *First State Bank of Nw. Arkansas v. Georgia 4-S Investments LLLP*, No. 1:09-CV-2828-ODE, 2010 WL 11636133, at *5 (N.D. Ga. Oct. 5, 2010) ("[E]ven though Plaintiff's [data compilation] ... contains hearsay, the evidence is admissible under hearsay exceptions codified in the Federal Rules of Evidence")).

## II. Defendants' Concerns About the Veracity of Ms. Heredia's Claims

In support of their right to question ex-Plaintiff Jocelyn Heredia[2], and the person with whom she lived in Atlanta while claiming in this case never to have moved away from Banks County, Defendants state as follows:

1. Defendants, accused by then-Plaintiff Heredia and the other Plaintiffs of creating challenges "disastrously fraught" with error, and having allegedly and indirectly "intimidated" her by suggesting to a Board of Election there was probable cause to believe she'd changed residence, are entitled to get answers that would reveal they were not, in fact, so unreasonable, let alone baseless or reckless, in the system they used to identify probable cause to

---

[2] Plaintiffs' counsel informed Defendants at about 2:30pm ET on October 19, 2023 that Plaintiffs wished to add Ms. Heredia back to the case as a Plaintiff.

believe she had moved permanently. Indeed, the fact that she does appear to have permanently relocated to the Atlanta area nearly four years ago, and had her voter registration deactivated, may be why Plaintiffs found her inconvenient to their arguments in this case, and dismissed her.

2. During her October 15, 2021, sworn deposition, Jocelyn Heredia testified she filed a permanent US Postal Service change-of-address request in February of 2020 so that her mail might be forwarded to Decatur, Georgia, in the Atlanta MSA. That February change-of-address request became the basis for defendants to believe there was probable cause that Heredia had permanently removed from Commerce, Georgia, in Banks County, where she was registered to vote.

3. During her October 2021 deposition, Heredia was asked, "*Ms. Heredia, where is your current address in Georgia?*" to which she responded with specificity, "*It is Banks County. It is – the actual address is 304 Borders Road, Commerce, Georgia 30520.*" When asked, "*when did you live in Atlanta, Georgia?*" Heredia replied, "*I lived in Atlanta in January and February of 2020.*" [DEPO, 12:19-20] Heredia testified she moved to Atlanta after securing employment with Atlanta-based CNN but she claimed she soon returned to Banks County, from where she had moved, due to COVID and the

14

implementation of remote-work policies by her employer. [13:17-22]. Heredia further clarified, "*in March* [2020]*, I moved back to Banks County."* [23:5-6]

4.  Despite the sixty-four miles that separate Decatur and Commerce, Georgia, Heredia testified she did not file a US Postal Service change-of-address to redirect her mail back to Banks County because "*I still had access to the apartment, so, you know, if I needed the mail, I could get it."* [DEPO, 13:7-13]. For Defendants, questions unanswered in her deposition immediately began to emerge.

5.  Later in her deposition, Heredia was asked if she had submitted a US Postal Service change-of-address request, other than the one in February 2020, at any time prior to September 2021. She responded she had. "*I believe it was in March of 2021, because the – this mailing – this mailing – this forwarding mailing was set to Decatur, Georgia, and the contract for the apartment for this – for Decatur – expired."* [DEPO 43:1-5]. Heredia's response suggests a fifteen-month lease that began in January 2020 and expired in March 2021, prompting the obvious question: why did Heredia testify she lived for only three months at an apartment at which she had maintained a lease and to which she had her mail forwarded for 15 months? These issues speak to residency concerns at the heart of the reasonableness of defendant's probable cause assessment. Enter Connor Isham.

6. A search of the US Postal Services NCOA[Link] database[3] reveals Heredia filed a permanent change-of-address to begin forwarding her mail to 3442 N Druid Hills #J, Decatur, GA, effective February 2020. This aligns perfectly with her testimony. The NCOA[Link] database also indicated Connor Isham filed a permanent change-of-address to begin forwarding his mail to the same address, 3442 N Druid Hills, #J, Decatur, GA, effective April 2020.

7. Georgia absentee ballot records, currently accessible to the general public on the Georgia Secretary of State's website, indicate both Heredia and Isham requested 2020 General Election absentee ballots on the *same* day, September 24, 2020, five months *after* Heredia testified she moved back to Commerce, Georgia. Less than two months later, Heredia and Isham requested 2021 Special Election Runoff absentee ballots, on the *same* day, November 17, 2020, with both specifically requesting their ballots be mailed to the Decatur apartment at 3442 North Druid Hills. Obvious questions arise.

8. Thus, on two separate occasions, two people who purportedly lived in two separate residences, 65 miles apart, requested absentee ballots on precisely the same day. Why did they request them to be sent to the *same* Decatur, Georgia residence — not in Banks County? Why did Ms. Heredia request her absentee ballot be mailed to an Atlanta-area apartment she testified she had abandoned

---

[3] Defendants are able to provide all referenced documents as exhibits for trial.

nine months earlier? Why did Heredia continue to have her mail forwarded to the address at which Isham too had his mail forwarded if she did not live there as well? All indications suggest Isham resided at the same Decatur address during this period, and it's both logical and reasonable that Isham's independent testimony may contribute to the clarification.

9. Furthering her testimony regarding the March 2021 expiration of her Decatur lease, Heredia added, "*so because the contract expired for the Decatur apartment, I then got another, you know – I – so because the contract expired for the Decatur apartment, I then got another apartment in West Midtown [Atlanta]. So I submitted a change of address to West Midtown [Atlanta] in March of 2021.*" [43:6-11]. Her response suggests the Decatur apartment was essential enough to her residency in the Atlanta area that the expiration of the lease necessitated **immediately** securing another one. Further, a search of the US Postal Services NCOA[Link] database revealed Heredia filed a permanent change-of-address to begin forwarding her mail to a West Midtown [Atlanta] apartment located at 871 3rd Street, Apartment 1545, Atlanta, effective February 2021. This NCOA record supports her testimony that she filed a change of address to West Midtown apartment. A separate search of the US Postal Services NCOA[Link] database revealed Isham also filed a permanent change-of-address to begin forwarding his mail to the *same* residence

effective the *same* period. Another apartment. Another change of address. Isham's address activities are in step with Heredia's.

10. That timeline can be summarized as follows: Heredia testified she moved to the Decatur, GA apartment in January 2020, allegedly moving back to Commerce, GA only three short months later. But she did not abandon her Atlanta-area lease, which by itself shows Defendants' assertion of a permanent move to Atlanta was not unreasonable. And despite allegedly moving roughly a 1.5-hour drive back to Banks County, Heredia testified she chose not to cancel her mail forwarding order, curiously preferring instead that her mail remain forwarded to the Decatur apartment. Her testimony also implies she maintained the Decatur lease for twelve months following her return to Banks County, and upon the March 2021 expiry of that Decatur lease she promptly secured *another* non-Banks-County lease for a new apartment in West Midtown. This time, she *did* want her mail forwarded – and to the new apartment. Yet, on October 15, 2021, seven months *after* securing the West Midtown apartment where her mail was being forwarded, she sat in that West Midtown apartment and testified on video that she still lived in Commerce, Georgia (Banks County). Records suggest Isham resided in both the Decatur and West Midtown apartments during these exact periods, and as such Isham's experience will help bring clarity to this confusing timeline.

11. Finally, a September 25, 2023, search of NCOA[Link] revealed yet another permanent change-of-address was filed by Heredia, her third in four years, to begin forwarding her mail to 871 3rd Steet NW, Apartment 1605, Atlanta, Georgia, effective May 2023. Apartment 1605 is in the *same* West Midtown apartment complex as the "West Midtown" apartment for which Heredia testified she secured a lease in March 2021, and in which she sat while providing her video deposition testimony. Mr. Isham too filed a permanent change-of-address request to this same apartment effective during the same period. In all, Heredia's three USPS permanent changes-of-address suggest she has maintained roughly forty-six (46) contiguous months of apartment leases spanning three apartments in and around Atlanta. All outside the county within which she remains registered to vote. All addresses to which Heredia directed the US Postal Service to forward her mail.

## III.   CONCLUSION

Defendants therefore ask the Court to deny Plaintiffs' premature motions *in limine,* Dkt. Nos. 262 and 263.

Dated: October 19, 2023

19

By: */s/ Jake Evans*
Jake Evans, Esq.
GA Bar No. 797018
**GREENBERG TRAURIG, LLP**
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
P: (678) 553-2100
F: (678) 553-2212
Jake.Evans@gtlaw.com

*Local Counsel for Defendants*

By*: /s/ Michael J. Wynne*
Michael J. Wynne*
TX Bar No. 785289
Cameron Powell*
DC Bar No. 459020
**GREGOR WYNNE ARNEY, PLLC**
909 Fannin Street, Suite 3800
Houston, TX 77010
P: (281) 450-7403
mwynne@gwafirm.com
cpowell@gwafirm.com
*Admitted Pro Hac Vice*

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE WITH L.R. 5.1C

I HEREBY CERTIFY that the foregoing document was prepared in Times New Roman, 14-point font, as approved by Local Rule 5.1C.

By: */s/ Michael J. Wynne*
Michael J. Wynne*

20

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

FAIR FIGHT, INC., SCOTT BERSON,
and JANE DOE,

     *Plaintiffs*,

v.

TRUE THE VOTE, INC., CATHERINE
ENGELBRECHT, DEREK
SOMERVILLE, MARK DAVIS, MARK
WILLIAMS, RON JOHNSON, and
JAMES COOPER,

     *Defendants*.

CIVIL ACTION FILE

NO. 2:20-cv-00302-SCJ

## <u>CERTIFICATE OF SERVICE</u>

This is to certify that I have filed a true and correct copy of the foregoing with the Clerk of the Court via the CM/ECF system, which will automatically serve electronic notification of same upon all counsel of record.

Respectfully submitted this 19th day of October, 2023.

By: */s/ Michael J. Wynne*
Michael J. Wynne*

21