# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

FAIR FIGHT, INC., SCOTT BERSON,
and JANE DOE,

     *Plaintiffs*,

v.

TRUE THE VOTE, INC., CATHERINE
ENGELBRECHT, DEREK
SOMERVILLE, MARK DAVIS, MARK
WILLIAMS, RON JOHNSON, and
JAMES COOPER,

     *Defendants*.

CIVIL ACTION FILE

NO. 2:20-cv-00302-SCJ

## **DEFENDANTS' TRIAL BRIEF**

## **TABLE OF CONTENTS**

Page

I.   A Plain-English Introduction……………………………………………………...1

    A.   Plaintiffs Have Proven *De Minimis*, Even Zero, Impact to Any Voter...2

    B.   Plaintiffs Certainly Created a Dramatic Narrative……………………...3

    C.   Plaintiffs Seek to Restrict Core Speech on the Basis of
        Conclusory Claims of Intimidation-by-Speech and Alleged
        Negligence in Petitions…………………………………………………8

II.  Defendants' Speech and Petitions Had — and Achieved — Many Lawful
    Civic Purposes……………………………………………………………....9

III. Speech-as-Intimidation Claims Must Prove (1) The Alleged Feeling
    of Intimidation Was Reasonable and (2) Defendants Were Reckless in
    Causing It …………………………………………………………………...11

    A.   Plaintiffs Cannot Show They Reasonably Felt Intimidated by
        Actions of Defendants……………………………………………….11

    B.   Plaintiffs Must Show Defendants Were Reckless in Their Speech
        And Had Baseless and Unlawful *Mens Rea* in Their Petitions……..12

        1.   *Counterman* Addressed Potentially Intimidating or Distressing
            Speech………………………………………………………………12

        2.   A Defendant Accused of Problematic Speech Must Be Aware
            of or Recklessly Disregard His or Her Speech's Impact…………13

        3.   *Counterman* Applies to Civil Cases Involving Speech…………..15

        4.   Plaintiffs Cannot Meet the Applicable Standards………………..16

    C.   Defendants' Facilitating Section 230 Petitions is Protected by the
        First Amendment……………………………………………………16

IV.    Defendants Did Not Act Reckless by Indirectly Supporting Petitions
       to Local Boards of Election……………………………………………..18

       A.    Analysis of Both Challenge Lists Shows the Spreadsheets'
             Predictions that Voters Had Moved Out of County Were
             Largely Meritorious………………………………………………18

       B.    Private Citizens are Incapable of Violating the NVRA, or Trying
             to………………………………………………………………………..19

       C.    Even in States' *Removal* of Voters, the NVRA Requires Only
             "Reasonable Efforts" – Not Perfection – to Identify Changed
             Residency………………………………………………………...20

       D.    Even for the More Serious Removal of Voters, Use of the NCOA
             Alone Constitutes a "Reasonable Effort" to Identify Movers………21

       E.    The Petitions Satisfied the *Prima Facie* Standard: Not Baseless
             or Frivolous……………………………………………………...23

## I.  A Plain-English Introduction

We were promised Navy SEALs.

They'd be rappelling into a nearby polling station soon, we were told, if this Court didn't issue an emergency temporary restraining order. But the SEALs, like most of Plaintiffs' overly dramatic narrative, never showed up. Those AWOL SEALs are a fitting metaphor for all of Plaintiffs' never-proven but scary-sounding allegations of intimidation in voting.

The question is whether "(1) Defendants' actions[1] directly or through means of a third-party in which they directed, (2) caused, or could have caused, (3) any person to be reasonably intimidated, threatened, or coerced from voting or attempting to vote," Dkt. No. 222 at 16-17, and Defendants would add that their *speech* must have been reckless, per *Counterman v. Colorado*, 600 U. S. 66 (2023), and that their petitions must have been "both objectively baseless and subjectively motivated by an unlawful purpose", per *BE & K Const. Co. V. N.L.R.B.*, 536 U.S. 516, 531 (2002).

These are understandably and frankly, rightfully, high bars, befitting alleged *attempts* to cause harm through mere *speech*. Opposing counsel have offered a lot of briefing about *their* interpretations of Section 230 within the First Amendment

---

[1] Defendants would clarify that no actions (or conduct) are at issue here, but *speech* that no voter-Plaintiff was aware of and *petitions* that reached voters only when Boards of Election decided there was probable cause to confirm residence.

1

context, but Plaintiffs cannot make their case, as they must to prevail here, that the *lay Defendants'* interpretations of their rights were reckless, baseless, or made with an unlawful purpose. Defendants' interpretations of Section 230, and use of the only tools available to them to assess possible residency changes, were not frivolous, particularly as part of an NCOA-centric process (1) sanctioned by the State of Georgia, (2) used by secretaries of state and validated by the Supreme Court, (3) whose predictive accuracy Defendants had seen and studied, (4) personally encouraged by Georgia's Secretary of State, his deputies, and several of legislators, (5) approved by legal counsel, and (6) affect voters if at all only by the intervening and independent action of county Boards of Election (also BOEs).

## A. Plaintiffs Have Proven *De Minimis*, Even Zero, Impact to Any Voter

This case now appears to be about alleged intimidation of, at most, one voter[2] who was allegedly affected, indirectly, in some way, by Defendants Somerville and Davis' facilitating a petition by a former state representative, Dan Gasaway, who not only knew his county intimately but had succeeded, twice, in litigation regarding

---

[2] That voter is Jocelyn Heredia. Plaintiffs bolstered their Motion for a TRO, Complaint, and Motion for Summary Judgment with affidavits from Gamaliel Turner, Stefanie Stinetorf, and Plaintiff Scott Berson, but Plaintiffs have simply recycled these allegedly affected persons from a different case *and a different challenger*. It was Ralph (aka Alton) Russell who filed the "Russell Challenge" against "six voters" in Muscogee County, including Turner, Berson, and Stinetorf. *See Majority Forward v. Ben Hill Cnty. Bd. of Elections*, 512 F. Supp. 3d 1354, 1363 (M.D. Ga. 2021).

2

voters improperly registered to vote in his election. In the context of Plaintiffs'
counsel claiming Defendants "accus[]ed hundreds of thousands of voters of being
unlawfully registered," Dkt. No. 210, Tr. Summ.J. Proceed, at 64, and confirming
"the basis of [Plaintiffs'] case" is "people who knew they were challenged," *id*. at
50, we have evidence of *one* (1) such person who claims to have been affected by
Defendants. So, Plaintiffs have had to add a narrative rife with speculation about
Defendants' *improper intent*.

## B. Plaintiffs Certainly Created a Dramatic Narrative

Plaintiffs stitched together a patchwork narrative made up of the following:

**The History of Voter Suppression**. Plaintiffs hired an expert to frame a story
for this case out of the tragic history of voter suppression in this country dating back
well over one hundred years, *see* Report of Dr. Burton [Dkt. 156-17, at 4-5, 9-21,
24, 26-29, 31, 34, 37, 38, 40-43, 53, 57, 60.] But none of it related to these
Defendants.

**Pure Speculation That Went Nowhere**. Plaintiffs then tried to tie that history
to this case with purely speculative innuendo about "racial targeting", *see id*.; Expert
Report of K. Mayer (regarding "disparate impact"), non-existent "poll-watching",
*see* Plfs Motion for TRO at 2, and the speech of unrelated third parties. But Dr.
Mayer admits his conclusion about an "observed racial pattern" among African-
Americans is not statistically significant, *id.* at 36, while his attempt to recover his

summarization by saying it's "unlikely to be random" suffers from fatal defects in his understanding of the challenge process that will be revealed at trial. Moreover, Dr. Mayer's *own report* admits the percentage of African-Americans in the TTV challenge files (27.3%, p. 26) was almost 10% less than the percentage of African-American voters in Georgia as whole (29.9%, p. 35). In short, African-Americans were *under-represented* in TTV's challenge file.[3]

**Lawyers Research Not Shown to Have Been Seen by Voter Pertinent to this Case**.[4] Inspired by prior cases' mention of "context" [Dkt. 156-1, Plfs. Mot. Summ.J at 10], and Attorney General Katzenbach's vague statement about "the natural consequences of actions," Plaintiffs' lawyers went to the Internet to scrape

---

[3] Dr. Mayer arrives at his statistically insignificant suggestion of disparate impact by unscientifically ignoring *two-thirds* (160,927) of all African-American voters in the TTV challenge files, inexplicably choosing to focus on only the one-third who filed *in-state COAs*. Having arbitrarily chosen which cherry tree he will pick from, he informs us that these *in-state* African-American COA filers constitute 38.4% of all in-state filers, *id.* at 35 — while ignoring the other *two-thirds* of *out-of-state* filers (160,927) that consist of only 20.9% African-Americans.

[4] At oral argument, the Court was skeptical of such evidence, saying, "But in order to be intimidated, don't you have to know?" Dkt. No. 210 at 10, and "where do I get intimidated at [sic] if I don't even know I've been challenged?" *Id*. at 14; *see also id*. at 49. Defendants maintain the "evidence" in the Historical Lawyers Research, and Plaintiffs' proposed standard for petitions, would violate their Due Process rights if used to restrict their First Amendment rights of speech, petition, and association, where even courts struggle with the task of defining what acts violate Section 11(b), a task that is not "clear or easy given the overall shortage of law interpreting Section 11(b)," Dkt. No. 222 at 12, and where "the statutory text and its relevant definitions [of intimidation are] largely unhelpful", *id.* at 14.

4

*contextual* examples of Defendants' *speech* that *no voter is alleged to have seen* (hereafter, the "Historical Lawyers Research") and that in most cases do not even "pertain[] to" the only "acts and evidence" this Court will consider, "*Defendants' activities in Georgia*", *cf.* Dkt. No. 222 at 4 n.4:

- Defendant Engelbrecht's one-time mention of "bounties," which was lifted from context, and where her next sentence *immediately* showed she meant "whistleblower support fund", *see* Dkt. 156-46 at 3 (transcript of True the Vote Live with Catherine Engelbrecht), making any "intimidation" from her malapropism highly unreasonable.

```
2    Vote."  And what Validate the Vote is about, is putting
3    a bounty on the fraud.  Creating an environment for
4    whistleblowers to come forward and tell the story,
5    making sure that they have protections, making sure
6    that they have compensation, and further, creating a
7    space for people to come and share what they know, or
8    share with us what they know, and then let us try to
9    aggregate it.
```

- Defendant Engelbrecht's musings on volunteer help at polls from readily recognizable veterans of honor familiar with detail and the chain of command, such as Navy SEALs. She might have used as a better metaphor the ***Pontifical Swiss Guard*** at the Vatican, an example that comes to undersigned counsel's mind only on the tenth version of this Trial Brief.

5

- Defendant TTV's financial support of election-related litigation, brought by third parties, and statements from a third party, Gregg Phillips, in 2016.

**Speech by Defendants Somerville and Davis**, posted on their personal Facebook accounts, encouraging voter participation and election integrity.

**Unidentified Twitter Account.** Plaintiffs "provide no evidence to confirm that these tweets were made on behalf of, in association with, or at the encouragement of TTV." TRO Order at 25. There remains no basis for even a plausible inference TTV had anything to do with the tweets.

**The Expressive Speech of Government Petitions**. Plaintiffs have tried to add some meat to the watery sauce above, arguing that in spite of the fact that Defendants' reliance on the NCOA to predict "probable" permanent moves would have been non-frivolous, and that Defendants reasonably relied on Boards of Election to exercise their statutorily-required judgment to filter challenges, Defendants did not go far enough to remove every voter record who *might* have comprised a false positive of a permanent move. Plaintiffs piled on baseless speculation that Defendants somehow hoped to "force" the counties to violate the NVRA by removing voters from rolls and that such an attempt, invisible to any voter, is somehow relevant to a voter's actual feelings of intimidation.

Confirming that you're voting in the right place after you've filed a permanent change of address is a pretty reasonable request. Plaintiffs push a narrative where

the big bad state yanks people out of line at polling stations as trained killers patrol nearby or humiliates them by asking for added proof of county residency already required of every voter. But if you have taken actions to give the U.S. Postal Service, Secretary of State, Boards of Election, and fellow citizens reason to believe you *have* moved permanently, like (1) filing a *permanent* change of address, (2) confirming several verifications of identity and intent from the USPS,[5] and a county BOE agrees, it's reasonable for someone to ask you to confirm you *haven't*.

In the petitions they supported,[6] Defendants reasonably suggested to BOEs there was reason to believe the BOEs might well find probable cause — and it's only BOEs who have that standard — that the voters who'd filed permanent NCOAs had permanently moved out of their counties of registration. "Probable" as in *probably* — not certainly, and not without error. Crucially, Plaintiffs cannot bear their burden of showing it's frivolous to rely on NCOA-predicted moves; they've produced no

---

[5]   *See*   https://faq.usps.com/s/article/Change-of-Address-The-Basics   (discussing "multi-factor process for online Change of Address requests", including $1.10 credit card charge, text verification, and email or in-person verification).

[6] The Court expressed interest in whether out-of-state Defendants Engelbrecht and TTV may rely on their First Amendment right to petition. Dkt. No. 222 at 77 n.33. The First Amendment contains no jurisdictional restriction on the right to associate to petition and may not be restricted by Section 230. *See Pierce v. Jacobsen*, 44 F.4th 853 (9th Cir. 2022) (finding First Amendment right of out-of-state parties to engage in petition circulation); *Libertarian Party of Va. v. Judd*, 881 F. Supp. 2d 719 (E.D. Va. 2012) (finding restriction violates First and Fourteenth Amendments); *Morrill v. Weaver*, 224 F. Supp. 2d 882 (E.D. Pa. 2002).

statistics on NCOA false positives that would prove Defendants' frivolous belief to the contrary.

**Three Minor Roles**. Finally, Plaintiffs allege that three Defendants who had little or no role in any of these activities are somehow nonetheless liable for recklessly engaging in intimidation, or "a serious expression of an intent to commit an act of unlawful non-violence against voters," Dkt. No. 222 at 75, by serving as a printing vendor and submitting challenges that reached no voters (Defendant Mark Williams), and by helping to find potential challengers (Defendants James Cooper and Ron Johnson).

### C. Plaintiffs Seek to Restrict Core Speech on the Basis of Conclusory Claims of Intimidation-by-Speech and Alleged Negligence in Petitions

Plaintiffs have thus come to the end of this adventure empty-handed of facts, and the few facts that *are* supported by evidence all consist of speech and allegedly mistaken petitions, not intimidating *conduct* like following people at the polls or evicting voters. *Cf.* Dkt. No. 222 at 19-20 (listing cases about conduct). But there are two fatal problems with Plaintiffs' negligent petitions claim. First, a state statute green-lighted the petitions, and a governmental third party, a local Board of Election, was solely authorized to examine probable cause sufficient to challenge a voter. Second, conceivable negligence is too low a bar to overcome Defendants' First Amendment rights. Consistent with caselaw requiring that allegedly abusive legal process be "*both* objectively baseless *and* subjectively motivated by an unlawful

8

purpose", *BE & K Const.*, 536 U.S. at 531 (emphases added), and that public officials alleging defamation must "prove by clear and convincing evidence that false statements were made with knowledge or reckless disregard for their falsity," *id*. (citing *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964), the Supreme Court in *Counterman v. Colorado* held not just that a plaintiff be reasonable in feeling intimidated by objectionable speech but that defendants so accused were reckless.

Here, that means each Defendant must have been demonstrably reckless when he or she uttered each First-Amendment-protected statement, and must have facilitated First-Amendment petitions baselessly and with unlawful purpose, through the mediating filter of county boards of election, using NVRA-approved NCOA records to suggest the BOEs might find probable cause to think a voter had moved out of her county of registration.

## II. Defendants' Speech and Petitions Had — and Achieved — Many Lawful Civic Purposes.

In contrast to Plaintiffs' speculation that Defendants "had no lawful purpose", Plfs Mot. for SummJ at 4-5, Defendants had in mind, and achieved, many legitimate purposes, including but not limited to, encouraging citizens to do the following:

1. exercise their First Amendment Rights of Speech and Association
2. engage and recruit county-specific citizens in the democratic process
3. facilitate petitions to county Boards of Election
4. get the attention of Georgia's executive officials

9

5. get the attention of Georgia's Secretary of State and legislature
6. engage local and national media
7. inject sanity and something productive into a toxic political conversation
8. raise public awareness about the real problem of inaccurate voter rolls in the state of Georgia, and
9. change Georgia's law and practices in dealing with its voter rolls

Defendants Engelbrecht, Davis, and Somerville spoke publicly on the issues of election integrity and voter-list maintenance, before citizen groups and the Georgia state legislature and on social media. Defendants did get the attention of the Georgia Secretary of State, county Boards of Election, the Georgia state legislature, and the national media. Mr. Davis, who has a decades-long reputation as an expert in Georgia's voter rolls, was invited to testify to the Georgia state legislature about his and Mr. Somerville's findings. Mr. Somerville, whose previous experience as a citizen investigator effected real change through similar volunteer efforts, met with state senators and representatives, some of whom even submitted challenges.

Defendants thus initiated conversations with exactly the governmental bodies capable of improving Georgia voter rolls — Georgia's Secretary of State and legislature. Someone was at last paying attention, albeit at times for unrelated reasons distinct from this particular effort. Finally, Defendants' effort to stand in the Secretary of State's shoes and generate challenges at scale, without limitation, was codified in Section 230 (via S.B. 202) in ways *directly* applicable to their efforts

here, clarifying there's no limit on the number of challenges a citizen may make –
even though some must fail.

### III.   Speech-as-Intimidation Claims Must Prove (1) The Alleged Feeling of Intimidation Was Reasonable and (2) Defendants Were Reckless in Causing It.

#### A. Plaintiffs Cannot Show They Reasonably Felt Intimidated by Actions of Defendants.

This Court has defined intimidation as "'a serious expression of an intent to
commit an act of unlawful non-violence' against voters." Dkt. No. 222 at 75 (citation
omitted). As the term "serious expression" conveys, and the Supreme Court's
*scienter* standards for restrictions of speech confirm, intimidation claims cannot be
proven simply by uttering the words "I was intimidated." Intimidation also cannot
be measured by such a low and vague bar as a plaintiff's *discomfort* or *annoyance,*
which is a more accurate term for what the voter-Plaintiffs and affiants here say they
experienced upon being asked to confirm they were voting in the right place. Another
difficulty with using such a loose, vague standard, based on parroting words from a
statute, is that it invites witness coaching.

This is not a case alleging any BOE's request burdened a fundamental right;
rather, Plaintiffs claim the request was "intimidating." But voters like Ms. Heredia
filed a *permanent* COA and was simply asked, *by a governmental body*, if her COA
was indeed *permanent.* This is a very small ask.

11

**B. Plaintiffs Must Show Defendants Were Reckless in Their Speech and Had Baseless and Unlawful *Mens Rea* in Their Petitions.**

The standard for restricting petitioning is arguably even higher than for restricting litigation – petitions to the government are expressly mentioned in the First Amendment, may not even reach the parallel of a defendant, and often evoked no BOE response at all, *contra* Dkt. No. 222 at 80 ("the voter challenges demanded a response") – but the standard for baseless litigation with unlawful purpose serves some use. *See id*. As for speech, Plaintiffs know Defendants' purpose and intent are relevant, because Plaintiffs built much of their case from the statements by Defendants about their cause and claimed Defendants had "no lawful purpose," and *therefore* the "only [] possible result" was "voter intimidation." Plfs Mot. for Summ.J. at 4-5.

**1. *Counterman* Addressed Potentially Intimidating or Distressing Speech**

In *Counterman*, the defendant was charged under a statute, strikingly similar to Section 11(b), making it unlawful to communicate with another person in "a manner that would cause a reasonable person to suffer serious emotional distress." In other words, the Court in *Counterman* considered a statute employing the same objective "reasonable plaintiff" standard, without regard to the defendant's awareness or *mens rea*, that Plaintiffs advance for Section 11(b).

12

**2. A Defendant Accused of Problematic Speech Must Be Aware of or Recklessly Disregard His or Her Speech's Impact**

But the defendant in *Counterman* argued that the First Amendment required that his statements were not only objectively threatening, *but also that he was aware of (or recklessly disregarded) their threatening nature*. The Supreme Court agreed, though it acknowledged that insistence on a "subjective element" would "shield some otherwise proscribable (here, threatening) speech" because it's difficult to prove "what the defendant thought." *Id.* at 75.[7] But the Court balanced the competing rights at issue in favor of more speech, holding that a subjective standard for the alleged perpetrator is still required lest legal action chill too much protected expression, *id.* at 75, 78, 80. In language equally applicable to Plaintiffs' Section 11(b) claims, the Court expressed concern for "[t]he speaker's fear of mistaking

---

[7] The Court's majority, concurrence, and dissent all clarified that "[]true threats subject individuals to '*fear of violence*' and to the many kinds of "disruption that fear engenders." *Id.* at 74 (majority opinion; emphasis in original); *see also id.* at 91 (concurrence defining true threats as "statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence"). The dissent, *id.* at 113 (citations omitted; cleaned up; first emphasis in original), makes a more pointed rebuttal of both Plaintiff Heredia's alleged intimidation and Plaintiffs' arguments of intimidation of all voters via speech:

> . . . only a very narrow class of statements satisfies the definition of a true threat. To make a true threat, the speaker must express an intent to commit an act of *unlawful violence. Speech that is merely "offensive," "'poorly chosen,'" or "unpopular" does not qualify. The statement must also threaten violence to a particular individual or group of individuals -- not just in general.* . . . While defamatory statements can cover an infinite number of topics, *true threats target one: unlawful violence.*

13

whether a statement is a threat; his fear of the legal system getting that judgment wrong; his fear, in any event, of incurring legal costs" — and his "swallow[ing] words" that are in fact not violations. *Id.* at 78 (emphasis added).

The Court acknowledged that while the presence of a threat depends not on "the mental state of the author," but on "what the statement conveys" to the person on the receiving end, *id*. at 74, "the First Amendment may still demand a subjective mental-state requirement . . . because bans on speech have the potential to chill, or deter, speech outside their boundaries." And an important tool to prevent chilled speech—even in the less protectable, non-political context of actual threats — "is to condition liability on …  a culpable mental state." *Id*. at 75.

The Supreme Court held that in cases of speech alleged to be problematic, the appropriate *mens rea* is a recklessness standard—*i.e.,* a showing that a person "consciously disregards a *substantial and unjustifiable risk* that the conduct will cause harm to another." *Id.* at 79 (citation omitted; cleaned up). "[R]ecklessness is morally culpable conduct, involving a 'deliberate decision to endanger another.'" *Id*. at 79. "In the threats context, it means that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Id*. (citing *Elonis v. United States*, 575 U.S. 723 at 746 (2015) (Alito, J., concurring in part and dissenting in part)). In the voting intimidation context, it would mean that defendants accused of intimidating speech were aware at the time of each act of

14

speech that relevant voters could regard the speech as intimidating with respect to voting and delivered it anyway.

### 3. *Counterman* Applies to Civil Cases Involving Speech

The Supreme Court explained how the "same idea arises" in the law respecting obscenity and incitement, where "harm can arise even when a clueless speaker fails to grasp his expression's nature and consequence" but "the First Amendment precludes punishment, *whether civil or criminal*, unless the speaker's words were 'intended' (not just likely)" to have that harmful effect. *Id.* at 76 (emphasis added). The dissent is in accord. *Id*. at 118 ("this case is about the scope of the First Amendment, not the interpretation of a criminal statute"). Addressing "the ambiguities inherent in the definition of obscenity," the Court explained, "the First Amendment required proof of *scienter* to avoid the hazard of self-censorship." *Id.* at 77. *Scienter* is just as relevant to the well-known "ambiguities inherent in the definition of" *intimidation,* which Section 11(b) famously does not even define. And proof of *scienter* is even more relevant where (1) plaintiffs press claims unmoored from causation or agency,[8] (2) few people are allegedly impacted, (3) plaintiffs are exercising the power of the state, and (4) the defendants were engaged in political speech...ot...defamatory, violence-threatening, inciting, or obscene speech. This

---

[8] Witness the statement by Plaintiffs' counsel at oral argument that Defendants are liable, for their exercise of core First Amendment rights, because "they *started a chain of events*" and "*elicited a process*." Dkt. No. 210 at 12 (emphases added).

Court must set precedent that accounts for "the ordinary citizen's predictable tendency to steer wide of the unlawful zone."

### 4. **Plaintiffs Cannot Meet the Applicable Standards**

Plaintiffs cannot show Defendants recklessly relied on the NCOA for change-of-address challenges, nor that they recklessly relied on BOEs to act as a filter before any petitions reached an actual voter. OCGA 21-2-226(a) makes it clear that it is not the petitioner's job to determine the eligibility of a voter; it is the responsibility of the Board of Elections "to determine the eligibility of each person applying to register to vote in such county." It was not frivolous for Defendants to rely on the counties to do what only the counties were legally authorized to do. And petitions that might reach a voter might do so only as the ultimate consequence of a BOE's finding of probable cause.[9]

## C. Defendants' Facilitating Section 230 Petitions is Protected by the First Amendment

Within the First Amendment right to free speech, citizens have a right to "petition the government for a redress of grievances." U.S. Const. amend. I. The petitions at issue here were not mere conduct but petitions expressly protected by

---

[9] That some BOEs did not accept (or review) petitions does not mean probable cause was lacking, *see BE & K Const.*, 536 U.S. at 531 ("the genuineness of a grievance does not turn on whether it succeeds"), especially where many of those Boards of Elections received threatening letters *before* the probable-cause determination.

the First Amendment, but even if they could be considered conduct, they were *inherently expressive.*

Conduct that is "sufficiently imbued with elements of communication"—known as "inherently expressive" conduct—falls within the scope of the First and Fourteenth Amendments. *Texas v. Johnson*, 491 U.S. 397, 404 (1989); *see also Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006). The test to determine whether conduct is inherently expressive was originally articulated in *Spence v. Washington*, 418 U.S. 405 (1974) and *Texas v. Johnson.*

The two-part *Johnson* test asks: (1) whether an intent to convey a particularized message was present, and (2) whether the likelihood was great that the message would be understood by those who viewed it." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336–37 (11th Cir. 2021) (cleaned up) (internal quotation marks omitted) (quoting *Johnson*, 491 U.S. at 404). This Court has already concluded that "Defendants intended to communicate a particularized message." Dkt. No. 222 at 10.

And as we make clear in Section II above, there's no question Defendants communicated a particularized message to others. Indeed, Plaintiffs devote a good deal of their case to complaining about petition-related messages of Defendants Engelbrecht, Somerville, and Davis, which were made in social media posts and comments, podcasts, and communications with challengers, as well as about the

messages' effects on others. Defendants argued publicly that the Secretary of State had been delinquent, and that Georgia needed to change its voter roll policies. Expressive speech need not communicate a specific message, *see Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (looking to whether "reasonable person would interpret [a display] as *some sort of message*, not whether an observer would necessarily infer a *specific message*") (emphases added), but Defendants' pure and expressive speech alike clearly did communicate messages about the undesirable state of the Georgia voter rolls whether to petitioners and BOEs or the media and Georgia government.

## IV.     Defendants Did Not Act Recklessly by Indirectly Supporting Petitions to Local Boards of Election

The willingness to build something imperfect, like a petition initiative, is the *sine qua non* of all progress. When non-reckless error is punished, people cease to become willing to innovate — or to speak out. Yet Defendants' own post-election analysis suggests their efforts to identify residency issues were on target.

### A. Analysis of Both Challenge Lists Shows the Spreadsheets' Predictions that Voters Had Moved Out of County Were Largely Meritorious

Defendants non-frivolously used the NCOA Registry of *permanent* changes-of-address to suggest that a voter had *probably* become ineligible to vote in a former county of residence, and in a large majority of cases, their predictions were right: the

18

voter had moved away permanently or even, like Plaintiffs Heredia and Berson, had their registration deactivated based on the NCOA.

## B.  Private Citizens are Incapable of Violating the NVRA, or Trying to

Fresh off using the NVRA in *Ben Hill Cty.*, 512 F.Supp.3d 1354, against a *state* actor, Plaintiffs' counsel early on confused the issues here by (1) contorting the NVRA to apply to *private* defendants if (2) those defendants allegedly wanted somehow to "force" counties to violate the NVRA. Both arguments are incorrect, as an analysis of the decision in *Ben Hill,* regarding the same challenges (to Berson, Turner, and Stinetorf) that Plaintiffs recycle here, shows.

First, the party enjoined in *Ben Hill* was the *county*, which both made the probable cause determination *and* removed voters from the rolls, not a citizen challenger who made a mere proposal to confirm residency, in the exercise of First Amendment petition rights. Second, unlike Defendants here, the challenger in that case expressly stated in his challenge letter that his challenge was "based on grounds that the challenged elector is not qualified to remain *on the list of electors,*" 512 F.Supp.3d at 1368 (emphasis added), and removal of voters from the list of electors is precisely what the county wrongly did. Third, while the *Ben Hill* court focused on language from subsection (i) that says "If the registrars uphold the challenge, the name of the challenged elector shall be removed from the list of electors," the preceding text in subsection (i) confusingly mentions both (1) challenges "based

upon the grounds that the challenged elector is not qualified to remain on the list of electors," and (2) challenges "based on other grounds." In the case of "other grounds," such as the grounds of ineligibility to vote in a particular election that Defendants cited in the facilitated petitions, "*no further action shall be required by the registrars*." (emphasis added). That means Defendants' understanding that they could not effect removal was not unreasonable, let alone reckless.

Finally, being asked to confirm residence, when there is probable cause to suspect a permanent move, and being allowed to vote a provisional ballot even if one cannot confirm residence, is many steps removed from any preclusion from voting. Confirmation of residence based on the NCOA is also indisputably allowed under the plain language of the NVRA and Georgia state law.

## C. Even in States' *Removal* of Voters, the NVRA Requires Only "Reasonable Efforts" – Not Perfection – to Identify Changed Residency

To "protect electoral integrity" and "maintenance of the voter rolls," the NVRA requires that states "conduct a general program of list maintenance that makes a ***reasonable effort*** to remove voters who become ineligible on account of . . . ***change of residence.***" *Bellitto v. Snipes*, 935 F.3d 1192, 1194 (11th Cir. 2019) (emphases added). Thus the NVRA empowers states, as Section 233 does Georgia's Secretary of State and Section 230 does its citizens, to make "reasonable efforts" — not cost-prohibitive or perfect efforts — to identify voters who have "changed residence". Now, Defendants did not seek to remove voters from the voter rolls, but

the "effort" required of a *citizen*, for voter *address correction*, is surely no higher, and arguably lower, than that for voter *removal* by the *state*.

### D. Even for the More Serious Removal of Voters, Use of the NCOA Alone Constitutes a "Reasonable Effort" to Identify Movers

The NVRA also provides that states "may meet the requirement" of identifying voters who have changed residence "by establishing a program under which (A) *change-of-address information supplied by the Postal Service through its licensees* [*NCOA*] is used to *identify registrants whose addresses may have changed*." 52 U.S.C. § 20507(c)(1) (emphasis added). In reviewing the state of Ohio's use of NCOA to identify voters who had moved, "the Supreme Court found that it complies with the NVRA." *Fair Fight*, 413 F.Supp.3d at 1290 (citing *Husted v. A. Philip Randolph Inst.*, 138 S.Ct. 1833 (2018) (holding "undisputedly lawful," under the NVRA, the state's utilization of a process that "sends notices to registrants whom the Postal Service's 'national change of address service' identifies as having moved)); *see also Bellitto,* 935 F.3d at 1205 (holding "the NCOA Process … constitutes a reasonable effort at identifying voters who have changed their addresses"); Dkt. No. 222 at 45 ("using the NCOA data can be a proper starting point for assessing voter eligibility" and "does not per se require a finding that the challenges were frivolous").

Congress permits use of the NCOA as a reasonable predictor of a truly permanent change of address because the U.S. Postal Service confirms the accuracy

of its sophisticated algorithms in matching names, as its extended documentation illustrates. USPS "NCOALink® User Technical Reference Guide," April 13, 2023, Version 12[10] at 20-35 (discussing NCOALink Name Sequence Presentation). Indeed, Defendants were aware that the state of Georgia itself uses NCOA to identify voters who have likely moved and that the state sends them notices to confirm their address based on NCOA.

Accordingly, there is no legal basis for Plaintiffs' assertion that citizens may not rely on the NCOA as part of a "reasonable" effort merely to "identify voters who have changed their address." Plaintiffs' argument that NCOA is not by itself probable cause of a permanent move comes with the fatal flaw that they offer no evidence that Defendants disregarded a known risk that the NCOA's predictive accuracy was too low to constitute "probable cause". Plaintiffs thus fail to bear their burden of showing Defendants' belief that NCOA is usually, *probably* correct was baseless, and could only have been part of an unlawful purpose.

The NCOA's statistical sufficiency can assure the presentation of only relevant evidence in this case. Plaintiffs' incorrect argument that reliance on the NCOA is

---

[10] *See* official USPS document at
https://postalpro.usps.com/NCOALink_User_Tech_Info.  USPS also maintains exacting standards for its licensees' use of NCOALink. *See* Appendix C, "NCOALink® Software Developer Software Performance Requirements End User Mailer Software", at 5 (requiring licensees "accurately match[] responses for at least 99% of the inquiries" and "produce no unexpected matches") (cited in Dr. Mayer's report at 22).

unreasonable leads directly to the factual morass of whether Defendants' efforts to *remove* voter records from their spreadsheets, because of the unknowable *possibility* that affected voters did not move, were negligent. This creative argument involves experts, and apparently the Court, examining spreadsheets for errors[11] in a removal process that is not legally required in the first place.

### E. The Petitions Satisfied the *Prima Facie* Standard: Not Baseless or Frivolous

The First Amendment is advanced by reasonable acts of petitioning, even if the petitions are ultimately unsuccessful. *BE & K Const. Co.*, 536 U.S. at 532. Because the right to petition is so fundamental to our system of governance, and because the purposes of the First Amendment are thereby advanced, finding a petition to be improper entails a rigorous *objective* legal standard.

The Supreme Court, in the less exacting context of litigation, has adopted a *mens rea* requirement as part of a two-part test to determine whether litigation lacks First Amendment protection. First, the lawsuit must be "objectively baseless in the sense that *no reasonable litigant could realistically expect success on the merits*." *Prof. Real Est. Inv'rs v. Columbia Pictures Indus., Inc.* 508 U.S. 49, 50 (1993) (emphasis added). Defendants were neither unrealistic nor unreasonable.

---

[11] Plaintiffs also offer no solution for the fact that citizens permitted to initiate residency-based challenges lack the tools — access to driver's licenses, voter registrations in other states — that states use to identify truly permanent COAs.

Second, did the petitioning party have an "unlawful purpose"? *BE & K Constr.,* 536 U.S. at 531. In *BE & K*, the Court reasoned that as long as a "plaintiff's purpose is to stop conduct he *reasonably believes is illegal*, petitioning is genuine both objectively and subjectively." *Id.* at 534 (emphasis added). Defendants easily pass this test. However, unlike legal process directed toward a person, Section 230 petitions are submitted to county governments, and may never come to the attention of a voter. When they do, the but-for cause is the intervention of the county and its independent finding of probable cause.

In this context, Plaintiffs cannot successfully argue Defendants were reckless in interpreting Section 230. First, Defendants followed subsection (a)'s permission for "any elector" to challenge the right of "any other elector . . . to vote in *an* election." Second, subsection informed Defendants that challenges would not be reckless if they were "in writing and specif[ied] distinctly the grounds" of the challenge. The ultimate success of the petition process is not dispositive. *Beach Blitz Co. v. City of Miami Beach*, 13 F.4th 1289, 1302 (11th Cir. 2021).

Third, the statute itself rendered non-reckless the timing of Defendants' challenges, which "may be made at any time prior to the [challenged] elector . . . voting at the elector's polling place or, if such elector cast an absentee ballot, prior to 5:00 P.M. on the day before the election." Or as the Court has put it, "how can you argue [Section 230] is being abused if the state allows it?" Dkt 210 at 42.

Moreover, while Section 8 of the NVRA says that *states* may not *remove* a voter from the rolls within 90 days of an election, in neither the NVRA nor Section 230 does any such time prohibition apply to anyone's *correction of a registered voter's information*. The U.S. Department of Justice confirms this guidance on its website. https://www.justice.gov/crt/national-voter-registration-act-1993-nvra, in paragraph 37: "This 90 day deadline does not, however, preclude correction of a registrant's information".

It cannot be baseless for Defendants to follow state law. Moreover, Defendants' motivations were realistic, per *Dept. of Mississippi*, and they expressed, in late 2020, the belief that the petitions might well remedy problems with voter eligibility issues, per *BE & K*. Finally, Defendants' belief that the petitions would "be held valid" and effect positive change, under *Professional Real Estate*, was also not baseless. And the undisputed fact that no challenge made its way to a voter without agreement of probable cause by governmental intermediaries is an "absolute defense" to allegations of frivolity. *Id*. at 63.

Dated: October 23, 2023

By: */s/ Jake Evans*
Jake Evans, Esq.
GA Bar No. 797018
**GREENBERG TRAURIG, LLP**
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
P: (678) 553-2100
F: (678) 553-2212
Jake.Evans@gtlaw.com

*Local Counsel for Defendants*

By*: /s/ Michael J. Wynne*
Michael J. Wynne*
TX Bar No. 785289
Cameron Powell*
DC Bar No. 459020
**GREGOR WYNNE ARNEY, PLLC**
909 Fannin Street, Suite 3800
Houston, TX 77010
P: (281) 450-7403
mwynne@gwafirm.com
cpowell@gwafirm.com
*Admitted Pro Hac Vice*

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE WITH L.R. 5.1C

I HEREBY CERTIFY that the foregoing document was prepared in Times New Roman, 14-point font, as approved by Local Rule 5.1C.

By: */s/ Michael J. Wynne*
Michael J. Wynne*

26

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## GAINESVILLE DIVISION

FAIR FIGHT, INC., SCOTT BERSON,
and JANE DOE,

     *Plaintiffs*,

v.

TRUE THE VOTE, INC., CATHERINE
ENGELBRECHT, DEREK
SOMERVILLE, MARK DAVIS, MARK
WILLIAMS, RON JOHNSON, and
JAMES COOPER,

     *Defendants*.

CIVIL ACTION FILE

NO. 2:20-cv-00302-SCJ

## CERTIFICATE OF SERVICE

This is to certify that I have filed a true and correct copy of the foregoing with the Clerk of the Court via the CM/ECF system, which will automatically serve electronic notification of same upon all counsel of record.

Respectfully submitted this 23rd day of October, 2023.

By: */s/ Michael J. Wynne*
Michael J. Wynne*

27