IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

FAIR FIGHT, INC., *et al.*,

                Plaintiffs,

                v.

TRUE THE VOTE, INC., *et al.*,

                Defendants.

Case No. 2:20-cv-0302-SCJ

## UNITED STATES' PROPOSED CONCLUSIONS OF LAW[1]

---

[1] Given that the United States' intervention in this case was solely to defend the constitutionality of Section 11(b) of the Voting Rights Act, the United States is not providing the Court with its own Proposed Findings of Fact.

# TABLE OF CONTENTS

I.  Section 11(b) of the Voting Rights Act Protects Against Intimidation Threats and Coercion. ................................................................................................3

II. Enforcement of Section 11(b) Does Not Conflict with the Free Speech Clause of the First Amendment ..............................................................................12

      A. False Speech Akin to Perjury and Defamation................................13
      B. Speech Integral to Illegal Conduct ...................................................15
      C. Narrow Tailoring Analysis ...............................................................17

III. Enforcement of Section 11(b) Does Not Conflict with the Petition Clause of the First Amendment ................................................................................20

## I.   Section 11(b) of the Voting Rights Act Protects Against Intimidation Threats and Coercion.

1.     Section 11(b) of the Voting Rights Act holds that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote[.]"  52 U.S.C. § 10307(b).

2.     Section 11(b) offers broad protections against intimidation, threats, and coercion during all phases of the voting process.  *See* 52 U.S.C. § 10310(c)(1) (defining the term "vote" broadly to encompass "all action necessary to make a vote effective"); *see also League of United Latin Am. Citizens-Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) ("*LULAC*") (discussing Section 11(b)'s "deliberately unqualified reach").

3.     The ordinary meaning of "intimidate" is to "make timid or fearful," or to "inspire or affect with fear," especially "to compel to action or inaction (as by threats)."  *Webster's Third New International Dictionary* 1183 (1966); *see also United States v. Norton*, 808 F.2d 908, 910 (1st Cir. 1987) (collecting definitions); *Nat'l Coal. on Black Civic Participation v. Wohl*, 498 F. Supp. 3d 457, 477 (S.D.N.Y. 2020) ("*Wohl I*").  A contemporary legal dictionary also defined "intimidation" as "[u]nlawful coercion; duress; putting in fear."  *Black's Law Dictionary* 957 (4th ed. 1968).

4.      The ordinary meaning of "threaten" is to "utter threats against" or "promise punishment, reprisal, or other distress." *Webster's Third New International Dictionary* 2381 (1966); *see also Wohl I*, 498 F. Supp. 3d at 477. Around the time when the Voting Rights Act was passed, Black's Law Dictionary defined "threat" also as "[a] menace; especially, any menace of such a nature and extent as to unsettle the mind of the person on whom it operates, and to take away from his acts that free and voluntary action which alone constitutes consent." *Black's Law Dictionary* 1651 (4th ed. 1968).

5.      The ordinary meaning of "coerce" is to "restrain, control, or dominate, nullifying individual will or desire (as by force, power, violence, or intimidation)." *Webster's Third New International Dictionary* 438 (1966); *see also Wohl I*, 498 F. Supp. 3d at 477.  "Coerce" also means "[c]ompelled to compliance; constrained to obedience, or submission in a vigorous or forcible manner." *Black's Law Dictionary* 324 (4th ed. 1968).

6.      In the context of threats and intimidation, "putting others 'in fear of harassment and interference with their right to vote'" is "'sufficient' to support a Section 11(b) claim." *Wohl I*, 498 F. Supp. 3d at 480 (quoting *LULAC*, 2018 WL 3848404, at *4).

7.      In the context of coercion, conduct restraining, controlling, or nullifying the individual's will to vote or attempt to vote is sufficient to support a

Section 11(b) claim.  *See Nat'l Coal. on Black Civic Participation v. Wohl*, 512 F. Supp. 3d 500, 509–10 (S.D.N.Y. 2021) ("*Wohl II*"); *see also United States v. Beaty*, 288 F.2d 653, 656–57 (6th Cir. 1961) (finding that evicting or denying credit to sharecropper tenants who attempted to vote constituted coercion under Section 11(b)'s predecessor, Section 131(b) of the Civil Rights Act of 1957).

8.      Section 11(b) does not require a subjective intent to intimidate, threaten, or coerce.  *See LULAC*, 2018 WL 3848404, at *3–*4; *see also Wohl I*, 498 F. Supp. 3d at 485.  Rather, under Section 11(b), "defendants would be deemed to intend the natural consequences of their acts."  *Voting Rights Act of 1965: Hearing Before the H. Comm. on the Judiciary*, 89th Cong. 12 (Katzenbach Statement), https://perma.cc/N9S4-KH2P.

9.      Because "threats, intimidation or coercion may take on many forms," Section 11(b) requires a holistic totality-of-circumstances legal analysis.  *Wohl I*, 498 F. Supp. 3d at 484 (quoting *Beaty*, 288 F.2d at 654).  As part of this fact- and context-specific analysis, a defendant's prior course of conduct or activities outside the relevant jurisdiction may be relevant for establishing intent or context for how that defendant's activities affected voters.  For example, the court in *Arizona Alliance for Retired Americans* considered an out-of-state defendant's social media and website posts in evaluating defendants' intent and impact on the voters who were being followed or filmed at ballot drop boxes.  *See Ariz. All. For Retired*

*Americans v. Clean Elections USA*, No. 22-CV-01823-PHX-MTL, ECF No. 51 (D.

Ariz. Nov. 1, 2022) (issuing a temporary restraining order and enjoining

defendants to post accurate information on their website regarding depositing

multiple ballots in a ballot drop box in Arizona); *cf. United States v. McLeod*, 385

F.2d 734, 740 (5th Cir. 1967) (extensively discussing "the background of

contemporaneous events in Selma and the general climate prevailing there at the

time" as context for the activities alleged to have violated Section 131(b) of the

Civil Rights Act of 1957, the predecessor statute of Section 11(b)).

10.     Section 11(b) "sweeps broadly" to cover all conduct, violent and non-

violent, that constitutes voter intimidation, threats, or coercion.  *Wohl II*, 512 F.

Supp. 3d at 509 (interpreting Section 11(b) to encompass violent and non-violent

intimidation); *see also, e.g.*, *LULAC*, 2018 WL 3848404, at *4 (finding the

omission of a specific intent requirement "suggest[s] § 11(b)'s deliberately

unqualified reach").  Such proscribed conduct "may include communications

inspiring fear of legal consequences, economic harm, dissemination of personal

information, and surveillance." *Nat'l Coal. on Black Civic Participation v. Wohl*,

No. 20 CIV. 8668 (VM) 2023 WL 2403012, at *20 (S.D.N.Y. Mar. 8, 2023)

("*Wohl III*").

11.     Section 11(b) does not focus on whether a defendant's actions

subjectively intimidated or coerced a particular voter.  *See McLeod*, 385 F.2d at

6

741 ("[T]he failure of . . . coercive acts to intimidate a few persons does not

negative their general coercive effect.").   Rather, it forbids any "messages that a

reasonable recipient familiar with the context of the message would interpret as a

threat of injury tending to deter individuals from exercising their voting rights."

*Wohl I*, 498 F. Supp. 3d at 477.

12.     The Supreme Court's recent decision in *Counterman v. Colorado*, 143

S. Ct. 2106 (2023), does not impose any new intent standard on Section 11(b).  The

Court's decision only concerns the true threats exception to the First Amendment,

and Section 11(b) is consistent with the First Amendment under other exceptions.

Moreover, even if it did not fall into any exceptions, Section 11(b) survives strict

scrutiny.  *See infra* Part II.

13.     An intimidation or coercion campaign may be targeting specific

voters, even if it casts a wide net.  *Cf. Federal Election Comm'n v. Akins*, 524 U.S.

11, 24 (1998) (stating that "where a harm is concrete, though widely shared"—

including "where large numbers of voters suffer interference with voting rights

conferred by law"—the Supreme Court "has found 'injury in fact'" for standing

purposes).

14.     Section 11(b) constrains successful, unsuccessful, and in-progress

attempts to coerce, intimidate, or threaten.  Section 11(b) prohibits both an

7

"*attempt* to intimidate, threaten, or coerce" and the completed act.  52 U.S.C.

§ 10307(b) (emphasis added); *see also Wohl II*, 512 F. Supp. 3d at 516.

15.    Voter challenges can give rise to a violation under Section 11(b) of

the Voting Rights Act if they are knowing or recklessly false, are lodged in an

intimidating, coercive, or threatening manner, or are part of a broader course of

conduct that is intimidating, coercive, or threatening when considered as a whole.

16.    Knowingly or recklessly false voter challenges can give rise to a

violation of Section 11(b) because they seek to and can coerce voters away from

voting by "nullifying individual will or desire" of eligible voters to vote.

*Webster's Third New International Dictionary* 438 (1966).  Recklessness is

defined as when a person "foresees the possibility" of harmful consequences "and

consciously takes the risk." *Black's Law Dictionary* (11th ed. 2019).

17.    Even if unsuccessful, knowing or recklessly false voter challenges can

constitute a prohibited attempt to intimidate, threaten, or coerce under Section

11(b).  Although intent is not necessary to establish liability under Section 11(b),

parties who file such challenges lack any plausible intent to legitimately enforce

state law.  *See McLeod*, 385 F.2d at 745.  Parties who engage in this activity are

most easily understood as intending the natural consequences of their actions: to

cast baseless suspicion on eligible voters, add administrative burdens to those

voters' voting experience, dissuade voters from going to the polls, and increase the

risk of erroneous disenfranchisement.  *See Mont. Democratic Party v. Eaton*, 581

F. Supp. 2d 1077, 1079 (D. Mont. 2008), *as amended* (Oct. 10, 2008) (discussing

"the mischief" a defendant who abuses voter challenge laws "could inject into an

election cycle"); *see also Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (explaining

that "voter confusion" can create a "consequent incentive to remain away from the

polls").

18.     Mass voter challenges based on unreliable second-hand information,

conjecture, or no information at all—especially those filed in the days and weeks

leading up to an election—are more likely to subject affected voters to erroneous

disenfranchisement and are therefore more likely to constitute intimidation or

coercion or attempted intimidation or coercion.  *See Arcia v. Fla. Sec'y of State*,

772 F.3d 1335, 1346 (11th Cir. 2014) (finding "[e]ligible voters removed days or

weeks before Election Day will likely not be able to correct the State's errors in

time to vote"); *see also N.C. State Conf. of the NAACP v. N.C. State Bd. of*

*Elections*, No. 1:16CV1274, 2016 WL 6581284, at *6 (M.D.N.C. Nov. 4, 2016)

(finding that eligible voters were "at risk of being erroneously disenfranchised,"

because of "large scale voter challenges [] close to an election" based on data that

"was unverified and of unknown reliability"); *Majority Forward v. Ben Hill Cnty.*

*Bd. of Elections*, 512 F. Supp. 3d 1354, 1373 (M.D. Ga. 2021) (finding that

inaccurate late-stage mass challenges could cause eligible voters to be "intimidated

or discouraged from voting altogether" or force them to "go extraordinary lengths . . . in order to have their vote counted").[2]

19.    Voter challenges that purport to or do target voters based on race or ethnicity are likely to be perceived as particularly intimidating or coercive and therefore violate Section 11(b).  *See, e.g.*, *Daschle v. Thune*, No. 4:04-cv-4177, ECF No. 6, 1–2 (D.S.D. Nov. 1, 2004) (enjoining campaign workers from following and writing down license plate numbers of Native American voters); *Democratic Nat'l. Comm. v. Republican Nat'l. Comm.*, 673 F.3d 192, 196–97 (3d Cir. 2012) (discussing a Section 11(b) consent decree that proscribed voter challenge campaigns targeting precincts with a high percentage of racial or ethnic minorities); *see also Council on Am.-Islamic Rels.-Minnesota v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 379 (D. Minn. 2020) (noting that defendants "aim[ed]" their activities at "particular group or groups of individuals" who ascribed to a particular political ideology).

20.    Similarly, threatening to subject targeted voters to adverse consequences such as harassment, "public opprobrium," and baseless allegations of felonious conduct may similarly be perceived as particularly intimidating or

---

[2] The National Voter Registration Act ("NVRA") safeguards voters against some of these harms by prohibiting jurisdictions from undertaking systematic removals of voters 90 days before an election.  *See* 52 U.S.C.A. § 20507(c)(2)(A).  Mass voter challenges submitted close to an election create administrative burdens and the risk of erroneous disenfranchisement.

coercive.  *See LULAC*, 2018 WL 3848404, at *4 (finding plaintiffs stated a claim under Section 11(b) where they alleged that defendants had published voters' names and personal information in "a report condemning felonious voter registration in a clear effort to subject the named individuals to public opprobrium"); *see also United States v. Nguyen*, 673 F.3d 1259, 1265 (9th Cir. 2012) (finding fair probability that a letter sent to Latino voters that warned "if they voted in the upcoming election their personal information would be collected . . . [and] could be provided to organizations who are 'against immigration'" constituted voter intimidation under California law, in the context of a search warrant); *Wohl II*, 512 F. Supp. 3d at 511 (noting that "the threat of dissemination of personal information alone could plausibly support a Section 11(b) claim").

21.    Compliance with state law and procedure is not sufficient to inoculate otherwise unlawful voter challenges from liability under Section 11(b).  In analyzing voter intimidation claims, courts determine whether otherwise lawful activities are being used for unlawful ends.  *See, e.g.*, *Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (holding that "spurious prosecutions" of those aiding voter registration fell within the scope of Section 11(b)); *Allen v. City of Graham*, No. 1:20-CV-997, 2021 WL 2223772, at *7–*8 (M.D.N.C. June 2, 2021) (finding that plaintiffs sufficiently stated a Section 11(b) claim by alleging that police tactics at a march to the polls intimidated voters and prevented voting); *see*

*also United States v. Wood*, 295 F.2d 772, 781 (5th Cir. 1961) (noting Section

131(b)'s application to "where the state criminal processes are used as instruments

for the deprivation of constitutional rights"); *United States v. Lucky*, 239 F. Supp.

233, 239 (W.D. La. 1965) (finding private parties liable for discriminatory voter

challenges under Section 131(a) of the Civil Rights Act of 1957); *United States v.*

*McElveen*, 180 F. Supp. 10, 13–14 (E.D. La.), *aff'd in part sub nom. United States*

*v. Thomas*, 362 U.S. 58 (1960) (same).  Therefore, the fact that Georgia allows an

unlimited number of voter challenges per challenger does not negate a finding of

liability under Section 11(b) for intimidating, threatening, or coercive voter

challenges.

## II.    Enforcement of Section 11(b) Does Not Conflict with the Free Speech Clause of the First Amendment

22.    Section 11(b)'s prohibition on intimidating, threatening, or coercive

voter challenges is consistent with the Free Speech Clause.  Even if Defendants'

conduct were considered expressive, any such conduct found to violate Section

11(b) is unprotected by the Free Speech Clause, because it falls under the

exceptions for false speech and speech integral to illegal conduct.[3]

---

[3] Further, to be considered expressive, "the conduct itself" must be recognizable as inherently expressive, rather than "the speech that accompanies it."  *Rumsfeld v. F. for Acad. & Institutional Rts.*, 547 U.S. 47, 66 (2006) (explaining that "[i]f combining speech and conduct were enough to create expressive conduct, a regulated party could always transform conduct into 'speech' simply by talking about it").

### A.  False Speech Akin to Perjury and Defamation

23.    Applying Section 11(b) to knowingly or recklessly false voter challenges is consistent with the Free Speech Clause.

24.    "[F]alse statements are not entitled to the same level of First Amendment protection as truthful statements."  *Weaver v. Bonner*, 309 F.3d 1312, 1319 (11th Cir. 2002).  Accordingly, laws that prohibit knowingly or recklessly false speech—such as perjury, defamation, and fraud statutes—where such speech inflicts "legally cognizable harm" do not run afoul of the First Amendment.  *See United States v. Alvarez*, 567 U.S. 709, 719 (2012) (plurality opinion); *see also id.* at 734 (Breyer, J., concurring in the judgment) (acknowledging constitutionality of statutes prohibiting false speech that inflicts "particular and specific harm"); *id.* at 739 (Alito, J., dissenting) (same).

25.    In delineating what "legally cognizable harm" may entail, the plurality in *Alvarez* explained that perjured statements lack First Amendment protection because "[p]erjury undermines the function and province of the law and threatens the integrity of judgments that are the basis of the legal system."  *Id.* at 720–21 (citing *United States v. Dunnigan*, 507 U.S. 87, 97 (1993)); *see also id.* at 734–35 (Breyer, J., concurring in the judgment) (describing statutes that prohibit lying to a government official where the "lie is likely to work particular and specific harm by interfering with the functioning of a government department").

Further, a witness under oath is aware that "his or her statements will be the basis for official governmental action, action that often affects the rights and liberties of others." *Id.* at 721.

26.    Under the same reasoning, courts have rejected First Amendment challenges to prohibitions on filing false claims, liens, judgments, and tax forms. *See, e.g.*, *United States v. Glaub*, 910 F.3d 1334, 1338 (10th Cir. 2018) (finding no First Amendment protection for submitting a false claim to the government "to effect a fraud or secure moneys or other valuable considerations" (quoting *Alvarez*, 567 U.S. at 723)); *United States v. Hoffert*, 949 F.3d 782, 790 (3d Cir. 2020) (denying First Amendment protection to filing false liens, partly because false liens "allow the perpetrator to 'file the lien with relative ease' while requiring the victim to 'go through a complicated ordeal, such as to seek judicial action, in order to remove the lien'" (citation omitted)); *United States v. Kaplowitz*, 201 F. App'x 659, 661–62 (11th Cir. 2006) (finding no First Amendment protection for filing false judgments in the public record); *United States v. Buttorff*, 572 F.2d 619, 624 (8th Cir. 1978) (denying First Amendment protection to speeches advising people how to file false tax forms); *see also United States v. Fleury*, 20 F.4th 1353, 1365 (11th Cir. 2021) (listing fraud and defamation as "well-defined and narrowly limited classes of speech" for which "content-based restrictions are permitted").

14

27.     Knowingly or recklessly false voter challenges, like perjury and defamation, fall outside the scope of the First Amendment because they inflict legally cognizable harm and undermine the function and province of the law. These false challenges inflict a legally cognizable harm by depriving eligible voters' of their right to vote—"a fundamental political right" that is "preservative of other basic civil and political rights." *Reynolds v. Sims*, 377 U.S. 533, 562 (1964).  False challenges also "undermine[] the function and province of the law" by abusing voter challenge laws to intimidate, coerce, and disenfranchise voters and "threaten[] the integrity" of critical election administration functions. *Alvarez*, 567 U.S. at 721.  Moreover, individuals submitting voter challenges know that their challenges "will be the basis for official governmental action, action that often affects the rights and liberties of others": knowingly or recklessly false voter challenges trigger official governmental actions that, at a minimum, impose unwarranted administrative hurdles that may coerce eligible voters away from voting and, worse, risk erroneous disenfranchisement. *Id.*; *see* Ga. Code § 21-2-230 (specifying administrative procedures for responding to voter challenges, including a hearing for challenged voters).

### B. Speech Integral to Illegal Conduct

28.     Section 11(b)'s application to intimidating or coercive voter challenges also falls within the First Amendment exception for speech integral to

illegal conduct.  Making "a course of conduct illegal" does not abridge freedom of

speech "merely because the conduct was in part initiated, evidenced, or carried out

by means of language, either spoken, written, or printed."  *Norwegian Cruise Line*

*Holdings Ltd. v. State Surgeon Gen., Fla. Dep't of Health*, 50 F.4th 1126, 1135

(11th Cir. 2022) (quoting *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456

(1978)).

      29.    Accordingly, courts have found that statutes prohibiting intimidation,

witness tampering, or extortion are consistent with the Free Speech Clause, even if

the underlying conduct involves speech.  For example, the Eleventh Circuit found

that a prohibition on "us[ing] intimidation . . . threaten[ing], or corruptly

persuad[ing]" a witness to influence, delay, or prevent the testimony of any person

in an official proceeding did not proscribe constitutionally protected speech.

*United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (agreeing with the

Second Circuit in *United States v. Thompson*, 76 F.3d 442 (2d Cir. 1996), that the

phrase "corruptly persuade" as used in 18 U.S.C. § 1512(b) is not

unconstitutionally overbroad); *see also Thompson*, 76 F.3d at 452 ("By targeting

only such persuasion as is 'corrupt[],' § 1512(b) does not proscribe lawful or

constitutionally protected speech"); *NLRB v. Gissel Packing Co.*, 395 U.S. 575,

618 (1969) (finding an employer's "threat of retaliation based on misrepresentation

and coercion" is "without the protection of the First Amendment"); *United States*

*v. Quinn,* 514 F.2d 1250, 1268 (5th Cir. 1975) ("[E]xtortionate speech has no more constitutional protection than that uttered by a robber while ordering his victim to hand over the money, which is no protection at all.").

30.     Similarly, finding that a course of action constitutes intimidation or coercion under Section 11(b) focuses on the unlawful *conduct*, such as submitting false voter challenges or combining voter challenges with other intimidating, threatening, or coercive conduct.  Because Section 11(b) focuses on illegal courses of conduct, any resulting prohibition on speech that initiates or carries out such illegal conduct is consistent with the First Amendment.  *See Norwegian Cruise Line*, 50 F.4th at 1136 (explaining that the "focal point" of anti-discrimination statutes is "on the *act* of discriminating" and that such statutes thus do not violate the First Amendment (alteration in original) (quoting *Hurley*, 515 U.S. at 572)).  Therefore, applying Section 11(b) to conduct that intimidates, threatens, or coerces voters—such as lodging false voter challenges or threatening to dox or surveil voters—is consistent with the Free Speech Clause.

### C.  Narrow Tailoring Analysis

31.     Even if the conduct or speech targeted by Section 11(b) were to fall within the First Amendment's scope, Section 11(b) survives any level of scrutiny. The Voting Rights Act safeguards "one of the most fundamental rights of our citizens: the right to vote."  *Bartlett v. Strickland*, 556 U.S. 1, 10 (2009).  "Casting

a vote is a weighty civic act, akin to a jury's return of a verdict, or a representative's vote on a piece of legislation." *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1887 (2018).  As a result, the Supreme Court has long held that "protecting voters from confusion and undue influence" in the voting process is a "compelling interest." *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality op.); *see id*. at 217–18 (Stevens, J., dissenting) (stating that protecting "orderly access to the polls" is "a compelling state interest"); *see also Citizens for Police Accountability Pol. Comm. v. Browning*, 572 F.3d 1213, 1219 (11th Cir. 2009) (affirming that "protecting voters from confusion and undue influence" and "preserving the integrity of the election process" are compelling governmental interests).

32.     In *Browning*, the Eleventh Circuit held that a 100-foot no-solicitation zone around polling locations was necessary to further those compelling governmental interests, based on "our country's long history of election regulation, the consensus emerging from that history, and the practical need to keep voters and voting undisturbed." *Id*. at 1221.  In finding that the solicitation ban was narrowly tailored because it was reasonable and did not significantly impinge on constitutionally protected rights, the court explained that "the State need not wait for actual interference or violence or intimidation to erupt near a polling place" to take "precautions to protect and to facilitate voting." *Id*. at 1220–21.

33.     Applying Section 11(b) to the alleged conduct at hand amply satisfies the standard set out in *Browning*.  Forty-nine states, the District of Columbia, and the federal government all proscribe voter intimidation, threats, and/or coercion, reflecting a universally shared understanding that protecting voters from undue influence is a compelling state interest and that proscribing voter intimidation is necessary to further that interest.  *See* Theodore Z. Wyman, *Litigation of Voter Intimidation Law* §§ 7–8, 174 Am. Jur. Trials 385 (Nov. 2022).  This "broadly shared judgment is entitled to respect."  *Mansky*, 138 S. Ct. at 1888.  And issuing a remedy whereby "each activity within the proscription's scope is an appropriately targeted evil" would satisfy the narrow tailoring requirement.  *Frisby v. Schultz*, 487 U.S. 474, 485 (1988).

34.     Finding that Section 11(b) prohibits knowingly or recklessly false challenges is narrowly tailored to further the compelling interest of protecting the right to vote.  The right to vote is "a fundamental political right" that is "preservative of other basic civil and political rights."  *Reynolds v. Sims,* 377 U.S. at 562.  A prohibition on intimidating or coercing voters through knowingly or recklessly false voter challenges would have no chilling effect on legitimate voter challenges submitted in accordance with state law, as it leaves the "requisite breathing space" for inadvertent falsehoods.  *Brown v. Hartlage*, 456 U.S. 45, 61 (1982) (holding that nullifying a political candidate's electoral victory for false

statements made in good faith was inconsistent with the First Amendment) (internal quotation marks omitted); *see Weaver*, 309 F.3d at 1319–20 (finding "restrictions on candidate speech during political campaigns must be limited to false statements that are made with knowledge of falsity or with reckless disregard as to whether the statement is false" in order to be narrowly tailored).

35.     Likewise, enjoining persons from threatening to publish personal information of voters who were subject to voter challenges would be narrowly tailored.  In fact, such an injunction would be far more narrowly tailored than the solicitation-free zone endorsed in *Browning*: it would target the exact harm—intimidation, threats, and coercion—the compelling governmental interest seeks to prevent, instead of prohibiting facially legitimate activities as a precautionary measure against "interference or violence or intimidation" of voters.  *Browning*, 572 F.3d at 1220.

## III.   Enforcement of Section 11(b) Does Not Conflict with the Petition Clause of the First Amendment

36.     "[T]he Petition Clause protects the rights of individuals to appeal to courts and other forums established by the government for resolution of legal disputes."  *Borough of Duryea v. Guarnieri*, 564 U.S. 379, 387 (2011).

37.     Section 11(b) does not violate the Petition Clause, as the Clause does not protect knowingly or recklessly false speech, nor does it protect illicit activities that take the form of a government petition.

20

38.    First, "petitions . . . that contain intentional and reckless falsehoods 'do not enjoy constitutional protection'" and may "be reached by" laws prohibiting such conduct, such as "the law of libel." *McDonald v. Smith*, 472 U.S. 479, 484 (1985) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964)).  In *McDonald*, the Supreme Court found that the right to petition does not "include an unqualified right to express damaging falsehoods in exercise of that right," and that state libel law may apply to damaging falsehoods in a petition without violating the First Amendment.  *Id.* at 484–86.  Likewise, voter challenges based on knowing or reckless falsehoods do not enjoy constitutional protection.[4]

39.    Second, illicit activities that take the form of a government petition may be prohibited without running afoul of the Petition Clause, just as speech integral to illegal activities may be banned without violating the Free Speech Clause.  The Petition Clause protects "lawful means to achieve legitimate political ends." *NAACP v. Button*, 371 U.S. 415, 430 (1963).  "[I]llegal and reprehensible practice which may corrupt the administrative or judicial processes . . . cannot acquire immunity by seeking refuge under the umbrella of 'political expression.'" *Cal. Motor Transp. Co. v. Trucking Unlimited*, 404 U.S. 508, 513 (1972).

---

[4] Although a separate "frivolity" standard is not required here, *see infra* ¶¶ 43, 45–46 (discussing the sham litigation doctrine from the antitrust context), even if it were required, voter challenges based on knowing or reckless falsehoods amply clear that standard.

40.     For that reason, courts have found that the Petition Clause is not

offended by sanctions for unethical or illegal conduct in administrative or legal

proceedings or tax collection from those who withhold payment under the guise of

a tax policy petition.  *See, e.g., id.* at 512 (noting that "unethical conduct in the

setting of the adjudicatory process often results in sanctions" without violating the

First Amendment); *Herndon v. Comm'r of Internal Revenue*, 758 F. App'x 857,

859 (11th Cir. 2019) (finding no Petition Clause violation for requiring income tax

payment); *Paganucci v. City of New York*, 785 F. Supp. 467, 479 (S.D.N.Y. 1992)

(finding that the Petition Clause allows Rule 11 sanctions where attorney failed to

meet "test of objective reasonableness"), *aff'd*, 993 F.2d 310 (2d Cir. 1993).

Applying Section 11(b) to intimidating, threatening, or coercive conduct, even if

that conduct involves a government petition, is therefore permissible under the

Petition Clause.

41.     Undergirding these permissible applications of Section 11(b) under

the Petition Clause is the principle that, as with the right to free speech, the right to

petition is constitutionally guaranteed, but not absolute.  *See Guarnieri*, 564 U.S. at

386 (balancing the plaintiff's petition rights against the State's interests in the

public employment context); *see also McDonald v. Smith*, 472 U.S. 479, 484–85

(1985) (holding that the Petition Clause does not provide immunity to defendants

charged with expressing "libelous and damaging falsehoods" in a petition to

government officials); *Edwards v. South Carolina*, 372 U.S. 229, 236 (1963)

(noting that right to petition may be subject to "evenhanded application of a precise

and narrowly drawn regulatory statute evidencing a legislative judgment that

certain specific conduct be limited or proscribed"); *Wright v. DeArmond*, 977 F.2d

339, 346  (7th Cir. 1992) ("Like other aspects of freedom of expression, [the right

to petition] never has been considered an absolute right but, rather, has been

considered subject to reasonable limitations in the face of very important

government interests.").

     42.    In *Guarnieri*, the Supreme Court balanced the right to petition against

the government's interest in the "efficient and effective operation of government,"

recognizing a "significant interest in disciplining public employees who abuse the

judicial process."  564 U.S. at 389–90.  The Court also considered the degree to

which a challenged restriction impairs the ability to seek redress of a grievance

from the government, noting alternative means of filing grievances and litigation

available to public employees.  *Id.* at 392, 397; *see also Wright*, 977 F.2d at 348

(noting that the Petition Clause prohibits the enforcement of laws that deny the

"opportunity to participate in [] legitimate effort[s] to obtain a favorable change in

the law").

     43.    In the context of antitrust law, courts have recognized the challenge of

distinguishing "objectively reasonable claims" from "a pattern of baseless,

repetitive claims," balancing the right to access courts with the governmental interest in preventing abuses of administrative and judicial processes. *Cal. Motor Transp.*, 404 U.S. at 513. In doing so, courts have drawn the line at "objectively baseless" litigation that aims to interfere directly with a competitor's business relationships, defining such "sham litigation" to violate antitrust laws. *See Pro. Real Est. Invs., Inc. v. Columbia Pictures Indus., Inc.*, 508 U.S. 49, 60 (1993).

44.    In evaluating a Petition Clause challenge to Section 11(b), courts must balance the right to petition against the federal government's compelling interest in protecting the right to vote without fear or intimidation. As noted above, Section 11(b)'s prohibition on intimidating or coercive voter challenges is narrowly tailored to further this well-recognized compelling state interest and would therefore survive any level of scrutiny. *See Cal. Motor Transp.*, 404 U.S. at 515 ("First Amendment rights may not be used as the means or the pretext for achieving 'substantive evils' which the legislature has the power to control." (internal citation omitted)). Because Section 11(b) ensures that voter challenges are not used as a vehicle for intimidation, threats, or coercion and leaves ample opportunity to seek redress from the government in a lawful manner, applying Section 11(b) to voter challenges is consistent with the Petition Clause.

45.    Given these considerations, the sham litigation doctrine from the antitrust context should not be imported here. First, no authority requires applying

the sham litigation doctrine to the voter intimidation context.  Further, courts must carefully consider the interests at stake to discern whether the doctrine would achieve the right balance here.  *See Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 555–57 (2014) (declining to import the sham litigation standard to the fee-shifting scheme in patent infringement cases, explaining that "[t]he threat of antitrust liability (and the attendant treble damages, 15 U.S.C. § 15) far more significantly chills the exercise of the right to petition than does the mere shifting of attorney's fees").  Here, the right to petition is being balanced against the right to vote, as distinguished from statutory rights created to prevent anticompetitive or unfair labor practices.  Because of the fundamental nature of the "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson*, 504 U.S. at 211, and because any citizen's ability to lodge a lawful, non-intimidating voter challenge is preserved under Section 11(b), a standard arising from an economic regulatory context is ill-suited here.

46.    Prohibiting false petitions or abuse of voter challenge processes does not run afoul of the Petition Clause, and applying Section 11(b) to such voter challenges is consistent with the Petition Clause.

Date:  October 26, 2023

Respectfully submitted,

RYAN K. BUCHANAN
United States Attorney
Northern District of Georgia

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

AILEEN BELL HUGHES
Georgia Bar No. 375505
Assistant U.S. Attorney
Office of the United States Attorney
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
Phone: (404) 581-6000
Fax: (404) 581-6181

*/s/  Jennifer J. Yun*
T. CHRISTIAN HERREN, JR.
TIMOTHY F. MELLETT
DANA PAIKOWSKY
JENNIFER J. YUN
JUDY J. BAO
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
timothy.f.mellett@usdoj.gov
dana.paikowsky@usdoj.gov
jennifer.yun@usdoj.gov
judy.j.bao@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on October 26, 2023, I electronically filed the foregoing

with the clerk of the court using the CM/ECF system, which will send notification

of this filing to counsel of record.

*/s/ Jennifer J. Yun*

JENNIFER J. YUN
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice

## CERTIFICATE OF COMPLAINCE

I hereby certify, pursuant to Local Rules 5.1 and 7.1D, that the foregoing

motion has been prepared using Times New Roman size 14 font.

*/s/ Jennifer J. Yun*
JENNIFER J. YUN
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice