# ATTACHMENT A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
## ALBANY DIVISION

MAJORITY FORWARD and GAMALIEL   :
WARREN TURNER, SR.,

      Plaintiffs,

v.                                 :      CASE NO.: 1:20-CV-266 (LAG)

BEN HILL COUNTY BOARD OF
ELECTIONS, *et al.*,

      Defendants.

## ORDER

     Before the Court is Plaintiffs' Amended Complaint which seeks both a declaratory judgment and a preliminary injunction. (Doc. 20 ¶ 27.) On December 30, 2020, the Court held a hearing on Plaintiffs' request for a preliminary injunction. The Court entered a preliminary Order granting, in part, Plaintiffs' request for a preliminary injunction. (Doc. 27.) During the hearing on the preliminary injunction, the Court advised the Parties that, due to the urgent nature of the case, the Court might issue its order on the preliminary injunction and later enter a full order with the Court's findings and conclusions. The Parties did not object. This is the Court's final Order on the preliminary injunction consistent with Rule 52 of the Federal Rules of Civil Procedure.

## FINDINGS OF FACT

     During the hearing, Plaintiff called no witnesses. The Ben Hill County Defendants also called no witnesses. Defendant Muscogee County called one witness, Defendant Boren. In addition to the testimony of Defendant Boren, the exhibits attached to the Parties' respective filings were admitted during the hearing. The following are the Court's findings of fact.

I certify that this document is a true copy of the original document or electronic filing in this case.

Bill Lawrence     11/6/2023
Deputy Clerk     Date

## I.   Ben Hill County

Plaintiffs allege that the Ben Hill County Defendants improperly sustained a mass challenge to the eligibility of voters in Ben Hill County based on data from the National Change of Address (NCOA) registry and, as a result, took actions in violation of the National Voter Registration Act (NVRA), 52 U.S.C. § 20501 *et seq.*, O.C.G.A. § 21-2-230, and the First and Fourteenth Amendments to the Constitution. As relates to Ben Hill County, the evidence offered during the hearing included a copy of the Elector Challenge made by Tommy Roberts and the declarations of Plaintiff Debra Lewis, Dr. Kenneth Mayer,[1] Defendant Cindi Dunlap, and Kathleen Searcy. As set forth in greater detail below, the sum of the evidence admitted at the hearing regarding Ben Hill County is that a challenge to an unspecified number of voters was submitted to the Board by Tommy Roberts on December 20, 2020, that Plaintiff Lewis was told by elections officials that her eligibility to vote had been challenged and that she would have to cast a provisional ballot and present evidence of her residency at a hearing on January 5, 2020, that Plaintiff Lewis denies having changed her residency from Georgia or having indicated a desire to change her residency, and that Dr. Mayer is of the opinion that the information submitted with the Roberts challenge letter was insufficient to support a challenge to the eligibility of the voters listed in the documents attached to the challenge.

Plaintiff Lewis' Declaration (Plaintiffs' Ex. P-10) was admitted, without objection, during the hearing. Plaintiff Lewis is a permanent resident and registered voter in Ben Hill County. (*Id.* ¶ 2.) In 2018 and 2019, Lewis regularly traveled to her boyfriend's residence in Missouri and temporarily changed her address to Missouri; but Lewis always intended to return to Georgia, never indicated a desire to change her residency to Missouri, and never registered to vote in Missouri. (*Id.* ¶¶ 4–5.) In fact, Lewis maintained her Georgia license,

---

[1]     Dr. Mayer has a Ph.D. in political science from Yale University, where his graduate training included courses in economics and statistics. (Plaintiffs' Ex. P-2 ¶ 5.) He also has an undergraduate degree from the University of California, San Diego, where he majored in political science and minored in applied mathematics. (*Id.*) Dr. Mayer has been on the faculty of the political science department at the University of Wisconsin-Madison since August 1989 and has authored several publications in peer-reviewed journals regarding election law, political science, and politics. (*Id.* ¶¶ 5–7.) In the past five years, he has been qualified as an expert and has testified in several cases in state and federal court. (*Id.* ¶ 8.)

continuously paid utilities at her permanent residence in Georgia, and, in October of 2020, changed her mailing address back to her permanent residence in Georgia. (*Id.* ¶¶ 4, 6.) Plaintiff Lewis attempted to vote in the Runoff Election on December 28, 2020 but was told that she "was not allowed to vote because the election workers thought [she] had voted in Missouri, even though [she had] never voted in Missouri." (*Id.* ¶ 7.) Plaintiff Lewis was told by a poll worker that she would have to attend a hearing on January 5, 2021 to prove her residency. (*Id.* ¶ 8.) Lewis was confused and stated, "I do not have time to go through this hassle." (*Id.* ¶¶ 8–9.)

Dr. Mayer's Declaration (Plaintiffs' Ex. P-2) was admitted, over objection, during the hearing. Dr. Mayer was asked to evaluate the list of challenged voters from Ben Hill County. (*Id.* ¶ 3.) According to Mayer, the data provided by Roberts did not contain any "information about how the voters on the list were identified [or] when the address changes were filed, nor is it entirely clear when the list itself was generated." (*Id.* ¶ 15.) While Dr. Mayer evaluates the data, he provides no information about the process used by the Ben Hill Board to evaluate the challenge or what action the Board took with regard to the challenge. (*See id.* ¶¶ 15–20.)

During the hearing, the Ben Hill Defendants offered the following evidence which was admitted without objection: the Elector Challenge filed by Tommy Roberts (Defendant Ben Hill County's Ex. DBH-1), the Declaration of Cindi Dunlap, (Defendant Ben Hill County's Ex. DBH-2), and the Declaration of Kathleen Searcy, (Defendant Ben Hill County's Ex. DBH-3). In the Elector Challenge, Roberts advises that he is challenging the eligibility of an unspecified number of voters whose voter registration numbers, registered addresses, and address changes are listed in an attached spreadsheet. (Defendant Ben Hill County's Ex. DBH-1.) The aforementioned spreadsheet was not offered into evidence. Roberts' challenge states,

> Available data from the United States Postal Service National Change of Address (NCOA) and other commercially available sources demonstrates probable cause to believe these individuals no longer reside where they are registered to vote. In fact, these electors appear to have permanently established

3

other residence, as reflected in their change of address, to residential addresses outside of the Georgia county in which they are currently registered to vote.

(Defendant Ben Hill County's Ex. DBH-1.) Defendant Cindi Dunlap, the Elections Supervisor and Chief Registrar, spoke to Plaintiff Lewis and told her that "her right to vote had been challenged based on her residence[,]" and that she "could cast a provisional ballot and attend a hearing on January 5, 2021 to provide evidence of her permanent residence." (Defendant Ben Hill County's Ex. DBH-2 ¶¶ 3–4.) Searcy advises that Plaintiff Lewis cast a regular ballot to vote on December 29, 2020. (Defendant Ben Hill County's Ex. DBH-3 ¶¶ 2–3.)

## II.   Muscogee County

Plaintiffs allege that the Muscogee County Defendants improperly sustained a mass challenge to the eligibility of voters in Ben Hill County based on data from the NCOA registry and, as a result, took actions in violation of the NVRA, O.C.G.A. § 21-2-230, and the First and Fourteenth Amendments to the Constitution. During the hearing, Plaintiffs offered the Elector Challenge filed by Ralph Russell, (Plaintiffs' Ex. P-1), and the declarations of six affected Muscogee voters,[2] all of which were admitted without objection.[3] As noted above, Plaintiffs also offered the declaration of Dr. Mayer which was admitted over objection. The Muscogee County Defendants offered the Declaration of Defendant Boren, and Defendant Boren testified during the hearing.[4]

### A. The Elector Challenge

---

[2]     Gamaliel Warren Turner, Sr. (Plaintiffs' Ex. P-3), Scott Berson (Plaintiffs' Ex. P-4), Nakeitha Essix (Plaintiffs' Ex. P-5), Stephanie Pfeiffer Stinetorf (Plaintiffs' Ex. P-6), Angel Luna Colon (Plaintiffs' Ex. P-7), and Gerald Williams (Plaintiffs' Ex. P-8).
[3]     The Court notes that when discussing Plaintiffs' Exhibits 1–10 during the hearing, the Court referred to such exhibits as being attached to Plaintiffs' "amended motion." The Court meant to refer to such exhibits as being attached to Plaintiffs' Motion for Temporary Restraining Order. (*See* Doc. 5.)
[4]     Defendant Muscogee County offered Boren as a witness after the Court stated that Boren's Declaration (Defendant Muscogee County's Ex. DM-1) had raised some questions. Defendant Muscogee County offered to allow the Court to question Boren. The Court conducted the initial questioning, and both Defendant Muscogee County and Plaintiffs were allowed to question Boren.

On December 14, 2020, Ralph Russell filed a challenged to the eligibility of 4,033 registered voters (hereinafter referred to as Targeted Voters) in Muscogee County to vote in the Runoff Elections. Russell stated,

> The grounds for my challenge are that I have evidence that there are approximately 4,033 individuals registered to vote in Muscogee county who reside outside of the State of Georgia. This information was gathered by running the Muscogee County voter registration data base against the National Change of Address Registry.
>
> ********
>
> I believe that each of the individuals named . . . as a result of registering their name and change of address to a location outside of Muscogee County, removed to another state with the intention of making the new state their residence. Thus, each individual has lost their residence in Muscogee County, and consequently, each individual is ineligible to vote in Muscogee County.

(Plaintiffs' Ex. P-1 at 2–3.) Russell attached a spreadsheet containing specific information about the 4,033 voters whose eligibility he was challenging. (*See* Defendant Muscogee County's Ex. DM-1 ¶ 3; *see also id.* at 14–33.) According to Boren, the spread sheet contained the voter's: registration number, county of registration, first name, middle or maiden name, last name, and an out-of-state address for mail delivery, including the city, state, and zip code. (*Id.* ¶ 5.)

Notably, Russell does not explain how or when he obtained the data that is included in the spreadsheet. (Plaintiffs' Ex. P-1.) While Russell states that the information was obtained by "running the Muscogee County voter registration data base against the National Change of Address Registry," there is no indication that the information purportedly culled from the Muscogee County data base or the NCOA registry was authentic. Nor is there any indication that the purported information was ripe. Russell does not explain how he obtained the information or attest to the veracity of the data. Moreover, as noted by Dr. Mayer, the data on the spreadsheet fails to include unique identifiers (such as Social Security Numbers) that appear in both the purported Muscogee

5

County voter registration data and the NCOA registry. Boren, as an election official, was able to obtain the dates of birth of the Georgia Voter Registration System and searched the voter registration systems of Alabama, Florida, and Washington "using the selected individuals' names, dates of birth, and counties." (Defendant Muscogee County's Ex. DM-1 ¶ 8.) During her testimony, however, Boren acknowledged that, due to the prevalence of voters with the same names and birthdates, the fact that a Georgia voter's first and last name and date of birth appear in another state's voter registration database does not mean that the same Georgia voter has been identified in the other state's registration.

After receiving the challenge, Boren sorted the information on the spreadsheet by state and randomly selected voters with mailing addresses in three states who had databases available to her as an election official—Alabama, Florida, and Washington. (*Id.* ¶ 7.) In her declaration, Boren stated that her purpose in searching the databases of these states was "to determine whether the individuals were registered in those states, when those individuals registered and their voting activity. By voting activity, [she means] when and where they voted and whether they are labeled as active voters by other states." (*Id.* ¶ 9.) During the hearing, however, Boren stated that voting activity was not important at that point, so she focused whether the voters were registered in other states. Boren testified that at least one voter had been an active registered voter in Florida since 2005 but had voted in the November 2020 election in Muscogee County. When asked about the voter activity for the other sample voters registered in Florida, Boren stated that she would have to check her notes, but that she could not recall that information.

Boren testified that her random sample consisted of ten voters. The search revealed nine voters registered to vote in those states: two in Alabama, one in Florida, and five in Washington State. (*Id.* ¶¶ 8, 10.) The search also revealed one voter registered in Washington, D.C. (*Id.* ¶ 10.) The next step in Boren's research was to ask the Georgia Secretary of State's Office to determine who on the list was military, disabled, or over the age of 65. (*Id.* ¶ 13.) Two days after receiving the challenge letter, on December 16, 2020, the Muscogee Board held a special meeting to determine if there was probable cause to sustain the challenge. (*Id.* ¶ 14.) During the meeting, Boren averred that she advised the

6

Board, that after conducting a random sampling, she had found that nine of the 4,033 voters appeared to be registered to vote in states other than Georgia. (*Id.*) Boren, however, did not take into account the fact that Washington State was an automatic registration state where a person is automatically registered to vote when they get a driver's license. Boren did not consider this information when recommending to the Board that there was probable cause to sustain the mass challenge. She also told the Board that she believed that "there were many more individuals on the Spreadsheet who [she] had not had time to specifically research who were also registered in states other than Georgia." (*Id.*)

Boren ultimately recommended that the Board find that there was probable cause to sustain the mass challenge. When asked what her recommendation would have been if she had been presented with a challenge to the eligibility of a single voter whose name appeared on the NCOA registry but who was not registered to vote outside of Georgia, Boren testified that she would have recommended to the Board that the challenge not proceed. Moreover, Boren stated that if the NCOA data is the only evidence of a change of residence, the voter is presumptively eligible to vote. During the hearing, the Court summarized Boren's actions as performing a random search and finding that nine of 4,033 people or approximately 0.22% of the people on the spreadsheet were registered in other states. The Court also noted that six of the nine people were registered in automatic voter registration states. The Court then asked Boren if, on the basis of finding that three out of 4,033 people on the spreadsheet were registered in non-automatic voter registration states, she recommended to the Board that there was probable cause to uphold the challenge to their right to vote. Boren responded that she had in fact done so because they were in the midst of the busiest time of the election. Boren repeatedly explained that her actions and recommendations were taken and made in light of the fact that the county was in the midst of an election with a record number of voters.

After receiving Boren's recommendation, the Board voted unanimously to find that probable cause existed to sustain the challenge. (*Id.* ¶ 16.) The Board excepted those in the military from the probable cause finding after determining "that military voters were more likely to have a valid reason for appearing on the [NCOA registry]." (*Id.*) The Board also

7

considered the burden that sustaining the challenge would have on the elderly and persons with disabilities in light of COVID-19 and ultimately determined not to sustain the challenges to the eligibility of those persons to vote. (*Id.*) The Board then implemented a procedure requiring those on the list who were not identified as military, elderly, or disabled to cast provisional ballots if they showed up to vote in person. (*Id.* ¶ 18.) The voter would be "asked for a preferred point of contact so that the [Board] can advise them of the time, date and location of the hearing during which the [Board] will complete its adjudication of the Russell Challenge and decide whether their ballot will be counted."[5] (*Id.*) Such voters would be advised that they could attend the hearing and present evidence as to why the challenge should be removed and their vote counted. (*Id.*) Absentee ballots submitted by voters on the list, other than those identified as military, elderly, or as persons with disabilities, would be marked as challenged and the voters would be similarly advised of the hearing and opportunity to cure. (*Id.* ¶ 25.) Ultimately, at the hearing the Board would determine if clear and convincing evidence existed to support an individual

---

[5]        Defendant Muscogee County submitted three versions of a letter purportedly sent to voters who had been challenged. (Defendant Muscogee County's DM-1 at 35, 37, 39.) Each version is addressed to "Sir/Madame." (*Id.*) The first version states: "Your eligibility to vote in the runoff election in Muscogee County has been challenged by another voter who claims that you reside outside of the State of Georgia. Therefore, you will need to complete a provisional/challenged ballot. The Muscogee County Board of Elections and Registration will hold a hearing on Friday, January 8, 2020 beginning at 4:00 pm in the Elections Office located at 3111 Citizens Way, Columbus, Georgia to decide whether your ballot will be counted. You will have an opportunity to be heard and present evidence at that hearing as to why the challenge to your ballot should be removed and your ballot should be counted. You may but are not required to appear at this hearing. Should you choose to appear, you will have an opportunity to be heard. If you choose not to or are unable to appear, you may submit documentation by emailing nboren@columbusga.org, faxing your documents to 706-225-4394 or mailing information to: Elections and Registration, P.O. Box 1340, Columbus, Georgia 31902 on or by January 8 at 5:00 pm. The Board will consider all information regarding your residency, including information typically used to verify provisional ballots. If you have any questions, please email nboren@columbusga.org or call 706-653-4392." (*Id.* at 35.) Each version of the letter is signed by Margaret Jenkins as Chairperson of the Muscogee County Board of Elections and Registration. (*Id.* at 35, 37, 39.)
        The second version of the letter begins by stating: "Your eligibility to vote in the runoff election in Muscogee County has been challenged by another voter who claims that you reside outside of the State of Georgia. Therefore, you were asked to complete a provisional/challenged ballot." (*Id.* at 37.) The third version of the letter begins by stating: "Your eligibility to vote in the runoff election in Muscogee County has been challenged by another voter who claims that you reside outside the State of Georgia. Therefore, your absentee ballot has been flagged as a provisional/challenged ballot." (*Id.* at 39.) The second and third versions contain the same statement as the first version regarding the steps challenged voters may take to resolve their challenge and the same contact information. (*Id.* at 37, 39.)

challenge. (*Id.* ¶ 31.) If so, the ballot would not be counted. (*Id.*) If not, the ballot would be counted. (*Id.*) Finally, according to Boren, in the event that the challenger, Russell, provides no additional information to support his challenge, the Board would examine the provisional ballots cast in accordance with O.C.G.A. § 21-2-419(b). (*Id.* ¶ 31.) Accordingly, the Board shall,

> make a good faith effort to determine whether the person casting the provisional ballot was entitled to vote in the primary or election. Such good faith effort shall include a review of all available voter registration documentation, including registration information made available by the electors themselves and documentation of modifications or alterations of registration data showing changes to an elector's registration status. Additional sources of information may include, but are not limited to, information from the Department of Driver Services, Department of Family and Children Services, Department of Natural Resources, public libraries, or any other agency of government including, but not limited to, other county election and registration offices.

O.C.G.A. § 21-2-419. Upon questioning by Plaintiffs' counsel, Boren admitted that the Board ultimately could sustain a challenge to a voter based solely on the appearance of a voter's name on the NCOA list. Boren testified that the history of the Board would indicate that the Board would err on the side of the voter, but Boren acknowledged it was possible that a majority of the Board could vote to sustain such a challenge and a voter could be denied the right to vote solely because their name appeared on the NCOA registry. The Board's action was necessary because, "[o]nce an individual casts an electronic ballot, it is impossible to reverse that vote based on a subsequent finding that the individual is not a Georgia resident." (*Id.* ¶ 15.)

**B. Affected Voters**

As mentioned above, the Court admitted the declarations of six voters who have been subjected to the Russell Challenge. The declarations demonstrate the following. Gamaliel Warren Turner, Sr. is a black, 67-year-old retired veteran who is registered to vote in Muscogee County. (Plaintiffs' Ex. P-3 ¶¶ 2, 12.) Turner has lived in Georgia for almost all his life, registered to vote in Georgia when he was eighteen, and has voted in

almost every election for the past fifty years. (*Id.* ¶ 2.) Turner is employed as a government contractor with the United States Navy. (*Id.* ¶ 3.) In October 2019, his contract required him to temporarily relocate to Camarillo, California. (*Id.*) Turner submitted a postal service change-of-address to avoid missing mail deliveries while he was in California for his temporary work assignment. (*Id.*) Accordingly, Turner voted by absentee ballot in the 2020 primary and general elections in Georgia. (*Id.* ¶ 7.) Turner owns a home in Columbus, Georgia where his nephew is currently house-sitting while Turner is in California. (*Id.* ¶ 5.) Although Turner's nephew is house-sitting, his nephew pays no rent, and the utilities remain in Turner's name. (*Id.*) Turner did not plan to remain in California and always intended to return to Georgia. (*Id.* ¶ 4.)

Turner plannned to vote in the Runoff Elections and, therefore, requested that the registrar mail his ballot to his California address until he returns to Georgia. (*Id.* ¶¶ 7–8.) After not receiving his ballot or any notice at either his California or Georgia address, he became concerned about the status of his absentee ballot and anxious that the delay would jeopardize his ability to receive and return his absentee ballot in time for the Runoff Elections. (*Id.* ¶¶ 8–9.) As a result of this concern, he contacted a clerk at the Muscogee County registrar's office, who informed him that he had been challenged for requesting an absentee ballot to be sent out-of-state. (*Id.* ¶ 9.) Turner was not provided any information about who had challenged his qualifications to vote or what he would need to rebut the challenge. (*Id.* ¶ 10.) The challenge made Turner worry about the legality of his participation in the Runoff Elections. (*Id.* ¶ 11.) Additionally, as a black voter, Turner grew up during an era in which his community strongly preferred to vote in person due to the lack of trust in the absentee voting process. (*Id.* ¶ 12.) The Muscogee County Board of Elections has added to his distrust of the elections process by accepting the Russell challenge against his voting eligibility. (*Id.*) Turner never would have registered to vote in California or indicated a desire to change his citizenship or residence to California. (*Id.* ¶ 4.) He never changed his driver's license from Georgia, and both of his cars are registered in Muscogee County. (*Id.* ¶ 6.) Turner has done nothing to change his eligibility to vote in

10

Georgia. (*Id.* ¶ 12.) He worries that the "frivolous challenge" will prevent his vote from being counted in the Runoff Elections. (*Id.*)

Scott Berson first registered to vote in Muscogee County, Georgia when he turned eighteen and has since remained registered to vote in Muscogee County. (Plaintiffs' Ex. P-4 ¶ 2.) In January 2019, Berson temporarily relocated to Alabama for a two-year residential master's program at Auburn University. (*Id.* ¶ 3.) Because he did not want to miss his mail deliveries during this semester at Auburn, Berson changed his mailing address to his temporary address in Alabama. (*Id.*) While a student at Auburn, Berson maintained a Georgia driver's license and his car remained registered in Muscogee County. (*Id.* ¶ 5.) During the school year, Berson returned to Muscogee County on average two or three times a month, during semester breaks, and during each summer. (*Id.*) As a student at Auburn, Berson also worked as a journalist for *The Local*, the monthly culture and arts publication for Columbus, Georgia. (*Id.* ¶ 6.) Berson graduated from Auburn in December 2020 and now lives in Georgia. (*Id.* ¶ 7.)

Berson never planned to remain in Alabama, always intended to return to Georgia, and, therefore, did not register to vote in Alabama or otherwise indicate a desire to change his citizenship or residence to Alabama. (*Id.* ¶ 4.) When Berson learned that his right to vote had been challenged, he became concerned about his eligibility. (*Id.* ¶ 8.) He fears that the challenge may make it impossible for him to vote or have his vote counted. (*Id.*) Berson is in "a period of transition" because he just graduated. (*Id.* ¶ 9.) Berson, therefore, worries that being required to cast a provisional ballot will be a hassle and he will not have time to "fight" to ensure his provisional ballot is counted. (*Id.*) Berson planned to vote in person on December 28, 2020, but because of the challenge, he is no longer sure if he will still attempt to vote. (*Id.* ¶ 10.)

Nakeitha Essix has lived in Georgia since January 2011 and is registered to vote in Muscogee County, Georgia. (Plaintiffs' Ex. P-5 ¶ 2.) She owns a home in Fortson, Georgia, which is located in Muscogee County. (*Id.*) Essix considers her Fortson home to be her permanent residence and averse that she has voted in-person in Muscogee County without any problem since moving to Georgia in 2011. (*Id.*) In Spring 2020, Essix traveled to

11

Colorado for approximately three weeks for the sole purpose of visiting a friend. While travelling, Essix lost her wallet. (*Id.* ¶¶ 3, 5.) Essix needed a replacement debit card immediately, so she temporarily changed her mailing address to her friend's residence in Colorado where she was staying for the three weeks. (*Id.* ¶ 4.) On December 23, 2020, Essix went to vote in person in Muscogee County. (*Id.* ¶ 6.) After showing the poll worker her registration card and identification, the poll worker told her that her eligibility to vote had been challenged and she was only permitted to vote by provisional ballot. (*Id.* ¶ 7.) Essix was not told who was challenging her eligibility or why her eligibility was being challenged and became concerned. (*Id.* ¶¶ 8–9.) Because of this concern, Essix asked what would happen next and was told to provide her phone number and that someone would call her. (*Id.* ¶ 9.) No one has called Essix, and she still does not know whether her provisional ballot will be counted or why her eligibility to vote is being challenged. (*Id.* ¶ 10.) Essix is "confused and bewildered" by the challenge because she voted without incident in the November elections and has done nothing to change her eligibility to vote. (*Id.* ¶ 11.) Additionally, Essix did not register to vote in Colorado or otherwise indicate a desire to change her citizenship or residence to Colorado. (*Id.* ¶ 5.)

Stephanie Pfeiffer Stinetorf moved to, bought a home, and registered to vote in Columbus, Georgia in May 2018. (Plaintiffs' Ex. P-6 ¶ 2.) She and her husband are civilian employees at the United States Department of Defense and received military orders to move to Germany in August 2020. (*Id.* ¶ 3.) Stinetorf submitted a postal service change of address in August 2020 to ensure that she continued to receive mail while she was away from Georgia. (*Id.* ¶ 4.) She received her absentee ballot for the Runoff Elections around November 19, 2020 and "promptly" marked and returned the ballot. (*Id.* ¶ 5.) After returning her ballot, Stinetorf checked the "My Voter Page" on the Georgia Secretary of State website almost every day to track when her ballot would be received and counted. (*Id.* ¶ 6.) On December 20, 2020, the My Voter Page reflected the status of her ballot as "Challenged." (*Id.* ¶ 7.) The challenged status left Stinetorf "very confused and concerned," and she was not provided any information about who had challenged her right to vote or why she had been challenged. (*Id.* ¶ 8.) As a result of the challenge, Stinetorf immediately

emailed the county registrar to find out what was going on. (*Id.* ¶ 9.) On December 23, 2020, she received an email stating that her ballot had been accepted and the "mistaken 'Challenge' status" on the My Voter Page had been changed. (*Id.* ¶ 10.) Stinetorf was given no explanation as to why her ballot was challenged in the first place until December 24, 2020, when she received a telephone call from someone at the Muscogee County elections office. (*Id.*) Even though the challenge to her ballot appears to be resolved, the process of figuring out why Stinetorf had been challenged and how she would have to prove her eligibility to vote in Georgia was "stressful and confusing." (*Id.* ¶ 11.)

Angel Luna Colon moved to Georgia in 2015 and is registered to vote in Muscogee County. (Plaintiffs' Ex. P-7 ¶ 2.) Colon has voted in every election in Georgia since 2015. (*Id.*) She voted in the November general election without incident and knows that her vote was counted at that time. (*Id.* ¶ 5.) Colon is currently serving in the military and was temporarily relocated to Washington state in 2018. (*Id.* ¶ 3.) For this reason, Colon changed her mailing address to an address in Washington. (*Id.*) She intends to return to Georgia fulltime after her service in Washington ends in June 2021. (*Id.*) Colon still returns to Georgia every chance she can. (*Id.*) She votes in person if she is in Georgia. (*Id.* ¶ 4.) Colon, however, decided to vote absentee in the Runoff Elections because she will be in Washington during that time and placed her absentee ballot in the mail around December 10, 2020. (*Id.*)

Because Colon has not made Washington her permanent residence, she has neither registered to vote there nor indicated any desire to change her residence or residency to Washington. (*Id.* ¶ 3.) Further, she has done nothing to change her eligibility to vote in Georgia. (*Id.* ¶ 5.) Colon is concerned that her absentee ballot will not be counted after learning that her vote is being challenged. (*Id.*) She does not have the means or resources to come to Georgia before the Runoff Elections to figure out why her vote is being challenged. (*Id.* ¶ 6.) Additionally, she "does not know what to do." (*Id.* ¶ 5.) Colon is concerned about her vote in the Runoff Elections and has broader concerns about continuing to vote absentee in Georgia. (*Id.* ¶ 6.) Colon knows she is eligible to vote in

Georgia, just as she has been eligible for the past five years, and wants her vote to count in the Runoff Elections. (*Id.*)

Gerald Williams is a Lieutenant Colonel in the United States Army Reserve, registered to vote in Muscogee County, Georgia where he has resided since the late 1990s. He has not voted outside of Georgia since that time. (Plaintiffs' Ex. P-8 ¶ 2.) While he has been temporarily posted out of state, Williams does not recall changing his residence via the NCOA within the past twenty years. (*Id.* ¶ 3.) His son, who is also named Gerald Williams, recently submitted a change of address when he moved to Texas. (*Id.* ¶ 4.) Williams voted early in the 2020 primary and general elections in Georgia. (*Id.* ¶ 5.) Around December 14, 2020, he went to vote early in person for the Runoff Elections. (*Id.* ¶ 6.) When he did so, an individual told him that his residency had been challenged and he would need to rebut this challenge for his vote to count. (*Id.*) Williams was "taken aback" and "shocked" to hear that his right to vote had been challenged. (*Id.*) He has done nothing to change his eligibility to vote in Georgia and is concerned that his right to vote was challenged by an unknown third-party on grounds that were not disclosed to him. (*Id.* ¶ 11.) He received no information about who challenged his qualifications to vote or what he would need to do to rebut the challenge. (*Id.* ¶ 7.) Additionally, because Williams' eligibility to vote has officially been challenged, he became worried about the legality of his participation in the Runoff Elections and, therefore, scrambled to address the situation. (*Id.* ¶ 8.) Addressing the situation, however, took time. (*Id.*) Since learning of the challenge, Williams has contacted community leaders and understands that any challenge to his residency status has been dropped. (*Id.* ¶ 9.) He voted early in person around December 22, 2020 and understands that his vote will count. (*Id.*)

Additionally, an unnamed voter on the list attempted to vote in person and was asked to cast a provisional ballot. (Defendant Muscogee County's Ex. DM-1 ¶ 20.) The individual was registered to vote in Nevada and had voted in the November 3, 2020 election in Nevada using a provisional ballot that was ultimately counted. (*Id.*) The individual had requested a Georgia absentee ballot for the November 3, 2020 election but did not return it. (*Id.*)

## DISCUSSION

### I.    Basis for Preliminary Injunction

A party moving for a preliminary injunction must demonstrate that:

> (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest.

*Transcon. Gas Pipe Line Co. v. 6.04 Acres*, 910 F.3d 1130, 1163 (11th Cir. 2018) (citation omitted). "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly established the burden of persuasion for each prong of the analysis." *Id.*

### A.    Ben Hill County

As to Ben Hill County, Plaintiffs have not clearly established the burden of persuasion as to the first prong—substantial likelihood of success on the merits. Plaintiffs claim that the actions of the Ben Hill Defendants related to the Roberts' challenge were in violation of the NVRA and O.C.G.A. 21-2-230. The NVRA places restrictions on the systematic removal of voters, but it "permits removals based on individualized information at any time." *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1346 (11th Cir. 2014). This is because, as noted by the Eleventh Circuit, basing removals "on individual correspondence or rigorous individualized inquiry, [leads] to a smaller chance for mistakes." *Arcia*, 772 F.3d at 1346).

While there is evidence that a voter challenge was made by Roberts, the record contains scant specifics about the challenge. Nor are there any facts in the record regarding how the Ben Hill Defendants addressed the challenge. As noted above, the list of challenged voters is not a part of the record. While Dr. Mayer's declaration provides that "the challenge list for Ben Hill County has 155 individuals with an out-of-state address," and that 17 of those persons has "an out-of-state address near a major military instillation," it is unclear what information about these 155 voters was provided on the spreadsheet

attached to the challenge and what, if any, indicia of reliability might have been submitted to the Ben Hill Board. Furthermore, while the fact that Lewis was required to submit a provisional ballot indicates that the Ben Hill Board made a finding of probable cause with regard to the challenges to her eligibility, the Court has no evidence related to how that finding was made. Absent such evidence, there is no way for the Court to determine if the spreadsheet contained the type of unique identifiers or evidence of authenticity which Plaintiffs argue are necessary to make the comparison performed reliable. More importantly, there is no evidence regarding whether or not the Ben Hill Board made the requisite individual inquiries required by the NVRA when finding there was probable cause to sustain the challenge as to Lewis or any other voter on the list.

Plaintiffs also claim that the actions of the Ben Hill County Defendants violated the First and Fourteenth Amendments as "[t]he Supreme Court has long recognized that burdens on voters implicate fundamental First and Fourteenth Amendment rights." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019) (citation omitted). "[E]ven when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Id.* at 1318–19 (citation omitted). Such interests may include "preventing fraud[,] promoting the orderly[,] efficient[,] and timely administration of the election[,] and ensuring fairness and public confidence in the legitimacy of the election." *See id.* at 1321–22. "The more a challenged law burdens the right to vote, the stricter the scrutiny to which [the Court] subject[s] that law." *Id.* at 1319 (citation omitted). While the record shows that Lewis was advised that her eligibility had been challenged and that she was required to cast a provisional ballot, there is no evidence in the record from which the Court could make a determination of the weight of the burden imposed on Lewis. Nor is there any evidence that any limitation was placed on the right of any of the other voters whose names appeared on the challenged list. Thus, the Court cannot conduct the requisite balancing test.

Accordingly, Plaintiffs have failed to carry their burden to establish that there is a substantial likelihood of success on the merits as to their claims under the NVRA or their Constitutional claims. Because Plaintiffs failed to establish the first prong, the Court does

not evaluate the remaining three.

**B.     Muscogee County**

Plaintiffs likewise claim that the actions of the Muscogee related to the Roberts' challenge were in violation of the NVRA, O.C.G.A. § 21-2-230, and First and Fourteenth Amendments. As discussed in detail below, Plaintiffs have carried their burden of persuasion as to all four prongs: substantial likelihood of success on the merits, irreparable injury, balance of harms, and public interest. The relief sought by Plaintiffs, however, is not narrowly tailored, and thus cannot be fully granted.

### 1. Likelihood of Success on the Merits

#### a.  Violation of NVRA

"Article I, Section 4, clause 1 of the United States Constitution permits states to regulate the manner of elections for federal office while making clear that Congress has the final authority to 'at any time . . . make or alter such regulations.'" *Ga. State Conference NAACP v. Georgia*, No. 1:17-cv-1397-TCB, 2017 WL 9435558, at *4 (N.D. Ga. May 4, 2017) (collecting cases). "Congress exercised that authority when it passed 52 U.S.C. § [20507(c)(2)(A)]," which prohibits states from removing voters from registration lists within ninety days of a primary or general election for federal office. *See id.* Defendants argue that, because the challenge to the Targeted Voters was brought pursuant to OCGA 21-2-230, Russell challenged the eligibility of the Targeted Voters to vote in the Runoff Election not their eligibility to appear on the list of electors, and the NVRA is not applicable. This is a distinction without a difference. The effect of not appearing on the list of electors is the same as not being eligible to vote—a voter for whom a challenge is ultimately upheld will not be allowed to cast a ballot in the Runoff Election. In fact, § 21-2-230(i) requires the removal of any voter for whom a challenge is sustained from the list of electors.

> If the registrars uphold the challenge, the name of the challenged elector *shall be removed from the list of electors and the ballot of the challenged elector shall be rejected and not counted* and, if necessary, the returns shall be adjusted to remove any votes cast by such elector. The elector making the challenge and the challenged

> elector may appeal the decision of the registrars in the same manner
> as provided in subsection (e) of Code Section 21-2-229.

O.C.G.A. § 21-2-230(i) (emphasis added). The Russell challenge clearly is "based upon grounds that the challenged elector is not qualified to remain on the list of electors." *See id.* As Russell states in the challenge, "each individual has lost their residence in Muscogee County, and consequently, *each individual is ineligible to vote in Muscogee County*." (Plaintiffs' Ex. P-1 at 3.)

As noted by the Eleventh Circuit, the 90 Day Provision of the NVRA limits "its reach to programs that 'systemically' remove voters from the voter rolls [but] permits removals based on individualized information at any time." *Arcia*, 772 F.3d at 1346. "Individualized removals do not present the same risks as systematic removals because they are based on individual correspondence or rigorous individualized inquiry, leading to a smaller chance for mistakes." *N.C. State Conf. of the NAACP v. The N.C. State Bd. of Elections*, No. 1:16-CV-1274, at *11 (M.D. N.C. Nov. 4, 2016) (quoting *Arcia*, 772 F.3d at 1346 (11th Cir. 2014)). The Eleventh Circuit noted that, "the 90 Day Provision strikes a careful balance: It permits systemic removal programs at any time *except* for the 90 days before an election because that is when the risk of disenfranchising eligible voters is the greatest." *Arcia*, at 1346.

To the extent that O.C.G.A. § 21-2-230 conflicts with the NVRA, it is preempted. *Id.* at *4. A fair reading of § 21-2-230, however, reveals no conflict. Section 21-2-230(a) permits "[a]ny elector of the county or municipality [to] challenge the right of any other elector of the county or municipality, whose name appears on the list of electors, to vote in an election." § 21-2-230(b) provides that

> [u]pon the filing of such challenge, the board of registrars shall
> immediately consider such challenge *and determine whether
> probable cause exists to sustain such challenge.* If the
> registrars do not find probable cause, the challenge shall be
> denied. If the registrars find probable cause, the registrars shall
> notify the poll officers of the challenged elector's precinct or,
> if the challenged elector voted by absentee ballot, notify the
> poll officers at the absentee ballot precinct and, if practical,

18

> notify the challenged elector and afford such elector an
> opportunity to answer.

(emphasis added). The statute does not define "probable cause" for purposes of § 21-2-230. "It is presumed that statutes are enacted by the legislature with full knowledge of the existing condition of the law and with reference to it." *Delong v. Welch*, 533 S.E.2d 724, 726 (Ga. 2000) (quoting *Avnet, Inc. v. Wyle Labs.*, 437 S.E.2d 302, 305 (Ga. 1993)). The statutes, therefore, should "be construed in connection and in harmony with the existing law, . . . and their meaning and effect is to be determined in connection, not only with the common law and the constitution, but also with reference to other statutes and the decisions of the courts." *Id.* (quoting *Avnet, Inc.*, 437 S.E.2d at 305). Thus, the Court looks to analogous Georgia statutes and case law for guidance. "[T]he meaning of the term 'probable cause' is well-established in both existing statutory law and the civil and criminal jurisprudence of this State." *Id.* (first citing *State v. Stephens*, 311 S.E.2d 823, 824 (Ga. 1984); and then citing *McMillan v. Day Realty Assoc.*, 275 S.E.2d 352, 353 (Ga. Ct. App. 1980) ("defining probable cause as 'reasonable grounds' or 'reasonable cause'"), *rev'd*, 277 S.E.2d 663 (Ga. 1981)). In the context of recall petitions seeking to recall public officers under O.C.G.A. § 21-4-6, Georgia courts define probable cause to mean "that apparent state of facts which seems to exist after reasonable and proper inquiry." *Id.* at 725–26 (citing *State*, 311 S.E.2d at 823). Moreover, in malicious prosecution claims under Georgia law, "[p]robable cause requires more than mere suspicion, but does not require convincing proof." *Bailey v. Bd. of Cty. Comm'rs*, 956 F.2d 1112, 1120 (11th Cir. 1992).

Reading the NVRA and § 21-2-230 together, Plaintiffs have demonstrated a substantial likelihood of success on the merits of establishing that Defendants violated the NVRA by failing to conduct the requisite individualized inquiry required for challenges made within 90 days of a federal election. Following the law, the Muscogee County Defendants could not make a finding of probable cause based on the information presented in the Russell challenge. First, as conceded by Boren, but for the circumstances presented by the magnitude and timing of the challenge in the middle of the election she would not have recommended that the Board find probable cause based on the information they had

at the time. With the exception of the nine voters Boren found to be registered in other states, there was no evidence before the Board other than the appearance of the voter's name in the NCOA registry. Boren testified that NCOA data, standing alone, is not sufficient to recommend a finding of probable cause. Second, the data in the challenge was unverified and of unknown reliability. Nothing in the letter or the spreadsheet gave the Board any evidence that the data was what it purported to be or was ripe or accurate. Most importantly, nothing in the evidence before the Board established probable cause that the voters had not changed their address for permissible reasons. The Board noted its duty to not find probable cause if there was a valid reason for a change of address when it determined to exempt military voters because "they were more likely to have a valid reason for appearing on the" NCOA registry. Rather than finding probable cause that the voters did not have a valid reason for being on the list, the Board instead made the erroneous determination that, except for those in the military, inclusion on the list constituted probable cause that a person did not have a valid reason for filling out a change of address card.

"To register to vote in Georgia, a person must be at least eighteen years old and a resident of the county in which he or she seeks to vote." *Morales v. Handel*, No. 1:08-CV-3172, 2008 WL 9401054, at *3 (N.D. Ga. Oct. 27, 2008) (citing O.C.G.A. § 21-2-216). An individual in Georgia resides wherever he or she is domiciled. O.C.G.A. § 21-2-2(32). More specifically, for purposes of voter registration, "[t]he residence of any person shall be held to be in that place in which such person's habitation is fixed, without any present intention of removing therefrom . . . ." O.C.G.A. § 21-2-217(a)(1). A person does not lose their residence if they temporarily move to another state, county, or municipality with the intent of returning, "unless such person shall register to vote or perform other acts indicating a desire to change such person's citizenship and residence[.]" *Id.* § 21-2-217(a)(2). "If a person removes to another state with the intention of making it such person's residence, such person shall be considered to have lost such person's residence in [Georgia.]" *Id.* § 21-2-217(a)(4). The same rule applies to those who move to a different county or municipality in Georgia. *Id.* § 21-2-217(a)(4.1). Thus, while arguably there was

probable cause to sustain the challenges to the nine voters Boren found to have been registered in other states,[6] there was no probable cause with regard to the other voters. The lack of evidence to support a finding of probable cause as to the remaining voters establishes an absence of the requisite individualized inquiry required by the NVRA.

Additionally, Plaintiffs' declarations show that at least some Targeted Voters never gave Defendants written confirmation of their change of address. (Plaintiffs' Ex. P-3 ¶¶ 9–10; Plaintiffs' Ex. P-4 ¶¶ 2–5; Plaintiffs' Ex. P-5 ¶¶ 2, 6–10; Plaintiffs' Ex. P-6 ¶¶ 2–9; Plaintiffs' Ex. P-7 ¶¶ 2–5; Plaintiffs' Ex. P-8 ¶¶ 2–7.) Thus, Defendant did not comply with § 20507(d)(1) of the NVRA. Accordingly, Plaintiffs have demonstrated a substantial likelihood of success on the merits for their claim that Plaintiffs violated the NVRA.

### b. Violation of the Right to Vote

As stated above, "[a] law that severely burdens the right to vote must be narrowly drawn to serve a compelling state interest." *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1318 (citation omitted). "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Id.* at 1318–19 (citation omitted). Such interests may include "preventing fraud[,] promoting the orderly[,] efficient[,] and timely administration of the election[,] and ensuring fairness and public confidence in the legitimacy of the election." *See id.* at 1321–22. "The more a challenged law burdens the right to vote, the stricter the scrutiny to which [the Court] subject[s] that law." *Id.* at 1319 (citation omitted). "The Supreme Court has long recognized that burdens on voters implicate fundamental First and Fourteenth Amendment rights." *Id.* (citation omitted).

The Russell Challenge was submitted to the Board on December 14, 2020—less than a month before the Runoff Election. (Defendant Muscogee County's Ex. DM-1 ¶ 3; Plaintiffs' Ex. P-1.) The Board's decision to sustain the challenges risks disenfranchising

---

[6]     Registering in an automatic registration state is not necessarily an indicator of intent to register in another state. *See Terese v. 1500 Lorene LLC*, No. 09-4342, 2013 WL 308988, at *10 (E.D. La. Jan. 25, 2013) (finding voter lacked intent to exercise political rights in Colorado and maintained his Florida citizenship where he "may have been automatically registered to vote in Colorado when he received a Colorado driver's license") (citing *Hendry v. Masonite Corp.*, 455 F.2d 955 (5th Cir. 1972)).

thousands of voters for whom there was no individualized inquiry or finding of probable cause that they were not eligible to vote based on a change of residence. As explained above, the challenges were submitted less than a month before the Runoff Elections, there is no evidence Defendants received written confirmation from the voter of a change of address, and the challenges did not include the individualized inquiries necessary to sustain challenges made within ninety days of a federal election. Colon, for example, risks disenfranchisement because he and other similarly situated Targeted Voters may not have the means or resources to travel to Georgia to resolve the challenge before the Runoff Elections, (*See* Plaintiffs' Ex. P-7 ¶ 6.), and voters like Essix, Williams, and Stinetorf could be discouraged from voting because of the additional hurdles set before them. (*See* Plaintiffs' Exs. P-5 ¶ 11; P-6 ¶¶ 8, 11; P-8 ¶ 7.) While Muscogee County recognized the undue burden that would be placed on elderly voters—defined by Boren as voters over 65—if the challenge to their eligibility had been sustained, Turner who is 67 years old was subjected to such burdens when his eligibility was challenged. (Plaintiffs' Ex. P-3.) That the rush to act without due process led to erroneous challenges being sustained is evidenced by the fact that Colon, Stinetorf, and Williams should have been excepted due to the Board's determination that there was no probable cause to sustain challenges to persons in the military because they likely had valid reasons for changing their addresses. Thus, Plaintiffs have demonstrated a substantial likelihood of success on the merits on both of their claims.

### C.    Immediate and Irreparable Injury

"The absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper." *Siegel*, 234 F.3d at 1176–77. "[I]rreparable injury 'must be neither remote nor speculative, but actual and imminent.'" *Id.* (quoting *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 973 (2d Cir.1989)); *accord Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir.1975) ("An injunction is appropriate only if the anticipated injury is imminent and irreparable."). "An injury is 'irreparable' only if it cannot be undone through monetary remedies." *Ga. State Conf. NAACP*, 2017 WL 9435558, at *4 (quoting *Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987)).

Here, Plaintiffs have demonstrated irreparable harm. The Targeted Voters are required to submit provisional ballots and told that they must—during the holidays and the ongoing pandemic—provide proof of their eligibility in writing or appear at a hearing on January 8, 2021. Failure to do so could result in their vote not being counted. Notably, the letter sent to the Targeted Voters does not tell them that their vote will still count if they do not take any of the aforementioned steps and Russell presents no other evidence. (*See* Defendant Muscogee County's Ex. DM-1 at 35, 37, 39; Plaintiffs' Ex. P-1.) Plaintiffs' declarations reiterate this omission by stating that they were not told how to resolve their challenge and do not know if their votes will count. (Plaintiffs' Exs. P-3 ¶¶ 10–12; P-4 ¶¶ 8, 10; P-5 ¶¶ 8–10; P-7 ¶ 5.) Thus, Defendants' actions confuse and intimidate voters by acting as a hurdle they must cross before they can be assured that their vote will count, with some Targeted Voters declaring they may not vote due to the challenge. (Plaintiffs' Exs. P-3 ¶¶ 11–12; P-4 ¶¶ 9–10; P-5 ¶ 11; P-6 ¶¶ 8, 11; P-8 ¶ 10.)

First, this hurdle to exercising their right to vote is needless as there was no probable cause to sustain the challenge in the first place. *See Louisiana v. United States*, 380 U.S. 145, 150 (1965) (affirming district court that enjoined state's use of interpretation test where the test acted "as a hurdle to voter qualification" and "deterred and [would] continue to deter" black people from attempting to register to vote); *Ga. Coal. for People's Agenda, Inc. v. Kemp*, 347 F. Supp. 3d 1251, 1266 (N.D. Ga. Nov. 2, 2018) (holding that a state's voting requirements that "unnecessarily burden . . . individuals' right to vote . . . need not be jumped"). Additionally, Plaintiffs' declarations demonstrate that some Targeted Voters will not be able to contest their challenge because they are serving in the military outside of Georgia are civilians who are temporarily outside of the country on military orders, or do not have the means or resources to contest the challenge. (Plaintiffs' Exs. P-6 ¶ 3; P-7 ¶ 6; P-8 ¶ 3.) Further, Plaintiffs' declarations show that some Targeted Voters never changed their driver's license or address via the NCOA, indicating that the challenge to their eligibility is frivolous. (Plaintiffs' Exs. P-3 ¶ 6; P-4 ¶ 5; P-8 ¶¶ 3, 9.) Thus, some Targeted Voters who are otherwise properly registered to vote may not be able to resolve their challenge for reasons outside of their control.

23

"Courts routinely deem restrictions on fundamental voting rights irreparable injury because once the election occurs, there can be no do-over and no redress." *Ga. State Conf. NAACP*, 2017 WL 9435558, at *4. "The runoff election to select Georgia's [two United States Senators] is imminent . . . ." and based on this mass challenge, "numerous voters who would otherwise be eligible to vote in the runoff will be denied that right." *Id.* "This is a substantial and irreparable harm." *Id.* "Such an injury to these voters is neither speculative nor remote but is real and imminent." *N.C. State Conf. of the NAACP*, No. 1:16-CV-1274, at *22 (quoting *In re Microsoft Corp. Antitrust Litig.*, 333 F.3d 517, 530 (4th Cir. 2003), *abrogated on other grounds by eBay, Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006)). While the Targeted Voters are able to cast provisional ballots, this alternative is insufficient to remedy the intimidation and needless hurdles imposed on Targeted Voters, especially since some Targeted Voters may not have the resources to access a provisional ballot and should not have been challenged in the first place. Moreover, "[p]rovisional ballot votes are not automatically counted and credited." *Curling v. Raffensperger*, No. 1:17-cv-2989-AT, 2020 WL 5757809, at *14 n.17 (N.D. Ga. Sept. 28, 2020); *see also* O.C.G.A. §§ 21-2-230(h), (i), 21-2-418, 419. Thus, Plaintiffs have demonstrated an irreparable injury.

**D.     Balance of Harms**

The next question before the Court is whether the potential harm to Plaintiffs outweighs the potential harm to Defendants if injunctive relief is granted. "Denying an individual the right to vote works a serious, irreparable injury upon that individual." *Ga. State Conf. NAACP*, 2017 WL 9435558, at *5. "Given the right at issue and the likely injury caused by not entering a preliminary injunction, the Court finds that the potential injury to Plaintiffs outweighs the harm to the State and Defendants caused by entering a preliminary injunction." *Id.* To quote our sister court in the Northern District of Georgia,

> The Court certainly appreciates and understands the inconvenience and expense that entering a preliminary injunction may work upon the State and Defendants. The Court, however, is mindful that the right to vote is a fundamental right and is preservative of all other rights.

24

> Denying an individual the right to vote works a serious, irreparable injury upon that individual. Given the right at issue and the likely injury caused by not entering a preliminary injunction, the Court finds that the potential injury to Plaintiffs outweighs the harm to the State and Defendants caused by entering a preliminary injunction.

*Common Cause/Georgia v. Billups*, 406 F. Supp. 2d 1326, 1376 (N.D. Ga. 2005).

Failure to grant injunctive relief could cause eligible voters—who would otherwise exercise their Constitutional right to vote—to be intimidated or discouraged from voting altogether, or result in eligible voters being forced to go to extraordinary lengths during the ongoing COVID-19 pandemic in order to have their vote counted. For example, Berson "fears the challenge may make it impossible for [him] to vote or to have [his] vote counted" and that he "worr[ies] that any requirement that [he] cast a provisional ballot will be a hassle, and [he] will not have time to fight to ensure [his] ballot is counted." (Plaintiffs' Ex. P-4 ¶¶ 8–9.) Other voters who have cast provisional ballots or successfully rebutted challenges highlight the stress, time, and confusion involved in proving eligibility. Essix states she was told by a poll worker that her "eligibility to vote had been challenged" but was "not told who . . . or why [her] eligibility [was] being challenged." (Plaintiffs' Ex. P-6 ¶¶ 7–8.) After asking what "would happen next" she was told someone would call her, however, she states that "[n]obody has called me" and that she "still does not know whether [her] provisional vote will be counted" or why her "eligibility to vote is challenged." (*Id.* ¶¶ 9–10.) Williams had to "scramble to address th[e] situation, but it took time." (Plaintiffs' Ex. P-8 ¶ 8.) Similarly, Stinetorf said "that the process of trying to figure out why [she] had been challenged and how [she] would have to prove her eligibility to vote in Georgia was stressful and confusing." (Plaintiffs' Ex. P-6 ¶ 11.) Moreover, the Board clearly was aware of the additional burden they were placing on voters when they determined to exempt certain voters due to "the concern of placing any *additional burden* on the elderly or disabled in light of Covid-19." (Defendant Muscogee County's Ex. DM-1 ¶ 16 (emphasis added).)

Defendants argue granting the injunctive relief requested by Plaintiffs would cause

irreparable harm because, "[o]nce an individual casts an electronic ballot, it is impossible to reverse that vote based on a subsequent finding that the individual was not a Georgia resident." (Defendant Muscogee Count's DM-1 ¶ 15.) Notably, in certain circumstances, allowing voters to cast provisional ballots has been deemed to be a remedy. *See Fla. Democratic Party v. Hood*, 342 F. Supp. 2d 1073, 1082 (N.D. Fla. 2004) (issuing preliminary injunction requiring defendants to allow voters to cast provisional ballots to remedy irreparable injury and noting that, "[t]hat is why [the Help America Vote Act, 42 U.S.C. § 15482,] created a right to cast a provisional ballot."). Here, however, where the burden has improperly shifted to the voter to prove his eligibility to vote based on an improperly vetted challenge, the harm to the voters outweighs the harm to Defendants of appropriate injunctive relief as such relief would be "minimal compared to the potential loss of a right to vote altogether by a group of people." *Ga. Coal. for People's Agenda, Inc.*, 347 F. Supp. 3d at 1268. Properly tailored injunctive relief would appropriately return to the status quo and require the Muscogee County Defendants to properly find probable cause to uphold each individual challenge prior to placing any burden on the Targeted Voters to provide additional documentation or other proof of their eligibility to vote. Accordingly, the balancing of harms favors granting the preliminary injunction.

### E.   Public Interest

Finally, the Court must determine whether granting the injunctive relief will serve the public interest. As noted by the Eleventh Circuit, the goals balanced by the NVRA are to:

> (1) increase the number of eligible citizens who register to vote in elections for Federal office;
> (2) allow for the implementation of the NVRA in a manner that enhances voter participation;
> (3) protect the integrity of the electoral process; and
> (4) ensure that accurate and current voter registration rolls are maintained.

*Arcia*, 772 F.3d at 1346 (citation omitted). Each of these goals are in the public interest as recognized by Congress when it passed the legislation, the President when it was signed into law, and the Courts each time a provision of the law is upheld. Thus, ensuring

    iv.  mailing the information to Elections and Registration, P.O. Box 1340, Columbus, Georgia 31902 on or by **5:00 pm (EST) on January 8, 2021.**

Because the Court has already dissolved the temporary restraining order (*see* Doc. 27), Defendants' Motion to Stay Temporary Restraining Order (Doc. 24) is **DENIED as moot.** The time from which to appeal the Court's decision shall run from the entry of this Order.

    **SO ORDERED**, this 4th day of January, 2021.

                        /s/ Leslie A. Gardner
                        **LESLIE A. GARDNER, JUDGE**
                        **UNITED STATES DISTRICT COURT**

adherence to the NVRA is necessarily in the public interest. Here, "granting Plaintiffs the relief they seek would be in the public's interest to ensure that there is a procedure in place to allow every eligible Georgia citizen to register and vote." *Ga. Coal. for People's Agenda, Inc.*, 347 F. Supp. 3d at 1268.

Nevertheless, the Court is conscious of its duty to "observe the principle that an injunction is to be narrowly tailored to remedy the specific action which gives rise to it." *Valley v. Rapides Par. Sch. Bd.,* 646 F.2d 925, 942 (5th Cir. 1981), *on reh'g*, 653 F.2d 941 (5th Cir. 1981). Given the extraordinary and drastic remedy that is a preliminary injunction, the Court's limited preliminary injunction carefully balances and promotes the goals of the NVRA by preventing discouragement or intimidation and removing the burden of traveling to a hearing and collecting evidence during an ongoing, global pandemic absent probable cause for the challenge, protecting the integrity of the electoral process by requiring the Board to comply with § 21-2-230, and upholding challenges where there is clear and convincing evidence suggesting the voter was ineligible. *See* O.C.G.A. § 21-2-230. "The public interest is served when citizens can look with confidence at an election process that [e]nsures that all votes cast by qualified voters are counted." *Bay Cty. Democratic Party v. Land*, 347 F. Supp. 2d 404, 438 (E.D. Mich. 2004) (citing *Bush v. Gore*, 531 U.S. 98, 109 (2000)). Indeed, "[t]he public interest is served when a federally granted right is enforced . . . and voters are not disenfranchised." *Id.* Accordingly, this factor weighs in favor of granting the limited injunctive relief outlined by the Court.

**II.    Duration**

Courts "may mold [their] decree[s] to meet the exigencies of the particular case." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citation omitted). Thus, the preliminary injunction will remain in effect until **11:59 p.m. (EST) on January 8, 2021**.

**III.   Security**

"The court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."

Fed. R. Civ. P. 65(c). "The amount of security required is a matter for the discretion of the trial court; it may elect to require no security at all." *Corrigan Dispatch Co. v. Casa Guzman, S. A.*, 569 F.2d 300, 303 (5th Cir. 1978). There is no evidence that security is required, and the Court will require none.

## IV.    Restricted Activities

It is **ORDERED** that Plaintiffs' request for preliminary injunction is **GRANTED in part** to the extent as set forth herein:

1. The Muscogee County Defendants are enjoined from upholding a challenge to any voter's eligibility solely on the basis of information in the NCOA registry.

2. The Muscogee County Defendants are required to advise any voter whose eligibility has been challenged on the basis of the National Change of Address (NCOA) registry that:

   a. Their eligibility to vote has been challenged because their name appeared on the NCOA registry;

   b. They may cast a provisional ballot in the January 2021 Runoff Election;

   c. The challenge to their eligibility will not be sustained absent specific evidence of ineligibility. Such specific evidence shall not include the appearance of a voter's name or other information on the NCOA registry;

   d. In the event that the Board obtains such specific evidence of ineligibility, the voter will be advised of the said specific evidence by phone and in writing by **5:00 pm (EST) on January 6, 2021**;

   e. Such voter will also be advised of the right to be heard and present evidence as to why the challenge to their ballot should be removed and their ballot should be counted. Specifically, voters will be advised that they can present evidence by:

      i. appearing at a hearing, in person or virtually, at **4:00 pm (EST) on January 8, 2021**;

      ii. emailing the information to nboren@columbusga.org;

      iii. faxing the information to 706-225-4394; or

28