```
 1              UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF GEORGIA
 2                    ATLANTA DIVISION

 3   FAIR FIGHT, INC., JOHN DOE,     )
     AND JANE DOE                    )VOLUME 1 -- A.M. SESSION
 4                    PLAINTIFFS,    )
                                     )DOCKET NO. 2:20-CV-0302-SCJ
 5        -VS-                       )
                                     )
 6   TRUE THE VOTE, INC., CATHERINE  )
     ENGELBRECHT, DEREK SOMERVILLE,  )
 7   MARK DAVIS, MARK WILLIAMS, RON  )
     JOHNSON, JAMES COOPER, AND      )
 8   JOHN DOES 1-10,                 )
                     DEFENDANTS.     )
 9   _____  )

10          TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
            BEFORE THE HONORABLE STEVE C. JONES
11             UNITED STATES DISTRICT JUDGE
                THURSDAY, OCTOBER 26, 2023
12

13   APPEARANCES:

14   ON BEHALF OF THE PLAINTIFFS:

15     ALLEGRA J. LAWRENCE-HARDY, ESQ.
       CHRISTINA ASHLEY FORD, ESQ.
16     LESLIE J. BRYAN, ESQ.
       MARCOS MOCINE-MC QUEEN, ESQ.
17     UZOMA NKWONTA, ESQ.
       TINA MENG MORRISON, ESQ.
18     JACOB SHELLY, ESQ.
       MICHELLE L. MC CLAFFERTY, ESQ.
19

20   ON BEHALF OF THE DEFENDANTS:

21     CAMERON POWELL, ESQ.
       MICHAEL JOHN WYNNE, ESQ.
22     JAMES CULLEN EVANS, ESQ.

23

24

25
```

1   APPEARANCES (CONTINUED):

2
    ON BEHALF OF INTERVENOR (USA):
3
      DANA PAIKOWSKY, ESQ.
4     JENNIFER J. YUN, ESQ.
      TIM MELLETT, ESQ.
5     AILEEN BELL HUGHES, ESQ.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21
            VIOLA S. ZBOROWSKI, RDR, FAPR, CMR, CRR, RPR, CRC
22     OFFICIAL COURT REPORTER TO THE HONORABLE STEVE C. JONES
                    UNITED STATES DISTRICT COURT
23                        ATLANTA, GEORGIA
                           404-215-1479
24            VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV

25

1                          I N D E X

2

3    WITNESS              DIRECT    CROSS    REDIRECT   RECROSS

4    CIANTI STEWART-REID      43      60        76        78

5    SCOTT SAMUEL BERSON      81     102       125       129

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (HELD IN OPEN COURT AT 9 A.M.)

2         THE COURT:  Good morning.  You-all can be seated.

3         I was driving in from I-85 north this morning from

4    Atlanta coming here and there were -- I've come this way, God,

5    for years.  And usually I can zip right through from --

6    because all the people are on the other side, there's traffic

7    coming into Atlanta, so usually I have no problems.

8         But this morning I was coming in from Atlanta on I-85

9    north and all this traffic.  And I said, where are all these

10   cars coming from?  And now I see why.

11        Good morning to you-all.  Hope everybody had a good

12   easy drive in, and we're getting ready to start this morning.

13        Ms. Wright is going to call the case.  And before we

14   start off with the case, there are a couple of administrative

15   matters we need to take care of and then we'll start with

16   opening statements.

17        Ms. Wright, you can go ahead and call the case.

18        THE DEPUTY CLERK:  The Court calls Fair Fight, Inc.

19   and others v. True the Vote, Inc. and others, Civil Action No.

20   2:20-cv-302.

21        THE COURT:  And representing the plaintiffs this

22   morning?

23        MS. LAWRENCE-HARDY:  Good morning, Your Honor.

24        THE COURT:  Good morning.

25        MS. LAWRENCE-HARDY:  Allegra Lawrence-Hardy on behalf

1   of the plaintiffs this morning.  And I'm joined at counsel

2   table by my colleagues Uzoma Nkwonta and Christina Ford.

3          THE COURT:  Good morning both of you-all.

4          MS. LAWRENCE-HARDY:  And, obviously, other members of

5   our team are here as well.

6          THE COURT:  Good morning to everyone on the team.

7          MS. YUN:  Good morning, Your Honor.  Jennifer Yun on

8   behalf of the United States.  And I'm joined by Dana Paikowsky

9   and Timothy Mellett.

10         THE COURT:  Good morning to you-all as well.

11         Representing the defense?

12         MR. WYNNE:  Yes.  Good morning, Your Honor.  Michael

13  Wynne on behalf of all of the defendants.  I'm joined by

14  Jake Evans, Greenberg Traurig, who is local counsel.  Our

15  client representative Catherine Engelbrecht, co-counsel

16  Cameron Powell.  Also in the room co-counsel Todd Burns,

17  Derek Somerville.  And most important by far, my paralegal

18  Heather Martinez.

19         THE COURT:  Good morning to all you-all.  Good to see

20  you this morning.

21         There are a couple of things -- there was a motion

22  filed regarding excluding witnesses from the witness list.  My

23  position is simply this:  The consolidated pretrial order says

24  if you're not on the -- name has not been given, then you are

25  excluded from being a witness unless you-all agree among each

1  other.  So if the names were not given prior to the

2  consolidated pretrial order you put together, that person is

3  not going to testify.

4       Secretary of State Brad Raffensperger yesterday filed

5  a motion to quash his subpoena.  They asked that he not be

6  required to be here this morning.  I entered an order, and I

7  let him know he did not have to be here this morning, that I

8  would deal with the matter on the motion to quash.  His

9  position is that he was not properly served.

10      I don't think you're going to exhibit any evidence --

11 witnesses this morning.  So I will tell them, again, he does

12 not have to appear until I make a ruling on the motion to

13 quash.

14      But here's a quick question:  Was Secretary of State

15 Raffensperger one of the witnesses that you-all asked to

16 exclude?

17      MS. LAWRENCE-HARDY:  Yes, Your Honor.  He was not on

18 the original witness list.

19      THE COURT:  Then I think you have a twofold

20 situation, then, Mr. Wynne.  A, if he's not on the witness

21 list, he's going to be excluded unless you can get plaintiffs

22 to agree, and that might be a little bit difficult.

23      And, second of all, Josh Belafonte who is

24 representing Mr. -- not Mr. -- Secretary of State

25 Raffensperger in his motion that you read, was pretty

1   conclusive that he was not properly served.  So if you decide

2   that you want to call him, I think your first hurdle is going

3   to be whether or not he's excluded, was not included; and your

4   second hurdle will be, of course, was he properly served or

5   not.

6           MR. WYNNE:  May I address that, Your Honor?

7           THE COURT:  Yeah.

8           MR. WYNNE:  Counsel was kind enough to forward me a

9   list of witnesses that -- within 48 hours for tomorrow,

10  including Ryan Germany and Mr. Watson and Ms. Silas.

11          This morning they said they'd like to offer

12  deposition designations of a witness they say they couldn't

13  serve yet.

14          Now, Germany --

15          THE COURT:  Look, if you have an objection about any

16  witness that they're going to call, at this point in time I

17  have not got any motion from you on that.  So you will have to

18  deal with that when they call them.  I'm just dealing with the

19  motions that's on the docket.  So I don't want to get into

20  anything -- if there's no motion regarding any of their

21  witnesses -- Ryan Germany, I think, is one of your witnesses.

22  But if he was one of your witnesses, then you have notice of

23  him.

24          MR. WYNNE:  Okay.  That's what I was wondering.

25          Well, in any event, we waive any objection as to

1  anybody who is not on their witness list.  So we just waive

2  it.  We're not going to be objecting.

3          THE COURT:  I appreciate your kindness, but I don't

4  think they're going to get a reciprocal from them.

5          MR. NKWONTA:  Your Honor, there was nothing to waive.

6  All of the witnesses that we identified were on our witness

7  list and have been since May.  All we provided was the order

8  of witnesses as a courtesy so they know the order in which

9  they would be called.

10          The deposition designations that opposing counsel

11  mentioned, we actually provided those deposition designations

12  again in May.  They served no objections.

13          We recently supplemented those designations 48 hours

14  ago, that is correct, from Mr. Martin.  That's one of the

15  issues I'd like to address, because Mr. Martin, we believe, is

16  unavailable under Rule 32.

17          THE COURT:  Well --

18          MR. NKWONTA:  We've tried to serve him three times.

19          THE COURT:  -- let's do this.  Let's deal with this

20  -- let's deal with this at this point in time.

21          MR. WYNNE:  Well, we're not going to object to

22  anything.

23          THE COURT:  All right.  Well, good.  All right.

24          Are plaintiffs ready to start your opening

25  statements?

1        Is both sides invoking the rule of sequestration in

2   this matter?

3        MS. LAWRENCE-HARDY:  Your Honor, we do have a few

4   more logistics items.  We can take them up at the Court's

5   convenience.

6        THE COURT:  All right.  Let's do that.  Let's go

7   ahead and get going.  Thank you.

8        MS. LAWRENCE-HARDY:  Thank you.

9        THE COURT:  All right.  You can proceed with your

10  opening statement.  Each side has 30 minutes for an opening

11  statement.

12        MR. NKWONTA:  Thank you, Your Honor.

13        Good morning, Your Honor.  May it please the Court.

14  My name is Uzoma Nkwonta, and I represent the plaintiff Fair

15  Fight, Inc.  I also represent the individual voters, all of

16  whom were lawful Georgia residents that became victims of

17  defendants' scheme to disrupt, destabilize, and undermine the

18  results of the 2020 presidential election and the 2021 runoff

19  for Georgia's U.S. Senate seats.

20        These individuals were pulled out of voting lines and

21  questioned, forced to jump through hoops, and navigate

22  challenging procedures to reprove their residence, and they

23  were all left with the ominous feeling that they had done

24  something wrong.

25        The truth is, Your Honor, they did nothing wrong.

1   This was all connected to True the Vote's Validate the Vote

2   scheme.  And that's not merely a figure of speech.  The scheme

3   was titled "Validate the Vote."  It was reduced to a written

4   proposal that True the Vote submitted to its biggest funder in

5   the immediate aftermath of the November 2020 election.

6        True The Vote's donor wanted to reverse election

7   losses, so True the Vote stepped in with a proposal.  And I

8   want to highlight a few elements of that plan that the Court

9   will hear throughout this trial.

10       First, True the Vote identified what it perceived to

11  be an issue, significant evidence of illegal ballots being

12  cast and counted in the 2020 general election.  Illegal votes

13  being counted in democratic counties.  Democratic officials

14  counting illegal ballots.  Once again, Democrats deliberate

15  efforts to radically expand mail voting.

16       And they created a plan of action.  And that plan of

17  action included building public momentum through broad

18  publicity, galvanizing Republican legislative support in key

19  states.  And the final payoff, to nullify the results of the

20  state's election so that the presidential electors can be

21  selected in a special election or by the state legislature.

22       Among those key states, True the Vote and Catherine

23  Engelbrecht, both Texas residents, set their sights on

24  Georgia.  They even filed a lawsuit seeking to overturn the

25  results from the presidential election and certain handpicked

1   Georgia counties.  There they alleged that over 70,000

2   non-citizens voted for President Biden.  They later dismissed

3   that lawsuit, of course.

4        So how is this Validate the Vote scheme relevant to

5   the Georgia runoff and to the events of this case?

6        Well, True the Vote's actions at issue in this case

7   are all part of the same campaign.  You'll hear that once the

8   efforts to overturn the presidential election failed, True the

9   Vote turned its attention to interfering in the Georgia

10  runoff.  Validate The Vote was rebranded as Validate the Vote

11  Georgia.

12       They announced a $1 million bounty on fraud, a public

13  call for heightened monitoring of polling places and voters at

14  the polls and drop boxes.  And they launched -- and defendants

15  collectively launched an unprecedented mass challenge effort

16  never before seen in Georgia's history, or larger than ever

17  before seen in Georgia's history.

18       They've recruited volunteers to challenge more than

19  250,000 voters just weeks before the runoff.

20       These challenges targeted voters that at one point

21  requested to forward their mail to a different address, even

22  while defendants recognize that people forward mail for a host

23  of reasons that have no impact on residents.  You'll hear that

24  defendants even told their volunteers and their challengers

25  that 99.9 percent of the voters on this list were unlawfully

1   registered.

2       But you'll also hear that those statements were

3   false, Your Honor.  In fact, you'll learn that much of what

4   True the Vote and defendants put into the airways as part of

5   this Validate the Vote program was false.

6       They did not have evidence of illegal ballots being

7   cast and counted in the 2020 election.  Nor did they have

8   evidence that most illegal votes were being counted in

9   Democratic counties.  Nor did they have evidence that over

10  70,000 individuals voted for President Biden.  And they

11  certainly had no evidence that 99.9 percent of the 250,000

12  voters on their challenge list were incorrectly or unlawfully

13  registered.  Quite the opposite, in fact.

14      You will hear testimony from plaintiffs' expert

15  Dr. Ken Mayer, an expert in political science and quantitative

16  methods, that the challenge lists that True the Vote and

17  defendants compiled were slapped together haphazardly, and the

18  result was an unmitigated disaster.

19      To give you a few examples:  Defendants challenged

20  voters whose registration address and alleged new address were

21  identical, meaning, voters had never moved.

22      Defendants challenged voters and presented challenge

23  lists with syntax errors in the street address field, meaning,

24  you could not even identify what street address they were

25  alleged to have moved to.

1        Defendants challenged voters who allegedly moved to a

2   street address in the same county.  Meaning those voters

3   retain their eligibility to vote in the runoff for Georgia's

4   U.S. Senate seats.

5        Defendants challenged voters even when the name on a

6   challenge file did not match the name on the voter file, on

7   the voter registration file.  That means it's not even clear

8   that they identified the right people.

9        They challenged individuals who were not even

10  registered in Georgia, which is a strong indication that that

11  list was rife with errors.

12       They challenged individuals who resided on military

13  installations.  They challenged individuals who were already

14  reregistered at their alleged new address as of December 2020,

15  which means that their lists and their -- and the voter file

16  that they consulted was out of date.  They challenged

17  individuals where the alleged address that they moved to was

18  blank, missing a street address, and there were over 15,000

19  instances of that.  And they challenged individuals that lived

20  adjacent to military installations and adjacent to colleges.

21       To put a finer point on these challenges, I will give

22  the Court a couple of examples of where some of the challenged

23  voters resided.  Defendants challenged individuals who they

24  alleged to reside on Andrews Air Force Base.  Defendants

25  challenged individuals who they alleged to reside on Camp

1   Pendleton.   Defendants challenged individuals who are most

2   certainly both students and in the military.   For instance,

3   they challenged voters who they claimed had moved to the

4   United States Air Force Academy.   They challenged voters who

5   they alleged had moved to West Point.

6          In other words, the evidence will show that

7   submitting formal challenges to voters based on this data was

8   reckless at best, but likely worse.   The accusations of

9   illegal voting were false.   To say that 99.9 percent of the

10  challenged voters were incorrectly registered was an outright

11  lie.

12         And we're here today, Your Honor, because these lies

13  have consequences.   These reckless accusations of harm impair

14  the work of organizations that support voters like Fair Fight,

15  just as much as they harm voters on.   And later you'll hear

16  from some of the names on the receiving end of defendants'

17  assault on the voting process.

18         You'll hear from Mr. Turner, Gamaliel Turner, who has

19  been registered to vote in Georgia for 52 years now.   Served

20  in our military for 19 years.   After he retired from the

21  military, he lived in Columbus, Georgia, for almost 20 years.

22         His offense?   He took a temporary assignment in

23  California as a government contractor with the U.S. Navy but

24  maintained his home and permanent residence in Columbus,

25  Georgia.

1           You'll hear about the hoops he had to jump through to

2   get his ballot counted and how it made him question his

3   participation in the voting process.

4           You'll also hear from plaintiff Scott Berson who, at

5   the time he was challenged, he had lived in Georgia since the

6   age of four.  He had strong roots in Columbus, wrote for the

7   school newspaper, was involved in the local art scene, even

8   served as a tour guide for the city.

9           His offense?  He moved to Alabama for a two-year

10  graduate school program, but then moved right back to the city

11  that he called home after he graduated.  You'll hear that he

12  first learned of these challenges in a news article.  He

13  learned of mass challenges that swept in students who had been

14  away from home while attending school.  And you'll hear how he

15  was overwhelmed and intimidated by the process of responding

16  to the challenge and reproving his eligibility.

17          You will also hear from Ms. Stephanie Stinetorf, a

18  Georgia resident who temporarily moved to Germany with her

19  husband for a job opportunity with the U.S. Department of

20  Defense.  They were challenged.  You will hear that Ms.

21  Stinetorf was immediately concerned that she had done

22  something wrong.  And you'll hear about the hurdles she had to

23  overcome just to vindicate her right to vote from overseas.

24          Now, these individuals were challenged by Alton

25  Russell, the same person listed on True the Vote's internal

1    records as the assigned challenger from Muscogee County.

2          Scott Berson was also on the list prepared by

3    Mr. Davis and Mr. Somerville, though that list was never

4    filed.

5          And later in this trial you will hear from

6    Ms. Jocelyn Heredia, the daughter of immigrants, born in

7    Georgia, raised in Georgia, first in Athens and then later in

8    Commerce, which is in Banks County.

9          You'll hear that her permanent residence during the

10   2021 runoff was that of her family home in Commerce, Georgia.

11   She was challenged by both volunteers working for True the

12   Vote and Ms. Engelbrecht, and volunteers working on --

13   alongside with Mr. Davis and Mr. Somerville.

14          As a result, she was singled out and pulled out of

15   her line at a polling place when she went to vote in person.

16   She had to retrieve documents to reprove her residence in an

17   ordeal that lasted approximately three hours.

18          And what was her offense according to defendants?

19   She and her partner rented an apartment in Atlanta that was

20   close to her job where, at the time, she was employed for only

21   a one-year term or less.

22          And you'll also hear testimony from Fair Fight's

23   executive director Cianti Stewart-Reid about the frenzied

24   chaos caused by defendants' mass challenges, and how Fair

25   Fight had to reconfigure its operations and divert resources

1  to assist voters and Georgians targeted by the defendants'
2  scheme and respond to True the Vote's threats.

3       As we'll show, Your Honor, these challenges were
4  baseless from the start.  Because determining whether someone
5  has established residence at a new address is not a simple
6  mathematical formula.  It requires review of a comprehensive
7  set of factors, one of which is the voter's intent.

8       Case in point, Jocelyn never intended to make Atlanta
9  her home, despite her lease.  In fact, she plans to move away
10  from Atlanta to be closer to her parents, because for Jocelyn,
11  home is and has always been near her family.

12       And that's the fundamental problem with defendants'
13  scheme.  They took what should be a comprehensive
14  individualized analysis involving an array of factors and
15  reduced it to an inconclusive spreadsheet with speculative
16  observations about voters who had their mail forwarded.  But
17  that tells us nothing.

18       We know, for instance, that voters can live
19  temporarily away from home and still vote.  That's one of the
20  features of absentee voting.  That's a feature, not a flaw,
21  because absentee voting contemplates exactly that:
22  Individuals voting while absent.

23       And you'll hear that even as defendants were
24  compiling and submitting these challenges, the people around
25  them, their supporters, their volunteers, their collaborators,

1  election officials, kept telling them that their approach was

2  flawed, that their lists were inaccurate, that innocent lawful

3  voters were being targeted.

4        Before they filed their challenges, they met with the

5  Secretary of State's Office's employees.  And you'll hear from

6  one of them in this trial who was at that meeting who told

7  True the Vote and Ms. Engelbrecht that presenting a

8  spreadsheet of challenged voters, as they intended to do,

9  would not accomplish anything.  And that's because the NCOA

10 data they relied on is not conclusive.  A spreadsheet listing

11 voters' names does not come close to the standard from voter

12 challenges.

13       The same is true for a spreadsheet of names prepared

14 by defendants Davis and Somerville.  And you'll hear that True

15 the Vote's volunteer challengers did not even have access to

16 the challenge list that they provided.  They simply gave their

17 names, permission to submit their challenge lists, and

18 defendants e-mailed the challenges with their signatures.

19       But the one challenger, Mr. Joseph Martin, who

20 actually demanded to see the list and bothered to look under

21 the hood and do his due diligence, was immediately alarmed.

22 You'll hear that he complained immediately about the quality

23 of the data.  He retracted his challenges because the

24 information was incorrect.  And he told defendants about this.

25 He said impact of challenges:  Not good.  This is on December

1  20th.

2        And then he told True the Vote and defendants once

3  again, please hold on to any challenge letters to Telfair

4  County, concerns with your information.  And, Your Honor, when

5  all signs indicated that something was terribly wrong and that

6  their challenge lists were flawed and that lawful, eligible

7  voters were being targeted, defendants didn't say, let's

8  reconsider.  No.  They said, keep going.  Let's look for

9  someone else to submit these challenges, someone who won't

10  question our challenge list.  Someone who will challenge

11  voters blindly, despite the fact that some of those voters are

12  lawful Georgia residents.

13        With this evidence, we'll ask the Court to apply the

14  plain language and establish elements of Section 11(b) of the

15  Voting Rights Act.  The statute prohibits any person from

16  intimidating, threatening or coercing, or attempting to

17  intimidate, threaten or coerce anyone for voting or attempting

18  to vote.  It was enacted in 1965, approximately eight years

19  after Congress outlawed voter intimidation under the Civil

20  Rights Act.

21        The events that led Congress to enact Section 11(b)

22  tell us a lot about the statute's purpose, the kinds of

23  activities it sought to address and how it should be enforced.

24  And there are two important lessons that I'd like to highlight

25  for the Court.

1          First, that's no intent requirement.  Congress

2    eliminated the intent requirement from the preexisting voter

3    intimidation law, recognizing that many types of nonviolent

4    intimidation or coercion were difficult to address under the

5    prior law.  So while the preexisting Civil Rights Act imposed

6    an intent requirement, Section 11(b) of the VRA removed that

7    requirement.

8          Second, activities that may be lawful in most

9    contexts will still violate Section 11(b) if they result in

10   voter intimidation or if intimidation is the natural

11   consequence of such conduct.  And while defendants will tell

12   you that Section 11(b) was focused on violence at the polls,

13   police dogs, fire hoses, that's not true.  Voter intimidation

14   cases around the time that this law was passed included

15   allegations of landowners enforcing trespass laws on the books

16   to bar individuals because they had registered to vote.  Or

17   landlords evicting tenants or cancelling contracts with

18   individuals because they had registered to vote.  Context

19   matters.

20         And courts recognize that in enforcing trespass laws,

21   for instance, or cancelling contracts that may be lawful in

22   normal circumstances, it's not lawful when it results in voter

23   intimidation or when voter intimidation is a natural

24   consequence.

25         Here, too, just because Georgia authorizes challenges

1   or does not place limits on a number of challenges one can

2   submit, doesn't mean that frivolous challenges or baseless

3   challenges that result in intimidation or that are likely to

4   result in intimidation are beyond reproach.  And it was

5   specifically to address these forms of nonviolent intimidation

6   and coercion that Congress enacted Section 11(b).

7        So following that legal framework, Your Honor, I want

8   to highlight some of defendants' rationalizations and preview

9   the evidence that you'll hear in response from plaintiffs.

10       Defendants will tell you that no one heard their

11  threats about heightened monitoring of polling places or SEALs

12  at the polls.  That's not true.  Fair Fight heard them loud

13  and clear, and you'll hear testimony about that.  You'll hear

14  that True the Vote made those threats in some of the most

15  publicly-accessible forums:  On a podcast, in a press release,

16  both designed to reach large numbers of people.

17       And even if we assume the implausible, that no one

18  heard these statements or these threats, we know from the

19  plain text of Section 11(b) that attempts are just as lawful

20  as proof of intimidation.

21       Next, defendants might tell you that their challenges

22  followed the same process that the Georgia Secretary of State

23  uses when conducting list maintenance or the same process

24  endorsed by the federal National Voter Registration Act.

25  That's not true either.

1          Even after -- and you'll hear that even after

2   identifying voters who submitted address changes or address

3   change request, the Secretary of State's Office sends written

4   notice to those voters, and those voters are not removed from

5   the rolls unless they confirm that they have moved or they

6   fail to vote in two consecutive general elections.  And that's

7   a requirement of federal law.

8          Defendants might even tell you that the claims in

9   their press releases and on their podcasts were untrue and

10  were merely embellishments not borne out in reality.  But

11  that's no defense because people heard these statements,

12  including Fair Fight.  And we know that the defendants

13  challenged over 250,000 voters in 65 counties.  That's not

14  contested.

15         And, finally, defendants will tell you that their

16  actions are protected by the First Amendment.  But we know

17  that true threats and defamatory statements are not entitled

18  to First Amendment protection.  And that's true even when such

19  statements appear in a petition.  Defamatory speech or threats

20  do not receive heightened protection simply because they are

21  made in a filing.

22         The evidence will show that defendants continuously

23  ignored the substantial risk that their challenge list

24  targeted eligible voters and that True the Vote's threats

25  would result in intimidation.  And the evidence will show that

1   defendants knew ahead of time that their challenges would

2   probably be rejected.

3          And in any event, neither True the Vote, nor

4   defendant Ms. Engelbrecht, were engaged in any lawful petition

5   activity, because they're not Georgia residents who are

6   authorized to challenge Georgia voters.  They're from Texas.

7          At the end of this trial, we'll ask the Court to

8   consider all of these circumstances surrounding defendants'

9   activities.  Because they illustrate, one, why defendants are

10  not entitled to First Amendment protection; and, two, they

11  provide important context for defendants' actions.

12         That context, that evidence will show, that True the

13  Vote and Catherine Engelbrecht launched the Validate the Vote

14  program originating as a scheme to overturn the 2020 election

15  results.  Continually publicized false claims of voter fraud

16  in a politically-charged climate.  Sought to align themselves

17  with the Trump campaign, and embarked on a crusade to subvert

18  the election apparatus in Georgia.  Secured a $2 million

19  donation from a funder, the largest single donation, after

20  promising to change the outcome -- or offering to change the

21  outcome of the presidential election.

22         Then after that failed, after True the Vote failed to

23  deliver on that promise, they immediately turned their

24  attention to Georgia and Validate the Vote was rebranded

25  Validate the Vote Georgia.

1      That their funder tried to recover this $2 million,

2  and accused them of using his money for baseless challenges in

3  Georgia.  That they announced a $1 million bounty on fraud.

4  That they called heightened monitoring of polling places and

5  drop boxes.  And they joined forces with the remaining

6  individual defendants to join -- to launch the largest mass

7  challenge effort in Georgia history.  And that those challenge

8  were riddled with errors, erroneous, and worse yet

9  intimidating.

10      In the end, we'll ask the Court to find that

11  defendants' reckless intimidating accusations have

12  consequences.  That false statements have consequences.  And

13  that they violated Section 11(b) of the Voting Rights Act.

14  Importantly, we'll ask the Court to grant relief that

15  vindicates the rights of the brave individuals and the Georgia

16  residents who have been targeted unlawfully and whose only

17  offense is that they dared to vote.

18      We thank the Court for its time and we look forward

19  to presenting our case.

20      THE COURT:  Thank you, sir.

21      Mr. Wynne, you may proceed with your opening.

22      MR. POWELL:  Cameron Powell.

23      THE COURT:  Hold on one section.  You may proceed.

24      MR. POWELL:  I am, Your Honor.

25      May it please the Court, counsel.

1        Now, I'm here to share a very different reality.

2   Sitting here today, we can't really recreate what it was like

3   to be in the state of Georgia in November of 2020, but we may

4   cast our minds back to a time of absolute pandaemonium, of an

5   era-defining pandemic, people on lockdowns, a maelstrom of

6   confusion and vitriol unprecedented in the state's history.  A

7   presidential candidate who's claiming he's been defrauded of

8   the election in several states, including Georgia.

9        An historic runoff race has been scheduled in not one

10  but both of Georgia's Senate races.  Wild conspiracy theories

11  begin to pollute the marketplace of ideas.  Bogus reports of

12  60,000 underage voters, shootouts in German warehouses, even

13  Italian espionage.

14       Now, Georgians' government is telling them everything

15  is fine.  Defendants' own eyes are telling them a perfect

16  storm is brewing.  The government is sending out 6.9 million,

17  unsolicited and, therefore, confusing, absentee ballot request

18  forms.  And to make matters worse, they're sending them to

19  voter registration addresses the defendants knew had been

20  getting stale since April 2019.

21       Defendants' concerns now are based on one overriding

22  value:  Everything is better when people vote in the right

23  place.  But the NVRA won't allow the State itself to try a new

24  remedy within 90 days of an election.  Is there no solution?

25  Defendants saw that there was one, Section 230, which empowers

1    Georgia voters to do the job.

2          So defendants, each uniquely and competently attuned

3    to election administration, decide to exercise their First

4    Amendment right to petition, to associate and to speak, to

5    take action they know will help clean voter rolls in a seismic

6    election where 18-month old voter rolls had been frozen from

7    any updating for five months, as of January 2021.

8          That's how they began to walk a responsible middle

9    path between the lunacy of the conspiracy theories thickening

10   the air and the Georgia government saying, no, no, everything

11   is fine.

12         Let's start with Mark Davis, one of five defendants,

13   who barely made an appearance in plaintiffs' narrative.

14   Sitting in his office, where he spent 30 years making sure

15   tens of millions of mailings get to Georgia voters.  30 years

16   crawling around inside the machinery of the National Change of

17   Address registry and the Georgia voting file.

18         And for decades he's been worried about what he's

19   seeing in the data.  Many people were not living where they

20   were registered to vote.  For decades he's been a lonely voice

21   in the wilderness, talking to and consulting with Georgia

22   Secretary of State and its legislature.  People are moving, he

23   tells them, and they're not updating their voter registration

24   or even driver's licenses.  And then they're going back to

25   their old precinct to vote, to vote for tax increases they

1  will never pay, to vote for sheriffs and school board

2  candidates outside their new communities, to vote for U.S.

3  representatives who won't be representing them, to vote for

4  someone else's mayor, and to cancel out someone else's vote

5  for city council.

6      Mr. Davis is no rogue.  He's been behind historical

7  election contest challenges that have highlighted holes in

8  Georgia's election administration that ultimately were

9  corrected by county election administers, the Secretary of

10  State and the Georgia legislature.  One case where he showed

11  off his command of the laws and the data of Georgia and its

12  voter files was the case that's known as Gasaway 1, where his

13  analyses forced Habersham County to admit it had

14  inappropriately districted hundreds of voters.

15      But even bigger was Gasaway 2, where then

16  Representative Dan Gasaway overturned an election against him

17  in 2018.  In the second election, he finished just two votes

18  short because of ineligible voters.  With Mr. Davis' expert,

19  Representative Gasaway discovered that more than 30 days

20  before the election, voters had moved out of the voting

21  district where they voted.  Mr. Davis found some voters who

22  had lived outside their county for years.  And others lived

23  side by side as neighbors, and yet voted in different counties

24  and House districts.

25      Ultimately, Mr. Davis's work in Gasaway 2 discovered

1   a hole in election administration that can only be corrected

2   by citizen eligibility challenges.

3          The NVRA says elector lists must be frozen for 90

4   days before an election.  That doesn't mesh with the Georgia

5   Election Code, at least as far as updating addresses, which

6   provides that voters must live in a county in which they vote

7   for 30 days before an election.  Meaning, if they have moved

8   away between 30 and 90 days before the election, they become

9   ineligible to vote.  But the State has no tools to ensure that

10  they find out they're ineligible in time for anyone to do

11  anything about it.

12         Mr. Davis believes this 60-day gap is a hole in the

13  law.  He believes Senior Judge David Sweat agreed with him in

14  Gasaway 2.  He heard the judge reason that the only way to

15  plug the hole in the law is for citizens to use individual

16  eligibility challenges.

17         Now, the problem of the hole in the law becomes

18  accentuated in the Georgia Senate runoff.  The first Senate

19  election took place on November 3, 2020.  The voter files have

20  been frozen for 90 days before that, or since August 3rd,

21  2020.  But by the time of the Senate runoff in January 5,

22  2021, the already stale voter file had not been updated at all

23  for five months.

24         So Mark Davis, a man as knowledgeable as anyone on

25  the NCOA and the mobility of Georgia voters, did an

1  independent analysis that led to credible voter challenges,

2  even if not one of those challenges can be proven to have

3  reached any plaintiff or voter.  Not one.

4       Now, Derek Somerville had just spent 2019 as a

5  tireless citizen investigator who, on his own time and his own

6  dime, single handedly and in painstaking detail, exposed the

7  full extent of the Georgia Speaker of the House's abuse of

8  legislative continuances to prevent his own criminal defendant

9  clients from ever having to go to trial.

10      Mr. Somerville is also concerned about the historic

11 number of unsolicited absentee ballots their Secretary of

12 State is sending to voters who have moved out of their county

13 any time since April 2019.  And Mr. Somerville has been

14 talking to his friend, defendant Ron Johnson, for weeks about

15 their concerns with the voter rolls.

16      Mr. Somerville, being a patriotic and idealistic

17 veteran of the Marine Corps and the FBI, wants to navigate a

18 path between conspiracy and vitriol, on one hand, and obsolete

19 voter files on the other.  And now Mr. Somerville sees that

20 he's found another cause worthy of his considerable energies.

21      Now, when Mr. Somerville and Mr. Davis meet soon

22 after on a conference call devoted to election integrity, they

23 realize they're kindred spirits.  They both care about people

24 voting in the right place, and they share values about using

25 data, following the data dispassionately, and avoiding the

1   hyperbole.

2        Mr. Somerville is eager to work with Mr. Davis, for

3   reasons I have explained, and because he's honest and he

4   cares.  Mr. Davis is over the moon that someone is listening

5   to him, listening to his concerns.  And he's excited by the

6   fact that Mr. Somerville has spent decades in quantitative

7   analysis, as a business executive, and as an FBI agent

8   investigating and poking holes in data.  Mr. Davis wants

9   Mr. Somerville to give an independent confirmation of his

10  analysis.

11        They decide to analyze the state of the Georgia voter

12  file.  Within days, Mr. Somerville confirms Mr. Davis' fears.

13  People are telling the U.S. Postal Service they're moving out

14  of their counties, but they're not updating their voter

15  registrations.

16        These two men know they can get a platform to talk

17  about what they've found.  And so they began to post their

18  findings on Facebook, and people start to get engaged at

19  least.  Not just ordinary citizens, but the Deputy Secretary

20  of State, the Deputy Chief of Investigations for the Secretary

21  of State, and countless state legislators.  Things are

22  beginning to pop.

23        Meanwhile, defendant Catherine Engelbrecht, president

24  of the nonprofit defendant True the Vote, has the same

25  concerns.  She founded True the Vote in 2010 to pursue

1  election integrity.  And she worries that absentee ballot

2  requests are being sent to voters who have moved out of their

3  counties, a voter registration.  She worries the combination

4  of inaccurate voter rolls, freely available absentee ballots,

5  and an experimental use of unmonitored drop boxes on a large

6  scale could create unprecedented risks.  So she leaps into

7  action.

8       Her True the Vote has filed manual residency

9  challenges since 2010.  She asked longtime colleague in the

10  field Gregg Phillips of OPSEC to look into what can be done to

11  ensure people are voting in the right county.  She understands

12  Mr. Phillips has been using NCOA in his businesses and

13  developing methods to resolve people's identity for years.

14  She's also aware of the trust with which the NCOA is regarded,

15  because a business she co-owns uses it constantly.

16       They decide to compare the NCOA against the Georgia

17  voter file to see which Georgia voters have filed permanent

18  changes of address out of their counties.  The resulting half

19  million or so records will be the foundation of the list of

20  voter records that they propose might be used to petition

21  boards of election to look into after they first remove some

22  categories of records from the NCOA file to arrive at about

23  364,000 names in their spreadsheets.

24       Ms. Engelbrecht meets personally with Georgia's

25  Secretary of State and his deputies.  She tells him of her

1  plans to challenge voters who have moved out of county.  She

2  understands him to agree with the need to do so.  She

3  understands that he already uses the NCOA to predict who

4  should be asked to confirm their residence.  She tells them

5  all, everyone in the meeting, of True the Vote's plans to use

6  the NCOA to facilitate residency petitions at scale, and not

7  one of them questions or even suggests improvements to any

8  part of her plan.

9      What's more, True the Vote's lawyer also tells her

10 that what she is trying to do is reasonable under the law.

11     In the end, challenges are submitted to 65 counties

12 based on True the Vote's challenge list.  These counties

13 include most of the most populous urban counties in Georgia,

14 which in turn have higher minority populations.  So we would

15 expect that the percentage of, say, African Americans would be

16 higher in True the Vote's 65-county challenge list than the

17 30 percent of African Americans in the Georgia voter file.

18     And yet, True the Vote's challenge file was only

19 27.3 percent African Americans, as Dr. Mayer confirms at

20 page 26 of his report.

21     Well, all the counties at this point have been

22 threatened with lawsuits if they accept any challenges.  And

23 only a handful accept the challenges they're given.  In the

24 end, not a single voter negatively affected by those

25 challenges is squarely before the Court.

1      Counsel for plaintiffs just now began dozens of

2 sentences with the refrain "they challenged voters who."  But

3 plaintiff hasn't identified any of those voters, which allows

4 us to conclude plaintiffs really mean, defendants had

5 spreadsheets sitting around with names in them -- a most

6 metaphysical harm.

7      Now, Ron Johnson, still talking frequently to

8 Mr. Somerville about voters not voting in the right county,

9 hears of True the Vote conducting challenges, and he

10 introduces Mr. Somerville to True the Vote.

11      Mr. Johnson has filed residency challenges before

12 with success.  And so he volunteers to use True the Vote's

13 records to file a residency petition in his own county.  His

14 petition will also reach no voter known before the Court.

15      James Cooper also decides to associate with True the

16 Vote and fellow citizens to find interested petitioners.  And

17 he, too, doesn't submit any petition that reaches any voter

18 before this Court.

19      Mark Williams of Gwinnett County is a printer.  He

20 was initially hired to help print when they thought they had

21 to submit challenges in paper form.  He helps True the Vote

22 find a few petitioners in various counties.  He volunteers to

23 submit a petition and it reaches no voter before the Court.

24      So everything is better when people vote in the right

25 place.  We will hear testimony about defendants' lawful public

1  spirited goals for their speech and their petitions -- not

2  conduct.  It's all speech and petitions.  And we'll hear how

3  they surprisingly were successful in reaching many of those

4  fairly ambitious goals.

5       As they prepared their challenges, defendants

6  Engelbrecht, Davis, and Somerville spoke publically on the

7  issues of election integrity and responsible voter list

8  maintenance before citizen groups, the Georgia legislature, on

9  social media, and in podcasts.

10      Defendants did successfully get the attention of the

11 Georgia Secretary of State, county boards of election, the

12 Georgia State Legislature, and the national media.  Mr. Davis,

13 boasting that decades-long reputation as an expert in

14 Georgia's voter files, was invited to testify to the Georgia

15 State Legislature about his and Mr. Somerville's findings.

16      Mr. Somerville met with citizens groups to explain

17 why everything is better when people vote in the right place.

18 And he frequently batted down the conspiracy theories they

19 threw at them.

20      Defendants Engelbrecht and Davis engaged journalists

21 who wrote articles on Georgia's voter rolls.  Mr. Somerville

22 also met with several state senators and representatives, many

23 of whom he already knew, and no fewer than seven of them

24 submitted challenges.

25      Their Banks County petitioner, former Representative

1  Dan Gasaway, who knew Georgia election law and the community

2  he represented like the back of his hand, and who informed

3  Mr. Somerville he considered every challenger on his list.

4        Did those efforts have an impact?  Even beyond

5  educating the right people, defendants' efforts to stand in

6  the Secretary of State's shoes and generate challenges of

7  scale without limitation, was codified in Senate Bill 202, now

8  a part of Section 230, which makes clear there's no limit on

9  the number of challenges a voter may file with the board of

10  election.

11        Now, before I turn to the Court's totality of

12  circumstances test for this case, allow me to address the

13  Court's concerns about causation with respect to defendants'

14  speech.

15        There's really no evidence showing either a voter or

16  a plaintiff knew of the various banal statements plaintiffs

17  have complained of appearing in distant corners of the

18  Internet.  The fact that Fair Fight's attorneys managed to

19  find them, and they're not Georgia voters, is not of much

20  moment.

21        With respect to defendants' Section 230 petitions,

22  there is no evidence defendants caused the challenges to

23  plaintiff person or the two non-plaintiff voters, Ms.

24  Stinetorf, and Mr. Turner.  Those challenges were made by

25  Alton Russell who was working with no defendant.

1       He did get on True the Vote's list of potential

2  challengers, and then he filed his own challenge days before

3  True the Vote began filing any, using his own letterhead,

4  FedExing it, instead of using True the Vote's address, not

5  using their template, and challenging a completely different

6  list of people almost ten times as large.  This is not -- this

7  is not the same challenger who had any relationship with True

8  the Vote or with the other defendants.

9       But the Court will also hear no causation of

10  Ms. Heredia's alleged intimidation by petition.  Both sets of

11  defendants did submit challenges against her in Banks County

12  because she'd filed a permanent change of address.  The

13  plaintiffs' own exhibit from the County shows other parties

14  submitted challenges in Banks as well.  There's no indication

15  which of those many challenges were directed at Ms. Heredia or

16  which the board accepted.

17       So plaintiffs will not be able to prove which of the

18  several challengers caused Banks County to challenge

19  Ms. Heredia's residency.  In other words, plaintiffs will not

20  prove the required chain of custody for a challenge submitted

21  by any defendant being the particular challenge that was

22  accepted by the board of election that somehow then reached

23  Ms. Heredia.

24       Ms. Heredia is like a person who has tripped over

25  something in a dark room with other people in it.  And when

1  the lights are turned on, she points at the first people she

2  sees.  Those people are the defendants, but they weren't the

3  only people in the room.

4        Now, the Court has indicated it will use a totality

5  of the circumstances standard that will look at evidence of

6  six factual factors.  The relevance, the proximity of

7  defendants' challenges to the runoff, the frivolity of the

8  challenges made, the intent to target specific voters or

9  demographics of voters, the bounty or legal defense fund

10  created to incentivize challengers, the recruitment of Navy

11  SEALs to guard or work polling places, and the publication of

12  challenged voters' names.  That's virtually verbatim from the

13  Court's order.

14        Now, regarding the proximity of asking, merely asking

15  boards of elections to consider asking challenged voters to

16  confirm and update their addresses and vote in the right

17  county, many defendants will explain their understanding that

18  even close to an election, Section 230 and DOJ guidance both

19  expressly allow Georgia's voters to submit petitions to boards

20  of election to look into whether challenged voters needed to

21  update their addresses.  No one was getting removed from

22  anything.

23        Indeed, given the State's hands were tied by the

24  NVRA's 90-day blackout period, several defendants were well

25  aware Section 230 citizen challenges were the only options

1  available.

2        Regarding the alleged frivolity, defendants will

3  explain why they believe their interpretations of Section 230

4  and reliance on the NCOA were well grounded.  They'll explain

5  their understanding that the legal standard in Georgia's

6  Section 230 did not require them to submit anything amounting

7  to probable cause that they had to identify as such.  They had

8  to submit a writing and a grounds for the challenge.

9        The defendants will explain their belief that the

10  standard for the petitions was to raise legitimate questions

11  that were not baseless and made for an unlawful purpose.  And

12  they knew those questions would reach voters, if at all, only

13  through the absolute firewall of county boards of election.

14        Most defendants already knew that when states have to

15  identify with accuracy voters who have moved permanently, the

16  NCOA is accurate enough to be a, quote, reasonable effort,

17  unquote, under the NVRA, even for the state's more serious

18  purpose of possible removal of voters from the list.

19        In addition, many defendants had personal experience

20  with mass mailings and with the NCOA registry in the context

21  of mass mailing that gave them a reliable sense of its

22  predictive power.  On average, about what percent of the time

23  does a permanent move filing with the U.S. Postal Service,

24  followed by e-mail and text verifications sent by the Postal

25  Service, did you really mean to send this, followed by please

1  give us a credit card so we can confirm your identity, what

2  percentage of the time does that predict that that person will

3  actually move away permanently?

4       Well, the missing data in this case is plaintiffs

5  don't have a percentage.  They can't show why it was

6  unreasonable to rely on this tool that mass mailers used to

7  send out hundreds of millions of pieces of mail a month.

8       Now, defendants did not attempt an individualized

9  inquiry for the most part.  Some of the petitioners did and

10  for good reasons.  When boards of election determine

11  residence, which they do under Section 21-2-217(a), they see

12  15 numbered items just about the rules for determining

13  residency.  And in subsection (b), they see 14 highly personal

14  pieces of information they believe no citizen should be using

15  to investigate another citizen:  Applicant's financial

16  independence, business pursuits, employment, income sources,

17  residence for income tax purposes, age, marital status,

18  residence of parents, spouse, children, if any, leaseholds,

19  site of personal and real property owned by the applicant,

20  motor vehicle, and other property registration, and more.

21       Defendants will explain their belief that if a

22  citizen challenger were to try to investigate any of these

23  things, let alone a combination of them, it would likely be

24  considered invasive, as stalking, even as intimidation.

25  Defendants had no obligation to do amateur hour stakeouts at

1   voter's former homes or show up at their kid's schools, and

2   they didn't.  They used an NCOA tool with a high degree of

3   accuracy in predicting that moves marked permanent were

4   permanent.  And then they submitted it to a board of elections

5   to make further inquiry into that situation.

6        Now, regarding the allegation of targeting, the third

7   factual factor in the Court's analysis, there is a lot of

8   evidence we won't hear in this case about racial or any other

9   demographic targeting.  As I've already eluded, we won't hear

10  any defendant considered race in which voters who filed

11  permanent changes of addresses to keep their NCOA-based

12  challenge list.  We won't hear any defendant considered race

13  in that process.  We won't hear that any defendant considered

14  race regarding which county to submit challenges.

15       As to the bounty, a/k/a legal defense fund, we won't

16  hear any credible evidence that Ms. Engelbrecht's malapropism

17  about bounties, a term stuck in her mind since she'd learned

18  of the IRS's bounty program, reached a single voter.  We won't

19  hear from plaintiffs why, when her very next sentence made

20  absolutely clear she was talking about a whistleblower fund.

21  It would be reasonable for her single non-reckless utterance

22  to make anyone feel intimidated about voting.

23       And, of course, disappointingly, we won't get to hear

24  testimony from any Navy SEALs.  Instead, we'll hear the same

25  silence about the intimidating potential of Ms. Engelbrecht's

1   also solitary mention of Navy SEALs during a private

2   presentation.  This was not available to voters.  This was

3   available only to attorneys doing some extreme due diligence.

4         In that closed-door presentation, when she explained

5   a slide's text that said veterans and first responders, she

6   added aloud a more specific call-out to the Navy SEALs for a

7   True the Vote colleague, Ed Hiner, who was at that very moment

8   a former Navy SEAL.  Nobody heard that, and that's really all

9   there is to that.

10        Regarding the publications of challenged voters'

11  names, we will not hear any evidence that any defendants'

12  actions, in the Court's words on summary judgment, directly or

13  through means of a third party they direct, published any

14  voters' names or threatened to.  Nor will we hear any credible

15  evidence that a tweet from the anonymous account Crusade for

16  Freedom came directly from or was directed by any defendant or

17  that it was seen by any voter, let alone a plaintiff.

18        Now, the plaintiffs have discussed the idea of there

19  being no intent requirement.  And I think what they're missing

20  is that Section 11(b) cases, perhaps without exception, all

21  involve conduct.  And this case involves speech and it

22  involves petitions.  So it's already different.

23        Counsel also mentioned toward the end that the Court

24  will need to find reckless intimidation, and that's something

25  we would agree with.  Pure speech, certainly after Counterman,

1  requires proof of mens rea, a reckless disregard for the

2  consequences that each utterance could well intimidate, not

3  just some group listening to a Navy SEAL presentation in a

4  private room in California, but a voter sitting in Georgia.

5       And the First Amendment requires that petitions to

6  intimidate must have baseless grounds and an unlawful purpose,

7  even for attempted intimidation, you've got to show someone

8  was making an attempt.  And that attempt was directed at

9  Georgia voters.  We won't hear any of that, Your Honor.  And

10  we're looking forward to getting started on it.

11       Thank you.

12       THE COURT:  Thank you, sir.

13       You may call your first witness, plaintiff.

14       MS. LAWRENCE-HARDY:  Thank you, Your Honor.

15  Plaintiffs call Cianti Stewart-Reid.

16       THE COURT:  All right.

17                    ******

18                 CIANTI STEWART-REID,

19       having been duly sworn, testified as follows:

20                    ******

21       THE DEPUTY CLERK:  State and spell your name for the

22  record.

23       THE WITNESS:  Sure.  My name is Cianti Stewart-Reid,

24  C-i-a-n-t-i, S-t-e-w-a-r-t, hyphen, R-e-i-d.

25  DIRECT EXAMINATION

1  BY MS. LAWRENCE-HARDY:

2  **Q.**   Good morning, Ms. Stewart-Reid.

3  **A.**   Good morning.

4  **Q.**   Are you here to testify today on behalf of Fair Fight,

5  Inc., one of the plaintiffs in this case?

6  **A.**   Yes, I am.

7  **Q.**   And what is your role at Fair Fight, Inc.?

8  **A.**   I'm executive director.

9  **Q.**   When did you become the organization's executive

10  director?

11  **A.**   In 2021.

12  **Q.**   And have you held any other positions with Fair Fight?

13  **A.**   Yes.   Immediately prior I was managing director.

14  **Q.**   Would you please tell the Court a bit about Fair Fight?

15  What type of organization it is, et cetera.

16  **A.**   Sure.  So our work is voter empowerment and voter

17  motivation and supporting candidates who are pro voter and pro

18  democracy.

19  **Q.**   And, Ms. Stewart-Reid, because the Court may be familiar

20  with you testifying in other matters, I'd like you to clarify,

21  you're here on behalf of Fair Fight, Inc., correct?

22  **A.**   That's correct.

23  **Q.**   And when you refer to the voter education empowerment

24  work, what types of activities go into that work?

25  **A.**   Sure.  So it's things like direct voter contact, so

1  calling voters, texting voters about upcoming elections and

2  why they should participate.  It's sending mail to them.  It's

3  digital ads and TV ads and just making sure they know when,

4  where, and how to vote.

5  **Q.**   Where does Fair Fight conduct this voter empowerment

6  work?

7  **A.**   We're a national organization, but our primary focus is

8  here in Georgia.

9  **Q.**   And do you live in Georgia?

10  **A.**   I do.  I live in Atlanta.

11  **Q.**   What drew you to work at the organization?

12  **A.**   I worked in policy and advocacy for a while, and I wanted

13  to come somewhere that I could sort of bring all those things

14  that I was working on together.  A place -- I don't think that

15  we're going to make any of the changes we want in this country

16  if our democracy doesn't work, and so this was a place that

17  was making sure our democracy worked.

18  **Q.**   What about Fair Fight, Inc.'s work resonates with you?

19  **A.**   I am incredibly proud of the work that we do to help

20  Georgians and to help voters who come to us and rely on us for

21  help.  It's a big task and a humbling task.  And I'm

22  incredibly proud of the advocacy that we're doing every day to

23  make sure people are able to participate in our democracy.

24  **Q.**   Ms. Stewart-Reid, would you please share a bit more of

25  your background?  Let's start with the issue advocacy and

1  policy work that you referenced.

2  **A.**   Sure.  So I -- immediately prior to this job, I worked as

3  the vice president of Community and Youth Engagement at Truth

4  Initiative.  Before that, I was executive director at Planned

5  Parenthood Advocates of Virginia and Planned Parenthood

6  Virginia PAC.  And before that, I was executive director of

7  the House Democratic Caucus in Virginia and assistant director

8  of the Nevada Assembly Democratic Caucus.

9  **Q.**   And what type of organization is the Truth Initiative?

10  **A.**   It's the largest public education campaign focused on

11  getting youth and young adults to reject tobacco.

12  **Q.**   So the truth about the effects of tobacco?

13  **A.**   That's right.

14  **Q.**   What learnings have you taken from your experience in

15  policy work to your election and voter empowerment work at

16  Fair Fight, Inc.?

17  **A.**   Sure.  So I think I know what it takes to be an effective

18  advocate.  And what issues are particularly important to

19  voters, particularly to voters of color that we serve at Fair

20  Fight.  And, also, the sort of levers it takes to make policy

21  change in state legislatures and -- across the country.

22  **Q.**   Would you briefly share your educational background,

23  please.

24  **A.**   Sure.  I have an undergraduate degree from the University

25  of North Carolina at Chapel Hill.  I have a law degree from

1   Western Michigan's Thomas Cooley School of Law.  And I have a

2   masters in public health from George Washington University.

3   **Q.**   And what are your duties as executive director of Fair

4   Fight?

5   **A.**   I'm responsible for overseeing of course the senior

6   staff, for setting the organizational budget, for setting the

7   original vision angles.

8   **Q.**   And when you arrived at Fair Fight, how did you prepare

9   to assume these leadership responsibilities?

10  **A.**   Well, in the beginning, as I was coming on board, there

11  was reviewing sort of historical documents, work plans and

12  team budgets.  All of the program directors reported to me.

13  So meeting with the program directors about what they had been

14  doing and what they were planning to do that year.

15  **Q.**   And were you able to develop a deep understanding of the

16  programming of Fair Fight at that time?

17  **A.**   Yes, I did.

18  **Q.**   Since your onboarding how have you maintained your

19  understanding of the various programs at the different levels

20  in your organization?

21  **A.**   So moving into this role as executive director was about

22  more the organizational budget, the organizational historical

23  documents, end-of-year reports, prospectuses, all the sort of

24  higher level organizational level items that Fair Fight needs

25  and creating those documents for our future.

1   **Q.**   And do you possess now a thorough understanding of the

2   organization's programming and activities?

3   **A.**   Yes, I do.

4   **Q.**   Have you also learned about activities of the

5   organizations prior to your arrival?

6   **A.**   Yes, I have.

7   **Q.**   Why was it important that you learn about the past

8   activities when you arrived?

9   **A.**   Well, if you're going to be a good leader, you've got to

10  know where you've gone, been, and to know where you're going.

11  And I talked to a lot of stakeholders and the media and lots

12  of people about the work that Fair Fight does.  And so it -- I

13  have to be able to tell them what we've done before and how

14  that relates to what we're doing now and where we're going in

15  the future.

16  **Q.**   I'd like to focus specifically now on the 2020 election

17  cycle.  Will you please describe for the Court the type of

18  work that the organization was engaged in leading up to the

19  November 2020 election?

20  **A.**   Sure.  So that voter empowerment and motivating work, so

21  getting people out to vote, so contacting them through direct

22  voter contacts, like calls and texts, ads, mail, all the

23  activities to make sure people could get -- would get out and

24  vote.

25  **Q.**   And did these activities align with Fair Fight's purpose?

1  **A.**    Yes.

2  **Q.**    And what about after the November 2020 election, did that

3  conclude Fair Fight's work for that election cycle?

4  **A.**    No, it did not, because there would be a runoff in

5  January.

6  **Q.**    Let's pause here for a moment before we get to the

7  runoff.  And if you would, please, tell us about your

8  impression of the environment in Georgia following the 2020

9  general election.

10  **A.**    Well, it was a crazy time.  So there were -- there were

11  statements about there being election fraud -- rampant

12  election fraud across the country.  We were aware of election

13  workers who were being docked, so their personal, private

14  information was being made public.

15      We were still in the midst of the pandemic.  This was

16  before vaccines were wildly available for people.  And then

17  Georgia was the focus of the country because these two Senate

18  races were going to determine the makeup of the U.S. Senate.

19  **Q.**    And in light of all of that happening in the environment,

20  how did Fair Fight plan to engage with voters for the U.S.

21  Senate runoff elections?

22  **A.**    We planned to do similar activities to the ones we had

23  done in November.  So directly contacting voters, mail,

24  digital ads.  Again, making sure people knew when, where, and

25  how to participate.

1   **Q.**   And was Fair Fight able to carry out its activity as

2   planned?

3   **A.**   No we were not.  We did as much as we could, but we had

4   to respond to the activities of True the Vote.

5   **Q.**   And can you provide more detail about the organization's

6   concerns as it relates to True the Vote?

7   **A.**   Yes.  So there were a number of concerns.  The first was

8   that they were offering this bounty of a million dollars for

9   voter fraud.  That they were setting up a voter fraud

10  reporting hotline.  That they were going to recruit Navy SEALs

11  and others to monitor absentee ballot drop boxes.  And then,

12  of course, the hundreds of thousands of voter challenges.

13  **Q.**   And how did Fair Fight learn about True the Vote and its

14  activity in Georgia?

15  **A.**   Through public statements that they made.

16          MS. LAWRENCE-HARDY:  Your Honor, if I may approach

17  the witness and the Court?

18          THE COURT:  Yes.

19          MS. LAWRENCE-HARDY:  I have some exhibits for you.

20          THE COURT:  Yes, please.

21          MS. LAWRENCE-HARDY:  Thank you.

22          MR. WYNNE:  May I have a copy?

23          MS. LAWRENCE-HARDY:  Absolutely.

24          MR. WYNNE:  Thank you.  Appreciate it.

25          MS. LAWRENCE-HARDY:  Give me one moment.

1          MR. WYNNE:  Thank you.  Thank you very much.

2          I have one for you also.

3          MR. EVANS:  Oh, great.

4  BY MS. LAWRENCE-HARDY:

5  **Q**.   Ms. Stewart-Reid, I'd like you to please look at the

6  first document in your binder.  It's marked as Plaintiff's

7  Exhibit 35.

8  **A**.   Yes.

9  **Q**.   Can you identify this document?

10 **A**.   Yes.  This is a press rerelease from True the Vote on

11 December 14, 2020, where they say that they're going to work

12 with the Georgia Republican Party on various activities in

13 advance of the runoff.

14         MS. LAWRENCE-HARDY:  At this time, Your Honor,

15 plaintiffs offer Exhibit 35 into evidence.

16         THE COURT:  Any objection?

17         MR. POWELL:  No, Your Honor.

18         THE COURT:  All right.  It's admitted without

19 objection.

20         MS. LAWRENCE-HARDY:  Thank you, Your Honor.

21         (Plaintiff's Exhibit 35 was received and marked into

22 evidence.)

23 BY MS. LAWRENCE-HARDY:

24 **Q**.   Ms. Stewart-Reid, what concerned Fair Fight about the

25 announcement contained in Exhibit 35?

**A.**   Well, this is where they say they're going to do the
fraud hotline.  That they're going to be monitoring absentee
ballot drop boxes.  And they say other activities.  And we
thought those activities -- we believed these activities were
frightening and threatening.

**Q.**   And why were you concerned about the hotline or these
monitoring initiatives?

**A.**   Right.  We were concerned that these activities would be
considered -- would potentially intimidate voters from
participating in the process or even showing up at all to
vote.  And so we thought these activities were -- they were
frightening to us, as we were thinking about how to get people
to participate, and seemed threatening to us -- and were
threatening to us as well and thought that they would be for
voters.

**Q.**   And do you know how the timing of this release that we
see in Exhibit 35 coincided with early voting?

**A.**   Yes, this is the first day of early vote.

**Q.**   So this announcement that you saw was announced on the
same day as the first day of early voting?

**A.**   That's correct.

**Q.**   Ms. Stewart-Reid, let's look at Exhibit 42, also there in
your folder.  Are you able to identify this document?

**A.**   Yes.  This is a press release from True the Vote from
December 18, 2020, where they state that they are going to

1  challenge 364,000 voters across Georgia.

2      MS. LAWRENCE-HARDY:  And at this time, Your Honor,

3  plaintiffs move to offer Exhibit 42 into evidence.

4      MR. POWELL:  No objection.

5      THE COURT:  It's admitted without objection.

6      MS. LAWRENCE-HARDY:  Thank you.

7      (Plaintiff's Exhibit 42 was received and marked into

8  evidence.)

9  BY MS. LAWRENCE-HARDY:

10 **Q.**   Ms. Stewart-Reid, looking at Exhibit 42, can you tell the

11 Court what concerned Fair Fight about this announcement?

12 **A.**   Yes.  Again, we were particularly concerned that --

13 particularly so close to the election and this vast number of

14 challenges, that people would be intimidated from

15 participating in the process and would feel threatened.  We

16 definitely found this frightening and threatening that so many

17 voters were being challenged.

18 **Q.**   And did Fair Fight have information that voters were

19 actually intimidated by True the Vote's actions?

20 **A.**   Yes, we were con -- we were being contacted by voters who

21 were being challenged who told us that they felt this activity

22 was threatening.

23 **Q.**   And how did Fair Fight respond to what it was hearing and

24 reading about True the Vote?

25 **A.**   We launched a number of activities in response.  We first

1  started to try to find the challenge list themselves.  Then we

2  were analyzing those lists and contacting those voters to make

3  sure they had resources available.  We were working with local

4  boards of election that were trying to respond.

5          THE COURT:  How'd you get the list?

6          THE WITNESS:  Well, we were -- we'd have to send

7  staff or send volunteers to some of these board of elections

8  meetings because they're not all, like, online.

9          THE COURT:  So you got them from the board of

10 elections?

11         THE WITNESS:  Some from the board of elections, yes,

12 directly and from -- and at the meetings.  So some of them

13 were e-mailed to us, like, from the boards of elections and

14 others were like --

15         THE COURT:  Did you get any from any other source

16 other than board of elections?

17         THE WITNESS:  From -- not that I'm aware of.

18         THE COURT:  Thank you.

19         THE WITNESS:  Sure.

20 BY MS. LAWRENCE-HARDY:

21 **Q.**  What other types of activities did Fair Fight engage in

22 to respond to what it was hearing and reading about True the

23 Vote's activities?

24 **A.**  We were also keeping an eye on the activities through

25 monitoring other public statements to see what they were doing

1   about these other activities that they said they were

2   participating in.

3   **Q.**   Can you tell us a little bit about how you interacted

4   with counties, as the Court was just asking you about, to get

5   this information?

6   **A.**   Sure.  So we were -- we have relationship with some of

7   the county board staff, and so we were e-mailing and they --

8   we were -- they were sometimes e-mailing us directly to say

9   here's the list.  And also we would take volunteers who would

10  have been doing other stuff and sending them in person to the

11  meetings, because they're not always, you know, online or

12  available online, and so we would send them out so they could

13  be there to collect the list and see what happened at the

14  meetings.

15  **Q.**   And then did Fair Fight contact voters who were on the

16  challenge lists to help them navigate the process?

17  **A.**   That's right.  To -- so they knew that they had resources

18  available if they were challenged.

19  **Q.**   So you just named a number of things Fair Fight did in

20  response to True the Vote's activities.  Let's take a moment

21  to really break those down into a little more detail.  Let's

22  start with the work of collecting the challenge lists.  You

23  said that you had both staff and volunteers involved in that

24  effort?

25  **A.**   That's right.

1  **Q.**   Can you describe how you were able to staff that

2  particular function across the state?

3  **A.**   Sure.  So we had people from our organizing team, our

4  research team, our voter protection team, who were all trying

5  to find -- get the lists of people.  And, also, then deploying

6  volunteers to be at counties where they were having meetings

7  to, like, try to collect the list and bring them back so we

8  knew who was on them.

9  **Q.**   And what was it about the collection process that

10  required such intense resources from so many different places

11  in your organization?

12  **A.**   Well, the number of challenges was unprecedented.  It was

13  in, like -- so it was in so many counties and it was all, you

14  know, really close to the holidays also, so it was trying to

15  get them and while people were actively voting.  So we were

16  trying to respond -- to shuffle resources to make sure we

17  could go out and get these lists.

18  **Q.**   Okay.  I want to look at each of the departments that you

19  say were involved at Fair Fight.  Organizing.  What activities

20  did the organizing department have planned originally for the

21  2021 runoff?  So without True the Vote, what would organizing

22  have been doing?

23  **A.**   Sure.  So their job is recruit volunteers and then have

24  phone banks, text banks, manage those.  So really the work of

25  talking to individual people to get them out to vote.

1  **Q.**   And when the organizing department instead became

2  involved in collecting challenge lists, how did that impact

3  its ability to do direct voter contact and lead those

4  initiatives?

5  **A.**   Sure.  So the volunteers that would have been spending

6  time calling people were then deployed to these counties to

7  pick up the -- to try to find these challenge lists.  And the

8  staff who would have been overseeing those activities of

9  recruiting volunteers and holding those phone banks, they were

10 then also spending time getting these challenge lists instead.

11 **Q.**   You also said that the research staff was involved in

12 collecting challenge lists.  How did the research staff have

13 their work impacted -- what would they have been doing

14 normally in the runoffs had True the Vote's activities not

15 come to your attention?

16 **A.**   So, as I said, you know, it was a crazy time.  And so

17 there was a lot of disinformation happening, particularly in

18 Georgia, leading up to the runoff.  And so they would have

19 been working on responding to that disinformation so that

20 voters were still able to participate in the election.

21 **Q.**   And you also referenced voter protection.  If voter

22 protection had not dedicated time and effort to collecting

23 challenge lists, what would it have been doing instead?

24 **A.**   Yeah.  They would have been monitoring the lines,

25 particularly if there were long lines happening at polling

1   locations.  They would have been help going folks navigate the

2   absentee ballot process.

3   **Q.**   Was the voter protection team about to carry out that

4   work for the runoff?

5   **A.**   Were they about to?

6   **Q.**   Were they able to carry out that work for the runoff?

7   **A.**   No.  They were spending time collecting challenge lists

8   and responding to the activities of True the Vote.

9   **Q.**   And we talked about what staff did to collect the

10  challenge lists and you've referenced, of course, volunteers.

11  Can you speak more specifically about how volunteers were

12  engaged by the organization?

13  **A.**   Sure.  So we were literally sending volunteers to, like,

14  a county to say, go -- we need -- we know there are challenge

15  voters there, please go get the list and send them to us so we

16  know who these people are who are being challenged.

17  **Q.**   And did Fair Fight originally plan to have volunteers

18  attending board meetings to monitor for challenges in the

19  runoffs?

20  **A.**   Absolutely not.

21  **Q.**   And what did Fair Fight plan to have its volunteers do

22  instead?

23  **A.**   We want them on the phones and texting people and calling

24  them to make sure that they show up to this runoff election.

25  **Q.**   So were Fair Fight's volunteers still able to do the

1  voter contact the organization had planned?

2  **A.**   Not in the way that we had planned, no.

3  **Q.**   In addition to collecting challenge list, you mentioned

4  that Fair Fight also responded to True the Vote by contacting

5  voters who had been challenged.  What was your goal in that

6  effort?

7  **A.**   It was really about making sure they knew they had

8  resources available if they had any trouble when they were

9  trying to vote.

10 **Q.**   And you also mentioned that Fair Fight worked with the

11 counties to speak with them and provide support where possible

12 as they navigated the challenge process.  Which departments

13 were involve with that work?

14 **A.**   That was the organizing department, the voter protection

15 department, and the research department.

16 **Q.**   And how did your staff's efforts to support counties with

17 the challenge process impact the other work planned for the

18 runoffs?

19 **A.**   Well, they -- instead of doing the work they were tasked

20 to do, they were spending time working with the counties.  We

21 provided legal guidance -- we provided a legal memo to them

22 and were fielding calls and questions to help them sort of

23 figure out this new problem in front of them with the

24 challenges.

25 **Q.**   And, Ms. Stewart-Reid, I just want to make clear, you-all

1  were, in addition to seeking information from the counties

2  about these lists that they had been receiving, you were

3  seeking to be a source of support for them as well?

4  **A.**   That's correct.

5  **Q.**   How did your staff's efforts to support counties with the

6  challenge process impact the other work that was planned in

7  your organization?

8  **A.**   Well, those departments would have been doing their other

9  activities, and instead of doing them, they were responding to

10  challenges directly.

11  **Q.**   You also noted that one of the primary activities became

12  staying on top of True the Vote's activities and plans.

13  **A.**   That's correct.

14  **Q.**   How did Fair Fight accomplish that goal?

15  **A.**   We had research staff who were monitoring the public

16  statements and other things that True the Vote was saying

17  about the activities that they had planned.

18  **Q.**   And what activities, specifically, was the research

19  department interested in monitoring?

20  **A.**   We were monitoring the bounty and, like, how that would

21  be carried out.  And this effort around the Navy SEALs and

22  absentee ballot monitoring, sort of when, where, how these

23  people would be deployed and what that would look like.

24  **Q.**   Why did Fair Fight choose to use its resources for this

25  monitoring?

1  **A.**    Well, we thought that the -- these activities were

2  frightening and threatening for voters and we wanted to make

3  sure we understood how they were being deployed.

4  **Q.**    If research staff had not been monitoring True the Vote's

5  announcements and activities what would the research staff

6  have been doing instead?

7  **A.**    Again, they would have been working on misinformation

8  particularly because it was so rampant during this period

9  between the -- before the runoff election.

10 **Q.**    We've talked a bit about how Fair Fight reallocated staff

11 and volunteer time in response to True the Vote and the

12 challenge effort.  Did Fair Fight also reallocate financial

13 resources?

14 **A.**    Yes, we did.

15 **Q.**    In what way?

16 **A.**    We spent more funds promoting the voter protection

17 hotline so that could be a resource for -- because that was a

18 resource for voters.

19 **Q.**    And particularly those who had been challenged?

20 **A.**    That's correct.

21 **Q.**    And what was the purpose of the voter protection hotline

22 as you understood it?

23 **A.**    Yeah.  So if you encounter a problem while you're trying

24 to vote, you can call them and it's staffed by lawyers and

25 trained attorneys who help you navigate your problem.  And so

1    we felt like this was a good resource for the people who had

2    been challenged and if they were encountering problems when

3    they were trying to vote, that they could call the voter

4    protection hotline.

5    **Q.**   Why did Fair Fight increase its spending on the hotline?

6    **A.**   Well, there were all these activities that True the Vote

7    had said they were going to do, the bounty and the absentee

8    ballot monitoring and the challenges, and so we felt like

9    voters needed a resource to be able to go to say I have a

10   problem, I've been challenged, and someone to call to help

11   them navigate that process.  And the voter protection hotline

12   does that.

13   **Q.**   And how did this additional spending on the hotline

14   impact Fair Fight's mission work?

15   **A.**   Yeah.  We would have been spending more money on just

16   getting people out to vote, right, just saying, like, go vote,

17   there's an election happening, you really need to go -- you

18   really need to show up to the runoff.  And instead we were

19   spending it on the hotline.  So we would have been doing

20   digital ads and other activities and other phone calls and

21   text messages to voters.  And instead we were promoting the

22   hotline.

23   **Q.**   And are Fair Fight's resources finite?

24   **A.**   Absolutely they are.

25   **Q.**   You've described numerous actions the organization took

1  in response to the activity of True the Vote.  How did that

2  shift in activity affect the organization mission of voter

3  education and empowerment?

4  **A.**   Yeah.  So when you're trying to get people out to vote in

5  a runoff in particular, in the communities we're surveying,

6  mostly people of color, sometimes low -- younger people, it's

7  hard to get them to show up in the first place.  And then to

8  show up for a runoff is even more difficult.  And so it takes

9  more time and more energy and more phone calls to get them to

10  come out.

11     And so instead of doing that, making those calls, we had

12  to focus our time on responding to these activities.

13  **Q.**   And since the 2021 runoff, has Fair Fight conducted any

14  other work aimed at responding to the activity of True the

15  Vote?

16  **A.**   Yes.  We've formalized our work in a program called

17  Democracy Watch.

18  **Q.**   And what is Democracy Watch?

19  **A.**   So we send volunteers to the counties and they advocate

20  for things like expanded voting hours and they also monitor

21  for challenges.

22  **Q.**   And what resources has Fair Fight allocated to the

23  Democracy Watch program?

24  **A.**   So there are staff time.  So there is a full-time staff

25  person who oversees Democracy Watch.  There's an organizer who

1  helps recruit volunteers and help them show up.  There are

2  staff who are helping write talking points and meeting with

3  volunteers to report back and track and monitor the challenges

4  that we collect.

5  **Q.**   And the most important part is you have a lot of

6  volunteers as well.

7  **A.**   400 volunteers participate in Democracy Watch.

8  **Q.**   And apart from Democrat Watch, are there any other

9  programs or initiatives Fair Fight is engaged in since the

10  2021 runoff aimed at countering the activity of True the Vote?

11  **A.**   We monitor True the Vote's activities with our research

12  department because we are aware that they plan to relaunch a

13  program they have called IV3, which is a tool to challenge

14  voters.

15  **Q.**   And can you tell us a little bit more about your

16  understanding of IV3?

17  **A.**   My understanding it's a website, web tool, where you can

18  look up people in your county and it facilitates you more

19  easily challenging voters.

20  **Q.**   And to file mass challenges; correct?

21  **A.**   Yes, yes.

22  **Q.**   And what is it that Fair Fight is doing with respect to

23  IV3?

24  **A.**   We have our research team tracking and making sure --

25  like when is it going to launch and is it being used.  So we

1   have our research team monitoring that activity.

2   **Q.**   And why has Fair Fight decided to devote resources to

3   monitoring this activity?

4   **A.**   Well, we're incredibly concerned about True the Vote's

5   previous challenges. We found them threatening. We

6   believe -- we want to make sure that there are other

7   challenges, we can respond to them because we think that they

8   are threatening to -- we find them threatening and think they

9   are to voters too.

10   **Q.**   Ms. Stewart-Reid, as the executive director of Fair

11   Fight, have you considered how the organization's activities

12   may change if Fair Fight prevails in this case?

13   **A.**   Yes.

14   **Q.**   Can you tell us how?

15   **A.**   Sure. I would love to spend more time researching what's

16   important to Black voters, to get them motivated to turn out,

17   particularly in this time when there is so much

18   disinformation, like, what is it going to take to make sure

19   people can show up. And, also, what are the motivating

20   messages to make sure people can show up. And making sure

21   that we are talking to people all the time, not -- you know,

22   we try to talk to people as much as we can, but talking to

23   them more through ads and digital ads and mail so they're

24   always hearing from us about what's important and why it's

25   important to be engaged. And we would definitely do more of

1  that if we didn't have spend our time on this.

2  **Q.**   Could you spend more time growing your volunteer base?

3  **A.**   Absolutely.

4  **Q.**   And how would you redirect your volunteer efforts if Fair

5  Fight prevails in this case?

6  **A.**   Yeah.  I think we definitely would spend more time

7  directly talking to voters.  Again, it can take multiple

8  conversations to get someone to show up.  And so we would have

9  more time for those volunteers to have those conversations.

10  They can be longer.  Because you're developing relationships

11  with people.  And so we'd spend more time talking to voters

12  directly.

13       MS. LAWRENCE-HARDY:  Thank you, Ms. Stewart-Reid.

14       Your Honor, I tender the witness.

15       THE COURT:  Let's take a break here before we have

16  the cross-examination.  We've been going for about an hour and

17  a half.  Let's take a 15-minutes break.  We'll start back at

18  ten to 11:00.  Thank you.

19       (A break was taken from 10:33 a.m. until 10:50 a.m.)

20       THE COURT:  Counsel, you may proceed with your

21  cross-examination.

22       MR. POWELL:  I'm sorry, Your Honor?

23       THE COURT:  You can proceed with your

24  cross-examination.

25       MR. POWELL:  Thank you.

1   CROSS-EXAMINATION

2   BY MR. POWELL:

3   **Q.**   Ms. Stewart-Reid?

4   **A.**   Good morning.

5   **Q.**   Thank you for your testimony this morning.  And,

6   honestly, for the work you do on behalf of our citizens.

7   **A.**   Thank you.

8   **Q.**   You had mentioned that you worked at Fair Fight during

9   the time of the complaint against True the Vote and the other

10  defendants; is that right?

11  **A.**   I started it --

12  **Q.**   I'm sorry?

13         MS. LAWRENCE-HARDY:  I'm sorry, she stopped because I

14  stood up.  I was -- I think the question actually

15  mischaracterizes the evidence, but I'm going to allow the

16  witness to answer.

17         THE COURT:  No objection?

18         MS. LAWRENCE-HARDY:  No objection.

19  BY MR. POWELL:

20  **Q.**   You worked for True -- for Fair Fight in November of

21  2020?

22  **A.**   No.

23  **Q.**   Okay.  When did you start with Fair Fight?

24  **A.**   August 2021.

25  **Q.**   I see.

1      And so the information that you have about the activities

2  that happened in November and December are from other people

3  on your team?

4  **A.**   From the people I've talked to on my team, from the

5  documents that I've read, from the conversations I've had.

6  **Q.**   Okay.

7  **A.**   From the learnings of becoming the leader of this

8  organization.

9  **Q.**   Did you -- did read True the Vote's press release

10  mentioning the 364,000 at around the time that you came in as

11  executive director?

12  **A.**   In December -- no, I did not at that time.

13  **Q.**   Did you read the complaint at some point?

14  **A.**   Yes.

15  **Q.**   Okay.  Did you share the complaint's concerns about True

16  the Vote announcing that it planned to issue petitions in the

17  Georgia counties?

18  **A.**   I share the concerns, yes, about the challenges.

19  **Q.**   Okay.  And did you have an idea of how many voters you

20  were worried about being affected by those challenges?

21  **A.**   We are worried about all of the voters who were

22  challenged.

23  **Q.**   Okay.  Do you know how many that was?

24  **A.**   It was around 260,000.

25  **Q.**   Okay.  And how did you find out about that number?

1  **A.**    Again, I've read many of the documents related to this

2  case, of course, and over the course of my work at Fair Fight.

3  **Q.**    Okay.  Did you say -- and I don't want to

4  mischaracterize, did you say that you had send out volunteers

5  to county boards of elections to get records of any hearings

6  that were held?

7  **A.**    The volunteers were sent to the county boards to try to

8  collect the list of challenged voters.

9  **Q.**    I see.

10     Do you know how many counties they got lists for?

11 **A.**    I do not know the exact numbers.

12 **Q.**    Okay.  Do you know whether they got lists of just True

13 the Vote or of other challengers that aren't even here today?

14 **A.**    I believe they would have gotten the list of the folks

15 who were challenged that day.

16 **Q.**    Of the people who were challenged.  But, I mean, do you

17 have the particular lists and do you know who made each

18 challenge on the list?

19 **A.**    I don't.  I'm not aware.

20 **Q.**    Okay.  You mentioned, I think it was volunteers you said

21 used the phrase they're always hearing from you.  Was that

22 about your volunteers or about another group of stakeholders?

23 **A.**    I think what I said was, what we want to make sure that

24 we were doing if we prevailed was to make sure that our

25 stakeholders, or particularly voters of color, are always

1  hearing from us about the work that's happening and why it's

2  so important to participate.  And that we would do more of

3  that if we didn't have to respond to the efforts of True the

4  Vote.

5  **Q.**   I see.

6       And so the stakeholders are people who -- how do they

7  identify themselves as stakeholders to you?  Do they sign up

8  for an e-mail list, a text notification?  How do you

9  communicate with them?

10  **A.**   Sure.  A number of ways, e-mail, text, one-on-one

11  conversations.

12  **Q.**   Do you know how many there are who are subscribed to your

13  various services, social media followers, that sort of thing?

14  **A.**   There are 31,000 volunteers for Fair Fight, and there are

15  several hundred thousand followers on social media sites.

16  **Q.**   Okay.  So are you aware that when True the Vote was

17  issuing its intentions in November and December of 2020, did

18  Fair Fight send out communications about that issue?

19  **A.**   I'm not aware of any.

20  **Q.**   Okay.  All right.  You mentioned that Fair Fight was

21  hearing from voters --

22  **A.**   Yes.

23  **Q.**   -- during 2020?  You were informed of this?

24       Is this because you had a hotline or were there other

25  ways that you found out?

1  **A.**    Voters come to us in a number of ways.  So they come --
2  we were talking to voters through phone banks.  And, also, we
3  have a feature called Story At where people will tell us their
4  voting stories.  And so we were receiving stories through that
5  as well, and direct e-mails.
6  **Q.**    Did you take any of those calls in the phone bank?
7  **A.**    Personally?
8  **Q.**    Yeah.
9  **A.**    No.
10 **Q.**    You mentioned a reference by Ms. Engelbrecht to bounties.
11 Do you know how many references she made to that phrase?
12 **A.**    I do not, no.
13 **Q.**    Did you hear or see anything further about bounties after
14 the mention that you're aware of?
15        MS. LAWRENCE-HARDY:  Objection, Your Honor.  I do
16 believe the question mischaracterizes the earlier testimony
17 and assumes facts not in evidence.
18        THE COURT:  Do you want to rephrase the question?
19 BY MR. POWELL:
20 **Q.**    Other than the one reference that you've mentioned about
21 bounties, were there any other references that you're aware
22 of?
23 **A.**    Not that I'm aware of.
24 **Q.**    Okay.  You also mentioned a reference to Navy SEALs.  Are
25 you aware of where Ms. Engelbrecht, in what forum she made

1  that comment?

2  **A.**   I know it was a public statement.  I've seen the

3  transcript of it.

4  **Q.**   I'm sorry, you've seen --

5  **A.**   I've seen the transcript of a public statement.

6  **Q.**   I see.

7     So you believe that was made in a public forum?

8  **A.**   Yes.

9  **Q.**   Okay.  Does Fair Fight send out mailings?

10 **A.**   Yes.

11 **Q.**   Do you have any idea how many a month?

12 **A.**   I don't know how many a month, no.

13 **Q.**   Do you have any knowledge of how you or your mailer, I

14 would imagine, ensures that the mailings get to their intended

15 recipients?

16 **A.**   That's not my role.  So I would rely on the mail vendor

17 for that.

18 **Q.**   Okay.  Do you have any familiarity with the National

19 Change of Address registry?

20 **A.**   Just what any normal layperson would know.  Nothing more

21 than that.

22 **Q.**   That's probably enough.

23     So you're not really familiar with how it works?

24 **A.**   Well, I know that -- I mean, I know that you can -- I've

25 changed my address before, so I know that.

1  **Q.**   Okay.  Do you recall the form?

2  **A.**   Not in particular.

3  **Q.**   Okay.  Are you aware that only people who filed for a

4  change of address they mark as permanent get put on the

5  National Change of Address registry?

6  **A.**   I was not aware of that.

7  **Q.**   Okay.  Are you aware of whether Fair Fight has any data

8  on the accuracy of the National Change of Address registry in

9  predicting whether a move in fact will remain permanent?

10 **A.**   That Fair Fight has?

11 **Q.**   Yes.

12 **A.**   I'm not aware of that.

13         MS. LAWRENCE-HARDY:  Your Honor, I'm going to object

14 here.  We are going far beyond the scope of Ms. Stewart-Reid's

15 testimony.  And so she's here to talk about standing.  She's

16 not here to talk about Fair Fight's mailing list.  We can

17 certainly -- there are witnesses who can do this.

18         THE COURT:  I think I saw this as a standing witness,

19 that they were trying to establish standing for Fair Fight.

20 So I think we're all kind of going a little bit beyond the

21 direct.

22         MR. POWELL:  Sure, Your Honor.  The witness has

23 mentioned the challenges.  I'd like to talk a little about

24 that.

25         THE COURT:  Anything she's testified to you can talk

1  about.  She did talk about some aspects, but I think some of

2  the other things we're kind of getting into may be a little

3  bit outside, but let's go from there.

4        MR. POWELL:  Sure.

5  BY MR. POWELL:

6  **Q.**   Do you a familiarity with Section 230 which allows

7  challenges, Ms. Stewart-Reid?

8  **A.**   I'm aware of the -- that it allow challenges.

9  **Q.**   Okay.  Do you know who decides if there's probable cause

10  to contact a voter who shows up to vote?

11  **A.**   I'm aware that the challenges go to the board of

12  elections.

13  **Q.**   Okay.  And what do they do with them?

14  **A.**   There's -- they review them and whether or not they

15  should be upheld or not.

16  **Q.**   Okay.  Do you know what standard they're using in trying

17  to decide if the voter should be asked for information about

18  their residency?

19  **A.**   I don't know what specific standard --

20        MS. LAWRENCE-HARDY:  Your Honor, we have the same

21  objection.  We've gone beyond the scope of the direct.

22        THE COURT:  This witness did testify,

23  Ms. Lawrence-Hardy, about getting the lists from the board of

24  elections.  I think she can testify about the lists.  As far

25  as anything beyond what -- getting the list and what the board

1  of elections can do with the list, I think she didn't get into

2  that.  But she did testify about getting the lists from the

3  board of elections and why she got the list.  So she can

4  testify about that part.

5          MR. POWELL:  I don't have many more --

6          MS. LAWRENCE-HARDY:  Your Honor, I would just also

7  add to our objection that any testimony around the standard,

8  et cetera, really calls for a legal conclusion, and, of

9  course, Ms. Stewart-Reid is here as a lay witness.

10          THE COURT:  Let's just keep it to basically what she

11  testified to on direct.

12  BY MR. POWELL:

13  Q.    Let me just ask, are you -- when you refer to the

14  challenges that were made against some of the co-plaintiffs,

15  for example, plaintiff Scott Berson, do you have any

16  familiarity with that challenge?

17  A.    I'm aware that he is a defendant (sic) in this case.

18  Q.    Okay.  And are you aware of any evidence connecting Scott

19  Berson to a challenge initiated by a defendant?

20          MS. LAWRENCE-HARDY:  Your Honor --

21          THE COURT:  Yeah, I'll sustain that objection.

22  BY MR. POWELL:

23  Q.    All right.  You talked about sending out volunteers to

24  the boards of election.  How many volunteers did you send out?

25  A.    What I said was that Democracy -- are you talking about

1  Democracy Watch?  We have 400 volunteers in Democracy Watch.

2          THE COURT:  I think he's talking about you sending

3  volunteers out to get the challenge.

4          THE WITNESS:  To receive the lists?

5          THE COURT:  Yes.

6          THE WITNESS:  I'm not sure the exact number of

7  volunteers, but I know there were several volunteers who were

8  sent.

9          MR. POWELL:  One moment, Your Honor.

10          THE COURT:  Yeah.

11          We need to move on.

12  BY MR. POWELL:

13  **Q.**   Ms. Stewart-Reid, when you got the lists of the voters

14  who had been challenged, what did you do with those?  Or what

15  did Fair Fight do with those?

16  **A.**   Sure.  So we took those lists, we analyzed them to see,

17  like, who's on the list, who was on there.

18  **Q.**   I see.

19          Do you know how many counties you had lists for?

20  **A.**   I'm not sure the total we received.  We, of course, would

21  have tried to receive all of them, but I'm not sure that we

22  received -- I'm sure we did not receive all of them.

23  **Q.**   Do you know anything about the analysis that you

24  performed on the lists?

25          MS. LAWRENCE-HARDY:  Objection, Your Honor.  Again,

1  we would argue this question is not probative.  We argue it

2  would be prejudicial.  We obviously have a First Amendment

3  concern about any analysis that Fair Fight would have

4  performed internally.  But our overriding objection is that

5  this is -- is not relevant evidence.

6           THE COURT:  I'll allow the question.

7           Ms. Stewart-Reid, you had testified that they

8  obtained the lists.  I'll allow questions why did they obtain

9  the lists.  But as far as anything more than that, I agree,

10  you're going to need to provide a little more expertise -- not

11  that you don't have expertise.

12          THE WITNESS:  No.

13          THE COURT:  Let's just go with that, okay?

14          MR. POWELL:  Your Honor, I don't have any more

15  questions.

16          THE COURT:  Thank you, sir.

17          Redirect?

18          MS. LAWRENCE-HARDY:  Yes, Your Honor.  Briefly.

19  REDIRECT EXAMINATION

20  BY MS. LAWRENCE-HARDY:

21  **Q.**   Ms. Stewart-Reid, my colleague asked you about voters

22  hearing from Fair Fight.  And you spoke about the resources

23  Fair Fight is dedicating to staying on top of the IV3 program

24  and information that may be -- voters may be hearing about

25  that program.

1    Whether or not that program actually goes live, whether

2    it works, whether it's successful, will Fair Fight continue to

3    allocate resources to responding to True the Vote's activities

4    absent relief by this Court?

5    **A.**   Yes.  We will have to continue to respond unless we

6    get -- unless something changes.  So we'll continue to have

7    Democracy Watch, we'll continue to have those 400 volunteers

8    monitoring, particularly for challenges, unless something

9    changes.

10   **Q.**   And you were asked if Fair Fight volunteers collected

11   challenge lists specifically submitted by True the Vote.  Are

12   you aware of Fair Fight receiving copies of challenges that

13   were submitted by one or more of the defendants?

14   **A.**   Yes.

15   **Q.**   And can you tell us, please, when you're -- again, when

16   voters are hearing from Fair Fight, Inc. and going forward,

17   what are the messages for challenged voters that Fair Fight is

18   communicating?

19   **A.**   We want to make sure they know that they have resources

20   available to them.  That, like, if they are being challenged,

21   what -- what that entails and so they are prepared and can

22   respond so that can be ready, so they can vote.  So it's

23   making sure they know they have resources available.

24         MS. LAWRENCE-HARDY:  No further questions.  Thank

25   you.

1          THE COURT:  Recross?

2    RECROSS-EXAMINATION

3    BY MR. POWELL:

4    **Q.**   Ms. Stewart-Reid, you mentioned just now that you got

5    challenge lists from defendants other than True the Vote?

6          MS. LAWRENCE-HARDY:  Objection, Your Honor,

7    mischaracterizes the testimony.

8          THE COURT:  I can't remember the exact answer.  I

9    guess -- let me do this, Ms. Lawrence-Hardy and Mr. Powell.

10         Did you get lists from anybody else?

11         THE WITNESS:  We were just -- we were getting the

12   lists that were filed.  And so whatever list that was, we got

13   and -- we know that some of -- we know that some of them came

14   from True the Vote specifically.

15         THE COURT:  My understanding is that the lists

16   you-all got all came from the board of elections in different

17   counties.

18         THE WITNESS:  Right.  They were e-mailed -- we would

19   get them e-mailed or received in paper form from the Board of

20   Election.  But we could see in some of them that they started

21   at True the Vote.

22   BY MR. POWELL:

23   **Q.**   Okay.  Did any of those lists come from defendants other

24   than True the Vote, to your knowledge?

25   **A.**   I'm not sure.

1  **Q.**   Do you know if there were any of those challenge lists

2  that came from parties -- people who aren't even parties to

3  this case?

4  **A.**   I'm not aware of that.

5  **Q.**   Okay.

6        MR. POWELL:  That's all, Your Honor.

7        THE COURT:  Thank you, ma'am.

8        THE WITNESS:  Thank you.

9        THE COURT:  Call your next witness.

10       MR. NKWONTA:  Your Honor, plaintiffs call Scott

11 Berson to the stand.

12       THE COURT:  All right.  Thank you.

13       Mr. Berson.

14       I thought we invoked the rule of sequestration.

15       MS. LAWRENCE-HARDY:  I'm sorry, Your Honor?

16       THE COURT:  I thought we invoked the rule of

17 sequestration in this case?  If we did we need to.  Unless

18 you-all don't want to invoke it.

19       MR. NKWONTA:  We do not plan to invoke the rule, Your

20 Honor.

21       MR. WYNNE:  We do wish to invoke the rule, Your

22 Honor.

23       THE COURT:  Okay.  All witnesses need to be outside,

24 not inside the courtroom.

25       MR. WYNNE:  I assume there's an exception for

1   parties?

2           THE COURT:  The parties can stay in.

3           THE DEPUTY CLERK:  Raise your right hand, please.

4                        ******

5                     SCOTT SAMUEL BERSON,

6           having been duly sworn, testified as follows:

7                        ******

8           THE DEPUTY CLERK:  Have a seat.  If you would please

9   state and spell your name for the record.

10          THE WITNESS:  My name is Scott Samuel Berson.

11  S-c-o-t-t, S-a-m-u-e-l, B-e-r-s-o-n.

12          THE COURT:  Hold on one second.

13          Are you-all excusing Ms. Stewart-Reid?  Is she

14  excused?

15          MR. WYNNE:  Your Honor, we are not excusing her.

16          THE COURT:  She's the representative for Fair Fight?

17          MS. LAWRENCE-HARDY:  She is.  She's --

18          THE COURT:  All right.  Then she can stay in because

19  she's representing Fair Fight.

20          MR. WYNNE:  Okay.  Of course.

21          THE COURT:  Okay.

22          MS. LAWRENCE-HARDY:  Thank you, Your Honor.

23          THE COURT:  All right.  Would you state your name

24  again, sir?

25          THE WITNESS:  Of course.  Scott Samuel Berson.

1          THE COURT:  Okay.  And you need to speak up a little

2     bit louder.

3          THE WITNESS:  Will do.

4          THE COURT:  You may proceed.

5          MS. MENG MORRISON:  Good morning, Your Honor.  My

6     name is Tina Meng Morrison for plaintiffs.

7          THE COURT:  All right.

8     DIRECT EXAMINATION

9     BY MS. MENG MORRISON:

10    **Q.**   Good morning, Mr. Berson.

11    **A.**   Good morning.

12    **Q.**   Do you know why you're here today?

13    **A.**   Yes.  To speak about my experience at the 2021 runoff in

14    Georgia.

15    **Q.**   And before we get into the details of that experience,

16    can you tell us where you lived during that period of time?

17    **A.**   I was living in Muscogee County at that time.

18    **Q.**   And do you still live in Muscogee County now?

19    **A.**   I do not.  Not anymore.

20    **Q.**   Where do you currently reside?

21    **A.**   I currently live in Pittsburgh, Pennsylvania.

22    **Q.**   And how long have you lived in Pittsburgh?

23    **A.**   Only about three months.

24    **Q.**   And why did you decide to move to Pittsburgh?

25    **A.**   My partner and I got some job opportunities in Pittsburgh

1   and we decided that that was the right step for us to take at

2   this time.

3   **Q.**    Now, Mr. Berson, I'd like to ask you a few questions

4   about your personal background.

5        Starting from the beginning, where were you born?

6   **A.**    I was born in Danbury, Connecticut.

7   **Q.**    And at what point did your family move to Georgia?

8   **A.**    We moved around 1999.

9   **Q.**    And how old were you at that time?

10  **A.**    Would have been about four years old.

11  **Q.**    And where did your family move to in Georgia when you

12  guys arrive?

13  **A.**    We moved to Johns Creek, Georgia in North Fulton County.

14  **Q.**    How long did you live in Johns Creek, Georgia?

15  **A.**    I lived in Johns Creek from that time when we moved until

16  the fall of 2013.

17  **Q.**    And why did you leave Johns Creek in 2013?

18  **A.**    I left to attend college at Georgia Southwestern State

19  University in Americus, Georgia.

20  **Q.**    And how many years did you spend at Georgia Southwestern

21  State University?

22  **A.**    Just one academic year.

23  **Q.**    And what time period would that have been?

24  **A.**    So that would have been fall 2013 until the end of the

25  spring semester of 2014.

**Q.**    Where did you live after spring of 2014?

**A.**    After that, I moved to Columbus, Georgia, Muscogee
County, to attend Columbus State University.

**Q.**    What time period were you at Columbus State University?

**A.**    I was at Columbus State from that fall 2014 until
December of 2017 when I graduated.

**Q.**    And after you graduated in December of 2017, did you stay
in Muscogee County?

**A.**    Yes, I was still in Muscogee County.

**Q.**    And why did you stay in Muscogee County?

**A.**    I had -- that previous summer of 2017, I had gotten a job
at the local newspaper and had gotten an internship and then
was offered a full-time job.  And so I had that job through
that final semester and then just continued working there
after graduating.

**Q.**    And at any point did you leave that job?

**A.**    I left that job at the end of 2018, December 2018.

**Q.**    So between when you moved to Johns Creek, Georgia in 1999
and when you left Muscogee County at the end of 2018, did you
ever live outside of Georgia?

**A.**    No.

**Q.**    Now, I'd like to ask you a few questions about your
history as a voter, Mr. Berson.

        Are you registered to vote?

**A.**    I am registered to vote.

1   **Q.**   And when did you first register to vote?

2   **A.**   I first registered to vote, it would have been shortly

3   after I turned 18 in 2012.

4   **Q.**   Where were you living at the time?

5   **A.**   I was in Johns Creek at the time.

6   **Q.**   Have you ever changed your voter registration in Georgia?

7   **A.**   I have.  I've changed it -- I know I changed it when I

8   moved to Columbus, so that would have been around 2014.  And

9   then I changed it again to Glynn County when I moved to Glynn

10  County in very early 2021.  It was either late January or

11  maybe into February.

12  **Q.**   So between 2012 when you first registered to vote and

13  then when you updated your registration in February of 2021,

14  did you ever change your registration to another state?

15  **A.**   No.

16  **Q.**   You said you now live and work in Pittsburgh; is that

17  correct?

18  **A.**   That's correct.

19  **Q.**   Have you updated your voter registration to Pennsylvania?

20  **A.**   I have.  For the time being I have, yes.

21  **Q.**   And can you explain to the Court what you mean for the

22  time being?

23  **A.**   Well, you know, I grew up in Georgia.  I have a long-term

24  partner and we both grew up in Georgia.  We have family still

25  here, still in Muscogee County, in fact.  I love Georgia.  I

1   love Columbus.  I love Muscogee County.  So we're in

2   Pittsburgh now, you know, because we have an opportunity, but,

3   you know, we are leaving the option open to return if the

4   opportunity is available for us.

5   **Q.**   So, Mr. Berson, rewinding a little bit, I'd like to ask

6   you about your educational background and some of your work

7   experiences.  You mention that you spent one year and then

8   moved to Columbus State University.  Can you briefly explain

9   to the Court some of the activities and things you were

10  involved in while you were a student in Columbus?

11  **A.**   Sure.  The main thing was I was the -- the

12  editor-in-chief of the student newspaper.  That was The Saber.

13  It's now called something else.  It's called the Uproar now.

14  But I started out as a staff writing and became an editor.  I

15  was elected editor-in-chief.

16        And during that time, you know, I was getting really

17  involved in the life of the city.  I was able to meet, you

18  know, a lot of kind of movers and shakers in town.  You know,

19  I was able meet to Betsy Covington of the Communication

20  Foundation, Yen King of Midtown, different people who were

21  kind of involved in lots of cool things happening in the city

22  and in the region.  And my job was to kind of direct coverage

23  and let people know what was going on.

24        So that was -- that was what I did most of the time in my

25  undergraduate years.  I had some other things.  I was a tour

1   guide, a Segway tour guide for downtown.  I loved the city so

2   much that I actually just cold called them one day and asked

3   if I could be a tour guide.  So I did that for a little while.

4       And I also did some writing for Electric City Life, which

5   is kind of a web blog that promotes the city and is kind of

6   promoting arts and culture and things like that.  And I also

7   had some odd jobs as well at the school and at restaurant and

8   things.

9   **Q.**   So what did you do after you graduated college?

10  **A.**   So I had gotten the newspaper job.  I had gotten an

11  internship at the local daily people, the Ledger-Enquirer,

12  that summer of 2017.  And a little while into that, they

13  offered me a full-time position.  So I had been doing that

14  that whole last semester, graduated, and I continued to work

15  for the Ledger and its parent company eventually, McClatchy,

16  after graduating.

17  **Q.**   And how long did you work at the Ledger-Enquirer in

18  total?

19  **A.**   I worked there from -- so sometime that summer of 2017

20  until December of 2018.

21  **Q.**   And, Mr. Berson, why did you choose to leave your job at

22  the Ledger-Enquirer?

23  **A.**   Part of my time there -- I had gotten into journalism

24  because I cared about the city, I cared about Columbus, I

25  cared about our community.  That's why I was interested in

1  writing and journalism in the first place.  And partway

2  through my employment there I had been kind of promoted to the

3  national team, McClatchy, working remotely.  I still went in

4  to the newsroom and helped where I could, but I was writing

5  stuff that was of national news, viral, trending kind of news

6  remotely.  And I just wasn't happy.  I wanted to be back in

7  the community doing work that I wanted to, you know, for our

8  area.

9      And in conversations with my editors and people at the

10  time, it didn't seem like that possibility was going to be

11  open.  So at the end of that year I decided it was time for --

12  time for me to do something else.

13  Q.   And what was that something else?

14  A.   I decided to attend graduate school at Auburn University.

15  Q.   And how long was that program?

16  A.   That program was a two-year program.

17  Q.   What degree did you pursue when you started at Auburn?

18  A.   It was a master of community planning.

19  Q.   And can you just remind me, when did you begin that

20  program?

21  A.   I began the program in January of 2019.

22  Q.   So, Mr. Berson, you've previously spoken about your

23  passion for Columbus and Muscogee County.  Why did you choose

24  to go to Auburn for grad school?

25  A.   Well, there are two main reasons.  One is just I really

1  wanted to leave that job at the time.  I was really unhappy.

2  And the two schools that had comparable programs in Georgia, a

3  city planning, urban planning program, Georgia Tech and UGA at

4  the time, based on just the way that their enrollment system

5  worked and applying, I would have had to wait another six

6  months or even a year to get in or to apply.  Auburn lets you

7  start every semester.  So I was able to start, you know, as

8  early as that January.  So that was one reason.

9        The other reason was that Auburn is really close to

10 Columbus.  It's 45 minutes to an hour away.  It's very tied

11 into the -- kind of the culture of the region.  And I, you

12 know, Georgia Tech is a little bit further, UGA is quite a bit

13 further, and I wanted to stay close.  I mean, my family was

14 there at the time still and all the people I knew, my friends,

15 places I liked to go to were all in Columbus.  And going only

16 this short distance to graduate school kind of in the same

17 area I was familiar with allowed me to continue to visit them,

18 to continue to be involved in kind of the life of the city.

19 **Q.**   So, Mr. Berson, I'd like to ask you a little bit about

20 your master's program.  When the program started in January of

21 2019, where were you living?

22 **A.**   I was living in Auburn in an off-campus apartment.

23 **Q.**   And did you have a driver's license at the time?

24 **A.**   I did.

25 **Q.**   What state was issued your driver's license?

**A.**    It was a Georgia driver's license.

**Q.**    And when you started your master's program, did you update your license or change it to a different state?

**A.**    No.

**Q.**    Did you have a car at the time?

**A.**    I did have a car.

**Q.**    Was it registered?

**A.**    It was registered.

**Q.**    And with what state?

**A.**    In Georgia.

**Q.**    When you started your master's program did you update or change that registration at all?

**A.**    I did not.

**Q.**    Did you change your voter registration from Muscogee County to Alabama?

**A.**    I did not.

**Q.**    And were you paying any bills when you started the program?

**A.**    When I started, yes, I was paying my auto insurance bill, my phone bill, I imagine, and my car note at least.

**Q.**    And what address did you have on file for those bills at the time?

**A.**    It would have been my Muscogee County address.

**Q.**    Mr. Berson, when you moved to Auburn from Muscogee County, did you update anything as a result?

1  **A.**   I did update my mailing address when I moved.

2  **Q.**   And why did you feel the need to update your mailing

3  address when you started your program?

4  **A.**   Well, the point of the program was -- it was -- it was a

5  residential program in the sense that you were working -- you

6  were supposed to be really involved.  You were supposed to

7  work kind of late into the night on studios, work with your

8  professors, kind of being involved with your cohort learning

9  and doing things, writing plans and talking over solutions.

10  And I -- I wanted to get full advantage of that and not have

11  to spend all this time driving back and forth every single day

12  to go to classes and things.

13      So I decided to change my mailing address so that I could

14  continue to get correspondence, packages.  You know, I had

15  stuff about student loans that I was -- that I needed to make

16  sure I was getting mail from.  And, you know, I just needed to

17  have the ability to get mail and correspondence and packages

18  and things without having to drive back to Georgia every

19  single time I needed to pick something up.

20  **Q.**   Can you explain why you chose not to update your driver's

21  license, car registration, and things like your bills to

22  Alabama when you started your master's program?

23  **A.**   Sure.  Frankly, it never crossed my mind.  I always

24  considered myself a Georgian, and a Columbusite is how they

25  say it.  I never intended to become an Alabama resident.  You

1  know, I was in Auburn for school.  And Auburn is great.
2  Auburn's fine.  It's a good city.  But, you know, I didn't
3  consider myself, you know, moving to Alabama permanently.  I
4  was there for school and I had always just had the assumption
5  that I was going to go there for school and then return to
6  Columbus, hopefully, and find work in the city that I really
7  loved.
8  **Q.**   While you were a student at Auburn, did you hold any
9  jobs?
10 **A.**   Yes.  I was a -- at Auburn I was a graduate research
11 assistant for three of the four semesters.  And then I had a
12 freelance position in Columbus doing some writing and
13 copyediting for a monthly print arts and entertainment
14 magazine called The Local, which is kind of an events calendar
15 and different features on artists and things like that.  And
16 so I was doing that remotely.  And I still have that position
17 today, actually.  I still have it.
18 **Q.**   During your time at Auburn, did you ever return to
19 Georgia?
20 **A.**   I did very frequently, two to three times a month, I
21 would say.  And during breaks, as much as I could.
22 **Q.**   And why did you return to Georgia or Muscogee County with
23 such frequency while you were in school?
24 **A.**   You know, I really -- like I said Auburn -- Auburn is
25 fine, Auburn's great, but I was there for school.  I was there

1  for, you know, the experience of talking to my classmates.

2  And if that wasn't happening, I wanted to be back in Columbus.

3  I wanted to be back in the places that I cared about and with

4  my friends and my family.  And that was where I was involved

5  and that's where, you know, I was familiar with and that's

6  where I wanted to go when I could, try to go back.

7  **Q.**    When did you graduate from your master's program?

8  **A.**    I graduated in December of 2020.

9  **Q.**    And between January 2019 when you started your program

10  and December 2020, did you vote in any elections?

11  **A.**    I did.  I voted in the primary and general election.

12  **Q.**    And what manner of voting did you use to vote in those

13  elections?

14  **A.**    I voted in person.

15  **Q.**    Did you ever run into any issues when you voted?

16  **A.**    No issues, no.

17  **Q.**    I'd like to spend some time now discussing December of

18  2020.  After you graduated from the program, where did you

19  choose to live?

20  **A.**    I returned to Muscogee County.

21  **Q.**    And do you recall approximately when that would have

22  been?

23  **A.**    Approximately -- I don't remember the exact date.  I

24  believe it was around December 10th.

25  **Q.**    And what was your intent in moving back to Muscogee

1  County?

2  **A.**   My intent was to move back to Muscogee County and begin

3  searching for work, hopefully and ideally in Muscogee County,

4  certainly in Georgia.  That was the intent.

5  **Q.**   And after you graduated, were you able to calmly search

6  for a job?

7  **A.**   No.  It was a very -- it was not a calm time.  It was a

8  very chaotic time.

9  **Q.**   Can you briefly elaborate for the Court what was going on

10  at the time in your life?

11  **A.**   Sure.  It is difficult to think back now, but it was the

12  height of the pandemic still.  It was still very much a scary

13  time.  As somebody else has said, that the vaccines were not

14  available, so it was still -- widely available, so it was

15  still a very stressful time as far as the pandemic going on.

16      But it was a very chaotic time for me just as a person.

17  I had finished graduate school and was trying to, you know, do

18  the process of relocating back to Muscogee County.  I was

19  working with my professor on trying to finish a book chapter

20  that whole time.  It was the holidays.  I was searching for

21  work.  I did not have -- I had this job at The Local, but it

22  was not full-time employment, so I was trying to find work

23  pretty quickly.

24      And then my partner, my long-term partner, had just

25  started a job that previous couple months ago in Floyd County,

1  Georgia, teaching full-time during the pandemic.  And she was

2  having a very difficult time.  And so I was spending a lot of

3  time kind of traveling up there for short periods, trying to

4  help her out, coming back, trying to sort my own stuff out.

5  So it was -- there was a lot going on.

6  Q.  And in the midst of all this, were you following what was

7  going on with the Georgia Senate runoff elections?

8  A.  I was, yes.

9  Q.  And why were you following the news?

10 A.  I think I've always considered it kind of part of a

11 person's civic duty to be following what's going on.  Probably

12 a lot of it is just aftereffects of me being a journalist, but

13 I always try to keep up-to-date with things going on and

14 especially things going on in Georgia.  I really -- you know,

15 I consider myself a Georgian.  I read Georgia things.  I

16 always assumed that I was going to go back to Georgia and so

17 these things were going to affect me.  So I was aware of this

18 case in particular, this election in particular, because it

19 was kind of both a nationally important election in the way

20 that it was kind of new and it's important to Georgia as well.

21 So I was aware.

22 Q.  And were you following news reports about the 2020

23 presidential election?

24 A.  I had been, yes.

25 Q.  And can you describe what the atmosphere felt like to you

1  at the time?

2  **A.**   The atmosphere, both in Georgia and the county, felt

3  extremely fraught.  I remember feeling -- in a way that I had

4  never experienced before.  I remember feeling like it felt as

5  though the country was on the verge of flying off the handle.

6  I think the atmosphere had this kind of air of desperation

7  about it.  And desperation, I think -- desperate people --

8  when people are desperate, I think it makes things

9  unpredictable.  And so that's kind of a scary thing, because

10 when people become desperate, I think a lot of the norms that

11 we're used to, things that we would expect in kind of normal

12 times, become less sure.

13 **Q.**   Given all of that, were you still planning to vote in the

14 Senate runoff elections?

15 **A.**   I did still plan to vote, yes.

16 **Q.**   And how did you plan to vote in that election?

17 **A.**   I planned to vote in person, as I always did.

18 **Q.**   Did you have any issues voting in the runoff election?

19 **A.**   I did, yes.

20 **Q.**   And can you just briefly describe what those issues were?

21 **A.**   In December I came across an article in the

22 Ledger-Enquirer newspaper which described that a Mr. Alton

23 Russell had filed a challenge to thousands of voters with

24 out-of-state mailing addresses.  I remember reading in that

25 article a line that talked about some people who may be

1  affected, including college students or students who had been

2  living outside of the state but had maintained residency in

3  Columbus were possibly on the list.  I remember reading that

4  and thinking, I sure bet that -- that is my case, so I sure

5  bet that maybe I'm on that list.

6  **Q.**    And can you recall where you read the article?

7  **A.**    I read it on the Ledger-Enquirer website.

8  **Q.**    And when you read this article, Mr. Berson, how did you

9  react?

10 **A.**    I remember reading it and my thought at the time was that

11 it seemed like it was targeting -- the challenge was an

12 attempt to kind of target people who, like me, were maybe

13 living in temporary situations and had to live outside the

14 state for some temporary reason, but were otherwise

15 completely -- you know, a completely reasonable reason.

16 College students who were, you know, living outside of state.

17 In my case, you know, only 40, 45 minutes away for college.

18 But also other people maybe, people maybe who had to go care

19 for a, say, family member or something for a longer period of

20 time, but had always intended to come back to Georgia.  But

21 this was kind of an attempt to throw up a barrier kind of at

22 the last minute and maybe discourage them from coming to the

23 polls.

24 **Q.**    Mr. Berson, you've stated that when you first read the

25 article you had a suspicion that perhaps you were also

1  challenged.  Were you ultimately challenged as a voter?

2  **A.**  I was ultimately challenged, yes.

3  **Q.**  And how did you discovery that information?

4  **A.**  A few days after reading the article, I got a call from a

5  community organizing group, I don't remember who it was or

6  what the exact time was, but they told me -- or they asked me

7  if I was aware that I was on a list of challenged voters.  And

8  I told them I was not sure but that I had read an article and

9  that I had suspected I might be.

10  **Q.**  And can you recall when you received that phone call?

11  **A.**  I don't remember exactly when.  It would have been a few

12  days after I had originally read the article.

13  **Q.**  And on that phone call, they confirmed you were a

14  challenged voter?

15  **A.**  They did, yes.

16  **Q.**  Can you describe to the Court what your reaction was when

17  you learned that you were a challenged voter on that call?

18  **A.**  When I actually learned that I had been challenged and

19  that, you know, I was now unsure if I was going to be able to

20  vote, I -- my reaction was, I think being overwhelmed,

21  especially in that situation that I was in, discouraged.  It

22  was -- it was a very discouraging and frustrating thing to

23  hear.

24       And it was -- it was -- it was intimidating to me to be

25  told that somebody had accused me of doing something wrong.

1   And that now I had to prove myself in a way that, you know,

2   I've never -- I never had to do before.  I'd done everything

3   the same way I always had.  I've always voted in person.  I

4   had always voted in Columbus.  And I was now told that

5   somebody had accused me of not being -- not being correct or

6   that I had done something wrong.  And that was very upsetting

7   and discouraging.

8   **Q.**   So, Mr. Berson, at this point in time, you've now found

9   out that you're a challenged voter.  So I'd like to ask you a

10  bit about your attempts to resolve those challenges.

11       You stated before you found out that you were challenged

12  you were seeking to participate in the runoff elections in

13  person.  Did you actually go to vote in person?

14  **A.**   I did, yes.

15  **Q.**   And around when was that?

16  **A.**   I believe it was December 28th.

17  **Q.**   And why did you take the time to go vote in person?

18  **A.**   I usually do vote in person, but in this case, I

19  specifically intended to vote in person.  I think because -- I

20  didn't know what this process was going to be.  I didn't know

21  what I needed.  I didn't know what was going to happen.  And I

22  thought that the best thing to do would be to go in person,

23  show my actual face, talk to actual people at the precinct

24  which I was very familiar with at the citizens service center

25  and, you know, try to resolve it there if I could, if there

1   was some way to resolve -- or at least get answers on how to

2   resolve it more clearly.

3       I was kind of unsure, you know, given the context of the

4   holidays, the pandemic, everything going on, I didn't know if

5   just -- I just didn't feel that dropping something off in the

6   mail or dropping something in a drop box, I wasn't -- I felt

7   like it was better to go in person and try to resolve it if

8   possible.

9   **Q.**   And can you describe for the Court what happened when you

10  showed up on Election Day to vote?

11  **A.**   I went into the precinct like I usually to do, just, you

12  know, handed my Georgia ID to the election workers.  This time

13  somebody went and got a supervisor and they pulled me aside,

14  told me I had been challenged, and that I needed to fill out a

15  provisional ballot.

16  **Q.**   And how did being pulled out of line and taken aside make

17  you feel?

18  **A.**   It didn't feel good.  This is something I had done many

19  times.  I voted in municipal elections, every election that I

20  could.  And it's always been, you know, a simple thing.  And

21  this felt suddenly like I was very -- very, othered.  It felt

22  isolating to kind of just now, never having happened before,

23  to be taken away, taken to a different section, kind of sat

24  down and told, look, now you need to fill out this extra thing

25  and prove yourself later.

1  **Q.**   And so did you vote a provisional ballot that day?

2  **A.**   I did, yes.

3  **Q.**   Can you describe what you did after you voted that

4  provisional ballot?

5  **A.**   So I submitted the provisional ballot.  I don't remember

6  exactly when, but some days later I called the election office

7  and asked, you know, where do I send proof, where do I send

8  residency documents, what do I need to do.  And they told

9  me -- they gave me Nancy Boren's e-mail address, she's the

10 elections supervisor, and told me to send them to her.

11 **Q.**   Did you end up reaching out to Ms. Boren?

12 **A.**   I did.

13 **Q.**   What did you do when you reached out to her?

14 **A.**   I -- I sent her a photo of my driver's license, my

15 Georgia driver's license, and a copy of my insurance bill that

16 had the -- my Muscogee County address on them.

17 **Q.**   And did you run into any hurdles trying to find those

18 pieces of documentation?

19 **A.**   Yes.  This was -- because of my situation, coming from

20 being out of state and just having a different mailing

21 address, it was shockingly difficult to find appropriate

22 documents.  I had my driver's license, which I always had been

23 fine, you know, I've always used my state ID, it's always been

24 up-to-date, it's been fine.  But because I was out of state,

25 everything had my mailing address on it at that time, because

1   I had just come back.

2        So it was very difficult, actually, to find what I

3   thought would be appropriate documents that proved that same

4   thing.  I would go -- I didn't have utility bills, you know, I

5   was living in apartments that were paid for by the landlord or

6   something or split with other people.  Leases were in Alabama.

7   And when I went to go look at a lot of my bills, a lot of

8   times there wasn't even an address on there.  It's just like a

9   list of payments and there's not really kind of an actual

10  document that you can have.

11       So it was actually quite difficult to find something.

12  And I struggled for quite a while before I finally was able to

13  locate the insurance bill.

14  **Q.**   What happened when you e-mailed Ms. Boren?

15  **A.**   I e-mailed those to her and she responded that that

16  would -- that I submitted sufficient information.

17  **Q.**   Mr. Berson, was being challenged as a voter during the

18  runoff elections intimidating to you?

19  **A.**   Yes.  It was intimidating to me to be accused of doing

20  something wrong, to be told I had done something wrong or that

21  I was thought to have done something wrong when I didn't --

22  just for participating the same way that I had always done in

23  the city that I had always loved, the city that I always, you

24  know, participated in in every other way.

25       And it was intimidating to me to be told that and not

1  know how I was going to resolve it.  Given my situation at the

2  time, and given kind of my period of crazy transition and not

3  knowing what my future was going to be, it was -- it was --

4  yes, it was a difficult -- it was a difficult thing.

5      MS. MENG MORRISON:  Well, thank you, Mr. Berson, for

6  sharing your story and coming here today.

7      No further questions, Your Honor.  I pass the

8  witness.

9      THE COURT:  Thank you.  Who will be doing the

10 questioning?

11     MR. EVANS:  Yes, Judge.

12     THE COURT:  You may proceed, Mr. Evans.

13 CROSS-EXAMINATION

14 BY MR. EVANS:

15 **Q.**   Mr. Berson, it's a pleasure to meet you.  My name is Jake

16 Evans.  I represent the defendants in this case.  I've got a

17 couple questions for you.

18     So throughout your testimony you said multiple times that

19 you're a Georgian, you're proud to be a Georgian, Georgia is

20 where you're home.

21     But you're not from Georgia, are you?

22 **A.**   I was not born in Georgia.

23 **Q.**   And you didn't move to Georgia until 1999; is that right?

24 **A.**   That's correct.

25 **Q.**   And your parents aren't from Georgia, are they?

1  **A.**   That's correct.

2  **Q.**   And when were you born?

3  **A.**   1994.

4  **Q.**   So for your first five years of your life, you didn't

5  live in Georgia, did you?

6  **A.**   I did not.  But I have barely any memory of Connecticut

7  whatsoever.  But yes.

8  **Q.**   And you don't live in Georgia now, do you?

9  **A.**   I do not.

10 **Q.**   And did you live in North Carolina at any point?

11 **A.**   I did, yes.

12 **Q.**   When did you live in North Carolina?

13 **A.**   I lived in North Carolina from July of 2021 until this

14 past July where we moved to Pittsburgh.

15 **Q.**   And why did you leave Georgia to go to North Carolina?

16 **A.**   Well, sometimes life takes us in interesting places.

17 I -- my partner has a very specific career field.  She trained

18 a very specific career at a Georgia university, in fact, and

19 she has a strong desire to work only at specific institutions

20 that would be supportive of her career.

21       She did work in Georgia, did not work out for other

22 reasons and she -- we decided to move to North Carolina so

23 that she could pursue her career of choice there.  And

24 similarly, similar reason, our recent move to Pittsburgh as

25 well.

1  **Q.**    And when you left North Carolina you didn't go back to
2  Georgia, did you?
3  **A.**    We did not.
4  **Q.**    You went to Pennsylvania; is that right?
5  **A.**    Pennsylvania, yes.
6  **Q.**    So in this case, have you ever spoken to any of the
7  defendants?
8  **A.**    Not that I'm aware of.
9  **Q.**    Do you know any of the defendants named in this case?
10 **A.**    I don't recall the exact times when I may have heard
11 them, but I don't believe -- I don't believe so before --
12 **Q.**    Who are the defendants in this case?
13 **A.**    I know True the Vote and then other parties, but...
14 **Q.**    So is True the Vote the only defendant you know in this
15 case; is that right?
16 **A.**    At this time, I don't -- I don't recall the entire
17 specifics.
18 **Q.**    So you haven't spoken to Catherine Engelbrecht at any
19 point in your life, have you?
20 **A.**    Not that I'm aware of.
21 **Q.**    And Ms. Engelbrecht's never directed a communication to
22 you, has she?
23 **A.**    Not that I'm aware of.
24 **Q.**    And you've never spoken to Derek Somerville at any point
25 in your life, have you?

1   **A.**   Not that I'm aware.

2   **Q.**   And Mr. Somerville's never directed a communication to

3   you, has he?

4   **A.**   Not that I'm aware of.

5   **Q.**   You've never spoken to Mark Williams at any point in your

6   life, have you?

7   **A.**   Not that I'm aware.

8   **Q.**   And Mr. Williams has never directed a communication to

9   you, has he?

10  **A.**   Not that I'm aware.

11  **Q.**   You've never spoken to Ron Johnson at any point in your

12  life, have you?

13  **A.**   Not that I'm aware of.

14  **Q.**   And Mr. Johnson has never directed a communication to

15  you, has he?

16  **A.**   Not that I'm aware of.

17  **Q.**   And you've never spoken to James Cooper at any point in

18  your life, have you?

19  **A.**   Not that I'm aware.

20  **Q.**   And Mr. Cooper has near directed a communication to you,

21  has he?

22  **A.**   Not that I'm aware of.

23  **Q.**   So, Mr. Berson, do you pay your own bills?

24  **A.**   Currently?  Yes.

25  **Q.**   In 20 -- well, yes.  Currently, do you pay your own

1  bills?

2  **A.**    Yes.

3  **Q.**    In 2020 did you pay your own bills?

4  **A.**    In 20 -- I paid some bills, yes.

5  **Q.**    What bills did you pay in 2020?

6  **A.**    I paid a phone bill, auto insurance bill and my car note,

7  and I believe some of the other -- I lived in three different

8  apartments when I was in Auburn.  I don't recall the exact

9  split of utilities throughout those.

10  **Q.**    So you paid your car note.  What else?

11  **A.**    My Progressive insurance bill.  And I imagine my cell

12  phone bill.

13  **Q.**    And when you signed up for Progressive insurance, what

14  all do you have to provide them to sign up to get insurance?

15  **A.**    I had had that insurance for a while.  I don't remember

16  what exactly I submitted to them.

17  **Q.**    So you don't know what you have to sign up for to get

18  insurance -- car insurance, is that right?

19  **A.**    I mean, I imagine I submitted information on the vehicle

20  and the mailing address.

21  **Q.**    So you would agree with me that you submitted your

22  mailing address when you signed up for car insurance, right?

23  **A.**    I would imagine so, yes.

24  **Q.**    And whenever -- how did you pay your car insurance?

25  **A.**    It was auto debited from a bank account.

1  **Q.**    So did you have an online portal in order to automate the

2  automatic payment; is that right?

3  **A.**    That's correct.  That's where I got the statement from

4  eventually.

5  **Q.**    And did you have a username and password to log on to

6  access your automotive insurance; is that right?

7  **A.**    I imagine so, yes.

8  **Q.**    So how difficult is it to log in and access a database or

9  your login and password for your automobile insurance?  How

10  difficult is that?  How long does that take?

11  **A.**    I -- I was -- that on its own perhaps is not particularly

12  difficult.  But I didn't know what was sufficient information

13  that on -- as far as proving my residency.  I don't know if

14  that was good enough.  That's what I eventually submitted.

15  But I attempted to find other things first.  But just finding

16  your username and password, perhaps, is not the most difficult

17  thing on its own.

18  **Q.**    So did you ask the election supervisor what was needed in

19  order for you to prove you -- your place of residence?

20  **A.**    Do you mean at the time when I cast the provisional

21  ballot?

22  **Q.**    Yes.

23  **A.**    I don't recall if I -- I don't believe so.  I don't

24  believe at the time that I asked for any additional

25  information.  I believe what happened was I filled out the

1  provisional ballot, she told me you'll need to prove your

2  residency at a later date.  And then I was -- you know, that

3  was it.

4          THE COURT:  What address was on your driver's

5  license?  Don't -- didn't you have to show your driver's

6  license?

7          THE WITNESS:  That's correct.

8          THE COURT:  What address was on it?

9          THE WITNESS:  It was my Muscogee County address.

10 BY MR. EVANS:

11 **Q.**   And did you show her your driver -- well, so --

12         MR. EVANS:  And that's a good question, Judge.

13         THE COURT:  Thank you.

14         MR. EVANS:  You're doing my job better than I am.

15 BY MR. EVANS:

16 **Q.**   So what address -- was the address on your driver's

17 license the same address that you were registered to vote for?

18 **A.**   Yes.

19 **Q.**   So what was the issue?

20 **A.**   That wasn't good enough.

21 **Q.**   So she said -- she told you she needed additional

22 affirmation of what your address was; is that right?

23 **A.**   That was my -- that was my assumption at the time.

24 **Q.**   And you said --

25         THE COURT:  Hold on, hold on.  Ask that question

1  again, because I didn't hear his answer.  She said she needed

2  more?  I think that was the question.  Ask it again,

3  Mr. Evans.

4          MR. EVANS:  Yeah.

5  BY MR. EVANS:

6  **Q.**  She said she needed more than -- she said she needed more

7  to affirm your address than what was on your driver's license

8  when it was the same address as on your voter registration?

9  **A.**  I believe so, yes.  Because I -- you give your driver's

10  license to vote.

11  **Q.**  If I told you that that was not appropriate election

12  administration, would you have any reason to disagree with

13  that?

14  **A.**  I couldn't say.

15  **Q.**  Is that a no?

16          MR. NKWONTA:  Objection, foundation, Your Honor.

17          MR. EVANS:  I'm asking him if --

18          THE COURT:  I'm going to allow that question.

19  Overruled.

20          THE WITNESS:  Could you ask that again?

21  BY MR. EVANS:

22  **Q.**  If I told you that that was inappropriate election

23  administration to require you to show an additional

24  affirmation on address whenever your driver's licenses address

25  matches your registration, would you have any reason to

1 disagree with that?

2 **A.** I don't believe so. But I don't recall specifics of what

3 was said at that time.

4 **Q.** Do you have any information or belief or testimony today

5 that any defendant in any way resulted in the election

6 administration official improperly requiring you to provide

7 additional layer of address affirmation?

8 **A.** I think that the fact that I was challenged in the first

9 place resulted in these things happening, but I don't have

10 further information than anybody directly in that way caused

11 anything.

12 **Q.** So outside of having to log in to your insurance and

13 getting an address and e-mailing it to anyone, is there any

14 other inconvenience that you felt in having to vote in the

15 runoff in 2020?

16 **A.** In this particular context, this was fairly difficult. I

17 had just moved back to Georgia and was preparing -- was trying

18 to find work, was helping my partner, was helping my family.

19 The timeline between the challenge, the election and then when

20 I eventually had to accept work somewhere else in Georgia was

21 extremely short. There were lots of things going on. There

22 was lots of uncertainty. So that was a challenge. It was a

23 difficult time. And I was not sure how I was going to resolve

24 it. So, yes, the experience was -- was challenging.

25 **Q.** So I'm going to add a different layer to hopefully add in

1  what you just said.

2       Outside of living life and life's normal obligations and

3  you having to log in and get your address and e-mail it to the

4  elections supervisor, is this anything else that caused you

5  inconvenience and frustration when you voted in 2020 in the

6  Senate runoff?

7  **A.**   I don't know if I dis -- I don't know if I would agree

8  with that characterization.

9  **Q.**   I'm asking is there anything else?  I want to get -- if

10 there's anything else, I want to hear what else it is.

11 **A.**   Not that I can say.

12 **Q.**   If I told you that a gentleman named Mr. Alton Russell

13 filed election challenges in Muscogee County, would that be

14 consistent with your testimony today?

15 **A.**   Yes, I believe so.

16 **Q.**   If I told you that True the Vote and no defendant in this

17 case was in any way affiliated with Mr. Alton Russell filing

18 those challenges, would you have any testimony today to

19 disagree with that?

20          THE COURT:  Hold on before you answer.  There's an

21 objection.

22          MR. NKWONTA:  Objection.  It assumes facts not in

23 evidence and lacks foundation.  It's asking the witness to

24 agree to facts not in evidence and have not been demonstrated

25 through any foundation.

1          MR. EVANS:  If I can respond, Judge?

2          THE COURT:  Yeah.

3          MR. EVANS:  I'm asking him what evidence or testimony

4    he has to disagree with that statement.

5          THE COURT:  I'll allow that over objection.

6          THE WITNESS:  I have no knowledge of that.  I can't

7    speak to that.

8    BY MR. EVANS:

9    Q.   So just so we get a clean record on this.  You have no

10   testimony to connect any of the defendants, True the Vote or

11   any of the individual defendants, to Mr. Alton Russell's

12   submission of vote challenges in Muscogee County; is that

13   right?

14   A.   I can't speak to it.  I don't have any personal

15   knowledge, no.

16         MR. EVANS:  So, Judge, I'm going to mark Defendants'

17   Exhibit 1, which is the interrogatory responses from

18   Mr. Berson.

19         If I may approach, Judge?

20         THE COURT:  Yes, you may approach.

21   BY MR. EVANS:

22   Q.   So, Mr. Berson, if you could flip through Defendants'

23   Exhibit 1.  Do you recognize that document?

24   A.   Yes, I do.

25   Q.   And what is that document?

1  **A.**   This is the interrogatory that I filled out in 2021

2  regarding this case.

3  **Q.**   And do you recall putting together each of those

4  responses?

5  **A.**   Yes, I believe so.  Yes.

6  **Q.**   So I want to refer you to Interrogatory No. 3.  Take your

7  time.

8          THE COURT:  Are you offering this?

9          MR. EVANS:  Yes, Judge.  I'll tender that for

10  admission.

11          THE COURT:  Any objections?

12          MR. NKWONTA:  No objection, other than the fact that

13  it doesn't match up with Exhibit 1 on the defendants' list.

14          MR. EVANS:  Oh, well, we can -- do we know what

15  exhibit it is?

16          MR. NKWONTA:  I just want to have a clear record of

17  the exhibit number.

18          MR. EVANS:  Yeah, that's fine.

19          THE COURT:  Well, hold on.  Do we have an exhibit

20  list for defendants?  I need an exhibit list -- I have an

21  exhibit up here for the plaintiffs.

22          MR. WYNNE:  Your Honor, as to all of the exhibits in

23  binders, we have them all printed out.  It's about 4,000

24  pages.  We'll bring them.

25          THE COURT:  The rules for the Northern District of

1  Georgia require you before the start a trial to submit an

2  exhibit list.  So you need to have an exhibit list.

3         MR. WYNNE:  Yes.  We filed it yesterday, Your Honor,

4  and provided a copy to opposing counsel.

5         THE COURT:  Did you receive correspondence from

6  Ms. Wright telling you that you need to have three copies of

7  the exhibit list at the trial?

8         MR. WYNNE:  Yes, Your Honor.

9         THE COURT:  All right.  So where are they?

10         MR. WYNNE:  We -- I beg my pardon, I don't -- I don't

11  have that list.  And I'm not so sure that plaintiffs have

12  provided a list, either.

13         THE DEPUTY CLERK:  Yes, they have.

14         MR. WYNNE:  Oh, they have?

15         Then it's on me, Your Honor.  And we're going to get

16  it.

17         THE COURT:  Well, here's what's going to happen.

18         Mr. Evans is not the issue, because you're not the

19  lead attorney in this case.

20         Unless I get a list I'm not going to accept this

21  exhibit because it has to match.

22         MR. EVANS:  Okay.  Judge, well, we will get that as

23  soon as possible.

24         MR. WYNNE:  We can get it over the lunch hour, Your

25  Honor.  We -- I have one copy in my hands right now.

1          THE DEPUTY CLERK:  Is that the same copy that was

2     filed?

3          MR. WYNNE:  Yes.

4          THE DEPUTY CLERK:  These "intentionally left blank,"

5     that has to be corrected.  That needs to match your premarked

6     notes.

7          THE COURT:  Let's do this.  Let's do this.  Again,

8     Mr. Evans, I know the correspondence was not with you, so you

9     don't know, but I'm not going to allow the exhibit in until I

10    get an appropriate list.  All right.  So once you get me an

11    appropriate list -- you may have to call this witness back as

12    your witness and we'll go from there.  Okay?

13         MR. EVANS:  Okay.

14         THE COURT:  You can proceed.

15         MR. EVANS:  All right, Judge.  Thank you.

16    BY MR. EVANS:

17    **Q.**   And I believe we're on Interrogatory No. 3, if you had a

18    chance to look through that.

19         THE COURT:  Well, he can't testify about something

20    not in evidence.  And this exhibit is not in evidence.

21         MR. EVANS:  Okay.

22         THE COURT:  He can't put his -- I'm not allowing you

23    to put it in evidence without a list.

24    BY MR. EVANS:

25    **Q.**   Earlier you testified that you found out about a list

1  that was published in the Columbus Ledger by a community

2  activist that informed you of that; right?

3  **A.**   I read the article myself.  Nobody informed me of the

4  article, if I understood your question correctly.

5  **Q.**   Did you find out -- would you agree with me that you

6  found out about your name being in that list by someone

7  calling you; is that right?

8  **A.**   That's correct.

9  **Q.**   And who was the person that called you?

10  **A.**   I don't remember who it was.

11  **Q.**   Was the person that called you in any way affiliated with

12  any of the defendants?

13  **A.**   I couldn't say.  I don't remember who it was.

14  **Q.**   Where did the person live?

15  **A.**   I don't remember.

16  **Q.**   Is the person a named defendant in this case?

17  **A.**   I could not say.

18  **Q.**   So you can't offer any testimony today that a person that

19  called you that informed you that you were on this list was in

20  any way affiliated with any defendant, can you?

21  **A.**   I can't say who called me.  I don't remember.

22  **Q.**   In your interrogatory responses, you refer to being

23  frustrating -- let me strike that.

24       Do you recall saying in your interrogatory responses that

25  having to find suitable identification and proof of residency

1   over and over again to vote every time I use my temporary

2   mailing address to receive packages and correspondence would

3   be extremely frustrated and burdensome?  Do you recall that?

4   **A.**   I recall that, yes.

5   **Q.**   Did you use the word "intimidating" anywhere in your

6   interrogatory responses?

7   **A.**   I did not use that in the interrogatory response, no.

8   **Q.**   And why did you not use it?

9   **A.**   I think I was speaking to the process, not necessarily

10  the challenge itself.  I think the process to prove your

11  residency over and over again is frustrating and burdensome.

12  But the idea of being accused itself is intimidating to me.

13  **Q.**   Why was the first time you used the word "intimidating"

14  today in your testimony at trial?

15  **A.**   I -- further thought?  I don't know.  I was -- that's

16  what I responded here was talking about the process.

17  **Q.**   So the reason why you used intimidating for the first

18  time at trial not in your discovery was because you were

19  talking about the process; is that right?

20  **A.**   Based on the questions that were asked in the

21  interrogatory, I suppose.

22  **Q.**   So what are you talking about today at trial that you

23  weren't talking about when you went to vote in your

24  interrogatory responses?

25  **A.**   I believe that the idea of being told you're doing

1   something wrong is intimidating to me.  And it's intimidating

2   to not know the correct way to respond to that and to have to

3   navigate that process.

4           THE COURT:  I've got some question that are

5   burdensome for the Court.

6           THE WITNESS:  Yes.

7           THE COURT:  Why didn't you say it earlier when you

8   were being questioned during interrogatories?

9           THE WITNESS:  Yes, sir.

10          THE COURT:  Why didn't you point that out then?

11          THE WITNESS:  I'm sorry?

12          THE COURT:  Why didn't you point out you felt

13  intimidated when you were being questioned through the

14  interrogatories?

15          THE WITNESS:  I can't recall.  I suppose the word

16  didn't come to mind at that time.

17  BY MR. EVANS:

18  **Q.**   Well, why did it now come to mind?

19  **A.**   Well, there's been time to sort of process it, I suppose.

20  **Q.**   Did anyone tell you to use the word "intimidating"?

21  **A.**   Nobody's directed me to use a specific word.

22  **Q.**   When you went to vote, did anybody yell at you?

23  **A.**   No, sir.

24  **Q.**   You would agree with me that when you went to vote nobody

25  threatened to take anything away from you, did you, as far as

1  property?

2  **A.**   No.

3  **Q.**   When you went to vote, did anyone threaten any type of

4  harm against you?

5  **A.**   Any type of harm?

6  **Q.**   Harm.

7  **A.**   No, sir.

8  **Q.**   Earlier you used the word that you felt as though someone

9  was telling you you did something wrong and that made you feel

10  intimidated; is that right?

11  **A.**   That's right.

12  **Q.**   What did someone tell you that you were doing wrong?

13  **A.**   The challenge -- I think being challenged has an implicit

14  assumption that you've -- are being accused of doing something

15  wrong.  That you are -- you know, you are attempting to vote

16  illegally.  That -- that was my feeling.

17  **Q.**   And that wrong was what?  What -- was the wrong -- would

18  you agree with me that the wrong was that you potentially

19  didn't live at an address in Muscogee County; is that right?

20  **A.**   That I was accused of living in Alabama permanently but

21  was still voting in Georgia.  That was what I was accused of.

22  **Q.**   Uh-huh.  But your driver's license said Muscogee County

23  right?

24  **A.**   That's correct.  It still did.

25  **Q.**   So outside of them saying you may not live in Muscogee

1  County, would you agree with me that no other threat,

2  coercion, statement was made that you were doing anything

3  wrong; is that right?

4  **A.**   With the idea being that you would not be able to vote,

5  that I would not be able to vote.  But yes, no other --

6  **Q.**   Were you able to vote?

7  **A.**   I was ultimately able to vote, yes.

8  **Q.**   Was your vote counted?

9  **A.**   It was ultimately counted.

10  **Q.**   Would you agree with me that you've moved a lot --

11  **A.**   I would agree --

12  **Q.**   -- in the past five to ten years?

13  **A.**   I would agree with you.

14  **Q.**   How many places have you lived in the past five to ten

15  years?

16  **A.**   A good many.  Seven or eight.

17  **Q.**   Seven or eight?

18  **A.**   Addresses.

19  **Q.**   Where all have you lived in the past five to ten years?

20  Go over them again for the Court, just so Your Honor can hear

21  it.

22  **A.**   Do you mean places within cities or do you want specific

23  locations?

24  **Q.**   Everywhere.

25  **A.**   I've lived in Columbus, Georgia.  I moved within

1   Columbus, Georgia to different addresses.  Moved to Auburn.
2   Had three different apartments in Auburn.  Moved back to
3   Muscogee County briefly to look for work and hopefully to
4   stay.  Was not able to stay.  Wounded up moving to Glynn
5   County.  Moved to North Carolina six or seven months later.
6   Lived in one address in Morganton, North Carolina.  Moved
7   several months later to a different address in Morganton,
8   North Carolina.  Stayed there for roughly two years.  And have
9   now gone to Pittsburgh.
10  **Q.**   So you can agree with me, just so the record is clear,
11  that you have lived at a lot of places in the past five to ten
12  years, right?
13  **A.**   I have.  It's not been fun, but yes, I have had.
14  **Q.**   And you would agree with me that it's probably pretty
15  difficult for someone, based upon how many places you've lived
16  in the past 10 to 15 years, where your domicile really is;
17  right?
18  **A.**   I couldn't -- I don't know.  I couldn't agree with that
19  necessarily.
20  **Q.**   And why would you disagree with that?
21  **A.**   It's not like every move was intended to be temporary.
22  **Q.**   But how would -- how would the county board of elections
23  know where you intend your residency to be?
24  **A.**   I don't know how -- my intention, I think -- well, I
25  mean, are we talking about right now?  In the future?  Are we

1  talking about back when this happened?

2  **Q.**   I'm talking about in the past five to ten years, we got

3  agreement here you've moved a lot of places.

4  **A.**   That's true.

5  **Q.**   You've lived -- a lot.

6         MR. NKWONTA:  Objection, Your Honor.

7         THE COURT:  Hold on, hold on.

8  BY MR. EVANS:

9  **Q.**   What --

10         MR. EVANS:  I'm in the middle of my question.  I

11  don't know how you're objecting when my question is not even

12  out.

13         THE COURT:  Excuse me.

14         MR. NKWONTA:  It was a long question.  I thought he

15  was done, but it looks but it was longer.

16         MR. EVANS:  I was in the middle of a sentence.

17         THE COURT:  Well, hold on a second.

18         Do you have an objection?

19         MR. NKWONTA:  Yes, Your Honor.

20         THE COURT:  What's your objection?

21         MR. NKWONTA:  My objection is relevance to the extent

22  that they are talking about Mr. Berson's moves after, well

23  after, the 2021 runoff.  And the only relevant point in time

24  here is when he was challenged during the runoff election.

25         THE COURT:  He's saying why is the moves he made

1  after the '21 election relevant?

2         MR. EVANS:  It's relevant to show domicile is a

3  highly fact-intensive issues that county election boards

4  board, at the ultimate end of the day ask the voter where

5  their residence is.  And that's where the line of questioning

6  is leading to.

7         THE COURT:  That's important, but it's not important

8  in this case.  So let's move on to another question.

9         MR. EVANS:  Okay.

10  BY MR. EVANS:

11  **Q.**  So just so the record is clear, when you went to vote,

12  nobody terrorized you, did they?

13  **A.**  No.  I wouldn't describe it that way, no.

14  **Q.**  And when you went to vote, nobody threatened you, did

15  they?

16  **A.**  No individual threatened me, that's correct.

17  **Q.**  And when you went to vote, outside of someone asking you

18  to provide an affirmation of your address, nobody intimidated

19  you, did they?

20  **A.**  No individual person, no.

21  **Q.**  And you can't offer any testimony to in any way connect

22  True the Vote or any of the individual defendants with any

23  eligibility challenge that is alleged was made against you,

24  can you?

25  **A.**  I can only speak to my own experience and what I know.

1   But as far as I know, I know of what I read in the article

2   about Mr. Alton Russell and that's --

3           THE COURT:  That's not responding to his question.

4           Repeat the question again.

5           THE WITNESS:  Yeah, please repeat the question.

6           MR. EVANS:  Sure.

7           And, Madam Court Reporter, if you want to read it, I

8   don't know if I'll be able to get it out as good.

9           THE COURT:  Do your best.  She's got --

10          MR. EVANS:  Okay.  I got it.  I'll do it again.

11  BY MR. EVANS:

12  **Q.**   You can't offer any testimony today to in any way connect

13  True the Vote or any of the individual defendants with any

14  alleged eligibility challenge made against you, can you?

15  **A.**   I don't believe so.

16  **Q.**   Did you allow your voter registration in Georgia to go

17  deactivated?

18  **A.**   At what time?

19  **Q.**   At any point.

20  **A.**   Yes, I imagine so.  I did change my voter registration

21  when I moved to North Carolina.

22  **Q.**   So right now you're not a registered voter in Georgia,

23  are you?

24  **A.**   That's correct.

25  **Q.**   Where are you a registered voter right now?

1  **A.**   Currently registered in Pennsylvania.  I try to be active

2  in the life of the places that I'm living, so...

3  **Q.**   So when you went to vote -- and let me strike that, just

4  for clarity.

5       Earlier you testified that you're very familiar with the

6  community in Muscogee County; right?

7  **A.**   That's correct.

8  **Q.**   Are you very familiar with the poll workers and folks

9  that worked in election administration in Muscogee County?

10 **A.**   Very familiar, like with them individually?

11 **Q.**   Do you know who they are?

12 **A.**   No.  I know the name of Nancy Boren.  I know of her.

13 **Q.**   And is Ms. Boren who came in and told you that you needed

14 to provide an additional layer affirmation for your address?

15 **A.**   I believe she is the one who ultimately told me I needed

16 to prove my residency at a later time.

17 **Q.**   And did she tell you anything else?

18 **A.**   I don't recall.

19       MR. EVANS:  No further questions, Judge.

20       THE COURT:  Thank you.

21       Redirect?

22       MS. MENG MORRISON:  Yes, Your Honor.

23 REDIRECT EXAMINATION

24 BY MS. MENG MORRISON:

25 **Q.**   Mr. Berson, I'd like to talk to you about your

1  interrogatory responses.  Do you recall answering those

2  questions?

3  **A.**   I do.

4  **Q.**   And do you recall a question that said please describe

5  any and all documents or communications that led you to

6  believe that you would face future, quote, burdens associated

7  with being forced to reprove your residency?

8         THE COURT:  Go ahead.  Go ahead.

9  BY MS. MENG MORRISON:

10  **Q.**   Do you recall that question?

11  **A.**   Yes.

12  **Q.**   And do you recall responding that there were challenges

13  to maintaining suitable proof of residency at the time?

14  **A.**   I'm sorry, repeat that?

15  **Q.**   Do you recall responding to that question, how

16  challenging it was to find suitable proof of residency?

17  **A.**   I do.

18  **Q.**   And was that the reason why you described the process of

19  being challenged a challenging and frustrating experience?

20  **A.**   Yes.

21  **Q.**   Do you recall being asked in your interrogatories whether

22  or not you were intimidated by being challenged?

23  **A.**   I don't recall being asked that specifically, no.

24  **Q.**   Mr. Berson, were you ever deposed in this case?

25  **A.**   I was not.

**Q.**    So is this the first time you've testified in this

matter?

**A.**    Yes.

**Q.**    You previously were talking about getting your

Progressive bill.  To find the documentation you used to prove

your residency, was it a matter of just logging in?

**A.**    It was more than just logging in.  Like I said before, a

lot of the time on these websites all you have is just a list

of debits to your account.  There's no address associated with

it.  I know I ran into that problem with many of the other

kind of attempts that I had made to try to find a suitable

address.  And I know in this case I had to wind up finding a

specific section of the website where I could actually get a

physical copy, like an actual form that had my address on it.

**Q.**    And did you go to -- was Progressive the first place you

went to find residency documents?

**A.**    No.  I believe I tried other -- other -- other options.

**Q.**    And what were those other options?

**A.**    It would have been probably my -- my bank account, maybe

my other bills, my car loan.  And I don't remember exactly

what the problems were with each of them, but I imagine it was

the same issue that the mailing address had been updated.  But

it was different.  So it was an Alabama address because they

had my mailing address but no longer had my Muscogee County

address.

1   **Q.**   And do you know roughly how long it took you to find

2   proper documentation for residency?

3   **A.**   It was several hours at least.  I mean, I don't think I

4   spent a long, long time at one time trying to find them.  But

5   there was a lot of other things going on over this period of

6   time where I had to handle other fires that were going on.

7   And so this was something else that I had to try to manage

8   whilst all these other things were going on.  So I think over

9   the entire span, it was certainly several hours, I think,

10  trying to get things together.

11  **Q.**   And speaking of this time in your life, counsel asked you

12  beyond your normal life obligations if there were other things

13  going on in your life.  Was this period of life normal for

14  you?

15  **A.**   No.  It was a period of -- of -- it was a transition

16  period right after leaving graduate school and trying to find

17  full-time work in a new field.

18  **Q.**   And just to be clear, Mr. Berson, what was your domicile

19  in 2020 when you voted in the runoff election?

20  **A.**   In 2020?

21  **Q.**   Yes.

22  **A.**   I believe it was still -- still in Muscogee County was my

23  legal domicile.

24  **Q.**   Do you know all of Alton Russell's affiliations?

25  **A.**   I do not.

1    **Q.**    And if I told you that Alton Russell, the challenger who

2    submitted your list, had coordinated with True the Vote, do

3    you have any reason to dispute that?

4    **A.**    I have no reason to dispute that.

5    **Q.**    And, Mr. Berson, one final question.  What about being

6    challenged did you find to be intimidating?

7    **A.**    I just -- I -- I find the idea of being accused of doing

8    something wrong to be intimidating.  I -- especially, you

9    know, someone -- where you don't have the ability to

10   adequately defend yourself from any kind of claim like that.

11   I found -- I find the accusation that I had done something

12   illegal or that I had done something against -- that I had

13   done something wrong to be an intimidating experience for me.

14   I don't -- I like to do things correctly.  And for somebody to

15   come and say that I'd -- you know, had done something wrong or

16   I was accused of doing something wrong, I find -- I find to be

17   an intimidating experience for me.

18          MS. MENG MORRISON:  No further questions, Your Honor.

19   Thank you.

20          THE COURT:  Recross?

21          Thank you.

22          Recross?

23   RECROSS-EXAMINATION

24   BY MR. EVANS:

25   **Q.**    So, Mr. Berson, you said that what was intimidating was

1   someone that said you did something wrong.  Who said you did

2   something wrong?

3   **A.**   The acc -- the challenge was -- was an accusation that I

4   had done something wrong in my eyes.

5   **Q.**   Well, when you went to vote, who said you did something

6   wrong?

7   **A.**   Nobody in particular said anything other than said I was

8   challenged, which I had already known.

9   **Q.**   So they didn't tell you that you may not be able to vote

10   because you don't live in that county?

11   **A.**   I was told that I had been challenged and that I would

12   need to prove my residency at a later date.

13   **Q.**   And that made you feel intimidated?

14   **A.**   The challenge was what made me feel intimidated.  A

15   person at the election office did not.

16   **Q.**   But who made the challenge?  Do you know who made the

17   challenge?

18   **A.**   I knew that Alton Russell had made the challenge.

19   **Q.**   Okay.  Why didn't you sue Alton Russell?

20   **A.**   I was concerned with voting at the time.  I did not think

21   about who was the one to sue at the time.

22   **Q.**   You testified earlier that you got no testimony at all

23   for today that in any way connects any of these defendants to

24   the challenge.  Why did you sue these defendants?

25   **A.**   I only know what I -- what I've gone through.

1  **Q.**   Why did you sue defendants, many of which you don't know

2  the name of?

3  **A.**   I am -- I don't know of the specific connections between

4  these two, between Mr. Russell and the defendants, if there is

5  one.  I don't -- I'm not aware at this time to speak to it.

6  **Q.**   I understand that, but I just want the record to be clear

7  on this question.  The record so far says you have nothing to

8  connect True the Vote or any of these defendants with

9  Mr. Alton Russell or his eligibility, alleged eligibility

10 challenge against you.  So why did you sue them?

11 **A.**   I was aware of many accusations at the time of voter

12 fraud and of different voter hotlines and things going on at

13 the time, so I knew that there were organizations that were

14 pursuing these kinds of challenges.  I know that Alton Russell

15 was the one who filed the challenge --

16         THE COURT:  You really can't be the one making the

17 objections because you're not the one doing the questioning.

18 I understand about a couple other times, but the person doing

19 the questioning has to be the one doing the objecting.  So

20 thank you.

21         MR. NKWONTA:  My apologies, Your Honor.

22 BY MR. EVANS:

23 **Q.**   You can finish.

24 **A.**   Okay.  Yeah, let me --

25         THE COURT:  Hold on.  Now we have the person doing

1    the questioning objecting.

2          MS. MENG MORRISON:  Your Honor, I just want to object

3    to the extent that counsel is asking Mr. Berson about

4    privileged attorney/client communications about this case.

5    That's privileged.

6          THE COURT:  I agree.  He can't ask privilege, but he

7    can ask him why did he sue someone.  That's not privileged.

8    You know, he had to make the decision why did you sue

9    somebody.  Any conversation -- you know, if he says, if I

10   understand what he's going to say, if he says, well, my

11   counsel told me to say it, that would be privileged, but if

12   that's his answer.  I don't know what his answer is.  But he

13   can answer why he sued someone.

14          Do you have a follow up?

15          MS. MENG MORRISON:  I just object to the extent that

16   counsel is characterizing Mr. Berson's testimony as to Alton

17   Russell, they're mischaracterizing that testimony.

18          THE COURT:  Say that again.

19          MS. MENG MORRISON:  Just an objection to any

20   mischaracterizations that counsel has made.

21          THE COURT:  And what -- yeah, yeah.

22          MR. EVANS:  Judge, may I respond?

23          THE COURT:  Well, I don't think she's done.  She's

24   reading a note.

25          MS. MENG MORRISON:  Your Honor, to the extent that

1  counsel is characterizing the record as containing evidence

2  of -- about the lack of connection between Alton Russell and

3  True the Vote, we would object to that.  There's no foundation

4  in the record at this point.  Mr. Berson has not testified at

5  all to the connections between True the Vote and Alton

6  Russell.

7        MR. EVANS:  That's --

8        THE COURT:  Do you want to respond, Mr. Evans?

9        MR. EVANS:  Well, first of all, Judge, that's not

10  accurate.  He has.  I asked the question about making the

11  connection, you asked a question about it, I'm on cross.  To

12  the extent he wants to correct my characterization, he can do

13  it.  But the question is a simple question.

14        THE COURT:  I'm going to overrule the objection.

15        What's your other objection?

16        MS. MENG MORRISON:  That's it, Your Honor, for now.

17  BY MR. EVANS:

18  **Q.**  You may have --

19        MR. EVANS:  He may have forgotten the --

20        THE WITNESS:  Yeah, please repeat.

21        MR. EVANS:  I may need help remembering what that one

22  was.

23        THE COURT:  Basically, the way I understood the

24  question was why he sued.

25        MR. EVANS:  I think it was why he sued.  That's

1  exactly right, Judge.  That's exactly right.

2  BY MR. EVANS:

3  **Q.**  So to try to rearticulate it, you testified earlier you

4  can offer no testimony connecting any True the Vote or any of

5  the individual defendants to the alleged eligibility challenge

6  against you.  You don't know the individual defendant's name.

7  I gave you the opportunity to name them, you couldn't do it.

8  So why did you sue them?

9  **A.**  May I -- may I say that I would like to -- to defer to my

10  privileged information?

11  **Q.**  There -- this isn't privileged.

12  **A.**  Okay.

13  **Q.**  Why you sued a party is not privileged.

14  **A.**  I -- I was aware of various groups that were --

15       THE COURT:  Let me say this:  Don't tell us about

16  anything your lawyers told you, but you -- that question can

17  be answered.  That's all I have to say on it.

18       THE WITNESS:  I understand.

19       I'm -- I'm not -- I can't offer anything for that,

20  sir.

21  BY MR. EVANS:

22  **Q.**  So you -- to be clear for the record, you can't offer

23  anything about why you sued these defendants and hauled them

24  into court today, right?

25  **A.**  I do -- I know that Fair Fight (sic) was involved in

1  these challenges.  That's what I know.

2      MS. MENG MORRISON:  Your Honor, I'd just like to

3  renew my objection to the extent that Mr. Berson would reveal

4  any privileged communications.  And he's already said that,

5  you know --

6      THE COURT:  The only way I could -- excuse me for

7  interpreting.  I'm sorry.  Go ahead and finish.

8      MS. MENG MORRISON:  Mr. Berson already said that he

9  defers to any privileged conversations he had with counsel

10 about the filing of this case.

11     THE COURT:  Here's my response to both counsel, both

12 you all.  The only way I can resolve this is to ask him -- ask

13 Mr. Berson, did his counsel tell him who to sue.  And that's

14 the only way I can resolve that.

15     If the answer is, yes, my counsel told me to sue,

16 then we're talking about privilege.  But if the answer is, no,

17 my counsel did not tell me who to sue, then Mr. Evans keeps

18 going.  Now, of course, Mr. Evans might want to follow up on

19 something else.

20     MR. EVANS:  All right.  And I do have follow up,

21 Judge.

22     THE COURT:  Yeah.  But I got -- that's the only way I

23 can resolve it.

24     MR. EVANS:  And I can ask that question simply.

25 BY MR. EVANS:

1    **Q.**    Did --

2              THE WITNESS:  I understand.

3    BY MR. EVANS:

4    **Q.**    Did your counsel tell you to sue these defendants?

5    **A.**    My counsel is the one who advised me, yes, correct.

6              THE COURT:  All right.  In that case, it stops -- we

7    stop that aspect of the questioning.  But there's other

8    aspects of the questioning Mr. Evans can follow up on, just

9    not getting to what communication between the counsel and the

10   witness.

11             MR. EVANS:  Yup.

12   BY MR. EVANS:

13   **Q.**    And did you review the pleadings in this case before they

14   went out with your name on them?

15   **A.**    The pleadings?  What do you mean by --

16   **Q.**    The legal filings, the documents in this case, did you

17   review them before they were filed?

18   **A.**    I don't recall what specific documents I reviewed.  I did

19   review documents, but I don't remember what specifics ones at

20   which times.

21   **Q.**    So when documents were filed in this case, did you review

22   them before they were filed?

23   **A.**    I believe so.

24   **Q.**    You believe you did?

25   **A.**    I don't know which documents you're referring to.  I

1  remember my -- my documents that I submitted I've certainly

2  reviewed, yes.

3  **Q.**   And the documents that you reviewed with your name on

4  them, did you approve those documents to be filed?

5  **A.**   The documents that I have signed?  I believe so, yes.  If

6  I've signed them, yes, I would have reviewed them.

7  **Q.**   How did you find out about this case?  How did you

8  find -- strike that.

9       What led you to file -- again, to be clear, you are a

10  plaintiff -- and I'm sure your counsel has told you this.

11  You're a plaintiff that has sued defendants.  That is

12  something that shouldn't be taken lightly.  Why did you sue

13  these defendants?

14           MS. MENG MORRISON:  Objection, Your Honor.

15           MR. EVANS:  No --

16           MS. MENG MORRISON:  Asked and answered.

17           MR. EVANS:  This is not.

18           THE COURT:  Well, he has answered.  He sued the

19  defendants because his lawyers told him to sue the defendants.

20  But the question I have was is that would you have sued

21  anybody if somebody hadn't told you to.

22           MR. EVANS:  That's right, Judge.  Thank you.

23           THE WITNESS:  No.

24           THE COURT:  Okay.

25  BY MR. EVANS:

1   **Q.**   So you would not have -- just to be clear for the record,

2   you would not have sued these defendants had someone not told

3   you to sue them; is that right?

4   **A.**   I felt as though something had been done -- that

5   something was -- had been done wrong.  And I was advised by my

6   attorney -- by counsel as to how to proceed.  I would not sue

7   anybody for any reason.

8   **Q.**   Who told you to sue these defendants?

9          THE COURT:  Well, I think he's answered that.  He's

10  answered that.  His lawyers told him to sue them.

11  BY MR. EVANS:

12  **Q.**   How did you be -- how were you connected -- how did you

13  find your lawyers?

14  **A.**   I was contacted over the phone.

15  **Q.**   By who?

16  **A.**   I don't -- I don't remember exactly by who at the time.

17  **Q.**   What organization was that person affiliated with he?

18  **A.**   It's gone through -- there's been several developments.

19  I don't remember exactly what it was at the time.  It was the

20  firm -- it was -- at one point it was a firm called Perkins

21  Coie.

22          THE COURT:  Say that last name again?  Perkins?

23          THE WITNESS:  Perkins Coie --

24          THE COURT:  Coie?

25          THE WITNESS:  -- I believe.

1  BY MR. EVANS:

2  **Q.**  So Perkins Coie just called you out of the blue and said

3  hey?

4  **A.**  That's my recollection.

5       THE COURT:  Let me make sure I understand what you're

6  testifying to here.  Because this is important.  All of your

7  testimony is important, excuse me.

8       You would not have sued anyone if you hadn't been

9  contacted and told to sue.

10      THE WITNESS:  I had thought that something had been

11  done wrong and people --

12      THE COURT:  Hey, hey.  That's not my question.

13      THE WITNESS:  Yes.  Yes, sir.

14      THE COURT:  You would not have sued anyone if you had

15  not been contacted by someone, this Perkins group, and told to

16  sue.

17      THE WITNESS:  I -- at that time, probably not.  I

18  probably would not have initiated it myself.

19      THE COURT:  Thank you.

20      THE WITNESS:  Yes, sir.

21  BY MR. EVANS:

22  **Q.**  Not waiving anything about privilege, what did the person

23  tell you that led you to file --

24      THE COURT:  Wait a minute.

25      MR. EVANS:  Okay.  I'll strike that.  I'll strike

1  that.  That's fine.  That's fine, Judge.  I think we've gotten

2  a lot out of this already.

3  BY MR. EVANS:

4  **Q.**   Getting to you having to prove your residence, you

5  said -- you had your own bank account; right?

6  **A.**   Yes.

7  **Q.**   And what address was that bank account registered at?

8  **A.**   It was -- when I opened it, it was in Muscogee County.

9  But I remember having trouble getting documents that showed it

10  was still in -- the mailing address had changed.

11  **Q.**   Did you check your bank account every week?

12  **A.**   Relatively often.

13  **Q.**   Do you check it every day?

14  **A.**   No.

15  **Q.**   Do you check it every other day?

16  **A.**   No.

17  **Q.**   You checked it every three days?

18  **A.**   I couldn't tell you the exact frequency of when I check

19  my bank account.

20  **Q.**   Okay.  I'm just asking.

21      And on your bank account does it indicate where your

22  address is, account information, doesn't it?

23  **A.**   It indicates your mailing address.

24  **Q.**   It indicates your mailing address, right.

25  **A.**   That's correct.

**Q.**   And that is just when you log in, you go to your account
information, and there's your mailing addresses, correct?

**A.**   It is in your account information, correct, yes.

**Q.**   And that mailing address, you just testified, is your
Muscogee County mailing address, right?

**A.**   It was when I began the program, yes.

**Q.**   Was it in 2020 whenever you were asked to provide your
residency?

**A.**   The mailing address I believe had been updated.  The
mailing address had been updated to Alabama, so I could
receive correspondence from the bank.

**Q.**   So where -- where -- what all -- let's -- that's a good
point.

        What all did you update to your Alabama address?  Where
all -- so you said you were having difficulty identifying
Georgia address because you had moved to Alabama.  What all
had you moved to Alabama?

**A.**   I had -- it was just -- it was my mailing address and --

**Q.**   No, well --

**A.**   Sorry.

**Q.**   Let me just --

**A.**   I understand the question.

        THE COURT:  Well, let him finish his answer.  Let him
finish his answer.

        THE WITNESS:  I understand the question.

1          The only things that I can recall, the bank account

2     address had been changed to a new mailing address so I could

3     receive correspondence from the bank.  That may be all I can

4     recall.

5     BY MR. EVANS:

6     **Q.**   Where was your car loan -- car loan registered at?  Was

7     your car loan registered in Alabama?

8     **A.**   The loan itself?  I believe the car loan itself was --

9     the mailing address for the loan was -- had been changed to

10    Alabama.  I don't recall whether I had done it or if they had

11    done it automatically somehow through the change of address

12    form.

13    **Q.**   And your insurance was still in Muscogee County?

14    **A.**   That one was, correct.

15    **Q.**   What other payments -- well, let me strike that just

16    for -- I want to get this clean.

17         What other institutions do you recall that you had to

18    provide an address to in December 2020?

19              MS. MENG MORRISON:  Objection, Your Honor.  This is

20    outside the scope of the redirect.

21              MR. EVANS:  This is directly into --

22              THE COURT:  I thought he did testify to that on

23    direct before he moved --

24              MS. MENG MORRISON:  He testified to his Progressive

25    bill and that was it.

1          MR. EVANS:  He -- he was -- she -- I have written

2    down, and we can pull the transcript, Your Honor --

3          THE COURT:  Well, hold on.  I'm going to overrule the

4    objection.

5          Let me say this.  I always hate interrupting

6    cross-examinations, but I'm supposed to take a lunch break at

7    12:30.  So we'll may have to stop and let you come back and

8    finish your recross after 12:30 -- after the lunch break.

9          MR. EVANS:  That's fine.  And we can pause it now,

10   Judge, if that's easier for the Court.

11         THE COURT:  Yeah, let's do it right now.

12         MR. EVANS:  Okay.  We can do that, Judge.

13         THE COURT:  It's probably a good spot to stop right

14   here.  Thank you.

15         MR. EVANS:  All right.  Thank you.

16         THE COURT:  We'll be back at 1:30.  Thank you.

17   Everybody have a good lunch.

18         One thing.  Hold on.  Mr. Berson, you cannot discuss

19   your testimony with anyone during the lunch break.  Okay?

20         THE WITNESS:  Okay, fine.

21         THE COURT:  Thank you.

22         (Lunch break taken at 12:30 p.m.)

23         (Change of reporters.)

24

25

1                    C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6        I do hereby certify that the foregoing pages are a true
    and correct transcript of the proceedings taken down by me in
7   the case aforesaid.

8
         This the 26th day of October, 2023.
9

10

11

12

13        _____
          VIOLA S. ZBOROWSKI, CRR, CRC, CMR, FAPR
14        OFFICIAL COURT REPORTER

15

16

17

18

19

20

21

22

23

24

25

'

'21 [1] - 123:1

**1**

1 [6] - 11:12, 24:3, 27:12, 112:17, 112:23, 113:13
1-10 [1] - 1:8
10 [1] - 121:16
102 [1] - 3:5
10:33 [1] - 65:19
10:50 [1] - 65:19
10TH [1] - 92:24
11(B [8] - 19:14, 19:21, 20:6, 20:9, 20:12, 21:19, 24:13, 41:20
11(B) [1] - 21:6
11:00 [1] - 65:18
125 [1] - 3:5
129 [1] - 3:5
12:30 [3] - 143:7, 143:8, 143:22
14 [2] - 39:13, 50:11
15 [2] - 39:12, 121:16
15,000 [1] - 13:18
15-MINUTES [1] - 65:17
18 [2] - 51:25, 84:3
18-MONTH [1] - 26:6
19 [1] - 14:20
1965 [1] - 19:18
1994 [1] - 103:3
1999 [3] - 82:8, 83:18, 102:23
1:30 [1] - 143:16

**2**

2 [5] - 23:18, 24:1, 27:15, 27:25, 28:14
20 [3] - 14:21, 105:25, 106:4
2010 [2] - 30:25, 31:9
2012 [2] - 84:3, 84:12
2013 [3] - 82:16, 82:17, 82:24
2014 [4] - 82:25, 83:1, 83:5, 84:8
2017 [5] - 83:6, 83:7, 83:11, 86:12, 86:19
2018 [5] - 27:17, 83:17, 83:19, 86:20
2019 [6] - 25:20, 29:4, 29:13, 87:21, 88:21, 92:9
202 [1] - 35:7
2020 [30] - 9:18, 10:5, 10:12, 12:7, 13:14, 23:14, 25:3, 28:19, 28:21, 47:16, 47:19, 48:2, 48:8, 50:11, 51:25, 66:21, 69:17, 69:23, 92:8, 92:10, 92:18, 94:22, 106:3, 106:5, 110:15, 111:5, 128:19, 128:20, 141:7, 142:18
2021 [15] - 9:18, 16:10, 26:7, 28:22, 43:11, 55:21, 62:13, 63:10, 66:24, 81:13, 84:10, 84:13, 103:13, 113:1, 122:23
2023 [2] - 1:11, 144:8
20TH [1] - 19:1
21-2-217(A [1] - 39:11
230 [8] - 25:25, 35:8, 35:21, 37:18,

37:25, 38:3, 38:6, 73:6
250,000 [3] - 11:19, 12:11, 22:13
26 [2] - 1:11, 32:20
260,000 [1] - 67:24
26TH [1] - 144:8
27.3 [1] - 32:19
28TH [1] - 98:16
2:20-CV-0302-SCJ [1] - 1:4
2:20-CV-302 [1] - 4:20

**3**

3 [3] - 28:19, 113:6, 115:17
30 [7] - 9:10, 26:14, 26:15, 27:19, 28:7, 28:8, 32:17
31,000 [1] - 69:14
32 [1] - 8:16
35 [5] - 50:7, 50:15, 50:21, 50:25, 51:17
364,000 [3] - 31:23, 52:1, 67:10
3RD [1] - 28:20

**4**

4,000 [1] - 113:23
40 [1] - 96:17
400 [3] - 63:7, 75:1, 77:7
404-215-1479 [1] - 2:23
42 [4] - 51:22, 52:3, 52:7, 52:10
43 [1] - 3:4
45 [2] - 88:10, 96:17
48 [2] - 7:9, 8:13

**5**

5 [1] - 28:21
52 [1] - 14:19

**6**

6.9 [1] - 25:16
60 [1] - 3:4
60,000 [1] - 25:12
60-DAY [1] - 28:12
65 [2] - 22:13, 32:11
65-COUNTY [1] - 32:16

**7**

70,000 [2] - 11:1, 12:10
76 [1] - 3:4
78 [1] - 3:4

**8**

81 [1] - 3:5

**9**

9 [1] - 4:1
90 [4] - 25:24, 28:3, 28:8, 28:20
90-DAY [1] - 37:24
99.9 [3] - 11:25, 12:11, 14:9

**A**

A.M [1] - 4:1
A.M [2] - 65:19
A/K/A [1] - 40:15
ABILITY [3] - 56:3, 90:17, 129:9
ABLE [24] - 36:17, 44:23, 46:15, 47:13, 49:1, 51:23, 55:1, 56:20, 57:6, 57:25, 61:9, 85:17, 85:19, 88:7, 93:5, 97:19, 101:12, 120:4, 120:5, 120:6, 120:7, 121:4, 124:8, 130:9
ABSENT [2] - 17:22, 77:4
ABSENTEE [11] - 17:20, 17:21, 25:17, 29:11, 31:1, 31:4, 49:11, 51:2, 57:2, 59:22, 61:7
ABSOLUTE [2] - 25:4, 38:13
ABSOLUTELY [5] - 40:20, 49:23, 57:20, 61:24, 65:3
ABUSE [1] - 29:7
ACADEMIC [1] - 82:22
ACADEMY [1] - 14:4
ACC [1] - 130:3
ACCENTUATED [1] - 28:18
ACCEPT [4] - 32:22, 32:23, 110:20, 114:20
ACCEPTED [2] - 36:16, 36:22
ACCESS [3] - 18:15, 107:6, 107:8
ACCESSIBLE [1] - 21:15
ACCOMPLISH [2] - 18:9, 59:14
ACCORDING [1] - 16:18
ACCOUNT [13] - 41:15, 106:25, 127:9, 127:19, 140:5, 140:7, 140:11, 140:19, 140:21, 140:22, 141:1, 141:3, 142:1
ACCURACY [3] - 38:15, 40:3, 72:8
ACCURATE [2] - 38:16, 133:10
ACCUSATION [2] - 129:11, 130:3
ACCUSATIONS [4] - 14:8, 14:13, 24:11, 131:11
ACCUSED [10] - 24:2, 97:25, 98:5, 101:19, 117:12, 119:14, 119:20, 119:21, 129:7, 129:16
ACT [5] - 19:15, 19:20, 20:5, 21:24, 24:13
ACTION [1] - 4:19
ACTION [4] - 10:16, 10:17, 26:5, 31:7
ACTIONS [6] - 11:6, 22:16, 23:11, 41:12, 52:19, 61:25
ACTIVE [1] - 125:1
ACTIVELY [1] - 55:15
ACTIVIST [1] - 116:2
ACTIVITIES [42] - 19:23, 20:8, 23:9, 43:24, 47:2, 47:4, 47:8, 47:23, 47:25, 48:22, 49:4, 50:12, 51:3, 51:4, 51:8, 51:11, 52:25, 53:21, 53:23, 53:24, 54:1, 54:20, 55:19, 56:8, 56:14, 57:8, 59:9, 59:11, 59:12, 59:17, 59:18, 60:1, 60:5, 61:6, 61:20, 62:12, 63:11, 64:11, 67:1, 77:3, 85:9
ACTIVITY [10] - 23:5, 49:1, 49:14, 52:21, 62:1, 62:2, 62:14, 63:10, 64:1, 64:3

**ACTUAL**[4] - 98:23, 101:9, 127:14
**ADD**[3] - 74:7, 110:25
**ADDED**[1] - 41:6
**ADDITION**[3] - 38:19, 58:3, 59:1
**ADDITIONAL**[6] - 61:13, 107:24, 108:21, 109:23, 110:7, 125:14
**ADDRESS**[79] - 7:6, 8:15, 11:21, 12:20, 12:23, 12:24, 13:2, 13:14, 13:17, 13:18, 17:5, 19:23, 20:4, 21:5, 22:2, 31:18, 35:12, 36:4, 36:12, 71:25, 72:4, 89:21, 89:23, 90:1, 90:3, 90:13, 100:9, 100:16, 100:21, 100:25, 101:8, 106:20, 106:22, 108:4, 108:8, 108:9, 108:16, 108:17, 108:22, 109:7, 109:8, 109:24, 110:7, 110:13, 111:3, 117:2, 119:19, 121:6, 121:7, 123:18, 125:14, 127:9, 127:12, 127:14, 127:22, 127:23, 127:24, 127:25, 140:7, 140:10, 140:22, 140:23, 140:24, 141:4, 141:5, 141:9, 141:10, 141:14, 141:16, 141:18, 142:2, 142:9, 142:11, 142:18
**ADDRESS**[4] - 26:17, 71:19, 72:5, 72:8
**ADDRESSES**[9] - 25:19, 28:5, 37:16, 37:21, 40:11, 95:24, 120:18, 121:1, 141:2
**ADEQUATELY**[1] - 129:10
**ADJACENT**[2] - 13:20
**ADMINISTERS**[1] - 27:9
**ADMINISTRATION**[7] - 26:3, 27:8, 28:1, 109:12, 109:23, 110:6, 125:9
**ADMINISTRATIVE**[1] - 4:14
**ADMISSION**[1] - 113:10
**ADMIT**[1] - 27:13
**ADMITTED**[2] - 50:18, 52:5
**ADS**[7] - 44:3, 47:22, 48:24, 61:20, 64:23
**ADULTS**[1] - 45:11
**ADVANCE**[1] - 50:13
**ADVANTAGE**[1] - 90:10
**ADVISED**[2] - 136:5, 138:5
**ADVOCACY**[3] - 44:12, 44:22, 44:25
**ADVOCATE**[2] - 45:18, 62:19
**ADVOCATES**[1] - 45:5
**AFFECT**[2] - 62:2, 94:17
**AFFECTED**[3] - 32:24, 67:20, 96:1
**AFFILIATED**[4] - 111:17, 116:11, 116:20, 138:17
**AFFILIATIONS**[1] - 128:24
**AFFIRM**[1] - 109:7
**AFFIRMATION**[5] - 108:22, 109:24, 110:7, 123:18, 125:14
**AFORESAID**[1] - 144:7
**AFRICAN**[3] - 32:15, 32:17, 32:19
**AFTEREFFECTS**[1] - 94:12
**AFTERMATH**[1] - 10:5
**AGE**[2] - 15:6, 39:17
**AGENT**[1] - 30:7
**AGO**[2] - 8:14, 93:25
**AGREE**[19] - 5:25, 6:22, 32:2, 41:25,

76:9, 106:21, 111:7, 111:24, 116:5, 118:24, 119:18, 120:1, 120:10, 120:11, 120:13, 121:10, 121:14, 121:18, 132:6
**AGREED**[1] - 28:13
**AGREEMENT**[1] - 122:3
**AHEAD**[6] - 4:17, 9:7, 23:1, 126:8, 135:7
**AILEEN**[1] - 2:5
**AIMED**[2] - 62:14, 63:10
**AIR**[2] - 26:10, 95:6
**AIR**[1] - 13:24, 14:4
**AIRWAYS**[1] - 12:4
**ALABAMA**[14] - 15:9, 89:15, 90:22, 90:25, 91:3, 101:6, 119:20, 127:23, 141:10, 141:14, 141:16, 141:17, 142:7, 142:10
**ALARMED**[1] - 18:21
**ALIGN**[2] - 23:16, 47:25
**ALLEGATION**[1] - 40:6
**ALLEGATIONS**[1] - 20:15
**ALLEGED**[14] - 11:1, 12:20, 12:25, 13:14, 13:17, 13:24, 13:25, 14:5, 36:10, 38:2, 123:23, 124:14, 131:9, 134:5
**ALLEGEDLY**[1] - 13:1
**ALLEGRA**[1] - 1:15
**ALLEGRA**[1] - 4:25
**ALLOCATE**[1] - 77:3
**ALLOCATED**[1] - 62:22
**ALLOW**[11] - 25:23, 35:12, 37:19, 66:15, 73:8, 76:6, 76:8, 109:18, 112:5, 115:9, 124:16
**ALLOWED**[1] - 88:17
**ALLOWING**[1] - 115:22
**ALLOWS**[2] - 33:3, 73:6
**ALMOST**[2] - 14:21, 36:6
**ALONE**[2] - 39:23, 41:17
**ALONGSIDE**[1] - 16:13
**ALOUD**[1] - 41:6
**ALTON**[15] - 15:24, 35:25, 95:22, 111:12, 112:11, 124:2, 128:24, 129:1, 130:18, 130:19, 131:9, 131:14, 132:16, 133:2, 133:5
**ALTON**[1] - 111:17
**AMATEUR**[1] - 39:25
**AMBITIOUS**[1] - 34:4
**AMENDMENT**[6] - 22:16, 22:18, 23:10, 26:4, 42:5, 76:2
**AMERICANS**[3] - 32:15, 32:17, 32:19
**AMERICUS**[1] - 82:19
**AMOUNTING**[1] - 38:6
**ANALYSES**[1] - 27:13
**ANALYSIS**[7] - 17:14, 29:1, 30:7, 30:10, 40:7, 75:23, 76:3
**ANALYZE**[1] - 30:11
**ANALYZED**[1] - 75:16
**ANALYZING**[1] - 53:2
**AND**[2] - 1:3, 1:7

**ANDREWS**[1] - 13:24
**ANGLES**[1] - 46:7
**ANNOUNCED**[3] - 11:12, 24:3, 51:19
**ANNOUNCEMENT**[3] - 50:25, 51:19, 52:11
**ANNOUNCEMENTS**[1] - 60:5
**ANNOUNCING**[1] - 67:16
**ANONYMOUS**[1] - 41:15
**ANSWER**[11] - 66:16, 78:8, 109:1, 111:20, 132:12, 132:13, 135:15, 135:16, 141:23, 141:24
**ANSWERED**[5] - 134:17, 137:16, 137:18, 138:9, 138:10
**ANSWERING**[1] - 126:1
**ANSWERS**[1] - 99:1
**APART**[1] - 63:8
**APARTMENT**[2] - 16:19, 88:22
**APARTMENTS**[3] - 101:5, 106:8, 121:2
**APOLOGIES**[1] - 131:21
**APPARATUS**[1] - 23:18
**APPEAR**[2] - 6:12, 22:19
**APPEARANCE**[1] - 26:13
**APPEARANCES**[2] - 1:13, 2:1
**APPEARING**[1] - 35:17
**APPLICANT**[1] - 39:19
**APPLICANT'S**[1] - 39:15
**APPLY**[2] - 19:13, 88:6
**APPLYING**[1] - 88:5
**APPRECIATE**[2] - 8:3, 49:24
**APPROACH**[4] - 18:1, 49:16, 112:19, 112:20
**APPROPRIATE**[5] - 100:21, 101:3, 109:11, 115:10, 115:11
**APPROVE**[1] - 137:4
**APRIL**[2] - 25:20, 29:13
**AREA**[2] - 87:8, 88:17
**ARGUE**[1] - 76:1
**ARRAY**[1] - 17:14
**ARRIVAL**[1] - 47:5
**ARRIVE**[2] - 31:22, 82:12
**ARRIVED**[2] - 46:8, 47:8
**ART**[1] - 15:7
**ARTICLE**[12] - 15:12, 95:21, 95:25, 96:6, 96:8, 96:25, 97:4, 97:8, 97:12, 116:3, 116:4, 124:1
**ARTICLES**[1] - 34:21
**ARTISTS**[1] - 91:15
**ARTS**[2] - 86:6, 91:13
**ASHLEY**[1] - 1:15
**ASIDE**[2] - 99:13, 99:16
**ASPECT**[1] - 136:7
**ASPECTS**[2] - 73:1, 136:8
**ASSAULT**[1] - 14:17
**ASSEMBLY**[1] - 45:8
**ASSIGNED**[1] - 16:1
**ASSIGNMENT**[1] - 14:22
**ASSIST**[1] - 17:1
**ASSISTANT**[2] - 45:7, 91:11
**ASSOCIATE**[2] - 26:4, 33:15

**ASSOCIATED** [2] - 126:6, 127:9
**ASSUME** [3] - 21:17, 46:9, 79:25
**ASSUMED** [1] - 94:16
**ASSUMES** [2] - 70:17, 111:22
**ASSUMPTION** [3] - 91:4, 108:23, 119:14
**AT** [1] - 4:1
**ATHENS** [1] - 16:7
**ATLANTA** [2] - 1:2, 2:23
**ATLANTA** [7] - 4:4, 4:7, 4:8, 16:19, 17:8, 17:10, 44:10
**ATMOSPHERE** [3] - 94:25, 95:2, 95:6
**ATTEMPT** [5] - 39:8, 42:8, 96:12, 96:21
**ATTEMPTED** [2] - 42:7, 107:15
**ATTEMPTING** [3] - 19:16, 19:17, 119:15
**ATTEMPTS** [3] - 21:19, 98:10, 127:11
**ATTEND** [3] - 82:18, 83:3, 87:14
**ATTENDING** [2] - 15:14, 57:18
**ATTENTION** [4] - 11:9, 23:24, 34:10, 56:15
**ATTORNEY** [2] - 114:19, 138:6
**ATTORNEY/CLIENT** [1] - 132:4
**ATTORNEYS** [3] - 35:18, 41:3, 60:25
**ATTUNED** [1] - 26:2
**AUBURN** [17] - 87:14, 87:17, 87:24, 88:6, 88:9, 88:22, 89:24, 91:1, 91:8, 91:10, 91:18, 91:24, 106:8, 121:1, 121:2
**AUBURN'S** [1] - 91:2
**AUBURN'S** [1] - 91:25
**AUGUST** [2] - 28:20, 66:24
**AUTHORIZED** [1] - 23:6
**AUTHORIZES** [1] - 20:25
**AUTO** [3] - 89:19, 106:6, 106:25
**AUTOMATE** [1] - 107:1
**AUTOMATIC** [1] - 107:2
**AUTOMATICALLY** [1] - 142:11
**AUTOMOBILE** [1] - 107:9
**AUTOMOTIVE** [1] - 107:6
**AVAILABLE** [14] - 31:4, 38:1, 41:2, 41:3, 48:16, 53:3, 54:12, 54:18, 58:8, 77:20, 77:23, 85:4, 93:14
**AVERAGE** [1] - 38:22
**AVOIDING** [1] - 29:25
**AWARE** [39] - 31:14, 37:25, 48:12, 53:17, 63:12, 68:19, 69:16, 69:19, 70:14, 70:21, 70:23, 70:25, 72:3, 72:6, 72:7, 72:12, 73:8, 73:11, 74:17, 74:18, 77:12, 79:4, 94:17, 94:21, 97:7, 104:8, 104:20, 104:23, 105:1, 105:4, 105:7, 105:10, 105:13, 105:16, 105:19, 105:22, 131:5, 131:11, 134:14

---

## B

**B-E-R-S-O-N** [1] - 80:11
**BACKGROUND** [4] - 44:25, 45:22, 82:4, 85:6
**BALLOT** [14] - 15:2, 25:17, 31:1, 49:11, 51:3, 57:2, 59:22, 61:8, 99:15, 100:1, 100:4, 100:5, 107:21, 108:1
**BALLOTS** [5] - 10:11, 10:14, 12:6, 29:11, 31:4
**BANAL** [1] - 35:16
**BANK** [11] - 70:6, 106:25, 127:19, 140:5, 140:7, 140:11, 140:19, 140:21, 141:11, 142:1, 142:3
**BANKS** [4] - 55:24, 56:9, 70:2
**BANKS** [5] - 16:8, 34:25, 36:11, 36:14, 36:18
**BAR** [1] - 20:16
**BARELY** [2] - 26:13, 103:6
**BARRIER** [1] - 96:21
**BASE** [1] - 65:2
**BASE** [1] - 13:24
**BASED** [7] - 14:7, 25:21, 32:12, 40:11, 88:4, 117:20, 121:15
**BASELESS** [5] - 17:4, 21:2, 24:2, 38:11, 42:6
**BATTED** [1] - 34:18
**BECAME** [4] - 9:16, 56:1, 59:11, 85:14
**BECOME** [5] - 28:8, 43:9, 90:25, 95:10, 95:12
**BECOMES** [1] - 28:17
**BECOMING** [1] - 67:7
**BEFORE** [1] - 1:10
**BEG** [1] - 114:10
**BEGAN** [6] - 26:8, 30:17, 33:1, 36:3, 87:21, 141:6
**BEGIN** [3] - 25:11, 87:19, 93:2
**BEGINNING** [3] - 30:22, 46:10, 82:5
**BEHALF** [3] - 1:14, 1:20, 2:2
**BEHALF** [6] - 4:25, 5:8, 5:13, 43:4, 43:21, 66:6
**BEHIND** [1] - 27:6
**BELAFONTE** [1] - 6:23
**BELIEF** [3] - 38:9, 39:21, 110:4
**BELIEVES** [2] - 28:12, 28:13
**BELL** [1] - 2:5
**BERSON** [35] - 15:4, 16:2, 74:15, 74:19, 79:11, 80:10, 80:25, 81:10, 82:3, 83:23, 85:5, 86:21, 87:22, 88:19, 89:24, 96:8, 96:24, 98:8, 101:17, 102:5, 102:15, 105:23, 112:18, 112:22, 125:25, 126:24, 128:18, 129:5, 129:25, 132:3, 133:4, 135:3, 135:8, 135:13, 143:18
**BERSON** [1] - 79:13
**BERSON** [2] - 3:5, 80:5
**BERSON'S** [2] - 122:22, 132:16
**BEST** [3] - 14:8, 98:22, 124:9
**BET** [2] - 96:4, 96:5
**BETSY** [1] - 85:19
**BETTER** [5] - 25:22, 33:24, 34:17, 99:7, 108:14
**BETWEEN** [13] - 26:9, 28:8, 29:18, 60:9, 83:18, 84:12, 92:9, 110:19, 131:3, 131:4, 133:2, 133:5, 136:9
**BEYOND** [7] - 21:4, 35:4, 72:14, 72:20, 73:21, 73:25, 128:12

**BIDEN** [2] - 11:2, 12:10
**BIG** [1] - 44:21
**BIGGER** [1] - 27:15
**BIGGEST** [1] - 10:4
**BILL** [10] - 89:19, 89:20, 100:15, 101:13, 106:6, 106:11, 106:12, 127:5, 142:25
**BILL** [1] - 35:7
**BILLS** [11] - 89:17, 89:21, 90:21, 101:4, 101:7, 105:23, 106:1, 106:3, 106:4, 106:5, 127:20
**BINDER** [1] - 50:6
**BINDERS** [1] - 113:23
**BIT** [14] - 6:22, 43:14, 44:24, 54:3, 60:10, 63:15, 72:20, 73:3, 81:2, 85:5, 88:12, 88:19, 98:10
**BLACK** [1] - 64:16
**BLACKOUT** [1] - 37:24
**BLANK** [2] - 13:18, 115:4
**BLINDLY** [1] - 19:11
**BLOG** [1] - 86:5
**BLUE** [1] - 139:2
**BOARD** [19] - 27:1, 35:9, 36:16, 36:22, 40:4, 46:10, 53:7, 53:9, 53:11, 53:16, 54:7, 57:18, 73:11, 73:23, 73:25, 74:3, 78:16, 121:22, 123:4
**BOARD** [1] - 78:19
**BOARDS** [12] - 31:21, 34:11, 37:15, 37:19, 38:13, 39:10, 53:4, 53:13, 68:5, 68:7, 74:24, 123:3
**BOASTING** [1] - 34:13
**BOGUS** [1] - 25:11
**BOOK** [1] - 93:19
**BOOKS** [1] - 20:15
**BOREN** [4] - 100:11, 101:14, 125:12, 125:13
**BOREN'S** [1] - 100:9
**BORN** [5] - 16:6, 82:5, 82:6, 102:22, 103:2
**BORNE** [1] - 22:10
**BOTHERED** [1] - 18:20
**BOUNTIES** [4] - 40:17, 70:10, 70:13, 70:21
**BOUNTY** [8] - 11:12, 24:3, 37:9, 40:15, 40:18, 49:8, 59:20, 61:7
**BOX** [1] - 99:6
**BOXES** [5] - 11:14, 24:5, 31:5, 49:11, 51:3
**BRAD** [1] - 6:4
**BRAVE** [1] - 24:15
**BREAK** [8] - 54:21, 65:15, 65:17, 65:19, 143:6, 143:8, 143:19, 143:22
**BREAKS** [1] - 91:21
**BREWING** [1] - 25:16
**BRIEFLY** [6] - 45:22, 76:18, 85:8, 93:9, 95:20, 121:3
**BRING** [3] - 44:13, 55:7, 113:24
**BROAD** [1] - 10:17
**BRYAN** [1] - 1:16
**BUDGET** [2] - 46:6, 46:22

**BUDGETS** [1] - 46:12
**BUILDING** [1] - 10:17
**BURDENS** [1] - 126:6
**BURDENSOME** [3] - 117:3, 117:11, 118:5
**BURNS** [1] - 5:16
**BUSINESS** [3] - 30:7, 31:15, 39:16
**BUSINESSES** [1] - 31:12
**BUT..** [1] - 104:13
**BY** [45] - 43:1, 50:4, 50:23, 52:9, 53:20, 66:2, 66:19, 70:19, 73:5, 74:12, 74:22, 75:12, 76:20, 78:3, 78:22, 81:9, 102:14, 108:10, 108:15, 109:5, 109:21, 112:8, 112:21, 115:16, 115:24, 118:17, 122:8, 123:10, 124:11, 125:24, 126:9, 129:24, 131:22, 133:17, 134:2, 134:21, 135:25, 136:3, 136:12, 137:25, 138:11, 139:1, 139:21, 140:3, 142:5

# C

**CALENDAR** [1] - 91:14
**CALIFORNIA** [2] - 14:23, 42:4
**CALL-OUT** [1] - 41:6
**CALM** [1] - 93:7
**CALMLY** [1] - 93:5
**CAMERON** [2] - 5:16, 24:22
**CAMERON** [1] - 1:21
**CAMP** [1] - 13:25
**CAMPAIGN** [3] - 11:7, 23:17, 45:10
**CAMPUS** [1] - 88:22
**CANCEL** [1] - 27:4
**CANCELLING** [2] - 20:17, 20:21
**CANDIDATE** [1] - 25:7
**CANDIDATES** [2] - 27:2, 43:17
**CANNOT** [1] - 143:18
**CAR** [14] - 89:5, 89:6, 89:20, 90:21, 106:6, 106:10, 106:18, 106:22, 106:24, 127:20, 142:6, 142:7, 142:8
**CARD** [1] - 39:1
**CARE** [3] - 4:15, 29:23, 96:18
**CARED** [4] - 86:24, 86:25, 92:3
**CAREER** [4] - 103:17, 103:18, 103:20, 103:23
**CARES** [1] - 30:4
**CAROLINA** [11] - 45:25, 103:10, 103:12, 103:13, 103:15, 103:22, 104:1, 121:5, 121:6, 121:8, 124:21
**CARRIED** [1] - 59:21
**CARRY** [3] - 49:1, 57:3, 57:6
**CARS** [1] - 4:10
**CASE** [44] - 4:13, 4:14, 4:17, 11:5, 11:6, 17:8, 24:19, 27:10, 27:12, 35:12, 39:4, 40:8, 41:21, 43:5, 64:12, 65:5, 68:2, 74:17, 79:3, 79:17, 94:18, 96:4, 96:17, 98:18, 102:16, 104:6, 104:9, 104:12, 104:15, 111:17, 113:2, 114:19, 116:16, 123:8, 126:24, 127:12, 132:4, 135:10, 136:6, 136:13, 136:16,

136:21, 137:7, 144:7
**CASES** [2] - 20:14, 41:20
**CAST** [4] - 10:12, 12:7, 25:4, 107:20
**CATEGORIES** [1] - 31:22
**CATHERINE** [1] - 1:6
**CATHERINE** [5] - 5:15, 10:22, 23:13, 30:23, 104:18
**CAUCUS** [2] - 45:7, 45:8
**CAUSATION** [2] - 35:13, 36:9
**CAUSED** [5] - 16:24, 35:22, 36:18, 110:10, 111:4
**CELL** [1] - 106:11
**CENTER** [1] - 98:24
**CERTAIN** [1] - 10:25
**CERTAINLY** [7] - 12:11, 14:2, 41:25, 72:17, 93:4, 128:9, 137:1
**CERTIFY** [1] - 144:6
**CETERA** [2] - 43:15, 74:8
**CHAIN** [1] - 36:20
**CHALLENGE** [69] - 11:15, 11:18, 12:12, 12:16, 12:22, 13:6, 15:16, 18:16, 18:17, 19:3, 19:6, 19:10, 22:23, 23:6, 24:7, 32:1, 32:12, 32:16, 32:18, 36:2, 36:18, 36:20, 36:21, 38:8, 40:12, 52:1, 53:1, 54:16, 54:22, 56:2, 56:7, 56:10, 56:12, 56:23, 57:7, 57:10, 57:14, 58:3, 58:12, 58:17, 59:6, 60:12, 63:13, 68:18, 74:16, 74:19, 75:3, 77:11, 78:5, 79:1, 95:23, 96:11, 110:19, 110:22, 117:10, 119:13, 123:23, 124:14, 130:3, 130:14, 130:16, 130:17, 130:18, 130:24, 131:10, 131:15, 134:5
**CHALLENGED** [61] - 12:19, 12:22, 13:1, 13:5, 13:9, 13:12, 13:13, 13:16, 13:19, 13:22, 13:23, 13:25, 14:1, 14:3, 14:4, 14:10, 15:5, 15:20, 15:24, 16:11, 18:8, 22:13, 33:2, 37:12, 37:15, 37:20, 41:10, 52:17, 52:21, 54:18, 57:16, 58:5, 60:19, 61:2, 61:10, 67:22, 68:8, 68:15, 68:16, 75:14, 77:17, 77:20, 97:1, 97:2, 97:7, 97:14, 97:17, 97:18, 98:9, 98:11, 99:14, 101:17, 110:8, 119:13, 122:24, 126:19, 126:22, 129:6, 130:8, 130:11
**CHALLENGER** [6] - 16:1, 18:19, 35:3, 36:7, 39:22, 129:1
**CHALLENGERS** [6] - 11:24, 18:15, 36:2, 36:18, 37:10, 68:13
**CHALLENGES** [75] - 11:20, 13:21, 14:7, 15:12, 15:13, 16:24, 17:3, 17:24, 18:4, 18:12, 18:18, 18:23, 18:25, 19:9, 20:25, 21:1, 21:2, 21:3, 21:21, 23:1, 24:2, 27:7, 28:2, 28:16, 29:1, 29:2, 31:9, 32:11, 32:22, 32:23, 32:25, 33:9, 33:11, 33:21, 34:5, 34:24, 35:6, 35:9, 35:22, 35:24, 36:11, 36:14, 36:15, 37:7, 37:8, 37:25, 40:14, 49:12, 52:14, 55:12, 57:18, 58:24, 59:10, 61:8, 62:21, 63:3, 63:20, 64:5, 64:7, 67:18, 67:20, 72:23, 73:7, 73:8, 73:11, 74:14,

77:8, 77:12, 98:10, 111:13, 111:18, 112:12, 126:12, 131:14, 135:1
**CHALLENGING** [6] - 9:22, 36:5, 63:19, 110:24, 126:16, 126:19
**CHANCE** [1] - 115:18
**CHANGE** [15] - 22:3, 23:20, 36:12, 45:21, 64:12, 72:4, 84:14, 89:3, 89:12, 89:14, 90:13, 124:20, 142:11, 143:23
**CHANGE** [4] - 26:16, 71:19, 72:5, 72:8
**CHANGED** [8] - 71:25, 84:6, 84:7, 84:9, 140:10, 142:2, 142:9
**CHANGES** [6] - 22:2, 31:18, 40:11, 44:15, 77:6, 77:9
**CHAOS** [1] - 16:24
**CHAOTIC** [2] - 93:8, 93:16
**CHAPEL** [1] - 45:25
**CHAPTER** [1] - 93:19
**CHARACTERIZATION** [2] - 111:8, 133:12
**CHARACTERIZING** [2] - 132:16, 133:1
**CHARGED** [1] - 23:16
**CHECK** [4] - 140:11, 140:13, 140:15, 140:18
**CHECKED** [1] - 140:17
**CHIEF** [2] - 85:12, 85:15
**CHIEF** [1] - 30:20
**CHILDREN** [1] - 39:18
**CHOICE** [1] - 103:23
**CHOOSE** [5] - 59:24, 86:21, 87:23, 92:19
**CHOSE** [1] - 90:20
**CHRISTINA** [1] - 5:2
**CHRISTINA** [1] - 1:15
**CIANTI** [3] - 16:23, 42:15, 42:23
**CIANTI** [3] - 3:4, 42:18, 42:24
**CIRCUMSTANCES** [4] - 20:22, 23:8, 35:12, 37:5
**CITIES** [1] - 120:22
**CITIZEN** [7] - 28:2, 29:5, 34:8, 37:25, 39:14, 39:15, 39:22
**CITIZENS** [7] - 11:2, 28:15, 30:19, 33:16, 34:16, 66:6, 98:24
**CITY** [1] - 86:4
**CITY** [14] - 15:8, 15:10, 27:5, 85:17, 85:21, 86:1, 86:5, 86:24, 88:3, 88:18, 91:2, 91:6, 101:23
**CIVIC** [1] - 94:11
**CIVIL** [3] - 4:19, 19:19, 20:5
**CLAFFERTY** [1] - 1:18
**CLAIM** [1] - 129:10
**CLAIMED** [1] - 14:3
**CLAIMING** [1] - 25:7
**CLAIMS** [2] - 22:8, 23:15
**CLARIFY** [1] - 43:20
**CLARITY** [1] - 125:4
**CLASSES** [1] - 90:12
**CLASSMATES** [1] - 92:1
**CLEAN** [3] - 26:5, 112:9, 142:16
**CLEAR** [13] - 13:7, 21:13, 35:8, 40:20,

58:25, 113:16, 121:10, 123:11, 128:18, 131:6, 134:22, 137:9, 138:1
**CLEARLY** [1] - 99:2
**CLERK** [7] - 4:18, 42:21, 80:3, 80:8, 114:13, 115:1, 115:4
**CLIENT** [1] - 5:15
**CLIENTS** [1] - 29:9
**CLIMATE** [1] - 23:16
**CLOSE** [7] - 16:20, 18:11, 37:18, 52:13, 55:14, 88:9, 88:13
**CLOSED** [1] - 41:4
**CLOSED-DOOR** [1] - 41:4
**CLOSER** [1] - 17:10
**CMR** [2] - 2:21, 144:13
**CO** [4] - 5:15, 5:16, 31:15, 74:14
**CO-COUNSEL** [2] - 5:15, 5:16
**CO-OWNS** [1] - 31:15
**CO-PLAINTIFFS** [1] - 74:14
**CODE** [1] - 28:5
**CODIFIED** [1] - 35:7
**COERCE** [1] - 19:17
**COERCING** [1] - 19:16
**COERCION** [3] - 20:4, 21:6, 120:2
**COHORT** [1] - 90:8
**COIE** [3] - 138:21, 138:23, 139:2
**COIE** [1] - 138:24
**COINCIDED** [1] - 51:17
**COLD** [1] - 86:2
**COLLABORATORS** [1] - 17:25
**COLLEAGUE** [3] - 31:9, 41:7, 76:21
**COLLEAGUES** [1] - 5:2
**COLLECT** [5] - 54:13, 55:7, 57:9, 63:4, 68:8
**COLLECTED** [1] - 77:10
**COLLECTING** [6] - 54:22, 56:2, 56:12, 56:22, 57:7, 58:3
**COLLECTION** [1] - 55:9
**COLLECTIVELY** [1] - 11:15
**COLLEGE** [5] - 82:18, 86:9, 96:1, 96:16, 96:17
**COLLEGES** [1] - 13:20
**COLOR** [3] - 45:19, 62:6, 68:25
**COLUMBUS** [23] - 14:21, 14:24, 15:6, 83:2, 83:3, 83:4, 83:5, 84:8, 85:1, 85:8, 85:10, 86:24, 87:23, 88:10, 88:15, 91:6, 91:12, 92:2, 96:3, 98:4, 116:1, 120:25, 121:1
**COLUMBUSITE** [1] - 90:24
**COMBINATION** [2] - 31:3, 39:23
**COMING** [9] - 4:4, 4:7, 4:8, 4:10, 46:10, 94:4, 96:22, 100:19, 102:6
**COMMAND** [1] - 27:11
**COMMENT** [1] - 71:1
**COMMERCE** [2] - 16:8, 16:10
**COMMUNICATE** [1] - 69:9
**COMMUNICATING** [1] - 77:18
**COMMUNICATION** [6] - 104:21, 105:2, 105:8, 105:14, 105:20, 136:9
**COMMUNICATION** [1] - 85:19

**COMMUNICATIONS** [4] - 69:18, 126:5, 132:4, 135:4
**COMMUNITIES** [2] - 27:2, 62:5
**COMMUNITY** [7] - 35:1, 86:25, 87:7, 87:18, 97:5, 116:1, 125:6
**COMMUNITY** [1] - 45:3
**COMPANY** [1] - 86:15
**COMPARABLE** [1] - 88:2
**COMPARE** [1] - 31:16
**COMPETENTLY** [1] - 26:2
**COMPILED** [1] - 12:17
**COMPILING** [1] - 17:24
**COMPLAINED** [2] - 18:22, 35:17
**COMPLAINT** [2] - 66:9, 67:13
**COMPLAINT'S** [1] - 67:15
**COMPLETELY** [3] - 36:5, 96:15
**COMPREHENSIVE** [2] - 17:6, 17:13
**CON** [1] - 52:20
**CONCERN** [1] - 76:3
**CONCERNED** [9] - 15:21, 29:10, 50:24, 51:6, 51:8, 52:11, 52:12, 64:4, 130:20
**CONCERNS** [10] - 19:4, 25:21, 29:15, 30:5, 30:25, 35:13, 49:6, 49:7, 67:15, 67:18
**CONCLUDE** [2] - 33:4, 48:3
**CONCLUSION** [1] - 79:2
**CONCLUSIVE** [2] - 7:1, 18:10
**CONDUCT** [4] - 20:11, 34:2, 41:21, 44:5
**CONDUCTED** [1] - 62:13
**CONDUCTING** [2] - 21:23, 33:9
**CONFERENCE** [1] - 29:22
**CONFIRM** [4] - 22:5, 32:4, 37:16, 39:1
**CONFIRMATION** [1] - 30:9
**CONFIRMED** [1] - 97:13
**CONFIRMS** [2] - 30:12, 32:19
**CONFUSING** [1] - 25:17
**CONFUSION** [1] - 25:6
**CONGRESS** [4] - 19:19, 19:21, 20:1, 21:6
**CONNECT** [4] - 112:10, 123:21, 124:12, 131:8
**CONNECTED** [2] - 10:1, 138:12
**CONNECTICUT** [2] - 82:6, 103:6
**CONNECTING** [2] - 74:18, 134:4
**CONNECTION** [2] - 133:2, 133:11
**CONNECTIONS** [2] - 131:3, 133:5
**CONNECTS** [1] - 130:23
**CONSECUTIVE** [1] - 22:6
**CONSEQUENCE** [2] - 20:11, 20:24
**CONSEQUENCES** [4] - 14:13, 24:12, 42:2
**CONSIDER** [4] - 23:8, 37:15, 91:3, 94:15
**CONSIDERABLE** [1] - 29:20
**CONSIDERED** [9] - 35:3, 39:24, 40:10, 40:12, 40:13, 51:9, 64:11, 90:24, 94:10
**CONSISTENT** [1] - 111:14
**CONSOLIDATED** [2] - 5:23, 6:2

**CONSPIRACY** [4] - 25:10, 26:9, 29:18, 34:18
**CONSTANTLY** [1] - 31:15
**CONSULTED** [1] - 13:16
**CONSULTING** [1] - 26:21
**CONTACT** [5] - 43:25, 54:15, 56:3, 58:1, 73:10
**CONTACTED** [4] - 52:20, 138:14, 139:9, 139:15
**CONTACTING** [4] - 47:21, 48:23, 53:2, 58:4
**CONTACTS** [1] - 47:22
**CONTAINED** [1] - 50:25
**CONTAINING** [1] - 133:1
**CONTEMPLATES** [1] - 17:21
**CONTEST** [1] - 27:7
**CONTESTED** [1] - 22:14
**CONTEXT** [6] - 20:18, 23:11, 23:12, 38:20, 99:3, 110:16
**CONTEXTS** [1] - 20:9
**CONTINUALLY** [1] - 23:15
**CONTINUANCES** [1] - 29:8
**CONTINUE** [7] - 77:2, 77:5, 77:6, 77:7, 88:17, 88:18, 90:14
**CONTINUED** [1] - 2:1
**CONTINUED** [2] - 83:14, 86:14
**CONTINUOUSLY** [1] - 22:22
**CONTRACTOR** [1] - 14:23
**CONTRACTS** [2] - 20:17, 20:21
**CONVENIENCE** [1] - 9:5
**CONVERSATION** [1] - 132:9
**CONVERSATIONS** [6] - 65:8, 65:9, 67:5, 69:11, 87:9, 135:9
**COOL** [1] - 85:21
**COOLEY** [1] - 46:1
**COOPER** [1] - 1:7
**COOPER** [3] - 33:15, 105:17, 105:20
**COORDINATED** [1] - 129:2
**COPIES** [2] - 77:12, 114:6
**COPY** [6] - 49:22, 100:15, 114:4, 114:25, 115:1, 127:14
**COPYEDITING** [1] - 91:13
**CORNERS** [1] - 35:17
**CORPS** [1] - 29:17
**CORRECT** [28] - 8:14, 43:21, 43:22, 51:21, 59:4, 59:13, 60:20, 63:20, 84:17, 84:18, 98:5, 102:24, 103:1, 107:3, 108:7, 116:8, 118:2, 119:24, 123:16, 124:24, 125:7, 133:12, 136:5, 140:25, 141:2, 141:3, 142:14, 144:6
**CORRECTED** [3] - 27:9, 28:1, 115:5
**CORRECTLY** [2] - 116:4, 129:14
**CORRESPONDENCE** [7] - 90:14, 90:17, 114:5, 115:8, 117:2, 141:11, 142:3
**COUNCIL** [1] - 27:5
**COUNSEL** [27] - 5:1, 5:14, 5:15, 5:16, 7:8, 8:10, 24:25, 33:1, 41:23, 65:20, 114:4, 128:11, 132:3, 132:11, 132:16,

132:20, 133:1, 135:9, 135:11, 135:13, 135:15, 135:17, 136:4, 136:5, 136:9, 137:10, 138:6
**COUNTED** [7] - 10:12, 10:13, 12:7, 12:8, 15:2, 120:8, 120:9
**COUNTERING** [1] - 63:10
**COUNTERMAN** [1] - 41:25
**COUNTIES** [27] - 10:13, 11:1, 12:9, 22:13, 27:23, 30:14, 31:3, 31:18, 32:11, 32:12, 32:13, 32:21, 33:22, 54:4, 55:6, 55:13, 56:6, 58:11, 58:16, 58:20, 59:1, 59:5, 62:19, 67:17, 68:10, 75:19, 78:17
**COUNTING** [1] - 10:14
**COUNTLESS** [1] - 30:21
**COUNTRY** [5] - 44:15, 45:21, 48:12, 48:17, 95:5
**COUNTY** [22] - 13:2, 27:9, 27:22, 28:6, 29:12, 31:11, 32:1, 33:8, 33:13, 34:11, 37:17, 38:13, 40:14, 54:7, 57:14, 63:18, 68:5, 68:7, 95:2, 121:22, 123:3, 130:10
**COUNTY** [48] - 16:1, 16:8, 19:4, 27:13, 33:19, 34:25, 36:11, 36:13, 36:18, 81:17, 81:18, 82:13, 83:3, 83:8, 83:9, 83:10, 83:19, 84:9, 84:10, 84:25, 85:1, 87:23, 89:15, 89:23, 89:25, 91:22, 92:20, 93:1, 93:2, 93:3, 93:18, 93:25, 100:16, 108:9, 111:13, 112:12, 119:19, 119:22, 120:1, 121:3, 121:5, 125:6, 125:9, 127:24, 128:22, 140:8, 141:5, 142:13
**COUPLE** [6] - 4:14, 5:21, 13:22, 93:25, 102:17, 131:18
**COURSE** [13] - 7:4, 11:3, 40:23, 46:5, 49:12, 57:10, 68:2, 74:9, 75:20, 80:20, 80:25, 135:18
**COURT** [1] - 134:24
**COURT** [34] - 4:18, 9:13, 10:8, 13:22, 19:13, 19:25, 23:7, 24:10, 24:14, 24:18, 24:25, 32:25, 33:14, 33:18, 33:23, 36:9, 37:4, 41:23, 43:14, 43:19, 47:17, 49:17, 52:11, 54:4, 77:4, 84:21, 85:9, 93:9, 97:16, 99:9, 118:5, 120:20, 124:7, 143:10
**COURT** [136] - 1:1, 2:22, 2:22, 4:1, 4:2, 4:21, 4:24, 5:3, 5:6, 5:10, 5:19, 6:19, 7:7, 7:15, 8:3, 8:17, 8:19, 8:23, 9:6, 9:9, 24:20, 24:23, 42:12, 42:16, 49:18, 49:20, 50:16, 50:18, 52:5, 53:5, 53:9, 53:15, 53:18, 65:15, 65:20, 65:23, 66:17, 70:18, 72:18, 72:25, 73:22, 74:10, 74:21, 75:2, 75:5, 75:10, 76:6, 76:13, 76:16, 78:1, 78:8, 78:15, 79:7, 79:9, 79:12, 79:16, 79:23, 80:2, 80:12, 80:16, 80:18, 80:21, 80:23, 81:1, 81:4, 81:7, 102:9, 102:12, 108:4, 108:8, 108:13, 108:25, 109:18, 111:20, 112:2, 112:5, 112:20, 113:8, 113:11, 113:19, 113:25, 114:5, 114:9, 114:17,

115:7, 115:14, 115:19, 115:22, 118:4, 118:7, 118:10, 118:12, 122:7, 122:13, 122:17, 122:20, 122:25, 123:7, 124:3, 124:9, 125:20, 126:8, 129:20, 131:16, 131:25, 132:6, 132:18, 132:21, 132:23, 133:8, 133:14, 133:23, 134:15, 135:6, 135:11, 135:22, 136:6, 137:18, 137:24, 138:9, 138:22, 138:24, 139:5, 139:12, 139:14, 139:19, 139:24, 141:23, 142:22, 143:3, 143:11, 143:13, 143:16, 143:21, 144:3, 144:14
**COURT'S** [6] - 9:4, 35:11, 35:13, 37:13, 40:7, 41:12
**COURTESY** [1] - 8:8
**COURTROOM** [1] - 79:24
**COURTS** [1] - 20:20
**COVERAGE** [1] - 85:22
**COVINGTON** [1] - 85:19
**CRAWLING** [1] - 26:16
**CRAZY** [3] - 48:10, 56:16, 102:2
**CRC** [2] - 2:21, 144:13
**CREATE** [1] - 31:6
**CREATED** [2] - 10:16, 37:10
**CREATING** [1] - 46:25
**CREDIBLE** [3] - 29:1, 40:16, 41:14
**CREDIT** [1] - 39:1
**CREEK** [6] - 82:13, 82:14, 82:15, 82:17, 83:18, 84:5
**CRIMINAL** [1] - 29:8
**CROSS** [5] - 65:16, 65:21, 65:24, 133:11, 143:6
**CROSS** [3] - 3:3, 66:1, 102:13
**CROSS-EXAMINATION** [3] - 65:16, 65:21, 65:24
**CROSS-EXAMINATION** [2] - 66:1, 102:13
**CROSS-EXAMINATIONS** [1] - 143:6
**CROSSED** [1] - 90:23
**CRR** [2] - 2:21, 144:13
**CRUSADE** [1] - 41:15
**CRUSADE** [1] - 23:17
**CULLEN** [1] - 1:22
**CULTURE** [2] - 86:6, 88:11
**CUSTODY** [1] - 36:20
**CYCLE** [2] - 47:17, 48:3

# D

**DAILY** [1] - 86:11
**DAN** [2] - 27:16, 35:1
**DANA** [1] - 5:8
**DANA** [1] - 2:3
**DANBURY** [1] - 82:6
**DARED** [1] - 24:17
**DARK** [1] - 36:25
**DATA** [10] - 14:7, 18:10, 18:23, 26:19, 27:11, 29:25, 30:8, 39:4, 72:7
**DATABASE** [1] - 107:8
**DATE** [6] - 13:16, 92:23, 94:13, 100:24,

108:2, 130:12
**DAUGHTER** [1] - 16:6
**DAVID** [1] - 28:13
**DAVIS** [1] - 1:7
**DAVIS** [15] - 16:3, 16:13, 18:14, 26:12, 27:6, 27:21, 28:12, 28:24, 29:21, 30:2, 30:4, 30:8, 34:6, 34:12, 34:20
**DAVIS'** [2] - 27:18, 30:12
**DAVIS'S** [1] - 27:25
**DAYS** [12] - 25:24, 27:19, 28:4, 28:7, 28:8, 28:20, 30:12, 36:2, 97:4, 97:12, 100:6, 140:17
**DEACTIVATED** [1] - 124:17
**DEAL** [4] - 6:8, 7:18, 8:19, 8:20
**DEALING** [1] - 7:18
**DEBITED** [1] - 106:25
**DEBITS** [1] - 127:9
**DECADES** [4] - 26:18, 26:20, 30:6, 34:13
**DECADES-LONG** [1] - 34:13
**DECEMBER** [18] - 13:14, 18:25, 50:11, 51:25, 67:2, 67:12, 69:17, 83:6, 83:7, 83:17, 86:20, 92:8, 92:10, 92:17, 92:24, 95:21, 98:16, 142:18
**DECIDE** [6] - 7:1, 26:3, 30:11, 31:16, 73:17, 81:24
**DECIDED** [6] - 64:2, 82:1, 87:11, 87:14, 90:13, 103:22
**DECIDES** [2] - 33:15, 73:9
**DECISION** [1] - 132:8
**DEDICATED** [1] - 56:22
**DEDICATING** [1] - 76:23
**DEEP** [1] - 46:15
**DEFAMATORY** [2] - 22:17, 22:19
**DEFEND** [1] - 129:10
**DEFENDANT** [18] - 23:4, 29:8, 29:14, 30:23, 30:24, 35:25, 36:21, 40:10, 40:12, 40:13, 41:16, 74:17, 74:19, 104:14, 110:5, 111:16, 116:16, 116:20
**DEFENDANT'S** [1] - 134:6
**DEFENDANTS** [79] - 5:13, 11:14, 11:22, 11:24, 12:4, 12:17, 12:19, 12:22, 13:1, 13:5, 13:23, 13:24, 14:1, 16:18, 17:23, 18:14, 18:18, 18:24, 19:2, 19:7, 20:11, 21:10, 21:21, 22:8, 22:12, 22:15, 22:22, 23:1, 23:9, 24:6, 25:19, 25:25, 26:2, 26:12, 33:4, 34:5, 34:10, 34:20, 35:22, 36:8, 36:11, 37:2, 37:17, 37:24, 38:2, 38:9, 38:14, 38:19, 39:8, 39:21, 39:25, 66:10, 77:13, 78:5, 78:23, 102:16, 104:7, 104:9, 104:12, 112:10, 112:11, 113:20, 116:12, 123:22, 124:13, 130:23, 130:24, 131:1, 131:4, 131:8, 134:5, 134:23, 136:4, 137:11, 137:13, 137:19, 138:2, 138:8
**DEFENDANTS** [2] - 1:8, 1:20
**DEFENDANTS'** [18] - 9:17, 14:16, 16:24, 17:1, 17:12, 21:8, 23:8, 23:11, 24:11, 25:15, 25:21, 33:25, 35:5, 35:13, 35:21, 37:7, 41:11, 113:13

**DEFENDANTS'** [2] - 112:16, 112:22
**DEFENSE** [1] - 15:20
**DEFENSE** [4] - 5:11, 22:11, 37:9, 40:15
**DEFER** [1] - 134:9
**DEFERS** [1] - 135:9
**DEFINING** [1] - 25:5
**DEFINITELY** [3] - 52:16, 64:25, 65:6
**DEFRAUDED** [1] - 25:7
**DEGREE** [4] - 40:2, 45:24, 45:25, 87:17
**DELIBERATE** [1] - 10:14
**DELIVER** [1] - 23:23
**DEMANDED** [1] - 18:20
**DEMOCRACY** [4] - 43:18, 44:16, 44:17, 44:23
**DEMOCRACY** [9] - 62:17, 62:18, 62:23, 62:25, 63:7, 74:25, 75:1, 77:7
**DEMOCRAT** [1] - 63:8
**DEMOCRATIC** [1] - 10:13
**DEMOCRATIC** [4] - 10:13, 12:9, 45:7, 45:8
**DEMOCRATS** [1] - 10:14
**DEMOGRAPHIC** [1] - 40:9
**DEMOGRAPHICS** [1] - 37:9
**DEMONSTRATED** [1] - 111:24
**DEPARTMENT** [7] - 55:20, 56:1, 58:14, 58:15, 59:19, 63:12
**DEPARTMENT** [1] - 15:19
**DEPARTMENTS** [3] - 55:18, 58:12, 59:8
**DEPLOYED** [3] - 56:6, 59:23, 60:3
**DEPLOYING** [1] - 55:5
**DEPOSED** [1] - 126:24
**DEPOSITION** [3] - 7:12, 8:10, 8:11
**DEPUTIES** [1] - 31:25
**DEPUTY** [2] - 30:19, 30:20
**DEPUTY** [7] - 4:18, 42:21, 80:3, 80:8, 114:13, 115:1, 115:4
**DEREK** [1] - 1:6
**DEREK** [3] - 5:17, 29:4, 104:24
**DESCRIBE** [9] - 47:17, 55:1, 94:25, 95:20, 97:16, 99:9, 100:3, 123:13, 126:4
**DESCRIBED** [3] - 61:25, 95:22, 126:18
**DESIGNATIONS** [4] - 7:12, 8:10, 8:11, 8:13
**DESIGNED** [1] - 21:16
**DESIRE** [1] - 103:19
**DESPERATE** [3] - 95:7, 95:8, 95:10
**DESPERATION** [2] - 95:6, 95:7
**DESPITE** [2] - 17:9, 19:11
**DESTABILIZE** [1] - 9:17
**DETAIL** [3] - 29:6, 49:5, 54:21
**DETAILS** [1] - 81:15
**DETERMINE** [2] - 39:10, 48:18
**DETERMINING** [2] - 17:4, 39:12
**DEVELOP** [1] - 46:15
**DEVELOPING** [2] - 31:13, 65:10
**DEVELOPMENTS** [1] - 138:18
**DEVOTE** [1] - 64:2
**DEVOTED** [1] - 29:22

**DIFFERENT** [20] - 11:21, 25:1, 27:23, 36:5, 41:22, 46:19, 55:10, 78:16, 85:20, 89:3, 91:15, 99:23, 100:20, 106:7, 110:25, 121:1, 121:2, 121:7, 127:23, 131:12
**DIFFICULT** [17] - 6:22, 20:4, 62:8, 93:11, 94:2, 100:21, 101:2, 101:11, 102:4, 107:8, 107:10, 107:12, 107:16, 110:16, 110:23, 121:15
**DIFFICULTY** [1] - 141:15
**DIGITAL** [4] - 44:3, 48:24, 61:20, 64:23
**DILIGENCE** [2] - 18:21, 41:3
**DIME** [1] - 29:6
**DIRECT** [3] - 3:3, 42:25, 81:8
**DIRECT** [10] - 41:13, 43:25, 47:21, 56:3, 70:5, 72:21, 73:21, 74:11, 85:22, 142:23
**DIRECTED** [9] - 36:15, 41:16, 42:8, 104:21, 105:2, 105:8, 105:14, 105:20, 118:21
**DIRECTLY** [10] - 41:12, 41:16, 48:23, 53:12, 54:8, 59:10, 65:7, 65:12, 110:10, 142:21
**DIRECTOR** [11] - 16:23, 43:8, 43:10, 43:13, 45:4, 45:6, 45:7, 46:3, 46:21, 64:10, 67:11
**DIRECTORS** [2] - 46:12, 46:13
**DIS** [1] - 111:7
**DISAGREE** [5] - 109:12, 110:1, 111:19, 112:4, 121:20
**DISAPPOINTINGLY** [1] - 40:23
**DISASTER** [1] - 12:18
**DISCOURAGE** [1] - 96:22
**DISCOURAGED** [1] - 97:21
**DISCOURAGING** [2] - 97:22, 98:7
**DISCOVERED** [2] - 27:19, 27:25
**DISCOVERY** [2] - 97:3, 117:18
**DISCUSS** [1] - 143:18
**DISCUSSED** [1] - 41:18
**DISCUSSING** [1] - 92:17
**DISINFORMATION** [3] - 56:17, 56:19, 64:18
**DISMISSED** [1] - 11:2
**DISPASSIONATELY** [1] - 29:25
**DISPUTE** [2] - 129:3, 129:4
**DISREGARD** [1] - 42:1
**DISRUPT** [1] - 9:17
**DISTANCE** [1] - 88:16
**DISTANT** [1] - 35:17
**DISTRICT** [1] - 27:21
**DISTRICT** [1] - 113:25
**DISTRICT** [6] - 1:1, 1:1, 1:11, 2:22, 144:3, 144:4
**DISTRICTED** [1] - 27:14
**DISTRICTS** [1] - 27:24
**DIVERT** [1] - 16:25
**DIVISION** [1] - 1:2
**DOCKED** [1] - 48:13
**DOCKET** [1] - 7:19

**DOCKET** [1] - 1:4
**DOCUMENT** [6] - 50:6, 50:9, 51:23, 101:10, 112:23, 112:25
**DOCUMENTATION** [3] - 100:18, 127:5, 128:2
**DOCUMENTS** [21] - 16:16, 46:11, 46:23, 46:25, 67:5, 68:1, 100:8, 100:22, 101:3, 126:5, 127:16, 136:16, 136:18, 136:19, 136:21, 136:25, 137:1, 137:3, 137:4, 137:5, 140:9
**DOE** [2] - 1:3, 1:3
**DOES** [1] - 1:8
**DOGS** [1] - 20:13
**DOJ** [1] - 37:18
**DOLLARS** [1] - 49:8
**DOMICILE** [4] - 121:16, 123:2, 128:18, 128:23
**DONATION** [2] - 23:19
**DONE** [23] - 9:23, 15:21, 31:10, 47:13, 48:23, 98:2, 98:6, 99:18, 101:20, 101:21, 101:22, 122:15, 129:11, 129:12, 129:13, 129:15, 130:4, 132:23, 138:4, 138:5, 139:11, 142:10, 142:11
**DONOR** [1] - 10:6
**DOOR** [1] - 41:4
**DOWN** [5] - 34:18, 54:21, 99:24, 143:2, 144:6
**DOWNTOWN** [1] - 86:1
**DOZENS** [1] - 33:1
**DR** [2] - 12:15, 32:19
**DREW** [1] - 44:11
**DRIVE** [2] - 4:12, 90:18
**DRIVER** [1] - 108:11
**DRIVER'S** [15] - 26:24, 88:23, 88:25, 89:1, 90:20, 100:14, 100:15, 100:22, 108:4, 108:5, 108:16, 109:7, 109:9, 109:24, 119:22
**DRIVING** [2] - 4:3, 90:11
**DROP** [6] - 11:14, 24:5, 31:5, 49:11, 51:3, 99:6
**DROPPING** [2] - 99:5, 99:6
**DUE** [2] - 18:21, 41:3
**DULY** [2] - 42:19, 80:6
**DURING** [14] - 16:9, 41:1, 60:8, 66:8, 69:23, 81:16, 85:16, 91:18, 91:21, 94:1, 101:17, 118:8, 122:24, 143:19
**DUTIES** [1] - 46:3
**DUTY** [1] - 94:11

# E

**E-MAIL** [5] - 38:24, 69:8, 69:10, 100:9, 111:3
**E-MAILED** [6] - 18:18, 53:13, 78:18, 78:19, 101:14, 101:15
**E-MAILING** [3] - 54:7, 54:8, 110:13
**E-MAILS** [1] - 70:5
**EAGER** [1] - 30:2
**EARLY** [5] - 51:17, 51:18, 51:20, 84:10,

88:8
**EASIER** [1] - 143:10
**EASILY** [1] - 63:19
**EASY** [1] - 4:12
**ED** [1] - 41:7
**EDITOR** [3] - 85:12, 85:14, 85:15
**EDITOR-IN-CHIEF** [2] - 85:12, 85:15
**EDITORS** [1] - 87:9
**EDUCATING** [1] - 35:5
**EDUCATION** [3] - 43:23, 45:10, 62:3
**EDUCATIONAL** [2] - 45:22, 85:6
**EFFECTIVE** [1] - 45:17
**EFFECTS** [1] - 45:12
**EFFORT** [8] - 11:15, 24:7, 38:16, 54:24, 56:22, 58:6, 59:21, 60:12
**EFFORTS** [8] - 10:15, 11:8, 35:4, 35:5, 58:16, 59:5, 65:4, 69:3
**EIGHT** [3] - 19:18, 120:16, 120:17
**EITHER** [4] - 21:25, 35:15, 84:10, 114:12
**ELABORATE** [1] - 93:9
**ELECTED** [1] - 85:15
**ELECTION** [77] - 9:18, 10:5, 10:6, 10:12, 10:20, 10:21, 10:25, 11:8, 12:7, 18:1, 23:14, 23:18, 23:21, 25:8, 25:24, 26:3, 26:6, 27:7, 27:8, 27:9, 27:16, 27:17, 27:20, 28:1, 28:4, 28:7, 28:8, 28:19, 29:22, 31:1, 31:21, 34:7, 34:11, 35:1, 35:10, 36:22, 37:18, 37:20, 38:13, 39:10, 45:15, 47:16, 47:19, 48:2, 48:3, 48:9, 48:11, 48:12, 52:13, 53:4, 56:20, 57:24, 60:9, 61:17, 74:24, 92:11, 94:18, 94:19, 94:23, 95:16, 95:18, 99:12, 99:19, 100:6, 107:18, 109:11, 109:22, 110:5, 110:19, 111:13, 122:24, 123:1, 123:3, 125:9, 128:19, 130:15
**ELECTION** [3] - 28:5, 78:20, 99:10
**ELECTIONS** [26] - 22:6, 37:15, 40:4, 44:1, 48:21, 53:7, 53:10, 53:11, 53:13, 53:16, 68:5, 73:12, 73:24, 74:1, 74:3, 78:16, 92:10, 92:13, 94:7, 95:14, 98:12, 99:19, 100:10, 101:18, 111:4, 121:22
**ELECTOR** [1] - 28:3
**ELECTORS** [1] - 10:20
**ELECTRIC** [1] - 86:4
**ELEMENTS** [2] - 10:8, 19:14
**ELIGIBILITY** [9] - 13:3, 15:16, 28:2, 28:16, 123:23, 124:14, 131:9, 134:5
**ELIGIBLE** [2] - 19:6, 22:24
**ELIMINATED** [1] - 20:2
**ELUDED** [1] - 40:9
**EMBARKED** [1] - 23:17
**EMBELLISHMENTS** [1] - 22:10
**EMPLOYED** [1] - 16:20
**EMPLOYEES** [1] - 18:5
**EMPLOYMENT** [3] - 39:16, 87:2, 93:22
**EMPOWERMENT** [4] - 43:16, 43:23, 44:5, 45:15, 47:20, 62:3

**EMPOWERS** [1] - 25:25
**ENACT** [1] - 19:21
**ENACTED** [2] - 19:18, 21:6
**ENCOUNTER** [1] - 60:23
**ENCOUNTERING** [1] - 61:2
**END** [13] - 14:16, 23:7, 24:10, 32:11, 32:24, 41:23, 46:23, 82:24, 83:17, 83:19, 87:11, 100:11, 123:4
**END-OF-YEAR** [1] - 46:23
**ENDORSED** [1] - 21:24
**ENERGIES** [1] - 29:20
**ENERGY** [1] - 62:9
**ENFORCED** [1] - 19:23
**ENFORCING** [2] - 20:15, 20:20
**ENGAGE** [2] - 48:20, 53:21
**ENGAGED** [7] - 23:4, 30:18, 34:20, 47:18, 57:12, 63:9, 64:25
**ENGAGEMENT** [1] - 45:3
**ENGELBRECHT** [13] - 5:15, 10:23, 16:12, 18:7, 23:4, 23:13, 30:23, 31:24, 34:6, 34:20, 70:10, 70:25, 104:18
**ENGELBRECHT** [1] - 1:6
**ENGELBRECHT'S** [3] - 40:16, 40:25, 104:21
**ENQUIRER** [5] - 86:11, 86:17, 86:22, 95:22, 96:7
**ENROLLMENT** [1] - 88:4
**ENSURE** [2] - 28:9, 31:11
**ENSURES** [1] - 71:14
**ENTAILS** [1] - 77:21
**ENTERED** [1] - 6:6
**ENTERTAINMENT** [1] - 91:13
**ENTIRE** [2] - 104:16, 128:9
**ENTITLED** [2] - 22:17, 23:10
**ENVIRONMENT** [2] - 48:8, 48:19
**ERA** [1] - 25:5
**ERA-DEFINING** [1] - 25:5
**ERRONEOUS** [1] - 24:8
**ERRORS** [3] - 12:23, 13:11, 24:8
**ESPECIALLY** [3] - 94:14, 97:21, 129:8
**ESPIONAGE** [1] - 25:13
**ESQ** [15] - 1:15, 1:15, 1:16, 1:16, 1:17, 1:17, 1:18, 1:18, 1:21, 1:21, 1:22, 2:3, 2:4, 2:4, 2:5
**ESTABLISH** [2] - 19:14, 72:19
**ESTABLISHED** [1] - 17:5
**ET** [2] - 43:15, 74:8
**EVANS** [10] - 5:14, 102:12, 102:16, 109:3, 114:18, 115:8, 133:8, 135:17, 135:18, 136:8
**EVANS** [69] - 1:22, 50:3, 102:11, 102:14, 108:10, 108:12, 108:14, 108:15, 109:4, 109:5, 109:17, 109:21, 112:1, 112:3, 112:8, 112:16, 112:21, 113:9, 113:14, 113:18, 114:22, 115:13, 115:15, 115:16, 115:21, 115:24, 118:17, 122:8, 122:10, 122:16, 123:2, 123:9, 123:10, 124:6, 124:10, 124:11, 125:19, 129:24, 131:22, 132:22, 133:7, 133:9, 133:17,

133:19, 133:21, 133:25, 134:2, 134:21, 135:20, 135:24, 135:25, 136:3, 136:11, 136:12, 137:15, 137:17, 137:22, 137:25, 138:11, 139:1, 139:21, 139:25, 140:3, 142:5, 142:21, 143:1, 143:9, 143:12, 143:15
**EVENT** [2] - 7:25, 23:3
**EVENTS** [3] - 11:5, 19:21, 91:14
**EVENTUALLY** [4] - 86:15, 107:4, 107:14, 110:20
**EVERYWHERE** [1] - 120:24
**EVICTING** [1] - 20:17
**EVIDENCE** [34] - 6:10, 10:11, 12:6, 12:8, 12:9, 12:11, 14:6, 19:13, 21:9, 22:22, 22:25, 23:12, 35:15, 35:22, 37:5, 40:8, 40:16, 41:11, 41:15, 50:15, 50:22, 52:3, 52:8, 66:15, 70:17, 74:18, 76:5, 111:23, 111:24, 112:3, 115:20, 115:23, 133:1
**EXACT** [8] - 68:11, 75:6, 78:8, 92:23, 97:6, 104:10, 106:8, 140:18
**EXACTLY** [9] - 17:21, 97:11, 100:6, 106:16, 127:20, 134:1, 138:16, 138:19
**EXAMINATION** [3] - 65:16, 65:21, 65:24
**EXAMINATION** [8] - 42:25, 66:1, 76:19, 78:2, 81:8, 102:13, 125:23, 129:23
**EXAMINATIONS** [1] - 143:6
**EXAMPLE** [1] - 74:15
**EXAMPLES** [2] - 12:19, 13:22
**EXCEPTION** [2] - 41:20, 79:25
**EXCITED** [1] - 30:5
**EXCLUDE** [1] - 6:16
**EXCLUDED** [3] - 5:25, 6:21, 7:3
**EXCLUDING** [1] - 5:22
**EXCUSE** [3] - 122:13, 135:6, 139:7
**EXCUSED** [1] - 80:14
**EXCUSING** [2] - 80:13, 80:15
**EXECUTIVE** [10] - 16:23, 30:7, 43:8, 43:9, 45:4, 45:6, 46:3, 46:21, 64:10, 67:11
**EXERCISE** [1] - 26:3
**EXHIBIT** [12] - 50:7, 50:15, 50:21, 50:25, 51:17, 51:22, 52:3, 52:7, 52:10, 112:17, 112:23, 113:13
**EXHIBIT** [13] - 6:10, 36:13, 113:15, 113:17, 113:19, 113:20, 113:21, 114:2, 114:7, 114:21, 115:9, 115:20
**EXHIBITS** [2] - 49:19, 113:22
**EXPAND** [1] - 10:15
**EXPANDED** [1] - 62:20
**EXPECT** [2] - 32:15, 95:11
**EXPERIENCE** [10] - 38:19, 45:14, 81:13, 81:15, 92:1, 110:24, 123:25, 126:19, 129:13, 129:17
**EXPERIENCED** [1] - 95:4
**EXPERIENCES** [1] - 85:7
**EXPERIMENTAL** [1] - 31:5
**EXPERT** [4] - 12:14, 12:15, 27:18, 34:13
**EXPERTISE** [2] - 76:10, 76:11
**EXPLAIN** [9] - 34:16, 37:17, 38:3, 38:4,

38:9, 39:21, 84:21, 85:8, 90:20
**EXPLAINED** [2] - 30:3, 41:4
**EXPOSED** [1] - 29:6
**EXPRESSLY** [1] - 37:19
**EXTENT** [7] - 29:7, 122:21, 132:3, 132:15, 132:25, 133:12, 135:3
**EXTRA** [1] - 99:24
**EXTREME** [1] - 41:3
**EXTREMELY** [3] - 95:3, 110:21, 117:3
**EYE** [1] - 53:24
**EYES** [2] - 25:15, 130:4

---

# F

**FACE** [2] - 98:23, 126:6
**FACEBOOK** [1] - 30:18
**FACILITATE** [1] - 32:6
**FACILITATES** [1] - 63:18
**FACT** [12] - 12:3, 12:13, 17:9, 19:11, 30:6, 35:18, 72:9, 84:25, 103:18, 110:8, 113:12, 123:3
**FACT-INTENSIVE** [1] - 123:3
**FACTOR** [1] - 40:7
**FACTORS** [3] - 17:7, 17:14, 37:6
**FACTS** [3] - 70:17, 111:22, 111:24
**FACTUAL** [2] - 37:6, 40:7
**FAIL** [1] - 22:6
**FAILED** [3] - 11:8, 23:22
**FAIR** [1] - 1:3
**FAIR** [79] - 4:18, 9:14, 14:14, 16:22, 16:24, 21:12, 22:12, 35:18, 43:4, 43:7, 43:12, 43:14, 43:21, 44:5, 44:18, 45:16, 45:19, 46:3, 46:8, 46:16, 46:24, 47:12, 47:25, 48:3, 48:20, 49:1, 49:13, 50:24, 52:11, 52:18, 52:23, 53:21, 54:15, 54:19, 55:19, 57:17, 57:21, 57:25, 58:4, 58:10, 59:14, 59:24, 60:10, 60:12, 61:5, 61:14, 61:23, 62:13, 62:22, 63:9, 63:22, 64:2, 64:10, 64:12, 65:4, 66:8, 66:20, 66:23, 68:2, 69:14, 69:18, 69:20, 71:9, 72:7, 72:10, 72:16, 72:19, 75:15, 76:3, 76:22, 76:23, 77:2, 77:10, 77:12, 77:17, 80:16, 80:19, 134:25
**FAIRLY** [2] - 34:4, 110:16
**FALL** [3] - 82:16, 82:24, 83:5
**FALSE** [5] - 12:3, 12:5, 14:9, 23:15, 24:12
**FAMILIAR** [8] - 43:19, 71:23, 88:17, 92:5, 98:24, 125:5, 125:8, 125:10
**FAMILIARITY** [3] - 71:18, 73:6, 74:16
**FAMILY** [9] - 16:10, 17:11, 82:7, 82:11, 84:24, 88:13, 92:4, 96:19, 110:18
**FAPR** [2] - 2:21, 144:13
**FAR** [10] - 5:17, 28:5, 72:14, 73:24, 76:9, 93:15, 107:13, 118:25, 124:1, 131:7
**FBI** [2] - 29:17, 30:7
**FEARS** [1] - 30:12
**FEATURE** [2] - 17:20, 70:3

**FEATURES** [2] - 17:20, 91:15
**FEBRUARY** [2] - 84:11, 84:13
**FEDERAL** [2] - 21:24, 22:7
**FEDEXING** [1] - 36:4
**FELLOW** [1] - 33:16
**FELT** [13] - 52:21, 61:1, 61:8, 94:25, 95:2, 95:4, 99:6, 99:21, 110:14, 118:12, 119:8, 138:4
**FEW** [8] - 9:3, 10:8, 12:19, 33:22, 82:3, 83:22, 97:4, 97:11
**FEWER** [1] - 34:23
**FIELD** [4] - 12:23, 31:10, 103:17, 128:17
**FIELDING** [1] - 58:22
**FIGHT** [1] - 1:3
**FIGHT** [71] - 4:18, 9:15, 14:14, 16:25, 21:12, 22:12, 43:4, 43:7, 43:12, 43:14, 43:21, 44:5, 44:18, 45:16, 45:20, 46:4, 46:8, 46:16, 46:24, 47:12, 48:20, 49:1, 49:13, 50:24, 52:11, 52:18, 52:23, 53:21, 54:15, 54:19, 55:19, 57:17, 57:21, 58:4, 58:10, 59:14, 59:24, 60:10, 60:12, 61:5, 62:13, 62:22, 63:9, 63:22, 64:2, 64:11, 64:12, 65:5, 66:8, 66:20, 66:23, 68:2, 69:14, 69:18, 69:20, 71:9, 72:7, 72:10, 72:19, 75:15, 76:3, 76:22, 76:23, 77:2, 77:10, 77:12, 77:16, 77:17, 80:16, 80:19, 134:25
**FIGHT'S** [6] - 16:22, 35:18, 47:25, 48:3, 57:25, 61:14, 61:23, 72:16
**FIGURE** [2] - 10:2, 58:23
**FILE** [17] - 13:6, 13:7, 13:15, 26:17, 28:22, 30:12, 31:17, 31:22, 32:17, 32:18, 33:13, 35:9, 63:20, 89:21, 137:9, 139:23
**FILED** [22] - 5:22, 6:4, 10:24, 16:4, 18:4, 31:8, 31:17, 33:11, 36:2, 36:12, 40:10, 72:3, 78:12, 95:23, 111:13, 114:3, 115:2, 131:15, 136:17, 136:21, 136:22, 137:4
**FILES** [4] - 27:12, 28:19, 29:19, 34:14
**FILING** [5] - 22:21, 36:3, 38:23, 111:17, 135:10
**FILINGS** [1] - 136:16
**FILL** [2] - 99:14, 99:24
**FILLED** [2] - 107:25, 113:1
**FINAL** [3] - 10:19, 83:14, 129:5
**FINALLY** [2] - 22:15, 101:12
**FINANCIAL** [2] - 39:15, 60:12
**FINDINGS** [2] - 30:18, 34:15
**FINE** [11] - 25:15, 26:11, 91:2, 91:25, 100:23, 100:24, 113:18, 140:1, 143:9, 143:20
**FINER** [1] - 13:21
**FINISH** [6] - 93:19, 131:23, 135:7, 141:23, 141:24, 143:8
**FINISHED** [2] - 27:17, 93:17
**FINITE** [1] - 61:23
**FIRE** [1] - 20:13
**FIRES** [1] - 128:6
**FIREWALL** [1] - 38:13

**FIRM** [2] - 138:20
**FIRST** [6] - 22:16, 22:18, 23:10, 26:3, 42:5, 76:2
**FIRST** [29] - 7:2, 10:10, 15:12, 16:7, 20:1, 28:18, 31:21, 37:1, 41:5, 42:13, 49:7, 50:6, 51:18, 51:20, 52:25, 62:7, 84:1, 84:2, 84:12, 87:1, 96:24, 103:4, 107:15, 110:8, 117:13, 117:17, 127:1, 127:15, 133:9
**FIVE** [9] - 26:7, 26:12, 28:23, 103:4, 120:12, 120:14, 120:19, 121:11, 122:2
**FLAW** [1] - 17:20
**FLAWED** [2] - 18:2, 19:6
**FLIP** [1] - 112:22
**FLOYD** [1] - 93:25
**FLYING** [1] - 95:5
**FOCUS** [4] - 44:7, 47:16, 48:17, 62:12
**FOCUSED** [2] - 20:12, 45:10
**FOLDER** [1] - 51:23
**FOLKS** [3] - 57:1, 68:14, 125:8
**FOLLOW** [4] - 132:14, 135:18, 135:20, 136:8
**FOLLOWED** [3] - 21:22, 38:24, 38:25
**FOLLOWERS** [2] - 69:13, 69:15
**FOLLOWING** [7] - 21:7, 29:25, 48:8, 94:6, 94:9, 94:11, 94:22
**FOLLOWS** [2] - 42:19, 80:6
**FOR** [1] - 1:1
**FORCE** [2] - 13:24, 14:4
**FORCED** [3] - 9:21, 27:13, 126:7
**FORCES** [1] - 24:5
**FORD** [1] - 1:15
**FORD** [1] - 5:2
**FOREGOING** [1] - 144:6
**FORGOTTEN** [1] - 133:19
**FORM** [5] - 33:21, 72:1, 78:19, 127:14, 142:12
**FORMAL** [1] - 14:7
**FORMALIZED** [1] - 62:16
**FORMER** [3] - 34:25, 40:1, 41:8
**FORMS** [2] - 21:5, 25:18
**FORMULA** [1] - 17:6
**FORTH** [1] - 90:11
**FORUM** [2] - 70:25, 71:7
**FORUMS** [1] - 21:15
**FORWARD** [6] - 7:8, 11:21, 11:22, 24:18, 42:10, 77:16
**FORWARDED** [1] - 17:16
**FOUNDATION** [5] - 31:19, 109:16, 111:23, 111:25, 133:3
**FOUNDATION** [1] - 85:20
**FOUNDED** [1] - 30:25
**FOUR** [3] - 15:6, 82:10, 91:11
**FRAMEWORK** [1] - 21:7
**FRANKLY** [1] - 90:23
**FRAUD** [9] - 11:12, 23:15, 24:3, 48:11, 48:12, 49:9, 51:2, 131:12
**FRAUGHT** [1] - 95:3
**FREEDOM** [1] - 41:16

**FREELANCE** [1] - 91:12
**FREELY** [1] - 31:4
**FRENZIED** [1] - 16:23
**FREQUENCY** [2] - 91:23, 140:18
**FREQUENTLY** [3] - 33:7, 34:18, 91:20
**FRIEND** [1] - 29:14
**FRIENDS** [2] - 88:14, 92:4
**FRIGHTENING** [4] - 51:5, 51:12, 52:16, 60:2
**FRIVOLITY** [2] - 37:7, 38:2
**FRIVOLOUS** [1] - 21:2
**FRONT** [1] - 58:23
**FROZEN** [3] - 26:6, 28:3, 28:20
**FRUSTRATED** [1] - 117:3
**FRUSTRATING** [4] - 97:22, 116:23, 117:11, 126:19
**FRUSTRATION** [1] - 111:5
**FULL** [8] - 29:7, 62:24, 83:13, 86:13, 90:10, 93:22, 94:1, 128:17
**FULL-TIME** [6] - 62:24, 83:13, 86:13, 93:22, 94:1, 128:17
**FULTON** [1] - 82:13
**FUN** [1] - 121:13
**FUNCTION** [1] - 55:2
**FUND** [3] - 37:9, 40:15, 40:20
**FUNDAMENTAL** [1] - 17:12
**FUNDER** [3] - 10:4, 23:19, 24:1
**FUNDS** [1] - 60:16
**FUTURE** [5] - 46:25, 47:15, 102:3, 121:25, 126:6

# G

**GALVANIZING** [1] - 10:18
**GAMALIEL** [1] - 14:18
**GAP** [1] - 28:12
**GASAWAY** [7] - 27:12, 27:15, 27:16, 27:19, 27:25, 28:14, 35:1
**GENERAL** [4] - 10:12, 22:6, 48:9, 92:11
**GENERATE** [1] - 35:6
**GENTLEMAN** [1] - 111:12
**GEORGE** [1] - 46:2
**GEORGIA** [3] - 1:1, 2:23, 144:4
**GEORGIA** [115] - 9:16, 10:24, 11:1, 11:5, 11:9, 11:11, 13:10, 14:19, 14:21, 14:25, 15:5, 15:18, 16:7, 16:10, 19:12, 20:25, 21:22, 23:5, 23:6, 23:18, 23:24, 23:25, 24:3, 24:7, 24:15, 25:3, 25:8, 26:1, 26:10, 26:15, 26:17, 26:21, 27:10, 27:11, 28:4, 28:18, 28:25, 29:7, 30:11, 31:16, 31:17, 32:13, 32:17, 34:8, 34:11, 34:12, 34:14, 35:1, 35:19, 42:4, 42:9, 44:8, 44:9, 48:8, 48:17, 49:14, 50:12, 52:1, 56:18, 67:17, 81:14, 82:7, 82:11, 82:13, 82:14, 82:18, 82:19, 82:20, 83:2, 83:18, 83:20, 84:6, 84:23, 84:24, 84:25, 88:2, 88:3, 88:12, 89:1, 89:10, 90:18, 91:19, 91:22, 93:4, 94:1, 94:7, 94:14, 94:15, 94:16, 94:20, 95:2, 96:20, 99:12,

100:15, 102:19, 102:21, 102:22, 102:23, 102:25, 103:5, 103:8, 103:15, 103:18, 103:21, 104:2, 110:17, 110:20, 114:1, 119:21, 120:25, 121:1, 124:16, 124:22, 141:16
**GEORGIA'S** [11] - 9:19, 11:16, 11:17, 13:3, 25:10, 27:8, 31:24, 34:14, 34:21, 37:19, 38:5
**GEORGIAN** [4] - 90:24, 94:15, 102:19
**GEORGIANS** [2] - 17:1, 44:20
**GEORGIANS'** [1] - 25:14
**GERMAN** [1] - 25:12
**GERMANY** [4] - 7:10, 7:14, 7:21, 15:18
**GIVEN** [8] - 5:24, 6:1, 32:23, 37:23, 95:13, 99:3, 102:1, 102:2
**GLYNN** [3] - 84:9, 121:4
**GOAL** [2] - 58:5, 59:14
**GOALS** [2] - 34:1, 34:4
**GOD** [1] - 4:4
**GOVERNMENT** [4] - 14:23, 25:14, 25:16, 26:10
**GRAD** [1] - 87:24
**GRADUATE** [7] - 15:10, 87:14, 88:16, 91:10, 92:7, 93:17, 128:16
**GRADUATED** [8] - 15:11, 83:6, 83:7, 86:9, 86:14, 92:8, 92:18, 93:5
**GRADUATING** [2] - 83:15, 86:16
**GRANT** [1] - 24:14
**GREAT** [3] - 50:3, 91:1, 91:25
**GREENBERG** [1] - 5:14
**GREGG** [1] - 31:10
**GREW** [2] - 84:23, 84:24
**GROUNDED** [1] - 38:4
**GROUNDS** [2] - 38:8, 42:6
**GROUP** [4] - 42:3, 68:22, 97:5, 139:15
**GROUPS** [3] - 34:8, 34:16, 134:14
**GROWING** [1] - 65:2
**GUARD** [1] - 37:11
**GUESS** [1] - 78:9
**GUIDANCE** [2] - 37:18, 58:21
**GUIDE** [4] - 15:8, 86:1, 86:3
**GUYS** [1] - 82:12
**GWINNETT** [1] - 33:19

# H

**HABERSHAM** [1] - 27:13
**HALF** [2] - 31:18, 65:17
**HAND** [3] - 29:18, 35:2, 80:3
**HANDED** [1] - 99:12
**HANDEDLY** [1] - 29:6
**HANDFUL** [1] - 32:23
**HANDLE** [2] - 95:5, 128:6
**HANDPICKED** [1] - 10:25
**HANDS** [2] - 37:23, 114:25
**HAPHAZARDLY** [1] - 12:17
**HAPPY** [1] - 87:6
**HARD** [1] - 62:7
**HARDY** [38] - 1:15, 4:23, 4:25, 5:4, 6:17, 9:3, 9:8, 42:14, 43:1, 49:16, 49:19,

49:21, 49:23, 49:25, 50:4, 50:14, 50:20, 50:23, 52:2, 52:6, 52:9, 53:20, 65:13, 66:13, 66:18, 70:15, 72:13, 73:20, 74:6, 74:20, 75:25, 76:18, 76:20, 77:24, 78:6, 79:15, 80:17, 80:22
**HARDY** [3] - 4:25, 73:23, 78:9
**HARM** [6] - 14:13, 14:15, 33:6, 119:4, 119:5, 119:6
**HATE** [1] - 143:5
**HAULED** [1] - 134:23
**HEALTH** [1] - 46:2
**HEAR** [44] - 10:9, 11:7, 11:23, 12:2, 12:14, 14:15, 14:18, 15:1, 15:4, 15:11, 15:14, 15:17, 15:20, 15:22, 16:5, 16:9, 16:22, 17:23, 18:5, 18:14, 18:22, 21:9, 21:13, 22:1, 33:25, 34:2, 36:9, 40:8, 40:9, 40:12, 40:13, 40:16, 40:19, 40:23, 40:24, 41:11, 41:14, 42:9, 70:13, 97:23, 109:1, 111:10, 120:20
**HEARD** [7] - 21:10, 21:12, 21:18, 22:11, 28:14, 41:8, 104:10
**HEARING** [9] - 52:23, 53:22, 64:24, 68:21, 69:1, 69:21, 76:22, 76:24, 77:16
**HEARINGS** [1] - 68:5
**HEARS** [1] - 33:9
**HEATHER** [1] - 5:18
**HEIGHT** [1] - 93:12
**HEIGHTENED** [4] - 11:13, 21:11, 22:20, 24:4
**HELD** [2] - 43:12, 68:6
**HELD** [1] - 4:1
**HELP** [13] - 26:5, 33:20, 44:19, 44:20, 44:21, 54:16, 57:1, 58:22, 60:25, 61:10, 63:1, 94:4, 133:21
**HELPED** [1] - 87:4
**HELPING** [3] - 63:2, 110:18
**HELPS** [2] - 33:21, 63:1
**HEREBY** [1] - 144:6
**HEREDIA** [4] - 16:6, 36:15, 36:23, 36:24
**HEREDIA'S** [2] - 36:10, 36:19
**HIGH** [1] - 40:2
**HIGHER** [3] - 32:14, 32:16, 46:24
**HIGHLIGHT** [3] - 10:8, 19:24, 21:8
**HIGHLIGHTED** [1] - 27:7
**HIGHLY** [2] - 39:13, 123:3
**HILL** [1] - 45:25
**HINER** [1] - 41:7
**HIRED** [1] - 33:20
**HISTORIC** [2] - 25:9, 29:10
**HISTORICAL** [3] - 27:6, 46:11, 46:22
**HISTORY** [5] - 11:16, 11:17, 24:7, 25:6, 83:23
**HOLD** [13] - 19:3, 80:12, 91:8, 108:25, 111:20, 113:19, 122:7, 122:17, 131:25, 143:3, 143:18
**HOLD** [1] - 24:23
**HOLDING** [1] - 56:9
**HOLE** [4] - 28:1, 28:12, 28:15, 28:17

**HOLES** [2] - 27:7, 30:8
**HOLIDAYS** [3] - 55:14, 93:20, 99:4
**HOME** [8] - 14:24, 15:11, 15:14, 16:10, 17:9, 17:11, 17:19, 102:20
**HOMES** [1] - 40:1
**HONEST** [1] - 30:3
**HONESTLY** [1] - 66:6
**HONOR** [64] - 4:23, 5:7, 5:12, 6:17, 7:6, 8:5, 9:3, 9:12, 9:13, 9:25, 12:3, 14:12, 17:3, 19:4, 21:7, 24:24, 42:9, 42:14, 49:16, 50:14, 50:17, 50:20, 52:2, 65:14, 65:22, 70:15, 72:13, 72:22, 73:20, 74:6, 74:20, 75:9, 75:25, 76:14, 76:18, 78:6, 79:6, 79:10, 79:15, 79:20, 79:22, 80:15, 80:22, 81:5, 102:7, 109:16, 113:22, 114:3, 114:8, 114:15, 114:25, 120:20, 122:6, 122:19, 125:22, 129:18, 131:21, 132:2, 132:25, 133:16, 135:2, 137:14, 142:19, 143:2
**HONORABLE** [2] - 1:10, 2:22
**HOOD** [1] - 18:21
**HOOPS** [2] - 9:21, 15:1
**HOPE** [1] - 4:11
**HOPEFULLY** [4] - 91:6, 93:3, 110:25, 121:3
**HOSES** [1] - 20:13
**HOST** [1] - 11:22
**HOTLINE** [12] - 49:10, 51:2, 51:6, 60:17, 60:21, 61:4, 61:5, 61:11, 61:13, 61:19, 61:22, 69:24
**HOTLINES** [1] - 131:12
**HOUR** [4] - 39:25, 65:16, 88:10, 114:24
**HOURS** [6] - 7:9, 8:13, 16:17, 62:20, 128:3, 128:9
**HOUSE** [2] - 27:24, 45:7
**HOUSE'S** [1] - 29:7
**HOW'D** [1] - 53:5
**HUGHES** [1] - 2:5
**HUMBLING** [1] - 44:21
**HUNDRED** [1] - 69:15
**HUNDREDS** [3] - 27:14, 39:7, 49:12
**HURDLE** [2] - 7:2, 7:4
**HURDLES** [2] - 15:22, 100:17
**HUSBAND** [1] - 15:19
**HYPERBOLE** [1] - 30:1
**HYPHEN** [1] - 42:24

**I**

**I-85** [2] - 4:3, 4:8
**ID** [2] - 99:12, 100:23
**IDEA** [7] - 41:18, 67:19, 71:11, 117:12, 117:25, 120:4, 129:7
**IDEALISTIC** [1] - 29:16
**IDEALLY** [1] - 93:3
**IDEAS** [1] - 25:11
**IDENTICAL** [1] - 12:21
**IDENTIFICATION** [1] - 116:25
**IDENTIFIED** [4] - 8:6, 10:10, 13:8, 33:3

**IDENTIFY** [6] - 12:24, 38:7, 38:15, 50:9, 51:23, 69:7
**IDENTIFYING** [2] - 22:2, 141:15
**IDENTITY** [2] - 31:13, 39:1
**IGNORED** [1] - 22:23
**ILLEGAL** [7] - 10:11, 10:12, 10:14, 12:6, 12:8, 14:9, 129:12
**ILLEGALLY** [1] - 119:16
**ILLUSTRATE** [1] - 23:9
**IMAGINE** [8] - 71:14, 89:20, 106:11, 106:19, 106:23, 107:7, 124:20, 127:21
**IMMEDIATE** [1] - 10:5
**IMMEDIATELY** [6] - 15:21, 18:21, 18:22, 23:23, 43:13, 45:2
**IMMIGRANTS** [1] - 16:6
**IMPACT** [7] - 11:23, 18:25, 35:4, 56:2, 58:17, 59:6, 61:14
**IMPACTED** [1] - 56:13
**IMPAIR** [1] - 14:13
**IMPLAUSIBLE** [1] - 21:17
**IMPLICIT** [1] - 119:13
**IMPORTANT** [16] - 5:17, 19:24, 23:11, 45:18, 47:7, 63:5, 64:16, 64:24, 64:25, 69:2, 94:19, 94:20, 123:7, 139:6, 139:7
**IMPORTANTLY** [1] - 24:14
**IMPOSED** [1] - 20:5
**IMPRESSION** [1] - 48:8
**IMPROPERLY** [1] - 110:6
**IMPROVEMENTS** [1] - 32:7
**IN** [1] - 4:1
**INACCURATE** [2] - 18:2, 31:4
**INAPPROPRIATE** [1] - 109:22
**INAPPROPRIATELY** [1] - 27:14
**INC** [8] - 4:18, 4:19, 9:15, 43:5, 43:7, 43:21, 45:16, 77:16
**INC** [2] - 1:3, 1:6
**INC.'S** [1] - 44:18
**INCENTIVIZE** [1] - 37:10
**INCLUDE** [1] - 32:13
**INCLUDED** [3] - 7:3, 10:17, 20:14
**INCLUDING** [4] - 7:10, 22:12, 25:8, 96:1
**INCOME** [2] - 39:16, 39:17
**INCONCLUSIVE** [1] - 17:15
**INCONVENIENCE** [2] - 110:14, 111:5
**INCORRECT** [1] - 18:24
**INCORRECTLY** [2] - 12:12, 14:10
**INCREASE** [1] - 61:5
**INCREASES** [1] - 26:25
**INCREDIBLY** [3] - 44:19, 44:22, 64:4
**INDEED** [1] - 37:23
**INDEPENDENCE** [1] - 39:16
**INDEPENDENT** [2] - 29:1, 30:9
**INDICATE** [1] - 140:21
**INDICATED** [2] - 19:5, 37:4
**INDICATES** [2] - 140:23, 140:24
**INDICATION** [2] - 13:10, 36:14
**INDIVIDUAL** [11] - 9:15, 24:6, 28:15, 55:25, 112:11, 123:16, 123:20,

123:22, 124:13, 134:5, 134:6
**INDIVIDUALIZED** [2] - 17:14, 39:8
**INDIVIDUALLY** [1] - 125:10
**INDIVIDUALS** [15] - 9:20, 12:10, 13:9, 13:12, 13:13, 13:17, 13:19, 13:23, 13:25, 14:1, 15:24, 17:22, 20:16, 20:18, 24:15
**INELIGIBLE** [3] - 27:18, 28:9, 28:10
**INFORMATION** [21] - 18:24, 19:4, 39:14, 48:14, 52:18, 54:5, 59:1, 67:1, 73:17, 76:24, 97:3, 101:16, 106:19, 107:12, 107:25, 110:4, 110:10, 134:10, 140:22, 141:2, 141:3
**INFORMED** [5] - 35:2, 69:23, 116:2, 116:3, 116:19
**INITIATED** [2] - 74:19, 139:18
**INITIATIVE** [2] - 45:4, 45:9
**INITIATIVES** [3] - 51:7, 56:4, 63:9
**INNOCENT** [1] - 18:2
**INQUIRY** [2] - 39:9, 40:5
**INSIDE** [2] - 26:16, 79:24
**INSTALLATIONS** [2] - 13:13, 13:20
**INSTANCE** [3] - 14:2, 17:18, 20:21
**INSTANCES** [1] - 13:19
**INSTEAD** [12] - 36:4, 40:24, 56:1, 56:10, 56:23, 57:22, 58:19, 59:9, 60:6, 61:18, 61:21, 62:11
**INSTITUTIONS** [2] - 103:19, 142:17
**INSURANCE** [16] - 89:19, 100:15, 101:13, 106:6, 106:11, 106:13, 106:14, 106:15, 106:18, 106:22, 106:24, 107:6, 107:9, 110:12, 142:13
**INTEGRITY** [3] - 29:22, 31:1, 34:7
**INTEND** [1] - 121:23
**INTENDED** [7] - 17:8, 18:8, 71:14, 90:25, 96:20, 98:19, 121:21
**INTENSE** [1] - 55:10
**INTENSIVE** [1] - 123:3
**INTENT** [9] - 17:7, 20:1, 20:2, 20:6, 37:8, 41:19, 92:25, 93:2, 93:4
**INTENTION** [1] - 121:24
**INTENTIONALLY** [1] - 115:4
**INTENTIONS** [1] - 69:17
**INTERACTED** [1] - 54:3
**INTERESTED** [3] - 33:16, 59:19, 86:25
**INTERESTING** [1] - 103:16
**INTERFERING** [1] - 11:9
**INTERNAL** [1] - 15:25
**INTERNALLY** [1] - 76:4
**INTERNET** [1] - 35:18
**INTERNSHIP** [2] - 83:12, 86:11
**INTERPRETATIONS** [1] - 38:3
**INTERPRETING** [1] - 135:7
**INTERROGATORIES** [3] - 118:8, 118:14, 126:21
**INTERROGATORY** [9] - 112:17, 113:1, 116:22, 116:24, 117:6, 117:7, 117:21, 117:24, 126:1
**INTERROGATORY** [2] - 113:6, 115:17

**INTERRUPTING** [1] - 143:5
**INTERVENOR** [1] - 2:2
**INTIMIDATE** [4] - 19:17, 42:2, 42:6, 51:9
**INTIMIDATED** [10] - 15:15, 40:22, 52:14, 52:19, 118:13, 119:10, 123:18, 126:22, 130:13, 130:14
**INTIMIDATING** [20] - 19:16, 24:9, 24:11, 40:25, 97:24, 101:18, 101:19, 101:25, 117:5, 117:12, 117:13, 117:17, 118:1, 118:20, 129:6, 129:8, 129:13, 129:17, 129:25
**INTIMIDATION** [17] - 19:19, 20:3, 20:4, 20:10, 20:13, 20:23, 21:3, 21:4, 21:5, 21:20, 22:25, 36:10, 39:24, 41:24, 42:7
**INTRODUCES** [1] - 33:10
**INVASIVE** [1] - 39:24
**INVESTIGATE** [2] - 39:15, 39:22
**INVESTIGATING** [1] - 30:8
**INVESTIGATIONS** [1] - 30:20
**INVESTIGATOR** [1] - 29:5
**INVITED** [1] - 34:14
**INVOKE** [3] - 79:18, 79:19, 79:21
**INVOKED** [2] - 79:14, 79:16
**INVOKING** [1] - 9:1
**INVOLVE** [2] - 41:21, 58:13
**INVOLVED** [13] - 15:7, 54:23, 55:19, 56:2, 56:11, 85:10, 85:17, 85:21, 88:18, 90:6, 90:8, 92:4, 134:25
**INVOLVES** [2] - 41:21, 41:22
**INVOLVING** [1] - 17:14
**IRS'S** [1] - 40:18
**ISOLATING** [1] - 99:22
**ISSUE** [8] - 10:11, 11:6, 44:25, 67:16, 69:18, 108:19, 114:18, 127:22
**ISSUED** [1] - 88:25
**ISSUES** [8] - 8:15, 34:7, 45:18, 92:15, 92:16, 95:18, 95:20, 123:3
**ISSUING** [1] - 69:17
**ITALIAN** [1] - 25:13
**ITEMS** [2] - 9:4, 39:12, 46:24
**ITSELF** [5] - 25:23, 117:10, 117:12, 142:8
**IV3** [4] - 63:13, 63:16, 63:23, 76:23

**J**

**JACOB** [1] - 1:18
**JAKE** [2] - 5:14, 102:15
**JAMES** [2] - 33:15, 105:17
**JAMES** [2] - 1:7, 1:22
**JANE** [1] - 1:3
**JANUARY** [8] - 26:7, 28:21, 48:5, 84:10, 87:21, 88:8, 88:20, 92:9
**JENNIFER** [1] - 2:4
**JENNIFER** [1] - 5:7
**JOB** [19] - 15:19, 16:20, 26:1, 45:2, 55:23, 81:25, 83:11, 83:13, 83:16, 83:17, 85:22, 86:10, 86:21, 88:1, 93:6, 93:21, 93:25, 108:14

**JOBS** [2] - 86:7, 91:9
**JOCELYN** [3] - 16:6, 17:8, 17:10
**JOHN** [3] - 1:3, 1:8, 1:21
**JOHNS** [6] - 82:13, 82:14, 82:15, 82:17, 83:18, 84:5
**JOHNSON** [5] - 29:14, 33:7, 33:11, 105:11, 105:14
**JOHNSON** [1] - 1:7
**JOIN** [1] - 24:6
**JOINED** [4] - 5:1, 5:8, 5:13, 24:5
**JONES** [2] - 1:10, 2:22
**JOSEPH** [1] - 18:19
**JOSH** [1] - 6:23
**JOURNALISM** [2] - 86:23, 87:1
**JOURNALIST** [1] - 94:12
**JOURNALISTS** [1] - 34:20
**JUDGE** [27] - 28:13, 102:11, 108:12, 112:1, 112:16, 112:19, 113:9, 115:15, 125:19, 132:22, 133:9, 134:1, 135:21, 137:22, 140:1, 143:10, 143:12
**JUDGE** [1] - 1:11
**JUDGE** [2] - 28:14, 114:22
**JUDGMENT** [1] - 41:12
**JUDGMENT** [1] - 1:10
**JULY** [2] - 103:13, 103:14
**JUMP** [2] - 9:21, 15:1

**K**

**KEEP** [4] - 19:8, 40:11, 74:10, 94:13
**KEEPING** [1] - 53:24
**KEEPS** [1] - 135:17
**KEN** [1] - 12:15
**KEPT** [1] - 18:1
**KEY** [2] - 10:18, 10:22
**KID'S** [1] - 40:1
**KIND** [33] - 7:8, 72:20, 73:2, 85:18, 85:21, 85:22, 86:5, 87:2, 87:5, 88:11, 88:16, 88:18, 90:7, 90:8, 91:14, 94:3, 94:10, 94:19, 94:20, 95:6, 95:9, 95:11, 96:12, 96:21, 99:3, 99:22, 99:23, 101:9, 102:2, 127:11, 129:10
**KINDNESS** [1] - 8:3
**KINDRED** [1] - 29:23
**KINDS** [2] - 19:22, 131:14
**KING** [1] - 85:20
**KNOWING** [1] - 102:3
**KNOWLEDGE** [4] - 71:13, 78:24, 112:6, 112:15
**KNOWLEDGEABLE** [1] - 28:24
**KNOWN** [3] - 27:12, 33:14, 130:8

**L**

**LACK** [1] - 133:2
**LACKS** [1] - 111:23
**LANDLORD** [1] - 101:5
**LANDLORDS** [1] - 20:17
**LANDOWNERS** [1] - 20:15
**LANGUAGE** [1] - 19:14

**LARGE** [3] - 21:16, 31:5, 36:6
**LARGER** [1] - 11:16
**LARGEST** [3] - 23:19, 24:6, 45:10
**LAST** [3] - 86:14, 96:22, 138:22
**LASTED** [1] - 16:17
**LATE** [2] - 84:10, 90:7
**LAUNCH** [2] - 24:6, 63:25
**LAUNCHED** [4] - 11:14, 11:15, 23:13, 52:25
**LAW** [1] - 46:1
**LAW** [10] - 20:3, 20:5, 20:14, 22:7, 28:13, 28:15, 28:17, 32:10, 35:1, 45:25
**LAWFUL** [10] - 9:16, 18:2, 19:6, 19:12, 20:8, 20:21, 20:22, 21:19, 23:4, 33:25
**LAWRENCE** [1] - 1:15, 4:23, 4:25, 5:4, 6:17, 9:3, 9:8, 42:14, 43:1, 49:16, 49:19, 49:21, 49:23, 49:25, 50:4, 50:14, 50:20, 50:23, 52:2, 52:6, 52:9, 53:20, 65:13, 66:13, 66:18, 70:15, 72:13, 73:20, 74:6, 74:20, 75:25, 76:18, 76:20, 77:24, 78:6, 79:15, 80:17, 80:22
**LAWRENCE** [4] - 4:25, 73:23, 78:9
**LAWRENCE-HARDY** [38] - 1:15, 4:23, 4:25, 5:4, 6:17, 9:3, 9:8, 42:14, 43:1, 49:16, 49:19, 49:21, 49:23, 49:25, 50:4, 50:14, 50:20, 50:23, 52:2, 52:6, 52:9, 53:20, 65:13, 66:13, 66:18, 70:15, 72:13, 73:20, 74:6, 74:20, 75:25, 76:18, 76:20, 77:24, 78:6, 79:15, 80:17, 80:22
**LAWRENCE-HARDY** [3] - 4:25, 73:23, 78:9
**LAWS** [3] - 20:15, 20:20, 27:11
**LAWSUIT** [2] - 10:24, 11:3
**LAWSUITS** [1] - 32:22
**LAWYER** [1] - 32:9
**LAWYERS** [5] - 60:24, 134:16, 137:19, 138:10, 138:13
**LAY** [1] - 74:9
**LAYER** [3] - 110:7, 110:25, 125:14
**LAYPERSON** [1] - 71:20
**LEAD** [2] - 56:3, 114:19
**LEADER** [2] - 47:9, 67:7
**LEADERSHIP** [1] - 46:9
**LEADING** [3] - 47:18, 56:18, 123:6
**LEAPS** [1] - 31:6
**LEARN** [3] - 12:3, 47:7, 49:13
**LEARNED** [6] - 15:12, 15:13, 40:17, 47:4, 97:17, 97:18
**LEARNING** [1] - 90:8
**LEARNINGS** [2] - 45:14, 67:7
**LEASE** [1] - 17:9
**LEASEHOLDS** [1] - 39:18
**LEASES** [1] - 101:6
**LEAST** [5] - 28:5, 30:19, 89:20, 99:1, 128:3
**LEAVE** [5] - 82:17, 83:16, 86:21, 88:1, 103:15

**LEAVING** [2] - 85:3, 128:16
**LED** [5] - 19:21, 29:1, 126:5, 137:9, 139:23
**LEDGER** [7] - 86:11, 86:15, 86:17, 86:22, 95:22, 96:7, 116:1
**LEDGER-ENQUIRER** [5] - 86:11, 86:17, 86:22, 95:22, 96:7
**LEFT** [6] - 9:23, 82:18, 83:17, 83:19, 104:1, 115:4
**LEGAL** [9] - 21:7, 37:9, 38:5, 40:15, 58:21, 74:8, 128:23, 136:16
**LEGISLATIVE** [2] - 10:18, 29:8
**LEGISLATORS** [1] - 30:21
**LEGISLATURE** [2] - 34:12, 34:15
**LEGISLATURE** [4] - 10:21, 26:22, 27:10, 34:8
**LEGISLATURES** [1] - 45:21
**LEGITIMATE** [1] - 38:10
**LESLIE** [1] - 1:16
**LESS** [2] - 16:21, 95:12
**LESSONS** [1] - 19:24
**LETTERHEAD** [1] - 36:3
**LETTERS** [1] - 19:3
**LEVEL** [2] - 46:24
**LEVELS** [1] - 46:19
**LEVERS** [1] - 45:20
**LICENSE** [14] - 88:23, 88:25, 89:1, 89:3, 90:21, 100:14, 100:15, 100:22, 108:5, 108:6, 108:17, 109:7, 109:10, 119:22
**LICENSES** [2] - 26:24, 109:24
**LIE** [1] - 14:11
**LIES** [1] - 14:12
**LIFE** [16] - 85:17, 88:18, 93:10, 103:4, 103:16, 104:19, 104:25, 105:6, 105:12, 105:18, 111:2, 125:2, 128:11, 128:12, 128:13
**LIFE** [1] - 86:4
**LIFE'S** [1] - 111:2
**LIGHT** [1] - 48:19
**LIGHTLY** [1] - 137:12
**LIGHTS** [1] - 37:1
**LIKELY** [3] - 14:8, 21:3, 39:23
**LIMIT** [1] - 35:8
**LIMITATION** [1] - 35:7
**LIMITS** [1] - 21:1
**LINE** [4] - 16:15, 95:25, 99:16, 123:5
**LINES** [3] - 9:20, 56:24, 56:25
**LIST** [63] - 5:22, 6:18, 6:21, 7:9, 8:1, 8:7, 11:25, 12:12, 13:11, 16:2, 16:3, 18:16, 18:20, 19:10, 21:23, 22:23, 31:19, 32:12, 32:16, 34:7, 35:3, 36:1, 36:6, 38:18, 40:12, 53:1, 53:5, 54:9, 54:13, 55:7, 57:15, 58:3, 68:8, 68:14, 68:18, 69:8, 72:16, 73:25, 74:1, 74:3, 75:17, 78:12, 96:3, 96:5, 97:7, 101:9, 113:13, 113:20, 114:2, 114:7, 114:11, 114:12, 114:20, 115:10, 115:11, 115:23, 115:25, 116:6, 116:19, 127:8, 129:2
**LISTED** [1] - 15:25
**LISTENING** [3] - 30:4, 30:5, 42:3

**LISTING** [1] - 18:10
**LISTS** [40] - 12:16, 12:23, 13:15, 18:2, 18:17, 19:6, 28:3, 53:2, 54:16, 54:22, 55:5, 55:17, 56:2, 56:7, 56:10, 56:12, 56:23, 57:7, 57:10, 59:2, 68:10, 68:12, 68:17, 73:23, 73:24, 74:2, 75:4, 75:13, 75:16, 75:19, 75:24, 76:8, 76:9, 77:11, 78:5, 78:10, 78:12, 78:15, 78:23, 79:1
**LITERALLY** [1] - 57:13
**LIVE** [21] - 17:18, 28:6, 44:9, 44:10, 77:1, 81:18, 81:21, 82:14, 83:1, 83:20, 84:16, 92:19, 96:13, 103:5, 103:8, 103:10, 103:12, 116:14, 119:19, 119:25, 130:10
**LIVED** [17] - 13:19, 14:21, 15:5, 27:22, 81:16, 81:22, 82:15, 103:13, 106:7, 120:14, 120:19, 120:25, 121:6, 121:11, 121:15, 122:5
**LIVING** [12] - 26:19, 81:17, 84:4, 88:21, 88:22, 96:2, 96:13, 96:16, 101:5, 111:2, 119:20, 130:10
**LOAN** [7] - 127:20, 142:6, 142:7, 142:8, 142:9
**LOANS** [1] - 90:15
**LOCAL** [5] - 5:14, 15:7, 53:3, 83:12, 86:11
**LOCAL** [2] - 91:14, 93:21
**LOCATE** [1] - 101:13
**LOCATIONS** [2] - 57:1, 120:23
**LOCKDOWNS** [1] - 25:5
**LOG** [5] - 107:5, 107:8, 110:12, 111:3, 141:1
**LOGGING** [2] - 127:6, 127:7
**LOGIN** [1] - 107:9
**LOGISTICS** [1] - 9:4
**LONELY** [1] - 26:20
**LONG-TERM** [2] - 84:23, 93:24
**LONGTIME** [1] - 31:9
**LOOK** [17] - 7:15, 18:20, 19:8, 24:18, 31:10, 31:21, 37:5, 37:20, 50:5, 51:22, 55:18, 59:23, 63:18, 99:24, 101:7, 115:18, 121:3
**LOOKING** [2] - 42:10, 52:10
**LOOKS** [1] - 122:15
**LOSSES** [1] - 10:7
**LOUD** [1] - 21:12
**LOUDER** [1] - 81:2
**LOVE** [4] - 64:15, 84:25, 85:1
**LOVED** [3] - 86:1, 91:7, 101:23
**LOW** [1] - 62:6
**LUNACY** [1] - 26:9
**LUNCH** [6] - 114:24, 143:6, 143:8, 143:17, 143:19, 143:22

## M

**MA'AM** [1] - 79:7
**MACHINERY** [1] - 26:16
**MADAM** [1] - 124:7
**MAELSTROM** [1] - 25:5

**MAGAZINE** [1] - 91:14
**MAIL** [18] - 10:15, 11:21, 11:22, 17:16, 38:24, 39:7, 44:2, 47:22, 48:23, 64:23, 69:8, 69:10, 71:16, 90:16, 90:17, 99:6, 100:9, 111:3
**MAILED** [6] - 18:18, 53:13, 78:18, 78:19, 101:14, 101:15
**MAILER** [1] - 71:13
**MAILERS** [1] - 39:6
**MAILING** [27] - 38:21, 54:7, 54:8, 72:16, 90:1, 90:2, 90:13, 95:24, 100:20, 100:25, 106:20, 106:22, 110:13, 117:2, 127:22, 127:24, 140:10, 140:23, 140:24, 141:2, 141:4, 141:5, 141:9, 141:10, 141:18, 142:2, 142:9
**MAILINGS** [4] - 26:15, 38:20, 71:9, 71:14
**MAILS** [1] - 70:5
**MAIN** [2] - 85:11, 87:25
**MAINTAINED** [3] - 14:24, 46:18, 96:2
**MAINTAINING** [1] - 126:13
**MAINTENANCE** [2] - 21:23, 34:8
**MAKEUP** [1] - 48:18
**MALAPROPISM** [1] - 40:16
**MAN** [1] - 28:24
**MANAGE** [2] - 55:24, 128:7
**MANAGED** [1] - 35:18
**MANAGING** [1] - 43:13
**MANNER** [1] - 92:12
**MANUAL** [1] - 31:8
**MARCOS** [1] - 1:16
**MARINE** [1] - 29:17
**MARITAL** [1] - 39:17
**MARK** [2] - 1:7
**MARK** [3] - 26:12, 28:24, 105:5
**MARK** [3] - 33:19, 72:4, 112:16
**MARKED** [4] - 40:3, 50:6, 50:21, 52:7
**MARKETPLACE** [1] - 25:11
**MARTIN** [3] - 8:14, 8:15, 18:19
**MARTINEZ** [1] - 5:18
**MASS** [8] - 11:15, 15:13, 16:24, 24:6, 38:20, 38:21, 39:6, 63:20
**MASTER** [1] - 87:18
**MASTER'S** [5] - 88:20, 89:2, 89:11, 90:22, 92:7
**MASTERS** [1] - 46:2
**MATCH** [4] - 13:6, 113:13, 114:21, 115:5
**MATCHES** [1] - 109:25
**MATHEMATICAL** [1] - 17:6
**MATTER** [4] - 6:8, 9:2, 127:2, 127:6
**MATTERS** [4] - 4:15, 20:19, 25:18, 43:20
**MAYER** [2] - 12:15, 32:19
**MAYOR** [1] - 27:4
**MC** [2] - 1:16, 1:18
**MCCLATCHY** [2] - 86:15, 87:3
**MEAN** [13] - 21:2, 33:4, 38:25, 68:16, 71:24, 84:21, 88:13, 106:19, 107:20,

120:22, 121:25, 128:3, 136:15
**MEANING** [4] - 12:21, 12:23, 13:2, 28:7
**MEANS** [3] - 13:7, 13:15, 41:13
**MEANWHILE** [1] - 30:23
**MEDIA** [5] - 34:9, 34:12, 47:11, 69:13, 69:15
**MEET** [4] - 29:21, 85:17, 85:19, 102:15
**MEETING** [4] - 18:6, 32:5, 46:13, 63:2
**MEETINGS** [6] - 53:8, 53:12, 54:11, 54:14, 55:6, 57:18
**MEETS** [1] - 31:24
**MELLETT** [1] - 5:9
**MELLETT** [1] - 2:4
**MEMBER** [1] - 96:19
**MEMBERS** [1] - 5:4
**MEMO** [1] - 58:21
**MEMORY** [1] - 103:6
**MEN** [1] - 30:16
**MENG** [1] - 81:6
**MENG** [19] - 1:17, 81:5, 81:9, 102:5, 125:22, 125:24, 126:9, 129:18, 132:2, 132:15, 132:19, 132:25, 133:16, 135:2, 135:8, 137:14, 137:16, 142:19, 142:24
**MENS** [1] - 42:1
**MENTION** [3] - 41:1, 70:14, 85:7
**MENTIONED** [12] - 8:11, 41:23, 58:3, 58:10, 66:8, 68:20, 69:20, 70:10, 70:20, 70:24, 72:23, 78:4
**MENTIONING** [1] - 67:10
**MERELY** [3] - 10:2, 22:10, 37:14
**MESH** [1] - 28:4
**MESSAGES** [3] - 61:21, 64:20, 77:17
**MET** [3] - 18:4, 34:16, 34:22
**METAPHYSICAL** [1] - 33:6
**METHODS** [2] - 12:16, 31:13
**MICHAEL** [1] - 5:12
**MICHAEL** [1] - 1:21
**MICHELLE** [1] - 1:18
**MICHIGAN'S** [1] - 46:1
**MIDDLE** [3] - 26:8, 122:10, 122:16
**MIDST** [2] - 48:15, 94:6
**MIDTOWN** [1] - 85:20
**MIGHT** [6] - 6:22, 21:21, 22:8, 31:20, 97:9, 135:18
**MILITARY** [5] - 13:12, 13:20, 14:2, 14:20, 14:21
**MILLION** [7] - 11:12, 23:18, 24:1, 24:3, 25:16, 31:19, 49:8
**MILLIONS** [2] - 26:15, 39:7
**MIND** [4] - 40:17, 90:23, 118:16, 118:18
**MINDS** [1] - 25:4
**MINORITY** [1] - 32:14
**MINUTE** [2] - 96:22, 139:24
**MINUTES** [3] - 9:10, 88:10, 96:17
**MISCHARACTERIZATIONS** [1] - 132:20
**MISCHARACTERIZE** [1] - 68:4
**MISCHARACTERIZES** [3] - 66:15, 70:16, 78:7

**MISCHARACTERIZING** [1] - 132:17
**MISINFORMATION** [1] - 60:7
**MISSING** [3] - 13:18, 39:4, 41:19
**MISSION** [2] - 61:14, 62:2
**MOBILITY** [1] - 28:25
**MOCINE** [1] - 1:16
**MOCINE-MC** [1] - 1:16
**MOMENT** [6] - 35:20, 41:7, 48:6, 49:25, 54:20, 75:9
**MOMENTUM** [1] - 10:17
**MONEY** [2] - 24:2, 61:15
**MONITOR** [5] - 49:11, 57:18, 62:20, 63:3, 63:11
**MONITORING** [17] - 11:13, 21:11, 24:4, 51:2, 51:7, 53:25, 56:24, 59:15, 59:19, 59:20, 59:22, 59:25, 60:4, 61:8, 64:1, 64:3, 77:8
**MONTH** [4] - 39:7, 71:11, 71:12, 91:20
**MONTHLY** [1] - 91:13
**MONTHS** [7] - 26:7, 28:23, 81:23, 88:6, 93:25, 121:5, 121:7
**MOON** [1] - 30:4
**MORGANTON** [2] - 121:6, 121:7
**MORNING** [28] - 4:2, 4:3, 4:8, 4:11, 4:12, 4:22, 4:23, 4:24, 5:1, 5:3, 5:6, 5:7, 5:10, 5:12, 5:19, 5:20, 6:6, 6:7, 6:11, 7:11, 9:13, 43:2, 43:3, 66:4, 66:5, 81:5, 81:10, 81:11
**MORRISON** [19] - 1:17, 81:5, 81:9, 102:5, 125:22, 125:24, 126:9, 129:18, 132:2, 132:15, 132:19, 132:25, 133:16, 135:2, 135:8, 137:14, 137:16, 142:19, 142:24
**MORRISON** [1] - 81:6
**MOST** [13] - 5:17, 12:8, 14:1, 20:8, 21:14, 32:13, 33:5, 38:14, 39:9, 63:5, 85:24, 107:16
**MOSTLY** [1] - 62:6
**MOTION** [7] - 5:21, 6:5, 6:8, 6:12, 6:25, 7:17, 7:20
**MOTIONS** [1] - 7:19
**MOTIVATED** [1] - 64:16
**MOTIVATING** [2] - 47:20, 64:19
**MOTIVATION** [1] - 43:17
**MOTOR** [1] - 39:20
**MOVE** [15] - 17:9, 38:23, 39:3, 52:3, 72:9, 75:11, 81:24, 82:7, 82:11, 93:2, 102:23, 103:22, 103:24, 121:21, 123:8
**MOVED** [39] - 12:21, 12:25, 13:1, 13:17, 14:3, 14:5, 15:9, 15:10, 15:18, 22:5, 27:20, 28:7, 29:12, 31:2, 32:1, 38:15, 82:8, 82:13, 82:15, 83:2, 83:18, 84:8, 84:9, 85:8, 89:24, 90:1, 103:14, 110:17, 120:10, 120:25, 121:1, 121:2, 121:5, 121:6, 122:3, 124:21, 141:16, 141:17, 142:23
**MOVERS** [1] - 85:18
**MOVES** [3] - 40:3, 122:22, 122:25
**MOVING** [6] - 26:22, 30:13, 46:21, 91:3, 92:25, 121:4

**MR** [122] - 5:12, 7:6, 7:8, 7:24, 8:5, 8:18, 8:21, 9:12, 24:22, 24:24, 49:22, 49:24, 50:1, 50:3, 50:17, 52:4, 65:22, 65:25, 66:2, 66:19, 70:19, 72:22, 73:4, 73:5, 74:5, 74:12, 74:22, 75:9, 75:12, 76:14, 78:3, 78:22, 79:6, 79:10, 79:19, 79:21, 79:25, 80:15, 80:20, 102:11, 102:14, 108:10, 108:12, 108:14, 108:15, 109:4, 109:5, 109:16, 109:17, 109:21, 111:22, 112:1, 112:3, 112:8, 112:16, 112:21, 113:9, 113:12, 113:14, 113:16, 113:18, 113:22, 114:3, 114:8, 114:10, 114:14, 114:22, 114:24, 115:3, 115:13, 115:15, 115:16, 115:21, 115:24, 118:17, 122:6, 122:8, 122:10, 122:14, 122:16, 122:19, 122:21, 123:2, 123:9, 123:10, 124:6, 124:10, 124:11, 125:19, 129:24, 131:21, 131:22, 132:22, 133:7, 133:9, 133:17, 133:19, 133:21, 133:25, 134:2, 134:21, 135:20, 135:24, 135:25, 136:3, 136:11, 136:12, 137:15, 137:17, 137:22, 137:25, 138:11, 139:1, 139:21, 139:25, 140:3, 142:5, 142:21, 143:1, 143:9, 143:12, 143:15
**MS** [56] - 4:23, 4:25, 5:4, 5:7, 6:17, 9:3, 9:8, 42:14, 43:1, 49:16, 49:19, 49:21, 49:23, 49:25, 50:4, 50:14, 50:20, 50:23, 52:2, 52:6, 52:9, 53:20, 65:13, 66:13, 66:18, 70:15, 72:13, 73:20, 74:6, 74:20, 75:25, 76:18, 76:20, 77:24, 78:6, 79:15, 80:17, 80:22, 81:5, 81:9, 102:5, 125:22, 125:24, 126:9, 129:18, 132:2, 132:15, 132:19, 132:25, 133:16, 135:2, 135:8, 137:14, 137:16, 142:19, 142:24
**MULTIPLE** [2] - 65:7, 102:18
**MUNICIPAL** [1] - 99:19
**MUSCOGEE** [35] - 16:1, 81:17, 81:18, 83:2, 83:8, 83:9, 83:10, 83:19, 84:25, 85:1, 87:23, 89:14, 89:23, 89:24, 91:22, 92:20, 92:25, 93:2, 93:3, 93:18, 100:16, 108:9, 111:13, 112:12, 119:19, 119:22, 119:25, 121:3, 125:6, 125:9, 127:24, 128:22, 140:8, 141:5, 142:13
**MUST** [3] - 28:3, 28:6, 42:6

## N

**NAME** [19] - 5:24, 9:14, 13:5, 13:6, 42:21, 42:23, 80:9, 80:10, 80:23, 81:6, 102:15, 116:6, 125:12, 131:2, 134:6, 134:7, 136:14, 137:3, 138:22
**NAMED** [4] - 54:19, 104:9, 111:12, 116:16
**NAMES** [10] - 6:1, 14:16, 18:11, 18:13, 18:17, 31:23, 33:5, 37:12, 41:11, 41:14
**NANCY** [2] - 100:9, 125:12

**NARRATIVE** [1] - 26:13
**NATIONAL** [4] - 34:12, 44:7, 87:3, 87:5
**NATIONAL** [5] - 21:24, 26:16, 71:18, 72:5, 72:8
**NATIONALLY** [1] - 94:19
**NATURAL** [2] - 20:10, 20:23
**NAVIGATE** [7] - 9:21, 29:17, 54:16, 57:1, 60:25, 61:11, 118:3
**NAVIGATED** [1] - 58:12
**NAVY** [10] - 14:23, 37:10, 40:24, 41:1, 41:6, 41:8, 42:3, 49:10, 59:21, 70:24
**NCOA** [13] - 18:9, 28:25, 31:12, 31:14, 31:16, 31:22, 32:3, 32:6, 38:4, 38:16, 38:20, 40:2, 40:11
**NCOA-BASED** [1] - 40:11
**NEAR** [2] - 17:11, 105:20
**NECESSARILY** [2] - 117:9, 121:19
**NEED** [20] - 4:15, 32:2, 41:24, 57:14, 61:17, 61:18, 75:11, 76:10, 79:17, 79:23, 81:1, 90:2, 99:24, 100:8, 108:1, 113:20, 114:2, 114:6, 130:12, 133:21
**NEEDED** [14] - 37:20, 61:9, 90:15, 90:16, 90:19, 98:21, 99:14, 107:18, 108:21, 109:1, 109:6, 125:13, 125:15
**NEEDS** [2] - 46:24, 115:5
**NEGATIVELY** [1] - 32:24
**NEIGHBORS** [1] - 27:23
**NEVADA** [1] - 45:8
**NEVER** [19] - 11:16, 12:21, 16:3, 17:8, 27:1, 90:23, 90:25, 95:4, 98:2, 99:22, 104:21, 104:24, 105:2, 105:5, 105:8, 105:11, 105:14, 105:17
**NEW** [9] - 12:20, 13:14, 17:5, 25:23, 27:2, 58:23, 94:20, 128:17, 142:2
**NEWS** [5] - 15:12, 87:5, 94:9, 94:22
**NEWSPAPER** [5] - 15:7, 83:12, 85:12, 86:10, 95:22
**NEWSROOM** [1] - 87:4
**NEXT** [3] - 21:21, 40:19, 79:9
**NIGHT** [1] - 90:7
**NKWONTA** [15] - 1:17, 8:5, 8:18, 9:12, 79:10, 79:19, 109:16, 111:22, 113:12, 113:16, 122:6, 122:14, 122:19, 122:21, 131:21
**NKWONTA** [2] - 5:2, 9:14
**NO** [1] - 1:4
**NOBODY** [7] - 41:8, 116:3, 118:24, 123:12, 123:14, 123:18, 130:7
**NOBODY'S** [1] - 118:21
**NON** [3] - 11:2, 35:23, 40:21
**NON-CITIZENS** [1] - 11:2
**NON-PLAINTIFF** [1] - 35:23
**NON-RECKLESS** [1] - 40:21
**NONPROFIT** [1] - 30:24
**NONVIOLENT** [2] - 20:3, 21:5
**NORMAL** [6] - 20:22, 71:20, 95:11, 111:2, 128:12, 128:13
**NORMALLY** [1] - 56:14
**NORMS** [1] - 95:10
**NORTH** [2] - 4:3, 4:9

**NORTH** [12] - 45:25, 82:13, 103:10, 103:12, 103:13, 103:15, 103:22, 104:1, 121:5, 121:6, 121:8, 124:21
**NORTHERN** [1] - 113:25
**NORTHERN** [2] - 1:1, 144:4
**NOTE** [4] - 89:20, 106:6, 106:10, 132:24
**NOTED** [1] - 59:11
**NOTES** [1] - 115:6
**NOTHING** [5] - 8:5, 9:25, 17:17, 71:20, 131:7
**NOTICE** [2] - 7:22, 22:4
**NOTIFICATION** [1] - 69:8
**NOVEMBER** [9] - 10:5, 25:3, 28:19, 47:19, 48:2, 48:23, 66:20, 67:2, 69:17
**NULLIFY** [1] - 10:19
**NUMBER** [2] - 1, 29:11, 35:9, 49:7, 52:13, 52:25, 54:19, 55:12, 67:25, 69:10, 70:1, 75:6, 113:17
**NUMBERED** [1] - 39:12
**NUMBERS** [2] - 21:16, 68:11
**NUMEROUS** [1] - 61:25
**NVRA** [3] - 25:23, 28:3, 38:17
**NVRA'S** [1] - 37:24

# O

**OBJECT** [5] - 8:21, 72:13, 132:2, 132:15, 133:3
**OBJECTING** [4] - 8:2, 122:11, 131:19, 132:1
**OBJECTION** [31] - 7:15, 7:25, 50:16, 50:19, 52:4, 52:5, 66:17, 66:18, 70:15, 73:21, 74:7, 74:21, 75:25, 76:4, 78:6, 109:16, 111:21, 111:22, 112:5, 113:12, 122:6, 122:18, 122:20, 122:21, 132:19, 133:14, 133:15, 135:3, 137:14, 142:19, 143:4
**OBJECTIONS** [3] - 8:12, 113:11, 131:17
**OBLIGATION** [1] - 39:25
**OBLIGATIONS** [2] - 111:2, 128:12
**OBSERVATIONS** [1] - 17:16
**OBSOLETE** [1] - 29:18
**OBTAIN** [1] - 76:8
**OBTAINED** [1] - 76:8
**OBVIOUSLY** [2] - 5:4, 76:2
**OCTOBER** [1] - 144:8
**OCTOBER** [1] - 1:11
**ODD** [1] - 86:7
**OF** [6] - 1:1, 1:10, 1:14, 1:20, 2:2, 144:4
**OFF-CAMPUS** [1] - 88:22
**OFFENSE** [4] - 14:22, 15:9, 16:18, 24:17
**OFFER** [9] - 7:11, 50:15, 52:3, 116:18, 123:21, 124:12, 134:4, 134:19, 134:22
**OFFERED** [2] - 83:13, 86:13
**OFFERING** [3] - 23:20, 49:8, 113:8
**OFFICE** [3] - 26:14, 100:6, 130:15
**OFFICE** [1] - 22:3
**OFFICE'S** [1] - 18:5
**OFFICIAL** [2] - 2:22, 144:14

**OFFICIAL** [1] - 110:6
**OFFICIALS** [2] - 10:13, 18:1
**OFTEN** [1] - 140:12
**OLD** [4] - 26:6, 26:25, 82:9, 82:10
**OMINOUS** [1] - 9:23
**ON** [3] - 1:14, 1:20, 2:2
**ONBOARDING** [1] - 46:18
**ONCE** [4] - 10:14, 11:7, 19:2, 115:10
**ONE** [56] - 6:15, 7:21, 7:22, 8:14, 11:20, 16:21, 17:7, 17:19, 18:6, 18:19, 21:1, 21:10, 21:17, 23:9, 24:23, 25:9, 25:21, 25:25, 26:12, 27:10, 29:2, 29:3, 29:18, 32:7, 37:21, 43:5, 49:25, 50:2, 59:11, 69:10, 70:20, 75:9, 77:13, 80:12, 82:22, 85:7, 86:2, 87:25, 88:8, 114:25, 121:6, 125:15, 128:4, 129:5, 130:21, 131:5, 131:15, 131:16, 131:17, 131:19, 133:21, 136:5, 138:20, 142:14, 143:18
**ONE-ON-ONE** [1] - 69:10
**ONE-YEAR** [1] - 16:21
**ONES** [2] - 48:22, 136:19
**ONLINE** [4] - 53:8, 54:11, 54:12, 107:1
**OPEN** [1] - 85:3, 87:11
**OPEN** [1] - 4:1
**OPENED** [1] - 140:8
**OPENING** [5] - 4:16, 8:24, 9:10, 24:21
**OPERATIONS** [1] - 16:25
**OPPORTUNITIES** [1] - 81:25
**OPPORTUNITY** [4] - 15:19, 85:2, 85:4, 134:7
**OPPOSING** [2] - 8:10, 114:4
**OPPOSITE** [1] - 12:13
**OPSEC** [1] - 31:10
**OPTION** [1] - 85:3
**OPTIONS** [3] - 37:25, 127:17, 127:18
**ORDEAL** [1] - 16:17
**ORDER** [8] - 5:23, 6:2, 6:6, 8:7, 8:8, 37:13, 107:1, 107:19
**ORDINARY** [1] - 30:19
**ORGANIZATION** [14] - 43:15, 44:7, 44:11, 45:9, 46:20, 47:18, 55:11, 57:12, 58:1, 59:7, 61:25, 62:2, 67:8, 138:17
**ORGANIZATION'S** [1] - 43:9, 47:2, 49:5, 64:11
**ORGANIZATIONAL** [4] - 46:6, 46:22, 46:24
**ORGANIZATIONS** [3] - 14:14, 47:5, 131:13
**ORGANIZER** [1] - 62:25
**ORGANIZING** [7] - 55:3, 55:19, 55:20, 55:21, 56:1, 58:14, 97:5
**ORIGINAL** [2] - 6:18, 46:7
**ORIGINALLY** [3] - 55:20, 57:17, 97:12
**ORIGINATING** [1] - 23:14
**OTHERED** [1] - 99:21
**OTHERWISE** [1] - 96:14
**OUT-OF-STATE** [1] - 95:24

**OUTCOME** [2] - 23:20, 23:21
**OUTLAWED** [1] - 19:19
**OUTRIGHT** [1] - 14:10
**OUTSIDE** [13] - 27:2, 27:22, 73:3, 79:23, 83:20, 96:2, 96:13, 96:16, 110:12, 111:2, 119:25, 123:17, 142:20
**OVERCOME** [1] - 15:23
**OVERRIDING** [2] - 25:21, 76:4
**OVERRULE** [2] - 133:14, 143:3
**OVERRULED** [1] - 109:19
**OVERSEAS** [1] - 15:23
**OVERSEEING** [2] - 46:5, 56:8
**OVERSEES** [1] - 62:25
**OVERTURN** [3] - 10:24, 11:8, 23:14
**OVERTURNED** [1] - 27:16
**OVERWHELMED** [2] - 15:15, 97:20
**OWN** [16] - 25:15, 29:5, 29:8, 33:13, 36:2, 36:3, 36:13, 94:4, 105:23, 105:25, 106:3, 107:11, 107:17, 123:25, 140:5
**OWNED** [1] - 39:19
**OWNS** [1] - 31:15

## P

**P.M** [1] - 143:22
**PAC** [1] - 45:6
**PACKAGES** [3] - 90:14, 90:17, 117:2
**PAGE** [1] - 32:20
**PAGES** [2] - 113:24, 144:6
**PAID** [4] - 101:5, 106:4, 106:6, 106:10
**PAIKOWSKY** [1] - 5:8
**PAIKOWSKY** [1] - 2:3
**PAINSTAKING** [1] - 29:6
**PANDAEMONIUM** [1] - 25:4
**PANDEMIC** [6] - 25:5, 48:15, 93:12, 93:15, 94:1, 99:4
**PAPER** [2] - 33:21, 78:19
**PARALEGAL** [1] - 5:17
**PARDON** [1] - 114:10
**PARENT** [1] - 86:15
**PARENTHOOD** [2] - 45:5
**PARENTS** [3] - 17:10, 39:18, 102:25
**PART** [9] - 11:7, 12:4, 32:8, 35:8, 39:9, 63:5, 74:4, 86:23, 94:10
**PARTICIPATE** [8] - 44:2, 44:23, 48:25, 51:13, 56:20, 63:7, 69:2, 98:12
**PARTICIPATED** [1] - 101:24
**PARTICIPATING** [4] - 51:10, 52:15, 54:2, 101:22
**PARTICIPATION** [1] - 15:3
**PARTICULAR** [9] - 36:21, 55:2, 62:5, 68:17, 72:2, 94:18, 110:16, 130:7
**PARTICULARLY** [12] - 45:18, 45:19, 52:12, 52:13, 56:17, 56:25, 60:8, 60:19, 64:17, 68:25, 77:8, 107:11
**PARTIES** [6] - 36:13, 79:2, 80:1, 80:2, 104:13
**PARTNER** [7] - 16:19, 81:25, 84:24, 93:24, 103:17, 110:18

**PARTWAY** [1] - 87:1
**PARTY** [2] - 41:13, 134:13
**PARTY** [1] - 50:12
**PASS** [1] - 102:7
**PASSED** [1] - 20:14
**PASSION** [1] - 87:23
**PASSWORD** [3] - 107:5, 107:9, 107:16
**PAST** [8] - 47:7, 103:14, 120:12, 120:14, 120:19, 121:11, 121:16, 122:2
**PATH** [2] - 26:9, 29:18
**PATRIOTIC** [1] - 29:16
**PAUSE** [2] - 48:6, 143:9
**PAY** [6] - 27:1, 105:23, 105:25, 106:3, 106:5, 106:24
**PAYING** [2] - 89:17, 89:19
**PAYMENT** [1] - 107:2
**PAYMENTS** [2] - 101:9, 142:15
**PAYOFF** [1] - 10:19
**PENDLETON** [1] - 14:1
**PENNSYLVANIA** [5] - 81:21, 84:19, 104:4, 104:5, 125:1
**PEOPLE** [71] - 4:6, 11:22, 13:8, 17:24, 21:16, 22:11, 25:5, 25:22, 26:19, 26:22, 29:23, 30:13, 30:18, 31:11, 33:24, 34:17, 35:5, 36:6, 36:25, 37:1, 37:2, 37:3, 44:23, 47:12, 47:21, 47:23, 48:16, 48:24, 51:12, 52:14, 55:3, 55:5, 55:15, 55:25, 56:6, 57:16, 57:23, 59:23, 61:1, 61:16, 62:4, 62:6, 63:18, 64:19, 64:20, 64:21, 64:22, 65:11, 67:2, 67:4, 68:16, 69:6, 70:3, 72:3, 79:2, 85:20, 85:23, 86:11, 87:9, 88:14, 95:7, 95:8, 95:10, 95:25, 96:12, 96:18, 98:23, 101:6, 139:11
**PEOPLE'S** [1] - 31:13
**PERCEIVED** [1] - 10:10
**PERCENT** [6] - 11:25, 12:11, 14:9, 32:17, 32:19, 38:22
**PERCENTAGE** [2] - 32:15, 39:2, 39:5
**PERFECT** [1] - 25:15
**PERFORMED** [2] - 75:24, 76:4
**PERHAPS** [4] - 41:20, 96:25, 107:11, 107:16
**PERIOD** [11] - 37:24, 60:8, 81:16, 82:23, 83:4, 96:19, 102:2, 128:5, 128:13, 128:15, 128:16
**PERIODS** [1] - 94:3
**PERKINS** [4] - 138:20, 138:23, 139:2, 139:15
**PERKINS** [1] - 138:22
**PERMANENT** [10] - 14:24, 16:9, 31:17, 36:12, 38:23, 40:3, 40:4, 40:11, 72:4, 72:9
**PERMANENTLY** [4] - 38:15, 39:3, 91:3, 119:20
**PERMISSION** [1] - 18:17
**PERSON** [31] - 6:2, 15:25, 16:15, 19:15, 35:23, 36:24, 39:2, 54:10, 62:25, 92:14, 93:16, 95:17, 98:3, 98:13, 98:17, 98:18, 98:19, 98:22, 99:7,

116:9, 116:11, 116:14, 116:16, 116:18, 123:20, 130:15, 131:18, 131:25, 138:17, 139:22
**PERSON'S** [1] - 94:11
**PERSONAL** [6] - 38:19, 39:13, 39:19, 48:13, 82:4, 112:14
**PERSONALLY** [2] - 31:24, 70:7
**PETITION** [6] - 22:19, 23:4, 26:4, 31:20, 33:13, 33:14, 33:17, 33:23, 36:10
**PETITIONER** [1] - 34:25
**PETITIONERS** [3] - 33:16, 33:22, 39:9
**PETITIONS** [9] - 32:6, 34:1, 34:2, 35:21, 37:19, 38:10, 41:22, 42:5, 67:16
**PHILLIPS** [2] - 31:10, 31:12
**PHONE** [12] - 55:24, 56:9, 61:20, 62:9, 70:2, 70:6, 89:20, 97:10, 97:13, 106:6, 106:12, 138:14
**PHONES** [1] - 57:23
**PHOTO** [1] - 100:14
**PHRASE** [2] - 68:21, 70:11
**PHYSICAL** [1] - 127:14
**PICK** [2] - 56:7, 90:19
**PIECES** [3] - 39:7, 39:14, 100:18
**PITTSBURGH** [9] - 81:21, 81:22, 81:24, 81:25, 84:16, 85:2, 103:14, 103:24, 121:9
**PLACE** [14] - 16:15, 21:1, 25:23, 28:19, 29:24, 33:25, 34:17, 44:14, 44:16, 62:7, 87:1, 107:19, 110:9, 127:15
**PLACES** [14] - 11:13, 21:11, 24:4, 37:11, 55:10, 88:15, 92:3, 103:16, 120:14, 120:22, 121:11, 121:15, 122:3, 125:2
**PLAIN** [2] - 19:14, 21:19
**PLAINTIFF** [12] - 9:14, 15:4, 29:3, 33:3, 35:16, 35:23, 41:17, 42:13, 74:15, 137:10, 137:11
**PLAINTIFF'S** [3] - 50:6, 50:21, 52:7
**PLAINTIFFS** [2] - 1:4, 1:14
**PLAINTIFFS** [22] - 4:21, 5:1, 6:21, 8:24, 21:9, 33:1, 33:4, 35:16, 36:17, 36:19, 39:4, 40:19, 41:18, 42:15, 43:5, 50:15, 52:3, 74:14, 79:10, 81:6, 113:21, 114:11
**PLAINTIFFS'** [5] - 12:14, 26:13, 36:13
**PLAN** [11] - 10:8, 10:16, 32:8, 48:20, 57:17, 57:21, 63:12, 79:19, 95:15, 95:16
**PLANNED** [10] - 48:22, 49:2, 55:20, 58:1, 58:2, 58:17, 59:6, 59:17, 67:16, 95:17
**PLANNED** [2] - 45:4, 45:5
**PLANNING** [5] - 46:14, 87:18, 88:3, 95:13
**PLANS** [6] - 17:9, 32:1, 32:5, 46:11, 59:12, 90:9
**PLATFORM** [1] - 30:16
**PLEADINGS** [2] - 136:13, 136:15
**PLEASURE** [1] - 102:15
**PLUG** [1] - 28:15

**PODCAST** [1] - 21:15
**PODCASTS** [2] - 22:9, 34:9
**POINT** [24] - 7:16, 8:20, 11:20, 13:21, 17:8, 32:21, 67:13, 82:7, 83:16, 90:4, 98:8, 103:10, 104:19, 104:24, 105:5, 105:11, 105:17, 118:10, 118:12, 122:23, 124:19, 133:4, 138:20, 141:13
**POINT** [1] - 14:5
**POINTS** [2] - 37:1, 63:2
**POKING** [1] - 30:8
**POLICE** [1] - 20:13
**POLICY** [4] - 44:12, 45:1, 45:15, 45:20
**POLITICAL** [1] - 12:15
**POLITICALLY** [1] - 23:16
**POLITICALLY-CHARGED** [1] - 23:16
**POLL** [1] - 125:8
**POLLING** [6] - 11:13, 16:15, 21:11, 24:4, 37:11, 56:25
**POLLS** [4] - 11:14, 20:12, 21:12, 96:23
**POLLUTE** [1] - 25:11
**POP** [1] - 30:22
**POPULATIONS** [1] - 32:14
**POPULOUS** [1] - 32:13
**PORTAL** [1] - 107:1
**POSITION** [5] - 5:23, 6:9, 86:13, 91:12, 91:16
**POSITIONS** [1] - 43:12
**POSSESS** [1] - 47:1
**POSSIBILITY** [1] - 87:10
**POSSIBLE** [4] - 38:18, 58:11, 99:8, 114:23
**POSSIBLY** [1] - 96:3
**POST** [1] - 30:17
**POSTAL** [3] - 30:13, 38:23, 38:24
**POTENTIAL** [2] - 36:1, 40:25
**POTENTIALLY** [2] - 51:9, 119:18
**POWELL** [3] - 5:16, 24:22, 78:9
**POWELL** [22] - 1:21, 24:22, 24:24, 50:17, 52:4, 65:22, 65:25, 66:2, 66:19, 70:19, 72:22, 73:4, 73:5, 74:5, 74:12, 74:22, 75:9, 75:12, 76:14, 78:3, 78:22, 79:6
**POWER** [1] - 38:22
**PRECINCT** [3] - 26:25, 98:23, 99:11
**PREDICT** [2] - 32:3, 39:2
**PREDICTING** [2] - 40:3, 72:9
**PREDICTIVE** [1] - 38:22
**PREEXISTING** [2] - 20:2, 20:5
**PREJUDICIAL** [1] - 76:2
**PREMARKED** [1] - 115:5
**PREPARE** [1] - 46:8
**PREPARED** [4] - 16:2, 18:13, 34:5, 77:21
**PREPARING** [1] - 110:17
**PRESENTATION** [3] - 41:2, 41:4, 42:3
**PRESENTED** [1] - 12:22
**PRESENTING** [2] - 18:7, 24:19
**PRESIDENT** [2] - 30:23, 45:3
**PRESIDENT** [2] - 11:2, 12:10

**PRESIDENTIAL** [7] - 9:18, 10:20, 10:25, 11:8, 23:21, 25:7, 94:23
**PRESS** [5] - 21:15, 22:9, 50:10, 51:24, 67:9
**PRETRIAL** [2] - 5:23, 6:2
**PRETTY** [3] - 6:25, 93:23, 121:14
**PREVAILED** [1] - 68:24
**PREVAILS** [2] - 64:12, 65:5
**PREVENT** [1] - 29:8
**PREVIEW** [1] - 21:8
**PREVIOUS** [2] - 64:5, 83:11, 93:25
**PREVIOUSLY** [2] - 87:22, 127:4
**PRIMARY** [3] - 44:7, 59:11, 92:11
**PRINT** [2] - 33:20, 91:13
**PRINTED** [1] - 113:23
**PRINTER** [1] - 33:19
**PRIVATE** [3] - 41:1, 42:4, 48:13
**PRIVILEGE** [3] - 132:6, 135:16, 139:22
**PRIVILEGED** [9] - 132:4, 132:5, 132:7, 132:11, 134:10, 134:11, 134:13, 135:4, 135:9
**PRO** [2] - 43:17
**PROBABLE** [2] - 38:7, 73:9
**PROBATIVE** [1] - 76:1
**PROBLEM** [7] - 17:12, 28:17, 58:23, 60:23, 60:25, 61:10, 127:10
**PROBLEMS** [3] - 4:7, 61:2, 127:21
**PROCEDURES** [1] - 9:22
**PROCEED** [9] - 9:9, 24:21, 24:23, 65:20, 65:23, 81:4, 102:12, 115:14, 138:6
**PROCEEDINGS** [1] - 1:10
**PROCEEDINGS** [1] - 144:6
**PROCESS** [24] - 14:17, 15:3, 15:15, 21:22, 21:23, 40:13, 51:10, 52:15, 54:16, 55:9, 57:2, 58:12, 58:17, 59:6, 61:11, 93:18, 98:20, 117:9, 117:10, 117:16, 117:19, 118:3, 118:19, 126:18
**PROFESSOR** [1] - 93:19
**PROFESSORS** [1] - 90:8
**PROGRAM** [31] - 12:5, 15:10, 23:14, 40:18, 46:12, 46:13, 62:16, 62:23, 63:13, 76:23, 76:25, 77:1, 87:15, 87:16, 87:20, 87:21, 88:3, 88:20, 89:2, 89:11, 89:18, 90:3, 90:4, 90:5, 90:22, 92:7, 92:9, 92:18, 141:6
**PROGRAMMING** [2] - 46:16, 47:2
**PROGRAMS** [3] - 46:19, 63:9, 88:2
**PROGRESSIVE** [5] - 106:11, 106:13, 127:5, 127:15, 142:24
**PROHIBITS** [1] - 19:15
**PROMISE** [1] - 23:23
**PROMISING** [1] - 23:20
**PROMOTED** [1] - 87:2
**PROMOTES** [1] - 86:5
**PROMOTING** [3] - 60:16, 61:21, 86:6
**PROOF** [6] - 21:20, 42:1, 100:7, 116:25, 126:13, 126:16
**PROPER** [1] - 128:2

**PROPERLY** [3] - 6:9, 7:1, 7:4
**PROPERTY** [3] - 39:19, 39:20, 119:1
**PROPOSAL** [2] - 10:4, 10:7
**PROPOSE** [1] - 31:20
**PROSPECTUSES** [1] - 46:23
**PROTECTED** [1] - 22:16
**PROTECTION** [12] - 22:18, 22:20, 23:10, 55:4, 56:21, 56:22, 57:3, 58:14, 60:16, 60:21, 61:4, 61:11
**PROUD** [3] - 44:19, 44:22, 102:19
**PROVE** [11] - 36:17, 36:20, 98:1, 99:25, 107:19, 108:1, 117:10, 125:16, 127:5, 130:12, 140:4
**PROVED** [1] - 101:3
**PROVEN** [1] - 29:2
**PROVIDE** [10] - 21:13, 49:5, 58:11, 76:10, 106:14, 110:6, 123:18, 125:14, 141:7, 142:18
**PROVIDED** [7] - 8:7, 8:11, 18:16, 58:21, 114:4, 114:12
**PROVIDES** [1] - 28:6
**PROVING** [1] - 107:13
**PROVISIONAL** [6] - 99:15, 100:1, 100:4, 100:5, 107:20, 108:1
**PROXIMITY** [2] - 37:6, 37:14
**PUBLIC** [12] - 10:17, 11:12, 33:25, 45:10, 46:2, 48:14, 49:15, 53:25, 59:15, 71:2, 71:5, 71:7
**PUBLICALLY** [1] - 34:6
**PUBLICATION** [1] - 37:11
**PUBLICATIONS** [1] - 41:10
**PUBLICITY** [1] - 10:18
**PUBLICIZED** [1] - 23:15
**PUBLICLY** [1] - 21:15
**PUBLICLY-ACCESSIBLE** [1] - 21:15
**PUBLISHED** [2] - 41:13, 116:1
**PULL** [1] - 143:2
**PULLED** [4] - 9:20, 16:14, 99:13, 99:16
**PURE** [1] - 41:25
**PURPOSE** [6] - 19:22, 38:11, 38:18, 42:6, 47:25, 60:21
**PURPOSES** [1] - 39:17
**PURSUE** [3] - 30:25, 87:17, 103:23
**PURSUING** [1] - 131:14
**PURSUITS** [1] - 39:16
**PUT** [6] - 6:2, 12:4, 13:21, 72:4, 115:22, 115:23
**PUTTING** [1] - 113:3

# Q

**QUALITY** [1] - 18:22
**QUANTITATIVE** [2] - 12:15, 30:6
**QUASH** [3] - 6:5, 6:8, 6:13
**QUEEN** [1] - 1:16
**QUESTIONED** [3] - 9:21, 118:8, 118:13
**QUESTIONING** [7] - 102:10, 123:5, 131:17, 131:19, 132:1, 136:7, 136:8
**QUESTIONS** [15] - 32:7, 38:10, 38:12, 58:22, 76:8, 76:15, 77:24, 82:3, 83:22,

102:7, 102:17, 117:20, 125:19, 126:2,
129:18
**QUICK** [1] - 6:14
**QUICKLY** [1] - 93:23
**QUITE** [4] - 12:13, 88:12, 101:11,
101:12
**QUOTE** [2] - 38:16, 126:6

## R

**R-E-I-D** [1] - 42:24
**RACE** [4] - 25:9, 40:10, 40:12, 40:14
**RACES** [2] - 25:10, 48:18
**RACIAL** [1] - 40:8
**RADICALLY** [1] - 10:15
**RAFFENSPERGER** [3] - 6:4, 6:15, 6:25
**RAISE** [2] - 38:10, 80:3
**RAISED** [1] - 16:7
**RAMPANT** [2] - 48:11, 60:8
**RAN** [1] - 127:10
**RATIONALIZATIONS** [1] - 21:8
**RDR** [1] - 2:21
**REA** [1] - 42:1
**REACH** [3] - 21:16, 33:14, 38:12
**REACHED** [4] - 29:3, 36:22, 40:18,
100:13
**REACHES** [2] - 33:17, 33:23
**REACHING** [2] - 34:3, 100:11
**REACT** [1] - 96:9
**REACTION** [2] - 97:16, 97:20
**READ** [15] - 6:25, 67:5, 67:9, 67:13,
68:1, 94:15, 96:6, 96:7, 96:8, 96:24,
97:8, 97:12, 116:3, 124:1, 124:7
**READING** [7] - 52:24, 53:22, 95:24,
96:3, 96:10, 97:4, 132:24
**READY** [3] - 4:12, 8:24, 77:22
**REAL** [1] - 39:19
**REALITY** [2] - 22:10, 25:1
**REALIZE** [1] - 29:23
**REALLOCATE** [1] - 60:12
**REALLOCATED** [1] - 60:10
**REALLY** [24] - 25:2, 33:4, 35:15, 38:25,
41:8, 54:21, 55:14, 55:24, 58:7, 61:17,
61:18, 71:23, 74:8, 85:16, 87:25, 88:1,
88:9, 90:6, 91:6, 91:24, 94:14, 101:9,
121:16, 131:16
**REARTICULATE** [1] - 134:3
**REASON** [13] - 28:14, 88:8, 88:9, 96:14,
96:15, 103:24, 109:12, 109:25,
117:17, 126:18, 129:3, 129:4, 138:7
**REASONABLE** [4] - 32:10, 38:16,
40:21, 96:15
**REASONS** [5] - 11:23, 30:3, 39:10,
87:25, 103:22
**REBRANDED** [2] - 11:10, 23:24
**RECEIVE** [8] - 22:20, 75:4, 75:21,
75:22, 114:5, 117:2, 141:11, 142:3
**RECEIVED** [6] - 50:21, 52:7, 75:20,
75:22, 78:19, 97:10
**RECEIVING** [4] - 14:16, 59:2, 70:4,

77:12
**RECENT** [1] - 103:24
**RECENTLY** [1] - 8:13
**RECIPIENTS** [1] - 71:15
**RECIPROCAL** [1] - 8:4
**RECKLESS** [6] - 14:8, 14:13, 24:11,
40:21, 41:24, 42:1
**RECOGNIZE** [3] - 11:22, 20:20, 112:23
**RECOGNIZING** [1] - 20:3
**RECOLLECTION** [1] - 139:4
**RECONFIGURE** [1] - 16:25
**RECONSIDER** [1] - 19:8
**RECORD** [12] - 42:22, 80:9, 112:9,
113:16, 121:10, 123:11, 131:6, 131:7,
133:1, 133:4, 134:22, 138:1
**RECORDS** [6] - 16:1, 31:19, 31:20,
31:22, 33:13, 68:5
**RECOVER** [1] - 24:1
**RECREATE** [1] - 25:2
**RECROSS** [4] - 78:1, 129:20, 129:22,
143:8
**RECROSS** [3] - 3:3, 78:2, 129:23
**RECROSS-EXAMINATION** [2] - 78:2,
129:23
**RECRUIT** [3] - 49:10, 55:23, 63:1
**RECRUITED** [1] - 11:18
**RECRUITING** [1] - 56:9
**RECRUITMENT** [1] - 37:10
**REDIRECT** [7] - 65:4, 76:17, 125:21,
142:20
**REDIRECT** [3] - 3:3, 76:19, 125:23
**REDUCED** [2] - 10:3, 17:15
**REFER** [4] - 43:23, 74:13, 113:6, 116:22
**REFERENCE** [3] - 70:10, 70:20, 70:24
**REFERENCED** [3] - 45:1, 56:21, 57:10
**REFERENCES** [2] - 70:11, 70:21
**REFERRING** [1] - 136:25
**REFRAIN** [1] - 33:2
**REGARDED** [1] - 31:14
**REGARDING** [8] - 5:22, 7:20, 37:14,
38:2, 40:6, 40:14, 41:10, 113:2
**REGION** [2] - 85:22, 88:11
**REGISTER** [1] - 84:1
**REGISTERED** [21] - 12:1, 12:13, 13:10,
14:10, 14:19, 20:16, 20:18, 26:20,
83:24, 83:25, 84:2, 84:12, 89:7, 89:8,
108:17, 124:22, 124:25, 125:1, 140:7,
142:6, 142:7
**REGISTRATION** [1] - 21:24
**REGISTRATION** [17] - 12:20, 13:7,
25:19, 26:23, 31:3, 39:20, 84:6, 84:13,
84:14, 84:19, 89:12, 89:14, 90:21,
109:8, 109:25, 124:16, 124:20
**REGISTRATIONS** [1] - 30:15
**REGISTRY** [5] - 26:17, 38:20, 71:19,
72:5, 72:8
**REID** [21] - 16:23, 42:15, 42:23, 43:2,
43:19, 44:24, 50:5, 50:24, 51:22,
52:10, 58:25, 64:10, 65:13, 66:3, 73:7,
74:9, 75:13, 76:7, 76:21, 78:4, 80:13

**REID** [2] - 3:4, 42:18
**REID'S** [1] - 72:14
**REJECT** [1] - 45:11
**REJECTED** [1] - 23:2
**RELATED** [1] - 68:1
**RELATES** [2] - 47:14, 49:6
**RELATIONSHIP** [2] - 36:7, 54:6
**RELATIONSHIPS** [1] - 65:10
**RELATIVELY** [1] - 140:12
**RELAUNCH** [1] - 63:12
**RELEASE** [4] - 21:15, 51:16, 51:24,
67:9
**RELEASES** [1] - 22:9
**RELEVANCE** [2] - 37:6, 122:21
**RELEVANT** [5] - 11:4, 76:5, 122:23,
123:1, 123:2
**RELIABLE** [1] - 38:21
**RELIANCE** [1] - 38:4
**RELIED** [1] - 18:10
**RELIEF** [2] - 24:14, 77:4
**RELOCATING** [1] - 93:18
**RELY** [3] - 39:6, 44:20, 71:16
**REMAIN** [1] - 72:9
**REMAINING** [1] - 24:5
**REMEDY** [1] - 25:24
**REMEMBER** [21] - 78:8, 92:23, 95:3,
95:4, 95:24, 96:3, 96:10, 97:5, 97:11,
100:5, 106:15, 116:10, 116:13,
116:15, 116:21, 127:20, 136:19,
137:1, 138:16, 138:19, 140:9
**REMEMBERING** [1] - 133:21
**REMIND** [1] - 87:19
**REMOTELY** [3] - 87:3, 87:6, 91:16
**REMOVAL** [1] - 38:18
**REMOVE** [1] - 31:21
**REMOVED** [3] - 20:6, 22:4, 37:21
**RENEW** [1] - 135:3
**RENTED** [1] - 16:19
**REPEAT** [4] - 124:4, 124:5, 126:14,
133:20
**REPHRASE** [1] - 70:18
**REPORT** [2] - 32:20, 63:3
**REPORTED** [1] - 46:12
**REPORTER** [2] - 2:22, 144:14
**REPORTER** [1] - 124:7
**REPORTERS** [1] - 143:23
**REPORTING** [1] - 49:10
**REPORTS** [3] - 25:11, 46:23, 94:22
**REPRESENT** [3] - 9:14, 9:15, 102:16
**REPRESENTATIVE** [2] - 5:15, 80:16
**REPRESENTATIVE** [3] - 27:16, 27:19,
34:25
**REPRESENTATIVES** [2] - 27:3, 34:22
**REPRESENTED** [1] - 35:2
**REPRESENTING** [5] - 4:21, 5:11, 6:24,
27:3, 80:19
**REPROACH** [1] - 21:4
**REPROVE** [3] - 9:22, 16:16, 126:7
**REPROVING** [1] - 15:16

**REPUBLICAN** [2] - 10:18, 50:12

**REPUTATION** [1] - 34:13

**REQUEST** [2] - 22:3, 25:17

**REQUESTED** [1] - 11:21

**REQUESTS** [1] - 31:2

**REQUIRE** [3] - 38:6, 109:23, 114:1

**REQUIRED** [3] - 6:6, 36:20, 55:10

**REQUIREMENT** [6] - 20:1, 20:2, 20:6, 20:7, 22:7, 41:19

**REQUIRES** [3] - 17:6, 42:1, 42:5

**REQUIRING** [1] - 110:6

**REREGISTERED** [1] - 13:14

**RERELEASE** [1] - 50:10

**RESEARCH** [12] - 55:4, 56:11, 56:12, 58:15, 59:15, 59:18, 60:4, 60:5, 63:11, 63:24, 64:1, 91:10

**RESEARCHING** [1] - 64:15

**RESIDE** [3] - 13:24, 13:25, 81:20

**RESIDED** [2] - 13:12, 13:23

**RESIDENCE** [12] - 9:22, 14:24, 16:9, 16:16, 17:5, 32:4, 39:11, 39:17, 39:18, 107:19, 123:5, 140:4

**RESIDENCY** [23] - 31:8, 32:6, 33:11, 33:13, 36:19, 39:13, 73:18, 96:2, 100:8, 107:13, 108:2, 116:25, 117:11, 121:23, 125:16, 126:7, 126:13, 126:16, 127:6, 127:16, 128:2, 130:12, 141:8

**RESIDENT** [2] - 15:18, 90:25

**RESIDENTIAL** [1] - 90:5

**RESIDENTS** [6] - 9:16, 10:23, 11:23, 19:12, 23:5, 24:16

**RESOLVE** [11] - 31:13, 98:10, 98:25, 99:1, 99:2, 99:7, 102:1, 110:23, 135:12, 135:14, 135:23

**RESONATES** [1] - 44:18

**RESOURCE** [4] - 60:17, 60:18, 61:1, 61:9

**RESOURCES** [15] - 16:25, 53:3, 54:17, 55:10, 55:16, 58:8, 59:24, 60:13, 61:23, 62:22, 64:2, 76:22, 77:3, 77:19, 77:23

**RESPECT** [3] - 35:13, 35:21, 63:22

**RESPOND** [14] - 17:2, 49:4, 52:23, 53:4, 53:22, 55:16, 64:7, 69:3, 77:5, 77:22, 112:1, 118:2, 132:22, 133:8

**RESPONDED** [3] - 58:4, 101:15, 117:16

**RESPONDERS** [1] - 41:5

**RESPONDING** [10] - 15:15, 56:19, 57:8, 59:9, 62:12, 62:14, 77:3, 124:3, 126:12, 126:15

**RESPONSE** [7] - 21:9, 52:25, 54:20, 60:11, 62:1, 117:7, 135:11

**RESPONSES** [7] - 112:17, 113:4, 116:22, 116:24, 117:6, 117:24, 126:1

**RESPONSIBILITIES** [1] - 46:9

**RESPONSIBLE** [3] - 26:8, 34:7, 46:5

**RESTAURANT** [1] - 86:7

**RESULT** [7] - 12:18, 16:14, 20:9, 21:3, 21:4, 22:25, 89:25

**RESULTED** [2] - 110:5, 110:9

**RESULTING** [1] - 31:18

**RESULTS** [5] - 9:18, 10:19, 10:25, 20:22, 23:15

**RETAIN** [1] - 13:3

**RETIRED** [1] - 14:20

**RETRACTED** [1] - 18:23

**RETRIEVE** [1] - 16:16

**RETURN** [4] - 85:3, 91:5, 91:18, 91:22

**RETURNED** [1] - 92:20

**REVEAL** [1] - 135:3

**REVERSE** [1] - 10:6

**REVIEW** [6] - 17:6, 73:14, 136:13, 136:17, 136:19, 136:21

**REVIEWED** [4] - 136:18, 137:2, 137:3, 137:6

**REVIEWING** [1] - 46:11

**REWINDING** [1] - 85:5

**RIDDLED** [1] - 24:8

**RIFE** [1] - 13:11

**RIGHTS** [4] - 19:15, 19:20, 20:5, 24:13

**RIGHTS** [1] - 24:15

**RISK** [1] - 22:23

**RISKS** [1] - 31:6

**ROGUE** [1] - 27:6

**ROLE** [3] - 43:7, 46:21, 71:16

**ROLLS** [6] - 22:5, 26:5, 26:6, 29:15, 31:4, 34:21

**RON** [1] - 1:7

**RON** [3] - 29:14, 33:7, 105:11

**ROOM** [4] - 5:16, 36:25, 37:3, 42:4

**ROOTS** [1] - 15:6

**ROUGHLY** [2] - 121:8, 128:1

**RPR** [1] - 2:21

**RULE** [1] - 8:16

**RULE** [5] - 9:1, 79:14, 79:16, 79:19, 79:21

**RULES** [2] - 39:12, 113:25

**RULING** [1] - 6:12

**RUN** [2] - 92:15, 100:17

**RUNOFF** [36] - 9:18, 11:5, 11:10, 11:19, 13:3, 16:10, 25:9, 28:18, 28:21, 37:7, 48:4, 48:7, 48:21, 50:13, 55:21, 56:18, 57:4, 57:6, 57:24, 60:9, 61:18, 62:5, 62:8, 62:13, 63:10, 81:13, 94:7, 95:14, 95:18, 98:12, 101:18, 110:15, 111:6, 122:23, 122:24, 128:19

**RUNOFFS** [3] - 56:14, 57:19, 58:18

**RUSSELL** [15] - 15:25, 35:25, 95:23, 111:12, 111:17, 124:2, 129:1, 130:18, 130:19, 131:4, 131:9, 131:14, 132:17, 133:2, 133:6

**RUSSELL'S** [2] - 112:11, 128:24

**RYAN** [2] - 7:10, 7:21

# S

**SABER** [1] - 85:12

**SAMUEL** [3] - 3:5, 80:5, 80:11

**SAMUEL** [2] - 80:10, 80:25

**SAT** [1] - 99:23

**SAW** [3] - 25:25, 51:19, 72:18

**SCALE** [3] - 31:6, 32:6, 35:7

**SCARY** [2] - 93:12, 95:9

**SCENE** [1] - 15:7

**SCHEDULED** [1] - 25:9

**SCHEME** [7] - 9:17, 10:2, 11:4, 17:2, 17:13, 23:14

**SCHOOL** [15] - 15:7, 15:10, 15:14, 27:1, 86:7, 87:14, 87:24, 88:16, 91:1, 91:4, 91:5, 91:23, 91:25, 93:17, 128:16

**SCHOOL** [1] - 46:1

**SCHOOLS** [2] - 40:1, 88:2

**SCIENCE** [1] - 12:15

**SCOPE** [3] - 72:14, 73:21, 142:20

**SCOTT** [3] - 3:5, 80:5, 80:11

**SCOTT** [7] - 15:4, 16:2, 74:15, 74:18, 79:10, 80:10, 80:25

**SEAL** [2] - 41:8, 42:3

**SEALS** [8] - 21:11, 37:11, 40:24, 41:1, 41:6, 49:10, 59:21, 70:24

**SEARCH** [1] - 93:5

**SEARCHING** [2] - 93:3, 93:20

**SEAT** [1] - 80:8

**SEATED** [1] - 4:2

**SEATS** [2] - 9:19, 13:4

**SECOND** [6] - 6:23, 7:4, 20:8, 27:17, 80:12, 122:17

**SECRETARY** [14] - 6:4, 6:14, 6:24, 18:5, 21:22, 22:3, 26:22, 27:9, 29:11, 30:19, 30:20, 31:25, 34:11, 35:6

**SECTION** [3] - 24:23, 99:23, 127:13

**SECTION** [18] - 19:14, 19:21, 20:6, 20:9, 20:12, 21:6, 21:19, 24:13, 25:25, 35:8, 35:21, 37:18, 37:25, 38:3, 38:6, 39:11, 41:20, 73:6

**SECURED** [1] - 23:18

**SEE** [17] - 4:10, 5:19, 18:20, 31:17, 39:11, 39:13, 51:17, 53:25, 54:13, 66:25, 68:9, 69:5, 70:13, 71:6, 75:16, 75:18, 78:20

**SEEING** [1] - 26:19

**SEEKING** [4] - 10:24, 59:1, 59:3, 98:12

**SEEM** [1] - 87:10

**SEES** [2] - 29:19, 37:2

**SEGWAY** [1] - 86:1

**SEISMIC** [1] - 26:5

**SELECTED** [1] - 10:21

**SEMESTER** [4] - 82:25, 83:14, 86:14, 88:7

**SEMESTERS** [1] - 91:11

**SENATE** [13] - 9:19, 13:4, 25:10, 28:18, 28:21, 35:7, 48:17, 48:18, 48:21, 94:7, 95:14, 111:6

**SENATORS** [1] - 34:22

**SEND** [14] - 38:25, 39:7, 53:6, 53:7, 54:12, 57:15, 62:19, 68:4, 69:18, 71:9, 74:24, 100:7, 100:10

**SENDING** [8] - 25:16, 25:18, 29:12, 44:2, 54:10, 57:13, 74:23, 75:2

**SENDS** [1] - 22:3
**SENIOR** [1] - 46:5
**SENIOR** [1] - 28:13
**SENSE** [2] - 38:21, 90:5
**SENT** [5] - 31:2, 38:24, 68:7, 75:8, 100:14
**SENTENCE** [2] - 40:19, 122:16
**SENTENCES** [1] - 33:2
**SEQUESTRATION** [3] - 9:1, 79:14, 79:17
**SERIOUS** [1] - 38:17
**SERVE** [3] - 7:13, 8:18, 45:19
**SERVED** [6] - 6:9, 7:1, 7:4, 8:12, 14:19, 15:8
**SERVICE** [3] - 30:13, 38:23, 38:25
**SERVICE** [1] - 98:24
**SERVICES** [1] - 69:13
**SET** [2] - 10:23, 17:7
**SETS** [1] - 36:10
**SETTING** [3] - 46:6, 49:9
**SEVEN** [4] - 34:23, 120:16, 120:17, 121:5
**SEVERAL** [10] - 25:8, 34:22, 36:18, 37:24, 69:15, 75:7, 121:7, 128:3, 128:9, 138:18
**SHAKERS** [1] - 85:18
**SHARE** [6] - 25:1, 29:24, 44:24, 45:22, 67:15, 67:18
**SHARING** [1] - 102:6
**SHELLY** [1] - 1:18
**SHERIFFS** [1] - 27:1
**SHIFT** [1] - 62:2
**SHOCKINGLY** [1] - 100:21
**SHOES** [1] - 35:6
**SHOOTOUTS** [1] - 25:12
**SHORT** [4] - 27:18, 88:16, 94:3, 110:21
**SHORTLY** [1] - 84:2
**SHOW** [21] - 14:6, 17:3, 22:22, 22:25, 23:12, 39:5, 40:1, 42:7, 57:24, 61:18, 62:7, 62:8, 63:1, 64:19, 64:20, 65:8, 98:23, 108:5, 108:11, 109:23, 123:2
**SHOWED** [3] - 27:10, 99:10, 140:9
**SHOWING** [2] - 35:15, 51:10
**SHOWS** [2] - 36:13, 73:10
**SHUFFLE** [1] - 55:16
**SIC** [2] - 74:17, 134:25
**SIDE** [4] - 4:6, 9:10, 27:23
**SIDES** [1] - 9:1
**SIGHTS** [1] - 10:23
**SIGN** [3] - 69:7, 106:14, 106:17
**SIGNATURES** [1] - 18:18
**SIGNED** [4] - 106:13, 106:22, 137:5, 137:6
**SIGNIFICANT** [1] - 10:11
**SIGNS** [1] - 19:5
**SILAS** [1] - 7:10
**SILENCE** [1] - 40:25
**SIMILAR** [2] - 48:22, 103:24
**SIMILARLY** [1] - 103:24

**SIMPLE** [3] - 17:5, 99:20, 133:13
**SIMPLY** [4] - 5:23, 18:16, 22:20, 135:24
**SINGLE** [7] - 23:19, 29:6, 32:24, 40:18, 40:21, 90:11, 90:19
**SINGLED** [1] - 16:14
**SITE** [1] - 39:19
**SITES** [1] - 69:15
**SITTING** [4] - 25:2, 26:14, 33:5, 42:4
**SITUATION** [5] - 6:20, 40:5, 97:21, 100:19, 102:1
**SITUATIONS** [1] - 96:13
**SIX** [3] - 37:6, 88:5, 121:5
**SLAPPED** [1] - 12:17
**SLIDE'S** [1] - 41:5
**SO..** [1] - 125:2
**SOCIAL** [3] - 34:9, 69:13, 69:15
**SOLITARY** [1] - 41:1
**SOLUTION** [1] - 25:24
**SOLUTIONS** [1] - 90:9
**SOMEONE** [21] - 17:4, 19:9, 19:10, 27:4, 30:4, 42:7, 61:10, 65:8, 116:6, 119:8, 119:12, 121:15, 123:17, 129:9, 130:1, 132:7, 132:13, 138:2, 139:15
**SOMERVILLE** [21] - 5:17, 16:3, 16:13, 18:14, 29:4, 29:10, 29:13, 29:16, 29:19, 29:21, 30:2, 30:6, 30:9, 30:12, 33:8, 33:10, 34:6, 34:16, 34:21, 35:3, 104:24
**SOMERVILLE** [1] - 1:6
**SOMERVILLE'S** [2] - 34:15, 105:2
**SOMETIME** [1] - 86:19
**SOMETIMES** [3] - 54:8, 62:6, 103:16
**SOMEWHERE** [2] - 44:13, 110:20
**SOON** [2] - 29:21, 114:23
**SORRY** [9] - 65:22, 66:12, 66:13, 71:4, 79:15, 118:11, 126:14, 135:7, 141:20
**SORT** [9] - 44:13, 45:20, 46:11, 46:23, 58:22, 59:22, 69:13, 94:4, 118:19
**SOUGHT** [2] - 19:23, 23:16
**SOURCE** [2] - 53:15, 59:3
**SOURCES** [1] - 39:16
**SOUTHWESTERN** [2] - 82:18, 82:20
**SPAN** [1] - 128:9
**SPEAKER** [1] - 29:7
**SPEAKING** [2] - 117:9, 128:11
**SPECIAL** [1] - 10:21
**SPECIFIC** [11] - 37:8, 41:6, 73:19, 103:17, 103:18, 103:19, 118:21, 120:22, 127:13, 131:3, 136:18
**SPECIFICALLY** [8] - 21:5, 47:16, 57:11, 59:18, 77:11, 78:14, 98:19, 126:23
**SPECIFICS** [2] - 104:17, 110:2, 136:19
**SPECULATIVE** [1] - 17:15
**SPEECH** [7] - 10:2, 22:19, 34:1, 34:2, 35:14, 41:21, 41:25
**SPELL** [2] - 42:21, 80:9
**SPEND** [8] - 64:15, 65:1, 65:2, 65:6, 65:11, 82:20, 90:11, 92:17
**SPENDING** [9] - 56:5, 56:10, 57:7,

58:20, 61:5, 61:13, 61:15, 61:19, 94:2
**SPENT** [6] - 26:14, 29:4, 30:6, 60:16, 85:7, 128:4
**SPIRITED** [1] - 34:1
**SPIRITS** [1] - 29:23
**SPLIT** [2] - 101:6, 106:9
**SPOKEN** [7] - 87:22, 104:6, 104:18, 104:24, 105:5, 105:11, 105:17
**SPOT** [1] - 143:13
**SPOUSE** [1] - 39:18
**SPREADSHEET** [4] - 17:15, 18:8, 18:10, 18:13
**SPREADSHEETS** [2] - 31:23, 33:5
**SPRING** [2] - 82:25, 83:1
**SQUARELY** [1] - 32:25
**STAFF** [17] - 46:6, 53:7, 54:7, 54:23, 55:1, 56:8, 56:11, 56:12, 57:9, 59:15, 60:4, 60:5, 60:10, 62:24, 63:2, 85:14
**STAFF'S** [2] - 58:16, 59:5
**STAFFED** [1] - 60:24
**STAKEHOLDERS** [5] - 47:11, 68:22, 68:25, 69:6, 69:7
**STAKEOUTS** [1] - 39:25
**STALE** [2] - 25:20, 28:22
**STALKING** [1] - 39:24
**STAND** [2] - 35:5, 79:11
**STANDARD** [7] - 18:11, 37:5, 38:5, 38:10, 73:16, 73:19, 74:7
**STANDING** [3] - 72:15, 72:18, 72:19
**START** [14] - 4:12, 4:14, 4:15, 8:24, 17:4, 26:12, 30:18, 44:25, 54:22, 65:17, 66:23, 88:7, 114:1
**STARTED** [15] - 42:10, 53:1, 66:11, 78:20, 85:14, 87:17, 88:20, 89:2, 89:11, 89:17, 89:19, 90:3, 90:22, 92:9, 93:25
**STARTING** [1] - 82:5
**STATE** [21] - 6:4, 6:14, 6:24, 21:22, 25:23, 26:22, 27:10, 28:9, 29:12, 30:20, 30:21, 31:25, 34:11, 34:12, 34:15, 82:18, 82:21, 83:3, 83:4, 83:5, 85:8
**STATE** [22] - 10:21, 25:3, 30:11, 30:21, 34:22, 42:21, 45:21, 51:25, 55:2, 80:9, 80:23, 84:14, 88:25, 89:3, 89:9, 95:24, 96:2, 96:14, 96:16, 100:20, 100:23, 100:24
**STATE'S** [4] - 18:5, 22:3, 35:6, 37:23
**STATE'S** [3] - 10:20, 25:6, 38:17
**STATEMENT** [7] - 9:10, 9:11, 71:2, 71:5, 107:3, 112:4, 120:2
**STATEMENTS** [13] - 4:16, 8:25, 12:2, 21:18, 22:11, 22:17, 22:19, 24:12, 35:16, 48:11, 49:15, 53:25, 59:16
**STATES** [4] - 1:1, 1:11, 2:22, 144:3
**STATES** [4] - 10:19, 10:22, 25:8, 38:14
**STATES** [2] - 5:8, 14:4
**STATUS** [1] - 39:17
**STATUTE** [1] - 19:15
**STATUTE'S** [1] - 19:22

**STAY** [7] - 80:2, 80:18, 83:7, 83:10, 88:13, 121:4
**STAYED** [1] - 121:8
**STAYING** [2] - 59:12, 76:23
**STEP** [1] - 82:1
**STEPHANIE** [1] - 15:17
**STEPPED** [1] - 10:7
**STEVE** [2] - 1:10, 2:22
**STEWART** [22] - 16:23, 42:15, 42:23, 43:2, 43:19, 44:24, 50:5, 50:24, 51:22, 52:10, 58:25, 64:10, 65:13, 66:3, 72:14, 73:7, 74:9, 75:13, 76:7, 76:21, 78:4, 80:13
**STEWART** [3] - 3:4, 42:18, 42:24
**STEWART-REID** [21] - 16:23, 42:15, 42:23, 43:2, 43:19, 44:24, 50:5, 50:24, 51:22, 52:10, 58:25, 64:10, 65:13, 66:3, 73:7, 74:9, 75:13, 76:7, 76:21, 78:4, 80:13
**STEWART-REID** [2] - 3:4, 42:18
**STEWART-REID'S** [1] - 72:14
**STILL** [26] - 17:19, 20:9, 33:7, 48:15, 56:20, 57:25, 81:18, 83:9, 84:24, 84:25, 87:3, 88:14, 91:16, 91:17, 93:12, 93:14, 93:15, 95:13, 95:15, 119:21, 119:24, 128:22, 140:10, 142:13
**STINETORFF** [3] - 15:17, 15:21, 35:24
**STOOD** [1] - 66:14
**STOP** [3] - 136:7, 143:7, 143:13
**STOPPED** [1] - 66:13
**STOPS** [1] - 136:6
**STORIES** [2] - 70:4
**STORM** [1] - 25:16
**STORY** [1] - 102:6
**STORY** [1] - 70:3
**STREET** [4] - 12:23, 12:24, 13:2, 13:18
**STRESSFUL** [1] - 93:15
**STRIKE** [6] - 116:23, 125:3, 137:8, 139:25, 142:15
**STRONG** [3] - 13:10, 15:6, 103:19
**STRUGGLED** [1] - 101:12
**STUCK** [1] - 40:17
**STUDENT** [4] - 85:10, 85:12, 90:15, 91:8
**STUDENTS** [5] - 14:2, 15:13, 96:1, 96:16
**STUDIOS** [1] - 90:7
**STUFF** [4] - 54:10, 87:5, 90:15, 94:4
**SUBMISSION** [1] - 112:12
**SUBMIT** [12] - 18:17, 19:9, 21:2, 33:17, 33:21, 33:23, 36:11, 37:19, 38:6, 38:8, 40:14, 114:1
**SUBMITTED** [17] - 10:4, 22:2, 32:11, 34:24, 36:14, 36:20, 40:4, 77:11, 77:13, 100:5, 101:16, 106:16, 106:19, 106:21, 107:14, 129:2, 137:1
**SUBMITTING** [2] - 14:7, 17:24
**SUBPOENA** [1] - 6:5
**SUBSCRIBED** [1] - 69:12

**SUBSECTION** [1] - 39:13
**SUBSTANTIAL** [1] - 22:23
**SUBVERT** [1] - 23:17
**SUCCESS** [1] - 33:12
**SUCCESSFUL** [2] - 34:3, 77:2
**SUCCESSFULLY** [1] - 34:10
**SUDDENLY** [1] - 99:21
**SUE** [20] - 130:19, 130:21, 130:24, 131:1, 131:10, 132:7, 132:8, 134:8, 135:13, 135:15, 135:17, 136:4, 137:12, 137:19, 138:3, 138:6, 138:8, 138:10, 139:9, 139:16
**SUED** [11] - 132:13, 133:24, 133:25, 134:13, 134:23, 137:11, 137:18, 137:20, 138:2, 139:8, 139:14
**SUFFICIENT** [2] - 101:16, 107:12
**SUGGESTS** [1] - 32:7
**SUITABLE** [4] - 116:25, 126:13, 126:16, 127:11
**SUMMARY** [1] - 1:10
**SUMMARY** [1] - 41:12
**SUMMER** [3] - 83:11, 86:12, 86:19
**SUPERVISOR** [4] - 99:13, 100:10, 107:18, 111:4
**SUPPLEMENTED** [1] - 8:13
**SUPPORT** [6] - 10:18, 14:14, 58:11, 58:16, 59:3, 59:5
**SUPPORTERS** [1] - 17:25
**SUPPORTING** [1] - 43:17
**SUPPORTIVE** [1] - 103:20
**SUPPOSE** [3] - 117:21, 118:15, 118:19
**SUPPOSED** [3] - 90:6, 143:6
**SURPRISINGLY** [1] - 34:3
**SURROUNDING** [1] - 23:8
**SURVEYING** [1] - 62:5
**SUSPECTED** [1] - 97:9
**SUSPICION** [1] - 96:25
**SUSTAIN** [1] - 74:21
**SWEAT** [1] - 28:13
**SWEPT** [1] - 15:13
**SWORN** [2] - 42:19, 80:6
**SYNTAX** [1] - 12:23
**SYSTEM** [1] - 88:4

## T

**TABLE** [1] - 5:2
**TARGET** [2] - 37:8, 96:12
**TARGETED** [6] - 11:20, 17:1, 18:3, 19:7, 22:24, 24:16
**TARGETING** [3] - 40:6, 40:9, 96:11
**TASK** [2] - 44:21
**TASKED** [1] - 58:19
**TAX** [2] - 26:25, 39:17
**TEACHING** [1] - 94:1
**TEAM** [12] - 5:5, 5:6, 46:12, 55:3, 55:4, 57:3, 63:24, 64:1, 67:3, 67:4, 87:3
**TECH** [2] - 88:3, 88:12
**TELFAIR** [1] - 19:3
**TEMPLATE** [1] - 36:5

**TEMPORARILY** [2] - 15:18, 17:19
**TEMPORARY** [5] - 14:22, 96:13, 96:14, 117:1, 121:21
**TEN** [7] - 36:6, 65:18, 120:12, 120:14, 120:19, 121:11, 122:2
**TENANTS** [1] - 20:17
**TENDER** [2] - 65:14, 113:9
**TENS** [1] - 26:15
**TERM** [4] - 16:21, 40:17, 84:23, 93:24
**TERRIBLY** [1] - 19:5
**TERRORIZED** [1] - 123:12
**TEST** [1] - 35:12
**TESTIFIED** [13] - 42:19, 72:25, 74:11, 76:7, 80:6, 115:25, 125:5, 127:1, 130:22, 133:4, 134:3, 141:4, 142:24
**TESTIFY** [9] - 6:3, 34:14, 43:4, 73:22, 73:24, 74:2, 74:4, 115:19, 142:22
**TESTIFYING** [2] - 43:20, 139:6
**TESTIMONY** [26] - 12:14, 16:22, 21:13, 33:25, 40:24, 66:5, 70:16, 72:15, 74:7, 78:7, 102:18, 110:4, 111:14, 111:18, 112:3, 112:10, 116:18, 117:14, 123:21, 124:12, 130:22, 132:16, 132:17, 134:4, 139:7, 143:19
**TEXAS** [2] - 10:23, 23:6
**TEXT** [7] - 21:19, 38:24, 41:5, 55:24, 61:21, 69:8, 69:10
**TEXTING** [2] - 44:1, 57:23
**TEXTS** [1] - 47:22
**THE** [178] - 1:1, 1:6, 1:10, 1:14, 1:20, 2:22, 4:2, 4:18, 4:21, 4:24, 5:3, 5:6, 5:10, 5:19, 6:19, 7:7, 7:15, 8:3, 8:17, 8:19, 8:23, 9:6, 9:9, 24:20, 24:23, 42:12, 42:16, 42:21, 42:23, 49:18, 49:20, 50:16, 50:18, 52:5, 53:5, 53:6, 53:9, 53:11, 53:15, 53:17, 53:18, 53:19, 65:15, 65:20, 65:23, 66:17, 70:18, 72:18, 72:25, 73:22, 74:10, 74:21, 75:2, 75:4, 75:5, 75:6, 75:10, 76:6, 76:12, 76:13, 76:16, 78:1, 78:8, 78:11, 78:15, 78:18, 79:7, 79:8, 79:9, 79:12, 79:16, 79:23, 80:2, 80:3, 80:8, 80:10, 80:12, 80:16, 80:18, 80:21, 80:23, 80:25, 81:1, 81:3, 81:4, 81:7, 102:9, 102:12, 108:4, 108:7, 108:8, 108:9, 108:13, 108:25, 109:18, 109:20, 111:20, 112:2, 112:5, 112:6, 112:20, 113:8, 113:11, 113:19, 113:25, 114:5, 114:9, 114:13, 114:17, 115:1, 115:4, 115:7, 115:14, 115:19, 115:22, 118:4, 118:6, 118:7, 118:9, 118:10, 118:11, 118:12, 118:15, 122:7, 122:13, 122:17, 122:20, 122:25, 123:7, 124:3, 124:5, 124:9, 125:20, 126:8, 129:20, 131:16, 131:25, 132:6, 132:18, 132:21, 132:23, 133:8, 133:14, 133:20, 133:23, 134:15, 134:18, 135:6, 135:11, 135:22, 136:2, 136:6, 137:18, 137:23, 137:24, 138:9, 138:22,

138:23, 138:24, 138:25, 139:5,
139:10, 139:12, 139:13, 139:14,
139:17, 139:19, 139:20, 139:24,
141:23, 141:25, 142:22, 143:3,
143:11, 143:13, 143:16, 143:20,
143:21
**THEMSELVES** [3] - 23:16, 53:1, 69:7
**THEORIES** [3] - 25:10, 26:9, 34:18
**THEREFORE** [1] - 25:17
**THEY'VE** [2] - 11:18, 30:17
**THICKENING** [1] - 26:9
**THINKING** [2] - 51:12, 96:4
**THIRD** [2] - 40:6, 41:13
**THOMAS** [1] - 46:1
**THOROUGH** [1] - 47:1
**THOUSAND** [1] - 69:15
**THOUSANDS** [2] - 49:12, 95:23
**THREAT** [1] - 120:1
**THREATEN** [2] - 19:17, 119:3
**THREATENED** [6] - 32:22, 41:14, 52:15,
118:25, 123:14, 123:16
**THREATENING** [10] - 19:16, 51:5,
51:13, 51:14, 52:16, 52:22, 60:2, 64:5,
64:8
**THREATS** [7] - 17:2, 21:11, 21:14,
21:18, 22:17, 22:19, 22:24
**THREE** [9] - 8:18, 16:17, 81:23, 91:11,
91:20, 106:7, 114:6, 121:2, 140:17
**THREW** [1] - 34:19
**THROUGHOUT** [3] - 10:9, 102:18, 106:9
**THROW** [1] - 96:21
**THURSDAY** [1] - 1:11
**TIED** [2] - 37:23, 88:10
**TIM** [1] - 2:4
**TIMELINE** [1] - 110:19
**TIMING** [1] - 51:16
**TIMOTHY** [1] - 5:9
**TINA** [1] - 81:6
**TINA** [1] - 1:17
**TIRELESS** [1] - 29:5
**TITLED** [1] - 10:3
**TO** [1] - 2:22
**TOBACCO** [2] - 45:11, 45:12
**TODAY** [16] - 14:12, 25:2, 43:4, 68:13,
81:12, 91:17, 102:6, 110:4, 111:14,
111:18, 116:18, 117:14, 117:22,
124:12, 130:23, 134:24
**TODD** [1] - 5:16
**TOGETHER** [5] - 6:2, 12:17, 44:14,
113:3, 128:10
**TOMORROW** [1] - 7:9
**TOOK** [6] - 14:22, 17:13, 28:19, 61:25,
75:16, 128:1
**TOOL** [4] - 39:6, 40:2, 63:13, 63:17
**TOOLS** [1] - 28:9
**TOP** [2] - 59:12, 76:23
**TOTAL** [2] - 75:20, 86:18
**TOTALITY** [2] - 35:11, 37:4
**TOUR** [4] - 15:8, 85:25, 86:1, 86:3

**TOWARD** [1] - 41:23
**TOWN** [1] - 85:18
**TRACK** [1] - 63:3
**TRACKING** [1] - 63:24
**TRAFFIC** [2] - 4:6, 4:9
**TRAINED** [2] - 60:25, 103:17
**TRANSCRIPT** [1] - 1:10
**TRANSCRIPT** [4] - 71:3, 71:5, 143:2,
144:6
**TRANSITION** [2] - 102:2, 128:15
**TRAURIG** [1] - 5:14
**TRAVELING** [1] - 94:3
**TRENDING** [1] - 87:5
**TRESPASS** [2] - 20:15, 20:20
**TRIAL** [10] - 10:9, 16:5, 18:6, 23:7, 29:9,
114:1, 114:7, 117:14, 117:18, 117:22
**TRIED** [4] - 8:18, 24:1, 75:21, 127:17
**TRIPPED** [1] - 36:24
**TROUBLE** [2] - 58:8, 140:9
**TRUE** [86] - 4:19, 10:1, 10:4, 10:7,
10:10, 10:22, 11:6, 11:8, 12:4, 12:16,
15:25, 16:11, 17:2, 18:7, 18:14, 19:2,
21:14, 22:24, 23:3, 23:12, 23:22,
30:24, 30:25, 31:8, 32:5, 32:9, 32:12,
32:16, 32:18, 33:9, 33:10, 33:12,
33:15, 33:21, 36:1, 36:3, 36:4, 36:7,
41:7, 49:4, 49:6, 49:13, 50:10, 51:24,
52:19, 52:24, 53:22, 54:20, 55:21,
56:14, 57:8, 58:4, 59:12, 59:16, 60:4,
60:11, 61:6, 62:1, 62:14, 63:10, 63:11,
64:4, 66:9, 66:20, 67:9, 67:15, 68:12,
69:3, 69:16, 77:3, 77:11, 78:5, 78:14,
78:21, 78:24, 104:13, 104:14, 111:16,
112:10, 123:22, 124:13, 129:2, 131:8,
133:3, 133:5, 134:4
**TRUE** [1] - 1:6
**TRUE** [9] - 10:6, 18:13, 20:13, 21:12,
21:25, 22:17, 22:18, 122:4, 144:6
**TRUMP** [1] - 23:17
**TRUST** [1] - 31:14
**TRUTH** [2] - 9:25, 45:12
**TRUTH** [2] - 45:3, 45:9
**TRY** [15] - 25:23, 39:22, 53:1, 55:7, 56:7,
64:22, 68:7, 92:6, 94:13, 98:25, 99:7,
125:1, 127:11, 128:7, 134:3
**TRYING** [21] - 32:10, 53:4, 55:4, 55:14,
55:16, 58:9, 60:23, 61:3, 62:4, 72:19,
73:16, 93:17, 93:19, 93:22, 94:3, 94:4,
100:17, 110:17, 128:4, 128:10, 128:16
**TURN** [3] - 32:14, 35:11, 64:16
**TURNED** [1] - 11:9, 23:23, 37:1, 84:3
**TURNER** [3] - 14:18, 35:24
**TV** [1] - 44:3
**TWEET** [1] - 41:15
**TWO** [14] - 15:9, 19:24, 22:6, 23:10,
27:17, 30:16, 35:23, 48:17, 87:16,
87:25, 88:2, 91:20, 121:8, 131:4
**TWO-YEAR** [2] - 15:9, 87:16
**TWOFOLD** [1] - 6:19
**TYPE** [5] - 43:15, 45:9, 47:17, 119:3,

119:5
**TYPES** [3] - 20:3, 43:24, 53:21

## U

**U.S** [9] - 9:19, 13:4, 14:23, 15:19, 27:2,
30:13, 38:23, 48:18, 48:20
**UGA** [2] - 88:3, 88:12
**ULTIMATE** [1] - 123:4
**ULTIMATELY** [7] - 27:8, 27:25, 97:1,
97:2, 120:7, 120:9, 125:15
**UNAVAILABLE** [1] - 8:16
**UNCERTAINTY** [1] - 110:22
**UNDER** [7] - 8:16, 18:20, 19:19, 20:4,
32:10, 38:17, 39:11
**UNDERAGE** [1] - 25:12
**UNDERGRADUATE** [2] - 45:24, 85:25
**UNDERMINE** [1] - 9:17
**UNDERSTOOD** [4] - 60:3, 60:22, 116:4,
133:23
**UNHAPPY** [1] - 88:1
**UNIQUELY** [1] - 26:2
**UNITED** [2] - 5:8, 14:4
**UNITED** [4] - 1:1, 1:11, 2:22, 144:3
**UNIVERSITY** [8] - 45:24, 46:2, 82:19,
82:21, 83:3, 83:4, 85:8, 87:14
**UNIVERSITY** [1] - 103:18
**UNLAWFUL** [2] - 38:11, 42:6
**UNLAWFULLY** [3] - 11:25, 12:12, 24:16
**UNLESS** [8] - 5:25, 6:21, 22:5, 77:5,
77:6, 77:8, 79:17, 114:20
**UNMITIGATED** [1] - 12:18
**UNMONITORED** [1] - 31:5
**UNPRECEDENTED** [4] - 11:15, 25:6,
31:6, 55:12
**UNPREDICTABLE** [1] - 95:9
**UNQUOTE** [1] - 38:17
**UNREASONABLE** [1] - 39:6
**UNSOLICITED** [2] - 25:17, 29:11
**UNSURE** [2] - 97:19, 99:3
**UNTRUE** [1] - 22:9
**UP** [41] - 9:4, 40:1, 47:18, 49:9, 51:10,
56:7, 56:18, 57:24, 61:18, 62:7, 62:8,
63:1, 63:18, 64:19, 64:20, 65:8, 66:14,
69:7, 73:10, 81:1, 84:23, 84:24, 90:19,
94:3, 94:13, 96:21, 99:10, 100:11,
100:24, 106:13, 106:14, 106:17,
106:22, 113:13, 113:21, 121:4,
127:12, 132:14, 135:18, 135:20, 136:8
**UP-TO-DATE** [2] - 94:13, 100:24
**UPCOMING** [1] - 44:1
**UPDATE** [9] - 37:16, 37:21, 89:3, 89:11,
89:25, 90:1, 90:2, 90:20, 141:14
**UPDATED** [6] - 28:22, 84:13, 84:19,
127:22, 141:9, 141:10
**UPDATING** [4] - 26:7, 26:23, 28:5, 30:14
**UPHELD** [1] - 73:15
**UPROAR** [1] - 85:13
**UPSETTING** [1] - 98:6
**URBAN** [2] - 32:13, 88:3

**USA** [1] - 2:2
**USERNAME** [2] - 107:5, 107:16
**USES** [3] - 21:23, 31:15, 32:3
**UTILITIES** [1] - 106:9
**UTILITY** [1] - 101:4
**UTTERANCE** [2] - 40:21, 42:2
**UZOMA** [1] - 1:17
**UZOMA** [2] - 5:2, 9:14

## V

**VACCINES** [2] - 48:16, 93:13
**VALIDATE** [9] - 10:1, 10:3, 11:4, 11:10, 12:5, 23:13, 23:24, 23:25
**VALUE** [1] - 25:22
**VALUES** [1] - 29:24
**VARIOUS** [6] - 33:22, 35:16, 46:19, 50:12, 69:13, 134:14
**VAST** [1] - 52:13
**VEHICLE** [2] - 39:20, 106:19
**VENDOR** [1] - 71:16
**VERBATIM** [1] - 37:12
**VERGE** [1] - 95:5
**VERIFICATIONS** [1] - 38:24
**VETERAN** [1] - 29:17
**VETERANS** [1] - 41:5
**VICE** [1] - 45:3
**VICTIMS** [1] - 9:16
**VINDICATE** [1] - 15:23
**VINDICATES** [1] - 24:15
**VIOLA** [2] - 2:21, 144:13
**VIOLA_ZBOROWSKI@GAND. USCOURTS.GOV** [1] - 2:24
**VIOLATE** [1] - 20:9
**VIOLATED** [1] - 24:13
**VIOLENCE** [1] - 20:12
**VIRAL** [1] - 87:5
**VIRGINIA** [3] - 45:5, 45:6, 45:7
**VIRTUALLY** [1] - 37:12
**VISION** [1] - 46:7
**VISIT** [1] - 88:17
**VITRIOL** [2] - 25:6, 29:18
**VOICE** [1] - 26:20
**VOLUNTEER** [4] - 18:15, 60:11, 65:2, 65:4
**VOLUNTEERS** [39] - 11:18, 11:24, 16:11, 16:12, 17:25, 33:12, 33:22, 53:7, 54:9, 54:23, 55:6, 55:23, 56:5, 56:9, 57:10, 57:11, 57:13, 57:17, 57:21, 57:25, 62:19, 63:1, 63:3, 63:6, 63:7, 65:9, 68:4, 68:7, 68:20, 68:22, 69:14, 74:23, 74:24, 75:1, 75:3, 75:7, 77:7, 77:10
**VOTE** [76] - 13:3, 14:19, 15:23, 16:15, 17:19, 19:18, 20:16, 20:18, 22:6, 24:17, 25:22, 26:20, 26:25, 27:1, 27:2, 27:3, 27:4, 28:6, 28:9, 33:24, 34:17, 37:16, 44:4, 47:21, 47:24, 51:11, 51:18, 55:25, 58:9, 60:24, 61:3, 61:16, 62:4, 73:10, 77:22, 83:24, 83:25, 84:1,

84:2, 84:12, 92:10, 92:12, 95:13, 95:15, 95:16, 95:17, 97:20, 98:13, 98:17, 98:18, 98:19, 99:10, 100:1, 108:17, 109:10, 110:14, 112:12, 117:1, 117:23, 118:22, 118:24, 119:3, 119:15, 120:4, 120:5, 120:6, 120:7, 120:8, 123:11, 123:14, 123:17, 125:3, 130:5, 130:9
**VOTE** [1] - 1:6
**VOTE** [70] - 4:19, 10:1, 10:3, 10:4, 10:7, 10:10, 10:22, 11:4, 11:9, 11:10, 12:4, 12:5, 12:16, 16:12, 18:7, 19:2, 21:14, 23:3, 23:13, 23:22, 23:24, 23:25, 30:24, 30:25, 31:8, 33:9, 33:10, 33:16, 33:21, 36:3, 36:8, 41:7, 49:4, 49:6, 49:13, 50:10, 51:24, 52:24, 55:21, 57:8, 58:4, 59:16, 60:11, 61:6, 62:1, 62:15, 63:10, 66:9, 67:16, 68:13, 69:4, 69:16, 77:11, 78:5, 78:14, 78:21, 78:24, 104:13, 104:14, 111:16, 112:10, 123:22, 124:13, 129:2, 131:8, 133:3, 133:5, 134:4
**VOTE'S** [25] - 10:1, 10:6, 11:6, 15:25, 17:2, 18:15, 22:24, 32:5, 32:9, 32:12, 32:16, 32:18, 33:12, 36:1, 36:4, 52:19, 53:23, 54:20, 56:14, 59:12, 60:4, 63:11, 64:4, 67:9, 77:3
**VOTED** [13] - 11:2, 12:10, 27:21, 27:23, 92:11, 92:14, 92:15, 98:3, 98:4, 99:19, 100:3, 111:5, 128:19
**VOTER** [84] - 13:6, 13:7, 13:15, 18:11, 19:19, 20:2, 20:10, 20:13, 20:22, 20:23, 23:15, 25:19, 26:5, 26:6, 26:23, 27:12, 28:19, 28:22, 29:1, 29:3, 29:15, 29:19, 30:11, 30:14, 31:3, 31:4, 31:17, 31:20, 32:17, 32:24, 33:14, 33:17, 33:23, 34:7, 34:14, 34:21, 35:9, 35:15, 40:18, 41:17, 42:4, 43:16, 43:17, 43:23, 43:25, 44:5, 45:15, 47:20, 47:22, 49:9, 49:12, 55:4, 56:3, 56:21, 57:3, 58:1, 58:14, 60:16, 60:21, 61:3, 61:11, 62:2, 73:10, 73:17, 83:23, 84:6, 84:19, 89:14, 97:1, 97:14, 97:17, 98:9, 101:17, 109:8, 123:4, 124:16, 124:20, 124:22, 124:25, 131:11, 131:12
**VOTER** [1] - 21:24
**VOTER'S** [2] - 17:7, 40:1
**VOTERS** [104] - 9:15, 11:13, 11:19, 11:20, 11:25, 12:12, 12:20, 12:21, 12:22, 13:1, 13:2, 13:5, 13:23, 14:3, 14:4, 14:7, 14:10, 14:14, 14:15, 17:1, 17:16, 17:18, 18:3, 18:8, 19:7, 19:11, 22:2, 22:4, 22:13, 22:24, 23:6, 25:12, 26:1, 26:15, 27:14, 27:18, 27:20, 27:21, 28:6, 28:25, 29:12, 31:2, 31:17, 32:1, 33:2, 33:3, 33:8, 35:19, 35:23, 37:8, 37:9, 37:15, 37:19, 37:20, 38:12, 38:15, 38:18, 40:10, 41:2, 42:9, 44:1, 44:20, 45:19, 48:20, 48:23, 51:9, 51:15, 52:1, 52:17, 52:18, 52:20, 53:2,

54:15, 56:20, 57:15, 58:5, 60:2, 60:18, 61:9, 61:21, 63:14, 63:19, 64:9, 64:16, 65:7, 65:11, 67:19, 67:21, 68:8, 68:25, 69:21, 70:1, 70:2, 75:13, 76:21, 76:24, 77:16, 77:17, 95:23, 97:7
**VOTERS'** [4] - 18:11, 37:12, 41:10, 41:14
**VOTES** [3] - 10:12, 12:8, 27:17
**VOTING** [2] - 19:15, 24:13
**VOTING** [24] - 9:20, 10:15, 14:9, 14:17, 15:3, 17:20, 17:21, 17:22, 19:17, 26:17, 27:20, 29:24, 31:11, 33:8, 40:22, 51:17, 51:20, 55:15, 62:20, 70:4, 92:12, 95:18, 119:21, 130:20
**VRA** [1] - 20:6
**VS** [1] - 1:5

## W

**WAIT** [2] - 88:5, 139:24
**WAIVE** [3] - 7:25, 8:1, 8:5
**WAIVING** [1] - 139:22
**WALK** [1] - 26:8
**WANTS** [3] - 29:17, 30:8, 133:12
**WAREHOUSES** [1] - 25:12
**WASHINGTON** [1] - 46:2
**WATCH** [9] - 62:17, 62:18, 62:23, 62:25, 63:7, 63:8, 75:1, 77:7
**WATSON** [1] - 7:10
**WAYS** [3] - 69:10, 69:25, 70:1
**WEB** [2] - 63:17, 86:5
**WEBSITE** [3] - 63:17, 96:7, 127:13
**WEBSITES** [1] - 127:8
**WEEK** [1] - 140:11
**WEEKS** [2] - 11:19, 29:14
**WEST** [1] - 14:5
**WESTERN** [1] - 46:1
**WHATSOEVER** [1] - 103:7
**WHILST** [1] - 128:8
**WHISTLEBLOWER** [1] - 40:20
**WHOLE** [2] - 86:14, 93:20
**WIDELY** [1] - 93:14
**WILD** [1] - 25:10
**WILDERNESS** [1] - 26:21
**WILDLY** [1] - 48:16
**WILLIAMS** [3] - 33:19, 105:5, 105:8
**WILLIAMS** [1] - 1:7
**WIND** [1] - 127:12
**WISH** [1] - 79:21
**WITNESS** [22] - 5:22, 5:25, 6:18, 6:20, 7:12, 7:16, 8:1, 8:6, 42:13, 49:17, 65:14, 66:16, 72:18, 72:22, 73:22, 74:9, 79:9, 102:8, 111:23, 115:11, 115:12, 136:10
**WITNESS** [36] - 3:3, 42:23, 53:6, 53:11, 53:17, 53:19, 75:4, 75:6, 76:12, 78:11, 78:18, 79:8, 80:10, 80:25, 81:3, 108:7, 108:9, 109:20, 112:6, 118:6, 118:9, 118:11, 118:15, 124:5, 133:20, 134:18, 136:2, 137:23, 138:23,

138:25, 139:10, 139:13, 139:17, 139:20, 141:25, 143:20
**WITNESSES** [11] - 5:22, 6:11, 6:15, 7:9, 7:21, 7:22, 8:6, 8:8, 72:17, 79:23
**WONDERING** [1] - 7:24
**WORD** [6] - 117:5, 117:13, 118:15, 118:20, 118:21, 119:8
**WORDS** [3] - 14:6, 36:19, 41:12
**WORKERS** [3] - 48:13, 99:12, 125:8
**WORKS** [2] - 71:23, 77:2
**WORRIED** [3] - 26:18, 67:20, 67:21
**WORRIES** [2] - 31:1, 31:3
**WORSE** [3] - 14:8, 24:8, 25:18
**WORTHY** [1] - 29:20
**WOUNDED** [1] - 121:4
**WRIGHT** [3] - 4:13, 4:17, 114:6
**WRITE** [1] - 63:2
**WRITING** [7] - 38:8, 85:14, 86:4, 87:1, 87:4, 90:9, 91:12
**WRITTEN** [3] - 10:3, 22:3, 143:1
**WROTE** [2] - 15:6, 34:21
**WYNNE** [3] - 5:13, 6:20, 24:21
**WYNNE** [20] - 1:21, 5:12, 7:6, 7:8, 7:24, 8:21, 49:22, 49:24, 50:1, 79:21, 79:25, 80:15, 80:20, 113:22, 114:3, 114:8, 114:10, 114:14, 114:24, 115:3

## Y

**YEAR** [9] - 15:9, 16:21, 46:14, 46:23, 82:22, 85:7, 87:11, 87:16, 88:6
**YEARS** [20] - 4:5, 14:19, 14:20, 14:21, 19:18, 26:14, 26:15, 27:22, 31:13, 82:10, 82:20, 85:25, 103:4, 120:12, 120:15, 120:19, 121:8, 121:12, 121:16, 122:2
**YELL** [1] - 118:22
**YEN** [1] - 85:20
**YESTERDAY** [2] - 6:4, 114:3
**YOU-ALL** [11] - 4:2, 4:11, 5:3, 5:10, 5:19, 5:25, 6:15, 58:25, 78:16, 79:18, 80:13
**YOUNG** [1] - 45:11
**YOUNGER** [1] - 62:6
**YOURSELF** [2] - 99:25, 129:10
**YOUTH** [1] - 45:3
**YOUTH** [1] - 45:11
**YUN** [2] - 2:4, 5:7
**YUN** [1] - 5:7
**YUP** [1] - 136:11

## Z

**ZBOROWSKI** [2] - 2:21, 144:13
**ZIP** [1] - 4:5