```
 1                  UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF GEORGIA
 2                      ATLANTA DIVISION

 3  FAIR FIGHT, INC., JOHN DOE,      )
    AND JANE DOE                     )VOLUME 2 -- A.M. SESSION
 4                    PLAINTIFFS,    )
                                     )DOCKET NO. 2:20-CV-0302-SCJ
 5         -VS-                      )
                                     )
 6  TRUE THE VOTE, INC., CATHERINE   )
    ENGELBRECHT, DEREK SOMERVILLE,   )
 7  MARK DAVIS, MARK WILLIAMS, RON   )
    JOHNSON, JAMES COOPER, AND       )
 8  JOHN DOES 1-10,                  )
                      DEFENDANTS.    )
 9  _____

10            TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
              BEFORE THE HONORABLE STEVE C. JONES
11               UNITED STATES DISTRICT JUDGE
                   FRIDAY, OCTOBER 27, 2023
12

13  APPEARANCES:

14  ON BEHALF OF THE PLAINTIFFS:

15     ALLEGRA J. LAWRENCE-HARDY, ESQ.
       CHRISTINA ASHLEY FORD, ESQ.
16     LESLIE J. BRYAN, ESQ.
       MARCOS MOCINE-MC QUEEN, ESQ.
17     UZOMA NKWONTA, ESQ.
       TINA MENG MORRISON, ESQ.
18     JACOB SHELLY, ESQ.
       MICHELLE L. MC CLAFFERTY, ESQ.
19

20  ON BEHALF OF THE DEFENDANTS:

21     CAMERON POWELL, ESQ.
       MICHAEL JOHN WYNNE, ESQ.
22     JAMES CULLEN EVANS, ESQ.

23

24

25
```

1   APPEARANCES (CONTINUED):

2
    ON BEHALF OF INTERVENOR (USA):
3
      DANA PAIKOWSKY, ESQ.
4     JENNIFER J. YUN, ESQ.
      TIM MELLETT, ESQ.
5     AILEEN BELL HUGHES, ESQ.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21
              VIOLA S. ZBOROWSKI, RDR, FAPR, CMR, CRR, RPR, CRC
22      OFFICIAL COURT REPORTER TO THE HONORABLE STEVE C. JONES
                    UNITED STATES DISTRICT COURT
23                        ATLANTA, GEORGIA
                           404-215-1479
24            VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV

25

1                          I N D E X

2

3   <u>WITNESS</u>                    <u>DIRECT</u>     <u>CROSS</u>     <u>REDIRECT</u>   <u>RECROSS</u>

4   GAMALIEL WARREN TURNER,
    SR.                                    301       313       318
5                                                    321       322
    DR. KENNETH MAYER         324        371
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (HELD IN OPEN COURT AT 9 A.M.)

2          THE COURT:  Good morning.  You-all may be seated.

3          Okay.  I think we can -- before we get started, any

4    matters I need to take up before we start back this morning?

5          MR. NKWONTA:  Yes, Your Honor.  May I raise a few

6    logistical matters quickly?

7          THE COURT:  Well, the key word's "quickly."

8          MR. NKWONTA:  Thank you, Your Honor.

9          For the first logistical matter is Ms. Stinetorf, who

10   is testifying via Zoom.  I believe that we are as far along as

11   we can be in setting up Ms. Stinetorf.  Ideally, she would go

12   after a prescheduled break, like lunchtime, so that the Zoom

13   room can be opened and she can log in, but sort of be in a

14   waiting room such that when it's time for her to testify there

15   won't be, you know, any of the delays that we saw last time.

16         Obviously I defer to Ms. Wright as to what is the

17   best way to do that, but we're prepared to have her sort of

18   log in and sit in the waiting room during the lunch hour so

19   that there is a seamless transition to her testimony, if that

20   is permissible.

21         The second, Mr. Germany is scheduled to testify this

22   afternoon.  We subpoenaed him.  Defendants subpoenaed

23   Mr. Germany as well, but he is -- he was not on their original

24   witness list.  And I just want to clarify or confirm that he

25   would be appearing only as a plaintiffs' witness and wanted to

1  make sure that the Court agreed.

2          THE COURT:  Well, I think the whole point about

3  witnesses is to let the other side know so they can be

4  prepared.  If you have him coming, you don't want them to be

5  able to call to, say, on direct?  You just want them to be

6  able to do a cross-examination on him?  I don't think they're

7  going to be upset about that at all.  Let me think about that

8  one.  Let me think about that one.

9          MR. NKWONTA:  Well, the main thing, Your Honor, is

10  that Mr. Germany has been subpoenaed and has concerns about

11  having to come back again after this testimony today.  So

12  that's sort of the main thing.

13          THE COURT:  Well, I agree, I hate to have to have him

14  come back.  Mr. Wynne, in other words, can you take care of

15  what you need to take care of on cross-examination this

16  afternoon?

17          MR. WYNNE:  Your Honor, we'll do what we can.  I

18  can't guarantee, because it's going to depend on what else

19  happens.  We'll do our very best.  I suggest, you know, we

20  leave these issues in the hands of Your Honor to make the

21  calls as they come up.

22          THE COURT:  Well, that's definitely going to happen.

23          MR. WYNNE:  It's going to happen anyway.

24          THE COURT:  It's going to happen anyway.

25          MR. WYNNE:  So I'm going to leave it to you.

1          THE COURT:  You subpoenaed Mr. Germany?

2          MR. WYNNE:  We did subpoena Mr. Germany.

3          MR. NKWONTA:  But he was not on their witness list,

4     so...

5          THE COURT:  Sometimes if you know about it --

6          MR. WYNNE:  Look --

7          MR. NKWONTA:  Your Honor, what I'm suggesting is

8     Mr. Germany just appear today.  Because he was subpoenaed by

9     plaintiffs.  He appeared today.  So he's not driving back and

10    forth from Atlanta.

11         THE COURT:  I agree with you there.  I guess, can

12    you -- would you allow them to call him out of place and then

13    do a direct on him today?

14         MR. NKWONTA:  Your Honor, we stand on our objection.

15    We believe their examination should be confined within the

16    scope of the direct because he was not a witness that they

17    designated.

18         THE COURT:  I understand that.  My only concern is

19    that -- I agree with you.  I have already excluded -- like

20    Secretary of State Raffensperger, not on the list, but you

21    have a situation where you know he's coming, you've got him

22    coming, he's here.  Sometimes it's just a little maybe a

23    courtesy both ways.

24         MR. NKWONTA:  I understand, Your Honor.

25         THE COURT:  With Raffensperger, I agree with you

1   totally.  He's out.

2           MR. NKWONTA:  Understood Your Honor.

3           Next point, briefly --

4           THE COURT:  Well, we've got to resolve, though, how

5   we're going to handle it generally.

6           MR. WYNNE:  Your Honor, I want to make one thing

7   clear about this nitpicking.  As you know, we --

8           THE COURT:  It's not nitpicking.

9           MR. WYNNE:  No.

10          THE COURT:  It's like people that tell me, where's

11  the technicality?  Well, I call it the Constitution, so....

12          MR. WYNNE:  We refer to -- they refer to the original

13  witness list, the original exhibit list, May 24th.  Our prior

14  counsel did not designate an expert, did not take a deposition

15  of expert, did not ask for a jury trial.  We got all the

16  exhibits in relativity -- we're scrambling at last minute.

17  I'm sorry if we didn't include it, but we're doing the darn

18  best we can with our hands tied behind our back.

19          THE COURT:  Let me say this again.  I have no

20  comments on what Mr. Bopp did or didn't do.  But I cannot go

21  against what the plaintiffs have a right to say and argue.

22  It's just because Mr. Bopp -- and I'm not saying he didn't do

23  anything correctly, but either way, plaintiffs have a right to

24  say we insist on the rules being followed.  We're going to

25  follow them.

1        So what I'm suggesting, talk it over with your fellow

2   counsel.  It's when Ryan Germany comes today, you do your

3   direct.

4        MR. EVANS:  And, Judge, I'll -- Ryan Germany --

5        THE COURT:  Well, we can only one have attorney at a

6   time.

7        MR. WYNNE:  Your Honor, one other thing, and I know

8   and we're bound by the rules and we respect that.  What I'm

9   saying is, we have almost a full courtroom here.  I'm sure we

10  have some reporters.  So we do not want Mr. Bopp's failings

11  inured to our client or these fine lawyers here and I want to

12  make that clear to whoever's listening that he made some huge

13  mistakes and that's why we find ourselves here and I'd ask

14  your counsel not to take it out on us.

15       THE COURT:  Well, that's the last time I'm going to

16  talk about Mr. Bopp now.  Whatever concerns you-all have with

17  Mr. Bopp, that's -- it's between his clients and you-all.  The

18  Court may have to get involved with it later, but right now

19  it's not an issue we're going to deal with.

20       Here's what I suggest.  You talk it over with your

21  fellow attorneys.  When Ryan Germany comes this afternoon, I

22  really would like to ask you, you do your direct, and then

23  when you finish your direct, let them call him out of turn,

24  let them do their direct, they can do their cross, then you

25  get to do your cross.

1          Again, legal standing I am not disagreeing with you.

2    If it's not on their list.  But I always take the position, if

3    he's coming anyway and you know about him, you've got him on

4    your list, why not just -- Ryan Germany is not going to say

5    anything that anybody in this courtroom doesn't know what he's

6    going to say.  You know?  So let's do that.

7          But talk to fellow counsel.  You know, there are two

8    witnesses I've tried -- how many of these cases have I tried

9    now?  Ryan Germany and the Pastor that's over the Sixth

10   District AME churches testify at just about every one of them.

11   So I practically know what the two of them are going to say

12   before they say it.  I can almost say it for them.  They can

13   put me on that stand and testify.  Let's work it out, okay?

14         MR. NKWONTA:  Understood, Your Honor.  We'll work it

15   out.

16         THE COURT:  All right.  Reverend Jackson -- no, not

17   Reverend Jackson -- Pastor -- Bishop Jackson.  We're supposed

18   to go to lunch when all these cases are over with.  He's

19   paying.

20         Let's do that.  Okay?  All right.  What's the next

21   thing?

22         MR. NKWONTA:  The next point, briefly, Your Honor,

23   yesterday Your Honor made an evidentiary ruling with respect

24   to a statement that Mr. Turner made during the

25   cross-examination.  We would respectfully request an

1  opportunity to seek reconsideration of that ruling.  And what

2  we would propose is, first, we have a very short bench brief

3  that we can make available to the Court, but what might be --

4          THE COURT:  Just tell me now.  Why does that hearsay

5  get to come in?

6          MR. NKWONTA:  Well, there is Eleventh Circuit case

7  law and case law from other courts, within the Eleventh

8  Circuit and outside, that establishes that once opposing

9  counsel elicits the potentially inadmissible evidence during

10 cross-examination, either by directly asking about the

11 potentially inadmissible evidence or taking a position that

12 requires the witness to testify about that inadmissible

13 evidence or to create an inference that requires admission of

14 that evidence, then that opens the door to the other side on

15 redirect being able to explore that topic or to be able to

16 have that evidence comes in.

17         THE COURT:  All right.  Let me say, at this point in

18 time I'm sticking by my ruling.  I'll think about it and get

19 back with you.  I don't need a brief.

20         MR. NKWONTA:  Fair enough.

21         But what I would suggest or request is, if we be

22 permitted to make a proffer of that testimony which can be

23 sequestered just to preserve our rights --

24         THE COURT:  I'll allow you to do that at the

25 appropriate time, but not right now.

1          MR. NKWONTA:  Mr. Turner is about to testify.  So in

2    other words, during the redirect --

3          THE COURT:  Go ahead and make your proffer and then

4    I'll hear from you, Mr. Evans.

5          MR. NKWONTA:  No.  The proffer -- what I mean by the

6    proffer is, during the redirect there would be a section of

7    the redirect where we would stop the redirect and then make a

8    proffer and ask the witness those questions so that we can

9    preserve on the record --

10         THE COURT:  At this point in time I'm going to stick

11   by my ruling.

12         MR. EVANS:  Thank you, Judge.

13         THE COURT:  Thank you.

14         What's next?

15         MR. NKWONTA:  We also have deposition designations

16   that we wish to play at some point before the close of our

17   case.

18         THE COURT:  I think what my ruling was that, as it

19   comes up, if you present your case and as they present their

20   case, if there's a deposition designation just say it.  If

21   there's no objection, you can either read it into the record

22   or point out to me where it's at and I can read it later when

23   I'm getting ready to make a determination.  I really don't

24   need a video, but if you've got a video of it, I will watch

25   the video of it.  I'd rather do it as it comes up, that way I

1  can rule on objections and go from there.

2          MR. NKWONTA:  Thank you, Your Honor.

3          And last point.  I want to renew our request for

4  judicial notice, which we were not able to address yesterday.

5  We sent the underlying documents to opposing counsel.

6          The request for judicial notice relates to the

7  lawsuit that was filed by True the Vote and some subpoenas

8  that were issued by defendants.  And I believe opposing

9  counsel's objection was relating to the documents not being

10 certified, but I -- I -- what we are seeking --

11         THE COURT:  That's not a requirement.

12         MR. NKWONTA:  What we are seeking to admit are

13 adjudicated facts based on incontrovertible statements.

14         THE COURT:  What do you -- I guess I'm going to ask,

15 what -- I'm going to hear from you, Mr. Wynne, but at what

16 point in time are you asking the Court to consider these

17 matters, this judicial notice?

18         MR. NKWONTA:  Well, we are prepared to submit a

19 motion or we are prepared to submit them to the Court right

20 now.  We wanted to get the Court's preference as to how we

21 present that.

22         THE COURT:  Let me hear from Mr. Wynne.

23         MR. WYNNE:  Your Honor, I got an e-mail last night.

24 And we were in the middle, obviously, preparing for today.

25 And so I'd ask that -- you know, I didn't see, first of all, a

1  foundation.  And I'd ask -- give me the weekend to read them

2  and then be properly informed to address them.  I stand by my

3  objections for now, but they don't seem to be essential for

4  the witness who's coming up.

5          THE COURT:  What do you have to say about that?

6          MR. NKWONTA:  First -- we're willing to give opposing

7  counsel until Monday and address it then and we can address

8  any objections then.

9          THE COURT:  All right.  Here's what we're going to

10  do.  First thing Monday morning at 9 o'clock, counsel will

11  tell me whether he objects or not.  If he objects, then you

12  will have a right to say, well, Judge, this is why you still

13  should let them in.  And I'll go ahead and rule after you make

14  all your -- if he doesn't object, we'll take them all at one

15  time.  The ones he object on, I'll give you the right to say,

16  well, here's why you should still do it, Judge, and I'll rule

17  right here from the bench.

18          MR. NKWONTA:  Thank you, Your Honor.

19          THE COURT:  All right.  Anything else?

20          If not, Mr. Turner, come back and take the stand.

21          And, Mr. Evans, you resume your cross-examination.

22          Good morning.  How are you doing, sir?  Mr. Turner, I

23  just want to remind you, you're still under oath so you don't

24  have to take another oath.  You can be seated.  And once

25  you're seated and ready, then Mr. Evans can start his

1   examination on you again.

2          THE WITNESS:  Thank you, Your Honor.

3          MR. EVANS:  Judge Jones, thank you.  And I'm going to

4   be efficient, quick.  I can sense the Court's desire to move

5   things along.  I'm going to do exactly that.

6          THE COURT:  Smart man.

7          MR. EVANS:  Well, thank you.

8                          * * * * * *

9                 GAMALIEL WARREN TURNER, SR.,

10              having been previously duly sworn,

11           resumes the stand and testified as follows:

12                          * * * * * *

13  CROSS-EXAMINATION (continued)

14  BY MR. EVANS:

15  **Q.**   Mr. Turner, I hope you had a good evening yesterday.  And

16  we're going to try to zip along here and I'm going to kind of

17  jump right into it.

18         Based upon what you told me yesterday, other than you

19  having to make some calls about getting your ballot, you

20  didn't have any other discomfort about voting in the 2020

21  Senate runoff, did you?

22  **A.**   To answer your question directly, no.

23  **Q.**   No one screamed at you when you voted in the 2020 Senate

24  runoff, did they?

25  **A.**   No.

1  **Q.**    No one terrorized you when you voted in the 2020 Senate

2  runoff, did they?

3  **A.**    Not a person, no.

4  **Q.**    No one threatened you when you voted in the 2020 Senate

5  runoff, did they?

6  **A.**    Not a person, no.

7  **Q.**    No one coerced you when you voted in the 2020 Senate

8  runoff, did they?

9  **A.**    Not a person, no.

10  **Q.**    And other than voting -- other than having to make a

11  couple calls to get your ballot, you had no other discomfort

12  or inconvenience in voting in the 2020 Senate runoff, did you?

13  **A.**    I have to answer yes to that.

14  **Q.**    And what else?

15  **A.**    The acceptance that the process is not working; the

16  acceptance that I am going through things that other people do

17  not go through; the acceptance that this is not the first

18  time, it's a continued problem.  So in that case, I can't -- I

19  can't give you that -- I can't give you that in a positive.

20  **Q.**    And the process you're referring to is what we discussed

21  yesterday, which is the not forwarding of an absentee ballot

22  to your National Change of Address address; right?

23  **A.**    Yes, that's a flawed process, as you have stated so

24  clearly.

25  **Q.**    In 2020 you lived in California, right?

1  **A.**   Yes, I did.

2  **Q.**   You didn't live in Georgia, did you?

3  **A.**   I was physically working and living -- living in

4  California, but it was not my residence.

5  **Q.**   And because you're in California, you didn't know what

6  the environment was like in Georgia, did you?

7  **A.**   I did.

8  **Q.**   Were you in Georgia?

9  **A.**   Not physically.

10  **Q.**   So how would you have known what the environment was like

11  in Georgia when you were living all the way across the country

12  in California?

13  **A.**   I stay very connected with everything that's going on in

14  my state and in my city.

15  **Q.**   But you didn't have any personal knowledge because you

16  weren't in Georgia, were you?

17  **A.**   I had personal knowledge.

18  **Q.**   How did you have personal knowledge when you were not in

19  the state of Georgia?

20       THE COURT:  Let me say this before he answers that

21  questions.  If he starts repeating hearsay this time, you

22  know --

23       MR. EVANS:  I'll object, Judge.

24       THE COURT:  Yeah.  All right.

25       MR. EVANS:  Thank you.

1        THE WITNESS:  In terms of actual language, to stay

2   away from the hearsay, I am connected in terms of conversation

3   on a daily basis with my insurance agent, that also happens to

4   be my state representative.  My classmate, who also happens to

5   be a state representative.  My church mate that also happens

6   to be city council representative.

7        So, therefore, in that language, and I've been before

8   you, before the Court, I am older than they are.  They come to

9   me to speak to me and my thought process in terms of what is

10  going on in the past and which moves they should make.  So

11  without the hearsay, yes, sir, I'm very connected to what's

12  going on in my city and my state.

13       MR. EVANS:  And I'll object, Judge, just to put it on

14  the record, to the extent that Mr. Turner alludes to any

15  conversations that took place outside of this courtroom.

16       THE COURT:  Say that again?  Any conversation that

17  took place outside of this courtroom.

18       MR. EVANS:  To the extent that he's offering the

19  truth of the statement that he knew about the environment.  He

20  offered no specific statements, but I want to put that on the

21  record to preserve that.

22       THE COURT:  Well, you can, but I haven't heard

23  anything he said wrong.  I've listened to him very closely.

24  He never said what anybody said.  You asked him how he knew,

25  and he told you he knew from phone conversation.  But he

1  didn't say what the conversations were.

2          MR. EVANS:  Yep.  That's fair, Judge.  And I'll

3  follow up on that.

4          THE COURT:  All right.

5          MR. EVANS:  Thank you.

6  BY MR. EVANS:

7  **Q.**    So, Mr. Turner, no one told you what the environment was

8  like in Georgia in the 2020 Senate runoff, did they?

9  **A.**    You're talking about before, leading up to or after?

10  **Q.**    Let me strike that question.  I'm going to take that one

11  off and throw another one that might be a bit better.

12         Other than what people told you about what Georgia was

13  like in the 2020 Senate runoff, you have no personal knowledge

14  of what Georgia was like for the 2020 Senate runoff, do you?

15  **A.**    Yes, I do.

16  **Q.**    How?

17  **A.**    Once again, to make it clear, I am a pillar of that

18  community in my own sort.  I advise other church people,

19  children, youth.  I speak on voting.  I have spoke on voting

20  all my life.  I have been a part of the civil rights movement

21  as a child and as an adult with a unique concern about the

22  problems associated with voting especially in my community.

23         So, yes, sir, I don't have to physically be there to know

24  what's going on.  I don't have to physically be there when I

25  have stood in line prior to October runoff to try to vote and

1  the difficulties associated with the absentee ballot.

2       Yes, sir, I was very, very aware.  I stated earlier,

3  yesterday, that we were tracking the receipt of those absentee

4  ballots in Atlanta; Albany, Georgia; Columbus, Georgia, with

5  my personal friends.  So, yes, there is a unique

6  understanding, a concern about the climate, not only that

7  climate but the climate of the nation.

8  **Q.**  So let me -- I'm going to try to limit this down.  If you

9  can answer this question, this'll go quick.

10  **A.**  Yes.

11  **Q.**  You have no personal knowledge because you weren't in

12  Georgia in the 2020 Senate runoff about what the environment

13  was like at that point, do you?

14  **A.**  I agree that I was not in Georgia.  I disagree that I

15  have no personal knowledge.

16  **Q.**  How did you have personal knowledge of what was going on

17  in Georgia when you --

18       THE COURT:  Hold on.  I have an objection.

19       MR. MOCINE-MC QUEEN:  This has been asked and

20  answered multiple times.

21       THE COURT:  He's right.  He's answered this question,

22  Mr. Evans.

23       MR. EVANS:  Okay.  That's fair, Judge.

24  BY MR. EVANS:

25  **Q.**  Are you represented by counsel in the trial today?

1  **A.**   No, I'm not.  Not directly or indirectly, to my

2  knowledge.  I'm just a witness.

3  **Q.**   Have you communicated with any attorneys about testifying

4  today?

5  **A.**   No, I have not.

6  **Q.**   So you have never communicated with any of these lawyers

7  here?

8  **A.**   You said testifying today.  I am a witness --

9          THE COURT:  Hold on, hold on, hold on, sir.

10          MR. MOCINE-MC QUEEN:  Your Honor, relevance.

11          MR. EVANS:  This -- if I could, Judge.  This goes

12  directly to intent.  Our case is going to show that this was a

13  case brought about by Fair Fight to prove a narrative that no

14  facts existed and each of these witnesses are mere pawns to

15  pursue that.  So we are entitled to determine how he got

16  brought in, what his intent is, and it also sheds lights on

17  what Fair Fight's intent is in bringing this case.

18          THE COURT:  I'll allow him to answer the question

19  whether he talked to any lawyers, not what the conversation

20  was, but the question is did he talk to any lawyers.

21          MR. MOCINE-MC QUEEN:  And I would -- yes.  Thank you,

22  Your Honor.

23          MR. EVANS:  Well, and, Judge, just for the record, he

24  said he's not represented by any of the lawyers here.

25          THE COURT:  Well --

1          MR. EVANS:  Or lawyers at all, so it --

2          THE COURT:  -- he's a plaintiff in this case.  These

3     are the lawyers presenting the case, so they've got to be his

4     lawyers.

5          MR. EVANS:  No, I don't -- he's not a plaintiff,

6     Judge.

7          MR. MOCINE-MC QUEEN:  Your Honor --

8          THE COURT:  He's not a plaintiff in this case?

9     That's you.

10          MR. MOCINE-MC QUEEN:  -- let me clarify.

11          Same locus of facts.  We represented Mr. Turner in

12     the Muscogee County case and he was our client and we did have

13     an attorney/client privilege.  And that is the same set --

14     that is the same issue.  And because that is the same issue,

15     the privilege is maintained.

16          MR. EVANS:  Judge, I would disagree with that.

17     Attorney/client privilege is limited to the scope of the

18     underlying representation.  I just asked Mr. Turner, is anyone

19     representing you and testifying today, he answered no.  There

20     is no attorney/client privilege.  Any of his communications

21     with anyone --

22          THE COURT:  Here's what I'm going to do.  I'll listen

23     very carefully, Mr. McQueen, on what question Mr. Evans asks

24     him.  There's a fine line between the representation on both

25     of these cases, because you-all did represent him, as you say,

1  in the other case, because you're not representing him in this

2  case, but these cases intertwine, so I might just listen very

3  closely to the questions Mr. Evans says.  You can object.

4  Even if you don't object, but I think it's crossing the line,

5  I'll stop it, but you are not his lawyers in this case, but

6  you are lawyers in the other case, but the question is for

7  this case did you talk to any lawyers.

8         MR. EVANS:  Thank you, Judge, that's fair.

9  BY MR. EVANS:

10 **Q.**   So, Mr. Turner, did you talk to any lawyers about

11 testifying today?

12 **A.**   I was approached because of the last case about my desire

13 or opportunity to participate in this case, yes, sir.

14 **Q.**   And how were you approached?

15 **A.**   Actually, if you want to know the truth, I was approached

16 in that I approached them and asked them what was my follow

17 up.  What was going to happen on the other side of the last

18 case that allowed me --

19        THE COURT:  Sir, would you do me a favor?  I'm trying

20 to determine what you said to your lawyers in the other case

21 and what you said in this case.  So when you said "them," can

22 you be specific like who is them?  Because it's going to help

23 me be able to say, if "them" is talking about Mr. McQueen

24 now --

25        THE WITNESS:  Yes.

1          THE COURT:  -- but if you're talking about "them" in

2    another set of lawyers, that's not something you can talk

3    about.

4          THE WITNESS:  The lawyers that I am talking to are

5    the same lawyers from the previous case.

6          THE COURT:  And who are those lawyers?

7          THE WITNESS:  Fair Fight.

8          THE COURT:  These exact same three lawyers sitting at

9    the table right now?

10         THE WITNESS:  Not all of them, but, yes,

11   representative, yes.

12         THE COURT:  Well, Ms. Bryan is kind of like Bishop

13   Jackson.  She's been in just about all of these cases.  Was

14   Mr. Bryan one of the lawyers in the other case?

15         THE WITNESS:  I was not physically there.  I was

16   teleconferenced in to listen to the case.  So this is the

17   first time I have seen them.  I have talked to two of them

18   that are sitting here at the table now.

19         THE COURT:  Which two?

20         THE WITNESS:  Ms. Summer and Marcos.

21         THE COURT:  Okay.  Go ahead.  Again, we're going to

22   have to just kind of crawl through it.

23         MR. EVANS:  I'll be efficient, Judge.  I'm not going

24   to belabor this issue.

25   BY MR. EVANS:

1   **Q.**   So just -- I'm going to ask this again, just for the

2   record and I can get my train of thought going again.

3        Have you talked to any lawyers about appearing today to

4   testify?

5   **A.**   At what point are you talking to?  What point in time are

6   you talking to so I can answer it correctly?

7   **Q.**   At any point have you talked to any lawyers about

8   testifying today at the trial?

9   **A.**   Yes, I did.

10  **Q.**   And what was said about you testifying today at the

11  trial?

12  **A.**   The question is would I be available to be able to

13  support the ongoing efforts for the voter registration

14  improprieties.

15  **Q.**   And let me clarify.  Today or yesterday did you talk to

16  any lawyers about testifying today or yesterday?

17  **A.**   No.

18  **Q.**   Did anyone tell you how to testify today or yesterday at

19  this trial?

20  **A.**   No one has ever told me how to testify.

21  **Q.**   Is anyone paying for you to be here to testify today or

22  yesterday?

23  **A.**   Yes.

24  **Q.**   How much are you being paid to testify today and

25  yesterday?

1  **A.**    I'm only providing lodging.  There is no money associated

2  with it.  The rental car is out of my pocket.

3  **Q.**    Is Fair Fight paying for your hotel?

4  **A.**    I would surmise, yes.

5  **Q.**    Is Fair Fight paying for your plane ticket to get here

6  from California?

7  **A.**    No.

8  **Q.**    You're paying for your own plane ticket to get here from

9  California?

10  **A.**    I paid for my plane ticket to get here.  I will ask for

11  reimbursement.  I'm in the middle of travel to check on my

12  home.  And further on from there, I will leave directly from

13  here to go to a Caterpillar demonstration in Peoria, Illinois.

14  **Q.**    I get it.  I have to do --

15  **A.**    If that is doable, yes.  But on the other side of that,

16  no.

17  **Q.**    I have to do reimbursements all the time.  They're the

18  bane of my existence.  I understand.

19        So Fair Fight is reimbursing you for your plane ticket

20  from California to get here, right?

21  **A.**    Yes.

22  **Q.**    Are they paying for your expenses while you're here

23  testifying; is that right?

24            MR. MOCINE-MC QUEEN:  Your Honor --

25            THE COURT:  Hold on.

1          MR. MOCINE-MC QUEEN:  We object.  This is -- it's

2     been established that he was --

3          THE COURT:  He's testified that he's being reimbursed

4     for his hotel room, Mr. Evans, by Fair Fight.  So I think

5     that's established.  And his airplane, he's paying for.

6          MR. EVANS:  Judge, I've got no further questions.

7          THE COURT:  Thank you, Mr. Evans.

8          Redirect?

9          MR. MOCINE-MC QUEEN:  Thank you, sir.

10    REDIRECT EXAMINATION

11    BY MR. MOCINE-MC QUEEN:

12    **Q.**   Good morning, Mr. Turner.

13    **A.**   Good morning.

14    **Q.**   I, too, will try to be quick.  I do have a few follow-up

15    questions for you, Mr. Turner.

16    **A.**   Yes.

17    **Q.**   Mr. Turner, did you apply for an absentee ballot soon

18    after arriving in California?

19    **A.**   Yes.  Immediately.

20    **Q.**   And did you put down your California address on that

21    application?

22    **A.**   Yes, I did.

23    **Q.**   And did you receive an absentee ballot for the local

24    elections that took place shortly after you arrived there in

25    November of 2019?

1  **A.**   Yes, I did.  With no problem.

2  **Q.**   And was that -- was that absentee ballot delivered to

3  your address in California?

4  **A.**   Yes.

5  **Q.**   And just to be clear, did you have any problems receiving

6  it at that address?

7  **A.**   Not for the local elections, no.

8  **Q.**   And just to be clear here, did those November 2019

9  elections occur before December of 2020?

10  **A.**   Yes.

11  **Q.**   You were talking to defense counsel earlier in your

12  testimony about trouble you had in obtaining an absentee

13  ballot for the runoff.

14       Do you recall that?

15  **A.**   Yes.

16  **Q.**   Did that occur after the 2019 local elections?

17  **A.**   Yes.

18  **Q.**   Do you recall when defense counsel said your county

19  election official sent your absentee ballot for the 2021

20  runoff to your Muscogee address?

21  **A.**   Yes.

22  **Q.**   Other than defense counsel's own statements, do you have

23  any personal knowledge of that happening?

24  **A.**   None.

25  **Q.**   I want to switch gears, Mr. Turner, and ask a few

1  questions about what you originally came here to discuss,

2  which was the challenge to your eligibility.  How did you find

3  out that you had been challenged?

4  **A.**   Trying to follow up on the missing absentee ballot that I

5  should have received a couple of days prior.

6  **Q.**   And I want to make sure I understand this.  At that --

7  what was your reaction at the point that you learned you had

8  been challenged?

9  **A.**   Serious confusion.  As you had indicated earlier and as

10  counsel had indicated earlier, I checked the box to where I

11  should have been receiving my ballot automatically.  Didn't

12  receive it the first time.  Every subsequent election,

13  primary, general election, to include the runoff election, I

14  had to call in and there was no record of my forwarding

15  address.  And only now I can surmise that for whatever reason

16  it went to my -- my home based on the information provided

17  yesterday.

18  **Q.**   And, Mr. Turner, I want to make sure.  I'm asking a very

19  specific question.

20      How did you feel upon learning you had been challenged?

21          THE COURT:  Hold on, hold on.

22          MR. EVANS:  Objection, asked and answered.  This was

23  not brought up on my cross.  I never asked him how he felt.

24  He asked this in his direct and I object as asked and

25  answered, Judge.

1          THE COURT:  I think I remember he indicated to the

2    Court he felt intimidated, frustrated, upset.  I think he even

3    got emotional, because I remember that from yesterday.

4          MR. MOCINE-MC QUEEN:  I will move along, Your Honor.

5    BY MR. MOCINE-MC QUEEN:

6    **Q.**   This is the last few questions, Mr. Turner.  I'd like to

7    revisit a topic that defense counsel raised when he was

8    examining you yesterday.

9          Do you recognize the name Alton Russell?

10   **A.**   Yes, I do.

11   **Q.**   Was that the name of the individual who challenged you?

12   **A.**   Yes, it was.

13   **Q.**   And when you were discussing those challenges yesterday

14   and you were trying to recall the name of the person who

15   challenged you, was that who you were referring to during that

16   conversation?

17   **A.**   Yes.

18   **Q.**   Have you ever met Mr. Russell?

19   **A.**   I have.

20   **Q.**   In what context did you meet Mr. Russell?

21   **A.**   In the context of a documentary where he had agreed to

22   sit down and talk to what happened during that challenge.

23   **Q.**   And when you say talk to -- sit down and talk to whom,

24   sir?

25   **A.**   A reporter and myself.

1  **Q.**    So you personally discussed -- let me rephrase that.

2       Did you have a discussion with Mr. Russell?

3  **A.**    I did.

4  **Q.**    And in that discussion, did the two of you discuss the

5  challenges?

6  **A.**    We did.

7       MR. MOCINE-MC QUEEN:  I think, Your Honor --

8       THE COURT:  As a result of that conversation, did you

9  do anything as a result of the conversation you had with

10 Mr. Russell?

11      THE WITNESS:  I don't follow, Your Honor.

12      THE COURT:  Did you do anything as a result of that

13 conversation you had with Mr. Russell?

14      THE WITNESS:  No, Your Honor.  I'm still waiting on

15 his return phone call.

16      THE COURT:  So after you had the conversation with

17 Mr. Russell, you did -- that conversation did not cause you to

18 do anything else or do anything?

19      THE WITNESS:  There was no action to be taken.

20 Nothing for me to do other than to accept what he said to me.

21      MR. EVANS:  And, Judge, I have to object to that

22 question.  It asked about statements made out of court, the

23 substance of the statements, and that's offered for the truth

24 of the substance of the statements that are allegedly made.

25 That is hearsay.  That's an out-of-court statement.  That

1  inadmissible.

2          THE COURT:  He never said what he said.

3          MR. EVANS:  You asked him, did the substance of the

4  conversation.  Did you discuss the challenges.  That is

5  absolutely --

6          THE COURT:  No.  He can ask him, did you talk about

7  it.  As long as you ask him what did you say, what did he say.

8  So I'll overrule that objection.

9          Next question.

10         MR. MOCINE-MC QUEEN:  I have no further questions,

11  Your Honor.

12         THE COURT:  Recross?

13  RECROSS-EXAMINATION

14  BY MR. EVANS:

15  **Q.**   So just now, Mr. Turner, you said you applied for an

16  absentee ballot for a local election and you got that ballot;

17  is that right?

18  **A.**   Yes, I did.

19  **Q.**   And when you said you applied, you independently filled

20  out an absentee ballot application; right?

21  **A.**   Correct.

22  **Q.**   And in that absentee ballot application, did you indicate

23  where you then lived, which was in California?

24  **A.**   Absolutely.

25  **Q.**   That is different from when you filled out the automatic

1  over 65 receipt of absentee ballot applications, isn't it?

2  **A.**    There lies the problem.  Because it was that application

3  for absentee ballot, that single application for absentee

4  ballot, that includes check here if you're over 65 and would

5  like to have your ballot sent to you repeatedly without having

6  to request an additional ballot.

7  **Q.**    I understand that.  But if you could answer that

8  question.

9        When you applied for an absentee ballot, that was a

10  different action that you took than checking the automatic

11  receipt or sending of absentee ballots, isn't it?

12  **A.**    I'm not understanding how you're trying to phrase that.

13  It's the same ballot.  It's the single -- the same ballot.

14  You fill it out, request for absentee ballot, and the block is

15  on that ballot.

16  **Q.**    And you don't have any evidence today to in any way

17  connect Mr. Alton Russell to any of the defendants, do you?

18  **A.**    Yes.

19            THE COURT:  Hold on, hold on, hold on, hold on.

20            THE WITNESS:  Yes, but it's not --

21            THE COURT:  Hold on, hold on, hold on, hold on, hold

22  on.

23            MR. MOCINE-MC QUEEN:  Your Honor, Mr. Turner has

24  attempted to address that and counsel has objected to that

25  previously.  This is now a sword and shield issue.

1          THE COURT:  Let me say this to Mr. Turner.  The

2   question is, do you have any way of connecting Mr. Russell to

3   any of the present defendants.  If you can do that without

4   telling us what he said, fine.  But if you can't do it without

5   telling us what he said, what Mr. Russell said to you, don't

6   say that.  Okay?

7          Now, that's all I have to say.

8          THE WITNESS:  Mr. Russell has publicly said on the

9   record --

10          THE COURT:  Well, don't repeat what he said.  I know

11   you think it's on the record, but --

12          THE WITNESS:  Do I physically have any, no.

13          MR. EVANS:  Okay.  Judge, no further questions.

14   Thank you.

15          THE COURT:  Thank you, Mr. Turner.

16          Is Mr. Turner excused?

17          MR. MOCINE-MC QUEEN:  Just one moment, Your Honor, if

18   I may?

19          THE COURT:  Well, I usually don't give two redirects.

20   So is he excused?  What is -- why do you want to call him back

21   again?  Why do you want to call him back for another

22   reredirect?

23          MR. MOCINE-MC QUEEN:  To get an understanding of why

24   he responded that he had -- why he gave the answer that he

25   gave to counsel.

1          MR. EVANS:  Judge, if I may respond, they've already

2    had two, a direct and a redirect, Judge.  He's answered that

3    exact question.  We need to move forward.

4          THE COURT:  Well, actually, no.  It's up to me to

5    decide whether he gets another one or not.

6          MR. EVANS:  I know it is.  It is, Judge.

7          THE COURT:  But I understand your objection.

8          Why do you want a reredirect?

9          MR. MOCINE-MC QUEEN:  We just have one question, Your

10   Honor.

11         THE COURT:  What is the question?

12         MR. MOCINE-MC QUEEN:  We want to know if, based on

13   the conversation that he had, he has an understanding about

14   that relationship.

15         THE COURT:  What relationship?

16         MR. MOCINE-MC QUEEN:  The relationship that counsel

17   asked about between True the Vote and Mr. Russell.

18         THE COURT:  I'll allow that one question and then, of

19   course, you get rerecross.

20   REREDIRECT EXAMINATION

21   BY MR. MOCINE-MC QUEEN:

22   **Q.**   Mr. Russell -- or sorry, Mr. Turner, I apologize.

23         Mr. Turner, based on the conversation you had with

24   Mr. Russell, do you have an understanding of any relationship

25   between True the Vote and Mr. Russell?

1  **A.**   Yes.

2  **Q.**   And what is your --

3        THE COURT:  Well, that was the one question you said

4  you wanted to ask.

5        MR. MOCINE-MC QUEEN:  Okay.

6        THE COURT:  You asked it.

7        MR. EVANS:  I'm going to put on the record an

8  objection, Your Honor, hearsay.  That question asked for the

9  truth of what was asserted in that conversation.  That's an

10 out-of-court statement and we're objecting.

11       THE COURT:  Okay.  I'm overruling your objection.

12 Recross?  Rerecross?

13 RERECROSS EXAMINATION

14 BY MR. EVANS

15 **Q.**   Other than what you allege the conversation you and

16 Mr. Russell had, which was outside of this court, you don't

17 have anything else to connect any of the defendants with

18 Mr. Russell, do you?

19 **A.**   The documentary where he stated it publicly.  That's it.

20 **Q.**   So nothing else?

21 **A.**   Don't need anything else.  Those were his words.

22 **Q.**   Okay.  Is that a no?

23 **A.**   No.

24       MR. EVANS:  Thank you.

25       THE COURT:  Thank you, Mr. Turner.

1          Can Mr. Turner be excused?

2          MR. MOCINE-MC QUEEN:  Yes, Judge.

3          MR. WYNNE:  Yes, Your Honor.

4          THE COURT:  Thank you, Mr. Turner.

5          Are you ready to go?

6          MR. MOCINE-MC QUEEN:  I apologize for interrupting,

7   sir.

8          But just in answer to your question, we would excuse

9   him, subject to reserving the right to seek that proffer in

10  the future if we may?

11         THE COURT:  So you're still under subpoena with the

12  plaintiffs, which means you can't go back to California until

13  they release you.  You've got to be -- you don't have to stay

14  at the courthouse, but you've got to give them a number where

15  they can be in touch with you if they need you.

16         MR. WYNNE:  Your Honor, one question of proceeding.

17  For these purposes, is he still considered on the stand, that

18  is, that he may not consult with anybody else about his

19  testimony, including counsel that's not his counsel?

20         THE COURT:  Well --

21         MR. WYNNE:  He's still on the stand.

22         THE COURT:  He can't -- he's still a witness.  So

23  more or less, yeah, in a sense, he can't discuss it.  Yeah, so

24  that's correct.

25         THE WITNESS:  Understood.

1          THE COURT:  All right.  Thank you, sir.

2          Call your next witness.

3          MR. SHELLY:  Good morning, Your Honor.  Plaintiffs

4   call Dr. Ken Mayer.

5          THE COURT:  And you are?

6          MR. SHELLY:  I'm Jacob Shelly.  I'm going to give my

7   card to the court reporter.

8          THE COURT:  To the court reporter.

9          All right.  Good morning, Mr. Shelly.

10         And Dr. Mayer?

11         MR. SHELLY:  Is on his way upstairs.

12         THE COURT:  Dr. Mayer, come on up.

13         THE DEPUTY CLERK:  Would you raise your right hand?

14                          * * * * * *

15                    DR. KENNETH MAYER,

16         having been duly sworn, testified as follows:

17                          * * * * * *

18         THE DEPUTY CLERK:  Have a seat.  If you could please

19   state and spell your name for the record.

20         THE WITNESS:  My name is Kenneth Mayer,

21   K-e-n-n-e-t-h, M-a-y-e-r.

22   DIRECT EXAMINATION

23   BY MR. SHELLY:

24   **Q.**   Good morning, Dr. Mayer.

25   **A.**   Good morning.

1  **Q.**   You're retained by plaintiffs as an expert in this case?

2  **A.**   That's correct.

3  **Q.**   I understand this is not your first time before this

4  honorable court, but I would like to give you an opportunity

5  to introduce yourself.  In what profession are you employed?

6  **A.**   I am on the faculty in the political science department

7  at the University of Wisconsin—Madison.

8  **Q.**   How long have you been employed there?

9  **A.**   Since 1989.

10  **Q.**   And are you a full professor?

11  **A.**   Yes.

12  **Q.**   Can you summarize your educational background?

13  **A.**   My bachelor's degree is from the University of

14  California, San Diego in political science with a minor in

15  applied mathematics in 1982.  My doctorate is from Yale

16  University in political science and I received that in 1988.

17  **Q.**   Did your graduate coursework include training in

18  econometrics and statistics?

19  **A.**   Yes.

20  **Q.**   Can you summarize your academic work?

21  **A.**   My academic work has been in American politics generally,

22  with a focus on election administration, voting rights,

23  redistricting, and also a focus on the presidency.

24  **Q.**   Dr. Mayer, how many articles have you published in these

25  fields you've just described?

**A.**   Probably north of 30.

**Q.**   And do these articles include publications about voter behavior?

**A.**   Yes.

**Q.**   How many books have you edited or written in these fields?

**A.**   Edited and written, I think it's probably close to 20.

**Q.**   Have you provided any professional consulting on behalf of state or local election administrators?

**A.**   Yes.  I have provided services both to state election authorities in Wisconsin, which have gone through several iterations in the last 15 years.  Also have provided analytic consulting services to county clerks, in particular the Dane County clerk in Wisconsin.

**Q.**   Has your academic work won any awards?

**A.**   Yes.

**Q.**   Can you summarize some of the main ones?

**A.**   So in 2002 I won a national award for the best book published on the presidency.  In 2013 a paper I wrote with some colleagues won an award for the best application of quantitative methods to a substantive policy question.  And in 2014 with some colleagues I won an award for the best article published in the journal called the American Journal of Political Science.

**Q.**   Dr. Mayer, have you previously testified as an expert

1  witness in cases related to voting or voting rights?

2  **A.**   Yes.  Many times.

3  **Q.**   Approximately how many?

4  **A.**   I think I've testified in court at trial in probably 12

5  or 13 cases.  And have testified in deposition probably in

6  another ten or so.

7  **Q.**   Any of those cases include any here in the Northern

8  District of Georgia?

9  **A.**   Yes, several.

10  **Q.**   And what kinds of analysis do you provide in these types

11  of cases?

12  **A.**   Generally, I'm asked to -- to provide analysis and

13  conclusions on an empirical question, given the data and

14  academic research.  I offer analyses of basically an empirical

15  question that can be answered with data.

16  **Q.**   In cases where courts have considered your testimony,

17  have they credited and relied on your analysis?

18  **A.**   Yes.

19  **Q.**   Has the Court ever excluded any of your opinions under

20  Daubert or any other standard?

21  **A.**   No.

22  **Q.**   Have courts cited your expert opinion in their decisions?

23  **A.**   Yes.

24          MR. SHELLY:  Your Honor, plaintiffs tender Dr. Mayer

25  as an expert in political science, quantitative analysis,

1  election administration and voter behavior.

2          THE COURT:  Do you wish to voir dire, Mr. Powell?

3          MR. POWELL:  No objection, Your Honor.

4          THE COURT:  All right.  Any objection to this person

5  testifying as an expert in those areas?

6          MR. POWELL:  No, not to those areas.

7          THE COURT:  All right.  Then he'll be allowed to

8  testify as an expert in those areas.

9          MR. SHELLY:  Thank you, Your Honor.

10  BY MR. SHELLY:

11  **Q.**  Dr. Mayer, did you submit an expert report in this case?

12  **A.**  I did.

13          MR. SHELLY:  I would like to hand him that report.

14          You have a copy in your binder, Your Honor.  Would

15  you like -- I have a separate copy if that's easier for you to

16  find.

17          THE COURT:  If you've got it up here, I'll find it.

18          MR. SHELLY:  Okay.

19          THE COURT:  Do you-all have it, Mr. Powell?

20          MR. SHELLY:  Plaintiff's Exhibit 15.

21          THE WITNESS:  Is it possible to get a sip of water?

22          THE COURT:  Yeah.  Hold on.

23  BY MR. SHELLY:

24  **Q.**  Dr. Mayer, is this the report that you authored?

25  **A.**  Yes.

1    **Q.**   Does it accurately summarize the conclusions that you've

2    reached in this case?

3    **A.**   Yes.

4            MR. SHELLY:  Your Honor, I would like to move this

5    exhibit into evidence as Plaintiff's Exhibit 15.

6            THE COURT:  Any objections?

7            MR. POWELL:  No, Your Honor.

8            THE COURT:  Admitted without objection.

9            (Plaintiff's Exhibit 15 was received and marked into

10   evidence.)

11   BY MR. SHELLY:

12   **Q.**   Dr. Mayer, is your CV included in your report?

13   **A.**   Yes.

14   **Q.**   And that's pages 57 to 73; is that correct?

15   **A.**   That's correct.

16   **Q.**   Now, this CV was created a couple of years ago.  Can you

17   summarize any relevant updates?

18   **A.**   There have been several additional publications, a new

19   edition of a book on the presidency, several additional

20   peer-reviewed articles on the use of geospatial data in

21   redistricting, and automated methods of creating literature

22   reviews, some additional conference presentations, and some

23   additional instances of public service to state or university

24   entities.

25   **Q.**   Thank you.

1        Dr. Mayer, what were you asked to do in this case?

2   **A.**   I was asked to analyze the challenge files that True the

3   Vote offered in 65 Georgia counties.  And to assess the

4   reliability of those -- of that data with respect to data in

5   the Georgia statewide voter file.

6   **Q.**   And how did you do that?  What methodology did you

7   employ?

8   **A.**   I used the same methods that would typically be used and

9   that I have used in my own work.  I evaluated the reliability

10  of the underlying data, evaluated the reliability of the

11  record linkage process that True the Vote appears to have used

12  based on what they said, and examined or reached conclusions

13  about the accuracy and reliability of those matches or claims

14  that someone in the Georgia file was no longer eligible to

15  vote in Georgia.

16  **Q.**   When you reviewed the county list that True the Vote

17  provided as part of its challenge file, did that include, for

18  example, Banks County?

19  **A.**   Yes, it did.

20  **Q.**   And did you find plaintiff Jocelyn Heredia within that

21  file?

22  **A.**   Yes.  She was in the challenge file for Banks County.

23  **Q.**   Thank you.

24        Can you summarize your overall conclusions that you

25  reached?

**A.**    Well, my overall conclusion is that I was just shocked at
how sloppy and inaccurate the underlying data and linkage
process was.  I found tens and tens of thousands of obvious
errors that were apparent based on immediate inspection.  I
found examples of missing data, duplicated records, records
that are linked to the wrong individual or someone with a
different name.  People who hadn't actually moved, people who
had reregistered, on and on and on.  And I -- it -- it was
just astounding how shoddily executed an unreliable the whole
enterprise was.

            THE COURT:  Dr. Mayer, you indicated sloppy,
inaccurate data.  Was this something obvious to a layperson or
is this something that only could be seen by an expert?

            THE WITNESS:  Well, some of it would be obvious to a
layperson.  For example, I identified over 15,000 records
where the challenge files claimed that someone had moved based
on a change of address file or a change of address request,
but there was no -- there was no address to where the person
who was alleged to have moved to.

            THE COURT:  15,000?

            THE WITNESS:  Over 15,000.

            I found examples where a zip code, which is either a
five or nine-digit number -- you can't have any other -- in
almost 10,000 cases, the zip code, or what should have been a
zip code, was actually a city name.  And I detail those in my

1  report.

2        Now, some of them, you know, might be something that

3  I know to look for because I've done this in my own work.  But

4  some of it was just completely obvious.  That someone could

5  have looked at this record or looked at this data and known

6  that something was not right because data that should have

7  been there was not there or was obviously wrong.

8        THE COURT:  Thank you.

9  BY MR. SHELLY:

10  **Q.**   Dr. Mayer, I want to start at the beginning.

11        What do you understand to have been the premise of True

12  the Vote's challenge program?

13  **A.**   My understanding of the premise is that True the Vote is

14  alleging that anyone who filed a National Change of Address

15  request with the U.S. Postal Service indicating they want

16  their mail forwarded lost their eligibility or was challenged

17  as ineligible to vote in Georgia based on that NCOA request.

18  **Q.**   Now, was ineligible voting in Georgia a serious problem

19  in 2020?

20  **A.**   No, not at all.  In fact, the results in 2020 in the

21  general election were repeatedly confirmed in multiple

22  recounts.  I note in my report that the Georgia Secretary of

23  State audited absentee voting in Cobb County and concluded

24  that there was not a single invalid absentee ballot that was

25  cast in 2020.

1  **Q.**   Does the academic literature have anything to say about
2  fraud voter claims?
3  **A.**   Yes.  The academic literature is -- has repeatedly
4  concluded over several decades of analysis that claims of
5  voter fraud are vastly exaggerated and that there are -- there
6  simply is no material level of voter fraud or ineligible
7  individuals casting ballots.
8  **Q.**   Does permitting ineligible voters to remain on the voting
9  list materially increase the risks of ineligible voting?
10 **A.**   No, not at all.  The reason is that every statewide
11 voting list has what's called deadwood, people who are on the
12 lists -- on the list but they are no longer eligible to vote:
13 They have died, they might have moved to another state and
14 registered, they might have done something else, committed a
15 crime or something that -- that gives up their eligibility to
16 vote.
17     And the reason this exists in every voter file is that it
18 is not possible to immediately remove someone who is
19 ineligible.  The data are not sufficient to do that
20 immediately or even quickly.  And the -- the effects of
21 improperly removing someone from the voter rolls can be
22 enormously significant where someone is no longer eligible to
23 vote.
24     And, again, the academic literature has established quite
25 clearly that the existence of this deadwood, which is what

1  it's called, does not increase the probability or likelihood

2  of ineligible people voting or ineligible ballots being cast.

3  **Q.**    I want to discuss in a little more detail how True the

4  Vote generated its challenge file.   Is True the Vote's

5  description of its methods consistent with professional

6  standards for describing record linkage or matching?

7  **A.**    No, it was woefully inadequate.

8  **Q.**   Can you explain?

9  **A.**    The problem in any record linkage, where we have two

10  large datasets and we're trying to determine if an individual

11  in one file is the same individual in another file, there are

12  all kinds of reasons that can go wrong.   And in the academic

13  realm, when someone is doing that, a scholar is doing some

14  research, there are very explicit steps and descriptions that

15  are typically offered:   The dates the files were generated,

16  the specific process by which the matching or record linkage

17  was conducted, what constituted a match, the type of matching,

18  how the data were preprocessed to make sure that the format of

19  the matching fields was consistent, how the results were

20  reviewed to assess the reliability of that process.

21      And I give an example in my report of one of the -- an

22  influential recent article that talks about record linkage

23  between administrative files and the voting files.   And there

24  was a 2,000-word explanation over multiple pages that allows

25  someone to go through and -- and replicate, so it's possible

1  to recreate and repeat that process, which is an essential

2  part of the social scientific process.

3  **Q.**   Based on the description that was provided, can you give

4  us just a high level understanding of what True the Vote's

5  process was?

6  **A.**   So, again, I'm off -- I'm operating off the descriptions

7  that they provided in the records that I reviewed.  And there

8  are actually two different descriptions that are -- that are

9  different.  My understanding is that what True the Vote did is

10 matched an individual's first name, last name, and address to

11 the Georgia voter file.  And that anybody who had the same

12 first name, last name, and address of an individual in the

13 voter file was identified as a challenged voter.

14 **Q.**   Dr. Mayer, did you create a demonstrative --

15            THE COURT:  Hold on, hold on.

16            MR. POWELL:  I'd like to object to the lack of

17 foundation.  I'm not sure what descriptions he's referring to.

18 We haven't seen them and I'm not sure what he's referring to

19 at all.

20            THE COURT:  Mr. Shelly?

21            MR. SHELLY:  Dr. -- again, I asked him to provide

22 the --

23            THE COURT:  All right.  At this point in time, I'll

24 sustain the objection.  You lay a foundation, we'll go from

25 there.

1  BY MR. SHELLY:

2  **Q.**   Dr. Mayer, can you tell us the materials that you

3  reviewed when reaching these conclusions?

4  **A.**   So it's in my report.  Let me have a moment here.  So I

5  describe the -- the descriptions that I worked with are on

6  page 19 and 20 of my report.  One of them is a document

7  that the OPSEC group gave in one of their amended responses,

8  it's footnote 4 in my report.

9       The second is an e-mail from Catherine Engelbrecht to

10 multiple recipients, which provided an actual -- actually

11 somewhat different description of the process.  So that's --

12 that's all I am aware of the descriptions that they have

13 given.  I haven't seen, I'm not aware of any more detailed

14 descriptions that have been offered.

15           THE COURT:  Mr. Powell, are you still objecting?

16           MR. POWELL:  Not at this time, Your Honor.

17           THE COURT:  All right.  Then you can proceed, Mr.

18 Shelly.

19           MR. SHELLY:  Thank you.

20 BY MR. SHELLY:

21 **Q.**   Dr. Mayer, did you create a demonstrative to help

22 illustrate this process?

23 **A.**   I did.

24 **Q.**   I'd like to show that.

25      Does this -- is this said demonstrative you're referring

1  to?  Do you see it on your screen?

2  **A.**  I do not.

3      MR. SHELLY:  Your Honor, is it on yours?

4      THE WITNESS:  I see it now.

5      THE COURT:  It's on mine.

6  BY MR. SHELLY:

7  **Q.**  Is this the demonstrative you're referring to?

8  **A.**  Yes.

9  **Q.**  Does this accurately illustrate and summarize the

10 conclusions in your report?

11 **A.**  Yes.

12 **Q.**  I'd like to walk -- I'd like you to walk the Court

13 through each piece of this.

14 **A.**  So I have a question.  Touching the screen, this is a

15 touch screen.  Can I clear this so that the -- the --

16     THE COURT:  The right bottom corner.

17     THE WITNESS:  Right bottom corner?

18     THE COURT:  I think Ms. Wright has already cleared it

19 for you.

20     THE WITNESS:  Now I just turned it off.

21     THE DEPUTY CLERK:  It is off.  Wait a minute.

22     THE COURT:  I'll tell you what.  Mr. Powell, with

23 your permission, I'm going to allow Dr. Mayer to step up here

24 and look at my screen and I will step down there, okay?

25     MR. POWELL:  All right.

1          THE COURT:  Record this for history.  The judge gave

2   up his position.  Come on up.

3          Are you okay?  Mr. Powell, okay?

4          MR. POWELL:  Yes, Your Honor.

5          THE COURT:  Is that okay?

6          MR. SHELLY:  I just want to make sure you're able to

7   see the screen as well.

8          THE COURT:  I'm going to -- I'll come over here and

9   look at this one.  I can look at that one.  Well, he could

10  look at that one.  I'll look at Madison's.

11          THE DEPUTY CLERK:  It's back on.

12          THE COURT:  There you go.

13          THE DEPUTY CLERK:  I think you turned it off.

14          THE COURT:  Just don't touch it.

15          THE DEPUTY CLERK:  I cleared it.

16          THE COURT:  Thank you.

17  BY MR. SHELLY:

18  **Q.**   Okay.  So, Dr. Mayer, you were describing a matching

19  process between the NCOA file --

20          MR. SHELLY:  Did we all just lose it?

21          THE COURT:  Are the ones over there working?

22          THE SECURITY DEPUTY:  They were.

23          THE COURT:  Dr. Mayer --

24          THE SECURITY DEPUTY:  They're off now.

25          THE WITNESS:  I didn't touch it.

1          THE COURT:  They're all off now.  Just hold it a

2    second.

3          MR. SHELLY:  All right.  Third time's a charm.

4    BY MR. SHELLY:

5    **Q.**   Dr. Mayer, you were describing a matching effort between

6    the NCOA file and the voter file.  And I want to break down

7    the different pieces here.  So starting with the NCOA file,

8    what are the four fields within that file?

9    **A.**   The fields from the NCOA file are an individual's first

10   name, their last name, their previous address, and the address

11   where they have asked their mail to be forwarded.

12   **Q.**   And to help us understand this third column on the right,

13   can you explain what a unique identifier is?

14   **A.**   A unique identifier is some data field or combination of

15   data fields that uniquely identifies an individual, such that

16   when we see those values in those fields, that we can be

17   certain or very confident that any other time you see those

18   fields we're talking about the same person.  So someone with

19   the first name, last name, address.

20        I note in this description -- that's not a unique

21   identifier -- that there are -- just, as an example, there are

22   over 85,000 individuals in the Georgia voter file who have the

23   same first name, last name, and street address, reflecting

24   multiple generations that are living -- living in one

25   household.

1        So the unique notation here is an indicator of whether

2    that field or whether any combination of those fields is

3    actually able to identify a unique individual.

4    **Q.**   And are any of these fields unique identifiers?

5    **A.**   No, neither on their own nor in combination.

6    **Q.**   Let me show you the next piece.  What fields are in the

7    voter file?

8    **A.**   So the voter file includes much more detailed

9    information.  The voter ID -- the voter registration number is

10    actually a unique identifier.  It's a number that is assigned

11    to everyone who is registered or, indeed, has been registered.

12    And that number does not change, that number is never given to

13    another person.  It is unique.

14        The voter file includes the voter's first name and last

15    name, their address, it includes their middle name -- which

16    the NCOA file does not or did not.  It also includes their

17    suffix, junior, senior, third.  The voter file includes the

18    registrant's birth year -- not the complete birthday, but the

19    birth year.  It includes the registrant's self-reported race,

20    the registrant's self-reported gender, the date on which the

21    registrant registered to vote, and the date of the last

22    election in which the registrant voted.

23    **Q.**   You mentioned that the voter ID number is a unique

24    identifier.  Are any of these other fields unique identifiers?

25    **A.**   No.  If you were using them in combination and using all

1    of them, you would be able to get close.  But none of these

2    fields on their own, other than the voter registration number,

3    is a unique identifier.

4    **Q.**   Was the one unique identifier, the voter ID, was that

5    used in the matching process?

6    **A.**   No.  It does not exist in the NCOA file.  It is in the

7    challenge file, but the only way that that number can be put

8    there is after that matching process had been conducted based

9    on the name and address.

10   **Q.**   And what would you expect to happen if matching does not

11   include unique identifiers?

12   **A.**   The -- the risk is that you are going to be matching or

13   linking to the wrong person.  That there's some -- an

14   individual you identified with the first name, last name, and

15   address in the NCOA file that is being linked to a different

16   individual in the voter file.

17   **Q.**   Of these other non-unique identifiers, were they all used

18   in the matching process?

19   **A.**   No.  Again, based on the files and descriptions that I

20   reviewed and noted in my report, it appears that True the Vote

21   matched only on first name, last name, and address.

22   **Q.**   And so what would you expect to happen as you reduce the

23   number of non-unique identifiers that are used in the matching

24   process?

25   **A.**   It by definition increases the probability that you're

1  linking to a different individual in the voter file.

2  **Q.**   Did you find any evidence of these mistakes in True the

3  Vote's challenge file?

4  **A.**   I did.

5  **Q.**   Can you tell us about some of those duplicates?

6  **A.**   So the starting point is that in the voter file, which is

7  in Georgia is pretty large, I found, which I noted, over

8  85,000 records that are actually duplicated on name and

9  address -- first name, last name, and address triplets.  Which

10  means there's more than one person with all of those values in

11  the voter file.

12      And I found 1,375 cases in the challenge files where

13  there was an individual in the NCOA file, in the challenge

14  file that linked to multiple individuals in the voter file.

15  There are also cases -- that also includes cases where it's

16  the same first name, last name, and street address.  So that

17  record is actually duplicated in the challenge file that is

18  linking to multiple individuals in the voter file.

19      And it is not possible to determine, based on just those

20  fields, whether those linkages are correct.  One of them is

21  almost certainly in the case where there is a single record

22  linking to multiple records in the voter file, one of those

23  has to be incorrect.  And in cases where there are duplicates

24  in the NCOA file, it's -- how would you determine which

25  individual in the voter file you were talking about?  And I

1   give a specific example in my report.

2   **Q.**   Do you want to explain that example?

3   **A.**   So in the challenge file for Gwinnett County, there are

4   two individuals named Eric Jones at the same address.  And

5   they are both in the challenge file.  In the voter file, there

6   are actually three Eric Jones at that address who are

7   registered to vote.  They all have voter different

8   registration numbers.  They all have different birth years.

9   They have different middle names or suffixes.  So there are

10  three distinct different Eric Jones at that address.

11       True the Vote challenged two of them.  I don't know how

12  they could tell which Eric Jones they were talking about.

13  It's not possible to determine, based on that challenge file,

14  whether -- you know, which Eric Jones they are challenging,

15  which one is actually the right Eric Jones, if any of them.

16  That's just -- that's just one of the examples.  And there

17  were close to 1400 other instances like that.

18  **Q.**   What do professional companies that are licensed to

19  conduct NCOA matching say about the risk of false positives?

20       MR. POWELL:  Your Honor, I'm going to object.  We've

21  laid no foundation for his expertise in NCOA link matching.

22  We heard a long resume, but that wasn't among the items.

23       MR. SHELLY:  This is a regular part of the election

24  administration.  And, yeah, I would say it was squarely within

25  election administration.

1          MR. POWELL:  It's not.  It's not, Your Honor.  This

2     is about mass mailing.  It's not election administration.  We

3     have no foundation for this.

4          MR. SHELLY:  Well, as defendants have frequently

5     offered, election administrators do rely on NCOA matching in

6     some contexts.

7          THE COURT:  Well, he's testifying as an expert.

8     Would he not have knowledge on this as an expert?

9          MR. POWELL:  He could have some knowledge.

10         THE COURT:  And using that some knowledge, can he not

11    use some of that knowledge to formulate his opinion that he's

12    testifying about here today?

13         MR. POWELL:  Well, as a layperson, yes.

14         THE COURT:  Well, he's not a layperson.  He's an

15    expert.

16         MR. POWELL:  I think on this issue he's a layperson.

17         THE COURT:  I disagree.  I'm going to allow him to

18    testify.

19    BY MR. SHELLY:

20    **Q.**   Dr. Mayer, can you tell the Court what professional

21    companies that are licensed to conduct NCOA matching say about

22    the risk of false positives?

23    **A.**   They note that false positives, where someone is in the

24    NCOA file when they shouldn't be or it's the wrong person to

25    match into another database, that that happens regularly.

1   **Q.**   Indeed, have you ever tried to undertake a matching

2   process like this yourself?

3   **A.**   I have in my own research.

4   **Q.**   Can you explain that experience to the court?

5   **A.**   So in 2016 I conducted -- and it's listed in my vita -- I

6   did a survey of non-voters, of non-voting registrants in

7   Wisconsin's two largest counties.  And so we mailed a survey

8   to individuals, we received responses.  And in order to

9   accurately calculate population estimates from that sample, we

10  needed to remove individuals who were no longer eligible to

11  vote at that address.

12      So I worked with an entity on campus called the UW Survey

13  Center, a survey research center which has been around for

14  decades, and we actually went through a process relying on

15  commercial databases, in this case it was LexisNexis, but one

16  of the things that they rely on is the NCOA process.

17      So I received a list of voters -- registrants who,

18  according to this process, were no longer eligible to vote at

19  that address where they were registered in the Wisconsin voter

20  file.

21      And the key thing about this process is every one of

22  those records where the result was some evidence that they

23  were no longer registered at that address, it came with a

24  probability estimate.  It came with an expression of the

25  confidence of that match.  And they weren't all 100 percent.

1    They ranged from high confidence to medium confidence to low

2    confidence.  So I've done this process, and I know what the

3    resulting data looked like.

4         It's not all or nothing.  Even if someone shows up in the

5    database, in the NCOA database, that by itself does not mean

6    that you have matched to the right person in a voter file.

7    **Q.**   To the extent defendants say they supplemented the NCOA

8    matching with other tools like SmartyStreets or fuzzy logic,

9    would that change any of your conclusions?

10   **A.**   No.  Because the -- as I noted, those processes were not

11   adequately described.  No idea of what they mean or what types

12   of fuzzy matching they relied on.  They don't indicate what

13   they used SmartyStreets for.  It's basically a -- it's a

14   website that you can use to complete an incomplete address.

15   There are all kinds of different things that True the Vote

16   says they did, but I can look at the data itself and conclude

17   that whatever they did, it was not sufficient because there

18   are still errors in the actual files that they created.

19   **Q.**   Did you read an explanation from defendants that the

20   challenge file was screened through the Social Security Death

21   Index to remove deceased voters?

22   **A.**   That's in the description.

23   **Q.**   Did you find any evidence that was done?

24   **A.**   Well, I'm not sure how you would do that, because the --

25   neither the NCOA, nor the voter file has information that

1  would allow you to reliably match to the Social Security Death

2  Index because it doesn't have dates of birth.

3      But I didn't find evidence that they had improperly

4  challenged someone who had died.  I didn't have access to that

5  data.  But it doesn't change my overall conclusion.

6      And even setting that aside, even if they reliably got

7  100 percent of people who they said had died, I don't think

8  they did, but that does not change my conclusion about the

9  tens of thousands of other areas -- of other areas, I'm sorry,

10  that are in the files that they created.

11  **Q.**   Is there any publicly accessible national database of an

12  individual's citizenship status?

13  **A.**   Not that is not mass available to the public.

14  **Q.**   Dr. Mayer, did you identify any racial disparities in

15  your analysis?

16  **A.**   I did.  I identified several.

17  **Q.**   Can you summarize those for us?

18  **A.**   The first is that True the Vote produced challenge files

19  in 65 of Georgia's 159 counties.  Again, I don't know why they

20  selected those counties.  All I observed is that a challenge

21  list was produced in those counties.  Those counties were

22  disproportionately African American.  All three of the

23  counties with the highest percentage of African American

24  registrants were challenged.

25      Of the 20 counties with the highest percentage of African

1   American registrants, ten of them were challenged, as opposed

2   to only four of the 20 counties with the lowest percentage.  I

3   found counties in the Atlanta metropolitan statistical area

4   were overrepresented with, I think, 17 of the 29 counties in

5   the Atlanta metropolitan statistical area challenge.

6        And I also found that using a -- a regression analysis

7   that I describe in my report, that the likelihood that a

8   county was selected for or the likelihood that a challenge

9   file was produced or was created, went up as the share of

10  African American registrants went up.

11       That's only one of them.  There were others.

12  **Q.**   Did you find any disparities in the -- the name and

13  address --

14  **A.**   Yes.

15  **Q.**   -- false positives?

16  **A.**   So of the 1,375 duplicated records, where there's either

17  more than one person with the same name and address in the

18  NCOA file or more than one person that has been challenged

19  with the same name or address in the voter file, the challenge

20  file was about 27 percent African American.  The duplicated

21  records that were challenged were 40 percent African American.

22       And I also found a disparity where challenged registrants

23  who are alleged to have moved within the state were

24  disproportionately African American.  The voter file is about

25  just shy of 30 percent African American.  But challenged

1  registrants who True the Vote says moved within Georgia, I
2  think the number was over 38 percent African American.
3  **Q.**   Okay.  So you've shared some of the limitations with the
4  kinds of data that was used.  Now I want to ask you about some
5  of the other categories that you described.
6       Did you find any missing values in key fields --
7  **A.**   Yes.
8  **Q.**   -- whatever that means?
9  **A.**   There were missing values in blank fields and records
10 where the information should have been there.
11 **Q.**   Is this what you were explaining to the Court in response
12 to his question?
13 **A.**   Yes, in terms of the 15,000 challenged records where
14 there is no address that shows where the registrant is alleged
15 to have moved to.
16 **Q.**   And what does this error convey to you about the kinds of
17 quality control that was used in the process?
18 **A.**   Well, what it tells you is that something went seriously
19 wrong, because any time you're dealing with large datasets
20 like this, and every time I have done this in the context of
21 my own work, you go through and you look at the results and
22 you see if the results make sense.  You see if the data that's
23 supposed to be there is there.  You see -- you determine if
24 the fields that are supposed to have values of a certain type,
25 whether they have values of that type.  And so the missing

1  street addresses is just one indication that something went

2  wrong, something doesn't make sense in how that process was

3  conducted.

4  **Q.**   And what do you understand what happened if an elections

5  official tried to contact one of these voters on the list?

6  **A.**   Well, it increases the likelihood that an election

7  official wouldn't be able to contact them.  Because if someone

8  has actually moved, there's no -- in the challenge file

9  there's no address where a clerk can send -- can send mail.

10  So it increases the likelihood that a voter whose eligibility

11  has been challenge, they might not even know that their

12  eligibility has been challenged until they show up to vote or

13  until they request an absentee ballot.

14  **Q.**   Did you identify any erroneous zip code data?

15  **A.**   Yes.

16  **Q.**   Can you describe that?

17  **A.**   So in the challenge file for Henry County, there were

18  about -- there were over 9,000 challenges in Henry County.

19  Every one of those records in the zip code of the address

20  where the voter was alleged to have been registered, instead

21  of a zip code, there's the name of the municipality in Henry

22  County where the voter is registered.

23       And, again, that's something that -- you can look at that

24  and immediately know something went seriously wrong with this

25  process, because that's supposed to be a zip code.  It's not

1   supposed to be a city name or a municipality name.

2   **Q.**   Did you identify any anomalies with how city names were

3   listed in the challenge file?

4   **A.**   Yes.  I found numerous examples where records in the NCOA

5   file had -- had misspellings or spelling variations of city

6   names.  Sometimes they were abbreviated, sometimes they were

7   not abbreviated, sometimes they were just misspelled.  And,

8   again, that indicates that there was a problem or a lack of

9   quality control.

10  **Q.**   Did you identify any instances where the name of the

11  registrant in the challenge file did not match the

12  corresponding name in the voter file?

13  **A.**   I did.  I found, I think it was -- I have to look, but it

14  was several hundred, 240 maybe, instances where the voter

15  registration number in the challenge file -- which is, again,

16  that's the voter registration number of the person that True

17  the Vote is saying is no longer eligible to vote because

18  they've moved -- that individual in the voter file has a

19  different name than the person in the NCOA file.

20  **Q.**   Did you identify any instances where --

21          THE COURT:  Hold on.

22          Explain that again.  I didn't quite understand.  The

23  name changes?  Explain.

24          THE WITNESS:  The name -- it's not the same.  And I

25  don't know why.  It could be it's just the wrong individual.

1  It could be that someone has -- you know, has legally changed

2  their name because they got married, got divorced or

3  something.  But I -- I looked at -- I have the challenge file

4  and it has the voter registration number, which True the Vote

5  extracted from the voter file.  If I go look for that number

6  in the voter file, the name of the person under that record is

7  not the same name as the person in the NCOA challenge file.

8          THE COURT:  Go ahead, Mr. Shelly.

9  BY MR. SHELLY:

10  **Q.**   Dr. Mayer, did you identify instances in the challenge

11  file where the registration addresses and the alleged move-to

12  address were the exact same?

13  **A.**   I did.  There were five records in the challenge file

14  where the address of the voter was registered and the address

15  that they are alleged to have moved to were identical.

16  **Q.**   How could that happen?

17  **A.**   It shouldn't.  It either means that there was -- it means

18  there was an error somewhere along the way.  It means that

19  that person never moved or it means that something went wrong

20  with the matching process in the process of trying to link the

21  change of address file or the change of address registry to

22  the voter file.

23          But that -- that -- that shouldn't happen.  If someone is

24  alleged -- if I'm asserting that someone has moved and the

25  address that I'm saying they moved to is the same address to

1  where they are, that tells you something -- something has gone

2  wrong.

3  **Q.**   Did you identify any instances in the challenge file

4  where the registration address and the alleged move-to address

5  were in the same county?

6  **A.**   Yes.   I identified, I think it was 343 cases where the

7  address where the voter is alleged to have moved to was in the

8  same county.

9  **Q.**   And why was that noteworthy to you?

10  **A.**   Well, it's noteworthy for two reasons:   One is that True

11  the Vote's own description said that they screened for that.

12  And they clearly didn't, because they didn't get them all.

13       The other is that under Georgia law someone who moves

14  within the same county retains their eligibility to vote in a

15  presidential or Senate election.

16  **Q.**   And how does that relate to challenges that were filed in

17  December 2020?

18  **A.**   Because the challenges were filed in the run up to the

19  2021 Senate runoff elections in Georgia.

20  **Q.**   Did you identify any instances in the challenge file

21  where individuals were registered at the address they were

22  alleged to have moved to?

23  **A.**   Yes.   I found almost 6,400 cases where the challenged

24  voter had actually reregistered at the address they were

25  alleged to have moved to.

**Q.** Did you identify any instances where True the Vote challenged individuals who are not registered to vote in Georgia?

**A.** Yes.  Again, I would have to look at my report to get the specific number, but my recollection is there were over 300 cases where True the Vote was challenging the registration of someone who actually wasn't registered in Georgia.

**Q.** Your report mentions a lack of adequate data preparation. What do you mean by that?

**A.** So, again, when you're matching across large scale data files, particularly when you're using what I would call nonstandard fields, like an address, people will write down their address in different ways.  Sometimes they would use street or they would write a suffix, but there are all kinds of ways we can write down our address.

Notably in the challenge file, the entire street address, the house number, the street, the street type, is one field. 141 Elm Lane would be the field.  In the voter file, all of those are broken out separately.  The house number is one field, the street name is one field, the street type is another field.

And so you have to be very careful when you are creating a -- a concatenated field, or a combined field, using multiple records to make sure that that's going to match the data in the other -- the other file.  And, again, I don't know how

1    True the Vote did that preprocessing.  I know that -- if I had

2    done that in my own work, I would have carefully described how

3    I preprocessed and ensured that those fields were comparable.

4    Q.    Roughly speaking, of all these types of errors that we've

5    just discussed, how many did you find in total?

6    A.    So just these errors of missing data, reregistration,

7    city or city names and the zip code, I think it's going to be

8    well in excess of 30,000 cases.

9    Q.    How does that inform your conclusions about the quality

10   of the challenge file?

11   A.    Well, it tells me that the challenge file is just rife

12   with errors.  And, I mean, I -- as I was going through and

13   doing the analysis, it just took my breath away how sloppy it

14   was.

15   Q.    If you submitted something like this in your academic

16   work, what would be the result?

17   A.    I would be laughed out of the room.

18   Q.    Are you familiar with the difference between what the

19   USPS refers to as a temporary versus a permanent change of

20   address request?

21   A.    Yes.

22   Q.    Can you summarize that difference for us?

23   A.    My understanding is the way the U.S. Postal Service

24   describes this is, a temporary change of address is filed by

25   someone who is going to be away from their address and wants

1   their mail forwarded for a period of greater than 15 days but

2   less than six months.  And so they -- in that case, they would

3   file what the USPS calls a temporary National Change of

4   Address.

5   **Q.**   And what would a permanent change refer to?

6   **A.**   A permanent change would be anything over six months.

7   **Q.**   Okay.

8   **A.**   Even if someone hadn't moved permanently, that's just

9   what the Postal Service calls it.

10  **Q.**   So if you were fortunate enough to be offered a visiting

11  position at the University of Georgia and you were here for

12  the academic year, from September through May, would you file

13  what the Postal Service calls a temporary change of address or

14  a permanent change of address?

15  **A.**   In that circumstance, since I would be here for nine or

16  ten months, I would file a permanent change of address.

17  **Q.**   Even if you intended to return to Wisconsin?

18  **A.**   That's correct.

19  **Q.**   Are you familiar with other reasons a voter might file a

20  so-called permanent NCOA request while still intending to

21  return to their registration address?

22  **A.**   Yes.  There are any number of reasons why someone might

23  do that.

24  **Q.**   Would you share some of those reasons with the Court?

25  **A.**   So two of the obvious ones would be someone who is in the

1  military and is temporarily deployed or stationed at -- on or

2  near a military base out of state.  I mean, that's a classic

3  kind of absentee voter, which would also include someone who

4  was in a family of an individual who fell into that category.

5        THE COURT:  How would someone -- looking at that

6  note -- let's go back to your example.  You leave the

7  University of Wisconsin, come to the University of Georgia for

8  ten months, you file a permanent change of address.  If I'm

9  looking at that, how would I know, well, he's obviously moved

10  there for good, he said it's permanent.  How would I know it's

11  not meant to be permanent?

12        THE WITNESS:  Well, I'll tell you, Your Honor, there

13  are two ways:  One is that I found, I think, 400 cases where

14  the address where a voter is alleged to have moved to is

15  literally on a military base.

16        THE COURT:  Okay.

17        THE WITNESS:  So their address says United States Air

18  Force Academy.  Their address says Dyess Air Force Base or

19  Joint Base Lewis-McChord.  So there's no ambiguity.

20        Another way that you would draw that inference, which

21  I did in my report, is I would look at a municipality that is

22  adjacent to or on or adjacent to or nearby a military

23  facility.  So not everyone who is deployed to Joint Base

24  Lewis-McChord actually lives on base.  They might live in an

25  adjacent municipality.

1          And so working with a dataset of large military

2     installations, where I go -- and I can see where Edwards Air

3     Force Base is or Fort Irwin or Warner Robins Air Force Base.

4     I can see on a map where the base is, and I can see the

5     municipalities that are around there.

6          THE COURT:  Two questions.

7          Question one:  If it's not on a military base -- you

8     know, again, come back to you.  If you go to the University of

9     Georgia in Athens, Georgia, and you put down permanent, how do

10    they know it's not permanent?

11         THE WITNESS:  Well, you wouldn't be able to tell just

12    by looking at that.  That -- you would not have sufficient

13    information to know whether someone had moved permanently

14    or -- I mean, permanently -- not in how the postal service

15    describes it, but permanently how you or I would describe

16    that.

17         THE COURT:  Yeah.

18         THE WITNESS:  So you would not -- you could not tell

19    that from the National Change of Address file.

20         THE COURT:  Did you find any number of people that

21    were challenged to show a military base location?

22         THE WITNESS:  Yes.  As I noted, there -- if we -- and

23    if you have my report, there's an appendix to my report that

24    shows I found -- I mean, this is literally the correct use of

25    the term "literally."  I'm not talking about metaphorically.

1  I'm talking about someone whose address lists as the city a

2  military installation.  I found -- I think it was 397 people

3  who were on 59 different military installations.

4         And one example.  There are nine people in the

5  challenge file who list as their moved address, it says where

6  they have moved is the United States Air Force Academy.  And

7  so that sort of fits.  That's someone who is both in the

8  military and a student almost certainly.

9         THE COURT:  Mr. Shelly, I think this is a good point

10 to take a break.

11        This demonstrative you have, make sure you give a

12 copy of that to Ms. Conkel.

13        We're going to take a 15-minute break and start back

14 at 10:50.  Thank you.

15        (A break was taken from 10:35 a.m. until 10:50 a.m.)

16        THE COURT:  Mr. Shelly, you may proceed.

17        MR. SHELLY:  Thank you.

18 BY MR. SHELLY:

19 **Q.**  Dr. Mayer, right before we took a break the Court was

20 asking you about examples of challenged voters who live on or

21 near military installations.  You mentioned you had a table of

22 that in your chart -- a chart of that in your report.  Were

23 you referring to Appendix A on page 49?

24 **A.**  That's correct.

25 **Q.**  Thank you.

1         In addition to military voters, can you give a

2   non-exhaustive list of other reasons that a person might file

3   a change of address request to the Postal Service and still

4   intend to return to their registration address?

5   **A.**    So another example would be the archetype of an absentee

6   voter, a college student who lives in Georgia, graduated high

7   school in Georgia, but is attending college or university away

8   from home.

9   **Q.**    I want to ask you more about that in a second, but just

10  to complete the record, can you also give any other examples

11  why someone might submit a change of address and not intend to

12  permanently move?

13  **A.**    So someone might be temporarily away for work.  They

14  could be on an extended vacation for someone who owns a house

15  in another state.  And, again, there are any number of reasons

16  why someone might temporarily be away from their registered

17  address for even an extended period of time without giving up

18  their eligibility to vote.  And the mere fact that someone has

19  filed an NCOA is not evidence that they have given up their

20  eligibility to vote in Georgia.

21  **Q.**    So let's take the students example that you give.  Did

22  you analyze the challenge file for potential students?

23  **A.**    I did.

24  **Q.**    How did you do that?

25  **A.**    I created a decision rule.  I was looking for a specific

1 set of universities or colleges that -- actually, it's not

2 exhaustive.  I identified municipalities where every public

3 university in Georgia, Alabama, Mississippi, and Texas were

4 located.  I identified every school in the SEC, every school

5 in the ACC, every school in the Big 12, Big 10, the Ivy

6 league.  And the Georgia governor's office produces a dataset

7 of the top destinations for graduating high school seniors in

8 Georgia.  And I included colleges or universities that are on

9 that list.

10        Again, so this is a fairly extensive list, but it's not

11 exhaustive.  I didn't include the UC system, I didn't include

12 the State University of New York, but I had a set of colleges

13 and universities.  And I looked for instances of someone in a

14 challenged file -- in the challenge file who had moved to an

15 address, either on or near one of those universities.

16 **Q.**   What did you find?

17 **A.**   I found over 33,000 cases where a student -- or not a

18 student -- someone had -- someone in the challenge file had

19 moved to an address that was in the same or adjacent

20 municipality as one of the colleges or universities in my set

21 that I examined.

22 **Q.**   Would removing students in college dorms be sufficient to

23 exclude all the students from the challenge file?

24 **A.**   No.  The first instance, I'm not aware of an easily

25 accessible database of all of the college or university

1  dormitory addresses.  But even if you were able to eliminate

2  everyone who was not living on campus, data from 2018 from the

3  American Association of Colleges and Universities shows that

4  only about 13 percent of even first-year students live on

5  campus.  And that number will actually go down as someone

6  moves through their college years.  So a very small percentage

7  of college students are actually living on campus.

8  **Q.**    You've discussed now challenged individuals who are

9  likely students, challenged individuals you are likely in the

10 military.  Did I hear you answer the Court's question that you

11 even found individuals who are likely students in the

12 military?

13 **A.**    Yes.  As I noted, there were nine challenges issued to

14 registrants whose move-to address was literally the United

15 States Air Force Academy.  And then there were others.  There

16 were people who were -- had an address in Annapolis where the

17 Naval Academy is.  There are people who listed an address in

18 West Point, New York, where the U.S. military academy is.  So

19 in addition to the Air Force -- I mean, there are other

20 instances where someone was likely both a student and in the

21 military.

22 **Q.**    Did you create another demonstrative summarizing all the

23 errors that we've been discussing this morning?

24 **A.**    I did.

25 **Q.**    Is this that demonstrative on your screen?

1  **A.**    It is.

2         MR. SHELLY:  And, Your Honor, do you have that on

3  your screen as well?

4         THE COURT:  Yes, thank you.

5         MR. SHELLY:  Thank you.

6  BY MR. SHELLY:

7  **Q.**    Does this accurately illustrate and summarize the

8  conclusions that you've reached in your report?

9  **A.**    Yes.

10 **Q.**    Now, you've done an impressive job reciting many of these

11 figures from memory as we've gone through it, but I want to

12 make sure that the record is clear.  So can you tell the Court

13 once again how many instances you found where the challenged

14 individual's registration address and the alleged move-to

15 address are identical?

16 **A.**    There were five instances.

17 **Q.**    And, again, how could that happen?

18 **A.**    I don't know.  It should not have.  And it is such an

19 obviously identifiable error that I am just flabbergasted that

20 this was not screened and caught.

21 **Q.**    How many instances did you find where there was kind

22 of -- some kind of syntax error in the street address field?

23 **A.**    So there were seven cases.  And this means that the

24 information in an address field was not blank, but it was

25 obviously wrong.  It was listed as null or missing, or in one

1  case it looked like a spreadsheet reference.  It had an equal

2  sign G16.  So there was something in that field that was

3  obviously not supposed to be there or obviously reflecting a

4  problem.

5           THE COURT:  Yeah, but the registration address and

6  the move-to address are identical.  So how do you miss that?

7           THE WITNESS:  I don't know.  It was -- again, there

8  is a process that I go -- or that anybody, any reputable

9  academic that's going through and reviewing this, these are

10  things that you look for.  What is the quality of the

11  underlying data?

12          And, again, these things tell me that there was

13  something fundamentally wrong with the process that was used

14  to generate these files, because that should not happen.

15  BY MR. SHELLY:

16  **Q.**   How many instances did you find where the registrant was

17  alleged to have moved to an undefined street address?

18  **A.**   There were 27.  And most of these were cases where the

19  move-to address was listed as general delivery or something

20  that was not actually a street address.

21  **Q.**   How many instances where the challenged file name did not

22  match -- sorry -- I skipped this one.

23          How many instances where the registration address and the

24  move-to address are in the same county?

25  **A.**   There were 145.  I think earlier I said there were in the

1    300s, but this is the correct number.  There were 145 cases

2    where a registrant is alleged to have moved to another address

3    in the same county.

4    **Q.**   How many examples where the challenge file name and the

5    voter file name did not match?

6    **A.**   263.

7    **Q.**   How many instances where the challenged individuals were

8    not registered in Georgia?

9    **A.**   336.

10   **Q.**   How many instances where the challenged individual

11   resided literally on a military installation?

12   **A.**   397.

13   **Q.**   How many instances where you found the duplicate in the

14   challenged file entries on the first name, last name, address,

15   triplet?

16   **A.**   1375.

17   **Q.**   How many instances where the challenged individuals had

18   been registered at the move-to address?

19   **A.**   6,377.

20   **Q.**   And, again, do you have any explanation for how that

21   result could appear in the file?

22   **A.**   So that reflects almost certainly that True the Vote was

23   relying on outdated information, maybe an older version of the

24   voter file.  But, again, this is something that -- you're

25   creating a file where you are alleging that someone is not

1  eligible to vote.  And you can immediately see that if someone

2  who has moved to an address where they are registered, I mean,

3  how do you question whether they're eligible to vote at that

4  address?  That -- that -- I mean, I'm using "shouldn't" as a

5  conditional, but there's no responsible process that would

6  have produced that result.  And, again, it was something that

7  was trivial to check.  It was one line of code.  And its

8  something that you -- that should have been done.

9  **Q.**   How many instances of erroneous zip code data?

10 **A.**   That would be every challenged record in Henry County,

11 9,270.

12 **Q.**   How many instances where the street address and the

13 move-to field was altogether missing?

14 **A.**   15,360.

15 **Q.**   How many total instances where the challenged individual

16 resided on or very closely adjacent to a military

17 installation?

18 **A.**   22,956 cases.

19 **Q.**   And similarly how many instances where challenged

20 individuals were alleged to reside on or adjacent to a college

21 or a university campus where you would expect Georgia high

22 school seniors to enroll?

23 **A.**   I found 35,056 cases.

24 **Q.**   Now, are you suggesting that nobody in a challenge file

25 could have been wrongly registered?

1  **A.**    No.  I'm not suggesting that there was nobody in the

2  challenge file who was no longer eligible to vote.  What I am

3  saying is that there are so many glaring examples of errors in

4  that process that even if there were some cases where someone

5  was properly identified as someone ineligible to vote -- the

6  way that I think about it is that you don't get to throw a

7  quarter million pieces of garbage at the wall and pat yourself

8  on the back that some of them actually stuck.

9  **Q.**    I want to conclude by talking some about how voters are

10 likely to be affected by voter challenges.  In your report you

11 discuss a voter turnout model.  Can you explain this concept

12 for the Court?

13 **A.**    So I describe in my report something called the cost of

14 voting model.  And it's a framework that people who study

15 voting turnout use to evaluate the effects of different

16 practices, different election administration practices.  And

17 the emphasis is on things that raise or lower the costs of

18 voting, the time costs, the informational costs, the

19 psychological costs of voting.  And the literature finds

20 generally that as the costs of voting go up, there are

21 additional barriers, additional burdens that are imposed on

22 individuals, the likelihood that an individual votes goes

23 down.

24 **Q.**    Is this model generally accepted among political

25 scientists?

1  **A.**   I would describe it as essentially almost universally

2  accepted.  There may be voting scholars who might sort of

3  quibble with one of the terms and -- but I would describe it

4  as almost universally accepted as an accurate way of thinking

5  about the effects of election administration practices.

6  **Q.**   I want to ask you to apply the concept of some of these

7  costs to the voter challenge process.  You mentioned time.

8  How could time be a cost?

9  **A.**   Well, the time could be a cost that under Georgia law,

10 the provisions I cite in my report, someone whose eligibility

11 is challenged can be required to appear or respond to prove

12 that they are eligible to vote, even if they've actually

13 already voted in an election, all the way up to responding to

14 a mailing, even being required to appear at a hearing in front

15 of a county board or county election officials where they

16 would -- they may have to prove -- they might have to be in a

17 position where they have to prove their eligibility to vote.

18 And just the administrative and time and opportunity costs of

19 doing that are enormously high.

20         THE COURT:  Is it decided by the local Board of

21 Elections whether they want to go through that cost?

22         THE WITNESS:  Well, the Board of Elections is not the

23 only entity that pays the costs.  It could be the voter that

24 pays.

25         THE COURT:  Yeah.  But the one that makes that

1  determination whether or not the person is going to have to
2  get up this information to prove that they can vote somewhere
3  in Georgia is the local Board of Elections.
4          THE WITNESS:  That would be true.  But they are the
5  ones that make a determination of whether -- I guess the term
6  would be whether they accept the challenge.
7          THE COURT:  Of course, they could look at it and say,
8  ah, we're not going to accept this challenge and not even
9  contact the people.  It's possible, or is it not?
10         THE WITNESS:  It's possible, but there's an
11 additional issue is that not every election board or entity
12 around the state will do it in the same way.  So a challenge
13 that is filed on the same basis in one county might be
14 immediately rejected; that same challenge might be accepted in
15 another county.
16         THE COURT:  That's my point, is that the costs you're
17 talking about, the individuals that decide whether or not we
18 want to create this cost, is the local board?
19         THE WITNESS:  That is my understanding.
20 BY MR. SHELLY:
21 Q.   For the counties that do require voters to appear in
22 person, would there be other costs to having to appear before
23 a government board in addition to the time?
24 A.   Yes.  A voter might be required to assemble documentation
25 and worry that they are not doing -- they need to do something

1  they're not doing.  A voter could perceive a risk that -- if
2  their eligibility is challenged.  A voter might worry that
3  they have done something wrong.

4       And I'm thinking about this.  I've been an academic for
5  40 years.  I've been a professor for over 30.  If I got one of
6  these notices saying I had to appear at the Madison City Clerk
7  to prove I was eligible to vote, that would make me nervous.
8  I'd wonder what happened, how did this happen.  I would find
9  that intimidating, and I'm not easily intimidated.

10 **Q.**   Could getting pulled out of line while someone is trying
11 to vote in person be a cost?

12 **A.**   Yes.  A voter might worry that they were being singled
13 out and they may worry to the point that they don't even try
14 to vote.

15 **Q.**   You just touched on this.  Could the perceived legal risk
16 of voting when you've been accused of an unlawful registration
17 be a cost?

18 **A.**   Yes.

19 **Q.**   Are these types of costs recognized in academic
20 literature?

21 **A.**   In this case they are universally recognized.

22 **Q.**   What is the expected foreseeable result of imposing these
23 costs on eligible voters?

24 **A.**   Well, we can identify an individual cost, the effect on
25 any individual voter, but it's important to keep in mind that

1  this is not an individual-level decision.  This was a mass

2  challenge of a quarter million people.  And the almost certain

3  effect, or certainly the likely effect, as there were, there

4  were voters whose eligibility was challenged and it made it

5  much more difficult for them to vote.

6       And my expectation is that what they were there --

7  certainly would be individuals whose registrations were

8  improperly challenged that resulted in them not voting.

9       MR. SHELLY:  Thank you, Dr. Mayer.  No further

10  questions for you at this time.

11       THE COURT:  Mr. Shelly, make sure you give Ms. Conkel

12  a copy of this.

13       MR. SHELLY:  I did during break.

14       THE COURT:  All right.  Thanks.

15       MR. SHELLY:  And I would now like to move those into

16  evidence as well.

17       THE COURT:  Mr. Powell, any objection?

18       MR. POWELL:  No, Your Honor.

19       THE COURT:  They're admitted without objection.

20       He's your witness now, Mr. Powell.

21       What exhibit numbers are these?

22       MR. SHELLY:  We're going to mark this one as 91.

23       (Plaintiff's Exhibit 91 was received and marked into

24  evidence.)

25  CROSS-EXAMINATION

1  BY MR. POWELL:

2  **Q.**   Good morning, Dr. Mayer.

3  **A.**   Good morning.

4  **Q.**   I apologize if I break into Dr. Meyer at some point,

5  because I didn't have the pleasure of deposing you and there's

6  some neuro pathways ingrained with Meyer, I'm sure.

7       So you -- congratulations on your book award, by the way.

8  **A.**   Thank you.

9  **Q.**   Since your report, have you reviewed any further

10 information about the case?

11 **A.**   I have not.

12 **Q.**   Okay.  Have you communicated with anybody about your

13 testimony?

14 **A.**   I had met with counsel, but I hadn't communicated with

15 anybody else.

16 **Q.**   Did you discuss your testimony?

17 **A.**   Yes.

18 **Q.**   Okay.  What was the nature of that discussion?

19 **A.**   Just what the questions would be, I'm under oath, answer

20 the questions, tell the truth.

21 **Q.**   Were you asked to perform any analysis of the defects or

22 disparate impact in the Davis Somerville challenge file?

23 **A.**   No.

24 **Q.**   Do you have the True the Vote challenge files with you

25 here today?

1  **A.**   No.

2  **Q.**   Is there any way we could look at them and verify what

3  you're saying?

4  **A.**   They would be on my home office computer.  I don't have

5  them -- I don't have my computer in my possession.

6  **Q.**   So if you said there were no middle names in the file and

7  we thought there were 61,000, is there any way we could

8  resolve that?

9  **A.**   I don't know.

10      But, again, even if there were middle names, that doesn't

11  have any affect on my conclusions about the problems that I've

12  talked about.

13  **Q.**   Why is that?

14  **A.**   Because those problems with the missing information and

15  the duplicate records and the military and students, that that

16  happens whether or not a voter's middle name or middle initial

17  had been included.

18  **Q.**   You do discuss the errors of no middle names being in

19  your report, though; right?

20  **A.**   Yes.

21  **Q.**   Okay.  And you're aware that the NCOA does do matching on

22  middle names?

23  **A.**   When it is available.  But, again, I was operating off of

24  the descriptions that True the Vote gave, so --

25  **Q.**   What did -- I'm sorry.

1   **A.**   No, that's -- I'm done.

2   **Q.**   What did you understand those descriptions -- did you

3   understand there was a particular audience for those

4   descriptions or what was the context of them?

5   **A.**   Well, these were -- one of them was a description that

6   was offered -- again, my understanding, I'm not a lawyer --

7   was offered in evidence as a response to questions.  The other

8   was, as I noted, an e-mail that was sent to multiple

9   recipients to describe the matching process.

10  **Q.**   Did you understand that e-mail to represent itself as a

11  complete and comprehensive description of the methods used?

12  **A.**   I was operating off the descriptions I had, the two

13  descriptions.  And, again, I -- there were references in those

14  descriptions to vague and ambiguous things.

15  **Q.**   And where did you get the files that you worked from?

16  Did you get 65 different Excel spreadsheets?

17  **A.**   I did.

18  **Q.**   Did you get just 65 or did you get 159?

19  **A.**   I received just 65.

20  **Q.**   Okay.  So there are 65 separate spreadsheets.  And how

21  did you put those -- did you put them together somehow?

22  **A.**   I did.  I used a statistical package called Stata, which

23  allows you to input the files and to -- there are commands

24  where you're allowed to combine files into a single database

25  with -- so that essentially you're stacking the data.  So I

1   was able to combine all 65 county files into a single file.

2   **Q.**   And does your -- the software used, does it extract that

3   information from the files or are you having to cut and paste

4   or how does that work?

5   **A.**   It's automatic.  It just imports the fields in the

6   spreadsheet.  Or in this case, I think they were comma --

7   well, no, they were a spreadsheet.  So it would just import

8   the data in spreadsheets directly from what was in the file.

9   **Q.**   Are you aware of an error rate of that importation?

10   **A.**   Not in Stata.  I'm not aware of what the error rate might

11   be.

12   **Q.**   Is there any way we could know that no errors were made

13   during that importation as you combined 65 files into one?

14   **A.**   Well, again, I did a data validation process.  But, no, I

15   can't -- I don't know what the error rate might have been.  In

16   my experience, having done that in multiple states with large

17   numbers of counties, that error rate I would expect to be

18   somewhere between zero and very, very small.

19   **Q.**   Did someone study your error rates?

20   **A.**   No.  This is from my experience in working with this

21   process.

22   **Q.**   But you have to have at least studied your error rate to

23   know what it might be.

24   **A.**   In this instance?

25   **Q.**   That 0 to 1 percent.  I'm just --

**A.**   Well, I'm not -- no, I'm not saying it's 0 to 1 percent.
I imported the files, and my expectation is that there would
not be a material number of errors resulting from that
process.  It's very straightforward.

**Q.**   Is it possible that the middle names that were in the
original files got left out in the combined file?

**A.**   I don't think so.

**Q.**   Did you inspect the 65 spreadsheets individually before
you combined them?

**A.**   Yes.

**Q.**   What did you look at?

**A.**   It's been two and a half years since I did this.  I
looked at them and I -- my recollection is that most, if not
all of them, had identical format.  But the -- I don't recall
specifically what -- I mean, I can't tell you what the field
names would be in every one of those spreadsheets.  I know
what the field names were in the resulting files.

**Q.**   So does your data suggest to you that True the Vote
targeted people on an individual basis?

**A.**   I'm not sure I understand the question.

**Q.**   Well, did they target people as -- individually for any
particular demographics?

**A.**   Well, I can tell you that my analysis found that the
counties -- in that set of 65 -- that I reviewed, were more
likely to have higher African American populations in terms of

1  registrants than the counties where there were no challenges.

2  So I don't know whether True the Vote had a particular name,

3  that we're going to challenge this person.  My understanding

4  is that it was a mass challenge based off of the NCOA

5  registry.

6  **Q.**   And did you say in your report that the impact on African

7  Americans was not statistically significant?

8  **A.**   Well, as I note in the report, in terms of that

9  selection, it doesn't meet conventional thresholds of

10 statistical significance.  But, again, it's increasingly

11 recognized in political science that that's not a binary.  It

12 doesn't -- you don't look at a coefficient and the errors and

13 then it doesn't mean anything, it doesn't mean anything, and

14 suddenly it does when you hit that .05 threshold.  I make that

15 very clear in my report.

16 **Q.**   What measure do we have to make decisions about whether

17 something matters?

18 **A.**   It's based on the data and experience and judgment.

19 **Q.**   Would you publish a peer-reviewed article announcing a

20 conclusion about the disparate impact in this case based on

21 your findings of not any statistical significance?

22 **A.**   I would.

23 **Q.**   And what would you say about it?

24 **A.**   I would say the same thing I said in my report, that

25 reflects the three counties with the highest percentage of

1  African American registrants.  Knowing those differences, that

2  table would go in.  And I would reach the same conclusion that

3  this doesn't meet the .05 level of statistical significance,

4  but we can be confident that the coefficient is positive.  And

5  I would -- I would use the same language and same techniques

6  in peer-reviewed research.

7  Q.   So in your report, there's quite a bit of reliance on the

8  idea that counties were selected or chosen or targeted; is

9  that right?

10  A.   I wouldn't say "quite a bit."  It was -- that was one

11  step in the analysis, but the bulk of the analysis is on the

12  actual files that were produced.  And, again, there were other

13  instances where there was a disproportionate impact on African

14  Americans, the -- the duplicate records, for example, or the

15  fact that African Americans are overrepresented among the

16  challenged voters who are alleged to have moved within

17  Georgia.

18  Q.   Would you have any reason to doubt that your report

19  mentions the idea of counties being selected by True the Vote

20  close to a dozen times?

21  A.   My understanding is that -- what that means is these were

22  the counties where the voter challenges were -- were at issue.

23  Q.   How do you think that happened?  Walk me through the

24  process of how True the Vote selects a county for challenge.

25  A.   I don't know.  The -- as I note, the decision process for

1  the purposes of my report is unobserved.  But in terms of the
2  effects, I don't think it matters.
3  **Q.**   Are you familiar with Section 230 that allows for the
4  challenges?
5  **A.**   In general, yes.
6  **Q.**   Okay.  So do you know how a petition gets from a
7  challenger or from someone like True the Vote to an actual
8  voter?
9  **A.**   So my understanding is that under Georgia law, someone
10 who is a registered voter in a county can challenge the
11 registration of other people in the county.  And, again, this
12 is based on -- my understanding of the data that I reviewed,
13 is that these were files that were provided or challenge files
14 that were issued under the name of True the Vote.  And I don't
15 know if -- I mean, I guess it's not relevant to my empirical
16 conclusions what that process looked like.
17 **Q.**   They were filed under the name of True the Vote?
18 **A.**   Well, these were -- my understanding of the data that I
19 received is that there were challenge files issued in 65
20 counties in which True the Vote was -- I don't know whether
21 the term is whether they organized it or whether they managed
22 it, but my understanding is that these are files that were --
23 these challenge files were -- were issued as part of an effort
24 that involved True the Vote.  What their precise role was
25 doesn't really affect my empirical conclusions.

1  **Q.**   So would your analysis change if TTV, True the Vote, had

2  not selected counties for submission but rather was forced to

3  submit only in counties where they had challengers come

4  forward to volunteer to petition?

5  **A.**   That doesn't at all change my analysis about the

6  sloppiness with which --

7  **Q.**   I'm not talking about the sloppiness.  I'm talking about

8  the targeting of counties.

9  **A.**   Well, again, as I note in the report, for my purposes

10 that process is unobserved.  All I see is whether a county

11 file has been created.

12 **Q.**   So I'm asking you a hypothetical then.  If the only

13 reason that a challenger -- if the only reason a challenge was

14 submitted in county A but not county B was solely because a

15 resident of county A had contacted True the Vote and said I'd

16 like to volunteer to file a challenge and no resident of

17 county B had come forward to do so, would that not affect your

18 assessment that True the Vote was selecting its counties?

19 **A.**   No.  Because I'm not making an argument about how True

20 the Vote selected its counties.  I'm making an empirical

21 argument about the nature of the counties that were selected,

22 in terms of the demographics.  So how True the Vote selected

23 them is not relevant to my determination of the empirical

24 effects --

25 **Q.**   What I'm asking is --

1          THE COURT:  Hold on, hold on.  Let him finish his

2   answer.  Let him finish his answer.

3          MR. POWELL:  Sorry.

4          THE WITNESS:  So I don't know where I cut off.

5   BY MR. POWELL:

6   Q.   Well, I -- you know, on your report, page 3, there's two

7   mentions of True the Vote selecting counties.  On page 7 there

8   is a mention.  On page 8, page 18.  On page 34 there are seven

9   mentions using the word "selected."  So it seems fairly

10  relevant that you think True the Vote went through a process

11  of selecting 65 counties in which to submit challenges.  So

12  I'm asking, would that not change if True the Vote wasn't

13  making those decisions?

14  A.   Well, in terms of the empirical conclusions, not at all.

15  Because I don't know what the process that True the Vote used

16  once it -- I mean, as I note in my report, there were

17  indications that there were other counties where they had

18  engaged in that process.  But I don't see that because the

19  challenge files were not produced.

20         But this was an effort that -- my understanding is that

21  it involved True the Vote.  And my empirical conclusions,

22  whether it was True the Vote or an individual in accounting or

23  -- we have the results in front of us.  I can see the files

24  that were produced or created.  I can evaluate those files and

25  the accuracy of those files.  Who actually is responsible for

1  creating those or what role the different groups were -- and

2  that's something that's opaque, because the descriptions that

3  were given by representatives or people in True the Vote about

4  how that process worked, were -- were not complete.

5  **Q.**   So you said your empirical conclusion of some kind of

6  impact wouldn't change, but your conclusion that True the Vote

7  was selecting counties would have to change, wouldn't it?

8         THE COURT:  Hold on.

9  BY MR. POWELL:

10 **Q.**   Under my hypothetical?

11        THE COURT:  What's your objection?

12        MR. SHELLY:  Respectfully, I think this question's

13 been asked three times and answered three times by now.

14        THE COURT:  I think it has, Mr. Powell.  He's given

15 the answer.  I think you can continue to proceed from it.

16        MR. POWELL:  Well, all right, Your Honor.

17 BY MR. POWELL:

18 **Q.**   But you calculated the percentage of African Americans in

19 the True the Vote challenge file; right?

20 **A.**   Yes.

21 **Q.**   Yeah.  So that's 27.3 percent?

22 **A.**   That's correct.

23 **Q.**   So that's less than the percentage of African Americans

24 in the Georgia voter file; right?

25 **A.**   That's correct.

**Q.**   Which is 29.9 percent?

**A.**   That's correct.

**Q.**   So that's almost a 3 percent difference between the two.
One's about 10 percent bigger or smaller than the other.  Is
that significant?

**A.**   Well, the problem with that argument is that their
selection as someone who is being challenged is conditional on
whether someone has filed an NCOA.  Because that's my
understanding of what the basis of these challenges were.  And
so some of the elements that I identified, such as the
duplicated records, there is a clear effect because we can
directly look at that.

   But the fact that the Georgia file was 30 percent African
American and the challenged file was 27 percent African
American, you don't stop there.  You look at who are the
voters who are most likely to be affected by this.  What is
the relationship between, for example, the fact that academic
research has shown repeatedly that using NCOA matching or
using NCOA data to do voter list maintenance, improperly
removes African Americans at a higher rate than non-Hispanic
white voters.

**Q.**   Removing?  From what?

**A.**   From voter files.

**Q.**   You understand that's what was happening here, an effort
to remove?

1  **A.**   I understand that these were challenge files that were

2  issued that were calling into question the eligibility of

3  registrants in Georgia.

4  **Q.**   The eligibility to do what?

5  **A.**   To vote.

6  **Q.**   When?

7  **A.**   The files that I evaluated, in my understanding, is that

8  they were created around or in December of 2020.

9  **Q.**   So there -- it was eligibility to vote in an election,

10  the upcoming election?

11  **A.**   I think that's right.

12  **Q.**   So not to remove someone from the voter file?

13  **A.**   Well, I mean, you're sort of quibbling with what the

14  effect of these is, and I'm offering an empirical conclusion

15  about what the data in those files actually show.

16      And my understanding of the process is that county

17  election officials could use that information to call into

18  question and to require a voter to prove their eligibility.

19  **Q.**   Under what circumstances would they call them to prove

20  their eligibility?

21  **A.**   Well, I don't know the specific processes that were used

22  in every county where a challenge file was issued.

23  **Q.**   It's only when someone tries to vote that they're asked

24  to confirm their residency in Georgia?

25  **A.**   It could be when someone has already voted.  But, again,

1  that's a distinction without a difference, because it's

2  calling into question the eligibility of someone to vote.

3  **Q.**   So you focused in your report on the counties around

4  Atlanta.

5  **A.**   No.  Hold on a second.  You're putting words in my mouth.

6  I didn't focus on my report on these counties.  I noted in my

7  report that of the 29 counties in the Atlanta Metro

8  statistical area, 17 were counted.  So it's not true that my

9  report is wrapped around as a foundational thing that these

10  were the counties that were selected.

11  **Q.**   Do you know what percentage of the Georgia population is

12  represented by the Atlanta MSA?

13  **A.**   Not off the top of my head.

14  **Q.**   Would it surprise you it's about 52 percent?

15  **A.**   Again, I don't know.

16  **Q.**   So if the way that petitions were carried to boards was

17  that volunteers came forward in different counties, all things

18  being equal, wouldn't a more populous county be more likely to

19  surface a volunteer to carry the petition than the rural

20  county with not many people in it?

21  **A.**   I don't know.  And, again, you know, my conclusions do

22  not depend on these being the counties that were selected.

23  Most of my report is about the observable errors and problems

24  with the files that were produced.

25  **Q.**   Well, Dr. Mayer, you're talking about targeting these

1  counties around the MSA, which are the most populous counties

2  in Georgia, and which I think you would agree have the highest

3  percentage of African American voters.

4  **A.**   Well, we know that of the 20 counties with the highest

5  percentage of African American registrants, ten of them were

6  challenged.

7  **Q.**   So there were more potential challengers in those

8  populous ten counties than in the least populous ten counties

9  in Georgia?

10  **A.**   I don't know who the actual challengers were.

11  **Q.**   I'm asking you a hypothetical.  All things being equal,

12  wouldn't it be easier for challengers to come forth in a

13  county like Fulton, which has a million people, than in the

14  other -- than to find 84 challengers in the other 84 smallest

15  counties, which also equal about a million people?

16  **A.**   You're saying easier to come forward -- I mean, it could

17  be possible that that -- that there -- would be more people

18  willing to serve as challengers.  But, again, that doesn't

19  matter for my conclusions.

20  **Q.**   I'm just talking about the odds of being able to find a

21  challenger in a county with a million people versus a county

22  with a thousand people.  You're treating counties as if

23  they're the same.  You don't account for population in your

24  analysis, do you?  You counted the population --

25  **A.**   Well, yes, I do.  In my analysis, I do include -- I do

1   assess the likelihood of a county being -- having a challenge

2   file using population.

3   **Q.**   Where is that in your report?

4   **A.**   Table 2 on page 35.

5   **Q.**   And how does that take into account the varying

6   populations of the counties?

7   **A.**   Because it measures the likelihood that a county has been

8   selected using, as an independent variable, the natural log of

9   the number of registrants in a county.  So even after you have

10  controlled for population, you still see an effect in which

11  counties with larger proportions of African American voters

12  are more likely to be selected, even after taking population

13  into account.

14  **Q.**   But, again, if it proved to be the case that it was the

15  petitioners who selected True the Vote and not the other way

16  around, would that change your conception that True the Vote

17  had targeted someone or had somehow themselves created the

18  disparate impact?

19  **A.**   No.

20  **Q.**   Why not?

21  **A.**   Because the impact is there.  And, I mean, True the

22  Vote's name is on it.  So, again, assigning culpability for

23  that is a separate matter from noting the fact that that

24  effect exists.

25  **Q.**   Is it not true that whites make up a larger percentage of

1   challenged voters in 60 of the 65 counties?

2   **A.**   I don't know.  I did not look at a county-by-county

3   breakdown of the demographics.  And, again, that would --

4   well, I'll stop there.

5   **Q.**   So you didn't notice, for example, that the percentage of

6   challenge voters in Banks County who were white was 81 and a

7   half percent?

8   **A.**   No.

9   **Q.**   All right.  Now, we looked at a demonstrative earlier.

10          MR. POWELL:  I don't know, could we get that back up

11   on the screen?  Is that --

12          THE COURT:  Mr. Shelly, can you-all put that back up?

13   BY MR. POWELL:

14   **Q.**   This is referring to pages, I think, 42 and 43 of your

15   report.  You summarize a number of errors in the challenge

16   file.

17          Do you have any data on how those errors impacted the

18   accuracy of the NCOA's work on the files?

19   **A.**   I'm sorry, I didn't catch the end of the question.

20   **Q.**   Do you have any idea how those errors impacted the

21   accuracy of the NCOA?

22   **A.**   So these errors wouldn't be -- these are not errors that

23   would affect the NCOA.  These would be errors that were in

24   part because of the NCOA and the known problem of false

25   positives.  But, again, the issue is that these are records

1  that are purporting to identify ineligible voters.  And we can

2  see that there are all kinds of missing data, incomplete data.

3  Whether that was in the NCOA or whether that was the result of

4  whatever process True the Vote used to generate these files, I

5  don't know.

6  **Q.**   How do we know they're purporting to identify -- you

7  mention in your report I think -- determine ineligible voters?

8  How does the spreadsheet determine that by itself?

9  **A.**   I don't understand the question.

10  **Q.**   Well, you're telling me that this is -- these

11  spreadsheets are purporting to identify ineligible voters.

12  How do they purport that?

13  **A.**   Well, the spreadsheets don't do anything.  The

14  spreadsheets don't have any agency.  The spreadsheets have

15  records that include data.  And my understanding of how

16  these -- the reason these spreadsheets were created -- the

17  reason these data were created was a process of challenging

18  the -- or challenging the eligibility of registrants based on

19  whether or not someone with that name and address had filed an

20  NCOA.

21  **Q.**   So they're challenging the eligibility; not determining

22  it?

23  **A.**   That's correct.

24  **Q.**   Who determines the eligibility?

25  **A.**   That would be the county election entities, the boards or

1  officials.

2  **Q.**   So you mentioned earlier that a number of the errors in

3  the challenge file were obvious, like the syntax error, for

4  example?

5  **A.**   That's correct.

6  **Q.**   Any others that you would consider obvious to an

7  observer?

8  **A.**   Well, I noted those in reports.  The records that don't

9  have an address, the records that have a city name where the

10  zip code is, someone who is already reregistered.  I mean,

11  these are errors that any responsible entity that was

12  producing this purporting to show -- or purporting to

13  challenge these -- the eligibility of these registrants, this

14  is a process that should have happened.  Someone should have

15  looked at this and found these errors and determined what

16  their origin was and to determine or to evaluate the accuracy

17  of the underlying process.

18  **Q.**   Would you consider boards of election and their lawyers

19  responsible entities?

20  **A.**   I'm not offering a conclusion about that.  I'm offering a

21  conclusion about the files.

22  **Q.**   So if these errors were obvious, in your experience with

23  election administration, would you expect a Board of Elections

24  would be able to look at them and see those errors?

25  **A.**   It's possible.

1  **Q.**   Because they're obvious?

2  **A.**   It's possible.  I don't know how the process that was

3  used in the -- these 65 counties, what the boards did with

4  these files once they got them.

5  **Q.**   Would you expect that a -- any of the members of the

6  Boards of Elections, or their lawyers who were examining these

7  files for probable cause to issue a challenge, would look at

8  these errors and say we're not going to find probable cause?

9  **A.**   They could.  But that -- I mean, that just begs the prior

10  question of why these challenges are issued in the first place

11  and why these errors weren't caught before dumping this

12  quarter million records on county election officials across

13  the state.

14  **Q.**   Well, that's a different question.

15  **A.**   Well, it's one that they -- it's one that should have

16  been answered.  These errors should have been caught.

17  **Q.**   Do you know how many of these errors made their way to a

18  voter?

19  **A.**   No.

20  **Q.**   So you've identified a bunch of errors in spreadsheets

21  and you don't have any information about their impact on

22  actual voters?

23  **A.**   My analysis was limited to an evaluation of the

24  reliability of the underlying data.

25  **Q.**   I'd like a yes or no.

1  **A.**    So I did not do an analysis of what happened to

2  individual voters following the submission of the files.

3  **Q.**    So you don't actually know whether the firewall of the

4  Board of Election allowed any of these erroneous challenges to

5  go through?

6  **A.**    That's correct.

7  **Q.**    Do you have any understanding of the connection between

8  any of the defendants and any of the challenges that reached

9  any of the plaintiffs?

10  **A.**    I'm aware that at least one of the testifying witnesses

11  or the plaintiffs was in a challenge file, but beyond that, I

12  have not done that kind of review.

13  **Q.**    So let's talk a little bit about your selection of in-

14  state movers for one of your conclusions.  You mention on

15  page 35 -- and I'll read it and then you can find it in the

16  document.

17        "Overall, the 2021 voter registration file shows that

18  29.9 percent of the registrants are African American," which I

19  believe you testified to earlier.

20        Starting up again with your quote, "But among the alleged

21  in-state movers in True the Vote's challenge file,

22  38.4 percent are African American."

23        Why focus on in-state movers?  Why exclude the relevant

24  cohort of out-of-state movers?

25  **A.**    Because that was a characteristic of the file.

**Q.**   What do you mean?

**A.**   That existed in the file.  And that was a pattern that I found in the data as part of my analysis about a disproportionate effect on, in particular, African American voters.

**Q.**   So could that effect be because African American voters are more likely than other voters to move in state rather than out of state?

**A.**   It could.

**Q.**   Could it be that they're less likely to file NCOA than other voters?

**A.**   It could.

**Q.**   Okay.  So do you know the percentage of African Americans in the out-of-state mover file?

**A.**   Based on the overall percentages, the out-of-state movers would be less likely to be African American than the representation in the voter file.

**Q.**   Do you know how many of the 250,000 or so records in the True the Vote file were in state versus out of state, just hard numbers?

**A.**   Not off the top of my head.

**Q.**   Let me see if this sounds familiar.  About 88,000, 89,000 for in state and the rest out of state?

**A.**   Again, I don't know -- I don't recall off the top of my head what those numbers look like.

1   **Q.**   Are you aware of any county Board of Elections that

2   received a True the Vote list that only had in-state movers on

3   it?

4   **A.**   Am I aware of any?  No.

5   **Q.**   Did you calculate that white voters make up 53 percent of

6   all True the Vote challenges but only 48 percent of all

7   registered voters?

8   **A.**   I don't know that I did that calculation, but I did note

9   that -- the percentage of the challenge file that was African

10  American.

11  **Q.**   Do you know the racial makeup of the people who actually

12  carried the challenges forward in their respective counties?

13  **A.**   No.

14  **Q.**   All right.  So you mention on page 30 -- and this is just

15  about the military bases, and I'm sure you have it partly

16  memorized -- but that about 22,956 -- I shouldn't even say

17  "about," that's exact.  It appears registrants in the

18  challenge file moved to an address on or near a military

19  installation.

20       Are military addresses obvious?

21  **A.**   They can be.

22  **Q.**   Like an APO or any other type of military designation?

23  **A.**   Yes, there were some addresses that were APOs.  And

24  others were -- the municipality was the name of a military

25  installation.

**Q.**    So a Board of Election could have seen that and excluded

them right away from any challenge?

**A.**    They could have.

**Q.**    Now, you mention that of that 22,956 that are on or near,

397 of those were on; is that right?

**A.**    That's correct.  That was based either on an APO address

or the name of -- of installation in the address.  And I --

that's listed in Appendix A of my report.

**Q.**    So about just a little under 2 percent appeared to live

on a base?

**A.**    2 percent of what?

**Q.**    Well, 397 as a percentage of 22,956?

**A.**    So that's about 2 -- 400 is a little under 2 percent of

the 22,956 --

**Q.**    I believe it's 1.73 percent, but I didn't know if you

could do all that in your head like A Beautiful Mind or

something.

       So do you know how many civilian employees of the

military branches live on bases?

**A.**    No.

**Q.**    Do you know how many of those 397 people found out that

there was a challenge made against them?

**A.**    No.

**Q.**    Now, you mentioned that -- I guess it's -- the difference

is 22,459 had moved near a base.  So they're in a city that

1  contains a military base?

2  **A.**   Well, as I describe in the report, it was a -- the -- a

3  nearby city that was either adjacent to or a municipality that

4  was the closest to a military base.

5  **Q.**   How near is near?

6  **A.**   I don't recall the precise rule that I used, but my

7  recollection is that, in most of the cases, they were either

8  contiguous to a military base or within a couple of miles.

9  **Q.**   So is your assumption that only service members live in

10 residential areas adjacent to military bases?

11 **A.**   No.

12 **Q.**   So why does it matter that there is a challenge that

13 might go to someone who is living in the city near a military

14 base?

15 **A.**   Well, again, being in the military is an archetypal type

16 of absentee voter.  And it's an entirely reasonable inference

17 that there are military or military families, individuals who

18 move to that address.

19     I'm not suggesting that everybody who moved to Austin,

20 Texas, or Atlanta is in the military, but there is a very high

21 likelihood that some -- most, perhaps, of these voters or

22 these registrants did that because of some relationship

23 between military service or a family service.  People don't

24 move from Augusta, Georgia, to West Point for the weather.

25 **Q.**   There are a lot of military bases in your analysis that

1  are in large cities.

2  **A.**   Well, that's a different matter.  Because if you look at

3  most of the installations that I've identified, you're

4  actually not likely to see a huge military installation next

5  to a large city.  It can happen, but most -- you know, Fort

6  Irwin, Fort Rucker, these are not near large cities.  Some

7  are.  Warner Robins is in the Atlanta area, but it's not --

8  these are municipalities that are so close to a military

9  installation that it's certainly reasonable to think that that

10  would be a reason for someone to file an NCOA to an address --

11  **Q.**   Would you say that in the dozens of states that allow

12  citizen challenges, they should simply avoid any areas that

13  are near a military base?

14  **A.**   I'm not offering a conclusion about how this process

15  should work.  I'm offering a conclusion about the

16  characteristics of the files that were created in this case.

17  **Q.**   Well, you said there is a likelihood that someone who's

18  with the military could be near the base.  But you don't have

19  that figure.  So how do we decide whether it would be

20  negligent or reasonable to use an NCOA to predict that that

21  move was permanent?

22  **A.**   Well, again, I'm not offering an opinion about

23  negligence.  I'm offering an opinion about the characteristics

24  of the data, and the -- the -- the errors and problems in

25  presenting this data as reflecting ineligible registrants.

1  I'm not offering an opinion about what an ideal system looked

2  like or looks like.

3  **Q.**   So you also mention that there are 34,578 records listing

4  a registrant who had moved to a city with a college or

5  university.  Is "with" broader than "near"?  What is the --

6  what does that entail?

7  **A.**   So "with" includes municipalities where the university is

8  actually located, Athens, Georgia; Madison, Wisconsin; College

9  Station, Texas.  There are also cases where there can be a

10 municipality that is adjacent to this.  The example I give in

11 the report is Opelika, Alabama, which is the municipality --

12 it's either where Auburn is located or it's right next door.

13 So it is a city where the university is actually located or it

14 can be a nearby adjacent city.

15      For example, I know Madison because the University of

16 Wisconsin is there.  There are a total of close to 50,000

17 students.  I include Middleton as an area where that can

18 happen because it is a couple of miles, it abuts Madison, and

19 there are places in Middleton that are -- where I know

20 students live.  So that was the thought process there.  Again,

21 I articulated the decision rule in the report.

22 **Q.**   In an ideal world, do you think that any voter living in

23 a town that has a college or university should be immune from

24 challenges to their eligibility?

25 **A.**   I'm not offering an opinion about what the system should

1   look like.  I'm offering an opinion that someone who files an

2   NCOA to 29 Palms, in the case of Fort Irwin or to Angusta or

3   Athens, Georgia, that there is a reasonable reason why someone

4   might do that.

5         And, again, True the Vote says that they've reviewed and

6   removed students or potential students or military.  But they

7   clearly didn't because those addresses remain in the challenge

8   file.  So this is something that True the Vote says should

9   have been done, but it was not done with -- with a lot of

10  accuracy.

11  **Q.**   Wouldn't the Board of Election make a determination of

12  how reasonable that was to include someone near a campus?

13  Don't they make the final determination?

14  **A.**   It's the Boards of Election that make that determination.

15  **Q.**   Is there anything in the Georgia voter file that

16  definitively identifies a registrant as a student?

17  **A.**   No.

18  **Q.**   How does the Secretary of State do that when it

19  identifies voters who might have moved?

20  **A.**   I don't believe they do.  I think they -- someone who has

21  filed an NCOA or someone who requests an absentee ballot to be

22  sent to a mailing address that might be different than their

23  residential address.  I'm not aware that the Secretary of

24  State has a process to identify students in the voter file.

25  **Q.**   So what tools should the average citizen use to try to

1  identify students?

2  **A.**   I mean, I'm not offering an opinion about what people

3  should do.  I'm offering an opinion about, first of all,

4  claims of voter fraud, and ineligible registrants voting is

5  vanishingly rare, and that there were enough errors in the

6  files that were produced that they were not created or

7  reviewed according to standards that would be used in my line

8  of work.

9  **Q.**   Is your line of work the standard for a citizen

10 petitioner, scholarly, peer reviewed, that sort of thing?

11 **A.**   No.

12 **Q.**   Okay.  Did you analyze any of the voters' dates of birth

13 for how likely they might have been students?

14 **A.**   I did not.

15 **Q.**   Do you know of a way someone like True the Vote might

16 have done that?

17 **A.**   They could have identified someone based on their birth

18 year.

19 **Q.**   So you can't eliminate all students from your challenge

20 list because you can't identify them.

21 **A.**   Well, but a student doesn't lose their eligibility to

22 vote because they're attending university out of state.

23 **Q.**   I'd like you to answer my question, though, which is you

24 can't remove all the students because you can't identify them;

25 is that right?

1  **A.**    That would be correct.  You would not be able to identify

2  and remove all students from the challenge file.

3  **Q.**    Did you review any evidence that suggested that True the

4  Vote's challenges had made false statements?

5  **A.**    So --

6  **Q.**    Are we talking about error or false statements?

7  **A.**    My analysis is about errors.

8  **Q.**    Did you see any indication of outright falsehoods in the

9  challenge files?

10 **A.**    I did not have any information that would allow me to

11 assess that.  My conclusions were based on the files as

12 produced.

13 **Q.**    I want to talk a little bit about your experience in

14 election administration and other expertise.

15      Was that what you would say your expertise is, how you

16 describe it, election administration?

17 **A.**    Yes, one of the areas.

18 **Q.**    And you have publications in election administration.

19 Are there any other areas of publication you consider relevant

20 to this case?

21 **A.**    I would say my experience handling large datasets.  But

22 for the purposes of this case, it's election administration,

23 the relationship between administrative practices and the

24 likelihood of voting.

25 **Q.**    And you've done voter roll analysis in the past?

1  **A.**   So I don't mean to quibble, but what do you mean by voter
2  role analysis?
3  **Q.**   Well, have you analyzed voter rolls for, you know, things
4  like residency issues?
5  **A.**   Yes.
6  **Q.**   Okay.  Have you had any hand in administering elections?
7  **A.**   Not as a poll worker.
8  **Q.**   Does your -- I know your resume as it is in your report
9  is, what, a year or two old.  Since -- since the time that --
10 that you provided that, have you gained any additional
11 experience with the NCOA registry?
12 **A.**   No, that -- that direct experience would be reflected in
13 an article that is in that CV.
14 **Q.**   Do you have any experience with the NCOA's matching
15 algorithms that the Postal Service has embedded?
16 **A.**   Not specifically with the NCOA.
17 **Q.**   What about with CASS?
18 **A.**   Not.
19 **Q.**   Do you know what CASS is and how it's used?
20 **A.**   No.
21 **Q.**   What about with DPV?
22 **A.**   I'm not familiar with what that means.
23 **Q.**   Delivery point validation.
24 **A.**   Again, I'm working with the NCOA and the files as
25 produced.  I don't know what DPV is.

1  **Q.**   Do you have experience in mass mailing systems?

2  **A.**   I would say no.  I have done some large scale mailings,

3  but I don't know that I would characterize them as mass.

4  **Q.**   Okay.  Have you published any articles on NCOA or Postal

5  Service or mass mailing in any of the scholarly journals?

6  **A.**   No.

7  **Q.**   What about the trade publications?

8  **A.**   What trade -- are you asking have I published in trade

9  publications?

10  **Q.**   Yeah.  MAIL Magazine for example.

11  **A.**   No.

12  **Q.**   Okay.  Do you attend any of the typical postal industry

13  conferences?

14  **A.**   No.

15  **Q.**   Have you published any online postal or mailing

16  communities on the Internet?

17  **A.**   I'm not sure I understand the question.

18  **Q.**   Well, have you published in any of the less formal

19  forums, like online newsletters and things like that that are

20  related to postal services?

21  **A.**   No.

22  **Q.**   Do you subscribe to any?

23  **A.**   No.

24  **Q.**   Do you subscribe to any of the scholarly journals in the

25  postal industry?

1  **A.**   No.

2  **Q.**   Do you follow any of the experts in that industry?

3  **A.**   It's possible that I could have come across their work

4  and reviewed it.  But follow, not that I regularly update

5  that.

6  **Q.**   Do you know how many states allow voters to make

7  residency-based challenges?

8  **A.**   No.

9  **Q.**   So you wouldn't know the key difference in how the

10  statutes work?

11  **A.**   No.

12  **Q.**   Do you know what the time frame to submit challenges was

13  in Georgia under the challenge law?

14  **A.**   Not off the top of my head.

15  **Q.**   Earlier you were talking about the cost of voting.  And

16  you, I think, referred to some -- some academic scholarship.

17  Does the cost of model tell us anything about voters'

18  willingness to endure greater cost when an election is very

19  close?

20  **A.**   There are things that are associated with proximity that

21  increase voter attentiveness.  So it could be that a voter

22  might pay more attention as an election gets close.

23  **Q.**   Is that not reflected in the actual articles that you

24  cite, though?

25  **A.**   Well, it's -- it's reflected in my own work for things

1  like states that have a 30-day or 28-day cutoff for

2  registration will have lower turnout than states that allow

3  same day, early voting or same day registration or Election

4  Day registration.

5  **Q.**   Do you know what the U.S. Postal Service's licensees of

6  NCOALink do with that database once they get access to it?

7  **A.**   My understanding is that that is most commonly used for

8  mass mailings and marketing, but it depends -- again, I note

9  in the report that based on data that the post office

10  publishes, there are hundreds of firms that have access to the

11  NCOA registry and they're allowed to market those services and

12  people pay them to use the registry.

13  **Q.**   Do you know if any of those licensees do any contextual

14  or probabilistic matching with the changes of address they get

15  from the Postal Service?

16  **A.**   I would expect that they would.

17  **Q.**   That's going to be more accurate than trying to do exact

18  match?

19  **A.**   It should be.  And it will -- well, when you -- I'll

20  leave it at that.

21  **Q.**   Do you have a general idea of the number of records that

22  are submitted by customers of NCOALink that return a match in

23  forwarding address information?

24  **A.**   No.

25  **Q.**   Do you know if the NCOA link licensees make any attempt

1  to predict for their mass mailer clients whether a permanent

2  change of address is indeed permanent?

3  **A.**   No.

4  **Q.**   How are temporary changes of address reflected in the

5  NCOA?

6  **A.**   So my understanding is that the nature of the form would

7  be reflected in the underlying NCOA data.  That it should show

8  whether this is filed as a temporary or permanent.

9  **Q.**   Did you identify any temporary filings in -- in True the

10  Vote's challenge file?

11  **A.**   No.  Because the only data that I had were the actual

12  challenge files.  And I am not aware if there was information

13  in there reflecting whether it was a temporary or permanent.

14  **Q.**   So it's your understanding that whether someone marks

15  permanent or temporary on their form, which sometimes is

16  online, it's going to go in the National Change of Address

17  registry?

18  **A.**   That's my understanding.

19  **Q.**   Do you know what information is returned from NCOALink

20  when the match is made on a temporary address?

21  **A.**   Well, I note in my report that the publications show that

22  they can return different types of statuses to note the types

23  of match and which fields match and which didn't, but, again,

24  the information that I had was the challenge files, which I'm

25  not aware that it included that information.

1   **Q.**   Um-hum.   Now, you mention at page 33 of your report that

2   states do not use an NCOA match alone as a reason for removing

3   a voter from the list of registered voters.   Why is it

4   relevant what states are trying to do to remove a voter?

5   **A.**   Well, because that reflects the inherent problems of

6   relying on the NCOA because of the issue of false positives.

7   So it's simply to note that the underlying data has some known

8   issues with its reliability.

9   **Q.**   What is the rate of false positives?

10  **A.**   I do he know.

11  **Q.**   Now, what is the source of your statement that states

12  don't use an NCOA match alone?

13  **A.**   It's based on my experience in studying elections, but I

14  don't know off the top of my head what the precise practices

15  are in every state as they do their list maintenance

16  processes.

17  **Q.**   So you don't know what other tools states use to make

18  that determination?

19  **A.**   Well, it's most commonly -- it's a combination of an NCOA

20  match, whether a voter responds to a card.   There are some

21  states that would rely or would have relied on something

22  called the electronic registration information center, which

23  would provide information about whether an individual had

24  actually registered in another state.   And it is typically

25  engaged when a voter has not voted over at least two general

1  elections.  So it's a combination of things.

2  **Q.**   Who has access to that?  I believe you referred to ERIC?

3  **A.**   Yes.

4  **Q.**   Who has access to that?

5  **A.**   So it's -- ERIC is a private organization that state

6  agencies can contract with.  The number of states that rely on

7  ERIC has gone down.  But I -- I -- I don't know if Georgia

8  still is or was a part of that consortium.  But in my

9  experience and understanding, that there are -- that states do

10 not conduct list maintenance practices solely on an NCOA.

11 **Q.**   How does someone who's not a state agency get access to

12 ERIC?

13 **A.**   I don't believe they can.

14 **Q.**   Are you aware of whether, before the NCOA gets to Postal

15 Service licensees, like the ones used by True the Vote, the

16 Postal Service has evaluated the likelihood that a permanent

17 change of address is actually going to be a permanent change?

18 **A.**   So, I'm sorry, there are different parts to that

19 question.  I don't -- can you ask it again?

20 **Q.**   Yeah.

21    Are you aware of whether, before the NCOA gets to a USPS

22 licensee, has the Postal Service evaluated the likelihood that

23 a change of address marked permanent will actually be

24 permanent?

25 **A.**   I don't know that they do that.  I think it's -- my

1   understanding, it's reflected on with the applicant or with

2   the individual files.  I don't know what their process is.

3   Q.   Are you aware of the measures the Postal Service takes in

4   evaluating whether someone who filed a change of address is

5   actually the person they represent themselves to be?

6   A.   So the online form does have some validation.  It

7   requires someone to upload some identifying information.  So

8   there is a validation process.

9   Q.   Will they hit your credit card as well?

10   A.   I don't know.  The form that I saw requires a driver's

11   license or other form of ID.

12   Q.   All right.  So you're not familiar with a $1.10 credit

13   card charge?

14   A.   No.

15   Q.   And what about the -- well, okay.

16       So you wouldn't -- you wouldn't know about the

17   requirement that either the old or the new address has to be

18   on the credit card bill?

19   A.   No.

20   Q.   Okay.  Are you familiar with the Postal Services

21   algorithms around the NCOA and its ability to predict whether

22   changes of address that are marked permanent might actually be

23   permanent?

24   A.   No.

25   Q.   Okay.  When was the last time you personally ran an NCOA

1  process?

2  **A.**   That would have been 2017 or 2018.  And it wasn't me,

3  personally.  I was involved in that process that used a

4  commercial variant of the NCOA.

5  **Q.**   Was it just that one time?

6  **A.**   That's correct.

7  **Q.**   Do you recall which vendor they used?

8  **A.**   It was LexisNexis.

9  **Q.**   Did you develop any opinions on which vendors were the

10  best to use?

11  **A.**   No.  That was the one that the survey center relied on.

12  **Q.**   Are you familiar with the various tiers of vendors of the

13  NCOALink?

14  **A.**   No.

15  **Q.**   The 18 month versus 48 month?

16  **A.**   No.

17  **Q.**   When you were involved in running NCOA, how many records

18  were associated with that effort?

19  **A.**   We ran it on several thousand.

20  **Q.**   2000?

21  **A.**   I think it was more than 2000, but I don't know what the

22  exact number was.

23  **Q.**   So you mentioned earlier that you're not familiar with

24  CASS; is that right?

25  **A.**   That's correct.

1  **Q.**   Do you believe the person running NCOA has any control

2  over the process?

3  **A.**   I don't know.  I mean, I don't know that there is a

4  single person who's responsible for the NCOA.

5  **Q.**   Are you familiar with the Postal Service's requirements

6  of its NCOA vendors?

7  **A.**   I have seen documents where the Postal Service describes

8  what that -- what vendors do, but I don't -- can't tell you

9  off the top of my head what their process is for evaluating

10  applications to become a licensed vendor.

11  **Q.**   So you don't know whether they have requirements for

12  accuracy in matching?

13  **A.**   No.

14  **Q.**   Whether they're audited?

15  **A.**   No.

16  **Q.**   Now, let's talk a little bit about false positives.  On

17  page 33 of your report, you say the NCOA data are not error

18  free and the companies that conduct NCOA matching note that

19  false positives occur on a regular basis.

20       What's the source of companies noting that?

21  **A.**   That's -- it's in footnote 18.  It's online, it's a web

22  page that talks about the NCOA processing.  I believe that's

23  from a -- from a particular licensee.

24  **Q.**   You believe it is?

25  **A.**   I mean, I wrote this report two and a half years ago, so

1   I don't know off the top of my head what that web page looks

2   like.

3   **Q.**   You don't recall that it is basically a mom-and-pop

4   organization?

5   **A.**   I don't know.

6   **Q.**   So they -- they say in that source, "You may receive a

7   new address when the addressee has not moved at all.  As

8   strange as that sounds, it happens.  Fortunately, these tend

9   to be in a small number, but do happen on a regular basis."

10       Is that what you were quoting from?

11          THE COURT:  Hold on one second.

12          MR. SHELLY:  Objection, Your Honor.  I'm not sure

13   what this is quoting from.  We have no way to verify its

14   accuracy.

15          MR. POWELL:  It's in his report, Your Honor.  It's in

16   his footnote, what he cites.  If you look at the web page that

17   he cites, that's the quote.

18          MR. SHELLY:  I don't know if you're quoting that

19   website that appears now or when he wrote this report two and

20   a half or three years ago.

21          THE COURT:  Do you have that page, Mr. Powell?

22          MR. POWELL:  We may come back to that.

23          THE COURT:  All right.

24          MR. POWELL:  Just to keep it --

25   BY MR. POWELL:

1  **Q.**   Do you have any other sources of false positives?

2  **A.**   Yes.   The academic literature on NCOA processes has found

3  that there are errors in people who are improperly flagged and

4  improperly removed based on NCOA data.   And, again, I cite

5  that in the report, that the academic literature discusses

6  some of the inherent issues and the fact that minority voters

7  are more likely to be improperly flagged than white voters.

8  **Q.**   So do you have a percent rate of the false positives?   Is

9  it five?   Is it 12?

10  **A.**   I don't know what that false positive would be.   I mean,

11  we can go back to the academic literature, which I cite, which

12  would have estimates of improper removals.   But I don't know

13  what those are off the top of my head.

14  **Q.**   Well, let's say it's 10 percent, that the person who

15  filed a permanent change of address form saying they intended

16  to move away permanently, for more than a year, actually comes

17  back to their home or don't actually go to that address, but

18  it's 10 percent.   So we've got about a 90 percent rate of

19  predictive power that someone who's in the NCOA registry

20  actually did move permanently; would you agree?

21  **A.**   If that's what the data show.   But I don't know what the

22  data show.   And, again, my conclusions are not based simply on

23  the status of temporary or permanent NCOA.   It's based on what

24  we can directly see in the data, and where voters who are --

25  registrants who are filing NCOAs are actually moving to.

1  **Q.**   So a petitioner who is trying to file a number of

2  challenges is, in a sense, able to rely on the accuracy of the

3  NCOA in saying, there may be probable cause to look into this

4  and conclude this person is ineligible.

5       What false positive error rate would make it unreasonable

6  for someone to say some considerable percentage of the people

7  in this file have probably moved away permanently and, Board

8  of Elections, we'd like you to look into it a little further

9  which tools that only you have?

10 **A.**   Well, again, I'm not offering a conclusion about whether

11 those beliefs are reasonable, except in regards to the fact

12 that there is no evidence that ineligible people are voting

13 and that this process is more likely to result in an eligible

14 person being improperly flagged than it is for -- to prevent

15 an ineligible voter from casting a ballot.

16 **Q.**   You think it's more likely to, but you don't have any

17 evidence that it did in reality.

18 **A.**   Well, I know what the election administration literature

19 says.  But I can't give you a percentage based on the data

20 that I analyzed because the information was not in those

21 files.

22 **Q.**   Now, in your demonstrative on page 17 you mention that

23 the additional key identifying information in the voter file,

24 such as a registrant's middle name, name, suffix, birth year,

25 race, and gender, are not used to match, do you mean the NCOA

1  doesn't use middle names and gender?

2  **A.**   I'm going off the description in the two places where I

3  noted how True the Vote -- or representatives of True the Vote

4  describe their process and the information that was in the --

5  in the challenge files.  But even if they did use middle

6  names, for example, that clearly didn't solve the problem of

7  eliminating duplicates.  So, I mean, I suppose it's -- it's

8  possible that the NCOA does use middle names, but that was not

9  reflected in the descriptions of what True the Vote says they

10  did.

11  **Q.**   So you're saying that you -- earlier I think you said

12  that you didn't see any middle names in True the Vote's

13  challenge file.

14  **A.**   That's my recollection of how they did it.  I don't know,

15  again, going back and looking at the specific county files,

16  whether there were any middle names in there.  But, again,

17  that doesn't affect my overall conclusion about the -- about

18  the flaws in that process and the accuracy and reliability

19  issues that we can directly see in the data, of which

20  apparently not matching on middle names is one of them, but

21  it's not the only one.

22  **Q.**   So when you searched for duplicates, did you use first,

23  middle, last, and address?

24  **A.**   So when I searched for duplicates, I used first,

25  middle -- sorry, first, last, and address, or in cases where

1  True the Vote had the voter registration number in the

2  challenge file actually linked to multiple individuals with

3  that name and address.

4  **Q.**   Are you familiar with the different ways that people can

5  select an identifier for their permanent change of address,

6  like F, I, and B and what those mean?

7  **A.**   No.

8  **Q.**   So you don't know if someone filed a change of address

9  and they marked F, that that stands for family and it could

10  include anyone in the home?

11  **A.**   It could.  I don't know.

12  **Q.**   All right.  So if you had searched for duplicates using

13  first, middle, last and address, and you can confirm this

14  during a break, and there are over 61,000 middle names in True

15  the Vote's input file, would that change your assessment of

16  the duplicate problem?

17  **A.**   Not in every case, because there were some instances

18  where a single voter or single challenged voter matched on

19  multiple individuals at that address.  But, again, whether or

20  not someone -- the type of NCOA card or their application is

21  not reflected in the underlying data.  So I wouldn't be able

22  to evaluate that.

23  **Q.**   So you were evaluating incomplete data?

24  **A.**   Well, it's not incomplete data.  It was based on the

25  descriptions that I -- that I had.  There may have been other

1  elements of that that were not reflected in the descriptions.

2  But when True the Vote says they used queries and algorithms,

3  I don't know what that means.  And it doesn't -- I don't know

4  why there would be a challenged voter who doesn't have an

5  address where they moved to or why there would be a name

6  change or why it would be someone who moved to a military

7  installation.

8      I mean, if I had a complete and accurate and reliable

9  explanation of what True the Vote actually did and what that

10 process looked like, I would have used that information in my

11 analysis.  But that didn't exist.

12 **Q.**  Did you look at their deposition transcripts?

13 **A.**  I don't believe I had those -- or I don't believe those

14 had occurred at the time I wrote my report.

15 **Q.**  They're not listed in your report; is that right?

16 **A.**  That's correct.

17     MR. POWELL:  Your Honor, would you like to break for

18 lunch at some point?  I probably don't have a lot more I need

19 to do, but --

20     THE COURT:  I'll let you know.  I'll let you know.

21     MR. POWELL:  All right.  Hold on just one moment.

22     THE COURT:  We need to move on.

23     MR. POWELL:  Your Honor, I think that's all I have

24 for now.

25     THE COURT:  Thank you.

1          Any redirect?

2          MR. SHELLY:  No, Your Honor.

3          THE COURT:  Thank you.  Can this witness be excused?

4          MR. SHELLY:  Yes.

5          THE COURT:  Mr. Powell, can this witness be excused?

6          MR. POWELL:  Yes, Your Honor.

7          THE COURT:  You're excused, sir.  Thank you.

8          THE WITNESS:  Thank you, Your Honor.

9          THE COURT:  We'll break for lunch, start back at

10   1:30.  Thank you.

11          (The trial concluded at 12:25 p.m.)

12          (Change of reporters.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3   UNITED STATES DISTRICT COURT

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6       I do hereby certify that the foregoing pages are a true
     and correct transcript of the proceedings taken down by me in
 7   the case aforesaid.

 8       This the 27the day of October, 2023.

 9

10

11

12

13                     /s/Viola S. Zborowski _____
                       VIOLA S. ZBOROWSKI,
14                     RDR, FAPR, CMR, CRR, RPR, CRC
                       OFFICIAL COURT REPORTER TO
15                     THE HONORABLE STEVE C. JONES

16

17

18

19

20

21

22

23

24

25
```

**$**

$1.10 [1] - 409:12

**/**

/S/VIOLA [1] - 419:13

**0**

0 [2] - 375:25, 376:1
05 [2] - 377:14, 378:3

**1**

1 [2] - 375:25, 376:1
1,375 [2] - 342:12, 348:16
1-10 [1] - 288:8
1.73 [1] - 395:15
10 [4] - 361:5, 383:4, 413:14, 413:18
10,000 [1] - 331:24
100 [2] - 345:25, 347:7
10:35 [1] - 359:15
10:50 [2] - 359:14, 359:15
12 [3] - 327:4, 361:5, 413:9
12:25 [1] - 418:11
13 [2] - 327:5, 362:4
1375 [1] - 365:16
1400 [1] - 343:17
141 [1] - 354:18
145 [2] - 364:25, 365:1
15 [5] - 326:12, 328:20, 329:5, 329:9, 356:1
15,000 [4] - 331:15, 331:20, 331:21, 349:13
15,360 [1] - 366:14
15-MINUTE [1] - 359:13
159 [2] - 347:19, 374:18
17 [3] - 348:4, 385:8, 414:22
18 [3] - 381:8, 410:15, 411:21
19 [1] - 336:6
1982 [1] - 325:15
1988 [1] - 325:16
1989 [1] - 325:9
1:30 [1] - 418:10

**2**

2 [6] - 288:3, 387:4, 395:9, 395:11, 395:13
2,000-WORD [1] - 334:24
20 [5] - 326:7, 336:6, 347:25, 348:2, 386:4
2000 [2] - 410:20, 410:21
2002 [1] - 326:18
2013 [1] - 326:19
2014 [1] - 326:22
2016 [1] - 345:5
2017 [1] - 410:2
2018 [2] - 362:2, 410:2
2019 [3] - 313:25, 314:8, 314:16
2020 [17] - 301:20, 301:23, 302:1, 302:4,

302:7, 302:12, 302:25, 305:8, 305:13, 305:14, 306:12, 314:9, 332:19, 332:20, 332:25, 353:17, 384:8
2021 [3] - 314:19, 353:19, 392:17
2023 [2] - 288:11, 419:8
22,459 [1] - 395:25
22,956 [5] - 366:18, 394:16, 395:4, 395:12, 395:14
230 [1] - 379:3
240 [1] - 351:14
24TH [1] - 294:13
250,000 [1] - 393:18
263 [1] - 365:6
27 [4] - 288:11, 348:20, 364:18, 383:14
27.3 [1] - 382:21
27THE [1] - 419:8
28-DAY [1] - 405:1
29 [3] - 348:4, 385:7, 399:2
29.9 [2] - 383:1, 392:18
2:20-CV-0302-SCJ [1] - 288:4

**3**

3 [2] - 381:6, 383:3
30 [5] - 326:1, 348:25, 370:5, 383:13, 394:14
30,000 [1] - 355:8
30-DAY [1] - 405:1
300 [1] - 354:5
300S [1] - 365:1
301 [1] - 290:4
313 [1] - 290:4
318 [1] - 290:4
321 [1] - 290:5
322 [1] - 290:5
324 [1] - 290:5
33 [2] - 407:1, 411:17
33,000 [1] - 361:17
336 [1] - 365:9
34 [1] - 381:8
34,578 [1] - 398:3
343 [1] - 353:6
35 [2] - 387:4, 392:15
35,056 [1] - 366:23
38 [1] - 349:2
38.4 [1] - 392:22
397 [5] - 359:2, 365:12, 395:5, 395:12, 395:21

**4**

4 [1] - 336:8
40 [2] - 348:21, 370:5
400 [2] - 357:13, 395:13
404-215-1479 [1] - 289:23
42 [1] - 388:14
43 [1] - 388:14
48 [2] - 394:6, 410:15
49 [1] - 359:23

**5**

50,000 [1] - 398:16
52 [1] - 385:14
53 [1] - 394:5
57 [1] - 329:14
59 [1] - 359:3

**6**

6,377 [1] - 365:19
6,400 [1] - 353:23
60 [1] - 388:1
61,000 [2] - 373:7, 416:14
65 [16] - 319:1, 319:4, 330:3, 347:19, 374:16, 374:18, 374:19, 374:20, 375:1, 375:13, 376:8, 376:24, 379:19, 381:11, 388:1, 391:3

**7**

7 [1] - 381:7
73 [1] - 329:14

**8**

8 [1] - 381:8
81 [1] - 388:6
84 [2] - 386:14
85,000 [2] - 339:22, 342:8
88,000 [1] - 393:22
89,000 [1] - 393:22

**9**

9 [2] - 291:1, 300:10
9,000 [1] - 350:18
9,270 [1] - 366:11
90 [1] - 413:18
91 [2] - 371:22, 371:23

**A**

A.M [1] - 359:15
A.M [2] - 288:3, 291:1
ABBREVIATED [2] - 351:6, 351:7
ABILITY [1] - 409:21
ABLE [19] - 292:5, 292:6, 297:15, 299:4, 309:23, 311:12, 338:6, 340:3, 341:1, 350:7, 358:11, 362:1, 375:1, 386:20, 390:24, 401:1, 414:2, 416:21
ABSENTEE [25] - 302:21, 306:1, 306:3, 313:17, 313:23, 314:2, 314:12, 314:19, 315:4, 318:16, 318:20, 318:22, 319:1, 319:3, 319:9, 319:11, 319:14, 332:23, 332:24, 350:13, 357:3, 360:5, 396:16, 399:21
ABSOLUTELY [2] - 318:5, 318:24
ABUTS [1] - 398:18
ACADEMIC [18] - 325:20, 325:21, 326:15, 327:14, 333:1, 333:3, 333:24, 334:12, 355:15, 356:12, 364:9, 370:4, 370:19, 383:17, 404:16, 413:2, 413:5,

413:11
**ACADEMY** [4] - 357:18, 359:6, 362:15, 362:17
**ACADEMY** [1] - 362:18
**ACC** [1] - 361:5
**ACCEPT** [3] - 317:20, 369:6, 369:8
**ACCEPTANCE** [3] - 302:15, 302:16, 302:17
**ACCEPTED** [4] - 367:24, 368:2, 368:4, 369:14
**ACCESS** [6] - 347:4, 405:6, 405:10, 408:2, 408:4, 408:11
**ACCESSIBLE** [2] - 347:11, 361:25
**ACCORDING** [2] - 345:18, 400:7
**ACCOUNT** [3] - 386:23, 387:5, 387:13
**ACCOUNTING** [1] - 381:22
**ACCURACY** [10] - 330:13, 381:25, 388:18, 388:21, 390:16, 399:10, 411:12, 412:14, 414:2, 415:18
**ACCURATE** [3] - 368:4, 405:17, 417:8
**ACCURATELY** [4] - 329:1, 337:9, 345:9, 363:7
**ACCUSED** [1] - 370:16
**ACTION** [2] - 317:19, 319:10
**ACTUAL** [9] - 304:1, 336:10, 346:18, 378:12, 379:7, 386:10, 391:22, 404:23, 406:11
**ADDITION** [3] - 360:1, 362:19, 369:23
**ADDITIONAL** [10] - 319:6, 329:18, 329:19, 329:22, 329:23, 367:21, 369:11, 402:10, 414:23
**ADDRESS** [5] - 302:22, 332:14, 356:4, 358:19, 406:16
**ADDRESS** [125] - 299:4, 300:2, 300:7, 302:22, 313:20, 314:3, 314:6, 314:20, 315:15, 319:24, 331:17, 331:18, 335:10, 335:12, 339:10, 339:19, 339:23, 340:15, 341:9, 341:15, 341:21, 342:9, 342:16, 343:4, 343:6, 343:10, 345:11, 345:19, 345:23, 346:14, 348:13, 348:17, 348:19, 349:14, 350:9, 350:19, 352:12, 352:14, 352:21, 352:25, 353:4, 353:7, 353:21, 353:24, 354:12, 354:13, 354:15, 354:16, 355:20, 355:24, 355:25, 356:13, 356:14, 356:16, 356:21, 357:8, 357:14, 357:17, 357:18, 359:1, 359:5, 360:3, 360:4, 360:11, 360:17, 361:15, 361:19, 362:14, 362:16, 362:17, 363:14, 363:15, 363:22, 363:24, 364:5, 364:6, 364:17, 364:19, 364:20, 364:23, 364:24, 365:2, 365:14, 365:18, 366:2, 366:4, 366:12, 389:19, 390:9, 394:18, 395:6, 395:7, 396:18, 397:10, 399:22, 399:23, 405:14, 405:23, 406:2, 406:4, 406:20, 408:17, 408:23, 409:4, 409:17, 409:22, 412:7, 413:15, 413:17, 415:23, 415:25, 416:3, 416:5, 416:8, 416:13, 416:19, 417:5

**ADDRESSEE** [1] - 412:7
**ADDRESSES** [6] - 350:1, 352:11, 362:1, 394:20, 394:23, 399:7
**ADEQUATE** [1] - 354:8
**ADEQUATELY** [1] - 346:11
**ADJACENT** [10] - 357:22, 357:25, 361:19, 366:16, 366:20, 396:3, 396:10, 398:10, 398:14
**ADJUDICATED** [1] - 299:13
**ADMINISTERING** [1] - 402:6
**ADMINISTRATION** [13] - 325:22, 328:1, 343:24, 343:25, 344:2, 367:16, 368:5, 390:23, 401:14, 401:16, 401:18, 401:22, 414:18
**ADMINISTRATIVE** [3] - 334:23, 368:18, 401:23
**ADMINISTRATORS** [2] - 326:9, 344:5
**ADMISSION** [1] - 297:13
**ADMIT** [1] - 299:12
**ADMITTED** [2] - 329:8, 371:19
**ADULT** [1] - 305:21
**ADVISE** [1] - 305:18
**AFFECT** [5] - 373:11, 379:25, 380:17, 388:23, 415:17
**AFFECTED** [2] - 367:10, 383:16
**AFORESAID** [1] - 419:7
**AFRICAN** [29] - 347:22, 347:23, 347:25, 348:10, 348:20, 348:21, 348:24, 348:25, 349:2, 376:25, 377:6, 378:1, 378:13, 378:15, 382:18, 382:23, 383:13, 383:14, 383:20, 386:3, 386:5, 387:11, 392:18, 392:22, 393:4, 393:6, 393:13, 393:16, 394:9
**AFTERNOON** [3] - 291:22, 292:16, 295:21
**AGENCIES** [1] - 408:6
**AGENCY** [2] - 389:14, 408:11
**AGENT** [1] - 304:3
**AGO** [3] - 329:16, 411:25, 412:20
**AGREE** [7] - 292:13, 293:11, 293:19, 293:25, 306:14, 386:2, 413:20
**AGREED** [2] - 292:1, 316:21
**AHEAD** [4] - 298:3, 300:13, 310:21, 352:8
**AILEEN** [1] - 289:5
**AIR** [7] - 357:17, 357:18, 358:2, 358:3, 359:6, 362:15, 362:19
**AIRPLANE** [1] - 313:5
**ALABAMA** [2] - 361:3, 398:11
**ALBANY** [1] - 306:4
**ALGORITHMS** [3] - 402:15, 409:21, 417:2
**ALLEGE** [1] - 332:15
**ALLEGED** [18] - 331:19, 348:23, 349:14, 350:20, 352:11, 352:15, 352:24, 353:4, 353:7, 353:22, 353:25, 357:14, 363:14, 364:17, 365:2, 366:20, 378:16, 392:20
**ALLEGEDLY** [1] - 317:24
**ALLEGING** [2] - 332:14, 365:25

**ALLEGRA** [1] - 288:15
**ALLOW** [11] - 293:12, 297:24, 307:18, 321:18, 337:23, 344:17, 347:1, 397:11, 401:10, 404:6, 405:2
**ALLOWED** [5] - 309:18, 328:7, 374:24, 392:4, 405:11
**ALLOWS** [3] - 334:24, 374:23, 379:3
**ALLUDES** [1] - 304:14
**ALMOST** [11] - 295:9, 296:12, 331:24, 342:21, 353:23, 359:8, 365:22, 368:1, 368:4, 371:2, 383:3
**ALONE** [2] - 407:2, 407:12
**ALTOGETHER** [1] - 366:13
**ALTON** [2] - 316:9, 319:17
**AMBIGUITY** [1] - 357:19
**AMBIGUOUS** [1] - 374:14
**AME** [1] - 296:10
**AMENDED** [1] - 336:7
**AMERICAN** [25] - 325:21, 326:23, 347:22, 347:23, 348:1, 348:10, 348:20, 348:21, 348:24, 348:25, 349:2, 362:3, 376:25, 378:1, 383:14, 383:15, 386:3, 386:5, 387:11, 392:18, 392:22, 393:4, 393:6, 393:16, 394:10
**AMERICANS** [7] - 377:7, 378:14, 378:15, 382:18, 382:23, 383:20, 393:13
**ANALYSES** [1] - 327:14
**ANALYSIS** [24] - 327:10, 327:12, 327:17, 327:25, 333:4, 347:15, 348:6, 355:13, 372:21, 376:23, 378:11, 380:1, 380:5, 386:24, 386:25, 391:23, 392:1, 393:3, 396:25, 401:7, 401:25, 402:2, 417:11
**ANALYTIC** [1] - 326:12
**ANALYZE** [3] - 330:2, 360:22, 400:12
**ANALYZED** [2] - 402:3, 414:20
**AND** [2] - 288:3, 288:7
**ANGUSTA** [1] - 399:2
**ANNAPOLIS** [1] - 362:16
**ANNOUNCING** [1] - 377:19
**ANOMALIES** [1] - 351:2
**ANSWER** [14] - 301:22, 302:13, 306:9, 307:18, 311:6, 319:7, 320:24, 323:8, 362:10, 372:19, 381:2, 382:15, 400:23
**ANSWERED** [4] - 306:20, 306:21, 308:19, 315:22, 315:25, 321:2, 327:15, 382:13, 391:16
**ANSWERS** [1] - 303:20
**ANYWAY** [3] - 292:23, 292:24, 296:3
**APO** [2] - 394:22, 395:6
**APOLOGIZE** [3] - 321:22, 323:6, 372:4
**APOS** [1] - 394:23
**APPARENT** [1] - 331:4
**APPEAR** [7] - 293:8, 365:21, 368:11, 368:14, 369:21, 369:22, 370:6
**APPEARANCES** [2] - 288:13, 289:1
**APPEARED** [2] - 293:9, 395:9
**APPEARING** [2] - 291:25, 311:3
**APPENDIX** [1] - 358:23

**APPENDIX** [2] - 359:23, 395:8
**APPLICANT** [1] - 409:1
**APPLICATION** [7] - 313:21, 318:20, 318:22, 319:2, 319:3, 326:20, 416:20
**APPLICATIONS** [2] - 319:1, 411:10
**APPLIED** [4] - 318:15, 318:19, 319:9, 325:15
**APPLY** [2] - 313:17, 368:6
**APPROACHED** [4] - 309:12, 309:14, 309:15, 309:16
**APPROPRIATE** [1] - 297:25
**ARCHETYPAL** [1] - 396:15
**ARCHETYPE** [1] - 360:5
**AREA** [5] - 348:3, 348:5, 385:8, 397:7, 398:17
**AREAS** [9] - 328:5, 328:6, 328:8, 347:9, 396:10, 397:12, 401:17, 401:19
**ARGUE** [1] - 294:21
**ARGUMENT** [3] - 380:19, 380:21, 383:6
**ARRIVED** [1] - 313:24
**ARRIVING** [1] - 313:18
**ARTICLE** [4] - 326:22, 334:22, 377:19, 402:13
**ARTICLES** [5] - 325:24, 326:2, 329:20, 403:4, 404:23
**ARTICULATED** [1] - 398:21
**ASHLEY** [1] - 288:15
**ASIDE** [1] - 347:6
**ASSEMBLE** [1] - 369:24
**ASSERTED** [1] - 322:9
**ASSERTING** [1] - 352:24
**ASSESS** [4] - 330:3, 334:20, 387:1, 401:11
**ASSESSMENT** [2] - 380:18, 416:15
**ASSIGNED** [1] - 340:10
**ASSIGNING** [1] - 387:22
**ASSOCIATED** [5] - 305:22, 306:1, 312:1, 404:20, 410:18
**ASSOCIATION** [1] - 362:3
**ASSUMPTION** [1] - 396:9
**ASTOUNDING** [1] - 331:9
**AT** [1] - 291:1
**ATHENS** [3] - 358:9, 398:8, 399:3
**ATLANTA** [2] - 288:2, 289:23
**ATLANTA** [9] - 293:10, 306:4, 348:3, 348:5, 385:4, 385:7, 385:12, 396:20, 397:7
**ATTEMPT** [1] - 405:25
**ATTEMPTED** [1] - 319:24
**ATTEND** [1] - 403:12
**ATTENDING** [2] - 360:7, 400:22
**ATTENTION** [1] - 404:22
**ATTENTIVENESS** [1] - 404:21
**ATTORNEY** [1] - 295:5
**ATTORNEY/CLIENT** [3] - 308:13, 308:17, 308:20
**ATTORNEYS** [2] - 295:21, 307:3
**AUBURN** [1] - 398:12
**AUDIENCE** [1] - 374:3

**AUDITED** [2] - 332:23, 411:14
**AUGUSTA** [1] - 396:24
**AUSTIN** [1] - 396:19
**AUTHORED** [1] - 328:24
**AUTHORITIES** [1] - 326:11
**AUTOMATED** [1] - 329:21
**AUTOMATIC** [3] - 318:25, 319:10, 375:5
**AUTOMATICALLY** [1] - 315:11
**AVAILABLE** [4] - 297:3, 311:12, 347:13, 373:23
**AVERAGE** [1] - 399:25
**AVOID** [1] - 397:12
**AWARD** [4] - 326:18, 326:20, 326:22, 372:7
**AWARDS** [1] - 326:15
**AWARE** [6] - 306:2, 336:12, 336:13, 361:24, 373:21, 375:9, 375:10, 392:10, 394:1, 394:4, 399:23, 406:12, 406:25, 408:14, 408:21, 409:3

---

# B

**BACHELOR'S** [1] - 325:13
**BACKGROUND** [1] - 325:12
**BALLOT** [29] - 301:19, 302:11, 302:21, 306:1, 313:17, 313:23, 314:2, 314:13, 314:19, 315:4, 315:11, 318:16, 318:20, 318:22, 319:1, 319:3, 319:4, 319:5, 319:6, 319:9, 319:13, 319:14, 319:15, 332:24, 350:13, 399:21, 414:15
**BALLOTS** [4] - 306:4, 319:11, 333:7, 334:2
**BANE** [1] - 312:18
**BANKS** [3] - 330:18, 330:22, 388:6
**BARRIERS** [1] - 367:21
**BASE** [14] - 357:2, 357:15, 357:24, 358:4, 358:7, 358:21, 395:10, 395:25, 396:1, 396:4, 396:8, 396:14, 397:13, 397:18
**BASE** [5] - 357:18, 357:19, 357:23, 358:3
**BASED** [31] - 299:13, 301:18, 315:16, 321:12, 321:23, 330:12, 331:4, 331:16, 332:17, 335:3, 341:8, 341:19, 342:19, 343:13, 377:4, 377:18, 377:20, 379:12, 389:18, 393:15, 395:6, 400:17, 401:11, 404:7, 405:9, 407:13, 413:4, 413:22, 413:23, 414:19, 416:24
**BASES** [4] - 394:15, 395:19, 396:10, 396:25
**BASIS** [6] - 304:3, 369:13, 376:19, 383:9, 411:19, 412:9
**BEAUTIFUL** [1] - 395:16
**BECOME** [1] - 411:10
**BEFORE** [1] - 288:10
**BEGINNING** [1] - 332:10
**BEGS** [1] - 391:9
**BEHALF** [1] - 326:8

**BEHALF** [3] - 288:14, 288:20, 289:2
**BEHAVIOR** [2] - 326:3, 328:1
**BEHIND** [1] - 294:18
**BELABOR** [1] - 310:24
**BELIEFS** [1] - 414:11
**BELL** [1] - 289:5
**BENCH** [1] - 288:10
**BENCH** [2] - 297:2, 300:17
**BEST** [7] - 291:17, 292:19, 294:18, 326:18, 326:20, 326:22, 410:10
**BETTER** [1] - 305:11
**BETWEEN** [14] - 295:17, 308:24, 321:17, 321:25, 334:23, 338:19, 339:5, 355:18, 375:18, 383:3, 383:17, 392:7, 396:23, 401:23
**BEYOND** [1] - 392:11
**BIG** [1] - 361:5
**BIGGER** [1] - 383:4
**BILL** [1] - 409:18
**BINARY** [1] - 377:11
**BINDER** [1] - 328:14
**BIRTH** [7] - 340:18, 340:19, 343:8, 347:2, 400:12, 400:17, 414:24
**BIRTHDAY** [1] - 340:18
**BISHOP** [2] - 296:17, 310:12
**BIT** [6] - 305:11, 378:7, 378:10, 392:13, 401:13, 411:16
**BLANK** [2] - 349:9, 363:24
**BLOCK** [1] - 319:14
**BOARD** [4] - 368:15, 369:11, 369:18, 369:23
**BOARD** [9] - 368:20, 368:22, 369:3, 390:23, 392:4, 394:1, 395:1, 399:11, 414:7
**BOARDS** [4] - 385:16, 389:25, 390:18, 391:3
**BOARDS** [2] - 391:6, 399:14
**BOOK** [3] - 326:18, 329:19, 372:7
**BOOKS** [1] - 416:5
**BOPP** [4] - 294:20, 294:22, 295:16, 295:17
**BOPP'S** [1] - 295:10
**BOTTOM** [2] - 337:16, 337:17
**BOUND** [1] - 295:8
**BOX** [1] - 315:10
**BRANCHES** [1] - 395:19
**BREAK** [11] - 291:12, 339:6, 359:10, 359:13, 359:15, 359:19, 371:13, 372:4, 416:14, 417:17, 418:9
**BREAKDOWN** [1] - 388:3
**BREATH** [1] - 355:13
**BRIEF** [2] - 297:2, 297:19
**BRIEFLY** [2] - 294:3, 296:22
**BRINGING** [1] - 307:17
**BROADER** [1] - 398:5
**BROKEN** [1] - 354:19
**BROUGHT** [3] - 307:13, 307:16, 315:23
**BRYAN** [2] - 310:12, 310:14
**BRYAN** [1] - 288:16

**BULK** [1] - 378:11
**BUNCH** [1] - 391:20
**BURDENS** [1] - 367:21
**BY** [32] - 301:14, 305:6, 306:24, 309:9, 310:25, 313:11, 316:5, 318:14, 321:21, 322:14, 324:23, 328:10, 328:23, 329:11, 332:9, 336:1, 336:20, 337:6, 338:17, 339:4, 344:19, 352:9, 359:18, 363:6, 364:15, 369:20, 372:1, 381:5, 382:9, 382:17, 388:13, 412:25

# C

**CALCULATE** [2] - 345:9, 394:5
**CALCULATED** [1] - 382:18
**CALCULATION** [1] - 394:8
**CALIFORNIA** [13] - 302:25, 303:4, 303:5, 303:12, 312:6, 312:9, 312:20, 313:18, 313:20, 314:3, 318:23, 323:12, 325:14
**CAMERON** [1] - 288:21
**CAMPUS** [6] - 345:12, 362:2, 362:5, 362:7, 366:21, 399:12
**CANNOT** [1] - 294:20
**CAR** [1] - 312:2
**CARD** [6] - 324:7, 407:20, 409:9, 409:13, 409:18, 416:20
**CARE** [2] - 292:14, 292:15
**CAREFUL** [1] - 354:22
**CAREFULLY** [2] - 308:23, 355:2
**CARRIED** [2] - 385:16, 394:12
**CARRY** [1] - 385:19
**CASE** [45] - 297:6, 297:7, 298:17, 298:19, 298:20, 302:18, 307:12, 307:13, 307:17, 308:2, 308:3, 308:8, 308:12, 309:1, 309:2, 309:5, 309:6, 309:7, 309:12, 309:13, 309:18, 309:20, 309:21, 310:5, 310:14, 310:16, 325:1, 328:11, 329:2, 330:1, 342:21, 345:15, 356:2, 364:1, 370:21, 372:10, 375:6, 377:20, 387:14, 397:16, 399:2, 401:20, 401:22, 416:17, 419:7
**CASES** [30] - 296:8, 296:18, 308:25, 309:2, 310:13, 327:1, 327:5, 327:7, 327:11, 327:16, 331:24, 342:12, 342:15, 342:23, 353:6, 353:23, 354:6, 355:8, 357:13, 361:17, 363:23, 364:18, 365:1, 366:18, 366:23, 367:4, 396:7, 398:9, 415:25
**CASS** [3] - 402:17, 402:19, 410:24
**CAST** [2] - 332:25, 334:2
**CASTING** [2] - 333:7, 414:15
**CATCH** [1] - 388:19
**CATEGORIES** [1] - 349:5
**CATEGORY** [1] - 357:4
**CATERPILLAR** [1] - 312:13
**CATHERINE** [1] - 288:6
**CATHERINE** [1] - 336:9
**CAUGHT** [3] - 363:20, 391:11, 391:16

**CENTER** [1] - 345:13
**CENTER** [3] - 345:13, 407:22, 410:11
**CERTAIN** [3] - 339:17, 349:24, 371:2
**CERTAINLY** [6] - 342:21, 359:8, 365:22, 371:3, 371:7, 397:9
**CERTIFIED** [1] - 299:10
**CERTIFY** [1] - 419:6
**CHALLENGE** [90] - 315:2, 316:22, 330:2, 330:17, 330:22, 331:16, 332:12, 334:4, 341:7, 342:3, 342:12, 342:13, 342:17, 343:3, 343:5, 343:13, 346:20, 347:18, 347:20, 348:5, 348:8, 348:19, 350:8, 350:11, 350:17, 351:3, 351:11, 351:15, 352:3, 352:7, 352:10, 352:13, 353:3, 353:20, 354:16, 355:10, 355:11, 359:5, 360:22, 361:14, 361:18, 361:23, 365:4, 366:24, 367:2, 368:7, 369:6, 369:8, 369:12, 369:14, 371:2, 372:22, 372:24, 377:3, 377:4, 378:24, 379:10, 379:13, 379:19, 379:23, 380:13, 380:16, 381:19, 382:19, 384:1, 384:22, 387:1, 388:6, 388:15, 390:3, 390:13, 391:7, 392:11, 392:21, 394:9, 394:18, 395:2, 395:22, 396:12, 399:7, 400:19, 401:2, 401:9, 404:13, 406:10, 406:12, 406:24, 415:5, 415:13, 416:2
**CHALLENGED** [44] - 315:3, 315:8, 315:20, 316:11, 316:15, 332:16, 335:13, 343:11, 347:4, 347:24, 348:1, 348:18, 348:21, 348:22, 348:25, 349:13, 350:12, 353:23, 354:2, 358:21, 359:20, 361:14, 362:8, 362:9, 363:13, 364:21, 365:7, 365:10, 365:14, 365:17, 366:10, 366:15, 366:19, 368:11, 370:2, 371:4, 371:8, 378:16, 383:7, 383:14, 386:6, 388:1, 416:18, 417:4
**CHALLENGER** [3] - 379:7, 380:13, 386:21
**CHALLENGERS** [6] - 380:3, 386:7, 386:10, 386:12, 386:14, 386:18
**CHALLENGES** [24] - 316:13, 317:5, 318:4, 350:18, 353:16, 353:18, 362:13, 367:10, 377:1, 378:22, 379:4, 381:11, 383:9, 391:10, 392:4, 392:8, 394:6, 394:12, 397:12, 398:24, 401:4, 404:7, 404:12, 414:2
**CHALLENGING** [5] - 343:14, 354:6, 389:17, 389:18, 389:21
**CHANGE** [34] - 331:17, 340:12, 346:9, 347:5, 347:8, 352:21, 355:19, 355:24, 356:5, 356:6, 356:13, 356:14, 356:16, 357:8, 360:3, 360:11, 380:1, 380:5, 381:12, 382:6, 382:7, 387:16, 406:2, 408:17, 408:23, 409:4, 413:15, 416:5, 416:8, 416:15, 417:6
**CHANGE** [6] - 302:22, 332:14, 356:3, 358:19, 406:16, 418:12
**CHANGED** [1] - 352:1

**CHANGES** [4] - 351:23, 405:14, 406:4, 409:22
**CHARACTERISTIC** [1] - 392:25
**CHARACTERISTICS** [2] - 397:16, 397:23
**CHARACTERIZE** [1] - 403:3
**CHARGE** [1] - 409:13
**CHARM** [1] - 339:3
**CHART** [2] - 359:22
**CHECK** [3] - 312:11, 319:4, 366:7
**CHECKED** [1] - 315:10
**CHECKING** [1] - 319:10
**CHILD** [1] - 305:21
**CHILDREN** [1] - 305:19
**CHOSEN** [1] - 378:8
**CHRISTINA** [1] - 288:15
**CHURCH** [2] - 304:5, 305:18
**CHURCHES** [1] - 296:10
**CIRCUIT** [2] - 297:6, 297:8
**CIRCUMSTANCE** [1] - 356:15
**CIRCUMSTANCES** [1] - 384:19
**CITE** [4] - 368:10, 404:24, 413:4, 413:11
**CITED** [1] - 327:22
**CITES** [2] - 412:16, 412:17
**CITIES** [2] - 397:1, 397:6
**CITIZEN** [3] - 397:12, 399:25, 400:9
**CITIZENSHIP** [1] - 347:12
**CITY** [18] - 303:14, 304:6, 304:12, 331:25, 351:1, 351:2, 351:5, 355:7, 359:1, 390:9, 395:25, 396:3, 396:13, 397:5, 398:4, 398:13, 398:14
**CITY** [1] - 370:6
**CIVIL** [1] - 305:20
**CIVILIAN** [1] - 395:18
**CLAFFERTY** [1] - 288:18
**CLAIMED** [1] - 331:16
**CLAIMS** [4] - 330:13, 333:2, 333:4, 400:4
**CLARIFY** [3] - 291:24, 308:10, 311:15
**CLASSIC** [1] - 357:2
**CLASSMATE** [1] - 304:4
**CLEAR** [9] - 294:7, 295:12, 305:17, 314:5, 314:8, 337:15, 363:12, 377:15, 383:11
**CLEARED** [2] - 337:18, 338:15
**CLEARLY** [5] - 302:24, 333:25, 353:12, 399:7, 415:6
**CLERK** [1] - 370:6
**CLERK** [6] - 324:13, 324:18, 337:21, 338:11, 338:13, 338:15
**CLERK** [2] - 326:14, 350:9
**CLERKS** [1] - 326:13
**CLIENT** [2] - 295:11, 308:12
**CLIENTS** [2] - 295:17, 406:1
**CLIMATE** [3] - 306:6, 306:7
**CLOSE** [9] - 298:16, 326:7, 341:1, 343:17, 378:20, 397:8, 398:16, 404:19, 404:22
**CLOSELY** [3] - 304:23, 309:3, 366:16

**CLOSEST** [1] - 396:4
**CMR** [2] - 289:21, 419:14
**COBB** [1] - 332:23
**CODE** [11] - 331:22, 331:24, 331:25, 350:14, 350:19, 350:21, 350:25, 355:7, 366:7, 366:9, 390:10
**COEFFICIENT** [2] - 377:12, 378:4
**COERCED** [1] - 302:7
**COHORT** [1] - 392:24
**COLLEAGUES** [2] - 326:20, 326:22
**COLLEGE** [1] - 398:8
**COLLEGE** [9] - 360:6, 360:7, 361:22, 361:25, 362:6, 362:7, 366:20, 398:4, 398:23
**COLLEGES** [1] - 362:3
**COLLEGES** [4] - 361:1, 361:8, 361:12, 361:20
**COLUMBUS** [1] - 306:4
**COLUMN** [1] - 339:12
**COMBINATION** [6] - 339:14, 340:2, 340:5, 340:25, 407:19, 408:1
**COMBINE** [2] - 374:24, 375:1
**COMBINED** [4] - 354:23, 375:13, 376:6, 376:9
**COMING** [5] - 292:4, 293:21, 293:22, 296:3, 300:4
**COMMA** [1] - 375:6
**COMMANDS** [1] - 374:23
**COMMENTS** [1] - 294:20
**COMMERCIAL** [2] - 345:15, 410:4
**COMMITTED** [1] - 333:14
**COMMONLY** [2] - 405:7, 407:19
**COMMUNICATED** [4] - 307:3, 307:6, 372:12, 372:14
**COMMUNICATIONS** [1] - 308:20
**COMMUNITIES** [1] - 403:16
**COMMUNITY** [2] - 305:18, 305:22
**COMPANIES** [4] - 343:18, 344:21, 411:18, 411:20
**COMPARABLE** [1] - 355:3
**COMPLETE** [6] - 340:18, 346:14, 360:10, 374:11, 382:4, 417:8
**COMPLETELY** [1] - 332:4
**COMPREHENSIVE** [1] - 374:11
**COMPUTER** [2] - 373:4, 373:5
**CONCATENATED** [1] - 354:23
**CONCEPT** [2] - 367:11, 368:6
**CONCEPTION** [1] - 387:16
**CONCERN** [3] - 293:18, 305:21, 306:6
**CONCERNS** [2] - 292:10, 295:16
**CONCLUDE** [2] - 346:16, 367:9, 414:4
**CONCLUDED** [3] - 332:23, 333:4, 418:11
**CONCLUSION** [14] - 331:1, 347:5, 347:8, 377:20, 378:2, 382:5, 382:6, 384:14, 390:20, 390:21, 397:14, 397:15, 414:10, 415:17
**CONCLUSIONS** [19] - 327:13, 329:1, 330:12, 330:24, 336:3, 337:10, 346:9,

355:9, 363:8, 373:11, 379:16, 379:25, 381:14, 381:21, 385:21, 386:19, 392:14, 401:11, 413:22
**CONDITIONAL** [2] - 366:5, 383:7
**CONDUCT** [4] - 343:19, 344:21, 408:10, 411:18
**CONDUCTED** [4] - 334:17, 341:8, 345:5, 350:3
**CONFERENCE** [1] - 329:22
**CONFERENCES** [1] - 403:13
**CONFIDENCE** [4] - 345:25, 346:1, 346:2
**CONFIDENT** [2] - 339:17, 378:4
**CONFINED** [1] - 293:15
**CONFIRM** [3] - 291:24, 384:24, 416:13
**CONFIRMED** [1] - 332:21
**CONFUSION** [1] - 315:9
**CONGRATULATIONS** [1] - 372:7
**CONKEL** [2] - 359:12, 371:11
**CONNECT** [2] - 319:17, 322:17
**CONNECTED** [3] - 303:13, 304:2, 304:11
**CONNECTING** [1] - 320:2
**CONNECTION** [1] - 392:7
**CONSIDER** [4] - 299:16, 390:6, 390:18, 401:19
**CONSIDERABLE** [1] - 414:6
**CONSIDERED** [2] - 323:17, 327:16
**CONSISTENT** [2] - 334:5, 334:19
**CONSORTIUM** [1] - 408:8
**CONSTITUTED** [1] - 334:17
**CONSTITUTION** [1] - 294:11
**CONSULT** [1] - 323:18
**CONSULTING** [2] - 326:8, 326:13
**CONTACT** [3] - 350:5, 350:7, 369:9
**CONTACTED** [1] - 380:15
**CONTAINS** [1] - 396:1
**CONTEXT** [4] - 316:20, 316:21, 349:20, 374:4
**CONTEXTS** [1] - 344:6
**CONTEXTUAL** [1] - 405:13
**CONTIGUOUS** [1] - 396:8
**CONTINUE** [1] - 382:15
**CONTINUED** [1] - 289:1
**CONTINUED** [2] - 301:13, 302:18
**CONTRACT** [1] - 408:6
**CONTROL** [3] - 349:17, 351:9, 411:1
**CONTROLLED** [1] - 387:10
**CONVENTIONAL** [1] - 377:9
**CONVERSATION** [15] - 304:2, 304:16, 304:25, 307:19, 316:16, 317:8, 317:9, 317:13, 317:16, 317:17, 318:4, 321:13, 321:23, 322:9, 322:15
**CONVERSATIONS** [2] - 304:15, 305:1
**CONVEY** [1] - 349:16
**COOPER** [1] - 288:7
**COPY** [4] - 328:14, 328:15, 359:12, 371:12
**CORNER** [2] - 337:16, 337:17

**CORRECT** [22] - 318:21, 323:24, 325:2, 329:14, 329:15, 342:20, 356:18, 358:24, 359:24, 365:1, 382:22, 382:25, 383:2, 389:23, 390:5, 392:6, 395:6, 401:1, 410:6, 410:25, 417:16, 419:6
**CORRECTLY** [2] - 294:23, 311:6
**CORRESPONDING** [1] - 351:12
**COST** [11] - 367:13, 368:8, 368:9, 368:21, 369:18, 370:11, 370:17, 370:24, 404:15, 404:17, 404:18
**COSTS** [12] - 367:17, 367:18, 367:19, 367:20, 368:7, 368:18, 368:23, 369:16, 369:22, 370:19, 370:23
**COUNCIL** [1] - 304:6
**COUNSEL** [19] - 294:14, 295:2, 295:14, 296:7, 297:9, 299:5, 300:7, 300:10, 306:25, 314:11, 314:18, 315:10, 316:7, 319:24, 320:25, 321:16, 323:19, 372:14
**COUNSEL'S** [2] - 299:9, 314:22
**COUNTED** [2] - 385:8, 386:24
**COUNTIES** [48] - 330:3, 345:7, 347:19, 347:20, 347:21, 347:23, 347:25, 348:2, 348:3, 348:4, 369:21, 375:17, 376:24, 377:1, 377:25, 378:8, 378:19, 378:22, 379:20, 380:2, 380:3, 380:8, 380:18, 380:20, 380:21, 381:7, 381:11, 381:17, 382:7, 385:3, 385:6, 385:7, 385:10, 385:17, 385:22, 386:1, 386:4, 386:8, 386:15, 386:22, 387:6, 387:11, 388:1, 391:3, 394:12
**COUNTRY** [1] - 303:11
**COUNTY** [38] - 314:18, 326:13, 330:16, 348:8, 353:5, 353:8, 353:14, 364:24, 365:3, 368:15, 369:13, 369:15, 375:1, 378:24, 379:10, 379:11, 380:10, 380:14, 380:15, 380:17, 384:16, 384:22, 385:18, 385:20, 386:13, 386:21, 387:1, 387:7, 387:9, 388:2, 389:25, 391:12, 394:1, 415:15
**COUNTY** [11] - 308:12, 326:14, 330:18, 330:22, 332:23, 343:3, 350:17, 350:18, 350:22, 366:10, 388:6
**COUNTY-BY-COUNTY** [1] - 388:2
**COUPLE** [5] - 302:11, 315:5, 329:16, 396:8, 398:18
**COURSE** [2] - 321:19, 369:7
**COURSEWORK** [1] - 325:17
**COURT** [9] - 317:22, 317:25, 322:10, 322:16, 324:7, 324:8, 325:4, 327:4, 345:4
**COURT** [159] - 288:1, 289:22, 289:22, 291:1, 291:2, 291:7, 292:2, 292:13, 292:22, 292:24, 293:1, 293:5, 293:11, 293:18, 293:25, 294:4, 294:8, 294:10, 294:19, 295:5, 295:15, 296:16, 297:4, 297:17, 297:24, 298:3, 298:10, 298:13, 298:18, 299:11, 299:14, 299:22, 300:5, 300:9, 300:19, 301:6,

303:20, 303:24, 304:16, 304:22,
305:4, 306:18, 306:21, 307:9, 307:18,
307:25, 308:2, 308:8, 308:22, 309:19,
310:1, 310:6, 310:8, 310:12, 310:19,
310:21, 312:25, 313:3, 313:7, 315:21,
316:1, 317:8, 317:12, 317:16, 318:2,
318:6, 318:12, 319:19, 319:21, 320:1,
320:10, 320:15, 320:19, 321:4, 321:7,
321:11, 321:15, 321:18, 322:3, 322:6,
322:11, 322:25, 323:4, 323:11,
323:20, 323:22, 324:1, 324:5, 324:8,
324:12, 328:2, 328:4, 328:7, 328:17,
328:19, 328:22, 329:6, 329:8, 331:11,
331:20, 332:8, 335:15, 335:20,
335:23, 336:15, 336:17, 337:5,
337:16, 337:18, 337:22, 338:1, 338:5,
338:8, 338:12, 338:14, 338:16,
338:21, 338:23, 339:1, 344:7, 344:10,
344:14, 344:17, 351:21, 352:8, 357:5,
357:16, 358:6, 358:17, 358:20, 359:9,
359:16, 363:4, 364:5, 368:20, 368:25,
369:7, 369:16, 371:11, 371:14,
371:17, 371:19, 381:1, 382:8, 382:11,
382:14, 388:12, 412:11, 412:21,
412:23, 417:20, 417:22, 417:25,
418:3, 418:5, 418:7, 418:9, 419:3,
419:14
**COURT** [15] - 292:1, 295:18, 297:3,
299:16, 299:19, 304:8, 316:2, 327:19,
337:12, 344:20, 349:11, 356:24,
359:19, 363:12, 367:12
**COURT'S** [3] - 299:20, 301:4, 362:10
**COURTESY** [1] - 293:23
**COURTHOUSE** [1] - 323:14
**COURTROOM** [4] - 295:9, 296:5,
304:15, 304:17
**COURTS** [3] - 297:7, 327:16, 327:22
**CRAWL** [1] - 310:22
**CRC** [2] - 289:21, 419:14
**CREATE** [5] - 297:13, 335:14, 336:21,
362:22, 369:18
**CREATED** [13] - 329:16, 346:18, 347:10,
348:9, 360:25, 380:11, 381:24, 384:8,
387:17, 389:16, 389:17, 397:16, 400:6
**CREATING** [4] - 329:21, 354:22, 365:25,
382:1
**CREDIT** [3] - 409:9, 409:12, 409:18
**CREDITED** [1] - 327:17
**CRIME** [1] - 333:15
**CROSS** [8] - 292:6, 292:15, 295:24,
295:25, 296:25, 297:10, 300:21,
315:23
**CROSS** [3] - 290:3, 301:13, 371:25
**CROSS-EXAMINATION** [2] - 301:13,
371:25
**CROSS-EXAMINATION** [5] - 292:6,
292:15, 296:25, 297:10, 300:21
**CROSSING** [1] - 309:4
**CRR** [2] - 289:21, 419:14
**CULLEN** [1] - 288:22

**CULPABILITY** [1] - 387:22
**CUSTOMERS** [1] - 405:22
**CUT** [2] - 375:3, 381:4
**CUTOFF** [1] - 405:1
**CV** [3] - 329:12, 329:16, 402:13

## D

**DAILY** [1] - 304:3
**DANA** [1] - 289:3
**DANE** [1] - 326:13
**DARN** [1] - 294:17
**DATA** [60] - 327:13, 327:15, 329:20,
330:4, 330:10, 331:2, 331:5, 331:12,
332:5, 332:6, 333:19, 334:18, 339:14,
339:15, 346:3, 346:16, 347:5, 349:4,
349:22, 350:14, 354:8, 354:10,
354:24, 355:6, 362:2, 364:11, 366:9,
374:25, 375:8, 375:14, 376:18,
377:18, 379:12, 379:18, 383:19,
384:15, 388:17, 389:2, 389:15,
389:17, 391:24, 393:3, 397:24,
397:25, 405:9, 406:7, 406:11, 407:7,
411:17, 413:4, 413:21, 413:22,
413:24, 414:19, 415:19, 416:21,
416:23, 416:24
**DATABASE** [7] - 344:25, 346:5, 347:11,
361:25, 374:24, 405:6
**DATABASES** [1] - 345:15
**DATASET** [2] - 358:1, 361:6
**DATASETS** [3] - 334:10, 349:19, 401:21
**DATE** [2] - 340:20, 340:21
**DATES** [3] - 334:15, 347:2, 400:12
**DAUBERT** [1] - 327:20
**DAVIS** [1] - 372:22
**DAVIS** [1] - 288:7
**DAYS** [2] - 315:5, 356:1
**DEADWOOD** [2] - 333:11, 333:25
**DEAL** [1] - 295:19
**DEALING** [1] - 349:19
**DEATH** [2] - 346:20, 347:1
**DECADES** [2] - 333:4, 345:14
**DECEASED** [1] - 346:21
**DECEMBER** [3] - 314:9, 353:17, 384:8
**DECIDE** [3] - 321:5, 369:17, 397:19
**DECIDED** [1] - 368:20
**DECISION** [4] - 360:25, 371:1, 378:25,
398:21
**DECISIONS** [3] - 327:22, 377:16,
381:13
**DEFECTS** [1] - 372:21
**DEFENDANTS** [9] - 291:22, 299:8,
319:17, 320:3, 322:17, 344:4, 346:7,
346:19, 392:8
**DEFENDANTS** [2] - 288:8, 288:20
**DEFENSE** [4] - 314:11, 314:18, 314:22,
316:7
**DEFER** [1] - 291:16
**DEFINITELY** [1] - 292:22
**DEFINITION** [1] - 341:25

**DEFINITIVELY** [1] - 399:16
**DEGREE** [1] - 325:13
**DELAYS** [1] - 291:15
**DELIVERED** [1] - 314:2
**DELIVERY** [2] - 364:19, 402:23
**DEMOGRAPHICS** [3] - 376:22, 380:22,
388:3
**DEMONSTRATION** [1] - 312:13
**DEMONSTRATIVE** [9] - 335:14, 336:21,
336:25, 337:7, 359:11, 362:22,
362:25, 388:9, 414:22
**DEPARTMENT** [1] - 325:6
**DEPLOYED** [2] - 357:1, 357:23
**DEPOSING** [1] - 372:5
**DEPOSITION** [5] - 294:14, 298:15,
298:20, 327:5, 417:12
**DEPUTY** [8] - 324:13, 324:18, 337:21,
338:11, 338:13, 338:15, 338:22,
338:24
**DEREK** [1] - 288:6
**DESCRIBE** [11] - 336:5, 348:7, 350:16,
358:15, 367:13, 368:1, 368:3, 374:9,
396:2, 401:16, 415:4
**DESCRIBED** [4] - 325:25, 346:11,
349:5, 355:2
**DESCRIBES** [3] - 355:24, 358:15, 411:7
**DESCRIBING** [3] - 334:6, 338:18, 339:5
**DESCRIPTION** [9] - 334:5, 335:3,
336:11, 339:20, 346:22, 353:11,
374:5, 374:11, 415:2
**DESCRIPTIONS** [18] - 334:14, 335:6,
335:8, 335:17, 336:5, 336:12, 336:14,
341:19, 373:24, 374:2, 374:4, 374:12,
374:13, 374:14, 382:2, 415:9, 416:25,
417:1
**DESIGNATE** [1] - 294:14
**DESIGNATED** [1] - 293:17
**DESIGNATION** [2] - 298:20, 394:22
**DESIGNATIONS** [1] - 298:15
**DESIRE** [2] - 301:4, 309:12
**DESTINATIONS** [1] - 361:7
**DETAIL** [2] - 331:25, 334:3
**DETAILED** [2] - 336:13, 340:8
**DETERMINATION** [6] - 298:23, 369:1,
369:5, 380:23, 399:11, 399:13,
399:14, 407:18
**DETERMINE** [10] - 307:15, 309:20,
334:10, 342:19, 342:24, 343:13,
349:23, 389:7, 389:8, 390:16
**DETERMINED** [1] - 390:15
**DETERMINES** [1] - 389:24
**DETERMINING** [1] - 389:21
**DEVELOP** [1] - 410:9
**DIED** [3] - 333:13, 347:4, 347:7
**DIEGO** [1] - 325:14
**DIFFERENCE** [6] - 355:18, 355:22,
383:3, 385:1, 395:24, 404:9
**DIFFERENCES** [1] - 378:1
**DIFFERENT** [28] - 318:25, 319:10,
331:7, 335:8, 335:9, 336:11, 339:7,

341:15, 342:1, 343:7, 343:8, 343:9,
343:10, 346:15, 351:19, 354:13,
359:3, 367:15, 367:16, 374:16, 382:1,
385:17, 391:14, 397:2, 399:22,
406:22, 408:18, 416:4
**DIFFICULT** [1] - 371:5
**DIFFICULTIES** [1] - 306:1
**DIGIT** [1] - 331:23
**DIRE** [1] - 328:2
**DIRECT** [10] - 292:5, 293:13, 293:16,
295:3, 295:22, 295:23, 295:24,
315:24, 321:2, 402:12
**DIRECT** [2] - 290:3, 324:22
**DIRECTLY** [9] - 297:10, 301:22, 307:1,
307:12, 312:12, 375:8, 383:12,
413:24, 415:19
**DISAGREE** [3] - 306:14, 308:16, 344:17
**DISAGREEING** [1] - 296:1
**DISCOMFORT** [2] - 301:20, 302:11
**DISCUSS** [8] - 315:1, 317:4, 318:4,
323:23, 334:3, 367:11, 372:16, 373:18
**DISCUSSED** [4] - 302:20, 317:1, 355:5,
362:8
**DISCUSSES** [1] - 413:5
**DISCUSSING** [2] - 316:13, 362:23
**DISCUSSION** [3] - 317:2, 317:4, 372:18
**DISPARATE** [3] - 372:22, 377:20,
387:18
**DISPARITIES** [2] - 347:14, 348:12
**DISPARITY** [1] - 348:22
**DISPROPORTIONATE** [2] - 378:13,
393:4
**DISPROPORTIONATELY** [2] - 347:22,
348:24
**DISTINCT** [1] - 343:10
**DISTINCTION** [1] - 385:1
**DISTRICT** [2] - 296:10, 327:8
**DISTRICT** [6] - 288:1, 288:1, 288:11,
289:22, 419:3, 419:4
**DIVISION** [1] - 288:2
**DIVORCED** [1] - 352:2
**DOABLE** [1] - 312:15
**DOCKET** [1] - 288:4
**DOCTORATE** [1] - 325:15
**DOCUMENT** [2] - 336:6, 392:16
**DOCUMENTARY** [2] - 316:21, 322:19
**DOCUMENTATION** [1] - 369:24
**DOCUMENTS** [3] - 299:5, 299:9, 411:7
**DOE** [2] - 288:3, 288:3
**DOES** [1] - 288:8
**DONE** [17] - 332:3, 333:14, 346:2,
346:23, 349:20, 355:2, 363:10, 366:8,
370:3, 374:1, 375:16, 392:12, 399:9,
400:16, 401:25, 403:2
**DOOR** [2] - 297:14, 398:12
**DORMITORY** [1] - 362:1
**DORMS** [1] - 361:22
**DOUBT** [1] - 378:18
**DOWN** [13] - 306:8, 313:20, 316:22,

316:23, 337:24, 339:6, 354:12,
354:15, 358:9, 362:5, 367:23, 408:7,
419:6
**DOZEN** [1] - 378:20
**DOZENS** [1] - 397:11
**DPV** [2] - 402:21, 402:25
**DR** [24] - 324:4, 324:10, 324:24, 325:24,
326:25, 327:24, 328:24, 329:12,
330:1, 331:11, 332:10, 335:14,
335:21, 336:2, 337:23, 338:18, 339:5,
347:14, 352:10, 359:19, 371:9, 372:2,
372:4, 385:25
**DR** [2] - 290:5, 324:15
**DR** [5] - 324:12, 328:11, 336:21, 338:23,
344:20
**DRAW** [1] - 357:20
**DRIVER'S** [1] - 409:10
**DRIVING** [1] - 293:9
**DULY** [2] - 301:10, 324:16
**DUMPING** [1] - 391:11
**DUPLICATE** [4] - 365:13, 373:15,
378:14, 416:16
**DUPLICATED** [6] - 331:5, 342:8,
342:17, 348:16, 348:20, 383:11
**DUPLICATES** [6] - 342:5, 342:23,
415:7, 415:22, 415:24, 416:12
**DURING** [10] - 291:18, 296:24, 297:9,
298:2, 298:6, 316:15, 316:22, 371:13,
375:13, 416:14
**DYESS** [1] - 357:18

# E

**E-MAIL** [4] - 299:23, 336:9, 374:8,
374:10
**EARLY** [1] - 405:3
**EASIER** [3] - 328:15, 386:12, 386:16
**EASILY** [2] - 361:24, 370:9
**ECONOMETRICS** [1] - 325:18
**EDITED** [2] - 326:5, 326:7
**EDITION** [1] - 329:19
**EDUCATIONAL** [1] - 325:12
**EDWARDS** [1] - 358:2
**EFFECT** [9] - 370:24, 371:3, 383:11,
384:14, 387:10, 387:24, 393:4, 393:6
**EFFECTS** [5] - 333:20, 367:15, 368:5,
379:2, 380:24
**EFFICIENT** [2] - 301:4, 310:23
**EFFORT** [5] - 339:5, 379:23, 381:20,
383:24, 410:18
**EFFORTS** [1] - 311:13
**EITHER** [12] - 294:23, 297:10, 298:21,
331:22, 348:16, 352:17, 361:15,
395:6, 396:3, 396:7, 398:12, 409:17
**ELECTION** [2] - 392:4, 395:1, 399:11,
399:14, 405:3
**ELECTION** [36] - 314:19, 315:12,
315:13, 316:18, 325:22, 326:9,
326:10, 328:1, 332:21, 340:22,
343:23, 343:25, 344:2, 344:5, 350:6,

353:15, 367:16, 368:5, 368:13,
368:15, 369:11, 384:9, 384:10,
384:17, 389:25, 390:18, 390:23,
391:12, 401:14, 401:16, 401:18,
401:22, 404:18, 404:22, 414:18
**ELECTIONS** [7] - 368:21, 368:22, 369:3,
390:23, 391:6, 394:1, 414:8
**ELECTIONS** [9] - 313:24, 314:7, 314:9,
314:16, 350:4, 353:19, 402:6, 407:13,
408:1
**ELECTRONIC** [1] - 407:22
**ELEMENTS** [2] - 383:10, 417:1
**ELEVENTH** [2] - 297:6, 297:7
**ELICITS** [1] - 297:9
**ELIGIBILITY** [24] - 315:2, 332:16,
333:15, 350:10, 350:12, 353:14,
360:18, 360:20, 368:10, 368:17,
370:2, 371:4, 384:2, 384:4, 384:9,
384:18, 384:20, 385:2, 389:18,
389:21, 389:24, 390:13, 398:24,
400:21
**ELIGIBLE** [13] - 330:14, 333:12, 333:22,
345:10, 345:18, 351:17, 366:1, 366:3,
367:2, 368:12, 370:7, 370:23, 414:13
**ELIMINATE** [2] - 362:1, 400:19
**ELIMINATING** [1] - 415:7
**ELM** [1] - 354:18
**EMBEDDED** [1] - 402:15
**EMOTIONAL** [1] - 316:3
**EMPHASIS** [1] - 367:17
**EMPIRICAL** [10] - 327:13, 327:14,
379:15, 379:25, 380:20, 380:23,
381:14, 381:21, 382:5, 384:14
**EMPLOY** [1] - 330:7
**EMPLOYED** [2] - 325:5, 325:8
**EMPLOYEES** [1] - 395:18
**END** [1] - 388:19
**ENDURE** [1] - 404:18
**ENGAGED** [2] - 381:18, 407:25
**ENGELBRECHT** [1] - 336:9
**ENGELBRECHT** [1] - 288:6
**ENORMOUSLY** [2] - 333:22, 368:19
**ENROLL** [1] - 366:22
**ENSURED** [1] - 355:3
**ENTAIL** [1] - 398:6
**ENTERPRISE** [1] - 331:10
**ENTIRE** [1] - 354:16
**ENTIRELY** [1] - 396:16
**ENTITIES** [3] - 329:24, 389:25, 390:19
**ENTITLED** [1] - 307:15
**ENTITY** [4] - 345:12, 368:23, 369:11,
390:11
**ENTRIES** [1] - 365:14
**ENVIRONMENT** [5] - 303:6, 303:10,
304:19, 305:7, 306:12
**EQUAL** [4] - 364:1, 385:18, 386:11,
386:15
**ERIC** [6] - 343:4, 343:6, 343:10, 343:12,
343:14, 343:15
**ERIC** [4] - 408:2, 408:5, 408:7, 408:12

**ERRONEOUS** [3] - 350:14, 366:9, 392:4
**ERROR** [14] - 349:16, 352:18, 363:19, 363:22, 375:9, 375:10, 375:15, 375:17, 375:19, 375:22, 390:3, 401:6, 411:17, 414:5
**ERRORS** [32] - 331:4, 346:18, 355:4, 355:6, 355:12, 362:23, 367:3, 373:18, 375:12, 376:3, 377:12, 385:23, 388:15, 388:17, 388:20, 388:22, 388:23, 390:2, 390:11, 390:15, 390:22, 390:24, 391:8, 391:11, 391:16, 391:17, 391:20, 397:24, 400:5, 401:7, 413:3
**ESPECIALLY** [1] - 305:22
**ESQ** [15] - 288:15, 288:15, 288:16, 288:16, 288:17, 288:17, 288:18, 288:18, 288:21, 288:21, 288:22, 289:3, 289:4, 289:4, 289:5
**ESSENTIAL** [2] - 300:3, 335:1
**ESSENTIALLY** [2] - 368:1, 374:25
**ESTABLISHED** [3] - 313:2, 313:5, 333:24
**ESTABLISHES** [1] - 297:8
**ESTIMATE** [1] - 345:24
**ESTIMATES** [2] - 345:9, 413:12
**EVALUATE** [4] - 367:15, 381:24, 390:16, 416:22
**EVALUATED** [5] - 330:9, 330:10, 384:7, 408:16, 408:22
**EVALUATING** [3] - 409:4, 411:9, 416:23
**EVALUATION** [1] - 391:23
**EVANS** [35] - 288:22, 295:4, 298:12, 301:3, 301:7, 301:14, 303:23, 303:25, 304:13, 304:18, 305:2, 305:5, 305:6, 306:23, 306:24, 307:11, 307:23, 308:1, 308:5, 308:16, 309:8, 309:9, 310:23, 310:25, 313:6, 315:22, 317:21, 318:3, 318:14, 320:13, 321:1, 321:6, 322:7, 322:14, 322:24
**EVANS** [8] - 298:4, 300:21, 300:25, 306:22, 308:23, 309:3, 313:4, 313:7
**EVENING** [1] - 301:15
**EVIDENCE** [19] - 297:9, 297:11, 297:13, 297:14, 297:16, 319:16, 329:5, 329:10, 342:2, 345:22, 346:23, 347:3, 360:19, 371:16, 371:24, 374:7, 401:3, 414:12, 414:17
**EVIDENTIARY** [1] - 296:23
**EXACT** [6] - 310:8, 321:3, 352:12, 394:17, 405:17, 410:22
**EXACTLY** [1] - 301:5
**EXAGGERATED** [1] - 333:5
**EXAMINATION** [7] - 301:13, 313:10, 318:13, 321:20, 322:13, 324:22, 371:25
**EXAMINATION** [7] - 292:6, 292:15, 293:15, 296:25, 297:10, 300:21, 301:1
**EXAMINED** [2] - 330:12, 361:21
**EXAMINING** [2] - 316:8, 391:6
**EXAMPLE** [18] - 330:18, 331:15, 334:21,

339:21, 343:1, 343:2, 357:6, 359:4, 360:5, 360:21, 378:14, 383:17, 388:5, 390:4, 398:10, 398:15, 403:10, 415:6
**EXAMPLES** [8] - 331:5, 331:22, 343:16, 351:4, 359:20, 360:10, 365:4, 367:3
**EXCEL** [1] - 374:16
**EXCEPT** [1] - 414:11
**EXCESS** [1] - 355:8
**EXCLUDE** [2] - 361:23, 392:23
**EXCLUDED** [3] - 293:19, 327:19, 395:1
**EXCUSE** [1] - 323:8
**EXCUSED** [6] - 320:16, 320:20, 323:1, 418:3, 418:5, 418:7
**EXECUTED** [1] - 331:9
**EXHAUSTIVE** [3] - 360:2, 361:2, 361:11
**EXHIBIT** [4] - 328:20, 329:5, 329:9, 371:23
**EXHIBIT** [3] - 294:13, 329:5, 371:21
**EXHIBITS** [1] - 294:16
**EXIST** [2] - 341:6, 417:11
**EXISTED** [2] - 307:14, 393:2
**EXISTENCE** [2] - 312:18, 333:25
**EXISTS** [2] - 333:17, 387:24
**EXPECT** [7] - 341:10, 341:22, 366:21, 375:17, 390:23, 391:5, 405:16
**EXPECTATION** [2] - 371:6, 376:2
**EXPECTED** [1] - 370:22
**EXPENSES** [1] - 312:22
**EXPERIENCE** [13] - 345:4, 375:16, 375:20, 377:18, 390:22, 401:13, 401:21, 402:11, 402:12, 402:14, 403:1, 407:13, 408:9
**EXPERT** [13] - 294:14, 294:15, 325:1, 326:25, 327:22, 327:25, 328:5, 328:8, 328:11, 331:13, 344:7, 344:8, 344:15
**EXPERTISE** [3] - 343:21, 401:14, 401:15
**EXPERTS** [1] - 404:2
**EXPLAIN** [7] - 334:8, 339:13, 343:2, 345:4, 351:22, 351:23, 367:11
**EXPLAINING** [1] - 349:11
**EXPLANATION** [4] - 334:24, 346:19, 365:20, 417:9
**EXPLICIT** [1] - 334:14
**EXPLORE** [1] - 297:15
**EXPRESSION** [1] - 345:24
**EXTENDED** [2] - 360:14, 360:17
**EXTENSIVE** [1] - 361:10
**EXTENT** [3] - 304:14, 304:18, 346:7
**EXTRACT** [1] - 375:2
**EXTRACTED** [1] - 352:5

## F

**FACILITY** [1] - 357:23
**FACT** [8] - 332:20, 360:18, 378:15, 383:13, 383:17, 387:23, 413:6, 414:11
**FACTS** [3] - 299:13, 307:14, 308:11
**FACULTY** [1] - 325:6
**FAILINGS** [1] - 295:10

**FAIR** [7] - 307:13, 307:17, 310:7, 312:3, 312:5, 312:19, 313:4
**FAIR** [4] - 297:20, 305:2, 306:23, 309:8
**FAIR** [1] - 288:3
**FAIRLY** [2] - 361:10, 381:9
**FALSE** [15] - 343:19, 344:22, 344:23, 348:15, 388:24, 401:4, 401:6, 407:6, 407:9, 411:16, 411:19, 413:1, 413:8, 413:10, 414:5
**FALSEHOODS** [1] - 401:8
**FAMILIAR** [11] - 355:18, 356:19, 379:3, 393:22, 402:22, 409:12, 409:20, 410:12, 410:23, 411:5, 416:4
**FAMILIES** [1] - 396:17
**FAMILY** [3] - 357:4, 396:23, 416:9
**FAPR** [2] - 289:21, 419:14
**FAR** [1] - 291:10
**FAVOR** [1] - 309:19
**FELL** [1] - 357:4
**FELLOW** [3] - 295:1, 295:21, 296:7
**FELT** [2] - 315:23, 316:2
**FEW** [4] - 291:5, 313:14, 314:25, 316:6
**FIELD** [15] - 339:14, 340:2, 354:17, 354:18, 354:20, 354:21, 354:23, 363:22, 363:24, 364:2, 366:13, 376:15, 376:17
**FIELDS** [21] - 325:25, 326:6, 334:19, 339:8, 339:9, 339:15, 339:16, 339:18, 340:2, 340:4, 340:6, 340:24, 341:2, 342:20, 349:6, 349:9, 349:24, 354:12, 355:3, 375:5, 406:23
**FIGHT** [6] - 307:13, 310:7, 312:3, 312:5, 312:19, 313:4
**FIGHT** [1] - 288:3
**FIGHT'S** [1] - 307:17
**FIGURE** [1] - 397:19
**FIGURES** [1] - 363:11
**FILE** [139] - 330:5, 330:14, 330:17, 330:21, 330:22, 331:17, 333:17, 334:4, 334:11, 335:11, 335:13, 338:19, 339:6, 339:7, 339:8, 339:9, 339:22, 340:7, 340:8, 340:14, 340:16, 340:17, 341:6, 341:7, 341:15, 341:16, 342:1, 342:3, 342:6, 342:11, 342:13, 342:14, 342:17, 342:18, 342:22, 342:24, 342:25, 343:4, 343:5, 343:13, 344:24, 345:20, 346:6, 346:20, 346:25, 348:9, 348:18, 348:19, 348:20, 348:24, 350:8, 350:17, 351:3, 351:5, 351:11, 351:12, 351:15, 351:18, 351:19, 352:3, 352:5, 352:6, 352:7, 352:11, 352:13, 352:21, 352:22, 353:3, 353:20, 354:16, 354:18, 354:25, 355:10, 355:11, 356:3, 356:12, 356:16, 356:19, 357:8, 358:19, 359:5, 360:2, 360:22, 361:14, 361:18, 361:23, 364:21, 365:4, 365:5, 365:14, 365:21, 365:24, 365:25, 366:24, 367:2, 372:22, 373:6, 375:1, 375:8, 376:6, 380:11, 380:16, 382:19,

382:24, 383:13, 383:14, 384:12,
384:22, 387:2, 388:16, 390:3, 392:11,
392:17, 392:21, 392:25, 393:2,
393:10, 393:14, 393:17, 393:19,
394:9, 394:18, 397:10, 399:8, 399:15,
399:24, 401:2, 406:10, 414:1, 414:7,
414:23, 415:13, 416:2, 416:15
**FILED** [15] - 299:7, 332:14, 353:16,
353:18, 355:24, 360:19, 369:13,
379:17, 383:8, 389:19, 399:21, 406:8,
409:4, 413:15, 416:8
**FILES** [55] - 330:2, 331:16, 334:15,
334:23, 341:19, 342:12, 346:18,
347:10, 347:18, 354:11, 364:14,
372:24, 374:15, 374:23, 374:24,
375:1, 375:3, 375:13, 376:2, 376:6,
376:17, 378:12, 379:13, 379:19,
379:22, 379:23, 381:19, 381:23,
381:24, 381:25, 383:23, 384:1, 384:7,
384:15, 385:24, 388:18, 389:4,
390:21, 391:4, 391:7, 392:2, 397:16,
399:1, 400:6, 401:9, 401:11, 402:24,
406:12, 406:24, 409:2, 414:21, 415:5,
415:15
**FILING** [1] - 413:25
**FILINGS** [1] - 406:9
**FILL** [1] - 319:14
**FILLED** [2] - 318:19, 318:25
**FINAL** [1] - 399:13
**FINDINGS** [1] - 377:21
**FINE** [3] - 295:11, 308:24, 320:4
**FINISH** [3] - 295:23, 381:1, 381:2
**FIREWALL** [1] - 392:3
**FIRMS** [1] - 405:10
**FIRST** [29] - 291:9, 297:2, 299:25,
300:6, 300:10, 302:17, 310:17,
315:12, 325:3, 335:10, 335:12, 339:9,
339:19, 339:23, 340:14, 341:14,
341:21, 342:9, 342:16, 347:18,
361:24, 362:4, 365:14, 391:10, 400:3,
415:22, 415:24, 415:25, 416:13
**FIRST-YEAR** [1] - 362:4
**FITS** [1] - 359:7
**FIVE** [4] - 331:23, 352:13, 363:16, 413:9
**FLABBERGASTED** [1] - 363:19
**FLAGGED** [3] - 413:3, 413:7, 414:14
**FLAWED** [1] - 302:23
**FLAWS** [1] - 415:18
**FOCUS** [4] - 325:22, 325:23, 385:6,
392:23
**FOCUSED** [1] - 385:3
**FOLLOW** [8] - 294:25, 305:3, 309:16,
313:14, 315:4, 317:11, 404:2, 404:4
**FOLLOW-UP** [1] - 313:14
**FOLLOWED** [1] - 294:24
**FOLLOWING** [1] - 392:2
**FOLLOWS** [2] - 301:11, 324:16
**FOOTNOTE** [3] - 336:8, 411:21, 412:16
**FOR** [1] - 288:1
**FORCE** [7] - 357:18, 358:3, 359:6,

362:15, 362:19
**FORCED** [1] - 380:2
**FORD** [1] - 288:15
**FOREGOING** [1] - 419:6
**FORESEEABLE** [1] - 370:22
**FORM** [6] - 406:6, 406:15, 409:6,
409:10, 409:11, 413:15
**FORMAL** [1] - 403:18
**FORMAT** [2] - 334:18, 376:14
**FORMULATE** [1] - 344:11
**FORT** [4] - 358:3, 397:5, 397:6, 399:2
**FORTH** [2] - 293:10, 386:12
**FORTUNATE** [1] - 356:10
**FORTUNATELY** [1] - 412:8
**FORUMS** [1] - 403:19
**FORWARD** [6] - 321:3, 380:4, 380:17,
385:17, 386:16, 394:12
**FORWARDED** [3] - 332:16, 339:11,
356:1
**FORWARDING** [3] - 302:21, 315:14,
405:23
**FOUNDATION** [5] - 300:1, 335:17,
335:24, 343:21, 344:3
**FOUNDATIONAL** [1] - 385:9
**FOUR** [2] - 339:8, 348:2
**FRAME** [1] - 404:12
**FRAMEWORK** [1] - 367:14
**FRAUD** [4] - 333:2, 333:5, 333:6, 400:4
**FREE** [1] - 411:18
**FREQUENTLY** [1] - 344:4
**FRIDAY** [1] - 288:11
**FRIENDS** [1] - 306:5
**FRONT** [2] - 368:14, 381:23
**FRUSTRATED** [1] - 316:2
**FULL** [2] - 295:9, 325:10
**FULTON** [1] - 386:13
**FUNDAMENTALLY** [1] - 364:13
**FUTURE** [1] - 323:10
**FUZZY** [2] - 346:8, 346:12

## G

**G16** [1] - 364:2
**GAINED** [1] - 402:10
**GAMALIEL** [2] - 290:4, 301:9
**GARBAGE** [1] - 367:7
**GEARS** [1] - 314:25
**GENDER** [3] - 340:20, 414:25, 415:1
**GENERAL** [6] - 315:13, 332:21, 364:19,
379:5, 405:21, 407:25
**GENERALLY** [5] - 294:5, 325:21,
327:12, 367:20, 367:24
**GENERATE** [2] - 364:14, 389:4
**GENERATED** [2] - 334:4, 334:15
**GENERATIONS** [1] - 339:24
**GEORGIA** [3] - 288:1, 289:23, 419:4
**GEORGIA** [59] - 303:2, 303:6, 303:8,
303:11, 303:16, 303:19, 305:8,
305:12, 305:14, 306:4, 306:12,
306:14, 306:17, 327:8, 330:3, 330:5,

330:14, 330:15, 332:17, 332:18,
332:22, 335:11, 339:22, 342:7, 349:1,
353:13, 353:19, 354:3, 354:7, 356:11,
357:7, 358:9, 360:6, 360:7, 360:20,
361:3, 361:6, 361:8, 365:8, 366:21,
368:9, 369:3, 378:17, 379:9, 382:24,
383:13, 384:3, 384:24, 385:11, 386:2,
386:9, 396:24, 398:8, 399:3, 399:15,
404:13, 408:7
**GEORGIA'S** [1] - 347:19
**GEOSPATIAL** [1] - 329:20
**GERMANY** [11] - 291:21, 291:23,
292:10, 293:1, 293:2, 293:8, 295:2,
295:4, 295:21, 296:4, 296:9
**GIVEN** [6] - 327:13, 336:13, 340:12,
360:19, 382:3, 382:14
**GLARING** [1] - 367:3
**GOVERNMENT** [1] - 369:23
**GOVERNOR'S** [1] - 361:6
**GRADUATE** [1] - 325:17
**GRADUATED** [1] - 360:6
**GRADUATING** [1] - 361:7
**GREATER** [2] - 356:1, 404:18
**GROUP** [1] - 336:7
**GROUPS** [1] - 382:1
**GUARANTEE** [1] - 292:18
**GUESS** [5] - 293:11, 299:14, 369:5,
379:15, 395:24
**GWINNETT** [1] - 343:3

## H

**HALF** [4] - 376:12, 388:7, 411:25,
412:20
**HAND** [3] - 324:13, 328:13, 402:6
**HANDLE** [1] - 294:5
**HANDLING** [1] - 401:21
**HANDS** [2] - 292:20, 294:18
**HARD** [1] - 393:20
**HARDY** [1] - 288:15
**HATE** [1] - 292:13
**HEAD** [9] - 385:13, 393:21, 393:25,
395:16, 404:14, 407:14, 411:9, 412:1,
413:13
**HEAR** [4] - 298:4, 299:15, 299:22,
362:10
**HEARD** [2] - 304:22, 343:22
**HEARING** [1] - 368:14
**HEARSAY** [6] - 297:4, 303:21, 304:2,
304:11, 317:25, 322:8
**HELD** [1] - 291:1
**HELP** [3] - 309:22, 336:21, 339:12
**HENRY** [4] - 350:17, 350:18, 350:21,
366:10
**HEREBY** [1] - 419:6
**HEREDIA** [1] - 330:20
**HIGH** [7] - 335:4, 346:1, 360:6, 361:7,
366:21, 368:19, 396:20
**HIGHER** [2] - 376:25, 383:20
**HIGHEST** [5] - 347:23, 347:25, 377:25,

386:2, 386:4
**HISPANIC** [1] - 383:20
**HISTORY** [1] - 338:1
**HIT** [2] - 377:14, 409:9
**HOLD** [27] - 306:18, 307:9, 312:25, 315:21, 319:19, 319:21, 328:22, 335:15, 339:1, 351:21, 381:1, 382:8, 385:5, 412:11, 417:21
**HOME** [6] - 312:12, 315:16, 360:8, 373:4, 413:17, 416:10
**HONOR** [56] - 291:5, 291:8, 292:9, 292:17, 292:20, 293:7, 293:14, 293:24, 294:2, 294:6, 295:7, 296:14, 296:22, 296:23, 299:2, 299:23, 300:18, 301:2, 307:10, 307:22, 308:7, 312:24, 316:4, 317:7, 317:11, 317:14, 318:11, 319:23, 320:17, 321:10, 322:8, 323:3, 323:16, 324:3, 327:24, 328:3, 328:9, 328:14, 329:4, 329:7, 336:16, 337:3, 338:4, 343:20, 344:1, 357:12, 363:2, 371:18, 382:16, 412:12, 412:15, 417:17, 417:23, 418:2, 418:6, 418:8
**HONORABLE** [1] - 325:4
**HONORABLE** [3] - 288:10, 289:22, 419:15
**HOPE** [1] - 301:15
**HOTEL** [2] - 312:3, 313:4
**HOUR** [1] - 291:18
**HOUSE** [3] - 354:17, 354:19, 360:14
**HOUSEHOLD** [1] - 339:25
**HUGE** [2] - 295:12, 397:4
**HUGHES** [1] - 289:5
**HUM** [1] - 407:1
**HUNDRED** [1] - 351:14
**HUNDREDS** [1] - 405:10
**HYPOTHETICAL** [3] - 380:12, 382:10, 386:11

## I

**ID** [4] - 340:9, 340:23, 341:4, 409:11
**IDEA** [5] - 346:11, 378:8, 378:19, 388:20, 405:21
**IDEAL** [2] - 398:1, 398:22
**IDEALLY** [1] - 291:11
**IDENTICAL** [4] - 352:15, 363:15, 364:6, 376:14
**IDENTIFIABLE** [1] - 363:19
**IDENTIFIED** [12] - 331:15, 335:13, 341:14, 347:16, 353:6, 361:2, 361:4, 367:5, 383:10, 391:20, 397:3, 400:17
**IDENTIFIER** [8] - 339:13, 339:14, 339:21, 340:10, 340:24, 341:3, 341:4, 416:5
**IDENTIFIERS** [5] - 340:4, 340:24, 341:11, 341:17, 341:23
**IDENTIFIES** [3] - 339:15, 399:16, 399:19
**IDENTIFY** [20] - 340:3, 347:14, 350:14, 351:2, 351:10, 351:20, 352:10, 353:3,

353:20, 354:1, 370:24, 389:1, 389:6, 389:11, 399:24, 400:1, 400:20, 400:24, 401:1, 406:9
**IDENTIFYING** [2] - 409:7, 414:23
**ILLINOIS** [1] - 312:13
**ILLUSTRATE** [3] - 336:22, 337:9, 363:7
**IMMEDIATE** [1] - 331:4
**IMMEDIATELY** [6] - 313:19, 333:18, 333:20, 350:24, 366:1, 369:14
**IMMUNE** [1] - 398:23
**IMPACT** [8] - 372:22, 377:6, 377:20, 378:13, 382:6, 387:18, 387:21, 391:21
**IMPACTED** [2] - 388:17, 388:20
**IMPORT** [1] - 375:7
**IMPORTANT** [1] - 370:25
**IMPORTATION** [2] - 375:9, 375:13
**IMPORTED** [1] - 376:2
**IMPORTS** [1] - 375:5
**IMPOSED** [1] - 367:21
**IMPOSING** [1] - 370:22
**IMPRESSIVE** [1] - 363:10
**IMPROPER** [1] - 413:12
**IMPROPERLY** [8] - 333:21, 347:3, 371:8, 383:19, 413:3, 413:4, 413:7, 414:14
**IMPROPRIETIES** [1] - 311:14
**IN** [1] - 291:1
**IN-STATE** [3] - 392:21, 392:23, 394:2
**INACCURATE** [2] - 331:2, 331:12
**INADEQUATE** [1] - 334:7
**INADMISSIBLE** [4] - 297:9, 297:11, 297:12, 318:1
**INC** [2] - 288:3, 288:6
**INCLUDE** [15] - 294:17, 315:13, 325:17, 326:2, 327:7, 330:17, 341:11, 357:3, 361:11, 386:25, 389:15, 398:17, 399:12, 416:10
**INCLUDED** [4] - 329:12, 361:8, 373:17, 406:25
**INCLUDES** [9] - 319:4, 340:8, 340:14, 340:15, 340:16, 340:17, 340:19, 342:15, 398:7
**INCLUDING** [1] - 323:19
**INCOMPLETE** [4] - 346:14, 389:2, 416:23, 416:24
**INCONTROVERTIBLE** [1] - 299:13
**INCONVENIENCE** [1] - 302:12
**INCORRECT** [1] - 342:23
**INCREASE** [3] - 333:9, 334:1, 404:21
**INCREASES** [3] - 341:25, 350:6, 350:10
**INCREASINGLY** [1] - 377:10
**INDEED** [3] - 340:11, 345:1, 406:2
**INDEPENDENT** [1] - 387:8
**INDEPENDENTLY** [1] - 318:19
**INDEX** [2] - 346:21, 347:2
**INDICATE** [2] - 318:22, 346:12
**INDICATED** [4] - 315:9, 315:10, 316:1, 331:11
**INDICATES** [1] - 351:8

**INDICATING** [1] - 332:15
**INDICATION** [2] - 350:1, 401:8
**INDICATIONS** [1] - 381:17
**INDICATOR** [1] - 340:1
**INDIRECTLY** [1] - 307:1
**INDIVIDUAL** [26] - 316:11, 331:6, 334:10, 334:11, 335:12, 339:15, 340:3, 341:14, 341:16, 342:1, 342:13, 342:25, 351:18, 351:25, 357:4, 365:10, 366:15, 367:22, 370:24, 370:25, 371:1, 376:19, 381:22, 392:2, 407:23, 409:2
**INDIVIDUAL'S** [4] - 335:10, 339:9, 347:12, 363:14
**INDIVIDUAL-LEVEL** [1] - 371:1
**INDIVIDUALLY** [2] - 376:8, 376:21
**INDIVIDUALS** [21] - 333:7, 339:22, 342:14, 342:18, 343:4, 345:8, 345:10, 353:21, 354:2, 362:8, 362:9, 362:11, 365:7, 365:17, 366:20, 367:22, 369:17, 371:7, 396:17, 416:2, 416:19
**INDUSTRY** [3] - 403:12, 403:25, 404:2
**INELIGIBLE** [17] - 332:17, 332:18, 333:6, 333:8, 333:9, 333:19, 334:2, 367:5, 389:1, 389:7, 389:11, 397:25, 400:4, 414:4, 414:12, 414:15
**INFERENCE** [3] - 297:13, 357:20, 396:16
**INFLUENTIAL** [1] - 334:22
**INFORM** [1] - 355:9
**INFORMATION** [26] - 315:16, 340:9, 346:25, 349:10, 358:13, 363:24, 365:23, 369:2, 372:10, 373:14, 375:3, 384:17, 391:21, 401:10, 405:23, 406:12, 406:19, 406:24, 406:25, 407:22, 407:23, 409:7, 414:20, 414:23, 415:4, 417:10
**INFORMATIONAL** [1] - 367:18
**INFORMED** [1] - 300:2
**INGRAINED** [1] - 372:6
**INHERENT** [2] - 407:5, 413:6
**INITIAL** [1] - 373:16
**INPUT** [2] - 374:23, 416:15
**INSIST** [1] - 294:24
**INSPECT** [1] - 376:8
**INSPECTION** [1] - 331:4
**INSTALLATION** [9] - 359:2, 365:11, 366:17, 394:19, 394:25, 395:7, 397:4, 397:9, 417:7
**INSTALLATIONS** [4] - 358:2, 359:3, 359:21, 397:3
**INSTANCE** [2] - 361:24, 375:24
**INSTANCES** [27] - 329:23, 343:17, 351:10, 351:14, 351:20, 352:10, 353:3, 353:20, 354:1, 361:13, 362:20, 363:13, 363:16, 363:24, 364:16, 364:21, 364:23, 365:7, 365:10, 365:13, 365:17, 366:9, 366:12, 366:15, 366:19, 378:13, 416:17
**INSTEAD** [1] - 350:20

**INSURANCE** [1] - 304:3
**INTEND** [2] - 360:4, 360:11
**INTENDED** [2] - 356:17, 413:15
**INTENDING** [1] - 356:20
**INTENT** [3] - 307:12, 307:16, 307:17
**INTERNET** [1] - 403:16
**INTERRUPTING** [1] - 323:6
**INTERTWINE** [1] - 309:2
**INTERVENOR** [1] - 289:2
**INTIMIDATED** [2] - 316:2, 370:9
**INTIMIDATING** [1] - 370:9
**INTRODUCE** [1] - 325:5
**INURED** [1] - 295:11
**INVALID** [1] - 332:24
**INVOLVED** [5] - 295:18, 379:24, 381:21, 410:3, 410:17
**IRWIN** [3] - 358:3, 397:6, 399:2
**ISSUE** [11] - 295:19, 308:14, 310:24, 319:25, 344:16, 369:11, 378:22, 388:25, 391:7, 407:6
**ISSUED** [8] - 299:8, 362:13, 379:14, 379:19, 379:23, 384:2, 384:22, 391:10
**ISSUES** [5] - 292:20, 402:4, 407:8, 413:6, 415:19
**ITEMS** [1] - 343:22
**ITERATIONS** [1] - 326:12
**ITSELF** [4] - 346:5, 346:16, 374:10, 389:8
**IVY** [1] - 361:5

**J**

**JACKSON** [4] - 296:16, 296:17, 310:13
**JACOB** [1] - 324:6
**JACOB** [1] - 288:18
**JAMES** [2] - 288:7, 288:22
**JANE** [1] - 288:3
**JENNIFER** [1] - 289:4
**JOB** [1] - 363:10
**JOCELYN** [1] - 330:20
**JOHN** [3] - 288:3, 288:8, 288:21
**JOHNSON** [1] - 288:7
**JOINT** [2] - 357:19, 357:23
**JONES** [7] - 301:3, 343:4, 343:6, 343:10, 343:12, 343:14, 343:15
**JONES** [3] - 288:10, 289:22, 419:15
**JOURNAL** [1] - 326:23
**JOURNAL** [1] - 326:23
**JOURNALS** [2] - 403:5, 403:24
**JUDGE** [4] - 308:16, 313:6, 320:13, 338:1
**JUDGE** [1] - 288:11
**JUDGE** [20] - 295:4, 298:12, 300:12, 300:16, 301:3, 303:23, 304:13, 305:2, 306:23, 307:11, 307:23, 308:6, 309:8, 310:23, 315:25, 317:21, 321:1, 321:2, 321:6, 323:2
**JUDGMENT** [1] - 377:18
**JUDICIAL** [3] - 299:4, 299:6, 299:17
**JUMP** [1] - 301:17

**JUNIOR** [1] - 340:17
**JURY** [1] - 294:15

**K**

**KEEP** [2] - 370:25, 412:24
**KEN** [1] - 324:4
**KENNETH** [3] - 290:5, 324:15, 324:21
**KENNETH** [1] - 324:20
**KEY** [5] - 291:7, 345:21, 349:6, 404:9, 414:23
**KIND** [8] - 301:16, 310:12, 310:22, 357:3, 363:21, 363:22, 382:5, 392:12
**KINDS** [7] - 327:10, 334:12, 346:15, 349:4, 349:16, 354:14, 389:2
**KNOWING** [1] - 378:1
**KNOWLEDGE** [13] - 303:15, 303:17, 303:18, 305:13, 306:11, 306:15, 306:16, 307:2, 314:23, 344:8, 344:9, 344:10, 344:11
**KNOWN** [4] - 303:10, 332:5, 388:24, 407:7

**L**

**LACK** [3] - 335:16, 351:8, 354:8
**LAID** [1] - 343:21
**LANE** [1] - 354:18
**LANGUAGE** [3] - 304:1, 304:7, 378:5
**LARGE** [11] - 334:10, 342:7, 349:19, 354:10, 358:1, 375:16, 397:1, 397:5, 397:6, 401:21, 403:2
**LARGER** [2] - 387:11, 387:25
**LARGEST** [1] - 345:7
**LAST** [25] - 291:15, 294:16, 295:15, 299:3, 299:23, 309:12, 309:17, 316:6, 326:12, 335:10, 335:12, 339:10, 339:19, 339:23, 340:14, 340:21, 341:14, 341:21, 342:9, 342:16, 365:14, 409:25, 415:23, 415:25, 416:13
**LAUGHED** [1] - 355:17
**LAW** [6] - 297:7, 353:13, 368:9, 379:9, 404:13
**LAWRENCE** [1] - 288:15
**LAWRENCE-HARDY** [1] - 288:15
**LAWSUIT** [1] - 299:7
**LAWYER** [1] - 374:6
**LAWYERS** [24] - 295:11, 307:6, 307:19, 307:20, 307:24, 308:1, 308:3, 308:4, 309:5, 309:6, 309:7, 309:10, 309:20, 310:2, 310:4, 310:5, 310:6, 310:8, 310:14, 311:3, 311:7, 311:16, 390:18, 391:6
**LAY** [1] - 335:24
**LAYPERSON** [5] - 331:12, 331:15, 344:13, 344:14, 344:16
**LEADING** [1] - 305:9
**LEAGUE** [1] - 361:6
**LEARNED** [1] - 315:7
**LEARNING** [1] - 315:20

**LEAST** [4] - 375:22, 386:8, 392:10, 407:25
**LEAVE** [5] - 292:20, 292:25, 312:12, 357:6, 405:20
**LEFT** [1] - 376:6
**LEGAL** [2] - 296:1, 370:15
**LEGALLY** [1] - 352:1
**LESLIE** [1] - 288:16
**LESS** [6] - 323:23, 356:2, 382:23, 393:10, 393:16, 403:18
**LEVEL** [4] - 333:6, 335:4, 371:1, 378:3
**LEWIS** [2] - 357:19, 357:24
**LEWIS-MCCHORD** [2] - 357:19, 357:24
**LEXISNEXIS** [2] - 345:15, 410:8
**LICENSE** [1] - 409:11
**LICENSED** [3] - 343:18, 344:21, 411:10
**LICENSEE** [2] - 408:22, 411:23
**LICENSEES** [4] - 405:5, 405:13, 405:25, 408:15
**LIES** [1] - 319:2
**LIFE** [1] - 305:20
**LIGHTS** [1] - 307:16
**LIKELIHOOD** [13] - 334:1, 348:7, 348:8, 350:6, 350:10, 367:22, 387:1, 387:7, 396:21, 397:17, 401:24, 408:16, 408:22
**LIKELY** [18] - 362:9, 362:11, 362:20, 367:10, 371:3, 376:25, 383:16, 385:18, 387:12, 393:7, 393:10, 393:16, 397:4, 400:13, 413:7, 414:13, 414:16
**LIMIT** [1] - 306:8
**LIMITATIONS** [1] - 349:3
**LIMITED** [2] - 308:17, 391:23
**LINE** [7] - 305:25, 308:24, 309:4, 366:7, 370:10, 400:7, 400:9
**LINK** [3] - 343:21, 352:20, 405:25
**LINKAGE** [6] - 330:11, 331:2, 334:6, 334:9, 334:16, 334:22
**LINKAGES** [1] - 342:20
**LINKED** [4] - 331:6, 341:15, 342:14, 416:2
**LINKING** [4] - 341:13, 342:1, 342:18, 342:22
**LIST** [24] - 291:24, 293:3, 293:20, 294:13, 296:2, 296:4, 330:16, 333:9, 333:11, 333:12, 345:17, 347:21, 350:5, 359:5, 360:2, 361:9, 361:10, 383:19, 394:2, 400:20, 407:3, 407:15, 408:10
**LISTED** [7] - 345:5, 351:3, 362:17, 363:25, 364:19, 395:8, 417:15
**LISTEN** [3] - 288:22, 309:2, 310:16
**LISTENED** [1] - 304:23
**LISTENING** [1] - 295:12
**LISTING** [1] - 398:3
**LISTS** [2] - 333:12, 359:1
**LITERALLY** [5] - 357:15, 358:24, 358:25, 362:14, 365:11
**LITERATURE** [10] - 329:21, 333:1,

333:3, 333:24, 367:19, 370:20, 413:2, 413:5, 413:11, 414:18

**LIVE** [8] - 303:2, 357:24, 359:20, 362:4, 395:9, 395:19, 396:9, 398:20

**LIVED** [2] - 302:25, 318:23

**LIVES** [2] - 357:24, 360:6

**LIVING** [9] - 303:3, 303:11, 339:24, 362:2, 362:7, 396:13, 398:22

**LOCAL** [8] - 313:23, 314:7, 314:16, 318:16, 326:9, 368:20, 369:3, 369:18

**LOCATED** [4] - 361:4, 398:8, 398:12, 398:13

**LOCATION** [1] - 358:21

**LOCUS** [1] - 308:11

**LODGING** [1] - 312:1

**LOG** [3] - 291:13, 291:18, 388:8

**LOGIC** [1] - 346:8

**LOGISTICAL** [2] - 291:6, 291:9

**LOOK** [31] - 293:6, 332:3, 337:24, 338:9, 338:10, 346:16, 349:21, 350:23, 351:13, 352:5, 354:4, 357:21, 364:10, 369:7, 373:2, 376:11, 377:12, 383:12, 383:15, 388:2, 390:24, 391:7, 393:25, 397:2, 399:1, 412:16, 414:3, 414:8, 417:12

**LOOKED** [12] - 332:5, 346:3, 352:3, 361:13, 364:1, 376:13, 379:16, 388:9, 390:15, 398:1, 417:10

**LOOKING** [5] - 357:5, 357:9, 358:12, 360:25, 415:15

**LOOKS** [2] - 398:2, 412:1

**LOSE** [2] - 338:20, 400:21

**LOST** [1] - 332:16

**LOW** [1] - 346:1

**LOWER** [2] - 367:17, 405:2

**LOWEST** [1] - 348:2

**LUNCH** [4] - 291:18, 296:18, 417:18, 418:9

**LUNCHTIME** [1] - 291:12

## M

**M-A-Y-E-R** [1] - 324:21

**MADISON** [4] - 370:6, 398:8, 398:15, 398:18

**MADISON'S** [1] - 338:10

**MAGAZINE** [1] - 403:10

**MAIL** [8] - 299:23, 332:16, 336:9, 339:11, 350:9, 356:1, 374:8, 374:10

**MAIL** [1] - 403:10

**MAILED** [1] - 345:7

**MAILER** [1] - 406:1

**MAILING** [6] - 344:2, 368:14, 399:22, 403:1, 403:5, 403:15

**MAILINGS** [2] - 403:2, 405:8

**MAIN** [3] - 292:9, 292:12, 326:17

**MAINTAINED** [1] - 308:15

**MAINTENANCE** [3] - 383:19, 407:15, 408:10

**MAKEUP** [1] - 394:11

**MAN** [1] - 301:6

**MANAGED** [1] - 379:21

**MAP** [1] - 358:4

**MARCOS** [1] - 310:20

**MARCOS** [1] - 288:16

**MARK** [2] - 288:7

**MARK** [1] - 371:22

**MARKED** [5] - 329:9, 371:23, 408:23, 409:22, 416:9

**MARKET** [1] - 405:11

**MARKETING** [1] - 405:8

**MARKS** [1] - 406:14

**MARRIED** [1] - 352:2

**MASS** [9] - 344:2, 347:13, 371:1, 377:4, 403:1, 403:3, 403:5, 405:8, 406:1

**MATCH** [17] - 334:17, 344:25, 345:25, 347:1, 351:11, 354:24, 364:22, 365:5, 405:18, 405:22, 406:20, 406:23, 407:2, 407:12, 407:20, 414:25

**MATCHED** [4] - 335:10, 341:21, 346:6, 416:18

**MATCHES** [1] - 330:13

**MATCHING** [29] - 334:6, 334:16, 334:17, 334:19, 338:18, 339:5, 341:5, 341:8, 341:10, 341:12, 341:18, 341:23, 343:19, 343:21, 344:5, 344:21, 345:1, 346:8, 346:12, 352:20, 354:10, 373:21, 374:9, 383:18, 402:14, 405:14, 411:12, 411:18, 415:20

**MATE** [1] - 304:5

**MATERIAL** [2] - 333:6, 376:3

**MATERIALLY** [1] - 333:9

**MATERIALS** [1] - 336:2

**MATHEMATICS** [1] - 325:15

**MATTER** [5] - 291:9, 386:19, 387:23, 396:12, 397:2

**MATTERS** [5] - 291:4, 291:6, 299:17, 377:17, 379:2

**MAYER** [1] - 328:11

**MAYER** [27] - 324:4, 324:10, 324:12, 324:20, 324:24, 325:24, 326:25, 327:24, 328:24, 329:12, 330:1, 331:11, 332:10, 335:14, 336:2, 336:21, 337:23, 338:18, 338:23, 339:5, 344:20, 347:14, 352:10, 359:19, 371:9, 372:2, 385:25

**MAYER** [2] - 290:5, 324:15

**MC** [25] - 288:16, 288:18, 306:19, 307:10, 307:21, 308:7, 308:10, 312:24, 313:1, 313:9, 313:11, 316:4, 316:5, 317:7, 318:10, 319:23, 320:17, 320:23, 321:9, 321:12, 321:16, 321:21, 322:5, 323:2, 323:6

**MCCHORD** [2] - 357:19, 357:24

**MCQUEEN** [2] - 308:23, 309:23

**MEAN** [32] - 298:5, 346:5, 346:11, 354:9, 355:12, 357:2, 358:14, 358:24, 362:19, 366:2, 366:4, 376:15, 377:13, 379:15, 381:16, 384:13, 386:16, 387:21, 390:10, 391:9, 393:1, 400:2,

**MAN** [1] - 301:6

402:1, 411:3, 411:25, 413:10, 414:25, 415:7, 416:6, 417:8

**MEANS** [11] - 323:12, 342:10, 349:8, 352:17, 352:18, 352:19, 363:23, 378:21, 402:22, 417:3

**MEANT** [1] - 357:11

**MEASURE** [1] - 377:16

**MEASURES** [2] - 387:7, 409:3

**MEDIUM** [1] - 346:1

**MEET** [3] - 316:20, 377:9, 378:3

**MELLETT** [1] - 289:4

**MEMBERS** [2] - 391:5, 396:9

**MEMORIZED** [1] - 394:16

**MEMORY** [1] - 363:11

**MENG** [1] - 288:17

**MENTION** [8] - 381:8, 389:7, 392:14, 394:14, 395:4, 398:3, 407:1, 414:22

**MENTIONED** [6] - 340:23, 359:21, 368:7, 390:2, 395:24, 410:23

**MENTIONS** [4] - 354:8, 378:19, 381:7, 381:9

**MERE** [2] - 307:14, 360:18

**MET** [2] - 316:18, 372:14

**METAPHORICALLY** [1] - 358:25

**METHODOLOGY** [1] - 330:6

**METHODS** [5] - 326:21, 329:21, 330:8, 334:5, 374:11

**METRO** [1] - 385:7

**METROPOLITAN** [2] - 348:3, 348:5

**MEYER** [2] - 372:4, 372:6

**MICHAEL** [1] - 288:21

**MICHELLE** [1] - 288:18

**MIDDLE** [22] - 299:24, 312:11, 340:15, 343:9, 373:6, 373:10, 373:16, 373:18, 373:22, 376:5, 414:24, 415:1, 415:5, 415:8, 415:12, 415:16, 415:20, 415:23, 415:25, 416:13, 416:14

**MIDDLETON** [2] - 398:17, 398:19

**MIGHT** [32] - 297:3, 305:11, 309:2, 332:2, 333:13, 333:14, 350:11, 356:19, 356:22, 357:24, 360:2, 360:11, 360:13, 360:16, 368:2, 368:16, 369:13, 369:14, 369:24, 370:2, 370:12, 375:10, 375:15, 375:23, 396:13, 399:4, 399:19, 399:22, 400:13, 400:15, 404:22, 409:22

**MILES** [2] - 396:8, 398:18

**MILITARY** [42] - 357:1, 357:2, 357:15, 357:22, 358:1, 358:7, 358:21, 359:2, 359:3, 359:8, 359:21, 360:1, 362:10, 362:12, 362:18, 362:21, 365:11, 366:16, 373:15, 394:15, 394:18, 394:20, 394:22, 394:24, 395:19, 396:1, 396:4, 396:8, 396:10, 396:13, 396:15, 396:17, 396:20, 396:23, 396:25, 397:4, 397:8, 397:13, 397:18, 399:6, 417:6

**MILLION** [6] - 367:7, 371:2, 386:13, 386:15, 386:21, 391:12

**MIND** [1] - 370:25
**MIND** [1] - 395:16
**MINE** [1] - 337:5
**MINOR** [1] - 325:14
**MINORITY** [1] - 413:6
**MINUTE** [2] - 294:16, 337:21
**MISS** [1] - 364:6
**MISSING** [10] - 315:4, 331:5, 349:6, 349:9, 349:25, 355:6, 363:25, 366:13, 373:14, 389:2
**MISSISSIPPI** [1] - 361:3
**MISSPELLED** [1] - 351:7
**MISSPELLINGS** [1] - 351:5
**MISTAKES** [2] - 295:13, 342:2
**MOCINE** [24] - 288:16, 306:19, 307:10, 307:21, 308:7, 308:10, 312:24, 313:1, 313:9, 313:11, 316:4, 316:5, 317:7, 318:10, 319:23, 320:17, 320:23, 321:9, 321:12, 321:16, 321:21, 322:5, 323:2, 323:6
**MOCINE-MC** [24] - 288:16, 306:19, 307:10, 307:21, 308:7, 308:10, 312:24, 313:1, 313:9, 313:11, 316:4, 316:5, 317:7, 318:10, 319:23, 320:17, 320:23, 321:9, 321:12, 321:16, 321:21, 322:5, 323:2, 323:6
**MODEL** [4] - 367:11, 367:14, 367:24, 404:17
**MOM** [1] - 412:3
**MOM-AND-POP** [1] - 412:3
**MOMENT** [3] - 320:17, 336:4, 417:21
**MONDAY** [2] - 300:7, 300:10
**MONEY** [1] - 312:1
**MONTH** [2] - 410:15
**MONTHS** [4] - 356:2, 356:6, 356:16, 357:8
**MORNING** [13] - 291:2, 291:4, 300:10, 300:22, 313:12, 313:13, 324:3, 324:9, 324:24, 324:25, 362:23, 372:2, 372:3
**MORRISON** [1] - 288:17
**MOST** [11] - 364:18, 376:13, 383:16, 385:23, 386:1, 396:7, 396:21, 397:3, 397:5, 405:7, 407:19
**MOTION** [1] - 299:19
**MOUTH** [1] - 385:5
**MOVE** [22] - 301:4, 316:4, 321:3, 329:4, 352:11, 353:4, 360:12, 362:14, 363:14, 364:6, 364:19, 364:24, 365:18, 366:13, 371:15, 393:7, 396:18, 396:24, 397:21, 413:16, 413:20, 417:22
**MOVE-TO** [9] - 352:11, 353:4, 362:14, 363:14, 364:6, 364:19, 364:24, 365:18, 366:13
**MOVED** [37] - 331:7, 331:16, 331:19, 333:13, 348:23, 349:1, 349:15, 350:8, 351:18, 352:15, 352:19, 352:24, 352:25, 353:7, 353:22, 353:25, 356:8, 357:9, 357:14, 358:13, 359:5, 359:6, 361:14, 361:19, 364:17, 365:2, 366:2,

378:16, 394:18, 395:25, 396:19, 398:4, 399:19, 412:7, 414:7, 417:5, 417:6
**MOVEMENT** [1] - 305:20
**MOVER** [1] - 393:14
**MOVERS** [6] - 392:14, 392:21, 392:23, 392:24, 393:15, 394:2
**MOVES** [3] - 304:10, 353:13, 362:6
**MOVING** [1] - 413:25
**MR** [164] - 291:5, 291:8, 292:9, 292:17, 292:23, 292:25, 293:2, 293:3, 293:6, 293:7, 293:14, 293:24, 294:2, 294:6, 294:9, 294:12, 295:4, 295:7, 296:14, 296:22, 297:6, 297:20, 298:1, 298:5, 298:12, 298:15, 299:2, 299:12, 299:18, 299:23, 300:6, 300:18, 301:3, 301:7, 301:14, 303:23, 303:25, 304:13, 304:18, 305:2, 305:5, 305:6, 306:19, 306:23, 306:24, 307:10, 307:11, 307:21, 307:23, 308:1, 308:5, 308:7, 308:10, 308:16, 309:8, 309:9, 310:23, 310:25, 312:24, 313:1, 313:6, 313:9, 313:11, 315:22, 316:4, 316:5, 317:7, 317:21, 318:3, 318:10, 318:14, 319:23, 320:13, 320:17, 320:23, 321:1, 321:6, 321:9, 321:12, 321:16, 321:21, 322:5, 322:7, 322:14, 322:24, 323:2, 323:3, 323:6, 323:16, 323:21, 324:3, 324:6, 324:11, 324:23, 327:24, 328:3, 328:6, 328:9, 328:10, 328:13, 328:18, 328:20, 328:23, 329:4, 329:7, 329:11, 332:9, 335:16, 335:21, 336:1, 336:16, 336:19, 336:20, 337:3, 337:6, 337:25, 338:4, 338:6, 338:17, 338:20, 339:3, 339:4, 343:20, 343:23, 344:1, 344:4, 344:9, 344:13, 344:16, 344:19, 352:9, 359:17, 359:18, 363:2, 363:5, 363:6, 364:15, 369:20, 371:9, 371:13, 371:15, 371:18, 371:22, 372:1, 381:3, 381:5, 382:9, 382:12, 382:16, 382:17, 388:10, 388:13, 412:12, 412:15, 412:18, 412:22, 412:24, 412:25, 417:17, 417:21, 417:23, 418:2, 418:4, 418:6
**MSA** [2] - 385:12, 386:1
**MULTIPLE** [13] - 306:20, 332:21, 334:24, 336:10, 339:24, 342:14, 342:18, 342:22, 354:23, 374:8, 375:16, 416:2, 416:19
**MUNICIPALITIES** [4] - 358:5, 361:2, 397:8, 398:7
**MUNICIPALITY** [9] - 350:21, 351:1, 357:21, 357:25, 361:20, 394:24, 396:3, 398:10, 398:11
**MUSCOGEE** [2] - 308:12, 314:20

# N

**NAME** [63] - 316:9, 316:11, 316:14, 324:19, 324:20, 331:7, 331:25, 335:10, 335:12, 339:10, 339:19,

339:23, 340:14, 340:15, 341:9, 341:14, 341:21, 342:8, 342:9, 342:16, 348:12, 348:17, 348:19, 350:21, 351:1, 351:10, 351:12, 351:19, 351:23, 351:24, 352:2, 352:6, 352:7, 354:20, 364:21, 365:4, 365:5, 365:14, 373:16, 377:2, 379:14, 379:17, 387:22, 389:19, 390:9, 394:24, 395:7, 414:24, 416:3, 417:5
**NAMED** [1] - 343:4
**NAMES** [18] - 343:9, 351:2, 351:6, 355:7, 373:6, 373:10, 373:18, 373:22, 376:5, 376:16, 376:17, 415:1, 415:6, 415:8, 415:12, 415:16, 415:20, 416:14
**NARRATIVE** [1] - 307:13
**NATION** [1] - 306:7
**NATIONAL** [2] - 326:18, 347:11
**NATIONAL** [5] - 302:22, 332:14, 356:3, 358:19, 406:16
**NATURAL** [1] - 387:8
**NATURE** [3] - 372:18, 380:21, 406:6
**NAVAL** [1] - 362:17
**NCOA** [73] - 332:17, 338:19, 339:6, 339:7, 339:9, 340:16, 341:6, 341:15, 342:13, 342:24, 343:19, 343:21, 344:5, 344:21, 344:24, 345:16, 346:5, 346:7, 346:25, 348:18, 351:4, 351:19, 352:7, 356:20, 360:19, 373:21, 377:4, 383:8, 383:18, 383:19, 388:21, 388:23, 388:24, 389:3, 389:20, 393:10, 397:10, 397:20, 399:2, 399:21, 402:11, 402:16, 402:24, 403:4, 405:11, 405:25, 406:5, 406:7, 407:2, 407:6, 407:12, 407:19, 408:10, 408:14, 408:21, 409:21, 409:25, 410:4, 410:17, 411:1, 411:4, 411:6, 411:17, 411:18, 411:22, 413:2, 413:4, 413:19, 413:23, 414:3, 414:25, 415:8, 416:20
**NCOA'S** [2] - 388:18, 402:14
**NCOALINK** [4] - 405:6, 405:22, 406:19, 410:13
**NCOAS** [1] - 413:25
**NEAR** [14] - 357:2, 359:21, 361:15, 394:18, 395:4, 395:25, 396:5, 396:13, 397:6, 397:13, 397:18, 398:5, 399:12
**NEARBY** [3] - 357:22, 396:3, 398:14
**NEED** [10] - 291:4, 292:15, 297:19, 298:24, 321:3, 322:21, 323:15, 369:25, 417:18, 417:22
**NEEDED** [1] - 345:10
**NEGLIGENCE** [1] - 397:23
**NEGLIGENT** [1] - 397:20
**NERVOUS** [1] - 370:7
**NEURO** [1] - 372:6
**NEVER** [6] - 304:24, 307:6, 315:23, 318:2, 340:12, 352:19
**NEW** [2] - 361:12, 362:18
**NEW** [3] - 329:18, 409:17, 412:7
**NEWSLETTERS** [1] - 403:19

**NEXT** [9] - 294:3, 296:20, 296:22, 298:14, 318:9, 324:2, 340:6, 397:4, 398:12
**NIGHT** [1] - 299:23
**NINE** [4] - 331:23, 356:15, 359:4, 362:13
**NINE-DIGIT** [1] - 331:23
**NITPICKING** [2] - 294:7, 294:8
**NKWONTA** [21] - 288:17, 291:5, 291:8, 292:9, 293:3, 293:7, 293:14, 293:24, 294:2, 296:14, 296:22, 297:6, 297:20, 298:1, 298:5, 298:15, 299:2, 299:12, 299:18, 300:6, 300:18
**NO** [1] - 288:4
**NOBODY** [2] - 366:24, 367:1
**NON** [6] - 341:17, 341:23, 345:6, 360:2, 383:20
**NON-EXHAUSTIVE** [1] - 360:2
**NON-HISPANIC** [1] - 383:20
**NON-UNIQUE** [2] - 341:17, 341:23
**NON-VOTERS** [1] - 345:6
**NON-VOTING** [1] - 345:6
**NONE** [2] - 314:24, 341:1
**NONSTANDARD** [1] - 354:12
**NORTH** [1] - 326:1
**NORTHERN** [2] - 288:1, 419:4
**NORTHERN** [1] - 327:7
**NOTABLY** [1] - 354:16
**NOTATION** [1] - 340:1
**NOTE** [14] - 332:22, 339:20, 344:23, 357:6, 377:8, 378:25, 380:9, 381:16, 394:8, 405:8, 406:21, 406:22, 407:7, 411:18
**NOTED** [9] - 341:20, 342:7, 346:10, 358:22, 362:13, 374:8, 385:6, 390:8, 415:3
**NOTEWORTHY** [2] - 353:9, 353:10
**NOTHING** [3] - 317:20, 322:20, 346:4
**NOTICE** [4] - 299:4, 299:6, 299:17, 388:5
**NOTICES** [1] - 370:6
**NOTING** [2] - 387:23, 411:20
**NOVEMBER** [2] - 313:25, 314:8
**NULL** [1] - 363:25
**NUMBER** [33] - 323:14, 331:23, 340:9, 340:10, 340:12, 340:23, 341:2, 341:7, 341:23, 349:2, 351:15, 351:16, 352:4, 352:5, 354:5, 354:17, 354:19, 356:22, 358:20, 360:15, 362:5, 365:1, 376:3, 387:9, 388:15, 390:2, 405:21, 408:6, 410:22, 412:9, 414:1, 416:1
**NUMBERS** [5] - 343:8, 371:21, 375:17, 393:20, 393:25
**NUMEROUS** [1] - 351:4

# O

**O'CLOCK** [1] - 300:10
**OATH** [3] - 300:23, 300:24, 372:19
**OBJECT** [11] - 300:14, 300:15, 303:23, 304:13, 309:3, 309:4, 313:1, 315:24, 317:21, 335:16, 343:20
**OBJECTED** [1] - 319:24
**OBJECTING** [2] - 322:10, 336:15
**OBJECTION** [17] - 293:14, 298:21, 299:9, 306:18, 315:22, 318:8, 321:7, 322:8, 322:11, 328:3, 328:4, 329:8, 335:24, 371:17, 371:19, 382:11, 412:12
**OBJECTIONS** [4] - 299:1, 300:3, 300:8, 329:6
**OBJECTS** [2] - 300:11
**OBSERVABLE** [1] - 385:23
**OBSERVED** [1] - 347:20
**OBSERVER** [1] - 390:7
**OBTAINING** [1] - 314:12
**OBVIOUS** [10] - 331:3, 331:12, 331:14, 332:4, 356:25, 390:3, 390:6, 390:22, 391:1, 394:20
**OBVIOUSLY** [8] - 291:16, 299:24, 332:7, 357:9, 363:19, 363:25, 364:3
**OCCUR** [3] - 314:9, 314:16, 411:19
**OCCURRED** [1] - 417:14
**OCTOBER** [2] - 305:25, 419:8
**OCTOBER** [1] - 288:11
**ODDS** [1] - 386:20
**OF** [6] - 288:1, 288:10, 288:14, 288:20, 289:2, 419:4
**OFFER** [1] - 327:14
**OFFERED** [9] - 304:20, 317:23, 330:3, 334:15, 336:14, 344:5, 356:10, 374:6, 374:7
**OFFERING** [14] - 304:18, 384:14, 390:20, 397:14, 397:15, 397:22, 397:23, 398:1, 398:25, 399:1, 400:2, 400:3, 414:10
**OFFICE** [3] - 361:6, 373:4, 405:9
**OFFICIAL** [3] - 314:19, 350:5, 350:7
**OFFICIAL** [2] - 289:22, 419:14
**OFFICIALS** [4] - 368:15, 384:17, 390:1, 391:12
**OLD** [2] - 402:9, 409:17
**OLDER** [2] - 304:8, 365:23
**ON** [3] - 288:14, 288:20, 289:2
**ONCE** [7] - 297:8, 300:24, 305:17, 363:13, 381:16, 391:4, 405:6
**ONE** [76] - 292:8, 294:6, 295:5, 295:7, 296:10, 300:14, 301:23, 302:1, 302:4, 302:7, 305:7, 305:10, 305:11, 310:14, 311:20, 320:17, 321:5, 321:9, 321:18, 322:3, 323:16, 334:11, 334:21, 336:6, 336:7, 338:9, 338:10, 339:24, 341:4, 342:10, 342:20, 342:22, 343:15, 343:16, 345:15, 345:21, 348:11, 348:17, 348:18, 350:1, 350:5, 350:19, 353:10, 354:17, 354:19, 354:20, 357:13, 358:7, 359:4, 361:15, 361:20, 363:25, 364:22, 366:7, 368:3, 368:25, 369:13, 370:5, 371:22, 374:5, 375:13, 376:16, 378:10, 391:15, 392:10, 392:14, 401:17, 410:5, 410:11, 412:11, 415:20, 415:21, 417:21
**ONE'S** [1] - 383:4
**ONES** [6] - 300:15, 326:17, 338:21, 356:25, 369:5, 408:15
**ONGOING** [1] - 311:13
**ONLINE** [5] - 403:15, 403:19, 406:16, 409:6, 411:21
**OPAQUE** [1] - 382:2
**OPELIKA** [1] - 398:11
**OPEN** [1] - 291:1
**OPENED** [1] - 291:13
**OPENS** [1] - 297:14
**OPERATING** [3] - 335:6, 373:23, 374:12
**OPINION** [9] - 327:22, 344:11, 397:22, 397:23, 398:1, 398:25, 399:1, 400:2, 400:3
**OPINIONS** [2] - 327:19, 410:9
**OPPORTUNITY** [4] - 297:1, 309:13, 325:4, 368:18
**OPPOSED** [1] - 348:1
**OPPOSING** [4] - 297:8, 299:5, 299:8, 300:6
**OPSEC** [1] - 336:7
**ORDER** [1] - 345:8
**ORGANIZATION** [2] - 408:5, 412:4
**ORGANIZED** [1] - 379:21
**ORIGIN** [1] - 390:16
**ORIGINAL** [4] - 291:23, 294:12, 294:13, 376:6
**ORIGINALLY** [1] - 315:1
**OURSELVES** [1] - 295:13
**OUT-OF-COURT** [2] - 317:25, 322:10
**OUT-OF-STATE** [3] - 392:24, 393:14, 393:15
**OUTDATED** [1] - 365:23
**OUTRIGHT** [1] - 401:8
**OUTSIDE** [4] - 297:8, 304:15, 304:17, 322:16
**OVERALL** [6] - 330:24, 331:1, 347:5, 392:17, 393:15, 415:17
**OVERREPRESENTED** [2] - 348:4, 378:15
**OVERRULE** [1] - 318:8
**OVERRULING** [1] - 322:11
**OWN** [12] - 305:18, 312:8, 314:22, 330:9, 332:3, 340:5, 341:2, 345:3, 349:21, 353:11, 355:2, 404:25
**OWNS** [1] - 360:14

# P

**P.M** [1] - 418:11
**PACKAGE** [1] - 374:22
**PAGE** [17] - 336:6, 359:23, 381:6, 381:7, 381:8, 387:4, 392:15, 394:14, 407:1, 411:17, 411:22, 412:1, 412:16, 412:21, 414:22
**PAGES** [4] - 329:14, 334:24, 388:14, 419:6
**PAID** [2] - 311:24, 312:10

**PAIKOWSKY**[1] - 289:3
**PALMS**[1] - 399:2
**PAPER**[1] - 326:19
**PART**[8] - 305:20, 330:17, 335:2, 343:23, 379:23, 388:24, 393:3, 408:8
**PARTICIPATE**[1] - 309:13
**PARTICULAR**[6] - 326:13, 374:3, 376:22, 377:2, 393:4, 411:23
**PARTICULARLY**[1] - 354:11
**PARTLY**[1] - 394:15
**PARTS**[1] - 408:18
**PAST**[2] - 304:10, 401:25
**PASTE**[1] - 375:3
**PASTOR**[2] - 296:9, 296:17
**PAT**[1] - 367:7
**PATHWAYS**[1] - 372:6
**PATTERN**[1] - 393:2
**PAWNS**[1] - 307:14
**PAY**[2] - 404:22, 405:12
**PAYING**[7] - 296:19, 311:21, 312:3, 312:5, 312:8, 312:22, 313:5
**PAYS**[2] - 368:23, 368:24
**PEER**[4] - 329:20, 377:19, 378:6, 400:10
**PEER-REVIEWED**[3] - 329:20, 377:19, 378:6
**PEOPLE**[37] - 294:10, 302:16, 305:12, 305:18, 331:7, 333:11, 334:2, 347:7, 354:12, 358:20, 359:2, 359:4, 362:16, 362:17, 367:14, 369:9, 371:2, 376:19, 376:21, 379:11, 382:3, 385:20, 386:13, 386:15, 386:17, 386:21, 386:22, 394:11, 395:21, 396:23, 400:2, 405:12, 413:3, 414:6, 414:12, 416:4
**PEORIA**[1] - 312:13
**PERCEIVE**[1] - 370:1
**PERCEIVED**[1] - 370:15
**PERCENT**[29] - 345:25, 347:7, 348:20, 348:21, 348:25, 349:2, 362:4, 375:25, 376:1, 382:21, 383:1, 383:3, 383:4, 383:13, 383:14, 385:14, 388:7, 392:18, 392:22, 394:5, 394:6, 395:9, 395:11, 395:13, 395:15, 413:8, 413:14, 413:18
**PERCENTAGE**[17] - 347:23, 347:25, 348:2, 362:6, 377:25, 382:18, 382:23, 385:11, 386:3, 386:5, 387:25, 388:5, 393:13, 394:9, 395:12, 414:6, 414:19
**PERCENTAGES**[1] - 393:15
**PERFORM**[1] - 372:21
**PERHAPS**[1] - 396:21
**PERIOD**[2] - 356:1, 360:17
**PERMANENT**[26] - 355:19, 356:5, 356:6, 356:14, 356:16, 356:20, 357:8, 357:10, 357:11, 358:9, 358:10, 397:21, 406:1, 406:2, 406:8, 406:13, 406:15, 408:16, 408:17, 408:23, 408:24, 409:22, 409:23, 413:15, 413:23, 416:5

**PERMANENTLY**[8] - 356:8, 358:13, 358:14, 358:15, 360:12, 413:16, 413:20, 414:7
**PERMISSIBLE**[1] - 291:20
**PERMISSION**[1] - 337:23
**PERMITTED**[1] - 297:22
**PERMITTING**[1] - 333:8
**PERSON**[30] - 302:3, 302:6, 302:9, 316:14, 328:4, 331:18, 339:18, 340:13, 341:13, 342:10, 344:24, 346:6, 348:17, 348:18, 351:16, 351:19, 352:6, 352:7, 352:19, 360:2, 369:1, 369:22, 370:11, 377:3, 409:5, 411:1, 411:4, 413:14, 414:4, 414:14
**PERSONAL**[9] - 303:15, 303:17, 303:18, 305:13, 306:5, 306:11, 306:15, 306:16, 314:23
**PERSONALLY**[3] - 317:1, 409:25, 410:3
**PETITION**[3] - 379:6, 380:4, 385:19
**PETITIONER**[2] - 400:10, 414:1
**PETITIONERS**[1] - 387:15
**PETITIONS**[1] - 385:16
**PHONE**[2] - 304:25, 317:15
**PHRASE**[1] - 319:12
**PHYSICALLY**[5] - 303:3, 303:9, 305:23, 305:24, 310:15, 320:12
**PIECE**[2] - 337:13, 340:6
**PIECES**[2] - 339:7, 367:7
**PILLAR**[1] - 305:17
**PLACE**[5] - 292:13, 304:15, 304:17, 313:24, 391:10
**PLACES**[2] - 398:19, 415:2
**PLAINTIFF**[4] - 308:2, 308:5, 308:8, 330:20
**PLAINTIFF'S**[4] - 328:20, 329:5, 329:9, 371:23
**PLAINTIFFS**[9] - 293:9, 294:21, 294:23, 323:12, 324:3, 325:1, 327:24, 392:9, 392:11
**PLAINTIFFS**[2] - 288:4, 288:14
**PLAINTIFFS'**[1] - 291:25
**PLANE**[4] - 312:5, 312:8, 312:10, 312:19
**PLAY**[1] - 298:16
**PLEASURE**[1] - 372:5
**POCKET**[1] - 312:2
**POINT**[22] - 292:2, 294:3, 296:22, 297:17, 298:10, 298:16, 298:22, 299:3, 299:16, 306:13, 311:5, 311:7, 315:7, 335:23, 342:6, 359:9, 369:16, 370:13, 372:4, 402:23, 417:18
**POINT**[2] - 362:18, 396:24
**POLICY**[1] - 326:21
**POLITICAL**[6] - 325:6, 325:14, 325:16, 327:25, 367:24, 377:11
**POLITICAL**[1] - 326:24
**POLITICS**[1] - 325:21
**POLL**[1] - 402:7
**POP**[1] - 412:3

**POPULATION**[7] - 345:9, 385:11, 386:23, 386:24, 387:2, 387:10, 387:12
**POPULATIONS**[2] - 376:25, 387:6
**POPULOUS**[4] - 385:18, 386:1, 386:8
**POSITION**[5] - 296:2, 297:11, 338:2, 356:11, 368:17
**POSITIVE**[4] - 302:19, 378:4, 413:10, 414:5
**POSITIVES**[11] - 343:19, 344:22, 344:23, 348:15, 388:25, 407:6, 407:9, 411:16, 411:19, 413:1, 413:8
**POSSESSION**[1] - 373:5
**POSSIBLE**[13] - 328:21, 333:18, 334:25, 342:19, 343:13, 369:9, 369:10, 376:5, 386:17, 390:25, 391:2, 404:3, 415:8
**POST**[1] - 405:9
**POSTAL**[5] - 358:14, 403:12, 403:15, 403:20, 403:25
**POSTAL**[16] - 332:15, 355:23, 356:9, 356:13, 360:3, 402:15, 403:4, 405:5, 405:15, 408:14, 408:16, 408:22, 409:3, 409:20, 411:5, 411:7
**POTENTIAL**[3] - 360:22, 386:7, 399:6
**POTENTIALLY**[2] - 297:9, 297:11
**POWELL**[10] - 328:2, 328:19, 336:15, 337:22, 338:3, 371:17, 371:20, 382:14, 412:21, 418:5
**POWELL**[30] - 288:21, 328:3, 328:6, 329:7, 335:16, 336:16, 337:25, 338:4, 343:20, 344:1, 344:9, 344:13, 344:16, 371:18, 372:1, 381:3, 381:5, 382:9, 382:16, 382:17, 388:10, 388:13, 412:15, 412:22, 412:24, 412:25, 417:17, 417:21, 417:23, 418:6
**POWER**[1] - 413:19
**PRACTICALLY**[1] - 296:11
**PRACTICES**[6] - 367:16, 368:5, 401:23, 407:14, 408:10
**PRECISE**[3] - 379:24, 396:6, 407:14
**PREDICT**[3] - 397:20, 406:1, 409:21
**PREDICTIVE**[1] - 413:19
**PREFERENCE**[1] - 299:20
**PREMISE**[2] - 332:11, 332:13
**PREPARATION**[1] - 354:8
**PREPARED**[4] - 291:17, 292:4, 299:18, 299:19
**PREPARING**[1] - 299:24
**PREPROCESSED**[2] - 334:18, 355:3
**PREPROCESSING**[1] - 355:1
**PRESCHEDULED**[1] - 291:12
**PRESENT**[4] - 298:19, 299:21, 320:3
**PRESENTATIONS**[1] - 329:22
**PRESENTING**[2] - 308:3, 397:25
**PRESERVE**[3] - 297:23, 298:9, 304:21
**PRESIDENCY**[3] - 325:23, 326:19, 329:19
**PRESIDENTIAL**[1] - 353:15
**PRETTY**[1] - 342:7
**PREVENT**[1] - 414:14

PREVIOUS [2] - 310:5, 339:10
PREVIOUSLY [3] - 301:10, 319:25, 326:25
PRIMARY [1] - 315:13
PRIVATE [1] - 408:5
PRIVILEGE [4] - 308:13, 308:15, 308:17, 308:20
PROBABILISTIC [1] - 405:14
PROBABILITY [3] - 334:1, 341:25, 345:24
PROBABLE [3] - 391:7, 391:8, 414:3
PROBLEM [11] - 302:18, 314:1, 319:2, 332:18, 334:9, 351:8, 364:4, 383:6, 388:24, 415:6, 416:16
PROBLEMS [7] - 305:22, 314:5, 373:11, 373:14, 385:23, 397:24, 407:5
PROCEED [3] - 336:17, 359:16, 382:15
PROCEEDING [1] - 323:16
PROCEEDINGS [1] - 419:6
PROCEEDINGS [1] - 288:10
PROCESS [65] - 302:15, 302:20, 302:23, 304:9, 330:11, 331:3, 334:16, 334:20, 335:1, 335:2, 335:5, 336:11, 336:22, 338:19, 341:5, 341:8, 341:18, 341:24, 345:2, 345:14, 345:16, 345:18, 345:21, 346:2, 349:17, 350:2, 350:25, 352:20, 364:8, 364:13, 366:5, 367:4, 368:7, 374:9, 375:14, 375:21, 376:4, 378:24, 378:25, 379:16, 380:10, 381:10, 381:15, 381:18, 382:4, 384:16, 389:4, 389:17, 390:14, 390:17, 391:2, 397:14, 398:20, 399:24, 409:2, 409:8, 410:1, 410:3, 411:2, 411:9, 414:13, 415:4, 415:18, 417:10
PROCESSES [4] - 346:10, 384:21, 407:16, 413:2
PROCESSING [1] - 411:22
PRODUCED [11] - 347:18, 347:21, 348:9, 366:6, 378:12, 381:19, 381:24, 385:24, 400:6, 401:12, 402:25
PRODUCES [1] - 361:6
PRODUCING [1] - 390:12
PROFESSION [1] - 325:5
PROFESSIONAL [4] - 326:8, 334:5, 343:18, 344:20
PROFESSOR [2] - 325:10, 370:5
PROFFER [6] - 297:22, 298:3, 298:5, 298:6, 298:8, 323:9
PROGRAM [1] - 332:12
PROPERLY [2] - 300:2, 367:5
PROPORTIONS [1] - 387:11
PROPOSE [1] - 297:2
PROVE [8] - 307:13, 368:11, 368:16, 368:17, 369:2, 370:7, 384:18, 384:19
PROVED [1] - 387:14
PROVIDE [4] - 327:10, 327:12, 335:21, 407:23
PROVIDED [1] - 315:16, 326:8, 326:10, 326:12, 330:17, 335:3, 335:7, 336:10,

379:13, 402:10
PROVIDING [1] - 312:1
PROVISIONS [1] - 368:10
PROXIMITY [1] - 404:20
PSYCHOLOGICAL [1] - 367:19
PUBLIC [3] - 329:23, 347:13, 361:2
PUBLICATION [1] - 401:19
PUBLICATIONS [6] - 326:2, 329:18, 401:18, 403:7, 403:9, 406:21
PUBLICLY [3] - 320:8, 322:19, 347:11
PUBLISH [1] - 377:19
PUBLISHED [7] - 325:24, 326:19, 326:23, 403:4, 403:8, 403:15, 403:18
PUBLISHES [1] - 405:10
PULLED [1] - 370:10
PURPORT [1] - 389:12
PURPORTING [5] - 389:1, 389:6, 389:11, 390:12
PURPOSES [4] - 323:17, 379:1, 380:9, 401:22
PURSUE [1] - 307:15
PUT [10] - 296:13, 304:13, 304:20, 313:20, 322:7, 341:7, 358:9, 374:21, 388:12
PUTTING [1] - 385:5

## Q

QUALITY [4] - 349:17, 351:9, 355:9, 364:10
QUANTITATIVE [2] - 326:21, 327:25
QUARTER [3] - 367:7, 371:2, 391:12
QUEEN [24] - 288:16, 306:19, 307:10, 307:21, 308:7, 308:10, 312:24, 313:1, 313:9, 313:11, 316:4, 316:5, 317:7, 318:10, 319:23, 320:17, 320:23, 321:9, 321:12, 321:16, 321:21, 322:5, 323:2, 323:6
QUERIES [1] - 417:2
QUESTION'S [1] - 382:12
QUESTIONS [14] - 298:8, 303:21, 309:3, 313:6, 313:15, 315:1, 316:6, 318:10, 320:13, 358:6, 371:10, 372:19, 372:20, 374:7
QUIBBLE [2] - 368:3, 402:1
QUIBBLING [1] - 384:13
QUICK [3] - 301:4, 306:9, 313:14
QUICKLY [3] - 291:6, 291:7, 333:20
QUITE [4] - 333:24, 351:22, 378:7, 378:10
QUOTE [2] - 392:20, 412:17
QUOTING [3] - 412:10, 412:13, 412:18

## R

RACE [2] - 340:19, 414:25
RACIAL [2] - 347:14, 394:11
RAFFENSPERGER [2] - 293:20, 293:25
RAISE [3] - 291:5, 324:13, 367:17
RAISED [1] - 316:7
RAN [2] - 409:25, 410:19

RANGED [1] - 346:1
RARE [1] - 400:5
RATE [10] - 375:9, 375:10, 375:15, 375:17, 375:22, 383:20, 407:9, 413:8, 413:18, 414:5
RATES [1] - 375:19
RATHER [3] - 298:25, 380:2, 393:7
RDR [2] - 289:21, 419:14
REACH [1] - 378:2
REACHED [5] - 329:2, 330:12, 330:25, 363:8, 392:8
REACHING [1] - 336:3
REACTION [1] - 315:7
READ [5] - 298:21, 298:22, 300:1, 346:19, 392:15
READY [3] - 298:23, 300:25, 323:5
REALITY [1] - 414:17
REALLY [3] - 295:22, 298:23, 379:25
REALM [1] - 334:13
REASON [11] - 315:15, 333:10, 333:17, 378:18, 380:13, 389:16, 389:17, 397:10, 399:3, 407:2
REASONABLE [6] - 396:16, 397:9, 397:20, 399:3, 399:12, 414:11
REASONS [7] - 334:12, 353:10, 356:19, 356:22, 356:24, 360:2, 360:15
RECEIPT [3] - 306:3, 319:1, 319:11
RECEIVE [3] - 313:23, 315:12, 412:6
RECEIVED [9] - 315:5, 325:16, 329:9, 345:8, 345:17, 371:23, 374:19, 379:19, 394:2
RECEIVING [2] - 314:5, 315:11
RECENT [1] - 334:22
RECIPIENTS [2] - 336:10, 374:9
RECITING [1] - 363:10
RECOGNIZE [1] - 316:9
RECOGNIZED [3] - 370:19, 370:21, 377:11
RECOLLECTION [4] - 354:5, 376:13, 396:7, 415:14
RECONSIDERATION [1] - 297:1
RECORD [24] - 298:9, 298:21, 304:14, 304:21, 307:23, 311:2, 315:14, 320:9, 320:11, 322:7, 324:19, 330:11, 332:5, 334:6, 334:9, 334:16, 334:22, 338:1, 342:17, 342:21, 352:6, 360:10, 363:12, 366:10
RECORDS [27] - 331:5, 331:15, 335:7, 342:8, 342:22, 345:22, 348:16, 348:21, 349:9, 349:13, 350:19, 351:4, 352:13, 354:24, 373:15, 378:14, 383:11, 388:25, 389:15, 390:8, 390:9, 391:12, 393:18, 398:3, 405:21, 410:17
RECOUNTS [1] - 332:22
RECREATE [1] - 335:1
RECROSS [2] - 318:12, 322:12
RECROSS [2] - 290:3, 318:13
RECROSS-EXAMINATION [1] - 318:13
REDIRECT [8] - 297:15, 298:2, 298:6, 298:7, 313:8, 321:2, 418:1

REDIRECT [2] - 290:3, 313:10
REDIRECTS [1] - 320:19
REDISTRICTING [2] - 325:23, 329:21
REDUCE [1] - 341:22
REFER [3] - 294:12, 356:5
REFERENCE [1] - 364:1
REFERENCES [1] - 374:13
REFERRED [2] - 404:16, 408:2
REFERRING [8] - 302:20, 316:15, 335:17, 335:18, 336:25, 337:7, 359:23, 388:14
REFERS [1] - 355:19
REFLECTED [9] - 402:12, 404:23, 404:25, 406:4, 406:7, 409:1, 415:9, 416:21, 417:1
REFLECTING [4] - 339:23, 364:3, 397:25, 406:13
REFLECTS [3] - 365:22, 377:25, 407:5
REGARDS [1] - 414:11
REGISTERED [22] - 333:14, 340:11, 340:21, 343:7, 345:19, 345:23, 350:20, 350:22, 352:14, 353:21, 354:2, 354:7, 360:16, 365:8, 365:18, 366:2, 366:25, 379:10, 394:7, 407:3, 407:24
REGISTRANT [8] - 340:21, 340:22, 349:14, 351:11, 364:16, 365:2, 398:4, 399:16
REGISTRANT'S [4] - 340:18, 340:19, 340:20, 414:24
REGISTRANTS [21] - 345:6, 345:17, 347:24, 348:1, 348:10, 348:22, 349:1, 362:14, 377:1, 378:1, 384:3, 386:5, 387:9, 389:18, 390:13, 392:18, 394:17, 396:22, 397:25, 400:4, 413:25
REGISTRATION [23] - 311:13, 340:9, 341:2, 343:8, 351:15, 351:16, 352:4, 352:11, 353:4, 354:6, 356:21, 360:4, 363:14, 364:5, 364:23, 370:16, 379:11, 392:17, 405:2, 405:3, 405:4, 407:22, 416:1
REGISTRATIONS [1] - 371:7
REGISTRY [7] - 352:21, 377:5, 402:11, 405:11, 405:12, 406:17, 413:19
REGRESSION [1] - 348:6
REGULAR [3] - 343:23, 411:19, 412:9
REGULARLY [2] - 344:25, 404:4
REIMBURSED [1] - 313:3
REIMBURSEMENT [1] - 312:11
REIMBURSEMENTS [1] - 312:17
REIMBURSING [1] - 312:19
REJECTED [1] - 369:14
RELATE [1] - 353:16
RELATED [2] - 327:1, 403:20
RELATES [1] - 299:6
RELATING [1] - 299:9
RELATIONSHIP [7] - 321:14, 321:15, 321:16, 321:24, 383:17, 396:22, 401:23
RELATIVITY [1] - 294:16

RELEASE [1] - 323:13
RELEVANCE [1] - 307:10
RELEVANT [7] - 329:17, 379:15, 380:23, 381:10, 392:23, 401:19, 407:4
RELIABILITY [8] - 330:4, 330:9, 330:10, 330:13, 334:20, 391:24, 407:8, 415:18
RELIABLE [1] - 417:8
RELIABLY [2] - 347:1, 347:6
RELIANCE [1] - 378:7
RELIED [4] - 327:17, 346:12, 407:21, 410:11
RELY [5] - 344:5, 345:16, 407:21, 408:6, 414:2
RELYING [3] - 345:14, 365:23, 407:6
REMAIN [2] - 333:8, 399:7
REMEMBER [2] - 316:1, 316:3
REMIND [1] - 300:23
REMOVALS [1] - 413:12
REMOVE [8] - 333:18, 345:10, 346:21, 383:25, 384:12, 400:24, 401:2, 407:4
REMOVED [2] - 399:6, 413:4
REMOVES [1] - 383:20
REMOVING [4] - 333:21, 361:22, 383:22, 407:2
RENEW [1] - 299:3
RENTAL [1] - 312:2
REPEAT [2] - 320:10, 335:1
REPEATEDLY [4] - 319:5, 332:21, 333:3, 383:18
REPEATING [1] - 303:21
REPHRASE [1] - 317:1
REPLICATE [1] - 334:25
REPORT [59] - 328:11, 328:13, 328:24, 329:12, 332:1, 332:22, 334:21, 336:4, 336:6, 336:8, 337:10, 341:20, 343:1, 348:7, 354:4, 354:8, 357:21, 358:23, 359:22, 363:8, 367:10, 367:13, 368:10, 372:9, 373:19, 377:6, 377:8, 377:15, 377:24, 378:7, 378:18, 379:1, 380:9, 381:6, 381:16, 385:3, 385:6, 385:7, 385:9, 385:23, 387:3, 388:15, 389:7, 395:8, 396:2, 398:11, 398:21, 402:8, 405:9, 406:21, 407:1, 411:17, 411:25, 412:15, 412:19, 413:5, 417:14, 417:15
REPORTED [2] - 340:19, 340:20
REPORTER [2] - 289:22, 419:14
REPORTER [3] - 316:25, 324:7, 324:8
REPORTERS [2] - 295:10, 418:12
REPORTS [1] - 390:8
REPRESENT [3] - 308:25, 374:10, 409:5
REPRESENTATION [3] - 308:18, 308:24, 393:17
REPRESENTATIVE [4] - 304:4, 304:5, 304:6, 310:11
REPRESENTATIVES [2] - 382:3, 415:3
REPRESENTED [4] - 306:25, 307:24, 308:11, 385:12
REPRESENTING [2] - 308:19, 309:1

REPUTABLE [1] - 364:8
REQUEST [13] - 296:25, 297:21, 299:3, 299:6, 319:6, 319:14, 331:17, 332:15, 332:17, 350:13, 355:20, 356:20, 360:3
REQUESTS [1] - 399:21
REQUIRE [2] - 369:21, 384:18
REQUIRED [3] - 368:11, 368:14, 369:24
REQUIREMENT [2] - 299:11, 409:17
REQUIREMENTS [2] - 411:5, 411:11
REQUIRES [4] - 297:12, 297:13, 409:7, 409:10
RERECROSS [2] - 321:19, 322:12
RERECROSS [1] - 322:13
REREDIRECT [2] - 320:22, 321:8
REREDIRECT [1] - 321:20
REREGISTERED [3] - 331:8, 353:24, 390:10
REREGISTRATION [1] - 355:6
RESEARCH [6] - 327:14, 334:14, 345:3, 345:13, 378:6, 383:18
RESERVING [1] - 323:9
RESIDE [1] - 366:20
RESIDED [2] - 365:11, 366:16
RESIDENCE [1] - 303:4
RESIDENCY [3] - 384:24, 402:4, 404:7
RESIDENCY-BASED [1] - 404:7
RESIDENT [2] - 380:15, 380:16
RESIDENTIAL [2] - 396:10, 399:23
RESOLVE [2] - 294:4, 373:8
RESPECT [3] - 295:8, 296:23, 330:4
RESPECTFULLY [2] - 296:25, 382:12
RESPECTIVE [1] - 394:12
RESPOND [2] - 321:1, 368:11
RESPONDED [1] - 320:24
RESPONDING [1] - 368:13
RESPONDS [1] - 407:20
RESPONSE [2] - 349:11, 374:7
RESPONSES [2] - 336:7, 345:8
RESPONSIBLE [5] - 366:5, 381:25, 390:11, 390:19, 411:4
REST [1] - 393:23
RESULT [10] - 317:8, 317:9, 317:12, 345:22, 355:16, 365:21, 366:6, 370:22, 389:3, 414:13
RESULTED [1] - 371:8
RESULTING [3] - 346:3, 376:3, 376:17
RESULTS [5] - 332:20, 334:19, 349:21, 349:22, 381:23
RESUME [3] - 300:21, 343:22, 402:8
RESUMES [1] - 301:11
RETAINED [1] - 325:1
RETAINS [1] - 353:14
RETURN [6] - 317:15, 356:17, 356:21, 360:4, 405:22, 406:22
RETURNED [1] - 406:19
REVEREND [1] - 296:16
REVEREND [1] - 296:17
REVIEW [2] - 392:12, 401:3
REVIEWED [15] - 329:20, 330:16,

334:20, 335:7, 336:3, 341:20, 372:9, 376:24, 377:19, 378:6, 379:12, 399:5, 400:7, 400:10, 404:4
**REVIEWING** [1] - 364:9
**REVIEWS** [1] - 329:22
**REVISIT** [1] - 316:7
**RIFE** [1] - 355:11
**RIGHTS** [4] - 297:23, 305:20, 325:22, 327:1
**RISK** [5] - 341:12, 343:19, 344:22, 370:1, 370:15
**RISKS** [1] - 333:9
**ROBINS** [2] - 358:3, 397:7
**ROLE** [3] - 379:24, 382:1, 402:2
**ROLL** [1] - 401:25
**ROLLS** [2] - 333:21, 402:3
**RON** [1] - 288:7
**ROOM** [5] - 291:13, 291:14, 291:18, 313:4, 355:17
**ROUGHLY** [1] - 355:4
**RPR** [2] - 289:21, 419:14
**RUCKER** [1] - 397:6
**RULE** [6] - 299:1, 300:13, 300:16, 360:25, 396:6, 398:21
**RULES** [2] - 294:24, 295:8
**RULING** [5] - 296:23, 297:1, 297:18, 298:11, 298:18
**RUN** [1] - 353:18
**RUNNING** [2] - 410:17, 411:1
**RUNOFF** [15] - 301:21, 301:24, 302:2, 302:5, 302:8, 302:12, 305:8, 305:13, 305:14, 305:25, 306:12, 314:13, 314:20, 315:13, 353:19
**RURAL** [1] - 385:19
**RUSSELL** [17] - 316:9, 316:18, 316:20, 317:2, 317:10, 317:13, 317:17, 319:17, 320:2, 320:5, 320:8, 321:17, 321:22, 321:24, 321:25, 322:16, 322:18
**RYAN** [5] - 295:2, 295:4, 295:21, 296:4, 296:9

## S

**SAMPLE** [1] - 345:9
**SAN** [1] - 325:14
**SAW** [2] - 291:15, 409:10
**SCALE** [2] - 354:10, 403:2
**SCHEDULED** [1] - 291:21
**SCHOLAR** [1] - 334:13
**SCHOLARLY** [3] - 400:10, 403:5, 403:24
**SCHOLARS** [1] - 368:2
**SCHOLARSHIP** [1] - 404:16
**SCHOOL** [6] - 360:7, 361:4, 361:5, 361:7, 366:22
**SCIENCE** [1] - 326:24
**SCIENCE** [5] - 325:6, 325:14, 325:16, 327:25, 377:11
**SCIENTIFIC** [1] - 335:2

**SCIENTISTS** [1] - 367:25
**SCOPE** [2] - 293:16, 308:17
**SCRAMBLING** [1] - 294:16
**SCREAMED** [1] - 301:23
**SCREEN** [8] - 337:1, 337:14, 337:15, 337:24, 338:7, 362:25, 363:3, 388:11
**SCREENED** [3] - 346:20, 353:11, 363:20
**SEAMLESS** [1] - 291:19
**SEARCHED** [3] - 415:22, 415:24, 416:12
**SEAT** [1] - 324:18
**SEATED** [3] - 291:2, 300:24, 300:25
**SEC** [1] - 361:4
**SECOND** [6] - 291:21, 336:9, 339:2, 360:9, 385:5, 412:17
**SECRETARY** [4] - 293:20, 332:22, 399:18, 399:23
**SECTION** [1] - 379:3
**SECTION** [1] - 298:6
**SECURITY** [2] - 346:20, 347:1
**SECURITY** [2] - 338:22, 338:24
**SEE** [25] - 299:25, 337:1, 337:4, 338:7, 339:16, 339:17, 349:22, 349:23, 358:2, 358:4, 366:1, 380:10, 381:18, 381:23, 387:10, 389:2, 390:24, 393:22, 397:4, 401:8, 413:24, 415:12, 415:19
**SEEK** [2] - 297:1, 323:9
**SEEKING** [2] - 299:10, 299:12
**SEEM** [1] - 300:3
**SELECT** [1] - 416:5
**SELECTED** [14] - 347:20, 348:8, 378:8, 378:19, 380:2, 380:20, 380:21, 380:22, 381:9, 385:10, 385:22, 387:8, 387:12, 387:15
**SELECTING** [4] - 380:18, 381:7, 381:11, 382:7
**SELECTION** [3] - 377:9, 383:7, 392:13
**SELECTS** [1] - 378:24
**SELF** [2] - 340:19, 340:20
**SELF-REPORTED** [2] - 340:19, 340:20
**SENATE** [12] - 301:21, 301:23, 302:1, 302:4, 302:7, 302:12, 305:8, 305:13, 305:14, 306:12, 353:15, 353:19
**SEND** [2] - 350:9
**SENDING** [1] - 319:11
**SENIOR** [1] - 340:17
**SENIORS** [2] - 361:7, 366:22
**SENSE** [5] - 301:4, 323:23, 349:22, 350:2, 414:2
**SENT** [5] - 299:5, 314:19, 319:5, 374:8, 399:22
**SEPARATE** [3] - 328:15, 374:20, 387:23
**SEPARATELY** [1] - 354:19
**SEPTEMBER** [1] - 356:12
**SEQUESTERED** [1] - 297:23
**SERIOUS** [2] - 315:9, 332:18
**SERIOUSLY** [2] - 349:18, 350:24

**SERVE** [1] - 386:18
**SERVICE** [5] - 329:23, 358:14, 396:9, 396:23
**SERVICE** [13] - 332:15, 355:23, 356:9, 356:13, 360:3, 402:15, 403:5, 405:15, 408:15, 408:16, 408:22, 409:3, 411:7
**SERVICE'S** [2] - 405:5, 411:5
**SERVICES** [4] - 326:10, 326:13, 403:20, 405:11
**SERVICES** [1] - 409:20
**SESSION** [1] - 288:3
**SET** [6] - 308:13, 310:2, 361:1, 361:12, 361:20, 376:24
**SETTING** [2] - 291:11, 347:6
**SEVEN** [2] - 363:23, 381:8
**SEVERAL** [8] - 326:11, 327:9, 329:18, 329:19, 333:4, 347:16, 351:14, 410:19
**SHARE** [2] - 348:9, 356:24
**SHARED** [1] - 349:3
**SHEDS** [1] - 307:16
**SHELLY** [5] - 324:6, 324:9, 359:16, 371:11, 388:12
**SHELLY** [46] - 288:18, 324:3, 324:6, 324:11, 324:23, 327:24, 328:9, 328:10, 328:13, 328:18, 328:20, 328:23, 329:4, 329:11, 332:9, 335:21, 336:1, 336:19, 336:20, 337:3, 337:6, 338:6, 338:17, 338:20, 339:3, 339:4, 343:23, 344:4, 344:19, 352:9, 359:17, 359:18, 363:2, 363:5, 363:6, 364:15, 369:20, 371:9, 371:13, 371:15, 371:22, 382:12, 412:12, 412:18, 418:2, 418:4
**SHELLY** [4] - 335:20, 336:18, 352:8, 359:9
**SHIELD** [1] - 319:25
**SHOCKED** [1] - 331:1
**SHODDILY** [1] - 331:9
**SHORT** [1] - 297:2
**SHORTLY** [1] - 313:24
**SHOW** [11] - 307:12, 336:24, 340:6, 350:12, 358:21, 384:15, 390:12, 406:7, 406:21, 413:21, 413:22
**SHOWN** [1] - 383:18
**SHOWS** [5] - 346:4, 349:14, 358:24, 362:3, 392:17
**SHY** [1] - 348:25
**SIDE** [4] - 292:3, 297:14, 309:17, 312:15
**SIGN** [1] - 364:2
**SIGNIFICANCE** [3] - 377:10, 377:21, 378:3
**SIGNIFICANT** [3] - 333:22, 377:7, 383:5
**SIMILARLY** [1] - 366:19
**SIMPLY** [4] - 333:6, 397:12, 407:7, 413:22
**SINGLE** [9] - 319:3, 319:13, 332:24, 342:21, 374:24, 375:1, 411:4, 416:18
**SINGLED** [1] - 370:12
**SIP** [1] - 328:21
**SIT** [3] - 291:18, 316:22, 316:23

**SITTING** [2] - 310:8, 310:18
**SITUATION** [1] - 293:21
**SIX** [2] - 356:2, 356:6
**SIXTH** [1] - 296:9
**SKIPPED** [1] - 364:22
**SLOPPINESS** [2] - 380:6, 380:7
**SLOPPY** [3] - 331:2, 331:11, 355:13
**SMALL** [3] - 362:6, 375:18, 412:9
**SMALLER** [1] - 383:4
**SMALLEST** [1] - 386:14
**SMART** [1] - 301:6
**SMARTYSTREETS** [2] - 346:8, 346:13
**SO-CALLED** [1] - 356:20
**SO..** [1] - 293:4
**SO...** [1] - 294:11
**SOCIAL** [2] - 346:20, 347:1
**SOCIAL** [1] - 335:2
**SOFTWARE** [1] - 375:2
**SOLELY** [2] - 380:14, 408:10
**SOLVE** [1] - 415:6
**SOMEONE** [76] - 330:14, 331:6, 331:16, 332:4, 333:18, 333:21, 333:22, 334:13, 334:25, 339:18, 344:23, 346:4, 347:4, 350:7, 352:1, 352:23, 352:24, 353:13, 354:7, 355:25, 356:8, 356:22, 356:25, 357:3, 357:5, 358:13, 359:1, 359:7, 360:11, 360:13, 360:14, 360:16, 360:18, 361:13, 361:18, 362:5, 362:20, 365:25, 366:1, 367:4, 367:5, 368:10, 370:10, 375:19, 379:7, 379:9, 383:7, 383:8, 384:12, 384:23, 384:25, 385:2, 387:17, 389:19, 390:10, 390:14, 396:13, 397:10, 397:17, 399:1, 399:3, 399:12, 399:20, 399:21, 400:15, 400:17, 406:14, 408:11, 409:4, 409:7, 413:19, 414:6, 416:8, 416:20, 417:6
**SOMERVILLE** [1] - 288:6
**SOMERVILLE** [1] - 372:22
**SOMETIMES** [7] - 293:5, 293:22, 351:6, 351:7, 354:13, 406:15
**SOMEWHAT** [1] - 336:11
**SOMEWHERE** [3] - 352:18, 369:2, 375:18
**SOON** [1] - 313:17
**SORRY** [9] - 294:17, 321:22, 347:9, 364:22, 373:25, 381:3, 388:19, 408:18, 415:25
**SORT** [8] - 291:13, 291:17, 292:12, 305:18, 359:7, 368:2, 384:13, 400:10
**SOUNDS** [2] - 393:22, 412:8
**SOURCE** [3] - 407:11, 411:20, 412:6
**SOURCES** [1] - 413:1
**SPEAKING** [1] - 355:4
**SPECIFIC** [9] - 304:20, 309:22, 315:19, 334:16, 343:1, 354:5, 360:25, 384:21, 415:15
**SPECIFICALLY** [2] - 376:15, 402:16
**SPELL** [1] - 324:19
**SPELLING** [1] - 351:5

**SPREADSHEET** [4] - 364:1, 375:6, 375:7, 389:8
**SPREADSHEETS** [11] - 374:16, 374:20, 375:8, 376:8, 376:16, 389:11, 389:13, 389:14, 389:16, 391:20
**SQUARELY** [1] - 343:24
**SR** [2] - 290:4, 301:9
**STACKING** [1] - 374:25
**STAND** [7] - 293:14, 296:13, 300:2, 300:20, 301:11, 323:17, 323:21
**STANDARD** [2] - 327:20, 400:9
**STANDARDS** [2] - 334:6, 400:7
**STANDING** [1] - 296:1
**STANDS** [1] - 416:9
**START** [5] - 291:4, 300:25, 332:10, 359:13, 418:9
**STARTED** [1] - 291:3
**STARTING** [3] - 339:7, 342:6, 392:20
**STARTS** [1] - 303:21
**STATA** [2] - 374:22, 375:10
**STATE** [5] - 293:20, 332:23, 361:12, 399:18, 399:24
**STATE** [33] - 303:14, 303:19, 304:4, 304:5, 304:12, 324:19, 326:9, 326:10, 329:23, 333:13, 348:23, 357:2, 360:15, 369:12, 391:13, 392:14, 392:21, 392:23, 392:24, 393:7, 393:8, 393:14, 393:15, 393:19, 393:23, 394:2, 400:22, 407:15, 407:24, 408:5, 408:11
**STATEMENT** [5] - 296:24, 304:19, 317:25, 322:10, 407:11
**STATEMENTS** [8] - 299:13, 304:20, 314:22, 317:22, 317:23, 317:24, 401:4, 401:6
**STATES** [12] - 375:16, 397:11, 404:6, 405:1, 405:2, 407:2, 407:4, 407:11, 407:17, 407:21, 408:6, 408:9
**STATES** [3] - 357:17, 359:6, 362:15
**STATES** [4] - 288:1, 288:11, 289:22, 419:3
**STATEWIDE** [1] - 330:5, 333:10
**STATION** [1] - 398:9
**STATIONED** [1] - 357:1
**STATISTICAL** [7] - 348:3, 348:5, 374:22, 377:10, 377:21, 378:3, 385:8
**STATISTICALLY** [1] - 377:7
**STATISTICS** [1] - 325:18
**STATUS** [2] - 347:12, 413:23
**STATUSES** [1] - 406:22
**STATUTES** [1] - 404:10
**STAY** [3] - 303:13, 304:1, 323:13
**STEP** [3] - 337:23, 337:24, 378:11
**STEPS** [1] - 334:14
**STEVE** [3] - 288:10, 289:22, 419:15
**STICK** [1] - 298:10
**STICKING** [1] - 297:18
**STILL** [14] - 300:12, 300:16, 300:23, 317:14, 323:11, 323:17, 323:21, 323:22, 336:15, 346:18, 356:20,

360:3, 387:10, 408:8
**STINETORF** [2] - 291:9, 291:11
**STOOD** [1] - 305:25
**STOP** [4] - 298:7, 309:5, 383:15, 388:4
**STRAIGHTFORWARD** [1] - 376:4
**STRANGE** [1] - 412:8
**STREET** [13] - 339:23, 342:16, 350:1, 354:14, 354:16, 354:17, 354:20, 363:22, 364:17, 364:20, 366:12
**STRIKE** [1] - 305:10
**STUCK** [1] - 367:8
**STUDENT** [7] - 359:8, 360:6, 361:17, 361:18, 362:20, 399:16, 400:21
**STUDENTS** [19] - 360:21, 360:22, 361:22, 361:23, 362:4, 362:7, 362:9, 362:11, 373:15, 398:17, 398:20, 399:6, 399:24, 400:1, 400:13, 400:19, 400:24, 401:2
**STUDIED** [1] - 375:22
**STUDY** [2] - 367:14, 375:19
**STUDYING** [1] - 407:13
**SUBJECT** [1] - 323:9
**SUBMISSION** [2] - 380:2, 392:2
**SUBMIT** [7] - 299:18, 299:19, 328:11, 360:11, 380:3, 381:11, 404:12
**SUBMITTED** [3] - 355:15, 380:14, 405:22
**SUBPOENA** [2] - 293:2, 323:11
**SUBPOENAED** [5] - 291:22, 292:10, 293:1, 293:8
**SUBPOENAS** [1] - 299:7
**SUBSCRIBE** [2] - 403:22, 403:24
**SUBSEQUENT** [1] - 315:12
**SUBSTANCE** [3] - 317:23, 317:24, 318:3
**SUBSTANTIVE** [1] - 326:21
**SUDDENLY** [1] - 377:14
**SUFFICIENT** [4] - 333:19, 346:17, 358:12, 361:22
**SUFFIX** [3] - 340:17, 354:14, 414:24
**SUFFIXES** [1] - 343:9
**SUGGEST** [4] - 292:19, 295:20, 297:21, 376:18
**SUGGESTED** [1] - 401:3
**SUGGESTING** [5] - 293:7, 295:1, 366:24, 367:1, 396:19
**SUMMARIZE** [11] - 325:12, 325:20, 326:17, 329:1, 329:17, 330:24, 337:9, 347:17, 355:22, 363:7, 388:15
**SUMMARIZING** [1] - 362:22
**SUMMER** [1] - 310:20
**SUPPLEMENTED** [1] - 346:7
**SUPPORT** [1] - 311:13
**SUPPOSE** [1] - 415:7
**SUPPOSED** [6] - 296:17, 349:23, 349:24, 350:25, 351:1, 364:3
**SURFACE** [1] - 385:19
**SURMISE** [2] - 312:4, 315:15
**SURPRISE** [1] - 385:14

**SURVEY** [4] - 345:6, 345:7, 345:13, 410:11
**SURVEY** [1] - 345:12
**SUSTAIN** [1] - 335:24
**SWITCH** [1] - 314:25
**SWORD** [1] - 319:25
**SWORN** [2] - 301:10, 324:16
**SYNTAX** [2] - 363:22, 390:3
**SYSTEM** [3] - 361:11, 398:1, 398:25
**SYSTEMS** [1] - 403:1

## T

**TABLE** [5] - 310:9, 310:18, 359:21, 378:2, 387:4
**TALKS** [2] - 334:22, 411:22
**TARGET** [1] - 376:21
**TARGETED** [3] - 376:19, 378:8, 387:17
**TARGETING** [2] - 380:8, 385:25
**TECHNICALITY** [1] - 294:11
**TECHNIQUES** [1] - 378:5
**TELECONFERENCED** [1] - 310:16
**TEMPORARILY** [3] - 357:1, 360:13, 360:16
**TEMPORARY** [11] - 355:19, 355:24, 356:3, 356:13, 406:4, 406:8, 406:9, 406:13, 406:15, 406:20, 413:23
**TEN** [7] - 327:6, 348:1, 356:16, 357:8, 386:5, 386:8
**TEND** [1] - 412:8
**TENDER** [1] - 327:24
**TENS** [3] - 331:3, 347:9
**TERM** [3] - 358:25, 369:5, 379:21
**TERMS** [10] - 304:1, 304:2, 304:9, 349:13, 368:3, 376:25, 377:8, 379:1, 380:22, 381:14
**TERRORIZED** [1] - 302:1
**TESTIFIED** [7] - 301:11, 313:3, 324:16, 326:25, 327:4, 327:5, 392:19
**TESTIFY** [13] - 291:14, 291:21, 296:10, 296:13, 297:12, 298:1, 311:4, 311:18, 311:20, 311:21, 311:24, 328:8, 344:18
**TESTIFYING** [13] - 291:10, 307:3, 307:8, 308:19, 309:11, 311:8, 311:10, 311:16, 312:23, 328:5, 344:7, 344:12, 392:10
**TESTIMONY** [8] - 291:19, 292:11, 297:22, 314:12, 323:19, 327:16, 372:13, 372:16
**TEXAS** [3] - 361:3, 396:20, 398:9
**THE** [204] - 288:1, 288:6, 288:10, 288:14, 288:20, 289:22, 291:2, 291:7, 292:2, 292:13, 292:22, 292:24, 293:1, 293:5, 293:11, 293:18, 293:25, 294:4, 294:8, 294:10, 294:19, 295:5, 295:15, 296:16, 297:4, 297:17, 297:24, 298:3, 298:10, 298:13, 298:18, 299:11, 299:14, 299:22, 300:5, 300:9, 300:19, 301:2, 301:6, 303:20, 303:24, 304:1, 304:16, 304:22, 305:4, 306:18,

306:21, 307:9, 307:18, 307:25, 308:2, 308:8, 308:22, 309:19, 309:25, 310:1, 310:4, 310:6, 310:7, 310:8, 310:10, 310:12, 310:15, 310:19, 310:20, 310:21, 312:25, 313:3, 313:7, 315:21, 316:1, 317:8, 317:11, 317:12, 317:14, 317:16, 317:19, 318:2, 318:6, 318:12, 319:19, 319:20, 319:21, 320:1, 320:8, 320:10, 320:12, 320:15, 320:19, 321:4, 321:7, 321:11, 321:15, 321:18, 322:3, 322:6, 322:11, 322:25, 323:4, 323:11, 323:20, 323:22, 323:25, 324:1, 324:5, 324:8, 324:12, 324:13, 324:18, 324:20, 328:2, 328:4, 328:7, 328:17, 328:19, 328:21, 328:22, 329:6, 329:8, 331:11, 331:14, 331:20, 331:21, 332:8, 335:15, 335:20, 335:23, 336:15, 336:17, 337:4, 337:5, 337:16, 337:17, 337:18, 337:20, 337:21, 337:22, 338:1, 338:5, 338:8, 338:11, 338:12, 338:13, 338:14, 338:15, 338:16, 338:21, 338:22, 338:23, 338:24, 338:25, 339:1, 344:7, 344:10, 344:14, 344:17, 351:21, 351:24, 352:8, 357:5, 357:12, 357:16, 357:17, 358:6, 358:11, 358:17, 358:18, 358:20, 358:22, 359:9, 359:16, 363:4, 364:5, 364:7, 368:20, 368:22, 368:25, 369:4, 369:7, 369:10, 369:16, 369:19, 371:11, 371:14, 371:17, 371:19, 381:1, 381:4, 382:8, 382:11, 382:14, 388:12, 412:11, 412:21, 412:23, 417:20, 417:22, 417:25, 418:3, 418:5, 418:7, 418:8, 418:9, 419:15
**THEMSELVES** [2] - 387:17, 409:5
**THEREFORE** [1] - 304:7
**THEY'VE** [5] - 308:3, 321:1, 351:18, 368:12, 399:5
**THINKING** [2] - 368:4, 370:4
**THIRD** [3] - 339:3, 339:12, 340:17
**THIS'LL** [1] - 306:9
**THOUSAND** [2] - 386:22, 410:19
**THOUSANDS** [2] - 331:3, 347:9
**THREATENED** [1] - 302:4
**THREE** [8] - 310:8, 343:6, 343:10, 347:22, 377:25, 382:13, 412:20
**THRESHOLD** [1] - 377:14
**THRESHOLDS** [1] - 377:9
**THROW** [2] - 305:11, 367:6
**TICKET** [4] - 312:5, 312:8, 312:10, 312:19
**TIED** [1] - 294:18
**TIERS** [1] - 410:12
**TIM** [1] - 289:4
**TIME'S** [1] - 339:3
**TINA** [1] - 288:17
**TO** [2] - 289:22, 419:14
**TODAY** [22] - 292:11, 293:8, 293:9, 293:13, 295:2, 299:24, 306:25, 307:4,

307:8, 308:19, 309:11, 311:3, 311:8, 311:10, 311:15, 311:16, 311:18, 311:21, 311:24, 319:16, 344:12, 372:25
**TOGETHER** [1] - 374:21
**TOOK** [6] - 304:15, 304:17, 313:24, 319:10, 355:13, 359:19
**TOOLS** [4] - 346:8, 399:25, 407:17, 414:9
**TOP** [9] - 361:7, 385:13, 393:21, 393:24, 404:14, 407:14, 411:9, 412:1, 413:13
**TOPIC** [2] - 297:15, 316:7
**TOTAL** [3] - 355:5, 366:15, 398:16
**TOTALLY** [1] - 294:1
**TOUCH** [4] - 323:15, 337:15, 338:14, 338:25
**TOUCHED** [1] - 370:15
**TOUCHING** [1] - 337:14
**TOWN** [1] - 398:23
**TRACKING** [1] - 306:3
**TRADE** [3] - 403:7, 403:8
**TRAIN** [1] - 311:2
**TRAINING** [1] - 325:17
**TRANSCRIPT** [1] - 288:10
**TRANSCRIPT** [1] - 419:6
**TRANSCRIPTS** [1] - 417:12
**TRANSITION** [1] - 291:19
**TRAVEL** [1] - 312:11
**TREATING** [1] - 386:22
**TRIAL** [7] - 294:15, 306:25, 311:8, 311:11, 311:19, 327:4, 418:11
**TRIAL** [1] - 288:10
**TRIED** [4] - 296:8, 345:1, 350:5
**TRIES** [1] - 384:23
**TRIPLET** [1] - 365:15
**TRIPLETS** [1] - 342:9
**TRIVIAL** [1] - 366:7
**TROUBLE** [1] - 314:12
**TRUE** [1] - 288:6
**TRUE** [4] - 369:4, 385:8, 387:25, 419:6
**TRUE** [72] - 299:7, 321:17, 321:25, 330:2, 330:11, 330:16, 332:11, 332:13, 334:3, 334:4, 335:4, 335:9, 341:20, 342:2, 343:11, 346:15, 347:18, 349:1, 351:16, 352:4, 353:10, 354:1, 354:6, 355:1, 365:22, 372:24, 373:24, 376:18, 377:2, 378:19, 378:24, 379:7, 379:14, 379:17, 379:20, 379:24, 380:1, 380:15, 380:18, 380:19, 380:22, 381:7, 381:10, 381:12, 381:15, 381:21, 381:22, 382:3, 382:6, 382:19, 387:15, 387:16, 387:21, 389:4, 392:21, 393:19, 394:2, 394:6, 399:5, 399:8, 400:15, 401:3, 406:9, 408:15, 415:3, 415:9, 415:12, 416:1, 416:14, 417:2, 417:9
**TRUTH** [2] - 304:19, 309:15, 317:23, 322:9, 372:20
**TRY** [6] - 301:16, 305:25, 306:8, 313:14,

370:13, 399:25
**TRYING** [10] - 309:19, 315:4, 316:14, 319:12, 334:10, 352:20, 370:10, 405:17, 407:4, 414:1
**TTV** [1] - 380:1
**TURN** [1] - 295:23
**TURNED** [2] - 337:20, 338:13
**TURNER** [2] - 290:4, 301:9
**TURNER** [1] - 300:22
**TURNER** [25] - 296:24, 298:1, 300:20, 301:15, 304:14, 305:7, 308:11, 308:18, 309:10, 313:12, 313:15, 313:17, 314:25, 315:18, 316:6, 318:15, 319:23, 320:1, 320:15, 320:16, 321:22, 321:23, 322:25, 323:1, 323:4
**TURNOUT** [3] - 367:11, 367:15, 405:2
**TWO** [25] - 296:7, 296:11, 310:17, 310:19, 317:4, 320:19, 321:2, 334:9, 335:8, 343:4, 343:11, 345:7, 353:10, 356:25, 357:13, 358:6, 374:12, 376:12, 381:6, 383:3, 402:9, 407:25, 411:25, 412:19, 415:2
**TYPE** [8] - 334:17, 349:24, 349:25, 354:17, 354:20, 394:22, 396:15, 416:20
**TYPES** [6] - 327:10, 346:11, 355:4, 370:19, 406:22
**TYPICAL** [1] - 403:12
**TYPICALLY** [3] - 330:8, 334:15, 407:24

---

# U

**U.S** [4] - 332:15, 355:23, 362:18, 405:5
**UC** [1] - 361:11
**UM-HUM** [1] - 407:1
**UNDEFINED** [1] - 364:17
**UNDER** [15] - 300:23, 323:11, 327:19, 352:6, 353:13, 368:9, 372:19, 379:9, 379:14, 379:17, 382:10, 384:19, 395:9, 395:13, 404:13
**UNDERLYING** [10] - 299:5, 308:18, 330:10, 331:2, 364:11, 390:17, 391:24, 406:7, 407:7, 416:21
**UNDERSTOOD** [3] - 294:2, 296:14, 323:25
**UNDERTAKE** [1] - 345:1
**UNIQUE** [17] - 305:21, 306:5, 339:13, 339:14, 339:20, 340:1, 340:3, 340:4, 340:10, 340:13, 340:23, 340:24, 341:3, 341:4, 341:11, 341:17, 341:23
**UNIQUELY** [1] - 339:15
**UNITED** [4] - 288:1, 288:11, 289:22, 419:3
**UNITED** [3] - 357:17, 359:6, 362:14
**UNIVERSALLY** [3] - 368:1, 368:4, 370:21
**UNIVERSITIES** [5] - 361:1, 361:8, 361:13, 361:15, 361:20
**UNIVERSITIES** [1] - 362:3

**UNIVERSITY** [9] - 325:7, 325:13, 325:16, 356:11, 357:7, 358:8, 361:12, 398:15
**UNIVERSITY** [10] - 329:23, 360:7, 361:3, 361:25, 366:21, 398:5, 398:7, 398:13, 398:23, 400:22
**UNLAWFUL** [1] - 370:16
**UNOBSERVED** [2] - 379:1, 380:10
**UNREASONABLE** [1] - 414:5
**UNRELIABLE** [1] - 331:9
**UP** [34] - 291:4, 291:11, 292:21, 298:19, 298:25, 300:4, 305:3, 305:9, 309:17, 313:14, 315:4, 315:23, 321:4, 324:12, 328:17, 333:15, 337:23, 338:2, 346:4, 348:9, 348:10, 350:12, 353:18, 360:17, 360:19, 367:20, 368:13, 369:2, 387:25, 388:10, 388:12, 392:20, 394:5
**UPCOMING** [1] - 384:10
**UPDATE** [1] - 404:4
**UPDATES** [1] - 329:17
**UPLOAD** [1] - 409:7
**UPSET** [2] - 292:7, 316:2
**UPSTAIRS** [1] - 324:11
**USA** [1] - 289:2
**USPS** [3] - 355:19, 356:3, 408:21
**UW** [1] - 345:12
**UZOMA** [1] - 288:17

---

# V

**VACATION** [1] - 360:14
**VAGUE** [1] - 374:14
**VALIDATION** [4] - 375:14, 402:23, 409:6, 409:8
**VALUES** [6] - 339:16, 342:10, 349:6, 349:9, 349:24, 349:25
**VANISHINGLY** [1] - 400:5
**VARIABLE** [1] - 387:8
**VARIANT** [1] - 410:4
**VARIATIONS** [1] - 351:5
**VARIOUS** [1] - 410:12
**VARYING** [1] - 387:5
**VASTLY** [1] - 333:5
**VENDOR** [2] - 410:7, 411:10
**VENDORS** [4] - 410:9, 410:12, 411:6, 411:8
**VERIFY** [2] - 373:2, 412:13
**VERSION** [1] - 365:23
**VERSUS** [4] - 355:19, 386:21, 393:19, 410:15
**VIA** [1] - 291:10
**VIDEO** [3] - 298:24, 298:25
**VIOLA** [2] - 289:21, 419:13
**VIOLA_ZBOROWSKI@GAND.
USCOURTS.GOV** [1] - 289:24
**VISITING** [1] - 356:10
**VITA** [1] - 345:5
**VOIR** [1] - 328:2
**VOLUME** [1] - 288:3

**VOLUNTEER** [3] - 380:4, 380:16, 385:19
**VOLUNTEERS** [1] - 385:17
**VOTE** [32] - 305:25, 330:15, 332:17, 333:12, 333:16, 333:23, 340:21, 343:7, 345:11, 345:18, 350:12, 351:17, 353:14, 354:2, 360:18, 360:20, 366:1, 366:3, 367:2, 367:5, 368:12, 368:17, 369:2, 370:7, 370:11, 370:14, 371:5, 384:5, 384:9, 384:23, 385:2, 400:22
**VOTE** [1] - 288:6
**VOTE** [61] - 299:7, 321:17, 321:25, 330:3, 330:11, 330:16, 332:13, 334:4, 335:9, 341:20, 343:11, 346:15, 347:18, 349:1, 351:17, 352:4, 354:1, 354:6, 355:1, 365:22, 372:24, 373:24, 376:18, 377:2, 378:19, 378:24, 379:7, 379:14, 379:17, 379:20, 379:24, 380:1, 380:15, 380:18, 380:20, 380:22, 381:7, 381:10, 381:12, 381:15, 381:21, 381:22, 382:3, 382:6, 382:19, 387:15, 387:16, 389:4, 393:19, 394:2, 394:6, 399:5, 399:8, 400:15, 408:15, 415:3, 415:9, 416:1, 417:2, 417:9
**VOTE'S** [11] - 332:12, 334:4, 335:4, 342:3, 353:11, 387:22, 392:21, 401:4, 406:10, 415:12, 416:15
**VOTED** [8] - 301:23, 302:1, 302:4, 302:7, 340:22, 368:13, 384:25, 407:25
**VOTER** [99] - 311:13, 326:2, 328:1, 330:5, 333:2, 333:5, 333:6, 333:17, 333:21, 335:11, 335:13, 339:6, 339:22, 340:7, 340:8, 340:9, 340:14, 340:17, 340:23, 341:2, 341:4, 341:16, 342:1, 342:6, 342:11, 342:14, 342:18, 342:22, 342:25, 343:5, 343:7, 345:19, 346:6, 346:25, 348:19, 348:24, 350:10, 350:20, 350:22, 351:12, 351:14, 351:16, 351:18, 352:4, 352:5, 352:6, 352:14, 352:22, 353:7, 353:24, 354:18, 356:19, 357:3, 357:14, 360:6, 365:5, 365:24, 367:10, 367:11, 368:7, 368:23, 369:24, 370:1, 370:2, 370:12, 370:25, 378:22, 379:8, 379:10, 382:24, 383:19, 383:23, 384:12, 384:18, 391:18, 392:17, 393:17, 396:16, 398:22, 399:15, 399:24, 400:4, 401:25, 402:1, 402:3, 404:21, 407:3, 407:4, 407:20, 407:25, 414:15, 414:23, 416:1, 416:18, 417:4
**VOTER'S** [2] - 340:14, 373:16
**VOTERS** [36] - 333:8, 345:6, 345:17, 346:21, 350:5, 359:20, 360:1, 367:9, 369:21, 370:23, 371:4, 378:16, 383:16, 383:21, 386:3, 387:11, 388:1, 388:6, 389:1, 389:7, 389:11, 391:22, 392:2, 393:5, 393:6, 393:7, 393:11, 394:5, 394:7, 396:21, 399:19, 404:6,

407:3, 413:6, 413:7, 413:24
**VOTERS'** [2] - 400:12, 404:17
**VOTES** [1] - 367:22
**VOTING** [30] - 301:20, 302:10, 302:12,
305:19, 305:22, 325:22, 327:1,
332:18, 332:23, 333:8, 333:9, 333:11,
334:2, 334:23, 345:6, 367:14, 367:15,
367:18, 367:19, 367:20, 368:2,
370:16, 371:8, 400:4, 401:24, 404:15,
405:3, 414:12
**VS** [1] - 288:5

## W

**WAIT** [1] - 337:21
**WAITING** [3] - 291:14, 291:18, 317:14
**WALK** [3] - 337:12, 378:23
**WALL** [1] - 367:7
**WANTS** [1] - 355:25
**WARNER** [2] - 358:3, 397:7
**WARREN** [2] - 290:4, 301:9
**WATCH** [1] - 298:24
**WATER** [1] - 328:21
**WAYS** [5] - 293:23, 354:13, 354:15,
357:13, 416:4
**WEATHER** [1] - 396:24
**WEB** [3] - 411:21, 412:1, 412:16
**WEBSITE** [2] - 346:14, 412:19
**WEEKEND** [1] - 300:1
**WEST** [2] - 362:18, 396:24
**WHITE** [4] - 383:21, 388:6, 394:5, 413:7
**WHITES** [1] - 387:25
**WHOEVER'S** [1] - 295:12
**WHOLE** [2] - 292:2, 331:9
**WILLIAMS** [1] - 288:7
**WILLING** [2] - 300:6, 386:18
**WILLINGNESS** [1] - 404:18
**WISCONSIN** [7] - 326:11, 326:14,
345:19, 356:17, 357:7, 398:8, 398:16
**WISCONSIN'S** [1] - 345:7
**WISCONSIN–MADISON** [1] - 325:7
**WISH** [2] - 298:16, 328:2
**WITNESS** [37] - 290:3, 301:2, 304:1,
309:25, 310:4, 310:7, 310:10, 310:15,
310:20, 317:11, 317:14, 317:19,
319:20, 320:8, 320:12, 323:25,
324:20, 328:21, 331:14, 331:21,
337:4, 337:17, 337:20, 338:25,
351:24, 357:12, 357:17, 358:11,
358:18, 358:22, 364:7, 368:22, 369:4,
369:10, 369:19, 381:4, 418:8
**WITNESS** [16] - 291:24, 291:25, 293:3,
293:16, 294:13, 297:12, 298:8, 300:4,
307:2, 307:8, 323:22, 324:2, 327:1,
371:20, 418:3, 418:5
**WITNESSES** [4] - 292:3, 296:8, 307:14,
392:10
**WOEFULLY** [1] - 334:7
**WON** [4] - 326:15, 326:18, 326:20,
326:22

**WONDER** [1] - 370:8
**WORD** [1] - 381:9
**WORD'S** [1] - 291:7
**WORDS** [4] - 292:14, 298:2, 322:21,
385:5
**WORKER** [1] - 402:7
**WORLD** [1] - 398:22
**WORRY** [4] - 369:25, 370:2, 370:12,
370:13
**WRAPPED** [1] - 385:9
**WRIGHT** [2] - 291:16, 337:18
**WRITE** [3] - 354:12, 354:14, 354:15
**WRITTEN** [2] - 326:5, 326:7
**WRONGLY** [1] - 366:25
**WROTE** [4] - 326:19, 411:25, 412:19,
417:14
**WYNNE** [3] - 292:14, 299:15, 299:22
**WYNNE** [14] - 288:21, 292:17, 292:23,
292:25, 293:2, 293:6, 294:6, 294:9,
294:12, 295:7, 299:23, 323:3, 323:16,
323:21

## Y

**YALE** [1] - 325:15
**YEAR** [8] - 340:18, 340:19, 356:12,
362:4, 400:18, 402:9, 413:16, 414:24
**YEARS** [8] - 326:12, 329:16, 343:8,
362:6, 370:5, 376:12, 411:25, 412:20
**YESTERDAY** [15] - 296:23, 299:4,
301:15, 301:18, 302:21, 306:3,
311:15, 311:16, 311:18, 311:22,
311:25, 315:17, 316:3, 316:8, 316:13
**YORK** [2] - 361:12, 362:18
**YOU-ALL** [6] - 291:2, 295:16, 295:17,
308:25, 328:19, 388:12
**YOURSELF** [3] - 325:5, 345:2, 367:7
**YOUTH** [1] - 305:19
**YUN** [1] - 289:4

## Z

**ZBOROWSKI** [1] - 419:13
**ZBOROWSKI** [2] - 289:21, 419:13
**ZERO** [1] - 375:18
**ZIP** [11] - 301:16, 331:22, 331:24,
331:25, 350:14, 350:19, 350:21,
350:25, 355:7, 366:9, 390:10
**ZOOM** [2] - 291:10, 291:12