```
 1                    UNITED STATES DISTRICT COURT
                   FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION

 3   FAIR FIGHT, INC., JOHN DOE,    )
     AND JANE DOE                   )VOLUME 3 - A.M. SESSION
 4                   PLAINTIFFS,    )
                                    )DOCKET NO. 2:20-CV-0302-SCJ
 5          -VS-                    )
                                    )
 6   TRUE THE VOTE, INC., CATHERINE )
     ENGELBRECHT, DEREK SOMERVILLE, )
 7   MARK DAVIS, MARK WILLIAMS, RON )
     JOHNSON, JAMES COOPER, AND     )
 8   JOHN DOES 1-10,                )
                     DEFENDANTS.    )
 9   _____

10           TRANSCRIPT OF SUMMARY JUDGMENT PROCEEDINGS
             BEFORE THE HONORABLE STEVE C. JONES
11              UNITED STATES DISTRICT JUDGE
                 MONDAY, OCTOBER 30, 2023
12

13   APPEARANCES:

14   ON BEHALF OF THE PLAINTIFFS:
        ALLEGRA J. LAWRENCE-HARDY, ESQ.
15      LESLIE J. BRYAN, ESQ.
        UZOMA NKWONTA, ESQ.
16      JACOB SHELLY, ESQ.

17

     ON BEHALF OF THE DEFENDANTS:
18       JAMES BOPP, JR., ESQ.

19

     ON BEHALF OF INTERVENOR (USA):
20      JENNIFER KEEN, ESQ.
        DANA PAIKOWSKY, ESQ.
21      JENNIFER J. YUN, ESQ.
        TIM MELLETT, ESQ.
22

           VIOLA S. ZBOROWSKI, RDR, FAPR, CMR, CRR, RPR, CRC
23     OFFICIAL COURT REPORTER TO THE HONORABLE STEVE C. JONES
                 UNITED STATES DISTRICT COURT
24                    ATLANTA, GEORGIA
                       404-215-1479
25            VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
```

1                    I N D E X

2  WITNESS              DIRECT      CROSS      REDIRECT RECROSS

3  JOCELYN CAROLINA
   HEREDIA              540, 606     557
4
       VOIR DIRE          597
5

6  ORVILLE VERNON
   BURTON                594        640
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (HELD IN OPEN COURT AT 9 A.M.)

2          THE COURT:  Good morning.  You-all can be seated.  I

3    hope everybody had a good weekend.

4          I just want to note, tomorrow we will not be having

5    court.  There is a matter I have to take care of in another

6    case in Atlanta division, so no court tomorrow, but we will

7    start back here at 9 o'clock here on Wednesday evening.  Okay?

8    So let your witnesses know.  We sent out a notice on Friday

9    but just to be on the safe side.

10         All rightie.  Anything before we call the next

11   witness?

12         There's one issue I have.  Ryan Germany, did

13   you-all -- we broke at 3:30 and you-all indicated that that

14   was the last witness for the day.  Did you-all hear anything

15   about Ryan Germany as a witness?  Because I indicated that the

16   plaintiffs had called him on direct.  And since he was here, I

17   was also just going to allow you-all to direct him as well.

18         So, Mr. Evans, did you-all get everything you needed

19   out of Mr. Germany?  Mr. Wynne?

20         MR. WYNNE:  I'm not sure at this point whether we're

21   going to need to call him back.

22         THE COURT:  Well --

23         MR. WYNNE:  I doubt it.  But I -- not -- on the

24   record, I'd rather not formally excuse him.  I think there's

25   like a 3 percent chance that we would do that, but, you know,

1   in the matter of course for the record, I can't do that.

2        THE COURT:  I question is my question, why didn't you

3   direct him on Friday when we had him here?

4        MR. WYNNE:  Because there may be things that came up

5   in the course of Ms. Engelbrecht's testimony that I need to

6   address and there are some matters that --

7        THE COURT:  But you understand, Mr. Wynne, the Court

8   did, over the objections of the plaintiffs, because you didn't

9   have him down and I said to the plaintiffs' counsel, since

10  he's going to be here anyway and he didn't want to come back

11  twice, over the objection of plaintiff, I said I'm going to

12  allow the defendants, which once you finish direct and then

13  once they finish cross, to call him as your direct witness?

14       So I'll be quite frank with you.  I'll listen to your

15  argument, but I'm probably not going to make him come back.

16  Because, again, I was just more or less overruling the

17  plaintiffs' objection, because the objection was valid, you

18  didn't do what you were supposed to have done.  So probably --

19  I will listen to what you have to say, but I'm probably not

20  going to make him come back.  Because I had him here.  I was

21  allowing you-all to call him as a direct witness once you

22  finished crossing him and nobody -- you indicate you did.

23       MR. WYNNE:  I perfectly understand.  In fact, I

24  agree.  I just have to say that for the record for, you know,

25  a number of professional reasons, but I agree with you.

1        THE COURT:  All right.  I'm not trying to be

2  difficult, Mr. Wynne, just it's --

3        MR. TYSON:  No, neither am I.  I just know I'm bound

4  by my rules to my client and I just have to do that.

5        THE COURT:  I fully expect you'll represent your

6  clients to the best of your ability and so forth you've been

7  doing a great job of doing that, so --

8        MR. WYNNE:  I appreciate that, Your Honor.  It's an

9  honor to appear before you as well.

10       THE COURT:  All right.  Thank you.  And you can

11  call -- anything?

12       MR. Nkwonta:  No.  We're ready to proceed, Your

13  Honor.

14       THE COURT:  Call your next witness.

15       MS. FORD:  Good morning, Your Honor.  Christina Ford

16  for the plaintiffs.

17       THE COURT:  Good morning.

18       MS. FORD:  And plaintiffs call Ms. Jocelyn Heredia.

19       THE COURT:  All right.  Thank you.

20       THE DEPUTY CLERK:  Would you raise your right hand,

21  please.

22                    ******

23              JOCELYN HEREDIA,

24       having been duly sworn, testified as follows:

25                    ******

1          THE DEPUTY CLERK:  Have a seat.  And if you could

2     please state and spell your name for the record.

3          THE WITNESS:  Yes.  Good morning.  My name is Jocelyn

4     Carolina Heredia.  Spelled J-o-c-e-l-y-n, Carolina is

5     C-a-r-o-l-i-n-a, Heredia is H-e-r-e-d-i-a.

6          THE DEPUTY CLERK:  Thank you.

7     DIRECT EXAMINATION

8     BY MS. FORD:

9     **Q.**   All right.  Good morning, Jocelyn.  Thank you for being

10    here today.

11    **A.**   Good morning.

12    **Q.**   I'd like to ask you some questions about your personal

13    background.  Where were you born?

14    **A.**   I was born in Athens, Georgia.

15    **Q.**   And where did you grow up?

16    **A.**   I grew up in Commerce, Georgia.  So I was born in Athens

17    Georgia.  And I -- my family bought a home in Commerce,

18    Georgia, and I went to the Banks County school system.  So I

19    went to Banks County Elementary School and Banks County Middle

20    School.  So if anyone asks me where I grew up, I basically say

21    like Commerce, Georgia, or Banks County.

22    **Q.**   Can you tell me a little bit about Commerce?  What is it

23    like?

24    **A.**   Yes.  So Commerce is -- it's a very small town, like

25    country feel.  I have a lot of family in Commerce.  I grew up

1   in Commerce so I have friends in Commerce.  So that's all

2   Commerce is to me.

3   **Q.**   And, Jocelyn, where is your family originally from?

4   **A.**   So my family is originally from El Salvador, which is in

5   Central America.  And my family came to the U.S. and my dad

6   actually became a citizen I want to say decades ago, like, 20

7   or so years ago.  And my mom actually became a citizen this

8   year.  And it took her like two to three years to become a

9   citizen, so...

10  **Q.**   Do you have any siblings?

11  **A.**   Yes.  I have a younger brother, we're about eight years

12  apart, and it's just the two of us.

13  **Q.**   And have you previously been responsible for helping take

14  care of your little brother?

15  **A.**   Yes.  So like I said we're eight years apart.  I consider

16  myself to be like a second mother to him.  I was very involved

17  with kind of like raising him.  I would do like drop-offs,

18  pickups, any after school programs, and help him with

19  homework, because my parents know like broken English, so I

20  was the one who knew, like, fluent English.  And, you know,

21  we're eight years apart, so I've been through the school

22  system, I know more, like, math or English or history to help

23  him.

24  **Q.**   Thank you, Jocelyn.

25        Where did you attend college?

1  **A.**    So I actually graduated from the University of Georgia.

2  I got a business degree.  And, yeah, I -- you know, grew up in

3  Commerce.  I went to school in Athens.  I went to school at

4  Cedar Shoals High School which is, you know, right down the

5  street from UGA, so it was an easy decision to go to UGA.

6         THE COURT:  Great high school, Cedar Shoals.  I

7  graduated from Cedar Shoals High School.

8         THE WITNESS:  Oh, my gosh.  Jaguars.

9         THE COURT:  Yeah.

10 BY MS. FORD:

11 **Q.**    And so did UGA allow you to be close to home?

12 **A.**    Yes.  So UGA is, I would say, 30 minutes from Commerce

13 from my parents' home.  And I -- we actually moved to

14 Commerce -- so let me back up.  We moved to Athens in middle

15 school -- when I was in middle school.  So I went to Hilsman

16 Middle School and then went to Cedar Shoals and then started

17 school at UGA.  And then it was around, like, my sophomore

18 year that we sold the home that we had bought in Athens and we

19 went back to the first home in Commerce.  And, yeah, so it

20 was -- it's like a 30-minute commute.  I would commute back

21 and forth.  It's not a difficult drive.  It's a very smooth

22 drive, unlike going to, like, Atlanta, for example.

23 **Q.**    So you didn't live in the dorms while you were in

24 college?

25 **A.**    Correct, I did not.  It was important to me to be with my

1  family, and, also, to help raise my brother, just because like

2  we're from El Salvador, I want him to be as successful as I

3  consider myself to be, so I -- it was -- it was important for

4  me to be with my family.

5  **Q.**   So, Jocelyn, I'd like to jump ahead in time.  What did

6  you do when you graduated college?

7  **A.**   So I graduated in May of 2019.  And when I graduated, I

8  didn't have anything lined up.  So I was looking for, like,

9  internships or a job.  I was looking in Athens, Commerce, I

10  was not -- did not have any luck.  So I looked in Atlanta,

11  because there's a lot of job opportunities.  And I ended up

12  landing an internship and it would start in September of 2019.

13  **Q.**   Did you change your permanent residence to Atlanta for

14  that internship?

15  **A.**   No, I did not.  So the internship it, was a very low

16  paying internship.  I basically took it in order to, like, get

17  my foot in the door and kind of like build a connection so

18  that maybe it would lead to something else.  So I actually

19  stayed with a friend in Alpharetta, Georgia, which is, I would

20  say, like a 30-minute drive or MARTA train ride.  So I stayed

21  with a friend in Alpharetta for the entirety of the

22  internship.

23  **Q.**   And would you travel back to Commerce during that

24  internship?

25  **A.**   Yes.  So on weekends I would go home to Commerce and for

1  holidays, like Thanksgiving I would go back.

2  **Q.**   So what happened at the end of your internship?

3  **A.**   So my internship ended in December and I was offered a

4  full-time -- sorry -- a contract position.  And the contract

5  was for a year.  And it was salaried and -- but it didn't have

6  benefits.

7  **Q.**   Okay.  So when you were hired at the end of your

8  internship, it was for a specific term of one year; correct?

9  **A.**   Correct.  It was just for one year.

10  **Q.**   So what did you decide to do about your housing situation

11  then?

12  **A.**   So this was in December that I got the contract position.

13  I started to look for apartments, because I couldn't just

14  crash -- couldn't just stay at a friend's house forever.  So

15  I, umm -- you know, it was an entry level position, so it

16  couldn't afford me an apartment in Atlanta, but I did find an

17  apartment in Decatur.  But I was looking for a while.  I was

18  looking in December and January.  And I was honestly

19  considering just living at home and commuting, because it's

20  just an hour -- Commerce is about an hour from -- to Atlanta.

21  So, yeah, I was considering, like, should I just go home and

22  just commute every day or get an apartment.  And I ended up

23  just getting an apartment in Decatur.

24  **Q.**   And how long was the term of the lease that you ended up

25  getting in Decatur?

**A.**    It was for one year.

**Q.**    So the same as the contract position, one year?

**A.**    Yes.

**Q.**    Was that the first time you'd ever been away from your family?

**A.**    Yes, yes.  It was -- yeah, it was my first time.  I was nervous about it, because I wanted to be able to pay my rent. My position was entry level, so I wasn't getting paid a lot of money.  And my parents wouldn't be able to help me if I couldn't make the rent payment.  But, yeah, I was, like, nervous.  I didn't want to miss any bills and have my credit impacted.  So, yeah, that was my first time getting an apartment.

**Q.**    So that lease started in February 2020; is that right?

**A.**    Yes.

**Q.**    And that same month, did you file a change of address form to get your mail sent to that apartment?

**A.**    Yes, I did.  I didn't want to miss any bills for the apartment.  So I had, like, gas -- a gas bill, a ^ bill, power bill.  So I just wanted to make sure I didn't miss anything.

**Q.**    In February 2020 did you update your voter registration to the Atlanta area?

**A.**    I did not.

**Q.**    Did you update your car registration to Atlanta?

**A.**    I did not.

**Q.**    Did you get a new driver's license to reflect the Atlanta address?

**A.**    I did not.

**Q.**    And why didn't you do any of those things?

**A.**    I didn't because I still considered Commerce or Banks County to be my home.  You know, this apartment had a lease, it had an end date.  So I just considered Commerce to be my home.  And I was traveling back and forth spending a lot of time in Commerce.  So I just -- I didn't find a reason to change those.

**Q.**    So you said you got the lease in February 2020.  What happened in March 2020?

**A.**    In March 2020 COVID-19 hits.  And as far as my job, we went fully remote.

**Q.**    Did that mean that you were able to go back to Commerce more often?

**A.**    Yes.  So I was able to spend weeks or, you know, months at a time in Commerce if I wanted to.  Yeah, I could just work from my laptop.

**Q.**    And what happened to the apartment that you had leased in Atlanta?

**A.**    So in March -- so COVID hit, a lot of things went remote, my job went fully remote.  At the time I was dating, and he was a student at UGA as well, getting a degree in accounting.

1  And the schools -- his classes also went fully remote.  So

2  what we decided to do is we subleased his apartment in Athens

3  and he moved in with me in Decatur and then we would split the

4  bill.  So it was more affordable for me.

5  **Q.**  Did you end up spending the majority of your time in 2020

6  in Commerce?

7  **A.**  Yes.  At the time my brother was still in school.  So,

8  like I said, I would help him with homework.  Picking him up

9  from school and dropping him off, stuff like that.  So I --

10  holidays as well, weekends, any time I could be with my

11  family, I would.

12  **Q.**  And for the remainder of 2020 similarly, is Commerce

13  where your consider your permanent residence to be?

14  **A.**  Yes, it is.

15  **Q.**  Jocelyn, I'd like to switch now to ask you a few

16  questions about your voting experience.

17      Is voting important to you?

18  **A.**  Yes.  Voting is very important to me.  Like I said, my

19  dad is a citizen, my mom just became a citizen this year.  And

20  one of her biggest reasons for wanting to become a citizen was

21  because she wanted to be able to vote.  And growing up my dad

22  always -- would always go vote, he would come back with the

23  sticker that he voted.  So in my family it's important to

24  vote.

25  **Q.**  Did you vote in the 2016 presidential election?

1  **A.**   Yes, I did.

2  **Q.**   What about the 2018 general election?

3  **A.**   Yes, I did.

4  **Q.**   And the 2020 general election?

5  **A.**   Yes.

6  **Q.**   And have you ever changed the county of your voter

7  registration before?

8  **A.**   Yes, I did.  So I started to vote in Athens, I think was

9  my first -- the first time I voted, it was in Athens.  And

10 when we moved to Commerce, I changed the voting registration

11 because we had sold the home in Athens and moved to the first

12 home in Commerce.

13 **Q.**   The one that your family has owned since the 1990s?

14 **A.**   Yes, correct.

15 **Q.**   So, Jocelyn, I'd like to talk about the runoff election

16 that's at issue in this case.  Can you tell us what happened

17 to you in 2021 runoff election?

18 **A.**   Yes.  So, let's see.  I got ready to vote.  I looked up

19 the location, I drove to the location, parked.  When I parked

20 I saw there was a long line.  It wrapped around the building.

21 But I was determined to go vote even if there was a wait.  I

22 got in line.  It took, I want to say, 30 to 45 minutes to get

23 to the front of the line.

24       Once I was at the front of the line inside the actual

25 voting location -- like, building, I was asked for my ID.  I

1  gave my ID.  And then the poll worker said, your vote has been

2  challenged.  And I said, what does that mean?  And I don't

3  think the poll worker explained to me what it meant, but he

4  said that I would -- or she said that I would have to vote by

5  paper and that I -- in order to vote, I would need to provide

6  two forms of mail that matched -- that had my address that

7  matched my license.

8       So I was given my ID back and I basically had to come up

9  with two forms of mail that had my address.  So I was

10 debating, like, should I go home and get some mail.  The

11 location was, like, 15 or 20 minutes from my home, or then I

12 thought, like, okay, let me just check my car to see if I have

13 some mail.  And I ended up having mail in my car.  So I got

14 two forms -- two different -- yeah, two forms of mail that had

15 my address.

16      And then I got back in line.  There was still a long

17 line.  I got back to the back of the line.  And I had to wait,

18 like, another 35 to 45 minutes.  While in line I was just

19 feeling like stressed out, thirsty, hungry, because I had at

20 this point already spent, you know, an hour, an hour and a

21 half in line.  And the whole time there I was just thinking,

22 like -- like, nervous to see if, like, my mail would get

23 accepted.

24      And I ended up making it to the -- back to the front of

25 the line.  And I presented the two forms of mail.  And then

1  they took the mail and they went to go make a copy of the

2  mail, returned the mail, and then gave me the -- a form to put

3  my vote and then an envelope.  And they told me not to seal

4  the envelope.  And I was just -- when they told me that, I was

5  thinking that's weird, like, I want to seal the envelope.  But

6  either way, I voted on paper and put it in the envelope.  And

7  handed it to, like, a poll worker.

8         And the whole time the poll worker was, like, standing

9  right next to me.  So it was just, like, a little bit

10 frightening, because they were just, like, standing right next

11 to me and I didn't feeling like it was a private experience.

12 **Q.**    Thank you, Jocelyn.

13        So I understand this entire process from when you arrived

14 at the polling location to when you were able to leave took

15 several hours; is that correct?

16 **A.**    Yes.

17             MR. EVANS:  Objection, leading.

18             THE COURT:  That was leading, sustained.

19 BY MS. FORD:

20 **Q.**    Jocelyn, how long were you at the polling location in

21 total?

22 **A.**    So I would say for the lines -- oh, total?  Three hours,

23 maybe a little bit more.  Because I was -- once I finished

24 voting I spent a little bit of time recollecting myself in the

25 car before I headed home, so three to four hours, I would say.

1  **Q.**   How did hearing that you had been challenged make you

2  feel?

3  **A.**   It made me feel confused.   At the time I didn't know what

4  that meant.   It made me feel, like, I was, you know, am I

5  committing a crime?   Because, like, why am I being challenged?

6  Like, are you questioning that I'm a citizen?   Like, what's --

7  what's -- because the poll worker didn't tell me why I was

8  being challenged.   She just told me that I was being

9  challenged.

10  **Q.**   And later on what did you do to try to figure out what it

11  did mean to be challenged?

12  **A.**   Yeah.   So I went home, I was upset, I was angry.   So I --

13  I looked it up.   I looked up, like, what is -- what does it

14  mean to be challenged.   I looked up why am I being challenged.

15  I also went to the Banks County voting websites, and I looked

16  through it and I ended up finding a phone number there that

17  said, like, if you have any issues call this number or, like,

18  something along those lines.

19       So I ended up calling that number, but nobody picked up.

20  And I ended up calling like several times throughout the

21  evening.   Nobody picked up.   And then I ended up calling a

22  voters rights, like, hotline.   And they -- I was able to tell

23  them my experience and, you know, they said, can we continue

24  to contact you for any reason.   And I said, yes, like, I want

25  to know what's going on.

1  **Q.**   Jocelyn, was your name ever published on the Banks County

2  website as a voter who had been challenged in that election?

3  **A.**   Yes.

4  **Q.**   And how do you know that?

5  **A.**   So when I went home, I looked at the Banks County

6  website.  And that's where I saw -- like I said, I found a

7  phone number and I also saw a link, yeah.

8         MS. FORD:  Your Honor, permission to approach the

9  witness?

10        THE COURT:  Yes.

11        MS. FORD:  Thank you.

12  BY MS. FORD:

13  **Q.**   Jocelyn, is this what the Banks County website looked

14  like that you were just speaking about?

15  **A.**   Yes, it is.

16        MS. FORD:  Your Honor, this is Plaintiffs' Exhibit 49

17  and we would move it into evidence at this time.  It has not

18  been objected to.

19        THE COURT:  Any objections?

20        MR. EVANS:  Judge, I haven't heard the foundation as

21  to this.  I heard that she saw it, but she needs to lay that

22  she pulled it from the online website, is it true and

23  accurate.

24        THE COURT:  A little more bit foundation.

25        MS. FORD:  I can do that, Your Honor, although they

1   not made any objection to authenticity, which I believe they

2   were required to do in the pretrial order.

3           THE COURT:  Just three questions, basically.

4           MS. FORD:  Okay.  Sounds good.

5   BY MS. FORD:

6   **Q.**   Jocelyn, is this what the Banks County website looked

7   like in the spring of 2021?

8   **A.**   It is.

9   **Q.**   And can you tell me what happened when you -- I realize

10  it's very small here -- clinked on this blue button that says

11  "Click here to view challenged electors list for the

12  January 5th, 2020, runoff election"?

13  **A.**   Yes.  So when I would click on that, it would have, like,

14  a file, like a -- kind of like an Excel file with several

15  people's name.  And then it would have, you know, first name,

16  middle name, last name, and then, like, whoever challenged

17  them on, like, a column.

18  **Q.**   Okay.  Can you flip forward to the spreadsheet in the

19  back and let me know if this is the spreadsheet that you saw

20  when you clicked on that?

21  **A.**   Yes, it looks like the spreadsheet I saw.

22          MS. FORD:  Your Honor, we move this into evidence at

23  this time.

24          THE COURT:  Does Plaintiffs' Exhibit 49 fairly

25  represent what you saw -- fairly and accurately represent what

1  you saw when you went to that website?

2         THE WITNESS:  Yeah, it looks very -- it looks exactly

3  the same.  I think the only thing missing is the phone number

4  that I called.  It was on the website.

5         THE COURT:  Any objection?

6         MR. EVANS:  No, Your Honor.

7         THE COURT:  All right.  49 is admitted without

8  objection.

9         (Plaintiffs' Exhibit 49 was received and marked into

10  evidence.)

11  BY MS. FORD:

12  **Q.**   Jocelyn, could you move forward a couple of pages for me

13  through this list and find your name and just let me know when

14  you found it.

15  **A.**   I found it.

16  **Q.**   Is that you on here twice, Jocelyn Heredia and Jocelyn

17  Carolina Heredia?

18  **A.**   It is.

19  **Q.**   Do you know who Representative Jerry Bowman is?

20  **A.**   I do not.

21  **Q.**   Do you know who Dan Gasaway is?

22  **A.**   I do not.

23  **Q.**   Do you have any reason to believe that either of those

24  individuals knew anything about your personal circumstances?

25  **A.**   I do not.  I don't know them.  I don't know how they

1 would know me or anything about me.

2 **Q.** And how did it make you feel to know that your name was

3 out there in public as a challenged voter?

4 **A.** Yeah. So when I saw my name on the list I felt kind of

5 like scared, like, why is my name on a list on, like, a public

6 website. This is, you know, public information. You know, I

7 was thinking, like, I'm being challenged. Like, my

8 eligibility to vote is being questioned. And, yeah, I was,

9 you know, kind of like scared, too, because I was, like, am I

10 going to get in trouble because I voted while my vote was

11 challenged? So I was, you know, scared, nervous, and I wanted

12 to know more about why my name was on the list.

13 **Q.** Jocelyn, have you voted since that 2021 runoff election?

14 **A.** I actually have not. I -- it's important for me to vote,

15 but that experience made me not vote, to be honest. So I just

16 didn't want to go through the process of spending a long

17 amount of time in line to wait to vote, potentially be

18 challenged again, just go through the whole process again.

19 **Q.** And how would you compare your experience voting in the

20 2016, 2018 and 2020 elections with your experience in that

21 runoff election?

22 **A.** I would say it was like night and day. So I, you know,

23 had a really good experience voting previously. I remember it

24 was, like, a fun experience, because I'm -- as a citizen, you

25 have a right to vote. So I was like, you know, this is fun.

And people talk about it, like, the experience to vote and to

be able to go vote.  It's an exciting thing.  But this

experience in 2021 was really different from prior

experiences.

**Q.**    Jocelyn, I have just a couple more questions for you.

After the runoff election, did you receive a full-time

offer of employment from your job?

**A.**    I did.  So in February of 2021, I got a full-time offer,

yeah.

**Q.**    And where are you living now?

**A.**    So it's actually a little bit complicated.

So for months -- so actually I got engaged in January to

the person who I was living with in Decatur.  He ended up

graduating from the University of Georgia, and then we got

engaged in January, and then we started to look for homes.  We

started to look for houses in Commerce and Athens.  We

actually didn't even look in Atlanta, because my family is in

Commerce and his family is actually in the, like, kind of like

Athens area.  It's called Wilkes County.

And so we actually bought a home at the end of September.

So it's -- yeah, it's complicated because we have to renovate

the home before we move in and -- but we still have an

apartment in Atlanta and I still have some stuff in Commerce.

So I'm just, like, bouncing back and forth between Athens,

Atlanta, Commerce for now.

1  **Q.**   And when you complete your move into your new home --

2  congratulations by the way.

3  **A.**   Thank you.

4  **Q.**   Do you plan to update your voter registration to Clarke

5  County?

6  **A.**   Yes.  So when I'm fully moved in -- it's a process.

7  Whenever we're done with that, I do plan to update my

8  registration and update my driver's license.

9  **Q.**   And do you plan to file another change of address form to

10 forward your mail when you move in?

11 **A.**   Yes, I do.  I don't want to miss a mortgage payment or

12 any bills to impact my credit, so...

13 **Q.**   And do you have any plans to leave Georgia?

14 **A.**   I do not.  I -- yeah, we signed a 30-year mortgage so

15 that is a long time that we're planning to stay in Georgia.

16 My family actually owns two homes in Georgia.  I have extended

17 family in Georgia.  Yeah.  No, plans to move out of Georgia.

18 I grew up here, raised here, I'll probably die here.

19 **Q.**   All right.  Thank you, Jocelyn.

20        MS. FORD:  No further questions at this time.

21        THE COURT:  Thank you, Mr. Ford.

22        Your witness, Mr. Evans.

23 CROSS-EXAMINATION

24 BY MR. EVANS:

25 **Q.**   All right, Ms. Heredia.  My name's Jake Evans.  It's a

1    pleasure to meet you.  Congratulations on the new house and

2    the engagement.  That's big.

3    **A.**    Thank you.  Good morning.

4    **Q.**    The first question I want to ask you is, do you remember

5    giving your deposition on October 15, 2021?

6    **A.**    Yes.

7    **Q.**    And did you give -- and you understand when you gave your

8    deposition October 15, 2021, that you were under oath; right?

9    **A.**    That's correct.

10   **Q.**    And when you gave your deposition on October 15, 2021,

11   you gave -- you told the truth, didn't you?

12   **A.**    Correct.

13   **Q.**    And the testimony you gave in your deposition on

14   October 15, 2021, was accurate; right?

15   **A.**    To the best of my ability.

16   **Q.**    Okay.  Thank you.

17          So in December of 2019 you graduated from UGA; right?

18   **A.**    No.  I graduated in May of 2019.

19   **Q.**    Okay.  So you graduated from Georgia May of 2019 and then

20   you began a job search; right?

21   **A.**    Correct.

22   **Q.**    And you get an internship for a job in the city of

23   Atlanta at the beginning of 2020; right?

24   **A.**    A contract position in February of 2020.

25   **Q.**    And at that point you file a National Change of Address

1    to an address in Decatur, Georgia; is that right?

2    **A.**    Yes.

3    **Q.**    And was that address 344 North Druid Hills, apartment J,

4    Decatur, Georgia?

5    **A.**    Yes.

6    **Q.**    And you live at this apartment for a number of months.

7    And you just testified at some point your boyfriend, now

8    fiancé, moves in with you; is that correct?

9    **A.**    That is correct.

10   **Q.**    And when did he move in?

11   **A.**    He moved in in March of 2020 when COVID-19 began.

12   **Q.**    And in November of 2020, you requested that an absentee

13   ballot be sent to the address at 3442 North Druid Hills in

14   Decatur, Georgia; right?

15   **A.**    November of 2020 you said?

16   **Q.**    That's right.

17   **A.**    Yes.

18   **Q.**    And so you were living at that address at 344 North Druid

19   Hills, Decatur, Georgia, from when you filed the National

20   Change of Address on February 2020 to when you requested that

21   absentee ballot, weren't you?

22   **A.**    I wouldn't say -- I would say I had access to the

23   apartment, I would stay in the apartment, but I would also be

24   in Commerce for long periods of time.  So I would say I was

25   living in both places.

1  **Q.**   Where were you getting your car serviced?

2  **A.**   I'm sorry?

3  **Q.**   Where were you getting your car serviced during that time

4  in 2020?

5  **A.**   In 2020 I would get my car serviced wherever they had an

6  appointment.  So whether that's Athens or I think there's only

7  a couple locations in Georgia, so Athens or anywhere in the

8  Atlanta area.

9  **Q.**   If I told you that you did not get your car serviced in

10  Athens in 2020, would you have any reason to disagree with me?

11  **A.**   No.

12         MR. EVANS:  Okay, Judge, if I may approach, I --

13         THE COURT:  Yes.

14  BY MR. EVANS:

15  **Q.**   I'm going to hand you Defendants' Exhibit 64.  If you

16  could take a look at that.  And do you drive a 2017 Toyota

17  Corolla?

18  **A.**   I do.

19  **Q.**   And does this car, if you look at the top left of

20  Defendants' Exhibit 64, is that an accurate depiction of the

21  car that you drive?

22  **A.**   Yes, this is correct.

23  **Q.**   And if you flip with me to the fifth page at the bottom,

24  it says, "January 19, 2020, World Toyota, Atlanta, Georgia,

25  vehicle service"; is that correct?

1    **A.**    What section of the page?  Sorry.

2    **Q.**    It's at the bottom of page 5?

3    **A.**    Okay.  It says "World Toyota, January 19."

4    **Q.**    Atlanta, Georgia.  And that's not in Athens, Georgia, is

5    it?

6    **A.**    No.

7    **Q.**    That's not in Commerce, Georgia, is it?

8    **A.**    It's not.

9    **Q.**    And if you look at page 6, at the top, vehicle serviced

10   again.  And does that say Marietta Toyota in Marietta,

11   Georgia?

12   **A.**    Yes.

13   **Q.**    And is the date August 13, 2021?

14   **A.**    Yes.

15   **Q.**    And that's not in Commerce, Georgia, is it?

16   **A.**    No.  It's Marietta, Georgia, but I don't live in

17   Marietta, Georgia either, so...

18   **Q.**    And that's not in Athens Georgia, is it?

19   **A.**    Nope.

20   **Q.**    So would you agree with me that the CARFAX on your car

21   says the only places after 2020 that you got your car serviced

22   was in Atlanta, Georgia and in Marietta, Georgia; right?

23   **A.**    That's what it says on this document, correct.

24   **Q.**    So do you recall testifying that you moved to an address

25   in west midtown after you left your 344 North Druid Hills

1  apartment address?

2  **A.**   Yes.

3       MS. FORD:  Your Honor, I just object to just the way

4  he's using her deposition testimony.  And I would request that

5  he ask her the question and not just read from her deposition.

6       THE COURT:  Are you trying to impeach her, Mr. Evans,

7  or what with the --

8       MR. EVANS:  Well, I'm trying to ask her does she

9  recall testifying.  If she does, it's going to make my job

10  easier.  If she doesn't, then I will impeach her.

11       THE COURT:  He can ask her if she recalls testifying,

12  but he can't ask her anything about it on there.  In other

13  words, did you testify, yeah.  Well, anything -- going, in

14  particular, was in there, no.

15       MS. FORD:  Understood, Judge.

16       MR. EVANS:  Thank you, Judge.

17       THE COURT:  But then, again, the substance of it,

18  Mr. Evans, if you get into the substance of it, unless you're

19  trying to impeach her or show a prior inconsistent statement,

20  in which this case I don't think we have to be getting into,

21  then I will sustain the objection.

22       MR. EVANS:  I understand.  And I get where you're

23  coming from.  And I'll try -- I was trying to make it easier,

24  but if I can't, I can't.  I'll just go straight into it.

25       THE COURT:  Yeah, they objected.

1          MR. EVANS:  I got it.

2    BY MR. EVANS:

3    **Q.**   Did you move to an apartment in west midtown in February

4    of 2021?

5    **A.**   I did.

6    **Q.**   And do you recall the address of that apartment?

7    **A.**   871 Third Street.  It's called Live 8 West.

8    **Q.**   And did you file a National Change of Address when you

9    moved to that apartment?

10   **A.**   Yes, I'm sure I did.  I didn't want to miss any mail.

11         MR. EVANS:  Your Honor, if I may?

12         THE COURT:  Yes, sir -- hold on.  Hold on one second,

13   Mr. Evans.

14         MS. FORD:  I just want to make an objection to the

15   line of questioning about Ms. Heredia's life and where she

16   lived after the runoff election, which I don't think has any

17   relevance to this case, particularly given that she has not

18   even voted since the end of the runoff election.

19         THE COURT:  Okay.  I missed that question.  Go ahead.

20         MR. EVANS:  This is going to show, Judge, that any

21   accusations that a challenge in this -- with Ms. Heredia was

22   frivolous is baseless.  And not only is it baseless, but this

23   was a proper challenge.  She has never moved back to Banks

24   County.  And I'm going to go through and show that.

25         MS. FORD:  Judge --

1          MR. EVANS:  It's directly relevant to the underlying

2    issues in the case, which they're claiming that this challenge

3    was frivolous.  And I'm going to dispute that and show that it

4    was meritorious.

5          MS. FORD:  Your Honor, under the legal standard, it

6    doesn't actually matter whether Jocelyn ever moved back to

7    Banks County.  If Banks County was her permanent residence at

8    the time she voted in the 2021 runoff election, I think that

9    would be the end of the story.

10          MR. EVANS:  And, Judge, may I?

11          THE COURT:  Yeah.

12          MR. EVANS:  It does matter.  This is the underlying

13   dispute.  This is factual testimony.  She's making legal

14   argument while we're -- the Court is hearing evidence.  She

15   can make legal argument in closing, but right now we're

16   hearing testifying and this is directly relevant.

17          THE COURT:  Well, why is it relevant if -- at the

18   time in 2021, the runoff election, if I'm understanding the

19   content, her testimony is that she was living in Banks County

20   and she was challenged in Banks County; correct?  So once that

21   runoff is off, that challenge is over, why is it relevant

22   where she lives at afterwards?

23          MR. EVANS:  What this is going to show is she never

24   moved back to Banks County.  She has stayed in Banks County.

25   Her intent -- this is a eligible -- they're claiming that the

1  eligibility challenge is frivolous.  Here, the evidence is

2  going to show she never moved back.  She got a job.  She moved

3  in with her boyfriend.  Not only, Judge, whenever she went to

4  the Decatur address, she didn't go back to Banks County, she

5  went to this address.

6          THE COURT:  Ms. Ford, domicile is determined by

7  intent.  Intent is when -- and your intent is shown by your

8  actions.  So Mr. Evans' argument is that, Judge, her intent

9  was never to go back to Banks County, so the challenge there

10 will not be frivolous.  It makes some sense now that I'm

11 thinking about it.  Intent is that -- most people go off to

12 college -- not most people -- a lot of people go off to

13 college, they don't move their voting because their intent is

14 to go back home.  But if your intent is never to go back,

15 should that not be something I have to consider?

16         MS. FORD:  Your Honor, I think intent matters at the

17 time that this election occurred.  And Ms. Heredia's testified

18 that she did in fact spend months at a time in Banks County in

19 2020.  And whatever intent -- whatever circumstances changed

20 in February of 2021, when she was offered full-time

21 employment, I just think is --

22         MR. EVANS:  Judge, if I --

23         MS. FORD:  -- could not possibly be relevant to this

24 case.

25         THE COURT:  It's a close call, Ms. Ford.  If I had a

1   jury in the box I might swear against you, because I

2   originally agreed with you, but I'll give Mr. Evans the

3   benefit of the doubt, just to let him show what intent is,

4   because -- and you always can redirect.  I'll allow it, but

5   let's don't get too far afield, Mr. Evans.

6          MR. EVANS:  Sure, Judge.  Thank you.

7   BY MR. EVANS:

8   **Q.**   Ms. Heredia, if you could take a look at

9   Defendants' Exhibit 297.

10  **A.**   I don't have it.

11  **Q.**   Oh, I guess I kept it.  Sorry.  The Judge stopped me

12  before I gave it to you.

13  **A.**   Thank you.

14  **Q.**   And whenever you're ready.

15  **A.**   I'm ready.

16  **Q.**   And is that your name in the top left of Defendants'

17  Exhibit 297?

18  **A.**   Yes.

19  **Q.**   And is that the address, 871 Third Street, that you moved

20  to?

21  **A.**   Yes.  It's the address that I got an apartment at.

22  **Q.**   And if you look at the far right, what is the date there?

23  **A.**   February 2021.

24  **Q.**   And if I told you that this was the National Change of

25  Address that you submitted, would you have any reason to

1  disagree with this?

2  **A.**   No.

3  **Q.**   And so would you agree with me that you moved to this

4  west midtown address on 871 Third Street in February of 2021?

5  **A.**   I would say that I got an apartment in 871, yeah, I got

6  an apartment at this address.  And that was because, umm, I

7  just don't -- at the time we were still fully remote and, umm,

8  my job -- I wasn't sure if I had to be back in person or if I

9  could continue to work from home.  So I wanted to have an

10 apartment that was close to work in case I did have to go in

11 to the office.

12 **Q.**   And did you sleep at this apartment?

13 **A.**   Yes, I did.

14 **Q.**   Did you brush your teeth at this apartment?

15 **A.**   Yes.

16 **Q.**   Did you eat dinner at this apartment?

17 **A.**   Yes.

18 **Q.**   Did your now fiancé/boyfriend live with you at this

19 apartment?

20 **A.**   Yes.

21 **Q.**   Why did you move from your Decatur address to this

22 apartment address?

23 **A.**   I just got an apartment that was a little bit closer to

24 work in case we did have to go into the office.  But at the

25 time, we were still fully remote.

1  **Q.**    And your -- in February of 2020, you signed a lease at

2  the Decatur address; is that right?

3  **A.**    Correct.

4  **Q.**    And it was a one-year lease, wasn't it?

5  **A.**    Yes.

6  **Q.**    February 2021 is about one year after you signed the

7  lease at the Decatur address, isn't it?

8  **A.**    Yes.   The prior lease expired.

9  **Q.**    And so you -- you got the address or the lease at this

10  west midtown apartment because your lease was expiring at the

11  Decatur address, wasn't it?

12  **A.**    Correct.

13  **Q.**    So when your Decatur address expired, why didn't you just

14  go live in Commerce, Georgia, because you had a place there;

15  right?

16  **A.**    So it was also partly because of my boyfriend.  I could

17  go back to Commerce, but he could not, like, live with me in

18  Commerce with my -- at my family's home.  So I had to get a

19  new apartment with him because he had to have a place to stay.

20  **Q.**    And in May of 2023 did you move to a different apartment

21  in the same building that you were in?

22  **A.**    Yes.  I just got -- I moved up a floor because I was

23  having issues with the apartment that was downstairs.

24  **Q.**    And what was the address of the new apartment that you

25  moved at?

**A.** It was the same address. It was just a different
apartment number.

**Q.** And why did you move in the same building to a new
apartment?

**A.** I wouldn't even call that a move. I just switched
apartments because I was having issues with my first -- the
apartment in 1545, which is downstairs from the current one,
which is 1605. Yeah, I was just having issues with the first
apartment.

**Q.** And you lived in that building continuously from when you
moved in in February 2021 to May 1, 2023; right?

**A.** Yes, I still had access to the apartment. My name is on
the lease.

**Q.** And CNN, where you were working, they're in the Metro
Atlanta area, aren't they?

**A.** Yes.

**Q.** And COVID was over in the mid-2021s; right?

**A.** I guess we're still living in it, but correct.

**Q.** And you had to start going into work around the
mid-2021s, didn't you?

**A.** No, I did not.

**Q.** So are you still working remotely now?

**A.** Yes, I am.

**Q.** So where does your fiancé live?

**A.** Yeah. So currently our situation is complicated. We

1  both bought a home in Athens, so we're back and forth from

2  Athens to Atlanta at the moment.

3          THE COURT:  Well, you bought one home, not two homes.

4          THE WITNESS:  I'm sorry?

5          THE COURT:  You bought one home in Athens?

6          THE WITNESS:  Yeah, we bought it together, uh-huh.

7  BY MR. EVANS:

8  **Q.**   So going back a bit.

9          So 2020 you moved to Decatur, you file a National Change

10 of Address to Decatur; right?

11 **A.**   Correct, I got an apartment in Decatur.

12 **Q.**   And the Secretary of State --

13         THE COURT:  2020, what month in 2020?  Say it again?

14         MR. EVANS:  It was in -- well, I believe it was

15 around February.

16         THE WITNESS:  February of 2020, I believe.  Yeah.

17 BY MR. EVANS:

18 **Q.**   And you file a National Change of Address, the Secretary

19 of State has on file that you reside at an address in Decatur;

20 is that right?

21         MS. FORD:  Your Honor, objection.

22         THE COURT:  Hold on.

23         MS. FORD:  I do not think that is in evidence at all.

24 If he wants to ask the question, he can.

25         THE COURT:  Did she file a move of address with the

1  Secretary of State?

2          What's the question you're objecting to?

3          MS. FORD:  Right.  I think the testimony that is in

4  evidence is that she filed a National Change of Address form

5  with the United States Postal Service.

6          MR. EVANS:  And I asked --

7          MS. FORD:  And Mr. Evans asked -- phrased the

8  question in a way to suggest that it was with the Secretary of

9  State's Office.

10         THE COURT:  You did say I Secretary of State.

11         MR. EVANS:  Well, at first I would say I've got her

12  on cross, Judge, so she can -- I'm going to lead her, but she

13  can answer the question.  But I'm happy to say -- I'm happy to

14  rephrase the question.

15         THE COURT:  Thank you.

16  BY MR. EVANS:

17  **Q.**   Did you know that by filing a National Change of Address

18  you had informed the Secretary of State that you live at a new

19  address?

20  **A.**   I did not know that.

21  **Q.**   Would you agree with me that, given you have moved from

22  Banks County to Decatur, from Decatur to midtown apartment 1,

23  from midtown apartment 1 to midtown apartment 2, that someone

24  may be reasonably confused where you call your domicile?

25  **A.**   I can understand that, but at the same time they don't

1  know my life or my circumstances.  So I would say, like, you

2  wouldn't know unless you spoke to me about what my situation

3  is where I'm considered to be my home.

4          THE COURT:  I guess the question the Court has, once

5  you left in February of 2020 from Banks County, did you ever

6  move back there?

7          THE WITNESS:  So I would say, like, even now, I'm

8  still back and forth with Banks County.  Like, I spend long,

9  like, weeks at a time in Banks County, so...

10         THE COURT:  Ms. Ford and Mr. Evans, you-all give me

11  one second, I want to ask one other question.

12         I guess, then, let's put it this way.  Have you moved

13  your mailing address back to Banks County since February of

14  2020?

15         THE WITNESS:  I think I have, actually.

16         THE COURT:  So you're getting mail in Banks County

17  and in Athens?

18         THE WITNESS:  I don't think I get mail in Athens, no.

19  I haven't -- I don't -- so we bought a home at the end of

20  September.  So from the end of September 2023 to now, I might

21  be getting mail in the home in Athens and potentially Atlanta

22  or Banks County.

23         THE COURT:  So you get mail in Banks County, Atlanta

24  or Decatur, and Athens?

25         THE WITNESS:  Yes.

1          THE COURT:  When you moved from Banks County in

2    February of 2020, other than your mail, did you change

3    anything else back to Banks County?  Utilities, anything?

4          THE WITNESS:  No.  Because my parents have utilities

5    to their name and stuff, they have, like, Wi-Fi to their name.

6    There's no reason for me to put anything to my name.

7          THE COURT:  What is in your name in Banks County once

8    you left in February of 2020?  What did you leave in your name

9    other than mail?

10          THE WITNESS:  As far as, like, what kind of mail

11    would go back to Banks County?

12          THE COURT:  Forget about the mail.

13          What else did you leave in your name in Banks County

14    once you left in February of 2020?

15          THE WITNESS:  My car registration, my driver's

16    license.  What else?  I don't know.  Any appointments, I

17    guess.  I still go to, like --

18          THE COURT:  Where is your doctor located?  What

19    county is your doctor, medical doctor?

20          THE WITNESS:  Commerce.  My dentist is in Commerce.

21    But I have gone to a dentist in Athens because my insurance

22    changed.  They stopped taking my insurance.

23          THE COURT:  Thank you, Mr. Evans -- hold on.

24          Ms. Ford?

25          MS. FORD:  I'm good.  No objection.

1   BY MR. EVANS:

2   **Q.**   Ms. Heredia, you never filed a National Change of Address

3   to Banks County, did you, after February 2020?

4   **A.**   I just don't recall.

5   **Q.**   If I told you that a request to the National Change of

6   Address to get all of the submissions that you had to indicate

7   you were moving your address showed that you did not file an

8   NOCA back to Banks, would you have any reason to disagree with

9   that?

10  **A.**   No.

11  **Q.**   And you haven't given your attorneys any documents to

12  show that you filed a National Change of Address for a move to

13  Banks County after February 2020, have you?

14  **A.**   I didn't know I had to.  If I knew that I had to, I might

15  have looked -- looked for -- like --

16  **Q.**   It's a yes or no.

17  **A.**   -- be able to provide it.

18  **Q.**   Did you provide it, yes or no?

19  **A.**   No, I did not.

20  **Q.**   How much time are you spending in your Decatur or midtown

21  address as compared to Banks County after February of 2020?

22  **A.**   I was spending weeks at a time in Commerce.  So, like I

23  said previously, my brother actually graduated high school

24  this year.  So the years that you're speaking of he would have

25  been in high school.  So I would have had to help him with

1  homework, drop-offs, pickups, anything like that.  So I was in

2  Commerce for, like, weeks at a time, as well as in Decatur for

3  weeks at a time, west midtown weeks at the time.  Like I would

4  just -- I couldn't say, like, a specific amount of time.

5  **Q.**   But your now fiancé was spending all the time in Atlanta;

6  right?

7  **A.**   No.  He works from home as well.  So he spends time in

8  Atlanta.  He has family in Alpharetta, Georgia, which is not

9  considered Atlanta, and his dad lives in Wilkes County, which

10 is closer to Athens than it is to Atlanta.

11 **Q.**   He wasn't sleeping in Banks County, was he, during 2020?

12        MS. FORD:  Your Honor, I'm going to renew my

13 objection to the relevance of this line of testimony.

14        THE COURT:  I think as far as where her fiancé is

15 sleeping after 2020, I can't say that's relevant.  Where she

16 was at, I agree, that shows intent.  So I'll sustain that

17 objection.

18 BY MR. EVANS:

19 **Q.**   So the new house that you have bought and remodeling,

20 it's in Athens, Georgia, right?

21 **A.**   Correct.

22 **Q.**   And that's in Athens, Clarke County; correct?

23 **A.**   Correct.

24 **Q.**   Why did you let your voter registration go inactive?

25 **A.**   I actually didn't even know that it went inactive, so...

1  yeah, I just --

2  **Q.**   Did you ever get -- well, earlier you testified that

3  voting is very important to you; correct?

4  **A.**   Correct.  However, there's not an election coming up --

5  like, there's no reason for me to look to see if my voting

6  registration is inactive at this moment.

7  **Q.**   Did you know that there was a gubernatorial election last

8  November in 2022 that would decide who would be the governor

9  of Georgia?

10  **A.**   Yes.  And I testified that I did not vote in that

11  election.

12  **Q.**   Would you regard that as an important election?

13  **A.**   Yes.  However, because of my experience prior, I decided

14  not to vote.

15  **Q.**   Well, you couldn't have voted because you let yourself go

16  inactive; isn't that right?

17  **A.**   I --

18       THE COURT:  Hold on.

19       MS. FORD:  Your Honor, this is --

20       MR. EVANS:  No.  The --

21       THE COURT:  She can object and then you respond.

22       MS. FORD:  Your Honor, I think this is like stating

23  facts not in evidence.

24       THE COURT:  Say that again?

25       MS. FORD:  This is -- I believe this is stating facts

1    not in evidence.

2              THE COURT:  Well, if he asked her whether she voted

3    or not, that don't have to be in evidence.

4              MS. FORD:  I think the -- okay, Your Honor.

5              THE COURT:  Yeah.

6    BY MR. EVANS:

7    **Q.**    You can answer.

8    **A.**    Can you repeat the question?

9    **Q.**    You said earlier that voting was very important to you,

10   but you allowed yourself to go inactive; correct?

11   **A.**    Correct, I don't know what that means.

12   **Q.**    Did you -- well, if voting was very important, wouldn't

13   you have called to find out whether or not you're an active

14   voter?

15   **A.**    I will call -- would or will call when I am ready to

16   go -- when I'm ready to vote again.

17   **Q.**    But if voting was very important to you, wouldn't you

18   vote in every election?

19   **A.**    Voting is important to me, but if -- it's my decision

20   whether I want to vote or not.  And I decide what's important.

21   **Q.**    But don't actions show where your priorities and what you

22   regard as important is?  You would agree with me; right?

23   **A.**    Then you can easily say, like, I voted prior in every

24   election.  So, you know, it was -- I stopped voting after this

25   situation occurred.

1  **Q.**   So do you know why you went inactive?

2         THE COURT:  Maybe you need to ask her does she

3  understand what it means to be an inactive voter.  I tried a

4  six-week case and I think after that, I don't think some of

5  the people still understood what it was all about, inactive

6  status.  Maybe we establish that first.

7         MR. EVANS:  And I'll back up, Judge.  And this is

8  where I was trying to go.

9  BY MR. EVANS:

10  **Q.**   When did you know that when you -- you file a National

11  Change of Address the Secretary of State will send you a card

12  asking you whether you live at that address?

13  **A.**   I didn't.

14  **Q.**   Did you receive a card from the Georgia Secretary of

15  State that would -- that asked you whether or not you still

16  lived at your Banks County address?

17  **A.**   I don't remember receiving that.

18  **Q.**   Did you know that that card that asked you whether you

19  lived at that Banks County address would be forwarded to

20  wherever you lived at the time, which would include your

21  Decatur address or your west midtown address?

22  **A.**   No, I didn't know.

23  **Q.**   Did you know that if you failed to respond to that card

24  that asked you where you live, that you will go inactive on

25  the voter rolls?

1   **A.**   I did not.

2   **Q.**   So standing -- sitting here today testifying, you don't

3   recall ever getting that card; is that right?

4   **A.**   No.

5   **Q.**   Is the reason why you may not have filled out that card

6   because you didn't want to say that you moved to either

7   Decatur or west midtown?

8   **A.**   I didn't know about the card and I don't recall receiving

9   the card.  So I don't -- like, I don't know what it says.

10  **Q.**   And you took no action to go vote, right, after 2021,

11  January 5th, did you?

12  **A.**   Correct.

13  **Q.**   You took no action to find out whether you could vote

14  after January 5, 2021, did you?

15  **A.**   Umm, correct.

16  **Q.**   And despite taking no action to vote after January 5,

17  2021, taking no action to find out whether you were an active

18  voter on the Georgia voter rolls, you're testifying here today

19  that voting is very important to you; is that right?

20          THE COURT:  Hold on, I have an objection.

21          MS. FORD:  Your Honor, I think this is asked and

22  answered and getting harassing.

23          THE COURT:  I think she testified that voting is

24  important to her and whether or not what follows up after that

25  backs that statement up.  I think we've gone across that,

1  Mr. Evans --

2           MR. EVANS:  Well --

3           THE COURT:  -- whether or not it backs up what she

4  says.  Her other testimony -- does her other testimony back up

5  her prior testimony that it was important or not.

6           MR. EVANS:  This is -- this goes straight to

7  credibility, Judge, and I'm about to finish this off with one

8  more question, but --

9           THE COURT:  She said voting is important to her

10 twice.

11          MR. EVANS:  And her actions show that it's not.

12          THE COURT:  And that's why I just said your

13 cross-examination has raised some questions to that.

14          MR. EVANS:  Okay.

15          THE COURT:  Let me say this while you still have her

16 on cross.  I think I understand Ms. Ford's earlier objection.

17 There is no evidence that she is an inactive voter in this

18 case.  In other words, if you-all have it, show it to me.  I

19 mean, her testimony, based on how I understand inactive voter,

20 probably would not make -- put her in active voter status, but

21 Ms. Ford, you are correct, there is no evidence in this case

22 right now that she -- not she -- Ms. Heredia is an active

23 voter.

24          MR. EVANS:  Is an inactive voter.

25          THE COURT:  Inactive voter.

1        MR. EVANS:  Yeah.  And that'll come in on -- in our

2    case.

3        THE COURT:  Okay.  But right now, Ms. Ford, you are

4    correct, there is no evidence of that.

5    BY MR. EVANS:

6    Q.   So, Ms. Heredia, why did you drop yourself as a plaintiff

7    in this case?

8    A.   So I dropped myself recently.  And it was because I

9    didn't want my private life to be looked into, but it ended up

10   still being looked into and I got a subpoena to be a witness

11   anyways, as well as, like, I am just bought a home, I am

12   dealing with a lot, but I was subpoenaed to be a witness.  So

13   I wanted to go back to be a plaintiff, because if I had to be

14   here anyways, then I wanted to see it through.

15   Q.   When you first filed this case, did you think that your

16   privacy may be looked into at all?

17   A.   I -- yes.  However, I didn't know to what extent.  And I

18   found out to what extent earlier this year and that's when I

19   dropped.

20   Q.   What do you mean to what extent?

21   A.   I knew, like, my address would be looked into,

22   potentially my job, but I didn't know that my boyfriend would

23   also be looked into and all his personal information.  Like,

24   he's not part of the case.  So I don't understand why, you

25   know, he's being looked into.

**Q.**   Did you know what this case is about?

**A.**   Yes.

**Q.**   What is this case about?

**A.**   About -- because I was challenged -- my vote was challenged.

**Q.**   So your understanding is you brought a lawsuit because your vote was challenged; is that right?

**A.**   No.  Well, partly.  So I know that several -- thousands of people were challenged and that's why this lawsuit came about.

**Q.**   Do you know that you have sued people?

**A.**   Yes.

**Q.**   And do you know who that you have sued?

**A.**   Yes.

**Q.**   Who have you sued?

**A.**   I didn't memorize their names.

**Q.**   Do you regard filing lawsuits against people as a serious exercise in our justice system?

**A.**   Yes.

**Q.**   When you agreed to file a lawsuit against someone, should you have known who you were suing?

**A.**   I know who I'm suing, I just don't know their names.  But I know that they're the reason that I got challenged.

**Q.**   So none of the defendants have ever spoken to you, have they?

1  **A.**   Correct.

2  **Q.**   You've never had any direct communication with any

3  defendant in this case; is that right?

4  **A.**   Correct.

5  **Q.**   You don't know, nor can you offer any testimony, about

6  who caused your challenge, can you?

7  **A.**   I -- no, I do know who caused my challenge.

8  **Q.**   Who caused your challenge?

9  **A.**   The people who I'm suing.

10  **Q.**   But you don't know the people you're suing; right?

11  **A.**   I do.  But I just didn't think to memorize their names.

12  **Q.**   Did you think before you filed a lawsuit you could have

13  at least given them the dignity of knowing who their names

14  were?

15  **A.**   Do they know my full -- like, they know my full name,

16  but --

17  **Q.**   I think they do know your name.

18       THE COURT:  You have to respond to the question he

19  asked you.

20       THE WITNESS:  No.  What was the question?

21  BY MR. EVANS:

22  **Q.**   Othe question was, before you filed a lawsuit against

23  someone, couldn't you have given them the dignity of at least

24  knowing their name?

25       MS. FORD:  Your Honor, objection.  Argumentative.

1      THE COURT:  That's not an argumentive question.  I'll

2  allow that question.

3      THE WITNESS:  Yes.

4  BY MR. EVANS:

5  **Q.**   Is that a yes, you should have given them -- you should

6  have given them the dignity of knowing their name?

7  **A.**   I know one name, but I don't know all of their names.

8  **Q.**   So earlier you testified -- strike that.

9      Were you intimidated or in any way -- well, strike that.

10      Did you feel uncomfortable the minute that you walked in

11  to vote at the polling place in the January 5, 2020, Senate

12  runoff?

13  **A.**   I did, because I -- it's -- it's a Republican county.

14  I'm Hispanic.  So any time I walk in the room -- well, I guess

15  I would say I felt more nervous when I learned that my vote

16  was being challenged.  But if it wouldn't have been

17  challenged, I might have felt differently.

18  **Q.**   So just for -- to have the record clear, and I want to

19  make sure I understand your answer, you -- did you feel

20  nervous the minute that you walked in to vote because it was a

21  Republican county?

22  **A.**   Yes.

23  **Q.**   So before you knew your vote had been challenged, you

24  felt nervous; right?

25  **A.**   Yes.

**Q.**   So the fact that your vote had been challenged did not lead to solely you being nervous because you already felt nervous when you walked in the door; right?

**A.**   It exasperated my nerves when -- I was already nervous when I walked in.  When I learned that my vote was being challenged, that made me feel even more nervous.  Because I'm wondering why is my vote being challenged, like, are they going to get away with it.  Like, that's what I was feeling.

**Q.**   And you understand that there was question about where you lived based upon the fact that you filed a National Change of Address; correct?

**A.**   At the time I did not know why my vote was being challenged.  The poll worker did not explain to me why.  All they -- all the poll worker said was that I needed to provide two forms of mail that had my address that matched my driver's license, and then I was -- and then I would be able to vote on paper.

**Q.**   And for you, the fact that having to provide that information, you viewed that as something that made you nervous in some way?

**A.**   I don't think it was necessarily because I had to provide, like, further proof that I lived at the address.  I think it was more so nobody else -- nobody else had to jump through the hoops that I had to jump through.  And, also, the fact that I had to get out of line, get back in line, get the

1  forms of mail, either drive home, spend more time to get the

2  mail.  I think it was not necessarily because I had to provide

3  the two forms of mail, but, like, just -- what I just said,

4  like, nobody else had to do it.  I had to get out of line,

5  back in line.  And the process to vote was just a lot longer.

6  **Q.**   So other than having to get out of line, provide

7  additional documentation saying you lived at the address in

8  Banks County, was anything else done that made you feel

9  nervous?

10      MS. FORD:  Objection, Your Honor.  This has been

11  asked and answered just the question before.

12      THE COURT:  Well, he asked was there anything else

13  that was done that made you feel nervous.  He outlined the

14  things that she said that made her nervous.  He asked is there

15  anything else.  That hasn't been asked.

16      THE WITNESS:  Yes.  So when I -- I was given a paper

17  ballot to cast my vote and the poll worker was standing right

18  next to me, but I noticed that no other poll workers were

19  standing next to people while they were casting their vote on,

20  like, the digital machine.

21      And the fact that I couldn't seal my votes.  I had to

22  put it in an envelope and then the poll worker took it, and I

23  had to trust that they would seal it.

24      As well as, like, my vote being challenged, I was

25  thinking, like, am I going to get in trouble for voting.

1  Like, is -- what does this mean?  Like, does this mean that

2  it's illegal for me to vote?  Like, all of those things as

3  well made me nervous.

4  BY MR. EVANS:

5  **Q.**   Are you aware that you just voted provisionally?

6  **A.**   No.

7  **Q.**   Did you know that a provisional ballot just means that

8  they will take your ballot, determine whether you're eligible,

9  and if you are, then they will cast your ballot?

10  **A.**   I did not know.  That wasn't explained to me.

11  **Q.**   Did you ever provide the additional documentation showing

12  you lived at the address in Banks County?

13  **A.**   I did provide it.

14  **Q.**   You did provide it?  What did you provide?

15  **A.**   Two forms of mail.

16  **Q.**   If I told you that what you provided was a car

17  registration that was expired, would you have any reason to

18  disagree with me?

19  **A.**   I don't recall what I provided.

20  **Q.**   Earlier your counsel -- and let me get this -- gave you

21  Plaintiffs' Exhibit 49.  And in that document it had the names

22  Dan Gasaway and Jerry Bowman next to your name.

23  **A.**   Correct.

24  **Q.**   You've never spoken to Dan Gasaway, have you?

25  **A.**   No.

1  **Q.**   You've never spoken to Jerry Bowman, have you?

2  **A.**   No.

3  **Q.**   You have no testimony today that can connect Dan Gasaway

4  to any of the defendants in this case, can you?

5  **A.**   No.

6  **Q.**   You've got no testimony today that can connect Jerry

7  Bowman to any of the defendants in this case, can you?

8  **A.**   No.

9  **Q.**   When you went to vote no one screamed at you, did they?

10 **A.**   No.

11 **Q.**   No one threatened you, did they?

12 **A.**   No.

13 **Q.**   No one coerced you, did they?

14 **A.**   No.

15 **Q.**   Your only testimony about feeling nervous was because

16 someone told you that you had been challenged and that you

17 would have to provide additional documents confirming you

18 lived at the address in Banks County; is that right?

19 **A.**   I just testified to what made me nervous, and it wasn't

20 necessarily just what you just said.

21 **Q.**   What else, other than the two things that I just said,

22 made you nervous?

23 **A.**   So when I voted, I voted on paper and the poll worker was

24 standing right next to me.  And I noticed that, you know, no

25 poll workers were standing right next to anyone else.  And it

1    just -- it didn't make the experience feel private.  That's

2    another thing you left out.

3    **Q.**    Okay.  So let me just get this clear so we can get a

4    clean record on this.  Other than you going to vote, someone

5    saying you've been challenged, a poll worker standing right

6    next to you, and you being asked to provide documents

7    confirming you live at the address in Banks County, nothing

8    else made you feel nervous, did it?

9    **A.**    Incorrect.  What -- I guess what mainly made me nervous

10   was I was told that I was being challenged, I didn't know what

11   that meant.  So I wasn't sure if I was lawfully voting or if I

12   would get in trouble for voting, even though I'm a citizen and

13   I should be able to vote.  It was more so -- yeah, I didn't

14   know what it meant.  So I wasn't sure if I was lawfully

15   voting.

16   **Q.**    If I told you that by voting provisionally that you would

17   not be allowed to unlawfully vote, would that make you feel

18   better?

19   **A.**    Yes.  However, I didn't know that at the time.  That

20   wasn't explained to me at the time.

21   **Q.**    So you would agree with me that the fact that you didn't

22   know what provisional voting was contributed to your

23   nervousness; right?

24   **A.**    Yes.

25   **Q.**    So had you have known the law, had you have known what

1  provisional voting was, your nervousness would have been

2  reduced; right?  Or not -- you would have not been nervous at

3  all?

4  **A.**   I think it's hard to say.  So I am a young voter.   There

5  is a lot I don't know about the law.  So it's -- it's hard to

6  say.

7  **Q.**   Understand -- do you understand that you have sued

8  defendants claiming that you are nervous based upon a lack of

9  understanding in the law in provisional voting?  Do you

10  understand that?

11  **A.**   No.   I sued because I was challenged because they believe

12  that I moved, but they don't know my circumstances, they don't

13  know where I live.  So I had to jump through, like, extra

14  hoops in order to just vote.

15  **Q.**   You would agree with me that if they only knew the public

16  knowledge of where you live, your National Change of Address,

17  that they would have reasonably concluded that you did not

18  live in Banks County; right?

19  **A.**   Can you repeat that?

20  **Q.**   Would you agree with me that if anyone was looking at

21  your circumstances in 2020, including the fact you rented an

22  apartment in DeKalb (sic), you filed a National Change of

23  Address in DeKalb (sic), you got a job in Atlanta, that they

24  would have reasonably concluded that you lived in the Atlanta

25  metro area; is that correct?

1  **A.**   I think they would have failed to know my circumstances,
2  my life, and that my job was fully remote so I could work from
3  wherever I wanted to.
4  **Q.**   That's not the question.  Listen to the question so we
5  can get an answer, otherwise I'm going to ask you until you
6  answer the question.
7       The question is, would you agree with me that if someone
8  only knew public information about you, like you had filed a
9  National Change of Address --
10           THE COURT:  Hold on.  We have an objection.
11           MS. FORD:  Your Honor, that has been asked and
12  answered.
13           MR. EVANS:  Judge, I will have to object on the fact
14  of lack of responsiveness.
15           MS. FORD:  And it's also argumentative.
16           THE COURT:  Let me hear the question.  I want you to
17  ask it again.  Let me hear the question once again.
18  BY MR. EVANS:
19  **Q.**   The question is, would you agree with me that if someone
20  only saw what was publicly accessible, including that you
21  lived in Decatur, you filed a National Change of Address in
22  Decatur, you got a job in Atlanta, that they would reasonably
23  believe you lived in the Atlanta metro area?
24           THE COURT:  All right.  Here's how we're going to
25  handle it.  You have to either answer yes or no.  But after

1  you answer yes or no, you can explain your answer.

2         THE WITNESS:  Okay.

3         I can see how that -- yes, I can see how that can be

4  assumed; however, people's lifes and circumstances aren't that

5  simple.  For example, even now I bought a home in Athens, I

6  still have an apartment in Atlanta.  So according to that

7  logic, like, where do I live?

8  BY MR. EVANS:

9  Q.   If someone would have told you at the beginning of this

10  case that you could not have cast an illegal vote because you

11  voted provisionally, would that have affected your decision in

12  suing these defendants?

13  A.   No, because I -- it wasn't just that.  It was my whole

14  experience voting that made me decide to.

15  Q.   But you don't know who any of the defendants are, do you?

16  A.   I do.

17  Q.   You don't know any of their names, do you?

18  A.   I know one name.

19  Q.   A couple more questions.

20         So if someone knocked on your door to ask you where you

21  lived, would that make you feel uncomfortable?

22  A.   It would.

23  Q.   So you would agree with me that you would not feel

24  comfortable if someone, in determining where you lived, came

25  up to your doorstep to ask you where you live, would you?

1   **A.**   Correct.

2          MR. EVANS:  Judge, no further questions.

3          THE COURT:  Redirect?

4          MS. FORD:  No redirect, Your Honor.

5          THE COURT:  All right.  Thank you, ma'am.

6          THE WITNESS:  Okay.  Thank you.

7          THE COURT:  You may step down.  Thank you.

8          We'll stop right here.  Take a 15-minute break.

9   Start back at 10:46.

10          (A break was taken at 10:32 a.m.)

11          THE COURT:  Ms. Ford, you can call your next witness.

12          MS. FORD:  Your Honor, we call Dr. Orville Vernon

13   Burton.

14          THE COURT:  Okay.

15          Hello, Mr. Burton.  Long time no see.

16          THE WITNESS:  It's always an honor to be in your

17   courtroom, Your Honor.

18          THE COURT:  Nice to see you again.

19          THE DEPUTY CLERK:  Would your raise your right hand,

20   please.

21          THE WITNESS:  I have a little problem.

22          THE DEPUTY CLERK:  That's fine.

23                        * * * * * *

24                  ORVILLE VERNON BURTON,

25          having been duly sworn, testified as follows:

1                              * * * * * *

2          THE DEPUTY CLERK:  Have a seat.  If you could state

3    and spell your name for the record.

4          THE WITNESS:  It's Orville, O-r-v-i-l-l-e, Vernon,

5    V-e-r-n-o-n, last name is Burton, B-u-r-t-o-n.

6    DIRECT EXAMINATION

7    BY MS. FORD:

8    **Q.**   Good morning, Dr. Burton.

9    **A.**   Good morning.

10   **Q.**   You've been retained as an expert for plaintiffs in this

11   case; is that correct?

12   **A.**   Yes.

13   **Q.**   Could you please briefly summarize your educational

14   background?

15   **A.**   I was born in Georgia, but reared in the, country, small

16   -- outside the town in the country near 96, South Carolina.

17   Went to public schools there.  I went to Furman University in

18   Greenville, South Carolina, for my undergraduate degree.  Did

19   ROTC.  So went in the Army '68 or '69, I think, and straight

20   there to Princeton where I did my master's and Ph.D. in

21   American U.S. history.  Got called back in the Army 1974.  In

22   that same year, then, I went to the University of Illinois at

23   Urbana-Champaign to teach, and, actually, received a Ph.D.,

24   wrote it that first year when I was teaching after I had been

25   hired and gone to the University of Illinois.

1  **Q.**   Thank you, Dr. Burton.

2       Do you have any particular specialty in history?

3  **A.**   As I said, particularly United States history, race

4  relations, particularly political and social history.  And I

5  most recently authored a book, did a book on race and the law.

6  *Justice Deferred: Race and the Supreme Court.*  And I have

7  specialized in the American south, but not exclusively.

8  **Q.**   Dr. Burton, have you previously served as an expert

9  witness in voting rights cases?

10  **A.**   I have.

11  **Q.**   What do your expert reports typically examine?

12  **A.**   Well, it's various things for whatever plaintiff's

13  attorneys or attorneys in general had asked me to address,

14  from redistricting, and particularly election laws,

15  socioeconomic status, what is commonly called the Senate five

16  factors, looking at health, education, things of that nature.

17  I have done racial bloc voting, looking at if voting is

18  polarized, felony laws for disenfranchisement.  So a number of

19  different reports over time.

20       The intent and the effect of laws has been the primary

21  reports and testifying I have done in a totality of

22  circumstance analysis, which is what historians do anyway to

23  get at motivation, purpose behind stakeholders, what they're

24  doing, particularly in passing laws.

25  **Q.**   Thank you, Dr. Burton.

1    Have courts consistently credited and relied upon your

2  analysis?

3  **A.**    Yes.

4  **Q.**    To your knowledge, has any court ever excluded you from

5  testifying as an expert or found that your testimony was not

6  credible?

7  **A.**    No.

8  **Q.**    Dr. Burton, in your May 2021 report you list a few cases

9  for which you had been recently retained.  Since then my

10  understanding is that you have also been retained as an expert

11  to provide historical analysis in a challenge to Georgia's

12  S.B. 202 voting law; is that correct?

13  **A.**    Yes.

14  **Q.**    And I understand that you were also retained as an expert

15  in Georgia's redistricting case in Pendergrass v.

16  Raffensperger and Grant v. Raffensperger; is that correct?

17  **A.**    Yes.

18  **Q.**    And that was recently before the Honorable Judge Jones

19  himself?

20  **A.**    Yes.

21         THE COURT:  Yeah, we spent a lot of time together.

22         MS. FORD:  Your Honor, I tender Dr. Burton as an

23  expert in the history of racial discrimination, voting, and

24  politics in the South, including in Georgia.

25         THE COURT:  Mr. Wynne, do you wish to voir dire?

 1          MR. WYNNE:  Sure.

 2          THE COURT:  Okay.

 3  VOIR DIRE EXAMINATION

 4  BY MR. WYNNE:

 5  **Q.**   Dr. Burton, good morning.

 6  **A.**   Good morning.

 7  **Q.**   You're a veteran; right?

 8  **A.**   Yes, I did ROTC.

 9  **Q.**   Okay.  And along with that comes some obligation to

10  serve; right?

11  **A.**   Yes.

12  **Q.**   And you fulfilled your obligation?

13  **A.**   I did through -- through the ROTC.

14  **Q.**   Okay.  Do you know what this case is about?

15  **A.**   I believe it is about challenges and the use of the

16  challenge law in Georgia.  But I was asked to, in fact, do a

17  specific job by plaintiffs' attorneys, and that's what I

18  focused on.

19  **Q.**   Have you done any empirical research concerning the

20  impact of Section 230, which is the statute at issue?

21  **A.**   Of the Voting Rights Act?

22  **Q.**   No.  Oh, do you think the Voting Rights Act is what's at

23  issue in this case?

24  **A.**   No.  I just know that -- as I read it, that the

25  plaintiffs cited the Voting Rights Act Section 11, so I didn't

1  understand your question.

2  **Q.**  Okay.  Do you understand that there is kind of an

3  intersection, if not a dispute, regarding whether Section 230

4  Georgia Election Code, which is 21-230, is inconsistent with

5  the Section 11(b) of the Voting Rights Act?

6  **A.**  And you're speaking of the challenge law section --

7  **Q.**  Yes.

8  **A.**  -- that was first adopted by the legislature in the

9  registration law of 1908?  And then put into the code in 1910?

10  **Q.**  No.  Actually, I'm interested in the version that is at

11  issue here in this case, passed, I believe, in 1994 and,

12  perhaps, amended since.  Are you familiar with that?

13  **A.**  I have read that.

14  **Q.**  Have you read the legislative history?

15  **A.**  I certainly in this case looked at legislative history.

16  **Q.**  The legislative history of the law currently in effect?

17  **A.**  Yes.

18  **Q.**  Can you tell me the difference between Section 229 and

19  230?

20  **A.**  Not by memory.

21  **Q.**  Did you look -- did you study the difference between

22  Section 229 and 230?

23  **A.**  I read the legislative history some time back, and I also

24  looked at the laws themselves.

25  **Q.**  Okay.  What sort of statistical analysis did you do to

1  study the impact of those laws on voter turnout of any kind in

2  the 2021 Senatorial runoff in Georgia?

3  **A.**   What did I do?

4  **Q.**   What statistical analysis as an expert did you do to

5  determine or to look at the impact of the ability to file a

6  challenge on voter turnout in the runoff?

7  **A.**   I was not asked to do that by plaintiffs' attorneys in my

8  report.

9  **Q.**   Have you ever done any type of statistical analysis,

10  that's a mathematical analysis involving percentages and

11  changes in percentages, yourself to look at the impact of any

12  law anywhere on voter turnout?

13  **A.**   Yes.

14  **Q.**   Okay.  Where?

15  **A.**   Oh, in a number of cases from El Centro -- well, the

16  first case that I did where I actually testified in court was

17  McCain either v. Lybrand or Jackson, was early in the 1980s,

18  was a racial bloc voting to see the impact of at-large

19  elections and how that influenced whether a person was able to

20  be elected who was a candidate of choice by minority

21  candidates and whether white voters voted similarly or

22  differently.  So that was the first case.  And I did a number

23  of those kind of cases.

24  **Q.**   Those kind of cases involved, let's take for instance a

25  school board, in an election concerning a school board where,

1  if you had had an at-large position or division between four

2  at-large -- if you had four separate precincts or districts,

3  one assigned to each district, then there's an argument that a

4  switch from that kind of system to an at-large system would

5  impact minority voters because you would dilute the strength

6  of that minority district and you would have none of those

7  minorities if, in fact, they're all concentrated in one

8  district.  Are you familiar with that?  Is that what you're

9  saying?

10  **A.**   It's a complicated --

11         THE COURT:  Let me say this to both of you-all --

12  hold on.  Let me say this to both of you-all.  If anybody

13  loves a good election discussion, it's me; however, you're

14  talking about Section 2 and this is Section 11(b), so let's

15  keep it to 11(b).  Okay?

16  BY MR. WYNNE:

17  **Q.**   That's it.  You've done all this work on Section 11(2) --

18  Section 2.  What have you done on Section 11(b)?

19  **A.**   Well, I have looked at intimidation of voters.

20  **Q.**   Have you done any statistical analysis as an expert to

21  determine whether there was a disproportionate number of any

22  minority challenged in the runoff in Georgia in January of

23  2021?

24  **A.**   I was not asked to look at the implementation of this

25  law.  But I read the newspapers, the closest of the election,

1   things -- I guess I do not understand your questions.

2   **Q.**   Do you understand that 46 states out of 50 have some type

3   of provision in their election code that permits citizens to

4   give notice to their county Boards of Election -- and I'll use

5   that word "give notice" instead of "challenge," because I

6   think it's more accurate.

7       Do you realize that 46 states give individual citizens

8   the opportunity to tell their county Boards of Election that

9   -- or bring to their attention that there may be some or a

10  group in their community that are not eligible to vote in the

11  precinct or have moved?  Do you know there's 46 states?

12  **A.**   I know there are several -- there are states, but I was

13  not specifically asked to look at that.  I was asked to look

14  at the voter intimidation in Georgia and particularly how that

15  related to challenges to vote in Georgia, and to look at,

16  then, given the context, for you attorneys and for Judge

17  Jones, to help them determine that --

18  **Q.**   Okay.

19  **A.**   -- how these things have been used and they reached the

20  level of intimidation, I guess, would be what you're doing,

21  but those are legal questions.  What I am doing --

22  **Q.**   Actually, sir --

23  **A.**   -- is the -- is the context.

24  **Q.**   The level of intimidation, does that not depend on some

25  type of statistical analysis concerning the impact of such a

1  law?

2  **A.**   I don't think necessarily so.  I don't think I'd agree,

3  if I understand your question correctly.

4  **Q.**   Okay.  And I respect all your work, and I -- believe it

5  or not, I've read a lot of it and have a great deal of respect

6  for people in your area.  I'm a fan, for instance, of Cornel

7  West, I go to hear him talk, I've read a lot of this.

8        But what I want to ask you, in this particular case, sir,

9  you said you were not asked to conduct the type of analysis to

10  determine whether this history has a specific impact on the

11  question that's posed for the Court.

12        Now --

13  **A.**   I'd like to interrupt you there.  I did not say that.

14  **Q.**   Okay.  What were you not asked to do?

15  **A.**   To do a statistical analysis of the impact.  I am -- was

16  asked to do the context; that history is important, it's very

17  important, particularly if you're going to understand how

18  certain people feel when they are challenged.  I hope you

19  would agree with that.

20  **Q.**   Yeah.  Did you talk to anybody who was challenged?

21  **A.**   No.

22        THE COURT:  Hold on.  I have an objection.  Hold on.

23  I have an objection.

24        MS. FORD:  I think this is going outside Dr. Burton's

25  qualifications.

1          THE COURT:  I think she's right, Mr. Wynne.  I'm
2    going to sustain that objection.
3    BY MR. WYNNE:
4    **Q.**   In any case in the past, have you looked at how this
5    history or context has impacted actual results in any of your
6    work?
7    **A.**   I have to -- I have to be careful how I answer this, to
8    be truthful.  I believe particularly when I did data analysis
9    and how -- was their bloc voting and things, how that
10   impacted, how in fact even the percentage of districts related
11   to whether candidates could be elected or not.  So in that
12   regard, I would say, yes, those are laws that regulate the
13   voting process.  And when I was asked to do that kind of
14   analysis, that I did and then I had a result.
15         But this -- in this case, I am asked to put all of this
16   into historical context of voter intimidation and particularly
17   how challenge laws have been used.  And then to look at how
18   the recent, with the 2020 election and the runoff, True the
19   Vote's challenges fits into that pattern.  And that was what I
20   was asked to do, to give that context for attorneys and for
21   Judge Jones to be able to make the legal arguments, come to
22   legal decisions about this case.
23   **Q.**   Look, I'm not criticizing you for not doing these things.
24   I have two other very brief questions.
25         Do you realize that under the statutory system in Georgia

1  it's the individual county Boards of Election who make the

2  decision whether to discard a notice or to look at it or to

3  actually use it to flag somebody who might be asked another

4  question?  Do you realize it's the county board of election

5  that makes those decisions?

6  **A.**   I believe that I am, but there is a lot with the state

7  that, you know, the -- particularly the laws of when to do

8  database maintenance, things of that nature.

9  **Q.**   Would you agree that database management is important?

10        THE COURT:  Hold on, I have an objection.

11        MS. FORD:  Your Honor, this is also outside the scope

12  of qualifications.

13        THE COURT:  I think so again.  I mean, what they

14  qualified Dr. Burton on, that last question particularly is

15  outside of that we're talking about he's going to be testify

16  about as an expert.  I'm not going to qualify him in that

17  area.

18        MR. WYNNE:  All right.  I'm sorry.  I was just

19  curious about the answer.

20  BY MR. WYNNE:

21  **Q.**   One other area.  On any election ballot, you realize that

22  there are down ballot questions about approving, say, a bond

23  issue for construction of a public work and other things like

24  that?

25        MS. FORD:  Your Honor --

1          THE COURT:  Hold on, I have an objection.

2          MS. FORD:  This is also outside --

3          THE WITNESS:  Do you want to give --

4          THE COURT:  Hold on, hold on.  Again, Mr. Wynne, I

5    agree with Ms. Ford.  It's outside what he's being qualified

6    to testify about.

7          MR. WYNNE:  Okay.

8    BY MR. WYNNE:

9    **Q.**   So you're not going to be testifying about any of those

10   sort of specific down ballot items as I described them, those

11   are school board and those kind of races, you're not going to

12   talk about that or bond issues?

13   **A.**   If questions come up, I might speak to school board

14   issues.  I can be specific on one I plan to --

15         THE COURT:  Well, okay.  Hold on, hold on.

16         MR. WYNNE:  Thank you, sir.  And thank you for the

17   work that I honor.

18         And I have no objection.  No objection.

19         THE COURT:  Okay.  Thank you, Mr. Wynne.

20         And this -- Ms. Ford, would you state again for the

21   record what Dr. Burton is being qualified as an expert in?

22         MS. FORD:  Yes, Your Honor.  We are asking to tender

23   Dr. Burton as an expert in the history of racial

24   discrimination, voting, and politics in the South, including

25   in Georgia.

1         MR. TYSON:  On those limited -- on those very

2    important subjects, I have no objection.

3         THE COURT:  All right.  Dr. Burton will testify as an

4    expert in those areas.

5         MS. FORD:  Thank you, Your Honor.

6    DIRECT EXAMINATION (continued)

7    BY MS. FORD:

8    **Q.**   And, Dr. Burton, you prepared a report in this case?

9    **A.**   I did.

10        MS. FORD:  Your Honor, permission to approach the

11   witness?

12        THE COURT:  Yes, ma'am.

13   BY MS. FORD:

14   **Q.**   Dr. Burton, is this the report that you authored?

15   **A.**   Yes.  And now that I look at it, also a declaration is

16   the first page.

17        MS. FORD:  Your Honor, at this time, we move

18   Dr. Burton's report, Plaintiffs' Exhibit 16, into evidence?

19        THE COURT:  Any objection, Mr. Wynne?

20        MR. WYNNE:  No objection.

21        THE COURT:  16 is admitted without objection.

22        (Plaintiff's Exhibit 16 was received and marked into

23   evidence.)

24   BY MS. FORD:

25   **Q.**   Dr. Burton, let me direct your attention to page 2 of the

1  substantive report, the section titled, "Statement of

2  Inquiry."

3      Is this an accurate summary of what you were asked to do

4  in this report?

5  **A.**   Yes, it is.

6  **Q.**   And can you summarize what you were asked to do?

7  **A.**   I think I've already done it.  But to give an overview of

8  voter intimidation, you know, the history of that in Georgia.

9  And then looking particularly at how voters have been

10  challenged.  And then to give the context of and compare how

11  the challenges in the -- particularly the runoff, that there

12  were some in the 2020 December election, but primarily the

13  runoff, the challenges done by True the Vote fit into this

14  particular history or context.

15  **Q.**   And, Dr. Burton, at a high level, what did you conclude

16  about how voter challenges have been used in Georgia's

17  history?

18  **A.**   Well, particularly since 1867 --

19      THE WITNESS:  Judge Jones, I hope I'm not repeating

20  too much here.

21      THE COURT:  I don't mind hearing it again.

22      THE WITNESS:  Okay.  Thank you.  It's always good

23  when I have students repeat my classes.

24      THE COURT:  I'll probably be in the front of the

25  class.  There are a lot of lawyers out here that would

1    probably say that.

2          THE WITNESS:  I don't think so.  I don't think so,

3    anyway.

4          Remind me of the question, please.

5    BY MS. FORD:

6    **Q.**   Sure.

7    **A.**   At the high level?

8    **Q.**   At a high level, what did you conclude about how voter

9    challenges have been used in Georgia's history?

10   **A.**   Well, it started in 1867 when African American men

11   specifically voted for the first time.  Then there has been

12   intimidation, particularly in the early years, voters were

13   killed and lost jobs.  I mean, it was -- it was that sort of

14   level of intimidation.

15         But in 1907, after they had already created the white

16   primary, they went further.  Because you had had a period of

17   cooperation, of multiracial cooperation where the white

18   Republicans in Georgia, particularly Black and white farmers

19   came together in what's called the People's Party, the

20   populist movement, and in the 1890s were actually successful

21   even electing candidates to Congress.

22         And so there was passed by the legislature

23   overwhelmingly, because by then most Black or Republicans had

24   been kept from being in the legislator by the -- at that time,

25   the poll tax and the cumulative poll tax that comes in with

1    the Constitution of 1877.  And then the introduction of the

2    white primary, which Georgia is the second state to do.

3         But to make certain, the Felder-Williams bill was passed,

4    it's called the disenfranchisement act.  And the next year, in

5    1908, is added to the Constitution.  And it really -- it was

6    called the disenfranchising law.  And particularly Governor

7    Hope Smith was very proud of the registration law that came

8    that following year in 1908, which included the challenge law.

9    And then those were in place.  So even those people with the

10   reregistration that was required had to go through the

11   challenge process.

12        But because most Black citizens, minority citizens, and

13   some whites were disfranchised by this, you really don't have

14   it come into the challenge law used very much until 1944, when

15   *Smith v. Allwright*, the Supreme Court says you cannot have the

16   white primary.

17        So for the 1946 election, there are lots of challenges.

18   And then there are challenges used pretty consistently after

19   that, particularly when light with reconstruction, light with

20   the populist movement, you have real influence or the

21   potential of influence by minority citizens, particularly

22   Black citizens in most of these cases, making a difference in

23   the electoral process.

24        And these continue, you know, in the '50s, right into the

25   2000s, 2014.  And then you have the context of what's just

1  happened with True the Vote, particularly in the runoff to the

2  Georgia election.

3      Is that a high enough level or --

4  **Q.**   Yes, thank you.

5      Dr. Burton, I'd like to go back to the origin of the

6  challenge law very briefly.

7      But how did state officials explain the purpose of the

8  law at the time?

9  **A.**   The same trope, that is the false trope that was created

10  after the Civil War.  Some people call it the -- you know,

11  sort of myth of the old south, but it's really a -- an excuse

12  that every time these kind of laws come in, that is, that

13  there is fraudulent voting, there is voter fraud.  You know,

14  there are quotes -- I'm happy to give you, if you want --

15  particularly from Governor Hope Smith who is sort of pushing

16  the registration law about the purchasable -- excuse me --

17  Negro --

18          THE WITNESS:  Sorry, Your Honor.

19          Is I believe the exact quote.  And that Black votes

20  are always fraudulent.  That they can be bought.  And then by

21  combining with whites or outsiders that they will particularly

22  challenge white supremacy or get elected.

23          But voter fraud is -- that trope is one that

24  Professor Lopez, who is one of the scholars who have written a

25  lot about dog whistle politics and coded racial appeals, says,

1 and I have this quoted in the report, that it is a dog

2 whistle, and that means that you don't talk about race when

3 you use it, but it triggers off subtly the idea that it is

4 these fraudulent voters and particularly minorities or Black

5 people.

6 **Q.**   Dr. Burton, is your testimony here today asking the Court

7 to find that the challenge law was motivated by discriminatory

8 intent?

9 **A.**   No.  But I wish it were.

10      Would you like me to elaborate?  It seems to me that this

11 law was founded in sin, if our sin in this country is racism

12 and with racial intent.  People at the time could not stop

13 bragging about that's what they were doing with this law,

14 which was then encoded into the Georgia code in 1910.  And

15 though it was modified, even when it was modified in the

16 1930s, the person doing it said this is essentially the same

17 law that has come down and the ordinance of it.

18 **Q.**   Well, Dr. Burton, let me ask you this.

19      If plaintiffs were not asking you to, you know, show

20 discriminatory intent in the law, if that was not your

21 essential purpose, why did you still feel it was important to

22 include this history?

23 **A.**   Well, I think because of the reasoning behind it.  It's

24 part of the context that this law comes in.  And I think it is

25 important.  But I can, you know, give you examples of what the

1  reasons that were given by this law.  And it's exactly the

2  same reasons that are given today and that were given in 2020

3  and 2001 -- no, I guess it's -- yes.  But for the runoff

4  election of voter fraud as being the reasoning without, as far

5  as I can tell, any proof of voter fraud.  And so you have to

6  ask, why do you do something if you don't have that as a

7  problem in elections?

8  **Q.**    Dr. Burton, on page 9 of your report you discuss the

9  actual language of the challenge law --

10 **A.**    I do.

11 **Q.**    -- at the time.  Could you briefly summarize for us --

12 **A.**    This is on page 9.

13 **Q.**    -- what the law said?

14 **A.**    The bill further stipulated that, quote, the list from

15 the voters' book shall be open to public inspection, and any

16 citizen of the county shall be allowed to contest the right of

17 registration of any person whose names appears upon the

18 voters' list.

19 **Q.**    And how was this challenge law perceived at the time?

20 **A.**    Well, as I explain in the sources that I use and the

21 methodology, newspapers are very, very important for public

22 opinion.  So I used some.  And I tried to look as many as I

23 could, as I always do, to try to get various interpretations.

24       But here's what the Cartersville news explained that the

25 law provided:  The registration list shall be placed on

1  exhibit in the Office of the Clerk of Court -- and I'm

2  quoting.  And I put this in bold, but it's my emphasis,

3  because I think it's very -- where all may inspect and may

4  challenge those who are thought not to be worthy of a place.

5      That's pretty powerful about judging people, not just

6  saying that they are illegally registered or improperly

7  registered, but they're not worthy at that time.

8      And then -- let's see.  Yes, let's go down to Governor

9  Smith, who I think is so important, because he takes credit

10  for this law.  This is something he's proud of.  He explained

11  during his tenure, quote -- again, page 9 -- "We adopted a

12  registration law that was intended to make complete and fully

13  effective the disfranchisement law," which they explain.  But

14  that was about the Atlanta paper next.

15      "This registration provision is a part of the pure

16  election law," that's what the registration law was called in

17  1908, from which the challenge law was a part and which got

18  incorporated into the code in 1910.  Still quoting, that my --

19  my noting there was not part of the quote.  Let me start over

20  for you.

21      "This registration provision is a part of the pure

22  election law which guarantees a ballot to every real white

23  citizen of the state and which guarantees further that this

24  ballot's power shall not be vitiated by a corrupt and floating

25  element."

1        Again, those are the kind of words that were used to

2   explain why they were doing these laws.

3   **Q.**   And, Dr. Burton, at a very high level, what was the

4   effect of this new disenfranchisement (sic) law and challenge

5   law after they were introduced?

6   **A.**   Well, it was totally effective.  Three-quarters of black

7   registered voters were removed, not there.  It affected -- to

8   compare it with 6 percent of white registered voters.  So

9   75 percent of black registered voters are removed from the

10  rolls and 6 percent of white voters.

11  **Q.**   Thank you, Dr. Burton.

12       I'd like to move ahead in time.  And at pages 11 to 13 of

13  your report you discuss how voter challenges were used in the

14  1940s.  Can you summarize that history for us briefly?

15  **A.**   Yes.  As I said, you did not have to rely -- intimidation

16  remained both physical, economic for people who stepped

17  outside.  But because Black people were pretty much -- and

18  some whites -- disfranchised by the white primary and the poll

19  tax, particularly the cumulative poll tax laws and things, it

20  wasn't used.

21       But in 1946, in *Smith v. Allwright*, the Supreme Court

22  said that at least in federal elections the white primary was

23  unconstitutional.  You could not exclude people in federal

24  elections.

25       And then the very next year, in *King v. Chapman* when in

1    fact Primus King tried to vote after the 1944 Supreme Court

2    election and he was denied that right to vote.  Then the judge

3    ruled that state elections could not, also, keep people out by

4    using a white primary.

5         So then you also had with -- I'm giving context.  Do you

6    want me to go back to your question?  I was just going to say

7    that there was a huge increase in registration after the

8    white -- both Black and white the largest effort.  The NAACP

9    worked with a group to get in particularly Black citizens

10   registered to vote.  But it was a huge increase.  As I

11   remember, someone quoted the largest increase for a white

12   primary ever.

13        And so with that, the 1946 gubernatorial campaign -- it's

14   rather famous -- the Talmadge machine that was Gene Talmadge,

15   was the original, and then Herman Talmadge becomes a part of

16   it, without going too much in history, a very power political

17   group that particularly used the challenge laws.

18        And he and Marvin Griffin, who was running for lieutenant

19   governor, used -- the Talmadge machine challenged voters in 30

20   counties.  And the effect was, from the best estimates a

21   historians can do, between 15,000 and 25,000 African Americans

22   were challenged and successfully were kept from voting.  And

23   that's the -- I believe that's the first use that I came

24   across in the sort of mass challenges.

25   Q.   Dr. Burton, does the historical record reveal whether the

1  challenges that were filed in the election had merit?

2  **A.**   They were -- yes, they were frivolous.  To show you just

3  how frivolous they were, they had mimeographed, just leaving a

4  place for the name and the county, and listed various reasons,

5  like, not 18 years of old, can't read or write or understand

6  or not a good -- you know, so it was just -- the only thing

7  they knew, that they were challenging Black voters and putting

8  their names in.

9       It was a mass attempt to disfranchise, in this case

10  particularly Black voters, many who were voting for the first

11  time, and challenge them in those counties.  The 30 -- it was

12  more than 30 counties now that I think about it, when I said

13  30 counties.

14  **Q.**   And how did the counties respond to the challenges?

15  **A.**   Well, in various ways, of course.  Some subpoenaed the

16  challenged voter to come to prove.  Some were so overwhelmed

17  they couldn't do anything because it was so close to the

18  election and how would they be able to do it.  But they did it

19  in various ways is the way the county did it.  Some were

20  challenged legally about the law.  And it varied from county

21  to county or even within the counties.

22  **Q.**   And did the challenge -- challenges have effect on voters

23  even if the county didn't process the challenge?

24  **A.**   Yes.

25  **Q.**   How so?

**A.**    Well, for a couple of reasons.  One, you are called out.
You are told -- and many people interpreted this as
something's wrong for me.  I'm being challenged by an
authority figure.  So that's part of it.

But also in terms of economics.  It's like adding a poll
tax, since most of the people were laborers, worked for
someone else.  And, of course, there is no law in Georgia that
says somebody has to give you time off and you may not even
want them to know that somehow you're being suspected of
something wrong within the government, an authority figure.
That carries a message upon itself.

And even then you had to go to a specific place during
specific times, particularly in 1946.  How many of these
voters even had cars or ways to get there if they could get
off work.  So it adds all these things that I think sort of
add up to what I would call a 1946, '50s, new kind of poll tax
that's differential.

**Q.**    And, Dr. Burton, so what was the overall effect of the
challenges in the 1946 election?

**A.**    Well, they were overall successful in disfranchising it.
Newspapers commented at the time that this was the way that
the Talmadge machine, in particular, those were the two people
who were running against other white candidates, incidentally,
no Black candidate could win against their opponents in that
election.

1  **Q.**   And did voter challenges, in fact, continue after that

2  election?

3  **A.**   Yes.

4  **Q.**   Can you give us just one or two examples?

5  **A.**   Yes.  In the 1948 election, of course, this is after

6  Talmadge is dead, and there's a really contested election.

7  There are a number of examples there.  In fact, it was during

8  that time that three-quarters of the Black voters who were

9  registered in Laurens County were purged.

10       There are -- and these are on page 15, the example,

11  Marion County.  The day before the Democrat primary election,

12  558, this is the day before the election, were purged from

13  Spalding County's registration list.  And I give other

14  counties where examples --

15  **Q.**   Thank you.

16  **A.**   They're there on page 15.

17  **Q.**   So I'd like to jump even further in time to get us closer

18  to the present day.

19       Did Georgia see any mass voter challenges in the 1980s or

20  1990s?

21  **A.**   Yes.  And, of course, in the 1950s, too, I didn't go

22  there, but, in fact, there is at least one example of one

23  person challenging about 300 voters, to give you an idea of

24  how people can challenge -- one person challenge so many.

25  There is another later one where I think someone challenged

1    700 -- one person challenged 700 or 900 people, if you can

2    just sort of imagine this sort of mass thing going.

3         So you asked about the 1980s; right?

4    Q.   Yes.

5    A.   Okay.  In 1981 there is an instant focus on Fulton

6    County.  And the demographics -- in particular in the 1950s

7    and World War II, this is where Black voters -- Black citizens

8    who were still able to vote had sort of concentrated.  And so

9    it's particularly important.

10        But there was a group by a candidate, really the leader

11   of it, Ben O'Callahan, who challenged voters, 50,000

12   registered voters there.  And there's a differential in Black

13   voters and white voters from Fulton County and the areas there

14   that are disfranchised.  58 percent of them were Black of

15   these 50,000.

16   Q.   And, Dr. Burton, what was the justification that was

17   given for those challenges?

18   A.   Voter fraud.

19   Q.   And in the historical record, was -- did it appear that

20   there was merit for that challenge?

21   A.   No.  In fact, I cite three articles there.  And the one I

22   believe by -- I'm blanking on his name all of a sudden.  The

23   Atlanta -- he wrote for the Atlanta Journal-Constitution, said

24   he was -- his expertise was voting -- voting and how it's

25   done.  I'll think of his name in a minute.  But he says that

1  he had one rule, when a law was so complicated in trying to

2  explain why it was necessary, why it was done, or how you

3  could then get yourself cleared so you can be on the

4  registration list, if he couldn't understand it, then there

5  was something fishy about that -- that purge and the law, he

6  said the way it was executed.

7  **Q.**   Dr. Burton, until 2020 was that the largest voter

8  challenge in Georgia history that you are aware of?

9  **A.**   Yes.  Unless you look at the number of counties that

10  we've talked about earlier in the 1946 governor's race that

11  Herman Talmadge and Marvin Griffin were joined.  It was the

12  largest number that I saw that had been challenged, 50,000.

13  **Q.**   And do voter mass challenges persist in the 2000s in

14  Georgia?

15  **A.**   They do.

16  **Q.**   How would you characterize them in comparison to the

17  challenges, the main challenges we've discussed today?

18  **A.**   Well, they are not as large.  2004 was a presidential

19  election and it was challenged in Latino and Hispanic voters.

20  And the 2016 was Black voters in Hancock County, even though

21  Hancock County is a white predominantly county.  Sparta is

22  predominantly black.  And 100 and -- if I can look -- yeah,

23  174 residents of Sparta were challenged in 2016.

24  **Q.**   Dr. Burton, we'll come back to the topic of voter

25  challenges in a moment, but for the moment I'd like to focus

1   on the environment in Georgia from 2010 to 2020.  Can you

2   summarize for us what was happening in Georgia in this time

3   period with respect to election and demographic trends?

4   **A.**   Well, the demographic trend is a recognition of the

5   increased minority population.  Let me just briefly explain

6   that it was interesting to me that of all the former

7   confederate states, only in Georgia has the proportion of the

8   population that is Black increased.  And then you have, of

9   course, the large influx or in migration of Hispanic and

10  Latino voters and also Asian voters -- a large percentage

11  increase in all of those.  Cumulative together.  I've seen it

12  both ways.

13      I had thought, as I understood it, that Georgia was now

14  barely a minority majority state.  But in your courtroom I saw

15  statistics that said it's just about at the tip edge, that it

16  is such a -- that there -- but people are concerned about

17  this, of course.

18      Was that -- was that your question or was there more?

19  **Q.**   It was.  And then I also asked, what do you see with

20  respect to election trends over this decade, 2010 to 2020?

21  **A.**   Well, increasing voting.  And one of the things in 2020

22  you see is, for the first time, you have a black Georgia

23  senator who will be elected eventually, as well as a Jewish

24  senator, but the first time a Democrat has won -- that a

25  former president keeps reminding us by less than 8,000 votes

1  in Georgia.  Very, very close when Joe Biden won.  And he's

2  the first Democrat to be elected since southerner Bill Clinton

3  in -- I believe -- yes, and then Jimmy Carter before him.

4      So it is a major invisible shift of the power of this

5  demographic shift of people voting and having an effect on the

6  elections.

7  **Q.**  And how did the state itself respond to the growing

8  participation of minority voters in Georgia?

9  **A.**  Well, this is something that surprised me when I got into

10  it.  I think I give the example of state-sponsored

11  investigations, which have a very intimidating effect I think

12  on anyone, and I try to give evidence of it.

13      But state sponsored -- I give at least three examples of

14  state-sponsored investigations, and some newspaper, as well as

15  statements, by the people who felt intimidated on what this

16  meant as part of my report.

17  **Q.**  Well, you don't need to give us all of your examples --

18  **A.**  Okay.

19  **Q.**  -- but could you give us one example?

20  **A.**  Sure.  I think the most famous is the Quitman's 10+2, and

21  this is in Brooks County, which is why Quitman's is a Black

22  school.  And in 2009, Nancy Dennard ran for the school board,

23  and she went out to try to get registered, people who had not

24  normally voted and also used absentee ballots and was elected.

25      And there were complaints.  There was an investigation.

1   And the investigation came back and said there was nothing

2   wrong.  But in 2010, two more African American women ran for

3   the school board and they, too, were elected.  And they worked

4   hard to get voters who had not normally voted to register to

5   vote and come out, and also who couldn't get their ballots to

6   the -- to voting places.  So absentee ballots again were --

7   were used strongly, and they were elected.

8        And then on and -- at that time, Governor Kemp -- not

9   Governor Kemp, excuse me -- then Secretary of State Kemp

10   started an investigation of these Quitman County Black elected

11   officials and others.  And so as I remember, 102 felony counts

12   were filed against them.  I use the word "doggedly."  He

13   doggedly pursued it.  It was six years.  It starts in 2000.

14   It was not until 2016 when, in fact, the Attorney General says

15   they've done nothing wrong and cleared them, that he backs

16   down from that particular state investigation.

17        And if I may, can I give some examples?

18   **Q.**   Sure.

19   **A.**   Okay.  Let's see if I can find them.  Let me see if I can

20   find what page, but both Dennard and Thompson made some

21   statements that I thought were important.  Oh, here it is.  On

22   page 19.

23        Dennard said -- and this -- you asked about changes.  She

24   calls it a movement, that particularly minority voters and

25   particularly Black voters are almost like a second civil

1  rights movement in some ways, are really registering to vote
2  that they see that now they have more people they can make a
3  difference, particularly in the local elections.
4       "They thought they could make an example out of me and
5  that would kill the spirit of the movement."
6       Now, Thomas interpreted the Quitman 10+2 originally
7  investigated by explaining that, and this is a quote that
8  really sends them, I think, an important idea of how people
9  perceived the state investigations would also relate, I think,
10  to challenge -- to being challenged.
11       "The message sent to our citizens was if you don't want
12  the Georgia Bureau of Investigation" -- the actual -- she had
13  GBI is what she called it but in the quote -- "want the GBI to
14  come visiting and put you in jail, you better not vote."
15  **Q.**    Dr. Burton, was the Quitman case an outlier?
16  **A.**    No, no.  Not at all.  2014, for instance, Secretary
17  Kemp -- I believe it's around that same time -- launched an
18  investigation into the New Georgia Project, whose mission was
19  to get people who hadn't voted before registered to vote and
20  vote.
21       And he also went after the Asian legal advisory
22  committee, an organization that had criticized Secretary Kemp
23  for not registering all voters who had applied to register.
24       And I will give a quote from a journalist.  As I said, I
25  think newspapers are particularly good to get the context of

1   the time following these.  And this is on page 20.  The

2   journalist said and described these investigations as, quote,

3   legal terrorism.  A powerful, powerful word.  Legal terrorism,

4   exploiting the law to intimidate and discourage citizens from

5   accessing their Constitutional right to vote.

6   **Q.**   Dr. Burton, these investigations obviously are not about

7   voter challenges, so why do you include a discussion of them

8   in your report?

9   **A.**   Because I think they fit, in fact, I know they fit the

10   pattern of trying to intimidate voters, to intimidate voters

11   from voting.  When I spoke about 1946 in the election,

12   governor at that time candidate Gene Talmadge said, "Wise

13   Negros will know not to mess around and vote in white people's

14   elections."

15        When a group near Warm Springs, Georgia, thought because

16   Franklin Delano Roosevelt was seen by a lot of Black citizens

17   as someone who would look favorably upon them and help, they

18   were going to register to vote, then groups dug graves at the

19   courthouse and then burnt crosses at every crossword.

20        This idea of intimidation is coming through a through

21   line in Georgia's history, particularly for minority voters.

22   There was a Black educator and administer from Blakely County

23   who went to vote in 1955.  And the county -- or the sheriff, I

24   can't remember, I believe -- said to him, no Black people --

25   didn't use that word -- are going to be allowed to vote in

1  this courthouse.  Then a cross was burned in his yard.  He did

2  not attempt to register to vote again until 1964.

3       These are the kind of messages you have to understand, I

4  think, from the perception of certain voters what a challenge

5  means to them.  And it's also as -- as I believe as

6  Ms. Thompson said, or at least reported, said in the newspaper

7  it sends a message.  If you don't want to get in trouble, if

8  you don't want the Georgia Bureau to come after you, you

9  better not vote.

10 **Q.**   Dr. Burton, so I'd like to return to the challenge

11 efforts that we saw in this election that's at issue, the 2021

12 Senate runoff election to bring us to the present day.

13      MS. FORD:  Your Honor, do I have permission to

14 approach?

15      THE COURT:  Yes.

16 BY MS. FORD:

17 **Q.**   So, Dr. Burton, this is Plaintiffs' Exhibit 42, which has

18 already been admitted in to evidence.

19      Dr. Burton, have you seen this exhibit before?

20 **A.**   I have.

21 **Q.**   And did you review it in preparing your report for this

22 case?

23 **A.**   I did.

24 **Q.**   And could you just tell us the date and title of this

25 document?

**A.**   Yes.  It is a press release by True the Vote in
December 18th, 2020.  "True the Vote partners with Georgians
in every county to preemptively challenge 364,541 potentially
ineligible voters."
**Q.**   Dr. Burton, in terms of their size, how do these
challenges, at least as described in the press release,
compare to prior mass challenge efforts in the state of
Georgia?
**A.**   Well, it dwarfs all of them.  I think if you added them
altogether you wouldn't come up with half of this.  But it
absolutely dwarfs all of the voter challenges in numbers that
we -- that I have seen and tried to record the number of.
**Q.**   And, Dr. Burton, of course this is just a press release.
     If the organization, in fact, challenged approximately
250,000 voters, would that still be larger than any mass
challenge effort that you were aware of in Georgia's history?
**A.**   Yes, it does not change a thing that I see.  It still
overwhelms more than all of them added together.  It is just
amazing 364,541 potentially ineligible voters when you think
about how close the 2020 election was.
**Q.**   Dr. Burton, having researched prior mass challenges in
Georgia's past, is it your opinion that challenges like this
can result in voter intimidation?
**A.**   Yes.
**Q.**   Why is that?

1 **A.**    Because as I pointed out historically what has happened;

2 first of all, you've been called out.  You're worried,

3 particularly, say, if you're a minority voter, perhaps, about

4 being subject to a criminal investigation, even though you

5 have done nothing wrong, you may not want your employer --

6 say, if you're a young voter, white or black, to say you have

7 done something wrong.  That's rather intimidating,

8 particularly, if you're starting your career and wanting to

9 get promoted.  Why are you listed?  Are you not smart enough

10 to be a -- a registered voter in the correct way?

11      So there is a lot of intimidation in this if you're being

12 challenged.  So much of it depends from the perception of the

13 voter and who they are and what their life experience has been

14 as well.

15 **Q.**    And, Dr. Burton, from what you have seen with other mass

16 voter challenges, what are the potential consequences of

17 having challenges like this filed so close to Election Day?

18 **A.**    Well, as we pointed out, even starting earlier with the

19 19 -- yes, 1946 and the '48 elections, filing them right

20 before, just overwhelmed, overwhelmed both the bureaucracy,

21 that is, the county administrators or the precinct that have

22 to deal with this; but, secondly, it doesn't give much time

23 for challenged voters to be able to respond and get whatever

24 necessary documentation they need, maybe to get off work to do

25 it, this adds to the poll tax.  They are in that 1981 purge,

1  as the newspaper reporter who held himself public as the

2  expert for the Atlanta Journal, that you can't even figure out

3  what you're supposed to do to prove that you are a registered

4  voter.

5      Was that the entirety of your question or was there more

6  to it?

7  **Q.**  It was.  Thank you, Dr. Burton.

8      Can I direct your attention back to this exhibit,

9  Plaintiffs' Exhibit 42, to the third page of text.

10  **A.**  The text, not just the third page; right?

11  **Q.**  I'm sorry, the third page.

12  **A.**  Oh, okay.  I'm there.

13  **Q.**  Can you read the paragraph for us that starts with, "An

14  electoral challenge"?

15  **A.**  Yes.  This is the second full paragraph, if I'm reading

16  the right one.

17      "An electoral challenge does not remove voter names from

18  the registry.  Voters who have been challenged and have the

19  opportunity via code Section 21-2-230 to prove eligibility and

20  still have their vote counted in the upcoming runoff

21  election."

22  **Q.**  Dr. Burton, having researched prior voter challenge

23  efforts, does having the ability to prove one's eligibility

24  mean that the challenge will not have an effect on voters?

25  **A.**  No.

1  **Q.**   And why not?

2  **A.**   Well, as I said, the intimidating fact or the idea that

3  you're being singled out, somehow unworthy, or that you've

4  made some mistake, or to get people the opportunity or even

5  having the opportunity if you're subpoenaed to be able to go

6  and prove what you need to find the documentation and other

7  things that you need to show that you're an eligible voter.

8  Or just to go through the whole rigamarole that it takes to

9  do.  That's sort of like adding this extra poll tax on someone

10  who has been challenged, particularly in this case -- I'm

11  sorry, somebody?

12        THE COURT:  Go ahead and repeat your answer.  Go

13  ahead and finish your question.

14        THE WITNESS:  Yeah, I got lost again.  I'm sorry but,

15  once again, the question?

16        THE COURT:  Repeat that question.

17  BY MS. FORD:

18  **Q.**   You adequately answered my question.

19  **A.**   Oh, okay.

20  **Q.**   I'll just ask you sort of a, you know, a concluding -- if

21  you could summarize for us, and at the end of the day, what

22  did you conclude about the voter challenges that were used in

23  the 2021 Senate runoff election by True the Vote and how they

24  fit in the historical pattern that you had previously seen?

25  **A.**   Well, they fit perfectly into the historical pattern

1  that -- with this demographic shift, with more minorities

2  registering to vote, with more younger people, whatever

3  their --

4          THE WITNESS:  As you know, Judge, I don't believe

5  there's any such thing as race, but for a shortcut, I'll say

6  whatever their ethnicity.  How's that?

7          THE COURT:  So noted.

8          THE WITNESS:  That they can make a difference, and,

9  in fact, we saw did make a difference in the election.  It

10  goes back to that same pattern.  Whenever people are able to

11  have an influence or an opportunity to elect candidates of

12  choice, or that potential has been shown, then there are --

13  that time when things like the challenge laws have been used

14  to try to restrict their influence in those elections.

15          Secondly, it seems to me that, once again, just as

16  Gene Talmadge did these mimeograph things, the challenges seem

17  very frivolous to me, the reasons given.

18          And also that while they are doing this, that it

19  is -- voter fraud has been the same thing that's been used

20  since 1867 -- I can go through each and every time -- as an

21  excuse for the laws that are put in, many of those, which have

22  been found unconstitutional, to stop people from voting.

23          And, of course, how close they are to the election,

24  once again, comes in.  And, again, I think these challenges

25  have to be understood from the individuals' perspective that's

1  being challenged.  What historically their experience has

2  been, such as, trying to register in 1955 and having a cross

3  burned on your yard if you were a minister and a teacher.  And

4  to follow-up, that's a long historical pattern that I have

5  actually testified to, not here, but previously.  And I know

6  you would not want to hear me go through all of that again,

7  but --

8          THE COURT:  I always enjoy your testimony, but I

9  think Ms. Ford has another question.

10 BY MS. FORD:

11 **Q.**   And, Dr. Burton, just to confirm, you're not offering

12 today any sort of statistical analysis about whether True the

13 Vote's challenge list had merit or was frivolous; right?

14 **A.**   No, I was not asked to do that.

15 **Q.**   Dr. Burton, I just have a few more questions for you

16 today.

17         MS. FORD:  May I approach?

18         THE COURT:  Yes.

19         THE WITNESS:  Thank you.

20 BY MS. FORD:

21 **Q.**   So this is Plaintiffs' Exhibit 25.  Dr. Burton, have you

22 seen this exhibit before?

23 **A.**   Yes.

24 **Q.**   And did you review it in preparing your report for this

25 case?

1   **A.**   I did.

2   **Q.**   And can you please tell us what this document is?

3   **A.**   It is dated November the 6th, 2020.   "True the Vote

4   launches Validate the Vote initiative and whistleblower fund

5   to ensure election validity, process integrity."

6          Again, it's a press release.

7   **Q.**   Thank you, Dr. Burton.

8          MS. FORD:   Your Honor, we move this exhibit into

9   evidence, Plaintiff Exhibit 25.

10          THE COURT:   Mr. Wynne, any objections?

11          MR. TYSON:   No objection.

12          THE COURT:   25 is admitted without objection.

13          (Plaintiff's Exhibit 25 was received and marked into

14   evidence.)

15   BY MS. FORD:

16   **Q.**   Dr. Burton, you've mentioned this idea that voters may be

17   reasonably worried that they will be investigated for the act

18   of voting.   In your opinion, does this press release have any

19   effect on that?

20   **A.**   Yes.

21   **Q.**   How so?

22   **A.**   Well, you've been offered a reward up to the astounding

23   sum of over a million dollars to -- for people who suspect or

24   think that people should not be on the registration list to

25   give evidence of voter fraud.   And not only that, you have a

1   24/7 hotline and a website where, you know, you can fill out

2   anything.

3        And historically we have examples of what I call

4   bounties, maybe not the proper -- but of trying to reward

5   people for doing these sorts of things.  This goes way back in

6   history, if you want to hear a little bit or not, but, you

7   know, in Antebellum, Georgia, they gave rewards if they

8   thought some white person might be an abolitionist.  In the

9   civil rights movement, rewards were given for whites suspected

10  of supporting integration.

11       And then when I talked about the 1944 election, after

12  the -- after the white primary was ruled unconstitutional by

13  the Supreme Court, Georgia was not alone in doing things to

14  try to get around it.

15       So in North Carolina, in Burlington, one group of voters

16  had a reward for $100 for -- similar to what we have here,

17  trying to find voters who should not be registered.  And as

18  one government official said, who will remain -- I have -- I

19  know a lot of people would tell a lie for $100.  I can imagine

20  what he would say about a million dollars.

21       And I would like to maybe just to quote from what -- or

22  at least what the election officials in Burlington, North

23  Carolina, state officials, that group could be accused of

24  insubordination or perjury through their blanket offer to pay

25  information about crimes not known to have been committed.

**Q.**   Thank you, Dr. Burton.  You can set this exhibit aside.

On a different topic, I understand that you conducted some research on the formation of True the Vote and some of their historical efforts with regards to elections; is that correct?

**A.**   Yes.

**Q.**   And from your research, does True the Vote have a history of engaging in any poll monitoring efforts?

**A.**   Yes.

**Q.**   Could you give us an example?

**A.**   Well, it starts in Texas, particularly Houston, Texas, before it was called True the Vote.  I believe it's the King Street Patriots.  I'd have to look back to be absolutely certain.  And they are -- they were very active in Houston, the city of Houston, and challenging or having particularly police officers and others, a lot of people, at the polls.

And like I said earlier, the excuse was, in fact, like Hope Smith, a century earlier, had argued the first step to appear and filing a ballot was exclusive of ignorant and purchasable negro.  This comes out in a conference that is part of it.  So I might want to strike that.  I'm flipping back to where I found it in my report, and that's later.

So True the Vote has sort of relied, though, on voter fraud since then.

In 2010 they dispatched a thousand volunteer poll workers

1  to voting sites across Houston.  And this is from Patrick

2  Michels of the Texas Observer wrote in 2011.  "Though it

3  generated little evidence of voter fraud, the King Street

4  Patriots' effort did result in complaints about voter

5  intimidation and breached ethics, a lawsuit from the

6  Democratic party, investigation by the U.S. Department of

7  Justice."

8       And this is what was reported that happened there.  Poll

9  watchers were accused of -- and I quote -- hovering over

10  voters, getting into election workers' faces, and blocking or

11  disrupting lines of voters waiting to cast their ballot.

12       To that end, True the Vote, as best I can tell from the

13  evidence, found no evidence of fraud, but generated 56

14  complaints about the group's behavior during the 2010

15  election.

16       And then, of course, it expanded to at least 30 states

17  that I found a record of.  In Ohio, for instance, was one of

18  the examples I gave where they challenged a number of voters

19  in one quiet county.

20  **Q.**   Dr. Burton --

21  **A.**   I'm sorry, I don't even remember your question, where I

22  started.  The history of?

23  **Q.**   You adequately answered my question.  Thank you.

24       Dr. Burton, has polling place surveillance acted to

25  intimidate voters in the past?

1  **A.**    Yes.

2  **Q.**    And is that effect exacerbated, in your opinion, when law

3  enforcement becomes involved in poll monitoring efforts?

4  **A.**    Yes.  And I gave the example of the police chief who had

5  told the minister that, using an unfortunate racial slur,

6  could vote in the courthouse, and even more recently of -- of

7  police driving voters, white voters to the polls and parking

8  police cars around where people were there, because the way

9  the law has been used over the years to discriminate, gives a

10  lot of minorities not the feeling that I might have about a

11  policeman giving me protection, but might abuse some -- his

12  authority in some way to hurt them.

13  **Q.**    Thank you, Dr. Burton.  I have one final exhibit for you

14  today.

15           MS. FORD:  If I may approach, Your Honor?

16           THE COURT:  Yes.

17           THE WITNESS:  Thank you.

18           THE COURT:  Thank you.

19  BY MS. FORD:

20  **Q.**    Dr. Burton, this is Plaintiffs' Exhibit 37.  Have you

21  seen this exhibit before?

22  **A.**    I have.

23  **Q.**    And did you review it in preparing your report for this

24  case?

25  **A.**    I did.

1  **Q.**    Could you please tell us what this document is?

2  **A.**    Well, it is, again, this is I believe the third press

3  release that you've handed me from December the 15th, 2020.

4  "True the Vote launches Georgia election integrity hotline as

5  part of the most comprehensive ballot security effort in

6  Georgia history."

7        MS. FORD:   Your Honor, we move Plaintiffs' Exhibit 37

8  into evidence.

9        THE COURT:   Any objections?

10       MR. WYNNE:   No objection.

11       THE COURT:   Admitted without objection.

12       (Plaintiff's Exhibit 37 was received and marked into

13 evidence.)

14 BY MS. FORD:

15 **Q.**    And, Dr. Burton, why did you include this press release

16 in your report?

17 **A.**    Well, particularly, for two things:   One, it announces a

18 partnership with the Georgia Republican Party to monitor

19 registrants, voters, attempt to register.   This may be the one

20 that also says that they're going to look at -- I might be

21 confused on this -- absentee voting ballot boxes, that would

22 be part of it.   But, particularly, because this is three days

23 before they announce that they're having over 350,000

24 challenges.   I can look back at the exact number.   So it's

25 like setting up a hotline and a website and then three days

1  later you have -- and I think that's rather telling in terms

2  of what -- what is going on about stirring things up in

3  notices.

4  **Q.**   And, Dr. Burton, when you take this all together, how do

5  these efforts compare to forms of intimidation that Georgia

6  has seen in the past?

7  **A.**   Well, it fits the perfect historical pattern.  I can

8  repeat it, but you see, particularly minority voters, but it

9  doesn't have to be, of a group of people who are perceived by

10  others, is that they will vote differently than they want them

11  to vote, whether it's a Democratic party or Republican Party,

12  as I've said before, martians, I don't think it matters, but

13  that they are then looking for ways to reduce their influence

14  and their impact.  And particularly it fits into this long

15  historical pattern of intimidation, both direct, physical --

16  what I can only describe as terrorism.  In fact, one of the

17  newspaper reporters talked about legal terrorism, but I was

18  thinking of a different type that has been so evident in the

19  history of Georgia.

20      The state-sponsored investigations that make people feel

21  that they are being challenged not to vote.  The insecurity

22  that you might be doing something wrong, or making it so hard

23  for you to find the time, the way, the effort, or the piece of

24  paper, whatever is needed, to prove that you are a legitimate

25  citizen voter.  And nobody likes to be considered, I certainly

1    don't, that you have done something fraudulent or wrong.  That

2    there is a -- could be any frivolous set of thing in terms of

3    challenge that would make you feel that you are going to be

4    looked at, say, by your employer or someone else as someone of

5    suspicion, and to feel like you don't belong as every other

6    citizen has the right to vote.  Again, it determines -- it's

7    really determined by who the person being challenged might be.

8    **Q.**   Thank you, Dr. Burton.

9         MS. FORD:  I have no further questions at this time.

10        THE COURT:  Thank you, Ms. Ford.

11        Mr. Wynne, your witness.

12   CROSS-EXAMINATION

13   BY MR. WYNNE:

14   **Q.**   Dr. Burton, you have your report in front of you?

15   **A.**   I have the report that was given to me as an exhibit.

16   **Q.**   16?

17   **A.**   16.  I don't -- I didn't bring anything else.

18   **Q.**   Okay.  I'd like to go through that very shortly, but ask

19   a couple of preliminary questions.

20        We started to get into this.  Would you agree that

21   maintaining accurate voting records in general is an

22   important -- is an important function?

23   **A.**   In the abstract, yes.  But also how it is done.  I can

24   only say this -- how it is done and in what context makes a

25   difference as well.

**Q.**    Sure.  And it's more than abstract.  Abstract means an
idea.  It's important in reality in the actual -- used to be
paper, but in the -- in the -- in the data, it's important not
just abstract but it really -- be accurate, that's important;
right?

**A.**    Well, I think as a historian I'd want to ask why are
you -- is there a reason to be concerned about the accuracy.
But in the abstract, maintaining lists without looking to how
it's being done or why it's being done, is a legitimate
function, I would think, of those in charge, that is the
elected or appointed officials.

**Q.**    Right.  Is True the Vote a state-sponsored entity?

**A.**    I do not believe so, to the best of my knowledge.

**Q.**    Derek Somerville here is a defendant in this case.  Is he
a state-sponsored entity?

**A.**    I do not know.

**Q.**    If I hadn't pointed it out, would you be able to identify
Mr. Somerville in the audience?

**A.**    Not -- not unless the name might have been one of the
names listed in the -- being thanked for getting people.  But
I am not certain.  But, no, I would not have, even after
reading.  But the name might have rung a memory from the
research.  But, no, I could not identify him.

**Q.**    Well, you realize that what you've done is put
Mr. Somerville in this historical context, including some

1   reprehensible individuals.

2       Do you realize that's what you've just done?

3   **A.**   Would you repeat the question?

4   **Q.**   Well, at the end of the questioning you said essentially

5   that the challenges preceding the Georgia 2021 runoff, the

6   challenges fit the abhorrent pattern, going back to 1868, and

7   that what Mr. Somerville did, what Ms. Engelbrecht did, what

8   Mark Davis did, is just a national outgrowth and a

9   continuation of that behavior.

10      Do you realize you just accused them of that?

11  **A.**   I don't agree with you.  I don't think I accused anyone

12  of anything.  I talked about the context and to which this law

13  has to be interpreted, how it came about, and how particularly

14  voters can feel intimidated by being challenged in the law.

15      But it fits into the pattern of when minority voters, in

16  particular, but voters are -- having the opportunity, often

17  for the first time, to really make a difference in the

18  electoral process.  I believe that's what I said.

19      And certainly I would not accuse individuals, because

20  that's not what I'm asked to do.  I am not talking about an

21  individual.  I am talking about the historical pattern and how

22  that fits in so that you and the other attorney can interpret

23  that and argue it out.  And it, hopefully, will help Judge

24  Jones to come to the legal decisions --

25  **Q.**   Sure.

1  **A.**    -- that need to be made --

2  **Q.**    Sure.  Of course he will.

3  **A.**    -- in this --

4  **Q.**    And my question is, you cannot tie Ms. Engelbrecht,

5  Mr. Somerville, Mr. Davis into this pattern.  You cannot tie

6  them and what they may have done, you can't tie the individual

7  defendants into this pattern, can you?

8  **A.**    I think that is a legal question for -- which I am not,

9  you know, equipped to do a legal opinion.  What I can do is

10  give the context and to what extent they were involved, and if

11  they were involved, then I'd have no evidence of them

12  specifically being involved, unless, you know, they're here

13  that they did some of these things, that they challenged

14  people, that they -- in their challenges they intimidated

15  people or in some way directly involved.  But that's not what

16  I was asked to do.

17  **Q.**    You understand that everything that you've just

18  identified is a factual question requiring facts and not a

19  legal one?  What did they do?  Specifically tie what did Derek

20  Somerville, Catherine Engelbrecht, and others, what did they

21  do?  Those are factual questions; right?

22  **A.**    It's a question that requires an answer, but I was not

23  investigating what these individuals did.  I was looking at

24  True the Vote's efforts and the press releases.  And unless

25  they are listed in that press release, or particularly I saw

1  something where they were accused of doing something in the

2  newspaper or something like that, then I would not be able to

3  testify to that.

4          THE COURT:  I guess, Dr. Burton, what Mr. Wynne is --

5  I think I'm hearing him say, you testified about some of the

6  things they did in 1946, the Talmadge regime, to keep Blacks

7  from voting.  I think it was 50,000 in 1946 was kept from

8  voting.  Was it set up along the lines where a lot of this was

9  done to prevent -- for racial reasons.  And Mr. Wynne is

10  saying, well, you're tying these three defendants into doing

11  the same thing for racial reasons.

12          And the question is, are you saying that?  If they --

13  the allegation of the plaintiffs is that these three

14  defendants were part of the challenges.  So Mr. Wynne is

15  asking, are you tying these three difference defendants into

16  the motivation for racial reasons?

17          Is that close?

18          MR. WYNNE:  Yes.  Not only that, but that they is

19  somehow an evolution of sorts of all the abhorrent things and

20  the Governor Hoke and all the others you mentioned, are

21  they -- put them all in the same basket?

22          THE WITNESS:  No, of course not.

23  BY MR. WYNNE:

24  **Q.**   Do you think that Mr. Engelbrecht and Derek Somerville,

25  Mark Davis, and a number of other defendants, James Cooper, do

1   you think they sinned by complying with the law in submitting

2   or -- well, encouraging others to send notices to their

3   election boards?  Did they sin?

4   **A.**   I think that's a theological question and why I take my

5   faith very seriously, and it's a Christian -- leave it open to

6   truth --

7           MS. FORD:  Your Honor --

8           THE COURT:  Let's use another word rather than sin,

9   whether that's a sin.

10          MR. WYNNE:  That's the word he used.  That is a word

11  he used.

12          THE COURT:  Well, if he used the word "sin,"

13  Ms. Ford, then I've got to allow him to answer the question,

14  though.  I'm looking at it, you can sin -- well, listen, if he

15  used the word "sin," then I've got to let him respond based on

16  sin.

17  BY MR. WYNNE:

18  **Q.**   Is following the law, is that -- Section 230, is that a

19  sin?

20  **A.**   Not necessarily.  And when you use "sin," let me explain

21  that someone who takes their faith very seriously, I

22  ultimately believe the truth will prevail.  But sometimes when

23  it's tied up in partisan clothing, it takes a while to get to

24  it.

25          And I'm not accusing any one person of intent.  I am

1  looking at a historical pattern.  And the challenge law I
2  think did grow out of sin if race and slavery is our original
3  sin in America, is the context I was hoping to use that in.
4       You say you like Cornel West.  He uses that quite often
5  in his writings, lecturing, or pontifications.  I don't think
6  he -- he may call somebody individually that way, but I
7  certainly have not.  But what we do, I think, need to
8  understand is how certain people, when challenged because of
9  the history of how these challenges have been used, will feel.
10  And will they feel intimidated or not, and to what level of
11  that intimidation is something for the judge, I think, to
12  decide.  But I have tried to lay out the evidence to help him
13  come to that decision.
14  **Q.**   Right.  And you have a lot of honorable experience in
15  history and of, I'll say, abhorrent behavior and -- you know,
16  I appreciate that, and you were qualified in some areas, but
17  you were not qualified as a behavioral psychologist as an
18  expert, were you?
19  **A.**   No.  I'm qualified a historian.  And historians, better
20  than any other disciplines, though, historically are better at
21  getting at motivation, purpose that -- and have been trained
22  to do that better than other disciplines, as much as we can
23  from the circumstantial and direct evidence.
24       You have a lot more direct evidence in 1910 and 1907 and
25  '8, but that is because times have changed and people don't

1  use the kind of language -- some don't, most -- in public at

2  least or to explain their reasons of why they're doing things

3  in those kind of terms.

4  **Q.**   Sure.  And so what historians do is they go back, look at

5  the evidence that they have from the historical record and

6  they use that to try to discern the intent of those actors at

7  that period in history.  And you've done that with regard to

8  the American South; right?

9  **A.**   Not exclusive to the American South, but, yes, I have

10  done that to -- but, remember, I wasn't asked to do intent in

11  this case.  I was asked to give context --

12  **Q.**   Yeah.  And, look, I'm not arguing --

13  **A.**   -- which I'm not sure why you're asking me that --

14  **Q.**   I'm not arguing that.  What you said -- or --

15        THE COURT:  One at a time.

16        Did you finish your answer?

17        THE WITNESS:  I apologize.  I'm sorry.  Yes, sir.

18  BY MR. WYNNE:

19  **Q.**   What you said is that historians are particularly

20  equipped to discern intent.  Well, aren't lawyers and isn't

21  the judge and isn't any jury and isn't any law enforcement

22  officer, aren't there other professions that are just about

23  equally schooled and skilled at determining intent as

24  historians who happen to also be able to carry out the

25  function of behavioral psychologists?

1  **A.**    I didn't say I was carrying out the function of a

2  behavioral psychologist.  I am using the methodologies that

3  historians are trained in that just so happen to align to the

4  Arlington Heights and the Senate factors and the Zimmer

5  factors that were laid down by Congress in the renewal of the

6  Voting Rights Act in 1982.  But this was not my charge, to

7  find intent --

8  **Q.**    No.  But what you --

9  **A.**    -- nor is it to anyone else.

10  **Q.**    No.  But what you did testify to was what you understood

11  or believed to discerned people would feel as a consequence of

12  the passage of a law like Section 230.  You speculated on

13  people's feelings and behavior.  How is that not behavioral

14  psychology?

15  **A.**    I used quotes directly from Ms. Thompson, from the

16  newspapers that said this is how people felt and what it was.

17  I was not trying to be a behavioral psychologist.  I was

18  giving the context of how and why this law needs to be looked

19  at carefully and how True the Vote has used this law.  And

20  given the context it had been used before.

21        So I don't see how you think I am doing behavioral

22  psychology or for that matter getting at intent.  We

23  established early on that I was not asked to do intent.  So I

24  am giving a contextual analysis of voter intimidation,

25  particularly how challenge laws have been used in that

1  context.  And then looking at how True the Vote used the

2  challenge law at the runoff election in 2020.

3  **Q.**   That's exactly what I'm trying to do, is try to determine

4  how your account of these historical things, which are

5  abhorrent, you know, there's no dispute about that, but I'm

6  trying to determine how, as a social scientist, you went about

7  your work to fit these individuals into this pattern that

8  you've, rightly described, exactly what you did to make your

9  determination and reach your conclusions.  What did you do?

10      You read the newspaper.  You picked some articles to

11  read, and you read some press releases.  What else did you do,

12  based on a scientific method as a social scientist and

13  historian, for that matter, historian, what did you do to

14  reach your conclusions?

15  **A.**   I used the standard methodologies that I would have used

16  to have written justice deferred race in the Supreme Court

17  that historians use.  I looked at the evidence, both

18  circumstantial and direct evidence.  I look at the laws.  I

19  look at even legislative histories and debates, but

20  particularly, I think in something like this, newspapers are

21  particularly good at explaining the public perception of

22  what's going on and to get at, particularly with the quotes I

23  gave, how people feel intimidated in recent Georgia history by

24  state-sponsored investigations and to help understand that

25  context of then when a challenge law is used.

1      And I hope you will agree that this is a huge, you know,

2  what is it, 450,000-something challenges that's being

3  advertised in the paper.  It just dwarfs all the other

4  challenges that I have found.  That something doesn't seem

5  right, particularly when there has been no evidence that I

6  have found, certainly in the research I've done, that there

7  was voter fraud.  And yet that very example, tenuous excuse

8  has been used since reconstruction every time there are

9  efforts to keep people from exercising their vote or their

10  citizenship rights to vote.

11  **Q.**   Okay.  So my question is -- I appreciate that, but the

12  question is:  What did you do, what research did you conduct

13  in this case with these people to reach your conclusions?  You

14  said you read newspaper articles and press releases.  Did you

15  do Google searches?

16  **A.**   Yes, I did Google searches.

17  **Q.**   What else?  Did you interview anyone?

18  **A.**   No.  I did not interview -- did you understand that I

19  said I was not -- I think the only person mentioned in this

20  report is Ms. Engelbrecht, that you have listed here.

21      Now, I might have seen their name, particularly some of

22  them sound familiar from having looked at the press releases

23  of people who helped recruit in every county.  That's the

24  other thing about the size of this I forgot to bring in.

25  There is a challenge in every county of Georgia.  I don't

1  think that had ever been done before either.

2  **Q.**   Well, let me --

3  **A.**   Well, can I finish here?

4  **Q.**   Of course, you can.  I'm trying to get back to my

5  question.

6          THE COURT:  Let him finish the answer.

7          MR. WYNNE:  Okay.

8  BY MR. WYNNE:

9  **Q.**   I appreciate -- I'm trying to get back to my -- I don't

10  disagree with any of this.  I'm trying to get back to the

11  question.

12          THE COURT:  Let's let him finish his answer, and then

13  you can proceed with your next question -- or repeat the

14  question you think you want to ask.

15  BY MR. WYNNE:

16  **Q.**   You didn't document --

17          THE COURT:  Did you finish your answer?

18          THE WITNESS:  Well, I just going to say, if you want

19  to see what I looked at that I thought was most relevant, just

20  not even anywhere close, I think the judge can attest to that

21  from other work I have done that he has seen, then you can

22  look at the footnotes.  That's what I say.

23  BY MR. WYNNE:

24  **Q.**   Yeah.  I've --

25  **A.**   I try to footnote for the evidence.  So that gives you a

1  clue.

2  **Q.**  Yeah.  I've actually read every single one of these.  And

3  what I'd like to ask you is, you know, these reporters that

4  you have quoted and listed in your footnotes, have you -- have

5  you called them to talk about their sources?

6  **A.**  No.

7  **Q.**  Why not?

8  **A.**  Because I don't think it's necessary.  I think I'm using

9  the standard methodology by using this.  And it would have

10 taken a lot more effort, of course, to try to track them down.

11 I read Greg Bluestein's book after it came out.

12 **Q.**  Well, we're going to go through your footnotes, but I

13 want to ask you if you've spoken with Abby Rapoport or Patrick

14 Mitchell or Lee Fang or Nick Surgey or Michael Wines, who I've

15 actually spoken with, have you spoken with any of these

16 persons that you cite to discuss the bases for their fairly

17 conclusory statements that they make in these articles on

18 which you rely?

19 **A.**  Not to my knowledge.  I may have spoken to them, but not

20 about that.  If I happen to be, say, at Morehouse College or

21 somewhere and they might have been in the audience, but -- or

22 met them, but to my knowledge, I have not spoken to them about

23 this particular case or the research I did.

24 **Q.**  I have in my hands Ms. Engelbrecht's 300 -- let's see --

25 it's about 315-page deposition, although I can read it in

1  about a day.  Did you read Ms. Engelbrecht's deposition

2  transcript?

3  **A.**   No.  Not that I remember.  I certainly don't remember

4  doing it.

5  **Q.**   I'm going to suggest to you that you'd remember reading

6  310 pages.  We'll leave it alone.

7       But you don't remember reading Ms. Engelbrecht's

8  deposition transcript?

9  **A.**   No, but I read more than 310 pages all the time.

10 **Q.**   Okay.  And have you read Derek Somerville's?  I think he

11 was deposed twice, totaling, oh, at least 400 pages.  Have you

12 read his deposition transcript?

13 **A.**   Not to my knowledge.  I do not remember doing it.

14 **Q.**   Mark Davis, another defendant in this case -- first of

15 all, you don't believe Mark Davis is a racist, do you?

16 **A.**   It doesn't matter what I believe.  I certainly don't know

17 Mark Davis.  So I am not accusing anybody of racism.  That's

18 not something you have to do anyway at all.  And I don't think

19 we're talking about race except in the context that voters

20 were disfranchised historically before that.  But also I would

21 say white voters also got caught in these challenge laws as

22 well over time.

23 **Q.**   Right.  And if you're looking at Ms. Engelbrecht and

24 trying to fit her in a pattern beginning in 1868, don't you

25 think it's important to read her deposition transcript, that

1   the lawyers who hired you took, to discern whether, in fact,

2   what she did, what she believes, is consistent with the

3   pattern you alleged she is part of?  Isn't that a fair thing

4   to do?

5   **A.**   I wasn't investigating her.  I was doing the totality of

6   the use of intimidation and voter challenges.  I was not

7   focused on an individual.  I was not looking for intent of an

8   individual.  I was not asked to look at intent.  I was given

9   the narrative to help, hopefully, you and the plaintiffs'

10   attorneys and the judge to put this into historical context.

11   **Q.**   Okay.  So you realize that we're in a trial where people

12   are accused of fitting, as you said, a certain pattern and not

13   in an academic lecture?  You realize that?

14   **A.**   I think I would be doing the same thing in an academic

15   lecture that I am doing here, except probably giving you a lot

16   more detail, things like that.  But I see the methodology is

17   basically the same.  I was not told that I should say anything

18   about a particular individual.  If I was told anything, just

19   to do this study.

20        So it was not to direct anyone.  And I would never call

21   anyone a racist.  I would say that, you know, that's sort of

22   between them and God.  But what I look at are the actions,

23   like, nearly 400,000 people being challenged, not -- I was not

24   trying to go to the motivation of that.  I was not even trying

25   to see whether the -- in this modern period, whether the

1   accusations were accurate or not or frivolous or not.  They

2   seemed, because of the nature of the mass thing, it seemed

3   pretty -- to me, to point one way, but I didn't even have to

4   come to that kind of conclusion.

5           THE COURT:  Mr. Wynne, I think this is a good point

6   to stop for our lunch break --

7           MR. TYSON:  I'll ask one -- one question?

8           THE COURT:  Well, if this is the last question you're

9   going to ask, yeah, you can ask it.  But if you've got more,

10  we might as well wait until after lunch.

11  BY MR. WYNNE:

12  Q.   Well, I just want to make sure, sir, that you said that

13  you were not looking at motivation.

14  A.   No, I was not asked to look at motivation is what I said.

15  Q.   Okay.

16  A.   And particularly -- no, let me finish, please.

17          THE COURT:  Yeah, finish.

18          THE WITNESS:  Yes.

19          Particularly about individual people.  That's

20  different than motivation in a historical context and looking

21  at why things are done or not.  And, you know, you look at

22  different things.  But I was never asked to look at the people

23  who you've told me are the defendants or that.  It was never

24  my job to accuse particular people or to show that they should

25  be accused of something.

1            I was just looking at how these things have looked

2   historically and then comparing the evidence of how they were

3   used in 2020, '21.  It could have been -- to me it didn't

4   matter, Democratic party, anybody else, I'm going to come to

5   the same conclusions as the evidence I work from.

6            THE COURT:  Thank you.  We'll take it up after lunch.

7            Everyone have a good lunch.  I'll see you-all at

8   1:30.

9            (Lunch break taken at 12:30.)

10           (Change of reporters.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6        I do hereby certify that the foregoing pages are a true
    and correct transcript of the proceedings taken down by me in
7   the case aforesaid.

8        This the 30th day of October, 2023.

9

10

11

12

13                    /s/Viola S. Zborowski _____
                      VIOLA S. ZBOROWSKI,
14                    RDR, FAPR, CMR, CRR, RPR, CRC
                      OFFICIAL COURT REPORTER TO
15                    THE HONORABLE STEVE C. JONES

16

17

18

19

20

21

22

23

24

25

## $

**$100** [2] - 634:16, 634:19

## '

**'21** [1] - 656:3
**'48** [1] - 628:19
**'50S** [2] - 609:24, 617:16
**'68** [1] - 594:19
**'69** [1] - 594:19

## /

**/S/VIOLA** [1] - 657:13

## 0

**0THE** [1] - 583:22

## 1

**1** [3] - 569:11, 571:22, 571:23
**1-10** [1] - 535:8
**10+2** [2] - 622:20, 624:6
**100** [1] - 620:22
**102** [1] - 623:11
**10:32** [1] - 593:10
**10:46** [1] - 593:9
**11** [2] - 597:25, 614:12
**11(2** [1] - 600:17
**11(B** [3] - 598:5, 600:14, 600:18
**11(B)** [1] - 600:15
**12:30** [1] - 656:9
**13** [2] - 561:13, 614:12
**15** [7] - 549:11, 558:5, 558:8, 558:10, 558:14, 618:10, 618:16
**15,000** [1] - 615:21
**15-MINUTE** [1] - 593:8
**1545** [1] - 569:7
**15TH** [1] - 638:3
**16** [5] - 606:18, 606:21, 606:22, 640:16, 640:17
**1605** [1] - 569:8
**174** [1] - 620:23
**18** [1] - 616:5
**1867** [3] - 607:18, 608:10, 631:20
**1868** [2] - 642:6, 653:24
**1877** [1] - 609:1
**1890S** [1] - 608:20
**18TH** [1] - 627:2
**19** [4] - 560:24, 561:3, 623:22, 628:19
**1907** [2] - 608:15, 646:24
**1908** [4] - 598:9, 609:5, 609:8, 613:17
**1910** [4] - 598:9, 611:14, 613:18, 646:24
**1930S** [1] - 611:16
**1940S** [1] - 614:14
**1944** [3] - 609:14, 615:1, 634:11
**1946** [11] - 609:17, 614:21, 615:13, 617:13, 617:16, 617:19, 620:10, 625:11, 628:19, 644:6, 644:7
**1948** [1] - 618:5

**1950S** [2] - 618:21, 619:6
**1955** [2] - 625:23, 632:2
**1964** [1] - 626:2
**1974** [1] - 594:21
**1980S** [3] - 599:17, 618:19, 619:3
**1981** [2] - 619:5, 628:25
**1982** [1] - 648:6
**1990S** [2] - 548:13, 618:20
**1994** [1] - 598:11
**1:30** [1] - 656:8

## 2

**2** [4] - 571:23, 600:14, 600:18, 606:25
**20** [3] - 541:6, 549:11, 625:1
**2000** [1] - 623:13
**2000S** [2] - 609:25, 620:13
**2001** [1] - 612:3
**2004** [1] - 620:18
**2009** [1] - 622:22
**2010** [5] - 621:1, 621:20, 623:2, 635:25, 636:14
**2011** [1] - 636:2
**2014** [2] - 609:25, 624:16
**2016** [5] - 547:25, 555:20, 620:20, 620:23, 623:14
**2017** [1] - 560:16
**2018** [2] - 548:2, 555:20
**2019** [5] - 543:7, 543:12, 558:17, 558:18, 558:19
**202** [1] - 596:12
**2020** [52] - 545:14, 545:22, 546:12, 546:13, 546:14, 547:5, 547:12, 548:4, 553:12, 555:20, 558:23, 558:24, 559:11, 559:12, 559:15, 559:20, 560:4, 560:5, 560:10, 560:24, 561:21, 565:19, 568:1, 570:9, 570:13, 570:16, 572:5, 572:14, 573:2, 573:8, 573:14, 574:3, 574:13, 574:21, 575:11, 575:15, 584:11, 590:21, 603:18, 607:12, 612:2, 620:7, 621:1, 621:20, 621:21, 627:2, 627:20, 633:3, 638:3, 649:2, 656:3
**2021** [27] - 548:17, 553:7, 555:13, 556:3, 556:8, 558:5, 558:8, 558:10, 558:14, 561:13, 563:4, 564:8, 564:18, 565:20, 566:23, 567:4, 568:6, 569:11, 579:10, 579:14, 579:17, 596:8, 599:2, 600:23, 626:11, 630:23, 642:5
**2022** [1] - 576:8
**2023** [5] - 535:11, 568:20, 569:11, 572:20, 657:8
**21-2-230** [1] - 629:19
**21-230** [1] - 598:4
**229** [2] - 598:18, 598:22
**230** [6] - 597:20, 598:3, 598:19, 598:22, 645:18, 648:12
**24/7** [1] - 634:1
**25** [4] - 632:21, 633:9, 633:12, 633:13
**25,000** [1] - 615:21

**250,000** [1] - 627:15
**297** [2] - 566:9, 566:17
**2:20-CV-0302-SCJ** [1] - 535:4

## 3

**3** [2] - 535:3, 537:25
**30** [8] - 535:11, 542:12, 548:22, 615:19, 616:11, 616:12, 616:13, 636:16
**30-MINUTE** [2] - 542:20, 543:20
**30-YEAR** [1] - 557:14
**300** [2] - 618:23, 652:24
**30TH** [1] - 657:8
**310** [2] - 653:6, 653:9
**315-PAGE** [1] - 652:25
**344** [3] - 559:3, 559:18, 561:25
**3442** [1] - 559:13
**35** [1] - 549:18
**350,000** [1] - 638:23
**364,541** [2] - 627:3, 627:19
**37** [3] - 637:20, 638:7, 638:12
**3:30** [1] - 537:13

## 4

**400** [1] - 653:11
**400,000** [1] - 654:23
**404-215-1479** [1] - 535:24
**42** [2] - 626:17, 629:9
**45** [2] - 548:22, 549:18
**450,000-SOMETHING** [1] - 650:2
**46** [3] - 601:2, 601:7, 601:11
**49** [5] - 552:16, 553:24, 554:7, 554:9, 587:21

## 5

**5** [4] - 561:2, 579:14, 579:16, 584:11
**50** [1] - 601:2
**50,000** [4] - 619:11, 619:15, 620:12, 644:7
**540** [1] - 536:3
**557** [1] - 536:3
**558** [1] - 618:12
**56** [1] - 636:13
**58** [1] - 619:14
**594** [1] - 536:6
**597** [1] - 536:4
**5TH** [2] - 553:12, 579:11

## 6

**6** [3] - 561:9, 614:8, 614:10
**606** [1] - 536:3
**64** [2] - 560:15, 560:20
**640** [1] - 536:6
**6TH** [1] - 633:3

## 7

**700** [2] - 619:1
**75** [1] - 614:9

## 8

**8** [2] - 563:7, 646:25
**8,000** [1] - 621:25
**871** [4] - 563:7, 566:19, 567:4, 567:5

## 9

**9** [5] - 537:1, 537:7, 612:8, 612:12, 613:11
**900** [1] - 619:1
**96** [1] - 594:16

## A

**A.M** [2] - 535:3, 537:1
**A.M** [1] - 593:10
**ABBY** [1] - 652:13
**ABHORRENT** [4] - 642:6, 644:19, 646:15, 649:5
**ABILITY** [4] - 539:6, 558:15, 599:5, 629:23
**ABLE** [21] - 545:7, 545:9, 546:16, 546:18, 547:21, 550:14, 551:22, 556:2, 574:17, 585:16, 589:13, 599:19, 603:21, 616:18, 619:8, 628:23, 630:5, 631:10, 641:17, 644:2, 647:24
**ABOLITIONIST** [1] - 634:8
**ABSENTEE** [5] - 559:12, 559:21, 622:24, 623:6, 638:21
**ABSOLUTELY** [2] - 627:11, 635:13
**ABSTRACT** [5] - 640:23, 641:1, 641:4, 641:8
**ABUSE** [1] - 637:11
**ACADEMIC** [2] - 654:13, 654:14
**ACCEPTED** [1] - 549:23
**ACCESS** [2] - 559:22, 569:12
**ACCESSIBLE** [1] - 591:20
**ACCESSING** [1] - 625:5
**ACCORDING** [1] - 592:6
**ACCOUNT** [1] - 649:4
**ACCOUNTING** [1] - 546:25
**ACCURACY** [1] - 641:7
**ACCURATE** [8] - 552:23, 558:14, 560:20, 601:6, 607:3, 640:21, 641:4, 655:1
**ACCURATELY** [1] - 553:25
**ACCUSATIONS** [2] - 563:21, 655:1
**ACCUSE** [2] - 642:19, 655:24
**ACCUSED** [7] - 634:23, 636:9, 642:10, 642:11, 644:1, 654:12, 655:25
**ACCUSING** [2] - 645:25, 653:17
**ACT** [2] - 609:4, 633:17
**ACT** [5] - 597:21, 597:22, 597:25, 598:5, 648:6
**ACTED** [1] - 636:24
**ACTION** [4] - 579:10, 579:13, 579:16, 579:17
**ACTIONS** [4] - 565:8, 577:21, 580:11, 654:22

**ACTIVE** [5] - 577:13, 579:17, 580:20, 580:22, 635:14
**ACTORS** [1] - 647:6
**ACTUAL** [5] - 548:24, 603:5, 612:9, 624:12, 641:2
**ADD** [1] - 617:16
**ADDED** [3] - 609:5, 627:9, 627:18
**ADDING** [2] - 617:5, 630:9
**ADDITIONAL** [3] - 586:7, 587:11, 588:17
**ADDRESS** [48] - 538:6, 545:16, 546:3, 549:6, 549:9, 549:15, 557:9, 559:1, 559:3, 559:13, 559:18, 561:24, 562:1, 563:6, 565:4, 565:5, 566:19, 566:21, 567:4, 567:6, 567:21, 567:22, 568:2, 568:7, 568:9, 568:11, 568:13, 568:24, 569:1, 570:19, 570:25, 571:19, 572:13, 574:7, 574:21, 578:12, 578:16, 578:19, 578:21, 581:21, 585:15, 585:22, 586:7, 587:12, 588:18, 589:7, 595:13
**ADDRESS** [17] - 558:25, 559:20, 563:8, 566:25, 570:10, 570:18, 571:4, 571:17, 574:2, 574:6, 574:12, 578:11, 585:11, 590:16, 590:23, 591:9, 591:21
**ADDS** [2] - 617:15, 628:25
**ADEQUATELY** [2] - 630:18, 636:23
**ADMINISTER** [1] - 625:22
**ADMINISTRATORS** [1] - 628:21
**ADMITTED** [5] - 554:7, 606:21, 626:18, 633:12, 638:11
**ADOPTED** [2] - 598:8, 613:11
**ADVERTISED** [1] - 650:3
**ADVISORY** [1] - 624:21
**AFFECTED** [2] - 592:11, 614:7
**AFFORD** [1] - 544:16
**AFFORDABLE** [1] - 547:4
**AFIELD** [1] - 566:5
**AFORESAID** [1] - 657:7
**AFRICAN** [3] - 608:10, 615:21, 623:2
**AFTERWARDS** [1] - 564:22
**AGO** [2] - 541:6, 541:7
**AGREE** [20] - 538:24, 538:25, 561:20, 567:3, 571:21, 575:16, 577:22, 589:21, 590:15, 590:20, 591:7, 591:19, 592:23, 602:2, 602:19, 604:9, 605:5, 640:20, 642:11, 650:1
**AGREED** [2] - 566:2, 582:20
**AHEAD** [5] - 543:5, 563:19, 614:12, 630:12, 630:13
**ALIGN** [1] - 648:3
**ALLEGATION** [1] - 644:13
**ALLEGED** [1] - 654:3
**ALLEGRA** [1] - 535:14
**ALLOW** [6] - 537:17, 538:12, 542:11, 566:4, 584:2, 645:13
**ALLOWED** [4] - 577:10, 589:17, 612:16, 625:25
**ALLOWING** [1] - 538:21
**ALLWRIGHT** [2] - 609:15, 614:21

**ALMOST** [1] - 623:25
**ALONE** [2] - 634:13, 653:6
**ALPHARETTA** [3] - 543:19, 543:21, 575:8
**ALTOGETHER** [1] - 627:10
**AMAZING** [1] - 627:19
**AMENDED** [1] - 598:12
**AMERICA** [2] - 541:5, 646:3
**AMERICAN** [6] - 594:21, 595:7, 608:10, 623:2, 647:8, 647:9
**AMERICANS** [1] - 615:21
**AMOUNT** [2] - 555:17, 575:4
**ANALYSIS** [15] - 595:22, 596:2, 596:11, 598:25, 599:4, 599:9, 599:10, 600:20, 601:25, 602:9, 602:15, 603:8, 603:14, 632:12, 648:24
**AND** [2] - 535:3, 535:7
**ANGRY** [1] - 551:12
**ANNOUNCE** [1] - 638:23
**ANNOUNCES** [1] - 638:17
**ANSWER** [17] - 571:13, 577:7, 584:19, 591:5, 591:6, 591:25, 592:1, 603:7, 604:19, 630:12, 643:22, 645:13, 647:16, 651:6, 651:12, 651:17
**ANSWERED** [5] - 579:22, 586:11, 591:12, 630:18, 636:23
**ANTEBELLUM** [1] - 634:7
**ANYWAY** [4] - 538:10, 595:22, 608:3, 653:18
**ANYWAYS** [2] - 581:11, 581:14
**APART** [3] - 541:12, 541:15, 541:21
**APARTMENT** [45] - 544:16, 544:17, 544:22, 544:23, 545:13, 545:17, 545:19, 546:7, 546:21, 547:2, 556:23, 559:3, 559:6, 559:23, 562:1, 563:3, 563:6, 563:9, 566:21, 567:5, 567:6, 567:10, 567:12, 567:14, 567:16, 567:19, 567:22, 567:23, 568:10, 568:19, 568:20, 568:23, 568:24, 569:2, 569:4, 569:7, 569:9, 569:12, 570:11, 571:22, 571:23, 590:22, 592:6
**APARTMENTS** [2] - 544:13, 569:6
**APOLOGIZE** [1] - 647:17
**APPEALS** [1] - 610:25
**APPEAR** [3] - 539:9, 619:19, 635:19
**APPEARANCES** [1] - 535:13
**APPLIED** [1] - 624:23
**APPOINTED** [1] - 641:11
**APPOINTMENT** [1] - 560:6
**APPOINTMENTS** [1] - 573:16
**APPRECIATE** [4] - 539:8, 646:16, 650:11, 651:9
**APPROACH** [5] - 552:8, 560:12, 606:10, 626:14, 632:17, 637:15
**APPROVING** [1] - 604:22
**AREA** [9] - 545:23, 556:19, 560:8, 569:15, 590:25, 591:23, 602:6, 604:17, 604:21
**AREAS** [3] - 606:4, 619:13, 646:16
**ARGUE** [1] - 642:23

**ARGUED** [1] - 635:18
**ARGUING** [2] - 647:12, 647:14
**ARGUMENT** [5] - 538:15, 564:14, 564:15, 565:8, 600:3
**ARGUMENTATIVE** [2] - 583:25, 591:15
**ARGUMENTIVE** [1] - 584:1
**ARGUMENTS** [1] - 603:21
**ARLINGTON** [1] - 648:4
**ARMY** [2] - 594:19, 594:21
**ARRIVED** [1] - 550:13
**ARTICLES** [4] - 619:21, 649:10, 650:14, 652:17
**ASIAN** [2] - 621:10, 624:21
**ASIDE** [1] - 635:1
**ASSIGNED** [1] - 600:3
**ASSUMED** [1] - 592:4
**ASTOUNDING** [1] - 633:22
**AT** [1] - 537:1
**AT-LARGE** [4] - 599:18, 600:1, 600:2, 600:4
**ATHENS** [30] - 540:14, 540:16, 542:3, 542:14, 542:18, 543:9, 547:2, 548:8, 548:9, 548:11, 556:16, 556:19, 556:24, 560:6, 560:7, 560:10, 561:4, 561:18, 570:1, 570:2, 570:5, 572:17, 572:18, 572:21, 572:24, 573:21, 575:10, 575:20, 575:22, 592:5
**ATLANTA** [35] - 537:6, 542:22, 543:10, 543:13, 544:16, 544:20, 545:23, 545:25, 546:2, 546:22, 556:17, 556:23, 556:25, 558:23, 560:8, 560:24, 561:4, 561:22, 569:15, 570:2, 572:21, 572:23, 575:5, 575:8, 575:9, 575:10, 590:23, 590:24, 591:22, 591:23, 592:6, 613:14, 619:23, 629:2
**ATLANTA** [2] - 535:2, 535:24
**ATTEMPT** [3] - 616:9, 626:2, 638:19
**ATTEND** [1] - 541:25
**ATTENTION** [3] - 601:9, 606:25, 629:8
**ATTEST** [1] - 651:20
**ATTORNEY** [1] - 642:22
**ATTORNEY** [1] - 623:14
**ATTORNEYS** [8] - 574:11, 595:13, 597:17, 599:7, 601:16, 603:20, 654:10
**AUDIENCE** [2] - 641:18, 652:21
**AUGUST** [1] - 561:13
**AUTHENTICITY** [1] - 553:1
**AUTHORED** [2] - 595:5, 606:14
**AUTHORITY** [3] - 617:4, 617:10, 637:12
**AWARE** [3] - 587:5, 620:8, 627:16

**B**

**B-U-R-T-O-N** [1] - 594:5
**BACKGROUND** [2] - 540:13, 594:14
**BACKS** [3] - 579:25, 580:3, 623:15
**BALLOT** [14] - 559:13, 559:21, 586:17, 587:7, 587:8, 587:9, 604:21, 604:22, 605:10, 613:22, 635:19, 636:11, 638:5, 638:21

**BALLOT'S** [1] - 613:24
**BALLOTS** [3] - 622:24, 623:5, 623:6
**BANKS** [45] - 540:18, 540:19, 540:21, 546:6, 551:15, 552:1, 552:5, 552:13, 553:6, 563:23, 564:7, 564:19, 564:20, 564:24, 565:4, 565:9, 565:18, 571:22, 572:5, 572:8, 572:9, 572:13, 572:16, 572:22, 572:23, 573:1, 573:3, 573:7, 573:11, 573:13, 574:3, 574:8, 574:13, 574:21, 575:11, 578:16, 578:19, 586:8, 587:12, 588:18, 589:7, 590:18
**BARELY** [1] - 621:14
**BASED** [5] - 580:19, 585:10, 590:8, 645:15, 649:12
**BASELESS** [2] - 563:22
**BASES** [1] - 652:16
**BASKET** [1] - 644:21
**BECAME** [3] - 541:6, 541:7, 547:19
**BECOME** [2] - 541:8, 547:20
**BECOMES** [2] - 615:15, 637:3
**BEFORE** [1] - 535:10
**BEGAN** [2] - 558:20, 559:11
**BEGINNING** [3] - 558:23, 592:9, 653:24
**BEHALF** [3] - 535:14, 535:17, 535:19
**BEHAVIOR** [4] - 636:14, 642:9, 646:15, 648:13
**BEHAVIORAL** [6] - 646:17, 647:25, 648:2, 648:13, 648:17, 648:21
**BEHIND** [2] - 595:23, 611:23
**BELIEVES** [1] - 654:2
**BELONG** [1] - 640:5
**BEN** [1] - 619:11
**BENEFIT** [1] - 566:3
**BENEFITS** [1] - 544:6
**BEST** [5] - 539:6, 558:15, 615:20, 636:12, 641:13
**BETTER** [6] - 589:18, 624:14, 626:9, 646:19, 646:20, 646:22
**BETWEEN** [6] - 556:24, 598:18, 598:21, 600:1, 615:21, 654:22
**BIDEN** [1] - 622:1
**BIG** [1] - 558:2
**BIGGEST** [1] - 547:20
**BILL** [1] - 622:2
**BILL** [6] - 545:19, 545:20, 547:4, 609:3, 612:14
**BILLS** [3] - 545:11, 545:18, 557:12
**BIT** [9] - 540:22, 550:9, 550:23, 550:24, 552:24, 556:11, 567:23, 570:8, 634:6
**BLACK** [5] - 614:6, 614:9, 620:22, 621:22, 628:6
**BLACK** [25] - 608:18, 608:23, 609:12, 609:22, 610:19, 611:4, 614:17, 615:8, 615:9, 616:7, 616:10, 617:24, 618:8, 619:7, 619:12, 619:14, 620:20, 621:8, 622:21, 623:10, 623:25, 625:16, 625:22, 625:24
**BLACKS** [1] - 644:6
**BLAKELY** [1] - 625:22
**BLANKET** [1] - 634:24

**BLANKING** [1] - 619:22
**BLOC** [3] - 595:17, 599:18, 603:9
**BLOCKING** [1] - 636:10
**BLUE** [1] - 553:10
**BLUESTEIN'S** [1] - 652:11
**BOARD** [7] - 599:25, 604:4, 605:11, 605:13, 622:22, 623:3
**BOARDS** [1] - 645:3
**BOARDS** [3] - 601:4, 601:8, 604:1
**BOLD** [1] - 613:2
**BOND** [2] - 604:22, 605:12
**BOOK** [4] - 595:5, 612:15, 652:11
**BOPP** [1] - 535:18
**BORN** [4] - 540:13, 540:14, 540:16, 594:15
**BOTTOM** [2] - 560:23, 561:2
**BOUGHT** [12] - 540:17, 542:18, 556:20, 570:1, 570:3, 570:5, 570:6, 572:19, 575:19, 581:11, 592:5, 610:20
**BOUNCING** [1] - 556:24
**BOUND** [1] - 539:3
**BOUNTIES** [1] - 634:4
**BOWMAN** [4] - 554:19, 587:22, 588:1, 588:7
**BOX** [1] - 566:1
**BOXES** [1] - 638:21
**BOYFRIEND** [4] - 559:7, 565:3, 568:16, 581:22
**BRAGGING** [1] - 611:13
**BREACHED** [1] - 636:5
**BREAK** [4] - 593:8, 593:10, 655:6, 656:9
**BRIEF** [1] - 603:24
**BRIEFLY** [5] - 594:13, 610:6, 612:11, 614:14, 621:5
**BRING** [4] - 601:9, 626:12, 640:17, 650:24
**BROKE** [1] - 537:13
**BROKEN** [1] - 541:19
**BROOKS** [1] - 622:21
**BROTHER** [5] - 541:11, 541:14, 543:1, 547:7, 574:23
**BROUGHT** [1] - 582:6
**BRUSH** [1] - 567:14
**BRYAN** [1] - 535:15
**BUILD** [1] - 543:17
**BUILDING** [5] - 548:20, 548:25, 568:21, 569:3, 569:10
**BUREAU** [2] - 624:12, 626:8
**BUREAUCRACY** [1] - 628:20
**BURLINGTON** [2] - 634:15, 634:22
**BURNED** [2] - 626:1, 632:3
**BURNT** [1] - 625:19
**BURTON** [55] - 593:13, 593:15, 594:5, 594:8, 595:1, 595:8, 595:25, 596:8, 596:22, 597:5, 604:14, 605:21, 605:23, 606:3, 606:8, 606:14, 606:25, 607:15, 610:5, 611:6, 611:18, 612:8, 614:3, 614:11, 615:25, 617:18, 619:16, 620:7, 620:24, 624:15, 625:6,

626:10, 626:17, 626:19, 627:5, 627:13, 627:21, 628:15, 629:7, 629:22, 632:11, 632:15, 632:21, 633:7, 633:16, 635:1, 636:20, 636:24, 637:13, 637:20, 638:15, 639:4, 640:8, 640:14, 644:4

**BURTON** [2] - 536:6, 593:24

**BURTON'S** [2] - 602:24, 606:18

**BUSINESS** [1] - 542:2

**BUTTON** [1] - 553:10

**BY** [48] - 540:8, 542:10, 550:19, 552:12, 553:5, 554:11, 557:24, 560:14, 563:2, 566:7, 570:7, 570:17, 571:16, 574:1, 575:18, 577:6, 578:9, 581:5, 583:21, 584:4, 587:4, 591:18, 592:8, 594:7, 597:4, 600:16, 603:3, 604:20, 605:8, 606:7, 606:13, 606:24, 608:5, 626:16, 630:17, 632:10, 632:20, 633:15, 637:19, 638:14, 640:13, 644:23, 645:17, 647:18, 651:8, 651:15, 651:23, 655:11

# C

**CAMPAIGN** [1] - 615:13

**CANDIDATE** [4] - 599:20, 617:24, 619:10, 625:12

**CANDIDATES** [5] - 599:21, 603:11, 608:21, 617:23, 631:11

**CANNOT** [3] - 609:15, 643:4, 643:5

**CAR** [14] - 545:25, 549:12, 549:13, 550:25, 560:1, 560:3, 560:5, 560:9, 560:19, 560:21, 561:20, 561:21, 573:15, 587:16

**CARD** [8] - 578:11, 578:14, 578:18, 578:23, 579:3, 579:5, 579:8, 579:9

**CARE** [2] - 537:5, 541:14

**CAREER** [1] - 628:8

**CAREFUL** [1] - 603:7

**CAREFULLY** [1] - 648:19

**CARFAX** [1] - 561:20

**CAROLINA** [2] - 536:3, 540:5

**CAROLINA** [7] - 540:4, 554:17, 594:16, 594:18, 634:15, 634:23

**CARRIES** [1] - 617:11

**CARRY** [1] - 647:24

**CARRYING** [1] - 648:1

**CARS** [2] - 617:14, 637:8

**CARTER** [1] - 622:3

**CARTERSVILLE** [1] - 612:24

**CASE** [46] - 537:6, 548:16, 562:20, 563:17, 564:2, 565:24, 567:10, 567:24, 578:4, 580:18, 580:21, 581:2, 581:7, 581:15, 581:24, 582:1, 582:3, 583:3, 588:4, 588:7, 592:10, 594:11, 596:15, 597:14, 597:23, 598:11, 598:15, 599:16, 599:22, 602:8, 603:4, 603:15, 603:22, 606:8, 616:9, 624:15, 626:22, 630:10, 632:25, 637:24, 641:14, 647:11, 650:13, 652:23,

653:14, 657:7

**CASES** [6] - 595:9, 596:8, 599:15, 599:23, 599:24, 609:22

**CAST** [4] - 586:17, 587:9, 592:10, 636:11

**CASTING** [1] - 586:19

**CATHERINE** [1] - 643:20

**CATHERINE** [1] - 535:6

**CAUGHT** [1] - 653:21

**CAUSED** [3] - 583:6, 583:7, 583:8

**CEDAR** [4] - 542:4, 542:6, 542:7, 542:16

**CENTRAL** [1] - 541:5

**CENTRO** [1] - 599:15

**CENTURY** [1] - 635:18

**CERTAIN** [7] - 602:18, 609:3, 626:4, 635:14, 641:21, 646:8, 654:12

**CERTAINLY** [7] - 598:15, 639:25, 642:19, 646:7, 650:6, 653:3, 653:16

**CERTIFY** [1] - 657:6

**CHALLENGE** [53] - 563:21, 563:23, 564:2, 564:21, 565:1, 565:9, 583:6, 583:7, 583:8, 596:11, 597:16, 598:6, 599:6, 601:5, 603:17, 609:8, 609:11, 609:14, 610:6, 610:22, 611:7, 612:9, 612:19, 613:4, 613:17, 614:4, 615:17, 616:11, 616:22, 616:23, 618:24, 619:20, 620:8, 624:10, 626:4, 626:10, 627:3, 627:7, 627:16, 629:14, 629:17, 629:22, 629:24, 631:13, 632:13, 640:3, 646:1, 648:25, 649:2, 649:25, 650:25, 653:21

**CHALLENGED** [62] - 549:2, 551:1, 551:5, 551:8, 551:9, 551:11, 551:14, 552:2, 553:11, 553:16, 555:3, 555:7, 555:11, 555:18, 564:20, 582:4, 582:5, 582:7, 582:9, 582:23, 584:16, 584:17, 584:23, 585:1, 585:6, 585:7, 585:13, 586:24, 588:16, 589:5, 589:10, 590:11, 600:22, 602:18, 602:20, 607:10, 615:19, 615:22, 616:16, 616:20, 617:3, 618:25, 619:1, 619:11, 620:12, 620:19, 620:23, 624:10, 627:14, 628:12, 628:23, 629:18, 630:10, 632:1, 636:18, 639:21, 640:7, 642:14, 643:13, 646:8, 654:23

**CHALLENGES** [41] - 597:15, 601:15, 603:19, 607:11, 607:13, 607:16, 608:9, 609:17, 609:18, 614:13, 615:24, 616:1, 616:14, 616:22, 617:19, 618:1, 618:19, 619:17, 620:13, 620:17, 620:25, 625:7, 627:6, 627:11, 627:21, 627:22, 628:16, 628:17, 630:22, 631:16, 631:24, 638:24, 642:5, 642:6, 643:14, 644:14, 646:9, 650:2, 650:4, 654:6

**CHALLENGING** [3] - 616:7, 618:23, 635:15

**CHAMPAIGN** [1] - 594:23

**CHANCE** [1] - 537:25

**CHANGE** [18] - 558:25, 559:20, 563:8,

566:24, 570:9, 570:18, 571:4, 571:17, 574:2, 574:5, 574:12, 578:11, 585:10, 590:16, 590:22, 591:9, 591:21, 656:10

**CHANGE** [6] - 543:13, 545:16, 546:11, 557:9, 573:2, 627:17

**CHANGED** [5] - 548:6, 548:10, 565:19, 573:22, 646:25

**CHANGES** [2] - 599:11, 623:23

**CHAPMAN** [1] - 614:25

**CHARACTERIZE** [1] - 620:16

**CHARGE** [2] - 641:10, 648:6

**CHECK** [1] - 549:12

**CHIEF** [1] - 637:4

**CHOICE** [2] - 599:20, 631:12

**CHRISTIAN** [1] - 645:5

**CHRISTINA** [1] - 539:15

**CIRCUMSTANCE** [1] - 595:22

**CIRCUMSTANCES** [7] - 554:24, 565:19, 572:1, 590:12, 590:21, 591:1, 592:4

**CIRCUMSTANTIAL** [2] - 646:23, 649:18

**CITE** [2] - 619:21, 652:16

**CITED** [1] - 597:25

**CITIZEN** [13] - 541:6, 541:7, 541:9, 547:19, 547:20, 551:6, 555:24, 589:12, 612:16, 613:23, 639:25, 640:6

**CITIZENS** [11] - 601:3, 601:7, 609:12, 609:21, 609:22, 615:9, 619:7, 624:11, 625:4, 625:16

**CITIZENSHIP** [1] - 650:10

**CITY** [2] - 558:22, 635:15

**CIVIL** [1] - 610:10

**CIVIL** [2] - 623:25, 634:9

**CLAIMING** [2] - 564:2, 564:25, 590:8

**CLARKE** [2] - 557:4, 575:22

**CLASS** [1] - 607:25

**CLASSES** [2] - 547:1, 607:23

**CLEAN** [1] - 589:4

**CLEAR** [2] - 584:18, 589:3

**CLEARED** [2] - 620:3, 623:15

**CLERK** [1] - 613:1

**CLERK** [6] - 539:20, 540:1, 540:6, 593:19, 593:22, 594:2

**CLICK** [1] - 553:11

**CLICK** [1] - 553:13

**CLICKED** [1] - 553:20

**CLIENT** [1] - 539:4

**CLIENTS** [1] - 539:6

**CLINKED** [1] - 553:10

**CLINTON** [1] - 622:2

**CLOSE** [10] - 542:11, 565:25, 567:10, 616:17, 622:1, 627:20, 628:17, 631:23, 644:17, 651:20

**CLOSER** [3] - 567:23, 575:10, 618:17

**CLOSEST** [1] - 600:25

**CLOSING** [1] - 564:15

**CLOTHING** [1] - 645:23

**CLUE** [1] - 652:1

**CMR** [2] - 535:22, 657:14

**CNN** [1] - 569:14

**CODE** [1] - 598:4
**CODE** [5] - 598:9, 601:3, 611:14, 613:18, 629:19
**CODED** [1] - 610:25
**COERCED** [1] - 588:13
**COLLEGE** [5] - 541:25, 542:24, 543:6, 565:12, 565:13
**COLLEGE** [1] - 652:20
**COLUMN** [1] - 553:17
**COMBINING** [1] - 610:21
**COMFORTABLE** [1] - 592:24
**COMING** [3] - 562:23, 576:4, 625:20
**COMMENTED** [1] - 617:21
**COMMERCE** [40] - 540:16, 540:17, 540:21, 540:22, 540:24, 540:25, 541:1, 541:2, 542:3, 542:12, 542:14, 542:19, 543:9, 543:23, 543:25, 544:20, 546:6, 546:8, 546:10, 546:16, 546:19, 547:6, 547:12, 548:10, 548:12, 556:16, 556:18, 556:23, 556:25, 559:24, 561:7, 561:15, 568:14, 568:17, 568:18, 573:20, 574:22, 575:2
**COMMITTED** [1] - 634:25
**COMMITTEE** [1] - 624:22
**COMMITTING** [1] - 551:5
**COMMONLY** [1] - 595:15
**COMMUNICATION** [1] - 583:2
**COMMUNITY** [1] - 601:10
**COMMUTE** [3] - 542:20, 544:22
**COMMUTING** [1] - 544:19
**COMPARE** [5] - 555:19, 607:10, 614:8, 627:7, 639:5
**COMPARED** [1] - 574:21
**COMPARING** [1] - 656:2
**COMPARISON** [1] - 620:16
**COMPLAINTS** [3] - 622:25, 636:4, 636:14
**COMPLETE** [2] - 557:1, 613:12
**COMPLICATED** [5] - 556:11, 556:21, 569:25, 600:10, 620:1
**COMPLYING** [1] - 645:1
**COMPREHENSIVE** [1] - 638:5
**CONCENTRATED** [2] - 600:7, 619:8
**CONCERNED** [2] - 621:16, 641:7
**CONCERNING** [3] - 597:19, 599:25, 601:25
**CONCLUDE** [3] - 607:15, 608:8, 630:22
**CONCLUDED** [2] - 590:17, 590:24
**CONCLUDING** [1] - 630:20
**CONCLUSION** [1] - 655:4
**CONCLUSIONS** [4] - 649:9, 649:14, 650:13, 656:5
**CONCLUSORY** [1] - 652:17
**CONDUCT** [2] - 602:9, 650:12
**CONDUCTED** [1] - 635:2
**CONFEDERATE** [1] - 621:7
**CONFERENCE** [1] - 635:20
**CONFIRM** [1] - 632:11

**CONFIRMING** [2] - 588:17, 589:7
**CONFUSED** [3] - 551:3, 571:24, 638:21
**CONGRATULATIONS** [2] - 557:2, 558:1
**CONGRESS** [2] - 608:21, 648:5
**CONNECT** [2] - 588:3, 588:6
**CONNECTION** [1] - 543:17
**CONSEQUENCE** [1] - 648:11
**CONSEQUENCES** [1] - 628:16
**CONSIDER** [4] - 541:15, 543:3, 547:13, 565:15
**CONSIDERED** [5] - 546:6, 546:8, 572:3, 575:9, 639:25
**CONSIDERING** [2] - 544:19, 544:21
**CONSISTENT** [1] - 654:2
**CONSISTENTLY** [2] - 596:1, 609:18
**CONSTITUTION** [3] - 609:1, 609:5, 619:23
**CONSTITUTIONAL** [1] - 625:5
**CONSTRUCTION** [1] - 604:23
**CONTACT** [1] - 551:24
**CONTENT** [1] - 564:19
**CONTEST** [1] - 612:16
**CONTESTED** [1] - 618:6
**CONTEXT** [25] - 601:16, 601:23, 602:16, 603:5, 603:16, 603:20, 607:10, 607:14, 609:25, 611:24, 615:5, 624:25, 640:24, 641:25, 642:12, 643:10, 646:3, 647:11, 648:18, 648:20, 649:1, 649:25, 653:19, 654:10, 655:20
**CONTEXTUAL** [1] - 648:24
**CONTINUATION** [1] - 642:9
**CONTINUE** [4] - 551:23, 567:9, 609:24, 618:1
**CONTINUED** [1] - 606:6
**CONTINUOUSLY** [1] - 569:10
**CONTRACT** [5] - 544:4, 544:12, 545:2, 558:24
**CONTRIBUTED** [1] - 589:22
**COOPER** [1] - 535:7
**COOPER** [1] - 644:25
**COOPERATION** [2] - 608:17
**COPY** [1] - 550:1
**CORNEL** [2] - 602:6, 646:4
**COROLLA** [1] - 560:17
**CORRECT** [41] - 542:25, 544:8, 544:9, 548:14, 550:15, 558:9, 558:12, 558:21, 559:8, 559:9, 560:22, 560:25, 561:23, 564:20, 568:3, 568:12, 569:18, 570:11, 575:21, 575:22, 575:23, 576:3, 576:4, 577:10, 577:11, 579:12, 579:15, 580:21, 581:4, 583:1, 583:4, 585:11, 587:23, 590:25, 593:1, 594:11, 596:12, 596:16, 628:10, 635:5, 657:6
**CORRECTLY** [1] - 602:3
**CORRUPT** [1] - 613:24
**COUNSEL** [2] - 538:9, 587:20
**COUNTED** [1] - 629:20
**COUNTIES** [8] - 615:20, 616:11, 616:12,

616:13, 616:14, 616:21, 618:14, 620:9
**COUNTRY** [4] - 540:25, 594:15, 594:16, 611:11
**COUNTS** [1] - 623:11
**COUNTY** [21] - 548:6, 573:19, 584:13, 584:21, 601:4, 601:8, 604:1, 604:4, 612:16, 616:4, 616:19, 616:20, 616:21, 616:23, 620:21, 625:23, 627:3, 628:21, 636:19, 650:23, 650:25
**COUNTY** [57] - 540:18, 540:19, 540:21, 546:7, 551:15, 552:1, 552:5, 552:13, 553:6, 556:19, 557:5, 563:24, 564:7, 564:19, 564:20, 564:24, 565:4, 565:9, 565:18, 571:22, 572:5, 572:8, 572:9, 572:13, 572:16, 572:22, 572:23, 573:1, 573:3, 573:7, 573:11, 573:13, 574:3, 574:13, 574:21, 575:9, 575:11, 575:22, 578:16, 578:19, 586:8, 587:12, 588:18, 589:7, 590:18, 618:9, 618:11, 619:6, 619:13, 620:20, 620:21, 622:21, 623:10, 625:22
**COUNTY'S** [1] - 618:13
**COUPLE** [6] - 554:12, 556:5, 560:7, 592:19, 617:1, 640:19
**COURSE** [15] - 538:1, 538:5, 616:15, 617:7, 618:5, 618:21, 621:9, 621:17, 627:13, 631:23, 636:16, 643:2, 644:22, 651:4, 652:10
**COURT** [4] - 537:5, 537:6, 596:4, 599:16
**COURT** [12] - 538:7, 564:14, 572:4, 595:6, 602:11, 609:15, 611:6, 613:1, 614:21, 615:1, 634:13, 649:16
**COURT** [123] - 535:1, 535:23, 535:23, 537:1, 537:2, 537:22, 538:2, 538:7, 539:1, 539:5, 539:10, 539:14, 539:17, 539:19, 542:6, 542:9, 550:18, 552:10, 552:19, 552:24, 553:3, 553:24, 554:5, 554:7, 557:21, 560:13, 562:6, 562:11, 562:17, 562:25, 563:14, 563:19, 564:11, 564:17, 565:6, 565:25, 570:3, 570:5, 570:13, 570:22, 570:25, 571:10, 571:15, 572:4, 572:10, 572:16, 572:23, 573:1, 573:7, 573:12, 573:18, 573:23, 575:14, 576:18, 576:21, 576:24, 577:2, 577:5, 578:2, 579:20, 579:23, 580:3, 580:9, 580:12, 580:15, 580:25, 581:3, 583:18, 584:1, 586:12, 591:10, 591:16, 591:24, 593:3, 593:5, 593:7, 593:11, 593:14, 593:18, 596:21, 596:25, 597:2, 600:11, 602:22, 603:1, 604:10, 604:13, 605:1, 605:4, 605:15, 605:19, 606:3, 606:12, 606:19, 606:21, 607:21, 607:24, 626:15, 630:12, 630:16, 631:7, 632:8, 632:18, 633:10, 633:12, 637:16, 637:18, 638:9, 638:11, 640:10, 644:4, 645:8, 645:12, 647:15, 651:6, 651:12, 651:17, 655:5, 655:8, 655:17, 656:6, 657:3, 657:14
**COURTHOUSE** [3] - 625:19, 626:1,

637:6

**COURTROOM** [2] - 593:17, 621:14
**COURTS** [1] - 596:1
**COVID** [2] - 546:23, 569:17
**COVID-19** [2] - 546:14, 559:11
**CRASH** [1] - 544:14
**CRC** [2] - 535:22, 657:14
**CREATED** [2] - 608:15, 610:9
**CREDIBILITY** [1] - 580:7
**CREDIBLE** [1] - 596:6
**CREDIT** [3] - 545:11, 557:12, 613:9
**CREDITED** [1] - 596:1
**CRIME** [1] - 551:5
**CRIMES** [1] - 634:25
**CRIMINAL** [1] - 628:4
**CRITICIZED** [1] - 624:22
**CRITICIZING** [1] - 603:23
**CROSS** [3] - 536:2, 557:23, 640:12
**CROSS** [6] - 538:13, 571:12, 580:13, 580:16, 626:1, 632:2
**CROSS-EXAMINATION** [2] - 557:23, 640:12
**CROSS-EXAMINATION** [1] - 580:13
**CROSSES** [1] - 625:19
**CROSSING** [1] - 538:22
**CROSSWORD** [1] - 625:19
**CRR** [2] - 535:22, 657:14
**CUMULATIVE** [3] - 608:25, 614:19, 621:11
**CURIOUS** [1] - 604:19
**CURRENT** [1] - 569:7

---

**D**

**DAD** [4] - 541:5, 547:19, 547:21, 575:9
**DAN** [4] - 554:21, 587:22, 587:24, 588:3
**DANA** [1] - 535:20
**DATA** [2] - 603:8, 641:3
**DATABASE** [2] - 604:8, 604:9
**DATE** [4] - 546:8, 561:13, 566:22, 626:24
**DATED** [1] - 633:3
**DATING** [1] - 546:24
**DAVIS** [6] - 642:8, 643:5, 644:25, 653:14, 653:15, 653:17
**DAVIS** [1] - 535:7
**DAYS** [2] - 638:22, 638:25
**DEAD** [1] - 618:6
**DEAL** [2] - 602:5, 628:22
**DEALING** [1] - 581:12
**DEBATES** [1] - 649:19
**DEBATING** [1] - 549:10
**DECADE** [1] - 621:20
**DECADES** [1] - 541:6
**DECATUR** [28] - 544:17, 544:23, 544:25, 547:3, 556:13, 559:1, 559:4, 559:14, 559:19, 565:4, 567:21, 568:2, 568:7, 568:11, 568:13, 570:9, 570:10, 570:11, 570:19, 571:22, 572:24, 574:20, 575:2, 578:21, 579:7, 591:21,

591:22

**DECEMBER** [7] - 544:3, 544:12, 544:18, 558:17, 607:12, 627:2, 638:3
**DECIDE** [5] - 544:10, 576:8, 577:20, 592:14, 646:12
**DECIDED** [2] - 547:2, 576:13
**DECISION** [5] - 542:5, 577:19, 592:11, 604:2, 646:13
**DECISIONS** [3] - 603:22, 604:5, 642:24
**DECLARATION** [1] - 606:15
**DEFENDANT** [2] - 583:3, 641:14, 653:14
**DEFENDANTS** [2] - 535:8, 535:17
**DEFENDANTS** [13] - 538:12, 582:24, 588:4, 588:7, 590:8, 592:12, 592:15, 643:7, 644:10, 644:14, 644:15, 644:25, 655:23
**DEFENDANTS'** [4] - 560:15, 560:20, 566:9, 566:16
**DEFERRED** [1] - 595:6
**DEFERRED** [1] - 649:16
**DEGREE** [3] - 542:2, 546:25, 594:18
**DEKALB** [2] - 590:22, 590:23
**DELANO** [1] - 625:16
**DEMOCRAT** [3] - 618:11, 621:24, 622:2
**DEMOCRATIC** [3] - 636:6, 639:11, 656:4
**DEMOGRAPHIC** [4] - 621:3, 621:4, 622:5, 631:1
**DEMOGRAPHICS** [1] - 619:6
**DENIED** [1] - 615:2
**DENNARD** [3] - 622:22, 623:20, 623:23
**DENTIST** [2] - 573:20, 573:21
**DEPARTMENT** [1] - 636:6
**DEPICTION** [1] - 560:20
**DEPOSED** [1] - 653:11
**DEPOSITION** [11] - 558:5, 558:8, 558:10, 558:13, 562:4, 562:5, 652:25, 653:1, 653:8, 653:12, 653:25
**DEPUTY** [6] - 539:20, 540:1, 540:6, 593:19, 593:22, 594:2
**DEREK** [1] - 535:6
**DEREK** [4] - 641:14, 643:19, 644:24, 653:10
**DESCRIBE** [1] - 639:16
**DESCRIBED** [4] - 605:10, 625:2, 627:6, 649:8
**DESPITE** [1] - 579:16
**DETAIL** [1] - 654:16
**DETERMINATION** [1] - 649:9
**DETERMINE** [7] - 587:8, 599:5, 600:21, 601:17, 602:10, 649:3, 649:6
**DETERMINED** [3] - 548:21, 565:6, 640:7
**DETERMINES** [1] - 640:6
**DETERMINING** [2] - 592:24, 647:23
**DIE** [1] - 557:18
**DIFFERENCE** [9] - 598:18, 598:21, 609:22, 624:3, 631:8, 631:9, 640:25, 642:17, 644:15

**DIFFERENT** [9] - 549:14, 556:3, 568:20, 569:1, 595:19, 635:2, 639:18, 655:20, 655:22
**DIFFERENTIAL** [2] - 617:17, 619:12
**DIFFERENTLY** [1] - 584:17, 599:22, 639:10
**DIFFICULT** [2] - 539:2, 542:21
**DIGITAL** [1] - 586:20
**DIGNITY** [3] - 583:13, 583:23, 584:6
**DILUTE** [1] - 600:5
**DINNER** [1] - 567:16
**DIRE** [1] - 596:25
**DIRE** [2] - 536:4, 597:3
**DIRECT** [14] - 537:16, 537:17, 538:3, 538:12, 538:13, 538:21, 583:2, 606:25, 629:8, 639:15, 646:23, 646:24, 649:18, 654:20
**DIRECT** [4] - 536:2, 540:7, 594:6, 606:6
**DIRECTLY** [4] - 564:1, 564:16, 643:15, 648:15
**DISAGREE** [5] - 560:10, 567:1, 574:8, 587:18, 651:10
**DISCARD** [1] - 604:2
**DISCERN** [3] - 647:6, 647:20, 654:1
**DISCERNED** [1] - 648:11
**DISCIPLINES** [2] - 646:20, 646:22
**DISCOURAGE** [1] - 625:4
**DISCRIMINATE** [1] - 637:9
**DISCRIMINATION** [2] - 596:23, 605:24
**DISCRIMINATORY** [2] - 611:7, 611:20
**DISCUSS** [3] - 612:8, 614:13, 652:16
**DISCUSSED** [1] - 620:17
**DISCUSSION** [2] - 600:13, 625:7
**DISENFRANCHISEMENT** [3] - 595:18, 609:4, 614:4
**DISENFRANCHISING** [1] - 609:6
**DISFRANCHISE** [1] - 616:9
**DISFRANCHISED** [4] - 609:13, 614:18, 619:14, 653:20
**DISFRANCHISEMENT** [1] - 613:13
**DISFRANCHISING** [1] - 617:20
**DISPATCHED** [1] - 635:25
**DISPROPORTIONATE** [1] - 600:21
**DISPUTE** [4] - 564:3, 564:13, 598:3, 649:5
**DISRUPTING** [1] - 636:11
**DISTRICT** [6] - 535:1, 535:1, 535:11, 535:23, 657:3, 657:4
**DISTRICT** [3] - 600:3, 600:6, 600:8
**DISTRICTS** [2] - 600:2, 603:10
**DIVISION** [2] - 537:6, 600:1
**DIVISION** [1] - 535:2
**DOCKET** [1] - 535:4
**DOCTOR** [3] - 573:18, 573:19
**DOCUMENT** [4] - 561:23, 587:21, 626:25, 633:2, 638:1, 651:16
**DOCUMENTATION** [4] - 586:7, 587:11, 628:24, 630:6
**DOCUMENTS** [3] - 574:11, 588:17,

589:6

**DOE** [2] - 535:3, 535:3
**DOES** [1] - 535:8
**DOG** [2] - 610:25, 611:1
**DOGGEDLY** [2] - 623:12, 623:13
**DOLLARS** [2] - 633:23, 634:20
**DOMICILE** [2] - 565:6, 571:24
**DONE** [33] - 538:18, 557:7, 586:8, 586:13, 595:17, 595:21, 597:19, 599:9, 600:17, 600:18, 600:20, 607:7, 607:13, 619:25, 620:2, 623:15, 628:5, 628:7, 640:1, 640:23, 640:24, 641:9, 641:24, 642:2, 643:6, 644:9, 647:7, 647:10, 650:6, 651:1, 651:21, 655:21
**DOOR** [3] - 543:17, 585:3, 592:20
**DOORSTEP** [1] - 592:25
**DORMS** [1] - 542:23
**DOUBT** [2] - 537:23, 566:3
**DOWN** [11] - 538:9, 542:4, 593:7, 604:22, 605:10, 611:17, 613:8, 623:16, 648:5, 652:10, 657:6
**DOWNSTAIRS** [2] - 568:23, 569:7
**DR** [54] - 593:12, 594:8, 595:1, 595:8, 595:25, 596:8, 596:22, 597:5, 602:24, 604:14, 605:21, 605:23, 606:3, 606:8, 606:14, 606:18, 606:25, 607:15, 610:5, 611:6, 611:18, 612:8, 614:3, 614:11, 615:25, 617:18, 619:16, 620:7, 620:24, 624:15, 625:6, 626:10, 626:17, 626:19, 627:5, 627:13, 627:21, 628:15, 629:7, 629:22, 632:11, 632:15, 632:21, 633:7, 633:16, 635:1, 636:24, 637:13, 637:20, 638:15, 639:4, 640:8, 640:14, 644:4
**DR** [1] - 636:20
**DRIVE** [6] - 542:21, 542:22, 543:20, 560:16, 560:21, 586:1
**DRIVER'S** [4] - 546:2, 557:8, 573:15, 585:15
**DRIVING** [1] - 637:7
**DROP** [3] - 541:17, 575:1, 581:6
**DROP-OFFS** [2] - 541:17, 575:1
**DROPPED** [2] - 581:8, 581:19
**DROPPING** [1] - 547:9
**DROVE** [1] - 548:19
**DRUID** [4] - 559:3, 559:13, 559:18, 561:25
**DUG** [1] - 625:18
**DULY** [2] - 539:24, 593:25
**DURING** [7] - 543:23, 560:3, 575:11, 613:11, 617:12, 618:7, 636:14
**DWARFS** [3] - 627:9, 627:11, 650:3

---

# E

**EARLY** [3] - 599:17, 608:12, 648:23
**EASIER** [2] - 562:10, 562:23
**EASILY** [1] - 577:23
**EASY** [1] - 542:5

**EAT** [1] - 567:16
**ECONOMIC** [1] - 614:16
**ECONOMICS** [1] - 617:5
**EDGE** [1] - 621:15
**EDUCATION** [1] - 595:16
**EDUCATIONAL** [1] - 594:13
**EDUCATOR** [1] - 625:22
**EFFECT** [11] - 595:20, 598:16, 614:4, 615:20, 616:22, 617:18, 622:5, 622:11, 629:24, 633:19, 637:2
**EFFECTIVE** [2] - 613:13, 614:6
**EFFORT** [6] - 615:8, 627:16, 636:4, 638:5, 639:23, 652:10
**EFFORTS** [9] - 626:11, 627:7, 629:23, 635:4, 635:8, 637:3, 639:5, 643:24, 650:9
**EIGHT** [3] - 541:11, 541:15, 541:21
**EITHER** [8] - 550:6, 554:23, 561:17, 579:6, 586:1, 591:25, 599:17, 651:1
**EL** [3] - 541:4, 543:2, 599:15
**ELABORATE** [1] - 611:10
**ELECT** [1] - 631:11
**ELECTED** [10] - 599:20, 603:11, 610:22, 621:23, 622:2, 622:24, 623:3, 623:7, 623:10, 641:11
**ELECTING** [1] - 608:21
**ELECTION** [64] - 547:25, 548:2, 548:4, 548:15, 548:17, 552:2, 553:12, 555:13, 555:21, 556:6, 563:16, 563:18, 564:8, 564:18, 565:17, 576:4, 576:7, 576:11, 576:12, 577:18, 577:24, 595:14, 599:25, 600:13, 600:25, 601:3, 603:18, 604:4, 604:21, 607:12, 609:17, 610:2, 612:4, 613:16, 613:22, 615:2, 616:1, 616:18, 617:19, 617:25, 618:2, 618:5, 618:6, 618:11, 618:12, 620:19, 621:3, 621:20, 625:11, 626:11, 626:12, 627:20, 629:21, 630:23, 631:9, 631:23, 633:5, 634:11, 634:22, 636:10, 636:15, 638:4, 645:3, 649:2
**ELECTION** [5] - 598:4, 601:4, 601:8, 604:1, 628:17
**ELECTIONS** [10] - 555:20, 599:19, 612:7, 614:22, 614:24, 615:3, 622:6, 624:3, 625:14, 628:19, 631:14, 635:4
**ELECTORAL** [4] - 609:23, 629:14, 629:17, 642:18
**ELECTORS** [1] - 553:11
**ELEMENT** [1] - 613:25
**ELEMENTARY** [1] - 540:19
**ELIGIBILITY** [4] - 555:8, 565:1, 629:19, 629:23
**ELIGIBLE** [4] - 564:25, 587:8, 601:10, 630:7
**EMPHASIS** [1] - 613:2
**EMPIRICAL** [1] - 597:19
**EMPLOYER** [2] - 628:5, 640:4
**EMPLOYMENT** [2] - 556:7, 565:21
**ENCODED** [1] - 611:14

**ENCOURAGING** [1] - 645:2
**END** [12] - 544:2, 544:7, 546:8, 547:5, 556:20, 563:18, 564:9, 572:19, 572:20, 630:21, 636:12, 642:4
**ENDED** [12] - 543:11, 544:3, 544:22, 544:24, 549:13, 549:24, 551:16, 551:19, 551:20, 551:21, 556:13, 581:9
**ENFORCEMENT** [2] - 637:3, 647:21
**ENGAGED** [2] - 556:12, 556:15
**ENGAGEMENT** [1] - 558:2
**ENGAGING** [1] - 635:8
**ENGELBRECHT** [6] - 642:7, 643:4, 643:20, 644:24, 650:20, 653:23
**ENGELBRECHT** [1] - 535:6
**ENGELBRECHT'S** [4] - 538:5, 652:24, 653:1, 653:7
**ENGLISH** [3] - 541:19, 541:20, 541:22
**ENJOY** [1] - 632:8
**ENSURE** [1] - 633:5
**ENTIRE** [1] - 550:13
**ENTIRETY** [2] - 543:21, 629:5
**ENTITY** [2] - 641:12, 641:15
**ENTRY** [2] - 544:15, 545:8
**ENVELOPE** [5] - 550:3, 550:4, 550:5, 550:6, 586:22
**ENVIRONMENT** [1] - 621:1
**EQUALLY** [1] - 647:23
**EQUIPPED** [2] - 643:9, 647:20
**ESQ** [9] - 535:14, 535:15, 535:15, 535:16, 535:18, 535:20, 535:20, 535:21, 535:21
**ESSENTIAL** [1] - 611:21
**ESSENTIALLY** [2] - 611:16, 642:4
**ESTABLISH** [1] - 578:6
**ESTABLISHED** [1] - 648:23
**ESTIMATES** [1] - 615:20
**ETHICS** [1] - 636:5
**ETHNICITY** [1] - 631:6
**EVANS** [12] - 537:18, 557:22, 557:25, 562:6, 562:18, 563:13, 566:2, 566:5, 571:7, 572:10, 573:23, 580:1
**EVANS** [46] - 550:17, 552:20, 554:6, 557:24, 560:12, 560:14, 562:8, 562:16, 562:22, 563:1, 563:2, 563:11, 563:20, 564:1, 564:10, 564:12, 564:23, 565:22, 566:6, 566:7, 570:7, 570:14, 570:17, 571:6, 571:11, 571:16, 574:1, 575:18, 576:20, 577:6, 578:7, 578:9, 580:2, 580:6, 580:11, 580:14, 580:24, 581:1, 581:5, 583:21, 584:4, 587:4, 591:13, 591:18, 592:8, 593:2
**EVANS'** [1] - 565:8
**EVENING** [2] - 537:7, 551:21
**EVENTUALLY** [1] - 621:23
**EVIDENCE** [36] - 552:17, 553:22, 554:10, 564:14, 565:1, 570:23, 571:4, 576:23, 577:1, 577:3, 580:17, 580:21, 581:4, 606:18, 606:23, 622:12, 626:18, 633:9, 633:14, 633:25, 636:3,

636:13, 638:8, 638:13, 643:11, 646:12, 646:23, 646:24, 647:5, 649:17, 649:18, 650:5, 651:25, 656:2, 656:5
EVIDENT [1] - 639:18
EVOLUTION [1] - 644:19
EXACERBATED [1] - 637:2
EXACT [2] - 610:19, 638:24
EXACTLY [4] - 554:2, 612:1, 649:3, 649:8
EXAMINATION [6] - 540:7, 557:23, 594:6, 597:3, 606:6, 640:12
EXAMINATION [1] - 580:13
EXAMINE [1] - 595:11
EXAMPLE [10] - 542:22, 592:5, 618:10, 618:22, 622:10, 622:19, 624:4, 635:10, 637:4, 650:7
EXAMPLES [9] - 611:25, 618:4, 618:7, 618:14, 622:13, 622:17, 623:17, 634:3, 636:18
EXASPERATED [1] - 585:4
EXCEL [1] - 553:14
EXCEPT [2] - 653:19, 654:15
EXCITING [1] - 556:2
EXCLUDE [1] - 614:23
EXCLUDED [1] - 596:4
EXCLUSIVE [2] - 635:19, 647:9
EXCLUSIVELY [1] - 595:7
EXCUSE [7] - 537:24, 610:11, 610:16, 623:9, 631:21, 635:17, 650:7
EXECUTED [1] - 620:6
EXERCISE [1] - 582:18
EXERCISING [1] - 650:9
EXHIBIT [18] - 552:16, 553:24, 554:9, 560:15, 560:20, 566:9, 566:17, 587:21, 606:18, 606:22, 626:17, 629:9, 632:21, 633:9, 633:13, 637:20, 638:7, 638:12
EXHIBIT [9] - 613:1, 626:19, 629:8, 632:22, 633:8, 635:1, 637:13, 637:21, 640:15
EXPANDED [1] - 636:16
EXPECT [1] - 539:5
EXPERIENCE [16] - 547:16, 550:11, 551:23, 555:15, 555:19, 555:20, 555:23, 555:24, 556:1, 556:3, 576:13, 589:1, 592:14, 628:13, 632:1, 646:14
EXPERIENCES [1] - 556:4
EXPERT [15] - 594:10, 595:8, 595:11, 596:5, 596:10, 596:14, 596:23, 599:4, 600:20, 604:16, 605:21, 605:23, 606:4, 629:2, 646:18
EXPERTISE [1] - 619:24
EXPIRED [3] - 568:8, 568:13, 587:17
EXPIRING [1] - 568:10
EXPLAIN [10] - 585:13, 592:1, 610:7, 612:20, 613:13, 614:2, 620:2, 621:5, 645:20, 647:2
EXPLAINED [5] - 549:3, 587:10, 589:20, 612:24, 613:10

EXPLAINING [2] - 624:7, 649:21
EXPLOITING [1] - 625:4
EXTENDED [1] - 557:16
EXTENT [4] - 581:17, 581:18, 581:20, 643:10
EXTRA [2] - 590:13, 630:9

## F

FACES [1] - 636:10
FACT [26] - 538:23, 565:18, 585:1, 585:10, 585:18, 585:25, 586:21, 589:21, 590:21, 591:13, 597:16, 600:7, 603:10, 615:1, 618:1, 618:7, 618:22, 619:21, 623:14, 625:9, 627:14, 630:2, 631:9, 635:17, 639:16, 654:1
FACTORS [3] - 595:16, 648:4, 648:5
FACTS [3] - 576:23, 576:25, 643:18
FACTUAL [3] - 564:13, 643:18, 643:21
FAILED [2] - 578:23, 591:1
FAIR [1] - 535:3
FAIR [1] - 645:3
FAIRLY [3] - 553:24, 553:25, 652:16
FAITH [2] - 645:5, 645:21
FALSE [1] - 610:9
FAMILIAR [3] - 598:12, 600:8, 650:22
FAMILY [16] - 540:17, 540:25, 541:3, 541:4, 541:5, 543:1, 543:4, 545:5, 547:11, 547:23, 548:13, 556:17, 556:18, 557:16, 557:17, 575:8
FAMILY'S [1] - 568:18
FAMOUS [2] - 615:14, 622:20
FAN [1] - 602:6
FANG [1] - 652:14
FAPR [2] - 535:22, 657:14
FAR [6] - 546:14, 566:5, 566:22, 573:10, 575:14, 612:4
FARMERS [1] - 608:18
FAVORABLY [1] - 625:17
FEBRUARY [23] - 545:14, 545:22, 546:12, 556:8, 558:24, 559:20, 563:3, 565:20, 566:23, 567:4, 568:1, 568:6, 569:11, 570:15, 570:16, 572:5, 572:13, 573:2, 573:8, 573:14, 574:3, 574:13, 574:21
FEDERAL [2] - 614:22, 614:23
FEELINGS [1] - 648:13
FELDER [1] - 609:3
FELDER-WILLIAMS [1] - 609:3
FELONY [2] - 595:18, 623:11
FELT [7] - 555:4, 584:15, 584:17, 584:24, 585:2, 622:15, 648:16
FEW [3] - 547:15, 596:8, 632:15
FI [1] - 573:5
FIANCÉ [4] - 559:8, 569:24, 575:5, 575:14
FIANCÉ/BOYFRIEND [1] - 567:18
FIFTH [1] - 560:23
FIGHT [1] - 535:3

FIGURE [4] - 551:10, 617:4, 617:10, 629:2
FILE [14] - 545:16, 553:14, 557:9, 558:25, 563:8, 570:9, 570:18, 570:19, 570:25, 574:7, 578:10, 582:20, 599:5
FILED [14] - 559:19, 571:4, 574:2, 574:12, 581:15, 583:12, 583:22, 585:10, 590:22, 591:8, 591:21, 616:1, 623:12, 628:17
FILING [4] - 571:17, 582:17, 628:19, 635:19
FILL [1] - 634:1
FILLED [1] - 579:5
FINAL [1] - 637:13
FINE [1] - 593:22
FINISH [1] - 538:12, 538:13, 580:7, 630:13, 647:16, 651:3, 651:6, 651:12, 651:17, 655:16, 655:17
FINISHED [2] - 538:22, 550:23
FIRST [29] - 542:19, 545:4, 545:6, 545:12, 548:9, 548:11, 553:15, 558:4, 569:6, 569:8, 571:11, 578:6, 581:15, 594:24, 598:8, 599:16, 599:22, 606:16, 608:11, 615:23, 616:10, 621:22, 621:24, 622:2, 628:2, 635:18, 642:17, 653:14
FISHY [1] - 620:5
FIT [8] - 607:13, 625:9, 630:24, 630:25, 642:6, 649:7, 653:24
FITS [5] - 603:19, 639:7, 639:14, 642:15, 642:22
FITTING [1] - 654:12
FIVE [1] - 595:15
FLAG [1] - 604:3
FLIP [2] - 553:18, 560:23
FLIPPING [1] - 635:21
FLOATING [1] - 613:24
FLOOR [1] - 568:22
FLUENT [1] - 541:20
FOCUS [2] - 619:5, 620:25
FOCUSED [2] - 597:18, 654:7
FOLLOW [1] - 632:4
FOLLOW-UP [1] - 632:4
FOLLOWING [3] - 609:8, 625:1, 645:18
FOLLOWS [3] - 539:24, 579:24, 593:25
FOOT [1] - 543:17
FOOTNOTE [1] - 651:25
FOOTNOTES [3] - 651:22, 652:4, 652:12
FOR [1] - 535:1
FORD [67] - 539:15, 539:18, 540:8, 542:10, 550:19, 552:8, 552:11, 552:12, 552:16, 552:25, 553:4, 553:5, 553:22, 554:11, 557:20, 562:3, 562:15, 563:14, 563:25, 564:5, 565:16, 565:23, 570:21, 570:23, 571:3, 571:7, 573:25, 575:12, 576:19, 576:22, 576:25, 577:4, 579:21, 583:25, 586:10, 591:11, 591:15, 593:4, 593:12, 594:7, 596:22, 602:24,

604:11, 604:25, 605:2, 605:22, 606:5, 606:7, 606:10, 606:13, 606:17, 606:24, 608:5, 626:13, 626:16, 630:17, 632:10, 632:17, 632:20, 633:8, 633:15, 637:15, 637:19, 638:7, 638:14, 640:9, 645:7
**FORD** [14] - 539:15, 557:21, 565:6, 565:25, 572:10, 573:24, 580:21, 581:3, 593:11, 605:5, 605:20, 632:9, 640:10, 645:13
**FORD'S** [1] - 580:16
**FOREGOING** [1] - 657:6
**FOREVER** [1] - 544:14
**FORGET** [1] - 573:12
**FORGOT** [1] - 650:24
**FORM** [4] - 545:17, 550:2, 557:9, 571:4
**FORMALLY** [1] - 537:24
**FORMATION** [1] - 635:3
**FORMER** [2] - 621:6, 621:25
**FORMS** [10] - 549:6, 549:9, 549:14, 549:25, 585:15, 586:1, 586:3, 587:15, 639:5
**FORTH** [6] - 539:6, 542:21, 546:9, 556:24, 570:1, 572:8
**FORWARD** [3] - 553:18, 554:12, 557:10
**FORWARDED** [1] - 578:19
**FOUNDATION** [2] - 552:20, 552:24
**FOUNDED** [1] - 611:11
**FOUR** [3] - 550:25, 600:1, 600:2
**FRANK** [1] - 538:14
**FRANKLIN** [1] - 625:16
**FRAUD** [11] - 610:13, 610:23, 612:4, 612:5, 619:18, 631:19, 633:25, 635:24, 636:3, 636:13, 650:7
**FRAUDULENT** [4] - 610:13, 610:20, 611:4, 640:1
**FRIDAY** [2] - 537:8, 538:3
**FRIEND** [2] - 543:19, 543:21
**FRIEND'S** [1] - 544:14
**FRIENDS** [1] - 541:1
**FRIGHTENING** [1] - 550:10
**FRIVOLOUS** [10] - 563:22, 564:3, 565:1, 565:10, 616:2, 616:3, 631:17, 632:13, 640:2, 655:1
**FRONT** [5] - 548:23, 548:24, 549:24, 607:24, 640:14
**FULFILLED** [1] - 597:12
**FULL** [7] - 544:4, 556:6, 556:8, 565:20, 583:15, 629:15
**FULL-TIME** [4] - 544:4, 556:6, 556:8, 565:20
**FULLY** [9] - 539:5, 546:15, 546:24, 547:1, 557:6, 567:7, 567:25, 591:2, 613:12
**FULTON** [2] - 619:5, 619:13
**FUN** [2] - 555:24, 555:25
**FUNCTION** [4] - 640:22, 641:10, 647:25, 648:1
**FUND** [1] - 633:4
**FURMAN** [1] - 594:17

### G

**GAS** [2] - 545:19
**GASAWAY** [4] - 554:21, 587:22, 587:24, 588:3
**GBI** [2] - 624:13
**GENE** [3] - 615:14, 625:12, 631:16
**GENERAL** [1] - 623:14
**GENERAL** [4] - 548:2, 548:4, 595:13, 640:21
**GENERATED** [2] - 636:3, 636:13
**GEORGIA** [3] - 535:1, 535:24, 657:4
**GEORGIA** [77] - 540:14, 540:16, 540:17, 540:18, 540:21, 542:1, 543:19, 556:14, 557:13, 557:15, 557:16, 557:17, 558:19, 559:1, 559:4, 559:14, 559:19, 560:7, 560:24, 561:4, 561:7, 561:11, 561:15, 561:16, 561:17, 561:18, 561:22, 568:14, 575:8, 575:20, 576:9, 578:14, 579:18, 594:15, 596:24, 597:16, 598:4, 599:2, 600:22, 601:14, 601:15, 603:25, 605:25, 607:8, 608:18, 609:2, 610:2, 611:14, 617:7, 618:19, 620:8, 620:14, 621:1, 621:2, 621:7, 621:13, 621:22, 622:1, 622:8, 624:12, 624:18, 625:15, 626:8, 627:8, 634:7, 634:13, 638:4, 638:6, 638:18, 639:5, 639:19, 642:5, 649:23, 650:25
**GEORGIA'S** [7] - 596:11, 596:15, 607:16, 608:9, 625:21, 627:16, 627:22
**GEORGIANS** [1] - 627:2
**GERMANY** [2] - 537:12, 537:15, 537:19
**GIVEN** [19] - 549:8, 563:17, 571:21, 574:11, 583:13, 583:23, 584:5, 584:6, 586:16, 601:16, 612:1, 612:2, 619:17, 631:17, 634:9, 640:15, 648:20, 654:8
**GOD** [1] - 654:22
**GOOGLE** [2] - 650:15, 650:16
**GOSH** [1] - 542:8
**GOVERNMENT** [2] - 617:10, 634:18
**GOVERNOR** [3] - 576:8, 615:19, 625:12
**GOVERNOR** [6] - 609:6, 610:15, 613:8, 623:8, 623:9, 644:20
**GOVERNOR'S** [1] - 620:10
**GRADUATED** [9] - 542:1, 542:7, 543:6, 543:7, 558:17, 558:18, 558:19, 574:23
**GRADUATING** [1] - 556:14
**GRANT** [1] - 596:16
**GRAVES** [1] - 625:18
**GREAT** [3] - 539:7, 542:6, 602:5
**GREENVILLE** [1] - 594:18
**GREG** [1] - 652:11
**GREW** [5] - 540:16, 540:20, 540:25, 542:2, 557:18
**GRIFFIN** [2] - 615:18, 620:11
**GROUP** [8] - 601:10, 615:9, 615:17, 619:10, 625:15, 634:15, 634:23, 639:9
**GROUP'S** [1] - 636:14
**GROUPS** [1] - 625:18

### H

**GROW** [2] - 540:15, 646:2
**GROWING** [2] - 547:21, 622:7
**GUARANTEES** [2] - 613:22, 613:23
**GUBERNATORIAL** [2] - 576:7, 615:13
**GUESS** [11] - 566:11, 569:18, 572:4, 572:12, 573:17, 584:14, 589:9, 601:1, 601:20, 612:3, 644:4

**H-E-R-E-D-I-A** [1] - 540:5
**HALF** [2] - 549:21, 627:10
**HANCOCK** [2] - 620:20, 620:21
**HAND** [3] - 539:20, 560:15, 593:19
**HANDED** [2] - 550:7, 638:3
**HANDLE** [1] - 591:25
**HANDS** [1] - 652:24
**HAPPY** [3] - 571:13, 610:14
**HARASSING** [1] - 579:22
**HARD** [4] - 590:4, 590:5, 623:4, 639:22
**HARDY** [1] - 535:14
**HEADED** [1] - 550:25
**HEALTH** [1] - 595:16
**HEAR** [6] - 537:14, 591:16, 591:17, 602:7, 632:6, 634:6
**HEARD** [2] - 552:20, 552:21
**HEARING** [5] - 551:1, 564:14, 564:16, 607:21, 644:5
**HEIGHTS** [1] - 648:4
**HELD** [1] - 537:1
**HELD** [1] - 629:1
**HELLO** [1] - 593:15
**HELP** [12] - 541:18, 541:22, 543:1, 545:9, 547:8, 574:25, 601:17, 625:17, 642:23, 646:12, 649:24, 654:9
**HELPED** [1] - 650:23
**HELPING** [1] - 541:13
**HEREBY** [1] - 657:6
**HEREDIA** [10] - 539:18, 540:4, 540:5, 554:16, 554:17, 563:21, 566:8, 574:2, 580:22, 581:6
**HEREDIA** [1] - 557:25
**HEREDIA** [2] - 536:3, 539:23
**HEREDIA'S** [2] - 563:15, 565:17
**HERMAN** [2] - 615:15, 620:11
**HIGH** [2] - 542:4, 542:7
**HIGH** [8] - 542:6, 574:23, 574:25, 607:15, 608:7, 608:8, 610:3, 614:3
**HILLS** [4] - 559:3, 559:13, 559:19, 561:25
**HILSMAN** [1] - 542:15
**HIMSELF** [2] - 596:19, 629:1
**HIRED** [3] - 544:7, 594:25, 654:1
**HISPANIC** [3] - 584:14, 620:19, 621:9
**HISTORIAN** [4] - 641:6, 646:19, 649:13
**HISTORIANS** [8] - 595:22, 615:21, 646:19, 647:4, 647:19, 647:24, 648:3, 649:17
**HISTORICAL** [17] - 596:11, 603:16, 615:25, 619:19, 630:24, 630:25,

632:4, 635:4, 639:7, 639:15, 641:25, 642:21, 646:1, 647:5, 649:4, 654:10, 655:20

**HISTORICALLY** [6] - 628:1, 632:1, 634:3, 646:20, 653:20, 656:2

**HISTORIES** [1] - 649:19

**HISTORY** [33] - 541:22, 594:21, 595:2, 595:3, 595:4, 596:23, 598:14, 598:15, 598:16, 598:23, 602:10, 602:16, 603:5, 605:23, 607:8, 607:14, 607:17, 608:9, 611:22, 614:14, 615:16, 620:8, 625:21, 627:16, 634:6, 635:7, 636:22, 638:6, 639:19, 646:9, 646:15, 647:7, 649:23

**HIT** [1] - 546:23

**HITS** [1] - 546:14

**HOKE** [1] - 644:20

**HOLD** [16] - 563:12, 570:22, 573:23, 576:18, 579:20, 591:10, 600:12, 602:22, 604:10, 605:1, 605:4, 605:15

**HOLIDAYS** [2] - 544:1, 547:10

**HOME** [33] - 540:17, 542:11, 542:13, 542:18, 542:19, 543:25, 544:19, 544:21, 546:7, 546:9, 548:11, 548:12, 549:10, 549:11, 550:25, 551:12, 552:5, 556:20, 556:22, 557:1, 565:14, 567:9, 568:18, 570:1, 570:3, 570:5, 572:3, 572:19, 572:21, 575:7, 581:11, 586:1, 592:5

**HOMES** [3] - 556:15, 557:16, 570:3

**HOMEWORK** [3] - 541:19, 547:8, 575:1

**HONEST** [1] - 555:15

**HONESTLY** [1] - 544:18

**HONOR** [37] - 539:8, 539:13, 539:15, 552:8, 552:16, 552:25, 553:22, 554:6, 562:3, 563:11, 564:5, 565:16, 570:21, 575:12, 576:19, 576:22, 577:4, 579:21, 583:25, 586:10, 591:11, 593:4, 593:12, 593:17, 596:22, 604:11, 604:25, 605:22, 606:5, 606:10, 606:17, 610:18, 626:13, 633:8, 637:15, 638:7, 645:7

**HONOR** [3] - 539:9, 593:16, 605:17

**HONORABLE** [1] - 646:14

**HONORABLE** [1] - 596:18

**HONORABLE** [3] - 535:10, 535:23, 657:15

**HOOPS** [2] - 585:24, 590:14

**HOPE** [4] - 537:3, 602:18, 607:19, 650:1

**HOPE** [3] - 609:7, 610:15, 635:18

**HOPEFULLY** [2] - 642:23, 654:9

**HOPING** [1] - 646:3

**HOTLINE** [4] - 551:22, 634:1, 638:4, 638:25

**HOUR** [4] - 544:20, 549:20

**HOURS** [3] - 550:15, 550:22, 550:25

**HOUSE** [3] - 544:14, 558:1, 575:19

**HOUSES** [1] - 556:16

**HOUSING** [1] - 544:10

**HOUSTON** [4] - 635:11, 635:14, 635:15,

636:1

**HOVERING** [1] - 636:9

**HUGE** [3] - 615:7, 615:10, 650:1

**HUNGRY** [1] - 549:19

**HURT** [1] - 637:12

## I

**ID** [3] - 548:25, 549:1, 549:8

**IDEA** [7] - 611:3, 618:23, 624:8, 625:20, 630:2, 633:16, 641:2

**IDENTIFIED** [1] - 643:18

**IDENTIFY** [2] - 641:17, 641:23

**IGNORANT** [1] - 635:19

**II** [1] - 619:7

**ILLEGAL** [2] - 587:2, 592:10

**ILLEGALLY** [1] - 613:6

**ILLINOIS** [2] - 594:22, 594:25

**IMAGINE** [2] - 619:2, 634:19

**IMPACT** [11] - 557:12, 597:20, 599:1, 599:5, 599:11, 599:18, 600:5, 601:25, 602:10, 602:15, 639:14

**IMPACTED** [3] - 545:12, 603:5, 603:10

**IMPEACH** [3] - 562:6, 562:10, 562:19

**IMPLEMENTATION** [1] - 600:24

**IMPORTANT** [35] - 542:25, 543:3, 547:17, 547:18, 547:23, 555:14, 576:3, 576:12, 577:9, 577:12, 577:17, 577:19, 577:20, 577:22, 579:19, 579:24, 580:5, 580:9, 602:16, 602:17, 604:9, 606:2, 611:21, 611:25, 612:21, 613:9, 619:9, 623:21, 624:8, 640:22, 641:2, 641:3, 641:4, 653:25

**IMPROPERLY** [1] - 613:6

**IN** [1] - 537:1

**INACTIVE** [13] - 575:24, 575:25, 576:6, 576:16, 577:10, 578:1, 578:3, 578:5, 578:24, 580:17, 580:19, 580:24, 580:25

**INC** [2] - 535:3, 535:6

**INCIDENTALLY** [1] - 617:23

**INCLUDE** [4] - 578:20, 611:22, 625:7, 638:15

**INCLUDED** [1] - 609:8

**INCLUDING** [5] - 590:21, 591:20, 596:24, 605:24, 641:25

**INCONSISTENT** [2] - 562:19, 598:4

**INCORPORATED** [1] - 613:18

**INCORRECT** [1] - 589:9

**INCREASE** [4] - 615:7, 615:10, 615:11, 621:11

**INCREASED** [2] - 621:5, 621:8

**INCREASING** [1] - 621:21

**INDICATE** [2] - 538:22, 574:6

**INDICATED** [2] - 537:13, 537:15

**INDIVIDUAL** [8] - 601:7, 604:1, 642:21, 643:6, 654:7, 654:8, 654:18, 655:19

**INDIVIDUALLY** [1] - 646:6

**INDIVIDUALS** [5] - 554:24, 642:1, 642:19, 643:23, 649:7

**INDIVIDUALS'** [1] - 631:25

**INELIGIBLE** [2] - 627:4, 627:19

**INFLUENCE** [5] - 609:20, 609:21, 631:11, 631:14, 639:13

**INFLUENCED** [1] - 599:19

**INFLUX** [1] - 621:9

**INFORMATION** [5] - 555:6, 581:23, 585:19, 591:8, 634:25

**INFORMED** [1] - 571:18

**INITIATIVE** [1] - 633:4

**INQUIRY** [1] - 607:2

**INSECURITY** [1] - 639:21

**INSIDE** [1] - 548:24

**INSPECT** [1] - 613:3

**INSPECTION** [1] - 612:15

**INSTANCE** [4] - 599:24, 602:6, 624:16, 636:17

**INSTANT** [1] - 619:5

**INSTEAD** [1] - 601:5

**INSUBORDINATION** [1] - 634:24

**INSURANCE** [2] - 573:21, 573:22

**INTEGRATION** [1] - 634:10

**INTEGRITY** [2] - 633:5, 638:4

**INTENDED** [1] - 613:12

**INTENT** [26] - 564:25, 565:7, 565:8, 565:11, 565:13, 565:14, 565:16, 565:19, 566:3, 575:16, 595:20, 611:8, 611:12, 611:20, 645:25, 647:6, 647:10, 647:20, 647:23, 648:7, 648:22, 648:23, 654:7, 654:8

**INTERESTED** [1] - 598:10

**INTERESTING** [1] - 621:6

**INTERNSHIP** [10] - 543:12, 543:14, 543:15, 543:16, 543:22, 543:24, 544:2, 544:3, 544:8, 558:22

**INTERNSHIPS** [1] - 543:9

**INTERPRET** [1] - 642:22

**INTERPRETATIONS** [1] - 612:23

**INTERPRETED** [3] - 617:2, 624:6, 642:13

**INTERRUPT** [1] - 602:13

**INTERSECTION** [1] - 598:3

**INTERVENOR** [1] - 535:19

**INTERVIEW** [2] - 650:17, 650:18

**INTIMIDATE** [4] - 625:4, 625:10, 636:25

**INTIMIDATED** [6] - 584:9, 622:15, 642:14, 643:14, 646:10, 649:23

**INTIMIDATING** [3] - 622:11, 628:7, 630:2

**INTIMIDATION** [18] - 600:19, 601:14, 601:20, 601:24, 603:16, 607:8, 608:12, 608:14, 614:15, 625:20, 627:23, 628:11, 636:5, 639:5, 639:15, 646:11, 648:24, 654:6

**INTRODUCED** [1] - 614:5

**INTRODUCTION** [1] - 609:1

**INVESTIGATED** [2] - 624:7, 633:17

**INVESTIGATING** [1] - 643:23, 654:5

**INVESTIGATION** [7] - 622:25, 623:1,

623:10, 623:16, 624:18, 628:4, 636:6
**INVESTIGATION** [1] - 624:12
**INVESTIGATIONS** [7] - 622:11, 622:14, 624:9, 625:2, 625:6, 639:20, 649:24
**INVISIBLE** [1] - 622:4
**INVOLVED** [7] - 541:16, 599:24, 637:3, 643:10, 643:11, 643:12, 643:15
**INVOLVING** [1] - 599:10
**ISSUE** [7] - 537:12, 548:16, 597:20, 597:23, 598:11, 604:23, 626:11
**ISSUES** [7] - 551:17, 564:2, 568:23, 569:6, 569:8, 605:12, 605:14
**ITEMS** [1] - 605:10
**ITSELF** [2] - 617:11, 622:7

**J**

**JACKSON** [1] - 599:17
**JACOB** [1] - 535:16
**JAGUARS** [1] - 542:8
**JAIL** [1] - 624:14
**JAKE** [1] - 557:25
**JAMES** [2] - 535:7, 535:18
**JAMES** [1] - 644:25
**JANE** [1] - 535:3
**JANUARY** [11] - 544:18, 553:12, 556:12, 556:15, 560:24, 561:3, 579:11, 579:14, 579:16, 584:11, 600:22
**JENNIFER** [2] - 535:20, 535:21
**JERRY** [4] - 554:19, 587:22, 588:1, 588:6
**JEWISH** [1] - 621:23
**JIMMY** [1] - 622:3
**JOB** [17] - 539:7, 543:9, 543:11, 546:14, 546:24, 556:7, 558:20, 558:22, 562:9, 565:2, 567:8, 581:22, 590:23, 591:2, 591:22, 597:17, 655:24
**JOBS** [1] - 608:13
**JOCELYN** [20] - 539:18, 540:3, 540:9, 541:3, 541:24, 543:5, 547:15, 548:15, 550:12, 550:20, 552:1, 552:13, 553:6, 554:12, 554:16, 555:13, 556:5, 557:19, 564:6
**JOCELYN** [3] - 536:3, 539:23, 540:4
**JOE** [1] - 622:1
**JOHN** [2] - 535:3, 535:8
**JOHNSON** [1] - 535:7
**JOINED** [1] - 620:11
**JONES** [5] - 596:18, 601:17, 603:21, 607:19, 642:24
**JONES** [3] - 535:10, 535:23, 657:15
**JOURNAL** [2] - 619:23, 629:2
**JOURNAL-CONSTITUTION** [1] - 619:23
**JOURNALIST** [2] - 624:24, 625:2
**JR** [1] - 535:18
**JUDGE** [18] - 560:12, 562:15, 562:16, 563:20, 564:10, 565:3, 565:8, 566:6, 566:11, 571:12, 578:7, 580:7, 596:18, 601:16, 603:21, 607:19, 631:4, 642:23
**JUDGE** [1] - 535:11

**JUDGE** [10] - 552:20, 563:25, 565:22, 591:13, 593:2, 615:2, 646:11, 647:21, 651:20, 654:10
**JUDGING** [1] - 613:5
**JUDGMENT** [1] - 535:10
**JUMP** [3] - 543:5, 585:23, 585:24, 590:13, 618:17
**JURY** [2] - 566:1, 647:21
**JUSTICE** [2] - 582:18, 649:16
**JUSTICE** [2] - 595:6, 636:7
**JUSTIFICATION** [1] - 619:16

**K**

**KEEN** [1] - 535:20
**KEEP** [4] - 600:15, 615:3, 644:6, 650:9
**KEEPS** [1] - 621:25
**KEMP** [5] - 623:8, 623:9, 624:17, 624:22
**KEPT** [4] - 566:11, 608:24, 615:22, 644:7
**KILL** [1] - 624:5
**KILLED** [1] - 608:13
**KIND** [21] - 541:17, 543:17, 553:14, 555:4, 555:9, 556:18, 573:10, 598:2, 599:1, 599:23, 599:24, 600:4, 603:13, 605:11, 610:12, 614:1, 617:16, 626:3, 647:1, 647:3, 655:4
**KING** [4] - 614:25, 615:1, 635:12, 636:3
**KNOCKED** [1] - 592:20
**KNOWING** [4] - 583:13, 583:24, 584:6
**KNOWLEDGE** [6] - 590:16, 596:4, 641:13, 652:19, 652:22, 653:13
**KNOWN** [4] - 582:21, 589:25, 634:25

**L**

**LABORERS** [1] - 617:6
**LACK** [2] - 590:8, 591:14
**LAID** [1] - 648:5
**LANDING** [1] - 543:12
**LANGUAGE** [2] - 612:9, 647:1
**LAPTOP** [1] - 546:20
**LARGE** [7] - 599:18, 600:1, 600:2, 600:4, 620:18, 621:9, 621:10
**LARGER** [1] - 627:15
**LARGEST** [4] - 615:8, 615:11, 620:7, 620:12
**LAST** [6] - 537:14, 553:16, 576:7, 594:5, 604:14, 655:8
**LATINO** [2] - 620:19, 621:10
**LAUNCHED** [1] - 624:17
**LAUNCHES** [2] - 633:4, 638:4
**LAURENS** [1] - 618:9
**LAW** [57] - 589:25, 590:5, 590:9, 595:5, 596:12, 597:16, 598:6, 598:9, 598:16, 599:12, 600:25, 602:1, 609:6, 609:7, 609:8, 609:14, 610:6, 610:8, 610:16, 611:7, 611:11, 611:13, 611:17, 611:20, 611:24, 612:1, 612:9, 612:13, 612:19, 612:25, 613:10, 613:12, 613:13, 613:16, 613:17, 613:22,

614:4, 614:5, 616:20, 617:7, 620:1, 620:5, 625:4, 637:2, 637:9, 642:12, 642:14, 645:1, 645:18, 646:1, 647:21, 648:12, 648:18, 648:19, 649:2, 649:25
**LAWFULLY** [2] - 589:11, 589:14
**LAWRENCE** [1] - 535:14
**LAWRENCE-HARDY** [1] - 535:14
**LAWS** [18] - 595:14, 595:18, 595:20, 595:24, 598:24, 599:1, 603:12, 603:17, 604:7, 610:12, 614:2, 614:19, 615:17, 631:13, 631:21, 648:25, 649:18, 653:21
**LAWSUIT** [6] - 582:6, 582:9, 582:20, 583:12, 583:22, 636:5
**LAWSUITS** [1] - 582:17
**LAWYERS** [3] - 607:25, 647:20, 654:1
**LAY** [2] - 552:21, 646:12
**LEAD** [3] - 543:18, 571:12, 585:2
**LEADER** [1] - 619:10
**LEADING** [2] - 550:17, 550:18
**LEARNED** [2] - 584:15, 585:5
**LEASE** [11] - 544:24, 545:14, 546:7, 546:12, 568:1, 568:4, 568:7, 568:8, 568:9, 568:10, 569:13
**LEASED** [1] - 546:21
**LEAST** [11] - 583:13, 583:23, 614:22, 618:22, 622:13, 626:6, 627:6, 634:22, 636:16, 647:2, 653:11
**LEAVE** [5] - 550:14, 557:13, 573:8, 573:13, 645:5, 653:6
**LEAVING** [1] - 616:3
**LECTURE** [2] - 654:13, 654:15
**LECTURING** [1] - 646:5
**LEE** [1] - 652:14
**LEFT** [7] - 560:19, 561:25, 566:16, 572:5, 573:8, 573:14, 589:2
**LEGAL** [14] - 564:5, 564:13, 564:15, 601:21, 603:21, 603:22, 624:21, 625:3, 639:17, 642:24, 643:8, 643:9, 643:19
**LEGALLY** [1] - 616:20
**LEGISLATIVE** [5] - 598:14, 598:15, 598:16, 598:23, 649:19
**LEGISLATOR** [1] - 608:24
**LEGISLATURE** [2] - 598:8, 608:22
**LEGITIMATE** [2] - 639:24, 641:9
**LESLIE** [1] - 535:15
**LESS** [2] - 538:16, 621:25
**LEVEL** [11] - 544:15, 545:8, 601:20, 601:24, 607:15, 608:7, 608:8, 608:14, 610:3, 614:3, 646:10
**LICENSE** [3] - 546:2, 549:7, 557:8, 573:16, 585:16
**LIE** [1] - 634:19
**LIEUTENANT** [1] - 615:18
**LIFE** [5] - 563:15, 572:1, 581:9, 591:2, 628:13
**LIFES** [1] - 592:4
**LIGHT** [2] - 609:19
**LIMITED** [1] - 606:1

LINE [19] - 548:20, 548:22, 548:23, 548:24, 549:16, 549:17, 549:18, 549:21, 549:25, 555:17, 563:15, 575:13, 585:25, 586:4, 586:5, 586:6, 625:21

LINED [1] - 543:8

LINES [4] - 550:22, 551:18, 636:11, 644:8

LINK [1] - 552:7

LIST [13] - 553:11, 554:13, 555:4, 555:5, 555:12, 596:8, 612:14, 612:18, 612:25, 618:13, 620:4, 632:13, 633:24

LISTED [6] - 616:4, 628:9, 641:20, 643:25, 650:20, 652:4

LISTEN [4] - 538:14, 538:19, 591:4, 645:14

LISTS [1] - 641:8

LIVE [16] - 542:23, 559:6, 561:16, 567:18, 568:14, 568:17, 569:24, 571:18, 578:12, 578:24, 589:7, 590:13, 590:16, 590:18, 592:7, 592:25

LIVE [1] - 563:7

LIVED [15] - 563:16, 569:10, 578:16, 578:19, 578:20, 585:10, 585:22, 586:7, 587:12, 588:18, 590:24, 591:21, 591:23, 592:21, 592:24

LIVES [2] - 564:22, 575:9

LIVING [7] - 544:19, 556:10, 556:13, 559:18, 559:25, 564:19, 569:18

LOCAL [1] - 624:3

LOCATED [1] - 573:18

LOCATION [6] - 548:19, 548:25, 549:11, 550:14, 550:20

LOCATIONS [1] - 560:7

LOGIC [1] - 592:7

LOOK [38] - 544:13, 556:15, 556:16, 556:17, 560:16, 560:19, 561:9, 566:8, 566:22, 576:5, 598:21, 599:5, 599:11, 600:24, 601:13, 601:15, 603:17, 603:23, 604:2, 606:15, 612:22, 620:9, 620:22, 625:17, 635:13, 638:20, 638:24, 647:4, 647:12, 649:18, 649:19, 651:22, 654:8, 654:22, 655:14, 655:21, 655:22

LOOKED [27] - 543:10, 548:18, 551:13, 551:14, 551:15, 552:5, 552:13, 553:6, 574:15, 581:9, 581:10, 581:16, 581:21, 581:23, 581:25, 598:15, 598:24, 600:19, 603:4, 640:4, 648:18, 649:17, 650:22, 651:19, 656:1

LOOKING [19] - 543:8, 543:9, 544:17, 544:18, 590:20, 595:16, 595:17, 607:9, 639:13, 641:8, 643:23, 645:14, 646:1, 649:1, 653:23, 654:7, 655:13, 655:20, 656:1

LOOKS [3] - 553:21, 554:2

LOPEZ [1] - 610:24

LOST [2] - 608:13, 630:14

LOVES [1] - 600:13

LOW [1] - 543:15

LUCK [1] - 543:10

LUNCH [5] - 655:6, 655:10, 656:6, 656:7, 656:9

LYBRAND [1] - 599:17

## M

MA'AM [2] - 593:5, 606:12

MACHINE [4] - 586:20, 615:14, 615:19, 617:22

MAIL [27] - 545:17, 549:6, 549:9, 549:10, 549:13, 549:14, 549:22, 549:25, 550:1, 550:2, 557:10, 563:10, 572:16, 572:18, 572:21, 572:23, 573:2, 573:9, 573:10, 573:12, 585:15, 586:1, 586:2, 586:3, 587:15

MAILING [1] - 572:13

MAIN [1] - 620:17

MAINTAINING [2] - 640:21, 641:8

MAINTENANCE [1] - 604:8

MAJOR [1] - 622:4

MAJORITY [2] - 547:5, 621:14

MANAGEMENT [1] - 604:9

MARCH [4] - 546:13, 546:14, 546:23, 559:11

MARIETTA [5] - 561:10, 561:16, 561:17, 561:22

MARION [1] - 618:11

MARK [1] - 653:14

MARK [2] - 535:7

MARK [4] - 642:8, 644:25, 653:15, 653:17

MARKED [4] - 554:9, 606:22, 633:13, 638:12

MARTA [1] - 543:20

MARTIANS [1] - 639:12

MARVIN [2] - 615:18, 620:11

MASS [10] - 615:24, 616:9, 618:19, 619:2, 620:13, 627:7, 627:15, 627:21, 628:15, 655:2

MASTER'S [1] - 594:20

MATCHED [3] - 549:6, 549:7, 585:15

MATH [1] - 541:22

MATHEMATICAL [1] - 599:10

MATTER [8] - 537:5, 538:1, 564:6, 564:12, 648:22, 649:13, 653:16, 656:4

MATTERS [3] - 538:6, 565:16, 639:12

MCCAIN [1] - 599:17

MEAN [11] - 546:16, 549:2, 551:11, 551:14, 580:19, 581:20, 587:1, 604:13, 608:13, 629:24

MEANS [6] - 577:11, 578:3, 587:7, 611:2, 626:5, 641:1

MEANT [5] - 549:3, 551:4, 589:11, 589:14, 622:16

MEDICAL [1] - 573:19

MEET [1] - 558:1

MELLETT [1] - 535:21

MEMORIZE [2] - 582:16, 583:11

MEMORY [2] - 598:20, 641:22

MEN [1] - 608:10

MENTIONED [3] - 633:16, 644:20, 650:19

MERIT [3] - 616:1, 619:20, 632:13

MERITORIOUS [1] - 564:4

MESS [1] - 625:13

MESSAGE [3] - 617:11, 624:11, 626:7

MESSAGES [1] - 626:3

MET [1] - 652:22

METHOD [1] - 649:12

METHODOLOGIES [2] - 648:2, 649:15

METHODOLOGY [3] - 612:21, 652:9, 654:16

METRO [2] - 590:25, 591:23

METRO [1] - 569:14

MICHAEL [1] - 652:14

MICHELS [1] - 636:2

MID-2021S [2] - 569:17, 569:20

MIDDLE [3] - 542:14, 542:15, 553:16

MIDDLE [2] - 540:19, 542:16

MIDTOWN [11] - 561:25, 563:3, 567:4, 568:10, 571:22, 571:23, 574:20, 575:3, 578:21, 579:7

MIGHT [18] - 566:1, 572:20, 574:14, 584:17, 604:3, 605:13, 634:8, 635:21, 637:10, 637:11, 638:20, 639:22, 640:7, 641:19, 641:22, 650:21, 652:21, 655:10

MIGRATION [1] - 621:9

MILLION [2] - 633:23, 634:20

MIMEOGRAPH [1] - 631:16

MIMEOGRAPHED [1] - 616:3

MIND [1] - 607:21

MINISTER [2] - 632:3, 637:5

MINORITIES [4] - 600:7, 611:4, 631:1, 637:10

MINORITY [14] - 599:20, 600:5, 600:6, 600:22, 609:12, 609:21, 621:5, 621:14, 622:8, 623:24, 625:21, 628:3, 639:8, 642:15

MINUTE [3] - 584:10, 584:20, 619:25

MINUTES [4] - 542:12, 548:22, 549:11, 549:18

MISS [5] - 545:11, 545:18, 545:20, 557:11, 563:10

MISSED [1] - 563:19

MISSING [1] - 554:3

MISSION [1] - 624:18

MISTAKE [1] - 630:4

MITCHELL [1] - 652:14

MODERN [1] - 654:25

MODIFIED [2] - 611:15

MOM [2] - 541:7, 547:19

MOMENT [4] - 570:2, 576:6, 620:25

MONDAY [1] - 535:11

MONEY [1] - 545:9

MONITOR [1] - 638:18

MONITORING [2] - 635:8, 637:3

MONTH [2] - 545:16, 570:13

**MONTHS** [4] - 546:18, 556:12, 559:6, 565:18

**MOREHOUSE** [1] - 652:20

**MORNING** [11] - 537:2, 539:15, 539:17, 540:3, 540:9, 540:11, 558:3, 594:8, 594:9, 597:5, 597:6

**MORTGAGE** [2] - 557:11, 557:14

**MOST** [11] - 565:11, 565:12, 595:5, 608:23, 609:12, 609:22, 617:6, 622:20, 638:5, 647:1, 651:19

**MOTHER** [1] - 541:16

**MOTIVATED** [1] - 611:7

**MOTIVATION** [7] - 595:23, 644:16, 646:21, 654:24, 655:13, 655:14, 655:20

**MOVE** [21] - 552:17, 553:22, 554:12, 556:22, 557:1, 557:10, 557:17, 559:10, 563:3, 565:13, 567:21, 568:20, 569:3, 569:5, 570:25, 572:6, 574:12, 606:17, 614:12, 633:8, 638:7

**MOVED** [26] - 542:13, 542:14, 547:3, 548:10, 548:11, 557:6, 559:11, 561:24, 563:9, 563:23, 564:6, 564:24, 565:2, 566:19, 567:3, 568:22, 568:25, 569:11, 570:9, 571:21, 572:12, 573:1, 579:6, 590:12, 601:11

**MOVEMENT** [6] - 608:20, 609:20, 623:24, 624:1, 624:5, 634:9

**MOVES** [1] - 559:8

**MOVING** [1] - 574:7

**MR** [78] - 537:20, 537:23, 538:4, 538:23, 539:3, 539:8, 539:12, 550:17, 552:20, 554:6, 557:24, 560:12, 560:14, 562:8, 562:16, 562:22, 563:1, 563:2, 563:11, 563:20, 564:1, 564:10, 564:12, 564:23, 565:22, 566:6, 566:7, 570:7, 570:14, 570:17, 571:6, 571:11, 571:16, 574:1, 575:18, 576:20, 577:6, 578:7, 578:9, 580:2, 580:6, 580:11, 580:14, 580:24, 581:1, 581:5, 583:21, 584:4, 587:4, 591:13, 591:18, 592:8, 593:2, 597:1, 597:4, 600:16, 603:3, 604:18, 604:20, 605:7, 605:8, 605:16, 606:1, 606:20, 633:11, 638:10, 640:13, 644:18, 644:23, 645:10, 645:17, 647:18, 651:7, 651:8, 651:15, 651:23, 655:7, 655:11

**MS** [67] - 539:15, 539:18, 540:8, 542:10, 550:19, 552:8, 552:11, 552:12, 552:16, 552:25, 553:4, 553:5, 553:22, 554:11, 557:20, 562:3, 562:15, 563:14, 563:25, 564:5, 565:16, 565:23, 570:21, 570:23, 571:3, 571:7, 573:25, 575:12, 576:19, 576:22, 576:25, 577:4, 579:21, 583:25, 586:10, 591:11, 591:15, 593:4, 593:12, 594:7, 596:22, 602:24, 604:11, 604:25, 605:2, 605:22, 606:5, 606:7, 606:10, 606:13, 606:17, 606:24, 608:5, 626:13, 626:16, 630:17, 632:10, 632:17, 632:20, 633:8, 633:15, 637:15, 637:19, 638:7, 638:14, 640:9, 645:7

**MULTIRACIAL** [1] - 608:17

**MYTH** [1] - 610:11

## N

**NAACP** [1] - 615:8

**NAME** [35] - 540:2, 540:3, 552:1, 553:15, 553:16, 554:13, 555:2, 555:4, 555:5, 555:12, 566:16, 569:12, 573:5, 573:6, 573:7, 573:8, 573:13, 583:15, 583:17, 583:24, 584:6, 584:7, 587:22, 592:18, 594:3, 594:5, 616:4, 619:22, 619:25, 641:19, 641:22, 650:21

**NAME'S** [1] - 557:25

**NAMES** [11] - 582:16, 582:22, 583:11, 583:13, 584:7, 587:21, 592:17, 612:17, 616:8, 629:17, 641:20

**NANCY** [1] - 622:22

**NARRATIVE** [1] - 654:9

**NATIONAL** [1] - 642:8

**NATIONAL** [17] - 558:25, 559:19, 563:8, 566:24, 570:9, 570:18, 571:4, 571:17, 574:2, 574:5, 574:12, 578:10, 585:10, 590:16, 590:22, 591:9, 591:21

**NATURE** [3] - 595:16, 604:8, 655:2

**NEAR** [2] - 594:16, 625:15

**NEARLY** [1] - 654:23

**NECESSARILY** [5] - 585:21, 586:2, 588:20, 602:2, 645:20

**NECESSARY** [3] - 620:2, 628:24, 652:8

**NEED** [10] - 537:21, 538:5, 549:5, 578:2, 622:17, 628:24, 630:6, 630:7, 643:1, 646:7

**NEEDED** [3] - 537:18, 585:14, 639:24

**NEEDS** [2] - 552:21, 648:18

**NEGRO** [1] - 635:20

**NEGRO** [1] - 610:17

**NEGROS** [1] - 625:13

**NERVES** [1] - 585:4

**NERVOUS** [23] - 545:7, 545:11, 549:22, 555:11, 584:15, 584:20, 584:24, 585:2, 585:3, 585:4, 585:6, 585:20, 586:9, 586:13, 586:14, 587:3, 588:15, 588:19, 588:22, 589:8, 589:9, 590:2, 590:8

**NERVOUSNESS** [2] - 589:23, 590:1

**NEVER** [12] - 563:23, 564:23, 565:2, 565:9, 565:14, 574:2, 583:2, 587:24, 588:1, 654:20, 655:22, 655:23

**NEW** [1] - 624:18

**NEW** [10] - 546:2, 557:1, 558:1, 568:19, 568:24, 569:3, 571:18, 575:19, 614:4, 617:16

**NEWS** [1] - 612:24

**NEWSPAPER** [7] - 622:14, 626:6, 629:1, 639:17, 644:2, 649:10, 650:14

**NEWSPAPERS** [6] - 600:25, 612:21,

**NEXT** [15] - 537:10, 539:14, 550:9, 550:10, 586:18, 586:19, 587:22, 588:24, 588:25, 589:6, 593:11, 609:4, 613:14, 614:25, 651:13

**NICE** [1] - 593:18

**NICK** [1] - 652:14

**NIGHT** [1] - 555:22

**NKWONTA** [1] - 539:12

**NKWONTA** [1] - 535:15

**NO** [1] - 535:4

**NOBODY** [7] - 538:22, 551:19, 551:21, 585:23, 586:4, 639:25

**NOCA** [1] - 574:8

**NONE** [2] - 582:24, 600:6

**NORMALLY** [2] - 622:24, 623:4

**NORTH** [6] - 559:3, 559:13, 559:18, 561:25, 634:15, 634:22

**NORTHERN** [2] - 535:1, 657:4

**NOTE** [1] - 537:4

**NOTED** [1] - 631:7

**NOTHING** [4] - 589:7, 623:1, 623:15, 628:5

**NOTICE** [4] - 537:8, 601:4, 601:5, 604:2

**NOTICED** [2] - 586:18, 588:24

**NOTICES** [2] - 639:3, 645:2

**NOTING** [1] - 613:19

**NOVEMBER** [4] - 559:12, 559:15, 576:8, 633:3

**NUMBER** [19] - 538:25, 551:16, 551:17, 551:19, 552:7, 554:3, 559:6, 569:2, 595:18, 599:15, 599:22, 600:21, 618:7, 620:9, 620:12, 627:12, 636:18, 638:24, 644:25

**NUMBERS** [1] - 627:11

## O

**O'CALLAHAN** [1] - 619:11

**O'CLOCK** [1] - 537:7

**OATH** [1] - 558:8

**OBJECT** [3] - 562:3, 576:21, 591:13

**OBJECTED** [2] - 552:18, 562:25

**OBJECTING** [1] - 571:2

**OBJECTION** [33] - 538:11, 538:17, 550:17, 553:1, 554:5, 554:8, 562:21, 563:14, 570:21, 573:25, 575:13, 575:17, 579:20, 580:16, 583:25, 586:10, 591:10, 602:22, 602:23, 603:2, 604:10, 605:1, 605:18, 606:2, 606:19, 606:20, 606:21, 633:11, 633:12, 638:10, 638:11

**OBJECTIONS** [4] - 538:8, 552:19, 633:10, 638:9

**OBLIGATION** [2] - 597:9, 597:12

**OBSERVER** [1] - 636:2

**OBVIOUSLY** [1] - 625:6

**OCCURRED** [2] - 565:17, 577:25

**OCTOBER** [1] - 535:11

**OCTOBER** [5] - 558:5, 558:8, 558:10,

**558**:14, 657:8
**OF** [6] - 535:1, 535:10, 535:14, 535:17, 535:19, 657:4
**OFFER** [4] - 556:7, 556:8, 583:5, 634:24
**OFFERED** [3] - 544:3, 565:20, 633:22
**OFFERING** [1] - 632:11
**OFFICE** [2] - 567:11, 567:24
**OFFICE** [1] - 571:9, 613:1
**OFFICER** [1] - 647:22
**OFFICERS** [1] - 635:16
**OFFICIAL** [2] - 535:23, 657:14
**OFFICIAL** [1] - 634:18
**OFFICIALS** [5] - 610:7, 623:11, 634:22, 634:23, 641:11
**OFFS** [2] - 541:17, 575:1
**OFTEN** [3] - 546:17, 642:16, 646:4
**OHIO** [1] - 636:17
**OLD** [2] - 610:11, 616:5
**ON** [3] - 535:14, 535:17, 535:19
**ONCE** [13] - 538:12, 538:13, 538:21, 548:24, 550:23, 564:20, 572:4, 573:7, 573:14, 591:17, 630:15, 631:15, 631:24
**ONE** [56] - 537:12, 541:20, 544:8, 544:9, 545:1, 545:2, 547:20, 548:13, 563:12, 568:4, 568:6, 569:7, 570:3, 570:5, 572:11, 580:7, 584:7, 588:9, 588:11, 588:13, 592:18, 600:3, 600:7, 604:21, 605:14, 610:23, 610:24, 617:1, 618:4, 618:22, 618:24, 618:25, 619:1, 619:21, 620:1, 621:21, 622:19, 629:16, 634:15, 634:18, 636:17, 636:19, 637:13, 638:17, 638:19, 639:16, 641:19, 643:19, 645:25, 647:15, 652:2, 655:3, 655:7
**ONE'S** [1] - 629:23
**ONE-YEAR** [1] - 568:4
**ONLINE** [1] - 552:22
**OPEN** [1] - 537:1
**OPEN** [2] - 612:15, 645:5
**OPINION** [5] - 612:22, 627:22, 633:18, 637:2, 643:9
**OPPONENTS** [1] - 617:24
**OPPORTUNITIES** [1] - 543:11
**OPPORTUNITY** [6] - 601:8, 629:19, 630:4, 630:5, 631:11, 642:16
**ORDER** [4] - 543:16, 549:5, 553:2, 590:14
**ORDINANCE** [1] - 611:17
**ORGANIZATION** [2] - 624:22, 627:14
**ORIGIN** [1] - 610:5
**ORIGINAL** [2] - 615:15, 646:2
**ORIGINALLY** [4] - 541:3, 541:4, 566:2, 624:6
**ORVILLE** [2] - 593:12, 594:4
**ORVILLE** [3] - 536:6, 593:24, 594:4
**OTHERWISE** [1] - 591:5
**OUTGROWTH** [1] - 642:8
**OUTLIER** [1] - 624:15
**OUTLINED** [1] - 586:13

**OUTSIDE** [7] - 594:16, 602:24, 604:11, 604:15, 605:2, 605:5, 614:17
**OUTSIDERS** [1] - 610:21
**OVERALL** [2] - 617:18, 617:20
**OVERRULING** [1] - 538:16
**OVERVIEW** [1] - 607:7
**OVERWHELMED** [3] - 616:16, 628:20
**OVERWHELMINGLY** [1] - 608:23
**OVERWHELMS** [1] - 667:18
**OWNED** [1] - 548:13
**OWNS** [1] - 557:16

# P

**PAGE** [17] - 560:23, 561:1, 561:2, 561:9, 606:16, 606:25, 612:8, 612:12, 613:11, 618:10, 618:16, 623:20, 623:22, 625:1, 629:9, 629:10, 629:11
**PAGES** [6] - 554:12, 614:12, 653:6, 653:9, 653:11, 657:6
**PAID** [1] - 545:8
**PAIKOWSKY** [1] - 535:20
**PAPER** [9] - 549:5, 550:6, 585:17, 586:16, 588:23, 613:14, 639:24, 641:3, 650:3
**PARAGRAPH** [2] - 629:13, 629:15
**PARENTS** [3] - 541:19, 545:9, 573:4
**PARENTS'** [1] - 542:13
**PARKED** [2] - 548:19
**PARKING** [1] - 637:7
**PART** [14] - 581:24, 611:24, 613:15, 613:17, 613:19, 613:21, 615:15, 617:4, 622:16, 635:21, 638:5, 638:22, 644:14, 654:3
**PARTICIPATION** [1] - 622:8
**PARTICULAR** [11] - 562:14, 595:2, 602:8, 607:14, 617:22, 619:6, 623:16, 642:16, 652:23, 654:18, 655:24
**PARTICULARLY** [54] - 563:17, 595:3, 595:4, 595:14, 595:24, 601:14, 602:17, 603:8, 603:16, 604:7, 604:14, 607:9, 607:11, 607:18, 608:12, 608:18, 609:6, 609:19, 609:21, 610:1, 610:15, 610:21, 611:4, 614:19, 615:9, 615:17, 616:10, 617:13, 619:9, 623:24, 623:25, 624:3, 624:25, 625:21, 628:3, 628:8, 630:10, 635:11, 635:15, 638:17, 638:22, 639:8, 639:14, 642:13, 643:25, 647:19, 648:25, 649:20, 649:21, 649:22, 650:5, 650:21, 655:16, 655:19
**PARTISAN** [1] - 645:23
**PARTLY** [2] - 568:16, 582:8
**PARTNERS** [1] - 627:2
**PARTNERSHIP** [1] - 638:18
**PARTY** [3] - 608:19, 638:18, 639:11
**PARTY** [1] - 636:6, 639:11, 656:4
**PASSAGE** [1] - 648:12
**PASSED** [3] - 598:11, 608:22, 609:3
**PASSING** [1] - 595:24

**PAST** [4] - 603:4, 627:22, 636:25, 639:6
**PATRICK** [2] - 636:1, 652:13
**PATRIOTS** [1] - 635:13
**PATRIOTS'** [1] - 636:4
**PATTERN** [18] - 603:19, 625:10, 630:24, 630:25, 631:10, 632:4, 639:7, 639:15, 642:6, 642:15, 642:21, 643:5, 643:7, 646:1, 649:7, 653:24, 654:3, 654:12
**PAY** [2] - 545:7, 634:24
**PAYING** [1] - 543:16
**PAYMENT** [2] - 545:10, 557:11
**PENDERGRASS** [1] - 596:15
**PEOPLE** [63] - 556:1, 565:11, 565:12, 578:5, 582:9, 582:11, 582:17, 583:9, 583:10, 586:19, 602:6, 602:18, 609:9, 610:10, 611:5, 611:12, 613:5, 614:16, 614:17, 614:23, 615:3, 617:2, 617:6, 617:22, 618:24, 619:1, 621:16, 622:5, 622:15, 622:23, 624:2, 624:8, 624:19, 625:24, 630:4, 631:2, 631:10, 631:22, 633:23, 633:24, 634:5, 634:19, 635:16, 637:8, 639:9, 639:20, 641:20, 643:14, 643:15, 646:8, 646:25, 648:11, 648:16, 649:23, 650:9, 650:13, 650:23, 654:11, 654:23, 655:19, 655:22, 655:24
**PEOPLE'S** [1] - 608:19
**PEOPLE'S** [4] - 553:15, 592:4, 625:13, 648:13
**PERCEIVED** [3] - 612:19, 624:9, 639:9
**PERCENT** [5] - 537:25, 614:8, 614:9, 614:10, 619:14
**PERCENTAGE** [2] - 603:10, 621:10
**PERCENTAGES** [2] - 599:10, 599:11
**PERCEPTION** [3] - 626:4, 628:12, 649:21
**PERFECT** [1] - 639:7
**PERFECTLY** [2] - 538:23, 630:25
**PERHAPS** [2] - 598:12, 628:3
**PERIOD** [4] - 608:16, 621:3, 647:7, 654:25
**PERIODS** [1] - 559:24
**PERJURY** [1] - 634:24
**PERMANENT** [3] - 543:13, 547:13, 564:7
**PERMISSION** [3] - 552:8, 606:10, 626:13
**PERMITS** [1] - 601:3
**PERSIST** [1] - 620:13
**PERSON** [12] - 556:13, 567:8, 599:19, 611:16, 612:17, 618:23, 618:24, 619:1, 634:8, 640:7, 645:25, 650:19
**PERSONAL** [3] - 540:12, 554:24, 581:23
**PERSONS** [1] - 652:16
**PERSPECTIVE** [1] - 631:25
**PH.D** [2] - 594:20, 594:23
**PHONE** [3] - 551:16, 552:7, 554:3
**PHRASED** [1] - 571:7
**PHYSICAL** [2] - 614:16, 639:15

**PICKED** [3] - 551:19, 551:21, 649:10
**PICKING** [1] - 547:8
**PICKUPS** [2] - 541:18, 575:1
**PIECE** [1] - 639:23
**PLACE** [8] - 568:14, 568:19, 584:11, 609:9, 613:4, 616:4, 617:12, 636:24
**PLACED** [1] - 612:25
**PLACES** [3] - 559:25, 561:21, 623:6
**PLAINTIFF** [1] - 633:9
**PLAINTIFF** [3] - 538:11, 581:6, 581:13
**PLAINTIFF'S** [1] - 595:12
**PLAINTIFF'S** [3] - 606:22, 633:13, 638:12
**PLAINTIFFS** [8] - 537:16, 538:8, 539:16, 539:18, 594:10, 597:25, 611:19, 644:13
**PLAINTIFFS** [2] - 535:4, 535:14
**PLAINTIFFS'** [10] - 552:16, 553:24, 554:9, 587:21, 606:18, 626:17, 629:9, 632:21, 637:20, 638:7
**PLAINTIFFS'** [5] - 538:9, 538:17, 597:17, 599:7, 654:9
**PLAN** [4] - 557:4, 557:7, 557:9, 605:14
**PLANNING** [1] - 557:15
**PLANS** [2] - 557:13, 557:17
**PLEASURE** [1] - 558:1
**POINT** [6] - 537:20, 549:20, 558:25, 559:7, 655:3, 655:5
**POINTED** [3] - 628:1, 628:18, 641:17
**POLARIZED** [1] - 595:18
**POLICE** [4] - 635:16, 637:4, 637:7, 637:8
**POLICEMAN** [1] - 637:11
**POLITICAL** [2] - 595:4, 615:16
**POLITICS** [3] - 596:24, 605:24, 610:25
**POLL** [25] - 549:1, 549:3, 550:7, 550:8, 551:7, 585:13, 585:14, 586:17, 586:18, 586:22, 588:23, 588:25, 589:5, 608:25, 614:18, 614:19, 617:5, 617:16, 628:25, 630:9, 635:8, 635:25, 636:8, 637:3
**POLLING** [4] - 550:14, 550:20, 584:11, 636:24
**POLLS** [2] - 635:16, 637:7
**PONTIFICATIONS** [1] - 646:5
**POPULATION** [2] - 621:5, 621:8
**POPULIST** [2] - 608:20, 609:20
**POSED** [1] - 602:11
**POSITION** [7] - 544:4, 544:12, 544:15, 545:2, 545:8, 558:24, 600:1
**POSSIBLY** [1] - 565:23
**POSTAL** [1] - 571:5
**POTENTIAL** [3] - 609:21, 628:16, 631:12
**POTENTIALLY** [5] - 555:17, 572:21, 581:22, 627:3, 627:19
**POWER** [4] - 545:20, 613:24, 615:16, 622:4
**POWERFUL** [3] - 613:5, 625:3

**PRECEDING** [1] - 642:5
**PRECINCT** [2] - 601:11, 628:21
**PRECINCTS** [1] - 600:2
**PREDOMINANTLY** [2] - 620:21, 620:22
**PREEMPTIVELY** [1] - 627:3
**PRELIMINARY** [1] - 640:19
**PREPARED** [1] - 606:8
**PREPARING** [3] - 626:21, 632:24, 637:23
**PRESENT** [2] - 618:18, 626:12
**PRESENTED** [1] - 549:25
**PRESIDENT** [1] - 621:25
**PRESIDENTIAL** [2] - 547:25, 620:18
**PRESS** [12] - 627:1, 627:6, 627:13, 633:6, 633:18, 638:2, 638:15, 643:24, 643:25, 649:11, 650:14, 650:22
**PRETRIAL** [1] - 553:2
**PRETTY** [4] - 609:18, 613:5, 614:17, 655:3
**PREVAIL** [1] - 645:22
**PREVENT** [1] - 644:9
**PREVIOUSLY** [6] - 541:13, 555:23, 574:23, 595:8, 630:24, 632:5
**PRIMARILY** [1] - 607:12
**PRIMARY** [10] - 595:20, 608:16, 609:2, 609:16, 614:18, 614:22, 615:4, 615:12, 618:11, 634:12
**PRIMUS** [1] - 615:1
**PRINCETON** [1] - 594:20
**PRIORITIES** [1] - 577:21
**PRIVACY** [1] - 581:16
**PRIVATE** [3] - 550:11, 581:9, 589:1
**PROBLEM** [2] - 593:21, 612:7
**PROCEED** [2] - 539:12, 651:13
**PROCEEDINGS** [1] - 657:6
**PROCEEDINGS** [1] - 535:10
**PROCESS** [11] - 550:13, 555:16, 555:18, 557:6, 586:5, 603:13, 609:11, 609:23, 616:23, 633:5, 642:18
**PROFESSIONAL** [1] - 538:25
**PROFESSIONS** [1] - 647:22
**PROFESSOR** [1] - 610:24
**PROGRAMS** [1] - 541:18
**PROJECT** [1] - 624:18
**PROMOTED** [1] - 628:9
**PROOF** [2] - 585:22, 612:5
**PROPER** [2] - 563:23, 634:4
**PROPORTION** [1] - 621:7
**PROTECTION** [1] - 637:11
**PROUD** [2] - 609:7, 613:10
**PROVE** [6] - 616:16, 629:3, 629:19, 629:23, 630:6, 639:24
**PROVIDE** [15] - 549:5, 574:17, 574:18, 585:14, 585:18, 585:22, 586:2, 586:6, 587:11, 587:13, 587:14, 588:17, 589:6, 596:11
**PROVIDED** [3] - 587:16, 587:19, 612:25
**PROVISION** [3] - 601:3, 613:15, 613:21
**PROVISIONAL** [4] - 587:7, 589:22,

590:1, 590:9
**PROVISIONALLY** [3] - 587:5, 589:16, 592:11
**PSYCHOLOGIST** [3] - 646:17, 648:2, 648:17
**PSYCHOLOGISTS** [1] - 647:25
**PSYCHOLOGY** [2] - 648:14, 648:22
**PUBLIC** [12] - 555:3, 555:5, 555:6, 590:15, 591:8, 594:17, 604:23, 612:15, 612:21, 629:1, 647:1, 649:21
**PUBLICLY** [1] - 591:20
**PUBLISHED** [1] - 552:1
**PULLED** [1] - 552:22
**PURCHASABLE** [2] - 610:16, 635:20
**PURE** [2] - 613:15, 613:21
**PURGE** [2] - 620:5, 628:25
**PURGED** [2] - 618:9, 618:12
**PURPOSE** [4] - 595:23, 610:7, 611:21, 646:21
**PURSUED** [1] - 623:13
**PUSHING** [1] - 610:15
**PUT** [14] - 550:2, 550:6, 572:12, 573:6, 580:20, 586:22, 598:9, 603:15, 613:2, 624:14, 631:21, 641:24, 644:21, 654:10
**PUTTING** [1] - 616:7

## Q

**QUALIFICATIONS** [2] - 602:25, 604:12
**QUALIFIED** [6] - 604:14, 605:5, 605:21, 646:16, 646:17, 646:19
**QUALIFY** [1] - 604:16
**QUARTERS** [2] - 614:6, 618:8
**QUESTIONED** [1] - 555:8
**QUESTIONING** [3] - 551:6, 563:15, 642:4
**QUESTIONS** [17] - 540:12, 547:16, 553:3, 556:5, 557:20, 580:13, 592:19, 593:2, 601:1, 601:21, 603:24, 604:22, 605:13, 632:15, 640:9, 640:19, 643:21
**QUIET** [1] - 636:19
**QUITE** [2] - 538:14, 646:4
**QUITMAN** [3] - 623:10, 624:6, 624:15
**QUITMAN'S** [2] - 622:20, 622:21
**QUOTE** [10] - 610:19, 612:14, 613:11, 613:19, 624:7, 624:13, 624:24, 625:2, 634:21, 636:9
**QUOTED** [3] - 611:1, 615:11, 652:4
**QUOTES** [3] - 610:14, 648:15, 649:22
**QUOTING** [2] - 613:2, 613:18

## R

**RACE** [8] - 595:3, 595:5, 611:2, 620:10, 631:5, 646:2, 649:16, 653:19
**RACE** [1] - 595:6
**RACES** [1] - 605:11
**RACIAL** [10] - 595:17, 596:23, 599:18, 605:23, 610:25, 611:12, 637:5, 644:9, 644:11, 644:16

**RACISM** [2] - 611:11, 653:17
**RACIST** [2] - 653:15, 654:21
**RAFFENSPERGER** [2] - 596:16
**RAISE** [3] - 539:20, 543:1, 593:19
**RAISED** [2] - 557:18, 580:13
**RAISING** [1] - 541:17
**RAN** [2] - 622:22, 623:2
**RAPOPORT** [1] - 652:13
**RATHER** [5] - 537:24, 615:14, 628:7, 639:1, 645:8
**RDR** [2] - 535:22, 657:14
**REACH** [3] - 649:9, 649:14, 650:13
**REACHED** [1] - 601:19
**READ** [22] - 562:5, 597:24, 598:13, 598:14, 598:23, 600:25, 602:5, 602:7, 616:5, 629:13, 649:10, 649:11, 650:14, 652:2, 652:11, 652:25, 653:1, 653:9, 653:10, 653:12, 653:25
**READING** [4] - 629:15, 641:22, 653:5, 653:7
**READY** [6] - 539:12, 548:18, 566:14, 566:15, 577:15, 577:16
**REAL** [2] - 609:20, 613:22
**REALITY** [1] - 641:2
**REALIZE** [10] - 553:9, 601:7, 603:25, 604:4, 604:21, 641:24, 642:2, 642:10, 654:11, 654:13
**REALLY** [12] - 555:23, 556:3, 609:5, 609:13, 610:11, 618:6, 619:10, 624:1, 624:8, 640:7, 641:4, 642:17
**REARED** [1] - 594:15
**REASON** [12] - 546:10, 551:24, 554:23, 560:10, 566:25, 573:6, 574:8, 576:5, 579:5, 582:23, 587:17, 641:7
**REASONABLY** [5] - 571:24, 590:17, 590:24, 591:22, 633:17
**REASONING** [2] - 611:23, 612:4
**REASONS** [11] - 538:25, 547:20, 612:1, 612:2, 616:4, 617:1, 631:17, 644:9, 644:11, 644:16, 647:2
**RECEIVE** [2] - 556:6, 578:14
**RECEIVED** [5] - 554:9, 594:23, 606:22, 633:13, 638:12
**RECEIVING** [2] - 578:17, 579:8
**RECENT** [2] - 603:18, 649:23
**RECENTLY** [5] - 581:8, 595:5, 596:9, 596:18, 637:6
**RECOGNITION** [1] - 621:4
**RECOLLECTING** [1] - 550:24
**RECONSTRUCTION** [2] - 609:19, 650:8
**RECORD** [13] - 537:24, 538:1, 538:24, 540:2, 584:18, 589:4, 594:3, 605:21, 615:25, 619:19, 627:12, 636:17, 647:5
**RECORDS** [1] - 640:21
**RECROSS** [1] - 536:2
**RECRUIT** [1] - 650:23
**REDIRECT** [3] - 566:4, 593:3, 593:4
**REDIRECT** [1] - 536:2
**REDISTRICTING** [2] - 595:14, 596:15
**REDUCE** [1] - 639:13

**REDUCED** [1] - 590:2
**REFLECT** [1] - 546:2
**REGARD** [5] - 576:12, 577:22, 582:17, 603:12, 647:7
**REGARDING** [1] - 598:3
**REGARDS** [1] - 635:4
**REGIME** [1] - 644:6
**REGISTER** [6] - 623:4, 624:23, 625:18, 626:2, 632:2, 638:19
**REGISTERED** [13] - 613:6, 613:7, 614:7, 614:8, 614:9, 615:10, 618:9, 619:12, 622:23, 624:19, 628:10, 629:3, 634:17
**REGISTERING** [3] - 624:1, 624:23, 631:2
**REGISTRANTS** [1] - 638:19
**REGISTRATION** [23] - 545:22, 545:25, 548:7, 548:10, 554:7, 557:8, 573:15, 575:24, 576:6, 587:17, 598:9, 609:7, 610:16, 612:17, 612:25, 613:12, 613:15, 613:16, 613:21, 615:7, 618:13, 620:4, 633:24
**REGISTRY** [1] - 629:18
**REGULATE** [1] - 603:12
**RELATE** [1] - 624:9
**RELATED** [2] - 601:15, 603:10
**RELATIONS** [1] - 595:4
**RELEASE** [8] - 627:1, 627:6, 627:13, 633:6, 633:18, 638:3, 638:15, 643:25
**RELEASES** [4] - 643:24, 649:11, 650:14, 650:22
**RELEVANCE** [2] - 563:17, 575:13
**RELEVANT** [7] - 564:1, 564:16, 564:17, 564:21, 565:23, 575:15, 651:19
**RELIED** [2] - 596:1, 635:23
**RELY** [2] - 614:15, 652:18
**REMAIN** [1] - 634:18
**REMAINDER** [1] - 547:12
**REMAINED** [1] - 614:16
**REMEMBER** [13] - 555:23, 558:4, 578:17, 615:11, 623:11, 625:24, 636:21, 647:10, 653:3, 653:5, 653:7, 653:13
**REMIND** [1] - 608:4
**REMINDING** [1] - 621:25
**REMODELING** [1] - 575:19
**REMOTE** [7] - 546:15, 546:23, 546:24, 547:1, 567:7, 567:25, 591:2
**REMOTELY** [1] - 569:22
**REMOVE** [1] - 629:17
**REMOVED** [2] - 614:7, 614:9
**RENEW** [1] - 575:12
**RENEWAL** [1] - 648:5
**RENOVATE** [1] - 556:21
**RENT** [2] - 545:7, 545:10
**RENTED** [1] - 590:21
**REPEAT** [8] - 577:8, 590:19, 607:23, 630:12, 630:16, 639:8, 642:3, 651:13
**REPEATING** [1] - 607:19

**REPHRASE** [1] - 571:14
**REPORT** [20] - 596:8, 599:8, 606:8, 606:14, 606:18, 607:1, 607:4, 611:1, 612:8, 614:13, 622:16, 625:8, 626:21, 632:24, 635:22, 637:23, 638:16, 640:14, 640:15, 650:20
**REPORTED** [2] - 626:6, 636:8
**REPORTER** [1] - 629:1
**REPORTER** [2] - 535:23, 657:14
**REPORTERS** [3] - 639:17, 652:3, 656:10
**REPORTS** [3] - 595:11, 595:19, 595:21
**REPREHENSIBLE** [1] - 642:1
**REPRESENT** [3] - 539:5, 553:25
**REPRESENTATIVE** [1] - 554:19
**REPUBLICAN** [4] - 584:13, 584:21, 638:18, 639:11
**REPUBLICANS** [2] - 608:18, 608:23
**REQUEST** [2] - 562:4, 574:5
**REQUESTED** [2] - 559:12, 559:20
**REQUIRED** [2] - 553:2, 609:10
**REQUIRES** [1] - 643:22
**REQUIRING** [1] - 643:18
**REREGISTRATION** [1] - 609:10
**RESEARCH** [7] - 597:19, 635:3, 635:7, 641:23, 650:6, 650:12, 652:23
**RESEARCHED** [2] - 627:21, 629:22
**RESIDE** [1] - 570:19
**RESIDENCE** [3] - 543:13, 547:13, 564:7
**RESIDENTS** [1] - 620:23
**RESPECT** [4] - 602:4, 602:5, 621:3, 621:20
**RESPOND** [7] - 576:21, 578:23, 583:18, 616:14, 622:7, 628:23, 645:15
**RESPONSIBLE** [1] - 541:13
**RESPONSIVENESS** [1] - 591:14
**RESTRICT** [1] - 631:14
**RESULT** [3] - 603:14, 627:23, 636:4
**RESULTS** [1] - 603:5
**RETAINED** [4] - 594:10, 596:9, 596:10, 596:14
**RETURN** [1] - 626:10
**RETURNED** [1] - 550:2
**REVEAL** [1] - 615:25
**REVIEW** [3] - 626:21, 632:24, 637:23
**REWARD** [3] - 633:22, 634:4, 634:16
**REWARDS** [2] - 634:7, 634:9
**RIDE** [1] - 543:20
**RIGAMAROLE** [1] - 630:8
**RIGHTIE** [1] - 537:10
**RIGHTLY** [1] - 649:8
**RIGHTS** [5] - 551:22, 595:9, 624:1, 634:9, 650:10
**RIGHTS** [5] - 597:21, 597:22, 597:25, 598:5, 648:6
**ROLLS** [3] - 578:25, 579:18, 614:10
**RON** [1] - 535:7
**ROOM** [1] - 584:14
**ROOSEVELT** [1] - 625:16

ROTC [3] - 594:19, 597:8, 597:13
RPR [2] - 535:22, 657:14
RULE [1] - 620:1
RULED [2] - 615:3, 634:12
RULES [1] - 539:4
RUNG [1] - 641:22
RUNNING [2] - 615:18, 617:23
RUNOFF [25] - 548:15, 548:17, 553:12, 555:13, 555:21, 556:6, 563:16, 563:18, 564:8, 564:18, 564:21, 584:12, 599:2, 599:6, 600:22, 603:18, 607:11, 607:13, 610:1, 612:3, 626:12, 629:20, 630:23, 642:5, 649:2
RYAN [2] - 537:12, 537:15

S

S.B [1] - 596:12
SAFE [1] - 537:9
SALARIED [1] - 544:5
SALVADOR [2] - 541:4, 543:2
SAW [15] - 548:20, 552:6, 552:7, 552:21, 553:19, 553:21, 553:25, 554:1, 555:4, 591:20, 620:12, 621:14, 626:11, 631:9, 643:25
SCARED [3] - 555:5, 555:9, 555:11
SCHOLARS [1] - 610:24
SCHOOL [20] - 540:18, 541:18, 541:21, 542:3, 542:6, 542:15, 542:17, 547:7, 547:9, 574:23, 574:25, 599:25, 605:11, 605:13, 622:22, 623:3
SCHOOL [5] - 540:19, 540:20, 542:4, 542:7, 542:16
SCHOOLED [1] - 647:23
SCHOOLS [2] - 547:1, 594:17
SCIENTIFIC [1] - 649:12
SCIENTIST [2] - 649:6, 649:12
SCOPE [1] - 604:11
SCREAMED [1] - 588:9
SEAL [4] - 550:3, 550:5, 586:21, 586:23
SEARCH [1] - 558:20
SEARCHES [2] - 650:15, 650:16
SEAT [2] - 540:1, 594:2
SEATED [1] - 537:2
SECOND [6] - 541:16, 563:12, 572:11, 609:2, 623:25, 629:15
SECONDLY [2] - 628:22, 631:15
SECRETARY [11] - 570:12, 570:18, 571:1, 571:8, 571:10, 571:18, 578:11, 578:14, 623:9, 624:16, 624:22
SECTION [3] - 561:1, 598:6, 607:1
SECTION [14] - 597:20, 597:25, 598:3, 598:5, 598:18, 598:22, 600:14, 600:17, 600:18, 629:19, 645:18, 648:12
SECURITY [1] - 638:5
SEE [25] - 548:18, 549:12, 549:22, 576:5, 581:14, 592:3, 593:15, 593:18, 599:18, 613:8, 618:19, 621:19, 621:22, 623:19, 624:2, 627:17, 639:8,

648:21, 651:19, 652:24, 654:16, 654:25, 656:7
SEEM [2] - 631:16, 650:4
SENATE [5] - 584:11, 595:15, 626:12, 630:23, 648:4
SENATOR [2] - 621:23, 621:24
SENATORIAL [1] - 599:2
SEND [2] - 578:11, 645:2
SENDS [2] - 624:8, 626:7
SENSE [1] - 565:10
SENT [4] - 537:8, 545:17, 559:13, 624:11
SEPARATE [1] - 600:2
SEPTEMBER [4] - 543:12, 556:20, 572:20
SERIOUS [1] - 582:17
SERIOUSLY [2] - 645:5, 645:21
SERVE [1] - 597:10
SERVED [1] - 595:8
SERVICE [1] - 560:25
SERVICE [1] - 571:5
SERVICED [6] - 560:1, 560:3, 560:5, 560:9, 561:9, 561:21
SESSION [1] - 535:3
SET [3] - 635:1, 640:2, 644:8
SETTING [1] - 638:25
SEVERAL [5] - 550:15, 551:20, 553:14, 582:8, 601:12
SHALL [4] - 612:15, 612:16, 612:25, 613:24
SHELLY [1] - 535:16
SHERIFF [1] - 625:23
SHIFT [3] - 622:4, 622:5, 631:1
SHOALS [4] - 542:4, 542:6, 542:7, 542:16
SHORTCUT [1] - 631:5
SHORTLY [1] - 640:18
SHOW [15] - 562:19, 563:20, 563:24, 564:3, 564:23, 565:2, 566:3, 574:12, 577:21, 580:11, 580:18, 611:19, 616:2, 630:7, 655:24
SHOWED [1] - 574:7
SHOWING [1] - 587:11
SHOWN [2] - 565:7, 631:12
SHOWS [1] - 575:16
SIBLINGS [1] - 541:10
SIC [3] - 590:22, 590:23, 614:4
SIDE [1] - 537:9
SIGNED [3] - 557:14, 568:1, 568:6
SIMILAR [1] - 634:16
SIMILARLY [2] - 547:12, 599:21
SIMPLE [1] - 592:5
SIN [13] - 611:11, 645:3, 645:8, 645:9, 645:12, 645:14, 645:15, 645:16, 645:19, 645:20, 646:2, 646:3
SINGLE [1] - 652:2
SINGLED [1] - 630:3
SINNED [1] - 645:1
SITES [1] - 636:1

SITTING [1] - 579:2
SITUATION [4] - 544:10, 569:25, 572:2, 577:25
SIX [2] - 578:4, 623:13
SIX-WEEK [1] - 578:4
SIZE [2] - 627:5, 650:24
SKILLED [1] - 647:23
SLAVERY [1] - 646:2
SLEEP [1] - 567:12
SLEEPING [2] - 575:11, 575:15
SLUR [1] - 637:5
SMALL [3] - 540:24, 553:10, 594:15
SMART [1] - 628:9
SMITH [6] - 609:7, 609:15, 610:15, 613:9, 614:21, 635:18
SMOOTH [1] - 542:21
SO.. [5] - 541:9, 557:12, 561:17, 572:9, 575:25
SOCIAL [3] - 595:4, 649:6, 649:12
SOCIOECONOMIC [1] - 595:15
SOLD [2] - 542:18, 548:11
SOLELY [1] - 585:2
SOMEONE [18] - 571:23, 582:20, 583:23, 588:16, 589:4, 591:7, 591:19, 592:9, 592:20, 592:24, 615:11, 617:7, 618:25, 625:17, 630:9, 640:4, 645:21
SOMERVILLE [7] - 641:14, 641:18, 641:25, 642:7, 643:5, 643:20, 644:24
SOMERVILLE [1] - 535:6
SOMERVILLE'S [1] - 653:10
SOMETHING'S [1] - 617:3
SOMETIMES [1] - 645:22
SOMEWHERE [1] - 652:21
SOPHOMORE [1] - 542:17
SORRY [12] - 544:4, 560:2, 561:1, 566:11, 570:4, 604:18, 610:18, 629:11, 630:11, 630:14, 636:21, 647:17
SORT [15] - 598:25, 605:10, 608:13, 610:11, 610:15, 615:24, 617:15, 619:2, 619:8, 630:9, 630:20, 632:12, 635:23, 654:21
SORTS [2] - 634:5, 644:19
SOUND [1] - 650:22
SOUNDS [1] - 553:4
SOURCES [2] - 612:20, 652:5
SOUTH [6] - 594:16, 594:18, 596:24, 605:24, 647:8, 647:9
SOUTH [2] - 595:7, 610:11
SOUTHERNER [1] - 622:2
SPALDING [1] - 618:13
SPARTA [2] - 620:21, 620:23
SPEAKING [3] - 552:14, 574:24, 598:6
SPECIALIZED [1] - 595:7
SPECIALTY [1] - 595:2
SPECIFIC [6] - 544:8, 575:4, 597:17, 602:10, 605:10, 605:14, 617:12, 617:13
SPECIFICALLY [4] - 601:13, 608:11,

643:12, 643:19
**SPECULATED**[1] - 648:12
**SPELL** [2] - 540:2, 594:3
**SPELLED** [1] - 540:4
**SPEND** [4] - 546:18, 565:18, 572:8, 586:1
**SPENDING** [6] - 546:9, 547:5, 555:16, 574:20, 574:22, 575:5
**SPENDS** [1] - 575:7
**SPENT** [3] - 549:20, 550:24, 596:21
**SPIRIT** [1] - 624:5
**SPLIT** [1] - 547:3
**SPOKEN** [8] - 582:24, 587:24, 588:1, 652:13, 652:15, 652:19, 652:22
**SPONSORED** [7] - 622:10, 622:13, 622:14, 639:20, 641:12, 641:15, 649:24
**SPREADSHEET** [1] - 553:18, 553:19, 553:21
**SPRING** [1] - 553:7
**SPRINGS** [1] - 625:15
**STAKEHOLDERS** [1] - 595:23
**STANDARD** [3] - 564:5, 649:15, 652:9
**STANDING** [8] - 550:8, 550:10, 579:2, 586:17, 586:19, 588:24, 588:25, 589:5
**START** [5] - 537:7, 543:12, 569:19, 593:9, 613:19
**STARTED** [10] - 542:16, 544:13, 545:14, 548:8, 556:15, 556:16, 608:10, 623:10, 636:22, 640:20
**STARTING** [2] - 628:8, 628:18
**STARTS** [3] - 623:13, 629:13, 635:11
**STATE** [8] - 570:12, 570:19, 571:1, 571:10, 571:18, 578:11, 578:15, 623:9
**STATE** [21] - 540:2, 594:2, 604:6, 605:20, 609:2, 610:7, 613:23, 615:3, 621:14, 622:7, 622:10, 622:13, 622:14, 623:16, 624:9, 627:7, 634:23, 639:20, 641:12, 641:15, 649:24
**STATE'S** [1] - 571:9
**STATE-SPONSORED** [6] - 622:10, 622:14, 639:20, 641:12, 641:15, 649:24
**STATEMENT** [1] - 607:1
**STATEMENT** [2] - 562:19, 579:25
**STATEMENTS** [3] - 622:15, 623:21, 652:17
**STATES** [6] - 601:2, 601:7, 601:11, 601:12, 621:7, 636:16
**STATES** [2] - 571:5, 595:3
**STATES** [4] - 535:1, 535:11, 535:23, 657:3
**STATING** [2] - 576:22, 576:25
**STATISTICAL** [7] - 598:25, 599:4, 599:9, 600:20, 601:25, 602:15, 632:12
**STATISTICS** [1] - 621:15
**STATUS** [3] - 578:6, 580:20, 595:15
**STATUTE** [1] - 597:20
**STATUTORY** [1] - 603:25
**STAY** [4] - 544:14, 557:15, 559:23,

568:19
**STAYED** [3] - 543:19, 543:20, 564:24
**STEP** [2] - 593:7, 635:18
**STEPPED** [1] - 614:16
**STEVE** [3] - 535:10, 535:23, 657:15
**STICKER** [1] - 547:23
**STILL** [23] - 546:6, 547:7, 549:16, 556:22, 556:23, 567:7, 567:25, 569:12, 569:18, 569:22, 572:8, 573:17, 578:5, 578:15, 580:15, 581:10, 592:6, 611:21, 613:18, 619:8, 627:15, 627:17, 629:20
**STIPULATED** [1] - 612:14
**STIRRING** [1] - 639:2
**STOP** [4] - 593:8, 611:12, 631:22, 655:6
**STOPPED** [3] - 566:11, 573:22, 577:24
**STORY** [1] - 564:9
**STRAIGHT** [3] - 562:24, 580:6, 594:19
**STREET** [1] - 542:5
**STREET** [5] - 563:7, 566:19, 567:4, 635:13, 636:3
**STRENGTH** [1] - 600:5
**STRESSED** [1] - 549:19
**STRIKE** [3] - 584:8, 584:9, 635:21
**STRONGLY** [1] - 623:7
**STUDENT** [1] - 546:25
**STUDENTS** [1] - 607:23
**STUDY** [3] - 598:21, 599:1, 654:19
**STUFF** [3] - 547:9, 556:23, 573:5
**SUBJECT** [1] - 628:4
**SUBJECTS** [1] - 606:2
**SUBLEASED** [1] - 547:2
**SUBMISSIONS** [1] - 574:6
**SUBMITTED** [1] - 566:25
**SUBMITTING** [1] - 645:1
**SUBPOENA** [1] - 581:10
**SUBPOENAED** [3] - 581:12, 616:15, 630:5
**SUBSTANCE** [2] - 562:17, 562:18
**SUBSTANTIVE** [1] - 607:1
**SUBTLY** [1] - 611:3
**SUCCESSFUL** [3] - 543:2, 608:20, 617:20
**SUCCESSFULLY** [1] - 615:22
**SUDDEN** [1] - 619:22
**SUED** [5] - 582:11, 582:13, 582:15, 590:7, 590:11
**SUGGEST** [2] - 571:8, 653:5
**SUING** [5] - 582:21, 582:22, 583:9, 583:10, 592:12
**SUM** [1] - 633:23
**SUMMARIZE** [6] - 594:13, 607:6, 612:11, 614:14, 621:2, 630:21
**SUMMARY** [1] - 607:3
**SUMMARY** [1] - 535:10
**SUPPORTING** [1] - 634:10
**SUPPOSED** [2] - 538:18, 629:3
**SUPREMACY** [1] - 610:22
**SUPREME** [6] - 595:6, 609:15, 614:21,

615:1, 634:13, 649:16
**SURGERY** [1] - 652:14
**SURPRISED** [1] - 622:9
**SURVEILLANCE** [1] - 636:24
**SUSPECT** [1] - 633:23
**SUSPECTED** [2] - 617:9, 634:9
**SUSPICION** [1] - 640:5
**SUSTAIN** [3] - 562:21, 575:16, 603:2
**SUSTAINED** [1] - 550:18
**SWEAR** [1] - 566:1
**SWITCH** [2] - 547:15, 600:4
**SWITCHED** [1] - 569:5
**SWORN** [2] - 539:24, 593:25
**SYSTEM** [6] - 540:18, 541:22, 582:18, 600:4, 603:25

## T

**TALMADGE** [10] - 615:14, 615:15, 615:19, 617:22, 618:6, 620:11, 625:12, 631:16, 644:6
**TAX** [8] - 608:25, 614:19, 617:6, 617:16, 628:25, 630:9
**TEACH** [1] - 594:23
**TEACHER** [1] - 632:3
**TEACHING** [1] - 594:24
**TEETH** [1] - 567:14
**TENDER** [2] - 596:22, 605:22
**TENUOUS** [1] - 650:7
**TENURE** [1] - 613:11
**TERM** [2] - 544:8, 544:24
**TERMS** [5] - 617:5, 627:5, 639:1, 640:2, 647:3
**TERRORISM** [4] - 625:3, 639:16, 639:17
**TESTIFIED** [12] - 539:24, 559:7, 565:17, 576:2, 576:10, 579:23, 584:8, 588:19, 593:25, 599:16, 632:5, 644:5
**TESTIFY** [6] - 562:13, 604:15, 605:6, 606:3, 644:3, 648:10
**TESTIFYING** [9] - 561:24, 562:9, 562:11, 564:16, 579:2, 579:18, 595:21, 596:5, 605:9
**TESTIMONY** [19] - 538:5, 558:13, 562:4, 564:13, 564:19, 571:3, 575:13, 580:4, 580:5, 580:19, 583:5, 588:3, 588:6, 588:15, 596:5, 611:6, 632:8
**TEXAS** [3] - 635:11, 636:2
**TEXT** [2] - 629:9, 629:10
**THANKED** [1] - 641:20
**THANKSGIVING** [1] - 544:1
**THAT'LL** [1] - 581:1
**THE** [166] - 535:1, 535:6, 535:10, 535:14, 535:17, 535:23, 537:2, 537:22, 538:2, 538:7, 539:1, 539:5, 539:10, 539:14, 539:17, 539:19, 539:20, 540:1, 540:3, 540:6, 542:6, 542:8, 542:9, 550:18, 552:10, 552:19, 552:24, 553:3, 553:24, 554:2, 554:5, 554:7, 557:21, 560:13, 562:6, 562:11, 562:17, 562:25, 563:12, 563:19,

564:11, 564:17, 565:6, 565:25, 570:3, 570:4, 570:5, 570:6, 570:13, 570:16, 570:22, 570:25, 571:10, 571:15, 572:4, 572:7, 572:10, 572:15, 572:16, 572:18, 572:23, 572:25, 573:1, 573:4, 573:7, 573:10, 573:12, 573:15, 573:18, 573:20, 573:23, 575:14, 576:18, 576:21, 576:24, 577:2, 577:5, 578:2, 579:20, 579:23, 580:3, 580:9, 580:12, 580:15, 580:25, 581:3, 583:18, 583:20, 584:1, 584:3, 586:12, 586:16, 591:10, 591:16, 591:24, 592:2, 593:3, 593:5, 593:6, 593:7, 593:11, 593:14, 593:16, 593:18, 593:19, 593:21, 593:22, 594:2, 594:4, 596:21, 596:25, 597:2, 600:11, 602:22, 603:1, 604:10, 604:13, 605:1, 605:3, 605:4, 605:15, 605:19, 606:3, 606:12, 606:19, 606:21, 607:19, 607:21, 607:22, 607:24, 608:2, 610:18, 626:15, 630:12, 630:14, 630:16, 631:4, 631:7, 631:8, 632:8, 632:18, 632:19, 633:10, 633:12, 637:16, 637:17, 637:18, 638:9, 638:11, 640:10, 644:4, 644:22, 645:8, 645:12, 647:15, 647:17, 651:6, 651:12, 651:17, 651:18, 655:5, 655:8, 655:17, 655:18, 656:6, 657:15
**THEMSELVES** [1] - 598:24
**THEOLOGICAL** [1] - 645:4
**THEY'VE** [1] - 623:15
**THINKING** [6] - 549:21, 550:5, 555:7, 565:11, 586:25, 639:18
**THIRD** [3] - 563:7, 566:19, 567:4
**THIRD** [4] - 629:9, 629:10, 629:11, 638:2
**THIRSTY** [1] - 549:19
**THOMAS** [1] - 624:6
**THOMPSON** [3] - 623:20, 626:6, 648:15
**THOUSAND** [1] - 635:25
**THOUSANDS** [1] - 582:8
**THREATENED** [1] - 588:11
**THREE** [13] - 541:8, 550:22, 550:25, 553:3, 614:6, 618:8, 619:21, 622:13, 638:22, 638:25, 644:10, 644:13, 644:15
**THREE-QUARTERS** [2] - 614:6, 618:8
**THROUGHOUT** [1] - 551:20
**TIE** [4] - 643:4, 643:5, 643:6, 643:19
**TIED** [1] - 645:23
**TIM** [1] - 535:21
**TIP** [1] - 621:15
**TITLE** [1] - 626:24
**TITLED** [1] - 607:1
**TO** [2] - 535:23, 657:14
**TODAY** [11] - 540:10, 579:2, 579:18, 588:3, 588:6, 611:6, 612:2, 620:17, 632:12, 632:16, 637:14
**TOGETHER** [6] - 570:6, 596:21, 608:19, 621:11, 627:18, 639:4

**TOMORROW** [2] - 537:4, 537:6
**TOOK** [9] - 541:8, 543:16, 548:22, 550:1, 550:14, 579:10, 579:13, 586:22, 654:1
**TOP** [3] - 560:19, 561:9, 566:16
**TOPIC** [2] - 620:24, 635:2
**TOTAL** [2] - 550:21, 550:22
**TOTALING** [1] - 653:11
**TOTALITY** [2] - 595:21, 654:5
**TOTALLY** [1] - 614:6
**TOWN** [2] - 540:24, 594:16
**TOYOTA** [4] - 560:16, 560:24, 561:3, 561:10
**TRACK** [1] - 652:10
**TRAIN** [1] - 543:20
**TRAINED** [2] - 646:21, 648:3
**TRANSCRIPT** [1] - 535:10
**TRANSCRIPT** [5] - 653:2, 653:8, 653:12, 653:25, 657:6
**TRAVEL** [1] - 543:23
**TRAVELING** [1] - 546:9
**TREND** [1] - 621:4
**TRENDS** [2] - 621:3, 621:20
**TRIAL** [1] - 654:11
**TRIED** [5] - 578:3, 612:22, 615:1, 627:12, 646:12
**TRIGGERS** [1] - 611:3
**TROPE** [3] - 610:9, 610:23
**TROUBLE** [4] - 555:10, 586:25, 589:12, 626:7
**TRUE** [1] - 535:6
**TRUE** [18] - 603:18, 607:13, 610:1, 627:1, 627:2, 630:23, 632:12, 633:3, 635:3, 635:7, 635:12, 635:23, 636:12, 638:4, 641:12, 643:24, 648:19, 649:1
**TRUE** [2] - 552:22, 657:6
**TRUST** [1] - 586:23
**TRUTH** [3] - 558:11, 645:6, 645:22
**TRUTHFUL** [1] - 603:8
**TRY** [11] - 551:10, 562:23, 612:23, 622:12, 622:23, 631:14, 634:14, 647:6, 649:3, 651:25, 652:10
**TRYING** [20] - 539:1, 562:6, 562:8, 562:19, 562:23, 578:8, 620:1, 625:10, 632:2, 634:4, 634:17, 648:17, 649:3, 649:6, 651:4, 651:9, 651:10, 653:24, 654:24
**TURNOUT** [3] - 599:1, 599:6, 599:12
**TWICE** [4] - 538:11, 554:16, 580:10, 653:11
**TWO** [19] - 541:8, 541:12, 549:6, 549:9, 549:14, 549:25, 557:16, 570:3, 585:15, 586:3, 587:15, 588:21, 603:24, 617:22, 618:4, 623:2, 638:17
**TYING** [2] - 644:10, 644:15
**TYPE** [5] - 599:9, 601:2, 601:25, 602:9, 639:18
**TYPICALLY** [1] - 595:11
**TYSON** [4] - 539:3, 606:1, 633:11, 655:7

**U**

**U.S** [3] - 541:5, 594:21, 636:6
**UGA** [7] - 542:5, 542:11, 542:12, 542:17, 546:25, 558:17
**ULTIMATELY** [1] - 645:22
**UMM** [4] - 544:15, 567:6, 567:7, 579:15
**UNCOMFORTABLE** [2] - 584:10, 592:21
**UNCONSTITUTIONAL** [3] - 614:23, 631:22, 634:12
**UNDER** [3] - 558:8, 564:5, 603:25
**UNDERGRADUATE** [1] - 594:18
**UNDERLYING** [2] - 564:1, 564:12
**UNDERSTOOD** [5] - 562:15, 578:5, 621:13, 631:25, 648:10
**UNFORTUNATE** [1] - 637:5
**UNITED** [2] - 571:5, 595:3
**UNITED** [4] - 535:1, 535:11, 535:23, 657:3
**UNIVERSITY** [5] - 542:1, 556:14, 594:17, 594:22, 594:25
**UNLAWFULLY** [1] - 589:17
**UNLESS** [6] - 562:18, 572:2, 620:9, 641:19, 643:12, 643:24
**UNLIKE** [1] - 542:22
**UNWORTHY** [1] - 630:3
**UP** [48] - 538:4, 540:15, 540:16, 540:20, 540:25, 542:2, 542:14, 543:8, 543:11, 544:22, 544:24, 547:5, 547:8, 547:21, 548:18, 549:8, 549:13, 549:24, 551:13, 551:14, 551:16, 551:19, 551:20, 551:21, 556:13, 557:18, 568:22, 576:4, 578:7, 579:24, 579:25, 580:3, 580:4, 581:9, 592:25, 605:13, 617:16, 627:10, 632:4, 633:22, 638:25, 639:2, 644:8, 645:23, 656:6
**UPCOMING** [1] - 629:20
**UPDATE** [5] - 545:22, 545:25, 557:4, 557:7, 557:8
**UPSET** [1] - 551:12
**URBANA** [1] - 594:23
**URBANA-CHAMPAIGN** [1] - 594:23
**USA** [1] - 535:19
**USES** [1] - 646:4
**UTILITIES** [2] - 573:3, 573:4
**UZOMA** [1] - 535:15

**V**

**VALID** [1] - 538:17
**VALIDATE** [1] - 633:4
**VALIDITY** [1] - 633:5
**VARIED** [1] - 616:20
**VARIOUS** [5] - 595:12, 612:23, 616:4, 616:15, 616:19
**VEHICLE** [2] - 560:25, 561:9
**VERNON** [3] - 536:6, 593:24, 594:5
**VERNON** [2] - 593:12, 594:4
**VERSION** [1] - 598:10

VETERAN [1] - 597:7
VIA [1] - 629:19
VIEW [1] - 553:11
VIEWED [1] - 585:19
VIOLA [2] - 535:22, 657:13
VIOLA_ZBOROWSKI@GAND.
  USCOURTS.GOV [1] - 535:25
VISITING [1] - 624:14
VITIATED [1] - 613:24
VOIR [1] - 596:25
VOIR [2] - 536:4, 597:3
VOLUME [1] - 535:3
VOLUNTEER [1] - 635:25
VOTE [16] - 607:13, 610:1, 627:1, 627:2,
  630:23, 633:3, 633:4, 635:3, 635:7,
  635:12, 635:23, 636:12, 638:4,
  641:12, 648:19, 649:1
VOTE [76] - 547:21, 547:22, 547:24,
  547:25, 548:8, 548:18, 548:21, 549:1,
  549:4, 549:5, 550:3, 555:8, 555:10,
  555:14, 555:15, 555:17, 555:25,
  556:1, 556:2, 576:10, 576:14, 577:16,
  577:18, 577:20, 579:10, 579:13,
  579:16, 582:4, 582:7, 584:11, 584:15,
  584:20, 584:23, 585:1, 585:5, 585:7,
  585:12, 585:16, 586:5, 586:17,
  586:19, 586:24, 587:2, 588:9, 589:4,
  589:13, 589:17, 590:14, 592:10,
  601:10, 601:15, 615:1, 615:2, 615:10,
  619:8, 623:5, 624:1, 624:14, 624:19,
  624:20, 625:5, 625:13, 625:18,
  625:23, 625:25, 626:2, 626:9, 629:20,
  631:2, 637:6, 639:10, 639:11, 639:21,
  640:6, 650:9, 650:10
VOTE [1] - 535:6
VOTE'S [3] - 603:19, 632:13, 643:24
VOTED [19] - 547:23, 548:9, 550:6,
  555:10, 555:13, 563:18, 564:8,
  576:15, 577:2, 577:23, 587:5, 588:23,
  592:11, 599:21, 608:11, 622:24,
  623:4, 624:19
VOTER [60] - 545:22, 548:6, 552:2,
  555:3, 557:4, 575:24, 577:14, 578:3,
  578:25, 579:18, 580:17, 580:19,
  580:20, 580:23, 580:24, 580:25,
  590:4, 599:1, 599:6, 599:12, 601:14,
  603:16, 607:8, 607:16, 608:8, 610:13,
  610:23, 612:4, 612:5, 614:13, 616:16,
  618:1, 618:19, 619:18, 620:7, 620:13,
  620:24, 625:7, 627:11, 627:23, 628:3,
  628:6, 628:10, 628:13, 628:16, 629:4,
  629:17, 629:22, 630:7, 630:22,
  631:19, 633:25, 635:23, 636:3, 636:4,
  639:25, 648:24, 650:7, 654:6
VOTERS [58] - 551:22, 599:21, 600:5,
  600:19, 607:9, 608:12, 611:4, 614:7,
  614:8, 614:9, 614:10, 615:19, 616:7,
  616:10, 616:22, 617:14, 618:8,
  618:23, 619:7, 619:11, 619:12,
  619:13, 620:19, 620:20, 621:10,

622:8, 623:4, 623:24, 623:25, 624:23,
  625:10, 625:21, 626:4, 627:4, 627:15,
  627:19, 628:23, 629:18, 629:24,
  633:16, 634:15, 634:17, 636:10,
  636:11, 636:18, 636:25, 637:7,
  638:19, 639:8, 642:14, 642:15,
  642:16, 653:19, 653:21
VOTERS' [2] - 612:15, 612:18
VOTES [3] - 586:21, 610:19, 621:25
VOTING [54] - 547:16, 547:17, 547:18,
  548:10, 548:25, 550:24, 551:15,
  555:19, 555:23, 565:13, 576:3, 576:5,
  577:9, 577:12, 577:17, 577:19,
  577:24, 579:19, 579:23, 580:9,
  586:25, 589:11, 589:12, 589:15,
  589:16, 589:22, 590:1, 590:9, 592:14,
  595:9, 595:17, 596:12, 596:23,
  599:18, 603:9, 603:13, 605:24,
  610:13, 615:22, 616:10, 619:24,
  621:21, 622:5, 623:6, 625:11, 631:22,
  633:18, 636:1, 638:21, 640:21, 644:7,
  644:8
VOTING [3] - 597:21, 597:22, 597:25,
  598:5, 648:6
VS [1] - 535:5

# W

WAIT [4] - 548:21, 549:17, 555:17,
  655:10
WAITING [1] - 636:11
WALK [1] - 584:14
WALKED [4] - 584:10, 584:20, 585:3,
  585:5
WANTS [1] - 570:24
WAR [2] - 610:10, 619:7
WARM [1] - 625:15
WATCHERS [1] - 636:9
WAYS [6] - 616:15, 616:19, 617:14,
  621:12, 624:1, 639:13
WEBSITE [10] - 552:2, 552:6, 552:13,
  552:22, 553:6, 554:1, 554:4, 555:6,
  634:1, 638:25
WEBSITES [1] - 551:15
WEDNESDAY [1] - 537:7
WEEK [1] - 578:4
WEEKEND [1] - 537:3
WEEKENDS [2] - 543:25, 547:10
WEEKS [6] - 546:18, 572:9, 574:22,
  575:2, 575:3
WEIRD [1] - 550:5
WEST [7] - 561:25, 563:3, 567:4,
  568:10, 575:3, 578:21, 579:7
WEST [3] - 563:7, 602:7, 646:4
WHISTLE [2] - 610:25, 611:2
WHISTLEBLOWER [1] - 633:4
WHITE [25] - 599:21, 608:15, 608:17,
  608:18, 609:2, 609:16, 610:22,
  613:22, 614:8, 614:10, 614:18,
  614:22, 615:4, 615:8, 615:11, 617:23,

619:13, 620:21, 625:13, 628:6, 634:8,
  634:12, 637:7, 653:21
WHITES [4] - 609:13, 610:21, 614:18,
  634:9
WHOLE [5] - 549:21, 550:8, 555:18,
  592:13, 630:8
WI [1] - 573:5
WI-FI [1] - 573:5
WILKES [2] - 556:19, 575:9
WILLIAMS [1] - 609:3
WILLIAMS [1] - 535:7
WIN [1] - 617:24
WINES [1] - 652:14
WISE [1] - 625:12
WISH [2] - 596:25, 611:9
WITNESS [14] - 537:11, 537:14, 537:15,
  538:13, 538:21, 539:14, 552:9,
  557:22, 581:10, 581:12, 593:11,
  595:9, 606:11, 640:11
WITNESS [37] - 536:2, 540:3, 542:8,
  554:2, 570:4, 570:6, 570:16, 572:7,
  572:15, 572:18, 572:25, 573:4,
  573:10, 573:15, 573:20, 583:20,
  584:3, 586:16, 592:2, 593:6, 593:16,
  593:21, 594:4, 605:3, 607:19, 607:22,
  608:2, 610:18, 630:14, 631:4, 631:8,
  632:19, 637:17, 644:22, 647:17,
  651:18, 655:18
WITNESSES [1] - 537:8
WOMEN [1] - 623:2
WON [2] - 621:24, 622:1
WONDERING [1] - 585:7
WORD [9] - 601:5, 623:12, 625:3,
  625:25, 645:8, 645:10, 645:12, 645:15
WORDS [3] - 562:13, 580:18, 614:1
WORKER [11] - 549:1, 549:3, 550:7,
  550:8, 551:7, 585:13, 585:14, 586:17,
  586:22, 588:23, 589:5
WORKERS [3] - 586:18, 588:25, 635:25
WORKERS' [1] - 636:10
WORKS [1] - 575:7
WORLD [3] - 560:24, 561:3, 619:7
WORRIED [2] - 628:2, 633:17
WORTHY [2] - 613:4, 613:7
WRAPPED [1] - 548:20
WRITE [1] - 616:5
WRITINGS [1] - 646:5
WRITTEN [2] - 610:24, 649:16
WROTE [3] - 594:24, 619:23, 636:2
WYNNE [14] - 537:19, 538:7, 539:2,
  596:25, 603:1, 605:4, 605:19, 606:19,
  633:10, 640:11, 644:4, 644:9, 644:14,
  655:5
WYNNE [27] - 537:20, 537:23, 538:4,
  538:23, 539:8, 597:1, 597:4, 600:16,
  603:3, 604:18, 604:20, 605:7, 605:8,
  605:16, 606:20, 638:10, 640:13,
  644:18, 644:23, 645:10, 645:17,
  647:18, 651:7, 651:8, 651:15, 651:23,
  655:11

## Y

**YARD** [2] - 626:1, 632:3
**YEAR** [17] - 541:8, 542:18, 544:5, 544:8, 544:9, 545:1, 545:2, 547:19, 568:4, 568:6, 574:24, 581:18, 594:22, 594:24, 609:4, 609:8, 614:25
**YEARS** [10] - 541:7, 541:8, 541:11, 541:15, 541:21, 574:24, 608:12, 616:5, 623:13, 637:9
**YOU-ALL** [12] - 537:2, 537:13, 537:14, 537:17, 537:18, 538:21, 572:10, 580:18, 600:11, 600:12, 656:7
**YOUNG** [2] - 590:4, 628:6
**YOUNGER** [2] - 541:11, 631:2
**YOURSELF** [5] - 576:15, 577:10, 581:6, 599:11, 620:3
**YUN** [1] - 535:21

## Z

**ZBOROWSKI** [1] - 657:13
**ZBOROWSKI** [2] - 535:22, 657:13
**ZIMMER** [1] - 648:4