1                     UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
2                          ATLANTA DIVISION

3    FAIR FIGHT, INC., JOHN DOE,       )
     AND JANE DOE                      )VOLUME 4 -- A.M. SESSION
4                      PLAINTIFFS,     )
                                       )DOCKET NO. 2:20-CV-0302-SCJ
5           -VS-                       )
                                       )
6    TRUE THE VOTE, INC., CATHERINE    )
     ENGELBRECHT, DEREK SOMERVILLE,    )
7    MARK DAVIS, MARK WILLIAMS, RON    )
     JOHNSON, JAMES COOPER, AND        )
8    JOHN DOES 1-10,                   )
                       DEFENDANTS.     )
9    _____

10

                  TRANSCRIPT OF BENCH TRIAL PROCEEDINGS
11              BEFORE THE HONORABLE STEVE C. JONES
                    UNITED STATES DISTRICT JUDGE
12                 WEDNESDAY, NOVEMBER 1, 2023

13
     APPEARANCES:
14
     ON BEHALF OF THE PLAINTIFFS:
15
        ALLEGRA J. LAWRENCE-HARDY, ESQ.
16      CHRISTINA ASHLEY FORD, ESQ.
        LESLIE J. BRYAN, ESQ.
17      MARCOS MOCINE-MC QUEEN, ESQ.
        UZOMA NKWONTA, ESQ.
18      TINA MENG MORRISON, ESQ.
        JACOB SHELLY, ESQ.
19      MICHELLE L. MC CLAFFERTY, ESQ.

20

     ON BEHALF OF THE DEFENDANTS:
21
        CAMERON POWELL, ESQ.
22      MICHAEL JOHN WYNNE, ESQ.
        JAMES CULLEN EVANS, ESQ.
23

24

25

1
  APPEARANCES (CONTINUED):
2

3  ON BEHALF OF INTERVENOR (USA):

4  DANA PAIKOWSKY, ESQ.
    JENNIFER J. YUN, ESQ.
5  TIM MELLETT, ESQ.
    AILEEN BELL HUGHES, ESQ.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22       VIOLA S. ZBOROWSKI, RDR, FAPR, CMR, CRR, RPR, CRC
    OFFICIAL COURT REPORTER TO THE HONORABLE STEVE C. JONES
23            UNITED STATES DISTRICT COURT
               ATLANTA, GEORGIA
24              404-215-1479
         VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV
25

1                          I N D E X

2

3    WITNESS                   DIRECT    CROSS    REDIRECT  RECROSS

4    CATHERINE ENGELBRECHT      827

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    (HELD IN OPEN COURT AT 9:18 A.M.)

2              THE COURT:  Let me ask plaintiffs' counsel.

3              Are you-all planning on calling any witnesses this

4    morning that's going to need to be by Zoom?

5              MR. NKWONTA:  No, Your Honor.

6              THE COURT:  Okay.  The clerk is out today because of

7    illness and we're trying to do some things to take care of

8    that.  We were worried if you were going to call someone by

9    Zoom this morning.  She's the only one that knows how to do

10   that, so we're trying to find somebody who could do it.

11             So let me ask you:  Do you think you'll call anybody

12   by Zoom at all today?

13             MR. NKWONTA:  Not on our end, Your Honor.

14             MR. WYNNE:  Your Honor, our second witness would be

15   by Zoom if we get to --

16             THE COURT:  We've got a long time before we get to

17   your case.

18             MR. WYNNE:  Okay.

19             THE COURT:  Yeah.

20             MR. WYNNE:  Just letting you --

21             THE COURT:  Yeah.  So no.  We're not going to get to

22   your case today, so that's not concerning.

23             All right, then.  You can call your next witness.

24             MR. NKWONTA:  Your Honor, before we do, can we have a

25   couple of minutes to address a few house --

1          THE COURT:  Yeah.

2          MR. NKWONTA:  -- administrative items that --

3          So the first administrative item is the request for

4  judicial notice that we first raised last week.  We -- I don't

5  believe we've reached an agreement with the other side yet and

6  wanted to get guidance whether the Court would prefer that we

7  just file the motion for judicial notice or we can discuss it

8  here very briefly.

9          THE COURT:  Just go ahead and file it and I'll rule.

10  They'll have a chance to note their objections and I'll decide

11  if I'm allowed to take judicial notice on this or I'm not

12  going to take judicial notice on it.

13          MR. NKWONTA:  Thank you, Your Honor.

14          And then the second issue that we need to address,

15  that actually impacts our case and our witnesses, is again the

16  exhibit list.  So as Your Honor knows, we submitted an exhibit

17  list back in May.

18          Despite numerous attempts, we have not received any

19  objections or despite numerous attempts to reach out to the

20  defendants.

21          And so we are asking the Court, at some point we will

22  plan to move into evidence our exhibits on our exhibit list.

23  And we are asking the Court to -- for the Court's agreement

24  and confirmation that per local Rule 16.4 that there are no

25  authenticity objections as to the exhibits in our exhibit

1  list.  If those authenticity objections are waived and we can

2  move in those exhibits without having a witness --

3       THE COURT:  You-all have not received any objections

4  on authenticity on any of these matters, correct?

5       MR. NKWONTA:  Correct.

6       MR. WYNNE:  Your Honor, I really feel that we need to

7  take these one at a time.  We're agreed on authenticity --

8       THE COURT:  Why haven't you already addressed that

9  under Rule 1644?

10      MR. WYNNE:  None of --

11      THE COURT:  Plaintiffs' counsel is correct.  If you

12  had a problem with those, just let them -- give them notice

13  ahead of time so they can have witnesses prepared to be here

14  to do that.  Your failure to do that is also like a waiver

15  that you weren't going to challenge them on that basis.

16      MR. WYNNE:  We are not challenging on the basis of

17  authenticity or certification of business records.  And to the

18  extent before, we're not challenging under, I think it's -- I

19  think it's 803.6 on -- on any business records.

20      THE COURT:  Does that not answer your question, then?

21      MR. NKWONTA:  That does.  I was just slightly

22  confused because they raised some foundation objections during

23  the last time we were before you and --

24      THE COURT:  Well, I think they can still argue where

25  it's relevant or not and things like that.

1          MR. NKWONTA:  Relevance, absolutely.  But foundation,

2    that's an authenticity objection and I just want a

3    confirmation that that is waived.

4          THE COURT:  Mr. Wynne just gave you the confirmation.

5          MR. WYNNE:  We're just going to do hearsay and

6    foundation and relevance.

7          THE COURT:  Thank you, Mr. Wynne.  Thank you.  All

8    right.

9          MR. NKWONTA:  Your Honor, he said just hearsay,

10   foundation and relevance.  And I want confirmation that

11   foundation is waived.

12         THE COURT:  Well, I think it's relevance.  He meant

13   to just say whether it's relevant or not and hearsay.

14         MR. NKWONTA:  Okay.  Thank you.

15         THE COURT:  It's early.  It's cold.  He's getting a

16   slow start, but he just meant relevance and hearsay.

17         MR. WYNNE:  I don't like objecting anyway.  If I do,

18   it would be one word.

19         THE COURT:  Well, I tell people all the time, when I

20   was taught to try a case I was told if it doesn't matter then

21   don't object.

22         MR. WYNNE:  Especially in a bench trial, Your Honor.

23   I respect that and respect your time.  I'm not going to --

24         THE COURT:  Thank you.

25         MR. WYNNE:  There will be a couple in a minute, in

1   the beginning.

2        THE COURT:  Well, no.  If there is an objection that
3   you and Mr. Powell and Mr. Evans think needs to be made, you
4   need to make it.

5        MR. NKWONTA:  Then, Your Honor, before we get started
6   with our next witness we -- to sort of minimize the time going
7   back and forth, we'd request permission to drop off some
8   selected exhibits with the witnesses.

9        THE COURT:  No problem.

10        MR. WYNNE:  No objection.  And, in fact, I greatly
11   appreciate that.  Counsel is very helpful.

12        THE COURT:  Thank you, sir.

13        MR. NKWONTA:  We have a copy for you too, Your Honor.

14        THE COURT:  Yes, sir.  Thank you.

15        Leave that right there for the witness.  Hand me one.
16   Yeah.  Thank you.  And you can just leave it right there for
17   whenever the witness comes up.  Thank you, sir.

18        MR. NKWONTA:  Now that we have those preliminary
19   items out of the way, Your Honor, plaintiffs call
20   Ms. Catherine Engelbrecht.

21        THE COURT:  All right.  For purposes of
22   cross-examination?

23        MR. NKWONTA:  Yes.  We call Ms. Engelbrecht as an
24   adverse witness for the purpose of cross-examination.

25        MR. WYNNE:  Your Honor, I want to make sure, and I

1    think the ground rules are set, that we may call her in her --

2    in our case-in-chief.

3              THE COURT:  Yes.

4              MR. WYNNE:  On any subject, including matters

5    covered.

6              THE COURT:  Yes, yes.

7              MR. WYNNE:  Thank you.

8              THE COURT:  Yes.

9              Now, let me also say -- come on up, ma'am.

10             Sometimes, but I think this question is already

11   answered, they're going to call her back.  Sometimes I read in

12   some cases where, you know, the purpose of calling a person

13   for cross-examination and plaintiffs' counsel objects and say,

14   well, Judge, since they are on can we do direct, but we're not

15   going to have to cross that bridge because Mr. Wynne has

16   already addressed it.

17             MR. WYNNE:  That may be the case.  I'll probably have

18   to go over a few areas and then I'll go into greater depth in

19   our case.

20             THE COURT:  All right.  But you don't get to question

21   her when plaintiffs' counsel, Mr. Nkwonta finishes, because

22   he's calling her for purposes of cross-examination as an

23   adverse witness.  So when he finishes, she steps down.  Unless

24   you agree to let Mr. Wynne then proceed with his direct on

25   her.

1    MR. NKWONTA:  I'm willing to agree for Mr. Wynne to

2  proceed with his direct to cut down on the amount of time that

3  this trial takes, so that we don't have to call her back.

4    THE COURT:  Thank you.

5    MR. WYNNE:  And then I'll resume my direct with the

6  understanding that I can go back into an issue I cover in my

7  first --

8    THE COURT:  Why would you want to do another direct

9  when you can do everything you want to do?  He's agreed that

10  once he's finished with his cross, he's going to allow you to

11  direct her on any aspect you want to direct her on.  You're

12  not going to be limited.

13    MR. WYNNE:  And I can go back over those subjects

14  again when I recall her.

15    THE COURT:  Well, I'll be quite frank with you.  If

16  you're going to recall her, then we don't -- you don't need to

17  do a direct after the cross is done.  I'm not -- Mr. Nkwonta

18  may be in agreement to allow you to do that, but I'm not going

19  to agree to that.

20    If he's not going to object to you doing direct once

21  he finishes cross for purpose of cross-examination, I'm not

22  going to allow you to call her back again later because you

23  can do every question you want to ask her when he finishes.

24  If you want to call her, you may have a strategy that says I

25  don't want to direct her right now, I want to direct her

1  later, fine.  Just when he finishes, she steps down.

2          MR. WYNNE:  Okay.  I'll make that call later on.

3          THE COURT:  All right.  Just let me know.

4          MR. WYNNE:  Thank you, Your Honor.

5          THE COURT:  All right.  Ma'am, if you'll stand and

6  raise your right hand.

7                        ******

8                  CATHERINE ENGELBRECHT,

9          having been duly sworn, testified as follows:

10                       ******

11         THE COURT:  Thank you.  You may be seated.

12         If you'll state your full name and spell it.

13         THE WITNESS:  Catherine Engelbrecht,

14  C-a-t-h-e-r-i-n-e, E-n-g-e-l-b-r-e-c-h-t.

15         THE COURT:  Thank you.

16         You may proceed.

17  CROSS-EXAMINATION

18  BY MR. NKWONTA:

19  **Q.**  Good morning, Ms. Engelbrecht.

20  **A.**  Good morning.

21  **Q.**  Ms. Engelbrecht, you're the founder and current president

22  of True the Vote; correct?

23  **A.**  Correct.

24  **Q.**  And when was True the Vote founded?

25  **A.**  2010.

1   **Q.**   What are your duties as the president of True the Vote?

2   **A.**   Before I go any further, can you hear me?  Am I okay

3   sitting like this?

4   **Q.**   Yes.

5   **A.**   Okay.  Thank you.

6        Runs the full gamut.  Program planning, spokesperson,

7   oversight of all of the administrative duties.

8   **Q.**   And during the 2020 election cycle, True the Vote had no

9   employees; correct?

10  **A.**   During 2020, that's correct.

11  **Q.**   You had a contractor, but no employees; correct?

12  **A.**   I was myself a contractor, yes, correct.

13  **Q.**   And so you were overseeing all of True the Vote's

14  operations; correct?

15  **A.**   Correct.

16  **Q.**   And you have visibility into all the organization's

17  operations and activities; right?

18  **A.**   Yes.  Not necessarily all at once, and certainly things

19  that, you know, slip passed in the everyday machinations of

20  the organization, but I had insight.

21  **Q.**   So you oversee the organization's strategy?

22  **A.**   Yes.

23  **Q.**   And you oversee the finances?

24  **A.**   With the board, yes.

25  **Q.**   And you oversee communications?

1  **A.**    As the president, yes.

2  **Q.**    And that includes external communications; correct?

3  **A.**    Oversight, yes.

4  **Q.**    And communications such as press releases and blog posts;

5  is that right?

6  **A.**    Yes, but I'd like to make, if I may, a clarification,

7  because there have been a number of -- well, we may get to it.

8  There have been a number of things that have been called press

9  releases that aren't, but we'll get to that, I'm sure.

10  **Q.**    I understand some may be press releases, some may be blog

11  posts, but either way you have oversight over those

12  activities, correct?

13  **A.**    Yes.

14  **Q.**    Let's discuss one of those communications briefly.  I

15  left the binder there for you, which includes some of the

16  exhibits that we may use today, just for ease of reference.

17  Could I ask you to turn to Exhibit 25, tab 25.  Exhibit 25,

18  which has already been admitted into evidence -- I'll give you

19  a second.

20  **A.**    Yes.

21  **Q.**    And that exhibit is dated November 6, 2020; correct?

22  **A.**    Correct.

23  **Q.**    And that was -- that is a blog post; right?

24  **A.**    It's a blog post, correct.

25  **Q.**    And that blog post was issued just days after the

1  presidential election; correct?

2  **A.**   Correct.

3  **Q.**   And there you announce the launch of True the Vote's

4  Validate the Vote initiative; correct?

5  **A.**   Correct.

6  **Q.**   And you announced True the Vote's whistleblower fund; is

7  that correct?

8  **A.**   Correct.

9  **Q.**   Now, True the Vote first created the Validate the Vote

10 initiative or program for the presidential election in

11 November; is that correct?

12 **A.**   No.  That's incorrect.

13 **Q.**   Is it your testimony -- well, why don't you tell me when

14 True the Vote created the Validate the Vote program.

15 **A.**   Sure.  Validate the Vote was -- Validate the Vote was a

16 name suggested to me, I accepted, shortly after a group of

17 consultants contacted me on the 5th of November.  And the

18 outcome of that initial conversation, in addition to a large

19 donation, was the suggested use of the term "Validate the

20 Vote."

21 **Q.**   Fair enough.  Just so I make sure we're not disagreeing

22 over semantics here --

23 **A.**   Sure.

24 **Q.**   -- True the Vote launched the Validate the Vote program

25 for the presidential election in November; correct?

1  **A.**    Well, it was post the election.

2  **Q.**    But in response to the presidential election in November;

3  correct?

4  **A.**    Oh, I see your -- yes, that's fair to say.

5  **Q.**    And then when the attentions of the electorate and the

6  media turned to Georgia, True the Vote started calling the

7  Validate the Vote initiative Validate the Vote Georgia, but it

8  was still the same program; correct?

9  **A.**    That's incorrect.

10 **Q.**    Is it your testimony today that when attentions turned to

11 Georgia, True the Vote did not call Validate the Vote Validate

12 the Vote Georgia?

13 **A.**    We did call the program as it was focused on Georgia

14 Validate the Vote Georgia, but the initiatives and intentions

15 had drastically changed from even just a few weeks before from

16 Validate the Vote.

17 **Q.**    Would you agree that you made all the resources you had

18 available for the national election in Georgia -- sorry, let

19 me repeat that.

20      Would you agree that you made all the resources you had

21 available for the national election, you made those resources

22 available in Georgia for the runoff election with respect to

23 the Validate the Vote program?

24 **A.**    I'm not sure I understand the question about the

25 resources.

1  **Q.**   Sure.  So all the resources that -- the resources that

2  you had available for the national election, for the

3  presidential election, would you agree that you made those

4  resources available in Georgia for the runoff election?

5  **A.**   We didn't cordon off resources.  But I would, again,

6  point out that the programs were vastly different coming in to

7  Georgia after the end of the Validate the Vote program.

8  **Q.**   Ms. Engelbrecht, you submitted responses -- or True the

9  Vote also submitted responses to plaintiffs' interrogatories

10  in this case back in 2021; correct?

11  **A.**   Correct.

12  **Q.**   And I'd like you to turn to Exhibit 10.

13  **A.**   Okay.

14  **Q.**   And Exhibit 10, those are the responses that you

15  submitted; correct?

16  **A.**   Yes, sir.

17  **Q.**   And you signed those responses --

18  **A.**   Yes.

19  **Q.**   -- on page 27 of Exhibit 10; correct?

20  **A.**   Well, just to be -- yes.

21  **Q.**   And in signing those responses, you affirmed under

22  penalties for perjury that the answers to the plaintiffs'

23  interrogatories were true and correct; is that right?

24  **A.**   That's correct.

25  **Q.**   I'd like to direct you to your response to Interrogatory

1  No. 3 on page 17.  There you said, "True the Vote created the

2  Validate the Vote program for the national presidential

3  election" --

4  **A.**    I apologize.  What -- I'm sorry, what page?

5  **Q.**    Page 17.

6        THE COURT:  Are you moving 10 into evidence?  Are you

7  moving Exhibit 10 into evidence or are you using --

8        MR. NKWONTA:  Yes, Your Honor.

9        THE COURT:  Any objection to Exhibit 10, Mr. Wynne?

10        MR. WYNNE:  No.  It's a statement of a party, Your

11  Honor.

12        THE COURT:  Okay.  It's admitted without objection.

13        (Plaintiff's Exhibit 10 was received and marked into

14  evidence.)

15  BY MR. NKWONTA:

16  **Q.**    So on page 17 of Exhibit 10 in response to Interrogatory

17  No. 3, you stated, "True the Vote created the Validate the

18  Vote program for the national presidential election.  And from

19  that, True the Vote created Validate the Vote Georgia.  When

20  True the Vote came to Georgia, we simply took the logo and put

21  the word 'Georgia' in the center of the logo.  True the Vote

22  then made all resources we had available for the national

23  election available in Georgia for the runoff election."

24        Is that a correct reading of the response to

25  Interrogatory No. 3?

1  **A.**   Yes, it's a correct reading.  There's context, but that's
2  a correct reading.
3  **Q.**   I want to talk to you a little bit more about the
4  Validate the Vote program.
5       As you mentioned, the name was given to you by a
6  consultant; correct?
7  **A.**   Correct.
8  **Q.**   And this consultant worked for one of True the Vote's
9  funders; correct?
10  **A.**   That's correct.
11  **Q.**   You said that's correct?
12  **A.**   That's correct.
13  **Q.**   And the funder in question was Fred Eshelman; correct?
14  **A.**   That's correct.
15  **Q.**   His consultant was Tom Crawford?
16  **A.**   That's correct.
17  **Q.**   And shortly after Election Day in November 2020, you sent
18  them a proposal titled Validate the Vote; correct?
19  **A.**   Well, I'd like to clear up in context how Validate the
20  Vote came about.  Because, again, it only came about after
21  Mr. Crawford recommended it, so --
22  **Q.**   I understand, but that's not my question.
23  **A.**   Okay.
24  **Q.**   My question is --
25  **A.**   Could you repeat it?

1  **Q.**   -- shortly after the November election -- shortly after

2  the November general election, you sent them a proposal titled

3  Validate the Vote; correct?

4  **A.**   At their request, yes.  I'm sure we'll get to more of

5  this, but at their request, yes, I submitted a one-page report

6  or a one-page -- I don't even know what we'd really even call

7  it.  It was just meant for him.  So a one-page document.

8  **Q.**   Exhibit 1 in your binder --

9          THE COURT:  Hold on.  I have an objection.

10         MR. WYNNE:  I mean.  I'm going to object to

11  relevance.  This relates to a separate case that True the Vote

12  prevailed on in Houston and that was dismissed, all these

13  question about Mr. Eshelman.  Sorry for the speaking

14  objection, but relevance.

15         THE COURT:  Response?

16         MR. NKWONTA:  Your Honor, this relates to the

17  Validate the Vote program.  Validate the Vote is on just about

18  every document that True the Vote has issued in this case

19  relating to the Georgia runoff.  And I just read testimony

20  or from True the Vote's interrogatory responses where they

21  said True the Vote merely replaced the logo from Validate the

22  Vote to Validate the Vote Georgia and made all resources

23  available for the Georgia runoff.

24         THE COURT:  How is it relevant to the challenges that

25  this case is based on?  How does it relate?

1          MR. NKWONTA:  It's relevant to the challenges because

2     it shows the origin of the Validate the Vote program and shows

3     the intent of the Validate the Vote program and it shows how

4     True the Vote sought to implement that program and its goals

5     by switching from Validate the Vote to Validate the Vote

6     Georgia.  Again, simply put the logo on it and made all the

7     same resources available.

8          THE COURT:  I think we've got that established.

9          MR. NKWONTA:  That is established, but now I want to

10    go into exactly what that program entails.  And you cannot

11    examine what Validate the Vote entails without going back to

12    see what the actual proposal is.  It doesn't -- it's not some

13    stand-alone project that was just created in mid-December.  It

14    was created in November, Your Honor.

15         THE COURT:  Well, how does the Validate the Vote,

16    again -- I'm still not quite connecting.  How does Validate

17    the vote show that Ms. Engelbrecht and True the Vote were

18    reckless in challenging these 364,000 people?  How does that

19    relate in here?

20         MR. NKWONTA:  It relates to intent, Your Honor.  And

21    I --

22         THE COURT:  Do you have to prove intent?

23         MR. NKWONTA:  I do not.  But it is -- but intent is

24    an element that can be used to demonstrate intimidation.  In

25    other words, as plaintiffs, we have several avenues to prove

1   our case and we need to be allowed to explore all those

2   different avenues.

3            THE COURT:  With relevant evidence.

4            Mr. Wynne, I'm going to give him a little bit more

5   rope, but I don't want to try the Houston case.  I'm going to

6   give him a little more rope --

7            MR. NKWONTA:  Your Honor, this has nothing --

8            THE COURT:  I said what I'm going to do.  I'm going

9   to give you a little more leeway.  I'm going to overrule the

10  objection at this time, but I'm not here to try another case.

11           MR. WYNNE:  May I say one thing?

12           THE COURT:  Yeah.

13           MR. WYNNE:  Just because an organization is a party

14  in a lawsuit and in a courtroom, Exxon comes to mind for some

15  reason, whatever it is, you can't go back and look at

16  everything that organization ever did.  It's just not

17  relevant.

18           THE COURT:  There is some relevancy, and the reason

19  why I'm giving more leeway is showing that this is a pattern

20  that they follow.

21           MR. WYNNE:  Understood, Your Honor.

22           MR. NKWONTA:  And I will endeavor not to delve into

23  the actual lawsuit or any of its allegations.  This is not

24  what the purpose of this --

25           THE COURT:  Again, what I'm hearing you say is you

1  want to show that this is a pattern that they followed based

2  on a past situation, somewhat similar.

3          MR. NKWONTA:  Exactly.  Not just based on a past

4  situation.  It's still the same situation.

5          THE COURT:  A pattern.

6          MR. NKWONTA:  A pattern:  It's still the same

7  program.

8          THE COURT:  Proceed.

9          Mr. Wynne, if you think he's going too long, too far,

10  then I'll entertain another objection.

11          MR. WYNNE:  Thank you, Your Honor.

12  BY MR. NKWONTA:

13  **Q.**  Ms. Engelbrecht, Exhibit 1 is the Validate the Vote

14  proposal; correct?

15  **A.**  I wouldn't call it a proposal, but it's a document that

16  talked about the Validate the Vote 2020 program.

17  **Q.**  And this document came from True the Vote; right?

18  **A.**  Yes.

19  **Q.**  In this document you were responding to the donor's

20  request to describe some of the activities that True the Vote

21  was planning to engage in; correct?

22  **A.**  That's -- yes, that's fair to say.

23  **Q.**  And this document was prepared on November 5th; correct?

24  **A.**  I don't know about that.  You know, it's interesting,

25  because now we're talking about this case and because you -- I

1  don't know if the other whole case was entered into evidence
2  or not.  But in going back through all of that, I don't even
3  know if I can answer it in this way, but tell me when I can't.
4      I read back through my deposition.  And, you know, you
5  asked me back in 2021 if I recognized the language on this
6  page.  And you may recall in my deposition I kept saying I
7  just don't -- it just doesn't sound right.
8      But what I learned in pulling (sic) through all of the
9  other lawsuit stuff is that this language was exactly what my
10 former counsel wrote and so --
11         MR. NKWONTA:  Your Honor, I object to this answer.
12 It's not relevant to the question that I just asked and I
13 would move to strike as not responsive.
14         THE COURT:  I understand you may want to explain the
15 answer more, but you have to kind of keep it narrowed in.  If
16 you don't know the answer, there's nothing wrong with saying I
17 don't know.
18         THE WITNESS:  That's fair.  That's fair.
19         THE COURT:  But you have to kind of keep it more
20 narrow.
21         THE WITNESS:  Then I don't -- I don't know the day
22 that it was sent.  Or I don't recall the day that it was sent.
23 It was either the 5th or the 6th.  It was sent.
24 BY MR. NKWONTA:
25 Q.  Would it refresh your recollection if I showed you an

1  e-mail sending that Validate the Vote proposal?

2  **A.**   Sure.

3  **Q.**   Would you turn to Exhibit 32 in your binder, please.

4      Let me know when you finish reviewing Exhibit 32.

5  **A.**   I've reviewed it.

6  **Q.**   I'll ask you again.

7      The Validate the Vote proposal was sent on November 5th,

8  just two days after the presidential election; correct?

9  **A.**   In -- yes, the afternoon.  Yes.

10      MR. NKWONTA:  Your Honor, plaintiffs move to admit

11  Exhibit 1 into evidence.

12      MR. WYNNE:  Objection, relevance.

13      THE COURT:  I'm going to allow 1 in, but I -- at this

14  time I'll allow it in.  It's -- it's -- I'll allow it in over

15  objection, Mr. Wynne.  I note your objection to my allowing 1

16  in.

17      (Plaintiff's Exhibit 1 was received and marked into

18  evidence.)

19      MR. WYNNE:  Your Honor, I also want for the record to

20  object to hearsay.

21      THE COURT:  What's the hearsay?

22      MR. WYNNE:  It's not her statement, it's the

23  statement of former counsel.  So it's not a statement of a

24  party.

25      MR. NKWONTA:  Your Honor, that has not been

1  established.  And I can introduce additional documentary

2  evidence establishing that Ms. Engelbrecht sent this proposal

3  and so --

4          THE COURT:  You probably need to do it right now

5  since he's objecting to No. 1.  His argument is this is not

6  Ms. Engelbrecht's statement.

7  BY MR. NKWONTA:

8  **Q.**   Ms. Engelbrecht, we just talked about Exhibit 32, which

9  you used to refresh your recollection.  Could you turn to

10 Exhibit 32 again?

11 **A.**   Still Exhibit 32?

12 **Q.**   Yes.

13 **A.**   Okay.  Yes.

14 **Q.**   And in Exhibit 32, is that an e-mail from you to one of

15 the consultants for the funder, Mr. Fred Eshelman?

16 **A.**   That -- it's a combination of e-mails, but the origin

17 e-mail is an e-mail to Tom Crawford, yes.

18 **Q.**   And the e-mail is dated November 5, 2020; correct?

19 **A.**   Correct.

20 **Q.**   And the e-mail attaches the Validate the Vote 2020

21 proposal; correct?

22 **A.**   Well, let's talk about that for a second.

23         The attachments that have my name by them, you can't tell

24 what they are.  The attachment that the two -- that the --

25 both of the consultants sent to, I guess, their attorney, then

 1  lists the name of the establishment, but it -- in -- you know,

 2  in -- in total --

 3         THE COURT:  What the attachment --

 4         THE WITNESS:  -- total accuracy here, it just doesn't

 5  say that where I sent it.

 6         THE COURT:  The attachment to it, is this the

 7  attachment you're talking about, behind 32?

 8         MR. NKWONTA:  Yes.

 9         THE COURT:  Is that your words?  Is that you saying

10  this?

11         THE WITNESS:  Yeah, I think that's the same one.  So,

12  yes.  I mean, that goes back to the original question.  I just

13  want to be absolutely crystal clear about how -- how these

14  were all documents sent and who sent what and when and who

15  named what and when and it turned into a big ugly lawsuit,

16  so...

17         THE COURT:  If you'll go to Plaintiffs Exhibit No. 1.

18         THE WITNESS:  Yes, sir.

19         THE COURT:  Is No. 1 the same as what's the

20  attachment to 32?  It looks like the same one to me.

21         THE WITNESS:  Yeah, it's the same document.  The

22  hesitancy here is -- and I do wish I could just be more clear.

23  I never recognized the language -- this came up in my

24  deposition.  I now know that my former counsel wrote this

25  language and was already well on his way to raising dollars

1    and doing this.  And I --

2         THE COURT:  Let me ask this.  This very part --

3         THE WITNESS:  Sure.

4         THE COURT:  -- especially looking at No. 1, did you

5    write this or did the attorney he write it?

6         THE WITNESS:  The attorney -- the attorney wrote the

7    plan.  I -- I can't -- that's all I can tell you.  The

8    attorney wrote the plan.  And that's copied in the actual

9    discovery documents of the --

10        THE COURT:  I understand.  I can't remember what

11   happened last week sometimes, it's difficult to remember, but

12   it's very important.

13        THE WITNESS:  Sure.

14        THE COURT:  If this is your document, then it's one

15   thing.  If you're saying this is not you, this is not your

16   document, you did not produce this document, that's something

17   else.

18        THE WITNESS:  Yeah, I know.

19        THE COURT:  And, again, I know it's difficult to

20   remember what happened, but if you want to look at it, you

21   want to read it, take your time.

22        THE WITNESS:  It's -- I'm really not sure how to

23   answer this.  I've been unclear about where some of this

24   language has come from even since 2021.

25        MR. NKWONTA:  May I clarify this, Your Honor?

1           THE COURT:  Yeah.

2    BY MR. NKWONTA:

3    **Q.**   Ms. Engelbrecht, you gave a deposition in this case in

4    January 2022; correct?

5    **A.**   I don't -- I don't recall the date.

6    **Q.**   Will you accept my representation that you gave a

7    deposition in this case?

8    **A.**   Sure.

9    **Q.**   And you were there --

10   **A.**   Yes.

11   **Q.**   -- for the deposition; correct?

12   **A.**   Yes.  We were there.

13   **Q.**   And your counsel was there; correct?  And your counsel

14   was there; correct?

15   **A.**   Former counsel.

16          MR. WYNNE:  Just a clarification, I want to make sure

17   it's former counsel.

18          THE WITNESS:  Former counsel was there.

19          THE COURT:  Mr. Bopp was there.

20          THE WITNESS:  Correct.

21          THE COURT:  Not Mr. Wynne.

22   BY MR. NKWONTA:

23   **Q.**   Your former counsel was there; correct?

24   **A.**   Correct.

25   **Q.**   And a court reporter was there?

1   **A.**   Correct.

2   **Q.**   And you swore to tell the truth in that deposition?

3   **A.**   I did.

4   **Q.**   And I'll direct your attention to pages 335, lines 1

5   through 5 of that deposition.  I won't direct your attention,

6   but I'll represent to you, that on pages 335 lines 1 to 5 of

7   that deposition --

8          THE COURT:  Well, is it on her screen in front of

9   her?  It's on my screen.

10          MR. NKWONTA:  It should be on everyone's screen.

11          THE WITNESS:  Oh, my screen just blanked.

12          THE COURT:  No, you can put it back up.  I think he's

13   trying to impeach her.  So you can put it back up.

14   BY MR. NKWONTA:

15   **Q.**   You were asked in relation to Exhibit 32, "So it looks

16   like this was attached to the e-mail that you sent; is that

17   correct?"

18          Your answer, "This is the format that I am familiar with

19   around what we call Validate the Vote."

20          That was your testimony; correct?

21   **A.**   That is correct.  But I think to give proper context, we

22   should consider looking at the very next line, which I say, "I

23   don't recognize the words."

24          THE COURT:  Let's go to the next line.

25          THE WITNESS:  I say, I just -- I don't remember some

1  of these words.

2           THE COURT:  Go down a little bit more.

3           THE WITNESS:  I just don't remember some of this

4  approach, this being that the way this is worded -- my grammar

5  is horrible.

6           MR. NKWONTA:  Your Honor, the witness has admitted in

7  testimony that this is the format that she is familiar with,

8  as I indicated when I impeached her.  She also acknowledged

9  that the document came from True the Vote.  And she also

10  acknowledged the document was attached to an e-mail that she

11  sent.

12           And the validate -- and she's also acknowledged that

13  the Validate the Vote program was launched by True the Vote.

14           So plaintiffs would move to admit Exhibits 1 and 32.

15  And the hearsay objection is unfounded because it is a party

16  admission, Your Honor.

17           MR. WYNNE:  Okay.  First of all, I do object to

18  hearsay and to relevance.  And with regard to Exhibit 32, I'll

19  note that the top certainly is hearsay because we have from

20  Tom Crawford to Ronald Jacobs.  We don't know who Ronald

21  Jacobs, at least in this, and then an individual named

22  Dichram, we haven't established a foundation for who he is.

23           Under Rule 801(d)(2), you know, it's -- it's not

24  admissible as a non-hearsay.  And as an 801(d)(1), it's not a

25  statement, you know, by a witness, or at least this top part,

1   because we don't have Mr. Jacobs or Mr. --

2        THE COURT:  Mr. Wynne, Mr. Nkwonta is arguing that

3   this is from a party, True the Vote.  I'm assuming

4   Ms. Engelbrecht's being called as a representative -- I don't

5   know what capacity she was called in, but she's also -- she's

6   an individual defendant.

7        They're arguing it comes in because it's from a party

8   opponent and I see who is a party opponent.  I don't know yet

9   whether or not this witness sent this based on what she said,

10  even when I look at the deposition.  I will admit that this --

11  if it came from True the Vote, while it still may come in, it

12  doesn't necessarily have to come from Ms. Engelbrecht, because

13  I'm not sure she said anything yet.  But it did come from True

14  the Vote, who is a party defendant in this case.

15       I think it comes in based on that.  Not so much that

16  it came from Ms. Engelbrecht, but it came from a party

17  opponent in this case, True the Vote.  That's how I will

18  accept it.

19       Now, that don't really help you completely, but you

20  can get it in.

21       MR. WYNNE:  Understood, Your Honor.

22       THE COURT:  Yeah.  But, again, I'm not clear if it

23  came from this witness, but it did come from a party opponent.

24       MR. NKWONTA:  Your Honor, if I may, I know you've

25  issued a ruling admitting the exhibits; am I correct?

1        THE COURT:  Yeah.

2        MR. NKWONTA:  To your latter point, if I may lay

3   additional foundation for that?

4        THE COURT:  Yeah.

5   BY MR. NKWONTA:

6   **Q.**   Ms. Engelbrecht, is your testimony --

7        THE COURT:  Let me state for the record, it's

8   admitted over objection.  I need to perfect his record.

9        (Plaintiff's Exhibit 32 was received and marked into

10  evidence.)

11  BY MR. NKWONTA:

12  **Q.**   Ms. Engelbrecht, is your testimony today that you don't

13  recognize the documents in Exhibit 1?  You don't recognize

14  that document.  Is that your testimony today?

15  **A.**   No, sir, that's not my testimony.  I mean, I recognize

16  it.  This has been through many lawsuits.  I've seen it

17  before.  I -- I don't recognize some of the language in it.

18  I -- well, I'll leave it at that.

19  **Q.**   Now turning to Exhibit 1, you received funding from

20  Mr. Eshelman to initiate the elements of this program;

21  correct?

22  **A.**   That's incorrect.

23  **Q.**   Is it your testimony today that you did not receive

24  funding from Mr. Eshelman?

25  **A.**   No, that's correct, but not to initiate this program.

1   **Q.**   Understood.

2        And you started working on elements of the program

3   shortly after November 5th; is that correct?

4   **A.**   That's correct.

5   **Q.**   And in doing that, you collaborated with Mr. Eshelman's

6   consultants?  You were in frequent communication?

7            THE COURT:  Hold on.  I have an objection.

8            MR. WYNNE:  Objection, relevance.

9            MR. NKWONTA:  I'm trying to lay the foundation.  I'm

10  not going into any litigation or any lawsuits.  I'm simply

11  trying to lay the foundation for the elements of the program

12  that we're about to discuss.  This is preliminary foundation.

13           MR. WYNNE:  She's answered the question that funding,

14  which also is irrelevant to this, was not directed for the

15  program and in fact separate from that.

16           THE COURT:  She did say that.

17           MR. WYNNE:  Counsel -- counsel knows -- the counsel

18  knows that the Court -- Appellate Court determined that this

19  was an unconditional contribution gift.  Now that makes it

20  completely irrelevant, I didn't even need to say that, but

21  that's the background.  Not relevant to the case.

22           THE COURT:  All right.  Here's what we're going to

23  do.  I want to hear counsel's next questions, then I will

24  determine whether it's relevant or not.  But it has been

25  established based on this witness that the money was not

1   received in the matter you first asked.  But she still

2   received the money.  Now, whether or not this is relevant is

3   going to be based on the next two questions counsel asks.

4            MR. NKWONTA:  And, Your Honor, I will again clarify,

5   I'm trying to lay the foundation for all the individuals

6   involved in this program.

7            THE COURT:  Yeah.

8   BY MR. NKWONTA:

9   **Q.**   On Exhibit 1, you'll see on the right-hand menu under

10  "Team," you'll see the name Gregg Phillips; is that correct?

11  **A.**   Yes.

12  **Q.**   And Gregg Phillips is listed under the title "data and

13  research"; correct?

14  **A.**   Correct.

15  **Q.**   And Gregg Phillips is the president of OpSec Group;

16  correct?

17  **A.**   Correct.

18  **Q.**   And OpSec Group is the same group that prepared the

19  challenge lists for the Georgia runoff challenges; is that

20  correct?

21  **A.**   Correct.

22  **Q.**   Also listed in this document you'll see True the Vote

23  under the "Team" menu; correct?

24  **A.**   Correct.

25  **Q.**   And your name is listed under there as the president of

1  True the Vote; correct?

2  **A.**   Correct.

3  **Q.**   And so just to speed this up, it lists True the Vote,

4  with your name as the president; Jim Bopp as counsel; and

5  Gregg Phillips, all under the same -- all under the "Team" for

6  the Validate the Vote proposal; right?

7  **A.**   In addition to others, but, yes, that's correct.

8  **Q.**   In addition to others that I haven't named that are

9  listed in Exhibit 1; correct?

10  **A.**   Correct.

11  **Q.**   And you were also in communication with Mr. Crawford and

12  the other consultants through the course of this program;

13  correct?

14  **A.**   Yes.  We texted and had phone calls.

15  **Q.**   Now, turning to the substance of the proposal.  Can you

16  read the first paragraph under the word "problem"?

17  **A.**   Yes, with the understanding that these words are not my

18  words.

19      "There is significant evidence that there are numerous

20  instances of illegal ballots being cast and counted in the

21  2020 general election.  Most of these illegal votes are being

22  counted in Democrat counties and are suppressing legitimate

23  results.  This is a result of Democrat officials' refusal to

24  obey state election laws in counting illegal votes.  It is

25  also the result of deliberate election fraud.  This situation

1   has been aided by the Democrats' deliberate effort to

2   radically expand mail-in balloting, create myriad

3   opportunities for voter fraud that does not exist with

4   in-person voting.  Furthermore, this flood of illegal votes

5   violates the U.S. Constitution's right to vote by diluting the

6   votes of legitimate voters," which was Mr. Bopp's argument.

7   **Q.**   Thank you.  You can stop there.

8       Did you have significant evidence that there were

9   numerous instances of illegal ballots being cast and counted

10  in the 2020 general election?

11  **A.**   Yes, I would say so.

12  **Q.**   So it is your testimony today that when that proposal was

13  issued you had significant evidence that there were numerous

14  instances of illegal ballots being cast and counted in the

15  2020 general election?

16  **A.**   I think that there was such systemic process breakdown

17  that all manner of ballots were being cast and counted that

18  needed to be reviewed.  This was Mr. Bopp's approach to it,

19  but I -- I absolutely agree that we had massive process

20  problems in 2020.

21          THE COURT:  Hold on.

22          MR. WYNNE:  I'm going to object to relevance on any

23  further questions down this line.  Again, because True the

24  Vote, as any organization, does a number of things, there are

25  a number of aspects of the law and disputes about election

1   law, instance, for example, redistricting, dilution, whatever.

2   And just because True the Vote is involved in these things, as

3   any organization, doesn't mean you go the whole universe the

4   organization's ever done.  It's not relevant.

5          THE COURT:  I think this is relevant.  This part is

6   relevant.  As a matter of fact, it's relevant to what you're

7   presenting and relevant on both sides.  So this is overruled.

8   BY MR. NKWONTA:

9   Q.   And just to make sure I'm understanding, and to put a

10  finer point on my question, is it your testimony today that

11  True the Vote had identified illegal votes in the 2020

12  presidential election at the time that proposal was issued?

13         THE COURT:  I have an objection, but I think I know

14  what the objection is.  I don't think it has to be established

15  that they had established it if they believed it.  I think

16  that would be enough for them to go forward.  In other words,

17  what -- you know, I think that's part of it.  I'll hear your

18  objection.

19         MR. NKWONTA:  Well, Your Honor, that goes to whether

20  they believe it, whether they had any evidence of it.  And

21  we're going to establish that they did not.

22         MR. WYNNE:  Your Honor, I'd rather not turn this into

23  a national, you know, debate or address issues that are on all

24  the 24-hour-news channels.

25         For the record, I do object to relevance.  And I've

1  been saying, you know, I fret about what kind of case I got to

2  put on next week.

3          THE COURT:  Well, part of the plaintiffs' position is

4  that the defendants were reckless.  There was no basis for

5  them believing that you had this widespread fraud.  I'm going

6  to say that's -- I think I'm stating their position as I've

7  heard it for the last 18 months, you know, the defendants were

8  reckless.  That they had no basis for doing what they were

9  doing.

10          So I think they can show, if there was nothing there,

11  there was no reason to challenge 364,000 people.  Well, that's

12  where I think they're going.

13          What do you have to say?

14          MR. NKWONTA:  That's correct, Your Honor.  There's

15  been an ongoing pattern of reckless accusations relating to

16  fraud in the 2020 election and the runoff that have not been

17  substantiated, and as a result, establishes recklessness and

18  intent and knowledge.

19          THE COURT:  Mr. Wynne, I agree with you, I only want

20  to try one case.  I'm not interested in trying the national

21  case.  But I do have -- but I do have to allow plaintiffs to

22  develop their theoretical case.  If it gets too far out, as I

23  indicated already, I will pull it back in without you

24  objecting.

25          Because, again, I'm not interested in trying the

1   national case.  I want to just try the cases I have.  However,

2   there's some relevance here.

3           MR. WYNNE:  I don't want to have to call Herschel

4   Walker and Tim Scott and Wesley Hunt and Stacey Abrams.  This

5   could easily turn into you know what.

6           THE COURT:  I don't think you're going to be able to

7   call any of them because they're not on the witness.

8           MR. WYNNE:  In rebuttal.  In rebuttal.  Your Honor,

9   as --

10          THE COURT:  Well, hold on, hold on.

11          I have ruled.  I note your exception.

12          Next question.

13          MR. NKWONTA:  I'm sorry, may I have your official

14  ruling, Your Honor?

15          THE COURT:  I said I overrule it.

16          MR. NKWONTA:  Okay.  Thank you.

17  BY MR. NKWONTA:

18  **Q.**   I'll repeat the question.

19      Ms. Engelbrecht, is it your testimony today that True the

20  Vote had evidence of illegal ballots or illegal votes in the

21  2020 presidential election when you issued that proposal?

22          MR. WYNNE:  Objection, relevance.  I'd like to ask

23  the Court, I know it's untraditional for running objections,

24  so I don't interrupt anymore?

25          THE COURT:  Yes.  You have a running objection on

1  that issue.

2          MR. WYNNE:  Thank you.

3          THE WITNESS:  Our position was that there was

4  absolute significant evidence.

5  BY MR. NKWONTA:

6  **Q.**  I'd like to return to that deposition you gave in January

7  2022.

8  **A.**  Sure.

9  **Q.**  And you were asked a similar question and I'd like to

10  play your response.

11          MR. NKWONTA:  Can we play clip number --

12          THE COURT:  Well, in order to impeach somebody, first

13  of all, you've got to let them look at it or hear it, and then

14  you ask the next question, is this still your position after

15  seeing this.

16          MR. NKWONTA:  She's about to hear it.

17          THE COURT:  Well, I don't think you need to

18  necessarily play it for the whole -- I guess, just --

19          Any objection to the whole courtroom hearing it?

20          MR. WYNNE:  Yes, Your Honor, there is an objection.

21  And so I'd ask counsel to follow the correct procedures and

22  let the witness review the statement first and then deny

23  saying it.

24          MR. NKWONTA:  There is absolutely no rule that

25  requires the witness to review the statement when impeaching

1   and so I'm entitled to play that.

2            THE COURT:  Play it, play it, please.

3            MR. NKWONTA:  And for everyone's record, I'm playing

4   deposition transcript page No. 271, lines 10 to 13.

5            THE COURT:  You-all don't have a written deposition

6   on this?

7            MR. NKWONTA:  Pardon?

8            THE COURT:  You don't have this in writing?

9            MR. NKWONTA:  I have the deposition.  They have the

10  deposition at well.

11           THE COURT:  Why do we have to play it, then, if you

12  have a written deposition?

13           MR. NKWONTA:  Your Honor, we were happy to read the

14  deposition transcript.  We thought playing it would give a

15  better sense of the --

16           THE COURT:  Just read the deposition.

17           MR. NKWONTA:  Okay.

18           THE WITNESS:  I'm sorry, what page?  Where was this?

19           THE COURT:  Does she have the --

20           MR. NKWONTA:  You don't have a copy of the deposition

21  transcript.

22           THE COURT:  They're going to hand you a copy in a

23  second.

24           THE WITNESS:  Okay.  Thank you.

25           MR. NKWONTA:  But if she --

1          MR. WYNNE:  Your Honor, I may be able to be of

2   assistance.  I have a copy right here.

3          MR. NKWONTA:  It's on the screen as well.

4          THE COURT:  Well, it's on the screen.  Just let her

5   look at it on the screen.

6          Is somebody tapping --

7          THE WITNESS:  Oh, it's -- I'm the culprit of the

8   blue.  I'm hitting this corner of this binder, so it's --

9          MR. WYNNE:  Your Honor, I'd ask nonetheless, it's

10  very difficult to read on there.  May I give her a copy?

11         THE COURT:  We're fixing to correct that.  We're

12  fixing to correct that.

13         MR. WYNNE:  Okay.

14         THE COURT:  Maybe.

15  BY MR. NKWONTA:

16  **Q.**   You were asked, "But had True the Vote identified any

17  flood of illegal votes at this point?"

18         Your answer, "No.  This was just a promotional piece that

19  was written."

20         That was the answer you gave in your deposition; right?

21  **A.**   Yes, that's how I answered it in the deposition.

22  **Q.**   Okay.  You also didn't have evidence that most of the

23  illegal votes were being cast in Democratic counties; correct?

24  **A.**   Well, I would -- I would say the context around that

25  answer versus the way this is phrased and the previous

1  exchange you and I had, coupled with the fact that this is not

2  what I wrote, but -- yeah, I don't even know how to answer it

3  honestly.

4          THE COURT:  Well, let's -- I want to make sure I

5  understand this.

6          THE WITNESS:  Sure.

7          THE COURT:  Can you read that?  If not, I can have

8  one of them hand you the deposition.

9          THE WITNESS:  Oh, I'm sorry.  I didn't --

10          THE COURT:  In other words, is that your answer, "No.

11  This was a promotional piece that was written"?  Again, the

12  question, "Had True the Vote identified any flood of illegal

13  votes at this point?"  And is your answer, "No.  This was a

14  promotional piece that was written."

15          THE WITNESS:  That is how I answered it.  And --

16          THE COURT:  Am I right or wrong in interpreting,

17  then, that you did not have any evidence to show all this

18  voter fraud and things?

19          THE WITNESS:  I don't know if this is the right way

20  to answer this or not, but --

21          THE COURT:  It's important because, again --

22          THE WITNESS:  Sure.

23          THE COURT:  -- one of the things they're saying is

24  you-all were reckless.

25          THE WITNESS:  Right.  So when I was answering that,

1   we were also involved in a great many things where there were

2   ongoing investigations.  And I was thinking about the

3   tangible, you know, what -- results of investigations.  And

4   that was my mindset at the time.

5           I stand by the -- my statement that there were --

6   when you look at instances of illegal process, we may disagree

7   on whether or not the process was illegal, but we had been in

8   court the entire year of 2020 prior to the election on grounds

9   of unconstitutionality and things that were setting up we

10  thought for, you know, a bad situation in 2020.

11          So I don't know if that's the way to answer that or

12  not, but -- because we are so detail oriented and so many

13  investigations were happening, I'm certain that the -- my

14  mindset at that time was, you know, what had been sort of

15  followed all the way through to prosecution or followed all

16  the way through an indictment.  And there wasn't much at that

17  point.

18          THE COURT:  I need to know the page number and line

19  number of this deposition.  What page?

20          MR. NKWONTA:  Page No. 271, line Nos. 10 to 13.

21          THE COURT:  All right.  You can go ahead.

22  BY MR. NKWONTA:

23  **Q.**  And then later in the Validate the Vote proposal,

24  Exhibit 1 where you state that most of the illegal votes were

25  being cast in Democratic counties, you didn't have a way of

1  determining that; is that correct?

2  **A.**   That's --

3         MR. WYNNE:  I'm going to object to

4  mischaracterization.  He said "you stated."  The witness has

5  already stated it's not her statement.

6         THE COURT:  Repeat that question.  I didn't quite

7  remember it that way.

8  BY MR. NKWONTA:

9  **Q.**   I want to return -- I'll try to repeat the statement.

10         I want to return to the Validate the Vote proposal,

11  Exhibit 1, in that second paragraph which states that most of

12  the illegal votes were being cast in Democratic counties.  Am

13  I correct that True the Vote did not have a way to determine

14  that as a matter of fact?

15         MR. WYNNE:  I'm going to object again.  He misread

16  it.  I'd ask the witness to read it again.

17         THE COURT:  I think he said basically what is there.

18  I was looking right at it.

19         Overruled.  Go ahead.  Overruled.

20         MR. NKWONTA:  Do I have to repeat the question a

21  third time?

22         THE COURT:  Unless Ms. Engelbrecht needs -- do you

23  need the question again?

24         THE WITNESS:  Honestly, yeah, please.  Sorry.  Thank

25  you.

1      THE COURT:  Just do what you did a few minutes ago.

2  You practically just read it off the thing.  Just do that.

3      MR. NKWONTA:  Well, I'm reading off memory, but I'll

4  try again.

5  BY MR. NKWONTA:

6  **Q.**   Going back to Exhibit 1, when you -- when exhibit --

7  Exhibit 1 in the Validate the Vote proposal, the second

8  paragraph under "Problem," which suggests -- or the first

9  paragraph which suggests that most illegal votes were being

10 counted in Democratic counties, you did not -- you or True the

11 Vote did not have a way of establishing that as a matter of

12 fact; is that correct?

13 **A.**   I would disagree with that.  Not correct.

14 **Q.**   I want to return to the deposition you gave in January

15 2022 when you were asked, "How did the True the Vote" -- and

16 this is --

17     THE COURT:  What page?

18     MR. NKWONTA:  Pages 268, lines 12 to 16.

19 BY MR. NKWONTA:

20 **Q.**   You were asked, "How did True the Vote determine that

21 most of the illegal votes were being counted in Democratic

22 counties?"

23     Your answer, "I would not know why that would have been

24 written that way."

25     Is that the answer you gave in your deposition?

**A.**   Yes, that's the answer I gave.  Yes, sir.

**Q.**   I'd like to direct you to the plan section of Exhibit 1

in the Validate the Vote proposal.  Under the plans you say,

"Build public momentum through broad publicity."

     Do you see that?

**A.**   I do.

**Q.**   And did you do that through press releases?

**A.**   I don't know that we issued a press release.  It's

possible.

**Q.**   Or did you do that through blog posts?

**A.**   We had posted, as we have here in these exhibits, things

that we posted to our website.

**Q.**   And was that part of your plan to build public momentum

through broad publicity?

**A.**   It's listed here on this paper.  I...

**Q.**   Understand.  But my question is a little bit more

precise, I hope.

     What I'm asking is, for the press releases and blog posts

that you have released, on your website or elsewhere, relating

to the November election and the Georgia runoff, was that part

of your plan to build momentum through broad publicity?

          MR. WYNNE:  I'm going to object, compound.  General

election and the runoff, two separate things.

          THE COURT:  It's not a compound question.  It's still

a single question.

1          THE WITNESS:  The words here related only to the

2     Validate the Vote 2020 program.  At this time, we had not --

3     there was no thought of challenges or anything that was going

4     to be looked at in Georgia.  So I don't know how to split that

5     for you.

6     BY MR. NKWONTA:

7     **Q.**   My question is a little different.

8     **A.**   Sure.

9     **Q.**   When you issued press releases and posts on your website,

10    was that part of a plan to build public momentum through broad

11    publicity post the November election?

12    **A.**   I would not say that posting on our website is broad

13    publicity.

14    **Q.**   But you would consider press releases to be part of the

15    plan to build public momentum through broad publicity?

16    **A.**   I think we have to define broad publicity.  I mean --

17         THE COURT:  Well, I think you already established

18    that you don't think that putting it on your website is broad

19    publicity.

20         THE WITNESS:  No, sir.

21         THE COURT:  Okay.  So what's the other part of your

22    question?

23         MR. NKWONTA:  Press releases.

24         THE WITNESS:  I mean, it depends upon the press

25    release.  It depends upon what was sent, who sent it.  I -- it

1  would just depend, but -- it would depend.

2  BY MR. NKWONTA:

3  **Q.**   I'd like to return again to your January 2022 deposition

4  in this case.

5  **A.**   Sure.

6  **Q.**   And direct your attention to page 274.  From pages 274,

7  line 16 to 275, line 12.  And in particular, I direct your

8  attention to page 275, lines 3 to 12.

9  **A.**   I'm sorry, hang on a second.  275, lines?

10  **Q.**   3 to 12.

11         THE COURT:  Hold on.  On page 274, you're only

12  talking about page -- I'm sorry -- you're only talking about

13  page 16?

14         MR. NKWONTA:  Sorry.  Page -- so let me.

15         Page 275, 3 to 12.  Let's do that.  That's the key.

16         THE COURT:  So you're not talking about page 274 at

17  all.

18         MR. NKWONTA:  No.  Page 275, lines 3 to 12.

19  BY MR. NKWONTA:

20  **Q.**   And there you testified, "So I can only respond to -- you

21  know, I mean to repeat back, build public momentum through

22  broad publicity.  We didn't do any advertising of any sort.  I

23  had a podcast.  I mean, that was it.

24         "Would you consider a press release?"  Question.

25         "Answer:  Oh, I'm sorry, yes.  And if we did press

1    releases, that would be considered in that bullet."

2         That was the testimony you gave during your deposition?

3    **A.**   That's the testimony I gave, yes, sir.

4         MR. NKWONTA:  And, Your Honor, as an aside, that's

5    sort of one of the reasons I asked to play the next clip.

6         THE COURT:  What's your next question?  What's your

7    next question?

8    BY MR. NKWONTA:

9    **Q.**   Under "Plans" there's also a line that reads, "Tactical

10   organizing:  National state with microtargeting in key

11   counties."

12        Do you see that?

13   **A.**   Yes, sir.

14   **Q.**   And there's a list of key states further down.

15        Do you see that --

16   **A.**   I do.

17   **Q.**   -- on the proposal?

18   **A.**   Yes.

19   **Q.**   And is Georgia one of those key states?

20   **A.**   It is.

21   **Q.**   Now, I want to move on to one of -- the key state,

22   Georgia, listed here.  And I want to look at your activities

23   in Georgia point by point, starting with the bounty on fraud.

24        True the Vote announced a bounty on fraud along with its

25   Validate the Vote program --

 1          THE COURT:  Hold on, hold on.  I have an objection.
 2          MR. WYNNE:  Objection, foundation for the first part
 3  of the question.
 4          THE COURT:  Okay.  I've got to admit I didn't quite
 5  get -- what's the question again?
 6  BY MR. NKWONTA:
 7  **Q.**   That True the Vote first announced its bounty on fraud
 8  along with its Validate the Vote program, starting with the
 9  November 6th --
10          THE COURT:  All right.  So your objection is to True
11  the Vote established the bounty on fraud?
12          MR. WYNNE:  Object to that.  That has not been
13  established.  It's taken out of context, for one.  And, you
14  know, the predicate has not been established.  I would say
15  it's inaccurate.  No foundation.  So...
16          MR. NKWONTA:  That's the purpose of the question,
17  Your Honor.
18          THE COURT:  All right.  I'll have to allow him, then,
19  to establish a foundation.  Earlier you were currently
20  objecting to him -- to counsel establishing a foundation, so
21  I'll allow him to establish a foundation for it, but, you
22  know, he may have to go a little bit further out, but you have
23  the leeway.
24          MR. NKWONTA:  Thank you, Your Honor.
25  BY MR. NKWONTA:

1  **Q.**   True the Vote established -- or first announced its

2  bounty on fraud in the November 6, 2020, press release;

3  correct?

4          THE COURT:  The objection is that there's nothing

5  been established that True the Vote establish a bounty on

6  fraud.  That's what the objection is.

7          MR. NKWONTA:  Right.  And the witness can say that

8  True the Vote did not.  But we've heard plaintiffs (sic),

9  throughout the course of their cross-examination, say you

10 would agree -- if I were to tell you that the sun is square,

11 you would have no reason to dispute that.  And that has come

12 into evidence.  And I'm asking about something that I'm going

13 to be able to prove with documents later on.

14         MR. WYNNE:  Your Honor, the word "established" is

15 inappropriate here.  Established requires a foundation to

16 establish.

17         THE COURT:  Why can't this witness answer yes or no

18 to that question?

19         MR. WYNNE:  Well, because I still have the foundation

20 objection.  You can't ask a question without a foundation.

21         THE COURT:  Well, every question you ask does not

22 have to require a foundation.  If you say, is your name Steve

23 Jones, you don't have to establish when I was born, what city

24 I was born in and what state I was born in.  Either he's Steve

25 Jones or he's not.

1          MR. WYNNE:  Well, this is a little more than what

2    state you were born in.  This is establishing a foundation for

3    an alleged program and he ain't got that yet.

4          THE COURT:  This witness can answer yes or no.  If

5    she can't -- not she, Ms. Engelbrecht cannot answer yes or no,

6    then we'll go from there.

7          THE WITNESS:  Okay.

8    BY MR. NKWONTA:

9    **Q.**    True the Vote first announced its bounty on fraud along

10   with its Validate the Vote program on November 6th, 2020; is

11   that right?

12   **A.**    We announced a whistleblower fund.

13   **Q.**    You call it a whistleblower fund?

14   **A.**    I believe we -- I'm sure we're going to get to the

15   exhibit.  I believe that's what it was called.

16   **Q.**    And you've used the -- but you've used the phrase "bounty

17   on fraud" before; correct?

18   **A.**    Well, you have it in a transcript, but yes.  On my

19   podcast I did say that and then immediately refined that to be

20   more definitive about a whistleblower fund that was meant to

21   provide litigation support and help for people that were

22   coming forward, yes.

23   **Q.**    But you used the phrase "bounty on fraud" in describing

24   this -- what you now call a whistleblower fund; correct?

25   **A.**    Well, I'm sure we'll get to it in exhibits, but that's

1  what it's called in the exhibits.  And when I said it on my

2  podcast, which was a live stream, I said the word.  It was --

3  frankly, it's not a word I would have used.  It's a word that

4  was in my head because of the donor, that's a different

5  lawsuit, but I immediately refined it to be what it meant.  It

6  wasn't -- that's what it was.  So I'm sure we'll get to the

7  exhibits.

8  **Q.**   And the purpose of the bounty, or the whistleblower fund

9  as you call it, was to make sure that voters receive

10 compensation; correct?

11 **A.**   No.

12 **Q.**   Or to make sure that whistleblowers, or people who report

13 fraud, receive compensation; correct?

14 **A.**   No.  It was -- it was meant so that people that were

15 coming forward -- it was a very -- as we all remember, it was

16 a very intense time and we had people coming forward who were

17 scared who had what sounded to be legitimate concerns.  And

18 the thought was, if they knew that they would be protected,

19 they would be more likely to come forward.

20      And I will, you know, some of the wording we're going --

21 you know, we're going to parse that, I know, but that was the

22 intent of the fund.

23 **Q.**   You have stated, though, that the purpose of the fund --

24 and there may be other purposes, but you have stated that one

25 of the purposes of the fund is to make sure that those

1  reporting fraud have compensation; correct?

2  **A.**   I think I did say that.  It was meant in the -- in the --

3  you know, when you have people that are coming forward about

4  things that they've experienced and they are -- they are

5  scared straight across the board, there's -- they don't know

6  who they can talk to, they don't know if they can take off

7  work to go talk -- it's -- so it was just a very broad way to

8  say, we're here to help.  That's what that was.

9  **Q.**   And you're referring to your statements on the podcast;

10  correct?

11  **A.**   It's -- I know you have exhibits in here.  I mean,

12  we'll -- wherever you -- wherever you want to point to.

13  **Q.**   So you have used the term "bounty" outside of the

14  podcasts in other contexts as well; correct?

15  **A.**   You would have to show me.

16  **Q.**   Can you turn to Exhibit 28?

17  **A.**   Oh, yeah.  Sure.  Okay.

18  **Q.**   And the second e-mail, the one that's not redacted in

19  Exhibit 28, that is an e-mail -- sorry -- the third e-mail

20  down, that is an e-mail from you to Fred Eshelman dated

21  November 14, 2020; is that correct?

22  **A.**   Correct.

23         MR. NKWONTA:  Your Honor, plaintiffs move Exhibit 28

24  into evidence.

25         THE COURT:  Any objections?

1          MR. WYNNE:  Yeah, I'm going to object to relevance.

2          THE COURT:  Okay.  I'm going to allow it in over

3   objection.  Plaintiffs' 28 is admitted over objection.

4          (Plaintiff's Exhibit 28 was received and marked into

5   evidence.)

6   BY MR. NKWONTA:

7   **Q.**   Ms. Engelbrecht, can you tell us what Exhibit 28 is

8   about?

9   **A.**   Well, so Exhibit 28 is about my -- one of my very few

10  outreaches to this person who gave money in response to a

11  $1 million invoice that I had received from his two

12  consultants five days after his initial donation -- donation

13  was made.  And I was trying to wrap my head around what was

14  going on.

15         There was -- there is a lot tucked into this e-mail.  We

16  can go through it line by line if you'd like.  I'm not sure --

17  I -- you tell me what you'd like to go with.  I'll make sure

18  we get to all of that.

19         THE COURT:  Well, I have a question.  This million

20  dollars, as I read this e-mail, and correct me if I'm wrong,

21  is like having money to pay people for reporting on people

22  they think is not voting legally.

23         THE WITNESS:  Oh, this million dollars -- I'm so

24  sorry.

25         THE COURT:  No, go ahead.  Am I reading that right or

1  wrong?

2        THE WITNESS:  This million dollars was -- what was at

3  the heart of this e-mail was an invoice that was sent to me by

4  Tom Crawford and Dikra Ukobian at this company I'd never heard

5  of.  And I was trying to -- I'd never had anything like this

6  happen before.  The donor was tied in with them.  And I didn't

7  know -- all of a sudden I felt like this is like taking this

8  donation was the worst thing we could ever have done and I

9  didn't know what to do.  Because it hadn't been given with any

10  conditions.  I didn't want any part of it.

11        THE COURT:  What was it for?

12        THE WITNESS:  This don -- this -- this was for his

13  two -- they said they had a company called Old Town Digital

14  Agency.  And so they sent me this invoice.  Their service was

15  for digital media creation and distribution, support staff.  I

16  didn't -- I'd only texted with him and talked to him a few

17  times.  I'd only known them for, at that point, just a handful

18  of days.  And so I was just trying to wrap my head around

19  what's really going on here.  So that was what that $1 million

20  was about.

21        THE COURT:  Thank you.

22        MR. NKWONTA:  Thank you.

23  BY MR. NKWONTA:

24  **Q.**  I'd like to direct your attention to the last paragraph

25  of your e-mail, at least the last paragraph on the first page

1    of Exhibit 28.  And starting with the last sentence, "At

2    present," can you read that out loud to the Court?

3    **A.**    I'm sorry, tell me where you'd like me to start again?

4    **Q.**    Starting on the last line, starting with "At present our

5    expenses."

6              THE COURT:  Is 28 in evidence?

7              MR. NKWONTA:  Yes, I just moved it into evidence.

8              THE COURT:  All right.  Thank you.

9              THE WITNESS:  Oh, okay.  At president our -- "At

10   present our expenses" --

11             THE COURT:  Hold on, hold on.  28 is not in evidence.

12   It is?  Okay.  I didn't mark it.  I'm sorry.

13   BY MR. NKWONTA:

14   **Q.**    You may continue.

15   **A.**    Okay.  "At present our expenses are around $100,000 for

16   the program including the live call center.  Only one of the

17   whistleblowers, the Georgia whistleblower, is interested in a

18   bounty.  We have offered $50,000 if his evidence leads to

19   prosecution.  We will need to obtain counsel for him as well.

20   When I send the investigation briefs, I'll include a more

21   thorough statement of expenses."

22   **Q.**    Thank you for reading that, Ms. Engelbrecht.

23             So if I'm understanding that e-mail that you sent to Fred

24   Eshelman, True the Vote offered a whistleblower a $50,000

25   bounty; correct?

1  **A.**   Well, there's more to the story there too.

2          THE COURT:  But the first part of his question, is

3  that yes or no?

4          THE WITNESS:  Yes, but with context.

5          THE COURT:  What's the context?

6          THE WITNESS:  Well, first of all, just, again, the

7  use of the word "bounty" was a word that was suggested.  And

8  it's -- when I was trying to sort of figure out what was

9  happening and maybe try to repair what -- you know, trying to

10 figure out who was on the up and up here, I used that word

11 because it was something I knew he had used in the past.

12         The $50,000 was in -- sort of in play, I guess, is --

13 maybe that's not the most exact way to say that, but this

14 individual had come forwards to us, had told us a lot about

15 what he had been involved in.  And shortly after that meeting,

16 I mean, that night he left and was brutally beaten and was put

17 into ICU.  And it was during the holidays.  And we didn't know

18 what was -- everything was just spinning.

19         And so it was -- it was trying to kind of level that

20 some -- you know, there's this big thing that's happening and

21 I wanted to make sure that if we were going to give it all

22 back, which was fine with me, that we would have enough, if we

23 needed to cover hospital bills, I didn't know where any of

24 that was going.

25         And, again, this was -- I mean, this was brought out

1  in a lawsuit.  This is not being advertised.  This is not --

2              THE COURT:  Thank you.

3              THE WITNESS:  But that's the story.

4              THE COURT:  Thank you.

5  BY MR. NKWONTA:

6  **Q.**   Just to clarify for the record, you offered the Georgia

7  whistleblower $50,000 in cash; correct?

8              THE COURT:  Hold on, I have an objection.

9              MR. WYNNE:  Yeah.  I'm going to object to that on the

10  basis of relevance and foundation and a mischaracterization.

11  I know that's outside my objection scope of --

12  mischaracterization of what she just said.

13             THE COURT:  All right.  I'm going to overrule the

14  objection.

15             What's your next question?

16             MR. NKWONTA:  I don't believe I got an answer, unless

17  Your Honor is satisfied with the answer.

18  BY MR. NKWONTA:

19  **Q.**   But my question was you offered the Georgia whistleblower

20  $50,000 in cash; correct?

21             MR. WYNNE:  Same objection.  He misread it.

22             THE COURT:  I think he's asking a question.

23             THE WITNESS:  Yeah.  I...

24             THE COURT:  So I'm going to overrule that objection.

25             THE WITNESS:  I wanted to make sure or attempt to

1  make sure that if we ended up giving everything back --

2  BY MR. NKWONTA:

3  **Q.**   I'm sorry to interrupt you, Ms. Engelbrecht, but --

4  **A.**   Sure.

5  **Q.**   -- I do want to get the answer to the question I asked.

6  I didn't ask why or what your reasons were.

7        THE COURT:  Let me tell you this:  You have to answer

8  yes or no and then you can explain your answer.

9        THE WITNESS:  Okay.  Thank you.

10        No.

11  BY MR. NKWONTA:

12  **Q.**   You did not offer $50,000 in cash to the Georgia

13  whistleblower?

14  **A.**   No.

15  **Q.**   So when you said in that exhibit, you said that you -- in

16  Exhibit 28 that you offered $50,000 to the Georgia

17  whistleblower if his evidence leads to prosecution, that was

18  not truthful is what you're saying?

19  **A.**   Well, this is where the context comes in.  I was dealing

20  with a very uncertain situation.  And I just wanted to make

21  sure we would have money if -- if we needed it for hospital

22  bills.  I had no idea how that would go, and I didn't know how

23  else to say it.

24        So it was inartful, but that's how I -- how I posed it.

25  I mean, this, again -- this came out because this was in a

1    lawsuit.  This was sent to one person in a very precarious

2    situation.

3    **Q.**   And you state in the e-mail, you claim now that you were

4    concerned about hospital bills and expenses, but the e-mail

5    says, "We've offered $50,000 if his evidence leads to

6    prosecution."

7         So the $50,000 in cash is contingent on the evidence

8    being sufficiently worthy of prosecution; correct?

9    **A.**   Well, that was, umm -- I want to give you a yes or no.

10   Could you repeat it so I can --

11   **Q.**   You offered the $50,000, as you stated here in the

12   e-mail, if the whistleblower's evidence leads to prosecution.

13   So the $50,000 was contingent on the evidence being

14   sufficiently weighty for prosecution; correct?

15   **A.**   No, that is not in actuality what happened.  It was

16   phrased -- context -- it was phrased in this way in the hope

17   that we would be able to keep at least that to try to deal

18   with a very difficult circumstance.  And this gentleman who

19   is -- that's not even the correct use of that word -- he was

20   all about -- I didn't -- I didn't know this person.  He'd

21   called and given this money, and, you know, I -- he was very

22   much about evidence leading to prosecution and --

23   **Q.**   But the e-mail says that you offered him $50,000 in

24   cash --

25   **A.**   I know.

1   **Q.**    -- if his evidence leads to prosecution; correct?

2   **A.**    It is what the e-mail says.  I'm trying to give you

3   context.

4   **Q.**    And so if his evidence did not lead to prosecution, no

5   medical bills for the whistleblower; right?

6   **A.**    My hope was to preserve $50,000 for legal bills at Grady

7   Medical -- at Grady Hospital.

8           THE COURT:  Hold on.

9           MR. WYNNE:  I'm going to object, asked and answered.

10  Also going to object that the statement speaks for itself and

11  it's repetitive.

12          THE COURT:  Well, let me say this:  I've read 28, and

13  28 says what 28 says.

14          MR. NKWONTA:  I'll move on, Your Honor.

15  BY MR. NKWONTA:

16  **Q.**    Let's look at other elements of the Validate the Vote

17  proposal.  True the Vote worked with OpSec and Gregg Phillips

18  to identify what you referred to as patterns of election

19  subversion; correct?

20  **A.**    I want to make sure I'm tracking with you.  On Exhibit 1?

21  **Q.**    Yes.

22  **A.**    Oh, yes.

23  **Q.**    And True the Vote had contact with Republican leadership

24  in Georgia; correct?

25          MR. WYNNE:  I'm sorry, what paragraph are we looking

1  at?

2      MR. NKWONTA:  I'm not reading from the proposal.  I'm

3  asking a question.

4      MR. WYNNE:  Oh, I'm sorry about that.  I thought we

5  were -- I was looking for it.

6      THE WITNESS:  At this point, no, I don't think that

7  we had talked to anybody.

8  BY MR. NKWONTA:

9  **Q.**  Let me clarify.

10     In the lead up to the runoff election, into the mass

11 challenge effort, True the Vote had contact with Republican

12 leadership in Georgia; correct?

13 **A.**  Well, yes, that is true.  That is not this.

14 **Q.**  Understood.

15     But is that -- that is correct that True the Vote had

16 contact with Republican leadership in Georgia; correct?

17 **A.**  Yes.

18 **Q.**  And True the Vote announced their partnership with

19 Republican leaders in Georgia shortly before it announced its

20 Georgia landmark elector challenge program; correct?

21 **A.**  That is true, yes.  But -- well...

22 **Q.**  So I want to go through this plan, bring it back to

23 Exhibit 1, and to confirm the things that you did do in

24 Georgia.

25     In Georgia, you solicited whistleblower testimony and

1  offered money; is that correct?

2          MR. WYNNE:  Object to compound.

3          THE COURT:  Break it down.  Say the first part first.

4  BY MR. NKWONTA:

5  **Q.**   In Georgia you solicited whistleblower testimony;

6  correct?

7  **A.**   That's correct.  Well, nationally.  But, yes, that's

8  correct.

9          THE COURT:  The second part.

10 BY MR. NKWONTA:

11 **Q.**   And you offered money to a prospective whistleblower in

12 Georgia; correct?

13 **A.**   We never offered money direct -- we never offered anybody

14 money directly.  What you're reading from in that e-mail is my

15 trying to preserve monies for somebody that had been injured.

16 **Q.**   You told your funder or you told individuals that you

17 were going to offer $50,000 to a whistleblower in Georgia;

18 correct?

19 **A.**   That is what the e-mail says, yes.

20 **Q.**   And in Georgia you built public momentum through broad

21 publicity in the form of press releases and blog posts,

22 et cetera; correct?

23 **A.**   I think we've discussed that, but -- I mean, we posted

24 some things on our website.  That's not broad publicity.

25 **Q.**   And in Georgia you coordinated and -- with Republican

1   Party leadership; correct?

2   **A.**   Coordinated?  I would disagree with that.

3   **Q.**   You formed a partnership with Republican Party leadership

4   in Georgia; correct?

5   **A.**   Define the word for your purposes of partnership, please.

6   **Q.**   Well, those were your words in Exhibit 35.  Can you turn

7   to Exhibit 35, which has already been admitted into evidence?

8   **A.**   Sure.

9   **Q.**   Exhibit 35 is a blog post or press release issued by True

10  the Vote; correct?

11  **A.**   Yes.

12  **Q.**   And at the bottom, underneath the bolded language -- or

13  sorry -- above the bolded language, it says, "True the Vote

14  partners with Georgia GOP to ensure transparent, secure ballot

15  effort for Senate runoff elections"; correct?

16  **A.**   That is the headline, yes.

17  **Q.**   All right.  So I'll repeat my original question, going

18  back to the bullet points in Plaintiffs' Exhibit 1.

19       True the Vote partnered with Republican leadership in

20  Georgia; correct?

21  **A.**   Correct, with context.  As the blog post goes on to say

22  exactly what it was, the subhead there is, "True the Vote

23  reached out to both parties to offer assistance."

24       The partnership was making available everything that we

25  had, which was training, which was the use of the hotline,

1  anything that we could do to try to help the people that were

2  coming and reporting to us their concerns to try to create

3  a -- to support an environment where everyone was working as

4  closely together -- that's not the right -- not as closely

5  together, but with the same spirit of election integrity.

6       So in that context, that's why the word "partnership" was

7  used.  But it goes on even in this website to talk about "the

8  offer to extend the same support to Georgia Democrat Party by

9  partnering in the interest of nonpartisan election integrity

10  has not yet received a rely to date.  The letter addressed to

11  the party and to the party chair, Senator Nikema Williams is

12  available here."

13       It was absolutely our intent, and partnership just meant

14  making everything we had known and available.

15  **Q.**  But you had not reached out to any Democratic party

16  leadership when you published that statement; correct?

17  **A.**  I don't -- I'm not sure on the timing.  I was introduced

18  to the GOP party chairperson.  It resulted in a conversation.

19  And I recognized immediately that if they're interested in

20  using any of the trainings or telling people to call the

21  hotline or anything like that, I need to reach out immediately

22  to the Georgia Democrat party, which I did.  So I'm not

23  sure -- I mean, the letter is attached.  I don't know the

24  timeline exactly.

25  **Q.**  Well, Exhibit 35 at the bottom of that blog post or press

1  release, it says, "True the Vote reached out to both parties

2  to offer assistance with critical election training and

3  resources."

4       And this post is dated December 14, 2020; correct?

5  **A.**   The -- I mean, that's the way the post came out, yes.

6  **Q.**   But on December 14, 2020, True the Vote had not reached

7  out to Democratic party leadership; correct?

8  **A.**   That, I don't recall.

9  **Q.**   Would it refresh your recollection if I showed you your

10  deposition testimony on this very topic?

11  **A.**   Sure.

12  **Q.**   I'd like to pull up page 161, line 15, to 162, line 16.

13  **A.**   61 -- can you given me the start line again, please?

14  **Q.**   Sure.  161, line 15, to 162, line 16.

15       THE COURT:  After she answers this question, we're

16  going to take a break.

17       THE WITNESS:  Okay.

18  BY MR. NKWONTA:

19  **Q.**   Does that refresh your recollection as to when you

20  reached out to Democratic party leadership?

21  **A.**   It does.  It introduces another question, but it does

22  refresh my recollection.

23  **Q.**   And isn't it correct that you first reached out to

24  Senator Williams on December 21, 2020?

25  **A.**   That's what the deposition says, yes.

1   **Q.**   And that's an entire week or entire seven days after you

2   announced this partnership with the Republican Party of

3   Georgia and -- sorry, let me rephrase that.

4       That's an entire week after you announced this

5   partnership with the Republican Party of Georgia; correct?

6   **A.**   That would be correct with context --

7   **Q.**   And that's an entire week --

8       THE COURT:  Hold on, hold on.  Let her finish her

9   answer.

10      THE WITNESS:  With context, the line that followed

11  that was that the e-mail sent to Brian Robinson, who was

12  managing all of the press at the time, was sent on the 28th.

13  So it leads me to question when this -- when this was actually

14  printed and how and -- I mean, there's just questions.  I

15  wouldn't have -- I wouldn't have e-mailed Brian Robinson on

16  the 28th to direct him to do anything if this was already out

17  two weeks previous.  So I just -- there's just questions.

18  BY MR. NKWONTA:

19  **Q.**   You testified in your deposition that the 21st was the

20  first time you reached out to Democratic Party leadership;

21  correct?

22  **A.**   If that's what I said in the deposition, which is then

23  yes.

24  **Q.**   And that is seven days after you issued this press

25  release or blog post on December 14, 2020, announcing a

1  partnership with the Georgia Republican Party; correct?

2  A.   On this page that we're looking at for Exhibit 35, it has

3  that date.

4  Q.   Correct.  And that's also seven days after you stated on

5  this blog post, on Exhibit 35, seven days after you stated

6  that you had reached out to both parties to offer assistance;

7  correct?

8  A.   That -- but in this blog post I talk about reaching out

9  to both parties.

10  Q.   In the blog post dated December 14, 2020, on Exhibit 35,

11  you said, "True the Vote vote reached out to both parties to

12  offer assistance with credible election training and

13  resources."

14       Based on your testimony, that is not correct; right?  At

15  least as of December 14, 2020, that was not correct?

16  A.   Well, I think the issue -- the question here is, is

17  December 14th correct.  It would suggest in my deposition that

18  my press person was getting -- just getting ready to do

19  something on the 28th.  So I don't know.  It wouldn't -- it

20  wouldn't make sense that I would have said in a broad -- or

21  that we would have said in a blog post, and not just one but

22  two places at least, that we've already done this and have a

23  letter attached.  I don't know.  I -- that's the best I can

24  tell you.

25  Q.   So you're questioning the date on your own blog post?

1   **A.**   I'm -- all of this --

2          THE COURT:  I think I've got it.  I think I know what

3   your position is and her position is, and I think we're going

4   to continue going in circles.

5          Let's stop and take a 15-minute break.  Start back at

6   10:55.  Thank you.

7          MR. SHELLY:  Your Honor, can I ask just briefly?

8          THE COURT:  Oh.  There you go.

9          MR. SHELLY:  Can I ask that our tech assistant be

10   allowed to approach the witness box to remove these blue

11   markings?

12          THE COURT:  Yes.  Thank you.  Please.

13          THE WITNESS:  My apologies, everyone, for that.

14          (A break was taken from 10:40 a.m. to 10:55 a.m.)

15          THE COURT:  You-all may be seated.

16          Ms. Engelbrecht, you can come back and take the

17   stand, please.

18          And you may proceed.

19   BY MR. NKWONTA:

20   **Q.**   Ms. Engelbrecht, before our short break we were

21   discussing True the Vote's actions in Georgia and also the --

22   Exhibit 1, the Validate the Vote proposal.  I'd like to turn

23   to some of the additional elements of the plan on Exhibit 1.

24          Now, the third bullet says, "Galvanize Republican

25   legislative support in key states."

1        And do you recall we discussed that True the Vote

2    announced the partnership with the --

3            THE COURT:  Wait a second.  I've just got a matter --

4    you can step over here.

5            (A discussion takes place off the record.)

6            THE COURT:  I need to take a -- I need to take a

7    five-minute quick break.  I'm sorry.  Give me five minutes.

8            (A break was taken.)

9            THE COURT:  You-all may be seated.

10           I apologize.  Counsel, Ms. Bryan, sometimes you've to

11   do what you've got to do.

12           MS. BRYAN:  Yes, sir, that's true.

13           THE COURT:  I apologize to you as well.

14   BY MR. NKWONTA:

15   **Q.**   Ms. Engelbrecht, I'd like to redirect your attention to

16   Plaintiffs' Exhibit 1.  And under the subheading "Plan," the

17   third bullet says, "Galvanized Republican legislative support

18   in key states."

19           And before the break you testified or acknowledged that

20   True the Vote announced a partnership with the Georgia

21   Republican Party in December of -- on December 14th, 2020;

22   correct?

23   **A.**   I'm -- it feels a little compound to me.

24           THE COURT:  Do you want him to break it down?

25           THE WITNESS:  Yeah.

1          Would you break that down for me?

2          MR. NKWONTA:   Sure.

3   BY MR. NKWONTA:

4   Q.    The third bullet says, under Exhibit 1, under the

5   subheading "Plan," third bullet says, "Galvanized Republican

6   legislative support in key states"; correct?

7   A.    That is what that says, yes.

8   Q.    On December 14th --

9   A.    With con -- with con -- again, if I may, with context, if

10  this is related to Validate the Vote 2020, which was not

11  related to the challenges, but that is what that bullet says.

12  Q.    I understand your position.

13          The next question I'll ask you is, on December 14, 2020,

14  True the Vote announced a partnership with the Republican

15  Party of Georgia; correct?

16  A.    With exception to the date, yes, we did announce in that

17  blog post in the way that we've covered.

18  Q.    The fourth bullet says, "Aggregate and analyze data to

19  identify patterns of election subversions," with a dash,

20  "OpSec Group"; is that correct?

21  A.    That's what it says, yes.

22  Q.    And am I correct that OpSec Group and Gregg Phillips

23  compiled the challenge lists and compiled the data used to

24  create the challenge lists for the Georgia runoff?

25  A.    We provided them with the voter rolls and then they ran

1  the analysis on NCOA.

2  **Q.**    The fifth bullet under "Plan" in Plaintiff's Exhibit 1

3  states, "File lawsuits in federal court with capacity to be

4  heard by SCOTUS"; correct?

5  **A.**    That is what that says.  Again, with context.  True the

6  Vote filed no lawsuits in federal court.  That was handled by

7  former counsel Jim Bopp representing aggrieved voters.

8  **Q.**    Isn't it true that Mr. Bopp filed that lawsuit on behalf

9  of True the Vote as well?

10 **A.**    Mr. Bopp put in his signature block -- I actually don't

11 recall if it was Validate the Vote or if he used the words

12 "True the Vote," but we were not parties in any of those

13 lawsuits.

14 **Q.**    I'd like to turn your attention to the legal strategy

15 section of Plaintiffs' Exhibit 1.  And I won't read this

16 entire section, but you agree that the proposal contemplates

17 True the Vote, or someone acting on behalf of True the Vote,

18 filing lawsuits and seeking to overturn the results of the

19 presidential election; correct?

20 **A.**    I wouldn't characterize it in that way, no.

21 **Q.**    Well, I will read it again then.

22        The fifth bullet under "Plan" states, "File lawsuits in

23 federal court with capacity to be heard by SCOTUS - True the

24 Vote"; is that correct?

25 **A.**    That's correct.

1   **Q.**   And under "Legal Strategy," the first paragraph says,

2   "Jim Bopp, True the Vote general counsel, lead attorney in

3   *Bush v. Gore and Citizens United*, will file federal suits in

4   the seven closest battleground states to investigate voter

5   fraud, expose it, and to nullify the result of the state's

6   election so that the presidential electors can be selected in

7   a special election or by the state legislature"; is that

8   correct?

9   **A.**   That is what it says, yes.  Again, with -- you know, I

10  must say with context here that, as I've often repeated, this

11  was not written by me, but that is what it says on this page.

12  **Q.**   Now, I'd like to turn your attention to Plaintiffs'

13  Exhibit 27.

14       Exhibit 27 is the lawsuit that True the Vote supported in

15  Georgia; correct?

16  **A.**   That's correct.

17  **Q.**   That is the complaint, I should say, for the lawsuit True

18  the Vote supported in Georgia; correct?

19  **A.**   I'm not certain of the nomenclature, but if that's called

20  the complaint, then, I mean, that's what was filed, yes.

21       MR. NKWONTA:  Your Honor, plaintiffs move Exhibit 27

22  into evidence.

23       THE COURT:  Any objections, Mr. Wynne?

24       MR. WYNNE:  Objection, relevance.

25       THE COURT:  Mr. -- relevance?

1        MR. NKWONTA:  Your Honor, this is -- again, goes back

2   to the pattern of activities in Georgia, reckless claims of

3   fraud, unsubstantiated allegations of fraud and false --

4        THE COURT:  What was -- give me a little more -- tell

5   me a little more.  What was this lawsuit about?  I'm not

6   familiar with this one.

7        MR. NKWONTA:  Sure.  In this lawsuit, True the Vote

8   alleged that several counties were engaged in fraud, several

9   specific counties had engaged in fraud, counted fraudulent

10  ballots, and that over 70,000 non-citizens, or someone had

11  reported over 70,000 non-citizens voted for President Biden.

12  True the Vote identified the fraud that occurred in certain

13  counties, but then named Fulton, DeKalb, Gwinnett, Cobb,

14  Clayton, Henry, Chatham, and Richmond as defendants --

15       THE COURT:  Clayton, Richmond, Cobb, Fulton?

16       MR. NKWONTA:  Let me try it again.

17       Fulton, DeKalb, Gwinnett, Cobb, Clayton, Henry,

18  Chatham, and Richmond Counties.

19       THE COURT:  All these counties were won by now

20  President Biden?

21       MR. NKWONTA:  Well, that's one element of it.

22       But the more important element is those are the top

23  eight counties for Black voter -- active -- Black active voter

24  population in Georgia.

25       THE COURT:  All right.

1       MR. NKWONTA:  One through eight were named in the

2  complaint as defendants.  And the allegations in the complaint

3  do not even --

4       THE COURT:  What was the results of this lawsuit?

5  Was it dismissed?  What was the result of it?

6       MR. NKWONTA:  True the Vote filed it, made the

7  allegations, and then voluntarily dismissed it a week later

8  without presenting any evidence.

9       MR. WYNNE:  Your Honor, True the Vote is not a party.

10  And it was withdrawn not by True the Vote.  And it was based

11  on entirely different factors.  They were not a party.

12       And if you look at Exhibit 1, it says Jim Bopp, True

13  the Vote general counsel, lead attorney in *Bush v. Gore and*

14  *Citizens United* and will file.  It doesn't say True the Vote

15  will file.  It says Jim Bopp --

16       MR. NKWONTA:  Your Honor --

17       MR. WYNNE:  -- will file.

18       MR. NKWONTA:  Your Honor, I will --

19       MR. WYNNE:  Indeed, Jim Bopp filed.  And if we need

20  to go into the basis and foundation of the lawsuit and

21  Mr. Bopp's responsibility, I'm already talking with Indiana

22  State Bar about that.  But if we want to get into whether he

23  had a good faith belief in the law or for the extension of

24  existing law, that's the question.  And that's for Jim Bopp,

25  not for her.

1           THE COURT:  Well, first of all, True the Vote is not

2    a plaintiff in what I'm looking at up here.

3           MR. NKWONTA:  Your Honor, I will establish, first,

4    two things in response to that, if you'll allow me.

5           On page 22 of that exhibit, the -- it's signed Jim

6    Bopp, True the Vote, Inc., and Validate the Vote Project.

7           Second, I will establish -- I will establish through

8    testimony that True the Vote actively supported this lawsuit.

9    Like they -- and True the Vote funded and supported this

10   lawsuit.

11          MR. WYNNE:  Your Honor, I'd say that's Jim Bopp

12   making a statement of agency that simply didn't exist.  He had

13   been -- had not been anointed general counsel.  It's a term he

14   used.  So if we bring him in and establish agency -- or I can

15   take the witness on voir dire.

16          MR. NKWONTA:  Well, or I can -- if you allow me to

17   ask two more questions to establish additional foundation for

18   this.

19          THE COURT:  You need to establish that True the Vote

20   was involved in this.  On its face, I'm having hard problems

21   with that.

22          In other words, I understand your theory of True the

23   Vote as being reckless, they're filing all these reckless

24   lawsuits.  Right now they're not a named plaintiff.  Your

25   position is that Mr. Bopp, when he signed this on page 22

1  saying that he represented True the Vote, that brought them

2  into it.  And Mr. Wynne is saying that's not correct.

3  MR. NKWONTA:  Not just that.  And if you'll allow me

4  to ask two more questions, I will --

5  THE COURT:  Well, I am asking -- you can remain

6  standing.  Let's let him ask those two questions.

7  MR. NKWONTA:  I'm sorry?

8  THE COURT:  Ask your two questions.

9  MR. NKWONTA:  Sure.

10  BY MR. NKWONTA:

11  **Q.**  Ms. Engelbrecht, is it true that True the Vote provided

12  support for the plaintiffs named in this lawsuit and funded

13  the lawsuit?

14  **A.**  Yes, we did pay the legal bills for this lawsuit.

15  THE COURT:  Well, Mr. Wynne, how is that any

16  different than the allegations that the plaintiffs are making

17  here, that Alton Russell and other individuals filed these

18  challenges because True the Vote could not, because they're

19  not a Georgia resident, but that they filed -- they got --

20  they obtained these people -- I'm not saying it's true or not

21  at this point, but their theory is that True the Vote obtained

22  people like Alton Russell to challenge people in their

23  counties, knowing they did it recklessly.  How is this any

24  different than that?

25  MR. WYNNE:  Because in that instance we had some sort

1  of testimony that came from the stand.  In fact, Mr. Turner

2  said some things that we objected to.  We at least had

3  something.  In this case, we didn't.  And I've just -- counsel

4  has represented all sorts of things about the demographics.

5  We don't have any proof of that yet.  And there's nobody who's

6  brought any statistics.  They could have brought an expert,

7  they didn't.  So we don't have that.

8          Moreover, I'll tell you, as an officer of the court,

9  that Mr. Bopp had no agency to do this.  And I -- none of the

10  statements, I would submit, were carefully read by

11  Ms. Engelbrecht.  In fact, what happened is Mr. Bopp had this

12  thing ready to go --

13          MR. NKWONTA:  Your Honor --

14          MR. WYNNE:  -- and he's pursuing his own interest.

15          THE COURT:  Hold on, hold on, hold on.  Let him

16  finish.

17          Here's my ruling.  If Ms. Engelbrecht had said, no,

18  we had nothing to do with it, put no money in it whatsoever, I

19  probably would sustain your objection and now allow 27 in.

20          But Ms. Engelbrecht, in her honesty, and I appreciate

21  your honesty, says we did fund it.  So if Mr. Bopp -- and he

22  may have put some things in front of Ms. Engelbrecht that she

23  may not have read, I don't know, that's an Indiana case you'll

24  handle after this case.  But Ms. Engelbrecht's honest answers,

25  yeah, we funded this, makes 27 come in.

1          MR. WYNNE:  Understood.

2          THE COURT:  And, again, I appreciate your honesty.

3  It is what it is.

4  BY MR. NKWONTA:

5  **Q.**   Ms. Engelbrecht, as you testified -- or just to clarify,

6  True the Vote provided support for the plaintiffs and funded

7  this lawsuit; correct?

8  **A.**   We had no direct contact whatsoever with any of the

9  plaintiffs.  We did pay the bills that Mr. Bopp put before us.

10 **Q.**   True the Vote provided support.  My question is a little

11 different.  I just want to get an answer to this question.

12        True the Vote provided support for the plaintiffs;

13 correct?

14        THE COURT:  What do you mean by "support"?  She's

15 answered that they paid the legal bills as soon as Mr. Bopp

16 filed these.  What do you mean by support to the plaintiffs?

17        MR. NKWONTA:  Well, that's a question that I would

18 like to pose to Ms. Engelbrecht, because that's what she --

19        THE COURT:  Well, I'm asking you, though.

20        MR. NKWONTA:  It could mean two things.  It could

21 mean paying legal bills or it could also mean -- it could also

22 relate back to the bounty that she referenced in Exhibit 28.

23        THE COURT:  Well, if you're talking about legal

24 bills, that's already answered, asked and answered.  If you're

25 asking that question regarding, you know, did you pay for

1  their hotel and things like that, that's a different question.

2  If you're talking about a bounty, then you need to say a

3  bounty.  But the reason why, it's a broad question then you

4  need to specify.

5  BY MR. NKWONTA:

6  **Q.**   Ms. Engelbrecht, did True the Vote offer a bounty to any

7  of the individual witnesses or plaintiffs named in this

8  lawsuit?

9  **A.**   No.  And for added context, again, going back to what we

10  discussed earlier, there were no bounties offered.  There was

11  an internal e-mail in an attempt to secure funding for

12  potential hospital -- well, definite hospital bills.  There

13  was no bounty offered.  I've explained all of it again, and

14  there's been no bounty here.

15  **Q.**   Can you turn to page 12 of the exhibit -- of Exhibit 27.

16  I'll direct your attention to paragraph 35.  It says, "Vincent

17  Chavis, a voter from Duluth, Georgia, reported to True the

18  Vote/Validate the Vote project hotline that an absentee ballot

19  was requested and submitted in his name although he voted in

20  person and did not us an absentee ballot."

21       Is Mr. Vincent Chavis the individual you are referring to

22  in Exhibit 28, the individual to whom --

23  **A.**   No.

24  **Q.**   -- you want to offer a bounty?

25  **A.**   No.

1  **Q.**   In paragraph 41 of the complaint -- and that's on

2  page 14 -- it alleges that over 73,000 votes were cast by

3  non-citizens for Joe Biden; correct?

4  **A.**   For context, this is a study that was added into this

5  lawsuit that says data-driven analysis to arrive at an

6  estimate that as many as 73,975 votes were cast for Joe Biden.

7  So that's what was entered into the lawsuit.

8  **Q.**   So other than the link in that paragraph, you had no --

9  or True the Vote had no other evidence to substantiate or

10  corroborate this; correct?

11          THE COURT:  Hold on.  I have an objection.

12          MR. WYNNE:  Yeah, I'm going to object to foundation.

13  He's taking this on a very global scale.  Moreover, there's no

14  foundation that she's ever read it or that all the facts -- as

15  we know, all the facts don't need to be included in an initial

16  complaint or -- initial complaint or petition.

17          THE COURT:  Okay.  I'm going to overrule your

18  objection.

19  BY MR. NKWONTA:

20  **Q.**   True the Vote had no evidence, and to this date has no

21  evidence, that over 73,000 votes were cast by non-citizens for

22  Joe Biden as alleged on page 14, paragraph 41 of Exhibit 27;

23  correct?

24          MR. WYNNE:  I'm going to object based on relevance.

25          THE COURT:  It is relevant, Mr. Wynne.  It's

1  relevant.

2      MR. WYNNE:  Well, my thought is that, you know, we're

3  talking about the challenges, not relitigating, you know,

4  everything that's involved in different cases.

5      THE COURT:  One of the things that I have to decide

6  in this case, as you know, you're a very learned attorney,

7  Mr. Wynne, so you understand.  I have to decide whether or

8  not -- a different -- a lot of elements.  And one is that I

9  have to decide whether True the Vote and these defendants were

10  reckless in what they were doing.  That's probably one of the

11  first things I have to decide before I move to different

12  aspects in this case.

13      If True the Vote -- and, again, I haven't made my

14  mind up one way or other on any aspects of this case.  But if

15  True the Vote knew that they didn't have 73,000 people

16  voting -- non-citizens voting and they filed a lawsuit along

17  those lines, that could work into whether I decide whether

18  they were reckless or not.

19      If they did have evidence of these matters or --

20  well, I won't get into other aspects of it -- then it might --

21  I also have to look at what they had as positive.  This is not

22  an irrelevant question.

23      It's -- again, it's a question of whether or not

24  Ms. Engelbrecht can answer or not, I don't know, but it's not

25  an irrelevant question.  So I respectfully disagree with you

1   on this one.

2          MR. WYNNE:  Okay.  Understand.

3   BY MR. NKWONTA:

4   **Q.**   Ms. Engelbrecht, at the time this complaint was filed,

5   did True the Vote have any evidence that over 73,000 votes

6   were cast by non-citizens for President Joe Biden as alleged

7   in paragraph 41 on page 14?

8   **A.**   I -- True the Vote didn't make that statement.  I'm not

9   sure why we would be pulled into that.

10  **Q.**   Is that a no?  True the Vote did not have evidence that

11  over 73,000 non-citizens voted for Joe Biden?

12  **A.**   I don't recall.

13  **Q.**   You don't recall whether you had evidence?

14  **A.**   I -- this is -- we didn't say this.  This is just a

15  report that was put in a -- in a lawsuit that we, you know, we

16  paid a legal bill for but we weren't a part of.

17  **Q.**   As you sit here today, does True the Vote have evidence

18  that over 73,000 non-citizens voted for Joe Biden in Georgia?

19         MR. WYNNE:  And I'm going to object on relevance one

20  last time because the sentence says "Just the Facts conducted

21  a study."

22         THE COURT:  I think Ms. Engelbrecht has answered this

23  question.  She didn't draft the order, so she can't take a

24  position -- I'm taking it she's saying she can't take a

25  position one way or the other whether they did or didn't have

1    evidence of it because she don't know.

2    BY MR. NKWONTA:

3    **Q.**    And this lawsuit was dismissed shortly after it was

4    filed; correct?

5    **A.**    Correct.

6    **Q.**    About a week or slightly more than a week after it was

7    filed; correct?

8    **A.**    Correct.

9    **Q.**    And True the Vote filed similar lawsuits in Michigan,

10   Pennsylvania, and Wisconsin; correct?

11   **A.**    Jim Bopp filed lawsuits on behalf of plaintiffs and we

12   paid those bills, yes.

13   **Q.**    And True the Vote paid the bills for those lawsuits in

14   Michigan, Pennsylvania, and Wisconsin as well; correct?

15   **A.**    Yes.

16   **Q.**    And those lawsuits were dismissed shortly after they were

17   filed as well; correct?

18   **A.**    Yes.

19   **Q.**    A little over a week after they were filed; correct?

20   **A.**    Right.

21   **Q.**    And True the Vote did not present any evidence in support

22   of those lawsuits at any point in time before dismissing the

23   lawsuits; correct?

24   **A.**    Well, correct, but with context.  At least to the best of

25   my understanding, the role that was -- the ultimate necessity

1 in any of these lawsuits was to be able to prove who actually

2 voted in 2020.  And as I understood it, and as the Court

3 proceedings were happening, and we can all remember the

4 environment at that time, those -- that data was simply not

5 available.  In fact, in Georgia, we couldn't even get rolls on

6 who voted for months.

7       And so while all of the things that were added in here by

8 Mr. Bopp and his team may have -- may have been -- I really

9 can't speak to it.  I mean, at the end, what we knew was that

10 you had to be able to prove who voted.  And the circumstances

11 at the time were such that those -- those rolls weren't

12 available.

13      And so why continue on, take up the Court's time, if we

14 knew that that was not going -- and I would also add that this

15 had never been tested in this way.  One would think that when

16 a state has certified an election, particularly close

17 elections, that they would be able to say who had voted in

18 2020 --

19           MR. NKWONTA:  Your Honor, this is a narrative answer

20 that strays far from the question and I object to it.  I'd

21 like to continue with my examination.

22           THE COURT:  I think I got your general gist that

23 you-all thought the state needed to more than they had done to

24 verify?

25           THE WITNESS:  I'm so sorry?

1    THE COURT:  You-all felt the state needed to do more

2  in order for them to verify?

3    THE WITNESS:  Yes, sir.

4    THE COURT:  Okay.  Next question.

5  BY MR. NKWONTA:

6  **Q.**   I want to pick up --

7  **A.**   Wait.

8  **Q.**   -- on a couple of things --

9  **A.**   Hang on.

10  **Q.**   -- Ms. Engelbrecht.  You mentioned that the voter rolls

11  were not available for the lawsuit, but they were available

12  for your landmark challenge program in the Georgia runoff;

13  correct?

14  **A.**   Yes.  Because it wasn't contingent on who voted, it was

15  just the rolls.

16  **Q.**   And you also mentioned that this was about identifying

17  who voted.  You would agree with me that all of those lawsuits

18  were strictly -- strictly sought to reverse the results of the

19  presidential election only; correct?

20  **A.**   I -- I really can't attest to the strategy or how that

21  would have really worked.  I don't know.

22  **Q.**   People, as you know, voted in a number -- for a number of

23  different elections on November 3, 2020; correct?

24  **A.**   I'm sorry, can you repeat that?

25  **Q.**   Sure.  Voters cast ballots for a number of different

1   elections up and down the ballot on November 3rd, 2020;

2   correct?

3   **A.**   Yes.   A number of different offices, yes.

4   **Q.**   But True the Vote's focus in the Validate the Vote

5   proposal was entirely about the presidential election;

6   correct?

7   **A.**   I would not agree with that statement, but I would also,

8   again, with context say, this Validate the Vote proposal was

9   not drafted by me, was given to one individual.   This was not

10  broadcast.   This was given to one individual that, within a

11  week, turned around and gave me a million dollar invoice and

12  was the subject of lawsuits that we won.   This is not

13  representative.

14  **Q.**   You would agree with me that the legal strategy in the

15  Validate the Vote proposal is focused solely on overturning

16  the results of the presidential election; correct?

17  **A.**   I can't say that it's focused solely on that.   I don't --

18  I don't really know what the legal implications of this

19  strategy would have -- would have elicited.

20  **Q.**   Let's jump to the next major initiative that True the

21  Vote announced, which is the landmark elector challenge

22  program.   I'd like to direct your attention to Exhibit 42,

23  which has already been admitted into evidence.

24         Exhibit 42 is the press release or blog post announcing

25  the Georgia landmark voter challenge effort in advance of the

1  Georgia runoff; correct?

2  **A.**   Correct.

3  **Q.**   And can you read the sentence in bold at the bottom of

4  Exhibit 42?

5  **A.**   "True the Vote partners with Georgians in every county to

6  preemptively challenge 364,541 potentially ineligible voters.

7  Citizen led-effort seeks to confirm all" voters -- "all votes

8  cast in U.S. Senate" election -- excuse me -- "U.S. Senate

9  runoff elections are legal, while ensuring any voter

10  challenged has full opportunity to prove their voting

11  eligibility."

12  **Q.**   And later in the press release or the blog post, in the

13  third full paragraph you identify several individuals whom

14  True the Vote claims to be working alongside; is that correct?

15  **A.**   Work -- that's correct in the way that it was phrased.

16  **Q.**   And the press release or blog post identifies Derek

17  Somerville of Forsyth County; correct?

18  **A.**   It does, yes.

19  **Q.**   And Mark Davis of Gwinnett County; correct?

20  **A.**   Yes.

21  **Q.**   It identifies them as individuals who have been leading

22  the citizen efforts to highlight issues in Georgia's voter

23  rolls; correct?

24  **A.**   That's what the statement says, yes.

25  **Q.**   It also identifies Mark Williams of Gwinnett County;

1   correct?

2   **A.**   Yes.

3   **Q.**   It identifies files Ron Johnson of Jackson County?

4   **A.**   Yes.

5   **Q.**   And James Cooper of Walton County; correct?

6   **A.**   Yes.

7   **Q.**   And states that everyone pitched in.  That was your quote

8   that followed, "everyone pitched in"; correct?

9   **A.**   Correct, with context.  It was not that we were working

10  together, because -- specifically with respect to Derek

11  Somerville and Mark Davis, we were not; however, everyone was

12  helping to bring attention to what the state knew, which is

13  that the rolls were not accurate.  And something needed to be

14  addressed to try to create a trustworthy environment,

15  particularly coming out of 2020 when -- when there was an

16  awful lot of mistrust.

17       So even in my saying, you know, we were proud to be

18  working alongside, that was sort of metaphorical.  These were

19  people that were trying to do their level best to ensure an

20  accurate process.

21  **Q.**   We'll return to that exhibit.  I want to talk to you a

22  little bit about the challenges themselves.

23       The press release or blog post indicated that True the

24  Vote was challenging 364,000 Georgians.  If those challenges

25  went according to plan, according to your plan, all 364,000 of

1  those individuals would have been required to present proof of

2  residency before voting; is that correct?

3  **A.**    That is correct.  Again, with the caveat that that's

4  already a requirement to vote in Georgia, and so there should

5  not have been any substantive difference in process.

6  **Q.**    So it is your understanding that providing documentary

7  proof of residency is a requirement to vote in Georgia?

8  **A.**    In Georgia, it's my understanding that you have to show a

9  form, a valid form of photo voter identification, and there

10  are quite a number.  But in my previous -- before this was

11  sent, I went and talked with the Secretary of State to make

12  sure we understood, and that was my understanding, yes.

13  **Q.**    And so it's your understanding that in -- because you

14  said photo identification.  My question is a little bit

15  different.

16       Is it your understanding that voters are required to

17  provide proof of residency before voting in Georgia?

18  **A.**    I -- it is my understanding that voters have to show some

19  form of valid identification that comports with state standard

20  that adheres to eligibility standards.  That's the best I can

21  tell you.

22  **Q.**    Well, I'm asking you specifically about proof of

23  residency.  Is it your understanding that proof of residency

24  is required to vote in Georgia?

25  **A.**    It's my understanding that you need to reside within the

1   county or the state in order to cast a vote.

2   **Q.**   Again, I'll ask my question, because I don't think you're

3   fully answering my question.  And maybe I'm not being as

4   precise as I can.

5         THE COURT:  I think you probably need to be a little

6   more precise, because you can interpret that question two

7   ways.

8         MR. NKWONTA:  Sure.

9   BY MR. NKWONTA:

10  **Q.**   When a voter appears to cast a ballot in an election in

11  Georgia, at the polling place, is it your understanding that

12  that voter needs to present proof of residence when appearing

13  at a polling place to cast their ballot?

14  **A.**   It is my understanding that the most commonly presented

15  form of identification includes residency.  There may be some

16  outliers that wouldn't require that.  Of that I'm not

17  familiar.

18  **Q.**   You understand that's a different question than what I

19  asked?

20  **A.**   I -- I -- then I --

21  **Q.**   Do you understand the question I asked you?

22        THE COURT:  Let me try it.

23        You go to vote in the state of Georgia on November

24  the 7th, 8th, general election, whatever.  What do you --

25  what's your understanding you have to show when you go into

1  that precinct to vote?  What do you have to show?

2        I understand you're from Texas.  But understanding

3  Georgia, what do you understand you have to show when you go

4  in to vote?

5        THE WITNESS:  You to have to show -- and my

6  understanding is you have to show a valid form of voter

7  identification.

8        THE COURT:  Okay.

9        THE WITNESS:  I misspoke earlier with photo.

10       THE COURT:  And that could be just a driver's

11  license; right?

12       THE WITNESS:  Correct.  It could be a driver's

13  license.

14       THE COURT:  Do you need to bring in your property tax

15  report to show that you live at that particular house?

16       THE WITNESS:  No, sir, that was not my understanding.

17  BY MR. NKWONTA:

18  **Q.**   And you understand that ID approved for voting, when a

19  voter appears at the polls, could include a government

20  employee ID; correct?

21  **A.**   Whatever -- whatever the state allows, I imagine.

22  **Q.**   Would it refresh your recollection if I showed you a copy

23  of the statute that lays out the list of proper voter

24  identification documents?

25       THE COURT:  I think it would be pretty hard, except

1  for maybe some people like Ms. Lawrence-Hardy and Ms. Bryan

2  who has done this a few times, to be able to name all the

3  different things that you need to take in to vote with.

4         MR. NKWONTA:  I assume the Court will take judicial

5  notice --

6         THE COURT:  Yeah, it's a number of things you can

7  use.  And to be fair, Mr. Wynne and Mr. Evans and Mr. Powell

8  probably also could name all the different things you could

9  take in.  It probably a list of at least 12, I think.

10        MR. NKWONTA:  Fair enough.

11  BY MR. NKWONTA:

12  **Q.**    And you would agree that when voting absentee in the 2021

13  runoff, voters who are casting absentee ballots did not have

14  to present proof of residency in order to cast their absentee

15  ballots; correct?

16  **A.**    That's my understanding, correct.

17  **Q.**    And if the challenges went according to your plan, all

18  364,000 Georgians identified in your challenge list, would

19  have been required to present proof of residency before

20  voting; correct?

21  **A.**    Well, I can't speak to --

22        THE COURT:  Let me make one correction.  Every

23  plaintiffs' attorney could answer that question as well.  I

24  just don't want to limit it to two plaintiffs.  I think every

25  plaintiffs' attorney could name every document you can use to

1   qualify.  I had a couple people, like, wait a minute, Judge,

2   you're not including me in that list?

3        Every plaintiffs' attorney, every defense attorney,

4   I'm quite confident could name everything on that list.

5        Okay.  Go ahead.

6        MR. NKWONTA:  Thank you, Your Honor.

7        I'll repeat my question.

8   BY MR. NKWONTA:

9   Q.   Ms. Engelbrecht, according to your plan, if the

10  challenges went according to your plan, what you expected to

11  happen or hoped would happen, is that all of the challenged

12  Georgians, all 364,000 individuals names, would have been

13  required to present proof of their residency before voting;

14  correct?

15  A.   No, that's incorrect.

16  Q.   That was not your plan?  That was not how you expected

17  the challenges to unfold?  Is that your testimony today?

18  A.   That's -- my testimony is that that is incorrect and with

19  context.  My hope was -- and understanding, and certainly

20  after having met with the Secretary of State and talking

21  through our methodology, my understanding was that we would

22  prepare the files relative for each county, that if Georgia

23  volunteers participated, would be presented and that the

24  counties would make those determinations, because they had no

25  other way to look at the voter rolls, which hadn't been

1  cleaned in 19 months.  It was something that the Secretary of

2  State said this is good, this is -- I'm glad this is being

3  done.

4  Q.   I want to return, again, to your January 2022 deposition.

5  And specifically pages 158, line 1 to 159, line 5, when you

6  were asked this very question.

7         MR. NKWONTA:  And, Your Honor, this one is kind of a

8  mouthful to read, this answer.  Would it be okay if we played

9  this one?  Just this one clip?

10        THE COURT:  Play it.

11        MR. NKWONTA:  Can you play clip 13, please.  13.

12        THE COURT:  They're going to play this one.

13        MR. NKWONTA:  And can we request --

14        THE COURT:  Go ahead.

15        MR. NKWONTA:  Can we request that the could reporter

16  record this as well?

17        THE COURT:  She can't.

18        MR. NKWONTA:  Cannot?  Okay.

19        (A video clip was played for the court.)

20  BY MR. NKWONTA:

21  Q.   And that was the testimony you gave in your deposition;

22  correct, Ms. Engelbrecht?

23  A.   Yup.  That was me on that, yes.

24  Q.   Now, True the Vote and OpSec started working on the

25  challenge file in the second week of December; correct?

1  **A.**    Yes, that's probably about right.  I don't recall

2  exactly, but in December.

3  **Q.**    You don't recall when in December?

4  **A.**    Not the specific day.

5  **Q.**    Would it refresh your recollection if I showed you a

6  transcript of your testimony on that issue?

7  **A.**    Sure.

8  **Q.**    I'll direct your attention to deposition transcript

9  page 127, line 7 to 16.

10        Can you review that on your screen?

11 **A.**    Yes.

12 **Q.**    Did that refresh your recollection as to when True the

13 Vote and OpSec started working on the challenge list?

14 **A.**    Yeah, I think it's consistent.  I said that would

15 probably have been starting the second week of December.  So

16 probably.

17 **Q.**    And then True the Vote launched the landmark challenge

18 effort announcing that it was challenging 364,000 voters on

19 December 18th; correct?

20 **A.**    That's when the post went up, yes.

21 **Q.**    That's a pretty fast turnaround; right?

22 **A.**    Well, yes, that is a fast turnaround if you -- if you

23 are -- I mean, we already had the -- there were already

24 elements that were put into place and -- with the availability

25 of the voter rolls, which we, you know, routinely work with,

1    so...

2    **Q.**    So you started working on the challenge list with OpSec

3    on the second week of December.  Am I right that you created

4    spreadsheets of challenged voters in all 159 counties?

5    **A.**    Well, we -- no.  We created a master file that had all of

6    the data in -- for all 159 counties.  And then as electors

7    volunteered, those challenges would be put into the proper

8    format.

9    **Q.**    So you --

10   **A.**    Which is an interesting point, which is a csv format

11   that -- well, we'll get to that, I'm sure.

12   **Q.**    So you created a file of 306 -- so you started working on

13   the challenge program in the second week of December.  And by

14   December 18th, you had created a file of 364,000 individuals,

15   or slightly over 364,000 individuals, whom you believed may

16   have been improperly registered; correct?

17   **A.**    Correct, again, with context.  Let's break that down.

18          So the second week would have been -- and, again, I've

19   said probably, both today and in the deposition, so I'm really

20   not certain when.  We had the voter rolls.  We didn't -- we

21   weren't looking at who voted.  And so to -- and we used the

22   NCOA routinely in other lines of work.  So none of this was

23   foreign.  This was a -- this was a -- and we were very

24   accustomed to working with big data and big data environments.

25   So I understand you're -- the goal you're trying to get to

1   here, but it's not applicable to us.

2   **Q.**   I'm just trying to understand the process.

3       So from the second week of December to December 18th, you

4   created a challenge file, or a file with 364,000 individuals

5   in Georgia who you claim were improperly registered.  Did

6   anybody review all of those entries to check the accuracy of

7   the challenged file?

8       MR. WYNNE:  Your Honor, I'm going to object because

9   of the compound nature of the predicate and ask counsel to

10  break it down.

11      THE COURT:  If you don't mind, just break it down in

12  sections.

13  BY MR. NKWONTA:

14  **Q.**   Did anybody review each of those entries of that 364,000

15  voter challenge file?

16  **A.**   There was absolute quality control, yes.

17  **Q.**   My question was a little different.  I didn't ask whether

18  there was quality control.

19      I asked did anybody review each of those entries of the

20  364,000 voter challenge file?

21  **A.**   When you're working with big data, the process of review

22  and the evaluation of fields is something done at scale.  So

23  it was properly quality controlled.

24  **Q.**   Again, my question was a little bit different.

25      Did anybody physically review -- I'm not asking about

1  scale or algorithms or whatever.

2       THE COURT:  Hold on, I have an objection.

3       MR. WYNNE:  I'd like for clarification if a computer

4  is in the scope of anyone?

5       THE COURT:  Well, I think that's something

6  Ms. Engelbrecht in her answer can say.

7       Ms. Engelbrecht, I think -- here's how we're going to

8  do it.  You're going to have either answer yes or no, and then

9  I'll allow you to explain your answer.  But you have to answer

10 yes or no.

11      THE WITNESS:  Okay.  No, not all rows were

12 individually examined; however, there was a comprehensive

13 quality effort to go through and assure that all the fields

14 were properly represented, that the selections going into --

15 when you work with NCOA, there are certain exclusions that you

16 can put into that process, there are certain normalizations

17 that go into the process in order to create an advanced

18 standard.  All of those things were done.

19      Additionally, those files were provided in a csv

20 format that I will note were somehow converted.  And I think

21 the -- my question is still what -- what -- what files --

22      MR. NKWONTA:  I'd object to this.  This is a

23 narrative answer that strays beyond my question.  The csv

24 format has nothing to do with the question, which is did

25 anybody review --

1          THE WITNESS:  But it --

2          THE COURT:  Well, let her finish this last part.

3          THE WITNESS:  I'm sorry.

4          THE COURT:  Go ahead.

5          THE WITNESS:  It does, because on the stand,

6   Dr. Mayer talked about how there were formals in cells, but

7   that's not possible in --

8          MR. NKWONTA:  Again, Your Honor --

9          THE WITNESS:  -- a csv file.

10          MR. NKWONTA:  -- what does this have to do with my --

11          THE COURT:  I think you got the answer.

12          What's your next question?

13   BY MR. NKWONTA:

14   **Q.**   After you created this master challenge file of 364,000

15   voters, True the Vote and its collaborators started the

16   process of reaching out to challengers or potential

17   challengers; correct?

18   **A.**   No.  The process was actually started because we had

19   people coming to us.  So that's how it started.

20   **Q.**   So True the Vote started communicating with potential

21   challengers; correct?

22   **A.**   We were communicating with people who wanted to

23   participate, yeah.  Yes.

24   **Q.**   And who wanted to participate as challengers; correct?

25   **A.**   Correct.

1   **Q.**   I'd like to direct your attention to Exhibit 73.

2           MR. NKWONTA:  And before we get to Exhibit 73, Your

3   Honor, I just want to clarify that Exhibit 27 was moved into

4   evidence.  I believe I requested that it be moved into

5   evidence.  I wanted to double-check that.

6           THE COURT:  It's in evidence over objection.

7           MR. NKWONTA:  Thank you, Your Honor.

8   BY MR. NKWONTA:

9   **Q.**   Exhibit 73 consists of e-mails from a number of the

10  defendants, some of which you are copied on, on behalf of True

11  the Vote, communications with potential challengers.  I'd like

12  to direct your attention to the second page.

13          MR. NKWONTA:  Before I do that, Your Honor,

14  plaintiffs move to admit Exhibit 73 into evidence.

15          THE COURT:  Any objections?

16          MR. WYNNE:  I'm going to have to take the witness on

17  voir dire.  I don't think any of these are from her.  They're

18  from Amy Hallsworth.  And the question is, what degree she was

19  acting as an agent for True the Vote to make these statements

20  as a party.  And I just don't know the answer to that.  And so

21  that's what I'm going to have to do.

22          THE COURT:  I don't think you need to voir dire.  I

23  think you can make an objection that it is hearsay.

24          MR. WYNNE:  Well, I'm going to object -- I'm going to

25  object to hearsay at this point until we get a foundation.

1          THE COURT:  Your response?

2          MR. NKWONTA:  One, we can lay the foundation for this

3    document and it can do that in two more questions.  Two, this

4    document was produced by True the Vote.  It just so happens

5    that the Bates numbers have been covered per the Court's

6    instructions, but opposing counsel is literally objecting to a

7    document that they produced to us.

8          MR. WYNNE:  You can produce a document, as we all

9    know --

10         MR. NKWONTA:  From True the Vote.

11         MR. WYNNE:  You can produce and you have to produce

12   everything in your custody, care, or control or you can get

13   from anybody else.  It doesn't mean it's your statement.

14         THE COURT:  Well, you said you can lay the foundation

15   for it.  So let's hear it.

16   BY MR. NKWONTA:

17   **Q.**   Ms. Engelbrecht, Amy Halsworth was working for True the

18   Vote at the time these challenges were launched in December

19   2020; correct?

20   **A.**   Yes, she was a contractor.

21   **Q.**   Okay.

22         MR. NKWONTA:  Your Honor, I move to admit Exhibit 73

23   into evidence.  Plaintiffs' Exhibit 73.

24         THE COURT:  Well, what about these other people, Mark

25   Williams?

1          MR. NKWONTA:  Mark Williams is a defendant.  These

2     are all defendants, party opponents.

3          MR. WYNNE:  They haven't set the foundation in terms

4     of the scope --

5          MR. NKWONTA:  It's waived.

6          MR. WYNNE:  -- of the agency under 801(d)(2)(e).  So

7     -- or, I'm sorry, (d).  The statement by the party's agent or

8     servant concerning a matter within the scope -- within the

9     scope of the agency or employment during the existence of the

10    relationship.

11         So I don't know.  I think you've got to go through

12    it.

13         THE COURT:  I think he can get it in.  Once he

14    establishes this individual worked for them and they're  party

15    defendants, it comes in.

16         Overruled.  Admitted.  Admitted over objection.

17         (Plaintiff's Exhibit 73 was received and marked into

18    evidence.)

19    BY MR. NKWONTA:

20    **Q.**   I'd like you to turn to the second page of this document,

21    which is part of an e-mail from Amy Halsworth to a perspective

22    challenger.  The challengers' names were redacted by opposing

23    counsel or prior opposing counsel.

24         Can you read the top two lines of that e-mail into the

25    record, please?

1   **A.**   At the top of the page?

2   **Q.**   The top of the second page.  Starting with "True the Vote

3   has identified."

4   **A.**   "True the Vote has identified over 500,000 people on the

5   Georgia voter roll list that shouldn't be there.  These folks

6   are registered to vote but do not meet the requirements of a

7   legal voter in the county in which they are registered."

8   **Q.**   And the purpose of this e-mail was to recruit or

9   coordinate with challengers; correct?

10  **A.**   I don't know what the purpose of this e-mail was.

11  **Q.**   So starting off with the first sentence, True the Vote

12  had not identified 500,000 people to challenge in Georgia; is

13  that correct?

14  **A.**   There were addition -- initially, there were over half a

15  million people.  And then we began the QC and got the number

16  down.

17  **Q.**   So the first sentence says, "True the Vote has identified

18  over 500,000 people in the Georgia voter list that shouldn't

19  be there."

20        That's false; right?

21  **A.**   I mean, that's what this line says in an e-mail by --

22  sent by someone who didn't even spell their last name --

23  **Q.**   I'm asking you whether --

24  **A.**   No.

25  **Q.**   -- the statement is false.

**A.**   We initially identified over half a million people that
did not appear to have the same -- or did not appear to have a
correct residency, yes.

**Q.**   Do you understand my question, though?  My question is --

THE COURT:  She's answered your question.  She says
they did identify over 500,000 people.

MR. NKWONTA:  No.  My question is a little different,
Your Honor, because --

THE COURT:  What is the question?  Don't -- don't --
just tell me, what is the question.

MR. NKWONTA:  The question is whether True the Vote
identified over 500,000 people on the Georgia list that should
not be there.

THE COURT:  What is the answer to that question?

MR. NKWONTA:  That should not be there.

THE WITNESS:  I -- I think it depends upon the
definition of what shouldn't be there means.

THE COURT:  If they shouldn't be there, isn't that
the same thing is that -- the answer is that -- I'm not saying
I'm agreeing or disagreeing with her answer, but I thought her
answer was they did identify over 500,000 people that
shouldn't be voting.

MR. NKWONTA:  Well, her answer was they conducted the
QC and removed individuals.  I -- presumptively because they
did not believe that all 500,000 were not -- did not belong on

1    the list.

2             THE COURT:  Let's try it one more time.

3    BY MR. NKWONTA:

4    **Q.**   Ms. Engelbrecht, the statement that True the Vote has

5    identified over 500,000 on the Georgia list that should not be

6    there, is that state -- isn't that statement false?

7    **A.**   No, that statement is not false, if I understand the

8    question with context.  I don't know that I understand the

9    question.

10   **Q.**   So it's your testimony that True the Vote did identify

11   over 500,000 people on the Georgia voter list that should not

12   be there?

13   **A.**   When -- when we first began the project, the number was

14   over 500,000.  And then -- but the use of the phrasing "that

15   shouldn't be there," you know, I think is vague and --

16            THE COURT:  Well, what's vague about it?

17            THE WITNESS:  Well, I think that it's -- it shouldn't

18   be there is -- is not the precise way to address that.  I

19   mean, it shouldn't -- it's not necessarily that they shouldn't

20   be there, but there's something about their address that is

21   indicated as inaccurate.

22            THE COURT:  Well, since I'm also acting as trier of

23   fact in this case, let me tell you how I'm interpreting this,

24   so I'm giving you a chance to say if I'm right or wrong.

25            THE WITNESS:  Sure.

1          THE COURT:  I'm interpreting you as saying there's

2    500,000 people who are on the Georgia voter registration list

3    that shouldn't have been on the Georgia voter registration

4    list.  Is that a right or wrong interpretation?

5          THE WITNESS:  I wish that Amy would have written that

6    differently.

7          THE COURT:  I'm sure.

8          THE WITNESS:  You know, I mean, it's...

9          THE COURT:  But you have to answer the question,

10   though.

11         THE WITNESS:  Whether or not they should have been on

12   the list, I mean, I -- this is what the sentence says.  I

13   can't -- I don't know what Amy was -- was meaning, assuming

14   Amy wrote this and spelled her last name wrong, I don't know.

15   BY MR. NKWONTA:

16   **Q.**   Are you willing --

17         THE COURT:  Let me tell both of you-all how the trier

18   of fact is interpreting it.  I'm interpreting it as she said

19   exactly what she says right here.  There's 500,000 people on

20   the Georgia voter list that shouldn't be there.

21         THE WITNESS:  Yeah, I mean, that's what it says.

22         THE COURT:  I'm interpreting it exactly as it says.

23         THE WITNESS:  That's what it says.  I -- you know, I

24   don't know what she was thinking.  I don't know --

25   BY MR. NKWONTA:

1  **Q.**   The problem is, I'm not asking what she was thinking.

2  I'm asking whether you agree with that statement --

3  **A.**   Oh, that's a different --

4  **Q.**   -- as you sit here today.  Do you agree with that

5  statement?

6  **A.**   I'm sorry.  If you've asked me that, I haven't heard

7  that.

8         THE COURT:  Yeah.

9         THE WITNESS:  I apologize.

10        Can you -- would you repeat?

11        THE COURT:  Do you agree with that statement?  Do you

12  agree with that statement that True the Vote has identified

13  over 500,000 people on the Georgia voter list that shouldn't

14  be there?

15        THE WITNESS:  I disagree with that statement.

16  BY MR. NKWONTA:

17  **Q.**   The following sentence, "These folks are registered to

18  vote but do not meet the requirements of a legal voter in the

19  county in which they are registered."

20        Is that a true statement?

21  **A.**   On the basis of the data that we had at that time -- I

22  say at that time, based off the number -- that -- I would

23  agree with that statement.

24  **Q.**   You would agree that every single person on that list

25  does not meet the requirements of a legal voter in the county

1  in which they are registered?

2  **A.**   I would say that when comparing the two datasets of the

3  Georgia voter roll list and the NCOA, at the highest level of

4  accreditation, that was the information that came back, yes.

5       May I just, by extension, no different than what the

6  Secretary of State just announced a couple weeks ago, saying

7  that they were going to amend the records of almost 700,000

8  Georgia residents.

9  **Q.**   It's very different.  And I want to ask you a question

10 again to be more precise so I can make sure I get an answer.

11 **A.**   Sure.

12 **Q.**   Is it correct to say that all 500,000 of the individuals

13 on that list, do not meet the requirements of a legal voter in

14 the county in which they are registered?

15 **A.**   Based on the data that we had, which --

16 **Q.**   It is a yes-or-no question.

17 **A.**   I -- I -- I mean --

18 **Q.**   Is it correct yes?  Or is it not correct?

19        THE COURT:  Again, you will be allowed to explain

20 your answer, but you have to answer yes or no first.

21        THE WITNESS:  Okay.

22        Yes, based on the data that we had, that was correct.

23 BY MR. NKWONTA:

24 **Q.**   And I'd like to -- I'd like you to take a look at the

25 sixth paragraph starting with, "When the challenge letter is

1   received."  The second sentence says, "True the Vote has

2   assured me that the list they are challenging is 99.9 percent

3   likely to be incorrectly registered."

4        Is that statement correct?

5             MR. WYNNE:  I'm sorry, what line are we looking at?

6             MR. NKWONTA:  It's the --

7             MR. WYNNE:  Oh, okay.  Okay.  I found it.  Okay.

8   Thanks.  We skipped a couple of paragraphs.

9             THE WITNESS:  It is correct, yes, in that that is

10   what the statement says.

11             I disagree that we ever said that.

12   BY MR. NKWONTA:

13   Q.   Do you agree that 99.9 percent of the individuals on the

14   list True the Vote was challenging were incorrectly

15   registered?

16   A.   I -- 99.9 percent, I -- I -- I can't affirm that.  I can

17   say that it was near that, but I can't say that it was 99.9

18   percent.

19   Q.   So you recognize that some portion or some individuals on

20   your challenge list were correctly registered; correct?

21   A.   I think there's two -- if I may, I know I need to give

22   you a yes or no.  Can you repeat the question and I'll add

23   context?

24   Q.   You recognize that some individuals on your challenge

25   list were correctly registered; is that right?

1  **A.**   I can answer yes or no with context.  The -- the data

2  that is provided back, the same datasets that Secretary of

3  State and others use, suggested that the information was

4  wrong.  It's -- it is meant to be -- elector petitions are

5  meant to be the starting point to say, county, can you take a

6  look at this.  And then there are circumstances that come into

7  play based upon what the county decides, based upon what the

8  circumstances -- extenuating circumstances may be.  So it

9  would be -- I mean, there's two ways to answer that.  I mean,

10 the data was the data.  We were confident in the data.  But

11 how the county chooses to interpret that.

12          THE COURT:  I guess my question is that if you're

13 giving the county all these names without really believing

14 yourself that it's accurate, isn't that a problem?  In other

15 words, wouldn't you not say, I'm giving you something I

16 believe is 100 percent accurate because I verified it?

17          THE WITNESS:  That's a good question, Judge.  And the

18 data that was presented -- the data that was presented -- I'm

19 100 percent confident in the data that was presented.  But I'm

20 also familiar enough with data and with the variances and with

21 the unique situations of people and their -- how things, you

22 know, sometimes are misconstrued or misunderstood, those

23 things are real.

24          And so that was, frankly, why I went to the Secretary

25 of State and went step by step through the methodology in my

1   understanding to make sure that the process was not going to

2   incur any additional burden.  Again, we were given, you

3   know --

4           THE COURT:  I've been looking up here for the last

5   20 minutes.  I had Ryan Germany's testimony transcript pulled

6   for me yesterday.  One of the things -- I'm trying to find an

7   exact quote.  One of the things he indicated -- I can't

8   remember whether it was on cross with Mr. Evans or direct with

9   Ms. Ford.  One thing he indicated, he said he told you-all

10  this broad way of doing this was not the right way to do it.

11          I'm not using his exact words, and I want to find the

12  exact words in a second, but he indicated, he said, I told

13  them just bringing in these thousands of names at one time, is

14  not the proper way of doing this.

15          So that's my question, is that -- it's very

16  important, and I may --  well, I need to get an answer, we're

17  maybe going to have to take a break.

18          If you-all do not feel there was a possibility that

19  all these names you were giving in these counties were

20  correct, then why did you do it?  Or if you did feel all these

21  names were correct, I need to know that as well.

22          THE WITNESS:  We absolutely felt that all the names

23  that we were giving the counties were correct.  It would be

24  irresponsible of me to not say that life happens and that had

25  to be interpreted by the county.

1          I also heard Mr. Germany say that, and I reflected

2   immediately back on my experience in that meeting.  And I'm

3   sorry that Secretary Raffensperger's not here to share his

4   take on what happened in the meeting.  But it was Mr.

5   Germany -- I don't recall him saying that, but what I do very

6   clearly --

7          THE COURT:  I'll find the transcript.

8          THE WITNESS:  Oh, no, no, I know he definitely said

9   it in the -- up here.  He definitely said it here.  But in the

10  meeting, it was Mr. Germany who went on to describe the actual

11  process of -- because we didn't -- one of the things that came

12  out that I was unclear about in the way the code was written

13  was, do we have to do this in hard copy or are digital files

14  sufficient or -- and he said, oh, no, you can just send them

15  digitally, and here's how it's going to work.

16         And, I mean, I remember this clear as day.  He said,

17  here's how it's going to work.  You send them.  The counties

18  will decide --

19         MR. NKWONTA:  Objection.  This is hearsay, Your

20  Honor, but it's up to you.

21         THE COURT:  Yeah, but I want to hear this answer.

22         THE WITNESS:  He said the counties will decide

23  whether or not they're going to take up the challenges.  And I

24  was concerned about -- I mean, is there enough time.  All of

25  that was discussed.

1          Then he said -- so he said, it's not going to be any
2     big deal at all.  This is actually in an affidavit that I did.
3     It's not going to be any problem because those go straight to
4     the state vendor, the state vendor will tag the record, and
5     then those reports will be sent back to the county.

6          And so it will be available.  No absentee ballots had
7     been opened yet.  They will be available for review, plenty of
8     time in the curing process.

9          And then when you break down the number, if I may,
10    because I know that's a big number, and if you're not familiar
11    with big data, that can be a big -- I mean, it's a big number.

12         But when you look at it in full context, 364,000
13    challenged records out of a database of 7.7 million, with 159
14    counties and roughly 2300 precincts, even at 100 percent
15    turnout would be 158 voters per precinct on average.  If you
16    break that down and you even say 70 percent turnout, that
17    would be 111 voters per precinct.  And if you break that out
18    into absentee and on paper, you're talking -- I mean, it's --

19         THE COURT:  What I'm hearing you saying is that one
20    of the things -- it wasn't a big deal because there weren't
21    going to be that many people anyway, when you compare it to 7
22    million voters.

23         Let me say this:  I understand a third of what she
24    just said is hearsay.  And what I have here is what
25    Mr. Germany said under oath on Friday in the transcript.

1        One last question then.  It's important that the

2   trier of fact get his questions answered.  And the one concern

3   I have -- and here's the question:  You-all were proceeding

4   with the understanding that you were going to give these names

5   to counties and the counties were going to investigate them?

6        THE WITNESS:  The -- our understanding was that

7   Georgia citizens who volunteered for the project would take

8   the -- the file, it would be submitted to the counties, and

9   the counties would determine whether or not the challenges

10  would be -- would be accepted.  And then as I mentioned --

11       THE COURT:  Was there any consideration given,

12  though, how the counties would go about doing this?  In other

13  words, there are some counties in Georgia contacting people

14  before they went to vote and had them come in and verify the

15  challenge.

16       And as we heard from two of the people that testified

17  last week, there are some counties that just say, when they

18  come in to vote, we'll flag them then.

19       So was there any consideration given regarding

20  that -- how these people would be treated?

21       THE WITNESS:  Oh, absolutely, yes.

22       THE COURT:  Well, how was that considered?

23       THE WITNESS:  It was -- it was our understanding,

24  again, from our reading of Section 230, but also reviewing the

25  process, because there's -- there's -- things that aren't as

1  clear as they could have been.  We wanted to be sure.

2       And so, yes, our understanding was that the -- that

3  there would be no contact with voters other than if a voter

4  decided to show up and vote.  And then if the record had been

5  flagged, again, it was our understanding that showing

6  identification would have been enough to resolve the

7  challenge.

8       Now, there is -- I understand -- the issue with

9  residency.

10      THE COURT:  Well, as you heard on cross-examination

11 with Mr. Evans last week, Mr. Berson testified he goes in to

12 vote, he shows his ID, license, and they still say, you've got

13 to vote a provisional ballot, made him get up identifications.

14      Thank you for answering.

15      Go ahead with your questions.

16 BY MR. NKWONTA:

17 **Q.**   Ms. Engelbrecht, the statement that we've been discussing

18 in Exhibit 73, "True the Vote has assured me that the list

19 they are challenging is 99.9 percent likely to be incorrectly

20 registered," that's a statement that you agree one should

21 never make; is that correct?

22 **A.**   I don't agree that it's a statement that should never be

23 made.  I don't agree that this is a statement that True the

24 Vote assured anybody of.  I mean, it's just -- it's just not

25 what someone that's accustomed to working with data would say.

1  **Q.**   I'd like to turn again back to your deposition from

2  January 2022.   In that deposition, you were asked a question

3  about the e-mail, the specific e-mail, and the statement about

4  99.9 percent of the challenges being incorrectly registered.

5  And that is on pages 234, lines 3 to 22.   In lines 11 to 12

6  you said, "No.   And my data background would never make that

7  kind of statement."   And in lines 21 to 22, you said, "You

8  shouldn't make assertions like that."

9       That was your testimony in your deposition; correct?

10  **A.**   That is what it says in the deposition.   Again, with

11  context, it was my observation or my -- my consideration of

12  who was saying this at the time.   And it's not -- it's just

13  not something that, you know, one would -- one would say.

14  This is an internal e-mail, again, with somebody that -- I

15  don't know exactly where, you know, the -- where this all came

16  from, but...

17  **Q.**   So you testified that you would never make a statement

18  like that and you shouldn't make assertions like that, yet

19  that was the statement that was conveyed to prospective

20  challengers in that e-mail; correct?

21  **A.**   Yeah, I'd have to look back at the whole thread to see

22  when this was actually said, who actually said it first, if it

23  was copy, pasted.   I wasn't copied on any of it that I can

24  see.   Maybe I'm somewhere in the depths of this copy, but I

25  can absolutely tell you that there were many conversations had

1   about the origins of the list, the process, what to expect,

2   and the understanding of -- of the fact that, you know,

3   bringing these things into the county, the counties will rely

4   upon the data as it's seen.  I...

5           THE COURT:  I think this is a good time to take a

6   break.  We'll take a lunch break and start back at 1:30.

7   Everybody have a good lunch.

8           THE WITNESS:  Thank you.

9           THE COURT:  Thank you.

10          MR. WYNNE:  Your Honor, may I ask a clarification?

11          THE COURT:  Yeah.

12          MR. WYNNE:  The witness is on the stand.  She's also

13  my client.  May I speak with her but try --

14          THE COURT:  Yes, but don't get into her testimony.

15  Obviously, you can speak with her and talk to her about your

16  future questions, but not this, as you know.

17          MR. WYNNE:  Thank you for your clarification.

18          (A break was taken at 12:15 p.m.)

19          (Change of reporter.)

20

21

22

23

24

25

1                    C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6       I do hereby certify that the foregoing pages are a true
    and correct transcript of the proceedings taken down by me in
7   the case aforesaid.

8       This the 1st day of November, 2023.

9

10

11

12

13                    /s/Viola S. Zborowski _____
                      VIOLA S. ZBOROWSKI,
14                    RDR, FAPR, CMR, CRR, RPR, CRC
                      OFFICIAL COURT REPORTER TO
15                    THE HONORABLE STEVE C. JONES

16

17

18

19

20

21

22

23

24

25

## $

**$100,000** [1] - 874:15
**$50,000** [14] - 874:18, 874:24, 875:12, 876:7, 876:20, 877:12, 877:16, 878:5, 878:7, 878:11, 878:13, 878:23, 879:6, 881:17

## '

**'GEORGIA'** [1] - 833:21

## /

**/S/VIOLA** [1] - 937:13

## 1

**1** [36] - 817:12, 835:8, 838:13, 840:11, 840:13, 840:15, 840:17, 841:5, 842:17, 842:19, 843:4, 845:4, 845:6, 846:14, 848:13, 848:19, 850:9, 851:9, 860:24, 861:11, 862:6, 862:7, 863:2, 872:11, 873:19, 879:20, 880:23, 882:18, 887:22, 887:23, 888:16, 889:4, 890:2, 890:15, 893:12, 913:5
**1-10** [1] - 817:8
**10** [10] - 832:12, 832:14, 832:19, 833:6, 833:7, 833:9, 833:13, 833:16, 857:4, 860:20
**100** [3] - 929:16, 929:19, 932:14
**10:40** [1] - 887:14
**10:55** [2] - 887:6, 887:14
**11** [1] - 935:5
**111** [1] - 932:17
**12** [9] - 862:18, 865:7, 865:8, 865:10, 865:15, 865:18, 898:15, 911:9, 935:5
**127** [1] - 914:9
**12:15** [1] - 936:18
**13** [4] - 857:4, 860:20, 913:11
**14** [10] - 871:21, 884:4, 884:6, 885:25, 886:10, 886:15, 889:13, 899:2, 899:22, 901:7
**14TH** [3] - 886:17, 888:21, 889:8
**15** [2] - 884:12, 884:14
**15-MINUTE** [1] - 887:5
**158** [2] - 913:5, 932:15
**159** [4] - 913:5, 915:4, 915:6, 932:13
**16** [6] - 862:18, 865:7, 865:13, 884:12, 884:14, 914:9
**16.4** [1] - 821:24
**161** [2] - 884:12, 884:14
**162** [2] - 884:12, 884:14
**1644** [1] - 822:9
**17** [3] - 833:1, 833:5, 833:16
**18** [1] - 854:7
**18TH** [3] - 914:19, 915:14, 916:3
**19** [1] - 913:1
**1:30** [1] - 936:6
**1ST** [1] - 937:8

## 2

**20** [1] - 930:5
**2010** [1] - 827:25
**2020** [35] - 828:8, 828:10, 829:21, 834:17, 838:16, 841:18, 841:20, 851:21, 852:10, 852:15, 852:20, 853:11, 854:16, 855:21, 860:8, 860:10, 864:2, 868:2, 869:10, 871:21, 884:4, 884:6, 884:24, 885:25, 886:10, 886:15, 888:21, 889:10, 889:13, 903:2, 903:18, 904:23, 905:1, 907:15, 920:19
**2021** [4] - 832:10, 839:5, 843:24, 911:12
**2022** [6] - 844:4, 856:7, 862:15, 865:3, 913:4, 935:2
**2023** [2] - 817:12, 937:8
**21** [2] - 884:24, 935:7
**21ST** [1] - 885:19
**22** [4] - 894:5, 894:25, 935:5, 935:7
**230** [1] - 933:24
**2300** [1] - 932:14
**234** [1] - 935:5
**24-HOUR-NEWS** [1] - 853:24
**25** [3] - 829:17
**268** [1] - 862:18
**27** [8] - 832:19, 891:13, 891:14, 891:21, 896:19, 896:25, 898:15, 899:22, 919:3
**271** [2] - 857:4, 860:20
**274** [4] - 865:6, 865:11, 865:16
**275** [5] - 865:7, 865:8, 865:9, 865:15, 865:18
**28** [16] - 871:16, 871:19, 871:23, 872:3, 872:4, 872:7, 872:9, 874:1, 874:6, 874:11, 877:16, 879:12, 879:13, 897:22, 898:22
**28TH** [3] - 885:12, 885:16, 886:19
**2:20-CV-0302-SCJ** [1] - 817:4

## 3

**3** [9] - 833:1, 833:17, 833:25, 865:8, 865:10, 865:15, 865:18, 904:23, 935:5
**306** [1] - 915:12
**32** [12] - 840:3, 840:4, 841:8, 841:10, 841:11, 841:14, 842:7, 842:20, 845:15, 846:14, 846:18, 848:9
**335** [2] - 845:4, 845:6
**35** [8] - 882:6, 882:7, 882:9, 883:25, 886:2, 886:5, 886:10, 898:16
**364,000** [14] - 836:18, 854:11, 907:24, 907:25, 911:18, 912:12, 914:18, 915:14, 915:15, 916:4, 916:14, 916:20, 918:14, 932:12
**364,541** [1] - 906:6
**3RD** [1] - 905:1

## 4

**4** [1] - 817:3
**404-215-1479** [1] - 818:24

## 41

**41** [3] - 899:1, 899:22, 901:7
**42** [3] - 905:22, 905:24, 906:4

## 5

**5** [4] - 841:18, 845:5, 845:6, 913:5
**500,000** [14] - 922:4, 922:12, 922:18, 923:6, 923:12, 923:21, 923:25, 924:5, 924:11, 924:14, 925:2, 925:19, 926:13, 927:12
**5TH** [5] - 830:17, 838:23, 839:23, 840:7, 849:3

## 6

**6** [2] - 829:21, 868:2
**61** [1] - 884:13
**6TH** [3] - 839:23, 867:9, 869:10

## 7

**7** [2] - 914:9, 932:21
**7.7** [1] - 932:13
**70** [1] - 932:16
**70,000** [2] - 892:10, 892:11
**700,000** [1] - 927:7
**73** [8] - 919:1, 919:2, 919:9, 919:14, 920:22, 920:23, 921:17, 934:18
**73,000** [6] - 899:2, 899:21, 900:15, 901:5, 901:11, 901:18
**73,975** [1] - 899:6
**7TH** [1] - 909:24

## 8

**801(D)(1** [1] - 846:24
**801(D)(2** [1] - 846:23
**801(D)(2)(E)** [1] - 921:6
**803.6** [1] - 822:19
**827** [1] - 819:4
**8TH** [1] - 909:24

## 9

**99.9** [6] - 928:2, 928:13, 928:16, 928:17, 934:19, 935:4
**9:18** [1] - 820:1

## A

**A.M** [2] - 817:3, 820:1
**A.M** [1] - 887:14
**ABLE** [8] - 855:6, 858:1, 868:13, 878:17, 903:1, 903:10, 903:17, 911:2
**ABRAMS** [1] - 855:4
**ABSENTEE** [7] - 898:18, 898:20, 911:12, 911:13, 911:14, 932:6, 932:18
**ABSOLUTE** [2] - 856:4, 916:16
**ABSOLUTELY** [8] - 823:1, 842:13, 852:19, 856:24, 883:13, 930:22, 933:21, 935:25
**ACCEPT** [2] - 844:6, 847:18
**ACCEPTED** [2] - 830:16, 933:10

ACCORDING [5] - 907:25, 911:17, 912:9, 912:10
ACCREDITATION [1] - 927:4
ACCURACY [2] - 842:4, 916:6
ACCURATE [4] - 907:13, 907:20, 929:14, 929:16
ACCUSATIONS [1] - 854:15
ACCUSTOMED [2] - 915:24, 934:25
ACKNOWLEDGED [4] - 846:8, 846:10, 846:12, 888:19
ACTING [3] - 890:17, 919:19, 924:22
ACTIONS [1] - 887:21
ACTIVE [2] - 892:23
ACTIVELY [1] - 894:8
ACTIVITIES [5] - 828:17, 829:12, 838:20, 866:22, 892:2
ACTUAL [4] - 836:12, 837:23, 843:8, 931:10
ACTUALITY [1] - 878:15
ADD [2] - 903:14, 928:22
ADDED [3] - 898:9, 899:4, 903:7
ADDITION [4] - 830:18, 851:7, 851:8, 922:14
ADDITIONAL [5] - 841:1, 848:3, 887:23, 894:17, 930:2
ADDITIONALLY [1] - 917:19
ADDRESS [5] - 820:25, 821:14, 853:23, 924:18, 924:20
ADDRESSED [4] - 822:8, 825:16, 883:10, 907:14
ADHERES [1] - 908:20
ADMINISTRATIVE [3] - 821:2, 821:3, 828:7
ADMISSIBLE [1] - 846:24
ADMISSION [1] - 846:16
ADMIT [6] - 840:10, 846:14, 847:10, 867:4, 919:14, 920:22
ADMITTED [8] - 829:18, 833:12, 846:6, 848:8, 872:3, 882:7, 905:23, 921:16
ADMITTED [1] - 921:16
ADMITTING [1] - 847:25
ADVANCE [1] - 905:25
ADVANCED [1] - 917:17
ADVERSE [2] - 824:24, 825:23
ADVERTISED [1] - 876:1
ADVERTISING [1] - 865:22
AFFIDAVIT [1] - 932:2
AFFIRM [1] - 928:16
AFFIRMED [1] - 832:21
AFORESAID [1] - 937:7
AFTERNOON [1] - 840:9
AGENCY [1] - 873:14
AGENCY [5] - 894:12, 894:14, 896:9, 921:6, 921:9
AGENT [2] - 919:19, 921:7
AGGREGATE [1] - 889:18
AGGRIEVED [1] - 890:7
AGO [2] - 862:1, 927:6
AGREE [24] - 825:24, 826:1, 826:19,

831:17, 831:20, 832:3, 852:19, 854:19, 868:10, 890:16, 904:17, 905:7, 905:14, 911:12, 926:2, 926:4, 926:11, 926:12, 926:23, 926:24, 928:13, 934:20, 934:22, 934:23
AGREED [2] - 822:7, 826:9
AGREEING [1] - 923:20
AGREEMENT [3] - 821:5, 821:23, 826:18
AHEAD [9] - 821:9, 822:13, 860:21, 861:19, 872:25, 912:5, 913:14, 918:4, 934:15
AIDED [1] - 852:1
AILEEN [1] - 818:5
AIN'T [1] - 869:3
ALGORITHMS [1] - 917:1
ALLEGATIONS [5] - 837:23, 892:3, 893:2, 893:7, 895:16
ALLEGED [4] - 869:3, 892:8, 899:22, 901:6
ALLEGES [1] - 899:2
ALLEGRA [1] - 817:15
ALLOW [15] - 826:10, 826:18, 826:22, 840:13, 840:14, 854:21, 867:18, 867:21, 872:2, 894:4, 894:16, 895:3, 896:19, 917:9
ALLOWED [4] - 821:11, 837:1, 887:10, 927:19
ALLOWING [1] - 840:15
ALLOWS [1] - 910:21
ALMOST [1] - 927:7
ALONE [1] - 836:13
ALONGSIDE [2] - 906:14, 907:18
ALTON [1] - 895:17, 895:22
AMEND [1] - 927:7
AMOUNT [1] - 826:2
AMY [6] - 919:18, 920:17, 921:21, 925:5, 925:13, 925:14
ANALYSIS [2] - 890:1, 899:5
ANALYZE [1] - 889:18
AND [2] - 817:3, 817:7
ANNOUNCE [2] - 830:3, 889:16
ANNOUNCED [15] - 830:6, 866:24, 867:7, 868:1, 869:9, 869:12, 880:18, 880:19, 885:2, 885:4, 888:2, 888:20, 889:14, 905:21, 927:6
ANNOUNCING [3] - 885:25, 905:24, 914:18
ANOINTED [1] - 894:13
ANSWER [53] - 822:20, 839:3, 839:11, 839:15, 839:16, 843:23, 845:18, 858:18, 858:20, 858:25, 859:2, 859:10, 859:13, 859:20, 860:11, 862:23, 862:25, 863:1, 865:25, 868:17, 869:4, 869:5, 876:16, 876:17, 877:5, 877:7, 877:8, 885:9, 897:11, 900:24, 903:19, 911:23, 913:8, 917:6, 917:8, 917:9, 917:23, 918:11, 919:20, 923:14, 923:19, 923:20, 923:21, 923:23, 925:9, 927:10, 927:20, 929:1,

929:9, 930:16, 931:21
ANSWERED [11] - 825:11, 849:13, 858:21, 859:15, 879:9, 897:15, 897:24, 901:22, 923:5, 933:2
ANSWERING [3] - 859:25, 909:3, 934:14
ANSWERS [3] - 832:22, 884:15, 896:24
ANYWAY [2] - 823:17, 932:21
APOLOGIES [1] - 887:13
APOLOGIZE [4] - 833:4, 888:10, 888:13, 926:9
APPEAR [2] - 923:2
APPEARANCES [2] - 817:13, 818:1
APPEARING [1] - 909:12
APPELLATE [1] - 849:18
APPLICABLE [1] - 916:1
APPRECIATE [3] - 824:11, 896:20, 897:2
APPROACH [3] - 846:4, 852:18, 887:10
APPROVED [1] - 910:18
AREAS [1] - 825:18
ARGUE [1] - 822:24
ARGUING [2] - 847:2, 847:7
ARGUMENT [2] - 841:5, 852:6
ARRIVE [1] - 899:5
ASHLEY [1] - 817:16
ASIDE [1] - 866:4
ASPECT [1] - 826:11
ASPECTS [4] - 852:25, 900:12, 900:14, 900:20
ASSERTIONS [2] - 935:8, 935:18
ASSISTANCE [5] - 858:2, 882:23, 884:2, 886:6, 886:12
ASSISTANT [1] - 887:9
ASSUME [1] - 911:4
ASSUMING [2] - 847:3, 925:13
ASSURE [3] - 928:2, 934:18, 934:24
AT [1] - 820:1
ATLANTA [2] - 817:2, 818:23
ATTACHED [4] - 845:16, 846:10, 883:23, 886:23
ATTACHES [1] - 841:20
ATTACHMENT [5] - 841:24, 842:3, 842:6, 842:7, 842:20
ATTACHMENTS [1] - 841:23
ATTEMPT [2] - 876:25, 898:11
ATTEMPTS [2] - 821:18, 821:19
ATTENTION [14] - 845:4, 845:5, 865:6, 865:8, 873:24, 888:15, 890:14, 891:12, 898:16, 905:22, 907:12, 914:8, 919:1, 919:12
ATTENTIONS [2] - 831:5, 831:10
ATTEST [1] - 904:20
ATTORNEY [12] - 841:25, 843:5, 843:6, 843:8, 891:2, 893:13, 900:6, 911:23, 911:25, 912:3
AUTHENTICITY [6] - 821:25, 822:1, 822:4, 822:7, 822:17, 823:2

**AVAILABILITY**[1] - 914:24
**AVAILABLE**[18] - 831:18, 831:21, 831:22, 832:2, 832:4, 833:22, 833:23, 835:23, 836:7, 882:24, 883:12, 883:14, 903:5, 903:12, 904:11, 932:6, 932:7
**AVENUES**[2] - 836:25, 837:2
**AVERAGE**[1] - 932:15
**AWFUL**[1] - 907:16

## B

**BACKGROUND**[2] - 849:21, 935:6
**BAD**[1] - 860:10
**BALLOT**[7] - 882:14, 898:18, 898:20, 905:1, 909:10, 909:13, 934:13
**BALLOTING**[1] - 852:2
**BALLOTS**[10] - 851:20, 852:9, 852:14, 852:17, 855:20, 892:10, 904:25, 911:13, 911:15, 932:6
**BAR**[1] - 893:22
**BASED**[15] - 835:25, 838:1, 838:3, 847:9, 847:15, 849:25, 850:3, 886:14, 893:10, 899:24, 926:22, 927:15, 927:22, 929:7
**BASIS**[7] - 822:15, 822:16, 854:4, 854:8, 876:10, 893:20, 926:21
**BATES**[1] - 920:5
**BATTLEGROUND**[1] - 891:4
**BEATEN**[1] - 875:16
**BEFORE**[1] - 817:11
**BEGAN**[2] - 922:15, 924:13
**BEGINNING**[1] - 824:1
**BEHALF**[4] - 890:8, 890:17, 902:11, 919:10
**BEHALF**[3] - 817:14, 817:20, 818:3
**BEHIND**[1] - 842:7
**BELIEF**[1] - 893:23
**BELL**[1] - 818:5
**BELONG**[1] - 923:25
**BENCH**[1] - 817:10
**BENCH**[1] - 823:22
**BERSON**[1] - 934:11
**BEST**[4] - 886:23, 902:24, 907:19, 908:20
**BETTER**[1] - 857:15
**BEYOND**[1] - 917:23
**BIDEN**[8] - 892:11, 892:20, 899:3, 899:6, 899:22, 901:6, 901:11, 901:18
**BIG**[11] - 842:15, 875:20, 915:24, 916:21, 932:2, 932:10, 932:11, 932:20
**BILL**[1] - 901:16
**BILLS**[13] - 875:23, 877:22, 878:4, 879:5, 879:6, 895:14, 897:9, 897:15, 897:21, 897:24, 898:12, 902:12, 902:13
**BINDER**[4] - 829:15, 835:8, 840:3, 858:8
**BIT**[8] - 834:3, 837:4, 846:2, 863:16, 867:22, 907:22, 908:14, 916:24

**BLACK**[2] - 892:23
**BLANKED**[1] - 845:11
**BLOCK**[1] - 890:10
**BLOG**[22] - 829:4, 829:10, 829:23, 829:24, 829:25, 863:10, 863:18, 881:21, 882:9, 882:21, 883:25, 885:25, 886:5, 886:8, 886:10, 886:21, 886:25, 889:17, 905:24, 906:12, 906:16, 907:23
**BLUE**[2] - 858:8, 887:10
**BOARD**[2] - 828:24, 871:5
**BOLD**[1] - 906:3
**BOLDED**[2] - 882:12, 882:13
**BOPP**[20] - 844:19, 851:4, 890:7, 890:8, 890:10, 891:2, 893:12, 893:15, 893:19, 893:24, 894:6, 894:11, 894:25, 896:9, 896:11, 896:21, 897:9, 897:15, 902:11, 903:8
**BOPP'S**[3] - 852:6, 852:18, 893:21
**BORN**[4] - 868:23, 868:24, 869:2
**BOTTOM**[3] - 882:12, 883:25, 906:3
**BOUNTIES**[1] - 898:10
**BOUNTY**[12] - 866:23, 866:24, 867:7, 867:11, 868:2, 868:5, 869:9, 869:16, 869:23, 870:8, 871:13, 874:18, 874:25, 875:7, 897:22, 898:2, 898:3, 898:6, 898:13, 898:14, 898:24
**BOX**[1] - 887:10
**BREAK**[20] - 881:3, 884:16, 887:5, 887:14, 887:20, 888:7, 888:8, 888:19, 888:24, 889:1, 915:17, 916:10, 916:11, 930:17, 932:9, 932:16, 932:17, 936:6, 936:18
**BREAKDOWN**[1] - 852:16
**BRIAN**[2] - 885:11, 885:15
**BRIDGE**[1] - 825:15
**BRIEFLY**[3] - 821:8, 829:14, 887:7
**BRIEFS**[1] - 874:20
**BRING**[4] - 880:22, 894:14, 907:12, 910:14
**BRINGING**[2] - 930:13, 936:3
**BROAD**[15] - 863:4, 863:14, 863:21, 864:10, 864:12, 864:15, 864:16, 864:18, 865:22, 871:7, 881:20, 881:24, 886:20, 898:3, 930:10
**BROADCAST**[1] - 905:10
**BROUGHT**[4] - 875:25, 895:1, 896:6
**BRUTALLY**[1] - 875:16
**BRYAN**[2] - 888:10, 911:1
**BRYAN**[2] - 817:16, 888:12
**BUILD**[1] - 863:4
**BUILD**[5] - 863:13, 863:21, 864:10, 864:15, 865:21
**BUILT**[1] - 881:20
**BULLET**[10] - 866:1, 882:18, 887:24, 888:17, 889:4, 889:5, 889:11, 889:18, 890:2, 890:22
**BURDEN**[1] - 930:2
**BUSH**[2] - 891:3, 893:13
**BUSINESS**[2] - 822:17, 822:19

**BUT..**[1] - 935:16
**BY**[66] - 827:18, 833:15, 838:12, 839:24, 841:7, 844:2, 844:22, 845:14, 848:5, 848:11, 850:8, 853:8, 855:17, 856:5, 858:15, 860:22, 861:8, 862:5, 862:19, 864:6, 865:2, 865:19, 866:8, 867:6, 867:25, 869:8, 872:6, 873:23, 874:13, 876:5, 876:18, 877:2, 877:11, 879:15, 880:8, 881:4, 881:10, 884:18, 885:18, 887:19, 888:14, 889:3, 895:10, 897:4, 898:5, 899:19, 901:3, 902:2, 904:5, 909:9, 910:17, 911:11, 912:8, 913:20, 916:13, 918:13, 919:8, 920:16, 921:19, 924:3, 925:15, 925:25, 926:16, 927:23, 928:12, 934:16

## C

**CAMERON**[1] - 817:21
**CANNOT**[3] - 836:10, 869:5, 913:18
**CAPACITY**[3] - 847:5, 890:3, 890:23
**CARE**[2] - 820:7, 920:12
**CAREFULLY**[1] - 896:10
**CASE**[35] - 820:17, 820:22, 821:15, 823:20, 825:2, 825:17, 825:19, 832:10, 835:11, 835:18, 835:25, 837:1, 837:5, 837:10, 838:25, 839:1, 844:3, 844:7, 847:14, 847:17, 849:21, 854:1, 854:20, 854:21, 854:22, 855:1, 865:4, 896:3, 896:23, 896:24, 900:6, 900:12, 900:14, 924:23, 937:7
**CASE-IN-CHIEF**[1] - 825:2
**CASES**[3] - 825:12, 855:1, 900:4
**CASH**[5] - 876:7, 876:20, 877:12, 878:7, 878:24
**CAST**[17] - 851:20, 852:9, 852:14, 852:17, 858:23, 860:25, 861:12, 899:2, 899:6, 899:21, 901:6, 904:25, 906:8, 909:1, 909:10, 909:13, 911:14
**CASTING**[1] - 911:13
**CATHERINE**[2] - 824:20, 827:13
**CATHERINE**[4] - 817:6, 819:4, 827:8, 827:14
**CAVEAT**[1] - 908:3
**CELLS**[1] - 918:6
**CENTER**[2] - 833:21, 874:16
**CERTAIN**[6] - 860:13, 891:19, 892:12, 915:20, 917:15, 917:16
**CERTAINLY**[3] - 828:18, 846:19, 912:19
**CERTIFICATION**[1] - 822:17
**CERTIFIED**[1] - 903:16
**CERTIFY**[1] - 937:6
**CETERA**[1] - 881:22
**CHAIR**[1] - 883:11
**CHAIRPERSON**[1] - 883:18
**CHALLENGE**[28] - 822:15, 850:19, 854:11, 880:11, 880:20, 889:23, 889:24, 895:22, 904:12, 905:21,

905:25, 906:6, 911:18, 913:25, 914:13, 914:17, 915:2, 915:13, 916:4, 916:15, 916:20, 918:14, 922:12, 927:25, 928:20, 928:24, 933:15, 934:7

**CHALLENGED** [5] - 906:10, 912:11, 915:4, 916:7, 932:13

**CHALLENGER** [1] - 921:22

**CHALLENGERS** [7] - 918:16, 918:17, 918:21, 918:24, 919:11, 922:9, 935:20

**CHALLENGERS'** [1] - 921:22

**CHALLENGES** [17] - 835:24, 836:1, 850:19, 864:3, 889:11, 895:18, 900:3, 907:22, 907:24, 911:17, 912:10, 912:17, 915:7, 920:18, 931:23, 933:9, 935:4

**CHALLENGING** [8] - 822:16, 822:18, 836:18, 907:24, 914:18, 928:2, 928:14, 934:19

**CHANCE** [2] - 821:10, 924:24

**CHANGE** [1] - 936:19

**CHANGED** [1] - 831:15

**CHANNELS** [1] - 853:24

**CHARACTERIZE** [1] - 890:20

**CHATHAM** [2] - 892:14, 892:18

**CHAVIS** [2] - 898:17, 898:21

**CHECK** [2] - 916:6, 919:5

**CHIEF** [1] - 825:2

**CHOOSES** [1] - 929:11

**CHRISTINA** [1] - 817:16

**CIRCLES** [1] - 887:4

**CIRCUMSTANCE** [1] - 878:18

**CIRCUMSTANCES** [4] - 903:10, 929:6, 929:8

**CITIZEN** [2] - 906:7, 906:22

**CITIZENS** [2] - 891:3, 893:14

**CITIZENS** [9] - 892:10, 892:11, 899:3, 899:21, 900:16, 901:6, 901:11, 901:18, 933:7

**CITY** [1] - 868:23

**CLAFFERTY** [1] - 817:19

**CLAIM** [2] - 878:3, 916:5

**CLAIMS** [2] - 892:2, 906:14

**CLARIFICATION** [5] - 829:6, 844:16, 917:3, 936:10, 936:17

**CLARIFY** [6] - 843:25, 850:4, 876:6, 880:9, 897:5, 919:3

**CLAYTON** [3] - 892:14, 892:15, 892:17

**CLEANED** [1] - 913:1

**CLEAR** [6] - 834:19, 842:13, 842:22, 847:22, 931:16, 934:1

**CLEARLY** [1] - 931:6

**CLERK** [1] - 820:6

**CLIENT** [1] - 936:13

**CLIP** [5] - 856:11, 866:5, 913:9, 913:11, 913:19

**CLOSE** [1] - 903:16

**CLOSELY** [2] - 883:4

**CLOSEST** [1] - 891:4

**CMR** [2] - 818:22, 937:14

**COBB** [3] - 892:13, 892:15, 892:17

**CODE** [1] - 931:12

**COLD** [1] - 823:15

**COLLABORATED** [1] - 849:5

**COLLABORATORS** [1] - 918:15

**COMBINATION** [1] - 841:16

**COMING** [8] - 832:6, 869:22, 870:15, 870:16, 871:3, 883:2, 907:15, 918:19

**COMMONLY** [1] - 909:14

**COMMUNICATING** [2] - 918:20, 918:22

**COMMUNICATION** [2] - 849:6, 851:11

**COMMUNICATIONS** [5] - 828:25, 829:2, 829:4, 829:14, 919:11

**COMPANY** [2] - 873:4, 873:13

**COMPARE** [1] - 932:21

**COMPARING** [1] - 927:2

**COMPENSATION** [3] - 870:10, 870:13, 871:1

**COMPILED** [2] - 889:23

**COMPLAINT** [8] - 891:17, 891:20, 893:2, 899:1, 899:16, 901:4

**COMPLETELY** [2] - 847:19, 849:20

**COMPORTS** [1] - 908:19

**COMPOUND** [5] - 863:22, 863:24, 881:2, 888:23, 916:9

**COMPREHENSIVE** [1] - 917:12

**COMPUTER** [1] - 917:3

**CON** [1] - 889:9

**CONCERN** [1] - 933:2

**CONCERNED** [2] - 878:4, 931:24

**CONCERNING** [2] - 820:22, 921:8

**CONCERNS** [2] - 870:17, 883:2

**CONDITIONS** [1] - 873:10

**CONDUCTED** [2] - 901:20, 923:23

**CONFIDENT** [3] - 912:4, 929:10, 929:19

**CONFIRM** [2] - 880:23, 906:7

**CONFIRMATION** [4] - 821:24, 823:3, 823:4, 823:10

**CONFUSED** [1] - 822:22

**CONNECTING** [1] - 836:16

**CONSIDER** [3] - 845:22, 864:14, 865:24

**CONSIDERATION** [3] - 933:11, 933:19, 935:11

**CONSIDERED** [2] - 866:1, 933:22

**CONSISTENT** [1] - 914:14

**CONSISTS** [1] - 919:9

**CONSTITUTION'S** [1] - 852:5

**CONSULTANT** [3] - 834:6, 834:8, 834:15

**CONSULTANTS** [6] - 830:17, 841:15, 841:25, 849:6, 851:12, 872:12

**CONTACT** [5] - 879:23, 880:11, 880:16, 897:8, 934:3

**CONTACTED** [1] - 830:17

**CONTACTING** [1] - 933:13

**CONTEMPLATES** [1] - 890:16

**CONTEXT** [29] - 834:1, 834:19, 845:21, 858:24, 867:13, 875:4, 875:5, 877:19, 878:16, 879:3, 882:21, 883:6, 885:6,

885:10, 889:9, 890:5, 891:10, 898:9, 899:4, 902:24, 905:8, 907:9, 912:19, 915:17, 924:8, 928:23, 929:1, 932:12, 935:11

**CONTEXTS** [1] - 871:14

**CONTINGENT** [3] - 878:7, 878:13, 904:14

**CONTINUE** [4] - 874:14, 887:4, 903:13, 903:21

**CONTINUED** [1] - 818:1

**CONTRACTOR** [3] - 828:11, 828:12, 920:20

**CONTRIBUTION** [1] - 849:19

**CONTROL** [3] - 916:16, 916:18, 920:12

**CONTROLLED** [1] - 916:23

**CONVERSATION** [2] - 830:18, 883:18

**CONVERSATIONS** [1] - 935:25

**CONVERTED** [1] - 917:20

**CONVEYED** [1] - 935:19

**COOPER** [1] - 817:7

**COOPER** [1] - 907:5

**COORDINATE** [1] - 922:9

**COORDINATED** [2] - 881:25, 882:2

**COPIED** [3] - 843:8, 919:10, 935:23

**COPY** [9] - 824:13, 857:20, 857:22, 858:2, 858:10, 910:22, 931:13, 935:23, 935:24

**CORDON** [1] - 832:5

**CORNER** [1] - 858:8

**CORRECT** [224] - 822:4, 822:5, 822:11, 827:22, 827:23, 828:9, 828:10, 828:11, 828:12, 828:14, 828:15, 829:2, 829:12, 829:21, 829:22, 829:24, 830:1, 830:2, 830:4, 830:5, 830:7, 830:8, 830:11, 830:25, 831:3, 831:8, 832:10, 832:11, 832:15, 832:19, 832:23, 832:24, 833:24, 834:1, 834:2, 834:6, 834:7, 834:9, 834:10, 834:11, 834:12, 834:13, 834:14, 834:16, 834:18, 835:3, 838:14, 838:21, 838:23, 840:8, 841:18, 841:19, 841:21, 844:4, 844:11, 844:13, 844:14, 844:20, 844:23, 844:24, 845:1, 845:17, 845:20, 845:21, 847:25, 848:21, 848:25, 849:3, 849:4, 850:10, 850:13, 850:14, 850:16, 850:17, 850:20, 850:21, 850:23, 850:24, 851:1, 851:2, 851:7, 851:9, 851:10, 851:13, 854:14, 856:21, 858:11, 858:12, 858:23, 861:1, 861:13, 862:12, 862:13, 868:3, 869:17, 869:24, 870:10, 870:13, 871:1, 871:10, 871:14, 871:21, 871:22, 872:20, 874:25, 876:7, 876:20, 878:8, 878:14, 878:19, 879:1, 879:19, 879:24, 880:12, 880:15, 880:16, 880:20, 881:1, 881:6, 881:7, 881:8, 881:12, 881:18, 881:22, 882:1, 882:4, 882:10, 882:15, 882:20, 882:21, 883:16, 884:4, 884:7, 884:23,

885:5, 885:6, 885:21, 886:1, 886:4, 886:7, 886:14, 886:15, 886:17, 888:22, 889:6, 889:15, 889:20, 889:22, 890:4, 890:19, 890:24, 890:25, 891:8, 891:15, 891:16, 891:18, 895:2, 897:7, 897:13, 899:3, 899:10, 899:23, 902:4, 902:5, 902:7, 902:8, 902:10, 902:14, 902:17, 902:19, 902:23, 902:24, 904:13, 904:19, 904:23, 905:2, 905:6, 905:16, 906:1, 906:2, 906:14, 906:15, 906:17, 906:19, 906:23, 907:1, 907:5, 907:8, 907:9, 908:2, 908:3, 910:12, 910:20, 911:15, 911:16, 911:20, 912:14, 913:22, 913:25, 914:19, 915:16, 915:17, 918:17, 918:21, 918:24, 918:25, 920:19, 922:9, 922:13, 923:3, 927:12, 927:18, 927:22, 928:4, 928:9, 928:20, 930:20, 930:21, 930:23, 934:21, 935:9, 935:20, 937:6
**CORRECTION** [1] - 911:22
**CORRECTLY** [2] - 928:20, 928:25
**CORROBORATE** [1] - 899:10
**COUNSEL** [32] - 820:2, 822:11, 824:11, 825:13, 825:21, 839:10, 840:23, 842:24, 844:13, 844:15, 844:17, 844:18, 844:23, 849:17, 850:3, 851:4, 856:21, 867:20, 874:19, 888:10, 890:7, 891:2, 893:13, 894:13, 896:3, 916:9, 920:6, 921:23
**COUNSEL'S** [1] - 849:23
**COUNTED** [8] - 851:20, 851:22, 852:9, 852:14, 852:17, 862:10, 862:21, 892:9
**COUNTIES** [1] - 892:18
**COUNTIES** [29] - 851:22, 858:23, 860:25, 861:12, 862:10, 862:22, 866:11, 892:8, 892:9, 892:13, 892:19, 892:23, 895:23, 912:24, 915:4, 915:6, 930:19, 930:23, 931:17, 931:22, 932:14, 933:5, 933:8, 933:9, 933:12, 933:13, 933:17, 936:3
**COUNTING** [1] - 851:24
**COUNTY** [14] - 906:5, 909:1, 912:22, 922:7, 926:19, 926:25, 927:14, 929:5, 929:7, 929:11, 929:13, 930:25, 932:5, 936:3
**COUNTY** [5] - 906:17, 906:19, 906:25, 907:3, 907:5
**COUPLE** [6] - 820:25, 823:25, 904:8, 912:1, 927:6, 928:8
**COUPLED** [1] - 859:1
**COURSE** [2] - 851:12, 868:9
**COURT** [245] - 817:1, 818:22, 818:23, 820:1, 820:2, 820:6, 820:16, 820:19, 820:21, 821:1, 821:9, 822:3, 822:8, 822:11, 822:20, 822:24, 823:4, 823:7, 823:12, 823:15, 823:19, 823:24, 824:2, 824:9, 824:12, 824:14, 824:21, 825:3, 825:6, 825:8, 825:20, 826:4, 826:8, 826:15, 827:3, 827:5, 827:11,

827:15, 833:6, 833:9, 833:12, 835:9, 835:15, 835:24, 836:8, 836:15, 836:22, 837:3, 837:8, 837:12, 837:18, 837:25, 838:5, 838:8, 839:14, 839:19, 840:13, 840:21, 841:4, 842:3, 842:6, 842:9, 842:17, 842:19, 843:2, 843:4, 843:10, 843:14, 843:19, 844:1, 844:19, 844:21, 845:8, 845:12, 845:24, 846:2, 847:2, 847:22, 848:1, 848:4, 848:7, 849:7, 849:16, 849:22, 850:7, 852:21, 853:5, 853:13, 854:3, 854:19, 855:6, 855:10, 855:15, 855:25, 856:12, 856:17, 857:2, 857:5, 857:8, 857:11, 857:16, 857:19, 857:22, 858:4, 858:11, 858:14, 859:4, 859:7, 859:10, 859:16, 859:21, 859:23, 860:18, 860:21, 861:6, 861:17, 861:22, 862:1, 862:17, 863:24, 864:17, 864:21, 865:11, 865:16, 866:6, 867:1, 867:4, 867:10, 867:18, 868:4, 868:17, 868:21, 869:4, 871:25, 872:2, 872:19, 872:25, 873:11, 873:21, 874:6, 874:8, 874:11, 875:2, 875:5, 876:2, 876:4, 876:8, 876:13, 876:22, 876:24, 877:7, 879:8, 879:12, 881:3, 881:9, 884:15, 885:8, 887:2, 887:8, 887:12, 887:15, 888:3, 888:6, 888:9, 888:13, 888:24, 891:23, 891:25, 892:4, 892:15, 892:19, 892:25, 893:4, 894:1, 894:19, 895:5, 895:8, 895:15, 896:15, 897:2, 897:14, 897:19, 897:23, 899:11, 899:17, 899:25, 900:5, 901:22, 903:22, 904:1, 904:4, 909:5, 909:22, 910:8, 910:10, 910:14, 910:25, 911:6, 911:22, 913:10, 913:12, 913:14, 913:17, 916:11, 917:2, 917:5, 918:2, 918:4, 918:11, 919:6, 919:15, 919:22, 920:1, 920:14, 920:24, 921:13, 923:5, 923:9, 923:14, 923:18, 924:2, 924:16, 924:22, 925:1, 925:7, 925:9, 925:17, 925:22, 926:8, 926:11, 927:19, 929:12, 930:4, 931:7, 931:21, 932:19, 933:11, 933:22, 934:10, 936:5, 936:9, 936:11, 936:14, 937:3, 937:14
**COURT** [7] - 844:25, 860:8, 890:3, 890:6, 890:23, 896:8, 913:19
**COURT** [9] - 821:6, 821:21, 821:23, 849:18, 855:23, 874:2, 903:2, 911:4
**COURT'S** [3] - 821:23, 903:13, 920:5
**COURTROOM** [2] - 837:14, 856:19
**COVER** [2] - 826:6, 875:23
**COVERED** [3] - 825:5, 889:17, 920:5
**CRAWFORD** [6] - 834:15, 834:21, 841:17, 846:20, 851:11, 873:4
**CRC** [2] - 818:22, 937:14
**CREATE** [5] - 852:2, 883:2, 889:24, 907:14, 917:17
**CREATED** [13] - 830:9, 830:14, 833:1, 833:17, 833:19, 836:13, 836:14,

915:3, 915:5, 915:12, 915:14, 916:4, 918:14
**CREATION** [1] - 873:15
**CREDIBLE** [1] - 886:12
**CRITICAL** [1] - 884:2
**CROSS** [12] - 824:22, 824:24, 825:13, 825:15, 825:22, 826:10, 826:17, 826:21, 868:9, 930:8, 934:10
**CROSS** [2] - 819:3, 827:17
**CROSS-EXAMINATION** [1] - 827:17
**CROSS-EXAMINATION** [7] - 824:22, 824:24, 825:13, 825:22, 826:21, 868:9, 934:10
**CRR** [2] - 818:22, 937:14
**CRYSTAL** [1] - 842:13
**CSV** [4] - 915:10, 917:19, 917:23, 918:9
**CULLEN** [1] - 817:22
**CULPRIT** [1] - 858:7
**CURING** [1] - 932:8
**CURRENT** [1] - 827:21
**CUSTODY** [1] - 920:12
**CUT** [1] - 826:2
**CYCLE** [1] - 828:8

# D

**D)** [1] - 921:7
**DANA** [1] - 818:4
**DASH** [1] - 889:19
**DATA** [24] - 850:12, 889:18, 889:23, 899:5, 903:4, 915:6, 915:24, 916:21, 926:21, 927:15, 927:22, 929:1, 929:10, 929:18, 929:19, 929:20, 932:11, 934:25, 935:6, 936:4
**DATA-DRIVEN** [1] - 899:5
**DATABASE** [1] - 932:13
**DATASETS** [2] - 927:2, 929:2
**DATE** [6] - 844:5, 883:10, 886:3, 886:25, 889:16, 899:20
**DATED** [5] - 829:21, 841:18, 871:20, 884:4, 886:10
**DAVIS** [1] - 817:7
**DAVIS** [2] - 906:19, 907:11
**DAYS** [8] - 829:25, 840:8, 872:12, 873:18, 885:1, 885:24, 886:4, 886:5
**DEAL** [3] - 878:17, 932:2, 932:20
**DEALING** [1] - 877:19
**DEBATE** [1] - 853:23
**DECEMBER** [23] - 836:13, 884:4, 884:6, 884:24, 885:25, 886:10, 886:15, 886:17, 888:21, 889:8, 889:13, 913:25, 914:2, 914:3, 914:15, 914:19, 915:3, 915:13, 915:14, 916:3, 920:18
**DECIDE** [8] - 821:10, 900:5, 900:7, 900:9, 900:11, 900:17, 931:18, 931:22
**DECIDED** [1] - 934:4
**DECIDES** [1] - 929:7
**DEFENDANT** [3] - 847:6, 847:14, 921:1
**DEFENDANTS** [9] - 821:20, 854:4, 854:7, 892:14, 893:2, 900:9, 919:10,

921:2, 921:15
**DEFENDANTS** [2] - 817:8, 817:20
**DEFENSE** [1] - 912:3
**DEFINE** [2] - 864:16, 882:5
**DEFINITE** [1] - 898:12
**DEFINITELY** [2] - 931:8, 931:9
**DEFINITION** [1] - 923:17
**DEFINITIVE** [1] - 869:20
**DEGREE** [1] - 919:18
**DEKALB** [2] - 892:13, 892:17
**DELIBERATE** [2] - 851:25, 852:1
**DELVE** [1] - 837:22
**DEMOCRAT** [4] - 851:22, 851:23, 883:8, 883:22
**DEMOCRATIC** [9] - 858:23, 860:25, 861:12, 862:10, 862:21, 883:15, 884:7, 884:20, 885:20
**DEMOCRATS'** [1] - 852:1
**DEMOGRAPHICS** [1] - 896:4
**DEMONSTRATE** [1] - 836:24
**DENY** [1] - 856:22
**DEPOSITION** [40] - 839:4, 839:6, 842:24, 844:3, 844:7, 844:11, 845:2, 845:5, 845:7, 847:10, 856:6, 857:4, 857:5, 857:9, 857:10, 857:12, 857:14, 857:16, 857:20, 858:20, 858:21, 859:8, 860:19, 862:14, 862:25, 865:3, 866:2, 884:10, 884:25, 885:19, 885:22, 886:17, 913:4, 913:21, 914:8, 915:19, 935:1, 935:2, 935:9, 935:10
**DEPTH** [1] - 825:18
**DEPTHS** [1] - 935:24
**DEREK** [1] - 817:6
**DEREK** [2] - 906:16, 907:10
**DESCRIBE** [2] - 838:20, 931:10
**DESCRIBING** [1] - 869:23
**DESPITE** [2] - 821:18, 821:19
**DETAIL** [1] - 860:12
**DETERMINATIONS** [1] - 912:24
**DETERMINE** [4] - 849:24, 861:13, 862:20, 933:9
**DETERMINED** [1] - 849:18
**DETERMINING** [1] - 861:1
**DEVELOP** [1] - 854:22
**DICHRAM** [1] - 846:22
**DIFFERENCE** [1] - 908:5
**DIFFERENT** [25] - 832:6, 837:2, 864:7, 870:4, 893:11, 895:16, 895:24, 897:11, 898:1, 900:4, 900:8, 900:11, 904:23, 904:25, 905:3, 908:15, 909:18, 911:3, 911:8, 916:17, 916:24, 923:7, 926:3, 927:5, 927:9
**DIFFERENTLY** [1] - 925:6
**DIFFICULT** [4] - 843:11, 843:19, 858:10, 878:18
**DIGITAL** [1] - 873:13
**DIGITAL** [2] - 873:15, 931:13
**DIGITALLY** [1] - 931:15
**DIKRA** [1] - 873:4

**DILUTING** [1] - 852:5
**DILUTION** [1] - 853:1
**DIRE** [3] - 894:15, 919:17, 919:22
**DIRECT** [1] - 819:3
**DIRECT** [27] - 825:14, 825:24, 826:2, 826:5, 826:8, 826:11, 826:17, 826:20, 826:25, 832:25, 845:4, 845:5, 863:2, 865:6, 865:7, 873:24, 881:13, 885:16, 897:8, 898:16, 905:22, 914:8, 919:1, 919:12, 930:8
**DIRECTED** [1] - 849:14
**DIRECTLY** [1] - 881:14
**DISAGREE** [6] - 860:6, 862:13, 882:2, 900:25, 926:15, 928:11
**DISAGREEING** [2] - 830:21, 923:20
**DISCOVERY** [1] - 843:9
**DISCUSS** [3] - 821:7, 829:14, 849:12
**DISCUSSED** [4] - 881:23, 888:1, 898:10, 931:25
**DISCUSSING** [2] - 887:21, 934:17
**DISCUSSION** [1] - 888:5
**DISMISSED** [5] - 835:12, 893:5, 893:7, 902:3, 902:16
**DISMISSING** [1] - 902:22
**DISPUTE** [1] - 868:11
**DISPUTES** [1] - 852:25
**DISTRIBUTION** [1] - 873:15
**DISTRICT** [6] - 817:1, 817:1, 817:11, 818:23, 937:3, 937:4
**DIVISION** [1] - 817:2
**DOCKET** [1] - 817:4
**DOCUMENT** [20] - 835:7, 835:18, 838:15, 838:17, 838:19, 838:23, 842:21, 843:14, 843:16, 846:9, 846:10, 848:14, 850:22, 911:25, 920:3, 920:4, 920:7, 920:8, 921:20
**DOCUMENTARY** [2] - 841:1, 908:6
**DOCUMENTS** [5] - 842:14, 843:9, 848:13, 868:13, 910:24
**DOE** [2] - 817:3, 817:3
**DOES** [1] - 817:8
**DOLLAR** [1] - 905:11
**DOLLARS** [4] - 842:25, 872:20, 872:23, 873:2
**DON** [1] - 873:12
**DONATION** [4] - 830:19, 872:12, 873:8
**DONE** [9] - 826:17, 853:4, 873:8, 886:22, 903:23, 911:2, 913:3, 916:22, 917:18
**DONOR** [2] - 870:4, 873:6
**DONOR'S** [1] - 838:19
**DOUBLE** [1] - 919:5
**DOUBLE-CHECK** [1] - 919:5
**DOWN** [18] - 825:23, 826:2, 827:1, 846:2, 852:23, 866:14, 871:20, 881:3, 888:24, 889:1, 905:1, 915:17, 916:10, 916:11, 922:16, 932:9, 932:16, 937:6
**DR** [1] - 918:6
**DRAFT** [1] - 901:23
**DRAFTED** [1] - 905:9

**DRASTICALLY** [1] - 831:15
**DRIVEN** [1] - 899:5
**DRIVER'S** [2] - 910:10, 910:12
**DROP** [1] - 824:7
**DULUTH** [1] - 898:17
**DULY** [1] - 827:9
**DURING** [6] - 822:22, 828:8, 828:10, 866:2, 875:17, 921:9
**DUTIES** [2] - 828:1, 828:7

## E

**E-MAIL** [35] - 840:1, 841:14, 841:17, 841:18, 841:20, 845:16, 846:10, 871:18, 871:19, 871:20, 872:15, 872:20, 873:3, 873:25, 874:23, 878:3, 878:4, 878:12, 878:23, 879:2, 881:14, 881:19, 885:11, 898:11, 921:21, 921:24, 922:8, 922:10, 922:21, 935:3, 935:14, 935:20
**E-MAILED** [1] - 885:15
**E-MAILS** [2] - 841:16, 919:9
**E-N-G-E-L-B-R-E-C-H-T** [1] - 827:14
**EARLY** [1] - 823:15
**EASE** [1] - 829:16
**EASILY** [1] - 855:5
**EFFORT** [7] - 852:1, 880:11, 882:15, 905:25, 906:7, 914:18, 917:13
**EFFORTS** [1] - 906:22
**EIGHT** [2] - 892:23, 893:1
**EITHER** [4] - 829:11, 839:23, 868:24, 917:8
**ELECTION** [1] - 834:17
**ELECTION** [49] - 828:8, 830:1, 830:10, 830:25, 831:1, 831:2, 831:18, 831:21, 831:22, 832:2, 832:3, 832:4, 833:3, 833:18, 833:23, 835:1, 835:2, 840:8, 851:21, 851:24, 851:25, 852:10, 852:15, 852:25, 853:12, 854:16, 855:21, 860:8, 863:20, 863:23, 864:11, 879:18, 880:10, 883:5, 883:9, 884:2, 886:12, 889:19, 890:19, 891:6, 891:7, 903:16, 904:19, 905:5, 905:16, 906:8, 909:10, 909:24
**ELECTIONS** [5] - 882:15, 903:17, 904:23, 905:1, 906:9
**ELECTOR** [3] - 880:20, 905:21, 929:4
**ELECTORATE** [1] - 831:5
**ELECTORS** [2] - 891:6, 915:6
**ELEMENT** [3] - 836:24, 892:21, 892:22
**ELEMENTS** [7] - 848:20, 849:2, 849:11, 879:16, 887:23, 900:8, 914:24
**ELICITED** [1] - 905:19
**ELIGIBILITY** [2] - 906:11, 908:20
**ELSEWHERE** [1] - 863:19
**EMPLOYEE** [1] - 910:20
**EMPLOYEES** [2] - 828:9, 828:11
**EMPLOYMENT** [1] - 921:9
**END** [3] - 820:13, 832:7, 903:9
**ENDEAVOR** [1] - 837:22

ENDED [1] - 877:1
ENGAGE [1] - 838:21
ENGAGED [2] - 892:8, 892:9
ENGELBRECHT [43] - 824:20, 824:23,
827:13, 827:19, 827:21, 832:8,
836:17, 838:13, 841:2, 841:8, 844:3,
847:12, 847:16, 848:6, 848:12,
855:19, 861:22, 869:5, 872:7, 874:22,
877:3, 887:16, 887:20, 888:15,
895:11, 896:11, 896:17, 896:20,
896:22, 897:5, 897:18, 898:6, 900:24,
901:4, 901:22, 904:10, 912:9, 913:22,
917:6, 917:7, 920:17, 924:4, 934:17
ENGELBRECHT [3] - 817:6, 819:4,
827:8
ENGELBRECHT'S [3] - 841:6, 847:4,
896:24
ENSURE [2] - 882:14, 907:19
ENSURING [1] - 906:9
ENTAILS [2] - 836:10, 836:11
ENTERED [2] - 839:1, 899:7
ENTERTAIN [1] - 838:10
ENTIRE [6] - 860:8, 885:1, 885:4, 885:7,
890:16
ENTIRELY [2] - 893:11, 905:5
ENTITLED [1] - 857:1
ENTRIES [3] - 916:6, 916:14, 916:19
ENVIRONMENT [3] - 883:3, 903:4,
907:14
ENVIRONMENTS [1] - 915:24
ESHELMAN [7] - 834:13, 835:13,
841:15, 848:20, 848:24, 871:20,
874:24
ESHELMAN'S [1] - 849:5
ESPECIALLY [2] - 823:22, 843:4
ESQ [15] - 817:15, 817:16, 817:16,
817:17, 817:17, 817:18, 817:18,
817:19, 817:21, 817:22, 817:22,
818:4, 818:4, 818:5, 818:5
ESTABLISH [12] - 853:21, 867:19,
867:21, 868:5, 868:16, 868:23, 894:3,
894:7, 894:14, 894:17, 894:19
ESTABLISHED [15] - 836:8, 836:9,
841:1, 846:22, 849:25, 853:14,
853:15, 864:17, 867:11, 867:13,
867:14, 868:1, 868:5, 868:14, 868:15
ESTABLISHES [2] - 854:17, 921:14
ESTABLISHING [1] - 841:2, 862:11,
867:20, 869:2
ESTABLISHMENT [1] - 842:1
ESTIMATE [1] - 899:6
ET [1] - 881:22
EVALUATION [1] - 916:22
EVANS [1] - 817:22
EVANS [4] - 824:3, 911:7, 930:8, 934:11
EVERYDAY [1] - 828:19
EVIDENCE [54] - 821:22, 829:18, 833:6,
833:7, 833:14, 837:3, 839:1, 840:11,
840:18, 841:2, 848:10, 851:19, 852:8,
852:13, 853:20, 855:20, 856:4,

858:22, 859:17, 868:12, 871:24,
872:5, 874:6, 874:7, 874:11, 874:18,
877:17, 878:5, 878:7, 878:12, 878:13,
878:22, 879:1, 879:4, 882:7, 891:22,
893:8, 899:9, 899:20, 899:21, 900:19,
901:5, 901:10, 901:13, 901:17, 902:1,
902:21, 905:23, 919:4, 919:5, 919:6,
919:14, 920:23, 921:18
EXACT [4] - 875:13, 930:7, 930:11,
930:12
EXACTLY [9] - 836:10, 838:3, 839:9,
882:22, 883:24, 914:2, 925:19,
925:22, 935:15
EXAMINATION [8] - 824:22, 824:24,
825:13, 825:22, 826:21, 868:9,
903:21, 934:10
EXAMINATION [1] - 827:17
EXAMINE [1] - 836:11
EXAMINED [1] - 917:12
EXAMPLE [1] - 853:1
EXCEPT [1] - 910:25
EXCEPTION [2] - 855:11, 889:16
EXCHANGE [1] - 859:1
EXCLUSIONS [1] - 917:15
EXCUSE [1] - 906:8
EXHIBIT [76] - 829:17, 832:12, 832:14,
832:19, 833:7, 833:9, 833:13, 833:16,
835:8, 838:13, 840:3, 840:4, 840:11,
840:17, 841:8, 841:10, 841:11,
841:14, 842:17, 845:15, 846:18,
848:9, 848:13, 848:19, 850:9, 851:9,
860:24, 861:11, 862:6, 862:7, 863:2,
871:16, 871:19, 871:23, 872:4, 872:7,
872:9, 874:1, 877:16, 879:20, 880:23,
882:6, 882:7, 882:9, 882:18, 883:25,
886:2, 886:5, 886:10, 887:22, 887:23,
888:16, 889:4, 890:2, 890:15, 891:13,
891:14, 891:21, 893:12, 897:22,
898:15, 898:22, 899:22, 905:22,
905:24, 906:4, 919:1, 919:2, 919:3,
919:9, 919:14, 920:22, 920:23,
921:17, 934:18
EXHIBIT [11] - 821:16, 821:22, 821:25,
829:21, 862:6, 869:15, 877:15, 894:5,
898:15, 907:21
EXHIBITS [1] - 846:14
EXHIBITS [11] - 821:22, 821:25, 822:2,
824:8, 829:16, 847:25, 863:11,
869:25, 870:1, 870:7, 871:11
EXIST [2] - 852:3, 894:12
EXISTENCE [1] - 921:9
EXISTING [1] - 893:24
EXPAND [1] - 852:2
EXPECT [1] - 936:1
EXPECTED [2] - 912:10, 912:16
EXPENSES [5] - 874:5, 874:10, 874:15,
874:21, 878:4
EXPERIENCE [1] - 931:2
EXPERIENCED [1] - 871:4
EXPERT [1] - 896:6

EXPLAIN [4] - 839:14, 877:8, 917:9,
927:19
EXPLAINED [1] - 898:13
EXPLORE [1] - 837:1
EXPOSE [1] - 891:5
EXTEND [1] - 883:8
EXTENSION [2] - 893:23, 927:5
EXTENT [1] - 822:18
EXTENUATING [1] - 929:8
EXTERNAL [1] - 829:2
EXXON [1] - 837:14

F

FACE [1] - 894:20
FACT [13] - 824:10, 849:15, 853:6,
859:1, 861:14, 862:12, 896:1, 896:11,
903:5, 924:23, 925:18, 933:2, 936:2
FACTORS [1] - 893:11
FACTS [2] - 899:14, 899:15
FACTS [1] - 901:20
FAILURE [1] - 822:14
FAIR [5] - 830:21, 831:4, 838:22,
839:18, 911:7, 911:10
FAIR [1] - 817:3
FAITH [1] - 893:23
FALSE [5] - 892:3, 922:20, 922:25,
924:6, 924:7
FAMILIAR [6] - 845:18, 846:7, 892:6,
909:17, 929:20, 932:10
FAPR [2] - 818:22, 937:14
FAR [3] - 838:9, 854:22, 903:20
FAST [2] - 914:21, 914:22
FEDERAL [4] - 890:3, 890:6, 890:23,
891:3
FELT [3] - 873:7, 904:1, 930:22
FEW [7] - 820:25, 825:18, 831:15,
862:1, 872:9, 873:16, 911:2
FIELDS [2] - 916:22, 917:13
FIFTH [2] - 890:2, 890:22
FIGHT [1] - 817:3
FIGURE [2] - 875:8, 875:10
FILE [2] - 890:3, 890:22
FILE [18] - 821:7, 821:9, 891:3, 893:14,
893:15, 893:17, 913:25, 915:5,
915:12, 915:14, 916:4, 916:7, 916:15,
916:20, 918:9, 918:14, 933:8
FILED [16] - 890:6, 890:8, 891:20,
893:6, 893:19, 895:17, 895:19,
897:16, 900:16, 901:4, 902:4, 902:7,
902:9, 902:11, 902:17, 902:19
FILES [5] - 907:3, 912:22, 917:19,
917:21, 931:13
FILING [2] - 890:18, 894:23
FINANCES [1] - 828:23
FINE [2] - 827:1, 875:22
FINER [1] - 853:10
FINISH [4] - 840:4, 885:8, 896:16, 918:2
FINISHED [1] - 826:10
FINISHES [5] - 825:21, 825:23, 826:21,

826:23, 827:1

**FIRST** [30] - 821:3, 821:4, 826:7, 830:9, 846:17, 850:1, 851:16, 856:12, 856:22, 862:8, 867:2, 867:7, 868:1, 869:9, 873:25, 875:2, 875:6, 881:3, 884:23, 885:20, 891:1, 894:1, 894:3, 900:11, 922:11, 922:17, 924:13, 927:20, 935:22

**FIVE** [3] - 872:12, 888:7

**FIVE-MINUTE** [1] - 888:7

**FIXING** [2] - 858:11, 858:12

**FLAG** [1] - 933:18

**FLAGGED** [1] - 934:5

**FLOOD** [3] - 852:4, 858:17, 859:12

**FOCUS** [1] - 905:4

**FOCUSED** [3] - 831:13, 905:15, 905:17

**FOLKS** [2] - 922:5, 926:17

**FOLLOW** [2] - 837:20, 856:21

**FOLLOWED** [5] - 838:1, 860:15, 885:10, 907:8

**FOLLOWING** [1] - 926:17

**FOLLOWS** [1] - 827:9

**FOR** [1] - 817:1

**FORD** [1] - 930:9

**FORD** [1] - 817:16

**FOREGOING** [1] - 937:6

**FOREIGN** [1] - 915:23

**FORM** [6] - 881:21, 908:9, 908:19, 909:15, 910:6

**FORMALS** [1] - 918:6

**FORMAT** [6] - 845:18, 846:7, 915:8, 915:10, 917:20, 917:24

**FORMED** [1] - 882:3

**FORMER** [8] - 839:10, 840:23, 842:24, 844:15, 844:17, 844:18, 844:23, 890:7

**FORSYTH** [1] - 906:17

**FORTH** [1] - 824:7

**FORWARD** [6] - 853:16, 869:22, 870:15, 870:16, 870:19, 871:3

**FORWARDS** [1] - 875:14

**FOUNDATION** [30] - 822:22, 823:1, 823:6, 823:10, 823:11, 846:22, 848:3, 849:9, 849:11, 849:12, 850:5, 867:2, 867:15, 867:19, 867:20, 867:21, 868:15, 868:19, 868:20, 868:22, 869:2, 876:10, 893:20, 894:17, 899:12, 899:14, 919:25, 920:2, 920:14, 921:3

**FOUNDED** [1] - 827:24

**FOUNDER** [1] - 827:21

**FOURTH** [1] - 889:18

**FRANK** [1] - 826:15

**FRANKLY** [2] - 870:3, 929:24

**FRAUD** [22] - 851:25, 852:3, 854:5, 854:16, 859:18, 866:23, 866:24, 867:7, 867:11, 868:2, 868:6, 869:9, 869:17, 869:23, 870:13, 871:1, 891:5, 892:3, 892:8, 892:9, 892:12

**FRAUDULENT** [1] - 892:9

**FRED** [4] - 834:13, 841:15, 871:20,

874:23

**FREQUENT** [1] - 849:6

**FRET** [1] - 854:1

**FRIDAY** [1] - 932:25

**FRONT** [2] - 845:8, 896:22

**FULL** [5] - 827:12, 828:6, 906:10, 906:13, 932:12

**FULLY** [1] - 909:3

**FULTON** [3] - 892:13, 892:15, 892:17

**FUND** [10] - 830:6, 869:12, 869:13, 869:20, 869:24, 870:8, 870:22, 870:23, 870:25, 896:21

**FUNDED** [4] - 894:9, 895:12, 896:25, 897:6

**FUNDER** [3] - 834:13, 841:15, 881:16

**FUNDERS** [1] - 834:9

**FUNDING** [4] - 848:19, 848:24, 849:13, 898:11

**FURTHERMORE** [1] - 852:4

**FUTURE** [1] - 936:16

## G

**GALVANIZE** [1] - 887:24

**GALVANIZED** [2] - 888:17, 889:5

**GAMUT** [1] - 828:6

**GENERAL** [10] - 835:2, 851:21, 852:10, 852:15, 863:22, 891:2, 893:13, 894:13, 903:22, 909:24

**GENTLEMAN** [1] - 878:18

**GEORGIA** [3] - 817:1, 818:23, 937:4

**GEORGIA** [87] - 831:6, 831:7, 831:11, 831:12, 831:13, 831:14, 831:18, 831:22, 832:4, 832:7, 833:19, 833:20, 833:23, 835:19, 835:22, 835:23, 836:6, 850:19, 863:20, 864:4, 866:19, 866:22, 866:23, 874:17, 876:6, 876:19, 877:12, 877:16, 879:24, 880:12, 880:16, 880:19, 880:20, 880:24, 880:25, 881:5, 881:12, 881:17, 881:20, 881:25, 882:4, 882:14, 882:20, 883:8, 883:22, 885:3, 885:5, 886:1, 887:21, 888:20, 889:15, 889:24, 891:15, 891:18, 892:2, 892:24, 895:19, 898:17, 901:18, 903:5, 904:12, 905:25, 906:1, 908:4, 908:7, 908:8, 908:17, 908:24, 909:11, 909:23, 910:3, 912:22, 916:5, 922:5, 922:12, 922:18, 923:12, 924:5, 924:11, 925:2, 925:3, 925:20, 926:13, 927:3, 927:8, 933:7, 933:13

**GEORGIA'S** [1] - 906:22

**GEORGIANS** [4] - 906:5, 907:24, 911:18, 912:12

**GERMANY** [4] - 931:1, 931:5, 931:10, 932:25

**GERMANY'S** [1] - 930:5

**GIFT** [1] - 849:19

**GIST** [1] - 903:22

**GIVEN** [9] - 834:5, 873:9, 878:21,

884:13, 905:9, 905:10, 930:2, 933:11, 933:19

**GLAD** [1] - 913:2

**GLOBAL** [1] - 899:13

**GOAL** [1] - 915:25

**GOALS** [1] - 836:4

**GOP** [2] - 882:14, 883:18

**GORE** [2] - 891:3, 893:13

**GOVERNMENT** [1] - 910:19

**GRADY** [2] - 879:6, 879:7

**GRAMMAR** [1] - 846:4

**GREAT** [1] - 860:1

**GREATER** [1] - 825:18

**GREATLY** [1] - 824:10

**GREGG** [6] - 850:10, 850:12, 850:15, 851:5, 879:17, 889:22

**GROUND** [1] - 825:1

**GROUNDS** [1] - 860:8

**GROUP** [2] - 830:16, 850:18

**GROUP** [4] - 850:15, 850:18, 889:20, 889:22

**GUESS** [4] - 841:25, 856:18, 875:12, 929:12

**GUIDANCE** [1] - 821:6

**GWINNETT** [4] - 892:13, 892:17, 906:19, 906:25

## H

**HALF** [2] - 922:14, 923:1

**HALLSWORTH** [1] - 919:18

**HALSWORTH** [2] - 920:17, 921:21

**HAND** [5] - 824:15, 827:6, 850:9, 857:22, 859:8

**HANDFUL** [1] - 873:17

**HANDLE** [1] - 896:24

**HANDLED** [1] - 890:6

**HANG** [2] - 865:9, 904:9

**HAPPY** [1] - 857:13

**HARD** [3] - 894:20, 910:25, 931:13

**HARDY** [1] - 911:1

**HARDY** [1] - 817:15

**HEAD** [3] - 870:4, 872:13, 873:18

**HEADLINE** [1] - 882:16

**HEAR** [7] - 828:2, 849:23, 853:17, 856:13, 856:16, 920:15, 931:21

**HEARD** [9] - 854:7, 868:8, 873:4, 890:4, 890:23, 926:6, 931:1, 933:16, 934:10

**HEARING** [3] - 837:25, 856:19, 932:19

**HEARSAY** [14] - 823:5, 823:9, 823:13, 823:16, 840:20, 840:21, 846:15, 846:18, 846:19, 846:24, 919:23, 919:25, 931:19, 932:24

**HEART** [1] - 873:3

**HELD** [1] - 820:1

**HELP** [4] - 847:19, 869:21, 871:8, 883:1

**HELPFUL** [1] - 824:11

**HELPING** [1] - 907:12

**HENRY** [2] - 892:14, 892:17

**HEREBY** [1] - 937:6

**HERSCHEL** [1] - 855:3
**HESITANCY** [1] - 842:22
**HIGHEST** [1] - 927:3
**HIGHLIGHT** [1] - 906:22
**HITTING** [1] - 858:8
**HOLD** [19] - 835:9, 849:7, 852:21, 855:10, 865:11, 867:1, 874:11, 876:8, 879:8, 885:8, 896:15, 899:11, 917:2
**HOLIDAYS** [1] - 875:17
**HONEST** [1] - 896:24
**HONESTLY** [2] - 859:3, 861:24
**HONESTY** [3] - 896:20, 896:21, 897:2
**HONOR** [69] - 820:5, 820:13, 820:14, 820:24, 821:13, 821:16, 822:6, 823:9, 823:22, 824:5, 824:13, 824:19, 824:25, 827:4, 833:8, 833:11, 835:16, 836:14, 836:20, 837:7, 837:21, 838:11, 839:11, 840:10, 840:19, 840:25, 843:25, 846:6, 846:16, 847:21, 847:24, 850:4, 853:19, 853:22, 854:14, 855:8, 855:14, 856:20, 857:13, 858:1, 858:9, 866:4, 867:17, 867:24, 868:14, 871:23, 876:17, 879:14, 887:7, 891:21, 892:1, 893:9, 893:16, 893:18, 894:3, 894:11, 896:13, 903:19, 912:6, 913:7, 916:8, 918:8, 919:3, 919:7, 919:13, 920:22, 923:8, 931:20, 936:10
**HONORABLE** [3] - 817:11, 818:22, 937:15
**HOPE** [4] - 863:17, 878:16, 879:6, 912:19
**HOPED** [1] - 912:11
**HORRIBLE** [1] - 846:5
**HOSPITAL** [5] - 875:23, 877:21, 878:4, 898:12
**HOSPITAL** [1] - 879:7
**HOTEL** [1] - 898:1
**HOTLINE** [3] - 882:25, 883:21, 898:18
**HOUSE** [2] - 820:25, 910:15
**HOUSTON** [2] - 835:12, 837:5
**HUGHES** [1] - 818:5
**HUNT** [1] - 855:4

**I**

**I..** [2] - 863:15, 936:4
**I..** [1] - 876:23
**ICU** [1] - 875:17
**ID** [3] - 910:18, 910:20, 934:12
**IDEA** [1] - 877:22
**IDENTIFICATION** [7] - 908:9, 908:14, 908:19, 909:15, 910:7, 910:24, 934:6
**IDENTIFICATIONS** [1] - 934:13
**IDENTIFIED** [13] - 853:11, 858:16, 859:12, 892:12, 911:18, 922:3, 922:4, 922:12, 922:17, 923:1, 923:12, 924:5, 926:12
**IDENTIFIES** [4] - 906:16, 906:21, 906:25, 907:3

**IDENTIFY** [6] - 879:18, 889:19, 906:13, 923:6, 923:21, 924:10
**IDENTIFYING** [1] - 904:16
**ILLEGAL** [18] - 851:20, 851:21, 851:24, 852:4, 852:9, 852:14, 853:11, 855:20, 858:17, 858:23, 859:12, 860:6, 860:7, 860:24, 861:12, 862:9, 862:21
**ILLNESS** [1] - 820:7
**IMAGINE** [1] - 910:21
**IMMEDIATELY** [5] - 869:19, 870:5, 883:19, 883:21, 931:2
**IMPACTS** [1] - 821:15
**IMPEACH** [2] - 845:13, 856:12
**IMPEACHED** [1] - 846:8
**IMPEACHING** [1] - 856:25
**IMPLEMENT** [1] - 836:4
**IMPLICATIONS** [1] - 905:18
**IMPORTANT** [5] - 843:12, 859:21, 892:22, 930:16, 933:1
**IMPROPERLY** [2] - 915:16, 916:5
**IN** [1] - 820:1
**IN-PERSON** [1] - 852:4
**INACCURATE** [2] - 867:15, 924:21
**INAPPROPRIATE** [1] - 868:15
**INARTFUL** [1] - 877:24
**INC** [1] - 894:6
**INC** [2] - 817:3, 817:6
**INCLUDE** [2] - 874:20, 910:19
**INCLUDED** [1] - 899:15
**INCLUDES** [3] - 829:2, 829:15, 909:15
**INCLUDING** [3] - 825:4, 874:16, 912:2
**INCORRECT** [5] - 830:12, 831:9, 848:22, 912:15, 912:18
**INCORRECTLY** [4] - 928:3, 928:14, 934:19, 935:4
**INCUR** [1] - 930:2
**INDEED** [1] - 893:19
**INDIANA** [2] - 893:21, 896:23
**INDICATED** [7] - 846:8, 854:23, 907:23, 924:21, 930:7, 930:9, 930:12
**INDICTMENT** [1] - 860:16
**INDIVIDUAL** [9] - 846:21, 847:6, 875:14, 898:7, 898:21, 898:22, 905:9, 905:10, 921:14
**INDIVIDUALLY** [1] - 917:12
**INDIVIDUALS** [15] - 850:5, 881:16, 895:17, 906:13, 906:21, 908:1, 912:12, 915:14, 915:15, 916:4, 923:24, 927:12, 928:13, 928:19, 928:24
**INELIGIBLE** [1] - 906:6
**INFORMATION** [2] - 927:4, 929:3
**INITIAL** [4] - 830:18, 872:12, 899:15, 899:16
**INITIATE** [2] - 848:20, 848:25
**INITIATIVE** [4] - 830:4, 830:10, 831:7, 905:20
**INITIATIVES** [1] - 831:14
**INJURED** [1] - 881:15

**INSIGHT** [1] - 828:20
**INSTANCE** [2] - 853:1, 895:25
**INSTANCES** [4] - 851:20, 852:9, 852:14, 860:6
**INSTRUCTIONS** [1] - 920:6
**INTEGRITY** [2] - 883:5, 883:9
**INTENSE** [1] - 870:16
**INTENT** [7] - 836:3, 836:20, 836:22, 836:23, 854:18, 870:22, 883:13
**INTENTIONS** [1] - 831:14
**INTEREST** [2] - 883:9, 896:14
**INTERESTED** [4] - 854:20, 854:25, 874:17, 883:19
**INTERESTING** [2] - 838:24, 915:10
**INTERNAL** [2] - 898:11, 935:14
**INTERPRET** [2] - 909:6, 929:11
**INTERPRETATION** [1] - 925:4
**INTERPRETED** [1] - 930:25
**INTERPRETING** [6] - 859:16, 924:23, 925:1, 925:18, 925:22
**INTERROGATORIES** [2] - 832:9, 832:23
**INTERROGATORY** [1] - 835:20
**INTERROGATORY** [3] - 832:25, 833:16, 833:25
**INTERRUPT** [2] - 855:24, 877:3
**INTERVENOR** [1] - 818:3
**INTIMIDATION** [1] - 836:24
**INTRODUCE** [1] - 841:1
**INTRODUCED** [1] - 883:17
**INTRODUCES** [1] - 884:21
**INVESTIGATE** [2] - 891:4, 933:5
**INVESTIGATION** [1] - 874:20
**INVESTIGATIONS** [3] - 860:2, 860:3, 860:13
**INVOICE** [2] - 872:11, 873:3, 873:14, 905:11
**INVOLVED** [6] - 850:6, 853:2, 860:1, 875:15, 894:20, 900:4
**IRRELEVANT** [4] - 849:14, 849:20, 900:22, 900:25
**IRRESPONSIBLE** [1] - 930:24
**ISSUE** [6] - 821:14, 826:6, 856:1, 886:16, 914:6, 934:8
**ISSUED** [10] - 829:25, 835:18, 847:25, 852:13, 853:12, 855:21, 863:8, 864:9, 882:9, 885:24
**ISSUES** [2] - 853:23, 906:22
**IT'S..** [1] - 925:8
**ITEM** [1] - 821:3
**ITEMS** [2] - 821:2, 824:19
**ITSELF** [1] - 879:10

**J**

**JACKSON** [1] - 907:3
**JACOB** [1] - 817:18
**JACOBS** [3] - 846:20, 846:21, 847:1
**JAMES** [2] - 817:7, 817:22
**JAMES** [1] - 907:5

**JANE** [1] - 817:3
**JANUARY** [6] - 844:4, 856:6, 862:14, 865:3, 913:4, 935:2
**JENNIFER** [1] - 818:4
**JIM** [10] - 851:4, 890:7, 891:2, 893:12, 893:15, 893:19, 893:24, 894:5, 894:11, 902:11
**JOE** [6] - 899:3, 899:6, 899:22, 901:6, 901:11, 901:18
**JOHN** [3] - 817:3, 817:8, 817:22
**JOHNSON** [1] - 907:3
**JOHNSON** [1] - 817:7
**JONES** [2] - 868:23, 868:25
**JONES** [3] - 817:11, 818:22, 937:15
**JUDGE** [3] - 825:14, 912:1, 929:17
**JUDGE** [1] - 817:11
**JUDICIAL** [5] - 821:4, 821:7, 821:11, 821:12, 911:4
**JUMP** [1] - 905:20

# K

**KEEP** [3] - 839:15, 839:19, 878:17
**KEPT** [1] - 839:6
**KEY** [8] - 865:15, 866:10, 866:14, 866:19, 866:21, 887:25, 888:18, 889:6
**KIND** [6] - 839:15, 839:19, 854:1, 875:19, 913:7, 935:7
**KNOWING** [1] - 895:23
**KNOWLEDGE** [1] - 854:18
**KNOWN** [2] - 873:17, 883:14
**KNOWS** [4] - 820:9, 821:16, 849:17, 849:18

# L

**LANDMARK** [5] - 880:20, 904:12, 905:21, 905:25, 914:17
**LANGUAGE** [8] - 839:5, 839:9, 842:23, 842:25, 843:24, 848:17, 882:12, 882:13
**LARGE** [1] - 830:18
**LAST** [16] - 821:4, 822:23, 843:11, 854:7, 873:24, 873:25, 874:1, 874:4, 901:20, 918:2, 922:22, 925:14, 930:4, 933:1, 933:17, 934:11
**LATTER** [1] - 848:2
**LAUNCH** [1] - 830:3
**LAUNCHED** [4] - 830:24, 846:13, 914:17, 920:18
**LAW** [4] - 852:25, 853:1, 893:23, 893:24
**LAWRENCE** [1] - 911:1
**LAWRENCE** [1] - 817:15
**LAWRENCE-HARDY** [1] - 911:1
**LAWRENCE-HARDY** [1] - 817:15
**LAWS** [1] - 851:24
**LAWSUIT** [27] - 837:14, 837:23, 839:9, 842:15, 870:5, 876:1, 878:1, 890:8, 891:14, 891:17, 892:5, 892:7, 893:4, 893:20, 894:8, 894:10, 895:12, 895:13, 895:14, 897:7, 898:8, 899:5,

899:7, 900:16, 901:15, 902:3, 904:11
**LAWSUITS** [17] - 848:16, 849:10, 890:3, 890:6, 890:13, 890:18, 890:22, 894:24, 902:9, 902:11, 902:13, 902:16, 902:22, 902:23, 903:1, 904:17, 905:12
**LAY** [6] - 848:2, 849:9, 849:11, 850:5, 920:2, 920:14
**LAYS** [1] - 910:23
**LEAD** [4] - 879:4, 880:10, 891:2, 893:13
**LEADERS** [1] - 880:19
**LEADERSHIP** [10] - 879:23, 880:12, 880:16, 882:1, 882:3, 882:19, 883:16, 884:7, 884:20, 885:20
**LEADING** [2] - 878:22, 906:21
**LEADS** [6] - 874:18, 877:17, 878:5, 878:12, 879:1, 885:13
**LEARNED** [2] - 839:8, 900:6
**LEAST** [9] - 846:21, 846:25, 873:25, 878:17, 886:15, 886:22, 896:2, 902:24, 911:9
**LEAVE** [3] - 824:15, 824:16, 848:18
**LED** [1] - 906:7
**LED-EFFORT** [1] - 906:7
**LEEWAY** [3] - 837:9, 837:19, 867:23
**LEFT** [2] - 829:15, 875:16
**LEGAL** [1] - 891:1
**LEGAL** [14] - 879:6, 890:14, 895:14, 897:15, 897:21, 897:23, 901:16, 905:14, 905:18, 906:9, 922:7, 926:18, 926:25, 927:13
**LEGALLY** [1] - 872:22
**LEGISLATIVE** [3] - 887:25, 888:17, 889:6
**LEGISLATURE** [1] - 891:7
**LEGITIMATE** [3] - 851:22, 852:6, 870:17
**LESLIE** [1] - 817:16
**LETTER** [4] - 883:10, 883:23, 886:23, 927:25
**LETTING** [1] - 820:20
**LEVEL** [3] - 875:19, 907:19, 927:3
**LICENSE** [3] - 910:11, 910:13, 934:12
**LIFE** [1] - 930:24
**LIKELY** [3] - 870:19, 928:3, 934:19
**LIMIT** [1] - 911:24
**LIMITED** [1] - 826:12
**LINE** [22] - 845:22, 845:24, 852:23, 860:18, 860:20, 865:7, 866:9, 872:16, 874:4, 884:12, 884:13, 884:14, 885:10, 913:5, 914:9, 922:21, 928:5
**LINES** [13] - 845:4, 845:6, 857:4, 862:18, 865:8, 865:9, 865:18, 900:17, 915:22, 921:24, 935:5, 935:7
**LINK** [1] - 899:8
**LIST** [32] - 821:16, 821:17, 821:22, 822:1, 866:14, 910:23, 911:9, 911:18, 912:2, 912:4, 914:13, 915:2, 922:5, 922:18, 923:12, 924:1, 924:5, 924:11, 925:2, 925:4, 925:12, 925:20, 926:13, 926:24, 927:3, 927:13, 928:2, 928:14,

928:20, 928:25, 934:18, 936:1
**LISTED** [6] - 850:12, 850:22, 850:25, 851:9, 863:15, 866:22
**LISTS** [5] - 842:1, 850:19, 851:3, 889:23, 889:24
**LITERALLY** [1] - 920:6
**LITIGATION** [2] - 849:10, 869:21
**LIVE** [3] - 870:2, 874:16, 910:15
**LOCAL** [1] - 821:24
**LOGO** [4] - 833:20, 833:21, 835:21, 836:6
**LOOK** [15] - 837:15, 843:20, 847:10, 856:13, 858:5, 860:6, 866:22, 879:16, 893:12, 900:21, 912:25, 927:24, 929:6, 932:12, 935:21
**LOOKED** [1] - 864:4
**LOOKING** [10] - 843:4, 845:22, 861:18, 879:25, 880:5, 886:2, 894:2, 915:21, 928:5, 930:4
**LOOKS** [2] - 842:20, 845:15
**LOUD** [1] - 874:2
**LUNCH** [2] - 936:6, 936:7

# M

**MA'AM** [2] - 825:9, 827:5
**MACHINATIONS** [1] - 828:19
**MAIL** [36] - 840:1, 841:14, 841:17, 841:18, 841:20, 845:16, 846:10, 852:2, 871:18, 871:19, 871:20, 872:15, 872:20, 873:3, 873:25, 874:23, 878:3, 878:4, 878:12, 878:23, 879:2, 881:14, 881:19, 885:11, 898:11, 921:21, 921:24, 922:8, 922:10, 922:21, 935:3, 935:14, 935:20
**MAIL-IN** [2] - 852:2
**MAILED** [1] - 885:15
**MAILS** [2] - 841:16, 919:9
**MAJOR** [1] - 905:20
**MANAGING** [1] - 885:12
**MANNER** [1] - 852:17
**MARCOS** [1] - 817:17
**MARK** [5] - 906:19, 906:25, 907:11, 920:24, 921:1
**MARK** [2] - 817:7
**MARK** [1] - 874:12
**MARKED** [5] - 833:13, 840:17, 848:9, 872:4, 921:17
**MARKINGS** [1] - 887:11
**MASS** [1] - 880:10
**MASSIVE** [1] - 852:19
**MASTER** [2] - 915:5, 918:14
**MATTER** [7] - 823:20, 850:1, 853:6, 861:14, 862:11, 888:3, 921:8
**MATTERS** [3] - 822:4, 825:4, 900:19
**MAYER** [1] - 918:6
**MC** [2] - 817:17, 817:19
**MEAN** [38] - 835:10, 842:12, 848:15, 853:3, 864:16, 864:24, 865:21, 865:23, 871:11, 875:16, 875:25,

877:25, 881:23, 883:23, 884:5,
885:14, 891:20, 897:14, 897:16,
897:20, 897:21, 903:9, 914:23,
920:13, 922:21, 924:19, 925:8,
925:12, 925:21, 927:17, 929:9,
931:16, 931:24, 932:11, 932:18,
934:24
**MEANING** [1] - 925:13
**MEANS** [1] - 923:17
**MEANT** [10] - 823:12, 823:16, 835:7,
869:20, 870:5, 870:14, 871:2, 883:13,
929:4, 929:5
**MEDIA** [2] - 831:6, 873:15
**MEDICAL** [1] - 879:5
**MEDICAL** [1] - 879:7
**MEET** [4] - 922:6, 926:18, 926:25,
927:13
**MEETING** [4] - 875:15, 931:2, 931:4,
931:10
**MELLETT** [1] - 818:5
**MEMORY** [1] - 862:3
**MENG** [1] - 817:18
**MENTIONED** [4] - 834:5, 904:10,
904:16, 933:10
**MENU** [2] - 850:9, 850:23
**MERELY** [1] - 835:21
**MET** [1] - 912:20
**METAPHORICAL** [1] - 907:18
**METHODOLOGY** [2] - 912:21, 929:25
**MICHAEL** [1] - 817:22
**MICHELLE** [1] - 817:19
**MICHIGAN** [2] - 902:9, 902:14
**MICROTARGETING** [1] - 866:10
**MID** [1] - 836:13
**MID-DECEMBER** [1] - 836:13
**MIGHT** [1] - 900:20
**MILLION** [10] - 872:11, 872:19, 872:23,
873:2, 873:19, 905:11, 922:15, 923:1,
932:13, 932:22
**MIND** [3] - 837:14, 900:14, 916:11
**MINDSET** [2] - 860:4, 860:14
**MINIMIZE** [1] - 824:6
**MINUTE** [3] - 823:25, 888:7, 912:1
**MINUTES** [4] - 820:25, 862:1, 888:7,
930:5
**MISCHARACTERIZATION** [3] - 861:4,
876:10, 876:12
**MISCONSTRUED** [1] - 929:22
**MISREAD** [2] - 861:15, 876:21
**MISSPOKE** [1] - 910:9
**MISTRUST** [1] - 907:16
**MISUNDERSTOOD** [1] - 929:22
**MOCINE** [1] - 817:17
**MOCINE-MC** [1] - 817:17
**MOMENTUM** [7] - 863:4, 863:13,
863:21, 864:10, 864:15, 865:21,
881:20
**MONEY** [11] - 849:25, 850:2, 872:10,
872:21, 877:21, 878:21, 881:1,
881:11, 881:13, 881:14, 896:18

**MONIES** [1] - 881:15
**MONTHS** [3] - 854:7, 903:6, 913:1
**MOREOVER** [2] - 896:8, 899:13
**MORNING** [4] - 820:4, 820:9, 827:19,
827:20
**MORRISON** [1] - 817:18
**MOST** [8] - 851:21, 858:22, 860:24,
861:11, 862:9, 862:21, 875:13, 909:14
**MOTION** [1] - 821:7
**MOUTHFUL** [1] - 913:8
**MOVE** [12] - 821:22, 822:2, 839:13,
840:10, 846:14, 866:21, 871:23,
879:14, 891:21, 900:11, 919:14,
920:22
**MOVED** [3] - 874:7, 919:3, 919:4
**MOVING** [2] - 833:6, 833:7
**MR** [266] - 820:5, 820:13, 820:14,
820:18, 820:20, 820:24, 821:2,
821:13, 822:5, 822:6, 822:10, 822:16,
822:21, 823:1, 823:5, 823:9, 823:14,
823:17, 823:22, 823:25, 824:5,
824:10, 824:13, 824:18, 824:23,
824:25, 825:4, 825:7, 825:17, 826:1,
826:5, 826:13, 827:2, 827:4, 827:18,
833:8, 833:10, 833:15, 835:10,
835:16, 836:1, 836:9, 836:20, 836:23,
837:7, 837:11, 837:13, 837:21,
837:22, 838:3, 838:6, 838:11, 838:12,
839:11, 839:24, 840:10, 840:12,
840:19, 840:22, 840:25, 841:7, 842:8,
843:25, 844:2, 844:16, 844:22,
845:10, 845:14, 846:6, 846:17,
847:21, 847:24, 848:2, 848:5, 848:11,
849:8, 849:9, 849:13, 849:17, 850:4,
850:8, 852:22, 853:8, 853:19, 853:22,
854:14, 855:3, 855:8, 855:13, 855:16,
855:17, 855:22, 856:2, 856:5, 856:11,
856:16, 856:20, 856:24, 857:3, 857:7,
857:9, 857:13, 857:17, 857:20,
857:25, 858:1, 858:3, 858:9, 858:13,
858:15, 860:20, 860:22, 861:3, 861:8,
861:15, 861:20, 862:3, 862:5, 862:18,
862:19, 863:22, 864:6, 864:23, 865:2,
865:14, 865:18, 865:19, 866:4, 866:8,
867:2, 867:6, 867:12, 867:16, 867:24,
867:25, 868:7, 868:14, 868:19, 869:1,
869:8, 871:23, 872:1, 872:6, 873:22,
873:23, 874:7, 874:13, 876:5, 876:9,
876:16, 876:18, 876:21, 877:2,
877:11, 879:9, 879:14, 879:15,
879:25, 880:2, 880:4, 880:8, 881:2,
881:4, 881:10, 884:18, 885:18, 887:7,
887:9, 887:19, 888:14, 889:2, 889:3,
891:21, 891:24, 892:1, 892:7, 892:16,
892:21, 893:1, 893:6, 893:9, 893:16,
893:17, 893:18, 893:19, 894:3,
894:11, 894:16, 895:3, 895:7, 895:9,
895:10, 895:25, 896:13, 896:14,
897:1, 897:4, 897:17, 897:20, 898:5,
899:12, 899:19, 899:24, 900:2, 901:2,

901:3, 901:19, 902:2, 903:19, 904:5,
909:8, 909:9, 910:17, 911:4, 911:10,
911:11, 912:6, 912:8, 913:7, 913:11,
913:13, 913:15, 913:18, 913:20,
916:8, 916:13, 917:3, 917:22, 918:8,
918:10, 918:13, 919:2, 919:7, 919:8,
919:13, 919:16, 919:24, 920:2, 920:8,
920:10, 920:11, 920:16, 920:22,
921:1, 921:3, 921:5, 921:6, 921:19,
923:7, 923:11, 923:15, 923:23, 924:3,
925:15, 925:25, 926:16, 927:23,
928:5, 928:6, 928:7, 928:12, 931:19,
934:16, 936:10, 936:12, 936:17
**MS** [1] - 888:12
**MUST** [1] - 891:10
**MYRIAD** [1] - 852:2

# N

**NAME** [16] - 827:12, 830:16, 834:5,
841:23, 842:1, 850:10, 850:25, 851:4,
868:22, 898:19, 911:2, 911:8, 911:25,
912:4, 922:22, 925:14
**NAMED** [8] - 842:15, 846:21, 851:8,
892:13, 893:1, 894:24, 895:12, 898:7
**NAMES** [8] - 912:12, 921:22, 929:13,
930:13, 930:19, 930:21, 930:22, 933:4
**NARRATIVE** [2] - 903:19, 917:23
**NARROW** [1] - 839:20
**NARROWED** [1] - 839:15
**NATIONAL** [10] - 831:18, 831:21, 832:2,
833:2, 833:18, 833:22, 853:23,
854:20, 855:1, 866:10
**NATIONALLY** [1] - 881:7
**NATURE** [1] - 916:9
**NCOA** [4] - 890:1, 915:22, 917:15, 927:3
**NEAR** [1] - 928:17
**NECESSARILY** [4] - 828:18, 847:12,
856:18, 924:19
**NECESSITY** [1] - 902:25
**NEED** [29] - 820:4, 821:14, 822:6, 824:4,
826:16, 837:1, 841:4, 848:8, 849:20,
856:17, 860:18, 861:23, 874:19,
883:21, 888:6, 893:19, 894:19, 898:2,
898:4, 899:15, 908:25, 909:5, 910:14,
911:3, 919:22, 928:21, 930:16, 930:21
**NEEDED** [6] - 852:18, 875:23, 877:21,
903:23, 904:1, 907:13
**NEEDS** [3] - 824:3, 861:22, 909:12
**NEVER** [10] - 842:23, 873:4, 873:5,
881:13, 903:15, 934:21, 934:22,
935:6, 935:17
**NEXT** [17] - 820:23, 824:6, 845:22,
845:24, 849:23, 850:3, 854:2, 855:12,
856:14, 866:5, 866:6, 866:7, 876:15,
889:13, 904:4, 905:20, 918:12
**NIGHT** [1] - 875:16
**NIKEMA** [1] - 883:11
**NKWONTA** [180] - 817:17, 820:5,
820:13, 820:24, 821:2, 821:13, 822:5,

822:21, 823:1, 823:9, 823:14, 824:5, 824:13, 824:18, 824:23, 826:1, 827:18, 833:8, 833:15, 835:16, 836:1, 836:9, 836:20, 836:23, 837:7, 837:22, 838:3, 838:6, 838:12, 839:11, 839:24, 840:10, 840:25, 841:7, 842:8, 843:25, 844:2, 844:22, 845:10, 845:14, 846:6, 847:24, 848:2, 848:5, 848:11, 849:9, 850:4, 850:8, 853:8, 853:19, 854:14, 855:13, 855:16, 855:17, 856:5, 856:11, 856:16, 856:24, 857:3, 857:7, 857:9, 857:13, 857:17, 857:20, 857:25, 858:3, 858:15, 860:20, 860:22, 861:8, 861:20, 862:3, 862:5, 862:18, 862:19, 864:6, 864:23, 865:2, 865:14, 865:18, 865:19, 866:4, 866:8, 867:6, 867:16, 867:24, 867:25, 868:7, 869:8, 871:23, 872:6, 873:22, 873:23, 874:7, 874:13, 876:5, 876:16, 876:18, 877:2, 877:11, 879:14, 879:15, 880:2, 880:8, 881:4, 881:10, 884:18, 885:18, 887:19, 888:14, 889:2, 889:3, 891:21, 892:1, 892:7, 892:16, 892:21, 893:1, 893:6, 893:16, 893:18, 894:3, 894:16, 895:3, 895:7, 895:9, 895:10, 896:13, 897:4, 897:17, 897:20, 898:5, 899:19, 901:3, 902:2, 903:19, 904:5, 909:8, 909:9, 910:17, 911:4, 911:10, 911:11, 912:6, 912:8, 913:7, 913:11, 913:13, 913:15, 913:18, 913:20, 916:13, 917:22, 918:8, 918:10, 918:13, 919:2, 919:7, 919:8, 919:13, 920:2, 920:10, 920:16, 920:22, 921:1, 921:5, 921:19, 923:7, 923:11, 923:15, 923:23, 924:3, 925:15, 925:25, 926:16, 927:23, 928:6, 928:12, 931:19, 934:16

**NKWONTA** [3] - 825:21, 826:17, 847:2

**NO** [1] - 817:4

**NOBODY** [1] - 896:5

**NOMENCLATURE** [1] - 891:19

**NON** [9] - 846:24, 892:10, 892:11, 899:3, 899:21, 900:16, 901:6, 901:11, 901:18

**NON-CITIZENS** [8] - 892:10, 892:11, 899:3, 899:21, 900:16, 901:6, 901:11, 901:18

**NON-HEARSAY** [1] - 846:24

**NONE** [3] - 822:10, 896:9, 915:22

**NONETHELESS** [1] - 858:9

**NONPARTISAN** [1] - 883:9

**NORMALIZATIONS** [1] - 917:16

**NORTHERN** [2] - 817:1, 937:4

**NOS** [1] - 860:20

**NOTE** [5] - 821:10, 840:15, 846:19, 855:11, 917:20

**NOTHING** [6] - 837:7, 839:16, 854:10, 868:4, 896:18, 917:24

**NOTICE** [6] - 821:4, 821:7, 821:11, 821:12, 822:12, 911:5

**NOVEMBER** [23] - 829:21, 830:11,


830:17, 830:25, 831:2, 834:17, 835:1, 835:2, 836:14, 838:23, 840:7, 841:18, 849:3, 863:20, 864:11, 867:9, 868:2, 869:10, 871:21, 904:23, 905:1, 909:23, 937:8

**NOVEMBER** [1] - 817:12

**NULLIFY** [1] - 891:5

**NUMBER** [20] - 829:7, 829:8, 852:24, 852:25, 856:11, 860:18, 860:19, 904:22, 904:25, 905:3, 908:10, 911:6, 919:9, 922:15, 924:13, 926:22, 932:9, 932:10, 932:11

**NUMBERS** [1] - 920:5

**NUMEROUS** [5] - 821:18, 821:19, 851:19, 852:9, 852:13


## O

**OATH** [1] - 932:25

**OBEY** [1] - 871:24

**OBJECT** [25] - 823:21, 826:20, 835:10, 839:11, 840:20, 846:17, 852:22, 853:25, 861:3, 861:15, 863:22, 867:12, 872:1, 876:9, 879:9, 879:10, 881:2, 899:12, 899:24, 901:19, 903:20, 916:8, 917:22, 919:24, 919:25

**OBJECTED** [1] - 896:2

**OBJECTING** [5] - 823:17, 841:5, 854:24, 867:20, 920:6

**OBJECTION** [45] - 823:2, 824:2, 824:10, 833:9, 833:12, 835:9, 835:14, 837:10, 838:10, 840:12, 840:15, 846:15, 848:8, 849:7, 849:8, 853:13, 853:14, 853:18, 855:22, 855:25, 856:19, 856:20, 867:1, 867:2, 867:10, 868:4, 868:6, 868:20, 872:3, 876:8, 876:11, 876:14, 876:21, 876:24, 891:24, 896:19, 899:11, 899:18, 917:2, 919:6, 919:23, 921:16, 931:19

**OBJECTIONS** [10] - 821:10, 821:19, 821:25, 822:1, 822:3, 822:22, 855:23, 871:25, 891:23, 919:15

**OBJECTS** [1] - 825:13

**OBSERVATION** [1] - 935:11

**OBTAIN** [1] - 874:19

**OBTAINED** [2] - 895:20, 895:21

**OBVIOUSLY** [1] - 936:15

**OCCURRED** [1] - 892:12

**OF** [6] - 817:1, 817:10, 817:14, 817:20, 818:3, 937:4

**OFFER** [9] - 877:12, 881:17, 882:23, 883:8, 884:2, 886:6, 886:12, 898:6, 898:24

**OFFERED** [14] - 874:18, 874:24, 876:6, 876:19, 877:16, 878:5, 878:11, 878:23, 881:1, 881:11, 881:13, 898:10, 898:13

**OFFICER** [1] - 896:8

**OFFICES** [1] - 905:3

**OFFICIAL** [1] - 855:13


**OFFICIAL** [2] - 818:22, 937:14

**OFFICIALS'** [1] - 851:23

**OFTEN** [1] - 891:10

**OLD** [1] - 873:13

**ON** [3] - 817:14, 817:20, 818:3

**ONCE** [4] - 826:10, 826:20, 828:18, 921:13

**ONE** [58] - 820:9, 822:7, 823:18, 824:15, 829:14, 834:8, 835:5, 835:6, 835:7, 837:11, 841:14, 842:11, 842:20, 843:14, 854:20, 859:8, 859:23, 866:5, 866:19, 866:21, 867:13, 870:24, 871:18, 872:9, 874:16, 878:1, 886:21, 892:6, 892:21, 893:1, 900:5, 900:8, 900:10, 900:14, 901:1, 901:19, 901:25, 903:15, 905:9, 905:10, 911:22, 913:7, 913:9, 913:12, 920:2, 924:2, 930:6, 930:7, 930:9, 930:13, 931:11, 932:19, 933:1, 933:2, 934:20, 935:13

**ONE-PAGE** [3] - 835:5, 835:6, 835:7

**ONGOING** [2] - 854:15, 860:2

**OPEN** [1] - 820:1

**OPENED** [1] - 932:7

**OPERATIONS** [2] - 828:14, 828:17

**OPPONENT** [4] - 847:8, 847:17, 847:23

**OPPONENTS** [1] - 921:2

**OPPORTUNITIES** [1] - 852:3

**OPPORTUNITY** [1] - 906:10

**OPPOSING** [3] - 920:6, 921:22, 921:23

**OPSEC** [5] - 850:15, 850:18, 879:17, 889:20, 889:22, 913:24, 914:13, 915:2

**ORDER** [6] - 856:12, 901:23, 904:2, 909:1, 911:14, 917:17

**ORGANIZATION** [5] - 828:20, 837:13, 837:16, 852:24, 853:4

**ORGANIZATION'S** [3] - 828:16, 828:21, 853:4

**ORGANIZING** [1] - 866:10

**ORIENTED** [1] - 860:12

**ORIGIN** [2] - 836:2, 841:16

**ORIGINAL** [2] - 842:12, 882:17

**ORIGINS** [1] - 936:1

**OUTCOME** [1] - 830:18

**OUTLIERS** [1] - 909:16

**OUTREACHES** [1] - 872:10

**OUTSIDE** [2] - 871:13, 876:11

**OVERRULE** [5] - 837:9, 855:15, 876:13, 876:24, 899:17

**OVERRULED** [4] - 853:7, 861:19, 921:16

**OVERSEE** [3] - 828:21, 828:23, 828:25

**OVERSEEING** [1] - 828:13

**OVERSIGHT** [3] - 828:7, 829:3, 829:11

**OVERTURN** [1] - 890:18

**OVERTURNING** [1] - 905:15

**OWN** [2] - 886:25, 896:14

# P

**P.M** [1] - 936:18
**PAGE** [39] - 832:19, 833:1, 833:4, 833:5, 833:16, 835:5, 835:6, 835:7, 839:6, 857:4, 857:18, 860:18, 860:19, 860:20, 862:17, 865:6, 865:8, 865:11, 865:12, 865:13, 865:14, 865:15, 865:16, 865:18, 873:25, 884:12, 886:2, 891:11, 894:5, 894:25, 898:15, 899:2, 899:22, 901:7, 914:9, 919:12, 921:20, 922:1, 922:2
**PAGES** [7] - 845:4, 845:6, 862:18, 865:6, 913:5, 935:5, 937:6
**PAID** [4] - 897:15, 901:16, 902:12, 902:13
**PAIKOWSKY** [1] - 818:4
**PAPER** [2] - 863:15, 932:18
**PARAGRAPH** [15] - 851:16, 861:11, 862:8, 862:9, 873:24, 873:25, 879:25, 891:1, 898:16, 899:1, 899:8, 899:22, 901:7, 906:13, 927:25
**PARAGRAPHS** [1] - 928:8
**PARDON** [1] - 857:7
**PARSE** [1] - 870:21
**PART** [18] - 843:2, 846:25, 853:5, 853:17, 854:3, 863:13, 863:20, 864:10, 864:14, 864:21, 867:2, 873:10, 875:2, 881:3, 881:9, 901:16, 918:2, 921:21
**PARTICIPATE** [2] - 918:23, 918:24
**PARTICIPATED** [1] - 912:23
**PARTICULAR** [2] - 865:7, 910:15
**PARTICULARLY** [2] - 903:16, 907:15
**PARTIES** [6] - 882:23, 884:1, 886:6, 886:9, 886:11, 890:12
**PARTNERED** [1] - 882:19
**PARTNERING** [1] - 883:9
**PARTNERS** [2] - 882:14, 906:5
**PARTNERSHIP** [12] - 880:18, 882:3, 882:5, 882:24, 883:6, 883:13, 885:2, 885:5, 886:1, 888:2, 888:20, 889:14
**PARTY** [22] - 833:10, 837:13, 840:24, 846:15, 847:3, 847:7, 847:8, 847:14, 847:16, 847:23, 883:11, 883:15, 883:18, 883:22, 884:7, 884:20, 893:9, 893:11, 919:20, 921:2, 921:14
**PARTY** [9] - 882:1, 882:3, 883:8, 885:2, 885:5, 885:20, 886:1, 888:21, 889:15
**PARTY'S** [1] - 921:7
**PASSED** [1] - 828:19
**PAST** [3] - 838:2, 838:3, 875:11
**PASTED** [1] - 935:23
**PATTERN** [6] - 837:19, 838:1, 838:5, 838:6, 854:15, 892:2
**PATTERNS** [2] - 879:18, 889:19
**PAY** [4] - 872:21, 895:14, 897:9, 897:25
**PAYING** [1] - 897:21
**PENALTIES** [1] - 832:22
**PENNSYLVANIA** [2] - 902:10, 902:14

**PEOPLE** [40] - 823:19, 836:18, 854:11, 869:21, 870:12, 870:14, 870:16, 871:3, 872:21, 883:1, 883:20, 895:20, 895:22, 900:15, 904:22, 907:19, 911:1, 912:1, 918:19, 918:22, 920:24, 922:4, 922:12, 922:15, 922:18, 923:1, 923:6, 923:12, 923:21, 924:11, 925:2, 925:19, 926:13, 929:21, 932:21, 933:13, 933:16, 933:20
**PER** [4] - 821:24, 920:5, 932:15, 932:17
**PERCENT** [10] - 928:2, 928:13, 928:16, 928:18, 929:16, 929:19, 932:14, 932:16, 934:19, 935:4
**PERFECT** [1] - 848:8
**PERJURY** [1] - 832:22
**PERMISSION** [1] - 824:7
**PERSON** [8] - 825:12, 852:4, 872:10, 878:1, 878:20, 886:18, 898:20, 926:24
**PERSPECTIVE** [1] - 921:21
**PETITION** [1] - 899:16
**PETITIONS** [1] - 929:4
**PHILLIPS** [6] - 850:10, 850:12, 850:15, 851:5, 879:17, 889:22
**PHONE** [1] - 851:14
**PHOTO** [3] - 908:9, 908:14, 910:9
**PHRASE** [2] - 869:16, 869:23
**PHRASED** [4] - 858:25, 878:16, 906:15
**PHRASING** [1] - 924:14
**PHYSICALLY** [1] - 916:25
**PICK** [1] - 904:6
**PIECE** [3] - 858:18, 859:11, 859:14
**PITCHED** [2] - 907:7, 907:8
**PLACE** [4] - 888:5, 909:11, 909:13, 914:24
**PLACES** [1] - 886:22
**PLAINTIFF** [2] - 894:2, 894:24
**PLAINTIFF'S** [6] - 833:13, 840:17, 848:9, 872:4, 890:2, 921:17
**PLAINTIFFS** [1] - 842:17
**PLAINTIFFS** [2] - 817:4, 817:14
**PLAINTIFFS** [18] - 824:19, 836:25, 840:10, 846:14, 854:21, 868:8, 871:23, 891:21, 895:12, 895:16, 897:6, 897:9, 897:12, 897:16, 898:7, 902:11, 911:24, 919:14
**PLAINTIFFS'** [4] - 882:18, 888:16, 890:15, 891:12
**PLAINTIFFS'** [12] - 820:2, 822:11, 825:13, 825:21, 832:9, 832:22, 854:3, 872:3, 911:23, 911:25, 912:3, 920:23
**PLAN** [16] - 821:22, 843:7, 843:8, 863:2, 863:13, 863:21, 864:10, 864:15, 880:22, 887:23, 907:25, 911:17, 912:9, 912:10, 912:16
**PLAN** [4] - 888:16, 889:5, 890:2, 890:22
**PLANNING** [3] - 820:3, 828:6, 838:21
**PLANS** [1] - 863:3
**PLANS** [1] - 866:9
**PLAY** [13] - 856:10, 856:11, 856:18, 857:1, 857:2, 857:11, 866:5, 875:12,

913:10, 913:11, 913:12, 929:7
**PLAYED** [2] - 913:8, 913:19
**PLAYING** [2] - 857:3, 857:14
**PLENTY** [1] - 932:7
**PODCAST** [4] - 865:23, 869:19, 870:2, 871:9
**PODCASTS** [1] - 871:14
**POINT** [17] - 821:21, 832:6, 848:2, 853:10, 858:17, 859:13, 860:17, 866:23, 871:12, 873:17, 880:6, 895:21, 902:22, 915:10, 919:25, 929:5
**POINTS** [1] - 882:18
**POLLING** [2] - 909:11, 909:13
**POLLS** [1] - 910:19
**POPULATION** [1] - 892:24
**PORTION** [1] - 928:19
**POSE** [1] - 897:18
**POSED** [1] - 877:24
**POSITION** [10] - 854:3, 854:6, 856:3, 856:14, 887:3, 889:12, 894:25, 901:24, 901:25
**POSITIVE** [1] - 900:21
**POSSIBILITY** [1] - 930:18
**POSSIBLE** [2] - 863:9, 918:7
**POST** [22] - 829:23, 829:24, 829:25, 831:1, 864:11, 882:9, 882:21, 883:25, 884:4, 884:5, 885:25, 886:5, 886:8, 886:10, 886:21, 886:25, 889:17, 905:24, 906:12, 906:16, 907:23, 914:20
**POSTED** [2] - 863:11, 863:12, 881:23
**POSTING** [1] - 864:12
**POSTS** [6] - 829:4, 829:11, 863:10, 863:18, 864:9, 881:21
**POTENTIAL** [4] - 898:12, 918:16, 918:20, 919:11
**POTENTIALLY** [1] - 906:6
**POWELL** [1] - 817:21
**POWELL** [2] - 824:3, 911:7
**PRACTICALLY** [1] - 862:2
**PRECARIOUS** [1] - 878:1
**PRECINCT** [3] - 910:1, 932:15, 932:17
**PRECINCTS** [1] - 932:14
**PRECISE** [5] - 863:17, 909:4, 909:6, 924:18, 927:10
**PREDICATE** [2] - 867:14, 916:9
**PREEMPTIVELY** [1] - 906:6
**PREFER** [1] - 821:6
**PRELIMINARY** [2] - 824:18, 849:12
**PREPARE** [1] - 912:22
**PREPARED** [3] - 822:13, 828:23, 850:18
**PRESENT** [10] - 874:2, 874:4, 874:10, 874:15, 902:21, 908:1, 909:12, 911:14, 911:19, 912:13
**PRESENTED** [5] - 909:14, 912:23, 929:18, 929:19
**PRESENTING** [2] - 853:7, 893:8
**PRESERVE** [2] - 879:6, 881:15

**PRESIDENT** [3] - 892:11, 892:20, 901:6
**PRESIDENT** [7] - 827:21, 828:1, 829:1, 850:15, 850:25, 851:4, 874:9
**PRESIDENTIAL** [15] - 830:1, 830:10, 830:25, 831:2, 832:3, 833:2, 833:18, 840:8, 853:12, 855:21, 890:19, 891:6, 904:19, 905:5, 905:16
**PRESS** [23] - 829:4, 829:8, 829:10, 863:7, 863:8, 863:18, 864:9, 864:14, 864:23, 864:24, 865:24, 865:25, 868:2, 881:21, 882:9, 883:25, 885:12, 885:24, 886:18, 905:24, 906:12, 906:16, 907:23
**PRESUMPTIVELY** [1] - 923:24
**PRETTY** [2] - 910:25, 914:21
**PREVAILED** [1] - 835:12
**PREVIOUS** [3] - 858:25, 885:17, 908:10
**PRINTED** [1] - 885:14
**PROBLEM** [6] - 822:12, 824:9, 851:16, 926:1, 929:14, 932:3
**PROBLEM** [1] - 862:8
**PROBLEMS** [2] - 852:20, 894:20
**PROCEDURES** [1] - 856:21
**PROCEED** [5] - 825:24, 826:2, 827:16, 838:8, 887:18
**PROCEEDING** [1] - 933:3
**PROCEEDINGS** [2] - 903:3, 937:6
**PROCEEDINGS** [1] - 817:10
**PROCESS** [17] - 852:16, 852:19, 860:6, 860:7, 907:20, 908:5, 916:2, 916:21, 917:16, 917:17, 918:16, 918:18, 930:1, 931:11, 932:8, 933:25, 936:1
**PRODUCE** [4] - 843:16, 920:8, 920:11
**PRODUCED** [2] - 920:4, 920:7
**PROGRAM** [36] - 828:6, 830:10, 830:14, 830:24, 831:8, 831:13, 831:23, 832:7, 833:2, 833:18, 834:4, 835:17, 836:2, 836:3, 836:4, 836:10, 838:7, 838:16, 846:13, 848:20, 848:25, 849:2, 849:11, 849:15, 850:6, 851:12, 864:2, 866:25, 867:8, 869:3, 869:10, 874:16, 880:20, 904:12, 905:22, 915:13
**PROGRAMS** [1] - 832:6
**PROJECT** [4] - 836:13, 898:18, 924:13, 933:7
**PROJECT** [1] - 894:6
**PROMOTIONAL** [3] - 858:18, 859:11, 859:14
**PROOF** [10] - 896:5, 908:1, 908:7, 908:17, 908:22, 908:23, 909:12, 911:14, 911:19, 912:13
**PROPER** [4] - 845:21, 910:23, 915:7, 930:14
**PROPERLY** [2] - 916:23, 917:14
**PROPERTY** [1] - 910:14
**PROPOSAL** [26] - 834:18, 835:2, 836:12, 838:14, 838:15, 840:1, 840:7, 841:2, 841:21, 851:6, 851:15, 852:12, 853:12, 855:21, 860:23, 861:10, 862:7, 863:3, 866:17, 879:17, 880:2,
887:22, 890:16, 905:5, 905:8, 905:15
**PROSECUTION** [10] - 860:15, 874:19, 877:17, 878:6, 878:8, 878:12, 878:14, 878:22, 879:1, 879:4
**PROSPECTIVE** [2] - 881:11, 935:19
**PROTECTED** [1] - 870:18
**PROUD** [1] - 907:17
**PROVE** [6] - 836:22, 836:25, 868:13, 903:1, 903:10, 906:10
**PROVIDE** [2] - 869:21, 908:17
**PROVIDED** [7] - 889:25, 895:11, 897:6, 897:10, 897:12, 917:19, 929:2
**PROVIDING** [1] - 908:6
**PROVISIONAL** [1] - 934:13
**PUBLIC** [6] - 863:4, 863:13, 864:10, 864:15, 865:21, 881:20
**PUBLICITY** [11] - 863:4, 863:14, 863:21, 864:11, 864:13, 864:15, 864:16, 864:19, 865:22, 881:21, 881:24
**PUBLISHED** [1] - 883:16
**PULL** [2] - 854:23, 884:12
**PULLED** [2] - 901:9, 930:5
**PULLING** [1] - 839:8
**PURPOSE** [9] - 824:24, 825:12, 826:21, 837:24, 867:16, 870:8, 870:23, 922:8, 922:10
**PURPOSES** [5] - 824:21, 825:22, 870:24, 870:25, 882:5
**PURSUING** [1] - 896:14
**PUT** [15] - 833:20, 836:6, 845:12, 845:13, 853:9, 854:2, 875:16, 890:10, 896:18, 896:22, 897:9, 901:15, 914:24, 915:7, 917:16
**PUTTING** [1] - 864:18

## Q

**QC** [2] - 922:15, 923:24
**QUALIFY** [1] - 912:1
**QUALITY** [4] - 916:16, 916:18, 916:23, 917:13
**QUEEN** [1] - 817:17
**QUESTIONING** [1] - 886:25
**QUESTIONS** [13] - 849:23, 850:3, 852:23, 885:14, 885:17, 894:17, 895:4, 895:6, 895:8, 920:3, 933:2, 934:15, 936:16
**QUICK** [1] - 888:7
**QUITE** [6] - 826:15, 836:16, 861:6, 867:4, 908:10, 912:4
**QUOTE** [2] - 907:7, 930:7

## R

**RADICALLY** [1] - 852:2
**RAFFENSPERGER'S** [1] - 931:3
**RAISE** [1] - 827:6
**RAISED** [2] - 821:4, 822:22
**RAISING** [1] - 842:25
**RAN** [1] - 889:25
**RATHER** [1] - 853:22
**RDR** [2] - 818:22, 937:14
**REACH** [2] - 821:19, 883:21
**REACHED** [10] - 821:5, 882:23, 883:15, 884:1, 884:6, 884:20, 884:23, 885:20, 886:6, 886:11
**REACHING** [2] - 886:8, 918:16
**READ** [22] - 825:11, 835:19, 839:4, 843:21, 851:16, 857:13, 857:16, 858:10, 859:7, 861:16, 862:2, 872:20, 874:2, 879:12, 890:15, 890:21, 896:10, 896:23, 899:14, 906:3, 913:8, 921:24
**READING** [6] - 833:24, 834:1, 834:2, 862:3, 872:25, 874:22, 880:2, 881:14, 933:24
**READS** [1] - 866:9
**READY** [2] - 886:18, 896:12
**REAL** [1] - 929:23
**REALLY** [11] - 822:6, 835:6, 843:22, 847:19, 873:19, 903:8, 904:20, 904:21, 905:18, 915:19, 929:13
**REASON** [5] - 837:15, 837:18, 854:11, 868:11, 898:3
**REASONS** [2] - 866:5, 877:6
**REBUTTAL** [2] - 855:8
**RECEIVE** [3] - 848:23, 870:9, 870:13
**RECEIVED** [13] - 821:18, 822:3, 833:13, 840:17, 848:9, 848:19, 850:1, 850:2, 872:4, 872:11, 883:10, 921:17, 928:1
**RECKLESS** [10] - 836:18, 854:4, 854:8, 854:15, 859:24, 892:2, 894:23, 900:10, 900:18
**RECKLESSLY** [1] - 895:23
**RECKLESSNESS** [1] - 854:17
**RECOGNIZE** [7] - 845:23, 848:13, 848:15, 848:17, 928:19, 928:24
**RECOGNIZED** [3] - 839:5, 842:23, 883:19
**RECOLLECTION** [8] - 839:25, 841:9, 884:9, 884:19, 884:22, 910:22, 914:5, 914:12
**RECOMMENDED** [1] - 834:21
**RECORD** [11] - 840:19, 848:7, 848:8, 853:25, 857:3, 876:6, 888:5, 913:16, 921:25, 932:4, 934:4
**RECORDS** [4] - 822:17, 822:19, 927:7, 932:13
**RECROSS** [1] - 819:3
**RECRUIT** [1] - 922:8
**REDACTED** [2] - 871:18, 921:22
**REDIRECT** [1] - 888:15
**REDIRECT** [1] - 819:3
**REDISTRICTING** [1] - 853:1
**REFERENCE** [1] - 829:16
**REFERENCED** [1] - 897:22
**REFERRED** [1] - 879:18
**REFERRING** [2] - 871:9, 898:21
**REFINED** [2] - 869:19, 870:5
**REFLECTED** [1] - 931:1
**REFRESH** [8] - 839:25, 841:9, 884:9,

884:19, 884:22, 910:22, 914:5, 914:12
REFUSAL [1] - 851:23
REGARD [1] - 846:18
REGARDING [2] - 897:25, 933:19
REGISTERED [14] - 915:16, 916:5,
922:6, 922:7, 926:17, 926:19, 927:1,
927:14, 928:3, 928:15, 928:20,
928:25, 934:20, 935:4
REGISTRATION [2] - 925:2, 925:3
RELATE [3] - 835:25, 836:19, 897:22
RELATED [3] - 864:1, 889:10, 889:11
RELATES [3] - 835:11, 835:16, 836:20
RELATING [3] - 835:19, 854:15, 863:19
RELATION [1] - 845:15
RELATIONSHIP [1] - 921:10
RELATIVE [1] - 912:22
RELEASE [11] - 863:8, 864:25, 865:24,
868:2, 882:9, 884:1, 885:25, 905:24,
906:12, 906:16, 907:23
RELEASED [1] - 863:19
RELEASES [10] - 829:4, 829:9, 829:10,
863:7, 863:18, 864:9, 864:14, 864:23,
866:1, 881:21
RELEVANCE [20] - 823:1, 823:6,
823:10, 823:12, 823:16, 835:11,
835:14, 840:12, 846:18, 849:8,
852:22, 853:25, 855:2, 855:22, 872:1,
876:10, 891:24, 891:25, 899:24,
901:19
RELEVANCY [1] - 837:18
RELEVANT [17] - 822:25, 823:13,
835:24, 836:1, 837:3, 837:17, 839:12,
849:21, 849:24, 850:2, 853:4, 853:5,
853:6, 853:7, 899:25, 900:1
RELITIGATING [1] - 900:3
RELY [2] - 883:10, 936:3
REMAIN [1] - 895:5
REMEMBER [10] - 843:10, 843:11,
843:20, 845:25, 846:3, 861:7, 870:15,
903:3, 930:8, 931:16
REMOVE [1] - 887:10
REMOVED [1] - 923:24
REPAIR [1] - 875:9
REPEAT [13] - 831:19, 834:25, 855:18,
861:6, 861:9, 861:20, 865:21, 878:10,
882:17, 904:24, 912:7, 926:10, 928:22
REPEATED [1] - 891:10
REPETITIVE [1] - 879:11
REPHRASE [1] - 885:3
REPLACED [1] - 835:21
REPORT [4] - 835:5, 870:12, 901:15,
910:15
REPORTED [1] - 892:11, 898:17
REPORTER [2] - 818:22, 937:14
REPORTER [3] - 844:25, 913:15,
936:19
REPORTING [3] - 871:1, 872:21, 883:2
REPORTS [1] - 932:5
REPRESENT [1] - 845:6
REPRESENTATION [1] - 844:6

REPRESENTATIVE [2] - 847:4, 905:13
REPRESENTED [3] - 895:1, 896:4,
917:14
REPRESENTING [1] - 890:7
REPUBLICAN [15] - 879:23, 880:11,
880:16, 880:19, 881:25, 882:3,
882:19, 885:2, 885:5, 886:1, 887:24,
888:17, 888:21, 889:5, 889:14
REQUEST [7] - 821:3, 824:7, 835:4,
835:5, 838:20, 913:13, 913:15
REQUESTED [2] - 898:19, 919:4
REQUIRE [2] - 868:22, 909:16
REQUIRED [5] - 908:1, 908:16, 908:24,
911:19, 912:13
REQUIREMENT [2] - 908:4, 908:7
REQUIREMENTS [4] - 922:6, 926:18,
926:25, 927:13
REQUIRES [2] - 856:25, 868:15
RESEARCH [1] - 850:13
RESIDE [1] - 908:25
RESIDENCE [1] - 909:12
RESIDENCY [11] - 908:2, 908:7, 908:17,
908:23, 909:15, 911:14, 911:19,
912:13, 923:3, 934:9
RESIDENT [1] - 895:19
RESIDENTS [1] - 927:8
RESOLVE [1] - 934:6
RESOURCES [13] - 831:17, 831:20,
831:21, 831:25, 832:1, 832:4, 832:5,
833:22, 835:22, 836:7, 884:3, 886:13
RESPECT [4] - 823:23, 831:22, 907:10
RESPECTFULLY [1] - 900:25
RESPOND [1] - 865:20
RESPONDING [1] - 838:19
RESPONSE [9] - 831:2, 832:25, 833:16,
833:24, 835:15, 856:10, 872:10,
894:4, 920:1
RESPONSES [6] - 832:8, 832:9, 832:14,
832:17, 832:21, 835:20
RESPONSIBILITY [1] - 893:21
RESPONSIVE [1] - 839:13
RESULT [5] - 851:23, 851:25, 854:17,
891:5, 893:5
RESULTED [1] - 883:18
RESULTS [6] - 851:23, 860:3, 890:18,
893:4, 904:18, 905:16
RESUME [1] - 826:5
RETURN [7] - 856:6, 861:9, 861:10,
862:14, 865:3, 907:21, 913:4
REVERSE [1] - 904:18
REVIEW [10] - 856:22, 856:25, 914:10,
916:6, 916:14, 916:19, 916:21,
916:25, 917:25, 932:7
REVIEWED [2] - 840:5, 852:18
REVIEWING [2] - 840:4, 933:24
RICHMOND [3] - 892:14, 892:15, 892:18
RIGHT-HAND [1] - 850:9
ROBINSON [2] - 885:11, 885:15
ROLE [1] - 902:25

ROLL [2] - 922:5, 927:3
ROLLS [10] - 889:25, 903:5, 903:11,
904:10, 904:15, 906:23, 907:13,
912:25, 914:25, 915:20
RON [1] - 907:3
RON [1] - 817:7
RONALD [2] - 846:20
ROPE [2] - 837:5, 837:6
ROUGHLY [1] - 932:14
ROUTINELY [2] - 914:25, 915:22
ROWS [1] - 917:11
RPR [2] - 818:22, 937:14
RULE [3] - 821:24, 822:9, 846:23
RULE [2] - 821:9, 856:24
RULED [1] - 855:11
RULES [1] - 825:1
RULING [3] - 847:25, 855:14, 896:17
RUNNING [2] - 855:23, 855:25
RUNOFF [16] - 831:22, 832:4, 833:23,
835:19, 835:23, 850:19, 854:16,
863:20, 863:23, 880:10, 882:15,
889:24, 904:12, 906:1, 906:9, 911:13
RUNS [1] - 828:6
RUSSELL [2] - 895:17, 895:22
RYAN [1] - 930:5

**S**

SATISFIED [1] - 876:17
SCALE [3] - 899:13, 916:22, 917:1
SCARED [2] - 870:17, 871:5
SCOPE [5] - 876:11, 917:4, 921:4,
921:8, 921:9
SCOTT [1] - 855:4
SCOTUS [2] - 890:4, 890:23
SCREEN [8] - 845:8, 845:9, 845:10,
845:11, 858:3, 858:4, 858:5, 914:10
SEATED [3] - 827:11, 887:15, 888:9
SECOND [20] - 820:14, 821:14, 829:19,
841:22, 857:23, 861:11, 862:7, 865:9,
871:18, 881:9, 888:3, 894:7, 913:25,
914:15, 915:3, 915:13, 915:18, 916:3,
919:12, 921:20, 922:2, 928:1, 930:12
SECRETARY [7] - 908:11, 912:20,
913:1, 927:6, 929:2, 929:24, 931:3
SECTION [3] - 863:2, 890:15, 890:16
SECTION [1] - 933:24
SECTIONS [1] - 916:12
SECURE [2] - 882:14, 898:11
SEE [11] - 831:4, 836:12, 847:8, 850:9,
850:10, 850:22, 863:5, 866:12,
866:15, 935:21, 935:24
SEEING [1] - 856:15
SEEKING [1] - 890:18
SEEKS [1] - 906:7
SELECTED [2] - 824:8, 891:6
SELECTIONS [1] - 917:14
SEMANTICS [1] - 830:22
SENATE [3] - 882:15, 906:8
SENATOR [2] - 883:11, 884:24

**SEND** [3] - 874:20, 931:14, 931:17

**SENDING** [1] - 840:1

**SENSE** [2] - 857:15, 886:20

**SENT** [25] - 834:17, 835:2, 839:22, 839:23, 840:7, 841:2, 841:25, 842:5, 842:14, 845:16, 846:11, 847:9, 864:25, 873:3, 873:14, 874:23, 878:1, 885:11, 885:12, 908:11, 922:22, 932:5

**SENTENCE** [8] - 874:1, 901:20, 906:3, 922:11, 922:17, 925:12, 926:17, 928:1

**SEPARATE** [3] - 835:11, 849:15, 863:23

**SERVANT** [1] - 921:8

**SERVICE** [1] - 873:14

**SESSION** [1] - 817:3

**SET** [2] - 825:1, 921:3

**SETTING** [1] - 860:9

**SEVEN** [5] - 885:1, 885:24, 886:4, 886:5, 891:4

**SEVERAL** [4] - 836:25, 892:8, 906:13

**SHARE** [1] - 931:3

**SHELLY** [3] - 817:18, 887:7, 887:9

**SHORT** [1] - 887:20

**SHORTLY** [9] - 830:16, 834:17, 835:1, 849:3, 875:15, 880:19, 902:3, 902:16

**SHOW** [14] - 836:17, 838:1, 854:10, 859:17, 871:15, 908:8, 908:18, 909:25, 910:1, 910:3, 910:5, 910:6, 910:15, 934:4

**SHOWED** [4] - 839:25, 884:9, 910:22, 914:5

**SHOWING** [2] - 837:19, 934:5

**SHOWS** [4] - 836:2, 836:3, 934:12

**SIC** [2] - 839:8, 868:8

**SIDE** [1] - 821:5

**SIDES** [1] - 853:7

**SIGNATURE** [1] - 890:10

**SIGNED** [3] - 832:17, 894:5, 894:25

**SIGNIFICANT** [4] - 851:19, 852:8, 852:13, 856:4

**SIGNING** [1] - 832:21

**SIMILAR** [3] - 838:2, 856:9, 902:9

**SIMPLY** [5] - 833:20, 836:6, 849:10, 894:12, 903:4

**SINGLE** [2] - 863:25, 926:24

**SIT** [2] - 901:17, 926:4

**SITTING** [1] - 828:3

**SITUATION** [7] - 838:2, 838:4, 851:25, 860:10, 877:20, 878:2

**SITUATIONS** [1] - 929:21

**SIXTH** [1] - 927:25

**SKIPPED** [1] - 928:8

**SLIGHTLY** [3] - 822:21, 902:6, 915:15

**SLIP** [1] - 828:19

**SLOW** [1] - 823:16

**SO..** [3] - 842:16, 867:15, 915:1

**SOLELY** [2] - 905:15, 905:17

**SOLICITED** [2] - 880:25, 881:5

**SOMEONE** [5] - 820:8, 890:17, 892:10, 922:22, 934:25

**SOMERVILLE** [2] - 906:17, 907:11

**SOMERVILLE** [1] - 817:6

**SOMETIMES** [5] - 825:10, 825:11, 843:11, 888:10, 929:22

**SOMEWHAT** [1] - 838:2

**SOMEWHERE** [1] - 935:24

**SOON** [1] - 897:15

**SORRY** [29] - 831:18, 833:4, 835:13, 855:13, 857:18, 859:9, 861:24, 865:9, 865:12, 865:14, 865:25, 871:19, 872:24, 874:3, 874:12, 877:3, 879:25, 880:4, 882:13, 885:3, 888:7, 895:7, 903:25, 904:24, 918:3, 921:7, 926:6, 928:5, 931:3

**SORT** [8] - 824:6, 860:14, 865:22, 866:5, 875:8, 875:12, 895:25, 907:18

**SORTS** [1] - 896:4

**SOUGHT** [2] - 836:4, 904:18

**SOUND** [1] - 839:7

**SOUNDED** [1] - 870:17

**SPEAKING** [1] - 835:13

**SPEAKS** [1] - 879:10

**SPECIAL** [1] - 891:7

**SPECIFIC** [3] - 892:9, 914:4, 935:3

**SPECIFICALLY** [3] - 907:10, 908:22, 913:5

**SPECIFY** [1] - 898:4

**SPEED** [1] - 851:3

**SPELL** [2] - 827:12, 922:22

**SPELLED** [1] - 925:14

**SPINNING** [1] - 875:18

**SPIRIT** [1] - 883:5

**SPLIT** [1] - 864:4

**SPOKESPERSON** [1] - 828:6

**SPREADSHEETS** [1] - 915:4

**SQUARE** [1] - 868:10

**STACEY** [1] - 855:4

**STAFF** [1] - 873:15

**STAND** [7] - 827:5, 836:13, 860:5, 887:17, 896:1, 918:5, 936:12

**STAND-ALONE** [1] - 836:13

**STANDARD** [2] - 908:19, 917:18

**STANDARDS** [1] - 908:20

**STANDING** [1] - 895:6

**START** [5] - 823:16, 874:3, 884:13, 887:5, 936:6

**STARTED** [1] - 824:5, 831:6, 849:2, 913:24, 914:13, 915:2, 915:12, 918:15, 918:18, 918:19, 918:20

**STARTING** [10] - 866:23, 867:8, 874:1, 874:4, 914:15, 922:2, 922:11, 927:25, 929:5

**STATE** [7] - 893:22, 908:11, 912:20, 913:2, 927:6, 929:3, 929:25

**STATE** [21] - 827:12, 848:7, 851:24, 860:24, 866:10, 866:21, 868:24, 869:2, 878:3, 891:7, 903:16, 903:23, 904:1, 907:12, 908:19, 909:1, 909:23, 910:21, 924:6, 932:4

**STATE'S** [1] - 891:5

**STATEMENT** [41] - 833:10, 840:22, 840:23, 841:6, 846:25, 856:22, 856:25, 860:5, 861:5, 861:9, 874:21, 879:10, 883:16, 894:12, 901:8, 905:7, 906:24, 920:13, 921:7, 922:25, 924:4, 924:6, 924:7, 926:2, 926:5, 926:11, 926:12, 926:15, 926:20, 926:23, 928:4, 928:10, 934:17, 934:20, 934:22, 934:23, 935:3, 935:7, 935:17, 935:19

**STATEMENTS** [3] - 871:9, 896:10, 919:19

**STATES** [10] - 861:11, 866:14, 866:19, 887:25, 888:18, 889:6, 890:3, 890:22, 891:4, 907:7

**STATES** [4] - 817:1, 817:11, 818:23, 937:3

**STATING** [1] - 854:6

**STATISTICS** [1] - 896:6

**STATUTE** [1] - 910:23

**STEP** [3] - 888:4, 929:25

**STEPS** [2] - 825:23, 827:1

**STEVE** [3] - 817:11, 818:22, 937:15

**STEVE** [2] - 868:22, 868:24

**STILL** [13] - 822:24, 831:8, 836:16, 838:4, 838:6, 841:11, 847:11, 850:1, 856:14, 863:24, 868:19, 917:21, 934:12

**STOP** [2] - 852:7, 887:5

**STORY** [2] - 875:1, 876:3

**STRAIGHT** [2] - 871:5, 932:3

**STRATEGY** [6] - 826:24, 828:21, 890:14, 904:20, 905:14, 905:19

**STRATEGY** [1] - 891:1

**STRAYS** [2] - 903:20, 917:23

**STREAM** [1] - 870:2

**STRICTLY** [2] - 904:18

**STRIKE** [1] - 839:13

**STUDY** [2] - 899:4, 901:21

**STUFF** [1] - 839:9

**SUBHEAD** [1] - 882:22

**SUBHEADING** [2] - 888:16, 889:5

**SUBJECT** [2] - 825:4, 905:12

**SUBJECTS** [1] - 826:13

**SUBMIT** [1] - 896:10

**SUBMITTED** [7] - 821:16, 832:8, 832:9, 832:15, 835:5, 898:19, 933:8

**SUBSTANCE** [1] - 851:15

**SUBSTANTIATE** [1] - 899:9

**SUBSTANTIATED** [1] - 854:17

**SUBSTANTIVE** [1] - 908:5

**SUBVERSION** [1] - 879:19

**SUBVERSIONS** [1] - 889:19

**SUDDEN** [1] - 873:7

**SUFFICIENT** [1] - 931:14

**SUFFICIENTLY** [2] - 878:8, 878:14

**SUGGEST** [1] - 886:17

**SUGGESTED** [4] - 830:16, 830:19, 875:7, 929:3

**SUGGESTS** [2] - 862:8, 862:9
**SUITS** [1] - 891:3
**SUN** [1] - 868:10
**SUPPORT** [14] - 869:21, 873:15, 883:3, 883:8, 887:25, 888:17, 889:6, 895:12, 897:6, 897:10, 897:12, 897:14, 897:16, 902:21
**SUPPORTED** [4] - 891:14, 891:18, 894:8, 894:9
**SUPPRESSING** [1] - 851:22
**SUSTAIN** [1] - 896:19
**SWITCHING** [1] - 836:5
**SWORE** [1] - 845:2
**SWORN** [1] - 827:9
**SYSTEMIC** [1] - 852:16

**T**

**TAB** [1] - 829:17
**TACTICAL** [1] - 866:9
**TAG** [1] - 932:4
**TANGIBLE** [1] - 860:3
**TAPPING** [1] - 858:6
**TAUGHT** [1] - 823:20
**TAX** [1] - 910:14
**TEAM** [3] - 850:10, 850:23, 851:5
**TEAM** [1] - 903:8
**TECH** [1] - 887:9
**TERM** [3] - 830:19, 871:13, 894:13
**TERMS** [1] - 921:3
**TESTED** [1] - 903:15
**TESTIFIED** [8] - 827:9, 865:20, 885:19, 888:19, 897:5, 933:16, 934:11, 935:17
**TESTIMONY** [29] - 830:13, 831:10, 835:19, 845:20, 846:7, 848:6, 848:12, 848:14, 848:15, 848:23, 852:12, 853:10, 855:19, 866:2, 866:3, 880:25, 881:5, 884:10, 886:14, 894:8, 896:1, 912:17, 912:18, 913:21, 914:6, 924:10, 930:5, 935:9, 936:14
**TEXAS** [1] - 910:2
**TEXTED** [2] - 851:14, 873:16
**THE** [324] - 817:1, 817:6, 817:11, 817:14, 817:20, 818:22, 820:2, 820:6, 820:16, 820:19, 820:21, 821:1, 821:9, 822:3, 822:8, 822:11, 822:20, 822:24, 823:4, 823:7, 823:12, 823:15, 823:19, 823:24, 824:2, 824:9, 824:12, 824:14, 824:21, 825:3, 825:6, 825:8, 825:20, 826:4, 826:8, 826:15, 827:3, 827:5, 827:11, 827:13, 827:15, 833:6, 833:9, 833:12, 835:9, 835:15, 835:24, 836:8, 836:15, 836:22, 837:3, 837:8, 837:12, 837:18, 837:25, 838:5, 838:8, 839:14, 839:18, 839:19, 839:21, 840:13, 840:21, 841:4, 842:3, 842:4, 842:6, 842:9, 842:11, 842:17, 842:18, 842:19, 842:21, 843:2, 843:3, 843:4, 843:6, 843:10, 843:13, 843:14, 843:18, 843:19, 843:22, 844:1,

844:18, 844:19, 844:20, 844:21, 845:8, 845:11, 845:12, 845:24, 845:25, 846:2, 846:3, 847:2, 847:22, 848:1, 848:4, 848:7, 849:7, 849:16, 849:22, 850:7, 852:21, 853:5, 853:13, 854:3, 854:19, 855:6, 855:10, 855:15, 855:25, 856:3, 856:12, 856:17, 857:2, 857:5, 857:8, 857:11, 857:16, 857:18, 857:19, 857:22, 857:24, 858:4, 858:7, 858:11, 858:14, 859:4, 859:6, 859:7, 859:9, 859:10, 859:15, 859:16, 859:19, 859:21, 859:22, 859:23, 859:25, 860:18, 860:21, 861:6, 861:17, 861:22, 861:24, 862:1, 862:17, 863:24, 864:1, 864:17, 864:20, 864:21, 864:24, 865:11, 865:16, 866:6, 867:1, 867:4, 867:10, 867:18, 868:4, 868:17, 868:21, 869:4, 869:7, 871:25, 872:2, 872:19, 872:23, 872:25, 873:2, 873:11, 873:12, 873:21, 874:6, 874:8, 874:9, 874:11, 875:2, 875:4, 875:5, 875:6, 876:2, 876:3, 876:4, 876:8, 876:13, 876:22, 876:23, 876:24, 876:25, 877:7, 877:9, 879:8, 879:12, 880:6, 881:3, 881:9, 884:15, 884:17, 885:8, 885:10, 887:2, 887:8, 887:12, 887:13, 887:15, 888:3, 888:6, 888:9, 888:13, 888:24, 888:25, 891:23, 891:25, 892:4, 892:15, 892:19, 892:25, 893:4, 894:1, 894:19, 895:5, 895:8, 895:15, 896:15, 897:2, 897:14, 897:19, 897:23, 899:11, 899:17, 899:25, 900:5, 901:22, 903:22, 903:25, 904:1, 904:3, 904:4, 909:5, 909:22, 910:5, 910:8, 910:9, 910:10, 910:12, 910:14, 910:16, 910:25, 911:6, 911:22, 913:10, 913:12, 913:14, 913:17, 916:11, 917:2, 917:5, 917:11, 918:1, 918:2, 918:3, 918:4, 918:5, 918:9, 918:11, 919:6, 919:15, 919:22, 920:1, 920:14, 920:24, 921:13, 923:5, 923:9, 923:14, 923:16, 923:18, 924:2, 924:16, 924:17, 924:22, 924:25, 925:1, 925:5, 925:7, 925:8, 925:9, 925:11, 925:17, 925:21, 925:22, 925:23, 926:8, 926:9, 926:11, 926:15, 927:19, 927:21, 928:9, 929:12, 929:17, 930:4, 930:22, 931:7, 931:8, 931:21, 931:22, 932:19, 933:6, 933:11, 933:21, 933:22, 933:23, 934:10, 936:5, 936:8, 936:9, 936:11, 936:14, 937:15
**THEMSELVES** [1] - 907:22
**THEORETICAL** [1] - 854:22
**THEORY** [2] - 894:22, 895:21
**THEY'VE** [1] - 871:4
**THINKING** [3] - 860:2, 925:24, 926:1
**THIRD** [8] - 861:21, 871:19, 887:24, 888:17, 889:4, 889:5, 906:13, 932:23
**THOROUGH** [1] - 874:21

**THOUSANDS** [1] - 930:13
**THREAD** [1] - 935:21
**THROUGHOUT** [1] - 868:9
**TIED** [1] - 873:6
**TIM** [1] - 855:4
**TIM** [1] - 818:5
**TIMELINE** [1] - 883:24
**TIMING** [1] - 883:17
**TINA** [1] - 817:18
**TITLE** [1] - 850:12
**TITLED** [2] - 834:18, 835:2
**TO** [2] - 818:22, 937:14
**TODAY** [15] - 820:6, 820:12, 820:22, 829:16, 831:10, 848:12, 848:14, 848:23, 852:12, 853:10, 855:19, 901:17, 912:17, 915:19, 926:4
**TOGETHER** [3] - 883:4, 883:5, 907:10
**TOM** [4] - 834:15, 841:17, 846:20, 873:4
**TOOK** [1] - 833:20
**TOP** [6] - 846:19, 846:25, 892:22, 921:24, 922:1, 922:2
**TOPIC** [1] - 884:10
**TOTAL** [2] - 842:2, 842:4
**TOWN** [1] - 873:13
**TRACKING** [1] - 879:20
**TRAINING** [3] - 882:25, 884:2, 886:12
**TRAININGS** [1] - 883:20
**TRANSCRIPT** [10] - 857:4, 857:14, 857:21, 869:18, 914:6, 914:8, 930:5, 931:7, 932:25, 937:6
**TRANSCRIPT** [1] - 817:10
**TRANSPARENT** [1] - 882:14
**TREATED** [1] - 933:20
**TRIAL** [2] - 823:22, 826:3
**TRIAL** [1] - 817:10
**TRIER** [3] - 924:22, 925:17, 933:2
**TRUE** [9] - 832:23, 880:13, 880:21, 888:12, 890:8, 895:11, 895:20, 926:20, 937:6
**TRUE** [140] - 827:22, 827:24, 828:1, 828:8, 828:13, 830:3, 830:6, 830:9, 830:14, 830:24, 831:6, 831:11, 832:8, 833:1, 833:17, 833:19, 833:20, 833:21, 834:8, 835:11, 835:18, 835:20, 835:21, 836:4, 836:17, 838:17, 838:20, 846:9, 846:13, 847:3, 847:11, 847:13, 847:17, 850:22, 851:1, 851:3, 852:23, 853:2, 853:11, 855:19, 858:16, 859:12, 861:13, 862:10, 862:15, 862:20, 866:24, 867:7, 867:10, 868:1, 868:5, 868:8, 869:9, 874:24, 879:17, 879:23, 880:11, 880:15, 880:18, 882:9, 882:13, 882:19, 882:22, 884:1, 884:6, 886:11, 887:21, 888:1, 888:20, 889:14, 890:5, 890:9, 890:12, 890:17, 890:23, 891:2, 891:14, 891:17, 892:7, 892:12, 893:6, 893:9, 893:10, 893:12, 893:14, 894:1, 894:6, 894:8, 894:9, 894:19, 894:22, 895:1, 895:11,

895:18, 895:21, 897:6, 897:10, 897:12, 898:6, 898:17, 899:9, 899:20, 900:9, 900:13, 900:15, 901:5, 901:8, 901:10, 901:17, 902:9, 902:13, 902:21, 905:4, 905:20, 906:5, 906:14, 907:23, 913:24, 914:12, 914:17, 918:15, 918:20, 919:10, 919:19, 920:4, 920:10, 920:17, 922:2, 922:4, 922:11, 922:17, 923:11, 924:4, 924:10, 926:12, 928:1, 928:14, 934:18, 934:23

**TRUE** [1] - 817:6
**TRUSTWORTHY** [1] - 907:14
**TRUTH** [1] - 845:2
**TRUTHFUL** [1] - 877:18
**TRY** [16] - 823:20, 837:5, 837:10, 854:20, 855:1, 861:9, 862:4, 875:9, 878:17, 883:1, 883:2, 892:16, 907:14, 909:22, 924:2, 936:13
**TRYING** [20] - 820:7, 820:10, 845:13, 849:9, 849:11, 850:5, 854:20, 854:25, 872:13, 873:5, 873:18, 875:8, 875:9, 875:19, 879:2, 881:15, 907:19, 915:25, 916:2, 930:6
**TUCKED** [1] - 872:15
**TURN** [14] - 829:17, 832:12, 840:3, 841:9, 853:22, 855:5, 871:16, 882:6, 887:22, 890:14, 891:12, 898:15, 921:20, 935:1
**TURNAROUND** [2] - 914:21, 914:22
**TURNED** [4] - 831:6, 831:10, 842:15, 905:11
**TURNER** [1] - 896:1
**TURNING** [2] - 848:19, 851:15
**TURNOUT** [2] - 932:15, 932:16
**TWO** [23] - 840:8, 841:24, 850:3, 863:23, 872:11, 873:13, 885:17, 886:22, 894:4, 894:17, 895:4, 895:6, 895:8, 897:20, 909:6, 911:24, 920:3, 921:24, 927:2, 928:21, 929:9, 933:16

# U

**U.S** [3] - 852:5, 906:8
**UGLY** [1] - 842:15
**UKOBIAN** [1] - 873:4
**ULTIMATE** [1] - 902:25
**UMM** [1] - 878:9
**UNCERTAIN** [1] - 877:20
**UNCLEAR** [2] - 843:23, 931:12
**UNCONDITIONAL** [1] - 849:19
**UNCONSTITUTIONALITY** [1] - 860:9
**UNDER** [22] - 822:9, 822:18, 832:21, 846:23, 850:9, 850:12, 850:23, 850:25, 851:5, 851:16, 862:8, 863:3, 866:9, 888:16, 889:4, 890:2, 890:22, 891:1, 921:6, 932:25
**UNDERNEATH** [1] - 882:12
**UNDERSTOOD** [7] - 837:21, 847:21, 849:1, 880:14, 897:1, 903:2, 908:12

**UNFOLD** [1] - 912:17
**UNFOUNDED** [1] - 846:15
**UNIQUE** [1] - 929:21
**UNITED** [2] - 891:3, 893:14
**UNITED** [4] - 817:1, 817:11, 818:23, 937:3
**UNIVERSE** [1] - 853:3
**UNLESS** [2] - 825:23, 876:16
**UNLESS** [1] - 861:22
**UNSUBSTANTIATED** [1] - 892:3
**UNTRADITIONAL** [1] - 855:23
**UP** [25] - 824:17, 825:9, 834:19, 842:23, 845:12, 845:13, 851:3, 860:9, 875:10, 877:1, 880:10, 884:12, 894:2, 900:14, 903:13, 904:6, 905:1, 914:20, 930:4, 931:9, 931:20, 931:23, 934:4, 934:13
**USA** [1] - 818:3
**UZOMA** [1] - 817:17

# V

**VAGUE** [2] - 924:15, 924:16
**VALID** [3] - 902:9, 908:19, 910:6
**VALIDATE** [1] - 846:12
**VALIDATE** [57] - 830:4, 830:9, 830:14, 830:15, 830:19, 830:24, 831:7, 831:11, 831:14, 831:16, 831:23, 832:7, 833:2, 833:17, 833:19, 834:4, 834:18, 834:19, 835:3, 835:17, 835:21, 835:22, 836:2, 836:3, 836:5, 836:11, 836:15, 836:16, 838:13, 838:16, 840:1, 840:7, 841:20, 845:19, 846:13, 851:6, 860:23, 861:10, 862:7, 863:3, 864:2, 866:25, 867:8, 869:10, 879:16, 887:22, 889:10, 890:11, 894:6, 905:4, 905:8, 905:15
**VARIANCES** [1] - 929:20
**VASTLY** [1] - 832:6
**VENDOR** [2] - 932:4
**VERIFIED** [1] - 929:16
**VERIFY** [3] - 903:24, 904:2, 933:14
**VERSUS** [1] - 858:25
**VIDEO** [1] - 913:19
**VINCENT** [2] - 898:16, 898:21
**VIOLA** [2] - 818:22, 937:13
**VIOLA_ZBOROWSKI@GAND. USCOURTS.GOV** [1] - 818:24
**VIOLATES** [1] - 852:5
**VISIBILITY** [1] - 828:16
**VOIR** [3] - 894:15, 919:17, 919:22
**VOLUME** [1] - 817:3
**VOLUNTARILY** [1] - 893:7
**VOLUNTEERED** [2] - 915:7, 933:7
**VOLUNTEERS** [1] - 912:23
**VOTE** [189] - 827:22, 827:24, 828:1, 828:8, 830:4, 830:9, 830:14, 830:15, 830:20, 830:24, 831:6, 831:7, 831:11, 831:12, 831:14, 831:16, 831:23, 832:7, 832:9, 833:1, 833:2, 833:17, 833:18, 833:19, 833:20, 833:21,

834:4, 834:18, 834:20, 835:3, 835:11, 835:17, 835:18, 835:21, 835:22, 836:2, 836:3, 836:4, 836:5, 836:11, 836:15, 836:17, 838:13, 838:16, 838:17, 838:20, 840:1, 840:7, 841:20, 845:19, 846:9, 846:13, 847:3, 847:11, 847:14, 847:17, 850:22, 851:1, 851:3, 851:6, 852:24, 853:2, 853:11, 855:20, 858:16, 859:12, 860:23, 861:10, 861:13, 862:7, 862:11, 862:15, 862:20, 863:3, 864:2, 866:24, 866:25, 867:7, 867:8, 867:11, 868:1, 868:5, 868:8, 869:9, 869:10, 874:24, 879:16, 879:17, 879:23, 880:11, 880:15, 880:18, 882:10, 882:13, 882:19, 882:22, 884:1, 884:6, 886:11, 887:22, 888:1, 888:20, 889:10, 889:14, 890:6, 890:9, 890:11, 890:12, 890:17, 890:24, 891:2, 891:14, 891:18, 892:7, 892:12, 893:6, 893:9, 893:10, 893:13, 893:14, 894:1, 894:6, 894:8, 894:9, 894:19, 894:23, 895:1, 895:11, 895:18, 895:21, 897:6, 897:10, 897:12, 898:6, 898:18, 899:9, 899:20, 900:9, 900:13, 900:15, 901:5, 901:8, 901:10, 901:17, 902:9, 902:13, 902:21, 905:4, 905:8, 905:15, 905:21, 906:5, 906:14, 907:24, 913:24, 914:13, 914:17, 918:15, 918:20, 919:11, 919:19, 920:4, 920:10, 920:18, 922:2, 922:4, 922:11, 922:17, 923:11, 924:4, 924:10, 926:12, 928:1, 928:14, 934:18, 934:24
**VOTE** [1] - 817:6
**VOTE** [18] - 836:17, 852:5, 886:11, 908:4, 908:7, 908:24, 909:1, 909:23, 910:1, 910:4, 911:3, 922:6, 926:18, 933:14, 933:18, 934:4, 934:12, 934:13
**VOTE'S** [7] - 828:13, 830:3, 830:6, 834:8, 835:20, 887:21, 905:4
**VOTE/VALIDATE** [1] - 898:18
**VOTED** [12] - 892:11, 898:19, 901:11, 901:18, 903:2, 903:6, 903:10, 903:17, 904:14, 904:17, 904:22, 915:21
**VOTER** [35] - 852:3, 859:18, 889:25, 891:4, 892:23, 898:17, 904:10, 905:25, 906:9, 906:22, 908:9, 909:10, 909:12, 910:6, 910:19, 910:23, 912:25, 914:25, 915:20, 916:15, 916:20, 922:5, 922:7, 922:18, 924:11, 925:2, 925:3, 925:20, 926:13, 926:18, 926:25, 927:3, 927:13, 934:3
**VOTERS** [16] - 852:6, 870:9, 890:7, 904:25, 906:6, 906:7, 908:16, 908:18, 911:13, 914:18, 915:4, 918:15, 932:15, 932:17, 932:22, 934:3
**VOTES** [18] - 851:21, 851:24, 852:4, 852:6, 853:11, 855:20, 858:17, 858:23, 859:13, 860:24, 861:12, 862:9, 862:21, 899:2, 899:6, 899:21,

901:5, 906:7
**VOTING** [12] - 852:4, 872:22, 900:16, 906:10, 908:2, 908:17, 910:18, 911:12, 911:20, 912:13, 923:22
**VS** [1] - 817:5

## W

**WAIT** [3] - 888:3, 904:7, 912:1
**WAIVED** [4] - 822:1, 823:3, 823:11, 921:5
**WAIVER** [1] - 822:14
**WALKER** [1] - 855:4
**WALTON** [1] - 907:5
**WAYS** [2] - 909:7, 929:9
**WEBSITE** [7] - 863:12, 863:19, 864:9, 864:12, 864:18, 881:24, 883:7
**WEDNESDAY** [1] - 817:12
**WEEK** [19] - 821:4, 843:11, 854:2, 885:1, 885:4, 885:7, 893:7, 902:6, 902:19, 905:11, 913:25, 914:15, 915:3, 915:13, 915:18, 916:3, 933:17, 934:11
**WEEKS** [3] - 831:15, 885:17, 927:6
**WEIGHTY** [1] - 878:14
**WELL..** [1] - 880:21
**WESLEY** [1] - 855:4
**WHATSOEVER** [2] - 896:18, 897:8
**WHISTLEBLOWER** [17] - 830:6, 869:12, 869:13, 869:20, 869:24, 870:8, 874:17, 874:24, 876:7, 876:19, 877:13, 877:17, 879:5, 880:25, 881:5, 881:11, 881:17
**WHISTLEBLOWER'S** [1] - 878:12
**WHISTLEBLOWERS** [2] - 870:12, 874:17
**WHOLE** [5] - 839:1, 853:3, 856:18, 856:19, 935:21
**WIDESPREAD** [1] - 854:5
**WILLIAMS** [1] - 817:7
**WILLIAMS** [5] - 883:11, 884:24, 906:25, 920:25, 921:1
**WILLING** [2] - 826:1, 925:16
**WISCONSIN** [2] - 902:10, 902:14
**WISH** [2] - 842:22, 925:5
**WITHDRAWN** [1] - 893:10
**WITNESS** [25] - 820:14, 820:23, 822:2, 824:6, 824:15, 824:17, 824:24, 825:23, 846:6, 846:25, 847:9, 847:23, 849:25, 855:7, 856:22, 856:25, 861:4, 861:16, 868:7, 868:17, 869:4, 887:10, 894:15, 919:16, 936:12
**WITNESS** [79] - 819:3, 827:13, 839:18, 839:21, 842:4, 842:11, 842:18, 842:21, 843:3, 843:6, 843:13, 843:18, 843:22, 844:18, 844:20, 845:11, 845:25, 846:3, 856:3, 857:18, 857:24, 858:7, 859:6, 859:9, 859:15, 859:19, 859:22, 859:25, 861:24, 864:1, 864:20, 864:24, 869:7, 872:23, 873:2,

873:12, 874:9, 875:4, 875:6, 876:3, 876:23, 876:25, 877:9, 880:6, 884:17, 885:10, 887:13, 888:25, 903:25, 904:3, 910:5, 910:9, 910:12, 910:16, 917:11, 918:1, 918:3, 918:5, 918:9, 923:16, 924:17, 924:25, 925:5, 925:8, 925:11, 925:21, 925:23, 926:9, 926:15, 927:21, 928:9, 929:17, 930:22, 931:8, 931:22, 933:6, 933:21, 933:23, 936:8
**WITNESSES** [5] - 820:3, 821:15, 822:13, 824:8, 898:7
**WON** [2] - 892:19, 905:12
**WORD** [13] - 823:18, 833:21, 851:16, 868:14, 870:2, 870:3, 875:7, 875:10, 878:19, 882:5, 883:6
**WORDED** [1] - 846:4
**WORDING** [1] - 870:20
**WORDS** [16] - 836:25, 842:9, 845:23, 846:1, 851:17, 851:18, 853:16, 859:10, 864:1, 882:6, 890:11, 894:22, 929:15, 930:11, 930:12, 933:13
**WORRIED** [1] - 820:8
**WORST** [1] - 873:8
**WORTHY** [1] - 878:8
**WRAP** [2] - 872:13, 873:18
**WRITE** [2] - 843:5
**WRITING** [1] - 857:8
**WRITTEN** [9] - 857:5, 857:12, 858:19, 859:11, 859:14, 862:24, 891:11, 925:5, 931:12
**WROTE** [6] - 839:10, 842:24, 843:6, 843:8, 859:2, 925:14
**WYNNE** [86] - 817:22, 820:14, 820:18, 820:20, 822:6, 822:10, 822:16, 823:5, 823:17, 823:22, 823:25, 824:10, 824:25, 825:4, 825:7, 825:17, 826:5, 826:13, 827:2, 827:4, 833:10, 835:10, 837:11, 837:13, 837:21, 838:11, 840:12, 840:19, 840:22, 844:16, 846:17, 847:21, 849:8, 849:13, 849:17, 852:22, 853:22, 855:3, 855:8, 855:22, 856:2, 856:20, 858:1, 858:9, 858:13, 861:3, 861:15, 863:22, 867:2, 867:12, 868:14, 868:19, 869:1, 872:1, 876:9, 876:21, 879:9, 879:25, 880:4, 881:2, 891:24, 893:9, 893:17, 893:19, 894:11, 895:25, 896:14, 897:1, 899:12, 899:24, 900:2, 901:2, 901:19, 916:8, 917:3, 919:16, 919:24, 920:8, 920:11, 921:3, 921:6, 928:5, 928:7, 936:10, 936:12, 936:17
**WYNNE** [18] - 823:4, 823:7, 825:15, 825:24, 826:1, 833:9, 837:4, 838:9, 840:15, 844:21, 847:2, 854:19, 891:23, 895:2, 895:15, 899:25, 900:7, 911:7

## Y

**YEAR** [1] - 860:8

**YES-OR-NO** [1] - 927:16
**YESTERDAY** [1] - 930:6
**YOU-ALL** [12] - 820:3, 822:3, 857:5, 859:24, 887:15, 888:9, 903:23, 904:1, 925:17, 930:9, 930:18, 933:3
**YOURSELF** [1] - 929:14
**YUN** [1] - 818:4
**YUP** [1] - 913:23

## Z

**ZBOROWSKI** [1] - 937:13
**ZBOROWSKI** [2] - 818:22, 937:13
**ZOOM** [4] - 820:4, 820:9, 820:12, 820:15