1                    UNITED STATES DISTRICT COURT
                FOR THE NORTHERN DISTRICT OF GEORGIA
2                         ATLANTA DIVISION

3   FAIR FIGHT, INC., JOHN DOE,      )
    AND JANE DOE                      )VOLUME 6 - A.M. Session
4                    PLAINTIFFS,      )
                                      )DOCKET NO. 2:20-Cv-0302-Scj
5          -vs-                       )
                                      )
6   TRUE THE VOTE, INC., CATHERINE    )
    ENGELBRECHT, DEREK SOMERVILLE,    )
7   MARK DAVIS, MARK WILLIAMS, RON    )
    JOHNSON, JAMES COOPER, AND        )
8   JOHN DOES 1-10,                   )
                     DEFENDANTS.      )
9   _____

10            TRANSCRIPT OF SUMMARY JUDGMENT PROCEEDINGS
              BEFORE THE HONORABLE STEVE C. JONES
11               UNITED STATES DISTRICT JUDGE
                  FRIDAY, NOVEMBER 3, 2023
12

13  APPEARANCES:

14  On Behalf of the Plaintiffs:

15    ALLEGRA J. LAWRENCE-HARDY, Esq.
      CHRISTINA ASHLEY FORD, ESQ.
16    LESLIE J. BRYAN, ESQ.
      MARCOS MOCINE-MC QUEEN, ESQ.
17    UZOMA NKWONTA, ESQ.
      TINA MENG MORRISON, ESQ.
18    JACOB SHELLY, ESQ.
      MICHELLE L. MC CLAFFERTY, ESQ.
19

20  On Behalf of the DefendantS:

21    CAMERON POWELL, ESQ.
      MICHAEL JOHN WYNNE, ESQ.
22    JAMES CULLEN EVANS, Esq.

23

24

25

1    APPEARANCES (CONTINUED):

2
     ON BEHALF OF INTERVENOR (USA):
3
       DANA PAIKOWSKY, ESQ.
4      JENNIFER J. YUN, ESQ.
       TIM MELLETT, ESQ.
5      AILEEN BELL HUGHES, ESQ.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I N D E X

2    WITNESS              DIRECT    CROSS    REDIRECT    RECROSS

3    GREGG PHILLIPS
       BY THE COURT      1309
4                        1327

5    MARK WILLIAMS        1332     1361

6    AMY HOLSWORTH                 1369

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              (HELD IN OPEN COURT AT 9 A.M.)

2              THE COURT:  Good morning.  You-all can be seated.

3              Here is how I'd like to handle things today.  First

4    of all, did you-all resolve Defendants' 238 yesterday?  It was

5    offered -- defendants offered 38 as an exhibit.

6              MR. POWELL:  That's right.

7              THE COURT:  Plaintiffs are saying, well, it's not on

8    our list, it isn't on our list.

9              Did you-all resolve that?

10             MR. POWELL:  I believe I misidentified it as being a

11   plaintiffs' exhibit.  They couldn't find it there, of course,

12   because it was a defendants' exhibit.

13             THE COURT:  Any objection, Ms. Ford, to

14   Defendants' 38?

15             MS. FORD:  No, Your Honor.

16             THE COURT:  All right.  Defendants' 38 is admitted

17   into evidence.

18             (Defendants' Exhibit 38 was received and marked into

19   evidence.)

20             THE COURT:  I'd like to have Gregg Phillips called to

21   the stand.

22             Before Mr. Phillips is called to the stand,

23   Mr. Wynne, I need you to answer me one simple question:  Is

24   Mr. Phillips going to be called as a witness in your case?

25   And the reason why I ask you this, in reading the law

1    regarding the rule of sequestration, how I approach it is

2    going to depend on what you say in this answer.

3            MR. WYNNE:  I've never gotten so much attention.

4            Mr. Phillips will not be called as a witness in the

5    case.

6            THE COURT:  All right.  At this time, I'd ask

7    Mr. Phillips to come have a seat in the witness stand.

8            THE DEPUTY CLERK:  Remain standing and raise your

9    right hand.

10                          * * * * * *

11                       GREGG PHILLIPS,

12           having been duly sworn, testified as follows:

13                          * * * * * *

14           THE DEPUTY CLERK:  Have a seat.  If you could please

15   state and spell your name for the record.

16           THE WITNESS:  Gregg Phillips.

17           THE COURT:  Mr. Phillips, yesterday it was brought to

18   my attention that you were on a podcast I think Monday night

19   of this week with Ms. Engelbrecht regarding -- something

20   you-all were doing Monday night regarding your organization;

21   is that correct?

22           THE WITNESS:  Yes, sir, I think so.

23           THE COURT:  Now, Mr. Phillips, who is your -- you

24   don't -- you're not -- do you have an attorney representing

25   you in this case or in this matter?

1           THE WITNESS:  No, sir.

2           THE COURT:  Okay.  Mr. Phillips, you were listed as a

3   witness in this case up until about five minutes ago.  Were

4   you explained regarding something called the rule of

5   sequestration?  Did anybody explain that rule to you?

6           THE WITNESS:  No, sir.

7           THE COURT:  So no one told you that you could not

8   talk to people, other witnesses or the defendants, about this

9   case while this case was going on?

10          THE WITNESS:  No, sir.

11          THE COURT:  So you did not know that whatsoever?

12          THE WITNESS:   (Witness shakes head.)

13          THE COURT:  You had no conversation with Mr. Powell,

14  Mr. Evans, or Mr. Wynne about not discussing this case with

15  anyone?

16          THE WITNESS:  I don't recall.

17          THE COURT:  Think about it.

18          THE WITNESS:  No, sir.

19          THE COURT:  So at no times you did not know you

20  couldn't discuss this case with other witnesses or defendants?

21          THE WITNESS:  No.

22          THE COURT:  Did you talk about this case with other

23  witnesses or defendants?

24          THE WITNESS:  No, sir.

25          THE COURT:  Did you have any conversation with

1   Ms. Engelbrecht regarding this case at all during the podcast

2   or after or before it?

3           THE WITNESS:  No, sir.

4           THE COURT:  All right.  During the podcast you

5   testified about a male witness crying on the witness stand.

6   How did you know about that?

7           THE WITNESS:  Somebody told me.

8           THE COURT:  Who told you?

9           THE WITNESS:  I really don't remember.

10          THE COURT:  Well, think about it.  And think about it

11  long and hard before you answer me again.  Think about it.

12          THE WITNESS:  I'm thinking.  I don't know.

13          THE COURT:  So you just, off the top of your head,

14  somebody told you about a man crying on the stand.  That

15  didn't stand -- but it stood out to you, because you talked

16  about it in your podcast.  So obviously it was an important

17  thing that you remembered.  As you sit here today, you're

18  telling me you don't remember who told you that?

19          THE WITNESS:  I've talked -- I mean, I was here the

20  other day and reporters were talking to me, people were

21  talking to me on the street.  I don't know.

22          THE COURT:  I don't mean to insult you, but I find

23  what you're telling me hard to believe.  It was so important

24  that you mentioned it a number of times in the podcast.  And I

25  won't use the words you used to describe males, but you

1   pointed out in that podcast very distinctly and directly about

2   some man crying on the witness stand.  And now you said I

3   don't remember who told you that.

4           THE WITNESS:  I don't remember.

5           THE COURT:  And so you just -- somebody told you that

6   out of the blue?

7           THE WITNESS:  I don't know about out of the blue, but

8   no one told me -- I mean, I don't remember.

9           THE COURT:  You talked about people lying and lying

10  and lying and crossing the line in that podcast very directly

11  and very distinctly.  How did you know about that?

12          THE WITNESS:  Read it in the paper.

13          THE COURT:  That wasn't in the paper.  I've read

14  every article that's been in the Atlanta Journal-Constitution

15  because I need to make sure what's going on.  That was not in

16  the paper.

17          THE WITNESS:  The Associated Press article had all

18  sorts of things in it.

19          THE COURT:  I have a law clerk back in my office and

20  she sends me every article regarding this case because I have

21  to know what's being said and that was not said in any of

22  them.

23          THE WITNESS:  What was not said?

24          THE COURT:  About anybody lying.  Nobody said

25  anything in any newspaper article about people would lie, lie,

1  lie.

2          THE WITNESS:  I'm saying that they were lying.

3          THE COURT:  Okay.

4          THE WITNESS:  I didn't say somebody else said it.

5          THE COURT:  How do you know they were lying?

6          THE WITNESS:  Because I know the truth.

7          THE COURT:  Well, how do you know what they said?

8          THE WITNESS:  Because it says it in the newspaper.

9  It says that he went to Auburn University and he was a

10  master's student, or something like that, and he went back to

11  Muscogee County.

12          THE COURT:  Who?  Who?

13          THE WITNESS:  I don't know what -- remember what the

14  name was.  It was in the paper.

15          THE COURT:  You don't remember what the person's name

16  was that you said was lying?

17          THE WITNESS:  He was -- it was a lie to say what he

18  said.

19          THE COURT:  Who said it?

20          THE WITNESS:  I don't remember.  If I had my phone I

21  could look at it.

22          THE COURT:  Do you have your phone here?

23          THE WITNESS:  No, sir.  They took it from me.

24          THE COURT:  Where is it?

25          THE WITNESS:  It's downstairs.

1          THE COURT:  Call downstairs, tell them to bring the

2    phone up here.

3          THE SECURITY DEPUTY:  Yes, sir.

4          THE COURT:  Ms. Wright, tell the Marshal to come up

5    here as well.

6          THE SECURITY DEPUTY:  Sir, do you have your tag that

7    you left with them?

8          THE WITNESS:  Yes, sir.

9          THE SECURITY DEPUTY:  If I could have that, please.

10         Would you call downstairs and have someone bring up a

11    phone --

12         THE COURT:  It is your testimony that you don't know

13    who it was that testified -- you read his testimony and you

14    knew he was lying?

15         THE WITNESS:  Yes.

16         THE COURT:  All right.  And his name is in your

17    phone?

18         THE WITNESS:  No.  The article's in the phone.

19         THE COURT:  All right.  So that article's in the

20    phone about who testified and you'll be able to identify this

21    man's name?

22         THE WITNESS:  Sure.

23         THE COURT:  Please have a seat, Mr. Wynne.

24         MR. WYNNE:  Okay.

25         THE COURT:  No one that you can remember told you

1   about the crying male witness?

2           THE WITNESS:  No.

3           THE COURT:  And you just off the top of your head

4   knew about it.

5           THE WITNESS:  No.  I mean, somebody told me, but I

6   don't know who.

7           THE COURT:  You don't know who told you?

8           THE WITNESS:  Right.

9           THE COURT:  You can remember fine, but you just don't

10  remember who said it.

11          THE WITNESS:  Well, it's a thing.  You can ask my

12  grandson.  It's a thing with me.  I don't like the idea that

13  adult males cry.  So it's -- I say it all the time.  I've said

14  it publicly.  I've said it many times.

15          THE COURT:  That's not what I'm asking you.

16          I'm asking you who told you that that adult male was

17  crying?

18          THE WITNESS:  I don't -- I don't recall.

19          THE COURT:  Okay.  And no -- none of these three

20  lawyers told you not to talk to anybody about this case?

21          THE WITNESS:  Not that I recall, but I wouldn't do it

22  anyway.

23          THE COURT:  Step outside.

24          (Mr. Phillips left the courtroom.)

25          THE COURT:  Mr. Wynne, you informed this Court

1  yesterday, you informed every witness about the rules of

2  sequestration.  This witness just under oath said you did not

3  do that.

4       MR. WYNNE:  Your Honor, when he was here on Sunday, I

5  did inform him of those rules.  When we met, we were going to

6  talk about that case.  I asked him to leave the room, and I

7  told him why.

8       In terms of the report and his redlining and so

9  forth, he told me yesterday what he was referring to was the

10  expert report in which there were lies, that he was referring

11  to the report and that he was referring to when and if the

12  transcripts become available, essentially, I predict it will

13  be lies.

14       He's known these experts for a very, very long time.

15  I'm satisfied with what he was saying is that they are liars,

16  whatever they said would have been a lie based on what he

17  knows of them, and he was -- he was reading, at least he told

18  me, the expert report that was filed six months ago.

19       THE COURT:  You just heard Mr. Phillips testify that

20  it came from something he read in the newspaper article.

21       MR. WYNNE:  I don't know where that comes from.

22       THE COURT:  Ms. Lawrence-Hardy.

23       MR. WYNNE:  Was he talking about a person?

24       THE COURT:  Hold on one second.

25       MR. WYNNE:  He said he was referring to -- my

1   colleague corrects me -- Berson's expert report?

2           MR. POWELL:  He had referred to someone moving out of

3   school for graduate school.  I think he thought you were

4   talking about Scott Berson.  And that's what he thought he

5   read about in the news article.  That's just what I understood

6   there.  I haven't talked to him.

7           THE COURT:  Thank you, Mr. Powell.

8           But that's not what the witness is saying.

9           MR. WYNNE:  Well, I did talk to him.  And he was

10  saying he was referring to the reports that were done in

11  preparation of the case.  That is the expert reports that we

12  picked apart during Dr. Mayer and Dr. Burton's testimony, that

13  they were lying there, they are liars.  He's read what they've

14  read in the past.  He has a different version.  He was

15  redlining, if you will, the report.  When the transcripts come

16  out, on appeal or whenever, they will bear out my saying that

17  they're liars.

18          He's says he is not familiar with what happened in

19  the court.  He also says it could have been somebody on the

20  street.  As you see, he's had several people who have been

21  close friends in the courtroom.  I will represent I did tell

22  him you've got to get out of the room now because we're

23  talking about the case.  You can't know what's going on in the

24  case.  You cannot know who's testifying.  Now, maybe I wasn't

25  clear enough, but I did tell him that.

1           THE COURT:  Thank you.

2           MR. WYNNE:  And Mr. Phillips, as you can see, God

3   bless him, love him to death, but he's a highly opinionated

4   man.  He's under a little stress today, but I'll tell you I

5   did tell him.

6           THE COURT:  I will take you for your word on that.

7           MS. LAWRENCE-HARDY:  Your Honor, I just want -- a few

8   things.  First of all, the transcript says expert testimony,

9   it doesn't say expert report.  So if, in fact, we want to

10  believe the expert report is what he meant, I think we should

11  get it on the record from the witness himself.  Because the

12  record is very clear what he said in the podcast.  What he

13  said in the podcast was testimony.

14          The other item I would just note, Your Honor -- and

15  we were going to flag this for you at our first opportunity,

16  but given what we just heard, I have even graver concerns.

17          We are certainly aware of one witness that Mr. Wynne

18  has told us he plans to call who we have seen in the

19  courtroom, actively in the courtroom.  There may be another

20  that --

21          THE COURT:  Who is that?

22          MS. LAWRENCE-HARDY:  So we believe Joe Knapp has been

23  in the courtroom.  And Brian Robinson may be in the courtroom.

24  We are not certain of that.  We -- obviously, these are not

25  our witnesses.  We don't know them as well as Mr. Wynne does.

1   But we -- our team is quite certain about Mr. Knapp.  So it

2   sounds like there has been an ongoing issue with regard to the

3   sequestration.

4           THE COURT:  Let me ask you a question,

5   Ms. Lawrence-Hardy.  Under the rule of sequestration, it

6   applies --

7           MR. WYNNE:  Mentions --

8           THE COURT:  Hold on a second, Mr. Wynne.

9           It applies to witnesses, lawyers, and defendants.  If

10  Mr. Phillips is not a witness, does that not change somewhat

11  the posture of which I have to look at this matter?

12          MS. LAWRENCE-HARDY:  Absolutely, Your Honor.

13          I mean, what I think we find the most offensive is

14  what Mr. Phillips just testified to in terms of this is a

15  court of law and one should not purger oneself.  I don't know

16  if he did or not, but it's very serious when one testifies

17  under oath.

18          And so whatever the conduct has been today, we agree

19  that with regard to Mr. Phillips, given that he is not being

20  called, we are not asking the Court for any additional relief

21  in that regard.

22          We believe we could, but we are not.  We take to

23  heart what the Court mentioned yesterday around resources, and

24  we certainly want to be very mindful of that.

25          But we are very concerned and we would ask for that

1  same rule to apply to any witness who has been present in the

2  courtroom in violation of the sequestration rule.

3       THE COURT:  I agree with you totally.  There is a

4  reason why we have the rule of sequestration.  It's not just

5  something we say.

6       Ms. Lawrence-Hardy, Mr. Wynne, I'm very concerned

7  about the testimony I heard from Mr. Phillips.  Believe it or

8  not, judges do not thrive on sanctioning people, fining

9  people, or putting people in jail or prison.

10      Mr. Wynne, I'm very concerned about what I heard.  I

11 don't think there is a sequestration violation by him that

12 he's no longer a witness.  But what he's testifying to, the

13 Court finds it hard to believe.  However, I don't have enough

14 in front of me to say he is definitely not telling the Court

15 the truth when he says, I don't remember who said it to me.

16      I have serious question about whether he's telling

17 the truth here, but I don't have enough to say this man has

18 just perjured himself here in the courtroom.

19      Now, what you said, though, Mr. Wynne, does raise

20 more questions about whether he did purger himself.

21      Do we have that phone?

22      THE SECURITY DEPUTY:  Yes, sir.

23      THE COURT:  Hand that phone to Mr. Wynne.

24      Mr. Wynne, you do me a favor and take it outside.

25 You give it to Mr. Phillips, tell him to find this AP article

1    he's talking about.  Or should we just have him do it in the

2    courtroom?  Let's bring him in the courtroom.  Let's have him

3    do it on the stand.  Bring Mr. Wynne back.  Hold on a second.

4    Bring Mr. Wynne back in.  We'll hand it to him on the stand.

5    Let him find it on the stand.

6         MR. WYNNE:  I have one other thing that may have a

7    bearing on this.  It's not clear about -- Mr. Powell thought

8    he was referring to Berson as opposed to Burton.  That's not

9    clear to me.

10        The other thing is Mr. Phillips is -- his -- his

11   health has deteriorated.  Last April he was given a year.  He

12   has stage 4 bone cancer.  I'd like people to respect that.

13   And it's had various ailments -- impacts on a number of

14   things.  So I'd ask the Court to keep that in mind.  I don't

15   know how it affects his cognitive condition.

16        I'm not making excuses for him whatsoever, but I'd

17   like everybody to bear that in mind.  As he's here, he's also

18   been here providing some emotional support.  I asked him to be

19   here to get the details of geospatial tracking and CCS and

20   others things I don't understand.

21        That's also why I hesitated to bring him back.  He's

22   not fit to testify.  That's another reason I would not call

23   him.  But I don't know if that impacts the Court at all, but

24   I'd ask the Court to take that in consideration.

25        THE COURT:  I don't know if I agree with you he's not

1  fit to testify.  I'm debating whether to bring him back in

2  here if I'm not going to do something -- imply sanctions other

3  than bring him --

4          What do you think?

5          MS. LAWRENCE-HARDY:  Your Honor, we are fine with

6  whatever the Court decides in this regard.

7          THE COURT:  Here's what I'm going to do.  I'm going

8  to bring Mr. Phillips back in here.  I'm going to have some

9  comments I'm going to make to him, and I'm going to just let

10  him go and we're going to move on.

11          MS. LAWRENCE-HARDY:  Your Honor, from plaintiffs'

12  perspective, what we're most worried about, as you say because

13  Mr. Phillips is not testifying, are these other witnesses who

14  may be present.

15          THE COURT:  Was Joe Knapp ever in this courtroom

16  while -- during testimony?

17          MR. WYNNE:  I have no idea who Joe Knapp -- well, I

18  know who he is.  I've never met him.  I wouldn't be able to

19  identify him -- nor Brian Robinson.  To the extent -- I've had

20  communications with the county attorney.  I think Joe Knapp is

21  on -- and I told them, stay away, we'll call you if we need

22  you.  I wouldn't be able to identify Dan Gasaway if he hadn't

23  told me who he is.

24          THE COURT:  Is Brian Robinson the Brian Robinson in

25  the media who used to be -- I know Brian Robinson.  I haven't

1   seen him in the courtroom.

2            MR. WYNNE:  Yeah.

3            MS. LAWRENCE-HARDY:  Your Honor, it's -- Mr. Wynne

4   might have an opportunity to confer with his co-counsel.  We

5   think his co-counsel spoke directly to Mr. Knapp and can speak

6   to -- may have more information than Mr. Wynne has.

7            MR. WYNNE:  I'll sit down, Jake.  The floor is yours.

8            MR. EVANS:  I mean, Judge, I did briefly see

9   Mr. Knapp.  We told him we weren't calling him that day, and I

10  think he left.  I don't have eyes in the back of my head.  We

11  can talk to Mr. Knapp to see.  He was advised that he can't

12  communicate.

13           THE COURT:  He's not going to be a witness?

14           MR. EVANS:  I don't think we've made a determination

15  yet on that.

16           MR. WYNNE:  No, we have not made a determination.

17           MS. LAWRENCE-HARDY:  So yesterday we were told he

18  would be a witness.  So that is the game that's been played.

19  As long as he's not going to be a witness, he can come back in

20  right now.

21           MR. WYNNE:  I said he may or may not be a witness.

22           THE COURT:  Then I need to get him up here today,

23  too, to find out was he sitting in the courtroom here.  If

24  he's maybe a witness, you need to call him up and tell him he

25  needs to get up here immediately.  Because if he sat in this

1  courtroom and heard testimony, he may not be a witness.

2          MR. WYNNE:  He may be today -- or tomorrow -- not --

3  he may -- not -- he ain't going to be a witness today, if it

4  matters.

5          THE COURT:  He may not be a witness at all if he sat

6  in this courtroom after being told he's under the rule of

7  sequestration.  If he sat in this courtroom, there's a good

8  possibility that this Court will eliminate him from being a

9  witness.

10          MR. WYNNE:  Understood.

11          THE COURT:  So he needs to -- call him up.  Tell him

12  to get back up here, I need to see him.

13          He's in Atlanta?

14          MR. WYNNE:  I -- I don't know.

15          THE COURT:  Where's he at?  What city is he in?

16          MR. EVANS:  He's in Forsyth.

17          THE COURT:  So he can be here by lunchtime.  Call

18  him.  We're going to call him up.  I need to have him here by

19  11:30.

20          MS. LAWRENCE-HARDY:  Your Honor, if I may just say,

21  you know, we had an opportunity to try a very long case in

22  front of Your Honor last year.  It is difficult to keep

23  witnesses sequestered for multiple months.  And it's expensive

24  and it takes a lot of trouble.  So the notion that we don't

25  have an obligation to monitor the courtroom for our witnesses

1   I just find very difficult to accept.

2          And so we would just ask strongly -- first of all, we

3   would ask counsel to please ensure that there are no witnesses

4   in the courtroom.  And we would ask the Court for a very

5   strong direction to defendants' counsel.

6          MR. WYNNE:  Your Honor, as you know -- as you know,

7   out of an abundance of precaution, at a point somebody started

8   saying something about Dan Gasaway, even though he's not on

9   our witness list, I brought it to your attention.  So any

10  implication that we're playing games, you know, that's just

11  not right.  I want it to be clear on the record.  I'm doing

12  the darn level best I can, not being a native Georgian.

13         THE COURT:  This is a simple procedure.  When you

14  have the rule of sequestration, lawyers for both sides, the

15  plaintiffs are supposed to inform their witnesses to stay

16  outside, don't discuss the case; the same thing with the

17  defendant.  Don't come in the courtroom, don't discuss the

18  case.  I think that case we tried last year took two and a

19  half months.  I had no problems in the whole two and a half

20  months of sequestration.

21         It's just a matter of telling your witnesses what

22  they're supposed to do.  They're not supposed to be in here.

23  So if Joe Knapp was told he wasn't supposed to be in here and

24  he was in here, that's going to be a problem.

25         As far as Mr. Phillips, I haven't decided how I'm

1  going to handle the Phillips situation.  I'm going to bring

2  him back in and talk to him and let him go back to Alabama for

3  right now, but I just want to think about it some.  But it

4  changes how I'm going to think about it because he's not going

5  to be a witness.

6          But what doesn't change, I'm very concerned about

7  what he testified to here under oath.  That is what I'm

8  concerned about.

9          Now, as far as the violation of the rule, once you

10 said he wasn't going to be a witness, that changed.  But when

11 you take an oath, it's not just something we do as part of

12 procedure.  It's something we're going to follow in Judge

13 Jones' courtroom.  If you take an oath, you step up and you

14 tell me something I've got some real concerns, then I can't

15 just wipe that off.  I'm not -- so I need to think about that

16 one.

17         Bring him in.

18         Tell the Marshals they can stay downstairs for right

19 now.

20         Okay.  Ms. Conkel just -- this is going to be chapter

21 25 of my book.

22         Hold on a second, Mr. Phillips.

23         Joe Knapp and Brian Robinson are on the witness list

24 for the defendants, are they?

25         MR. WYNNE:  We're going to remove Joe Knapp.  We

1   would not be calling him.  If that's the case --

2          THE COURT:  Brian Robinson is on the witness list for

3   you-all.

4          MR. WYNNE:  Brian Robinson, we had not an allegation

5   that he was in the --

6          THE COURT:  That's not what I'm asking.

7          Was he on the witness list for you-all?

8          MR. WYNNE:  He was on the amended one.  He was on the

9   amended witness list.  And Your Honor's ruling was that you

10  reserved your ruling on those individuals.

11         THE COURT:  Brian Robinson is out.  Joe Knapp is out.

12  So Joe Knapp does not need to come here --

13         MR. WYNNE:  Okay.  Thank you.

14         THE COURT:  -- if they're not going to be testifying.

15         MS. LAWRENCE-HARDY:  Thank you.

16         THE COURT:  Thank you, Ms. Conkel.

17         Mr. Phillips.

18         (Mr. Phillips resumes the stand and testifies as

19  follows:)

20         THE COURT:  Please have a seat, Mr. Phillips.

21         Mr. Phillips, since your name has been removed from

22  the witness list, I'm not so much concerned at this time about

23  a violation of the rule of sequestration in your matter.

24  However, I've got to tell you this:  Your attorney -- and I'll

25  say this -- indicated to me he did tell you about the rule of

1  sequestration.

2           THE WITNESS:  I just don't recall, Judge.

3           THE COURT:  I understand you disagree, and you don't

4  remember.

5           There are a few things people -- being a judge and a

6  public official, I have to be kind of thick skinned.  I can't

7  get upset.  You've got a right to criticize me, and they do;

8  okay?  But there's a few things that people can say about me

9  that does -- that will upset me very quickly, if somebody says

10 I'm not telling the truth or I'm not honest.

11          So what I'm going to say to you I do not say quickly,

12 because I like to treat people the same way people treat me.

13 And, again, you can say a lot about me -- and I -- big deal up

14 here.  But when you question my honesty or say I'm not telling

15 the truth, that will get me upset.

16          So I'll be honest with you.  I have some serious

17 concerns about what you testified to about here this morning.

18 And I want to preface with that first, because when I start

19 questioning people's honesty and truthfulness under oath,

20 that's a very serious matter.  And I don't say that lightly.

21          And I have no reason to disrespect you.  It's the

22 first time I've met you other than seeing you on the podcast.

23 And you indicated you love America, trying to do what's best,

24 so --

25          But what I'm saying to you now -- and I want to say

1   it again, I don't say this lightly, because it's a very

2   serious thing to say to somebody.  I have concerns about what

3   you just told me under oath.  I need to think about it.

4        I have no intentions of trying to sanction people,

5   fine people, put them in jail, put them in prison.  I know in

6   the podcast you indicated you and Ms. Engelbrecht, I think,

7   was jailed for a day, something like that, in Texas?

8        THE WITNESS:  Ten days.

9        THE COURT:  Well, if I put somebody in jail, in

10  prison, that's a serious, serious matter, as far as I'm

11  concerned.  It's somebody telling me I'm a liar or I didn't

12  tell the truth.  So I need to think about what you said.

13       But on the other hand, as a judge, I take it serious

14  when people raise their right hand and say they're going to

15  tell the truth.  I told Ms. Engelbrecht yesterday in the

16  courtroom, as far as I'm concerned, the law is the foundation

17  for America.  And when we don't respect the law, we have

18  cracks in the law, then the foundation of America begins to

19  sink.

20       I need to think about what you testified to today.

21  As far as a rule violation, that is no longer on the table as

22  far as I'm concerned.  Your testimony is.  And I want to be

23  honest, I don't have anything to really say that what you told

24  me was the truth.

25       THE WITNESS:  It was the truth.

 1          THE COURT:  That's the only reason I told Ms. Wright

 2     to send the Marshal back downstairs.  Because I can't say

 3     unequivocally what you told me was not the truth.  And I'm

 4     hoping at the end of the day, when I think about this more, I

 5     can say to myself, I have no reason to believe Mr. Phillips

 6     lied to me under oath, the matter is over with, move on into

 7     the weekend.  But I have to think about it.

 8          And I hope I come to that conclusion that what you

 9     told was me was the truth and that will be the end of it.  We

10     may never meet again.  I have to think about it.

11          The last thing I'm going to tell you, though, this is

12     a serious business.  This is not a criminal case, but this is

13     a civil case.  This is dealing with something very important.

14     And if the lawyers tell you don't talk about something, that's

15     coming from me.  Don't talk about it.

16          Now, I understand you said they didn't tell you, but

17     in the future, pay attention.  I understand there are certain

18     matters you have to deal with in life, and I sympathize with

19     you and I hope everything works out well, but that's all I can

20     say to you.

21          You're free to go back to Alabama.  If I need to talk

22     to you further, Mr. Wynne will be in touch with you.  Okay?

23          To be fair, is there anything you want to say before

24     you leave?

25          THE WITNESS:  Yes.  I told the truth in my testimony,

1  Judge.

2          THE COURT:  Thank you.  Thank you, Mr. Phillips.

3          All right.  What I want to do next --

4          (Mr. Phillips left the courtroom.)

5          THE COURT:  And you'll get your phone downstairs as

6  you're getting ready to leave.

7          What I want to deal with next, Mr. Powell, I'm going

8  to stop your direct.  I want the plaintiffs to go ahead and

9  put Mr. Williams on the stand and officially rest, because I

10 have maybe one or two questions for the plaintiff and the

11 Department of Justice.

12         So Mr. Williams is here.  Put him on the stand.

13         MR. WYNNE:  Your Honor, may I be excused just for one

14 moment to make sure everybody is all right?

15         THE COURT:  Yes, yeah.

16         Is Mark Williams here?

17         MR. EVANS:  Yes, Judge.  He's outside.

18         THE COURT:  Mr. Evans, if you will bring him in.

19         MR. EVANS:  Yes.

20         THE DEPUTY CLERK:  Raise your right hand, please.

21                         * * * * * *

22                      MARK WILLIAMS,

23         having been duly sworn, testified as follows:

24                         * * * * * *

25         THE DEPUTY CLERK:  Have a seat.  If you would please

1  state and spell your name for the record.

2          THE WITNESS:  Mark Williams, M-a-r-k,

3  W-i-l-l-i-a-m-s.

4          THE DEPUTY CLERK:  Thank you.

5          THE COURT:  You may proceed, Ms. Ford.

6          MS. FORD:  Thank you, Your Honor.

7          Before I proceed, I would like to clarify a

8  misstatement I made earlier when you asked about Exhibit 38.

9  What I was trying to convey was that we believed yesterday

10  that it hadn't been on defendants' exhibit list at all.  I was

11  removing my objection on that basis, but we still do have an

12  objection to the extent that there is hearsay in the document.

13          THE COURT:  Okay.  We'll deal with that when we put

14  him back on the stand.

15          MS. FORD:  Thank you.  I just wanted to clarify.

16  DIRECT EXAMINATION

17  BY MS. FORD:

18  **Q.**   Good morning, Mr. Williams.

19  **A.**   Good morning.

20  **Q.**   I have a few things to talk to you about today, but I

21  want to start from the beginning.

22          You originally got involved with True the Vote to provide

23  printing services; correct?

24  **A.**   Correct.

25  **Q.**   And that's your profession?  You have a professional

1   printing company?

2   **A.**   Correct.

3   **Q.**   And I understand that in December 2020, it was David

4   Shafer who made an introduction between you and

5   representatives of True the Vote?

6   **A.**   That's correct.

7   **Q.**   And David Shafer at the time was the chairman of the

8   Republican Party of Georgia?

9   **A.**   Yes.

10  **Q.**   And before that introduction, you had not met

11  Mr. Phillips or Ms. Engelbrecht; correct?

12  **A.**   Not at all.

13  **Q.**   And so you understand from Mr. Phillips that he needed

14  help with the -- a very big print job in a short amount of

15  time?

16  **A.**   That's correct.

17  **Q.**   And my understanding is that what True the Vote needed

18  help with was physically printing the individual challenge

19  letters that would be going to the counties?

20  **A.**   That's correct.

21  **Q.**   And so I'm not in the printing business, but I just want

22  to make sure I understand what you were asked to do.

23       So say True the Vote had a list of, say, 10,000 voters in

24  a county that was on the challenge list, you needed to produce

25  10,000 individual letters, each one different with a different

1  voter's name; is that right?

2  **A.**   That's correct.  That's what they were planning to

3  present to the -- I guess the elections boards or whatever it

4  was they were doing.  So we were to provide the hard copies.

5  **Q.**   Okay.  And then on that letter, the -- so the voter's

6  name would be at the top and the challenger's name would be at

7  the bottom; correct?

8  **A.**   It would be installed in that letter.  I'm not sure

9  exactly where it was.  I don't think I paid attention to it.

10  **Q.**   Okay.  Here I have Exhibit 71.

11        MS. FORD:  Can I approach, Your Honor?

12        THE COURT:  Which Exhibit?

13        MS. FORD:  71.

14        THE COURT:  Yes.

15        Ms. Ford, if you can speak a little slower sometimes

16  so the court reporter can keep up with you.

17        MS. FORD:  Sure.

18        THE COURT:  Thanks.

19        THE WITNESS:  I feel like I should take a shower in

20  here.

21        THE COURT:  Excuse me?  What did you say?

22        THE WITNESS:  I said I feel like I should take a

23  shower in here.  I feel like I'm in a shower stall.

24        THE COURT:  Okay.  Yeah.

25  BY MS. FORD:

1   **Q.**   So, Mr. Williams, this is a challenge letter that

2   actually has your name at the bottom; correct?

3   **A.**   That's correct.

4   **Q.**   Okay.  So this would have been, basically, an example

5   letter for one of the voters that was challenged in Gwinnett

6   County; correct?

7   **A.**   That's correct.

8   **Q.**   So I just wanted to get a sense of how the printing

9   process worked.  And this is my own lack of knowledge with

10  your business.  So am I correct that you would have had,

11  basically, the shell this letter that True the Vote had given

12  to you, correct, with this language --

13  **A.**   That's correct.

14  **Q.**   -- in the middle?

15       And then depending on where the challenge was, you'd swap

16  out the county and who the letter was to?

17  **A.**   That's correct.

18  **Q.**   You'd swap out the voter name?

19  **A.**   Yes.

20  **Q.**   And then you'd swap out at the bottom here the challenger

21  at the bottom?

22  **A.**   That's correct.

23  **Q.**   Okay.  And I assume this was sort of an automated

24  process?  That you had all the information and you sort of had

25  a system to hit sort of go, it would shuffle all the

1  information in and you would send it to the printers?

2  **A.**   Yes.

3  **Q.**   And so to be able to do this, True the Vote had to send

4  you the information in the first place; right?

5  **A.**   Yes.

6  **Q.**   And so they sent you spreadsheets of the lists of all of

7  the challenged voters for the counties?

8  **A.**   Yes.  I believe that's correct.

9  **Q.**   Okay.  And then when plaintiffs asked you for documents

10  in this case, you gave your attorneys a ton of spreadsheets;

11  correct?  Of all these -- of all these lists?

12  **A.**   I don't know how that was -- I don't really recall how

13  that was presented to us.  I'm not sure that we had those,

14  actually, spreadsheets and stuff.  That might have just come

15  in and loaded right up.  I don't recall how we did that.

16  **Q.**   One second.

17      Well, I guess -- my question is I think pretty simple,

18  which is to say, you weren't providing the information for

19  these -- the challenge lists; right?  You were receiving the

20  information --

21  **A.**   That's correct.

22  **Q.**   -- from True the Vote and you worked off of that

23  information?

24  **A.**   That's correct.

25  **Q.**   Okay.  And at some point you would have had to receive a

1  spreadsheet with all of this information, whether it was

2  e-mails, zip drive, hard drive, something; right?

3  **A.**   A file of some type.

4  **Q.**   Okay.

5  **A.**   Again, I'm not sure how that was -- I don't even know.

6  That was done with my staff and stuff.  I'm not real sure how

7  that came in and what went on.

8  **Q.**   Okay.  Thank you.

9          MS. FORD:  Your Honor, may I approach?

10          THE COURT:  Yes.

11  BY MS. FORD:

12  **Q.**   Mr. Williams, you provided this to us in discovery.  This

13  is a list of the challengers that you used; correct?

14  **A.**   I don't recall this right offhand.  I don't recognize

15  this.

16          THE COURT:  This is Plaintiffs' 86.  You do not

17  recognize it?

18          THE WITNESS:  I do not recognize it.  It -- it could

19  have been one of ours, but I don't recognize it right offhand.

20  BY MS. FORD:

21  **Q.**   Mr. Williams, would it help refresh your recollection if

22  I showed you a copy that has the metadata?

23  **A.**   It might.  We very well might have had this, but I just

24  don't recognize it as something that I had -- I didn't have a

25  lot of the day-to-day stuff.  So this might have been...

1          Yeah, I don't recognize this at all.

2          THE COURT:  Even after looking at the other document

3   Ms. Ford has given you, you still don't recognize it?

4          THE WITNESS:  No.  And, again, we might have had this

5   in my company or something as part of this thing, but I

6   personally don't recall this and don't remember seeing it.

7   BY MS. FORD:

8   **Q.**   Okay.  Just a couple of questions for you.

9          You were asked to produce documents in this case relating

10  to your interactions with True the Vote; right?

11  **A.**   Correct.

12  **Q.**   And your assistance with the challenges?

13  **A.**   Yes.

14  **Q.**   And I assume you did a search for documents to produce

15  that?

16  **A.**   Yes.

17  **Q.**   And you did -- Mr. Williams, you produced more documents

18  than anyone else in this case, and we thank you for your

19  cooperation.

20         MR. EVANS:  Judge, I would just respect a little bit

21  of pause between the question and answer.  It's a little

22  quick.

23         THE COURT:  Yeah, You're going a little fast.

24         MS. FORD:  Sorry, Your Honor.

25         Sorry, Mr. Williams.

1          THE WITNESS:  It was probably me.

2    BY MS. FORD:

3    **Q.**   So you did perform a search for documents, and you

4    produced documents that you believed were relevant to your

5    work with True the Vote; is that correct?

6    **A.**   That's correct.  And I believe we searched all of our

7    files.  So, like I say, this could have been in here and I

8    never even saw it, so...

9    **Q.**   Okay.  And the title of this document as produced to us

10   was:  Georgia Challengers All Counties.pdf.  Do you have any

11   reason to dispute that?

12   **A.**   As I said, I don't recognize it so I couldn't speak to

13   that.

14   **Q.**   Okay.  And do you have any reason to believe you would

15   have manipulated the files or changed them before you sent

16   them to us?

17   **A.**   No.  Definitely not.

18   **Q.**   Mr. Williams, would you mind taking a look at this list

19   and looking at Banks County?

20          THE COURT:  Well, he can't testify from this list

21   because it's not in evidence.

22          MS. FORD:  Okay.  All right.  Well, at this point,

23   Your Honor, we would move Plaintiffs' Exhibit 86 into

24   evidence.

25          THE COURT:  How?  He doesn't recognize it.

1   MS. FORD:  Your Honor, I think he's testified he

2   produced this in discovery as a document that was related to

3   the work with True the Vote.

4   THE COURT:  Did you produce Plaintiffs' 86?

5   THE WITNESS:  I couldn't tell you if I did or not.

6   MS. FORD:  Your Honor --

7   THE COURT:  I would say you have it from the

8   defendants, but doesn't the witness have to at least identify

9   it?

10  MS. FORD:  Your Honor, Mr. Williams provided probably

11  the most thorough --

12  THE COURT:  I'm not questioning that.

13  What I'm saying is that you've got a lot of documents

14  from the defendants.  And I understand you-all are claiming

15  that 86 came from the defendants and the defendants got it

16  from Mr. Williams.  But a witness on the witness stand, don't

17  they have to at least identify it?  You can't say we got this

18  from the defendants, therefore, it comes into evidence.

19  MS. FORD:  Your Honor, I think maybe Mr. Williams'

20  testimony today could go to the weight you decide to give the

21  testimony.

22  THE COURT:  I don't know.  Let me hear from

23  Mr. Evans.

24  MS. FORD:  But there was --

25  THE COURT:  Let Ms. Ford finish.

1       Ms. Ford, finish.  I cut you off.

2       MS. FORD:  Can I --

3       THE COURT:  Yeah, yeah.

4       MR. EVANS:  Judge, there's no foundation.  This is

5   pure hearsay.  It's an out-of-court statement.  The witness

6   has not confirmed a later predicate in any way.  He doesn't

7   even know.  There's no way that this could be admissible or

8   admitted into evidence, given the basis.  There's a complete

9   and total lack of foundation.  This is an easy call.

10       THE COURT:  Ms. Ford.

11       MS. FORD:  Thank you, Your Honor.

12       THE COURT:  Thank you, Mr. Evans.

13       MR. EVANS:  Thank you.

14       MS. FORD:  The only thing I would say is that Your

15   Honor could take notice of the fact that it is Bates stamped

16   with Mr. Williams' name.  It was produced in connection to our

17   request with his --

18       THE COURT:  Do you have an objection?

19       MR. EVANS:  Well, Judge, we would object.  It didn't

20   get into the record in any form.  I mean, this is -- there is

21   complete and total lack of foundation.  The Court should not

22   consider this document, which is a random document allegedly

23   produced, when Mr. Williams, who is the only person that can

24   lay the foundation for it, and so it shouldn't be

25   considered --

1       THE COURT:  Thank you, Mr. Evans.

2       MR. EVANS:  Thank you.

3       MS. FORD:  And the last point I was going to make is

4  that Your Honor could consider that Mr. Williams does not

5  dispute that he produced this document.

6       THE COURT:  He doesn't dispute it, but he doesn't say

7  this is a document he produced.  I understand what you're

8  saying.  You got it from the defendants.  It's Bates stamped

9  defendant William.  But if that would be the case, you

10  wouldn't have to identify any document.  You could say these

11  are all the documents I got from the defendants and they all

12  come in.  I'm not trying to be difficult.  But he has to at

13  least be able to identify some aspect of it.

14       If you want to ask him more questions about it, I'll

15  allow it.  But right now I can't allow it into evidence.  He

16  hasn't identified it.

17  BY MS. FORD:

18  **Q**.   Mr. Williams, just a few more questions.

19       To be able to create these letters and swap out the

20  challenger names at the bottom, you had to have been provided

21  a list of the challengers; correct?

22  **A**.   And a lot of that -- and to answer a little bit --

23       THE COURT:  First you have to answer Ms. Ford's

24  question.

25       THE WITNESS:  Okay.  I was kind of asking if I could

1  answer you.

2        THE COURT:  No.  You have to answer Ms. Ford's

3  question then you can explain your answer.

4        THE WITNESS:  All right.  There might have been a lot

5  of -- several documents that were used by my company in the

6  normal procedures and stuff that I never saw or even looked

7  at, but it was just part of normal operating procedures, that

8  kind of thing.  And there might have been one like this here

9  that I never saw.  It might have been in there, and apparently

10 it was produced from somewhere.  So we found it in our records

11 when we went and did searches to produce the documents that

12 you-all had asked for.

13 BY MS. FORD:

14 **Q.**   Just two more questions for you, Mr. Williams, on this

15 topic.  And then I promise I'll move on.

16        Did you meet with your counsel last night?

17 **A.**   Yes.

18 **Q.**   And did you discuss this exhibit?

19        MR. EVANS:  Objection, Judge.  Attorney/client

20 privilege.

21        MS. FORD:  I'm just asking whether he discussed the

22 exhibit.

23        THE COURT:  You can't ask what he said.  You can't

24 ask if he discussed it.  You can ask, have you talked -- did

25 any lawyers talk.  You can ask that.  But not what you-all

1  talked about.  Not he, Ms. Ford can.

2           MS. FORD:  Yeah, that's all I'm asking, whether they

3  discussed the --

4           THE COURT:  You can ask that.

5           MS. FORD:  I'm not asking for the substance.

6           THE WITNESS:  I don't think so.

7  BY MS. FORD:

8  **Q.**   Okay.  Did you discuss Plaintiffs' Exhibit 86?

9           MR. EVANS:  Judge, objection.  We're -- I'm giving

10 leeway here.

11          THE COURT:  Well, you're not giving any leeway

12 whatsoever.

13          MR. EVANS:  This is attorney/client privilege.

14          THE COURT:  Well, first of all, you're not giving any

15 leeway whatsoever.  You're objecting so, therefore, you're not

16 giving any leeway on what is attorney/client privilege.

17          To ask if they talked is permissible.  You get into

18 direct when you ask about a specific document.  That is

19 getting into attorney/client privilege.  To ask if they talked

20 last night, you're fine.  But when you start asking specific

21 questions of what they talked about, that does get into the

22 privilege.

23          MR. EVANS:  Thank you, Judge.

24          MS. FORD:  Okay.  Your Honor, just for the record, we

25 are moving Exhibit 86 into evidence.

1          THE COURT:  I note your exception, but I'm not going

2    to allow it to be admitted at this point.

3    BY MS. FORD:

4    **Q.**   Mr. Williams, just going back big picture here.  You

5    understood that True the Vote wanted to challenge a lot of

6    votes; correct?

7    **A.**   Correct.

8    **Q.**   And they needed challengers to do so?

9    **A.**   I'm sorry?

10   **Q.**   They needed challengers from each county to do so?

11   **A.**   Yes, I believe so.  Yes.

12   **Q.**   And do I understand correctly that you put True the Vote

13   in touch with James Cooper and Ron Johnson?

14   **A.**   That's correct.

15   **Q.**   And they were fellow GOP county chairs?

16   **A.**   They were friends that were in the party, and I just knew

17   that they knew a lot of people and felt they might be able to

18   help them on their agenda.

19   **Q.**   And I understand that True the Vote paid you a retainer

20   of approximately $40,000 to print the lists for them; correct?

21   **A.**   That's correct.

22   **Q.**   But you had no personal role in compiling the challenges?

23   **A.**   No.

24   **Q.**   So you left that entirely to True the Vote?

25   **A.**   Yes.  We were just the printer.

1  **Q.**   Right, yeah.  So this is -- I think you described it as

2  like a customer --

3  **A.**   Yeah.

4  **Q.**   -- vendor relationship?

5  **A.**   Vendor/customer, yeah.  Sorry.

6         MS. FORD:  Your Honor, may I approach?

7         THE COURT:  Yes, ma'am.

8  BY MS. FORD:

9  **Q.**   So this is Plaintiffs' Exhibit 67.  Mr. Williams, this

10 appears to be an e-mail -- it's a -- there's a front page and

11 a back page.  If you flip to the back, it appears to be

12 started by Ms. Engelbrecht, forwarded -- I'm sorry -- sent to

13 you on December 16th and then there's a kind of a forward

14 chain on the front.

15        Does that appear to be correct?

16 **A.**   That's what it appears to be, yes.

17 **Q.**   So if you'll flip to the back, you'll see that

18 Ms. Engelbrecht writes to you, "Hi Mark, Attached please find

19 our residency challenge data and letter."

20        And just for the purposes of a clear record, I assume

21 when she says "letter" we're talking about this, the main body

22 of the text that went in the core of the challenge letters?

23 Is that what you understand that to be?

24 **A.**   I guess.  I'm not real sure.

25 **Q.**   Okay.  I'll keep going.

1    So here she says, "Hi Mark, Attached please find our

2    residency challenge data and letter.  We didn't have the

3    county elections offices' data ready to go, but we will have

4    it within the next hour so I will send it your way ASAP.  Also

5    please remove addresses that would suggest they are military

6    basis (Fort Benning, Moody Air Force Base, addresses with

7    APOs, FPO or DPO in them...)"

8        THE COURT:  You've got to go slower.

9        MS. FORD:  I'm sorry.  I'm reading it.

10        Do you want me to read from the top?

11        THE COURT REPORTER:  Yes, please.

12        MS. FORD:  Okay.

13        "Hi Mark, Attached please find our residency

14    challenge data and letter.  We didn't have the county election

15    offices' data ready to go, but we will have it within the next

16    hour.  So I will send it your way ASAP.  Also, please remove

17    addresses that would suggest they are military bases (Fort

18    Benning, Moody Air Force Base, addresses with APO, FPO or DPO

19    in them).  For completeness, if you need anything from us

20    please don't hesitate to give me a call at," and then a number

21    from Catherine Engelbrecht.

22    BY MS. FORD:

23    **Q.**   Do you remember receiving this e-mail?

24    **A.**   No.

25        THE COURT:  You're not saying you didn't, you just

1   don't remember?

2          THE WITNESS:  Correct.  And let me explain there a

3   little bit.  A lot of these were coming through.  This was a

4   fast job.  This was about a three or four-week project that we

5   had to squeeze down into a few days.  So it was coming in

6   fast.

7          So my staff and stuff of the company -- and it was --

8   it was just a print job.  So they were sending e-mails and

9   things, and they were copying us, and a lot of it didn't have

10  anything to do with us.  And this appears to be one of those

11  that didn't really have anything to do with us.  So it just

12  came through and was probably just passed through and not paid

13  much attention to.

14  BY MS. FORD:

15  **Q.**   Yeah.  So that's just all I wanted to confirm is that you

16  didn't actually go into the spreadsheets themselves that she

17  had sent you and remove this information; right?

18  **A.**   No.

19  **Q.**   And that's --

20  **A.**   We would not have done that.  We could do that, but we

21  didn't manipulate any data.  We only printed the stuff that

22  was sent to us.

23  **Q.**   And I assume you had not told True the Vote that you

24  were -- you had the capability to remove these kinds of things

25  or that you would make those kind of changes?

1  **A.**    Not that I'm aware of.  And, again, let me say that

2  again.  There might have been a couple of cases where the

3  staff did something like that.  It's very easy to do something

4  like that, like to take a name or add a name or something like

5  that.

6       I don't think any of that happened by any means in our

7  company, but I can't say for sure that it did not happen.

8  Because it -- like this, this document that probably came

9  through, that I never paid any attention to it or anything.

10 **Q.**    Okay.  And just to clarify, when you were approached for

11 this job, you were not told that it was part of your

12 responsibility to make sure that these lists were accurate or

13 vetted; correct?

14 **A.**    No.

15 **Q.**    Mr. Williams, just a few more questions for you.

16      At some point you agreed to be the challenger for

17 Gwinnett County; correct?

18 **A.**    Correct.

19 **Q.**    Okay.  And the Gwinnett County challenge list was over

20 32,000 voters?

21 **A.**    That's correct.

22 **Q.**    And prior to this you had never filed an elector

23 challenge before; correct?

24 **A.**    That's correct.

25 **Q.**    And in your deposition I believe you said that True the

1   Vote e-mailed your challenges to Gwinnett under your

2   signature; correct?

3   **A.**   I don't recall, but that probably was the case, yes.

4           THE COURT:  Were you given the option of removing

5   names off of that list or were you just, sign here, we're

6   going to send this to Gwinnett County?

7           THE WITNESS:  Umm, they were producing the challenges

8   for every county and producing the data for that and all.  And

9   the data was coming through NCOA --

10          THE COURT:  Listen to my question.

11          THE WITNESS:  Okay.

12          THE COURT:  Were you given the option to remove names

13  off of that list?

14          THE WITNESS:  No.

15          THE COURT:  Were you told you could take names off of

16  that list in any way?

17          THE WITNESS:  I don't know that it was discussed.

18  Yes.

19          THE COURT:  Did you even look at the list?

20          THE WITNESS:  Umm, I looked at the numbers on the

21  list and knew that it was correct with what I had seen.

22          THE COURT:  Did you look at the names on the list?

23          THE WITNESS:  Did I look at the names?  Did I look at

24  the individual names?  No.

25  BY MS. FORD:

1  **Q.**   Mr. Williams, Your Honor just asked a few of my

2  questions, so I can skip them --

3          THE COURT:  I'm sorry.

4          MS. FORD:  No.  That was very efficient.

5  BY MS. FORD:

6  **Q.**   So you did not -- and prior to the list being submitted,

7  you didn't take any steps to individually verify the names on

8  the list; correct?

9  **A.**   Correct.

10  **Q.**   My understanding from your deposition is that you

11  believed that was unnecessary because you believed that True

12  the Vote had already identified ineligible voters; correct?

13  **A.**   Correct.

14          THE COURT:  What made you believe that?

15          THE WITNESS:  Before -- before True the Vote, I had

16  questioned the -- the list as well.  And I had actually run

17  the voters list through NCOA, because that's what we do in my

18  office, just to see the numbers.  So the numbers that they had

19  matched up with the numbers that I had run on my own to see

20  that.  So -- so I trusted that to be the NCOA list.

21          THE COURT:  You, basically, thought it was accurate

22  based on your numbers matched their numbers?

23          THE WITNESS:  Well, and knowing the NCOA system.

24          THE COURT:  All right.  I don't want to get in

25  Ms. Ford's territory again, and I was going to ask some other

1   questions.  So I'm going to assume you'll probably ask the

2   questions I want to ask.

3          MS. FORD:  Yes.

4   BY MS. FORD:

5   **Q.**   So Mr. Williams, so it was your belief that anyone

6   appearing on the NCOA list was probably ineligible to vote in

7   Gwinnett County?

8   **A.**   I believe it needed to be questioned.

9   **Q.**   So Gwinnett County did end up having a short hearing on

10  your challenge; correct?

11  **A.**   Correct.

12  **Q.**   And at that hearing you asked the Gwinnett board to

13  uphold the challenge and to investigate all 32,000 voters on

14  the list; correct?

15  **A.**   That's correct.

16  **Q.**   And you told the Gwinnett board at the hearing that you

17  believed that some people on the list were voting twice;

18  right?

19  **A.**   I felt like it needed to be questioned.

20  **Q.**   And you told the Gwinnett board that you believed that

21  people should go to jail for that?

22  **A.**   I don't recall that.

23  **Q.**   Would it refresh your recollection to see a transcript of

24  that hearing?

25  **A.**   It might, yes.

1           THE WITNESS:  Thank you.

2           THE COURT:  Thank you.

3    BY MS. FORD:

4    Q.    Mr. Williams, just for your awareness, this is a

5    certified copy of the transcript of that hearing from

6    December 29th.  If you'll go with me to page 5.  And I -- the

7    part I want to ask you about is, if you start at the very top

8    where Mr. Day asks you a question, and through your answer on

9    line 18.  And let me know when you're finished.

10   A.    Okay.

11   Q.    Okay.  Thank you.

12         So does this help refresh your memory that at the

13   Gwinnett board hearing you did suggest that you thought people

14   should go to jail over this?

15   A.    Yeah.  I think my -- my statement was about that -- that

16   if the intent, once the list was vetted, the individual voters

17   were vetted, if their intent was to vote in two different

18   residences, that they did that intentionally, then, yes,

19   that's a jailable offense, I believe.  I think that was the

20   intent of my discussion there.

21   Q.    Okay.  And you also told the Gwinnett board that you

22   didn't think that people on the list should be permitted to

23   vote in the January 5th runoff; right?

24   A.    I don't recall saying that particular, but I did say that

25   they needed to be vetted and anyones that they deemed had

1   illegally voted shouldn't be able to vote in the January 5th

2   election.

3   **Q.**   Okay.  And I assume you remember you were very urgent at

4   this hearing that you believed this had to be addressed

5   immediately before the runoff; right?

6   **A.**   No.  I don't think it was that I was -- yes, I did think

7   it needed to be addressed right away.  Yeah, I was probably

8   pushing urgency, because there was an election coming up and I

9   did feel like that needed to be -- the names needed to be

10  vetted in some way.

11  **Q.**   And do you recall the board of commissioners asking you,

12  you know, I'm going to paraphrase what they said, hey, this is

13  a list of 32,000 voters.  How are we possibly supposed to get

14  through all these individuals before the hearing?  Do you

15  remember them asking you that -- or sorry -- before the

16  runoff?

17         THE COURT:  Hold on, I have an objection.

18         MR. EVANS:  Hearsay, Judge.  Objection.

19         THE COURT:  Well, it's in -- well, this exhibit is

20  not in evidence.

21         MS. FORD:  Yeah, Your Honor, I was just using this to

22  refresh his recollection.  And I'm just asking him --

23         THE COURT:  You're not offering that as folks

24  actually saying it.  I'll take it that way, that it was not

25  what was actually said for the truthfulness of the matter.

1        MS. FORD:  Yes, Your Honor.

2        THE COURT:  If they said it.

3        THE WITNESS:  Okay.  What's the question.

4   BY MS. FORD:

5   **Q.**   Let me rephrase my question.

6        Do you remember being asked to address what the county

7   was supposed to do about the fact that you had given them a

8   32,000-plus list and it was, at this point, one week before

9   the runoff election?

10  **A.**   The way I recall it was that they had no way to do that

11  massive amount of vetting in that short of time and didn't

12  have a way to -- they weren't willing to try to address that

13  is my recollection of it.

14  **Q.**   Okay.  And do you recall responding that that was not

15  your problem if they weren't able to do that?

16  **A.**   I probably did say that.

17  **Q.**   Okay.  You were, fair to say, upset that Gwinnett did not

18  find probable cause for your challenge?

19  **A.**   Yes.  For a couple of reasons.  One is they didn't even

20  let me know when my hearing was.  I got it by surprise that it

21  was going on and my case was coming up.  They had originally

22  kind of denied my hearing and I said, no, I wanted one of

23  these names to be vetted and heard.  And they said, we'll set

24  up a hearing.  I said okay.  And I never heard back at all

25  until somebody told me my hearing was going on and I was

1   supposed to be on in a few minutes.

2       So it was a struggle to get into the Zoom call.  This was

3   during the pandemic.  And it was a struggle for me to get in

4   to get heard at all.  And it -- the -- it appeared to look

5   like they had intended to just blow past me.  They had several

6   witnesses against them vetting the list, but not me or anybody

7   else to substantiate the list or to even bring that up.

8   **Q.**   You were given an opportunity to speak eventually at the

9   hearing; correct?

10  **A.**   Eventually.  Once I finally got in and -- and I was able

11  to speak.

12  **Q.**   And when you were asked to substantiate the list, what

13  were you able to provide?

14  **A.**   Well, I had provided the list.  And the discussion was

15  over the list of names.  And they said, well, we just can't

16  accept a list of names.  I said they're not.  There are 32,000

17  individual challenges and they need to be vetted.

18  **Q.**   Mr. Williams, is it fair to say that your overall goal in

19  filing these challenges was to expose wrongdoing in Gwinnett

20  County?

21  **A.**   To question it, not expose it.

22  **Q.**   Have you previously testified in this case that it was

23  your goal to expose wrongdoing?

24  **A.**   Not that I'm aware of.

25  **Q.**   Would it refresh your recollection to see your

1  deposition?

2  **A.**   If you -- yeah.

3  **Q.**   Mr. Williams, if you want to go to page 115, line 6.

4  **A.**   Okay.

5  **Q.**   And read all the way to the bottom.

6  **A.**   Okay.  Okay.

7  **Q.**   Okay.  You agree with me you expressed that you were

8  hoping to expose wrongdoing in your county; correct?

9  **A.**   No.  I was hoping to find out if there was wrongdoing.

10 And if there was, then to expose it.  And I believe that's

11 what the testimony says.

12 **Q.**   And, Mr. Williams, given the opportunity, you would issue

13 challenges like these again; correct?

14 **A.**   If -- if I felt like there was the possibility or if I

15 was questioning it, yes.  This -- this would be the legal way

16 to do it or the proper way to address it.

17          THE COURT:  How many days before the actual election

18 did you file these 32,000 challenges?

19          THE WITNESS:  There wasn't a lot of time between the

20 two.  I believe it was about mid-December, maybe.

21          THE COURT:  Less than 30 days before the --

22          THE WITNESS:  Yes, it was less than 30 days.  It was

23 hardly 30 days between the two elections.

24          THE COURT:  So filing 32,000 challenges in less than

25 30 days before the election, you didn't see any concern about

1  that?

2          THE WITNESS:  It makes no difference in filing one.

3  If there was a question, it was a question.

4          THE COURT:  There is a big difference between filing

5  one and filing 32,000.

6          THE WITNESS:  There was still a question on those, so

7  it --

8          THE COURT:  I guess my question is that you filed

9  32,000 challenges with -- and Gwinnett County is a large

10 county.

11         THE WITNESS:  Yes.

12         THE COURT:  You've got probably a pretty large board.

13 But you didn't see any concern with filing 32,000 challenges

14 less than 30 days before election is any concern for this

15 board?

16         THE WITNESS:  Well, the question that I had was that

17 I wondered if there was a way that somebody had maybe inserted

18 some votes that shouldn't have been or something like that.

19 And my personal thought was that we should take the voter

20 lists of people that had voted in that -- the general election

21 and run it through NCOA to see what it kicked out.  And I was

22 shocked at how many it kicked out, to tell you the truth.

23         I didn't know what I would find when I did that.  But

24 I was shocked that it kicked out over 32,000 names in Gwinnett

25 and 370,000, or whatever it was, in the state.

1          THE COURT:  Let me add, under 21-2-230 in the State

2    of Georgia, you could file 32,000 challenges 30 days before

3    election.  So --

4          THE WITNESS:  Yeah.

5          THE COURT:  But I disagree with you on the law part.

6          THE WITNESS:  Yeah, I agree with you there.

7    BY MS. FORD:

8    **Q.**   And, Mr. Williams, just to clarify something, you filed

9    these, I think you said, sometime mid-late December; you'd

10   agree with that?

11   **A.**   Correct.

12   **Q.**   Okay.  You had the opportunity to file challenges on this

13   basis, I presume, at any point earlier in the year before

14   these elections; correct?

15   **A.**   Well, like I said, I started thinking about it and I ran

16   my own data through -- the voter data through NCOA, and I had

17   run that.  And then when True the Vote came in, they were

18   actually on the same path I was, as far as questioning that.

19   So it was a matter of a time thing of getting that run through

20   NCOA and then getting it and setting it up and filing the

21   challenges.

22   **Q.**   Okay.  But what caused you to act was the runoff election

23   that was upcoming; correct?

24   **A.**   No, no.  The questioning was on the 2020 general

25   election.  But, yes, the other election was coming up and that

1  was an urgency to me, that if we had 360,000 questionable

2  votes out there that were about to vote again, yes, it needed

3  to be vetted.

4  Q.   But just to clarify, you did have all year that you could

5  have filed these challenges?

6           MR. EVANS:  Objection, asked and answered.

7           THE COURT:  I think he'd indicated he could have been

8  filed earlier.  So I'll sustain that objection.

9           THE WITNESS:  You know --

10           MR. EVANS:  Objection -- he sustained the objection

11  so there's no need to answer.

12           THE WITNESS:  Okay.  All right.

13  BY MS. FORD:

14  Q.   You could have filed these challenges earlier, correct?

15           MR. EVANS:  Objection, asked and answered.

16           THE COURT:  It's the same question.  It's sustained.

17           MS. FORD:  All right, Your Honor.  I have no further

18  questions.

19           THE COURT:  Thank you, sir.  You can step down, Mr.

20  Williams.

21           THE WITNESS:  Okay.  Thank you.

22           MS. PAIKOWSKY:  Excuse me, Your Honor.  The United

23  States would like to ask some questions.

24           THE COURT:  Sorry, sit back down.

25  CROSS-EXAMINATION

1  BY MS. PAIKOWSKY:

2  **Q.**  Good morning, Mr. Williams.

3  **A.**  Good morning.

4  **Q.**  My name is Dana Paikowsky, and I represent the United

5  States.

6      So your testimony today indicates that you've been an

7  advocate for election integrity issues; is that true?

8  **A.**  It's hard to say that I was an advocate.  I'm an advocate

9  for voting and true elections and things like that, yes.  So

10 when I had questions, I raised those questions.

11 **Q.**  And have you ever communicated those questions with

12 members of the Georgia Legislature?

13 **A.**  Yes.

14 **Q.**  Have you ever communicated those questions to the

15 Secretary of State's Office?

16 **A.**  And let me clarify that.  Not formally, but I know a lot

17 of these guys and I do know our Secretary of State and things

18 like that.

19 **Q.**  I'm sorry?

20 **A.**  So I did voice those.

21 **Q.**  So you'll speak with them about issues of election

22 integrity that are on your mind?

23 **A.**  No.  I think I had questions and I questioned if it could

24 have happened and things like that.  And there was -- it was

25 never anything formal or anything like that.  It was just

1  discussions.

2  **Q.**    Informally is fine as well.

3        So you would -- you would communicate these questions or

4  these thoughts with the folks you know who might be

5  legislators?

6            MR. EVANS:  Objection, asked and answered.

7            THE COURT:  I don't think he answered that.  I'll

8  overrule that objection.

9            THE WITNESS:  Yes, that's correct.

10  BY MS. PAIKOWSKY:

11  **Q.**    And also members of the Secretary of State's Office who

12  you might know?

13  **A.**    Correct.

14  **Q.**    And do you speak about it with people in the community as

15  well?

16  **A.**    I would say yeah.

17  **Q.**    If you knew someone at the time that you filed these

18  challenges, say a neighbor who told you that they moved and

19  didn't intend to come back to Georgia, could you have filed a

20  challenge as to their eligibility?

21  **A.**    That didn't happen.

22  **Q.**    I'm asking could it have?

23  **A.**    I don't know.

24            MR. EVANS:  Objection, calls for speculation.

25            THE WITNESS:  Yeah.  I don't know.

1    THE COURT:  Well, he could -- because she's asking

2  him -- asking Mr. Williams.  I'll allow that question.

3    THE WITNESS:  Yeah, I don't know.  It didn't come up,

4  so I didn't have a reason to think about that.  I'm not sure

5  what would be the situation there.

6  BY MS. FORD:

7  **Q.**   I think what I'm asking -- so we know that you did file

8  this list of 32,000 voters in Gwinnett County; is that

9  correct?

10  **A.**   That's correct.

11  **Q.**   And you had the ability to do that because you're a

12  resident of Gwinnett County?

13  **A.**   Correct.

14  **Q.**   And so if you had a different reason to believe, because

15  you had a conversation with someone, that they did not belong

16  on the voter list at that time, could you also have challenged

17  their eligibility to vote at that time?

18  **A.**   Yes, I might have, because of the fact that I didn't look

19  at the list.  The -- I was counting on the NCOA to kick out

20  that -- I knew that system and knew -- trusted that system.

21  So I didn't review to see if one of my neighbors was on there

22  or anything to like that.

23    MS. PAIKOWSKY:  Thank you very much, Mr. Williams.

24  No further questions.

25    THE COURT:  Anything else, Ms. Ford?

1      MS. FORD:  No, Your Honor.

2      THE COURT:  This witness is called for purposes of

3  cross-examination, so you-all can call Mr. Williams back on

4  your direct at the appropriate time.

5      MR. EVANS:  Yes, Judge.  We're going to reserve him

6  for our case and call him on direct.

7      THE COURT:  All right.  Mr. Williams, I have to tell

8  you something very important.  You are a witness in this case.

9  You cannot discuss this case with anyone whatsoever.  And you

10  can talk with your lawyers about strategy or your testimony,

11  but what you've testified about here today, the questions you

12  were asked today, you can't go over that with anybody or

13  discuss it with anybody, period.  No one.

14      THE WITNESS:  Okay.

15      THE COURT:  And don't come in the courtroom

16  whatsoever until this case is over.

17      THE WITNESS:  Okay.

18      THE COURT:  Thank you, Mr. Williams.

19      MR. WYNNE:  Your Honor, Mark Williams is a party.

20  He's a defendant.

21      THE COURT:  You can't discuss the case, but you can

22  remain in the courtroom.

23      MR. WYNNE:  We had this confusion last night and he

24  reminded me he's a party.  He's been sued.

25      THE COURT:  You can sit in the courtroom as a party

1    but you still can't discuss the case with anyone.

2              THE WITNESS:  I understand.

3              Can I keep one of these documents?

4              THE COURT:  No.

5              THE WITNESS:  Okay.

6              THE COURT:  Thank you, sir.

7              THE WITNESS:  I was trying to get one before and I

8    didn't get the transcript.

9              THE COURT:  Thank you.

10             THE WITNESS:  Thank you.

11             THE COURT:  You're free to go.

12             THE WITNESS:  Okay.  Thank you.

13             THE COURT:  Plaintiff?

14             MR. NKWONTA:  Your Honor, I appreciate the Court's

15   patience.  We would request leave of the Court, in light of

16   what happened on testimony, to call one more witness and that

17   would be Ms. Amy Holsworth, whom defendants have indicated

18   would be here today, I believe.

19             THE COURT:  Amy Holsworth.

20             MR. WYNNE:  Your Honor, I said that -- last night

21   that she would be called in our case.  She is not here today.

22   And she's in -- I mean, she's in town, she's not here today.

23             THE COURT:  Did you subpoena her?

24             MR. NKWONTA:  We did not subpoena her, but, again,

25   they indicated -- and according to the pretrial order, because

1  they indicated that she would be here today --

2       THE COURT:  Were they on their will-call list or

3  may-call list?

4       MR. NKWONTA:  Will-call list.  As they -- as

5  Mr. Wynne just mentioned, she is here today.  And they

6  indicated that she would be here?

7       THE COURT:  Is she in the courthouse?

8       MR. WYNNE:  She is not in the courthouse.

9       THE COURT:  Where is she?

10      MR. WYNNE:  And she came over last night, because we

11 were thinking that we may call her and it's still may call if

12 necessaries.

13      THE COURT:  Well --

14      MR. WYNNE:  She's in the -- she's in there -- now, we

15 met her -- we're not done preparing her, though.  So she's

16 coming in cold.  If it's limited to authenticating a document,

17 that'd be fine.

18      THE COURT:  I don't -- I don't have anything to say.

19 I told you-all as best as I can tell you about following the

20 law, so I have nothing to say.  All we can do is simply this:

21 If you told Mr. Nkwonta that you were going to have that

22 witness here today yesterday -- when did he tell you that?

23      MR. NKWONTA:  Wednesday evening she was listed as one

24 of the witnesses.

25      THE COURT:  So we're just going to have to stop the

1  trial until she gets here.  I don't know what else to do.  I

2  have nothing to say.  We're just going to have to do it that

3  way.  We're going to stop the trial until she gets here.

4        Why do you need this witness?

5        MR. NKWONTA:  To introduce the information that

6  Mr. Williams refused to authenticate on the stand.  In other

7  words, that the document that Mr. Williams -- we assumed

8  Mr. Williams would authenticate because he produced, he claims

9  not to --

10        THE COURT:  How can this witness, Amy --

11        MR. NKWONTA:  Amy Holsworth.

12        THE COURT:  How could Ms. Holsworth identify 86?

13        MR. NKWONTA:  She would not identify 86.  What she

14  would identify is the information that's on 86 through

15  questioning.  In other words, if we cannot get 86 in, we can

16  get the information in 86 through questioning.

17        THE COURT:  I'm not understanding you correctly.  The

18  way I'm understanding is -- I don't know how she can do this.

19  She is going to identify all this information?

20        MR. NKWONTA:  No.  There is specific information that

21  we're trying to identify.  I don't want to reveal everything

22  here, but we believe Ms. Holsworth can identify it.

23        THE COURT:  All right.  If Ms. Holsworth, Amy, is on

24  the will-call list and you told him on Wednesday she would be

25  here, then we've just got to stop the trial, call her and tell

1   her to come.  When she comes, we'll start the trial back.  I

2   don't know what to say.  I've given all the speeches I can

3   give.  So that's just the way we're going to have to do it.

4   That's it.

5          MR. NKWONTA:  We apologize for this, Your Honor.

6   We'll try to be as quick as possible.

7          MR. WYNNE:  Your Honor, we'll do that.  And it's

8   only -- I have a little egg on my face because I said she

9   wouldn't have to come until this afternoon.  I'll try to find

10  her.

11         THE COURT:  Well, again, I don't have much to say.  I

12  told you-all yesterday I preached as much as I'm going to

13  preach, so...

14         MR. WYNNE:  We'll try to find her.

15         THE COURT:  When she gets here, we'll start the trial

16  back.

17         Where does she live?

18         MR. NKWONTA:  She lives in Houston.

19         THE COURT:  Texas?  Where is she at right now in

20  Georgia?

21         MR. WYNNE:  She -- I told her she had the day to

22  enjoy downtown Gainesville and we'd catch up with her after

23  lunch.

24         THE COURT:  Do you have her cell phone?

25         MR. WYNNE:  We do have her cell phone.

1    THE COURT:  So if she's in downtown Gainesville she

2  ought to be here in 10 to 15 minutes.

3    MR. WYNNE:  We'll check where she is.

4    THE COURT:  We'll resume when she gets here.

5    MR. WYNNE:  Thank you, Your Honor.

6    (A break was taken at 10:25 a.m.)

7    THE COURT:  You-all can be seated.

8    All right, Mr. Nkwonta  is Ms. Amy Holsworth here?

9  You can call your witness.

10    MR. NKWONTA:  Your Honor, plaintiffs call Ms. Amy

11  Holsworth to the stand.

12    THE DEPUTY CLERK:  Would you raise your right hand,

13  please.

14                        ******

15                     AMY HOLSWORTH,

16    having been duly sworn, testified as follows:

17                        ******

18    THE DEPUTY CLERK:  Have a seat.  Please state and

19  spell your name for the record.

20    THE WITNESS:  Amy, A-m-y, Holsworth,

21  H-o-l-s-w-o-r-t-h.

22    THE DEPUTY CLERK:  Thank you.

23  CROSS-EXAMINATION

24  BY MR. NKWONTA:

25  **Q.**   Good morning, Ms. Holsworth.

1  **A.**    Good morning.

2  **Q.**    Over here.

3  **A.**    Hi.

4  **Q.**    Thank you for being here today and for taking the time

5  out of your day on short notice.  We very much appreciate it.

6  I'll try to move through this as quickly as possible.

7        Ms. Holsworth, you were a contractor for True the Vote

8  from September 2020 to July 2021; correct?

9  **A.**    Yes, sir.

10  **Q.**    And you reported directly to Ms. Catherine Engelbrecht;

11  is that correct?

12  **A.**    Yes, sir.

13  **Q.**    And you were familiar with True the Vote's Georgia

14  election integrity hotline; correct?

15  **A.**    Yes, sir.

16  **Q.**    And True the Vote had a national election integrity

17  hotline that morphed into Georgia's election integrity hotline

18  after the 2020 presidential election; correct?

19  **A.**    Yes, sir.

20  **Q.**    And you discussed this hotline with Ms. Engelbrecht and

21  True the Vote's communications person; is that right?

22  **A.**    Yes, sir.

23  **Q.**    And you reviewed notes about the calls that the hotline

24  received; correct?

25  **A.**    Yes, sir.

1  **Q.**   And this hotline received about 6 or 7,000 phone calls

2  that you were aware of; correct?

3  **A.**   Hmm, I don't know if it's specifically for Georgia or --

4  I can't remember -- in total.  But, yes, it was a substantial

5  amount of phone calls.

6  **Q.**   And some of those phone calls may have been for other

7  states.  They weren't necessarily all for Georgia; is that

8  what you're saying?

9  **A.**   Yes, sir.

10  **Q.**   Fair enough.

11        And you're familiar with what True the Vote called its

12  whistleblower compensation fund; correct?

13  **A.**   Yes, sir.

14  **Q.**   And you also discussed this fund with Ms. Engelbrecht; is

15  that correct?

16  **A.**   There were some discussions, yes, sir.

17  **Q.**   And is it true that the number of calls made to the

18  election integrity hotline increased after the compensation

19  fund was announced?

20  **A.**   I don't -- I didn't see a marked increase.  It was the --

21  we had a steady flow of calls.  I think it increased more

22  when -- you know, getting closer to the election, things

23  heating up, more people going to the polls.  I think that was

24  probably the reason why the increase.

25  **Q.**   You're familiar with True the Vote's Georgia elector

1   challenge program; correct?

2   **A.**   Yes, sir.

3   **Q.**   And your job as part of that program was to make sure

4   True the Vote had the consent of volunteer challengers and

5   then to send the challenge list to the county officials; is

6   that right?

7   **A.**   Partly.  My job was to, yes, be a contact for the

8   challengers and make sure that they were aware and knew what

9   was going on and to get their consent to do so.  The

10  challenges first were sent by another contractor named

11  Heather, I think Heather Long, and she sent those out.  So I

12  would -- yes.

13  **Q.**   Thank you for that context.

14       And as part of your involvement, you sent the list

15  directly to the counties; correct?

16  **A.**   That would be Heather sent those.

17  **Q.**   So Heather sent the challenge lists directly to the

18  counties?

19  **A.**   Not the challenge lists.  The challenge -- let me

20  understand what you're asking.  When you say "challenge list,"

21  are you talking the actual challenge?  Because we didn't send

22  like a list of -- the challengers --

23  **Q.**   Let me be more precise.

24  **A.**   Thank you.

25  **Q.**   So the information that -- that would go to the counties

1    indicating that the challenger was in fact challenging these

2    voters, that was e-mailed?

3    **A.**    Correct.

4    **Q.**    Directly from True the Vote; correct?

5    **A.**    Correct.  From the -- yes.

6    **Q.**    And were you involved in sending those e-mails?

7    **A.**    My involvement mostly was -- we had a spreadsheet that

8    Heather had access to, she set it up, and she also set up the

9    Georgia elector -- I believe that was the name of the e-mail,

10   you can probably correct me on that.  Set that up and she

11   would send those out from that e-mail.

12        So I would fill in the information, like, so-and-so this

13   person, you know, we had to have his -- I think -- we call it

14   VUID, whatever your voting identification number, you call it

15   in Georgia, the VUID.  Their consent, you know, their -- you

16   know, signature, all that stuff.  And then she would send

17   those to the -- the actual county official.

18   **Q.**    And when Heather would send the challenge information to

19   the county official, she would send that directly from the

20   gaelectorchallenge.com account; correct?

21   **A.**    That was my understanding, yes.

22   **Q.**    And your understanding is the actual challenger

23   themselves would not be involved in that process of sending

24   the challenge materials directly to the county; correct?

25   **A.**    Correct.

1  **Q.**   You mentioned a spreadsheet of -- of challengers that you

2  maintained; is that correct?

3  **A.**   Yes.  That was maintained, yes.

4  **Q.**   Now, do you recall the names on that spreadsheet?

5  **A.**   I -- not -- not a lot of them, no.  I mean, there were

6  quite a substantial amount of people I was talking to at that

7  time.  So...

8  **Q.**   Fair enough.

9       And this is the spreadsheet of challengers; correct?

10 **A.**   Correct.

11 **Q.**   Now, would it refresh your recollection if I showed you a

12 copy of that spreadsheet that we showed to you during your

13 deposition?

14 **A.**   Yes, sir.

15       MR. NKWONTA:  May I approach the witness, Your Honor?

16       THE COURT:  Yes.

17       MR. NKWONTA:  I need a few more copies.

18       THE COURT:  Is that Plaintiff' 86?

19       MR. NKWONTA:  No.

20       THE COURT:  Question?

21       MR. NKWONTA:  Yes.  I wanted to make sure you were

22 finished reviewing.

23 BY MR. NKWONTA:

24 **Q.**   And that spreadsheet, does that look like the spreadsheet

25 that you were shown during your deposition?

1   **A.**    Yeah.  I -- yeah, I believe it is.  We had a Zoom

2   deposition, so the -- yeah, but it looks very similar.  Yes,

3   sir.

4   **Q.**    And can you turn to -- can you turn to the third to the

5   last page of that spreadsheet and review that page.  The page

6   that starts with Montgomery County.

7   **A.**    Okay.  Monroe County, then the first one in it says

8   Montgomery; correct?

9   **Q.**    Sorry.  It starts with Monroe County.

10  **A.**    Correct, yes, sir.

11  **Q.**    And then can you look at the entry for Muscogee County,

12  which is five rows down?

13  **A.**    Okay.  Muscogee.  Yes, sir.

14  **Q.**    You can put that to the side.

15       And do you -- do you recall or can you tell the Court

16  what name was listed on True the Vote's spreadsheet next to

17  Muscogee County as a challenger?

18  **A.**    May I look?

19  **Q.**    Yes.  If -- you may look at the list --

20       THE COURT:  Well, are you testifying based on what

21  you're reading here or does it refresh your memory or you

22  would remember it?

23       THE WITNESS:  I would have no idea without looking at

24  the spreadsheet.

25  BY MR. NKWONTA:

1   **Q.**   Well, what I'm asking is what was on True the Vote's

2   list.  So would it refresh your recollection to look at

3   Exhibit 8 to determine what was on True the Vote's spreadsheet

4   that you maintained for Muscogee County?

5   **A.**   You mean, if it was on the spreadsheet then it was on the

6   spreadsheet.  I don't -- I don't have any recollection of it

7   being on the spreadsheet without seeing the spreadsheet.

8          THE WITNESS:  Does that make sense?

9          THE COURT:  Yes, yes.

10         THE WITNESS:  Okay.  Thank you.

11  MR. NKWONTA:

12  **Q.**   Would you agree that Alton Russell was listed on the

13  spreadsheet under Muscogee County on the spreadsheet that you

14  maintained for True the Vote challengers?

15  **A.**   What I would --

16         MR. WYNNE:  I'm going to object to the extent it's

17  not a foundation because a spreadsheet, Excel spreadsheet is a

18  dynamic document.  So we've got to establish a point in time.

19         THE COURT:  Overruled.

20  BY MR. NKWONTA:

21  **Q.**   Would you agree with me that Mr. Alton Russell was listed

22  next to Muscogee County or under Muscogee County as a

23  challenger on True the Vote's spreadsheet?

24         THE COURT:  Well --

25         THE WITNESS:  I would say that name is there, then

1   that name is there, so...

2   BY MR. NKWONTA:

3   **Q.**   And is that name on the spreadsheet?

4   **A.**   May I look at it?

5        Yes, sir, it is.

6            THE COURT:  But you only know that because you read

7   it.

8            THE WITNESS:  Yes, sir.

9   BY MR. NKWONTA:

10  **Q.**   And you also filled out information on that spreadsheet

11  as well; correct?

12  **A.**   May I look at the spreadsheet?

13  **Q.**   Would it refresh your recollection to look at the

14  spreadsheet --

15  **A.**   Yes.

16  **Q.**   -- to know whether you entered information in there?

17  **A.**   I mean, yes.  I -- I put information in because my

18  initials are on two of those.  Done, AH.

19  **Q.**   And, Ms. Holsworth, do you recall whether there was any

20  highlighting on the spreadsheet as you were maintaining it?

21  **A.**   Yes, sir.

22  **Q.**   But you don't recall what that highlighting meant;

23  correct?

24  **A.**   I do recall, yeah, seeing it and going through it again.

25  Well...

1   **Q.**   Do you -- is it your testimony that you recall what all

2   of the highlighting meant or do you recall what some of the

3   highlighting meant?

4   **A.**   I recall what some of it meant.

5   **Q.**   Do you recall what the green highlighting meant?

6   **A.**   Yes, sir, the ones -- yes, sir, I do.

7   **Q.**   And the green highlighting, that simply meant you already

8   had the challenger's voter ID number; correct?

9   **A.**   My recollection is -- and what I remember it to be is

10   that when it said done, AH, it was highlighted green, that

11   means that they had been sent to the county.  Everything was

12   done and they had already -- the challenges had been sent.

13   **Q.**   Sent from True the Vote's gaelectorchallenge.com account?

14   **A.**   Yes, sir.

15   **Q.**   But you don't have any recollection of what the other

16   highlighting means; correct?

17   **A.**   May I look and see?  Thank you.

18       So the yellow, that was -- our challenger was -- had

19   agreed.  We had probably part of his, you know, documentation,

20   maybe a signature.  We were probably -- a lot of times we were

21   waiting for the -- them to get their voter ID number to put

22   in.  So, yes, I was still in the process of collecting the

23   necessary information and approval in making sure that the --

24   but that was all done.  So that was kind of like in the queue

25   next to go.  And then after that was all done and they were

1    sent, they were then green.

2    **Q.**   Ms. Holsworth, is it your understanding that the names on

3    that list were the names -- let me strike that.

4        You gave a deposition in this case back in 2021, I

5    believe; correct?

6    **A.**   Yes, sir.

7    **Q.**   Sorry.  January 2022; correct?

8    **A.**   Yes, sir.

9    **Q.**   And in that deposition you swore to tell the truth;

10   correct?

11   **A.**   Yes, sir, of course.

12   **Q.**   And you were represented by counsel at the time; correct?

13   **A.**   Yes.

14   **Q.**   And there was a court reporter there; correct?

15   **A.**   Yes, sir.

16   **Q.**   And you endeavored to tell the truth in that deposition;

17   correct?

18   **A.**   Of course, yes, sir.

19   **Q.**   And you were asked in that deposition on page 76, lines 5

20   through 15, "And we saw some rows highlighted in yellow.  What

21   would the yellow refer to?

22       Your answer, "I don't know what that would refer to."

23       Do you recall giving that testimony?

24   **A.**   Yes, sir.

25   **Q.**   And has your memory since -- of that spreadsheet of the

1  yellow highlighting since improved from January 2022 until

2  now?

3  **A.**   Well, when I first saw that spreadsheet in the

4  deposition, that was the first time I'd seen the spreadsheet

5  in quite some time.  So coming cold, at the moment, I didn't

6  remember.  But now that I've seen it and had a chance to, you

7  know, recollect and see it again, you know, it kind of

8  triggers my memory, you know.  I remember more of what that

9  was at the time.  So, yes.

10 **Q.**   And are the names on that spreadsheet, are those names of

11 individuals you understood to be challengers that True the

12 Vote had recruited?

13 **A.**   May I look at the list again?

14 **Q.**   Yes.

15 **A.**   My understanding that of this list it was potential

16 challengers, ones that had been referred or reached out to,

17 but maybe not have been confirmed, the ones that were in

18 yellow.  And I don't know at what point this spreadsheet

19 represents, but the ones that were in yellow were the ones

20 that had confirmed and were in the process of giving their

21 information over and then agreeing to the ones that were sent.

22 **Q.**   Thank you, Ms. Holsworth.

23        MR. NKWONTA:  I have no further questions at this

24 time.  I pass the witness.

25        THE COURT:  Did you call this witness as an adverse

1   witness or did call this as a regular witness?

2          MR. NKWONTA:  So we call Ms. Holsworth as an adverse

3   witness for the purposes of cross-examination.

4          THE COURT:  All right.

5          Any questions?

6          MS. PAIKOWSKY:  No, Your Honor.

7          THE COURT:  All right.  You're going to probably be

8   called again as a witness by the defense so don't discuss your

9   testimony with anybody, any other witnesses.  You are not a

10  party to this case, I don't think, so you have to remain

11  outside of the courtroom and then Mr. Wynne will give you

12  further instructions, okay?

13         THE WITNESS:  Yes, sir.  Thank you.

14         THE COURT:  And I'm sorry you had to come on such

15  short notice.  I was informed you don't give a lady 30 minutes

16  to get ready, but this morning we had to do that.

17         THE WITNESS:  No problem.  I appreciate it.  Thank

18  you.

19         THE COURT:  Thank you.

20         THE WITNESS:  May I just step down?

21         THE COURT:  Yes, you may.

22         THE WITNESS:  Do I leave this here?

23         THE COURT:  You can leave that there.

24         THE WITNESS:  All right.  Thank you.

25         MR. NKWONTA:  May I collect that, Your Honor, from

1   the witness?  I believe it's confidential.

2            THE COURT:  Yeah.

3            MR. WYNNE:  While I have the chance, I want to make

4   sure -- because I didn't get a chance to outline her direct,

5   will I have a chance to talk with her before I call her on the

6   stand?  Because I'm going to have to get the story.

7            THE COURT:  You can talk to her about the strategy

8   you're going to use in your questioning, just, as you know,

9   don't go over -- will use but don't go.

10            MR. WYNNE:  Oh, no.  I won't go over --

11            THE COURT:  I can't allow that.  This is your

12   witness --

13            MR. WYNNE:  I got it, Your Honor.

14            (Cross talk.)

15            THE COURT:  All right.  Who is next for the

16   plaintiff?

17            MR. NKWONTA:  Your Honor, plaintiffs rest.

18            THE COURT:  Okay.  I have some questions for

19   defense -- Department of Justice plaintiffs, but in order to

20   save time, I will wait until the end of the case.  But there

21   are some questions that I've got for you-all to deal with

22   personally, free speech.

23            MR. EVANS:  And, Judge, we'd like to move for a

24   directed verdict, which in a bench trial is actually called a

25   motion for judgment on partial findings --

1          THE COURT REPORTER:  Judge, I don't have sound.

2          MR. EVANS:  Madam Court Reporter, can you hear me?

3          THE COURT REPORTER:  Yes.

4          MR. EVANS:  And, Judge, we also had a brief, which we

5   will file as well for the Court to consider.  As the Court is

6   well aware, in jury trials this is directed verdict, in bench

7   trials it's actually called a motion for judgment on partial

8   findings.

9          And the standard on that is under Federal Rule of

10  Civil Procedure 52(c), which is if any party has been fully

11  heard on an issue, during a non-jury trial, and the Court

12  finds against the party on that issue, the Court may enter

13  judgment against that party on the claim or defense that under

14  controlling law can be maintained or defeating only with a

15  favorable ruling on that issue.

16         The courts -- federal courts throughout the country,

17  and I've got many citations, find that these streamlined bench

18  trials, having heard all the evidence the plaintiff has to

19  offer to make findings of fact adverse to the plaintiff,

20  including determinations of credibility without waiting for

21  the defense to put on their case.

22         You, Your Honor, as you know, you're sitting as a

23  trier of fact.  As a result of that, there are no inferences

24  that can be made in favor of the plaintiff.  The Court can

25  make credibility determinations and, as the Court has said,

1  has ruled on evidentiary objections throughout this case, has

2  the record that the plaintiffs presented before them.

3          So this Court and Your Honor laid out what the

4  standard was in your summary judgment order, which is

5  defendants have to show by a preponderance of the evidence

6  that any of the -- or plaintiffs have to show by a

7  preponderance of the evidence that any of the defendants'

8  action directly or through means of a third party in which

9  they directed with recklessness, which we pointed out in our

10  trial brief, caused or could have caused any person to be

11  reasonably intimidated, threatened or coerced from voting.

12          The evidence so far has been abundantly lacking in

13  each of these.  And I'll go through each of these for the

14  Court to consider.

15          The first, Judge, is directly or through means of a

16  third party.  Each of -- the plaintiffs put on four plaintiffs

17  or four parties, two of which are plaintiffs, two of which

18  were non-parties.  I crossed each of these folks.  Each of

19  these fact witnesses and parties testified they had never

20  directly communicated with any defendant in this case.

21          And, in fact, Judge, they said they didn't even know

22  the names of any of the defendants in the case.  This is after

23  redirect, this is after my cross.  That negates, standing

24  alone, that there was any direct communication by any

25  defendant in this case with any party in this case.

1    Driving this point home even further, Judge, three

2  out of the four were all in -- from Muscogee County.  As the

3  evidence showed, there was a case named Ben Hill where a court

4  order was entered that mandated that the county boards of

5  elections officials had to inform voters that they would be

6  challenged.  That is why it is no coincidence that three out

7  of four are from Muscogee.  The reason why those voters were

8  informed they were challenged was from a court order.

9  Otherwise they would not have been.

10    So that a drives home in this case -- for all four

11  there was no direct communication, but specifically and most

12  he principally, as the Court ruled in its summary judgment

13  order which initially was granted, there was no evidence

14  before trial, there was no evidence during trial, that anyone

15  communicated in any way, shape or form through any of the

16  plaintiffs in this case.

17    THE COURT:  Well, in 11(b), do they have to have

18  direct communications with the challengers?  Under

19  Section 11(b), would deal with attempting.  They have to.

20    MR. EVANS:  They either have to, directly or through

21  a third party.  In this case, what it makes it particularly

22  nuanced is we have a firewall that exists.  The firewall is

23  they submit them through 230, the county boards of elections

24  thereby evaluate whether there is probable cause, and if

25  there's no probable cause the analysis stops.  Mr. Germany

1   testified to that.

2          And as a result of --

3          THE COURT:  I'm not asking about 230, I'm asking

4   about 11(b) under the Civil Rights Act.

5          MR. EVANS:  Well, 11(b) should -- very comfortably,

6   the case -- the interpretive case law shows you have to have

7   direct communication or through a third party.

8          THE COURT:  Give me what case that's in.

9          MR. EVANS:  It's in our brief that we'll submit to

10  the Court, if that's okay with Your Honor.

11         THE COURT:  Yeah.

12         MR. EVANS:  So I'll get to the next factor, which is

13  caused or could have caused.  Your Honor, in footnote -- I

14  believe it was 12 -- raised up and predicted, I would say, the

15  future in some ways, which is you said there are significant

16  questions regarding causation in this case.  What we can see

17  is, even assuming there is direct contact with any voter

18  attempted, which the record shows that wasn't the case, there

19  is no causal link between any of the folks that testified, any

20  of the general public, any of the evidence that's been

21  submitted, and any of these defendants.

22         In Muscogee County, the only thing that -- this is

23  fresh on the Court's mind -- they've been able to attempt to

24  concoct is this spreadsheet that the last witness testified

25  the white were not folks that had went forward and been

1  contacted.

2       No witness offered any testimony that they knew or

3  could connect any of the challenges in Muscogee County with

4  any of the defendants in this case.  They not only, Judge,

5  have to show it, a very small causal link, they have to show

6  it beyond 51 percent, beyond a preponderance of the evidence.

7       That has not happened in this case.  We have now been

8  here six days of testimony.  And no causal link has been

9  offered by any witness, by any expert that can say that in any

10 way any of these defendants caused any alleged intimidation of

11 any person or voter that has testified in the case or offered

12 any evidence in the case.

13      That, again, Judge, alone negates any of their

14 ability to succeed under 11(b).

15      And last but not least, any person to be reasonably

16 intimidated, threatened, or coerced from voters.  You evaluate

17 the objective standard.  You evaluate what each of the

18 witnesses testified in this case.  And if we go through them

19 one by one, just to refresh all of our minds.  The first was

20 Mr. Berson.

21      Mr. Berson allegedly lived in Muscogee County.  He

22 went to college.  He then moved to North Carolina.  He then

23 now lives in Pennsylvania.  He admitted on the stand, because

24 Your Honor put a number of analysis and factors that go into

25 determining and evaluating whether or not someone is

1   objectively reasonably intimidated.  He admitted himself that

2   if someone didn't know where -- who he was, that it would be

3   reasonable to say you wouldn't know where he lived.  He could

4   live in Alabama.  He could live in North Carolina.  He wasn't

5   sure.

6        The only -- and I don't believe he used the word

7   "intimidation," but the only discomfort he had was someone

8   told him that he needed to provide an additional layer of

9   voter -- go ahead, Judge.

10       THE COURT:  He used the word "intimidation," but you

11  pointed out to him, it was the first time he used it was on

12  the stand.  He used it to testify.  And you pointed out he

13  hadn't used it before, but he did use it on the stand.

14       MR. EVANS:  You're right, Judge.  And I -- your

15  memory is better than mine.

16       But in that, he said it, but earlier -- and that's a

17  credibility determination for Your Honor.  Earlier, he did not

18  use it.  This has been months and months and months and

19  suddenly he gets here and he uses it.

20       But that doesn't change the fact that it's an

21  objective reasonable standard that the Court determines.  Does

22  simply being pulled out of line and asked to provide a bill

23  that confirms where you live, and that's all he said, I pinned

24  him down very carefully.  You're saying the only reason why

25  you were allegedly intimidated is you had to provide an

1  additional confirmation of where you live, which is a bill.

2       That is -- number one, the frivolity, there was no

3  frivolousness.  It was very confusing where he lived.  He

4  admitted on the stand that it was very confusing where he

5  lived.  There has been nothing going to the intent.  There has

6  been nothing to suggest any of these defendants operated with

7  intent.  And, in fact, everything in the record says they

8  didn't operate with any intent to challenge any specific

9  demographic, to challenge the eligibility, to stop anyone from

10 voting.

11      The record shows each of the defendants, and not all

12 of them have testified, but that's not on our making.  Each of

13 the defendants testified they did this to pursue the First

14 Amendment right to ensure vote -- the elections are properly

15 done.  And election integrity is maintained.

16      So Berson, again -- and just to hit on this very

17 briefly, and I'm going to back up one second just from Berson.

18      The Navy SEALs and any alleged bounties.  There is

19 nothing in the record to suggest that any Navy SEALs were ever

20 recruited, went to the polls, operated in any way to

21 intimidate any of the polls, talked to anyone.  The record is

22 wholly lacking in that.

23      And, secondarily, anything about the legal defense

24 fund, there was one line in an e-mail that Ms. Engelbrecht

25 said there was 50,000 to help with someone's healthcare costs,

1    I believe she said because someone had been hurt and as a

2    result they were covering that.

3            That does not in any way meet a preponderance of the

4    evidence or sufficient evidence really to warrant much time or

5    consideration from the Court or much time or consideration in

6    my argument on this motion.

7            The sixth point that the Court brings up in

8    evaluating objective reasonableness is the publication of

9    challenged voter names.  There is nothing that suggests these

10   were published in any mass form.  These weren't published in a

11   press release.  No names have been published anywhere.  None

12   of the individual defendants have published them anywhere.

13   There is nothing in the record that says any of the individual

14   defendants have published them anywhere.  That opens and

15   closes the door on that.

16           Moving forward on the frivolity.  And I'll try to do

17   this quickly, Judge.

18           We had Mr. Turner.  Mr. Turner, I had the opportunity

19   to cross him, as Your Honor knows, he moved to California.

20   Every public piece of information confirmed he moved to

21   California.  He still lives in California.  He says eventually

22   he may move back to Georgia, but he's not sure when that will

23   be.

24           He testified on the stand that if a reasonable person

25   looked at where he lived, they would probably -- without

1    knowing him, they would conclude that he lived in California.

2          I asked him, did you know the only reason why you

3    didn't get your absentee ballot was that the U.S. Postal

4    Service doesn't forward them.  He says, yes, he did know that.

5    And he agreed that the U.S. Postal Service didn't forward them

6    because they don't forward official ballots.  And when he

7    called and he asked will you send it to me, they ended up

8    sending it to him.

9          That shows there was no frivolousness.

10          And the only alleged intimidation that he had he

11   said, the record reflects, he had to call, apparently multiple

12   times, to get his absentee ballot sent to him.

13          That happens to every voter in Georgia.  That if you

14   request an official ballot to be forwarded, you're going to

15   have to let them know, hey, I'm going to fill out my absentee

16   ballot application and indicate this is the address I've sent

17   it to.

18          The objective reasonable standard would show in that

19   context that is not reasonable intimidation under Georgia law.

20          Next we had Ms. Stinetorf.  Ms. Stinetorf lives in

21   Germany.  That's a long way away there here.  No one ever

22   reached out to Ms. Stinetorf and said, hi, you've been

23   challenged.  No one ever reached out to her and said, hello,

24   your vote hasn't been counted.

25          In fact, Judge, when I handed her the e-mail, which

1  refreshed her recollection and I looked at the record last

2  night it shows, her ballot in fact had already been counted

3  eight days before she reached out.  There was no intimidation.

4      I don't know -- she alleges the e-mail -- an e-mail

5  said it, that's nowhere in the record.  There's nothing in the

6  record that says she received an e-mail that said she was

7  challenged.

8      The only thing that she alleges, that the e-mail said

9  she was challenged, is her fair, self-serving testimony, which

10  as the judge knows that is not going to be sufficient by any

11  means to meet a preponderance of the evidence standard.  And I

12  gave her the e-mail and I said, is this a true and accurate

13  reflection of what this e-mail said, did you receive it?

14      THE COURT:  I may be misremembering what she said.  I

15  thought she said she called someone in Muscogee County and

16  they told her she had been challenged.  I may remember that

17  wrong.

18      MR. EVANS:  She may have, Judge, but I would -- that

19  would be hearsay and I likely object to it to the extent that

20  she testified to that.

21      But looking at even her, even assuming those facts as

22  true, which I'm not, because, again, this is not -- we give no

23  inferences to the plaintiff in this case.  She is halfway

24  around the world.  She alleges she called and said she was

25  challenged.  She never had to provide anything.  And, in fact,

1    on or before -- after she -- before she reached out, her vote

2    had already been counted.  I mean, that is just the facts.

3            Additionally, Judge, she was not on any of the

4    alleged challenge lists.  That's in the record as well.

5            So last is Mr. Heredia -- or Ms. Heredia.

6            Ms. Heredia is the only person that testified in this

7    case that's not from Muscogee County.  She, as the Court

8    remembers, had filed a National Change of Address to Decatur.

9    She then filed a National Change of Address to midtown

10   apartment one.  Then filed a National Change of Address to

11   midtown apartment 2.  And now she's moving to Athens, Georgia.

12           There is -- she admitted she moves a lot.  There was

13   reasonable uncertainty about where she lived.  In fact, I

14   believe she really moved to Atlanta never to move back to

15   Banks County.  That's a -- this is not an eligibility

16   challenge that we have to meet to prove that, but looking at

17   whether or not that challenge qualifies as frivolous is

18   something that is an easy analysis.  It wasn't frivolous.

19           Looking at the facts and circumstances as she had,

20   it's very clear that, in fact, she had moved, every

21   indication, from social media, from her CARFAX report

22   indicated she got her car serviced in the Metro Atlanta area,

23   not Banks County.  So each of the factors for her also weigh

24   in favor of showing there was no intimidation.

25           So looking at these collectively, Judge, you've got

1  seven defendants in this case.  A couple of the defendants I

2  don't even know have been mentioned:  Ron Johnson, Mark Davis,

3  James Copper, I don't even know if they've been mentioned in

4  the case.

5           I would argue, at a minimum, the plaintiffs have not

6  met their burden as to those defendants in showing beyond a --

7  by a preponderance of the evidence they directly or through

8  means of a third party caused or could have caused -- and

9  again, Your Honor, also with recklessness -- any person to be

10 reasonably intimidated, threatened or coerced from voting.

11          Those are easy calls.  James Copper, Ron Johnson,

12 Mark Davis.

13          I would also argue Marc Williams.  Marc Williams, as

14 he just testified, the only place he challenged was Gwinnett

15 County.  Gwinnett County is in no way implicated in this case.

16          The remaining defendants, True the Vote,

17 Ms. Engelbrecht and Mr. Somerville, additionally should be

18 dismissed.

19          Mr. Somerville didn't challenge anyone at all.

20 Mr. Somerville, as he testified on direct, had a very

21 methodical, a very intentional analysis in determining the

22 voters that were challenged.  He did not communicate with any

23 of the voters that have testified.  He did not direct anyone

24 to communicate with any of the voters that have testified.  He

25 did not cause or could have caused any voter to reasonably be

1  intimidated.

2         The plaintiffs have to show by a preponderance of the

3  evidence, with no favorable inferences, that they met that

4  standard.  For Mr. Somerville that has not happened.

5         The last two, Judge, is True the Vote and Catherine

6  Engelbrecht.  The same arguments apply to each of them.

7         Ms. Engelbrecht got on the stand, testified.  She

8  used a very methodical approach.  Never communicated directly

9  with voters.  Never publicly posted any voter names.

10        The plaintiffs have to show there was a causal link

11  between her and each of these defendants and each of the

12  alleged voters implicated in this case.

13        There is no way to know.  There is no way to know --

14  Muscogee, there is nothing that ties any defendant in the case

15  point blank, period.  That only leaves Ms. Heredia.

16        Ms. Heredia, there was -- who knows how many people

17  challenged -- were submitting challenges.  We don't know.

18  It's speculation.  But there is no way to in any way connect

19  Ms. Engelbrecht or True the Vote with any of, number one, the

20  Muscogee County, that's an easy call, or Ms. Heredia in the

21  case, and even still they can't meet the standard because

22  there was not reasonable intimidation.

23        So at the end, Judge, what I would present to the

24  Court is courts like Your Honor is in a fact-finding capacity.

25  The plaintiffs have rested their case.

1    It is in the Court's prerogative to streamline the

2  issues if any should go forward in this case.  But the

3  plaintiffs simply have not shown beyond a preponderance of the

4  evidence that any of the defendants directed through a third

5  party to cause or could have caused anyone to feel reasonably

6  intimidated.

7    Each of those factors, and the precedent that would

8  be set by this case, show very firmly that in an 11(b)

9  challenge, when you have a firewall through the county board

10 of elections, when you have no direct communication with any

11 of the alleged 350,000 -- they can only put on the stand

12 four -- all of which show, if all the facts were known, they

13 may in fact not have been domiciled in Georgia at the time.

14 That is not enough.

15    We should not burden the Court or any of the parties'

16 time with additional testimony in this case, using up any

17 further resources in this case.  The Court should rule right

18 now on this motion that plaintiffs' case should be denied.

19    We're happy to submit our brief in short order, give

20 the Court an opportunity to take a look at it, take it under

21 advisement.  But I do think that a lot of time has already

22 been expended on this, Judge.  As the Court predicted in the

23 summary judgment order, there is no causal link.  There is no

24 caution.  The plaintiffs' case should be dismissed.

25    Thank you.

1        THE COURT:  Thank you, Mr. Evans.

2        Who's going to respond?  Whoever responds from the

3   plaintiffs, let's talk particularly about Somerville, Davis,

4   Johnson, and Cooper.  That's the ones I want you-all to

5   respond to:  Somerville, Davis, Johnson, and Cooper in your

6   response.  Williams -- not Williams.  Somerville -- respond

7   about Somerville, Davis, Johnson, and Copper.

8        MR. EVANS:  What about Marc Williams, Judge?  Okay.

9        THE COURT:  Somerville, Davis, Johnson, Copper.

10       MR. NKWONTA:  Thank you, Your Honor.

11       To directly answer your questions, I'll start off

12  with Mr. Somerville.  So as you heard Mr. Somerville testify,

13  and based on the evidence we've submitted, including

14  deposition designations, Mr. Somerville created a challenge

15  list consisting of 39 -- at least 39,000 voters to submit,

16  based on information that those voters had moved or had

17  submitted a change of address request through the NCOA

18  registry.

19       We know, and we've submitted evidence, that that

20  information alone is not sufficient to determine an

21  individual's residence.  And that is true as a matter of law.

22  And that is also --

23       THE COURT:  That's true, it's a matter of law that

24  that's not sufficient?

25       MR. NKWONTA:  It is true as a matter of law that's

1  not sufficient.

2        THE COURT:  I may have missed something.  Give me the

3  case and the statute.

4        MR. NKWONTA:  So I don't have the specific statutory

5  cite in front of me, but I will tell you how it's established

6  as a matter of law.

7        THE COURT:  But you will get that to me; right?

8        MR. NKWONTA:  We will get that to you.  And this

9  is -- and I'll give you the reasoning why it's established as

10 a matter of law.

11        It's established as a matter of law because when

12 one's residency -- when one's registration depends on their

13 residency, and federal law prevents that person from being

14 removed from the registration rolls on the grounds that they

15 are no longer residents, or they have moved, based solely on

16 NCOA data.

17        There are procedural steps, coordinated --

18        THE COURT:  Mr. Somerville testified that he didn't

19 just base it on NCOA data.

20        MR. NKWONTA:  So Mr. Somerville testified --

21        THE COURT:  He talked about, what phrase did he use?

22        MR. EVANS:  A funnel?

23        THE COURT:  A funnel.  Yeah.  He started with a

24 funnel and he narrowed it down.

25        MR. NKWONTA:  So you -- but, Your Honor, that would

1    require you to credit testimony about the effect of that

2    funneling and what it means.

3         THE COURT:  Isn't that what the trier of fact does?

4         MR. NKWONTA:  Well, that goes to our motion to -- in

5    limine, Your Honor, because when we talk about that funneling,

6    I asked the Court who is the gatekeeper to understand or

7    determine whether -- what funneling means or if any funneling

8    existed at all.  And you are the gatekeeper, Your Honor.

9         And as that gatekeeper, what assurance do you have

10   that Mr. Somerville conducted funneling and that that

11   funneling results in a list that does not rely solely on NCOA.

12        THE COURT:  Let me ask you a question:  I wasn't

13   going to ask you-all this question, I was just going to go

14   straight -- because I didn't whether defendants were going to

15   file a motion, they did, under 52(c).  The only question I was

16   going to ask you all -- and I'm going to give this question to

17   the DOJ in a few minutes -- is that Mr. Somerville testified

18   that the only thing he did was to file on Facebook that he was

19   looking for challengers.

20        Now, I may have misunderstood what he said and

21   interpreted wrong, but I never heard -- I didn't interpret he

22   filed the names on the list on Facebook.

23        MR. NKWONTA:  Well, he placed the challenge list on a

24   DropBox or Google Drive that was available to all comers who

25   requested to see those lists.

1        THE COURT:  Yeah.

2        MR. NKWONTA:  So that is the equivalent.  Yes, it was

3    -- may not -- the list may not have been on Facebook, but it

4    was publicly accessible in the most public manner possible.

5        Second, going back to Your Honor's question about

6    where it's established in the law that NCOA is not enough.

7    Now, I don't remember the Court's exact words, but if you

8    recall that the case, Majority Forward v. Ben Hill County, and

9    Muscogee County was also a defendant, Your Honor, in that

10   case -- what was that case about?

11       That case was about Muscogee and Ben Hill County's

12   attempt to use NCOA challenges alone to determine whether

13   voters should be able to cast absentee ballots or whether they

14   should be able to present additional --

15       THE COURT:  I remember the case.  I think it was in

16   the district court there, but, you know, you're saying it's

17   set law that NCOA is not enough.

18       MR. NKWONTA:  The -- and it's set law because the

19   NVRA says NCOA is not enough by itself to remove a voter and

20   to determine a voter's not registered without going through

21   the choreographed steps that NVRA sets forward.

22       What would be the purpose of the NVRA if an

23   individual could be registered but just denied the right to

24   vote?  Right.  The purpose of the NVRA is to ensure that

25   people are not removed from the rolls improperly so that they

1  can protect their right to vote.

2          Now, if the NVRA does not allow you to --

3          THE COURT:  If that's the case, then 21-2-230 might

4  be unconstitutional.

5          MR. NKWONTA:  So 2 -- and I'll -- I can address that

6  point specifically, Your Honor.

7          So 230 allows challenges, but does not specify the

8  specific grounds for challenges.  In other words, specific

9  grounds -- it allows challenges to one's eligibility to vote.

10  But it does not specify the specific grounds or what

11  information, what data is it, that informs one's ability to

12  vote.  230 does not tell us that.

13          THE COURT:  That's my point, is that 230 just says --

14  I have it here, I guess I'll read it out.  It just says you

15  can do it -- "A person has to live within the county that is

16  making the challenge" -- it doesn't say -- they changed it, to

17  leave it unspecified number to do it on, but go ahead let me

18  just listen to your argument.  Go ahead.

19          MR. NKWONTA:  So I don't think this is a question of

20  whether 230 is unconstitutional, because 230 -- under 230, a

21  county can still reject the challenge itself, right.  And

22  constitutionality relates to the government's conduct or the

23  county's conduct, right.

24          So the county can receive a 230 challenge, a

25  frivolous 230 challenge, and not consider it.  And, therefore,

1   not have violated anyone's Constitutional rights.  But that

2   doesn't mean that the voter has not been intimidated and that

3   doesn't mean that the person submitting the frivolous

4   challenge has not violated the VRA.

5           And I will give you a clear example.

6           THE COURT:  It's not about -- really what we're

7   talking about is an attempt at intimidation, because Mr. Evans

8   used the word, and it's come up before, firewall, that the

9   county is the firewall.  And Mr. Germany talked about that you

10  have to say -- there at least has to be probable cause to go

11  forward.  So we're talking about -- are we talking about

12  actual intimidation or attempted intimidation?

13          MR. NKWONTA:  We're talking about both, Your Honor.

14          And now first I'll start with actual intimidation.

15  Saying that the county's a firewall is a meaningless statement

16  because the firewall doesn't -- what does firewall mean?  Does

17  that mean that the voter never finds out that they are

18  challenge?

19          When a voter -- when an individual goes to vote in

20  person and they have been challenged, as you heard with

21  Ms. Jocelyn Heredia, and as you heard with Mr. Scott Berson,

22  those individuals are informed that they are challenged.  And

23  being informed that you're challenged, even if the county

24  itself is ultimately going to deny the challenge for lack of

25  probable cause, that is still intimidating.  And you heard

1    those individuals say that they were intimidated.

2          And then you also heard Ms. Engelbrecht testify that

3    if she had her way, the way she envisioned those challenges

4    would unfold, is that all 365,000 of those individuals --

5          THE COURT:  Somerville, Davis, Johnson, Copper.

6          MR. NKWONTA:  Sure.  Certainly.

7          And when you look at Mr. Somerville and Mr. Davis,

8    the whole purpose in submitting those challenges was to spur

9    investigation.  You heard Mr. Somerville testify about the

10   need to spur that investigation, ensure, you know, citizen

11   participation in getting these voters investigated.

12         The purpose of the challenges was not to go away in

13   the night quietly.  It was to ensure investigation.  And as

14   you heard and as you will hear in the testimony of

15   Mr. Somerville, they -- there would lots -- there was a lot of

16   discussion about what should happen to the voters.  This was

17   not -- this was not a -- this was not a challenge that was

18   just meant to go to the counties without the voters hearing

19   about it.

20         Second --

21         THE COURT:  Well, some of them have it.  And how

22   would you expand on this except -- don't they have a right

23   under this statute in Georgia to challenge people?

24         MR. NKWONTA:  They do have a right to challenge

25   people, but they don't have a right, under the VRA, to

1  challenge people for frivolous reasons that puts their

2  eligibility or their lawfulness in question.

3          Just for instance, for instance, landowners in the

4  '60s had every right to deny people access to their land for

5  trespassing.  I think we would all agree with that.

6          However, when you deny someone the right to your land

7  for trespassing because they had registered to vote or when it

8  implicates voting, that implicates the voter intimidation law.

9          So just because they have a right to submit

10  challenges doesn't mean that they didn't commit voter

11  intimidation.

12          THE COURT:  That's a bad analogy.

13          MR. NKWONTA:  I'll give you another analogy.

14          Because there are a number of different instances

15  where lawful conduct can still become voter intimidation.

16          THE COURT:  I'll agree with that.

17          MR. NKWONTA:  And so -- yes.  Maybe excluding someone

18  from your land is not unlawful conduct, but employment

19  actions, for instance, negating contracts with individuals who

20  may be voting.  Or calling voters, calling voters and talking

21  about the impacts of the COVID vaccine, for instance, or

22  impacts of COVID.  Like things that would -- that may not

23  necessarily trigger scrutiny when you get within the sphere of

24  elections and when you get into the -- when the potential

25  result is voter intimidation, the Court has to undergo a

1   different analysis set forth under Section 11(b).

2           And Section 11(b) doesn't make any exception for

3   conduct that would be otherwise lawful if it did not

4   intimidate voters.

5           So where the Court has to start with is whether the

6   conduct is objectively intimidating or whether the conduct

7   was -- did it in fact intimidate voters or whether the natural

8   result is intimidation.  That's the first question.

9           And so the question --

10          THE COURT:  That's why I really have a question.

11  You're absolutely right.  I really have a question when it

12  comes to Somerville, Davis, Johnson, and Copper.  I'm looking

13  at that question right now.

14          MR. NKWONTA:  So those individuals collaborated to

15  send and to ensure and implement challenges to thousands and

16  thousands of voters.  It is the natural result of mass voter

17  challenges, intimidation.  And we've submitted extensive

18  evidence that it is.

19          It's intimidation because the voters have gotten up

20  here and told you it's intimidation.  It's intimidation

21  because -- and you can also --

22          THE COURT:  Which voters said they were intimidated

23  by what Mr. Davis, Mr. Somerville, Mr. Johnson, Mr. Cooper

24  did?

25          MR. NKWONTA:  So Ms. Jocelyn Heredia was challenged

1  by both Dan Gasaway and Mr. Robert Bowling.  And it's

2  established -- and those individuals were recruited and/or

3  worked with both Mr. Somerville and Davis and True the Vote to

4  submit a challenge to Banks County.

5      THE COURT:  Bowling -- and, again, I may have the

6  evidence wrong, you have a better mind than mine, but I think

7  Bowling was more or less directly connected with True the

8  Vote.

9      Mr. Gasaway was connected more with Mr. Somerville.

10      MR. NKWONTA:  Yes.  So I listed both to show the

11  connection of both, right.  So let's talk about Mr. Somerville

12  and Mr. Davis.

13      They coordinated with Mr. Gasaway to submit a

14  challenge in Banks County.  And that challenge intimidated

15  Jocelyn Heredia because she thought she had violated the law.

16  She thought she had done something wrong by voting.

17      THE COURT:  But you're talking more about

18  intimidation because of mass challenges.  And I'm saying

19  which -- which of these defendants (sic) testified that they

20  were intimidated based on the mass Facebook or Google matter

21  that Mr. Somerville did?

22      MR. NKWONTA:  Well, the fact that there were mass

23  challenges, Your Honor, I don't think goes to the individual

24  intimidation.  Jocelyn was intimidated because she was

25  challenged.  And I'll -- I can --

1    THE COURT:  That comes back again, though, to 230.

2  Under 230, if one -- if I challenge my neighbor four doors

3  down the street, that does not automatically mean that person

4  is -- the person probably was intimidated.  It's probably

5  upsetting.  You get a drop in your stomach.

6    But you're making two different arguments.  You're

7  making the mass challenge would cause intimidation.  And I can

8  see that.  I -- you notice I'm saying Davis, Johnson,

9  Somerville, and Copper.  But I'm asking you which

10  defendants -- I mean which plaintiffs testified they were

11  intimidated because of the mass challenge?

12    MR. NKWONTA:  So a few things.  The -- in terms of

13  the mass challenges, Scott Berson learned about his challenges

14  by reading -- he testified by reading a --

15    THE COURT:  Go ahead.

16    MR. NKWONTA:  Scott Berson learned about the

17  challenges by reading an article.

18    THE COURT:  Coming from True the Vote.  Not what

19  Somerville -- Somerville was Facebook or Google.  It didn't

20  come to Google until the person said, oh, yeah, I want to

21  challenge for Fulton County, according to the testimony,

22  Somerville said he wanted to talk to them first, find out what

23  they were, and then he would provide for them the challenges

24  for Fulton County.

25    Berson was based on True the Vote.

1       The lady in Germany, I think, was based on True the

2  Vote.

3       I could -- I've heard a lot of evidence and

4  testimony.  Tell me what plaintiffs were intimidated or

5  attempted to be intimidated by what Somerville did on Facebook

6  and Google.

7       MR. NKWONTA:  So what Somerville did was -- and what

8  Mr. Somerville and Mr. Davis did was an attempt -- can be

9  considered an attempt to intimidate any of the plaintiffs.  In

10  other words, because the attempt is unlawful, you don't have

11  to have a plaintiff up here saying Mr. Somerville's --

12  Mr. Somerville's mass challenge intimidated me.

13       The -- for -- if Mr. Somerville implemented a mass

14  challenge in conjunction with Mr. Davis, which he did, then

15  the question is --

16       THE COURT:  If it's unlawful, why are these people

17  not prosecuting them for violating the law?  Federal law?

18       MR. NKWONTA:  Well, the absence of prosecution by any

19  entity, I can't speak to all the reasons that go towards it,

20  but it's certainly not evidence --

21       THE COURT:  Oh, I'm going to ask them about that.

22  That's one of the questions I was going to ask them about.

23       MR. NKWONTA:  Okay.  So going back to your question.

24  An attempt to intimidate means that if the result, if the

25  natural result is intimidation, then that is also a Section

1   11(b) violation.

2          THE COURT:  I grant you they don't have to ask

3   them --

4          MR. NKWONTA:  And then --

5          THE COURT:  I don't know if I agree with Mr. Evans

6   when he said they have to know about it.  I agree -- we had a

7   discussion one time before, the attempt can mean they don't

8   know about it, it was an attempt to be done, which leads to

9   the question, though, is that -- well, go ahead, finish.  I'll

10  ask them the question.

11         MR. NKWONTA:  Certainly.

12         And I'd also like to point out that Mr. Johnson

13  challenged 2,300 voters in Jackson County.  That's in our

14  deposition designations.

15         So when I talk about the attempt --

16         THE COURT:  Is Jackson County one of the counties

17  that we're dealing with here?

18         MR. NKWONTA:  When you say "one of the counties we're

19  dealing with," I have to ask for clarification, Your Honor,

20  because our -- the case and the challenge -- the claim for

21  voter intimidation is not county by county.  It's not limited

22  to county.  The question is whether defendants' conduct caused

23  voter intimidation.

24         And the attempt to cause voter intimidation, how you

25  determine whether voter intimidation resulted, you can

1  determine that without someone saying this person intimidated

2  me.

3          THE COURT:  I agree with you there.

4          MR. NKWONTA:  And the answer, the way you determine

5  that is you ask whether that conduct itself, whether the

6  natural result is intimidation.  So how do we know that the

7  natural result of those types of challenge is intimidation?

8          Well, one, we can look to what the plaintiffs said

9  was their reaction when they found out, number one.

10         Number two, you can also look to Dr. Burton's

11 historical context as to all of -- the history of intimidation

12 that has resulted from similar actions in the past.  In other

13 words, there can be very little question that challenging

14 voters, especially on a broad scale, results in intimidation,

15 naturally results in intimidation.

16         And so the question the Court needs to answer is

17 whether it's actionable.  But I don't think there's any

18 dispute that challenging voters, even just from personal

19 practical experience, from the testimony, from what Dr. Burton

20 mentioned, I don't think.

21         There's any dispute that challenging voters,

22 individually or in a broad scale, the natural result of that

23 is intimidation because they believe they did something wrong.

24 They believe they acted unlawfully.

25         THE COURT:  So what if I challenge one person and

1   they feel intimidated, under Georgia law, that is not a

2   violation.

3        In other words, your argument I think -- I thought it

4   was, is the mass intimidation.  But if you're tell -- because

5   if you're just -- you're telling me one person.  I agree with

6   you, anybody tells you -- if you go down there and say I'm

7   challenging you, yeah, you're going to feel like what did I do

8   wrong, did I violate the law, but...

9        MR. NKWONTA:  It's both, Your Honor.  It's both the

10  mass challenge, but the individual challenge can be

11  intimidating.  The question is whether it's actionable under

12  Section 11(b).

13       So I have addressed the mass knowledge, but now I

14  want to address how an individual challenge can be

15  intimidating.

16       Individual challenge that is baseless can be

17  intimidating under Section 11(b) because it's not protected.

18  It's no longer protected activity.  It's no longer protected

19  speech.  And it's no longer a protected petition when an

20  individual asserts a frivolous challenge.

21       And so when that conduct is not protected, then you

22  have to look at the impact on the voter.  And there's no

23  concern of interpreting this too broadly and having a wide

24  reach, because the Court can be assured that an individual

25  challenge that is -- that is meritorious, or that is based on

1    quality information, or that -- that is reasonably founded and

2    reasonably directed towards individual -- that provides

3    evidence that is at least sufficient to demonstrate or suggest

4    that somebody might -- you know, might not be eligibly voting,

5    the Court can determine whether that type of a challenge was

6    protected.

7            But we know that a frivolous challenge, or a

8    challenge that's baseless or a challenge that has no chance of

9    success, we know that type of challenge is not protected.  And

10   the Court does not -- does not put itself in a position where

11   it has to make a ruling on all challenges, because we're

12   focusing on what it is that makes these challenge unlawful.

13           And there are specific aspects or characteristics of

14   these challenges that make them unlawful that would not

15   necessarily apply to every single suggestion 230 challenge

16   that someone sends, or a challenge that you send to your

17   neighbor based on individualized knowledge that you have of

18   your neighbor.

19           So is a challenge to your neighbor, someone across

20   the street, based on your individualized knowledge?  Does

21   that -- you know, is that a legitimate section 230 challenge?

22   I could see many instances -- or most instances of when that

23   could be.  Is a challenge to voters where you didn't even look

24   at the challenge list before it went up, didn't even know it

25   went up until after the fact, is that a legitimate 230

1   challenge?  Of course not.

2            THE COURT:  That's why Mr. Williams is not part of

3   this group.  But Davis, Somerville, Johnson, Cooper.

4            MR. NKWONTA:  Yes.  So I've talked about Mr. Davis

5   and Mr. Somerville and how they're challenging 40,000

6   individuals is -- if not anything, an attempt, because we know

7   that that type of conduct naturally results in intimidation.

8            Mr. Cooper and Mr. Johnson were instrumental in

9   recruiting challengers.  In other words, our argument is that

10  they were instrumental in the effort with True the Vote, along

11  with Mr. Davis and Mr. Somerville.  We believe they

12  collaborated with True the Vote.  We presented evidence of 60

13  pages of text message communications between True the Vote and

14  Mr. Davis and Somerville coordinating on the challenges,

15  coordinating on what to tell the challengers, coordinating on

16  which counties to sue if the counties rejected their

17  challenges.

18           And that goes back to another point, Your Honor.

19  These individuals --

20           THE COURT:  Slow it down.

21           MR. NKWONTA:  Sorry.

22           That goes back to another point, Your Honor.  These

23  individuals expected the voters to be addressed.  They

24  expected counties to hold hearings because they planned to sue

25  Cobb County if Cobb County dismissed the challenges.  And what

1   these individuals were trying to effectuate was not just the

2   list that the county would look at and toss away.  It was a

3   list that the counties would act on and they advocated for

4   this.  And when counties chose not to act on it, they

5   considered filing lawsuits.

6        And without the recruitment -- because True the

7   Vote's challenge effort was a significant undertaking.  You

8   may recall that I asked Ms. Engelbrecht, when did this start.

9   It started the second week of December.  When were the

10  challenges issued.  About a week.  Being 360, what came out to

11  250,000 challenges about a week later.

12       Recruiting challengers in at least 65 counties, maybe

13  more.  It was a massive effort.  It's not anything that True

14  the Vote and Ms. Engelbrecht, who was the only True the Vote

15  employee at the time, could have done by themselves.  In order

16  to effectuate this, in order to make this plan go forward,

17  they needed the assistance and the collaboration of these

18  individuals that you named, Mr. James Cooper, Mr. Ron Johnson,

19  Mr. Marc Williams, Mr. Davis Somerville -- Mr. Mark Davis and

20  Mr. Derek Somerville.  And all of these individuals

21  collaborated on True the Vote challenges.

22       So going back to sort of the evidence, and I'll try

23  to stick to the individuals you mentioned.

24       I think what Your Honor may have been looking for is

25  sort of a direct link between a plaintiff's testimony and --

1  well, I don't want to presuppose what you're your Honor would

2  be looking for.

3          THE COURT:  Make your argument.

4          MR. NKWONTA:  But what Mr. Davis and Mr. Somerville's

5  challenge effort shows is one, they collaborated with True the

6  Vote in a challenge effort that we know is rife with errors,

7  flawed, and impermissible and unlawful.

8          Then they filed their own set of challenges to -- or

9  submitted their own set of challenge that would go to 40,000

10 voters.

11         That type of activity, the natural result is

12 intimidation.  And even if there's nobody here to say

13 Mr. Davis was the one who caused my intimidation, we have

14 people here to say challenges caused my intimidation.  We have

15 an expert here to say challenges cause intimidation.

16         And then Mr. Johnson and Mr. Cooper, True the Vote

17 could not have conducted this challenge effort without them.

18 They recruited these individuals.  They collaborated in this

19 effort.  Mr. Cooper sent e-mails to prospective challengers to

20 try to convince them to lend their name and signature to this

21 challenge effort.

22         And the way he convinced them to do that, the way he

23 convinced them to sign their name without even seeing the

24 challenge list, is that he told them if we had done this in

25 October, Trump would still be in office.  The Court remembers

1   that e-mail.  That's how Mr. Cooper tried to convince these

2   individuals.

3          You saw e-mails going out saying 500,000 people are

4   on the list that should not be there.  99.9 percent of these

5   individuals are ineligible to vote.  You saw all of those

6   e-mails.

7          Those e-mails didn't just come from Ms. Engelbrecht.

8   Those e-mails didn't just come from True the Vote.  They came

9   from all of these individuals.

10          THE COURT:  Bring it to a conclusion here.

11          MR. NKWONTA:  So bringing this to a conclusion, Your

12   Honor, we have demonstrated all of the elements that the Court

13   identified in the summary judgment order and more.

14          One, these challenges were reckless.  And how do we

15   know they were reckless?  We know they were reckless because

16   they were submitted two weeks sometimes --

17          THE COURT:  What if I said to you -- and I won't be

18   specific -- you've probably got a strong argument on the

19   reckless.

20          MR. NKWONTA:  Then we also know that individuals were

21   challenged.  Mr. Scott Berson got on the stand and said --

22   sorry, we know individuals who were challenged, who were

23   intimidated.  Mr. Scott Berson --

24          THE COURT:  To be fair, I'm not necessarily saying

25   you have a strong argument on reckless when it comes to Davis,

1    Somerville, Johnson and Cooper.

2            MR. NKWONTA:  And the reason we know why those

3    challenges were reckless is because, as Mr. Germany testified

4    and as we know from the law, the determination of residency is

5    a multifactor complex test of which intent is a particularly

6    important portion.

7            In other words, if you look at the statute and you

8    look at all of the elements of residency and ask yourself, can

9    NCOA tell us -- and the statute is 21-2-217, there are 15

10   factors in that statute.  Can NCOA tell us anything we need to

11   know about all those factors or how a county should combine

12   those factors.  It cannot.

13           And that's why Mr. Germany said, and he testified

14   that merely submitting a list to county election officials is

15   not -- does not come close to meeting the standard.  That's

16   exactly what Mr. Davis and Mr. Somerville did.

17           It does not come close to meeting the standard for

18   challenges.  And it does not come close to meeting the

19   standard for --

20           THE COURT:  I don't think he used the word

21   "standard."  I think his words were not efficient, was not the

22   proper way to proceed and obtain probable cause on these

23   matters.

24           MR. NKWONTA:  I'm sorry.  Can you repeat that, Your

25   Honor?

1        THE COURT:  I don't think he used the word

2   "standard."  I think he used the word that it was not -- he

3   told the True the Vote people that it was not efficient, not

4   correct way to proceed on making challenges.  And he felt they

5   would not meet the probable cause aspect and he would inform

6   any board of election attorney that called him they would

7   probably not meet probable cause, but I don't think he used

8   the word "standard."

9        MR. NKWONTA:  Well, let's say he didn't use the word

10  "standard."  We know he used the word "probable cause."

11       THE COURT:  He used probable cause.  He definitely

12  used probable cause.

13       MR. NKWONTA:  If it lacks probable cause, that let's

14  you know that it is not sufficient and it was reckless.

15       And then, lastly, we -- when you look at the conduct

16  of Mr. Cooper and Mr. Johnson, and both in -- Mr. Johnson

17  filed challenges to 2300 individuals in Jackson County, or

18  recruiting individuals to challenge, their conduct was

19  reckless in facilitating True the Vote's challenges and

20  telling challengers who signed on that 99.9 percent of those

21  individuals were -- were not eligible and telling them Trump

22  would have won if they had conducted these challenges before

23  the general election.  And it's telling that both Mr. Davis

24  and Mr. Somerville, as the evidence in our deposition

25  designations show, were not willing or did not elect to put

1   their names on their own challenges in their own counties

2   where they were eligible challengers.  They let somebody else

3   do that.

4           Thank you, Your Honor.

5           THE COURT:  Thank you, sir.

6           Come on up, Counsel.

7           MS. PAIKOWSKY:  Can I ask for the Court's indulgence

8   for one moment?

9           THE COURT:  Take your time.

10          MS. PAIKOWSKY:  Thank you very much, Your Honor.

11          THE COURT:  Counsel has argued that just relying on

12  the NCOA is automatically -- I don't want to use the word

13  "automatic," but it's illegal, just the mere fact that you're

14  just relying on that is illegal to proceed in a challenge.

15          MS. PAIKOWSKY:  Your Honor, I want to be careful here

16  in talking about --

17          THE COURT:  I understand.

18          MS. PAIKOWSKY:  -- the significance of relying on

19  NCOA data alone and disentangling the significance of the NVRA

20  in this context and violating the NVRA overall.

21          It is the Department of Justice's position that not

22  all voter challenges violate Section 11(b).  To begin, I think

23  it is important to say that.  And -- but it also true, and

24  courts have found that private citizens cannot use voter

25  challenges as a means to subvert the NVRA.

1          Now, that is a distinct question from whether those

2     attempts give rise to a violation of Section 11(b).  And so

3     here we would say that defendants' knowledge of whether they

4     were attempting to subvert federal law, of the rationales

5     behind federal law could be probative here.  And we'd also say

6     that the rationales themselves are probative.  So the reason

7     why the 90-day quiet period exists is to protect voters

8     against erroneous removals and so --

9          THE COURT:  The 90-day requirement, you can't remove

10    people from the voter list.  It doesn't say you can't

11    challenge people.  It says you cannot remove people.  The

12    State of Georgia cannot, 90 days within an election, purge

13    anyone unless the person dies or the person themselves

14    contacts and consents in writing to have their name removed.

15         But it does not say you can't challenge someone

16    within the 90 days.  Because if it did, 21-2-230 would be

17    conflicting with the federal law.  And as you-all know,

18    federal law preempts state law.

19         MS. PAIKOWSKY:  Correct, Your Honor.

20         So I guess what I was trying to say is that it is --

21    it would be our position, right, that like the State could not

22    affect a systematic removal using NCOA data alone through the

23    vehicle of a voter challenge.

24         THE COURT:  I agree.

25         MS. PAIKOWSKY:  And under federal law, we highly

1  regulate the process by which a person can be removed from the

2  rolls based on NCOA data, so --

3         THE COURT:  I'm putting you in a very unfair spot but

4  that's the way it goes when you become a lawyer.  They pick

5  you to come up here to be the one.

6         MS. PAIKOWSKY:  So I think what I'm trying to say is

7  that under federal law, you are correct, that a person cannot

8  be removed from the rolls based on NCOA data alone.  I think

9  that under Section 11(b), which demands a totality of the

10  circumstances inquiry, the Court has to pay attention to a few

11  things.  The natural consequences of the defendant's action.

12         THE COURT:  I agree.

13         MS. PAIKOWSKY:  So if a defendant, for example, files

14  a mass voter list using NCOA data alone --

15         THE COURT:  Is that in itself automatically a

16  violation of the law?

17         MS. PAIKOWSKY:  A violation of Section 11(b)?

18         THE COURT:  Yeah.

19         MS. PAIKOWSKY:  The Court would have to make a few

20  other findings after that.

21         THE COURT:  After that.

22         MS. PAIKOWSKY:  So first it would have to find that

23  that act had a likely consequence -- or the natural

24  consequence of that action would be to coerce, intimidate, or

25  threaten a voter.  And each one of those words has its own

1  definition that is important.

2        So if it coerces voters by nullifying their intent to

3  vote, or deprive them of the opportunity to vote, that could

4  plausibly meet the standard.

5        If it intimidates a voter, again, because it --

6        THE COURT:  I agree with you.  It's not just filing

7  based on NCOA.  You're right, you have to look at all these

8  other aspects.

9        MS. PAIKOWSKY:  Correct.

10        And then the other part of this that I think we do

11  want to emphasize, and this is going to the significance of

12  knowledge, and, again, we're not taking any position on the

13  facts of this case.  We're not here in favor of either party.

14        But the significance of knowledge could be, well, if

15  I understood the natural consequences of my actions would be

16  to burden election officials, which could have the consequence

17  of depriving people of their right to vote, could directly

18  deprive people of their right to vote by putting them in a

19  position where they couldn't answer a challenge or where they

20  knew that a list was error prone.  And that actually

21  transitions into something that I think we did really want to

22  clarify is the significance of the finding of recklessness.

23        So in this context, we believe that a finding of

24  falsity and reckless falsity is most relevant to the First

25  Amendment defenses here.

1          THE COURT:  That's why I was going to talk to you

2     about the First Amendment aspects.  But you're right.  You and

3     I are on the same page on the reckless part.  And that's why I

4     say Davis, Somerville, Johnson, Cooper.

5          Because under the First Amendment, free speech, does

6     11(b) completely say you can't do this?  Does it still

7     recognize free speech rights?

8          MS. PAIKOWSKY:  I'm sorry, Your Honor --

9          THE COURT:  Does 11(b) recognize free speech rights?

10         MS. PAIKOWSKY:  I'm so sorry, Your Honor.  From the

11    beginning of the question?

12         THE COURT:  11(b) of the Civil Rights Act, does it

13    not recognize that individuals have free speech rights?

14         MS. PAIKOWSKY:  Of course, Your Honor.

15         THE COURT:  All right.

16         MS. PAIKOWSKY:  Of course.

17         THE COURT:  Where is the limitation?  I admit free

18    speech don't allow you to say or do anything you want.  Where

19    does the DOJ, representing the United States of America, say

20    when you go forth this line, you're violating 11(b).

21         MS. PAIKOWSKY:  Of course, Your Honor.

22         THE COURT:  Is it --

23         MS.PAIKOWSKY:  And I'm also happy --

24         THE COURT:  Go ahead.

25         MS. PAIKOWSKY:  I'm also happy to provide additional

1  briefing to the Court on this later on if it would be helpful.

2       But as we explained in our briefing, to the extent

3  that the Court finds that the challenge conduct here gives

4  rise to a violation and is speech, there are few possible

5  exceptions that could apply.  And then also, in any event,

6  Section 11(b) --

7       THE COURT:  I need those exceptions.

8       MS. PAIKOWSKY:  So we'll start with the exceptions.

9       Exception No. 1 is that in this case we're talking

10  about likely speech integral to illegal conduct.  So in

11  this -- in this case --

12       THE COURT:  Again, I apologize to you.  I didn't get

13  you forewarning.  So Mr. Evans knew what he was going to do,

14  he already had his brief ready.  The plaintiffs kind of knew

15  this was coming.  So if you want to put this in a brief to me,

16  I will.  But remember, blame them.  They are the ones that put

17  you up here.

18       MS. PAIKOWSKY:  Yeah, no, no.  Of course.  We're

19  happy to answer the Court's questions.  And we're also happy

20  to supplement with a brief.

21       With the speech integral to illegal conduct, many

22  courts have found, for example, that intimidation or fraud

23  under statutes, even if they use speech to effect the conduct,

24  that speech does not inoculate unlawful behavior simply

25  because speech is the vehicle through which it is used to

1   create the impact.

2          So insofar as the challenged conduct here is filing

3   voter challenges, i.e., something where the defendants here

4   expected to effect a process, or have an impact, that is

5   primarily conduct and the fact that they use speech through

6   which to effect that conduct would make it consistent with the

7   speech integral to a legal conduct exception.

8          The second exception that we think applies is the

9   false and reckless -- false -- recklessly false speech

10  exception.  And under that exception, we have -- courts have

11  found --

12         THE COURT:  Would you say putting names on Facebook

13  or Google falls under that exception?

14         MS. PAIKOWSKY:  The conduct exception?

15         THE COURT:  Right.

16         MS. PAIKOWSKY:  It could, Your Honor.  I mean, if the

17  defendants were using Facebook as a means to intimidate

18  voters, then intimidation would be the sort of outcome of that

19  action.

20         THE COURT:  What if -- what if I was a United States

21  senator or a United States representative or a state

22  representative or a state senator or a form of one of those,

23  and I got on Fox or CNN, MSNBC or on any network you name, and

24  I said we're going to put an end to all these people voting

25  illegally and all these people double voting and all these --

1   counting all these dead people, we're going to put an end to

2   that.  And 10 million people heard me say that, would I be

3   intimidating people?

4        MS. PAIKOWSKY:  Your Honor, this is why Section 11(b)

5   demands a fact and conduct-specific inquiry for everything

6   that's posted.  And one of the things that I think maybe I'll

7   skip to, because I think it's especially relevant here, is

8   that Section 11(b) is Constitutional because it survives any

9   level of scrutiny.  And this Court has the ability to provide

10  a remedy that is narrowly tailored and specifically aimed at

11  the exact conduct that gives rise to the violation.

12       So if the Court believed that, for example,

13  Mr. Somerville's Facebook post was intimidating because it

14  threatened to publicly release names and subject people to

15  public approbation, which is something the Court may consider

16  in these cases, but that his voter challenge list was accurate

17  and it was not false or recklessly false, then the Court could

18  say -- could provide a narrow remedy that targets the release

19  of names of vote -- specific voters.  And there are other

20  courts that have -- have issued such targeted remedies.

21       And the reverse is also true.  In the event that the

22  Court thinks that those posts are benign, that they didn't

23  intimidate anybody, that they didn't reach anyone, then the

24  Court could tailor its remedy, again, to only the specific

25  behavior, the specific conduct that it thinks gave rise to the

1  violation.

2          THE COURT:  At this point in time I have heard

3  absolutely nothing that leads me to think 11(b) is

4  unconstitutional.

5          MS. PAIKOWSKY:  Well, we agree, Your Honor.

6          THE COURT:  But it's not over yet, though.  Thank

7  you.

8          MS. PAIKOWSKY:  All right.  Thank you very much, Your

9  Honor.

10          THE COURT:  A five-minute reply.  It's 12:29.

11          MR. EVANS:  You're going to put me on a timer, Judge.

12          All right.  I'll be very quick.

13          First, we've got to think about what's before the

14  Court.  This is not an eligibility case.  We're not

15  challenging the eligibility of the voters.  There's been a lot

16  of statements about NCOA is not enough to find probable cause.

17  It's definitely -- filing a voter challenge based upon NCOA is

18  not illegal.  There is nothing that says it's illegal.  That's

19  a false statement.  I would love to see a case that says it

20  doesn't -- it needs to be a statute if it's going to say it's

21  criminal.

22          The second thing is that what's not before the Court

23  is a challenge to the NVRA.  We're not challenging the NVRA.

24  So let's just take those off the table.

25          Taking those off the table, First Amendment comes

1  into play if there is a possibility that the underlying

2  elements for Section 11(b) have been met and it infringes upon

3  a First Amendment right.

4        My point to the Court is we don't need to get to

5  First Amendment.  The elements have not been met as to

6  Somerville, Johnson, Davis, and Cooper.

7        And I'm going to start easy -- and I don't want to

8  say any of them are hard, because all of them are easy.  James

9  Cooper, Ron Johnson, they haven't even hardly been met in

10  this -- mentioned in this case.  They're not in the record in

11  the case.  There is no witness that has said that they know

12  their name, that they are in a county in which these folks

13  challenge them.  They -- no dispute.  The plaintiffs cannot

14  show by a preponderance of the evidence that Ron Johnson or

15  James Cooper directed any communication at anyone, through a

16  third-party directed any communication at anyone, through a

17  causal link, created anyone to be intimidated, period.

18        The only time we get into mass challenges being

19  relevant is if there is an underlying -- the Court finds that

20  there was an underlying attempt to intimidate.  There is

21  nothing in the record that shows that either Ron Johnson or

22  James Cooper attempted to intimidate anyone.  That they were

23  involved with any mass challenge.  The analysis on them is

24  easy.

25        The record is closed as to the plaintiffs.  I heard

1  plaintiffs' counsel mention a couple of times "Mr. Somerville

2  is going to say," no.  There is no "Mr. Somerville is going to

3  say."  Their case is over.  There is no further evidence.

4  They rested their case.

5       The only analysis before the Court right now is what

6  was in their case.  The Court draws no inferences in favor of

7  them.  This isn't summary judgment.

8       So as to Mr. Johnson and Mr. Cooper, nothing in the

9  record shows that plaintiff by a preponderance of the

10 elements -- the preponderance of the evidence has met the

11 elements necessary for 11(b).  First Amendment right is

12 irrelevant.

13      Mr. Davis.  Nothing's in the record that says

14 Mr. Davis directed, or through a third party attempted to

15 direct, any communication to any voter.  Mr. Somerville may

16 have went through the analysis that they underwent, which was

17 a methodical analysis where they did not stop at NCOA.

18      The evidence shows -- and nothing in the evidence

19 contradicts this, so the judge really doesn't have to weigh

20 the evidence -- that he went through a multi-pronged approach

21 to narrow down the voters that he would ultimately challenge.

22 He was completely uninvolved with Muscogee County.  He was

23 uninvolved with Mr. Bowling.

24      There is nothing that shows in any way that any

25 action that he took attempted to intimidate.  There's been a

1    couple of statements, both by the DOJ and I believe

2    plaintiffs' counsel, that a Facebook post somehow maybe

3    intimidated somebody.

4         A couple of factors.  Facebook is limited to the

5    people who are your friends.  You can only have 5,000 friends.

6    I don't know how many Mr. Somerville has, I bet it's less than

7    5,000.  There is no post where he posted the names of any

8    people that he challenged.

9         The only post that I saw was something about Stacey

10   Abrams, absentee ballot.  That is completely irrelevant to

11   suggesting if you vote, violate the law, you're going to be

12   prosecuted, I'm going to come after you, I'm going to

13   challenge you.  That's not in the record.

14        So taking off, one, he didn't do a mass challenge.

15        Two, there's nothing in the record.  In fact, the

16   record directly contradicts any statement that he attempted to

17   intimidate anyone.  That's out.

18        So we go to, did he direct, or through a third party,

19   cause anyone in this case to be reasonably intimidated.  Your

20   Honor correctly went to recklessness.  Your Honor has

21   correctly evaluated whether or not you did a very methodical

22   approach which included inquiries in addition to the NCOA,

23   which Mr. Somerville got on the stand and testified that he

24   did.

25        Him and Mr. Davis, even though the record is very

1  lean for Mr. Davis, him and Mr. Davis did do some analysis

2  together.  That analysis also showed that Mr. Davis, included

3  within that same analysis, the multiple-prong approach.

4       So as to James Cooper, Ron Johnson, there's nothing

5  in the record that shows they attempted in any way to

6  intimidate anyone or do a mass challenge.  That's over.  There

7  is nothing in the record that shows they directed --

8       THE COURT:  Ms. Wright's informed me that's your

9  time.  So finish that sentence.

10       MR. EVANS:  Okay.

11       THE COURT:  Don't make it a long, long sentence.

12       MR. EVANS:  It's going to be kind of long.

13       But there's nothing that indicates that Mr. Cooper or

14  Johnson in any way directed anything at any defendant (sic) or

15  caused anyone to be intimidated.  They should be dismissed.

16       Mr. Davis, Mr. Somerville engaged in a very

17  methodical, multi-pronged analysis.  They did not direct any

18  communication to any defendant (sic).  They didn't cause any

19  defendant (sic) to be intimidated.  And in no way can what

20  they did be suggested as reckless.  They should be dismissed

21  from this case, Judge.

22       THE COURT:  Thank you, Mr. Evans.

23       MR. EVANS:  Thank you.

24       THE COURT:  Here's what the Court's going to do.  At

25  different points during the trial, I can rule on a 52(c).  At

1    this point in time, I'm not going to grant the motion.  I want

2    to read your brief.

3         If you want to file a brief, you can.  You answered

4    the questions I had, though.  So I'll read it, obviously, if

5    you file one.

6         But your brief is not more than 25 pages; right?

7         MR. EVANS:  It's not more than 25 pages, Your Honor.

8         THE COURT:  If you decide to file a brief, 25 pages

9    or less.

10        MS. PAIKOWSKY:  Thank you, Your Honor.

11        I also realized that we -- you had asked a question

12   previously during colloquy about our lack of participation in

13   this.  And if that's something you are interested in, the

14   Department of Justice, as a general rule, does not believe

15   that our decision to -- our prosecutorial decisions are

16   significant, especially in Voting Rights Act cases.  It was

17   the intent of the Voting Rights Act to allow private citizens

18   to have an ability to enforce the Voting Rights Act and also

19   our prosecutorial decisions are subject to many factors.  That

20   is all we want to emphasize for the Court.  And if you'd like

21   any additional brief, I'm happy to provide it.

22        THE COURT:  I think, again, you answered every

23   question I had.  But I'm going to give plaintiffs' counsel an

24   option to file a 25-page or less brief, I want to give you the

25   same option.

1        MS. PAIKOWSKY:  Thank you, Your Honor.

2        THE COURT:  Thank you.

3        MR. NKWONTA:  That was my question to Your Honor.

4        THE COURT:  Okay.

5        All right.  Mr. Wynne, Mr. Evans, and Mr. Powell, be

6   prepared to present your first witness at 1:45 today, okay?

7   Everybody have a good lunch.  Thank you.

8        (The hearing concluded at 12:35 p.m.)

9        (Change of court reporter.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    C E R T I F I C A T E

2

3    UNITED STATES DISTRICT COURT

4    NORTHERN DISTRICT OF GEORGIA

5

6        I do hereby certify that the foregoing pages are a true
     and correct transcript of the proceedings taken down by me in
7    the case aforesaid.

8        This the 3rd day of November, 2023.

9

10

11

12

13                   /s/Viola S. Zborowski _____
                     VIOLA S. ZBOROWSKI,
14                   RDR, FAPR, CMR, CRR, RPR, CRC
                     OFFICIAL COURT REPORTER TO
15                   THE HONORABLE STEVE C. JONES

16

17

18

19

20

21

22

23

24

25
```

## $

**$40,000** [1] - 1345:20

## '

**'60S** [1] - 1404:4

## /

**/S/VIOLA** [1] - 1434:13

## 1

**1** [1] - 1424:9
**1-10** [1] - 1305:8
**10** [2] - 1369:2, 1426:2
**10,000** [2] - 1333:23, 1333:25
**10:25** [1] - 1369:6
**11(B** [18] - 1385:17, 1385:19, 1386:4, 1386:5, 1396:8, 1405:2, 1409:1, 1411:17, 1421:9, 1421:17, 1423:6, 1423:9, 1423:12, 1424:6, 1426:4, 1426:8, 1427:3, 1428:2
**11(B)** [7] - 1387:14, 1405:1, 1411:12, 1419:22, 1420:2, 1423:20, 1429:11
**115** [1] - 1357:3
**11:30** [1] - 1324:19
**12** [1] - 1386:14
**12:29** [1] - 1427:10
**12:35** [1] - 1433:8
**1309** [1] - 1307:3
**1327** [1] - 1307:4
**1332** [1] - 1307:5
**1361** [1] - 1307:5
**1369** [1] - 1307:6
**15** [3] - 1369:2, 1379:20, 1417:9
**16TH** [1] - 1346:13
**18** [1] - 1353:9
**1:45** [1] - 1433:6

## 2

**2** [2] - 1393:11, 1401:5
**2,300** [1] - 1409:13
**2020** [4] - 1333:3, 1359:24, 1370:8, 1370:18
**2021** [2] - 1370:8, 1379:4
**2022** [2] - 1379:7, 1380:1
**2023** [2] - 1305:11, 1434:8
**21-2-217** [1] - 1417:9
**21-2-230** [3] - 1359:1, 1401:3, 1420:16
**230** [15] - 1385:23, 1386:3, 1401:7, 1401:12, 1401:13, 1401:20, 1401:24, 1401:25, 1407:1, 1407:2, 1412:15, 1412:21, 1412:25
**2300** [1] - 1418:17
**238** [1] - 1308:4
**25** [4] - 1326:21, 1432:6, 1432:7, 1432:8
**25-PAGE** [1] - 1432:24
**250,000** [1] - 1414:11
**29TH** [1] - 1353:6

## 2:20-CV-0302-SCJ [1] - 1305:4

## 3

**3** [1] - 1305:11
**30** [7] - 1357:21, 1357:22, 1357:23, 1357:25, 1358:14, 1359:2, 1381:15
**32,000** [12] - 1349:20, 1352:13, 1354:13, 1356:16, 1357:18, 1357:24, 1358:5, 1358:9, 1358:13, 1358:24, 1359:2, 1363:8
**32,000-PLUS** [1] - 1355:8
**350,000** [1] - 1396:11
**360** [1] - 1414:10
**360,000** [1] - 1360:1
**365,000** [1] - 1403:4
**370,000** [1] - 1358:25
**38** [5] - 1308:5, 1308:14, 1308:16, 1308:18, 1332:8
**39** [1] - 1397:15
**39,000** [1] - 1397:15
**3RD** [1] - 1434:8

## 4

**4** [1] - 1321:12
**40,000** [2] - 1413:5, 1415:9

## 5

**5** [2] - 1353:6, 1379:19
**5,000** [2] - 1430:5, 1430:7
**50,000** [1] - 1389:25
**500,000** [1] - 1416:3
**51** [1] - 1387:6
**52(C** [1] - 1383:10
**52(C)** [2] - 1399:15, 1431:25
**5TH** [2] - 1353:23, 1354:1

## 6

**6** [3] - 1305:3, 1357:3, 1371:1
**60** [1] - 1413:12
**65** [1] - 1414:12
**67** [1] - 1346:9

## 7

**7,000** [1] - 1371:1
**71** [2] - 1334:10, 1334:13
**76** [1] - 1379:19

## 8

**8** [1] - 1376:3
**86** [12] - 1337:16, 1339:23, 1340:4, 1340:15, 1344:8, 1344:25, 1367:12, 1367:13, 1367:14, 1367:15, 1367:16, 1374:18

## 9

**9** [1] - 1308:1

**90** [2] - 1420:12, 1420:16
**90-DAY** [2] - 1420:7, 1420:9
**99.9** [2] - 1416:4, 1418:20

## A

**A.M** [2] - 1305:3, 1308:1
**A.M** [1] - 1369:6
**ABILITY** [5] - 1363:11, 1387:14, 1401:11, 1426:9, 1432:18
**ABLE** [14] - 1314:20, 1322:18, 1322:22, 1336:3, 1342:13, 1342:19, 1345:17, 1354:1, 1355:15, 1356:10, 1356:13, 1386:23, 1400:13, 1400:14
**ABRAMS** [1] - 1430:10
**ABSENCE** [1] - 1408:18
**ABSENTEE** [5] - 1391:3, 1391:12, 1391:15, 1400:13, 1430:10
**ABSOLUTELY** [3] - 1319:12, 1405:11, 1427:3
**ABUNDANCE** [1] - 1325:7
**ABUNDANTLY** [1] - 1384:12
**ACCEPT** [2] - 1325:1, 1356:16
**ACCESS** [2] - 1373:8, 1404:4
**ACCESSIBLE** [1] - 1400:4
**ACCORDING** [2] - 1365:25, 1407:21
**ACCOUNT** [2] - 1373:20, 1378:13
**ACCURATE** [4] - 1349:12, 1351:21, 1392:12, 1426:16
**ACT** [5] - 1386:4, 1423:12, 1432:16, 1432:17, 1432:18
**ACT** [4] - 1359:22, 1414:3, 1414:4, 1421:23
**ACTED** [1] - 1410:24
**ACTION** [5] - 1384:8, 1421:11, 1421:24, 1425:19, 1429:25
**ACTIONABLE** [2] - 1410:17, 1411:11
**ACTIONS** [3] - 1404:19, 1410:12, 1422:15
**ACTIVELY** [1] - 1318:19
**ACTIVITY** [2] - 1411:18, 1415:11
**ACTUAL** [6] - 1357:17, 1372:21, 1373:17, 1373:22, 1402:12, 1402:14
**ADD** [2] - 1349:4, 1359:1
**ADDITION** [1] - 1430:22
**ADDITIONAL** [7] - 1319:20, 1388:8, 1389:1, 1396:16, 1400:14, 1423:25, 1432:21
**ADDITIONALLY** [2] - 1393:3, 1394:17
**ADDRESS** [3] - 1393:8, 1393:9, 1393:10
**ADDRESS** [7] - 1355:6, 1355:12, 1357:16, 1391:16, 1397:17, 1401:5, 1411:14
**ADDRESSED** [4] - 1354:4, 1354:7, 1411:13, 1413:23
**ADDRESSES** [4] - 1347:5, 1347:6, 1347:17, 1347:18
**ADMISSIBLE** [1] - 1341:7
**ADMIT** [1] - 1423:17
**ADMITTED** [7] - 1308:16, 1341:8,

1345:2, 1387:23, 1388:1, 1389:4, 1393:12

**ADULT** [2] - 1315:13, 1315:16

**ADVERSE** [3] - 1380:25, 1381:2, 1383:19

**ADVISED** [1] - 1323:11

**ADVISEMENT** [1] - 1396:21

**ADVOCATE** [3] - 1361:7, 1361:8

**ADVOCATED** [1] - 1414:3

**AFFECT** [1] - 1420:22

**AFFECTS** [1] - 1321:15

**AFORESAID** [1] - 1434:7

**AFTERNOON** [1] - 1368:9

**AGENDA** [1] - 1345:18

**AGO** [2] - 1310:3, 1316:18

**AGREE** [18] - 1319:18, 1320:3, 1321:25, 1357:7, 1359:6, 1359:10, 1376:12, 1376:21, 1404:5, 1404:16, 1409:5, 1409:6, 1410:3, 1411:5, 1420:24, 1421:12, 1422:6, 1427:5

**AGREED** [3] - 1349:16, 1378:19, 1391:5

**AGREEING** [1] - 1380:21

**AH** [2] - 1377:18, 1378:10

**AHEAD** [7] - 1331:8, 1388:9, 1401:17, 1401:18, 1407:15, 1409:9, 1423:24

**AILEEN** [1] - 1306:5

**AILMENTS** [1] - 1321:13

**AIMED** [1] - 1426:10

**AIN'T** [1] - 1324:3

**AIR** [2] - 1347:6, 1347:18

**ALABAMA** [3] - 1326:2, 1330:21, 1388:4

**ALLEGATION** [1] - 1327:4

**ALLEGED** [6] - 1387:10, 1389:18, 1391:10, 1393:4, 1395:12, 1396:11

**ALLEGEDLY** [3] - 1341:22, 1387:21, 1388:25

**ALLEGES** [3] - 1392:4, 1392:8, 1392:24

**ALLEGRA** [1] - 1305:15

**ALLOW** [8] - 1342:15, 1345:2, 1363:2, 1382:11, 1401:2, 1423:18, 1432:17

**ALLOWS** [2] - 1401:7, 1401:9

**ALONE** [8] - 1384:24, 1387:13, 1397:20, 1400:12, 1419:19, 1420:22, 1421:8, 1421:14

**ALTON** [2] - 1376:12, 1376:21

**AMENDED** [2] - 1327:8, 1327:9

**AMENDMENT** [8] - 1389:14, 1422:25, 1423:2, 1423:5, 1427:25, 1428:3, 1428:5, 1429:11

**AMERICA** [4] - 1328:23, 1329:17, 1329:18, 1423:19

**AMOUNT** [4] - 1333:14, 1355:11, 1371:5, 1374:6

**AMY** [3] - 1307:6, 1369:15, 1369:20

**AMY** [1] - 1369:20

**AMY** [7] - 1365:17, 1365:19, 1367:10, 1367:11, 1367:23, 1369:8, 1369:10

**ANALOGY** [2] - 1404:12, 1404:13

**ANALYSIS** [13] - 1385:25, 1387:24,

1393:18, 1394:21, 1405:1, 1428:23, 1429:5, 1429:16, 1429:17, 1431:1, 1431:2, 1431:3, 1431:17

**AND** [2] - 1305:3, 1305:7

**ANNOUNCED** [1] - 1371:19

**ANSWER** [17] - 1308:23, 1309:2, 1311:11, 1338:21, 1342:22, 1342:23, 1343:1, 1343:2, 1343:3, 1353:8, 1360:11, 1379:22, 1397:11, 1410:4, 1410:16, 1422:19, 1424:19

**ANSWERED** [6] - 1360:6, 1360:15, 1362:6, 1362:7, 1432:3, 1432:22

**ANYWAY** [1] - 1315:22

**AP** [1] - 1320:25

**APART** [1] - 1317:12

**APARTMENT** [2] - 1393:10, 1393:11

**APO** [1] - 1347:18

**APOLOGIZE** [2] - 1368:5, 1424:12

**APOS** [1] - 1347:7

**APPEAL** [1] - 1317:16

**APPEAR** [1] - 1346:15

**APPEARANCES** [2] - 1305:13, 1306:1

**APPEARED** [1] - 1356:4

**APPEARING** [1] - 1352:6

**APPLICATION** [1] - 1391:16

**APPLIES** [3] - 1319:6, 1319:9, 1425:8

**APPLY** [4] - 1320:1, 1395:6, 1412:15, 1424:5

**APPRECIATE** [3] - 1365:14, 1370:5, 1381:17

**APPROACH** [9] - 1309:1, 1334:11, 1337:9, 1346:6, 1374:15, 1395:8, 1429:20, 1430:22, 1431:3

**APPROACHED** [1] - 1349:10

**APPROBATION** [1] - 1426:15

**APPROPRIATE** [1] - 1364:4

**APPROVAL** [1] - 1378:23

**APRIL** [1] - 1321:11

**AREA** [1] - 1393:22

**ARGUE** [2] - 1394:5, 1394:13

**ARGUED** [1] - 1419:11

**ARGUMENT** [7] - 1390:6, 1401:18, 1411:3, 1413:9, 1415:3, 1416:18, 1416:25

**ARGUMENTS** [2] - 1395:6, 1407:6

**ARTICLE** [8] - 1312:14, 1312:17, 1312:20, 1312:25, 1316:20, 1317:5, 1320:25, 1407:17

**ARTICLE'S** [2] - 1314:18, 1314:19

**ASAP** [2] - 1347:4, 1347:16

**ASHLEY** [1] - 1305:15

**ASPECT** [2] - 1342:13, 1418:5

**ASPECTS** [3] - 1412:13, 1422:8, 1423:2

**ASSERTS** [1] - 1411:20

**ASSISTANCE** [2] - 1338:12, 1414:17

**ASSOCIATED** [1] - 1312:17

**ASSUME** [6] - 1335:23, 1338:14, 1346:20, 1348:23, 1352:1, 1354:3

**ASSUMED** [1] - 1367:7

**ASSUMING** [2] - 1386:17, 1392:21

**ASSURANCE** [1] - 1399:9

**ASSURED** [1] - 1411:24

**AT** [1] - 1308:1

**ATHENS** [1] - 1393:11

**ATLANTA** [1] - 1305:2

**ATLANTA** [4] - 1312:14, 1324:13, 1393:14, 1393:22

**ATTACHED** [3] - 1346:18, 1347:1, 1347:13

**ATTEMPT** [13] - 1386:23, 1400:12, 1402:7, 1408:8, 1408:9, 1408:10, 1408:24, 1409:7, 1409:8, 1409:15, 1409:24, 1413:6, 1428:20

**ATTEMPTED** [8] - 1386:18, 1402:12, 1408:5, 1428:22, 1429:14, 1429:25, 1430:16, 1431:5

**ATTEMPTING** [2] - 1385:19, 1420:4

**ATTEMPTS** [1] - 1420:2

**ATTENTION** [8] - 1309:3, 1309:18, 1325:9, 1330:17, 1334:9, 1348:13, 1349:9, 1421:10

**ATTORNEY** [4] - 1309:24, 1322:20, 1327:24, 1418:6

**ATTORNEY/CLIENT** [4] - 1343:19, 1344:13, 1344:16, 1344:19

**ATTORNEYS** [1] - 1336:10

**AUBURN** [1] - 1313:9

**AUTHENTICATE** [2] - 1367:6, 1367:8

**AUTHENTICATING** [1] - 1366:16

**AUTOMATED** [1] - 1335:23

**AUTOMATIC** [1] - 1419:13

**AUTOMATICALLY** [3] - 1407:3, 1419:12, 1421:15

**AVAILABLE** [2] - 1316:12, 1399:24

**AWARE** [6] - 1318:17, 1349:1, 1356:24, 1371:2, 1372:8, 1383:6

**AWARENESS** [1] - 1353:4

## B

**BAD** [1] - 1404:12

**BALLOT** [6] - 1391:3, 1391:12, 1391:14, 1391:16, 1392:2, 1430:10

**BALLOTS** [2] - 1391:6, 1400:13

**BANKS** [5] - 1339:19, 1393:15, 1393:23, 1406:4, 1406:14

**BASE** [2] - 1347:6, 1347:18

**BASE** [1] - 1398:19

**BASED** [16] - 1316:16, 1351:22, 1375:20, 1397:13, 1397:16, 1398:15, 1406:20, 1407:25, 1408:1, 1411:25, 1412:17, 1412:20, 1421:2, 1421:8, 1422:7, 1427:17

**BASELESS** [2] - 1411:16, 1412:8

**BASES** [1] - 1347:17

**BASIS** [4] - 1332:11, 1341:8, 1347:6, 1359:13

**BATES** [2] - 1341:15, 1342:8

**BEAR** [2] - 1317:16, 1321:17

**BEARING** [1] - 1321:7
**BECOME** [3] - 1316:12, 1404:15, 1421:4
**BEEN..** [1] - 1337:25
**BEFORE** [1] - 1305:10
**BEGIN** [1] - 1419:22
**BEGINNING** [2] - 1332:21, 1423:11
**BEGINS** [1] - 1329:18
**BEHALF** [2] - 1305:14, 1305:20
**BEHALF** [1] - 1306:2
**BEHAVIOR** [2] - 1424:24, 1426:25
**BEHIND** [1] - 1420:5
**BELIEF** [1] - 1352:5
**BELL** [1] - 1306:5
**BELONG** [1] - 1363:15
**BEN** [3] - 1385:3, 1400:8, 1400:11
**BENCH** [3] - 1382:24, 1383:6, 1383:17
**BENIGN** [1] - 1426:22
**BENNING** [2] - 1347:6, 1347:18
**BERSON** [12] - 1317:4, 1321:8, 1387:20, 1387:21, 1389:16, 1389:17, 1402:21, 1407:13, 1407:16, 1407:25, 1416:21, 1416:23
**BERSON'S** [1] - 1317:1
**BEST** [3] - 1325:12, 1328:23, 1366:19
**BET** [1] - 1430:6
**BETTER** [2] - 1388:15, 1406:6
**BETWEEN** [9] - 1333:4, 1338:21, 1357:19, 1357:23, 1358:4, 1386:19, 1395:11, 1413:13, 1414:25
**BEYOND** [4] - 1387:6, 1394:6, 1396:3
**BIG** [4] - 1328:13, 1333:14, 1345:4, 1358:4
**BILL** [2] - 1388:22, 1389:1
**BIT** [3] - 1338:20, 1342:22, 1348:3
**BLAME** [1] - 1424:16
**BLANK** [1] - 1395:15
**BLESS** [1] - 1318:3
**BLOW** [1] - 1356:5
**BLUE** [2] - 1312:6, 1312:7
**BOARD** [10] - 1352:12, 1352:16, 1352:20, 1353:13, 1353:21, 1354:11, 1358:12, 1358:15, 1396:9, 1418:6
**BOARDS** [3] - 1334:3, 1385:4, 1385:23
**BODY** [1] - 1346:21
**BONE** [1] - 1321:12
**BOOK** [1] - 1326:21
**BOTTOM** [6] - 1334:7, 1335:2, 1335:20, 1335:21, 1342:20, 1357:5
**BOUNTIES** [1] - 1389:18
**BOWLING** [2] - 1406:1, 1406:7
**BOWLING** [2] - 1406:5, 1429:23
**BREAK** [1] - 1369:6
**BRIAN** [9] - 1318:23, 1322:19, 1322:24, 1322:25, 1326:23, 1327:2, 1327:4, 1327:11
**BRIEF** [13] - 1383:4, 1384:10, 1386:9, 1396:19, 1424:14, 1424:15, 1424:20, 1432:2, 1432:3, 1432:6, 1432:8, 1432:21, 1432:24

**BRIEFING** [2] - 1424:1, 1424:2
**BRIEFLY** [2] - 1323:8, 1389:17
**BRING** [13] - 1314:1, 1314:10, 1321:2, 1321:4, 1321:21, 1322:1, 1322:3, 1322:8, 1326:1, 1326:17, 1331:18, 1356:7, 1416:10
**BRING** [1] - 1321:3
**BRINGING** [1] - 1416:11
**BRINGS** [1] - 1390:7
**BROAD** [2] - 1410:14, 1410:22
**BROADLY** [1] - 1411:23
**BROUGHT** [2] - 1309:17, 1325:9
**BRYAN** [1] - 1305:16
**BURDEN** [3] - 1394:6, 1396:15, 1422:16
**BURTON** [1] - 1321:8
**BURTON** [1] - 1410:19
**BURTON'S** [2] - 1317:12, 1410:10
**BUSINESS** [3] - 1330:12, 1333:21, 1335:10
**BUT..** [1] - 1411:8
**BY** [30] - 1307:3, 1332:17, 1334:25, 1337:11, 1337:20, 1338:7, 1339:2, 1342:17, 1343:13, 1344:7, 1345:3, 1346:8, 1347:22, 1348:14, 1350:25, 1351:5, 1352:4, 1353:3, 1355:4, 1359:7, 1360:13, 1361:1, 1362:10, 1363:6, 1369:24, 1374:23, 1375:25, 1376:20, 1377:2, 1377:9

## C

**CALIFORNIA** [4] - 1390:19, 1390:21, 1391:1
**CAMERON** [1] - 1305:21
**CANCER** [1] - 1321:12
**CANNOT** [9] - 1317:24, 1364:9, 1367:15, 1417:12, 1419:24, 1420:11, 1420:12, 1421:7, 1428:13
**CAPABILITY** [1] - 1348:24
**CAPACITY** [1] - 1395:24
**CAR** [1] - 1393:22
**CAREFUL** [1] - 1419:15
**CAREFULLY** [1] - 1388:24
**CARFAX** [1] - 1393:21
**CAROLINA** [2] - 1387:22, 1388:4
**CASE** [96] - 1308:24, 1309:5, 1309:25, 1310:3, 1310:9, 1310:14, 1310:20, 1310:22, 1311:1, 1312:20, 1315:20, 1316:6, 1317:11, 1317:23, 1317:24, 1324:21, 1325:16, 1325:18, 1327:1, 1330:12, 1330:13, 1336:10, 1338:9, 1338:18, 1342:9, 1350:3, 1355:21, 1356:22, 1364:6, 1364:8, 1364:9, 1364:16, 1364:21, 1365:1, 1365:21, 1379:4, 1381:10, 1382:20, 1383:21, 1384:1, 1384:20, 1384:22, 1384:25, 1385:3, 1385:10, 1385:16, 1385:21, 1386:6, 1386:8, 1386:16, 1386:18, 1387:4, 1387:7, 1387:11, 1387:12, 1387:18, 1392:23, 1393:7, 1394:1,

1394:4, 1394:15, 1395:12, 1395:14, 1395:21, 1395:25, 1396:2, 1396:8, 1396:16, 1396:17, 1396:18, 1396:24, 1398:3, 1400:8, 1400:10, 1400:11, 1400:15, 1401:3, 1409:20, 1422:13, 1424:9, 1424:11, 1427:14, 1427:19, 1428:10, 1428:11, 1429:3, 1429:4, 1429:6, 1430:19, 1431:21, 1434:7
**CASES** [3] - 1349:2, 1426:16, 1432:16
**CAST** [1] - 1400:13
**CATCH** [1] - 1368:22
**CATHERINE** [3] - 1347:21, 1370:10, 1395:5
**CATHERINE** [1] - 1305:6
**CAUSAL** [6] - 1386:19, 1387:5, 1387:8, 1395:10, 1396:23, 1428:17
**CAUSATION** [1] - 1386:16
**CAUSED** [14] - 1359:22, 1384:10, 1386:13, 1387:10, 1394:8, 1394:25, 1396:5, 1409:22, 1415:13, 1415:14, 1431:15
**CAUTION** [1] - 1396:24
**CCS** [1] - 1321:19
**CELL** [2] - 1368:24, 1368:25
**CERTAIN** [3] - 1318:24, 1319:1, 1330:17
**CERTAINLY** [5] - 1318:17, 1319:24, 1403:6, 1408:20, 1409:11
**CERTIFIED** [1] - 1353:5
**CERTIFY** [1] - 1434:6
**CHAIN** [1] - 1346:14
**CHAIRMAN** [1] - 1333:7
**CHAIRS** [1] - 1345:15
**CHALLENGE** [99] - 1333:18, 1333:24, 1335:1, 1335:15, 1336:19, 1345:5, 1346:19, 1346:22, 1347:2, 1347:14, 1349:19, 1349:23, 1352:10, 1352:13, 1355:18, 1362:20, 1372:1, 1372:5, 1372:17, 1372:19, 1372:20, 1372:21, 1373:18, 1373:24, 1389:8, 1389:9, 1393:4, 1393:16, 1393:17, 1394:19, 1396:9, 1397:14, 1399:23, 1401:16, 1401:21, 1401:24, 1401:25, 1402:4, 1402:18, 1402:24, 1403:17, 1403:23, 1403:24, 1404:1, 1406:4, 1406:14, 1407:2, 1407:7, 1407:11, 1407:21, 1408:12, 1408:14, 1409:20, 1410:7, 1410:25, 1411:10, 1411:14, 1411:16, 1411:20, 1411:25, 1412:5, 1412:7, 1412:8, 1412:9, 1412:12, 1412:15, 1412:16, 1412:19, 1412:21, 1412:23, 1412:24, 1413:1, 1414:7, 1415:5, 1415:6, 1415:9, 1415:17, 1415:21, 1415:24, 1418:18, 1419:14, 1420:11, 1420:15, 1420:23, 1422:19, 1424:3, 1426:16, 1427:17, 1427:23, 1428:13, 1428:23, 1429:21, 1430:13, 1430:14, 1431:6
**CHALLENGED** [24] - 1335:5, 1336:7, 1363:16, 1385:6, 1385:8, 1390:9,

1391:23, 1392:7, 1392:9, 1392:16,
1392:25, 1394:14, 1394:22, 1395:17,
1402:20, 1402:22, 1402:23, 1405:25,
1406:25, 1409:13, 1416:21, 1416:22,
1425:2, 1430:8
**CHALLENGER** [8] - 1335:20, 1342:20,
1349:16, 1373:1, 1373:22, 1375:17,
1376:23, 1378:18
**CHALLENGER'S** [2] - 1334:6, 1378:8
**CHALLENGERS** [20] - 1337:13,
1342:21, 1345:8, 1345:10, 1372:4,
1372:8, 1372:22, 1374:1, 1374:9,
1376:14, 1380:11, 1380:16, 1385:18,
1399:19, 1413:9, 1413:15, 1414:12,
1415:19, 1418:20, 1419:2
**CHALLENGERS** [1] - 1339:10
**CHALLENGES** [60] - 1338:12, 1345:22,
1350:1, 1350:7, 1356:17, 1356:19,
1357:13, 1357:18, 1357:24, 1358:9,
1358:13, 1359:2, 1359:12, 1359:21,
1360:5, 1360:14, 1362:18, 1372:10,
1378:12, 1387:3, 1395:17, 1400:12,
1401:7, 1401:8, 1401:9, 1403:3,
1403:8, 1403:12, 1404:10, 1405:15,
1405:17, 1406:18, 1406:23, 1407:13,
1407:17, 1407:23, 1412:11, 1412:14,
1413:14, 1413:17, 1413:25, 1414:10,
1414:11, 1414:21, 1415:8, 1415:14,
1415:15, 1416:14, 1417:3, 1417:18,
1418:4, 1418:17, 1418:19, 1418:22,
1419:1, 1419:22, 1419:25, 1425:3,
1428:18
**CHALLENGING** [8] - 1373:1, 1410:13,
1410:18, 1410:21, 1411:7, 1413:5,
1427:15, 1427:23
**CHANCE** [5] - 1380:6, 1382:3, 1382:4,
1382:5, 1412:8
**CHANGE** [3] - 1393:8, 1393:9, 1393:10
**CHANGE** [5] - 1319:10, 1326:6,
1388:20, 1397:17, 1433:9
**CHANGED** [3] - 1326:10, 1339:15,
1401:16
**CHANGES** [2] - 1326:4, 1348:25
**CHAPTER** [1] - 1326:20
**CHARACTERISTICS** [1] - 1412:13
**CHECK** [1] - 1369:3
**CHOREOGRAPHED** [1] - 1400:21
**CHOSE** [1] - 1414:4
**CHRISTINA** [1] - 1305:15
**CIRCUMSTANCES** [2] - 1393:19,
1421:10
**CITATIONS** [1] - 1383:17
**CITE** [1] - 1398:5
**CITIZEN** [1] - 1403:10
**CITIZENS** [2] - 1419:24, 1432:17
**CITY** [1] - 1324:15
**CIVIL** [3] - 1383:10, 1386:4, 1423:12
**CIVIL** [1] - 1330:13
**CLAFFERTY** [1] - 1305:18
**CLAIM** [2] - 1383:13, 1409:20

**CLAIMING** [1] - 1340:14
**CLAIMS** [1] - 1367:8
**CLARIFICATION** [1] - 1409:19
**CLARIFY** [7] - 1332:7, 1332:15,
1349:10, 1359:8, 1360:4, 1361:16,
1422:22
**CLEAR** [8] - 1317:25, 1318:12, 1321:7,
1321:9, 1325:11, 1346:20, 1393:20,
1402:5
**CLERK** [8] - 1309:8, 1309:14, 1331:20,
1331:25, 1332:4, 1369:12, 1369:18,
1369:22
**CLERK** [1] - 1312:19
**CLOSE** [4] - 1317:21, 1417:15, 1417:17,
1417:18
**CLOSED** [1] - 1428:25
**CLOSER** [1] - 1371:22
**CLOSES** [1] - 1390:15
**CMR** [1] - 1434:14
**CNN** [1] - 1425:23
**CO** [2] - 1323:4, 1323:5
**CO-COUNSEL** [2] - 1323:4, 1323:5
**COBB** [2] - 1413:25
**COERCE** [1] - 1421:24
**COERCED** [3] - 1384:11, 1387:16,
1394:10
**COERCES** [1] - 1422:2
**COGNITIVE** [1] - 1321:15
**COINCIDENCE** [1] - 1385:6
**COLD** [2] - 1366:16, 1380:5
**COLLABORATED** [5] - 1405:14,
1413:12, 1414:21, 1415:5, 1415:18
**COLLABORATION** [1] - 1414:17
**COLLEAGUE** [1] - 1317:1
**COLLECT** [1] - 1381:25
**COLLECTING** [1] - 1378:22
**COLLECTIVELY** [1] - 1393:25
**COLLEGE** [1] - 1387:22
**COLLOQUY** [1] - 1432:12
**COMBINE** [1] - 1417:11
**COMERS** [1] - 1399:24
**COMFORTABLY** [1] - 1386:5
**COMING** [11] - 1330:15, 1348:3, 1348:5,
1350:9, 1354:8, 1355:21, 1359:25,
1366:16, 1380:5, 1407:18, 1424:15
**COMMENTS** [1] - 1322:9
**COMMISSIONERS** [1] - 1354:11
**COMMIT** [1] - 1404:10
**COMMUNICATE** [4] - 1323:12, 1362:3,
1394:22, 1394:24
**COMMUNICATED** [5] - 1361:11,
1361:14, 1384:20, 1385:15, 1395:8
**COMMUNICATION** [8] - 1384:24,
1385:11, 1386:7, 1396:10, 1428:15,
1428:16, 1429:15, 1431:18
**COMMUNICATIONS** [4] - 1322:20,
1370:21, 1385:18, 1413:13
**COMMUNITY** [1] - 1362:14
**COMPANY** [5] - 1333:1, 1338:5, 1343:5,

1348:7, 1349:7
**COMPENSATION** [2] - 1371:12,
1371:18
**COMPILING** [1] - 1345:22
**COMPLETE** [2] - 1341:8, 1341:21
**COMPLETELY** [3] - 1423:6, 1429:22,
1430:10
**COMPLETENESS** [1] - 1347:19
**COMPLEX** [1] - 1417:5
**CONCERN** [4] - 1357:25, 1358:13,
1358:14, 1411:23
**CONCERNED** [9] - 1319:25, 1320:6,
1320:10, 1326:6, 1326:8, 1327:22,
1329:11, 1329:16, 1329:22
**CONCERNS** [4] - 1318:16, 1326:14,
1328:17, 1329:2
**CONCLUDE** [1] - 1391:1
**CONCLUDED** [1] - 1433:8
**CONCLUSION** [3] - 1330:8, 1416:10,
1416:11
**CONCOCT** [1] - 1386:24
**CONDITION** [1] - 1321:15
**CONDUCT** [26] - 1319:18, 1401:22,
1401:23, 1404:15, 1404:18, 1405:3,
1405:6, 1409:22, 1410:5, 1411:21,
1413:7, 1418:15, 1418:18, 1424:3,
1424:10, 1424:21, 1424:23, 1425:2,
1425:5, 1425:6, 1425:7, 1425:14,
1426:5, 1426:11, 1426:25
**CONDUCT-SPECIFIC** [1] - 1426:5
**CONDUCTED** [3] - 1399:10, 1415:17,
1418:22
**CONFER** [1] - 1323:4
**CONFIDENTIAL** [1] - 1382:1
**CONFIRM** [1] - 1348:15
**CONFIRMATION** [1] - 1389:1
**CONFIRMED** [4] - 1341:6, 1380:17,
1380:20, 1390:20
**CONFIRMS** [1] - 1388:23
**CONFLICTING** [1] - 1420:17
**CONFUSING** [2] - 1389:3, 1389:4
**CONFUSION** [1] - 1364:23
**CONJUNCTION** [1] - 1408:14
**CONKEL** [2] - 1326:20, 1327:16
**CONNECT** [2] - 1387:3, 1395:18
**CONNECTED** [2] - 1406:7, 1406:9
**CONNECTION** [2] - 1341:16, 1406:11
**CONSENT** [3] - 1372:4, 1372:9, 1373:15
**CONSENTS** [1] - 1420:14
**CONSEQUENCE** [3] - 1421:23,
1421:24, 1422:16
**CONSEQUENCES** [2] - 1421:11,
1422:15
**CONSIDER** [6] - 1341:22, 1342:4,
1383:5, 1384:14, 1401:25, 1426:15
**CONSIDERATION** [3] - 1321:24, 1390:5
**CONSIDERED** [3] - 1341:25, 1408:9,
1414:5
**CONSISTENT** [1] - 1425:6
**CONSISTING** [1] - 1397:15

**CONSTITUTION** [1] - 1312:14
**CONSTITUTIONAL** [2] - 1402:1, 1426:8
**CONSTITUTIONALITY** [1] - 1401:22
**CONTACT** [2] - 1372:7, 1386:17
**CONTACTED** [1] - 1387:1
**CONTACTS** [1] - 1420:14
**CONTEXT** [5] - 1372:13, 1391:19, 1410:11, 1419:20, 1422:23
**CONTINUED** [1] - 1306:1
**CONTRACTOR** [2] - 1370:7, 1372:10
**CONTRACTS** [1] - 1404:19
**CONTRADICTS** [2] - 1429:19, 1430:16
**CONTROLLING** [1] - 1383:14
**CONVERSATION** [3] - 1310:13, 1310:25, 1363:15
**CONVEY** [1] - 1332:9
**CONVINCE** [2] - 1415:20, 1416:1
**CONVINCED** [2] - 1415:22, 1415:23
**COOPER** [1] - 1305:7
**COOPER** [20] - 1345:13, 1397:4, 1397:5, 1405:23, 1413:3, 1413:8, 1414:18, 1415:16, 1415:19, 1416:1, 1417:1, 1418:16, 1423:4, 1428:6, 1428:9, 1428:15, 1428:22, 1429:8, 1431:4, 1431:13
**COOPERATION** [1] - 1338:19
**COORDINATED** [2] - 1398:17, 1406:13
**COORDINATING** [3] - 1413:14, 1413:15
**COPIES** [2] - 1334:4, 1374:17
**COPPER** [7] - 1394:3, 1394:11, 1397:7, 1397:9, 1403:5, 1405:12, 1407:9
**COPY** [3] - 1337:22, 1353:5, 1374:12
**COPYING** [1] - 1348:9
**CORE** [1] - 1346:22
**CORRECT** [100] - 1309:21, 1332:23, 1332:24, 1333:2, 1333:6, 1333:11, 1333:16, 1333:20, 1334:2, 1334:7, 1335:2, 1335:3, 1335:6, 1335:7, 1335:10, 1335:12, 1335:13, 1335:17, 1335:22, 1336:8, 1336:11, 1336:21, 1336:24, 1337:13, 1338:11, 1339:5, 1339:6, 1342:21, 1345:6, 1345:7, 1345:14, 1345:20, 1345:21, 1346:15, 1348:2, 1349:13, 1349:17, 1349:18, 1349:21, 1349:23, 1349:24, 1350:2, 1350:21, 1351:8, 1351:9, 1351:12, 1351:13, 1352:10, 1352:11, 1352:14, 1352:15, 1356:9, 1357:8, 1357:13, 1359:11, 1359:14, 1359:23, 1360:14, 1362:9, 1362:13, 1363:9, 1363:10, 1363:13, 1370:8, 1370:11, 1370:14, 1370:18, 1370:24, 1371:2, 1371:12, 1371:15, 1372:1, 1372:15, 1373:3, 1373:4, 1373:5, 1373:10, 1373:20, 1373:24, 1373:25, 1374:2, 1374:9, 1374:10, 1375:8, 1375:10, 1377:11, 1377:23, 1378:8, 1378:16, 1379:5, 1379:7, 1379:10, 1379:12, 1379:14, 1379:17, 1418:4, 1420:19, 1421:7, 1422:9, 1434:6

**CORRECTLY** [4] - 1345:12, 1367:17, 1430:20, 1430:21
**CORRECTS** [1] - 1317:1
**COSTS** [1] - 1389:25
**COUNSEL** [1] - 1419:6
**COUNSEL** [10] - 1323:4, 1323:5, 1325:3, 1325:5, 1343:16, 1379:12, 1419:11, 1429:1, 1430:2, 1432:23
**COUNTED** [3] - 1391:24, 1392:2, 1393:2
**COUNTIES** [15] - 1333:19, 1336:7, 1372:15, 1372:18, 1372:25, 1403:18, 1409:16, 1409:18, 1413:16, 1413:24, 1414:3, 1414:4, 1414:12, 1419:1
**COUNTIES.PDF** [1] - 1339:10
**COUNTING** [2] - 1363:19, 1426:1
**COUNTRY** [1] - 1383:16
**COUNTY** [44] - 1313:11, 1335:6, 1339:19, 1349:17, 1349:19, 1350:6, 1352:7, 1352:9, 1356:20, 1358:9, 1363:8, 1363:12, 1375:6, 1375:7, 1375:9, 1375:11, 1375:17, 1376:4, 1376:13, 1376:22, 1385:2, 1386:22, 1387:3, 1387:21, 1392:15, 1393:7, 1393:15, 1393:23, 1394:15, 1395:20, 1400:8, 1400:9, 1406:4, 1406:14, 1407:21, 1407:24, 1409:13, 1409:16, 1413:25, 1418:17, 1429:22
**COUNTY** [31] - 1322:20, 1333:24, 1335:16, 1345:10, 1345:15, 1347:3, 1347:14, 1350:8, 1355:6, 1357:8, 1358:10, 1372:5, 1373:17, 1373:19, 1373:24, 1378:11, 1385:4, 1385:23, 1396:9, 1401:15, 1401:21, 1401:24, 1402:9, 1402:23, 1409:21, 1409:22, 1414:2, 1417:11, 1417:14, 1428:12
**COUNTY'S** [2] - 1401:23, 1402:15
**COUNTY'S** [1] - 1400:11
**COUPLE** [7] - 1338:8, 1349:2, 1355:19, 1394:1, 1429:1, 1430:1, 1430:4
**COURSE** [8] - 1308:11, 1379:11, 1379:18, 1413:1, 1423:14, 1423:16, 1423:21, 1424:18
**COURT** [60] - 1315:25, 1319:20, 1319:23, 1320:13, 1320:14, 1321:14, 1321:23, 1321:24, 1322:6, 1324:8, 1325:4, 1341:21, 1365:15, 1375:15, 1383:2, 1383:5, 1383:11, 1383:12, 1383:24, 1383:25, 1384:3, 1384:14, 1385:12, 1386:10, 1388:21, 1390:5, 1390:7, 1393:7, 1395:24, 1396:15, 1396:17, 1396:20, 1396:22, 1399:6, 1404:25, 1405:5, 1410:16, 1411:24, 1412:5, 1412:10, 1415:25, 1416:12, 1421:10, 1421:19, 1424:1, 1424:3, 1426:9, 1426:12, 1426:15, 1426:17, 1426:22, 1426:24, 1427:14, 1427:22, 1428:4, 1428:19, 1429:5, 1429:6, 1432:20
**COURT** [288] - 1305:1, 1307:3, 1308:1, 1308:2, 1308:7, 1308:13, 1308:16,

1308:20, 1309:6, 1309:17, 1309:23, 1310:2, 1310:7, 1310:11, 1310:13, 1310:17, 1310:19, 1310:22, 1310:25, 1311:4, 1311:8, 1311:10, 1311:13, 1311:22, 1312:5, 1312:9, 1312:13, 1312:19, 1312:24, 1313:3, 1313:5, 1313:7, 1313:12, 1313:15, 1313:19, 1313:22, 1313:24, 1314:1, 1314:4, 1314:12, 1314:16, 1314:19, 1314:23, 1314:25, 1315:3, 1315:7, 1315:9, 1315:15, 1315:19, 1315:23, 1315:25, 1316:19, 1316:22, 1316:24, 1317:7, 1318:1, 1318:6, 1318:21, 1319:4, 1319:8, 1320:3, 1320:23, 1321:25, 1322:7, 1322:15, 1322:24, 1323:13, 1323:22, 1324:5, 1324:11, 1324:15, 1324:17, 1325:13, 1327:2, 1327:6, 1327:11, 1327:14, 1327:16, 1327:20, 1328:3, 1329:9, 1330:1, 1331:2, 1331:5, 1331:15, 1331:18, 1332:5, 1332:13, 1334:12, 1334:14, 1334:18, 1334:21, 1334:24, 1337:10, 1337:16, 1338:2, 1338:23, 1339:20, 1339:25, 1340:4, 1340:7, 1340:12, 1340:22, 1340:25, 1341:3, 1341:10, 1341:12, 1341:18, 1342:1, 1342:6, 1342:23, 1343:2, 1343:23, 1344:4, 1344:11, 1344:14, 1344:1, 1346:7, 1347:8, 1347:11, 1347:25, 1350:4, 1350:10, 1350:12, 1350:15, 1350:19, 1350:22, 1351:3, 1351:14, 1351:21, 1351:24, 1353:2, 1354:17, 1354:19, 1354:23, 1355:2, 1357:17, 1357:21, 1357:24, 1358:4, 1358:8, 1358:12, 1359:1, 1359:5, 1360:7, 1360:16, 1360:19, 1360:24, 1362:7, 1363:1, 1363:25, 1364:2, 1364:7, 1364:15, 1364:18, 1364:21, 1364:25, 1365:4, 1365:6, 1365:9, 1365:11, 1365:13, 1365:19, 1365:23, 1366:2, 1366:7, 1366:9, 1366:13, 1366:18, 1366:25, 1367:10, 1367:12, 1367:17, 1367:23, 1368:11, 1368:15, 1368:19, 1368:24, 1369:1, 1369:4, 1369:7, 1374:16, 1374:18, 1374:20, 1375:20, 1376:9, 1376:19, 1376:24, 1377:6, 1380:25, 1381:4, 1381:7, 1381:14, 1381:19, 1381:21, 1381:23, 1382:2, 1382:7, 1382:11, 1382:15, 1382:18, 1383:1, 1383:3, 1385:17, 1386:3, 1386:8, 1386:11, 1388:10, 1392:14, 1397:1, 1397:9, 1397:23, 1398:2, 1398:7, 1398:18, 1398:21, 1398:23, 1399:3, 1399:12, 1400:1, 1400:15, 1401:3, 1401:13, 1402:6, 1403:5, 1403:21, 1404:12, 1404:16, 1405:10, 1405:22, 1406:5, 1406:17, 1407:1, 1407:15, 1407:18, 1408:16, 1408:21, 1409:2, 1409:5, 1409:16, 1410:3, 1410:25, 1413:2, 1413:20, 1415:3, 1416:10, 1416:17, 1416:24, 1417:20, 1418:1, 1418:11,

1419:5, 1419:9, 1419:11, 1419:17,
1420:9, 1420:24, 1421:3, 1421:12,
1421:15, 1421:18, 1421:21, 1422:6,
1423:1, 1423:9, 1423:12, 1423:15,
1423:17, 1423:22, 1423:24, 1424:7,
1424:12, 1425:12, 1425:15, 1425:20,
1427:2, 1427:6, 1427:10, 1431:8,
1431:11, 1431:22, 1431:24, 1432:8,
1432:22, 1433:2, 1433:4, 1434:3,
1434:14
**COURT** [9] - 1317:19, 1319:15, 1334:16,
1341:5, 1379:14, 1385:3, 1385:8,
1400:16, 1433:9
**COURT'S** [7] - 1365:14, 1386:23,
1396:1, 1400:7, 1419:7, 1424:19,
1431:24
**COURTHOUSE** [2] - 1366:7, 1366:8
**COURTROOM** [26] - 1315:24, 1317:21,
1318:19, 1318:23, 1320:2, 1320:18,
1321:2, 1322:15, 1323:1, 1323:23,
1324:1, 1324:6, 1324:7, 1324:25,
1325:4, 1325:17, 1326:13, 1329:16,
1331:4, 1364:15, 1364:22, 1364:25,
1381:11
**COURTS** [7] - 1383:16, 1395:24,
1419:24, 1424:22, 1425:10, 1426:20
**COVERING** [1] - 1390:2
**COVID** [2] - 1404:21, 1404:22
**CRACKS** [1] - 1329:18
**CRC** [1] - 1434:14
**CREATE** [2] - 1342:19, 1425:1
**CREATED** [2] - 1397:14, 1428:17
**CREDIBILITY** [3] - 1383:20, 1383:25,
1388:17
**CREDIT** [1] - 1399:1
**CRIMINAL** [2] - 1330:12, 1427:21
**CRITICIZE** [1] - 1328:7
**CROSS** [3] - 1307:2, 1360:25, 1369:23
**CROSS** [1] - 1382:14
**CROSS** [4] - 1364:3, 1381:3, 1384:23,
1390:19
**CROSS-EXAMINATION** [2] - 1360:25,
1369:23
**CROSS-EXAMINATION** [2] - 1364:3,
1381:3
**CROSSED** [1] - 1384:18
**CROSSING** [1] - 1312:10
**CRR** [1] - 1434:14
**CRY** [1] - 1315:13
**CRYING** [5] - 1311:5, 1311:14, 1312:2,
1315:1, 1315:17
**CULLEN** [1] - 1305:22
**CUSTOMER** [1] - 1346:2
**CUT** [1] - 1341:1

# D

**DAN** [3] - 1322:22, 1325:8, 1406:1
**DANA** [1] - 1361:4
**DANA** [1] - 1306:3

**DARN** [1] - 1325:12
**DATA** [18] - 1346:19, 1347:2, 1347:3,
1347:14, 1347:15, 1348:21, 1350:8,
1350:9, 1359:16, 1398:16, 1398:19,
1401:11, 1419:19, 1420:22, 1421:2,
1421:8, 1421:14
**DAVID** [2] - 1333:3, 1333:7
**DAVIS** [35] - 1394:2, 1394:12, 1397:3,
1397:5, 1397:7, 1397:9, 1403:5,
1403:7, 1405:12, 1405:23, 1406:3,
1406:12, 1407:8, 1408:8, 1408:14,
1413:3, 1413:4, 1413:11, 1413:14,
1414:19, 1415:4, 1415:13, 1416:25,
1417:16, 1418:23, 1423:4, 1428:6,
1429:13, 1429:14, 1430:25, 1431:1,
1431:2, 1431:16
**DAVIS** [1] - 1305:7
**DAY-TO-DAY** [1] - 1337:25
**DAYS** [13] - 1329:8, 1348:5, 1357:17,
1357:21, 1357:22, 1357:23, 1357:25,
1358:14, 1359:2, 1387:8, 1392:3,
1420:12, 1420:16
**DEAD** [1] - 1426:1
**DEAL** [6] - 1328:13, 1330:18, 1331:7,
1332:13, 1382:21, 1385:19
**DEALING** [3] - 1330:13, 1409:17,
1409:19
**DEATH** [1] - 1318:3
**DEBATING** [1] - 1322:1
**DECATUR** [1] - 1393:8
**DECEMBER** [6] - 1333:3, 1346:13,
1353:6, 1357:20, 1359:9, 1414:9
**DECIDE** [2] - 1340:20, 1432:8
**DECIDED** [1] - 1325:25
**DECIDES** [1] - 1322:6
**DECISION** [1] - 1432:15
**DECISIONS** [2] - 1432:15, 1432:19
**DEEMED** [1] - 1353:25
**DEFEATING** [1] - 1383:14
**DEFENDANT** [11] - 1325:17, 1342:9,
1364:20, 1384:20, 1384:25, 1395:14,
1400:9, 1421:13, 1431:14, 1431:18,
1431:19
**DEFENDANT'S** [1] - 1421:11
**DEFENDANTS** [35] - 1308:5, 1310:8,
1310:20, 1310:23, 1319:9, 1326:24,
1340:8, 1340:14, 1340:15, 1340:18,
1342:8, 1342:11, 1365:17, 1384:5,
1384:22, 1386:21, 1387:4, 1387:10,
1389:6, 1389:11, 1389:13, 1390:12,
1390:14, 1394:1, 1394:6, 1394:16,
1395:11, 1396:4, 1399:14, 1406:19,
1407:10, 1425:3, 1425:17
**DEFENDANTS** [1] - 1305:8
**DEFENDANTS** [1] - 1305:20
**DEFENDANTS'** [3] - 1308:4, 1308:14,
1308:18
**DEFENDANTS'** [7] - 1308:12, 1308:16,
1325:5, 1332:10, 1384:7, 1409:22,
1420:3

**DEFENSE** [5] - 1381:8, 1382:19,
1383:13, 1383:21, 1389:23
**DEFENSES** [1] - 1422:25
**DEFINITELY** [4] - 1320:14, 1339:17,
1418:11, 1427:17
**DEFINITION** [1] - 1422:1
**DEMANDS** [2] - 1421:9, 1426:5
**DEMOGRAPHIC** [1] - 1389:9
**DEMONSTRATE** [1] - 1412:3
**DEMONSTRATED** [1] - 1416:12
**DENIED** [3] - 1355:22, 1396:18, 1400:23
**DENY** [3] - 1402:24, 1404:4, 1404:6
**DEPARTMENT** [4] - 1331:11, 1382:19,
1419:21, 1432:14
**DEPOSITION** [14] - 1349:25, 1351:10,
1357:1, 1374:13, 1374:25, 1375:2,
1379:4, 1379:9, 1379:16, 1379:19,
1380:4, 1397:14, 1409:14, 1418:24
**DEPRIVE** [2] - 1422:3, 1422:18
**DEPRIVING** [1] - 1422:17
**DEPUTY** [12] - 1309:8, 1309:14, 1314:3,
1314:6, 1314:9, 1320:22, 1331:20,
1331:25, 1332:4, 1369:12, 1369:18,
1369:22
**DEREK** [1] - 1414:20
**DEREK** [1] - 1305:6
**DESCRIBE** [1] - 1311:25
**DESCRIBED** [1] - 1346:1
**DESIGNATIONS** [3] - 1397:14, 1409:14,
1418:25
**DETAILS** [1] - 1321:19
**DETERIORATED** [1] - 1321:11
**DETERMINATION** [3] - 1323:14,
1323:16, 1388:17, 1417:4
**DETERMINATIONS** [2] - 1383:20,
1383:25
**DETERMINE** [9] - 1376:3, 1397:20,
1399:7, 1400:12, 1400:20, 1409:25,
1410:1, 1410:4, 1412:5
**DETERMINES** [1] - 1388:21
**DETERMINING** [2] - 1387:25, 1394:21
**DIES** [1] - 1420:13
**DIFFERENCE** [2] - 1358:2, 1358:4
**DIFFERENT** [9] - 1317:14, 1333:25,
1353:17, 1363:14, 1404:14, 1405:1,
1407:6, 1431:25
**DIFFICULT** [3] - 1324:22, 1325:1,
1342:12
**DIRECT** [2] - 1307:2, 1332:16
**DIRECT** [17] - 1331:8, 1344:18, 1364:4,
1364:6, 1382:4, 1384:24, 1385:11,
1385:18, 1386:7, 1386:17, 1394:20,
1394:23, 1396:10, 1414:25, 1429:15,
1430:18, 1431:17
**DIRECTED** [10] - 1382:24, 1383:6,
1384:9, 1396:4, 1412:2, 1428:15,
1428:16, 1429:14, 1431:7, 1431:14
**DIRECTION** [1] - 1325:5
**DIRECTLY** [19] - 1312:1, 1312:10,
1323:5, 1370:10, 1372:15, 1372:17,

1373:4, 1373:19, 1373:24, 1384:8, 1384:15, 1384:20, 1385:20, 1394:7, 1395:8, 1397:11, 1406:7, 1422:17, 1430:16
**DISAGREE** [2] - 1328:3, 1359:5
**DISCOMFORT** [1] - 1388:7
**DISCOVERY** [2] - 1337:12, 1340:2
**DISCUSS** [10] - 1310:20, 1325:16, 1325:17, 1343:18, 1344:8, 1364:9, 1364:13, 1364:21, 1365:1, 1381:8
**DISCUSSED** [6] - 1343:21, 1343:24, 1344:3, 1350:17, 1370:20, 1371:14
**DISCUSSING** [1] - 1310:14
**DISCUSSION** [4] - 1353:20, 1356:14, 1403:16, 1409:7
**DISCUSSIONS** [2] - 1362:1, 1371:16
**DISENTANGLING** [1] - 1419:19
**DISMISSED** [5] - 1394:18, 1396:24, 1413:25, 1431:15, 1431:20
**DISPUTE** [6] - 1339:11, 1342:5, 1342:6, 1410:18, 1410:21, 1428:13
**DISRESPECT** [1] - 1328:21
**DISTINCT** [1] - 1420:1
**DISTINCTLY** [2] - 1312:1, 1312:11
**DISTRICT** [1] - 1400:16
**DISTRICT** [5] - 1305:1, 1305:1, 1305:11, 1434:3, 1434:4
**DIVISION** [1] - 1305:2
**DOCKET** [1] - 1305:4
**DOCUMENT** [14] - 1332:12, 1338:2, 1339:9, 1340:2, 1341:22, 1342:5, 1342:7, 1342:10, 1344:18, 1349:8, 1366:16, 1367:7, 1376:18
**DOCUMENTATION** [1] - 1378:19
**DOCUMENTS** [11] - 1336:9, 1338:9, 1338:14, 1338:17, 1339:3, 1339:4, 1340:13, 1342:11, 1343:5, 1343:11, 1365:3
**DOE** [2] - 1305:3, 1305:3
**DOES** [1] - 1305:8
**DOJ** [3] - 1399:17, 1423:19, 1430:1
**DOMICILED** [1] - 1396:13
**DONE** [14] - 1317:10, 1337:6, 1348:20, 1366:15, 1377:18, 1378:10, 1378:12, 1378:24, 1378:25, 1389:15, 1406:16, 1409:8, 1414:15, 1415:24
**DOOR** [1] - 1390:15
**DOORS** [1] - 1407:2
**DOUBLE** [1] - 1425:25
**DOWN** [13] - 1323:7, 1348:5, 1360:19, 1360:24, 1375:12, 1381:20, 1388:24, 1398:24, 1407:3, 1411:6, 1413:20, 1429:21, 1434:6
**DOWNSTAIRS** [6] - 1313:25, 1314:1, 1314:10, 1326:18, 1330:2, 1331:5
**DOWNTOWN** [2] - 1368:22, 1369:1
**DPO** [2] - 1347:7, 1347:18
**DR** [4] - 1317:12, 1410:10, 1410:19
**DRAWS** [1] - 1429:6
**DRIVE** [2] - 1337:2

**DRIVE** [1] - 1399:24
**DRIVES** [1] - 1385:10
**DRIVING** [1] - 1385:1
**DROP** [1] - 1407:5
**DROPBOX** [1] - 1399:24
**DULY** [3] - 1309:12, 1331:23, 1369:16
**DURING** [11] - 1311:1, 1311:4, 1317:12, 1322:16, 1356:3, 1374:12, 1374:25, 1383:11, 1385:14, 1431:25, 1432:12
**DYNAMIC** [1] - 1376:18

# E

**E-MAIL** [13] - 1346:10, 1347:23, 1373:9, 1373:11, 1389:24, 1391:25, 1392:4, 1392:6, 1392:8, 1392:12, 1392:13, 1416:1
**E-MAILED** [2] - 1350:1, 1373:2
**E-MAILS** [8] - 1337:2, 1348:8, 1373:6, 1415:19, 1416:3, 1416:6, 1416:7, 1416:8
**EASY** [8] - 1341:9, 1349:3, 1393:18, 1394:11, 1395:20, 1428:7, 1428:8, 1428:24
**EFFECT** [4] - 1399:1, 1424:23, 1425:4, 1425:6
**EFFECTUATE** [2] - 1414:1, 1414:16
**EFFICIENT** [3] - 1351:4, 1417:21, 1418:3
**EFFORT** [8] - 1413:10, 1414:7, 1414:13, 1415:5, 1415:6, 1415:17, 1415:19, 1415:21
**EGG** [1] - 1368:8
**EIGHT** [1] - 1392:3
**EITHER** [3] - 1385:20, 1422:13, 1428:21
**ELECT** [1] - 1418:25
**ELECTION** [26] - 1347:14, 1354:2, 1354:8, 1355:9, 1357:17, 1357:25, 1358:14, 1358:20, 1359:3, 1359:22, 1359:25, 1361:7, 1361:21, 1370:14, 1370:16, 1370:17, 1370:18, 1371:18, 1371:22, 1389:15, 1417:14, 1418:6, 1418:23, 1420:12, 1422:16
**ELECTIONS** [10] - 1334:3, 1347:3, 1357:23, 1359:14, 1361:9, 1385:5, 1385:23, 1389:14, 1396:10, 1404:24
**ELECTOR** [3] - 1349:22, 1371:25, 1373:9
**ELEMENTS** [6] - 1416:12, 1417:8, 1428:2, 1428:5, 1429:10, 1429:11
**ELIGIBILITY** [8] - 1362:20, 1363:17, 1389:9, 1393:15, 1401:9, 1404:2, 1427:14, 1427:15
**ELIGIBLE** [2] - 1418:21, 1419:2
**ELIGIBLY** [1] - 1412:4
**ELIMINATE** [1] - 1324:8
**EMOTIONAL** [1] - 1321:18
**EMPHASIZE** [2] - 1422:11, 1432:20
**EMPLOYEE** [1] - 1414:15
**EMPLOYMENT** [1] - 1404:18

**END** [7] - 1330:4, 1330:9, 1352:9, 1382:20, 1395:23, 1425:24, 1426:1
**ENDEAVORED** [1] - 1379:16
**ENDED** [1] - 1391:7
**ENFORCE** [1] - 1432:18
**ENGAGED** [1] - 1431:16
**ENGELBRECHT** [20] - 1309:19, 1311:1, 1329:6, 1329:15, 1333:11, 1346:12, 1346:18, 1347:21, 1370:10, 1370:20, 1371:14, 1389:24, 1394:17, 1395:6, 1395:7, 1395:19, 1403:2, 1414:8, 1414:14, 1416:7
**ENGELBRECHT** [1] - 1305:6
**ENJOY** [1] - 1368:22
**ENSURE** [6] - 1325:3, 1389:14, 1400:24, 1403:10, 1403:13, 1405:15
**ENTER** [1] - 1383:12
**ENTERED** [2] - 1377:16, 1385:4
**ENTIRELY** [1] - 1345:24
**ENTITY** [1] - 1408:19
**ENTRY** [1] - 1375:11
**ENVISIONED** [1] - 1403:3
**EQUIVALENT** [1] - 1400:2
**ERRONEOUS** [1] - 1420:8
**ERROR** [1] - 1422:20
**ERRORS** [1] - 1415:6
**ESPECIALLY** [3] - 1410:14, 1426:7, 1432:16
**ESQ** [13] - 1305:15, 1305:16, 1305:16, 1305:17, 1305:17, 1305:18, 1305:18, 1305:21, 1305:21, 1306:3, 1306:4, 1306:4, 1306:5
**ESQ** [2] - 1305:15, 1305:22
**ESSENTIALLY** [1] - 1316:12
**ESTABLISH** [1] - 1376:18
**ESTABLISHED** [5] - 1398:5, 1398:9, 1398:11, 1400:6, 1406:2
**EVALUATE** [3] - 1385:24, 1387:16, 1387:17
**EVALUATED** [1] - 1430:21
**EVALUATING** [2] - 1387:25, 1390:8
**EVANS** [38] - 1305:22, 1323:8, 1323:14, 1324:16, 1331:17, 1331:19, 1338:20, 1341:4, 1341:13, 1341:19, 1342:2, 1343:19, 1344:9, 1344:13, 1344:23, 1354:18, 1360:6, 1360:10, 1360:15, 1362:6, 1362:24, 1364:5, 1382:23, 1383:2, 1383:4, 1385:20, 1386:5, 1386:9, 1386:12, 1388:14, 1392:18, 1397:8, 1398:22, 1427:11, 1431:10, 1431:12, 1431:23, 1432:7
**EVANS** [11] - 1310:14, 1331:18, 1340:23, 1341:12, 1342:1, 1397:1, 1402:7, 1409:5, 1424:13, 1431:22, 1433:5
**EVENING** [1] - 1366:23
**EVENT** [2] - 1424:5, 1426:21
**EVENTUALLY** [3] - 1356:8, 1356:10, 1390:21
**EVIDENCE** [41] - 1308:17, 1308:19,

1339:21, 1339:24, 1340:18, 1341:8,
1342:15, 1344:25, 1354:20, 1383:18,
1384:5, 1384:7, 1384:12, 1385:3,
1385:13, 1385:14, 1386:20, 1387:6,
1387:12, 1390:4, 1392:11, 1394:7,
1395:3, 1396:4, 1397:13, 1397:19,
1405:18, 1406:6, 1408:3, 1408:20,
1412:3, 1413:12, 1414:22, 1418:24,
1428:14, 1429:3, 1429:10, 1429:18,
1429:20
EVIDENTIARY [1] - 1384:1
EXACT [2] - 1400:7, 1426:11
EXACTLY [2] - 1334:9, 1417:16
EXAMINATION [3] - 1332:16, 1360:25,
1369:23
EXAMINATION [2] - 1364:3, 1381:3
EXAMPLE [5] - 1335:4, 1402:5,
1421:13, 1424:22, 1426:12
EXCEL [1] - 1376:17
EXCEPT [1] - 1403:22
EXCEPTION [9] - 1345:1, 1405:2,
1424:9, 1425:7, 1425:8, 1425:10,
1425:13, 1425:14
EXCEPTIONS [3] - 1424:5, 1424:7,
1424:8
EXCLUDING [1] - 1404:17
EXCUSE [2] - 1334:21, 1360:22
EXCUSED [1] - 1331:13
EXCUSES [1] - 1321:16
EXHIBIT [7] - 1308:5, 1308:11, 1308:12,
1332:10, 1343:18, 1343:22, 1354:19
EXHIBIT [9] - 1308:18, 1332:8, 1334:10,
1334:12, 1339:23, 1344:8, 1344:25,
1346:9, 1376:3
EXISTED [1] - 1399:8
EXISTS [2] - 1385:22, 1420:7
EXPAND [1] - 1403:22
EXPECTED [3] - 1413:23, 1413:24,
1425:4
EXPENDED [1] - 1396:22
EXPENSIVE [1] - 1324:23
EXPERIENCE [1] - 1410:19
EXPERT [9] - 1316:10, 1316:18, 1317:1,
1317:11, 1318:8, 1318:9, 1318:10,
1387:9, 1415:15
EXPERTS [1] - 1316:14
EXPLAIN [3] - 1310:5, 1343:3, 1348:2
EXPLAINED [2] - 1310:4, 1424:2
EXPOSE [5] - 1356:19, 1356:21,
1356:23, 1357:8, 1357:10
EXPRESSED [1] - 1357:7
EXTENSIVE [1] - 1405:17
EXTENT [5] - 1322:19, 1332:12,
1376:16, 1392:19, 1424:2
EYES [1] - 1323:10

F

FACE [1] - 1368:8
FACEBOOK [11] - 1399:18, 1399:22,

1400:3, 1406:20, 1407:19, 1408:5,
1425:12, 1425:17, 1426:13, 1430:2,
1430:4
FACILITATING [1] - 1418:19
FACT [26] - 1318:9, 1341:15, 1355:7,
1363:18, 1373:1, 1383:19, 1383:23,
1384:19, 1384:21, 1388:20, 1389:7,
1391:25, 1392:2, 1392:25, 1393:13,
1393:20, 1395:24, 1396:13, 1399:3,
1405:7, 1406:22, 1412:25, 1419:13,
1425:5, 1426:5, 1430:15
FACT-FINDING [1] - 1395:24
FACTOR [1] - 1386:12
FACTORS [8] - 1387:24, 1393:23,
1396:7, 1417:10, 1417:11, 1417:12,
1430:4, 1432:19
FACTS [5] - 1392:21, 1393:2, 1393:19,
1396:12, 1422:13
FAIR [7] - 1330:23, 1355:17, 1356:18,
1371:10, 1374:8, 1392:9, 1416:24
FAIR [1] - 1305:3
FALLS [1] - 1425:13
FALSE [6] - 1425:9, 1426:17, 1427:19
FALSITY [2] - 1422:24
FAMILIAR [4] - 1317:18, 1370:13,
1371:11, 1371:25
FAPR [1] - 1434:14
FAR [8] - 1325:25, 1326:9, 1329:10,
1329:16, 1329:21, 1329:22, 1359:16,
1384:12
FAST [2] - 1338:23, 1348:4, 1348:6
FAVOR [5] - 1320:24, 1383:24, 1393:24,
1422:13, 1429:6
FAVORABLE [2] - 1383:15, 1395:3
FEDERAL [1] - 1383:9
FEDERAL [3] - 1383:16, 1398:13,
1408:17, 1420:4, 1420:5, 1420:17,
1420:18, 1420:25, 1421:7
FELLOW [1] - 1345:15
FELT [4] - 1345:17, 1352:19, 1357:14,
1418:4
FEW [15] - 1318:7, 1328:5, 1328:8,
1332:20, 1342:18, 1348:5, 1349:15,
1351:1, 1356:1, 1374:17, 1399:17,
1407:12, 1421:10, 1421:19, 1424:4
FIGHT [1] - 1305:3
FILE [12] - 1337:3, 1357:18, 1359:2,
1359:12, 1363:7, 1383:5, 1399:15,
1399:18, 1432:3, 1432:5, 1432:8,
1432:24
FILED [15] - 1316:18, 1349:22, 1358:8,
1359:8, 1360:5, 1360:8, 1360:14,
1362:17, 1362:19, 1393:8, 1393:9,
1393:10, 1399:22, 1415:8, 1418:17
FILES [3] - 1339:7, 1339:15, 1421:13
FILING [11] - 1356:19, 1357:24, 1358:2,
1358:4, 1358:5, 1358:13, 1359:20,
1414:5, 1422:6, 1425:2, 1427:17
FILL [2] - 1373:12, 1391:15
FILLED [1] - 1377:10

FINALLY [1] - 1356:10
FINDINGS [4] - 1382:25, 1383:8,
1383:19, 1421:20
FINE [6] - 1315:9, 1322:5, 1329:5,
1344:20, 1362:2, 1366:17
FINING [1] - 1320:8
FINISH [4] - 1340:25, 1341:1, 1409:9,
1431:9
FINISHED [2] - 1353:9, 1374:22
FIREWALL [8] - 1385:22, 1396:9,
1402:8, 1402:9, 1402:15, 1402:16
FIRMLY [1] - 1396:8
FIRST [22] - 1308:3, 1318:8, 1318:15,
1325:2, 1328:18, 1328:22, 1336:4,
1342:23, 1344:14, 1372:10, 1375:7,
1380:3, 1380:4, 1384:15, 1387:19,
1388:11, 1402:14, 1405:8, 1407:22,
1421:22, 1427:13, 1432:19
FIRST [8] - 1389:13, 1422:24, 1423:2,
1423:5, 1427:25, 1428:3, 1428:5,
1429:11
FIT [2] - 1321:22, 1322:1
FIVE [3] - 1310:3, 1375:12, 1427:10
FIVE-MINUTE [1] - 1427:10
FLAG [1] - 1318:15
FLAWED [1] - 1415:7
FLIP [2] - 1346:11, 1346:17
FLOOR [1] - 1323:7
FLOW [1] - 1371:21
FOCUSING [1] - 1412:12
FOLKS [5] - 1354:23, 1362:4, 1384:18,
1386:19, 1386:25, 1428:12
FOLLOW [1] - 1326:12
FOLLOWING [1] - 1366:19
FOLLOWS [4] - 1309:12, 1327:19,
1331:23, 1369:16
FOOTNOTE [1] - 1386:13
FOR [1] - 1305:1
FORCE [2] - 1347:6, 1347:18
FORD [9] - 1308:13, 1332:5, 1334:15,
1338:3, 1340:25, 1341:1, 1341:10,
1344:1, 1363:25
FORD [53] - 1305:15, 1308:15, 1332:6,
1332:15, 1332:17, 1334:11, 1334:13,
1334:17, 1334:25, 1337:9, 1337:11,
1337:20, 1338:7, 1338:24, 1339:2,
1339:22, 1340:1, 1340:6, 1340:10,
1340:19, 1340:24, 1341:2, 1341:11,
1341:14, 1342:3, 1342:17, 1343:13,
1343:21, 1344:2, 1344:5, 1344:7,
1344:24, 1345:3, 1346:6, 1346:8,
1347:9, 1347:12, 1347:22, 1348:14,
1350:25, 1351:4, 1351:5, 1352:3,
1352:4, 1353:3, 1354:21, 1355:1,
1355:4, 1359:7, 1360:13, 1360:17,
1363:6, 1364:1
FORD'S [3] - 1342:23, 1343:2, 1351:25
FOREGOING [1] - 1434:6
FOREWARNING [1] - 1424:13
FORM [4] - 1341:20, 1385:15, 1390:10,

1425:22

**FORMAL** [1] - 1361:25
**FORMALLY** [1] - 1361:16
**FORSYTH** [1] - 1324:16
**FORT** [1] - 1347:6
**FORT** [2] - 1347:17
**FORTH** [3] - 1316:9, 1405:1, 1423:20
**FORWARD** [1] - 1400:8
**FORWARD** [10] - 1346:13, 1386:25, 1390:16, 1391:4, 1391:5, 1391:6, 1396:2, 1400:21, 1402:11, 1414:16
**FORWARDED** [2] - 1346:12, 1391:14
**FOUNDATION** [7] - 1329:16, 1329:18, 1341:4, 1341:9, 1341:21, 1341:24, 1376:17
**FOUNDED** [1] - 1412:1
**FOUR** [8] - 1348:4, 1384:16, 1384:17, 1385:2, 1385:7, 1385:10, 1396:12, 1407:2
**FOUR-WEEK** [1] - 1348:4
**FOX** [1] - 1425:23
**FPO** [2] - 1347:7, 1347:18
**FRAUD** [1] - 1424:22
**FREE** [8] - 1330:21, 1365:11, 1382:22, 1423:5, 1423:7, 1423:9, 1423:13, 1423:17
**FRESH** [1] - 1386:23
**FRIDAY** [1] - 1305:11
**FRIENDS** [4] - 1317:21, 1345:16, 1430:5
**FRIVOLITY** [2] - 1389:2, 1390:16
**FRIVOLOUS** [7] - 1393:17, 1393:18, 1401:25, 1402:3, 1404:1, 1411:20, 1412:7
**FRIVOLOUSNESS** [2] - 1389:3, 1391:9
**FRONT** [5] - 1320:14, 1324:22, 1346:10, 1346:14, 1398:5
**FULLY** [1] - 1383:10
**FULTON** [2] - 1407:21, 1407:24
**FUND** [4] - 1371:12, 1371:14, 1371:19, 1389:24
**FUNNEL** [3] - 1398:22, 1398:23, 1398:24
**FUNNELING** [6] - 1399:2, 1399:5, 1399:7, 1399:10, 1399:11
**FUTURE** [2] - 1330:17, 1386:15

## G

**GAELECTORCHALLENGE.COM** [2] - 1373:20, 1378:13
**GAINESVILLE** [2] - 1368:22, 1369:1
**GAME** [1] - 1323:18
**GAMES** [1] - 1325:10
**GASAWAY** [5] - 1322:22, 1325:8, 1406:1, 1406:9, 1406:13
**GATEKEEPER** [3] - 1399:6, 1399:8, 1399:9
**GENERAL** [5] - 1358:20, 1359:24, 1386:20, 1418:23, 1432:14
**GEORGIA** [20] - 1333:8, 1339:10,

1359:2, 1361:12, 1362:19, 1368:20, 1370:13, 1371:3, 1371:7, 1371:25, 1373:9, 1373:15, 1390:22, 1391:13, 1391:19, 1393:11, 1396:13, 1403:23, 1411:1, 1420:12
**GEORGIA** [2] - 1305:1, 1434:4
**GEORGIA'S** [1] - 1370:17
**GEORGIAN** [1] - 1325:12
**GEOSPATIAL** [1] - 1321:19
**GERMANY** [6] - 1385:25, 1391:21, 1402:9, 1408:1, 1417:3, 1417:13
**GIVEN** [12] - 1318:16, 1319:19, 1321:11, 1335:11, 1338:3, 1341:8, 1350:4, 1350:12, 1355:7, 1356:8, 1357:12, 1368:2
**GOAL** [2] - 1356:18, 1356:23
**GOD** [1] - 1318:2
**GOOGLE** [6] - 1399:24, 1406:20, 1407:19, 1407:20, 1408:6, 1425:13
**GOP** [1] - 1345:15
**GOVERNMENT'S** [1] - 1401:22
**GRADUATE** [1] - 1317:3
**GRANDSON** [1] - 1315:12
**GRANT** [2] - 1409:2, 1432:1
**GRANTED** [1] - 1385:13
**GRAVER** [1] - 1318:16
**GREEN** [4] - 1378:5, 1378:7, 1378:10, 1379:1
**GREGG** [2] - 1307:3, 1309:11
**GREGG** [2] - 1308:20, 1309:16
**GROUNDS** [4] - 1398:14, 1401:8, 1401:9, 1401:10
**GROUP** [1] - 1413:3
**GUESS** [6] - 1334:3, 1336:17, 1346:24, 1358:8, 1401:14, 1420:20
**GUYS** [1] - 1341:17
**GWINNETT** [20] - 1335:5, 1349:17, 1349:19, 1350:1, 1350:6, 1352:7, 1352:9, 1352:12, 1352:16, 1352:20, 1353:13, 1353:21, 1355:17, 1356:19, 1358:9, 1358:24, 1363:8, 1363:12, 1394:14, 1394:15

## H

**H-O-L-S-W-O-R-T-H** [1] - 1369:21
**HALF** [2] - 1325:19
**HALFWAY** [1] - 1392:23
**HAND** [7] - 1309:9, 1320:23, 1321:4, 1329:13, 1329:14, 1331:20, 1369:12
**HANDED** [1] - 1391:25
**HANDLE** [2] - 1308:3, 1326:1
**HAPPY** [6] - 1396:19, 1423:23, 1423:25, 1424:19, 1432:21
**HARD** [7] - 1311:11, 1311:23, 1320:13, 1334:4, 1337:2, 1361:8, 1428:8
**HARDLY** [2] - 1357:23, 1428:9
**HARDY** [3] - 1316:22, 1319:5, 1320:6
**HARDY** [10] - 1305:15, 1318:7, 1318:22, 1319:12, 1322:5, 1322:11, 1323:3,

1323:17, 1324:20, 1327:15
**HEAD** [4] - 1310:12, 1311:13, 1315:3, 1323:10
**HEALTH** [1] - 1321:11
**HEALTHCARE** [1] - 1389:25
**HEAR** [3] - 1340:22, 1383:2, 1403:14
**HEARD** [22] - 1316:19, 1318:16, 1320:7, 1320:10, 1324:1, 1355:23, 1355:24, 1356:4, 1383:11, 1383:18, 1397:12, 1399:21, 1402:20, 1402:21, 1402:25, 1403:2, 1403:9, 1403:14, 1408:3, 1426:2, 1427:2, 1428:25
**HEARING** [15] - 1352:9, 1352:12, 1352:16, 1352:24, 1353:5, 1353:13, 1354:4, 1354:14, 1355:20, 1355:22, 1355:24, 1355:25, 1356:9, 1403:18, 1433:8
**HEARINGS** [1] - 1413:24
**HEARSAY** [4] - 1332:12, 1341:5, 1354:18, 1392:19
**HEART** [1] - 1319:23
**HEATHER** [6] - 1372:11, 1372:16, 1372:17, 1373:8, 1373:18
**HEATING** [1] - 1371:23
**HELD** [1] - 1308:1
**HELLO** [1] - 1391:23
**HELP** [6] - 1333:14, 1333:18, 1337:21, 1345:18, 1353:12, 1389:25
**HELPFUL** [1] - 1424:1
**HEREBY** [1] - 1434:6
**HEREDIA** [9] - 1393:5, 1393:6, 1395:15, 1395:16, 1395:20, 1402:21, 1405:25, 1406:15
**HESITATE** [1] - 1347:20
**HESITATED** [1] - 1321:21
**HI** [2] - 1346:18, 1347:1
**HI** [3] - 1347:13, 1370:3, 1391:22
**HIGHLIGHTED** [1] - 1378:10, 1379:20
**HIGHLIGHTING** [8] - 1377:20, 1377:22, 1378:2, 1378:3, 1378:5, 1378:7, 1378:16, 1380:1
**HIGHLY** [2] - 1318:3, 1420:25
**HILL** [3] - 1385:3, 1400:8, 1400:11
**HIMSELF** [4] - 1318:11, 1320:18, 1320:20, 1388:1
**HISTORICAL** [1] - 1410:11
**HISTORY** [1] - 1410:11
**HIT** [2] - 1335:25, 1389:16
**HMM** [1] - 1371:3
**HOLD** [6] - 1316:24, 1319:8, 1321:3, 1326:22, 1354:17, 1413:24
**HOLSWORTH** [14] - 1365:17, 1365:19, 1367:11, 1367:12, 1367:22, 1367:23, 1369:8, 1369:11, 1369:20, 1369:25, 1377:19, 1379:2, 1380:22, 1381:2
**HOLSWORTH** [2] - 1307:6, 1369:15
**HOLSWORTH** [1] - 1370:7
**HOME** [2] - 1385:1, 1385:10
**HONEST** [3] - 1328:10, 1328:16, 1329:23

**HONESTY** [2] - 1328:14, 1328:19
**HONOR** [87] - 1308:15, 1316:4, 1318:7, 1318:14, 1319:12, 1322:5, 1322:11, 1323:3, 1324:20, 1324:22, 1325:6, 1331:13, 1332:6, 1334:11, 1337:9, 1338:24, 1339:23, 1340:1, 1340:6, 1340:10, 1340:19, 1341:11, 1341:15, 1342:4, 1344:24, 1346:6, 1351:1, 1354:21, 1355:1, 1360:17, 1360:22, 1364:1, 1364:19, 1365:14, 1365:20, 1368:5, 1368:7, 1369:5, 1369:10, 1374:15, 1381:6, 1381:25, 1382:13, 1382:17, 1383:22, 1384:3, 1386:10, 1386:13, 1387:24, 1388:17, 1390:19, 1394:9, 1395:24, 1397:10, 1398:25, 1399:5, 1399:8, 1400:9, 1401:6, 1402:13, 1406:23, 1409:19, 1411:9, 1413:18, 1413:22, 1414:24, 1415:1, 1416:12, 1417:25, 1419:4, 1419:10, 1419:15, 1420:19, 1423:8, 1423:10, 1423:14, 1423:21, 1425:16, 1426:4, 1427:5, 1427:9, 1430:20, 1432:7, 1432:10, 1433:1, 1433:3
**HONOR'S** [2] - 1327:9, 1400:5
**HONORABLE** [2] - 1305:10, 1434:15
**HOPE** [2] - 1330:8, 1330:19
**HOPING** [3] - 1330:4, 1357:8, 1357:9
**HOTLINE** [7] - 1370:14, 1370:17, 1370:20, 1370:23, 1371:1, 1371:18
**HOUR** [2] - 1347:4, 1347:16
**HOUSTON** [1] - 1368:18
**HUGHES** [1] - 1306:5
**HURT** [1] - 1390:1

**I**

**I.E** [1] - 1425:3
**ID** [2] - 1378:8, 1378:21
**IDEA** [3] - 1315:12, 1322:17, 1375:23
**IDENTIFICATION** [1] - 1373:14
**IDENTIFIED** [3] - 1342:16, 1351:12, 1416:13
**IDENTIFY** [13] - 1314:20, 1322:19, 1322:22, 1340:8, 1340:17, 1342:10, 1342:13, 1367:12, 1367:13, 1367:14, 1367:19, 1367:21, 1367:22
**ILLEGAL** [6] - 1419:13, 1419:14, 1424:10, 1424:21, 1427:18
**ILLEGALLY** [2] - 1354:1, 1425:25
**IMMEDIATELY** [2] - 1323:25, 1354:5
**IMPACT** [3] - 1411:22, 1425:1, 1425:4
**IMPACTS** [4] - 1321:13, 1321:23, 1404:21, 1404:22
**IMPERMISSIBLE** [1] - 1415:7
**IMPLEMENT** [1] - 1405:15
**IMPLEMENTED** [1] - 1408:13
**IMPLICATED** [2] - 1394:15, 1395:12
**IMPLICATES** [2] - 1404:8
**IMPLICATION** [1] - 1325:10
**IMPLY** [1] - 1322:2

**IMPORTANT** [7] - 1311:16, 1311:23, 1330:13, 1364:8, 1417:6, 1419:23, 1422:1
**IMPROPERLY** [1] - 1400:25
**IMPROVED** [1] - 1380:1
**IN** [1] - 1308:1
**INC** [2] - 1305:3, 1305:6
**INCLUDED** [2] - 1430:22, 1431:2
**INCLUDING** [2] - 1383:20, 1397:13
**INCREASE** [2] - 1371:20, 1371:24
**INCREASED** [2] - 1371:18, 1371:21
**INDICATE** [1] - 1391:16
**INDICATED** [9] - 1327:25, 1328:23, 1329:6, 1360:7, 1365:17, 1365:25, 1366:1, 1366:6, 1393:22
**INDICATES** [2] - 1361:6, 1431:13
**INDICATING** [1] - 1373:1
**INDICATION** [1] - 1393:21
**INDIVIDUAL** [16] - 1333:18, 1333:25, 1350:24, 1353:16, 1356:17, 1390:12, 1390:13, 1400:23, 1402:19, 1406:23, 1411:10, 1411:14, 1411:16, 1411:20, 1411:24, 1412:2
**INDIVIDUAL'S** [1] - 1397:21
**INDIVIDUALIZED** [2] - 1412:17, 1412:20
**INDIVIDUALLY** [2] - 1351:7, 1410:22
**INDIVIDUALS** [26] - 1327:10, 1354:14, 1380:11, 1402:22, 1403:1, 1403:4, 1404:19, 1405:14, 1406:2, 1413:6, 1413:19, 1413:23, 1414:1, 1414:18, 1414:20, 1414:23, 1415:18, 1416:2, 1416:5, 1416:9, 1416:20, 1416:22, 1418:17, 1418:18, 1418:21, 1423:13
**INDULGENCE** [1] - 1419:7
**INELIGIBLE** [3] - 1351:12, 1352:6, 1416:5
**INFERENCES** [4] - 1383:23, 1392:23, 1395:3, 1429:6
**INFORM** [4] - 1316:5, 1325:15, 1385:5, 1418:5
**INFORMALLY** [1] - 1362:2
**INFORMATION** [27] - 1323:6, 1335:24, 1336:1, 1336:4, 1336:18, 1336:20, 1336:23, 1337:1, 1348:17, 1367:5, 1367:14, 1367:16, 1367:19, 1367:20, 1372:25, 1373:12, 1373:18, 1377:10, 1377:16, 1377:17, 1378:23, 1380:21, 1390:20, 1397:16, 1397:20, 1401:11, 1412:1
**INFORMED** [7] - 1315:25, 1316:1, 1381:15, 1385:8, 1402:22, 1402:23, 1431:8
**INFORMS** [1] - 1401:11
**INFRINGES** [1] - 1428:2
**INITIALS** [1] - 1377:18
**INOCULATE** [1] - 1424:24
**INQUIRIES** [1] - 1430:22
**INQUIRY** [2] - 1421:10, 1426:5
**INSERTED** [1] - 1358:17
**INSOFAR** [1] - 1425:2

**INSTALLED** [1] - 1334:8
**INSTANCE** [4] - 1404:3, 1404:19, 1404:21
**INSTANCES** [3] - 1404:14, 1412:22
**INSTRUCTIONS** [1] - 1381:12
**INSTRUMENTAL** [2] - 1413:8, 1413:10
**INSULT** [1] - 1311:22
**INTEGRAL** [3] - 1424:10, 1424:21, 1425:7
**INTEGRITY** [7] - 1361:7, 1361:22, 1370:14, 1370:16, 1370:17, 1371:18, 1389:15
**INTEND** [1] - 1362:19
**INTENDED** [1] - 1356:5
**INTENT** [9] - 1353:16, 1353:17, 1353:20, 1389:5, 1389:7, 1389:8, 1417:5, 1422:2, 1432:17
**INTENTIONAL** [1] - 1394:21
**INTENTIONALLY** [1] - 1353:18
**INTENTIONS** [1] - 1329:4
**INTERACTIONS** [1] - 1338:10
**INTERESTED** [1] - 1432:13
**INTERPRET** [1] - 1399:21
**INTERPRETED** [1] - 1399:21
**INTERPRETING** [1] - 1411:23
**INTERPRETIVE** [1] - 1386:6
**INTERVENOR** [1] - 1306:2
**INTIMIDATE** [13] - 1389:21, 1405:4, 1405:7, 1408:9, 1408:24, 1421:24, 1425:17, 1426:23, 1428:20, 1428:22, 1429:25, 1430:17, 1431:6
**INTIMIDATED** [26] - 1384:11, 1387:16, 1388:1, 1388:25, 1394:10, 1395:1, 1396:6, 1402:2, 1403:1, 1405:22, 1406:14, 1406:20, 1406:24, 1407:4, 1407:11, 1408:4, 1408:5, 1408:12, 1410:1, 1411:1, 1416:23, 1428:17, 1430:3, 1430:19, 1431:5, 1431:19
**INTIMIDATES** [1] - 1422:5
**INTIMIDATING** [7] - 1402:25, 1405:6, 1411:11, 1411:15, 1411:17, 1426:3, 1426:13
**INTIMIDATION** [43] - 1387:10, 1388:7, 1388:10, 1391:10, 1391:19, 1392:3, 1393:24, 1395:22, 1402:7, 1402:12, 1402:14, 1404:8, 1404:11, 1404:15, 1404:25, 1405:8, 1405:17, 1405:19, 1405:20, 1406:18, 1406:24, 1407:7, 1408:25, 1409:21, 1409:23, 1409:24, 1409:25, 1410:6, 1410:7, 1410:11, 1410:14, 1410:15, 1410:23, 1411:4, 1413:7, 1415:12, 1415:13, 1415:14, 1415:15, 1424:22, 1425:18
**INTRODUCE** [1] - 1367:5
**INTRODUCTION** [2] - 1333:4, 1333:10
**INVESTIGATE** [1] - 1352:13
**INVESTIGATED** [1] - 1403:11
**INVESTIGATION** [3] - 1403:9, 1403:10, 1403:13
**INVOLVED** [4] - 1332:22, 1373:6,

1373:23, 1428:23
**INVOLVEMENT** [2] - 1372:14, 1373:7
**IRRELEVANT** [2] - 1429:12, 1430:10
**ISSUE** [5] - 1319:2, 1357:12, 1383:11, 1383:12, 1383:15
**ISSUED** [2] - 1414:10, 1426:20
**ISSUES** [3] - 1361:7, 1361:21, 1396:2
**ITEM** [1] - 1318:14
**ITSELF** [6] - 1400:19, 1401:21, 1402:24, 1410:5, 1412:10, 1421:15

## J

**JACKSON** [3] - 1409:13, 1409:16, 1418:17
**JACOB** [1] - 1305:18
**JAIL** [5] - 1320:9, 1329:5, 1329:9, 1352:21, 1353:14
**JAILABLE** [1] - 1353:19
**JAILED** [1] - 1329:7
**JAKE** [1] - 1323:7
**JAMES** [8] - 1345:13, 1394:3, 1394:11, 1414:18, 1428:8, 1428:15, 1428:22, 1431:4
**JAMES** [2] - 1305:7, 1305:22
**JANE** [1] - 1305:3
**JANUARY** [4] - 1353:23, 1354:1, 1379:7, 1380:1
**JENNIFER** [1] - 1306:4
**JOB** [6] - 1333:14, 1348:4, 1348:8, 1349:11, 1372:3, 1372:7
**JOCELYN** [4] - 1402:21, 1405:25, 1406:15, 1406:24
**JOE** [9] - 1318:22, 1322:15, 1322:17, 1322:20, 1325:23, 1326:23, 1326:25, 1327:11, 1327:12
**JOHN** [3] - 1305:3, 1305:8, 1305:21
**JOHNSON** [27] - 1345:13, 1394:2, 1394:11, 1397:4, 1397:5, 1397:7, 1397:9, 1403:5, 1405:12, 1405:23, 1407:8, 1409:12, 1413:3, 1413:8, 1414:18, 1415:16, 1417:1, 1418:16, 1423:4, 1428:6, 1428:9, 1428:14, 1428:21, 1429:8, 1431:4, 1431:14
**JOHNSON** [1] - 1305:7
**JONES** [2] - 1305:10, 1434:15
**JONES'** [1] - 1326:13
**JOURNAL** [1] - 1312:14
**JOURNAL-CONSTITUTION** [1] - 1312:14
**JUDGE** [1] - 1305:11
**JUDGE** [32] - 1323:8, 1326:12, 1328:2, 1331:1, 1331:17, 1338:20, 1341:19, 1343:19, 1344:23, 1354:18, 1364:5, 1382:23, 1383:1, 1383:4, 1384:15, 1384:21, 1385:1, 1387:4, 1387:13, 1388:9, 1388:14, 1390:17, 1391:25, 1392:18, 1393:3, 1393:25, 1395:5, 1395:23, 1396:22, 1397:8, 1427:11, 1431:21

**JUDGE** [6] - 1328:5, 1329:13, 1341:4, 1344:9, 1392:10, 1429:19
**JUDGES** [1] - 1320:8
**JUDGMENT** [8] - 1382:25, 1383:7, 1383:13, 1384:4, 1385:12, 1396:23, 1416:13, 1429:7
**JUDGMENT** [1] - 1305:10
**JULY** [1] - 1370:8
**JURY** [2] - 1383:6, 1383:11
**JUSTICE** [3] - 1331:11, 1382:19, 1432:14
**JUSTICE'S** [1] - 1419:21

## K

**KEEP** [5] - 1321:14, 1324:22, 1334:16, 1346:25, 1365:3
**KICK** [1] - 1363:19
**KICKED** [3] - 1358:21, 1358:22, 1358:24
**KIND** [10] - 1328:6, 1342:25, 1343:8, 1346:13, 1348:25, 1355:22, 1378:24, 1380:7, 1424:14, 1431:12
**KINDS** [1] - 1348:24
**KNAPP** [13] - 1318:22, 1319:1, 1322:15, 1322:17, 1322:20, 1323:5, 1323:9, 1323:11, 1325:23, 1326:23, 1326:25, 1327:11, 1327:12
**KNOWING** [2] - 1351:23, 1391:1
**KNOWLEDGE** [7] - 1335:9, 1411:13, 1412:17, 1412:20, 1420:3, 1422:12, 1422:14
**KNOWN** [2] - 1316:14, 1396:12
**KNOWS** [4] - 1316:17, 1390:19, 1392:10, 1395:16

## L

**LACK** [5] - 1335:9, 1341:9, 1341:21, 1402:24, 1432:12
**LACKING** [2] - 1384:12, 1389:22
**LACKS** [1] - 1418:13
**LADY** [2] - 1381:15, 1408:1
**LAID** [1] - 1384:3
**LAND** [3] - 1404:4, 1404:6, 1404:18
**LANDOWNERS** [1] - 1404:3
**LANGUAGE** [1] - 1335:12
**LARGE** [2] - 1358:9, 1358:12
**LAST** [16] - 1321:11, 1324:22, 1325:18, 1330:11, 1342:3, 1343:16, 1344:20, 1364:23, 1365:20, 1366:10, 1375:5, 1386:24, 1387:15, 1392:1, 1393:5, 1395:5
**LASTLY** [1] - 1418:15
**LATE** [1] - 1359:9
**LAW** [37] - 1308:25, 1312:19, 1319:15, 1329:16, 1329:17, 1329:18, 1359:5, 1366:20, 1383:14, 1386:6, 1391:19, 1397:21, 1397:23, 1397:25, 1398:6, 1398:10, 1398:11, 1398:13, 1400:6, 1400:17, 1400:18, 1404:8, 1406:15, 1408:17, 1411:1, 1411:8, 1417:4,

**JUDGE** — (continued)
1420:4, 1420:5, 1420:17, 1420:18, 1420:25, 1421:7, 1421:16, 1430:11
**LAWFUL** [2] - 1404:15, 1405:3
**LAWFULNESS** [1] - 1404:2
**LAWRENCE** [10] - 1305:15, 1318:7, 1318:22, 1319:12, 1322:5, 1322:11, 1323:3, 1323:17, 1324:20, 1327:15
**LAWRENCE** [3] - 1316:22, 1319:5, 1320:6
**LAWRENCE-HARDY** [10] - 1305:15, 1318:7, 1318:22, 1319:12, 1322:5, 1322:11, 1323:3, 1323:17, 1324:20, 1327:15
**LAWRENCE-HARDY** [3] - 1316:22, 1319:5, 1320:6
**LAWSUITS** [1] - 1414:5
**LAWYER** [1] - 1421:4
**LAWYERS** [6] - 1315:20, 1319:9, 1325:14, 1330:14, 1343:25, 1364:10
**LAY** [1] - 1341:24
**LAYER** [1] - 1388:8
**LEADS** [2] - 1409:8, 1427:3
**LEAN** [1] - 1431:1
**LEARNED** [2] - 1407:13, 1407:16
**LEAST** [9] - 1316:17, 1340:8, 1340:17, 1342:13, 1387:15, 1397:15, 1402:10, 1412:3, 1414:12
**LEAVE** [7] - 1316:6, 1330:24, 1331:6, 1365:15, 1381:22, 1381:23, 1401:17
**LEAVES** [1] - 1395:15
**LEEWAY** [4] - 1344:10, 1344:11, 1344:15, 1344:16
**LEFT** [5] - 1314:7, 1315:24, 1323:10, 1331:4, 1345:24
**LEGAL** [3] - 1357:15, 1389:23, 1425:7
**LEGISLATORS** [1] - 1362:5
**LEGISLATURE** [1] - 1361:12
**LEGITIMATE** [2] - 1412:21, 1412:25
**LEND** [1] - 1415:20
**LESLIE** [1] - 1305:16
**LESS** [8] - 1357:21, 1357:22, 1357:24, 1358:14, 1406:7, 1430:6, 1432:9, 1432:24
**LETTER** [10] - 1334:5, 1334:8, 1335:1, 1335:5, 1335:11, 1335:16, 1346:19, 1346:21, 1347:2, 1347:14
**LETTERS** [4] - 1333:19, 1333:25, 1342:19, 1346:22
**LEVEL** [2] - 1325:12, 1426:9
**LIAR** [1] - 1329:11
**LIARS** [3] - 1316:15, 1317:13, 1317:17
**LIE** [5] - 1312:25, 1313:1, 1313:17, 1316:16
**LIED** [1] - 1330:6
**LIES** [2] - 1316:10, 1316:13
**LIFE** [1] - 1330:18
**LIGHT** [1] - 1365:15
**LIGHTLY** [2] - 1328:20, 1329:1
**LIKELY** [3] - 1392:19, 1421:23, 1424:10
**LIMINE** [1] - 1399:5

LIMITATION [1] - 1423:17
LIMITED [3] - 1366:16, 1409:21, 1430:4
LINE [6] - 1312:10, 1353:9, 1357:3, 1388:22, 1389:24, 1423:20
LINES [1] - 1379:19
LINK [7] - 1386:19, 1387:5, 1387:8, 1395:10, 1396:23, 1414:25, 1428:17
LIST [71] - 1308:8, 1325:9, 1326:23, 1327:2, 1327:7, 1327:9, 1327:22, 1332:10, 1333:23, 1333:24, 1337:13, 1339:18, 1339:20, 1342:21, 1349:19, 1350:5, 1350:13, 1350:16, 1350:19, 1350:21, 1350:22, 1351:6, 1351:8, 1351:16, 1351:17, 1351:20, 1352:6, 1352:14, 1352:17, 1353:16, 1353:22, 1354:13, 1355:8, 1356:6, 1356:7, 1356:12, 1356:14, 1356:15, 1356:16, 1363:8, 1363:16, 1363:19, 1366:2, 1366:3, 1366:4, 1367:24, 1372:5, 1372:14, 1372:20, 1372:22, 1375:19, 1376:2, 1379:3, 1380:13, 1380:15, 1397:15, 1399:11, 1399:22, 1399:23, 1400:3, 1412:24, 1414:2, 1414:3, 1415:24, 1416:4, 1417:14, 1420:10, 1421:14, 1422:20, 1426:16
LISTED [6] - 1310:2, 1366:23, 1375:16, 1376:12, 1376:21, 1406:10
LISTEN [2] - 1350:10, 1401:18
LISTS [10] - 1336:6, 1336:11, 1336:19, 1345:20, 1349:12, 1358:20, 1372:17, 1372:19, 1393:4, 1399:25
LIVE [6] - 1368:17, 1388:4, 1388:23, 1389:1, 1401:15
LIVED [7] - 1387:21, 1388:3, 1389:3, 1389:5, 1390:25, 1391:1, 1393:13
LIVES [4] - 1368:18, 1387:23, 1390:21, 1391:20
LOADED [1] - 1336:15
LOOK [30] - 1313:21, 1319:11, 1339:18, 1350:19, 1350:22, 1350:23, 1356:4, 1363:18, 1374:24, 1375:11, 1375:18, 1375:19, 1376:2, 1377:4, 1377:12, 1377:13, 1378:17, 1380:13, 1396:20, 1403:7, 1410:8, 1410:10, 1411:22, 1412:23, 1414:2, 1417:7, 1417:8, 1418:15, 1422:7
LOOKED [4] - 1343:6, 1350:20, 1390:25, 1392:1
LOOKING [11] - 1338:2, 1339:19, 1375:23, 1392:21, 1393:16, 1393:19, 1393:25, 1399:19, 1405:12, 1414:24, 1415:2
LOOKS [1] - 1375:2
LOVE [3] - 1318:3, 1328:23, 1427:19
LUNCH [2] - 1368:23, 1433:7
LUNCHTIME [1] - 1324:17
LYING [9] - 1312:9, 1312:10, 1312:24, 1313:2, 1313:5, 1313:16, 1314:14, 1317:13

**M**

MA'AM [1] - 1346:7
MADAM [1] - 1383:2
MAIL [13] - 1346:10, 1347:23, 1373:9, 1373:11, 1389:24, 1391:25, 1392:4, 1392:6, 1392:8, 1392:12, 1392:13, 1416:1
MAILED [2] - 1350:1, 1373:2
MAILS [8] - 1337:2, 1348:8, 1373:6, 1415:19, 1416:3, 1416:6, 1416:7, 1416:8
MAIN [1] - 1346:21
MAINTAINED [6] - 1374:2, 1374:3, 1376:4, 1376:14, 1383:14, 1389:15
MAINTAINING [1] - 1377:20
MAJORITY [1] - 1400:8
MALE [3] - 1311:5, 1315:1, 1315:16
MALES [2] - 1311:25, 1315:13
MAN [4] - 1311:14, 1312:2, 1318:4, 1320:17
MAN'S [1] - 1314:21
MANDATED [1] - 1385:4
MANIPULATE [1] - 1348:21
MANIPULATED [1] - 1339:15
MANNER [1] - 1400:4
MARC [4] - 1394:13, 1397:8, 1414:19
MARCOS [1] - 1305:16
MARK [7] - 1331:16, 1346:18, 1347:1, 1347:13, 1364:19, 1394:2, 1394:12
MARK [5] - 1305:7, 1307:5, 1331:22, 1332:2
MARK [2] - 1332:2, 1414:19
MARKED [2] - 1308:18, 1371:20
MARSHAL [2] - 1314:4, 1330:2
MARSHALS [1] - 1326:18
MASS [18] - 1390:10, 1405:16, 1406:18, 1406:20, 1406:22, 1407:7, 1407:11, 1407:13, 1408:12, 1408:13, 1411:4, 1411:10, 1411:13, 1421:14, 1428:18, 1428:23, 1430:14, 1431:6
MASSIVE [2] - 1355:11, 1414:13
MASTER'S [1] - 1313:10
MATCHED [2] - 1351:19, 1351:22
MATERIALS [1] - 1373:24
MATTER [16] - 1309:25, 1319:11, 1325:21, 1327:23, 1328:20, 1329:10, 1330:6, 1354:25, 1359:19, 1397:21, 1397:23, 1397:25, 1398:6, 1398:10, 1398:11, 1406:20
MATTERS [3] - 1324:4, 1330:18, 1417:23
MAY-CALL [1] - 1366:3
MAYER [1] - 1317:12
MC [2] - 1305:16, 1305:18
MEAN [21] - 1311:19, 1311:22, 1312:8, 1315:5, 1319:13, 1323:8, 1341:20, 1365:22, 1374:5, 1376:5, 1377:17, 1393:2, 1402:2, 1402:3, 1402:16, 1402:17, 1404:10, 1407:3, 1407:10,

MEANINGLESS [1] - 1402:15
MEANS [12] - 1349:6, 1378:11, 1378:16, 1384:8, 1384:15, 1392:11, 1394:8, 1399:2, 1399:7, 1408:24, 1419:25, 1425:17
MEANT [8] - 1318:10, 1377:22, 1378:2, 1378:3, 1378:4, 1378:5, 1378:7, 1403:18
MEDIA [2] - 1322:25, 1393:21
MEET [9] - 1330:10, 1343:16, 1390:3, 1392:11, 1393:16, 1395:21, 1418:5, 1418:7, 1422:4
MEETING [3] - 1417:15, 1417:17, 1417:18
MELLETT [1] - 1306:4
MEMBERS [2] - 1361:12, 1362:11
MEMORY [5] - 1353:12, 1375:21, 1379:25, 1380:8, 1388:15
MENG [1] - 1305:17
MENTION [1] - 1429:1
MENTIONED [9] - 1311:24, 1319:23, 1366:5, 1374:1, 1394:2, 1394:3, 1410:20, 1414:23, 1428:10
MENTIONS [1] - 1319:7
MERE [1] - 1419:13
MERELY [1] - 1417:14
MERITORIOUS [1] - 1411:25
MESSAGE [1] - 1413:13
MET [11] - 1316:5, 1322:18, 1328:22, 1333:10, 1366:15, 1394:6, 1395:3, 1428:2, 1428:5, 1428:9, 1429:10
METADATA [1] - 1337:22
METHODICAL [5] - 1394:21, 1395:8, 1429:17, 1430:21, 1431:17
METRO [1] - 1393:22
MICHAEL [1] - 1305:21
MICHELLE [1] - 1305:18
MID [2] - 1357:20, 1359:9
MID-DECEMBER [1] - 1357:20
MID-LATE [1] - 1359:9
MIDDLE [1] - 1335:14
MIDTOWN [2] - 1393:9, 1393:11
MIGHT [18] - 1323:4, 1336:14, 1337:23, 1337:25, 1338:4, 1343:4, 1343:8, 1343:9, 1345:17, 1349:2, 1352:25, 1362:4, 1362:12, 1363:18, 1401:3, 1412:4
MILITARY [2] - 1347:5, 1347:17
MILLION [1] - 1426:2
MIND [6] - 1321:14, 1321:17, 1339:18, 1361:22, 1386:23, 1406:6
MINDFUL [1] - 1319:24
MINDS [1] - 1387:19
MINE [2] - 1388:15, 1406:6
MINIMUM [1] - 1394:5
MINUTE [1] - 1427:10
MINUTES [5] - 1310:3, 1356:1, 1369:2, 1381:15, 1399:17
MISIDENTIFIED [1] - 1308:10

**MISREMEMBERING** [1] - 1392:14
**MISSED** [1] - 1398:2
**MISSTATEMENT** [1] - 1332:8
**MISUNDERSTOOD** [1] - 1399:20
**MOCINE** [1] - 1305:16
**MOCINE-MC** [1] - 1305:16
**MOMENT** [3] - 1331:14, 1380:5, 1419:8
**MONDAY** [2] - 1309:18, 1309:20
**MONITOR** [1] - 1324:25
**MONROE** [2] - 1375:7, 1375:9
**MONTGOMERY** [2] - 1375:6, 1375:8
**MONTHS** [7] - 1316:18, 1324:23, 1325:19, 1325:20, 1388:18
**MOODY** [2] - 1347:6, 1347:18
**MORNING** [9] - 1308:2, 1328:17, 1332:18, 1332:19, 1361:2, 1361:3, 1369:25, 1370:1, 1381:16
**MORPHED** [1] - 1370:17
**MORRISON** [1] - 1305:17
**MOST** [7] - 1319:13, 1322:12, 1340:11, 1385:11, 1400:4, 1412:22, 1422:24
**MOSTLY** [1] - 1373:7
**MOTION** [7] - 1382:25, 1383:7, 1390:6, 1396:18, 1399:4, 1399:15, 1432:1
**MOVE** [8] - 1322:10, 1330:6, 1339:23, 1343:15, 1370:6, 1382:23, 1390:22, 1393:14
**MOVED** [8] - 1362:18, 1387:22, 1390:19, 1390:20, 1393:14, 1393:20, 1397:16, 1398:15
**MOVES** [1] - 1393:12
**MOVING** [4] - 1317:2, 1344:25, 1390:16, 1393:11
**MR** [145] - 1308:6, 1308:10, 1309:3, 1314:24, 1316:4, 1316:21, 1316:23, 1316:25, 1317:2, 1317:9, 1318:2, 1319:7, 1321:6, 1322:17, 1323:2, 1323:7, 1323:8, 1323:14, 1323:16, 1323:21, 1324:2, 1324:10, 1324:14, 1324:16, 1325:6, 1326:25, 1327:4, 1327:8, 1327:13, 1331:13, 1331:17, 1331:19, 1338:20, 1341:4, 1341:13, 1341:19, 1342:2, 1343:19, 1344:9, 1344:13, 1344:23, 1354:18, 1360:6, 1360:10, 1360:15, 1362:6, 1362:24, 1364:5, 1364:19, 1364:23, 1365:14, 1365:20, 1365:24, 1366:4, 1366:8, 1366:10, 1366:14, 1366:23, 1367:5, 1367:11, 1367:13, 1367:20, 1368:5, 1368:7, 1368:14, 1368:18, 1368:21, 1368:25, 1369:3, 1369:5, 1369:10, 1369:24, 1374:15, 1374:17, 1374:19, 1374:21, 1374:23, 1375:25, 1376:11, 1376:16, 1376:20, 1377:2, 1377:9, 1380:23, 1381:2, 1382:3, 1382:10, 1382:13, 1382:17, 1382:23, 1383:2, 1383:4, 1385:20, 1386:5, 1386:9, 1386:12, 1388:14, 1392:18, 1397:8, 1397:10, 1397:25, 1398:4, 1398:8, 1398:20, 1398:22, 1398:25, 1399:4,

1399:23, 1400:18, 1401:5, 1401:19, 1402:13, 1403:6, 1403:24, 1404:13, 1404:17, 1405:14, 1405:25, 1406:10, 1406:22, 1407:12, 1407:16, 1408:7, 1408:18, 1408:23, 1409:4, 1409:11, 1409:18, 1410:4, 1411:9, 1413:4, 1413:21, 1415:4, 1416:11, 1416:20, 1417:2, 1417:24, 1418:9, 1418:13, 1427:11, 1431:10, 1431:12, 1431:23, 1432:7, 1433:3
**MS** [92] - 1308:15, 1318:7, 1318:22, 1319:12, 1322:5, 1322:11, 1323:3, 1323:17, 1324:20, 1327:15, 1332:6, 1332:15, 1332:17, 1334:11, 1334:13, 1334:17, 1334:25, 1337:9, 1337:11, 1337:20, 1338:7, 1338:24, 1339:2, 1339:22, 1340:1, 1340:6, 1340:10, 1340:19, 1340:24, 1341:2, 1341:11, 1341:14, 1342:3, 1342:17, 1343:13, 1343:21, 1344:2, 1344:5, 1344:7, 1344:24, 1345:3, 1346:6, 1346:8, 1347:9, 1347:12, 1347:22, 1348:14, 1350:25, 1351:4, 1351:5, 1352:3, 1352:4, 1353:3, 1354:21, 1355:1, 1355:4, 1359:7, 1360:13, 1360:17, 1360:22, 1361:1, 1362:10, 1363:6, 1363:23, 1364:1, 1419:7, 1419:10, 1419:15, 1419:18, 1420:19, 1420:25, 1421:6, 1421:13, 1421:17, 1421:19, 1421:22, 1422:9, 1423:8, 1423:10, 1423:14, 1423:16, 1423:21, 1423:25, 1424:8, 1424:18, 1425:14, 1425:16, 1426:4, 1427:5, 1427:8, 1432:10, 1433:1
**MS.PAIKOWSKY** [1] - 1423:23
**MSNBC** [1] - 1425:23
**MULTI** [2] - 1429:20, 1431:17
**MULTI-PRONGED** [2] - 1429:20, 1431:17
**MULTIFACTOR** [1] - 1417:5
**MULTIPLE** [3] - 1324:23, 1391:11, 1431:3
**MULTIPLE-PRONG** [1] - 1431:3
**MUSCOGEE** [20] - 1313:11, 1375:11, 1375:13, 1375:17, 1376:4, 1376:13, 1376:22, 1385:2, 1385:7, 1386:22, 1387:3, 1387:21, 1392:15, 1393:7, 1395:14, 1395:20, 1400:9, 1400:11, 1429:22

## N

**NAME** [27] - 1309:15, 1313:14, 1313:15, 1314:16, 1314:21, 1327:21, 1332:1, 1334:1, 1334:6, 1335:2, 1335:18, 1341:16, 1349:4, 1361:4, 1369:19, 1373:9, 1375:16, 1376:25, 1377:1, 1377:3, 1415:20, 1415:23, 1420:14, 1425:23, 1428:12
**NAMED** [3] - 1372:10, 1385:3, 1414:18
**NAMES** [28] - 1342:20, 1350:5, 1350:12,

1350:15, 1350:22, 1350:23, 1350:24, 1351:7, 1354:9, 1355:23, 1356:15, 1356:16, 1358:24, 1374:4, 1379:2, 1379:3, 1380:10, 1384:22, 1390:9, 1390:11, 1395:9, 1399:22, 1419:1, 1425:12, 1426:14, 1426:19, 1430:7
**NARROW** [2] - 1426:18, 1429:21
**NARROWED** [1] - 1398:24
**NARROWLY** [1] - 1426:10
**NATIONAL** [3] - 1393:8, 1393:9, 1393:10
**NATIONAL** [1] - 1370:16
**NATIVE** [1] - 1325:12
**NATURAL** [10] - 1405:7, 1405:16, 1408:25, 1410:6, 1410:7, 1410:22, 1415:11, 1421:11, 1421:23, 1422:15
**NATURALLY** [2] - 1410:15, 1413:7
**NAVY** [2] - 1389:18, 1389:19
**NCOA** [30] - 1350:9, 1351:17, 1351:20, 1351:23, 1352:6, 1358:21, 1359:16, 1359:20, 1363:19, 1397:17, 1398:16, 1398:19, 1399:11, 1400:6, 1400:12, 1400:17, 1400:19, 1417:9, 1417:10, 1419:12, 1419:19, 1420:22, 1421:2, 1421:8, 1421:14, 1422:7, 1427:16, 1427:17, 1429:17, 1430:22
**NECESSARIES** [1] - 1366:12
**NECESSARILY** [1] - 1371:7, 1404:23, 1412:15, 1416:24
**NECESSARY** [2] - 1378:23, 1429:11
**NEED** [22] - 1308:23, 1312:15, 1322:21, 1323:22, 1323:24, 1324:12, 1324:18, 1326:15, 1327:12, 1329:3, 1329:12, 1329:20, 1330:21, 1347:19, 1356:17, 1360:11, 1367:4, 1374:17, 1403:10, 1417:10, 1424:7, 1428:4
**NEEDED** [14] - 1333:13, 1333:17, 1333:24, 1345:8, 1345:10, 1352:8, 1352:19, 1353:25, 1354:7, 1354:9, 1360:2, 1388:8, 1414:17
**NEEDS** [4] - 1323:25, 1324:11, 1410:16, 1427:20
**NEGATES** [2] - 1384:23, 1387:13
**NEGATING** [1] - 1404:19
**NEIGHBOR** [5] - 1362:18, 1407:2, 1412:17, 1412:18, 1412:19
**NEIGHBORS** [1] - 1363:21
**NETWORK** [1] - 1425:23
**NEVER** [17] - 1309:3, 1322:18, 1330:10, 1339:8, 1343:6, 1343:9, 1349:9, 1349:22, 1355:24, 1361:25, 1384:19, 1392:25, 1393:14, 1395:8, 1395:9, 1399:21, 1402:17
**NEWS** [1] - 1317:5
**NEWSPAPER** [3] - 1312:25, 1313:8, 1316:20
**NEXT** [10] - 1331:3, 1331:7, 1347:4, 1347:15, 1375:16, 1376:22, 1378:25, 1382:15, 1386:12, 1391:20
**NIGHT** [9] - 1309:18, 1309:20, 1343:16,

1344:20, 1364:23, 1365:20, 1366:10, 1392:2, 1403:13

**NKWONTA** [68] - 1305:17, 1365:14, 1365:24, 1366:4, 1366:23, 1367:5, 1367:11, 1367:13, 1367:20, 1368:5, 1368:18, 1369:10, 1369:24, 1374:15, 1374:17, 1374:19, 1374:21, 1374:23, 1375:25, 1376:11, 1376:20, 1377:2, 1377:9, 1380:23, 1381:2, 1381:25, 1382:17, 1397:10, 1397:25, 1398:4, 1398:8, 1398:20, 1398:25, 1399:4, 1399:23, 1400:2, 1400:18, 1401:5, 1401:19, 1402:13, 1403:6, 1403:24, 1404:13, 1404:17, 1405:14, 1405:25, 1406:10, 1406:22, 1407:12, 1407:16, 1408:7, 1408:18, 1408:23, 1409:4, 1409:11, 1409:18, 1410:4, 1411:9, 1413:4, 1413:21, 1415:4, 1416:11, 1416:20, 1417:2, 1417:24, 1418:9, 1418:13, 1433:3

**NKWONTA** [2] - 1366:21, 1369:8

**NO** [1] - 1305:4

**NOBODY** [2] - 1312:24, 1415:12

**NON** [2] - 1383:11, 1384:18

**NON-JURY** [1] - 1383:11

**NON-PARTIES** [1] - 1384:18

**NONE** [2] - 1315:19, 1390:11

**NORMAL** [2] - 1343:6, 1343:7

**NORTH** [2] - 1387:22, 1388:4

**NORTHERN** [1] - 1305:1, 1434:4

**NOTE** [2] - 1318:14, 1345:1

**NOTES** [1] - 1370:23

**NOTHING** [19] - 1366:20, 1367:2, 1389:5, 1389:6, 1389:19, 1390:9, 1390:13, 1392:5, 1395:14, 1427:3, 1427:18, 1428:21, 1429:8, 1429:18, 1429:24, 1430:15, 1431:4, 1431:7, 1431:13

**NOTHING'S** [1] - 1429:13

**NOTICE** [4] - 1341:15, 1370:5, 1381:15, 1407:8

**NOTION** [1] - 1324:24

**NOVEMBER** [1] - 1305:11

**NOVEMBER** [1] - 1434:8

**NOWHERE** [1] - 1392:5

**NUANCED** [1] - 1385:22

**NULLIFYING** [1] - 1422:2

**NUMBER** [14] - 1311:24, 1321:13, 1347:20, 1371:17, 1373:14, 1378:8, 1378:21, 1387:24, 1389:2, 1395:19, 1401:17, 1404:14, 1410:9, 1410:10

**NUMBERS** [6] - 1350:20, 1351:18, 1351:19, 1351:22

**NVRA** [10] - 1400:19, 1400:21, 1400:22, 1400:24, 1401:2, 1419:19, 1419:20, 1419:25, 1427:23

---

## O

**OATH** [8] - 1316:2, 1319:17, 1326:7,
1326:11, 1326:13, 1328:19, 1329:3, 1330:6

**OBJECT** [3] - 1341:19, 1376:16, 1392:19

**OBJECTING** [1] - 1344:15

**OBJECTION** [16] - 1308:15, 1332:11, 1332:12, 1341:18, 1343:19, 1344:9, 1354:17, 1354:18, 1360:6, 1360:8, 1360:10, 1360:15, 1362:6, 1362:8, 1362:24

**OBJECTIONS** [1] - 1384:1

**OBJECTIVE** [4] - 1387:17, 1388:21, 1390:8, 1391:18

**OBJECTIVELY** [2] - 1388:1, 1405:6

**OBLIGATION** [1] - 1324:25

**OBTAIN** [1] - 1417:22

**OBVIOUSLY** [3] - 1311:16, 1318:24, 1432:4

**OCTOBER** [1] - 1415:25

**OF** [4] - 1305:1, 1305:10, 1306:2, 1434:4

**OFFENSE** [1] - 1353:19

**OFFENSIVE** [1] - 1319:13

**OFFER** [1] - 1383:19

**OFFERED** [5] - 1308:5, 1387:2, 1387:9, 1387:11

**OFFERING** [1] - 1354:23

**OFFHAND** [2] - 1337:14, 1337:19

**OFFICE** [3] - 1312:19, 1351:18, 1415:25

**OFFICE** [2] - 1361:15, 1362:11

**OFFICES'** [2] - 1347:3, 1347:15

**OFFICIAL** [1] - 1434:14

**OFFICIAL** [5] - 1328:6, 1373:17, 1373:19, 1391:6, 1391:14

**OFFICIALLY** [1] - 1331:9

**OFFICIALS** [4] - 1372:5, 1385:5, 1417:14, 1422:16

**ON** [1] - 1306:2

**ONCE** [3] - 1326:9, 1353:16, 1356:10

**ONE** [59] - 1308:23, 1310:7, 1312:8, 1314:25, 1316:24, 1318:17, 1319:15, 1319:16, 1321:6, 1326:16, 1327:8, 1331:10, 1331:13, 1333:25, 1335:5, 1336:16, 1337:19, 1343:8, 1348:10, 1355:8, 1355:19, 1355:22, 1358:2, 1358:5, 1363:21, 1364:13, 1365:3, 1365:7, 1365:16, 1366:23, 1375:7, 1387:19, 1389:2, 1389:17, 1389:24, 1391:21, 1391:23, 1393:10, 1395:19, 1407:2, 1408:22, 1409:7, 1409:16, 1409:18, 1410:8, 1410:9, 1411:25, 1411:5, 1415:5, 1415:13, 1416:14, 1419:8, 1421:5, 1421:25, 1425:22, 1426:6, 1430:14, 1432:5

**ONE'S** [4] - 1398:12, 1401:9, 1401:11

**ONES** [8] - 1378:6, 1380:16, 1380:17, 1380:19, 1380:21, 1397:4, 1424:16

**ONESELF** [1] - 1319:15

**ONGOING** [1] - 1319:2

**OPEN** [1] - 1308:1

**OPENS** [1] - 1390:14

**OPERATE** [1] - 1389:8

**OPERATED** [2] - 1389:6, 1389:20

**OPERATING** [1] - 1343:7

**OPINIONATED** [1] - 1318:3

**OPPORTUNITY** [11] - 1318:15, 1323:4, 1324:21, 1356:8, 1357:12, 1359:12, 1390:18, 1396:20, 1422:3

**OPPOSED** [1] - 1321:8

**OPTION** [4] - 1350:4, 1350:12, 1432:24, 1432:25

**ORDER** [11] - 1365:25, 1382:19, 1384:4, 1385:4, 1385:8, 1385:13, 1396:19, 1396:23, 1414:15, 1414:16, 1416:13

**ORGANIZATION** [1] - 1309:20

**ORIGINALLY** [2] - 1332:22, 1355:21

**OTHERWISE** [2] - 1385:9, 1405:3

**OUGHT** [1] - 1369:2

**OUT-OF-COURT** [1] - 1341:5

**OUTCOME** [1] - 1425:18

**OUTLINE** [1] - 1382:4

**OUTSIDE** [5] - 1315:23, 1320:24, 1325:16, 1331:17, 1381:11

**OVERALL** [2] - 1356:18, 1419:20

**OVERRULE** [1] - 1362:8

**OVERRULED** [1] - 1376:19

**OWN** [7] - 1335:9, 1351:19, 1359:16, 1415:8, 1415:9, 1419:1, 1421:25

---

## P

**P.M** [1] - 1433:8

**PAGE** [9] - 1346:10, 1346:11, 1353:6, 1357:3, 1375:5, 1379:19, 1423:3

**PAGES** [5] - 1413:13, 1432:6, 1432:7, 1432:8, 1434:6

**PAID** [4] - 1334:9, 1345:19, 1348:12, 1349:9

**PAIKOWSKY** [33] - 1306:3, 1360:22, 1361:1, 1362:10, 1363:23, 1381:6, 1419:7, 1419:10, 1419:15, 1419:18, 1420:19, 1420:25, 1421:6, 1421:13, 1421:17, 1421:19, 1421:22, 1422:9, 1423:8, 1423:10, 1423:14, 1423:16, 1423:21, 1423:25, 1424:8, 1424:18, 1425:14, 1425:16, 1426:4, 1427:5, 1427:8, 1432:10, 1433:1

**PAIKOWSKY** [1] - 1361:4

**PANDEMIC** [1] - 1356:3

**PAPER** [4] - 1312:12, 1312:13, 1312:16, 1313:14

**PARAPHRASE** [1] - 1354:12

**PART** [12] - 1326:11, 1338:5, 1343:7, 1349:11, 1353:7, 1359:5, 1372:3, 1372:14, 1378:19, 1413:2, 1422:10, 1423:3

**PARTIAL** [2] - 1382:25, 1383:7

**PARTICIPATION** [2] - 1403:11, 1432:12

**PARTICULAR** [1] - 1353:24

**PARTICULARLY** [3] - 1385:21, 1397:3,

1417:5
PARTIES[3] - 1384:17, 1384:18, 1384:19
PARTIES'[1] - 1396:15
PARTLY[1] - 1372:7
PARTY[19] - 1345:16, 1364:19, 1364:24, 1364:25, 1381:10, 1383:10, 1383:12, 1383:13, 1384:8, 1384:16, 1384:25, 1385:21, 1386:7, 1394:8, 1396:5, 1422:13, 1428:16, 1429:14, 1430:18
PARTY[1] - 1333:8
PASS[1] - 1380:24
PASSED[1] - 1348:12
PAST[3] - 1317:14, 1356:5, 1410:12
PATH[1] - 1359:18
PATIENCE[1] - 1365:15
PAUSE[1] - 1338:21
PAY[2] - 1330:17, 1421:10
PENNSYLVANIA[1] - 1387:23
PEOPLE[48] - 1310:8, 1311:20, 1312:9, 1312:25, 1317:20, 1320:8, 1320:9, 1321:12, 1328:5, 1328:8, 1328:12, 1329:4, 1329:5, 1329:14, 1345:17, 1352:17, 1352:21, 1353:13, 1353:22, 1358:20, 1362:14, 1371:23, 1374:6, 1395:16, 1400:25, 1403:23, 1403:25, 1404:1, 1404:4, 1408:16, 1415:14, 1416:3, 1418:3, 1420:10, 1420:11, 1422:17, 1422:18, 1425:24, 1425:25, 1426:1, 1426:2, 1426:3, 1426:14, 1430:5, 1430:8
PEOPLE'S[1] - 1328:19
PERCENT[3] - 1387:6, 1416:4, 1418:20
PERFORM[1] - 1339:3
PERIOD[4] - 1364:13, 1395:15, 1420:7, 1428:17
PERJURED[1] - 1320:18
PERMISSIBLE[1] - 1344:17
PERMITTED[1] - 1353:22
PERSON[24] - 1316:23, 1341:23, 1370:21, 1373:13, 1384:10, 1387:11, 1387:15, 1390:24, 1393:6, 1394:9, 1398:13, 1401:15, 1402:3, 1402:20, 1407:3, 1407:4, 1407:20, 1410:1, 1410:25, 1411:5, 1420:13, 1421:1, 1421:7
PERSON'S[1] - 1313:15
PERSONAL[3] - 1345:22, 1358:19, 1410:18
PERSONALLY[2] - 1338:6, 1382:22
PERSPECTIVE[1] - 1322:12
PETITION[1] - 1411:19
PHILLIPS[32] - 1308:20, 1308:22, 1308:24, 1309:4, 1309:7, 1309:16, 1309:17, 1309:23, 1310:2, 1315:24, 1316:19, 1318:2, 1319:10, 1319:14, 1319:19, 1320:7, 1320:25, 1321:10, 1322:8, 1322:13, 1325:25, 1326:1, 1326:22, 1327:17, 1327:18, 1327:20,

1327:21, 1330:5, 1331:2, 1331:4, 1333:11, 1333:13
PHILLIPS[2] - 1307:3, 1309:11
PHONE[15] - 1313:20, 1313:22, 1314:2, 1314:11, 1314:17, 1314:18, 1314:20, 1320:21, 1320:23, 1331:5, 1368:24, 1368:25, 1371:1, 1371:5, 1371:6
PHRASE[1] - 1398:21
PHYSICALLY[1] - 1333:18
PICK[1] - 1421:4
PICKED[1] - 1317:12
PICTURE[1] - 1345:4
PIECE[1] - 1390:20
PINNED[1] - 1388:23
PLACE[2] - 1336:4, 1394:14
PLACED[1] - 1399:23
PLAINTIFF[9] - 1331:10, 1365:13, 1382:16, 1383:18, 1383:19, 1383:24, 1392:23, 1408:11, 1429:9
PLAINTIFF'[1] - 1374:18
PLAINTIFF'S[1] - 1414:25
PLAINTIFFS[1] - 1305:4
PLAINTIFFS[26] - 1308:7, 1325:15, 1331:8, 1336:9, 1369:10, 1382:17, 1382:19, 1384:2, 1384:6, 1384:16, 1384:17, 1385:16, 1394:5, 1395:2, 1395:10, 1395:25, 1396:3, 1397:3, 1407:10, 1408:4, 1408:9, 1410:8, 1424:14, 1428:13, 1428:25
PLAINTIFFS[1] - 1305:14
PLAINTIFFS'[5] - 1337:16, 1339:23, 1340:4, 1344:8, 1346:9
PLAINTIFFS'[7] - 1308:11, 1322:11, 1396:18, 1396:24, 1429:1, 1430:2, 1432:23
PLAN[1] - 1414:16
PLANNED[1] - 1413:24
PLANNING[1] - 1334:2
PLANS[1] - 1318:18
PLAUSIBLY[1] - 1422:4
PLAY[1] - 1428:1
PLAYED[1] - 1323:18
PLAYING[1] - 1325:10
PODCAST[11] - 1309:18, 1311:1, 1311:4, 1311:16, 1311:24, 1312:1, 1312:10, 1318:12, 1318:13, 1328:22, 1329:6
POINT[21] - 1325:7, 1336:25, 1339:22, 1342:3, 1345:2, 1349:16, 1355:8, 1359:13, 1376:18, 1380:18, 1385:1, 1390:7, 1395:15, 1401:6, 1401:13, 1409:12, 1413:18, 1413:22, 1427:2, 1428:4, 1432:1
POINTED[4] - 1312:1, 1384:9, 1388:11, 1388:12
POINTS[1] - 1431:25
POLLS[3] - 1371:23, 1389:20, 1389:21
PORTION[1] - 1417:6
POSITION[5] - 1412:10, 1419:21, 1420:21, 1422:12, 1422:19

POSSIBILITY[3] - 1324:8, 1357:14, 1428:1
POSSIBLE[4] - 1368:6, 1370:6, 1400:4, 1424:4
POSSIBLY[1] - 1354:13
POST[4] - 1426:13, 1430:2, 1430:7, 1430:9
POSTAL[2] - 1391:3, 1391:5
POSTED[3] - 1395:9, 1426:6, 1430:7
POSTS[1] - 1426:22
POSTURE[1] - 1319:11
POTENTIAL[2] - 1380:15, 1404:24
POWELL[5] - 1310:13, 1317:7, 1321:7, 1331:7, 1433:5
POWELL[4] - 1305:21, 1308:6, 1308:10, 1317:2
PRACTICAL[1] - 1410:19
PREACH[1] - 1368:13
PREACHED[1] - 1368:12
PRECAUTION[1] - 1325:7
PRECEDENT[1] - 1396:7
PRECISE[1] - 1372:23
PREDICATE[1] - 1341:6
PREDICT[1] - 1316:12
PREDICTED[2] - 1386:14, 1396:22
PREEMPTS[1] - 1420:18
PREFACE[1] - 1328:18
PREPARATION[1] - 1317:11
PREPARED[1] - 1433:6
PREPARING[1] - 1366:15
PREPONDERANCE[11] - 1384:5, 1384:7, 1387:6, 1390:3, 1392:11, 1394:7, 1395:2, 1396:3, 1428:14, 1429:9, 1429:10
PREROGATIVE[1] - 1396:1
PRESENT[6] - 1320:1, 1322:14, 1334:3, 1395:23, 1400:14, 1433:6
PRESENTED[3] - 1336:13, 1384:2, 1413:12
PRESIDENTIAL[1] - 1370:18
PRESS[1] - 1312:17
PRESS[1] - 1390:11
PRESUME[1] - 1359:13
PRESUPPOSE[1] - 1415:1
PRETRIAL[1] - 1365:25
PRETTY[2] - 1336:17, 1358:12
PREVENTS[1] - 1398:13
PREVIOUSLY[2] - 1356:22, 1432:12
PRIMARILY[1] - 1425:5
PRINCIPALLY[1] - 1385:12
PRINT[3] - 1333:14, 1345:20, 1348:8
PRINTED[1] - 1348:21
PRINTER[1] - 1345:25
PRINTERS[1] - 1336:1
PRINTING[5] - 1332:23, 1333:1, 1333:18, 1333:21, 1335:8
PRISON[3] - 1320:9, 1329:5, 1329:10
PRIVATE[2] - 1419:24, 1432:17
PRIVILEGE[5] - 1343:20, 1344:13,

1344:16, 1344:19, 1344:22
**PROBABLE** [13] - 1355:18, 1385:24, 1385:25, 1402:10, 1402:25, 1417:22, 1418:5, 1418:7, 1418:10, 1418:11, 1418:12, 1418:13, 1427:16
**PROBATIVE** [2] - 1420:5, 1420:6
**PROBLEM** [3] - 1325:24, 1355:15, 1381:17
**PROBLEMS** [1] - 1325:19
**PROCEDURAL** [1] - 1398:17
**PROCEDURE** [1] - 1383:10
**PROCEDURE** [2] - 1325:13, 1326:12
**PROCEDURES** [2] - 1343:6, 1343:7
**PROCEED** [5] - 1332:5, 1332:7, 1417:22, 1418:4, 1419:14
**PROCEEDINGS** [1] - 1434:6
**PROCEEDINGS** [1] - 1305:10
**PROCESS** [7] - 1335:9, 1335:24, 1373:23, 1378:22, 1380:20, 1421:1, 1425:4
**PRODUCE** [5] - 1333:24, 1338:9, 1338:14, 1340:4, 1343:11
**PRODUCED** [10] - 1338:17, 1339:4, 1339:9, 1340:2, 1341:16, 1341:23, 1342:5, 1342:7, 1343:10, 1367:8
**PRODUCING** [2] - 1350:7, 1350:8
**PROFESSION** [1] - 1332:25
**PROFESSIONAL** [1] - 1332:25
**PROGRAM** [2] - 1372:1, 1372:3
**PROJECT** [1] - 1348:4
**PROMISE** [1] - 1343:15
**PRONE** [1] - 1422:20
**PRONG** [1] - 1431:3
**PRONGED** [2] - 1429:20, 1431:17
**PROPER** [2] - 1357:16, 1417:22
**PROPERLY** [1] - 1389:14
**PROSECUTED** [1] - 1430:12
**PROSECUTING** [1] - 1408:17
**PROSECUTION** [2] - 1408:18
**PROSECUTORIAL** [2] - 1432:15, 1432:19
**PROSPECTIVE** [1] - 1415:19
**PROTECT** [2] - 1401:1, 1420:7
**PROTECTED** [7] - 1411:17, 1411:18, 1411:19, 1411:21, 1412:6, 1412:9
**PROVE** [1] - 1393:16
**PROVIDE** [12] - 1332:22, 1334:4, 1356:13, 1388:8, 1388:22, 1388:25, 1392:25, 1407:23, 1423:25, 1426:9, 1426:18, 1432:21
**PROVIDED** [4] - 1337:12, 1340:10, 1342:20, 1356:14
**PROVIDES** [1] - 1412:2
**PROVIDING** [2] - 1321:18, 1336:18
**PUBLIC** [5] - 1328:6, 1386:20, 1390:20, 1400:4, 1426:15
**PUBLICATION** [1] - 1390:8
**PUBLICLY** [4] - 1315:14, 1395:9, 1400:4, 1426:14

**PUBLISHED** [5] - 1390:10, 1390:11, 1390:12, 1390:14
**PULLED** [1] - 1388:22
**PURE** [1] - 1341:5
**PURGE** [1] - 1420:12
**PURGER** [2] - 1319:15, 1320:20
**PURPOSE** [4] - 1400:22, 1400:24, 1403:8, 1403:12
**PURPOSES** [3] - 1346:20, 1364:2, 1381:3
**PURSUE** [1] - 1389:13
**PUSHING** [1] - 1354:8
**PUT** [21] - 1329:5, 1329:9, 1331:9, 1331:12, 1332:13, 1345:12, 1375:14, 1377:17, 1378:21, 1383:21, 1384:16, 1387:24, 1396:11, 1412:10, 1418:25, 1424:15, 1424:16, 1425:24, 1426:1, 1427:11
**PUTS** [1] - 1404:1
**PUTTING** [4] - 1320:9, 1421:3, 1422:18, 1425:12

## Q

**QUALIFIES** [1] - 1393:17
**QUALITY** [1] - 1412:1
**QUEEN** [1] - 1305:16
**QUESTIONABLE** [1] - 1360:1
**QUESTIONED** [4] - 1351:16, 1352:8, 1352:19, 1361:23
**QUESTIONING** [8] - 1328:19, 1340:12, 1357:15, 1359:18, 1359:24, 1367:15, 1367:16, 1382:8
**QUESTIONS** [30] - 1320:20, 1331:10, 1338:8, 1342:14, 1342:18, 1343:14, 1344:21, 1349:15, 1351:2, 1352:1, 1352:2, 1360:18, 1360:23, 1361:10, 1361:11, 1361:14, 1361:23, 1362:3, 1363:24, 1364:11, 1380:23, 1381:5, 1382:18, 1382:21, 1386:16, 1397:11, 1408:22, 1424:19, 1432:4
**QUEUE** [1] - 1378:24
**QUICK** [3] - 1338:22, 1368:6, 1427:12
**QUICKLY** [4] - 1328:9, 1328:11, 1370:6, 1390:17
**QUIET** [1] - 1420:7
**QUIETLY** [1] - 1403:13
**QUITE** [3] - 1319:1, 1374:6, 1380:5

## R

**RAISE** [5] - 1309:8, 1320:19, 1329:14, 1331:20, 1369:12
**RAISED** [2] - 1361:10, 1386:14
**RAN** [1] - 1359:15
**RANDOM** [1] - 1341:22
**RATIONALES** [2] - 1420:4, 1420:6
**RDR** [1] - 1434:14
**REACH** [2] - 1411:24, 1426:23
**REACHED** [5] - 1380:16, 1391:22, 1391:23, 1392:3, 1393:1

**REACTION** [1] - 1410:9
**READ** [13] - 1312:12, 1312:13, 1314:13, 1316:20, 1317:5, 1317:13, 1317:14, 1347:10, 1357:5, 1377:6, 1401:14, 1432:2, 1432:4
**READING** [7] - 1308:25, 1316:17, 1347:9, 1375:21, 1407:14, 1407:17
**READY** [5] - 1331:6, 1347:3, 1347:15, 1381:16, 1424:14
**REAL** [3] - 1326:14, 1337:6, 1346:24
**REALIZED** [1] - 1432:11
**REALLY** [11] - 1311:9, 1329:23, 1336:12, 1348:11, 1390:4, 1393:14, 1402:6, 1405:10, 1405:11, 1422:21, 1429:19
**REASON** [16] - 1308:25, 1320:4, 1321:22, 1328:21, 1330:1, 1330:5, 1339:11, 1339:14, 1363:4, 1363:14, 1371:24, 1385:7, 1388:24, 1391:2, 1417:2, 1420:6
**REASONABLE** [7] - 1388:3, 1388:21, 1390:24, 1391:18, 1391:19, 1393:13, 1395:22
**REASONABLENESS** [1] - 1390:8
**REASONABLY** [9] - 1384:11, 1387:15, 1388:1, 1394:10, 1394:25, 1396:5, 1412:1, 1412:2, 1430:19
**REASONING** [1] - 1398:9
**REASONS** [3] - 1355:19, 1404:1, 1408:19
**RECEIVE** [3] - 1336:25, 1392:13, 1401:24
**RECEIVED** [4] - 1308:18, 1370:24, 1371:1, 1392:6
**RECEIVING** [2] - 1336:19, 1347:23
**RECKLESS** [7] - 1416:14, 1416:15, 1416:19, 1416:25, 1417:3, 1418:14, 1418:19, 1422:24, 1423:3, 1425:9, 1431:20
**RECKLESSLY** [2] - 1425:9, 1426:17
**RECKLESSNESS** [4] - 1384:9, 1394:9, 1422:22, 1430:20
**RECOGNIZE** [12] - 1337:14, 1337:17, 1337:18, 1337:19, 1337:24, 1338:1, 1338:3, 1339:12, 1339:25, 1423:7, 1423:9, 1423:13
**RECOLLECT** [1] - 1380:7
**RECOLLECTION** [12] - 1337:21, 1352:23, 1354:22, 1355:13, 1356:25, 1374:11, 1376:2, 1376:6, 1377:13, 1378:9, 1378:15, 1392:1
**RECORD** [32] - 1309:15, 1318:11, 1318:12, 1325:11, 1332:1, 1341:20, 1344:24, 1346:20, 1369:19, 1384:2, 1386:18, 1389:7, 1389:11, 1389:19, 1389:21, 1390:13, 1391:11, 1392:1, 1392:5, 1392:6, 1393:4, 1428:10, 1428:21, 1428:25, 1429:9, 1429:13, 1430:13, 1430:15, 1430:16, 1430:25, 1431:5, 1431:7

**RECORDS** [1] - 1343:10
**RECROSS** [1] - 1307:2
**RECRUITED** [4] - 1380:12, 1389:20, 1406:2, 1415:18
**RECRUITING** [3] - 1413:9, 1414:12, 1418:18
**RECRUITMENT** [1] - 1414:6
**REDIRECT** [1] - 1384:23
**REDIRECT** [1] - 1307:2
**REDLINING** [2] - 1316:8, 1317:15
**REFER** [2] - 1379:21, 1379:22
**REFERRED** [2] - 1317:2, 1380:16
**REFERRING** [6] - 1316:9, 1316:10, 1316:11, 1316:25, 1317:10, 1321:8
**REFLECTION** [1] - 1392:13
**REFLECTS** [1] - 1391:11
**REFRESH** [10] - 1337:21, 1352:23, 1353:12, 1354:22, 1356:25, 1374:11, 1375:21, 1376:2, 1377:13, 1387:19
**REFRESHED** [1] - 1392:1
**REFUSED** [1] - 1367:6
**REGARD** [4] - 1319:2, 1319:19, 1319:21, 1322:6
**REGARDING** [7] - 1309:1, 1309:19, 1309:20, 1310:4, 1311:1, 1312:20, 1386:16
**REGISTERED** [3] - 1400:20, 1400:23, 1404:7
**REGISTRATION** [2] - 1398:12, 1398:14
**REGISTRY** [1] - 1397:18
**REGULAR** [1] - 1381:1
**REGULATE** [1] - 1421:1
**REJECT** [1] - 1401:21
**REJECTED** [1] - 1413:16
**RELATED** [1] - 1340:2
**RELATES** [1] - 1401:22
**RELATING** [1] - 1338:9
**RELATIONSHIP** [1] - 1346:4
**RELEASE** [3] - 1390:11, 1426:14, 1426:18
**RELEVANT** [4] - 1339:4, 1422:24, 1426:7, 1428:19
**RELIEF** [1] - 1319:20
**RELY** [1] - 1399:11
**RELYING** [3] - 1419:11, 1419:14, 1419:18
**REMAIN** [3] - 1309:8, 1364:22, 1381:10
**REMAINING** [1] - 1394:16
**REMEDIES** [1] - 1426:20
**REMEDY** [3] - 1426:10, 1426:18, 1426:24
**REMEMBER** [28] - 1311:9, 1311:18, 1312:3, 1312:4, 1312:8, 1313:13, 1313:15, 1313:20, 1314:25, 1315:9, 1315:10, 1320:15, 1328:4, 1338:6, 1347:23, 1348:1, 1354:3, 1354:15, 1355:6, 1371:4, 1375:22, 1378:9, 1380:6, 1380:8, 1392:16, 1400:7, 1400:15, 1424:16
**REMEMBERED** [1] - 1311:17

**REMEMBERS** [2] - 1393:8, 1415:25
**REMINDED** [1] - 1364:24
**REMOVAL** [1] - 1420:22
**REMOVALS** [1] - 1420:8
**REMOVE** [9] - 1326:25, 1347:5, 1347:16, 1348:17, 1348:24, 1350:12, 1400:19, 1420:9, 1420:11
**REMOVED** [6] - 1327:21, 1398:14, 1400:25, 1420:14, 1421:1, 1421:8
**REMOVING** [2] - 1332:11, 1350:4
**REPEAT** [1] - 1417:24
**REPHRASE** [1] - 1355:5
**REPLY** [1] - 1427:10
**REPORT** [9] - 1316:8, 1316:10, 1316:11, 1316:18, 1317:1, 1317:15, 1318:9, 1318:10, 1393:21
**REPORTED** [1] - 1370:10
**REPORTER** [1] - 1383:2
**REPORTER** [4] - 1347:11, 1383:1, 1383:3, 1434:14
**REPORTER** [3] - 1334:16, 1379:14, 1433:9
**REPORTERS** [1] - 1311:20
**REPORTS** [2] - 1317:10, 1317:11
**REPRESENT** [2] - 1317:21, 1361:4
**REPRESENTATIVE** [2] - 1425:21, 1425:22
**REPRESENTATIVES** [1] - 1333:5
**REPRESENTED** [1] - 1379:12
**REPRESENTING** [2] - 1309:24, 1423:19
**REPRESENTS** [1] - 1380:19
**REPUBLICAN** [1] - 1333:8
**REQUEST** [4] - 1341:17, 1365:15, 1391:14, 1397:17
**REQUESTED** [1] - 1399:25
**REQUIRE** [1] - 1399:1
**REQUIREMENT** [1] - 1420:9
**RESERVE** [1] - 1364:5
**RESERVED** [1] - 1327:10
**RESIDENCE** [1] - 1397:21
**RESIDENCES** [1] - 1353:18
**RESIDENCY** [7] - 1346:19, 1347:2, 1347:13, 1398:12, 1398:13, 1417:4, 1417:8
**RESIDENT** [1] - 1363:12
**RESIDENTS** [1] - 1398:15
**RESOLVE** [2] - 1308:4, 1308:9
**RESOURCES** [2] - 1319:23, 1396:17
**RESPECT** [3] - 1321:12, 1329:17, 1338:20
**RESPOND** [3] - 1397:2, 1397:5, 1397:6
**RESPONDING** [1] - 1355:14
**RESPONDS** [1] - 1397:2
**RESPONSE** [1] - 1397:6
**RESPONSIBILITY** [1] - 1349:12
**REST** [2] - 1331:9, 1382:17
**RESTED** [1] - 1395:25, 1429:4
**RESULT** [12] - 1383:23, 1386:2, 1390:2, 1404:25, 1405:8, 1405:16, 1408:24,

1408:25, 1410:6, 1410:7, 1410:22, 1415:11
**RESULTED** [2] - 1409:25, 1410:12
**RESULTS** [4] - 1399:11, 1410:14, 1410:15, 1413:7
**RESUME** [1] - 1369:4
**RESUMES** [1] - 1327:18
**RETAINER** [1] - 1345:19
**REVEAL** [1] - 1367:21
**REVERSE** [1] - 1426:21
**REVIEW** [2] - 1363:21, 1375:5
**REVIEWED** [1] - 1370:23
**REVIEWING** [1] - 1374:22
**RIFE** [1] - 1415:6
**RIGHTS** [5] - 1386:4, 1423:12, 1432:16, 1432:17, 1432:18
**RIGHTS** [4] - 1402:1, 1423:7, 1423:9, 1423:13
**RISE** [4] - 1420:2, 1424:4, 1426:11, 1426:25
**ROBERT** [1] - 1406:1
**ROBINSON** [9] - 1318:23, 1322:19, 1322:24, 1322:25, 1326:23, 1327:2, 1327:4, 1327:11
**ROLE** [1] - 1345:22
**ROLLS** [4] - 1398:14, 1400:25, 1421:2, 1421:8
**RON** [1] - 1305:7
**RON** [8] - 1345:13, 1394:2, 1394:11, 1414:18, 1428:9, 1428:14, 1428:21, 1431:4
**ROOM** [2] - 1316:6, 1317:22
**ROWS** [2] - 1375:12, 1379:20
**RPR** [1] - 1434:14
**RULE** [16] - 1309:1, 1310:4, 1310:5, 1319:5, 1320:1, 1320:2, 1320:4, 1324:6, 1325:14, 1326:9, 1327:23, 1327:25, 1329:21, 1396:17, 1431:25, 1432:14
**RULE** [1] - 1383:9
**RULED** [2] - 1384:1, 1385:12
**RULES** [2] - 1316:1, 1316:5
**RULING** [4] - 1327:9, 1327:10, 1383:15, 1412:11
**RUN** [5] - 1351:16, 1351:19, 1358:21, 1359:17, 1359:19
**RUNOFF** [5] - 1353:23, 1354:5, 1354:16, 1355:9, 1359:22
**RUSSELL** [2] - 1376:12, 1376:21

## S

**SANCTION** [1] - 1329:4
**SANCTIONING** [1] - 1320:8
**SANCTIONS** [1] - 1322:2
**SAT** [3] - 1323:25, 1324:5, 1324:7
**SATISFIED** [1] - 1316:15
**SAVE** [1] - 1382:20
**SAW** [8] - 1339:8, 1343:6, 1343:9, 1379:20, 1380:3, 1416:3, 1416:5,

1430:9

**SCALE** [2] - 1410:14, 1410:22
**SCHOOL** [2] - 1317:3
**SCOTT** [6] - 1317:4, 1402:21, 1407:13, 1407:16, 1416:21, 1416:23
**SCRUTINY** [2] - 1404:23, 1426:9
**SEALS** [2] - 1389:18, 1389:19
**SEARCH** [2] - 1338:14, 1339:3
**SEARCHED** [1] - 1339:6
**SEARCHES** [1] - 1343:11
**SEAT** [6] - 1309:7, 1309:14, 1314:23, 1327:20, 1331:25, 1369:18
**SEATED** [2] - 1308:2, 1369:7
**SECOND** [11] - 1316:24, 1319:8, 1321:3, 1326:22, 1336:16, 1389:17, 1400:5, 1403:20, 1414:9, 1425:8, 1427:22
**SECONDARILY** [1] - 1389:23
**SECRETARY** [3] - 1361:15, 1361:17, 1362:11
**SECTION** [1] - 1412:21
**SECTION** [14] - 1385:19, 1405:1, 1405:2, 1408:25, 1411:12, 1411:17, 1419:22, 1420:2, 1421:9, 1421:17, 1424:6, 1426:4, 1426:8, 1428:2
**SECURITY** [4] - 1314:3, 1314:6, 1314:9, 1320:22
**SEE** [22] - 1317:20, 1318:2, 1323:8, 1323:11, 1324:12, 1346:17, 1351:18, 1351:19, 1352:23, 1356:25, 1357:25, 1358:13, 1358:21, 1363:21, 1371:20, 1378:17, 1380:7, 1386:16, 1399:25, 1407:8, 1412:22, 1427:19
**SEEING** [5] - 1328:22, 1338:6, 1376:7, 1377:24, 1415:23
**SELF** [1] - 1392:9
**SELF-SERVING** [1] - 1392:9
**SENATOR** [2] - 1425:21, 1425:22
**SEND** [15] - 1330:2, 1336:1, 1336:3, 1347:4, 1347:16, 1350:6, 1372:5, 1372:21, 1373:11, 1373:16, 1373:18, 1373:19, 1391:7, 1405:15, 1412:16
**SENDING** [4] - 1348:8, 1373:6, 1373:23, 1391:8
**SENDS** [2] - 1312:20, 1412:16
**SENSE** [2] - 1335:8, 1376:8
**SENT** [18] - 1336:6, 1339:15, 1346:12, 1348:17, 1348:22, 1372:10, 1372:11, 1372:14, 1372:16, 1372:17, 1378:11, 1378:12, 1378:13, 1379:1, 1380:21, 1391:12, 1391:16, 1415:19
**SENTENCE** [2] - 1431:9, 1431:11
**SEPTEMBER** [1] - 1370:8
**SEQUESTERED** [1] - 1324:23
**SEQUESTRATION** [13] - 1309:1, 1310:5, 1316:2, 1319:3, 1319:5, 1320:2, 1320:4, 1320:11, 1324:7, 1325:14, 1325:20, 1327:23, 1328:1
**SERIOUS** [9] - 1319:16, 1320:16, 1328:16, 1328:20, 1329:2, 1329:10,

1329:13, 1330:12
**SERVICE** [2] - 1391:4, 1391:5
**SERVICED** [1] - 1393:22
**SERVICES** [1] - 1332:23
**SERVING** [1] - 1392:9
**SESSION** [1] - 1305:3
**SET** [10] - 1355:23, 1373:8, 1373:10, 1396:8, 1400:17, 1400:18, 1405:1, 1415:8, 1415:9
**SETS** [1] - 1400:21
**SETTING** [1] - 1359:20
**SEVEN** [1] - 1394:1
**SEVERAL** [3] - 1317:20, 1343:5, 1356:5
**SHAFER** [2] - 1333:4, 1333:7
**SHAKES** [1] - 1310:12
**SHAPE** [1] - 1385:15
**SHELL** [1] - 1335:11
**SHELLY** [1] - 1305:18
**SHOCKED** [2] - 1358:22, 1358:24
**SHORT** [6] - 1333:14, 1352:9, 1355:11, 1370:5, 1381:15, 1396:19
**SHOW** [12] - 1384:5, 1384:6, 1387:5, 1391:18, 1395:2, 1395:10, 1396:8, 1396:12, 1406:10, 1418:25, 1428:14
**SHOWED** [5] - 1337:22, 1374:11, 1374:12, 1385:3, 1431:2
**SHOWER** [1] - 1334:19, 1334:23
**SHOWING** [2] - 1393:24, 1394:6
**SHOWN** [2] - 1374:25, 1396:3
**SHOWS** [12] - 1386:6, 1386:18, 1389:11, 1391:9, 1392:2, 1415:5, 1428:21, 1429:9, 1429:18, 1429:24, 1431:5, 1431:7
**SHUFFLE** [1] - 1335:25
**SIC** [3] - 1406:19, 1431:14, 1431:19
**SIC)** [1] - 1431:18
**SIDE** [1] - 1375:14
**SIDES** [1] - 1325:14
**SIGN** [2] - 1350:5, 1415:23
**SIGNATURE** [4] - 1350:2, 1373:16, 1378:20, 1415:20
**SIGNED** [1] - 1418:20
**SIGNIFICANCE** [5] - 1419:18, 1419:19, 1422:11, 1422:14, 1422:22
**SIGNIFICANT** [3] - 1386:15, 1414:7, 1432:16
**SIMILAR** [2] - 1375:2, 1410:12
**SIMPLE** [3] - 1308:23, 1325:13, 1336:17
**SIMPLY** [5] - 1366:20, 1378:7, 1388:22, 1396:3, 1424:24
**SINGLE** [1] - 1412:15
**SINK** [1] - 1329:19
**SIT** [4] - 1311:17, 1323:7, 1360:24, 1364:25
**SITTING** [2] - 1323:23, 1383:22
**SITUATION** [2] - 1326:1, 1363:5
**SIX** [2] - 1316:18, 1387:8
**SIXTH** [1] - 1390:7
**SKINNED** [1] - 1328:6

**SKIP** [2] - 1351:2, 1426:7
**SLOW** [1] - 1413:20
**SLOWER** [2] - 1334:15, 1347:8
**SMALL** [1] - 1387:5
**SO-AND-SO** [1] - 1373:12
**SO..** [4] - 1339:8, 1368:13, 1374:7, 1377:1
**SOCIAL** [1] - 1393:21
**SOLELY** [2] - 1398:15, 1399:11
**SOMEONE** [15] - 1314:10, 1317:2, 1362:17, 1363:15, 1387:25, 1388:2, 1388:7, 1390:1, 1392:15, 1404:6, 1404:17, 1410:1, 1412:16, 1412:19, 1420:15
**SOMERVILLE** [1] - 1305:6
**SOMERVILLE** [51] - 1394:17, 1394:19, 1394:20, 1395:4, 1397:3, 1397:5, 1397:6, 1397:7, 1397:9, 1397:12, 1397:14, 1398:18, 1398:20, 1399:10, 1399:17, 1403:5, 1403:7, 1403:9, 1403:15, 1405:12, 1405:23, 1406:3, 1406:9, 1406:11, 1406:21, 1407:9, 1407:19, 1407:22, 1408:5, 1408:7, 1408:8, 1408:13, 1413:3, 1413:5, 1413:11, 1413:14, 1414:19, 1414:20, 1417:1, 1417:16, 1418:24, 1423:4, 1428:6, 1429:1, 1429:2, 1429:15, 1430:6, 1430:23, 1431:16
**SOMERVILLE'S** [4] - 1408:11, 1408:12, 1415:4, 1426:13
**SOMETIME** [1] - 1359:9
**SOMETIMES** [2] - 1334:15, 1416:16
**SOMEWHAT** [1] - 1319:10
**SOMEWHERE** [1] - 1343:10
**SORRY** [18] - 1338:24, 1338:25, 1345:9, 1346:5, 1346:12, 1347:9, 1351:3, 1354:15, 1360:24, 1361:19, 1375:9, 1379:7, 1381:14, 1413:21, 1416:22, 1417:24, 1423:8, 1423:10
**SORT** [6] - 1335:23, 1335:24, 1335:25, 1414:22, 1414:25, 1425:18
**SORTS** [1] - 1312:18
**SOUND** [1] - 1383:1
**SOUNDS** [1] - 1319:2
**SPECIFIC** [14] - 1344:18, 1344:20, 1367:20, 1389:8, 1398:4, 1401:8, 1401:10, 1412:13, 1416:18, 1426:5, 1426:19, 1426:24, 1426:25
**SPECIFICALLY** [4] - 1371:3, 1385:11, 1401:6, 1426:10
**SPECIFY** [2] - 1401:7, 1401:10
**SPECULATION** [1] - 1362:24, 1395:18
**SPEECH** [16] - 1382:22, 1411:19, 1423:5, 1423:7, 1423:9, 1423:13, 1423:18, 1424:4, 1424:10, 1424:21, 1424:23, 1424:24, 1424:25, 1425:5, 1425:7, 1425:9
**SPEECHES** [1] - 1368:2
**SPELL** [3] - 1309:15, 1332:1, 1369:19
**SPHERE** [1] - 1404:23

SPOT [1] - 1421:3
SPREADSHEET [32] - 1337:1, 1373:7, 1374:1, 1374:4, 1374:9, 1374:12, 1374:24, 1375:5, 1375:16, 1375:24, 1376:3, 1376:5, 1376:6, 1376:7, 1376:13, 1376:17, 1376:23, 1377:3, 1377:10, 1377:12, 1377:14, 1377:20, 1379:25, 1380:3, 1380:4, 1380:10, 1380:18, 1386:24
SPREADSHEETS [4] - 1336:6, 1336:10, 1336:14, 1348:16
SPUR [2] - 1403:8, 1403:10
SQUEEZE [1] - 1348:5
STACEY [1] - 1430:9
STAFF [3] - 1337:6, 1348:7, 1349:3
STAGE [1] - 1321:12
STALL [1] - 1334:23
STAMPED [2] - 1341:15, 1342:8
STAND [27] - 1308:21, 1308:22, 1309:7, 1311:5, 1311:14, 1311:15, 1312:2, 1321:3, 1321:4, 1321:5, 1327:18, 1331:9, 1331:12, 1332:14, 1340:16, 1367:6, 1369:11, 1382:6, 1387:23, 1388:12, 1388:13, 1389:4, 1390:24, 1395:7, 1396:11, 1416:21, 1430:23
STANDARD [16] - 1383:9, 1384:4, 1387:17, 1388:21, 1391:18, 1392:11, 1395:4, 1395:21, 1417:15, 1417:17, 1417:19, 1417:21, 1418:2, 1418:8, 1418:10, 1422:4
STANDING [2] - 1309:8, 1384:23
START [12] - 1328:18, 1332:21, 1344:20, 1353:7, 1368:1, 1368:15, 1397:11, 1402:14, 1405:5, 1414:8, 1424:8, 1428:7
STARTED [5] - 1325:7, 1346:12, 1359:15, 1398:23, 1414:9
STARTS [2] - 1375:6, 1375:9
STATE [7] - 1309:15, 1332:1, 1358:25, 1369:18, 1420:18, 1425:21, 1425:22
STATE [4] - 1359:1, 1361:17, 1420:12, 1420:21
STATE'S [2] - 1361:15, 1362:11
STATEMENT [5] - 1341:5, 1353:15, 1402:15, 1427:19, 1430:16
STATEMENTS [2] - 1427:16, 1430:1
STATES [3] - 1305:1, 1305:11, 1434:3
STATES [5] - 1360:23, 1361:5, 1423:19, 1425:20, 1425:21
STATES [1] - 1371:7
STATUTE [6] - 1398:3, 1403:23, 1417:7, 1417:9, 1417:10, 1427:20
STATUTES [1] - 1424:23
STATUTORY [1] - 1398:4
STAY [3] - 1322:21, 1325:15, 1326:18
STEADY [1] - 1371:21
STEP [4] - 1315:23, 1326:13, 1360:19, 1381:20
STEPS [3] - 1351:7, 1398:17, 1400:21
STEVE [2] - 1305:10, 1434:15

STICK [1] - 1414:23
STILL [13] - 1332:11, 1338:3, 1358:6, 1365:1, 1366:11, 1378:22, 1390:21, 1395:21, 1401:21, 1402:25, 1404:15, 1415:25, 1423:6
STINETORF [3] - 1391:20, 1391:22
STOMACH [1] - 1407:5
STOOD [1] - 1311:15
STOP [6] - 1331:8, 1366:25, 1367:3, 1367:25, 1389:9, 1429:17
STOPS [1] - 1385:25
STORY [1] - 1382:6
STRAIGHT [1] - 1399:14
STRATEGY [2] - 1364:10, 1382:7
STREAMLINE [1] - 1396:1
STREAMLINED [1] - 1383:17
STREET [4] - 1311:21, 1317:20, 1407:3, 1412:20
STRESS [1] - 1318:4
STRIKE [1] - 1379:3
STRONG [3] - 1325:5, 1416:18, 1416:25
STRONGLY [1] - 1325:2
STRUGGLE [2] - 1356:2, 1356:3
STUDENT [1] - 1313:10
STUFF [7] - 1336:14, 1337:6, 1337:25, 1343:6, 1348:7, 1348:21, 1373:16
SUBJECT [2] - 1426:14, 1432:19
SUBMIT [7] - 1385:23, 1386:9, 1396:19, 1397:15, 1404:9, 1406:4, 1406:13
SUBMITTED [8] - 1351:6, 1386:21, 1397:13, 1397:17, 1397:19, 1405:17, 1415:9, 1416:16
SUBMITTING [4] - 1395:17, 1402:3, 1403:8, 1417:14
SUBPOENA [2] - 1365:23, 1365:24
SUBSTANCE [1] - 1344:5
SUBSTANTIAL [2] - 1371:4, 1374:6
SUBSTANTIATE [2] - 1356:7, 1356:12
SUBVERT [2] - 1419:25, 1420:4
SUCCEED [1] - 1387:14
SUCCESS [1] - 1412:9
SUDDENLY [1] - 1388:19
SUE [2] - 1413:16, 1413:24
SUED [1] - 1364:24
SUFFICIENT [7] - 1390:4, 1392:10, 1397:20, 1397:24, 1398:1, 1412:3, 1418:14
SUGGEST [6] - 1347:5, 1347:17, 1353:13, 1389:6, 1389:19, 1412:3
SUGGESTED [1] - 1431:20
SUGGESTING [1] - 1430:11
SUGGESTION [1] - 1412:15
SUGGESTS [1] - 1390:9
SUMMARY [5] - 1384:4, 1385:12, 1396:23, 1416:13, 1429:7
SUMMARY [1] - 1305:10
SUNDAY [1] - 1316:4
SUPPLEMENT [1] - 1424:20
SUPPORT [1] - 1321:18

SUPPOSED [7] - 1325:15, 1325:22, 1325:23, 1354:13, 1355:7, 1356:1
SURPRISE [1] - 1355:20
SURVIVES [1] - 1426:8
SUSTAIN [1] - 1360:8
SUSTAINED [2] - 1360:10, 1360:16
SWAP [4] - 1335:15, 1335:18, 1335:20, 1342:19
SWORE [1] - 1379:9
SWORN [3] - 1309:12, 1331:23, 1369:16
SYMPATHIZE [1] - 1330:18
SYSTEM [4] - 1335:25, 1351:23, 1363:20
SYSTEMATIC [1] - 1420:22

## T

TABLE [3] - 1329:21, 1427:24, 1427:25
TAG [1] - 1314:6
TAILOR [1] - 1426:24
TAILORED [1] - 1426:10
TARGETED [1] - 1426:20
TARGETS [1] - 1426:18
TEAM [1] - 1319:1
TEN [1] - 1329:8
TERMS [3] - 1316:8, 1319:14, 1407:12
TERRITORY [1] - 1351:25
TEST [1] - 1417:5
TESTIFIED [38] - 1309:12, 1311:5, 1314:13, 1314:20, 1319:14, 1326:7, 1328:17, 1329:20, 1331:23, 1340:1, 1356:22, 1364:11, 1369:16, 1384:19, 1386:1, 1386:19, 1386:24, 1387:11, 1387:18, 1389:12, 1389:13, 1390:24, 1392:20, 1393:6, 1394:14, 1394:20, 1394:23, 1394:24, 1395:7, 1398:18, 1398:20, 1399:17, 1406:19, 1407:10, 1407:14, 1417:3, 1417:13, 1430:23
TESTIFIES [2] - 1319:16, 1327:18
TESTIFY [8] - 1316:19, 1321:22, 1322:1, 1339:20, 1388:12, 1397:12, 1403:2, 1403:9
TESTIFYING [5] - 1317:24, 1320:12, 1322:13, 1327:14, 1375:20
TESTIMONY [29] - 1314:12, 1314:13, 1317:12, 1318:8, 1318:13, 1320:7, 1322:16, 1324:1, 1329:22, 1330:25, 1340:20, 1340:21, 1357:11, 1361:6, 1364:10, 1365:16, 1378:1, 1379:23, 1381:9, 1387:2, 1387:8, 1392:9, 1396:16, 1399:1, 1403:14, 1407:21, 1408:4, 1410:19, 1414:25
TEXAS [1] - 1329:7, 1368:19
TEXT [2] - 1346:22, 1413:13
THAT'D [1] - 1366:17
THE [396] - 1305:1, 1305:6, 1305:10, 1307:3, 1308:2, 1308:7, 1308:13, 1308:16, 1308:20, 1309:6, 1309:8, 1309:14, 1309:16, 1309:17, 1309:22, 1309:23, 1310:1, 1310:2, 1310:6,

1310:7, 1310:10, 1310:11, 1310:12,
1310:13, 1310:16, 1310:17, 1310:18,
1310:19, 1310:21, 1310:22, 1310:24,
1310:25, 1311:3, 1311:4, 1311:7,
1311:8, 1311:9, 1311:10, 1311:12,
1311:13, 1311:19, 1311:22, 1312:4,
1312:5, 1312:7, 1312:9, 1312:12,
1312:13, 1312:17, 1312:19, 1312:23,
1312:24, 1313:2, 1313:3, 1313:4,
1313:5, 1313:6, 1313:7, 1313:8,
1313:12, 1313:13, 1313:15, 1313:17,
1313:19, 1313:20, 1313:22, 1313:23,
1313:24, 1313:25, 1314:1, 1314:3,
1314:4, 1314:6, 1314:8, 1314:9,
1314:12, 1314:15, 1314:16, 1314:18,
1314:19, 1314:22, 1314:23, 1314:25,
1315:2, 1315:3, 1315:5, 1315:7,
1315:8, 1315:9, 1315:11, 1315:15,
1315:18, 1315:19, 1315:21, 1315:23,
1315:25, 1316:19, 1316:22, 1316:24,
1317:7, 1318:1, 1318:6, 1318:21,
1319:4, 1319:8, 1320:3, 1320:22,
1320:23, 1321:25, 1322:7, 1322:15,
1322:24, 1323:13, 1323:22, 1324:5,
1324:11, 1324:15, 1324:17, 1325:13,
1327:2, 1327:6, 1327:11, 1327:14,
1327:16, 1327:20, 1328:2, 1328:3,
1329:8, 1329:9, 1329:25, 1330:1,
1330:25, 1331:2, 1331:5, 1331:15,
1331:18, 1331:20, 1331:25, 1332:2,
1332:4, 1332:5, 1332:13, 1334:12,
1334:14, 1334:18, 1334:19, 1334:21,
1334:22, 1334:24, 1337:10, 1337:16,
1337:18, 1338:2, 1338:4, 1338:23,
1339:1, 1339:20, 1339:25, 1340:4,
1340:5, 1340:7, 1340:12, 1340:22,
1340:25, 1341:3, 1341:10, 1341:12,
1341:18, 1342:1, 1342:6, 1342:23,
1342:25, 1343:2, 1343:4, 1343:23,
1344:4, 1344:6, 1344:11, 1344:14,
1345:1, 1346:7, 1347:8, 1347:11,
1347:25, 1348:2, 1350:4, 1350:7,
1350:10, 1350:11, 1350:12, 1350:14,
1350:15, 1350:17, 1350:19, 1350:20,
1350:22, 1350:23, 1351:3, 1351:14,
1351:15, 1351:21, 1351:23, 1351:24,
1353:1, 1353:2, 1354:17, 1354:19,
1354:23, 1355:2, 1355:3, 1357:17,
1357:19, 1357:21, 1357:22, 1357:24,
1358:2, 1358:4, 1358:6, 1358:8,
1358:11, 1358:12, 1358:16, 1359:1,
1359:4, 1359:5, 1359:6, 1360:7,
1360:9, 1360:12, 1360:16, 1360:19,
1360:21, 1360:24, 1362:7, 1362:9,
1362:25, 1363:1, 1363:3, 1363:25,
1364:2, 1364:7, 1364:14, 1364:15,
1364:17, 1364:18, 1364:21, 1364:25,
1365:2, 1365:4, 1365:5, 1365:6,
1365:7, 1365:9, 1365:10, 1365:11,
1365:12, 1365:13, 1365:19, 1365:23,
1366:2, 1366:7, 1366:9, 1366:13,

1366:18, 1366:25, 1367:10, 1367:12,
1367:17, 1367:23, 1368:11, 1368:15,
1368:19, 1368:24, 1369:1, 1369:4,
1369:7, 1369:12, 1369:18, 1369:20,
1369:22, 1374:16, 1374:18, 1374:20,
1375:20, 1375:23, 1376:8, 1376:9,
1376:10, 1376:19, 1376:24, 1376:25,
1377:6, 1377:8, 1380:25, 1381:4,
1381:7, 1381:13, 1381:14, 1381:17,
1381:19, 1381:20, 1381:21, 1381:22,
1381:23, 1381:24, 1382:2, 1382:7,
1382:11, 1382:15, 1382:18, 1383:1,
1383:3, 1385:17, 1386:3, 1386:8,
1386:11, 1388:10, 1392:14, 1397:1,
1397:9, 1397:23, 1398:2, 1398:7,
1398:18, 1398:21, 1398:23, 1399:3,
1399:12, 1400:1, 1400:15, 1401:3,
1401:13, 1402:6, 1403:5, 1403:21,
1404:12, 1404:16, 1405:10, 1405:22,
1406:5, 1406:17, 1407:1, 1407:15,
1407:18, 1408:16, 1408:21, 1409:2,
1409:5, 1409:16, 1410:3, 1410:25,
1413:2, 1413:20, 1415:3, 1416:10,
1416:17, 1416:24, 1417:20, 1418:1,
1418:11, 1419:5, 1419:9, 1419:11,
1419:17, 1420:9, 1420:24, 1421:3,
1421:12, 1421:15, 1421:18, 1421:21,
1422:6, 1423:1, 1423:9, 1423:12,
1423:15, 1423:17, 1423:22, 1423:24,
1424:7, 1424:12, 1425:12, 1425:15,
1425:20, 1427:2, 1427:6, 1427:10,
1431:8, 1431:11, 1431:22, 1431:24,
1432:8, 1432:22, 1433:2, 1433:4,
1434:15

**THEM)** [1] - 1347:19

**THEM..** [1] - 1347:7

**THEMSELVES** [5] - 1348:16, 1373:23,
1414:15, 1420:6, 1420:13

**THEREBY** [1] - 1385:24

**THEREFORE** [3] - 1340:18, 1344:15,
1401:25

**THEY'VE** [3] - 1317:13, 1386:23, 1394:3

**THICK** [1] - 1328:6

**THINKING** [3] - 1311:12, 1359:15,
1366:11

**THINKS** [2] - 1426:22, 1426:25

**THIRD** [10] - 1375:4, 1384:8, 1384:16,
1385:21, 1386:7, 1394:8, 1396:4,
1428:16, 1429:14, 1430:18

**THIRD-PARTY** [1] - 1428:16

**THOROUGH** [1] - 1340:11

**THOUGHTS** [1] - 1362:4

**THOUSANDS** [2] - 1405:15, 1405:16

**THREATEN** [1] - 1421:25

**THREATENED** [4] - 1384:11, 1387:16,
1394:10, 1426:14

**THREE** [4] - 1315:19, 1348:4, 1385:1,
1385:6

**THRIVE** [1] - 1320:8

**THROUGHOUT** [2] - 1383:16, 1384:1

**TIES** [1] - 1395:14

**TIM** [1] - 1306:4

**TIMER** [1] - 1427:11

**TINA** [1] - 1305:17

**TITLE** [1] - 1339:9

**TO** [1] - 1434:14

**TODAY** [21] - 1308:3, 1311:17, 1318:4,
1319:18, 1323:22, 1324:2, 1324:3,
1329:20, 1332:20, 1340:20, 1361:6,
1364:11, 1364:12, 1365:18, 1365:21,
1365:22, 1366:1, 1366:5, 1366:22,
1370:4, 1433:6

**TOGETHER** [1] - 1431:2

**TOMORROW** [1] - 1324:2

**TON** [1] - 1336:10

**TOOK** [3] - 1313:23, 1325:18, 1429:25

**TOP** [5] - 1311:13, 1315:3, 1334:6,
1347:10, 1353:7

**TOPIC** [1] - 1343:15

**TOSS** [1] - 1414:2

**TOTAL** [3] - 1341:9, 1341:21, 1371:4

**TOTALITY** [1] - 1421:9

**TOTALLY** [1] - 1320:3

**TOUCH** [2] - 1330:22, 1345:13

**TOWARDS** [2] - 1408:19, 1412:2

**TOWN** [1] - 1365:22

**TRACKING** [1] - 1321:19

**TRANSCRIPT** [1] - 1305:10

**TRANSCRIPT** [5] - 1318:8, 1352:23,
1353:5, 1365:8, 1434:6

**TRANSCRIPTS** [1] - 1316:12, 1317:15

**TRANSITIONS** [1] - 1422:21

**TREAT** [2] - 1328:12

**TRESPASSING** [2] - 1404:5, 1404:7

**TRIAL** [11] - 1367:1, 1367:3, 1367:25,
1368:1, 1368:15, 1382:24, 1383:11,
1384:10, 1385:14, 1431:25

**TRIALS** [3] - 1383:6, 1383:7, 1383:18

**TRIED** [2] - 1325:18, 1416:1

**TRIER** [2] - 1383:23, 1399:3

**TRIGGER** [1] - 1404:23

**TRIGGERS** [1] - 1380:8

**TROUBLE** [1] - 1324:24

**TRUE** [54] - 1332:22, 1333:5, 1333:17,
1333:23, 1335:11, 1336:3, 1336:22,
1338:10, 1339:5, 1340:3, 1345:5,
1345:12, 1345:19, 1345:24, 1348:23,
1349:25, 1351:11, 1351:15, 1359:17,
1370:7, 1370:13, 1370:16, 1370:21,
1371:11, 1371:25, 1372:4, 1373:4,
1375:16, 1376:1, 1376:3, 1376:14,
1376:23, 1378:13, 1380:11, 1394:16,
1395:5, 1395:19, 1406:3, 1406:7,
1407:18, 1407:25, 1408:1, 1413:10,
1413:12, 1413:13, 1414:6, 1414:13,
1414:14, 1414:21, 1415:5, 1415:16,
1416:8, 1418:3, 1418:19

**TRUE** [1] - 1305:6

**TRUE** [11] - 1361:7, 1361:9, 1371:17,
1392:12, 1392:22, 1397:21, 1397:23,

1397:25, 1419:23, 1426:21, 1434:6

**TRUMP** [2] - 1415:25, 1418:21

**TRUSTED** [2] - 1351:20, 1363:20

**TRUTH** [15] - 1313:6, 1320:15, 1320:17, 1328:10, 1328:15, 1329:12, 1329:15, 1329:24, 1329:25, 1330:3, 1330:9, 1330:25, 1358:22, 1379:9, 1379:16

**TRUTHFULNESS** [2] - 1328:19, 1354:25

**TRY** [9] - 1324:21, 1355:12, 1368:6, 1368:9, 1368:14, 1370:6, 1390:16, 1414:22, 1415:20

**TRYING** [9] - 1328:23, 1329:4, 1332:9, 1342:12, 1365:7, 1367:21, 1414:1, 1420:20, 1421:6

**TURN** [2] - 1375:4

**TURNER** [2] - 1390:18

**TWICE** [1] - 1352:17

**TWO** [15] - 1325:18, 1325:19, 1331:10, 1343:14, 1353:17, 1357:20, 1357:23, 1377:18, 1384:17, 1395:5, 1407:6, 1410:10, 1416:16, 1430:15

**TYPE** [5] - 1337:3, 1412:5, 1412:9, 1413:7, 1415:11

**TYPES** [1] - 1410:7

## U

**U.S** [2] - 1391:3, 1391:5

**ULTIMATELY** [2] - 1402:24, 1429:21

**UMM** [2] - 1350:7, 1350:20

**UNCERTAINTY** [1] - 1393:13

**UNCONSTITUTIONAL** [3] - 1401:4, 1401:20, 1427:4

**UNDER** [36] - 1316:2, 1318:4, 1319:5, 1319:17, 1324:6, 1326:7, 1328:19, 1329:3, 1330:6, 1350:1, 1359:1, 1376:13, 1376:22, 1383:9, 1383:13, 1385:18, 1386:4, 1387:14, 1391:19, 1396:20, 1399:15, 1401:20, 1403:23, 1403:25, 1405:1, 1407:2, 1411:1, 1411:11, 1411:17, 1420:25, 1421:7, 1421:9, 1423:5, 1424:23, 1425:10, 1425:13

**UNDERGO** [1] - 1404:25

**UNDERLYING** [3] - 1428:1, 1428:19, 1428:20

**UNDERSTOOD** [5] - 1317:5, 1324:10, 1345:5, 1380:11, 1422:15

**UNDERTAKING** [1] - 1414:7

**UNDERWENT** [1] - 1429:16

**UNEQUIVOCALLY** [1] - 1330:3

**UNFAIR** [1] - 1421:3

**UNFOLD** [1] - 1403:4

**UNINVOLVED** [2] - 1429:22, 1429:23

**UNITED** [5] - 1360:22, 1361:4, 1423:19, 1425:20, 1425:21

**UNITED** [1] - 1305:1, 1305:11, 1434:3

**UNIVERSITY** [1] - 1313:9

**UNLAWFUL** [7] - 1404:18, 1408:10,

1408:16, 1412:12, 1412:14, 1415:7, 1424:24

**UNLAWFULLY** [1] - 1410:24

**UNLESS** [1] - 1420:13

**UNNECESSARY** [1] - 1351:11

**UNSPECIFIED** [1] - 1401:17

**UP** [41] - 1310:3, 1314:2, 1314:4, 1314:10, 1323:22, 1323:24, 1323:25, 1324:11, 1324:12, 1324:18, 1326:13, 1328:13, 1334:16, 1336:15, 1351:19, 1352:9, 1354:8, 1355:21, 1355:24, 1356:7, 1359:20, 1359:25, 1363:3, 1368:22, 1371:23, 1373:8, 1373:10, 1386:14, 1389:17, 1390:7, 1391:7, 1396:16, 1402:8, 1405:19, 1408:11, 1412:24, 1412:25, 1419:6, 1421:5, 1424:17

**UPCOMING** [1] - 1359:23

**UPHOLD** [1] - 1352:13

**UPSET** [4] - 1328:7, 1328:9, 1328:15, 1355:17

**UPSETTING** [1] - 1407:5

**URGENCY** [2] - 1354:8, 1360:1

**URGENT** [1] - 1354:3

**USA** [1] - 1306:2

**USES** [1] - 1388:19

**UZOMA** [1] - 1305:17

## V

**VACCINE** [1] - 1404:21

**VARIOUS** [1] - 1321:13

**VEHICLE** [2] - 1420:23, 1424:25

**VENDOR** [1] - 1346:4

**VENDOR/CUSTOMER** [1] - 1346:5

**VERDICT** [2] - 1382:24, 1383:6

**VERIFY** [1] - 1351:7

**VERSION** [1] - 1317:14

**VETTED** [8] - 1349:13, 1353:16, 1353:17, 1353:25, 1354:10, 1355:23, 1356:17, 1360:3

**VETTING** [2] - 1355:11, 1356:6

**VIOLA** [1] - 1434:13

**VIOLATE** [3] - 1411:8, 1419:22, 1430:11

**VIOLATED** [3] - 1402:1, 1402:4, 1406:15

**VIOLATING** [3] - 1408:17, 1419:20, 1423:20

**VIOLATION** [13] - 1320:2, 1320:11, 1326:9, 1327:23, 1329:21, 1409:1, 1411:2, 1420:2, 1421:16, 1421:17, 1424:4, 1426:11, 1427:1

**VOICE** [1] - 1361:20

**VOLUME** [1] - 1305:3

**VOLUNTEER** [1] - 1372:4

**VOTE** [44] - 1332:22, 1333:5, 1333:17, 1333:23, 1335:11, 1336:3, 1336:22, 1338:10, 1339:5, 1340:3, 1345:5, 1345:12, 1345:19, 1345:24, 1348:23, 1350:1, 1351:12, 1351:15, 1359:17,

1370:7, 1370:16, 1371:11, 1372:4, 1373:4, 1376:14, 1380:12, 1394:16, 1395:5, 1395:19, 1406:3, 1406:8, 1407:18, 1407:25, 1408:2, 1413:10, 1413:12, 1413:13, 1414:14, 1414:21, 1415:6, 1415:16, 1416:8, 1418:3

**VOTE** [1] - 1305:6

**VOTE** [2] - 1352:6, 1353:17, 1353:23, 1354:1, 1360:2, 1363:17, 1389:14, 1391:24, 1393:1, 1400:24, 1401:1, 1401:9, 1401:12, 1402:19, 1404:7, 1416:5, 1422:3, 1422:17, 1422:18, 1426:19, 1430:11

**VOTE'S** [10] - 1370:13, 1370:21, 1371:25, 1375:16, 1376:1, 1376:3, 1376:23, 1378:13, 1414:7, 1418:19

**VOTED** [2] - 1354:1, 1358:20

**VOTER** [38] - 1335:18, 1358:19, 1359:16, 1363:16, 1378:8, 1378:21, 1386:17, 1387:11, 1388:9, 1390:9, 1391:13, 1394:25, 1395:9, 1400:19, 1402:2, 1402:17, 1402:19, 1404:8, 1404:10, 1404:15, 1404:25, 1405:16, 1409:21, 1409:23, 1409:24, 1409:25, 1411:22, 1419:22, 1419:24, 1420:10, 1420:23, 1421:14, 1421:25, 1422:5, 1425:3, 1426:16, 1427:17, 1429:15

**VOTER'S** [3] - 1334:1, 1334:5, 1400:20

**VOTERS** [45] - 1333:23, 1335:5, 1336:7, 1349:20, 1351:12, 1351:17, 1352:13, 1353:16, 1354:13, 1363:8, 1373:2, 1385:5, 1385:7, 1387:16, 1394:22, 1394:23, 1394:24, 1395:9, 1395:12, 1397:15, 1397:16, 1400:13, 1403:11, 1403:16, 1403:18, 1404:20, 1405:4, 1405:7, 1405:16, 1405:19, 1405:22, 1409:13, 1410:14, 1410:18, 1410:21, 1412:23, 1413:23, 1415:10, 1420:7, 1422:2, 1425:18, 1426:19, 1427:15, 1429:21

**VOTES** [3] - 1345:6, 1358:18, 1360:2

**VOTING** [12] - 1352:17, 1361:9, 1373:14, 1384:11, 1389:10, 1394:10, 1404:8, 1404:20, 1406:16, 1412:4, 1425:24, 1425:25

**VOTING** [3] - 1432:16, 1432:17, 1432:18

**VRA** [2] - 1402:4, 1403:25

**VS** [1] - 1305:5

**VUID** [2] - 1373:14, 1373:15

## W

**W-I-L-L-I-A-M-S** [1] - 1332:3

**WAIT** [1] - 1382:20

**WAITING** [2] - 1378:21, 1383:20

**WARRANT** [1] - 1390:4

**WAYS** [1] - 1386:15

**WEDNESDAY** [2] - 1366:23, 1367:24

**WEEK** [6] - 1309:19, 1348:4, 1355:8, 1414:9, 1414:10, 1414:11

**WEEKEND** [1] - 1330:7

**WEEKS** [1] - 1416:16
**WEIGH** [2] - 1393:23, 1429:19
**WEIGHT** [1] - 1340:20
**WELL..** [1] - 1377:25
**WHATSOEVER** [6] - 1310:11, 1321:16, 1344:12, 1344:15, 1364:9, 1364:16
**WHISTLEBLOWER** [1] - 1371:12
**WHITE** [1] - 1386:25
**WHOLE** [2] - 1325:19, 1403:8
**WHOLLY** [1] - 1389:22
**WIDE** [1] - 1411:23
**WILL-CALL** [3] - 1366:2, 1366:4, 1367:24
**WILLIAM** [1] - 1342:9
**WILLIAMS** [42] - 1331:9, 1331:12, 1331:16, 1332:2, 1332:18, 1335:1, 1337:12, 1337:21, 1338:17, 1338:25, 1339:18, 1340:10, 1340:16, 1341:23, 1342:4, 1342:18, 1345:4, 1346:9, 1351:1, 1352:5, 1353:4, 1356:18, 1357:3, 1357:12, 1359:8, 1360:20, 1361:2, 1363:2, 1363:23, 1364:3, 1364:7, 1364:18, 1364:19, 1367:6, 1367:7, 1367:8, 1394:13, 1397:6, 1397:8, 1413:2, 1414:19
**WILLIAMS** [3] - 1305:7, 1307:5, 1331:22
**WILLIAMS** [3] - 1343:14, 1349:15, 1397:6
**WILLIAMS'** [2] - 1340:19, 1341:16
**WILLING** [2] - 1355:12, 1418:25
**WIPE** [1] - 1326:15
**WITNESS** [1] - 1310:12
**WITNESS** [97] - 1307:2, 1309:16, 1309:22, 1310:1, 1310:6, 1310:10, 1310:12, 1310:16, 1310:18, 1310:21, 1310:24, 1311:3, 1311:7, 1311:9, 1311:12, 1311:19, 1312:4, 1312:7, 1312:12, 1312:17, 1312:23, 1313:2, 1313:4, 1313:6, 1313:8, 1313:13, 1313:17, 1313:20, 1313:23, 1313:25, 1314:8, 1314:15, 1314:18, 1314:22, 1315:2, 1315:5, 1315:8, 1315:11, 1315:18, 1315:21, 1328:2, 1329:8, 1329:25, 1330:25, 1332:2, 1334:19, 1334:22, 1337:18, 1338:4, 1339:1, 1340:5, 1342:25, 1343:4, 1344:6, 1348:2, 1350:7, 1350:11, 1350:14, 1350:17, 1350:20, 1350:23, 1351:15, 1351:23, 1353:1, 1355:3, 1357:19, 1357:22, 1358:2, 1358:6, 1358:11, 1358:16, 1359:4, 1359:6, 1360:9, 1360:12, 1360:21, 1362:9, 1362:25, 1363:3, 1364:14, 1364:17, 1365:2, 1365:5, 1365:7, 1365:10, 1365:12, 1369:20, 1375:23, 1376:8, 1376:10, 1376:25, 1377:8, 1381:13, 1381:17, 1381:20, 1381:22, 1381:24
**WITNESS** [58] - 1308:24, 1309:4, 1309:7, 1310:3, 1311:5, 1312:2, 1315:1, 1316:1, 1316:2, 1317:8,

1318:11, 1318:17, 1319:10, 1320:1, 1320:12, 1323:13, 1323:18, 1323:19, 1323:21, 1323:24, 1324:1, 1324:3, 1324:5, 1324:9, 1325:9, 1326:5, 1326:10, 1326:23, 1327:2, 1327:7, 1327:9, 1327:22, 1340:8, 1340:16, 1341:5, 1364:2, 1364:8, 1365:16, 1366:22, 1367:4, 1367:10, 1369:9, 1374:15, 1380:24, 1380:25, 1381:1, 1381:3, 1381:8, 1382:1, 1382:12, 1386:24, 1387:2, 1387:9, 1428:11, 1433:6
**WITNESSES** [16] - 1310:8, 1310:20, 1310:23, 1318:25, 1319:9, 1322:13, 1324:23, 1324:25, 1325:3, 1325:15, 1325:21, 1356:6, 1366:24, 1381:9, 1384:19, 1387:18
**WON** [1] - 1418:22
**WONDERED** [1] - 1358:17
**WORD** [11] - 1318:6, 1388:6, 1388:10, 1402:8, 1417:20, 1418:1, 1418:2, 1418:8, 1418:9, 1418:10, 1419:12
**WORDS** [12] - 1311:25, 1367:7, 1367:15, 1400:7, 1401:8, 1408:10, 1410:13, 1411:3, 1413:9, 1417:7, 1417:21, 1421:25
**WORKS** [1] - 1330:19
**WORLD** [1] - 1392:24
**WORRIED** [1] - 1322:12
**WRIGHT** [2] - 1314:4, 1330:1
**WRIGHT'S** [1] - 1431:8
**WRITES** [1] - 1346:18
**WRITING** [1] - 1420:14
**WRONGDOING** [4] - 1356:19, 1356:23, 1357:8, 1357:9
**WYNNE** [41] - 1305:21, 1309:3, 1314:24, 1316:4, 1316:21, 1316:23, 1316:25, 1317:9, 1318:2, 1319:7, 1321:6, 1322:17, 1323:2, 1323:7, 1323:16, 1323:21, 1324:2, 1324:10, 1324:14, 1325:6, 1326:25, 1327:4, 1327:8, 1327:13, 1331:13, 1364:19, 1364:23, 1365:20, 1366:8, 1366:10, 1366:14, 1368:7, 1368:14, 1368:21, 1368:25, 1369:3, 1369:5, 1376:16, 1382:3, 1382:10, 1382:13
**WYNNE** [20] - 1308:23, 1310:14, 1314:23, 1315:25, 1318:17, 1318:25, 1319:8, 1320:6, 1320:10, 1320:19, 1320:23, 1320:24, 1321:3, 1321:4, 1323:3, 1323:6, 1330:22, 1366:5, 1381:11, 1433:5

**Y**

**YEAR** [5] - 1321:11, 1324:22, 1325:18, 1359:13, 1360:4
**YELLOW** [6] - 1378:18, 1379:20, 1379:21, 1380:1, 1380:18, 1380:19
**YESTERDAY** [10] - 1308:4, 1309:17, 1316:1, 1316:9, 1319:23, 1323:17,

1329:15, 1332:9, 1366:22, 1368:12
**YOU-ALL** [17] - 1308:2, 1308:4, 1308:9, 1309:20, 1327:3, 1327:7, 1340:14, 1343:12, 1343:25, 1364:3, 1366:19, 1368:12, 1369:7, 1382:21, 1397:4, 1399:13, 1420:17
**YOURSELF** [1] - 1417:8
**YUN** [1] - 1306:4

**Z**

**ZBOROWSKI** [1] - 1434:13
**ZBOROWSKI** [1] - 1434:13
**ZIP** [1] - 1337:2
**ZOOM** [2] - 1356:2, 1375:1