```
 1                    UNITED STATES DISTRICT COURT
                  FOR THE NORTHERN DISTRICT OF GEORGIA
 2                          ATLANTA DIVISION

 3   FAIR FIGHT, INC., JOHN DOE,      )
     AND JANE DOE                     )VOLUME 8
 4                    PLAINTIFFS,     )
                                      )DOCKET NO. 2:20-CV-0302-SCJ
 5           -VS-                     )
                                      )
 6   TRUE THE VOTE, INC., CATHERINE   )
     ENGELBRECHT, DEREK SOMERVILLE,   )
 7   MARK DAVIS, MARK WILLIAMS, RON   )
     JOHNSON, JAMES COOPER, AND       )
 8   JOHN DOES 1-10,                  )
                      DEFENDANTS.     )
 9   _____

10           TRANSCRIPT OF SUMMARY JUDGMENT PROCEEDINGS
               BEFORE THE HONORABLE STEVE C. JONES
11               UNITED STATES DISTRICT JUDGE
                  TUESDAY, NOVEMBER 7, 2023
12

13
     APPEARANCES:
14
     ON BEHALF OF THE PLAINTIFFS:
15
        ALLEGRA J. LAWRENCE-HARDY, ESQ.
16      CHRISTINA ASHLEY FORD, ESQ.
        LESLIE J. BRYAN, ESQ.
17      MARCOS MOCINE-MC QUEEN, ESQ.
        UZOMA NKWONTA, ESQ.
18      TINA MENG MORRISON, ESQ.
        JACOB SHELLY, ESQ.
19      MICHELLE L. MC CLAFFERTY, ESQ.

20
     ON BEHALF OF THE DEFENDANTS:
21
        CAMERON POWELL, ESQ.
22      MICHAEL JOHN WYNNE, ESQ.
        JAMES CULLEN EVANS, ESQ.
23

24

25
```

1   APPEARANCES (CONTINUED):

2
    ON BEHALF OF INTERVENOR (USA):
3
       DANA PAIKOWSKY, ESQ.
4      JENNIFER J. YUN, ESQ.
       TIM MELLETT, ESQ.
5      AILEEN BELL HUGHES, ESQ.
       JUDY BAO, ESQ.
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21
                VIOLA S. ZBOROWSKI, RDR, FAPR, CMR, CRR, RPR, CRC
22       OFFICIAL COURT REPORTER TO THE HONORABLE STEVE C. JONES
                    UNITED STATES DISTRICT COURT
23                       ATLANTA, GEORGIA
                          404-215-1479
24              VIOLA_ZBOROWSKI@GAND.USCOURTS.GOV

25

1                    I N D E X

2   WITNESS                    DIRECT    CROSS   REDIRECT  RECROSS

3   CATHERINE ENGELBRECHT      1889      1896     1913

4

    CLOSINGS:
5
    BY MR. NKWONTA          1939
6   BY MR. WYNNE            1969
    BY MR. EVANS            1979
7   REBUTTAL BY MR. KNWONTA 2007

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (HELD IN OPEN COURT AT 9 A.M.)

2          THE COURT:  Good morning.  You-all can be seated.

3          Okay.  I think, Ms. Engelbrecht, you were on the

4    stand and you were doing direct, Mr. Evans.

5          MR. EVANS:  Thank you, Judge Jones.

6                         * * * * * *

7                    CATHERINE ENGELBRECHT,

8               having been previously duly sworn,

9          Resumes the stand and testified as follows:

10                        * * * * * *

11   DIRECT EXAMINATION (Continued)

12   BY MR. EVANS:

13   **Q.**   Ms. Engelbrecht, I hope you had a nice evening.  I just

14   have a couple of questions to finish your direct.

15          In making its eligibility inquiry list, did True the Vote

16   seek to create as limited a list as possible?

17   **A.**   Yes.  The mindset was to be exclusive rather than

18   inclusive.  Some of the actions that we took to ensure that

19   that was the case -- it's important to note that with -- with

20   NCOA as a sort of primary foundation, unless you have an exact

21   match, it's not going to return anything.  So by using middle

22   name, suffix -- of course, full name, full address, but middle

23   name and suffix, those were two additional steps.  And if you

24   don't get an exact match, that's not going to return anything.

25   So that's step one, or one way of making sure you're not

1    getting any false positives.

2        Then going through and reviewing for military addresses,

3    as we've discussed, reviewing for students as best as you can,

4    and deceased, the goal was to create as tight a list as

5    possible.

6    Q.   And why did True the Vote try to create as limited a list

7    as possible?

8    A.   It's, you know, the basis of solid data, that what

9    volunteers would then be presenting to their counties was

10   trustworthy.

11   Q.   In making its eligibility inquiry list, did True the Vote

12   target any demographic group?

13   A.   No.

14   Q.   Why?

15   A.   It just wasn't -- not what we do.  It was just -- we were

16   just trying to determine the accuracy of the list and

17   providing ineligibility potentials as they, you know, were

18   returned.  There was no other motivation there.

19   Q.   In making its eligibility inquiry list, did True the Vote

20   select counties in which to file inquiries?

21   A.   We didn't select counties.  We made our dataset for the

22   entire state and then it was dependent upon where volunteers

23   came forward.

24   Q.   In making its eligibility inquiry list, did True the Vote

25   target any minority-majority counties?

**A.**   No.

**Q.**   I think that's majority-minority counties.  Let me ask that again just for a clean record.

In making its eligibility inquiry list, did True the Vote target any majority-minority counties?

**A.**   No.

**Q.**   Does True the Vote have a hotline?

**A.**   Yes.

**Q.**   Did True the Vote have a hotline in December of 2020?

**A.**   Yes.

**Q.**   What was this hotline used for?

**A.**   It was a resource for individuals to call in and ask questions or report concerns.  And we -- we have that ongoing all the time.

**Q.**   Were you expressing your voice in facilitating eligibility inquiries in December of 2020?

**A.**   Absolutely, yes.

**Q.**   What rights were you exercising and working with Georgia citizens in facilitating eligibility inquiries in December 2020?

**A.**   First Amendment rights, rights of free speech and assembly and petition.

**Q.**   Approximately, how many middle names were there in True the Vote's eligibility inquiry list?

**A.**   Over 61,000 --

1          MR. NKWONTA:  Objection, Your Honor.  This goes to

2    data analysis that we've already determined she's not

3    qualified to --

4          THE COURT:  How many middle names?

5          MR. NKWONTA:  From the entire challenge list.

6          THE COURT:  You response?

7          MR. EVANS:  She's got personal knowledge.  I'm asking

8    her, based upon her personal knowledge of generating the list,

9    how many middle names were in the eligibility inquiry list.

10          THE COURT:  Well, she's free to tell you later, but I

11    don't think she, off the top of her head, can remember all the

12    middle names in that list without reading the list.  So I

13    sustain the objection.

14    BY MR. EVANS:

15    Q.    To your knowledge sitting here today, how many middle

16    names are in True the Vote's eligibility inquiry list?

17          MR. NKWONTA:  Same objection, Your Honor.  It's

18    250,000-plus, or maybe 364,000 list.

19          THE COURT:  I don't know how she can know this

20    without reading this, Mr. Evans.  So I'm sustaining the

21    objection.

22          Hold on, hold on.

23    BY MR. EVANS:

24    Q.    Did True the Vote's list of eligibility inquiries have

25    suffixes?

1  **A.**   Yes.

2  **Q.**   Did True the Vote's list --

3        THE COURT:  Hold on.  I have an objection.

4        MR. NKWONTA:  Same objection with respect to the

5  analysis of the list of 364,000 voters.

6        MR. EVANS:  Judge, if I may respond.  I'm asking if

7  the list had suffixes.  This is not data analysis.

8        THE COURT:  She can answer that question, yeah.  It's

9  overruled.

10  **Q.**   Did True the Vote's eligibility inquiry list have middle

11  names?

12  **A.**   Yes.

13  **Q.**   Did True the Vote's master csv file contain any formulas?

14  **A.**   No.

15  **Q.**   In your experience, if you were to try to combine 65

16  files into one file, would that combination causes problems?

17  **A.**   Yes.

18        MR. NKWONTA:  Objection, Your Honor.  She's not

19  qualified to give that type of analysis about combining files

20  and conducing data analysis.

21        THE COURT:  In her opinion would it cause trouble.

22  You can ask in her opinion.

23        MR. EVANS:  I'm asking her experience.

24        MR. NKWONTA:  Our position would be that opinion

25  testimony is improper under Rule 702 and 703 as a lay or an

1    expert witness.

2         THE COURT:  I disagree with you on that.  I'll allow

3    that question in her opinion.

4         MR. EVANS:  Thank you, Judge.

5    BY MR. EVANS:

6    **Q.**   Go ahead.

7    **A.**   Yes, it would cause massive problems.  And we see these

8    types of problems in my line of work with CoverMe, in working

9    with healthcare data, when you're trying to integrate

10   disparate datasets, unless you have exact data from -- exact

11   same -- the exact same structure dataset to dataset.  And

12   there's many other underpinnings that would determine

13   potential problems, but just the notion that you would take 65

14   disparate files and merge, you're going to get all manner of

15   error.

16   **Q.**   In your experience, would you ever try to combined 65

17   files into one file?

18   **A.**   No.  And certainly not in an xml format.  That's a recipe

19   for disaster.

20   **Q.**   Why not?

21   **A.**   Because in the -- in the merger, there are necessary

22   assumptions that have to be made that, if you don't have -- if

23   you have -- if you don't have a working knowledge of --

24        MR. NKWONTA:  Objection, Your Honor.

25        THE COURT:  Hold on.

1          MR. NKWONTA:  This is now going to analysis of

2  creating a merged file.

3          THE COURT:  I agree with that, Mr. Evans.  I allowed

4  the opinion, but that's going beyond what she has expertise to

5  testify about -- analysis.  Sustained.

6  BY MR. EVANS:

7  **Q.**   Would you facilitate the submission of eligibility

8  inquiries again?

9  **A.**   It's been a very trying experience, but I think what's

10  more important -- what's most important is that citizens have

11  the right to question and have the right to work towards

12  improvements.  So, yes, we would.

13  **Q.**   Has the filing of this lawsuit affected your willingness

14  to facilitate eligibility challenges again?

15  **A.**   It's been intimidating, I'll use that word.  It's

16  affected our ability in that there's been -- it's been a long

17  three years, as I say, with a lot of things that have been

18  said that make it difficult to find partnerships, to -- it's

19  affected our ability in -- in -- it's affected our ability in

20  that the process has been sullied.

21  **Q.**   Has the filing of this lawsuit affected your willingness

22  to voice your belief in election integrity?

23  **A.**   It's -- it's not affected my willingness, but, you know,

24  I bear a few more scars.  It's been a difficult process, but

25  certainly I believe that my right to free speech in all of

1   this has been abridged.

2           MR. EVANS:  Judge, no further questions.

3           THE COURT:  Thank you, Mr. Evans.

4           Mr. Nkwonta, your witness.

5   CROSS-EXAMINATION

6   BY MR. NKWONTA:

7   **Q.**   Ms. Engelbrecht, you've given a lot of testimony about

8   the analysis of the challenge list and what went into creating

9   the challenge list; correct?

10  **A.**   I'm not -- I've talked about the methodology and the

11  process, yes.

12  **Q.**   But you didn't conduct any of that analysis yourself;

13  correct?

14  **A.**   No, I don't know if we can use the word "analysis."  Is

15  that -- I don't want to overstep.

16          THE COURT:  She's paying attention.

17  BY MR. NKWONTA:

18  **Q.**   You have not conducted any analysis of the challenge list

19  yourself; correct?

20  **A.**   No, that's not correct.

21  **Q.**   So you have conducted analysis of the challenge list?

22  **A.**   Yes.

23  **Q.**   That's your testimony today?

24  **A.**   Yes.

25  **Q.**   You remember that you gave a deposition in this case in

1  January 2022; correct?

2  **A.**   Yes.

3  **Q.**   And your counsel was there?

4  **A.**   Yes.

5  **Q.**   And a court reporter was there?

6  **A.**   Yes.

7  **Q.**   And you were under oath?

8  **A.**   Yes.

9  **Q.**   In that deposition on -- starting on page 137, line 9,

10 you were asked, "Did you conduct any of the analyses that went

11 into identifying the voters who appeared on the challenges?

12     "Answer:  I did not, no."

13 **A.**   I'm sorry, I need to catch-up.  I apologize.  What's --

14     THE COURT:  Give her time to read it.

15     MR. EVANS:  Judge, just for completeness, I would

16 appreciate --

17     MR. NKWONTA:  Page 137.

18     MR. EVANS:  -- if she could get a copy of the

19 deposition that she's looking at, so it's not zoomed in on any

20 certain phrases and she can review it.

21     MR. NKWONTA:  She's -- if I'm impeaching the witness,

22 the witness is not entitled to review what I'm holding.

23     THE COURT:  She can look at what she's says.

24     MR. EVANS:  She does.  Actually --

25     THE COURT:  Hold on, hold on, hold on.

1            MR. EVANS:  -- by what rule?

2            THE COURT:  Hold on, hold on.

3            Let her look at it.  In other words, she can't just

4    do -- say what she wants to say off of it.

5            MR. NKWONTA:  We are pulling it up.  In fact, I have

6    copies here.

7            THE COURT:  At least let her look at it, you know.

8            MR. NKWONTA:  May I approach the witness, Your Honor?

9            THE COURT:  Yes.

10   BY MR. NKWONTA:

11   **Q.**   I'll direct your attention, Ms. Engelbrecht, to page 137,

12   starting on line 9.  You were asked, "Did you conduct any of

13   the analyses that went into identifying the voters who

14   appeared on the challenges?"

15           You responded, "I did not, no."

16           Next question:  "And you mentioned that other databases

17   were incorporated in creating matching lists and filtering the

18   matching lists.  Were some of those databases or some of those

19   filtering methods outsourced to outside companies?"

20           Response:  "Yes.

21           "Question:  And were they outsourced to companies other

22   than OpSec Group?

23           "Answer:  We outsourced to OpSec and then OpSec followed

24   their process."

25           Was that your testimony, Ms. Engelbrecht?

1  **A.**   Yes.

2  **Q.**   But your testimony today is that you did, in fact,

3  conduct this analysis; is that right?

4  **A.**   Well, I think there's a distinction in the way this

5  question was asked.  And if you continue to read in my --

6  through my testimony, I talk very specifically about the

7  databases that were used.  I talked about TrueNCOA and

8  SmartyStreets.  I described the web-based apps.  If you -- in

9  taking these out of context, which has been, you know, the

10  theme admittedly here, taking out of context, it's what it

11  says.  But if you read the rest of it, clearly I talk about

12  the process and the methodology which I was responsible for.

13  **Q.**   Okay.  Well, let's add some context.

14  **A.**   Sure.

15  **Q.**   You just mentioned SmartyStreets.  And is it your

16  testimony today that you used SmartyStreets in your analysis

17  of the challenge list?

18  **A.**   In the analysis?  We used SmartyStreets in the analysis

19  of the TrueNCOA findings to just compare.

20  **Q.**   And you did that personally, is that your testimony

21  today?

22  **A.**   No, that's not my testimony.

23  **Q.**   In fact, you did not do that personally, you did not

24  conduct any analysis using SmartyStreets.  Mr. Phillips

25  conducted that; correct?

1  **A.**   Well, if we could, I think it's important to define what

2  you mean by "conduct."

3  **Q.**   Have you used "conduct" in a sentence before?

4  **A.**   Yes.

5  **Q.**   And whatever you determine conduct meant when you used it

6  in a sentence, that would apply to this scenario.

7  **A.**   Okay.

8  **Q.**   So --

9  **A.**   So I conducted the authorization of this entire project.

10  I conducted that to happen.

11  **Q.**   So you authorized the project?

12  **A.**   Authorized is another word you can use.

13  **Q.**   But you did not use SmartyStreets like you said you did

14  in the direct examination; correct?

15  **A.**   SmartyStreets was part of a process that I authorized.

16  I'm not -- I -- really, I don't mean to be difficult, I just

17  don't understand the distinction.

18  **Q.**   Well, let me return.  Because the question I just asked

19  you is the same question I asked in your deposition, so let me

20  return to your January 22nd -- January 2022 deposition.  And

21  now I'm looking at lines -- or page 139, lines 3 to 13.

22       You were asked:  "Have you used SmartyStreets before?"

23       Your response:  "Yes."

24       Next question:  "And did you use SmartyStreets to refine

25  NCOA lists?"

1     Your response:  "Yes."

2     "Question:  And in what context?  For the Georgia

3  election law challenges?"

4     Your response:  "Yes.  I should say, I did not personally

5  do that.  But that was my understanding as part of what was

6  being used broadly to refine the NCOA list itself."

7     Was that your testimony, that you did not conduct the

8  SmartyStreets analysis or use SmartyStreets to refine the NCOA

9  list yourself?

10  **A.**   Well, that is my testimony here.  But, again, with

11  context, when you -- when you manage a project and when you

12  outline the requirements for that project and then give that

13  authorization to a vendor, they're following that -- they're

14  putting their fingers on the keyboard, but it was at my

15  authorization.  So I feel like there's -- we're getting this a

16  little muddled.

17  **Q.**   So just to clarify, the extent of your personal knowledge

18  is based on you authorizing these activities to occur, not

19  actually conducting the analyses yourself?

20  **A.**   Well, authorizing and seeing the return results.  And

21  these are -- these -- both of these systems, SmartyStreets and

22  TrueNCOA, the output is reports that have been included as

23  exhibits.  So it's clear that we used them.

24  **Q.**   Would it be fair to say that OpSec Group and Gregg

25  Phillips were the ones that actually conducted this analysis

1  that you authorized?

2  **A.**   It -- it would be -- parts of it, yes.

3  **Q.**   And you referenced Social Security databases and some

4  analysis that involved reviewing or applying Social Security

5  databases to the challenge list.  Is it your testimony today

6  that True the Vote or yourself applied Social Security

7  databases to refine the challenge list?

8  **A.**   We used the -- TrueNCOA has a -- within it has a filter

9  for -- called TrueDeceased that ties to the Social Security

10 Death Index.

11 **Q.**   Let me see if I can rephrase your question -- rephrase my

12 question to try to get a direct answer.

13        On direct you made specific reference to using the Social

14 Security database.  Is it your testimony today that you or

15 True the Vote used the Social Security database to refine the

16 challenge list?

17        MR. EVANS:  Objection, asked and answered.

18        THE COURT:  Overruled.  You can answer that question.

19        THE WITNESS:  I believe what I said even yesterday

20 was that TrueNCOA has a connection with the Social Security

21 Death Index.  The name of it is TrueDeceased.  And so we

22 relied upon TrueNCOA's use of TrueDeceased, which is a

23 connection, just as TrueNCOA is a connection to NCOALink.

24        THE COURT:  That's a yes to his question?

25        THE WITNESS:  I think so.

1   BY MR. NKWONTA:

2   **Q.**   I want to return again to your January 2022 deposition,

3   which we've established you were testifying under oath.  And I

4   direct your attention to page 139, lines 14 to 19.

5        "Question:  And you mentioned other databases like the

6   Social Security database and a few others.  Do you know if

7   OpSec conducted all of those -- all of that analyses

8   internally or whether it outsourced some of that analysis?"

9        Your answer:  "I do not know."

10       Is your testimony today that you do know whether there

11  was some analysis involving a Social Security database?

12  **A.**   Give me one second.  I want to -- it's sort of a compound

13  question.  I want to make sure I'm clear.

14       Well, the way I read the question, you were asking if

15  sort of a -- to my understanding, it was a broad question, all

16  of that analyses internally or whether it outsourced some of

17  the analysis.  To my understanding, it's not specific to the

18  Social Security database, which is a particular one, because

19  it's part of the overall program of TrueNCOA.

20       And my response was like, you know, I don't know.  But

21  TrueNCOA has TrueDeceased in it, which is what was provided in

22  exhibits with TrueAppend.  All of that just comes out

23  together.

24  **Q.**   I understand.  So let me ask a more direct question.

25       When you spoke of the Social Security Death Index and the

1  use of the Social Security Death Index during your direct

2  examination, is that something that you did personally or is

3  that something that you authorized OpSec or Gregg Phillips to

4  do?

5  **A.**   I did not put my fingers on the keyboards to do it, no.

6  **Q.**   You authorized Gregg Phillips and OpSec to do that; is

7  that right?

8  **A.**   Correct.

9  **Q.**   So I'd like to pull up the deposition testimony of Mr.

10  Gregg Phillips, which has been admitted as Plaintiffs'

11  Exhibit 102.  And I'd like to direct you to page 148, lines 13

12  to 18, which should appear on the screen.

13      Question Mr. Phillips was asked:  "Did you use the Social

14  Security Death Index as part of your process?

15      "Answer:  Not in this instance.

16      "Question:  'This instance' referring to the Georgia

17  challenge list?

18      "Answer:  Yes."

19      Do you disagree with Mr. Phillips' testimony on the use

20  of the Social Security Death Index?

21  **A.**   No, no.  Because we also have licensure to directly

22  access the Social Security Death Index, and that's not -- he

23  -- I can -- I absolutely see where he would have made a

24  distinction of whether or not we used the licensure from SSDI

25  or to NCOA TrueDeceased and he would have answered it in that

1  way.

2  **Q.**   Now, I recall hearing you testifying about efforts to

3  remove duplicate names in the challenge list.

4       Do you recall that?

5  **A.**   Yes.

6  **Q.**   And would you have done that, engaged in those efforts,

7  or did you authorize Gregg Phillips to do that?

8  **A.**   My fingers were not on the keyboard to do that, no.

9  **Q.**   So you authorized Gregg Phillips to do that?

10 **A.**   Right, yes.

11 **Q.**   I want to direct your attention to the same exhibit,

12 Exhibit 102, page 122, line 17 to 123, line 5.

13      "Question:  How many duplicates did you identify where a

14 record in the NCOA registry matched more than one record in

15 the voter file?

16      "Answer:  I have no idea.

17      "Question:  Are you aware if any such duplicates were

18 identified?

19      "Answer:  I have no idea.

20      "Question:  Did you investigate whether there were any

21 such duplicates?

22      "Answer:  I have no idea.  I don't -- it wasn't a topic."

23      Do you disagree with Mr. Phillips' testimony on that?

24 **A.**   No, that's his testimony.

25 **Q.**   You also testified during your direct about efforts to

1  remove military voters?

2  **A.**    Yes.

3  **Q.**    Do you recall that?

4        And, again, I'll ask you, were those efforts that you

5  personally engaged in or that you authorized Gregg Phillips

6  and OpSec to complete?

7  **A.**    Again, my fingers weren't on the keyboard to do it, but I

8  was not only -- not only authorized, but was involved in the

9  conversations about the -- the various levels of effort to

10  remove military addresses.

11  **Q.**    So I'll direct your attention to Plaintiffs' Exhibit 102,

12  page 131, lines 3 to 16 from Mr. Phillips' deposition.

13        "Question:  If someone submitted a permanent change of

14  address to Dover Air Force Base, would you understand that

15  that person was no longer eligible to vote in Georgia?

16        "Answer:  I don't know.  It depends.  I mean, not really,

17  because military situations are different, because even if

18  their permanent duty station is somewhere, they can still

19  be -- their permanent residence can still be in the state in

20  which they register.  So it's much more complicated.

21        "Question:  What further analysis did you perform to

22  identify if military voters who moved to a base can retain

23  their eligibility in Georgia?

24        "Answer:  We didn't."

25        THE COURT:  What's your objection?

1        MR. EVANS:  Judge, I'm not sure why Gregg Phillips'

2    testimony is relevant.  He can't use it for impeachment.  The

3    deposition says what it says that it says.  She can't say

4    whether or not his testimony is -- his knowledge is true or

5    false.  So I'm not sure how this is relevant.

6        MR. NKWONTA:  Well, she testified that she conducted

7    these analysis on direct.  And now we're hearing that Gregg

8    Phillips conducted these analysis.  So I'm asking her if she

9    agrees with Gregg Phillips' assessment.

10       THE COURT:  I'll allow it in, Mr. Evans.  Overruled.

11   BY MR. NKWONTA:

12   Q.   And then I'll direct you to page 136, lines 4 to 13 where

13   Mr. Phillips is talking about UOCAVA voters.

14       "Question:  How would you have researched or sought to

15   identify whether an individual had requested a UOCAVA ballot?

16       "Answer:  Almost impossible, because the counties don't

17   publicize that.

18       "Question:  Okay.  When you say 'almost impossible," so

19   was there anything you did to identify whether a voter had

20   requested a UOCAVA ballot?

21       "Answer:  No.  I'm not aware of any way to do that

22   effectively."

23       That conflicts with the testimony you gave on direct.  Do

24   you disagree with Mr. Phillips' analysis?

25   A.   Can we -- I do disagree with your translation of this,

1  yes.  I mean, he's being -- he's being -- in my opinion, being
2  responsive to the specific question about a UOCAVA ballot.
3  The broad step that was taken was we just removed
4  international addresses.
5      But UOCAVA, as you know, is a very specific type of
6  ballot -- or not ballot, but status.  And it's not denoted in
7  the voter file.  So I would say that this was a very literal
8  interpretation of UOCAVA.
9  Q.  So to cut this short, just to make sure we're in
10  agreement, the analyses that you discuss in your direct
11  examination, you were referring to analyses that you had
12  authorized Gregg Phillips to conduct; is that correct?
13  A.  No.
14  Q.  Which analyses did you press the keyboard on yourself, to
15  use your lingo?
16  A.  Well, analyses is -- is -- can be defined as observing
17  data as it's provided back to you or making assessments about
18  the data that is provided.  That part of the analysis, if I
19  can use that word, is certainly something that I participated
20  in.
21      And because I've been doing this for 13 years, my
22  understanding of what outliers might look like, what anomalies
23  might look like is significant.  I have -- yeah, I've
24  participated in many of these programs.  But I'm not sure if
25  that's even what I'm being asked.

1   **Q.**   So other than reviewing the data, did you conduct any

2   analyses yourself by, as you refer to it, pressing the keys on

3   the keyboard?

4   **A.**   I don't -- I don't think that's how you define analyses.

5   That's how you've, I think, tried to define analyses.

6   **Q.**   Can you tell me what analyses you conducted yourself as

7   opposed to Mr. Gregg Phillips?

8   **A.**   First, if we're going to use the word "analysis," I guess

9   I analyzed how to procure the Georgia state voter database.

10  And then I analyzed how to draw up a project plan.  And I

11  analyzed who to enlist and help who would have licensure to

12  make sure that all of the necessary elements would be

13  accessible, the right software licensure, the quality of the

14  process.  And then I analyzed the output.  And I analyzed,

15  much later and over the last three years, the reviews.  So

16  that's -- that was my role.

17  **Q.**   Thank you.

18       I want to switch over briefly to your discussion of

19  Mr. Joe Martin.  I believe I heard you say on direct that you

20  did not know Joe Martin or did not know of Joe Martin outside

21  this process; is that correct?

22  **A.**   Not outside of this process, no.

23  **Q.**   So can you clarify what you meant when you say you did

24  not know Joe Martin?

25  **A.**   Prior to him volunteering to work as a -- or to volunteer

1  for this effort or to -- indicated he wanted to participate,

2  to the best of my knowledge, I did not know Joe Martin.

3  Q.   So -- but after he volunteered, then you knew of Joe

4  Martin; correct?

5  A.   After he volunteered and there were e-mail exchanges that

6  I read about in this trial, then I knew of Joe Martin.

7  Q.   And you saw his e-mails; correct?

8  A.   Correct, yes.

9  Q.   You also mentioned during the direct examination that

10 before the 2020 election, True the Vote was involved in

11 lawsuits challenging some of the voting measures or voting

12 procedures that you believe were unlawful in the lead-up to

13 the 2020 election.

14      Do you recall that?

15 A.   Correct.

16 Q.   And was True the Vote a plaintiff in all those lawsuits?

17 A.   No.

18 Q.   So in some of those lawsuits, you had individual

19 plaintiffs and True the Vote covered the fees for those

20 individual plaintiffs; correct?

21 A.   Correct.  I'm sorry.

22      MR. EVANS:  Judge, this is -- I don't believe this

23 was brought up on direct.  This was asked and answered in his

24 cross in his case-in-chief.

25      THE COURT:  I don't remember it being on direct.  The

1   direct was long yesterday, but I don't think he --

2            MR. NKWONTA:  It was brought up on direct.  And if

3   the Court wants to take a two-minute break, we can pull up the

4   exact citation.

5            THE COURT:  I don't have time to do that.  I'm trying

6   to move this case along.  I'm going to just take him at his

7   word, Mr. Evans, and proceed from there.

8            MR. NKWONTA:  And what was brought up, just for

9   the -- to make sure everyone's on the same page, was the fact

10  that True the Vote filed lawsuits before 2020.  We -- I don't

11  believe he went into what those lawsuits were about

12  specifically or any of the details about who paid for what and

13  stuff.

14           MR. EVANS:  Okay.  So long as it's limited to that,

15  Judge.

16           THE COURT:  Okay.

17  BY MR. NKWONTA:

18  **Q.**   And in filing those lawsuits on behalf of individual

19  voters where True the Vote was not named as a plaintiff, who

20  did True the Vote retain to file those lawsuits?

21  **A.**   Jim Bopp.  Well, and local counsel.

22  **Q.**   And the same person who filed the Georgia lawsuit that we

23  discussed during my cross-examination, which is Plaintiffs'

24  Exhibit 27?

25  **A.**   I'm not sure what Plaintiffs' Exhibit 27 is.

**Q.**   This would be the *Brooks v. Mahoney* lawsuit in Georgia,
seeking to overturn the results of the presidential election
in eight Georgia counties.

Do you recall that?

**A.**   Yes, Jim Bopp did file that.

**Q.**   And True the Vote was not a plaintiff in that case
either?

**A.**   No.

**Q.**   And just now you mentioned that you were talking about
the impact of this lawsuit on True the Vote's and your future
plans to file challenges and to facilitate challenges in the
future.

The IV3 platform that we discussed previously during my
cross, that platform is meant to facilitate voter challenges
by citizens; correct?

**A.**   It's meant to facilitate the ability for voters to look
at their local voter rolls.  And then if they are in a state
where they have a challenge process, that's part -- that could
be part of it, if that's what the citizen chose to do.  But
that's not what IV3 is --

(Reporter asked for a clarification.)

THE WITNESS:  Is the name of it, IV3.

**Q.**   And True the Vote is ready to launch that platform;
correct?

**A.**   It's -- yes, it's up.

1          MR. NKWONTA:  Thank you, Your Honor.  I pass the

2     witness.

3          THE COURT:  Thank you.

4          Any redirect?

5     REDIRECT EXAMINATION

6     BY MR. EVANS:

7     Q.   Ms. Engelbrecht, just a couple of questions.

8          Were you actively involved in the generation of the

9     eligibility inquiry list?

10    A.   Yes.

11    Q.   Do you have to have your fingers pushing keys on a

12    keyboard to be actively involved in the generation of an

13    eligibility challenge list?

14    A.   No.

15    Q.   Why not?

16    A.   Because providing the -- the oversight and the direction

17    and the management and the analysis is sufficient.

18    Q.   Was it important to you to be actively involved in the

19    generation of the eligibility challenge list?

20    A.   Absolutely, yes.

21    Q.   Why is that?

22    A.   Because the data needed to be correct.  And this was

23    something that -- that volunteers were entrusting us to

24    represent.  And it's an important process and not to be taken

25    lightly.  And for all the reasons you do good work.

1  **Q.**   And in your experience as the CEO of True the Vote and at

2  CoverMe, did you generate experience in dealing with datasets

3  like --

4  **A.**   I'm sorry.

5  **Q.**   -- like you did in generating the eligibility challenge

6  lists?

7  **A.**   Every day, yes.

8          MR. EVANS:  No further questions, Judge.

9          THE COURT:  Thank you.

10         Recross?

11         MR. NKWONTA:  Nothing further, Your Honor.

12         THE COURT:  Thank you, Ms. Engelbrecht.  You can step

13 down.  Run while you can.

14         THE WITNESS:  Thank you.  Thank you.

15         THE COURT:  All right.  Call your next witness.

16         THE WITNESS:  Leave this --

17         THE COURT:  Yes, ma'am.  Leave that up there.

18         MR. WYNNE:  Your Honor, the defense does not intend

19 to call any additional witnesses.  But there are a number of

20 housekeeping matters that need to be addressed, including the

21 motion for judicial notice and the supplement.

22         THE COURT:  Let me say this:  The one -- Mr. Nkwonta,

23 the one they filed this morning dealing with Ben Hill, I've

24 read those cases, those orders.  So I don't see a big issue,

25 but I'll tell you, I've read them at least twice.

1          MR. NKWONTA:  Your Honor, they're --

2          THE COURT:  I know you haven't had a chance to

3   respond.

4          MR. NKWONTA:  Right.  And, Your Honor, there

5   generally isn't a big issue with it.  I think there's just one

6   quirk about the Ben Hill case which is that the Court entered

7   a TRO shortly after we filed our complaint.  That TRO, if you

8   look on the docket, it says the TRO has been withdrawn, which

9   is normal because, you know, after you enter a TRO, then you

10  schedule a PI hearing.

11         And so I think the TRO bridges a lot of the gap

12  between what the parties are discussing.  And if there's a way

13  to include the TRO and include the other filings, like the

14  Muscogee County response to the motion for TRO, where they

15  explain what it is that they were doing --

16         THE COURT:  Judge Garner issued an order on

17  December 28, 2020; Judge Anand ordered on January 4, 2021.

18  What is missing out of those orders that you think I need to

19  go further on?

20         MR. NKWONTA:  Well, I -- so -- and my apologies if

21  this is included in their motion for judicial notice, I don't

22  remember seeing it, but the TRO opinion I don't believe was

23  included.

24         THE COURT:  All right.  Well -- some of my staff can

25  pull up the exact -- I've read her opinion, her orders.  But

1 if there's something missing, we'll go on the docket.  What

2 you're asking is for the Court to see the exact TRO opinion?

3          MR. NKWONTA:  Yes, the exact TRO opinion, which I

4 don't believe --

5          THE COURT:  That's no problem.

6          MR. NKWONTA:  I don't believe -- I don't believe it's

7 on the docket anymore because it was withdrawn.

8          MR. WYNNE:  It is, Your Honor.  It's docket --

9 it's -- that was the one entered December 28th.  There was a

10 hearing December 30th.  And it wasn't withdrawn.  There was a

11 new one.  It's still on the docket.  And under Rule 201(d),

12 judicial notice is mandatory when supplied with the necessary

13 information.  We've supplied the necessary information.

14          THE COURT:  I've already indicated I've read those

15 orders at least twice.  I know what's in them.  I'm just

16 trying to figure out what Mr. Nkwonta wants me to read

17 additionally.  I --

18          MR. NKWONTA:  That was both -- just to ensure that

19 both opinions were included and the Muscogee brief was

20 included.  It's more an issue of completeness.  We don't

21 object to taking judicial notice.

22          THE COURT:  If there is something in addition to --

23 other that the orders that were entered by Judge Gardner, send

24 it to us again.  Or if you can't find it, we can definitely

25 get it, so --

1          MR. WYNNE:  I can give it to you right now.

2          THE COURT:  Well, if you've got it printed out --

3          MR. WYNNE:  I've got the whole docket sheet right

4   here.  And, in fact, I believe that we have --

5          THE COURT:  Well, I've looked at what you --

6          MR. WYNNE:  -- entered the docket sheet.

7          THE COURT:  I looked at what you gave me.  I'm

8   familiar with it.  Let Mr. Nkwonta look at it and make sure

9   that he's satisfied that the Court has everything.

10         Because, again, I think I thoroughly read it, but,

11  you know, I admit, you know, we didn't go and pull everything

12  off the docket.  We pulled mainly just the orders off the

13  docket.

14         MR. WYNNE:  Will do.  It's Exhibit A1 or Exhibit A

15  and 1.  Here is the docket sheet.  And we don't object to the

16  inclusion of anything, you know, for optional completeness and

17  because it's mandatory under 201(d).

18         And I'd ask the other items there also be taken into

19  judicial notice.

20         THE COURT:  Again, I don't mind reading everything.

21  I thought I pulled -- you know, I didn't just read the order,

22  we read everything that went along with the order.  But if I'm

23  missing something, I have no problem with you-all giving it to

24  me and I'll read it.  Judicial notice, but I'm going to allow

25  it.

1           MR. WYNNE:  Yeah.  And there were also some websites
2  and I have the authority allowing those to be taken judicial
3  notice of dynamic websites that the Court could go to, media
4  articles and so forth, and these things are --
5           THE COURT:  I don't think the media -- I think the
6  media is one of the best things in America, in the world, but
7  I don't base decisions on media articles.
8           MR. WYNNE:  No, of course not.
9           THE COURT:  Nothing personal.
10          MR. WYNNE:  Of course not.  But to counterbalance
11  their references to articles during one of these crosses that
12  I was handling, take a look at the others.
13          THE COURT:  Listen, listen, listen.  If it's not on
14  that docket, I can't base a decision on something that's not
15  on the docket.  Again, with all due respect to the media, I
16  read it every day, especially in this case I've been trying to
17  keep up with what the media is saying, but I'm not going to
18  base decisions based on that.
19          MR. WYNNE:  No.  I was talking about the other
20  attachments, not just Attachment A relating to Ben Hill in
21  Muscogee, but there are other items.
22          THE COURT:  Let's keep it simple.
23          Mr. Nkwonta, is this anything else that's missing out
24  of the -- what's been filed by defendants or what the Court
25  has already read?

1    MR. WYNNE:  And we have no objection to the items

2    they've listed, obviously.  I think there's three of them,

3    including the prior subpoenas that were withdrawn.

4         THE COURT:  Mr. Wynne, are you talking about what

5    you-all filed on Sunday night or Monday?

6         MR. WYNNE:  Yes.

7         THE COURT:  Okay.  I think the response -- we got a

8    response back from the plaintiff.  I think the plaintiffs only

9    had some objections about some hearsay matters in there.  They

10   didn't object to all of it.  We can pull it again and look at

11   it.

12        I think we're fine, Mr. Nkwonta, on the Ben Hill part

13   of this, unless you-all have something else you want to add

14   that you think I need to read that wasn't available to me.

15        MR. NKWONTA:  And we'll identify it, but we're fine

16   with the Ben Hill.

17        THE COURT:  We saw your response to the judicial

18   notice regarding the e-mails on Stephanie -- what's her last

19   name?

20        MR. NKWONTA:  Stinetorf.

21        THE COURT:  -- Stinetorf, and you-all had some

22   objections.  And I can't remember exactly from when we pulled

23   it, but just tell me:  What were your objections to that

24   judicial notice?

25        MR. NKWONTA:  Well, the objection is it's not

1  appropriate for judicial notice.  It's not -- it's not a
2  matter that's not -- that is not reasonably contested.
3  Stephanie Stinetorf testified that that e-mail was mistaken
4  and there were subsequent e-mails that clarified the issue.
5       So we believe it's not appropriate to take judicial
6  notice of a single e-mail, but I think this can be resolved.
7  What we propose is the Court can take that e-mail into account
8  but also take Ms. Stinetorf's other e-mails with individuals
9  from Muscogee --
10       THE COURT:  Rule of completeness.
11       MR. NKWONTA:  -- under Rule 106.
12       THE COURT:  I have no problem doing that.  And
13  Mr. Wynne has noted he has no problem with that, so we will do
14  that.
15       So it's in, Mr. Wynne.  And we're going to add -- you
16  give me the other e-mails, just to make sure I have them all?
17       MR. NKWONTA:  Yeah, we attached them to our response.
18       THE COURT:  All right.  Then I have them right here,
19  then.  Thank you.
20       MR. NKWONTA:  Thank you.
21       MR. WYNNE:  Thank you.  It's perfectly fair.  We're
22  in favor of more information.
23       THE COURT:  Well, since I have to read it all, I
24  can't say I'm totally in agreement with you.  But we'll do it
25  that way.  Rule of completeness says the law says I have to do

1    it now.  So I'm going to follow the law.

2            What else?  Those are the two judicial notices I

3    received from the defendants.  And they both are in, and,

4    again, we'll do a rule of completeness.  We'll read all the

5    e-mails that you ask me to read.

6            MR. NKWONTA:  Have you gotten to plaintiffs' requests

7    for judicial --

8            THE COURT:  Not yet.  Since the defendant is

9    standing, we'll deal with his first and then we'll get back to

10   yours.

11           What else?

12           MR. WYNNE:  Yeah.  And as to C and D, those

13   government --

14           THE COURT:  C and D on what?  C and D on what?

15           MR. WYNNE:  C and D is the screen print from the

16   Georgia's Secretary of State's website.

17           THE COURT:  Which one are you talking about, Monday's

18   judicial notice or today's judicial notice?

19           MR. WYNNE:  Sunday's.

20           THE COURT:  Okay.

21           MR. WYNNE:  And Attachment C is a screenprint taken

22   from the Georgia Secretary of State's website and the fact as

23   illustrated by this attachment, counting absentee ballots

24   files can be accessed by year and by individual and are

25   publicly available.  Defendants request the Court take

1  judicial notice of that fact and all records relating to
2  absentee ballots that can be downloaded --
3          THE COURT:  Mr. Wynne, Mr. Wynne, I'm taking judicial
4  notice of everything you filed Sunday.
5          MR. WYNNE:  Okay.  Thank you.  That was -- I was just
6  clarifying that.  And I got the case law about taking judicial
7  notice of dynamic --
8          THE COURT:  Mr. Wynne, you're winning.  You're
9  winning.  When you're winning what happens?  You quit talking.
10         MR. WYNNE:  All right.  Hey, I haven't had a chance
11 to be up here in a couple days.
12         THE COURT:  Well, I miss hearing you, but when you're
13 winning, the way I was taught, sit down, leave it alone.
14         MR. WYNNE:  I gotcha.
15         THE COURT:  You might say something that changes the
16 judge's mind.
17         MR. WYNNE:  I don't want to do that.
18         THE COURT:  Yeah.  All right.  Let's take up
19 plaintiffs' judicial notices.
20         MR. NKWONTA:  Just give us one minute, Your Honor.
21         THE COURT:  Okay.  Thank you, Mr. Wynne.
22         MR. NKWONTA:  I'll start by -- just to avoid any
23 delay while we pull up the motion --
24         THE COURT:  Hold on.  Before Mr. Wynne sits down,
25 Mr. Wynne, do you have everything in evidence for the

1   defendant you want to put into evidence?

2          MR. WYNNE:  Could I have just a moment to confer?

3          THE COURT:  You can do that while Mr. Nkwonta is

4   talking.

5          MR. NKWONTA:  Well, we pulled up the motion itself to

6   make sure I don't say anything wrong.  I believe what we seek

7   to admit or ask the Court to take judicial notice of is the

8   data from the Secretary of State's -- from Georgia Secretary

9   of State that lists the voting age population by race in each

10  county in Georgia.  And we've provided sort of the relevant

11  cite for that.

12         We also attached, I believe, three subpoenas that

13  were issued to Ms. Heredia's apartment buildings and her -- I

14  believe her auto dealership or her auto --

15         THE COURT:  I plan on -- unless defense can tell me

16  something they haven't told me, I plan on allowing everything

17  you requested judicial notice.

18         MR. NKWONTA:  And we specifically request that the

19  Court take judicial notice of the eight counties in Georgia

20  that have the highest Black voting age populations.  The

21  counties are listed in our --

22         THE COURT:  I have it listed.  Matter of fact, I read

23  them this morning.  They are Fulton, DeKalb, Gwinnett, Cobb,

24  Clay, Chatman, and Richmond.

25         MR. NKWONTA:  Yes, that's correct.

1         THE COURT:  I will take judicial notice of everything

2    you've asked me to take judicial notice of.

3         MR. NKWONTA:  Thank you, Your Honor.

4         THE COURT:  Okay.  Mr. Wynne, do you know exactly

5    whether your exhibit list is complete?

6         MR. WYNNE:  Your Honor, I'm going to have to ask for

7    about five-minutes, it's been a two-week trial, to confer with

8    cocounsel here.

9         THE COURT:  Take five minutes.  I'll sit right here.

10        Say that out loud, Ms. Wright.

11        Mr. Wynne, listen up very closely.  It's Ms. Wright's

12   responsibility to keep up with what's been admitted, and she's

13   going to tell you what has been admitted.

14        THE DEPUTY CLERK:  Defendants 38' and that's it.

15        THE COURT:  And while they're looking at their

16   exhibit list, you might want to recheck yours.

17        Mr. Nkwonta, I directed you-all to provide me an

18   updated exhibit list because you-all added 91 through 105.

19   And we need that updated exhibit list before we close this

20   out.

21        Department of Justice, you're fine.

22        MS. BOA:  Thank you, Your Honor.

23        MR. NKWONTA:  Very quick cleanup, Your Honor, while

24   they sort through their exhibits.

25        The docket numbers that we wanted to make sure were

1  added for the Muscogee County case were ECF 12, which is the

2  original TRO order, and ECF 23, which is the Muscogee County

3  brief in opposition to the motion for TRO.

4          THE COURT:  12 and 23?

5          MR. NKWONTA:  Correct.

6          THE COURT:  Maddie, did you get that?

7          MR. NKWONTA:  And then for our updated exhibit list,

8  i just want to make sure I heard the Court correctly.  The

9  version that you have doesn't go to 105?  It stops at --

10         THE COURT:  It stops at 90.

11         MR. NKWONTA:  Okay.  We'll provide you an updated

12 version.  Would you like us to file them on the docket as

13 well?

14         THE COURT:  Yes.  The main -- first, get one to

15 Ms. Wright as quick as possible.  The docket one you can do

16 tomorrow, but we need this one ASAP.

17         MR. NKWONTA:  We'll do that.  Thank you.

18         THE COURT:  All right, Mr. Wynne.

19         MR. WYNNE:  Yes, Your Honor.  A few things.

20 According to our list, we'd like to offer 53 and 54.  Those

21 are the audio transcripts of the -- of the matters that -- I

22 think they're audio of the alleged SEAL's statement.  And then

23 we've got the audio transcript.  I may be mistaken if we have

24 actual audio.  Do we not have audio?  Well, we have just the

25 transcript.  Then strike that.  I'm trying to be complete

1  here.  Strike that request.

2          THE COURT:  Four transcripts.

3          MR. NKWONTA:  I believe those are already in

4  evidence.  I believe 53 is Plaintiffs' Exhibit 51.  And I

5  believe Defendants' Exhibit 54 is Plaintiffs' Exhibit 52.

6          THE COURT:  I don't know.

7          MR. WYNNE:  Well, if they're in, then my point is

8  moot.

9          THE COURT:  As usual, let me talk to the paralegal.

10 Are those the same and are they in?

11         MR. WYNNE:  They are the same.  Okay.

12         THE COURT:  Then we don't need 53 and 54.

13         MR. WYNNE:  All right.  Just being careful.

14         Next we'd ask for No. 64, which Ms. Heredia -- or

15 that Mr. -- Mr. Evans proved up with Ms. Heredia.  That was

16 the CARFAX.

17         MR. NKWONTA:  Object on authenticity grounds and

18 hearsay and foundation.

19         MR. WYNNE:  I don't think they preserved those.

20         MR. NKWONTA:  We did preserve those.  This is part of

21 the -- this is also disclosed untimely, so...

22         THE COURT:  They did, Mr. Wynne, on the 26th of

23 October.

24         What's next?

25         MR. WYNNE:  I would just respond to their -- to their

1   hearsay objection and the Court's ruling under the residual

2   hearsay rule.

3        THE COURT:  Well, your first objection, though -- and

4   I'll have plaintiffs' counsel repeat it again.  The hearsay

5   objection is not your -- it's a problem, but it's not your

6   biggest problem.

7        MR. NKWONTA:  So, Your Honor, actually, I want to

8   retract one of my objections.  I believe Exhibit 64, the

9   CARFAX, I believe that was disclosed in May of 2023.  So I

10  apologize and I retract that objection.

11       THE COURT:  I think Ms. Heredia testified about it,

12  Mr. Nkwonta, and she -- I think she probably verified -- I

13  haven't seen the exhibit, but she probably verified what was

14  in the exhibit, because I didn't see the exhibit.  But she --

15  Mr. Evans on direct -- on cross questioned her about it.

16       MR. NKWONTA:  She verified one entry that showed

17  where her car got service.  So, obviously, that is in evidence

18  that the car got serviced on that date.  But the CARFAX report

19  itself is unverified.

20       THE COURT:  Okay.  Without seeing the exhibit, I

21  can't -- if he's talking about the whole CARFAX report, you

22  know, it's telling if the car if it's been in an accident and

23  all that, she did not testify to that.

24       MR. WYNNE:  We'd ask to offer it under 807, which is

25  the residual hearsay exception and point out that throughout,

1   plaintiffs have been criticizing our various -- our various

2   witnesses for not having looked at things like the CARFAX

3   report, which is a concession of some element of reliability

4   putting it in Rule 807.

5           THE COURT:  I almost should ask either

6   Ms. Lawrence-Hardy or Ms. Bryan to stand up here and rule on

7   your objection, because this came up in another case and we

8   spent about, what, an hour and a half on it.  And at the end

9   of the day, Ms. Bryan and Ms. Laawrence-Hardy was not happy

10  with the Court.  I didn't allow it then, and I'm not allowing

11  it now.

12          MR. WYNNE:  Okay.  Well --

13          THE COURT:  And let me say, anybody reading this

14  record, so the Appellate Court can be really sure, what

15  happened in the case, Ms. Bryan and Ms. Lawrence-Hardy, I just

16  used it to relate it, because they both were looking at me

17  like what the world are you doing.

18          Totally different matter.  But there's a whole

19  different set of procedures you have to follow to get

20  something in on residual and you haven't offered not one of

21  them yet.

22          MR. WYNNE:  I'm ready.

23          A, the statement is offered as evidence of a material

24  fact.  It's a material fact that there was dispute about

25  Ms. Heredia's residence for purpose of Section 230.

1          The statement is more -- B, the statement is more

2    probative on the point for which it is offered, that any other

3    evidence that the public can cure through reasonable efforts

4    and because plaintiffs have put so much effort --

5          THE COURT:  There's your problem right there.  I

6    don't find there's been enough reasonable efforts that you

7    could not have gotten this in another way.

8          Residual is the last resort to get something in where

9    all of the other mechanisms have not been met.  But the key is

10   that you have to show this Court that you used all those other

11   mechanisms and did not work out.  Not because of your failure

12   to do it, but because you haven't shown the Court that it

13   couldn't have been done another way.  And that's my ruling

14   here.

15         MR. WYNNE:  For the record, I would just suggest that

16   the large array of things that were done that they objected to

17   as an intrusion upon Ms. Heredia's personal affairs, that is

18   everything that Mr. Somerville, who is nothing but thorough,

19   did.

20         THE COURT:  I respectfully disagree with you,

21   Mr. Wynne, but I note your objection for the record.  I'm not

22   allowing it in.

23         MR. WYNNE:  Okay.  Thank you.

24         Along the same lines and potentially risking the same

25   ruling, I'd offer, again with Ms. Heredia, Exhibits 127

1  through 129.  Those are the NCOA result, the CASS summary

2  report, and the CASS certification, which I believe Mr. Evans,

3  you know, set the foundation through cross.

4         THE COURT:  127 through what?

5         MR. WYNNE:  129.

6         MR. NKWONTA:  Your Honor, I don't know who laid the

7  foundation on this.  If they are suggesting that Jocelyn laid

8  a foundation a CASS summary report, I would object to that.

9  I'm not sure what a CASS -- I'm still not sure what CASS means

10  after this trial.

11         MR. WYNNE:  Well, I think Ms. Engelbrecht explained

12  that admirably.  And if you take the testimony of Jocelyn

13  Heredia and combine it with that explanation, there is a

14  sufficient evidentiary foundation to let these uncontested

15  materials, in terms of whether they're accurate and probative,

16  in.

17         MR. NKWONTA:  Your Honor, 127 is just a screenshot.

18  128 and 129 are pages that -- it's unclear what it is they

19  are.  And I'm -- I don't think you can cobble together

20  testimony from different witnesses to establish foundation.

21  But even if you could, I still -- there still has been no

22  foundation laid for these exhibits.

23         MR. WYNNE:  Of course you can.  We did it with the

24  text message exchange.  We had to wait until Derek Somerville

25  was on the stand to -- to authenticate his part of that

1  communication.  So of course you can use two witnesses to

2  establish a foundation.  That's fundamental.

3       THE COURT:  Well, I agree you can use two witnesses

4  to establish a foundation.  I'm just trying to think, did you

5  establish the foundation?

6       Tell me again your objection, other than the

7  foundation aspect of it.

8       MR. NKWONTA:  Foundation, authenticity.  And it's

9  unclear what these -- it's unclear what these pages are.

10      THE COURT:  So what are they?  Are they the ones

11  where it's showing Mr. Bowling and them challenging?

12      MR. WYNNE:  We can pull the exact exhibits and show

13  them.

14      MR. NKWONTA:  No witness actually explained what

15  these documents are.

16      THE COURT:  I need to see them, because I don't

17  remember -- I probably saw them, but just -- I remember one

18  dealing with Ms. Heredia, the other showing -- Representative

19  Bowling and Mr. Gasaway -- Dan Gasaway was challenging her.

20  Is that the one you-all are talking about?

21      MR. WYNNE:  Ms. Martinez has them pulled up on her

22  screen right here.  If we want to find a way --

23      THE COURT:  Well, plaintiffs' counsel said he doesn't

24  know what it is.  So you've got to show it to him as well.  I

25  don't remember seeing this.

1       MR. WYNNE:  It's in voluminous binders, I'm not

2  sure -- but we have them on the screen.

3       THE COURT:  What -- your screen.  Is that -- I don't

4  remember seeing that, I've got to be honest with you,

5  Mr. Wynne.  I don't agree that the testimony regarding this is

6  extensive enough to establish a foundation.  I would think the

7  person would have to establish a foundation, one of the two

8  people would have to at least looked at it to identify it.  It

9  was never put up on the screen.  So I don't know how you can

10  establish a foundation when the person -- again, two people

11  can do it, but neither of them was ever shown this.

12       MR. WYNNE:  Fair enough.

13       THE COURT:  Denied.

14       MR. WYNNE:  All right.  128.

15       THE COURT:  128.  I think you've got the same problem

16  with 128.  I don't remember either one of the two people

17  you're trying to lay a foundation with ever identified this.

18       MR. WYNNE:  Well, okay.  Could I recall

19  Ms. Engelbrecht?

20       THE COURT:  I already told you your problem.

21       What's your next one?

22       MR. WYNNE:  All right.  129.

23       THE COURT:  One more time.  If one of the two people

24  had identified it, that's part of laying the foundation.  But

25  neither one of these people were shown 129 either.  So they

1  never identified it.

2       MR. WYNNE:  So is that --

3       THE COURT:  That's a no as well.  127, 128, 129 are

4  not allowed.  I note Mr. Wynne's exceptions for the record.

5       MR. WYNNE:  Okay.  Then I go to -- and I think this

6  is in order that they were presented.  This is regarding

7  Mr. Turner.  We have 278, which was presented.  And that's

8  this one.  And he did --

9       THE COURT:  Yeah.  On the first day, October the

10  26th, that one was presented.

11       MR. NKWONTA:  Your Honor, this exhibit was disclosed

12  12 hours before trial.

13       THE COURT:  Okay.  Well, Mr. Wynne, your problem is

14  that it was not timely disclosed, according to plaintiffs'

15  counsel.

16       MR. WYNNE:  Well, I still need a ruling for the

17  record, if you will.

18       THE COURT:  It was not timely disclosed and that's

19  the reason why I'm not allowing it in.  I think it probably

20  would come in otherwise, but plaintiffs' counsel is saying it

21  was not timely disclosed under the rules.  So based on that --

22  that is your objection?

23       MR. NKWONTA:  Yes, Your Honor.

24       THE COURT:  I would have to deny it.  I remember this

25  one.  Because this one was presented, it was shown to

1   Mr. Turner on the 26th of October, but it was not put in, it

2   was not offered, and it was not timely disclosed.  So I'm

3   denying it on that basis, it was not timely disclosed.

4         MR. WYNNE:  And then 276.  Again, I would -- I would

5   say that it was fully -- a foundation was laid for this

6   exhibit during Mr. Turner's testimony, and as -- I offer it

7   into evidence.

8         THE COURT:  I think we're going to have the same

9   problem.  I remember it also being shown to Mr. Turner.  I

10  think the proper foundation was set up.  The question is, was

11  it timely disclosed?

12        MR. NKWONTA:  It was not timely disclosed, Your

13  Honor.  And just for the record, we would also assert a

14  foundation objection because it was still -- no one has

15  testified as to where that document came from or what it is.

16        THE COURT:  Mr. Wynne, if it is not timely disclosed

17  we don't even get to the other part.  So, again, I note your

18  exception.  I think you'll probably -- if you had timely

19  disclosed, you probably would have got it in, but...

20        MR. WYNNE:  And for the record as well, I'd also note

21  that new counsel did not get the entire files from former

22  counsel until after the May date, which seriously handicapped

23  our ability to understand the relevance and to supplement that

24  exhibit list, the due date for which had already passed.

25        That being the same for the witnesses we had hoped to

1 call, but we were precluded because of prior counsel's neglect

2 and negligence.

3          THE COURT:  I don't quite know how to respond to

4 that, because I don't want to get subpoenaed for an Indiana

5 case.

6          MR. WYNNE:  I just wanted to note it for the record

7 and ask the Court to take judicial notice of my statement.

8          THE COURT:  I take judicial notice of your statement.

9 I'm not saying whether it's true or false, but I take judicial

10 notice of your statement.

11          MR. WYNNE:  And so with that, so I don't have to

12 repeat everything again, we offer Exhibit 277.

13          THE COURT:  I think we're in the same situation that

14 it was not timely disclosed.  So I'm denying it for that

15 basis.

16          MR. WYNNE:  Same offer into evidence, Exhibit 280.

17          MR. NKWONTA:  Yes, Your Honor, same objection.

18          THE COURT:  Denied because it was not timely

19 disclosed.

20          MR. WYNNE:  And 275.

21          MR. NKWONTA:  Same objection, Your Honor.

22          THE COURT:  It's denied because it was not timely

23 disclosed.

24          MR. WYNNE:  There are a couple more here.

25          And then Exhibits 297 through 302.  Those relate to

 1  Jocelyn Heredia and inquiry into, you know, her residence for
 2  purposes of the Section 230 eligibility inquiry.
 3          THE COURT:  Now, 297 was shown to her on October the
 4  27th, but it was not admitted.
 5          MR. NKWONTA:  Same objection.  It was not timely
 6  disclosed.
 7          THE COURT:  Is that same way for 298 and 299 as well?
 8          MR. NKWONTA:  Yes, Your Honor.
 9          MR. WYNNE:  299 through 302.
10          THE COURT:  All right.  Just for the record,
11  Mr. Wynne, from 297 to 302, the Court is going to deny it
12  because it was not timely disclosed.
13          MR. WYNNE:  Okay.  And I believe that's it.  And so
14  the defendants --
15          THE COURT:  Just for the record, I did allow in 64
16  over objection.  Wait a minute.  Yeah, I allowed that one --
17  well, I didn't, excuse me, because the CARFAX included extra
18  information.  I think you're going to have to go through it
19  and take out the part -- one part of it is admissible, but not
20  all of it.
21          MR. WYNNE:  Okay.
22          THE COURT:  One part she testified to about going to
23  CARFAX and things like that, but she didn't testify about the
24  entire CARFAX report that talks about accidents in the past
25  and things like that.

1      MR. WYNNE:  Well, we can redact that and reoffer it.

2      THE COURT:  You redact that and show it to

3  plaintiffs' counsel.

4      MR. NKWONTA:  Your Honor, if the Court is going to

5  admit that exhibit, then we would prefer the entire exhibit be

6  admitted under the rule of completeness.  So no need to

7  redact.  Our view is just it shouldn't be admitted.  If it

8  comes in, we think the entire thing should come in.

9      THE COURT:  All right.  Here's what I'll do.  To

10  perfect your record, I'm going to allow it in over objection.

11  So that we'll put it all in, but I'll just say you objected to

12  it.  So I allowed it in over objection.

13      MR. NKWONTA:  Thank you, Your Honor.

14      THE COURT:  So the whole thing comes in over

15  objection.

16      So you don't have to redact, Mr. Wynne.

17      MR. WYNNE:  Okay.  Then defendants rest.

18      THE COURT:  Okay.  Plaintiffs, anything?  Have you

19  got all your exhibits in?

20      Ms. Wright, is the defendants' list up-to-date and is

21  plaintiffs' list up-to-date?

22      THE DEPUTY CLERK:  Yes, sir.

23      THE COURT:  Okay.  Closing arguments start at 10:30.

24  I think both sides requested an hour for closing; is that

25  correct, plaintiffs?

1    MR. NKWONTA:  Yes, Your Honor.  May I request to

2  reserve 15 minutes for rebuttal?

3    THE COURT:  You can reserve as much time as you want.

4    MR. WYNNE:  Your Honor, we're going to split our

5  part.  I'm going to take the first 15 minutes, and then

6  Mr. Evans will take the last 45 minutes.

7    THE COURT:  Okay.  All right.  That's fine.  We'll

8  start at 10:30.  Thank you-all.

9    (A break was taken. )

10   THE COURT:  You-all can may be seated.

11       Before we start the closings, one announcement I need

12  to make -- two announcements.  Defendants' counsel filed a

13  motion 52(c) last week.  I told plaintiffs' counsel they had

14  till noon today to respond.

15       I read defense counsels' brief Sunday night, a very

16  good brief, but based on what I've heard in the argument last

17  week, I'm going to deny the motion to 52(c).  So I don't need

18  today to brief.  But both sides still are required by next

19  Wednesday at 5 p.m. to file findings of facts and conclusions

20  of law.  So you probably -- your brief will not be in vein,

21  whoever did the research, you can probably work it into that.

22  Okay?

23       All right.  Yes, sir.

24   MR. NKWONTA:  Sorry, just one last housekeeping item

25  I want to verify with Ms. Wright.

1          THE COURT:  Yeah.

2          THE DEPUTY CLERK:  Yes.

3          (A discussion is held off the record.)

4          THE COURT:  Okay.  Are you ready?

5          MR. NKWONTA:  Yes, Your Honor.

6          THE COURT:  Which clock is the plaintiffs' clock,

7    Ms. Wright?

8          THE DEPUTY CLERK:  That would be the left.

9          THE COURT:  Mr. Nkwonta, the clock on the left is

10   yours.  The clock on the right is defendants.  The one on the

11   far left is the one -- is yours.

12         MR. NKWONTA:  Thank you.

13         THE COURT:  All right.

14         MR. NKWONTA:  Good morning, may it please the Court.

15         THE COURT:  Sir.

16         MR. NKWONTA:  When we started this trial, Your Honor,

17   I said that defendants' false accusations and threats would

18   have consequences and that lies have consequences.  And now

19   that the evidence is in, I want to put a finer point on that

20   statement.

21         Because with the evidence that we've seen, Your

22   Honor, we submit that the standard to which we hold defendants

23   and the standard by which we judge their conduct, as we've

24   seen through this trial before the January 2021 runoff, will

25   have serious consequences and serious implications for the

1   right to vote.

2        Now we know what the stakes are.  And we know what

3   the stakes are because Jocelyn Heredia has not voted since the

4   January 2021 runoff.  And you heard her, Your Honor, talk

5   about how excited she was to be voting.  How she emerged from

6   the voting booth with an "I Voted" sticker.  How she watched

7   her parents become citizens and take part in one of the most

8   cherished Constitutional rights.  How she voted in 2016, 2018,

9   2020, and the 2021 runoff.  She was politically active.

10       But after her experience being challenged by both

11  True the Vote's volunteer Jerry Bowling, and Mark Davis and

12  Derek Somerville's volunteer, Dan Gasaway, she stayed away in

13  2022.

14       Those are the stakes.  And it's not just Jocelyn.

15  The Court heard testimony from several voters, all of whom

16  approached the voting process from different stages of life,

17  from different backgrounds, and even from different parts of

18  the world.

19       You had D'Malio Turner on temporary assignment in

20  California.  You had Scott Berson, recent Auburn graduate who

21  came back home to Georgia and voted in the 2021 runoff while

22  he was at home.  And you have Stephanie Stinetorf who was in

23  Germany working.  And yet the one thing that all of these

24  individuals shared in common, in addition with Jocelyn, the

25  one thing they shared in common is that the challenges made

1  them fear that they had done something wrong.  They were being

2  accused of voting unlawfully.  They felt that they were being

3  accused of violating the law.  They were fearful.  They were

4  intimidated.

5       So these are the consequences.  And we saw the

6  consequences when these individuals, these brave individuals

7  testified.

8       And so the question is whether these plaintiffs and

9  Georgia voters must bear these consequences alone.  Whether

10 they have to fend for themselves or whether the VRA provides

11 some protection when they are falsely and recklessly accused

12 of being unlawful voters.

13      Now, before I get too deep into the testimony and the

14 exhibits, I want to recognize that this case presents some

15 difficult legal questions that the Court has been working

16 through, and to be frank, that I've been wrestling with.  And,

17 thankfully, the path that was laid out in the Court's summary

18 judgment order, I believe is one that gives us a way out of

19 this legal thicket.  And it starts out by explaining how to

20 prove a Section 11(b) violation.  And it's grounded in the

21 text of the statute and we can follow it.

22      It says, "Plaintiffs must show that plaintiffs'

23 actions, directly or through the means of a third party in

24 which they're directed" -- that's the first element -- "caused

25 or could have caused" -- that's the second element -- "any

1    person to be reasonably intimidated, threatened, or coerced

2    from voting or attempting to vote."

3           So I'll start with what I think is a threshold

4    question.  And it's a question that Your Honor raised during

5    the Rule 52 motion arguments as well.  What did these

6    defendants do to end up here?  What did each of them do?  What

7    are their actions that violated Section 11(b)?

8           I'm going to start with True the Vote, because True

9    the Vote is the hub of all of this.  And there are numerous

10   connections.  But starting with True the Vote.

11          We know that True the Vote challenged more than a

12   quarter million voters just weeks before the January 2021

13   runoff.  And by now it's well-established that their challenge

14   lists, consisting of over a quarter million voters, was an

15   unmitigated disaster.

16          The Court has seen Plaintiffs' Exhibit 91, which

17   we'll pull up briefly.  And I don't want to belabor this --

18   the next page, the next page, the next one, next.

19          I don't want to belabor this, Your Honor, but some of

20   these errors are appalling.  To challenge voters that have not

21   even moved, that have the same moved from and moved to

22   address.  To challenge over 15,000 voters without even

23   indicating the address they allegedly moved to.  To challenge

24   individuals whose addresses reside or reflect a military

25   installation, to challenge students who are both students and

1   in the military, that is the height of recklessness, Your

2   Honor.

3          And you heard Dr. Mayer testify credibly that he was

4   in shock.  He didn't just disagree, he was in shock by the

5   quality of the challenge list and the errors that he saw.

6          We can take this down.

7          And you heard no evidence to refute Dr. Mayer's

8   observations.  Defendants did not put up an expert.  They

9   attempted to have Mr. Davis and Mr. Somerville opine on True

10  the Vote's challenge list even while simultaneously claiming

11  they were completely separate from True the Vote and did not

12  know about True the Vote's methodology.

13         Then they tried to have Ms. Engelbrecht testify and

14  give details about how the challenges were constructed, which

15  she did, only to reveal on cross-examination that what she

16  meant by analysis and construction was actually giving the

17  order for somebody else to do the analysis and construction

18  and -- and preparation of the challenge list.

19         And that other person she gave the instruction to,

20  Gregg Phillips from OpSec.  Well, you heard his deposition

21  testimony.  You heard experts from the deposition designations

22  of all the things he didn't do.  The things that

23  Ms. Engelbrecht said True the Vote did, he said they didn't

24  do.  Didn't research how to remove military voters.  Didn't

25  research how to remove UOCAVA voters.  She said she applied

1   SmartyStreets during the direct examination.  On

2   cross-examination, realized she did not.  She sent a direct

3   order, I guess, to Mr. Phillips to do it.

4          Long story short, the Court has heard no credible

5   testimony to refute Mr. Mayer's -- or Dr. Mayer's observations

6   in this case.

7          And the Court can make a finding just based on that

8   chart alone, even without any further discussion, that the

9   creation of those lists was reckless.  And we know it was

10  reckless, not just because of those errors, but because they

11  were never caught.

12         When there are 15,000 entries that do not have a

13  date, that do not have a move to date, when you challenge

14  15,000 voters, that's 15,000 lines on whatever spreadsheets

15  you've constructed where you alleged somebody moved but the

16  address they moved to is blank and you don't see that.  That

17  means that you did not exercise the bare minimum diligence

18  required when contesting someone's most sacred Constitutional

19  right.

20         Now, that's what that statistic indicates, but we

21  actually don't have to guess.  Because you heard

22  Ms. Engelbrecht testify and you heard others testify,

23  Mr. Williams included, that they did not review those entries

24  before they submitted the list.  They took the list and they

25  passed it off.

1         In some instances, the challengers themselves never
2  received the list.  In many instances, the challengers never
3  received the list.  In some instances, the volunteer
4  challengers didn't even know they were submitting challenges
5  on their behalf.  You heard Mr. Martin express his shock that
6  the challenges had been submitted in his name by True the
7  Vote.
8         What Your Honor may not have heard but is in evidence
9  as one of plaintiffs' deposition designations is testimony
10  from Mr. Ron Johnson who also expressed shock that
11  challenges -- or surprise that challenges were submitted in
12  his name by True the Vote.
13         So obvious errors in the tens of thousands.  Nobody
14  reviewed those entries.  And these are errors that you would
15  see if you reviewed each entry.  That is the height of
16  recklessness for True the Vote's challenge list.
17         But it gets worse.  They scrape together the
18  challenge list of over 364,000 voters, they challenged about a
19  quarter million but scraped together a list of over 364,000
20  voters in approximately 2 weeks, according to
21  Ms. Engelbrecht's testimony.  Maybe even less.
22         Ms. Engelbrecht testified that they started preparing
23  or conducting the data analysis in the second week of
24  December.  Then met with Mr. Davis and Mr. Somerville on
25  December 16th.  Announced the challenge effort on December

1  18th, and they were off to the races.  That's a fast

2  turnaround.  And it's a fast turnaround considering that there

3  isn't a preordained or predetermined window for filing these

4  types of challenges in Georgia.  They had all year.  And they

5  had the year before.

6       They chose to do it in the last two weeks before a

7  hotly contested Senate runoff election.  And they chose to

8  overwhelm counties, meanwhile demanding that those counties

9  conduct hearings and force the voters who had been challenged

10 to present evidence of residency.  And they did this even

11 after a meeting with the Secretary of State's office.

12      You've heard a lot of discussion about that meeting.

13 You've heard about Ms. Engelbrecht's takeaways from that

14 meeting.  And you've heard about various interpretations of

15 that meeting.  But you've only heard from one witness as to

16 what was said in that meeting.  The only witness who has been

17 able to tell you what was said in that meeting reliably with

18 admissible evidence is Ryan Germany.

19      And you can believe what Ryan Germany says because

20 Ryan Germany does not have, you know, any stake in this fight.

21 Ryan Germany met with True the Vote willingly with the

22 Secretary of State's Office.  And he told them, submitting

23 spreadsheets with just names of voters is not going to

24 accomplish what you hope to accomplish.  It's not going to

25 establish probable cause.  Relying on that alone is not

1    enough.  But they persisted anyway.

2           Then they heard from one of their challengers, Joe

3    Martin, who told them problems with the challenge list,

4    concerns about the quality.  He said some of the folks he

5    challenged were residents, had homes in Toliver County.  They

6    didn't revisit their lists, they didn't regroup.  They said,

7    fine, we'll find somebody else.  James Cooper said I'll find

8    somebody else to submit the same challenges.  That's reckless.

9           And so with Dr. Mayer's unrefuted testimony

10   explaining just how reckless True the Vote was in compiling

11   these challenges, the Court should compare that with the

12   purpose of the challenges.  The purpose of the challenges, as

13   Ms. Engelbrecht has testified and as she stated in her

14   deposition, was to require voters to provide proof of

15   residence, to challenge voters to provide proof of residence.

16   So that means when a voter who goes to vote in person who can

17   typically use a student ID or who can typically use a

18   government employed ID, would no longer be able to use that

19   ID.  They've have to present something with proof of residence

20   or an absentee voter, who at the time, could submit a ballot

21   without additional evidence, would have to provide proof of

22   residence.  That was the stated purpose of these challenges.

23          And there's more even.  You heard evidence that True

24   the Vote created a -- we'll call it a whistleblower program,

25   to use their words.  To compensate individuals who report

1  fraud.  And yet in private conversations, when discussing how

2  to implement this program, Ms. Engelbrecht called it a bounty

3  and revealed that she offered a Georgia whistleblower $50,000

4  in cash.

5          Now, the e-mail says what it says.  It's in

6  Exhibit 28.  When this Court asked Ms. Engelbrecht about that

7  $50,000 offer, which was, again, contingent upon evidence

8  leading to prosecution, and in addition to securing

9  representation for that -- for that whistleblower, the Court

10 should take note of Ms. Engelbrecht's response.  She didn't

11 say that's not true.  She didn't say I didn't make that

12 statement.  What she gave was the equivalent of a word salad

13 that didn't really tell us why a voter was being offered

14 $50,000 in order to report fraud.

15         And then that, Your Honor, is combined with the

16 increased monitoring of polling places, with the references

17 to -- the reference to Navy SEALs monitoring ballot drop

18 boxes.  Those are the activities that brought True the Vote

19 here, and those are the reasons that True the Vote and

20 Ms. Engelbrecht are defendants in this lawsuit.

21         During last week's argument, the Court asked about

22 Ron Johnson, James Cooper, Mark -- well, they didn't ask about

23 Mark Williams, but I'll address him as well.

24         So True the Vote and Ms. Engelbrecht, they're not

25 Georgia residents.  They don't have the right to file

1   challenges in any county in Georgia.  So that's where these

2   individuals come in.  That's where Mr. Johnson, Mr. Cooper,

3   and Mr. Williams come in.  And they weren't just bystanders in

4   this process.

5         Mr. Williams personally challenged more than 32,000

6   voters in Gwinnett County.  And you heard him testify that he

7   didn't review any of those entries before he submitted the

8   challenge.  He assumed that -- he claimed to have run NCOA at

9   some point in the past and saw that True the Vote had run NCOA

10  and figured they were both correct and submitted the

11  challenge.

12        And he helped True the Vote print and submit

13  challenges to other counties.  Mr. Cooper and Mr. Johnson

14  recruited voter challengers.

15        And let me take a step back.  Mr. Williams, in

16  addition to challenging 32,000 voters in Gwinnett County, he

17  demanded an investigation of every voter on this list, even

18  though he didn't himself conduct any review of that list.

19        Mr. Johnson and Mr. Cooper were the head recruiters.

20  True the Vote admitted that they assisted with recruiting

21  hundreds of voter challengers across the state of Georgia.

22  They admitted this in Plaintiffs' Exhibit 10 in their

23  interrogatory responses.

24        And as Mr. Cooper testified in his deposition, which

25  we've admitted as Plaintiffs' Exhibit 96, Mr. Johnson took

1   North Georgia, Mr. Cooper took South Georgia.  This was a

2   coordinated recruiting effort to ensure that they had enough

3   challengers to carry out True the Vote's plan, carry out

4   Ms. Engelbrecht's plan, carry out a plan that they could not

5   implement themselves in Georgia.

6        And then the Court saw the e-mails from Mr. Cooper

7   soliciting potential challengers, repeating false statements

8   about the challenge lists, that 99.9 percent of the

9   individuals on the challenge list were unlawfully registered.

10  Well, we know that's false based on Dr. Mayer's analysis.  Or

11  stating that these efforts would have kept former President

12  Trump in office if they had started earlier, if they started

13  before the general election.

14        So Mr. Johnson and Mr. Cooper are integral to this

15  effort.  So is Mr. Williams and his 32,000 voter challenge in

16  Gwinnett County.  They're all part of the same enterprise.

17        And then the next question Your Honor asked is how do

18  Mr. Davis and Mr. Somerville factor into this equation?  Well,

19  they collaborated with True the Vote in launching their

20  challenges.  They discussed the data, where to get the data,

21  what it looks like.  They shared talking points for the

22  challengers.  They invited their volunteer challengers to True

23  the Vote strategy calls.  Ms. Engelbrecht and Mr. Somerville

24  exchanged more than 60 texts, many of which they failed to

25  disclose during the discovery process, mostly related to their

1  challenge effort.

2      They even talked about jointly suing counties that

3  did not process their challenges.  And Mr. Somerville added

4  his name and Mr. Davis' name to the press release announcing

5  the challenges.  And they told their volunteers that they were

6  collaborating with True the Vote.

7      But putting that aside, even assuming that their

8  challenge effort was entirely separate, the Court doesn't need

9  to find that Mr. Davis and Mr. Somerville were collaborating

10  with True the Vote or were operating in some joint enterprise

11  with True the Vote in order to find them liable, because their

12  separate challenges create liability under Section 11(b).

13  Their actions in creating the challenge lists of 40,000 voters

14  who they accuse of being unlawfully registered based on

15  nothing more than NCOA data, that is enough.

16      And Mr. Davis and Mr. Somerville admit that they

17  collaborated with Dan Gasaway to provide a challenge list for

18  Banks County.  And Jocelyn Heredia was challenged by Mr. Dan

19  Gasaway.

20      So that's why these defendants are here, Your Honor.

21  And moving through the elements of Section 11(b), these

22  defendants cross and check every box for establishing

23  liability.

24      First, the first question Your Honor posed in his

25  order and the first question I'll address is whether there was

1    direct action toward voters caused by their actions.  And the
2    answer is a resounding yes.  It was direct action because by
3    creating these challenge lists and soliciting challengers,
4    they sought to act through a third party, the counties, the
5    election officials, to confront these challenge voters and to
6    force them to present evidence of their residence.

7            Now, you have heard throughout trial, you've heard
8    opposing counsel ask witnesses whether they've ever met the
9    challenge voters, whether they have accosted or caused any
10   harm to the challenged voters, whether they confronted the
11   challenged voters in person.  Numerous variations of that
12   question.  Those are legally irrelevant questions.

13           This Court has already recognized that is not the
14   standard.  Nothing about Section 11(b) suggests that the
15   interaction or the acts must be violent or made personally in
16   order to be considered intimidation.  In fact, the Court
17   emphasized twice in its order that direct contact need not be
18   made by defendants themselves.  A person cannot escape
19   liability for doing indirectly through another what he or she
20   would be liable for doing directly themselves.

21           So conduct through third parties we know can
22   intimidate voters just the same as conduct initiated directly
23   through defendants.  And defendants have told us what they
24   intended to do.  They intended to use third parties to force
25   voters to prove their residence.  That is a direct action.

1          It's also true of the bounty on fraud.  That is

2     another direct action.  When True the Vote or Ms. Engelbrecht

3     offers a third party $50,000 to report claims of fraud,

4     they're acting through a third party.  But they're also

5     directly intimidating voters by making these announcements.

6          Now, given that the Court has rejected the idea that

7     there needs to be some direct contact or some communication or

8     some physical act, I'll move on to causation and how we

9     establish that defendants' actions caused intimidation, both

10    among Georgia voters in general and among the defendants.

11         So the first step is what is now I believe settled

12    law in that interpreting Section 11(b), defendants are deemed

13    to intend the natural consequence of their acts.  And the

14    conduct must generate the possibility that voters would feel

15    threatened, intimidated, or coerced.

16         So is intimidation the natural consequence of voter

17    challenges, whether individual voter challenges or mass voter

18    challenges?

19         I believe in prior arguments or prior discussions,

20    counsel and the parties have wrestled with that discussion.

21    And, Your Honor, one of the reasons we've wrestled with that

22    discussion is because there are a number of things that I

23    think we know to be true but have not explicitly put in the

24    record until Mr. -- until Dr. Burton got up there and

25    testified.  And that is, we know that voter challenges result

1   in intimidation because that was the motivation behind

2   enacting voter challenge laws to begin with.  When the first

3   voter challenge law in Georgia was introduced in the early

4   20th Century, the 1908 peer registration law, that law, as

5   Dr. Burton testified and as his expert report shows, that law

6   required that "registration lists shall be placed on exhibit

7   in the office of the clerk of the court where all may inspect

8   and may challenge those who are thought not to be worthy of a

9   place."  And then it was incorporated into the 1910 code of

10  the state of Georgia.

11          And that law, as Mr. Burton testified, was designed

12  to disenfranchise Black Georgians.  And it was exploited for

13  that very purpose, with devastating effect, particularly in

14  the 1946 gubernatorial election.

15          So the resulting intimidation, coercion, and threats,

16  it's not just a byproduct or something we have to guess may be

17  a product of challenges at this point.  It's the entire point.

18  It is the very purpose of the challenge law.

19          Now, we're not alleging or seeking to strike down the

20  challenge law, but we are recognizing that sometimes it's

21  important to call these challenges what they are.  It started

22  as a tool to disenfranchise.  It has evolved into a tool that

23  citizens can use to ensure election integrity.  But it can

24  still be a tool to disenfranchise.  It can still be a tool to

25  intimidate.  And we cannot ignore and pretend that its origins

1   do not exist.

2          And that historical perspective allows us to sort of

3   dispense with this awkward dance where we try to figure out

4   what types of challenges intimidate voters and what types of

5   challenges don't intimidate voters.  Or whether a voter should

6   expect to be challenged, as Mr. Davis suggested, whether a

7   voter who files an NCOA list should expect to be challenged.

8   We know that challenges are intimidating because they were

9   meant to be intimidating.

10         And we know that these challenges caused our

11  plaintiffs to be intimidated.  Jocelyn Heredia, who was

12  challenged by Jerry Bowling, a True the Vote volunteer,

13  testified that she was intimidated, that she thought she had

14  violated the law.

15         Scott Berson gave the same testimony.

16         Gamaliel Turner, Stephanie Stinetorf.  They all

17  testified about the fear they felt when they were challenged.

18         Now, you'll hear from defendants that some of those

19  individuals were not challenged by them or that there's no

20  causation, but we have to look at exactly what the evidence

21  shows, Your Honor, and differentiate the evidence with

22  attorney statements.

23         So the first question:  Was Jocelyn Heredia

24  challenged by defendants?  Did defendants cause her

25  intimidation?  Of course they did.

1          Because Ms. Engelbrecht admitted on the stand that

2   Jerry Bowling was a True the Vote volunteer.  And Jerry

3   Bowling, as established in Plaintiffs' Exhibit 49, challenged

4   Ms. Jocelyn Heredia.

5          Mr. Davis and Mr. Somerville, their challenge list

6   for Banks County was submitted by Mr. Gasaway.  They testified

7   that they collaborated or worked with Mr. Gasaway to provide

8   him a challenge list.  And Jocelyn was challenged by

9   Mr. Gasaway, again, Plaintiffs' Exhibit 49.

10          Then we go to the Muscogee County voters.  Defendants

11   suggest that the Muscogee County voters were challenged by

12   Alton Russell and not by True the Vote.  But the evidence

13   doesn't establish that.

14          Amy Holsworth testified on the stand that True the

15   Vote kept a list of challengers that it was recruiting.  And

16   on that list, under Muscogee County, she testified that Alton

17   Russell's name was listed there.  So on the list of

18   challengers that True the Vote maintained, challengers that

19   True the Vote maintained that Amy Holsworth testified that

20   were individuals True the Vote was either -- had either

21   recruited to submit challenges or was recruiting or had been

22   referred to True the Vote, Alton Russell's name was listed

23   there.

24          We know that Alton Russell submitted a challenge for

25   Muscogee County.  Defendants, who are in the best position to

1  refute that inference, have provided nothing other than their
2  own statements that they did not work with Alton Russell.  But
3  they why was he on their recruited challenger list?

4          They've offered no explanation as to why Mr. Russell
5  was on that list, on that list of challengers that they
6  recruited.  And even assuming, even assuming that Mr. Russell
7  went off and filed his own challenges, even if we accept that,
8  the list still shows that they attempted to recruit him to
9  submit challenges in Muscogee County.  And Section 11(b)
10 forecloses both attempts and actual intimidation.

11         So they can't escape liability by just pointing to
12 Alton Russell without providing any explanation or any
13 evidence to explain why Mr. Russell was on their list of
14 challenge recruiters.

15         THE COURT:  Explain to me again.  You said it doesn't
16 matter whether they recruited him or not if he filed the
17 challenges.  Go over that again.

18         MR. NKWONTA:  Certainly.

19         So Section 11(b) prohibits attempts, attempts to
20 intimidate.  And if True the Vote attempted to submit a
21 challenge in Muscogee County through Alton Russell, the fact
22 that they were not successful doesn't absolve them from
23 liability under Section 11(b).

24         And the same -- the same issues that plagued the
25 challenge list that they submit, that they submitted, also

1  plague the challenges that they attempted to submit.  The

2  challenges that they attempted to submit were not any more

3  refined than the challenges they submitted.  The challenges

4  that they attempted to submit would not have created any less

5  of a burden on voters who would have been forced to show their

6  residence.  And the challenges that they attempted to submit

7  were not -- were not supported by any stronger legal argument

8  or law.  They were still based on shoddy NCOA data analysis.

9       And so the completion of the act is not necessary to

10  find a Section 11(b) violation.

11       Now, that is the most charitable interpretation of

12  the evidence when it comes to defendants.  But in terms of

13  what is most likely, what the preponderance of the evidence

14  shows, the preponderance of the evidence shows that Mr. Alton

15  Russell was on their list of recruited challengers and was

16  listed under Muscogee County.  And Mr. Alton Russell submitted

17  a challenge in Muscogee County.  And the only thing they have

18  offered to refute that is to say, no, he didn't.

19       The next question that the Court may have is whether

20  these challenges or whether the intimidation that resulted

21  from the challenges was objectively reasonable.  And here I

22  admit there's not a whole lot of guidance in the statutory

23  text and not a ton of guidance in the case law as to what

24  objectively reasonable means.

25       But the Court has sketched out some parameters

1  through its multifactor test.  And using those factors as a

2  guide, the evidence has clearly demonstrated that these --

3  that intimidation is objectively reasonable under these

4  circumstances.

5          The first factor the Court mentioned was proximity to

6  the runoff election.  We've already established these

7  challenges were submitted mere weeks, as little as two weeks,

8  sometimes less, before the runoff election.  The frivolity of

9  the challenges.  We've established through Dr. Mayer's

10 testimony that these challenges were largely frivolous for

11 multiple reasons.

12         First, True the Vote's challenges were error prone.

13 The lists were sloppy.  The lists were rife with errors that

14 were shocking to Dr. Mayer, errors that should have been

15 obvious.  As I've mentioned, people warned True the Vote that

16 the challenges they were submitting were both inaccurate and

17 were not sufficient to establish probable cause.

18         So beyond the errors in the list itself, they were

19 also legally baseless, because they relied solely on NCOA data

20 to establish that the challenged voter did not reside in the

21 specific county.

22         And that's not how Georgia law determines residence.

23 Georgia law determines residence through a set of interrelated

24 factors.  There are approximately 15 rules in OCGA 21-2-217.

25 Many of those rules focus on intent.  In fact, intent is the

1  common theme that's woven through pretty much all of those

2  rules.

3        And then the statute lists a number of factors as

4  well to consider.  Factors like financial independence,

5  business pursuits, employment, income sources, residence,

6  income tax purposes, age, marital status, residence of

7  parents, spouse and children, sites of personal and real

8  property, motor vehicle and other property registrations.

9        And NCOA database doesn't reveal any of that.  It

10  does not reveal any information that would tell you much about

11  the factors I just listed.  Nor does it reveal anything that

12  will tell you about the highly individualized intent focused

13  rules set forth in Section 21-2-217.

14        So to rely on NCOA data alone to determine that an

15  individual -- or to allege that an individual is not a proper

16  resident or is not voting correctly in a specific county, is

17  to rely on evidence that is by definition insufficient to

18  establish somebody's residence or to refute somebody's

19  residence.

20        And how do we know that it's insufficient by

21  definition?  I've previously referred to the NVRA in numerous

22  circumstances.  And we've talked at length about the NVRA,

23  Your Honor.  I'm not suggesting that there's some potential

24  NVRA violation that we're trying to litigate here.  That's not

25  the purpose of bringing up the NVRA.

1       But I think the NVRA provisions can provide a little

2  bit of guidance, some guidance, as to how to view NCOA data

3  within the context of voter registration and voter

4  eligibility.  And I'll give you one example.

5       The NVRA lists a number of sources of data that can

6  be used by election officials to identify and remove

7  ineligible voters.  For instance, ineligible voters can be

8  removed for evidence or information showing prior convictions,

9  or eligible voters can be removed under the NVRA for

10 information showing that the individual had died.

11      For those reasons, the NVRA allows county officials

12 to remove voters without further examination, without voter

13 notification, without the procedural steps that you see for

14 the NCOA.

15      When it comes to the NCOA, NVRA does not allow

16 removal for residency-based reasons alone.  NVRA does not

17 allow removal based simply on data showing a person changed

18 their address.

19      Instead, there's a two-step process that the State

20 and election officials must engage in.  So while an individual

21 can be removed for prior conviction or because of information

22 indicating that that individual has died; when it comes to

23 residency, when it comes to change of address, when it comes

24 to information that would be revealed by the NCOA, election

25 officials have to confirm with the voter.  And if the voter

1  does not confirm that they have moved, election officials have

2  to wait two election cycles, two general election cycles.

3       So putting aside what's an NVRA violation and what's

4  not, the treatment of that source of data and the distinction

5  between that source of data and other sources of data that the

6  NVRA contemplates, should tell you something about how

7  reliable the NCOA is in determining whether somebody is a

8  registrant in a specific county or not.

9       And as the Court recognized in a summary judgment

10  order, if defendants only used NCOA data to make their lists,

11  then such fact might weigh in favor of finding that the

12  challenges were frivolous, because a change of address alone

13  is not sufficient to remove a voter from the rolls.

14       And that's exactly right.  Because it's all

15  defendants have recognized, or defendants that have testified,

16  Ms. Engelbrecht, Mr. Davis, Mr. Somerville.  People change

17  their address for a host of reasons that are unrelated to a

18  change in their permanent residence.

19       And if we -- next I want to point to the motivations

20  at stake here.  Because that's one of the factors that the

21  Court considered, what were defendants' motivations.

22       Now, Section 11(b) does not require proof of intent.

23  But it's notable, the motivations of the defendants, which

24  they've admitted to in filing these challenges, again, it was

25  to force voters who were challenged to provide evidence of

1   their residence, to do something more, something extra, to

2   learn that they were challenged and to prove that they were

3   entitled to vote.

4          As Dr. Mayer reliably testified, under the cost of

5   voting framework, the increased legal risk and the additional

6   steps required to establish one's eligibility, that

7   dramatically increases the cost of voting and that burdens

8   voters and discourages them from participating in the

9   elections.

10         It sounds a lot like Jocelyn Heredia.  And defendants

11  have offered nothing to rebut that.

12         Now, True the Vote's -- that intent analysis or

13  motivation, that applies to all defendants.  But True the

14  Vote's intent is even more fraught with improper attempts to

15  reshape the electorate and nullify votes.

16         You've heard evidence about the Validate the Vote

17  program and the effort to overturn the result of the 2020

18  election.  And how True the Vote converted the Validate the

19  Vote program for the general election to Validate the Vote

20  Georgia, merely changed the logo, and in Ms. Engelbrecht's own

21  words, used the same resources, applied the same resources to

22  Georgia.

23         And if we pull up Plaintiffs' Exhibit 1, under the

24  Validate the Vote plan, you'll see that everything listed

25  under that plan, True the Vote did in Georgia.  Solicit

1  whistleblower testimonies of those impacted or involved in

2  election fraud.  Ms. Engelbrecht offered $50,000 to an

3  individual if his information would lead to prosecution.

4       Build momentum through broad publicity.  We saw True

5  the Vote's press releases and press statements announcing the

6  challenge effort, exaggerating the challenge effort even,

7  announcing the election integrity hotline, announcing

8  partnership with GOP.  Galvanized Republican legislative

9  support in key states.  You heard about all the legislators

10  that Ms. Engelbrecht met with.  You heard it again about the

11  partnership with the Georgia GOP.

12       Aggregate and analyze data to identify patterns of

13  election subversion.  And it lists OpSec Group.  Well, you

14  heard about OpSec Group's analysis of the Georgia voter file

15  and NCOA analysis to identify what they consider ineligible

16  voters.

17       File lawsuits in federal court with capacity to be

18  heard by SCOTUS.  That's exactly what True the Vote did.  They

19  filed a lawsuit in Plaintiffs' Exhibit 27.  They filed a

20  lawsuit where they named eight counties as defendants and

21  sought to overturn the presidential election results in those

22  eight counties.  They didn't even have plaintiffs that lived

23  in those eight counties.  They didn't even allege fraud

24  occurred in those eight counties.  Yet, those eight counties

25  matched up perfectly with the eight counties with the largest

1   Black voting age populations in Georgia, per the Secretary of

2   State's website.

3          And then we know about the bounty, which we just

4   discussed, which Ms. Engelbrecht had a lot of difficulty

5   explaining why she was explicitly stating that she was

6   offering someone $50,000 to report fraud.  You heard

7   statements about medical bills and you heard statements about

8   everything that was going on.  But it's still not clear, Your

9   Honor, what that had to do with offering $50,000 in exchange

10  for information leading to prosecution of voter fraud.

11         And then publication.  Defendants knew that these

12  challenge lists could or would become public.  They knew that

13  they'd be subject to public records request.  And there's

14  strong evidence that True the Vote, or someone affiliated with

15  True the Vote, and Ms. Engelbrecht and Mr. Phillips published

16  a tweet on Twitter, the Time For a Hero tweet.  The Crusade

17  For Freedom tweet.  Threatening to release the list of

18  challenged voters.  That's in addition to defendants'

19  knowledge that these lists would become public or that they

20  had become public.

21         Now, before delving too much and eating too much into

22  my rebuttal time, the last thing I'll point out for Your

23  Honor, as we established the elements of Section 11(b) and the

24  elements of voter intimidation, is that this -- this case and

25  the evidence we've provided and defendants have provided, will

1   require the Court to make credibility determinations.

2        For some of these issues, there is conflicting

3   testimony.  We acknowledge that.  But the Eleventh Circuit

4   does provide some guidance as to what factors this Court

5   should take into account when making credibility

6   determination, when deciding who to believe and what it can

7   believe.

8        For instance, variations in a witness's testimony and

9   any failure of memory throughout the course of discovery

10  create an issue of credibility.  The Eleventh Circuit said

11  that in *Tippens v. Celotex*, 805 F.2d 949, Insight 954.

12       And you've seen some of that already.  You saw some

13  of that today, where Ms. Engelbrecht claimed that she

14  conducted all this analysis yesterday on the challenge list,

15  and today testified that she actually did not punch the

16  button, she authorized the analysis for someone else -- for

17  Mr. Phillips to conduct.  And Mr. Phillips conducted the

18  analysis and he said he actually did not do some of the things

19  that Ms. Engelbrecht said that he did.

20       Another factor that the Court can take into account

21  when assessing credibility.  The directness in answering -- or

22  lack thereof in answering questions.  The recall of events,

23  noteworthy events.  Contradictions between testimony and other

24  evidence and self-interest.

25       And this comes from a Southern District of Florida

1  case, *Bernal v. All American Investment Realty, Inc.*, 479 F.
2  Supp. 2d 1291.  And, again, we saw some of this.  We saw
3  defendants' responses to direct questions.  We saw
4  Ms. Engelbrecht's responses to direct questions about the
5  $50,000 offer.  We saw Ms. Engelbrecht's responses to direct
6  questions about the analysis of the challenge lists, about the
7  attempt to remove -- or the so-called attempt to remove
8  military voters.

9          Also, another factor the Court can take into account
10  is litigation or discovery conduct.  Courts have found that a
11  party's failure to abide by discovery, a party's failure to
12  provide documents, responsive documents, despite repeated
13  requests for documents, despite knowing the documents were
14  pertinent, that that is something to take into account when
15  considering credibility.  And that's *Fernandez v. Havana*
16  *Gardens, LLC*, 562 F. App'x 854.

17          And as we mentioned, you -- this Court has seen
18  numerous instances in which defendants have withheld material
19  from discovery.  That 60 -- those 60 text messages that I
20  mentioned earlier between Ms. Engelbrecht and Mr. Somerville,
21  those text messages, the majority of them were not produced.
22  We received them shortly before this trial.

23          And then, Your Honor, as you saw in my
24  cross-examination of Ms. Engelbrecht, you saw the
25  embellishments in the December 14th press release or the blog

1   post claiming that True the Vote had partnered with the GOP,

2   with the Georgia GOP and had reached out to the Democratic

3   Party in Georgia, only to reveal that they did not reach out

4   until at least a week later.

5           Or December 18th blog post claiming that True the

6   Vote challenges 364,000 voters in all 159 counties.  They did

7   not do that.

8           Or when analyzing the Validate the Vote document,

9   Plaintiffs' Exhibit 1.  When Ms. Engelbrecht was asked whether

10  True the Vote had evidence of illegal votes in Democratic

11  counties, as they stated in their proposal.  And her response

12  in her deposition was "No, it's just promotional."

13          So a finder of fact can take these elements into

14  account and can assess that against the testimony that this

15  Court heard from plaintiffs, who credibly testified about

16  their experience.  Their experience being intimidated comports

17  with everything we know about how challenges have been used in

18  Georgia's history, about how bounties have been used in

19  Georgia's history, and confirms for this Court that defendants

20  accomplished exactly what they set out to do.  And which is,

21  to threaten, coerce, and intimidate these voters into

22  believing that they were not eligible to vote or that they had

23  to provide evidence that the law would not otherwise have

24  required of them to vote.

25          And these actions have consequences, Your Honor.  And

1 we ask the Court to provide plaintiffs the protection that

2 they need so they can participate in our electoral process.

3          I reserve the reminder of my time for rebuttal.

4 Thank you.

5          THE COURT:  How much time does he have left,

6 Ms. Wright?

7          THE DEPUTY CLERK:  Ten minutes.

8          THE COURT:  All right.  Thank you, Counsel.

9          Counsel?

10          MR. EVANS:  We're ready to go, but I'm just -- I'll

11 go now.

12          THE COURT:  I've got time.  I'm going to deal with

13 DOJ.  You-all go ahead and start.

14          I have not forgotten you.

15          MR. WYNNE:  There may be a case where mass challenge,

16 lacking rhyme or reason, would be actionable under

17 Section 11(b).  This is not that case.

18          We're ailing in this country, as we've seen with

19 imprecision, our choice of words, exacerbated by social media,

20 24-hour news cycle.

21          What we're talking about here is eligibility

22 inquiries.  A finding of massive voter fraud, whatever that

23 is, is not a prerequisite to the exercise of one's right to

24 free speech, freedom of assembly, freedom of association, even

25 with people from Texas.  Loaded phrases like "voter fraud,"

1  "voter challenge" have become and have taken on ill-starred

2  meaning in our common parlance.

3        Voter fraud is one of the things I was trying to

4  bring out the meaning of in the cross of Dr. Burton, pointing

5  out in what I hope was an artful way, I wasn't trying to be

6  cute, a lie is a lie.  When you tell someone who's manning a

7  voting location that you live somewhere where you don't,

8  that's a lie.  It is a lie told by someone who is in the act

9  of voting, that -- that is voter fraud.

10       The phrase has been turned on its head by the mass

11  media, and I dare to say by the plaintiffs in this courtroom.

12  And it's divided us.  But, ironically, this is the exact state

13  of affairs that True the Vote has been trying to address in

14  multiple projects for years and years.  Voter Latino, the

15  Prairie View A&M initiative, training people, encouraging them

16  to work the polls in precincts where you can't get three

17  people or can't find them, encouraging people to embrace their

18  democracy, Tocqueville style.

19       Now, it just so happens that at this time Georgia was

20  at the center, making manifest this tension.  And it was,

21  perhaps, a potential tinder box.  So you've got to insert a

22  fuse to identify and let those interested know about a middle

23  lane for citizen participation, informing Georgians in this

24  instance that their Legislature had codified, had codified in

25  230 a First Amendment right and put bounds on it, a right to

1  petition, assembly, speak, association.

2       And, again, people in Texas, people in Georgia can

3  associate.  When you get up, oh, maybe a mile, you can see

4  there aren't lines between states and you don't see different

5  pastel colors.  We're all Americans.  And we associate with

6  one another.  And, watch out, Texas is coming to the SEC.

7       Now --

8       THE COURT:  They're in trouble.

9       MR. WYNNE:  Yeah, I think so.  A&M has already shown

10  that.

11       This is a lawful, measured, and an important thing in

12  our civic life.

13       Now, 230, like all legislation, might be understood

14  as the product of an argument between and among multiple

15  interests that took place in the legislature.

16       Now, ideally when that happens, we, through our

17  elected representatives, we search ourselves and our souls and

18  we see if we can identify some type of shared principles.

19  This one, I'll submit, is relatively easy to find, hard to

20  disagree with.

21       Voter rolls should be kept up-to-date.  People should

22  vote in the right place.  This sustains confidence that

23  elections reflect the people who actually live there and that

24  citizens elect the people that will be representing them and

25  they vote for or against the propositions that will impact

1  them and the taxes, increases, that they actually have to pay.

2  This is democracy.

3       It is an alternative to the Kraken or taking to the

4  streets.  Now, this is important.  The concern underlying all

5  of this is strikingly nonpartisan.  It's about addressing, in

6  this instance, the introduction of vulnerabilities and

7  uncertainty, as our society evolves, which Ms. Engelbrecht

8  chronicled in her response to the Court's question.

9       And on a microscale, the consequences of voting in

10  the wrong place, or a couple of people doing that, is

11  sustainable.  On a much larger scale, it is not.  And it

12  undermines confidence in our system.

13       Now, plaintiffs' self-righteous exertion is to the

14  contrary.  Finding massive voter fraud, again, is not a

15  prerequisite to exercising one's rights as codified in Georgia

16  by Section 230.

17       THE COURT:  Let me ask you a question.

18       MR. WYNNE:  Yes, sir.

19       THE COURT:  If this Court found that some of the

20  defendants were reckless in putting together this challenge,

21  could that lead to a finding of attempted intimidation?

22       MR. WYNNE:  This is not that case.

23       THE COURT:  Okay.

24       MR. WYNNE:  That is not that case.

25       THE COURT:  Tell me.

1          MR. WYNNE:  Because the kind of case you're talking

2    about -- you've got to remember, the average citizen does not

3    have access to the NCOA.  You've got to go through a licensee.

4    That licensee is regulated.  They don't have access to -- you

5    can't subpoena bank records, all these other things.  We

6    cannot lower ourselves to society where not being reckless

7    means you've got to spy on your neighbor.  You've got to

8    search their social media.  That's not what the Legislature

9    intended.

10         I think the standard is, for recklessness in this

11   context, is not that you have, you know, some sort of surety

12   measured in probable cause, you don't have to have the

13   resources to hire a Derek Somerville or a Mark Davis or even

14   Catherine Engelbrecht and a statistical technician with a

15   Ph.D. in order to do what this law says you can do.  And as

16   counsel was -- my co-counsel will say, you know, there is some

17   type of firewall.  You can't call the NCOA garbage.  Who said

18   that is the standard?

19         Look, for the reasonable person, the reasonable

20   Georgian, the reasonable Texan, I look at it and I say, okay,

21   somebody expressed an intent, a permanent intent to move.

22   Now, I'm no busybody, if going into that, I have to try to

23   figure out, well, you know, do I go to college thinking I'm

24   going to come back, this, that or the other?  You can't get

25   into subjective intent.

1          What you're asking is what a reasonable person,

2   reasonable person, has an opportunity, as the law reads, and

3   it doesn't give a limit on it, says you know what, NCOA, you

4   know, I'd say that's sufficient to send it on to the people

5   who are supposed to know what they're doing to tailor it to

6   their communities.  All right?  They're the ones.  Some of

7   these counties have 1700 people.  And your neighbor is the one

8   who is sitting at that table.  All right.  And some people,

9   some people are going to say, well, thank you, sir.  You know,

10  I appreciate it.  I forgot to update it when I moved.  I did

11  driver's license, I did my magazine subscription, this, that,

12  or the other, but forgot that.  Thanks for telling me.  And,

13  in fact, what I'm going to do is go across the expressway and

14  vote for the guy who's -- guy or woman who's going to

15  represent me, or the bond issue I've got to pay.

16         I mean, that is -- as I've tried to say, that's a

17  public good.  And the average person, average person who

18  doesn't have all of the statistical knowledge, and there are

19  some down on the street I was talking to last night who have

20  been sitting in this courtroom.  And those people are

21  concerned.  They're concerned about the integrity of our

22  system.

23         This case is not about Donald Trump.  It's not about

24  January 6.  And I'll submit to you that -- that Catherine

25  Engelbrecht, in the midst of what could have become a tinder

1  box and finally did, not because of her, that could have

2  happened here.  But these people are mad.  And instead of

3  yelling at their TVs, or Lord knows what, you know, because

4  like it or not, they listen to one side.  All right.  You

5  watch Sean Hannity every night, or whoever does; right?  You

6  get that perspective and you get that, let's create a fuse.  A

7  lawful system for that person to feel like they are an

8  American exercising their right.  Okay.

9          So you -- shoot, I would have thought NCOA, that's

10  regulated.  There's nothing wrong with the U.S. Postal System.

11  But leaving a roll unchecked for two years?  I mean, that

12  ain't fair.  That ain't right.

13         And we got someone who is stepping in, trying to

14  solve the problem.  And maybe, maybe that'll leave us in

15  better status we otherwise hurdle.  We hurdle towards a

16  tumultuous 2024.  What this Court says will really, really

17  matter.

18         As Benjamin Franklin reportedly said in response to a

19  question he was asked emerging from the Constitutional

20  Convention about the form of a government, "The new States now

21  have found themselves bound together to form a union of any

22  sort, a more perfect one."  Not a perfect one.  A more perfect

23  one.  A democracy, if you can keep it.

24         And you know when we're all reading that back when in

25  high school, middle school, I didn't imagine, you know, and I

1   was watching the convention when Jimmy Carter was nominated.

2   I couldn't imagine a world in which we -- our democracy would

3   be threatened.  But that's happening.

4           I ain't seeing -- I'm not saying either side is

5   right.  But both sides have to feel that they have a way to

6   participate other than some of the crazy things we've all been

7   seeing.

8           And Ms. Engelbrecht is not part of that.  And I hope,

9   I pray that she showed you that during the course of her

10  testimony.  She is a precise person, articulate, studied.  All

11  right.  Maybe she didn't have her hands on the keyboard, but

12  she's the one who is the project manager.  She's the one who

13  had to know, you don't tell somebody or ask somebody to do

14  something and observe the results and study the results and be

15  in -- I mean, you know, my wife's a contractor.  She hires

16  people to, you know, frame the house and put in the plumbing,

17  electrician stuff.  Does she actually put in the plumbing?

18  No.  But she sure better know how it works when the building

19  inspector comes around.  Sure better.

20          This is not intimidation or coercion.  It may be

21  inconvenient.  It may be at the poll you've got to reboot your

22  phone.  Maybe you've got to dig into your pocket.  Maybe

23  you've got to go out to your car in the glove compartment and

24  get something.  Maybe it's inconvenient.

25          I'll tell you, I think those are necessary sacrifices

1   to maintain our democracy and its manifest and things we do

2   every day.  I had to take out all my electronics and stuff

3   going through security here.  I lost my key -- card key for

4   the hotel there, I don't know how many times in the past three

5   weeks.  I couldn't just go up to the desk and say, hey, you

6   know, I'm in 619, give me another.  No.  Show your ID, or

7   maybe show two forms of ID.  My credit card, something, too.

8         You know, that's not coercion.  And the person across

9   the desk may be a different race than me, a different

10  background.  Shoot, you know, they may have three earrings in

11  their nose and face and ears and red hair; right?  Okay.

12  Maybe I'm -- it's just simple.  Okay.  If you got to -- sorry

13  it's inconvenient, but you've got to follow the -- we've got

14  to have some rules.

15        No one is challenging anyone's right to vote.

16  Ms. Engelbrecht doesn't want to remove anybody from any voter

17  roll.

18        Thanks to your question, I skipped a lot of this.

19        Was enacting Section 223 a good policy choice?

20  That's an issue to be brought up before the Legislature,

21  frankly.

22        Does the lawfulness of setting in motion the

23  procedural the Legislature has outlined in Section 230 change

24  when the exercise is supported or even encouraged

25  systematically?  No.  There's a statutory basis for doing it.

1      True the Vote -- let me say something else.  Deadwood

2  should not be thrown around so cavalierly.  Shouldn't it be

3  laudable, if not consistent, with Democratic principles, to

4  minimize deadwood -- as plaintiffs' expert used that term.

5      The choice of word by whatever academic has chosen it

6  is telling.  Deadwood doesn't sound like something you want to

7  have around littering your yard, your beach, your public

8  space.

9      I'm done just about.  One more paragraph.

10     Okay.  Plaintiffs' complaint at its core is not

11  about -- not the True the Vote or anyone else honed in on

12  African Americans or anyone else.  It's not true.  Evidence

13  doesn't support it.  Plaintiff didn't even try to make the

14  case in a serious manner.

15     Mr. Turner, Dr. Burton, raised some serious points,

16  we should never forget.  I commend them for raising it.  This

17  is not that case.  This is not a civil rights case.  Any

18  suggestion to the contrary does not hold up.

19     I know Your Honor sees that.  I know Your Honor would

20  never take that kind of thing into account and would weigh

21  this case differently.  But others out there surely will.

22     I'm just telling it like it is.  Let's acknowledge

23  it.  And let's acknowledge our past and instead look at the --

24  but then look at the evidence and whether plaintiffs have met

25  their burden under Section 11(b).

1        This case is not about anything else that was going

2   on in the aftermath of 2020.  You know -- and, again, it's

3   really not about control of the Senate.  What happened here

4   will have aftereffects.  People will be involved.  They'll

5   know about the system.  It's not a core about that Senate

6   runoff.

7        This is about a moment where election integrity

8   finally came to the forefront.  Issues that have long

9   interested Catherine Engelbrecht, Derek Somerville, Mark

10  Davis.  Issues which perhaps only they and a select few were

11  passionate.  Those issues were now front and center.  It could

12  have been anywhere.

13       That's why they chose to engage in this election in

14  Georgia at this time through this lawful vehicle.  It has

15  nothing to do with threats, intimidation, or coercion.  Again,

16  there may be a case out there some day, there may be a case

17  where some random mass challenges, I'm going to challenge

18  everybody, I don't know, over 50 or some type of group.  All

19  right?  Every Georgia Tech fan, throw that out.  Whatever it

20  is, this is not that case.  This is not that case.

21       MR. EVANS:  All right, Judge.  I'm going to reference

22  a PowerPoint.  I've got a courtesy copy if I could approach

23  real quickly.

24       THE COURT:  All right.

25       MR. EVANS:  May it please the Court, my name's Jake

1  Evans.  I represent the defendants in this case, and I'm going
2  to present our closing argument.
3         I think -- and I'll do this whenever -- I'm ready.
4  Next slide.
5         I think to begin, we have to look at this case for
6  what it is.  What this case is, is it's a partisan manipulated
7  fact set to support a narrative which simply does not exist.
8         Mr. Berson testified the only reason why he filed
9  this case was because Fair Fight told him to do it.  They have
10  tried to concoct a bunch of arbitrary unrelated facts to
11  support something which simply does not exist.
12         So as we look at the evidence in the case, and I'll
13  go through, Judge, very quickly, each of the voters.  I know
14  you have heard their testimony, you've heard argument on it
15  from plaintiffs' counsel, now you'll hear from me.
16         What the testimony showed is, in my opinion, and what
17  the evidence showed, is Fair Fight trying to find many, many
18  voters to come forward and testify about something which did
19  not happen.
20         Scott Berson is the first one.  Scott Berson, if
21  anything, is someone that shows the reason why NCOA is
22  accurate.  The reason why the voter lists were 100 percent
23  accurate.  You have an individual who lived in Muscogee, who
24  moved to Auburn, Alabama, who then moved back to Muscogee, who
25  then moved to North Carolina and who now lives in

1    Pennsylvania.

2         He admitted, when he was on the stand, it would be
3    very difficult, if you didn't know who he was, where he really
4    lived.  And, in fact, if a full eligibility hearing went
5    forward on him, who knows what an impartial county Board of
6    Election would ultimately determine in where he really
7    resided.  We don't know.

8         But what we do know is this was not someone who had
9    lived in the same place for 30 years and never moved and there
10   was no dispute over whether or not they really lived in
11   Muscogee County.  That was not in any suggestion, shape, or
12   form a frivolous challenge.

13        And even more, Scott Berson did not know any of the
14   defendants in this case, couldn't name one defendant in the
15   case, had never talked to a defendant in the case, and knew
16   nothing about True the Vote.  Didn't mention their name.

17        Next, Judge, we have Gamaliel Turner.  Mr. Turner was
18   someone who moved to California four years ago at this point,
19   had a year-to-year contract that he continued to renew, looked
20   at his Facebook page, which said he lived in California.
21   Looked at his ancestry page, which said he lived in
22   California.  Looked at his LinkedIn page, which said he lived
23   in California.

24        He said he may go back at some point to Georgia.
25   Right now he hasn't.  And, in fact, he's another example,

1  Judge Jones, of someone who, if they had an eligibility

2  challenge, your intent can change over time.  You may

3  initially move somewhere and intend to go back to Georgia, but

4  at some point the facts show that maybe you're not going back.

5  So if an eligibility challenge went forward on him, who knows

6  what an impartial county Board of Elections would find.  But

7  what they wouldn't find was that was a wholly frivolous

8  challenge because the facts show that it wasn't.

9        The other additional point is Mr. Turner didn't know

10  any of the defendants, couldn't name any of the defendants,

11  and had no way of connecting his alleged challenge to any of

12  the defendants.

13        Lastly, Mr. Turner said the only way he found out

14  about any alleged challenge was because he was calling to find

15  out why he didn't get his ballot.  And he didn't get his

16  ballot, not because of a challenge, but because the U.S.

17  Postal Service doesn't forward official ballots.  And when he

18  gave them the address, they sent it to him, he got it, his

19  vote was counted.

20        Ms. Stinetorf is next.  Ms. Stinetorf was a voter in

21  Muscogee County.  She was in Germany, didn't know anything

22  about the environment here in the U.S., but what's most

23  notable about her is the e-mail that the Court has judicially

24  noticed, is when she had sent the e-mails, her vote had

25  already been counted ten days before.

1      Nobody called Ms. Stinetorf and said listen, you've

2   been challenged, your vote's not going to be counted.  She's

3   the one that made the proactive means to do it, and she

4   testified on the stand the only way that she had any

5   discomfort was because she logged on and when she logged on it

6   said, allegedly, challenged.

7      This is a challenge that what happened, likely, was

8   even if she was challenged, the county Board of Elections

9   shows she was a military person.  They immediately resolved

10   that challenge.  It never took one step forward further than

11   that because she was, in fact, a military person overseas.

12      Ms. Heredia.  Ms. Heredia is another one that if you

13   look at the record, she left Banks County, she moved to

14   Decatur.  She lived in Decatur for a period of time then she

15   moved to Midtown Apartment 1.  She lived there for a period of

16   time, and then she lived in Midtown Apartment 2.  She stayed

17   there for a period of time, and now she lives in Athens,

18   Georgia.

19      I would believe that if there was an eligibility

20   hearing on determining where she resided and it endeavored to

21   do the full analysis, that there is a more than likely

22   probability that she was not a Banks County voter.

23      Now, that's not what is before this Court.  This is

24   not an eligibility case.  This is a Section 11(b) voter

25   intimidation case.

1          But the reason why that's important is because that

2    shows not only in this case was it not frivolous, in this case

3    it may have been meritorious.

4          And taking it further, she didn't know any of the

5    defendants.  She hadn't talked to any of the defendants.  She

6    hasn't updated, even though she testified voting is very

7    important to me, I would never miss the opportunity to vote,

8    she took directly contrary actions in that she didn't take the

9    initiative to in any way ensure her voter registration was

10   active.

11         And, likely, all she had to do was fill out a form

12   that said, under oath, under penalty of perjury, I still live

13   in Banks County.  Why would she not do that?  Maybe because

14   she didn't want to purger herself and not say she lived

15   somewhere she didn't.

16         I don't know what happened.  You're the trier of

17   fact.  I will say actions often speak louder than words.  And

18   in this case, it's pretty clear she didn't take actions.  And

19   plaintiffs' counsel began their argument on the fact she

20   didn't vote.  The fact, in my opinion, she didn't vote, is she

21   didn't want to purger herself and she didn't take the actions

22   to do that.  I'll let the judge make that determination.

23         Next we heard from Dr. Mayer.  Dr. Mayer we heard

24   about a decent amount.  There's a lot of problems with

25   Dr. Mayer's analysis, some -- many of which the Court can make

1   the determination based upon reading his testimony.

2        He has no knowledge of NCOA.  He doesn't know the

3   error rate of NCOA and its predictive value.  The database

4   that he evaluates says it doesn't have any middle initials,

5   yet every defendant that in any way submitted eligibility

6   inquiries in this case had middle initials.

7        He had clear combination issues because he said he

8   had formula -- there was formulas in his database.  There was

9   no formulas in any of the eligibility inquiry data that was

10  submitted in this case.

11       In his analysis he includes every address that's in a

12  military town or a college town, suggesting that everyone that

13  lives in those towns were improperly included in any

14  eligibility challenge list.

15       I will tell you, I went to the University of Georgia.

16  There are people there that are called the locals.  And the

17  locals oftentimes don't like the students, and a lot of times

18  the locals hang out at different bars than the students did,

19  and restaurants.  I remember that very well.

20       I think if I went to the locals and I said, hey, just

21  because you're a local here, we're going to assume you're a

22  student and you go to the University of Georgia and you deal

23  with all this mess over here, I don't think that they would

24  appreciate that too much.  That's exactly what Dr. Mayer did.

25  And it underscores the lack of legitimacy in his analysis.

1          Dr. Burton.  Dr. Burton, quite frankly, offered

2     completely and totally irrelevant testimony in this case.  He

3     attempted to offer testimony about whether these voters would

4     be intimidated.

5          Dr. Burton is not a behavioral psychologist.  He's

6     not a psychiatrist.  He has no expertise in determining the

7     way stimuli creates emotion in human beings.  He knows

8     history, and he knows history in a very unfortunate time in

9     our country's history.

10          But in any way extrapolating upon the history way

11     back when into creating this voter in this moment felt this

12     way, is not testimony that is probative on the issue that is

13     before this Court.  He admitted on the stand he's not trying

14     to offer any testimony about any motivation of any of the

15     defendants.  He's not trying to say any of the defendants

16     wanted to burn crosses or races, et cetera, et cetera.  He

17     limited his own testimony to testifying about people feeling a

18     certain way based upon historical references, taking history,

19     what happened many, many years ago, can't be extrapolated

20     until today.

21          Any psychologist would tell you the way people feel

22     depends on a number of subjective life experiences, subjective

23     value sets that they accumulate over the course of their life.

24     We didn't hear testimony about how people feel the way that

25     they do in certain life situations.  That would have been

1    probative.  Talking about history way back when is not

2    probative and, quite frankly, inflammatory, in my opinion.

3            Going to the defendants' case.  The defendants' case

4    was short, sweet, to the point, and completely and totally

5    debunked, a strung together smoke and mirrors case presented

6    by plaintiffs.

7            First we have Mr. Somerville.  Mr. Somerville is a

8    military veteran.  He's a former Marine.  As Your Honor saw

9    him on the stand, very methodical.  Takes tremendous pride in

10   what he does, what he stands for.  And he worked meticulously

11   in generating these lists.

12           Mr. Somerville, in my opinion, is every instance of

13   what the word "active and admirable citizen" is.  This is a

14   guy that went after the former Speaker of the House, David

15   Ralston, for a number of factors that he testified about.  And

16   in this instance, he found and felt public sentiment was at an

17   all-time low.  And the way that we get away from the crazy is

18   we focus on getting people engaged and focusing on projects

19   that truly can make a difference.

20           And in this case what could make a difference is

21   voters rolls that were outdated for a long period of time.

22   Voter rolls that were frozen by NC -- NVRA for at least 90

23   days.

24           He did a multilevel funnel, which the Court heard at

25   great lengths.  He went through NCOA.  He went through

1   military.  He went through Social Security Death Index.  I'm

2   not even going to try to go through all the stuff because I'm

3   not an expert on it.  The record reflects he was extremely

4   methodical.  He was extremely diligent.  He was extremely

5   exclusive, trying to get a list that, at the end of the day,

6   only folks that at an incredible level could be challenged is

7   exactly what he did.

8           Next we heard Mark Davis.  Mark Davis is a friend of

9   mine.  He's a man that's been doing this for a very, very,

10  very long time.  His record spoke for itself.  He has been

11  experts in cases.  He has been talking about the importance

12  and necessity of ensuring voter rolls are maintained, updated.

13          He is someone that didn't jump into this game

14  recently.  He is someone that took exactly what he did

15  extremely seriously.  He did the NCOA search.  He removed

16  folks to the maximum extent he could, like Mr. Somerville,

17  from college towns, from military bases.

18          He made sure that the Court would know this is

19  something that is not a recent phenomenon.  It was something

20  that was extenuated in the 2020 election, and it was something

21  that for a long time the majority of the public had wholly

22  neglected but had came to the forefront.

23          So people like Mr. Davis, Ms. Engelbrecht, this is

24  something that they have created, is their life's work.  But a

25  lot of times people don't appreciate the importance of your

1  life's work until it really, really is in the forefront.  And

2  that presents an opportunity to engage the citizens, to bring

3  the issue to the table, to make sure that everybody can

4  appreciate the importance of it so you can make positive

5  change.

6         Mark Williams is the next witness we heard.  Mark

7  Williams may not be the most articulate man in the world, I

8  probably am not either, but he did a good job explaining

9  exactly what he is and what he stands for.

10        He created a printing company.  Many years ago there

11 was a family printing company.  In this printing company they

12 send out thousands upon thousands of mail on a daily basis.

13 He understands the importance of NCOA, the value that it has,

14 the underlying issues that NCOA highlights.

15        And in this instance exactly what it highlighted was

16 that many, many, many people moved out of the area in which

17 they lived at the point at which December 2020 occurred.  Many

18 folks were absolutely and totally surprised and shocked.  He

19 was one of those.

20        Before he ever spoke to True the Vote, he did his own

21 analysis, created his own list.  And he saw that list and was

22 taken aback.  And at that point, being someone that had been

23 in this business for decades, being someone that is active in

24 his community, understanding the importance of voter rolls,

25 understanding the importance of voicing his voice for election

1   integrity, he took at his own initiatives to say this needs to

2   be fixed.  Around that time he was introduced to True the Vote

3   who was looking at getting engaged as well and that is how the

4   pair happened.

5           But he didn't just take, his own testimony says --

6   confirms, he didn't just take the list and run with it.  He

7   took the list, compared it to what he had already done,

8   ensured that he was comfortable, he was confident the match

9   was sufficient, and he went for it and did it.

10          He testified he didn't know any of the voters in this

11  case.  He testified he didn't know who Alton Russell was.  He

12  submitted a challenge in one county, in one county only, which

13  is Gwinnett County.  There is no voter in this case who is a

14  plaintiff or who is a fact witness who has anything to do with

15  Gwinnett County.

16          Next we have Ms. Engelbrecht.  Ms. Engelbrecht, as

17  the Court noted, we had a long direct, but it was an important

18  direct for the Court to know where Ms. Engelbrecht came from,

19  who she is as a person, what she stands for, how she got

20  involved, and why that she is here today.

21          She grew up in a small town in Texas.  She was an

22  early home provider for her family.  She started a company, a

23  family company.  Her ex-husband was involved with it, her

24  husband was involved with it, which forced her to generate

25  very significant skill sets early on for managing, handling

1    datasets, handling adversity, overcoming adversity.

2         Around 2009, she had -- she felt -- found a calling

3    in many respects where she gave up a high paying job helping

4    run her family company to pursuing a passion of fighting for

5    election integrity.

6         2009 is a long time ago.  Back in 2009, no one talked

7    about safe and secure elections.  Election integrity wasn't

8    something that was a mainstream issue.  It wasn't something

9    you do to get on TV or get publicity or get sued or get

10   involved in anything like that.  It was something that she did

11   because she felt she could make an impact and a difference.

12        For the next ten years, she continued that fight.

13   She engaged in multiple numerous public empowerment

14   initiatives getting people involved.  Prairie View A&M, as

15   Mr. Wynne referred to, is one of them.  But, ultimately, how

16   it all culminated in many respects is looking at Georgia in

17   2020.

18        And we tried -- she went back to where we were in

19   2020.  2020 was not a typical year.  I don't think anyone can

20   disagree with that statement.  We were hit with a

21   once-in-century global pandemic.  No one knew how to respond,

22   no one knew how to react.  That includes Secretaries of State

23   throughout the U.S.

24        Many mail-in ballots were sent out.  Most objective

25   nonpartisan people would agree the least secure way to vote is

1  mail-in voting.  You can't verify identification.  And, as a
2  result, we had a presidential election, the election was
3  close, and public sentiment hit an all-time low.
4        Georgia, as all of us here know, saw the commercials.
5  Was ground zero.  Not only did we have one Senate runoff,
6  because of Senator Isakson's passing we had two.  They would
7  both be decided on the same days.  And not only two Senate
8  races on the same day, but they would decide control of the
9  U.S. Senate.
10        A lot of focus is sealed (phonetic) down to Georgia.
11  And that's how Ms. Engelbrecht first got involved.  But she
12  didn't willy-nilly jump in to the Georgia arena.  She did
13  diligence.  She met with the Georgia Secretary of State.  She
14  asked them what they thought.  She ensured that if she didn't
15  have the assurances that she needed she would not have went
16  forward.
17        But she didn't stop there.  She talked to not one,
18  not two, three attorneys.  She talked to folks in the
19  Department of Justice.  She talked to folks in election
20  administration.  She did significant diligence that took time.
21  And it took time, which delayed her ability to move forward
22  and ultimately take any action here in Georgia.
23        Whenever she testified, she testified to her
24  involvement with generating and making these lists.  She took
25  great pains and lengths to make sure that she could utilize

1  the experience she got running True the Vote, the experience

2  she got running CoverMe, to ensure these lists were very

3  targeted -- or not targeted -- very diligent, methodical, and

4  well done.  And she did multiple layers in generating and

5  making each and every one of the lists.  And that's the

6  testimony.

7          So now let's get to the law.  And the Judge and the

8  Court is well aware of the law in this case.  So this is a

9  case that is under Section 11(b) of the Voting Rights Act.

10 The Court, I think the parties can appreciate, took a major

11 endeavor in articulating a standard which controls this case.

12 And this standard is highly, highly, highly important to the

13 ultimate determination the Court will make, the way that I'm

14 going to generate my remaining remarks, and the ultimate

15 inevitable conclusion that must be brought about.

16         As the Court is well aware, the law -- case law in

17 this is somewhat nebulous, but it does underscore each of

18 these factors.  And each of these factors hit on a question

19 that the Court asked earlier about recklessness and I will get

20 to that in one moment.

21         The first factor is the defendants must directly, or

22 through means of a third party, direct some type of action.

23 In this case, not only did no defendant direct any action,

24 either directly or through someone else, but it, quite

25 frankly, would not have been possible if they act within the

1  confines of Georgia law, Section 230, which is exactly what

2  they did.

3       No one -- there is no evidence in the record, in fact

4  all of the evidence in the record says, no defendant

5  communicated with any of the four folks that testified.  And

6  that is a very important point.  Because plaintiffs have

7  alleged there's been tens of thousands Georgia, or quabillions

8  of zillions of challenges and so many before people testified.

9  I would not -- we can say a lot of things about the plaintiffs

10 in this case, I wouldn't say they're not well staffed.  They

11 have many folks that can get, call, reach out to, like they

12 called Mr. Berson, to find people and they had four.  And

13 those are the four that the Court must consider as we evaluate

14 the record.

15      Mr. Berson never talked to, never heard of a

16 defendant.  Every defendant that I called testified, never

17 talked to him, never heard of him, never directed any

18 communication at him.

19      Mr. Turner, Ms. Stinetorf, Ms. Heredia, the facts are

20 the same.  They don't know any defendants.  They never talked

21 to any defendant.  No defendant talked to them.  There is no,

22 either directly or through a third party directed by the

23 defendants, to talk to them.

24      To show the weakness in plaintiffs' case they have

25 suggested that the defendants directed a county Board of

1  Elections to talk to them.

2         I will tell you many things, any time I try to tell a

3  judge or whoever or an impartial arbitrator what to do, they

4  don't always listen to me and they're definitely not forced to

5  listen to what I have to say.  I think the Judge and the Court

6  can agree with me.

7         When these are submitted, the record is -- the law

8  and the record in this case is very clear.  You submit an

9  eligibility challenge.  That goes to, what I regard and what

10 the facts regard, is an inevitable firewall.  And it's not

11 just a firewall, Judge.  This is a firewall that must be, by

12 the letter of the law, impartial, nonpartisan.

13        Each county elects and selects who is on their

14 firewall Board of Elections.  There must be two Democrats, two

15 Republicans, and then the chairman can be appointed by

16 typically someone on the county board of -- the Board of

17 Commissioners.  These folks are created by design to be an

18 impartial, nonpartisan body that will decide eligibility

19 challenges.

20        No -- there is no evidence in this record that any

21 defendant talked to any county Board of Elections and said,

22 hey, I want you to talk to this person.  In fact, the county

23 Board of Elections takes an oath of office when they are sworn

24 in that they must uphold the letter of the law.  That is

25 exactly what they did.  If they don't find probable cause,

1  they go no further.  There is no dispute on that.  Mr. Germany
2  testified to that when he was on the stand.

3       So here the only direct connection by plaintiffs
4  counsels' own admission is telling county Board of Elections,
5  who were -- take an oath of office, must uphold the letter of
6  the law, by design must be nonpartisan, that, hey, you need to
7  take action to ensure this person is talked to.  The case
8  really ends there.

9       But I'm not going to stop.  I'm going to continue
10 going.  The direct element is not met.  It's not met through
11 any of the four, despite the quabillions of people that were
12 alleged challenged, testified no defendant talked to them.

13      Next let's get to causation.  The Court in its order
14 very well articulates that there has to be a casual link
15 between the parties.  Here there's no casual link.  There's no
16 causal link because Mr. Berson, Mr. Turner, Ms. Stinetorf are
17 Muscogee County.  There is nothing that connects any defendant
18 in this case to Muscogee County.

19      The only allegation that plaintiffs admit is a
20 spreadsheet that was not admitted into the record.  And
21 Ms. Amy testified that, well, white means that we didn't reach
22 out to them; yellow means they are -- may be; green means that
23 they've submitted.  So we have a hearsay statement, which is
24 not corroborated by witness testimony, somehow having a guy's
25 name on a list trying to outweigh every other witness

1   testifying I have no idea who that was, he never submitted it.

2         Plaintiffs have to prove their case by a

3   preponderance of the evidence.  That's not a close call.  That

4   is completely and totally insufficient to show by a

5   preponderance of the evidence that there is any connection.

6         And that is still assuming you can get passed prong

7   one, which is direct communication, which cannot happen in

8   this instance.  There is nothing in the record that says.

9         Ms. Heredia, same -- same issue.  Ms. Heredia -- it

10  is impossible to know how many people made challenges.  It is

11  impossible to know how those challenges resulted in any

12  activity because of the necessary mechanism that is at play in

13  this case.  Unlike any case ever under 11(b), you have a

14  necessary firewall, an impartial, sworn by the letter of the

15  law firewall, to stop any direction communication with voters.

16        Let me see how long I've got?  Is that a 15?  15

17  minutes.

18        THE DEPUTY CLERK:  About 14.

19        MR. EVANS:  So getting to the last section is

20  reasonable -- or the intimidation.  It's very difficult to do

21  intimidation, so the Court admirably put together each of

22  these factors.

23        Proximity.  Proximity is 100 percent explained here,

24  given the tight timeline between when the general took place

25  and when January 5th runoff happened.

1          Frivolity.  There is no frivolity here.  I mean, each

2   of the four -- I mean, we can't -- we're not talking about

3   pontificating maybe some voters somewhere someplace.  They are

4   well-resourced.  They had an opportunity to present their

5   case.  They presented four.  And the four were not frivolous,

6   in fact could be meritorious.

7          Defendants motivation in making the case.  Each of

8   the defendants that we called, testified they did this

9   100 percent credible reasons.  The only contrary evidence is a

10  historian that said he's not actually testifying about

11  motivations.

12         The bounty.  That's unsupported by evidence.  That is

13  a one liner and underscores the weakness of plaintiffs' case

14  that they have to bring forward completely unrelated, in my

15  opinion, grossly inflammatory statements to try to make facts

16  exist which don't exist.

17         The mention of Navy SEALs.  Same way.  That was a

18  small speech -- that was a small statement unsupported by any

19  evidence.

20         Publication of challenged voters.  It never happened

21  in this case.  There is no evidence in this case at any point

22  saying here's the list of voters.

23         And to accentuate greatly the weakness of the case,

24  plaintiffs have went on to say, well, somebody could submit an

25  open records request and request this and, therefore, the

1  causation tenuousness highlighted by the fact that you have to

2  make that argument shows there is no causation.

3          Proximity.  I just want -- we'll skirt through these.

4          Proximity was close.

5          Go ahead.  Keep going.  Right here.

6          So when you look at the six factors taken

7  conclusively.

8          First, there is no direct contact.  We really should

9  stop this.  The analysis stops at that point in time.  There's

10 a nonpartisan firewall.  Bam.  Over.

11         Causation.  Muscogee voters.  We've got nothing in

12 the record, an exhibit's not in the record.  Even if it was,

13 it still be -- would not be enough to controvert the

14 overwhelming testimony nobody knows who Alton Russell is.

15 Nobody has connected them.  No witness has.  No document.

16         They didn't meet the burden on causation as Muscogee.

17         Heredia.  It's really impossible to know who

18 submitted what eligibility challenge.  We have a nonpartisan,

19 bound by the letter of the law, firewall which stops any

20 communication.

21         So, bam, case is over.

22         Let's go to three.  Three here, you've got to show

23 the reasonableness of intimidation.  If you look at these

24 factors collectively.

25         Proximity.  100 percent explained.

1        Motivation.  You've heard it.  There was no testimony

2   offered as to what the motivation was.  Trying to pull

3   together random facts said and one-off text messages or

4   e-mails at one point to extrapolate a motivation is highly,

5   highly problematic, unfair, and in no way a credible use of

6   evidence.

7        I can't imagine what I've said about the Florida

8   Gators at some point in my life.  Does that mean I'm a bad

9   person?  I don't know.  Maybe, maybe not.

10        The reality is that that's not enough.

11        Bounty.  Not enough.  Because that's nothing there.

12        Navy SEALs.  Nothing there.

13        No publication of names.

14        Okay.  Next.

15        What the plaintiffs -- this is a very, very

16   significant point.  Notwithstanding the overwhelming factual

17   weakness in this case, if you look at the case law, what the

18   plaintiffs are asking for is a wholesale departure of existing

19   jurisprudence on 11(b).

20        The first case we've got the National Coalition of

21   Black Civic Participation.  That was a case about robocalls.

22   And if you take a look at this robocall, I would agree, voter

23   intimidation -- voter mail-in sounds great.  But did you know

24   that if you vote by mail, your personal information will be

25   part of a public database that will be used by the police

1  department to track down --

2              (The reporter asks for clarification.)

3              MR. EVANS:  Sorry.  I'm trying to get through it.  I

4  only have so much time.

5              THE COURT REPORTER:  You've got to repeat that.

6              THE COURT:  Hold on, hold on.  She has to record it,

7  though.

8              MR. EVANS:  I've got it.

9              THE COURT:  Why don't you say, Judge, I refer you to

10  reading this.

11             MR. EVANS:  I refer you to reading that section.

12             Point being that is a robocall, direct communication.

13  You read it.  If someone was going to -- if I was going to be

14  contacted by the police department, I agree.

15             Let's go to the next one.  Following -- I'm sorry.

16  Stay on that slide.

17             Following Native Americans at polling places.  Taking

18  notes.  Tracking license plates.  Having loud conversations in

19  polling places.

20             You've got direct communication.  Right there.  Or

21  act.  Go to the -- don't -- stay on the slide.

22             Next case here.  Willingham.  Going to voters' homes,

23  disseminating false information.  Direct contact.  Talking to

24  people.

25             The next one.  Arizona Democratic Party.  Coordinate

1  poll watchers.  Acting improperly over polls where people are

2  voting.

3            It's the same thing.  This is what 11(b) is about.

4            11(b) is not about operating within the confines of

5  the law, submitting an eligibility challenge to a non-partial

6  im -- nonpartisan a county Board of Elections to determine

7  whether or not you will take any further action.

8            And if you want to go to a motivation here, if the

9  defendants in this case really wanted to intimidate a voter,

10 would they have done what they did?  Or would they have sent

11 out a mass text?  Or made a robocall?  Or sent people to the

12 polls?  Or did a big post about here are the people.

13           If they really wanted to intimidate a voter, they

14 would have done what these people did.  They would have done

15 what courts throughout the United States have found to be

16 intimidating to potential voters.

17           But that's not what they did.  What they did was they

18 operated within the letter of the law.  They exercised great

19 diligence in getting there to ensure voter rolls were

20 important.

21           But before we go to the next factor, Judge, what's

22 really, really important in the law is that that is where the

23 analysis should stop.  We should not get into recklessness if

24 all of these three requisites and elements are not met.  And

25 they weren't met.

1        The recklessness element came out relatively recently

2   in a U.S. Supreme Court case.

3        Now, I also agree that they weren't reckless, and we

4   will get to that quickly in one moment.  But the Court's

5   analysis only gets to recklessness if 11(b) elements, pursuant

6   to the summary judgment order is found, we cannot get there.

7   It's not possible with the record before the Court.

8        Okay.  So we have First Amendment rights.  And one of

9   the balances the Court will make is if we find those elements

10  were met, which they were, then you have to weigh that with

11  the First Amendment.

12       Okay.  Next.

13       First Amendment applies, the Johnson case.  When you

14  have an intent to convey a particularized message.  Here the

15  Court has already found that.  Whether the likelihood was

16  great that the message would be understood to those who viewed

17  it.

18       Next.

19       Here, courts concluded, element one is met.

20       Next.

21       And then element two is also met.

22       You have communications.  I've asked her on the

23  stand, did you voice your opinion, is this important in

24  voicing your opinion.  Yes, it is.  Yes, it is.  They did

25  that -- True the Vote did it publicly.  They didn't name many

1   people, but they did voice it.  Undoubtedly First Amendment

2   here is met.

3           Next.

4           So if the Court gets through all of the first three

5   elements, which I would highly argue there is no way that's

6   possible, it would require a complete departure with

7   jurisprudence and would set a very, very dangerous precedent

8   to almost eviscerate Section 230.

9           If it gets there, then we say, okay, we also have a

10  First Amendment right here.  This recklessness, we really

11  don't even need to think about it unless we get to these other

12  ones, but let's do it just for the heck of it.

13          Here recklessness is not negligence.  Recklessness is

14  you're acting with disregard of your actions.  You're not

15  operating methodically.  You're not operating with diligence.

16  You're not operating and spending significant sums and times

17  and efforts to make eligibility inquiries to the best way that

18  you know how.

19          Because we have to remember, to submit an eligibility

20  inquiry, you don't have to be a genius, you don't have to be

21  an expert, you just have to be a citizen of that county.

22  Because we want citizens to be engaged.

23          It's just like a leadership class I took years ago,

24  what is the best way to make people engaged and feel a part of

25  the process?  You empower them.  You bring them in.  That's

1    what we want to do with the citizens of Georgia.  That's the
2    whole purpose of Section 230.
3            There is no limit on how many you can submit.  There
4    is no limit on what you can submit.  And why?  Because there
5    is a nonpartisan sworn by the letter of law firewall that
6    stops any frivolous, negligent inquiries from going forward.
7            So here, plaintiffs provided no error rate as the
8    NCOA.  They needed an expert.  And really they found just
9    about whoever they could get.  But notwithstanding all of
10   that, Judge, it doesn't matter, because the law was complied
11   with.
12           Go ahead.
13           So this is important.  These are a number of quotes
14   from Brad Raffensperger.  I'm not going to read them.  I will
15   encourage them -- maybe I'll read one, but I'll encourage the
16   Court to read them.
17           "The election integrity of free and fair, secure is
18   two of the things American is founded on.  We must protect
19   vigorously and prosecute people who undermine them just as
20   vigorously."
21           Each of these quotes are pretty strong quotes.  That
22   if you few break the law, that if you don't do what you're
23   supposed to do, there are going to be consequences.  We are a
24   society based upon the rule of law.
25           But is that intimidation?  No.  Is that reckless?

1   No.  Is that free speech?  Yes.

2        That is -- I would argue the defendants did far less

3   than this in this case.  They didn't scream out on a blow horn

4   I will vigorously prosecute you.  Voting -- one of these is

5   kind of cut off on mine.  One of these is, "Felony is not

6   enough."

7        That's pretty strong words there.  A reasonable

8   person, maybe somewhere, I don't know if they read that, could

9   feel intimidated.  But you know what?  The First Amendment

10  protects that.  That's not reckless.  I mean, maybe someone

11  could argue it is, I don't think it is.

12        But what is for sure is that is less than operating

13  within the confines of the law.  Submitting an eligibility

14  inquiry that a firewall will stop any further action from

15  coming forward.

16        This one I'll hit briefly.  Diverted funds, Fair

17  Fight, they lack standing in the case.  They haven't shown any

18  quantifiable claim of any sort.  But given that they -- they

19  can't prevail on 11(b) or getting by the First Amendment, it

20  doesn't really matter.  The case should be dismissed in

21  totality.

22        So at the end of the day, Judge, what this case is

23  about.  This case is about a plaintiff pursuing a narrative.

24  Trying to string together not only fake facts out of context,

25  but unfortunately people.  And getting them here to testify to

1    things that simply aren't supported by the law.

2          The law is clear.  Under 11(b), as the Court has

3    pointed out, you have to meet those three factors.  Those

4    incontrovertibly cannot be met here.  Only then, only then

5    does the First Amendment come into play.  And only then do we

6    have to meet recklessness, which is a high threshold to meet.

7    It must be disregarded for actions -- am I out of time?

8          THE COURT:  Thank you.

9          MR. EVANS:  The case should be dismissed.  Thank you.

10         THE COURT:  Thank you, Mr. Evans.

11         Counsel, you have ten minutes for rebuttal.

12         MR. NKWONTA:  Your Honor, I'd like to address a few

13   points that defendants made and reiterate a few points that we

14   made that I believe have been distorted.

15         First, based on the evidence that has come in in this

16   trial, the First Amendment really just has no application

17   here, because we are talking about baseless challenges.  We're

18   talking about challenges that are based solely on NCOA data

19   that we know is not enough to determine whether someone is a

20   resident.  And that's why it's baseless, Your Honor.

21         The definition of a baseless challenge, Your Honor,

22   is one in which the proponent of that challenge has no

23   reason -- or has no reasonable expectation of success on the

24   merits.  And they didn't have a reasonable expectation of

25   success on the merits.

1          The Secretary of State's Office, Ryan Germany told

2     them that their challenges were going to fail.  True the

3     Vote's challenger told them that their challenges were

4     inaccurate.

5          Mr. Davis and Mr. Somerville, they knew that what

6     they were putting out there was going to be a burden on the

7     counties.  And nobody was surprised when their challenges did

8     not achieve any success because it was a baseless petition.

9     It was a baseless challenge.

10          Another reason why you can tell it was a baseless

11     challenge is that when you compare it to the residency law

12     that I mentioned earlier, you compare it to the 15-factor test

13     and you compare it to all the other enumerated factors like

14     income, where the individual pays their taxes, where their car

15     is registered, et cetera, when you compare it to all those

16     factors and intent, the NCOA list sheds light on none of that.

17     It sheds light on none of that.

18          So to suggest that -- that these challenges are

19     somehow protected by the First Amendment is to reinvent the

20     standard for determining eligibility and residence in Georgia.

21     No reasonable litigant could realistically expect success on

22     the merits.  That is the definition of a baseless challenge.

23     That's the definition the Court used in its summary judgment

24     order.  And that definition applied here.

25          There was no reasonable chance of success.  No

1  reasonable chance that a list of 250,000 voters would be

2  vetted and would be somehow investigated such that those

3  voters would all be forced to show proof of residence before

4  the election.  They were frivolous from the get-go.

5          Second, we know that the allegations in the

6  challenges were false.  They were defamatory.  They were false

7  because they alleged that individuals were unlawfully voting

8  or that were not registered in their counties.  We know that's

9  not true.  One voter after another has had the courage to step

10  up and testify to that effect.

11          But we also know it's not true because even True the

12  Vote's own challenger, Joe Martin, has recognized that's not

13  true and told True the Vote that's not true.

14          We also know it's not true because it's based on a

15  faultily premise, that you can determine one's residence based

16  solely on NCOA data.  So because it's defamatory, it doesn't

17  matter whether they put it in a petition.  It doesn't matter

18  where they put it in a filing.

19          And I'll direct the Court to *McDonald v. Smith*, a

20  U.S. Supreme Court case, 472 U.S. 479.  In that case, the

21  Court recognized that defamatory material does not receive

22  protection because it's placed in a petition.  You cannot

23  defame someone, you cannot falsely accuse someone of being an

24  unlawful voter and receive protection for that statement

25  because it's in a petition.

 1        And then recklessness.  Their conduct was reckless.
 2   The definition of recklessness is when a person consciously
 3   disregards a substantial and unjustifiable risk that the
 4   conduct will cause harm to another.
 5        This case and the evidence we've presented is filled
 6   with alarm bells of unjustifiable risks of harm.  That entire
 7   chart that Dr. Mayer presented, that is a red flag,
 8   unjustifiable risk after unjustifiable risk.  Statements from
 9   the Secretary of State's Office in a meeting with Ryan
10   Germany.  Statements from True the Vote's only challenger.
11        Unjustifiable risk that True the Vote navigated,
12   disregarded and trampled over in order to make a big slash to
13   challenge 250,000-plus voters.
14        THE COURT:  Are the voter election's firewalls in
15   this case -- not only this case, any case -- challenged?
16        MR. NKWONTA:  The Board of Elections are not
17   firewalls, Your Honor.  And for two reasons.
18        One, we saw in this case that the Board of Elections
19   in some select counties did, in fact, process the challenges
20   and held hearings.
21        Two, Jocelyn Heredia's name was published on the
22   website.  It was publicized.  And she saw her name on the
23   website as being challenged.
24        Suggesting that the Board of Elections is like a --
25   is a firewall is equivalent of individuals calling the cops on

1    people who are voting and suggesting that it's not voter

2    intimidation because the cops get to decide whether they

3    actually enforce the law or whether they prosecute.

4          Yes, the Board of Elections gets to decide, but

5    defendants advocated for the outcome that would result in

6    intimidation.  They pushed the Board of Elections to accept

7    those challenges.  And they even considered filing a lawsuit

8    against Board of Elections that did not accept those

9    challenges and did not approach voters and require voters to

10   show their proof of residence.

11         And I also want to talk about the funnel approach

12   that you've heard, which has been used to suggest that perhaps

13   NCOA data was not the only data that Mr. Davis and

14   Mr. Somerville used to identify the 39,000 list of challenged

15   voters.

16         That is not true.  That's a lot of smoke and mirrors

17   there.  But as you saw in the cross-examination, that, yes,

18   Mr. Davis and Mr. Somerville relied on military data to

19   exclude some military voters.  Yes, they may have relied on

20   data to exclude some UOCAVA voters.  But once they excluded

21   voters, excluded military voters, UOCAVA voters, and whittled

22   it down to 40,000, at the end of the day, the only information

23   they had about that 40,000 list of challenged voters is that

24   they filed an NCOA change of address request.  That was the

25   only information.

1          And because they relied on that solely, what they

2     filed and what they submitted was a baseless petition.

3          And, lastly, in terms of petitions, True the Vote and

4     Catherine Engelbrecht have no right to petition to challenge

5     any voter in Georgia.  So whatever right to petition

6     individuals -- individuals on this side of the v. may claim,

7     or defendants may claim, that does not apply to True the Vote.

8     That does not apply to Ms. Engelbrecht.

9          And any petition they would file would be baseless on

10    their own.  So they don't have First Amendment rights

11    implicated there.

12         And then, with my remaining few minutes, Your Honor,

13    I want to talk about the plaintiffs.  I want to bring this

14    back to the plaintiffs who -- whose testimony has been

15    unfairly mischaracterized.

16         Mr. Gamaliel Turner.  His return date to Georgia is

17    not uncertain.  He testified that he is returning to Georgia.

18    He testified that his contract is ending and he's returning to

19    the home that he currently owns and has always owned in

20    Muscogee County.

21         Ms. Stephanie Stinetorf.  She looked up her voting

22    record on the My Voter page.  And, yes, she saw on the My

23    Voter page that she had been challenged.  But that's not a

24    surprise.

25         Voters determine and check whether their ballots have

1   been counted.  Voters show up in person, like Scott Berson

2   did, and try to vote.  And that's when they learn that they

3   have been challenged.

4        In other words, these voters were all confronted with

5   the idea that they had been challenged.

6        And Ms. Jocelyn Heredia.  Like I mentioned, she was

7   challenged -- the list, the challenge list was published

8   online, on the Internet, for her to see, for anyone to see.

9   And on that challenge list that was Plaintiffs' Exhibit 46 it

10  showed that she was challenged by two individuals, Mr. Jerry

11  Bowling, associated with True the Vote, and Mr. Don Gasaway,

12  associated with Mr. Davis and Mr. Somerville.

13       They have presented no evidence of any other

14  individual who challenged Jocelyn, but yet they want to

15  suggest there was some mystery challenge that may have broken

16  causation.  There is no such thing.  There was no mystery

17  challenge to have broken causation.

18       And Fair Fight here clearly diverted resources in

19  response to these challenges.  And the suggestion that Fair

20  Fight has not calculated the amount of resources, that

21  transgresses Eleventh Circuit case law, specifically Florida

22  *NAACP v. Browning*, which recognizes it's the act of diverting

23  resources, not the amount.

24       And, lastly, defendants have pointed to all of the

25  different moves that Jocelyn has made, moving to Decatur,

1  moving to Atlanta, renewing her lease, and all of these things

2  that occurred after January 2021, which has no bearing on what

3  her residence was in January 2021, where she was a resident of

4  Banks County where she took care of her little brother and was

5  a staple in her household, even though she had an apartment

6  that would get her closer to work.  She was a resident of

7  Banks County.

8          But even if -- putting aside -- putting that aside,

9  yes, Jocelyn had an apartment in Decatur.  Yes, she eventually

10  moved to a different apartment closer to Atlanta.  So what?

11          The challenge law does not allow you to challenge an

12  individual for bases that are not covered under the grounds

13  set forth in -- under Georgia law.  Georgia's residency law

14  sets forth the grounds of which one can establish residency.

15  And intent is what's required.  Jocelyn's intent has not been

16  show.

17          THE COURT:  Thank you, sir.

18          MR. NKWONTA:  Can I just make one more point, Your

19  Honor?

20          THE COURT:  No.  I stopped Mr. Evans mid sentence.  I

21  have to stop you there.  Thank you.

22          MR. NKWONTA:  Thank you.

23          THE COURT:  At this point in time, I have a question

24  for the plaintiffs and I have a question for the defendants.

25  In this case the Department of Justice, representing the

1   United States of America, intervened on a protection of

2   Section 11(b) of the Civil Rights Act.

3           I have not heard anything during the course of this

4   trial where I've came to the conclusion that the plaintiffs

5   are challenging 11(b); is that correct?

6           MR. NKWONTA:  Sorry, can you repeat that, Your Honor?

7           THE COURT:  I have not heard any evidence or argument

8   during the course of this trial where the plaintiffs are

9   challenging the constitutionality of Section 11(b) of the

10  Civil Rights Act; is that correct?

11          MR. NKWONTA:  That's correct Your Honor.

12          THE COURT:  Through the course of this trial, I have

13  not heard any evidence or argument from the defendants that

14  indicate that you are challenging the constitutionality of

15  Section 11(b) of the Civil Rights Act.

16          MR. WYNNE:  That is correct, Your Honor.

17          THE COURT:  That's correct?

18          If you-all would like to be heard, but at this point

19  in time, I -- my findings is that Section 11(b) of the Civil

20  Rights Act is Constitutional.  But if you-all want to be heard

21  on that before I close out for the day, I will.

22          MS. PAIKOWSKY:  Your Honor.

23          THE COURT:  Yeah, yeah.

24          MS. PAIKOWSKY:  Thank you, Your Honor.

25          We just want to clarify for the record that

1  defendants are not challenging the constitutionality of

2  Section 11(b) with their -- the Constitutional defenses that

3  they have discussed.  The constitutionality of 11(b) as

4  applied here.  If they are, we would like to be heard and we

5  would be happy to present argument on the Constitutional

6  issues.

7          MR. WYNNE:  No, we are not challenging the

8  constitutionality of Section 11(b).  Something, in fact, we're

9  very proud of and we honor.  We're not challenging it in any

10 respect.

11         MS. PAIKOWSKY:  Okay, Your Honor.  As long as we're

12 all clear that if the Court finds a violation here, then it

13 can properly impose a remedy consistent with the First

14 Amendment.  Thank you.

15         THE COURT:  Okay.  Thank you.

16         I want to commend all the lawyers and the parties in

17 this case.  You-all have done an excellent job preparing for

18 this case.  You have given me a lot of information I need to

19 try to make a decision.  I would agree, I think everybody

20 agrees that voting is very important.  And the Court is going

21 to try to get you an answer on this matter as soon as

22 possible.

23         Also I need, by 5 p.m. next Wednesday, the 14th, your

24 findings of fact and conclusions of law.  Whatever you send to

25 me, obviously, send to the other side.  And then as soon as I

1   get that, we'll go through the information.

2         I wish I could give you an exact date for a ruling to

3   be coming out.  There's a lot of information, a lot of facts.

4   And I agree to both sides it's a very important decision the

5   Court has to make.  So we will be very thorough as possible in

6   rendering a verdict or a decision in this case.

7         Anything else from the plaintiffs?

8         MR. NKWONTA:  Nothing further, Your Honor.

9         THE COURT:  Yeah.  I thank you the plaintiffs for

10  your effort and everything you-all presented.

11        Anything else from the defendants?

12        MR. WYNNE:  No, Your Honor.

13        THE COURT:  I thank the defendants for everything

14  you-all presented and your efforts as well.  Everybody have a

15  great week.  And it's been a pleasure working with you-all.

16        MR. SHELLY:  I'm sorry, Your Honor, to get in the

17  last word.

18        I think you said it's due on Tuesday -- on Wednesday

19  the 14th?  I think that Tuesday is the 14th.  Would you like

20  it on Wednesday?

21        THE COURT:  That's right.  Wednesday the 15th.  Yeah.

22  So you've eight days rather than seven.

23        I don't think we mind, do we, Ms. Conkel?  No.

24        Thank you-all.  Have a great week.

25        (The hearing concluded at 12:40 p.m.)

1                    C E R T I F I C A T E

2

3   UNITED STATES DISTRICT COURT

4   NORTHERN DISTRICT OF GEORGIA

5

6        I do hereby certify that the foregoing pages are a true
    and correct transcript of the proceedings taken down by me in
7   the case aforesaid.
         This the 7th day of November, 2023.

8

9

10

11

12                      /s/Viola S. Zborowski _____
                        VIOLA S. ZBOROWSKI,
13                      RDR, FAPR, CMR, CRR, RPR, CRC
                        OFFICIAL COURT REPORTER TO
14                      THE HONORABLE STEVE C. JONES

15

16

17

18

19

20

21

22

23

24

25

## $

**$50,000** [8] - 1948:3, 1948:7, 1948:14, 1953:3, 1964:2, 1965:6, 1965:9, 1967:5

## '

**'ALMOST** [1] - 1907:18
**'THIS** [1] - 1904:16

## /

**/S/VIOLA** [1] - 2018:12

## 1

**1** [4] - 1917:15, 1963:23, 1968:9, 1983:15
**1-10** [1] - 1886:8
**10** [1] - 1949:22
**100** [4] - 1980:22, 1997:23, 1998:9, 1999:25
**102** [3] - 1904:11, 1905:12, 1906:11
**105** [2] - 1924:18, 1925:9
**106** [1] - 1920:11
**10:30** [2] - 1937:23, 1938:8
**11(B** [25] - 1941:20, 1942:7, 1951:21, 1952:14, 1953:12, 1957:9, 1957:19, 1958:10, 1962:22, 1965:23, 1983:24, 1993:9, 1997:13, 2002:3, 2002:4, 2003:5, 2006:19, 2007:2, 2015:2, 2015:5, 2015:9, 2015:15, 2015:19, 2016:2, 2016:3
**11(B)** [6] - 1951:12, 1957:23, 1969:17, 1978:25, 2000:19, 2016:8
**12** [3] - 1925:1, 1925:4, 1933:12
**122** [1] - 1905:12
**123** [1] - 1905:12
**127** [4] - 1929:25, 1930:4, 1930:17, 1933:3
**128** [5] - 1930:18, 1932:14, 1932:15, 1932:16, 1933:3
**129** [6] - 1930:1, 1930:5, 1930:18, 1932:22, 1932:25, 1933:3
**1291** [1] - 1967:2
**12:40** [1] - 2017:25
**13** [4] - 1900:21, 1904:11, 1907:12, 1908:21
**131** [1] - 1906:12
**136** [1] - 1907:12
**137** [3] - 1897:9, 1897:17, 1898:11
**139** [2] - 1900:21, 1903:4
**14** [2] - 1903:4, 1997:18
**148** [1] - 1904:11
**14TH** [4] - 1967:25, 2016:23, 2017:19
**15** [5] - 1938:2, 1938:5, 1959:24, 1997:16
**15,000** [4] - 1942:22, 1944:12, 1944:14
**15-FACTOR** [1] - 2008:12
**159** [1] - 1968:6

**15TH** [1] - 2017:21
**16** [1] - 1906:12
**16TH** [1] - 1945:25
**17** [1] - 1905:12
**1700** [1] - 1974:7
**18** [1] - 1904:12
**1889** [1] - 1888:3
**1896** [1] - 1888:3
**18TH** [2] - 1946:1, 1968:5
**19** [1] - 1903:4
**1908** [1] - 1954:4
**1910** [1] - 1954:9
**1913** [1] - 1888:3
**1939** [1] - 1888:5
**1946** [1] - 1954:14
**1969** [1] - 1888:6
**1979** [1] - 1888:6

## 2

**2** [2] - 1945:20, 1983:16
**2007** [1] - 1888:7
**2009** [3] - 1991:2, 1991:6
**201(D** [1] - 1916:11
**201(D)** [1] - 1917:17
**2016** [1] - 1940:8
**2018** [1] - 1940:8
**2020** [15] - 1891:9, 1891:16, 1891:20, 1910:10, 1910:13, 1911:10, 1915:17, 1940:9, 1963:17, 1979:2, 1988:20, 1989:17, 1991:17, 1991:19
**2021** [8] - 1915:17, 1939:24, 1940:4, 1940:9, 1940:21, 1942:12, 2014:2, 2014:3
**2022** [4] - 1897:1, 1900:20, 1903:2, 1940:13
**2023** [3] - 1886:11, 1927:9, 2018:7
**2024** [1] - 1975:16
**20TH** [1] - 1954:4
**21-2-217** [2] - 1959:24, 1960:13
**223** [1] - 1977:19
**22ND** [1] - 1900:20
**23** [2] - 1925:2, 1925:4
**230** [9] - 1928:25, 1936:2, 1970:25, 1971:13, 1972:16, 1977:23, 1994:1, 2004:8, 2005:2
**24-HOUR** [1] - 1969:20
**250,000** [1] - 2009:1
**250,000-PLUS** [2] - 1892:18, 2010:13
**26TH** [3] - 1926:22, 1933:10, 1934:1
**27** [3] - 1911:24, 1911:25, 1964:19
**275** [1] - 1935:20
**276** [1] - 1934:4
**277** [1] - 1935:12
**278** [1] - 1933:7
**27TH** [1] - 1936:4
**28** [2] - 1915:17, 1948:6
**280** [1] - 1935:16
**28TH** [1] - 1916:9
**297** [3] - 1935:25, 1936:3, 1936:11

**298** [1] - 1936:7
**299** [2] - 1936:7, 1936:9
**2:20-CV-0302-SCJ** [1] - 1886:4
**2D** [1] - 1967:2

## 3

**3** [2] - 1900:21, 1906:12
**30** [1] - 1981:9
**302** [3] - 1935:25, 1936:9, 1936:11
**30TH** [1] - 1916:10
**32,000** [3] - 1949:5, 1949:16, 1950:15
**364,000** [5] - 1892:18, 1893:5, 1945:18, 1945:19, 1968:6
**38** [1] - 1924:14
**39,000** [1] - 2011:14

## 4

**4** [2] - 1907:12, 1915:17
**40,000** [3] - 1951:13, 2011:22, 2011:23
**404-215-1479** [1] - 1887:23
**45** [1] - 1938:6
**46** [1] - 2013:9
**472** [1] - 2009:20
**479** [2] - 1967:1, 2009:20
**49** [2] - 1956:3, 1956:9

## 5

**5** [3] - 1905:12, 1938:19, 2016:23
**50** [1] - 1979:18
**51** [1] - 1926:4
**52** [2] - 1926:5, 1942:5
**52(C** [1] - 1938:13
**52(C)** [1] - 1938:17
**53** [3] - 1925:20, 1926:4, 1926:12
**54** [3] - 1925:20, 1926:5, 1926:12
**562** [1] - 1967:16
**5TH** [1] - 1997:25

## 6

**6** [1] - 1974:24
**60** [3] - 1950:24, 1967:19
**61,000** [1] - 1891:25
**619** [1] - 1977:6
**64** [3] - 1926:14, 1927:8, 1936:15
**65** [3] - 1893:15, 1894:13, 1894:16

## 7

**7** [1] - 1886:11
**702** [1] - 1893:25
**703** [1] - 1893:25
**7TH** [1] - 2018:7

## 8

**8** [1] - 1886:3
**805** [1] - 1966:11
**807** [2] - 1927:24, 1928:4

**854** [1] - 1967:16

# 9

**9** [3] - 1889:1, 1897:9, 1898:12
**90** [2] - 1925:10, 1987:22
**91** [2] - 1924:18, 1942:16
**949** [1] - 1966:11
**954** [1] - 1966:11
**96** [1] - 1949:25
**99.9** [1] - 1950:8

# A

**A&M** [3] - 1970:15, 1971:9, 1991:14
**A.M** [1] - 1889:1
**A1** [1] - 1917:14
**ABACK** [1] - 1989:22
**ABIDE** [1] - 1967:11
**ABILITY** [6] - 1895:16, 1895:19, 1912:16, 1934:23, 1992:21
**ABLE** [2] - 1946:17, 1947:18
**ABRIDGED** [1] - 1896:1
**ABSENTEE** [3] - 1921:23, 1922:2, 1947:20
**ABSOLUTELY** [4] - 1891:17, 1904:23, 1913:20, 1989:18
**ABSOLVE** [1] - 1957:22
**ACADEMIC** [1] - 1978:5
**ACCENTUATE** [1] - 1998:23
**ACCEPT** [3] - 1957:7, 2011:6, 2011:8
**ACCESS** [3] - 1904:22, 1973:3, 1973:4
**ACCESSED** [1] - 1921:24
**ACCESSIBLE** [1] - 1909:13
**ACCIDENT** [1] - 1927:22
**ACCIDENTS** [1] - 1936:24
**ACCOMPLISH** [2] - 1946:24
**ACCOMPLISHED** [1] - 1968:20
**ACCORDING** [3] - 1925:20, 1933:14, 1945:20
**ACCOSTED** [1] - 1952:9
**ACCOUNT** [7] - 1920:7, 1966:5, 1966:20, 1967:9, 1967:14, 1968:14, 1978:20
**ACCUMULATE** [1] - 1986:23
**ACCURACY** [1] - 1890:16
**ACCURATE** [3] - 1930:15, 1980:22, 1980:23
**ACCUSATIONS** [1] - 1939:17
**ACCUSE** [2] - 1951:14, 2009:23
**ACCUSED** [3] - 1941:2, 1941:3, 1941:11
**ACHIEVE** [1] - 2008:8
**ACKNOWLEDGE** [3] - 1966:3, 1978:22, 1978:23
**ACT** [7] - 1952:4, 1953:8, 1958:9, 1970:8, 1993:25, 2001:21, 2013:22
**ACT** [5] - 1993:9, 2015:2, 2015:10, 2015:15, 2015:20
**ACTING** [3] - 1953:4, 2002:1, 2004:14
**ACTION** [10] - 1952:1, 1952:2, 1952:25,

1953:2, 1992:22, 1993:22, 1993:23, 1996:7, 2002:7, 2006:14
**ACTIONABLE** [1] - 1969:16
**ACTIONS** [13] - 1889:18, 1941:23, 1942:7, 1951:13, 1952:1, 1953:9, 1968:25, 1984:8, 1984:17, 1984:18, 1984:21, 2004:14, 2007:7
**ACTIVE** [4] - 1940:9, 1984:10, 1987:13, 1989:23
**ACTIVELY** [3] - 1913:8, 1913:12, 1913:18
**ACTIVITIES** [2] - 1901:18, 1948:18
**ACTIVITY** [1] - 1997:12
**ACTS** [2] - 1952:15, 1953:13
**ACTUAL** [2] - 1925:24, 1957:10
**ADD** [3] - 1899:13, 1919:13, 1920:15
**ADDED** [3] - 1924:18, 1925:1, 1951:3
**ADDITION** [5] - 1916:22, 1940:24, 1948:8, 1949:16, 1965:18
**ADDITIONAL** [5] - 1889:23, 1914:19, 1947:21, 1963:5, 1982:9
**ADDITIONALLY** [1] - 1916:17
**ADDRESS** [16] - 1889:22, 1906:14, 1942:22, 1942:23, 1944:16, 1948:23, 1951:25, 1961:18, 1961:23, 1962:12, 1962:17, 1970:13, 1982:18, 1985:11, 2007:12, 2011:24
**ADDRESSED** [1] - 1914:20
**ADDRESSES** [4] - 1890:2, 1906:10, 1908:4, 1942:24
**ADDRESSING** [1] - 1972:5
**ADMINISTRATION** [1] - 1992:20
**ADMIRABLE** [1] - 1987:13
**ADMIRABLY** [2] - 1930:12, 1997:21
**ADMISSIBLE** [2] - 1936:19, 1946:18
**ADMISSION** [1] - 1996:4
**ADMIT** [6] - 1917:11, 1923:7, 1937:5, 1951:16, 1958:22, 1996:19
**ADMITTED** [14] - 1904:10, 1924:12, 1924:13, 1936:4, 1937:6, 1937:7, 1949:20, 1949:22, 1949:25, 1956:1, 1962:24, 1981:2, 1986:13, 1996:20
**ADMITTEDLY** [1] - 1899:10
**ADVERSITY** [2] - 1991:1
**ADVOCATED** [1] - 2011:5
**AFFAIRS** [2] - 1929:17, 1970:13
**AFFECTED** [6] - 1895:13, 1895:16, 1895:19, 1895:21, 1895:23
**AFFILIATED** [1] - 1965:14
**AFORESAID** [1] - 2018:7
**AFRICAN** [1] - 1978:12
**AFTEREFFECTS** [1] - 1979:4
**AFTERMATH** [1] - 1979:2
**AGE** [4] - 1923:9, 1923:20, 1960:6, 1965:1
**AGGREGATE** [1] - 1964:12
**AGO** [5] - 1981:18, 1986:19, 1989:10, 1991:6, 2004:23
**AGREE** [10] - 1895:3, 1931:3, 1932:5, 1991:25, 1995:6, 2000:22, 2001:14,

2003:3, 2016:19, 2017:4
**AGREEMENT** [2] - 1908:10, 1920:24
**AGREES** [2] - 1907:9, 2016:20
**AHEAD** [4] - 1894:6, 1969:13, 1999:5, 2005:12
**AILEEN** [1] - 1887:5
**AILING** [1] - 1969:18
**AIN'T** [3] - 1975:12, 1976:4
**AIR** [1] - 1906:14
**ALABAMA** [1] - 1980:24
**ALARM** [1] - 2010:6
**ALL-TIME** [2] - 1987:17, 1992:3
**ALLEGATION** [1] - 1996:19
**ALLEGATIONS** [1] - 2009:5
**ALLEGE** [2] - 1960:15, 1964:23
**ALLEGED** [7] - 1925:22, 1944:15, 1982:11, 1982:14, 1994:7, 1996:12, 2009:7
**ALLEGEDLY** [2] - 1942:23, 1983:6
**ALLEGING** [1] - 1954:19
**ALLEGRA** [1] - 1886:15
**ALLOW** [9] - 1894:2, 1907:10, 1917:24, 1928:10, 1936:15, 1937:10, 1961:15, 1961:17, 2014:11
**ALLOWED** [4] - 1895:3, 1933:4, 1936:16, 1937:12
**ALLOWING** [5] - 1918:2, 1923:16, 1928:10, 1929:22, 1933:19
**ALLOWS** [2] - 1955:2, 1961:11
**ALMOST** [3] - 1907:16, 1928:5, 2004:8
**ALONE** [7] - 1922:13, 1941:9, 1944:8, 1946:25, 1960:14, 1961:16, 1962:12
**ALTERNATIVE** [1] - 1972:3
**ALTON** [11] - 1956:12, 1956:16, 1956:22, 1956:24, 1957:2, 1957:12, 1957:21, 1958:14, 1958:16, 1990:11, 1999:14
**AMENDMENT** [14] - 1891:21, 1970:25, 2003:8, 2003:11, 2003:13, 2004:1, 2004:10, 2006:9, 2006:19, 2007:5, 2007:16, 2008:19, 2012:10, 2016:14
**AMERICA** [2] - 1918:6, 2015:1
**AMERICAN** [3] - 1967:1, 1975:8, 2005:18
**AMERICANS** [3] - 1971:5, 1978:12, 2001:17
**AMOUNT** [3] - 1984:24, 2013:20, 2013:23
**AMY** [3] - 1956:14, 1956:19, 1996:21
**ANALYSES** [13] - 1897:10, 1898:13, 1901:19, 1903:7, 1903:16, 1908:10, 1908:11, 1908:14, 1908:16, 1909:2, 1909:4, 1909:5, 1909:6
**ANALYSIS** [50] - 1892:2, 1893:5, 1893:7, 1893:19, 1893:20, 1895:1, 1895:5, 1896:8, 1896:12, 1896:14, 1896:18, 1896:21, 1899:3, 1899:16, 1899:18, 1899:24, 1901:8, 1901:25, 1902:4, 1903:8, 1903:11, 1903:17, 1906:21, 1907:7, 1907:8, 1907:24,

1908:18, 1909:8, 1913:17, 1943:16, 1943:17, 1945:23, 1950:10, 1958:8, 1963:12, 1964:14, 1964:15, 1966:14, 1966:16, 1966:18, 1967:6, 1983:21, 1984:25, 1985:11, 1985:25, 1989:21, 1999:9, 2002:23, 2003:5
**ANALYZE** [1] - 1964:12
**ANALYZED** [5] - 1909:9, 1909:10, 1909:11, 1909:14
**ANALYZING** [1] - 1968:8
**ANAND** [1] - 1915:17
**ANCESTRY** [1] - 1981:21
**AND** [2] - 1886:3, 1886:7
**ANNOUNCED** [1] - 1945:25
**ANNOUNCEMENT** [1] - 1938:11
**ANNOUNCEMENTS** [2] - 1938:12, 1953:5
**ANNOUNCING** [4] - 1951:4, 1964:5, 1964:7
**ANOMALIES** [1] - 1908:22
**ANSWER** [16] - 1893:8, 1897:12, 1898:23, 1902:12, 1902:18, 1903:9, 1904:15, 1904:18, 1905:16, 1905:19, 1905:22, 1906:16, 1906:24, 1907:21, 1952:2, 2016:21
**ANSWER** [1] - 1907:16
**ANSWERED** [3] - 1902:17, 1904:25, 1910:23
**ANSWERING** [2] - 1966:21, 1966:22
**ANYWAY** [1] - 1947:1
**APARTMENT** [2] - 1983:15, 1983:16
**APARTMENT** [4] - 1923:13, 2014:5, 2014:9, 2014:10
**APOLOGIES** [1] - 1915:20
**APOLOGIZE** [2] - 1897:13, 1927:10
**APP'X** [1] - 1967:16
**APPALLING** [1] - 1942:20
**APPEAR** [1] - 1904:12
**APPEARANCES** [2] - 1886:13, 1887:1
**APPEARED** [2] - 1897:11, 1898:14
**APPELLATE** [1] - 1928:14
**APPLICATION** [1] - 2007:16
**APPLIED** [5] - 1902:6, 1943:25, 1963:21, 2008:24, 2016:4
**APPLIES** [2] - 1963:13, 2003:13
**APPLY** [3] - 1900:6, 2012:7, 2012:8
**APPLYING** [1] - 1902:4
**APPOINTED** [1] - 1995:15
**APPRECIATE** [6] - 1897:16, 1974:10, 1985:24, 1988:25, 1989:4, 1993:10
**APPROACH** [4] - 1898:8, 1979:22, 2011:9, 2011:11
**APPROACHED** [1] - 1940:16
**APPROPRIATE** [2] - 1920:1, 1920:5
**APPS** [1] - 1899:8
**ARBITRARY** [1] - 1980:10
**ARBITRATOR** [1] - 1995:3
**AREA** [1] - 1989:16
**ARENA** [1] - 1992:12

**ARGUE** [3] - 2004:5, 2006:2, 2006:11
**ARGUMENT** [11] - 1938:16, 1948:21, 1958:7, 1971:14, 1980:2, 1980:14, 1984:19, 1999:2, 2015:7, 2015:13, 2016:5
**ARGUMENTS** [3] - 1937:23, 1942:5, 1953:19
**ARIZONA** [1] - 2001:25
**ARRAY** [1] - 1929:16
**ARTFUL** [1] - 1970:5
**ARTICLES** [3] - 1918:4, 1918:7, 1918:11
**ARTICULATE** [2] - 1976:10, 1989:7
**ARTICULATES** [1] - 1996:14
**ARTICULATING** [1] - 1993:11
**ASAP** [1] - 1925:16
**ASHLEY** [1] - 1886:16
**ASIDE** [4] - 1951:7, 1962:3, 2014:8
**ASPECT** [1] - 1931:7
**ASSEMBLY** [3] - 1891:22, 1969:24, 1971:1
**ASSERT** [1] - 1934:13
**ASSESS** [1] - 1968:14
**ASSESSING** [1] - 1966:21
**ASSESSMENT** [1] - 1907:9
**ASSESSMENTS** [1] - 1908:17
**ASSIGNMENT** [1] - 1940:19
**ASSISTED** [1] - 1949:20
**ASSOCIATE** [2] - 1971:3, 1971:5
**ASSOCIATED** [2] - 2013:11, 2013:12
**ASSOCIATION** [2] - 1969:24, 1971:1
**ASSUME** [1] - 1985:21
**ASSUMED** [1] - 1949:8
**ASSUMING** [4] - 1951:7, 1957:6, 1997:6
**ASSUMPTIONS** [1] - 1894:22
**ASSURANCES** [1] - 1992:15
**AT** [1] - 1889:1
**ATHENS** [1] - 1983:17
**ATLANTA** [2] - 1886:2, 1887:23
**ATLANTA** [2] - 2014:1, 2014:10
**ATTACHED** [2] - 1920:17, 1923:12
**ATTACHMENT** [2] - 1918:20, 1921:21
**ATTACHMENT** [1] - 1921:23
**ATTACHMENTS** [1] - 1918:20
**ATTEMPT** [2] - 1967:7
**ATTEMPTED** [9] - 1943:9, 1957:8, 1957:20, 1958:1, 1958:2, 1958:4, 1958:6, 1972:21, 1986:3
**ATTEMPTING** [1] - 1942:2
**ATTEMPTS** [4] - 1957:10, 1957:19, 1963:14
**ATTENTION** [5] - 1896:16, 1898:11, 1903:4, 1905:11, 1906:11
**ATTORNEY** [1] - 1955:22
**ATTORNEYS** [1] - 1992:18
**AUBURN** [2] - 1940:20, 1980:24
**AUDIO** [5] - 1925:21, 1925:22, 1925:23, 1925:24
**AUTHENTICATE** [1] - 1930:25

**AUTHENTICITY** [2] - 1926:17, 1931:8
**AUTHORITY** [1] - 1918:2
**AUTHORIZATION** [3] - 1900:9, 1901:13, 1901:15
**AUTHORIZE** [1] - 1905:7
**AUTHORIZED** [11] - 1900:11, 1900:12, 1900:15, 1902:1, 1904:3, 1904:6, 1905:9, 1906:5, 1906:8, 1908:12, 1966:16
**AUTHORIZING** [2] - 1901:18, 1901:20
**AUTO** [2] - 1923:14
**AVAILABLE** [2] - 1919:14, 1921:25
**AVERAGE** [3] - 1973:2, 1974:17
**AVOID** [1] - 1922:22
**AWARE** [4] - 1905:17, 1907:21, 1993:8, 1993:16
**AWKWARD** [1] - 1955:3

## B

**BACKGROUND** [1] - 1977:10
**BACKGROUNDS** [1] - 1940:17
**BAD** [1] - 2000:8
**BALANCES** [1] - 2003:9
**BALLOT** [9] - 1907:15, 1907:20, 1908:2, 1908:6, 1947:20, 1948:17, 1982:15, 1982:16
**BALLOTS** [5] - 1921:23, 1922:2, 1982:17, 1991:24, 2012:25
**BAM** [2] - 1999:10, 1999:21
**BANK** [1] - 1973:5
**BANKS** [7] - 1951:18, 1956:6, 1983:13, 1983:22, 1984:13, 2014:4, 2014:7
**BAO** [1] - 1887:5
**BARE** [1] - 1944:17
**BARS** [1] - 1985:18
**BASE** [1] - 1906:14
**BASE** [4] - 1906:22, 1918:7, 1918:14, 1918:18
**BASED** [19] - 1892:8, 1899:8, 1901:18, 1918:18, 1933:21, 1938:16, 1944:7, 1950:10, 1951:14, 1958:8, 1961:16, 1961:17, 1985:1, 1986:18, 2005:24, 2007:15, 2007:18, 2009:14, 2009:15
**BASELESS** [10] - 1959:19, 2007:17, 2007:20, 2007:21, 2008:8, 2008:9, 2008:10, 2008:22, 2012:2, 2012:9
**BASES** [2] - 1988:17, 2014:12
**BASIS** [5] - 1890:8, 1934:3, 1935:15, 1977:25, 1989:12
**BEACH** [1] - 1978:7
**BEAR** [2] - 1895:24, 1941:9
**BEARING** [1] - 2014:2
**BECOME** [6] - 1940:7, 1965:12, 1965:19, 1965:20, 1970:1, 1974:25
**BEFORE** [1] - 1886:10
**BEGAN** [1] - 1984:19
**BEGIN** [2] - 1954:2, 1980:5
**BEHALF** [2] - 1911:18, 1945:5
**BEHALF** [3] - 1886:14, 1886:20, 1887:2

**BEHAVIORAL**[1] - 1986:5
**BEHIND**[1] - 1954:1
**BEINGS**[1] - 1986:7
**BELABOR**[2] - 1942:17, 1942:19
**BELIEF**[1] - 1895:22
**BELL**[1] - 1887:5
**BELLS**[1] - 2010:6
**BEN**[5] - 1914:23, 1915:6, 1918:20, 1919:12, 1919:16
**BENJAMIN**[1] - 1975:18
**BERNAL**[1] - 1967:1
**BERSON**[10] - 1940:20, 1955:15, 1980:8, 1980:20, 1981:13, 1994:12, 1994:15, 1996:16, 2013:1
**BEST**[6] - 1890:3, 1910:2, 1918:6, 1956:25, 2004:17, 2004:24
**BETTER**[3] - 1975:15, 1976:18, 1976:19
**BETWEEN**[8] - 1915:12, 1962:5, 1966:23, 1967:20, 1971:4, 1971:14, 1996:15, 1997:24
**BEYOND**[2] - 1895:4, 1959:18
**BIG**[4] - 1914:24, 1915:5, 2002:12, 2010:12
**BIGGEST**[1] - 1927:6
**BILLS**[1] - 1965:7
**BINDERS**[1] - 1932:1
**BIT**[1] - 1961:2
**BLACK**[4] - 1923:20, 1954:12, 1965:1, 2000:21
**BLANK**[1] - 1944:16
**BLOG**[2] - 1967:25, 1968:5
**BLOW**[1] - 2006:3
**BOA**[1] - 1924:22
**BOARD**[16] - 1981:5, 1982:6, 1983:8, 1994:25, 1995:14, 1995:16, 1995:21, 1995:23, 1996:4, 2002:6, 2010:16, 2010:18, 2010:24, 2011:4, 2011:6, 2011:8
**BOARD**[1] - 1995:16
**BODY**[1] - 1995:18
**BOND**[1] - 1974:15
**BOOTH**[1] - 1940:6
**BOPP**[2] - 1911:21, 1912:5
**BOUND**[2] - 1975:21, 1999:19
**BOUNDS**[1] - 1970:25
**BOUNTIES**[1] - 1968:18
**BOUNTY**[5] - 1948:2, 1953:1, 1965:3, 1998:12, 2000:11
**BOWLING**[1] - 1931:11
**BOWLING**[6] - 1931:19, 1940:11, 1955:12, 1956:2, 1956:3, 2013:11
**BOX**[3] - 1951:22, 1970:21, 1975:1
**BOXES**[1] - 1948:18
**BRAD**[1] - 2005:14
**BRAVE**[1] - 1941:6
**BREAK**[3] - 1911:3, 1938:9, 2005:22
**BRIDGES**[1] - 1915:11
**BRIEF**[6] - 1916:19, 1925:3, 1938:15,

1938:16, 1938:18, 1938:20
**BRIEFLY**[3] - 1909:18, 1942:17, 2006:16
**BRING**[5] - 1970:4, 1989:2, 1998:14, 2004:25, 2012:13
**BRINGING**[1] - 1960:25
**BROAD**[3] - 1903:15, 1908:3, 1964:4
**BROADLY**[1] - 1901:6
**BROKEN**[2] - 2013:15, 2013:17
**BROOKS**[1] - 1912:1
**BROTHER**[1] - 2014:4
**BROUGHT**[6] - 1910:23, 1911:2, 1911:8, 1948:18, 1977:20, 1993:15
**BROWNING**[1] - 2013:22
**BRYAN**[3] - 1928:6, 1928:9, 1928:15
**BRYAN**[1] - 1886:16
**BUILD**[1] - 1964:4
**BUILDING**[1] - 1976:18
**BUILDINGS**[1] - 1923:13
**BUNCH**[1] - 1980:10
**BURDEN**[4] - 1958:5, 1978:25, 1999:16, 2008:6
**BURDENS**[1] - 1963:7
**BURN**[1] - 1986:16
**BURTON**[8] - 1953:24, 1954:5, 1954:11, 1970:4, 1978:15, 1986:1, 1986:5
**BUSINESS**[2] - 1960:5, 1989:23
**BUSYBODY**[1] - 1973:22
**BUT..**[1] - 1934:19
**BUTTON**[1] - 1966:16
**BY**[16] - 1888:5, 1888:6, 1888:6, 1888:7, 1889:12, 1892:14, 1892:23, 1894:5, 1895:6, 1896:6, 1896:17, 1898:10, 1903:1, 1907:11, 1911:17, 1913:6
**BYPRODUCT**[1] - 1954:16
**BYSTANDERS**[1] - 1949:3

# C

**CALCULATED**[1] - 2013:20
**CALIFORNIA**[5] - 1940:20, 1981:18, 1981:20, 1981:22, 1981:23
**CAMERON**[1] - 1886:21
**CANNOT**[8] - 1952:18, 1954:25, 1973:6, 1997:7, 2003:6, 2007:4, 2009:22, 2009:23
**CAPACITY**[1] - 1964:17
**CAR**[5] - 1927:17, 1927:18, 1927:22, 1976:23, 2008:14
**CARD**[2] - 1977:3, 1977:7
**CARE**[1] - 2014:4
**CAREFUL**[1] - 1926:13
**CARFAX**[6] - 1926:16, 1927:9, 1927:18, 1927:21, 1928:2, 1936:17, 1936:23, 1936:24
**CAROLINA**[1] - 1980:25
**CARRY**[3] - 1950:3, 1950:4
**CARTER**[1] - 1976:1

**CASE**[101] - 1889:19, 1896:25, 1910:24, 1911:6, 1912:6, 1915:6, 1918:16, 1922:6, 1925:1, 1928:7, 1928:15, 1935:5, 1941:14, 1944:6, 1958:23, 1965:24, 1967:1, 1969:15, 1969:17, 1972:22, 1972:24, 1973:1, 1974:23, 1978:14, 1978:17, 1978:21, 1979:1, 1979:16, 1979:20, 1980:1, 1980:5, 1980:6, 1980:9, 1980:12, 1981:14, 1981:15, 1983:24, 1983:25, 1984:2, 1984:18, 1985:6, 1985:10, 1986:2, 1987:3, 1987:5, 1987:20, 1990:11, 1990:13, 1993:8, 1993:9, 1993:11, 1993:16, 1993:23, 1994:10, 1994:24, 1995:8, 1996:7, 1996:18, 1997:2, 1997:13, 1998:5, 1998:7, 1998:13, 1998:21, 1998:23, 1999:21, 2000:17, 2000:20, 2000:21, 2001:22, 2002:9, 2003:2, 2003:13, 2006:3, 2006:17, 2006:20, 2006:22, 2006:23, 2007:9, 2009:20, 2010:5, 2010:15, 2010:18, 2013:21, 2014:25, 2016:17, 2016:18, 2017:6, 2018:7
**CASE-IN-CHIEF**[1] - 1910:24
**CASES**[2] - 1914:24, 1988:11
**CASH**[1] - 1948:4
**CASS**[5] - 1930:1, 1930:2, 1930:8, 1930:9
**CASUAL**[2] - 1996:14, 1996:15
**CATCH**[1] - 1897:13
**CATCH-UP**[1] - 1897:13
**CATHERINE**[4] - 1973:14, 1974:24, 1979:9, 2012:4
**CATHERINE**[1] - 1886:6, 1888:3, 1889:7
**CAUGHT**[1] - 1944:11
**CAUSAL**[1] - 1996:16
**CAUSATION**[9] - 1953:8, 1955:20, 1996:13, 1999:1, 1999:2, 1999:11, 1999:16, 2013:16, 2013:17
**CAUSED**[6] - 1941:24, 1941:25, 1952:1, 1952:9, 1953:9, 1955:10
**CAUSES**[1] - 1893:16
**CAVALIERLY**[1] - 1978:2
**CELOTEX**[1] - 1966:11
**CENTER**[2] - 1970:20, 1979:11
**CENTURY**[1] - 1991:21
**CENTURY**[1] - 1954:4
**CEO**[1] - 1914:1
**CERTAIN**[3] - 1897:20, 1986:18, 1986:25
**CERTAINLY**[4] - 1894:18, 1895:25, 1908:19, 1957:18
**CERTIFICATION**[1] - 1930:2
**CERTIFY**[1] - 2018:6
**CETERA**[3] - 1986:16, 2008:15
**CHAIRMAN**[1] - 1995:15
**CHALLENGE**[89] - 1892:5, 1896:8, 1896:9, 1896:18, 1896:21, 1899:17, 1902:5, 1902:7, 1902:16, 1904:17,

1905:3, 1912:18, 1913:13, 1913:19,
1914:5, 1942:13, 1942:20, 1942:22,
1942:23, 1942:25, 1943:5, 1943:10,
1943:18, 1944:13, 1945:16, 1945:18,
1945:25, 1947:3, 1947:15, 1949:8,
1949:11, 1950:8, 1950:9, 1950:15,
1951:1, 1951:8, 1951:13, 1951:17,
1952:3, 1952:5, 1952:9, 1954:2,
1954:3, 1954:8, 1954:18, 1954:20,
1956:5, 1956:8, 1956:24, 1957:14,
1957:21, 1957:25, 1958:17, 1964:6,
1965:12, 1966:14, 1967:6, 1969:15,
1970:1, 1972:20, 1979:17, 1981:12,
1982:2, 1982:5, 1982:8, 1982:11,
1982:14, 1982:16, 1983:7, 1983:10,
1985:14, 1990:12, 1995:9, 1999:18,
2002:5, 2007:21, 2007:22, 2008:9,
2008:11, 2008:22, 2010:13, 2012:4,
2013:7, 2013:9, 2013:15, 2013:17,
2014:11
**CHALLENGED** [38] - 1940:10, 1942:11,
1945:18, 1946:9, 1947:5, 1949:5,
1951:18, 1952:10, 1952:11, 1955:6,
1955:7, 1955:12, 1955:17, 1955:19,
1955:24, 1956:3, 1956:8, 1956:11,
1959:20, 1962:25, 1963:2, 1965:18,
1983:2, 1983:6, 1983:8, 1988:6,
1996:12, 1998:20, 2010:15, 2010:23,
2011:14, 2011:23, 2012:23, 2013:3,
2013:5, 2013:7, 2013:10, 2013:14
**CHALLENGER** [4] - 1957:3, 2008:3,
2009:12, 2010:10
**CHALLENGERS** [16] - 1945:1, 1945:2,
1945:4, 1947:2, 1949:14, 1949:21,
1950:3, 1950:7, 1950:22, 1952:3,
1956:15, 1956:18, 1957:5, 1958:15
**CHALLENGES** [71] - 1895:14, 1897:11,
1898:14, 1901:3, 1912:11, 1912:14,
1940:25, 1943:14, 1945:4, 1945:6,
1945:11, 1946:4, 1947:8, 1947:11,
1947:12, 1947:22, 1949:1, 1949:13,
1950:20, 1951:3, 1951:5, 1951:12,
1953:17, 1953:18, 1953:25, 1954:17,
1954:21, 1955:4, 1955:5, 1955:8,
1955:10, 1956:21, 1957:7, 1957:9,
1957:17, 1958:1, 1958:2, 1958:3,
1958:6, 1958:20, 1958:21, 1959:7,
1959:9, 1959:10, 1959:12, 1959:16,
1962:12, 1962:24, 1968:6, 1968:17,
1979:17, 1994:8, 1995:19, 1997:10,
1997:11, 2007:17, 2007:18, 2008:2,
2008:3, 2008:7, 2008:18, 2009:6,
2010:19, 2011:7, 2011:9, 2013:19
**CHALLENGING** [11] - 1910:11,
1931:11, 1931:19, 1949:16, 1977:15,
2015:5, 2015:9, 2015:14, 2016:1,
2016:7, 2016:9
**CHANCE** [4] - 1915:2, 1922:10,
2008:25, 2009:1
**CHANGE** [9] - 1906:13, 1961:23,

1962:12, 1962:16, 1962:18, 1977:23,
1982:2, 1989:5, 2011:24
**CHANGED** [2] - 1961:17, 1963:20
**CHANGES** [1] - 1922:15
**CHARITABLE** [1] - 1958:11
**CHART** [2] - 1944:8, 2010:7
**CHATMAN** [1] - 1923:24
**CHECK** [2] - 1951:22, 2012:25
**CHERISHED** [1] - 1940:8
**CHIEF** [1] - 1910:24
**CHILDREN** [1] - 1960:7
**CHOICE** [3] - 1969:19, 1977:19, 1978:5
**CHOSE** [4] - 1912:19, 1946:6, 1946:7,
1979:13
**CHOSEN** [1] - 1978:5
**CHRISTINA** [1] - 1886:16
**CHRONICLED** [1] - 1972:8
**CIRCUIT** [3] - 1966:3, 1966:10, 2013:21
**CIRCUMSTANCES** [2] - 1959:4,
1960:22
**CITATION** [1] - 1911:4
**CITE** [1] - 1923:11
**CITIZEN** [5] - 1912:19, 1970:23, 1973:2,
1987:13, 2004:21
**CITIZENS** [9] - 1891:19, 1895:10,
1912:15, 1940:7, 1954:23, 1971:24,
1989:2, 2004:22, 2005:1
**CIVIC** [1] - 1971:12
**CIVIC** [1] - 2000:21
**CIVIL** [1] - 1978:17
**CIVIL** [4] - 2015:2, 2015:10, 2015:15,
2015:19
**CLAFFERTY** [1] - 1886:19
**CLAIM** [3] - 2006:18, 2012:6, 2012:7
**CLAIMED** [2] - 1949:8, 1966:13
**CLAIMING** [3] - 1943:10, 1968:1, 1968:5
**CLAIMS** [1] - 1953:3
**CLARIFICATION** [2] - 1912:21, 2001:2
**CLARIFIED** [1] - 1920:4
**CLARIFY** [3] - 1901:17, 1909:23,
2015:25
**CLARIFYING** [1] - 1922:6
**CLASS** [1] - 2004:23
**CLAY** [1] - 1923:24
**CLEAN** [1] - 1891:3
**CLEANUP** [1] - 1924:23
**CLEAR** [8] - 1901:23, 1903:13, 1965:8,
1984:18, 1985:7, 1995:8, 2007:2,
2016:12
**CLEARLY** [3] - 1899:11, 1959:2,
2013:18
**CLERK** [1] - 1954:7
**CLERK** [6] - 1924:14, 1937:22, 1939:2,
1939:8, 1969:7, 1997:18
**CLOCK** [4] - 1939:6, 1939:9, 1939:10
**CLOSE** [5] - 1924:19, 1992:3, 1997:3,
1999:4, 2015:21
**CLOSELY** [1] - 1924:11
**CLOSER** [2] - 2014:6, 2014:10

**CLOSING** [3] - 1937:23, 1937:24,
1980:2
**CLOSINGS** [1] - 1888:4
**CLOSINGS** [1] - 1938:11
**CMR** [2] - 1887:21, 2018:13
**CO** [1] - 1973:16
**CO-COUNSEL** [1] - 1973:16
**COALITION** [1] - 2000:20
**COBB** [1] - 1923:23
**COBBLE** [1] - 1930:19
**COCOUNSEL** [1] - 1924:8
**CODE** [1] - 1954:9
**CODIFIED** [3] - 1970:24, 1972:15
**COERCE** [1] - 1968:21
**COERCED** [2] - 1942:1, 1953:15
**COERCION** [4] - 1954:15, 1976:20,
1977:8, 1979:15
**COLLABORATED** [3] - 1950:19,
1951:17, 1956:7
**COLLABORATING** [2] - 1951:6, 1951:9
**COLLECTIVELY** [1] - 1999:24
**COLLEGE** [3] - 1973:23, 1985:12,
1988:17
**COLORS** [1] - 1971:5
**COMBINATION** [2] - 1893:16, 1985:7
**COMBINE** [2] - 1893:15, 1930:13
**COMBINED** [2] - 1894:16, 1948:15
**COMBINING** [1] - 1893:19
**COMFORTABLE** [1] - 1990:8
**COMING** [3] - 1971:6, 2006:15, 2017:3
**COMMEND** [2] - 1978:16, 2016:16
**COMMERCIALS** [1] - 1992:4
**COMMISSIONERS** [1] - 1995:17
**COMMON** [4] - 1940:24, 1940:25,
1960:1, 1970:2
**COMMUNICATED** [1] - 1994:5
**COMMUNICATION** [8] - 1931:1, 1953:7,
1994:18, 1997:7, 1997:15, 1999:20,
2001:12, 2001:20
**COMMUNICATIONS** [1] - 2003:22
**COMMUNITIES** [1] - 1974:6
**COMMUNITY** [1] - 1989:24
**COMPANIES** [2] - 1898:19, 1898:21
**COMPANY** [6] - 1989:10, 1989:11,
1990:22, 1990:23, 1991:4
**COMPARE** [6] - 1899:19, 1947:11,
2008:11, 2008:12, 2008:13, 2008:15
**COMPARED** [1] - 1990:7
**COMPARTMENT** [1] - 1976:23
**COMPENSATE** [1] - 1947:25
**COMPILING** [1] - 1947:10
**COMPLAINT** [2] - 1915:7, 1978:10
**COMPLETE** [4] - 1906:6, 1924:5,
1925:25, 2004:6
**COMPLETELY** [5] - 1943:11, 1986:2,
1987:4, 1997:4, 1998:14
**COMPLETENESS** [7] - 1897:15,
1916:20, 1917:16, 1920:10, 1920:25,
1921:4, 1937:6

**COMPLETION** [1] - 1958:9
**COMPLICATED** [1] - 1906:20
**COMPLIED** [1] - 2005:10
**COMPORTS** [1] - 1968:16
**COMPOUND** [1] - 1903:12
**CONCERN** [1] - 1972:4
**CONCERNED** [2] - 1974:21
**CONCERNS** [2] - 1891:13, 1947:4
**CONCESSION** [1] - 1928:3
**CONCLUDED** [2] - 2003:19, 2017:25
**CONCLUSION** [2] - 1993:15, 2015:4
**CONCLUSIONS** [2] - 1938:19, 2016:24
**CONCLUSIVELY** [1] - 1999:7
**CONCOCT** [1] - 1980:10
**CONDUCING** [1] - 1893:20
**CONDUCT** [21] - 1896:12, 1897:10,
   1898:12, 1899:3, 1899:24, 1900:2,
   1900:3, 1900:5, 1901:7, 1908:12,
   1909:1, 1939:23, 1946:9, 1949:18,
   1952:21, 1952:22, 1953:14, 1966:17,
   1967:10, 2010:1, 2010:4
**CONDUCTED** [12] - 1896:18, 1896:21,
   1899:25, 1900:9, 1900:10, 1901:25,
   1903:7, 1907:6, 1907:8, 1909:6,
   1966:14, 1966:17
**CONDUCTING** [2] - 1901:19, 1945:23
**CONFER** [2] - 1923:2, 1924:7
**CONFIDENCE** [2] - 1971:22, 1972:12
**CONFIDENT** [1] - 1990:8
**CONFINES** [3] - 1994:1, 2002:4,
   2006:13
**CONFIRM** [2] - 1961:25, 1962:1
**CONFIRMS** [2] - 1968:19, 1990:6
**CONFLICTING** [1] - 1966:2
**CONFLICTS** [1] - 1907:23
**CONFRONT** [1] - 1952:5
**CONFRONTED** [2] - 1952:10, 2013:4
**CONKEL** [1] - 2017:23
**CONNECTED** [1] - 1999:15
**CONNECTING** [1] - 1982:11
**CONNECTION** [5] - 1902:20, 1902:23,
   1996:3, 1997:5
**CONNECTIONS** [1] - 1942:10
**CONNECTS** [1] - 1996:17
**CONSCIOUSLY** [1] - 2010:2
**CONSEQUENCE** [2] - 1953:13, 1953:16
**CONSEQUENCES** [9] - 1939:18,
   1939:25, 1941:5, 1941:6, 1941:9,
   1968:25, 1972:9, 2005:23
**CONSIDER** [3] - 1960:4, 1964:15,
   1994:13
**CONSIDERED** [3] - 1952:16, 1962:21,
   2011:7
**CONSIDERING** [2] - 1946:2, 1967:15
**CONSISTENT** [2] - 1978:3, 2016:13
**CONSISTING** [1] - 1942:14
**CONSTITUTIONAL** [6] - 1940:8,
   1944:18, 1975:19, 2015:20, 2016:2,
   2016:5

**CONSTITUTIONALITY** [5] - 2015:9,
   2015:14, 2016:1, 2016:3, 2016:8
**CONSTRUCTED** [2] - 1943:14, 1944:15
**CONSTRUCTION** [2] - 1943:16,
   1943:17
**CONTACT** [4] - 1952:17, 1953:7,
   1999:8, 2001:23
**CONTACTED** [1] - 2001:14
**CONTAIN** [1] - 1893:13
**CONTEMPLATES** [1] - 1962:6
**CONTESTED** [2] - 1920:2, 1946:7
**CONTESTING** [1] - 1944:18
**CONTEXT** [8] - 1899:9, 1899:10,
   1899:13, 1901:2, 1901:11, 1961:3,
   1973:11, 2006:24
**CONTINGENT** [1] - 1948:7
**CONTINUE** [2] - 1899:5, 1996:9
**CONTINUED** [3] - 1889:11, 1981:19,
   1991:12
**CONTINUED** [1] - 1887:1
**CONTRACT** [2] - 1981:19, 2012:18
**CONTRACTOR** [1] - 1976:15
**CONTRADICTIONS** [1] - 1966:23
**CONTRARY** [4] - 1972:14, 1978:18,
   1984:8, 1998:9
**CONTROL** [2] - 1979:3, 1992:8
**CONTROLS** [1] - 1993:11
**CONTROVERT** [1] - 1999:13
**CONVENTION** [1] - 1975:20
**CONVENTION** [1] - 1976:1
**CONVERSATIONS** [3] - 1906:9, 1948:1,
   2001:18
**CONVERTED** [1] - 1963:18
**CONVEY** [1] - 2003:14
**CONVICTION** [1] - 1961:21
**CONVICTIONS** [1] - 1961:8
**COOPER** [1] - 1886:7
**COOPER** [9] - 1947:7, 1948:22, 1949:2,
   1949:13, 1949:19, 1949:24, 1950:1,
   1950:6, 1950:14
**COORDINATE** [1] - 2001:25
**COORDINATED** [1] - 1950:2
**COPIES** [1] - 1898:6
**COPS** [2] - 2010:25, 2011:2
**COPY** [2] - 1897:18, 1979:22
**CORE** [2] - 1978:10, 1979:5
**CORRECT** [29] - 1896:9, 1896:13,
   1896:19, 1896:20, 1897:1, 1899:25,
   1900:14, 1904:8, 1908:12, 1909:21,
   1910:4, 1910:7, 1910:8, 1910:15,
   1910:20, 1910:21, 1912:15, 1912:24,
   1913:22, 1923:25, 1925:5, 1937:25,
   1949:10, 2015:5, 2015:10, 2015:11,
   2015:16, 2015:17, 2018:6
**CORRECTLY** [2] - 1925:8, 1960:16
**CORROBORATED** [1] - 1906:24
**COST** [2] - 1963:4, 1963:7
**COUNSEL** [1] - 1969:8
**COUNSEL** [19] - 1897:3, 1911:21,

   1927:4, 1931:23, 1933:15, 1933:20,
   1934:21, 1934:22, 1937:3, 1938:12,
   1938:13, 1952:8, 1953:20, 1969:9,
   1973:16, 1980:15, 1984:19, 2007:11
**COUNSEL'S** [1] - 1935:1
**COUNSELS** [2] - 1938:15, 1996:4
**COUNTED** [4] - 1982:19, 1982:25,
   1983:2, 2013:1
**COUNTERBALANCE** [1] - 1918:10
**COUNTIES** [27] - 1890:9, 1890:20,
   1890:21, 1890:25, 1891:2, 1891:5,
   1907:16, 1912:3, 1923:19, 1923:21,
   1946:8, 1949:13, 1951:2, 1952:4,
   1964:20, 1964:22, 1964:23, 1964:24,
   1964:25, 1968:6, 1968:11, 1974:7,
   2008:7, 2009:8, 2010:19
**COUNTING** [1] - 1921:23
**COUNTRY** [1] - 1969:18
**COUNTRY'S** [1] - 1986:9
**COUNTY** [19] - 1923:10, 1949:1,
   1959:21, 1960:16, 1961:11, 1962:8,
   1981:5, 1982:6, 1983:8, 1990:12,
   1994:25, 1995:13, 1995:16, 1995:21,
   1995:22, 1996:4, 2002:6, 2004:21
**COUNTY** [29] - 1915:14, 1925:1, 1925:2,
   1947:5, 1949:6, 1949:16, 1950:16,
   1951:18, 1956:6, 1956:10, 1956:11,
   1956:16, 1956:25, 1957:9, 1957:21,
   1958:16, 1958:17, 1981:11, 1982:21,
   1983:13, 1983:22, 1984:13, 1990:13,
   1990:15, 1996:17, 1996:18, 2012:20,
   2014:4, 2014:7
**COUPLE** [5] - 1889:14, 1913:7,
   1922:11, 1935:24, 1972:10
**COURAGE** [1] - 2009:9
**COURSE** [12] - 1889:22, 1918:8,
   1918:10, 1930:23, 1931:1, 1955:25,
   1966:9, 1976:9, 1986:23, 2015:3,
   2015:8, 2015:12
**COURT** [80] - 1911:3, 1915:6, 1916:2,
   1917:9, 1918:3, 1918:24, 1920:7,
   1921:25, 1923:7, 1923:19, 1925:8,
   1928:10, 1928:14, 1929:10, 1929:12,
   1935:7, 1936:11, 1937:4, 1939:14,
   1940:15, 1941:15, 1942:16, 1944:4,
   1944:7, 1947:11, 1948:6, 1948:9,
   1948:21, 1950:6, 1951:8, 1952:13,
   1952:16, 1953:6, 1958:19, 1958:25,
   1959:5, 1962:9, 1962:21, 1966:1,
   1966:4, 1966:20, 1967:9, 1967:17,
   1968:15, 1968:19, 1969:1, 1972:19,
   1975:16, 1979:25, 1982:23, 1983:23,
   1984:25, 1986:13, 1987:24, 1988:18,
   1990:17, 1990:18, 1993:8, 1993:10,
   1993:13, 1993:16, 1993:19, 1994:13,
   1995:5, 1996:13, 1997:21, 2003:2,
   2003:7, 2003:9, 2003:15, 2004:4,
   2005:16, 2007:2, 2008:23, 2009:19,
   2009:20, 2009:21, 2016:12, 2016:20,
   2017:5

**COURT** [163] - 1886:1, 1887:22, 1887:22, 1889:1, 1889:2, 1892:4, 1892:6, 1892:10, 1892:19, 1893:3, 1893:8, 1893:21, 1894:2, 1894:25, 1895:3, 1896:3, 1896:16, 1897:14, 1897:23, 1897:25, 1898:2, 1898:7, 1898:9, 1902:18, 1902:24, 1906:25, 1907:10, 1910:25, 1911:5, 1911:16, 1913:3, 1914:9, 1914:12, 1914:15, 1914:17, 1914:22, 1915:2, 1915:16, 1915:24, 1916:5, 1916:14, 1916:22, 1917:2, 1917:5, 1917:7, 1917:20, 1918:5, 1918:9, 1918:13, 1918:22, 1919:4, 1919:7, 1919:17, 1919:21, 1920:10, 1920:12, 1920:18, 1920:23, 1921:8, 1921:14, 1921:17, 1921:20, 1922:3, 1922:8, 1922:12, 1922:15, 1922:18, 1922:21, 1922:24, 1923:3, 1923:15, 1923:22, 1924:1, 1924:4, 1924:9, 1924:15, 1925:4, 1925:6, 1925:10, 1925:14, 1925:18, 1926:2, 1926:6, 1926:9, 1926:12, 1926:22, 1927:3, 1927:11, 1927:20, 1928:5, 1928:13, 1929:5, 1929:20, 1930:4, 1931:3, 1931:10, 1931:16, 1931:23, 1932:3, 1932:13, 1932:15, 1932:20, 1932:23, 1933:3, 1933:9, 1933:13, 1933:18, 1933:24, 1934:8, 1934:16, 1935:3, 1935:8, 1935:13, 1935:18, 1935:22, 1936:3, 1936:7, 1936:10, 1936:15, 1936:22, 1937:2, 1937:9, 1937:14, 1937:18, 1937:23, 1938:3, 1938:7, 1938:10, 1939:1, 1939:4, 1939:6, 1939:9, 1939:13, 1939:15, 1957:15, 1969:5, 1969:8, 1969:12, 1971:8, 1972:17, 1972:19, 1972:23, 1972:25, 1979:24, 2001:5, 2001:6, 2001:9, 2007:8, 2007:10, 2010:14, 2014:17, 2014:20, 2014:23, 2015:7, 2015:12, 2015:17, 2015:23, 2016:15, 2017:9, 2017:13, 2017:21, 2018:3, 2018:13

**COURT** [3] - 1897:5, 1954:7, 1964:17

**COURT'S** [4] - 1927:1, 1941:17, 1972:8, 2003:4

**COURTESY** [1] - 1979:22

**COURTROOM** [2] - 1970:11, 1974:20

**COURTS** [3] - 1967:10, 2002:15, 2003:19

**COVERED** [2] - 1910:19, 2014:12

**COVERME** [3] - 1894:8, 1914:2, 1993:2

**CRAZY** [2] - 1976:6, 1987:17

**CRC** [2] - 1887:21, 2018:13

**CREATE** [6] - 1889:16, 1890:4, 1890:6, 1951:12, 1966:10, 1975:6

**CREATED** [6] - 1947:24, 1958:4, 1988:24, 1989:10, 1989:21, 1995:17

**CREATES** [1] - 1986:7

**CREATING** [6] - 1895:2, 1896:8, 1898:17, 1951:13, 1952:3, 1986:11

**CREATION** [1] - 1944:9

**CREDIBILITY** [5] - 1966:1, 1966:5, 1966:10, 1966:21, 1967:15

**CREDIBLE** [3] - 1944:4, 1998:9, 2000:5

**CREDIBLY** [2] - 1943:3, 1968:15

**CREDIT** [1] - 1977:7

**CRITICIZING** [1] - 1928:1

**CROSS** [2] - 1888:2, 1896:5

**CROSS** [11] - 1910:24, 1911:23, 1912:14, 1927:15, 1930:3, 1943:15, 1944:2, 1951:22, 1967:24, 1970:4, 2011:17

**CROSS-EXAMINATION** [1] - 1896:5

**CROSS-EXAMINATION** [5] - 1911:23, 1943:15, 1944:2, 1967:24, 2011:17

**CROSSES** [2] - 1918:11, 1986:16

**CRR** [2] - 1887:21, 2018:13

**CRUSADE** [1] - 1965:16

**CSV** [1] - 1893:13

**CULLEN** [1] - 1886:22

**CULMINATED** [1] - 1991:16

**CURE** [1] - 1929:3

**CUT** [2] - 1908:9, 2006:5

**CUTE** [1] - 1970:6

**CYCLE** [1] - 1969:20

**CYCLES** [2] - 1962:2

# D

**D'MALIO** [1] - 1940:19

**DAILY** [1] - 1989:12

**DAN** [4] - 1931:19, 1940:12, 1951:17, 1951:18

**DANA** [1] - 1887:3

**DANCE** [1] - 1955:3

**DANGEROUS** [1] - 2004:7

**DARE** [1] - 1970:11

**DATA** [33] - 1890:8, 1892:2, 1893:7, 1893:20, 1894:9, 1894:10, 1908:17, 1908:18, 1909:1, 1913:22, 1923:8, 1945:23, 1950:20, 1951:15, 1958:8, 1959:19, 1960:14, 1961:2, 1961:5, 1961:17, 1962:4, 1962:5, 1962:10, 1964:12, 1985:9, 2007:18, 2009:16, 2011:13, 2011:18, 2011:20

**DATABASE** [10] - 1902:14, 1902:15, 1903:6, 1903:11, 1903:18, 1909:9, 1960:9, 1985:3, 1985:8, 2000:25

**DATABASES** [7] - 1898:16, 1898:18, 1899:7, 1902:3, 1902:5, 1902:7, 1903:5

**DATASET** [3] - 1890:21, 1894:11

**DATASETS** [3] - 1894:10, 1914:2, 1991:1

**DATE** [10] - 1927:18, 1934:22, 1934:24, 1937:20, 1937:21, 1944:13, 1971:21, 2012:16, 2017:2

**DAVID** [1] - 1987:14

**DAVIS** [18] - 1940:11, 1943:9, 1945:24, 1950:18, 1951:9, 1951:16, 1955:6,

1956:5, 1962:16, 1973:13, 1979:10, 1988:8, 1988:23, 2008:5, 2011:13, 2011:18, 2013:12

**DAVIS** [1] - 1886:7

**DAVIS'** [1] - 1951:4

**DAYS** [5] - 1922:11, 1982:25, 1987:23, 1992:7, 2017:22

**DEADWOOD** [3] - 1978:1, 1978:4, 1978:6

**DEAL** [3] - 1921:9, 1969:12, 1985:22

**DEALERSHIP** [1] - 1923:14

**DEALING** [3] - 1914:2, 1914:23, 1931:18

**DEATH** [8] - 1902:10, 1902:21, 1903:25, 1904:1, 1904:14, 1904:20, 1904:22, 1988:1

**DEBUNKED** [1] - 1987:5

**DECADES** [1] - 1989:23

**DECATUR** [4] - 1983:14, 2013:25, 2014:9

**DECEASED** [1] - 1890:4

**DECEMBER** [12] - 1891:9, 1891:16, 1891:19, 1915:17, 1916:9, 1916:10, 1945:24, 1945:25, 1967:25, 1968:5, 1989:17

**DECENT** [1] - 1984:24

**DECIDE** [4] - 1992:8, 1995:18, 2011:2, 2011:4

**DECIDED** [1] - 1992:7

**DECIDING** [1] - 1966:6

**DECISION** [4] - 1918:14, 2016:19, 2017:4, 2017:6

**DECISIONS** [2] - 1918:7, 1918:18

**DEEMED** [1] - 1953:12

**DEEP** [1] - 1941:13

**DEFAMATORY** [3] - 2009:6, 2009:16, 2009:21

**DEFAME** [1] - 2009:23

**DEFENDANT** [14] - 1921:8, 1923:1, 1981:14, 1981:15, 1985:5, 1993:23, 1994:4, 1994:16, 1994:21, 1995:21, 1996:12, 1996:17

**DEFENDANTS** [2] - 1886:8, 1886:20

**DEFENDANTS** [62] - 1918:24, 1921:3, 1921:25, 1924:14, 1936:14, 1937:17, 1939:10, 1939:22, 1942:6, 1943:8, 1948:20, 1951:20, 1951:22, 1952:18, 1952:23, 1953:10, 1953:12, 1955:18, 1955:24, 1956:10, 1956:25, 1958:12, 1962:10, 1962:15, 1962:23, 1963:10, 1963:13, 1964:20, 1965:11, 1965:25, 1967:18, 1968:19, 1972:20, 1980:1, 1981:14, 1982:10, 1982:12, 1984:5, 1986:15, 1993:21, 1994:20, 1994:23, 1994:25, 1998:7, 1998:8, 2002:9, 2006:2, 2007:13, 2011:5, 2012:7, 2013:24, 2014:24, 2015:13, 2016:1, 2017:11, 2017:13

**DEFENDANTS** [1] - 1926:5

**DEFENDANTS'** [9] - 1937:20, 1938:12,

1939:17, 1953:9, 1962:21, 1965:18, 1967:3, 1987:3
**DEFENSE** [3] - 1914:18, 1923:15, 1938:15
**DEFENSES** [1] - 2016:2
**DEFINE** [3] - 1900:1, 1909:4, 1909:5
**DEFINED** [1] - 1908:16
**DEFINITELY** [2] - 1916:24, 1995:4
**DEFINITION** [7] - 1960:17, 1960:21, 2007:21, 2008:22, 2008:23, 2008:24, 2010:2
**DEKALB** [1] - 1923:23
**DELAY** [1] - 1922:23
**DELAYED** [1] - 1992:21
**DELVING** [1] - 1965:21
**DEMANDED** [1] - 1949:17
**DEMANDING** [1] - 1946:8
**DEMOCRACY** [5] - 1970:18, 1972:2, 1975:23, 1976:2, 1977:1
**DEMOCRATIC** [4] - 1968:2, 1968:10, 1978:3, 2001:25
**DEMOCRATS** [1] - 1995:14
**DEMOGRAPHIC** [1] - 1890:12
**DEMONSTRATED** [1] - 1959:2
**DENIED** [3] - 1932:13, 1935:18, 1935:22
**DENOTED** [1] - 1908:6
**DENY** [3] - 1933:24, 1936:11, 1938:17
**DENYING** [2] - 1934:3, 1935:14
**DEPARTMENT** [2] - 2001:1, 2001:14
**DEPARTMENT** [3] - 1924:21, 1992:19, 2014:25
**DEPARTURE** [2] - 2000:18, 2004:6
**DEPENDENT** [1] - 1890:22
**DEPOSITION** [15] - 1896:25, 1897:9, 1897:19, 1900:19, 1900:20, 1903:2, 1904:9, 1906:12, 1907:3, 1943:20, 1943:21, 1945:9, 1947:14, 1949:24, 1968:12
**DEPUTY** [6] - 1924:14, 1937:22, 1939:2, 1939:8, 1969:7, 1997:18
**DEREK** [4] - 1930:24, 1940:12, 1973:13, 1979:9
**DEREK** [1] - 1886:6
**DESCRIBED** [1] - 1899:8
**DESIGN** [2] - 1995:17, 1996:6
**DESIGNATIONS** [2] - 1943:21, 1945:9
**DESIGNED** [1] - 1954:11
**DESK** [2] - 1977:5, 1977:9
**DESPITE** [3] - 1967:12, 1967:13, 1996:11
**DETAILS** [2] - 1911:12, 1943:14
**DETERMINATION** [4] - 1966:6, 1984:22, 1985:1, 1993:13
**DETERMINATIONS** [1] - 1966:1
**DETERMINE** [9] - 1890:16, 1894:12, 1900:5, 1960:14, 1981:6, 2002:6, 2007:19, 2009:15, 2012:25
**DETERMINED** [1] - 1892:2
**DETERMINES** [2] - 1959:22, 1959:23

**DETERMINING** [4] - 1962:7, 1983:20, 1986:6, 2008:20
**DEVASTATING** [1] - 1954:13
**DIED** [2] - 1961:10, 1961:22
**DIFFERENCE** [3] - 1987:19, 1987:20, 1991:11
**DIFFERENT** [13] - 1906:17, 1928:18, 1928:19, 1930:20, 1940:16, 1940:17, 1971:4, 1977:9, 1985:18, 2013:25, 2014:10
**DIFFERENTIATE** [1] - 1955:21
**DIFFERENTLY** [1] - 1978:21
**DIFFICULT** [6] - 1895:18, 1895:24, 1900:16, 1941:15, 1981:3, 1997:20
**DIFFICULTY** [1] - 1965:4
**DIG** [1] - 1976:22
**DILIGENCE** [5] - 1944:17, 1992:13, 1992:20, 2002:19, 2004:15
**DILIGENT** [2] - 1988:4, 1993:3
**DIRECT** [47] - 1889:4, 1889:14, 1898:11, 1900:14, 1902:12, 1902:13, 1903:4, 1903:24, 1904:1, 1904:11, 1905:11, 1905:25, 1906:11, 1907:7, 1907:12, 1907:23, 1908:10, 1909:19, 1910:9, 1910:23, 1910:25, 1911:1, 1911:2, 1927:15, 1944:1, 1944:2, 1952:1, 1952:2, 1952:17, 1952:25, 1953:2, 1953:7, 1967:3, 1967:4, 1967:5, 1990:17, 1990:18, 1993:22, 1993:23, 1996:3, 1996:10, 1997:7, 1999:8, 2001:12, 2001:20, 2001:23, 2009:19
**DIRECT** [2] - 1888:2, 1889:11
**DIRECTED** [5] - 1924:17, 1941:24, 1994:17, 1994:22, 1994:25
**DIRECTION** [2] - 1913:16, 1997:15
**DIRECTLY** [9] - 1904:21, 1941:23, 1952:20, 1952:22, 1953:5, 1984:8, 1993:21, 1993:24, 1994:22
**DIRECTNESS** [1] - 1966:21
**DISAGREE** [6] - 1894:2, 1904:19, 1905:23, 1907:24, 1907:25, 1929:20, 1943:4, 1971:20, 1991:20
**DISASTER** [2] - 1894:19, 1942:15
**DISCLOSE** [1] - 1950:25
**DISCLOSED** [17] - 1926:21, 1927:9, 1933:11, 1933:14, 1933:18, 1933:21, 1934:2, 1934:3, 1934:11, 1934:12, 1934:16, 1934:19, 1935:14, 1935:19, 1935:23, 1936:6, 1936:12
**DISCOMFORT** [1] - 1983:5
**DISCOURAGES** [1] - 1963:8
**DISCOVERY** [5] - 1950:25, 1966:9, 1967:10, 1967:11, 1967:19
**DISCUSS** [1] - 1908:10
**DISCUSSED** [6] - 1890:3, 1911:23, 1912:13, 1950:20, 1965:4, 2016:3
**DISCUSSING** [2] - 1915:12, 1948:1
**DISCUSSION** [6] - 1909:18, 1939:3, 1944:8, 1946:12, 1953:20, 1953:22

**DISCUSSIONS** [1] - 1953:19
**DISENFRANCHISE** [3] - 1954:12, 1954:22, 1954:24
**DISMISSED** [2] - 2006:20, 2007:9
**DISPARATE** [2] - 1894:10, 1894:14
**DISPENSE** [1] - 1955:3
**DISPUTE** [3] - 1928:24, 1981:10, 1996:1
**DISREGARD** [1] - 2004:14
**DISREGARDED** [2] - 2007:7, 2010:12
**DISREGARDS** [1] - 2010:3
**DISSEMINATING** [1] - 2001:23
**DISTINCTION** [4] - 1899:4, 1900:17, 1904:24, 1962:4
**DISTORTED** [1] - 2007:14
**DISTRICT** [6] - 1886:1, 1886:1, 1886:11, 1887:22, 2018:3, 2018:4
**DISTRICT** [1] - 1966:25
**DIVERTED** [2] - 2006:16, 2013:18
**DIVERTING** [1] - 2013:22
**DIVIDED** [1] - 1970:12
**DIVISION** [1] - 1886:2
**DOCKET** [15] - 1915:8, 1916:1, 1916:7, 1916:8, 1916:11, 1917:3, 1917:6, 1917:12, 1917:13, 1917:15, 1918:14, 1918:15, 1924:25, 1925:12, 1925:15
**DOCKET** [1] - 1886:4
**DOCUMENT** [3] - 1934:15, 1968:8, 1999:15
**DOCUMENTS** [5] - 1931:15, 1967:12, 1967:13
**DOE** [2] - 1886:3, 1886:3
**DOES** [1] - 1886:8
**DOJ** [1] - 1969:13
**DON** [1] - 2013:11
**DONALD** [1] - 1974:23
**DONE** [11] - 1905:6, 1929:13, 1929:16, 1941:1, 1978:9, 1990:7, 1993:4, 2002:10, 2002:14, 2016:17
**DOVER** [1] - 1906:14
**DOWN** [10] - 1914:13, 1922:13, 1922:24, 1943:6, 1954:19, 1974:19, 1992:10, 2001:1, 2011:22, 2018:6
**DOWNLOADED** [1] - 1922:2
**DR** [20] - 1943:3, 1943:7, 1944:5, 1947:9, 1950:10, 1953:24, 1954:5, 1959:9, 1959:14, 1963:4, 1970:4, 1978:15, 1984:23, 1984:25, 1985:24, 1986:1, 1986:5, 2010:7
**DRAMATICALLY** [1] - 1963:7
**DRAW** [1] - 1909:10
**DRIVER'S** [1] - 1974:11
**DROP** [1] - 1948:17
**DUE** [3] - 1918:15, 1934:24, 2017:18
**DULY** [1] - 1889:8
**DUPLICATE** [1] - 1905:3
**DUPLICATES** [3] - 1905:13, 1905:17, 1905:21
**DURING** [14] - 1904:1, 1905:25, 1910:9, 1911:23, 1912:13, 1918:11, 1934:6,

1942:4, 1944:1, 1948:21, 1950:25, 1976:9, 2015:3, 2015:8
**DUTY** [1] - 1906:18
**DYNAMIC** [2] - 1918:3, 1922:7

# E

**E-MAIL** [6] - 1910:5, 1920:3, 1920:6, 1920:7, 1948:5, 1982:23
**E-MAILS** [9] - 1910:7, 1919:18, 1920:4, 1920:8, 1920:16, 1921:5, 1950:6, 1982:24, 2000:4
**EARLY** [3] - 1954:3, 1990:22, 1990:25
**EARRINGS** [1] - 1977:10
**EARS** [1] - 1977:11
**EASY** [1] - 1971:19
**EATING** [1] - 1965:21
**ECF** [2] - 1925:1, 1925:2
**EFFECT** [2] - 1954:13, 2009:10
**EFFECTIVELY** [1] - 1907:22
**EFFORT** [12] - 1906:9, 1910:1, 1929:4, 1945:25, 1950:2, 1950:15, 1951:1, 1951:8, 1963:17, 1964:6, 2017:10
**EFFORTS** [9] - 1905:2, 1905:6, 1905:25, 1906:4, 1929:3, 1929:6, 1950:11, 2004:17, 2017:14
**EIGHT** [9] - 1912:3, 1923:19, 1964:20, 1964:22, 1964:23, 1964:24, 1964:25, 2017:22
**EITHER** [10] - 1912:7, 1928:5, 1932:16, 1932:25, 1956:20, 1976:4, 1989:8, 1993:24, 1994:22
**ELECT** [1] - 1971:24
**ELECTED** [1] - 1971:17
**ELECTION** [35] - 1895:22, 1901:3, 1910:10, 1910:13, 1912:2, 1946:7, 1950:13, 1952:5, 1954:14, 1954:23, 1959:6, 1959:8, 1961:6, 1961:20, 1961:24, 1962:1, 1962:2, 1963:18, 1963:19, 1964:2, 1964:7, 1964:13, 1964:21, 1979:7, 1979:13, 1988:20, 1989:25, 1991:5, 1991:7, 1992:2, 1992:19, 2005:17, 2009:4
**ELECTION** [1] - 1981:6
**ELECTION'S** [1] - 2010:14
**ELECTIONS** [3] - 1963:9, 1971:23, 1991:7
**ELECTIONS** [14] - 1982:6, 1983:8, 1995:1, 1995:14, 1995:21, 1995:23, 1996:4, 2002:6, 2010:16, 2010:18, 2010:24, 2011:4, 2011:6, 2011:8
**ELECTORAL** [1] - 1969:2
**ELECTORATE** [1] - 1963:15
**ELECTRICIAN** [1] - 1976:17
**ELECTRONICS** [1] - 1977:2
**ELECTS** [1] - 1995:13
**ELEMENT** [7] - 1928:3, 1941:24, 1941:25, 1996:10, 2003:1, 2003:19, 2003:21
**ELEMENTS** [9] - 1909:12, 1951:21,

1965:23, 1965:24, 1968:13, 2002:24, 2003:5, 2003:9, 2004:5
**ELEVENTH** [3] - 1966:3, 1966:10, 2013:21
**ELIGIBILITY** [39] - 1889:15, 1890:11, 1890:19, 1890:24, 1891:4, 1891:16, 1891:19, 1891:24, 1892:9, 1892:16, 1892:24, 1893:10, 1895:7, 1895:14, 1906:23, 1913:9, 1913:13, 1913:19, 1914:5, 1936:2, 1961:4, 1963:6, 1969:21, 1981:4, 1982:1, 1982:5, 1983:19, 1983:24, 1985:5, 1985:9, 1985:14, 1995:9, 1995:18, 1999:18, 2002:5, 2004:17, 2004:19, 2006:13, 2008:20
**ELIGIBLE** [3] - 1906:15, 1961:9, 1968:22
**EMBELLISHMENTS** [1] - 1967:25
**EMBRACE** [1] - 1970:17
**EMERGED** [1] - 1940:5
**EMERGING** [1] - 1975:19
**EMOTION** [1] - 1986:7
**EMPHASIZED** [1] - 1952:17
**EMPLOYED** [1] - 1947:18
**EMPLOYMENT** [1] - 1960:5
**EMPOWER** [1] - 2004:25
**EMPOWERMENT** [1] - 1991:13
**ENACTING** [2] - 1954:2, 1977:19
**ENCOURAGE** [2] - 2005:15
**ENCOURAGED** [1] - 1977:24
**ENCOURAGING** [2] - 1970:15, 1970:17
**END** [5] - 1928:8, 1942:6, 1988:5, 2006:22, 2011:22
**ENDEAVOR** [1] - 1993:11
**ENDEAVORED** [1] - 1983:20
**ENDING** [1] - 2012:18
**ENDS** [1] - 1996:8
**ENFORCE** [1] - 2011:3
**ENGAGE** [3] - 1961:20, 1979:13, 1989:2
**ENGAGED** [7] - 1905:6, 1906:5, 1987:18, 1990:3, 1991:13, 2004:22, 2004:24
**ENGELBRECHT** [3] - 1886:6, 1888:3, 1889:7
**ENGELBRECHT** [44] - 1889:3, 1889:13, 1896:7, 1898:11, 1898:25, 1913:7, 1914:12, 1930:11, 1932:19, 1943:13, 1943:23, 1944:22, 1945:22, 1947:13, 1948:2, 1948:6, 1948:20, 1948:24, 1950:23, 1953:2, 1956:1, 1962:16, 1964:2, 1964:10, 1965:4, 1965:15, 1966:13, 1966:19, 1967:20, 1967:24, 1968:9, 1972:7, 1973:14, 1974:25, 1976:8, 1977:16, 1979:9, 1988:23, 1990:16, 1990:18, 1992:11, 2012:4, 2012:8
**ENGELBRECHT'S** [7] - 1945:21, 1946:13, 1948:10, 1950:4, 1963:20, 1967:4, 1967:5
**ENLIST** [1] - 1909:11

**ENSURE** [8] - 1889:18, 1916:18, 1950:2, 1954:23, 1984:9, 1993:2, 1996:7, 2002:19
**ENSURED** [2] - 1990:8, 1992:14
**ENSURING** [1] - 1988:12
**ENTER** [1] - 1915:9
**ENTERED** [4] - 1915:6, 1916:9, 1916:23, 1917:6
**ENTERPRISE** [2] - 1950:16, 1951:10
**ENTIRE** [9] - 1890:22, 1892:5, 1900:9, 1934:21, 1936:24, 1937:5, 1937:8, 1954:17, 2010:6
**ENTIRELY** [1] - 1951:8
**ENTITLED** [2] - 1897:22, 1963:3
**ENTRIES** [4] - 1944:12, 1944:23, 1945:14, 1949:7
**ENTRUSTING** [1] - 1913:23
**ENTRY** [2] - 1927:16, 1945:15
**ENUMERATED** [1] - 2008:13
**ENVIRONMENT** [1] - 1982:22
**EQUATION** [1] - 1950:18
**EQUIVALENT** [2] - 1948:12, 2010:25
**ERROR** [4] - 1894:15, 1959:12, 1985:3, 2005:7
**ERRORS** [8] - 1942:20, 1943:5, 1944:10, 1945:13, 1945:14, 1959:13, 1959:14, 1959:18
**ESCAPE** [2] - 1952:18, 1957:11
**ESPECIALLY** [1] - 1918:16
**ESQ** [16] - 1886:15, 1886:16, 1886:16, 1886:17, 1886:17, 1886:18, 1886:18, 1886:19, 1886:21, 1886:22, 1886:22, 1887:3, 1887:4, 1887:4, 1887:5, 1887:5
**ESTABLISH** [15] - 1930:20, 1931:2, 1931:4, 1931:5, 1932:6, 1932:7, 1932:10, 1946:25, 1953:9, 1956:13, 1959:17, 1959:20, 1960:18, 1963:6, 2014:14
**ESTABLISHED** [6] - 1903:3, 1942:13, 1956:3, 1959:6, 1959:9, 1965:23
**ESTABLISHING** [1] - 1951:22
**ET** [3] - 1986:16, 2008:15
**EVALUATE** [1] - 1994:13
**EVALUATES** [1] - 1985:4
**EVANS** [31] - 1886:22, 1888:6, 1889:5, 1889:12, 1892:7, 1892:14, 1892:23, 1893:6, 1893:23, 1894:4, 1894:5, 1895:6, 1896:2, 1897:15, 1897:18, 1897:24, 1898:1, 1902:17, 1907:1, 1910:22, 1911:14, 1913:6, 1914:8, 1969:10, 1979:21, 1979:25, 1997:19, 2001:3, 2001:8, 2001:11, 2007:9
**EVANS** [13] - 1889:4, 1892:20, 1895:3, 1896:3, 1907:10, 1911:7, 1926:15, 1927:15, 1930:2, 1938:6, 1980:1, 2007:10, 2014:20
**EVENING** [1] - 1889:13
**EVENTS** [2] - 1966:22, 1966:23
**EVENTUALLY** [1] - 2014:9

**EVIDENCE** [54] - 1922:25, 1923:1, 1926:4, 1927:17, 1928:23, 1929:3, 1934:7, 1935:16, 1939:19, 1939:21, 1943:7, 1945:8, 1946:10, 1946:18, 1947:21, 1947:23, 1948:7, 1952:6, 1955:20, 1955:21, 1956:12, 1957:13, 1958:12, 1958:13, 1958:14, 1959:2, 1960:17, 1961:8, 1962:25, 1963:16, 1965:14, 1965:25, 1966:24, 1968:10, 1968:23, 1978:12, 1978:24, 1980:12, 1980:17, 1994:3, 1994:4, 1995:20, 1997:3, 1997:5, 1998:9, 1998:12, 1998:19, 1998:21, 2000:6, 2007:15, 2010:5, 2013:13, 2015:7, 2015:13

**EVIDENTIARY** [1] - 1930:14

**EVISCERATE** [1] - 2004:8

**EVOLVED** [1] - 1954:22

**EVOLVES** [1] - 1972:7

**EX** [1] - 1990:23

**EX-HUSBAND** [1] - 1990:23

**EXACERBATED** [1] - 1969:19

**EXACT** [12] - 1889:20, 1889:24, 1894:10, 1894:11, 1911:4, 1915:25, 1916:2, 1916:3, 1931:12, 1970:12, 2017:2

**EXACTLY** [13] - 1919:22, 1924:4, 1955:20, 1962:14, 1964:18, 1968:20, 1985:24, 1988:7, 1988:14, 1989:9, 1989:15, 1994:1, 1995:25

**EXAGGERATING** [1] - 1964:6

**EXAMINATION** [11] - 1900:14, 1904:2, 1908:11, 1910:9, 1911:23, 1943:15, 1944:1, 1944:2, 1961:12, 1967:24, 2011:17

**EXAMINATION** [3] - 1889:11, 1896:5, 1913:5

**EXAMPLE** [2] - 1961:4, 1981:25

**EXCELLENT** [1] - 2016:17

**EXCEPTION** [2] - 1927:25, 1934:18

**EXCEPTIONS** [1] - 1933:4

**EXCHANGE** [2] - 1930:24, 1965:9

**EXCHANGED** [1] - 1950:24

**EXCHANGES** [1] - 1910:5

**EXCITED** [1] - 1940:5

**EXCLUDE** [2] - 2011:19, 2011:20

**EXCLUDED** [2] - 2011:20, 2011:21

**EXCLUSIVE** [2] - 1889:17, 1988:5

**EXCUSE** [1] - 1936:17

**EXERCISE** [3] - 1944:17, 1969:23, 1977:24

**EXERCISED** [1] - 2002:18

**EXERCISING** [3] - 1891:18, 1972:15, 1975:8

**EXERTION** [1] - 1972:13

**EXHIBIT** [23] - 1904:11, 1905:12, 1906:11, 1911:24, 1911:25, 1917:14, 1926:4, 1926:5, 1927:8, 1935:12, 1935:16, 1942:16, 1948:6, 1949:22, 1949:25, 1956:3, 1956:9, 1963:23, 1964:19, 1968:9, 2013:9

**EXHIBIT** [16] - 1905:11, 1924:5, 1924:16, 1924:18, 1924:19, 1925:7, 1927:13, 1927:14, 1927:20, 1933:11, 1934:6, 1934:24, 1937:5, 1954:6

**EXHIBIT'S** [1] - 1999:12

**EXHIBITS** [2] - 1929:25, 1935:25

**EXHIBITS** [7] - 1901:23, 1903:22, 1924:24, 1930:22, 1931:12, 1937:19, 1941:14

**EXIST** [5] - 1955:1, 1980:7, 1980:11, 1998:16

**EXISTING** [1] - 2000:18

**EXPECT** [3] - 1955:6, 1955:7, 2008:21

**EXPECTATION** [2] - 2007:23, 2007:24

**EXPERIENCE** [11] - 1893:15, 1893:23, 1894:16, 1895:9, 1914:1, 1914:2, 1940:10, 1968:16, 1993:1

**EXPERIENCES** [1] - 1986:22

**EXPERT** [7] - 1894:1, 1943:8, 1954:5, 1978:4, 1988:3, 2004:21, 2005:8

**EXPERTISE** [2] - 1895:4, 1986:6

**EXPERTS** [2] - 1943:21, 1988:11

**EXPLAIN** [3] - 1915:15, 1957:13, 1957:15

**EXPLAINED** [4] - 1930:11, 1931:14, 1997:23, 1999:25

**EXPLAINING** [4] - 1941:19, 1947:10, 1965:5, 1989:8

**EXPLANATION** [3] - 1930:13, 1957:4, 1957:12

**EXPLICITLY** [2] - 1953:23, 1965:5

**EXPLOITED** [1] - 1954:12

**EXPRESS** [1] - 1945:5

**EXPRESSED** [2] - 1945:10, 1973:21

**EXPRESSING** [1] - 1891:15

**EXPRESSWAY** [1] - 1974:13

**EXTENSIVE** [1] - 1932:6

**EXTENT** [2] - 1901:17, 1988:16

**EXTENUATED** [1] - 1988:20

**EXTRA** [2] - 1936:17, 1963:1

**EXTRAPOLATE** [1] - 2000:4

**EXTRAPOLATED** [1] - 1986:19

**EXTRAPOLATING** [1] - 1986:10

**EXTREMELY** [4] - 1988:3, 1988:4, 1988:15

---

# F

**F.2D** [1] - 1966:11

**FACE** [1] - 1977:11

**FACEBOOK** [1] - 1981:20

**FACILITATE** [5] - 1895:7, 1895:14, 1912:11, 1912:14, 1912:16

**FACILITATING** [2] - 1891:15, 1891:19

**FACT** [31] - 1898:5, 1899:2, 1899:23, 1911:9, 1917:4, 1921:22, 1922:1, 1923:22, 1928:24, 1952:16, 1957:21, 1959:25, 1962:11, 1968:13, 1974:13, 1980:7, 1981:4, 1981:25, 1983:11, 1984:17, 1984:19, 1984:20, 1990:14,

1994:3, 1995:22, 1998:6, 1999:1, 2010:19, 2016:8, 2016:24

**FACTOR** [6] - 1950:18, 1959:5, 1966:20, 1967:9, 1993:21, 2002:21

**FACTORS** [16] - 1959:1, 1959:24, 1960:3, 1960:4, 1960:11, 1962:20, 1966:4, 1987:15, 1993:18, 1997:22, 1999:6, 1999:24, 2007:3, 2008:13, 2008:16

**FACTS** [10] - 1938:19, 1980:10, 1982:4, 1982:8, 1994:19, 1995:18, 2000:3, 2006:24, 2017:3

**FACTUAL** [1] - 2000:16

**FAIL** [1] - 2008:2

**FAILED** [1] - 1950:24

**FAILURE** [4] - 1929:11, 1966:9, 1967:11

**FAIR** [5] - 1901:24, 1920:21, 1932:12, 1975:12, 2005:17

**FAIR** [5] - 1980:9, 1980:17, 2006:16, 2013:18, 2013:19

**FAIR** [1] - 1886:3

**FAKE** [1] - 2006:24

**FALSE** [8] - 1890:1, 1907:5, 1935:9, 1939:17, 1950:7, 1950:10, 2001:23, 2009:6

**FALSELY** [2] - 1941:11, 2009:23

**FAMILIAR** [1] - 1917:8

**FAMILY** [4] - 1989:11, 1990:22, 1990:23, 1991:4

**FAN** [1] - 1979:19

**FAPR** [2] - 1887:21, 2018:13

**FAR** [2] - 1939:11, 2006:2

**FAST** [2] - 1946:1, 1946:2

**FAULTILY** [1] - 2009:15

**FAVOR** [2] - 1920:22, 1962:11

**FEAR** [2] - 1941:1, 1955:17

**FEARFUL** [1] - 1941:3

**FEDERAL** [1] - 1964:17

**FEES** [1] - 1910:19

**FELONY** [1] - 2006:5

**FELT** [6] - 1941:2, 1955:17, 1986:11, 1987:16, 1991:2, 1991:11

**FEND** [1] - 1941:10

**FERNANDEZ** [1] - 1967:15

**FEW** [8] - 1895:24, 1903:6, 1925:19, 1979:10, 2005:22, 2007:12, 2007:13, 2012:12

**FIGHT** [5] - 1980:9, 1980:17, 2006:17, 2013:18, 2013:20

**FIGHT** [2] - 1946:20, 1991:12

**FIGHT** [1] - 1886:3

**FIGHTING** [1] - 1991:4

**FIGURE** [3] - 1916:16, 1955:3, 1973:23

**FIGURED** [1] - 1949:10

**FILE** [16] - 1890:20, 1893:13, 1893:16, 1894:17, 1895:2, 1905:15, 1908:7, 1911:20, 1912:5, 1912:11, 1925:12, 1938:19, 1948:25, 1964:14, 1964:17, 2012:9

**FILED** [15] - 1911:10, 1911:22, 1914:23,

1915:7, 1918:24, 1919:5, 1922:4, 1938:12, 1957:7, 1957:16, 1964:19, 1980:8, 2011:24, 2012:2
**FILES** [7] - 1893:16, 1893:19, 1894:14, 1894:17, 1921:24, 1934:21, 1955:7
**FILING** [7] - 1895:13, 1895:21, 1911:18, 1946:3, 1962:24, 2009:18, 2011:7
**FILINGS** [1] - 1915:13
**FILL** [1] - 1984:11
**FILLED** [1] - 2010:5
**FILTER** [1] - 1902:8
**FILTERING** [2] - 1898:17, 1898:19
**FINALLY** [2] - 1975:1, 1979:8
**FINANCIAL** [1] - 1960:4
**FINDER** [1] - 1968:13
**FINDINGS** [4] - 1899:19, 1938:19, 2015:19, 2016:24
**FINE** [5] - 1919:12, 1919:15, 1924:21, 1938:7, 1947:7
**FINER** [1] - 1939:19
**FINGERS** [5] - 1901:14, 1904:5, 1905:8, 1906:7, 1913:11
**FINISH** [1] - 1889:14
**FIREWALL** [12] - 1973:17, 1995:10, 1995:11, 1995:14, 1997:14, 1997:15, 1999:10, 1999:19, 2005:5, 2006:14, 2010:25
**FIREWALLS** [2] - 2010:14, 2010:17
**FIRST** [14] - 1891:21, 1970:25, 2003:8, 2003:11, 2003:13, 2004:1, 2004:10, 2006:9, 2006:19, 2007:5, 2007:16, 2008:19, 2012:10, 2016:13
**FIRST** [23] - 1909:8, 1921:9, 1925:14, 1927:3, 1933:9, 1938:5, 1941:24, 1951:24, 1951:25, 1953:11, 1954:2, 1955:23, 1959:5, 1959:12, 1980:20, 1987:7, 1992:11, 1993:21, 1999:8, 2000:20, 2004:4, 2007:15
**FIVE** [2] - 1924:7, 1924:9
**FIVE-MINUTES** [1] - 1924:7
**FIXED** [1] - 1990:2
**FLAG** [1] - 2010:7
**FLORIDA** [3] - 1966:25, 2000:7, 2013:21
**FOCUS** [3] - 1959:25, 1987:18, 1992:10
**FOCUSED** [1] - 1960:12
**FOCUSING** [1] - 1987:18
**FOLKS** [9] - 1947:4, 1988:6, 1988:16, 1989:18, 1992:18, 1992:19, 1994:5, 1994:11, 1995:17
**FOLLOW** [4] - 1921:1, 1928:19, 1941:21, 1977:13
**FOLLOWED** [1] - 1898:23
**FOLLOWING** [3] - 1901:13, 2001:15, 2001:17
**FOLLOWS** [1] - 1889:9
**FOR** [1] - 1886:1
**FORCE** [1] - 1906:14
**FORCE** [4] - 1946:9, 1952:6, 1952:24, 1962:25

**FORCED** [4] - 1958:5, 1990:24, 1995:4, 2009:3
**FORD** [1] - 1886:16
**FORECLOSES** [1] - 1957:10
**FOREFRONT** [3] - 1979:8, 1988:22, 1989:1
**FOREGOING** [1] - 2018:6
**FORGET** [1] - 1978:16
**FORGOT** [2] - 1974:10, 1974:12
**FORGOTTEN** [1] - 1969:14
**FORM** [4] - 1975:20, 1975:21, 1981:12, 1984:11
**FORMAT** [1] - 1894:18
**FORMER** [4] - 1934:21, 1950:11, 1987:8, 1987:14
**FORMS** [1] - 1977:7
**FORMULA** [1] - 1985:8
**FORMULAS** [3] - 1893:13, 1985:8, 1985:9
**FORTH** [4] - 1918:4, 1960:13, 2014:13, 2014:14
**FORWARD** [11] - 1890:23, 1980:18, 1981:5, 1982:5, 1982:17, 1983:10, 1992:16, 1992:21, 1998:14, 2005:6, 2006:15
**FOUNDATION** [21] - 1889:20, 1926:18, 1930:3, 1930:7, 1930:8, 1930:14, 1930:20, 1930:22, 1931:2, 1931:4, 1931:5, 1931:7, 1931:8, 1932:6, 1932:7, 1932:10, 1932:17, 1932:24, 1934:5, 1934:10, 1934:14
**FOUNDED** [1] - 2005:18
**FOUR** [9] - 1926:2, 1981:18, 1994:5, 1994:12, 1994:13, 1996:11, 1998:2, 1998:5
**FRAME** [1] - 1976:16
**FRAMEWORK** [1] - 1963:5
**FRANK** [1] - 1941:16
**FRANKLIN** [1] - 1975:18
**FRANKLY** [4] - 1977:21, 1986:1, 1987:2, 1993:25
**FRAUD** [13] - 1948:1, 1948:14, 1953:1, 1953:3, 1964:2, 1964:23, 1965:6, 1965:10, 1969:22, 1969:25, 1970:3, 1970:9, 1972:14
**FRAUGHT** [1] - 1963:14
**FREE** [6] - 1891:21, 1892:10, 1895:25, 1969:24, 2005:17, 2006:1
**FREEDOM** [1] - 1965:17
**FREEDOM** [2] - 1969:24
**FRIEND** [1] - 1988:8
**FRIVOLITY** [3] - 1959:8, 1998:1
**FRIVOLOUS** [8] - 1959:10, 1962:12, 1981:12, 1982:7, 1984:2, 1998:5, 2005:6, 2009:4
**FRONT** [1] - 1979:11
**FROZEN** [1] - 1987:22
**FULL** [4] - 1889:22, 1981:4, 1983:21
**FULLY** [1] - 1934:5
**FULTON** [1] - 1923:23

**FUNDAMENTAL** [1] - 1931:2
**FUNDS** [1] - 2006:16
**FUNNEL** [2] - 1987:24, 2011:11
**FUSE** [2] - 1970:22, 1975:6
**FUTURE** [2] - 1912:10, 1912:12

## G

**GALVANIZED** [1] - 1964:8
**GAMALIEL** [3] - 1955:16, 1981:17, 2012:16
**GAME** [1] - 1988:13
**GAP** [1] - 1915:11
**GARBAGE** [1] - 1973:17
**GARDENS** [1] - 1967:16
**GARDNER** [1] - 1916:23
**GARNER** [1] - 1915:16
**GASAWAY** [1] - 1931:19
**GASAWAY** [8] - 1931:19, 1940:12, 1951:17, 1951:19, 1956:6, 1956:7, 1956:9, 2013:11
**GATORS** [1] - 2000:8
**GENERAL** [5] - 1950:13, 1953:10, 1962:2, 1963:19, 1997:24
**GENERALLY** [1] - 1915:5
**GENERATE** [4] - 1914:2, 1953:14, 1990:24, 1993:14
**GENERATING** [5] - 1892:8, 1914:5, 1987:11, 1992:24, 1993:4
**GENERATION** [3] - 1913:8, 1913:12, 1913:19
**GENIUS** [1] - 2004:20
**GEORGIA** [3] - 1886:1, 1887:23, 2018:4
**GEORGIA** [60] - 1891:18, 1901:2, 1904:16, 1906:15, 1906:23, 1909:9, 1911:22, 1912:1, 1912:3, 1921:22, 1923:8, 1923:10, 1923:19, 1940:21, 1941:9, 1946:4, 1948:3, 1948:25, 1949:1, 1949:21, 1950:1, 1950:5, 1953:10, 1954:3, 1954:10, 1959:22, 1959:23, 1963:20, 1963:22, 1963:25, 1964:11, 1964:14, 1965:1, 1968:2, 1968:3, 1970:19, 1971:2, 1972:15, 1979:14, 1979:19, 1981:24, 1982:3, 1983:18, 1985:15, 1985:22, 1991:16, 1992:4, 1992:10, 1992:12, 1992:13, 1992:22, 1994:1, 1994:7, 2005:1, 2008:20, 2012:5, 2012:16, 2012:17, 2014:13
**GEORGIA'S** [4] - 1921:16, 1968:18, 1968:19, 2014:13
**GEORGIAN** [1] - 1973:20
**GEORGIANS** [2] - 1954:12, 1970:23
**GERMANY** [9] - 1940:23, 1946:18, 1946:19, 1946:20, 1946:21, 1982:21, 1996:1, 2008:1, 2010:10
**GET-GO** [1] - 2009:4
**GIVEN** [5] - 1896:7, 1953:6, 1997:24, 2006:18, 2016:18
**GLOBAL** [1] - 1991:21

**GLOVE** [1] - 1976:23
**GOAL** [1] - 1890:4
**GOP** [4] - 1964:8, 1964:11, 1968:1, 1968:2
**GOTCHA** [1] - 1922:14
**GOVERNMENT** [3] - 1921:13, 1947:18, 1975:20
**GRADUATE** [1] - 1940:20
**GREAT** [7] - 1987:25, 1992:25, 2000:23, 2002:18, 2003:16, 2017:15, 2017:24
**GREATLY** [1] - 1998:23
**GREEN** [1] - 1996:22
**GREGG** [13] - 1901:24, 1904:3, 1904:6, 1904:10, 1905:7, 1905:9, 1906:5, 1907:1, 1907:7, 1907:9, 1908:12, 1909:7, 1943:20
**GREW** [1] - 1990:21
**GROSSLY** [1] - 1998:15
**GROUND** [1] - 1992:5
**GROUNDED** [1] - 1941:20
**GROUNDS** [3] - 1926:17, 2014:12, 2014:14
**GROUP** [3] - 1898:22, 1901:24, 1964:13
**GROUP** [2] - 1890:12, 1979:18
**GROUP'S** [1] - 1964:14
**GUBERNATORIAL** [1] - 1954:14
**GUESS** [4] - 1909:8, 1944:3, 1944:21, 1954:16
**GUIDANCE** [5] - 1958:22, 1958:23, 1961:2, 1966:4
**GUIDE** [1] - 1959:2
**GUY** [3] - 1974:14, 1987:14
**GWINNETT** [6] - 1923:23, 1949:6, 1949:16, 1950:16, 1990:13, 1990:15

# H

**HAIR** [1] - 1977:11
**HALF** [1] - 1928:8
**HANDICAPPED** [1] - 1934:22
**HANDLING** [3] - 1918:12, 1990:25, 1991:1
**HANDS** [1] - 1976:11
**HANG** [1] - 1985:18
**HANNITY** [1] - 1975:5
**HAPPY** [2] - 1928:9, 2016:5
**HARD** [1] - 1971:19
**HARDY** [1] - 1886:15
**HARDY** [3] - 1928:6, 1928:9, 1928:15
**HARM** [3] - 1952:10, 2010:4, 2010:6
**HAVANA** [1] - 1967:15
**HEAD** [3] - 1892:11, 1949:19, 1970:10
**HEALTHCARE** [1] - 1894:9
**HEAR** [3] - 1955:18, 1980:15, 1986:24
**HEARD** [48] - 1909:19, 1925:8, 1938:16, 1940:4, 1940:15, 1943:3, 1943:7, 1943:20, 1943:21, 1944:4, 1944:21, 1944:22, 1945:5, 1945:8, 1946:12, 1946:13, 1946:14, 1946:15, 1947:2, 1947:23, 1949:6, 1952:7, 1963:16,

1964:9, 1964:10, 1964:14, 1964:18, 1965:6, 1965:7, 1968:15, 1980:14, 1984:23, 1987:24, 1988:8, 1989:6, 1994:15, 1994:17, 2000:1, 2011:12, 2015:3, 2015:7, 2015:13, 2015:18, 2015:20, 2016:4
**HEARING** [8] - 1905:2, 1907:7, 1915:10, 1916:10, 1922:12, 1981:4, 1983:20, 2017:25
**HEARINGS** [2] - 1946:9, 2010:20
**HEARSAY** [7] - 1919:9, 1926:18, 1927:1, 1927:2, 1927:4, 1927:25, 1996:23
**HECK** [1] - 2004:12
**HEIGHT** [2] - 1943:1, 1945:15
**HELD** [2] - 1939:3, 2010:20
**HELD** [1] - 1889:1
**HELP** [1] - 1909:11
**HELPED** [1] - 1949:12
**HELPING** [1] - 1991:3
**HEREBY** [1] - 2018:6
**HEREDIA** [20] - 1926:14, 1926:15, 1927:11, 1929:25, 1930:13, 1931:18, 1936:1, 1940:3, 1951:18, 1955:11, 1955:23, 1956:4, 1963:10, 1983:12, 1994:19, 1997:9, 1999:17, 2013:6
**HEREDIA'S** [3] - 1923:13, 1928:25, 1929:17, 2010:21
**HERO** [1] - 1965:16
**HERSELF** [2] - 1984:14, 1984:21
**HIGH** [3] - 1975:25, 1991:3, 2007:6
**HIGHEST** [1] - 1923:20
**HIGHLIGHTED** [2] - 1989:15, 1999:1
**HIGHLIGHTS** [1] - 1989:14
**HIGHLY** [7] - 1960:12, 1993:12, 2000:4, 2000:5, 2004:5
**HILL** [5] - 1914:23, 1915:6, 1918:20, 1919:12, 1919:16
**HIMSELF** [1] - 1949:18
**HIRE** [1] - 1973:13
**HIRES** [1] - 1976:15
**HISTORIAN** [1] - 1998:10
**HISTORICAL** [2] - 1955:2, 1986:18
**HISTORY** [8] - 1968:18, 1968:19, 1986:8, 1986:9, 1986:10, 1986:18, 1987:1
**HIT** [4] - 1991:20, 1992:3, 1993:18, 2006:16
**HOLD** [14] - 1892:22, 1893:3, 1894:25, 1897:25, 1898:2, 1922:24, 1939:22, 1978:18, 2001:6
**HOLDING** [1] - 1897:22
**HOLSWORTH** [2] - 1956:14, 1956:19
**HOME** [4] - 1940:21, 1940:22, 1990:22, 2012:19
**HOMES** [2] - 1947:5, 2001:22
**HONED** [1] - 1978:11
**HONEST** [1] - 1932:4
**HONOR** [67] - 1892:1, 1892:17, 1893:18, 1894:24, 1898:8, 1913:1,

1914:11, 1914:18, 1915:1, 1915:4, 1916:8, 1922:20, 1924:3, 1924:6, 1924:22, 1924:23, 1925:19, 1927:7, 1930:6, 1930:17, 1933:11, 1933:23, 1934:13, 1935:17, 1935:21, 1936:8, 1937:4, 1937:13, 1938:1, 1938:4, 1939:5, 1939:16, 1939:22, 1940:4, 1942:4, 1942:19, 1943:2, 1945:8, 1948:15, 1950:17, 1951:20, 1951:24, 1953:21, 1955:21, 1960:23, 1965:9, 1965:23, 1967:23, 1968:25, 1978:19, 1987:8, 2007:12, 2007:20, 2007:21, 2010:17, 2012:12, 2014:19, 2015:6, 2015:11, 2015:16, 2015:22, 2015:24, 2016:11, 2017:8, 2017:12, 2017:16
**HONOR** [1] - 2016:9
**HONORABLE** [3] - 1886:10, 1887:22, 2018:14
**HOPE** [4] - 1889:13, 1946:24, 1970:5, 1976:8
**HOPED** [1] - 1934:25
**HORN** [1] - 2006:3
**HOST** [1] - 1962:17
**HOTEL** [1] - 1977:4
**HOTLINE** [4] - 1891:7, 1891:9, 1891:11, 1964:7
**HOTLY** [1] - 1946:7
**HOUR** [2] - 1928:8, 1937:24
**HOURS** [1] - 1933:12
**HOUSE** [1] - 1976:16
**HOUSE** [1] - 1987:14
**HOUSEHOLD** [1] - 2014:5
**HOUSEKEEPING** [2] - 1914:20, 1938:24
**HUB** [1] - 1942:9
**HUGHES** [1] - 1887:5
**HUMAN** [1] - 1986:7
**HUNDREDS** [1] - 1949:21
**HURDLE** [2] - 1975:15
**HUSBAND** [2] - 1990:23, 1990:24

# I

**ID** [5] - 1947:17, 1947:18, 1947:19, 1977:6, 1977:7
**IDEA** [6] - 1905:16, 1905:19, 1905:22, 1953:6, 1997:1, 2013:5
**IDEALLY** [1] - 1971:16
**IDENTIFICATION** [1] - 1992:1
**IDENTIFIED** [4] - 1905:18, 1932:17, 1932:24, 1933:1
**IDENTIFY** [12] - 1905:13, 1906:22, 1907:15, 1907:19, 1919:15, 1932:8, 1961:6, 1964:12, 1964:15, 1970:22, 1971:18, 2011:14
**IDENTIFYING** [2] - 1897:11, 1898:13
**IGNORE** [1] - 1954:25
**ILL** [1] - 1970:1
**ILL-STARRED** [1] - 1970:1
**ILLEGAL** [1] - 1968:10

**ILLUSTRATED**[1] - 1921:23
**IMAGINE**[3] - 1975:25, 1976:2, 2000:7
**IMMEDIATELY**[1] - 1983:9
**IMPACT**[3] - 1912:10, 1971:25, 1991:11
**IMPACTED**[1] - 1964:1
**IMPARTIAL**[6] - 1981:5, 1982:6, 1995:3, 1995:12, 1995:18, 1997:14
**IMPEACHING**[1] - 1897:21
**IMPEACHMENT**[1] - 1907:2
**IMPLEMENT**[2] - 1948:2, 1950:5
**IMPLICATED**[1] - 2012:11
**IMPLICATIONS**[1] - 1939:25
**IMPORTANCE**[6] - 1988:11, 1988:25, 1989:4, 1989:13, 1989:24, 1989:25
**IMPORTANT**[20] - 1889:19, 1895:10, 1900:1, 1913:18, 1913:24, 1954:21, 1971:11, 1972:4, 1984:1, 1984:7, 1990:17, 1993:12, 1994:6, 2002:20, 2002:22, 2003:23, 2005:13, 2016:20, 2017:4
**IMPOSE**[1] - 2016:13
**IMPOSSIBLE**[5] - 1907:16, 1907:18, 1997:10, 1997:11, 1999:17
**IMPRECISION**[1] - 1969:19
**IMPROPER**[2] - 1893:25, 1963:14
**IMPROPERLY**[2] - 1985:13, 2002:1
**IMPROVEMENTS**[1] - 1895:12
**IN**[1] - 1889:1
**INACCURATE**[2] - 1959:16, 2008:4
**INC**[2] - 1886:3, 1886:6
**INC**[1] - 1967:1
**INCLUDE**[2] - 1915:13
**INCLUDED**[8] - 1901:22, 1915:21, 1915:23, 1916:19, 1916:20, 1936:17, 1944:23, 1985:13
**INCLUDES**[2] - 1985:11, 1991:22
**INCLUDING**[2] - 1914:20, 1919:3
**INCLUSION**[1] - 1917:16
**INCLUSIVE**[1] - 1889:18
**INCOME**[3] - 1960:5, 1960:6, 2008:14
**INCONTROVERTIBLY**[1] - 2007:4
**INCONVENIENT**[3] - 1976:21, 1976:24, 1977:13
**INCORPORATED**[2] - 1898:17, 1954:9
**INCREASED**[2] - 1948:16, 1963:5
**INCREASES**[2] - 1963:7, 1972:1
**INCREDIBLE**[1] - 1988:6
**INDEPENDENCE**[1] - 1960:4
**INDEX**[8] - 1902:10, 1902:21, 1903:25, 1904:1, 1904:14, 1904:20, 1904:22, 1988:1
**INDIANA**[1] - 1935:4
**INDICATE**[1] - 2015:14
**INDICATED**[2] - 1910:1, 1916:14
**INDICATES**[1] - 1944:20
**INDICATING**[2] - 1942:23, 1961:22
**INDIRECTLY**[1] - 1952:19
**INDIVIDUAL**[16] - 1907:15, 1910:18, 1910:20, 1911:18, 1921:24, 1953:17,

1960:15, 1961:10, 1961:20, 1961:22, 1964:3, 1980:23, 2008:14, 2013:14, 2014:12
**INDIVIDUALIZED**[1] - 1960:12
**INDIVIDUALS**[16] - 1891:12, 1920:8, 1940:24, 1941:6, 1942:24, 1947:25, 1949:2, 1950:9, 1955:19, 1956:20, 2009:7, 2010:25, 2012:6, 2013:10
**INELIGIBILITY**[1] - 1890:17
**INELIGIBLE**[3] - 1961:7, 1964:15
**INEVITABLE**[2] - 1993:15, 1995:10
**INFERENCE**[1] - 1957:1
**INFLAMMATORY**[2] - 1987:2, 1998:15
**INFORMATION**[18] - 1916:13, 1920:22, 1936:18, 1960:10, 1961:8, 1961:10, 1961:21, 1961:24, 1964:3, 1965:10, 2000:24, 2001:23, 2011:22, 2011:25, 2016:18, 2017:1, 2017:3
**INFORMING**[1] - 1970:23
**INITIALS**[2] - 1985:4, 1985:6
**INITIATED**[1] - 1952:22
**INITIATIVE**[2] - 1970:15, 1984:9
**INITIATIVES**[2] - 1990:1, 1991:14
**INQUIRIES**[9] - 1890:20, 1891:16, 1891:19, 1892:24, 1895:8, 1969:22, 1985:6, 2004:17, 2005:6
**INQUIRY**[15] - 1889:15, 1890:11, 1890:19, 1890:24, 1891:4, 1891:24, 1892:9, 1892:16, 1893:10, 1913:9, 1936:1, 1936:2, 1985:9, 2004:20, 2006:14
**INSERT**[1] - 1970:21
**INSIGHT**[1] - 1966:11
**INSPECT**[1] - 1954:7
**INSPECTOR**[1] - 1976:19
**INSTALLATION**[1] - 1942:25
**INSTANCE**[9] - 1904:15, 1961:7, 1966:8, 1970:24, 1972:6, 1987:12, 1987:16, 1989:15, 1997:8
**INSTANCE**'[1] - 1904:16
**INSTANCES**[4] - 1945:1, 1945:2, 1945:3, 1967:18
**INSTEAD**[3] - 1961:19, 1975:2, 1978:23
**INSTRUCTION**[1] - 1943:19
**INSUFFICIENT**[3] - 1960:17, 1960:20, 1997:4
**INTEGRAL**[1] - 1950:14
**INTEGRATE**[1] - 1894:9
**INTEGRITY**[9] - 1895:22, 1954:23, 1964:7, 1974:21, 1979:7, 1990:1, 1991:5, 1991:7, 2005:17
**INTEND**[3] - 1914:18, 1953:13, 1982:3
**INTENDED**[3] - 1952:24, 1973:9
**INTENT**[14] - 1959:25, 1960:12, 1962:22, 1963:12, 1963:14, 1973:21, 1973:25, 1982:2, 2003:14, 2008:16, 2014:15
**INTERACTION**[1] - 1952:15
**INTEREST**[1] - 1966:24
**INTERESTED**[2] - 1970:22, 1979:9

**INTERESTS**[1] - 1971:15
**INTERNALLY**[2] - 1903:8, 1903:16
**INTERNATIONAL**[1] - 1908:4
**INTERNET**[1] - 2013:8
**INTERPRETATION**[2] - 1908:8, 1958:11
**INTERPRETATIONS**[1] - 1946:14
**INTERPRETING**[1] - 1953:12
**INTERRELATED**[1] - 1959:23
**INTERROGATORY**[1] - 1949:23
**INTERVENED**[1] - 2015:1
**INTERVENOR**[1] - 1887:2
**INTIMIDATE**[8] - 1952:22, 1954:25, 1955:4, 1955:5, 1955:5, 1957:20, 1968:21, 2002:9, 2002:13
**INTIMIDATED**[8] - 1941:4, 1942:1, 1953:15, 1955:11, 1955:13, 1968:16, 1986:4, 2006:9
**INTIMIDATING**[5] - 1895:15, 1953:5, 1955:8, 1955:9, 2002:16
**INTIMIDATION**[21] - 1952:16, 1953:9, 1953:16, 1954:1, 1954:15, 1955:25, 1957:10, 1958:20, 1959:3, 1965:24, 1972:21, 1976:20, 1979:15, 1983:25, 1997:20, 1997:21, 1999:23, 2000:23, 2005:25, 2011:2, 2011:6
**INTRODUCED**[2] - 1954:3, 1990:2
**INTRODUCTION**[1] - 1972:6
**INTRUSION**[1] - 1929:17
**INVESTIGATE**[1] - 1905:20
**INVESTIGATED**[1] - 2009:2
**INVESTIGATION**[1] - 1949:17
**INVESTMENT**[1] - 1967:1
**INVITED**[1] - 1950:22
**INVOLVED**[14] - 1902:4, 1906:8, 1910:10, 1913:8, 1913:12, 1913:18, 1964:1, 1979:4, 1990:20, 1990:23, 1990:24, 1991:10, 1991:14, 1992:11
**INVOLVEMENT**[1] - 1992:24
**INVOLVING**[1] - 1903:11
**IRONICALLY**[1] - 1970:12
**IRRELEVANT**[2] - 1952:12, 1986:2
**ISAKSON'S**[1] - 1992:6
**ISSUE**[11] - 1914:24, 1915:5, 1916:20, 1920:4, 1966:10, 1974:15, 1977:20, 1986:12, 1989:3, 1991:8, 1997:9
**ISSUED**[2] - 1915:16, 1923:13
**ISSUES**[8] - 1957:24, 1966:2, 1979:8, 1979:10, 1979:11, 1985:7, 1989:14, 2016:6
**ITEM**[1] - 1938:24
**ITEMS**[3] - 1917:18, 1918:21, 1919:1
**ITSELF**[5] - 1901:6, 1923:5, 1927:19, 1959:18, 1988:10
**IV3**[3] - 1912:13, 1912:20, 1912:22

## J

**JACOB**[1] - 1886:18
**JAKE**[1] - 1979:25

**JAMES** [2] - 1886:7, 1886:22
**JAMES** [2] - 1947:7, 1948:22
**JANE** [1] - 1886:3
**JANUARY** [12] - 1897:1, 1900:20, 1903:2, 1915:17, 1939:24, 1940:4, 1942:12, 1974:24, 1997:25, 2014:2, 2014:3
**JENNIFER** [1] - 1887:4
**JERRY** [5] - 1940:11, 1955:12, 1956:2, 2013:10
**JIM** [2] - 1911:21, 1912:5
**JIMMY** [1] - 1976:1
**JOB** [3] - 1989:8, 1991:3, 2016:17
**JOCELYN** [17] - 1930:7, 1930:12, 1936:1, 1940:3, 1940:14, 1940:24, 1951:18, 1955:11, 1955:23, 1956:4, 1956:8, 1963:10, 2010:21, 2013:6, 2013:14, 2013:25, 2014:9
**JOCELYN'S** [1] - 2014:15
**JOE** [9] - 1909:19, 1909:20, 1909:24, 1910:2, 1910:3, 1910:6, 1947:2, 2009:12
**JOHN** [3] - 1886:3, 1886:8, 1886:22
**JOHNSON** [8] - 1945:10, 1948:22, 1949:2, 1949:13, 1949:19, 1949:25, 1950:14, 2003:13
**JOHNSON** [1] - 1886:7
**JOINT** [1] - 1951:10
**JOINTLY** [1] - 1951:2
**JONES** [3] - 1886:10, 1887:22, 2018:14
**JONES** [2] - 1889:5, 1982:1
**JUDGE** [9] - 1893:6, 1896:2, 1897:15, 1907:1, 1910:22, 1915:16, 1939:23, 1984:22, 1995:3
**JUDGE** [17] - 1889:5, 1894:4, 1911:15, 1914:8, 1915:17, 1916:23, 1979:21, 1980:13, 1981:17, 1982:1, 1993:7, 1995:5, 1995:11, 2001:9, 2002:21, 2005:10, 2006:22
**JUDGE** [1] - 1886:11
**JUDGE'S** [1] - 1922:16
**JUDGMENT** [4] - 1941:18, 1962:9, 2003:6, 2008:23
**JUDGMENT** [1] - 1886:10
**JUDICIAL** [27] - 1914:21, 1915:21, 1916:12, 1916:21, 1917:19, 1917:24, 1918:2, 1919:17, 1919:24, 1920:1, 1920:5, 1921:2, 1921:7, 1921:18, 1922:1, 1922:3, 1922:6, 1922:19, 1923:7, 1923:17, 1923:19, 1924:1, 1924:2, 1935:7, 1935:8, 1935:9
**JUDICIALLY** [1] - 1982:23
**JUDY** [1] - 1887:5
**JUMP** [2] - 1988:13, 1992:12
**JURISPRUDENCE** [2] - 2000:19, 2004:7
**JUSTICE** [3] - 1924:21, 1992:19, 2014:25

**K**

**KEEP** [5] - 1918:17, 1918:22, 1924:12, 1975:23, 1999:5
**KEPT** [3] - 1950:11, 1956:15, 1971:21
**KEY** [4] - 1929:9, 1964:9, 1977:3
**KEYBOARD** [7] - 1901:14, 1905:8, 1906:7, 1908:14, 1909:3, 1913:12, 1976:11
**KEYBOARDS** [1] - 1904:5
**KEYS** [2] - 1909:2, 1913:11
**KIND** [3] - 1973:1, 1978:20, 2006:5
**KNOWING** [1] - 1967:13
**KNOWLEDGE** [10] - 1892:7, 1892:8, 1892:15, 1894:23, 1901:17, 1907:4, 1910:2, 1965:19, 1974:18, 1985:2
**KNOWS** [6] - 1975:3, 1981:5, 1982:5, 1986:7, 1986:8, 1999:14
**KNWONTA** [1] - 1888:7
**KRAKEN** [1] - 1972:3

**L**

**LAAWRENCE** [1] - 1928:9
**LAAWRENCE-HARDY** [1] - 1928:9
**LACK** [3] - 1966:22, 1985:25, 2006:17
**LACKING** [1] - 1969:16
**LAID** [5] - 1930:6, 1930:7, 1930:22, 1934:5, 1941:17
**LANE** [1] - 1970:23
**LARGE** [1] - 1929:16
**LARGELY** [1] - 1959:10
**LARGER** [1] - 1972:11
**LARGEST** [1] - 1964:25
**LAST** [13] - 1909:15, 1919:18, 1929:8, 1938:6, 1938:13, 1938:16, 1938:24, 1946:6, 1948:21, 1965:22, 1974:19, 1997:19, 2017:17
**LASTLY** [3] - 1982:13, 2012:3, 2013:24
**LATINO** [1] - 1970:14
**LAUDABLE** [1] - 1978:3
**LAUNCH** [1] - 1912:23
**LAUNCHING** [1] - 1950:19
**LAW** [51] - 1901:3, 1920:25, 1921:1, 1922:6, 1938:20, 1941:3, 1953:12, 1954:3, 1954:4, 1954:5, 1954:11, 1954:18, 1954:20, 1955:14, 1958:8, 1958:23, 1959:22, 1959:23, 1968:23, 1973:15, 1974:2, 1993:7, 1993:8, 1993:16, 1994:1, 1995:7, 1995:12, 1995:24, 1996:6, 1997:15, 1999:19, 2000:17, 2002:5, 2002:18, 2002:22, 2005:5, 2005:10, 2005:22, 2005:24, 2006:13, 2007:1, 2007:2, 2008:11, 2011:3, 2013:21, 2014:11, 2014:13, 2016:24
**LAWFUL** [3] - 1971:11, 1975:7, 1979:14
**LAWFULNESS** [1] - 1977:22
**LAWRENCE** [1] - 1886:15
**LAWRENCE** [2] - 1928:6, 1928:15

**LAWRENCE-HARDY** [1] - 1886:15
**LAWRENCE-HARDY** [2] - 1928:6, 1928:15
**LAWS** [1] - 1954:2
**LAWSUIT** [9] - 1895:13, 1895:21, 1911:22, 1912:1, 1912:10, 1948:20, 1964:19, 1964:20, 2011:7
**LAWSUITS** [8] - 1910:11, 1910:16, 1910:18, 1911:10, 1911:11, 1911:18, 1911:20, 1964:17
**LAWYERS** [1] - 2016:16
**LAY** [2] - 1893:25, 1932:17
**LAYERS** [1] - 1993:4
**LAYING** [1] - 1932:24
**LEAD** [3] - 1910:12, 1964:3, 1972:21
**LEAD-UP** [1] - 1910:12
**LEADERSHIP** [1] - 2004:23
**LEADING** [2] - 1948:8, 1965:10
**LEARN** [2] - 1963:2, 2013:2
**LEASE** [1] - 2014:1
**LEAST** [7] - 1898:7, 1914:25, 1916:15, 1932:8, 1968:4, 1987:22, 1991:25
**LEAVE** [4] - 1914:16, 1914:17, 1922:13, 1975:14
**LEAVING** [1] - 1975:11
**LEFT** [5] - 1939:8, 1939:9, 1939:11, 1969:5, 1983:13
**LEGAL** [4] - 1941:15, 1941:19, 1958:7, 1963:5
**LEGALLY** [2] - 1952:12, 1959:19
**LEGISLATION** [1] - 1971:13
**LEGISLATIVE** [1] - 1964:8
**LEGISLATORS** [1] - 1964:9
**LEGISLATURE** [4] - 1970:24, 1973:8, 1977:20, 1977:23
**LEGISLATURE** [1] - 1971:15
**LEGITIMACY** [1] - 1985:25
**LENGTH** [1] - 1960:22
**LENGTHS** [2] - 1987:25, 1992:25
**LESLIE** [1] - 1886:16
**LESS** [5] - 1945:21, 1958:4, 1959:8, 2006:2, 2006:12
**LETTER** [7] - 1995:12, 1995:24, 1996:5, 1997:14, 1999:19, 2002:18, 2005:5
**LEVEL** [1] - 1988:6
**LEVELS** [1] - 1906:9
**LIABILITY** [5] - 1951:12, 1951:23, 1952:19, 1957:11, 1957:23
**LIABLE** [2] - 1951:11, 1952:20
**LICENSE** [2] - 1974:11, 2001:18
**LICENSEE** [2] - 1973:3, 1973:4
**LICENSURE** [4] - 1904:21, 1904:24, 1909:11, 1909:13
**LIE** [4] - 1970:6, 1970:8
**LIES** [1] - 1939:18
**LIFE** [6] - 1940:16, 1971:12, 1986:22, 1986:23, 1986:25, 2000:8
**LIFE'S** [2] - 1988:24, 1989:1
**LIGHT** [2] - 2008:16, 2008:17

**LIGHTLY** [1] - 1913:25
**LIKELIHOOD** [1] - 2003:15
**LIKELY** [4] - 1958:13, 1983:7, 1983:21, 1984:11
**LIMIT** [3] - 1974:3, 2005:3, 2005:4
**LIMITED** [4] - 1889:16, 1890:6, 1911:14, 1986:17
**LINE** [5] - 1894:8, 1897:9, 1898:12, 1905:12
**LINER** - 1998:13
**LINES** [9] - 1900:21, 1903:4, 1904:11, 1906:12, 1907:12, 1929:24, 1944:14, 1971:4
**LINGO** [1] - 1908:15
**LINK** [3] - 1996:14, 1996:15, 1996:16
**LINKEDIN** [1] - 1981:22
**LIST** [92] - 1889:15, 1889:16, 1890:4, 1890:6, 1890:11, 1890:16, 1890:19, 1890:24, 1891:4, 1891:24, 1892:5, 1892:8, 1892:9, 1892:12, 1892:16, 1892:18, 1892:24, 1893:2, 1893:5, 1893:7, 1893:10, 1896:8, 1896:9, 1896:18, 1896:21, 1899:17, 1901:6, 1901:9, 1902:5, 1902:7, 1902:16, 1904:17, 1905:3, 1913:9, 1913:13, 1913:19, 1924:5, 1924:16, 1924:18, 1924:19, 1925:7, 1925:20, 1934:24, 1937:20, 1937:21, 1943:5, 1943:10, 1943:18, 1944:24, 1945:2, 1945:3, 1945:16, 1945:18, 1945:19, 1947:3, 1949:17, 1949:18, 1950:9, 1951:17, 1955:7, 1956:5, 1956:8, 1956:15, 1956:16, 1956:17, 1957:3, 1957:5, 1957:8, 1957:13, 1957:25, 1958:15, 1959:18, 1965:17, 1966:14, 1985:14, 1988:5, 1989:21, 1990:6, 1990:7, 1996:25, 1998:22, 2008:16, 2009:1, 2011:14, 2011:23, 2013:7, 2013:9
**LISTED** [8] - 1919:2, 1923:21, 1923:22, 1956:17, 1956:22, 1958:16, 1960:11, 1963:24
**LISTEN** [8] - 1918:13, 1924:11, 1975:4, 1983:1, 1995:4, 1995:5
**LISTS** [26] - 1898:17, 1898:18, 1900:25, 1914:6, 1923:9, 1942:14, 1944:9, 1947:6, 1950:8, 1951:13, 1952:3, 1954:6, 1959:13, 1960:3, 1961:5, 1962:10, 1964:13, 1965:12, 1965:19, 1967:6, 1980:22, 1987:11, 1992:24, 1993:2, 1993:5
**LITERAL** [1] - 1908:7
**LITIGANT** [1] - 2008:21
**LITIGATE** [1] - 1960:24
**LITIGATION** [1] - 1967:10
**LITTERING** [1] - 1978:7
**LIVE** [3] - 1970:7, 1971:23, 1984:12
**LIVED** [13] - 1964:22, 1980:23, 1981:4, 1981:9, 1981:10, 1981:20, 1981:21, 1981:22, 1983:14, 1983:15, 1983:16, 1984:14, 1989:17

**LIVES** [3] - 1980:25, 1983:17, 1985:13
**LLC** [1] - 1967:16
**LOADED** [1] - 1969:25
**LOCAL** [3] - 1911:21, 1912:17, 1985:21
**LOCALS** [4] - 1985:16, 1985:17, 1985:18, 1985:20
**LOCATION** [1] - 1970:7
**LOGGED** [2] - 1983:5
**LOGO** [1] - 1963:20
**LOOK** [22] - 1897:23, 1898:3, 1898:7, 1908:22, 1908:23, 1912:16, 1915:8, 1917:8, 1918:12, 1919:10, 1955:20, 1973:19, 1973:20, 1978:23, 1978:24, 1980:5, 1980:12, 1983:13, 1999:6, 1999:23, 2000:17, 2000:22
**LOOKED** [8] - 1917:5, 1917:7, 1928:2, 1932:8, 1981:19, 1981:21, 1981:22, 2012:21
**LOOKING** [6] - 1897:19, 1900:21, 1924:15, 1928:16, 1990:3, 1991:16
**LOOKS** [1] - 1950:21
**LORD** [1] - 1975:3
**LOST** [1] - 1977:3
**LOUD** [2] - 1924:10, 2001:18
**LOUDER** [1] - 1984:17
**LOW** [2] - 1987:17, 1992:3
**LOWER** [1] - 1973:6

# M

**MA'AM** [1] - 1914:17
**MAD** [1] - 1975:2
**MADDIE** [1] - 1925:6
**MAGAZINE** [1] - 1974:11
**MAHONEY** [1] - 1912:1
**MAIL** [11] - 1910:5, 1920:3, 1920:6, 1920:7, 1948:5, 1982:23, 1989:12, 1991:24, 1992:1, 2000:23, 2000:24
**MAIL-IN** [3] - 1991:24, 1992:1, 2000:23
**MAILS** [9] - 1910:7, 1919:18, 1920:4, 1920:8, 1920:16, 1921:5, 1950:6, 1982:24, 2000:4
**MAIN** [1] - 1925:14
**MAINSTREAM** [1] - 1991:8
**MAINTAIN** [1] - 1977:1
**MAINTAINED** [3] - 1956:18, 1956:19, 1988:12
**MAJOR** [1] - 1993:10
**MAJORITY** [5] - 1890:25, 1891:2, 1891:5, 1967:21, 1988:21
**MAJORITY-MINORITY** [2] - 1891:2, 1891:5
**MAN** [2] - 1988:9, 1989:7
**MANAGE** [1] - 1901:11
**MANAGEMENT** [1] - 1913:17
**MANAGER** [1] - 1976:12
**MANAGING** [1] - 1990:25
**MANDATORY** [2] - 1916:12, 1917:17
**MANIFEST** [2] - 1970:20, 1977:1
**MANIPULATED** [1] - 1980:6

**MANNER** [2] - 1894:14, 1978:14
**MANNING** [1] - 1970:6
**MARCOS** [1] - 1886:17
**MARINE** [1] - 1987:8
**MARITAL** [1] - 1960:6
**MARK** [9] - 1940:11, 1948:22, 1948:23, 1973:13, 1979:9, 1988:8, 1989:6
**MARK** [2] - 1886:7
**MARTIN** [10] - 1909:19, 1909:20, 1909:24, 1910:2, 1910:4, 1910:6, 1945:5, 1947:3, 2009:12
**MARTINEZ** [1] - 1931:21
**MASS** [5] - 1953:17, 1969:15, 1970:10, 1979:17, 2002:11
**MASSIVE** [3] - 1894:7, 1969:22, 1972:14
**MASTER** [1] - 1893:13
**MATCH** [3] - 1889:21, 1889:24, 1990:8
**MATCHED** [2] - 1905:14, 1964:25
**MATCHING** [2] - 1898:17, 1898:18
**MATERIAL** [4] - 1928:23, 1928:24, 1967:18, 2009:21
**MATERIALS** [1] - 1930:15
**MATTER** [10] - 1920:2, 1923:22, 1928:18, 1957:16, 1975:17, 2005:10, 2006:20, 2009:17, 2016:21
**MATTERS** [3] - 1914:20, 1919:9, 1925:21
**MAXIMUM** [1] - 1988:16
**MAYER** [7] - 1943:3, 1959:14, 1963:4, 1984:23, 1985:24, 2010:7
**MAYER'S** [7] - 1943:7, 1944:5, 1947:9, 1950:10, 1959:9, 1984:25
**MC** [2] - 1886:17, 1886:19
**MCDONALD** [1] - 2009:19
**MEAN** [11] - 1900:2, 1900:16, 1906:16, 1908:1, 1974:16, 1975:11, 1976:15, 1998:1, 1998:2, 2000:8, 2006:10
**MEANING** [2] - 1970:2, 1970:4
**MEANS** [11] - 1930:9, 1941:23, 1944:17, 1947:16, 1958:24, 1973:7, 1983:3, 1993:22, 1996:21, 1996:22
**MEANT** [6] - 1900:5, 1909:23, 1912:14, 1912:16, 1943:16, 1955:9
**MEANWHILE** [1] - 1946:8
**MEASURED** [2] - 1971:11, 1973:12
**MEASURES** [1] - 1910:11
**MECHANISM** [1] - 1997:12
**MECHANISMS** [2] - 1929:9, 1929:11
**MEDIA** [9] - 1918:3, 1918:5, 1918:6, 1918:7, 1918:15, 1918:17, 1969:19, 1970:11, 1973:8
**MEDICAL** [1] - 1965:7
**MEET** [4] - 1999:16, 2007:3, 2007:6
**MEETING** [7] - 1946:11, 1946:12, 1946:14, 1946:15, 1946:16, 1946:17, 2010:9
**MELLETT** [1] - 1887:4
**MEMORY** [1] - 1966:9
**MENG** [1] - 1886:18

**MENTION** [2] - 1981:16, 1998:17
**MENTIONED** [11] - 1898:16, 1899:15, 1903:5, 1910:9, 1912:9, 1959:5, 1959:15, 1967:17, 1967:20, 2008:12, 2013:6
**MERE** [1] - 1959:7
**MERELY** [1] - 1963:20
**MERGE** [1] - 1894:14
**MERGED** [1] - 1895:2
**MERGER** [1] - 1894:21
**MERITORIOUS** [2] - 1984:3, 1998:6
**MERITS** [3] - 2007:24, 2007:25, 2008:22
**MESS** [1] - 1985:23
**MESSAGE** [3] - 1930:24, 2003:14, 2003:16
**MESSAGES** [3] - 1967:19, 1967:21, 2000:3
**MET** [16] - 1929:9, 1945:24, 1946:21, 1952:8, 1964:10, 1978:24, 1992:13, 1996:10, 2002:24, 2002:25, 2003:10, 2003:19, 2003:21, 2004:2, 2007:4
**METHODICAL** [3] - 1987:9, 1988:4, 1993:3
**METHODICALLY** [1] - 2004:15
**METHODOLOGY** [3] - 1896:10, 1899:12, 1943:12
**METHODS** [1] - 1898:19
**METICULOUSLY** [1] - 1987:10
**MICHAEL** [1] - 1886:22
**MICHELLE** [1] - 1886:19
**MICROSCALE** [1] - 1972:9
**MID** [1] - 2014:20
**MIDDLE** [12] - 1889:21, 1889:22, 1891:23, 1892:4, 1892:9, 1892:12, 1892:15, 1893:10, 1970:22, 1975:25, 1985:4, 1985:6
**MIDST** [1] - 1974:25
**MIDTOWN** [2] - 1983:15, 1983:16
**MIGHT** [6] - 1908:22, 1908:23, 1922:15, 1924:16, 1962:11, 1971:13
**MILE** [1] - 1971:3
**MILITARY** [18] - 1890:2, 1906:1, 1906:10, 1906:17, 1906:22, 1942:24, 1943:1, 1943:24, 1967:8, 1983:9, 1983:11, 1985:12, 1987:8, 1988:1, 1988:17, 2011:18, 2011:19, 2011:21
**MILLION** [3] - 1942:12, 1942:14, 1945:19
**MIND** [3] - 1917:20, 1922:16, 2017:23
**MINDSET** [1] - 1889:17
**MINE** [2] - 1988:9, 2006:5
**MINIMIZE** [1] - 1978:4
**MINIMUM** [1] - 1944:17
**MINORITY** [3] - 1890:25, 1891:2, 1891:5
**MINORITY-MAJORITY** [1] - 1890:25
**MINUTE** [3] - 1911:3, 1922:20, 1936:16
**MINUTES** [9] - 1924:7, 1924:9, 1938:2, 1938:5, 1938:6, 1969:7, 1997:17, 2007:11, 2012:12
**MIRRORS** [2] - 1987:5, 2011:16

**MISCHARACTERIZED** [1] - 2012:15
**MISS** [2] - 1922:12, 1984:7
**MISSING** [4] - 1915:18, 1916:1, 1917:23, 1918:23
**MISTAKEN** [2] - 1920:3, 1925:23
**MOCINE** [1] - 1886:17
**MOCINE-MC** [1] - 1886:17
**MOMENT** [5] - 1923:2, 1979:7, 1986:11, 1993:20, 2003:4
**MOMENTUM** [1] - 1964:4
**MONDAY** [1] - 1919:5
**MONDAY'S** [1] - 1921:17
**MONITORING** [2] - 1948:16, 1948:17
**MOOT** [1] - 1926:8
**MORNING** [4] - 1889:2, 1914:23, 1923:23, 1939:14
**MORRISON** [1] - 1886:18
**MOST** [8] - 1895:10, 1940:7, 1944:18, 1958:11, 1958:13, 1982:22, 1989:7, 1991:24
**MOSTLY** [1] - 1950:25
**MOTION** [10] - 1914:21, 1915:14, 1915:21, 1922:23, 1923:5, 1925:3, 1938:13, 1938:17, 1942:5, 1977:22
**MOTIVATION** [9] - 1890:18, 1954:1, 1963:13, 1986:14, 1998:7, 2000:1, 2000:2, 2000:4, 2002:8
**MOTIVATIONS** [4] - 1962:19, 1962:21, 1962:23, 1998:11
**MOTOR** [1] - 1960:8
**MOVE** [6] - 1911:6, 1944:13, 1953:8, 1973:21, 1982:3, 1992:21
**MOVED** [18] - 1906:22, 1942:21, 1942:23, 1944:15, 1944:16, 1962:1, 1974:10, 1980:24, 1980:25, 1981:9, 1981:18, 1983:13, 1983:15, 1989:16, 2014:10
**MOVES** [1] - 2013:25
**MOVING** [3] - 1951:21, 2013:25, 2014:1
**MR** [182] - 1888:5, 1888:6, 1888:6, 1888:7, 1889:5, 1889:12, 1892:1, 1892:5, 1892:7, 1892:14, 1892:17, 1892:23, 1893:4, 1893:6, 1893:18, 1893:23, 1893:24, 1894:4, 1894:5, 1894:24, 1895:1, 1895:6, 1896:2, 1896:6, 1896:17, 1897:15, 1897:17, 1897:18, 1897:21, 1897:24, 1898:1, 1898:5, 1898:8, 1898:10, 1902:17, 1903:1, 1907:1, 1907:6, 1907:11, 1910:22, 1911:2, 1911:8, 1911:14, 1911:17, 1913:1, 1913:6, 1914:8, 1914:11, 1914:18, 1915:1, 1915:4, 1915:20, 1916:3, 1916:6, 1916:8, 1916:18, 1917:1, 1917:3, 1917:6, 1917:14, 1918:1, 1918:8, 1918:10, 1918:19, 1919:1, 1919:6, 1919:15, 1919:20, 1919:25, 1920:11, 1920:17, 1920:20, 1920:21, 1921:6, 1921:12, 1921:15, 1921:19, 1921:21, 1922:5, 1922:10, 1922:14, 1922:17, 1922:20,

1922:22, 1923:2, 1923:5, 1923:18, 1923:25, 1924:3, 1924:6, 1924:23, 1925:5, 1925:7, 1925:11, 1925:17, 1925:19, 1926:3, 1926:7, 1926:11, 1926:13, 1926:17, 1926:19, 1926:20, 1926:25, 1927:7, 1927:16, 1927:24, 1928:12, 1928:22, 1929:15, 1929:23, 1930:5, 1930:6, 1930:11, 1930:17, 1930:23, 1931:8, 1931:12, 1931:14, 1931:21, 1932:1, 1932:12, 1932:14, 1932:18, 1932:22, 1933:2, 1933:5, 1933:11, 1933:16, 1933:23, 1934:4, 1934:12, 1934:20, 1935:6, 1935:11, 1935:16, 1935:17, 1935:20, 1935:21, 1935:24, 1936:5, 1936:8, 1936:9, 1936:13, 1936:21, 1937:1, 1937:4, 1937:13, 1937:17, 1938:1, 1938:4, 1938:24, 1939:5, 1939:12, 1939:14, 1939:16, 1957:18, 1969:10, 1969:15, 1971:9, 1972:18, 1972:22, 1972:24, 1973:1, 1979:21, 1979:25, 1997:19, 2001:3, 2001:8, 2001:11, 2007:9, 2007:12, 2010:16, 2014:18, 2014:22, 2015:6, 2015:11, 2015:16, 2016:7, 2017:8, 2017:12, 2017:16
**MS** [4] - 1924:22, 2015:22, 2015:24, 2016:11
**MUDDLED** [1] - 1901:16
**MULTIFACTOR** [1] - 1959:1
**MULTILEVEL** [1] - 1987:24
**MULTIPLE** [5] - 1959:11, 1970:14, 1971:14, 1991:13, 1993:4
**MUSCOGEE** [23] - 1915:14, 1916:19, 1918:21, 1920:9, 1925:1, 1925:2, 1956:10, 1956:11, 1956:16, 1956:25, 1957:9, 1957:21, 1958:16, 1958:17, 1980:23, 1980:24, 1981:11, 1982:21, 1996:17, 1996:18, 1999:11, 1999:16, 2012:20
**MUST** [15] - 1941:9, 1941:22, 1952:15, 1953:14, 1961:20, 1993:15, 1993:21, 1994:13, 1995:11, 1995:14, 1995:24, 1996:5, 1996:6, 2005:18, 2007:7
**MYSTERY** [2] - 2013:15, 2013:16

## N

**NAACP** [1] - 2013:22
**NAME** [19] - 1889:22, 1889:23, 1902:21, 1912:22, 1919:19, 1945:6, 1945:12, 1951:4, 1956:17, 1956:22, 1981:14, 1981:16, 1982:10, 1996:25, 2003:25, 2010:21, 2010:22
**NAME'S** [1] - 1979:25
**NAMED** [2] - 1911:19, 1964:20
**NAMES** [9] - 1891:23, 1892:4, 1892:9, 1892:12, 1892:16, 1893:11, 1905:3, 1946:23, 2000:13
**NARRATIVE** [2] - 1980:7, 2006:23
**NATIONAL** [1] - 2000:20
**NATIVE** [1] - 2001:17

**NATURAL** [2] - 1953:13, 1953:16
**NAVIGATED** [1] - 2010:11
**NAVY** [3] - 1948:17, 1998:17, 2000:12
**NC** [1] - 1987:22
**NCOA** [39] - 1889:20, 1900:25, 1901:6, 1901:8, 1904:25, 1905:14, 1930:1, 1949:8, 1949:9, 1951:15, 1955:7, 1958:8, 1959:19, 1960:9, 1960:14, 1961:2, 1961:14, 1961:15, 1961:24, 1962:7, 1962:10, 1964:15, 1973:3, 1973:17, 1974:3, 1975:9, 1980:21, 1985:2, 1985:3, 1987:25, 1988:15, 1989:13, 1989:14, 2005:8, 2007:18, 2008:16, 2009:16, 2011:13, 2011:24
**NCOALINK** [1] - 1902:23
**NEBULOUS** [1] - 1993:17
**NECESSARY** [8] - 1894:21, 1909:12, 1916:12, 1916:13, 1958:9, 1976:25, 1997:12, 1997:14
**NECESSITY** [1] - 1988:12
**NEED** [19] - 1897:13, 1914:20, 1915:18, 1919:14, 1924:19, 1925:16, 1926:12, 1931:16, 1933:16, 1937:6, 1938:11, 1938:17, 1951:8, 1952:17, 1969:2, 1996:6, 2004:11, 2016:18, 2016:23
**NEEDED** [3] - 1913:22, 1992:15, 2005:8
**NEEDS** [2] - 1953:7, 1990:1
**NEGLECT** [1] - 1935:1
**NEGLECTED** [1] - 1988:22
**NEGLIGENCE** [2] - 1935:2, 2004:13
**NEGLIGENT** [1] - 2005:6
**NEIGHBOR** [2] - 1973:7, 1974:7
**NEVER** [19] - 1932:9, 1933:1, 1944:11, 1945:1, 1945:2, 1978:16, 1978:20, 1981:9, 1981:15, 1983:10, 1984:7, 1994:15, 1994:16, 1994:17, 1994:20, 1997:1, 1998:20
**NEW** [3] - 1916:11, 1934:21, 1975:20
**NEWS** [1] - 1969:20
**NEXT** [33] - 1898:16, 1900:24, 1914:15, 1926:14, 1926:24, 1932:21, 1938:18, 1942:18, 1950:17, 1958:19, 1962:19, 1980:4, 1981:17, 1982:20, 1984:23, 1988:8, 1989:6, 1990:16, 1991:12, 1996:13, 2000:14, 2001:15, 2001:22, 2001:25, 2002:21, 2003:12, 2003:18, 2003:20, 2004:3, 2016:23
**NICE** [1] - 1889:13
**NIGHT** [4] - 1919:5, 1938:15, 1974:19, 1975:5
**NILLY** [1] - 1992:12
**NKWONTA** [81] - 1886:17, 1888:5, 1892:1, 1892:5, 1892:17, 1893:4, 1893:18, 1893:24, 1894:24, 1895:1, 1896:6, 1896:17, 1897:17, 1897:21, 1898:5, 1898:8, 1898:10, 1903:1, 1907:6, 1907:11, 1911:2, 1911:8, 1911:17, 1913:1, 1914:11, 1915:1, 1915:4, 1915:20, 1916:3, 1916:6, 1916:18, 1919:15, 1919:20, 1919:25,

1920:11, 1920:17, 1920:20, 1921:6, 1922:20, 1922:22, 1923:5, 1923:18, 1923:25, 1924:3, 1924:23, 1925:5, 1925:7, 1925:11, 1925:17, 1926:3, 1926:17, 1926:20, 1927:7, 1927:16, 1930:6, 1930:17, 1931:8, 1931:14, 1933:11, 1933:23, 1934:12, 1935:17, 1935:21, 1936:5, 1936:8, 1937:4, 1937:13, 1938:1, 1938:24, 1939:5, 1939:12, 1939:14, 1939:16, 1957:18, 2007:12, 2010:16, 2014:18, 2014:22, 2015:6, 2015:11, 2017:8
**NKWONTA** [10] - 1896:4, 1914:22, 1916:16, 1917:8, 1918:23, 1919:12, 1923:3, 1924:17, 1927:12, 1939:9
**NO** [1] - 1886:4
**NOBODY** [5] - 1945:13, 1983:1, 1999:14, 1999:15, 2008:7
**NOMINATED** [1] - 1976:1
**NON** [1] - 2002:5
**NON-PARTIAL** [1] - 2002:5
**NONE** [2] - 2008:16, 2008:17
**NONPARTISAN** [9] - 1972:5, 1991:25, 1995:12, 1995:18, 1996:6, 1999:10, 1999:18, 2002:6, 2005:5
**NOON** [1] - 1938:14
**NORMAL** [1] - 1915:9
**NORTH** [2] - 1950:1, 1980:25
**NORTHERN** [2] - 1886:1, 2018:4
**NOSE** [1] - 1977:11
**NOTABLE** [2] - 1962:23, 1982:23
**NOTE** [7] - 1889:19, 1929:21, 1933:4, 1934:17, 1934:20, 1935:6, 1948:10
**NOTED** [2] - 1920:13, 1990:17
**NOTES** [1] - 2001:18
**NOTEWORTHY** [1] - 1966:23
**NOTHING** [16] - 1914:11, 1918:9, 1929:18, 1951:15, 1952:14, 1957:1, 1963:11, 1975:10, 1979:15, 1981:16, 1996:17, 1997:8, 1999:11, 2000:11, 2000:12, 2017:8
**NOTICE** [24] - 1914:21, 1915:21, 1916:12, 1916:21, 1917:19, 1917:24, 1918:3, 1919:18, 1919:24, 1920:1, 1920:6, 1921:18, 1922:1, 1922:4, 1922:7, 1923:7, 1923:17, 1923:19, 1924:1, 1924:2, 1935:7, 1935:8, 1935:10
**NOTICED** [1] - 1982:24
**NOTICES** [2] - 1921:2, 1922:19
**NOTIFICATION** [1] - 1961:13
**NOTION** [1] - 1894:13
**NOTWITHSTANDING** [2] - 2000:16, 2005:9
**NOVEMBER** [1] - 2018:7
**NOVEMBER** [1] - 1886:11
**NULLIFY** [1] - 1963:15
**NUMBER** [7] - 1914:19, 1953:22, 1960:3, 1961:5, 1986:22, 1987:15, 2005:13

**NUMBERS** [1] - 1924:25
**NUMEROUS** [5] - 1942:9, 1952:11, 1960:21, 1967:18, 1991:13
**NVRA** [13] - 1960:21, 1960:22, 1960:24, 1960:25, 1961:1, 1961:5, 1961:9, 1961:11, 1961:15, 1961:16, 1962:3, 1962:6, 1987:22

---

## O

**OATH** [5] - 1897:7, 1903:3, 1984:12, 1995:23, 1996:5
**OBJECT** [5] - 1916:21, 1917:15, 1919:10, 1926:17, 1930:8
**OBJECTED** [2] - 1929:16, 1937:11
**OBJECTION** [28] - 1892:1, 1892:13, 1892:17, 1892:21, 1893:3, 1893:4, 1893:18, 1894:24, 1902:17, 1906:25, 1919:1, 1919:25, 1927:1, 1927:3, 1927:5, 1927:10, 1928:7, 1929:21, 1931:6, 1933:22, 1934:14, 1935:17, 1935:21, 1936:5, 1936:16, 1937:10, 1937:12, 1937:15
**OBJECTIONS** [4] - 1919:9, 1919:22, 1919:23, 1927:8
**OBJECTIVE** [1] - 1991:24
**OBJECTIVELY** [3] - 1958:21, 1958:24, 1959:3
**OBSERVATIONS** [2] - 1943:8, 1944:5
**OBSERVE** [1] - 1976:14
**OBSERVING** [1] - 1908:16
**OBVIOUS** [2] - 1945:13, 1959:15
**OBVIOUSLY** [3] - 1919:2, 1927:17, 2016:25
**OCCUR** [1] - 1901:18
**OCCURRED** [3] - 1964:24, 1989:17, 2014:2
**OCGA** [1] - 1959:24
**OCTOBER** [4] - 1926:23, 1933:9, 1934:1, 1936:3
**OF** [6] - 1886:1, 1886:10, 1886:14, 1886:20, 1887:2, 2018:4
**OFFER** [10] - 1925:20, 1927:24, 1929:25, 1934:6, 1935:12, 1935:16, 1948:7, 1967:5, 1986:3, 1986:14
**OFFERED** [12] - 1928:20, 1928:23, 1929:2, 1934:2, 1948:3, 1948:13, 1957:4, 1958:18, 1963:11, 1964:2, 1986:1, 2000:2
**OFFERING** [2] - 1965:6, 1965:9
**OFFERS** [1] - 1953:3
**OFFICE** [5] - 1946:11, 1950:12, 1954:7, 1995:23, 1996:5
**OFFICE** [3] - 1946:22, 2008:1, 2010:9
**OFFICIAL** [2] - 1887:22, 2018:13
**OFFICIAL** [1] - 1982:17
**OFFICIALS** [6] - 1952:5, 1961:6, 1961:11, 1961:20, 1961:25, 1962:1
**OFTEN** [1] - 1984:17
**OFTENTIMES** [1] - 1985:17

ON [3] - 1886:14, 1886:20, 1887:2
ONCE [2] - 1991:21, 2011:20
ONCE-IN-CENTURY [1] - 1991:21
ONE [100] - 1889:25, 1893:16, 1894:17, 1903:12, 1903:18, 1905:14, 1914:22, 1914:23, 1915:5, 1916:9, 1916:11, 1918:6, 1918:11, 1921:17, 1922:20, 1925:14, 1925:15, 1925:16, 1927:8, 1927:16, 1928:20, 1931:17, 1931:20, 1932:7, 1932:16, 1932:21, 1932:23, 1932:25, 1933:8, 1933:10, 1933:25, 1934:14, 1936:16, 1936:19, 1936:22, 1938:11, 1938:24, 1939:10, 1939:11, 1940:7, 1940:23, 1940:25, 1941:18, 1942:18, 1945:9, 1946:15, 1947:2, 1953:21, 1961:4, 1962:20, 1970:3, 1971:6, 1971:19, 1974:7, 1975:4, 1975:22, 1975:23, 1976:12, 1977:15, 1978:9, 1980:20, 1981:14, 1983:3, 1983:10, 1983:12, 1989:19, 1990:12, 1991:6, 1991:15, 1991:21, 1991:22, 1992:5, 1992:17, 1993:5, 1993:20, 1994:3, 1997:7, 1998:13, 2000:3, 2000:4, 2001:15, 2001:25, 2003:4, 2003:8, 2003:19, 2005:15, 2006:4, 2006:5, 2006:16, 2007:22, 2009:9, 2010:18, 2014:14, 2014:18
ONE'S [4] - 1963:6, 1969:23, 1972:15, 2009:15
ONE-OFF [1] - 2000:3
ONES [4] - 1901:25, 1931:10, 1974:6, 2004:12
ONGOING [1] - 1891:13
ONLINE [1] - 2013:8
OPEN [1] - 1998:25
OPEN [1] - 1889:1
OPERATED [1] - 2002:18
OPERATING [6] - 1951:10, 2002:4, 2004:15, 2004:16, 2006:12
OPINE [1] - 1943:9
OPINION [17] - 1893:21, 1893:22, 1893:24, 1894:3, 1895:4, 1908:1, 1915:22, 1915:25, 1916:2, 1916:3, 1980:16, 1984:20, 1987:2, 1987:12, 1998:15, 2003:23, 2003:24
OPINIONS [1] - 1916:19
OPPORTUNITY [4] - 1974:2, 1984:7, 1989:2, 1998:4
OPPOSED [1] - 1909:7
OPPOSING [1] - 1952:8
OPPOSITION [1] - 1925:3
OPSEC [11] - 1898:22, 1898:23, 1901:24, 1903:7, 1904:3, 1904:6, 1906:6, 1943:20, 1964:13, 1964:14
OPTIONAL [1] - 1917:16
ORDER [19] - 1915:16, 1917:21, 1917:22, 1925:2, 1933:6, 1941:18, 1943:17, 1944:3, 1948:14, 1951:11, 1951:25, 1952:16, 1952:17, 1962:10, 1973:15, 1996:13, 2003:6, 2008:24, 2010:12

ORDERED [1] - 1915:17
ORDERS [6] - 1914:24, 1915:18, 1915:25, 1916:15, 1916:23, 1917:12
ORIGINAL [1] - 1925:2
ORIGINS [1] - 1954:25
OTHERWISE [3] - 1933:20, 1968:23, 1975:15
OURSELVES [2] - 1971:17, 1973:6
OUTCOME [1] - 2011:5
OUTDATED [1] - 1987:21
OUTLIERS [1] - 1908:22
OUTLINE [1] - 1901:12
OUTLINED [1] - 1977:23
OUTPUT [2] - 1901:22, 1909:14
OUTSIDE [3] - 1898:19, 1909:20, 1909:22
OUTSOURCED [5] - 1898:19, 1898:21, 1898:23, 1903:8, 1903:16
OUTWEIGH [1] - 1996:25
OVERALL [1] - 1903:19
OVERCOMING [1] - 1991:1
OVERRULED [2] - 1893:9, 1902:18, 1907:10
OVERSEAS [1] - 1983:11
OVERSIGHT [1] - 1913:16
OVERSTEP [1] - 1896:15
OVERTURN [3] - 1912:2, 1963:17, 1964:21
OVERWHELM [1] - 1946:8
OVERWHELMING [2] - 1999:14, 2000:16
OWN [11] - 1957:2, 1957:7, 1963:20, 1986:17, 1989:20, 1989:21, 1990:1, 1990:5, 1996:4, 2009:12, 2012:10
OWNED [1] - 2012:19
OWNS [1] - 2012:19

# P

P.M [3] - 1938:19, 2016:23, 2017:25
PAGE [17] - 1897:9, 1897:17, 1898:11, 1900:21, 1903:4, 1904:11, 1905:12, 1906:12, 1907:12, 1911:9, 1942:18, 1981:20, 1981:21, 1981:22, 2012:22, 2012:23
PAGES [3] - 1930:18, 1931:9, 2018:6
PAID [1] - 1911:12
PAIKOWSKY [4] - 1887:3, 2015:22, 2015:24, 2016:11
PAINS [1] - 1992:25
PAIR [1] - 1990:4
PANDEMIC [1] - 1991:21
PARAGRAPH [1] - 1978:9
PARALEGAL [1] - 1926:9
PARAMETERS [1] - 1958:25
PARENTS [2] - 1940:7, 1960:7
PARLANCE [1] - 1970:2
PART [21] - 1900:15, 1901:5, 1903:19, 1904:14, 1908:18, 1912:18, 1912:19,

1919:12, 1926:20, 1930:25, 1932:24, 1934:17, 1936:19, 1936:22, 1938:5, 1940:7, 1950:16, 1976:8, 2000:25, 2004:24
PARTIAL [1] - 2002:5
PARTICIPATE [3] - 1910:1, 1969:2, 1976:6
PARTICIPATED [2] - 1908:19, 1908:24
PARTICIPATING [1] - 1963:8
PARTICIPATION [1] - 2000:21
PARTICIPATION [1] - 1970:23
PARTICULAR [1] - 1903:18
PARTICULARIZED [1] - 2003:14
PARTICULARLY [1] - 1954:13
PARTIES [7] - 1915:12, 1952:21, 1952:24, 1953:20, 1993:10, 1996:15, 2016:16
PARTISAN [1] - 1980:6
PARTNERED [1] - 1968:1
PARTNERSHIP [2] - 1964:8, 1964:11
PARTNERSHIPS [1] - 1895:18
PARTS [2] - 1902:2, 1940:17
PARTY [2] - 1968:3, 2001:25
PARTY [6] - 1941:23, 1952:4, 1953:3, 1953:4, 1993:22, 1994:22
PARTY'S [2] - 1967:11
PASS [1] - 1913:1
PASSED [3] - 1934:24, 1944:25, 1997:6
PASSING [1] - 1992:6
PASSION [1] - 1991:4
PASSIONATE [1] - 1979:11
PAST [4] - 1936:24, 1949:9, 1977:4, 1978:23
PASTEL [1] - 1971:5
PATH [1] - 1941:17
PATTERNS [1] - 1964:12
PAY [2] - 1972:1, 1974:15
PAYING [2] - 1896:16, 1991:3
PAYS [1] - 2008:14
PEER [1] - 1954:4
PENALTY [1] - 1984:12
PENNSYLVANIA [1] - 1981:1
PEOPLE [49] - 1932:8, 1932:10, 1932:16, 1932:23, 1932:25, 1959:15, 1962:16, 1969:25, 1970:15, 1970:17, 1971:2, 1971:21, 1971:23, 1971:24, 1972:10, 1974:4, 1974:7, 1974:8, 1974:9, 1974:20, 1975:2, 1976:16, 1979:4, 1985:16, 1986:17, 1986:21, 1986:24, 1987:18, 1988:23, 1988:25, 1989:16, 1991:14, 1991:25, 1994:8, 1994:12, 1996:11, 1997:10, 2001:24, 2002:1, 2002:11, 2002:12, 2002:14, 2004:1, 2004:24, 2005:19, 2006:25, 2011:1
PER [1] - 1965:1
PERCENT [5] - 1950:8, 1980:22, 1997:23, 1998:9, 1999:25
PERFECT [4] - 1937:10, 1975:22
PERFECTLY [2] - 1920:21, 1964:25

**PERFORM** [1] - 1906:21

**PERHAPS** [3] - 1970:21, 1979:10, 2011:12

**PERIOD** [4] - 1983:14, 1983:15, 1983:17, 1987:21

**PERJURY** [1] - 1984:12

**PERMANENT** [5] - 1906:13, 1906:18, 1906:19, 1962:18, 1973:21

**PERSISTED** [1] - 1947:1

**PERSON** [27] - 1906:15, 1911:22, 1932:7, 1932:10, 1942:1, 1943:19, 1947:16, 1952:11, 1952:18, 1961:17, 1973:19, 1974:1, 1974:2, 1974:17, 1975:7, 1976:10, 1977:8, 1983:9, 1983:11, 1990:19, 1995:22, 1996:7, 2000:9, 2006:8, 2010:2, 2013:1

**PERSONAL** [7] - 1892:7, 1892:8, 1901:17, 1918:9, 1929:17, 1960:7, 2000:24

**PERSONALLY** [7] - 1899:20, 1899:23, 1901:4, 1904:2, 1906:5, 1949:5, 1952:15

**PERSPECTIVE** [2] - 1955:2, 1975:6

**PERTINENT** [1] - 1967:14

**PETITION** [10] - 1891:22, 1971:1, 2008:8, 2009:17, 2009:22, 2009:25, 2012:2, 2012:4, 2012:5, 2012:9

**PETITIONS** [1] - 2012:3

**PH.D** [1] - 1973:15

**PHENOMENON** [1] - 1988:19

**PHILLIPS** [18] - 1899:24, 1901:25, 1904:3, 1904:6, 1904:10, 1904:13, 1905:7, 1905:9, 1906:5, 1907:8, 1907:13, 1908:12, 1909:7, 1943:20, 1944:3, 1965:15, 1966:17

**PHILLIPS'** [6] - 1904:19, 1905:23, 1906:12, 1907:1, 1907:9, 1907:24

**PHONE** [1] - 1976:22

**PHONETIC** [1] - 1992:10

**PHRASE** [1] - 1970:10

**PHRASES** [2] - 1897:20, 1969:25

**PHYSICAL** [1] - 1953:8

**PI** [1] - 1915:10

**PLACE** [6] - 1954:9, 1971:15, 1971:22, 1972:10, 1981:9, 1997:24

**PLACED** [2] - 1954:6, 2009:22

**PLACES** [3] - 1948:16, 2001:17, 2001:19

**PLAGUE** [1] - 1958:1

**PLAGUED** [1] - 1957:24

**PLAINTIFF** [7] - 1910:16, 1911:19, 1912:6, 1919:8, 1978:13, 1990:14, 2006:23

**PLAINTIFFS** [1] - 1941:22

**PLAINTIFFS** [31] - 1910:19, 1910:20, 1919:8, 1928:1, 1929:4, 1937:18, 1937:25, 1941:8, 1955:11, 1964:22, 1968:15, 1969:1, 1970:11, 1978:24, 1987:6, 1994:6, 1994:9, 1996:3, 1996:19, 1997:2, 1998:24, 2000:15,

2000:18, 2005:7, 2012:13, 2012:14, 2014:24, 2015:4, 2015:8, 2017:7, 2017:9

**PLAINTIFFS** [2] - 1886:4, 1886:14

**PLAINTIFFS'** [15] - 1904:10, 1906:11, 1911:23, 1911:25, 1926:4, 1926:5, 1942:16, 1949:22, 1949:25, 1956:3, 1956:9, 1963:23, 1964:19, 1968:9, 2013:9

**PLAINTIFFS'** [19] - 1921:6, 1922:19, 1927:4, 1931:23, 1933:14, 1933:20, 1937:3, 1937:21, 1938:13, 1939:6, 1941:22, 1945:9, 1972:13, 1978:4, 1978:10, 1980:15, 1984:19, 1994:24, 1998:13

**PLAN** [8] - 1909:10, 1923:15, 1923:16, 1950:3, 1950:4, 1963:24, 1963:25

**PLANS** [1] - 1912:11

**PLATES** [1] - 2001:18

**PLATFORM** [3] - 1912:13, 1912:14, 1912:23

**PLAY** [2] - 1997:12, 2007:5

**PLEASURE** [1] - 2017:15

**PLUMBING** [2] - 1976:16, 1976:17

**POCKET** [1] - 1976:22

**POINT** [26] - 1926:7, 1927:25, 1929:2, 1939:19, 1949:9, 1954:17, 1962:19, 1965:22, 1981:18, 1981:24, 1982:4, 1982:9, 1987:4, 1989:17, 1989:22, 1994:6, 1998:21, 1999:9, 2000:4, 2000:8, 2000:16, 2001:12, 2014:18, 2014:23, 2015:18

**POINTED** [2] - 2007:3, 2013:24

**POINTING** [2] - 1957:11, 1970:4

**POINTS** [4] - 1950:21, 1978:15, 2007:13

**POLICE** [2] - 2000:25, 2001:14

**POLICY** [1] - 1977:19

**POLITICALLY** [1] - 1940:9

**POLL** [2] - 1976:21, 2002:1

**POLLING** [3] - 1948:16, 2001:17, 2001:19

**POLLS** [3] - 1970:16, 2002:1, 2002:12

**PONTIFICATING** [1] - 1998:3

**POPULATION** [1] - 1923:9

**POPULATIONS** [2] - 1923:20, 1965:1

**POSED** [1] - 1951:24

**POSITION** [2] - 1893:24, 1956:25

**POSITIVE** [1] - 1989:4

**POSITIVES** [1] - 1890:1

**POSSIBILITY** [1] - 1953:14

**POSSIBLE** [9] - 1889:16, 1890:5, 1890:7, 1925:15, 1993:25, 2003:7, 2004:6, 2016:22, 2017:5

**POST** [3] - 1968:1, 1968:5, 2002:12

**POSTAL** [2] - 1975:10, 1982:17

**POTENTIAL** [5] - 1894:13, 1950:7, 1960:23, 1970:21, 2002:16

**POTENTIALLY** [1] - 1929:24

**POTENTIALS** [1] - 1890:17

**POWELL** [1] - 1886:21

**POWERPOINT** [1] - 1979:22

**PRAIRIE** [2] - 1970:15, 1991:14

**PRAY** [1] - 1976:9

**PRECEDENT** [1] - 2004:7

**PRECINCTS** [1] - 1970:16

**PRECISE** [1] - 1976:10

**PRECLUDED** [1] - 1935:1

**PREDETERMINED** [1] - 1946:3

**PREDICTIVE** [1] - 1985:3

**PREFER** [1] - 1937:5

**PREMISE** [1] - 2009:15

**PREORDAINED** [1] - 1946:3

**PREPARATION** [1] - 1943:18

**PREPARING** [2] - 1945:22, 2016:17

**PREPONDERANCE** [4] - 1958:13, 1958:14, 1997:3, 1997:5

**PREREQUISITE** [2] - 1969:23, 1972:15

**PRESENT** [6] - 1946:10, 1947:19, 1952:6, 1980:2, 1998:4, 2016:5

**PRESENTED** [11] - 1933:6, 1933:7, 1933:10, 1933:25, 1987:5, 1998:5, 2010:5, 2010:7, 2013:13, 2017:10, 2017:14

**PRESENTING** [1] - 1890:9

**PRESENTS** [2] - 1941:14, 1989:2

**PRESERVE** [1] - 1926:20

**PRESERVED** [1] - 1926:19

**PRESIDENT** [1] - 1950:11

**PRESIDENTIAL** [3] - 1912:2, 1964:21, 1992:2

**PRESS** [5] - 1908:14, 1951:4, 1964:5, 1967:25

**PRESSING** [1] - 1909:2

**PRETEND** [1] - 1954:25

**PRETTY** [4] - 1960:1, 1984:18, 2005:21, 2006:7

**PREVAIL** [1] - 2006:19

**PREVIOUSLY** [3] - 1889:8, 1912:13, 1960:21

**PRIDE** [1] - 1987:9

**PRIMARY** [1] - 1889:20

**PRINCIPLES** [2] - 1971:18, 1978:3

**PRINT** [2] - 1921:15, 1949:12

**PRINTED** [1] - 1917:2

**PRINTING** [3] - 1989:10, 1989:11

**PRIVATE** [1] - 1948:1

**PROACTIVE** [1] - 1983:3

**PROBABILITY** [1] - 1983:22

**PROBABLE** [4] - 1946:25, 1959:17, 1973:12, 1995:25

**PROBATIVE** [5] - 1929:2, 1930:15, 1986:12, 1987:1, 1987:2

**PROBLEM** [12] - 1916:5, 1917:23, 1920:12, 1920:13, 1927:5, 1927:6, 1929:5, 1932:15, 1932:20, 1933:13, 1934:9, 1975:14

**PROBLEMATIC** [1] - 2000:5

**PROBLEMS** [6] - 1893:16, 1894:7, 1894:8, 1894:13, 1947:3, 1984:24

**PROCEDURAL** [2] - 1961:13, 1977:23
**PROCEDURES** [2] - 1910:12, 1928:19
**PROCEED** [1] - 1911:7
**PROCEEDINGS** [1] - 2018:6
**PROCEEDINGS** [1] - 1886:10
**PROCESS** [20] - 1895:20, 1895:24, 1896:11, 1898:24, 1899:12, 1900:15, 1904:14, 1909:14, 1909:21, 1909:22, 1912:18, 1913:24, 1940:16, 1949:4, 1950:25, 1951:3, 1961:19, 1969:2, 2004:25, 2010:19
**PROCURE** [1] - 1909:9
**PRODUCED** [1] - 1967:21
**PRODUCT** [2] - 1954:17, 1971:14
**PROGRAM** [5] - 1903:19, 1947:24, 1948:2, 1963:17, 1963:19
**PROGRAMS** [1] - 1908:24
**PROHIBITS** [1] - 1957:19
**PROJECT** [6] - 1900:9, 1900:11, 1901:11, 1901:12, 1909:10, 1976:12
**PROJECTS** [2] - 1970:14, 1987:18
**PROMOTIONAL** [1] - 1968:12
**PRONE** [1] - 1959:12
**PRONG** [1] - 1997:6
**PROOF** [7] - 1947:14, 1947:15, 1947:19, 1947:21, 1962:22, 2009:3, 2011:10
**PROPER** [2] - 1934:10, 1960:15
**PROPERLY** [1] - 2016:13
**PROPERTY** [2] - 1960:8
**PROPONENT** [1] - 2007:22
**PROPOSAL** [1] - 1968:11
**PROPOSE** [1] - 1920:7
**PROPOSITIONS** [1] - 1971:25
**PROSECUTE** [3] - 2005:19, 2006:4, 2011:3
**PROSECUTION** [3] - 1948:8, 1964:3, 1965:10
**PROTECT** [1] - 2005:18
**PROTECTED** [1] - 2008:19
**PROTECTION** [5] - 1941:11, 1969:1, 2009:22, 2009:24, 2015:1
**PROTECTS** [1] - 2006:10
**PROUD** [1] - 2016:9
**PROVE** [4] - 1941:20, 1952:25, 1963:2, 1997:2
**PROVED** [1] - 1926:15
**PROVIDE** [13] - 1924:17, 1925:11, 1947:14, 1947:15, 1947:21, 1951:17, 1956:7, 1961:1, 1962:25, 1966:4, 1967:12, 1968:23, 1969:1
**PROVIDED** [8] - 1903:21, 1908:17, 1908:18, 1923:10, 1957:1, 1965:25, 2005:7
**PROVIDER** [1] - 1990:22
**PROVIDES** [1] - 1941:10
**PROVIDING** [3] - 1890:17, 1913:16, 1957:12
**PROVISIONS** [1] - 1961:1

**PROXIMITY** [6] - 1959:5, 1997:23, 1999:3, 1999:4, 1999:25
**PSYCHIATRIST** [1] - 1986:6
**PSYCHOLOGIST** [2] - 1986:5, 1986:21
**PUBLIC** [12] - 1929:3, 1965:12, 1965:13, 1965:19, 1965:20, 1974:17, 1978:7, 1987:16, 1988:21, 1991:13, 1992:3, 2000:25
**PUBLICATION** [3] - 1965:11, 1998:20, 2000:13
**PUBLICITY** [2] - 1964:4, 1991:9
**PUBLICIZE** [1] - 1907:17
**PUBLICIZED** [1] - 2010:22
**PUBLICLY** [2] - 1921:25, 2003:25
**PUBLISHED** [3] - 1965:15, 2010:21, 2013:7
**PULL** [10] - 1904:9, 1911:3, 1915:25, 1917:11, 1919:10, 1922:23, 1931:12, 1942:17, 1963:23, 2000:2
**PULLED** [5] - 1917:12, 1917:21, 1919:22, 1923:5, 1931:21
**PULLING** [1] - 1898:5
**PUNCH** [1] - 1966:15
**PURGER** [2] - 1984:14, 1984:21
**PURPOSE** [8] - 1928:25, 1947:12, 1947:22, 1954:13, 1954:18, 1960:25, 2005:2
**PURPOSES** [2] - 1936:2, 1960:6
**PURSUANT** [1] - 2003:5
**PURSUING** [2] - 1991:4, 2006:23
**PURSUITS** [1] - 1960:5
**PUSHED** [1] - 2011:6
**PUSHING** [1] - 1913:11
**PUT** [15] - 1904:5, 1923:1, 1929:4, 1932:9, 1934:1, 1937:11, 1939:19, 1943:8, 1953:23, 1970:25, 1976:16, 1976:17, 1997:21, 2009:17, 2009:18
**PUTTING** [8] - 1901:14, 1928:4, 1951:7, 1962:3, 1972:20, 2008:6, 2014:8

**Q**

**QUABILLIONS** [2] - 1994:7, 1996:11
**QUALIFIED** [2] - 1892:3, 1893:19
**QUALITY** [3] - 1909:13, 1943:5, 1947:4
**QUANTIFIABLE** [1] - 2006:18
**QUARTER** [3] - 1942:12, 1942:14, 1945:19
**QUEEN** [1] - 1886:17
**QUESTIONED** [1] - 1927:15
**QUESTIONS** [11] - 1889:14, 1891:13, 1896:2, 1913:7, 1914:8, 1941:15, 1952:12, 1966:22, 1967:3, 1967:4, 1967:6
**QUICK** [2] - 1924:23, 1925:15
**QUICKLY** [3] - 1979:23, 1980:13, 2003:4
**QUIRK** [1] - 1915:6
**QUIT** [1] - 1922:9
**QUITE** [4] - 1935:3, 1986:1, 1987:2,

1993:24
**QUOTES** [3] - 2005:13, 2005:21

**R**

**RACE** [2] - 1923:9, 1977:9
**RACES** [3] - 1946:1, 1986:16, 1992:8
**RAFFENSPERGER** [1] - 2005:14
**RAISED** [2] - 1942:4, 1978:15
**RAISING** [1] - 1978:16
**RALSTON** [1] - 1987:15
**RANDOM** [2] - 1979:17, 2000:3
**RATE** [2] - 1985:3, 2005:7
**RATHER** [2] - 1889:17, 2017:22
**RDR** [2] - 1887:21, 2018:13
**REACH** [3] - 1968:3, 1994:11, 1996:21
**REACHED** [1] - 1968:2
**REACT** [1] - 1991:22
**READ** [27] - 1897:14, 1899:5, 1899:11, 1903:14, 1910:6, 1914:24, 1914:25, 1915:25, 1916:14, 1916:16, 1917:10, 1917:21, 1917:22, 1917:24, 1918:16, 1918:25, 1919:14, 1920:23, 1921:4, 1921:5, 1923:22, 1938:15, 2001:13, 2005:14, 2005:15, 2005:16, 2006:8
**READING** [8] - 1892:12, 1892:20, 1917:20, 1928:13, 1975:24, 1985:1, 2001:10, 2001:11
**READS** [1] - 1974:2
**READY** [5] - 1912:23, 1928:22, 1939:4, 1969:10, 1980:3
**REAL** [2] - 1960:7, 1979:23
**REALISTICALLY** [1] - 2008:21
**REALITY** [1] - 2000:10
**REALIZED** [1] - 1944:2
**REALLY** [23] - 1900:16, 1906:16, 1928:14, 1948:13, 1975:16, 1979:3, 1981:3, 1981:6, 1981:10, 1989:1, 1996:8, 1999:8, 1999:17, 2002:9, 2002:13, 2002:22, 2004:10, 2005:8, 2006:20, 2007:16
**REALTY** [1] - 1967:1
**REASON** [8] - 1933:19, 1969:16, 1980:8, 1980:21, 1980:22, 1984:1, 2007:23, 2008:10
**REASONABLE** [17] - 1929:3, 1929:6, 1958:21, 1958:24, 1959:3, 1973:19, 1973:20, 1974:1, 1974:2, 1997:20, 2006:7, 2007:23, 2007:24, 2008:21, 2008:25, 2009:1
**REASONABLENESS** [1] - 1999:23
**REASONABLY** [2] - 1920:2, 1942:1
**REASONS** [9] - 1913:25, 1948:19, 1953:21, 1959:11, 1961:11, 1961:16, 1962:17, 1998:9, 2010:17
**REBOOT** [1] - 1976:21
**REBUT** [1] - 1963:11
**REBUTTAL** [3] - 1938:2, 1965:22, 1969:3, 2007:11
**REBUTTAL** [1] - 1888:7

**RECEIVE** [2] - 2009:21, 2009:24
**RECEIVED** [4] - 1921:3, 1945:2, 1945:3, 1967:22
**RECENT** [2] - 1940:20, 1988:19
**RECENTLY** [3] - 1988:14, 2003:1
**RECHECK** [1] - 1924:16
**RECIPE** [1] - 1894:18
**RECKLESS** [10] - 1944:9, 1944:10, 1947:8, 1947:10, 1972:20, 1973:6, 2003:3, 2005:25, 2006:10, 2010:1
**RECKLESSLY** [1] - 1941:11
**RECKLESSNESS** [13] - 1943:1, 1945:16, 1973:10, 1993:19, 2002:23, 2003:1, 2003:5, 2004:10, 2004:13, 2007:6, 2010:1, 2010:2
**RECOGNIZE** [1] - 1941:14
**RECOGNIZED** [5] - 1952:13, 1962:9, 1962:15, 2009:12, 2009:21
**RECOGNIZES** [1] - 2013:22
**RECOGNIZING** [1] - 1954:20
**RECORD** [33] - 1891:3, 1905:14, 1928:14, 1929:15, 1929:21, 1933:4, 1933:17, 1934:13, 1934:20, 1935:6, 1936:10, 1936:15, 1937:10, 1939:3, 1953:24, 1983:13, 1988:3, 1988:10, 1994:3, 1994:4, 1994:14, 1995:7, 1995:8, 1995:20, 1996:20, 1997:8, 1999:12, 2001:6, 2003:7, 2012:22, 2015:25
**RECORDS** [4] - 1922:1, 1965:13, 1973:5, 1998:25
**RECROSS** [1] - 1888:2
**RECROSS** [1] - 1914:10
**RECRUIT** [1] - 1957:8
**RECRUITED** [6] - 1949:14, 1956:21, 1957:3, 1957:6, 1957:16, 1958:15
**RECRUITERS** [2] - 1949:19, 1957:14
**RECRUITING** [4] - 1949:20, 1950:2, 1956:15, 1956:21
**RED** [2] - 1977:11, 2010:7
**REDACT** [4] - 1937:1, 1937:2, 1937:7, 1937:16
**REDIRECT** [1] - 1913:4
**REDIRECT** [2] - 1888:2, 1913:5
**REFER** [3] - 1909:2, 2001:9, 2001:11
**REFERENCE** [3] - 1902:13, 1948:17, 1979:21
**REFERENCED** [1] - 1902:3
**REFERENCES** [3] - 1918:11, 1948:16, 1986:18
**REFERRED** [3] - 1956:22, 1960:21, 1991:15
**REFERRING** [2] - 1904:16, 1908:11
**REFINE** [5] - 1900:24, 1901:6, 1901:8, 1902:7, 1902:15
**REFINED** [1] - 1958:3
**REFLECT** [2] - 1942:24, 1971:23
**REFLECTS** [1] - 1988:3
**REFUTE** [5] - 1943:7, 1944:5, 1957:1, 1958:18, 1960:18

**REGARD** [2] - 1995:9, 1995:10
**REGARDING** [3] - 1919:18, 1932:5, 1933:6
**REGISTER** [1] - 1906:20
**REGISTERED** [4] - 1950:9, 1951:14, 2008:15, 2009:8
**REGISTRANT** [1] - 1962:8
**REGISTRATION** [4] - 1954:4, 1954:6, 1961:3, 1984:9
**REGISTRATIONS** [1] - 1960:8
**REGISTRY** [1] - 1905:14
**REGROUP** [1] - 1947:6
**REGULATED** [2] - 1973:4, 1975:10
**REINVENT** [1] - 2008:19
**REITERATE** [1] - 2007:13
**REJECTED** [1] - 1953:6
**RELATE** [2] - 1928:16, 1935:25
**RELATED** [1] - 1950:25
**RELATING** [2] - 1918:20, 1922:1
**RELATIVELY** [2] - 1971:19, 2003:1
**RELEASE** [3] - 1951:4, 1965:17, 1967:25
**RELEASES** [1] - 1964:5
**RELEVANCE** [1] - 1934:23
**RELEVANT** [3] - 1907:2, 1907:5, 1923:10
**RELIABILITY** [1] - 1928:3
**RELIABLE** [1] - 1962:7
**RELIABLY** [2] - 1946:17, 1963:4
**RELIED** [5] - 1902:22, 1959:19, 2011:18, 2011:19, 2012:1
**RELY** [2] - 1960:14, 1960:17
**RELYING** [1] - 1946:25
**REMAINING** [2] - 1993:14, 2012:12
**REMARKS** [1] - 1993:14
**REMEDY** [1] - 2016:13
**REMEMBER** [15] - 1892:11, 1896:25, 1910:25, 1915:22, 1919:22, 1931:17, 1931:25, 1932:4, 1932:16, 1933:24, 1934:9, 1973:2, 1985:19, 2004:19
**REMINDER** [1] - 1969:3
**REMOVAL** [2] - 1961:16, 1961:17
**REMOVE** [11] - 1905:3, 1906:1, 1906:10, 1943:24, 1943:25, 1961:6, 1961:12, 1962:13, 1967:7, 1977:16
**REMOVED** [5] - 1908:3, 1961:8, 1961:9, 1961:21, 1988:15
**RENDERING** [1] - 2017:6
**RENEW** [1] - 1981:19
**RENEWING** [1] - 2014:1
**REOFFER** [1] - 1937:1
**REPEAT** [4] - 1927:4, 1935:12, 2001:5, 2015:6
**REPEATED** [1] - 1967:12
**REPEATING** [1] - 1950:7
**REPHRASE** [2] - 1902:11
**REPORT** [12] - 1891:13, 1927:18, 1927:21, 1928:3, 1930:2, 1930:8, 1936:24, 1947:25, 1948:14, 1953:3,

1954:5, 1965:6
**REPORTEDLY** [1] - 1975:18
**REPORTER** [2] - 1897:5, 2001:2
**REPORTER** [3] - 1887:22, 2001:5, 2018:13
**REPORTER** [1] - 1912:21
**REPORTS** [1] - 1901:22
**REPRESENT** [3] - 1913:24, 1974:15, 1980:1
**REPRESENTATION** [1] - 1948:9
**REPRESENTATIVE** [1] - 1931:18
**REPRESENTATIVES** [1] - 1971:17
**REPRESENTING** [2] - 1971:24, 2014:25
**REPUBLICAN** [1] - 1964:8
**REPUBLICANS** [1] - 1995:15
**REQUEST** [6] - 1921:25, 1923:18, 1926:1, 1938:1, 1965:13, 1998:25, 2011:24
**REQUESTED** [4] - 1907:15, 1907:20, 1923:17, 1937:24
**REQUESTS** [2] - 1921:6, 1967:13
**REQUIRE** [5] - 1947:14, 1962:22, 1966:1, 2004:6, 2011:9
**REQUIRED** [6] - 1938:18, 1944:18, 1954:6, 1963:6, 1968:24, 2014:15
**REQUIREMENTS** [1] - 1901:12
**REQUISITES** [1] - 2002:24
**RESEARCH** [3] - 1938:21, 1943:24, 1943:25
**RESEARCHED** [1] - 1907:14
**RESERVE** [3] - 1938:2, 1938:3, 1969:3
**RESHAPE** [1] - 1963:15
**RESIDE** [2] - 1942:24, 1959:20
**RESIDED** [2] - 1981:7, 1983:20
**RESIDENCE** [23] - 1906:19, 1928:25, 1936:1, 1947:15, 1947:19, 1947:22, 1952:6, 1952:25, 1958:6, 1959:22, 1959:23, 1960:5, 1960:6, 1960:18, 1960:19, 1962:18, 1963:1, 2008:20, 2009:3, 2009:15, 2011:10, 2014:3
**RESIDENCY** [6] - 1960:16, 1961:16, 1961:23, 2008:11, 2014:13, 2014:14
**RESIDENCY-BASED** [1] - 1961:16
**RESIDENT** [4] - 1960:16, 2007:20, 2014:3, 2014:6
**RESIDENTS** [2] - 1947:5, 1948:25
**RESIDUAL** [4] - 1927:1, 1927:25, 1928:20, 1929:8
**RESOLVED** [2] - 1920:6, 1983:9
**RESORT** [1] - 1929:8
**RESOUNDING** [1] - 1952:2
**RESOURCE** [1] - 1891:12
**RESOURCED** [1] - 1998:4
**RESOURCES** [6] - 1963:21, 1973:13, 2013:18, 2013:20, 2013:23
**RESPECT** [3] - 1893:4, 1918:15, 2016:10
**RESPECTFULLY** [1] - 1929:20
**RESPECTS** [2] - 1991:3, 1991:16

**RESPOND** [6] - 1893:6, 1915:3, 1926:25, 1935:3, 1938:14, 1991:21
**RESPONDED** [1] - 1898:15
**RESPONSE** [16] - 1892:6, 1898:20, 1900:23, 1901:1, 1901:4, 1903:20, 1915:14, 1919:7, 1919:8, 1919:17, 1920:17, 1948:10, 1968:11, 1972:8, 1975:18, 2013:19
**RESPONSES** [4] - 1949:23, 1967:3, 1967:4, 1967:5
**RESPONSIBILITY** [1] - 1924:12
**RESPONSIBLE** [1] - 1899:12
**RESPONSIVE** [2] - 1908:2, 1967:12
**REST** [2] - 1899:11, 1937:17
**RESTAURANTS** [1] - 1985:19
**RESULT** [5] - 1930:1, 1953:25, 1963:17, 1992:2, 2011:5
**RESULTED** [2] - 1958:20, 1997:11
**RESULTING** [1] - 1954:15
**RESULTS** [5] - 1901:20, 1912:2, 1964:21, 1976:14
**RESUMES** [1] - 1889:9
**RETAIN** [2] - 1906:22, 1911:20
**RETRACT** [2] - 1927:8, 1927:10
**RETURN** [7] - 1889:21, 1889:24, 1900:18, 1900:20, 1901:20, 1903:2, 2012:16
**RETURNED** [1] - 1890:18
**RETURNING** [2] - 2012:17, 2012:18
**REVEAL** [5] - 1943:15, 1960:9, 1960:10, 1960:11, 1968:3
**REVEALED** [2] - 1948:3, 1961:24
**REVIEW** [5] - 1897:20, 1897:22, 1944:23, 1949:7, 1949:18
**REVIEWED** [2] - 1945:14, 1945:15
**REVIEWING** [4] - 1890:2, 1890:3, 1902:4, 1909:1
**REVIEWS** [1] - 1909:15
**REVISIT** [1] - 1947:6
**RHYME** [1] - 1969:16
**RICHMOND** [1] - 1923:24
**RIFE** [1] - 1959:13
**RIGHTEOUS** [1] - 1972:13
**RIGHTS** [8] - 1891:18, 1891:21, 1940:8, 1972:15, 1978:17, 2003:8, 2012:10
**RIGHTS** [5] - 1993:9, 2015:2, 2015:10, 2015:15, 2015:20
**RISK** [5] - 1963:5, 2010:3, 2010:8, 2010:11
**RISKING** [1] - 1929:24
**RISKS** [1] - 2010:6
**ROBOCALL** [3] - 2000:22, 2001:12, 2002:11
**ROBOCALLS** [1] - 2000:21
**ROLE** [1] - 1909:16
**ROLL** [2] - 1975:11, 1977:17
**ROLLS** [8] - 1912:17, 1962:13, 1971:21, 1987:21, 1987:22, 1988:12, 1989:24, 2002:19

**RON** [2] - 1945:10, 1948:22
**RON** [1] - 1886:7
**RPR** [2] - 1887:21, 2018:13
**RULE** [5] - 1893:25, 1916:11, 1920:11, 1928:4, 1942:5
**RULE** [8] - 1898:1, 1920:10, 1920:25, 1921:4, 1927:2, 1928:6, 1937:6, 2005:24
**RULES** [6] - 1933:21, 1959:24, 1959:25, 1960:2, 1960:13, 1977:14
**RULING** [5] - 1927:1, 1929:13, 1929:25, 1933:16, 2017:2
**RUN** [5] - 1914:13, 1949:8, 1949:9, 1990:6, 1991:4
**RUNNING** [2] - 1993:1, 1993:2
**RUNOFF** [11] - 1939:24, 1940:4, 1940:9, 1940:21, 1942:13, 1946:7, 1959:6, 1959:8, 1979:6, 1992:5, 1997:25
**RUSSELL** [12] - 1956:12, 1956:24, 1957:2, 1957:4, 1957:6, 1957:12, 1957:13, 1957:21, 1958:15, 1958:16, 1990:11, 1999:14
**RUSSELL'S** [2] - 1956:17, 1956:22
**RYAN** [6] - 1946:18, 1946:19, 1946:20, 1946:21, 2008:1, 2010:9

## S

**SACRED** [1] - 1944:18
**SACRIFICES** [1] - 1976:25
**SAFE** [1] - 1991:7
**SALAD** [1] - 1948:12
**SATISFIED** [1] - 1917:9
**SAW** [22] - 1910:7, 1919:17, 1931:17, 1941:5, 1943:5, 1949:9, 1950:6, 1964:4, 1966:12, 1967:2, 1967:3, 1967:5, 1967:23, 1967:24, 1987:8, 1989:21, 1992:4, 2010:18, 2010:22, 2011:17, 2012:22
**SCALE** [1] - 1972:11
**SCARS** [1] - 1895:24
**SCENARIO** [1] - 1900:6
**SCHEDULE** [1] - 1915:10
**SCHOOL** [2] - 1975:25
**SCOTT** [6] - 1940:20, 1955:15, 1980:20, 1981:13, 2013:1
**SCOTUS** [1] - 1964:18
**SCRAPE** [1] - 1945:17
**SCRAPED** [1] - 1945:19
**SCREAM** [1] - 2006:3
**SCREEN** [6] - 1904:12, 1921:15, 1931:22, 1932:2, 1932:3, 1932:9
**SCREENPRINT** [1] - 1921:21
**SCREENSHOT** [1] - 1930:17
**SEAL'S** [1] - 1925:22
**SEALED** [1] - 1992:10
**SEALS** [3] - 1948:17, 1998:17, 2000:12
**SEAN** [1] - 1975:5
**SEARCH** [3] - 1971:17, 1973:8, 1988:15
**SEATED** [2] - 1889:2, 1938:10

**SEC** [1] - 1971:6
**SECOND** [4] - 1903:12, 1941:25, 1945:23, 2009:5
**SECRETARIES** [1] - 1991:22
**SECRETARY** [10] - 1921:16, 1921:22, 1923:8, 1946:11, 1946:22, 1965:1, 1992:13, 2008:1, 2010:9
**SECTION** [31] - 1928:25, 1936:2, 1941:20, 1942:7, 1951:12, 1951:21, 1952:14, 1953:12, 1957:9, 1957:19, 1957:23, 1958:10, 1960:13, 1962:22, 1965:23, 1969:17, 1972:16, 1977:19, 1977:23, 1978:25, 1983:24, 1993:9, 1994:1, 2004:8, 2005:2, 2015:2, 2015:9, 2015:15, 2015:19, 2016:2, 2016:8
**SECTION** [2] - 1997:19, 2001:11
**SECURE** [3] - 1917:7, 1991:25, 2005:17
**SECURING** [1] - 1948:8
**SECURITY** [1] - 1977:3
**SECURITY** [16] - 1902:3, 1902:4, 1902:6, 1902:9, 1902:14, 1902:15, 1902:20, 1903:6, 1903:11, 1903:18, 1903:25, 1904:1, 1904:14, 1904:20, 1904:22, 1988:1
**SEE** [17] - 1894:7, 1902:11, 1904:23, 1914:24, 1916:2, 1927:14, 1931:16, 1944:16, 1945:15, 1961:13, 1963:24, 1971:3, 1971:4, 1971:18, 1997:16, 2013:8
**SEEING** [7] - 1901:20, 1915:22, 1927:20, 1931:25, 1932:4, 1976:4, 1976:7
**SEEK** [2] - 1889:16, 1923:6
**SEEKING** [2] - 1912:2, 1954:19
**SEES** [1] - 1978:19
**SELECT** [4] - 1890:20, 1890:21, 1979:10, 2010:19
**SELECTS** [1] - 1995:13
**SELF** [2] - 1966:24, 1972:13
**SELF-INTEREST** [1] - 1966:24
**SELF-RIGHTEOUS** [1] - 1972:13
**SENATE** [6] - 1946:7, 1979:3, 1979:5, 1992:5, 1992:7, 1992:9
**SENATOR** [1] - 1992:6
**SEND** [5] - 1916:23, 1974:4, 1989:12, 2016:24, 2016:25
**SENT** [6] - 1944:2, 1982:18, 1982:24, 1991:24, 2002:10, 2002:11
**SENTENCE** [3] - 1900:3, 1900:6, 2014:20
**SENTIMENT** [2] - 1987:16, 1992:3
**SEPARATE** [3] - 1943:11, 1951:8, 1951:12
**SERIOUS** [4] - 1939:25, 1978:14, 1978:15
**SERIOUSLY** [2] - 1934:22, 1988:15
**SERVICE** [1] - 1982:17
**SERVICE** [1] - 1927:17
**SERVICED** [1] - 1927:18

SET [9] - 1928:19, 1930:3, 1934:10, 1959:23, 1960:13, 1968:20, 1980:7, 2004:7, 2014:13
SETS [3] - 1986:23, 1990:25, 2014:14
SETTING [1] - 1977:22
SETTLED [1] - 1953:11
SEVEN [1] - 2017:22
SEVERAL [1] - 1940:15
SHALL [1] - 1954:6
SHAPE [1] - 1981:11
SHARED [4] - 1940:24, 1940:25, 1950:21, 1971:18
SHEDS [2] - 2008:16, 2008:17
SHEET [3] - 1917:3, 1917:6, 1917:15
SHELLY [2] - 1886:18, 2017:16
SHOCK [4] - 1943:4, 1945:5, 1945:10
SHOCKED [1] - 1989:18
SHOCKING [1] - 1959:14
SHODDY [1] - 1958:8
SHOOT [2] - 1975:9, 1977:10
SHORT [3] - 1908:9, 1944:4, 1987:4
SHORTLY [2] - 1915:7, 1967:22
SHOW [17] - 1929:10, 1931:12, 1931:24, 1937:2, 1941:22, 1958:5, 1977:6, 1977:7, 1982:4, 1982:8, 1994:24, 1997:4, 1999:22, 2009:3, 2011:10, 2013:1, 2014:16
SHOWED [5] - 1927:16, 1976:9, 1980:16, 1980:17, 2013:10
SHOWING [5] - 1931:11, 1931:18, 1961:8, 1961:10, 1961:17
SHOWN [8] - 1929:12, 1932:11, 1932:25, 1933:25, 1934:9, 1936:3, 1971:9, 2006:17
SHOWS [9] - 1954:5, 1955:21, 1957:8, 1958:14, 1980:21, 1983:9, 1984:2, 1999:2
SIDE [4] - 1975:4, 1976:4, 2012:6, 2016:25
SIDES [4] - 1937:24, 1938:18, 1976:5, 2017:4
SIGNIFICANT [5] - 1908:23, 1990:25, 1992:20, 2000:16, 2004:16
SIMPLE [2] - 1918:22, 1977:12
SIMPLY [4] - 1961:17, 1980:7, 1980:11, 2007:1
SIMULTANEOUSLY [1] - 1943:10
SINGLE [1] - 1920:6
SIT [2] - 1922:13, 1924:9
SITES [1] - 1960:7
SITS [1] - 1922:24
SITTING [3] - 1892:15, 1974:8, 1974:20
SITUATION [1] - 1935:13
SITUATIONS [2] - 1906:17, 1986:25
SIX [1] - 1999:6
SKETCHED [1] - 1958:25
SKILL [1] - 1990:25
SKIPPED [1] - 1977:18
SKIRT [1] - 1999:3

SLASH [1] - 2010:12
SLIDE [3] - 1980:4, 2001:16, 2001:21
SLOPPY [1] - 1959:13
SMALL [3] - 1990:21, 1998:18
SMARTYSTREETS [13] - 1899:8, 1899:15, 1899:16, 1899:18, 1899:24, 1900:13, 1900:15, 1900:22, 1900:24, 1901:8, 1901:21, 1944:1
SMITH [1] - 2009:19
SMOKE [2] - 1987:5, 2011:16
SO-CALLED [1] - 1967:7
SO.. [1] - 1926:21
SOCIAL [16] - 1902:3, 1902:4, 1902:6, 1902:9, 1902:13, 1902:15, 1902:20, 1903:6, 1903:11, 1903:18, 1903:25, 1904:1, 1904:13, 1904:20, 1904:22, 1988:1
SOCIAL [2] - 1969:19, 1973:8
SOCIETY [3] - 1972:7, 1973:6, 2005:24
SOFTWARE [1] - 1909:13
SOLELY [4] - 1959:19, 2007:18, 2009:16, 2012:1
SOLICIT [1] - 1963:25
SOLICITING [2] - 1950:7, 1952:3
SOLID [1] - 1890:8
SOLVE [1] - 1975:14
SOMEONE [22] - 1906:13, 1965:6, 1965:14, 1966:16, 1970:6, 1970:8, 1975:13, 1980:21, 1981:8, 1981:18, 1982:1, 1988:13, 1988:14, 1989:22, 1989:23, 1993:24, 1995:16, 2001:13, 2006:10, 2007:19, 2009:23
SOMEPLACE [1] - 1998:3
SOMERVILLE [22] - 1929:18, 1930:24, 1943:9, 1945:24, 1950:18, 1950:23, 1951:3, 1951:9, 1951:16, 1956:5, 1962:16, 1967:20, 1973:13, 1979:9, 1987:7, 1987:12, 1988:16, 2008:5, 2011:14, 2011:18, 2013:12
SOMERVILLE [1] - 1886:6
SOMERVILLE'S [1] - 1940:12
SOMETIMES [2] - 1954:20, 1959:8
SOMEWHAT [1] - 1993:17
SOMEWHERE [6] - 1906:18, 1970:7, 1982:3, 1984:15, 1998:3, 2006:8
SOON [2] - 2016:21, 2016:25
SORRY [9] - 1897:13, 1910:21, 1914:4, 1938:24, 1977:12, 2001:3, 2001:15, 2015:6, 2017:16
SORT [9] - 1889:20, 1903:12, 1903:15, 1923:10, 1924:24, 1955:2, 1973:11, 1975:22, 2006:18
SOUGHT [3] - 1907:14, 1952:4, 1964:21
SOULS [1] - 1971:17
SOUND [1] - 1978:6
SOUNDS [2] - 1963:10, 2000:23
SOURCE [2] - 1962:4, 1962:5
SOURCES [3] - 1960:5, 1961:5, 1962:5
SOUTH [1] - 1950:1
SOUTHERN [1] - 1966:25

SPACE [1] - 1978:8
SPEAKER [1] - 1987:14
SPECIFIC [7] - 1902:13, 1903:17, 1908:2, 1908:5, 1959:21, 1960:16, 1962:8
SPECIFICALLY [4] - 1899:6, 1911:12, 1923:18, 2013:21
SPEECH [5] - 1891:21, 1895:25, 1969:24, 1998:18, 2006:1
SPENDING [1] - 2004:16
SPENT [1] - 1928:8
SPLIT [1] - 1938:4
SPOUSE [1] - 1960:7
SPREADSHEET [1] - 1996:20
SPREADSHEETS [2] - 1944:14, 1946:23
SPY [1] - 1973:7
SSDI [1] - 1904:24
STAFF [1] - 1915:24
STAFFED [1] - 1994:10
STAGES [1] - 1940:16
STAKE [2] - 1946:20, 1962:20
STAKES [3] - 1940:2, 1940:3, 1940:14
STAND [7] - 1889:4, 1889:9, 1928:6, 1930:25, 1956:1, 1956:14, 1981:2, 1983:4, 1986:13, 1987:9, 1996:2, 2003:23
STANDARD [8] - 1939:22, 1939:23, 1952:14, 1973:10, 1973:18, 1993:11, 1993:12, 2008:20
STANDING [2] - 1921:9, 2006:17
STANDS [3] - 1987:10, 1989:9, 1990:19
STAPLE [1] - 2014:5
STARRED [1] - 1970:1
START [7] - 1922:22, 1937:23, 1938:8, 1938:11, 1942:3, 1942:8, 1969:13
STARTED [4] - 1939:16, 1945:22, 1950:12, 1954:21, 1990:22
STARTING [3] - 1897:9, 1898:12, 1942:10
STARTS [1] - 1941:19
STATE [7] - 1890:22, 1906:19, 1909:9, 1912:17, 1949:21, 1954:10, 1970:12
STATE [4] - 1923:9, 1961:19, 1991:22, 1992:13
STATE'S [8] - 1921:16, 1921:22, 1923:8, 1946:11, 1946:22, 1965:2, 2008:1, 2010:9
STATEMENT [13] - 1925:22, 1928:23, 1929:1, 1935:7, 1935:8, 1935:10, 1939:20, 1948:12, 1991:20, 1996:23, 1998:18, 2009:24
STATEMENTS [1] - 1950:7, 1955:22, 1957:2, 1964:5, 1965:7, 1998:15, 2010:8, 2010:10
STATES [2] - 1964:9, 1971:4
STATES [3] - 1975:20, 2002:15, 2015:1
STATES [4] - 1886:1, 1886:11, 1887:22, 2018:3
STATING [2] - 1950:11, 1965:5

**STATION**[1] - 1906:18
**STATISTIC**[1] - 1944:20
**STATISTICAL**[2] - 1973:14, 1974:18
**STATUS**[3] - 1908:6, 1960:6, 1975:15
**STATUTE**[2] - 1941:21, 1960:3
**STATUTORY**[2] - 1958:22, 1977:25
**STAY**[2] - 2001:16, 2001:21
**STAYED**[2] - 1940:12, 1983:16
**STEP**[8] - 1889:25, 1908:3, 1914:12, 1949:15, 1953:11, 1961:19, 1983:10, 2009:9
**STEPHANIE**[5] - 1919:18, 1920:3, 1940:22, 1955:16, 2012:21
**STEPPING**[1] - 1975:13
**STEPS**[3] - 1889:23, 1961:13, 1963:6
**STEVE**[3] - 1886:10, 1887:22, 2018:14
**STICKER**[1] - 1940:6
**STILL**[17] - 1906:18, 1906:19, 1916:11, 1930:9, 1930:21, 1933:16, 1934:14, 1938:18, 1954:24, 1957:8, 1958:8, 1965:8, 1984:12, 1997:6, 1999:13
**STIMULI**[1] - 1986:7
**STINETORF**[11] - 1919:20, 1919:21, 1920:3, 1940:22, 1955:16, 1982:20, 1983:1, 1994:19, 1996:16, 2012:21
**STINETORF'S**[1] - 1920:8
**STOP**[7] - 1992:17, 1996:9, 1997:15, 1999:9, 2002:23, 2006:14, 2014:21
**STOPPED**[1] - 2014:20
**STOPS**[5] - 1925:9, 1925:10, 1999:9, 1999:19, 2005:6
**STORY**[1] - 1944:4
**STRATEGY**[1] - 1950:23
**STREET**[1] - 1974:19
**STREETS**[1] - 1972:4
**STRIKE**[3] - 1925:25, 1926:1, 1954:19
**STRIKINGLY**[1] - 1972:5
**STRING**[1] - 2006:24
**STRONG**[3] - 1965:14, 2005:21, 2006:7
**STRONGER**[1] - 1958:7
**STRUCTURE**[1] - 1894:11
**STRUNG**[1] - 1987:5
**STUDENT**[2] - 1947:17, 1985:22
**STUDENTS**[5] - 1890:3, 1942:25, 1985:17, 1985:18
**STUDIED**[1] - 1976:10
**STUDY**[1] - 1976:14
**STUFF**[4] - 1911:13, 1976:17, 1977:2, 1988:2
**STYLE**[1] - 1970:18
**SUBJECT**[1] - 1965:13
**SUBJECTIVE**[3] - 1973:25, 1986:22
**SUBMISSION**[1] - 1895:7
**SUBMIT**[19] - 1939:22, 1947:8, 1947:20, 1949:12, 1956:21, 1957:9, 1957:20, 1957:25, 1958:1, 1958:2, 1958:4, 1958:6, 1971:19, 1974:24, 1995:8, 1998:24, 2004:19, 2005:3, 2005:4

**SUBMITTED**[20] - 1906:13, 1944:24, 1945:6, 1945:11, 1949:7, 1949:10, 1956:6, 1956:24, 1957:25, 1958:3, 1958:16, 1959:7, 1985:5, 1985:10, 1990:12, 1995:7, 1996:23, 1997:1, 1999:18, 2012:2
**SUBMITTING**[5] - 1945:4, 1946:22, 1959:16, 2002:5, 2006:13
**SUBPOENA**[1] - 1973:5
**SUBPOENAED**[1] - 1935:4
**SUBPOENAS**[2] - 1919:3, 1923:12
**SUBSCRIPTION**[1] - 1974:11
**SUBSEQUENT**[1] - 1920:4
**SUBSTANTIAL**[1] - 2010:3
**SUBVERSION**[1] - 1964:13
**SUCCESS**[5] - 2007:23, 2007:25, 2008:8, 2008:21, 2008:25
**SUCCESSFUL**[1] - 1957:22
**SUED**[1] - 1991:9
**SUFFICIENT**[6] - 1913:17, 1930:14, 1959:17, 1962:13, 1974:4, 1990:9
**SUFFIX**[2] - 1889:22, 1889:23
**SUFFIXES**[2] - 1892:25, 1893:7
**SUGGEST**[5] - 1929:15, 1956:11, 2008:18, 2011:12, 2013:15
**SUGGESTED**[2] - 1955:6, 1994:25
**SUGGESTING**[5] - 1930:7, 1960:23, 1985:12, 2010:24, 2011:1
**SUGGESTION**[3] - 1978:18, 1981:11, 2013:19
**SUGGESTS**[1] - 1952:14
**SUING**[1] - 1951:2
**SULLIED**[1] - 1945:22
**SUMMARY**[1] - 1886:10
**SUMMARY**[6] - 1930:1, 1930:8, 1941:17, 1962:9, 2003:6, 2008:23
**SUMS**[1] - 2004:16
**SUNDAY**[3] - 1919:5, 1922:4, 1938:15
**SUNDAY'S**[1] - 1921:19
**SUPP**[1] - 1967:2
**SUPPLEMENT**[2] - 1914:21, 1934:23
**SUPPLIED**[2] - 1916:12, 1916:13
**SUPPORT**[4] - 1964:9, 1978:13, 1980:7, 1980:11
**SUPPORTED**[2] - 1958:7, 1977:24, 2007:1
**SUPPOSED**[2] - 1974:5, 2005:23
**SUPREME**[2] - 2003:2, 2009:20
**SURELY**[1] - 1978:21
**SURETY**[1] - 1973:11
**SURPRISE**[2] - 1945:11, 2012:24
**SURPRISED**[2] - 1989:18, 2008:7
**SUSTAIN**[1] - 1892:13
**SUSTAINABLE**[1] - 1972:11
**SUSTAINED**[1] - 1895:5
**SUSTAINING**[1] - 1892:20
**SUSTAINS**[1] - 1971:22
**SWEET**[1] - 1987:4
**SWITCH**[1] - 1909:18

**SWORN**[4] - 1889:8, 1995:23, 1997:14, 2005:5
**SYSTEM**[4] - 1972:12, 1974:22, 1975:7, 1979:5
**SYSTEM**[1] - 1975:10
**SYSTEMATICALLY**[1] - 1977:25
**SYSTEMS**[1] - 1901:21

# T

**TABLE**[2] - 1974:8, 1989:3
**TAILOR**[1] - 1974:5
**TAKEAWAYS**[1] - 1946:13
**TALKS**[1] - 1936:24
**TARGET**[3] - 1890:12, 1890:25, 1891:5
**TARGETED**[2] - 1993:3
**TAUGHT**[1] - 1922:13
**TAX**[1] - 1960:6
**TAXES**[2] - 1972:1, 2008:14
**TECH**[1] - 1979:19
**TECHNICIAN**[1] - 1973:14
**TEMPORARY**[1] - 1940:19
**TEN**[4] - 1969:7, 1982:25, 1991:12, 2007:11
**TENS**[2] - 1945:13, 1994:7
**TENSION**[1] - 1970:20
**TENUOUSNESS**[1] - 1999:1
**TERM**[1] - 1978:4
**TERMS**[3] - 1930:15, 1958:12, 2012:3
**TEST**[2] - 1959:1, 2008:12
**TESTIFIED**[41] - 1889:9, 1905:25, 1907:6, 1920:3, 1927:11, 1934:15, 1936:22, 1941:7, 1945:22, 1947:13, 1949:24, 1953:25, 1954:5, 1954:11, 1955:13, 1955:17, 1956:6, 1956:14, 1956:16, 1956:19, 1962:15, 1963:4, 1966:15, 1968:15, 1980:8, 1983:4, 1984:6, 1987:15, 1990:10, 1990:11, 1992:23, 1994:5, 1994:8, 1994:16, 1996:2, 1996:12, 1996:21, 1998:8, 2012:17, 2012:18
**TESTIFY**[11] - 1895:5, 1927:23, 1936:23, 1943:3, 1943:13, 1944:22, 1949:6, 1980:18, 2006:25, 2009:10
**TESTIFYING**[5] - 1903:3, 1905:2, 1986:17, 1997:1, 1998:10
**TESTIMONIES**[1] - 1964:1
**TESTIMONY**[54] - 1893:25, 1896:7, 1896:23, 1898:25, 1899:2, 1899:6, 1899:16, 1899:20, 1899:22, 1901:7, 1901:10, 1902:5, 1902:14, 1903:10, 1904:9, 1904:19, 1905:23, 1905:24, 1907:2, 1907:4, 1907:23, 1930:12, 1930:20, 1932:5, 1934:6, 1940:15, 1941:13, 1943:21, 1944:5, 1945:9, 1945:21, 1947:9, 1955:15, 1959:10, 1966:3, 1966:8, 1966:23, 1968:14, 1976:10, 1980:14, 1980:16, 1985:1, 1986:2, 1986:3, 1986:12, 1986:14, 1986:17, 1986:24, 1990:5, 1993:6,

1996:24, 1999:14, 2000:1, 2012:14

**TEXAN** [1] - 1973:20

**TEXAS** [4] - 1969:25, 1971:2, 1971:6, 1990:21

**TEXT** [7] - 1930:24, 1941:21, 1958:23, 1967:19, 1967:21, 2000:3, 2002:11

**TEXTS** [1] - 1950:24

**THANKFULLY** [1] - 1941:17

**THAT'LL** [1] - 1975:14

**THE** [175] - 1886:1, 1886:6, 1886:10, 1886:14, 1886:20, 1887:22, 1889:2, 1892:4, 1892:6, 1892:10, 1892:19, 1893:3, 1893:8, 1893:21, 1894:2, 1894:25, 1895:3, 1896:3, 1896:16, 1897:14, 1897:23, 1897:25, 1898:2, 1898:7, 1898:9, 1902:18, 1902:19, 1902:24, 1902:25, 1906:25, 1907:10, 1910:25, 1911:5, 1911:16, 1912:22, 1913:3, 1914:9, 1914:12, 1914:14, 1914:15, 1914:16, 1914:17, 1914:22, 1915:2, 1915:16, 1915:24, 1916:5, 1916:14, 1916:22, 1917:2, 1917:5, 1917:7, 1917:20, 1918:5, 1918:9, 1918:13, 1918:22, 1919:4, 1919:7, 1919:17, 1919:21, 1920:10, 1920:12, 1920:18, 1920:23, 1921:8, 1921:14, 1921:17, 1921:20, 1922:3, 1922:8, 1922:12, 1922:15, 1922:18, 1922:21, 1922:24, 1923:3, 1923:15, 1923:22, 1924:1, 1924:4, 1924:9, 1924:14, 1924:15, 1925:4, 1925:6, 1925:10, 1925:14, 1925:18, 1926:2, 1926:6, 1926:9, 1926:12, 1926:22, 1927:3, 1927:11, 1927:20, 1928:5, 1928:13, 1929:5, 1929:20, 1930:4, 1931:3, 1931:10, 1931:16, 1931:23, 1932:3, 1932:13, 1932:15, 1932:20, 1932:23, 1933:3, 1933:9, 1933:13, 1933:18, 1933:24, 1934:8, 1934:16, 1935:3, 1935:8, 1935:13, 1935:18, 1935:22, 1936:3, 1936:7, 1936:10, 1936:15, 1936:22, 1937:2, 1937:9, 1937:14, 1937:18, 1937:22, 1937:23, 1938:3, 1938:7, 1938:10, 1939:1, 1939:2, 1939:4, 1939:6, 1939:8, 1939:9, 1939:13, 1939:15, 1957:15, 1969:5, 1969:7, 1969:8, 1969:12, 1971:8, 1972:17, 1972:19, 1972:23, 1972:25, 1979:24, 1997:18, 2001:5, 2001:6, 2001:9, 2007:8, 2007:10, 2010:14, 2014:17, 2014:20, 2014:23, 2015:7, 2015:12, 2015:17, 2015:23, 2016:15, 2017:9, 2017:13, 2017:21, 2018:14

**THEME** [2] - 1899:10, 1960:1

**THEMSELVES** [6] - 1941:10, 1945:1, 1950:5, 1952:18, 1952:20, 1975:21

**THEREFORE** [1] - 1998:25

**THEREOF** [1] - 1966:22

**THEY'VE** [6] - 1919:2, 1947:19, 1952:8, 1957:4, 1962:24, 1996:23

**THICKET** [1] - 1941:19

**THINKING** [1] - 1973:23

**THIRD** [8] - 1941:23, 1952:4, 1952:21, 1952:24, 1953:3, 1953:4, 1993:22, 1994:22

**THOROUGH** [2] - 1929:18, 2017:5

**THOROUGHLY** [1] - 1917:10

**THOUSANDS** [4] - 1945:13, 1989:12, 1994:7

**THREATEN** [1] - 1968:21

**THREATENED** [3] - 1942:1, 1953:15, 1976:3

**THREATENING** [1] - 1965:17

**THREATS** [3] - 1939:17, 1954:15, 1979:15

**THREE** [13] - 1895:17, 1909:15, 1919:2, 1923:12, 1970:16, 1977:4, 1977:10, 1992:18, 1999:22, 2002:24, 2004:4, 2007:3

**THRESHOLD** [2] - 1942:3, 2007:6

**THROUGHOUT** [5] - 1927:25, 1952:7, 1966:9, 1991:23, 2002:15

**THROW** [1] - 1979:19

**THROWN** [1] - 1978:2

**TIES** [1] - 1902:9

**TIGHT** [2] - 1890:4, 1997:24

**TIM** [1] - 1887:4

**TIMELINE** [1] - 1997:24

**TIMELY** [14] - 1933:14, 1933:18, 1933:21, 1934:2, 1934:3, 1934:11, 1934:12, 1934:16, 1934:18, 1935:14, 1935:18, 1935:22, 1936:5, 1936:12

**TINA** [1] - 1886:18

**TINDER** [2] - 1970:21, 1974:25

**TIPPENS** [1] - 1966:11

**TO** [2] - 1887:22, 2018:13

**TOCQUEVILLE** [1] - 1970:18

**TODAY** [14] - 1892:15, 1896:23, 1899:2, 1899:16, 1899:21, 1902:5, 1902:14, 1903:10, 1938:14, 1938:18, 1966:13, 1966:15, 1986:20, 1990:20

**TODAY'S** [1] - 1921:18

**TOGETHER** [10] - 1903:23, 1930:19, 1945:17, 1945:19, 1972:20, 1975:21, 1987:5, 1997:21, 2000:3, 2006:24

**TOLIVER** [1] - 1947:5

**TOMORROW** [1] - 1925:16

**TON** [1] - 1958:23

**TOOK** [17] - 1889:18, 1944:24, 1949:25, 1950:1, 1971:15, 1983:10, 1984:8, 1988:14, 1990:1, 1990:7, 1992:20, 1992:21, 1992:24, 1993:10, 1997:24, 2004:23, 2014:4

**TOOL** [4] - 1954:22, 1954:24

**TOP** [1] - 1892:11

**TOPIC** [1] - 1905:22

**TOTALITY** [1] - 2006:21

**TOTALLY** [6] - 1920:24, 1928:18, 1986:2, 1987:4, 1989:18, 1997:4

**TOWARD** [1] - 1952:1

**TOWARDS** [2] - 1895:11, 1975:15

**TOWN** [3] - 1985:12, 1990:21

**TOWNS** [2] - 1985:13, 1988:17

**TRACK** [1] - 2001:1

**TRACKING** [1] - 2001:18

**TRAINING** [1] - 1970:15

**TRAMPLED** [1] - 2010:12

**TRANSCRIPT** [1] - 1886:10

**TRANSCRIPT** [3] - 1925:23, 1925:25, 2018:6

**TRANSCRIPTS** [2] - 1925:21, 1926:2

**TRANSGRESSES** [1] - 2013:21

**TRANSLATION** [1] - 1907:25

**TREATMENT** [1] - 1962:4

**TREMENDOUS** [1] - 1987:9

**TRIAL** [12] - 1910:6, 1924:7, 1930:10, 1933:12, 1939:16, 1939:24, 1952:7, 1967:22, 2007:16, 2015:4, 2015:8, 2015:12

**TRIED** [5] - 1909:5, 1943:13, 1974:16, 1980:10, 1991:18

**TRIER** [1] - 1984:16

**TRO** [12] - 1915:7, 1915:8, 1915:9, 1915:11, 1915:13, 1915:14, 1915:22, 1916:2, 1916:3, 1925:2, 1925:3

**TROUBLE** [2] - 1893:21, 1971:8

**TRUE** [13] - 1907:4, 1935:9, 1948:11, 1953:1, 1953:23, 1978:12, 2009:9, 2009:11, 2009:13, 2009:14, 2011:16, 2018:6

**TRUE** [1] - 1886:6

**TRUE** [92] - 1889:15, 1890:6, 1890:11, 1890:19, 1890:24, 1891:4, 1891:7, 1891:9, 1891:23, 1892:16, 1892:24, 1893:2, 1893:10, 1893:13, 1902:6, 1902:15, 1910:10, 1910:16, 1910:19, 1911:10, 1911:19, 1911:20, 1912:6, 1912:10, 1912:23, 1914:1, 1940:11, 1942:8, 1942:10, 1942:11, 1943:9, 1943:11, 1943:12, 1943:23, 1945:6, 1945:12, 1945:16, 1946:21, 1947:10, 1947:23, 1948:18, 1948:19, 1948:24, 1949:9, 1949:12, 1949:20, 1950:3, 1950:19, 1950:22, 1951:6, 1951:10, 1951:11, 1953:2, 1955:12, 1956:2, 1956:12, 1956:14, 1956:18, 1956:19, 1956:20, 1956:22, 1957:20, 1959:12, 1959:15, 1963:12, 1963:13, 1963:18, 1963:25, 1964:4, 1964:18, 1965:14, 1965:15, 1968:1, 1968:5, 1968:10, 1970:13, 1978:1, 1978:11, 1981:16, 1989:20, 1990:2, 1993:1, 2003:25, 2008:2, 2009:11, 2009:13, 2010:10, 2010:11, 2012:3, 2012:7, 2013:11

**TRUEAPPEND** [1] - 1903:22

**TRUEDECEASED** [5] - 1902:9, 1902:21, 1902:22, 1903:21, 1904:25

**TRUENCOA** [8] - 1899:7, 1899:19, 1901:22, 1902:8, 1902:20, 1902:23, 1903:19, 1903:21

**TRUENCOA'S** [1] - 1902:22
**TRULY** [1] - 1987:19
**TRUMP** [2] - 1950:12, 1974:23
**TRUSTWORTHY** [1] - 1890:10
**TRY** [13] - 1890:6, 1893:15, 1894:16, 1902:12, 1955:3, 1973:22, 1978:13, 1988:2, 1995:2, 1998:15, 2013:2, 2016:19, 2016:21
**TRYING** [22] - 1890:16, 1894:9, 1895:9, 1911:5, 1916:16, 1918:16, 1925:25, 1931:4, 1932:17, 1960:24, 1970:3, 1970:5, 1970:13, 1975:13, 1980:17, 1986:13, 1986:15, 1988:5, 1996:25, 2000:2, 2001:3, 2006:24
**TUESDAY** [2] - 2017:18, 2017:19
**TUESDAY** [1] - 1886:11
**TUMULTUOUS** [1] - 1975:16
**TURNAROUND** [2] - 1946:2
**TURNED** [1] - 1970:10
**TURNER** [13] - 1933:7, 1934:1, 1934:9, 1940:19, 1955:16, 1978:15, 1981:17, 1982:9, 1982:13, 1994:19, 1996:16, 2012:16
**TURNER'S** [1] - 1934:6
**TV** [1] - 1991:9
**TVS** [1] - 1975:3
**TWEET** [3] - 1965:16, 1965:17
**TWICE** [3] - 1914:25, 1916:15, 1952:17
**TWITTER** [1] - 1965:16
**TWO** [28] - 1889:23, 1911:3, 1921:2, 1924:7, 1931:1, 1931:3, 1932:7, 1932:10, 1932:16, 1932:23, 1938:12, 1946:6, 1959:7, 1961:19, 1962:2, 1975:11, 1977:7, 1992:6, 1992:7, 1992:18, 1995:14, 2003:21, 2005:18, 2010:17, 2010:21, 2013:10
**TWO-MINUTE** [1] - 1911:3
**TWO-STEP** [1] - 1961:19
**TWO-WEEK** [1] - 1924:7
**TYPE** [6] - 1893:19, 1908:5, 1971:18, 1973:17, 1979:18, 1993:22
**TYPES** [4] - 1894:8, 1946:4, 1955:4
**TYPICAL** [1] - 1991:19
**TYPICALLY** [3] - 1947:17, 1995:16

## U

**U.S** [8] - 1975:10, 1982:16, 1982:22, 1991:23, 1992:9, 2003:2, 2009:20
**ULTIMATE** [2] - 1993:13, 1993:14
**ULTIMATELY** [3] - 1981:6, 1991:15, 1992:22
**UNCERTAIN** [1] - 2012:17
**UNCERTAINTY** [1] - 1972:7
**UNCHECKED** [1] - 1975:11
**UNCLEAR** [3] - 1930:18, 1931:9
**UNCONTESTED** [1] - 1930:14
**UNDER** [28] - 1893:25, 1897:7, 1903:3, 1916:11, 1917:17, 1920:11, 1927:1, 1927:24, 1933:21, 1937:6, 1951:12,

1956:16, 1957:23, 1958:16, 1959:3, 1961:9, 1963:4, 1963:23, 1963:25, 1969:16, 1978:25, 1984:12, 1993:9, 1997:13, 2007:2, 2014:12, 2014:13
**UNDERLYING** [2] - 1972:4, 1989:14
**UNDERMINE** [1] - 2005:19
**UNDERMINES** [1] - 1972:12
**UNDERPINNINGS** [1] - 1894:12
**UNDERSCORE** [1] - 1993:17
**UNDERSCORES** [2] - 1985:25, 1998:13
**UNDERSTOOD** [2] - 1971:13, 2003:16
**UNDOUBTEDLY** [1] - 2004:1
**UNFAIR** [1] - 2000:5
**UNFAIRLY** [1] - 2012:15
**UNFORTUNATE** [1] - 1986:8
**UNFORTUNATELY** [1] - 2006:25
**UNION** [1] - 1975:21
**UNITED** [4] - 1886:1, 1886:11, 1887:22, 2018:3
**UNITED** [2] - 2002:15, 2015:1
**UNIVERSITY** [2] - 1985:15, 1985:22
**UNJUSTIFIABLE** [5] - 2010:3, 2010:6, 2010:8, 2010:11
**UNLAWFUL** [3] - 1910:12, 1941:12, 2009:24
**UNLAWFULLY** [4] - 1941:2, 1950:9, 1951:14, 2009:7
**UNLESS** [5] - 1889:20, 1894:10, 1919:13, 1923:15, 2004:11
**UNLIKE** [1] - 1997:13
**UNMITIGATED** [1] - 1942:15
**UNREFUTED** [1] - 1947:9
**UNRELATED** [3] - 1962:17, 1980:10, 1998:14
**UNSUPPORTED** [2] - 1998:12, 1998:18
**UNTIMELY** [1] - 1926:21
**UNVERIFIED** [1] - 1927:19
**UOCAVA** [9] - 1907:13, 1907:15, 1907:20, 1908:2, 1908:5, 1908:8, 1943:25, 2011:20, 2011:21
**UP** [44] - 1897:13, 1898:5, 1904:9, 1909:10, 1910:12, 1910:23, 1911:2, 1911:3, 1911:8, 1912:25, 1914:17, 1915:25, 1918:17, 1922:11, 1922:18, 1922:23, 1923:5, 1924:11, 1924:12, 1926:15, 1928:6, 1928:7, 1931:21, 1932:9, 1934:10, 1937:20, 1937:21, 1942:6, 1942:17, 1943:8, 1953:24, 1960:25, 1963:23, 1964:25, 1971:3, 1971:21, 1977:5, 1977:20, 1978:18, 1990:21, 1991:3, 2009:10, 2012:21, 2013:1
**UP-TO-DATE** [3] - 1937:20, 1937:21, 1971:21
**UPDATE** [1] - 1974:10
**UPDATED** [6] - 1924:18, 1924:19, 1925:7, 1925:11, 1984:6, 1988:12
**UPHOLD** [2] - 1995:24, 1996:5
**USA** [1] - 1887:2
**USUAL** [1] - 1926:9

**UTILIZE** [1] - 1992:25
**UZOMA** [1] - 1886:17

## V

**VALIDATE** [5] - 1963:16, 1963:18, 1963:19, 1963:24, 1968:8
**VALUE** [3] - 1985:3, 1986:23, 1989:13
**VARIATIONS** [2] - 1952:11, 1966:8
**VARIOUS** [4] - 1906:9, 1928:1, 1946:14
**VEHICLE** [2] - 1960:8, 1979:14
**VEIN** [1] - 1938:20
**VENDOR** [1] - 1901:13
**VERDICT** [1] - 2017:6
**VERIFIED** [3] - 1927:12, 1927:13, 1927:16
**VERIFY** [2] - 1938:25, 1992:1
**VERSION** [2] - 1925:9, 1925:12
**VETERAN** [1] - 1987:8
**VETTED** [1] - 2009:2
**VIEW** [2] - 1970:15, 1991:14
**VIEW** [1] - 1937:7, 1961:2
**VIEWED** [1] - 2003:16
**VIGOROUSLY** [3] - 2005:19, 2005:20, 2006:4
**VIOLA** [2] - 1887:21, 2018:12
**VIOLA_ZBOROWSKI@GAND. USCOURTS.GOV** [1] - 1887:24
**VIOLATED** [3] - 1942:7, 1955:14
**VIOLATING** [1] - 1941:3
**VIOLATION** [5] - 1941:20, 1958:10, 1960:24, 1962:3, 2016:12
**VIOLENT** [1] - 1952:15
**VOICE** [5] - 1891:15, 1895:22, 1989:25, 2003:23, 2004:1
**VOICING** [2] - 1989:25, 2003:24
**VOLUME** [1] - 1886:3
**VOLUMINOUS** [1] - 1932:1
**VOLUNTEER** [7] - 1909:25, 1940:11, 1940:12, 1945:3, 1950:22, 1955:12, 1956:2
**VOLUNTEERED** [2] - 1910:3, 1910:5
**VOLUNTEERING** [1] - 1909:25
**VOLUNTEERS** [4] - 1890:9, 1890:22, 1913:23, 1951:5
**VOTE** [19] - 1906:15, 1940:1, 1942:2, 1947:16, 1963:3, 1968:22, 1968:24, 1971:22, 1971:25, 1974:14, 1977:15, 1982:19, 1982:24, 1984:7, 1984:20, 1991:25, 2000:24, 2013:2
**VOTE** [78] - 1889:15, 1890:6, 1890:11, 1890:19, 1890:24, 1891:4, 1891:7, 1891:9, 1902:6, 1902:15, 1910:10, 1910:16, 1910:19, 1911:10, 1911:19, 1911:20, 1912:6, 1912:23, 1914:1, 1942:8, 1942:9, 1942:10, 1942:11, 1943:11, 1943:23, 1945:7, 1945:12, 1946:21, 1947:10, 1947:24, 1948:18, 1948:19, 1948:24, 1949:9, 1949:12, 1949:20, 1950:19, 1950:23, 1951:6,

1951:10, 1951:11, 1953:2, 1955:12, 1956:2, 1956:12, 1956:15, 1956:18, 1956:19, 1956:20, 1956:22, 1957:20, 1959:15, 1963:16, 1963:18, 1963:19, 1963:24, 1963:25, 1964:18, 1965:14, 1965:15, 1968:1, 1968:6, 1968:8, 1968:10, 1970:13, 1978:1, 1978:11, 1981:16, 1989:20, 1990:2, 1993:1, 2003:25, 2009:13, 2010:11, 2012:3, 2012:7, 2013:11

**VOTE** [1] - 1886:6

**VOTE'S** [1] - 1983:2

**VOTE'S** [19] - 1891:24, 1892:16, 1892:24, 1893:2, 1893:10, 1893:13, 1912:10, 1940:11, 1943:10, 1943:12, 1945:16, 1950:3, 1959:12, 1963:12, 1963:14, 1964:5, 2008:3, 2009:12, 2010:10

**VOTED** [3] - 1940:3, 1940:8, 1940:21

**VOTED** [1] - 1940:6

**VOTER** [3] - 1970:14, 2012:22, 2012:23

**VOTER** [59] - 1905:15, 1907:19, 1908:7, 1909:9, 1912:14, 1912:17, 1947:16, 1947:20, 1948:13, 1949:14, 1949:17, 1949:21, 1950:15, 1953:16, 1953:17, 1953:25, 1954:2, 1954:3, 1955:5, 1955:7, 1959:20, 1961:3, 1961:12, 1961:25, 1962:13, 1964:14, 1965:10, 1965:24, 1969:22, 1969:25, 1970:1, 1970:3, 1970:9, 1971:21, 1972:14, 1977:16, 1980:22, 1982:20, 1983:22, 1983:24, 1984:9, 1986:11, 1987:22, 1988:12, 1989:24, 1990:13, 2000:22, 2000:23, 2002:9, 2002:13, 2002:19, 2009:9, 2009:24, 2010:14, 2011:1, 2012:5

**VOTERS** [79] - 1893:5, 1897:11, 1898:13, 1906:1, 1906:22, 1907:13, 1911:19, 1912:16, 1940:15, 1941:9, 1941:12, 1942:12, 1942:14, 1942:20, 1942:22, 1943:24, 1943:25, 1944:14, 1945:18, 1945:20, 1946:9, 1946:23, 1947:14, 1947:15, 1949:6, 1949:16, 1951:13, 1952:1, 1952:5, 1952:9, 1952:10, 1952:11, 1952:22, 1952:25, 1953:5, 1953:10, 1953:14, 1955:4, 1955:5, 1956:10, 1956:11, 1958:5, 1961:7, 1961:9, 1961:12, 1962:25, 1963:8, 1964:16, 1965:18, 1967:8, 1968:6, 1968:21, 1980:13, 1980:18, 1986:3, 1987:21, 1990:10, 1997:15, 1998:3, 1998:20, 1998:22, 1999:11, 2002:16, 2009:1, 2009:3, 2010:13, 2011:9, 2011:15, 2011:19, 2011:20, 2011:21, 2011:23, 2012:25, 2013:1, 2013:4

**VOTERS'** [1] - 2001:22

**VOTES** [2] - 1963:15, 1968:10

**VOTING** [24] - 1910:11, 1923:9, 1923:20, 1940:5, 1940:6, 1940:16,

1941:2, 1942:2, 1960:16, 1963:5, 1963:7, 1965:1, 1970:7, 1970:9, 1972:9, 1984:6, 1992:1, 2002:2, 2006:4, 2009:7, 2011:1, 2012:21, 2016:20

**VOTING** [1] - 1993:9

**VRA** [1] - 1941:10

**VS** [1] - 1886:5

**VULNERABILITIES** [1] - 1972:6

---

## W

**WAIT** [3] - 1930:24, 1936:16, 1962:2

**WANTS** [3] - 1898:4, 1911:3, 1916:16

**WARNED** [1] - 1959:15

**WATCH** [2] - 1971:6, 1975:5

**WATCHED** [1] - 1940:6

**WATCHERS** [1] - 2002:1

**WATCHING** [1] - 1976:1

**WEAKNESS** [4] - 1994:24, 1998:13, 1998:23, 2000:17

**WEB** [1] - 1899:8

**WEB-BASED** [1] - 1899:8

**WEBSITE** [5] - 1921:16, 1921:22, 1965:2, 2010:22, 2010:23

**WEBSITES** [2] - 1918:1, 1918:3

**WEDNESDAY** [5] - 1938:19, 2016:23, 2017:18, 2017:20, 2017:21

**WEEK** [7] - 1924:7, 1938:13, 1938:17, 1945:23, 1968:4, 2017:15, 2017:24

**WEEK'S** [1] - 1948:21

**WEEKS** [6] - 1942:12, 1945:20, 1946:6, 1959:7, 1977:5

**WEIGH** [3] - 1962:11, 1978:20, 2003:10

**WELL-ESTABLISHED** [1] - 1942:13

**WELL-RESOURCED** [1] - 1998:4

**WHISTLEBLOWER** [4] - 1947:24, 1948:3, 1948:9, 1964:1

**WHITE** [1] - 1996:21

**WHITTLED** [1] - 2011:21

**WHOLE** [6] - 1917:3, 1927:21, 1928:18, 1937:14, 1958:22, 2005:2

**WHOLESALE** [1] - 2000:18

**WHOLLY** [2] - 1982:7, 1988:21

**WIFE'S** [1] - 1976:15

**WILLIAMS** [8] - 1944:23, 1948:23, 1949:3, 1949:5, 1949:15, 1950:15, 1989:6, 1989:7

**WILLIAMS** [1] - 1886:7

**WILLINGHAM** [1] - 2001:22

**WILLINGLY** [1] - 1946:21

**WILLINGNESS** [3] - 1895:13, 1895:21, 1895:23

**WILLY** [1] - 1992:12

**WILLY-NILLY** [1] - 1992:12

**WINDOW** [1] - 1946:3

**WINNING** [4] - 1922:8, 1922:9, 1922:13

**WISH** [1] - 2017:2

**WITHDRAWN** [4] - 1915:8, 1916:7, 1916:10, 1919:3

**WITHHELD** [1] - 1967:18

**WITNESS** [15] - 1894:1, 1896:4, 1897:21, 1897:22, 1898:8, 1913:2, 1914:15, 1931:14, 1946:15, 1946:16, 1989:6, 1990:14, 1996:24, 1996:25, 1999:15

**WITNESS** [6] - 1888:2, 1902:19, 1902:25, 1912:22, 1914:14, 1914:16

**WITNESS'S** [1] - 1966:8

**WITNESSES** [7] - 1914:19, 1928:2, 1930:20, 1931:1, 1931:3, 1934:25, 1952:8

**WOMAN** [1] - 1974:14

**WORD** [10] - 1895:15, 1896:14, 1900:12, 1908:19, 1909:8, 1911:7, 1948:12, 1978:5, 1987:13, 2017:17

**WORDS** [7] - 1898:3, 1947:25, 1963:21, 1969:19, 1984:17, 2006:7, 2013:4

**WORKS** [1] - 1976:18

**WORLD** [5] - 1918:6, 1928:17, 1940:18, 1976:2, 1989:7

**WORSE** [1] - 1945:17

**WORTHY** [1] - 1954:8

**WOVEN** [1] - 1960:1

**WRESTLED** [2] - 1953:20, 1953:21

**WRESTLING** [1] - 1941:16

**WRIGHT** [6] - 1924:10, 1925:15, 1937:20, 1938:25, 1939:7, 1969:6

**WRIGHT'S** [1] - 1924:11

**WYNNE** [71] - 1886:22, 1888:6, 1914:18, 1916:8, 1917:1, 1917:3, 1917:6, 1917:14, 1918:1, 1918:8, 1918:10, 1918:19, 1919:1, 1919:6, 1920:21, 1921:12, 1921:15, 1921:19, 1921:21, 1922:5, 1922:10, 1922:14, 1922:17, 1923:2, 1924:6, 1925:19, 1926:7, 1926:11, 1926:13, 1926:19, 1926:25, 1927:24, 1928:12, 1928:22, 1929:15, 1929:23, 1930:5, 1930:11, 1930:23, 1931:12, 1931:21, 1932:1, 1932:12, 1932:14, 1932:18, 1932:22, 1933:2, 1933:5, 1933:16, 1934:4, 1934:20, 1935:6, 1935:11, 1935:16, 1935:20, 1935:24, 1936:9, 1936:13, 1936:21, 1937:1, 1937:17, 1938:4, 1969:15, 1971:9, 1972:18, 1972:22, 1972:24, 1973:1, 2015:16, 2016:7, 2017:12

**WYNNE** [20] - 1919:4, 1920:13, 1920:15, 1922:3, 1922:8, 1922:21, 1922:24, 1922:25, 1924:4, 1924:11, 1925:18, 1926:22, 1929:21, 1932:5, 1933:13, 1934:16, 1936:11, 1937:16, 1991:15

**WYNNE'S** [1] - 1933:4

---

## X

**XML** [1] - 1894:18

## Y

**YARD** [1] - 1978:7
**YEAR** [6] - 1921:24, 1946:4, 1946:5,
  1981:19, 1991:19
**YEAR-TO-YEAR** [1] - 1981:19
**YEARS** [12] - 1895:17, 1908:21,
  1909:15, 1970:14, 1975:11, 1981:9,
  1981:18, 1986:19, 1989:10, 1991:12,
  2004:23
**YELLING** [1] - 1975:3
**YELLOW** [1] - 1996:22
**YESTERDAY** [3] - 1902:19, 1911:1,
  1966:14
**YOU-ALL** [18] - 1889:2, 1917:23,
  1919:5, 1919:13, 1919:21, 1924:17,
  1924:18, 1931:20, 1938:8, 1938:10,
  1969:13, 2015:18, 2015:20, 2016:17,
  2017:10, 2017:14, 2017:15, 2017:24
**YOURSELF** [8] - 1896:12, 1896:19,
  1901:9, 1901:19, 1902:6, 1908:14,
  1909:2, 1909:6
**YUN** [1] - 1887:4

## Z

**ZBOROWSKI** [1] - 2018:12
**ZBOROWSKI** [2] - 1887:21, 2018:12
**ZERO** [1] - 1992:5
**ZILLIONS** [1] - 1994:8
**ZOOMED** [1] - 1897:19