UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
GAINESVILLE DIVISION

| | |
|---|---|
| FAIR FIGHT, INC., SCOTT BERSON, JOCELYN HEREDIA, and JANE DOE,<br><br>Plaintiffs,<br><br>v.<br><br>TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, JAMES COOPER, and JOHN DOES 1-10,<br><br>Defendants. | **Civil Action No.**<br>**2:20-cv-00302-SCJ** |

**DEFENDANTS' PROPOSED FINDINGS OF FACT and CONCLUSIONS OF LAW**

TABLE OF CONTENTS

Pg.

I.      INTRODUCTION...................................................................1

II.     PROCEDURAL HISTORY OF CASE.....................................3

III.    LEGAL STANDARD..............................................................5

IV.     FINDINGS OF FACT............................................................10

        **A. Plaintiffs Did Not Prove Direct or Directed Contact**...............**10**

                1. Individual Voters...................................................10

                        *a.  Scott Berson*.................................................10

                        *b.  Gamaliel Turner*..........................................15

                        *c.  Stefanie Stinetorf*........................................20

                        *d.  Jocelyn Heredia*..........................................22

                2. Dr. Orville Vernon Burton......................................26

                3. Catherine Engelbrecht and True The Vote............................27

                4. Derek Somerville...................................................51

                5. Mark Davis.........................................................65

V.      CONLUSIONS OF LAW.......................................................125

        **A. Plaintiffs Have Failed to Prove Their Affirmative Case**...........**125**

                Element (A): If Defendants (or Their Agents) Directly Engaged
                With Others................................................................126

                Element (B): If Defendants' Actions Caused or Could Have
                Caused Voters' Fear......................................................130

Element (C): If the Voters' Potential Or Experienced Intimidation Was Reasonable…………….………………………130

*Factor (1) – Proximity of the Challenges to the Election*…………131

*Factor (2) – The Frivolity of the Challenges Made (if any)*……....136

*Factor (3) – The Intent (or not) To Target Specific Voters or Demographics of Voters*………………………………………..143

*Factors (4) – The Bounty (or Legal Defense Fund); (5) – The Recruitment of Navy SEALs to Watch (or Work) Polling Places; And (6) – The Publication of Challenged Voters' Names*…………146

**B. Defendants' Affirmative Defense of Free Speech and Freedom To Petition**………………………………………....**148**

**VI.   CONLCUSION**………………………………………………**157**

TABLE OF AUTHORITIES

Pg.

*BE & K Const. Co. V. N.L.R.B.*, 536 U.S. 516, 531 (2002)….….6, 141, 152, 153, 154

*Beach Blitz Co. v. City of Miami Beach*, 13 F.4th 1289, 1302 (11th Cir. 2021)….154

*Bellitto v. Snipes*, 935 F.3d 1192, 1194 (11th Cir. 2019)……………...…..135, 150

*Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336–37 (11th Cir. 2021)…………10

*Bryant v. Mil. Dept. of Mississippi*, 597 F.3d 678, 691 (5th Cir. 2010)…………..152

*Counterman v. Colorado*, 600 U. S. 66 (2023)………………….………6, 7, 157

*Elonis v. United States*, 575 U.S. 723 at 746 (2015)………………………………..8

*Fair Fight*, 413 F.Supp.3d at 1290………………………………………………149

*Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004)…..149

*Husted v. A. Philip Randolph Inst.*, 138 S.Ct. 1833 (2018)………………………149

*Libertarian Party of Va. v. Judd*, 881 F. Supp. 2d 719 (E.D. Va. 2012)…………….9

*Morrill v. Weaver*, 224 F. Supp. 2d 882 (E.D. Pa. 2002)……………………………9

*Pierce v. Jacobsen*, 44 F.4th 853 (9th Cir. 2022)…………………………………….9

*Prof. Real Est. Inv'rs v. Columbia Pictures Indus., Inc*. 508 U.S. 49 (1993)...152, 153

*Rumsfeld v. F. for Acad. & Institutional Rts., Inc*., 547 U.S. 47, 66 (2006)……..…9

*Spence v. Washington*, 418 U.S. 405 (1974)………………………………………….9

*Texas v. Johnson*, 491 U.S. 397, 404 (1989)………………………………………….9

Civil Case No. 1:20-CV-0266-LAG;
*Majority Forward, et al, v. Ben Hill County Board of Elections and Muscogee County Board of Elections, et al;* in the United States District Court for the Middle District of Georgia, Albany Division...........................................134

iv

U.S. Const. amend. I…………………………………………………..…9

O.C.G.A Section, Chapter 21-2-226(a); 229; 230; 233; et seq……………..…passim

Voting Rights Act, 52 U.S.C. Section 10307(b)……………………………….passim

## I.    INTRODUCTION

1. This case concerns Section 230 of the Georgia Elections Code, which authorizes a citizen elector to inquire about the eligibility of any voter in his or her county to vote in that county, in any given election. O.C.G.A. Section 21-2-230(a)(2019). Plaintiffs Fair Fight, Inc. ("Fair Fight"), Scott Berson ("Berson"), and Jocelyn Heredia ("Heredia") (collectively "Plaintiffs") allege that in attempting to make, sponsor, or coordinate  Section 230 challenges in the weeks leading up to the January 5, 2021, Run-Off Election (the "Run-Off"), Defendants True the Vote, Inc. ("True the Vote"), Catherine Engelbrecht ("Engelbrecht"), Derek Somerville ("Somerville"), Mark Davis ("Davis"), Mark Williams ("Williams"), Ron Johnson ("Johnson"), and James Cooper ("Cooper") (collectively, "Defendants"), violated Section 11(b) of the Voting Rights Act.

2. Plaintiffs failed to present evidence that meets the standard established by this Court by a preponderance of the evidence.[1] This failure necessitates a dismissal of all the claims brought and Judgment for Defendants.

---

[1] Plaintiffs take two approaches. First, they allege Defendants' actions violated the individual voting rights of Plaintiffs Berson and Heredia through threats, coercion, and intimidation. Second, they allege more broadly that by facilitating the submission of eligibility inquiries en masse in the weeks preceding the Senatorial Run-Off in Georgia without adequate scrutiny, Defendants created an atmosphere

3. The parties at various points during the trial acknowledged that, to succeed on their 11(b) claim, Plaintiffs must show that Defendants directly (or directed a third party) to cause or attempt to cause a reasonable, objective person to be intimidated. Plaintiffs presented no evidence that any Defendant directly or through a third party communicated with a voter. The most Plaintiffs suggested was that Defendants directed county election boards to communicate with voters. This suggestion is predicated upon a factual impossibility as county election boards, by operation of law, cannot uncritically take direction from others. Plaintiffs further presented no evidence that any Defendant caused any voter to be intimidated. There is no evidentiary connection between any Defendant and a Muscogee County voter and no sufficiently causal tie between a Defendant and any Banks County voter, such as Jocelyn Heredia. Finally, the six factors weighed by the Court in considering objective intimidation affirm a finding that any feelings of

_____

that would be perceived by a rational voter to be threatening, coercive, or intimidating with respect to his or her voting behavior. For this point, Plaintiffs offered the personal expectations and perceptions of Berson and Heredia and non-plaintiffs Gamaliel Turner and Stephanie Stinetorf, as well as the expert opinions of Dr. Kenneth Mayer and Dr. Vernon Burton. The parties at various points during the trial acknowledged that the standard to be applied in determining whether Defendants violated Section 11(b) with respect to (a) the individual plaintiffs; or (b) the citizenry writ large was whether Defendants had acted "recklessly," in conscious disregard of a known risk of intimidation in their speech and petitions.

intimidation were not reasonable. As such, Plaintiffs failed to meet the standard established by the Court to succeed on an 11(b) claim.

4. Should it be found that Plaintiffs have a possibility of meeting the Court's 11(b) standard, Plaintiffs regardless did not meet the standard to infringe on Defendants' First Amendment rights. Plaintiffs did not prove Defendants recklessly disregarded known risks, as Plaintiffs admitted is required, by a preponderance of the evidence.

5. Defendants' use of the only tools available to them to assess possible residency changes, were not reckless or frivolous, particularly as part of an NCOA-centric process (1) sanctioned by the State of Georgia, (2) used by secretaries of state and validated by the Supreme Court, (3) whose predictive accuracy many Defendants had seen and studied, (4) personally encouraged by Georgia's Secretary of State, his deputies, and several of legislators, (5) approved by legal counsel, and (6) that affected voters if at all only by the intervening and independent action of county Boards of Election (also BOEs).

## II.    PROCEDURAL HISTORY OF CASE

6. Plaintiffs include Fair Fight, a corporation organized under the law of Georgia, which has been in existence since 2018; an individual, Scott Berson, recruited by Fair Fight to participate as a party plaintiff in this lawsuit; and

Jocelyn Heredia, also recruited by Fair Fight to participate as a party plaintiff in this lawsuit.

7. Defendant True the Vote is a Texas corporation, which was founded by co-defendant and president and CEO Engelbrecht.

8. Defendant Somerville is an individual now residing in Kentucky, who lived in Georgia at the time of the events relevant to this case.

9. Defendant Davis is an individual residing in Georgia who is president of a company, Data Productions, that for about three decades has helped large mailers accurately put mail in the hands of recipients, mostly voters.

10. Defendant Williams is an individual residing in Georgia who owns and manages a commercial print shop.

11. Defendant Johnson is an individual residing in New York, who resided in Georgia at the time of the events relevant to this case.

12. Defendant Cooper is an individual residing in Georgia.

13. Approximately forty-six (46) other states have similar statutory provisions authorizing challenges to the eligibility of an individual to vote in a county based on residency or other factors making them ineligible.

14. To try to buttress their claims in this case, Plaintiffs attempted to make relevant various lawsuits True the Vote did not file but did support financially in the weeks following the 2020 General Election. True the Vote's then-

counsel Jim Bopp, who filed identical suits in Michigan, Pennsylvania, Wisconsin, and Georgia, voluntarily dismissed them within one week. Ex. 90; Eng. Tr. 902:3-20.

15. After engaging in discovery, the parties filed cross motions for summary judgment upon with the Court ruled March 9, 2022 [Dkt. 222], revising its ruling on May 3, 2023 [Dkt. 235], denying summary judgment, striking certain defenses asserted, and setting out the six factors comprising the totality of the circumstances upon which the Court wanted to hear and consider testimony at trial. Those are and were the following, upon which the Court did hear testimony at trial between October 26, 2023, and November 7, 2023:

- Proximity

- Frivolity

- Defendants' Motivation

- The Use of the Word "Bounty" by Ms. Engelbrecht

- The Mention of Navy SEALs by Ms. Engelbrecht

- The Publication of the Names of Challenged Voters.

## III.   LEGAL STANDARD

16. To prevail, Plaintiffs must show by a preponderance of the evidence that "(1) Defendants' actions directly or through means of a third-party in which they

directed, (2) caused, or could have caused, (3) any person to be reasonably intimidated, threatened, or coerced from voting or attempting to vote," Dkt. No. 222 at 16-17. Plaintiffs must also show at a minimum, by a preponderance of the evidence that Defendants' *speech* was reckless, per *Counterman v. Colorado*, 600 U. S. 66 (2023), and that their petitions must have been "both objectively baseless and subjectively motivated by an unlawful purpose", per *BE & K Const. Co. V. N.L.R.B.*, 536 U.S. 516, 531 (2002).

17. If Plaintiffs cannot show causation, that is, that an individually-named Plaintiff was directly or indirectly intimidated by any named Defendant, then Plaintiffs cannot make their case. Dkt. 222 at 19 n.12.

18. The standard for restricting petitioning is even higher than for restricting litigation – petitions to the government are expressly mentioned in the First Amendment, may not even reach the parallel of a defendant, and in this case often evoked no BOE response at all, *contra* Dkt. No. 222 at 80 ("the voter challenges demanded a response") – but the standard for baseless litigation with unlawful purpose still serves some use here. *See id*.

19. In *Counterman*, the defendant was charged under a statute, strikingly similar to Section 11(b), making it unlawful to communicate with another person in "a manner that would cause a reasonable person to suffer serious emotional distress." In other words, the Court in *Counterman* considered a statute

employing the same objective "reasonable plaintiff" standard, without regard to the defendant's awareness or *mens rea*, that Plaintiffs advance for Section 11(b).

## A Defendant Accused of Problematic Speech Must Be Aware of or Recklessly Disregard His or Her Speech's Impact

20. But the defendant in *Counterman* argued that the First Amendment required that his statements were not only objectively threatening, but also that he was aware of (or recklessly disregarded) their threatening nature. The Supreme Court agreed, though it acknowledged that insistence on a "subjective element" would "shield some otherwise prescribable (here, threatening) speech" because it's difficult to prove "what the defendant thought." 600 U.S. at 75. But the Court balanced the competing rights at issue in favor of more speech, holding that a subjective standard for the alleged perpetrator is still required lest legal action chill too much protected expression, *id*. at 75, 78, 80. In language equally applicable to Plaintiffs' Section 11(b) claims, the Court expressed concern for "[t]he speaker's fear of mistaking whether a statement is a threat; his fear of the legal system getting that judgment wrong; his fear, in any event, of incurring legal costs" — and his "swallow[ing] words" that are in fact not violations. *Id*. at 78 (emphasis added).

21. The Court acknowledged that while the presence of a threat depends not on "the mental state of the author," but on "what the statement conveys" to the person on the receiving end, *id*. at 74, "the First Amendment may still demand a subjective mental-state requirement . . . because bans on speech have the potential to chill, or deter, speech outside their boundaries." And an important tool to prevent chilled speech—even in the less protectable, non-political context of actual threats — "is to condition liability on ... a culpable mental state." *Id*. at 75.

22. The Supreme Court held that in cases of speech alleged to be problematic, the appropriate mens rea is a recklessness standard—i.e., a showing that a person "consciously disregards a substantial and unjustifiable risk that the conduct will cause harm to another." *Id*. at 79 (citation omitted; cleaned up). "[R]ecklessness is morally culpable conduct, involving a 'deliberate decision to endanger another.'" *Id*. at 79. "In the threats context, it means that a speaker is aware 'that others could regard his statements as' threatening violence and 'delivers them anyway.'" *Id*. (citing *Elonis v. United States*, 575 U.S. 723 at 746 (2015) (Alito, J., concurring in part and dissenting in part)). In the voting intimidation context, it would mean that defendants accused of intimidating speech were aware at the time of each act of speech that relevant voters could

regard the speech as intimidating with respect to voting and delivered it anyway.

23. Within the First Amendment right to free speech, citizens have a right to "petition the government for a redress of grievances." U.S. Const. amend. I.

24. The First Amendment contains no jurisdictional restriction on the right to associate or to petition and may not be restricted by Section 230. *See Pierce v. Jacobsen*, 44 F.4th 853 (9th Cir. 2022) (finding First Amendment right of out-of-state parties to engage in petition circulation); *Libertarian Party of Va. v. Judd*, 881 F. Supp. 2d 719 (E.D. Va. 2012) (finding restriction violates First and Fourteenth Amendments); *Morrill v. Weaver*, 224 F. Supp. 2d 882 (E.D. Pa. 2002).

25. Conduct that is "sufficiently imbued with elements of communication"— known as "inherently expressive" conduct—falls within the scope of the First and Fourteenth Amendments. *Texas v. Johnson*, 491 U.S. 397, 404 (1989); *see also Rumsfeld v. F. for Acad. & Institutional Rts., Inc.*, 547 U.S. 47, 66 (2006). The test to determine whether conduct is inherently expressive was originally articulated in *Spence v. Washington*, 418 U.S. 405 (1974) and *Texas v. Johnson*.

26. The two-part *Johnson* test asks: (1) whether an intent to convey a particularized message was present, and (2) whether the likelihood was great

that the message would be understood by those who viewed it." *Burns v. Town of Palm Beach*, 999 F.3d 1317, 1336–37 (11th Cir. 2021) (cleaned up) (internal quotation marks omitted) (quoting *Johnson*, 491 U.S. at 404). This Court has already concluded that "Defendants intended to communicate a particularized message." Dkt. No. 222 at 10.

## IV.   FINDINGS OF FACT

### A. Plaintiffs Did Not Prove Direct or Directed Contact.

27. Plaintiffs' four witnesses—Scott Berson, Gamaliel Turner, Stephanie Stinetorf, and Jocelyn Heredia—affirmed that there was no direct or directed contact from a Defendant.

28. Through none of those witnesses, individually or collectively, were Plaintiffs able to establish that Defendants, individually or collectively, directly or indirectly coerced, threatened, or intimidated any of them from exercising their right to vote.

### 1.   Individual Voters

#### a.  Scott Berson

29. Scott Berson was the first witness Plaintiffs called on the issue of causation. Ber. Tr. 80:23-81:14.

30. Mr. Berson testified that he became a Muscogee County voter in approximately 2014, when he moved to Columbus, Georgia. Ber. Tr. 83:22-84:8.

31. Mr. Berson testified that he left Muscogee County in January of 2019, to attend graduate school in Auburn, Alabama. Ber. Tr. 87:11-21.

32. Mr. Berson then testified that following graduate school, he moved to North Carolina and then Pennsylvania for various personal reasons. Ber. Tr. 103:8-104:5.

33. According to Mr. Berson, he was asked by an election official at the Muscogee County polling place to which he went to vote in the Georgia Run-Off Election on January 5, 2021, that his driver's license was not sufficient to confirm his eligibility to vote at that location. Ber. Tr. 107:18-110:11.

34. According to Mr. Berson, he found that to be difficult or inconvenient for him due to a number of situations in his personal life at the time. Ber. Tr. 110: 12-24.

35. According to Mr. Berson, he learned about his having been subject to a challenge from an unknown caller, who informed him that his name was on a list. Tr. 116:5-8.

36. Mr. Berson could provide no testimony connecting any of the Defendants with Alton Russell, the elector who submitted challenges in Muscogee

County, including the challenge relating to Mr. Berson. Ber. Tr. 112:9-116:17; 130:16-18: 131:14-15.

37. In his interrogatory answers, Mr. Berson did not say he felt intimidated, but only that he was "frustrated" that he had to get an additional form of identification, that is, that his driver's license alone was not sufficient to prove residency. Ber. Tr. 116:22-117:4.

38. Mr. Berson brought up the word "intimidating" for the first time at trial in describing his experience voting in the Run-Off. Ber. Tr. 117:5-7.

39. Mr. Berson provided no articulable reason for introducing the word "intimidating" only at trial and could not explain himself when he was questioned by the Court. Ber. Tr. 117:8-118:19.

40. At trial, Mr. Berson testified instead that to him "the idea of being accused itself is intimidating to [him] and that "the idea of being told you're doing something wrong is intimidating to [him] and "it's intimidating to not know the correct way to respond to that and to have to navigate that process." Ber. Tr. 117:12-118:16.

41. Mr. Berson did not, however, testify that anyone told him he was doing anything wrong, only that he had the idea in his own mind he was being accused or that he was being told he was doing something wrong. Ber. Tr. 119:25-120:5.

42. Mr. Berson testified that no one yelled at him or threatened to take anything away from him. Ber. Tr. 118:22-23.

43. Mr. Berson testified that no one threatened him with any type of harm. Ber. Tr. 119: 3-7.

44. There is no testimony in the record that anyone pulled Mr. Berson out of the line, jeered at him, or subjected him to shame or embarrassment.

45. Mr. Berson testified that he made the "implicit assumption" he had been "accused of living in Alabama" and therefore his residency for purposes of the election laws was not what he thought it was. Ber. Tr. 119:20-21.

46. Mr. Berson nonetheless voted, and his vote was counted. Ber. Tr. 120:6-9.

47. Mr. Berson testified that he had moved frequently in the preceding five to ten years, in fact seven to eight times. Ber. Tr. 120:10-16.

48. Mr. Berson testified that at the time he went to vote in the Georgia Run-Off, he had a few accounts with various service providers listing his Alabama addresses and that he could not say whether some were in Muscogee County or elsewhere.  Ber. Tr. 172:15-174:17.

49. Mr. Berson testified that at the time he went to vote in the Georgia Run-Off, he had updated his mailing addresses, directing the United States Postal Service to send any mail that might be addressed to him to Alabama. Ber. Tr. 89:24 – 90:1.

13

50. Mr. Berson testified that he filed this lawsuit because Fair Fight told him to. Ber. Tr. 137:18-23.

51. Mr. Berson testified that he received an unsolicited call from the law firm Perkins Coie. Ber. Tr. 139:2-4.

52. When asked by the Court if he would have sued anyone had he "not been contacted by someone, this Perkins group, and told to sue", Mr. Berson testified "probably not. I probably would not have initiated it myself." Ber. Tr. 139:14-17.

53. Mr. Berson testified he knew Alton Russell was responsible for his challenged vote. Ber. Tr. 130:18

54. Mr. Berson could offer no testimony or personal knowledge to connect any of the defendants, True the Vote or any individual defendants, to Alton Russell's submission of voter challenges in Muscogee County. Ber. Tr. 112:9-15.

55. When asked why Mr. Berson did not sue Alton Russell, Mr. Berson testified, "I was concerned with voting at the time. I did not think about who was the one to sue at the time." Ber. Tr. 130:19-21

56. Mr. Berson testified he has never spoken with any of the defendants and no defendant has ever directed a communication to him. Ber. Tr. 104:18-105:22.

57. The Court finds that under these circumstances, an elector would have been reasonable in believing there was a basis to submit an eligibility inquiry or

challenge to the local county board of elections, naming Mr. Berson, pursuant to Section 230, and that doing so was not frivolous.

> b. *Gamaliel Turner*

58. Gamaliel Turner was the second witness Plaintiffs called. Turner Tr. 188:1-13.

59. Mr. Turner testified that he considers Columbus, in Muscogee County, Georgia to be his home, Turner Tr. 193:1-4, but that he moved to California to accept a work assignment in or about October of 2019. Turner Tr. 193:18-23.

60. Mr. Turner testified that although the initial term of his contract was only one year, the contract was renewed three times; he stayed in California up through the January 5, 2021, Georgia Senatorial Run-Off election. Turner Tr. 194:8-10; 195:17-19.

61. Mr. Turner testified that when he moved to California in 2019, he submitted an NCOA form to the United States Postal Service, instructing the Postal Service to change his mailing address to the California address he provided. Turner Tr. 10-12.

62. Mr. Turner testified that he knew he could receive absentee ballots automatically because he was over 65 years of age, without having to request one for each election. Turner Tr. 214:20-25.

63. Mr. Turner testified that when he completed and submitted the NCOA form to the United States Postal Service instructing the Postal Service to change his mailing address to the California address that he checked "yes" to the question asking if he wanted absentee ballots to be mailed to him automatically. Turner Tr. 216:13-15.

64. Mr. Turner acknowledged multiple times, including in response to the Court's question, that he knew the United States Postal Service will not forward an official ballot regardless of whether a person submits an NCOA form. Turner Tr. 215:23-216:5; 226:18-22.

65. Alerted to the fact that his absentee ballot was being sent to his old address and not forwarded to his California address, not for the first time, Turner called the Muscogee County registrar's office, and following the call, the County canceled the old absentee ballot and then reissued it and sent it to him at his address in California. Turner Tr. 219:22-220:5.

66. Mr. Turner testified, "My ballot being sent to my home address in Muscogee County and going back, because they could not forward it -- follow me now -- is a problem with their process. And that's why I had to call them." Turner Tr. 226:5-8.

67. Mr. Turner testified that the challenge to his voting registration in Muscogee County was resolved only after he filed a lawsuit that as he testified, "allowed me the opportunity to receive a ballot." Turner Tr. 202:12-19.

68. Mr. Turner did not refute the sequence set out by defense counsel, that his absentee ballot for the Run-Off Election was issued November 18, 2020, that it was canceled and reissued on December 18, 2020, following his call with the Registrar's Office, and that his completed absentee ballot was received in Muscogee County and cast for him in the Senate Run-Off on December 29, 2020. Turner 217:21-227:22.

69. The Court finds that Mr. Turner's testimony concerning the lawsuit should be granted little weight given that it is undisputed the County reissued Mr. Turner's absentee ballot following his telephone conversation with the registrar and that Mr. Turner received and completed that absentee ballot and sent it back and that it was received and counted by Muscogee County before the *Ben Hill* case was even resolved. Turner Tr. 202:22-203:4.

70. Mr. Turner acknowledged that his publicly accessible property tax record on file with the Muscogee County / Columbus Consolidated Government lists California as his address in the "Owner" data field. Turner Tr. 240:5-21.

71. Mr. Turner testified his publicly accessible Facebook page indicates he lives in Camarillo, California. Turner Tr. 244:7-11.

17

72. Mr. Turner acknowledged publicly available records on Ancestry.com lists Camarillo, California as Mr. Turner's current address. Turner Tr. 244:25-245:7

73. Mr. Turner acknowledged his publicly accessible, October 18, 2019, Facebook post indicates he secured a new job at Point Hueneme, California. Turner Tr. 245:25-246:21. When asked if he had any reason to disagree the "whole world" could see that post, Mr. Turner testified, "Absolutely not. That's the intent." Turner Tr. 246:25-247:4.

74. When asked where he lives now, Mr. Turner testified, "Where do I reside?...I have an apartment in Camarillo, California." Turner Tr. 240: 25-241:3.

75. Mr. Turner acknowledged that a reasonable person who did not know him would probably assume he had moved to California. Turner Tr. 247:5-13.

76. In response to the question whether a person might think he lived somewhere other than Georgia based on the foregoing facts, Mr. Turner testified, "If you did not know me, easily. If you knew me, no." The Court interprets this to mean that if a person were aware of the foregoing facts and did not personally know Mr. Turner, then he or she would be reasonable in concluding Mr. Turner resided somewhere other than Georgia.

77. Along the same lines, Mr. Turner went on to testify that the only way a person would know he hadn't intended to stay in California would have been if he or she had known him personally. Turner Tr. 247:20-24.

78. The record is devoid of any evidence that any of the Defendants knew Mr. Turner personally or that any of them had a reason or opportunity to get to know him personally before any Section 230 eligibility inquiry or challenge was submitted involving him, leading up to the Georgia Senatorial Run-Off Election on January 5, 2021.

79. The Court thus finds it would have been reasonable for an elector to file an eligibility inquiry or a challenge regarding Mr. Turner's registration to vote in Muscogee County for the Georgia Senatorial Run-Off Election on January 5, 2021.

80. Mr. Turner testified that his issue was with the County's process for updating its address rolls, which is not the responsibility of the Defendants. Turner Tr. 226:5-13.

81. Mr. Turner testified he would not be intimidated if someone he did not know knocked on his door and asked whether he lived there. Turner Tr. 253:2-11.

82. Mr. Turner then testified that he "could be very uncomfortable" with someone knocking on his Columbus, Georgia home to find out where he lived because, "that doesn't happen to everybody."  Turner Tr. 251:2-8.

83. Other than having to make some calls about getting his ballot, Mr. Turner testified he didn't have any other discomfort about voting in the Senate runoff. Turner Tr. 18-22.

84. No one terrorized, threatened, or coerced Mr. Turner when voting in the Senate runoff. Turner Tr. 1-8.

85. Mr. Turner testified he experienced discomfort because "it's a continued problem" that his absentee ballots were not being forwarded, and he believed without evidence the reason was because he had a National Change of Address on file. Turner Tr. 302:10-23.

86. Mr. Turner was unable to name any individual defendants and was unaware there were individually named defendants in this matter. Mr. Turner stated he "never had any interest to know any of the individuals." Turner Tr. 234:2-8. Mr. Turner was unable to point out if any of the defendants were present in the courtroom. Turner Tr. 234:25-235:2.

87. Mr. Turner has never spoken with any defendant and no defendant has ever made a statement directly to Mr. Turner in any form or medium.  Turner Tr. 235:3-236:6.

c. Stefanie Stinetorf

88. The third witness Plaintiffs called to try to show causation was Stephanie Stinetorf, who testified remotely, by video, from Germany.

20

89. Ms Stinetorf testified that she was a Muscogee County voter. Stin. Tr. 446:21.

90. Ms. Stinetorf testified that she had relocated to Germany with her husband and was on a Department of Defense assignment. Stin. Tr. 448: 3-18.

91. Ms. Stinetorf testified that about two weeks after mailing in her absentee ballot she began checking the My Voter Page website to determine the status of her ballot and that on December 20th the My Voter Page showed her ballot had been received and was marked as challenged.  Stin. Tr. 452:5-13.

92. Ms. Stinetorf testified she emailed the Muscogee Board of Elections on December 20th inquiring about her ballot (Stin. Tr. 467:6-7) and received a response from the Board on December 23rd. (Stin. Tr. 468:1-2).

93. Ms. Stinetorf believed her ballot was challenged for a period of "two days or so, between the 20th and the 22nd or 23rd."  Stin. Tr. 472:1-2.

94. Upon refreshing her memory, Ms. Stinetorf testified she received an email from the Muscogee County Board of Elections on December 23rd, 2020, stating her ballot had been received and accepted 9 days earlier on December 11th, 2020. Stin. Tr. 473:22-474:8.

95. There is insufficient evidence under these facts to conclude that Ms. Stinetorf was threatened, coerced, or intimidated.

96. There is no evidence that any eligibility inquiry or challenge list traceable to either Mr. Davis and Mr. Somerville or True the Vote included Stefanie

Stinetorf's name at all. *See also* Som. Tr. 1539:12-17 (noting Ms. Stinetorf was removed from the Davis-Somerville List per UOCAVA removals); Engel. Tr. 1807:24-25 (noting removal of all UOCAVA).

97. Ms. Stinetorf testified that no defendant communicated with her at any point in her life and no defendant directed any communication at her in any form or by any media.  Tr. 464:5-465:24.

### d.  Jocelyn Heredia

98. The fourth and final voter whom Plaintiffs called as a witness was Jocelyn Heredia. Ms. Heredia testified that she had been a Banks County, Georgia resident. Heredia Tr. 540:20-21.

99. Ms. Heredia testified she graduated college in May 2019. Heredia Tr. 543:7.

100. Ms. Heredia testified she secured a paid internship in September 2019. Heredia Tr. 543:11-12.

101. Upon receiving her internship in September 2019, Ms. Heredia testified she moved away from Banks County, Georgia, to Alpharetta, Georgia, "for the entirety of the internship".  Heredia Tr. 543:20-22.

102. Ms. Heredia testified her internship ended in December (2020) following which she was offered a full-time contract position for one year. Heredia Tr. 544:2-5.

103. Ms. Heredia testified that in February 2020 she secured a one-year lease for an apartment in Decatur, Georgia. Heredia Tr. 544:22 - 545:114.

104. Ms. Heredia testified she filed a National Change of Address form, directing the United States Postal Service to send all her mail to the Decatur apartment in February of 2020. Heredia Tr. 558:25-559:2.

105. Ms. Heredia testified that in November 2020 she requested her absentee ballot be mailed to the Decatur, Georgia apartment. Heredia Tr. 559:12-16.

106. Ms. Heredia testified that she filed a permanent change of address form with the United States Postal Service when she moved from Banks County in February of 2020, which would indicate to a reasonable person that she had moved permanently out of Banks County.

107. Ms. Heredia testified that in February 2021 she moved to a new apartment in West Midtown, Atlanta, and filed a new National Change of Address form. Heredia Tr. 566:19-567:6.

108. Ms. Heredia testified that in May 2023 she moved again to a new apartment in the same West Midtown, Atlanta, apartment complex.  Heredia Tr. 568:20-23.

109. Ms. Heredia testified she and her fiancé have recently purchased a home in Athens, Georgia.  Heredia Tr. 569:25-570:2.

110. When asked by the Court if Ms. Heredia moved her mailing address back to Banks County, Ms. Heredia responds, "I think I have, actually." Her. Tr. 572:12-15. Shortly thereafter, Ms. Heredia testified she could not recall ever filing a change of address form changing her mailing address back to Banks County, and she would have no reason to disagree that a request to the National Change of Address registry to get all her change of address submissions showed she did not file a change of address form to re-direct her mail back to Banks County. Heredia Tr. 574:2-9.

111. Ms. Heredia testified she did not give her attorneys any documents showing she ever filed a National Change of Address form to re-direct her mail back to Banks County after February 2020. Heredia Tr. 11-19.

112. Ms. Heredia testified she felt nervous at the polling location in Banks County where she went to vote in the January 5, 2021 Run-Off election before she was told her registration had been challenged based on residency or that there was a question about her residency. Heredia Tr. 584:23-25

113. Ms. Heredia testified that when she went to vote no one screamed at her, threatened her, or coerced her. Heredia Tr. 588:9-14.

114. Ms. Heredia testified that when she went to vote, a poll worker explained that her vote had been challenged, that she would have to "vote by paper", and that

she would need to provide two forms of mail that matched the address on her driver's license. Heredia Tr. 549:1-7.

115. There is no evidence in the record suggesting that Ms. Heredia was presented the paper ballot in a hostile, coercive, intimidating, or threatening manner.

116. Ms. Heredia was able to retrieve two pieces of mail from her car parked at the polling location to present to the poll worker. Heredia Tr. 549:13-15.

117. That the election official who requested identification did not turn Ms. Heredia away but instead assisted her by providing her a provisional [paper] ballot in itself is evidence that the election officials took efforts to make sure Ms. Heredia could participate by voting provisionally.

118. The Court takes Judicial Notice that as of April 2020 there were approximately 18,037 residents in the entire county of Banks County, Georgia. *See* https://www.census.gov/quickfacts/fact/table/bankscountygeorgia/PST045222

119. Ms. Heredia agreed that if someone only saw what was publicly accessible, it would be reasonable for him or her to believe she lived in the Atlanta metro area. Heredia Tr. 591:19-592: 3

120. Ms. Heredia testified that if someone (like a challenger doing more personalized inquiry) knocked on her door to ask where she lived, it would make her feel uncomfortable. Heredia Tr. 592:20-22.

121. Ms. Heredia testified that no defendant has ever spoken with her, and she's never had any direct communication with any defendant in the case. Heredia Tr. 582:24-583:4.

122. Ms. Heredia testified that she has never spoken with Dan Gasaway [or Jerry Bowman – *sic: Boling*] and cannot connect either one with any Defendant. Heredia Tr. 587:24-588:8.

123. The Court finds there is no reasonable way for a citizen to determine that another citizen who resides continuously for 46 months outside of his or her county of registration does intend to return to that county. Som. Tr. 1551:4-13.

   2.  Dr. Orville Vernon Burton.

124. Plaintiffs presented as their first expert Dr. Orville Vernon Burton.

125. While it is evident Dr. Burton may be well-versed in the history of the American South, his testimony in this case focused on his attempt to tie Defendants' actions to historical patterns and to represent a continuation of those patterns. Burton Tr. 642:4-9. Such history and interpretation are not probative of matters in this case.

126. It was shown at trial that Dr. Burton's resources had been pulled selectively from the internet and media sources and did not include empirical studies or academic research. Bur. Tr. 695: 3-6.

127. Dr. Burton testified that he has no specialized insight into the motivations of any of the Defendants in this case.  Bur. Tr. 737:8-20.

128. Dr. Burton testified that he did not read the deposition of Ms. Engelbrecht or Mr. Somerville. Bur. Tr. 653:1-13.

129. Dr. Burton acknowledged he is a historian and not a behavioral psychologist, (Bur. Tr. 646:14-19), and he exhibited no understanding of the residency bases of the challenges (Bur. Tr. 598:18-20), but he nevertheless opined that a hypothetical person might be intimidated on learning he or she had been challenged under Section 230. Bur. Tr. 642:13-14.

130. In the end, Dr. Burton retracted his conclusions, acknowledging that they were not supportable.

131. The Court will therefore disregard Dr. Burton's testimony.

   3. <u>Catherine Engelbrecht and True the Vote.</u>

132. There was no evidence Ms. Engelbrecht or True the Vote directly or indirectly contacted any voter who might have been the subject of an eligibility inquiry or challenge, including the individual Plaintiffs and their non-party witnesses.

133. There was no evidence that prior to this trial Ms. Engelbrecht or True the Vote knew who plaintiffs Scott Berson or Jocelyn Heredia or non-party witnesses Gamaliel Warren Turner or Stephanie Stinetorf were.

134. There was no evidence Ms. Engelbrecht or True the Vote had any connection to any actual or threatened publication of voter identities. Neither Ms. Engelbrecht nor True the Vote was aware of any voter from any True the Vote List being made aware of a challenge.

135. There was no credible evidence that Ms. Engelbrecht or True the Vote mentioned or recruited veterans or SEALs in any way that could have threatened, coerced, or intimidated a reasonable voter.

136. There was no credible evidence that Ms. Engelbrecht or True the Vote offered to pay bounties, understood as rewards, in return for reporting instances of voter fraud. Instead, the evidence shows that what Ms. Engelbrecht was referring to when she misused the word "bounty" was a potential legal fund to defer expenses that might be incurred by volunteer whistleblower participants. Eng. Tr. 869:9-12; 1833:22-1834:2.

137. There was no evidence Ms. Engelbrecht or True the Vote had any connection to any actual or threatened publication of the identities of Electors who submitted voter challenges pursuant to Section 2-21-230.

138. According to Ms. Engelbrecht, Alton Russell, a challenger in Muscogee County, has never to her knowledge been affiliated with True the Vote.

139. According to Ms. Engelbrecht, True the Vote was not involved with Alton Russell's submission of any eligibility inquiries or challenges in Muscogee County in the weeks preceding the January 5, 2021, Run-Off election. Eng. Tr. 1839:17-19. No evidence to the contrary was presented.

140. Ms. Engelbrecht is a native of Texas, graduated from the University of Houston, and started and built a high-precision manufacturing company making component parts for downhole oil field applications. Eng. Tr. 1749:23-1750:25.

141. Operating that business, Engelbrecht Manufacturing, required Ms. Engelbrecht to work with extremely tight tolerances and the dynamic nature of data components, including elements of quality control. Eng. Tr. 1751:1-10.

142. Ms. Engelbrecht ran Engelbrecht Manufacturing for approximately nineteen (19) years. Eng. Tr. 1752:2-6.

143. Ms. Engelbrecht founded True the Vote, a Texas corporation, in 2009, initially to look at effective ways to recruit volunteers to staff under-staffed voting locations. Eng. Tr. 1752:16-21.

144. According to Ms. Engelbrecht, following the 2010 election cycle, it became evident that the unmet need with regard to election integrity was far greater than she had expected. Eng. Tr. 1753:1-6.

145. Ms. Engelbrecht has a family history and background in citizen service. Eng. Tr. 1753:12-25.

146. Aside from True the Vote, Ms. Engelbrecht co-founded a company named CoverMe, which arose out of her observations concerning service problems caused at least in part by government-imposed restrictions. Eng. Tr. 1754:1-3. CoverMe is a healthcare software financial technology company, which "find[s] healthcare coverage for uninsured or underinsured patients in realtime." Eng. Tr. 1763:17-18.

147. According to Ms. Engelbrecht, the knowledge she has gained in operating CoverMe "has blended over into a greater appreciation for the possibilities on the election side." Eng. Tr. 1763:19-21.

148. According to Ms. Engelbrecht, the software used by CoverMe "takes a little bit of information from patients and pulls in information from third-party data providers and then pushes that through engines that have been curated for [its] clients, which are hospitals and long-term care facilities and states." Eng. Tr. 1763:22-1764:1. According to Ms. Engelbrecht, "[t]he first thing that require[d] … is that you resolve identity, residency, and you get as close as

you can on citizenship because that determines what kind of programs you're going to be eligible for." Eng. Tr. 1764:5-8.

149. According to Ms. Engelbrecht, CoverMe "exposed [her] to a great many things in the way of data. Certainly, the ways of big data. The ways of identity resolution. NCOA is also used [as part of the program and analysis]." Eng. Tr. 1764:17-19. According to Ms. Engelbrecht, by virtue of her experience with CoverMe, she had confidence in the NCOA. Eng. Tr. 1809:1-14.

150. According to Ms. Engelbrecht, the mission of True the Vote is to support voters' rights and to empower citizens to serve. Eng. Tr. 1754:16-19.

151. According to Ms. Engelbrecht, that mission grew out of observations made at polling locations, including observations that individual voters "showing more than one card and still being allowed to vote," that others were being told whom to vote for, and other irregularities. Eng. Tr. 1755, Tr. 3-14.

152. According to Ms. Engelbrecht, these observations and further considerations led True the Vote to understand that there were deeper problems, and that "many of those problems seemed to revolve around bad data in the voter rolls." Eng. Tr. 1755:17-21.

153. Shortly after Ms. Engelbrecht founded True the Vote, she observed in the Houston-area that, "there was a group that had come to town that was going

to – that was making headlines saying they were going to register huge numbers of voters very quickly. Eng. Tr. 1755:25-1756:2.

154. Following the attention garnered from its efforts to bring the problems attendant to such otherwise laudable registration campaigns to the attention of local officials in Harris County, True the Vote was approached by citizen groups from multiple parts of the country. Eng. Tr. 1756:25-1757:12.

155. True the Vote has since been engaged in election worker training, election integrity, legislative proposals, participation on absentee ballot review boards, and signature verification, among other initiatives. Eng. Tr. 1757:13-1758:8.

156. True the Vote ran an initiative called Voto Honesto, which was "an effort to reach out to the Latino community" to educate them about elections and voting and their rights and opportunities to participate as citizens in the system. Eng. Tr. 1758:20-1759:5

157. As part of this initiative, Ms. Engelbrecht went to Mexico City to understand how elections are conducted there and then came back with a broader understanding. Eng. Tr. 1759:6-8.

158. True the Vote also worked to establish on-campus voting at Prairie View A&M University, recognized by the state of Texas as a Historically Black College or University. Eng. Tr. 1759:9-15.

159. While founded in Texas, True the Vote does not focus on a particular geographic area, and Ms. Engelbrecht has observed that regardless of where in the country one may live, "It's important that you feel confident that your vote matters in this country." Eng. Tr. 1761: 9-18.

160. In 2009, when True the Vote was founded, election integrity was not a widely discussed issue. Eng. Tr. 1761: 19-21.

161. According to Ms. Engelbrecht, over the years, "True the Vote has become a safe harbor for many people who don't know how to get involved...and... is that safe space that people can come to and can be – can be supported." Eng. Tr. 1762: 13-21.

162. According to Ms. Engelbrecht, citizen empowerment is at the core of True the Vote's mission, but "it's citizen empowered to work inside of a functional process." Eng. Tr. 1765:4-6.

163. According to Ms. Engelbrecht, the 2020 pandemic and rapid changes implemented by bodies of government without legislative involvement to respond to the national health care crisis helped to create "an environment of just confusion" during "such an intense time." Eng. Tr. 1765:7-1766:10.

164. According to Ms. Engelbrecht, many people were contacting True the Vote to ask how that might help. Eng. Tr. 1766:11-13.

165. According to Ms. Engelbrecht, with COVID-19, True the Vote "saw a massive push to mail-in ballots." Eng. Tr. 1767:4-5.

166. In addition, according to Ms. Engelbrecht, COVID-19 introduced a host of other uncertainties, including dropboxes and their distribution, chain of custody requirements, security, how to encourage people to get out and vote, the fact that both active and inactive voters are receiving invitations to vote by mail while the voter rolls are out of date, concerns about pushing that quantity of mail through the postal system, staffing, and postmarking. Eng. Tr. 1769:16-1770:16.

167. According to Ms. Engelbrecht, she felt an obligation to do the best she and True the Vote could do "to help be sort of a pressure release by engaging people and . . . encouraging them to serve so that they could be a part of the constructive process." Eng. Tr. 1771:6-10.

168. According to Ms. Engelbrecht, one illegally cast ballot not only cancels out a legally cast ballot but also breeds distrust and "that's … [a] very slippery slope." Also according to Ms. Engelbrecht, "If citizens start to lose trust and then choose not to engage because they don't believe it matters, then that's a – that problem gets exponentially bigger very quickly." Eng. Tr. 1772:11-22.

169. According to Ms. Engelbrecht, True the Vote's concerns surrounding the George Run-Off election were heightened due to the tight election results in

Georgia during the 2020 General Election, combined with Secretary of State Raffensperger's having long been very vocal about his concerns around the limitations of the NVRA, and the rolls not having been updated for a significant period of time, as well as the number of people reaching out to True the Vote. Eng. Tr. 1774:17-1776:4.

170. Ms. Engelbrecht testified that True the Vote's initiative in Georgia preceding the Run-Off, while it may have been referred to as "Validate the Vote Georgia," was not the same as any prior initiative. Eng. Tr. 831:7-832:7.

171. Ms. Engelbrecht became aware of the vehicle of a Section 230 challenge and then reached out to counsel to ask about the possibility of using it as a way for citizens to serve. Eng. Tr. 1776:10-1777:2.

172. Before she or True the Vote took any action in Georgia, they conducted due diligence, including speaking with at least two Georgia law firms specifically about Section 230 challenges, consulting with two acquaintances who serve as commissioners on the Election Assistance Commission, and consulting with an attorney in the Department of Justice, Civil Rights Division, Election Integrity Department. Eng. Tr. 1777:4-20.

173. Ms. Engelbrecht and True the Vote took these measures to understand the impact challenges might have on the system, as "the goal was to be a value add and to be an outlet for citizens who wanted to serve." 1779:23-1780:8.

174. Ms. Engelbrecht sought and obtained a meeting with the Secretary of State and his staff to discuss the logistics and implications of voter challenge at scale, which took place on December 16, 2020. Eng. Tr. 1780:9-1781:14.

175. According to Ms. Engelbrecht, in attendance were Ryan Germany, Jordan Fuchs, Secretary of State Brad Raffensperger, and Brian Johnson. Eng. Tr. 1781:15-18.

176. Brian Robinson was recommended to True the Vote by a Georgia legislator and had previously worked for the Secretary of State. Eng. Tr. 1823:14-1824:2.

177. Ryan Germany testified at trial. According to Mr. Germany, at the time of the meeting, he was serving as General Counsel at the Georgia Secretary of State's Office. Ger. Tr. 483:14-18.

178. According to Mr. Germany, his duties included providing legal support to the Elections Division of the Secretary of State's Office, which included working with the Elections Division on litigation and interpreting laws and implementing procedures. Ger. Tr. 483:19-23.

179. Mr. Germany also testified that in his capacity as General Counsel, he provided legal support or guidance to counties. Ger. Tr. 484:5-11.

180. According to Mr. Germany, he understood that the challenges True the Vote was intended to facilitate were only "based off of data from the National

Change of Address [NCOA] database," which the Secretary of State's Office

uses to "run a matching program through the state voter registration list and

then see who has – basically who matches." Ger. Tr. 484:19-21.

181. According to Mr. Germany, a "match" is an indication the matching program

has identified someone on the voter rolls who has filed a change of address

form with the United States Postal Service through the NCOA system. Ger.

Tr. 485:2-8.

182. According to Mr. Germany, for each such "match," involving a voter who has

informed the United States Postal Service he or she has moved out of state,

the Secretary of State's Office has a trigger in place to send the voter a

confirmation notice so that his or her address can be updated. Ger. Tr. 485:9-

19.

183. According to Mr. Germany, for each such "match," involving a voter who has

informed the United States Postal Service he or she has moved within the

state, from one county to another county, the Secretary of State's Office has a

similar trigger in place to send the voter a similar confirmation notice so that

his or her address can be updated. Ger. Tr. 485:20-23.

184. According to Mr. Germany, if a "matching" voter who has filed an NCOA

form with the United States Postal Service indicating he or she has moved out

of state or to a different county within the state does not respond to the

confirmation notice, he or she is placed in "inactive" status, for at least two general election cycles. Ger. Tr. 486:15-23. If he or she has no contact with the county elections office in that four-year period, he or she would eventually be removed from the rolls. Ger. Tr. 486:24-1.

185. According to Mr. Germany, for each "match," involving a voter who has informed the United States Postal Service he or she has moved within the same county, the Secretary of State will send the voter notice to contact the Office within 30 days to notify the office of an error; otherwise, the address is automatically updated. Ger. Tr. 485:24-486:8.

186. Mr. Germany testified at some length about a complaint submitted to the Secretary of State's Office following the 2020 General Election, a complaint he believed did not involve True the Vote, where a person or entity claimed people had filed change-of-address forms for out-of-state moves prior to the voter registration deadline, insinuating they had voted illegally. Ger. Tr. 487:10-18; 492:10-17; 503:1-23.

187. Testifying about those allegations, Mr. Germany criticized the complaint because, in his view, the complainant had done nothing to attempt to screen for overseas and military voters, college students, and persons forwarding mail to vacation homes, among others. Ger. Tr. 488:4-20.

188. According to Mr. Germany, although the Secretary of State's Office followed up on the complaint with an investigation and survey of approximately 8,000 people, none of the self-selected (and therefore not randomly selected) respondents, to Mr. Germany's knowledge, reported having felt intimidated by any question regarding his or her eligibility to vote. Ger. Tr. 509:2-12; 512:10-14.

189. Mr. Germany testified that maintaining clean voter rolls is important to the administration of elections. Ger. Tr. 509:13-15 (stating "list maintenance can be enfranchising, which I think that's really one of the benefits of it").

190. Mr. Germany testified the task of maintaining clean voter rolls became more difficult with passage of the NVRA in the early 1990's. Ger. Tr. 510:7-18.

191. Mr. Germany testified that with the NVRA, there is a 90-day lag before a federal election where the states and counties cannot do any systematic list maintenance whose goal is removal. Ger. Tr. 511:6-9.

192. Mr. Germany acknowledged in his testimony that Section 230 is a means Georgia uses to help address that gap. Ger. 513:5-514:8.

193. As for True the Vote and the meeting involving Secretary Raffensperger, Mr. Germany, Ms. Fuchs, and Mr. Williams on December 16, 2020, Ms. Engelbrecht testified that she left the meeting with several takeaways, including a firm understanding that the Secretary of State and his staff had

confirmed digital submissions of eligibility inquiries or challenges were sufficient and that hard copies were not needed. Eng. Tr. 1781:19-1782:25.

194. Ms. Engelbrecht also testified that she left the meeting understanding that as far as the Secretary of State's Office as concerned, True the Vote's plan was fully compliant with the law and that the Secretary's staff did not believe the boards of election would be overwhelmed by a large number of Section 230 eligibility challenges. Eng. Tr. 1781:19-1782:25.

195. Ryan Germany, then General Counsel for the Secretary of State's Office, acknowledged that the purpose of the meeting was for True the Vote to present to the Office what it planned to do in connection with Section 230 challenges in the weeks leading up to the Run-Off. Ger. Tr. 496: 20-23.

196. According to Ryan Germany, he communicated during the meeting with Ms. Engelbrecht that he felt counties were busy following the General Election and "that if you just kind of plop a big thing on counties right now, it's not going to be received well by them." Ger. Tr. 499:1-8.

197. There is, however, no evidence in the record that anyone in attendance at the meeting with Secretary of State Brad Raffensperger and his staff instructed Ms. Engelbrecht and True the Vote that they could not follow through with their proposal. Eng. Tr. 1782:18-1784:13; Ger. Tr. 499:1-15. There is no

evidence that challenges not being "received well" could have been construed as those challenges' being illegal, baseless, frivolous, or improper.

198. That the proposal Ms. Engelbrecht and True the Vote presented to the Secretary of State and his staff in mid-December included mass challenges is evident because were that not the case, Mr. Germany would have had no reason to emphasize that he expressed his view to that effect at the meeting, (at least as recounted during his testimony at trial), that challenges should be individualized. Ger. Tr. 499:1-15.

199. Accordingly, there is no evidence in the record that the Secretary of State or anyone on his staff at the mid-December 2020, meeting told her that she and True the Vote were prohibited from following through with a statewide challenge effort, whether distilled or otherwise. Ger. Tr. 499:1-15; 500:14-20.

200. According to Mr. Germany, testifying as legal counsel for the Georgia Secretary of State at that time, as the Court noted, "Georgia law placed that determination [probable cause] in the county board of elections. And so they have to weigh that, make that determination for themselves." Ger. Tr. 501:23-25.

201. Had Ms. Engelbrecht walked away from the meeting with the Secretary of State and his staff with the understanding that filing challenges at scale in the weeks preceding the Run-Off was illegal in any respect and not just an issue

41

of potentially annoying county boards of election at a busy time, as Mr. Germany testified, she and True the Vote would not have pursued this course of action. Eng. Tr. 1785:24-1786:4. According to Ms. Engelbrecht, she does not recall "anything negative at all coming out of that meeting." Eng. Tr. 1787: 20-23. There is no evidence any authority she consulted told Ms. Engelbrecht that submitting challenges at scale was legally without merit.

202. Nor is there any evidence in the record that any authority with whom Ms. Engelbrecht consulted instructed Ms. Engelbrecht that "inactive" voters and those that did not participate in the 2020 General Election should necessarily be excluded from any Section 230 challenge.

203. Nor is there any evidence in the record that any authority with whom Ms. Engelbrecht consulted instructed or advised Ms. Engelbrecht that relying solely on the NCOA (to which True the Vote did not limit itself, as the evidence shows), was insufficient to meet the requirements under Section 230.

204. Instead, as Mr. Germany testified, what he told county attorneys was that as general counsel for the Secretary of State, what was sufficient to serve as probable cause, whether the NCOA or more, "that was their determination to make," essentially that reasonable minds may differ but that the decision on probable cause, including whether the NCOA was enough had been delegated to them. Ger. Tr. 502:8-17; 505:10.

205. According to Ms. Engelbrecht, True the Vote consciously chose to include inactive voters on its challenge lists because "in the 2020 cycle there was not a procedural distinction between active and inactive." Eng. Tr. 1787:6-8.

206. True the Vote made the informed and deliberate decision to include on its lists inactive voters as well as voters who had not voted in the November 2020 General Election in order to create a uniform dataset from which any county could include or exclude what it individually chose to include or exclude. Eng. Tr. 1808:1-15.

207. Ms. Engelbrecht testified that through application of basic arithmetic, she determined that if inactive voters and voters who did not vote in the November 2020 General Election were added back into the number of challenges or eligibility inquiries with which Mr. Somerville and Mr. Davis were left after application of their methodologies, the number of challenges or eligibility inquiries for both True the Vote and Davis/Somerville would be practically equal or even out. Eng. Tr. 1819:11-21; 1823:9-13. There is no evidence inconsistent with this summarization.

208. True the Vote took additional steps in conducting due diligence prior to working to educate voters and facilitate election inquiries or challenges by individual electors in the weeks leading up to the January 5, 2021, Run-Off, including consulting with two state senators, and as stated above, consulting

with Election Assistance Commissioners and an attorney with the Department of Justice, Civil Rights Division. Eng. Tr. 1793:2-1796:7.

209. There is no evidence any of these steps yielded an instruction or suggestion that the plan True the Vote planned to implement was illegal or improper or violated Section 11(b) of the Voting Rights Act.

210. Ms. Engelbrecht and True the Vote understood that the Section 230 process would entail an ultimate determination by the local boards of election whether to accept any challenge or eligibility inquiry, which decision was left to their sole discretion. Eng. Tr. 1796:15-1797:10.

211. According to Ms. Engelbrecht, she and True the Vote understood there was no limit to the number of eligibility inquiries for challenges any one elector could submit under Section 230. Eng. Tr. 1797:11-12. This Court agrees that there was no such limit.

212. According to Amy Holsworth, who worked as a contractor for True the Vote during the relevant time, True the Vote maintained an election integrity hotline, with which Ms. Holsworth was familiar. Hol. Tr. 1370:7-15.

213. According to Ms. Holsworth, the Georgia election integrity hotline was an extension or outgrowth of the True the Vote's national hotline. Hol. Tr. 1370:16-19.

214. According to Ms. Holsworth, she reviewed notes of calls that were received through the hotline. Hol. Tr. 1370:23-25.

215. According to Ms. Holsworth, the hotline received approximately 6,000 – 7,000 calls during the period leading up to the Run-Off, though not all related to the Run-Off in Georgia; some may instead have concerned voting questions and concerns in other states. Hol. Tr. 1371:1-9.

216. According to Ms. Holsworth, the number of calls increased not on account of True the Vote's announcing a whistleblower compensation fund, but because the Run-Off election drew nearer and nearer. Hol. Tr. 1371:11-24.

217. True the Vote also created an email, GA Elector Challenge, through which final versions of lists of eligibility inquiries could be transmitted to local boards of elections, to ensure an unbroken chain of custody. Eng. Tr. 1848:12-17; 1799:9-19.

218. While it was True the Vote that accepted responsibility for transmitting the final eligibility inquires or challenge lists to the local boards of election, using the standalone email address, individual electors had every opportunity to review and edit the lists before True the Vote pushed "send," transmitting the final copies of the lists to the local county election boards. Eng. Tr. 1799:10-13.

219. According to Ms. Engelbrecht, True the Vote sent the lists on behalf of the local electors to the county boards of election in both CSV and Excel format, which made editing simpler than it would have been had the lists been transmitted in another format. Eng. Tr. 1848:10-25.

220. According to Ms. Engelbrecht and Ms. Holsworth, this meant the lists True the Vote sent local electors amounted to suggestions, based on True the Vote's distillation from the voter rolls; each volunteer could interact with True the Vote to add or delete names or to forego the exercise altogether. Eng. Tr. 1816:20-1817:1; Hol. Tr. 1371:25-1372:12.

221. According to Ms. Holsworth, it was another True the Vote contractor, Heather Long, who emailed the lists to the individual local electors. Hol. Tr. 1372:9-11.

222. According to Ms. Holsworth, she then would serve as a liaison between True the Vote and the individual local electors, challengers in Georgia counties who had decided to volunteer to participate. Hol. Tr. 1371:25-1372:12.

223. According to Ms. Holsworth, part of her job as a liaison was to "be a contact for the challengers and make sure that they were aware and knew what was going on and to get their consent to do so [to submit challenges or eligibility inquiries]." Hol. Tr. 1372:7-9.

224. According to Ms. Holsworth, to keep track of local electors, True the Vote kept a spreadsheet, showing the status of proposed lists of eligibility inquiries or challenges by color. The color "yellow" indicated communications were ongoing with the prospective local elector but he or she had not yet confirmed it was okay to send to their county board of elections, that is, it was in the queue. The color "green" indicated the local elector had approved the list and it had been sent by email to the relevant county board of elections. Hol. Tr. 1374:1-1380:21.

225. Ms. Holsworth did not testify and counsel for Plaintiffs could not elicit from her testimony that Alton Russell's name and Muscogee County appeared on the spreadsheet in either "yellow" or "green," indicating that True the Vote did not submit a challenge on behalf of Mr. Russell. Hol. Tr. 1376:21-1377:5.

226. According to Ms. Holsworth, True the Vote did not send a challenge list to any county board of elections without the individual elector's having had an opportunity to review it and consent to its transmission to the local county board of elections on his or her behalf. Hol. Tr. 1372:7-1373:11.

227. According to Ms. Holsworth, it was True the Vote contractor Heather Long who emailed the lists to the county boards of election once the local electors had given Ms. Holsworth and True the Vote the "green light." Hol. Tr. 1372:14-1373:25.

228. According to Ms. Engelbrecht, the form Mr. Joe Martin used to submit his challenges differs in many ways from the uniform form True the Vote used and is dated December 17, 2020, the day before True the Vote submitted any challenges on behalf of local electors. Eng. Tr. 1850:25-1852:20; Plaintiff's Ex. 69.

229. According to Ms. Engelbrecht, it was not her intention, nor was it True the Vote's intention, to intimidate any voter. Eng. Tr. 1799:21-23.

230. According to Ms. Engelbrecht, it was not her intention, nor was it True the Vote's intention, to threaten any voter. Eng. Tr. 1799:24-1800:1.

231. According to Ms. Engelbrecht, it was not her intention, nor was it True the Vote's intention, to coerce any voter. Eng. Tr. 1800:2-4.

232. According to Ms. Engelbrecht at no point in her involvement or True the Vote's involvement with the submission or facilitation of any eligibility inquiry did she or True the Vote attempt to intimidate, threaten, or coerce a voter. Eng. Tr. 1800:5-9.

233. According to Ms. Engelbrecht, she and True the Vote were concerned that voter rolls are quickly outdated given that society is increasingly mobile, and Georgia had not updated its voting rolls since early 2019, consistent with its policy of only updating its rolls only in the first six months of every odd-numbered year. Eng. Tr. 1800:17-1801:4.

234. Ms. Engelbrecht understands that the National Voter Registration Act ("NVRA") encourages states to perform regular voter roll maintenance but leaves the mechanics to the individual states. Eng. Tr. 1801:10-12.

235. According to Ms. Engelbrecht, the NCOA is at least one acceptable standard used in performing this function under the NVRA, and indeed that is one of its primary functions. Eng. Tr. 1801:13-17.

236. Like Mr. Somerville and Mr. Davis, discussed below, Ms. Engelbrecht and True the Vote itself and through its contractors engaged in a distillation process, which began with inputting the Georgia voter file into the NCOA, which was then subjected to a multivariate process, beginning with CASS, a system used to normalize the data. Eng. Tr. 1801:18-1802:22.

237. Ms. Engelbrecht testified that once the input data had been normalized and subjected to delivery point validation, NCOA kicked in to look at moves on the basis of data provided by the United States Postal Service. Eng. Tr. 1804:22-1805:2.

238. Ms. Engelbrecht testified that once that had been completed, True the Vote ran a parallel process with another provider called SmartyStreets. Eng. Tr. 1805:1-7.

239. Ms. Engelbrecht testified that TrueNCOA had an additional functionality, in that the Social Security Death Index is integrated with it. Eng. Tr. 1805:8-9.

240. Ms. Engelbrecht testified that also integrated with data point validation, which is part of the NCOALink data construct, a feature known as "M1" is used to filter out persons living on or near military basis. Eng. Tr. 1805:20-1806:2.

241. Ms. Engelbrecht testified that True the Vote then removed all international addresses, including UOCAVA, and those assigned to certain ZIP codes reserved for the military. Eng. Tr. 1806:1-5; 1806:18-23-25.

242. Ms. Engelbrecht testified that True the Vote also endeavored to remove all Post Office Box addresses and commercial addresses, as well as duplicates. Eng. Tr. 1806:10-14.

243. Ms. Engelbrecht testified that True the Vote did what it could to filter out university students, given their mobility and possible registration in their home precincts, but noted that filtering them out is a very difficult process. Eng. Tr. 1806:8-17. She testified True the Vote made all reasonable efforts to exclude students. Eng. Tr. 1806:16-17; 1815:1-9.

244. Ms. Engelbrecht testified that an additional feature of the distillation process True the Vote employed was quality control, which included random sampling. Eng. Tr. 1810:13-1811:6.

245. Ms. Engelbrecht testified that the quality control process True the Vote decided to use entailed taking a random sample of 2,500 records and evaluating them with every tool at its disposal, noting that True the Vote is

licensed with all the major data providers, including LexisNexis, Experian, and TransUnion. Eng. Tr. 1811:7-10.

246. Ms. Engelbrecht testified that the quality control program yielded an accuracy rate of plus or minus 3 percent, which she and True the Vote determined was acceptable. Eng. Tr. 1811:15-18. Three percent is actually greater than the effective rate of errors identified by Dr. Mayer.

247. Ms. Engelbrecht testified that the distillation method True the Vote employed was not partisan or racial in any way. Eng. Tr. 1816: 3-8.

248. There is no evidence True the Vote in its distillation process and in facilitating eligibility inquiries or challenges targeted any group of voters.

   4. Derek Somerville.

249. There was no evidence Mr. Somerville directly or indirectly contacted any voter who might have been the subject of an eligibility inquiry or challenge, including the individual Plaintiffs and their non-party witnesses.

250. There was no evidence Mr. Somerville directly or indirectly caused any challenge received by any voter, including Plaintiffs and their witnesses.

251. There was no evidence Mr. Somerville had any connection to bounties.

252. There was no evidence Mr. Somerville had any connection to SEALs.

253. There was no evidence Mr. Somerville had any connection to any actual or threatened publication of voter identities.

51

254. Mr. Somerville honorably served as a US Marine and believed his mission was characterized by "honor, courage, and commitment." Som. Tr. 1217:12-14. Mr. Somerville honorably served as a Special Agent with the Federal Bureau of Investigation where he investigated violations of civil liberties. Som. Tr. 1222:7-10.

255. Mr. Somerville believed "citizens need to be engaged" and that the "Government works very well when citizens are engaged and hold it accountable." Som. Tr. 1259:14-16.

256. Mr. Somerville viewed the Boards of Election as having "subjective discretion" over the determination whether to accept a challenge. Som. Tr. 1467:12-13. He believed it would be difficult to know how they would respond. Som. Tr. 1467:15-16.

257. Mr. Somerville and Mr. Davis relied on more than data from just the Georgia Voter File and the National Change of Address database when compiling their NCOA voter lists. Georgia's Absentee Ballot File was used to identify UOCAVA voters and geospatial data was used to place NCOA address in the proper county.  Som. Tr. 1539:3-1540:90

258. Mr. Somerville reviewed the Davis-Somerville List to see what had become of the voters who had filed permanent changes of address (and had not been narrowed down through the funnel). Som. Tr. 1466:6-20. He reviewed the list

for those voters who had remained at the location they'd told the USPS they were moving away from, Som. Tr. 1469:15-18, or had moved as predicted, Som. Tr. 1469:19-20 and 1471:14-20 ("self-confirmation"), or the state had removed from the voter rolls, Som. Tr. 1470:23-25, and whether the voter had become inactive, Som. Tr. 1471:2-13.

259. Mr. Somerville did not contact or communicate with any voter on the Davis-Somerville List. Som. Tr. 1472:19-23. No evidence suggested otherwise.

260. Mr. Somerville was concerned about a 6.5x increase in absentee ballots during the pandemic. Som. Tr. 1473:12-16.

261. Mr. Somerville believed COVID drove an unprecedented reliance on the U.S. Mail, which in turn forced greater reliance upon the quality of voters' addresses. Som. Tr. 1473:22-25. The Secretary of State's sending 6.9 million unsolicited absentee voter ballot requests to voters added to his concern. Som. Tr. 1474:20-23. Mr. Somerville believed Fulton County alone had about 50,000 absentee ballots canceled, and that in the Run-Off about 150,000 were canceled. Som. Tr. 1475:3-7. The combination of these numbers created what he believed was a perfect storm. Tr. 1475:19-20. He worried it would be understandable for a voter who received an absentee ballot request form to fill it out with their old address information, even if that person had moved away

from their old address, and then to vote in the wrong county. Som. Tr. 1476:3-16.

262. The fact that over 580,000 voters (out of 7.6M total, 6.9M active) had instructed the U.S. Postal Service to forward their mail to a location other than their voter registration address was significant to Mr. Somerville. Som. Tr. 1477:11.

263. Mr. Somerville first learned about Georgia's Section 230 statute from then-State Representative Sheri Gilligan, who approached him following a speaking engagement in which he was discussing election integrity. Tr. 1246:8-12.

264. Through State Representative Gilligan, Mr. Somerville requested and received guidance from legislative counsel on Section 230. Som. Tr. 1247:2-4.

265. Mr. Somerville believed Section 230 was "a citizen's tool to engage and petition the Government with their speech." Som. Tr. 1185:19-21.

266. Mr. Somerville "always considered [Section 230] a benign process." Tr. 1257:1-2. Mr. Somerville believed "there is no way we would have engaged in [Section 230] if we thought it would have resulted in any amount of harm." Som. Tr. 1257:23-25.

267. Mr. Somerville never launched a press release or any other broad media release regarding Section 230 challenges. Som. Tr. 1258:24-1259:2.

268. Mr. Somerville and Mr. Davis "obsessively" went up and down their deductive funnel, with scrutiny and a third-party review, to whittle their NCOA Voter List to 39,141 names. Som. Tr. 1477:4; 1477:24-25-1478:1-5. Their list was complete by December 15, 2023. Som. Tr. 1478:7-8.

269. Mr. Somerville and Mr. Davis completed their list of NCOA voters before learning about True the Vote or that it was interested in conducting a similar effort in Georgia. Som. Tr. 1478:4-10.

270. On December 16, 2020, Mr. Somerville sent information on the challenge process to some potential petitioners he knew personally. Som. Tr. 1480:6. He invited other interested petitioners to engage with him and the NCOA Voter List on December 18, 2020. Som. Tr. 1478:18-24. He did so solely through his personal Facebook page. Som. Tr. 1479:22. Interested persons first had to raise their hands before being directed to private Facebook messaging, Som. Tr. 1480:2, as well as private email. Som. Tr. 1480:7. After "an explanation of all of it," the interested petitioner was provided, for his or her review, an editable Excel file of voters, a PDF file of voters, and email templates to use with Boards of Election. Som. Tr. 1480:10-11; Som. Tr. 1482:9-10. Mr. Davis established a folder in the Dropbox service, Som. Tr. 1479:4, but did not make

it public, Som. Tr. 1479:5, and the specific link was given to select petitioners who may have wished to review the information in that way. Mr. Somerville provided interested challengers a disclaimer, in bold, that said "we weren't accusing anybody of . . . any wrongdoing or anything deliberate." Som. Tr. 1481:22-25. Som. Tr. 1479:5-6. *See generally* Def. Ex. 38.

271. After volunteers took possession of a NCOA voter file, Mr. Somerville and Mr. Davis "didn't have the ability to necessarily influence" their actions. Som. Tr. 1262:10-13.

272. Mr. Somerville first learned of True the Vote's similar effort in Georgia on December 15, 2020. Som. Tr. 1482:24-25. He met with Catherine Engelbrecht and Gregg Phillips that evening and the three learned generally about each other's activities and concerns regarding Georgia's voter rolls and planned facilitation of challenges. Som. Tr. 1484:20-1485:13. This was an introductory meeting, and neither learned much about each other's processes or rationale about narrowing their lists. Som. Tr. 1485:14-16. Mr. Somerville did not discuss preparing their lists and the criteria for their challenges with Ms. Engelbrecht. Som. Tr. 1487:16-17. He and Mr. Davis did not modify their approach after that meeting. Som. Tr. 1485:17-25. Mr. Somerville did not see the data in True the Vote's list until about four weeks before trial. Som. Tr. 1486:8-10. He was sued by Fair Fight nine or ten days after his meeting with

Ms. Engelbrecht. Som. Tr. 1486:11-12. During that time, the respective groups had not set up a war room together, conducted daily standup meetings, compared NCOA voter lists, or coordinated volunteers. Som. Tr. 1486:13-21. After December 16, neither Mr. Somerville nor Mr. Davis had any communication with True the Vote's list-building contractor, Gregg Phillips, or Mr. Phillips' company, OpSec Group. Som. Tr. 1486:24-1487:8. True the Vote did not offer assistance to Mr. Somerville in delivering petitions to Boards of Election. Mr. Somerville did not believe True the Vote had insight into Mr. Davis' methodology. Som. Tr. 1492:20-22.

273. During the December 15, 2020 dinner, the persons present did not discuss issuing a press release. Som. Tr. 1489:3-5. On December 18, 2020, True the Vote issued a press release about various parties participating in Section 230 challenges. Som. Tr. 1488:24. True the Vote shared the draft press release with Mr. Somerville, who asked that the release include Mark Davis, Som. Tr. 1489:11-23; 1490:5-12, who had not been included because no one at True the Vote had known of him and his expertise. Som. Tr. 1490:14-19.

274. Mr. Somerville knew True the Vote's list was larger, in part because it included inactive voters, Som. Tr. 1490:23-25.

275. Mr. Somerville had no knowledge of True the Vote's Georgia election integrity hotline, any plans to monitor absentee ballot drop-boxes, its Validate

the Vote initiative, its whistleblower fund, any mention of a "bounty", any press releases announcing Validate the Vote or the whistleblower fund, or any launching of a whistleblower fund. Som. Tr. 1393:13-1494:5.

276. Mr. Somerville does not believe any volunteers that assisted him and Mr. Davis also volunteered with True the Vote. Tr. 1142:11-16

277. Mr. Somerville believed no voter would learn of their inclusion in the Davis-Somerville List unless "the board of elections reviewed the data and under their judgment agreed with the probable cause and then that individual showed up to vote," Som. Tr. 1497:6-8, while if they did not show up to vote, nothing would happen. Som. Tr. 1497:9-12.

278. Mr. Somerville had a "tremendous amount of confidence in the National Change of Address system." Som. Tr. 1158:23-24

279. Mr. Somerville believed the challenge effort yielded beneficial results. "We highlighted a significant issue that is imperially [sic; empirically] demonstrable." Som. Tr. 1501:13-14. In his view, "there were so many conspiracy theories going on that we were able to hook into something that was tangible. It was real. It was measurable. And we were able to start engaging in a discussion with other people that I had mentioned were moving off of the rational reservation and following these conspiracy theories and not wanting to vote." Som. Tr. 1502:21 – 1503:2.

280. Mr. Somerville believed there were numerous benefits to their efforts, saying, "one of the benefits was that it gave us a way to engage our fellow citizens in what was actually a meaningful effort under the rule of law, as we interpreted it at the time. Secondly, it brought this to the attention of legislators, both in the House and the State Senate that had never considered the state of the voter files. That was [a] very significant advance in the discussion of election integrity to the benefit of everybody in that voter file. Because who is talking about large data up until that point? Nobody is. Who is talking about the importance of the accurate addresses? Nobody is. So, we had a lot of conversations with members, again, of the House and of the Senate that asked a lot of questions. And, of course, my partner in this effort is very articulate as well, and he was speaking to people." Som. Tr. 1503:9 – 1504:1. Their effort relied on free speech to engage the Government. Som. Tr. 1504:3-5. Mr. Somerville testified he and Mr. Davis went far out of their way to communicate the nonpartisan nature of this and used consistent language everywhere: "Everybody should vote. This benefits everybody." Som. Tr. 1504:20-22.

281. Mr. Somerville spoke to numerous state legislators about the problems he and Mr. Davis had identified with Georgia's voting system in 2020, Som. Tr. 1505:6-8, and seven or eight legislators expressed interest in carrying

challenges from the Davis-Somerville List in their own counties. Som. Tr. 1505:9-11.

282. Mr. Somerville testified that after the experience of being sued for his efforts, he would never again try to exercise his rights to associate and petition in the form of eligibility challenges. Som. Tr. 1506:22 – 1507:2.

283. The Deputy Secretary of State, Jordan Fuchs, reached out to Mr. Somerville about his efforts with Mr. Davis, as did the Chief of Investigations, Frances Watson, and Deputy Chief of Investigations. Som. Tr. 1507:13-19. Ms. Watson asked for Davis and Somerville's data. Som. Tr. 1507:23-25.

284. Mr. Davis and Mr. Somerville divided up the work so that Mr. Davis used his computing resources to deal with the large files and databases, while Mr. Somerville had more discussions with third parties. Som. Tr. 1508:9-19. The men applied a lot of exclusionary logic. Som. Tr. 1509:11. Mindful of state law, they omitted from their list anyone who had moved within 30 days of the November 2020 General Election. Som. Tr. 1509:15-21, or anyone who had filed a COA more than 18 months before that. Som. Tr. 1510:1-7. People who filed temporary COAs were not included. Som. Tr. 1510:8-10.

285. Mr. Somerville read two manuals on NCOA Processing. Som. Tr. 1510:15 – 1511:4.

286. At the time he prepared their challenge file, Mr. Somerville had filled out a COA seven or eight times in the last 20 years. 1513:15. The USPS Change of Address form offers those filling it out a direct way to begin updating their voter registration. Som. Tr. 1511:8-12; https://moversguide.usps.com/mgo/disclaimer. The COA form asks for first name, middle name, and last name. *Id*; Som. Tr. 1511:14-16. It provides for gender identification and allows one to input any applicable suffix, such as Jr. or Sr. Som. Tr. 1511:17-18. It asks users whether they intend the move to be temporary or permanent. Som. Tr. 1511:22. It asks users to identify for whom they are filing: individually (I), as a family (F), or as a business (B), and those designations, which Dr. Mayer expressed no awareness of, can become a significant source of what appear to be, but are not, duplicates. Som. Tr. 1512:10 - 1513:10.

287. After a person has filled out a COA, there are still more steps to verify identity as well as to reaffirm one's intentions to move permanently. Som. Tr. 1513:20 - 1514:5.

288. Mr. Somerville did not believe appearance on the Davis-Somerville List meant someone was not eligible to vote at all, just that they may not be eligible to vote in their moved-from or former county. Som. Tr. 1514:14-20.

289. Mr. Somerville testified, "There was no expectation of removal. There was no
     expectation of denying anyone the right to vote. Not at all." Som. Tr. 1545:19-
     20.

290. All of the matches in the Davis-Somerville List were 'A Record Matches', or
     highest-level, matches. Som. Tr. 1545:9-10. Use of NCOA immediately
     eliminated 7 to 7.1 million names from Defendants' lists right off the bat.
     Som. Tr. 1521:23-24. In arriving at about 580,000 records, use of NCOA
     successfully reduced the initial number of potential challenges by roughly
     92%.

291. Mr. Somerville did not consider party affiliation in building his list. Som. Tr.
     1521:25 - 1522:2. Neither race nor gender played any part. 1522:9-10. Mr.
     Somerville found no anomalies in the demographic trends of the list. Som. Tr.
     1522:15 - 1523:6. Mr. Somerville believed that the demographics of his list
     were in line with those reflected on the Secretary of State's website
     concerning the demographics of the state voter file. 1526:14 - 1527:19.

292. There is no evidence Mr. Somerville declined to submit a challenge in his own
     county because he was trying to distance himself from his own process, Som.
     Tr. 1527:22-24, while Mr. Somerville's undisputed testimony was that he did
     not file in his own county so that he could give other people "a meaningful

role in a citizen effort that involved election integrity," including, specifically, a former employee. Som. Tr. 1528:4-7.

293. In the two depositions conducted of Mr. Somerville by Plaintiffs' lawyers, his reading of their briefs, and his attendance at the hearing for the TRO, Mr. Somerville did not ever hear anything suggested by Plaintiffs that he should have done to his and Mr. Davis' list but didn't. Som. Tr. 1528:14-18.

294. Mr. Somerville had conversations before November 2020 with elected officials in the legislature about election integrity issues, as well as with people in the Secretary of State's office, and gave presentations and spoke publicly about election integrity issues. Som. Tr. 1530:15 - 1531:8.

295. It is not accurate to say that the lists were based only on information about NCOA and that they did not take into account any other information relating to voters. Som. Tr. 1539:6 - 1540:4-19; 1544:9-23; 1547:7-12; 1549:13-24. The lists removed 97% of voters with an NCOA process, and then looked at other individualized information about voters to make reasonable predictions of a permanent move, including whether the voters lived on or reasonably adjacent to military bases or college campuses, were electronic (or overseas) voters, had registered with PO Boxes, whether the voters were inactive or active, whether the voters were in the UOCAVA program (per the absentee voter file), whether the voters had voted in the General Election, what county

the voter's moved-from and moved-to addresses were in (via geospatial data), whether the records were duplicates, and so on. Som. Tr. 1545:1 - 1546:5. By the time the list was complete, Mr. Somerville and Mr. Davis had exhausted all tools available to them as citizens, and were unable to use the driver's license database or Social Security database. Som. Tr. 1547:15 - 1548:5. While the NCOA may in and of itself be sufficient, NCOA was not their only basis for determining whether a move was temporary or permanent. Som. Tr. 1550:3-7.

296. The NCOA database does not include moves marked temporary. Som. Tr. 1544:2-6.

297. Private citizens do not have access to the additional tools used by Secretaries of State to determine residency, including ERIC. Mayer Tr. 408:2-13.

298. Mr. Somerville and Mr. Davis attempted to remove possible students from their list, though there is no non-intrusive way using publicly-available sources to determine who is a student, Som. Tr. 1551:24 - 1553:8; Mayer Tr. 361:22 – 362:2, or that their move wasn't permanent. Mayer Tr. 358:9-12.

299. Mr. Somerville would consider a challenge to his own eligibility to vote reasonable if he had filed a COA. Som. Tr. 1555:10-23. He believed election workers are generally polite. Som. Tr. 1555:24 – 1556:14.

300. Mr. Somerville did not believe a petitioner had to have probable cause to submit a petition to the board of elections in his or her county. Som. Tr. 1563:10-13. He did not believe the standard for probable cause itself was equivalent to beyond a reasonable doubt, or certainty. Som. Tr. 1564:2-7. Mr. Somerville's own standard was to "err on the side of the voter." Som. Tr. 1564:9-10.

301. Electors interested in examining and potentially working with the Davis-Somerville List could look at the list and decide for themselves who they knew in their county and who they wanted to challenge, and many did. Som. Tr. 1532:25 - 1533:10. Providing an editable Excel file came at the suggestion of prospective petitioners, whom Mr. Somerville knew personally, expressing interest in modifying and being able to inspect their respective county files. Som. Tr. 1535:9-17.

<u>5.  Mark Davis.</u>

302. There was no evidence Mr. Davis directly or indirectly contacted any voter who might have been the subject of an eligibility inquiry or challenge, including the individual Plaintiffs and their non-party witnesses.

303. There was no evidence Mr. Davis directly or indirectly caused any challenge received by any voter, including Plaintiffs and their witnesses.

304. There was no evidence Mr. Davis had any connection to bounties.

305. There was no evidence Mr. Davis had any connection to SEALs.

306. There was no evidence Mr. Davis had any connection to any actual or threatened publication of voter identities.

307. Mr. Davis resides in Suwanee, Georgia. Davis Tr. 1601:13-24.

308. Mr. Davis is registered to vote in Gwinnett County. Davis Tr. 1603:1-4.

309. Mr. Davis has been President of Data Productions since 1991. Davis Tr. 1603:8-11.

310. Data Productions performs data processing, project management, and reporting for political, commercial, and nonprofit clients. He helps his clients do a tremendous amount of communication through either first class or bulk mail. Davis Tr. 1603:13-18. He helps to facilitate mailings that can range from a few hundred to a million and a half pieces of mail. Davis Tr. 1604:23 - 1605:2. He processes typically around 50 million address records per year. Davis Tr. 1605:11-16; Davis Tr. 1606:5. Because the Georgia voter database contains both physical mailing addresses and other addresses, he typically processes two addresses for each record in a voter file of almost 8 million voters, for a total of about 15 million records per instance. Davis Tr. 1605:19-25.

311. Mr. Davis has worked with the Georgia voter database since 1986, Davis Tr. 1607:1-2, when the files were on magnetic reel-to-reel tapes whose use

required a mainframe computer or were maintained on a typewriter and had to be sourced one by one from each county. Davis Tr. 1607:4-14. He built his own PC-based computer system to read the magnetic reel-to-reel mainframe tapes, Davis Tr. 1607:17 - 1608:2, found a way to translate stack tapes (smaller tape cartridges) and floppy discs, Davis Tr. 1608:9-12, and then built an enhanced version of the Georgia voter database, which he has been working with for decades. Davis Tr. 1603:21-23. He tends to handle the data processing and project management of the company himself. Davis Tr. 1604:15-18.

312. Mr. Davis' success in cobbling together one of the first or only complete voter files in Georgia led to his being sought out by many clients. Davis Tr. 1608:18-22. His practice was further enhanced when the NVRA created a standardized structure for file formats, Davis Tr. 1609:13-18, and the Secretary of State began to sell the Georgia voter file. Davis Tr. 1608:25 - 1609:8.

313. Mr. Davis began working with NCOA processing on the Georgia voter file in the mid-1990s. Davis Tr. 1609:7-10. He defined his own structure for importing the Georgia voter file and he imports into that structure the state's version of the voter file, performing CASS, DPV, and then NCOA on it. Davis Tr. 1610:15-19.

314. NCOA stands for National Change of Address processing. CASS is an acronym for Coding Accuracy Support System. And Delivery Point Validation is an acronym for Delivery Point Validation. DPV is part of the CASS process. CASS processing assigns the zip code plus four and the delivery point and then the 11-digit ZIP code serves as kind of a pointer to a specific address, or delivery point. The Postal Service maintains a database of all known delivery points and different data points about those delivery points. Davis Tr. 1606:11-22.

315. Because the goal of Mr. Davis' work is to get mail into the hands of voters, rather than to remove them, he has fewer limitations than the State in creating his enhanced version of the Georgia voter file. Davis Tr. 1611:10-19. His clients regularly have him mail voters only where the NCOA says they have moved. Davis Tr. 1611:20-25.

316. Mr. Davis processes the voter file through the NCOA registry up to four times in even-numbered (election) years and fewer times in odd-numbered years. Davis Tr. 1612:9-18.

317. Mr. Davis' clients main concern revolves around getting their message into the hands of the person they intend it for. They mail at bulk rates (aka presort standard or marketing mail) but they only get the available discounts if the USPS does not have to forward such mail. Davis Tr. 1612:21 - 1613:6. Clients

are motivated to use NCOA to prevent mail from ending up in the dead-letter bin. Davis Tr. 1613:7-11. Mr. Davis has never seen NCOA processing produce a false match, or heard of one from a customer. Davis Tr. 1613:12-16.

318. Mr. Davis has served as an expert in five cases. Davis Tr. 1614:8-10. He gets involved in such cases only after exhaustive research, and because he wants to highlight issues in the voter data for voters, elected officials, and election officials. Davis Tr. 1616:1-4.

319. Mr. Davis began to spot issues in the voter file shortly after the motor voter (NVRA) law was passed and he became more concerned over time. He began to feel a sense of responsibility and an obligation to do something about the issues because he had a unique set of tools that not too many people had, such as data processing tools, postal processing tools, geocoding and digital mapping tools, and the ability to run queries and studies. Davis Tr. 1618:6-22. His concerns included people who no longer lived where they were registered to vote. Davis Tr. 1618:23-25. As early as 2002, Mr. Davis met with the State Elections Board and Secretary of State to discuss the issues, Davis Tr. 1619:7-10, and he did a presentation for them, and was later asked to speak with the Secretary of State herself, the elections division at the Secretary of State's office, the Georgia Technological Authority, the Voter Fraud Unit at the

Burris Institute, and other stakeholders to go over the issues he had raised before the state board of elections and talk about potential solutions. Davis Tr. 1620:12 - 1621:3. He also discussed the issues with Secretary of State Brad Raffensperger. Davis Tr. 1687:17. Mr. Davis has also testified about voter rolls issues, in 2020, before the Senate Government Oversight Committee at the invitation of Senator William Ligon and has worked for many political campaigns, with whom he also shared his concerns about issues regarding the voter database and election integrity. Davis Tr. 1621:11-20.

320. Mr. Davis ran NCOA processing on the Georgia voter file both before and after the 2020 General Election. Davis Tr. 1622:2-4. With a new, "hotrod" computer, he realized he could run the analyses he'd run for years, on smaller data sets, on the full state voter file. *Id.* at 10-15. He was shocked to see that thousands of Georgia General-Election voters were voting out of their county. He believed that, aside from the 30-day grace period immediately before an election, voters were not supposed to be doing that. They're supposed to be casting ballots in the county and municipality where they actually live. Davis Tr. 1522:20-25. Such voters might move to a new county and not get around to updating their driver's license within 60 days. Davis Tr. 1624:11-12. That voter could then go to the polling station in his former county, show his former address to the election worker, have the election worker pull up a matching

70

voter registration, and then vote in the wrong county without the poll worker having any idea. Davis Tr. 1624:11 - 1625:2. He saw 110,000 such ineligible voters in his own analysis, Davis Tr. 1625:18-21, and he saw about 35,000 of those who actually voted in their former county. Davis Tr. 1625:22-25.

321. But Mr. Davis believed the Secretary of State could not have done anything about such voters before the Runoff. Davis Tr. 1623:11-15. And he was worried that the same thing would happen in the Senate Runoff without the Secretary of State or State Board of Elections being able to do anything about it. 1623:16-21. He believed the only avenue to correct the problem was through a challenge that a county Board of Election chose to accept. Davis Tr. 1623:22-24.

322. Soon after they met, on or about November 25, 2020, Mr. Davis asked Mr. Somerville to independently verify his findings and try to poke holes in them. Davis Tr. 1629:10-25. After that, they communicated a great deal about voter data, including their findings that multiple people were registering at the same address, like a Commercial Mail Receiving Agency (CMRA). Davis Tr. 1630:13 - 1631:22. Mr. Davis provided his analysis of the 2020 General Election to the Georgia Secretary of State. Davis Tr. 1633:12-15.

323. The idea of facilitating Section 230 challenges also began to take shape by early December, Davis Tr. 1637:5, and Mr. Davis and Mr. Somerville did a

lot of studies of the data and formulated a plan. Davis Tr. 1635:18 - 1636:3. The two men tried to limit their challenges to voters who had arguably already cast ballots in the general election with potential residency issues. This was partly to limit the size of the challenge and make it more likely that a county board of elections would consider the challenge. Davis Tr. 1636:4-9.

324. Mr. Davis understood there to be a difference between Section 229 and Section 230 challenges, believing the former was a challenge to a voter's registration while the latter was a challenge to their qualifications to cast a ballot in a particular election. Davis Tr. 1636:23 - 1637:2.

325. Between 10:30 and 11am on December 15, Mr. Davis output all of the final files in the Davis-Somerville List of NCOA voters. Davis Tr. 1637:8-11. He did not attend the dinner with Ms. Engelbrecht and Mr. Phillips later that night.

326. Mr. Davis' goals for his challenges were, primarily, to draw the attention of Georgia's elected officials and boards of elections, Secretary of State's office, the state board of elections, and legislators to the residency issues he'd identified. Davis Tr. 1637:14-20. He was concerned that the Secretary of State had not sent letters to the out-of-county voters on his list. Davis Tr. 1637:5-21.

327. Mr. Davis did not intend for any voters on his list to be removed from the voter rolls, nor did he think they could be. Davis Tr. 1641:2-6.

328. Mr. Davis did not believe that a voter's appearance on the NCOA meant he or she was ineligible to vote, but that a local board of elections should conduct an inquiry into the matter. Davis Tr. 1641:15-24. He believed the Boards used a standard of probable cause in deciding whether to do so. Davis Tr. 1642:3-7.

329. Mr. Davis did not meaningfully interact with any people who were interested in being challengers. Davis Tr. 1642:8-18.

330. Mr. Davis believed it would be inappropriate to conduct research into the background and personal information of voters on his list, believing it could be intrusive, harassing, or intimidating. Davis Tr. 1642:21 - 1643:3. He elected instead to follow the statute and make an argument for probable cause, Davis Tr. 1643:6-7, and to let Boards use their greater range of research tools to make a decision. Davis Tr. 1643:8-24. Mr. Davis didn't talk to any challenged voter, contact them, or mail them anything. Davis Tr. 1644:1-5.

331. Mr. Davis did not believe even multiple hundreds of thousands of challenges would overwhelm local boards of Election. His own list averaged about 250 voters per county, some of which were smaller than precincts in larger counties. Davis Tr. 1644:15-24. He expected that counties could very well

throw up their hands and simply decline to process any number of challenges they felt to be burdensome. Davis Tr. 1681:21-24. He understood that larger counties would have larger staffs, Davis Tr. 1682:3-7, and more precincts into which to divide any challenges they wished to look into, *id.* at lines 16-18. He also believed that a Board could benefit from and be interested in a challenge even if it didn't accept the challenge. Davis Tr. 1645:5-20.

332. Mr. Davis did not believe a voter who had moved to a new county, and in many instances had likely already been contacted by the Secretary of State, should be particularly surprised by a challenge, Davis Tr. 1646:17-22; 1681:1-3, or find it overly burdensome, if the voter knows he or she moved. Davis Tr. 1691:8-14.

333. Mr. Davis did not communicate about any challenges with Mark Williams, Ron Johnson, or James Cooper. Davis Tr. 1647:11-21. Mr. Davis had no contact about challenges with Representative Jerry Boling, and he referred Dan Gasaway to Mr. Somerville. Davis Tr. 1648:15-25. He did not know if Mr. Gasaway filed a challenge based on the Davis-Somerville List. Davis Tr. 1649:5-6. The lists he created for provision to potential challengers were editable. Davis Tr. 1649:10-13.

334. Mr. Davis believed a person's appearance in the NCOA had a great deal of bearing on that person's intent to move out of their county permanently,

including because the Postal Service put them through subsequent verification and confirmation procedures: submitting a debit or credit card to verify identity; responding to an emailed or snail-mailed confirmation letter, and then another round of such confirmations before the move date, so that the NCOA winds up being very accurate. Davis Tr. 1649:20 - 1650:11; *see also* https://faq.usps.com/s/article/Change-of-Address-The-Basics (discussing "multi-factor process for online Change of Address requests", including $1.10 credit card charge, text verification, and email or in-person verification). Mr. Davis believed a voter's expressed intention to move permanently can demonstrate probable cause for a Board inquiry. Davis Tr. 1652:2-10.

335. At the same time, Mr. Davis and Mr. Somerville did not consider using only the NCOA list for their challenges, but rather added other data sources, Davis Tr. 1650:18-25, while deciding to exclude inactive voters, Davis Tr. 1651:4, numbering in the hundreds of thousands. Davis Tr. 1652:11-15. They also removed other categories of voters for various reasons, including people who had not voted in the general election, people who had moved within the same county, and absentee and UOCAVA (overseas military) voters and their spouses. Davis Tr. 1652:22 - 1653:3.

336. Inactive voters who were inactivated after NCOA processing would need to confirm residency with the county to become active again. Mr. Davis and Mr.

Somerville decided not to challenge these people because the challenge process would have them to do the same thing. Davis Tr. 1654:2-8, while the True the Vote Defendants kept inactive voters on their list because it would add no burden. Mr. Davis and Mr. Somerville did not include in their list anyone who had not voted in the General Election, believing they were not likely or even able to vote in the Run-off, Davis Tr. 1654:21-25, while the True the Vote Defendants believed such voters could vote in the Run-off, and included them.

337. Mr. Davis spent a lot of time during the day, for weeks, when time was available, as well as a lot of evenings and weekends working with Mr. Somerville to check and check and recheck their data. Davis Tr. 1656:3-18.

338. Mr. Davis did not target counties in generating the Davis-Somerville List, Davis Tr. 1657:1-12, nor demographic categories like race, gender, or political party. *Id*. lines 15-21.

339. Mr. Davis only heard about True the Vote's list-building process much later. Davis Tr. 1657:25 - 1658:2. He saw that True the Vote had different ways of approaching the same goal of voter integrity and challenges. About nine days after meeting a True the Vote vendor on an introductory call, Mr. Davis was sued in this matter. Davis Tr. 1658:5-23. Mr. Davis believed True the Vote was well down the road in defining their challenges when he met them and

their vendor, and he didn't have input into who True the Vote did or didn't challenge, Davis Tr. 1678:5-8, nor they into his. Davis Tr. 1678:15-18.

340. Mr. Davis spoke with Georgia legislators one-on-one about residency issues. Davis Tr. 1660:14-23. He also spoke with several journalists who later published articles and books based on their conversations. Davis Tr. 1661:1-21.

341. Mr. Davis would not consider utilizing Section 230 to facilitate challenges at scale, and exercise his constitutional right to petition his Government to redress grievances, because it's not worth it, and the legal fees would prevent him from retiring. Davis Tr. 1662:10-18.

342. Mr. Davis did not believe there was any reliable way to identify students. Davis Tr. 1669:1-5; 1671:13-15 and 21-25.

343. Based on Mr. Davis' knowledge of people who knew Alton Russell and his own inquiries, he had no reason to believe Mr. Russell was affiliated with True the Vote. Davis Tr. 1677:18-25.

344. Mr. Davis believed Derek gave an extremely limited number of people, a handful, access to a Google Drive folder with a private URL. Davis Tr. 1679:9-20. There is no evidence to the contrary.

Dr. Kenneth Mayer's Arguments of Error and Disparate Impact

345. Dr. Mayer was allowed to testify as an expert in elections administration. His "academic work has been in American politics generally, with a focus on election administration, voting rights, redistricting, and also a focus on the presidency," Mayer Tr. 325:21-23, as well as general "voter behavior". *Id*. 326:2-4. Dr. Mayer is generally asked, in his expert roles, to provide analysis and conclusions on an empirical question that can be answered with data. Mayer Tr. 327:12-15. Dr. Mayer was offered in this case as an expert in political science, quantitative analysis, election administration and voter behavior. Tr. 327:25 - 328:1. However, most of Dr. Mayer's testimony purported to be about the reasonableness of relying on NCOA in the context of voter-initiated residency challenges under Section 230, and Dr. Mayer exhibited little understanding of either subject.

Dr. Mayer's Ignorance of NCOA Processing and Section 230 Nullifies His Conclusions

346. Dr. Mayer's scholarly connection to NCOA is limited to one article on which he was listed as an author. Mayer Tr. 402:10-13. Dr. Mayer had no experience with the NCOA's matching algorithms, no experience with NCOA's CASS or knowledge of what it is or how it is used, and no knowledge of the meaning of CASS's DPV or Delivery Point Validation. Mayer Tr. 402:14-25. He had no experience with mass mailings. Mayer Tr. 403:1-3. He has published no

articles on NCOA in scholarly journals or trade publications related to the Postal Service or mass mailing, attends no postal industry conferences, and does not publish or subscribe to industry sources in any less formal media. Mayer Tr. 403:4 - 404:5. Dr. Mayer was not familiar with the identity verification procedures the USPS applies in change of address filings. Mayer Tr. 12-19. Dr. Mayer has not himself run NCOA processing and was involved in such processing by others just once. Mayer Tr. 410:2-6. That effort processed only "several thousand" records, perhaps more than 2000. Mayer Tr. 410:17-21.

347. Dr. Mayer claimed no expertise in NCOA processing, nor did he exhibit such expertise in his responses to questions about the NCOA Registry. Dr. Mayer did not know if NCOA licensees predicted for clients like Defendants whether a permanent change of address was indeed permanent. Mayer Tr. 405:25 - 406:3. Dr. Mayer was not familiar with the various tiers of NCOA vendors, Mayer Tr. 410:12-16, or what requirements they must meet, *id*. 411:3-10, including requirements for matching or auditing, *id.* 411:11-15. Dr. Mayer erroneously believed temporary changes of addresses were reflected in the NCOA. Mayer Tr. 406:4-18.

348. Dr. Mayer is not familiar with the state system of residency-based challenges, such as how many states allow them, the differences in how the statutes work,

or the time frames for allowing challenges under Georgia law. Mayer Tr. 404:6-14.

349. Dr. Mayer's conclusions proceeded from a crucial misunderstanding of how NCOA processing works. He incorrectly believed, and offered neither evidence nor expertise to support his belief, that NCOA processing entails "matching" two different files. Mayer Tr. 341:4-18 (incorrectly stating the only way that the unique identifier of the voter registration can be put in a challenge file "is after that matching process had been conducted based on the name and address").

350.     As Mr. Somerville explained, "matching" two files is not how NCOA works at all, so the lack of unique or non-erroneous identifiers does not create *any* "risk … that you are going to be matching or linking to the wrong person." Mayer Tr. 341:12-13. The lack of unique identifiers *has no impact* because NCOA processing does not attempt to *combine* two files, such as the NCOA file and the voter file with its unique identifier of the voter registration number. Som. Tr. 1537:5-6; 1538:3-4. Instead, NCOA processing works to take an input file (such as the Georgia voter file, with its unique voter registration identifier), Som. Tr. 1538:21-23, and then, if it finds a match to a record in that file, it *appends* additional information to that record. Som. Tr. 1538:23-25. During the attempt to match, NCOA processing utilizes any

gender designation (e.g., Mr. and Mrs.), first name, middle name, last name, suffix, primary address, secondary address, if any, apartment number or suite, and the rest of the address. Som. Tr. 1516:17-24. The only way to get a match, and therefore to have NCOA data *appended* to one's input file, is through one of three (out of 25) match categories or levels of matching quality. Som. Tr. 1518:22-25. No match means no record in the challenge file in the first instance.

351.     A record that fails CASS certification due to missing or improperly formatted input data will not receive an NCOA match and did not end up in any Defendant's list. Accordingly, Dr. Mayer's conclusions that the spreadsheet errors he purported to identify, in his problematic Combined File, could have prevented accurate matching, let alone caused improper challenges, are unsupportable.

### Dr. Mayer Failed to Understand True The Vote's Process

352.     Dr. Mayer stated he attempted to comprehend True the Vote's process by referring to a few sentences from an email Ms. Engelbrecht had sent through Amy Holsworth to a volunteer, Mayer Report at 12, and he stated that he had never read the depositions of Ms. Engelbrecht or Mr. Phillips in which they explained their process. Mayer Tr. 417:12-16. Dr. Mayer stated he reviewed two different descriptions of True the Vote's process but did not

explain how he reconciled them into one cogent, and correct, description of the actual process. Mayer Tr. 335:6-9; 336:11.

353.    Dr. Mayer attempted to address True the Vote's process without understanding True the Vote's or its contractor's references to the contractor's use of queries and algorithms, and Dr. Mayer did not believe he had a "complete and accurate and reliable explanation" of what True the Vote actually did and what its process looked like. Mayer Tr. 417:2-11.

354.    Dr. Mayer developed conclusions, including statistically insignificant ones about disparate racial impact, based on (a) what he admitted was an incomplete understanding of True the Vote's file and its provenance and purpose, (b) a file he created from spreadsheets that Fair Fight volunteers allegedly collected from counties, none of them authenticated or entered in evidence, and (c) an analysis not reviewed by any independent third parties for error (including his conclusion that 65 was 38% of 159, Mayer Report at 18, when in reality 65 is 40.8% of 159), but his conclusions did both produce, rely upon, and compound serious error, such as:

   a.  His repeated, significant conclusion – offered *33 times* in his Report —
       that True the Vote had "selected", *see* Mayer Report at 3 (2 times), 7,
       8, 18, 34 (7 times), 35 (2x), 36 (4x), 37 (4x), and 39 (3x), "chosen", *id.*
       at 17, 34 (twice), or "targeted" counties, *id.* at 7, 8, and thus the voters

in them. Dr. Mayer claimed that he had "seen no explanation" for why 65 counties were "selected". Mayer Report at 34.

b.   His failure to openly compare for the Court, let alone explain away, the 27.3% of African-Americans he admits (Report at 26) are in True the Vote's challenge file with the 29.9% he admits (page 35) are in Georgia's voter file.

c.   His conclusion that his Combined File had no middle names, Mayer Tr. 340:15-16, when numerous witnesses testified that both the Georgia voter file that was input into NCOA processing and True the Vote's resulting NCOA voter file contained middle names. *See* Eng. Tr. 1891:23-25 (noting middle names existed, while objections were sustained to counting them up).

d.   His incorrect statement that the NCOA doesn't use middle names or gender for matching, when several witnesses testified, and publicly available documents show, that it does. Davis Tr. 1613:22-25 (NCOA matches both middle name and gender); Som. Tr. 1511:14-16 (COA form uses middle names); *id*. 1512:18, 1516:20, 1519:6-16, 1538:5-7. Dr. Mayer's own Report makes this clear, at page 22, note 9, wherein he cites the U.S. Postal Service Guide for NCOALink that establishes NCOA uses middle names and gender.

*See* U.S. Postal Service, *NCOALINK User's Technical Reference*, Version 10, July 5, 2018, https://postalpro.usps.com/mnt/glusterfs/2018-07/User_Tech_Info.pdf at 5 ("Match on first name, middle name, surname and title required. Gender is checked and nickname possibilities are considered").

e.  His incorrect statement that there were 1365 surname-firstname-address duplicates in True the Vote's file, notwithstanding that (a) when True the Vote's files are merged properly and (b) the extant middle names are used rather than lost in the merger, there are only 90 such duplicates.

No Chain of Custody for the 65 Files Allegedly Procured from Counties

355. In choosing to stake their claim on errors in spreadsheets, Plaintiffs chose a difficult road with many hurdles. First, Plaintiffs either needed to (1) introduce in evidence the spreadsheets True the Vote submitted to the counties or (2) show an unbroken chain of custody (with authenticating witnesses) for the spreadsheets reviewed by their expert, Dr. Mayer, as those spreadsheets traveled (1) from True the Vote to volunteer petitioners, (2) from volunteer petitioners to Boards of Election, (3) from Boards of Election to Fair Fight volunteers, (4) from Fair Fight volunteers to Fair Fight itself, (5) from Fair

Fight to its attorneys and (6) finally from the attorneys to Dr. Mayer, all without possibility of modification, inadvertent or otherwise, along the way. In making arguments about True the Vote's process of working with volunteer petitioners, Plaintiffs showed they well understood the possibility of spreadsheets being capable of modification by parties unknown, but their organization of their own efforts with spreadsheets suffered from the very issue they purported to be concerned about.

356. Plaintiffs did not introduce True the Vote's spreadsheets, provided in discovery, in evidence. They also did not establish a chain of custody for the spreadsheets reviewed by Dr. Mayer and incorporated into his report, which was entered in evidence. Dr. Mayer's report clearly identifies which documents, of those he reviewed, had been "produced [by True the Vote] in discovery," Mayer Report at 12, and the 65 Excel files from nameless, faceless volunteers were not among them. *Cf. id*. at 11.

357. Instead, Plaintiffs offered the following explanation of their haphazard process. Fair Fight sent volunteers out to the counties to collect the 65 Excel spreadsheets ultimately provided to Mayer: "we had people from our organizing team, our research team, our voter protection team, who were all trying to find -- get the lists of people. And, also, then deploying volunteers to be at counties where they were having meetings to, like, try to collect the

list and bring them back so we knew who was on them." Stewart-Reid, Tr. 55:3-8. Fair Fight produced no evidence regarding who retrieved the files, whether any chain-of-custody protocols were in place, whether any of the files were modified, in what format the files the counties presented the files to Fair Fight volunteers, how Fair Fight volunteers transmitted these files to Fair Fight, who at Fair Fight opened or could have modified the files, who at Fair Fight consolidated the files, or how the 65 files were presented to Dr. Mayer. When asked if he got "65 different Excel spreadsheets," Dr. Mayer stated, "I did." Mayer Tr. 374:16-17. His Report states that in "reaching my opinions in this report, I relied on" these 65 Excel files as combined into his own file, which he decided to call "the 'challenge file.'" Mayer Report at 11. Dr. Mayer's resulting "challenge file" lacks authentication as being based on True the Vote's files, neither it nor the underlying files was entered in evidence, nor were any underlying files inspected by the Court or Defendants, and therefore the result of his attempt to concatenate the spreadsheets he got from Fair Fight volunteers will be referred to hereafter as ***Dr. Mayer's Combined File***.

Dr. Mayer Offered Neither a Clear Description of His Own Process Nor Third-party Validation

358. Dr. Mayer admitted that "where we have two large datasets and we're trying to determine if an individual in one file is the same individual in another file, there are all kinds of reasons that can go wrong. And in the academic realm, when someone is doing that, a scholar is doing some research, there are very explicit steps and descriptions that are typically offered: The *dates the files* were generated, *the specific process* by which the matching or record linkage was conducted, what constituted a match, the type of matching, *how the data were preprocessed* to make sure that the format of the matching fields was consistent, *how the results were reviewed* to assess the reliability of that process." Mayer Tr. 334:9-20. Dr. Mayer failed to heed this advice:

   a. Dr. Mayer failed to show that the <u>date</u> of the Georgia voter file against which he compared his Combined Files (or what he believed to be True the Vote's files) was the same vintage of the Georgia voter file True the Vote had used months before.

   b. Dr. Mayer offered no details, in either his testimony or his Report, on the "*specific process*" by which his own matching or record linkage was conducted. For his own analysis, Dr. Mayer did not provide anything like a "2,000-word explanation over multiple pages that allows someone to go through and . . . replicate, so it's possible to

recreate and repeat that process, which is an essential part of the social scientific process." Mayer Tr. 334:24 – 335:2.

c.  Dr. Mayer offered no details about how he preprocessed the files from the counties to make sure the "format of the matching fields was consistent."

d.  Dr. Mayer offered no evidence of any "review" of his process.

## Dr. Mayer Did Not Rule Out His Own Error

359. Dr. Mayer admitted no one reviewed his results, and that he had no data on the reliability of the Stata program he used to attempt to marry 65 files into his Combined File. Dr. Mayer admitted his Combined File was at home on his computer and there would be no way to resolve any errors in his calculations or observations. Mayer Tr. 373:2-9. Dr. Mayer said he couldn't say and didn't "know what the error rate might have been" in importing the files he got from Fair Fight volunteers. Mayer Tr. 375:12-15.

360. Dr. Mayer used a software program called Stata to combine the 65 files into his Combined File. Mayer, Tr. 374:20-25 – 375:1. However, Dr. Mayer was unaware of the error rate of Stata importation. Mayer Tr., 375:9-11. Dr. Mayer knew of no way the Court could know that no errors were made during the importation that combined 65 files into one. Mayer Tr. 375:12-15.

361. Stata is a statistical software package for data science that uses proprietary file types. True The Vote did not create its files in Stata, but rather in Excel and as .csv (comma separated value) files. As such, the importation process used by Dr. Mayer to create the Combined File (Mayer, 374:20-25 – 375:1-2) required non-Stata files to be converted into Stata file types (.dta) before they could be combined in Dr. Mayer's software application. Dr. Mayer offered no assurance that this process occurred without error and offered no opinion on the error rate associated with combining disparate files not in native Stata file format into one.

362. Dr. Mayer placed great "importance" on "huge" alleged errors in True the Vote's challenge files that seem only to have occurred in his own, saying, "True the Vote's challenge file contains huge numbers of missing values for crucial fields. For example, no middle initials or name suffixes are recorded for anyone in the challenge file," Mayer Report at 5, and "Importantly, the name fields that True the Vote has apparently used to conduct the match do not include either middle names…" Mayer Report at 24; *see also* Mayer Tr. 340:15-16. But Dr. Mayer conceded that this "important" conclusion may be inaccurate, testifying, "I don't know, again, going back and looking at the specific county files, *whether there were any middle names in there*." Mayer Tr. 415:14-16 (emphasis added).

363. Dr. Mayer's uncertainty not only has profound implications on his calculation of duplicates but calls into question exactly what errors were introduced when he tried to combine 65 files into one using a software application that must accurately convert the original file type (in this instance, Excel or .csv) in order to "stack" the data, as described by Dr. Mayer. Mayer Tr. 374:24-25.

### Dr. Mayer Found No False Statements in TTV's Challenge Process

364. Dr. Mayer did not see any indication that True the Vote's challenges contained false statements or falsehoods. Mayer Tr. 401:3-11.

### Dr. Mayer Did Not Establish that Alleged Errors Rendered Any Challenges "Garbage"

365. The second major hurdle Plaintiffs faced in attempting to establish that the TTV Defendants were reckless by virtue of errors in spreadsheets (even if they could have been shown to derive from True the Vote and not later modifications) was to show that the TTV Defendants did indeed attempt to "throw a quarter million pieces of garbage at the wall." Mayer Tr. 367:6-7.

366. In using such a metaphor, Dr. Mayer revealed assumptions he had made without evidence before him, revealing some bias. First, he grossly overstated the amount of what even he considered garbage, using the figure – 250,000 – applicable to the entire alleged challenge effort. In reality, Dr. Mayer identified only a fraction of those records as containing errors of any kind, let

alone errors (as shown below) that could have resulted in an erroneous challenge.

367. Second, in two crucial admissions, Dr. Mayer admitted (1) that the errors mentioned in his testimony and at pages 42 and 43 of his Report *would not have impacted the accuracy of the NCOA*, Mayer Tr. 388:20-23, and (2) he *did not actually know whether the errors he had attributed to True the Vote were already contained in the NCOA or were the result of True the Vote's own process.* Mayer Tr. 389:3-5.

368. Third, Dr. Mayer assumed Defendants were trying to "throw" a lot of something they shouldn't have been throwing, as in doing so irresponsibly. But the evidence revealed the TTV Defendants (and others) fully knew, as they prepared their challenges, that they would not find volunteers for even half the counties, that Boards of Election were being threatened with lawsuits, and that Boards of Election could choose not to even consider challenges, let alone accept them. There is no evidence, certainly none reported by Dr. Mayer, that Defendants believed, hoped, or intended that a quarter million challenges would be "thrown" anywhere, let alone were even expected to be seen by anyone.

369. The Court finds that designing challenges *en masse* is not reckless where each of the Defendants possessed a reasonable belief such challenges were

reasonable. Section 230 allowed such challenges, the Secretary of State engaged in similar address verification at scale, legal counsel gave affirming advice to Ms. Engelbrecht and legislative counsel gave similar advice to Mr. Somerville, and Ms. Engelbrecht reasonably believed the Secretary of State did not consider challenges at scale illegal or irresponsible even if the Secretary or his staff may have thought they might not be "well viewed", which is the extent of Mr. Germany's recollection. If there is no intention to overwhelm a Board of Election, then it cannot be reckless to submit petitions for which one has numerous goals - not just the single-minded hope and expectation that all challenges be not just reviewed but accepted.

370. Fourth, Dr. Mayer assumed what the TTV Defendants were "throwing" was "garbage", which assumes that what he believed were academic errors in spreadsheets actually had some negative (garbage) impact on the eventual challenges' propriety. But Dr. Mayer admitted he does not know what True the Vote process actually was, and he conveyed no understanding of the details of how Section 230 worked, and neither he nor Plaintiffs generally proved beyond a preponderance of doubt one crucial fact, one they imply but never prove: that the errors Dr. Mayer identified would have had any impact once those errors in spreadsheets were translated into the real world of the

complex operation of volunteers negotiating varying terms to carry Section 230 challenges under Georgia law.

371. The Court declines to invite future parties to hire experts, including literal academics, to identify merely academic errors and to mis-identify as errors phenomena in the data they don't understand in their relevant context.

372. In sum, Plaintiffs produced an expert who identified what he considered errors, albeit in his own Combined File of spreadsheets not shown to have come from True the Vote, whose supposedly negative impact on voters would be considered obvious. But because the expert understood neither how NCOA processing worked nor considered the alleged errors in the context of a board of elections' role, he was unable to say how any of the errors could have had an impact in the real world. Specifically, the expert provided no indication whatsoever of which errors would make the challenge less likely to have acceptable grounds, or more likely to wrongly persuade a board of elections there was probable cause. In other words, Plaintiffs' argument reduces to claiming negligence in a spreadsheet with no known potential effects.

Errors "Obvious" to Boards of Election Cannot Be Reckless

373. Dr. Mayer also admitted the supposed errors in his Combined File were "obvious". Mayer Tr. 331:3-4. ("I found tens and tens of thousands of *obvious errors* that were *apparent based on immediate inspection*")

(emphases added); *id.* 332:4 ("some of it was just completely obvious"); *id.* 390:;8-10 (stating as obvious "[t]he records that don't have an address, the records that have a city name where the zip code is, someone who is already reregistered"). Dr. Mayer conceded it's possible a Board of Elections would be able to look at the errors he identified and see them. Mayer Tr. 390:20-25. They could look at the errors and decline to find probable cause. Mayer Tr. 391:5-9. Dr. Mayer had no idea how many of the spreadsheet errors he found in his Combined File made their way to a voter. Mayer Tr. 391:17-19; 391:2 - 392:6.

374. This is consistent with his Report, which states: "The result [of True the Vote's processes] is a mistake-prone list that is rife with tens of thousands of *obvious errors*." Mayer Report at 46 (emphases added).

Dr. Mayer Did Not Show How Any Category of Error Would Have Rendered a Challenge Improper

375. The following table summarizes the reasons Plaintiffs cannot be said to have shown by a preponderance of the evidence that the alleged "errors" identified by Dr. Mayer created real risks that True the Vote recklessly risked intimidating voters by means of erroneous challenges.

| Type of Issue | Chain of Cust | Error Possibly | Maximum Allege | Other Error | Error Shown by a | "Obvious" | Could have | Could Render a | Effective Maxi |
|---|---|---|---|---|---|---|---|---|---|

| | ody Issues | Introduced by 65-file Merger | d TTV Error | by Dr. Mayer | Preponderance | to BOEs | reached a voter | Challenge Incorrect | mum Potential Effect on Voter |
|---|---|---|---|---|---|---|---|---|---|
| Voter registration address = moved-to address | Yes | Yes | 5 | | 5 | Yes. Mayer Tr. 363:18-20 | Unlikely | Possible | 5 |
| Syntax errors in street address | Yes | Yes | 7 | Didn't rule out CASS correcting street address | 7 | Yes. Mayer Tr. 363:25; 390:2-5 | Possible | No | 0 |
| Move-to address undefined | Yes | Yes | 27 | Possible | 27 | Yes. Mayer Tr. 390:6-10. | No | No | 0 |
| Registration and move-to in same county | Yes | Yes | 145 | Failed to account for counties with same names in other states | 0 | Yes | Yes | No | 0 |
| Not register | Yes | No | 336 | Used newer | 0 | Yes | No - could | No | 0 |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| ed in Georgia | | | | version of GA voter file | | | not be accepted | | |
| Registrant name in list doesn't match voter file | Yes | Yes | 263 | | | Yes | No - could not be accepted | Yes | 0 |
| On or "near" military base | Yes | No | 22,956 | "near" is meaningless | 0 | N/A | Yes | No | 0 |
| On a military base | Yes | No | 397 | | 397 | Yes. Mayer Tr. 394:20-21 | Yes | Possible | 397 |
| Move-to address in city "with" college | Yes | No | 34,578 | meaningless data | 0 | Yes | Yes | No | 0 |
| Duplicates | Yes | Yes | 1325 | Use of middle names would have reduced duplicates | 0 | Yes | Yes | No | 0 |
| No move- | Yes | Yes | 15,360 | | 15,360 | Yes. Mayer Tr. | No | No | 0 |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| to address | | | | | 331:14 -19 | | | |
| City name in registra tion ZIP field | Yes | Yes | 9,270 | Merge error possibl e | 0 | Yes. Mayer Tr. 390:6- 10. | Yes | No | 0 |
| Re- register ed at new address | Yes | No | 6,377 | Failed to rule out differen t vintage voter file | 0 | Yes. Mayer Tr. 366:1; 390:6- 10. | No | No | 0 |
| TOTA L | | | | | 15796 | | | | 402 |
| % of 250,78 3 with errors | | | | | 6.30% | | | | 0.16% |
| % of 250,78 3 without errors | | | | | 93.70% | | | | 99.84 % |
| % of 7,600,0 00 with errors | | | | | 0.21% | | | | 0.01% |
| % of 7,600,0 00 w/o errors | | | | | 99.79% | | | | 99.99 % |

376. Once erroneous assumptions about errors are corrected for, as well as whether the errors could have had any real-world impact, the academic error rate drops to a maximum of 6.3%, and may be as low as .01%, depending on one's chosen frame of reference. The latter number is closer to a true error rate in which we define "error" as a mistake that, in the context, could have created a greater chance of a Board of Election erroneously finding probable cause. The alleged errors are discussed in detail below.

377. Dr. Mayer identified 5 instances where the registration address was the same as the moved-to address. Mayer: 363:12-20. He believed this was an "obviously identifiable error." Mayer Tr. 363:18-20.

    a. First, 5 out of more than 250,000 rows of data is far from "obviously identifiable" and the average lay person would not be able to identify such a small number strewn randomly across a quarter-million records. To identify such an anomaly would require database programming experience to write a query that identified the matches between multiple distinct fields to the exclusion of over 250,778 other records.

    b. Second, Dr. Mayer did not explain why a registration address being the same as the moved-to address is necessarily an error, let alone one capable of being considered a reckless attempt to intimidate. This can be explained by the following hypothetical: the voter resides at 123

Main Street with their family and that is where they are registered to vote. They take a job out of the state, move, and file a change of address to a new address. They have no intention of returning. A year later, they are laid off from that job and return home. In the prior year, they never updated their voter registration; it's still 123 Main Street. They now file another change of address back to 123 Main Street. When this voter is run through the NCOA[Link] database, they will have an active change-of-address on file with the USPS for 123 Main Street and still be registered there to vote. This is rare, happened 5 times out of 250,783, but completely explainable.

378. Dr. Mayer identified 7 instances of syntax errors in the street address field. Mayer Tr. 363:21-23. Once again, 7 out of more than 250,783 is hardly material, and Dr. Mayer acknowledged that errors during his import process into Stata could not be ruled out. Mayer Tr. 375:12-15.

379. Dr. Mayer identified 27 instances where a registrant was alleged to have moved to an undefined street address. Mayer Tr. 364:16-20. Dr. Mayer testified, "most of these were cases where the move-to address was listed as general-delivery or something that was not actually a street address." Mayer Tr. 364:18-20.

380. Dr. Mayer identified 145 instances where registration address and the move-to address are in the same county, Mayer Tr. 364:23-25, but this error category contains two serious flaws.

   a. First, Dr. Mayer identified no such error that resulted in a Board finding probable cause or a voter being challenged. Mayer Report at 28.

   b. Second, Dr. Mayer's analysis failed to consider whether these 145 fields contained county names *in other* states, thus rendering the challenges appropriate. For example, 59 of the 145 are for registrations in Cherokee County Georgia and move-to addresses in Cherokee County Alabama. Lee county is present for registrations in Georgia and move-to's in Alabama and Florida. Douglas county is present for registrations in Georgia and move-to's in Colorado, Nebraska, and Nevada. Union County is present for registrations in Georgia and move-to's in North Carolina and South Dakota. Of the 145 alleged errors, Dr. Mayer did not identify a single match where the registration county *and* state match the move-to county *and* state.

381. Dr. Mayer identified 336 instances where the challenged individuals were not registered in Georgia, Mayer Tr. 365:7-9, but, once again, he didn't provide evidence as to why such an error could have been of any consequence to a Board or a voter, particularly given (1) his likely comparison of his

100

manufactured Combined File with a later version of the Georgia voter file than the one used by True the Vote and (2) the obvious alternative explanation that those records could represent individuals who had been removed from the voter rolls by the Secretary of State — nor was he able to rule out that such removal could have been due to a change of residency. This calculation cannot be credited because Dr. Mayer did not indicate the time that lapsed between the date of the GA Voter File used by True the Vote to compile their NCOA lists and the date of GA Voter File he used to analyze his attempted recreation of True the Vote's NCOA list. This distinction is critical because individuals who appeared on True the Vote's NCOA list but not on the GA Voter File used by Dr. Mayer had almost certainly been removed from the file by the Secretary of State; such removal is permitted at any time if the voter notifies the state they have moved out of state. This is more of an indication of predictive accuracy of the NCOA data than an example of a data discrepancy.

382. Dr. Mayer identified 1,325 instances of duplicates in the challenge file based upon first name, last name, and address. Mayer Tr. 365:13-16. However, Dr. Mayer's analysis of duplicates is fatally flawed for four reasons in addition to those already identified.

   a. The first is that the Georgia voter file already contains duplicates. Davis Tr. 1626:21-24, which Dr. Mayer did not realize or acknowledge, and

challenges to voter file duplicates would have been absolutely meritorious. Some of these duplicates are of people who have registered twice. Davis Tr. 1626:23.

b. Second, Dr. Mayer failed to include middle names in his duplicate matching algorithm. Dr. Mayer conceded that middle names may have been present in the True the Vote file and lost during his combining 65 files into 1 file. Mayer Tr. 415:11-16. When duplicates are searched using only first name, last name, and address, more than 1,300 duplicates could be present in the 250,783 records Dr. Mayer analyzed. But Dr. Mayer did not attempt to use middle names in the duplicate search (first name, middle name, last name, address), nor to calculate how many duplicates would result.

c. The third flaw in the conclusion of duplicates is that because Dr. Mayer does not understand how the NCOA works, he did not count up how many of these duplicate voters filed a Family 'F' change of address, in which everyone with the same last name and same address is linked to the NCOA record. Dr. Mayer was unaware of the different types of change of address requests — individual, family, and business — that could affect whether a record is a duplicate, but conceded a Family designation could have included anyone in the home (such as Jr. or Sr.).

Mayer Tr. 416:4-11. This, too, would affect the number of alleged duplicates.

d. The fourth error in Dr. Mayer's logic is no less significant. On page 12 of his expert report, Dr. Mayer referenced a True Append document, Exhibit 99.

| | |
|---|---|
| DPV Updated/Address Corrected Records | 351,943 (88.67%) |
| DPV Deliverable Records | 378,194 (95.29%) |
| DPV Non-Deliverable Records | 18,700 (4.71%) |
| LACS Updated (Rural Address converted to Street Address) | 4,110 (1.04%) |
| Residential Delivery Indicator | 396,865 (99.99%) |
| Addresses matched to the USPS Database | 396,895 (100.00%) |
| Invalid Addresses | 729 (0.18%) |

**Address Types**

| | |
|---|---|
| General Delivery Address | 27 (0.01%) |
| High Rise Address | 74,400 (18.75%) |
| PO Box Address | 20,219 (5.09%) |
| Rural Route Address | 46 (0.01%) |
| Single Family Address | 300,594 (75.74%) |
| Unknown | 211 (0.05%) |

**Match Details**

| | |
|---|---|
| Duplicate Input Names and Addresses | 35,043 (8.83%) |
| Valid Input Names and Addresses | 361,852 (91.17%) |

e.  The True Append report indicates that True the Vote identified 35,043 actual duplicates during the True Append processing and that those errors were not included in the True the Vote challenge file (see "Valid Input Names and Address" boxed in green). Dr. Mayer's failure either to import middle names or to use them in identifying duplicates misrepresented True the Vote's success in removing duplicates. Had he used the middle name in his duplicate search, he would have concluded the same.

f.  The True Append report also reveals telling information about the state of the Georgia Voter File. The True Append report indicates 18,700 non-deliverable addresses, which are not addresses capable of voter registration. An additional 729 records had invalid addresses altogether. The 27 "General Delivery" address types were mentioned by Dr. Mayer as data error, but these are addresses the USPS does not associate with a permanent residential address.

g.  Finally, as with all of the alleged errors he identified, Dr. Mayer was unable to say how the presence of duplicates could result in a voter being improperly challenged.

383. Dr. Mayer identified 6,377 instances where the challenged individuals had been registered at the move-to address. Mayer Tr. 365:17-19.

a.  But this is an expected result and evidence of the predictive reliability of NCOA, likely due to the difference in vintage between the Georgia Voter File used by True the Vote and the Georgia Voter File used by Dr. Mayer. Dr. Mayer himself says so, even if, fatally for his conclusion, he failed to specify the timestamp on the voter file used by True the Vote. Mayer Tr. 365:22-24. That individuals ultimately moved to an address to which the NCOA suggested they had their mail forwarded confirms the legitimacy of an NCOA-based elector challenge.

b.  Dr. Mayer used a Georgia Voter file dated December 14, 2020, Mayer Report at 12, but offered no insight into the vintage of the Georgia voter file used by True the Vote. A gap of as little as a few weeks between the vintage of Dr. Mayer's Georgia Voter File and True the Vote's Georgia Voter File could easily account for the updated registrations Dr. Mayer noted in his file.

384. Dr. Mayer identified 9,270 instances of erroneous zip code data in the Henry County data. Mayer Tr. 366:9-11; Mayer Report at 27.

a.  But, first, Dr. Mayer could not say how such an error could impair the ability of a Board of Elections to research the voter, including because

the Board would have the voter's unique record identifier of the Voter ID.

b. Moreover, there is no evidence the original True the Vote file had anything but zip code values in the zip code field, while the complete shift of an entire column of data, in this case a complete shift of city names 2 places to the right, is a common error when combining data from multiple spreadsheets and is the very type of error Dr. Mayer himself acknowledges he could not ensure did not occur when combining the 65 files into his Combined File. Mayer Tr. 375:12-15. This error, as with the middle names present in the original files but not in the file Dr. Mayer created by converting and combining 65 individual spreadsheets, Mayer Tr. 374:20-25 – 375:1, and Dr. Mayer's own inability to assure that no such errors occurred, Mayer Tr. 375:12-15), draw his analysis and conclusions into question.

385. Dr. Mayer claimed "15,360 records do not list an address to where the registrant has moved," but he admitted such an alleged error would have been obvious to a Board of Election, Mayer Tr. 331:14-19, affecting no voter.

386. Dr. Mayer claimed "263 records have a registrant name that does not match the name in the voter file," but such an error would have been obvious to any

Board of Election, and any challenges based on such a record could not have been accepted, and therefore could not have affected a voter.

387. In terms of sheer numbers, most of the "errors" Dr. Mayer purports to find are not errors at all, but rather numbers he created from unsupportable assumptions. The largest numbers of unsupportable assumptions are in his discussion of possible military and student records.

   a. For example, he claims 22,956 registrants in the challenge file moved to an address on "*or near*" (which he does not define) a military installation, Mayer Report at 30, and he counts all 22,956 as "errors" even as he admitted that only 397, or 1.73%, of those 22,956 registrants were listed as actually living ***on*** a military installation. In the end, Dr. Mayer could not say why it mattered if a registrant record's address was ***near*** a military installation. Thus, of the 22,956 registrants, only the 397 on-base registrants may be considered even potentially problematic as consisting of people who might not have moved away permanently.

388. Dr. Mayer identified 397 instances where the challenged individuals moved-to address was on a military installation. Mayer Tr. 365:10-12; Mayer Report at 21, 30, 42.

   a. First, and most importantly, that someone is a servicemember or lists an address on a base does not render a challenge *per se* baseless.

    b.  Second, any on-base address would be obvious to a local Board of Election, and the Board could elect to do what it wished with such a challenge, including using its additional tools to make determinations of probable cause.

    c.  Third, an error rate of 397 out of either 250,000 (0.16%), or 7.6 million (0.01%) voters is not significant.

    d.  Fourth, while Dr. Mayer noted that 397 records featured addresses on military bases, he did not know how many civilian employees of the military branches lived on bases. Mayer Tr. 395:18-20.

    e.  Fifth, Dr. Mayer did not provide any data on how often service members move away only temporarily versus permanently.

    f.  Finally, he did not know if any of the 397 on-base registrants received a challenge. Mayer Tr. 395:21-23.

389. Dr. Mayer claimed "34,578 records list a registrant who has moved to a city with a college or university", but:

    a.  He was unable to articulate why, as either a statistical or policy matter, a challenge should never be issued to anyone in a college town. The Court should find no relevance to this number of alleged "errors" when no error was identified or defined.

b. He also did not have any data on how many of those 34,578 records reached a voter.

c. Dr. Mayer admitted it's county Boards of Election that make the final determination of whether someone is too "near" a campus. Mayer Tr. 399:11-14.

d. He did not analyze the birth dates of any of the 35,000-plus people he identified as being somehow too "near" a campus. Mayer Tr. 400:12-14.

e. There is nothing in the Georgia voter file that definitively identifies a registrant as a student, and even Secretaries of State cannot do so. Mayer Tr. 399:15-20. Dr. Mayer had no suggestions for how a citizen challenger might reliably identify students. Mayer Tr. 399:25 - 400:2. He admitted one could not remove all students because one could not identify them. Mayer Tr. 400:23 - 401:2.

Findings of Statistically Insignificant Racial Disparity

390. Dr. Mayer chose to take his quantitative analysis of the racial dynamics of True the Vote's NCOA voter file to only 3 arbitrarily selected categories: county selection, duplicate records, and in-state movers.

*County Selection*

391. When asked if he had evidence True the Vote had targeted individuals, Dr. Mayer conceded "[m]y understanding is that it was a mass challenge based off of the NCOA registry." Mayer Tr. 377:2-5. He did not allege True the Vote engaged in intentional or conscious discrimination, but rather asserted a disparate impact that "doesn't meet conventional thresholds of statistical significance." Mayer Tr. 377:9-10.

392. Dr. Mayer had no knowledge of how True the Vote might have "selected" counties, in part because he did not know how the challenge submission and review process worked. When asked to walk counsel "through the process of how True the Vote selects a county for challenge," Dr. Mayer stated, "I don't know." Mayer Tr. 378:24-25. He was only "generally" familiar with Section 230. Mayer Tr. 379:3-5. Though his conclusions leaned heavily on his assumptions — across 33 mentions — of True the Vote "selecting", "choosing", or "targeting" counties, and he alleged True the Vote made errors in submissions of challenges to Boards of Election in the challenge process, Dr. Mayer believed "what that process looked like" were "not relevant to [his] empirical conclusions [of statistically insignificant unconscious disparate impact]." Mayer Tr. 379:15-16. Indeed, Dr. Mayer admitted he did not know what the challenge process looked like. Mayer Tr. 384:19-22. He erroneously

believed a voter could be asked to prove residency after they had already voted. Mayer Tr. 384:23-25.

393. 77% (50) of the 65 counties referenced in Dr. Mayer's report have a higher percentage of whites than African Americans. (https://data.census.gov). The counties in which True the Vote submitted challenges are the most densely populated in Georgia. Dr. Mayer admitted that it could be possible that a county with a larger population would have more people willing to serve as challengers than smaller counties would. Mayer Tr. 386:11-18.

394. On page 35 of his Report, Dr. Mayer concluded his summary of the counties challenged by saying True the Vote was 2.5-3x more likely to challenge voters in counties with high concentrations of African American voters than those with low concentrations. But his analysis did not consider whether African-Americans are more likely to live in the most populous, or urban, counties. Because he did not consider how challenges were carried to counties by voters themselves, he also failed to rule out that True the Vote could have been 2.5-3x more likely to find a volunteer in a county with 2.5-3x more voters, or potential Section 230 volunteers, in it. For example, the population of Fulton County alone is equal to the combined population of Georgia's least populous 84 counties. (https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/2020-count-by-county-

population--with-2010.pdf?sfvrsn=cbc99191_2). Finding a single elector to volunteer for Section 230 challenges within the population of Fulton County would be far easier than finding 84 volunteers, one for each of Georgia's 84 least populous counties.

395. Dr. Mayer noted that True the Vote found volunteers to carry challenges in 10 of 11 counties around Atlanta and 17 of the 29 counties in the Atlanta MSA. Mayer Report at 18. In short, he noticed that True the Vote found challengers in Georgia's most populous, and densely populated, counties. These counties — Cherokee. Clayton, Cobb, Coweta, DeKalb, Douglas, Fayette, Forsyth, Fulton, Gwinnett, and Henry — comprise 6.5 million people or 60.7% of the state's population. Those 11 counties have about 900,000 more residents than the remaining 148 counties combined. (6.5M vs. 5.7M).

| County | Near ATL | ATL MSA | TTV Challenge | 2020 Total Population |
|--------|----------|---------|---------------|----------------------|
| Cherokee | YES | YES | YES | 266,620 |
| Clayton | YES | YES | YES | 297,595 |
| Cobb | YES | YES | YES | 766,149 |
| Coweta | YES | YES | YES | 146,158 |
| DeKalb | YES | YES | YES | 764,382 |
| Douglas | YES | YES | YES | 144,237 |
| Fayette | YES | YES | YES | 119,194 |
| Forsyth | YES | YES | NO | 251,283 |
| Fulton | YES | YES | YES | 1,066,710 |
| Gwinnett | YES | YES | YES | 957,062 |

| Henry | YES | YES | YES | 240,712 |
|---|---|---|---|---|

Source: U.S. Census

396. In addition, in 2020, when the files were created, *49.6%* of the state's population resided in the 11 most highly populated counties. *See* https://www.legis.ga.gov/api/document/docs/default-source/reapportionment-document-library/2020-count-by-county-population--with-2010.pdf?sfvrsn=cbc99191_2. In 2020, when the files were created, *56.8%* of the state's population resided in the 29 counties that comprise the Atlanta Metropolitan Statistical Area. *See id*. Because challengers and African-Americans alike are more likely to be found in Georgia's most populous counties, there can be no significance to the fact that challengers could be found to submit challenges in Georgia's most populous counties.

### 65 True the Vote Counties
### Population Demographics: US Census Bureau
*% African-American above state average (29.9%) in bold*

| County | Total Population | Population Black or African American | Population White | % Black / African American | % White | Population Majority |
|---|---|---|---|---|---|---|
| FULTON | 1,066,710 | 448,803 | 404,793 | **42%** | 38% | BLACK |
| GWINNETT | 957,062 | 257,124 | 310,583 | 27% | 32% | WHITE |
| COBB | 766,149 | 200,072 | 369,182 | 26% | 48% | WHITE |

113

| | | | | | |
|---|---|---|---|---|---|
| DEKALB | 764,382 | 384,438 | 215,895 | **50%** | 28% | BLACK |
| CLAYTON | 297,595 | 205,301 | 25,902 | **69%** | 9% | BLACK |
| CHEROKEE | 266,620 | 17,326 | 197,867 | 6% | 74% | WHITE |
| HENRY | 240,712 | 116,431 | 86,297 | **48%** | 36% | BLACK |
| HALL | 203,136 | 14,256 | 120,418 | 7% | 59% | WHITE |
| HOUSTON | 163,633 | 51,992 | 86,211 | **32%** | 53% | WHITE |
| BIBB | 157,346 | 85,234 | 56,787 | **54%** | 36% | BLACK |
| COLUMBIA | 156,010 | 27,621 | 99,111 | 18% | 64% | WHITE |
| COWETA | 146,158 | 25,544 | 99,421 | 17% | 68% | WHITE |
| DOUGLAS | 144,237 | 68,763 | 49,877 | **48%** | 35% | BLACK |
| CLARKE | 128,671 | 31,367 | 72,201 | 24% | 56% | WHITE |
| FAYETTE | 119,194 | 29,166 | 68,144 | 24% | 57% | WHITE |
| WALTON | 96,673 | 17,136 | 68,499 | 18% | 71% | WHITE |
| ROCKDALE | 93,570 | 53,785 | 24,500 | **57%** | 26% | BLACK |
| DOUGHERTY | 85,790 | 59,720 | 20,631 | **70%** | 24% | BLACK |
| BARROW | 83,505 | 10,141 | 55,582 | 12% | 67% | WHITE |
| JACKSON | 75,907 | 5,136 | 59,064 | 7% | 78% | WHITE |
| HABERSHAM | 46,031 | 1,722 | 34,694 | 4% | 75% | WHITE |
| THOMAS | 45,798 | 16,259 | 25,994 | **36%** | 57% | WHITE |
| BALDWIN | 43,799 | 18,318 | 22,432 | **42%** | 51% | WHITE |
| COFFEE | 43,092 | 11,872 | 24,158 | 28% | 56% | WHITE |
| OCONEE | 41,799 | 1,897 | 33,886 | 5% | 81% | WHITE |
| TIFT | 41,344 | 12,049 | 22,189 | 29% | 54% | WHITE |
| LEE | 33,163 | 7,331 | 22,758 | 22% | 69% | WHITE |
| MADISON | 30,120 | 2,753 | 23,549 | 9% | 78% | WHITE |
| SUMTER | 29,616 | 15,051 | 11,528 | **51%** | 39% | BLACK |
| JONES | 28,347 | 6,739 | 20,074 | 24% | 71% | WHITE |
| WHITE | 28,003 | 467 | 24,959 | 2% | 89% | WHITE |
| TOOMBS | 27,030 | 6,980 | 16,007 | 26% | 59% | WHITE |
| DAWSON | 26,798 | 200 | 23,544 | 1% | 88% | WHITE |
| HART | 25,828 | 4,324 | 19,250 | 17% | 75% | WHITE |
| BUTTS | 25,434 | 6,808 | 16,628 | 27% | 65% | WHITE |
| UNION | 24,632 | 126 | 22,646 | 1% | 92% | WHITE |

| FRANKLIN | 23,424 | 1,888 | 19,262 | 8% | 82% | WHITE |
|---|---|---|---|---|---|---|
| TATTNALL | 22,842 | 5,961 | 13,825 | 26% | 61% | WHITE |
| MCDUFFIE | 21,632 | 8,644 | 11,417 | **40%** | 53% | WHITE |
| CRISP | 20,128 | 8,821 | 9,892 | **44%** | 49% | WHITE |
| DODGE | 19,925 | 5,847 | 12,865 | 29% | 65% | WHITE |
| LAMAR | 18,500 | 4,888 | 12,344 | 26% | 67% | WHITE |
| APPLING | 18,444 | 3,339 | 12,674 | 18% | 69% | WHITE |
| BANKS | 18,035 | 394 | 15,578 | 2% | 86% | WHITE |
| BEN HILL | 17,194 | 6,222 | 9,219 | **36%** | 54% | WHITE |
| BROOKS | 16,301 | 5,684 | 9,066 | **35%** | 56% | WHITE |
| JEFFERSON | 15,709 | 7,970 | 6,834 | **51%** | 44% | BLACK |
| OGLETHOR PE | 14,825 | 2,248 | 10,903 | 15% | 74% | WHITE |
| JASPER | 14,588 | 2,442 | 10,771 | 17% | 74% | WHITE |
| BLECKLEY | 12,583 | 2,788 | 8,867 | 22% | 70% | WHITE |
| CHARLTON | 12,518 | 2,386 | 7,532 | 19% | 60% | WHITE |
| TOWNS | 12,493 | 124 | 11,469 | 1% | 92% | WHITE |
| CRAWFORD | 12,130 | 2,267 | 8,866 | 19% | 73% | WHITE |
| DOOLY | 11,208 | 5,540 | 4,611 | **49%** | 41% | BLACK |
| BACON | 11,140 | 1,747 | 8,103 | 16% | 73% | WHITE |
| MCINTOSH | 10,975 | 3,176 | 7,060 | 29% | 64% | WHITE |
| WILKES | 9,565 | 3,838 | 4,952 | **40%** | 52% | WHITE |
| JOHNSON | 9,189 | 3,017 | 5,800 | **33%** | 63% | WHITE |
| TERRELL | 9,185 | 5,540 | 3,189 | **60%** | 35% | BLACK |
| WILCOX | 8,766 | 3,096 | 5,185 | **35%** | 59% | WHITE |
| HANCOCK | 8,735 | 6,025 | 2,413 | **69%** | 28% | BLACK |
| WHEELER | 7,471 | 2,875 | 4,157 | **38%** | 56% | WHITE |
| CALHOUN | 5,573 | 3,569 | 1,766 | **64%** | 32% | BLACK |
| WEBSTER | 2,348 | 1,063 | 1,136 | **45%** | 48% | WHITE |
| TALIAFERR O | 1,559 | 833 | 591 | **53%** | 38% | BLACK |
| Total | 6,940,87 9 | 2,334,484 | 3,095,60 8 | 34% | 45% | WHITE |

**Source (https://data.census.gov)**

https://data.census.gov/table?q=Race+and+Ethnicity&g=040XX00US13_050XX00US13001,13005,13009,13011,13013,13017,13021,13023,13027,13035,13037,13049,13057,13059,13063,13067,13069,13073,13077,13079,13081,13085,13089,13091,13093,13095,13097,13113,13119,13121,13135,13137,13139,13141,13147,13151,13153,13157,13159,13163,13167,13169,13171,13177,13189,13191,13195,13219,13221,13247,13261,13265,13267,13273,13275,13277,13279,13281,13291,13297,13307,13309,13311,13315,13317

(clicking the link opens the same table on the U.S. Census website)

397. At page 43 of his report, Dr. Mayer stated, "True the Vote's challenge" shows "higher probabilities of challenges occurring in counties with large percentages of African American registrants, and a disproportionately high percentage of African Americans challenged who have purportedly moved within Georgia." Aside from referring to equations he did not explain, Dr. Mayer did not point out anywhere in his report how this conclusion could be reconciled with a direct comparison between the percentage of African Americans in the full True the Vote challenge file (27.3%) and the full GA Voter File (29.9%).

116

*Duplicate records*

398. Dr. Mayer testified the records he identified as being duplicated were comprised of 40% African Americans, Mayer Tr. 348:20-21, but, as noted above, he either did not import correctly or did not use middle names when trying to identify duplicates. Mayer Tr. 415:22-24; 342:12-16. Dr. Mayer subsequently testified that he could not recall if there were middle names in the True the Vote files. Mayer Tr. 415:14-16. (Ms. Engelbrecht testified her own analysis counted up over 61,000 middle names, Eng. Tr. 1891:23-25, but the Court sustained an objection based on either the erroneous argument that she was not "qualified" to perform this count or that she could not remember the number). Dr. Mayer's failure to properly include the middle names present in the original True the Vote files corrupted any analysis regarding duplicates and the racial characteristics therein.

*Selection of Only In-State African-American Movers*

399. Dr. Mayer arrived at his statistically insignificant suggestion of disparate impact by unscientifically ignoring *two-thirds* (160,927) of all African-American voters in the True the Vote challenge files, inexplicably choosing to focus on only the one-third who filed *in-state COAs*. Having arbitrarily chosen a cherry tree to pick from, he concluded that *in-state* African-

American COA filers was comprised of 38.4% African Americans, Mayer Report at 35, while ignoring the other *two-thirds* of *out-of-state* filers that consist of only 20.9% African-Americans.

400. Dr. Mayer did not explain why he chose to create a racial analysis only from the cohort of voters who he identified as having moved within the state. Mayer Tr. 348:11-24. Dr. Mayer indicated that the "in-state movers," as he called them in his expert report, Mayer Report at 3, were 40% African American versus "just shy of 30 percent African American" in the Georgia Voter File. Mayer Tr. 348:21-25; Tr. 349:2 (using 38% instead of 40%). Under cross examination, when asked why he focused only on in-state movers, Dr. Mayer responded, "Because that was a characteristic of the file." Mayer Tr. 392:23-25. This unexplained failure means the Court can find no relevance in his conclusions that African-Americans constitute a higher proportion of in-state movers than they do Georgia voters. What if out-of-state movers are disproportionately white? We know they are because when we count both in- and out-of-state movers, African-Americans make up only 27.3% of the True the Vote challenge file. Dr. Mayer conceded, "based on the overall percentages, the out-of-state movers would be less likely to be African American than the representation in the voter file." Mayer Tr. 393:15-16.

401. With the exception of the cherry-picked cohort of in-state movers, Dr. Mayer never endeavored to apply his statistical analysis to the question of racial composition at the individual voter level. Specifically, at no point did Dr. Mayer offer the statistical probability that an individual of a certain race within a certain county would be challenged more or less than another individual of a different race within the same county. Nor did he provide this probabilistic assessment at the state level. This basic statistical calculation is the only one that could have supported any inference of racial bias in any aspect of the True the Vote list of NCOA voters.

402. Dr. Mayer admitted that the variation among in-state movers who were African-American could be explained because they are more likely than other movers to move within the state and less likely to file NCOA than other voters. Mayer Tr. 393:6-12. He admitted that the percentage of African-Americans among out-of-state movers was likely less than in the Georgia voter file. Mayer Tr. 393:15-17. Dr. Mayer was aware of no county BOE that received a True the Vote list that only had in-state movers on it. Mayer Tr. 394:1-4.

*Dr. Mayer's Cost of Voting Citations*

403. Dr. Mayer testified to the "Cost of Voting" model, indicating it's a framework that "people who study voting turnout use to evaluate the effects of different practices, different election practices." Mayer Tr. 367:14-16. In his expert

119

report, Dr. Mayer cited Riker, William H. and Peter C. Ordeshook. 1968. "A Theory of the Calculus of Voting." The American Political Science Review 62:25-42. Dr. Mayer testified "the literature finds generally that as the costs of voting go up, there are additional barriers, additional burdens that are imposed on individuals, the likelihood that an individual votes goes down." Mayer Tr. 365:19-23. But it is the local Board of Elections that decide whether to expose voters to any additional cost of voting. The local Board of Elections could determine not to accept a challenge and "not even contact the people," Mayer Tr. 369:7-10 (statement of Court), and "the individuals that decide whether or not we want to create this cost, is the local board," Mayer Tr. 369:16-18 (statement of Court). Dr. Mayer responded "that is my understanding." Mayer Tr. 369:19.

404. Dr. Mayer presented only a narrow view into Riker and Ordershooks' 1968 findings and omitted a critical element the researchers spent considerable time developing: "the probability that the citizen will, by voting, bring about the success of their preferred candidate over their less preferred candidate." (Riker and Ordershook, 1968, p.25). Riker and Ordershook went on to explain, "If the halo effects of voting (D) are high, then the costs of voting (C) are low simply because the citizen who believes it is terribly important to vote is likely to minimize costs of voting while the citizen who thinks voting is

unimportant is likely to maximize the cost of voting." Riker and Ordershook, 1968 at 37. Dr. Mayer considered no evidence related to voters' views of the cost of voting – or not voting – in the historic, high-stakes 2021 Georgia Senate Run-off elections. Plaintiff Heredia, for example, described voting as "very important to me." Heredia Tr. 13:18.

405. Dr. Mayer cited "Huber Gregory A., Marc Meredith, Michael Morse, and Katie Steele. 2021. "The Racial Burden of Voter List Maintenance Errors: Evidence from Wisconsin's Supplemental Movers Poll Books." Science Advances. February 17, as evidence that "list maintenance processes are far more likely to affect minority voters, who are twice as likely to be improperly removed" (Mayer expert report, p14). However, the Huber report materially reshapes Dr. Mayer's inferences. First, Huber indicates that only "4% of suspected movers cast a vote…at the address flagged as out of date." (Huber et al, 1). In other words, 96% of those suspected of moving permanently did not cast a vote at the address flagged as out of date. This is an important finding of the reliability of change-of-address information that Dr. Mayer chose to omit from his report.

406. Huber et al. confirm the difficulty level involved in any citizen challenger knowing for certain whether someone who has filed a permanent change of address has indeed moved permanently, saying, even when administrative

records are correctly linked to a particular registrant, identifying the current residence of a registrant can be challenging, "particularly if someone is a frequent mover."  (Huber et al, 2021, 2)

407. Huber et al. also point out why minorities, through no action of citizen challengers, may be more likely to move and to vote at out-of-date addresses. "Our best estimate is that minorities in the movers poll books[2] were 3.8 percentage points more likely to vote at the address of registration flagged by ERIC than whites in the movers poll books, meaning that about 6.5% of minorities in the movers poll books cast a ballot at the address of registration flagged by ERIC." (Huber et al, 2021, 5) . The researchers went on to acknowledge, "Because we cannot observe a registrant's prior movement history, we cannot control for the frequency of prior moves, which is another reason that we hypothesized we may observe differences across racial groups" and "the fact that minorities are more likely to move, making it more difficult to identify which address is the most recent, may be the culprit." (Huber et al, 2021, 5)

408. Finally, Huber writes, "List maintenance is essential, and our data show that a large majority of the registrations ERIC flags as potential movers are for

---

[2] The article refers to "special poll books, available via public records requests, listed those registrants who were identified as potential movers and did not respond to a subsequent postcard." (Page 1, Abstract).

registrants who no longer reside at their address of registration. There is unlikely to be a method of conducting list maintenance that avoids incorrect removals without leaving a large number of ineligible registrations on the rolls." (Huber et al, 2021, 7). By the same logic, Defendants reasonably concluded that there is unlikely to be a method of conducting address verification that avoids incorrect challenges without leaving a large number of ineligible voters unchallenged at all.

409. The Court also finds that while Plaintiffs mounted a criticism of the spreadsheets Defendants used in designing their challenges, Plaintiffs presented no evidence showing the alleged errors in those spreadsheets gave rise to challenges that were baseless.

410. In the absence of data on the Secretary of State's rate of false positives in contacting people who have not in fact changed residence, it is not possible to determine whether the as yet unknown rate of any Defendants was unreasonable, let alone a sign of recklessness.

411. Dr. Mayer's Report states at page 33 that "NCOA registries are known to produce *false positives* (errors occurring when individuals who have not moved are on the registry)". Dr. Mayer did not provide a number of such false positives in True the Vote's data. Instead, having failed to produce any direct data applicable to True the Vote, Dr. Mayer was reduced to creating a pale

imitation of data: finding various metaphysical errors in spreadsheets. Dr. Mayer also did not provide a credible source for the existence of false positives generally, nor, more importantly, given Plaintiffs' burden, did he provide *the rate* of false positives, so that one could say a person making eligibility challenges based on non-residency was reckless in starting with (or even relying solely upon) the NCOA. Dr. Mayer did not know the rate of false positives in NCOA matching. Mayer Tr. 407:9-10. He could not say whether it was 5%, 12%, or any other number. Mayer Tr. 413:8-10. He could not say at what rate of false positives it would be unreasonable for a citizen challenger to say "some considerable percentage of the people in this file have probably moved away permanently and, Board of Elections, we'd like you to look into it a little further which tools that only you have." Mayer Tr. 414:5-11. Dr. Mayer did not know whether the USPS takes measures to evaluate whether someone who has filed a change of address marked permanent actually does end up moving permanently. Mayer Tr. 408:21-25. He was not familiar with whether the NCOA utilized algorithms to predict whether changes of address marked permanent are actually permanent. Mayer Tr. 409:20-24.

## V.  CONCLUSIONS OF LAW

### A.  Plaintiffs Have Failed to Prove Their Affirmative Case.

1.  In its Order on the Parties' Cross Motions for Summary Judgment [Dkt. 222] and its Order Amending that Order as to pp. 29-31 [Dkt. 235], the Court set out a framework for analysis concluding "that for Plaintiffs to succeed in their Section 11(b) claims against Defendants, that must show that

> (1) Defendants' actions directly or through means of a third-party in which they directed,

> (2) caused, or could have caused,

> (3) any person to be reasonably … intimidated, threatened, or coerced from voting or attempting to vote.

[Dkt. 222, pp. 16-17]. The Court then said it would address each of these three elements in turn, by considering:

> (A) if Defendants (or their agents) *directly* engaged with voters;

> (B) whether Defendants' actions *caused* or *could have caused* voters' fear,

> (C) if the voters' potential or experienced intimidation was *reasonable*.

[Dkt. 222, p. 17] (Emphases in original.)

## ELEMENT (A): IF DEFENDANTS (OR THEIR AGENTS) DIRECTLY ENGAGED WITH VOTERS

2. In short, as set out below, the Court concludes there is no evidence to prove that True the Vote or Ms. Engelbrecht, or Mr. Williams, Mr. Johnson, or Mr. Cooper *directly* engaged, through an agent or otherwise, with voters for the purpose of the Court's analysis within the framework set out above. The evidence shows none of them, through an agent or otherwise, informed any voter he or she had been challenged, much less Plaintiffs and the witnesses who testified. Furthermore, there was no evidence presented showing that either True the Vote or Ms. Engelbrecht, or Mr. Williams, or Mr. Johnson, or Mr. Cooper was connected to any voter who was made aware of a challenge. It turns out, after considering the evidence presented at trial, that the challenges at issue were communications not with any voter or potential voter but with the individual county boards of election and were communications made by individual electors as defined by Georgia state law who were not acting as agents of the above-named Defendants.

3. Likewise, in short, there is no evidence to prove that Mr. Somerville or Mr. Davis *directly* engaged, through an agent or otherwise, with voters, for the purpose of the Court's analysis within the framework set out above. The evidence shows that neither of them, through an agent or otherwise, informed any voter he or she had been challenged, much less Plaintiffs and the witnesses

126

who testified. Furthermore, there was no evidence presented showing that either Mr. Somerville or Mr. Davis was connected to any voter who was made aware of a challenge, including Plaintiffs and their witnesses. And Mr. Somerville was aware of no voter from the Davis-Somerville List aware of a challenge. No evidence was presented to the contrary. It turns out, after considering the evidence presented at trial, that the challenges at issue were communications not with any voter or potential voter but with the individual county boards of election and were, to be more precise, communications made by individual electors as defined by Georgia state law who were not acting as agents of the above-named Defendants.

## Muscogee County

4. No evidence was presented that Ms. Engelbrecht or True the Vote was connected to any challenge in Muscogee County. Mr. Somerville recalled the Davis-Somerville list included 534 names for Muscogee County. He did not contribute in any way to challenges filed in Muscogee County. He only learned about Alton Russell, the Muscogee County challenger, "in this complaint". He never met nor communicated with Alton Russell and had no connection to any Muscogee County challenges.

5. Likewise, there is no evidence in the record either Ms. Engelbrecht or True the Vote were affiliated with Alton Russell. And there is no evidence that

Alton Russell received, considered, or submitted to Muscogee County any challenges to voter names he received from True the Vote.

6. When asked if he could connect his challenge to any of the defendants he had sued, Mr. Berson said, "I don't believe so." Mr. Berson had no knowledge whether Alton Russell's submission was connected to any Defendant.

7. Neither Ms. Engelbrecht, nor True the Vote, nor Mr. Somerville, nor Mr. Davis, nor any other Plaintiff, challenged Mr. Gamaliel Turner, and none were working with anyone who challenged Mr. Turner.

8. There was no evidence either the Davis-Somerville List or the True the Vote List included Stefanie Stinetorf's name ruling out any direct communication or communication through an agent.

## Banks County

9. Mr. Somerville did not know whether Dan Gasaway submitted to Banks County the voter names Mr. Somerville had given him. And there is no evidence any of the other Defendants knew what if anything Mr. Gasaway submitted or that any of them directed him to submit anything.

10. There is no other testimony or exhibit indicating Mr. Gasaway opened, used, or relied upon the list Mr. Somerville emailed to him. Mr. Somerville also was not aware whether Mr. Gasaway used the email templates Mr. Somerville had created for potential challengers, with whom he was working, to submit to

boards of election. Mr. Somerville did not recognize in the email sent by Mr. Gasaway any of the voluminous language in Mr. Somerville's email templates for submission to counties. There is no evidence any of the other Defendants were involved directly or through an agent with anyone with whom Mr. Gasaway interacted in connection with any challenge.

11. Plaintiffs provided no evidence that any challenge submitted by someone working with a Defendant (including Jerry Boling and Dan Gasaway) was the one that reached Jocelyn Heredia, nor did Plaintiffs show any chain of custody in any record relating to the challenges that would rule out any third parties who might have filed challenges in Banks County.

12. Plaintiffs introduced no evidence that any Defendant foresaw that a person in Ms. Stinetorf's or Mr. Turner's position would have been challenged because he or she did not show up in person to vote.

13. Mr. Turner acknowledged that his official absentee ballot would not have reached him, because the Postal Service does not forward official ballots, and not because of any challenge. He further acknowledged that ballot could not be forwarded to his California address, because he had not updated his address with the County for purposes of the voting rolls. This Court finds, as Mr. Turner acknowledged, that his complaint was with the elections systems itself and not with a challenger.

## <u>ELEMENT (B): IF DEFENDANTS' ACTIONS CAUSED OR COULD HAVE CAUSED VOTERS' FEAR</u>

14. The Court finds that Defendants' actions did not form or carry on a pattern of intimidation as described by Dr. Burton.

15. The Court on account of the discussions set out relating to Element (A) above, where the Court concludes Defendants did not directly engage voters; and Element (C) below, where the Court cannot agree based on the evidence that voters' potential or experienced intimation fear was reasonable, the Court must conclude that the Defendants' actions did not cause and could not have caused voters' fears, as defined by law, under Section 11(b).

## <u>ELEMENT (C): IF THE VOTERS' POTENTIAL OR EXPERIENCED INTIMIDATION WAS REASONABLE.</u>

16. Applying the legal standards prescribed under Section 11(b), the Court on considering cross motions for summary judgment identified six (6) factual areas on which it wanted to hear evidence:

    a. the proximity of the challenges to the election (hereafter, "Proximity"),

    b. the frivolity of challenges (hereafter, "Frivolity")

    c. Defendants' motivation in making the challenges (hereafter, "Motivation")

    d. the bounty (or legal defense fund) to incentivize challengers (hereafter, "Bounty")

e. the recruitment of Navy SEALS to watch (or work) polling places (hereafter, "SEALs")

f. the publication of challenged voters' names (hereafter, "Publication")

[Dkt. 222, p. 32].

### Factor (1) -- Proximity of the Challenges to the Election

17. Plaintiffs did not show this factor to weigh in their favor. No witness testified credibly that proximity played a significant factor in any voting act. Mr. Turner testified that he sent his replacement ballot by overnight mail to meet the deadline, but there is no evidence it would not have arrived in time to be tabulated. Nor is there any evidence Defendants were responsible for any delay. Mr. Turner did not receive his first absentee ballot through any fault of Defendants. Moreover, Mr. Turner is a Muscogee County voter, and Defendants were responsible for no challenges in Muscogee County.

18. There is no law proscribing eligibility challenges under Section 230 close to an election, and to the extent a Defendant's intent in timing is relevant, no evidence was introduced on the record to support any such allegation. Moreover, Dr. Mayer, Plaintiffs' expert, admitted that proximity to an election might actually make voters pay more attention to the voting process, Mayer Tr. 404:20-22, reducing their perceived cost of voting.

a. The Court takes Judicial Notice that the Department of Justice's website shows that the NVRA does not prohibit updating a registrant's information during the 90-day "black-out" period for programs designed to remove individuals from the voter rolls. *See also* Tr.1184:23-24.

b. No evidence shows that any of the Defendants understood that the NVRA applied to his own efforts. Indeed, this Court holds that they do not as a matter of law.

c. Several Defendants testified regarding what they saw as a hole in election administration that could only be corrected by citizen eligibility challenges.  The NVRA provides that localities cannot adjust elector lists 90 days before an election involving a federal candidate. But at the same time, the Georgia Election Code provides a limited 30-day grace period for electors who do move within the state or a given county to change their residence with the County Registrar so the rolls might be corrected.  So, if a voter has moved away from the county in which he or she is registered between 30 and 90 days before the election, he or she becomes ineligible to vote. But the State has no tool at its disposal to do anything about it. Mr. Davis testified that he believed this 60-day gap was a hole in the law. He believed the only

way to address the hole in the law is for citizens to use individual eligibility challenges. Ms. Engelbrecht and other Defendants testified to the same effect. The Court recognizes this gap. There is no evidence to the contrary. There was also the potential for this gap to have more significant consequences in the Georgia Senate Run-Off, due in part to the attention the race had garnered. The General Election took place on November 3, 2020. The voter files had at that time been frozen for 90 days, or since August 3rd, 2020. But by the time of the Senate Run-Off on January 5, 2021, the already stale voter file had not been updated at all for five months. This was through no fault of any of the Defendants.

19. Plaintiffs' counsel argued (1) the NVRA's restrictions on states somehow may also inform the conduct of private defendants if (2) those defendants allegedly wanted somehow to "force" counties to violate the NVRA close to an election. Both arguments are incorrect, as an analysis of the decision in *Ben Hill* case, Civil Case No. 1:20-CV-0266-LAG; *Majority Forward, et al, v. Ben Hill County Board of Elections and Muscogee County Board of Elections, et al;* in the United States District Court for the Middle District of Georgia, Albany Division, regarding the same challenges (to Berson, Turner, and Stinetorf) that Plaintiffs recycle here, shows.

20. First, the parties enjoined in *Ben Hill* were the counties, which both made the probable cause determination and removed voters from the rolls, not a citizen challenger who made a mere proposal to confirm residency, in the exercise of his or her First Amendment petition rights and those rights and duties granted or conferred by statute by the Georgia Legislature. Second, unlike Defendants here, the challenger in that case expressly stated in his challenge letter that his challenge was "based on grounds that the challenged elector is not qualified to remain on the list of electors," 512 F.Supp.3d at 1368, and removal of voters from the list of electors is precisely what the county did. Third, while the *Ben Hill* court focused on language from subsection (i) that says "If the registrars uphold the challenge, the name of the challenged elector shall be removed

from the list of electors," the preceding text in subsection (i) confusingly mentions both (1) challenges "based upon the grounds that the challenged elector is not qualified to remain on the list of electors," and (2) challenges "based on other grounds." In the case of "other grounds," such as the grounds of ineligibility to vote in a particular election that Defendants cited in the facilitated petitions, "no further action shall be required by the registrars." That means Defendants' understanding that they could not effect removal was not unreasonable, let alone reckless, or frivolous as such.

21. Finally, being asked to confirm residence, when there is probable cause to suspect a permanent move, and being allowed to vote a provisional ballot even if one cannot confirm residence, is many steps removed from any preclusion from voting. Confirmation of residence based on the NCOA is also indisputably allowed under the plain language of the NVRA and Georgia state law.

22. To "protect electoral integrity" and "maintenance of the voter rolls," the NVRA requires that states "conduct a general program of list maintenance that makes a reasonable effort to remove voters who become ineligible on account of . . . change of residence." *Bellitto v. Snipes*, 935 F.3d 1192, 1194 (11th Cir. 2019) (emphases added). Thus, the NVRA empowers states, as Section 233 does Georgia's Secretary of State and Section 230 does its

citizens, to make "reasonable efforts" — not cost-prohibitive or perfect efforts — to identify voters who have "changed residence". In this instance, Defendants did not seek to remove voters from the voter rolls, but the "effort" required of a citizen, for voter address correction, is surely no higher, and arguably lower, than that for voter removal by the state.

**Factor (2) -- the Frivolity of the Challenges Made (if any)**

23. The weight of the evidence establishes that True the Vote and Ms. Engelbrecht took several steps to confirm challenges at scale would not be inconsistent with the law and that they were considered constructive grounds through which to engage in the process. True the Vote selected at scale rather than in a more localized fashion, which in this instance was appropriate and not reckless or frivolous.

24. Those steps included her meeting along with former state officials, contracting with well-regarded Georgia public relations expert Brian Robinson, and meeting with the Secretary of State and his staff before proceeding.

25. The weight of the evidence establishes that while Mr. Germany indicated the effort might displease some local county boards of election due to the extra work, there was no evidence presented suggesting anyone in the Secretary of State's Office told Ms. Engelbrecht it could not be handled within the time given or that it would be prohibitively burdensome for the county boards of

election. In any event, the Court notes that such inquiry, that is, the presumed or imagined burden imposed on the local boards of election, is not a governing standard under Section 230.

26. Ms. Engelbrecht calculated that given 364,000 challenges and assuming for illustrative purposes 10% of counties accepted the challenges and acknowledging that the 159 counties in Georgia have a total of approximately 2,300 precincts, there would be approximately 158 challenges per precinct, and assuming further, generously, that 70% of the voters turned out to vote, there would be approximately 110 challenges considered per precinct. And given that approximately 70% vote absentee, that would mean at most 33 per precinct as a rough average per county on election day. Larger counties as a matter of course would have more, but that would likely be offset by proportionately larger election staff members, as Ms. Engelbrecht testified and is in any event immaterial to these conclusions. There was anyway no testimony to the contrary. The Court is willing to conclude that the Secretary of State's Office and the other authorities Ms. Engelbrecht consulted would have been aware of these demographic statistics and would have been able to make similar calculations.

27. Ms. Engelbrecht took several other precautionary steps, which satisfy the Court that neither she nor True the Vote acted recklessly, including conferring

with three separate law firms as well as Legislative Counsel and a member of the staff of the Department of Justice, Civil Rights Division. All of these efforts and others confirm neither she nor True the Vote acted frivolously or were reckless in facilitating challenges or election inquiries at scale at the time those efforts were made.

28. The True the Vote lists and the Davis/Somerville list differed in that True the Vote included (a) inactive voters and (b) voters who did not vote in the 2020 General Election, while the Davis/Somerville list excluded those voters, in part because Mr. Davis and Mr. Somerville misunderstood through no fault of their own that if one did not vote in the General Election, he or she could not vote in the Run-Off election. Doing this analysis one way or the other, distilled or funneled, or otherwise is not a touchstone of recklessness or frivolity.

29. The record suggests that factoring out (a) inactive voters and (b) voters who did not vote in the 2020 General Election, the total challenges or election inquiries on the True the Vote and the Davis/Somerville lists would be roughly equal.

30. The submission of challenges at scale can instead be considered less intrusive to the individual voter because it requires less snooping into the individual

personal lives of those challenged, including combing his or her social media posts, surveillance, or confrontation.

31. The Court finds that neither approach is better than the other and that neither approach taken was frivolous.

32. The Court further finds that the Section 230 process as enacted by the Legislature provides individual citizens a peaceful and meaningful though admittedly far from perfect means to participate in public affairs and to confirm their belief that they do have a lawful and structured means to participate in the election process.

33. There was no evidence Mr. Cooper directly or indirectly caused any challenge received by any voter, including Plaintiffs and their witnesses, or that his actions were frivolous, much less reckless, for the same reasons.

34. There was no evidence Mr. Williams directly or indirectly caused any challenge received by any voter, including Plaintiffs and their witnesses. His prior use of the NCOA and True the Vote's and his own reliance on similar employment of NCOA and their arrival at similar numbers for out-of-county permanent moves were not frivolous.

35. There was no evidence Mr. Johnson directly or indirectly caused any challenge received by any voter, including Plaintiffs and their witnesses.

36. Plaintiff's expert Dr. Mayer suggested several standards for Section 230 petitioners that are not contained in Section 230 or elsewhere. For example, Dr. Mayer contrasted the information he was given about True the Vote's challenge file with a study by Ansolabehere and Hersh from 2017 that includes a "*3900-word description* of record linkage methods, data preparation, and validity checking." Mayer Report at 22 (emphasis added). He also opined that True the Vote's matching process "does not adhere to *standard practice in political science*". *Id.* at 32 (emphasis added). And Dr. Mayer complained that the results of the True the Vote challenge file "do not come anywhere close to what would be required for *valid practices in academic studies of election administration." Id.* at 2 (emphasis added). The Court does not find such standards useful in the context of voter-initiated challenges.

37. Dr. Mayer did not analyze how many inactive voter registrations were in True the Vote's challenge files, nor, therefore, did he consider whether the many inactive voters in the True the Vote challenge file were properly challenged or could have been simply harmlessly listed as challenged. Nor did he provide evidence as to how many voters in True the Vote's list were both inactive and either servicemembers or students.

38. The Court declines to accept the argument that Section 230 challenges made at scale, presumably if conducted by anyone other than the Secretary of State, are *per se* reckless if they are not based on particularized information of the sort delegated to county Boards of Election.

39. Plaintiffs failed to show Defendants recklessly relied on the NCOA for change-of-address challenges, or that they recklessly relied on BOEs to act as a filter before any petitions reached an actual voter. OCGA 21-2-226(a) makes it clear that it is not the petitioner's job to determine the eligibility of a voter; it is the responsibility of the Board of Elections "to determine the eligibility of each person applying to register to vote in such county." It was not frivolous for Defendants to rely on the counties to do what only the counties were legally authorized to do. And petitions that might come to the attention of a voter might do so only as the ultimate consequence of a BOE's independent of finding of probable cause.[3]

40. A conclusion to the contrary is not supported by the language or statutorily-prescribed process for Section 230 challenges, whether the Court considers the standard incumbent upon a petitioner or the firewall comprised of the

---

[3] That some BOEs did not accept (or review) petitions does not mean probable cause was lacking, *see BE & K Const.*, 536 U.S. at 531 ("the genuineness of a grievance does not turn on whether it succeeds"), especially where many of those Boards of Elections received threatening letters *before* the probable-cause determination.

Board of Election that alone makes the actual finding of probable cause that either ensures a challenge never reaches a voter, or that if it does, there was probable cause to ask the voter to confirm his or her residence. In the former case, the system has worked, and there is no harm to a voter. In the latter case, the Board's finding of probable cause in the challenge has nullified any suggestion that the challenge was frivolous. In both cases, the Board has acted as an effective filter.

41. If a voter has taken actions to give the U.S. Postal Service, Secretary of State, Boards of Election, and fellow citizens reason to believe he or she has moved permanently, like (1) filing a permanent change of address, and (2) confirming several verifications of identity and intent from the USPS, and a county Board of Election agrees, it is not unreasonable for an elections official to ask them to confirm they had not moved permanently.

42. Liability for challenges conducted at scale may not turn on error in predicting that an individual voter has moved permanently - particularly where a board of election has utilized its own tools to inquire into the residency status of that voter and found probable cause for a challenge. Nor may recklessness be found on the basis of a proportionately small percentage of alleged errors in the challenge file. Even if Plaintiffs' expert were correct in identifying various spreadsheet errors, the manifestation of which may never come to the attention

of a voter, errors that represent a tiny fraction of the Georgia voter file records do not bespeak recklessness. Errors that are (as Dr. Mayer admitted) obvious to boards of election and therefore harmless also cannot constitute recklessness.

43. The Court concludes that the Defendants did not act recklessly. Nor, as it naturally follows, does the Court find that the challenges at issue were frivolous.

## FACTOR (3) -- THE INTENT (or not) TO TARGET SPECIFIC VOTERS OR DEMOGRAPHICS OF VOTERS.

44. Plaintiffs did not introduce evidence that Defendants True the Vote, Engelbrecht, Cooper, Davis, Somerville, or Williams harbored any improper motive in participating in Section 230 petitions relating to the Georgia Senate Runoff. Nor did they show through credible evidence that Ms. Engelbrecht had an improper motive or intent to target specific voters or demographics of voters. To the contrary, that True the Vote and Ms. Engelbrecht supported untargeted challenges, consulted relevant authorities, had systems in place to field questions, implemented a chain of custody system through a dedicated email address that necessarily limited contact between electors and persons subject to an eligibility and fostered uniformity, all show that True the Vote and Ms. Engelbrecht did not intend to target specific voters or demographics of voters.

45. The evidence establishes that True the Vote and Ms. Engelbrecht made every reasonable effort to avoid targeting specific voters or demographics of voters, and had not motive or intent to do so, and accordingly the Court cannot find that they attempted to threaten, intimidate, or coerce any voter in the process of voting or otherwise.

46. The evidence further shows that True the Vote and Ms. Engelbrecht believed the program would effect an update to the voter rolls.

47. And Mr. Somerville believed there was a good chance he and Mr. Davis could also use challenges to effect updates to voters' addresses, indicating again that neither of them had the intent to target specific voters or demographic groups of voters.

48. The Court holds that as to motive, a finding of recklessness in the fashion Defendants went about collecting and culling data or in facilitating challenges at a large scale or *en masse* does not mean or equate to a finding that any defendant attempted to intimidate a voter for the purpose of Section 11(b) of the Voting Rights Act.

49. While a finding of specific intent, whether animated by malice or racial bias or not, is not a requisite to liability under Section 11(b) of the Voting Rights Act, nothing precludes the Court from considering evidence of intent, including general intent, in deciding whether Plaintiffs have met their burden

of proving an attempt to violate Section 11(b). The Court notes that a discussion of attempt is inseparable in many ways though not necessarily completing overlapping with an inquiry into whether a defendant was engaged in an "attempt" to do anything. In that regard, the case law does not prohibit consideration of intent, it only provides that the Court need not find specific intent. Defendants may have been attempting to do something, including perhaps, consistent with Ms. Engelbrecht's testimony, encouraging civic participation, updating the voting rolls, putting a pressure relief on an otherwise volatile public situation, providing an alternative path for voters to express themselves, or something else, or any combination. Even if the means they undertook was reckless (which it was not), that it was reckless would not satisfy the requirement that Plaintiffs show an actionable attempt to threaten, coerce, or intimidate within the meaning of Section 11(b).

50. As a final consideration on the intent to target specific voters or demographics of voters, the Court finds that Plaintiff Fair Fight has not provided sufficient evidence to establish standing, including sufficient evidence to support its conclusory statement that it was required on account of Defendants' actions to divert resources.

51. Fair Fight's representative had limited familiarity with Plaintiff Fair Fight's financial affairs and offered only conclusory statements.

52. Fair Fight's representative could not offer proof of funds diverted on account of any illegal action of the Defendants and could not tie any such diversion to any action of any of the Defendants inconsistent with or in violation of Section 11(b) of the Voting Rights Act.

53. The case Fair Fight has pursued is devoid of evidence supporting its claims, indicating that any diversion of resources was unwarranted or was a conscious decision of Fair Fight in response to lawful action on the part of Plaintiffs.

## FACTORS  (4) -- THE BOUNTY (OR LEGAL DEFENSE FUND); (5) -- THE RECRUITMENT OF NAVY SEALS TO WATCH (OR WORK) POLLING PLACES; AND (6) -- THE PUBLICATION OF CHALLENGED VOTERS' NAMES.

54. The Court will treat these factors together.

55. There is no evidence connecting Defendants Cooper, Johnson, Somerville, Davis, or Williams to  any mention, however lifted from context, of a bounty, any mention, however lifted from context, of veterans or Navy SEALs, also veterans or otherwise serving at polling locations; (and there is no evidence there was any suggestion any would serve in uniform) or any publication of names of those challenged.

56. Plaintiffs attempted to link Defendants True the Vote and Ms. Engelbrecht to a bounty, that they insinuated would serve as a prize or award, for turning someone in. The evidence failed to show the term "bounty," which Ms. Engelbrecht mentioned once and immediately clarified to be a whistleblower

fund in the next sentence, was known to any voter (including the voters who testified), treated seriously as such by anyone at True the Vote, or put into place. Any resultant hypothetical intimidation could not therefore be either reasonable or be said to derive from a reckless state of mind.

57. Plaintiffs attempted to link Defendants True the Vote and Ms. Engelbrecht to the recruitment of veterans and Navy SEALs, but the evidence failed to show that Ms. Engelbrecht's single mention of Navy SEALs, uttered in private while discussing veteran service and leaked by third parties, was known to any voter or was animated by any improper intent, let alone a reckless disregard of a known risk of intimidation. The Court declines to find that the mere mention of Navy SEALs is *per se* intimidating in this instance.

58. Plaintiffs attempted to link Defendants True the Vote and Ms. Engelbrecht to the potential publication of names of those challenged, but the evidence failed to show that either Defendant threatened to or did publish voter names. Plaintiffs' efforts to link hashtags between organizations to which Ms. Engelbrecht was not demonstrably affiliated does not bear sufficient probative weight for this Court to find to the contrary.

59. Plaintiffs speculated that it might happen that an individual or organization might some day in the future submit to a given county an Open Records Request, which would require the county to disclose the identities of voters

who had been the subject of a challenge, thereby exposing them to shame and discouraging them from exercising their right to vote in the future, that is, the possibility of such future exposure amounted at the present time to a threat, coercion or intimidation.

60. There is no evidence Ms. Engelbrecht or True the Vote intended at any time to expose or facilitate the exposure of the identities of voters challenged (or those whose eligibility had been subject to inquiry).

61. In any event, the scenario Plaintiffs describe is too attenuated to constitute a threat, coercion, or intimidation for the purpose of Section 11(b). For among other reasons, any Open Records Request would be subject to screening and adjudication at the local and, if necessary, the state level, in accordance with the operative Open Records Request statute in Georgia.

62. The Court finds that such speculation and that the scenario Plaintiffs envision is too attenuated to rise to the level of an actionable threat, or to amount to an attempt at coercion, or intimidation under Section 11(b).

### B. Defendants' Affirmative Defense of Free Speech and Freedom to Petition

63. Defendants communicated a particularized message to others. Indeed, Plaintiffs devote a good deal of their case to complaining about petition-related messages of Defendants Engelbrecht, Somerville, and Davis, which

were made in social media posts and comments, podcasts, and communications with challengers, as well as about the messages' effects on others. Defendants argued publicly that the Secretary of State had been delinquent, and that Georgia needed to change its voter roll policies. Expressive speech need not communicate a specific message, *see Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1270 (11th Cir. 2004) (looking to whether "reasonable person would interpret [a display] as *some sort of message*, not whether an observer would necessarily infer a *specific message*") (emphases added), but Defendants' pure and expressive speech alike clearly did communicate messages about the deficient state of the Georgia voter rolls whether to petitioners and BOE's or the media and Georgia government.

64. The NVRA also provides that any state "may meet the requirement" of identifying voters who have changed residence "by establishing a program under which (A) change-of-address information supplied by the Postal Service through its licensees [NCOA] is used to identify registrants whose addresses may have changed." 52 U.S.C. § 20507(c)(1) (emphasis added). In reviewing the state of Ohio's use of NCOA to identify voters who had moved, "the Supreme Court found that it complies with the NVRA." *Fair Fight*, 413 F.Supp.3d at 1290 (citing *Husted v. A. Philip Randolph Inst.*, 138 S.Ct. 1833

(2018) (holding "undisputedly lawful," under the NVRA, the state's utilization of a process that "sends notices to registrants whom the Postal Service's 'national change of address service' identifies as having moved)); *see also Bellitto*, 935 F.3d at 1205 (holding "the NCOA Process ... constitutes a reasonable effort at identifying voters who have changed their addresses"); Dkt. No. 222 at 45 ("using the NCOA data can be a proper starting point for assessing voter eligibility" and "does not per se require a finding that the challenges were frivolous").

65. Congress permits use of the NCOA as a reasonable predictor of a permanent change of address because the U.S. Postal Service confirms the accuracy of its sophisticated algorithms in matching names, as its extended documentation illustrates. USPS "NCOALink® User Technical Reference Guide," April 13, 2023, Version 12[4] at 20-35 (discussing NCOALink Name Sequence Presentation). Indeed, Defendants were aware that the state of Georgia itself uses NCOA to identify voters who have likely moved and that the state sends them notices to confirm their address based on NCOA.

---

[4]      *See* official USPS document at https://postalpro.usps.com/NCOALink_User_Tech_Info. USPS also maintains exacting standards for its licensees' use of NCOALink. *See* Appendix C, "NCOALink® Software Developer Software Performance Requirements End User Mailer Software", at 5 (requiring licensees "accurately match[] responses for at least 99% of the inquiries" and "produce no unexpected matches") (cited in Dr. Mayer's report at 22).

66. Accordingly, there is no legal basis for Plaintiffs' assertion that citizens may not rely on the NCOA as part of a "reasonable" effort merely to "identify voters who have changed their address." Plaintiffs' argument that NCOA is not by itself probable cause of a permanent move comes with the fatal flaw that they offer no evidence that Defendants disregarded a known risk that the NCOA's predictive accuracy was too low to constitute "probable cause". Plaintiffs thus failed to bear their burden of showing that Defendants' belief – that NCOA is usually, probably correct – was baseless, and could only have been part of an unlawful purpose.

67. Plaintiffs' incorrect argument that reliance on the NCOA is unreasonable leads directly to the factual morass of whether Defendants' efforts to *remove* voter records from their spreadsheets, because of the unknowable *possibility* that some affected voters might not move, were negligent. This argument involves experts examining spreadsheets for errors[5] in a removal process that is not legally required in the first place.

---

[5] Plaintiffs and their experts offered no solution for the fact that citizens permitted to initiate residency-based challenges lack the tools — access to driver's licenses, voter registrations in other states — that states use to identify truly permanent COAs.

68. The First Amendment is advanced by reasonable acts of petitioning, even if the petitions are ultimately unsuccessful. *BE & K Const. Co.*, 536 U.S. at 532. Because the right to petition is so fundamental to our system of governance, and because the purposes of the First Amendment are thereby advanced, finding a petition to be improper entails a rigorous objective legal standard.

69. The Supreme Court has adopted a *mens rea* requirement as part of a two-part test to determine whether litigation lacks First Amendment protection. First, the lawsuit must be "objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits." *Prof. Real Est. Inv'rs v. Columbia Pictures Indus., Inc.* 508 U.S. 49, 50 (1993) (emphasis added). Defendants were neither unrealistic nor unreasonable in this instance.

70. Second, only if the challenged litigation is found to be objectively meritless should a court consider the litigant's subjective motivation. *Id.* (requiring a finding that the petitioning activity is "*objectively baseless*," before subjective intent is considered); *Bryant v. Mil. Dept. of Mississippi*, 597 F.3d 678, 691 (5th Cir. 2010). In an NRLB case, the Court reasoned that as long as a "plaintiff's purpose is to stop conduct he *reasonably believes is illegal*, petitioning is genuine both objectively and subjectively." *BE & K Const. Co.*, 536 U.S. at 534 (emphasis added) (rejecting contention that evidence of animus means the underlying litigation was not "genuine"). The Court has

152

emphasized that probable cause to institute civil proceedings requires "no more than a *reasonable* belief that *there is a chance* that a claim may be held valid upon adjudication" (internal quotations parks omitted) and that *the existence of this probable cause is an absolute defense against allegations of frivolity*. *Prof. Real Est. Inv'rs v. Columbia Pictures Indus., Inc.* 508 U.S. 49, 62-63 (1993) (cleaned up).

71. Did the petitioning party have an "unlawful purpose"? *BE & K Constr.*, 536 U.S. at 531. In *BE & K*, the Court reasoned that as long as a "plaintiff's purpose is to stop conduct he reasonably believes is illegal, petitioning is genuine both objectively and subjectively." *Id*. at 534 (emphasis added). Defendants easily pass this test. However, unlike legal process directed toward a person, Section 230 petitions are submitted to county governments, and may never come to the attention of a voter. When they do, the but-for cause is the intervention of the county and its independent finding of probable cause.

72. In this context, Plaintiffs have not successfully shown Defendants were reckless in interpreting Section 230 as they did. First, Defendants adhered to subsection (a)'s authorization for "any elector" to challenge the right of "any other elector . . . to vote in an election." Second, subsection (a) informed Defendants that challenges would not be reckless if they were "in writing and

specif[ied] distinctly the grounds" of the challenge. The ultimate success of the petition process is not dispositive. *Beach Blitz Co. v. City of Miami Beach*, 13 F.4th 1289, 1302 (11th Cir. 2021).

73. Third, the statute itself makes the timing of challenges a non-issue, much less a talisman of recklessness. The statute provides that a challenge "may be made at any time prior to the [challenged] elector . . . voting at the elector's polling place or, if such elector cast an absentee ballot, prior to 5:00 P.M. on the day before the election." Or as the Court has put it, "how can you argue [Section 230] is being abused if the state allows it?" Dkt 210 at 42.

74. Moreover, while Section 8 of the NVRA provides that *states* may not *remove* a voter from the rolls within 90 days of an election, in neither the NVRA nor Section 230 does any such time prohibition apply to anyone's correction of a registered voter's information. The U.S. Department of Justice confirms this guidance on its website. https://www.justice.gov/crt/national-voter-registration-act-1993-nvra, in paragraph 37: "This 90 day deadline does not, however, preclude correction of a registrant's information".

75. It cannot be baseless for Defendants to follow state law. Moreover, Defendants' motivations were realistic, and per *Mississippi*, they expressed, in late 2020, the belief that the petitions might well remedy problems with voter eligibility issues, per *BE & K*. Finally, Defendants' belief that the

petitions would "be held valid" and effect positive change, under *Professional Real Estate*, was also not baseless. And the undisputed fact that no challenge made its way to a voter without agreement of probable cause by governmental intermediaries is an "absolute defense" to allegations of frivolity. 508 U.S. at 63.

76. This Court has defined intimidation as "'a serious expression of an intent to commit an act of unlawful non-violence' against voters." [Dkt. No. 222 at 75 (citation omitted)]. As the term "serious expression" conveys, and the Supreme Court's scienter standards for restrictions of speech confirm, intimidation claims cannot be proven simply by uttering the words "I was intimidated." Intimidation also cannot be measured by such a low and vague bar as a plaintiff's discomfort or annoyance, which is a more accurate term for what the voter-Plaintiffs and affiants here say they experienced upon being asked to confirm they were voting in the right place. Another difficulty with using such a loose, vague standard, based on parroting words from a statute, is that it invites both plaintiff-shopping and witness-coaching.

77. This is not a case alleging any petition to a Board of Election burdened a fundamental right; rather, Plaintiffs claim the request was "intimidating." But voters like Ms. Heredia filed a permanent COA and were simply asked, by a governmental body, if her COA was indeed permanent.

78. Ms. Engelbrecht testified True the Vote pulled the plug on her then-counsel's complaints when she realized the necessary evidence of who voted wasn't forthcoming, so as not to "waste the courts' time". Withdrawing lawsuits is not reckless, especially if the lawsuits one's counsel had filed were allegedly not grounded in sufficient fact.

79. Plaintiffs have not satisfied the legal standard necessary to show any of the Defendants were reckless in connection with challenges or eligibility inquiries submitted to county boards of election in the weeks leading up to the January 5, 2021, Run-Off election.

80. That challenges or eligibility inquiries are made at scale does not per se amount to a violation of Section 11(b) of the Voting Rights Act.

81. That challenges or eligibility inquiries are made at scale may, to the contrary, indicate that the challengers or those facilitating challenges or eligibility inquiries have made reasonable efforts to steer clear of the possibility of inadvertently targeting any particular voting group. The Court concludes that is the case here for both True the Vote's challenges and the Davis/Somerville challenges.

82. Both True the Vote and Mr. Davis and Mr. Somerville made reasonable and informed efforts to funnel or distill data first collected from the NCOA into a smaller set to be placed ultimately on challenge lists.

83. Those efforts exceeded the requirements the law imposes on private citizens to avoid claims of recklessness in engaging lawfully in the civic process set out in Section 230.

84. Neither True the Vote's nor the Davis/Somerville lists, combined with the evidence presented at trial, evince recklessness on the part of Defendants or a violation of Section 11(b) of the Voting Rights Act.

## VI.   CONCLUSION

85. Defendants are not liable under Section 11(b) of the Voting Rights Act.

86. A defendant does not need to have a specific intent to intimidate in order to violate Section 11(b) of the Voting Rights Act, but in order to punish attempted speech or petitions protected by the First Amendment, a defendant must still have had some understanding of the speech or petition's intimidating character, and must have recklessly chosen to disregard that known risk.

87. It is not sufficient that a Defendant attempted to facilitate a challenge that went nowhere. Just as the First Amendment requires that allegedly intimidating speech requires *mens rea* on the part of the defendant, attempts to intimidate through speech or petitioning must also require some *mens rea* to make the attempt. One cannot unintentionally make an attempt at speech or petitioning that makes one liable. The Court in *Counterman* held that the State must prove

that the defendant had some understanding (awareness or recklessness) of his statements' threatening character. In addition, Defendants may not be held to a standard of one-hundred-percent perfection; rather, because they were seeking to remedy stale voter rolls at scale. The Court finds that to be actionable under Section 11(b) any alleged attempt to intimidate must be supported by more substantial and measurable credible evidence than Plaintiffs have presented here.

88. For all of the foregoing reasons, Plaintiffs were therefore unable to carry their burden. Defendants have established their First Amendment defense.

89. Judgement is rendered for Defendants.

Respectfully submitted,

By:  */s/ Jake Evans*_____
Jake Evans, Esq.
GA Bar No. 797018
GREENBERG TRAURIG, LLP
3333 Piedmont Road NE, Suite 2500
Atlanta, Georgia 30305
P: (678) 553-2100
F: (678) 553-2212
Jake.Evans@gtlaw.com
*Local Counsel for Defendants*

By: */s/ Michael J. Wynne*
Michael J. Wynne*
TX Bar No. 785289
mwynne@gwafirm.com
Cameron Powell*
DC Bar No. 459020
cpowell@gwafirm.com
GREGOR WYNNE ARNEY, PLLC
909 Fannin Street, Suite 3800
Houston, TX 77010
Telephone: (281) 450-7403
*Counsel for Defendants*

*\*Admitted Pro Hac Vice*

<u>**CERTIFICATE OF COMPLIANCE**</u>

I certify the foregoing document has been prepared in accordance with the font type and margin requirements of LR 5.1, NDGA, using font type of Times New Roman and point size of 14.

Dated: November 15, 2023

By: _/s/ Michael J. Wynne*_____
Michael J. Wynne
*Counsel for Defendants*

<u>**CERTIFICATE OF CONFERENCE**</u>

I have conferred with counsel for Plaintiffs and Intervenor the United States and that all are opposed to this motion.

By: _/s/ Michael J. Wynne*_____
Michael J. Wynne
*Counsel for Defendants*

## <u>CERTIFICATE OF SERVICE</u>

I certify that today I filed a copy of the foregoing document with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of filing to all counsel of record.

Dated: November 15,  2023

By:  /s/ *Michael J. Wynne*
Michael J. Wynne
*Counsel for Defendants*

161