# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
### GAINESVILLE DIVISION

| | |
|---|---|
| FAIR FIGHT, INC., JOCELYN HEREDIA, SCOTT BERSON, and JANE DOE, | |
| Plaintiffs, | Civil Action No. 2:20-cv-00302-SCJ |
| v. | |
| TRUE THE VOTE, INC., CATHERINE ENGELBRECHT, DEREK SOMERVILLE, MARK DAVIS, MARK WILLIAMS, RON JOHNSON, and JAMES COOPER, | |
| Defendants. | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

# TABLE OF CONTENTS

PROPOSED FINDINGS OF FACT ............................................................... 1

I.   Procedural History ............................................................................ 1

II.  Named Parties ................................................................................... 6

    A.   Plaintiffs .................................................................................. 6

    B.   Defendants ............................................................................... 8

III. Defendants worked collaboratively to file hundreds of thousands of challenges to Georgia voters in the runoff election...................... 10

    A.   True the Vote........................................................................ 11

    B.   Catherine Engelbrecht .......................................................... 15

    C.   Mark Williams...................................................................... 16

    D.   James Cooper and Ron Johnson ........................................... 17

    E.   Derek Somerville and Mark Davis ....................................... 19

        1.   Collaboration with True the Vote .............................. 19

        2.   Somerville and Davis's Challenges to 39,141 Georgia Voters 24

IV.  The natural consequence of Defendants' actions was to intimidate or coerce voters from exercising their rights...................................... 28

    A.   Voter challenges have been historically used in Georgia to impede voters' lawful participation in the franchise........................ 28

    B.   Voter challenges impose significant burdens on voters...................... 32

    C.   True the Vote was specifically on notice that their challenges could lead to voter intimidation. .................................................. 33

    D.   Defendants' actions leading up to the 2021 Senate runoff election contributed to an environment in which voters could be reasonably intimidated, threatened, or coerced by their challenges...................... 34

        1.   True the Vote's "Validate the Vote" Effort .............................. 35

        2.   True the Vote's "Validate the Vote Georgia" program ........... 40

    E.   Defendants widely publicized their challenge program and other voter intimidation efforts throughout the state. ............................ 43

    F.   Defendants threatened to release the full list of challenged voters publicly. .................................................................................... 46

G.    Defendants' challenges were filed in close proximity to the election. ...............................................................................49

V.    Defendants' actions intimidated, threatened, or coerced voters and caused Fair Fight to divert resources in response. ..........................................50

A.    Jocelyn Heredia ........................................................................50

B.    Scott Berson ..............................................................................51

C.    Gamaliel Turner ........................................................................55

D.    Stefanie Stinetorf......................................................................57

E.    Jane Doe ....................................................................................59

F.    Fair Fight ..................................................................................61

VI.    Defendants' challenges were virtually guaranteed to—and did—target eligible voters...........................................................................................66

A.    True the Vote's challenges were recklessly compiled. ......................66

1.    Challenges to hundreds of thousands of voters were compiled in a matter of days. ........................................................................66

2.    Challenge lists contained tens of thousands of obvious errors.67

3.    Challenges were submitted without challengers having seen the list and in some cases without their authorization. ..................71

4.    Challengers were induced to submit challenges on the basis of false information. ......................................................................72

5.    Even True the Vote's Co-Defendants believed True the Vote's challenge lists were recklessly compiled. ..................................73

B.    All of Defendants' challenges based on NCOA data were inherently frivolous...........................................................................................74

1.    Defendants' only evidence of voters' ineligibility to vote was NCOA data.................................................................................74

a.    True the Vote Challenges ...............................................75

b.    Somerville and Davis Challenges...................................77

2.    NCOA data is not a reliable indicator of a voter's eligibility...81

a.    NCOA data does not indicate a voter's intent...............81

b.    NCOA data does not contain a unique identifier. ..........84

3. Defendants' misplaced reliance on NCOA data resulted in challenges targeting eligible Georgia voters............................86

 a. Challenges to known military and student voters. .........86

 b. Jocelyn Heredia ...............................................................87

 c. Scott Berson.......................................................................90

 d. Gamaliel Turner.................................................................92

 e. Stephanie Stinetorf ..........................................................94

 f. Jane Doe..............................................................................95

C. Defendants consciously disregarded evidence that their challenges were frivolous...........................................................................96

 1. The Secretary of State's office warned True the Vote that its intended challenge program was frivolous. ..............................96

 2. Defendants' own volunteer challenger told Defendants that the challenges were frivolous. .......................................................98

 3. True the Vote has a history of advancing baseless voter challenges and frivolous allegations of voter fraud................102

VII. Defendants intend to file challenges in the future. ......................................103

PROPOSED CONCLUSIONS OF LAW ...................................................................104

I. Plaintiffs have standing to obtain relief against Defendants. ......................104

A. Legal Standard.................................................................................105

 1. Injury-in-Fact .......................................................................106

  a. Organizational Diversion of Resources........................106

  b. Injury to Voters...............................................................108

 2. Causation and Traceability ...................................................109

 3. Redressability........................................................................110

B. Plaintiff Fair Fight, Inc. has organizational standing.........................111

C. Plaintiff Jocelyn Heredia has standing................................................114

D. Plaintiff Scott Berson has standing. ...................................................117

E. Plaintiff Jane Doe has standing. ........................................................119

II. Defendants violated Section 11(b). .............................................................120

iv

A. Legal Standard...................................................................121

B. Application of Section 11(b) to Defendants' actions.......................126

    1. Defendants are liable for intimidating, threatening, or coercing voters. ....................................................................126

        a. Defendants directed their actions at voters directly or through means of a third party.....................................127

        b. Defendants' actions caused or could have caused voters to be reasonably intimidated, threatened, or coerced from voting or attempting to vote..........................................130

        c. Defendants' actions were reasonably likely to cause voters to feel intimidated, threatened, or coerced from voting. ........................................................................132

    2. Defendants are liable for attempting to intimidate, threaten, or coerce voters. ........................................................144

III. Defendants do not have a First Amendment defense. ................................146

A. Defendants waived their First Amendment defense. ........................146

B. Defendants' behavior is not protected by the First Amendment. .....147

IV. An injunction is warranted. ........................................................153

PROPOSED ORDER GRANTING INJUNCTIVE RELIEF ..............................154

## INTRODUCTION

Pursuant to the Court's Order, *see* Tr. 1938:18–20,[1] Plaintiffs respectfully submit the following proposed findings of fact and conclusions of law.

## PROPOSED FINDINGS OF FACT

## I.     Procedural History

1.     Shortly after a tidal wave of mass challenges slammed into Georgia in December 2020, Fair Fight, Inc. and John and Jane Doe plaintiffs filed a complaint alleging violations of Section 11(b) of the Voting Rights Act and immediately moved for a temporary restraining order. ECF Nos. 1, 11.

2.     True the Vote boasted that it was responsible for these challenges against 364,541 voters, and identified the individuals whose contributions were essential to the effort: Catherine Engelbrecht, Derek Somerville, Mark Davis, Mark Williams, Ron Johnson, and James Cooper. Plaintiffs' Exhibit ("PX") 42 at 2.

---

[1] Plaintiffs use "Tr." in this submission to refer to the consecutively paginated daily transcripts of trial testimony. A morning and afternoon transcript was provided for each trial day. For the Court's ease of reference, the following table provides the respective page ranges for the 15 component transcripts:

| Day 1 AM: 1–168 | Day 3 PM: 679–816 | Day 6 AM: 1305–1455 |
| --- | --- | --- |
| Day 1 PM: 169–287 | Day 4 AM: 817–956 | Day 6 PM: 1456–1595 |
| Day 2 AM: 288–441 | Day 4 PM: 957–1083 | Day 7 AM: 1596–1712 |
| Day 2 PM: 442–534 | Day 5 AM: 1084–1117 | Day 7 PM: 1713–1885 |
| Day 3 AM: 535–678 | Day 5 PM: 1118–1304 | Day 8 AM: 1886–2046 |

Plaintiffs named True the Vote and these six individuals, as well as unnamed John Does, as Defendants.

3.    The Court denied the motion for temporarily relief, finding that more evidence of Defendants' conduct was needed than was available on the then-existing TRO record, but noted "its grave concerns regarding Defendants' coordinated, broad-strokes challenge" to hundreds of thousands of Georgia voters "on the eve of an unprecedented two-seat Senate runoff." ECF No. 29 at 11. The Court further noted it was "extremely concerned that Defendants' actions are an attempt to circumvent the National Voter Registration Act," which provides strict protections for voters who have not certified to the state in writing that they have permanently moved to a new address. *Id.* at 11–12.

4.    The Court expressed concern that Defendants' challenges "may disenfranchise eligible voters," as "a global pandemic continue[d] to rage," and "[m]any of the voters flagged by Defendants' use of the NCOA for various COVID-19 related reasons" or "for any number of [other] reasons that do not affect their eligibility to vote." *Id.* at 15 & n.8.

5.    The Court recognized that "the voters targeted by Defendants may be unable to appear for a county board of elections hearing to defend their eligibility, *see* § 21-2-230(g), or to correct their challenged absentee ballot, *see* § 21-2-230(e)."

ECF 29 at 16. "Such issues," that Court warned, "are even more likely given that Defendants began filing their challenges *after* early voting had already begun." *Id.*

6.      In March 2021, Plaintiffs amended their complaint to add challenged voters Scott Berson and Jocelyn Heredia as plaintiffs, to remove John Doe as a plaintiff, and to make minor updates to the factual allegations to reflect that the January 5, 2021, runoff elections had concluded. *See* ECF No. 66.

7.      During discovery, Defendants repeatedly prevented Plaintiffs from eliciting candid answers during the depositions of Catherine Engelbrecht and Gregg Phillips, the contractor responsible for generating True the Vote's list of Georgia voters to be challenged. *See* ECF No. 242-01. Defendants also withheld hundreds of responsive text messages between Ms. Engelbrecht and Mr. Somerville (including a request by Ms. Engelbrecht to move their communications to the ephemeral messaging app Signal on January 6, 2021), and only produced these communications in a last-minute attempt to supplement their exhibit list fewer than 48 hours before trial. *See* ECF No. 284; PX 92 (originally offered as Defendants' Exhibit ("DX") 231).

8.      On October 21, 2022, Defendants filed notice of their constitutional challenge to Section 11(b), as required by Federal Rule of Civil Procedure 5.1(a). ECF No. 183. Defendants stated that several of their "affirmative defenses raised constitutional questions, on an as applied basis," including the defenses that

"Defendants' activities are constitutionally protected under the First Amendment's right of free speech, to petition the government, and to vote," and "Judicial enforcement of Section 11(b), as sought to be applied by Plaintiffs, is unconstitutional under the First Amendment." *Id.* at 2–3.

9.     To rebut these affirmative defenses and defend the constitutionality of Section 11(b), the United States intervened in December 2022 pursuant to 28 U.S.C. § 2403(a). *See* ECF No. 187.

10.     In March 2023, the Court denied the parties' cross motions for summary judgment on the Section 11(b) claim but granted Plaintiffs' summary judgment on Defendants' vote dilution and unconstitutional vagueness defenses. Mot. Summ. J. Order at 86, ECF No. 222; *see also* ECF No. 235 (reconsidering and vacating partial summary judgment for Defendants).

11.     The Court identified three elements to be tried: *First*, whether "Defendants directed their actions at voters, or directed the actions of a third-party toward voters," Mot. Summ. J. Order at 19; *second*, whether Defendants' conduct "generate[d] the possibility that voters would feel threatened, intimidated, or coerced," a causal link that the Court explained "does not . . . need[] to be onerous," *id.* at 25; and *third*, "whether Defendants reasonably could have intimidated or did actually intimidate voters," under a totality-of-circumstances analysis including factors such as (1) the proximity of the challenges to the election, (2) the frivolity of

challenges, (3) Defendants' motivation in making the challenges, (4) True the Vote's bounty to incentivize allegations of voter fraud, (5) True the Vote's recruitment of Navy SEALS to watch (or work) polling places, and (6) the publication of challenged voters' names, *id.* at 31–32.

12.     Trial was held from October 26 to November 7, 2023. In their case in chief, Plaintiffs called Cianti Stewart-Reid, Fair Fight's executive director; Scott Berson; Jocelyn Heredia; experts Dr. Ken Mayer and Dr. Vernon Burton; challenged voters Stephanie Stinetorf and Gamaliel Turner; the Secretary of State's former General Counsel Ryan Germany; and adverse witnesses Catherine Engelbrecht, Derek Somerville, Mark Williams, and True the Vote contractor Amy Holsworth. Plaintiffs admitted 87 exhibits, including deposition designations for the remaining Defendants and other unavailable witnesses. The Court took an additional exhibit (PX 45) under advisement.

13.     After Plaintiffs rested, Defendants moved for judgment on partial findings under Rule 52(c). The Court denied the motion. Tr. 1938:17.

14.     Defendants called Mr. Somerville, Mr. Davis, Mr. Williams, and Ms. Engelbrecht, and admitted two exhibits.

15.     After Plaintiffs and Defendants delivered closing arguments, the Court announced its finding "that Section 11(b) of the [Voting] Rights Act is constitutional." Tr. 2015:19–20.

16.     In lieu of delivering its own closing argument, the United States sought "to clarify for the record that Defendants are not challenging the constitutionality of Section 11(b) with their – the constitutional defenses that they have discussed. The constitutionality of 11(b) as applied here." Tr. 2015:25–2016:4. If Defendants did intend to maintain their constitutional defense, the United States made clear, it "would like to be heard" and present argument. Tr. 2016:4–6.

17.     In response, defense counsel explicitly disclaimed any affirmative defense, reiterating, "We're not challenging [the constitutionality of Section 11(b)] in any respect," a representation they were "very proud of." Tr. 2016:7–10. The United States confirmed it was willing to forgo its closing argument "[a]s long as we're all clear that if the Court finds a violation here, then it can properly impose a remedy consistent with the First Amendment." Tr. 2016:11–14. The Court accepted Defendants' waiver, and neither party objected. Tr. 2016:15.

## II.   Named Parties

### A.     Plaintiffs

18.     Plaintiff Fair Fight, Inc. is a national organization that focuses primarily, as part of its mission, on securing the voting rights of Georgians. To advance its mission, Fair Fight supports pro-voter and pro-democracy candidates by motivating and empowering Georgians, particularly in communities of color, to turn out and vote. Tr. 43:14–45:19, 61:25–62:12.

19.    Plaintiff Jocelyn Heredia is a life-long Georgia resident whose eligibility to vote in the 2021 Senate runoff election was challenged by both True the Vote and Defendants Mark Davis and Derek Somerville, through separate volunteers. Tr. 330:16–22, 1026:23–1027:1, 1172:7–15; PX 49 at 8. At the time, Ms. Heredia, a recent graduate of the University of Georgia, maintained her permanent residence at her family's home in Banks County, Georgia. Tr. 545:22–546:11, 547:12–14.

20.    Plaintiff Scott Berson was a long-time Georgia resident whose eligibility to vote in the 2021 Senate runoff election was challenged by an individual recruited by True the Vote and who was the subject of an attempted challenge by Mr. Somerville and Mr. Davis. Tr. 130:16–18, 1376:21–1377:5, 1177:15–17; PX 89 at 40. At the time, Mr. Berson was a graduate student at Auburn University who maintained his permanent residence in Columbus, Georgia, in the state he had lived in nearly all his life. Tr. 90:23–91:7. Mr. Berson currently lives in Pittsburgh, Pennsylvania, where he relocated with his partner after the January 2021 runoff, though he hopes to return to Georgia given his deep roots in the state. Tr. 84:19–85:4.

21.    Plaintiff Jane Doe was a long-time Georgia resident whose eligibility to vote in the 2021 Senate runoff election was challenged by a volunteer challenger for True the Vote. PX 78; PX 73 at 17. At the time, Ms. Doe was a registered voter

in Clarke County, where she had resided for over a decade, owned a home, had a family, and maintained a permanent job. PX 78.

**B.    Defendants**

22.    Defendant True the Vote, Inc. is a 501(c)(3) Texas organization. Tr. 1757:17. In the weeks after the 2020 general election, True the Vote launched a "Validate the Vote" program that sought, among other things, to identify illegal votes in Democratic counties and compensate individuals for reporting claims of voter fraud. PX 1; PX 25. As part of its "Validate the Vote Georgia" effort, True the Vote launched the largest voter challenge effort in Georgia history, ultimately challenging over 250,000 Georgians just weeks before the 2021 Senate runoff election. PX 42; PX 16 at 24.

23.    Defendant Catherine Engelbrecht is a Texas resident and the Founder and President of True the Vote. Tr. 827:21–23, 1034:9–18. Ms. Engelbrecht oversees all of True the Vote's activities and was directly involved in coordinating and implementing the Georgia elector challenges at issue here. PX 10 at 10; Tr. 828:1–829:3.

24.    Defendant Mark Williams is a resident of Gwinnett County, Georgia, who assisted True the Vote in their elector challenge efforts by agreeing to deliver physical copies of True the Vote's challenge materials to each county. PX 42 at 2.

Mr. Williams also challenged more than 32,000 voters in Gwinnett County for True the Vote just weeks before the runoff election. Tr. 1349:16–21; PX 71.

25.     Defendant Ron Johnson is a resident of Jackson County, Georgia, who, along with Defendant James Cooper, led efforts to recruit challengers across the state for True the Vote's landmark elector challenge efforts; Mr. Johnson "took basically North Georgia," while Mr. Cooper "took South Georgia." PX 96 at 33:3–34:5; PX 42 at 2; PX 10 at 11; PX 72. Although Mr. Johnson had previously submitted voter challenges from lists supplied by True the Vote that were rejected before the November 2020 general election, PX 101 at 20:10–21:19; Tr. 24:2–6, he did not authorize True the Vote's submission of 2,300 voter challenges to Jackson County in the 2021 Senate runoff election. PX 72; PX 101 at 74:10–75:12.

26.     Defendant James Cooper is a resident of Walton County, Georgia, who, along with Defendant Ron Johnson, led efforts to recruit challengers across the state for True the Vote's elector challenge efforts in advance of the 2021 Georgia senate runoff elections. PX 96 at 63:18–20. Mr. Cooper recruited potential challengers with the pitch that 99.9% of voters on True the Vote's challenge list were illegally registered and that Trump would have won the presidential election had these challenges been filed sooner. PX 21 at 1–2.

27.     Defendant Derek Somerville is a former resident of Forsyth County, Georgia who, with Defendant Mark Davis, collaborated with True the Vote on their

elector challenge efforts and separately prepared challenges to 39,141 Georgia voters weeks before the 2021 Senate runoff election. PX 42 at 2; PX 55 at 11.

28.    Defendant Mark Davis is a resident and registered voter of Gwinnett County who, with Defendant Derek Somerville, collaborated with True the Vote over their elector challenge efforts and separately prepared challenges to 39,141 Georgia voters weeks before the 2021 Senate runoff election. PX 42 at 2; PX 56 at 10.

## III.    Defendants worked collaboratively to file hundreds of thousands of challenges to Georgia voters in the runoff election.

29.    On January 5, 2021, Georgia held a runoff election for two U.S. Senate seats. The outcome of those two races would determine control of the U.S. Senate. Tr. 48:17–18.

30.    True the Vote ultimately filed challenges against over 250,000 voters in the weeks before this election, and Mr. Somerville and Mr. Davis separately prepared to file nearly 40,000 more. PX 15 at 14; PX 55 at 10; PX 56 at 10.

31.    The Court finds that Defendants' "landmark" voter challenge for the 2021 Senate runoff election was a cooperative effort by every Defendant. True the Vote supplied the challenge lists; Ms. Engelbrecht oversaw the challenge program; Mr. Williams challenged more than 32,000 voters from True the Vote's list and connected True the Vote with Mr. Cooper and Mr. Johnson, who in turn supplied True the Vote with the Georgia volunteers they needed to sponsor the challenges.

And Mr. Davis and Mr. Somerville, Georgia natives with more experience than True the Vote with Georgia's voter file, collaborated with True the Vote on developing their challenge lists, amplifying the challenges after they were filed, and compelling county action on the challenges. The Court specifies each Defendants' role in the challenge effort below.

## A.  True the Vote

32.  True the Vote, a Texas organization, turned its attention towards Georgia in late November 2020 in light of the upcoming Senate runoff election. PX 10 at 10.

33.  True the Vote's purported goal in organizing the challenge effort was to "identify electors who appeared not to meet the qualifications legally required to cast a ballot" and to prevent those electors from casting ballots in the runoff election. *Id*.

34.  True the Vote recruited Mr. Gregg Phillips of OpSec Group, who had previously served on True the Vote's board of directors, to produce "county-by-county list of voters to be challenged." *Id.* at 12; Tr. 850:15-21; PX 1; PX 76; *see also* PX 46 at 8; PX 57 at 8.

35.  After preparing the challenge lists, "OpSec provided TTV with digital spreadsheets of the challenged voters to send via email to the respective County

Board of Elections on behalf of the Georgia volunteers serving as challengers for various Georgia counties." PX 10 at 13.

36.     Amy Holsworth, who was a contractor for True the Vote in 2020, recruited challengers for the effort with the following pitch: "True the Vote has identified over 500,000 people on the Georgia voter list that shouldn't be there. These folks are registered to vote but do not meet the requirements of a legal voter in the county in which they are registered. Georgia law allows any registered voter in a county to challenge any other voter in their county. True the Vote is funding a campaign to challenge all 500,000 in the state of Georgia. They are covering all the costs involved. They are printing the challenge letters, and drop shipping them to each election office in the state." PX 73 at 1–2; *see also* PX 21 at 2; PX 63 at 1; Tr. 920:17–20.

37.     All True the Vote asked of its volunteer challengers was that they provide their name, address, voter registration number, and signature. PX 73 at 1–2.

38.     Once True the Vote obtained authorization from a volunteer challenger, True the Vote's contractors sent the lists of voters to be challenged directly to county elections officials from the email account "gaelectorchallenge@truethevote.org." PX 10 at 20; Tr. 1373:18–25, 966:23–964:1, 1047:35–1049:24. In some cases, True the Vote's "volunteer challengers" did not even know that True the Vote had submitted challenges on their behalf. *See infra* ¶¶ 64–65, 275.

39.    True the Vote knew that its mass challenges would burden voters if those challenges were accepted; it specifically sought to require absentee voters to "present proof of residency before voting," even though no such requirement existed at the time. PX 95 at 158:1–159:5; Tr. 911:12–913:23.

40.    In addition to these 65 counties in which True the Vote submitted challenges directly, Ms. Engelbrecht agreed that challengers could also submit True the Vote's challenges individually on their own. Tr. 1849:11–13.

41.    True the Vote ultimately filed challenges to more than 250,000 Georgia voters during the first week of early voting for the 2021 Senate runoff election. PX 15 at 7, 14.

42.    When it announced the challenges to the public, True the Vote described its mass challenges as a "landmark coordinated" effort between all named Defendants. PX 42 at 2.

43.    One of True the Vote's many recruited challengers was a man named Jerry Boling, who submitted True the Vote's challenge list to Banks County, ultimately resulting in the challenge to Plaintiff Jocelyn Heredia. Tr. 1026:23–1027:1, 1043:19–1044:5, 1050:19–1051:15, 330:16–23; PX 49 at 8.

44.    One of True the Vote's other recruited challengers was a man named Alton Russell, who challenged Plaintiff Scott Berson and fellow Georgia voters Gamaliel Turner and Stephanie Stinetorf. *See* Tr. 1374:1–10; 1376:21–1377:5 (Ms.

Holsworth identifying Mr. Russell as True the Vote's Muscogee County challenger);

Tr. 236:21–24 (Mr. Turner testifying he has a basis to disagree with opposing

counsel that Mr. Russell was not affiliated with True the Vote); Tr. 316:6–317:6

(Mr. Turner testifying that Mr. Russell was his challenger and that he met Mr.

Russell in-person "in the context of a documentary where he had agreed to sit down

and to talk about what happened during that challenge"); Tr. 111:12–15 (Mr. Russell

challenged Mr. Berson); Tr. 472:15–21 (Mr. Russell challenged Ms. Stinetorf).[2]

---

[2] At trial, after Mr. Turner testified that a man named "Austin" [sic] challenged him, that Mr. Turner had spoken to Mr. Russell in person in Columbus, Georgia, and that Mr. Turner had a basis to believe that Mr. Russell was affiliated with the Defendants in this case, Mr. Evans asked, "What did he say?" to which Mr. Turner responded that Alton Russell had told him how he came to challenge Mr. Turner. Tr. 236:7–237:7. Although the Court excluded part of this testimony, Plaintiffs respectfully submit that all of this testimony is admissible because Mr. Evans explicitly invited it on cross-examination. *See United States v. West*, 898 F.2d 1493, 1500 (11th Cir.1990); *Rogers v. S. Star Logistics, Inc.*, No. 3:14-CV-179-WHA-WC, 2015 WL 5053901, at *6 (M.D. Ala. Aug. 26, 2015) ("The Eleventh Circuit has continued to apply the opening the door doctrine in this manner, finding otherwise inadmissible evidence permissible where defense counsel elicits such evidence as rebuttal during cross-examination), *aff'd*, 661 F. App'x 667 (11th Cir. 2016); *see also United States v. Balfany*, 965 F.2d 575, 582–83 (8th Cir. 1992) (finding a party waives its objection to inadmissible hearsay, even when such testimony is prejudicial, when the testimony is elicited by the party's questioning of the witness on cross examination). In any event, Mr. Turner's understanding that Mr. Russell had challenged him in coordination with True the Vote is still admissible evidence, even if the underlying details about his conversation are not admitted. The Court permitted Defendants to testify to their understandings of many conversations they had with individuals who were not before the court, including Secretary Raffensperger, legislators, and others. *See, e.g.*, Tr. 1781:15–1786:4, 1793:12–1795:1.

45.    One of True the Vote's recruited challengers was a man named Gordon Rhoden, who submitted True the Vote's challenge to Clarke County, ultimately resulting in the challenge of Plaintiff Jane Doe. PX 78 at 2 ¶ 5 (Ms. Doe identifying Mr. Rhoden as her challenger); PX 73 at 17 (Mr. Rhoden authorizing True the Vote to submit challenges on his behalf in Clarke County).

46.    True the Vote's actions did not end after they submitted the challenges to the counties. Just one week before the runoff election, True the Vote was still pushing counties to conduct challenge hearings. Tr. 1029:23–1030:7.

47.    When counties were afraid they would be sued if they accepted True the Vote's challenges, True the Vote offered them legal support if the county was willing to move forward with the challenge. Tr. 989:24–25; PX 92 at 38.

48.    And when counties denied their challenges, Ms. Engelbrecht made plans (along with Defendant Derek Somerville) to sue those counties that refused to acquiesce. Tr. 989:15–18, 992:3–7; PX 92 at 11–25.

**B.    Catherine Engelbrecht**

49.    Catherine Engelbrecht is True the Vote's Founder and President. PX 10 at 10.

50.    As President of True the Vote, Ms. Engelbrecht oversees the group's strategy, finances, and communications. Tr. 828:1–829:3; PX 99 at 27:14–29:18.

51.     Ms. Engelbrecht was directly involved in coordinating and supporting True the Vote's mass challenges at issue here. *See, e.g.*, PX 10 at 10, 16–20; PX 80 (email chain reflecting Engelbrecht's personal involvement in recruiting challengers); PX 92.

### C.     Mark Williams

52.     Mark Williams was first introduced to True the Vote by David Shafer, who, at the time, was the Chairman of the Georgia Republican Party ("Georgia GOP"). PX 105 at 17:22–18:10.

53.     Mr. Williams agreed to assist True the Vote's challenge effort by quickly printing and delivering hundreds of thousands of challenge letters to the counties. PX 42; Tr. 1333:17–1334:4; PX 10 at 10, 13.

54.     After agreeing to help True the Vote, Mr. Williams introduced True the Vote to Mr. Cooper and Mr. Johnson so that True the Vote could recruit resident challengers in every county. Tr. 1345:4–18; PX 96 at 137:7–138:17; *see also* PX 10 at 11.

55.     Mr. Williams was also True the Vote's challenger to more than 32,000 Gwinnett County voters. Tr. 1349:16–21; PX 71. Prior to True the Vote facilitating this challenge, Mr. Williams had never submitted elector challenges before. Tr. 1349:22–24.

56.     Although Mr. Williams personally appeared at the Gwinnett County challenge hearing and demanded that the Gwinnett election board investigate each voter on the challenge list, Tr. 1352:9–15, 1356:12–17, Mr. Williams took no steps to verify that any of the names on his challenge list were ineligible or to ensure the challenges he submitted were accurate. Tr. 1351:6–9; PX 105 at 36:22–37:2.

57.     None of these challenges were accepted by Gwinnett County. PX 105 at 63:13–15.

**D.     James Cooper and Ron Johnson**

58.     Neither True the Vote nor Ms. Engelbrecht could file any voter challenges without the assistance of actual Georgian volunteers in each county. O.C.G.A. § 21-2-230(a) ("Any *elector of the county* or municipality may challenge the right of any other elector of the county or municipality, whose name appears on the list of electors, to vote in an election.") (emphasis added).

59.     Therefore, True the Vote had to rely on Ron Johnson and James Cooper to "[lead] the charge in recruiting hundreds of volunteer challengers across the state." PX 42 at 2; *see also* PX 10 at 11.

60.     Mr. Cooper confirmed that while Mr. Johnson "took basically North Georgia," Mr. Cooper "took South Georgia" to recruit challengers. PX 96 at 33:3–34:5.

61.     Mr. Cooper and Mr. Johnson focused their recruitment in the first instance on fellow county Georgia GOP chairs in furtherance of True the Vote's partnership with the state party. PX 101 at 42:18–43:2; PX 96 at 36:21–37:3.

62.     Mr. Cooper's pitch to prospective challengers explained: "We need one person in each county to agree to be the signer of the letters for your county," and then outlined the necessary steps for True the Vote to facilitate the challenge, including sending True the Vote the volunteer's full name, voter registration number, home address, and a photo or scan of the volunteer's signature. PX 21 at 1–2. After providing the requested information, Defendants told volunteers that they "don't have to do anything else." *Id.* at 2.

63.     Mr. Johnson similarly "contact[ed] eligible Georgia voters" to ask "if they would be interested in bringing a Georgia Elector Challenge in the county in which they live." PX 46 at 8. Mr. Johnson asked the volunteers for their signed permission to allow "[True the Vote] to submit the challenges in their name." *Id.* When a prospective volunteer expressed interest in supporting the challenges, Mr. Johnson forwarded their contact information to True the Vote. *Id.*

64.     Although Mr. Cooper recruited many challengers for this effort, PX 42, he did not authorize True the Vote to use his own name to challenge voters in his own county for the 2021 Senate runoff election. PX 96 at 63:14–16.

65.    Similarly, although Mr. Johnson had previously submitted residency-based challenges using lists prepared by True the Vote (which had been rejected for a lack of probable cause), PX 101 at 20:10–21:9, 21:10-22:6, 24:2–6, Mr. Johnson did not authorize True the Vote to file a challenge in his name in Jackson County for the 2021 Senate runoff election. PX 101 at 74:10-13, 75:2–12. Nevertheless, around mid to late December 2020, a challenge targeting approximately 2,300 voters in Jackson County was filed under Mr. Johnson's name, address, voter registration number, and signature. PX 72; PX 101 at 73:15–75:12.

**E.    Derek Somerville and Mark Davis**

66.    Derek Somerville and Mark Davis collaborated with True the Vote on elector challenge efforts, often coordinating on both the strategic decisions and logistical difficulties posed by launching a mass challenge effort just weeks before the 2021 Senate runoff elections. Beyond their collaboration with True the Vote, Mr. Somerville and Mr. Davis also separately prepared challenge to 39,141 Georgia voters in the final weeks before the runoff election. The Court details those activities below.

**1.    Collaboration with True the Vote**

67.    Mr. Johnson, who was responsible for recruiting other challengers for True the Vote, introduced Mr. Somerville to Ms. Engelbrecht and Mr. Phillips. Tr. 1122:9–11, 1153:22–24.

68.     Mr. Somerville met with Ms. Engelbrecht and Mr. Phillips on December 15, 2020—three days before True the Vote announced its landmark elector challenge effort. Tr. 1122:12–14; PX 42.

69.     At the December 15, 2020 meeting, Mr. Somerville, Ms. Engelbrecht, and Mr. Phillips discussed aligning their elector challenges. Tr. 1122:15-20; PX 95 at 145:21–146:5. Mr. Somerville was left with the impression that Ms. Englebrecht and Mr. Phillips were unfamiliar with the State of Georgia. Tr. 1122:24–1123:7.

70.     After that initial meeting, Mr. Somerville understood that True the Vote's landmark coordinated challenge was going to be a "broad, sweeping effort." PX 104 at 27:19–28:1.

71.     The next day, on December 16, 2020, Mr. Somerville, Mr. Davis, and Mr. Phillips were invited by Ms. Engelbrecht to attend a meeting called "Elector Challenge Alignment." PX 6; Tr. 1124:2–19. During this meeting, Mr. Davis and Mr. Somerville spoke about their work on voter challenges. Tr. 1675:12–14. And because Mr. Phillips was unfamiliar with Georgia, Mr. Davis gave Mr. Phillips a primer on the data from Georgia's voter file—"where to get it, what it looks like, what's in it" —and the information True the Vote would need "to get started." PX 97 at 50:12–16; *see also* Tr. 1674:21–11.

72.     On December 17, 2020, Ms. Engelbrecht texted Mr. Somerville about a meeting she had with the Secretary of State's office about the elector challenges.

PX 70. Afterward, the two planned to speak so that they could align their efforts in light of the SOS meeting. PX 92 at 3–6.

73.     That same day, Ms. Engelbrecht also told Mr. Somerville that she would send him a draft press release along with digital files for his review. PX 70.[3] Mr. Somerville confirmed this press release was the same one that True the Vote would publish the next day, on December 18, 2020, announcing their landmark challenge effort. PX 104 at 38:14–20; PX 42.

74.     Ms. Engelbrecht sent the draft press release to Mr. Somerville before True the Vote published it; Mr. Somerville edited the draft and added himself and Mr. Davis among the list of individuals identified as collaborators in the press release. PX 104 at 38:21–39:17; PX 42; Tr. 1135:2–7.

75.     On December 17, 2020, the day Ms. Engelbrecht informed Mr. Somerville of her meeting with the Secretary of State's Office, she wrote: "[I]f

---

[3] PX 70 consists of a single text message from Ms. Engelbrecht to Mr. Somerville—and it is the only text message between Ms. Engelbrecht and Mr. Somerville that Defendants produced to Plaintiffs during discovery. Yet on the evening before trial began, Defendants disclosed nearly 200 *new* exhibits that they planned to use. ECF No. 284. One of those exhibits, Defendants' Exhibit 231, contained nearly 50 pages of text messages between Ms. Engelbrecht and Mr. Somerville that Mr. Somerville acknowledged would have been responsive to discovery requests seeking communications about the Georgia elector challenges. Tr. 1127:11–1130:6. Mr. Somerville could not explain why those communications had not been produced in the discovery process. Tr. 1130:7–13. That exhibit, which Defendants never entered into evidence, was later accepted as Plaintiffs' Exhibit 92. Tr. 1129:3–1130:1.

counties won't comply, we should jointly sue. Think on that and I'll call in a bit." Mr. Somerville responded: "Thought about it. YES!" PX 92 at 4–5.

76.    The same day, Ms. Engelbrecht told Mr. Somerville that she would send him their list of volunteer challenges, and Mr. Somerville promised that he would share other resources in return. *Id.* at 5–6. Mr. Somerville later sent Ms. Engelbrecht a list of talking points for volunteer challengers to bring to the counties. PX 47 at 9.

77.    On December 18, 2020, Ms. Engelbrecht informed Mr. Somerville that their challenge in Cobb County had been denied and Ms. Engelbrecht asked Mr. Somerville if he wanted to jointly sue Cobb County and "join forces behind the scenes." PX 92 at 11–14. Ms. Engelbrecht and Mr. Somerville then made plans to speak with challenger Pamela Reardon, who Ms. Engelbrecht believed was carrying the challenges for both True the Vote and Mr. Somerville in Cobb County. PX 92 at 11–14. Just a few hours after his conversation with Ms. Engelbrecht and Ms. Reardon, Mr. Somerville informed another one of his volunteer challengers that they planned to sue Cobb County. PX 75 at 1 (Mr. Somerville stating, "Cobb dismissed the challenges today, and we'll probably file a lawsuit as a result").

78.    On December 19, 2020, Mr. Somerville shared on his social media True the Vote's press release announcing the plan to challenge more than 360,000 Georgians. Tr. 1137:24–1138:1. In that post, he stated that he and True the Vote had

collaborated on the methodology for the challenges. Tr. 1138:2–9; PX 104 at 41:18–42:5.

79.     On December 19, 2020, Ms. Engelbrecht asked Mr. Somerville if he would participate in a call with all of True the Vote's challengers, acknowledging, "I know we don't have total overlap in our volunteers, but we have a lot." PX 92 at 15–16. Mr. Somerville responded affirmatively and noted that he would invite the remainder of his volunteer challengers who had not offered a challenge on behalf of True the Vote to "consolidate and expand the armies." *Id.* at 16.

80.     That same day, Mr. Somerville did in fact invite his volunteer challengers to attend a "strategy zoom call with True the Vote." PX 75 at 2. Mr. Somerville's invitation described True the Vote as a group with "whom we have been collaborating" and noted the call would "discuss the challenges and the path forward." PX 76 at 1.

81.     On December 20, 2020, Mr. Somerville did attend that call, where he offered encouragement to all challengers. PX 47 at 9; PX 10. Mr. Davis was also invited and attended that call. PX 79; PX 10.

82.     Over the next several days, Mr. Somerville provided Ms. Engelbrecht with updates on the outcome of his own challenges and Ms. Engelbrecht and Mr. Somerville continued to discuss a plan to sue the counties that had rejected their challenges. Tr. 1143:14–22; PX 92 at 15–25.

83.     Mr. Somerville told Ms. Engelbrecht that he would ask his challengers to stay in a "holding pattern until we (you and I) could discuss strategy." PX 92 at 24.

84.     Mr. Somerville later advised Ms. Engelbrecht that he would tell his challengers to threaten legal action if their challenges were not accepted. *Id.* at 28–29.

85.     A few days later, when Ms. Engelbrecht informed Mr. Somerville that he had been named in a lawsuit with True the Vote over the challenges, Mr. Somerville responded: "Not unexpected." *Id.* at 33–34.

86.     On January 6, 2021, Ms. Engelbrecht invited Mr. Somerville to move their communications to Signal, an application in which encrypted messages disappear. *Id.* at 44; Tr. 999:6–1000:8.[4]

**2.     Somerville and Davis's Challenges to 39,141 Georgia Voters**

87.     In addition to their work with True the Vote, Mr. Somerville and Mr. Davis separately compiled challenges to 39,141 Georgia voters who had submitted an NCOA request between June 2019 and October 2020 and voted in Georgia in the 2020 general election. Tr. 1165:16–21; PX 55 at 9–11; PX 56 at 9–10.

---

[4] Ms. Engelbrecht and Mr. Somerville's decision to move their communications to Signal occurred after the complaint in this action was served, at which point the Defendants should have received clear instructions to preserve all potentially relevant documents and communications.

88.     Around November 25, 2020, shortly after the 2020 general election, Mr. Davis met Mr. Somerville on a conference call, and from that interaction, Mr. Davis and Mr. Somerville decided to partner to analyze the state's voter files. Tr. 1629:4–7, 1629:13–25, 1630:3–10.

89.     On December 15, 2020, Mr. Davis and Mr. Somerville's finalized the plans and criteria for their challenges. Tr. 1637:6–11.

90.     Mr. Davis then generated separate challenge lists for all 159 counties, and those files were placed in Google Drive so volunteers could access them. Tr. 1657:3–4, 1679:3–4.

91.     After compiling the challenge lists, Mr. Somerville sought volunteers to submit challenges in each county—a process he advertised as a "15-minute effort." PX 41.

92.     Upon finding a volunteer, Mr. Somerville and Mr. Davis provided the individual with all the necessary materials to complete the challenge, including detailed instructions, a cover letter to the counties, and the challenge list itself, all of which were "made [] available on the internet for interested parties who wanted to file them to download them." PX 97 at 48:1–12; DX 38.

93.     Although Mr. Somerville testified at trial that his volunteers had the opportunity to review and edit his lists, the detailed instructions that Mr. Somerville provided to his volunteer challenges did not ask volunteers to review the lists in any

way. To the contrary, his instructions stated: "These PDF files contain the names of voters (electors) to be challenged, and must be submitted with the Cover Letter." DX 38 at 2. He further instructed volunteers that, "Time is of the essence. All challenges should be submitted **As Soon As Possible**." DX 38 at 1. And during his testimony, Mr. Somerville conceded there were no documents he was aware of that would show that he had asked his volunteer challengers to examine the lists carefully before submitting them. Tr. 1168:18–1169:14

94.   Mr. Somerville and Mr. Davis's volunteers ultimately submitted challenges in approximately 40 counties. Tr. 1171:12–1172:1.

95.   However, because Mr. Somerville and Mr. Davis "made [the challenge] files generally available to those that wanted to participate," Mr. Somerville does not know if additional challenges were filed beyond that number. PX 97 at 48:1–12; PX 104 at 88:21–89:5.

96.   Like Mr. Johnson and Mr. Cooper, Mr. Somerville elected not to sign his own name to the challenges in his home county, Tr. 1189:1–3, PX 104 at 100:17–19, even though he induced others to do just that.

97.   Mr. Davis, who is a resident and registered voter of Gwinnett County, Tr. 1602:25–1603:4, also elected not to file a challenge for his own county. Tr. 1680:3–8; 1680:10–11.

98.     After the challenges were filed, Mr. Somerville and Mr. Davis encouraged their challengers to attend challenge hearings and advocate for their challenges. PX 82.

99.     In an email to his volunteers, Mr. Somerville recognized that merely "participating in these [challenge] hearings is an intimidating prospect for most." *Id.*

100.    Mr. Somerville and Mr. Davis also knew that their challenges would create additional hurdles for voters. Mr. Somerville hoped that the local boards of elections would investigate the voters on his list. PX 104 at 48:15–21. Mr. Davis similarly hoped that filing challenges would result in increased scrutiny of these voters. Tr. 1683:10–13.

101.    As Mr. Somerville admitted during his testimony, Plaintiff Jocelyn Heredia was challenged by Mr. Somerville and Mr. Davis's volunteer challenger in Banks County, Dan Gasaway. PX 49 at 8 (Banks County website identifying Mr. Gasaway as challenging Ms. Jocelyn Heredia); Tr. 1172:7–15.

102.    Mr. Somerville and Mr. Davis also attempted to challenge thousands of other Georgians in "each county" in the state, PX 41, but failed to do so only because they could not find challengers for every county. Tr. 1164:24–1165:3.

103.    For example, Mr. Somerville and Mr. Davis attempted to challenge Plaintiff Scott Berson, a student who was away from his home in Columbus, Georgia. PX 89 at 40 (Mr. Berson included on Mr. Davis's Muscogee County

27

Challenge List); *see also* Tr. 1174:9–14. But as Mr. Somerville explained during his testimony, these efforts failed only because he and Mr. Somerville could not find a volunteer challenger for Muscogee County. Tr. 1172:18–23, 1178:17–21.

104.   Similarly, Mr. Somerville and Mr. Davis also attempted to challenge Mr. Gamaliel Turner, a veteran who was on a temporary job assignment as a federal government contractor in California, and only failed to do so because they could not find a volunteer challenger for Muscogee county. *See* PX 89 at 10 (Mr. Turner included on Mr. Davis's Muscogee County Challenge List); Tr. 1172:18–23, 1178:17–21.

105.   After submitting their challenges, Mr. Somerville made plans with Ms. Engelbrecht to sue the counties that did not acquiesce. Tr. 989:15–18, 992:3–7; PX 92 at 11–25.

## IV.   The natural consequence of Defendants' actions was to intimidate or coerce voters from exercising their rights.

### A.   Voter challenges have been historically used in Georgia to impede voters' lawful participation in the franchise.

106.   Plaintiffs presented the expert testimony and report of Dr. Orville Burton to review prior intimidation efforts in Georgia's history, including the use of elector challenges, and to assess how True the Vote's challenges fit within that historical pattern. *See generally* PX 16. Plaintiffs tendered and the Court accepted Dr. Burton as qualified to testify as an expert in the history of racial discrimination,

voting, and politics in the south, including Georgia. Tr. 605:22–25. The Court finds Dr. Burton credible, his analysis methodologically sound, and his conclusions reliable. The Court credits Dr. Burton's testimony and conclusions.[5]

107.   As Dr. Burton testified, Georgia's elector challenge statute was originally adopted in 1910 as a tool to disenfranchise Black Georgians. PX 16 at 7–9. Just as Black voters were beginning to form political coalitions in the state, the challenge mechanism emerged to prevent them from exercising political power and quickly became a tool of voter intimidation. *Id.* at 7–10; Tr. 608:15–609:11.

108.   As originally written, the law stated: "[T]he list from the voters' book shall be open to public inspection, and any citizen of the county shall be allowed to contest the right of registration of any person whose name appears on the voters' list." Tr. 612:14–18. The law was understood to allow individuals to challenge those they believed were not "worthy of a place" on the registration lists, which was widely understood to mean Black voters. Tr. 613:2–25. The challenge law, along with the "pure registration" law of the time, was devastatingly effective at eliminating Black voters from the rolls—75% of Georgia's Black voters were removed after Georgia's challenge law was introduced. Tr. 614:3–10.

---

[5] Dr. Burton specifically testified that he was not presenting testimony about whether Georgia's challenge law is motivated by discriminatory intent, Tr. 611:6–9, but he felt it was important to understand the history of the law to understand how voters might respond to learning they had been challenged. Tr. 611:19–612:3.

109.    The challenge law did not gain prominence again until the 1940s, after the Supreme Court forced Georgia to abandon its "Whites only" primaries in 1944 and there was a surge in Black voter registration. Tr. 609:17–23, 615:6–12. In the 1946 Georgia gubernatorial election, the largest election since the White primaries had been outlawed, Eugene Talmadge and his lieutenant governor used Georgia's challenge laws to successfully exclude 15,000 to 25,000 Black voters from the election across 30 counties. Tr. 615:13–24. The historical record reveals, however, that these challenges were frivolous—they were "mimeographed" with a space for the voter's name and county, and challengers would fill in the voter's name without specific knowledge of the individuals being challenged. Tr. 615:25–616:8.

110.    In response to these challenges, some counties subpoenaed voters to appear and prove their eligibility, while others were so overwhelmed by the number of challenges that they could not process them. Either way, the challenged voters understood that they had been accused of doing something wrong; the challenges thus had great atmospheric effect, even if they were not fully processed. Tr. 616:22–617:11, 627:25–628:9.

111.    Dr. Burton testified that mass challenges were used again in the 1980s in response to a growing Black voter population in Fulton County, Georgia. Although voter fraud was cited as the basis for the challenge, there was no evidence

of such fraud. That challenge targeted 50,000 Georgians and was the largest number of challenges that had ever been filed in the state's history. Tr. 619:3–620:12.

112.   Dr. Burton analyzed the voter challenges at issue in this case and came to three conclusions, each of which the Court credits.

113.   First, Dr. Burton concluded that True the Vote's coordinated effort to challenge over 250,000 voters far exceeded the size and scope of any other challenge effort in Georgia's history. Tr. 627:1–17. As Dr. Burton testified, if you added all previous challenges together "you wouldn't come up with half of this." Tr. 627:5–12.

114.   Second, Dr. Burton concluded that True the Vote's challenges "fit perfectly into the historical pattern" in which, in response to increased influence of voters, including Black voters, "challenge laws have been used to try to restrict their influence in those elections." Tr. 630:20–631:14. As Dr. Burton noted, Defendants' challenges came after a decade of increasing numbers of voters of color in Georgia and during a runoff in which Georgians would go on to select the first Black Senator in the state's history. Tr. 620:24–622:1. Previously, the largest mass challenge effort in Georgia history occurred in the 1940s as a means to disenfranchise Black men who had just gained the right to vote in formerly white primaries. Tr. 615:18–20, 620:9–12. True the Vote's mass challenges, similarly launched in the weeks before

Georgians elected their first Black United States senator, eclipsed previous mass challenge efforts in the state.

115.   Third, Dr. Burton concluded that True the Vote's challenges were likely to have the result of intimidating voters. Tr. 627:21–628:14. By definition, a voter challenge alleges that the challenged individual may be voting unlawfully, which leaves the voter feeling "singled out, somehow unworthy, or that you've made some mistake." Tr. 630:1–630:7. For all of those reasons, simply "having the ability to prove one's eligibility" does not negate the impact that a challenge is likely to have on a voter. Tr. 629:22–630:7.

**B.     Voter challenges impose significant burdens on voters.**

116.   The Court accepted Dr. Ken Mayer, a tenured professor of political science at the University of Wisconsin, Tr. 325:6–7, 326:25–327:24, as an expert in political science, quantitative analysis, election administration, and voter behavior, Tr. 327:24–328:8. The Court finds Dr. Mayer's analysis methodologically sound and his conclusions reliable. In addition, based upon his demeanor at trial, and in particular his straightforward and candid responses to questions posed to him by the Court, the Court finds Dr. Mayer to be highly credible. The Court credits Dr. Mayer's testimony and conclusions.

117.   As Dr. Mayer testified, voter challenges impose predictable, universally recognized costs on voters. These costs include the tax on a voter's time,

the voter's perception they have done something wrong, and the embarrassment of getting pulled out of line when attempting to vote in person. Tr. 367:9–371:8; *see also* PX 15 at 38–42 (literature establishes that administrative costs and burdens imposed by voter challenges reduce the likelihood that a person votes).

### C.    True the Vote was specifically on notice that their challenges could lead to voter intimidation.

118.    As then-Representative Elijah Cummings wrote to Ms. Engelbrecht in October 2012, "True the Vote, its volunteers, and its affiliated groups have a horrendous record of filing inaccurate voter registration challenges, causing legitimate voters—through no fault of their own—to receive letters from local election officials notifying them that their registrations have been challenged and requiring them to take steps to remedy false accusations against them." PX 17 at 3.

119.    As Representative Cummings summarized, "[m]ultiple reviews by state and local governments have documented voter registration challenges submitted by your volunteers based on insufficient evidence, outdated or inaccurate data, and faulty software and database capabilities." *Id*.

120.    Representative Cummings' letter to True the Vote also quoted the then-Republican Secretary of State in Ohio, who had told True the Vote: "When you cry wolf, and there's no wolf, you undermine your credibility, and you have unjustly inconvenienced a legally registered voter, and that can border on voter intimidation." *Id*.

33

**D.    Defendants' actions leading up to the 2021 Senate runoff election contributed to an environment in which voters could be reasonably intimidated, threatened, or coerced by their challenges.**

121.   Georgia's 2021 Senate runoff election was one of the most closely watched elections in recent history; Georgia was "the epicenter of the country." Tr. 1175:14–15.

122.   As Defendants have acknowledged, the period leading up to the runoff election was permeated with wild accusations of voter fraud. As even Mr. Somerville testified, there was a "cacophony, if you will, of just madness. There was just – it was just absolute madness." Tr. 1163:15–16. Conspiracy theories were rampant during this time period. Tr. 1163:17–24.

123.   Defendants True the Vote and Ms. Engelbrecht willfully contributed to this rhetorical wildfire: In the aftermath of the 2020 presidential election, True the Vote repeatedly insisted without evidence that widespread voter fraud was corrupting the electoral process, PX 25, and announced its plan to have "Eyes on Georgia" to "prevent[] a repetition of the uncertainties that arose from the November general election." PX 35 at 3.

124.   True the Vote's public accusations of voter fraud culminated in two efforts relevant here: Validate the Vote, their national effort to overturn the 2020 presidential election, and Validate the Vote Georgia, its pre-emptive effort to influence the outcome of the 2021 Senate runoff election.

### 1.    True the Vote's "Validate the Vote" Effort

125.    True the Vote began "Validate the Vote" in response to the results of the 2020 presidential election. Tr. 830:24–831:4.

126.    On the morning of November 5, 2020, two days after the election, True the Vote's counsel wrote to Ms. Engelbrecht: "Call me asap. I have been contacted by a friend with access to substantial funding regarding an idea about law suits re voter fraud. You might be central to that." Ms. Engelbrecht responded, "I am all in." PX 90 at 1.

127.    Later that same evening, on behalf of True the Vote, Ms. Engelbrecht emailed a plan called "Validate the Vote" to potential funders and included instructions for wiring money to True the Vote and OpSec Group. PX 1; PX 32; Tr. 838:13–18, 842:19–21.

128.    The Validate the Vote proposal identified Ms. Engelbrect and Mr. Phillips of OpSec Group as key architects of the plan. PX 1; PX 10 at 17 (True the Vote interrogatory responses acknowledging "TTV created [] 'Validate the Vote'").

129.    In essence, Validate the Vote was a campaign designed to solicit donations for True the Vote's attempt to subvert the outcome of the 2020 presidential election. PX 1. True the Vote sought $7.325 million in funding to execute the plan. *Id.*; PX 32. It ultimately received a $2.5 million donation from a single funder, Fred Eshelman. PX 28; Tr. 824:13–14.

130.   As True the Vote wrote in its Validate the Vote proposal sent to prospective donors, "There is significant evidence that there are numerous instances of illegal ballots being cast and counted in the 2020 general election. Most of these illegal votes are being counted in Democrat counties . . ." PX 1. The plan sought to "solicit whistleblower testimonies" to expose election fraud, use broad publicity to promote their findings, analyze data to identify election subversion, and eventually file lawsuits that would "seek to have the state's election results overturned." *Id*. The plan named Georgia as one of its key states, along with Arizona, Nevada, North Carolina, Pennsylvania, Michigan, and Wisconsin—all battleground states. *Id*.

131.   Ms. Engelbrecht later conceded that she had no way to determine that illegal votes were being counted in Democratic counties and could not recall any evidence of voter fraud that True the Vote had received to support these statements. PX 99 at 266:7–271:13. As Ms. Engelbrecht explained over and over when confronted with these statements, the Validate the Vote proposal was "a promotional piece . . . I don't really have much more to say about it than that." *Id.* at 269:15–21; *see also id.* at 271:10–13 (Q: [H]ad True the Vote identified any flood of illegal votes at this point? A: No, this was a promotional piece that was written.").

132.   On November 6, 2020, True the Vote nevertheless issued a press release announcing the "Validate the Vote" initiative and "Whistleblower Fund." PX 25. The press release repeated the same claims that True the Vote possessed significant

evidence of fraud and announced a $1 million fund to "incentivize" citizens to report fraud, which it encouraged individuals to do through its 24/7 fraud hotline or at validatethevote.us. *Id.* at 1–2. The press release claimed that True the Vote had already received "thousands of calls reporting alleged incidents of fraud" and that it would begin to take legal action in response. *Id.* at 1–2.

133.   As Ms. Engelbrecht explained in a public podcast, "earlier, today, we launched an initiative called 'Validate the Vote.' And what Validate the Vote is about, is putting a bounty on the fraud. Creating an environment for whistleblowers to come forward and tell the story, making sure that they have protections, making sure that they have compensation . . ." PX 52 at 2–3.

134.   As Ms. Engelbrecht further explained, "As you all know, we've had our election integrity hotline up for weeks, and we have just been inundated with reports . . . Right now we have a pool of up to a million dollars for whistleblower reports, but that pool is growing, and growing quickly . . . We've already gotten a couple of whistleblowers to come forward that are going to blow your mind." *Id.* at 1–6.

135.   A few days after announcing the Whistleblower Fund, Ms. Engelbrecht wrote to its main donor, "The whistleblower effort was a huge success. . . . [O]ne of the whistleblowers (the Georgia whistleblower) is interested in a bounty. We have

offered $50,000 if his evidence leads to prosecution. We will need to obtain counsel for him, as well." PX 28 at 1–2.[6]

136.   On November 10, 2020, True the Vote issued another press release announcing it was "laser[-]focused on Georgia" and called for an "army of volunteers" to keep their eyes on Georgia. PX 26. True the Vote once again claimed that they had received thousands of calls reporting fraud in Georgia and once again promoted its whistleblower fund and hotline. *Id.*

137.   The next day, on November 11, 2020, True the Vote's counsel, on behalf of True the Vote and the "Validate the Vote Project" effort, filed a federal lawsuit in Georgia alleging that tens of thousands of illegal ballots had been cast in Georgia and seeking to invalidate Georgia's presidential election results. PX 27. True the Vote provided the financial support for this lawsuit, and Mr. Phillips of OpSec Group provided the data analysis. PX 99 at 281:5–282:3; Tr. 891:14–20, 895:11–14; 1020:18-22.

---

[6] At trial, Ms. Engelbrecht attempted to explain that the $50,000 was offered only because the whistleblower had been "brutally beaten and was put in the ICU" shortly after meeting with True the Vote, and the $50,000 was meant to cover this individual's hospital bills. Tr. 875:5–24. The Court does not find this testimony credible for a multitude of reasons, including the witness's demeanor, implausibility of the explanation, and that Ms. Engelbrecht separately claimed True the Vote never actually received any whistleblower reports in the first place. PX 99 at 271:14–274:14.

138.   The lawsuit alleged "there exists sufficient evidence to place in doubt the November 3 presidential-election results in identified key counties" in Georgia and named as Defendants the following eight counties: Chatham, DeKalb, Fulton, Clayton, Gwinnett, Cobb, Richmond, and Henry. PX 27.

139.   Not coincidentally, the eight counties that True the Vote named as Defendants in their suit are also the eight counties with the largest Black active voter populations in Georgia. *See* ECF Nos. 294, 294-2; Tr. 1923:18–1924:2 (Court taking judicial notice of these facts).

140.   None of the plaintiffs to the lawsuit resided in these counties. PX 27. Nor did True the Vote actually name as Defendants four of the six counties in which they alleged fraud had occurred. *Id*.

141.   Although the lawsuit alleged that over 70,000 non-citizens had voted in Georgia, Ms. Engelbrecht could not recall whether they had any evidence to support this statement. PX 27; Tr. 901:4–902:1.

142.   Over the following week, True the Vote's donors grew increasingly frustrated with True the Vote's lack of evidence of voter fraud. As Mr. Eshelman wrote to Ms. Engelbrecht on November 15, "I would like to get on the phone tomorrow and get real granularity on whistleblowers and exactly what validated data we have on vote fraud. Just citing registration data won't get it done as you know."

PX 90 at 301.[7] The next day, they wrote again: "Have we actually shown fraud anywhere? . . . Reward program being used/advertised?" *Id.* at 310.

143.   Ms. Engelbrecht later admitted that True the Vote had not found any fraud to support the claims it had made. Instead, True the Vote was "just beginning the research." PX 99 at 300:12–302:17; Tr. 1015:3–11.

144.   True the Vote ultimately admitted it never had any evidence of fraud to support the lawsuits that it had filed, and dismissed its lawsuit in Georgia (along with the other lawsuits it filed in several battleground states) one week after it was filed. Tr. 902:2–903:6.

### 2.   True the Vote's "Validate the Vote Georgia" program

145.   After True the Vote's national Validate the Vote campaign failed, and when attention turned to Georgia for the Senate runoff election, True the Vote renamed the program "Validate the Vote Georgia." PX 99 at 68:16–69:7. As True the Vote explained, "when TTV came to Georgia, we simply took the [Validate the Vote] logo and put the word 'Georgia' in the center of the logo. TTV then made all the resources we had available for the national election available in Georgia for the Run-off Election." PX 10 at 17.

---

[7] Page cites to PX 90 are to the imposed black page numbers over the existing red Bates stamping.

146.   On December 14, 2020, the first day of early voting, True the Vote issued another press release, this time with the "Validate the Vote Georgia" logo and announced its partnership with the Georgia GOP to work on election integrity efforts. PX 35 at 1–3. In this press release, True the Vote referred to Georgia as "Ground Zero" and called for all "Eyes on Georgia" with a "goal of preventing a repetition of the uncertainties that arose in the November general election." *Id.* at 3. In the same announcement, True the Vote reiterated its plan to "monitor[] absentee ballot drop boxes" as part of its anti-fraud effort. *Id*.

147.   True the Vote's announced intention to monitor absentee drop boxes was consistent with its earlier calls for heightened monitoring at the polls; earlier in 2020, Ms. Engelbrecht had publicly discussed True the Vote's efforts to recruit and train veterans and first responders, including Navy SEALs, to monitor the polls. PX 51; Tr. 1837:15–20.

148.   On December 15, 2020—three days before True the Vote announced its challenge effort—True the Vote announced its "Georgia election integrity hotline as part of the most comprehensive ballot security effort in Georgia history." PX 37 at 1. True the Vote encouraged individuals who believed they had witnessed fraud to call their 24/7 hotline or fill out a report at GAValidatetheVote.org. *Id.* at 2.

149.   The next day, True the Vote's challenger recruitment effort began in earnest. True the Vote represented to its prospective challengers that "True the Vote

has identified over 500,000 people on the Georgia voter list that shouldn't be there. These folks are registered to vote but do not meet the requirements of a legal voter in the county in which they are registered." PX 73. It further assured prospective challengers that the list of 500,000 voters was "99.9% likely to be incorrectly registered." *Id*.

150.   As Defendant James Cooper wrote when recruiting challengers for True the Vote, "If this very type action had been taken back in October it is very likely Trump would have won Georgia! We can't look back now we must look forward and save the senate!" PX 21 at 1.

151.   Two days later, True the Vote announced it was challenging the eligibility of 364,541 Georgia voters, calling it a "landmark coordinated challenge." PX 42 at 2.

152.   Having enthusiastically contributed to this toxic environment, Defendants cannot be surprised that voters were reasonably afraid upon discovering they had been accused of unlawfully voting in the runoff election and contemplating the potential consequences that could come from such an accusation, whether meritorious or not.

153.   True the Vote's mass challenge effort also had another notable feature: Although True the Vote had prepared challenges that could have been filed for all 159 Georgia counties, it directly submitted challenges in only 65 counties. PX 15 at

3; Tr. 915:2–8. As Dr. Mayer found, True the Vote's challenges were disproportionately filed in Georgia's counties with the highest Black voter populations; "the higher a county's percentage of African American registrants, the higher the probability that True the Vote selected that county for voter challenges." Tr. 347:14–348:11.[8]

### E.   Defendants widely publicized their challenge program and other voter intimidation efforts throughout the state.

154.   Throughout November and December, True the Vote publicly promoted its fraud hotline, its million-dollar whistleblower fund, and its plan to monitor absentee ballot drop boxes. PX 25, 26, 35, 37. These press releases were meant to build public momentum and awareness of their plans. PX 95 at 275:3–12.

155.   True the Vote's fraud hotline, for example, was so broadly publicized that it received between approximately 6,000 and 7,000 calls. Tr. 1370:20–1371:5.

156.   The number of calls made to the hotline increased after True the Vote announced its bounty and advertised compensation for reports. Tr. 1371:17–23.

157.   As Dr. Burton opined, and the Court credits, these types of rewards have been used historically to direct suspicion towards certain groups of voters, and

---

[8] Although Defendants have claimed that the *individuals* they challenged were not disproportionately Black, Defendants had no control over which individuals submitted NCOA challenges. What they did have control over was which counties received the challenges.

these types of rewards can risk incentivizing individuals to create fraud out of whole cloth. PX 16 at 26.

158.   True the Vote's announcement of its intention to challenge 364,541 Georgians in all 159 counties came in a press release, mere days after promoting its fraud hotline and whistleblower fund. PX 42. Although True the Vote did not actually have challengers in all 159 counties at the time of the press release, it still hoped to attract new challengers through this announcement. PX 99 at 250:10–251:13.

159.   Shortly before recruiting his own volunteer challengers, Mr. Somerville wrote on social media: "I anticipate formal challenges being filed in all counties for voters who appear ineligible. If that happens as planned, all documentation will be public." Tr. 1187:18–23; PX 34 at 4.

160.   Mr. Somerville and Mr. Davis eventually made their own challenge files available on Google Drive, Tr. 1679:3–4, where anyone interested could access and download the list. PX 104 at 88:21–89:5, 91:5–10. As Mr. Somerville would later tell Mr. Davis, "a lot of people have [access to] the link." PX 85 at 1.

161.   Mr. Davis admitted that he personally did not know how many individuals actually had access to the Google Drive folder. Tr. 1679:15–20.

162.   Mr. Somerville and Mr. Davis also both recognized at the time the challenges were filed that they would become public record. PX 103 at 86:13–22; Tr. 1679:24–1680:2.

163.   Mr. Somerville understood that True the Vote's plan was to "draw[] attention to these individuals" whom they contended were ineligible to vote. PX 104 at 26:18.

164.   As Ms. Engelbrecht acknowledged, even some counties that did not accept their challenges still published the list of challenged voters. PX 92 at 42.

165.   News of the challenges spread widely and quickly. As Mr. Somerville wrote to his volunteer challengers less than one week after launching the challenges, "your efforts have captured the attention of both state and national audiences." PX 82 at 1.

166.   Mr. Somerville was correct. Mr. Berson was first alerted to challenges in Muscogee County after he came across an article on the Columbus Ledger-Enquirer website reporting that a man named Alton Russell had filed challenges against thousands of voters with out-of-state mailing addresses, including students who had been living outside the state. Tr. 95:21–96:7. The article led Mr. Berson—who had just recently graduated from a master's program at Auburn University—to suspect his right to vote had been challenged as well. Tr. 96:3–5.

167.   Similarly, Ms. Doe's challenge in Clarke County was reported on her city's local news website, and her name can still be found online as a challenged voter to this day.[9] *See* PX 78 at 3, 6–8.

168.   Banks County, too, published the list of challenged voters online; that list identified Plaintiff Jocelyn Heredia as a challenged voter. PX 49; Tr. 552:1–554:8.

### F.   Defendants threatened to release the full list of challenged voters publicly.

169.   On December 20, 2020, a Twitter account called "Crusade for Freedom" tweeted: "We just prospectively challenged the eligibility of 360,000

---

[9] PX 78 includes a citation to the local news article reporting on Clarke County challenges in the runoff election. *See* Blake Aued, *Republican Challenges Thousands of Athens Voters' Residency*, Flagpole (Dec. 19, 2020), https://flagpole.com/news/in-the-loop/2020/12/19/republicans-challenge-thousands-of-athens-voters-residency/. The article includes a link at the bottom to a Google Drive file that lists all of the challenged voters in Clarke County. *See* Clarke Match File, https://drive.google.com/file/d/1fxy8ta4puWx06CcrOetyPm0m4kO soRy_/view (last visited Nov. 14, 2023). Both the article and a redacted version of the challenge list are reproduced as Exhibit 1 to Ms. Doe's declaration in PX 78. The Court may take judicial notice of the fact that both the article and the challenge lists are still publicly available on the internet, as such a fact is "not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see, e.g., JB Oxford Holdings, Inc. v. Net Trade, Inc.*, 76 F. Supp. 2d 1363, 1368 n.10 (S.D. Fla. 1999) (taking judicial notice of fact that Florida residents could access website).

voters in GA. Largest single election challenge in Georgia and American history. #eyesonGA #validate the voteGA." PX 45.[10]

170.   It then followed up: "If the Georgia counties refuse to handle the challenges of 366,00 ineligible voters in accordance with the law, I plan to release the entire list so America can do the QC. #validatethevoteGA #eyesonGA." *Id.*

171.   Although Ms. Engelbrecht disclaimed an affiliation with this post at trial, the Court declines to credit her testimony based on Ms. Engelbrecht's demeanor at trial, improper consultations with counsel during depositions over this topic, and prior affiliations that make it implausible that neither Ms. Engelbrecht nor True the Vote were responsible for these posts.

172.   First, posts by the twitter account consistently used the hashtags #validatethevoteGA and #eyesonGA, which were notable hallmarks of True the Vote's various endeavors at the time. *Compare* PX 45, *with* PX 10 at 17 (True the Vote claiming credit for "Validate the Vote Georgia"); PX 25 (True the Vote advertising "Validate the Vote"); PX 26 (same); PX 35 (True the Vote advertising both "Validate the Vote Georgia" and "Eyes on Georgia"); PX 37 (same); PX 2 (OpSec invoice for "Eyes on Georgia"); PX 92 at 39 (Mr. Somerville writing to Ms. Engelbrecht, "Eyesonga.org is an AMAZING idea!").

---

[10] Plaintiffs' Exhibit 45 is under advisement pending further ruling from the Court. Tr. 1094:2–3.

173.   Second, there is no other organization in Georgia that launched around 360,000 challenges to Georgia voters in December 2020, let alone another organization that used the same "Eyes on Georgia" *and* "Validate the Vote Georgia" promotional language that True the Vote regularly used during this period. True the Vote has acknowledged as much. PX 99 at 264:2–265:17.

174.   Third, Ms. Engelbrecht and Mr. Phillips previously founded an organization called "Time for a Hero," and Ms. Engelbrecht handled the communications for the organization. Tr. 974:16–975:4; PX 99 at 36:21–37:6, 41:10–13; PX 23 at 2. In the summer of 2020, Time for a Hero posted, "Crusade for Freedom coming soon," using the same logo that appears on the Crusade for Freedom twitter account that threatened to release the list of all challenged voters. *Compare* PX 22 at 20, *with* PX 45; PX 99 at 263:8–19 (Ms. Engelbrecht agreeing the logos are the same).

175.   During Ms. Engelbrecht's deposition, defense counsel obstructed a pending question about the individuals responsible for Time for a Hero's social media feed. *See* ECF No. 242-1 at 6–7 (motion for sanctions). The Court infers from this obstruction that the candid answer would have been adverse to Ms. Engelbrecht's interests and finds that Ms. Engelbrecht used the same individuals to direct the @Crusade4Freedom tweets as she used to direct the related Time for a Hero social media posts.

48

176.   Based on this evidence, the Court finds that Defendants were directly responsible for public threats to publish the names and information of voters identified on True the Vote's challenge list.

**G.     Defendants' challenges were filed in close proximity to the election.**

177.   The Court finds that it is undisputed that Defendants disclosed their intent to file, and did in fact file, hundreds of thousands of voter challenges in mid-December just weeks before Georgia's Senate runoff elections concluded on January 5, 2021.

178.   December 14, 2020 was the first day of early voting. Tr. 51:16–18; PX 35.

179.   On December 15, 2020, Mr. Somerville and Mr. Davis finalized their challenge lists. Tr. 1637:6–11. The two of them began recruiting volunteers across the state to file challenges and publicized those efforts on social media no later than December 17, 2020. PX 41.

180.   True the Vote started preparing its challenge list in the second week of December 2020, Tr. 913:24–914:20, and launched its mass challenge effort on December 18, five days into the early voting period. PX 42.

**V.    Defendants' actions intimidated, threatened, or coerced voters and caused Fair Fight to divert resources in response.**

**A.    Jocelyn Heredia**

181.   The Court finds that Plaintiff Jocelyn Heredia was intimidated, threatened, or coerced when she was challenged in the 2021 Senate runoff election.

182.   At the time of the runoff election, Ms. Heredia was a registered voter in Banks County, Georgia, and she had previously voted in Banks County without incident in the 2018 and 2020 general elections. Tr. 548:2–12.

183.   Ms. Heredia first learned that she had been challenged when she arrived in person at her polling location for the 2021 Senate runoff election and a poll worker informed her she would need to prove her eligibility to vote. Tr. 548:18–549:7.

184.   The Court credits Ms. Heredia's testimony that being challenged made her fear she had done something wrong. Tr. 551:4–6 ("It made me feel, like, I was, you know, am I committing a crime? Because, like, why am I being challenged? Like, are you questioning that I'm a citizen?").

185.   After a three- to four-hour ordeal at the polling location, in which Ms. Heredia had to find further qualifying identification, go to the back of the line, and ultimately vote a challenged ballot in front of a poll worker, Tr. 549:8–550:25, Ms. Heredia went home upset, where she further learned her name had been published online as a challenged voter. Tr. 551:10–552:7; *see also* PX 49.

186.   As Ms. Heredia described, "[W]hen I saw my name on the list I felt kind of like scared, like, why is my name on a list on, like, a public website. This is, you know, public information. . . . Like, my eligibility to vote is being questioned. And, yeah, I was, you know, kind of like scared, too, because I was, like, am I going to get in trouble because I voted while my vote was challenged? So I was, you know, scared, nervous, and I wanted to know more about why my name was on the list." Tr. 555:4–12.

187.   Regrettably, Ms. Heredia's experience of being challenged in the 2021 runoff election altered her entire relationship with voting. Although Heredia voted in the 2016, 2018, and 2020 general elections, Tr. 547–548, she has not voted since the 2021 runoff election because of the fear of being challenged again, Tr. 555:13–556:4; Tr. 576:7–14.[11]

**B.    Scott Berson**

188.   The Court finds that Plaintiff Scott Berson was intimidated, threatened, or coerced when he was challenged in the 2021 Senate runoff election.

---

[11] During cross examination, Defendants suggested that voting was not important to Ms. Heredia because she had let herself go on "inactive" status. Defendants did not introduce evidence of this, either at this time, Tr. 580:15–581:4, or in their case-in-chief. In any event, the Court credits Ms. Heredia's testimony that voting is important to her, and her explanation that her decision to not vote in the 2022 general election was attributable to her experience being challenged in the 2021 runoff election. Tr. 555:13–556:4; Tr. 576:7–14; 577:17–25.

51

189.   At the time of the runoff, Mr. Berson was an active voter registered in Muscogee County, Georgia, Tr. 84:6–8, 84:12–15, 92:9–14, and had voted in prior elections in 2020, Tr. 95:13–17.

190.   In December 2020, Mr. Berson had just graduated from his Masters program at Auburn University and returned to Muscogee County, where he began searching for work. Tr. 92:7–8, 97:17–2, Tr. 93:2–4. This was a chaotic period in Mr. Berson's life as he attempted to move back home during the height of the pandemic, search for work, and support his long-time partner. Tr. 93:5–8, 93:11–94:5.

191.   Mr. Berson described the period after the 2020 general election as "extremely fraught"; he felt as if "the country was on the verge of flying off the handle." Tr. 95:2–5. The atmosphere had "this kind of air of desperation about it." Tr. 95:6–12.

192.   Before he went to vote, Mr. Berson came across an article on the Ledger-Enquirer website that reported a man named Alton Russell had filed challenges against thousands of voters with out-of-state mailing addresses. Tr. 95:21–24; 96:5–7. The article mentioned that students who had been living outside of the state but maintained residency in Columbus were likely to be challenged. Tr. 95:24–96:3.

193.   Mr. Berson suspected, on the basis of the article, that he might be caught up in this challenge . Tr. 96:3–5, 96:10–23. A few days later, Mr. Berson received a call from a community organizing group that confirmed his suspicions; he was indeed a challenged voter on Alton Russell's Muscogee County challenge list. Tr. 97:1–15, 111:12–15 (confirming Mr. Russell filed the challenge against Mr. Berson), 130:16–18 (same).

194.   The Court credits Mr. Berson's testimony that, upon learning he was challenged, he felt overwhelmed and discouraged. Tr. 97:18–23. Mr. Berson elaborated, "it was intimidating to me to be told that somebody had accused me of doing something wrong," that now he had to "prove himself in a way that . . . [he] had never had to do before." Tr. 97:24–3. "[T]hat was very upsetting." Tr. 98:6–7.

195.   Mr. Berson ultimately decided he would still try to vote, Tr. 98:11–16, and attempted to vote in-person where he could "show [his] actual face, talk to actual people at the precinct" that he was familiar with to try to "resolve [the challenge] there" if possible or "at least get answers on how to resolve [the challenge] more clearly." Tr. 98:18–99:2.

196.   When Mr. Berson arrived at the precinct, he handed his Georgia ID to election workers like he usually did, but this time, he was pulled aside and told he had been challenged, and that he "needed to fill out a provisional ballot." Tr. 99:11–15.

197.   The Court credits Mr. Berson's testimony that being challenged and taken out of line felt very isolating to Mr. Berson and made him feel "othered" to be "taken away" and told "you need to . . . prove yourself." Tr. 99:18–25.

198.   A few days after voting his provisional ballot, Mr. Berson called the election office himself, and he was told to submit additional documentation. Tr. 100:5–10. Mr. Berson ultimately submitted a copy of his Georgia driver's license and copy of his car insurance bill with his Muscogee County address on it. Tr. 100:13–16.

199.   The Court credits Mr. Berson's testimony that it was "shockingly difficult to find appropriate documents" because he was in the process of vacating his student housing in Alabama and returning  to Georgia. Tr. 100:19–22. For instance, he did not have recent utility bills because those were oftentimes being paid by his landlord or split with other roommates, and his leases were all addressed to his temporary housing in Alabama. Tr. 101:2–6. It ultimately took Mr. Berson several hours before he was able to locate the insurance bill he sent to the county elections office. Tr. 101:11–24; 128:1–10.

200.   The Court credits Mr. Berson's testimony that being challenged in the runoff election was intimidating to him because he felt he was being accused of

doing something wrong for just trying to participate in voting as he had always done and in a city he called home for many years. Tr. 101:19–102:4.[12]

### C.    Gamaliel Turner

201.    The Court finds that Georgia voter Gamaliel Turner was intimidated, threatened, or coerced when he was challenged in the 2021 Senate runoff election.

202.    Mr. Turner, a 70-year-old military veteran who grew up during the civil rights movement and witnessed the fears and sacrifices of his family members and friends as they struggled for equality, takes voting very seriously and attempts to exercise his right to vote whenever he can. Tr. 199:2–14.

203.    At the time of the runoff election, Mr. Turner was a registered voter in Muscogee County, Georgia, where he had lived for over two decades. Tr. 192:18–193:4, 198:11–14.

---

[12] Although on cross examination Defendants accused Mr. Berson of failing to describe his experience as "intimidating" in his interrogatory responses and manufacturing that testimony for the first time on the stand at trial, Tr. 117:13–118:21, the Court does not credit this suggestion because Mr. Berson later clarified that his interrogatories never asked if the challenge experience was intimidating to him. Tr. 126:21–23. The interrogatory question counsel asked about pertained only to the burdens Mr. Berson faced in reproving residency, which is a much narrower question. Tr. 126:4–17. Separately, counsel's own statements about this matter are not supported by any admissible evidence, as Defendants failed to successfully introduce Mr. Berson's interrogatory responses into evidence.

204.   After starting a temporary position as a federal government contractor in California in the fall of 2019, Tr. 193:18–194:16; Mr. Turner successfully voted absentee in the primary and general elections in Georgia in 2020. Tr. 200:9–18.

205.   For the Georgia Senate runoff elections that followed, however, Mr. Turner experienced difficulty voting. Tr. 200:13–22.

206.   In the lead-up to the runoff election, Mr. Turner noticed that those around him had started receiving their absentee ballots but he had not yet received his. Tr. 200:23–201:6.[13]

207.   After giving it another two or three days after those around him had started receiving ballots, he decided to call Muscogee County to ask about the status of his ballot. Tr. 201:7–10.

208.   During that phone call, Mr. Turner was informed that he had been "challenged." Tr. 201:11–17.

209.   Mr. Turner testified that when he heard he had been challenged, he felt anguish and confusion, and this news made him revisit his personal history of voting difficulties in Georgia. Tr. 201:23–202:4. Mr. Turner testified that voting has not

---

[13] Defendants suggested that Mr. Turner's ballot did not arrive in California because absentee ballots cannot be forwarded. Tr. 225:2–226:16. The Court does not credit this explanation as it came entirely from counsel's own statements, and Mr. Turner testified he had previously received absentee ballots at his California address before the runoff election. Tr. 200:2–18.

been easy for him but recently, over the last 10 or 15 years, he had begun to feel more comfortable and at ease with voting freely. Tr. 202:4–6.

210. Mr. Turner testified that learning his right to vote had come into question "mentally destroyed" him for a period. Tr. 202:7. Mr. Turner felt "lost" and "alone." Tr. 201:23–202:11.

211. Since being challenged, Mr. Turner now fears that his votes will no longer be counted and that he cannot rely on the voting system. Tr. 204:3–13.

**D.    Stefanie Stinetorf**

212. The Court finds that Georgia voter Stephanie Stinetorf was intimidated, threatened, or coerced when she was challenged in the 2021 Senate runoff election.

213. At the time of the runoff election, Ms. Stinetorf was registered in Muscogee County, Georgia, and had previously been a regular voter. Tr. 445:17–21, 447:20–24, 449:19–22.

214. In August 2020, Ms. Stinetorf and her family moved to Stuttgart, Germany, where she is currently employed by the U.S. Department of Defense. Tr. 448:9–16. Ms. Stinetorf voted absentee in the November general election, Tr. 450:10–14, and within two weeks of mailing her ballot, her My Georgia Voter Page showed it had been received and accepted without issue. Tr. 450:23–451:7, 451:10–14.

215.    Ms. Stinetorf followed the same procedure to request and submit an absentee ballot for the runoff election. Tr. 451:15–452:2.

216.    This time, Ms. Stinetorf quickly ran into problems. As she had done before, she started checking her My Voter Page about two weeks after mailing in her ballot. Tr. 452:5–7. On December 20, Ms. Stinetorf checked her My Voter Page and saw that her ballot had been received, but that it was marked as challenged. Tr. 452:9–13.[14]

217.    The Court credits Ms. Stinetorf's testimony that when she saw her My Voter Page display the word "challenged," it was a "very stressful" experience. Tr. 452:14–453:8. Ms. Stinetorf also felt "overwhelmed," "concerned" and "a little scared" about the consequences of being challenged and what that meant for her vote in a "very high-stakes election, where the whole country was looking at Georgia." Tr. 453:1–6. She wondered if she was doing something wrong by trying to vote from her overseas station. Tr. 453:9–24.

---

[14] At trial, the Defendants insinuated Ms. Stinetorf's ballot was not only accepted but also counted as of December 20. Tr. 472:8-13; 475:2-8. This could not have been true; the Georgia Election Code prohibits counting absentee ballots until Election Day. *See* O.C.G.A. 21-2-386(a)(2)(A). Defendants also suggested that Ms. Stinetorf had never been challenged at all. Tr. 471:24–474:11. The Court credits Ms. Stinetorf's testimony that she had been challenged, which is supported by contemporaneous communications with her county election board. *See* ECF Nos. 306 at 3–4, 306-1; Tr. 1920:12–16 (taking judicial notice of Ms. Stinetorf's communications).

218.   The Court credits Ms. Stinetorf's testimony that a few days later, on December 23, Ms. Stinetorf received an email from the Muscogee County elections board saying that the challenge had been lifted and her ballot had been accepted, but she received no explanation about what had happened or why she had been challenged to begin with. Tr. 456:13–17; *see also* ECF No. 306-1; Tr. 1920:6–1921:1 (taking judicial notice of this email communication under Fed. R. Evid. 106).

219.   The Court also credits Ms. Stinetorf's testimony that being challenged in the 2021 runoff elections in Georgia was "stressful, confusing, and a little scary." Tr. 458:5–6. The ordeal gave her "quite a lot of concern going forward" and "affected [her] trust in the system to know that just a letter from some private citizen can throw as much doubt and chaos and upheaval to such a large number of voters." Tr. 457:24–458:21.

**E.   Jane Doe**

220.   The Court finds that Plaintiff Jane Doe was intimidated, threatened, or coerced when she was challenged in the 2021 Senate runoff election.

221.   At the time of the runoff, Ms. Doe was registered in Clarke County. PX 78 ¶ 2, but traveled frequently to see her spouse who had relocated temporarily for a short-term career opportunity, *id.* ¶ 3.

222.   Ms. Doe learned about the challenge to her eligibility to vote in the runoff election through an article in her local paper about True the Vote's challenges

in her county. *Id.* ¶ 5. Ms. Doe was particularly upset when she saw her name and address had been published online through a link to the challenge list embedded in the news article. *Id.*

223.   In fact, both the local news article and the link to the challenge list are still live and online as of the date of this filing. *Id.* ¶ 11.

224.   When Ms. Doe learned this information, she was "extremely upset" because participating in elections is very important to her, and she "felt like someone was trying to deprive [her] right to vote, and in a public way." *Id.* ¶¶ 5–6.

225.   These challenges were particularly concerning to Ms. Doe because even though she was temporarily away from Georgia during the general election, she "saw the consequences of claims of voter fraud in that election" and "watched as our election workers, in particular, were harassed, threatened, and doxxed." *Id.* ¶ 7.

226.   As a result of being challenged, Ms. Doe was worried her vote would not count. Therefore, instead of voting absentee as she had planned, she made the effort to vote in person for the runoff election so she could "physically see and know that [her] ballot was accepted." *Id.* ¶ 8.

227.   Despite ultimately being able to vote, Ms. Doe's experience of being challenged was stressful. She feared she, or her family, could become the next target of harassment from True the Vote and its supporters, especially because her name

and address were published online and she had been publicly identified as a challenged voter. *Id.* ¶ 9.

228.   After 2020, Ms. Doe and her husband fully settled back in Georgia, where they continue to own a home, pay taxes, and work. *Id.* ¶ 10.

229.   But Ms. Doe fears that she will be challenged again and will have her eligibility questioned in future elections. *Id.* ¶ 11.

**F.    Fair Fight**

230.   Plaintiff Fair Fight was represented at trial by its Executive Director, Ms. Cianti Stewart-Reid. The Court found Ms. Stewart-Reid credible and credits her testimony.

231.   Fair Fight is a national organization with a focus in Georgia which works to support pro-voter and pro-democracy candidates by motivating voters to turn out to vote. Tr. 43:14–44:8.

232.   In the lead up to the 2020 general election, Fair Fight was focused on its traditional get-out-the-vote work, including calling and texting voters to encourage them to get to the polls and "making sure people knew when, where, and how to participate." Tr. 47:16–24, 48:19–25. This kind of voter motivation is core to Fair Fight's mission and purpose. Tr. 47:25–48:1.

233.   Although Fair Fight intended to continue these activities for the runoff election, the organization was not able to carry out its activities as planned because

it was forced to divert resources "to respond to the activities of True the Vote." Tr. 48:18–49:4.

234.   On December 14, 2020, the first day of early voting for the Senate runoff election, Tr. 51:16–21, True the Vote issued a press release promoting its fraud hotline and promising to monitor absentee ballot drop boxes. Tr. 50:24–51:15; PX 35. Fair Fight found this announcement threatening and was concerned these activities "would potentially intimidate voters from participating in the process or even showing up at all to vote." Tr. 50:24–51:15.

235.   A few days later, on December 18, 2020, True the Vote issued a press release announcing its intent to challenge over 364,000 voters in Georgia in all 159 counties. Tr. 51:22–52:1; PX 42. Fair Fight saw this announcement and was concerned that "particularly so close to the election and [with] this vast number of challenges . . . people would be intimidated from participating in the process and would feel threatened." Tr. 52:10–17.

236.   Fair Fight's fears were quickly realized; it was soon "contacted by voters who were being challenged who told [Fair Fight] that they felt this activity was threatening." Tr. 52:18–22.

237.   Over the next several weeks, Fair Fight launched a number of activities in direct response to True the Vote's actions. Tr. 53:23–54:4.

238.   First, Fair Fight enlisted volunteers and staff to obtain the lists of voters who had been challenged in each county and monitor the status of the challenges, which sometimes required attending county Board of Elections meetings in person. Tr. 54:19–55:17. Many of the challenge lists that Fair Fight ultimately received originated from True the Vote. Tr. 78:4–14. Before True the Vote announced its plans to challenge voters in every county, Fair Fight had no plans to have volunteers and staff attend county board meetings to monitor challenges. Tr. 57:13–20.

239.   The work of gathering challenge lists and monitoring county challenge proceedings became a joint effort of Fair Fight's Organizing, Research, and Voter Protection Teams, Tr. 55:1–8, and required Fair Fight to divert staff and volunteer time from its get-out-the-vote phonebanks and text banks. Tr. 55:18–56:10. For instance, Fair Fight pulled volunteers off the phones, where they had been "texting people and calling them to make sure that they show up this election," to attend county board meetings to monitor for challenges. Tr. 57:17–58:2.

240.   Fair Fight's response to the mass challenge effort—and the staff and volunteer resources it diverted as a result—impaired its Research Team's ability to respond to the rampant disinformation that plagued Georgia during the runoff election and its Voter Protection Team's ability to monitor long lines at polling locations or help voters navigate the absentee voting process. Tr. 56:11–57:2.

241.   In addition to obtaining challenge lists and monitoring proceedings, Fair Fight began working to arm voters who had been challenged with resources and information on overcoming the challenge, and to support county boards of elections that reached out to Fair Fight for guidance on how to handle the mass challenges. Tr. 58:3–24. This work similarly involved Fair Fight's Organizing, Research, and Voter Protection Teams, which were drawn away from all of their activities described above. Tr. 58:10–24.

242.   Fair Fight's research staff also began monitoring True the Vote's public statements and activities to track their announced plans for heightened monitoring of drop boxes and polling places; Fair Fight found these announced plans "frightening and threatening and . . . wanted to make sure [it] understood how they were being deployed." Tr. 53:21–54:2, 59:11–60:3. This work was done by Fair Fight's Research staff, who would otherwise have been responding to disinformation efforts. Tr. 60:4–9.

243.   Finally, Fair Fight spent more funds than anticipated on a voter protection hotline so that voters who had been challenged or witnessed intimidating activities could find help. Tr. 60:10–61:12. As Fair Fight described, "we felt like voters needed a resource to be able to go to say 'I have a problem, I've been challenged,' and someone to call to help them navigate that process." Tr. 61:5–12. Because Fair Fight's resources are finite, this additional spending came at the

expense of Fair Fight's traditional get-out-the-vote phonebanks, text banks, and digital advertisements encouraging people to vote. Tr. 61:12–22. "[I]nstead," Ms. Stewart-Reid explained, "we were spending it on the hotline." Tr. 61:18–19.

244.   All of these activities impaired Fair Fight's ability to execute its mission of turning voters out to vote. Tr. 61:25–62:12.

245.   After the runoff election, Fair Fight formalized its activities aimed at responding to True the Vote into a program called Democracy Watch. Tr. 62:13–17. Democracy Watch was created to monitor for the filing of voter challenges in every county; it currently has a full-time staffer, an organizer, and 400 volunteers who have been trained in the program. Tr. 62:18–63:7.

246.   Since the runoff election, Fair Fight's Research Team has also continued to monitor True the Vote's activities given True the Vote's announced IV3 program, a web tool which is designed to facilitate mass challenges in future elections. Tr. 63:8–21.

247.   But for these activities, Fair Fight would (1) redirect its Research Team's efforts and resources towards determining what messages motivate Black voters to turn out, and (2) growing its base of volunteers that can speak to voters directly to convince them to turn out in elections. Tr. 64:10–65:12.

**VI.   Defendants' challenges were virtually guaranteed to—and did—target eligible voters.**

    **A.   True the Vote's challenges were recklessly compiled.**

        **1.   Challenges to hundreds of thousands of voters were compiled in a matter of days.**

248.   True the Vote did not secure the Georgia voter file needed to begin analyzing data until sometime after December 5, 2020. PX 10 at 12.

249.   OpSec did not begin working on the challenge list until the second week of December. Tr. 914:12–16.

250.   Mr. Phillips spent only an hour reviewing the challenge file to determine whether the number of errors seemed "reasonable" to him. PX 102 at 140:8–18.[15]

251.   Mr. Phillips admitted that the accuracy of the matching process he used to generate True the Vote's challenge file has never been independently verified. PX 102 at 109:1–3.

---

[15] The Court declines to credit Ms. Engelbrecht's suggestion that an unstated entity performed quality control by evaluating "a sampling of 2500 randomly selected records." Tr. 1811:7–8. Defendants had never previously disclosed this step in their interrogatories, depositions, or internal correspondence discussing their methodology, and Ms. Engelbrecht's explanation of the process for generating the challenge file was directly contradicted on numerous other points by Mr. Phillips, *see infra* ¶¶ 291, 293–295, 325, who had personal knowledge of the steps that were taken, *see supra* ¶¶ 7, 137.

252.   By December 16, True the Vote had sent the challenge lists to Mr. Williams for printing and had begun challenger recruitment in earnest. PX 67; PX 21.

### 2.   Challenge lists contained tens of thousands of obvious errors.

253.   Ms. Engelbrecht confirmed that no one reviewed any of the individual entries on the challenge file before True the Vote submitted them. Tr. 916:14–917:12.

254.   Dr. Mayer, Plaintiffs' expert in quantitative analysis, reviewed True the Vote's challenge file and summarized his key finding: "[M]y overall conclusion is that I was just shocked at how sloppy and inaccurate the underlying data and linkage process was. I found tens and tens of thousands of obvious errors that were apparent based on immediate inspection. I found examples of missing data, duplicated records, records that are linked to the wrong individual or someone with a different name. People who hadn't actually moved, people who had reregistered, on and on and on. [I]t was just astounding how shoddily executed an[d] unreliable the whole enterprise was." Tr. 331:1–10; PX 91. The Court credits this unrebutted testimony.

255.   Dr. Mayer further testified that as he was "going through [True the Vote's challenge file] and doing the analysis, it just took [his] breath away how sloppy it was," Tr. 355:11–14, and if he submitted something like this in his academic work, he "would be laughed out of the room," Tr. 355:15–17. The Court

also credits this unrebutted testimony, recognizing that unlike a university lecture or journal publication, the challenges had direct and immediate consequences for the voting rights of hundreds of thousands of Georgia registrants.

256.   True the Vote's challenge file included numerous examples of misspellings or spelling variations of city names, indicating there was a problem or lack of quality control. Tr. 351:4–9.

257.   True the Vote's challenge file included entries where the challenged individual's registration address and the alleged moved-to address are identical, which Dr. Mayer recognized as "such an obviously identifiable error that I am just flabbergasted that this was not screened and caught." Tr. 363:12–20; PX 91 at 2.

258.   True the Vote's challenge file included entries where there was a syntax error in the street address field, such as "null" or "=G16." Tr. 363:21–364:4; PX 91 at 2.

259.   True the Vote's challenge file included entries where the registrant was alleged to have moved to an undefined street address, such as "general delivery." Tr. 364:16–20; PX 91 at 2.

260.   True the Vote's challenge file included entries where the challenged individual's registration address and moved-to address were alleged to be in the same county. Tr. 364:23–365:3; PX 91 at 2. This is noteworthy because True the Vote's own description of its process said it screened for these errors, when it clearly

did not. Tr. 353:10–12. And these voters would all have remained eligible to vote in Georgia's 2021 Senate runoff elections. Tr. 354:13–19.

261. True the Vote's challenge file included entries where the challenge file name and the corresponding voter file name did not match. Tr. 365:4–6; PX 91 at 2.

262. True the Vote's challenge file included entries where the challenged individuals were not even registered to vote in Georgia. Tr. 365:7–9; PX 91 at 2.

263. True the Vote's challenge file included hundreds of entries where the challenged individual was alleged to reside literally on a military installation. Tr. 365:10–12; PX 91 at 2.

264. True the Vote's challenge file included 1,375 instances of duplicates on the first name, last name, address triplet that True the Vote attempted to match between the voter file and NCOA registry. Tr. 365:13–16; PX 91 at 2.

265. True the Vote's challenge file included 6,377 instances where the challenged individuals had already re-registered at their moved-to address before True the Vote challenged them. Tr. 365:17–19; PX 91 at 2. As Dr. Mayer explained, "there's no responsible process that would have produced that result. And, again, it was something that was trivial to check. It was one line of code. And it[']s something that . . . should have been done." Tr. 366:2–8.

266.   True the Vote's challenge file included 9,270 instances of erroneous zip code data, comprising every single challenged record in Henry County. Tr. 366:9–11; PX 91 at 2.

267.   True the Vote's challenge file included 15,360 instances where the street address in the moved-to field was altogether missing. Tr. 366:12–14; PX 91 at 2. This error increases the likelihood that election officials would not be able to contact the challenged voters to give them advance notice of the challenge. Tr. 350:4–13.

268.   True the Vote's challenge file included 22,956 instances where the challenged individual was alleged to reside on or adjacent to a military installation. Tr. 366:15–18; PX 91 at 2.

269.   True the Vote's challenge file included 35,056 instances where the challenged individuals were alleged to reside on or adjacent to a college or university campus where Georgia high school seniors typically enroll. Tr. 366:19–23; PX 91 at 2.

270.   In sum, Dr. Mayer concluded, "there are so many glaring examples of errors in [True the Vote's] process that even if there were some cases where someone was properly identified as someone ineligible to vote . . . you don't get to throw a quarter million pieces of garbage at the wall and pat yourself on the back that some of them actually stuck." Tr. 367:1–8. The Court credits this testimony.

### 3. Challenges were submitted without challengers having seen the list and in some cases without their authorization.

271. True the Vote's recruitment email to potential challengers did not request that volunteers review the challenge list before submission—it requested simply that the volunteers provide their name, address, voter registration number, signature, and consent for True the Vote to file on their behalf. PX 21; PX 99 at 233:18–234:2; Tr. 1053:22–1054:3 (Ms. Engelbrecht explaining, if a volunteer didn't "ask[] for [the list], I doubt we would have sent it").

272. Before True the Vote's challenges of more than 32,000 voters were submitted in Gwinnett County, the challenger, Mr. Williams, was not given the option to remove names from the list. Tr. 1350:12–24.

273. Mr. Williams further testified that at no point did he look at the names on the list. Tr. 1350:22–23. And he took no steps to ensure that any of the challenges that were submitted to Gwinnett County were accurate. PX 105 at 36:22–37:2. ("Q: What steps did you take to ensure that the challenges you submitted were accurate? A: None.")

274. True the Vote separately used Mr. Johnson's name to file challenges in Jackson County—without his authorization or awareness—before the runoff election. PX 101 at 73:15–21; 74:10–13.

275. True the Vote volunteer Joseph Martin of Taliaferro County, too, did not realize that True the Vote had submitted a challenge in his name until he was

subpoenaed in this case and pulled an open records request on himself with his county. PX 94 at 56:17–21; 57:5–9; 62:21–63:1

276.   Seanie Zappendorf was another volunteer challenger for True the Vote. Shortly after Plaintiffs subpoenaed Ms. Zappendorf in March 2021, *see* ECF 69 at 2, Ms. Engelbrecht wrote to Mr. Somerville, "Seanie didn't know her challenge was used . . . ." PX 92 at 48. Mr. Somerville responded: "Opportunity to improve the process in the future. :)". *Id.*

### 4.   Challengers were induced to submit challenges on the basis of false information.

277.   In recruiting volunteer challenges for True the Vote's elector challenge effort, Ms. Holsworth, a True the Vote contractor, wrote: "We have identified over 500,000 people on the Georgia voter list that shouldn't be there. These folks are registered to vote but do not meet the requirements of a legal voter in the county in which they are registered." PX 73 at 1–2. Mr. Cooper made the same representation to prospective challengers. PX 21 at 1–2.

278.   Ms. Engelbrecht later acknowledged this representation was false. PX 99 at 231:20–233:17: Tr. 925:1–24.

279.   Ms. Holsworth also wrote that "True the Vote has assured me that the list [of voters] they are challenging is 99.9% likely to be incorrectly registered." PX 73 at 2.

280. Ms. Engelbrecht also later acknowledged this representation was false and should not have been made. PX 99 at 234:3–235:15; Tr. 928:13–18.

281. Mr. Phillips similarly knew that some individuals on the challenge list could be eligible to vote, and he had "no idea" if the list he generated was 99% accurate. PX 102 at 147:20–22, 148:4–7.

282. True the Vote told Mr. Cooper that it had verified the challenge list by "canvassing," or going door-to-door to confirm that the voter did not live at their registration address. PX 96 at 66:18–67:16.

283. There is no evidence that True the Vote ever canvassed any (let alone hundreds of thousands of) Georgia addresses to ascertain whether the voter registered at the address maintained lawful residence there.

**5.   Even True the Vote's Co-Defendants believed True the Vote's challenge lists were recklessly compiled.**

284. In late December 2020, Mr. Somerville told Mr. Davis that he was "concerned" the moment True the Vote's leaders shared how many voters they intended to challenge and that he "always felt the size [of True the Vote's challenge] was too big." PX 58 at 163, 192. The size, he said, would invite the argument that the challenge was "systemic"—that is, one barred by the National Voter Registration Act ("NVRA"). PX 58 at 192.

285. Mr. Somerville testified that he would not have adopted the methodology that True the Vote took in compiling its challenges. Tr. 1157:11–13.

In other words, he and Mr. Davis "would never have produced [the] numbers" of challenges that True the Vote did. Tr. 1157:18–20.

286.   Mr. Davis had similar concerns about the size and scope of True the Vote's lists because they were "broader" than he "would have personally done." Tr. at 1659:9–12.

287.   On the day that True the Vote announced its challenges, Mr. Somerville told another volunteer challenger that True the Vote's challenges would "overwhelm" the county boards and that the counties "could not possibly be equipped to work through that many allegations." Tr. 1162:5–20. This, to him, was a matter of "common sense." Tr. 1162:21–1163:2.

### B.   All of Defendants' challenges based on NCOA data were inherently frivolous.

#### 1.   Defendants' only evidence of voters' ineligibility to vote was NCOA data.

288.   Because mass challenges based on the U.S. Postal Service's National Change of Address ("NCOA") data alone are virtually *guaranteed* to ensnare lawful voters, *see infra* ¶¶ 310–325, the only way to minimize this risk is to incorporate individualized data or information *other than* what is in the NCOA registry to confirm the voter's residence, *see infra* ¶¶ 326–378. Yet none of the Defendants did so.

### a.     True the Vote Challenges

289.   True the Vote attempted to conduct a "record linkage" process in which it attempted to link names and addresses in Georgia's statewide file of registered voters to names and addresses in the NCOA registry, the database of individuals who have requested that the postal service forward their mail. The names and addresses that "matched" across the voter file and the NCOA Registry were extracted and placed into True the Vote's "challenge file," with each matched record claiming to represent an ineligible voter. *See* PX 15 at 1.

290.   A careful review of True the Vote's challenge file failed to identify any indication that sources other than NCOA were used, as errors that would be expected if True the Vote relied exclusively on NCOA data appeared in their final challenge file. Tr. 346:7–346:18.

291.   True the Vote did not use the Social Security Death Index—the only other database potentially relevant to eligibility that Defendants suggested they accessed—to create its challenge file. PX 102 at 148:13–18 (Gregg Phillips admitting he did not use the Social Security Death Index to generate True the Vote's challenge file); Tr. 346:19–347:2 (Dr. Mayer explaining this would not have been possible because neither the NCOA registry nor the voter file has information that would allow True the Vote to reliably match to the Social Security Death Index).

292.   Mr. Williams testified that it was his understanding that True the Vote's challenge lists were created by running the voter file against NCOA lists. PX 105 at 64:3–18, 65:3–12. As he testified, he had personally run a list of Gwinnett County voters through the NCOA system, and his numbers matched those that True the Vote had come up with for his county. Tr. 1351:10–23, 1733:7–18 (Mr. Williams explaining, True the Vote was "doing exactly the same thing I was when I created my list" and in the end "their list was the same because it was the same numbers").

293.   Gregg Phillips, who generated True the Vote's challenge file, *see* PX 10 at 11, 12–13, recognized there are many reasons a voter may submit an address change to the postal service while remaining eligible to vote where they are registered, including if they are deployed in the military, enrolled in school, moving inside the county in which they are registered, moving for non-military government service, moving temporarily for a part-time job, visiting family, on vacation, or intending to move in the future. PX 102 at 125:12–127:19.

294.   Yet Mr. Phillips did not remove these voters, including military and overseas voters who had requested an absentee ballot pursuant to the Uniformed and Overseas Citizens Absentee Voting Act ("UOCAVA"), from True the Vote's challenge file. PX 102 at 136:4–13.

295.   Mr. Phillips also failed to conduct any analysis to determine whether military voters who moved to a military base retained their eligibility to vote in Georgia. PX 102 at 3–16.

### b.   Somerville and Davis Challenges

296.   The only information that Mr. Somerville and Mr. Davis knew about the 39,141 individuals in their challenge list was that those individuals were believed to have submitted an NCOA request and voted in the 2020 general election. Tr. 1159:3–10 (Mr. Somerville testifying, "the National Change of Address was the basis of how you wound up in the funnel"); PX 55 at 9–11; PX 56 at 9–10.

297.   From their pool of NCOA voters, Mr. Somerville and Mr. Davis attempted to exclude certain individuals from the challenge lists—including individuals with P.O. box addresses, UOCAVA voters, and voters on military bases. PX 55 at 9–11; PX 56 at 9–10.

298.   Although Mr. Somerville testified that he attempted to remove students "where [he] saw a large number of files from the NCOA that came back to a common address" on a college campus, PX 103 at 22:9–22, 23:1–6, only a small percentage of all students live on campus in a dorm in a manner that might be identifiable on the NCOA list. Tr. 361:22–362:7. As Mr. Somervile acknowledged, "there's no

record in the voter file that indicates that somebody's a student." PX 103 at 22:16–18.[16]

299.   But beyond those few *removals*, neither Mr. Somerville nor Mr. Davis possessed any further information about the 39,141 voters who remained on their challenge list other than that they had submitted an NCOA request in the 18 months before the 2020 general election. DX 38 at 1 (Mr. Somerville telling his challenge volunteers that the list was formulated by identifying "voters with a U.S. postal service change of address effective June 2019 or sooner" and "voters who voted in our 2020 general election").

300.   When Mr. Somerville was asked whether he had confidence in the methodology of his challenge list of roughly 40,000 voters, Mr. Somerville responded, "I have tremendous confidence that those individuals filed a change of address *for one reason or another*." PX 104 at 87:17–88:1 (emphasis added).

301.   In other words, Mr. Somerville believed all he was "communicating to the Board of Elections" with his challenges was that "an individual has a National Change of Address record," which suggested "probable cause to believe that they have moved"—nothing more, nothing less. PX 103 at 87:16–88:1.

---

[16] Neither Mr. Somerville nor Mr. Davis disclosed that they ever attempted to remove students from their challenge files in their interrogatory responses, which asked both to describe their methodology "in detail." *See* PX 55 at 9–11; PX 56 at 9–10.

302.    At the time they organized and filed their challenges, however, Mr. Somerville and Mr. Davis knew that there were many reasons why an individual could reside or receive mail at a different address than the one where they were registered to vote and still remain an eligible voter. PX 103 at 20:8–24:6.

303.    At the time they organized and filed the challenges, Mr. Somerville was aware of the fact that the NVRA prohibited states from removing voters from the rolls absent written confirmation the voter has moved or evidence of inactivity for at least two federal election cycles—a process Mr. Somerville recognized typically takes a long time and contains multiple protections for voters. PX 104 at 119:9–122:9; *see also* 52 U.S.C. § 20507(d)(1).

304.    Although they understood that the State of Georgia could not legally remove voters on the basis of NCOA so close to the runoff election, Mr. Somerville and Mr. Davis's challenges "sought to force that verification anyway." Tr. 1185:15–17.

305.    Ultimately when asked by his counsel, "Would the appearance of someone on your list mean that they are not eligible to vote?" Mr. Somerville, answered, "No, not at all." Tr. 1514:12–14. Mr. Somerville and Mr. Davis nonetheless organized challenges to those voters.

306.   Mr. Davis also admitted that neither he nor Mr. Somerville consulted any other sources to determine residency after identifying the 39,141 challenged voters based on NCOA data. Tr. 1673:6–17.

307.   Although Mr. Somerville and Mr. Davis took a more disciplined approach to removing voters from their challenge list than True the Vote did, it remains true that the only basis for inclusion on their challenge list was that the voter had submitted an NCOA request shortly before the election. Tr. 1159:9–10.

308.   For example, although Defendants attempted at trial to introduce evidence of Ms. Heredia's leases, employment, and other information to suggest a reasonable person would believe Ms. Heredia had changed her permanent residence to Atlanta, they had not investigated any of Ms. Heredia's personal circumstances at the time they filed their challenge—Defendants knew only that Ms. Heredia filed a NCOA request to forward her mail. Tr. 1566:19–1568:1 (Mr. Somerville confirming he investigated Ms. Heredia's leases, social media, car information, work history, and romantic relationships only after he had been named a Defendant in this lawsuit).

309.   Mr. Somerville himself should have known that legal residency for voting depends on the voter's intent, which is a complicated inquiry. For example, although no one contests that Mr. Somerville was properly registered to vote in Georgia in 2020, that year he also owned homes in Kentucky and North Carolina and spent time in both states. Tr. 1203:15–1204:22. In fact, Mr. Somerville was a

legal Georgia voter even though Mr. Somerville sold his Georgia home shortly after the runoff election. Tr. 1204:18–22. The touchstone of the inquiry is, again, intent, which NCOA records alone fail to determine.

>    **2.     NCOA data is not a reliable indicator of a voter's eligibility.**

>        **a.     NCOA data does not indicate a voter's intent.**

310.   As Dr. Mayer explained, "the fact that a registrant appears in the NCOA Registry cannot be used to conclude that these registrants are ineligible to vote." PX 15 at 7. "[T]he fundamental premise of True the Vote's challenge effort[,] that a voter who appears to have filed a change of address is ineligible to vote[,] is utterly false." *Id.* at 14.

311.   The NCOA list does not reveal where an individual subjectively intends to establish their permanent residence. *See* Tr. 356:19–23. *But cf.* O.C.G.A. § 21-2-217(a) (providing 15 intent-based rules for determining an individual's residency for purposes of voting eligibility, and codifying several examples where an individual may be away from their registration address without forfeiting their voting eligibility).

312.   Nor does the NCOA list reveal an individual's financial independence, business pursuits, employment, income sources, residence for income tax purposes, age, marital status, residence of parents, spouse, and children, if any, leaseholds, sites of personal and real property owned by the applicant, motor vehicle and other

personal property registration. Tr. 339:5–11 (Dr. Mayer explaining the fields in the NCOA file "are an individual's first name, their last name, their previous address, and the address where they have asked their mail to be forwarded"). *But cf.* O.C.G.A. § 21-2-217(b) (listing factors relevant to ascertaining an individual's residency for purposes of voting).

313.   What the NCOA dubs a "permanent" mail-forwarding request is simply a request to forward mail for more than six months. Tr. 355:18–356:9. Thus, the NCOA's use of the word "permanent" does not match the colloquial or legal use of that term, and it is not probative of whether an individual remains eligible to vote at their registration address. Tr. 356:10–357:4; *see also* PX 103 at 23:13–18 (Somerville admitting "I'm not sure we would have clarity into" whether moves were temporary); PX 97 at 148:13–16 (Davis recognizing someone can file a "permanent change of address when they really intend to go away temporarily"); Tr. 1684:19–23 (Davis admitting during his testimony that individuals who file what the USPS categorizes as a permanent change of address do not necessarily permanently leave the state and can return in the future); Tr. 1985:24–1685:2 (Davis further recognizing that individuals who file change of addresses can remain eligible to vote in Georgia).

314.   While NCOA matching may be one element in the process of a state's voter list maintenance, states may not use an NCOA match alone to determine that

a voter is ineligible to remain registered. *See* 52 U.S.C. § 20507(d) (restricting states from relying on an alleged change in residence alone to remove individuals from voter rolls). As Dr. Mayer relayed, "NCOA registries are known to produce false positives (errors occurring when individuals who have not moved are on the registry), and even voters who have moved can remain eligible to vote in Georgia." PX 15 at 33.

315. Illustrating the inadequacy of relying on the NCOA list alone, after the November 2020 general election, the Georgia Secretary of State's office surveyed individuals who had filed an NCOA request and had requested an absentee ballot to be mailed to an out-of-state address. PX 8. Over 1,000 individuals completed the questionnaire, and their responses identified many of the reasons that individuals may lawfully vote out of state. *Id.*

316. For example, surveyed individuals explained that they were active military; immediate family of active military; temporarily visiting or assisting family; out of state due to medical treatment; in the process of a move that had not been completed at the time of the election; temporarily out of state due to a job assignment; temporarily out of state due to COVID; maintaining an out-of-state home while Georgia remained their primary residence; forwarding mail to out-of-state family who assisted with bill payments; or otherwise temporarily traveling. *Id.*; Tr. 493:2–493:21.

83

317.   Only 13 (or 1.2195%) of the 1,066 survey respondents indicated that they had relocated prior to July 2020, but many of these individuals "reported that due to COVID they were having difficulty getting appointments to obtain their driver's license in the new state and believed they needed the new driver's license in order to complete their registration in the new state." *Id.*

> b.   **NCOA data does not contain a unique identifier.**

318.   NCOA data is insufficient to supply the basis for voter challenges for the additional reason that it lacks a unique identifier that can reliably be matched to individuals in the voter file. PX 15 at 15–17.

319.   A unique identifier is a data field or combination of data fields that uniquely identifies an individual, such as a social security number or a driver's license number, such that when the identifier appears in two different databases, "we can be certain or very confident that . . . we're talking about the same person." Tr. 339:12–18; PX 15 at 15.

320.   The only common fields between the voter file and NCOA registry are an individual's first name, last name, and address. PX 91 at 1; Tr. 339:9–11.

321.   These fields are not unique on their own or in combination. Tr. 340:4–5. There are 85,219 records in the Georgia voter file with at least one duplicate on the first name, last name, and address triplet. PX 15 at 25.

322.   True the Vote's challenge file showed 1,375 duplicated records, where it is impossible to ascertain whether the person with the name and address in the NCOA database was matched to the same person in the voter file. *Id.* at 26; Tr. 342:6–18.

323.   For example, the challenge file lists two registrants named Eric Jones at the same address in Gwinnett County, neither of whom show an NCOA street address for the location they have moved to. But there are three Eric Joneses in the voter file at the same address as the two in the challenge file, with three different birth years and three different middle names, one of whom is a "Jr." It is impossible to tell which individual is the correct match because the voter registration number, birth year, middle name, and suffix fields are not included in the NCOA file. PX 15 at 25; Tr. 346:19–347:17.

324.   Professional companies that are licensed to conduct NCOA matching specifically warn that false positives occur "on a regular basis." PX 15 at 33, Tr. 344:20–25.

325.   Mr. Phillips recognized that the lack of unique identifiers could affect the accuracy of the challenge list he was generating for True the Vote, yet he had "no idea" how many duplicates where in the challenge file because "it wasn't a topic" that he took time to investigate. PX 102 at 121:3–6, 122:17–123:5.

3.   **Defendants' misplaced reliance on NCOA data resulted in challenges targeting eligible Georgia voters.**

a.   **Challenges to known military and student voters.**

326.   Among the many reasons a voter might file an NCOA request while maintaining eligibility to vote at their registration address is if they are temporarily away from home for military service or attending school. *See* Tr. 356:19–357:4, 360:1–8; PX 15 at 7 ("Military personnel serving at an installation away from home and college students moving to attend school are archetypes of legitimate absentee voters.").

327.   True the Vote's challenge file predictably included tens of thousands of likely military and student voters. PX 15 at 30–32; Tr. 356:24–362:21.

328.   Specifically, True the Vote's challenge file included 397 registrants alleged to reside literally *on a military installation*, including multiple voters with addresses on, for example, Fort Knox, Fort Bragg, Fort Campbell, Joint Base Lewis McChord, Fort Stewart, Fort Meade, Eglin Air Force Base, Fort Erwin, and Camp Lejeune, respectively. In total, the challenge list included registrants with an address on 59 different military installations. PX 15 at 30; Tr. 357:12–15.

329.   Not all service members deployed to a base, however, actually live on a base. They and their family may live in an adjacent municipality. Tr. 3587:20–25. Yet True the Vote's challenge file included nearly 23,000 voters alleged to reside immediately adjacent to one of 189 major military installations. PX 15 at 30, 49–53.

330.   True the Vote's challenge file also included over 34,000 registrants alleged to reside at an address on or near a major college or university that Georgia students may be expected to attend (excluding cities of populations of more than one million). PX 15 at 31; Tr. 360:21–362:7. Examples include registrants alleged to reside in Clemson, South Carolina; College Station, Texas; Notre Dame, Indiana; State College, Pennsylvania; and Princeton, New Jersey. PX 15 at 54–56.

331.   True the Vote's challenge file even included voters who likely fell in *both* of these archetypal categories of eligible voters temporarily away from home—*students in the military*. Tr. 362:8–21 (identifying students with an alleged moved-to address on the campus of the United States Air Force Academy, as well as in West Point and Annapolis).

### b.   Jocelyn Heredia

332.   The Court finds that Ms. Heredia's permanent residence was in Commerce, Georgia (Banks County) at the time of the runoff election, where Defendants challenged her eligibility to vote on the basis that she had filed an NCOA request. Tr. 545:22–546:11; 547:12–14.

333.   Ms. Heredia was born in Georgia and spent her childhood between Athens and Commerce, Georgia. Tr. 540:12–16. Ms. Heredia's immediate and extended family still reside in Commerce, where they have had a home for more than twenty years. Tr. 540:24–541:2; 548:13–14. To this day, Ms. Heredia maintains

her regular appointments in Commerce, including her doctors' appointments. Tr. 573:18–22.

334.   While Ms. Heredia attended college at the University of Georgia, she resided at her family's home in Commerce instead of living on campus to help raise her significantly younger sibling and to be with family. Tr. 541:10–543:4.

335.   In December 2019, after Ms. Heredia graduated college, she was offered a temporary, one-year contract position with a company in Atlanta and leased an apartment in Decatur to be closer to work; in February 2020, she submitted an NCOA request to forward her mail there. Tr. 544:2–545:3, 545:6–21.

336.   At this time, however, Ms. Heredia did not update her voter registration, car registration, driver's license, or any other form of identification to Atlanta because she still considered Commerce to be her permanent residence. Tr. 545:22–546:11, 573:12–22.

337.   In March 2020, one month after Ms. Heredia began her contract position, the COVID-19 pandemic resulted in Ms. Heredia's job going fully remote, allowing her to spend "months at a time in Commerce." Tr. 546:12–20.

338.   Ms. Heredia ultimately spent the majority of 2020 in Commerce, where she was responsible for picking up and dropping off her younger brother at school and assisting with his education. Tr. 547:5–12.

339.   Ms. Heredia testified that she considered Commerce to be her permanent residence for the remainder of 2020, Tr. 547:12–14, and the Court credits that testimony based upon its observations of Ms. Heredia and the facts of her family circumstances.

340.   Demonstrating her fastidiousness about ensuring her voter registration properly reflects her intended permanent residence, Ms. Heredia registered in Clarke County, where her family resided during her first year of college and she updated her registration to Banks County the next year when she and her family moved back to Commerce, Georgia. Tr. 548:6–12. Ms. Heredia intends to update her voter registration again when she moves into her new home in Athens, Georgia later this year. Tr. 557:4–8.

341.   Ms. Heredia's permanent residence in 2022 or 2023, which Defendants sought to question at trial, is irrelevant to the inquiry whether Defendants' challenges in *December 2020* were well founded.[17] While Ms. Heredia renewed her lease in Atlanta *after* the runoff election when she received a full-time offer of employment in February 2021, Tr. 556:6–9, there is no legitimate dispute that she was properly registered in Banks County in 2020.

_____

[17] For example, Mr. Somerville now resides and is registered to vote in Kentucky, a place where he has owned a home for years and even spent time in 2020. Tr. 1203–04. But no one contests that Mr. Somerville was an eligible voter in Georgia at the time of the runoff election in January 2021.

342.   The Court also credits Ms. Heredia's testimony that her earlier decision to attempt to leave this case was attributable not to Ms. Heredia's "realization" that she had voted illegally, as Defendants have implied, but instead to Defendants' invasive investigation into Ms. Heredia's personal life, including but not limited to her romantic relationships and her partner's personal life. Tr. 581:15–25; ECF No. 236-7 (Defendants' May 2023 exhibit list which included multiple photos of Ms. Heredia and her partner, along with other invasive exhibits).

### c.   Scott Berson

343.   The Court finds that Mr. Berson's permanent residence was in Columbus, Georgia (Muscogee County) at the time of the runoff election, where Defendants challenged or attempted to challenge his eligibility to vote on the basis that he had filed an NCOA request out-of-state.

344.   Mr. Berson has strong ties to Georgia, having resided there for most of his life. Mr. Berson lived in Johns Creek, Georgia with his family from 1999 to 2013, where he first registered to vote when he turned 18. Tr. 82:7–10, 82:13–16, 84:1–5.

345.   Mr. Berson subsequently left Johns Creek to attend college at Georgia Southwestern State University and then transferred to Columbus State University in Muscogee County, where he re-registered to vote. Tr. 82:13–22, 83:1–3, 84:6–8.

346.   While at Columbus State University, Mr. Berson was heavily involved in the local community: he served as editor-in-chief of the student newspaper, gave

guided Segway tours in downtown Columbus, and wrote for a local web blog that promoted Columbus Arts and Culture. Tr. 85:11–86:8. After graduating college, Mr. Berson worked in Columbus for the local paper, the Ledger-Enquirer. Tr. 83:7–15, 86:10–16.

347.    Mr. Berson stayed in Columbus, Georgia until the end of 2018 when he enrolled in a two-year graduate program at Auburn University that began in January 2019. Attending Auburn allowed him to be geographically close to Columbus, maintain his ties to the region, and continue to see family and friends in Columbus. Tr. 87:11–21, 88:9–18.

348.    When Mr. Berson began his program at Auburn, he lived in an off-campus apartment where he forwarded his correspondence so he would continue to receive mail without having to drive back to Georgia. Tr. 88:22, 89:24–90:1, 90:4–19.

349.    While he was a student at Auburn, Mr. Berson maintained a Georgia driver's license and registered his car in Georgia. Tr. 88:23–89:16.

350.    Mr. Berson also continued to hold his freelance position for a Columbus arts and entertainment magazine during his time at Auburn. Tr. 91:11–17.

351.    Mr. Berson regularly returned to Georgia to see family and friends — approximately two to three times a month and during breaks—while he was a student at Auburn. Tr. 91:18–92:6.

352.   The Court credits Mr. Berson's testimony that he "never intended to become an Alabama resident" or to move to Alabama permanently. Tr. 90:25–91:3. His assumption was always that he would go to Auburn for his degree, and then return to Columbus to "find work in the city that [he] really loved." Tr. 91:4–7.

353.   The Court credits Mr. Berson's testimony that his intent was always to maintain Muscogee County as his residence during this time, including when he voted in the runoff elections in December 2020. Tr. 128:18–23. As Mr. Berson explained, he "always" considered himself "a Georgian, a Columbusite." Tr. 90:23–24.

### d.   Gamaliel Turner

354.   The Court finds that Mr. Turner's permanent residence was in Columbus, Georgia (Muscogee County) at the time of the runoff election, where Defendants challenged or attempted to challenge his eligibility to vote on the basis that he had filed an NCOA request out-of-state.

355.   Mr. Turner was born and raised in Atlanta. Tr. 188:18–191:5.

356.   He first registered to vote on his 18th birthday in Fulton County, Georgia, and has remained a registered Georgia voter ever since. Tr. 198:11–23.

357.   After college, Mr. Turner joined the service in December 1976. Tr. 191:6–23.

358.   After spending almost 19 years in the military with assignments in Georgia and other parts of the world, Mr. Turner retired in 1996. Tr. 192:13–19.

359.   Upon retirement, Mr. Turner moved back to the Columbus, Georgia home he bought in 1980 when he had served at Fort Benning. Tr. 192:22–25.

360.   Mr. Turner testified that since 1996, Columbus, Georgia has been his home. Tr. 193:1–4.

361.   Mr. Turner relocated temporarily to Camarillo, California, where he serves as a Navy contractor at the Port Hueneme naval installation. Tr. 241:3; 248:8–23.

362.   Mr. Turner first moved to California in 2019 when he accepted a temporary, one-year contract with his employer to help set up a Navy Construction Group. Tr. 193:18–193:7.

363.   The initial contract was from October 2019 until August 2020, and he intended to return to Georgia after that temporary contract concluded. Tr. 194:8–13.

364.   Because of unexpected rotations of his California colleagues, Mr. Turner agreed to renew his contract for additional temporary periods to train new groups of contractors. Tr. 195:8–13, 195:14–16, 196:11–12.

365.   The Court credits Mr. Turner's testimony that while in California, he has maintained residency in Georgia—he has not sold his home or rented it out; he did not change his driver's license or vehicle registration; and he continues to pay

taxes, utilities, and other bills in Georgia. Tr. 194:17–195:7, 196:16–197:6. He has never registered to vote in California. Tr. 198:24–199:1.

366.   Despite having spent several more years in California than he initially intended, Mr. Turner has never considered California to be his home state. Tr. 197:12–14. In fact, Mr. Turner testified that "[q]uite the opposite," his "plans have always been to go back home." Tr. 197:15–19.

367.   Mr. Turner recently gave his letter of intent and resignation to his employer with a termination date of April 2024, upon which he will return to Georgia. Tr. 197:15–198:4.

### e.   Stephanie Stinetorf

368.   The Court finds that Ms. Stinetorf's permanent residence for voting was in Columbus, Georgia (Muscogee County) at the time of the runoff election, where Defendants challenged her eligibility to vote on the basis that she had filed an NCOA request forwarding her mail to Germany.

369.   Ms. Stinetorf first moved to Columbus, Georgia in May 2018 with her husband, who worked for the Army at Fort Benning, Georgia. Tr. 446:23–24; 447:1–2.

370.   When Ms. Stinetorf and her husband moved to Georgia, they were excited to make the state their home as she was pregnant with their first child. Tr. 447:7–9. They quickly established residency in Columbus by buying a house and a

car, obtaining driver's licenses, establishing utility accounts, paying taxes, and starting to meet people and making a life in the city. Tr. 447:9–17. After settling in, Ms. Stinetorf and her husband also registered to vote by July 2018. Tr. 447:21–24.

371.   In August 2020, Ms. Stinetorf and her family moved from Columbus, Georgia to Stuttgart, Germany when Ms. Stinetorf and her husband secured civilian jobs with the U.S. Department of Defense. Tr. 448:15–16.

372.   When Ms. Stinetorf and her family moved to Germany, she submitted a U.S. postal service change of address so she would still receive mail at her overseas address. Tr. 450:4–6.

373.   However, Ms. Stinetorf remained properly registered to vote in Muscogee County, Georgia, which was her last domicile in the United States before her assignment overseas. Tr. 449:17–22.

### f.    Jane Doe

374.   The Court finds that Ms. Doe's permanent residence was in Athens, Georgia (Clarke County) at the time of the runoff election, where Defendants challenged her eligibility to vote on the basis that she had filed an NCOA request out-of-state.

375.   Ms. Doe is a permanent resident of Athens, Georgia in Clarke County, and has lived in Georgia for more than 12 years. PX 78 ¶ 2. She owns a home, has a family, and has a permanent job in Georgia. *Id.*

376.   In 2020, Ms. Doe's spouse accepted a short-term career opportunity in another state. *Id.* ¶ 3. Therefore, throughout 2020, Ms. Doe traveled back and forth between Georgia and the other state to see her spouse. *Id.*

377.   To avoid missing mail while she was not home, Ms. Doe decided to forward her mail to her spouse's temporary location. *Id.* ¶ 4.

378.   At the time, however, Ms. Doe still owned a home in Georgia, still paid taxes in Georgia, and was still employed and working in Georgia. *Id.*

**C.   Defendants consciously disregarded evidence that their challenges were frivolous.**

   **1.   The Secretary of State's office warned True the Vote that its intended challenge program was frivolous.**

379.   Ms. Engelbrecht and other True the Vote representatives met with the Secretary of State's office in December 2020 to explain the voter challenge program that True the Vote intended to pursue. Tr. 496:8–23.

380.   Mr. Ryan Germany, the Secretary of State's General Counsel at the time, explained to Ms. Engelbrecht that "the challenge process in Georgia really is an individualized inquiry. And if you're going to file challenges, you really need to make sure that you're submitting evidence that's sufficient for each voter that you're challenging and not just basically a list of people without kind of individualized evidence." Tr. 496:24–497:7.

381.   Mr. Germany further warned Ms. Engelbrecht of his serious concerns with the viability of True the Vote's anticipated challenges. Tr. 498:19–24.

382.   As Mr. Germany explained, valid challenges under Georgia law must supply *individualized* information about each challenged voter in a way that is impossible to glean from reams of NCOA spreadsheets. Tr. 499:9–500:13.

383.   Mr. Germany also recalled relaying that, given the serious stress counties were under to prepare for the 2021 runoff elections, "if you just kind of plop a big thing on counties right now, it's not going to be received well by them." Tr. 498:25–499:8.

384.   When Mr. Germany explained these serious misgivings to Ms. Engelbrecht, she did not push back or dispute his understanding. Tr. 500:14–20. Instead, she ignored these warnings, and continued full throttle with True the Vote's mass challenge program. *See, e.g.*, PX 42.

385.   When asked directly by the Court whether Mr. Germany conveyed these warnings to her, Ms. Engelbrecht responded: "[H]onestly, I don't remember — I'm certainly not suggesting it wasn't said." Tr. 1786:8–11 (question from Court); Tr. 1787:20–22 (response).

386.   Based on Mr. Germany's demeanor on the stand, and because he has no personal interest in the outcome of this litigation nor any incentive to misreport

his recollection of the conversations at issue, the Court finds Mr. Germany credible and credits his testimony.

### 2. Defendants' own volunteer challenger told Defendants that the challenges were frivolous.

387.   Joseph Martin was first recruited by Defendant James Cooper as a member of the Georgia GOP to assist with True the Vote's challenges. PX 94 at 16:20–17:8.

388.   Mr. Cooper asked Mr. Martin if he could find a volunteer who was willing to challenge voters registered in Taliaferro County. PX 94 at 20:17–21:10.

389.   At the time, Mr. Martin was the chairman of the Taliaferro County GOP. *Id.* at 22:6–7.

390.   In response to Mr. Cooper's request, Mr. Martin volunteered to submit the challenges himself. *Id.* at 23:13–19.

391.   After Mr. Cooper later clarified with Mr. Martin that the challenges were on behalf of True the Vote, Mr. Martin began to question the validity of the challenge list. *Id.* at 31:1–8. In particular, Mr. Martin wondered how Mr. Cooper got this list of 37 Taliaferro County names to be challenged and whether the list accurately identified ineligible voters. *Id.* at 31:8–13; *see also id.* at 46:17–47:5.

392.   Mr. Martin thus requested a copy of the list of voters True the Vote wanted him to challenge, expressing to Mr. Cooper that allowing the organization to use his name to file challenges was contingent on seeing the list first. *Id.* at 41:6–16.

In fact, Mr. Martin was the only True the Vote challenger who requested to review his county's challenge list before it was filed. *Id.* at 74:11–76:4.[18]

393.   Mr. Martin subsequently received True the Vote's full list of 37 individuals it wished to challenge in Taliaferro County. *Id.* at 45:14–46:4.

394.   True the Vote ultimately submitted the challenge list in Taliaferro County under Mr. Martin's name but failed to copy him on the transmission or otherwise inform him that the list had been submitted. PX 94 at 62:17–63:3.

395.   Around that time, Mr. Martin also drafted a separate letter to challenge all 37 individuals on True the Vote's list, but he never signed it and never sent it to the county. PX 69; *see also* PX 93 at 90:18–91:14.

396.   Once he received the list from True the Vote, Mr. Martin sent it to a fellow member of the Georgia GOP, who informed him that some of the individuals on that list had already voted and been sent absentee ballots. PX 94 at 38:21–39:5, 49:20–50:2. Mr. Martin decided to cull the list down and challenge these individuals specifically. *Id.* at 54:1–15, 38:10–14 (Mr. Martin stating that he decided to take "a different path to challenge" a smaller subset of voters); PX 38; PX 39.

397.   Mr. Martin quickly realized there were problems with True the Vote's data once he filed his smaller subset of challenges. For instance, on December 17,

---

[18] Several individuals who volunteered to challenge voters for True the Vote requested and received lists of voter names after the challenges had been submitted. PX 96 at 75:1–18.

Mr. Martin challenged a voter who, according to True the Vote's list, lived in Patterson, New Jersey. PX 94 at 61:12–13, 61:17–18; *see also* PX 38. As a result of the challenge, the county superintendent of elections called the voter who said she did in fact live in Taliaferro County. *Id.* at 62:7–10. Based on this information, Mr. Martin personally retracted this challenge. *Id.* at 60:20–61:3, 62:12–13; *see also* PX 38; PX 81.

398.   Mr. Martin also challenged another voter who, according to True the Vote's challenge list, resided in Greene County. PX 94 at 64:4–7; *see also* PX 39. However, county election officials confirmed that the voter had a homestead exemption for a house in Taliaferro County. PX 94 at 64:7–11. Based on this information, Mr. Martin retracted the challenge to this voter as well. PX 94 at 65:6–7; *see also* PX 39; PX 81.

399.   Based on this experience, Mr. Martin was concerned about the legitimacy of challenges to the remaining list of voters he had received from True the Vote. PX 94 at 62:15–16, 69:2–8.

400.   After Mr. Martin withdrew his test case challenges, he summarized his experience in an email to Ms. Engelbrecht and Mr. Cooper: "Concerns with your information. . . . Impact of 3 challenges. Not good!" PX 43 at 1. He told them, as he had discovered to his embarrassment, that individuals on the challenge list included a 100-year-old woman who lived in Taliaferro County all along, and another elderly

voter in a nursing home who maintained a homestead exemption in Taliaferro County. *Id.* "Not sure where the out of state residence information came from," Martin wrote to Defendants, "but it appears incorrect." *Id.*

401.   Mr. Martin similarly sent an email to Amy Holsworth with True the Vote stating, "[m]y experience with the True the Vote data base has not been good," and expressed "[c]oncerns with the quality of your information," including that he believed there were "problem[s] with data accuracy and relevance." PX 80 at 1–2.

402.   But Defendants were not remorseful about these mistakes; nor did they seek to re-assess their data. Instead, they redoubled their efforts and attempted to find a new volunteer challenger to re-file the *same erroneous challenge list* in Taliaferro County. *Id.* at 1 (Mr. Cooper stating "Please hold Mr. Martin's challenge. I'll look for someone else in Taliaferro county.").

403.   And far from expressing concern about the errors, Mr. Cooper complained to Ms. Engelbrecht and Mr. Williams that "[t]he fact that these counties are telling some [volunteers] they have to make their case, is running folks off!" *Id.*; *see also* PX 96 at 111:18–112:16 (Mr. Cooper complaining that it became "extremely difficult" to recruit volunteers who were willing or able to defend True the Vote's methodology to county boards of elections).

### 3. True the Vote has a history of advancing baseless voter challenges and frivolous allegations of voter fraud.

404. In 2016, when Gregg Phillips was on True the Vote's board of directors, he publicized allegations of non-citizen voting in the 2016 election that received national attention. PX 102 at 41:6–10.

405. These exaggerated claims were clearly unfounded, as there is no publicly accessible database of individuals' citizenship status. Tr. 347:11–13.

406. True the Vote nonetheless chose Mr. Phillips to generate its challenge list even though his primary notoriety in this area was for propounding obviously baseless claims of ineligible voting. *See* PX 102 at 41:6–44:19 (Phillips refusing to answer questions on subject); ECF No. 242 (request for adverse inference).

407. As Ms. Engelbrecht admitted in this case, although True the Vote supported four lawsuits in Georgia, Pennsylvania, Wisconsin, and Michigan under the Validate the Vote project alleging fraud and attempting to overturn the presidential election results in those states, they never had any evidence of fraud when those suits were filed. PX 1; Tr. 902:2–903:12. Rather, their allegations that there had been a flood of illegal voting in the 2020 general election were purely "promotional." PX 99 at 271:6–13.

408. Mr. Johnson also had good reason to know that True the Vote's challenges were likely to be frivolous, as he claimed that he had filed challenges

prepared by True the Vote against 1,400 voters based on NCOA data *before* the 2020 general election that had already been rejected. PX 101 at 20:10–22:6.

## VII.   Defendants intend to file challenges in the future.

409.   The Georgia runoff election was not True the Vote's first foray into baseless voter challenges: the organization has been coordinating challenges across multiple states for a decade. PX 17 (summarizing True the Vote's prior unmeritorious challenges); PX 10 at 10–11 (True the Vote acknowledging Ms. Engelbrecht has previously "support[ed] citizen-led challenges in a number of states").

410.   In fact, True the Vote's very first project was to challenge voter registrations on the basis of residency in Houston, Texas. Tr. 1756:7–15.

411.   True the Vote has given every indication that it plans to continue this practice. Shortly after the Georgia challenges had been filed, Mr. Somerville became aware that True the Vote was working on a website that would put the voter file and NCOA data online and "equip citizens to go in there and investigate . . . just hand everything over to everybody and give them an easy platform to check on their neighbors, for example." PX 103 at 137:8–139:6.

412.   As of February 2022, Mr. Somerville's understanding was that the website had either not been created or had not yet been released. Mr. Somerville

believed the website was a "horrible idea," but that horrible ideas are fine, "as long as you don't act on them." *Id.* at 138:19–139:4.

413.   Since the runoff election, however, True the Vote has made substantial progress on this web-platform, called IV3, which allows visitors to look up the voter rolls in their county and to use data supplied by True the Vote to prepare challenges. Tr. 1035:10–1036:10. True the Vote designed the platform so that it could be used in the 45 states, including Georgia, that allow voter challenges of some kind. Tr. 1036:7–10.

414.   True the Vote is ready to launch IV3 and Ms. Engelbrecht testified that she would assist in submitting challenges again. Tr. 1895:7–12, 1912:23–25.

415.   When asked, Mr. Williams, who was True the Vote's challenger in Gwinnett County to 32,000 voters, also testified that he would challenge voters in the same manner again. Tr. 1357:12–16, 1744:14–16.

## PROPOSED CONCLUSIONS OF LAW

### I.   Plaintiffs have standing to obtain relief against Defendants.

416.   Only one plaintiff needs standing to sue Defendants for their acts. *See Town of Chester, N.Y. v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651 (2017); *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1195 (11th Cir. 2009). So long as this Court finds that one Plaintiff has standing, it need not proceed to evaluate standing for the remaining Plaintiffs. *See Ga. Ass'n of Latino Elected Offs., Inc. v.*

*Gwinnett Cnty. Bd. of Registration & Elections*, 36 F.4th 1100, 2022 WL 2061703, at *7 (11th Cir. June 8, 2022) ("We need not parse each Plaintiff's standing, however, because one—GALEO—has standing, under a diversion of resources theory, to assert all of the claims in the second amended complaint."). But here Plaintiffs Fair Fight, Jocelyn Heredia, Jane Doe, and Scott Berson each have standing to sue for the injuries Defendants have caused.

### A.    Legal Standard

417.    The well-established standard for standing requires a plaintiff to show three elements. First, the plaintiff must show an "injury in fact," constituting "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (formatting altered). Second, the plaintiff must show that the injury is "fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party who is not before the court." *Id.* Third, the plaintiff must show that it is "likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Id.* (quotation omitted).

418.    Plaintiffs bear the burden of establishing injury-in-fact, traceability, and redressability by a preponderance of the evidence. *See id.* at 561 ("[E]ach element must be supported … with the manner and degree of evidence required at the successive stages of the litigation."); *Langston By and Through Langston v. ACT*,

890 F.2d 380, 383–84 (11th Cir. 1989) (noting that the plaintiff bears the burden of "prov[ing] his case by a preponderance of the evidence" at trial). Thus, to establish standing, Plaintiffs need only "demonstrate that it is more likely than not that" they have suffered an injury-in-fact; that the injury is traceable to Defendants, and that a favorable decision likely will redress the injury. *Tellabs, Inc. v. Makor Issues & Rights Ltd.*, 551 U.S. 308, 328–29 (2007) (emphasis omitted).

### 1.   Injury-in-Fact

419.   To establish an injury in fact, a plaintiff must show that it "suffered an invasion of a legally protected interest that is concrete and particularized and actual or imminent, not conjectural or hypothetical." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (internal quotations omitted).

### a.   Organizational Diversion of Resources

420.   An organization has standing to sue when it incurs a diversion of resources in response to Defendants' unlawful actions, *see Fla. State Conf. of NAACP v. Browning*, 522 F.3d 1153, 1156 (11th Cir. 2008), which can include diversion of not only of money, but also of staff and volunteer time, *see Ft. Lauderdale Food Not Bombs v. City of Ft. Lauderdale*, 11 F.4th 1266, 1287 (11th Cir. 2021) (diversion of volunteer time sufficient); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335 (11th Cir. 2014) (diversion of personnel and time sufficient).

421.   To create a concrete injury, the diversion must cause a "perceptible impairment" of organizational activities. *Fair Fight Action, Inc. v. Raffensperger*, 634 F. Supp. 3d 1128, 1178 (N.D. Ga. 2022) (citing *Jacobson v. Fla. Sec'y of State*, 974 F.3d 1236, 1249 (11th Cir. 2020)). "And to show a concrete injury, the organization must identify the specific activities from which it diverted or is diverting resources." *Id.* at 1178 (citing *Jacobson*, 974 F.3d at 1250).

422.   Organizations need not quantify the precise dollars or volunteer time diverted to establish injury. *See, e.g., Browning*, 522 F.3d at 1165 (citing the principle that "the fact that the added cost has not been estimated and may be slight does not affect standing, which requires only a minimal showing of injury") (citation omitted); *OCA-Greater Hous. v. Texas*, 867 F.3d 604, 610–12 (5th Cir. 2017) (explaining that standing's injury requirement is "qualitative, not quantitative, in nature" and that injury need not be large); *Nnebe v. Daus*, 644 F.3d 147, 156–58 (2d Cir. 2011) (explaining that organization can establish standing by showing a perceptible impairment of its activities with "some perceptible opportunity cost"); *People for the Ethical Treatment of Animals, Inc. v. Mia. Seaquarium*, 189 F. Supp. 3d 1327, 1340 (S.D. Fla. 2016) (noting "[t]he showing of an actual, concrete injury is a modest requirement for Article III standing, which does not require quantification"), *aff'd,* 879 F.3d 1142 (11th Cir. 2018).

423.   Courts have applied this same diversion of resources standard in the Section 11(b) context. *See Nat'l Coal. on Black Civic Participation v. Wohl* ("*Wohl III*"), No. 20 CIV. 8668 (VM), 2023 WL 2403012, at \*18–19 (S.D.N.Y. Mar. 8, 2023) (holding multiple organizations diverted resources in responding to groups' voter intimidation activities and consequently had standing to sue over those activities); *Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, No. 22-CV-00581-PAB, 2022 WL 1266612, at \*4–6 (D. Colo. Apr. 28, 2022) (recognizing diversion of resources injury in Section 11(b) claim); *Council on Am.-Islamic Rels.-Minn. v. Atlas Aegis, LLC*, 497 F. Supp. 3d 371, 379 n.5 (D. Minn. 2020) (same).

### b.    Injury to Voters

424.   Individual voter plaintiffs satisfy the injury-in-fact requirement when subjected to circumstances that make it more difficult for them to exercise their right to vote—even if they are not ultimately disenfranchised. *See*, *e.g*., *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 (11th Cir. 2005) ("A plaintiff need not have the franchise wholly denied to suffer injury."); *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1351–52 (11th Cir. 2009) (holding imposition of an additional burden in the voting context, even if that burden can be overcome, is sufficient to show standing).

425.   Emotional distress can also suffice as injury-in-fact. *Walters v. Fast AC,*

*LLC*, 60 F.4th 642, 648 (11th Cir. 2023) ("Our precedent recognizes[] these harms

as a concrete injury in fact. We have held that such injuries include not only

'straightforward economic injuries,' like lost money, but also 'more nebulous' ones,

like wasted time, missed credit opportunities, and emotional distress.")

426.   Courts have applied these standards to find injury-in-fact for voters who

are the subject of voter intimidation activities. *See, e.g., Wohl III*, 2023 WL 2403012,

at *17–18 (in Section 11(b) case, holding that individuals who received robocalls

and experienced consequent emotional distress had suffered an Article III injury).

Such voters were injured even if they successfully voted in the election despite the

intimidation because the statute also proscribes attempts. *Id.* at *18.

## 2.   Causation and Traceability

427.   "To establish causation [for standing,] a plaintiff need only

demonstrate, as a matter of fact, a fairly traceable connection between the plaintiff's

injury and the complained-of conduct of the defendant." *Charles H. Wesley Educ.*

*Found., Inc.*, 408 F.3d at 1352 (emphasis in original) (internal quotations omitted).

The traceability requirement is not stringent and can be satisfied even with a showing

that the alleged injury is indirectly caused by the defendant. *See Cordoba v.*

*DIRECTV, LLC*, 942 F.3d 1259, 1271 (11th Cir. 2019); *see also Resnick v. AvMed,*

*Inc.*, 693 F.3d 1317, 1324 (11th Cir. 2012) (emphasizing same standard and that traceability does not require a showing of proximate cause).

428.   Where the injury alleged is diversion of resources, traceability is established by showing that the resources were diverted to "'counteract' the defendants' assertedly illegal practices." *Browning*, 522 F.3d at 1166 (quotation omitted).

### 3.    Redressability

429.   An injury is redressable when "a decision in a plaintiff's favor would significantly increase the likelihood that she would obtain relief." *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1301 (11th Cir. 2019) (en banc) (internal quotation marks and alterations omitted).

430.   "[A] plaintiff satisfies the redressability requirement when he shows that a favorable decision will relieve a discrete injury to himself. He need not show that a favorable decision will relieve his every injury." *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982).

431.   In the Section 11(b) context, courts have found that they can redress injuries by a court order enjoining the intimidating conduct in the future. *See Nat'l Coal. on Black Civic Participation v. Wohl* ("*Wohl I*"), 498 F. Supp. 3d 457, 471–72 (S.D.N.Y. 2020); *Colo. Mont. Wyo. State Area Conf. of NAACP*, 2022 WL 1266612, at *4–6.

**B.     Plaintiff Fair Fight, Inc. has organizational standing.**

432.   After carefully reviewing the evidence adduced at trial, the Court holds that Fair Fight has organizational standing to sue for the actual and attempted intimidation that Defendants perpetrated on Georgia voters, which caused Fair Fight to divert organizational resources away from its critical get-out-the-vote efforts in the two weeks before the runoff elections to instead respond to Defendants' mass challenges and other intimidating activities, a diversion which has occurred through the present day. Tr. 47:16–49:12, 62:13–63:21; 78:8–21.

433.   Specifically, the evidence at trial showed that Fair Fight expended resources by (1) sending Fair Fight staff and volunteers to attend Board of Election hearings to determine the status of the challenges and collecting challenge lists, (2) working with voters who had been challenged to arm them with resources needed to respond to the challenge and with county election boards to help them respond to the challenges, (3) monitoring True the Vote's activities to determine when and where their announced monitoring efforts would be deployed, and (4) allocating more funding to promoting the voter protection hotline so that voters who had been challenged or experienced intimidation at the polls would have a resource to call. *See* Tr. 52:23–54:4, 57:6–24, 58:3–24, 60:10–61:24.

434.   The Court finds that Fair Fight diverted these resources away from its traditional get-out-the-vote phonebanks and text banks, which encouraged voters to

vote, letting them know when, where, and how they could participate, Tr. 55:1–8, 55:18–56:10, 57:17–58:2, 60:10–61:19, away from its efforts to combat disinformation in the election, Tr. 56:11–20, 58:10–24, 60:4–9, and away from its regular election activities such as monitoring long lines at polling locations or helping voters understand how to request and return absentee ballots, Tr. 56:21–57:2, 58:10–24.

435.   This diversion of resources, which included money, staff time, and volunteer time, is sufficient to establish injury-in-fact. *See Browning*, 522 F.3d at 1156; *Ft. Lauderdale Food Not Bombs*, 11 F.4th at 1287; *see also Wohl III*, 2023 WL 2403012, at *18–19 (finding injury-in-fact in Section 11(b) case for organizations that diverted resources to respond to voter intimidation activities).

436.   Standing doctrine does not require Fair Fight to quantify the dollars spent or volunteer hours expended in the runoff election period in responding to Defendants' activities; it is sufficient that Fair Fight showed that the diversion impaired its activities. *See, e.g.*, *Browning*, 522 F.3d at 1165.

437.   The Court also finds that Fair Fight's injuries are fairly traceable to Defendants' actions. Fair Fight testified that it took action in response to True the Vote's press releases announcing its "landmark" efforts to challenge more than 360,000 Georgians, Tr. 50:24–51:15, 51:22–52:17, 53:23–54:4, and that many of the challenge lists that Fair Fight obtained did in fact originate from True the Vote, Tr.

78:4–14. The Court credits this testimony, particularly in light of True the Vote's admission that it filed challenges that would have been identifiable as originating from gaelectorchallenge@truethevote.org. PX 10 at 20 (TTV Interrogatory Responses admitting it submitted challenges under this email). This evidence is sufficient to demonstrate traceability, which is established by showing that the resources were diverted to "'counteract' the defendants' assertedly illegal practices." *Browning*, 522 F.3d at 1166.

438.   Furthermore, it is irrelevant to the traceability analysis whether counties did or did not accept True the Vote's challenges. The testimony at trial made clear that Fair Fight's diversion was incurred in response to (1) True the Vote's announcement of heightened monitoring and its fraud hotline, (2) True the Vote's announced intent to file challenges, and (3) True the Vote's actual filing of those challenges. Tr. 50:24–52:17, 53:23–54:4, 78:4–14.

439.   Because the Court has found that all Defendants—including Ms. Engelbrecht, Mr. Williams, Mr. Cooper, Mr. Johnson, Mr. Somerville, and Mr. Davis—assisted True the Vote in launching and amplifying its challenges, the Court finds that Fair Fight has satisfied the traceability requirement as to these Defendants as well. *See, e.g.*, *Cordoba*, 942 F.3d at 1271 (holding that traceability can be satisfied even with showing that injury is indirectly caused by defendant).

440. Finally, the Court finds that Fair Fight has also shown that its injuries would be redressed by a favorable ruling from this court declaring True the Vote's activities unlawful or enjoining them from filing similar challenges in the future. As Fair Fight's Executive Director testified, Fair Fight has continued to divert resources after the runoff election and into the present day to monitor True the Vote's activities, particularly in light of True the Vote's announced plan to release a web tool to allow individuals to more easily file mass challenges, including in Georgia, and to attend county Board of Election meetings to monitor for such challenges. Tr. 62:13–63:21. These resources continue to take away from Fair Fight's ability to carry out its traditional get-out-the-vote efforts. Tr. 64:10–65:12.

### C. Plaintiff Jocelyn Heredia has standing.

441. After carefully reviewing the evidence adduced at trial, the Court holds Plaintiff Jocelyn Heredia has standing to sue Defendants as a voter who was challenged as a result of both True the Vote's challenges and Mr. Somerville and Mr. Davis's challenges.

442. Ms. Heredia suffered an injury-in-fact for two separate reasons.

443. First, even though Ms. Heredia did cast a ballot in the Senate runoff election, the challenges made it more difficult for her to exercise her right to vote. Tr. 549:8–550:25 (testimony that challenge caused Ms. Heredia to spend three- to four-hours at her polling location, in which Ms. Heredia had to find further

qualifying identification, go to the back of the line, and ultimately vote a challenged ballot in front of a poll worker).

444. Because voter plaintiffs satisfy the injury-in-fact requirement when subjected to circumstances that make it more difficult for them to exercise their right to vote—even if they are not ultimately disenfranchised—the fact that Ms. Heredia was pulled out of line, had to provide qualifying information, and spend significant additional time at the polling location constitutes an injury-in-fact. *See*, *e.g.*, *Charles H. Wesley Educ. Found.*, 408 F.3d at 1352; *Common Cause/Ga.*, 554 F.3d at 1351–52.

445. Second, Ms. Heredia suffered an injury-in-fact as a result of the emotional distress caused when she learned she had been challenged. *See*. Tr. 551:4–6, Tr. 555:4–12 (describing fear and distress from learning she had been challenged). This, too, constitutes an injury-in-fact. *Walters*, 60 F.4th at 648 (recognizing emotional distress as concrete injury-in-fact).

446. The evidence shows that these injuries are also fairly traceable to Defendants. Specifically, Ms. Heredia was challenged by True the Vote through its volunteer challenger Jerry Boling, *see* PX 49 at 8 (Banks County identifying Mr. Boling as challenging Ms. Heredia); Tr. 330:16–22 (Dr. Mayer identifying Ms. Heredia on True the Vote's Banks County Challenge List); Tr. 1026:23–1027:1 (Ms. Engelbrect acknowledging that Jerry Boling worked with True the Vote to submit

challenges in Banks County), and by Somerville and Davis through their volunteer challenger Dan Gasaway, *see* PX 49 at 8 (Banks County identifying Mr. Gasaway as challenging Ms. Heredia, Tr. 1172:7–15 (Somerville admitting that Ms. Heredia was on their challenge list for Banks County and was challenged through his volunteer, Mr. Gasaway).

447.   The Court finds this proof is more than sufficient to demonstrate traceability as to all Defendants. Although the Defendants have suggested that the county itself is responsible for informing Ms. Heredia that she had been challenged, the traceability requirement does not require a showing of proximate cause, *see Resnick*, 693 F.3d at 1324, and it is obvious that Banks County would not have informed Ms. Heredia of the challenge had Defendants never filed one in the first place.[19]

448.   The Court also finds that Ms. Heredia's injuries would be redressed, at least in part, by a favorable ruling from this court. As Ms. Heredia testified, she intends to remain in Georgia for the foreseeable future and has filed and will continue to file NCOA requests, particularly in light of her recent purchase of a new home near her family. Tr. 556:12–557:18. Moreover, as Ms. Heredia testified, and

---

[19] Although Defendants implied that someone else could have also challenged Ms. Heredia, Defendants never provided any evidence to this effect. And the challenge list provided by Banks County itself identified only two challengers to Ms. Heredia, both of whom were acting at the direction of Defendants. *See* PX 49 at 8.

this Court credits, although Ms. Heredia used to be a regular voter, Ms. Heredia has

not voted since the runoff election because of what happened to her in that election

and for fear that she will be challenged again. Tr. 547:15–548:5, 555:13–556:4,

576:7–14. This testimony is more than sufficient to establish that Ms. Heredia's

injuries would be redressed, at least in part, by a favorable ruling from this Court

enjoining Defendants from challenging Georgia voters, including Ms. Heredia, in

the future. *See, e.g.*, *Wohl III*, 2023 WL 2403012, at *18 (in Section 11(b) case,

holding that voters who had received threatening robocalls would have their injuries

redressed by prevailing in the litigation "as they would no longer be subject to

Defendants' robocalls or similar calls infringing upon their right to vote in the

future").

**D.   Plaintiff Scott Berson has standing.**

449.   After carefully reviewing the evidence adduced at trial, the Court also

finds that Plaintiff Scott Berson has standing to sue Defendants as a voter who was

challenged as a result of True the Vote's challenges and as a voter whom Mr.

Somerville and Davis attempted to challenge because Section 11(b) proscribes

attempts.

450.   Like Ms. Heredia, Mr. Berson suffered an injury in fact because the

challenge made it more difficult for Mr. Berson to exercise his right to vote, *see* Tr.

98:11–101:13, 128:1–10 (Mr. Berson describing getting pulled out of line, needing

to cast a provisional ballot, and being forced to find and provide additional proof of residency to ensure his ballot would count, a process that took several hours), and because the challenge caused him emotional distress, *see* Tr. 97:18–25 (Mr. Berson testifying that he felt "overwhelmed" when he learned he was challenged; "it was intimidating to me to be told that somebody had accused me of doing something wrong").

451.   The evidence also shows that these injuries are fairly traceable to Defendants. Specifically, Mr. Berson was challenged by True the Vote through its volunteer challenger Alton Russell. Tr. 111:12–15, 130:16–18, 1376:21–1377:5 (Alton Russell identified as a challenger on TTV's list). Mr. Somerville and Mr. Davis also attempted to challenge Mr. Berson and only failed to do so because they could not find a volunteer challenger for his county. PX 89 at 40 (Somerville and Davis challenge list for Muscogee identifying Mr. Berson as voter to challenge); 1176:10–1178:21 (Mr. Somerville agreeing Mr. Berson was a voter who "made it through our proverbial funnel"); Tr. 1178:10–21 (Mr. Somerville stating that although he did not receive a volunteer for Muscogee County, he would have provided this list for challenging had he received one).

452.   Finally, although it is a closer call than it is for Fair Fight, Ms. Heredia, or Ms. Doe, the Court also finds that Mr. Berson's injuries would be redressed, at least in part, by a favorable ruling from this Court. Although Mr. Berson is presently

located in Pennsylvania, having moved there after the runoff election, Tr. 84:16–20, Mr. Berson spent most of his life in Georgia, still has family in Georgia, still conducts freelance work for a Columbus, Georgia newspaper, and is likely to move back to Georgia when the opportunity presents itself. Tr. 84:23–85:1, 91:11–17. In other words, Mr. Berson would be likely to benefit from an order from this Court enjoining Defendants from challenging Georgia voters, including Mr. Berson, in the future.

### E. Plaintiff Jane Doe has standing.

453. After carefully reviewing the exhibits submitted by the Parties, the Court also finds that Plaintiff Jane Doe has standing to sue Defendants as a voter who was challenged as a result of True the Vote's challenges.

454. Like Ms. Heredia and Mr. Berson, Ms. Doe suffered an injury in fact because the challenge made it more difficult for Ms. Doe to exercise her right to vote, *see* PX 78 ¶ 8 (although Ms. Doe had planned to vote absentee, the challenge made her nervous that her ballot would be counted and therefore made the effort to vote in person so she could physically see her ballot accepted), and because the challenge caused her emotional distress, *see id.* ¶¶ 9, 12 (Ms. Doe explaining that the challenge made her fearful that she or her family would become a target of harassment).

455.   The evidence also shows that these injuries are fairly traceable to Defendants. Specifically, Ms. Doe was challenged by True the Vote through its volunteer challenger Gordon Rhoden. *See id.* ¶ 5 (Ms. Doe identifying Gordon Rhoden as her challenger); *id.* Ex. 1 (noting the Chairman of the Athens Republican Party, Gordon Rhoden, had filed a challenge to Clarke County voters based on NCOA data on December 16, 2020 through an organization called True the Vote); PX 73 at 17 (True the Vote challenger recruitment email showing Gordon Rhoden of Clarke County, from the email chairman@athensgop.com, giving True the Vote permission to file a challenge on his behalf on December 16, 2020).

456.   The Court also finds that Mr. Doe's injuries would be redressed, at least in part, by a favorable ruling from this Court. Ms. Doe has affirmed that she remains a Georgia voter and that she fears that she will be challenged again in future elections. PX 78 ¶¶ 10–12. Ms. Doe's injuries would be redressed, at least in part, by a favorable ruling from this Court enjoining Defendants from challenging Georgia voters, including Ms. Doe, in the future.

## II.    Defendants violated Section 11(b).

457.   As the Court has previously articulated, to succeed on a Section 11(b) claim, Plaintiffs must show action directed toward voters that caused or could have caused voters to feel reasonably intimidated. Mot. Summ. J. Order at 12–13.

## A.    Legal Standard

458.   Section 11(b) provides, in relevant part that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote . . . ." 52 U.S.C. § 10307(b).

459.   The ordinary meaning of Section 11(b), as well as the evolution of federal voter intimidation statutes and the legislative history of the Voting Rights Act, demonstrates that Section 11(b) was intentionally drafted to operate as a broader, more effective tool than precursor statutes to prevent more subtle forms of nonviolent voter intimidation without requiring any proof of intent or racial motivation. Such broad remedial scope also aligns with judicial interpretations of analogous civil rights statutes.

460.   This is consistent with standards previously articulated by this Court and others regarding the scope of Section 11(b)—"intimidation includes messages that a reasonable recipient, familiar with the context of the message, would interpret as a threat of injury—whether physical or nonviolent—intended to deter individuals from exercising their voting rights*." Nat'l Coal. on Black Civic Participation v. Wohl* ("*Wohl II"*), 512 F. Supp. 3d 500, 509 (S.D.N.Y. 2021); *see also* Mot. Summ. J. Order at 14.

461.   Actions that are illegal under Section 11(b) "may take on many forms": "actions or communications that inspire fear of economic harm, legal repercussions, privacy violations, and even surveillance can constitute unlawful threats or intimidation under the statute." *Wohl II*, 512 F. Supp. 3d at 509 (citing *United States v. Beaty*, 288 F.2d 653, 656 (6th Cir. 1961)); *see also* Mot. Summ. J. Order at 14.

462.   The plain text of Section 11(b) does not require an intent to intimidate, threaten, or coerce, as the language of the provision specifically does not include the words "intent" or "purpose." *See* 52 U.S.C. § 10307(b); *see also supra* ¶ 461; Mot. Summ. J. Order at 15 n.8.

463.   The history of Section 11(b) further supports this conclusion.

464.   In 1957, Congress enacted the Civil Rights Act ("CRA") which provides that "[n]o person . . . shall intimidate, threaten, coerce, or attempt to intimidate, threaten, or coerce any other person *for the purpose* of interfering with the right of such other person to vote or to vote as he may choose, or of causing such other person to vote for, or not to vote for, any candidate[.]" 52 U.S.C. § 10101(b) (emphasis added) ("Section 131(b)").

465.   After the CRA's enactment, the Department of Justice ("DOJ") began to rely on Section 131(b) to address a range of voter intimidation activities across the country, but over time, DOJ found that there were serious weaknesses in Section 131(b)'s effectiveness against voter intimidation. In recommending ways to

strengthen federal voter intimidation laws, Attorney General Katzenbach said that "[w]hat is necessary, what is essential, is a new approach" to defeat forms of intimidation that go beyond "beatings [and] arrests" to include more subtle forms of intimidation such as "lost jobs, lost credit, and *other forms of pressure*[.]" *Hr'gs on H.R. 6400 Before the H. Subcomm. No. 5 on the Judiciary*, 89th Cong. 9 (1965) (statements of Att'y Gen. Katzenbach) (emphasis added).

466.   In light of these shortcomings of Section 131(b), Congress enacted Section 11(b) of the Voting Rights Act, a provision that again incorporated the identical phrase "intimidate, threaten, or coerce" but was explicitly intended to operate as a broader, more robust and effective tool at countering voter intimidation. *See id.* at 11 (Att'y Gen. Katzenbach explaining that Section 11(b) "represent[s] a deliberate and . . . constructive departure from the language and construction of [Section 131(b)]"); *see also Whatley v. City of Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968) (concluding Congress "broadened the law in 1965 by adopting [Section 11(b)]"); *League of United Latin Am. Citizens - Richmond Region Council 4614 v. Pub. Int. Legal Found.*, No. 1:18-CV-00423, 2018 WL 3848404, at *4 (E.D. Va. Aug. 13, 2018) ("*LULAC*") (describing Section 11(b) of the VRA's "deliberately unqualified reach" in comparison to its predecessor counterpart in the CRA).

467.   The "most serious inadequacy" that Section 11(b) sought to remedy was that pursuant to the plain language of Section 131(b), "some district courts . . .

require[d] the Government to carry a very onerous burden of proof of 'purpose'" to intimidate, threaten, or coerce voters. *See Hr'gs on H.R. 6400 Before the H. Subcomm. No. 5 on the Judiciary*, 89th Cong. 11 (1965) (Statement by Att'y Gen. Katzenbach).

468.   But as Attorney General Katzenbach explained during hearings for the VRA, "many types of intimidation . . . involve subtle forms of pressure," and thus the need to demonstrate that an action was taken for the *purpose* of intimidating, threatening, or coercing voters rendered the CRA provisions largely ineffective. *Id.*

469.   To ensure that litigation could be successful, Attorney General Katzenbach—who was one of the principal drafters of the VRA, *id.* at 163, and the chief executive branch official charged with enforcing the VRA upon its enactment—explained before Congress that, "under [the VRA] no subjective 'purpose' need be shown, in either civil or criminal proceedings, in order to prove intimidation . . . . Rather, *defendants would be deemed to intend the natural consequences of their acts*." *Id.* at 11 (emphasis added).

470.   Attorney General Katzenbach's "contemporaneous administrative construction of the [VRA] is persuasive evidence of the [statute's] original understanding, especially in light of the extensive role the Attorney General played in drafting the statute and explaining its operation to Congress." *United States v. Bd. of Comm'rs of Sheffield*, 435 U.S. 110, 131 (1978).

471.    Congress echoed Attorney General Katzenbach's goals in passing the VRA. The House Report explained that, "unlike [the CRA] (which requires proof of a 'purpose' to interfere with the right to vote) no subjective purpose or intent need be shown" under Section 11(b). *See* H. Rep. No. 89-439 at 30, 89th Cong., 1st Sess. 32 (1965).

472.    Courts that have assessed this legislative history, including this Court, have recognized that Congress intended to broaden Section 11(b) beyond the confines of the original CRA by eliminating any requirement that plaintiffs prove the "purpose" or "intent" of the defendant. *See* Mot. Summ. J. Order at 14–15 n.8 (concluding Section 11(b) does not have an intent requirement); *see also Whatley*, 399 F.2d at 526; *Willingham v. Cnty. of Albany*, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006) ("[U]nlike [Section 131(b)] (which requires proof of a 'purpose' to interfere with the right to vote), no subjective purpose or intent need be shown" under Section 11(b)) (quoting H.R. Rep. No. 89-439, at 30 (1965)).

473.    Relatedly, the Court finds that Section 11(b) does not require Plaintiffs to show that the intimidating, threatening, or coercive actions were racially motivated. In enacting Section 11(b), Congress relied on sources of power that did not "require[] a nexus with race." *See* H. Rep. No. 89-439 at 30 (1965); *see also Willingham*, 593 F. Supp. 2d at 462 ("While the purpose of the VRA was to eliminate racial discrimination in voting, Section 11(b) of the act does not explicitly require

proof that racial discrimination motivated the intimidation, threats, or coercion. Thus, a plain reading of Section 11(b) refutes the contention . . . that proof of racial discrimination as a motive must be shown to establish a claim under this provision.").

474.   Thus, this Court concludes that Plaintiffs need not demonstrate that Defendants specifically intended to intimidate, coerce, or threaten Georgians from voting—or did so with any racial intent—to find Defendants liable under Section 11(b); *see also LULAC*, 2018 WL 3848404, at *4 (concluding that Section 11(b) "does not [require] a showing of specific intent or racial animus").

**B.    Application of Section 11(b) to Defendants' actions.**

   **1.   Defendants are liable for intimidating, threatening, or coercing voters.**

475.   The Court finds that to succeed on their Section 11(b) claim, Plaintiffs must show that (1) Defendants' actions directly or through means of a third-party in which they directed, (2) caused, or could have caused, (3) any person to be reasonably be intimidated, threatened, or coerced from voting or attempting to vote. *See* Mot. Summ. J. Order at 16–17.

476.   To assess these required showings, the Court will use a totality of relevant circumstances inquiry. *See id.* at 17.

a.   **Defendants directed their actions at voters directly or through means of a third party.**

477.   The Court concludes that Defendants both directed their actions at voters and directed the actions of third parties at voters in an intimidating fashion. *Id.* at 19.

478.   As this Court has previously clarified, Section 11(b) does not require Defendants to make direct contact with voters. "Certainly, a person cannot escape liability by doing indirectly through another what he or she would be liable for directly doing themselves." *Id.* at 20. Therefore, it is sufficient for Plaintiffs to show that the named Defendants engaged a third-party to make direct contact with voters. *See, e.g., Wohl I*, 498 F. Supp. 3d at 485 (concluding that robocalls to voters by means of a third-party agent still constituted a violation of Section 11(b)).

479.   Plaintiffs satisfy this requirement. First, Defendants worked together to recruit volunteers and file challenges with county boards of elections with the knowledge and expectation that once election officials received these challenges, they would reach out to voters, inform them they had been challenged, and require that those individuals take additional steps to reprove their residency in Georgia. *See supra* ¶¶ 39, 117–120, 304; *see also supra* ¶¶ 183–185, 198–199.

480.   The fact that challenged voters did not speak or interact directly with Defendants or their volunteers is irrelevant—Defendants directed the action of election officials to adjudicate these challenges by communicating with voters. That

127

is sufficient to find a violation of Section 11(b). *See* Mot. Summ. J. Order at 21 ("The Court further, at this stage, accepts that Defendants' mass voter challenges as described by Plaintiffs could constitute direct contact with voters. Thus, to the extent that Plaintiffs have submitted evidence that voters felt or could have felt intimidated by being, or possibly being, challenged by Defendants via their county challengers, this element would be satisfied.").

481.   Defendants' efforts to require voters to prove their residency did not stop with just having the voter provide documentation—Defendants also pressured counties to hold hearings to resolve these challenges and had internal discussions about avenues of recourse, including filing lawsuits, if counties disposed of their challenges. *See supra* ¶¶ 46, 48, 75, 77, 82, 84. Defendants also offered legal support to any counties that may have been sued for accepting the challenges. *See supra* ¶ 47.

482.   The Court concludes these actions were all taken in furtherance of directing challenge efforts at voters to compel action against the voter before they could cast a ballot or have their ballot counted in the runoff election.

483.   Second, in addition to their challenge efforts, True the Vote's other activities also constitute actions directed at voters. True the Vote's numerous press releases covering various topics including the group's Validate the Vote program, collaborative mass voter challenges aimed at all 159 counties in the state, voter hotline, and whistleblower fund (also described as a "bounty") are communications

directed to reach the public, which includes voters in Georgia. *See supra* ¶¶ 78, 132, 136, 146, 154, 158, 234, 235.

484.   Similarly, Ms. Engelbrecht's statements in podcasts to recruit veterans and first responders to monitor precincts and livecasts to advertise True the Vote's various "ballot security" efforts were made in forums directed to reach the broader public. *See supra* ¶¶ 133, 147.

485.   The details of how broadly these broadcasts reached are immaterial—to the extent True the Vote and Ms. Engelbrecht directed these statements publicly and targeted their message at the voting public in Georgia, the Court concludes that they directed their actions at voters.

486.   Finally, as the Court has previously noted, Section 11(b) does not require acts of intimidation to be violent. *See* Mot. Summ. J. Order at 20; *Wohl I*, 498 F. Supp. 3d at 484 ("There is no requirement—in the statutory text or the case law—that intimidation be violent or physical."). Thus, whether voters were directly threatened, yelled at, or otherwise harassed by anyone is immaterial; Defendants' non-violent conduct—and voters' reasonable reactions of intimidation or coercion, *see supra* ¶¶ 181–229—support liability under Section 11(b).

**b.**   **Defendants' actions caused or could have caused voters to be reasonably intimidated, threatened, or coerced from voting or attempting to vote.**

487.   The Court concludes that Defendants caused the intimidation, threats, or coercion that Plaintiffs and other voters felt from the voter challenges in the runoff election.

488.   The Court has previously recognized that there "must be some connection between Defendants' conduct and the intimidation felt by or could be reasonably felt by a voter," though this requirement "need not be onerous." Mot. Summ. J. Order at 25.

489.   This standard derives from other cases where "courts have concluded that conduct *putting others* in fear of harassment and interference with their right to vote constitutes intimidation 'sufficient' to support a Section 11(b) claim." *Id.* at 24 (citing *Wohl I*, 498 F. Supp. 3d at 480) (citations omitted).

490.   Here, the Court concludes that Plaintiffs have satisfied this causation requirement. As the Court found above, True the Vote's Banks County challenger was Jerry Boling. *See supra* ¶¶ 43, 446. Similarly, Mr. Somerville and Mr. Davis also filed a challenge in Banks County through their volunteer challenger Dan Gasaway. *See supra* ¶¶ 101, 446. Both Mr. Boling and Mr. Gasaway's names appear as the sources of the voter challenge to Ms. Heredia's voting eligibility in the 2021 Senate runoff elections. *See supra* ¶¶ 446. Thus, the Court concludes that

Defendants' actions are the cause of the intimidation Ms. Heredia experienced and testified about at trial. *See supra* ¶¶ 181–187.

491.   True the Vote's challenge in Clarke County, filed by Gordon Rhoden, also was the cause of the intimidation Ms. Doe experienced after she was challenged. *See supra* ¶¶ 45, 455.

492.   Finally, one of True the Vote's other recruited challengers for Muscogee County, Alton Russell, challenged Mr. Berson and fellow Georgia voters Mr. Turner and Ms. Stinetorf. *See supra* ¶¶ 44, 166, 192, 193, 451. The Court concludes that their negative experiences with voting in the 2021 runoff elections are attributable to the actions of True the Vote as well.

493.   Importantly, True the Vote and Ms. Engelbrecht could not file *any* of these challenges without the assistance of Mr. Williams, Mr. Cooper, and Mr. Johnson, who recruited registered voters in these counties to serve as challengers. *See supra* ¶¶ 52–65. And as the Court has already found, True the Vote worked in collaboration with Mr. Somerville and Mr. Davis to orient themselves to Georgia and were in communication with them throughout these challenge efforts. *See supra* ¶¶ 67–86.

494.   Thus, the Court concludes the intimidation experienced by Plaintiffs and voters in this case were caused by each of the Defendants.

### c. Defendants' actions were reasonably likely to cause voters to feel intimidated, threatened, or coerced from voting.

495.   The Court has identified several factors, including the contextual atmosphere of the mass challenges, the proximity of the challenges to the election, the publication of challenged voters' names, and Defendants' motivation in making the challenges may bear on the reasonableness of voters' experience of intimidation. Mot. Summ. J. Order at 32. These factors, as well as the inherent nature of mass NCOA-based challenges, all weigh in favor of a liability finding.

### i. Nature of challenges

496.   When a voter's eligibility has been challenged and the county board of registrars finds probable cause to sustain the challenge, that voter must affirmatively re-prove their eligibility, *even if they have already voted*. *See* O.C.G.A. § 21-2-230(e). This is substantially more onerous than the regular process of voter list maintenance, in which voters who are matched to the NCOA file by state election authorities and who do not respond to a mailing asking them to confirm their registration status are moved to inactive status, but are automatically restored to active status the next time they vote. *See id.* §§ 21-2-233, 21-2-235(d); *see also* PX 15 at 41 (Dr. Mayer explaining process).

497.   Responding to a voter challenge by proving legal residency is also substantially more onerous than the regular voting process. In 2020, Georgia voters

were not required at all to provide identification to vote by absentee ballot, and acceptable forms of identification for in-person voters were not limited to documents that listed their Georgia address. *See* O.C.G.A. § 21-2-417 (authorizing form of ID including identification cards from "any other state," a U.S. passport, government-issued military or employee ID cards, and others).

498.   The risks with using NCOA data alone to determine an individual's residence for purposes of voting eligibility are so severe that federal law *prohibits* states from making residency determinations solely on that basis. Where a registrant has not confirmed their change of address in writing, the NVRA provides that a state "shall not" remove the individual from the voter rolls for non-residency *unless* the registrant fails to return an official postage prepaid and preaddressed return card *and* does not vote in the jurisdiction in two consecutive federal election cycles. 52 U.S.C. § 20507(d)(1).

499.   While states may use postal service records to *initiate* an inquiry into an individual's residency status, the serious risk that NCOA data will fail to reflect an individual's intended permanent residence necessitates the several additional safeguards (including a multi-year waiting period) before any conclusion can be drawn about the individual's intentions. *Id*.

500.   Postal service data alone cannot capture an individual's long-term intentions and sheds no light on their individual circumstances. *See supra* ¶¶ 310–

325. Thus, mass challenges based on NCOA data alone are virtually *guaranteed* to ensnare lawful voters like those who testified here.

501.   Another court foresaw precisely the crisis that Defendants perpetrated here:

> One can imagine the mischief an immature political operative could inject into an election cycle were he to use [state challenge] statutes, not for their intended purpose of protecting the integrity of the people's democracy, but rather to execute a tawdry partisan ploy. **Voters might be intimidated, confused, or even discouraged from voting upon receiving notice that their right to vote—the most precious right in a government of, by, and for the people—has been challenged.**

*Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1081 (D. Mont. 2008), *as amended* (Oct. 10, 2008) (emphasis added).

502.   Given the unmistakable context of elector challenges as historical weapons of intimidation, *see supra* ¶¶ 106–115; the severe limitations of NCOA-based challenges, which will inherently sweep up eligible voters, *see supra* ¶¶ 310–378; and the fact that these eligible voters must bear significant—but entirely unnecessary—burdens to cast their ballot and have it counts, *see supra* ¶¶ 116–117, the Court concludes that the nature of the challenges at issue here weigh in favor of a determination that Defendants violated Section 11(b).

## ii.    Atmosphere

503.   The Court concludes that the atmosphere in Georgia in the lead-up to the Senate runoff elections also contributed to voters' reasonable feelings of intimidation. *See* Mot. Summ. J. Order at 32.

504.   Georgia's 2021 Senate runoff election was one of the most closely watched elections in recent history and the voting period was permeated with wild accusations of voter fraud. *See supra* ¶¶ 121–124.

505.   Voters were not blind to this toxic atmosphere. Even though she was away from Georgia during and after the general election, Ms. Doe "saw the consequences of claims of voter fraud in that election" and "watched as our election workers, in particular, were harassed, threatened, and doxxed." *See supra* ¶ 225.

506.   And Mr. Berson described the atmosphere around this time as "extremely fraught," with "this kind of air of desperation about it," which was scary to him because "when people are desperate . . . it makes things unpredictable," and "a lot of the norms that we're used to, things that we would expect . . . become less sure." *See supra* ¶ 191.

507.   The Court concludes that Defendants True the Vote and Ms. Engelbrecht contributed to this firestorm. In the aftermath of the 2020 presidential election, True the Vote repeatedly insisted without evidence that rampant voter fraud was corrupting the electoral process, and subsequently announced plans to have

"Eyes on Georgia" to prevent a repeat of the "uncertainties that arose from the November general election." *See supra* ¶¶ 121–152. On the heels of the presidential election, True the Vote also created the "Validate the Vote" program which then became the "Validate the Vote Georgia" program. *Id.*

508.   As the runoff elections loomed, True the Vote continued to publicly promote a series of efforts aimed at alleged voter fraud, including advertising a 24/7 hotline for voters to report suspected election fraud and publicizing a million-dollar whistleblower fund "to incentivize" reporting of fraud. *See supra* ¶ 132.

509.   True the Vote also touted its "ballot security" efforts, including its plan to monitor absentee ballot drop boxes in partnership with the Georgia GOP, and publicly discussed their plan to recruit veterans and law enforcement to monitor precincts on a vigilante basis. *See supra* ¶¶ 145–148.

510.   Courts have long recognized that different types of "ballot security" measures are likely to intimidate voters, particularly voters of color who have all too often been the target of these schemes. As one court concluded, a Republican National Committee "ballot security" program that involved "posting off-duty sheriffs and policemen . . . at polling places in minority precincts"—which for decades had been prohibited under a consent decree—would functionally disenfranchise even those voters whose eligibility was not questioned. *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 579, 612 (D.N.J.

2009). "Some voters—especially in minority districts where the legacy of racism and history of clashes between the population and authorities has given rise to a suspicion of police and other officials—may choose to refrain from voting rather than wait for the qualifications of those ahead of them to be verified, especially if the verification process becomes confrontational." *Id.*

511. Defendants' actions were being conducted in communities that have historically suffered the effects of disenfranchisement efforts. *See supra* ¶¶ 106–115.

512. Along those same lines, courts have also found that stationing private armed guards at polling places can be "certainly likely to intimidate voters." *Council on Am.-Islamic Rels.-Minn.*, 497 F. Supp. 3d at 379; *see also United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (finding local sheriff using his law enforcement power "highly intimidatory and coercive" to Black voters); Mot. Summ. J. Order at 57.

513. The Court concludes that in this toxic environment—in which Defendants fanned the flames and took a multi-pronged approach to drum up anxiety and fear about election issues—voters would be reasonably intimidated upon discovering they had been accused of unlawfully voting in the runoff election and from contemplating the potential consequences that could come from such an accusation, whether meritorious or not. The Court finds any claim that Defendants would be surprised by such a response from voters to be implausible.

### iii.    Proximity

514.  The Court concludes that the proximity of Defendants' mass voter challenges to the Senate runoff election weighs in favor of finding that Defendants' mass voter challenges would and did intimidate voters. *See* Mot. Summ. J. Order at 33–34.

515.  As the Court has previously articulated, there is a federal interest in prohibiting major changes to the voter rolls close to an election. *Id.* at 33–34. This federal interest is explicitly reflected in the NVRA, which generally prohibits states from systematic, mass removals of voters' names from voter registration lists less than 90 days before an election. *See* 52 U.S.C. § 20507(c)(2)(A). Thus, the only removals that can occur in this 90-day period are "(1) at the request of the registrant; (2) as provided by State law, by reason of criminal conviction or mental incapacity; and (3) upon death of the registrant." *Arcia*, 772 F.3d at 1345; 52 U.S.C. § 20507(a)(3). So while "individualized removals are safe to conduct at any time," Congress has required more caution with "programs that systematically remove voters" by prohibiting them close to election day. *Arcia*, 772 F.3d at 1346.

516.  As noted above, Defendants' challenge efforts kicked off right after early voting for the senate runoff began, which was just weeks—and certainly less than 90 days—before the runoff election day. *See supra* ¶¶ 41, 177-180.

517.    The Court also finds that Defendants' mass challenges were not based on individualized information or investigations into the residency of each voter. *See supra* ¶¶ 288-309. Instead, Defendants utilized "mass computerized data-matching process[es] to compare the voter rolls" with the NCOA database, which are prohibited within 90 days of election day. *Arcia*, 772 F.3d at 1344; *see also id.* (concluding that Congress's use of the phrase "any program" in the NVRA "strongly suggests that Congress intended the 90 Day Provision to encompass programs of any kind").

518.    Thus, Defendants' mass challenges conflict with the clear federal interest advanced by prohibiting such systematic purges of the voter rolls within 90 days of an election, and the close proximity of Defendants' mass voter challenges could reasonably have resulted in voter intimidation. Mot. Summ. J. Order at 35.

### iv.    Publication

519.    The Court recognizes that publication of the voter challenges, including the challenged voters' names, can result in intimidation. Mot. Summ. J. Order at 58–59. That is exactly what happened to Plaintiffs Jane Doe and Jocelyn Heredia—their names were disclosed online because they had been challenged by True the Vote as being ineligible to vote. *See supra* ¶¶ 185–186, 222–223. The Court concludes this factor supports a determination that voters are reasonably intimidated by the real risk that their names and information will be publicized.

520.    The Court has also previously articulated that Defendants' efforts or knowledge that filing these voter challenges could indirectly lead to the publication of challenged voter names is a factor to consider in support of finding that voters could be reasonably intimidated as a result of Defendants' actions. Mot. Summ. J. Order at 62 n.28.

521.    Both Mr. Somerville and Mr. Davis recognized that voter challenges would become public records after being submitted. For instance, Mr. Somerville admitted that "any challenge that was filed, obviously that data has to be made public," and Mr. Davis testified at trial without hesitation that once a challenge list is submitted to a county, he believed it would be subject to open records requests in that county. *See supra* ¶ 162.

522.    Thus, the Court concludes that Mr. Somerville and Mr. Davis were well aware of the possibility that their voter challenges could and would lead to the publication of challenged voter names—yet they chose to proceed with their tens of thousands of voter challenges anyway.

523.    Mr. Somerville and Mr. Davis also decided to place their challenge lists online in a broadly accessible and downloadable forum, Google Drive. *See supra* ¶ 90. Anyone who had a link—which added up to "a lot of people"—would have access to challenge lists for all 159 counties, which is over 39,000 voter names. *See supra* ¶ 160. Notably, it does not appear that either Mr. Somerville or Mr. Davis

bothered to keep track of how many people had access to these files. *See supra* ¶¶ 160–161.

524.    Similarly, in addition to Mr. Martin, who received True the Vote's list of challenged voters before they were filed, several other individuals received lists of challenged voter names after the challenges had been submitted. *See supra* ¶ 393 n.18. These disclosures of the lists of challenged voters to volunteer challengers are further evidence of Defendants' publication of voters' information, and thus, of their culpability for intimidation. *Cf. Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1153 (11th Cir. 2011) (concluding that "[a] claim for libel arises when the defamatory statement is published . . . namely 'as soon as it is communicated to any person other than the party libeled.'") (citing O.C.G.A. § 51–5–3).

525.    Additionally, Defendants are liable under Section 11(b) for threatening to disseminate personal information. *See Wohl II*, 512 F. Supp. 3d at 511. For instance, courts have previously concluded that defendants' actions linking plaintiffs' names and personal information to a report condemning felonious voter registration in an effort to subject the named individuals to "public opprobrium" would be sufficient to support a finding of voter intimidation under Section 11(b). *LULAC*, 2018 WL 3848404, at *4. And in a comparable voter intimidation lawsuit under state law, the Ninth Circuit has concluded that a "letter targeted [at] immigrant voters with threats that their personal information would be provided to anti-

immigration groups if they exercised their right to vote, and was mailed by a campaign with a vested interest in inducing these voters . . . not to vote in the upcoming election . . . created a fair probability that the distribution of the letter constituted an act of voter intimidation." *United States v. Tan Duc Nguyen*, 673 F.3d 1259, 1265 (9th Cir. 2012).

526.   Here, the Court concludes that Defendants were directly responsible for public threats to publish the names and information of voters identified on True the Vote's challenge list. As the Court has already found above, there are several undeniable features connecting the threat made by the Crusade for Freedom account to release all challenged individuals' names with Ms. Engelbrecht and True the Vote. *See supra* ¶¶ 169-176.

527.   Pursuant to these public posts, the Court concludes that a voter would be reasonably intimidated by True the Vote and Ms. Engelbrecht's threats to disseminate the names and information of voters who allegedly engaged in wrongdoing to intimidate those voters from voting.

### v.    Motivation

528.   As the Court has previously recognized, while Plaintiffs are under no obligation to prove Defendants intended to intimidate voters, any evidence of such intent would supply further confirmation that intimidation occurred. *See* Mot. Summ. J. Order at 48.

529.   The Court finds that Defendants' mass challenge effort in Georgia was simply an extension of its earlier "Validate the Vote" scheme, in which it made unmeritorious allegations of illegal voting in an effort to change election outcomes. *See supra* ¶¶ 125–144.

530.   For example, although Defendants coordinated the filing of lawsuits after the 2020 election that alleged unlawful voting, Defendants never had any evidence of such fraud when they made those allegations; instead, those lawsuits were simply vehicles to target counties with large Black voter populations and attempt to exclude their votes. *See supra* ¶¶ 137–144.

531.   Like its national program, Validate the Vote Georgia also sought to use unmeritorious accusations of voter fraud to "save the Senate" in Georgia—in this case, by attempting to intimidate and dissuade lawful Georgia voters from exercising their right to vote. *See supra* ¶¶ 145–153.

532.   Much like Defendants' earlier lawsuits after the 2020 elections, Defendants' voter challenges in this case were frivolous vehicles to skew electoral outcomes and burden voters in disproportionately Black counties in Georgia. *See supra* ¶ 153.

533.   The Court concludes that Defendants intended to influence election results by targeting particular counties and voters, and that this constituted an attempt to intimidate or coerce voters from exercising their voting rights.

534.   Separately, the Court has also found that Defendants intended for their mass challenges to have the effect of burdening challenged voters to re-prove their eligibility to vote. *See supra* ¶¶ 39, 100, 118–120. The Court concludes that Defendants' intent to burden eligible voters with re-proving their residency constitutes an intent to intimidate or coerce voters from exercising their voting rights. *See supra* ¶¶ 116–117.

535.   Accordingly, this factor also weighs in favor of liability.

### 2.   Defendants are liable for attempting to intimidate, threaten, or coerce voters.

536.   Section 11(b) also prohibits "*attempt[s]* to intimidate, coerce, or threaten voters for voting or attempting to vote." 52 U.S.C. § 10307(b) (emphasis added); *see also* Mot. Summ. J. Order at 17 n.10.

537.   "Attempts" are defined as "the act or an instance of making an effort to accomplish something." Attempt, Black's Law Dictionary (11th ed. 2019); *see also* Mot. Summ. J. Order at 17 n.10.

538.   While there is no general federal "attempt" statute, *see U.S. v. Hite*, 769 F.3d 1154, 1162 (D.C. Cir. 2014), federal courts have recognized the elements of attempt in criminal cases include (i) the specific intent to engage in the prohibited conduct, and (ii) a substantial step taken toward the commission of the offense. *See United States v. St. Hubert*, 909 F.3d 335, 351 (11th Cir. 2018), *abrogated on other grounds by United States v. Taylor*, 142 S. Ct. 2015 (2022).

144

539.   A substantial step is "some overt act adapted to, approximating, and which in the ordinary and likely course of things will result in, the commission of" the proscribed act, and which requires "something more than mere preparation, but less than the last act necessary before actual commission of the substantive crime." *United States v. Muratovic*, 719 F.3d 809, 815 (7th Cir. 2013).

540.   While Section 11(b) is not a criminal statute, the Court finds that this framework suffices to establish that Defendants violated Section 11 by attempting to intimidate, threaten, or coerce individuals for voting or attempting to vote. *See* 52 U.S.C. § 10307(b).

541.   First, Defendants specifically intended that counties would deem their challenges to be supported by probable cause, that challenged voters would discover that they had been challenged, and that these voters would have to reprove their residency. *See supra* ¶¶ 528–535.

542.   Second, Defendants took *many* substantial steps toward the commission of the Section 11(b) violation, including generating massive challenge lists that were highly likely to and did include eligible voters, recruiting volunteers willing to have challenges submitted in their names, publicizing the challenge effort, and in some instances directly submitting challenges to counties. *See supra* ¶¶ 32–105.

543.   Thus, Defendants attempted to challenge voters in all 159 Georgia counties, even where they were ultimately unable to successfully recruit a volunteer to submit the challenges on their behalf, and even where counties ultimately rejected Defendants' challenges.

544.   Specifically, Mr. Somerville and Mr. Davis attempted to challenge Muscogee County voters including Mr. Berson and Mr. Turner. *See* PX 89 at 10, 40. Even though Mr. Somerville and Mr. Davis's attempt to find a volunteer to file their challenge list in Muscogee County was unsuccessful, Mr. Somerville and Mr. Davis compiled a Muscogee County challenge list that they intended a volunteer would file to initiate challenges on voters. *See supra* ¶¶ 103–104, 451.

545.   Accordingly, Defendants are liable for violating Section 11(b) because of their unlawful attempts to intimidate, threaten, or coerce voters.

## III.   Defendants do not have a First Amendment defense.

### A.   Defendants waived their First Amendment defense.

546.   "Waiver is the voluntary, intentional relinquishment of a known right." *Glass v. United of Omaha Lif. Ins. Co.*, 33 F.3d 1341, 1347 (11th Cir. 1994).

547.   "Waiver directly implicates the power of the parties to control the course of the litigation; if a party affirmatively and intentionally relinquishes an issue, then courts must respect that decision." *United States v. Campbell*, 26 F.4th

860, 872 (11th Cir. 2022). "[A] federal court assessing waiver does not generally ask about prejudice." *Morgan v. Sundance, Inc.*, 596 U.S. 411, 417 (U.S. 2022).

548.   Constitutional rights are subject to waiver. *See Clement v. U.S. Attorney General*, 75 F.4th 1193, 1202 (11th Cir. 2023); *Comer v. Schriro*, 480 F.3d 960, 965 (9th Cir. 2007) ("A waiver of constitutional rights is voluntary if, under the totality of the circumstances, it was the product of a free and deliberate choice rather than coercion or improper inducement.").

549.   Defendants affirmatively, voluntarily, and repeatedly disavowed any constitutional affirmative defense. *See supra* ¶¶ 8–9, 15–17 (United States counsel "clarify[ing] for the record that Defendants are not [pressing] the constitutional defenses that they have discussed," and defense counsel answering in affirmative). Accordingly, any such defense has been waived.

**B.   Defendants' behavior is not protected by the First Amendment.**

550.   In addition to having been waived, Defendants' First Amendment affirmative defense lacks merit.

551.   "An affirmative defense is established only when a defendant *admits the essential facts* of a complaint and sets up other facts in justification or avoidance." *Morrison v. Exec. Aircraft Refinishing, Inc.*, 434 F. Supp. 2d 1314, 1318 (S.D. Fla. 2005); *see also In re Rawson Food Service, Inc.*, 846 F.2d 1343, 1349 (11th Cir. 1988) ("A defense which points out a defect in the plaintiff's prima facie

case is not an affirmative defense.") Accordingly, Defendants' First Amendment

defense is premised on a finding that they violated Section 11(b).

552.   True the Vote and Ms. Engelbrecht do not enjoy a First Amendment

right to petition Georgia government officials through voter challenges because they

are not Georgia citizens. *See supra* ¶¶ 22, 23, 410; O.C.G.A. § 21-2-230(a).

553.   Defendants' constitutional defense fails for the additional reason that

Defendants' speech falls outside the First Amendment's scope. Several categories

of speech, including true threats of nonviolent or nonbodily harm and defamation,

have been carved out from constitutional protection. *See* TRO Order at 17; *Wohl I*,

498 F. Supp. 3d at 478, 480; *Otto v. City of Boca Raton*, 981 F.3d 854, 865 (11th

Cir. 2020). Unprotected speech does not receive First Amendment protection simply

by virtue of being placed in a petition. *McDonald v. Smith*, 472 U.S. 479, 484 (1985).

554.   The true threats doctrine strips First Amendment protections from

messages that a "reasonable recipient . . . would interpret [] as a threat of injury,

physical or not." *Wohl II*, 512 F. Supp. 3d at 514. This Court has already concluded

"[t]hreats of nonviolent harm may be exempted from [the] First Amendment's

speech protections as true threats." Mot. Summ. J. Order at 73–75 (recognizing cases

including *United States v. Tapanes*, 284 F. App'x 617, 620 (11th Cir. 2008) and

*Everett v. Cobb Cnty.*, 823 F. App'x 888, 892 (11th Cir. 2020) "suggest a more

expansive application of the true threat exception—one that would be inclusive of

nonviolent threats""). "This conclusion is reinforced by the context of this case where the alleged intimidation would potentially inter with another's constitutionally and statutorily protected right to vote free of such intimidation." *Id.* As the Court has found, voters reasonably interpreted Defendants' challenges as threats to deprive them of their vote. *See supra* ¶¶ 181–229, 495–535.

555.   Defendants' conduct additionally falls outside of any First Amendment protection for the same reasons that defamation is unprotected. *See Beauharnais v. People of State of Ill.*, 343 U.S. 250, 266 ("Libelous utterances [are not] within the area of constitutionally protected speech").

556.   Under Georgia law, defamation has four elements: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault by the defendant amounting at least to negligence; and (4) special harm or the actionability of the statement irrespective of special harm." *StopLoss Specialists, LLC v. VeriClaim, Inc.*, 340 F. Supp. 3d 1334, 1346 (N.D. Ga. 2018) (quoting *Smith v. DiFrancesco*, 341 Ga. App. 786, 787–88 (2017)); *see also McDonald*, 472 U.S. at 484 (rejecting argument that "the Framers of the First Amendment understood the right to petition to include an unqualified right to express damaging falsehoods in exercise of that right.").

557.   This framework closely tracks Defendants' communications to third parties that targeted electors who were ineligible to vote under Georgia law due to a

residency change despite obvious indicators that the purported evidence of residency changes was unreliable.

558.   *First*, Defendants' accusations were false: many of the individuals targeted by Defendants, including Ms. Heredia, Mr. Berson, Mr. Turner, Ms. Stinetorf, and Ms. Doe, were lawful residents of the counties in which they were registered. *See supra* ¶¶ 332–378.

559.   *Second*, these accusations were published to county officials, to individuals participating in the challenge process, and in some cases to the broader public. *See supra* ¶¶ 154–168.

560.   Regarding the *third* element, while Georgia law recognizes a privilege for "[s]tatements made in good faith as part of an act in furtherance of the person's or entity's right of petition or free speech," O.C.G.A. § 51-5-7(4), "the failure to exercise ordinary care to reasonably ascertain the truth or accuracy of the statement may show a lack of good faith when the facts and circumstances require such exercise." *Smith v. Vencare, Inc.*, 519 S.E.2d 735, 741 (Ga. App. Ct. 1999).

561.   By relying exclusively on NCOA data—and in the case of True the Vote and Catherine Engelbrecht, ignoring blaring warning signs that their sloppy data analysis was misidentifying eligible registrants, *see supra* ¶¶ 118–120, 288–309, 379–403—Defendants demonstrated a recklessness (or worse) that refutes any good faith defense and easily satisfies the *mens rea* element of unprotected speech.

*Cf. Counterman v. Colorado*, 600 U.S. 66, 79 (2023) (recognizing criminal prosecution of true threats does not violate First Amendment where threats were made recklessly); *McDonald*, 472 U.S. at 484 (recognizing petitions "that contain intentional and reckless falsehoods" are not entitled to First Amendment protection).

562. Defendants' belated individualized inquiry on the eve of trial into the residency of a small handful of challenged voters—years after the challenges were lodged, *see supra* ¶ 308—does not mitigate the recklessness of Defendants' 2020 challenges. To the contrary, Defendants' 2023 review of public information to attempt to ascertain Plaintiffs' legal residence merely confirms that Defendants were aware that much more than NCOA data is needed to draw an inference about an individual's residency for purposes of voting eligibility.

563. Regarding the *fourth* element of defamation, an individual who "imput[es] to another a crime punishable by law" is liable for defamation per se, and harm is inferred. O.C.G.A. § 51-5-4(a)(1), (b). In Georgia, individuals who attempt to vote without possessing the requisite qualifications—the substance of Defendants' accusations—commit a felony. *See id.* §§ 21-2-561, 21-2-571. The Supreme Court has also explicitly recognized that the Constitution provides no refuge for individuals who falsely accuse a private individual of criminal conduct. *See Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 326, 348 (1974) (rejecting First

Amendment defense in libel action where "[t]he implication that petitioner had a criminal record was false").

564.   Just as defamation law seeks to prevent false accusations from being communicated in a way that injures a private individual's reputation, Section 11(b) seeks to prevent false accusations (or other intimidating speech) from being communicated in a way that interferes with an individual's right to vote. Because the right to vote—unlike the right to a clean reputation—is grounded in the Constitution, there can be no question that statutory voting protections are even safer from First Amendment challenge than the state defamation laws that the Supreme Court has consistently blessed.

565.   Finally, Defendants' violations of Section 11(b) are not subject to a First Amendment affirmative defense because, even if the First Amendment applies, the government's interest in "preventing voter intimidation" is sufficiently compelling to survive strict scrutiny under the First Amendment. TRO Order at 17, ECF No. 29 (quoting *Burson v. Freeman*, 504 U.S. 191, 206 (1992)). Because Section 11(b) prevents voter intimidation according to its plain terms, 52 U.S.C. § 10307(b), its application is constitutional. *See also Cal. Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 514 (1972) (recognizing "[i]t is well settled" that the right to petition does not immunize "conduct which violates a valid statute").

**IV.    An injunction is warranted.**

566.    This case presents a significant risk of future harm that warrants injunctive relief.

567.    As this Court has already discussed, True the Vote has developed a tool to facilitate mass challenges in future elections. *See supra* ¶¶ 246, 411–414. For several years now, Fair Fight has continued to divert resources to counteract the threat imposed by True the Vote to the voters Fair Fight works to empower and turn out, in large part in anticipation that True the Vote will organize mass challenges again. *See supra* ¶¶ 245–247. And Ms. Heredia has not voted since the 2021 Senate runoff election for fear of being challenged again. *See supra* ¶ 187. Indeed, any voter who plans to file an NCOA before the next election is at risk that they will face a similar challenge from Defendants, most of whom have expressed that they will organize or file challenges again.

568.    Injunctive relief is an appropriate remedy for Defendants' conduct because voting rights violations cannot be fully remedied once those violations occur. *See, e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) (finding voting rights injuries are irreparable and deserving of injunctions because "once the election occurs, there can be no do-over and no redress"); *Charles H. Wesley Educ. Found., Inc.*, 408 F.3d at 1355 (similar).

569.   Courts have the authority to tailor the scope of injunctive relief "to address the specific violations of law by the defendants." *Dunkin' Donuts Inc. v. Kashi Enterprises, Inc*., 119 F. Supp. 2d 1363, 1364 (N.D. Ga. 2000) (citing *Madsen v. Women's Health Ctr*., 512 U.S. 753, 762 (1994)); *see also Chanel, Inc. v. 21748632*, No. 23-CV-60087, 2023 WL 2871257, at *7 (S.D. Fla. Mar. 24, 2023), *report and recommendation adopted*, No. 23-60087-CV, 2023 WL 2868826 (S.D. Fla. Apr. 10, 2023) (concluding that "the district court can use the court's broad discretion to fashion the injunctive relief necessary to cease Defendants' infringing activities").

## PROPOSED ORDER GRANTING INJUNCTIVE RELIEF

570.   The Court enjoins Defendants and their respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from:

a.   Coordinating, submitting, or attempting to coordinate and submit, any challenges to a voter's eligibility to vote in the State of Georgia; recruiting or training individuals for these activities; or advertising these activities on Defendants' websites or social media accounts. This includes but is not limited to challenges based on National Change of Address data.

b.   Coordinating or attempting to coordinate challenges shall include creating or utilizing any online platform, such as https://www.iv3.us/ or any similar

website or database, to facilitate the creation and submission of voter challenges. This includes, but is not limited to, submitting challenges by email, letter, excel spreadsheet, CSV file, word document, or PDF, whether on behalf of or directly from the resident voter challenger.

c. Contacting, or attempting to contact, any voter at their home, in person, by mail, by phone, by internet, by social media, or by any other means, for the purposes of confirming or attempting to confirm any voter's eligibility to vote. Contact includes both direct contact as well as indirect contact through a third party such as a county election official or employee or a local or state party official or employee.

d. Recruiting or training individuals to conduct any poll watching or poll monitoring activities; or advertising these activities on Defendants' websites or social media accounts; or

e. Creating or attempting to create any type of monetary fund, such as a whistleblower fund or a "bounty" fund, to pay for, support or encourage the submission or reporting of individuals for alleged issues with voting; recruiting and training individuals for these activities; or advertising these activities on Defendants' websites or social media accounts.

Respectfully submitted, this 15th day of November, 2023.


Allegra J. Lawrence
Georgia Bar No. 439797
Leslie J. Bryan
Georgia Bar No. 091175
Maia Cogen
Georgia Bar No. 832438
Michelle McClafferty
Georgia Bar No. 161970
**LAWRENCE & BUNDY LLC**
1180 West Peachtree Street, Suite 1650
Atlanta, GA 30309
Telephone: (404) 400-3350
Fax: (404) 609-2504
allegra.lawrence-
hardy@lawrencebundy.com
leslie.bryan@lawrencebundy.com
maia.cogen@lawrencebundy.com
michelle.mcclafferty@lawrencebundy.com

*/s/ Uzoma N. Nkwonta*
Marc E. Elias*
Uzoma N. Nkwonta*
Christina A. Ford*
Tina Meng Morrison*
Marcos Mocine-McQueen*
Jacob D. Shelly*
**ELIAS LAW GROUP LLP**
250 Massachusetts Ave., Suite 400
Washington, D.C. 20001
Telephone: (202) 968-4490
melias@elias.law
unkwonta@elias.law
cford@elias.law
tmengmorrison@elias.law
mmcqueen@elias.law
jshelly@elias.law


*Counsel for Plaintiffs*
*Admitted pro hac vice*

156

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing *Plaintiffs' Proposed Findings of Fact and Conclusions of Law* has been prepared in accordance with the font type and margin requirements of LR 5.1, N.D. Ga, using font type of Times New Roman and a point size of 14.

Dated: November 15, 2023                 *Uzoma N. Nkwonta*

                                                        *Counsel for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that I have on this date caused to be electronically filed a copy of the foregoing *Plaintiffs' Proposed Findings of Fact and Conclusion of Law* with the Clerk of Court using the CM/ECF system, which will automatically send e-mail notification of such filing to counsel of record.

Dated: November 15, 2023                 *Uzoma N. Nkwonta*

                                                        *Counsel for Plaintiffs*